JS 44 (Rev. 10/20)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS

**DEFENDANTS**

**(b)** County of Residence of First Listed Plaintiff _Walker_
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant _Travis_
*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
Jodi Cole, Law Office of Jodi Cole, PLLC
203 E. Murphy, Alpine, TX 79830 (432)837-4266

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

| | |
|---|---|
| ☐ 1 U.S. Government Plaintiff | ☒ 3 Federal Question *(U.S. Government Not a Party)* |
| ☐ 2 U.S. Government Defendant | ☐ 4 Diversity *(Indicate Citizenship of Parties in Item III)* |

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff*
*(For Diversity Cases Only)* and One Box for Defendant)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☒ 1 | ☒ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 365 Personal Injury - | ☐ 690 Other | ☐ 423 Withdrawal 28 USC 157 | ☐ 376 Qui Tam (31 USC 3729(a)) |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | Product Liability | | | ☐ 400 State Reapportionment |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & | ☐ 367 Health Care/ Pharmaceutical | | **PROPERTY RIGHTS** | ☐ 410 Antitrust |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | Slander | Personal Injury Product Liability | | ☐ 820 Copyrights | ☐ 430 Banks and Banking |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' Liability | ☐ 368 Asbestos Personal Injury Product | | ☐ 830 Patent | ☐ 450 Commerce |
| ☐ 152 Recovery of Defaulted Student Loans | ☐ 340 Marine | Liability | | ☐ 835 Patent - Abbreviated New Drug Application | ☐ 460 Deportation |
| (Excludes Veterans) | ☐ 345 Marine Product Liability | **PERSONAL PROPERTY** | **LABOR** | ☐ 840 Trademark | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 370 Other Fraud | ☐ 710 Fair Labor Standards Act | ☐ 880 Defend Trade Secrets Act of 2016 | ☐ 480 Consumer Credit (15 USC 1681 or 1692) |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 371 Truth in Lending | ☐ 720 Labor/Management Relations | | ☐ 485 Telephone Consumer Protection Act |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 380 Other Personal Property Damage | ☐ 740 Railway Labor Act | **SOCIAL SECURITY** | ☐ 490 Cable/Sat TV |
| ☐ 195 Contract Product Liability | ☐ 362 Personal Injury - Medical Malpractice | ☐ 385 Property Damage Product Liability | ☐ 751 Family and Medical Leave Act | ☐ 861 HIA (1395ff) | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 196 Franchise | | | ☐ 790 Other Labor Litigation | ☐ 862 Black Lung (923) | ☐ 890 Other Statutory Actions |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 791 Employee Retirement Income Security Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 891 Agricultural Acts |
| ☐ 210 Land Condemnation | ☒ 440 Other Civil Rights | **Habeas Corpus:** | | ☐ 864 SSID Title XVI | ☐ 893 Environmental Matters |
| ☐ 220 Foreclosure | ☐ 441 Voting | ☐ 463 Alien Detainee | | ☐ 865 RSI (405(g)) | ☐ 895 Freedom of Information Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment | ☐ 510 Motions to Vacate Sentence | **FEDERAL TAX SUITS** | | ☐ 896 Arbitration |
| ☐ 240 Torts to Land | ☐ 443 Housing/ Accommodations | ☐ 530 General | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | | ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 535 Death Penalty | ☐ 871 IRS—Third Party 26 USC 7609 | | |
| ☐ 290 All Other Real Property | ☒ 446 Amer. w/Disabilities - Other | **Other:** | **IMMIGRATION** | | ☐ 950 Constitutionality of State Statutes |
| | ☐ 448 Education | ☐ 540 Mandamus & Other | ☐ 462 Naturalization Application | | |
| | | ☐ 550 Civil Rights | ☐ 465 Other Immigration Actions | | |
| | | ☐ 555 Prison Condition | | | |
| | | ☐ 560 Civil Detainee - Conditions of Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

| | | | | | | |
|---|---|---|---|---|---|---|
| ☒ 1 Original Proceeding | ☐ 2 Removed from State Court | ☐ 3 Remanded from Appellate Court | ☐ 4 Reinstated or Reopened | ☐ 5 Transferred from Another District *(specify)* | ☐ 6 Multidistrict Litigation - Transfer | ☐ 8 Multidistrict Litigation - Direct File |

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
§1983; ADA & Rehabilitation Act

Brief description of cause:
Unlawful conditions of confinement; wrongful re-emprisonment

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P.

**DEMAND $**

CHECK YES only if demanded in complaint:

**JURY DEMAND:** ☒ Yes ☐ No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):*

JUDGE _____ DOCKET NUMBER _____

DATE 8/24/23

SIGNATURE OF ATTORNEY OF RECORD

**FOR OFFICE USE ONLY**

RECEIPT # _____ AMOUNT _____ APPLYING IFP _____ JUDGE _____ MAG. JUDGE _____

# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT
## AUSTIN DIVISION

BERNHARDT TIEDE, II,                      §
                                          §
                    *Plaintiff,*          §
                                          §
                                          §
                                          §
v.                                        §
                                          §     CIVIL ACTION NO. 1:23-cv-1003
                                          §
                                          §
*BRYAN COLLIER, in his official*          §
*capacity as Executive Director of*       §
*Texas Department of Criminal Justice,*   §
THE TEXAS DEPARTMENT OF CRIMINAL          §
JUSTICE, ANGELA COLMENERO, *in her official* §
*capacity as Interim Texas Attorney General,* §
and/or *KENNETH PAXTON, in his official capacity* §
*as The Attorney General of Texas (currently* §
*suspended),* and THE TEXAS OFFICE OF     §
ATTORNEY GENERAL.                         §
                                          §
                    *Defendants.*         §


## COMPLAINT

Plaintiff, Bernhardt Tiede, II, ("Plaintiff" or "Mr. Tiede"), brings this action on behalf of himself because Mr. Tiede's life is in very serious immediate, and ongoing, danger due to the following grounds:

While housed in a prison cell without air conditioning, Plaintiff experienced acute emergency stroke symptom, heat related and/or exacerbated, necessitating an ambulance transport to an emergency room, and yet Plaintiff, 65-years old with chronic health issues, including Diabetes and Hypertension, continues to be housed under dangerous and deadly conditions maintained by a Defendant, Texas Department of Criminal Justice (and its

Executive Director, Defendant Bryan Collier), which include indoor triple digit temperatures in Mr. Tiede's cell.

Plaintiff has been wrongfully re-incarcerated subsequent to Plaintiff's 2014 legal release from imprisonment from the unlawful and unjust interference and re-prosecution by the Defendants, the Texas Office of the Attorney General, and their acting Attorney Generals, which is the ongoing cause of Mr. Tiede's current dangerous incarceration conditions.

Mr. Tiede seeks immediate relief in the forms of an *ex parte* Temporary Restraining Order, Injunctive Relief, and Declaratory Relief.

## I.    STATEMENT OF THE CASE

1.    Mr. Tiede's life is endangered.

2.    **Time is of the essence.**

3.    Plaintiff has experienced serious, chronic and acute, heat related symptoms resulting in permanent facial disfiguration from partial paralysis, ongoing chronic ear infections, and ongoing chronic health conditions related to heat, because TDCJ houses Mr. Tiede, a 65-year-old man with Diabetes and Hypertension, in a cell with no air-conditioning. The cell reaches triple digit temperatures, endangering Mr. Tiede's life.

4.    Mr. Tiede was legally released from incarceration at TDCJ in 2014, on bond, with the agreement of the state prosecutor. All appropriate legal parties to Mr. Tiede's criminal case (the Court, the Prosecutor, and the Defendant) intended, agreed, and fully committed to one another that Mr. Tiede was to never return to prison.

5.     If the laws were followed and Mr. Tiede's federal and state constitutional rights were duly protected, Mr. Tiede would have been fully released on community supervision in 2016.

6.     Instead, Mr. Tiede was illegally returned to TDCJ due to the conduct of the OAG, where he has been, and continues to be, housed by TDCJ under inhumane, sadistic, and dangerous heat conditions, while being denied adequate and appropriate health care, causing continued violations of his Eight Amendment protections against cruel and unusual punishment, Fifth Amendment Rights to Due Process, as applied to Texas through the Fourteenth Amendment, and Equal Protections as guaranteed by the Fourteenth Amendment. [1]

## II.     PARTIES

7.     Bernhardt Tiede, II, a 65-year-old prisoner, is currently incarcerated at the Estelle Unit, in Huntsville, Texas.  Mr. Tiede was convicted of murder in 1999; however, he was released on community supervision for almost two years as his state habeas cleared the Court of Criminal Appeals successfully in Texas.  Mr. Tiede's behavior during his community supervision was without exemplary.

8.     Bryan Collier, ("Mr. Collier") is the executive director of the Texas Department of Criminal Justice, ("TDCJ"). Mr. Collier is the commanding officer of all TDCJ correctional officers, guards, and TDCJ employees and contractors.  Mr. Collier is responsible for each of their training, supervision, and conduct.    Part of Mr. Collier's official

---

[1] It must be noted that other TDCJ inmates and TDCJ employees are dying and suffering serious health consequences from being incarcerated in, and working under, inhumane, high temperatures that may exceed 120 degrees Fahrenheit indoors; other lawsuits addressing these issues are pending.

responsibilities incudes ensuring the protection of the constitutional rights of all persons held in TDCJ custody. Mr. Collier has at all times described herein acted under the color of state law.

9.     The Texas Department of Criminal Justice, ("TDCJ"), is the state prison system, an agency of the State of Texas. Tex. Gov't Code § 493.004. TDCJ is a recipient of federal funds. At all relevant times, TDCJ operated the Estelle Unit, a public facility with programs and services for which Plaintiff qualifies.

10.     Mr. Kenneth Paxton, ("Mr. Paxton") is the current Texas Attorney General, Texas's chief legal officer, head of the Texas Office of the Attorney General, ("the OAG"). As the state's lead legal and law enforcement officer, Mr. Paxton is responsible for managing around 4,000 employees in 38 divisions, in each of the 117 offices in Texas, according to his biography. Among these employees, Mr. Paxton is responsible for leading nearly 750 attorneys, and he purports to "secure justice for Texans by investigating and prosecuting crimes…". Mr. Paxton is responsible for lawyers and criminal investigators employed by the OAG and their training, supervision, and conduct. Mr. Paxton has at all times described herein acted under the color of state law. He is sued in his official capacity for declaratory and injunctive relief.

11.     Ms. Angela Colmenero, ("Ms. Colmenero"), is currently acting as interim Attorney General in Texas because Mr. Paxton is currently suspended from his position pending his own impeachment trial. Ms. Colmenero is now responsible for the lawyers and criminal investigators employed by the OAG, and their training, supervision, and conduct. Ms. Colmenero is therefore named along with Mr. Paxton, in both of their official capacity. Ms. Colmenero is responsible for lawyers and criminal investigators employed by the OAG

4

and their training, supervision, and conduct Ms. Colmenero has at most times described herein acting under state law. She is sued in her official capacity for declaratory and injunctive relief.

12.     The Texas Office of the Attorney General, ("OAG"), is the governmental entity responsible for safeguarding all Texans' constitutional rights, as guaranteed by the United States and Texas Constitutions. These Texans include Texans who are criminal defendants and convicted felons. The OAG is responsible for the conduct of their lawyers and criminal investigators employed by the OAG and oversees all employees' training, supervision, and conduct. The OAG is a recipient of federal funds. The OAG has at all times described herein acted under the color of state law.

13.     Defendants TDCJ and Mr. Collier are herein collectively referred to as "TDCJ", unless necessary to refer to the individual defendant.

14.     Defendants OAG, Mr. Paxton, and Ms. Colmenero are herein collectively referred to as "the OAG", unless necessary to refer to the individual defendant.

### III.    JURISDICTION AND VENUE

15.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question), §1343 (civil rights), and §2201 (Declaratory Judgment Act); and 42 U.S.C. §1983.

16.     A civil action may be brought in a judicial district in which any defendant resides, if all defendants are residents of the State in which the district is located. *See 28 USCS § 1391(b)(1).* In present case, all defendants reside in Texas. If an entity is a

defendant, it is deemed to reside in any judicial district in which it is subject to the court's personal jurisdiction with respect to the civil action in question 28 USCS § 1391(c)(2).

17.     The Office of the Attorney General in Texas can be served at the Price Daniel Building, 209 West 14th Street, Austin, Texas 78701.  The Texas Department of Criminal Justice may be served at 209 West 14th Street Austin, Texas 78701.

18.     Venue is also property pursuant to 28 USC §1391(c)(2).

19.     A substantial part of the acts and omissions causing the  constitutional violations involving the wrongful re-incarceration of Mr. Tiede occurred in this federal district because the culpable OAG employees were working from, and overseen from, the Austin, Texas office of the OAG, and TDCJ has a physical office involved with the agency's oversight and administration in Austin, Texas.


## IV.     FACTS

20.     **Current Consequences of the OAG's and TDCJ Constitutionally Impermissible Actions are Likely Fatal for Mr. Tiede without this Court's Immediate Expedited Intervention – August 2023:**

21.     Mr. Tiede, TDCJ No. 00864378, is currently housed at the Estelle Unit, in Huntsville, Texas.

22.     Mr. Tiede did not receive time towards his sentence while he was under community supervision on a habeas bond in 2014-2016, and his current projected release date is August 2, 2098.

23.     Without official intervention, Mr. Tiede will not be eligible for parole until August 8, 2029, at which point Mr. Tiede will be 71 years old if he survives incarceration at TDCJ.

24.     When Mr. Tiede was out on CCP 11.65 bond (2014-2016) living in Austin, Texas, Mr. Tiede was in a fairly good health, and was greatly improving mentally and physically with regular good nutrition and excellent mental health care. *See Attached Photo of Mr. Tiede from 2014, almost immediately upon his release on bond, Attached as "Plaintiff's Exhibit N."*

25.     Mr. Tiede, now 65 years old, had an acute health crisis on June 22, 2023, which is evidenced in a portion of Mr. Tiede's medical records. *See Medical Records Portion, Pages 7-54, Attached as "Plaintiff's Exhibit O."*

26.     Mr. Tiede had regular contact with undersigned since April of 2022, when Mr. Tiede and undersigned reconnected.

27.     Mr. Tiede wished for undersigned to begin efforts to secure his early release, whether through post-conviction work or an effort for compassionate release or early medical release because of his age, Diabetes, Hypertension, and the numerous equitable grounds from Mr. Tiede's good deeds and positive, loving contributions made in service to others both during his release on habeas bond and while again incarcerated, which would support such a request.

28.     Mr. Tiede indicated that there was no air-conditioning available at the Estelle Unit cell where he was housed during this summer, and Mr. Tiede stated that the cells were known to reach 110 to 112 degrees and other inmates were becoming ill or dying from heat-related medical issues that were suspected of being hidden by TDCJ.

29.     Mr. Tiede indicated that the employees of TDCJ were also suffering physical and mental health consequences, causing the prison to become short staffed.

30.     Mr. Tiede indicated that he did have the fans, but the heat was so high that the fans were merely circulating hot air, causing him to feel ill.

31.     Mr. Tiede indicated that the attempts to alleviate the heat by delivering periodic cups of ice water and cold washcloths was insufficient.

32.     Mr. Tiede reported that he is unable to sleep until 3:30 am or 4:00 a.m., which is the time the heat dissipates to a degree that sleep becomes possible.

33.     **Acute Medical Crisis:**

34.     On or about June 21, 2023, Mr. Tiede experienced severe numbness on the left side of his face, an actual paralysis on the right side of his face, and became so ill from dizziness and unsteadiness that he was unable to safely walk, and his speech was impaired. *See Plaintiff's Exhibit O, pp. 42.*

35.     Mr. Tiede's symptoms resolved but returned on June 22, 2023, becoming severe enough that TDCJ sent Mr. Tiede to the emergency room at the local hospital.

36.     At this time of this health crisis, Mr. Tiede had already been diagnosed with Chronic Obstructive Pulmonary Disease, COPD, Emphysema, Diabetes, hyperlipidemia, hypertension, and dental disease. *See Plaintiff's Exhibit O, p 44.*

37.     Mr. Tiede was tested medically and was apparently discharged without being diagnosed with a stroke, although a stroke was initially suspected.

38.     Mr. Tiede returned to his unairconditioned cell, and his health did not greatly improve, and in fact the paralysis remained. Mr. Tiede was required to use a walker to walk and was additionally suffering from a sever ear infection.

39.     Mr. Tiede was alerted to having a telemedicine doctor's appointment by a guard slipping a sheet of paper under his pillow while he was sleeping, alerting him to a 7:45 am doctor appointment, but Mr. Tiede did not find the paper until after he woke up. He was told he missed a doctor appointment that morning.

40.     Undersigned realized that Mr. Tiede needed to receive credit for the time he was out on bond in 2014, so a Motion for Nunc Pro Tunc was filed on July 19, 2023 in the state district court retaining plenary power to correct his sentence, requesting a hearing for no later than July 23, 2023.

41.     There was no action on the motion, no hearing set, and while the motion was served on the Panola County District Attorney's office and the OAG, no response was made to undersigned's office.

42.     Mr. Tiede was in such bad health, that Richard Linklater, who had joined Mr. Tiede's legal team as a legal case narrative strategist, made a legal visit to him on Friday, August 4, 2023, in order to document Mr. Tiede's acute health issues and the chronic, deadly heat in Mr. Tiede's cell for the state district court, along with some equitable information to support granting the requested back time.

43.     Mr. Tiede's legal team hoped that by securing additional time, it would be easier to obtain some kind of compassionate release for Mr. Tiede, because his parole eligibility and release date would be moved up by almost two years.

44.     Mr. Linklater was extremely disturbed after meeting with Mr. Tiede, and expressed concern that Mr. Tiede may die soon, and Mr. Linklater shared a photo documenting Mr. Tiede's health state. *See Photo of Mr. Tiede from August 4, 2023, Attached as "Plaintiff's Exhibit P."*

45.     Mr. Tiede's photo shows ongoing facial paralysis and a marked decline in health when compared to Plaintiff's Exhibit N. *See Plaintiff's Exhibits "N" and "P."*

46.     Mr. Linklater made a three-page signed statement which included video footage of Mr. Tiede and an explanation to the district court about the poor conditions he

observed and heard about from Mr. Tiede directly. *See Mr. Linklater's Statement with Video Footage, Attached as "Plaintiff's Exhibit Q."*

47.     Mr. Linklater's evidence was added to an Amended Nunc Pro Tunc motion which was filed in Panola County on August 10, 2023, requesting a hearing by August 21, 2023. *See File Marked Motion for Judgment for Nunc Pro Tunc, Amended, Attached as "Plaintiff's Exhibit R."*

48.     **Emergency Relief Demanded:**

49.     The public arena nationwide is focusing on the ongoing horrendous conditions of aging prisons, especially in hot Texas, where individuals under state custody are being kept in horrendous horrible conditions with inside temperatures reaching triple digits. *See Current Articles by Brant Bingham, in the Austin Chronicle, "Texas Prisons are Cooking People Alive. Are We Ok with That?" Part 1 of a 3-part series about heat in prison and "The State Claims No One is Dying from 120 plus F. Heat in Prisons, part 2", dated August 11, 2023, an August 18, 2023, Both Articles Attached as "Plaintiff's Exhibits "T" and "S".*

50.     The terrible health conditions are explicitly reported by Mr. Bingham, including prisoner's seeing spots, dizziness from severe heat exhaustion, and deaths from cardiac arrest.

51.     Worse, Mr. Bingham honestly reports on evidence suggesting that the TDCJ's culpability exceeds that for maintain these horrible cell conditions, but also that the TDCJ is engaging in active efforts to conceal the deaths and harm to inmates housed in sadistic, inhumane conditions.

52.     Desperate activists and family members of the tortured prisoners are holding press conferences in a desperate attempt to gain attention and secure relief for their loved

ones. *See AP Article entitled "Texas Heat Waive has Inmate's families worried about Lack of Air Conditioning in State's Prisons" by Juan A. Lozano, Published July 18, 2023, Attached as Plaintiff's Exhibit U."*

53. This article discusses numerous deaths occurring from heat-related illnesses, and the desperation inmates endure living in these deadly conditions, surviving on toilet water for hydration. *Id.*

54. Earlier in the Summer, death from heat in Texas prisons was reported nationally in a New York Times Article entitled "*Man down! Surviving the Texas Heat in Prisons Without Air-Conditioning*, by J. David Goodman, Published June 29, 2023. *See Article Attached as "Plaintiff's Exhibit U2".*

55. This article was written before temperatures were known to top 120 degrees Fahrenheit.

56. The OAG not only perpetuates these conditions with TDCJ, but also fights any attempt to address them, appealing Court ordered relief for prisoners. *See Attorney General of Texas Statement "AG Paxton: Texas will Appeal Prison Heat Ruling, Attached as "Plaintiff's Exhibit V".*

57. The currently suspended attorney general is quoted as saying "Texas taxpayers shouldn't be on the hook for tens of millions of dollars to pay for expensive prison air conditioning systems which are unnecessary and not constitutionally mandated..." belligerently ignoring constitutional mandates that actually do mandate healthy imprisonment conditions, not to mention common human decency.

58. Furthermore, the current heat wave is bringing much higher, unprecedented temperatures than there were in 2017, when the OAG's office made their inexplicable

statement regarding heath conditions in Texas prisons. *See Sweltering Temperatures Bring Misery to Large Portion of Central US, Setting Heat Records" by Juan A. Lozano, published by Associated Press on August 21, 2023, Attached as "Plaintiff's Exhibit W."*

59.     Horrible record temperature highs are being reached, and prisoners are receiving the worst of the rising weather temperatures in Texas.

60.     Locally, the weather forecast for Mr. Tiede's current housing is set to be in the triple digits for 9 out of the next 12 days, any consecutive days of this sweltering, unusual heat. *See the Weather Channels ten day forecast for Huntsville Texas for Tuesday august 22 through Monday, September 4, 2023, Attached as "Plaintiff's Exhibit X."*

61.     This Court is required to intervene as Texas legislatures refuse to take action, even when funding is available. *See Jolie McCullough's "As Death Toll in Stifling Texas Prisons Climbs, Congressional Democrats ask for Investigations", The Texas Tribune, August 21, 2023, Attached as "Plaintiff's Exhibit Y."*

62.     This article reports that "State legislators prevail with the mindset that allowing inmates to suffer form excessive heat is appropriately "tough on crime" according to some representatives. *See Plaintiff's Exhibit Y.*

63.     There is no natural relief expected, as a current heat wave has brought unusually high number of consecutive 100-degree days. *See "This Summer is on Track to be Among Texas' Most Extreme" by Erin Douglas, published in the Texas Tribune, July 18, 2023, Attached as "Plaintiff's Exhibit Z."*

64.     Mr. Tiede is an elderly man with conditions that make him especially vulnerable to heat related illness (diabetes, hypertension, and chronic obstructive pulmonary Disease (COPD).

65.     If Mr. Tiede's current deadly incarceration conditions continue unabated, Mr. Tiede is likely to die this summer, in 2023.

66.     Mr. Tiede's continued incarceration in the fatal conditions is especially obscene, because Mr. Tiede's unnecessary and illegal continued re-incarceration is a result of the nauseating violations of Mr. Tiede's constitutional rights by the OAG, currently ongoing, along with the ongoing atrocious TDCJ's violations of Mr. Tiede's constitutional rights. *See infra.*

67.     **Original Conviction - 1999:**

68.     Mr. Tiede sustained a first-degree felony murder conviction in 1999 in the 123rd District Court, Panola County, for an offense committed in 1996, in Cause No. 1997-c-103. *See Judgment, Attached as "Plaintiff's Exhibit A."*

69.     Mr. Tiede received a life sentence in TDCJ. *See Plaintiff's Exhibit A.*

70.     In 2012, after seeing a movie entitled "Bernie" and receiving trial transcripts from the director Richard Linklater, undersigned undertook a post-conviction investigation of Mr. Tiede's case, finding serious constitutional error in Mr. Tiede's original conviction.

71.     **Post-Conviction Relief Investigation – 2012-2014**:

72.     Part of the constitutional error involved the discovery that Mr. Tiede, after being blackmailed by law enforcement with the release of secretly filmed sex videotapes, signed a statement which included false premeditation language. The tapes showed Mr. Tiede giving oral sex to married men, one of whom was a deputy reservist with the local law enforcement agency, and the use of the video tapes to secure confession is referenced on the

13

original pretrial record. The statement was used in Mr. Tiede's original conviction and sentence.

73.    More importantly, Mr. Davidson and undersigned jointly discovered and objectively developed previously unknown mitigating evidence indicating that Mr. Tiede was sexually abused as a child by his uncle, a serial pedophile, and new evidence regarding a higher level of abuse that Mr. Tiede experienced from Decedent Marjorie Nugent, ("Decedent") during their long term, close relationship.

74.    Much of the new evidence regarding the level of abuse and dysfunction exhibited by the Decedent to Mr. Tiede and other members of the community was discovered after further investigation which started from a New York Times Article written by Decedent's nephew, Joe Rhodes, and entitled "How my Aunt Marge Ended Up in the Deep Freeze", the abusive treatment was further corroborated by Mr. Rhode's mother (Decedent's sister), Merrell Rhodes.

75.    The Panola County District Attorney Danny Buck Davidson ("Mr. Tiede") independently verified much of the evidence presented by undersigned.

76.    This verification included a very new psychiatric report from Mr. Davidson's original expert witness, Dr. Edward Gripon, which indicated that Dr. Gripon corroborated the new evidence and dramatically changed his own psychiatric assessment of the circumstances around Decedent's death, assessing that Mr. Tiede committed Decedent's homicide in a dissociative state.

77.    The dissociative episode, involuntary *mens rea,* was dramatically different from a premeditative, intentional *mens rea*. Therefore, Mr. Davidson agreed to recommend a new sentence of no more than twenty years for Mr. Tiede if undersigned would agree not to file a

habeas based on the constitutionally infirm original conviction and sentence, and instead file a habeas for a new sentencing based on the newly discovered equitable and mitigating sentencing evidence, where Mr. Davidson agreed to sentence Mr. Tiede to "time served".

78.     Undesigned agreed to Mr. Davidson's terms only if Mr. Davidson committed his intention to recommend a sentence of time served on the record, and if Mr. Davidson agreed to allow Mr. Tiede to be released on bond while the habeas procedural passed through the Texas Court of Criminal Appeals.

79.     Mr. Davidson agreed to these terms, contingent on Mr. Tiede living with Mr. Linklater and working for undersigned while on a Texas Code of Criminal Procedure 11.65 bond, being closely supervised by Travis County Probation, with regular personal updates from Mr. Tiede's probation officer and undersigned specifically sent to Mr. Davidson and the district court.

80.     The district Court judge multiple times explicitly told both Mr. Davidson and undersigned that she would agree to accept Mr. Davidson's recommendation of a sentence of time served after she carefully reviewed the record and proposed submissions.

81.     On May 6th, 2014, undersigned filed a motion for a Texas Code of Criminal Procedure Art. 11.65 bond, which included affidavits from undersigned and Richard Linklater memorializing the required agreement that Mr. Tiede lives at Mr. Linklater's and works at undersigned's office, per undersigned's agreement with Mr. Davidson.  *See Motion for Bond, Attached as "Plaintiff's Exhibit B."*

82.     The Court, privy and agreeable to the agreement between undersigned and Mr. Davidson, released Mr. Tiede on bond.  *See Order on Motion for Bond, Attached as "Plaintiff's Exhibit C."*

83. During the Habeas hearing on May 6th, Mr. Davidson committed to his recommended sentence by both admitting and reading his own affidavit on the record. *See Affidavit and Transcript Portion, Attached Plaintiff's Exhibits "D" and "E"*

84. Mr. Davidson memorialized his agreement and intention to recommend a sentence of time served when he clearly stated, "Had Mr. Tiede been sentenced in the 2-to-20-year range, he would have been released outright or be on parole by now…therefore I am agreeable to considering his sentence to be time served…" *Id.*

85. Mr. Davidson further explained in his affidavit and on the record, that "if the appellate court grants [Mr. Tiede's] Motion for Habeas Corpus Relief and he is resentenced released from prison he will be a convicted felon who served almost 17 years behind bars for murder…". *Id.*

86. Mr. Davidson explained that "based upon my views as stated above and in light of Article 2.01 of the Texas Code of Criminal Procedure that expressly states, 'it shall be the primary duty of all prosecuting attorney not to convict, but to see that justice is done,' I am executing this sworn affidavit" *Id.*

87. A "Findings of Fact, Conclusions of Law Recommendation, and Order", where the Court attested to the credibility of the new evidence and Mr. Davidson's commitment to sentencing Mr. Tiede to no more than 20 years (explained in paragraphs 66-68 entitled "General Effect of New Evidence on the Prosecution") was signed by all parties on May 6th, 2014, and entered into the record. *See "Finding of Fact and Conclusions of Law Recommendation and Order", Attached as "Plaintiff's Exhibit F."*

88. The Court specifically recommended to the Court of Criminal Appeals that "in accordance with the above and foregoing findings of fact and conclusions of law, the Court

recommends to the Court of Criminal Appeals that Applicant be granted relief in the form of a new punishment hearing." *Id.*

89.     Mr. Tiede was released, and the state habeas was submitted to the Court of Criminal Appeals. *See Public Record New York Times Article entitled "Bernie Goes Home with Director." Attached as Plaintiff's Exhibit "G."*

90.     The Court of Criminal Appeals of Texas granted the requested relief on November 14, 2014.

91.     During the pendency of Mr. Tiede's habeas in the appellate court, a portion of the Decedent's family began to aggressively interfere with Mr. Tiede's case by making their own legal filings through a private attorney.

92.     The portion of the Decedent's family continued to aggressively harass Mr. Davidson, purportedly by soliciting an unflattering student film about Mr. Davidson, meeting with him and apparently tape recording him, and threatening him unless he recused himself.

93.     At this point Mr. Davidson told undersigned that the family's behavior had become so extreme that he felt that he should recuse himself to act as a witness against them.

94.     **Wrongful Re-prosecution by OAG 2014-2016**

95.     The OAG entered a notice of appearance with employees Lisa Tanner and Jane Starnes acting as new criminal prosecutors.

96.     The OAG attorneys became aware of all of the constitutional violations in the original plea negotiations, trial, and sentencing, including but not limited to being blackmailed into signing an inaccurate statement with embarrassing sex tapes, the state and government requiring Mr. Tiede to invalidate a will in a private family will contest which would result in one side of the Decedent's family gaining leverage against another in

17

inheriting the Decedent's multi-million dollar estate, homophobic conduct of most parties of the original proceedings that rose to the level of constitutional violations in many forms, and a variety of serious issues.

97.     The OAG was aware of both the compelling newly discovered mitigating evidence supporting a dissociative episode, and the agreement of all parties that Mr. Tiede would not be returned to prison. They were also well aware of the Court's findings of fact and law.

98.     The OAG affirmative intimated that Mr. Davidson had a criminal record and had attempted to bribe a portion of the Decedent's family.

99.     The OAG promised that they were not the stalking horse of the portion of the Decedent's family who had injected themselves into Mr. Tiede's criminal case, and that the OAG would look at all of the developed evidence with an open mind.

100.    However, the OAG appeared to disregard all of this fully developed evidence, which had been strong enough to support the release of a man convicted of murder and had been validated by the Texas Court of Criminal Appeals majority; at the request of one portion of the Decedent's family (who drove the original plea negotiations, as evidence suggests) and produced a huge amount of evidence in the form of financial records, which had never been shown to undersigned during the original investigation and prior to undersigned's habeas agreement with Mr. Davidson.

101.    The OAG told undersigned that the materials were always in the possession of the law enforcement agency (the Panola County Sheriff's Department) and had never been out of the state's possession or possessed by the family or private attorneys.

102.     However, the OAG attorneys were vague about where these newly presented financial documents originated, or what they were mean to indicate.

103.     The OAG affirmatively told defense counsel that they did not believe that Mr. Tiede was attempting to hide financial misdeeds and was motivated to kill the Decedent based on that theory.

104.     The OAG proceeded to aggressively re-prosecute Mr. Tiede in an emotionally difficult sentencing trial before an East Texas jury, where they attempted to proceed on immoral and outrageous theories, including that Mr. Tiede had never been sexually abused as a child (disproven when the pedophile and three other victims corroborated the abuse). They forced Mr. Tiede to be "assessed" by the OAG's own second "expert" who presented evidence that even if Mr. Tiede was sexually abused, it did not matter or harm Mr. Tiede or victims in general. Further, they had all of the "new financial evidence," never submitted to habeas counsel during habeas investigations, that the OAG, without showing a clear chain of custody, affirmatively represented to defense as originating from the state's original possession, and not being relevant to the homicide, inexplicitly admitted into the record.

105.     During the OAG's strangely biased reprosecution of Mr. Tiede, Mr. Tiede had done so well on his community release that he was granted the ability to stay out of prison on a modified bond. *See Attached Joint Motion and Order for Mr. Tiede's Release on Bond, Attached as "Plaintiff's Exhibits "I" and "J."*

106.     While released on bond, Mr. Tiede enjoyed excellent reports from senior probation officer Leo Cruz. *See Letter to the Judge, Dated October 22, 2015, Attached as "Plaintiff's Exhibit "K."*

107.     Against the great weight of the evidence, the OAG ultimately argued to the jury exactly what they had affirmatively stated to defense counsel that they did not believe, that Mr. Tiede had murdered Decedent to conceal financial wrongdoing.

108.     Mr. Tiede was sentenced to "Ninety-Nine (99) years to Life" by the East Texas Jury, which was altered in a *nunc pro tunc* order to "Ninety-Nine Years Institutional Division of TDCJ". *See Original and Amended Judgments, Attached as Plaintiff's Exhibits "L" and "M".*

1.     If Mr. Tiede's federal and state constitutional rights were legally protected, Mr. Tiede would still be on community supervision.

2.     Mr. Tiede was released with the state prosecutor Danny Buck Davidson's agreement in 2014, while a habeas filed on his behalf successfully cleared by the Texas Court of Criminal Appeal.

3.     The state prosecutor negotiated an agreement with Mr. Tiede's counsel, where Mr. Davidson would recommend a sentence of time served, once the habeas cleared the Texas Court of Criminal Appeal and was remanded to the district court level for resentencing.

4.     The Court knew of this agreement prior to the filing of the habeas, agreed that the negotiated agreement and the basis on which the it rested was reasonable and fair, and indicated that she would accept the state's recommendation for time served.

5.     Instead of recommending a sentence of time served for Mr. Tiede, as was intended and memorialized on the record and in his own affidavit, Mr. Davidson recused himself from the case after receiving extremely unusual and aggressive pressure from some, not all, of the Decedent's family.

6.     Mr. Davidson recused himself because he has become a witness to impermissible events and conduct that were reported to the OAG.

7.     The OAG agreed to step in for Mr. Davidson.

8.     Instead of honoring Mr. Davidson's previous agreement with Mr. Tiede's counsel, without any reasonable, sufficient explanation, the OAG improperly re-prosecuted Mr. Tiede's in a sentencing trial. In order to wrongly re-prosecute Mr. Tiede, the OAG ignored evidence of very serious, fundamental constitutional infirmities and official conduct that occurred during Mr. Tiede's original plea negotiations, trial, and conviction. The OAG also appeared to ignore Mr. Davidson's very serious grounds for recusal.

9.     In doing actions that included but were not limited to investigation and prosecution, the OAG violated Mr. Tiede's Eight Amendment constitutional protection against Cruel and Unusual Punishment, Sixth Amendment Rights to Confrontation, Fifth Amendment Rights to Due Process, all as applied to Texas through the Fourteenth Amendment, along with violating Mr. Tiede's Fourteenth Amendment Right to Equal Protection.

10.     Mr. Tiede was correctly released from prison in 2014, with the agreement of the state prosecutor. All appropriate parties to Mr. Tiede's criminal case (the Court, the Prosecutor, and the Defendant) intended and committed to one another that Mr. Tiede was to never return to prison. If the law were followed and Mr. Tiede's constitutional rights were duly protected, Mr. Tiede would have been released on community supervision in 2016.

11.     Instead, Mr. Tiede was inappropriately and illegally returned to prison based on the conduct of the OAG, where he has been, and continues to be, housed by TDCJ under inhumane, sadistic, and dangerous heat conditions, while being denied adequate and

21

appropriate health care, causing continued violations of his Eight Amendment protections against cruel and unusual punishment, Fifth Amendment Rights to Due Process, as applied to Texas through the Fourteenth Amendment, and Equal Protections as guaranteed by the Fourteenth Amendment.


## V.     CAUSES OF ACTION


### Count I
### § 1983 Action Against All Defendants Based on 8th and 14th U.S. Constitutional Amendments: Unlawful Conditions of Confinement


12.     Plaintiff incorporates the previous paragraphs as alleged herein.

13.     The U.S. Constitution's Eight Amendment, as incorporated against the states through the Fourteenth Amendment, protects prison inmates form cruel and unusual punishment by State actors and requires State actors to provide adequate healthcare to prison inmates.

14.     The State actors violate this right when they subject prison inmates to cruel treatment and conditions of confinement amounting to additional punishment than the inmate received at sentencing, or that do not ensure those inmates' safety and health.

15.     Pursuant to 42 U.S.C. § 1983, Defendant Mr. Collier, in his official capacity as executive director of TDCJ, and Defendant TDCJ act with deliberate indifference to the deadly heat conditions of Mr. Tiede's imprisonment environment, and act with deliberate indifference to the serious risk the dangerous heat conditions cause Mr. Tiede, a medically vulnerable inmate.

16.     The Defendants Mr. Paxton on Ms. Colmenero, as suspended and acting interim attorney generals, heading the OAG, and Defendant OAG perpetuate the constitutional violations of Mr. Tiede by not only knowingly maintaining the archaic and backwards prison heat conditions with TDCJ, but also by actively colluding with TDCJ in an effort to prevent legislation from passing that is intended to correct this deadly, inhumane issue; the OAG practices legal maneuvers that actively allow and assist TDCJ in escaping responsibility (liability) for violating Texas prisoners' constitutional rights against cruel and unusual punishment, including medically vulnerable Plaintiff Mr. Tiede's constitutional rights.

17.     Not only do all Defendants knowingly and actively perpetuate the inhumane prison conditions related to heat, but they also failed and continue to fail to provide adequate medical care to Plaintiff by housing him in suitable airconditioned conditions while he recovers from what appears to be a stroke.

<u>**Count II**</u>
<u>**The Americans with Disability Act and Rehabilitation Act (against all**</u>

<u>**Defendants)**</u>

18.     Plaintiff realleges and incorporates by reference all previous paragraphs.

19.     TDCJ and the AOG, along with their Defendant executive directors and attorney generals, receive federal funding, invoking the mandates of the Rehabilitation Act.

20.     The Rehabilitation Act requires recipients of federal monies to reasonably accommodate persons with disabilities in their facilities, provide program activities and

services, and reasonably modify such facilities, services and programs to accomplish these purposes.

21.     Mr. Tiede is a medically vulnerable prisoner, to such a degree as to invoke these protections.

22.     Further, Title II of the ADA and the ADA Amendments apply to all Defendants, with the above stated mandates. *See 42 U.S.C.§1213 et seq.*

23.     Title II of the ADA and the ADA Amendments act protects prisoners with disabilities because exposure to extreme temperatures also actually violates the Eight and Fourteenth Amendments of the U.S. Constitution.

24.     Mr. Tiede is a prisoner with disabilities to such a degree as to invoke the ADA and ADA mandates, as his constitutional rights against cruel and unusual punishment in the Eight and Fourteenth Amendment are violated by his ongoing exposure to extreme heat, even after having an acute medical issue with chronic lingering effects related to exposure to extreme heat, and being held int the same heat-exposed conditions while now trying to recover from his heat related illnesses.

25.     All Defendants know that Mr. Tiede suffers from heat-sensitive disabilities, is prescribed medications to treat his disabilities; yet, despite their knowledge, all defendants intentionally discriminate against Mr. Tiede, in violation of the ADA, ADAAA and Rehabilitation Act.


**Count III**
**§ 1983 Action Against All Defendants Based on 5th[th], 6th, and 14th U.S. Constitutional Amendments: Violation of U.S. Constitutionally Guaranteed Due Process and Confrontation Rights by Enhancing Sentence without a Hearing**

26.     Plaintiff realleges and incorporates by reference all facts and allegations stated in previous paragraphs.

27.     Defendants Collier and TDCJ are punishing Mr. Tiede by housing him in dangerous extreme heat conditions, instead of safe climate control conditions, by moving him from airconditioned units to the unit with deadly extreme heat without giving Mr. Tiede a reason for enhancing his punishment, affording him a hearing in compliance with Due Process, or allowing him to confront witnesses against him.   These actions are illegally enhancing Mr. Tiede's sentence in violation of his constitutional rights, as guaranteed to Mr. Tiede through the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution.

28.     Defendant attorney generals Paxton and Colmenero, in their official capacities, and the OAG violated the same constitutional rights by wrongfully re-prosecuting Mr. Tiede, wrongfully enhancing his sentence,  exceeding the scopes of protected action by immunity and/or qualified immunity afforded to them normally, and may have been actively involved in moving and maintaining Mr. Tiede in extreme heat conditions.

**Count IV**
**§ 1983 Action Against All Defendants based on the Equal Protection Clause of the**
**Fourteenth Amendment**

29.     Plaintiff realleges and incorporates by reference the allegations in all previous paragraphs.

30.     The Fourteenth Amendment of the U.S Constitution provides that  "…no State shall make or enforce any law which shall abridge the privileges or immunities of citizens of

25

the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws." *See USCS Const. Amend. 14.*

31.     The Equal Protection Clause of the U.S. Constitution, as applied to states through the Fourteenth Constitution requires the State to treat all similarly situated people equally. *See City of Cleburne v. Cleburne Living Center*, 473 U.S. 432, 439, 105 S. Ct. 3249, 87 L. Ed. 2d 313 (1985)(cited by *Soria v. Nev. Dep't of Corr.,* No. 3:09-cv-00762-RCJ-VPC, 2012 U.S. Dist. LEXIS 33953, at *23 (D. Nev. Feb. 7, 2012).

32.      In the prison context, however, even fundamental rights, such as the right to equal protection, are judged by a standard of reasonableness — specifically, whether the actions of prison officials are "reasonably related to legitimate penological interests." *Soria* (citing *Walker v. Gomez*, 370 F.3d 969, 974 (9th Cir. 2004) (quoting *Turner*, 482 U.S. at 89).

33.     To establish a violation of the Equal Protection Clause, the prisoner must present evidence of discriminatory intent. *See Washington v. Davis*, 426 U.S. 229, 239-40, 96 S. Ct. 2040, 48 L. Ed. 2d 597 (1976).

34.     Mr. Tiede has a constitutional right to equal protection of the laws.

35.     Similarly situated United States citizens who are incarcerated in federal and state prisons are provided protection from extreme heat by the use of air conditioners.

36.     A minority of the states, 13, including Texas, fail to provide safe, climate-controlled environments for human beings in their custodies.

37.     By failing to provide Mr. Tiede with a safe, temperature-controlled environment protecting him from extreme heat conditions all Defendants fail to provide Mr.

Tiede with the equal protection afforded to other similarly situated individuals in the United States.

38.     As to the Defendants who act as prison officials, Collier and the TDCJ, there is not reasonably related, legitimate penological interests involved in exposing Mr. Tiede to extreme heat conditions, allowing him to become ill because of the heat exposure, allowing him to die by continuing to expose Mr. Tiede to extreme heat conditions, and  failing to provide protection to medically vulnerable Mr. Tiede, and then publicly concealing the number of deaths and illnesses related to extreme heat exposure.

39.     The Defendants who are attorney generals (Paxton and Colmenero) and the OAG itself are failing to protect Mr. Tiede, a Texas prisoner, from extreme heat conditions, denying him the protections afforded to other similarly situated prisoners in other states.

40.     By violating Mr. Tiede's rights to equal protection, Defendants are abusing Mr. Tiede, acting sadistically, and callously disregarding strongly held United States values rooted in common human decency.

## VI.     INJUNCTIVE AND DECLARATORY RELIEF

41.     Plaintiff Bernhardt Tiede, II, seeks injunctive and declaratory relief pursuant to 42 U.S.C. § 1983, the ADA, ADAAA, and the Rehabilitation Act against Defendants to immediate require that TDCJ provide Mr. Tiede with safe housing conditions.

42.     Without injunctive relief, Defendants will continue to endanger Mr. Tiede's life by failing to provide him with safe housing which includes temperature controls protecting him from extreme heat and/or cold.

43.    Plaintiff has no plain, adequate, or complete remedy at law to address the Defendants' wrongful conduct.

44.    Plaintiff requests that Defendants maintain a heat index of 85 degrees or lower, but not to dangerously cold temperatures, for any housing or prison environment for Mr. Tiede.

45.    In the alternative, Mr. Tiede requests that this Court grants a preliminary injunction requesting Mr. Tiede's immediate release to his sister's home, on leg monitor, until the pendency of this case is complete.

46.    It is imperative that this situation is not normal, so realistic words are not used for the dramatic affect for the Court but rather to state the truth about these inhumanities and in an earnest effort to save Mr. Tiede's life.

47.    Mr. Tiede does not seek damages at this time.

## VII.    JURY DEMAND

48.    Plaintiff demands a jury trial.

## VIII.    ATTORNEY'S FEES

49.    Plaintiff is entitled to and does wish to recover attorney's fees, litigation expenses, and court costs, including expert costs, pursuant to 42 U.S.C. §1988 and 42 U.S.C. § 12205.

## IX.    PRAYER FOR RELIEF

50.    Plaintiff Bernhardt Tiede, II, respectfully requests that the Court award the following relief:

a. Remedy ongoing violations of law and the Constitution by granting declaratory and injunctive relief, as set out in this Complaint, on behalf of Mr. Tiede;

b. Permanently enjoin Defendants to abate the situation where Mr. Tiede is exposed to extreme heat, by moving Mr. Tiede immediately, and maintaining Mr. Tiede only in incarceration environments where he is exposed to no higher than 85 degrees (preferably lower) and temperatures that are not dangerously cold, at the Estelle Unit or any other Unit housing Mr. Tiede.

c. In the alternative, Mr. Tiede requests that this Court orders that Mr. Tiede is allowed to substitute home confinement with an electronic monitor for his punishment, during the pendency of present case before this Court.

d. Find that Mr. Tiede, Plaintiff, is the prevailing party in this case, and award him attorney's fees, court costs, expert costs, and litigation expenses;

e. Grant such other and further relief as appears reasonable and just, to which Plaintiff may be entitled.

Dated: August 24th, 2023,

LAW OFFICE OF JODI COLE, PLLC
*Counsel for Bernhardt Tiede, II*
203 East Murphy Street
Alpine, Texas 79830
Telephone:     (432) 837-4266
Facsimile:     (512) 692-2575

By: */s/ Jodi Cole*

Jodi Cole, Esq.
Texas Bar No. 24045602
jcole@jodicole.com

VERIFICATION AND AFFIDAVIT

| | |
|---|---|
| **STATE OF TEXAS** | § |
| | § |
| | § |
| **COUNTY OF BREWSTER** | § |

BEFORE ME, the undersigned notary, on this day personally appeared, Jodi Cole, the affiant, a person whose identity is known to me, after being by me duly sworn, did depose and state:

> My name is Jodi Cole. I have read Plaintiff Bernhardt Tiede, II's federal complaint and Motion for Temporary Restraining Order. The facts stated in it are within my personal knowledge and are trust and correct.

Jodi Cole, Attorney for Plaintiff and Affiant

SUBSCRIBED AND SWORN TO before me, the undersigned authority, on 24th of August, 2023.

Notary Public in and for
the State of Texas
My Commission Expires: 11/12/25

ALEKSANDRA CHAPMAN
NOTARY PUBLIC
STATE OF TEXAS
MY COMM. EXP. 11/12/25
NOTARY ID 13344594-9



PLAINTIFF'S
EXHIBIT
A

SC.

FILED

99 FEB 17 AM 11: 55

_____ KING, CLERK
DISTRICT COURT
PANOLA COUNTY, TEXAS

No. 1997-C-103

THE STATE OF TEXAS      :      IN THE 123rd JUDICIAL

VS.      :      DISTRICT COURT

BERNHARDT TIEDE, II      :      PANOLA COUNTY, TEXAS

## JUDGMENT ON JURY VERDICT OF GUILTY
## PUNISHMENT FIXED BY COURT OR JURY - NO PROBATION GRANTED

Judge Presiding:                              Guy Griffin
Date of Judgment:                            February 9, 1999
Attorney for State:                          Danny Buck Davidson
Attorney for Defendant:                      Clifton L. Holmes and Eric Albritton
Offense Convicted of:                        Murder
Penal Code Violation Section:                19.02
Degree:                                      1st Degree Felony
Date Offense Committed:                       November 19, 1996
Charging Instrument:                         Indictment
Plea:                                        Not Guilty
Jury Verdict:                                Guilty
Foreman:                                     Jessie Jacks
Plea to Enhancement Paragraph(s):            n/a
Findings on Enhancement:                     n/a
Findings on Use of Deadly Weapon:            yes
Punishment assessed by:                       Jury
Date Sentence Imposed:                        February 11, 1999
Costs:                                        n/a
Punishment & Place of Confinement:           Life in the Texas Department of Criminal Justice,
                                             Institutional Division
Date to Commence:                            February 11, 1999
Time Credited:                               540 days
Amount of Restitution/Reparation/Fine:       $10,000.00 fine
Concurrent:                                  n/a

10

The Defendant having been indicted in the above entitled and numbered cause for the felony offense indicated above and this cause being this day called for trial, the State appeared by its Criminal District Attorney named above and the Defendant named above appeared in person and with counsel as named above, and both parties announced ready for trial.

A jury composed of Jessie Jacks, Foreman and eleven others was selected, empaneled and sworn. The indictment was read to the jury and the Defendant, entered a plea of not guilty thereto. After having heard the evidence submitted and having been charged by the Court as to their duty to determine the guilt or innocence of the Defendant and the argument of counsel, the Jury retired in charge of the proper officer and returned into open court on February 9, 1999, the following verdict, which was received by the Court and is here entered of record upon the minutes:

"We, the jury, find the defendant guilty of the offense of MURDER, as charged in the indictment.

/s/
Jessie Jacks, Foreman"

The Defendant having requested in writing at the time he entered his plea that the jury assess the punishment, the jury heard further evidence, was again charged by the Court, and retired in charge of the proper officer and returned into open court on February 11, 1999, the following verdict, which was received by the Court and is here entered of record upon the minutes:

" We the jury, having found the defendant guilty of the offense of Murder and assess his punishment at confinement in the Texas Department of Criminal Justice Institutional Division for Life, and in addition assess a fine in the amount of $10,000.00.

/s/
Jessie Jacks, Foreman

It is therefore, considered, ordered and adjudged by the Court that the Defendant is guilty of the offense indicated above a felony, as found by the verdict of the jury, and that the said Defendant committed the said offense on the date indicated above, and that he

11

be punished, as found by the verdict of the jury, by confinement in the Texas Department of Criminal Justice Institutional Division for the period indicated above, for which execution will issue.

And thereupon the said Defendant was asked by the Court whether he had anything to say why sentence should not be pronounced against him and he answered nothing in bar thereof. Whereupon the Court proceeded in the presence of the said Defendant to pronounce sentence against him as follows: to-wit:

"It is the order of the Court that the Defendant named above, who has been adjudged to be guilty of the offense named above, a felony, and whose punishment has been assessed at confinement in the Texas Department of Criminal Justice Institutional Division for the period indicated above in accordance with the provisions of the law governing the Texas Department Criminal Justice Institutional Division."

Signed and entered on this the _12_ day of February, 1999.

Gay Griffin,
Judge Presiding
123rd Judicial District Court in and for
Panola County, Texas

PLAINTIFF'S
EXHIBIT
*A2*

Magazine

# How My Aunt Marge Ended Up in the Deep Freeze . . .

By JOE RHODES    APRIL 12, 2012

"Bernie," the new film from Richard Linklater, the director of "Dazed and Confused," is a dark deadpan comedy that Linklater has called his East Texas "Fargo." It stars Jack Black as Bernie Tiede — a small-town funeral director beloved by nearly everyone in Carthage, Tex., sweet-natured and gregarious, a lover of show tunes and Jesus — who ends up murdering an ornery wealthy widow, played by Shirley MacLaine. Tiede stuffs her in a freezer, after shooting her four times in the back. Her frozen body stays there for nine months while Bernie spends a big chunk of her fortune, millions of dollars, on assorted good deeds and indulgences, buying the people of Carthage pretty much whatever they want — cars, Jet Skis, airplanes — and pledging a new wing for the Methodist church with hardly anyone bothering to ask where he got so much money.

Even after the body is discovered and Bernie confesses to the crime, a lot of people in Carthage are so sure he couldn't have done it ("Bernie? Dear, sweet Bernie?") that the district attorney (played by Matthew McConaughey) has to move the trial two counties south just to find a jury that's willing to convict him. It's a story about people believing what they want to believe, even when there's evidence to the contrary. It's a story about people not being what they seem. And it's a story, as the movie poster says, "so unbelievable it must be true."

Which it is. I know this because the widow in the freezer was, in real life, my Aunt Marge, Mrs. Marjorie Nugent, my mother's sister and, depending on whom you ask, the meanest woman in East Texas. She was 81 when she was murdered, and Bernie Tiede, her constant companion and rumored paramour, was 38. He'll

be eligible for parole in 2027, when he'll be 69.

There are little things in "Bernie" that aren't exactly true, bits of dialogue, a changed name here and there. But the big things, the weirdest things, the things you'd assume would *have* to be made up, happened exactly as the movie says they did. The trial lawyers really did wear Stetsons and cowboy boots and really were named Danny Buck Davidson and Scrappy Holmes. Daddy Sam's barbecue and bail bonds, just a few blocks from the courthouse in Carthage (population: 6,700), really does have a sign that says, "You Kill It, I'll Cook It!" And they really did find my Aunt Marge on top of the flounder and under the Marie Callender's chicken potpies, wrapped in a Lands' End sheet. They had to wait two days to do the autopsy. It took her that long to thaw.

**I was living** in Los Angeles when Aunt Marge was murdered in 1996 and hadn't been to Carthage, where I was born, in quite a few years. I went back for the trial in 1998 because, let's face it, it's not often that someone in your family becomes the focus of a sensational murder case, on the local news for weeks at a time, the circumstances of her demise so tawdry and bizarre that the story appeared in People magazine, on "Hard Copy" and, eventually, on the guilty-pleasure pinnacle of true-crime cable-TV programs, "City Confidential." And there was something about Aunt Marge's ending up in a freezer that seemed appropriate. She'd always been kind of coldhearted. It was not an unfitting end.

Aunt Marge wasn't on speaking terms with anyone in her immediate family when she died. Not my mother, with whom she'd had an ugly falling out over the terms of my grandfather's will. Not her only child, Rod Nugent Jr., a successful Amarillo pathologist she hadn't seen in years, or her grandchildren, who sued her over some trust money she wouldn't let them have. When informed that Marge died, the first thing my Aunt Sue, her other sister, said was, "What a relief."

Aunt Marge met Bernie Tiede at my Uncle Nugent's funeral in 1990. Bernie did the embalming. He helped pick out the coffin and the headstone. He arranged the flowers, sang a hymn at the memorial service and escorted my aunt to and from her husband's grave. He offered her his coat when a chilly breeze blew through the cemetery. She ended up wearing it home.

When I visited the set of "Bernie," filmed outside Austin in the fall of 2010,

that was the scene they were shooting: my uncle's funeral and my aunt's first meaningful encounter with the man who would end up killing her. There was a Texas actress named Margaret Bowman playing my mother, sitting in the front row. And 30 feet away from her, past a half-dozen extras playing my relatives, sat Shirley MacLaine as Aunt Marge.

I didn't go to the actual funeral, so no one was playing me. But that's the only thing that could have made the day feel more surreal. I met my "mother" a half-hour before the scene, when she was having her makeup done. We posed for pictures together, and when I showed them to my actual mother later, she seemed pleased enough at the resemblance. "She looks nice," my real mother said.

But the freakiest part, by far, was seeing Shirley MacLaine looking so much like Aunt Marge. There was a natural physical resemblance. Aunt Marge, like MacLaine, had red hair and pale, freckled skin. But what really unsettled me was the look on MacLaine's face as she went into character, with pursed lips and accusing eyes. I'd seen that face before, whenever Aunt Marge disapproved of something, which seemed to be most of the time. It usually meant she was going to tell you, in no uncertain terms, why you weren't good enough or smart enough or otherwise worthy of her time. She used it on salesclerks, on waiters, on farmhands, housekeepers and cooks. She used it on my parents. She used it on me. I really hated that face.

After the scene was over, I had lunch with MacLaine in her trailer. She was still in costume, and I was still a little freaked out. She wound up asking me more questions than I asked her. She coaxed stories out of me I hadn't told in years, how Aunt Marge once threatened to put me in a mental institution because I wouldn't cut my hair; how she chased me around her yard with garden shears because I wouldn't clean out a wasp's nest with my bare hands; how, when I was 14, she locked me in her house for two days and wouldn't let me call home. Finally, when Aunt Marge went to the grocery store, the maid, sympathetic to my plight, unlocked the bedroom door so I could get to the phone and beg my mother to come rescue me. She did. That was the last time I went to Aunt Marge's house.

There were darker stories that even I didn't know until the last few years. Aunt Marge, who loved to sew and shop and didn't have a daughter of her own, tried to

get custody of my sister, Carrie, by having our parents declared unfit. She claimed that my father was an alcoholic — which wasn't true; he barely drank — and that she could provide a more suitable upbringing. It didn't work. But apparently she was serious enough to meet with attorneys.

The movie makes a point of establishing how, except for Bernie, most people in Carthage did their best to avoid Aunt Marge, for fear of incurring her wrath. She grew up in Carthage and later moved to Longview, 40 miles away. Her husband, Rod Nugent Sr., made a fortune as an independent oilman, a ruthless operator. They moved back to Carthage in 1989 (just a year before my uncle died), buying a controlling interest in a local bank and building a huge Austin stone house on the outskirts of town, just off Dixie Lake Road. Marge seemed to lord her wealth and status over everyone she encountered. As one character says in the film, "Marjorie Nugent's nose was so high, she'd drown in a rainstorm."

Maybe she had an inflated sense of entitlement simply because she was the oldest daughter of a prominent local merchant and landowner, my grandfather, Spencer Midyett. She was 12 years older than my mother and spent a lifetime bossing her around. "She was so demanding," my mother said. "If you did something she didn't think was up to her standards, she'd tear it up and make you do it again."

I always knew that my mother and Aunt Marge weren't very close. Even so, my mother hosted her wake and said only kind things about her in public. It's only been in recent months, since the murder, the trial and the making of the film, that she's been willing to talk about how bad their relationship really was.

"She hated your father," my mom told me. "I think she hated everybody. I don't know why she was so ugly to so many people, but she was." And then my mother said something I'd never heard her say before, something I wish I could have shared with Shirley MacLaine.

"I was scared of her," my mother said of her oldest sister. "I think Mem" — my grandmother, Marge's mother — "was scared to death of her. Sometimes I think she was the devil on earth."

**Bernie Tiede currently** resides just outside New Boston, Tex., 100 miles

north of Carthage, in the Telford Unit of the Texas Department of Criminal Justice, where he is listed as Offender No. 00864378, sentenced to life. That's where I interviewed him last spring, the first time I'd seen him since the trial, 14 years ago. In 1998 he looked more like a middle linebacker than a funeral director at 6 foot 3 and 270 pounds. He's 40 pounds thinner now, and his hair has gone totally gray.

He started crying as soon as he saw me. We were on opposite sides of a glass window, just as in every prison movie you've ever seen. Five minutes into the conversation, after he asked me, "How's your mama doing?" the guards decided it would be all right for us to be in the same room.

He came into the visitation area, a linoleum-floored cinder-block room with long tables and brown plastic chairs, and hugged me longer and harder than I've ever been hugged in my life. "Oh, gracious," Bernie said. "I'm just so glad you came to see me."

Even as he sat there in prison whites, I found it hard to imagine Bernie as anything other than the sweet, gentle Samaritan everyone in Carthage had known and loved. He became a lay preacher and featured soloist in the choir at the First United Methodist Church not long after he started working at Hawthorn Funeral Home in 1985. He sponsored Little League teams and volunteered at the local community college, working with the music and theater departments. He was on the Chamber of Commerce Christmas decorating committee. He sang at weddings and funerals and, of course, every Sunday at church. He took hot meals to shut-ins. More than one person in Carthage described Bernie Tiede as an angel. To which Danny Buck Davidson, the district attorney, responded during the trial: "Oh, he's an angel, all right. An angel of death!"

Bernie was extremely good at his job, not just in working with the bodies (he had a special talent for makeup and hair) but also in comforting the families of the deceased. He stayed close to the grieving widows, steadying them, holding their hands. He looked in on them, sometimes days and weeks after the burial, long after his official responsibilities as a funeral director ended, just to make sure they were doing all right.

And that, he says, is why he took such an interest in Aunt Marge. He knew her reputation around town, that she could be curt and vindictive. But seeing her at the

funeral, Bernie couldn't help feeling sorry for her. That's why he gave her his coat. That's why, a few days later, he showed up at her house. Just to make sure she was doing all right.

"It just seemed like she didn't have any friends," he told me, "and I just felt this compelling desire, this need, to give her some friendship. I don't know, maybe I thought I could rescue her."

He invited her to go places with him. He took her shopping. He took her to dinner. Soon, it seemed, they were going everywhere together, often seen holding hands. They started taking longer trips, to Dallas, to New York, where they went to Broadway shows. It seemed an odd pairing to the gossips in town — and there were plenty — who began to speculate on the nature of their relationship. There were rumors that on those out-of-town trips, they slept in the same room. It was a brewing scandal, a whispered topic in every coffee shop in Carthage.

Robert Evans, one of Uncle Nugent's business associates, testified during the trial that Marge took Bernie to lunch in Shreveport once and made him uncomfortable with the way they were "physically familiar."

"I would say that the greeting kiss or goodbye kiss was not one you would give your mother," he testified.

Bernie says now that he knew about the rumors, even understood why people might assume their relationship was something more than friendly. But, he says, there was nothing sexual about it. He thought of her as more of a mother figure and a friend. Besides, Bernie is gay.

"We never talked about that," he said when I asked if Aunt Marge knew he was gay. "It just didn't crop up."

They traveled the world together, with Aunt Marge footing the bill. They went to Hong Kong and Bangkok and Russia. They cruised the Nile and the Rhine. They took trips to San Francisco and Las Vegas. There were shopping sprees and fancy meals. Aunt Marge paid for all of it, and Bernie, whose funeral-director salary was less than $25,000 a year, wasn't about to say no.

"She just kind of blossomed," Bernie said of those first few years, trying to

explain why the notoriously cranky widow behaved so differently with him. "She liked to go to concerts. She liked to travel, and I don't think she was able to do any of those things when Nugent was alive.

"We had a ball," he said. "I think I probably saw her happier than anyone in her family ever did. Including her husband. She kind of opened up to me. She became a different person."

For a while anyway. As time passed, Bernie noticed that Aunt Marge was becoming more and more possessive. She seemed to resent his having other friends and expected him to be available for her whenever she wanted, 24 hours a day. She'd page Bernie at work, sometimes three or four times in an hour, to demand he run some sort of errand for her. He went to her house and made coffee in the morning, had lunch with her every afternoon.

"I picked out her clothes; I helped her with the laundry," Bernie testified during the trial. "I, on occasion, trimmed her toenails, helped her pull out the long hairs that grew in her chin, combed her hair in the morning. . . . Everything that you could imagine, she had asked me to do that for her."

He did it, Bernie says now, because he didn't want Marge to feel abandoned. And also because the perks were pretty good: all that first-class travel, all the clothes she bought him, the $7,000 Rolex. In 1993, three years after they met, Marge talked Bernie into quitting his job at the funeral home and working for her full time, as her "business manager." She gave him access to her checking accounts so he could pay her bills. And, he says, she encouraged him to spend some of the money on himself. She wanted him to buy a house and a new car. She also rewrote her will, making Bernie the sole beneficiary. It seemed like a pretty sweet deal.

"The money was a lure, O. K.?" he told me, admitting that he didn't trim Aunt Marge's toenails just out of the goodness of his heart. "I was also afraid to leave her. She could be very vindictive. I'd seen that."

Bernie thought about leaving her for months before he killed her. He just couldn't work up the courage. He even fantasized about hitting her over the head with a baseball bat but couldn't bear the thought of her suffering.

"She was just so controlling," he said. "She felt like she could own me, and I guess to some degree, she did. It was like that feeling I've read in some books about spousal abuse, that type of thing where a woman keeps going back to her husband even though she knows she shouldn't. And I felt like that sometimes.

"I felt like I was in prison. And now I know what that feels like."

**I've now seen** the movie "Bernie" twice and, except for a few insignificant details — Aunt Marge's hair was never as long as Shirley MacLaine's; Danny Buck Davidson (short, doughy and distinctly doubled-chinned) looks nothing like Matthew McConaughey — it tells the story pretty much the way it happened. As far as I know, my cousin Rod, Aunt Marge's only child, hasn't seen the movie yet. But I guarantee he won't like it. I wanted him to be a part of this article. I called his home a dozen times, getting nothing but voice mail, until finally his wife, Sylvia, answered. As soon as I told her why I was calling, she said, "We don't want to talk to you," and immediately hung up.

I got a letter from his Dallas lawyer, Charles M. Hosch, a few weeks after that. It warned that he expected to be asked to "weigh every syllable" of this article "against the strictest requirements of the law." The letter goes on to say that any characterization of Aunt Marge as "unpleasant" was based on a faulty assumption. "The reason was that Marjorie Nugent was painfully shy," the letter contends. "The story lines about her murderer have been untrue also. He is not sympathetic. He preyed on an elderly, vulnerable widow. He deceived her, stole her savings and tried to use her money to buy friends.

"Marjorie Nugent's son and grandchildren do not want their mother and grandmother's memory ridiculed and dragged through the mud, or her murderer celebrated. After many years, they have found rest. We may hope that Marjorie Nugent is beyond all this, in a place of light and peace."

**It was a week** before Thanksgiving in 1996 when Bernie finally snapped. When I asked him what happened that day, he became defensive and visibly frustrated for the only time in our two-hour visit, waving his hands in the air, letting out an exasperated sigh.

"Gosh, it's been so long since I've even thought about these things," he said.

"We're talking 16 years ago. I don't sit and ponder this stuff. Please forgive me, but I don't even think about that day. Is that some kind of dissociative disorder? I don't know! I don't know! Somebody called it that. Do I shelve some thoughts and put them away? Of course I do. Just like you do."

But during the trial, Bernie described the day in detail. He went to Aunt Marge's house around 7 a.m. to make her breakfast, then went back to his home to take a shower. Before he left, he noticed a Browning .22-caliber rifle that she kept around to kill armadillos and scare blackbirds and squirrels away from her bird feeder. Bernie moved it into a bathroom near the garage.

He came back to the house around 10 a.m. to drive Aunt Marge to the dry cleaners in Longview. She was in the garage, ahead of Bernie, when she stopped to pet her dog, Bo, a Chow mix. Bernie took the rifle from the bathroom and shot Aunt Marge in the back. She fell after the first shot but was still breathing. Bernie shot her three more times.

He dragged her body down a hallway and into the utility room where the Amana deep freezer was waiting. He removed enough food so that Aunt Marge — 5 feet 2 inches tall — would fit. He wrapped her in the Lands' End sheet, stuffed her inside and covered her up with the food he'd taken out. He hosed away the blood in the garage, found the spent rifle shells and threw them away. He left the rifle by the freezer. And then he went on with his day. He went to a rehearsal of the Panola College production of "Guys and Dolls" and that night at Pizza Hut bought dinner for the cast. Everyone who saw Bernie that day — for that matter in the days and weeks that followed — said he seemed just fine, as if nothing in his life had changed.

Bernie continued to sing and preach at church, to pay Aunt Marge's bills and make sure her yard was mowed, her driveway swept. If anyone asked to see Marge, he'd tell them that they just missed her, or that she was taking a nap. He promised he'd give her the message and see that she called back. On the outside, he was all smiles and reassurance, the way he'd always been. On the inside?

"I was freaking out," he said. "Oh, good gracious. I thought every moment, I'm going to be found."

If he'd done things differently, Bernie might have gotten away with it. He has gone through the scenarios a thousand times in his head. She was, after all, an 81-year-old woman with a bad temper and a heart condition. He could have just waited her out. Or he could have disposed of the body. "Someone said I could have dropped her from an airplane into the Gulf of Mexico," he said. "And if I'd done that, I would not be here with you in prison. I'd be on the lam somewhere. She wouldn't have been found. But none of those things occurred to me, because it was not premeditated. It was not my intention to kill her that day. I never thought it through."

He knew that, eventually, someone would find her. He convinced himself that would be for the best. "I wanted her to have a proper burial," he said. In the meantime, he continued to spend her money on himself, on others, on the town. He bought several planes and hangars and installed them at the Panola County airport. He invested in the Boot Scootin' Western Wear shop. He pledged money to the church's building fund. He bought cars for at least 10 people. In the nine months before he was arrested, he spent an estimated $2 million. And he convinced himself it's what she'd have wanted.

"She wanted me to enjoy the money," he said. "She said that to me." It's why she'd given him unfettered access to her accounts, why'd she left him everything in her will. "She was mostly concerned that it didn't go to anyone in her family. 'Not one thin dime,' she used to say. Good gracious, how many zillions of times must she have said it."

As the months passed, Bernie's lies became more elaborate. He started telling people that Aunt Marge was in Ohio, visiting her sister. Or that she was in the hospital, having suffered a stroke that left her speechless. "I'm not a very good liar," Bernie told me. "I told a whole bunch of lies, so many that I couldn't remember who I told what. I don't know how I pulled it off, but apparently I did." He sounded, momentarily, proud. "I've heard some people say, 'He could have won an Academy Award for that performance.'"

Aunt Marge's stockbroker grew suspicious when she didn't thank him for sending a Christmas turkey, and even more so when she didn't show up to sign some important investment documents. He called the Sheriff's Department, which

had also received an anonymous tip telling them to look for Marge. Finally, a deputy called Rod, Aunt Marge's estranged son, and suggested that something might have happened to his mother.

Rod, his daughter Jennifer and several Panola County deputies went to the house off Dixie Lake Road on Aug. 19, 1997. They were looking for evidence of where Marge might be, a hospital bill perhaps. They found her in the freezer instead. The deputies put the freezer, its contents undisturbed, on the back of a pickup truck and hooked it up to a generator. That's how they drove Aunt Marge to the coroner's office in Dallas, still frozen solid.

"I deserve to be in prison," Bernie told me, "of course I do. But not for as long as I have. There are people in here who have done things more heinous than I can imagine in my wildest dreams, and they'll be going home before I do." He was crying again. "I've adjusted. But I want to feel the grass under my feet. I want something other than concrete. I want to step on carpet again. I have not stepped on carpet in 14 years." He leaned in, his shaky voice barely a whisper.

"I want to go home," he said, as the tears flowed. "Every day I want to go home. And one of these days, they're gonna let me."

**I think my visit** to the "Bernie" set may have been more unsettling to some of the cast and crew than it was to me. As Skip Hollandsworth, who co-wrote the screenplay, introduced me around, a few people clearly weren't sure how to react. Should they apologize for making a comedy about my aunt's murder? Should they say they were sorry for my loss? I told them not to worry about it. "Bernie's not the first one who thought about killing her," I told them. "He's just the first one who went through with it."

Besides which, the whole thing felt like farce from the moment it happened, even to the family. I mean, seriously, under the chicken potpies? Shot and then frozen by the nicest man in town, who spent her money to finance the Boot Scootin' Western Wear store (and also, it turned out, some German gay porn)? How is that not funny? There has been some talk that, if the movie does well, a producer might even be interested in a Broadway musical version. This does not strike me as a terrible idea.

But it has taken awhile for my mom to adjust to all this. She has slowly come to accept that the movie version of her sister's murder is the version that most people will know. She's not yet comfortable with the idea that people at the grocery store will most likely be whispering behind her back, that people who don't know her will act as if they do. She's an 83-year-old woman in a small Southern town. She'd rather have kept this all to herself.

Last spring I drove her to the Bass Performance Hall in Fort Worth, where Shirley MacLaine was touring with a one-woman show called, simply, "An Evening With Shirley MacLaine," in which she sits onstage in a comfortable chair, shows photographs and movie clips from her life and career and tells stories about all the famous people she has known. Reincarnation is mentioned. As is Frank Sinatra.

After the show, I escorted my mother backstage, past the long line of fans who wanted autographs or advice on what to do when the Mayan calendar ends. We elbowed our way past a couple of security guards and finally into a back hallway, where MacLaine was surrounded by a small circle of V.I.P. well-wishers. She abandoned them as soon as my mother entered the room.

I was going to introduce them, but there didn't seem to be any need. MacLaine came rushing toward her, arms outstretched. "I'm happy you came," she said to my mother. And then, for a very long time, they hugged, neither of them saying a word, both with tears in their eyes. Maybe it was just the emotion of meeting a movie star, but it felt like something more than that, for both of them. For a moment, it felt as if Shirley MacLaine had become Aunt Marge again, but this time she wasn't making that face.

"I will see you again," she said, before she touched my mom's cheek.

"I hope so," said my mother, who looked happier than I'd seen her in years.

**Joe Rhodes** is a writer based in Los Angeles.

Editor: **Adam Sternbergh**

A version of this article appears in print on April 15, 2012, on page MM40 of the Sunday Magazine with the headline: How My Aunt Marge Ended Up In The Deep Freeze...

© 2016 The New York Times Company

SCANNED



PLAINTIFF'S
EXHIBIT

B

FILED

2014 MAY -6 AM 9: 48

DEBRA JOHNSON, CLERK
DISTRICT COURT
PANOLA COUNTY, TEXAS
BY _____ DEPUTY

CAUSE NO. 1997-C-103
CAUSE NO. 1997-C-103A

| | | |
|---|---|---|
| THE STATE OF TEXAS | § | IN THE 123RD JUDICIAL |
| v. | § | DISTRICT COURT OF |
| BERNHARDT TIEDE, II | § | PANOLA COUNTY, TEXAS |

## MOTION FOR BOND PURSUANT TO TEXAS CODE OF CRIMINAL PROCEDURE ART. 11.65

TO THE HONORABLE JUDGE DIANE V. DEVASTO, VISITING JUDGE OF THE 123RD JUDICIAL DISTRICT COURT OF PANOLA COUNTY, TEXAS:

COMES NOW Bernhardt Tiede, II, TDCJ # 00864378, Applicant in the above styled and numbered cause, by and through his undersigned counsel, and pursuant to Article 11.07 of the Texas Code of Criminal Procedure and Article I, Section 12 of the Texas Constitution, and Article 1, Section 9 of the United States Constitution, requests this Court to accept the proposed jointly stipulated findings of facts and conclusions of law regarding previously unresolved facts which are material to the legality of the Applicant's confinement, and grant the requested relief. Applicant would show this Court the following:

47

## I. Introduction

Texas Code of Criminal Procedure Art. 11.65 provides that for certain applicants for writs of habeas corpus seeking relief from the judgment in a criminal case, other than an applicant seeking relief from a judgment imposing a penalty of death, bond is available. On making proposed findings of fact and conclusions of law jointly stipulated to by the applicant and the state, or on approving proposed findings of fact and conclusions of law made by an attorney or magistrate appointed by the court to perform that duty and jointly stipulated to by the applicant and the state, the convicting court may order the release of the applicant on bond, subject to conditions imposed by the convicting court, until the applicant is denied relief, remanded to custody, or ordered released. Tex. Code Crim. Proc. art. 11.65(b). *Ex parte Williams*, 2013 Tex. Crim. App. Unpub. LEXIS 618 (Tex. Crim. App. May 22, 2013) ([t]he parties are reminded that under certain circumstances, an applicant may be eligible for release on bond under Article 11.65 of the Code of Criminal Procedure); *Ex parte Pines*, 2013 Tex. Crim. App. Unpub. LEXIS 469 (Tex. Crim. App. Apr. 17, 2013) ([t]he parties are reminded that under certain circumstances, an applicant may be eligible for release on bond under Article 11.65 of the Code of Criminal Procedure.); *Ex parte Sellers*, 2012 Tex. Crim. App. Unpub. LEXIS 1268 (Tex. Crim. App. Dec. 5, 2012) ([t]he parties are reminded that

48

under certain circumstances, an applicant may be eligible for release on bond under Article 11.65 of the Code of Criminal Procedure).

For the purposes of habeas law, an applicant released on bond under this article remains restrained in his liberty. *Tex. Code Crim. Proc. art. 11.65(c)*. Article 44.04(b) does not apply to the release of an applicant on bond under this article. *Tex. Code Crim. Proc. art. 11.65(d)*. Because the convicting court is the proper forum for this relief, any motion seeking an Article 11.65 bond must be in the convicting court. *Ex parte Briggs*, 159 S.W.3d 926, 926-927 (Tex. Crim. App. 2004) (*Unpublished*).

Therefore, Mr. Tiede should be considered eligible for release pursuant to an Article 11.65 bond, if this Court accepts the proposed jointly stipulated findings of fact and conclusions of law.

## II. Ties to the Community

Mr. Tiede will have a very supportive community waiting for him, in his new home of Austin, Texas. Mr. Tiede will be living in the garage apartment of his friend, Richard Linklater while released on this bond. *See Affidavit, Attached as "Exhibit A."* Mr. Tiede has full-time employment guaranteed upon release, for the duration of his release on this bond, as a legal assistant with The Law Firm of Jodi Cole, a criminal defense law firm in Austin, Texas. *See Affidavit of Jodi Cole and Mr. Tiede's Certificate of Legal Assistance Training, Attached as "Exhibit B."* Mr. Tiede's friends, Mr. Linklater

49

Mr. Tiede is close to his sister and her husband. They live in Waco, a close drive to Austin, and they are both very supportive. They have expressed a willingness to assist Mr. Tiede in any way possible, especially during his initial transitional period upon immediate release. Mr. Tiede will have transportation made available, and assistance with all of his necessities and health care during his release on this bond. Mr. Tiede has been in the process of obtaining his valid driver's license, using his future address. Mr. Tiede's support network will assist him in maintaining a low profile, calm life in Austin, Texas, where he can be himself and expect to find full acceptance and support.

### III. Lack of Future Dangerousness

Mr. Tiede has been recently assessed by Dr. Richard Pesikoff, M.D. *See C.V. of Dr. Richard B. Pesikoff, M.D., Attached as "Exhibit C."* Dr. Pesikoff reported that during Mr. Tiede's 16 years in prison, he has an exemplary record of good behavior and holds a position as one of the highest ranking trustees in the prison. *See Psychiatric Evaluation, Attached as "Exhibit D."* In Dr. Pesikoff's opinion, and in all medical probability, it is extremely unlikely that, if released from prison and the recipient of appropriate psychological counseling, Mr. Tiede would ever commit any similar act in the future. Dr. Pesikoff believes that through counseling, Mr. Tiede can address his past experiences as an abuse victim and develop appropriate coping skills that would allow him to form and maintain healthy interpersonal relationships.

Pesikoff believes that through counseling, Mr. Tiede can address his past experiences as an abuse victim and develop appropriate coping skills that would allow him to form and maintain healthy interpersonal relationships.

Mr. Tiede has already made arrangements with an Austin therapist, Liz Cohen, J.D., LCSW. *See C.V. of Elizabeth Cohen, J.D., LCSW, Attached as "Exhibit E."* Ms. Cohen has developed a comprehensive treatment plan for Mr. Tiede. *See Treatment Plan for Bernie Tiede, Attached as "Sealed Exhibit 1."* Ms. Cohen's treatment goal is to assist Mr. Tiede in addressing his psychological issues and developing appropriate coping skills, so that he is able to adjust to life outside of prison, develop and maintain healthy interpersonal relationships, and become a productive member of society once again.

Mr. Linklater, Ms. Cole, and Ms. Cohen strongly agree with Dr. Pesikoff's opinion, which stated that because Mr. Tiede has always been a generous and helpful person; given the opportunity to return to civilian life, Mr. Tiede will likely have the desire and capacity to once again become a constructive and positive force in society.

## CONCLUSION

WHEREFORE, PREMISES CONSIDERED, Mr. Tiede respectfully requests that this Honorable Court, upon accepting and making the proposed findings of facts and conclusions of law which have been jointly stipulated to by the Applicant and the State, order the release of the Applicant on bond, subject to conditions imposed by this Court, until the Applicant is denied relief, remanded to custody, or ordered release. Applicant

shall be considered restrained in his liberty while released on this bond, for purposes of

Chapter 11 of the Texas Code of Criminal Procedure.

Filed by:

JODI CALLAWAY COLE
Attorney for Bernhardt Tiede, II, Petitioner
Law Firm of Jodi Cole
502 West 30th Street
Austin, TX 78705,
Telephone: (512) 926-5634
Facsimile: (512) 692-2575

## CERTIFICATE OF SERVICE

I certify by my signature above that a true and correct copy of the foregoing has been
mailed, faxed, or hand delivered to the Panola County District Attorney's Office on this
the 6th day of May, 2014.

By: JODI CALLAWAY COLE



EXHIBIT

A

THE STATE OF TEXAS     §
          §
COUNTY OF TRAVIS    §

## AFFIDAVIT OF RICHARD LINKLATER

BEFORE ME the undersigned authority on this the 18 th day of December, 2013,

appeared before me RICHARD LINKLATER who after being sworn on his oath stated and

subscribed as follows:

"My name is Richard Linklater. I am over the age of twenty-one and I am competent to make this affidavit. I am attesting to the following information at the request of Jodi Callaway Cole, attorney for Bernhardt Tiede, II.

I am the filmmaker who made the movie "Bernie." While researching and making the movie "Bernie," I have become good friends with Mr. Tiede, and have assisted his attorney in learning more about his legal case. Over the last year and a half, after reviewing new evidence, I understand that my instincts about Mr. Tiede were right. The previously unknown circumstances explain how the unfortunate chain of events occurred, that led to the very unfortunate outcome of Mrs. Nugent's death. This new information indicates to me that Mr. Tiede's action was aberrant, and will not be repeated with proper mental health treatment and community support.

I would like the Court to know that I fully believe that Mr. Tiede has been punished and rehabilitated. There is a garage apartment on one of my properties that is available for Mr. Tiede to live in, for the duration of his release on an Art. 11.65 bond. The Court can be assured that I will personally participate in assisting Mr. Tiede to reenter into our community, upon his release. I believe that Mr. Tiede is a good person, who, now that he has paid his price for his wrongdoings to society, can continue being a possitive and contributing member of society.

I am committed to assisting Mr. Tiede to receive necessary mental health treatment, so that he can get back onto his feet and regain his status as a contributing tax payer. I will continue to work with his attorney to ensure that Mr. Tiede complies with any Art. 11.65 bond requirements.

The Court should not hesitate to contact me with any further questions or concerns that it may have regarding Mr. Tiede's living situation while on Art. 11.65 bond release.

Further, affiant sayeth not.

Richard Linklater

SUBSCRIBED AND SWORN TO BEFORE ME on this 18th day of December 2013.

KIRSTEN MCMURRAY
Notary Public, State of Texas
My Commission Expires
November 16, 2016

NOTARY PUBLIC IN AND FOR
THE STATE OF TEXAS

54

THE STATE OF TEXAS            §
                             §
COUNTY OF TRAVIS             §



## AFFIDAVIT OF JODI COLE

BEFORE ME the undersigned authority on this the 18 <sup>th</sup> day of December, 2013,

appeared before me JODI COLE who after being sworn on her oath stated and subscribed as

follows:

> "My name is JODI COLE. I am over the age of twenty-one and I
> am competent to make this affidavit. I am attesting to the following
> information to present to the Court. I represent Bernhardt Tiede,
> II.
>
> I have assisted Mr. Tiede on his case for a year and a half. I have
> become good friends with Mr. Tiede, over this time. Based on the
> newly discovered information, the previously unknown
> circumstances explain how the unfortunate chain of events
> occurred, that led to the very unfortunate outcome of Mrs.
> Nugent's death. I agree that this new information indicates that
> Mr. Tiede's action was aberrant, and will not be repeated with
> proper mental health treatment and community support.
>
> I would like the Court to know that I agree with Mr. Linklater
> personally, that Mr. Tiede has been fully punished and
> rehabilitated. Based on the competence I have observed during his
> legal representation, along with his legal assistant training, I can
> offer him full time employment as a legal assistant at my law firm,
> for the duration of his release on an Art. 11.65 bond. The Court
> can be assured that I will join Mr. Linklater in personally assisting
> Mr. Tiede to reenter into our community. I agree with Mr.
> Linklater, that that Mr. Tiede is a good person, who, now that he
> has paid his price for his wrongdoings to society, can continue
> being a positive and contributing member of society.
>
> I join Mr. Linklater in my commitment to assist Mr. Tiede in
> receiving necessary mental health treatment, so that he can get
> back onto his feet and regain his status as a contributing tax payer.
> I will continue to work with Mr. Linklater and the State to ensure
> that Mr. Tiede complies with any Art. 11.65 bond requirements.
>
> The Court should not hesitate to contact me with any further
> questions or concerns that it may have regarding Mr. Tiede's
> employment while on Art. 11.65 bond release.

55

Further, affiant sayeth not.

_____
Jodi Callaway Cole

SUBSCRIBED AND SWORN TO BEFORE ME on this 18th day of December 2013.

Daniel Eash
My Commission Expires
02/08/2016

_____
NOTARY PUBLIC IN AND FOR
THE STATE OF TEXAS

**PLAINTIFF'S EXHIBIT**

*C*

CAUSE NO. 1997-C-103
CAUSE NO. 1997-C-103A

**FILED**

At _3:43_ O'clock _P_ M.

MAY - 6 2014

DEBRA JOHNSON,
DISTRICT COURT CLERK
COURT AT LAW & COUNTY
BY: _____ PANOLA CO., TX
DEPUTY

| | | |
|---|---|---|
| THE STATE OF TEXAS | § | IN THE 123RD JUDICIAL |
| v. | § | DISTRICT COURT OF |
| BERNHARDT TIEDE, II | § | PANOLA COUNTY, TEXAS |

## ORDER ON MOTION FOR BOND PURSUANT TO TEXAS CODE OF CRIMINAL PROCEDURE ART. 11.65

Came on this day to be considered the Motion for Bond Pursuant to Texas Code of Criminal Procedure Art. 11.65. The Court, having carefully reviewed the file, considered the positions of the Applicant and the State, and accepted and made the proposed findings of facts and conclusions of law jointly stipulated to by the Applicant and the State, finds that the motion has merit and orders that it be GRANTED.

This District Court orders that Bernhardt Tiede, II, TDCJ # 00864378, Applicant in the abovestyled and numbered cause, be immediately released from the Panola County Detention Center, subject to all conditions of Art. 11.65 bond that are ordered by the convicting court, the 123rd Judicial District Court of Panola County, Texas.

The ordered release will be subject to any conditions imposed by the convicting court, until the Applicant is denied relief, remanded to custody, or ordered release. Applicant shall be considered restrained in his liberty while released on this bond, for

95

purposes of Chapter 11 of the Texas Code of Criminal Procedure. *Ct. order with conditions of release.*

So ordered on this the *6th* day of May, 2014.

Honorable District Judge Diane V. DeVasto
123rd District Court, Panola County, Texas



**PLAINTIFF'S EXHIBIT**

D

THE STATE OF TEXAS      §

COUNTY OF PANOLA      §

### AFFIDAVIT OF DANNY BUCK DAVIDSON

BEFORE ME the undersigned authority on this the $\mathbf{5^{th}}$ day of May, 2014, appeared

Danny Buck Davidson who after being sworn on his oath stated and subscribed as follows:

"My name is Danny Buck Davidson. I am over the age of 21 and I am competent to make this affidavit. I am attesting to the following at the request of Jodi Callaway Cole, attorney for Bernhardt Tiede, II.

I am the elected Criminal District Attorney of Panola County, Texas. I prosecuted the defendant, Bernhardt Tiede, II in The State of Texas vs. Bernhardt Tiede, II, Cause #1997-C-103 in San Augustine, Texas in February of 1999.

Delay never helps the State on its duty to seek justice.

The allegation by applicant in his Memorandum in Support of the Application for Writ of Habeas Corpus Seeking Relief from Final Felony Conviction filed April 28, 2014 that the State or its prosecutor acted in bad faith and used false evidence to obtain its punishment verdict is not true. The State, its prosecutor and its expert witness Dr. Gripon used the only information available at trial. Knowledge of the applicant's history of being sexually abused as a child or knowledge of any kind of abuse psychological, emotional or otherwise by decedent, was known only to the applicant and the Prosecutor, the State and its expert only became aware of this bombshell in late January of this year. Under the circumstances the State and Prosecutor have acted fairly and under the guidelines prescribed by Article 2.01 CCP and applicable law.

In light of the evidence presented at the guilt/innocence phase of trial and at sentencing, I requested the maximum life sentence for murder.

I did not know that Mr. Tiede had been sexually abused as a child, and I did not know the extent of the decedent's encroachment on his reasonable personal boundaries. These issues are thoroughly explained in Mr. Tiede's latest psychiatric evaluations. I now believe child abuse ultimately led Mr. Tiede to kill Mrs. Nugent along with other factors. In consideration of the opinion and affidavit of my punishment expert Dr. Edward Brown Gripon, M. D., the psychiatric evaluation of Dr. Richard Pesikoff, M.D., the new mitigating evidence presented by the defense, and my own independent investigation; I have made a new, fully informed assessment of the circumstances surrounding the shooting event and Mr. Tiede's lack of future dangerousness. I now feel that a life sentence is an inappropriate sentence for Mr. Tiede.

Ideally, in the criminal justice system, prosecutors are the good guys. We should never be afraid of the truth, no matter where it leads us in our quest for justice. We must make the right decision for our community, whether the decisions are immediately popular or nor.

Jury verdicts are sacred to me and have been for over 19 years that I have been the elected Criminal District Attorney of Panola County.

However, when new credible and mitigating evidence comes to light that was not available for the jury to consider in arriving at a just punishment, justice requires that something needs to be done.

Based upon my extensive review of all of the above mitigating evidence, I would have still prosecuted Mr. Tiede for murder. However, I would have sought the maximum penalty provided under the sudden passion provision of the Texas Penal Code. The sudden passion maximum sentence of 20 years , however there was no guarantee he would have gotten 20 years. The sentence would have been anytime from two to 20 years in TDC.

Had Mr. Tiede been sentenced in the two to 20 year range, he would have been released outright or be on parole by now. Therefore I am agreeable to considering his sentence to be time served.

If the Appellate Court grants his Motion for Habeas Corpus Relief and if he is resentenced released from prison he will be a convicted felon who served almost 17 years behind bars for murder.

Based upon my views as stated above and in light of Article 2.01 of the Texas Code of Criminal Procedure that expressly states "it shall be the primary duty of all prosecuting attorneys not to convict, but to see that justice is done, I am executing this sworn affidavit"

Further, affiant sayeth not.


Danny Buck Davidson
Panola County Criminal District Attorney


SUBSCRIBED AND SWORN TO BEFORE ME, this the 5th day of May, 2014.


Notary Public, State of Texas

1  those?

2                    THE WITNESS:  Yes.

3                    THE COURT:  After your interview?

4                    THE WITNESS:  Yes.

5                    THE COURT:  Okay.  I was unclear of that

6  timing.

7                    MR. DAVIDSON:  And he had Dr. Pesikoff's

8  report.

9                    THE WITNESS:  Report.

10                    MR. DAVIDSON:  And I asked him what he

11 thought of Dr. Pesikoff, and he said he's a highly well

12 thought of expert.

13                    THE WITNESS:  I know Richard Pesikoff and

14 have for years.  I had that also.

15                    THE COURT:  And Dr. Pesikoff's report,

16 his affidavit, is part of the Memorandum here.

17                    THE WITNESS:  And I also had a copy of

18 that brought to me in January before I saw him.

19                    THE COURT:  Okay.

20       Q.   (By Mr. Davidson) And I didn't tell you

21 which-a-way to fall on the fence, did I?

22       A.   No.

23       Q.   I told you I would --

24       A.   It took me a while to understand exactly which

25 side of the fence anybody was on.

1                    MR. DAVIDSON:  Pass the witness.

2                    THE COURT:  Any other questions?

3                    MS. COLE:  No further questions, Your

4    Honor.

5                    THE COURT:  We want to thank you very

6    much for being here, Dr. Gripon.  Can we release him?

7                    MR. DAVIDSON:  As far as I'm concerned,

8    we can, Your Honor.

9                    MS. COLE:  Same with us, Your Honor.

10                   THE COURT:  Thank you.

11                   (Witness exits courtroom)

12                   MR. DAVIDSON:  Your Honor, at this time,

13   I would like to read into the record my affidavit that

14   has been filed.

15                   THE COURT:  Yes.  I have it here.  You

16   can go ahead and do that if you like.

17                   MR. DAVIDSON:  Okay.

18                   THE COURT:  There's no objection,

19   correct, Ms. Cole?

20                   MS. COLE:  No objection, Your Honor.

21                   MR. DAVIDSON:  "Before me the undersigned

22   authority on the 5th day of May, 2004 [sic], appeared

23   Danny Buck Davidson being sworn under oath and subscribed

24   as follows:

25                   "My name is Danny Buck Davidson.  I am

1 over the age of 21 and I am competent to make this
2 affidavit....

3          "I am the elected Criminal District
4 Attorney of Panola County.  I prosecuted the defendant,
5 Bernhardt Tiede, II in The State of Texas v. Bernhardt
6 Tiede, II, Cause #1997-C-103 in San Augustine, Texas in
7 February of 1999.

8          "Delay never helps the State on its duty
9 to seek justice....

10          "In light of the evidence presented at
11 the guilt/innocence phase of the trial and at sentencing,
12 I requested the maximum life sentence for murder.  I did
13 not know that Mr. Tiede had been sexually abused as a
14 child, and I did not know the extent of the decedent's
15 encroachments on his reasonable personal boundaries.
16 These issues are thoroughly explained in Mr. Tiede's
17 latest psychiatric evaluations.  I now believe child
18 abuse ultimately led Mr. Tiede to kill Mrs. Nugent along
19 with other factors.  In consideration of the opinion and
20 affidavit of my punishment expert Dr. Edward Brown
21 Gripon, M.D., the psychiatric evaluation of Dr. Richard
22 Pesikoff, the new mitigating evidence presented by the
23 defense, and my own independent investigation, I have
24 made new, fully informed assessments of the circumstances
25 surrounding the shooting event and Mr. Tiede's lack of

1  future dangerousness.  I now feel that a life sentence is

2  an inappropriate sentence for Mr. Tiede.

3                  "Ideally, in the criminal justice system,

4  prosecutors are the good guys.  We should never be afraid

5  to follow [sic] the truth, no matter where it leads us in

6  our quest for justice.  We must make the right decision

7  for our community, whether the decisions are immediately

8  popular or not.

9                  "Jury verdicts are sacred to me and have

10 been for over 19 years that I have been the elected

11 Criminal District Attorney of Panola County.

12                  "However, when new and credible

13 mitigating evidence comes to light that was not available

14 to a jury to consider in arriving at a just punishment,

15 justice requires that something needs to be done.

16                  "Based upon my extensive review of all of

17 the above mitigating evidence, I would have still

18 prosecuted Mr. Tiede for murder.  However, I would have

19 sought the maximum penalty provided under the sudden

20 passion provision of the Texas Penal Code...," which the

21 maximum sentence was "20 years, however there was no

22 guarantee he would have gotten 20 years.  The sentence

23 could [sic] have been anywhere from two to 20 years in

24 TDC.

25                  "Had Mr. Tiede been sentenced to two to

1  20 year range, he would have been released outright or be

2  on parole by now.  Therefore I am agreeable to

3  considering his sentence to be time served.

4           "If the Appellate Court grants his Motion

5  for Habeas Corpus Relief and he is resentenced and

6  released from prison he will be a convicted felon who has

7  served almost 17 years behind bars for murder.

8           "Based on my views as stated above and in

9  light of Article 2.01 of the Texas Code of Criminal

10  Procedure that expressly states 'it shall be the primary

11  duty of all prosecuting attorneys not to convict, but to

12  see that justice is done,' I am executing this sworn

13  affidavit.

14           "Further affiant sayeth not."

15           Signed by me, notarized May 15th [sic],

16  2014.

17           THE COURT:  Thank you.  Any questions

18  about that, Ms. Cole?

19           MS. COLE:  No questions, Your Honor.

20           THE COURT:  And again, I'm submitting the

21  affidavit.  I'll make it part of the record.

22           Anything else in regard to the writ of

23  habeas corpus?  Do you have a proposed order?

24           MS. COLE:  Yes, Your Honor.  I would like

25  to submit our jointly stipulated Findings of Fact and

1 Conclusions of Law and Recommendation and Order. May I
2 approach, Your Honor?

3                THE COURT: Yes. Mr. Davidson, have you
4 reviewed these thoroughly?

5                MR. DAVIDSON: Yes, Your Honor.

6                THE COURT: I want to make sure it bears
7 both of your signatures, correct?

8                MS. COLE: Yes, Your Honor.

9                THE COURT: This has not been made a part
10 of the record as yet?

11                MS. COLE: No, Your Honor.

12                THE COURT: Anything else before making
13 any pronouncement regarding the writ?

14                MR. DAVIDSON: No, Your Honor.

15                THE COURT: Of course, this is -- what
16 we're doing here today will be reviewed completely by the
17 Court of Criminal Appeals. This is just simply a
18 recommendation.

19                And the law is pretty clear about a
20 jointly submitted Findings of Fact and Conclusions of
21 Law. The request that you've made is not only for these
22 Findings of Fact and Conclusions of Law to be the Court's
23 order as it goes to the Court of Criminal Appeals, but
24 you're also urging an 11.65 motion that is triggered by
25 the fact that this is a joint submission. Correct?

1          MS. COLE:  Yes, Your Honor.

2          THE COURT:  Okay.  And anything else from

3   counsel?

4          MR. DAVIDSON:  No.

5          MS. COLE:  No, Your Honor.

6          THE COURT:  And at this time, the Court

7   will find that, after review of the writ and all of the

8   previously mentioned documents and evidence submitted in

9   the case, will find that the Findings of Fact and

10  Conclusions of Law are hereby adopted and made the order

11  of the Court, approved by the Court.

12          And I have entered that and it will be

13  file marked here in court.  You can get a copy here

14  today.

15          I know we have other business, but after

16  the conclusion of these proceedings.  Anything else?

17          MS. COLE:  No, Your Honor.  Thank you.

18          THE COURT:  Thank you very much.  You may

19  have a seat.  And I am giving those to the clerk's

20  office.

21          We are going to have a slight recess, go

22  into a bond hearing which, as I mentioned, is triggered

23  by the jointly submitted Findings of Fact and Conclusions

24  of Law and all the evidence we've heard here that's

25  included.  It's quite voluminous.

1            But what happens now is that we go into a

2    bond hearing under 11.65.  So let's just take about five

3    minutes and come back on the record.  Thank you.

4                    *(End of proceedings)*

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**PLAINTIFF'S EXHIBIT**

**F**


No. 1997-C-103

| EX PARTE | § | IN THE DISTRICT COURT |
|---|---|---|
| | § | |
| | § | 123rd JUDICIAL DISTRICT |
| | § | |
| BERNHARDT TIEDE II | § | PANOLA COUNTY, TEXAS |

## Findings of Fact, Conclusions of Law, Recommendation and Order

The Court, having reviewed the Clerk's file in this case, including any previous Orders entered by this Court and the Court of Criminal Appeals, all pleadings of the parties, enters the following Findings of Fact, Conclusions of Law, Recommendation and Order:

### I

### Findings of Fact

### Procedural History

1. Applicant was convicted of murder and sentenced by the jury to life imprisonment and a $10,000 fine. That conviction was appealed, and it was affirmed, but the case was remanded for a new hearing on punishment. *Tiede v. State*, 104 S.W.3d 552 (Tex.App. - Tyler 2000).

2. The Court of Criminal Appeals vacated the Court of Appeals' judgment and remanded for reconsideration of the character and harmfulness of the trial court's exclusion of the proffered testimony of Applicant's expert. *Tiede v. State*, 76 S.W.3d 13 (Tex.Cr.App. 2002). Subsequently, after finding the error at issue to be harmless, the Court of Appeals affirmed the trial court's judgment. *Tiede v. State*, No. 12-99-00182-CR (Tex.App. - Tyler; November 20, 2002)(unpublished).

3. Applicant has not heretofore filed an application for a writ of *habeas corpus* under Article 11.07, C.Cr.P.

4. The instant *habeas corpus* application was filed with the Court on April 21, 2014.

5. The State has waived its right to file a response to the *habeas corpus* application.

### Pertaining to the Testimony of Dr. Edward Gary Mears

6. At trial, Dr. Mears testified, outside of the jury, that Applicant "felt outside of his body" when he shot the decedent. Dr. Mears thought that Applicant could have had an episodic dissociative episode event.

7. Dr. Mears did not have any further information from Applicant's history that would suggest that he would be capable of having dissociative episodes of any significant length of time.

8. Before the jury, Applicant's trial counsel asked Dr. Mears if the condition of dissociation could explain one's ignoring circumstances that they had produced and caused.

9. Dr. Mears answered that, if they have a history of childhood trauma or an occupation that requires dissociation, they may.

10. Dr. Mears was permitted to explain the definition of a dissociative disorder, and he explained that a funeral director or mortician could be prone to disassociation. This was offered so the jury could deduce that Applicant's past occupation as a funeral director may have increased the likelihood that he experienced a dissociative episode at the time of the shooting.

11. The jury did not know, however, that Applicant had a history of child abuse which could lend itself to him being able to ignore the decedent's death and continue living as if it had never happened. Significantly, neither did Dr. Mears.

12. During a bill of exception, outside of the presence of the jury, Dr. Mears testified that Applicant did not have a traumatic childhood, and that Applicant was definitely not abused by the decedent.

2

13. Dr. Mears testified: ". . . not to say that he's [Applicant] a traumatized child . . . many traumatized children have this same kind of ability to put very traumatic events sort of out of awareness and go about business as it normally was , not to imply that he was abused by the deceased, not at all. But the mechanism is still there when people are under a high degree of stress. Certainly individuals do engage in dissociative episodes."

14. Dr. Mears attributed Applicant's conduct subsequent to the killing as related to some kind of dissociative episode. However, he was unable to support his conclusion with any relevant information about the possibility of there being an abusive relationship or Applicant's childhood history; that would explain how Applicant would have any propensity to engage in dissociative behavior.

15. There was no discussion of Applicant's ability to live a deeply closeted life as a gay man. This information was unknown to most people at the time.

## Pertaining to the Testimony of Dr. Edward Gripon, the State's Expert

16. Dr. Gripon, followed Dr. Mears onto the stand. When asked a question by counsel for the State regarding the relevance of the dissociation discussion to the case at hand, the doctor plainly testified that "[t]here isn't any."

17. Dr. Gripon's opinion was the jury heard a brief discussion of what could be dissociation, but "but you've heard some extremely poor examples, in my opinion of that . . . those of us who do very difficult work . . .they used the example of an ambulance driver . . . we do compartmentalize . . . basically, there is nothing... there's no relevance to dissociation in this matter."

18. During cross examination, Dr. Gripon testified that dissociative disorder is basically a condition in which a person can have splitting and separation from their surroundings, in which they can have some phenomenon in which they are not aware of what they are doing and what is going on at that point in time.

3

19. Dr. Gripon testified that he did not believe anyone had testified that Applicant had a dissociative disorder; only that Applicant, according to what the psychologist said, described that during the murder or the incident with the decedent, Applicant felt separated from his body.

20. Dr. Gripon also testified that, based on what he had heard; nothing supported a diagnosis of dissociative disorder. Dr. Gripon testified that a dissociative disorder was a specific condition which was a diagnosis and that dissociation itself was a phenomenon that can occur in any number of situations that have no relevance or no clinical relevance. He testified that there was a tremendous difference between those two.

21. When asked if you could have one or the other depending on what was found during a clinical examination, Dr. Gripon answered in the affirmative, explaining that it would depend on that particular point in attempting to extrapolate backward with that individual.

22. Dr. Gripon further testified that one would not normally expect a dissociative disorder if the individual had not had a previous occurrence or the presence of a current mental disorder.

23. Dr. Gripon also testified that, if a person seemed to have a clean bill of mental health, it would certainly not support the idea that they had had some dissociative episode at some time several years ago. Specifically, Dr. Gripon testified that although it was possible to have a dissociative episode without having a dissociative disorder, there was a reasonable psychiatric probability that it would not be likely to happen.

24. When asked if one could have a dissociative disorder that resolved, Dr. Gripon answered that it would not be psychiatrically probable. He reasoned that if there was no evidence of a mental disorder suggesting dissociative phenomenon in the individual at other times other than one single time, then it would be highly unlikely and certainly not psychiatrically probable.

4

25. Dr. Gripon testified that to make an accurate diagnosis of a dissociative disorder, one would need information which suggested that there was some dissociative phenomenon that had previously occurred. He also stated that, to make the diagnosis of a disorder that persists over time, one would have to have some information which supported that.

26. At that time, Dr. Gripon did not know that Applicant had suffered from childhood sexual abuse memories, the abusive degree to which decedent was capable of acting, or the fact that Applicant had extensive experience in hiding his sexual identity from the public. Furthermore, at this point, there was no evidence which indicated that the decedent was verbally abusive to, and about, individuals with whom Applicant was romantically involved.

27. Relying on Exhibit "C" - the affidavit of Alissa Sherry, PhD, the Court finds that one of the aspects of Post Traumatic Stress Disorder ("PTSD") is the ability for someone suffering from PTSD to "look" as if they have a clean bill of health.

### Evidence Discovered During the *Habeas Corpus* Investigation

28. During the *habeas corpus* investigation, Applicant's counsel discovered an itemized list of items removed from Applicant's home, during an initial search by authorities. In this list, she saw four self-help sexual abuse survivor books.

29. Counsel provided this information to Noel Bridget Busch-Armendariz, PhD, a psychologist who was working with Applicant.

30. After many months of discussion and additional interviews with Dr. Busch-Armendariz, Applicant was finally able to discuss severe sexual abuse which had occurred when he was an adolescent.

31. Applicant was also able to discuss new issues regarding decedent's lack of boundaries in this sexually abusive context.

32. Dr. Busch-Armendariz ascertained that a relative had abused Applicant and numerous other boys.

5

33. The Court is informed and finds that, as counsel for the State is now aware, "TH" (a pseudonym) was also sexually abused as a child by the same man who sexually abused Applicant when he was a child.

34. The Court finds that, like Applicant, TH also delayed outcry for a great number of years. He only came forward with allegations of abuse in 2009.

35. Relying on Exhibits "C" "D" and "E" - the affidavits of Alissa Sherry, PhD, Noel Bridget Busch-Armendariz PhD, Elizabeth Cohen, JD, LCSW, the Court finds that it is well known to forensic psychologists and other mental health professionals, that it is not unusual for victims of child sex abuse to hide the events due to extreme guilt and shame. This denial of abuse usually continues well into adulthood, and is even more prevalent when the sexual abuse is male-to-male.

36. Relying on the three aforementioned affidavits, and Shame and Guilt in Men Exposed to Childhood Sexual Abuse: A Qualitative Investigation, Martin J. Dorahy and Ken Clearwater; Journal of Child Sexual Abuse, Vol. 21, PP. 155-175 (2012); which was attached as Exhibit "C" to the *habeas corpus* application, the Court further finds that men are reluctant to report their abuse and seek counseling because they believe being a victim diminishes their self-reliance, independence and the freedom associated with the male ethic. Male victims of child sex abuse feel shame about same sex abuse, and fear the assumption that they will become abusers.

37. After the discovery of evidence of abuse, Applicant was examined by Dr. Richard Pesikoff, M.D., whom the Court finds to be a well-regarded psychiatrist with extensive experience in psychological assessments for both criminal and civil cases.

38. Dr. Pesikoff reviewed materials and met with Applicant. After performing a diligent and thorough examination of provided evidence, and a personal interview with the Applicant, Dr. Pesikoff provided a report to the State and Applicant, on December 15, 2013.

6

39. The Court has reviewed Dr. Pesikoff's Expert Evaluation, submitted to the Court as Exhibit "G." Relying on that evaluation, the Court finds that Dr. Pesikoff discovered details regarding Applicant's past abuse which had not been revealed prior to the *habeas corpus* investigation.

40. Relying on Exhibit "G," the Court finds that Applicant had an extensive history of having suffered severe, ongoing sexual abuse for six years between the ages of 12 and 18. The Court further finds that the perpetrator was Applicant's uncle, who also sexually abused a number of other boys, during and subsequent to his abuse of Applicant (including the aforementioned "TH"). The Court further finds that the instances of abuse went on until he was 18-years-old.

41. Relying on Exhibit "G," the Court finds that Applicant indicated that he knew Mr. and Mrs. Nugent for five years prior to Mr. Nugent's death. Applicant had reported that Mr. Nugent had kept his wife "under his thumb" and that he was trying to help her feel better and do more things after her husband's death. The Court further finds that Applicant told Dr. Pesikoff that, "everyone deserves a friend."

42. Relying on Exhibit "G," he Court further finds that Applicant also told Dr. Pesikoff that, at first, Ms. Nugent got along well with him, feeling like he was a son; a replacement for her biological son (and only child) with whom she had a severe falling out, many years previously. The Court further finds that Applicant stated that he and the decedent spent time together every day and then later traveled extensively over a period of few years; and that Applicant stated that they had a close relationship, and he enjoyed the attention that the decedent paid to him.

43. Relying on Exhibit "G," the Court further finds that gradually, over their five years together, the relationship between the decedent and Applicant significantly deteriorated, with the decedent becoming unbearably abusive, painfully controlling, and constantly demeaning of him. The Court further finds that Applicant reported that the decedent became extremely possessive and jealous, not allowing him to go any place without her; and that Applicant recited numerous examples of her mean and nasty behavior towards him during this

7

period including: (a) Making him shoot armadillos while she demeaned and ridiculed him -- he indicated he had never fired a rifle before in his life and intensely disliked killing the animals; (b) demanding he shave her legs while she was undressed and massage her back with her vibrator; and, (c) becoming extremely critical and accusatory of his friend, Chris, a younger man who worked as a gardener at her house (and with whom Applicant had a clandestine sexual relationship).

44. Relying on Exhibit "G," the Court further finds that Applicant indicated to Dr. Pesikoff that the decedent's anger continued to increase to the point that he attempted to end their relationship on many occasions. Applicant was unsure why he felt unable to simply pick up and leave -- even after the abusive treatment he received from the decedent. Applicant stated to Dr. Pesikoff that when picking up decedent's loaded rifle and shooting her, he felt like he "didn't feel like I was doing it" and that he was, "outside my body" during the entire experience.

45. During trial, Applicant presented expert testimony from Dr. Frederick Mears. The Court finds that Dr. Mears did not know that Applicant had been sexually abused, nor did he know of any specific instances regarding decedent's abusive treatment of Applicant or her immediate family.

46. Only part of Dr. Mears' testimony was admitted before the jury, although the State's expert, the well-regarded Dr. Edward Gripon, based his own testimony, before the jury, on information testified to by Dr. Mears both before the jury and during a bill of exception.

47. The Court finds that Dr. Gripon also did not know that Applicant had been the victim of both sexual abuse as a child and young adult, or of his abuse by the decedent.

48. Relying on Exhibit "H," the Court finds that, because of the lack of information, Dr. Gripon provided false evidence, both as to his opinion and to the underlying facts involved. In a statement provided to the Criminal District Attorney on January 28, 2014, Dr. Gripon stated: "At the time of trial, I did not know, nor was it known, that Mr. Tiede had a history of being sexually abused as a child, nor was the degree of

8

psychological, emotional and possibly-other abuse from Ms. Nugent to which Applicant was subjected known, at that time. I, also, did not know about the secret, sexually intimate relationship shared by Applicant and Chris, who worked for Ms. Nugent as a gardener, nor how demeaning and cruelly Chris was treated by Ms. Nugent. *** I testified that if a person seemed to have a clean bill of mental health, it would certainly not support the idea that they had a dissociative episode at some time several years prior. *** From what I've heard and knew, the defendant had an unremarkable mental health history. *** I was not aware of information indicating that Applicant was a victim of childhood sexual abuse, nor of the abusive nature to which the decedent had acted toward Applicant or his associates."

49. The evidence now available demonstrates that Applicant: (a) had a long history of being sexually abused, (b) had sustained a significant degree of psychological, emotional and other abuse by the decedent, and (c) did not have a "unremarkable mental health history." It is now also known that the decedent had acted in quite an abusive nature toward Applicant and/or his associates.

50. The Court also finds that, as as demonstrated by the affidavits of Alissa Sherry, PhD, Noel Bridget Busch-Armendariz, PhD, Elizabeth Cohen, JD, LCSW, submitted to the Court as Sealed Exhibits 1, 2 and 3, respectively, it is not unusual for victims of sexual child abuse to hide the events due to extreme guilt and shame. This denial of abuse usually continues well into adulthood, and is even more prevalent when the sexual abuse is male-to-male.

51. During sentencing, the jury had to decide what punishment would best fit the circumstances of the offense.

52. In order to make this assessment, the jury had to consider whether Applicant could have "snapped" or experienced a dissociative-type episode at the time of the offense, instead of premeditating the killing for financial gain.

53. Evidence that Applicant had a long history of being sexually abused and had sustained a significant degree of psychological, emotional and other abuse by the decedent, would have been important in making

this determination. Instead, what the jury heard was that Applicant had no history of being abused and had a clean mental health history.

## Effect of New Evidence on Dr. Mears' Testimony

54. Prior to the testimony of Dr. Mears before the jury, the prosecutor took the witness on voir dire. He stated that he was a clinical neuropsychologist and that he had doctorate degrees in psychology and neuropsychology. Dr. Mears examined Appellant three times and administered numerous psychological tests to him.

55. Dr. Mears stated that he would testify about Appellant's mental state and relation to traditional mental disorders as of the time of the offense.

56. Dr. Mears was prepared to testify as follows: (a) regarding the issues of "sudden passion" and "adequate cause," Appellant's capacity for cool reflection was degraded or diminished by the stress of his relationship with Nugent and the demands that she placed on him; (b) regarding the issue of Appellant's future dangerousness, Appellant posed no danger to anyone in the prison system; and (c) regarding Appellant's behavior after the offense, Dr. Mears would testify that Appellant had experienced certain dissociative episodes in which he mentally separated from the act of killing the decedent.

57. Fact "56c" was in direct response to the State's characterization of Appellant as a person who could kill Nugent in a cold, calculating fashion and then appear with a normal, undisturbed demeanor and conduct his usual business without effect.

58. Dr. Mears defined dissociative disorder as follows: "a situation in which the person can really more or less become somewhat different than they normally were, and it is an identified disorder as listed in the American Psychiatric Association's DSM4. *** So some people can become dissociative, and that means they really are sort of engaging in a high level of repression where they can almost develop two different aspects of themselves. Not a Dr. Jeckel-Mr. Hyde kind of thing. But they can have two different kinds of personalities so to

10

speak, or different kinds of behavior, and in some cases, that can be stress-induced behavior."

59. The State objected to Dr. Mears' testimony on the ground that it was not admissible under Rule 702, Tex.R.Evid., in that it was not helpful to the jury. The trial court allowed Dr. Mears to testify about dissociative behavior in general, but did not allow him to discuss his examination, testing, or evaluation of Appellant specifically.

60. When offering his opinion at the time of trial, the defense expert, Dr. Mears, did not know that Applicant had ever been sexually abused. He also did not know of any specific instances regarding decedent's abusive treatment of Applicant or her immediate family.

61. Relying on Exhibit "I," the Court finds that, had Dr. Mears learned that, contrary to his beliefs, Applicant had an extensive history of being sexually abused and had been abused by the decedent, Dr. Mears' voir dire testimony would have been greatly enhanced.

62. Relying on Exhibit "I," the Court finds that, had the new evidence been available at the time of trial, it is doubtful that the trial court would have excluded Dr. Mears' testimony in front of the jury.

### Effect on New Evidence Dr. Gripon's Testimony

63. With the new information supplied to him by Applicant and counsel for the State, and having considered the document submitted to the Court as Exhibit "I," Dr. Gripon interviewed Applicant on January 24, 2014. He also reviewed trial transcripts and other information.

64. Relying on Exhibit "H," the Court finds that, although he determined that Applicant is not currently mentally ill or suffering from any current mental disorder, Dr. Gripon stated that: "based on reasonable psychiatric probability, a review of his history and the history of the offense, as it is described, would indicate that he suffered from a Dissociate Episode, at that time. It would appear that the totality of his history of sexual abuse, his abusive/negative relationship with the victim and a culmination of other emotional factors resulted in an act of sudden passion/emotion."

11

65. Relying on Exhibit "H," the Court finds that there is a reasonable probability that a dissociative episode could have been involved in this offense and the subsequent behavior of the defendant.

### General Effect of New Evidence on the Prosecution

66. When the underlying conviction was obtained, the State was represented by its elected Criminal District Attorney, Danny Buck Davidson.

67. Having had the opportunity to review the newly discovered and/or newly available evidence in the case, Mr. Davidson, who is still the elected Criminal District Attorney, has indicated that, although he would still have prosecuted the case as a murder case, he would have sought a significantly lower sentence that he sought or obtained.

68. Specifically, Mr. Davidson has indicated that, with knowledge of all the newly available evidence, he would have sought only a twenty-year sentence. Furthermore, there would be no guarantee that Mr. Davidson would have received the requested sentence of 20 years; as the entire range of punishment for which Mr. Tiede was eligible was 2-20 years in TDCJ-CID.

### General Effect of the New Evidence on the Outcome of Trial

69. Had he known that Applicant had a long history of sexual abuse as a child and had been abused by the decedent herself, the testimony of Dr. Gripon, the State's expert, would have been significantly different.

70. Had Dr. Gripon been able to testify at trial in the manner set out in Sealed Exhibit 5, it is highly likely that the jury's verdict on punishment would have been different.

12

## Conclusions of Law

1.  The new evidence detailed in the sealed exhibits constitutes scientific evidence which was not available to be offered at the time of the trial in the instant case, and which contradicts scientific evidence relied on by the State at trial.

2.  Because of the new evidence detailed in the sealed exhibits, there is a reasonable probability that the outcome of the original trial court have been different.

3.  Because of the new evidence detailed in the sealed exhibits, the Court's confidence in the outcome of the punishment phase of trial is undermined.

## Recommendation

In accordance with the above and foregoing findings of fact and conclusions of law, the Court recommends to the Court of Criminal Appeals, that Applicant be granted relief in the form of a new punishment hearing.

# Order

The Clerk of the Court is hereby Ordered to immediately transfer to the Court of Criminal Appeals a supplemental Clerk's Record containing a true and correct copy of this document.

SIGNED this _6th_ day of _May_, 2014.

**JUDGE PRESIDING**

APPROVED AS TO FORM AND SUBSTANCE:

**Danny Buck Davidson**
Panola County Criminal District Attorney
SBN 05430800
Counsel for the State of Texas

**Jodi Callaway Cole**
Attorney at Law
SBN 24045602
Counsel for Applicant

14

**PLAINTIFF'S EXHIBIT**

6

THE TEXAS TRIBUNE

# 'Bernie' Goes Home With Director

By Brandi Grissom

May 8, 2014

CARTHAGE, Tex. — Richard Linklater could not have imagined a more bizarre final scene for "Bernie," the dark comedy film he directed, than the one that unfolded Tuesday in East Texas. After nearly two decades behind bars, the convicted killer on whom the movie was based was driven away from the jail (by Mr. Linklater no less) to a home in Central Texas owned by — you guessed it — Mr. Linklater.

The convict, Bernie Tiede, 55, in plain clothes for the first time in 17 years, slid into the front seat of the S.U.V. that Mr. Linklater had rented for the four-and-a-half hour drive. Mr. Tiede fiddled with an iPhone — flashy new technology to him — as he settled in for the ride from the rural, piney woods of Carthage, Tex., near the Louisiana border, to Mr. Linklater's modest home in an eclectic Austin neighborhood. Along the way, he stopped for brief but emotional reunions with friends he had not seen in years, and a meal at a Mexican restaurant, where he held a fork for the first time since 1997.

Mr. Linklater had always thought a life sentence was too harsh for Mr. Tiede. But he never thought that his 2011 film about the strange crime would lead to an early release.

"It was a dream, but only a dream," Mr. Linklater said. (Mr. Linklater is a major donor to The Texas Tribune.)

Mr. Tiede was convicted in 1999 of killing Marjorie Nugent, 81, whose body was discovered nine months after she was shot, wrapped in a sheet and tucked in her freezer beneath the potpies and vegetables. Mr. Tiede was released this week on a $10,000 bond after a judge agreed with his lawyers and the prosecutor who sent him to prison that his crime was one of passion and that he had been punished long enough.

Those involved in the case said that had it not been for Mr. Linklater's film, Mr. Tiede would still be behind bars.

No one feels that more acutely than Mrs. Nugent's relatives.

"I kind of feel like Hollywood has taken over the Texas criminal justice system," said Shanna Nugent, her 40-year-old granddaughter.

Ms. Nugent said she still missed her "Nanny" every day. The grandmother she recalled was nothing like the unkind character in Mr. Linklater's movie. Her grandmother, she said, was a sweet woman who canned green beans, taught her to cook and sewed her own clothes.

For Mr. Linklater, "Bernie" is no longer just a movie. Bernie is a friend and now a tenant.

Diane DeVasto, a state district judge, put several strict conditions on Mr. Tiede's release, including that he live on Mr. Linklater's property in Austin.

"I've been kind of overcredited here," Mr. Linklater said in an interview. "It's not a big deal for me to let him live in a garage apartment I own."

Mr. Linklater's film, which featured Jack Black, Shirley MacLaine and Matthew McConaughey, was based on a 1998 Texas Monthly article. It portrayed Mr. Tiede as a lovable, popular funeral director and church singer caught in an abusive relationship with a miserly wealthy widow.

A defense lawyer, Jodi Callaway Cole, saw the movie and asked Mr. Linklater for the trial transcripts. She had a hunch there was more to the story, and like the filmmaker, she thought a life sentence seemed too harsh.

"Jodi's the hero," Mr. Linklater said.

Ms. Cole began digging through the evidence and discovered a collection of self-help books for victims of sexual abuse in Mr. Tiede's library. She met with the inmate and asked psychiatrists to evaluate him. Eventually, he revealed that he had been sexually abused from ages 12 to 18 — something he had not told the lawyers during his original trial.

Richard Pesikoff, a psychiatrist, concluded that just as Mr. Tiede was unable to escape the abusive relationship of his youth, he was unable to extricate himself from what became an abusive relationship with Mrs. Nugent. Mr. Tiede said she forced him to shave her legs while she was undressed and to massage her back with a vibrator. He said she demeaned him and became critical and accusatory toward a male gardener with whom Mr. Tiede had a clandestine sexual relationship.

Dr. Pesikoff concluded that years of abuse caused Mr. Tiede to snap.

Ms. Cole asked District Attorney Danny Buck Davidson of Panola County — the prosecutor who had convinced jurors that Mr. Tiede was a murderous gold-digger — to consider the new evidence. In January, the prosecutor sent a psychiatric expert, Edward Gripon — the same one who had told jurors in 1999 that Mr. Tiede had no mental impairment — to interview the inmate.

Dr. Gripon agreed with Dr. Pesikoff's assessment. He concluded that after years spent repressing the effects of childhood abuse and hiding his homosexuality, Mr. Tiede learned to compartmentalize his emotions, allowing him to act normally for the months after the murder.

Mr. Davidson said he was beginning to change his view of the crime when he met Todd Hine, a man who had grown up in the same Louisiana town, attended church with and participated in a youth group led by the man Mr. Tiede said had abused him. Mr. Hine, nearly a decade younger than Mr. Tiede, broke down in tears in the prosecutor's office as he described abuse nearly identical to what Mr. Tiede said he had experienced.

At Tuesday's hearing, Mr. Davidson submitted an affidavit in which he said that if he had known of the abuse Mr. Tiede suffered, he would have sought a lesser sentence. Mr. Davidson said he agreed with the inmate's lawyers that Mr. Tiede should be released.

Mr. Linklater teared up as the prosecutor read the remarks. Mr. Tiede spent much of the hearing lifting his wire-framed glasses to wipe away tears.

"Ideally, in the criminal justice system, prosecutors are the good guys," Mr. Davidson said. "We should never be afraid of the truth, no matter where it leads us in our quest for justice."

After Mr. Tiede's release, Mr. Linklater played down his role in the cascade of events and cast of characters that led to Mr. Tiede's freedom. Mr. Tiede remains on bond until the Texas Court of Criminal Appeals makes a final ruling. Violating the bond conditions, which include a prohibition on speaking with the news media, could send him back to prison.

Mr. Linklater said Mr. Tiede recognized that his path forward would be fraught with challenges. But before Mr. Tiede starts tackling them, Mr. Linklater said, there is one thing his new tenant wants to do: watch the movie that made his case famous.

"I told him, 'Well, you have to like it, Bernie, because it was the first domino,' " Mr. Linklater said.

bgrissom@texastribune.org

A version of this article appears in print on , Section A, Page NaN of the National edition with the headline: 'Bernie' Goes Home With Director



FILED

20¼ DEC I AM II: 56

DIST. CT.
PANOLA COUNTY TEXAS





# IN THE COURT OF CRIMINAL APPEALS OF TEXAS

### NO. WR-81,532-01

### EX PARTE BERNHARDT TIEDE, II, Applicant

### ON APPLICATION FOR A WRIT OF HABEAS CORPUS CAUSE NO. 1997-C-103-A IN THE 123RD DISTRICT COURT FROM PANOLA COUNTY

*Per curiam.* ALCALA, J., filed a concurring opinion in which PRICE, JOHNSON, and COCHRAN JJ., joined. KELLER, P.J., filed a dissenting opinion in which KEASLER and HERVEY, JJ., joined. MEYERS, J., would file and set.

## OPINION

Pursuant to the provisions of Article 11.07 of the Texas Code of Criminal Procedure, the clerk of the trial court transmitted to this Court this application for a writ of habeas corpus. *Ex parte Young*, 418 S.W.2d 824, 826 (Tex. Crim. App. 1967). Applicant was convicted of murder and sentenced to life imprisonment. The Twelfth Court of Appeals affirmed his conviction. *Tiede v. State*, No. 12-99-00182-CR (Tex. App.—Tyler, delivered November 20, 2002, pet. ref'd).

Applicant alleges there is newly available relevant scientific evidence that contradicts the scientific evidence relied upon by the State at trial, and that false evidence was presented at trial thus

153

undermining confidence in the verdict at sentencing.

The trial court, after conducting a live hearing and based upon an extensive record, has recommended that Applicant be granted relief in the form of a new punishment hearing. The State agrees that Applicant is entitled to relief. *Ex parte Weinstein*, 421 S.W.3d 656 (Tex. Crim. App. 2014).

Relief is granted. The sentence in Cause No. 1997-C-103-A in the 123rd District Court of Panola County is set aside, and Applicant is remanded to the custody of the Sheriff of Panola County so that a new punishment hearing may be conducted. The trial court shall issue any necessary bench warrant within 10 days after the mandate of this Court issues.

Copies of this opinion shall be sent to the Texas Department of Criminal Justice–Correctional Institutions Division and Pardons and Paroles Division.

Delivered: November 26, 2014
Publish

FILE COPY



**SHARON KELLER**
PRESIDING JUDGE

**LAWRENCE MEYERS**
**TOM PRICE**
**PAUL WOMACK**
**CHERYL JOHNSON**
**MIKE KEASLER**
**BARBARA P. HERVEY**
**CATHY COCHRAN**
**ELSA ALCALA**
JUDGES

## COURT OF CRIMINAL APPEALS
P.O. BOX 12308, CAPITOL STATION
AUSTIN, TEXAS 78711

**ABEL ACOSTA**
CLERK
(512) 463-1551

**SIAN SCHILHAB**
GENERAL COUNSEL
(512) 463-1597

Wednesday, November 26, 2014

District Attorney Panola County
County Courthouse
Rm. 103
Carthage, TX 75633
* DELIVERED VIA E-MAIL *

David A. Schulman
Attorney at Law
P.O. Box 783
Austin, TX 78767
* DELIVERED VIA E-MAIL *

Charles "Chad" Baruch
3201 Main Street
Rowlett, TX 75088
* DELIVERED VIA E-MAIL *

Jodi Callaway Cole
502 West 30th Street
Austin, TX 78705

District Clerk Panola County
County Courthouse
Carthage, TX 75633
* DELIVERED VIA E-MAIL *

John G. Jasuta
Attorney At Law
P. O. Box 783
Austin, TX 78767
* DELIVERED VIA E-MAIL *

Re: Tiede, Bernhardt II
CCA No. WR-81,532-01
**Trial Court Case No. 1997-C-103-A**

COA No. 12-99-00182-CR

The court has issued an opinion on the above referenced cause number.

Sincerely,

Abel Acosta, Clerk

cc:  Joni White (DELIVERED VIA E-MAIL)
Sharon Felfe Howell (DELIVERED VIA E-MAIL)
123rd District Court Presiding Judge

SUPREME COURT BUILDING, 201 WEST 14TH STREET, ROOM 106, AUSTIN, TEXAS 78701
WEBSITE WWW.TXCOURTS.GOV/CCA.ASPX

155



FILE COPY

FILED

20__ DEC 23 AM II: 52

___ A. JOHNSON, CLERK
___ DISTRICT COURT
PANOLA COUNTY, TEXAS
BY: ___



## TEXAS COURT OF CRIMINAL APPEALS

### Austin, Texas

# M A N D A T E

THE STATE OF TEXAS,

## TO THE 123RD DISTRICT COURT OF PANOLA COUNTY — GREETINGS:

Before our **COURT OF CRIMINAL APPEALS**, on **NOVEMBER 26, 2014**, the cause upon an Application for Writ of Habeas Corpus styled:

### EX PARTE BERNHARDT TIEDE, II

CCRA No. WR-81,532-01

Tr. Crt. No. 1997-C-103-A

was determined; and therein our said **COURT OF CRIMINAL APPEALS** made its order in these words:

"This cause came on to be heard on the Application for Writ of Habeas Corpus, and the same being considered, it is **ORDERED, ADJUDGED AND DECREED** that **HABEAS CORPUS RELIEF IS GRANTED**, in accordance with the Opinion of this Court, and that this Decision be certified below for Observance."

**WHEREFORE,** We command you to observe the order of our said **COURT OF CRIMINAL APPEALS** in this behalf and in all things have it duly recognized, obeyed and executed.

WITNESS, **THE HONORABLE SHARON KELLER**, Presiding Judge

of our said **COURT OF CRIMINAL APPEALS,**

with the Seal thereof annexed, at the City of Austin,

on this day **Monday, December 22, 2014.**

**ABEL ACOSTA**, Clerk

**PLAINTIFF'S EXHIBIT**



CAUSE NO. 1997-C-103
CAUSE NO. 1997-C-103A

| | | |
|---|---|---|
| THE STATE OF TEXAS | § | IN THE 123RD JUDICIAL |
| v. | § | DISTRICT COURT OF |
| BERNHARDT TIEDE, II | § | PANOLA COUNTY, TEXAS |

## JOINT MOTION TO MODIFY CONDITIONS OF SUPERVISED RELEASE

TO THE HONORABLE JUDGE DIANE V. DEVASTO, VISITING JUDGE OF THE 123RD JUDICIAL DISTRICT COURT OF PANOLA COUNTY, TEXAS:

COMES NOW Bernhardt Tiede, II, TDCJ # 00864378, Applicant in the above-styled and numbered cause, by and through his undersigned counsel, to request the following:

Mr. Tiede was released from incarceration pursuant to a Texas Code of Criminal Procedure 11.65 bond and a personal bond for Cause No. 1997-C-104 on May 6, 2014. Mr. Tiede's community supervision was transferred to Travis County Pretrial Services for courtesy supervision from Panola County. Mr. Tiede requests that this Honorable Court modify Mr. Tiede's conditions of supervision so that Travis County Pretrial Services may effectively supervise Mr. Tiede. The modified conditions of supervision would be the following:

1. Submit to random drug testing at Mr. Tiede's expense;
2. Report to Travis County Pretrial Services within 48 hours of release;

**FILED**

9:29 _____ O'clock _A_ .M.

MAY 21 2014

_Debra Johnson_
DEBRA JOHNSON, CLERK
DISTRICT COURT & COUNTY
COURT AT LAW, PANOLA CO., TX

BY _____ 117 _____ DEPUTY

1

3. Any supervision fees related to Travis County's courtesy supervision should be paid by Mr. Tiede as a bond condition;

4. Live in designated residence, the location of which this Court will directly provide to Travis County Pretrial Supervision;

5. Maintain employment with designated employer, the location of which this Court will directly provide to Travis County Pretrial Supervision;

6. Surrender any passport to the Court as verified through Mr. Tiede or his attorney;

7. Not obtain a passport or other international travel document;

8. No voluntary contact with media;

9. No change of address without informing Travis County Pretrial Services and the Court in writing within 12 hours of the address change;

10. No change of employment without informing Travis County Pretrial Services and the Court in writing within 12 hours of the employment change;

11. No travel outside of Travis County, Bastrop County, Williamson County, Caldwell County, Hays County, Burlison County, and Comal County without prior permission from the Court;

12. Fully adhere to terms specified in "Treatment Plan" at Mr. Tiede's expense;

13. Participate in family counseling with sister as recommended by therapist;

14. No contact with victim's family;

15. Any other conditions required by Travis County Pretrial Supervision;

16. Mr. Tiede may not possess, buy, or receive any firearms, ammunition, or explosive device;

17. Mr. Tiede should not participate in social media during the pendency of Cause Nos. 1997-C-103/103A and 1997-C-104, including, but not limited to, participation on Facebook or Twitter.

2

These modifications of the conditions of Mr. Tiede's supervised release will facilitate a smooth transition for Travis County Pretrial Services, the State, Mr. Tiede, and the Court. Because the requested modifications of conditions result in a more stringent supervision, elected Panola County Criminal District Attorney, Mr. Danny Buck Davidson, joins in this motion.

Jointly Filed by:


JODI CALLAWAY COLE
Attorney for Bernhardt Tiede, II
Law Firm of Jodi Cole
502 West 30th Street
Austin, Texas 78705
Telephone: (512) 926-5634
Facsimile: (512) 692-2575

DANNY BUCK DAVIDSON
Attorney for the State of Texas
Panola Co. Criminal District Attorney
108 South Sycamore, Room 301
Carthage, Texas 75633
Telephone: (903) 693-0310
Facsimile: (903) 693-0368

## CERTIFICATE OF SERVICE

Although jointly filed, I certify by my signature above that a true and correct copy of the foregoing has been mailed, faxed, or hand delivered to the Panola County District Attorney's Office and Travis County Pretrial Services on this the 15 day of May, 2014.


By: _____
JODI CALLAWAY COLE

**PLAINTIFF'S EXHIBIT**



At _____ O'clock _____ M.

CAUSE NO. 1997-C-103
CAUSE NO. 1997-C-103A

MAY 27 2014

DEBRA JOHNSON, CLERK
DISTRICT COURT & COUNTY
COURT AT LAW, PANOLA CO., TX

| THE STATE OF TEXAS | § | IN THE 123RD JUDICIAL ___ DEPUTY |
| v. | § | DISTRICT COURT OF |
| BERNHARDT TIEDE, II | § | PANOLA COUNTY, TEXAS |

### ORDER ON JOINT MOTION TO MODIFY CONDITIONS OF SUPERVISED RELEASE

Came on this day to be considered Bernhardt Tiede, II's Joint Motion to Modify Conditions of Supervised Release. The Court, having carefully reviewed the file, finds that this motion should be GRANTED/denied.

If granted, Mr. Tiede's conditions of community supervision shall be modified, so that they are the following:

1. Submit to random drug testing at Mr. Tiede's expense;

2. Report to Travis County Pretrial Services within 48 hours of release;

3. Any supervision fees related to Travis County's courtesy supervision should be paid by Mr. Tiede as a bond condition;

4. Live in designated residence, the location of which this Court will directly provide to Travis County Pretrial Supervision;

5. Maintain employment with designated employer, the location of which this Court will directly provide to Travis County Pretrial Supervision;

6. Surrender any passport to the Court as verified through Mr. Tiede or his attorney;

7. Not obtain a passport or other international travel document;

8. No voluntary contact with media;

1

9. No change of address without informing Travis County Pretrial Services and the Court in writing within 12 hours of the address change;

10. No change of employment without informing Travis County Pretrial Services and the Court in writing within 12 hours of the employment change;

11. No travel outside of Travis County, Bastrop County, Williamson County, Caldwell County, Hays County, Burlison County, and Comal County without prior permission from the Court;

12. Fully adhere to terms specified in "Treatment Plan" at Mr. Tiede's expense;

13. Participate in family counseling with sister as recommended by therapist;

14. No contact with victim's family;

15. Any other conditions required by Travis County Pretrial Supervision;

16. Mr. Tiede may not possess, buy, or receive any firearms, ammunition, or explosive device;

17. Mr. Tiede should not participate in social media during the pendency of Cause Nos. 1997-C-103/103A and 1997-C-104, including, but not limited to, participation on Facebook or Twitter.

Mr. Tiede's supervised release will be subject to any conditions imposed by the convicting court until he is denied relief, remanded to custody, or ordered release. Applicant will be considered restrained in his liberty while released on this bond, for purposes of Chapter 11 of the Texas Code of Criminal Procedure.

So ordered on this the 2/ day of May, 2014.

Honorable District Judge Diane V. DeVasto
Visiting Judge of the 123rd District Court
Panola County, Texas

2





**PLAINTIFF'S EXHIBIT**

K

**Travis County Pretrial Services**

*a division of the Adult Probation Department*

411 West 13th Street 5th Floor Room 501
Austin, TX 78701
512-854-9381
512-854-6407 Fax

October 22, 2015

Honorable Judge Diane V DeVasto

This letter is a summary update on Bernhardt Tiede's compliance with Travis County Pretrial Services. Mr. Tiede continues to comply with the requirement of Pretrial Services Supervision. He has been cooperative and has reported as instructed. There have been no violations.

Mr. Tiede continues to participate in ongoing therapy with Elizabeth Cohen and he continues to attend counseling at Safe Place. He is also active in the Capital City Men's Chorus.

Mr. Tiede has been drug tested on ten (10) occasions (5/13/14, 7/10/14, 9/9/14, 11/5/14, 1/20/15, 3/11/15, 6/15/15, 7/23/15, 9/3/15 and 10/16/15) and all drug test results have been negative. Mr. Tiede is employed part at Texas Criminal Justice Coalition and he also works part time at Texas Jail Project.

If additional information is required or for any questions please feel free to contact me

Sincerely,

Leo Cruz
Senior Pretrial Officer
Mental Health Supervision/Electronic Monitoring
Executive Office Building (EOB)
411 W. 13th St. 5th Floor Rm. 501
Office (512) 854 – 4506
Fax     (512) 854 - 6407
Leo.cruz@traviscountytx.gov

**PLAINTIFF'S EXHIBIT**

2



CASE No. 1997-C-103    COUNT 1
INCIDENT NO./TRN: 0204510872

**FILED**
2016 APR 29 PM 1:40
DEBRA JOHNSON, CLERK
DISTRICT COURT
RUSK COUNTY, TEXAS
_____ DEPUTY

| | | |
|---|---|---|
| **THE STATE OF TEXAS** | § | **IN THE 123RD DISTRICT** |
| | § | |
| v. | § | **COURT** |
| | § | |
| **BERNHARDT TIEDE, II** | § | **RUSK COUNTY, TEXAS** |
| | § | |
| STATE ID No.: TX05931666 | § | On change of venue from PANOLA COUNTY |

## JUDGMENT OF RESENTENCING BY JURY

| | | | |
|---|---|---|---|
| Judge Presiding: | HON. DIANE V. DEVASTO | Date Judgment Entered: | 4/22/2016 |
| Attorney for State: | LISA TANNER | Attorney for Defendant: | JODI COLE |

Offense for which Defendant Convicted:
**MURDER INTENTIONALLY CAUSE DEATH**

| Charging Instrument: | Statute for Offense: |
|---|---|
| **INDICTMENT** | **19.02(b)(1) Penal Code** |

Date of Offense:
**11/19/1996**

| Degree of Offense: | Plea to Offense: |
|---|---|
| **1ST DEGREE FELONY** | **NOT GUILTY** |

| Verdict of Jury: | Findings on Deadly Weapon: |
|---|---|
| **GUILTY** | **N/A** |

| Plea to 1st Enhancement Paragraph: | N/A | Plea to 2nd Enhancement/Habitual Paragraph: | N/A |
|---|---|---|---|
| Findings on 1st Enhancement Paragraph: | N/A | Findings on 2nd Enhancement/Habitual Paragraph: | N/A |

| Punished Assessed by: | Date Sentence Imposed: | Date Sentence to Commence: |
|---|---|---|
| **JURY** | **04/22/2016** | **4/22/2016** |

Punishment and Place of Confinement:    **NINETY-NINE (99) YEARS TO LIFE  INSTITUTIONAL DIVISION, TDCJ**

THIS SENTENCE SHALL RUN **CONCURRENTLY.**

☐ SENTENCE OF CONFINEMENT SUSPENDED, DEFENDANT PLACED ON COMMUNITY SUPERVISION FOR N/A .

| Fine: | Court Costs: | Restitution: | Restitution Payable to: |
|---|---|---|---|
| $ N/A | $ N/A | $ N/A | ☐ VICTIM (see below)   ☐ AGENCY/AGENT (see below) |

☐ Attachment A, Order to Withdraw Funds, is incorporated into this judgment and made a part hereof.

Sex Offender Registration Requirements do not apply to the Defendant. TEX. CODE CRIM. PROC. chapter 62.

The age of the victim at the time of the offense was N/A .

If Defendant is to serve sentence in TDCJ, enter incarceration periods in chronological order.

| Time Credited: | From 8/18/1997 to 5/6/2014 | From 4/22/2016 to PRESENT | From     to |
|---|---|---|---|
| | From     to | From     to | From     to |

If Defendant is to serve sentence in county jail or is given credit toward fine and costs, enter days credited below.

N/A DAYS   NOTES: N/A

All pertinent information, names and assessments indicated above are incorporated into the language of the judgment below by reference.

This cause was called for trial in            County, Texas. The State appeared by her District Attorney.

Counsel / Waiver of Counsel (select one)
☒ Defendant appeared in person with Counsel.
☐ Defendant knowingly, intelligently, and voluntarily waived the right to representation by counsel in writing in open court.

It appeared to the Court that Defendant was mentally competent and had pleaded as shown above to the charging instrument. Both parties announced ready for trial. A jury was selected, impaneled, and sworn. The INDICTMENT was read to the jury, and Defendant entered a plea to the charged offense. The Court received the plea and entered it of record.

The jury heard the evidence submitted and argument of counsel. The Court charged the jury as to its duty to determine the guilt or innocence of Defendant, and the jury retired to consider the evidence. Upon returning to open court, the jury delivered its verdict in the presence of Defendant and defense counsel, if any.

391

The Court received the verdict and ORDERED it entered upon the minutes of the Court.

**Punishment Assessed by Jury / Court / No election (select one)**

☒ **Jury.** Defendant entered a plea and filed a written election to have the jury assess punishment. The jury heard evidence relative to the question of punishment. The Court charged the jury and it retired to consider the question of punishment. After due deliberation, the jury was brought into Court, and, in open court, it returned its verdict as indicated above.

☐ **Court.** Defendant elected to have the Court assess punishment. After hearing evidence relative to the question of punishment, the Court assessed Defendant's punishment as indicated above.

☐ **No Election.** Defendant did not file a written election as to whether the judge or jury should assess punishment. After hearing evidence relative to the question of punishment, the Court assessed Defendant's punishment as indicated above.

The Court FINDS Defendant committed the above offense and ORDERS, ADJUDGES AND DECREES that Defendant is GUILTY of the above offense. The Court FINDS the Presentence Investigation, if so ordered, was done according to the applicable provisions of TEX. CODE CRIM. PROC. art. 42.12 § 9.

The Court ORDERS Defendant punished as indicated above. The Court ORDERS Defendant to pay all fines, court costs, and restitution as indicated above.

**Punishment Options (select one)**

☒ **Confinement in State Jail or Institutional Division.** The Court ORDERS the authorized agent of the State of Texas or the Sheriff of this County to take, safely convey, and deliver Defendant to the Director, Institutional Division, TDCJ. The Court ORDERS Defendant to be confined for the period and in the manner indicated above. The Court ORDERS Defendant remanded to the custody of the Sheriff of this county until the Sheriff can obey the directions of this sentence. The Court ORDERS that upon release from confinement, Defendant proceed immediately to the ____. Once there, the Court ORDERS Defendant to pay, or make arrangements to pay, any remaining unpaid fines, court costs, and restitution as ordered by the Court above.

☐ **County Jail—Confinement / Confinement in Lieu of Payment.** The Court ORDERS Defendant immediately committed to the custody of the Sheriff of ____ County, Texas on the date the sentence is to commence. Defendant shall be confined in the County Jail for the period indicated above. The Court ORDERS that upon release from confinement, Defendant shall proceed immediately to the ____. Once there, the Court ORDERS Defendant to pay, or make arrangements to pay, any remaining unpaid fines, court costs, and restitution as ordered by the Court above.

☐ **Fine Only Payment.** The punishment assessed against Defendant is for a FINE ONLY. The Court ORDERS Defendant to proceed immediately to the Office of the ____ County. Once there, the Court ORDERS Defendant to pay or make arrangements to pay all fines and court costs as ordered by the Court in this cause.

**Execution / Suspension of Sentence (select one)**

☒ The Court ORDERS Defendant's sentence EXECUTED.

☐ The Court ORDERS Defendant's sentence of confinement SUSPENDED. The Court ORDERS Defendant placed on community supervision for the adjudged period (above) so long as Defendant abides by and does not violate the terms and conditions of community supervision. The order setting forth the terms and conditions of community supervision is incorporated into this judgment by reference.

The Court ORDERS that Defendant is given credit noted above on this sentence for the time spent incarcerated.

**Furthermore, the following special findings or orders apply:**

Signed and entered on April 27, 2016

_[signature]_

DIANE V. DEVASTO
JUDGE PRESIDING

Clerk:

Right Thumbprint


**PLAINTIFF'S EXHIBIT**

**M**



CASE NO. 1997-C-103    COUNT 1
INCIDENT NO./TRN: 0204510872

**FILED**

2016 JUL -8 PM 1: 18

DEERA JOHNSON CLERK
DISTRICT COURT
RUSK COUNTY, TEXAS

| | | |
|---|---|---|
| **THE STATE OF TEXAS** | | IN THE **123RD** DISTRICT |
| **v.** | | COURT |
| **BERNHARDT TIEDE, II** | | RUSK COUNTY, TEXAS |
| STATE ID NO : TX05931686 | | On change of venue from PANOLA COUNTY |

# NUNC PRO TUNC
## JUDGMENT OF RESENTENCING BY JURY

| | | | |
|---|---|---|---|
| Judge Presiding: | HON. | Date Judgment Entered: | 4/22/2016 |
| Attorney for State: | **LISA TANNER** | Attorney for Defendant: | **MIKE DEGEURIN** |

**Offense for which Defendant Convicted:**
**MURDER INTENTIONALLY CAUSE DEATH**

| | |
|---|---|
| **Charging Instrument:** **INDICTMENT** | **Statute for Offense:** **19.02(b)(1) Penal Code** |
| **Date of Offense:** **11/19/1996** | |
| **Degree of Offense:** **1ST DEGREE FELONY** | **Plea to Offense:** **NOT GUILTY** |
| **Verdict of Jury:** **GUILTY** | **Findings on Deadly Weapon:** **N/A** |

| | | | |
|---|---|---|---|
| Plea to 1st Enhancement Paragraph: | N/A | Plea to 2nd Enhancement/Habitual Paragraph: | N/A |
| Findings on 1st Enhancement Paragraph: | N/A | Findings on 2nd Enhancement/Habitual Paragraph: | N/A |

| | | |
|---|---|---|
| Punished Assessed by: **JURY** | Date Sentence Imposed: **4/22/2016** | Date Sentence to Commence: **4/22/2016** |

**Punishment and Place of Confinement:**     **NINETY-NINE YEARS INSTITUTIONAL DIVISION, TDCJ**

**THIS SENTENCE SHALL RUN CONCURRENTLY.**

☐ SENTENCE OF CONFINEMENT SUSPENDED, DEFENDANT PLACED ON COMMUNITY SUPERVISION FOR **N/A** .

| | | | |
|---|---|---|---|
| **Fine:** $ N/A | Court Costs: $ | Restitution: $ N/A | Restitution Payable to: ☐ VICTIM (see below) ☐ AGENCY/AGENT (see below) |

☐ Attachment A, Order to Withdraw Funds, is incorporated into this judgment and made a part hereof.

Sex Offender Registration Requirements do not apply to the Defendant. TEX. CODE CRIM. PROC. chapter 62.

The age of the victim at the time of the offense was **N/A** .

| | | | | |
|---|---|---|---|---|
| Time Credited: | If Defendant is to serve sentence in TDCJ, enter incarceration periods in chronological order. | | | |
| | From 8/18/1997 to 5/6/2014 | From 4/22/2016 to PRESENT | From to | |
| | From to | From to | From to | |
| | If Defendant is to serve sentence in county jail or is given credit toward fine and costs, enter days credited below. | | | |

**N/A DAYS**   **NOTES: N/A**

All pertinent information, names and assessments indicated above are incorporated into the language of the judgment below by reference.

This cause was called for trial in Rusk County, Texas. The State appeared by her District Attorney.

**Counsel / Waiver of Counsel (select one)**

☒ Defendant appeared in person with Counsel.
☐ Defendant knowingly, intelligently, and voluntarily waived the right to representation by counsel in writing in open court.

It appeared to the Court that Defendant was mentally competent and had pleaded as shown above to the charging instrument. Both parties announced ready for trial. A jury was selected, impaneled, and sworn. The INDICTMENT was read to the jury, and Defendant entered a plea to the charged offense. The Court received the plea and entered it of record.

The jury heard the evidence submitted and argument of counsel. The Court charged the jury as to its duty to determine the guilt or innocence of Defendant, and the jury retired to consider the evidence. Upon returning to open court, the jury delivered its verdict in the presence of Defendant and defense counsel, if any.

The Court received the verdict and ORDERED it entered upon the minutes of the Court.

**Punishment Assessed by Jury / Court / No election (select one)**

☒ Jury. Defendant entered a plea and filed a written election to have the jury assess punishment. The jury heard evidence relative to the question of punishment. The Court charged the jury and it retired to consider the question of punishment. After due deliberation, the jury was brought into Court, and, in open court, it returned its verdict as indicated above.

☐ Court. Defendant elected to have the Court assess punishment. After hearing evidence relative to the question of punishment, the Court assessed Defendant's punishment as indicated above.

☐ No Election. Defendant did not file a written election as to whether the judge or jury should assess punishment. After hearing evidence relative to the question of punishment, the Court assessed Defendant's punishment as indicated above.

The Court FINDS Defendant committed the above offense and ORDERS, ADJUDGES AND DECREES that Defendant is GUILTY of the above offense. The Court FINDS the Presentence Investigation, if so ordered, was done according to the applicable provisions of TEX. CODE CRIM. PROC. art. 42.12 § 9.

The Court ORDERS Defendant punished as indicated above. The Court ORDERS Defendant to pay all fines, court costs, and restitution as indicated above.

**Punishment Options (select one)**

☒ Confinement in State Jail or Institutional Division. The Court ORDERS the authorized agent of the State of Texas or the Sheriff of this County to take, safely convey, and deliver Defendant to the Director, Institutional Division, TDCJ. The Court ORDERS Defendant to be confined for the period and in the manner indicated above. The Court ORDERS Defendant remanded to the custody of the Sheriff of this county until the Sheriff can obey the directions of this sentence. The Court ORDERS that upon release from confinement, Defendant proceed immediately to the            . Once there, the Court ORDERS Defendant to pay, or make arrangements to pay, any remaining unpaid fines, court costs, and restitution as ordered by the Court above.

☐ County Jail—Confinement / Confinement in Lieu of Payment. The Court ORDERS Defendant immediately committed to the custody of the Sheriff of            County, Texas on the date the sentence is to commence. Defendant shall be confined in the County Jail for the period indicated above. The Court ORDERS that upon release from confinement, Defendant shall proceed immediately to the            . Once there, the Court ORDERS Defendant to pay, or make arrangements to pay, any remaining unpaid fines, court costs, and restitution as ordered by the Court above.

☐ Fine Only Payment. The punishment assessed against Defendant is for a FINE ONLY. The Court ORDERS Defendant to proceed immediately to the Office of the            County. Once there, the Court ORDERS Defendant to pay or make arrangements to pay all fines and court costs as ordered by the Court in this cause.

**Execution / Suspension of Sentence (select one)**

☒ The Court ORDERS Defendant's sentence EXECUTED.

☐ The Court ORDERS Defendant's sentence of confinement SUSPENDED. The Court ORDERS Defendant placed on community supervision for the adjudged period (above) so long as Defendant abides by and does not violate the terms and conditions of community supervision. The order setting forth the terms and conditions of community supervision is incorporated into this judgment by reference.

The Court ORDERS that Defendant is given credit noted above on this sentence for the time spent incarcerated.

**Furthermore, the following special findings or orders apply:**

Signed and entered on ____ July 7, 2016

_DIANE V. DEVASTO_
JUDGE PRESIDING

Clerk:

**Right Thumbprint**



PLAINTIFF'S
EXHIBIT

N


**PLAINTIFF'S EXHIBIT**

Date:  02/27/2022 13:22
From:  DONNA BURTON LVN
Facility: ESTELLE (E2)

To:  COLEMAN, REBECCA L;
Subject:  TIEDE #864378
Re:  BERNHARDT TIEDE -  MRN: 864378 - UOA: ESTELLE (E2) (878)

## VISUALCORRECTIONAL  MANAGED CARE
### VISUAL ACUITY TEST

**Patient Name:**  TIEDE, BERNHARDT**TDCJ#:**  864378**Date:**
**Facility:**  ESTELLE (E2)
**Most recent vitals from 2/27/2022:** BP: 156 / 87 (Sitting)  Wt. 240.4 Lbs. Height 75 In. Pulse:  82 (Sitting) Resp.:  18 / minTemp: 98.4 (Forehead)
**Age:**  63

| Patient Language:  ENGLISH | Name of Interpreter: |
|---|---|

REASON FOR THE EXAM:

Related Health Problems:

| Diabetes | Yes: X | No: |
|---|---|---|
| Hypertension | Yes: X | No: |
| Infections Disease | Yes: | No: X |
| Other/Program Participation:   N/A | | |

Eyewear Status:

| Wears glasses: | Yes: X | No: | |
|---|---|---|---|
| Wear contacts | Yes: | No:   X | |
| In possession at this time | Yes: | No:   X | N/A |
| In good condition | Yes: | No: | N/A X |
| Lost | Yes: | No: | N/A X |
| Broken beyond unit repair | Yes: | No: | N/A X |
| TDCJ issued: | Yes: X | No: | |
| Date issued: 11-30-07 (HAS FREE WORLD GLASSES THAT ARE OLD) | | | |

| FAR VISION (20 FEET OPTICAL CHART) | | | |
|---|---|---|---|
| WITHOUT GLASSES | | WITH GLASSES | |
| RIGHT EYE: | 20/50 | RIGHT EYE: | BLURRED |
| LEFT EYE: | 20/25 | LEFT EYE: | BLURRED |
| BOTH EYES: | 20/25 | BOTH EYES: | BLURRED |

NEAR VISION (ROSENBAUM NEAR CARD)

| WITHOUT GLASSES | | WITH GLASSES | |
|---|---|---|---|
| RIGHT EYE: | BLURRED | RIGHT EYE: | BLURRED |
| LEFT EYE: | BLURRED | LEFT EYE: | 20/400 |
| BOTH EYES: | BLURRED | BOTH EYES: | 20/400 |

## CORRECTIONAL MANAGED HEALTH CARE
### Unit Provider Emergency Room Note

Name: TIEDE, BERNHARDT I  
TDCJ#: 864378

Date: 06/22/2023 20:03  
Facility: ESTELLE (E2)

Age: 64  DOB: 08/02/1958  Sex: Male  Race: WHITE  DOI: 3/26/1999

**Patient Language:** ENGLISH

**Most recent vitals from 6/22/2023:**

| BP: 157 / 83 (Sitting) | Weight: | Height: 75 In. | BMI: |
|---|---|---|---|
| Pulse: 77 (Sitting) | Resp: 16 / min | Temp: 97.8 (Oral) | O2 Sat: 100% RA |

**Allergies:** ACE INHIBITORS

**Current Medications:**

**ALBUTEROL HFA INH 6.7G 200PF**  
2 PUFFS INHALATION 4 TIMES DAILY  
for 180 Days KOP  As Needed (PRN)

EXPIRATION DATE: 2/05/2024 01:03:00PM  
REFILLS: 0 / 1

LAST DATE GIVEN KOP: 02/13/2023 06:19:24PM  
ORDERING PROVIDER: BARBER, MARK A

ORDERING FACILITY: ESTELLE (E2)

**AMLODIPINE 10MG TABLET**  
1 TABS ORAL EVERY MORNING for 30  
Days KOP

EXPIRATION DATE: 2/05/2024 01:01:00PM  
REFILLS: 4 / 11

LAST DATE GIVEN KOP: 06/12/2023 09:53:57PM  
ORDERING PROVIDER: BARBER, MARK A

ORDERING FACILITY: ESTELLE (E2)

**ASPIRIN EC 81MG TABLET**  
1 TABS ORAL EVERY MORNING for 30  
Days KOP

EXPIRATION DATE: 8/01/2023 01:25:00AM  
REFILLS: 10 / 11

LAST DATE GIVEN KOP: 06/05/2023 03:00:12PM  
ORDERING PROVIDER: ROBERTSON, NATHANIEL R

ORDERING FACILITY: ESTELLE (E2)

**DULOXETINE DR 60MG CAPSULE**  
1 CAPS ORAL EVERY EVENING for 30  
Days KOP

EXPIRATION DATE: 2/05/2024 01:01:00PM  
REFILLS: 4 / 11

LAST DATE GIVEN KOP: 06/12/2023 09:54:00PM  
ORDERING PROVIDER: BARBER, MARK A

ORDERING FACILITY: ESTELLE (E2)

**FUROSEMIDE 40MG TABLET**  
1 TABS ORAL EVERY MORNING for 30  
Days KOP

EXPIRATION DATE: 12/25/2023 01:15:00PM  
REFILLS: 5 / 11

LAST DATE GIVEN KOP: 06/05/2023 03:00:17PM  
ORDERING PROVIDER: BARBER, MARK A

ORDERING FACILITY: ESTELLE (E2)

**GLIPIZIDE 10MG TABLET**  
2 TABS ORAL EVERY MORNING for 30  
Days KOP

EXPIRATION DATE: 2/05/2024 01:01:00PM  
REFILLS: 4 / 11

LAST DATE GIVEN KOP: 06/12/2023 09:54:02PM  
ORDERING PROVIDER: BARBER, MARK A

ORDERING FACILITY: ESTELLE (E2)

**IBUPROFEN 800MG TABLET**  
1 TABS ORAL TWICE DAILY for 30  
Days KOP  As Needed (PRN)

EXPIRATION DATE: 9/10/2023 07:07:00AM  
REFILLS: 0 / 2

LAST DATE GIVEN KOP: 06/13/2023 11:54:53PM  
ORDERING PROVIDER: BECK, DENE Y

ORDERING FACILITY: ESTELLE (E2)

**LOSARTAN 50MG TABLET #**  
1 TABS ORAL EVERY MORNING for 30  
Days KOP  
NF# 896539A [INDEF]

EXPIRATION DATE: 12/25/2023 01:15:00PM  
REFILLS: 5 / 11

LAST DATE GIVEN KOP: 06/05/2023 03:00:24PM  
ORDERING PROVIDER: BARBER, MARK A

ORDERING FACILITY: ESTELLE (E2)

**metFORMIN HCL 1000MG TABLET**  
1 TABS ORAL TWICE DAILY for 30  
Days KOP

EXPIRATION DATE: 2/05/2024 01:01:00PM  
REFILLS: 4 / 11

LAST DATE GIVEN KOP: 06/12/2023 09:54:06PM  
ORDERING PROVIDER: BARBER, MARK A

ORDERING FACILITY: ESTELLE (E2)

**METOPROLOL 100MG TABLET**  
1 TABS ORAL TWICE DAILY for 30  
Days KOP

EXPIRATION DATE: 8/01/2023 01:24:00AM  
REFILLS: 10 / 11

LAST DATE GIVEN KOP: 06/05/2023 03:00:07PM  
ORDERING PROVIDER: ROBERTSON, NATHANIEL R

ORDERING FACILITY: ESTELLE (E2)

**TERAZOSIN 10MG CAPSULE**  
1 CAPS ORAL EVERY EVENING for 30

EXPIRATION DATE: 8/01/2023 01:24:00AM  
REFILLS: 10 / 11

LAST DATE GIVEN KOP: 06/05/2023 03:00:02PM  
ORDERING PROVIDER: ROBERTSON, NATHANIEL R

## CORRECTIONAL MANAGED HEALTH CARE
### Unit Provider Emergency Room Note

Name:  TIEDE, BERNHARDT I

TDCJ#:  864378

Days KOP

Date:    06/22/2023 20:03

Facility:  ESTELLE (E2)

ORDERING FACILITY: ESTELLE (E2)

**S: The patient presents for right sided facial numbness that began yesterday at approximately 6pm. The patient states that around 10 pm last night his symptoms spontaneously resolved. Then at approximately 1600 today his symptoms returned. The patient denies headache or blurry vision. However, the patient does describe dizziness. The patient does not complain of any other neurologic deficits.**

**O: VSS PE Normal**

> **Neuro exam. Left facial droop. Pt can bilateral wrinkle forehead. Difficulty closing left eye. Numbness to right face. Symmetric upper and lower strength. No pronator drift.**

**A: The patient is a 64 yo male who presents for right sided facial numbness but has left sided facial droop.**

**P: Pt also complains of dizziness. Bell's Palsy was considered as a possible etiology however, the patient has incongruent symptoms. The may be central in nature. Pt requires a higher level of care to rule out any central neurologic pathology.**

Electronically Signed by NEWMAN, DONNELL S. MD on 06/23/2023.
##And No Others##

## CORRECTIONAL MANAGED HEALTH CARE
### Urgent / Emergent Care Record

Name:  TIEDE, BERNHARDT I
TDCJ#:  864378

Date:  06/22/2023 19:51
Facility:  ESTELLE (E2)

Age: 64          DOB: 08/02/1958          Sex: Male          Race: WHITE          DOI: 3/26/1999

**Patient Language:** ENGLISH

**Most recent vitals from 6/22/2023:**

| BP: 158 / 72 (Sitting) | Weight: 237 Lbs. | Height: 75 In. | BMI: 30 (% Diff: +3.45) |
|---|---|---|---|
| Pulse: 79 (Sitting) | Resp: 17 / min | Temp: 97.4 (Forehead) | O2 Sat: 99% RA |

**Allergies:** ACE INHIBITORS

**Current Medications:**

**ALBUTEROL HFA INH 6.7G 200PF**
2 PUFFS INHALATION 4 TIMES DAILY
for 180 Days KOP   As Needed (PRN)

EXPIRATION DATE: 2/05/2024 01:03:00PM
REFILLS: 0 / 1

LAST DATE GIVEN KOP: 02/13/2023 06:19:24PM
ORDERING PROVIDER: BARBER, MARK A

ORDERING FACILITY: ESTELLE (E2)

**AMLODIPINE 10MG TABLET**
1 TABS ORAL EVERY MORNING for 30
Days KOP

EXPIRATION DATE: 2/05/2024 01:01:00PM
REFILLS: 4 / 11

LAST DATE GIVEN KOP: 06/12/2023 09:53:57PM
ORDERING PROVIDER: BARBER, MARK A

ORDERING FACILITY: ESTELLE (E2)

**ASPIRIN EC 81MG TABLET**
1 TABS ORAL EVERY MORNING for 30
Days KOP

EXPIRATION DATE: 8/01/2023 01:25:00AM
REFILLS: 10 / 11

LAST DATE GIVEN KOP: 06/05/2023 03:00:12PM
ORDERING PROVIDER: ROBERTSON, NATHANIEL R

ORDERING FACILITY: ESTELLE (E2)

**DULOXETINE DR 60MG CAPSULE**
1 CAPS ORAL EVERY EVENING for 30
Days KOP

EXPIRATION DATE: 2/05/2024 01:01:00PM
REFILLS: 4 / 11

LAST DATE GIVEN KOP: 06/12/2023 09:54:00PM
ORDERING PROVIDER: BARBER, MARK A

ORDERING FACILITY: ESTELLE (E2)

**FUROSEMIDE 40MG TABLET**
1 TABS ORAL EVERY MORNING for 30
Days KOP

EXPIRATION DATE: 12/25/2023 01:15:00PM
REFILLS: 5 / 11

LAST DATE GIVEN KOP: 06/05/2023 03:00:17PM
ORDERING PROVIDER: BARBER, MARK A

ORDERING FACILITY: ESTELLE (E2)

**GLIPIZIDE 10MG TABLET**
2 TABS ORAL EVERY MORNING for 30
Days KOP

EXPIRATION DATE: 2/05/2024 01:01:00PM
REFILLS: 4 / 11

LAST DATE GIVEN KOP: 06/12/2023 09:54:02PM
ORDERING PROVIDER: BARBER, MARK A

ORDERING FACILITY: ESTELLE (E2)

**IBUPROFEN 800MG TABLET**
1 TABS ORAL TWICE DAILY for 30
Days KOP   As Needed (PRN)

EXPIRATION DATE: 9/10/2023 07:07:00AM
REFILLS: 0 / 2

LAST DATE GIVEN KOP: 06/13/2023 11:54:53PM
ORDERING PROVIDER: BECK, DENE Y

ORDERING FACILITY: ESTELLE (E2)

**LOSARTAN 50MG TABLET #**
1 TABS ORAL EVERY MORNING for 30
Days KOP
NF# 896539A [INDEF]

EXPIRATION DATE: 12/25/2023 01:15:00PM
REFILLS: 5 / 11

LAST DATE GIVEN KOP: 06/05/2023 03:00:24PM
ORDERING PROVIDER: BARBER, MARK A

ORDERING FACILITY: ESTELLE (E2)

**metFORMIN HCL 1000MG TABLET**
1 TABS ORAL TWICE DAILY for 30
Days KOP

EXPIRATION DATE: 2/05/2024 01:01:00PM
REFILLS: 4 / 11

LAST DATE GIVEN KOP: 06/12/2023 09:54:06PM
ORDERING PROVIDER: BARBER, MARK A

ORDERING FACILITY: ESTELLE (E2)

**METOPROLOL 100MG TABLET**
1 TABS ORAL TWICE DAILY for 30
Days KOP

EXPIRATION DATE: 8/01/2023 01:24:00AM
REFILLS: 10 / 11

LAST DATE GIVEN KOP: 06/05/2023 03:00:07PM
ORDERING PROVIDER: ROBERTSON, NATHANIEL R

ORDERING FACILITY: ESTELLE (E2)

**TERAZOSIN 10MG CAPSULE**
1 CAPS ORAL EVERY EVENING for 30
Days KOP

EXPIRATION DATE: 8/01/2023 01:24:00AM
REFILLS: 10 / 11

LAST DATE GIVEN KOP: 06/05/2023 03:00:02PM
ORDERING PROVIDER: ROBERTSON, NATHANIEL R

HSM-16 (08/16)

1 of 6

## CORRECTIONAL MANAGED HEALTH CARE
### Urgent / Emergent Care Record

Name: TIEDE, BERNHARDT I
TDCJ#: 864378

Date: 06/22/2023 19:51
Facility: ESTELLE (E2)

ORDERING FACILITY: ESTELLE (E2)

---

**SIGNIFICANT MEDICAL HISTORY:**

**Chronic Care:**
Chronic Obstructive Pulmonary Disease, Copd, Emphysema First Observed 3/27/2013 02:03PM
Type 2 Diabetes Mellitus First Observed 8/17/2016 07:42AM
Hyperlipidemia, Unspecified First Observed 8/17/2016 07:42AM
Essential (primary) Hypertension (htn) First Observed 8/17/2016 07:42AM

**Dental:**
Perio Type Iv First Observed 9/21/2016 12:02PM
Dental Examination First Observed 9/21/2016 12:02PM
Gingival/periodontal First Observed 1/31/2017 07:14AM
Hard Tissue Disease First Observed 2/11/2019 08:16AM

**Not Specified:**
Other Disorders Of Muscle First Observed 3/22/2021 12:45PM

---

| Quantitative Pain Scale:  Place an "X" below | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| X  0 | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 |

| Qualitative Description of Pain | | | |
|---|---|---|---|
| Location: | PT. DENIES PAIN | Onset: | |
| Duration: | | | |
| Aggravating Factors: | | | |
| Alleviating Factors: | | | |
| Pain Character: | Dull | Sharp | Throbbing | Other: |
| Frequency: | Constant | Intermittent | Other: |
| Radiating: | No | Yes | Location: |

### GLASGOW COMA SCALE

| Eye Opening | Best Verbal Response | Best Motor Response |
|---|---|---|
| Spontaneous = 4 | Oriented = 5 | Obeys Command = 6 |
| To voice = 3 | Confused = 4 | Localizes pain = 5 |
| To pain = 2 | Inappropriate words = 3 | Withdraws to pain = 4 |
| None = 1 | Incomprehensible sounds = 2 | Flexion to pain = 3 |
| | None = 1 | Extension to pain = 2 |
| | | None = 1 |

| Time | Initials | Eye Opening | Verbal Response | Motor Response | Total Score |
|---|---|---|---|---|---|
| 1948 | NJ | 4 | 5 | 6 | 15 |
| | | | | | |
| | | | | | |
| | | | | | |

**CORRECTIONAL MANAGED HEALTH CARE**
**Urgent / Emergent Care Record**

Name: TIEDE, BERNHARDT I
TDCJ#: 864378

Date: 06/22/2023 19:51
Facility: ESTELLE (E2)

| NURSING ASSESSMENT | CARDIAC | N/A | PULMONARY | X N/A | GI | X N/A | SKIN | X N/A | NEURO | | N/A |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | **Apical Pulse** | | **Respirations** | | Denies Problems | | Cold | X | Alert | | |
| | X Regular | | Normal | | Nausea | | Warm | X | Oriented X: | 3 | |
| | Irregular | | Shallow | | Vomiting | | Hot | | Confused | | |
| | JVD | | Labored | | Diarrhea | | Dry | | Lethargic | | |
| | **Peripheral Pulses** | | Nasal Flaring | | Rectal Bleeding | | Moist | | Unresponsive | | |
| | Upper | | Grunting | | Constipation | | Diaphoretic | | **Arm Strength** | | |
| | X R   L X | | Retractions | | Incontinent | | Normal | X | R L X Normal | | |
| | Lower | | Hyperventilating | | Date | | Pale | | R L Weak | | |
| | X R   L X | | Use of accessory | | Last BM: | | Mottled | | R L Flaccid | | |
| | **Bleeding** | | muscles | | **Abdomen** | | Cyanotic | | **Leg Strength** | | |
| | X None | | **Lungs** | | Soft | | Jaundiced | X | R L X Normal | | |
| | Controlled | | R L Clear | | Firm | | Flushed | | R L Weak | | |
| | Excessive | | R L Crackles | | Distended | | Intact | | R L Flaccid | | |
| | Location: | | R L Wheezes | | Obese | | **Ortho** | N/A | **Pupils** | | |
| | Est. Blood Loss | | R L Diminish | | Tender | | Deformity | X | Equal | | |
| | cc: | | R L Absent | | Location: | | Swelling | | Unequal | | |
| | **Capillary Refill** | | **GU** | X N/A | Rebound | | Location | X | R L X Reactive | | |
| | X Normal | | Burning | | **Bowel Sounds** | | **ROM** | | R L Nonreactive | | |
| | Delayed | | Frequency | | Normoactive | | Full | | R L Dilated | | |
| | **Edema** | | Urine Odor | | Hyperactive | | Limited | | R L Constricted | | |
| | Upper | | Hematuria | | Hypoactive | | Absent | | R L Fixed | | |
| | 0 1+ 2+ 3+ | | Incontinent | | Absent | | | | | | |
| | 0 R   L 0 | | Anuric | | NG/G tube | | | **Name** | | | **Time** |
| | Lower | | Vag. Discharge | | **Initial Assessment** | | | | | | |
| | 0 1+ 2+ 3+ | | Vag. Bleeding | | Completed By: | | **N.JAMES, RN** | | | | **1948** |
| | 0 R   L 0 | | Catheter | | | | | | | | |

| **\*\*Contact Provider\*\*** | | | |
|---|---|---|---|
| Name of Provider Notified: | D. NEWMAN, MD | Time: | 2015 |
| Provider Orders: SEND PT. OUT 911 TO R/O STROKE. | | | |
| Orders obtained and read back/verified by: (Name) | N.JAMES, RN | | |

## CORRECTIONAL MANAGED HEALTH CARE
### Urgent / Emergent Care Record

Name: TIEDE, BERNHARDT I      Date: 06/22/2023 19:51

TDCJ#: 864378      Facility: ESTELLE (E2)

| Time | Nursing Notes | Initials |
|------|---------------|----------|
| 1934 | PT. ARRIVES TO RMF ER, V/S OBTAINED AND PT. ASSESSED | NJ |
| 1955 | DR. NEWMAN ASSESSES PT. | NJ |
| 2015 | DR. NEWMAN ORDERS PT. SENT OUT 911 FOR STROKE PROTOCOL. | NJ |
| 2016 | 911 NOTIFIED. | NJ |
| 2018 | ATTEMPTED TO NOTIFY CMC UR – NO ANSWER, WILL TRY AGAIN LATER. | NJ |
| 2023 | HMH NOTIFIED-REPORT GIVEN TO ADAM. | NJ |
| 2031 | CMC UR NOTIFIED (ANGIE). | NJ |

**Details of abnormal findings and ongoing assessment and care.**

| Date Time | BP | Pulse | Resp | Wgt | Hgt | BMI | Temp | FI02 | O2 Flow | O2 Sat | PF1 | PF2 | PF3 | PL |
|-----------|-----|-------|------|-----|-----|-----|------|------|---------|--------|-----|-----|-----|-----|
| 6/22/2023 07:52PM | 157/83 (SI) | 77 (SI) | 16 | | | | 97.8 (OR) | | 0.00 | 100 RA | | | | |

| VITAL SIGNS | | | | | | | | |
|------|------|------|-------|------|-------|-------|------|----------|
| Time | Temp | BP | Pulse | Resp | SpO2 | FS/BS | FHT | Initials |
| 1934 | 97.8 | 157/83 | 77 | 16 | 100%RA | 274 | N/A | NJ |
| 2033 | 97.8 | 195/83 | 83 | 16 | 100%RA | N/A | N/A | NJ |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |

| PEAK FLOW | | | X | N/A |
|------|-------------|-------------|-------------|---------------------|
| Time | Peak Flow #1 | Peak Flow #2 | Peak Flow #3 | Peak Flow Personal Best |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

\* Continue hourly peak flow measurements for patients with respiratory distress for the duration of the clinic visit.

| MEDICATIONS | | | | | | | | |
|------|------------|------|-------|------|----------|--------------|------|----------|
| Time | Medication | Dose | Route | Site | Initials | Outcome Eval | Time | Initials |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |

## CORRECTIONAL MANAGED HEALTH CARE
### Urgent / Emergent Care Record

Name: TIEDE, BERNHARDT I  
TDCJ#: 864378

Date: 06/22/2023 19:51  
Facility: ESTELLE (E2)

| I. V. THERAPY | | | | | | | Intake | | Output | |
|---|---|---|---|---|---|---|---|---|---|---|
| Site # | Location | Gauge | IVF | Rate | Time | Initials | | PO | | Urine |
| 1 | LAC | 20 | | | | | | IV | | Emesis |
| | | | | | | | | NG | | NG |
| | | | | | | | | Other: | | Other: |

❖ **Do not release a patient from the clinic without a provider's order if the patient's SpO2 is less than 90% or peak flow is less than 80% of personal best. Normal adult peak flow without existing disease is 300-500.**

NUR - URGENT/EMERGENT CARE RECORD

Responded to patient OUTSIDE the medical department: No

Arrival in medical department:
  HUB facility where patient was seen:  Estelle  (E2)
  Date/Time of arrival:  06/22/2023 19:34
  Mode of arrival:  Ambulatory
  Condition on arrival:  Stable
  Chief complaint:  LEFT SIDE FACIAL DROOP
  Symptom / Problem category:  Other: LEFT SIDE FACIAL DROOP
  Standing Delegated Order implemented:  No

Discharge condition:
  Condition on discharge:  Stable
  Date / time of discharge:  06/22/2023 19:55

Discharge disposition provided to officer and patient:
  Medical observation

*Nursing encounter capture:*
  Nursing visit:
    Patient Order Added: #NURSING LEVEL 4 EMERGENCY VISIT (F) Procedure Date: 06/22/2023 19:55:16 User: JAMES, NICHOLAS L

**Details of abnormal findings and ongoing assessment and care.**

## CORRECTIONAL MANAGED HEALTH CARE
### Urgent / Emergent Care Record

Name: TIEDE, BERNHARDT I
TDCJ#: 864378

Date: 06/22/2023 19:51
Facility: ESTELLE (E2)

| Time | Nursing Notes con't |
|------|---------------------|
| 2057-PT. DEPARTS UNIT VIA STRETCHER WITH EMS AND SECURITY STAFF. | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |

**Procedures Ordered:**

| Date Time | Description | Comments |
|-----------|-------------|----------|
| 6/22/2023 09:00PM | PROVIDER4-EMERGENCY OFFICE VISIT (F) | |

Electronically Signed by JAMES, NICHOLAS L. RN on 06/22/2023.
##And No Others##

## CORRECTIONAL MANAGED HEALTH CARE
### Urgent / Emergent Care Record

Name: TIEDE, BERNHARDT I
TDCJ#: 864378

Date: 06/22/2023 19:14
Facility: ESTELLE (E2)

Age: 64          DOB: 08/02/1958          Sex: Male          Race: WHITE          DOI: 3/26/1999

Patient Language: ENGLISH

**Most recent vitals from 6/22/2023:**

| BP: 158 / 72 (Sitting) | Weight: 237 Lbs. | Height: 75 In. | BMI: 30 (% Diff: +3.45) |
|---|---|---|---|
| Pulse: 79 (Sitting) | Resp: 17 / min | Temp: 97.4 (Forehead) | O2 Sat: 99% RA |

**Allergies:** ACE INHIBITORS

**Current Medications:**

**ALBUTEROL HFA INH 6.7G 200PF**
2 PUFFS INHALATION 4 TIMES DAILY
for 180 Days KOP  As Needed (PRN)

EXPIRATION DATE: 2/05/2024 01:03:00PM
REFILLS: 0 / 1

LAST DATE GIVEN KOP: 02/13/2023 06:19:24PM
ORDERING PROVIDER: BARBER, MARK A

ORDERING FACILITY: ESTELLE (E2)

**AMLODIPINE 10MG TABLET**
1 TABS ORAL EVERY MORNING for 30
Days KOP

EXPIRATION DATE: 2/05/2024 01:01:00PM
REFILLS: 4 / 11

LAST DATE GIVEN KOP: 06/12/2023 09:53:57PM
ORDERING PROVIDER: BARBER, MARK A

ORDERING FACILITY: ESTELLE (E2)

**ASPIRIN EC 81MG TABLET**
1 TABS ORAL EVERY MORNING for 30
Days KOP

EXPIRATION DATE: 8/01/2023 01:25:00AM
REFILLS: 10 / 11

LAST DATE GIVEN KOP: 06/05/2023 03:00:12PM
ORDERING PROVIDER: ROBERTSON, NATHANIEL R

ORDERING FACILITY: ESTELLE (E2)

**DULOXETINE DR 60MG CAPSULE**
1 CAPS ORAL EVERY EVENING for 30
Days KOP

EXPIRATION DATE: 2/05/2024 01:01:00PM
REFILLS: 4 / 11

LAST DATE GIVEN KOP: 06/12/2023 09:54:00PM
ORDERING PROVIDER: BARBER, MARK A

ORDERING FACILITY: ESTELLE (E2)

**FUROSEMIDE 40MG TABLET**
1 TABS ORAL EVERY MORNING for 30
Days KOP

EXPIRATION DATE: 12/25/2023 01:15:00PM
REFILLS: 5 / 11

LAST DATE GIVEN KOP: 06/05/2023 03:00:17PM
ORDERING PROVIDER: BARBER, MARK A

ORDERING FACILITY: ESTELLE (E2)

**GLIPIZIDE 10MG TABLET**
2 TABS ORAL EVERY MORNING for 30
Days KOP

EXPIRATION DATE: 2/05/2024 01:01:00PM
REFILLS: 4 / 11

LAST DATE GIVEN KOP: 06/12/2023 09:54:02PM
ORDERING PROVIDER: BARBER, MARK A

ORDERING FACILITY: ESTELLE (E2)

**IBUPROFEN 800MG TABLET**
1 TABS ORAL TWICE DAILY for 30
Days KOP  As Needed (PRN)

EXPIRATION DATE: 9/10/2023 07:07:00AM
REFILLS: 0 / 2

LAST DATE GIVEN KOP: 06/13/2023 11:54:53PM
ORDERING PROVIDER: BECK, DENE Y

ORDERING FACILITY: ESTELLE (E2)

**LOSARTAN 50MG TABLET #**
1 TABS ORAL EVERY MORNING for 30
Days KOP
NF# 896539A [INDEF]

EXPIRATION DATE: 12/25/2023 01:15:00PM
REFILLS: 5 / 11

LAST DATE GIVEN KOP: 06/05/2023 03:00:24PM
ORDERING PROVIDER: BARBER, MARK A

ORDERING FACILITY: ESTELLE (E2)

**metFORMIN HCL 1000MG TABLET**
1 TABS ORAL TWICE DAILY for 30
Days KOP

EXPIRATION DATE: 2/05/2024 01:01:00PM
REFILLS: 4 / 11

LAST DATE GIVEN KOP: 06/12/2023 09:54:06PM
ORDERING PROVIDER: BARBER, MARK A

ORDERING FACILITY: ESTELLE (E2)

**METOPROLOL 100MG TABLET**
1 TABS ORAL TWICE DAILY for 30
Days KOP

EXPIRATION DATE: 8/01/2023 01:24:00AM
REFILLS: 10 / 11

LAST DATE GIVEN KOP: 06/05/2023 03:00:07PM
ORDERING PROVIDER: ROBERTSON, NATHANIEL R

ORDERING FACILITY: ESTELLE (E2)

**TERAZOSIN 10MG CAPSULE**
1 CAPS ORAL EVERY EVENING for 30
Days KOP

EXPIRATION DATE: 8/01/2023 01:24:00AM
REFILLS: 10 / 11

LAST DATE GIVEN KOP: 06/05/2023 03:00:03PM
ORDERING PROVIDER: ROBERTSON, NATHANIEL R

HSM-16 (08/16)

## CORRECTIONAL MANAGED HEALTH CARE
### Urgent / Emergent Care Record

Name: TIEDE, BERNHARDT I
TDCJ#: 864378

Date: 06/22/2023 19:14
Facility: ESTELLE (E2)

ORDERING FACILITY: ESTELLE (E2)

---

**SIGNIFICANT MEDICAL HISTORY:**

**Chronic Care:**
Chronic Obstructive Pulmonary Disease, Copd, Emphysema First Observed 3/27/2013 02:03PM
Type 2 Diabetes Mellitus First Observed 8/17/2016 07:42AM
Hyperlipidemia, Unspecified First Observed 8/17/2016 07:42AM
Essential (primary) Hypertension (htn) First Observed 8/17/2016 07:42AM

**Dental:**
Perio Type Iv First Observed 9/21/2016 12:02PM
Dental Examination First Observed 9/21/2016 12:02PM
Gingival/periodontal First Observed 1/31/2017 07:14AM
Hard Tissue Disease First Observed 2/11/2019 08:16AM

**Not Specified:**
Other Disorders Of Muscle First Observed 3/22/2021 12:45PM

---

| Quantitative Pain Scale: Place an "X" below | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 0 | 1 | | 2 | x | 3 | | 4 | | 5 | | 6 | | 7 | 8 | 9 | 10 |

| Qualitative Description of Pain | | | | | | | |
|---|---|---|---|---|---|---|---|
| Location: | Right side of face | | | | | Onset: | unknown |
| Duration: | Since yesterday | | | | | | |
| Aggravating Factors: | None | | | | | | |
| Alleviating Factors: | none | | | | | | |
| Pain Character: | | Dull | | Sharp | | Throbbing | Other: | "numbness/ Tingling" |
| Frequency: | | Constant | | x | Intermittent | | Other: | |
| Radiating: | x | No | | Yes | | Location: | |

| GLASGOW COMA SCALE | | |
|---|---|---|
| **Eye Opening** | **Best Verbal Response** | **Best Motor Response** |
| Spontaneous = 4 | Oriented = 5 | Obeys Command = 6 |
| To voice = 3 | Confused = 4 | Localizes pain = 5 |
| To pain = 2 | Inappropriate words = 3 | Withdraws to pain = 4 |
| None = 1 | Incomprehensible sounds = 2 | Flexion to pain = 3 |
| | None = 1 | Extension to pain = 2 |
| | | None = 1 |

| Time | Initials | Eye Opening | Verbal Response | Motor Response | Total Score |
|---|---|---|---|---|---|
| 1905 | AB | 4 | 5 | 6 | 15 |
| | | | | | |
| | | | | | |
| | | | | | |

## CORRECTIONAL MANAGED HEALTH CARE
### Urgent / Emergent Care Record

Name: TIEDE, BERNHARDT I
TDCJ#: 864378

Date: 06/22/2023 19:14
Facility: ESTELLE (E2)

**NURSING ASSESSMENT**

| CARDIAC | x | N/A | PULMONARY | x | N/A | GI | x | N/A | SKIN | | N/A | NEURO | | N/A |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Apical Pulse** | | | **Respirations** | | | Denies Problems | | | Cold | x | | **Alert** | | |
| | x | Regular | | x | Normal | Nausea | x | | Warm | x | | Oriented X: | | 4 |
| | | Irregular | | | Shallow | Vomiting | | | Hot | | | Confused | | |
| | | JVD | | | Labored | Diarrhea | x | | Dry | x | | Lethargic | | |
| **Peripheral Pulses** | | | | | Nasal Flaring | Rectal Bleeding | | | Moist | | | Unresponsive | | |
| | | Upper | | | Grunting | Constipation | | | Diaphoretic | | | **Arm Strength** | | |
| x | R | L | x | | Retractions | Incontinent | | | Normal | x | R | L | x | Normal |
| | | Lower | | | Hyperventilating | | | Date | Pale | | R | L | | Weak |
| x | R | L | x | | Use of accessory muscles | Last BM: | | | Mottled | | R | L | | Flaccid |
| **Bleeding** | | | | | | **Abdomen** | | | Cyanotic | | | **Leg Strength** | | |
| x | None | | | | **Lungs** | Soft | | | Jaundiced | x | R | L | x | Normal |
| | Controlled | | x | R | L x Clear | Firm | | | Flushed | | R | L | | Weak |
| | Excessive | | | R | L Crackles | Distended | | | Intact | | R | L | | Flaccid |
| Location: | | | | R | L Wheezes | Obese | | | **Ortho** | x | N/A | **Pupils** | | |
| Est. Blood Loss | | | | R | L Diminish | Tender | | | Deformity | x | | Equal | | |
| cc: | | | | R | L Absent | Location: | | | Swelling | | | Unequal | | |
| **Capillary Refill** | | | **GU** | x | N/A | Rebound | | | Location | x | R | L x Reactive | | |
| x | Normal | | | | Burning | **Bowel Sounds** | | | **ROM** | | R | L | | Nonreactive |
| | Delayed | | | | Frequency | Normoactive | | | Full | | R | L | | Dilated |
| **Edema** | | | | | Urine Odor | Hyperactive | | | Limited | | R | L | | Constricted |
| | Upper | | | | Hematuria | Hypoactive | | | Absent | | R | L | | Fixed |
| | 0 1+ 2+ 3+ | | | | Incontinent | Absent | | | | | | | | |
| 0 | R | L | 0 | | Anuric | NG/G tube | | | **Name** | | | | | **Time** |
| | Lower | | | | Vag. Discharge | **Initial Assessment** | | | | | | | | |
| | 0 1+ 2+ 3+ | | | | Vag. Bleeding | Completed By: | | | A. Boyce, RN | | | | | 1905 |
| 0 | R | L | 0 | | Catheter | | | | | | | | | |

---

| **Contact Provider** | | |
|---|---|---|
| Name of Provider Notified: | M. Walker, NP | Time: 1910 |
| Provider Orders: Send offender to the RMF ER for evaluation by the provider | | |
| Orders obtained and read back/verified by: (Name) | A. Boyce, RN | |

## CORRECTIONAL MANAGED HEALTH CARE
### Urgent / Emergent Care Record

Name: TIEDE, BERNHARDT I      Date: 06/22/2023 19:14
TDCJ#: 864378      Facility: ESTELLE (E2)

| Time | Nursing Notes | Initials |
|------|---------------|----------|
| 1905 | Offender ambulatory to the infirmary with C/O "I think I'm having a stroke". NAD. VSS. Respirations even and unlabored. Lungs CTA bilaterally. PERRL. A&Ox4. NO weakness noted in the upper or lower extremities. No deficits noted neurologically. FSBS 214. Offender states he had numbness/ tingling yesterday afternoon that lasted for a couple hours then had right sided facial drooping, but it went away without treatment. States the numbness/ tingling started again approx. 3:45 PM today. States he has some problems with his balance when he is having the numbness/ tingling but not any problem with strength. | AB, RN |
| 1910 | On call provider notified and orders received. Security notified. Report called to the RMF Er. | AB, RN |
| 1920 | Offender taken to RMF ER via wheelchair by security. | AB, RN |
| | | |
| | | |
| | | |
| | | |

Details of abnormal findings and ongoing assessment and care.

| VITAL SIGNS | | | | | | | | |
|------|------|------|------|------|------|------|------|------|
| Time | Temp | BP | Pulse | Resp | SpO2 | FS/BS | FHT | Initials |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |

| PEAK FLOW | | | x | N/A | |
|------|------|------|------|------|------|
| Time | Peak Flow #1 | Peak Flow #2 | Peak Flow #3 | Peak Flow Personal Best | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |

* Continue hourly peak flow measurements for patients with respiratory distress for the duration of the clinic visit.

| MEDICATIONS | | | | | | | | |
|------|------------|------|-------|------|----------|--------------|------|----------|
| Time | Medication | Dose | Route | Site | Initials | Outcome Eval | Time | Initials |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |

**CORRECTIONAL MANAGED HEALTH CARE**
**Urgent / Emergent Care Record**

Name:  TIEDE, BERNHARDT I                    Date:  06/22/2023 19:14
TDCJ#:  864378                                Facility:  ESTELLE (E2)

|  |  |  |  |  |  |  |  |
|---|---|---|---|---|---|---|---|
|  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |

| I. V. THERAPY | | | | | | | Intake | | Output | |
|---|---|---|---|---|---|---|---|---|---|---|
| Site # | Location | Gauge | IVF | Rate | Time | Initials |  | PO |  | Urine |
|  |  |  |  |  |  |  |  | IV |  | Emesis |
|  |  |  |  |  |  |  |  | NG |  | NG |
|  |  |  |  |  |  |  |  | Other: |  | Other: |

❖ **Do not release a patient from the clinic without a provider's order if the patient's SpO2 is less than 90% or peak flow is less than 80% of personal best.  Normal adult peak flow without existing disease is 300-500.**

NUR - URGENT/EMERGENT CARE RECORD

Responded to patient OUTSIDE the medical department: No

Arrival in medical department:
    HUB facility where patient was seen:    Estelle  (E2)
    Date/Time of arrival:    06/22/2023 19:02
    Mode of arrival:    Ambulatory
    Condition on arrival:    Stable
    Chief complaint:    Facial tingling/ Numbness
    Symptom / Problem category:    Other: Numbness/ tingling to the right side of face
    Standing Delegated Order implemented:    No

Discharge condition:
    Condition on discharge:    Stable
    Date / time of discharge:    06/22/2023 19:20

Discharge disposition provided to officer and patient:
    Transfer to HUB facility: Estelle  (E2)

*Nursing encounter capture:*
    Nursing visit:
        Patient Order Added: #NURSING LEVEL 4 EMERGENCY VISIT (F) Procedure Date: 06/22/2023 19:23:54 User:
BOYCE, ADRIENE L

**Details of abnormal findings and ongoing assessment and care.**

## CORRECTIONAL MANAGED HEALTH CARE
### Urgent / Emergent Care Record

Name:  TIEDE, BERNHARDT I
TDCJ#:  864378

Date:   06/22/2023 19:14
Facility:  ESTELLE (E2)

| Time | Nursing Notes con't |
|------|---------------------|
|      |                     |
|      |                     |
|      |                     |
|      |                     |
|      |                     |
|      |                     |
|      |                     |
|      |                     |
|      |                     |
|      |                     |
|      |                     |
|      |                     |

Electronically Signed by BOYCE, ADRIENE L. RN on 06/22/2023.
Electronically Signed by WALKER, MARTHA J. APRN, FNP on 06/23/2023.
##And No Others##



PLAINTIFF'S
EXHIBIT

P
_____

PLAINTIFF'S EXHIBIT

Q



Sometimes all you can do in this world is bear witness.

On Friday, August 4th I visited Bernie Tiede, who's currently incarcerated at the Estelle Unit just outside of Huntsville, Texas.

I was stunned at how much his health had deteriorated since the last time I saw him. Half of his face is paralyzed and he seemed to be truly struggling – I left worrying not only about his physical health but his mental health as well. The Bernie I've visited before in prison has always been very upbeat, positive, smiling and fundamentally joyful and appreciative, despite his situation. That's the Bernie everyone knows – the positive guy who's helping others and making the best of his situation. Sadly, that's only a small percentage of the Bernie I encountered on this day. As we visited for an hour and a half or so, I found myself starting to film him with my phone, to maybe share some of what I was hearing.

I think the clips below represent not only his personal situation but serves as a firsthand account of the conditions everyone there is living under. I've cut out almost all of the personal banter and distilled it down to bits that I think others considering his case might want to hear.

This first one is about his recent medical emergency:

**Bernie : Clip One**

These next four concern the extreme heat conditions at Estelle Unit and how the lack of air conditioning affects everyone there. It's perhaps a little redundant, but it's telling that the conversation kept floating back to this one subject. Why wouldn't it? It's the problem in the room, that no one can escape for long and is ruining the health, atmosphere and relations of everyone there.

**Bernie : Clip Two**

**Bernie : Clip Three**

**Bernie : Clip Four**

**Bernie : Clip Five**

Another thing he talked about that I thought was odd is the crazy schedule they've been imposing on the inmates.  After a few hours of sleep they have to get up and take showers, have meals at very strange hours, etc.  There's something about not being allowed to sleep continuously that seems cruel and unhealthy – maybe something you'd find more in a P.O.W. camp than a government facility.

**Bernie : Clip Six**

These last three clips are more personal to Bernie, about his past and possible future.  The first is Bernie reflecting on his two years in Austin when he was out, and the last two are about how he has a nice situation awaiting him in the Dallas area at his sister's house should he be released.

**Bernie : Clip Seven**

**Bernie : Clip Eight**

**Bernie : Clip Nine**

I think it's very telling that the whole time I was there Bernie had not one bad thing to say about any person, a fellow inmate or corrections officer – he had no personal problems with anyone.  It was all about these miserable and unnecessary conditions he and everyone there are having to live under.  You could sense it in the atmosphere everywhere, no smiles or light-heartedness, just people suffering and trying to make it through the next hour of their lives.  Even sweet and kind Bernie was sad and edgy – the opposite of his true nature.

As I said earlier, I left very depressed at his (and everyone else's) situation.  Bernie just turned 65 years old, is in poor health, and is physically being pushed to the brink.  I wondered if this was maybe the last time I would ever see him – that the heat could very well finish him off before this excruciating summer is finally over.  That I might be witnessing a kind of slow manslaughter-in-

progress.  Dark thoughts for sure, but all these things have been swirling through my mind.  I share all this in hopes it could possibly make a difference with someone who has some authority.

Bernie used to sit outside his garage apartment in our back yard and read the newspaper to "Dude," our pet pig (born Yankee Doodle on the 4th of July 12 years ago).  He loved all the animals that swirled around our family, but had a special bond with the Dude.  When Bernie asked me the other day how the little guy was doing, I talked about a small shady room we have for him out on our farm, where he lives with 3 younger rescue pigs.  It's been so hot and Dude's had some health problems recently, so we splurged and put in a small $129 air conditioner so they can at least get out of the heat if they want to.  I had to say, "but to answer your question as to how Dude the pig is doing, all I can say is he's living better than you are."

Richard Linklater
August 8, 2023



**PLAINTIFF'S EXHIBIT**

_R_

Filed 8/10/2023 2:24 PM
Lindsey Smith, District Clerk
Panola County, Texas
By: Lora Brown,
Deputy Clerk
1997-C-103

**Case No. 1997-C-103**

| | | |
|---|---|---|
| **The State of Texas,** | § | **In the 123rd District Court** |
| **Plaintiff,** | § | |
| | § | |
| **vs.** | § | **Rusk County, Texas** |
| | § | |
| **Bernhardt Tiede, II,** | § | |
| **Defendant** | § | *(On Change of Venue from Panola County)* |

## MOTION FOR JUDGMENT *NUNC PRO TUNC*

TO THE HONORABLE JUDGE DIANE V. DEVASTO:

Bernhardt Tiede, the defendant in the above-entitled and numbered case, moves this Court for an order amending the judgment *Nunc pro tunc* in the above-entitled and numbered action, signed on April 27, 2016, and file marked on April 29, 2016, and shows:

The judgment in the above-entitled cause as entered by the clerk of this Court does not faithfully correspond to the judgment of the Court rendered in this Cause on April 22, 2016. *See Judgment, Attached as "Exhibit A."*

The judgment for resentencing of by the jury, signed by the Court, stated for Mr. Tiede, "the sentence shall run concurrently." *See Exhibit A.*

The judgment then stated that if defendant is to serve a sentence in TDCJ, the incarceration periods should be stated in chronological order. The judgment stated the following incarceration periods:

"From 8/18/1997 to 5/6/2014"; then it stated "From 4/22/2016 until present"

There is an error in that no subsequent period of incarceration was entered was entered. Under this part of the judgment, the time credited shall be entered. Under the section that stated "if the defendant is to serve sentence in county jail or is given credit toward fine and costs, enter days credited below, the judgment recorded the following:

"N/A DAYS    NOTES:N/A"

*See Exhibit A.*

Mr. Tiede was released on a CCP 11.65 bond by this Court on May 6, 2014, in Cause No. 1997-C-103 H. *See "Order on Motion for Bond Pursuant to Texas Code of Criminal Art. 11.65," Attached as Exhibit B.* The order stated that "Applicant shall be considered restrained in his liberty while released on this bond, for purposes of Chapter 11 of the Texas Code of Criminal Procedure. *See Exhibit B.*

Mr. Tiede was required to submit to conditions of release, including supervision from the Travis County Supervision (meaning Travis County's Community Supervision Office." *See Criminal Court Docket from the Panola County District Court, in Cause No. 1997-C 103 – A; Attached as Exhibit C.*

Mr. Tiede was supervised successfully during the pendency of his habeas in Cause 1997-C-103 A, and his 11.65 bond was converted into a Personal Bond for Cause No. 1997-C-103. *See Order on Motion for Personal Bond, Attached as "Exhibit D."* The order again stated that Mr. Tiede shall be considered restrained in his liberty while released on the $10,000 personal bond. *See Exhibit D.*

A clerical error was made regarding counting the time Mr. Tiede was released on bonds on both 1997-C-103- A and 1997-C-103. The error is identical to a Nunc Pro Tunc Judgment filed on July 7, 2016, which corrected another De Minimus error. *See Nunc Pro Tunc Judgment of Resentencing by Jury, signed on July 7, 2016; Attached as "Exhibit E."*

No substantive legal right will be changed by correcting the judgment to reflect credit for back time, but rather a mere clerical error of failing to record the back time is being corrected.

***Mr. Tiede has experienced a serious acute medical issue last month, July 2023.*** Mr. Tiede is currently incarcerated in the Estelle Unit in very dangerous and inhumane conditions. Correcting Mr. Tiede's sentence will increase the likelihood of success as his current legal team attempts to secure an early release for Mr. Tiede through whatever legal or administrative means is possible.

The form of proposed judgment accurately reflects the judgment rendered by this Court, is attached to this motion. *See Form of Proposed Judgement, Attached as "Exhibit F".*

To support Mr. Tiede's request for present relief, please find a letter to the Court, along with video evidence taken by our Legal Case Narrative Strategist, Richard Linklater. *See Letter with Links to Video Evidence, Attached as "Exhibit G."* Mr. Linklater, as part of Mr. Tiede's legal team, has acquired video evidence for the Court's consideration of Mr. Tiede's current health condition.

Mr. Tiede turned 65 years old on August 2, 2023, had an acute health condition requiring an ambulance ride to the ER in July, continues to have half of his face frozen and impaired, receives inconsistent, limited medical care, has diabetes, and is living under inhumane conditions where the prison cell temperatures have been reported to surpass 120 degrees.

If Mr. Tiede is not released soon, it is very possible that he will prematurely die due to his poor health, unnecessarily prolonged incarceration, and inhumane prison conditions. Mr. Linklater's letter shares information with the Court about Bernie's acute health condition and his inhumane incarceration conditions, and shares information for this Court or any other judge or hearings officer to consider granting all legal procedural steps possible to obtain Mr. Tiede's early release. Mr. Tiede was released for two years and lived in Austin, Texas; where he demonstrated that he was no danger to society and further incarceration is an unnecessary burden on taxpayers. *See Exhibit G.*

Mr. Tiede's sister, Anna Hoffman, has indicated that Mr. Tiede may stay at her family upon release on community supervision, or for a portion of home confinement that would allow Mr. Tiede to complete his current sentence under home confinement with the use of an ankle monitor.

**Time is of the essence**. Mr. Tiede requests a Zoom hearing, and that the corrected judgment *nunc pro tunc* order be signed and entered into the record prior to the end of this month, July 2023.

Mr. Tiede acknowledges that this Court has limited plenary jurisdiction. Mr. Tiede requests that this Court grant him time served for the almost two-year period for which he was on bond granted from this Court. Once back time is received, it will be easier to petition the appropriate administrative bodies, the governor, and/or take legal action to gain Mr. Tiede's early release because Mr. Tiede will have an earlier parole date.

Therefore, Mr. Tiede requests that this hearing occur, and this judgment be signed, by or on Monday, August 21, 2023.

Respectfully submitted,

LAW OFFICE OF JODI COLE, PLLC
*Counsel for Defendant Bernhardt Tiede, II*
203 East Murphy Street
Alpine, Texas 79830
Telephone: (432)837-4266

By: */s/ Jodi Cole*
Jodi Cole, Esq.
Texas Bar No. 24045602
jcole@jodicole.com

## CERTIFICATE OF SERVICE

I certify by my signature above that a true and correct copy of the foregoing has been served to the state, via efile, on this the 10th day of August 2023.

*/s/ Jodi Cole*

3

**CASE NO. 1997-C-103**  COUNT 1
INCIDENT NO./TRN: 0204510872

FILED

2016 APR 29 PM 1:40

THE STATE OF TEXAS §
§
V. §
§
BERNHARDT TIEDE, II §
§
STATE ID No.: TX05931666 §

IN THE 123RD DISTRICT

COURT

DEBRA JOHNSON, CLERK
DISTRICT COURT
RUSK COUNTY, TEXAS COUNTY, TEXAS

On change of venue from PANOLA COUNTY

DEPUTY

## JUDGMENT OF RESENTENCING BY JURY

| | | |
|---|---|---|
| Judge Presiding: | HON. DIANE V. DEVASTO | Date Judgment Entered: 4/22/2016 |
| Attorney for State: | LISA TANNER | Attorney for Defendant: JODI COLE |

Offense for which Defendant Convicted:
**MURDER INTENTIONALLY CAUSE DEATH**

| Charging Instrument: | Statute for Offense: |
|---|---|
| INDICTMENT | 19.02(b)(1) Penal Code |

Date of Offense:
**11/19/1996**

| Degree of Offense: | Plea to Offense: |
|---|---|
| 1ST DEGREE FELONY | NOT GUILTY |

| Verdict of Jury: | Findings on Deadly Weapon: |
|---|---|
| GUILTY | N/A |

| Plea to 1st Enhancement Paragraph: | N/A | Plea to 2nd Enhancement/Habitual Paragraph: | N/A |
|---|---|---|---|
| Findings on 1st Enhancement Paragraph: | N/A | Findings on 2nd Enhancement/Habitual Paragraph: | N/A |

| Punishment Assessed by: | Date Sentence Imposed: | Date Sentence to Commence: |
|---|---|---|
| JURY | 04/22/2016 | 4/22/2016 |

| Punishment and Place of Confinement: | NINETY-NINE (99) YEARS TO LIFE INSTITUTIONAL DIVISION, TDCJ |
|---|---|

### THIS SENTENCE SHALL RUN CONCURRENTLY.

☐ SENTENCE OF CONFINEMENT SUSPENDED, DEFENDANT PLACED ON COMMUNITY SUPERVISION FOR N/A .

| Fine: | Court Costs: | Restitution: | Restitution Payable to: |
|---|---|---|---|
| $ N/A | $ N/A | $ N/A | ☐ VICTIM (see below) ☐ AGENCY/AGENT (see below) |

☐ Attachment A, Order to Withdraw Funds, is incorporated into this judgment and made a part hereof.

Sex Offender Registration Requirements do not apply to the Defendant. TEX. CODE CRIM. PROC. chapter 62.

The age of the victim at the time of the offense was N/A .

| | If Defendant is to serve sentence in TDCJ, enter incarceration periods in chronological order. | | | |
|---|---|---|---|---|
| Time Credited. | From 8/18/1997 to 5/6/2014 | From 4/22/2016 to PRESENT | From to | From to |
| | From to | From to | From to | |
| | If Defendant is to serve sentence in county jail or is given credit toward fine and costs, enter days credited below. | | | |
| | N/A DAYS | NOTES: N/A | | |

All pertinent information, names and assessments indicated above are incorporated into the language of the judgment below by reference.

This cause was called for trial in _____ County, Texas. The State appeared by her District Attorney.

**Counsel / Waiver of Counsel (select one)**
☒ Defendant appeared in person with Counsel.
☐ Defendant knowingly, intelligently, and voluntarily waived the right to representation by counsel in writing in open court.

It appeared to the Court that Defendant was mentally competent and had pleaded as shown above to the charging instrument. Both parties announced ready for trial. A jury was selected, impaneled, and sworn. The INDICTMENT was read to the jury, and Defendant entered a plea to the charged offense. The Court received the plea and entered it of record.

The jury heard the evidence submitted and argument of counsel. The Court charged the jury as to its duty to determine the guilt or innocence of Defendant, and the jury retired to consider the evidence. Upon returning to open court, the jury delivered its verdict in the presence of Defendant and defense counsel, if any.

391

The Court received the verdict and ORDERED it entered upon the minutes of the Court.

**Punishment Assessed by Jury / Court (No election (select one)**

☒ **Jury.** Defendant entered a plea and filed a written election to have the jury assess punishment. The jury heard evidence relative to the question of punishment. The Court charged the jury and it retired to consider the question of punishment. After due deliberation, the jury was brought into Court, and, in open court, it returned its verdict as indicated above.

☐ **Court.** Defendant elected to have the Court assess punishment. After hearing evidence relative to the question of punishment, the Court assessed Defendant's punishment as indicated above.

☐ **No Election.** Defendant did not file a written election as to whether the judge or jury should assess punishment. After hearing evidence relative to the question of punishment, the Court assessed Defendant's punishment as indicated above.

The Court FINDS Defendant committed the above offense and ORDERS, ADJUDGES AND DECREES that Defendant is GUILTY of the above offense. The Court FINDS the Presentence Investigation, if so ordered, was done according to the applicable provisions of TEX. CODE CRIM. PROC. art. 42.12 § 9.

The Court ORDERS Defendant punished as indicated above. The Court ORDERS Defendant to pay all fines, court costs, and restitution as indicated above.

**Punishment Options (select one)**

☒ **Confinement in State Jail or Institutional Division.** The Court ORDERS the authorized agent of the State of Texas or the Sheriff of this County to take, safely convey, and deliver Defendant to the Director, Institutional Division, TDCJ. The Court ORDERS Defendant to be confined for the period and in the manner indicated above. The Court ORDERS Defendant remanded to the custody of the Sheriff of this county until the Sheriff can obey the directions of this sentence. The Court ORDERS that upon release from confinement, Defendant proceed immediately to the _____. Once there, the Court ORDERS Defendant to pay, or make arrangements to pay, any remaining unpaid fines, court costs, and restitution as ordered by the Court above.

☐ **County Jail—Confinement / Confinement in Lieu of Payment.** The Court ORDERS Defendant immediately committed to the custody of the Sheriff of _____ County, Texas on the date the sentence is to commence. Defendant shall be confined in the County Jail for the period indicated above. The Court ORDERS that upon release from confinement, Defendant shall proceed immediately to the _____. Once there, the Court ORDERS Defendant to pay, or make arrangements to pay, any remaining unpaid fines, court costs, and restitution as ordered by the Court above.

☐ **Fine Only Payment.** The punishment assessed against Defendant is for a FINE ONLY. The Court ORDERS Defendant to proceed immediately to the Office of the _____ County . Once there, the Court ORDERS Defendant to pay or make arrangements to pay all fines and court costs as ordered by the Court in this cause.

**Execution / Suspension of Sentence (select one)**

☒ The Court ORDERS Defendant's sentence EXECUTED.

☐ The Court ORDERS Defendant's sentence of confinement SUSPENDED. The Court ORDERS Defendant placed on community supervision for the adjudged period (above) so long as Defendant abides by and does not violate the terms and conditions of community supervision. The order setting forth the terms and conditions of community supervision is incorporated into this judgment by reference.

The Court ORDERS that Defendant is given credit noted above on this sentence for the time spent incarcerated.

**Furthermore, the following special findings or orders apply:**

---

Signed and entered on April 27, 2016

_____
**DIANE V. DEVASTO**
JUDGE PRESIDING

Clerk:

Right Thumbprint

CAUSE NO. 1997-C-103
CAUSE NO. 1997-C-103A

**FILED**
At 3:43 O'clock P .M.

MAY - 6 2014

DEBRA JOHNSON, CLERK
DISTRICT COURT AT LAW
COURT AT LAW & COUNTY
BY: PANOLA CO., TX
DEPUTY

| THE STATE OF TEXAS | § | IN THE 123RD JUDICIAL |
| --- | --- | --- |
| v. | § | DISTRICT COURT OF |
| BERNHARDT TIEDE, II | § | PANOLA COUNTY, TEXAS |

## ORDER ON MOTION FOR BOND PURSUANT TO TEXAS CODE OF CRIMINAL PROCEDURE ART. 11.65

Came on this day to be considered the Motion for Bond Pursuant to Texas Code of Criminal Procedure Art. 11.65. The Court, having carefully reviewed the file, considered the positions of the Applicant and the State, and accepted and made the proposed findings of facts and conclusions of law jointly stipulated to by the Applicant and the State, finds that the motion has merit and orders that it be GRANTED.

This District Court orders that Bernhardt Tiede, II, TDCJ # 00864378, Applicant in the abovestyled and numbered cause, be immediately released from the Panola County Detention Center, subject to all conditions of Art. 11.65 bond that are ordered by the convicting court, the 123rd Judicial District Court of Panola County, Texas.

The ordered release will be subject to any conditions imposed by the convicting court, until the Applicant is denied relief, remanded to custody, or ordered release. Applicant shall be considered restrained in his liberty while released on this bond, for

purposes of Chapter 11 of the Texas Code of Criminal Procedure. *Ct. enters order — with Conditions of release* .

So ordered on this the 12th day of May, 2014.

Honorable District Judge Diane V. DeVasto
123rd District Court, Panola County, Texas

Exhibit C

# CRIMINAL DOCKET

CASE NO. 1997-C-103-A

| NUMBER OF CASE | NAMES OF PARTIES | ATTORNEYS | OFFENSE | DATE OF FILING | | |
|---|---|---|---|---|---|---|
| | | | | Mo. | Day | Year |
| 1997-C-103-A | THE STATE OF TEXAS vs. BERNHARDT TIEDE II | Danny Buck Davidson  Jodi Callaway Cole | Sealed Preliminary Application for Writ of Habeas Corpus | 1 | 28 | 2014 |

| | FEE BOOK | |
|---|---|---|
| | VOL. | PAGE |

| DATE OF ORDERS | | | ORDERS OF COURT | MINUTE BOOK | | INFORMATION OR INDICTMENT WITNESSES |
|---|---|---|---|---|---|---|
| Month | Day | Year | | Vol. | Page | |
| 2 | 5 | 14 | *(handwritten orders)* | | | |

THUMB OR FINGERPRINT

157

# CRIMINAL DOCKET

THE STATE OF TEXAS

vs. NO. 1997-C-103-A

Tiede, Bernhardt

| DATE OF ORDERS | | | ORDERS OF COURT - continued | MINUTE BOOK | |
|---|---|---|---|---|---|
| Month | Day | Year | | Vol. | Page |
| | | | h.c. instructs the David son | | |
| | | | no oblig to follow-up with Lt. | | |
| | | | hppd make file in this matter | | |
| | | | (trial case) for review. C.A | | |
| | | | proceed to plea hearing if needed | SCANNED | |
| 5/6/14 | | | (1) Parties case on bond per Agr. | | |
| | | | Writ h.c. Bail Partie | | |
| | | | can ready Writ h.c. p.19 | | |
| | | | retarded related - no-plead | | |
| | | | in agreement. Evidence submitted | | |
| | | | Dr. Gripon testified Dff 2. | | |
| | | | Standoun be has entire Dff | | |
| | | | Cs. depts. Agencies Standard | | |
| | | | Order entered | | |
| 5/11/14 | | | Hears on 11.65 Writ motion | | |
| | | | for Release. Evid. provided | | |
| | | | no evid as proposed conditions | | |

1997-C-103 A

# CRIMINAL DOCKET

| Number of Case | STYLE OF CASE | ATTORNEYS | OFFENSE | Date |
|---|---|---|---|---|
| | THE STATE OF TEXAS vs. | | State | Month |
| | *Beauchamp* *Leslie F.* | *Jimmy R. Dardes* *Cyba Ulrich* *Jack Tela* | *Cyba Ulrich* 40 | |

Defendant

**ORDERS OF COURT**

| Minute Book | |
|---|---|
| Vol. | Page |

Date of Orders: Month / Day / Year

5-6-16
Cont'd

*Cy gr o 73 breach (P.R.)*
*for 30.00 with condition*
*Dawson for Travis Cy*
*Suspension*

159

# CRIMINAL DOCKET

1997-C-103 A

160

| No. | STYLE OF CASE | ATTORNEYS | OFFENSE | | |
|---|---|---|---|---|---|
| Number of Case | THE STATE OF TEXAS vs. | Stand | | | |
| | Bombaret Burke G. | Henry E. Doster (App Atty) Jodie Cole (AD) | | | |
| | | **Defendant** | | | |

| Date of Orders | | ORDERS OF COURT | | Minute Book | |
|---|---|---|---|---|---|
| Month | Day | Year | | Vol. | Page |

| Date of Orders | ORDERS OF COURT |
|---|---|
| 5-6-14 Cont'd | Ct grants bond (P.R.) for $10,000 with Condition of Release for "Pre-trial Supervision" |
| 1-2-15 | Mandate of Court Appeals C/A received in Open Ct. |

SCANNED

THE STATE OF TEXAS
vs. NO. 1997-C-103-A
Tiede, Bernhardt

# CRIMINAL DOCKET

| DATE OF ORDERS | | | ORDERS OF COURT - CONTINUED | MINUTE BOOK | | |
|---|---|---|---|---|---|---|
| Month | Day | Year | | Vol. | Page | |
| | | | *(handwritten entry, illegible)* | | | |

# Exhibit D

CAUSE NO. ~~1997-C-104~~
*1997-C-103*

FILED

2011 JAN -5 PH 3: 16

| THE STATE OF TEXAS | § | IN THE 123RD JUDICIAL |
| v. | § | DISTRICT COURT OF |
| BERNHARDT TIEDE, II | § | PANOLA COUNTY, TEXAS |

## ORDER ON MOTION FOR PERSONAL BOND

Came on this day to be considered Bernhardt Tiede, II's Motion for Personal
Bond. The Court, having carefully reviewed the file, finds that this motion should be
GRANTED/denied.

If granted, Mr. Tiede's previous conditions of community supervision shall
continue to apply to the new bond, so that they are the following:

1. Submit to random drug testing at Mr. Tiede's expense;

2. Report to Travis County Pretrial Services, within 48 hours of release;

3. Any supervision fees related to Travis County's courtesy supervision should be
   paid by Mr. Tiede, as a bond condition;

4. Live in designated residence, the location of which this Court will directly provide
   to Travis County Pretrial Supervision;

5. Maintain employment with designated employer, the location of which this Court
   will directly provide to Travis County Pretrial Supervision;

6. Surrender any passport to the Court, as verified through Mr. Tiede or his attorney;

7. Not obtain a passport or other international travel document;

8. No voluntary contact with media;

189

9. No change of address without informing Travis County Pretrial Services and the Court, in writing, within 12 hours;

10. No change of employment without informing Travis County Pretrial Services and the Court, in writing, within 12 hours;

11. No travel outside of Travis County, Bastrop County, Williamson County, Caldwell County, Hays County, Burlison County, McLennan County, and Comal County, without prior permission from the Court;

12. Fully adhere to terms specified in "Treatment Plan" at Mr. Tiede's expense;

13. Participate in family counseling with sister, as recommended by therapist;

14. No contact with victim's family;

15. Any other conditions required by Travis County Pretrial Supervision;

16. Mr. Tiede may not possess, buy, or receive any firearms, ammunition, or explosive device;

17. Mr. Tiede should not be a participant in social media during the pendency of Cause Nos. 1997-C-103/103A and 1997-C-104, including, but not limited to, participation on Facebook or Twitter.

Mr. Tiede's supervised release will be subject to any conditions imposed by the convicting court, until his criminal cases are resolved. Movant shall be considered restrained in his liberty while released on this bond, for purposes of Chapter 11 of the Texas Code of Criminal Procedure.

So ordered on this the 2 day of January, 2015.

Honorable District Judge Diane V. DeVasto
Visiting Judge of the 123rd District Court, Panola County, Texas

190

# Exhibit E



**CASE NO. 1997-C-109**  COUNT 1
INCIDENT NO./TRN: 0204610872

**FILED**

| | |
|---|---|
| **THE STATE OF TEXAS** | IN THE 123RD DISTRICT |
| | 2016 JUL -8 PM 1:18 |
| **v.** | COURT |
| | DEBRA JOHNSON, CLERK |
| | DISTRICT COURT |
| **BERNHARDT TIEDE, II** | RUSK COUNTY, TEXAS |
| | BY ~~Williams~~ DEPUTY |
| **STATE ID NO : TX05931686** | On change of venue from PANOLA COUNTY |

## NUNC PRO TUNC
## JUDGMENT OF RESENTENCING BY JURY

| | | | |
|---|---|---|---|
| **Judge Presiding:** | HON. | **Date Judgment Entered:** | 4/22/2016 |
| **Attorney for State:** | **LISA TANNER** | **Attorney for Defendant:** | **MIKE DEGEURIN** |

| | |
|---|---|
| **Offense for which Defendant Convicted:** | |
| MURDER INTENTIONALLY CAUSE DEATH | |
| **Charging Instrument:** | **Statute for Offense:** |
| INDICTMENT | 19.02(b)(1) Penal Code |
| **Date of Offense:** | |
| 11/19/1996 | |
| **Degree of Offense:** | **Plea to Offense:** |
| 1ST DEGREE FELONY | NOT GUILTY |
| **Verdict of Jury:** | **Findings on Deadly Weapon:** |
| GUILTY | N/A |

| | | | |
|---|---|---|---|
| **Plea to 1st Enhancement Paragraph:** | N/A | **Plea to 2nd Enhancement/Habitual Paragraph:** | N/A |
| **Findings on 1st Enhancement Paragraph:** | N/A | **Findings on 2nd Enhancement/Habitual Paragraph:** | N/A |
| **Punished Assessed by:** | **Date Sentence Imposed:** | | **Date Sentence to Commence:** |
| JURY | 4/22/2016 | | 4/22/2016 |
| **Punishment and Place of Confinement:** | NINETY-NINE YEARS INSTITUTIONAL DIVISION, TDCJ | | |

### THIS SENTENCE SHALL RUN CONCURRENTLY.

☐ SENTENCE OF CONFINEMENT SUSPENDED, DEFENDANT PLACED ON COMMUNITY SUPERVISION FOR N/A .

| **Fine:** | **Court Costs:** | **Restitution:** | **Restitution Payable to:** |
|---|---|---|---|
| $ N/A | $ | $ N/A | ☐ VICTIM (see below) ☐ AGENCY/AGENT (see below) |

☐ Attachment A, Order to Withdraw Funds, is incorporated into this judgment and made a part hereof.

Sex Offender Registration Requirements do not apply to the Defendant. TEX. CODE CRIM. PROC. chapter 62.

The age of the victim at the time of the offense was N/A .

| | | | | | |
|---|---|---|---|---|---|
| | If Defendant is to serve sentence in TDCJ, enter incarceration periods in chronological order. | | | | |
| | From 8/19/1997 to 5/6/2014 | From 4/22/2016 to PRESENT | From | to | |
| **Time Credited:** | From | to | From | to | From | to |
| | If Defendant is to serve sentence in county jail or is given credit toward fine and costs, enter days credited below. | | | | |
| | N/A DAYS | NOTES: N/A | | | |

All pertinent information, names and assessments indicated above are incorporated into the language of the judgment below by reference.

This cause was called for trial in Rusk County, Texas. The State appeared by her District Attorney.

Counsel / Waiver of Counsel (select one)

☒ Defendant appeared in person with Counsel.

☐ Defendant knowingly, intelligently, and voluntarily waived the right to representation by counsel in writing in open court.

It appeared to the Court that Defendant was mentally competent and had pleaded as shown above to the charging instrument. Both parties announced ready for trial. A jury was selected, impaneled, and sworn. The INDICTMENT was read to the jury, and Defendant entered a plea to the charged offense. The Court received the plea and entered it of record.

State Bernhardt 1997-C-109 Nunc Pro Tunc (2).DOC    Page 1 of 2

444

The jury heard the evidence submitted and argument of counsel. The Court charged the jury as to its duty to determine the guilt or innocence of Defendant, and the jury retired to consider the evidence. Upon returning to open court, the jury delivered its verdict in the presence of Defendant and defense counsel, if any.

The Court received the verdict and ORDERED it entered upon the minutes of the Court.

**Punishment Assessed by Jury / Court / No election (select one)**

☒ Jury. Defendant entered a plea and filed a written election to have the jury assess punishment. The jury heard evidence relative to the question of punishment. The Court charged the jury and it retired to consider the question of punishment. After due deliberation, the jury was brought into Court, and, in open court, it returned its verdict as indicated above.

☐ Court. Defendant elected to have the Court assess punishment. After hearing evidence relative to the question of punishment, the Court assessed Defendant's punishment as indicated above.

☐ No Election. Defendant did not file a written election as to whether the judge or jury should assess punishment. After hearing evidence relative to the question of punishment, the Court assessed Defendant's punishment as indicated above.

The Court FINDS Defendant committed the above offense and ORDERS, ADJUDGES AND DECREES that Defendant is GUILTY of the above offense. The Court FINDS the Presentence Investigation, if so ordered, was done according to the applicable provisions of TEX. CODE CRIM. PROC. art. 42.13 § 9.

The Court ORDERS Defendant punished as indicated above. The Court ORDERS Defendant to pay all fines, court costs, and restitution as indicated above.

**Punishment Options (select one)**

☒ Confinement in State Jail or Institutional Division. The Court ORDERS the authorized agent of the State of Texas or the Sheriff of this County to take, safely convey, and deliver Defendant to the Director, Institutional Division, TDCJ. The Court ORDERS Defendant to be confined for the period and in the manner indicated above. The Court ORDERS Defendant remanded to the custody of the Sheriff of this county until the Sheriff can obey the directions of this sentence. The Court ORDERS that upon release from confinement, Defendant proceed immediately to the _____. Once there, the Court ORDERS Defendant to pay, or make arrangements to pay, any remaining unpaid fines, court costs, and restitution as ordered by the Court above.

☐ County Jail—Confinement / Confinement in Lieu of Payment. The Court ORDERS Defendant immediately committed to the custody of the Sheriff of _____ County, Texas on the date the sentence is to commence. Defendant shall be confined in the County Jail for the period indicated above. The Court ORDERS that upon release from confinement, Defendant shall proceed immediately to the _____. Once there, the Court ORDERS Defendant to pay, or make arrangements to pay, any remaining unpaid fines, court costs, and restitution as ordered by the Court above.

☐ Fine Only Payment. The punishment assessed against Defendant is for a FINE ONLY. The Court ORDERS Defendant to proceed immediately to the Office of the _____ County. Once there, the Court ORDERS Defendant to pay or make arrangements to pay all fines and court costs as ordered by the Court in this cause.

**Execution / Suspension of Sentence (select one)**

☒ The Court ORDERS Defendant's sentence EXECUTED.

☐ The Court ORDERS Defendant's sentence of confinement SUSPENDED. The Court ORDERS Defendant placed on community supervision for the adjudged period (above) so long as Defendant abides by and does not violate the terms and conditions of community supervision. The order setting forth the terms and conditions of community supervision is incorporated into this judgment by reference.

The Court ORDERS that Defendant is given credit noted above on this sentence for the time spent incarcerated.

**Furthermore, the following special findings or orders apply:**

Signed and entered on ___ Jly 7, 2016

DIANE V. DEVASTO
JUDGE PRESIDING

Clerk

Right Thumbprint

445




**Exhibit F**

| | | |
|---|---|---|
| **THE STATE OF TEXAS** | § | **IN THE 123RD DISTRICT** |
| | § | |
| **V.** | § | **COURT** |
| | § | |
| **BERNHARDT TIEDE, II** | § | **RUSK COUNTY, TEXAS** |
| | § | |
| STATE ID NO.: TX05931666 | § | On change of venue from PANOLA COUNTY |

# NUNC PRO TUNC
## JUDGMENT OF RESENTENCING BY JURY

| Judge Presiding: | HON. | Date Judgment Entered: | 4/22/2016 |
|---|---|---|---|
| Attorney for State: | **LISA TANNER** | Attorney for Defendant: | **MIKE DEGEURIN** |

Offense for which Defendant Convicted:
**MURDER INTENTIONALLY CAUSE DEATH**

| Charging Instrument: | Statute for Offense: |
|---|---|
| **INDICTMENT** | **19.02(b)(1) Penal Code** |

Date of Offense:
**11/19/1996**

| Degree of Offense: | Plea to Offense: |
|---|---|
| **1ST DEGREE FELONY** | **NOT GUILTY** |

| Verdict of Jury: | Findings on Deadly Weapon: |
|---|---|
| **GUILTY** | **N/A** |

| Plea to 1st Enhancement Paragraph: | **N/A** | Plea to 2nd Enhancement/Habitual Paragraph: | **N/A** |
|---|---|---|---|
| Findings on 1st Enhancement Paragraph: | **N/A** | Findings on 2nd Enhancement/Habitual Paragraph: | **N/A** |

| Punished Assessed by: | Date Sentence Imposed: | Date Sentence to Commence: |
|---|---|---|
| **JURY** | **4/22/2016** | **4/22/2016** |

| Punishment and Place of Confinement: | **NINETY-NINE YEARS INSTITUTIONAL DIVISION, TDCJ** |
|---|---|

### THIS SENTENCE SHALL RUN **CONCURRENTLY**.

☐ SENTENCE OF CONFINEMENT SUSPENDED, DEFENDANT PLACED ON COMMUNITY SUPERVISION FOR **N/A**.

| Fine: | Court Costs: | Restitution: | Restitution Payable to: |
|---|---|---|---|
| $ **N/A** | $ | $ **N/A** | ☐ VICTIM (see below)   ☐ AGENCY/AGENT (see below) |

☐ Attachment A, Order to Withdraw Funds, is incorporated into this judgment and made a part hereof.

Sex Offender Registration Requirements do not apply to the Defendant. TEX. CODE CRIM. PROC. chapter 62.

The age of the victim at the time of the offense was **N/A**.

If Defendant is to serve sentence in TDCJ, enter incarceration periods in chronological order.

| Time Credited: | From **8/18/1997** to **5/6/2014** | From **4/22/2016** to **PRESENT** | From | to |
|---|---|---|---|---|
| | From | to | From | to | From | to |

If Defendant is to serve sentence in county jail or is given credit toward fine and costs, enter days credited below.

**717 DAYS**    NOTES: **TOWARD INCARCERATION**

All pertinent information, names and assessments indicated above are incorporated into the language of the judgment below by reference.

This cause was called for trial in Rusk County, Texas. The State appeared by her District Attorney.

**Counsel / Waiver of Counsel (select one)**

☒ Defendant appeared in person with Counsel.

☐ Defendant knowingly, intelligently, and voluntarily waived the right to representation by counsel in writing in open court.

It appeared to the Court that Defendant was mentally competent and had pleaded as shown above to the charging instrument. Both parties announced ready for trial. A jury was selected, impaneled, and sworn. The INDICTMENT was read to the jury, and Defendant entered a plea to the charged offense. The Court received the plea and entered it of record.

The jury heard the evidence submitted and argument of counsel. The Court charged the jury as to its duty to determine the guilt or innocence of Defendant, and the jury retired to consider the evidence. Upon returning to open court, the jury delivered its verdict in the presence of Defendant and defense counsel, if any.

The Court received the verdict and **ORDERED** it entered upon the minutes of the Court.

### Punishment Assessed by Jury / Court / No election (select one)

☒ **Jury.** Defendant entered a plea and filed a written election to have the jury assess punishment. The jury heard evidence relative to the question of punishment. The Court charged the jury and it retired to consider the question of punishment. After due deliberation, the jury was brought into Court, and, in open court, it returned its verdict as indicated above.

☐ **Court.** Defendant elected to have the Court assess punishment. After hearing evidence relative to the question of punishment, the Court assessed Defendant's punishment as indicated above.

☐ **No Election.** Defendant did not file a written election as to whether the judge or jury should assess punishment. After hearing evidence relative to the question of punishment, the Court assessed Defendant's punishment as indicated above.

The Court **FINDS** Defendant committed the above offense and **ORDERS, ADJUDGES AND DECREES** that Defendant is **GUILTY** of the above offense. The Court **FINDS** the Presentence Investigation, if so ordered, was done according to the applicable provisions of TEX. CODE CRIM. PROC. art. 42.12 § 9.

The Court **ORDERS** Defendant punished as indicated above. The Court **ORDERS** Defendant to pay all fines, court costs, and restitution as indicated above.

### Punishment Options (select one)

☒ **Confinement in State Jail or Institutional Division.** The Court **ORDERS** the authorized agent of the State of Texas or the Sheriff of this County to take, safely convey, and deliver Defendant to the **Director, Institutional Division, TDCJ** The Court **ORDERS** Defendant to be confined for the period and in the manner indicated above. The Court **ORDERS** Defendant remanded to the custody of the Sheriff of this county until the Sheriff can obey the directions of this sentence. The Court **ORDERS** that upon release from confinement, Defendant proceed immediately to the                . Once there, the Court **ORDERS** Defendant to pay, or make arrangements to pay, any remaining unpaid fines, court costs, and restitution as ordered by the Court above.

☐ **County Jail—Confinement / Confinement in Lieu of Payment.** The Court **ORDERS** Defendant immediately committed to the custody of the Sheriff of                County, Texas on the date the sentence is to commence. Defendant shall be confined in the County Jail for the period indicated above. The Court **ORDERS** that upon release from confinement, Defendant shall proceed immediately to the                . Once there, the Court **ORDERS** Defendant to pay, or make arrangements to pay, any remaining unpaid fines, court costs, and restitution as ordered by the Court above.

☐ **Fine Only Payment.** The punishment assessed against Defendant is for a **FINE ONLY.** The Court **ORDERS** Defendant to proceed immediately to the Office of the                County. Once there, the Court **ORDERS** Defendant to pay or make arrangements to pay all fines and court costs as ordered by the Court in this cause.

### Execution / Suspension of Sentence (select one)

☒ The Court **ORDERS** Defendant's sentence **EXECUTED.**

☐ The Court **ORDERS** Defendant's sentence of confinement **SUSPENDED.** The Court **ORDERS** Defendant placed on community supervision for the adjudged period (above) so long as Defendant abides by and does not violate the terms and conditions of community supervision. The order setting forth the terms and conditions of community supervision is incorporated into this judgment by reference.

The Court **ORDERS** that Defendant is given credit noted above on this sentence for the time spent incarcerated.

### Furthermore, the following special findings or orders apply:

_____

**Signed and entered on July _____, 2023**

*X* _____
**DIANE V. DEVASTO**
JUDGE PRESIDING

Clerk

Right Thumbprint

# Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Aleksandra Chapman on behalf of Jodi Cole
Bar No. 24045602
achapman@jodicole.com
Envelope ID: 77680807
Filing Code Description: Motion
Filing Description: Motion for Judgment Nunc Pro Tunc
Status as of 7/19/2023 4:02 PM CST

Associated Case Party: BERNHARDTIITIEDE

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Jodi Cole | | jcole@jodicole.com | 7/19/2023 2:17:05 PM | SENT |
| Aleksandra Chapman | | achapman@jodicole.com | 7/19/2023 2:17:05 PM | SENT |

Associated Case Party: State of Texas

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Danny BuckDavidson | | Danny.davidson@co.panola.tx.us | 7/19/2023 2:17:05 PM | SENT |

Associated Case Party: RODMNUGENT

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Danny BuckDavidson | | Danny.davidson@co.panola.tx.us | 7/19/2023 2:17:05 PM | SENT |

Associated Case Party: ALEXANDRIAL.NUGENT

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Danny BuckDavidson | | Danny.davidson@co.panola.tx.us | 7/19/2023 2:17:05 PM | SENT |

Associated Case Party: SUSANNUGENTJENULL

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Danny BuckDavidson | | Danny.davidson@co.panola.tx.us | 7/19/2023 2:17:05 PM | SENT |

Associated Case Party: SHANNANUGENTCOBBS

## Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Aleksandra Chapman on behalf of Jodi Cole
Bar No. 24045602
achapman@jodicole.com
Envelope ID: 77680807
Filing Code Description: Motion
Filing Description: Motion for Judgment Nunc Pro Tunc
Status as of 7/19/2023 4:02 PM CST

Associated Case Party: SHANNANUGENTCOBBS

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Danny  BuckDavidson | | Danny.davidson@co.panola.tx.us | 7/19/2023 2:17:05 PM | SENT |

Associated Case Party: MATHEWTODNUGENT

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Danny  BuckDavidson | | Danny.davidson@co.panola.tx.us | 7/19/2023 2:17:05 PM | SENT |

**Automated Certificate of eService**

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Aleksandra Chapman on behalf of Jodi Cole
Bar No. 24045602
achapman@jodicole.com
Envelope ID: 78408425
Filing Code Description: Motion
Filing Description: Motion for Judgment Nunc Pro Tunc
Status as of 8/10/2023 4:31 PM CST

Associated Case Party: SHANNANUGENTCOBBS

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|---------------------|--------|
| Danny BuckDavidson | | Danny.davidson@co.panola.tx.us | 8/10/2023 2:24:08 PM | SENT |

Associated Case Party: MATHEWTODNUGENT

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|---------------------|--------|
| Danny BuckDavidson | | Danny.davidson@co.panola.tx.us | 8/10/2023 2:24:08 PM | SENT |

# THE AUSTIN CHRONICLE



**PLAINTIFF'S EXHIBIT**

**5**

https://www.austinchronicle.com/news/2023-08-18/the-state-claims-no-one-is-dying-from-120-plus-df-heat-in-prisons/

# The State Claims No One Is Dying From 120+° F Heat in Prisons

## Part 2: The state's response to the prison heat crisis

BY BRANT BINGAMON, AUGUST 18, 2023, NEWS

The thermometer had been installed high up on the wall and covered by a piece of black electrical tape so the prisoners couldn't read it. **Marci Simmons** and her fellow inmates were surviving another summer of extreme heat in the **Dr. Lane Murray Unit**, a prison without air conditioning. They knew the temperature was hotter than 100 degrees. They wanted to know how much hotter.

"It was too high without a ladder," Simmons said. "So we took a couple of Maxi pads and turned them inside out, so the sticky side was out, and put them on a mop handle. And I climbed up on this big industrial fan, with two of the girls holding it, and rolled back the tape. And it was 136 degrees."

136 degrees is a suffocating level of heat. It's what you feel when you enter a car that has been sitting in the sun for hours, with a steering wheel too hot to touch. But this is the kind of heat that inmates in two-thirds of the state's prisons – about **95,000 people** – have been enduring this summer, according to their family members and supporters. Prison advocates believe the heat has killed at least 12 inmates since June and sickened dozens, if not hundreds, more.

The **Texas Department of Criminal Justice**, which runs the prisons, disagrees. Department spokesperson **Amanda Hernandez** told us there have been no heat-related deaths this summer and only nine inmates have required medical treatment beyond first aid. (Meanwhile 25 employees have required such aid, though prisoners outnumber corrections officers 7 to 1.) "We take numerous precautions to lessen the effects of hot temperatures," Hernandez wrote in a response identical to ones she has shared with other media outlets. "These efforts work."

In fact, TDCJ has not admitted to a single heat-related death in its prisons since 2012. That year, the department acknowledged that 10 inmates had died during the historically hot summer of 2011, which, at the time, was the hottest in 75 years (though this summer is breaking many of the heat records set then). The acknowledgment led to a series of wrongful death lawsuits. It also led to *Cole vs. Collier*, a suit filed by inmates of the Wallace Pack Unit near College Station, which houses older prisoners and those in bad health. The plaintiffs in the Pack lawsuit, diagnosed with diabetes, heart disease, and obesity – conditions that made them more vulnerable to extreme heat – asked the court to force TDCJ to install AC in the prison, saying the conditions there constituted cruel and unusual punishment.

TDCJ responded that the ice and fans it provided the prisoners in the summer months were enough to keep them safe. But in 2017, Judge **Keith Ellison** ruled that the conditions at Pack were analogous to torture, that TDCJ was "deliberately indifferent" to the suffering of its inmates. "The Court finds that, despite a significant risk of harm faced by the men at the Pack Unit, [TDCJ has] done the bare minimum," the judge wrote. "They have implemented mitigating measures that they know, or should know, are ineffective given the extreme heat at the Pack Unit, and they have failed to consider seriously the many more effective options available to them."

TDCJ's defense and settlement of the Pack lawsuit cost taxpayers $7 million dollars. When AC was finally installed, it cost only $4 million. The suit demonstrated how far TDCJ was willing to go to deny that any problem existed. For example, the department presented a doctor at trial who testified that heat cramps and heat exhaustion are not serious conditions. In fact, heat-related illnesses kill more Americans each year than hurricanes, lightning, and **any other natural disasters, combined**.

After the lawsuit was settled in 2018, TDCJ enacted new policies to move elderly and medically vulnerable inmates to **air-conditioned prisons**. But it didn't ask state legislators to fund the installation of AC in its other prisons.

Instead, the department doubled down on the policies that Ellison had described as the bare minimum, requiring guards to provide ice water, fans, and extra showers to inmates in the summer months. It emphasized that inmates who felt in danger of overheating could be moved to air-conditioned areas of the prison, like the chapel or barbershop, until they cooled off, a measure known as "respite."

But with TDCJ's ongoing, statewide staff shortage, our sources tell us that many prisons aren't capable of following the policy. **Tiffany Turner** said her husband, incarcerated at the Polunsky Unit in far East Texas, is only getting cold water sporadically. "He said maybe they will get it once a day and, if they get it, there's no ice, it's just water that's a little better than lukewarm," Turner said. "He said with it being so hot, a lot of the staff are calling in. They don't want to be there."

Turner told us the staffing crisis has made respite almost nonexistent at Polunsky. **Kat Comisky**'s husband, who was recently released from the **Estelle Unit**, said the same is true there and that some guards arbitrarily deny respite. "He's seen people ask, 'Can I go to respite?' And certain guards will just say no. He said it all depends on the guard."

We've also heard repeatedly that respite is crowded and uncomfortable. "Respite is supposed to be a place with air conditioning that you can go to for 30 minutes if you feel like you're going to faint or throw up," said Samantha Woods, whose daughter, Alexis, is at Lane Murray. "But this is a room that fits 18 people and it has a tiny portable A/C unit in it that does nothing. And the room will be packed with inmates. So the body heat coming off them is just ridiculous. The inmates have to sit on the floor and be silent to get 30 minutes of cool air and then be shoved back out into the oven."

Inmates who use wheelchairs and walkers avoid respite, we're told, because it's difficult for them to sit on the floor. These inmates remain in their cells with their personal, palm-sized fans set on high. TDCJ touts the effectiveness of these fans but many regard them as worthless. "The heat gets to a certain temperature where the fans are just blowing hot air," said **Angela Gonzalez**, whose husband is at the Jim Ferguson Unit. "Most of the men are

dehydrated because they can't get to a healthy level of hydration due to all of the sweating. Their stomachs cramp up and it becomes difficult to eat."

The sweating is necessary, of course. When it stops, the inmate dies. Isaiah May, incarcerated at the Holliday Unit, said he and his fellow inmates are constantly soaked. "If it's 100 degrees outside, it's 120 in here, but you can't have your shirt off, you got to wear the cotton uniforms they give you. When you go to the chow hall, they close the doors and there'll be 200 inmates sitting in that chow hall for an hour, soaking wet with sweat."

May said he has a heat rash covering his arms. Woods' daughter has a heat rash, too. "She is in a state of perpetual dripping sweat. She doesn't sit down, if she does she's sitting in a puddle of sweat. And yeah, there's heat cramps and migraines and trouble breathing – all that stuff is going on. But the authorities don't care. And nobody on the outside knows what's happening."

---

*This is Part 2 of a three-part series on the dangerous heat in the two-thirds of state prisons that lack air conditioning. **Read Part 1 here**. Next week, we'll dive into what prisoners and advocates are demanding from the state.*

*Copyright © 2023 Austin Chronicle Corporation. All rights reserved.*





PLAINTIFF'S
EXHIBIT

https://www.austinchronicle.com/news/2023-08-11/texas-prisons-are-cooking-people-alive-are-we-okay-with-that/

# Texas Prisons Are Cooking People Alive. Are We Okay With That?

Part 1 in a series about heat in prison

BY BRANT BINGAMON, AUGUST 11, 2023, NEWS

**Alexis Woods** is facing the same crisis as other prisoners across Texas in this summer's historic heat. With temperatures soaring to 120 and even 130 degrees in her cell at the Dr. **Lane Murray Unit** outside Waco, Woods' cot is too hot to sleep on. So the 26-year-old is sleeping on the floor.

"She will take a shower, then lay on the floor, go under her bed, pull the covers down, and put her fan right there," Alexis' mother, Samantha, told the *Chronicle*. "So it's like a little box that is bearable. But as it's gotten hotter and hotter, now the floor is hot, and the walls are hot. So she's just like, 'Mom, I don't know what to do.'"

We heard from over a dozen family members of incarcerated people in researching this article, as well as several former and current prisoners. They say this improvisation – drenching yourself and lying down on bare concrete to sleep – is a near-universal practice in cells without air conditioning. These cells, metal and concrete boxes that retain and amplify the heat of the day, are found in two-thirds of Texas prisons. They house approximately 95,000 people. Roughly **4 out of 10** are serving time for nonviolent offenses, according to stats from the **Texas Department of Criminal Justice**.

"And in an hour, when that water is completely evaporated, they're waking up and pouring more water onto the floor," said **Marci Simmons**, a former inmate at Lane Murray who now runs the advocacy group Lioness Justice Impacted Women's Alliance. "And some people don't have access to the shower. They have to use the sink in their cell. The water that comes out of the sink, it's warm, it's warm enough to melt instant coffee. But the water in the toilet, if you flush it several times, it gets cool. And you have people who scrub their toilet out and put toilet water on the floor, trying to get some relief."

Simmons told us that during her years at Lane Murray the summer routine was regularly punctuated by the arrival of ambulances, putting the prison on lockdown. She said she witnessed vomiting, seizures, and loss of consciousness each year – symptoms of heat cramps and heat stroke. Left untreated, heat stroke can progress to heat exhaustion, with the heartbeat elevating to dangerous levels as the body works frantically to cool itself. Death often comes from cardiac arrest.

TDCJ denies that there is widespread heat stroke or heat exhaustion in the prisons. A TDCJ spokesperson told the *Chronicle* that in the last year, 25 employees and only 9 inmates needed medical care beyond first aid for heat-related illness. But given that prisoners outnumber corrections officers roughly 7 to 1, we would expect to see at

least 175 inmates with heat-related illness requiring medical care – and that estimate is probably too low, because it assumes that the rate of heat-related illness is the same for staff who go home at the end of their shift and prisoners who are in hot cells around the clock. (The TDCJ employs roughly 17,000 COs and houses 116,000 prisoners, per a spokesperson and TDCJ's 2022 statistical report.)

Samantha Woods says Alexis has repeatedly called her in tears this summer, describing fellow inmates collapsing and having seizures. "They're dropping like flies," Woods said. "And my daughter tells me, 'Mom, there are people in here that are too old. There are people that are mentally ill, that should be in another unit. There's people that have major medical issues, they're in wheelchairs, they're on walkers.' And with TDCJ, the narrative is so twisted. They say they have special units for the elderly. Well, I see them every single time I visit my daughter."

**Joseph Martire** has spent this summer at the **Estelle Unit** north of Huntsville, where five inmates have died since June. He said that Estelle, like Lane Murray, has many infirm inmates. "Of course there is fear," Martire told us. "You got a lot of people on this unit that have medical problems. The heat's a very big risk for them, exacerbating their health problems. They could get heat stroke or a heart attack, heat exhaustion. And you've got regular people that are susceptible too."

Martire himself has had difficulties. He says this summer has been the hottest in his 18 years behind bars. That includes last year, when he had a serious episode of heat stroke. "For 2½ hours his cellie and other people on the run were hollering, lighting fires, trying to get an officer to come down," Martire's wife, Kat Komisky, said. "When medical got to him, they said it was just in time. He had been unconscious and convulsing. Since then he's had more sensitivity to the heat. He's had multiple episodes with loss of consciousness, numbness and tingling throughout his body, seeing black spots in his vision."

## "That's a Bald-Faced Lie"

"Every summer the deaths and suicides increase – it's like clockwork," said Dr. **Amite Dominick**, the founder of **Texas Prisons Community Advocates**, which tracks inmate deaths. With this summer being so hot, Dominick has been deluged with pleas from inmates and their families. "Right now, the family members are terrified," she said. "They're panicking, honestly. It's well beyond, 'They're in prison and it's hot.' It's, 'Oh my God, they haven't called me – are they alive or dead?'"

According to the Texas Attorney General's **Custodial Death Report**, over 100 people have died in Texas prisons since the middle of June, when the heat began in earnest. A pair of recent studies by Texas A&M and Brown University estimate that as many as 12% of these deaths could be heat-related. But that's not something you will hear from TDCJ. According to the agency, there hasn't been a heat-related death in any Texas prison since 2011.

"When TDCJ insists that they haven't had a death from heat-related causes in 12 years, that's a bald-faced lie," said **Tona Southards Naranjo**, mother of Jon Anthony Southards, who died at the Estelle Unit on June 28. Naranjo said she viewed her son's body after his death and he had a heat rash "from the top of his head to the backs of his knees."

Naranjo told me that she spoke to her son three times the day he died. "He was complaining that it was so hot. 'Turn your fan on, baby,' I said. He said, 'I can't, Mama, it makes it hard for me to breathe.' I said, 'What about a

cold shower?' He laughed at me and said, 'Mama, I haven't had a shower in four days.' My son was in solitary confinement. So he was dependent on the guards for respite.

"I believed with all my heart that he would be safe in TDCJ. I believed with all my heart that going to prison would save his life, that he was safer there than he was on the streets at the time. But what happened was a judge sentenced my son to 20 years, but the TDCJ sentenced him to death."

---

*This article is part of a three-part series on the mounting heat crisis in Texas prisons. Expect Part 2 on TDCJ's response to the heat crisis in next week's issue.*

*Copyright © 2023 Austin Chronicle Corporation. All rights reserved.*

Child killer sentenced to life     Tropical Storm Hilary     Trump will skip debate     See a movie for $4     Back to school



U.S. NEWS

# Texas heat wave has inmates' families worried about lack of air conditioning in state's prisons



**BY JUAN A. LOZANO**
Published 5:56 PM CDT, July 18, 2023

AUSTIN, Texas (AP) — A heat wave that has consistently pushed temperatures well above 100 degrees Fahrenheit (37.8 degrees Celsius) across much of Texas this summer had family members of inmates on Tuesday calling for lawmakers to ensure that all of the state's prisons are fully air conditioned.

"They're cooking our inmates in the Texas prison system," said Tona Southards Naranjo, who believes the death last month of her son, Jon Southards, was caused by excessive heat in his prison, the Estelle Unit in Huntsville. Naranjo was one of more than 60 people who attended a rally outside the Texas Capitol on Tuesday.

Advocates and others have been highly critical of the lack of air conditioning in the nation's largest prison system, alleging temperatures that often go past 120 degrees Fahrenheit (48.9 degrees Celsius) inside Texas prisons in the summer have been responsible for hundreds of inmate deaths in recent years. Only about 30% of Texas' 100 prison units are fully air conditioned, with the rest having partial or no air conditioning. Texas currently has more than 128,000 inmates.

However, the Texas Department of Criminal Justice, or TDCJ, says there have been no heat-related deaths in the state's prisons since 2012. Officials are still investigating what caused Jon Southards' death, said Amanda Hernandez, a TDCJ spokesperson. At least eight other inmate deaths in recent weeks that advocates allege are heat-related were either due to cardiac arrest or other medical conditions, Hernandez said. The cause of some are still under investigation.

**OTHER NEWS**



**Sweltering temperatures bring misery to large portion of central US, setting heat records**



**Houstonians worry new laws will deter voters who don't recall the hard-won fight for voting rights**



**Are forced-reset triggers illegal machine guns? ATF and gun rights advocates at odds in court fights**

But Naranjo said her son's body was covered in a heat rash. The last time she talked with him, just hours before his death on June 28, the 36-year-old, who had asthma, complained about not being able to breathe in his cell's stifling air. He also complained about having to drink water out of his toilet because it was colder than the water from his sink.

"As a mother, this is crushing," she said.

Texas is one of at least thirteen states that doesn't have universal air conditioning in state prisons, according to a report last year by the Texas A&M University Hazard Reduction and Recovery Center and Texas Prisons Community Advocates, an advocacy group for inmates.

State Rep. Carl Sherman was one of several Democratic lawmakers who unsuccessfully tried getting bills passed in the GOP-controlled Texas Legislature this year that would have required prisons to be fully air conditioned.

"This is not a political issue. This is a humanity issue ... This is about survival," Sherman said Tuesday.

During this year's regular legislative session, which ended in May, the Texas House had proposed more than $343 million for the next two years to install air conditioning in state prisons and pay for operating expenses and maintenance. But the Senate declined to provide any funding.

The lack of funding took place as Texas had a more than $32 billion budget surplus to work with during this year's legislative session.

Cece Perez said her fiancé Martin Martinez has endured terrible conditions in his hot prison, the Stevenson Unit in Cuero, without being provided any sort of relief.

"He says that he wakes up gasping for air like somebody is suffocating him or sitting on his chest," Perez said.

Hernandez declined to comment on criticism of TDCJ from Tuesday's rally.

Rally participants asked that Republican Gov. Greg Abbott call a special legislative session to allocate funding for prison air conditioning.

A spokesperson for Abbott did not immediately return an email seeking comment.

In 2017, U.S. District Judge Keith Ellison in Houston said the nation's largest prison system was "deliberately indifferent" to heat risks and subjected inmates to "a substantial risk of serious injury or death."

Ellison's comments came as part of a settlement of a lawsuit filed by Texas inmates at one unit.

Advocates in other states are also trying to bring attention to the issue.

In Las Vegas, where temperatures have reached 116 degrees Fahrenheit (46.7 degrees Celsius) in a historic heat wave, members of prisoners' rights group Return Strong stood outside of a transitional housing center on Tuesday calling attention to the effect extreme heat has on incarcerated people. In Nevada, air conditioning in prisons can be spotty and prone to jams, Return Strong's Executive Director Jodi Hocking said in a phone interview.

Hocking said people don't really think about when it's over 115 degrees Fahrenheit (46.1 degrees Celsius) and inmates are sitting in a cell and the air conditioning only goes to some sections "and it never reaches where you live."

TDCJ has continually pushed back against any claims that there have been any recent prisoner deaths due to the heat. There were 17 deaths from 2000 to 2012, with 10 of those deaths just in 2011, when Texas experienced a record heat wave, according to TDCJ.

But a November study by researchers at Brown, Boston and Harvard universities found that 13%, or 271, of the deaths that happened in Texas prisons without universal air conditioning between 2001 and 2019 may be attributed to extreme heat during warm months.

———

Associated Press/Report for America corps member Gabe Stern contributed to this report from Reno, Nevada. Report for America is a nonprofit national service program that places journalists in local newsrooms.

———

Follow Juan A. Lozano on Twitter: https://twitter.com/juanlozano70

# 'Man Down!': Surviving the Texas Heat in Prisons Without Air-Conditioning

The record June heat has been particularly dangerous inside the state's prisons, where indoor temperatures can top 110 degrees.



**By J. David Goodman**
Reporting from Houston

Published June 29, 2023   Updated June 30, 2023

PLAINTIFF'S
EXHIBIT
U2

On the third day of 100-degree temperatures last week, locked without air-conditioning in a Texas prison north of Houston, Joseph Martire said he began to feel overwhelmed. His breathing grew heavy.

An inmate for nearly 16 years, Mr. Martire was expecting to be released in a few weeks. But it was so hot that day, he recalled, that he wondered if he would make it that long. He was covered in sweat and felt so lightheaded that he had to brace himself against a wall. At some point, he passed out.

"It's kind of weird getting woken up with fingers in your eyes and not knowing how you got there," Mr. Martire, 35, said of the efforts to revive him by pressing on pressure points around his eyes. He was eventually moved to an air-conditioned emergency medical area. "They kept me there for two hours, drinking ice water, salt water, taking my temperature, making sure I was still alive," he said.

The weekslong June heat wave scorching Texas has been particularly brutal and dangerous inside the state's sprawling prison system, where a majority of those incarcerated, and the guards who watch over them, have been struggling without air-conditioning.

In more than a dozen interviews this week, current and former inmates, as well as their relatives and friends, described an elemental effort at survival going on inside the prisons, with inmates relying on warm water, wet towels and fans that push hot air. Some flooded their cells with water from their combination sink-toilets, lying on the wet concrete for relief. Others, desperate for the guards' attention, lit fires or took to screaming in unison for water or for help with an inmate who had passed out.

"If somebody goes down, we start beating on the lockers and doors yelling, 'Man down!" said Luke King, 41, an inmate who, along with Mr. Martire, is in a prison in Huntsville, Texas. With the heat, he said, that has been happening "at least daily."

The superheated conditions inside many prisons — where temperatures can reach 110 degrees or above — have been a well-known problem for years, and not just in Texas. Across the South, prisons in habitually hot states like Louisiana, Alabama and Mississippi also do not provide centralized air-conditioning in most cases, according to a 2019 report. And the heat dome that has settled in recent weeks over Texas has been increasingly shifting to the east, bringing extreme temperatures into those Southern states.

In Texas, the Republican-controlled House this year proposed spending $545 million to install air-conditioning in the majority of state prisons that do not have it. The House also overwhelmingly approved a bill to require that the temperature in prisons be no higher than 85 degrees and no lower than 65. State law in Texas already requires county jails to keep the temperature within that range.

The bill to require cooling died in the State Senate. And despite a record surplus, the final state budget did not include money specifically for prison air-conditioning, though state prison officials have been slowly expanding cooling facilities within their existing budgets.

State Representative Terry Canales, a Democrat from South Texas, blamed the lack of action on Lt. Gov. Dan Patrick, a conservative Republican who leads the Senate. Mr. Patrick's office did not respond to a request for comment.

"The narrative comes from the 1980s that we need to be tough on crime, and installing A.C. in prisons seems soft on inmates," said Mr. Canales, who sponsored the temperature legislation and has brought bills to address prison heat in each of the last two legislative sessions.

"The truth is the state is paying millions of dollars a year in heat-related lawsuits and we're facing chronic corrections-officer shortages," he added. "It's not conservative. Being in prison in and of itself is a punishment. But nobody is signed up to be tortured."



An inmate worked outdoors outside a prison unit in Huntsville, Texas, where temperatures have recently topped 100 degrees.  Rose Baca/The Dallas Morning News, via Associated Press

The Texas Department of Criminal Justice, which runs the prisons, has not attributed any of the 32 inmate deaths recorded this month to excessive heat, and has not reported a heat-related death since 2012. Inmate advocates have questioned those statistics. A 2022 study of Texas prisoner deaths found that on average, more than 10 a year could be attributed to the heat in prisons without air-conditioning.

"We take numerous precautions to lessen the effects of hot temperatures for those incarcerated within our facilities," Amanda Hernandez, a department spokeswoman, said in a statement. "These efforts work." So far in June, she said, there have been five inmates with heat-related injuries who required medical care "beyond first aid." Last June, there were three such cases.

She added: "Much like those Texans who do not have access to air-conditioning in their homes," inmates are able to keep themselves cool by other means: ice water, fans and "access to air-conditioned respite areas when needed." She said that the department had taken steps to identify inmates who were potentially more vulnerable to the heat and given them priority placement in areas with air-conditioning.

The department operates 98 facilities, of which 31 are fully air-conditioned and 14 have no cooling at all. The rest have air-conditioning only in certain areas. The department has been adding air-conditioning each year and now has more than 43,000 "cool beds" — about a third of those in the system — according to Ms. Hernandez. The department has discussed plans to eventually air-condition all prisons at a projected cost of more than $1 billion, but still needs the funding.

In the meantime, several current inmates and their families said prisoners were suffering through the heat and had often been unable to access the promised respite areas, either because of staffing shortages or because they were denied permission. Others said there were few fans available, or that the water in their prison showers — meant as a means of cooling — offered little relief.

"He says, 'I feel terrible, I have to go take a shower,'" said Cynthia Anguiano, 41, describing a conversation with her fiancé, who has been serving a long sentence for a fatal shooting. "And then the water comes out like almost hot."

She said two of her brothers, also in Texas prisons, had been sharing their struggles with her via text messages. "Hey sis, what's up? It's been hot as hell over here," read one of their messages, shared with The New York Times. "I get shortness of breath because there's no air circulation."



An inmate sweated in a cell at the Reynaldo V. Lopez State Jail, where the main way to keep cool was with fans. Verónica G. Cárdenas for The New York Times

Hope Thommen, 40, said her boyfriend was serving a sentence for armed robbery in a prison in Central Texas, which he described to her as feeling "like a chicken coop in the heat with no shade." He told her that other inmates had set fire to sheets and mattresses, "trying to get the guards attention because they're hot," she said.

"From the minute he wakes up he says, 'I feel like I'm dying,'" Ms. Thommen said.

One of the most vocal groups advocating for inmates in Texas grew out of concern over the heat in past years. "The way to solve this problem would be to simply put the air-conditioners in," said Amite Dominick, one of the authors of the 2022 heat death study and the founder of the group, Texas Prisons Community Advocates. "People are desperate. They're tired of it."

Excessive temperatures inside prisons have also been a problem for employees and guards, said Jeff Ormsby, the executive director of the American Federation of State, County and Municipal Employees Texas Corrections, a union representing prison workers.

"It's been really bad. We've had several people call and say they're quitting because of the heat," Mr. Ormsby said. "It's a messed-up situation. The working conditions are horrific. The assaults go up in the summer because of the heat. It's just a stress factor."

An employee at one prison said the heat was so intense that his work clothes were often soaked through with sweat and that he occasionally felt overwhelmed enough to need to sit down. The employee, who requested anonymity because he feared reprisal for complaining about his work conditions, said he had seen a colleague taken away in an ambulance this month.

Inmates described similar experiences of watching those around them succumb to the extreme temperatures. "I've seen a lot of old people go down from this heat. There's just no relief here, there ain't none," said Mr. King in Huntsville, who was imprisoned for crimes including theft and burglary. "I'd hate to lose my life behind this. I'd hate to die because I'm in a hot cell."

He added: "I understand that we're inmates and we make mistakes. Paying for your mistakes is one thing. But living like this is wrong."

Mr. Martire, who has been serving a sentence for burglary, said that when he passed out from the heat this month there were two others in the emergency area, also recovering from being overheated.

"It's like sitting inside of a convection oven," he said in a telephone interview. "It heats up and it keeps on heating up when the sun goes down." He has tried to stay focused on his impending release and said his plans for coping with the summer heat on the outside were relatively simple.

"Swimming as much as possible," he said.

Audio produced by Adrienne Hurst.

**J. David Goodman** is the Houston bureau chief, covering Texas. He has written about government, criminal justice and the role of money in politics for The Times since 2012. More about J. David Goodman

A version of this article appears in print on , Section A, Page 11 of the New York edition with the headline: Surviving Texas Heat in Prisons Without Air-Conditioning




PLAINTIFF'S EXHIBIT

✔
_____

**July 19, 2017 | Press Release**

# AG Paxton: Texas Will Appeal Prison Heat Ruling

Attorney General Ken Paxton today voiced his disappointment after a federal judge sided with a group of Texas inmates who sued the Texas Department of Criminal Justice (TDCJ) over summer heat conditions at the Wallace Pack Unit northwest of Houston.

Among other things, U.S. District Judge Keith Ellison granted a preliminary injunction that orders the TDCJ to lower the temperatures in the Pack Unit's housing areas where heat-sensitive inmates reside to a heat index of no more than 88 degrees or transfer them to other jails, and provide even young and healthy inmates access to unlimited periods in air-conditioned respite areas. The court refused to grant all of the relief the plaintiffs sought, such as retrofitting the Unit with a permanent air conditioning system.

"The judge's ruling downplays the substantial precautions TDCJ already has in place to protect inmates from the summer heat," Attorney General Paxton said. "Texas taxpayers shouldn't be on the hook for tens of millions of dollars to pay for expensive prison air conditioning systems, which are unnecessary and not constitutionally mandated. We'll appeal the decision and are

confident that TDCJ is already doing what is constitutionally required to adequately safeguard offenders from heat-related illnesses."

It has been estimated it would have cost TDCJ $20 million to retrofit the Pack Unit with a permanent air conditioning system had the Court required TDCJ to provide such a remedy. To mitigate potential health problems from the heat, Pack Unit offenders are constantly provided ice water, along with fans and other ventilation, cool-down showers, unlimited rest periods in air-conditioned areas, and education concerning heat precautions. When heat conditions warrant, normal inmate activity is restricted. In addition, prison employees are trained and instructed to identify those that may have heat-related illnesses and refer them to medical staff for treatment.

Back to Top


**PLAINTIFF'S EXHIBIT**

W

https://apnews.com/article/heat-wave-record-temperature-c55d9f858297c9941560c5c50b5dc77b

| AP | DEVELOPING | EDITOR'S PICK | SPOTLIGHT |

# Sweltering temperatures bring misery to large portion of central US, setting heat records

Sweltering temperatures are lingering in a large swath of the central U.S., causing misery from the Gulf of Mexico to the Great Lakes

By JUAN A. LOZANO - Associated Press
Aug 21, 2023

## Walker County, TX

Home / Walker County, TX



**Map released: Thurs. August 17, 2023**
Data valid: August 15, 2023 at 8 a.m. EDT

### Intensity

☐ None
☐ D0 (Abnormally Dry)
☐ D1 (Moderate Drought)
☐ D2 (Severe Drought)
☐ D3 (Extreme Drought)
☐ D4 (Exceptional Drought)
☐ No Data

### Authors

**United States and Puerto Rico Author(s):**
Lindsay Johnson, National Drought Mitigation Center

**Pacific Islands and Virgin Islands Author(s):**
Curtis Riganti, National Drought Mitigation Center

Walker County is .75% in the D3-4 in the last week.

droughtmonitor.unl.edu

    



HOUSTON — Sweltering temperatures lingered Sunday in a large swath of the central U.S., causing misery from the Gulf of Mexico to the Great Lakes.

Record high temperatures were recorded in Texas and other states. People were told to chug extra water while mowing lawns or exercising outdoors, and to check on neighbors to ensure air conditioning is available. The extreme heat prompted Texas' electric power grid manager to ask residents to voluntary conserve power for three hours on Sunday night.

"These high temperatures can impact our friends, families, and neighbors who may live alone, especially if they limit their use of air conditioning," Sarah Russell, commissioner for the St. Louis Emergency Management Agency, said in a statement. "We urge everyone to stop and visit loved ones to ensure they are healthy and well during this extreme heat."

The area is not cooling off enough at night, Sarah Barnes, a meteorologist with the National Weather Service said.

"That's really going to contribute to an increased risk of heat-related illnesses," Barnes said Sunday. "That's the main concern when it comes to people and the heat."

The Electric Reliability Council of Texas, or ERCOT, on Sunday asked the state's 30 million residents to voluntarily reduce power use from 7 p.m. to 10 p.m. CDT because of "extreme temperatures, continued high demand and unexpected loss of thermal generation."

ERCOT's request for voluntary power conservation was the second such request in the past three days. The agency said it was not in emergency operations. Many residents still view the power grid nervously more than 2.5 years after a deadly winter blackout.

The heat wave causing misery this weekend is just the latest to punish the U.S. this year.

Scientists have long warned that climate change, driven by the burning of fossil fuels, by deforestation and by certain agricultural practices, will lead to more and prolonged bouts of extreme weather, including hotter temperatures.

The entire globe has simmered to record heat both in June and July. And if that's not enough, smoke from wildfires, floods and droughts have caused problems globally.

The National Weather Service set an excessive heat warning Sunday for parts of Texas, Louisiana, Arkansas, Oklahoma, Kansas, Missouri, Illinois, Iowa and Nebraska. Heat advisories or watches were also in place in parts of Alabama, Mississippi, Tennessee, Kentucky, Indiana, Wisconsin, Minnesota and South Dakota.

Tourism in New Orleans often slows during the peak of summer heat, and that's happening as temperatures approach 100 F (37.8 C).

NOLA Poboys is closing two days a week for now, said Lucas McQueen, one of the restaurant's chefs. "I can't wait to be complaining about being cold," McQueen told WWL-TV.

The temperature reached a record high for the date of 104 F (40 C) Saturday in Jackson, Mississippi, as people walked between indoor and outdoor events at the Mississippi Book Festival. Volunteers distributed chilled water, and people used handheld fans while chatting with authors and shopping for books at large tents outside the state Capitol building.

Houston on Sunday added to its ongoing streak of high temperatures at or above 100 F (37.8 C). Through Sunday, the high temperature in Houston has been at least 100 F for 22 days. Sunday's high was 108 F (42.2 C), breaking a record for the date that goes back to 1909.

The stifling heat in Texas overwhelmed people taking part in orientation for new students at Prairie View A&M University, 48 miles (77 kilometers) northwest of Houston. University officials said they were reviewing operations after 38 students were hospitalized Friday night after suffering heat-related illnesses, including dehydration. One student was taken by helicopter to a hospital in nearby College Station, while 37 were taken in ambulances to other facilities, Waller County EMS Chief Rhonda Getschman told KBTX.

"It's very easy to overheat quickly in this Texas heat. We highly encourage everyone to stay indoors as much as possible," Getschman said.

Much of Iowa is expected to see high temperatures in the upper 90s Sunday and Monday, followed by three days where the reading will likely top 100 F (37.8 C).

The heat was worrisome for Sunday as thousands were expected for the final day of the Iowa State Fair in Des Moines. In a Facebook post, fair officials urged patrons to visit air-conditioned buildings, take regular breaks and stay hydrated.

Forecasters expected high temperatures to reach 99 F (37.2 C) to 103 F (39.4 C) through Friday in St. Louis, and the heat's only part of the problem: Excessive humidity will lead to a heat index of up to 115 F (46.1 C) each day. The St. Louis Post-Dispatch reported that if the prediction holds, it will be the worst stretch of heat in St. Louis since August 2014, when temperatures rose to about 95 F (35 C) for seven straight days.

Similar heat is expected all week in Little Rock, Arkansas, prompting the community to open several cooling centers for people who live on the streets or without air conditioning.

Last month, the Phoenix area broiled under a record-setting 31 days of daily high temperatures of 110 F (43.4 C) or above. The historic heat began blasting the region in June, stretching from Texas across New Mexico and Arizona and into California's desert.

The previous record was 18 straight days in 1974. In July, the continental United States set a record for overnight warmth, providing little relief from daytime heat for people, animals, plants and the electric grid, meteorologists said.

The Centers for Disease Control and Prevention reports just 600 to 700 heat deaths annually in the United States. But experts say the mishmash of ways that more than 3,000 counties calculate heat deaths means the public doesn't really know how many people die in the U.S. each year.

Associated Press writers Jim Salter in St. Louis, Jackie Quinn in Washington and Emily Wagster Pettus in Jackson, Mississippi, contributed to this report.

Follow AP's climate and environment coverage at https://apnews.com/hub/climate-and-environment

Copyright 2023 The Associated Press. All rights reserved. This material may not be published, broadcast, rewritten or redistributed without permission.

Trending Video

Loading...

# Huntsville Item Events

📅 See All Events    ➕ Add your event

Sat, Sep 02        Sat, Sep 02        Wed, Sep 06        Fri, Sep 08

‹                                                                    ›

| Rick Treviño | | | Kayleigh Mathews | | | Coach-Led Lap Swim at Recreational Sports Cente... | | | Weekly Seminar Series: Emerging Technologies | | |
| Hunstville Community Theatre | | | West Sandy Creek Winery | | | Sam Houston State University | | | Sam Houston State Univer: | | |

| 📅 | TUE 22 | WED 23 | THU 24 | FRI 25 | SAT 26 | SUN 27 | MON 28 | TUE 29 | WED 30 | THU 31 | FRI 1 | SAT 2 | SUN 3 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|



**PLAINTIFF'S EXHIBIT**

Search City or Zip Code    US  °F

Today   Hourly   10 Day   Weekend   Monthly   Rac

**Sign Up. It's free**  ✕

Access your saved locations and preference on any device. Sign up for a free account.

Sign Up

# 10 Day Weather - Huntsville, TX

As of 1:16 pm CDT

⚠️ **Red Flag Warning +2 More**

---

**Tue 22 | Day**

## 101° 

 6%
 ESE10 mph

Sunshine and clouds mixed. Near record high temperatures. High 101F. Winds ESE at 5 to 10 mph.

|  Humidity **35%** | ❋ UV Index **Extreme** |
|  Sunrise **6:52 am** | Sunset **7:57 pm** |

**Tue 22 | Night**

## 79° ☁️

 8%
SSE8 mph

Some passing clouds. Low 79F. Winds SSE at 5 to 10 mph.

Advertisement

**Heart Surgeon Begs Americans: "Stop Doing This To Your Blueberries"**

Learn More

Can Dental Implants Be Paid For By

5 Odd Things About Hilary

| | Humidity **67%** | | UV Index **0 of 11** |
|---|---|---|---|
| | Moonrise **12:24 pm** | | Moonset **11:20 pm** |
| | Waxing Crescent | | |

| Wed 23 | **104°**/81° | | Mostly Sunny | 8% | E 6 mph |
|---|---|---|---|---|---|
| Thu 24 | **107°**/81° | | Mostly Sunny | 8% | NE 6 mph |
| Fri 25 | **105°**/79° | | Partly Cloudy | 15% | S 6 mph |
| Sat 26 | **105°**/79° | | Mostly Sunny | 24% | SSW 5 mph |
| Sun 27 | **104°**/80° | | Partly Cloudy | 15% | WSW 6 mph |
| Mon 28 | **103°**/78° | | Partly Cloudy | 24% | NW 7 mph |
| Tue 29 | **97°**/75° | | AM Thunderstorms | 39% | |
| Wed 30 | **99°**/75° | | Mostly Sunny | 24% | N 8 mph |
| Thu 31 | **99°**/75° | | Mostly Sunny | 5% | NNE 8 mph |
| Fri 01 | **101°**/76° | | Mostly Sunny | 20% | S 8 mph |
| Sat 02 | **102°**/77° | | Mostly Sunny | 20% | S 7 mph |
| Sun 03 | **101°**/77° | | PM Thunderstorms | 39% | |
| Mon 04 | **100°**/77° | | AM Thunderstorms | 46% | |



We Noticed Several Things Worth Highlighting

## Sign Up for Web Notifications



**Don't Miss a Beat**

Turn on notifications for your desktop, tablet, or mobile web browser to stay on top of breaking news, top stories and all our best content. Read More >

Get Notifications

Advertisement



PLAINTIFF'S
EXHIBIT
_____
y
_____

# As the death toll in stifling Texas prisons climbs, congressional Democrats ask for investigation

> Most Texas prisons lack air conditioning. At least 41 prisoners have died of heart-related or undetermined causes since the unrelenting heat wave began.

BY **JOLIE MCCULLOUGH**   AUG. 21, 2023   11 AM CENTRAL                **SHARE**

*Sign up for The Brief, The Texas Tribune's daily newsletter that keeps readers up to speed on the most essential Texas news.*

At least 41 people have died in stifling, uncooled prisons of either heart-related or unknown causes during Texas' relentless and record-breaking heat wave this summer, according to a Texas Tribune analysis.

Relatives of those who died and prison rights advocates insist at least some of those deaths were caused by the heat. More than a dozen of the prisoners were in their 20s or 30s, with at least four people 35 and under reportedly dying of cardiac arrest or heart failure. The Texas Department of Criminal Justice says no prisoner has died from the brutal heat in its facilities since 2012, around the time the agency began being bombarded with wrongful death and civil rights lawsuits over the heat.

On Monday, Democrats on the U.S. House Committee on Oversight and Accountability implored Republican Chair James Comer to launch an investigation into conditions at prisons enduring sweltering temperatures, especially in Texas. The request follows the Republican committee members' investigation into conditions for defendants jailed on charges related to the Jan. 6, 2021, insurrection at the U.S. Capitol.

"The capacity of prisons and jails to adequately prepare for and provide resources to meet the increasingly extreme weather caused by climate change deserves immediate attention from this Committee," the Democrats, including Texas Reps. Greg Casar and Jasmine Crockett, wrote. "If Committee Republicans are serious about conducting oversight of the conditions within prisons and correctional facilities, and not just playing politics with a single facility, it is critical that you demand that facilities across the country hold inmates in a humane environment and not limit your interest to a single facility."

Comer's office did not immediately respond to questions about the letter.

More than two-thirds of Texas' 100 prisons don't have air conditioning in most living areas inside the concrete and steel buildings where officers and prisoners work and live. With little to no ventilation and temperatures routinely soaring into the triple digits outside, the thermometer reading often rises even higher inside the prisons.

Since June, at least a dozen prisoners have died from reported cardiac arrest or heart failure in uncooled prisons on days when the regions' outdoor heat indices were above 100 degrees, according to a Texas Tribune analysis of prison death reports and weather data. At least another 29 have died of what are still unknown causes pending autopsy results.

The death count is likely higher, as prisons have 30 days to report a prisoner's death to the state.

Mothers and sisters of prisoners who died this summer insist the heat and indifference killed their loved ones, condemning TDCJ for failing to recognize the heat as a cause of death. Heat deaths are often undercounted and misclassified, according to medical experts, and an abundance of studies link an increase in fatal heart failures to extreme heat.

TDCJ spokesperson Amanda Hernandez said Monday that her agency alone does not determine cause of death; rather a medical examiner decides if deaths are heat-related. In at least one death, the agency said officials believed the man was on drugs.

Relatives also argue the agency's reports are unreliable given that it reports more heat illnesses for staff than prisoners, despite employees being able to leave after their shifts.

TDCJ has reported 35 employee heat-related illnesses this year, but only 14 among prisoners, despite seemingly unending reports from prisoners and their loved ones of men and women passing out or experiencing other symptoms of heat exhaustion.

Under court scrutiny, TDCJ in recent years has implemented a variety of mitigation strategies for the heat, including providing fans and ice water to prisoners and allowing requests for cold showers and respite relief in air-conditioned parts of the prison, like the chapel or barbershops. But every summer, a plethora of prisoners and their supporters claim that such policies aren't followed.

"They have respite areas where people can go to get cooled off, but you rarely see them in there because we're too short handed, and this is why. It's too freaking hot," a prison officer at the Wainwright Unit in East Texas said, asking to remain anonymous for fear of losing her job.

TDCJ has been chronically understaffed for years, and officer unions often point to the debilitating heat as a major reason employees leave.

In the congressional letter, the Democrats noted that the Texas Legislature has rejected attempts to put money directly toward air conditioning its prisons, despite increasingly hot summers and a surplus in the state budget this year.

"State legislators prevail with the mindset that allowing inmates to suffer from excessive heat is appropriately 'tough on crime,'" the representatives said, concluding "the problem of prison conditions demands serious attention by Congress, and we hope that you will join us in this critical endeavor."

Hernandez said the letter ignores that lawmakers have set aside funds to air condition Texas prisons, including $85 million allocated for the upcoming biennium. The $85 million was given for TDCJ to use on "deferred maintenance projects," not specifically for air conditioning. Hernandez previously would not say whether the money was specifically intended for that purpose.

---

*The full program is now LIVE for the 2023 Texas Tribune Festival, happening Sept. 21-23 in Austin. Explore the program featuring more than 100 unforgettable conversations coming to TribFest. Panel topics include the biggest 2024 races and what's ahead, how big cities in Texas and around the country are changing, the integrity of upcoming elections and so much more.* **See the full program.**



**CLIMATE CHANGE IN TEXAS**

# This summer is on track to be among Texas' most extreme

June was only the 16th-warmest on record in Texas, but a mid-month heatwave brought an unusually high number of 100-degree days.

BY **ERIN DOUGLAS**  JULY 18, 2023   5 AM CENTRAL                          **SHARE**

*Sign up for The Brief, The Texas Tribune's daily newsletter that keeps readers up to speed on the most essential Texas news.*

An unrelenting stretch of blistering days amid an ongoing heat wave has put this summer on track to be one of Texas' most extreme, weather data shows.

Although June was only Texas' 16th warmest on record by average temperature, according to the state climatologist, a long period of very hot days between mid-June and mid-July has made this summer one of the most intense in terms of extended high temperatures.

In June, a sample of 38 weather stations across the state recorded a temperature at or above 100 degrees 250 times — the fifth-greatest monthly total for that month in the past three decades, according to a Texas Tribune analysis of National Weather Service data. The average temperature for June was 82.2 degrees, which was 2.6 degrees above the 20th century average, according to data provided by the state climatologist.

Heat waves — and the record-breaking temperatures they bring — are becoming more common and severe due to climate change, scientists have found. In the past decade in Texas, there were 1,000 more days of record-breaking heat than a normal decade, a Tribune analysis found.

"As we warm the atmosphere, the likelihood that we will have days over 100 degrees is higher," said Sylvia Dee, a Rice University climate scientist. "The tails, or extremes, will be hotter."

Still, this summer has yet to exceed last summer's historic heat. Last year was Texas' second-hottest summer on record, by average temperature. Climate change, combined with

a severe drought and La Niña weather pattern made for hot days and nights. Much of the state got enough rain earlier this year that reduced or eliminated drought conditions across the state and provided some cooling.

"We could conceivably crack the top three [warmest summers] but would have a hard time beating the summer averages from last year," said John Nielsen-Gammon, the state climatologist.

This year, an El Niño pattern has developed, meaning higher-than-average surface sea temperatures. In Texas, an El Niño pattern usually brings more moisture and a cooling effect with it. However, the length and duration of the heat wave this year has dominated the weather pattern instead.

The high-pressure weather system bearing down on the Southwest has made West Texas and the Rio Grande Valley particularly intolerable this summer.

In El Paso, it's been more than a month since temperatures didn't reach 100 degrees — the longest stretch of 100-degree heat ever in that area.

The previous record was set in 1994 with a 23-day long stretch of 100-degree heat, said Jason Grzywacz, a meteorologist for the National Weather Service in El Paso.

Though El Paso has not set very many all-time temperature records this year, it's the relentlessness of the extreme heat that's particularly notable this summer, Grzywacz said. Typically in El Paso, a monsoon pattern develops in early July that brings moisture, breaking up a heat wave, he said. But this year, the strength of the high-pressure system is pushing out any chance of rainy weather that could cool the area.

"We usually don't get this string [of high-heat days] into mid-July," he said. "But the high [pressure system] has just been sitting on the four corners [of Colorado, New Mexico, Arizona and Utah], so the moisture isn't being brought in like it normally would."

There's little relief in sight for West Texas: Nighttime temperatures have stayed in the 80s this summer, he said. Usually, El Paso's summer nights dip down to at least the 70s.

"We're running a good 6 to 12 degrees above normal [this summer], as far as low temperatures go," Grzywacz said.

As climate change pushes temperatures up over time, average nighttime temperatures globally are warming faster than daytime temperatures, scientists have found.

In McAllen, the annual heat wave that smothers northern Mexico and its border with Texas — locals call it "La Canícula" — came earlier this year, said Barry Goldsmith, warning coordination meteorologist at the National Weather Service in Brownsville.

Since June 12, McAllen has recorded 30 days at or above 100 degrees, the second-longest such stretch since 1941, when recording began at that weather station. McAllen should soon break the all-time record of 31 triple-digit days, set in 1988.

"We've had full months of July be 100 [degrees] plus in McAllen," Goldsmith said. "But what makes this year different is June."

Goldsmith said the early and sudden onset of the heat wave is likely contributing to the spiking rates of emergency room visits in South Texas.

"Heat is a normal thing down here — don't get me wrong, we are used to heat," Goldsmith said. "But we had a sharp shift in the pattern. ... We just flipped the switch."

If the heat wave continues, McAllen and other parts of Texas could break all-time records.

"We are pretty convinced July in McAllen will [continue topping] 100 degrees," Goldsmith said. "The question becomes August."

*Disclosure: Rice University has been a financial supporter of The Texas Tribune, a nonprofit, nonpartisan news organization that is funded in part by donations from members, foundations and corporate sponsors. Financial supporters play no role in the Tribune's journalism. Find a complete list of them here.*