

 Caution
As of: August 29, 2023 9:23 PM Z

## *Blackmon v. Garza*

United States Court of Appeals for the Fifth Circuit

July 30, 2012, Filed

No. 11-40316

### Reporter

484 Fed. Appx. 866 *; 2012 U.S. App. LEXIS 15711 **; 2012 WL 3086215

EUGENE BLACKMON, Plaintiff - Appellant v. EXIQUIO GARZA, Assistant Warden; DIANA KUKUA, Defendants - Appellees

**Notice:** PLEASE REFER TO *FEDERAL RULES OF APPELLATE PROCEDURE RULE 32.1* GOVERNING THE CITATION TO UNPUBLISHED OPINIONS.

**Prior History: [**1]** Appeal from the United States District Court for the Southern District of Texas. U.S.D.C. No. 2:08-cv-273.

*Blackmon v. Kukua, 758 F. Supp. 2d 398, 2010 U.S. Dist. LEXIS 128339 (S.D. Tex., 2010)*

## Core Terms

heat, dorm, temperature, prison official, inmates, prison, district court, conditions, risks, deliberately, heat-related, medication, showers, fans, high blood pressure, reasonable jury, matter of law, health risk, Defendants', indifferent, quotation, measures, marks, air, remedial measure, pre-existing, conditions of confinement, present evidence, substantial risk, physical injury

## Case Summary

### Procedural Posture

Plaintiff prisoner sued defendants, a warden and an assistant warden, pursuant to *42 U.S.C.S. § 1983*, alleging violations of his *Eighth Amendment* rights. The United States District Court for the Southern District of Texas granted judgment as a matter of law in defendants' favor. The prisoner appealed.

### Overview

The prisoner alleged that defendants did not take constitutionally adequate measures to address the extremely high temperatures in his dormitory. The prisoner contended that he was particularly susceptible to the effects of the heat because he was 63 to 64 years old and took prescription medication for pre-existing high blood pressure. The appellate court determined that the district court erred by granting judgment as a matter of law in favor of defendants because (1) a reasonable jury could conclude that the extreme heat caused substantial health risks to the prisoner, who was especially susceptible to the health risks of extreme heat because of his advanced age, pre-existing high blood pressure, and use of prescription medication, (2) a jury could reasonably conclude that the remedial

measures adopted by prison officials were inadequate, (3) the evidence presented at trial would allow a reasonable jury to find that defendants knew of the risks to the prisoner's health, and (4) the physical symptoms he described, such as headaches, nausea, shortness of breath, and blurred and dimmed vision, would constitute more than a de minimis physical injury.

**Outcome**
The appellate court reversed the judgment of the district court and remanded for a new trial.

## LexisNexis® Headnotes

Civil Procedure > Appeals > Standards of Review > De Novo Review

Civil Procedure > Trials > Judgment as Matter of Law > General Overview

*HN1*[↓]  **Standards of Review, De Novo Review**

An appellate court reviews de novo a district court's ruling on a motion for judgment as a matter of law, applying the same legal standard as the trial court.

Civil Procedure > Trials > Judgment as Matter of Law > General Overview

*HN2*[↓]  **Trials, Judgment as Matter of Law**

Judgment as a matter of law is proper after a party has been fully heard by the jury on a given issue, and there is no legally sufficient evidentiary basis for a reasonable jury to have found for that party with respect to that issue. The court is to consider all of the evidence in the light most favorable to the non-movant, drawing all factual inferences in favor of the non-moving party, and leaving credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts to the jury. Judgment as a matter of law should only be granted if the facts and inferences point so strongly and overwhelmingly in the movant's favor that reasonable jurors could not reach a contrary conclusion.

Civil Rights Law > Protection of Rights > Prisoner Rights > Confinement Conditions

Constitutional Law > Bill of Rights > Fundamental Rights > Cruel & Unusual Punishment

Civil Rights Law > Protection of Rights > Prisoner Rights > Safety

*HN3*[↓]  **Prisoner Rights, Confinement Conditions**

The *Eighth Amendment to the Constitution of the United States* prohibits the infliction of "cruel and unusual punishment." Although the Constitution does not mandate comfortable prisons, prison officials must provide humane conditions of confinement; prison officials must ensure that inmates receive adequate food, clothing, shelter, and medical care, and must take reasonable measures to guarantee the safety of the inmates.

Jodi Cole

484 Fed. Appx. 866, *866; 2012 U.S. App. LEXIS 15711, **1

Civil Rights Law > Protection of Rights > Prisoner Rights > Confinement Conditions

Constitutional Law > Bill of Rights > Fundamental Rights > Cruel & Unusual Punishment

## *HN4*[⬇] Prisoner Rights, Confinement Conditions

In a suit against a prison official for a violation of the *Eighth Amendment* relating to an inmate's conditions of confinement, two requirements must be met. First, the prison official's act or omission must be objectively serious, in that it results in the denial of the minimal civilized measure of life's necessities. For a claim based on a failure to prevent harm, the inmate must show that he is incarcerated under conditions posing a substantial risk of serious harm. Some conditions of confinement may establish an *Eighth Amendment* violation in combination when each would not do so alone, but only when they have a mutually enforcing effect that produces the deprivation of a single, identifiable human need such as food, warmth, or exercise—for example, a low cell temperature at night combined with a failure to issue blankets.

Civil Rights Law > Protection of Rights > Prisoner Rights > Confinement Conditions

Constitutional Law > Bill of Rights > Fundamental Rights > Cruel & Unusual Punishment

## *HN5*[⬇] Prisoner Rights, Confinement Conditions

Regarding the second requirement that must be met in a suit against a prison official for a violation of the *Eighth Amendment* relating to an inmate's conditions of confinement, the prison official must have a sufficiently culpable state of mind, meaning that the official was deliberately indifferent to inmate health or safety. A prison official cannot be liable for deliberate indifference unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference. Subjective recklessness as used in the criminal law is the test for "deliberate indifference" under the *Eighth Amendment*. Whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious.

Civil Rights Law > Protection of Rights > Prisoner Rights > Confinement Conditions

Constitutional Law > Bill of Rights > Fundamental Rights > Cruel & Unusual Punishment

## *HN6*[⬇] Prisoner Rights, Confinement Conditions

Allowing a prisoner to be exposed to

extreme temperatures can constitute a violation of the *Eighth Amendment*. If the proof shows the occurrence of extremes of temperature that are likely to be injurious to inmates' health, relief should be granted.

Civil Procedure > Trials > Judgment as Matter of Law > Directed Verdicts

Civil Procedure > Trials > Judgment as Matter of Law > General Overview

Civil Procedure > Appeals > Standards of Review > General Overview

*HN7*[⬇] **Judgment as Matter of Law, Directed Verdicts**

The determination of whether the district court properly granted judgment as a matter of law turns on the evidence presented at trial. An appellate court will affirm a directed verdict only if, viewing the evidence presented at trial in the light most favorable to the non-movant, there is no legally sufficient evidentiary basis for a reasonable jury to enter a contrary verdict.

Civil Rights Law > Protection of Rights > Prisoner Rights > Confinement Conditions

Constitutional Law > Bill of Rights > Fundamental Rights > Cruel & Unusual Punishment

*HN8*[⬇] **Prisoner Rights, Confinement Conditions**

The court has acknowledged that medications can impact a prisoner's ability to contend with extreme heat.

Civil Rights Law > Protection of Rights > Prisoner Rights > Confinement Conditions

Constitutional Law > Bill of Rights > Fundamental Rights > Cruel & Unusual Punishment

*HN9*[⬇] **Prisoner Rights, Confinement Conditions**

The court does not suggest that air conditioning is mandatory to meet the requirements of the *Eighth Amendment*.

Civil Procedure > Appeals > Standards of Review > General Overview

Civil Procedure > Trials > Judgment as Matter of Law > General Overview

*HN10*[⬇] **Appeals, Standards of Review**

In reviewing a district court's grant of judgment as a matter of law, an appellate court resolves all credibility determinations in the non-movant's favor.

Civil Rights Law > Protection of Rights > Prisoner Rights > Confinement Conditions

Constitutional Law > Bill of Rights > Fundamental Rights > Cruel & Unusual Punishment

*HN11*[⬇] **Prisoner Rights, Confinement Conditions**

The fact that a risk is obvious supports the conclusion that a prison official was aware

484 Fed. Appx. 866, *866; 2012 U.S. App. LEXIS 15711, **1

of the risk.

Civil Rights Law > Protection of
Rights > Prisoner Rights > Confinement
Conditions

Constitutional Law > Bill of
Rights > Fundamental Rights > Cruel &
Unusual Punishment

*HN12*[⤓] **Prisoner Rights, Confinement Conditions**

The court has previously required a showing of more than a de minimis physical injury to sustain a claim predicated on a violation of *Eighth Amendment* rights.

**Counsel:** For EUGENE BLACKMON, Plaintiff - Appellant: Scott Charles Medlock, Brian Rolland McGiverin, Esq., Texas Civil Rights Project, Austin, TX; Srinivas Behara, Esq., DLA Piper, L.L.P. (US), Austin, TX.

For EXIQUIO GARZA, Assistant Warden, DIANA KUKUA, Defendants - Appellees: Nadine Felicia Phillpotts, Assistant Attorney General, Office of the Attorney General, Law Enforcement Defense Division, Austin, TX.

For TEXAS CITIZENS UNITED FOR THE REHABILITATION OF ERRANTS, TEXAS INMATE FAMILIES ASSOCIATION, TEXAS JAIL PROJECT, PRISONERS' LEGAL SERVICES OF NEW YORK, FLORIDA JUSTICE INSTITUTE, INCORPORATED, Amicus Curiaes: Sean Patrick Flammer, Esq., Scott, Douglass & McConnico, L.L.P., Austin, TX.

**Judges:** Before KING, HIGGINBOTHAM, and HAYNES, Circuit Judges.

## Opinion

[*867] PER CURIAM:[*]

Plaintiff–Appellant Eugene Blackmon brought claims under *42 U.S.C. § 1983* against Warden Diana Kukua and Assistant Warden Exiquio Garza based on alleged [**2] violations of his *Eighth Amendment* rights while he was jailed at a Texas Department of Criminal Justice facility in Beeville, Texas. According to Blackmon, the wardens did not take constitutionally adequate measures to address the extremely high temperatures in his dormitory during the summer of 2008, exposing him to substantial health risks. Blackmon contended that he was particularly susceptible to the effects of the heat because, during the relevant time of his confinement, he was 63 to 64 years old and took prescription medication for pre-existing high blood pressure. The district court granted judgment as a matter of law in Defendants' favor at the close of Blackmon's case-in-chief. For the reasons stated below, we REVERSE the judgment of the district court and REMAND for a new trial.

[*868] **I. FACTUAL AND PROCEDURAL BACKGROUND**

Eugene Blackmon, initially proceeding pro se, filed this action against Warden Diana

---

[*] Pursuant to **5TH CIR. R.** 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in **5TH CIR. R.** 47.5.4.

Kukua, Assistant Warden Exiquio Garza, Mark Garza, Oliver Esparza, and Ramona Tucker of the Garza East Unit in Beeville, Texas, a facility operated by the Texas Department of Criminal Justice. Blackmon alleged that these defendants had turned on the heaters in the C-8 dorm during **[**3]** the summer of 2008. At that time, Blackmon was 63 to 64 years old and taking prescription medication for pre-existing high blood pressure. Defendants moved for summary judgment, and the magistrate judge recommended that the motion be granted. However, the district court denied the defendants' motion and appointed counsel for Blackmon.

Subsequently, the magistrate judge allowed Blackmon to file an amended complaint, in which Blackmon added defendants Captain Helen Latorre and Brad Livingston and alleged that the C-8 dorm where he was housed was extremely hot and lacked adequate ventilation, water, showers, and fans. Latorre and Livingston filed answers, and the parties filed cross-motions for summary judgment. The district court granted the defendants' summary judgment motion in part as to Livingston, Latorre, and Mark Garza; denied it in part as to Wardens Kukua and Garza in their individual capacities; denied Blackmon's claim for injunctive relief as moot; and denied Blackmon's summary judgment motion. The remaining claims against Wardens Kukua and Garza (together, "Defendants" or "wardens") were transferred to a different judge and set for trial.

At the close of Blackmon's case-in-chief **[**4]** and prior to the jury reaching a verdict, the district court granted Defendants' motion for judgment as a matter of law under *Federal Rule of Civil Procedure 50(a)*. The court concluded that Blackmon had not met his burden of demonstrating that Kukua and Garza were deliberately indifferent to a substantial risk of harm to Blackmon. Blackmon timely appealed.

## II. DISCUSSION

### A. Standard of Review

*HN1*[↑] This court "review[s] de novo the district court's ruling on a motion for judgment as a matter of law, applying the same legal standard as the trial court." *Flowers v. S. Reg'l Physician Servs. Inc., 247 F.3d 229, 235 (5th Cir. 2001)* (citation omitted). *HN2*[↑] "Judgment as a matter of law is proper after a party has been fully heard by the jury on a given issue, and there is no legally sufficient evidentiary basis for a reasonable jury to have found for that party with respect to that issue." *Foreman v. Babcock & Wilcox Co., 117 F.3d 800, 804 (5th Cir. 1997)* (citation and internal quotation marks omitted); *see also Fed. R. Civ. P. 50(a)*. "[T]he court is to consider all of the evidence . . . in the light most favorable to the non-movant, drawing all factual inferences in favor of the non-moving party, and **[**5]** leaving credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts to the jury." *Id.* (citations omitted). "[J]udgment as a matter of law should only be granted if the facts and inferences point so strongly and overwhelmingly in the movant's favor that reasonable jurors could not reach a

contrary conclusion." *Coffel v. Stryker Corp., 284 F.3d 625, 630 (5th Cir. 2002)* (citation and internal quotation marks omitted).

## B. The *Eighth Amendment*

*HN3*[⬆] The *Eighth Amendment to the Constitution of the United States* prohibits the infliction of "cruel and unusual punishment." Although the Constitution "does not mandate comfortable prisons," *Rhodes v. Chapman, 452 U.S. 337, 349, 101 S. Ct. [*869] 2392, 69 L. Ed. 2d 59 (1981)*, prison officials "must provide humane conditions of confinement; prison officials must ensure that inmates receive adequate food, clothing, shelter, and medical care, and must 'take reasonable measures to guarantee the safety of the inmates.'" *Farmer v. Brennan, 511 U.S. 825, 832, 114 S. Ct. 1970, 128 L. Ed. 2d 811 (1994)* (quoting *Hudson v. Palmer, 468 U.S. 517, 526-27, 104 S. Ct. 3194, 82 L. Ed. 2d 393 (1984))*.

*HN4*[⬆] In a suit against a prison official for a violation of the *Eighth Amendment* relating to an inmate's conditions of confinement, two **[**6]** requirements must be met. First, the prison official's act or omission must be objectively serious, in that it "result[s] in the denial of the minimal civilized measure of life's necessities." *Id. at 834* (citations and internal quotation marks omitted). "For a claim . . . based on a failure to prevent harm, the inmate must show that he is incarcerated under conditions posing a substantial risk of serious harm." *Id.* "Some conditions of confinement may establish an *Eighth Amendment* violation in combination when

each would not do so alone, but only when they have a mutually enforcing effect that produces the deprivation of a single, identifiable human need such as food, warmth, or exercise—for example, a low cell temperature at night combined with a failure to issue blankets." *Wilson v. Seiter, 501 U.S. 294, 304, 111 S. Ct. 2321, 115 L. Ed. 2d 271 (1991)* (emphasis, citations, and internal quotation marks omitted).

*HN5*[⬆] Second, the "prison official must have a sufficiently culpable state of mind," meaning that the official was "deliberate[ly] indifferen[t] to inmate health or safety." *Farmer, 511 U.S. at 834* (citations and internal quotation marks omitted). A prison official cannot be liable for deliberate indifference "unless **[**7]** the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id. at 837*. "[S]ubjective recklessness as used in the criminal law is . . . the test for 'deliberate indifference' under the *Eighth Amendment*." *Id. at 839-40*. "Whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence . . . and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." *Id. at 842* (internal citations omitted).

*1. The Objective Risks to Blackmon's Health*

Blackmon claims that the extreme heat he was exposed to while confined in the C-8 dorm of the Garza East Unit, combined with prison officials' inadequate measures to address it, violated his *Eighth Amendment* rights. **HN6**[⬆] Allowing a prisoner to be exposed to extreme temperatures can constitute a violation of the *Eighth Amendment*. *See, e.g., Wilson, 501 U.S. at 304*; *Smith v. Sullivan, 553 F.2d 373, 381 (5th Cir. 1977)* **[**8]** ("If the proof shows the occurrence of extremes of temperature that are likely to be injurious to inmates' health[,] relief should be granted . . . ."). In *Gates v. Cook, 376 F.3d 323 (5th Cir. 2004)*, this court held that an injunction requiring prison officials in the Mississippi Department of Corrections "to provide fans, ice water, and daily showers when the heat index is 90 degrees or above" was "justified by an *Eighth Amendment* violation." *Id. at 339-40*. The *Gates* court noted that "summer temperatures in the Mississippi Delta average[d] in the nineties with high humidity," and that the facility housing the inmates was largely not air conditioned. *Id. [*870] at 334*. There were industrial fans to help circulate the air, and most prisoners had personal fans. *Id.* Keeping the windows open, however, was problematic because of mosquitoes. *Id.* The district court concluded that the ventilation was inadequate to meet the minimum demands of the *Eighth Amendment*. *Id. at 334*. In addition, there was expert testimony that it was very likely that an inmate would die of heat stroke or some other heat-related illness because of the extreme conditions at issue. *Id. at 339*. This court affirmed the district **[**9]** court's conclusion that conditions "present[ed] a substantial risk of serious harm to the inmates." *Id. at 340*.

Similarly, in *Valigura v. Mendoza, 265 F. App'x 232 (5th Cir. 2008)*, this court upheld the denial of prison officials' motion for summary judgment when a prisoner in the Garza East Unit—the unit at issue in the instant case—alleged that he had been subjected to "fifteen days of being confined to a bunk for 24 hours a day except to use the bathroom and to shower on occasion, . . . and temperatures above the eighties and into the hundreds." *Id. at 235*. The court also noted that Valigura "was not permitted to get up from his bunk . . . to get a drink of water" in concluding that Valigura had "present[ed] evidence to support a finding of an *Eighth Amendment* violation."[1] *Id.*

In the instant case, Blackmon set out sufficient evidence at trial to allow a reasonable jury to find that the conditions of confinement met the threshold for objective seriousness and "result[ed] in the denial of the minimal **[**10]** civilized measure of life's necessities."[2] *Farmer, 511 U.S. at 834* (citation and internal quotation marks omitted). Warden Kukua testified that the heat in South Texas was

---

[1] Whether Blackmon had adequate access to other cooler or air-conditioned areas of the prison, like the law library, recreation yard, or church, *see Valigura, 265 F. App'x at 235*, is disputed.

[2] Much of the evidence Defendants cite to contest Blackmon's arguments on appeal was not presented at trial, but instead appears in **[**11]** other portions of the record. **HN7**[⬆] The determination of whether the district court properly granted judgment as a matter of law, however, turns on the evidence presented *at trial. See Tharling v. City of Port Lavaca, 329 F.3d 422, 426 (5th Cir. 2003)* ("[W]e will affirm a directed verdict only if, viewing the evidence presented at trial in the light most favorable to the non-movant, there is no legally sufficient evidentiary basis for a reasonable jury to enter a contrary verdict." (citation and internal quotation marks omitted)).

sometimes "intense." However, temperatures were not taken or monitored inside the C-8 dorm during the time at issue. Because of the lack of temperature records, Professor James Balsamo, Director of Environmental Health and Safety at Tulane University, used historical data from sources such as the National Oceanic and Atmospheric Association ("NOAA") to calculate the temperature and heat index in Beeville, Texas.[3] The C-8 dorm was equipped with an air handler, which, according to Balsamo's testimony, did nothing to modify the humidity or temperature inside the dorm and simply functioned to move air in and out of the unit. Balsamo concluded that the temperature and humidity were the same both inside Blackmon's dorm and outdoors. A memo dated June 18, 2008, from the prison maintenance department also indicated that the temperature inside the dorms was the same as the outside temperature.

Balsamo testified that on "a substantial number of days . . . [the] heat index . . . presented a danger to [inmates'] health because of heat conditions." According to [*871] Balsamo's testimony, he examined days between July 1 and September 15, 2008, where the heat index was 103 degrees or higher. He found that there were 51 days where temperatures in the C-8 dorm were in the range classified by NOAA as "extreme caution," "danger," or "extreme danger."[4] Of the 51 days, 11 were

in the range of extreme danger. Balsamo testified that, on days in the extreme caution and, to a greater extent, [**12] the danger range, heat exhaustion was possible. Balsamo further testified that, on days in the extreme danger range, heat exhaustion was probable. Heat exhaustion is a condition that can result in sweating, mental confusion, headaches, nausea, and fatigue. Balsamo also testified that when conditions in Blackmon's dorm were in the extreme danger range, the risk of heat stroke was imminent. Heat stroke can cause organ failure and, ultimately, death. Balsamo also testified that Blackmon's age made him particularly susceptible to the effects of the heat. In addition, Blackmon was on medication for high blood pressure, which functioned as a diuretic and had the potential to make the high temperatures in the C-8 dorm even more dangerous to Blackmon than to other prisoners. *HN8*[↑] This court has acknowledged that medications can impact a prisoner's ability to contend with extreme heat. *See Gates, 376 F.3d at 334* ("[T]he medications often given to deal with various medical problems interfere with the body's ability to maintain a normal temperature.").

Although prison officials implemented several measures to combat the heat within the C-8 dorm, a reasonable jury could nonetheless conclude that such measures were inadequate to satisfy the *Eighth Amendment's* demands. Blackmon was confined in the C-8 dorm with 53 other men. There was no air conditioning; the inmates were not able to use personal fans because of a lack of electrical outlets; and the windows were sealed. There was one

---

[3] The heat index accounts for temperature and humidity and reflects how hot the air feels.

[4] According to the plaintiff's expert, these categories reflect increasing heat-related health risks. A heat index of 90 to 105 degrees Fahrenheit brings [**13] conditions within the "extreme caution" category. The "danger" range encompasses

a heat index of 105 to 129 degrees. A heat index of 130 degrees or higher is in the range of "extreme danger."

484 Fed. Appx. 866, *871; 2012 U.S. App. LEXIS 15711, **12

industrial fan mounted roughly ten feet off the floor, as well as an air handler, as mentioned above. Blackmon testified that the C-8 dorm did not have a water fountain, but Warden Kukua testified that prison officials provided cool water in the dorms, with ice water being delivered at least three times a day. Nonetheless, Blackmon testified that inmates were forced to drink from "filthy" sinks in the dormitory because prison officials did not supply a sufficient amount of water. Prisoners were allowed to take extra showers, but Blackmon testified that on hot days, **[\*\*14]** when extra showers were needed the most, he had to wait roughly an hour to use the shower because two of the four showers were broken.

Defendants contend that they took appropriate measures to counteract the heat and assert that, during the summer of 2008, they were implementing all the remedial measures required by the *Gates* court. *See id. at 339-40* (upholding an injunction requiring the provision of iced water, fans, and extra showers). However, the ventilation in the prison at issue in *Gates* was different than that in the C-8 dorm. Although the C-8 dorm had an air handler and the prison in *Gates* did not, the windows in the prison at issue in *Gates* could be opened to alleviate the heat.[5] *Id. [\*872] at 334*. In addition, unlike the prisoners in the C-8 dorm, most prisoners in *Gates* had personal fans. *Id.* Further, Blackmon's testimony regarding the need to drink from the sinks in his dormitory

raises questions regarding whether prison officials provided cool water in sufficient amounts.

Thus, despite the existence of some parallels between the remedial measures in place in the instant case and those required in *Gates,* the conditions in *Gates* were not identical to those in Blackmon's dorm. Further, Blackmon's testimony regarding the provision of water created a fact issue regarding whether the remedial measures required by the *Gates* court were fully implemented with respect to the C-8 dorm. Moreover, the instant case pertains to the heat-related health risks to a single prisoner who was 63 to 64 years old, had pre-existing high blood pressure, and was taking medication that could have interfered with his body's ability to dissipate heat. Consequently, even though we conclude that the evidence presented at trial could potentially support a verdict in Blackmon's favor, we do not suggest that the remedial measures required by the *Gates* court are insufficient to address the risks of high heat and humidity, particularly with regard to prisoners who are younger and healthier than Blackmon.[6]

Furthermore, **[\*\*16]** despite the remedial measures implemented by prison officials, there was evidence presented at trial that the heat in the C-8 dorm adversely affected Blackmon's health. Blackmon testified that he suffered from headaches and dizziness almost constantly. He also testified that he was often light headed and nauseated. According to Blackmon's testimony, his

---

[5] An influx of mosquitoes initially made opening the windows problematic, but the *Gates* court upheld the portion of the injunction requiring the installation of screens with an appropriate gauge to keep mosquitoes **[\*\*15]** out. *Gates, 376 F.3d at 334, 340*.

[6] We also note that, like the *Gates* court, *HN9*[⬆] we do not suggest that air conditioning is mandatory to meet the requirements of the *Eighth Amendment*.

vision frequently blurred and dimmed, and he often had difficulty catching his breath. In addition, he testified that the heat aggravated his pre-existing high blood pressure. This testimony, if credited by the jury, would further support the conclusion that Blackmon was exposed to serious health risks while incarcerated in the C-8 dorm.

In sum, when viewed in the light most favorable to Blackmon, the evidence presented at trial would allow a reasonable jury to conclude that the extreme heat in Blackmon's dorm caused substantial health risks to Blackmon—a prisoner who, according to testimony presented at trial, was especially susceptible to the health risks of extreme heat because of his advanced age, pre-existing high blood pressure, and use of prescription medication. Further, with respect to a prisoner such as Blackmon, a jury could **[**17]** reasonably conclude that the remedial measures adopted by prison officials were inadequate to combat the extreme conditions in the C-8 dorm and to address the salient health risks. Thus, the evidence was not so overwhelmingly in Defendants' favor that a reasonable jury could not have concluded that Blackmon satisfied his burden of proof with regard to the objective prong of the *Eighth Amendment* analysis.

## 2. The Defendants' States of Mind

We also conclude that the evidence presented at trial, when viewed in the light most favorable to Blackmon, was sufficient to allow a jury to conclude that Defendants were deliberately indifferent to significant risks to Blackmon's health. Defendants argue that there was no direct evidence that they had actual knowledge of any risks to Blackmon. They note that prison doctors did not impose any housing or work restrictions on Blackmon based on his age or health. Further, Defendants contend that Blackmon failed to bring any **[*873]** heat-related health problems to their attention and that blood pressure readings in Blackmon's medical records reflect that his high blood pressure was not aggravated by the heat. They also highlight Warden Kukua's testimony that there **[**18]** was no record of any prisoners being diagnosed with heat-related illnesses between March and September 2008.

However, Blackmon testified that, prior to filing this lawsuit, he filed numerous grievances complaining about the heat, its effect on his health, and prison officials' failure to address his concerns. Warden Kukua testified that she did not recall seeing Blackmon's grievances, but that Assistant Warden Garza would have reviewed them. Blackmon further testified that on June 18, 2008, in response to a grievance Blackmon had filed, a prison maintenance worker and Assistant Warden Garza took measurements in the dorm and found that the temperature was 108 degrees and the heat index was 115 degrees, suggesting that, at a minimum, Garza was aware of the high temperatures in the C-8 dorm. Also, as discussed above, a memorandum dated June 18, 2008, which was sent to all prisoners by prison maintenance, indicated that the temperature in the C-8 dorm was the same as the temperature outdoors. Warden Kukua denied seeing the memorandum, but she testified that she should have been

aware of it. In addition, Blackmon testified that he visited the prison infirmary on numerous occasions and complained [**19] of the heat's adverse effects on his health. According to Blackmon, his blood pressure was very high during these visits, but the clinic staff refused to document his blood-pressure readings or health complaints.[7] Based on the evidence described above, we conclude that the evidence presented at trial would allow a reasonable jury to find that Defendants knew of the risks to Blackmon's health.

In addition to the evidence suggesting Defendants had specific knowledge of the risks to Blackmon, a jury could reasonably conclude that the heat-related health risks to Blackmon were obvious. *See Farmer, 511 U.S. at 842* (stating that *HN11*[↑] the fact that a risk is obvious supports [**20] the conclusion that a prison official was aware of the risk). As discussed above, Kukua testified that she was aware that the summer heat was "intense." Moreover, the evidence set out at trial indicated that Defendants had received training making them aware of the potential dangers of heat to prisoners. The training highlighted the particular risks to prisoners such as Blackmon—an older inmate taking medications with a diuretic effect. Thus, the obvious nature of the risks to Blackmon would further support a jury finding that

Defendants were deliberately indifferent to the risks to Blackmon's health. *See Gates, 376 F.3d at 340* ("[B]ased on the open and obvious nature of these [exceedingly hot] conditions [in the prison] and the evidence that inmates had complained of symptoms of heat-related illness, the trial court's finding regarding MDOC's deliberate indifference is not clearly erroneous.").

*3. Injury to Blackmon*

Blackmon argues that the district court erred by requiring him to prove that he suffered a significant physical heat-related [*874] injury to maintain his claims. It is unclear that the district court required such a showing, but after concluding that Blackmon had not established [**21] that the wardens were deliberately indifferent to risks to Blackmon's health, the court stated:

> Furthermore, the evidence in [Blackmon's] case-in-chief fell short of establishing by a preponderance of the evidence that the alleged acts or omissions on the part of the Defendants had proximately caused any significant physical injury. Although the Plaintiff contended that his exposure to excessive heat aggravated his preexisting condition of hypertension, his medical records contained actual blood pressure readings taken between May 2008 and August 2008, and those readings did not indicate any significant increase in his blood pressure.

Blackmon contends that, in light of *Wilkins v. Gaddy, 130 S. Ct. 1175, 175 L. Ed. 2d 995 (2010)*, he was not required to establish that he suffered even a *de*

---

[7] Dr. Charles Adams offered conflicting testimony, indicating that Blackmon did not complain of heat-related problems and that Blackmon was not diagnosed with a heat-related illness. Dr. Adams further testified that Blackmon's blood pressure actually improved during the summer months of 2008 in comparison to the previous winter. However, *HN10*[↑] in reviewing the district court's grant of judgment as a matter of law, we resolve all credibility determinations in the non-movant's favor. *See Porter v. Epps, 659 F.3d 440, 444-45 (5th Cir. 2011)*.

minimis physical injury. He notes that, in the context of a claim of excessive force, the Supreme Court stated that "contemporary standards of decency" can be violated "whether or not significant injury is evident." *Id. at 1178* (citations and internal quotation marks omitted).

**HN12**[↑] This court has previously required a showing of more than a *de minimis* physical injury to sustain a claim predicated on a violation of *Eighth Amendment* **[**22]** rights. *See, e.g., Woods v. Edwards, 51 F.3d 577, 581 (5th Cir. 1995)* (affirming the district court's grant of summary judgment where the plaintiff "ha[d] failed to present medical evidence of any significance"); *Johnson v. Tex. Bd. of Criminal Justice, 281 F. App'x 319, 321 (5th Cir. 2008)* ("While Johnson alleged that the temperatures were sometimes uncomfortably hot, he did not allege that he suffered from any heat-related injuries . . . ."). However, this court has yet to address the potential impact of *Wilkins* on cases pertaining to conditions of confinement. Nonetheless, because the physical symptoms Blackmon described in his testimony at trial (i.e., headaches, nausea, shortness of breath, and blurred and dimmed vision) would constitute more than a *de minimis* physical injury, it is unnecessary to determine whether Blackmon must show more than a *de minimis* injury to sustain his claims. *See Brown v. Lippard, 472 F.3d 384, 386 (5th Cir. 2006)* (suggesting that knee, hand, and shoulder pain, accompanied by several one-centimeter abrasions, would exceed a *de minimis* threshold). Thus, to the extent that the district court based its grant of judgment as a matter of law on Blackmon's **[**23]** failure to prove he suffered a significant physical injury, the district court erred.

## III. CONCLUSION

Viewing the evidence set out at trial in the light most favorable to Blackmon, we conclude that the evidence did not militate so strongly in Defendants' favor that a reasonable jury could not have reached a verdict in Blackmon's favor. Consequently, the district court erred by granting judgment as a matter of law in favor of Defendants. Thus, we REVERSE the judgment of the district court and REMAND the case for a new trial.

**End of Document**

 Caution
As of: August 29, 2023 9:22 PM Z

# Yates v. Collier

United States Court of Appeals for the Fifth Circuit

August 18, 2017, Filed

No. 16-20505

**Reporter**

868 F.3d 354 *; 2017 U.S. App. LEXIS 15847 **; 98 Fed. R. Serv. 3d (Callaghan) 767; 2017 WL 3574968

MARVIN RAY YATES; KEITH COLE; JACKIE BRANNUM; RICHARD ELVIN KING; FRED WALLACE; LAVAR JOHN SANTEE, Plaintiffs — Appellees, v. BRYAN COLLIER; ROBERTO M. HERRERA; TEXAS DEPARTMENT OF CRIMINAL JUSTICE, Defendants — Appellants.

**Prior History: [**1]** Appeal from the United States District Court for the Southern District of Texas.

*Cole v. Livingston, 2016 U.S. Dist. LEXIS 77435 (S.D. Tex., June 14, 2016)*

## Core Terms

district court, inmates, heat, subclasses, air-conditioned, injunctive relief, temperatures, serious harm, general class, certification, disability, housing, fans, class certification, prison, measures, heat-mitigation, conditions, respite, substantial risk, excessive heat, injunction, showers, mitigation measures, class member, certifying, indoor, declaratory, prospective relief, heat-related

## Case Summary

## Overview

HOLDINGS: [1]-In inmates' suit alleging violations of the *Eighth Amendment*, the ADA, and the *Rehabilitation Act* from high temperatures in a correctional facility's housing areas, *Fed. R. Civ. P. 23(a)* certification of a general inmate class, a heat-sensitive subclass, and a disability subclass was appropriate because there was a common question of fact or law since the facility's heat-mitigation measures were ineffective to reduce the risk of heat-related harm below the constitutional baseline for any of the inmates; [2]-*Rule 23(b)(2)* certification was appropriate because the same acts were the source of injury for all inmates as they were all subjected to the same lack of air-conditioning, had the same available heat-mitigation measures, and were all harmed by exposure to excessive heat and they identified specific injunctive relief of maintaining a heat index of 88 degrees or lower.

## Outcome
Decision affirmed.

## LexisNexis® Headnotes

868 F.3d 354, *354; 2017 U.S. App. LEXIS 15847, **1

Civil Procedure > Appeals > Standards of Review > Abuse of Discretion

Civil Procedure > Special Proceedings > Class Actions > Appellate Review

Civil Procedure > Appeals > Standards of Review > De Novo Review

**_HN1_[⬇]  Standards of Review, Abuse of Discretion**

Appellate courts review a district court's decision to certify a class for an abuse of discretion. A trial court abuses its discretion when its ruling is based on an erroneous view of the law or a clearly erroneous assessment of the evidence. This deference stems from a recognition of the essentially factual basis of the certification inquiry and of the district court's inherent power to manage and control pending litigation. Nonetheless, this broad discretion must operate within the framework of _Fed. R. Civ. P. 23_, and appellate courts review de novo whether the district court applied the correct legal standards.

Civil Rights Law > Protection of Rights > Prisoner Rights > Confinement Conditions

Constitutional Law > Bill of Rights > Fundamental Rights > Cruel & Unusual Punishment

**_HN2_[⬇]  Prisoner Rights, Confinement Conditions**

It is well-established that the _Eighth Amendment_ guarantees inmates a right to be free from exposure to extremely dangerous temperatures without adequate remedial measures.

Civil Procedure > ... > Class Actions > Prerequisites for Class Action > Commonality

**_HN3_[⬇]  Prerequisites for Class Action, Commonality**

_Fed. R. Civ. P. 23(a)_ states that a class may be certified only if there are questions of law or fact common to the class. _Fed. R. Civ. P. 23(a)(2)_. _Rule 23(a)(2)_ demands that the putative class members' claims must depend upon a common contention that must be of such a nature that it is capable of class-wide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke.

Civil Procedure > ... > Class Actions > Prerequisites for Class Action > Commonality

**_HN4_[⬇]  Prerequisites for Class Action, Commonality**

What matters for _Fed. R. Civ. P. 23(a)_ is not the raising of common questions—even in droves—but, rather the capacity of a class-wide proceeding to generate common answers apt to drive the resolution of the litigation. It is not enough, then, that plaintiffs have all suffered a violation of the same provision of law because laws can be violated in different

868 F.3d 354, *354; 2017 U.S. App. LEXIS 15847, **1

ways, and so suffering a violation of the same provision of law gives no cause to believe that all the plaintiffs' claims can productively be litigated at once.

Civil Procedure > ... > Class Actions > Prerequisites for Class Action > Commonality

Civil Procedure > Special Proceedings > Class Actions > Prerequisites for Class Action

### HN5[⬇] Prerequisites for Class Action, Commonality

*Fed. R. Civ. P. 23* does not set forth a mere pleading standard. Instead, a plaintiff must affirmatively demonstrate his compliance with the Rule—that is, he must be prepared to prove that there are in fact common questions of law or fact. And the district must conduct a rigorous analysis of the *Rule 23* prerequisites before certifying a class. Because class determination generally involves considerations that are enmeshed in the factual and legal issues comprising the plaintiff's cause of action, courts have traditionally construed the directive to conduct a rigorous analysis to require district courts to, inter alia, look beyond the pleadings to understand the claims, defenses, relevant facts, and applicable substantive law in order to make a meaningful determination of the certification issues.

Civil Procedure > Appeals > Standards of Review > Clearly Erroneous Review

Civil Procedure > Appeals > Standards of Review > Questions of Fact & Law

### HN6[⬇] Standards of Review, Clearly Erroneous Review

A finding of fact is clearly erroneous only when although there may be evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed. If the district court's account of the evidence is plausible in light of the record viewed in its entirety, appellate courts may not reverse even though convinced that had they been sitting as the trier of fact, they would have weighed the evidence differently.

Civil Procedure > Trials > Evidence & Testimony

Civil Procedure > Appeals > Standards of Review

### HN7[⬇] Trials, Evidence & Testimony

Appellate courts are extremely deferential to a district court's assessment of witness credibility.

Civil Procedure > Appeals > Standards of Review > Clearly Erroneous Review

### HN8[⬇] Standards of Review, Clearly Erroneous Review

Under the clearly erroneous standard of review, if the district court's account of the evidence is plausible in light of the record viewed in its entirety, appellate courts may not reverse it even though convinced that had they been sitting as the trier of fact, they would have weighed the evidence differently.

868 F.3d 354, *354; 2017 U.S. App. LEXIS 15847, **1

Civil Procedure > ... > Class Actions > Prerequisites for Class Action > Commonality

*HN9*[⬇] **Prerequisites for Class Action, Commonality**

For purposes of *Fed. R. Civ. P. 23(a)(2)* even a single common question will do.

Civil Procedure > ... > Class Actions > Prerequisites for Class Action > Maintainability

*HN10*[⬇] **Prerequisites for Class Action, Maintainability**

In addition to meeting the requirements of *Fed. R. Civ. P. 23(a)*, a plaintiff must also demonstrate that a proposed class satisfies one of the criteria articulated in *Fed. R. Civ. P. 23(b)*. *Rule 23(b)(2)* permits class certification where the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole. *Fed. R. Civ. P. 23(b)(2)*.

Civil Procedure > ... > Class Actions > Prerequisites for Class Action > Maintainability

*HN11*[⬇] **Prerequisites for Class Action, Maintainability**

The key to the *Fed. R. Civ. P. 23(b)(2)* class is the indivisible nature of the injunctive or declaratory remedy warranted—the notion that the conduct is such that it can be enjoined or declared unlawful only as to all of the class members or as to none of them. In other words, *Rule 23(b)(2)* applies only when a single injunction or declaratory judgment would provide relief to each member of the class. It does not authorize class certification when each individual class member would be entitled to a different injunction or declaratory judgment against the defendant.

Civil Procedure > ... > Class Actions > Prerequisites for Class Action > Maintainability

*HN12*[⬇] **Prerequisites for Class Action, Maintainability**

By its terms, *Fed. R. Civ. P. 23(b)(2)* looks to whether the defendant's conduct applies generally to the class. *Fed. R. Civ. P. 23(b)(2)*. *Rule 23(b)(2)* does not require common issues, but rather requires common behavior by the defendant towards the class, such that class members have been harmed in essentially the same way.

Civil Procedure > ... > Class Actions > Prerequisites for Class Action > Maintainability

*HN13*[⬇] **Prerequisites for Class Action, Maintainability**

Rule *Fed. R. Civ. P. 23(b)(2)* does not require that every jot and tittle of injunctive relief be spelled out at the class certification stage; it requires only "reasonable detail" as to the acts required.

Civil Rights Law > ... > Prisoner Rights > Prison Litigation Reform Act > Prospective Relief

Civil Rights Law > ... > Prisoner Rights > Prison Litigation Reform Act > Scope

## *HN14*[⬇] Prison Litigation Reform Act, Prospective Relief

The *Prison Litigation Reform Act* provides: Prospective relief in any civil action with respect to prison conditions shall extend no further than necessary to correct the violation of the Federal right of a particular plaintiff or plaintiffs. The court shall not grant or approve any prospective relief unless the court finds that such relief is narrowly drawn, extends no further than necessary to correct the violation of the Federal right, and is the least intrusive means necessary to correct the violation of the Federal right. *18 U.S.C.S. § 3626(a)(1)(A)*.

Governments > Legislation > Interpretation

## *HN15*[⬇] Legislation, Interpretation

As is always the case when interpreting legal text, a court's task is to give effect to the language Congress has enacted, not to read additional meaning into the statute that its terms do not convey. The charge is to give effect to the law Congress enacted. It follows that when a statute is silent with respect to a particular subject, courts will not construe the statute to nonetheless reach the matter. Indeed, the principle that a matter not covered is not covered is so obvious that it seems absurd to recite it. This is especially true where the claim is that Congress has implicitly altered one provision of law via another provision; in such cases, Congress ordinarily provides a relatively clear indication of its intent to do so in the text.

Civil Procedure > ... > Class Actions > Prerequisites for Class Action > Maintainability

Civil Rights Law > ... > Prisoner Rights > Prison Litigation Reform Act > Remedies

Civil Rights Law > ... > Prisoner Rights > Prison Litigation Reform Act > Scope

## *HN16*[⬇] Prerequisites for Class Action, Maintainability

*18 U.S.C.S. § 3626(a)(1)(A)* does not alter the requirements for certifying a class action under *Fed. R. Civ. P. 23(b)(2)*.

**Counsel:** For MARVIN RAY YATES, KEITH COLE, JACKIE BRANNUM, RICHARD ELVIN KING, FRED WALLACE, Plaintiffs - Appellees: Jeff S. Edwards, David James, Scott Charles Medlock, Michael C. Singley, Edwards Law, Austin, TX; Jeremy Leon Doyle, Esq., Nathan Mark Smith, Reynolds Frizzell, L.L.P., Houston, TX; Wallis Nade, Texas Civil Rights Project, Houston, TX.

For BRYAN COLLIER, ROBERTO M. HERRERA, TEXAS DEPARTMENT OF CRIMINAL JUSTICE, Defendants - Appellants: Matthew Hamilton Frederick, Deputy Solicitor General, Office of the

868 F.3d 354, *354; 2017 U.S. App. LEXIS 15847, **1

Solicitor General for the State of Texas, Austin, TX; Cynthia Lee Burton, Assistant Attorney General, Office of the Attorney General, Law Enforcement Defense Division, Austin, TX.

**Judges:** Before REAVLEY, ELROD, and GRAVES, Circuit Judges.

**Opinion by:** JENNIFER WALKER ELROD

## Opinion

 [*358]   JENNIFER WALKER ELROD, Circuit Judge:

This appeal presents yet another chapter in a long saga of challenges to conditions of confinement in prisons throughout this circuit. The plaintiffs are inmates in the Wallace Pack Unit, a prison operated by the Texas Department of Criminal Justice. They allege violations of the *Eighth Amendment*, the Americans with Disabilities Act, and **[**2]** the Rehabilitation Act due to the high temperatures in the prison housing areas. Plaintiffs sought, and the district court granted, certification of a general class and two subclasses, and the defendants now appeal. Because we conclude that the district court did not abuse its discretion, we AFFIRM.

I.

The six named Plaintiffs are inmates in the Wallace Pack Unit, a prison operated by the Texas Department of Criminal Justice (TDCJ). Plaintiffs brought this lawsuit in 2014 against TDCJ, Bryan Collier (TDCJ's executive director), and Roberto Herrera

(the Pack Unit's warden) (collectively, the Defendants). The Pack Unit houses approximately 1,400 inmates. Though portions of the Pack Unit are air-conditioned, it is undisputed that the inmate housing areas are not. During the summer months, indoor temperatures within the Pack Unit housing area can reach 100 degrees and consistently exceed 90 degrees. TDCJ is aware of these high temperatures as it routinely monitors the outdoor apparent temperatures at the Pack Unit during the summer months. Acknowledging that these high temperatures are a potential risk to the health and safety of the inmates in the Pack Unit and in an effort to reduce the **[**3]** risk from these high temperatures, Defendants claim that they provide certain "heat-mitigation" measures—including more frequent showers, cold drinking water, fans, and temporary access to air-conditioned "respite areas" outside the housing area.

Up until this lawsuit was filed, TDCJ's policy regarding mitigation measures remained largely unchanged, despite the heat-related injuries occurring within the Pack Unit and in various other Texas prisons. Indeed, since 1998, twenty or more inmates have died as a result of excessive heat. This history led the district court to conclude that, "as a factual matter," there was a "significant history of serious heat related illnesses" within the Pack Unit. Only in 2015, after this lawsuit was filed, did TDCJ begin its respite-area practice.

Of the six named Plaintiffs, only one is younger than 60 years old and has no medical conditions that would affect his

sensitivity to heat. The remaining five named Plaintiffs range in age from 60 to 72 years and all have one or more conditions that render them particularly sensitive to heat, including Type II diabetes, coronary arterial disease, high blood pressure, high cholesterol, hypertension, schizoaffective **[\*\*4]** disorder, and obesity.

Plaintiffs assert two causes of action. First, they assert an _Eighth Amendment_ claim against Collier and Herrera. Second, they claim that TDCJ has failed to provide reasonable accommodations for inmates with heat-sensitive disabilities in violation of the Americans with Disabilities Act and the Rehabilitation Act. Plaintiffs seek a **[\*359]** declaratory judgment and a permanent injunction requiring defendants to "maintain a safe indoor apparent temperature (e.g., maintaining a heat index of 88 degrees or lower) inside each of the Pack Unit's housing areas . . . or enter other injunctive relief sufficient to protect the health and safety of the prisoners at the Pack Unit."[1]

Plaintiffs moved to certify three classes, one general class and two subclasses:

> **General Class**: All inmates who currently are, or in the future will be, incarcerated at the Pack Unit, and who are subjected to TDCJ's policy and practice of failing to regulate high indoor heat index temperatures in the housing areas.

> **Heat-Sensitive Subclass**: All people who are incarcerated at the Pack Unit, or in the future will be, that are

subjected to TDCJ's policy and practice of failing to regulate high indoor heat index temperatures **[\*\*5]** in the housing areas, and either: (1) have a physiological condition that places them at increased risk of heat-related illness, injury, or death (including, but not limited to, suffering from obesity, diabetes, hypertension, cardiovascular disease, psychiatric conditions, cirrhosis of the liver, chronic obstructive pulmonary disease, cystic fibrosis, asthma, sweat gland dysfunction, and thyroid dysfunction); or, (2) are prescribed an anticonvulsant, anticholinergic, antipsychotic, antihistamine, antidepressant, beta blocker, or diuretic; or (3) are over age 65.

> **Disability SubClass**: All people incarcerated at the Pack Unit, or who will be in the future, that are subjected to TDCJ's policy and practice of failing to regulate high indoor heat index temperatures in the housing areas and suffer from a disability that substantially limits one or more of their major life activities and who are at increased risk of heat-related illness, injury, or death due to their disability or any medical treatment necessary to treat their disability.

The district court certified all three classes. It concluded that Plaintiffs sufficiently demonstrated that they met all requirements of _Federal Rule of Civil Procedure 23(a)_. It then determined **[\*\*6]** that certification was authorized under _Rule 23(b)(2)_. Last, the district court rejected Defendants' argument that the Prison Litigation Reform Act—which directs that

---

[1] Plaintiffs also seek attorneys' fees, but they do not seek damages.

prospective relief in the prison context "shall extend no further than necessary to correct the violation," *18 U.S.C. § 3626(a)(1)(A)*—must be applied as part of the *Rule 23(b)(2)* analysis.

Defendants moved under *Rule 23(f)*[2] for authorization to appeal the district court's certification order, and this court granted the motion.

## II.

*HN1*[↑] "We review the district court's decision to certify a class for abuse of discretion." *M.D. ex rel. Stukenberg v. Perry, 675 F.3d 832, 836 (5th Cir. 2012)* (quoting *Bell Atl. Corp. v. AT&T Corp., 339 F.3d 294, 301 (5th Cir. 2003))*. "A trial court abuses its discretion when its ruling is based on an erroneous view of the law or a clearly erroneous assessment of the evidence." *Bocanegra v. Vicmar Servs., Inc., [*360] 320 F.3d 581, 584 (5th Cir. 2003)*. This deference stems from "a recognition of the essentially factual basis of the certification inquiry and of the district court's inherent power to manage and control [**7] pending litigation." *Perry, 675 F.3d at 836*. Nonetheless, this broad discretion must operate "within the framework of *Rule 23*," and we "review *de novo* whether the district court applied the correct legal standards." *Id.* (citations omitted).

---

[2] *Fed. R. Civ. P. 23(f)* provides:

A court of appeals may permit an appeal from an order granting or denying class-action certification under this rule if a petition for permission to appeal is filed with the circuit clerk within 14 days after the order is entered. An appeal does not stay proceedings in the district court unless the district judge or the court of appeals so orders.

## III.

*HN2*[↑] It is well-established in our circuit "that the *Eighth Amendment* guarantees inmates a right to be free from exposure to extremely dangerous temperatures without adequate remedial measures." *Hinojosa v. Livingston, 807 F.3d 657, 669 (5th Cir. 2015)*. Over the past several years, we have decided numerous appeals arising from cases in which inmates have challenged the heat levels within prisons located throughout this circuit. We have repeatedly upheld district court findings that the heat levels within these prisons violate the *Eighth Amendment*, and we have done so in the context of a class action in at least one case.

In *Gates v. Cook, 376 F.3d 323 (5th Cir. 2004)*, we upheld a permanent class-wide injunction based on the *Eighth Amendment*, which required the Mississippi Department of Corrections to "provide fans, ice water, and daily showers when the heat index is 90 degrees or above," *id. at 339-40*, even though most of the inmates had the benefit of industrial sized fans as well as smaller personal fans. *Id. at 334*. Summer temperatures in the area averaged above 90° Fahrenheit, and the ventilation within the facility was "inadequate to afford [**8] prisoners a minimal level of comfort during the summer months," and the inmates were "not afforded extra showers, ice water, or fans . . . when the heat index [was 90° Fahrenheit] or above." *Id.* Similarly, in *Ball v. LeBlanc, 792 F.3d 584 (5th Cir. 2015)*, we affirmed the district court's finding that the heat within a prison housing area posed a substantial risk of serious harm to

inmates, where the heat index ranged from 81.5° Fahrenheit to 107.79° Fahrenheit and surpassed 100° Fahrenheit on five or more days during a roughly two week period. *Id. at 590-91, 592-94.* We did so even though the inmates had continued access to potable water and ice, and despite the defendant's argument that "because it provide[d] the remedies [upheld in *Gates*], there can be no *Eighth Amendment* violation as a matter of law." *Id. at 590, 592.* And in *Blackmon v. Garza, 484 F. App'x 866 (5th Cir. 2012),* we reversed the grant of judgment as a matter of law in favor of TDCJ officials. *Id. at 874.* Though recognizing that TDCJ had taken some remedial steps, such as providing cool ice water three times a day and allowing extra showers, we concluded this was insufficient to justify judgment in TDCJ's favor. We relied in part on the fact that "[t]here was no air-conditioning," "the windows were sealed," the unit "did not have a water fountain," and "the inmates were not able to use personal **[**9]** fans," though there was a large industrial fan available. *Id. at 871-72.*

Indeed, TDCJ officials are, or have been, defendants in numerous other cases alleging *Eighth Amendment* violations based on excessive heat in prison. *See, e.g., Hinojosa, 807 F.3d at 661* (deciding appeal involving TDCJ prisoner who suffered a seizure at night due to high indoor temperatures, "[fell] out of his bed and was convulsing," and died twenty minutes later); *Webb v. Livingston, 618 F. App'x 201, 204 (5th Cir. 2015)* (deciding appeal involving the "heat-related deaths of five prisoners who died while housed in facilities operated by [TDCJ]"); *Valigura v. Mendoza, [*361] 265 F. App'x 232, 233-34 (5th Cir. 2008)* (deciding appeal involving prisoner who alleged that "temperatures in the bunk area reached into the nineties and hundreds due to poor ventilation" and that "he was not able to use the restroom or showers without lengthy waits, which caused him severe discomfort").

In short, we have repeatedly recognized the serious risk of harm that excessive heat can pose in the prison context absent adequate mitigating measures, and we have consistently found evidence sufficient in these cases to support an *Eighth Amendment* violation, even when certain mitigating measures were available. It is against this backdrop that we now address the discrete issue presented in this appeal: whether the district court **[**10]** erred in certifying the General Class and the two subclasses.

Defendants challenge only two of the class certification criteria. First, they assert that the district court erred in concluding that Plaintiffs demonstrated a common question of law or fact for each of the classes.[3] Second, Defendants argue that the district court erred in concluding that the proposed classes could be certified under *Rule 23(b)(2).* As part of this second argument, Defendants reassert their contention that the Prison Litigation Reform Act precludes certification in this case. We discuss each in turn.

**A.**

---

[3] Defendants do not make any argument regarding numerosity, typicality, or adequacy. *See Fed. R. Civ. P. 23(a).*

**1.**

HN3[↑] *Rule 23(a)* states that a class may be certified "only if . . . there are questions of law or fact common to the class." *Fed. R. Civ. P. 23(a)(2)*. At first blush, it might seem that *Rule 23(a)(2)*'s requirement can be easily satisfied. After all, "any competently crafted class complaint literally raises common questions." *Wal-Mart Stores, Inc. v. Dukes, 564 U.S. 338, 349, 131 S. Ct. 2541, 180 L. Ed. 2d 374 (2011)* (alteration omitted) (quotation marks omitted). As the Supreme Court has indicated, however, *Rule 23(a)(2)* demands that the putative class members' claims "must depend upon a common contention" that "must be of such a nature that it is capable of class-wide resolution—which means that determination of its truth or falsity will resolve an issue that is central **[**11] to the validity of each one of the claims in one stroke." *Wal-Mart, 564 U.S. at 350*; *see also Perry, 675 F.3d at 840*.

Thus, HN4[↑] what matters for *Rule 23(a)* "'is not the raising of common questions—even in droves—but, rather the capacity of a class-wide proceeding to generate common answers apt to drive the resolution of the litigation.'" *Wal-Mart, 564 U.S. at 350* (emphasis omitted) (quoting Nagareda, *Class Certification in the Age of Aggregate Proof*, *84 N.Y.U. L. Rev. 97, 132 (2009)*). It is not enough, then, that plaintiffs "have all suffered a violation of the same provision of law" because laws can be violated in different ways, and so suffering a violation of the same provision of law "gives no cause to believe that all [the plaintiffs'] claims can productively be litigated at once." *Wal-Mart, 564 U.S. at 350*; *Perry, 675 F.3d at 840* ("Further, the members of a proposed class do not establish that their claims can productively be litigated at once, merely by alleging a violation of the same legal provision by the same defendant." (quotation marks omitted)).

**[*362]** HN5[↑] "*Rule 23* does not set forth a mere pleading standard." Instead, a plaintiff "must affirmatively demonstrate his compliance with the Rule—that is, he must be prepared to prove that there are *in fact* . . . common questions of law or fact[.]" *Wal-Mart, 564 U.S. at 350*. And the district "must conduct a rigorous analysis of the **[**12] *Rule 23* prerequisites before certifying a class." *Perry, 675 F.3d at 837* (alteration omitted) (quoting *Castano v. Am. Tobacco Co., 84 F.3d 734, 740 (5th Cir. 1996))*; *Wal-Mart, 564 U.S. at 350-51* (same). Because "class determination generally involves considerations that are enmeshed in the factual and legal issues comprising the plaintiff's cause of action," *Wal-Mart, 564 U.S. at 351*, we have "traditionally construed [the] directive [to conduct a rigorous analysis] to require district courts to, *inter alia*, 'look beyond the pleadings to understand the claims, defenses, relevant facts, and applicable substantive law in order to make a meaningful determination of the certification issues.'" *Perry, 675 F.3d at 837* (quoting *McManus v. Fleetwood Enters., Inc., 320 F.3d 545, 548 (5th Cir. 2003))*; *see also Wal-Mart, 564 U.S. at 350-51* (same).

**2.**

The district court concluded that Plaintiffs

868 F.3d 354, *362; 2017 U.S. App. LEXIS 15847, **12

had demonstrated the existence of "questions of law or fact common" to the General Class and the subclasses. *See Fed. R. Civ. P. 23(a)(2)*. For the General Class, the district court identified the following common questions: (1) "that excessive heat constitutes a condition of confinement that poses a substantial risk of serious harm to the health of all inmates"; and (2) "that TDCJ officials were deliberately indifferent to the risk posed to the inmates." Further, the district court concluded that the "heat-sensitive subclass has the same common contentions as the General Class, but the **[**13]** subclass must only prove a substantial risk of serious harm, and deliberate indifference, to the inmates with heat sensitivity." Finally, as to the disability subclass, the district court stated that "[o]ne additional common contention of the disability subclass is that TDCJ officials failed to provide reasonable accommodations to inmates suffering from disabilities that may impact (or that cause the inmates to take medication that may impact) their ability to withstand extreme heat."

*i. General Class*

Defendants' overarching objection to the district court's certification of the General Class focuses on the first common contention—that "excessive heat constitutes a condition of confinement that poses a substantial risk of serious harm to the health of inmates." Defendants do not contest that putative class members are all exposed to essentially the same temperatures. Defendants also do not contest that Pack Unit temperatures, particularly in the summer months, are

often extreme. Nor do they contest that, absent mitigation measures, *every inmate* in the Pack Unit is at a substantial risk of serious harm due to the heat. They do contest, however, the ability to decide the substantial-risk-of-serious-harm **[**14]** question "in one stroke," *Wal-Mart, 564 U.S. at 350*, in light of the various heat mitigation measures that TDCJ makes available to Pack Unit inmates.

Specifically, Defendants assert that the efficacy of TDCJ's heat-mitigation measures to reduce the risk of serious harm to a constitutionally acceptable level will largely depend on the age and health of each particular individual—for the young and healthy, they may; for the old and sick, they may not. And because the Pack Unit inmate population is diverse in both **[*363]** age and health, it is impossible to determine all at once whether the excessive heat in the Pack Unit "constitutes a condition of confinement that poses a substantial risk of serious harm to the health of all inmates." So, Defendants assert that in order for this question to be "common" for *Rule 23(a)* purposes Plaintiffs were required to prove "that even the youngest, healthiest, and most acclimatized inmates face a substantial threat of serious harm *despite* TDCJ's existing heat-mitigation measures."

The district court made precisely this finding. It acknowledged that "[n]o two individuals have the exact same risk." Nonetheless, it concluded that this "obvious fact [does not] destroy[ ] commonality" because "[t]he evidence **[**15]** calls into serious question the adequacy of TDCJ's mitigation measures—as applied in practice—*in*

868 F.3d 354, *363; 2017 U.S. App. LEXIS 15847, **15

*reducing the heat risk for all the inmates*, and particularly those with comorbidities that diminish their ability to thermoregulate." In other words, the district court found, based on the expert testimony, that TDCJ's heat-mitigation measures—more frequent showers, cold drinking water, fans, and temporary access to air-conditioned "respite areas"—were ineffective to reduce the risk of serious harm to a constitutionally permissible level for *any* inmate, including the healthy inmates, and the Defendants concede the existence of a common question under these circumstances. Thus, in order to prevail, the Defendants must demonstrate that the district court's factual finding is clearly erroneous.[4]

HN6[↑] "A finding of fact is 'clearly erroneous' only when although there may be evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *Westwego Citizens for Better Gov't v. City of Westwego, 946 F.2d 1109, 1118 (5th Cir. 1991)* (citing *Campos v. City of Baytown, Texas, 840 F.2d 1240, 1243 (5th Cir. 1988))*. "If the district court's account of the evidence is plausible in light of the record viewed in its entirety, [we] may not reverse . . . even though convinced that had [we] **[**16]** been sitting as the trier of fact, [we] would have weighed the evidence differently." *In re Omega Protein, Inc., 548 F.3d 361, 367 (5th Cir. 2008)*.

We conclude that the district court did not clearly err. The district court personally toured the Pack Unit and held a four day evidentiary hearing, resulting in thousands of pages of expert testimony and other evidence from both sides related to the heat impact on the inmates in the Pack Unit. During the hearing, Plaintiffs put forward two experts—Dr. McGeehin and Dr. Vassallo—who testified regarding the inadequacies of the TDCJ heat-mitigation measures. Dr. McGeehin was previously the lead scientist with the Center for Disease Control (CDC) regarding health effects from extreme heat and heat waves; he has over fifteen years of experience in this area. Dr. Vassallo is a licensed physician and a recognized expert in the field of thermoregulation and hyperthermia, with over twenty-five years treating heat stroke and heat-related disorders. Dr. Vassallo has previously served as an expert witness in lawsuits challenging prison conditions, and this court has (at least) twice upheld district court findings that relied heavily **[*364]** on Dr. Vassallo's testimony. *See Ball, 792 F.3d at 593-94*; *Gates, 376 F.3d 339-40*.

Dr. McGeehin testified that while showers **[**17]** are helpful "for the short term," "giving a person a shower and then putting them back into a very hot, humid environment has limited effect." Likewise, Dr. Vassallo testified that "taking extra showers" did not reduce the health risks of extreme heat to a "statistically significant" degree. This conclusion was supported by peer-reviewed studies included in the record, indicating that "[t]aking extra showers or baths and using fan ventilation during a heat wave were associated with a trend toward lower risk of death *but were*

---

[4] Defendants argue that the district court stopped short of finding that TDCJ's heat-mitigation measures were ineffective as to all inmates by concluding only that the evidence called their effectiveness into "serious question." We conclude that the district court's opinion can only fairly be read as concluding that TDCJ's heat-mitigation measures are ineffective to sufficiently reduce the risk of serious harm as to all inmates.

*not statistically significant.*"

Dr. McGeehin's testimony relied on peer-reviewed publications indicating that while fans may have a mitigating effect, they are actually counterproductive at higher temperatures: "Although fans provide a cooling effect by evaporating sweat, fan use can pose a significant risk when the heat index exceeds . . . 99 degrees Fahrenheit . . . because it serves to increase heat stress by blowing air that is warmer than body temperature over the skin surface." He also indicated that the CDC does not recommend the use of fans when the temperature is above 95 degrees Fahrenheit, which frequently occurs in the Pack Unit. Dr. Vassallo likewise testified **[**18]** that "[f]ans are not protective at temperature[s] [of] 90 degrees with the humidity of 35 percent or more."

As to air-conditioned "respite areas," Plaintiffs also put forward evidence calling into question the effectiveness of TDCJ's air-conditioned "respite areas." For example, Dr. Vassallo testified that these respite areas are not "an adequate plan to deal with the heat risk" precisely because they are only temporary and so "the time [the inmates] are not in air-conditioning, they are subjected to the temperatures at the Pack Unit which are risky and cause harm, including sickness, morbidity and mortality." Moreover, Dr. Vassallo noted that the harmful effects of excessive heat can begin to occur *before* an individual might feel the need to go to an air-conditioned space: "Q. Is it possible for someone to start having cognitive problems from heat illness before they realize they need to go to air-conditioning? A. Of course." Thus, according to Dr.

Vassallo, because Pack Unit inmates must take the initiative to go to an air-conditioned respite area, they may not know they are in imminent danger until it is too late, and, especially at night, prison officials are unlikely to notice either. Finally, Plaintiffs **[**19]** offered affidavits from inmates in the Pack Unit indicating that access to air-conditioned "respite areas" is not "on demand," and such rooms are often not available. The district court found these affidavits credible on this point—a determination to which we owe significant deference. *See In re Omega Protein, 548 F.3d at 367* ("Findings based on the credibility of witnesses demand even greater deference."). As Dr. McGeehin observed, while respite areas might theoretically be an effective measure, their effectiveness depends on being available to inmates upon request.[5]

Both of Plaintiffs' experts indicated that the conditions in the Pack Unit, including the heat-mitigation measures, posed a substantial risk of harm to the inmates. In her expert report, Dr. Vassallo stated that "[t]he current measures used to mitigate these serious risks . . . are inadequate to sufficiently reduce the serious risk of harm to the inmates." Upon reviewing TDCJ's **[*365]** most up-to-date mitigation policy, Dr. McGeehin indicated that "it has some improvements in it, but it still has major areas of concern." When asked whether "there [are] any really effective way[s], other than air-conditioning, to mitigate the risk of heat at the Pack Unit," Dr. Vassallo

_____

[5] Notably, the district court could not determine whether an official policy regarding respite areas exists because "the only policy or practice of allowing inmates to access respite areas is . . . stated in an email, and cannot be found in a separate policy."

said, **[\*\*20]** "No."

Defendants put forward the testimony of Dr. Means and Dr. Reiger, who testified regarding the various factors relevant to an individual's heat risk and concluded that the heat-mitigation measures at the Pack Unit were effective to reduce the risk of serious harm. Dr. Means is a former employee of TDCJ—a defendant in this case—and is herself a defendant in related wrongful death actions. The district court found that Dr. Means "was unable to directly answer most of the questions by Plaintiffs' counsel," was "nonresponsive to questions posed by [the district court]," and "appeared incapable of admitting to anything she did not view as helpful to her side's case." Consequently, the district court "found her to be biased and, frankly, unbelievable," and therefore "[did not] credit any part of her testimony." Notably, Defendants do not contest this finding.

While Dr. Reiger testified that the heat-mitigation measures in the Pack Unit rendered the risk of harm "quite reasonable," this conclusion was countered by the testimony of Dr. Vassallo and Dr. McGeehin, who, as already noted, concluded that the various heat mitigation measures that Defendants employ are of limited value in reducing **[\*\*21]** inmate risk. Moreover, the district court specifically found Dr. Reiger's testimony less credible, given that he consistently misremembered statements made by inmates regarding the availability of respite areas. Such credibility determinations fall squarely within the district court's purview. *See, e.g., Env't Texas Citizen Lobby, Inc. v. ExxonMobil Corp., 824 F.3d 507, 529 (5th Cir. 2016)* (*HN7*[⬆]) "[W]e are extremely deferential to

a district court's assessment of witness credibility[.]").

*HN8*[⬆] Under the clearly erroneous standard of review, "[i]f the district court's account of the evidence is plausible in light of the record viewed in its entirety, [we] may not reverse it even though convinced that had [we] been sitting as the trier of fact, [we] would have weighed the evidence differently." *In re Omega Protein, 548 F.3d at 367*. Upon careful review of the record before us, we conclude that the district court's "account of the evidence is plausible," *id.*, and we are not "left with the definite and firm conviction that a mistake has been committed." *See Westwego, 946 F.2d at 1118*. Accordingly, the district court did not clearly err in finding that TDCJ's heat-mitigation measures are ineffective to reduce the heat-related risk of serious harm below the constitutional baseline.

This being so, we affirm the district court's conclusion that Plaintiffs **[\*\*22]** have demonstrated the presence of a "question[ ] of law or fact common to the class." *Fed. R. Civ. P. 23(a)(2)*. As already noted, Defendants concede that "[c]ommonality required Plaintiffs to prove that TDCJ's existing heat-mitigation efforts necessarily mitigated the risk of high temperature for all class members *or for none of them*." The district court found the latter to be true and, again, that finding is not clearly erroneous.[6]

---

[6] The district court also concluded that whether "TDCJ officials were deliberately indifferent to the risk posed to the inmates" was a separate common question. The Supreme Court has determined that *HN9*[⬆] "for purposes of *Rule 23(a)(2)* even a single common question will do[.]" *Wal-Mart, 564 U.S. at 359* (alterations omitted) (quotation marks omitted); *see also* Newberg on Class Actions § 3:20 (5th ed.). This holding is consistent with our prior decision in *Forbush v. J.C. Penney*

**[*366]** *ii. Subclasses*

Defendants also challenge the district court's certification of the two subclasses. As noted, the district court certified a "heat-sensitive" subclass and a "disability" subclass. The heat-sensitive subclass, like the General Class, is asserting an *Eighth Amendment* claim. Likewise, the disability subclass asserts an *Eighth Amendment* claim, but also relies on a claim under the Americans with Disabilities Act and the Rehabilitation Act. And, as noted, the district court determined that both subclasses shared the common questions it identified for the General Class.

Defendants' primary objection to subclass certification is similar to their objection to General Class certification. They argue that the existence of a substantial risk of serious harm cannot be collectively determined because the **[**23]** risk of serious harm from excessive heat varies even among those with conditions rendering them susceptible to heat.

We reject Defendants' challenge to certification of both subclasses. The district court found that TDCJ's heat mitigation measures are not effective to bring the risk of serious harm below the constitutional baseline for *any* Pack Unit inmate—which includes the inmates within the subclasses who have some condition making them particularly susceptible to heat. In addition, the district court concluded that the disability subclass had the "additional common contention . . . that TDCJ officials failed to provide reasonable accommodations to inmates suffering from disabilities that may impact . . . their ability to withstand extreme heat." We find no error.

**B.**

**1.**

**HN10**[↑] In addition to meeting the requirements of *Rule 23(a)*, a plaintiff must also demonstrate that a proposed class satisfies one of the criteria articulated in *Fed. R. Civ. P. 23(b)*. Here, the district court certified the classes under *Rule 23(b)(2)*, which permits class certification where "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate **[**24]** respecting the class as a whole . . . ." *Fed. R. Civ. P. 23(b)(2)*.

It is well-established that "[i]nstead of requiring common issues, [Rule] 23(b)(2) requires common behavior by the defendant toward the class." *In re Rodriguez, 695 F.3d 360, 365 (5th Cir. 2012)*; *see also Casa Orlando Apts., Ltd. v. Fannie Mae, 624 F.3d 185, 198 (5th Cir. 2010)* (same). Thus, we have held that *Rule 23(b)(2)* certification is available if

---

*Co., 994 F.2d 1101, 1106 (5th Cir. 1993)* (holding that *Rule 23(a)*'s commonality requirement is satisfied where there is "at least one" common question of law or fact). However, a later decision of ours—*Applewhite v. Reichhold Chemicals, Inc., 67 F.3d 571 (5th Cir. 1995)*—held that "class certification requires at least *two* issues in common." *Id. at 573* (emphasis added). Given that we are bound under the rule of orderliness to follow our earlier precedent, and must in any event adhere to Supreme Court precedent, we reaffirm that *Rule 23(a)(2)* requires only that a plaintiff demonstrate at least one common question of law or fact, notwithstanding *Applewhite's* contrary holding. Accordingly, we have no cause to assess whether the district court's second asserted common question satisfies *Rule 23(a)(2)*.

three requirements are satisfied: (1) "class members must have been harmed in essentially the same way"; (2) "injunctive relief must predominate over monetary damage claims"; and (3) "the injunctive relief sought must be specific." *Maldonado v. Ochsner Clinic Found., 493 F.3d 521, 524 [*367] (5th Cir. 2007)*; *see also Perry, 675 F.3d at 845.* The specificity element requires plaintiffs to "give content" to the injunctive relief they seek "so that 'final injunctive relief may be crafted to describe in reasonable detail the acts required.'" *Perry, 675 F.3d at 848* (quoting *Shook v. Bd. of Cty. Comm'rs of Cty. of El Paso, 543 F.3d 597, 605-06 (10th Cir. 2008))*.

The Supreme Court has further expounded on *Rule 23(b)(2)*:

*HN11*[↑] The key to the (b)(2) class is the indivisible nature of the injunctive or declaratory remedy warranted—the notion that the conduct is such that it can be enjoined or declared unlawful only as to all of the class members or as to none of them. In other words, *Rule 23(b)(2)* applies only when a single injunction or declaratory judgment would provide relief to each member of the class. It does not authorize class certification when each individual class member **[**25]** would be entitled to a different injunction or declaratory judgment against the defendant.

*Wal-Mart, 564 U.S. at 360* (quotation marks omitted) (citation omitted).

**2.**

In their second amended complaint,

Plaintiffs request the following injunctive relief for the General Class and both subclasses:

> Plaintiffs ask that the Court enjoin Defendants to maintain a safe indoor apparent temperature (e.g., maintaining a heat index of 88 degrees or lower) inside each of the Pack Unit's housing areas (calculated using the NWS heat index table), or enter other injunctive relief sufficient to protect the health and safety of the prisoners at the Pack Unit.

The district court concluded that the General Class and both subclasses "easily" met the standard for *Rule 23(b)(2)* because: (1) "the conditions of confinement [*i.e.*, non-air-conditioned housing areas] apply uniformly to the class of inmates as a whole"; and (2) "[o]ther mitigation measures, such as providing ice water and fans, and the availability of respite areas, are similarly applied uniformly to all the inmates." For this reason, the district court concluded that "[i]njunctive or declaratory relief . . . would be appropriate respecting the class as a whole if an *Eighth Amendment* violation were to be found," whether "air-conditioning **[**26]** is indeed needed to cure the violation, or if less drastic measures (such as ordering TDCJ to create and adhere to a more definitive policy regarding respite areas) are shown to suffice . . . ."

Defendants argue that certifying the classes under *Rule 23(b)(2)* was not appropriate. In essence, Defendants contend that the district court's order does not "identify *specific injunctive relief* that could apply to the entire class or subclasses" or *"explain how [that] single form of injunctive relief—whether it be air

868 F.3d 354, *367; 2017 U.S. App. LEXIS 15847, **26

conditioning or something less—would necessarily be appropriate (or not) for the entire class." According to Defendants, the district court improperly "assumed" that a single form of injunctive relief "would necessarily be required for all class members or none of them."

The district court did not abuse its discretion. **HN12**[⬆] By its terms, *Rule 23(b)(2)* looks to whether the *defendant's* conduct applies "generally to the class." *Fed. R. Civ. P. 23(b)(2)*. *Rule 23(b)(2)* does not require "common issues," but rather "requires common behavior by the defendant towards the class," *In re Rodriguez, 695 F.3d at 365*, such that "class members . . . have been harmed in essentially the same way." *Perry, 675 F.3d at 845*. Here, there is no serious question that Defendants **[*368]** have engaged in common behavior that "appl[ies] generally **[**27]** to the class[es]." *Fed. R. Civ. P. 23(b)(2)*. All inmates, regardless of age or health, are subject to the *same* policy on climate control (*i.e.*, their housing units are not air-conditioned), all have the *same* heat-mitigation measures available to them (whether or not those measures are effective), and all are (allegedly) harmed in essentially the *same* way—*i.e.*, by exposure to a substantial risk of serious harm because of exposure to excessive heat. Thus, the same action/inaction by Defendants is the source of any injury for the entire General Class and the subclasses.

Defendants lean heavily on *Rule 23(b)(2)*'s requirement that "the injunctive relief sought . . . be specific," *Perry, 675 F.3d at 845*, and that there be "content" given "so that 'final injunctive relief may be crafted to describe in reasonable detail the acts required.'" *Id. at 848* (quoting *Shook, 543 F.3d at 605-06*). Few of our cases expound on the "specificity" requirement. In one— *Maldonado v. Ochsner Clinic Foundation*— we held that *Rule 23(b)(2)* certification was inappropriate where the plaintiffs sought to compel the defendants to provide "mutually affordable healthcare." *493 F.3d at 524-25*. There, we faulted the plaintiffs for not "identify[ing] any way to determine what a reasonable or 'mutually affordable' rate is for the wide variety of medical services offered **[**28]** by [the defendant]." *Id. at 524*.

We find this requirement satisfied here. While Plaintiffs requested that the district court "enjoin Defendants to maintain a safe indoor apparent temperature" (which admittedly offers little content), they *also* identified specific relief in "reasonable detail" that would fit this standard: "maintaining a heat index of 88 degrees or lower." The district court—of course aware of Plaintiffs' requested relief—identified air-conditioning as a remedy that "would provide relief to each member of the class." *Wal-Mart, 564 U.S. at 360*. While the district court did not specify the precise temperature (as the complaint does), **HN13**[⬆] *Rule 23(b)(2)* does not require that every jot and tittle of injunctive relief be spelled out at the class certification stage; it requires only "reasonable detail" as to the "acts required." *Perry, 675 F.3d at 848*. For this reason, this case is quite unlike *Maldonado*, where the requested injunctive relief (the provision of "mutually affordable health care") lacked any meaningful content and provided no guidance.[7]

---

[7] The Plaintiffs are not seeking damages in this case, so there

Defendants contend that the district court "fail[ed] to explain how a single form of injunctive relief . . . would necessarily be appropriate (or not) for the entire class." It seems that Defendants take issue **[**29]** with the district court's failure to explain how air-conditioning as a possible remedy could provide class-wide relief from injuries caused by excessive heat. The answer, of course, is self-evident, and the district court did not abuse its discretion in declining to state the obvious. And, in any event, the district court heard expert testimony on this issue.

## C.

Defendants also argue that the district court's *Rule 23(b)(2)* certification was prohibited by the Prison Litigation Reform Act (PLRA). **HN14**[↑] The relevant provision of the PLRA provides:

> Prospective relief in any civil action with respect to prison conditions shall extend no further than necessary to correct the **[*369]** violation of the Federal right of a particular plaintiff or plaintiffs. The court shall not grant or approve any prospective relief unless the court finds that such relief is narrowly drawn, extends no further than necessary to correct the violation of the Federal right, and is the least intrusive means necessary to correct the violation of the Federal right.

*18 U.S.C. § 3626(a)(1)(A)*.

The district court reasoned that the PLRA "does not prohibit[ ] class-wide relief in this case" because it only "prohibits relief that is unnecessary to correct the alleged *Eighth Amendment* violation." **[**30]** So, while the district court recognized that the PLRA's restrictions on injunctive relief would *later* come into play, it concluded that they were irrelevant to class certification.

Defendants argue that a district court is required to take *Section 3626(a)(1)(A)* into account when undergoing its *Rule 23(b)(2)* analysis. The rationale for this position is straightforward: *Rule 23(b)(2)* requires district courts to determine whether a single injunction (or declaratory relief) could remedy violations as to all class members; but, the PLRA limits the scope of permissible prospective relief to that which is "necessary to correct the violation of the Federal right of a particular plaintiff or plaintiffs," *id. § 3626(a)(1)(A)*; so, to be at all meaningful, a district court's *Rule 23(b)(2)* analysis should only take account of injunctive relief that the PLRA would authorize it to award as a remedy. Defendants make this argument while acknowledging that one of our sister circuits has already rejected it. *See Shook v. El Paso Cty., 386 F.3d 963, 969-71 (10th Cir. 2004)*.

**HN15**[↑] As is always the case when interpreting legal text, our task is to give effect to the language Congress has enacted, not to read additional meaning into the statute that its terms do not convey. *See, e.g., Lewis v. City of Chicago, Ill., 560 U.S. 205, 217, 130 S. Ct. 2191, 176 L. Ed. 2d 967 (2010)* ("Our charge is to give effect to the law Congress enacted."). **[**31]** It follows that when a statute is silent with respect to a particular subject, we will not construe the statute to

is no issue as to whether "injunctive relief . . . predominate[s] over monetary damage claims[.]" *Maldonado, 493 F.3d at 524*.

nonetheless reach the matter. Indeed, "[t]he principle that a matter not covered is not covered is so obvious that it seems absurd to recite it." Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 93 (Thomas/West 2012). This is especially true where the claim is that Congress has implicitly altered one provision of law via another provision; in such cases, Congress "ordinarily provides a relatively clear indication of its intent [to do so] in the text[.]" *See TC Heartland LLC v. Kraft Foods Grp. Brands LLC, 137 S. Ct. 1514, 1520, 197 L. Ed. 2d 816 (2017)*.

The text of *Section 3626(a)(1)(A)* plainly says nothing at all about class actions or the requirements for class certification. Nor have Defendants directed us to any other provision of the PLRA—or any other statute for that matter—that would support applying *Section 3626(a)(1)(A)* at the class certification stage. There is therefore no basis for engrafting *Section 3626(a)(1)(A)*'s requirements onto *Rule 23(b)(2)*.

In reaching this conclusion, we are mindful that Congress rarely seeks to effect a fundamental change in law through circuitous means. "Congress . . . does not, one might say, hide elephants in mouseholes." *Whitman v. Am. Trucking Assocs., 531 U.S. 457, 468, 121 S. Ct. 903, 149 L. Ed. 2d 1 (2001)*. *Rule 23(b)(2)*—unlike the PLRA—does not require that the injunctive **[**32]** relief underlying the certification decision (or ultimately awarded as a remedy) **[*370]** be the bare minimum necessary to cure the violation as to each inmate. Applying *Section 3626(a)(1)(A)* at the class certification stage would work a considerable restriction on the availability

of class action suits in the prison context. These lawsuits overwhelmingly involve *Eighth Amendment* claims, which require proof: (1) that the inmate "is incarcerated under conditions posing a substantial risk of serious harm"; and (2) that the defendant prison official was "deliberately indifferent" to that risk. *See Farmer v. Brennan, 511 U.S. 825, 834, 114 S. Ct. 1970, 128 L. Ed. 2d 811 (1994)*. As is true in this case, determining whether particular conditions pose a substantial risk of serious harm or whether there was deliberate indifference will often depend on characteristics that vary across a prison population. Imposing *Section 3626(a)(1)(A)*'s requirements at the class certification stage would pose a substantial barrier to class certification in a significant number of prison condition challenges. Absent some indication in the text of *Section 3626(a)(1)(A)*, we cannot conclude that Congress intended that provision to alter the well-established requirements of class certification *sub silentio*.

Defendants' argument is also in tension with our decision in *Williams v. Edwards, 87 F.3d 126 (5th Cir. 1996)*, where **[**33]** we held that the PLRA is not implicated at all until the district court actually sets its hand to fashioning injunctive relief. *Williams* involved a prison case that was certified as a class action prior to the PLRA's enactment. *See id. at 128* & n.4, 133. The district court had not yet awarded prospective relief, and so we determined that *Section 3626(a)(1)(A)*—which only applies to prospective relief—"ha[d] yet to be triggered." *Id. at 133*. The same principle applies here. Because the district court has not yet come to the point of awarding injunctive relief, "the provisions of

868 F.3d 354, *370; 2017 U.S. App. LEXIS 15847, **33

[Section 3626(a)(1)] have yet to be triggered[.]" *Id.*

Relying on our decision in *Ball v. LeBlanc*, Defendants argue that the PLRA categorically prohibits an injunction requiring that the Pack Unit be air-conditioned. This is not so. In *Ball*—which was not a class action case—we held that a permanent injunction requiring that a prison facility be air-conditioned was overbroad under the PLRA because the evidence produced at trial showed that "there [were] many acceptable remedies short of facility-wide air conditioning" that could possibly cure the *Eighth Amendment* violation. *792 F.3d at 598-99*. In other words, *Ball* held that air-conditioning was not appropriate in that case because other acceptable and less-intrusive **[**34]** remedies had yet to be tried—not that air-conditioning was necessarily an impermissible remedy. *Id. at 599*. We also held that a facility-wide injunction was not appropriate under the PLRA because only the three named plaintiffs were at issue. *Id. at 599-600*.

Neither of these holdings precludes class certification here. Just as in *Ball*, if Plaintiffs obtain a favorable judgment at trial and it appears that air-conditioning the Pack Unit "extend[s] . . . further than necessary to correct the violation," *18 U.S.C. § 3626(a)(1)(A)*, the district court would be required to tailor any injunctive relief to adhere to the PLRA. As the district court noted, "[i]f an *Eighth Amendment* violation is found, this Court will need to determine whether air-conditioning the housing areas is indeed the least intrusive means of correcting the violation, or whether augmenting the mitigation measures that

are already in place at the Wallace Pack Unit would be sufficient to remedy the violation." Nothing in *Ball*, however, requires the district court to make this determination at the point of certifying a class, and we do not pass **[*371]** judgment on the issue either.[8]

We hold that *HN16* *Section 3626(a)(1)(A)* does not alter the requirements for certifying a class action under **[**35]** *Rule 23(b)(2)*.

## IV.

Accordingly, because we conclude that the district court did not abuse its discretion in certifying the General Class or the subclasses, we AFFIRM.

---

**End of Document**

---

[8] The Defendants also cite to *Gates v. Cook*. In *Gates*, which was a class action case, the district court entered an injunction requiring, *inter alia*, that the defendant "provide fans, ice water, and daily showers when the heat index is 90 degrees or above . . . ." *376 F.3d at 339*; *see generally id. at 339-40*. Of course, just because *Gates* affirmed a different injunction on a different record does not speak to whether the Plaintiffs' requested relief in this case would be permissible under the PLRA.

 Caution
As of: August 29, 2023 9:15 PM Z

# *Jones-El v. Berge*

United States Court of Appeals for the Seventh Circuit

June 1, 2004, Argued ; July 2, 2004, Decided

No. 03-4318

**Reporter**

374 F.3d 541 *; 2004 U.S. App. LEXIS 13729 **

DENNIS E. JONES-EL, et al., Plaintiffs-Appellees, v. GERALD A. BERGE, MATTHEW J. FRANK, and JON E. LITSCHER, Defendants-Appellants.

**Prior History: [**1]** Appeal from the United States District Court for the Western District of Wisconsin. No. 00 C 421. Barbara B. Crabb, Chief Judge.

*Jones-El v. Berge, 2003 U.S. Dist. LEXIS 28673 (W.D. Wis., Nov. 26, 2003)*

**Disposition:** Affirmed.

## Core Terms

air conditioning, cells, district court, enforcement order, consent decree, cooling, decree, installation, postjudgment, injunction

## Case Summary

### Procedural Posture

Plaintiffs, prisoners, sued defendants, a correctional facility and individuals, alleging that the conditions of their confinement violated the *Eighth Amendment*. The parties entered into a consent decree. The prisoner later moved to enforce the consent decree. The United States District Court for the Western District of Wisconsin issued an enforcement order against defendants. Defendants appealed.

### Overview

The consent decree required defendants to implement a means of cooling the cells. Defendants admitted that the only practical way to cool the cells was to install air conditioning. Consequently, the district court ordered defendants to take immediate steps to air condition the cells. The court of appeals found that it had jurisdiction under *28 U.S.C.S. § 1292* to hear the appeal because the enforcement order substantially and obviously changed the legal relationship of the parties by specifically requiring the installation of air conditioning, evidenced by the irreparable harm defendants could suffer absent the availability of an immediate appeal. The enforcement of a valid consent decree was not the kind of "prospective relief" considered by *18 U.S.C.S. § 3626(a)*. So long as the underlying consent decree remained valid, the district court had to be able to enforce it. Defendants would be hard-pressed to demonstrate that they should not be held to their admission that air conditioning was the only practical way to cool the cells.

374 F.3d 541, *541; 2004 U.S. App. LEXIS 13729, **1

## Outcome

The district court's enforcement order was affirmed.

## LexisNexis® Headnotes

Civil Procedure > Judgments > Entry of Judgments > Consent Decrees

Civil Procedure > Appeals > Appellate Jurisdiction > General Overview

Civil Procedure > Appeals > Appellate Jurisdiction > Final Judgment Rule

### *HN1*[⬇] Entry of Judgments, Consent Decrees

Under *28 U.S.C.S. § 1291*, an appellate court has jurisdiction over appeals from all final decisions of the district courts. A consent decree is a final decision for purposes of *§ 1291*, even though, as a complex equitable decree, it lacks the trappings of a readily-identifiable-as-final money judgment. Appellate courts treat a postjudgment proceeding as if it were a freestanding lawsuit and attempt to identify the final decision in that proceeding.

Civil Procedure > Appeals > Appellate Jurisdiction > Interlocutory Orders

Civil Procedure > Appeals > Appellate Jurisdiction > General Overview

### *HN2*[⬇] Appellate Jurisdiction, Interlocutory Orders

Under *28 U.S.C.S. § 1292(a)(1)*, an appellate court has jurisdiction over appeals from interlocutory orders of the district courts granting injunctions. An order--including a postjudgment order--is properly characterized as an "injunction" when it substantially and obviously alters the parties' pre-existing legal relationship. Even though an interlocutory order may not explicitly grant an injunction, if its consequences may cause a party irreparable harm, then it likely substantially altered the legal relationship of the parties and immediate appealability is appropriate. Put differently, an unappealable order is one that interprets or clarifies a prior order and does not create new rights or obligations independently enforceable through a contempt action.

Civil Rights Law > ... > Prisoner Rights > Prison Litigation Reform Act > Prospective Relief

Civil Rights Law > ... > Prisoner Rights > Prison Litigation Reform Act > General Overview

### *HN3*[⬇] Prison Litigation Reform Act, Prospective Relief

Under the Prison Litigation Reform Act of 1995 (PLRA), *18 U.S.C.S. § 3626(a)(1)* mandates that prospective relief must be narrowly drawn, extend no further than necessary to correct the violation of the federal right, and must be the least intrusive means necessary to correct the violation.

Civil Procedure > Judgments > Entry of Judgments > Consent Decrees

Civil Rights Law > ... > Prisoner Rights > Prison Litigation Reform Act > Prospective Relief

Civil Rights Law > ... > Prisoner Rights > Prison Litigation Reform Act > General Overview

*HN4*[⤓]  **Entry of Judgments, Consent Decrees**

The enforcement of a valid consent decree is not the kind of "prospective relief" considered by *18 U.S.C.S. § 3626(a)*. So long as the underlying consent decree remains valid the district court must be able to enforce it.

**Counsel:** For DENNIS E. JONES-EL, Plaintiff - Appellant: David C. Fahti, ACLU NATIONAL PRISON PROJECT, Washington, DC.

For MICHA'EL JOHNSON, DE'ONDRE J. CONQUEST, LUIS NIEVES, SCOTT SEAL, Plaintiffs - Appellants: Edward B. Garvey, GARVEY & STODDARD, Madison, WI.

For GERALD A. BERGE, Warden, MATTHEW J. FRANK, Secretary, JON E. LITSCHER, Defendant - Appellee: Charles D. Hoonstra, OFFICE OF THE ATTORNEY GENERAL, Wisconsin Department of Justice, Madison, WI. :

**Judges:** Before EASTERBROOK, KANNE, and ROVNER, Circuit Judges.

**Opinion by:** KANNE

## Opinion

 [*542] KANNE, *Circuit Judge*. This appeal arises out of an action filed in 2000 by two prisoners confined at the Supermax Correctional Institution in Boscobel,  [*543] Wisconsin (this facility was recently renamed the Wisconsin Secure Program Facility, but for the sake of continuity, we will refer to the prison as "Supermax"). In their conditions of confinement suit, the plaintiffs asserted that they were subjected to extreme temperatures in violation of the *Eighth Amendment*, in addition to other claims. After a plaintiff class was certified, the district court granted a preliminary injunction requiring, in part, that certain inmates particularly susceptible to elevated temperatures be immediately removed from Supermax. *Jones'El v. Berge, 164 F. Supp. 2d 1096 (W.D. Wis. 2001)* ("*Jones'El I* "). Prior to trial on January 24,2002, the parties entered into a consent decree. Among other concessions, the Wisconsin Department of Corrections ("DOC") agreed to investigate and implement **[**2]** a means of cooling the cells during summer heat waves. The agreement also stated that the district court would retain jurisdiction to enforce its terms and that it was consistent with the requirements of the Prison Litigation Reform Act ("PLRA"),*18 U.S.C. § 3626*. On June 24, 2002, the district court approved the agreement.

Then, on October 10, 2003, the plaintiffs moved to enforce various provisions of the consent decree, including the term requiring the DOC to implement a means of cooling the cells. During the November 24, 2003 hearing on this motion, the defendants admitted that the only practical way to cool the cells was to install air conditioning. Consequently, the district court ordered the defendants to take immediate steps to air condition the cells at Supermax ("November order" or

374 F.3d 541, *543; 2004 U.S. App. LEXIS 13729, **2

"enforcement order"). The defendants have appealed that award of relief by the district court, and, as of March 11, 2004, the November order has been stayed pending the disposition of this appeal. For the following reasons, we affirm the district court's enforcement order.

## I. Analysis

First, we must address whether jurisdiction lies to consider this appeal. *HN1*[↑] Under [**3] *28 U.S.C. § 1291*, we have jurisdiction over appeals from all final decisions of the district courts. The consent decree itself was a final decision for purposes of *§ 1291*, even though, as a complex equitable decree, it lacks the trappings of a readily-identifiable-as-final money judgment. As a result, the district court's enforcement order, the subject of this appeal, is properly conceived of as a postjudgment order. We treat a postjudgment proceeding as if it were a freestanding lawsuit and attempt to identify the final decision in that proceeding. *See Alliance to End Repression v. City of Chicago, 356 F.3d 767, 773 (7th Cir. 2004)* (citing *Bogard v. Wright, 159 F.3d 1060, 1062-63 (7th Cir. 1998)* (citing cases)); *Gautreaux v. Chicago Hous. Auth., 178 F.3d 951, 955-56 (7th Cir. 1999)*(citing *Ass'n of Cmty. Orgs. for Reform Now v. Ill. State Bd. of Elections, 75 F.3d 304, 306 (7th Cir. 1996))*. Hence, we find ourselves heading into rocky terrain--where a consent decree serves as the "first" order of the postjudgment controversy, the postjudgment proceedings may not bear sufficient similarities [**4] to a freestanding lawsuit to enable easy identification of a plausible counterpart to a final judgment as

required under *§ 1291*. *See Bogard, 159 F.3d at 1062-63*. Because the finality question in the context of postjudgment proceedings is such a tough one, instead of attempting to conquer such terrain, we assume the November order was non-final and take the plainer path--*28 U.S.C. § 1292(a)(1)*.

*HN2*[↑] Under *§ 1292(a)(1)*, we have jurisdiction over appeals from interlocutory [*544] orders of the district courts granting injunctions. An order--including a postjudgment order--is properly characterized as an "injunction" when it substantially and obviously alters the parties' pre-existing legal relationship. *Gautreaux, 178 F.3d at 958* (citing *Bogard, 159 F.3d at 1064*; *Motorola, Inc. v. Computer Displays Int'l, Inc., 739 F.2d 1149, 1155 (7th Cir. 1984))*. Even though an interlocutory order may not explicitly grant an injunction, if its consequences may cause a party irreparable harm, then it likely substantially altered the legal relationship of the parties and immediate appealability is appropriate. *See Heartwood, Inc. v. U.S. Forest Serv., 316 F.3d 694, 698 (7th Cir. 2003)* [**5] (citing *Carson v. Am. Brands, Inc., 450 U.S. 79, 84, 67 L. Ed. 2d 59, 101 S. Ct. 993 (1981))*. Put differently, an unappealable order is one that interprets or clarifies a prior order and does not create new rights or obligations independently enforceable through a contempt action.

Applying this standard to the November order, we conclude that it is an appealable grant of a "fresh" injunction, and not simply an interpretation of the consent decree. The November order required the DOC to immediately take steps to air condition the

cells at Supermax and set a deadline for completion of the air conditioning project: the first heat of 2004. [1] Assuming *arguendo* that the order is in error, without an immediate appeal, the defendants would have to comply with the order and incur substantial costs, and would therefore suffer serious irreparable harm.

**[**6]** Moreover, it is impossible to conceive that, absent the enforcement order, the plaintiffs could have successfully pursued a motion for contempt of the decree based upon the defendants' failure to air condition the cells at Supermax. The decree included no provision guaranteeing air conditioning, it only stated that the defendants would implement a means of cooling the cells during summer heat waves. The plaintiffs assert that because the defendants admitted at the pre-order hearing that the only practical means of cooling the cells is air conditioning, the consent decree *ipso facto* required air conditioning and the enforcement order should properly be construed as an interpretation of the decree and not as an injunction. This circular logic is unavailing. It is still the case that, absent the November order, it would not be possible to hold the DOC in contempt of the original consent decree for failing to install air conditioning. [2]

---

[1] In fact, the district court denied the defendants' motion to stay the enforcement order on December 23, 2003. The defendants were able to discontinue the air conditioning project only because this court on March 11, 2004 granted their motion to stay the order pending disposition of the appeal. The record reveals that approximately one-third of the project has been completed (although much to our vexation, the defendants were not able to identify at oral argument what exact improvements or construction have thus far been completed), at a cost of about $ 250,000.

[2] Following the defendants' admission at the November 24,

**[**7]** The enforcement order substantially and obviously changed the legal relationship of the parties by specifically requiring the installation of air conditioning, evidenced by the irreparable harm the defendants could suffer absent the availability of an immediate appeal. Therefore, we have jurisdiction under *§ 1292(a)(1)*.

**[*545]** Next, we briefly address the defendants' assertions that the district court's enforcement order is invalid. All these arguments allege that the November order fails to comply with the requirements for prospective relief under the PLRA. Specifically, *18 U.S.C. § 3626(a)(1) HN3[↑]* mandates that prospective relief must be narrowly drawn, extend no further than necessary to correct the violation of the federal right, and must be the least intrusive means necessary to correct the violation. Problematically, the defendants failed to make any of their highly fact-bound arguments as to why the order would violate the PLRA in their briefing to the district court or at the November 24, 2003 hearing on the issue. This failure not only deprived the plaintiffs of a meaningful opportunity to respond (and concomitantly waived these arguments for the purposes of **[**8]** appeal, *see, e.g., United States v. Berkowitz, 927 F.2d 1376, 1384 (7th Cir. 1991))*, but also reveals that this appeal of the enforcement order is not the proper mechanism for the particular challenges

---

2003 hearing, the plaintiffs certainly could have abandoned their motion to compel enforcement with respect to the air conditioning and instead filed a contempt action against the state for violating the decree based upon that admission. But this never came to pass. The plaintiffs continued to press their enforcement motion and obtained the desired--and, despite their protestations to the contrary, appealable--enforcement order.

the defendants wish to raise.

**HN4**[⬆] The enforcement of a valid consent decree is not the kind of "prospective relief" considered by *§ 3626(a)*. *See*, *e.g.*, *Hallett v. Morgan, 296 F.3d 732, 743 (9th Cir. 2002)* (citing *Essex County Jail Annex Inmates v. Terffinger, 18 F. Supp. 2d 445, 462 (D.N.J. 1998))*. So long as the underlying consent decree remains valid--and the defendants here have not (yet) made a *§ 3626(b)* motion to terminate or modify the decree--the district court must be able to enforce it. *Id.* The district court's enforcement order on its face is valid, and the defendants offer no proper argument (i.e., one that does not rest upon the PLRA) to the contrary. Challenges to the appropriateness of the November order requiring the installation of air conditioning based upon the PLRA can only be properly brought as a *§ 3626(b)* motion to terminate or modify the decree. By this route, both parties will be offered an equal **[**9]** opportunity to argue the facts and substantive merits with respect to the consent decree's provision requiring the cooling of the cells at Supermax.

Before concluding, we must mention a few items regarding the defendants' arguments as to the "practicality" of installing air conditioning. First, the defendants will be hard-pressed to demonstrate that they should not be held to their admission at the November 24, 2003 hearing that air conditioning is the only practical way to cool the cells at Supermax. *See*, *e.g.*, *Burgin v. Broglin, 900 F.2d 990, 993 n.3 (7th Cir. 1990)*. Second and relatedly, at oral argument, the defendants also (and somewhat surprisingly) disclaimed costs as a practical impediment to the installation of

the air conditioning. Last, we note that before this court, only one argument as to why air conditioning would not be a practical means to cool the cells at Supermax was offered. Defendants incredibly argued that the air conditioning of cells at Supermax to a balmy temperature between 80 and 84 degrees during summer heat waves would entice inmates at other prisons to attack prison guards and/or other inmates in order to be transferred there. **[**10]** This is despite the fact that Supermax inmates are held in windowless cells for all but four to five hours a week and have almost no human contact. We agree with the district court that this proposition is "dubious in the extreme."

## II. Conclusion

For the foregoing reasons, the November 25, 2003 enforcement order of the district court is AFFIRMED.

---

**End of Document**

Q Questioned
As of: August 29, 2023 9:10 PM Z

## *Rhem v. Malcolm*

United States District Court for the Southern District of New York

January 7, 1974

No. 70 Civ. 3962

**Reporter**

371 F. Supp. 594 *; 1974 U.S. Dist. LEXIS 12938 **

James RHEM et al., Plaintiffs, v. Benjamin J. MALCOLM, Commissioner of Correction for the City of New York, et al., Defendants

## Core Terms

detainees, inmates, visits, conditions, cells, contact visit, rights, jail, maximum security, lock-out, cases, prisons, mail, deprivation, floor, housing, noise, witnesses, visitors, windows, confinement, booth, due process, institutions, limitations, recommended, heat, custody, recreation, courts

## Case Summary

### Procedural Posture

Plaintiffs, unconvicted detainees housed in the Manhattan House of Detention for Men (MHD), brought a civil rights action against defendants, the Commissioner of Correction for the City of New York, and others, claiming that numerous practices and physical conditions at MHD deprived them of rights under the *First*, *Fifth*, *Sixth*, *Eighth* and *Fourteenth Amendments*. Their class action suit was filed under *42 U.S.C.S. § 1983* and *28 U.S.C.S. § 2201*.

### Overview

The prisoners challenged the constitutionality of the conditions under which the City of New York held persons in pre-trial custody. The court agreed that the conditions violated the prisoners' Constitutional right to due process, equal protection, and amounted to cruel and unusual punishment. The visiting regulations violated their rights because of restrictions on visiting hours, visiting days, the length of visits and the number of visits. The limitations contrasted markedly with visiting policy at New York State prisons. The court found that dangerously high noise levels, excessive heat, inadequate ventilation, and absence of transparent windows, at least collectively, constituted cruel and unusual punishment. The court determined that it was unconstitutional for the facility to open all mail received by the prisoners. The court found that there were not enough opportunities for employment of prisoners. The court concluded that the dismal conditions that existed in the institution manifestly violated the Constitution and would shock the conscience of any citizen who knew of them.

### Outcome

The court held that the conditions at MHD required that changes be implemented. The court instructed the parties to prepare for a conference to determine the contents of an order consistent with the opinion.

Jodi Cole

Case 1:23-cv-01004-RP   Document 10-2   Filed 08/30/23   Page 41 of 202

Page 2 of 57

371 F. Supp. 594, *594; 1974 U.S. Dist. LEXIS 12938, **12938

## LexisNexis® Headnotes

to assure his appearance for trial.

Civil Rights Law > Protection of
Rights > Prisoner Rights > Confinement
Conditions

Criminal Law &
Procedure > Postconviction
Proceedings > Imprisonment

Civil Rights Law > Protection of
Rights > Prisoner Rights > General
Overview

### *HN1*[⬇]  **Prisoner Rights, Confinement Conditions**

Federal courts sit not to supervise prisons
but to enforce the constitutional rights of all
"persons," including prisoners.

Civil Rights Law > Protection of
Rights > Prisoner Rights > Confinement
Conditions

Criminal Law &
Procedure > Postconviction
Proceedings > Imprisonment

### *HN2*[⬇]  **Prisoner Rights, Confinement Conditions**

All prisoners, convicted or detained, retain
all rights of an ordinary citizen except those
expressly or by necessary implication
taken from them by law, but also by the
precept that, because of the presumption
of innocence, secured only after centuries
of struggle, a detainee retains all rights of
the ordinary citizen except those necessary

Civil Rights Law > Protection of
Rights > Prisoner Rights > Confinement
Conditions

Criminal Law & Procedure > Preliminary
Proceedings > Bail > General Overview

### *HN3*[⬇]  **Prisoner Rights, Confinement Conditions**

Upon the whole, if the offense be not
bailable, or the party cannot find bail, he is
to be committed to the county jail there to
abide till delivered by due course of law.
But this imprisonment, as has been said, is
only for safe custody, not for punishment.
Therefore, in this dubious interval between
the commitment and the trial, a prisoner
ought to be used with the utmost humanity,
and neither be loaded with needless fetters
or subjected to other hardships than such
as are absolutely requisite for the purpose
of confinement only.

Civil Rights Law > Protection of
Rights > Prisoner Rights > Confinement
Conditions

Criminal Law &
Procedure > Sentencing > Consecutive
Sentences

### *HN4*[⬇]  **Prisoner Rights, Confinement Conditions**

The conditions of incarceration for
detainees must, cumulatively, add up to
the least restrictive means of achieving the
purpose requiring and justifying the
deprivation of liberty. Even though the

Case 1:23-cv-01004-RP   Document 10-2   Filed 08/30/23   Page 42 of 202

Page 3 of 57

371 F. Supp. 594, *594; 1974 U.S. Dist. LEXIS 12938, **12938

governmental purpose be legitimate and substantial, that purpose cannot be pursued by means that broadly stifle fundamental personal liberties when the end can be more narrowly achieved. The breadth of legislative abridgment must be viewed in the light of less drastic means for achieving the same basic purpose.

Civil Rights Law > Protection of Rights > Prisoner Rights > Confinement Conditions

Constitutional Law > Bill of Rights > Fundamental Rights > Cruel & Unusual Punishment

Criminal Law & Procedure > Sentencing > Cruel & Unusual Punishment

Constitutional Law > ... > Fundamental Rights > Procedural Due Process > Scope of Protection

*HN5*[⤓]  **Prisoner Rights, Confinement Conditions**

A detainee may not be deprived of the rights of other citizens beyond the extent necessary to assure his appearance at trial and the security of the institution to which he is confined; a detainee may not be confined under conditions more rigorous than a convicted prisoner, and a detainee is entitled to protection from cruel and unusual punishment at least as a matter of due process if not under the *Eighth Amendment*.

Civil Rights Law > Protection of Rights > Prisoner Rights > Confinement

Conditions

Criminal Law & Procedure > Sentencing > Consecutive Sentences

*HN6*[⤓]  **Prisoner Rights, Confinement Conditions**

The rights of detainees who do not require maximum security custody are abridged by being held in maximum security since the conditions of their incarceration do not cumulatively add up to the least restrictive means of achieving the purpose requiring and justifying the deprivation of liberty.

Civil Rights Law > Protection of Rights > Prisoner Rights > Confinement Conditions

Constitutional Law > Equal Protection > Nature & Scope of Protection

Constitutional Law > ... > Fundamental Rights > Procedural Due Process > Scope of Protection

*HN7*[⤓]  **Prisoner Rights, Confinement Conditions**

The imposition of maximum security confinement, including lock-ins in cells of 16 hours per day, on those detainees in whose cases it is not necessary, violates their rights to due process by punishing them although they are unconvicted, and violates their rights to equal protection of the laws by unnecessarily treating them more harshly than convicts or bailees.

371 F. Supp. 594, *594; 1974 U.S. Dist. LEXIS 12938, **12938

Constitutional Law > Equal
Protection > Nature & Scope of
Protection

Criminal Law &
Procedure > Postconviction
Proceedings > Imprisonment

Civil Rights Law > Protection of
Rights > Prisoner Rights > Confinement
Conditions

Constitutional Law > Equal
Protection > Judicial
Review > Standards of Review

*HN8*[↧]  **Equal Protection, Nature &
Scope of Protection**

The conditions of visiting are
simultaneously fundamental to institutional
security and to inmate morale. When the
two are in conflict, the need for security is
paramount; but the need must be
supported by the evidence, and the
doctrine of least necessary restraint
requires, as a matter of due process, that
jail visiting conditions be curbed only to the
extent needed to assure institutional
security and administrative manageability.
Moreover the *equal protection clause*
mandates treatment of New York City
detainees at least as favorable as that
accorded New York State prisoners, unless
a rational basis for the different treatment
is provided.

Civil Rights Law > Protection of
Rights > Prisoner Rights > Confinement
Conditions

*HN9*[↧]  **Prisoner Rights, Confinement
Conditions**

Humane considerations and constitutional
requirements are not to be measured or
limited by dollar considerations.

Civil Rights Law > Protection of
Rights > Prisoner Rights > Confinement
Conditions

Constitutional Law > Bill of
Rights > Fundamental Rights > Cruel &
Unusual Punishment

Criminal Law &
Procedure > Sentencing > Cruel &
Unusual Punishment

*HN10*[↧]  **Prisoner Rights, Confinement
Conditions**

Confinement for long periods of time
without the opportunity for regular outdoor
exercise does, as a matter of law,
constitute cruel and unusual punishment in
violation of the *Eighth Amendment to the
United States Constitution*.

Civil Rights Law > Protection of
Rights > Prisoner Rights > Confinement
Conditions

*HN11*[↧]  **Prisoner Rights, Confinement
Conditions**

The right of a prisoner to reasonable
physical exercise is fundamental.

Civil Rights Law > Protection of
Rights > Prisoner Rights > Confinement
Conditions

Criminal Law &

Case 1:23-cv-01004-RP   Document 10-2   Filed 08/30/23   Page 44 of 202

Page 5 of 57

371 F. Supp. 594, *594; 1974 U.S. Dist. LEXIS 12938, **12938

Procedure > Postconviction Proceedings > Imprisonment

*HN12*[⬇] **Prisoner Rights, Confinement Conditions**

The courts cannot close their judicial eyes to prison conditions which present a grave and immediate threat to health or physical well being.

Civil Rights Law > Protection of Rights > Prisoner Rights > Confinement Conditions

*HN13*[⬇] **Prisoner Rights, Confinement Conditions**

A tolerable living environment is now guaranteed by the law for prisoners.

Civil Rights Law > Protection of Rights > Prisoner Rights > Confinement Conditions

Constitutional Law > Bill of Rights > Fundamental Rights > Cruel & Unusual Punishment

*HN14*[⬇] **Prisoner Rights, Confinement Conditions**

A prisoner's claim of excessive or inadequate heat states a claim, under the *Eighth Amendment* and *42 U.S.C.S. § 1983*, and injunctive relief may be granted against such burdens. Inadequate ventilation has been ordered remedied by judicial decree. Clear glass has been ordered to be installed.

Civil Rights Law > Protection of Rights > Prisoner Rights > Confinement Conditions

*HN15*[⬇] **Prisoner Rights, Confinement Conditions**

Prisoners, whether detainees or convicts, are constitutionally entitled to be free of mistreatment by their custodians and to be protected from harm. Where deprivation of these rights flows from inadequacy of staffing, the shortage must be remedied. The alternative is the release of those held in custody.

Constitutional Law > ... > Fundamental Rights > Procedural Due Process > Scope of Protection

*HN16*[⬇] **Procedural Due Process, Scope of Protection**

Due process is not a fixed concept, but varies according to the precise nature of the government function involved as well as of the private interest affected and the right to due process arises when one is condemned to suffer a grievous loss.

Criminal Law & Procedure > Trials > Examination of Witnesses > Cross-Examination

Criminal Law & Procedure > Preliminary Proceedings > Preliminary Hearings > General Overview

Criminal Law & Procedure > Postconviction Proceedings > Parole

*HN17*[⤓]   **Examination of Witnesses, Cross-Examination**

The minimal requirements of due process in parole revocation cases are defined to include a preliminary hearing and a revocation hearing which afford (1) written notice of the claimed violations of parole; (2) disclosure of the parolee of the evidence against him; (3) opportunity to be heard in person and to present witnesses and documentary evidence; (4) the right to confront and cross-examine adverse witnesses (unless the hearing officer specifically finds good cause for not allowing confrontation); (5) a "neutral and detached" hearing body (whose members, however, need not be judicial officers or lawyers); and (6) a written statement by the fact finders as to the evidence relied on and reasons for revoking parole. A parole revocation proceeding was not to be equated with a criminal proceeding, but was a "narrow inquiry" in which the process should be flexible enough to consider material not admissible in a criminal trial.

> Criminal Law & Procedure > Postconviction Proceedings > Parole

> Criminal Law & Procedure > Counsel > Right to Counsel > General Overview

> Criminal Law & Procedure > Counsel > Right to Counsel > Postconviction

*HN18*[⤓]   **Postconviction Proceedings, Parole**

No inflexible constitutional rule affording counsel is justified in revocation cases, but, rather, the decision as to the need for counsel must be made on a case-by-case basis in the exercise of a sound discretion by the state authority charged with responsibility for administering the system. Presumptively, it may be said that counsel should be provided in cases where, after being informed of his right to request counsel, the probationer or parolee makes such a request, based on a timely and colorable claim (i) that he has not committed the alleged violation of the conditions upon which he is at liberty; or (ii) that, even if the violation is a matter of public record or is uncontested, there are substantial reasons which justified or mitigated the violation and make revocation inappropriate, and that the reasons are complex or otherwise difficult to develop or present. In passing on a request for the appointment of counsel, the responsible agency also should consider, especially in doubtful cases, whether the probationer appears to be capable of speaking effectively for himself. In every case in which a request for counsel at a preliminary or final hearing is refused, the grounds for refusal should be stated succinctly in the record.

> Criminal Law & Procedure > Counsel > Right to Counsel > General Overview

> Criminal Law & Procedure > Postconviction Proceedings > Imprisonment

*HN19*[⤓]   **Counsel, Right to Counsel**

In all cases of serious charges, that is,

371 F. Supp. 594, *594; 1974 U.S. Dist. LEXIS 12938, **12938

threatening "grievous loss," a detainee is entitled to (1) written notice of the charge, (2) the right to confront accusers and to call and cross-examine witnesses, (3) written findings and reasons for the decision with limitations only on the right to counsel or counsel-substitute. Counsel or counsel-substitute must be allowed in cases of seriously disputed infractions, substantial mitigation or which involve difficulty of presentation because of the complex nature of the charge or because the detainee appears incapable of speaking effectively for himself; and where the charges may result in criminal prosecution.

Constitutional Law > ... > Fundamental Freedoms > Freedom of Speech > Scope

## HN20[⤓] Fundamental Freedoms, Freedom of Speech

The use of the mails is almost as much a part of free speech as the right to use our tongues.

Civil Rights Law > Protection of Rights > Prisoner Rights > Freedom of Speech

Constitutional Law > ... > Fundamental Freedoms > Freedom of Speech > Scope

Criminal Law & Procedure > Preliminary Proceedings > Bail > General Overview

Civil Rights Law > Protection of Rights > Prisoner Rights > Confinement Conditions

Constitutional Law > Bill of Rights > Fundamental Freedoms > General Overview

Constitutional Law > ... > Fundamental Freedoms > Freedom of Speech > General Overview

Criminal Law & Procedure > Postconviction Proceedings > Imprisonment

## HN21[⤓] Prisoner Rights, Freedom of Speech

The Constitution protects the right to receive information and ideas. This freedom of speech and press necessarily protects the right to receive. This right to receive information and ideas, regardless of their social worth, is fundamental to our free society. A detainee's right to exercise free speech under the *First Amendment* carries over into confinement pending bail or disposition of charges the concomitant of access to all reading material not unlawful per se, until it is shown that the exercise of such right reasonably creates a clear and present danger of a breach of prison discipline, or some substantial interference with orderly institutional administration.

Civil Rights Law > Protection of Rights > Prisoner Rights > Confinement Conditions

Criminal Law & Procedure > Postconviction Proceedings > Imprisonment

Governments > Courts > Authority to Adjudicate

Civil Rights Law > Protection of Rights > Prisoner Rights > General Overview

**HN22**[↴]  **Prisoner Rights, Confinement Conditions**

Courts are the agency which must enforce the execution of public responsibilities when other branches of government fail to do so: courts sit not to supervise prisons but to enforce the constitutional rights of all "persons," including prisoners.

**Judges:** [**1]  Lasker, District Judge.

**Opinion by:** LASKER

## Opinion

 [*596]  LASKER, District Judge.

Sixty-two years ago, Winston Churchill, then Home Secretary of Great  [*597] Britain observed with characteristic eloquence that "the mood and temper of the public in regard to the treatment of crime and criminals is one of the most unfailing tests of the civilization of any country".  This suit raises most serious issues relating to one element of the criminal process -- the constitutionality of the conditions under which persons are held in pre-trial custody by the City of New York.

Plaintiffs are unconvicted detainees housed in the Manhattan House of Detention for Men (MHD), popularly but forbiddingly known as the "Tombs".  They bring this civil rights action claiming that numerous practices and physical conditions at MHD deprive them of rights under the *First*, *Fifth*, *Sixth*, *Eighth* and

*Fourteenth Amendments*.  Their suit under *42 U.S.C. § 1983* and *28 U.S.C. § 2201* on behalf of all persons confined at MHD originally complained of overcrowding, unsanitary conditions, lack of light and air, excessive noise, mistreatment by guards, arbitrary disciplinary procedures, inadequate medical care, lack [**2] of recreation, and restrictions on visiting and mail.

On October 26, 1970, the case was declared a class action.  On March 17, 1971, Judge Mansfield denied the City's motion to dismiss, and granted a preliminary injunction against the City ordering the Department of Correction to adopt, publish and distribute to all inmates rules governing inmate behavior and other aspects of inmate life and prohibiting the Department from interfering with private consultations between inmates and their attorneys in cases in which the Commissioner or his staff were parties.

On December 16, 1971, a motion by defendants Rockefeller, Oswald and Stevens (the State defendants) to dismiss as to them was denied.

In the latter months of 1972 and January, 1973, constructive negotiations took place between parties, as the result of which the plaintiffs and the City entered into a stipulation of settlement as to the issues relating to overcrowding, unsanitary conditions, and inadequate medical care. A consent decree enforcing the stipulation was entered August 2, 1973.  The remaining issues were tried to the court during several trial weeks.

Plaintiffs' witnesses included four plaintiff detainees: John [**3] Anderson, Warden

371 F. Supp. 594, *597; 1974 U.S. Dist. LEXIS 12938, **3

of Northumberland County Prison in Sunbury, Pennsylvania; Donald Goff, General Secretary of the Correctional Association of New York; William vanden Heuvel, then Chairman of the New York City Board of Correction; Dr. Karl Menninger, Chairman of the Board of the Menninger Foundation, Topeka, Kansas; Dr. Augustus F. Kinzel, formerly staff psychiatrist at the United States Medical Center for Federal prisoners at Springfield, Missouri; Dr. Stephen Teich, Director of Mental Health at MHD, and Richard Botshon, photographer. [1]

---

[1] John Anderson has been Warden at Northumberland since July 1972. Before that he served for a year as Project Director for Correctional Facility Study for ten counties in Central Pennsylvania, and prior to that was employed by the Federal Bureau of Prisons as an Inspector for the Northeastern United States in non-Federal institutions which housed Federal prisoners. He worked for the Federal Government for 23 years starting as a Correctional Officer at the Correctional Institution in Danbury, then as a Lieutenant at the Federal Detention Center in New York City; later at the United States Correctional Facility, Sandstone, Minnesota; finally as Senior Correctional Inspector in the Jail Inspection Service of the United States Bureau of Prisons in Washington. He has visited the Tombs on numerous occasions in recent years, at least once a year to determine whether conditions there were suitable for the housing of Federal Prisoners.

Donald Goff is General Secretary of the Correctional Association of New York, which was formed by an Act of the Legislature in 1844 for the purpose of improving the administration of criminal justice in the State with particular emphasis upon institutions and to report annually to the Legislature on the status of criminal justice in the State. Before taking his present position, Mr. Goff was Associate General Secretary of both the Correctional Association of New York and the American Correctional Association. For six years earlier, he was Chief of the Bureau of Corrections for the State of New Jersey with responsibilities for the administration of the correctional institutions of the State, as well as jail lockup inspection for the State. Previously, he was Director of Classification and Education for the Bureau of Corrections of the State of New Jersey. He is presently a non-governmental organization representative to the United Nations acting as a consultant to the Social Defense Division. He has been a delegate to various international conferences on the prevention of crime in the years 1960, 1965 and 1970. Dr. Karl Menninger is nationally known as a psychiatrist, author,

[**4] [*598] Defense witnesses included: Hon. Benjamin J. Malcolm, Commissioner, New York City Department of Correction;

---

teacher, lecturer, with particular interest in the field of penology and criminology. He has acted as a consultant to the Federal Bureau of Prisons, the President's Task Force on Prisoner Rehabilitation in 1969, the Veterans Administration, United State Office of Vocational Rehabilitation, etc. His credentials are listed in substantial detail in Exhibit 6.

Dr. Augustus F. Kinzel is a psychiatrist in private practice and an instructor in psychiatry at Columbia University, graduate of the Pennsylvania Medical School in 1962, certified by the American Board of Psychiatry and Neurology in 1971, a graduate of the Columbia Psychoanalytic Clinic for Training and Research; member of the subcommittee on prisons of the American Psychiatric Association. He served as Staff Psychiatrist at the United States Medical Center for Prisoners in Springfield, Missouri from 1966 to 1968, and was the Chief Psychiatrist for the maximum security unit there and consultant to the Prison Discipline Committee. Dr. Stephen Teich is a psychiatrist and became Director of Mental Health at MHD in 1972. As Director, he is in charge of all mental health services provided to the inmates. He received his medical degree in 1967 from the Downstate Medical Center and served three years as psychiatric resident at Kings County Hospital after interning at Montefiore Hospital. At Kings County Hospital, he treated inmates in the Kings County Prison Ward.

The four plaintiff detainees who testified were:

Bert Scott, 28 years old, in custody at MHD on possession of drugs and weapon, and robbery. Bail was set at $4,500. bond, 1,000. cash. Scott worked as a laborer in a printing shop before his arrest. He has previously been fined for unauthorized use of a motor vehicle and had served a federal sentence for possession of marijuana and a state sentence for possession of drugs.

Russell Meade -- at the time of trial he had been detained at MHD for about 15 months on charges of robbery and attempted murder. He had no prior conviction and had been a salesman in a record store prior to his arrest. His bail was set at $25,000.

Leo Robinson was held at MHD facing charges of robbery. Bail had been set for $3500. bond or $500. cash. He had been held at MHD for 7 months prior to testifying. He had previously been convicted for theft of interstate shipment, fraudulently accosting and petty larceny.

William Hood, held at MHD on charges of assault in the first degree. Prior to his arrest he was working as a truck driver. He served in the Army in 1963 and 1964 and received a medical discharge. Originally he was held in bail of $100,000. which, after 3 months in custody at MHD, was ultimately reduced to $250.

Case 1:23-cv-01004-RP   Document 10-2   Filed 08/30/23   Page 49 of 202

Page 10 of 57

371 F. Supp. 594, *598; 1974 U.S. Dist. LEXIS 12938, **4

Joseph D'Elia, Director of Operations of the City Department of Corrections; Peter M. Schaefer, then Deputy Warden-In-Command of MHD; Professor Hyman H. A. Cooper, Deputy Director of the Criminal Law Education & Research Center of the New York University School of Law and (by deposition) Louis S. Aytch, Superintendent of Prisons for the City of Philadelphia. [2]

[**5] The court toured MHD on August 2, 1973 and February 26, 1973 in the company of counsel, some members of the [*599] plaintiff class, and officials of MHD. The court also visited the Federal Detention Center in New York City on February 8, 1973, in the company of counsel. On that occasion Warden Louis

_____

[2] Commissioner Malcolm has been in service of the City since 1948. For 20 years he was a parole officer rising to the ranks of Deputy Chief Parole Officer, at the end of that period. For 3 1/2 years he was an assistant director of Labor Relations for the City of New York and for a year and a half served as Deputy Commissioner of the Department of Corrections. Since January 19, 1972, he has been the Commissioner.

Joseph D'Elia has held the position of Director of Operations of the Department of Corrections for two years. He has served in the Department itself for 21 years as Correction Officer, Captain, Assistant Deputy Warden and Warden. He is thoroughly acquainted with the workings of the Department and its institutional components.

Peter M. Schaefer has been employed in the Department of Corrections for more than 22 years and is presently the Warden at MHD.

At the time of trial he was the Deputy Warden in Command.

Professor H. H. Anthony Cooper received an LL.B. at the University of London in 1961 and an LL.M. in Criminal Justice at New York University in 1972. He has lectured in Law at the City of Liverpool College of Commerce and at the Universidad Nacional Mayor de San Marcos Lima, Peru. He served as Adjunct Professor of Law at New York University. His detailed credentials are set forth in Exhibit E.

Louis S. Aytch started as a social worker for the Holmesburg Prison in 1956. He became a supervisor of social work in 1959, Associate Warden of the House of Corrections in 1965 and Warden in 1970. In February of 1972, he was appointed Superintendent of Prisons for the City of Philadelphia.

Gengler of the Federal Detention Center testified as a witness called by the court.

I.

MHD is a twelve floor structure forming part of a complex that includes the Criminal Courts of the City of New York and the offices of the District Attorney of New York County. The complex is located on Centre Street in the heart of Manhattan's Civic Center, heavily populated in the daytime and deserted at night. It consumes all of the city block on which it is built, leaving no open space or outdoor area.

The official capacity of MHD (effective August, 1971) is 902. As of October 6, 1972, its population was 1301. (Stipulation of Facts #8 and 9.) Pursuant to the consent decree, the Department is now housing only one detainee to a cell (of which there are 808). There are approximately 100 convicted misdemeants housed on a dormitory floor, for a total authorized population of something [**6] over 900.

Although all the plaintiff class and 80% of persons housed at MHD are unconvicted detainees, (the remainder being sentenced misdemeanants who have jobs at MHD) the building is a maximum security institution in every sense. One may surmise that its fortress-like character is the result partly of the penological philosophy in vogue at the time of its construction and partly of concern that its location was believed to provide an easy opportunity for an escapee to melt into the city population during the daytime, or evaporate into the dark of city streets at night. In fact, only one escape has occurred since the institution opened for business some forty years ago. There is

Case 1:23-cv-01004-RP   Document 10-2   Filed 08/30/23   Page 50 of 202

Page 11 of 57

371 F. Supp. 594, *599; 1974 U.S. Dist. LEXIS 12938, **6

no evidence whether this is the result of its maximum security features, or whether it proves that they are not necessary.

The character of the structure is of more than passing narrative interest, since many of the conditions which form the issues of this case flow from that character; and the claimed need for a maximum security institution as well as the given fact of the building's character form the basis of defendants' justification of those conditions.

Prisoners are housed in two-storied units **[**7]** of rectangular tiers of cells, each tier surrounding an unwindowed central "lock-out" area. The lock-out area derives its name from the fact that when inmates are allowed to leave their cells, they are prevented, or "locked-out" *from* returning to the cells. Each cell is, of course, only one floor high. But the lock-out area rises the full two stores from the bottom of the lower to the ceiling of the higher cells. A catwalk-gallery, used by prison guards, runs along the inside of the lock-out area, at the floor level of the upper deck of cells, allowing guards to see both the upper and lower decks. Each housing floor contains two such units (four cell tiers in all) divided by a hallway which gives access to the units on east and west, and to the elevators on the south. Except for the exterior walls of the building, constructed exclusively of masonry, some spaces of translucent (but not transparent) glass block and occasional high-set transparent windows, partitions on the housing floors consist **[*600]** solely of steel doors or gates. That is, each cell is secured by a steel barred door as is every access to the lock-out area.

Some critical issues presented flow from **[**8]** the maximum security nature of the institution. These include allegations of excessive "lock-in" (in cells), undue restrictions on the length, conditions and number of visits, grossly inadequate opportunity for exercise and recreation and limitations on correspondence and access to reading matter. Others, such as intolerable noise, inadequate ventilation, severe heat in summer and cold in winter and an absence of transparent windows are largely functions of the building's architectural structure (although to some extent they are the result of its maximum security features). Still others are unrelated either to considerations of security or the nature of the building, such as mistreatment by officers -- said to be caused by overworking the guards: a fiscal question -- and a disciplinary procedure which is claimed to violate due process and which is the child of administrative policy only.

To understand the significance of the facts, and the necessity of reviewing them quite fully, it is worthwhile sketching the major legal arguments at this point, although they are treated in detail later in this opinion. Plaintiffs argue that their incarceration at MHD (1) violates due process **[**9]** because, as unconvicted detainees, they are entitled to but are not being held under the least restrictive conditions necessary to assure the sole justification of their imprisonment: appearance at trial; (2) violates the *equal protection clause* because, although they are unconvicted detainees, they are held in undeniably harsher conditions than convicted prisoners and (3) violates the *Eighth Amendment*, because those conditions

singly or collectively constitute cruel and unusual punishment. Defendants' answer, as we have earlier indicated, is that it is necessary that plaintiffs be held in maximum security, and that that necessity and the given character of MHD constitutionally justify existing conditions.

We treat separately the facts raised by each issue.

(1) *Excessive Lock-In.*

Most cells are 4 ' 10" wide by 7' 11" deep (Stipulation of Facts #2), or about 5500 square inches. The American Correctional Association Manual of Correctional Standards (1971) (ACA Manual) specifies minimum cell size of 50 square feet (7200 square inches). [3] Inmates are locked in the cells 16 hours a day. This, of course, does not include the time locked in the "lock-out" area of 66 1/2 hours [**10] per week, excluding participation in such programs as are offered (Stipulation of Facts #20). The lock-out areas are a maximum of 68' x 9 '. A number are significantly smaller (Stipulation of Facts #16). Plaintiffs vigorously challenge the necessity of such extended lock-in hours.

At trial, Donald Goff, General Secretary of the American Correctional Association (ACA) testified (Transcript 600) that, except for a range of 20-40% of detainees whose characteristics or offense might require maximum security confinement, it is not necessary to keep detainee-inmates in cells at all (Transcript 613). His views are supported by the ACA Manual which states (at 48) that "inside security cells [such as

those at MHD], the most expensive type of construction, are necessary only for prisoners requiring maximum security, who in the average jail rarely exceed 20% of the [**11] population". It is true that the manual qualifies this statement by commenting that "in the large metropolitan jail with a high count and a turnover too rapid to allow time for classification of inmates it may be necessary to provide a higher proportion of maximum security housing", but, as we shall see, the question of whether a classification [*601] system (which does not presently exist) is not a workable possibility at MHD is very much at issue in this case.

Goff stated further that it is not necessary in minimum or medium security facilities to lock in detainees more than for short periods (20 minutes or so) to count heads (Transcript 612-613).

William vanden Heuvel, then Chairman of the City Board of Corrections criticized the inflexibility of the lock-in policy. He believed that detainees could safely be allowed greater freedom of movement after problem inmates had been identified through classification (Transcript 988, 1021-24).

Defendants' witness, Louis Aytch, Superintendent of Philadelphia's City Prisons, testified that in Philadelphia detainees are permitted to remain out of their cells most of the day (Aytch deposition 37-8).

Indeed, the City admits (Exhibit [**12] 43) that at the Bronx House of Detention -- a sister facility of MHD -- whose inmates are also unconvicted detainees facing trial for the same serious range of offenses as

---

[3] The consent decree requires that each cell be occupied by only one man except that in particular circumstances two men may occupy a double size cell.

Case 1:23-cv-01004-RP   Document 10-2   Filed 08/30/23   Page 52 of 202

Page 13 of 57

371 F. Supp. 594, *601; 1974 U.S. Dist. LEXIS 12938, **12

inmates at MHD, prisoners enjoy nearly 90 hours weekly out of their cells (compared with 56 at MHD), and that nearly 1/2 of the prisoners in the Bronx, living in dormitories, are never locked in cells (Transcript 1205). Dormitory arrangements exist also at the Federal House of Detention in New York City, where only a small percentage of detainees, classified for maximum security, are held in cells.

(2) *Visiting Conditions.*

While visits from family, friends (and lawyers) are the most important events of a prisoner's time in custody, in the eyes of MHD's administrators they entail perhaps the most significant threat to the security of the institution. It is, therefore, not surprising that no issue in this litigation has been more sharply contested than whether current visiting arrangements at MHD are constitutionally justifiable.

Visits occur in special booths under what defendants' post-trial memorandum itself describes as a "rigorous security procedure". Each detainee is separated from his visitor by **[**13]** a steel wall and a pane of bullet proof glass 20" square. The booth is locked from behind on the detainee's side. Voice communication from the detainee's booth to the facing visitor is by sound powered telephone except for a limited number of high fidelity phones (Stipulation of Facts # 34). While new electronic instruments and larger booth windows have been ordered by city officials, they had not been received or installed at the time of trial, and in any event, such improvements, as useful as they may be, will leave unresolved the central issue between the parties.

Non-contact booth visits are not unknown elsewhere; but it is significant to note that detainees in the Federal House of Detention in New York City, and the Westchester (N.Y.) County jail are accorded contact visits as are convicted prisoners in all New York State correctional facilities. (Deposition of Louis Gengler, Warden, New York City Federal Detention Center, *passim*; Exhibit 13, p. 18; Stipulation re New York State Practices, Paragraph 1.)

The impact of deprivation of contact visits, and its psychological importance are real. The limitations resulting from the booth system are exacerbated by the frequent **[**14]** non-function of the telephone instruments, and the noise arising from the physical arrangement of many contiguous booths occupied simultaneously. As Clayton Williams, a detainee, testified:

> "When you visit in the old booths, the row of them, everybody has a defective phone and so the noise is consistent. Every inmate is yelling, you know, and it's hard to hear above the yelling from the guy next to you or either side of you." (Transcript 1053)

The time taken to find a usable booth has frequently cut deeply into the 30 minutes allowed per visit (Transcript 760-61; 815-17; 1053-4). Inmates must stand on tiptoe to see a visitor of **[*602]** short stature through the high window. (Transcript 95-6, 813).

Typical of inmate reaction to such truncated experiences are descriptions (Transcript 1051-5) by an inmate (whose daughter and sisters visited him for the first time in seven years) of loneliness after a

Case 1:23-cv-01004-RP   Document 10-2   Filed 08/30/23   Page 53 of 202

Page 14 of 57

371 F. Supp. 594, *602; 1974 U.S. Dist. LEXIS 12938, **14

visit is over, as compared to visits at Sing Sing Prison (now Ossining Correctional Institution), where contact visits were such that "you don't feel isolated", (Transcript 1056-7) or "bitter sweet" as to a wife's visit (Transcript 819-20). Self-serving as these **[**15]** declarations might be considered in ordinary litigation, they bore a stamp of candor and straightness in the testimony here: and however subjective the testimony of inmate witnesses, it was supported without qualification by expert witnesses and undisputed by defendants.

Dr. Karl Menninger, the psychiatrist of national renown who has studied and written about prison conditions over a long lifetime, deplored non-contact visits as "the most unpleasant and most disturbing detail in the whole prison", and described them as "a violation of ordinary principles of humanity" (Transcript 859). Indeed, he remarked of booth visits " -- it's such a painful sight that I don't stay but a minute or two as a rule. It's a painful thing, your Honor. . . . I feel so sorry for them, so ashamed of myself that I get out of the room" (Transcript 910). In his view, the MHD visiting system deprives an inmate of "what little decency and humanity there is in the care of the prisoner" (Transcript 884). He described the critical value of direct visits: "the most positive experience . . . is going to be the reestablishment of a feeling of contact, of closeness with somebody who has enough love for him to **[**16]** come clear in there to see him" (Transcript 862-63). As Dr. Menninger put it:

". . . the one great thing that he [the inmate] can look forward to is the reestablishment, contact, with this world. Because everybody lives constantly with a lot of contacts established, with, you, them, with the judge, with the grocer and so forth. These have all been broken for this man."

"Now, this makes for a dangerous state of instability, because without these contacts he can't live psychologically." (Transcript 863)

"All this is interposed into this establishment of this contact, a pane of dirty glass and a dim -- in my experience often a nonfunctional, nonfunctioning telephone -- I didn't get to test all the telephones over there, but if my experience in other places is any criteria, they don't work. A person goes in and shouts and the poor visitor stands up on his or her tiptoes and tries to see him. And he shouts and after a certain amount of frantic effort to establish a piece of communication, they just give it up. . . .

". . . it breaks that very important human lifeline of contact. . . ." (Transcript 864).

Dr. Menninger's conclusion was that the MHD's visiting **[**17]** system amounted to "dangling a fragment of meat in front of a dog and jerking it away" (Transcript 865).

Menninger contrasted the MHD system with the contact visits which prevail in an equivalent Kansas institution where contact visits have been in effect for ten years without adverse consequence.

He described the advantages and success of the Kansas method this way:

"I think the result is magnificent. I mean, the prisoner has a contact with -- a civilized contact. He can't leave but he can talk, he can ask questions, he

Case 1:23-cv-01004-RP    Document 10-2    Filed 08/30/23    Page 54 of 202
Page 15 of 57

371 F. Supp. 594, *602; 1974 U.S. Dist. LEXIS 12938, **17

can hold a wife's hand, he can have the advantage of tactile and visual and auditory -- reestablish contact in all these ways and I think the result has been magnificent." (Transcript 869)

* * *

"If you tell the relatives what they can't do, tell the prisoners what they can't do, that's that. We have very few violations of that. Nobody wants **[*603]** to give up a privilege like that." (Transcript 870)

In Menninger's view, any security risks of contact visits can be controlled by careful searching of prisoner and visitor (Transcript 869-70) and by psychological evaluation which an experienced psychiatrist can easily perform (Transcript **[**18]** 899).

Dr. August F. Kinzel, whose professional experience includes a stint as staff psychiatrist at the only United States medical center for prisoners (at Springfield, Missouri) agreed with Menninger that the MHD's visiting system causes severe prisoner frustration. He pictured it as ". . . like the carrot on the stick that is held in front of the person who can't quite attain it. . ." (Transcript 321). Kinzel told of the positive value of contact visits at Springfield which are open to both pretrial detainees and sentenced prisoners (Transcript 322-4). Indeed, it was his view that contact visits may even be suitable for detainees classified as violent (Transcript 324-6). As he saw it, contact visits were compatible with security requirements at MHD (Transcript 397-99) and were one of the most important opportunities a prison can provide (Transcript 409).

Dr. Stephen Teich is Director of Mental Health at MHD itself. Even his testimony as a witness for plaintiffs was consistent with that of Menninger and Kinzel. He told of psychological damage to a prisoner who returned from visits ". . . even worse than when he went down because of the separation".

Donald Goff's views **[**19]** were in harmony with those which have been cited. In his opinion, non-contact booth visits are necessary, at most, only for the 20-40% of prisoners who may require maximum security (Transcript 600, 605). He found no reason why detainees should not have the same opportunity for physical contact with their wives and children as New York State convicted prisoners (Transcript 606). As he put it:

"You are reducing tensions . . . you are reducing anxieties; you are reducing frustrations -- just to be able to touch somebody; not just to see them but just to be able to touch them." (Transcript 608).

Contact visits are available to all convicted prisoners in New York State adult correctional facilities and detainees at the Federal House of Detention in New York City. While the New York State practice is of particular importance in assessing the validity of plaintiffs' contention that their right to equal protection is violated by treatment more restrictive than that of convicted prisoners, we put it aside for the moment because of the contrast between the MHD's central urban location as compared to the rural setting of New York State prisons. No such contrast exists between **[**20]** MHD and the Federal Detention Center which is located on a downtown Manhattan street adjacent to the West Side Highway. Furthermore, the

Federal Center, like MHD -- and again in contrast to State prisons -- is populated almost exclusively by detainees, not convicted prisoners.

Louis Gengler, an experienced prison administrator who is warden of the Federal Center, testified that visits are his "highest priority" (Gengler, Transcript 18). He regarded contact visits as more "humane" and booth visits as penologically obsolete. He remarked that:

"It is unbearable for me to go to a visiting room and see a wife talk to her husband through the telephone. To our way of thinking, that has gone out a of years ago." (Gengler Transcript 8-9).

We shall discuss shortly the relationship of contact visits at the Federal Center to the security of the institution. At the moment, it is sufficient to note the practice of allowing contact visits for all inmates and that the practice has been successful. Indeed, it is planned that contact visits will be available to all at the new Federal Detention Center which is under construction as an annex to the United States Court House, **[\*\*21]** located **[\*604]** only two city blocks from the MHD itself. Contact visits at the Federal Center are, of course, approved by the United States Bureau of Prisons.

In the summer of 1970, serious riots occurred at the MHD and were widely reported. This suit, indeed, constitutes the effort to secure by law the objectives of the 1970 violence. The New York State Senate Committee on Crime and Correction held hearings on the MHD disturbances and, on October 5, 1970, issued its report (New York Senate Committee Report). Its finding and recommendation on visits included the

following (at 38):

"Another complaint of the inmates is that the visitation booths which separate the inmate from his visitor by thick, plate glass, do not always have telephones that are in working order, thus preventing any communication between the inmate and his visitor. The Committee recommends:
2. That the Department of Correction make immediate feasibility studies with the objective toward:
b. Making visits to detention prisoners on a face to face basis."

No action has been taken on this recommendation.

Even defendants' witnesses agreed that there are virtues to contact visiting, although **[\*\*22]** as discussed below they believed that such visits were not feasible at MHD and that the advantage to the detainees was outweighed by the threat to institutional security. However, Joseph D'Elia, Director of Operation of the City Department of Corrections, who was the City's principal witness on the subject, admitted that contact visits might reduce prisoner anxiety and prison tension and to that extent increase security at MHD (Transcript 1255).

Aytch, the Philadelphia Superintendent, called by defendants, testified that at the Philadelphia House of Correction "open" visits are allowed to the 900 detainees although actual contact is not permitted.

Former City Commissioner of Correction, George F. McGrath (an original defendant in this case, who was Commissioner at the time of the 1970 riots and at the institution of this litigation), testified (by deposition, June 1971) that the City then had plans for

Case 1:23-cv-01004-RP   Document 10-2   Filed 08/30/23   Page 56 of 202

Page 17 of 57

371 F. Supp. 594, *604; 1974 U.S. Dist. LEXIS 12938, **22

a new MHD (since abandoned) including more open visiting for some of the detainee population, predicated upon an improved classification system, (Exhibit 36, page 62) and that he had opposed allowing children to visit because he concluded it would be harmful for a child to view [**23] his father only through the window of a booth "in those obvious prison surroundings". (Exhibit 37, pp. 192-93)

In sum, all the witnesses agreed that booth visits were painful and psychologically harmful to inmates and that contact visits would be beneficial. The sole justification of the system by defense witnesses was that contact visits are not feasible because of the physical characteristics of the structure, and would constitute a threat to the security of MHD (including the introduction of contraband) since no classification system yet existed at the institution capable of determining which inmates were sufficiently trustworthy to be accorded contact with visitors.

Defense witnesses testified that as a result of the vertical nature (i.e. high rise character) of MHD and its location, there was not enough space within the building to hold contact visits. In particular, they pointed to the facts that contact visits in themselves require greater space than booth visits and that this difficulty would be intensified by the need for an enlarged waiting room (presumably because more persons would take advantage of the opportunity to visit on a contact basis) and a strip search [**24] room to search inmates before and after visits.

Furthermore, defendants contend that contact visits are inappropriate at MHD because inmates in its central urban location are "more predisposed to attempt an escape than they would be in a more rural location" (Defendants' Post Trial [*605] Memorandum, p. 23), and that detainees awaiting trial tend to be more anxious and likely to take precipitate action than sentenced persons. The defendants claim that the present system is a reasonable balance between the need to minimize security risks and acknowledged right of the inmates to humane treatment. Finally, defendants argue that it is "impossible" to grant contact visits to some inmates and not to others (Defendants' Post Trial Memorandum, p. 26). In any event, say the defendants, changes in the visiting system should be deferred until the institution is "adequately equipped" to handle them (thereby implying the possibility of such an event), and in particular until the completion of a study now being conducted by the Department to determine the feasibility of establishing a plan of classification for inmates.

There can be no doubt that the necessity of assuring security must [**25] be balanced against the right to humane treatment of prisoners, and that if contact visits are incompatible with that need they must be sacrificed. The critical question is whether the two can coexist. We are persuaded that they can or that, in any event, the Department has not taken all reasonable steps -- which as indicated below it is obligated to do -- to determine the feasibility of contact visits at MHD. In reaching this conclusion, we do not suggest that defendants are not concerned with the welfare of the MHD inmates. We recognize that they conscientiously believe that contact visits may not be feasible at MHD, and that the present administration

Case 1:23-cv-01004-RP   Document 10-2   Filed 08/30/23   Page 57 of 202
Page 18 of 57

371 F. Supp. 594, *605; 1974 U.S. Dist. LEXIS 12938, **25

of the Department of Correction is entitled to public thanks for the significant improvement which, in an extraordinarily difficult situation, inordinately complicated by the obsolete and inhumane structure of MHD itself, and severe budget limitations, it has voluntarily achieved. Nevertheless, we cannot agree that even the difficult problem of security at MHD render booth visits the least restrictive alternative available in the circumstances.

The vertical character of MHD is an obstacle, but not an insuperable obstacle, to **[\*\*26]** transportation of inmates for visits. In the first place, inmates are presently being transported adequately. Reasonable adjustments can be made in the number and length of visits if future experience actually demonstrates that the number of visits grows unmanageably on a contact visit basis. The experience at the Federal Center, which, also is affected by limited elevator service and stairways, is some evidence that such limitations can be overcome. It is true that the Federal Center is only four stories high, whereas MHD is twelve; but that contrast is misleading, because at MHD inmates are not housed above the eighth floor. In any event, the plans for contact visits at the new Federal Center which will be eleven floors high demonstrate that such verticality need not prevent contact visits.

Space limitations may be a greater difficulty, but again the evidence is not convincing. One method of alleviating space problems might be to spread visiting hours (thereby reducing the number of visits at a given time) rather than concentrate them in the evening. D'Elia agreed that this might be the effect

(Transcript 1268). Furthermore, reduction of MHD's population pursuant to the **[\*\*27]** consent decree should reduce the present number of visits.

The evidence also establishes that the risk of introduction of contraband caused by contact visits is controllable. D'Elia conceded that metal detectors can be used to prevent visitors bringing weapons to detainees -- much as such detectors are now used regularly in aircraft boarding checks. Strip searches of detainees can, of course, be conducted to discover contraband. Defendants fear that contact visits may permit passage of drugs mouth-to-mouth (Transcript 1242), as apparently has happened on occasion; but such evidence as there was as to this esoteric practice indicated that its rate of occurrence was of marginal significance, and several witnesses testified that it could be easily controlled **[\*606]** by watchful guards. In any event, there is no evidence that the risk is greater than at State prisons or the Federal Center; and at the Department's own Adolescent Remand Shelter on Riker's Island (New York City), where contact visits are permitted for sentenced prisoners and strip searches are made, few instances of passing contraband have been noted. Mouth-to-mouth passage of drugs has been reported there, but **[\*\*28]** the Department has nevertheless continued the contact visit system (Transcript 1266).

The claim that MHD's urban location justifies booth visits is undetermined by experience at other urban institutions, such as Philadelphia and the present New York Federal Center, and by the plan for contact visits at the new center which will be only

Case 1:23-cv-01004-RP    Document 10-2    Filed 08/30/23    Page 58 of 202

Page 19 of 57

371 F. Supp. 594, *606; 1974 U.S. Dist. LEXIS 12938, **28

two city blocks from MHD and, like it, annexed to both a court house and prosecutor's office.

While it may be true that pre-trial detainees are generally in a greater state of anxiety than convicted prisoners, there is simply no evidence in the record that as a consequence they are more precipitate in their actions or more predisposed to attempt escape. Indeed it could well be argued that a detainee would consider escape highly unwise because it would render him subject to imprisonment even if acquitted on the charge for which he was being held, or would seriously lessen the possibility of a satisfactory plea bargain or lengthen the sentence imposed on him for the original crime. Furthermore, experience at other urban institutions fails to support the claim of detainee predisposition to attempt escape.

Whether changes to a contact visit should [**29] be deferred until a classification system is installed, is, of course, no argument against the right to such visits, but is an appropriate factor to be considered as to the terms of any relief which may be granted.

Plaintiffs also contend that MHD's visiting regulations violate their rights, because of restrictions on visiting hours, visiting days, the length of visits and the number of visits.

Before the 1970 riots each detainee was allowed five visits a week (Stipulation of Facts #3), and in recent earlier years an inmate could receive three visitors at a time (Transcript 1058-9). At present, visits are limited to two a week (at 4:30-7:30 P.M.), with a third visit possible by an inmate's child on a day set aside for that purpose.

Prisoners are now permitted only one visitor at a time. No visits take place mornings, afternoons or weekends. Visits are limited to thirty minutes, a period which, as indicated above, is often shortened by the search for a booth with an operable telephone.

These limitations contrast markedly with visiting policy at New York State prisons where daily visits are allowed, and where visits normally occur from 9:00 A.M. to 3:30 P.M. Inmates are allowed [**30] three visitors at a time at some institutions, four at others. Families traveling long distances, a situation which occurs at MHD when out-of-city defendants are held, (Transcript 818) may be granted permission to visit on successive days. This is not allowed at MHD. At some institutions visits may last an entire day, and the shortest period allowed appears to be two hours on weekends when there is a greater number of visits. When a visiting room becomes overcrowded the duration of visit may have to be curtailed, the visitors who came first being asked to leave first (all the above from Stipulation of Facts re New York State Correctional practice). Weekend and daytime visits are also allowed at the Federal Center and at the Department's own Brooklyn and Queens institutions visits are allowed both afternoon and evenings.

The ACA Manual states (Exhibit 4 at p. 542), that:

"Correspondence and visiting privileges can be an important and valuable part of a realistic treatment program".

and that:

"As a matter of general policy the members of the inmate's family [*607]

Case 1:23-cv-01004-RP   Document 10-2   Filed 08/30/23   Page 59 of 202
Page 20 of 57

371 F. Supp. 594, *607; 1974 U.S. Dist. LEXIS 12938, **30

should be permitted and encouraged to maintain close contact with the inmate. . **[\*\*31]** ."

The Manual recommends that:

"Ordinarily a visit of less than one hour would not be regarded as adequate."

and that:

"The prison administrator should not, however, impose restrictions purely to suit the convenience of the institution." (p. 543).

vanden Heuvel pointed out that MHD's practices imposed hardships on visitors who are employed, and prevented daytime visits by mothers whose children are in school and who cannot visit at other times. The Board of Correction has recommended allowing daytime and weekend visits, and its study presenting the recommendations (Exhibit 13) shows, for example, that Los Angeles, Denver, Chicago, Baltimore, the District of Columbia and Nassau County (New York) jails permit both weekend and daytime visits. The Board's report indicates that nearly 50% of MHD's inmates interviewed had no visitors, and concluded that the inconvenience of visiting hours was a cause of this condition (Exhibit 13, pp. 1, 8-9). Aytch testified that Philadelphia also allows weekend visits (Aytch Deposition, p. 31).

The State Senate Committee Report, issued after the MHD riots, and at a time when five visits a week were **[\*\*32]** permitted, recommended that visiting hours be lengthened. As stated above, visiting hours have not only not been lengthened, rather the number of visiting days has been cut from five to two.

The chief obstacle to enlarging visiting hours and days to allowing a greater number of visitors per inmate appears to be a shortage of staff manpower, as indicated, for example, by Commissioner Malcolm's testimony. The only improvement which the Commissioner plans is to enlarge visiting time from 30 to 45 minutes (Transcript 1210). To his credit, the Commissioner has already alleviated the situation slightly by permitting visits by children of inmates and non-family adults; but these liberalizations, commendable as they are, do not affect the issues before us or explain why visiting opportunities at MHD should be so much more restricted than at comparable institutions; or so far below the level of 1970 arrangements at MHD itself.

We are persuaded that given adequate manpower, the Department could and willingly would meet more acceptable standards of visiting hours and days and numbers of visitors. We treat the relationship of this fiscal problem to the case below in our discussion of the **[\*\*33]** law.

(3) *Environment: Noise, Ventilation and Heat, Windows*:

Plaintiffs claim that dangerously high noise levels, excessive heat and inadequate ventilation and absence of transparent windows at MHD at least collectively constitute cruel and unusual punishment to those housed there, and in other ways violate their rights. The court's visits to MHD confirm that such conditions do factually exist. The legal consequences of these facts is discussed below.

The present Departmental administration has made some laudable efforts to

Case 1:23-cv-01004-RP   Document 10-2   Filed 08/30/23   Page 60 of 202
Page 21 of 57

371 F. Supp. 594, *607; 1974 U.S. Dist. LEXIS 12938, **33

overcome the conditions criticized, but has by no means succeeded, and is swimming upstream partly because of problems inherent in the nature of the building and partly because of budgetary limitations imposed on it by the City government.

Noise levels are intolerable. For example, on the eighth floor (a housing floor) a team of experts from the City's Environmental Protection Agency (EPA) which recently studied the situation with sophisticated noise-measuring instruments, found the volume of noise to be at least that of the New York City subways system (Transcript 1018). It must be emphasized that such levels are fairly constant during all waking **[\*\*34]** hours.

The structure, so largely built of steel and concrete, is a natural for noise, a **[\*608]** perfect soundbox in itself. As vanden Heuvel put it:

> ". . . almost every acoustical advantage that could be available to lessen or deaden the sound was removed and you have steel hitting concrete, hitting solid walls and the cacophony of it is such that it has to be truly destructive to any orientation to institutional life." (Transcript 1017)

The natural disadvantages of the building are exacerbated by the constant opiate use of television and radio, and court visits confirmed vanden Heuvel's description of the sound:

> ". . . the television playing against that steel and concrete and radios and a loudspeaker system and the yelling of prisoners who are communicating through blank walls, and the metal utensils, trays, et cetera, cups, that are used for eating. . ." (Transcript 1017-

18)

An inmate testified that:

> "Early in the morning they have . . . emptying of the garbage cans . . . That's the first noise that you hear . . . the dragging of a stack of garbage cans. . . .
>
> . . . then you have the radios turned on. Then you have the buildup **[\*\*35]** of the voices, the clanking of the doors, and there's a real piercing sound from the trays that we use, the steel trays . . . they would be stacking the trays for the morning meal and it would just be a constant you know, high pitched clanking." (Transcript 798)

Although inmate witnesses testified to the hardship imposed by noise and that, for example, it caused inmates to stay up late at night as the only quiet time, or the only time when reading was possible, it is unnecessary to rely on their testimony which was corroborated not only by observations on court visits but by the reactions of non-inmate witnesses.

Warden Anderson found the level of noise exceptionally high even though his professional experience has generally inured him to prison clatter. Dr. Kinzel, testified that on a tour of MHD he and fellow visitors developed severe headaches from the noise. Nor did he believe that population reduction would solve the problem. As he observed:

> "My impression as a non-architect is that it is the kind of building that you could drop a penny in and be the only person in the place and it would make a racket. . ." (Transcript 396)

The effect of such noise [**36] levels on the health of inmates cannot be ignored. Kinzel testified that mental health students have established a correlation between high noise levels and irritability (Transcript 316). Dr. Menninger stated that the noise was worse than any of the 150 to 200 jails he has visited and that it was high on the list of damaging psychological effects of confinement at MHD (Transcript 883, 885).

The findings reported by the EPA (Exhibit 12) are, as plaintiffs' memorandum describes them, startling. They establish that hearing loss is a real danger at decibel readings averaging 80dB, and that noise levels should remain 10-15dB below that level to insure safety. Decibel readings at the Center of the eighth floor bridge averaged 83dB, ranged as high as 87dB and never dropped below the danger point of 80dB. Readings for the tenth floor (then a housing floor) were only a few points lower. The report concluded:

> "Noise exposure levels in the 10th floor detention area are such that long-term exposure to these levels may cause permanent hearing loss. The levels certainly interfere with normal speech conversation and listening and may well cause a number of psychological and physiological [**37] deleterious effects." (p. 9E)

Extensive literature from the field of noise control is appended to the report in support of the conclusion. The decibel readings of the report are as great as or greater than the maximum noise levels for 1974 prescribed by the City's [*609] Noise Code (Exhibit 19) for air compressors, garbage trucks, and automobile horns (§§ 1403.3-5.11, 5.15 and 5.17 of Exhibit 19).

EPA found television to be the major source of the very high noise levels (on the eighth floor) (Exhibit 12, p. 9B), and recommended isolation of television in separate rooms (at the Federal Center, a dormitory type institution, head-sets are available to listen to television, so that television noise is eliminated) or at least the use of evenly distributed low-level loudspeakers for both radio and television. However, EPA notes that decibel readings were very high even when television is eliminated, because of the hard reverberant acoustics of the building. The report's central recommendation is, therefore, to apply to walls and ceilings various forms of acoustical treatment such as spraying cellulose-fibre or the installation of fibre-glass boards (Exhibit 12, p. 9D).

 [**38] None of these recommendations has been adopted, and at trial there was a total and conspicuous absence of defense testimony on the noise issue, nor have the defendants proposed any solution to this issue.

Although at trial defense counsel conceded (Transcript 614) that the obstacles to improvement were solely financial or related to feasibility, no testimony was offered to dispute the feasibility of recommendations by EPA or plaintiffs' witnesses. Indeed, even in their post-trial memorandum, defendants' sole proposal as to the noise levels at MHD is that ". . . The Court should take judicial notice that a high level of noise is [a] permanent fixture everywhere in Manhattan and that most Manhattanites have come to live with, if not positively accept, the level of noise pervading their daily lives." While we freely

Case 1:23-cv-01004-RP    Document 10-2    Filed 08/30/23    Page 62 of 202

Page 23 of 57

371 F. Supp. 594, *609; 1974 U.S. Dist. LEXIS 12938, **38

take judicial notice, as requested, the suggestion hardly meets the issue whether the undisputedly intolerable level of noise at MHD cannot be effectively lowered, and whether plaintiffs do not have a right to be free from this gross tax on their mental health. We find that such improvements can be made effectively, and discuss below the legal consequence of the finding.

**[\*\*39]** *Ventialation and Heat*: Almost all the light that is admitted to MHD is through solid glass brick. There is no fenestration whatever in cells or lock-out areas, and the few windows in high walls throughout the institution -- many of which have been sealed or rendered inoperable in the past -- cannot admit much air even when open. The result is not only that ventilation is emphatically poor, but, equally important, that the inhabitants of the building suffer from excess heat through most, if not all the year. In the warm months, of course, the unventilated steel and concrete structure is a heat trap and temperatures can reach 100 degrees when the New York heat is intense. Inmate testimony established that this condition even applied on the lowest (4th) housing floor (Transcript 929).

Goff testified that on his visit to MHD in the summer of 1972, it was "hot", "humid" and "smelly" (Transcript 610) and these adjectives were applicable on the day of the court visit in August 1972. Dr. Teich, Director of Mental Health at MHD reported at trial that in the summer of 1972 his "team sat down and considered coming in bathing suits at times because of the heat" (Transcript 441).

**[\*\*40]** Unhappily since the lack of ventilation is a year round problem, the problem of excess heat exists in the cooler as well as summer months. Even in winter, although heat does not fully circulate until late morning hours (and before that time inmates must wear coats or blankets, Transcript 39-40; 728-29), once the artificial heat is effective, it becomes excessive. The result is that, for example, one witness testified that he could not sleep at night because of the heat (Transcript 793-4).

The root of the problem is the inadequacy of the interior ventilation system which has become affected over the years by air ducts plugged with dirt. Although the MHD authorities have **[\*610]** made real efforts to clean the ducts in recent months, the problem at least at the time of trial, remained critical, and it appeared altogether unlikely that it would be cured even when the City carried out its consent decree agreement to open certain windows which have been bolted shut as a security measure (Transcript 36, 839-40; 928).

Plaintiffs do not claim that excessive heat and lack of ventilation in themselves violate constitutional standards, but they do argue that these conditions are properly **[\*\*41]** cognizable as part, of the totality of circumstances at MHD against which their rights must be measured. Defendants do not dispute the conditions described, but minimize the significance of the acknowledged facts. We agree with plaintiffs' assertions (Post Trial Memorandum, p. 57) that the problem is grave and the need for relief pressing.

*Windows*: Such windows as exist at MHD are nearly all of frosted glass -- translucent but not transparent. The result is that inmates cannot see human activity outside

Case 1:23-cv-01004-RP    Document 10-2    Filed 08/30/23    Page 63 of 202
Page 24 of 57

371 F. Supp. 594, *610; 1974 U.S. Dist. LEXIS 12938, **41

the building or even look at the sky. As one inmate described it:

> "It's very depressing. You know, I was locked into a big box and just didn't have any access of, you know, like finding out what was happening or anything. It was like a dungeon or something." (Transcript 789)

The same witness who later had one of the few cells which has access to a window through which one can see, but only if standing on a seat, often found a fellow inmate standing on a bench when he returned to his cell for lock-in. When asked to leave, one of them once remarked, "I just want a shot of life" (Transcript 790).

Goff testified on the basis of a long professional experience **[**42]** as a penologist that "any facility which can have open windows, clear windows, without violating a privacy factor [a threat which does not exist at MHD] should do so". As he commented:

> "Again, we are trying to break down the confinement aspect, and if a person can look out the window and see a clear blue sky so much the better." (Transcript 592)

He pointed out that clear glass could be fabricated as thick as frosted glass to avoid security problems and former Commissioner McGrath admitted that there are no policy objections to clear glass. Indeed, it appears that there are transparent windows at the Bronx and Brooklyn Houses of Detention which vanden Heuvel found to provide a sense of fresh air and sunshine (Transcript 998-9).

Most significantly, Dr. Teich, Director of Mental Health at MHD, testified that the absence of transparent windows has a negative effect on mental health by causing inmates to become disoriented.

As he said:

> "People begin losing orientation as to what season it is. Frequently on a day like this morning it is hard to tell whether it is really day time out or night time because the light doesn't get through the windows there. **[**43]** They really have no contact with what the normal life is outside." (Transcript 452)

In Dr. Menninger's opinion, the absence of transparent windows was one of a number of sensory deprivations at MHD which were harmful to mental stability (Transcript 880-1). He wrapped it up by observing:

> ". . . a window in the room keeps the prisoner aware of the fact that this isn't the end of the road, this isn't -- there is still a world there . . ." (Transcript 880)

Defendants presented no evidence in refutation. They argue that plaintiffs have failed to prove the allegations of the complaint (Paragraph 26) that inmates at MHD spend months without seeing the sun or sky. Except for the brief period of roof recreation afforded weekly, we find otherwise.

**[*611]** (4) *Recreation, Work Opportunities and Optional Lock-Out.*

*A) Physical Exercise*:

Since no open areas exist on the block on which MHD is built, and no space has been provided within the structure, the only location available for physical exercise is the roof. It is divided in halves each of which contains 2076 square feet

Case 1:23-cv-01004-RP   Document 10-2   Filed 08/30/23   Page 64 of 202
Page 25 of 57

371 F. Supp. 594, *611; 1974 U.S. Dist. LEXIS 12938, **43

(Stipulation of Facts # 22). Prior to the entry of the consent **[**44]** decree, when there were two detainees in most cells, 50-60 men used each half at one time (Stipulation of Facts # 24). Since the consent judgment provides for a phased reduction of population of nearly 50%, we assume that the number of men using each half of the roof at one time will be scaled down to about 30 for a total of 60.

At the most, inmates spend one 50 minute period per week on the roof (Testimony of Commissioner Malcolm 1183-4, corroborated by all other witnesses on the subject). A basketball court covers one-half of the roof, and a volley ball court and ping pong table the other. Since no more than 10-12 men can profitably use either half, it is clear that 36 to 40 men using the roof will not get any exercise, or, if the opportunities are shared, that every man will get considerably less than 50 minutes of exercise. Indeed, one detainee testified that "the only thing you could do is play a little volley ball or basket ball and you had to wait your turn. So you're up there about an hour, an hour and a half and if you've got about ten or fifteen minutes exercise, you were lucky" (Transcript 1096). No effort was made by defense counsel to qualify this statement on **[**45]** cross-examination, and no defense testimony was offered to contradict it.

As part of the agreement underlying the consent decree, the roof is being covered, so that it can be used in inclement weather; and in the interim cold weather, jackets have been purchased to allow winter use. But these praiseworthy improvements will not expand the 50 minute hour per week; they will merely remedy the lack of *any* exercise in inclement weather as has been the case up to this time (Transcript 1172).

The significance of these facts is illuminated by Dr. Menninger's remark (Transcript 878) that ". . . I think my profession considers it almost part of its ten commandments to say that everyone should have some exercise daily".

The ACA standards (p. 57) recommend that "Prisoners should be allowed some form of exercise daily" and the United Nations Standard Minimal Rules (Exhibit 3) specify, "Every prisoner who is not employed in out-door work shall have at least one hour of suitable exercise in the open air daily if the weather permits" (Rule 21(1)).

Jails in other cities, such as Baltimore and Philadelphia, provide outdoor exercise yards (Transcript 671). In some cities an adjacent area **[**46]** (such as a parking lot) is enclosed for exercise use (Transcript 672).

We cannot agree with the argument of the City defendants (Memorandum pp. 18-19) that plaintiff's experts admitted that existing recreation conditions at MHD, when improved as planned (of which more below) will be sufficient to meet the needs of inmates. Goff's statements (Transcript 655), that, after planned improvements the program might meet minimal standards, or Dr. Menninger's that detainees might "get by" with two hours physical exercise weekly (Transcript 874) were peripheral admissions as to a program which they clearly found inadequate -- much as they admired the efforts of the Department to improve the situation. Indeed Goff's

statement was for all practical purposes withdrawn by the qualification that the presentation to him of a "bare schedule" was an insufficient basis for making a "firm evaluation" (Transcript 655). Nor can we accept the contention of the Municipal defendants' brief (p. 19) that Dr. Menninger's agreement that some people are not affected by lack of physical exercise (Transcript 874) or vanden Heuvel's "admission" in that inmates **[*612]** free to do push-ups in their cells moots **[**47]** the issue. (Indeed vanden Heuvel, who praised the Department for its efforts to expand recreational opportunities, criticized it, when discussing the "push-up" suggestion, for not encouraging or organizing that marginal possibility.)

*B) The Lock-Out Corridor.*

In his address to the National Conference on Prisons (December 7, 1971) Chief Justice Burger gave his view of prison dead time and its consequences in these words:

> "Playing cards, watching television or an occasional movie with nothing more, is building up to an expensive accounting when these men are released -- if not before. Such crude recreation may keep men quiet for the time, but it is a quiet that is ominous for the society they will try to re-enter." (Address to the National Conference on Prisons, December 7, 1971.)

The Chief Justice's description is an appropriate picture of lock-out time at MHD.

When not locked *in* their cells, or participating in physical exercise or other programmatic activities, such as those described below, inmates are locked *out* of their cells within the "lock-out" area adjacent to the cells described at the opening of this opinion. Most of the eight hours **[**48]** of such lock-out time is spent in idleness or unproductive activity.

The largest of the lock-out areas is 66 ' x 9 '; [4] and the usable area is diminished by the location of some eleven combination tables and benches at which inmates eat their meals (Stipulation of Facts # 17). The significance of these dimensions is illuminated by the testimony of Dr. Kinzel that a violence-prone person needs a 30 sq. foot area in which to function unless he is to become acutely uncomfortable (Transcript 305, 312-14). Since the average lock-out area is approximately 600 sq. feet, limited further by the presence of tables and benches, and is used by 30 inmates at a time, even with reduced population the average usable space for each of them will be less than 20 sq. feet.

Although, fortunately, the Departmental Administration is **[**49]** planning renovations, described below, which are intended to provide each inmate one hour per day of programmatic activity away from the housing floors (Transcript 1170), nevertheless, as Commissioner Malcolm agreed, the remainder of the inmate's day (when he is not locked in his cell) will continue to be spent locked in the lock-out area.

The accuracy of Chief Justice Burger's description of such dead time was confirmed by the testimony of one inmate

---

[4] At the time of trial, the ninth and tenth floor lock-out areas, including two corridors, were 55 ' x 10 ' and one 10' x 37' day room which also included tables (Stipulation of Facts 18 and 19).

371 F. Supp. 594, *612; 1974 U.S. Dist. LEXIS 12938, **49

who, when asked what he did during lock-out, answered:

"A. Well, I sit down. Sometimes I might play cards. I can't read out there.
THE COURT: Why?
THE WITNESS: Because it's too much distraction. And I go up and shower. I just pace the corridor, that's all." (Transcript 945).

As Warden Anderson pictured lock-out:

". . . there was no room for moving around; they could not have any activity. About all they can do is play checkers, and I didn't see anything like that, or cards." (Transcript 206)

In earlier days, the situation was somewhat better than it is today. For example, Warden Anderson testified that in the 1960's MHD had a separate arts and crafts area, and until the 1970 riots, **[**50]** inmates were allowed to visit the commissary area to select the purchases. Today, neither such arrangement exists (Transcript 215-17). Inmates are still accorded commissary privileges but they order from a list instead of visiting the **[*613]** store. While in life outside it may reasonably be considered a privilege to buy from a list rather than going to a shop, such an arrangement in jail simply eliminates an opportunity for relief from monotony.

Among its "Minimum Standards" for *jails*, the ACA Manual (at p. 45) states:

"*Inmate Employment & Activities*: Useful employment and constructive leisure-time activities are assurance against the damaging effects of idleness and are essential to the program of every jail housing prisoners held for service of sentence or for long periods awaiting trial."
(MHD is such an institution.)

Witnesses uniformly agreed that life at MHD failed to meet this standard. Warden Anderson criticized abandonment of pre-existing visits to the commissary (Transcript 217). Mr. Goff emphasized the desirability of getting inmates away from a fixed place as often as possible and recommended the use of day-rooms instead of lock-out **[**51]** areas (Transcript 588). Commissioner Aytch testified that Philadelphia detainees at least eat in a common dining area away from their cells (Aytch Deposition, p. 40), as they also do at the Federal Center in New York. Dr. Menninger stressed "the idleness and the boredom and the non-programming, the fact that this [MHD] is just a bin" (Transcript 883). No defense witness testified in contradiction to these conclusions.

*C) Programmatic Activities*:

By the consent decree, the City defendants have agreed to renovate two floors at MHD by June 1974, to provide one hour daily of programmatic activity. Some useful, indeed admirable, opportunities for education and diversion presently exist, but the testimony was in sharp conflict as to the scope of such activities. For example, Commissioner Malcolm's estimates (at various points, Transcript 1139-70) of the number of hours spent by inmates in educational activities differed markedly from those of Russell Meade who had been detained at MHD fifteen months at the time of trial. These programs include High School equivalency, English as a second language, adult basic education, arts and crafts and drama. Commissioner Malcolm believed **[**52]** about 230

inmates participated in these sessions; Meade 60 to 70. The Commissioner estimated that of the total, 70 were students in the High School program; Meade put the number at 15. On the occasion of a court visit to the High School class during the course of trial, the number of students was unquestionably no more than 20. Assuming, as we reasonably can, that the number of students in attendance would not likely be below normal on the day of a preannounced court visit, Meade's estimates (based on observation over a period of fifteen months) appear dependable.

The Department has committed itself to what may amount to a major improvement of the programmatic activities available by agreeing, pursuant to Paragraph 2C of the consent decree, to remove cells from one-half of the eighth floor and one-half of the fifth floor to provide space for inmate programs and quiet recreation no later than June 30, 1974. The Commissioner and his staff deserve solid commendation for this commitment (and for making some further space available in the basement) which, if sufficient useful recreational equipment is made available, has the potential of significantly remedying the present serious **[**53]** programmatic deficiencies. It is appropriate to note, however, that even after the completion of the proposed alterations, inmates will still enjoy only two hours per week of activity in the new recreations space (Transcript 1197).

*D) Detainee Employment*:

To help eliminate idleness and boredom, plaintiffs urge that the Department provide greater employment opportunities for detainees within MHD itself. Although

Commissioner Malcolm testified that such opportunities have increased -- and the Departmental Administration is to be credited for the increase **[*614]** -- nevertheless only 90 detainees (out of the reduced population of about 800) are employed at MHD. There are acknowledged difficulties in providing such jobs, not only because of limitations on useful work to be done, but also because turnover of population prevents proper training of many detainees, and of course the administration has no certain way of knowing how long a detainee will remain at MHD. Indeed, the turnover problem, as Commissioner Malcolm testified, is the fundamental reason for giving 160 jobs to convicted misdemeanant inmates whose sentences are fixed.

However that may be, 26 of the convicted **[**54]** inmates only perform sanitation and food serving work on housing floors, (Testimony of Commissioner Malcolm, February 26, 1973, pp. 25-7) and fourteen others merely do sanitation work on other floors. It seems reasonable to believe that such elementary jobs, especially on housing floors, could be performed by inmates.

The ACA Manual (at p. 59) stresses the value of work programs for detainees. It is true that the Manual recognizes that "the administrator who seeks to rid his jail of the traditional atmosphere of idleness is confronted with many obstacles -- ", but the roadblocks enumerated, "lack of space, lack of funds, lack of trained personnel" do not appear to apply to sanitation and food serving work on housing floors. As the Manual goes on to say, at page 59:

"But even in the traditional jail it is

371 F. Supp. 594, *614; 1974 U.S. Dist. LEXIS 12938, **54

possible to provide purposeful activity for all inmates. A systematic program of good housekeeping with attention to painting, minor plumbing repairs and other preventive maintenance operations will provide employment for many inmates."

Considering the agreed needs for improved sanitation and maintenance at MHD, it is questionable whether the City defendants' position **[\*\*55]** that further work opportunities are not available is supportable.

*E) Optional Lock-Out:*

Plaintiffs claim that even if there are obstacles to the increase of exercise, program and employment opportunities, a detainee should at least be afforded the option of privacy of being locked-*in* his cell during the lock-out period rather than being compelled to spend that time in the lock-out area. The defendants sharply contest the proposal.

Witnesses testified that even a sick detainee is rarely permitted to remain in his cell during lock-out (Transcript 803-08). Detainees are not permitted to clean their cells during lock-out even though cleaning materials are most easily available at that time (Transcript 53-5). Dr. Teich testified that he himself has had difficulty in securing permission for a detainee to remain in his cell for an interview with the doctor or a member of his staff (Transcript 541).

vanden Heuvel recommended allowing detainees optional lock-in during the lock-out period:

"... so that they can have an opportunity to read or to study or to work or to be by themselves if they want to be. It's not very much to give a person, but to the extent we **[\*\*56]** can give it, we ought to." (Transcript 1024) He also saw it as an advantage that a detainee locked in would be free of assault.

The expressed concern of the Department as to optional lock-in was that it increased the risk of suicides (Transcript 1243-5) -- a subject the gravity of which is accentuated by the significant number of suicides which have occurred at MHD and other city jails. The other side of the coin, however, is, as vanden Heuvel pointed out (Transcript 1027-8) that a detainee bent on suicide can just as easily perform his grim objective in the sixteen hours of *required* lock-in. Indeed, the Report of the Prison Death Review Board (Exhibit 10, p. 10), of which Commissioner Malcolm and vanden Heuvel were both members unhappily indicates that an inmate can hang **[\*615]** himself with "amazing rapidity" and that even surveillance on housing floors is unlikely to prevent such a tragedy.

The testimony was uniform that an effective classification system, which could, as far as humanly possible, identify suicide prone inmates early after admission, presented the most feasible method of avoiding the risk of such events.

For example, Superintendent Aytch **[\*\*57]** of Philadelphia gave his view in answer to the following question:

"Q A little bit earlier on direct examination you were discussing optional lockouts and lockins. Assuming that the population of the Tombs were reduced to one man in a cell and assuming also for the purposes

Case 1:23-cv-01004-RP   Document 10-2   Filed 08/30/23   Page 69 of 202

Page 30 of 57

371 F. Supp. 594, *615; 1974 U.S. Dist. LEXIS 12938, **57

of this question, there was a screening system to screen out people who were potentially suicidal, do you think there would be any problems to allow an inmate to stay in his cell during the daytime?

A Given the conditions you put, if this was available, I do not see any problems with it, if I understood your question correctly.  I hope I did." (Aytch Deposition, p. 36).

Nevertheless, although considerable evidence supports plaintiffs' claims that optional lock-in is appropriate and feasible, Professor Cooper cautions (Transcript 1337-38) that no change in present policy should be made until conclusion of his study to determine the feasibility of inaugurating such a classification system.

Since the Cooper study may cast light on the extent to which the major obstacle to optional lock-in is controllable, a decision on that issue should be reserved until the completion of the study which is **[\*\*58]** expected at an early date.

*(5) Correction Officers*: Plaintiffs assert that a significant shortage of correction officers results in serious mistreatment of inmates.

In June of 1971, the complement of correction officers at MHD was 240.  At that time, Albert Glick, Deputy Warden testified that 45 more officers were needed. (Exhibit 35, pp. 9, 145-6).  In January of 1972, Glick told Inspectors of the New York State Commission of Correction that although there were then 250 correction officers, considerable overtime work on their part had been necessary to man the institution.  Indeed, he asserted that post coverage required 372.76 officers (Exhibit

7; Report of New York State Commission of Correction, p. 1).

According to the City defendants, the number of correction officers at trial time was 246.  (Exhibit 43; Answer to #13 of plaintiffs' second set of interrogatories).  In November, 1972, MHD employees' overtime amounted to nearly 2,000 hours, at a cost of $17,000 (Exhibit 16).

It is true that Mr. D'Elia, Director of Operations of the Department of Corrections, believed that "the numbers we have [at MHD] are capable of doing the job they have to do", although he admitted **[\*\*59]** that "as far as I am concerned I would like to see a few more. . ." (Transcript 1283).  Nevertheless, substantial testimony established that the pressures of overwork at an intrinsically difficult job performed in the same environment of noise and heat suffered by inmates took its toll on the correction officers and was reflected on numerous occasions in mistreatment of prisoners.

These incidents ranged from the relatively minor but frustrating failure of officers to furnish inmates with information (Transcript 850) to more serious matters such as the refusal to assist a sick inmate by calling a doctor (Transcript 84-5), failure to observe an inmate switching cells, (Transcript 57-8), failure to respond to alerts of queer behavior on the part of an inmate who two days later stabbed another prisoner (Transcript 936-9), failure to observe a distraught inmate who scratched his face until it bled, and attempted suicide (Transcript 751-3); ripping and tearing **[\*616]** of legal papers, books and clothes of inmates (Transcript 78-81), beating of an inmate chained naked to bars, (Transcript

Case 1:23-cv-01004-RP   Document 10-2   Filed 08/30/23   Page 70 of 202
Page 31 of 57

371 F. Supp. 594, *616; 1974 U.S. Dist. LEXIS 12938, **59

1100-1, 1106-7) and the beating of an inmate who was also burned by officers putting out cigarettes **[**60]** or cigars on his body (Transcript 101-110; 128-136).

One might have been inclined to discount the more extravagant details of these reports if they had not often involved the very cases of testifying witnesses (as, for example, the incident of burns by cigarettes and cigars), in all cases consisted of eye witness testimony, or gone totally unrefuted by the defendants either through cross-examination or by offering evidence in contradiction. Indeed, Board of Correction Reports (e.g. Exhibit 7, pp. 17-20 and Exhibit 8) corroborate plaintiffs' trial testimony by describing other similar incidents.

The burden of overtime also affects the conditions of visits to inmates. As the Board of Correction's Report on the Visiting System (Exhibit 13, p. 7) indicates, the officer posts in the visiting area are permanent overtime posts, and the report describes those who police visits as, consequentially, "those who are most tired and bitter," with an unsatisfactory attitude towards visitors (pp. 15-16).

The Board Report on suicides (Exhibit 9, p. 19) points out that heavy overtime has an adverse effect on an officer's treatment of mentally disturbed detainees. While this aspect of the problem **[**61]** may be mooted by the Department's policy announced (since trial) of removing mentally disturbed detainees from MHD and other jails to a central facility, it nevertheless corroborates the strain under which correction officers work and the consequentially adverse effect on inmates.

Commenting on the lot of the correction officer, Dr. Teich stated:

> "They are locked in just as much as the inmates are and they are aware of that. "They live in a constant state of anxiety that something is going to jump off and they will be trapped in there and won't be able to get out. . ." (Transcript 508).

It was his view that "working a double shift is intolerable in that place" (Transcript 507).

Warden Anderson believed that the morale of MHD correction officers had declined since his inspections of the Tombs before 1970 (Transcript 220-1), that officers feared, and often failed to observe inmates (Transcript 220) and that they regarded service at MHD as "punishment duty" (Transcript 218).

Mr. Goff stressed that overtime work in a jail, by impairing efficiency and morale, aggravates relations between officers and inmates (Transcript 597). He and vanden Heuvel were in agreement **[**62]** that overtime could be at least reduced by greater use of lay workers for such duties as clerical functions and other non-custodial matters (Transcript 597, 666-7, 1006).

The undesirability of requiring correction officers to work overtime is illuminated by the ACA Manual's prescription that "A 40-hour work week of five consecutive days should be provided" (p. 175) and its warning that:

> ". . . without proper employment conditions, personnel incentive will be lacking. The alternative is a mediocre staff, an impotent source of supervisory and administrative staff, a high rate of turnover of employees, low morale,

Case 1:23-cv-01004-RP   Document 10-2   Filed 08/30/23   Page 71 of 202
Page 32 of 57

371 F. Supp. 594, *616; 1974 U.S. Dist. LEXIS 12938, **62

and, in general, a poorly operated correctional facility".  (p. 175)

(6)  *Discipline*:  The Department's disciplinary rules do not provide for written notice of charges, confrontation or cross-examination of accusers, an independent hearing officer, written findings of fact or reasons for imposing punishment or the right to be represented by counsel or a counsel-substitute.  While Rule 4.49(d) (1) (d) requires the hearing officer to "notify the inmate that he may have a reasonable number of witnesses -- in his behalf if he claims **[\*617]** that witnesses **[\*\*63]** could establish his innocence or bring about important mitigating facts in the case", the Board of Correction Reports covering the period March 19, 1973 through June 19, 1973, submitted to the court pursuant to the consent decree and based on monitored hearings, demonstrate that the rule is more honored in the breach than in the observance and that hearing officers interpret the rule to mean that a detainee is to be advised of his right only if he first indicates that he has witnesses.

Correspondence and visits (except to and from counsel) are suspended as punishment for inmate infraction; although the ACA Manual recommends (at 268) in regard to correspondence and visits that "such rights shall not be restricted for reasons of discipline except in instances where they have been abused", and repeats the admonition at 412 (Loss of Privileges) and 546 (Correspondence Privileges).

Detainees have been placed in confinement for as long as 31 days without a hearing (Transcript 97-8), without any egress except for a daily shower.

We discuss below the legal significance of these undisputed facts.

(7) *Classification*: That MHD is a maximum security institution is unquestioned.  As **[\*\*64]** we have indicated earlier, this characteristic has a direct effect on some of the major issues described, particularly the denial of contact visits, limitations on recreation, the hours of lock-in and lock-out policies, and handling of prisoner correspondence.  Plaintiffs argue that it is unnecessary to confine most detainees under conditions of maximum security and that the Departmental administrators have within their power the capability of classifying detainees to identify those who require maximum security custody thereby permitting less restrictive confinement for the large majority of inmates whom they contend need no such restraint.

Goff, who prior to his present position as General Secretary of the Correctional Association of New York acted as Director of Classification for the New Jersey prison system (Transcript 578-9), testified that at most 20 to 40% of the MHD population needs to be held in maximum security.  In his view, the Department is presently capable of classifying detainees to determine those requiring maximum security custody, and indeed does so informally, but only with the result of imposing especially tight security in "heavy" cases (Transcript 601, 637).  **[\*\*65]** He strongly believed that MHD could safely lift many restrictions without sacrificing security through refinements of classification (Transcript 600-4) which are in use today at other pre-trial institutions (Transcript 641, 683-4).

Goff's testimony was supported by the

Case 1:23-cv-01004-RP   Document 10-2   Filed 08/30/23   Page 72 of 202

Page 33 of 57

371 F. Supp. 594, *617; 1974 U.S. Dist. LEXIS 12938, **65

views of Dr. Teich (Transcript 435, 501, 504), Dr. Menninger (Transcript 899), vanden Heuvel (Transcript 988, 1009-11, 1021-2), and Warden Gengler (Gengler Transcript 19-20).

A number of methods are available to secure information on which to form reliable conclusions as to a detainee's potential threat to security, including questionnaires currently used to evaluate the risk of releasing a defendant on his own recognizance and a "Prisoner Inventory" developed by the Federal Bureau of Prisons (Exhibit 2).

Warden Anderson described the information provided by the latter:

". . . whether he is awaiting trial, or probation violation, things of this nature, or any possibility of detainers coming in on the individual from other offenses, the type of offense he is in on, whether it is against a person, against the public, a sex offense and so forth, and the estimated time; also whether it is a felony or a misdemeanor, **[**66]** the estimated time that the individual will be in the facility, whether there is a good chance of him making bail and being out shortly. His age, sex, of course, his employment history, how long he's been there, his work skills, work status, whether he has had a full time job or just moving him around from job to job, and how long he was there, **[*618]** whether it is six months or over a year, the length of employment.

"His education, whether or not he has been in school, his marital status, and whether or not he has been living with a family, the duration of residence, the status, whether they own the residence,

his attitude, his physical condition, his previous history, whether he is on drugs or alcoholic, whether he is in any special program, whether he would like to participate in the drug program or alcoholic program, and whether he would like to participate in the educational program for high school equivalency, et cetera." (Transcript 234-35).

It was the Warden's view that the system enabled authorities to determine satisfactorily whether inmates require maximum or less security.

According to the testimony of Warden Gengler (a court witness), the Federal Detention **[**67]** Center reaches a decision as to whether a detainee should be held in maximum security on the basis of FBI reports, information from marshals, arresting officers, other institutions and the observations of his staff. Such information is or should be equally available to authorities at MHD.   It was Gengler's opinion that even on the basis of staff observation only, a useful classification could be made within a week after admission (Gengler Transcript 19-20).  He has given up his predecessor's practice of sending maximum security detainees to MHD.

Superintendent Aytch (a City witness) testified that in Philadelphia, any detainee whose bail is less than $4,000 is housed in a minimum security institution (Aytch Deposition 7-8, 28).

We have referred above to the ACA Manual's assertion (p. 48) that prisoners requiring maximum security ". . . in the average rarely exceed 20% of the population." Indeed the Manual states

Case 1:23-cv-01004-RP   Document 10-2   Filed 08/30/23   Page 73 of 202

Page 34 of 57

371 F. Supp. 594, *618; 1974 U.S. Dist. LEXIS 12938, **67

(Principle V, pp. xx):

"Until the guilt of the suspected offender has been established in the course of due process of law, he should be considered innocent and his rights as a free citizen should be respected, except for such restraints as are indispensable to insure **[**68]** the proper investigation and trial. (Principle V, pp. xx)

and, under the heading "Essentials for Custody and Security", the Manual puts at the top of the list (p. 366):

"1. *An Adequate System of Classification of Prisoners*. Careful study, diagnosis and recommendations for treatment documented into case histories give prison workers the knowledge they need to handle inmates."

Like the ACA, the United Nations Standards for prisoners (Exhibit 3) assert that "unconvicted prisoners are presumed to be innocent and shall be treated as such" (Rule 84(2)) and that varying degrees of security should be provided to accord with the needs of prisoners.

The present departmental authorities are conscious of the desirability, if not the necessity, of developing a dependable classification system for MHD, and to their credit have (as we have indicated) retained Professor H. H. A. Cooper, Deputy Director of the Criminal Law Education and Research Center of New York University School of Law to conduct a study as to classification of inmates at MHD (Transcript 1310-12). While Professor Cooper's study, the completion of which is anticipated at an early date, will **[**69]** no

doubt define any obstacles to classifying detainees which are peculiar to MHD, he testified that he was "confident" that the study would develop a workable system (Transcript 1333) and his optimism was consistent with the views of almost all witnesses, whether for the plaintiffs or the defendants, that classification of detainees at MHD was indeed feasible.    In the opinion of Dr. Teich, who is Director of Mental Health at MHD, inmates can be classified at intake with regard to mental illness and aggressiveness (Transcript 433-35).   He believed that mental health aides could be trained to make **[*619]** these evaluations, and he stated that the Warden of MHD agreed that such a procedure was desirable (Transcript 504). In his view, some suicides could have been prevented by the existence of such a classification system (Transcript 463). Teich acknowledged, however, that those disturbed detainees who are quiet would probably not be observed at intake, and that, in any event, the present staff was not large enough to put into effect the system he proposed.

Dr. Kinzel, who had served as Staff Psychiatrist at the United States Medical Center for prisoners in Springfield, Missouri, **[**70]** testified that potentially violent prisoners can be identified by psychological screening (Transcript 329-30; 362-3).   While he agreed that less information might be available to MHD authorities as to detainees (than, for example, as to convicted prisoners or pretrial prisoners under study at Springfield), he testified that the most significant information as to tendency to violence could be secured in a screening interview (Transcript 360-1).

Case 1:23-cv-01004-RP   Document 10-2   Filed 08/30/23   Page 74 of 202
Page 35 of 57

371 F. Supp. 594, *619; 1974 U.S. Dist. LEXIS 12938, **70

Kinzel estimated that a psychological interview could be concluded in 30 minutes except in cases in which the interview suggested that the inmate was violence-prone (Transcript 365). Warden Anderson testified that it took only 15 minutes to interview an inmate to secure the information for the "Inventory" which he uses, although additional time may be required for follow-up telephone calls to refine the information secured (Transcript 293-4). Dr. Menninger shared Kinzel's belief that potentially disruptive persons can be identified by psychiatric examination (Transcript 899).

vanden Heuvel referred to the St. Louis classification system, which identifies persons who are mentally disturbed or potentially suicidal. Since its inauguration **[**71]** in 1968, no jail suicides have occurred (Transcript 990). The Board of Correction's Report on Prison Suicides and Urgent Recommendations for Action (Exhibit 9, pp. 15-18) of August 12, 1972, recommended that such a system be installed in New York City institutions.

Goff believed that a new detainee could be properly classified within a week of his arrival at MHD (Transcript 600, 608). This estimate is to be measured against information furnished by the Department (Exhibit 15), that as of April 30, 1972, 315 detainees at MHD had been held more than four months; of the 315, 167 had been in custody for more than six months, 81 for more than nine months and 37 for more than one year. While the reduction of total MHD population since April 30, 1972, undoubtedly has reduced these numbers, it is nevertheless clear beyond dispute that in the very large majority of cases detainees are held long enough to permit thorough classification processing.

As to City witnesses, Commissioner McGrath, who headed the Department when this suit was brought, testified two years ago (Deposition; Exhibit 36, p. 65) that MHD's security had "to be designed to take care of the most dangerous of them rather **[**72]** than the least dangerous" because of lack of "time, staff [and] facilities." He nevertheless stated that the Department sought to commence classifying inmates (Exhibit 36, pp. 66-7). It was McGrath's plan to house minimum security risk inmates at a new MHD, a building then planned, but since abandoned by the City.

Commissioner Malcolm testified at trial that his preference was to have separate maximum, medium and minimum facilities, an objective devoutly to be sought, but apparently nowhere in the cards. The problems of security at MHD are undoubtedly complicated by the fact that it houses all types of detainees; but this difficulty exists in many other large municipal jails in which inmates are permitted greater mobility and freedom than at MHD. Indeed, even at MHD's sister institution, the Bronx House of Detention, 50% of the inmates live in dormitories, allowing substantially greater freedom of movement Transcript 1205, 1253). Commissioner Malcolm agreed that the mix of **[*620]** cases at MHD was not unrepresentatively "heavy" but rather was a fair reflection of the jail population of the City as a whole (Transcript 1178).

Joseph D'Elia, Director of Operations of the **[**73]** Department, who earlier had served as Assistant Deputy Warden of

MHD and as a correction officer and Captain at various departmental institutions, believed that even with a refined classification system, maximum security would nevertheless be necessary for all because distinctions as to security arrangements among detainees would cause jealousy and resentment on the part of the less favored (Transcript 1253, 1280). But his view was not shared by Professor Cooper who is retained by the City to develop a classification system which would, of course, result in such distinctions (Transcript 1338-9).

We conclude that although Professor Cooper's finished study may outline special problems at MHD which would properly affect the precise relief to be afforded here, the evidence has established that the institution of a workable classification system at MHD is feasible.

(8) *Correspondence*: Plaintiffs claim that MHD's policies as to the handling of inmate mail, and limitations on receipt of inmate reading matter, violate their *First Amendment* rights and, in the case of mail from attorneys and courts, their rights under the *Sixth Amendment*. There are no disputes as to the facts.

All **[**74]** incoming mail is opened and inspected for contraband. While Departmental Rule 4.18A generally forbids officers to read or censor mail, they are permitted to do so where a "mail watch" is required for security reasons in individual cases. The rule makes no exception for mail received from courts or attorneys, and all mail, including that received from courts or attorneys, is opened without the detainee being present.

Inmates may receive books or magazines through the mail only from the publisher directly. The purpose of the rule is to prevent the introduction of contraband in books or magazines brought or mailed by relatives or friends (Transcript 1208-9). The burden of this limitation might not be great if the institution supplied books, periodicals and newspapers in reasonable number, but two court inspections of the printed material available to inmates at MHD established decisively that the number of books or other items is grossly insufficient in relation to the number of inmates (and the average length of stay) and that the material which is available (e.g. "Yachting" magazine) is largely irrelevant to the interests of the defendants. This is true in spite of the fact that **[**75]** a small law library exists, that libraries very limited in numbers of books have been established on housing floors and an attempt is being made to improve the relevance of available reading material by including books relating to Black and Puerto Rican culture.

Evidence as to the security risk of a more flexible mail policy is sparse, but such as it is, it appears to indicate that the risk is minimal, and at the worst controllable. For example, Deputy Warden Glick testified (Deposition, Exhibit 35, pp. 139-40) that the only contraband found in incoming mail during his tenure as commander was money, which was deposited in the inmate's commissary account.

FINDINGS

This long recital leads to the following findings of fact:

1.    Detainees at MHD are subject to

Case 1:23-cv-01004-RP   Document 10-2   Filed 08/30/23   Page 76 of 202

Page 37 of 57

371 F. Supp. 594, *620; 1974 U.S. Dist. LEXIS 12938, **75

maximum security conditions at all times.

2. MHD, like other pre-trial detention facilities, is capable of classifying inmates to determine those requiring maximum security custody.

3. Most detainees at MHD, as at other detention centers, can be safely held in custody in less than maximum security conditions.

 [*621] 4. Booth visiting arrangements at MHD are frustrating and degrading to inmates and their visitors [**76] at MHD.

5. An adequate classification system would permit MHD to determine those inmates who could be permitted contact visits without significant added risk to the institution, although contact visits would require some additional correctional officers to observe visits and some rearrangement of existing physical facilities.

6. Prior to 1970, each MHD inmate was permitted five visits weekly and allowed to receive more than one visitor at a time. Today he is granted only two visits per week, and sometimes less, by only one visitor at a time. Visits do not occur mornings, afternoons, weekends or holidays. The visiting schedule at MHD is unnecessarily restrictive. The addition of correction officers would permit an appropriate expansion of visiting arrangements.

7. The levels of noise at MHD at all times except late night or early morning are unbearably high. Long term exposure to such noise can cause impairment of hearing, and even short exposure may increase tension and adversely affect mental health.

8. As a result of inadequate ventilation, heat at MHD is a burden in summer and at times even in cold weather. There are occasions in winter when heat is inadequate. [**77] These factors have adverse effect on mental and physical health.

9. Most detainees at MHD are unable to see out of the building. Such lack of contact with sun, sky, street or the outside world can result in psychological disorientation, especially in an institution in which a large number of detainees are held for a long period. Installation of transparent windows at MHD would not significantly increase security risks at MHD.

10. Physical recreation at MHD is limited to a maximum of 50 minutes per week in a small rooftop area and these limitations generally have an adverse effect on mental and physical health.

11. Detainees are required to be outside their cell eight hours per day. During this period they are generally confined to lock-out areas of limited space adjacent to their cells where the only activities are television, radio and table games. This situation will be alleviated when alterations of one-half of the fifth and eighth floors, totalling 10,000 square feet, is made available for program activity and quiet recreation in June, 1974. The extent of alleviation will depend on furnishing the new areas with sufficient useful equipment. Admirable educational [**78] programs exist, but are restricted in number and scope so that only a small percentage of detainees are able to take part in them. The result is that most detainees spend

Case 1:23-cv-01004-RP    Document 10-2    Filed 08/30/23    Page 77 of 202
Page 38 of 57

371 F. Supp. 594, *621; 1974 U.S. Dist. LEXIS 12938, **78

their time at MHD in destructive idleness and boredom.

12.  The mental health of detainees would be promoted and tensions at MHD reduced if detainees were given the option of remaining in their cells in the lock-out period.  The granting of such an option, with cells doors locked during the lock-out period, would not jeopardize the security of the institution.

13.  The number of security officers at MHD is insufficient for observation or protection of detainees from others or themselves, or to assist detainees as to fundamental needs.  As a result of working long and hard hours under the trying physical conditions which exist at MHD, morale of officers is adversely affected, and accordingly some officers become tense and upon occasion mistreat detainees.

14.  The disciplinary rules at MHD do not provide for written notice of charges, confrontation of accusers, free summoning of witnesses, or an independent hearing officer, written findings of fact or reasons for punishment, or the right to be represented either **[\*\*79]** by counsel or counsel substitute.  A detainee found guilty of disciplinary infraction may be rigorously punished.

 **[\*622]**  15. Rules as to correspondence at MHD require that all mail, including that from attorneys and courts, be opened to inspect for contraband.  In individual cases involving security considerations, mail may be read and censored.  All mail is opened without the detainee being present.  Books and periodicals may be received only from the publisher directly and not from friends or relatives.

16.  The totality of circumstances at MHD have produced dismal conditions significantly inferior to those existing at New York State penal institutions and many other municipal or federal houses of detention.

II.

The great majority of prisons in America are municipal or state institutions.  Yet in recent years, the assertion of constitutional rights by prisoners has been litigated largely in the federal courts.  In earlier times the federal courts withheld action or acted with great caution in such cases, observing the principle of comity and recognizing that the administration of prisons requires an expertise to which courts do not pretend.  However, the reluctance to **[\*\*80]** assert authority has rapidly eroded in recent years as one federal court after another has concluded that conditions in America's prisons and jails have sunk below federal constitutionally acceptable levels.  As the United States Supreme Court has put it, *HN1*[⬆] "Federal courts sit not to supervise prisons but to enforce the constitutional rights of all 'persons, ' including prisoners." *Cruz v. Beto, 405 U.S. 319, 321, 92 S. Ct. 1079, 1081, 31 L. Ed. 2d 263 (1972)*.

The major contentions of the plaintiffs are clean cut.  They argue that the City of New York has subjected them to degrading or punitive conditions inconsistent with their status as pre-trial detainees who are presumed innocent, and has thus violated their rights to due process of law, the equal protection of the laws and to be free from cruel and unusual punishment.

Case 1:23-cv-01004-RP   Document 10-2   Filed 08/30/23   Page 78 of 202

Page 39 of 57

371 F. Supp. 594, *622; 1974 U.S. Dist. LEXIS 12938, **80

In judging the validity of these contentions, we take as our starting point that plaintiffs are unconvicted detainees who, but for their inability to furnish bail, would remain at liberty, enjoying all the rights of free citizens until and unless convicted. We are guided, therefore, not only by the modern judicial view, originating in the seminal declaration of **[\*\*81]** *Coffin v. Reichard, 143 F.2d 443, 445 (6th Cir. 1944)*, that **HN2[↑]** *all* prisoners, convicted or detained, "[retain] all rights of an ordinary citizen except those expressly or by necessary implication taken from [them] by law," but also by the precept that, because of "the presumption of innocence, secured only after centuries of struggle" ( *Stack v. Boyle, 342 U.S. 1, 4, 72 S. Ct. 1, 3, 96 L. Ed. 3 (1951))*, a *detainee* retains all rights of the ordinary citizen except those necessary to assure his appearance for trial.

The words of Blackstone still express the law:

> **HN3[↑]** "Upon the whole, if the offense be not bailable, or the party cannot find bail, he is to be committed to the county gaol . . . there to abide till delivered by due course of law. . . . But this imprisonment, as has been said, is only for safe custody, not for punishment: Therefore, in this dubious interval between the commitment and the trial, a prisoner ought to be used with the utmost humanity, and neither be loaded with needless fetters or subjected to other hardships than such as are absolutely requisite for the purpose of confinement only." 4 Blackstone Commentaries 300.

It follows from these **[\*\*82]** ancient commands that detainees may not be subjected to punishment (much less cruel and unusual punishment) *qua* detainees, and that:

> ". . . it is manifestly obvious that *HN4[↑]* the conditions of incarceration for detainees must, cumulatively, add up to the least restrictive means of achieving the purpose requiring and justifying the deprivation of liberty". **[\*623]** *Hamilton v. Love, 328 F. Supp. 1182, 1192 (E.D. Ark. W.D. 1971)*.

As the Supreme Court has said:

> ". . . even though the governmental purpose be legitimate and substantial, that purpose cannot be pursued by means that broadly stifle fundamental personal liberties when the end can be more narrowly achieved. The breadth of legislative abridgment must be viewed in the light of less drastic means for achieving the same basic purpose." *Shelton v. Tucker, 364 U.S. 479, 488, 81 S. Ct. 247, 252, 5 L. Ed. 2d 231 (1960)*.

See also "Constitutional Limitations on the Conditions of Pretrial Detention", 79 Yale Law Journal 941, 949.

The application of these principles has resulted in a legion of recent decisions ordering improvement of the conditions of custody for detainees, based variously on **[\*\*83]** the presumption of innocence, the due process clause, the *equal protection clause* (conditions of confinement of detainees more restrictive

Case 1:23-cv-01004-RP   Document 10-2   Filed 08/30/23   Page 79 of 202

Page 40 of 57

371 F. Supp. 594, *623; 1974 U.S. Dist. LEXIS 12938, **83

than necessary to assure appearance at trial discriminate impermissibly between detainees and bailees; jail conditions may not be harsher for detainees than prison conditions of convicts) and, the *Eighth Amendment's* proscription against cruel and unusual punishment. For example, see *Jones v. Wittenberg, 323 F. Supp. 93* and *330 F. Supp. 707 (N.D. Ohio 1971)*, aff'd sub nom., *Jones v. Metzger, 456 F.2d 854 (6th Cir. 1972)*; Bishop v. Lamb, Civ. LV-1864 (D. Nev. August 24, 1973); *Inmates of Suffolk County Jail v. Eisenstadt, 360 F. Supp. 676 (D. Mass. 1973)* (". . . it is reasonable to believe that [the sense of the community] would be offended by a facility housing presumptively innocent persons, as to whom theories of deterrence and retribution are inapplicable, the quality level of which is grossly inferior to that afforded convicts." at 688); *Palma v. Treuchtlinger, 72 C 1653 (E.D.N.Y. March 5, 1973)*; Hodge v. Dodd, Civ. 16171 (N.D. Ga. March 5, 1973); *Inmates of Milwaukee County Jail v. Petersen, 353 F. Supp. 1157 (E.D. Wis. 1973)* (". . . as individuals **[\*\*84]** who have not been convicted of crime, they retain all rights retained by arrestees who have been released on bail, except for the curtailment of mobility deemed necessary to secure attendance at trial and the limitations necessary to protect the security of the institution in which they are detained" at 1160); Jones v. Sharkey, Civ. No. 4948 (D.R.I., June 7, 1972); *Collins v. Schoonfield, 344 F. Supp. 257 (D. Md. 1972)* (a detainee "can only be deprived of the constitutional rights a defendant on bail awaiting trial enjoys to the extent such denial is required to insure that he appears at trial and to restrain him from endangering or disrupting the security of

the institution. . ." at 265); *Brenneman v. Madigan, 343 F. Supp. 128 (N.D. Cal. 1972)* (". . . the principle of the least restrictive alternative consistent with the purposes of a commitment inheres in the very nature of a pre-trial confinement which entails an extraordinary deprivation of liberty justifiable only when the detainee is unable to make bail" at 138); *Conklin v. Hancock, 334 F. Supp. 1119 (D.N.H. 1971)*; *Seale v. Manson, 326 F. Supp. 1375 (D. Conn. 1971)* ("unconvicted detainees may be treated as convicts only to the **[\*\*85]** extent the security, internal order, health, and discipline of the prison demand; considerations of rehabilitation, deterrence or punishment are not material", at 1379) and *Davis v. Lindsay, 321 F. Supp. 1134, 1139 (S.D.N.Y. 1970)*.

These propositions are now firmly embedded in the law: That **HN5**[⬆] a detainee may not be deprived of the rights of other citizens beyond the extent necessary to assure his appearance at trial and the security of the institution to which he is confined; that a detainee may not be confined under conditions more rigorous than a convicted prisoner, and that a detainee is entitled to protection from cruel and unusual punishment at least as a matter of due process if not **[\*624]** under the *Eighth Amendment*. [5] The conditions at

_____

[5] We recognize that since detainees may not constitutionally be punished *at all qua* detainees (as distinct from being punished for infractions of rules of the institution) there exists ". . . considerable doubt that the *cruel and unusual punishment clause* is properly applicable at all until after conviction and sentence" ( *Johnson v. Glick, 481 F.2d 1028, 1032 (2d Cir. 1973))*. We find however, that the maximum security conditions at MHD factually constitute cruel punishment, at least for those in whose cases maximum security is not required, and we agree with *Johnson, supra*, that ". . . it would be absurd to hold that a pre-trial detainee has less

MHD must be measured by these standards.

**[**86]** 1.    *Maximum    Security: Classification*:

Without exception, all detainees at MHD are housed in maximum security conditions.  In this respect MHD is not atypical of American jails. Even though one leading expert on penology has noted that maximum security is unnecessary for 80% of the jail population under the most extreme circumstances (Myrl Alexander, Jail Administration 284 (1957) as cited at 79 Yale Law Journal 957 fn. 98), another student of the subject has recently written:

> "Most jails are maximum-security facilities.  Lack of programs and lack of staff lead to the standard practice of viewing all inmates as maximum-security risks. . . .
>
> * * * * * *
>
> "Judging from the experience of some innovators in the field, we know that the need for maximum-security detention at the local level has been vastly exaggerated.  For example, roughly 50% of most jail populations do not even belong in jail". (Jails and Criminal Justice in "Prisoners in America" published by the American Assembly, Columbia University, 1973), pp. 66-67.

However representative the maximum security nature of MHD may be, the question remains whether confinement in such circumstances abridges **[**87]** the rights of the large number of detainees who pose no risk to the security of the institution, and whose appearance at trial can be assured without such rigorous restraint.  It must always be remembered that but for his inability to provide bail *every* detainee at MHD would be free to lead his life without *any* restraint until and unless he was tried and convicted.

We have found that MHD is capable of classifying inmates to determine those who do and do not require maximum security custody, and that most detainees can be safely held under less restraint.  It follows that *HN6*[⬆] the rights of the latter group are abridged by being held in maximum security since the conditions of their incarceration do not ". . . cumulatively, add up to the least restrictive means of achieving the purpose requiring and justifying the deprivation of liberty." *Hamilton v. Love, supra, 328 F. Supp., at 1192*.  *Shelton v. Tucker, 364 U.S. 479, 488, 81 S. Ct. 247, 5 L. Ed. 2d 231*.

*HN7*[⬆] The imposition of maximum security confinement (including lock-ins in cells of 16 hours per day) on those detainees in whose cases it is not necessary, violates their rights to due process by punishing them although they **[**88]** are unconvicted, and violates their rights to equal protection of the laws by unnecessarily treating them more harshly than convicts or bailees.

It follows that defendants are obligated to eliminate or modify those features of maximum security at MHD which are not necessary for the safety of the institution or to assure appearance of detainees at trial.  The first step in this regard must be the establishment of a classification system to

---

constitutional protection . . . than one who has been convicted." The "solution," as *Johnson* points out, is that detainees are protected against such punishment by the due process clause and, where applicable, the *equal protection clause*.

Case 1:23-cv-01004-RP   Document 10-2   Filed 08/30/23   Page 81 of 202

Page 42 of 57

371 F. Supp. 594, *624; 1974 U.S. Dist. LEXIS 12938, **88

determine those who do and who do not require **[*625]** maximum security custody. In requiring such relief, we join a parade of other federal courts which in recent years have imposed similar provisions in order to protect the constitutional rights of detainees. Bishop v. Lamb, Civ. LV, 1864 (D. Nev. 1973); Obadele v. McAdory, Civ. Act 72-J 103(N) (S.D. Miss., June 19, 1973); *Hamilton v. Landrieu, 351 F. Supp. 549, 552 (E.D. La. 1972)*; *Taylor v. Sterrett, 344 F. Supp. 411, 423 (N.D. Tex. 1972)*; *Brenneman v. Madigan, supra, 343 F. Supp. 128, 131 (N.D. Cal. 1972)*; *Hamilton v. Love, 328 F. Supp. 1182 (E.D. Ark. 1971)*; *Jones v. Wittenberg, supra, 330 F. Supp. 707, 717 (N.D. Ohio 1971)*, aff'd sub nom., *Jones v. Metzger, 456 F.2d 854 (6th Cir.* **[**89]** *1972)*.

2. *Visiting Rights*:

**HN8**[⬆] The conditions of visiting are simultaneously fundamental to institutional security and to inmate morale. When the two are in conflict, the need for security is paramount; but the need must be supported by the evidence, and the doctrine of least necessary restraint requires, as a matter of due process, that jail visiting conditions be curbed only to the extent needed to assure institutional security and administrative manageability. Moreover the *equal protection clause* mandates treatment of New York City detainees at least as favorable as that accorded New York State prisoners, unless a rational basis for the different treatment is provided. Yet convicted prisoners in New York are permitted contact visits, and substantially more visits than MHD detainees (including daytimes, weekends and holidays), for substantially longer periods.

The reasons proffered for the very much less favorable treatment of MHD detainees do not stand up. Although the City defendants have theorized that a detainee, anxious because of the uncertainty of his future, is more "predisposed" to attempt escape than a convicted prisoner, they have offered no evidence to support **[**90]** the theory, and we have indicated our doubt as to its validity. Although the fact that only one escape has occurred in the history of MHD may be argued to result from maximum security conditions, there is no evidence on the point, and in any event such an unusually good security record certainly does not support the view that MHD detainees have a particular predisposition to attempt escape. Indeed, defendants did not submit any evidence that *attempts* to escape were proportionately higher at MHD than other institutions, and it is reasonable to assume that such highly relevant proof would have been offered if it existed.

Nor is the argument that the urban location of MHD (as distinct from the rural, walled sites of State prisons) presents special escape problems persuasive in view of the fact that for example, New York City federal detainees (presently held within a short distance and soon to be held within two blocks of MHD) are permitted contact visits, as are detainees in other cities such as Philadelphia and even adolescent detainees held by New York City itself. Defendants furnished no evidence that escape problems were greater at these institutions because of their more **[**91]** liberal visiting programs and the evidence indicates no such consequences.

Case 1:23-cv-01004-RP   Document 10-2   Filed 08/30/23   Page 82 of 202

Page 43 of 57

371 F. Supp. 594, *625; 1974 U.S. Dist. LEXIS 12938, **91

The same observations apply to the claim that the MHD visiting system is justified because of the threat of introduction of contraband. While that threat is undoubtedly higher than elsewhere in the present narcotic-ridden condition of New York City, it has not been demonstrated to be higher than at the New York City federal detention center or the Department's own Adolescent Remand Facility, and the testimony is persuasive that it can be controlled at MHD as well as at other institutions by strip searches or other appropriate methods.

There is no doubt that the Department's administrators genuinely believe that allowing contact visits will pose a threat to institutional security. It is natural that those who are responsible for operations and who bear the **[*626]** brunt of the public's criticism if things go wrong will in good faith come to such a conclusion. Nevertheless, constitutional rights cannot be denied on the basis of "dire predictions" not supported by the evidence. *Goodwin v. Oswald, 462 F.2d 1237, 1244-1245 (2d Cir. 1972)*; *Davis v. Lindsay, 321 F. Supp. 1134 (S.D.N.Y. 1970)*. Although we **[**92]** recognize that the Department is closest to the situation, we find the evidence to establish that the increase in risk caused by contact visits will be marginal and controllable. In the circumstances, the dictates of due process and equal protection require that a system of contact visiting be introduced at MHD, including liberalization of visiting days and hours, at least for all detainees who, by classification, are shown not to require maximum security custody.

For reasons stated at footnote 5 above, we

do not rest our decision on the prohibition of cruel and unusual punishment (nor, as suggested by plaintiffs' brief, on the right to privacy under the *Ninth Amendment*). Nevertheless, we find that the present visiting system, which denies presumably innocent detainees (20% of whose cases may well be dismissed, [6] many of whom are held for long periods and all of whom are in custody solely because of inability to furnish bail) the right to shake hands with a friend, to kiss a wife, or to fondle a child, to be inhumane and cruel in fact. One court described similar visiting conditions as:

> ". . . an affront to the dignity of the prisoner as a man; they exceed the limits **[**93]** of standards of decency; and they are a shame to Philadelphia, as they would be a shame to any civilized community." Jackson v. Hendrick, 71-2437, Court of Common Pleas, Philadelphia County, Pa., April 7, 1972 at 225.

**[**94]** Such claims are proof against defendants' assertion that instituting a liberalized visiting system will require

_____

[6] See plaintiffs' memorandum before the *Appellate Division of the New York Supreme Court, First Department, in Bellamy v. The Judges and Justices Authorized to Sit in The New York City Criminal Court, etc., 41 A.D. 2d 196, 342 N.Y.S. 2d 137* p. 11 (Table 4) and Appendix A. In Bellamy, plaintiffs conducted a study, under the supervision of the Legal Aid Society of New York which represented them, which established that for the months of April, May and June 1971, 26% of the cases of detainees were disposed of by dismissal, 79% by pleas of guilty and 1% by trial. The documentation contained in Appendix A demonstrates that the study was responsibly made by fully qualified professionals and that its results are dependable. A copy of the study, furnished by the plaintiffs here, was made available to the defendants, and the Court requested comment or furnishing of statistics by the City as to the percentage of cases dismissed. The City has made no comment nor offered any figures to challenge those contained in the *Bellamy* study.

Case 1:23-cv-01004-RP   Document 10-2   Filed 08/30/23   Page 83 of 202

Page 44 of 57

371 F. Supp. 594, *626; 1974 U.S. Dist. LEXIS 12938, **94

expenditures to increase the number of guards and to alter the visiting facilities. As Justice (then Judge) Blackmun has said: *HN9*[↑] "humane considerations and constitutional requirements are not, in this day, to be measured or limited by dollar considerations . . ." ( *Jackson v. Bishop, 404 F.2d 571, 580 (8th Cir. 1968))*.

Our disposition of this issue follows many recent holdings to the same effect. Bishop v. Lamb, *supra*, Civil LV-1864 (D. Nev.), August 24, 1973; *Inmates of Suffolk County Jail v. Eisenstadt, 360 F. Supp. 676 (D. Mass. 1973)*; *Collins v. Schoonfield, 344 F. Supp. 257 (D. Md., July 27, 1972)*; Jones v. Sharkey, *supra*, C.A. 4948 (D.R.I., June 7, 1972); Jackson v. Hendrick, *supra*, 71-2437 (Court of Common Pleas, Philadelphia County, Pa., April 4, 1972, at 131-7); *Jones v. Wittenberg, supra, 330 F. Supp. 707, 717 (N.D. Ohio 1971)*, aff'd sub nom., *Jones v. Metzger, 456 F.2d 854 (6th Cir. 1972)*; *Brenneman v. Madigan, supra, 343 F. Supp. 128, 141 (N.D. Cal. 1972)* and *Hamilton v. Love, supra, 328 F. Supp. 1182*.

3. *Exercise and Recreation* **[\*\*95]** :

Dr. Menninger's observation that ". . . my profession considers it almost part of its ten commandments to **[\*627]** say that everyone should have some exercise daily" finds its counterpart in the rule that *HN10*[↑] confinement for long periods of time without the opportunity for regular outdoor exercise does, as a matter of law, constitute cruel and unusual punishment in violation of the *Eighth Amendment to the United States Constitution*". *Sinclair v. Henderson, 331 F. Supp. 1123, 1131 (E.D. La. 1971)*, quoted with approval in *Palma*

*v. Treuchtlinger, 72 C. 1653 (E.D.N.Y., March 5, 1973)*.

*HN11*[↑] The right of a prisoner to reasonable physical exercise is fundamental. Where necessary, courts have required structural alterations to provide the required space, see, e.g., *Hamilton v. Love, supra, 328 F. Supp. at 1193* and decree of June 22, 1971, Par. 7D; Wayne County Inmates v. Wayne County Board of Commissioners, Civ. #173-217 Circuit Court, Wayne County, Michigan, July 28, 1972, at 25-6, and have ordered that particular periods of exercise be made available, *Hamilton v. Landrieu, supra, 351 F. Supp. at 550*, or that outdoor exercise areas be created, *Taylor v. Sterrett, supra, 344 F. [\*\*96] Supp. at 422*. *See also*, Holland v. Donelon, Civ. No. 71-1442 (E.D. La., June 6, 1973) at 12 and cases cited, *Brenneman v. Madigan, supra, 343 F. Supp. at 135, 140*; *Conklin v. Hancock, supra, 334 F. Supp. at 1122* and *Jones v. Wittenberg, supra, 330 F. Supp. at 717*.

The 50 minute per week opportunity for exercise at MHD (even supplemented by other recreational programs) does not meet constitutional standards. The difficulty of providing space for exercise in an urban institution is unacceptable as justification for the deprivation imposed on MHD inmates. The jail in question in the cases cited were city facilities faced with the same difficulty.

The present administration of the Department is making admirable efforts to overcome the deficiencies in the existing program of physical exercise at MHD. Unfortunately, it appears unlikely that even the improved program will bring MHD up to

Case 1:23-cv-01004-RP   Document 10-2   Filed 08/30/23   Page 84 of 202

Page 45 of 57

371 F. Supp. 594, *627; 1974 U.S. Dist. LEXIS 12938, **96

constitutional standards. The plaintiffs are entitled to the relief necessary to achieve that objective.

4. *Environment*:

HN12[↑] "The courts cannot close their judicial eyes to prison conditions which present a grave and immediate threat to health or physical well being." *Campbell [**97] v. Beto, 460 F.2d 765, 768 (5th Cir. 1972)*.

As Chief Judge Kaufman has recently written HN13[↑] "a tolerable living environment is now guaranteed by the law" for prisoners. Book Review, 86 Harvard L. Rev. 637, 639 (1973).

MHD does not provide a tolerable living environment for its inmates. Extremes of noise and heat, inadequacy of ventilation and inability to see the sun, sky or outside world, in some instances threaten, and in all cases unnecessarily burden the health of its prisoners.

Such deprivations are of constitutional magnitude. HN14[↑] A prisoner's claim of excessive or inadequate heat states a claim under the *Eighth Amendment* and *42 U.S.C. § 1983* ( *Rozecki v. Gaughan, 459 F.2d 6 (1st Cir. 1972)*, and injunctive relief may be granted against such burdens. *See, also*, *New York State Assn. for Retarded Children Inc. v. Rockefeller, 357 F. Supp. 752, 765 (E.D.N.Y. 1973)*; *Brenneman v. Madigan, supra, 343 F. Supp. 128 (N.D. Cal. 1972)*; *Jones v. Wittenberg, supra, 330 F. Supp. 707, 721 (N.D. Ohio 1971)*. Inadequate ventilation has been ordered remedied by judicial decree, *Hamilton v. Love, supra*; *Hamilton v. Landrieu, 351 F. Supp. 549, 554 (E.D. La. 1972)*; *Hamilton [**98] v. Schiro, 338 F. Supp. 1016, 1017, (E.D. La. 1970)*; *Jones v. Wittenberg, supra, 330 F. Supp. at 721*; Jackson v. Hendrick, *supra*. Clear glass has been ordered installed in *Hamilton v. Landrieu, supra, 351 F. Supp. at 554*.

Lack of precedent as to an inmate's right to be protected from intolerable noise may be explained by Dr. Menninger's testimony (Transcript 882, **[*628]** 885) that the Tombs is noisier than any of the 150 to 200 jails he has visited. In any event, as we have indicated earlier, the City's own Environmental Protection Agency's findings establish that the level of noise at MHD constitutes a threat to hearing and mental health. Such a condition falls easily within the rationale of the decisions cited above.

The decree implementing this opinion must contain remedial provisions which will assure a "tolerable living environment" at MHD.

5. *Optional Lock-Out*:

We have found that the mental health of MHD detainees would be promoted if they were given the option of remaining in their cells in lock-out periods. The security of the institution would not be jeopardized by granting such an option. We recognize that adoption of a system of optional [**99] lock-out may require experimentation before an effective plan can be developed on the basis of experience. A plan for changing to an optional lock-out system will be provided in the decree, to assure, as the least restrictive alternative, that detainees are accorded, where possible, the "right to be left alone". (Brandeis, J.,

Case 1:23-cv-01004-RP   Document 10-2   Filed 08/30/23   Page 85 of 202

Page 46 of 57

371 F. Supp. 594, *628; 1974 U.S. Dist. LEXIS 12938, **99

dissenting, in *Olmstead v. United States, 277 U.S. 438, 478, 48 S. Ct. 564, 72 L. Ed. 944 (1928))*.

6. *Correction Officers*:

We have found that the number of security officers at MHD is insufficient for observation or protection of detainees, or to assist detainees as to fundamental needs; and that morale of the officers is adversely affected by working long hours under trying physical conditions so that some officers occasionally mistreat prisoners.

*HN15*[↑] Prisoners, whether detainees or convicts, are constitutionally entitled to be free of mistreatment by their custodians and to be protected from harm, *New York State Assn. for Retarded Children, Inc. v. Rockefeller, 357 F. Supp. 752 at 764-765 (E.D.N.Y. 1973)*, and cases cited. Where deprivation of these rights flows, as it does here, from inadequacy of staffing, the shortage must be remedied. *Jackson [**100] v. Bishop, supra, 404 F.2d at 580*; *New York State Assn. for Retarded Children, Inc. v. Rockefeller, supra, 357 F. Supp. at 768*. The alternative is the release of those held in custody. *Hamilton v. Love, supra, 328 F. Supp. at 1194*; *Holt v. Sarver, 309 F. Supp. 362, 385 (E.D. Ark. 1970)*, aff'd, *442 F.2d 304 (8th Cir. 1971)*.

Yet no one suggests that the City of New York does not have the resources to do the job or that the plaintiffs should be released. The solution is clearly to provide the necessary personnel, as has been ordered, for example in New York State Association, *supra*; *Hamilton v. Love, supra*; *Hamilton v. Landrieu, supra, 351 F.*

*Supp. at 552*; *Jones v. Wittenberg, supra, 330 F. Supp. at 715-716* (aff'd sub nom. *Jones v. Metzger, 456 F.2d 854*): and Jackson v. Hendrick, *supra* at 16. The relief to be granted here will be fashioned accordingly.

We note that the Department has recently entered into an agreement with the Security Officers' Union which permits a ten hour shift. (Testimony of Commissioner Malcolm, Transcript February 26, 1973 at 18-19). Since the Department is convinced that this new authority will give it important operating **[**101]** flexibility, its implementation should not be precluded by the decree if it can be demonstrated that a ten hour shift will not interfere with the objectives of prisoner protection and the avoidance of mistreatment.

7. *Discipline*:

*A: Disciplinary Procedures*: MHD detainees may be punished for infractions of the rules without written notice of the charge; the right to confront accusers, cross-examine witnesses, or, to call witnesses except on condition; [7] the **[*629]** right to written findings and reasons for the decision; or

_____

[7] The regulations (4.49d) do provide that, *at the hearing* on disciplinary charges, the disciplinary officer shall:

"(d). Notify the inmate that he may have a reasonable number of witnesses appear in his behalf, if he claims that witnesses could establish his innocence or bring out important mitigating facts in the case."

While on its face this provision may meet the requirements of due process, the fact is that the rule is interpreted by hearing officers to mean that a detainee is to be advised of his right only if he indicates first that he has witnesses whom he wishes to present. (See pp. 55-6 of text above, referring to Board of Correction Reports submitted pursuant to the consent decree). It is to be noted that the regulation does not require advice to the detainee *in advance* of the hearing.

Case 1:23-cv-01004-RP    Document 10-2    Filed 08/30/23    Page 86 of 202

Page 47 of 57

371 F. Supp. 594, *629; 1974 U.S. Dist. LEXIS 12938, **101

the right to counsel or counsel substitute. Plaintiffs claim that they are entitled to these rights as a matter of due process.

 [**102] If found guilty of an infraction, a detainee may be confined to his cell nearly 24 hours each day, thus losing any opportunity for recreation, and may be deprived of mail and visiting privileges. New York State prisoners may not be deprived of any of these privileges (7 NYCRR § 306(a)). Again unlike State practice, there is no time limitation during which punishment -- including the possibility of "punitive segregation" -- may be imposed. (*Compare* Rule 4.49(e) of the Department *with* 7 NCRR § 253.5(a)).

If the detainee is found guilty of the offense for which he is being detained, disciplinary reports are available for preparation of pre-sentence reports for the courts. This possibility of course, heightens the seriousness of the consequences of disciplinary action against a detainee. Furthermore, some infractions of discipline involve criminal charges, and in such cases the elements of due process are of critical importance.

In recent years, the Supreme Court has notably extended the parameters of due process in cases involving deprivations which may result in serious loss. While the Court has written no opinion as to the requirements of due process in cases of [**103] prisoner discipline, its opinions in related areas chart the course which guides us.

All of the Court's decisions have been governed by two earlier fundamental precepts: that *HN16*[↑] due process is not a fixed concept, but varies according to

"the precise nature of the government function involved as well as of the private interest . . . affected . . . ." *Cafeteria Workers v. McElroy, 367 U.S. 886, 895, 81 S. Ct. 1743, 1748, 6 L. Ed. 2d 1230 (1961)* and that the right to due process arises when one is "condemned to suffer [a] grievous loss" *Joint Anti-Fascist Committee v. McGrath, 341 U.S. 123, 168, 71 S. Ct. 624, 95 L. Ed. 817 (1951)* (Frankfurter, J., concurring).

The significant determinations on the subject include *Goldberg v. Kelly, 397 U.S. 254, 90 S. Ct. 1011, 25 L. Ed. 2d 287 (1970)* (welfare recipient cannot be deprived of benefits without evidentiary hearing subject to specified procedures); *Sniadach v. Family Finance Corp., 395 U.S. 337, 89 S. Ct. 1820, 23 L. Ed. 2d 349 (1969)* (debtor's property cannot be garnished without notice and prior hearing); *Wisconsin v. Constantineau, 400 U.S. 433, 91 S. Ct. 507, 27 L. Ed. 2d 515 (1971)* (statute providing for public posting of names [**104] of "excessive drinkers" of liquor may not be posted, to prevent purchase, without notice or hearing); *Bell v. Burson, 402 U.S. 535, 91 S. Ct. 1586, 29 L. Ed. 2d 90 (1971)* (license of uninsured motorist involved in an accident may not be suspended without hearing on issue of fault); *Fuentes v. Shevin, 407 U.S. 67, 92 S. Ct. 1983, 32 L. Ed. 2d 556 (1972)* (property may not be replevined in ex parte proceedings), and *Board of Regents v. Roth, 408 U.S. 564, 92 S. Ct. 2701, 33 L. Ed. 2d 548 (1972)* (untenured teacher may not suffer nonrenewal of contract without hearing where the action would deprive him of "liberty" or "property".)

The recent rulings in *Morrissey v. Brewer,*

Case 1:23-cv-01004-RP   Document 10-2   Filed 08/30/23   Page 87 of 202

Page 48 of 57

371 F. Supp. 594, *629; 1974 U.S. Dist. LEXIS 12938, **104

*408 U.S. 471, 92 S. Ct. 2593, 33 L. Ed. 2d 484 (1972)*, and *Gagnon v. Scarpelli, 411 U.S. 778, 93 S. Ct. 1756, 36 L. Ed. 2d 656 (1973)*, are closer to the subject at hand. In *Morrissey*, the Court defined **HN17**[⬆] the minimal requirements of due process in parole revocation cases to include **[*630]** a preliminary hearing and a revocation hearing which afford (1) written notice of the claimed violations of parole; (2) disclosure of the parolee of the evidence against him; (3) opportunity to be heard in person and to present **[**105]** witnesses and documentary evidence; (4) the right to confront and cross-examine adverse witnesses (unless the hearing officer specifically finds good cause for not allowing confrontation); (5) a "neutral and detached" hearing body (whose members, however, need not be judicial officers or lawyers); and (6) a written statement by the fact finders as to the evidence relied on and reasons for revoking parole. The court "emphasized" that a parole revocation proceeding was not to be equated with a criminal proceeding, but was a "narrow inquiry" in which the process should be flexible enough to consider material not admissible in a criminal trial. *408 U.S. at 489, 92 S. Ct. 2593*.

The *Morrissey* Court declined to decide whether a parolee was entitled to assistance of counsel (*id.*), but quoted § 305.15(1) of the Model Penal Code (Proposed Official Draft 1962), which provides that "the institutional parole staff shall render reasonable aid to the parolee in preparation for the hearing and he shall be permitted to advise with his own legal counsel" (*id., n. 16, 92 S. Ct. 2604*).

In *Gagnon*, decided last term -- only a year

after *Morrissey* -- the court took up the question **[**106]** of the right to counsel in probation revocation proceedings, which it equated conceptually with parole revocation.

Distinguishing a revocation hearing from a criminal trial which "is an adversary proceeding with its own unique characteristics." (*411 U.S. at 789, 93 S. Ct. at 1763*) and from a juvenile delinquency proceeding "which while denominated civil [is] functionally akin to a criminal trial" (*id.*, n. 12, *93 S. Ct., at 1763*), the Court concluded that **HN18**[⬆] no inflexible constitutional rule affording counsel was justified in revocation cases, but, "rather, that the decision as to the need for counsel must be made on a case-by-case basis in the exercise of a sound discretion by the state authority charged with responsibility for administering the . . . system". *Id. at 790, 93 S. Ct. at 1763*. However, while recognizing the need for "flexibility" in revocation cases (*id. at 788, 93 S. Ct. 1756*), the Court did not leave it at that. Although it expressed the impossibility of formulating a precise set of guidelines, it designated categories of cases in which the right to counsel should be granted. As the Court put it:

"Presumptively, it may be said that counsel **[**107]** should be provided in cases where, after being informed of his right to request counsel, the probationer or parolee makes such a request, based on a timely and colorable claim (i) that he has not committed the alleged violation of the conditions upon which he is at liberty; or (ii) that, even if the violation is a matter of public record or is

Case 1:23-cv-01004-RP   Document 10-2   Filed 08/30/23   Page 88 of 202

Page 49 of 57

371 F. Supp. 594, *630; 1974 U.S. Dist. LEXIS 12938, **107

uncontested, there are substantial reasons which justified or mitigated the violation and make revocation inappropriate, and that the reasons are complex or otherwise difficult to develop or present. In passing on a request for the appointment of counsel, the responsible agency also should consider, especially in doubtful cases, whether the probationer appears to be capable of speaking effectively for himself. In every case in which a request for counsel at a preliminary or final hearing is refused, the grounds for refusal should be stated succinctly in the record." *Id. at 790-791, 93 S. Ct. at 1764*.

In this Circuit, the leading decision delineating the shape of due process in prisoner discipline cases is *Sostre v. McGinnis, 442 F.2d 178 (2d Cir. 1971)*. In *Sostre*, the District Court had ruled that a prisoner could not be **[**108]** deprived of good time credit without (1) written notice of the charges, (2) a recorded hearing before a disinterested official with a chance to cross-examine adverse witnesses and present his own, (3) the right to **[*631]** retain counsel or counsel-substitute and (4) a written decision. *Sostre v. Rockefeller, 312 F. Supp. 863, 872 (S.D.N.Y. 1970)*. The Court of Appeals disagreed "that each of the procedural elements incorporated in [the] mandatory injunction are necessary constitutional ingredients of every proceeding resulting in serious discipline of a prisoner." *442 F.2d at 198*. The court stated its view of the matter this way:

". . . In thus rejecting Judge Motley's conclusions, however, we are not to be understood as disapproving the

judgment of many courts that our constitutional scheme does not contemplate that society may commit lawbreakers to the capricious and arbitrary actions of prison officials. If substantial deprivations are to be visited upon a prisoner, it is wise that such action should at least be premised on facts rationally determined. This is not a concept without meaning. In most cases it would probably be difficult to find an inquiry minimally **[**109]** fair and rational unless the prisoner were confronted with the accusation, informed of the evidence against him, see *Armstrong v. Manzo, 380 U.S. 545, 552, 85 S. Ct. 1187, 14 L. Ed. 2d 62 (1965)*; *Mullane v. Central Hanover Bank & Trust Co., 339 U.S. 306, 70 S. Ct. 652, 94 L. Ed. 865 (1950)*, and afforded a reasonable opportunity to explain his actions. See *Nolan v. Scafati, 306 F. Supp. 1 (D. Mass 1969)* (Wyzanski, J.)." *Id.* (footnotes omitted).

At first blush it might appear that the limits of the Circuit Court's ruling in *Sostre* foreclose granting plaintiffs the panoply of rights they seek here. There are a number of reasons, however, which lead to a contrary conclusion. The first is the cautious nature of the language of *Sostre* itself, and in particular its observation that "each of the procedural elements incorporated in [the] mandatory injunction are [not] necessary constitutional ingredients of every proceeding resulting in serious discipline of a prisoner." *Id.* A panel of the court has this year construed that passage as follows:

"In providing these minima [*i.e.*, those

Case 1:23-cv-01004-RP   Document 10-2   Filed 08/30/23   Page 89 of 202

Page 50 of 57

371 F. Supp. 594, *631; 1974 U.S. Dist. LEXIS 12938, **109

which were allowed in *Sostre*] and rejecting *universal* application **[\*\*110]** of those safeguards required by Judge Motley, however, we did not state that none of the rejected safeguards were ever to be constitutionally required in any case;" *Nieves v. Oswald, 477 F.2d 1109, 1113 (2d Cir. 1973).* (emphasis added) (footnote omitted).

Second, there is an important factual distinction between this case and *Sostre*: that Sostre was a convicted felon, while the plaintiffs here are untried detainees. In *Sostre*, the court hesitated to impose due process requirements which might deter the rehabilitative process.   As the court stated:

"It would be mere speculation for us to decree that the effect of equipping prisoners with more elaborate constitutional weapons against the administration of discipline would be more soothing to the prisoner atmosphere and rehabilitative of the prisoner or, on the other hand, more disquieting and destructive of remedial ends." *442 F.2d at 197.*

In the case at hand, no considerations of rehabilitation exist: The sole aim of imposing discipline in the case of a detainee is to preserve order in the institution.   We deal, therefore, with a situation in which the government's function is markedly narrower **[\*\*111]** than in *Sostre*, while the detainee-prisoner's interests is undiminished.

Finally, we note that *Sostre* antedates some of the Supreme Court opinions referred to above, in particular *Morrissey* and *Gagnon*, as well as those of lower

courts referred to below.  The questions left open by the flexible language of *Sostre* noted above are answered in these later cases.

A deluge of decisions has granted prisoners in disciplinary proceedings, the rights which plaintiffs here seek: (1) written notice of the charge, (2) the right to confront accusers and to call **[\*632]** and cross-examine witnesses, (3) written findings and reasons for the decision and (4) the right to counsel or counsel-substitute.   While not every opinion accords each of the rights sought, many of them do accord all such rights and all accord some.  They include *McDonnell v. Wolff, 483 F.2d 1059 (8th Cir. 1973)*; *United States ex rel. Miller v. Twomey, 479 F.2d 701 (7th Cir. 1973)*; Crafton v. Luttrell, No. 6615 (M.D. Tenn., September 13, 1973); *Inmate 24394 v. Schoen, 363 F. Supp. 683 (D. Minn. 1973)*; Crowe v. Erickson, Civ. 72-4101 (D.S.D., August 24, 1973); *Pearson v. Townsend, 362 F. Supp. 207 (D.S.C.  [\*\*112] 1973)*; *Rinehart v. Brewer, 360 F. Supp. 105 (S.D. Iowa 1973)*; Batchelder v. Geary, No. C-71-2017 (N.D. Cal., April 16, 1973); Collins v. Hancock, Civil 72-114 (D.N.H., February 23, 1973); *Sands v. Wainwright, 357 F. Supp. 1062 (M.D. Fla. 1973)*; *Worley v. Bounds, 355 F. Supp. 115 (W.D.N.C. 1973)*; *Inmates of Milwaukee County Jail v. Petersen, 353 F. Supp. 1157 (E.D. Wis. 1973)*; *Collins v. Schoonfield, supra*, Civ. #71-500 (D. Md., decree of July 27, 1972); *Colligan v. United States, 349 F. Supp. 1233 (E.D. Mich. 1972)*; *Stewart v. Jozwiak, 346 F. Supp. 1062 (E.D. Wis. 1972)*; *United States ex rel. Neal v. Wolfe, 346 F. Supp. 569 (E.D. Pa. 1972)*; *Landman v. Royster, 333 F. Supp. 621*

Case 1:23-cv-01004-RP   Document 10-2   Filed 08/30/23   Page 90 of 202

Page 51 of 57

371 F. Supp. 594, *632; 1974 U.S. Dist. LEXIS 12938, **112

(E.D. Va. 1971); Clutchette v. Procunier, 328 F. Supp. 767 (N.D. Cal. 1971) and Bundy v. Cannon, 328 F. Supp. 165 (D. Md. 1971).

Except for the right to counsel, as to which limitations discussed below are sometimes expressed, these cases emphatically establish that the rights which plaintiffs seek are now recognized as constitutionally required elements of due process. The rights to written notice of the charge (accorded in New York State prisons, 7 NYCRR §§ 253.2(b) and 253.3(b)) confrontation of the **[**113]** accuser, and written decision and findings of fact have been required by nearly every court presented with the issues. While the formulas vary, the majority of decisions considering the subject have required hearing by an impartial tribunal, at least to the extent of prohibiting a single supervisor from acting both as investigating and hearing officer. See, for example, Bundy v. Cannon, supra; Colligan v. United States, supra, 349 F. Supp. at 1237 and Collins v. Schoonfield, supra, 344 F. Supp. 257.

Decisions are more divided as to the right to counsel or counsel-substitute in disciplinary proceedings; but the right has recently been recognized by the First Circuit as constitutionally required in a comprehensive opinion by Judge Coffin. Palmigiano v. Baxter, 487 F.2d 1280 (1st Cir. 1973). Among the opinions cited above which agree are Collins v. Schoonfield, supra; Sands v. Wainwright, supra; Landman v. Royster, supra; Clutchette v. Procunier, supra, and Jackson v. Hendrick, supra.

In the light of this massive advance in the recognition of prisoners' rights, we believe that **HN19[↑]** in all cases of serious charges, i.e., threatening "grievous loss," **[**114]** a detainee is entitled to all of the rights sought here, with limitations only on the right to counsel or counsel-substitute. Counsel or counsel-substitute must be allowed (1) in accord with the rule of Gagnon v. Scarpelli, supra, in cases of seriously disputed infractions, substantial mitigation or which involve difficulty of presentation because of the complex nature of the charge or because the detainee appears incapable of speaking effectively for himself; and (2) where the charges may result in criminal prosecution Nieves v. Oswald, supra, 477 F.2d 1109, 1113 (2d Cir. 1973).

We recognize that modification of disciplinary procedures at an institution as large as MHD may present difficulties, and that significant questions of definition remain, (such as that of "serious charges") or the extent to which the Department should be permitted to exercise discretion in executing the modified procedures. These important issues must be left for the precise delineation of a decree after presentation of the views of the parties.

**[*633]** B: Deprivation of Mail and Visiting Privileges:

§ 4.49e of the Department's regulations authorizes, as punishment for a disciplinary **[**115]** infraction, "loss of one or more privileges, temporarily or permanently". Under the regulation, deprivation of mail and visiting privileges (except correspondence with or visits from an attorney) may be imposed.

Plaintiffs attack the constitutional validity of

Case 1:23-cv-01004-RP   Document 10-2   Filed 08/30/23   Page 91 of 202

Page 52 of 57

371 F. Supp. 594, *633; 1974 U.S. Dist. LEXIS 12938, **115

this deprivation on several grounds. They argue that the policy violates due process, since it is not the least restrictive method necessary to preserve institutional security (and impliedly that it is gratuitous, hence cruel and unusual punishment); that it violates due process because it interferes with a detainee's access to the courts, by impeding his ability to prepare his defense on the criminal charge for which he is detained; and that it violates the *equal protection clause*, because, without a rational basis for distinction, it denies MHD detainees rights accorded to convicted New York State prisoners by State Regulation (7 NYCRR Chap. VI, § 301.6(a)).

 The defendants answer that the Department's regulation and MHD procedures are a valid exercise of the State's power to punish -- and it must be remembered that we are dealing here not with limits on the deprivation of the rights of an inmate who is merely in custody **[**116]** awaiting trial, but of one who has been found guilty of an infraction while in custody.

It is unnecessary to determine whether the City's contentions might be supportable under other circumstances, because we are persuaded that the *equal protection clause* bars the City from imposing on its inmates more severe punishment than may be imposed on convicted New York prisoners.

7 N.Y.C.R.R., Chapter VI, § 301.6, which governs the privileges of State prisoners, reads:

"301.6 *Correspondence & Visiting* (a) No inmate shall be deprived of the correspondence or visiting privileges available to inmates in the general population.  (b) Visits for persons in segregation units shall be in accordance with any special precautions deemed necessary or appropriate by the Superintendent of the facility, but no employee shall be permitted to monitor the content of conversation between an inmate and his legal or spiritual advisor."

Although this Regulation, like the State Department of Correction's policy referred to in *Wright v. McMann, 460 F.2d 126 (2d Cir. 1972)*, may grant a prisoner rights which the constitution does not require, the City cannot, as a creature of the State,  **[**117]** deny to its inmates the rights granted to State prisoners. No evidence in the record establishes any basis for distinction between the two classes, and the defendants have offered no rationale for the difference.  To the contrary it can well be contended, that the State Department is entitled to greater latitude in curbing the rights of its prisoners, since its interest is to punish and rehabilitate, while that of the City is solely to protect the security of the institution and assure the appearance of a detainee at trial.

Although this determination is dispositive, we add that a respectable argument can be made that interference with a detainee's mail and visiting privileges by impeding his ability to prepare his defense, is suspect under the *Sixth Amendment*, since without access to family or friends -- even if he has contact with his lawyer -- he may be deprived of the opportunity to secure critical information, evidence or witnesses on his behalf.

Case 1:23-cv-01004-RP   Document 10-2   Filed 08/30/23   Page 92 of 202

Page 53 of 57

371 F. Supp. 594, *633; 1974 U.S. Dist. LEXIS 12938, **117

In any event, we hold that the City may not as a matter of discipline limit the mail and visiting privileges of detainees to an extent greater than the minor limit allowed in 7 NYCRR, Chapter VI, § 301.6.

8. *Correspondence* **[\*\*118]** :

It is the City Department's policy to open and on occasion read outside **[\*634]** a detainee's presence, his mail from courts, attorneys and public officials.   Plaintiffs contend that this procedure violates their *First* and *Sixth Amendment* rights.   We agree.

As far back as 1921, Justice Holmes, with characteristic insight, pointed out that **HN20**[↑] "the use of the mails is almost as much a part of free speech as the right to use our tongues . . . ." *Milwaukee Social Democratic Publishing Co. v. Burleson, 255 U.S. 407, 437, 41 S. Ct. 352, 363, 65 L. Ed. 704 (1921)* (dissenting opinion) quoted with approval in *Blount v. Rizzi, 400 U.S. 410, 416, 91 S. Ct. 423, 27 L. Ed. 2d 498 (1971)*.

The Court of Appeals of this Circuit has most recently observed:

"As to mail to and from counsel, this court had already made it very clear that prison officials who would interfere with *first amendment* rights bear a heavy burden to show abuse in terms of transmittal of contraband or the laying of plans for some unlawful scheme." *Wilkinson v. Skinner, 462 F.2d 670, 671* (2 Cir., 1972) (citations omitted).

Wilkinson was a pre-trial detainee whose

mail from counsel and others had been censored **[\*\*119]** or barred from the mail by jail authorities under the authority of the then controlling state regulation.   Before Wilkinson's case reached the Court of Appeals, the state amended its regulations (7 NYCRR, § 5100.10 (e)) to forbid examination or censorship of the content of correspondence between detainees and courts, attorneys or public officials, while permitting inspection for contraband in the presence of the detainee. The Court of Appeals held that the amended regulation met the constitutional requirements of the *First* and *Sixth Amendments*, and it is clear that the greater infringement on the rights of MHD detainees does not.

*See also Smith v. Robbins, 454 F.2d 696 (1st Cir. 1972)*, aff'g in relevant part, *328 F. Supp. 162 (D. Me. 1971)*; *Inmates of Milwaukee County Jail v. Petersen, supra, 353 F. Supp. at 1167*; *Rhem v. McGrath, 326 F. Supp. 681, 690-691 (S.D.N.Y. 1971)*; *Palmigiano v. Travisono, 317 F. Supp. 776 (D.R.I. 1970)* and Note, Prison Mail Censorship and The *First Amendment*, 81 Yale L.J. 87 (1971).

Furthermore, although the argument is not pressed by plaintiffs, we believe that, as in the instances of deprivation of mail and visiting privileges discussed above **[\*\*120]** the *equal protection clause* requires the City defendants to afford detainees the same mail rights as those granted State prisoners by 7 NYCRR, § 5100.10(e). The City defendants must therefore alter their policy to grant MHD inmates the rights secured by 7 NYCRR, § 5100.10(e).

A detainee's right to receive mail is also limited by the rule which prevents receipt of

Case 1:23-cv-01004-RP   Document 10-2   Filed 08/30/23   Page 93 of 202

Page 54 of 57

371 F. Supp. 594, *634; 1974 U.S. Dist. LEXIS 12938, **120

any publication except those sent directly by the publisher. We have found that the evidence does not support the claim that this policy is necessary for security purposes. Although it is true that contraband may be smuggled within the pages of a magazine, or in hollowed books, the risk is absolutely controllable by inspection of incoming mail. Thus the true reason for the rule is to promote economy and administrative convenience. Aside from the fact that the policy imposes a significant hardship on inmates, most of whom are poor, by requiring them to buy books and magazines which they could otherwise receive without cost from friends or relatives, the rationale of economy and administrative convenience is unsupportable, particularly where the "preferred" rights secured by the *First Amendment* are at stake.

HN21[↑] "The [**121] Constitution protects the right to receive information and ideas. 'This freedom [of speech and press] . . . necessarily protects the right to receive . . . ' [citing cases]. This right to receive information and ideas, regardless of their social worth, . . . is fundamental to our free society." *Stanley v. Georgia, 394 U.S. 557, 564, 89 S. Ct. 1243, 22 L. Ed. 2d 542 (1969).*

[*635] We agree with the view, expressed in similar circumstances to those here, that a detainee's

"right to exercise free speech under the *First Amendment* carries over into confinement pending bail or disposition of charges the concomitant of access to all reading material not unlawful per se,

until it is shown that the exercise of such right reasonably creates a clear and present danger of a breach of prison discipline, or some substantial interference with orderly institutional administration." Hodge v. Dodd, Civ. No. 16171 (N.D. Ga., March 5, 1973), quoting *Fortune Society v. McGinnis, 319 F. Supp. 901 (S.D.N.Y. 1970)).*

*See also Inmates of Milwaukee v. Petersen, supra, 353 F. Supp. at 1168-1169; Collins v. Schoonfield, supra, 344 F. Supp. at 281; Jones v. Wittenberg, [**122] supra, 330 F. Supp. at 719-720; Seale v. Manson, supra, 326 F. Supp. at 1382;* and *United States ex rel. Manicone v. Corso, 365 F. Supp. 576 (E.D.N.Y. 1973).*

The record here supports no such showing, and the policy is therefore constitutionally invalid.

III.

At the outset of the case the State defendants moved to dismiss the complaint on the grounds that it stated no claim as to them upon which relief could be granted. The motion was denied by opinion filed December 16, 1971, on grounds that under Sections 46 and 504 of the New York Correction Law, McKinney's Consol. Laws, c. 43, the State Commission of Correction and the Presiding Justice of the Appellate Division are respectively charged with responsibilities at MHD; and that under Section 9(1) (b) [8] of the Executive Law,

---

[8] The applicable provisions of §§ 46 and 504 of the Correction Law and § 9(1) (b) of the Executive Law read as follows:

Section 46:

Case 1:23-cv-01004-RP   Document 10-2   Filed 08/30/23   Page 94 of 202

Page 55 of 57

371 F. Supp. 594, *635; 1974 U.S. Dist. LEXIS 12938, **122

McKinney's Consol. Laws, c. 18, the Governor has authority to take action which could afford relief to the plaintiffs if they prevailed, as they now have.

[**123] The State defendants now renew their motion on the grounds that the stipulation between the plaintiffs and the City defendants, formalized in the consent decree, has mooted the grounds for relief sought against the State defendants. In particular, they argue that the only relief which the complaint demands against them is that they use their powers to relieve overcrowding at MHD, and that the provisions of the consent decree ordering a

---

"The state commission of correction shall visit and inspect all institutions used for the detention of sane adults charged with or convicted of crime, or detained as witnesses or debtors, and, subject to the direction and control of the commissioner of correction, shall: (1) Aid in securing the just, humane and economic administration of all institutions subject to its [jurisdiction] . . . . (5) Secure the best sanitary conditions of the buildings . . . and protect and preserve the health of the inmates . . . (8) Close any . . . jail . . . which is unsafe, unsanitary or . . . which has not adhered to or complied with the rules or regulations promulgated . . . by the state commission of correction pursuant to subdivision seven-a of this section."

Section 504:

"If . . . the jail becomes unfit or unsafe for the confinement of some or all of the prisoners, civil or criminal, . . . the presiding justice of the appellate division of the supreme court of the first department, must . . . designate another suitable place within the county, or the jail of [a contiguous] county, for the confinement of some or all of the prisoners, as the case requires."

Section 9(1) (b):

"The governor, from time to time, whenever he deems it to be in the public interest, is hereby authorized to enter into a contract on behalf of the state for the lease or loan, on such terms and conditions as he may deem necessary to promote the public welfare and protect the interests of the state, of any real or personal property of the state, or the temporary transfer or employment of personnel of the state to any municipal subdivision or other public corporation of the state."

reduction in MHD population have removed this issue from the case.

We do not agree either that the elimination of overcrowding is the sole relief sought against the State defendants or that the consent decree provisions render [*636] even that issue moot. Paragraph II of the complaint's prayer for relief requests the court to enjoin all defendants from allowing all of the conditions complained of, including of course those that are dealt with in this opinion. Moreover, neither the obligations of the State Commission under § 46 of the Correction Law to "aid in securing the just [and] humane . . . administration, of all institutions subject to its [jurisdiction]" and to ". . . protect and preserve the health of the inmates", nor [**124] the Presiding Justice's obligation under § 504 to designate another place of confinement for prisoners if a jail is "unfit", can be extinguished until the action required by the consent decree has been fulfilled and the unconstitutional conditions described in this opinion have been remedied.

Of course, it is to be assumed that the requirements of the consent decree and of the decree pursuant to this opinion will be carried out timely and in good faith by the City, and it is certainly possible that before that point of finality has been reached the claims against the State defendants can be justly dismissed; but that time is not now.

The New York State Senate Committee's report on the Tombs Disturbances, supra, (at 20) found that:

"The State Commission has been lax in its responsibilities by failing to utilize the powers it possessed to compel the City to correct the overcrowding and

Case 1:23-cv-01004-RP   Document 10-2   Filed 08/30/23   Page 95 of 202

Page 56 of 57

371 F. Supp. 594, *636; 1974 U.S. Dist. LEXIS 12938, **124

inhumane conditions in its institutions and has thereby contributed, at least in part, to the disturbances of the Tombs."

Moreover, the report quotes the testimony before it of former City Commissioner McGrath (an original defendant in this suit) that "somebody has to mandate the **[\*\*125]** system" and that if someone in authority issued orders to change the system "I think there would be a lot of scrambling and activity and I think that something would happen."

In the light of such authoritative testimony, the Senate Committee's finding and the posture of the case, the State defendants' motion to dismiss is denied without prejudice to renewal at an appropriate time.

IV.

Three years have passed since the "Tombs disturbances". The dismal conditions which still exist in the institution manifestly violate the Constitution and would shock the conscience of any citizen who knew of them. The thousands of inmates who pass through its portals each year, more than 69,000 in 1972 and 49,000 in the first eleven months of 1973, [9] are in some instances subjected to cruel punishment, although the Constitution forbids any punishment of detainees, and are deprived of due process and equal protection of the laws. This state of affairs exists in spite of the humane efforts of the present Departmental administration to

afford the "tolerable living conditions" to which prisoners are entitled by law. It exists because the public through its government has not assumed its responsibilities **[\*\*126]** to provide a decent environment within jail walls. *HN22*[⬆] Courts are the agency which must enforce the execution of public responsibilities when other branches of government fail to do so: "courts sit not to supervise prisons but to enforce the constitutional rights of all 'persons, ' including prisoners." *Cruz v. Beto, 405 U.S. 319, 321, 92 S. Ct. 1079, 1081, 31 L.E. 2d 263 (1972).*

In 1970, the Law Enforcement Assistance Administration conducted the first national census of American jails. [10] According **[\*637]** to the study, an average of 160000 persons, that is one out of every 1380 Americans, is in jail every day of the year. Some students of the subject estimate that, during the course of a year, jails confine at least 1,500,000 **[\*\*127]** and perhaps as many as 5,500,000 Americans. "Prisoners in America," *supra, at 55* (published by the American Assembly of Columbia Univ. 1973). The chilling impact of these numbers dictates the necessity to come to grips with the constitutionality of conditions in the jails of America.

To remedy the violations at MHD will cost money and will require deliberate and careful thought and planning. The framing

---

[9] According to oral advice received January 4, 1973, from James Latham, counsel to the Department of Corrections, 69,375 persons were admitted to and 69,641 were discharged from MHD in 1972 and from January 1st to November 30th, 1973, 49,529 were admitted and 49,971 were discharged.

[10] 4,037 jails were found to meet LEAA's definition of a jail; i.e., "any facility operated by a unit of local government for the detention or correction of adults suspected or convicted of a crime and which has authority to detain longer than forty-eight hours." The definition excludes police lock-ups, jails in municipalities reporting fewer than 1,000 persons and state-controlled facilities for convicted short term offenders -- facilities such as reformatories, state farms and road camps. See *Prisoners in America, supra* at 55.

371 F. Supp. 594, *637; 1974 U.S. Dist. LEXIS 12938, **127

of a decree will demand the considered guidance of all concerned. The **[\*\*128]** parties are instructed to prepare for a conference to determine the contents of an order consistent with this opinion.

---

**End of Document**

 Caution
As of: August 29, 2023 9:08 PM Z

## *Reece v. Gragg*

United States District Court for the District of Kansas

December 17, 1986

Civ. A. No. 82-1970

**Reporter**

650 F. Supp. 1297 *; 1986 U.S. Dist. LEXIS 16340 **

Michael D. REECE, et al., Plaintiffs, v. Don GRAGG, Tom Scott, Bernard Hentzen, Sedgwick County Commissioners, and Michael Hill, Sheriff of Sedgwick County, Kansas, Defendants

## Core Terms

inmates, cells, jail, county jail, floor, space, conditions, square foot, bunks, overcrowding, facilities, housing, day room, confinement, injunction, visitation, log, summary judgment, courts, incarcerated, ceiling, figures, constitutional violation, pretrial detainee, special master, limitations, isolation, razors, cases, unconstitutional condition

**Counsel:** **[\*\*1]** Jim Lawing, Wichita, Kansas, for Plaintiffs.

Royce E. Wallace, Wichita, Kansas, for Defendants.

**Judges:** Theis, District Judge.

**Opinion by:** THEIS

## Opinion

### [\*1298] OPINION AND ORDER

THEIS, District Judge.

On October 14, 1982, Michael Reece was arrested and charged with a traffic offense. Pursuant to his arrest, he was incarcerated in the Sedgwick County jail briefly, and was later released on bond. While in the jail, he was given a mattress and told he would have to sleep on the floor because there were no available bunks. On November 16, 1982, he brought this action pursuant to *28 U.S.C. § 1343* and *42 U.S.C. § 1983*, contending that the conditions of the jail violated the constitutional prohibition against cruel and unusual punishment. He sought injunctive relief against defendants to require them to cease and desist operation of the Sedgwick County Jail under the present conditions, and for damages in excess of $10,000.00. Plaintiff later waived his request for monetary damages in open court, so this action now seeks only injunctive relief.

 [\*1299] This matter was certified as a class action on February 13, 1984, with plaintiff representing the class of all present and **[\*\*2]** future sentenced inmates of the Sedgwick County Jail. Subsequently, the Court granted the motions of Ronald Cross and Robert Engle for intervention. Engle has replaced Reece as the representative of the class of sentenced inmates. The Court also granted

Case 1:23-cv-01004-RP    Document 10-2    Filed 08/30/23    Page 98 of 202

Page 2 of 22

650 F. Supp. 1297, *1299; 1986 U.S. Dist. LEXIS 16340, **2

Cross' motion for certification of a class of all present and future pretrial detainees held in the Sedgwick County Jail, formalizing the way both parties and the Court had viewed the case from the outset.

On January 24, 1985, the Court conducted an unannounced tour of the jail facilities. Based on the Court's observations and conversations with prisoners during that tour, the Court issued a report listing problems it discerned with the jail. Among other things, the problems then involved excessive overcrowding of bunks into small cells; lack of day rooms or exercise rooms for daytime activities for the prisoners; toilet facilities that were dirty, stained, and had no seat or lid; walls, floors and bars which were dirty and in need of repainting; massive insect infestation; a lack of adequate personal hygiene products such as soap and razors; a small number of showers available to service all the prisoners; restrictive telephone policies; **[**3]** complaints of inadequate medical attention; complaints involving food quality and lack of hygienic standards in serving the food; a hot and fetid climate; and numerous appliances such as heaters and fans in need of repair. During 1985 and 1986, the Court conducted a number of hearings at which various assertions were made by plaintiffs' counsel, some admissions were made by defendants' counsel, and evidence was presented on jail conditions.

On January 29, 1986, the Sedgwick County Commission enacted a resolution to authorize a mail ballot election to obtain voter approval for the issuance of bonds to construct a new jail. The amount of the bonds was for approximately twenty-three million dollars. This mail ballot election was to be completed by April 10, 1986. The election was held amidst much publicity, and the bond issue was defeated.

On September 24, 1986, plaintiff filed a new motion for summary judgment, wherein he urged the Court to set a population ceiling of 81 (Kansas Department of Correction's standards) or at least of 135 (maximum number the facility was intended to house when it was built in the 1950s). Additionally, the motion seeks the establishment of a date no more **[**4]** than two years hence by when the constitutional problems of the facility must all be resolved, or the facility ordered closed. This motion has been fully briefed. On November 12, 1986, the Court conducted another visit of the jail premises. Although unannounced, the visit could not exactly be characterized as a "surprise" visit, because the county had been inviting the Court to visit for some time.

Since the Court's last visit, the Sheriff has made significant improvements in the facility. Most notably, the Court was impressed with the dramatic improvements made in cleanliness. The facility was freshly painted in a bright color which, along with the improved lighting in the jail, substantially reduced the drab nature of the facility evident on the last visit. Visitation and telephone policies were also improved. However, the Court noted several continuing problems. Chief among these was the tremendous overcrowding that continues unabated from the last visit. The plumbing facilities are still antiquated, unsightly and apparently unsanitary. The Court's impressions and findings of the current status of the jail will be set out in

Case 1:23-cv-01004-RP   Document 10-2   Filed 08/30/23   Page 99 of 202

Page 3 of 22

650 F. Supp. 1297, *1299; 1986 U.S. Dist. LEXIS 16340, **4

more detail below. Briefly, the Court finds that substantial **[**5]** improvements have been made, but that severe problems still exist.

Plaintiff's motion for summary judgment is currently pending before the Court. Also pending before the Court is plaintiff's earlier motion for partial summary judgment, seeking an order from this Court prohibiting the defendants from placing juveniles in the jail. The Court has delayed resolution of these motions for a reason. This Court is not amenable to partisan political **[*1300]** pressures or exigencies. Our democratic government has been tolerant of the political principle that citizens choose their representatives and should not have decisions on individual candidates influenced by judicial decision, especially at an election time. Further, although the jail issue is one of constitutional magnitude, it is not going to be solved by any instantaneous political action. Hence, the Court postponed until after the election its decision on what must be done to alleviate the present abhorrent conditions at the jail.

## I. SUMMARY JUDGMENT STANDARDS

The Court is familiar with the standards governing the consideration of a motion for summary judgment. Summary judgment is a drastic remedy to be applied with caution **[**6]** in order to preserve a litigant's right to trial. _Machinery Center, Inc. v. Anchor National Life Insurance. Co., 434 F.2d 1, 6 (10th Cir.1970)_. To rule favorably on a motion for summary judgment, the Court must first determine that the matters on file regarding the

motion "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." _Fed.R.Civ.P. 56(c)_. By its very terms, _Rule 56(c)_ "provides that the mere existence of _some_ alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no _genuine_ issue of _material_ fact." _Anderson v. Liberty Lobby, Inc., 477 U.S. 242,    , 106 S. Ct. 2505, 2510, 91 L. Ed. 2d 202 (1986)_ (emphasis in original). Instead, the inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." _Id._ at __, 106 S. Ct. at 2512. However, the Court must look at the record in the light most favorable to the non-moving party. _Lindley v. Amoco Production Co **[**7]** ., 639 F.2d 671, 672 (10th Cir.1981)_. Pleadings and documentary evidence must be liberally construed in favor of the party opposing the motion. _Harman v. Diversified Medical Investments Corp., 488 F.2d 111, 113 (10th Cir.1973)_, cert. denied 425 U.S. 951, 96 S. Ct. 1727, 48 L. Ed. 2d 195 (1976). If the facts support an inference which would permit the non-movant to prevail, summary judgment is inappropriate. _Thomas v. United States Department of Energy, 719 F.2d 342, 344 (10th Cir.1983)_.

## II. CONSTITUTIONAL VIOLATIONS

Conditions of confinement in jails are subject to constitutional scrutiny when pretrial detainees claim the protections of the _due process clauses of the Fifth_ and _Fourteenth Amendments_, _Bell v. Wolfish,_

650 F. Supp. 1297, *1300; 1986 U.S. Dist. LEXIS 16340, **7

441 U.S. 520, 99 S. Ct. 1861, 60 L. Ed. 2d 447 (1979), or when convicted inmates contend that they suffer cruel and unusual punishment in violation of the *Eighth Amendment*, *Rhodes v. Chapman, 452 U.S. 337, 101 S. Ct. 2392, 69 L. Ed. 2d 59 (1981)*. Sentenced inmates may be held under conditions that are punitive, while pretrial detainees may not be because they are still cloaked with the presumption of innocence. Therefore, as to pretrial detainees, **[\*\*8]** "the proper inquiry is whether [the] conditions [of confinement] amount to punishment of the detainee." *Bell, 441 U.S. at 535, 99 S. Ct. at 1871*. Sentenced inmates may be punished, but the *Eighth Amendment* prohibits any punishment that involves the unnecessary infliction of pain, *Gregg v. Georgia, 428 U.S. 153, 96 S. Ct. 2909, 49 L. Ed. 2d 859 (1979)*, or that is incompatible with societal standards of decency, *Trop v. Dulles, 356 U.S. 86, 78 S. Ct. 590, 2 L. Ed. 2d 630 (1958)*. Since the Sedgwick County Jail houses both pretrial detainees and convicted inmates, both standards are relevant to determining the propriety of relief, although, to the extent that the jail is unable to segregate pretrial and sentenced inmates, the higher standard applicable under the due process clause must be met for the entire facility. *Fischer v. Winter, 564 F. Supp. 281 (N.D.Cal.1983)*. However, the distinction is immaterial, since the Court finds that even the more stringent *Eighth Amendment* standard is not satisfied.

**[\*1301] A. Overcrowding**

Overcrowding amounts to punishment when it "subjects a detainee over an extended period to genuine privations and hardship not reasonably **[\*\*9]** related to a legitimate governmental objective." *Lareau v. Manson, 651 F.2d 96, 103 (2nd Cir.1981)*. In deciding whether overcrowding is unconstitutional for convicted inmates, the inquiry is whether the totality of conditions "deprive[s] inmates of the minimal civilized measures of life's necessities." *Rhodes, 452 U.S. at 346, 101 S. Ct. at 2398*. The many federal cases concerning jail overcrowding establish no clear standards for ascertaining at what point overcrowding violates the *Eighth Amendment*, although the conditions in other cases and the analysis employed by other courts affords this Court some guidance in its determination. In *Rhodes v. Chapman, 452 U.S. 337, 348, 101 S. Ct. 2392, 2400, 69 L. Ed. 2d 59 (1981)*, the Supreme Court held that allegations of overcrowding must be tested by an examination of the effects of overcrowding on the totality of prison conditions, including among other factors the adequacy of food, sanitation, medical care, and the quality of the physical facility. Yet, overcrowding may be the root cause of deficiencies in other areas of prison life. *Fischer v. Winter, 564 F. Supp. 281, 298 (N.D.Cal.1983)*. Indeed, a number of recent cases **[\*\*10]** have found constitutional violations which in large part were the product of overcrowding. *See, e.g., Toussaint v. Yockey, 722 F.2d 1490 (9th Cir.1984)*; *Wellman v. Faulkner, 715 F.2d 269 (7th Cir.1983)*, cert. denied, *468 U.S. 1217, 104 S. Ct. 3587, 82 L. Ed. 2d 885 (1984)*; *Monmouth County Correctional Institution Inmates v. Lanzaro, 595 F. Supp. 1417 (D.N.J.1984)*; *Benjamin v. Malcolm, 564 F. Supp. 668 (S.D.N.Y.1983)*. The decision in the instant case is not based solely on the

Case 1:23-cv-01004-RP   Document 10-2   Filed 08/30/23   Page 101 of 202

Page 5 of 22

650 F. Supp. 1297, *1301; 1986 U.S. Dist. LEXIS 16340, **10

overcrowding. The Court has considered the crowding as it affects the factors listed in *Rhodes*.

The Sedgwick County Jail was designed to house 135 inmates when it was built in the 1950s. Under today's standards, the Kansas Department of Corrections would recommend that this facility house no more than 90 inmates. Yet, in 1986, an average of 239 prisoners were confined in the jail on any given day. In 1985, an average of 225 inmates were in the jail each day. On one dark day in that year, a total of 298 inmates were housed there. Even worse, the county has rated the population capacity of the facility at 327; that is, the county has placed on a permanent basis 327 bunks in the jail facility **[\*\*11]** (13 of which are located in isolation cells) and apparently would have no compunctions about filling every one of them.

In *Battle v. Anderson, 564 F.2d 388 (10th Cir.1977)*, the Tenth Circuit Court of Appeals affirmed the district court's finding of a constitutional violation where the institution was 91% over capacity. The United States District Court for the Northern District of New York issued injunctive relief where a jail population fluctuated between 2.4% and 31.1% over capacity. *Albro v. County of Onondaga, 627 F. Supp. 1280 (N.D.N.Y.1986)*. *See also Ruiz v. Estelle, 503 F. Supp. 1265 (S.D.Tex.1980)* (constitutional violation where the prisons were 100% over design capacity); *Ambrose v. Malcolm, 414 F. Supp. 485 (S.D.N.Y.1976)* (injunctive relief granted when institution was operated at 66 2/3% over rated capacity). During the past year, the Sedgwick County Jail has operated on the average at 266% over

recommended capacity. Indeed, the Sedgwick County Jail's overpopulation in relation to its design capacity was far more egregious than any other example of overcrowding seen by the Court in its review of reported cases.

An additional way of evaluating the extent **[\*\*12]** of overcrowding at the Sedgwick County Jail is to examine the amount of space provided per inmate. By adding the individual cells' measurements, not including holding and isolation cells, the Court has determined that there is a total of 9263 square feet of space available in the jail. In that area, the County has placed 314 bunks. If all bunks were filled, each inmate would be afforded an average of only 29.5 square feet of space (before deductions for space occupied by bunks, stools **[\*1302]** and showers). Of course, the jail has never housed 314 inmates. But based on the last four years' average daily population of 239, each inmate still had only an average of 38.76 square feet of space available (again before deductions for stools, showers, and for all 314 bunks, which are there whether filled or not). Even this average does not give a completely accurate picture, however, since some cells are far more cramped than others. For instance, the city tank cell on the fifth floor has ten bunks in a room of only 166 square feet. If all of these bunks were filled, the inmates would each have only 16.6 square feet of space available. Not counting this tank, the cell space averages **[\*\*13]** in the jail range from a high of 68 square feet to a low of 18 square feet per inmate.

Numerous courts have determined that overcrowding in cell areas constitutes cruel

650 F. Supp. 1297, *1302; 1986 U.S. Dist. LEXIS 16340, **13

and unusual punishment even when the inmates had considerably more cell space than the inmates in the Sedgwick County Jail. *French v. Owens, 777 F.2d 1250 (7th Cir.1985)* (double-celling in 48 square feet of space unconstitutional); *Toussaint v. Yockey, 722 F.2d 1490 (9th Cir.1984)* (prisoners were unconstitutionally confined when each had 54 square feet of cell space); *Campbell v. Cauthron, 623 F.2d 503 (8th Cir.1980)* (17-26 square feet per inmate found unconstitutional); *Burks v. Teasdale, 603 F.2d 59 (8th Cir.1979)* (unconstitutional to hold two inmates in 47 square foot cells and three inmates in 65 square foot cells); *Johnson v. Levine, 588 F.2d 1378 (4th Cir.1978)* (unconstitutional to hold two inmates in 44 square foot and 50.7 square foot cells for ten to fifteen hours per day); *Battle v. Anderson, 564 F.2d 388 (10th Cir.1977)* (adopting as a constitutional minimum the standards of the American Public Health Association: 60 square feet per inmate in a cell; 75 square feet per inmate in a **[**14]** dormitory); *Jackson v. Gardner, 639 F. Supp. 1005 (E.D.Tenn.1986)* (housing prisoners in cells of 20 square feet unconstitutional); *Hendrix v. Faulkner, 525 F. Supp. 435 (N.D.Ind.1981)*, *aff'd sub nom. Wellman v. Faulkner, 715 F.2d 269 (7th Cir.1983)* (cell size ranging between 37.3 and 38.3 square feet amounts to unconstitutional overcrowding); *Ramos v. Lamm, 485 F. Supp. 122, 170 (N.D.Col.1979)*, *aff'd, 639 F.2d 559 (10th Cir.1980)*, *cert. denied*, 450 U.S. 1041, 101 S. Ct. 1759, 68 L. Ed. 2d 239 (1981) (district court ordered that "no prisoner . . . may be housed in less than 80 square feet for 20 or more hours a day. If the confining space decreased from 80 square feet, the hours of confinement therein must be reduced proportionately.");

*Ahrens v. Thomas, 434 F. Supp. 873 (W.D.Mo.1977)* (court ordered new jail to provide 70 square feet per inmate); *Anderson v. Redman, 429 F. Supp. 1105 (D.Del.1977)* (constitutional compliance required the provision of 75 square feet per inmate); *Ambrose v. Malcolm, 414 F. Supp. 485 (S.D.N.Y.1976)* (75 square feet per inmate required).

Distinguishable from the present case are two recent Supreme Court decisions. In **[**15]** *Bell v. Wolfish, 441 U.S. 520, 99 S. Ct. 1861, 60 L. Ed. 2d 447 (1979)*, the Court held that double-celling of pretrial detainees in a seventy-five square foot room was not violative of due process. Unlike the situation in the instant case, in *Bell* the cells in question were used only for sleeping, and the detainees had substantial room to move about in common areas during the day. Furthermore, the common areas contained a variety of exercise and recreational equipment. The Supreme Court observed that the facility in *Bell* "differs markedly from the familiar image of a jail; there are no barred cells, dank, colorless corridors, or clanging steel gates." *Id. at 525, 99 S. Ct. at 1866*. In contrast, the Sedgwick County Jail has barred cells and steel gates, and, as this Opinion later explains, no opportunities for inmate exercise.

In *Rhodes v. Chapman, 452 U.S. 337, 101 S. Ct. 2392, 69 L. Ed. 2d 59 (1981)*, the Court determined that double-celling of convicted inmates in cells averaging sixty-three square feet was not unconstitutional. The institution involved in *Rhodes* was described as a "top-flight, first-class facility," which was essentially state of the art in **[**16]** prison construction. *Chapman*

Case 1:23-cv-01004-RP   Document 10-2   Filed 08/30/23   Page 103 of 202

Page 7 of 22

650 F. Supp. 1297, *1302; 1986 U.S. Dist. LEXIS 16340, **16

*v. Rhodes, 434 F. Supp. 1007 (S.D.Ohio 1977)*. Each **[*1303]** cell had shelf space, a cabinet, a built-in radio, and a heating and air circulation vent. Many of the cells had windows that the inmates could open and close. About 75% of the inmates were in their cells only at night and had dayrooms, schools, workshops and gymnasiums available to them during the day. None of these factors are present in this case.

While the amount of space per inmate in the Sedgwick County Jail, standing alone, is deplorable, the Court cannot assess these figures in isolation. In *Lareau v. Manson, 651 F.2d 96 (2nd Cir.1981)*, the court emphasized the importance of the duration of confinement as a factor in the constitutional balance. For example, the court in *Lareau* permitted double-celling for a period of up to fifteen days. The County has submitted an estimate of the average length of stay for 1984 as 31 days and an average length of stay for 1986 as 20 days. However, the Court notes that these figures are only estimates and that they do not afford an accurate picture of the duration of confinement, since the release of a substantial percentage of inmates within **[**17]** just a few days skews the statistics. Between October of 1979 and September of 1983 (the most recent figures available to the Court), a study of the Sedgwick County jail population revealed that almost two-thirds of inmates incarcerated in the jail resided there for two days or less. K. Arnold, *The Sedgwick County Jail: An Inmate Population Study* 8 (1984). Since the two day residents are figured into the county's 31 day average, it is apparent that the balance of the inmates reside in the jail substantially longer than

31 days.

Perhaps a more relevant consideration at the Sedgwick County facility is that many inmates are confined in their own cells twenty-four hours a day. While some inmates are in cells which, during the day, may be open to interconnected cells, this does not increase the available space per inmate. It merely allows inmates to move from their crowded cells into other inmates' crowded cells. Furthermore, none of the inmates has access at any time to exercise or activity rooms or equipment.

The sheer physical limitations have detrimental consequences on the mental well-being of the inmates. The negative effect of overcrowding on prisoners' mental health is well-documented. **[**18]** *Campbell v. McGruder, 188 U.S. App. D.C. 258, 580 F.2d 521, 536 (D.C.Cir.1978)* (overcrowding impairs mental health, causes tension, and permits sexual assaults); *LaReau v. MacDougall, 473 F.2d 974, 978 (2nd Cir.1972)* (coerced stagnation seriously threatens the mental soundness of the inmates); *Inmates of Allegheny County Jail v. Wecht, 565 F. Supp. 1278, 1295 (W.D.Pa.1983)* (overcrowding causes idleness and increased noise levels); *Ruiz v. Estelle, 503 F. Supp. 1265, 1391 (S.D.Tex.1980)* (". . . it is impossible for a written opinion to convey the pernicious conditions and the pain and degradation which ordinary inmates suffer within [unconstitutionally operated prisons] . . .; the sheer misery, the discomfort, the wholesale loss of privacy for prisoners housed one, two, or three in a forty-five foot cell. . . ."). Simply crowding too many people into too small a space has been described as "among the

Case 1:23-cv-01004-RP   Document 10-2   Filed 08/30/23   Page 104 of 202

Page 8 of 22

650 F. Supp. 1297, *1303; 1986 U.S. Dist. LEXIS 16340, **18

most debasing and dehumanizing aspects of present prison life. It rips away the sense of privacy -- of dignity -- which can make bearable many things which otherwise could not be endured." *Delgado v. Cady, 576 F. Supp. 1446, 1448 (E.D.Wis.1983)*.

The only conceivable **[**19]** purpose of overcrowding at the Sedgwick County Jail is to allow the county to house more inmates without creating more jail space. This economic motive is an impermissible justification for the resulting constitutional violations. *Lareau v. Manson, 651 F.2d 96, 104 (2nd Cir.1981)*. *See also Ahrens v. Thomas, 434 F. Supp. 873, 898 (W.D.Mo.1977)* ("Inadequate resources can never be an adequate justification for the State's depriving any person of his constitutional rights.").

## B. Other Unconstitutional Conditions

The offensiveness of the physical space limitations is exacerbated by other undesirable conditions that exist at the jail. **[*1304]** These conditions, while perhaps not unconstitutional in and of themselves, combine with each other and with the overcrowding to convince this Court that, considering the totality of the circumstances, the Sedgwick County Jail is unconstitutional.

Two significant problems with the current facility are closely related to the overcrowding in that they also involve lack of space. The first is critical: inmates have no area available for exercise. In fact, no space outside of the inmates' cells exists for activity of any type at all. **[**20]** Coupled with the crowded conditions inside

the cells, this means that inmates can do little all day except sit or lie on their bunks. A review of the reported cases on the unconstitutionality of jails has convinced the Court that this is considered to be as significant a problem as overcrowding in the cells. The "lack of opportunity for regular outdoor recreation alone has been held to violate the *Eighth Amendment*." *Jackson v. Gardner, 639 F. Supp. 1005, 1011 (E.D.Tenn.1986)*. *See also Laaman v. Helgemoe, 437 F. Supp. 269, 309 (D.N.H.1977)* ("The Constitution does not demand sophisticated athletic equipment or an Olympic style gym; it does require that sufficient opportunities be offered all inmates so that they can keep physically fit.").

The second problem, also related to lack of space, is that no separate dining area exists for any inmates. The lack of dining space is especially critical in light of the preceding demonstration of lack of activity space. This leaves an inmate only his cell in which to receive and consume his meals. Coupled with the demonstrated fact that the inmates' cells are already horribly overcrowded, the inmates have no room in their cells for tables **[**21]** from which to consume their meals. They are therefore forced to eat from their bunks, a situation that is not only unpleasant but unsanitary and likely to add to pest control problems.

Like the problems concerning the lack of space in the jail, the remaining deficiencies are almost exclusively related to the inadequacies of the physical structure as opposed to problems with the Sheriff's staff or operational procedures. Among these are basic creature comfort considerations. Adequate ventilation to provide sufficient

Case 1:23-cv-01004-RP   Document 10-2   Filed 08/30/23   Page 105 of 202

Page 9 of 22

650 F. Supp. 1297, *1304; 1986 U.S. Dist. LEXIS 16340, **21

fresh air is lacking. Inadequate temperature control exists. The Court's most recent tour was conducted on a bitterly cold day. The jail was discovered to be warm on that day; in fact, it was almost hot. Indications are that, due probably to the building's heating system, it is usually hot and fetid there in the winter. The Court has received numerous complaints about the oppressive heat problems during the summer as well: the jail is not air conditioned and the limited number of fans available simply blow the hot air around.

Especially critical is the antiquated and unsanitary plumbing system that exists at the jail. The stools and sinks available to the inmates in their **[**22]** cells are ancient, stained, unsanitary and repulsive. Incident report logs show that a disproportionate number of facility problems are related to the worn out plumbing system. The electrical wiring system in the jail also is inadequate for the population and for modern electrical requirements. The Court suspects that it certainly would not meet with standard electrical codes. Unconfirmed reports of dangerous outlets have been received by the Court. The Court has personally observed an excessive, and probably unsafe, use of extension cords in places where appropriate wiring should exist.

The defendants have made significant progress in cleanliness and pest control. However, complaints about cleanliness continue to be received, perhaps inevitably. Complaints about excessive noise levels also are registered, and those are primarily a product of the large number of people housed in a structure that is basically only an open floor divided only by

cell bars. Yet despite this open floor arrangement the floors are not designed so that guards can see into cell areas from their stations. Only one elevator exists for the entire eight floor jail. There is no appropriate segregation system for **[**23]** mentally or chemically impaired inmates, violence prone inmates, juveniles, inmates with emotional or **[*1305]** medical problems, suicidal inmates, or escape artists. In short, the building is antiquated, outmoded, seriously crowded, and not adequate for the use required of it today.

Plaintiff submitted to this Court at an earlier hearing the daily incident report log which began at the first of this year. That log showed almost daily problems with the facility requiring constant attention from the jail administrators. Substantial improvements have been made by the Sheriff's department in the overall physical condition of the jail; improvements that the Court would not belittle, and which in fact it applauds. Even the plaintiff in his brief supporting his motion for summary judgment admits of numerous improvements. Dk. 97, p. 5. But serious physical problems remain which are mostly of a structural nature. The Sheriff can not be blamed for these problems, but neither can the deficiencies be tolerated.

While facility problems predominate, and are the principal basis for this Court's finding that the Sedgwick County Jail is unconstitutional, there are some operational practices **[**24]** or policies that also concern the Court. The *Sedgwick County Detention Facility Policy and Procedure Manual* has been made available to the Court. The Court finds it largely commendable and enlightened. But

some policies bear investigation. Currently, when they check in, inmates are provided with a clean towel, mattress, pillow, pillowcase, *one* sheet, and one blanket, in addition to his or her standard issue orange jumpsuits or coveralls. They are given only one jumpsuit to wear, and it is laundered only once a week. Although they are not given a top sheet for their bunks -- just a blanket -- the blanket is scheduled to be laundered only after the inmate has used it for three months. The Court believes that hygienic concerns would dictate a more frequent schedule of laundering both items. It may be that the jail's laundry facilities will not accommodate a more frequent schedule, but if so, the facilities should be improved or laundry sent out.

Significant improvements have been made in the visitation policy.  Visitation has been moved from the individual cell floors, where it was noisy and awkward, to a second floor visitation room equipped with individual stalls which provide **[**25]** a large viewing glass and audio assistance. Additionally, visitation time has been expanded from a Sunday afternoon melee to a six day a week procedure. But it should be noted that this jail, like most jails, has no provision for contact visitation. The Court also notes that while it was informed that the *practice* is to generally let visits continue until a natural termination, the *written policy* limits each prisoner's visitation time to thirty minutes regardless of how many visitors he or she is receiving. While the Court believes that prison officials should have significant discretion in shaping their visitation policies, any isolation caused by strictures on visitation must be viewed as an additional factor in

the *Eighth Amendment* calculus.

The policy manual is silent as to the practices concerning providing inmates shampoo and razors. If shampoo is not provided, it should be. The Court, during its last tour of the facility, received conflicting reports from officers of the Sheriff's department concerning the availability of safety razors to inmates. Naturally, this is a security concern, and one in which the Court is hesitant to interfere. Yet it appears that when razors **[**26]** are distributed to the men in the mornings, a razor may be expected to be shared by several men. While the Court is not certain how many men share a razor, it was reported to the Court that as many as twenty men may share a single razor. This unwritten policy of "community razors" also bears examination.

Upon consideration of the totality of the conditions at the Sedgwick County Jail, the Court finds that the human warehousing that is occurring at the jail violates the *due process clauses of the Fifth* and *Fourteenth Amendments* and runs afoul of the *Eighth Amendment's* proscription against cruel and unusual punishment. By this Opinion **[*1306]** and Order, the Court does not intend to impose its views of how best to run a jail on the officials of Sedgwick County; nor is the purpose of the Court's order to intercede in the internal administration of the jail. However, in this case the Court is not dealing with mere administrative matters or policies which should be left to the wisdom of jail administrators. This lawsuit involves nothing less than the most basic conditions of human existence. When the overcrowding of prisoners in antiquated

Case 1:23-cv-01004-RP   Document 10-2   Filed 08/30/23   Page 107 of 202

Page 11 of 22

650 F. Supp. 1297, *1306; 1986 U.S. Dist. LEXIS 16340, **26

facilities becomes incompatible with contemporary **[\*\*27]** standards of decency, it is not only the province, but the duty, of this Court to intervene.

As stated previously, the jail officials made some significant improvements in the cleanliness and provisions available for inmates at the Sedgwick County jail in the interim between the Court's first visit and the Court's most recent tour of inspection. Yet, administrators have been stymied by the lack of financial means to alleviate many of the adverse effects of the living conditions.

> Though the county defendants are subject to order of this court to take affirmative steps to eliminate the unconstitutional conditions, the court would be remiss if it laid blame on the county officials responsible for running the [jail]. Rather, the blame must fall squarely on the shoulders of the public which pressures legislators to increase criminal penalties yet simultaneously denies the authority for public expenditure for programs directed toward persons against whom these laws are enforced -- whether these be alternative programs for pretrial release or alternate sentences or for construction of additional prisons.

*Albro v. County of Onondaga, 627 F. Supp. 1280, 1286 (N.D.N.Y.1986)*. **[\*\*28]**

The Court does not have the power to order legislative appropriations for jail construction. However, unconstitutional conditions will not be tolerated merely because constitutional requirements are expensive to satisfy. The Court possesses the power to order prison officials to fulfill certain constitutional minima. *Jackson v.*

*Gardner, 639 F. Supp. 1005, 1011 (E.D.Tenn.1986)*. The Court specifically wants to put to rest any speculation that its order will result in coddled felons or a country club jail; the Court is ordering only the removal of the current dilapidated, debilitating and intolerable conditions, and the provision of constitutionally acceptable conditions of confinement.

## III. REMEDY

This Court has no reservoir of funds nor any suggested method of raising funds for the construction of a minimally sufficient jail. The Court has no architects, engineers or general contractors standing by. Even if this Court could order a new jail built, it would not do so. A decision such as that is a decision to be made by the political process, not by judicial fiat. But the courts do have a duty to enforce constitutional standards, and the continued operation of the Sedgwick **[\*\*29]** County Jail in its current position is clearly unconstitutional and cannot be allowed to continue indefinitely. The Court has waited on the political process as long as it can, and has now reached the point where it can no longer continue to ignore the egregious constitutional violations in the present facility. The Court therefore finds the present operation of the Sedgwick County Jail unconstitutional.

The Supreme Court has stated that "once a constitutional violation is demonstrated, the scope of the district court's equitable powers to remedy past wrongs is broad, for breadth is inherent in equitable remedies." *Swann v. Charlotte-Mecklenburg Board of Education, 402 U.S. 1, 15, 91 S. Ct. 1267,*

Case 1:23-cv-01004-RP   Document 10-2   Filed 08/30/23   Page 108 of 202

Page 12 of 22

650 F. Supp. 1297, *1306; 1986 U.S. Dist. LEXIS 16340, **29

*1275, 28 L. Ed. 2d 554 (1971)*. A district court's equitable powers are certainly no less broad in the instance of unconstitutional conditions at a jail as here than were the court's powers to remedy the school desegregation crisis in *Swann*. The federal courts are equally obligated in both cases to correct the wrongs and to enjoin them from continuing. "When conditions of confinement amount to cruel and unusual punishment, 'federal courts will discharge their duty to protect constitutional **[\*\*30]** **[\*1307]** rights.'" *Rhodes v. Chapman, 452 U.S. 337, 352, 101 S. Ct. 2392, 2402, 69 L. Ed. 2d 59 (1981)* (citations omitted). Having found the Sedgwick County Jail in violation of the *Eighth Amendment's* proscription against cruel and unusual punishment, and in violation of the *Fifth* and *Fourteenth Amendment's* due process provisions, this Court now enjoins the defendants from continuing to operate the Sedgwick County Jail in its present condition. It is well within the Court's power to issue such an injunction. Courts have not hesitated to shape various forms of injunctive relief in prison and jail cases when constitutional violations have been established. *See, e.g., Todaro v. Ward, 565 F.2d 48, 52 (2d Cir.1977)*; *Johnson v. Levine, 450 F. Supp. 648, 661 (D.Md.1978)*.

The Court is cognizant of the fact that the jail currently houses nearly 250 inmates whom the courts have decided should not be at liberty in society for one reason or another. Without minimizing the egregious nature of the constitutional deficiencies in the jail, the Court recognizes that the wholesale release of these inmates upon society would create even greater problems. Therefore, the Court stays enforcement **[\*\*31]** of its injunction upon continued operation of the jail on the following conditions:

## A. Remedial Action Proposal

The County through its proper officials is to present to this Court a plan for bringing the Sedgwick County Jail facilities into compliance with *all* constitutional standards. Whether the County chooses to do so by renovation of the existing facility, renewed use of other facilities in the county, construction of new facilities, or some combination of these or other factors is not material to the Court. All that is required is that the County's proposal meet constitutional guidelines not only concerning square feet per inmate, but also regarding operational and physical plant standards. Minimum constitutional standards for jail facilities are too detailed and too well known to bear repeating in full here. The Court will inform the defendants that it has relied on the Kansas Department of Corrections' *Kansas Advisory Jail Standards and Procedures* (March 1985) in its analysis of minimum standards, and would recommend the same to the defendants for their calculations. The Court has also referred to the American Correctional Association's *Standards for Adult* **[\*\*32]** *Local Detention Facilities*, Second Edition. Any plan that the defendants present to the Court for its approval will be weighed against these reference works. The Court does not intend to be coy in its general reference to these publications as comprising constitutional standards; it is well known that constitutional standards for jails are *minimum* standards, and that

many things which may be decent or humane are nonetheless not constitutionally required. This Court is empowered only to order the facility brought up to minimum constitutional standards, and that is all it will require for approval of the County's proposed plan.

Because the situation at the jail has continued for so long, a requirement of staying the injunction is that this proposal be before this Court no later than March 2, 1987. Frankly, that is longer than the Court considers necessary for the development of such a proposal. However, the Court is aware of the political situation at the Sedgwick County Commission. On January 12, 1987, three new commissioners take office for a four year term, and they will comprise a majority of the expanded five person commission. The Court believes that they should have input **[\*\*33]** into the proposal. Therefore, the proposal due date will be delayed until after they have taken office. If the County Commission, both as the present three-member body and as the incoming five-member body, feels that this time is insufficient for development of a proposal, the Court suggests that the new Commissioners-elect be consulted now. The situation at the jail is bad enough, and has gone on long enough, that the Court will not be receptive to a motion for an extension of time of the due date for any but the most compelling of reasons. After the County has presented its proposal, counsel for the plaintiffs will be given three weeks in which to study and review **[\*1308]** the proposal, and file any comments it deems pertinent regarding the proposal with the Court. Such filing shall be made no later than March 23, 1987. The County will be allowed to reply to plaintiffs'

filing, if it deems a reply necessary, by March 30, 1987. Thereafter, the Court will schedule a hearing on the proposal if the Court determines that such a hearing is necessary.

If the County presents a proposal to this Court by March 2, 1987, and if the proposal to bring the Sedgwick County Jail facilities **[\*\*34]** into constitutional compliance meets with the Court's approval, barring unforeseen circumstances the Court will continue the stay of its injunction for so long as progress on implementing the County's proposal continues at a reasonable pace.

## B. Population Cap

Assuming that the County presents a thoroughly acceptable proposal to this Court on March 2, 1987, and that work is begun promptly on bringing the facilities into compliance with constitutional requirements pursuant to that proposal, it will still most likely be 1989 before Sedgwick County prisoners are being housed in a constitutional facility. While the Court may be willing to stay its injunction against the operation of an unconstitutional facility until that time, it is not willing to allow the continued unaltered operation of the jail. As this opinion has demonstrated, prisoners are currently warehoused in that facility in numbers as much as three times greater than should be allowed. In thirty cells, four inmates are packed like sardines into a space as small as seven feet by ten feet. From that small space, the inmates must deduct the space occupied by their bunks (taking into consideration that bunks are double **[\*\*35]** stacked), and frequently the space occupied by a toilet and/or a

Case 1:23-cv-01004-RP   Document 10-2   Filed 08/30/23   Page 110 of 202

Page 14 of 22

650 F. Supp. 1297, *1308; 1986 U.S. Dist. LEXIS 16340, **35

shower. Constitutional considerations aside, these conditions do not comport with anyone's notion of humane, twentieth century conditions. Indeed, so appalling are the crowded conditions that the Court is frankly amazed that the Sedgwick County Jail has not been the site of protests or uprisings by the inmates. While the fact that these potentially incendiary conditions have not erupted is a tribute to the prisoners themselves and to the Sheriff's Department officers who operate the facility, there is no guarantee that this powder keg will remain unexploded.

But there is a countervailing consideration, which was aptly stated by the Court in *Anderson v. Redman, 429 F. Supp. 1105 (D.Del.1977)*:

> Against this picture of [the jail] as a ticking time bomb must be weighed the fact that the inmates are convicted criminals, and in order to reduce the prison population to even emergency capacity involves certain risks. The difficulty of this balancing is compounded because it weighs the certainty of potentially undesirable, but perhaps minimal consequences of ordering interim reduction against the uncertainty of **[\*\*36]** inaction with a potential for disastrous consequences. Putting aside for the moment the right of a prisoner to proper housing and right of a correctional officer to relatively safe working conditions, the remaining interest at stake is the right of the citizens of Delaware to be secure in their persons and property. The issue is whether an order to reduce the inmate population immediately to emergency capacity thereby limiting the possibility

> of random escapes by dangerous inmates better serves these citizens than an order which permits the present threat of a riot to continue with the concomitant possibility of a mass escape. Although the release of any inmate involves certain risks, those released pursuant to a controlled reduction are the least likely to present a threat to society.

*Id. at 1127*.

It was consideration of these types of factors that led the Court to its decision to stay enforcement of its injunction against operation of the jail in an unconstitutional condition, subject to the conditions enumerated above. Consideration of these factors has also led the Court to conclude that the jail cannot be allowed to continue to operate at its present capacity. Therefore, **[\*\*37]** during the pendency of the County's development **[\*1309]** of a proposal to bring its jail facilities within constitutional requirements, it will only be allowed to operate the existing facilities subject to a population cap. The details of that cap are as follows.

Kansas Department of Correction standards as delineated in the *Kansas Advisory Jail Standards and Procedures* requires the following regarding space available to inmates:

§ 32.05 EXISTING AND NEW PLANT.

All single rooms or cells with a capacity of two or less in detention facilities have at least sixty (60) square feet of floor space per inmate when immediate access to a day room is provided. When access to a day room is not provided there is to be at least seventy

Case 1:23-cv-01004-RP   Document 10-2   Filed 08/30/23   Page 111 of 202

Page 15 of 22

650 F. Supp. 1297, *1309; 1986 U.S. Dist. LEXIS 16340, **37

(70) square feet of floor space per inmate. (Jail/Lockup) *Necessary*.
§ 33.01 EXISTING AND NEW PLANT.

Multi-occupancy cells house no less than three (3) inmates in each and are used for inmates classified as minimum or medium security only. Such cells shall provide a minimum of fifty (50) square feet per inmate. (Jail/Lockup) *Necessary*.

§ 34.02 EXISTING. Space outside the cell or room should be provided for inmate exercise. (Jail) **[\*\*38]** *Desirable*.

It goes without saying that the Sedgwick County Jail does not meet these criteria. While the Court will not yet require them to be met, it will require that the following interim space requirements be met. The County will be excused for now from the requirement to provide day room/exercise space, although the Court reserves the right to require such space be made available later if it appears that the continued denial of such space to the inmates is detrimental to their physical well being. However, the County will be required to provide approximately seventy-five per cent of the above space requirements to the inmates. Those *target* figures are:

    a. Single cell, day room provided -- 45 sq. ft. per inmate.
    b. Single cell, no day room provided -- 52.5 sq. ft. per inmate.
    c. Multi cell, day room provided -- 37.5 sq. ft. per inmate.
    d. Multi cell, no day room provided -- 45 sq. ft. per inmate.

(The standards do not have separate requirements for multi cells when no day room is provided. However, in such instances, the Court determined that 37.5 square feet was insufficient space for multi celled inmates. Therefore, this category was **[\*\*39]** created by the Court to accommodate multi celled inmates who have no additional room available to them.)

Because calculating these figures by taking the total area available in the jail divided by the total inmate population would not insure that each inmate would have the necessary area, the Court has calculated the maximum number of inmates to be allowed in *each cell* within the existing jail. Attached to this opinion as Exhibit A is a map of the Sedgwick County Jail provided by the Kansas Department of Corrections. Written in each cell is the number of bunks placed in that cell (total 327 bunks). A figure in a circle indicates the square feet of that cell. The Sheriff's office has, at the Court's request, checked these figures and corrected them where necessary. Their corrected figure is also written in a circle, and can be distinguished from the original figure in that the Sheriff's figures are written with a finer pen, and unlike the original figures they place both the number and the words "sq. ft." inside the circle. (Attached to this opinion as Exhibit B is a map provided by the Sheriff's office indicating the actual dimensions of the cells.) The figure written inside **[\*\*40]** a square is the Kansas Department of Correction's indication of how many inmates should be allowed in that cell. Finally, the Court has numbered each cell for discussion purposes. Those numbers are written in triangles to distinguish them from all other numbers. The holding cells outside the elevators, which are only used

Case 1:23-cv-01004-RP   Document 10-2   Filed 08/30/23   Page 112 of 202

Page 16 of 22

650 F. Supp. 1297, *1309; 1986 U.S. Dist. LEXIS 16340, **40

to hold prisoners being transported to court or elsewhere, are not numbered.

In the chart following, the Court lists the cell numbers and their classification, a-d, referring to the above listed size definitions. The maximum number of inmates to be allowed in each cell is then indicated. **[*1310]** The total number at the far left merely indicates the total for all cells listed on that line. When particular designations need additional discussion, an asterisk by the cell number will indicate that a discussion on that cell follows the chart.

🗔 *Go to table1*

**[**41]** NOTES

FOURTH FLOOR: This floor is the women's floor for the jail. Even though only one of the five floors is designated for women, the number of women in the jail consistently is less than one-fifth of the total population. Consequently, female inmates have more space available to them than male inmates do. That is why the fourth floor only still uses its day rooms as day rooms.

FIFTH FLOOR: *Cells 11 & 12*. Because the bunks are typically double stacked, an odd number of bunks takes up no less floor space than one additional bunk would. This generally does not concern the Court; it is more concerned with space for inmates than with space for bunks. Cells 11 & 12's mathematical calculations would indicate that they should have five and seven bunks respectively. But since cells 11 and 12 are interconnected, the Court recommends that instead of placing five bunks in one cell and seven in the other, six bunks be

placed in each cell. This will create more floor space in total, and not infringe upon the allocated floor space per inmate. If jail officials for security or other reasons must keep the cells separated from each other during the daytime hours, and not open the block **[**42]** containing these two cells, then the indicated number of bunks must be placed in the respective cells.

FIFTH FLOOR: *Cells 14 -- 16*. These cells are classified as a "b" cell, which means they should provide 52.5 square feet per inmate. But these cells are the smallest cells in the jail, they only have 37 -- 39 square feet in them. Because the Court recognizes that this population ceiling will cause a dramatic reduction in the number of inmates that can be incarcerated at the Sedgwick County Jail, it will not further exacerbate the problem by requiring that these cells be kept vacant. But it does require, as a part of this order, that no single inmate be incarcerated in these cells for more than fifteen consecutive days.

SIXTH THROUGH EIGHT FLOORS: The floor plan of these three floors is virtually identical, although for some reason cells seem to get progressively larger as one moves to higher floors. But the space differences are minimal. Therefore, the Court treats the three floors as one, rather than repeat the list three times. The totals given in the far left column represent only one floor's totals, not totals for all three floors.

SIXTH -- EIGHT: *Cells 7 --* **[**43]** *16*. The area of these ten cells on the three floors range from 72 -- 80 square feet. They are classified as "b" cells, which means they should provide 52.5 square feet per inmate. Therefore their mathematical

Case 1:23-cv-01004-RP   Document 10-2   Filed 08/30/23   Page 113 of 202

Page 17 of 22

650 F. Supp. 1297, *1310; 1986 U.S. Dist. LEXIS 16340, **43

calculation **[*1311]** yields a factor of 1.37 to 1.52 inmates. Because the cells have no apparent difference in size, the Court determines that it would be ridiculous to put one inmate in the cells factoring 1.37 to 1.49, and two inmates in the remaining cells. Having determined to place an identical number of inmates in all cells, the Court decides that the cells can each house two. Although pure mathematics would recommend rounding *down* for a consistent result in this instance, to do so would reduce the number of inmates allowed in the jail by an additional thirty. The Court is not willing to so further reduce the population ceiling of the jail at this time.

SIXTH -- EIGHT: *Cells 18 -- 19.* Currently, the room which the Court has marked as Cell 19 is actually the only room in the men's portion of the jail available as a day room (actually three are available: one on each floor). Because all other day rooms have been converted to dormitories, the Court has calculated **[**44]** this one as if it also will be used to house inmates. If the prison officials are for any reason unwilling or unable to convert cell 19 into a housing cell, then cell 18 would be reclassified as a "c" cell, as it would have a day room available. In that instance, it would be entitled to six bunks instead of the five indicated. Alternatively, if both cells are used for housing, four bunks may be placed in each cell instead of the five and three indicated, for the reasons and under the conditions previously discussed for cells 11 and 12 on the Fifth Floor.

The above population ceiling restrictions will result in a maximum inmate population at the jail of 191 to 197 inmates (Fourth Floor, twenty; Fifth Floor, thirty-six; Sixth through Eighth Floors, forty-five to forty-seven, depending on the arrangement of cells 18 and 19). The Sheriff's office will be required to remove from all cells the bunks in excess of the maximum number of inmates allowed for that cell. Existing bunks may be kept in the isolation cells, although they were not included in the total count. In the event that the Sheriff determines that community safety requires the detention of people in excess of the maximum number **[**45]** indicated, he will be allowed to exceed the above established limits for a period not to exceed 72 hours upon his certification in writing that concerns for community safety require the detention of excess people. That certification must be filed with the Court no later than one week after the day on which the ceiling was first exceeded, along with an indication of how many excess inmates were detained, and how long the excess lasted. Excess inmates may not be bedded on the floors. The Sheriff's department must move in additional bunks sufficient for the number of excess inmates. Once the crisis has passed, the additional bunks must be removed.

The defendants will be given sixty days from the date of this order in which to bring the Sedgwick County Jail facilities into compliance with the above limitations. After that date, they may not exceed the limitations except upon the emergency conditions indicated above. The Court will not indicate how the population is to be reduced; such determinations are the province of the state judiciary and relevant county officers, not of this Court. This Court will suggest that defendants investigate such methods as continued transfer of

Case 1:23-cv-01004-RP   Document 10-2   Filed 08/30/23   Page 114 of 202

Page 18 of 22

650 F. Supp. 1297, *1311; 1986 U.S. Dist. LEXIS 16340, **45

prisoners [**46] to other facilities; release on their own recognizance of those pretrial detainees held on default of low level bonds; and probation of inmates incarcerated for low level, non violent offenses.

The Court bases these recommendations upon information contained in a report submitted by defendants that, of the surrounding seventeen county jails which Sedgwick County has used to house county prisoners in the past, those counties' combined jail capacities exceed their average population by 200 inmates; of all inmates incarcerated in the Sedgwick County Jail, approximately half are pretrial detainees; and 22% of the inmates in the Sedgwick County Jail are there on low level misdemeanor charges -- C misdemeanors or city misdemeanors (such as tampering with a landmark, theft of cable television services or unlawful hunting). Arnold, *The Sedgwick County Jail: An Inmate Population Study, supra* at 34. The County has also [*1312] operated its jail to house prisoners for other jurisdictions. Only about three-fifths of the inmates incarcerated in the Sedgwick County Jail are county prisoners. A little more than one-third are city prisoners, and five to ten percent are federal prisoners. [**47] *Id. at 17*. However, the Court notes these options merely as suggestions. Actual individual determinations of which inmates may be dealt with in what manner will be properly left to the appropriate state and county authorities.

While this interim ceiling causes a substantial reduction in the capacity of the jail, it should not be confused with what constitutional requirements for jail facilities actually are. Not only has the Court settled on a temporarily lower level of space requirements, but it has not required for now that activity rooms be made available. If progress on bringing county facilities within constitutional parameters is not made promptly, this Court reserves the right to modify its ceiling order later on to require such changes as making activity space available. Specifically, the Court would probably require as a minimum that the following cells be vacated and restored to day room status: Fifth Floor, cell 12, Sixth through Eighth Floors, cells 6, 17, and 19.

## C. Special Master

The Court finds that the exceptional circumstances of this case -- the declaration of unconstitutionality and the interim relief ordered -- warrant the appointment of a special [**48] master to monitor the defendants' efforts to comply with its Order. It is clear that federal courts have the power to appoint agents to supervise the implementation of their decrees, and that the appointment of special masters in prison cases is an expeditious method of assisting courts in overseeing remedial action. *See, e.g., Ruiz v. Estelle, 679 F.2d 1115, 1161 (5th Cir.1982)*. The special master shall report on the county's compliance with the Court's decree and assist with implementation of that decree. The master shall make sporadic, unannounced visits to the jail to observe conditions there (such as heating, cooling, lighting, noise levels, ventilation, and plumbing) and shall report his observations to this Court. To that end, the master may also report inmate complaints

Case 1:23-cv-01004-RP   Document 10-2   Filed 08/30/23   Page 115 of 202

Page 19 of 22

650 F. Supp. 1297, *1312; 1986 U.S. Dist. LEXIS 16340, **48

to both the jail administrators and to this Court. However, the master is not to intervene in the daily operation of the jail, since the master is an arm of the Court. The Court will, of course, take into consideration the master's reports in determining the propriety of or necessity for further relief. The Court shall appoint United States Marshall Eddie De Herrera as its special master.

### D. Reporting

 [**49]  Because the Court is conditioning the continued stay of its injunction upon the County's compliance with certain restrictions, and because the stay of the injunction results in the continued operation of an unconstitutional facility, the Court will require that it be kept informed of the ongoing conditions of the jail. In part, this will be accomplished by the reports which the Court will receive from its special master. But for some conditions the Court will require daily information, and this information must be provided to the Court by the County.

The County will be required to keep a temperature log of the daily temperatures on each floor. The temperature reports are to be taken at 7:00 a.m. and at 4:00 p.m. These logs are to be filed with the Court on the first and the third Monday of each month, for so long as the Court continues to stay its injunction.

The County is also required to keep a daily log of the number of prisoners incarcerated in each cell. The log should identify the cells by the numbers used for them in Appendix A of this Opinion and Order. For each day, the log should indicate the highest number of prisoners incarcerated

in each cell that day. Although the [**50] County is not required to comply with the Court-ordered ceiling until sixty days from the date of this Order, reporting is to begin immediately. These logs are also to be filed with the Court on the first and third Monday of each month for so long as the Court continues to stay its injunction.

### [*1313] IV. JUVENILE PARTIAL SUMMARY JUDGMENT MOTION

Also before the Court is plaintiff's motion for partial summary judgment, which seeks an order preventing defendants from continuing to place juveniles in the Sedgwick County Jail. While the motion may have some merit, the Court has received no affidavits nor conducted evidentiary hearings on this issue, and is therefore unable to grant the plaintiff summary judgment on this issue. Plaintiff's reply memorandum itself acknowledges that controverted facts exist. Dk. 91, p. 1. It is elementary law that the existence of controverted, material facts precludes the granting of summary judgment. *See supra* Section I.

It may be that methods employed by the defendants to comply with the jail population ceiling imposed by this Court earlier in this opinion will moot this particular motion. If not, plaintiff must come forward with evidence [**51] to support such a motion before it may be considered by the Court.

### V. SUMMARY

This Opinion and Order addresses an action of long standing before this Court.

Case 1:23-cv-01004-RP   Document 10-2   Filed 08/30/23   Page 116 of 202

Page 20 of 22

650 F. Supp. 1297, *1313; 1986 U.S. Dist. LEXIS 16340, **51

Even older than this case, though, is the problem of overcrowding at the Sedgwick County Jail which this case addresses. From the inception of this case, both sides have worked with each other and with the Court in a spirit of cooperation and candidness. The Court recognizes that this matter is one of intense public debate, one of those proverbial "hot political issues" which could have been the subject of obstructive tactics and public posturing by both sides, and the Court appreciates that neither side has chosen that route. The Court further recognizes that the county officials have attempted to fashion a solution to this problem on several occasions. By this Order, the Court means only to encourage them in that endeavor, not to thwart their intentions or constrain their actions in any way.

As the Court has stressed throughout this Opinion, it is not the Court's intention to require the County to build a new jail or to otherwise make any capital expenditures. Such decisions are not the province of the courts. But this **[\*\*52]** Court does have an obligation to enjoin unconstitutional conditions at the jail. While the Court recognizes that the effect of its decision herein may be to require the County to ultimately make capital expenditures of some nature, that mere fact cannot allow the Court to shirk its duty. The overcrowded conditions at the Sedgwick County Jail are egregious and demand judicial intervention.

There is no significant disagreement on the underlying facts found or noted by the Court herein from either the elected officials of the County or their counsel. They have been forthright concerning that.

From the Court's observation of public comment in the press and the news accounts and editorials concerning this situation, there is also no significant dissent on these facts. While press items are rarely evidentiary in character, a recent cartoon published during the preparation of this Opinion by the *Wichita Eagle Beacon* on Wednesday, November 26, 1986, portrays most graphically the root cause of the legal issues raised by conditions at the Jail. That cartoon is attached as Exhibit C. It is the problems arising from this undisputed overcrowding that mandate the Court's Order today.

IT IS **[\*\*53]** THEREFORE ORDERED that plaintiff's motion for summary judgment is hereby granted, the current operation and condition of the Sedgwick County Jail are found by the Court to be violative of the *due process clause of the Fifth* and *Fourteenth Amendments* and of the *cruel and unusual punishment clause* of the Eight Amendment, and the Sedgwick County Jail is hereby declared unconstitutional.

IT IS FURTHER ORDERED that defendants are hereby enjoined from the continued operation of the Sedgwick County Jail in its current, unconstitutional condition.

IT IS FURTHER ORDERED that the enforcement of this injunction is hereby stayed upon the following conditions. The defendants shall present to this Court by March 2, 1987, a proposal for bringing the  **[\*1314]** Sedgwick County Jail facilities within constitutional parameters. Plaintiffs will be given until March 23, 1987, to respond to this proposal, and defendants will be given until March 30, 1987, to reply

Case 1:23-cv-01004-RP  Document 10-2  Filed 08/30/23  Page 117 of 202

Page 21 of 22

650 F. Supp. 1297, *1314; 1986 U.S. Dist. LEXIS 16340, **53

to plaintiffs' response. Thereafter, defendants must proceed with reasonable speed to implement that proposal once it is approved by the Court. Defendants shall within sixty days from the date of this Order reduce the total population of **[**54]** the jail to comply with the maximum population limitations detailed previously in this Opinion. The Court's special master must be given access to the jail as he requests for inspection and reports to the Court; and the County shall log daily temperature readings and cell populations, and file such logs with the Court semi-monthly, pursuant to the standards detailed above.

IT IS FURTHER ORDERED that Eddie De Herrera is appointed as the Court's special master for this case.

IT IS FURTHER ORDERED that plaintiff's motion for partial summary judgment seeking an order prohibiting the defendants from housing juveniles in the jail is hereby denied.

IT IS FURTHER ORDERED that when the new county commissioners take office, the Clerk of the Court is directed to substitute the new commissioners for the departing commissioners pursuant to the automatic substitution procedures provided in *Rule 25(d) of the Federal Rules of Civil Procedure*.

**[*1315]** [SEE EXHIBITS A THROUGH C IN                          ORIGINAL]

650 F. Supp. 1297, *1315; 1986 U.S. Dist. LEXIS 16340, **54

**Table1 (***Return to related document text***)**

**SEDGWICK COUNTY JAIL**

**MAXIMUM OCCUPANCY LIMITS**

**Cell number Classification Maximum per cell Total**

* FOURTH FLOOR

| Cell number | Classification | Maximum per cell | Total |
|---|---|---|---|
| 1-2 | b | 1 | 2 |
| 3 | c | 4 | 4 |
| 4-6 | a | 2 | 6 |
| 7-8 | a | 2 | 4 |
| 9-12 | b | 1 | 4 |
| 13 | Isolation cell, not for permanent housing | | |

FIFTH FLOOR

| Cell number | Classification | Maximum per cell | Total |
|---|---|---|---|
| 1 | d | 3 | 3 |
| 2-3 | b | 1 | 2 |
| 4 | d | 4 | 4 |
| 5-8 | b | 1 | 4 |
| 9 | b | 1 | 1 |
| 10 | b | 2 | 2 |
| * 11 | d | 5 | 5 |
| * 12 | d | 7 | 7 |
| 13 | d | 4 | 4 |
| * 14-16 | b | 1 | 3 |
| 17 | b | 1 | 1 |
| 18-19 | Isolation cells, not for permanent housing | | |

* SIXTH THROUGH EIGHTH FLOORS

| Cell number | Classification | Maximum per cell | Total |
|---|---|---|---|
| 1-2 | Isolation cells, not for permanent housing | | |
| 3-5 | b | 1 | 3 |
| 6 | d | 9 | 9 |
| * 7-16 | b | 2 | 20 |
| 17 | d | 7 | 7 |
| * 18 | d | 5 | 5 |
| * 19 | d | 3 | 3 |

**Table1 (***Return to related document text***)**

 Caution
As of: August 29, 2023 9:05 PM Z

## *Gates v. Cook*

United States Court of Appeals for the Fifth Circuit

June 28, 2004, Filed

No. 03-60529

**Reporter**

376 F.3d 323 *; 2004 U.S. App. LEXIS 13890 **

NAZARETH GATES, etc., ET AL Plaintiffs versus THOMAS D. COOK, etc., ET AL Defendants. WILLIE RUSSELL, Etc., ET AL Plaintiffs WILLIE RUSSELL, on his own behalf and on behalf of those similarly situated; SHERWOOD BROWN, on his own behalf and on behalf of those similarly situated; KEVIN JORDAN, on his own behalf and on behalf of those similarly situated; JOHN NIXON, on his own behalf and on behalf of those similarly situated; PAUL WOODWARD, on his own behalf and on behalf of those similarly situated Plaintiffs-Appellees versus ROBERT L. JOHNSON, COMMISSIONER, MISSISSIPPI DEPARTMENT OF CORRECTIONS, in his official capacity; CHRISTOPHER EPPS, Deputy Commissioner, Mississippi Department of Corrections, in his official capacity; EMMITT L. SPARKMAN, Superintendent, Mississippi State Penitentiary, in his official capacity; JESSIE STREETER, Warden, Area IV, Mississippi State Penitentiary, in his official capacity; LARRY D. HARRIS, Captain, Unit Administrator, Unit 32, Mississippi State Penitentiary, in his official capacity Defendants-Appellants

**Subsequent History:** As Revised July 9, 2004.

**Prior History:** [**1]   Appeal from the United States District Court for the Northern District of Mississippi, Eastern Division.

**Disposition:** AFFIRMED.

## Core Terms

inmates, injunction, cell, conditions, Row, trial court, argues, heat, toilets, deliberate indifference, illness, emergency, cruel and unusual punishment, mental health, laundry, screens, administrative remedy, clean, clearly erroneous, prison system, exhausted, purports, windows, medication, mosquitoes, prison, temperature, sanitation, equitable, lighting

## Case Summary

### Procedural Posture

Appellants, Mississippi prison officials, sought review of a judgment from the United States District Court for the Northern District of Mississippi, Eastern Division, which found several *Eighth Amendment* violations in the conditions of confinement of appellee death row prisoners and which entered 10 injunctions designed to alleviate those conditions.

### Overview

376 F.3d 323, *323; 2004 U.S. App. LEXIS 13890, **1

The prisoners asserted that death row inmates were knowingly and deliberately subjected to profound isolation, lack of exercise, stench and filth, malfunctioning plumbing, high temperatures, uncontrolled mosquito and insect infestations, a lack of sufficient mental health care, and exposure to psychotic inmates in adjoining cells. As a threshold matter, the court rejected the officials' contentions that the case was not brought in accordance with the Gates class action framework, that the prisoners failed to exhaust administrative remedies, and that the officials' attempts to meet the district court's standards sufficed to moot the issues. The court affirmed the injunctions related to filthy conditions, heat, pest infestation, plumbing, lighting, and inadequate mental health care because the prisoners showed that the conditions posed a substantial risk of harm to which the officials had shown a deliberate indifference. The court vacated the injunctions related to the requirement of a written preventative maintenance program, laundry conditions, and outdoor exercise conditions because they were not justified by conditions in violation of the *Eighth Amendment*.

**Outcome**
The court vacated three injunctions in their entirety. The court vacated four injunctions to the extent that they purported to apply to portions of the prison beyond the death row unit. The court affirmed the remainder of the injunctive relief.

## LexisNexis® Headnotes

Administrative Law > Judicial Review > Reviewability > Exhaustion of Remedies

Criminal Law & Procedure > Postconviction Proceedings > Imprisonment

Administrative Law > Judicial Review > Reviewability > Questions of Law

Civil Rights Law > ... > Prisoner Rights > Prison Litigation Reform Act > General Overview

Civil Rights Law > ... > Prisoner Rights > Prison Litigation Reform Act > Exhaustion of Administrative Remedies

Civil Rights Law > ... > Prisoner Rights > Prison Litigation Reform Act > Scope

### *HN1*[⬇] Reviewability, Exhaustion of Remedies

The Prison Litigation Reform Act (PLRA) mandates that no action shall be brought with respect to prison conditions by a prisoner until such administrative remedies as are available are exhausted. *42 U.S.C.S.. § 1997e(a)*. The United States Supreme Court has held that the PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes. The Supreme Court made clear that exhaustion is now mandatory. The United States Court of Appeals for the Fifth Circuit has held that the available administrative remedy must be pursued to its conclusion.

Administrative Law > Judicial Review > Reviewability > Exhaustion of Remedies

Civil Procedure > ... > Class Actions > Prerequisites for Class Action > General Overview

Civil Rights Law > ... > Prisoner Rights > Prison Litigation Reform Act > General Overview

Civil Procedure > ... > Justiciability > Exhaustion of Remedies > General Overview

Civil Procedure > ... > Justiciability > Exhaustion of Remedies > Administrative Remedies

Civil Procedure > ... > Class Actions > Class Members > Named Members

## *HN2*[📥]  Reviewability, Exhaustion of Remedies

The exhaustion of remedies requirement is satisfied for a class action if the named plaintiff representing the class exhausted remedies.

Administrative Law > Judicial Review > Reviewability > Exhaustion of Remedies

Civil Procedure > ... > Justiciability > Exhaustion of Remedies > Administrative Remedies

Civil Rights Law > ... > Prisoner Rights > Prison Litigation Reform Act > Exhaustion of Administrative Remedies

Civil Rights Law > ... > Prisoner Rights > Prison Litigation Reform Act > General Overview

## *HN3*[📥]  Reviewability, Exhaustion of Remedies

Available administrative remedies are exhausted in compliance with the Prison Litigation Reform Act, *42 U.S.C.S. § 1997e*, when the time limits for the prison's response set forth in the prison grievance procedures have expired.

Civil Rights Law > Protection of Rights > Prisoner Rights > General Overview

Criminal Law & Procedure > Sentencing > Cruel & Unusual Punishment

Civil Rights Law > Protection of Rights > Prisoner Rights > Confinement Conditions

Civil Rights Law > Protection of Rights > Prisoner Rights > Medical Treatment

Civil Rights Law > Protection of Rights > Prisoner Rights > Safety

Civil Rights Law > Protection of Rights > Prisoner Rights > Welfare

Constitutional Law > ... > Fundamental Rights > Procedural Due Process > General Overview

Constitutional Law > Bill of Rights > Fundamental Rights > Cruel & Unusual Punishment

Constitutional Law > Bill of Rights > State Application

Criminal Law & Procedure > Postconviction Proceedings > Imprisonment

## HN4[🔖]  Protection of Rights, Prisoner Rights

The *Eighth Amendment* dictates that cruel and unusual punishment shall not be inflicted, *U.S. Const. amend. VIII*, and it is applicable to the states by reason of the *Due Process Clause of the Fourteenth Amendment*. The treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the *Eighth Amendment*. The Constitution does not mandate comfortable prisons, but neither does it permit inhumane ones. Prison officials must provide humane conditions of confinement; they must ensure that inmates receive adequate food, clothing, shelter, and medical care, and must take reasonable measure to ensure the safety of the inmates. The United States Court of Appeals for the Fifth Circuit has worded the test as requiring extreme deprivation of any minimal civilized measure of life's necessities. Further, mental health needs are no less serious than physical needs. The United States Supreme Court has made clear that the standards against which a court measures prison conditions are the evolving standards of decency that mark the progress of a maturing society and not the standards in effect during the time of the drafting of the *Eighth*

*Amendment*.

Civil Rights Law > Protection of Rights > Prisoner Rights > Confinement Conditions

Criminal Law & Procedure > Postconviction Proceedings > Imprisonment

Civil Rights Law > ... > Scope > Law Enforcement Officials > Prison Officials

Constitutional Law > Bill of Rights > Fundamental Rights > Cruel & Unusual Punishment

Criminal Law & Procedure > Sentencing > Capital Punishment > Cruel & Unusual Punishment

## HN5[🔖]  Prisoner Rights, Confinement Conditions

A prison official has violated the *Eighth Amendment* when he (1) shows a subjective deliberate indifference to (2) conditions posing a substantial risk of serious harm to the inmate. Whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence, and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious. Conditions of confinement may establish an *Eighth Amendment* violation "in combination" when each would not do so alone, but only when they have a mutually enforcing effect that produces the deprivation of a single, identifiable human

need such as food, warmth, or exercise--for example, a low cell temperature at night combined with a failure to issue blankets. The United States Supreme Court has noted that the length of confinement cannot be ignored. A filthy, overcrowded cell might be tolerable for a few days and intolerably cruel for weeks or months. It is also important to note that the inmate need not show that death or serious illness has occurred.

Civil Procedure > Appeals > Standards of Review > Clearly Erroneous Review

### *HN6*[🔽] Standards of Review, Clearly Erroneous Review

In reviewing factual findings, an appellate court employs a clearly erroneous standard. A finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.

Civil Rights Law > Protection of Rights > Prisoner Rights > Confinement Conditions

Criminal Law & Procedure > ... > Standards of Review > Clearly Erroneous Review > Findings of Fact

Civil Procedure > Appeals > Standards of Review > General Overview

Civil Procedure > Appeals > Standards of Review > Clearly Erroneous Review

Civil Rights Law > ... > Scope > Law Enforcement Officials > Prison Officials

### *HN7*[🔽] Prisoner Rights, Confinement Conditions

Whether a prison official showed a deliberate indifference to a prison condition is a factual finding that is reviewed under a clearly erroneous standard. Once the facts are established, the issue of whether the facts constitute a constitutional violation is a question of law to be reviewed de novo. If a constitutional violation is found, the appellate court employs an abuse of discretion standard in reviewing the equitable remedy itself.

Civil Procedure > Appeals > Reviewability of Lower Court Decisions > Preservation for Review

### *HN8*[🔽] Reviewability of Lower Court Decisions, Preservation for Review

An appellate court does not generally review issues raised for the first time on appeal.

Civil Procedure > Remedies > Injunctions > Permanent Injunctions

Civil Procedure > ... > Justiciability > Mootness > General Overview

Civil Procedure > ... > Justiciability > Mootness > Voluntary Cessation Exception

376 F.3d 323, *323; 2004 U.S. App. LEXIS 13890, **1

*HN9*[⬇] **Injunctions, Permanent Injunctions**

A defendant's voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice. If it did, the courts would be compelled to leave the defendant free to return to his old ways. In accordance with this principle, the standard for determining whether a case has been mooted by the defendant's voluntary conduct is stringent: A case might become moot if subsequent events made it absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur. The heavy burden of persuading the court that the challenged conduct cannot reasonably be expected to start up again lies with the party asserting mootness.

Civil Rights Law > Protection of Rights > Prisoner Rights > Confinement Conditions

Constitutional Law > Bill of Rights > Fundamental Rights > Cruel & Unusual Punishment

Criminal Law & Procedure > Postconviction Proceedings > Imprisonment

Evidence > Relevance > Relevant Evidence

*HN10*[⬇] **Prisoner Rights, Confinement Conditions**

While compliance with the American Correctional Association standards may be a relevant consideration in determining whether prison conditions violate the *Eighth Amendment*, it is not per se evidence of constitutionality.

Civil Rights Law > Protection of Rights > Prisoner Rights > Confinement Conditions

Criminal Law & Procedure > Sentencing > Cruel & Unusual Punishment

Constitutional Law > Bill of Rights > Fundamental Rights > Cruel & Unusual Punishment

Criminal Law & Procedure > Postconviction Proceedings > Imprisonment

*HN11*[⬇] **Prisoner Rights, Confinement Conditions**

Filthy prison cell conditions may constitute an *Eighth Amendment* violation.

Civil Procedure > Remedies > Injunctions > Permanent Injunctions

Civil Rights Law > Protection of Rights > Prisoner Rights > Confinement Conditions

Constitutional Law > Bill of Rights > Fundamental Rights > Cruel & Unusual Punishment

*HN12*[⬇] **Injunctions, Permanent Injunctions**

While federal courts can certainly enter injunctions to prevent *Eighth Amendment*

violations, they are not to micromanage state prisons.

Civil Rights Law > Protection of Rights > Prisoner Rights > Medical Treatment

Constitutional Law > Bill of Rights > Fundamental Rights > Cruel & Unusual Punishment

Criminal Law & Procedure > Postconviction Proceedings > Imprisonment

Civil Rights Law > Protection of Rights > Prisoner Rights > Confinement Conditions

Civil Rights Law > ... > Scope > Law Enforcement Officials > Prison Officials

Criminal Law & Procedure > Sentencing > Cruel & Unusual Punishment

_HN13_[⤓]   **Prisoner Rights, Medical Treatment**

Exposure to waste may constitute cruel and unusual punishment, and the length of time a prisoner must endure unsanitary conditions is undoubtedly a factor in the constitutional calculus. While evidence of a past medical injury would clearly strengthen a prisoner's case, the prisoner does not have to prove a past medical injury. He must prove a substantial risk of serious harm and the prison officials' deliberate indifference to that harm.

**Counsel:** For WILLIE RUSSELL, SHERWOOD BROWN, KEVIN JORDAN, JOHN NIXON, PAUL WOODWARD, Plaintiffs - Appellees: Robert Bruce McDuff, Jackson, MS.

For WILLIE RUSSELL, SHERWOOD BROWN, KEVIN JORDAN, JOHN NIXON, PAUL WOODWARD, Plaintiffs - Appellees: Margaret Winter, Amy Fettig, American Civil Liberties Union, Washington, DC.

For ROBERT L JOHNSON, CHRISTOPHER EPPS, EMMITT L SPARKMAN, JESSIE STREETER, LARRY D HARRIS, Defendants - Appellants: Tom Hunt Cole, Jr, Forman, Perry, Watkins, Krutz & Tardy, John Lewis Clay, Mary Jo Woods, Office of the Attorney General for the State of Mississippi, Jackson, MS.

For ROBERT L JOHNSON, CHRISTOPHER EPPS, EMMITT L SPARKMAN, JESSIE STREETER, LARRY D HARRIS, Defendants - Appellants: Leonard Charlton Vincent, James Marshall Norris, Mississippi Department of Corrections, Parchman, MS.

**Judges:** Before DEMOSS, DENNIS, and PRADO, Circuit Judges.

**Opinion by:** DENNIS

## Opinion

[*327]  DENNIS, Circuit Judge:

Willie Russell ("Russell") brought suit in the Northern District of Mississippi against officials of the Mississippi Department of Corrections ("MDOC") **[**2]** on behalf of himself and other prisoners confined to Death Row, or Unit 32-C, in the Mississippi State Penitentiary in Parchman, Mississippi. Russell alleges that certain conditions of confinement on Death Row violate the _Eighth Amendment's_ prohibition

against cruel and unusual punishment. By consent of the parties, the case was tried to the magistrate judge, who found several *Eighth Amendment* violations and entered injunctions designed to alleviate those conditions. MDOC appealed. [1] **[\*\*3]** We affirm in part and vacate in part. [2]

## BACKGROUND

Russell argues that the prisoners housed on Death Row are knowingly and deliberately subjected to profound isolation, lack of exercise, stench and filth, malfunctioning plumbing, high temperatures, uncontrolled mosquito and insect infestations, a lack of sufficient mental health care, and exposure to psychotic inmates in adjoining cells. On May 21, 2003, the trial court issued a "Memorandum Opinion" containing its

___

[1] Russell filed a motion to dismiss the appeal, arguing that this court was without jurisdiction because the order from which MDOC appeals was inherently tentative. We disagree. In addition to having jurisdiction to review final decisions of district courts, *28 U.S.C. § 1291*, this court has jurisdiction to review interlocutory decisions "granting, continuing, modifying, refusing or dissolving injunctions." *28 U.S.C. § 1292(a)(1)*. The order from which MDOC appeals is the "Final Judgment" issued on May 21, 2003. That order imposes ten detailed injunctive requirements on MDOC. As Russell points out, the order also requires MDOC to report its "progress in meeting the remedial actions" on July 7. The requirement of a progress report does not change the fact that the May 21st order grants injunctions against Mississippi requiring immediate action. In fact, this court granted MDOC a stay of this injunctive order to relieve MDOC from the burden of compliance pending appeal. In short, the May 21st order qualifies as an order granting an injunction; thus, this court has jurisdiction pursuant to *28 U.S.C. § 1292(a)(1)*, and Russell's motion to dismiss for lack of jurisdiction is denied.

[2] As mentioned in Footnote 1, this court previously granted MDOC's motion for a stay of the injunctive relief pending appeal. On March 31, 2004, Russell filed a motion to lift that stay. Due to the filing of this opinion, the stay pending appeal is vacated and Russell's motion to lift the stay is denied as moot.

findings of fact and conclusions of law in which the court found that a number of the conditions alleged by Russell violated the *Eighth Amendment's* prohibition against cruel and unusual punishment. That same day, the court also issued a "Final Judgment" in which it mandated that MDOC comply with injunctive relief designed to alleviate those conditions. MDOC **[\*\*4]** timely appealed. The trial court denied MDOC's motion for a stay pending appeal. MDOC then filed a motion for stay pending appeal with this court; we granted MDOC's motion.

ANALYSIS

Should this case be dismissed because it was not brought in accordance with the *Gates v. Collier* class action framework?

MDOC first argues that this case should have been brought under the **[\*328]** framework for enforcing injunctive relief on the Mississippi prison system provided by *Gates v. Collier, 501 F.2d 1291 (5th Cir 1974)*. MDOC bases this argument on this court's decision in *Gillespie v. Crawford, 858 F.2d 1101 (5th Cir 1998)*. The plaintiff in *Gillespie* attempted to bring suit in federal district court challenging prison conditions in Texas state prison. At that time, a separate district court still retained jurisdiction over *Ruiz v. Estelle, 503 F. Supp. 1265 (S.D. Tex. 1980)*, a class action that successfully challenged unconstitutional Texas prison conditions, to monitor the prison system until the injunctions issued in *Ruiz* had been met. *See Gillespie, 858 F.2d at 1102*. The *Gillespie* court stated:

> Separate **[\*\*5]** individual suits may not be maintained for equitable relief from

allegedly unconstitutional Texas prison conditions. To allow individual suits would interfere with the orderly administration of the class action and risk inconsistent adjudications. Individual members of the class and other prisoners may assert any equitable or declaratory claims they have, but they must do so by urging further action through the class representative and attorney, including contempt proceedings, or by intervention in the class action.

*Id. at 1103*.

*Gates* involved alleged constitutional deficiencies in the Mississippi prison system, and in 1998, after twenty-five years of oversight, the District Court for the Northern District of Mississippi finally dismissed the action from its inactive docket as to state-owned, state-operated, and private-company-contracted facilities (not as to county facilities), complimenting the state on its compliance with prior orders. No. GC-71-6. The court stated:

This dismissal shall be without prejudice for the plaintiffs, through counsel, to petition the Court to reopen the case or a portion thereof in order to enforce, amend, or seek **[\*\*6]** additional injunctive relief. … This dismissal shall not apply to any order of the court with respect to the payment of attorneys fees and costs/expenses to plaintiffs' counsel, who shall, post-dismissal, continue to monitor compliance in state-owned, state-operated, and private-company-contracted facilities…. The court finds and concludes that the rule of [*Gillespie*] will continue to apply in this

case with respect to prisoners in state-owned, state-operated, and private-company-contracted facilities, and the court will continue to forward such prisoner petitions to plaintiffs' class counsel.

No. GC-71-6. Thus, in writing this dismissal order for *Gates*, the court apparently assumed that *Gates* was the sole vehicle for future prisoner complaints. Although Russell argues that the court only intended *Gates* as an option for seeking future equitable relief, the court's invoking the rule of *Gillespie* indicates that it was meant to be the sole vehicle.

But it does not appear that the reasoning of *Gillespie* is applicable here. The *Gillespie* court justified its rule as follows:

Permitting multiple courts to entertain equitable claims and issue **[\*\*7]** decrees that might affect the Texas prison system would require other courts to become familiar with the *Ruiz* decree, the current problems of the Texas prison system, and the possible disruptive effect of the exercise of equitable powers over matters covered by the *Ruiz* decree. Moreover, if separate suits for equitable relief are filed in other districts than that in which *Ruiz* is pending, even with respect to problems not encompassed by the relief granted in *Ruiz*, the court's orders may hobble the effect of the *Ruiz* court's continuing decree over the Texas **[\*329]** prison system and its power both to enforce and to modify that decree.

*Id. at 1103*. As this passage illustrates, the *Gillespie* court was concerned with

avoiding the inefficiency of a situation in which multiple courts would be forced to familiarize themselves with the problems of the Texas prison system. Similarly, the court was concerned with the increased confusion and decreased effectiveness that would likely arise if multiple district courts were simultaneously exercising equitable powers over the state prison system.

In the present case, the district court judge who was the **[**8]** author of the *Gates* dismissal order assigned this case to this magistrate judge in light of this magistrate's previous experience with *Gates*. Thus, we are not here faced with either the problem of a new district court being forced to get up to speed on the factually-intensive problems of the state prison system or with the problem of multiple district courts simultaneously exercising equitable powers over the prison system. Additionally, the magistrate judge purported to consolidate this case with *Gates* after certifying the death row inmates as a subclass of *Gates*. MDOC argues that this is not sufficient, citing cases stating that "consolidation does not merge [multiple] suits into a single cause." *See, e.g., Johnson v. Manhattan R. Co., 289 U.S. 479, 77 L. Ed. 1331, 53 S. Ct. 721 (1933)*. Nevertheless, because of the consolidation and because the same judge has jurisdiction over the present action and *Gates*, the problems addressed by the *Gillespie* court are not present here.

MDOC points out that the *Gates* class counsel and class representative are not being utilized. But MDOC does not articulate what difference that makes, and we find it to be of no **[**9]** import. In fact,

this court has already recognized that it may be proper for different counsel to represent a *Gates* subclass. *See Gates v. Cook, 234 F.3d 221, 227-30 (5th Cir 2000)* (reversing the district court's denial of a motion for substitution of counsel by a *Gates* subclass comprised of HIV-positive prisoners in the Mississippi prison system). Because this case was dealt with by the same court and judge who dealt with *Gates* and was consolidated with *Gates*, the concerns behind *Gillespie* are not present here and there is thus not any reason to dismiss this case.

Should this case have been dismissed because of the class members' alleged failure to exhaust administrative remedies?

MDOC argues that the judgment should be vacated and the case dismissed because the trial court did not require all of the inmates who are members of the present class to exhaust their administrative remedies. The plaintiffs respond that the named plaintiff, Russell, did exhaust his administrative remedies, and that no more is required. MDOC disputes the plaintiffs' contention that Russell exhausted his administrative remedies.

**[**10]**   **HN1[↑]**   The Prison Litigation Reform Act ("PLRA") mandates that "no action shall be brought with respect to prison conditions … by a prisoner … until such administrative remedies as are available are exhausted." *42 U.S.C.A. § 1997e(a)*. The Supreme Court has held that "the PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes." *Porter v. Nussle, 534 U.S. 516, 532, 152 L. Ed. 2d 12, 122 S. Ct. 983 (2002)*. The

Court made clear that exhaustion is now mandatory. *Id. at 524*. This court has held that the available administrative remedy must be pursued to its conclusion. *Wright v. Hollingsworth, 260 F.3d 357 (5th Cir 2001)*. Thus, if the plaintiffs did not exhaust administrative **[*330]** remedies, this suit should be dismissed.

The trial court found that Russell was the only class member who had completed the MDOC Administrative Remedy Program ("ARP"). If true, this is enough to satisfy the requirement for the class. *See, e.g., Oatis v. Crown Zellerbach Corp., 398 F.2d 496, 498-99 (5th Cir. 1968)* **HN2**[↑] (exhaustion of remedies requirement satisfied for class action if named **[**11]** plaintiff representing class exhausted remedies); 7A CHARLES ALAN WRIGHT, ARTHUR R. MILLER & MARY KAY KANE, FEDERAL PRACTICE AND PROCEDURE: CIVIL 2d § 1776 (2d ed. 1986) ("When prospective relief is the primary remedy being sought, a representative who has exhausted his administrative remedies may bring a class suit on behalf of those who have not done so."). Thus, if Russell completed the ARP, exhausting administrative remedies, this case was ripe for adjudication. Again, the trial court found that Russell had completed the ARP and that the record adequately reflected Russell's and his counsel's steps taken through the administrative remedy process. MDOC disagrees.

MDOC maintains that the ARP is a three-step process: 1) the inmate writes a letter [3] to the Superintendent/Deputy

Commissioner in care of the Legal Claims Adjudicator that is referred to a respondent by the Legal Claims Adjudicator; 2) if dissatisfied, the inmate may request relief from the Superintendent/Deputy Commissioner; 3) if dissatisfied, the inmate may appeal to the Commissioner in care of the ARP Administrator. The Commissioner will notify the inmate of his final decision within forty days of receiving the appeal. **[**12]** If a request is rejected for technical reasons or matters of form, the inmate is given five days from the date of rejection to file a corrected grievance. The ARP also provides that "no more than ninety (90) days from initiation to completion of the process shall elapse, unless an extension has been granted" and that "expiration of response time limits without receipt of a written response shall entitle the offender to move on to the next step in the process." [4]

**[**13]** The ARP rules also provide that an inmate may make a request for emergency review by sending an emergency request to the Legal Adjudicator "to determine to what level the grievance must be forwarded if substantive actions must occur. The request shall be handled as expeditiously as possible, and shall be reviewed at the Commissioner's level by the Commissioner or his designee." The emergency review procedures further provide that, if the grievance is ruled not to

_____

[3] The ARP rules indicate that the letter should state that it is a request for an administrative remedy and should present as many facts as possible.

[4] Although no part of the ARP rules provide for a certificate of completion, MDOC asserts that the inmate receives a certificate of completion upon finishing the ARP. Under the prior version of *section 1997e*, before its amendment in 1996, the administrative remedy was required to be certified. *42 U.S.C. § 1997e(a)(2) (1994)* (amended 1996). The 1994 district court order certifying the ARP under the prior version of the statute required inmates to complete the procedure and to attach a certificate to that effect to their complaint.

be an emergency, it "may be resubmitted as a regular grievance" and that "abuse of the emergency review process … shall be treated as a frivolous or malicious request." The emergency review procedure thus expedites the review process in certain situations so that the request can be dealt with expediently at the Commissioner's level. [5] The ARP [*331] does not provide a definitive end for the emergency review procedure, but, as the emergency review procedure facilitates quicker review at the Commissioner's level, it follows that the requirement that the Commissioner provide a written answer within forty days of receiving the complaint likewise applies to the emergency review procedure.

[**14] Russell maintains that he exhausted his administrative remedies by utilizing the emergency review process. On January 31, 2002, Russell's counsel delivered to MDOC Commissioner Johnson a document titled "Emergency Request by Inmate Willie C. Russell for an Administrative Remedy Concerning Conditions on Death Row," complaining of the conditions at issue here and requesting a meeting to discuss these problems in an effort to avoid litigation. [6] On March 8, before a March 12 meeting with Commissioner Johnson, Russell's counsel sent the Commissioner a memorandum, outlining the complained of conditions on Death Row in greater detail.

[**15] On April 1, Russell's counsel sent a third letter to Commissioner Johnson referencing the original emergency request for an administrative remedy. This letter noted that Commissioner Johnson had agreed to remedy such conditions, if they existed, at the March 12 meeting. It further asked MDOC to respond by May 1 so as to inform Russell whether it would be able to make the necessary repairs by June 1. On April 15, Johnson sent a letter to Russell's counsel asserting that Russell's concerns regarding ventilation (heat) had been addressed by simply drilling some holes in the metal sheet on his cell door and that the concerns regarding sanitation and pest control were unwarranted. On June 14, Russell's counsel sent Johnson a final letter reiterating Russell's complaints and

---

[5] MDOC argues that the emergency request procedure only provides a mechanism for temporary relief and does not excuse an inmate from pursuing relief through the three-step ARP process. Thus, MDOC maintains that Russell did not exhaust administrative remedies because, in addition to utilizing the emergency relief process, he did not complete the three-step process culminating in a certificate of completion.

But MDOC's contention is simply not supported by the language of the policy outlining the ARP process. The portion of that policy detailing the procedure for emergency relief requests does not indicate that the inmate must simultaneously proceed through the three-step process. In fact, it refers to the regular grievance process only as an alternative when an emergency request has been deemed to be a non-emergency. MDOC never rejected the emergency request nor advised Russell to resubmit it as a regular grievance. The policy does not indicate that the emergency request procedure is simply designed to provide stop-gap measures while the request proceeds through the normal administrative procedures. The most natural reading of the policy leads to the conclusion that the emergency request procedure simply expedites the administrative process by allowing the request to be reviewed at the Commissioner's level without having to proceed through the entire three-step process in limited circumstances.

[6] Although the form was submitted directly to Commissioner Johnson instead of being sent through the Legal Adjudicator, MDOC never rejected the request for technical reasons or for matters of form. To the contrary, as discussed below, MDOC addressed the substance of Russell's request, albeit with some delay. As MDOC ignored this technical defect but instead addressed Russell's request at the administrative level and denied it for matters of substance, it cannot now claim that Russell failed to exhaust based on this technical defect. Cf. Wendell v. Asher, 162 F.3d 887, 890 (5th Cir. 1998) (stating that the exhaustion requirement imposed by the PLRA is subject to the defenses of waiver and estoppel).

disputing Johnson's April 15th denial of the accuracy of the inmates' claims; Commissioner Johnson never responded. Throughout these negotiations, MDOC never rejected the emergency request on technical grounds or for matters of form nor advised Russell to resubmit it as a **[*332]** regular grievance. On the contrary, MDOC addressed Russell's core concerns by simply disagreeing with Russell's characterization of the conditions **[**16]** on Death Row.

We agree with the trial court that Russell concluded the ARP and thus exhausted administrative remedies. Initially, MDOC failed to comply with ARP procedures by failing to deal with Russell's complaint within the time limits provided by the ARP. Over ninety days expired between the time that Russell initiated the process, and the time he finally filed suit, and Commissioner Johnson did not provide a written response to Russell's complaint within the forty day period. *HN3*[↑] Available administrative remedies are exhausted in compliance with the PLRA when the time limits for the prison's response set forth in the prison grievance procedures have expired. *Underwood v. Wilson, 151 F.3d 292, 295 (5th Cir. 1998)*. Similarly, per the terms of the ARP, Commissioner Johnson's failure to provide a written response to Russell's complaint within the forty day period entitled Russell to "move on to the next step in the process." As review at the Commissioner's level constitutes the final step in the process, Russell was then entitled to file suit. Finally, even if MDOC was allowed to unduly delay the administrative process in violation of the terms of the ARP by failing to **[**17]** provide an answer from Commissioner

Johnson within the forty day period, the April 15th letter denied that relief was warranted, effecting a rejection of the claim. That letter thus terminated the administrative process, as evidenced by Commissioner Johnson's refusal to respond to any further communications regarding these complaints. We agree with trial court's conclusion that Russell completed the ARP by utilizing the procedure for emergency review. Thus, Russell, and by extension the plaintiffs, properly exhausted administrative remedies.

**Should the injunctions be vacated on the grounds that they are not justified by conditions constituting cruel and unusual punishment in violation of the *Eighth Amendment***

*The *Eighth Amendment* Standard*

MDOC argues that none of the provisions of the injunctive decree were warranted by conditions constituting *Eighth Amendment* violations. *HN4*[↑] The *Eighth Amendment* dictates that cruel and unusual punishment shall not be inflicted, *U.S. CONST. amend. VIII*, and it is applicable to the States by reason of the *Due Process Clause of the Fourteenth Amendment*. *Robinson v. California, 370 U.S. 660, 675, 8 L. Ed. 2d 758, 82 S. Ct. 1417 (1962).* **[**18]** The treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the *Eighth Amendment*. *Helling v. McKinney, 509 U.S. 25, 31, 125 L. Ed. 2d 22, 113 S. Ct. 2475 (1993)*.

The Constitution does not mandate comfortable prisons, but neither does it permit inhumane ones. *Farmer v. Brennan,*

376 F.3d 323, *332; 2004 U.S. App. LEXIS 13890, **18

*511 U.S. 825, 832, 128 L. Ed. 2d 811, 114 S. Ct. 1970 (1994)*. Prison officials must provide humane conditions of confinement; they must ensure that inmates receive adequate food, clothing, shelter, and medical care, and must take reasonable measure to ensure the safety of the inmates. *Id*. This circuit has worded the test as requiring extreme deprivation of any "minimal civilized measure of life's necessities." *Davis v. Scott, 157 F.3d 1003, 1006 (5th Cir 1998)*. Further, mental health needs are no less serious than physical needs. *Partridge v. Two Unknown Police Officers of City of Houston, Texas, 791 F.2d 1182, 1187 (5th. Cir. 1986)*. The Supreme Court has made clear that the standards against which a **[*333]** court measures prison conditions are "the evolving standards of decency that mark the progress of a maturing society" **[**19]** and not the standards in effect during the time of the drafting of the *Eighth Amendment*. *Estelle v. Gamble, 429 U.S. 97, 102, 50 L. Ed. 2d 251, 97 S. Ct. 285 (1976)* (internal quotation omitted).

*HN5*[↑] A prison official has violated the *Eighth Amendment* when he 1) shows a subjective deliberate indifference to 2) conditions posing a substantial risk of serious harm to the inmate. *Farmer, 511 U.S. at 833-34*. Whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence, and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious. *Id. at 842*.

Conditions of confinement may establish an *Eighth Amendment* violation "in combination" when each would not do so alone, but only when they have a mutually enforcing effect that produces the deprivation of a single, identifiable human need such as food, warmth, or exercise -- for example, a low cell temperature at night combined with a failure to issue blankets. *Wilson v. Seiter, 501 U.S. 294, 304, 115 L. Ed. 2d 271, 111 S. Ct. 2321 (1991).* **[**20]** The Supreme Court has noted that "the length of confinement cannot be ignored…. A filthy, overcrowded cell … might be tolerable for a few days and intolerably cruel for weeks or months." *Hutto v. Finney, 437 U.S. 678, 686-87, 57 L. Ed. 2d 522, 98 S. Ct. 2565 (1978)*. It is also important to note that the inmate need not show that death or serious illness has occurred. *Helling, 509 U.S. at 32* ("It would be odd to deny an injunction to inmates who plainly proved an unsafe, life-threatening condition in their prison on the ground that nothing yet had happened to them.").

*Standard of Review*

MDOC argues that many of the trial court's findings of fact were clearly erroneous. *HN6*[↑] In reviewing the factual findings, this court employs a "clearly erroneous" standard. *Alberti v. Klevenhagen, 790 F.2d 1220, 1224 (5th Cir 1986)*. A finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed. *Id. HN7*[↑] Whether the official showed a deliberate indifference to the condition is a factual finding that is reviewed under a **[**21]** "clearly

376 F.3d 323, *333; 2004 U.S. App. LEXIS 13890, **21

erroneous" standard. *Brice v. Virginia Beach Correctional Ctr., 58 F.3d 101, 105 (4th Cir. 1995)*. Once the facts are established, the issue of whether the facts constitute a constitutional violation is a question of law to be reviewed *de novo Alberti, 790 F.2d at 1224*. If a constitutional violation is found, we employ an abuse of discretion standard in reviewing the equitable remedy itself. *Swann v. Charlotte-Mecklenburg Bd. of Educ., 402 U.S. 1, 15-16, 28 L. Ed. 2d 554, 91 S. Ct. 1267 (1971)*.

### The Trial Court's Factual Findings

The trial court made the following findings of fact, *inter alia*, as to the conditions on Parchman's Death Row.

### Sanitation

Inmates have been subjected to cells that were extremely filthy with chipped, peeling paint, dried fecal matter and food encrusted on the walls, ceilings, and bars, as well as water from flooded toilets and rain leaks. Inmates are routinely moved from cell to cell and are forced to clean their new cells that may have been left in horrendous sanitation by the prior occupants, **[*334]** especially if the occupant were mentally ill. Adequate cleaning supplies and equipment are not routinely made available **[**22]** for inmates to clean their cells. These filthy conditions contribute to the infestation of pests and play a role in the mental well-being of inmates. *Russell v. Johnson, 2003 U.S. Dist. LEXIS 8576 at *4-5 (N.D. Miss.)*.

### Heating and Cooling

The summer temperatures in the Mississippi Delta average in the nineties with high humidity, and Death Row is primarily not an air-conditioned facility. There are industrial type fans in the hallways to help with air circulation, and most inmates have smaller fans. Relief from the heat can be obtained by keeping the windows open in the cell using fans. But keeping the windows open increases the mosquito population in the cells since there are holes in the cell window screens and the screen gauge is not sufficient to keep mosquitoes out. The ambient temperature in the cells is within reasonable limits except during the summer months. The ventilation is inadequate to afford prisoners a minimal level of comfort during the summer months. The probability of heat-related illness is extreme on Death Row, and is dramatically more so for mentally ill inmates who often do not take appropriate behavioral steps to deal with the heat. Also, **[**23]** the medications often given to deal with various medical problems interfere with the body's ability to maintain a normal temperature. The inmates are not afforded extra showers, ice water, or fans if they don't have fans when the heat index is 90 or above. The heat problem extends to all of Death Row and possibly throughout Parchman. *Id. at *5-7*.

### Pest Control

The heat problem also exacerbates the problem of pest control. Mosquitoes in Mississippi, and the Delta in particular, are a problem that cannot be eliminated. But

the problem must be addressed and the impact lessened, especially with the incidence of West Nile virus, a mosquito-born disease increasing in Mississippi. Inadequate screening on the cell windows causes the inmates to choose between suffering from the heat or increasing the mosquitoes in their cells. The problems of heat and mosquitoes must be addressed to provide the inmates with conditions that would meet minimal constitutional standards. The problem of roaches and other vermin will be met by adhering to the ACA standards and by meeting the sanitation goals the court will set. *Id. at *7*.

### "Ping-Pong" Toilets and Plumbing

Fecal and other matter flushed **[**24]** by a toilet in one cell will bubble up in the adjoining cell unless the toilets are flushed simultaneously. This has been a problem since the unit opened. Parchman officials have identified the problem as one of calibration, especially if the water is shut off. The toilets must be recalibrated to work properly. Recalibration has helped, but not eliminated, the problem of ping-pong toilets. No one in civilized society should be forced to live under conditions that force exposure to another person's bodily wastes. The showers, water temperature, and quality of water are adequate. *Id. at *7-8*.

### Lighting

The lighting in the cells is grossly inadequate. While 20 foot-candles [7] is the

appropriate **[*335]** level of lighting for the cells, the maximum foot-candles measured by Russell's expert was seven or eight, with the typical cell being in the 2-4 foot-candle range. *Id. at *9-10*.

**[**25]** *Preventive Maintenance Program*

The preventive maintenance program instituted by MDOC appears to be adequate, although it should be in writing. *Id. at *10*.

### Laundry

The inmates' laundry is returned foul-smelling, necessitating the inmates to wash their clothes in their cells. The inmates are entitled to laundry that is clean and not foul-smelling. *Id.*

### Mental Health Issues

At least six severely psychotic prisoners are housed on Death Row, and many more are diagnosed with quantifiable mental health problems. The extremely psychotic prisoners scream at night, throw feces, and generally make life miserable for the other inmates and guards. As stated by Dr. Kupers, a psychiatry professor and expert for Russell, "it boils down to warehousing people with severe mental illness … some are medicated, but there is essentially no other mental health services." The mental health care afforded the inmates on Death Row is grossly inadequate. The isolation of Death Row, along with the inmates' pending sentences of death and the conditions on Death Row are enough to

---

[7] A foot-candle is "[a] unit of measure of the intensity of light falling on a surface, equal to one lumens per square foot and originally defined with reference to a standardized candle burning at one foot from a given surface." THE AMERICAN

HERITAGE COLLEGE DICTIONARY 530 (3rd ed. 1993).

weaken even the strongest individual. What mental health services are provided generally take place at the inmate's **[\*\*26]** cell within hearing of other inmates and guards. This results in the failure of inmates to tell the mental health specialists anything of substance. Moreover, comprehensive mental health evaluations are consistently inadequate. Inmates are also prescribed psychotropic drugs with only sporadic monitoring. This can result in life-threatening situations due to the toxicity of these drugs. Appropriate treatment of mentally ill inmates will in turn help address the issues of excessive noise and sanitation problems caused by severely psychotic inmates. *Id. at \*11-12*.

## Exercise

Proper exercise is advantageous for mental health and well-being. The exercise facilities provided are adequate. While, in general, the use of "flip-flops" is understandable as a security measure, such shoes do not allow effective exercise. The inmates should be given access to sneakers prior to entering the exercise pen and should be given access to water and shade while exercising. *Id. at 12*.

## The Trial Court's Conclusions of Law

The court concluded that the conditions identified in the court's findings of fact constituted *Eighth Amendment* violations because they posed a substantial risk of harm **[\*\*27]** to the inmates' health and, based on the obvious nature of these risks, the prison officials showed a deliberate indifference to such harm.

## Injunctive Relief Entered by the Trial Court

The court directed the following remedial actions.

1. If defendants wish to continue the practice of moving inmates from cell to cell in Unit 32-C, they will insure that the cell to which an inmate is moved is clean prior to the move. While an inmate should be required to keep his own cell clean, he should not be required to clean the cell of another inmate in order to inhabit it.

2. Adequate cleaning supplies and equipment shall be provided inmates in **[\*336]** order that they may clean their cells at least weekly.

3. A general preventive maintenance schedule and program shall be reduced to writing within 60 days of this order.

4. Defendants shall take the necessary measurements in the unit in order to determine the heat index on the individual tiers. These measurements shall be taken daily at 10:00 a.m., 1:00 p.m., 4:00 p.m., and 7:00 p.m. during the months of May through September and at 1:00 p.m. in all other months. If the heat index reaches 90 degrees or above, the defendants **[\*\*28]** will insure that each cell is equipped with a fan, that ice water is available to each inmate, and that each inmate may take one shower during each day when the heat index is 90 degrees or above. As an alternative, the defendants may provide fans, ice water, and daily showers during the months of May through September. This remedy shall apply to all of Unit 32.

5. The defendants shall continue their efforts at mosquito eradication and pest

control. The defendants shall also insure that all cell windows are repaired and screened with 18 gauge window screen or better. This remedy shall apply to all of Unit 32.

6. The defendants shall insure that the problem of "ping-pong" toilets in Unit 32 as a whole is addressed. The defendants shall provide to the court within 60 days the details of a plan to eradicate this problem. The court is not convinced that recalibration is sufficient, but will await the defendants' report on their plan.

7. The defendants shall also upgrade the lighting in Unit 32 as a whole to provide lighting in each cell equal to 20 foot-candles.

8. The defendants shall insure that the proper chemical agents are used at the laundry so that inmates' laundry **[\*\*29]** is returned clean and without a foul smell.

9. The defendants shall insure that the new vendor for medical services complies with the ACA and the National Commission on Correctional Healthcare medical and mental health standards. Each inmate on Death Row shall be given a comprehensive mental health examination in private. These comprehensive examinations shall be conducted on a yearly basis. Those inmates diagnosed with psychosis and severe mental health illnesses shall be housed separately and apart from all other inmates. The medication levels of all inmates receiving psycotropic medications shall be monitored and assessed in accordance with appropriate medical standards. All inmates receiving mental health counseling or evaluation shall meet with the mental health professionals in a private setting.

10. The inmates on Unit 32-C shall continue to receive the opportunity to exercise as currently available. However, the inmates shall be given the opportunity to wear sneakers while exercising if they prefer rather than "flip-flops." A shaded area for exercise shall be provided with access to water.

**[\*\*30]** _Russell v. Johnson, 2003 U.S. Dist. LEXIS 8573 at \*1-4 (N.D. Miss.)_. [8]

**[\*\*31]   [\*337] Is the injunctive relief entered by the trial court justified by conditions in violation of the _Eighth Amendment's_** prohibition against cruel and unusual punishment?

MDOC asserts that, as to several of the injunctions (Injunctions # 2, # 5, # 6, # 7, and # 9), it is already meeting, intending to meet, or attempting to meet the standards enunciated by the trial court. Thus, MDOC argues, the injunctions are not required.

---

[8] MDOC makes a cursory argument that the injunctions must be reversed because the trial court failed to make particularized findings required by the PLRA, _18 U.S.C. § 3626(a)_. There are multiple problems with this argument. The first is that MDOC never presented this argument to the trial court. **HN8[⬆]** This court does not generally review issues raised for the first time on appeal. See, e.g., _Yohey v. Collins, 985 F.2d 222, 225 (5th Cir. 1993)_. Additionally, MDOC cites _Castillo v. Cameron County, 238 F.3d 339, 351 (5th Cir. 2001)_, for the proposition that a court must make particularized findings, on a provision-by-provision basis, that each injunction is narrowly drawn, goes no further than necessary to correct the violation, and is the least intrusive means of correcting the violation. But MDOC's reliance on _Castillo_ is misplaced. _Castillo_ requires such findings to be made when the district court holds that prior injunctive relief should not be terminated, relying on _section 3626(b)(3)_. _Id. at 351-54_. _Section 3626(b)(3)_ on its face requires such written findings. Conversely, _section 3626(a)(1)_, which applies to prospective relief and is thus applicable here, does not.

But MDOC's assertions that it intends to meet these standards do not suffice to moot the issue. It is well settled that *HN9*[↑] a defendant's voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice. *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc., 528 U.S. 167, 190, 145 L. Ed. 2d 610, 120 S. Ct. 693 (2000)* (citations omitted). If it did, the courts would be compelled to leave "the defendant . . . free to return to his old ways." *Id.* In accordance with this principle, the standard for determining whether a case has been mooted by the defendant's voluntary conduct is stringent: "A case might become moot if subsequent events made it absolutely clear that the allegedly wrongful **[**32] behavior could not reasonably be expected to recur." *Id.* The "heavy burden of persuading" the court that the challenged conduct cannot reasonably be expected to start up again lies with the party asserting mootness. *Id.* The trial court's citation to *Friends of the Earth* accompanied by its assertion that Russell's claims were not moot indicates that the trial court was not persuaded. The fact that many of these conditions have persisted for years despite MDOC's purported efforts leads us to likewise conclude that MDOC has not met the heavy burden of showing that its voluntary conduct has mooted any of the issues presented here.

Similarly, MDOC also argues, as to several of the injunctions, that Parchman's accreditation by the American Correctional Association ("ACA") is proof that the conditions in question don't violate the *Eighth Amendment*. But it is absurd to suggest that the federal courts should subvert their judgment as to alleged *Eighth Amendment* violations to the ACA whenever it has relevant standards. Additionally, the ACA's limited inspections are not be binding as factual findings on the magistrate or on this court. *HN10*[↑] While compliance with ACA standards may be a relevant **[**33] consideration, it is not *per se* evidence of constitutionality. See *Ruiz v. Johnson, 37 F. Supp. 2d 855 924-25 (S.D. Tex. 1999)* (recognizing the limitations of ACA accreditation and noting situations where it has not equated to constitutionality), *rev'd on other grounds*, *178 F.3d 385*.

MDOC finally argues that none of the injunctions are based on *Eighth Amendment* violations and, thus, that all of the injunctions must be reversed. Using the relevant *Eighth Amendment* standard, we will examine each of the injunctions in turn.

*Injunctions # 1 and # 2*

MDOC argues that the first injunction, which prohibits MDOC from requiring inmates to clean the cells into **[*338]** which they are transferred, cannot stand because there was no proof of any medical injury or illness resulting from this practice. MDOC similarly maintains that the second injunction, which requires that adequate cleaning supplies be provided to the inmates at least weekly, is unsupported by any evidence of medical illness arising from this situation or a showing of deliberate indifference by MDOC officials. MDOC also contends that cleaning supplies are regularly issued to inmates and that the **[**34] cells were clean as of the date of trial.

This court has previously held that **HN11**[↑] filthy cell conditions may constitute an *Eighth Amendment* violation. *See Harper v. Showers, 174 F.3d 716, 720 (5th Cir 1999)*. Other circuits have made similar holdings; the Eighth Circuit has held that a prisoner being placed in a cell covered with filth and human waste for a two-year period without proper cleaning supplies constitutes cruel and unusual punishment. *Howard v. Adkison, 887 F.2d 134, 137 (8th Cir. 1989)* (recognizing that "inmates are entitled to reasonably adequate sanitation, personal hygiene, and laundry privileges, particularly over a lengthy course of time"); *see also McBride v. Deer, 240 F.3d 1287, 1292 (10th Cir. 2001)* (holding that three days in a feces-covered cell states a claim upon which relief could be granted).

Russell points to testimony adduced at the trial court indicating that the cells were "extremely filthy" with crusted fecal matter, urine, dried ejaculate, peeling and chipping paint, and old food particles on the walls. Living in such conditions would present a substantial risk of serious harm to the inmates, and we cannot **[**35]** say that trial court's decision to credit this testimony was clearly erroneous. Also, in light of substantial testimony indicating that such conditions were not atypical and were easily observed, we cannot say that the trial court's conclusion that MDOC officials showed a deliberate indifference to this risk is clearly erroneous. Further, the testimony was conflicting as to the frequency and quality of the provision of cleaning supplies, and we cannot say that the trial court's conclusion to credit testimony supporting the inadequacy of cleaning supplies was clearly erroneous. As living in

such filthy conditions would present the inmates with a risk of serious harm to which MDOC officials have displayed a deliberate indifference, Injunctions # 1 and # 2 were justified by an *Eighth Amendment* violation. They are, therefore, affirmed.

*Injunction # 3*

MDOC challenges the third injunction, which directs MDOC to reduce a general preventive maintenance schedule and program to writing. MDOC argues that there is no evidence supporting the elements required for a finding of cruel and unusual punishment that would support this injunction. Russell responds that "the risks of squalid conditions **[**36]** and the constantly recurring break-down of the water, plumbing, and other operating systems were obvious," and Russell's environmental health and safety expert testified that the same problems would continue to recur if MDOC did not put a written plan in place.

**HN12**[↑] While federal courts can certainly enter injunctions to prevent *Eighth Amendment* violations, they are not to micromanage state prisons. *Bell v. Wolfish, 441 U.S. 520, 562, 60 L. Ed. 2d 447, 99 S. Ct. 1861 (1979)*. The trial court entered injunctions to directly remedy each of the complained-of conditions that rise to the level of an *Eighth Amendment* violation. Russell has cited no case that supports the proposition that the trial court can further affect the internal operations of MDOC by requiring it to produce a writing preventive maintenance **[*339]** program to which it will adhere. The additional requirement of a written preventive maintenance program,

376 F.3d 323, *339; 2004 U.S. App. LEXIS 13890, **36

while desirable, is not independently supported by additional conditions that constitute an *Eighth Amendment* violation, and it cannot stand. Thus, we vacate that injunction.

*Injunction # 4*

The fourth injunction directs MDOC to provide fans, ice water, and daily showers when the heat index is **[**37]** 90 degrees or above, or alternatively to make such provisions during the months of May through September. The injunction also purports to apply to all of Unit 32, as opposed to only Unit 32-C. Initially, it is important to note that the class represented by Russell consists entirely of Parchman's Death Row prisoners, who are housed in Unit 32-C. Thus, to the extent that the injunction purports to apply to parts of Unit 32 beyond Unit 32-C, it exceeds the scope of the litigation and is therefore invalid. *See Thomas v. County of Los Angeles, 978 F.2d 504, 509-10 (9th Cir. 1992)* (reversing an injunction as overbroad when it purported to apply to the entire Los Angeles County Sheriff's Department although the plaintiff's complaint and evidence only applied to one specific station).

MDOC contends that no Unit 32-C inmate has ever suffered any serious heat-related illness. But, as noted above, Russell does not need to show that death or serious illness has yet occurred to obtain relief. He must show that the conditions pose a substantial risk of harm to which MDOC officials have shown a deliberate indifference. Russell presented the court with expert testimony from Dr. **[**38]**

Vassallo [9] that it was "very likely" that, under current conditions on Death Row, an inmate will die of heat stroke or some other heat-related illness. In fact, Dr. Vassallo's testimony indicated that Death Row prisoners had made many complaints of symptoms commonly recognized to be related to heat-related illness and that those conditions had simply gone undiagnosed.

MDOC further cites language from *Woods v. Edwards, 51 F.3d 577 (5th Cir. 1995)*, in which Woods, a prisoner at the Louisiana State Penitentiary at Angola, claimed, *inter alia*, that the conditions **[**39]** in extended lockdown were unconstitutional. Extended lockdown isolates inmates as punishment for disciplinary violations. One of Woods' claims was that the cell used in his extended lockdown was inadequately cooled and that the high temperature aggravated his sinus condition. *Id. at 581*. This court noted that Woods "failed to present medical evidence of any significance." *Id.* This court went on to state: "while the temperature in extended lockdown may be uncomfortable, that alone cannot support a finding that the plaintiff was subjected to cruel and unusual punishment in violation of the *Eighth Amendment*." *Id.* The *Woods* court found that Woods had not presented medical evidence sufficient to state an *Eighth Amendment* violation; *Woods* does not stand for the proposition that extreme heat

[9] Dr. Vassallo is a faculty member of the Department of Surgery and Division of Emergency Medicine at New York University School of Medicine and is a medical toxicologist at the New York Regional Poison Control Center. She has lectured extensively on thermoregulation and hyperthermia (heat illness) and has authored the "Thermoregulatory Principles" chapter of Goldfrank's Toxicologic Emergencies, a textbook on medical toxicology.

can never constitute cruel and unusual punishment. Finally, MDOC points out that the Seventh Circuit has held that one shower a week is sufficient.*Davenport v. De Robertis, 844 F.2d 1310, 1316-17 (7th Cir. 1988)*. **[*340]** But *Davenport* is inapt, as it dealt only with cleanliness while the testimony upon which this injunction rests indicated that cold showers **[**40]** would help alleviate the risk of heat-related illness.

Based on the evidence presented, we cannot say that the trial court's finding that the probability of heat-related illness is extreme at Unit 32-C was clearly erroneous. Thus, this condition presents a substantial risk of serious harm to the inmates. Again, based on the open and obvious nature of these conditions and the evidence that inmates had complained of symptoms of heat-related illness, the trial court's finding regarding MDOC's deliberate indifference is not clearly erroneous. Thus, Injunction # 4 was justified by an *Eighth Amendment* violation, and it is affirmed insofar as it applies to Unit 32-C. [10]

**[**41]** *Injunction # 5*

The fifth injunction requires MDOC to continue its efforts at pest control and, more specifically, to ensure that all cell

windows are repaired and screened with 18 gauge window screen or better. Injunction # 5 purports to apply to all of Unit 32. Initially, like Injunction # 4, to the extent that Injunction # 5 purports to apply to parts of Unit 32 beyond Unit 32-C, it is invalid.

MDOC first argues that there is no basis for a federal court to order MDOC to continue to do what it is already doing. But, as discussed above, the pest infestation problems persist, and MDOC has not met the burden of convincing the trial court or this court that its efforts at pest control have mooted this issue. MDOC also argues that the evidence shows that there were no holes in the screens at the time of trial. But the trial court was presented with testimony that there were cells with holes in the screens, and, in any event, the insufficient gauge on the screens would allow the infestation problem to continue even in absence of holes in the screens.

MDOC argues generally that Russell did not show either a substantial risk of harm to the inmates or deliberate indifference on the **[**42]** part of MDOC officials. But the trial court was presented with testimony that insects swarm in the inmates' food and beds and that the inmates often must choose between opening the window for relief from the heat or closing the window for protection from mosquitoes, as the gauge on the screens is too large to keep out the mosquitoes. It is important to recognize that this injunction is supported by the trial court's findings on heat, as the court noted that the mosquito infestation accompanied by the insufficient screen gauge exacerbated the heat problems by deterring the inmates from opening their

---

[10] In a footnote in its brief, MDOC asserts that the extra showers ordered by the trial court would cause a major prison security problem. Russell replies that no such evidence was presented at trial and, thus, that the trial court should be given the first opportunity to rule on this issue. In their reply brief, MDOC admits that such evidence was only presented to the court as part of MDOC's July 2003 progress report. But only the May 21, 2003, final order of the trial court is currently under review, not any subsequent monitoring of the trial court's injunctive relief. This issue is thus not before us.

windows to increase circulation. In addition to the risk of heat-related illness, the pest infestation problems were linked to chronic sleep deprivation, which exacerbates the symptoms of mental illness. As Injunction # 5, like Injunction # 4, is supported by the constitutional violation stemming from the excessive heat, it is affirmed as to Unit 32-C.

*Injunction # 6*

The sixth injunction requires MDOC to remedy the problem of "ping-pong" **[*341]** toilets. Like Injunctions # 4 and # 5, this injunction is invalid to the extent it purports to apply to parts of Unit 32 outside of Unit 32-C.

MDOC **[**43]** argues that there is no evidence of any serious medical problem stemming from the ping-pong toilets and, further, that in absence of objective evidence of such a problem there can be no finding of deliberate indifference on the part of MDOC officials. MDOC cites *Tokar v. Armontrout, 97 F.3d 1078 (8th Cir. 1996)*, for the proposition that exposure to raw sewage is not cruel and unusual punishment where there has been no demonstration of an adverse medical reaction. But MDOC seriously misconstrues *Tokar*. Tokar complained generally that the prison toilets were "filthy" without specifying how long the toilets remained filthy and while acknowledging that he had not asked for cleaning supplies because cleaning the toilets was the job of other inmates. *Id. at 1081*. The facts of *Tokar* are quite different from the facts presented here, in which inmates have regularly been exposed to each others'

feces for over a decade. In fact, the Eighth Circuit's recognitions that *HN13*[⬆] exposure to waste may constitute cruel and unusual punishment and that the length of time a prisoner must endure unsanitary conditions is undoubtedly a factor in the constitutional calculus, **[**44]** *id. at 1082 n.4*, both weigh in Russell's favor. While evidence of a past medical injury would clearly strengthen Russell's case, Russell does not have to prove a past medical injury. He must prove a substantial risk of serious harm and MDOC officials' deliberate indifference to that harm.

Russell points to expert testimony stating that the situation presented when the feces of one inmate bubbles up in the neighboring cell, exacerbated when the toilets overflow, does constitute a serious health hazard. Russell also presented evidence to the trial court that the Mississippi State Department of Health warned MDOC every year for the past eleven years that the malfunctioning toilets in Unit 32-C are a critical public health problem requiring immediate attention. Additionally, Russell points to several circuit court cases indicating that "courts have been especially cautious about condoning conditions involving exposure to human waste." *Fruit v. Norris, 905 F.2d 1147, 1151 (8th Cir. 1990)*; *see also, e.g., Despain v. Uphoff, 264 F.3d 965, 974 (10th Cir. 2001)* (exposure to human waste "evokes both the health concerns emphasized in *Farmer* **[**45]** and the more general standards of dignity embodied in the *Eighth Amendment*").

MDOC also asserts that there was substantial testimony regarding its

attempts to correct the toilet problem, presumably arguing that this further rebuts a finding of deliberate indifference. As evidence of deliberate indifference, Russell points to the fact that the problems persist despite MDOC officials having been warned that the problem was urgent for more than a decade. Frequent exposure to the waste of other persons can certainly present health hazards that constitute a serious risk of substantial harm. Given the evidence presented to the trial court, we cannot say that the court's factual findings regarding the ping-pong toilets or the MDOC officials' deliberate indifference were clearly erroneous. Thus, this injunction, as applied to Unit 32-C, is affirmed.

### Injunction # 7

This injunction requires MDOC to upgrade the lighting in each cell to the level of twenty foot-candles. This injunction also purports to apply to Unit 32 as a whole and is invalid insofar as it purports to apply beyond Unit 32-C. MDOC argues that the injunction is wholly invalid because MDOC officials were in the process **[*342]** of **[**46]** upgrading cell lighting. As with the sanitation issues, the pest control issues, and the ping-pong toilets, MDOC's assertions that it is working on the problem are inadequate to moot the issue. MDOC also argues that there was no evidence of a substantial risk of serious harm stemming from the admittedly inadequate lighting or of MDOC officials' deliberate indifference to such harm. But the trial court judge apparently credited expert testimony asserting that the lighting in the cells was grossly inadequate for the purposes of

sanitation, personal hygiene, and reading, that this condition also contributes to further mental health deterioration, and that twenty foot-candles was the appropriate minimum level at which these activities could take place. Thus, this injunction is supported by the conditions supporting Injunctions # 1, # 2, and # 9, discussed below, and it is affirmed.

### Injunction # 8

The eighth injunction requires MDOC to return the inmates' laundry clean and without a foul smell. MDOC argues that the prison laundry condition is not sufficiently serious to implicate the *Eighth Amendment*, citing *Green v. Ferrell, 801 F.2d 765, 771 (5th Cir. 1986)*, and **[**47]** similarly that there was no proof of any serious medical harm to any inmate stemming from this condition. The *Green* court reiterated that "jails must provide 'reasonably adequate' sanitation" but overturned the district court's injunction requiring the jail to provide laundry services because the prisoners were provided with laundry detergent that they could use to wash their own clothes in the sink located in their cells. *Id.*

Russell points to testimonial evidence that, unlike the situation in *Green*, the Death Row inmates are not provided with detergent and in fact can be disciplined for doing their own laundry. First, the trial court found that the inmates do in fact wash their own clothes, as conceded by one of MDOC's witnesses, who testified that the inmates wash their own clothes because it is part of "prison culture." This finding was supported by substantial evidence and is

incongruous with the proposition that inmates are disciplined for washing their own clothes. Given that the inmates do wash their own clothes, the only distinction between this case and *Green* is that the prisoners in *Green* were provided with laundry detergent while the Death Row inmates **[**48]** in this case wash their clothes with the bar soap. The difference between laundry detergent and bar soap is not sufficient to distinguish this case from *Green* and thus does not implicate the *Eighth Amendment*. Injunction # 8 is therefore vacated.

*Injunction # 9*

The ninth injunction outlines a number of requirements designed to alleviate some of the problems stemming from the allegedly inadequate mental health care afforded the inmates on Death Row. This injunction requires MDOC to comply with ACA and National Commission on Correctional Healthcare ("NCCH") standards regarding mental health, to give each inmate private, comprehensive mental health examinations on a yearly basis, to monitor and assess the medication levels of inmates receiving psychotropic medications, and to house the inmates with psychosis and severe mental illnesses separately from the other inmates.

MDOC argues that it was already in compliance with ACA standards and, somewhat contradictorily, that MDOC has already begun the process of selecting a new medical vendor that would comply with ACA and NCCH standards. Once again, MDOC's assertion that it was already on the path towards compliance is **[*343]** insufficient **[**49]** to moot the

issue. Further, the injunction does not require only ACA compliance. In any event, MDOC's assertion that it is already in compliance with ACA and NCCH standards is incongruous with the trial court's findings, including the statement that "the mental health care afforded the inmates on Death Row is grossly inadequate." These findings were based on substantial testimony adduced at trial and apparently credited by the trial court. For example, Russell produced evidence that the isolation and idleness of Death Row combined with the squalor, poor hygiene, temperature, and noise of extremely psychotic prisoners create an environment "toxic" to the prisoners' mental health. There was also evidence that the severely psychotic prisoners smear garbage and excrement in their cells, scream all night, and flood the tiers. This contributes to the problems of uncleanliness and sleep deprivation, and by extension mental health problems, for the other inmates. There was also testimony that prisoners seldom see medical staff and that monitoring of medication was sporadic, with prisoners potentially being prescribed the wrong medication or no medication for long periods of time, potentially **[**50]** leading to extremely dangerous physical side effects or psychotic breakdowns.

MDOC also points out that two inmates have refused psychiatric medication so as to remain incompetent for execution. But this does not refute the trial court's findings that the mental health care afforded to inmates on Death Row is grossly inadequate. MDOC is only obligated to make adequate mental health care available for all Death Row inmates. The fact that some inmates may refuse to take

advantage of such treatment so as to avoid execution is irrelevant to whether MDOC is meeting its obligation of complying with constitutional standards.

MDOC further argues that there was no demonstration of deliberate indifference to any serious mental or medical problem stemming from insufficient mental health care. In analyzing this argument, it is important to remember that mental health needs are no less serious than physical needs. *Partridge v. Two Unknown Police Officers of City of Houston, Texas, 791 F.2d 1182, 1187 (5th Cir. 1986)*. This court has previously held that an inmate stated a nonfrivolous claim in complaining that he was placed in cells next to psychiatric patients who scream, beat **[**51]** on metal toilets, short out the power, flood the cells, throw feces, and light fires, resulting in his loss of sleep for days at a time.*Harper v. Showers, 174 F.3d 716, 720 (5th Cir. 1999)*. The trial court's findings indicate that the inmates are subjected to substantial risk of serious harm based on the mental health conditions on Death Row, and, based on the evidence presented to the trial court, we cannot conclude that the court's credibility determinations and factual findings are clearly erroneous. We agree that the conditions of inadequate mental health care, as found by the trial court, do present a risk of serious harm to the inmates mental and physical health. Again, the obvious and pervasive nature of these conditions supports the trial court's conclusion that MDOC officials displayed a deliberate indifference to these conditions. Thus, this injunction was justified by an *Eighth Amendment* violation and is affirmed.

*Injunction # 10*

The tenth injunction requires MDOC to allow the inmates to wear sneakers instead of flip-flops while exercising and to provide the inmates with a shaded area for exercise and access to water. MDOC argues that this is impermissible **[**52]** micromanagement of state prison operations **[*344]** and that no evidence was presented establishing a constitutional violation. The evidence shows that inmates are allowed an hour of exercise four or five days a week. The evidence also shows that shoes and boots were replaced with flip flops because the inmates used the boots and shoes to kick other inmates and to throw at MDOC staff, and because the flip flops make escape more difficult. In fact, the trial court stated that it understood "the use of 'flip-flops' as general footwear as a security measure."

Russell argues that the flip-flops make it difficult or impossible to exercise vigorously. But there is no support for the proposition that exercising in flip-flops constitutes cruel and unusual punishment. Nor is there any support for the proposition that an hour of outdoor exercise without water or shade constitutes cruel and unusual punishment. While exercise is certainly beneficial to physical and mental health, we find that the provisions for exercise made by MDOC are appropriate and that the tenth injunction is not justified by conditions in violation of the *Eighth Amendment*. Thus, the tenth injunction is vacated.

**CONCLUSION**

**[**53]** Injunctions # 3, 8, and 10 are

vacated in their entirety. Injunctions # 4, 5, 6, and 7 are vacated to the extent they purport to apply to portions of Unit 32 beyond Unit 32-C. The remainder of the injunctive relief is AFFIRMED.

---

**End of Document**

 Caution
As of: August 29, 2023 8:59 PM Z

# *Ball v. LeBlanc*

United States Court of Appeals for the Fifth Circuit

July 8, 2015, Filed

No. 14-30067

**Reporter**

792 F.3d 584 *; 2015 U.S. App. LEXIS 11769 **

ELZIE BALL; NATHANIEL CODE; JAMES MAGEE, Plaintiffs - Appellees Cross-Appellants v. JAMES M. LEBLANC, SECRETARY, DEPARTMENT OF PUBLIC SAFETY AND CORRECTIONS; BURL CAIN, WARDEN, LOUISIANA STATE PENITENTIARY; ANGELA NORWOOD, Warden of Death Row; LOUISIANA DEPARTMENT OF PUBLIC SAFETY AND CORRECTIONS, Defendants - Appellants Cross-Appellees

**Subsequent History:** Costs and fees proceeding at, Motion granted by, in part, Motion denied by, in part, On remand at *Ball v. LeBlanc, 2015 U.S. Dist. LEXIS 94513 (M.D. La., July 17, 2015)*

Motion granted by, in part, Motion denied by, in part *Ball v. LeBlanc, 2015 U.S. Dist. LEXIS 133875 (M.D. La., Sept. 30, 2015)*

Costs and fees proceeding at, Motion granted by, in part, Motion denied by, in part, Sanctions disallowed by *Ball v. LeBlanc, 2015 U.S. Dist. LEXIS 133874 (M.D. La., Sept. 30, 2015)*

Motion granted by, in part, Motion denied by, in part, Injunction granted at *Ball v. LeBlanc, 223 F. Supp. 3d 529, 2016 U.S. Dist. LEXIS 177911 (M.D. La., Dec. 22, 2016)*

Motion granted by *Ball v. LeBlanc, 2017 U.S. Dist. LEXIS 69336 (M.D. La., May 5, 2017)*

Magistrate's recommendation at *Ball v. LeBlanc, 2017 U.S. Dist. LEXIS 211311 (M.D. La., June 23, 2017)*

**Prior History: [**1]** Appeals from the United States District Court for the Middle District of Louisiana.

*Ball v. Leblanc, 988 F. Supp. 2d 639, 2013 U.S. Dist. LEXIS 178557 (M.D. La., Dec. 19, 2013)*

## Core Terms

heat, district court, inmates, injunction, tiers, cells, disabled, temperature, conditions, substantial risk, air conditioning, deliberate indifference, serious harm, major life activity, heat-related, violates, blood, fans, body temperature, disability claim, prison official, death row, prison, judicial notice, Plaintiffs', ailments, housing, install, injunctive relief, hypertension

## Case Summary

### Overview

Jodi Cole

792 F.3d 584, *584; 2015 U.S. App. LEXIS 11769, **1

HOLDINGS: [1]-Housing three death-row inmates in very hot cells without sufficient access to heat-relief measures, while knowing that each suffered from conditions that rendered him extremely vulnerable to serious heat-related injury, violated the *Eighth Amendment*; [2]-The inmates' accommodation claims under the Americans with Disabilities Act and the Rehabilitation Act failed because there was no evidence that they were disabled since there was no evidence that their thermoregulatory systems were actually impaired; [3]-The district court's injunction violated the Prison Litigation Reform Act because the district court ordered a type of relief, air conditioning, that was unnecessary to correct the *Eighth Amendment* violation, and the district court awarded relief facility-wide, instead of limiting such relief to the three plaintiffs.

**Outcome**
Affirmed in part, injunction vacated, and case remanded.

## LexisNexis® Headnotes

Civil Procedure > Appeals > Standards of Review > Abuse of Discretion

Evidence > Burdens of Proof > Allocation

Civil Procedure > ... > Standards of Review > Harmless & Invited Errors > Harmless Error Rule

*HN1*[⬇] **Standards of Review, Abuse of Discretion**

An appellate court reviews evidentiary rulings for abuse of discretion. Even if the court abused its discretion, the appellate court will presume the error is harmless. *Fed. R. Civ. P. 61*. The party asserting the error has the burden of proving that the error was prejudicial.

Evidence > Judicial Notice > General Overview

*HN2*[⬇] **Evidence, Judicial Notice**

*Fed. R. Evid. 201* expressly contemplates courts' taking judicial notice without prior warning. *Fed. R. Evid. 201(e)*. If the court takes judicial notice before notifying a party, the party, on request, is still entitled to be heard. *Fed. R. Evid. 201(e)*. *Rule 201* does not require any notice to the parties that judicial notice is about to be taken, and a party might get no advance notice at all. The Rule's provision requires the court to provide an opportunity to be heard. *Fed. R. Evid. 201(e)*.

Civil Rights Law > Protection of Rights > Prisoner Rights > Confinement Conditions

Constitutional Law > Bill of Rights > Fundamental Rights > Cruel & Unusual Punishment

*HN3*[⬇] **Prisoner Rights, Confinement Conditions**

The Constitution does not mandate comfortable prisons, but neither does it permit inhumane ones. Extreme cell temperatures, therefore, can violate the *Eighth Amendment*. To be tantamount to

the infliction of cruel and unusual punishment, prison conditions must pose "an unreasonable risk of serious damage" to a prisoner's health — an objective test — and prison officials must have acted with deliberate indifference to the risk posed—a subjective test. Exposure to an unreasonable risk of damage to a plaintiff's health is actionable under the *Eighth Amendment*. A low cell temperature at night combined with a failure to issue blankets can violate the *Eighth Amendment*. Without the requisite proof of both subjective and objective components of an *Eighth Amendment* violation, however, merely "uncomfortable" heat in a prisoner's cell does not reflect a basic human need that the prison has failed to meet and is not constitutionally suspect.

Civil Procedure > Appeals > Standards of Review > Clearly Erroneous Review

Constitutional Law > Bill of Rights > Fundamental Rights > Cruel & Unusual Punishment

Civil Rights Law > Protection of Rights > Prisoner Rights > Confinement Conditions

Civil Procedure > Appeals > Standards of Review > De Novo Review

## *HN4*[⤓] Standards of Review, Clearly Erroneous Review

The predicate findings of a substantial risk of serious harm and officials' deliberate indifference to the risk are factual findings reviewed for clear error. A finding is clearly erroneous if it is without substantial evidence to support it, the court

misinterpreted the effect of the evidence, or the appellate court is convinced that the findings are against the preponderance of credible testimony. The appellate court reviews de novo whether the facts so found violate the *Eighth Amendment*.

Civil Rights Law > Protection of Rights > Prisoner Rights > Confinement Conditions

Constitutional Law > Bill of Rights > Fundamental Rights > Cruel & Unusual Punishment

## *HN5*[⤓] Prisoner Rights, Confinement Conditions

To prove unconstitutional prison conditions, inmates need not show that death or serious injury has already occurred. That the *Eighth Amendment* protects against future harm to inmates is not a novel proposition. They need only show that there is a "substantial risk of serious harm."

Civil Rights Law > Protection of Rights > Prisoner Rights > Confinement Conditions

Constitutional Law > Bill of Rights > Fundamental Rights > Cruel & Unusual Punishment

## *HN6*[⤓] Prisoner Rights, Confinement Conditions

The second element for *Eighth Amendment* liability requires prison officials to have a "sufficiently culpable state of mind." In prison conditions cases that state

of mind is one of "deliberate indifference" to inmate health or safety. Deliberate indifference is itself a two-prong inquiry. An official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists and he must also draw the inference. Whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence, and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious.

Civil Rights Law > ... > Prisoner Rights > Prison Litigation Reform Act > Exhaustion of Administrative Remedies

**_HN7_[🔽] Prison Litigation Reform Act, Exhaustion of Administrative Remedies**

In the context of _42 U.S.C.S. § 1997e_, as a statutory necessity, every case includes an administrative remedy request.

Civil Rights Law > Protection of Rights > Prisoner Rights > Confinement Conditions

Constitutional Law > Bill of Rights > Fundamental Rights > Cruel & Unusual Punishment

**_HN8_[🔽] Prisoner Rights, Confinement Conditions**

A request for administrative relief cannot alone prove deliberate indifference. A request for administrative relief is at best

only circumstantial evidence that a prison official is aware of facts from which he can deduce a risk of harm; it is not even particularly strong evidence of that. Because grievances are essentially pleadings, not evidence, they must have independent verification before they become probative. Separating the few meritorious complaints from the mountain of frivolous complaints is as difficult work for prison officials as for federal courts. A legitimate complaint can go unrecognized by even the most diligent official. As a result, a prison administrator who has received an administrative remedy request is not necessarily made aware, without factual corroboration, that there is a substantial risk of serious harm.

Civil Procedure > Appeals > Reviewability of Lower Court Decisions > Preservation for Review

**_HN9_[🔽] Reviewability of Lower Court Decisions, Preservation for Review**

It is a bedrock principle of appellate review that claims raised for the first time on appeal will not be considered.

Civil Rights Law > ... > Protection of Disabled Persons > Americans With Disabilities Act > Accommodations

Civil Rights Law > Protection of Rights > Prisoner Rights > Discrimination

**_HN10_[🔽] Americans With Disabilities Act, Accommodations**

To succeed on a failure-to-accommodate claim, a plaintiff must prove: (1) he is a qualified individual with a disability; (2) the disability and its consequential limitations were known by the covered entity; and (3) the entity failed to make reasonable accommodations. The Americans with Disabilities Act applies to prisoners.

Civil Procedure > Appeals > Standards of Review > Clearly Erroneous Review

Civil Procedure > Appeals > Standards of Review > De Novo Review

*HN11*[⬇] **Standards of Review, Clearly Erroneous Review**

An appellate court reviews a district court's conclusions of law de novo, and its factual findings for clear error. If the district court made a legal error that affected its factual findings, remand is the proper course unless the record permits only one resolution of the factual issue.

Civil Rights Law > ... > Protection of Disabled Persons > Federal Employment & Services > Scope

Civil Rights Law > ... > Protection of Disabled Persons > Americans With Disabilities Act > Scope

*HN12*[⬇] **Protection of Disabled Persons, Federal Employment & Services**

Under both the Americans with Disabilities Act and Rehabilitation Act, a person is disabled if he has a physical or mental impairment that substantially limits one or more major life activities. *42 U.S.C.S. § 12102(1)(A)*. The statute defines a major life activity in two ways. First, major life activities include, but are not limited to: caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working. *42 U.S.C.S. § 12102(2)(A)*. Second, a major life activity includes the operation of a major bodily function. *42 U.S.C.S. § 12102(2)(B)*. Such functions include, but are not limited to: the immune system, normal cell growth, digestive, bowel, bladder, neurological, brain, respiratory, circulatory, endocrine, and reproductive functions. *42 U.S.C.S. § 12102(2)(B)*. Plaintiffs can prove themselves disabled if their ailments substantially limit either a major life activity or the operation of a major bodily function.

Civil Rights Law > ... > Protection of Disabled Persons > Federal Employment & Services > Scope

Civil Rights Law > ... > Protection of Disabled Persons > Americans With Disabilities Act > Scope

*HN13*[⬇] **Protection of Disabled Persons, Federal Employment & Services**

The Rehabilitation Act incorporates the Americans with Disabilities Act definition of disability by reference. *29 U.S.C.S. § 705(20)(B)*.

Civil Rights Law > ... > Protection of

Disabled Persons > Americans With Disabilities Act > Scope

## HN14[⬇] Protection of Disabled Persons, Americans With Disabilities Act

A major life activity includes the operation of a major bodily function. *42 U.S.C.S. § 12102(2)(B)*.

Business & Corporate Compliance > ... > Protection of Disabled Persons > Americans With Disabilities Act > Enforcement Actions

Civil Rights Law > ... > Protection of Disabled Persons > Americans With Disabilities Act > Scope

## HN15[⬇] Accessibility Requirements in Public Facilities, Enforcement Actions

Although the current definition of disability expresses Congress's intention to broaden the definition and coverage of the term "disability," it in no way eliminated the term from the Americans with Disabilities Act or the need to prove a disability on a claim of disability discrimination.

Civil Procedure > Appeals > Standards of Review > Abuse of Discretion

Civil Procedure > Remedies > Injunctions > Permanent Injunctions

## HN16[⬇] Standards of Review, Abuse of Discretion

An appellate court reviews permanent injunctions for abuse of discretion. An abuse of discretion occurs when the district court (1) relies on clearly erroneous factual findings when deciding to grant or deny the permanent injunction, (2) relies on erroneous conclusions of law when deciding to grant or deny the permanent injunction, or (3) misapplies the factual or legal conclusions when fashioning its injunctive relief.

Civil Procedure > Remedies > Injunctions > General Overview

Constitutional Law > Bill of Rights > Fundamental Rights > Cruel & Unusual Punishment

Civil Rights Law > Protection of Rights > Prisoner Rights > Confinement Conditions

## HN17[⬇] Remedies, Injunctions

Courts have upheld injunctions in *Eighth Amendment* cases alleging unreasonably risky exposure to extreme temperatures.

Civil Rights Law > ... > Prisoner Rights > Prison Litigation Reform Act > Remedies

## HN18[⬇] Prison Litigation Reform Act, Remedies

The Prison Litigation Reform Act greatly limits a court's ability to fashion injunctive relief. Before a district court can award such relief, it must find that such relief is narrowly drawn, extends no further than necessary to correct the violation of the Federal right, and is the least intrusive

means necessary to correct the violation. *18 U.S.C.S. § 3626(a)(1)(A)*. The court must also give substantial weight to any adverse impact on public safety or the operation of a criminal justice system caused by the relief. *18 U.S.C.S. § 3626(a)(1)(A)*. If, after making the necessary findings and weighing the adverse impact on the criminal justice system, the court still feels injunctive relief is required, such relief shall extend no further than necessary to correct the violation of the Federal right of a particular plaintiff or plaintiffs. *18 U.S.C.S. § 3626(a)(1)(A)*.

Civil Rights Law > ... > Prisoner Rights > Prison Litigation Reform Act > Remedies

*HN19*[⬇] **Prison Litigation Reform Act, Remedies**

Under the Prison Litigation Reform Act, plaintiffs are not entitled to the most effective available remedy; they are entitled to a remedy that eliminates the constitutional injury. In *Eighth Amendment* cases, plaintiffs can only obtain a remedy that reduces the risk of harm to a socially acceptable level. Some risk is permissible and perhaps unavoidable.

Civil Rights Law > ... > Prisoner Rights > Prison Litigation Reform Act > Remedies

*HN20*[⬇] **Prison Litigation Reform Act, Remedies**

The Prison Litigation Reform Act limits relief to the particular plaintiffs before the

court. *18 U.S.C.S. § 3626(a)(1)(A)*.

Civil Rights Law > ... > Prisoner Rights > Prison Litigation Reform Act > Remedies

*HN21*[⬇] **Prison Litigation Reform Act, Remedies**

The scope of the order must be determined with reference to the constitutional violations established by the specific plaintiffs before the court. If the district court can limit relief to an affected class-member, it must do so under the Prison Litigation Reform Act.

**Counsel:** For Elzie Ball, Nathaniel Code, Plaintiffs - Appellees Cross-Appellants: Mercedes Hardy Montagnes, Elizabeth Claire O'Kane Compa, Promise of Justice Initiative, New Orleans, LA; Cecelia Trenticosta Kappel, Capital Appeals Project, New Orleans, LA; Nilay U. Vora, Bird, Marella, Boxer, Wolpert, Nessim, Drooks, & Linceberg, P.C., Los Angeles, CA.

For James M. Leblanc, Secretary, Department of Public Safety And Corrections, Burl Cain, Warden, Louisiana State Penitentiary, ANGELA NORWOOD, Warden of Death Row, Louisiana Department of Public Safety And Corrections, Defendants - Appellants Cross-Appellees: James Leslie Hilburn, Esq., Grant Joseph Guillot, Edmond Wade Shows, Assistant Attorney General, Shows, Cali & Walsh, L.L.P., Baton Rouge, LA; Carlton Jones III, Roedel, Parsons, Koch, Blache, Balhoff & McCollister, A.L.C., Baton Rouge, LA.

For Advocacy Center (La), Disability Rights

792 F.3d 584, *584; 2015 U.S. App. LEXIS 11769, **1

Texas, Amicus Curiae: Brian D. East, Senior Attorney, Disability Rights Texas, Austin, TX.

For United States of America, Amicus Curiae: Erin Helene Flynn, Esq., U.S. Department of Justice, Civil Division, Appellate Staff, Washington, **[\*\*2]** DC; Mark Lenard Gross, Esq., Deputy Chief Counsel, U.S. Department of Justice, Civil Rights Div - Appellate Section, Washington, DC.

For Local 3807, American Federation of State County Municipal Employees (Texas Correctional Employees), Amicus Curiae: Hiren Pravinchandra Patel, Patel Ervin Dinn, P.L.L.C., Houston, TX.

For Families of Deceased Texas Prisoners, Amicus Curiae: Scott Charles Medlock, Edwards Law, Austin, TX.

**Judges:** Before REAVLEY, JONES and ELROD, Circuit Judges. REAVLEY, Circuit Judge, dissenting.

**Opinion by:** EDITH H. JONES

## Opinion

 **[\*589]**  EDITH H. JONES, Circuit Judge:

In 2006, Louisiana built a new state-of-the-art prison facility to house death-row inmates. The cells in that facility, located in Angola, Louisiana, lack air conditioning. Three inmates sued the Louisiana Department of Corrections (the "State") and various prison officials in their official capacities,[1] claiming that the heat they

endure during the summer months violates the *Eighth Amendment* because of their pre-existing medical problems. They also assert that the failure to provide air conditioning violates the Americans with Disabilities Act ("ADA"), *42 U.S.C. § 12132*, and the Rehabilitation Act ("RA"), *29 U.S.C. § 794*. After a bench trial, the district court sustained the prisoners' *Eighth Amendment* claims, **[\*\*3]** rejected their disability claims, and issued an injunction effectively ordering the Defendants to install air conditioning throughout death row.

Although the trial court's findings of deliberate indifference by prison officials to these particular inmates' serious heat-related vulnerability suffice to support a constitutional violation, the scope of its injunctive relief exceeds our prior precedent, *Gates v. Cook, 376 F.3d 323, 339 (5th Cir. 2004)*, and the Prison Litigation Reform Act ("PLRA"), *18 U.S.C. § 3626*. Despite an oversight concerning applicable law, the court did not err in rejecting the prisoners' disability claims. We affirm in part, but vacate and remand the court's injunction for further consideration.[2]

## BACKGROUND

Angola's 25,000 square-foot **[\*\*4]** death-row facility[3] consists of a pod surrounded

---

[1] The officials include James M. LeBlanc, Secretary of the Louisiana Department of Public Safety and Corrections; Nathan Burl Cain, Warden of the Louisiana State Penitentiary

in Angola; and Angela Norwood, Assistant Warden in charge of death row. We refer to all appellants collectively as "the State" because suit against officials in their official capacity only is essentially against the State of Louisiana.

[2] Our issuance of this ruling renders moot the Plaintiffs' request that we lift the stay pending appeal.

[3] The death row unit is one of several buildings collectively known as the "Louisiana State Penitentiary" or "Angola." Only

by four housing wings. Inside the pod are [*590] administrative offices, visitation rooms, a medical and dental clinic, a control center, and an execution chamber. Within each of the four housing wings, two tiers of cells sit back-to-back. Each tier is lettered A through H. None of the housing tiers are air conditioned, but the rest of the facility is. To alleviate the summer heat, windows (which can be opened) line the exterior wall of each housing tier. Next to the windows are 30-inch fans, which serve two adjoining cells. Inside each cell is a six-by-eight-inch vent that draws air into the cell from the window across the tier and vents outside.

Although death-row inmates spend twenty-three hours a day in their cells, in-cell sinks provide unlimited access to potable water. Inmates also enjoy access to ice. Each housing tier has an ice chest, which the Angola staff maintains. Inmates can only access the chest themselves during the one hour a day they are allowed to walk [**5] the tiers. The rest of the time inmates depend on guards or other inmates for ice.[4] The uncontroverted evidence shows that the ice chests run out from time to time, either because the lone ice machine cannot generate enough ice or it breaks.

The three plaintiffs here, Elzie Ball, Nathaniel Code, and James Magee, are long-time residents of Angola's death-row facility. Magee lives on tier A, while Ball and Code live on tier H. Each suffers from various conditions: all three prisoners have hypertension; Ball has diabetes and is obese; Code is also obese and has hepatitis; and Magee is depressed and has high cholesterol. They take a variety of medications to control their ailments. According to the inmates, the extreme heat, not ameliorated by air conditioning, exacerbates their ailments, causing dizziness, headaches, and cramps.

Each inmate filed administrative complaints explaining that the heat was exacerbating his conditions and requesting air conditioning. The Defendants [**6] denied their requests. Internal appeals of the rulings were unsuccessful. Consequently, in June 2013, the inmates sued the Louisiana Department of Corrections and prison officials asserting claims under the *Eighth Amendment's* ban on cruel and unusual punishment and violations of the ADA and RA. As relief, the prisoners sought an injunction requiring the state to keep the heat index at or below 88° F.

A month later, the district court appointed United States Risk Management ("USRM") to monitor the temperature at the facility. During the monitoring period, July 15 to August 5, the temperature on tiers A and H ranged from 78.26° to 92.66° F.[5] Meanwhile, the heat index ranged from 81.5° to 107.79° F. On five separate days the heat index on tier A surpassed 100° F. On tier H, the heat index surpassed 100° F on seven days.

After the data collection period, the district

the death-row facility is implicated here, however.

[4] Inmates can distribute ice to other inmates during the one hour they are allowed to walk the tiers. If, however, those inmates spend their free hour in recreation or showering, then the other inmates may not receive ice.

[5] USRM monitored the temperature on all the tiers. But because the Plaintiffs only reside on tiers A and H, and because this is not a class-action, only readings from those tiers are relevant to this appeal.

court held a three-day bench trial. Experts testified about the Plaintiffs' medical conditions, the conditions on death row, the design and **[\*\*7]** construction of the facility, and the effectiveness of current practices and procedures. The judge personally toured the facility to observe the conditions first-hand. Several months later, the district court issued a 100-page ruling that concluded the conditions on death row are cruel and unusual because **[\*591]** of extreme heat during parts of the year. The court denied the prisoners' ADA and RA claims because they are not disabled. Based on the constitutional violation, the court issued a permanent injunction, requiring the state to develop a plan to keep the heat index at or below 88° F. Effectively, the district court ordered Louisiana to install air conditioning. Both sides now appeal.

## DISCUSSION

The parties present four issues. The Defendants assert that the district court made several erroneous evidentiary rulings, wrongly found a constitutional violation, and issued an overbroad injunction contrary to the PLRA, *18 U.S.C. § 3626*, and *Gates v. Cook, 376 F.3d 323 (5th Cir. 2004)*. The inmates' cross-appeal contends that the district court used a superseded definition to determine whether they are disabled under the ADA and RA. We review the liability issues first, then the scope of the injunction.

I. Evidence

The State's evidentiary objections are **[\*\*8]** easily resolved. It contends that the heat index, on which the district court based its ruling, is inherently unreliable and inappropriate in prison settings. It also contends that the court should not have taken judicial notice of other facts without providing the State an opportunity to respond. The objections are meritless. *HN1*[⬆] We review evidentiary rulings for abuse of discretion. *Battle ex rel. Battle v. Mem'l Hosp. at Gulfport, 228 F.3d 544, 550 (5th Cir. 2000)* (citing *Jon-T Chemicals, Inc. v. Freeport Chem. Co., 704 F.2d 1412, 1417 (5th Cir. 1983))*. Even if the court abused its discretion, this court will presume the error is harmless. *See Fed. R. Civ. P. 61*; *Bocanegra v. Vicmar Servs., Inc., 320 F.3d 581, 584 (5th Cir. 2003)*. The party asserting the error has the burden of proving that the error was prejudicial. *See Dietz v. Consol. Oil & Gas, Inc., 643 F.2d 1088, 1093 (5th Cir. 1981)* (quoting *Liner v. J.B. Talley and Co., Inc. 618 F.2d 327, 329 (5th Cir. 1980))*.

The district court did not abuse its discretion by admitting evidence of or relying on the heat index. The thrust of the State's argument is that because heat index is a derived number, courts cannot use it as a basis for ruling. Although the State's expert meteorologist, Jay Grymes, testified that the heat index is "not a real number," the rest of his testimony bolsters the use of the heat index. For example, Grymes testified that the heat index is a "guideline number" and that he "provide[s] heat index as a guide to [his] viewers to make better decisions." Dr. Susi Vassallo, the Plaintiffs' expert, **[\*\*9]** testified that peer reviewed scientific articles measure the correlation between heat index and morbidity and mortality. This court also has relied on the heat index before. *See Gates, 376 F.3d at 339* (upholding increased

access to ice, water, and showers when the heat index exceeds 90° F.). In the absence of further proof, the court did not abuse its discretion.

The State's complaint about the court's taking judicial notice of publicly available evidence is similarly weak. The court cited an article from the National Weather Service's website called *Heat: A Major Killer* and referred to temperature readings from the Baton Rouge Regional Airport.

Because the district court did not warn the State that it would be taking judicial notice of these materials, the State complains it was "deprived of the opportunity to request an opportunity to be heard regarding the data." **HN2**[↑] *Rule 201*, however, expressly contemplates courts' taking judicial notice without prior warning. *See Fed. R. Evid. 201(e)* ("If the court takes judicial **[*592]** notice *before notifying a party*, the party, on request, is still entitled to be heard." (emphasis added)); 21B KENNETH W. GRAHAM, JR., FED. PRAC. & PROC. EVID. § 5109 (2d ed.) (*Rule 201* does "not require any notice to the parties **[**10]** that judicial notice [is] about to be taken," and "a party might get no advance notice at all"). The State, moreover, did not avail itself of the Rule's provision requiring the court to provide an opportunity to be heard. *See Fed. R. Evid. 201(e)*; *See also Fed. R. Civ. P. 59(a)(2)* ("After a nonjury trial, the court may, on motion for a new trial, open the judgment if one has been entered, take additional testimony, amend findings of fact and conclusions of law or make new ones, and direct the entry of a new judgment."). In any event, the State's explanation of prejudice is vague, cursory and unpersuasive. It makes no showing that the district court's consideration of the National Weather Service article or Baton Rouge temperature readings altered the outcome. *See Dietz, 643 F.2d at 1093*. The judicial notice objections fail as well as the heat index objection.

## II. *Eighth Amendment*

Turning to the Plaintiffs' *Eighth Amendment* claims, **HN3**[↑] the Constitution "'does not mandate comfortable prisons,' but neither does it permit inhumane ones." *Farmer v. Brennan, 511 U.S. 825, 832, 114 S. Ct. 1970, 1976, 128 L. Ed. 2d 811 (1994)* (quoting *Rhodes v. Chapman, 452 U.S. 337, 349, 101 S. Ct. 2392, 2400, 69 L. Ed. 2d 59 (1981))*. Extreme cell temperatures, therefore, can violate the *Eighth Amendment*. To be tantamount to the infliction of cruel and unusual punishment, prison conditions must pose "an unreasonable risk of serious damage" to a prisoner's health **[**11]** — an objective test — and prison officials must have acted with deliberate indifference to the risk posed—a subjective test. *Helling v. McKinney, 509 U.S. 25, 33-35, 113 S. Ct. 2475, 2481-82, 125 L. Ed. 2d 22 (1993)* (holding exposure to an "unreasonable risk of damage to [a plaintiff's] health" actionable under the *Eighth Amendment*); *see also Wilson v. Seiter, 501 U.S. 294, 304, 111 S. Ct. 2321, 2327, 115 L. Ed. 2d 271 (1991)* (postulating that "a low cell temperature at night combined with a failure to issue blankets" can violate the *Eighth Amendment*); *Gates, 376 F.3d at 339*. Without the requisite proof of both subjective and objective components of an *Eighth Amendment* violation, however, merely "uncomfortable" heat in a prisoner's

cell does not reflect "a basic human need that the prison has failed to meet" and is not constitutionally suspect. *Woods v. Edwards, 51 F.3d 577, 581 (5th Cir. 1995)*.

*HN4*[↑] The predicate findings of a substantial risk of serious harm and officials' deliberate indifference to the risk are factual findings reviewed for clear error. *Gates, 376 F.3d at 333*; *Thomas v. Bryant, 614 F.3d 1288, 1312 (11th Cir. 2010)* (citing *Farmer, 511 U.S. at 842, 114 S. Ct. at 1981*). "'A finding is clearly erroneous if it is without substantial evidence to support it, the court misinterpreted the effect of the evidence, or this court is convinced that the findings are against the preponderance of credible testimony.'" *Petrohawk Props., L.P. v. Chesapeake La., L .P., 689 F.3d 380, 388 (5th Cir. 2012)* (quoting *French v. Allstate Indem. Co., 637 F.3d 571, 577 (5th Cir. 2011))*. This court reviews *de novo* whether the facts so found violate the *Eighth Amendment*. *Gates, 376 F.3d at 333*.

For various reasons, the State asserts that the Plaintiffs are not at substantial risk of serious **[**12]** harm and its officials were not deliberately indifferent to this risk. Further, the State contends that, because it provides the remedies this court mandated in *Gates*, there can be no *Eighth Amendment* violation as a matter of law. **[*593]** We reject these challenges to the trial court's findings.

Based mainly on Dr. Vassallo's testimony, the district court found that the heat puts these plaintiffs at substantial risk of serious harm. According to Dr. Vassallo, the cardiovascular system is critical for maintaining normal body temperature. Dr. Vassallo testified that both hypertension

and diabetes can adversely affect this critical system. "The heart has to be able to pump very hard to meet the demands of heat." Hypertension generally can decrease "the ability of the blood vessels to open and close." As a result, those vessels are "not as compliant as they should be," "they can't open like they should and have to in response to heat," and blood therefore cannot circulate to cool the body. Therefore, people with hypertension generally can have a hard time controlling their body temperature. The same is true for people with diabetes. Cardiovascular disease, which can result from diabetes, can harden the arteries **[**13]** and blood vessels, thus inhibiting circulation. As a result, diabetics can lose ability to circulate blood properly and thus the ability to maintain normal body temperature.

The treatments for hypertension can further inhibit these prisoners' ability to regulate body temperature. Specifically, beta blockers, which help control blood pressure, can compound the effects hypertension has on the cardiovascular system. Beta blockers prevent blood vessels from dilating properly while at the same time "decreas[ing] the heart's ability to pump as hard and to meet the requirements of heat or exercise." Likewise, diuretics decrease the total amount of water and salt in the body, resulting in less fluid around which the heart can contract. According to Dr. Vassallo, without sufficient fluid to contract, the heart is unable to meet the increased demands heat places on the cardiovascular system. Therefore, even if prisoners receive proper care for their ailments, they may be at increased risk of heat stroke. This evidence of the Plaintiffs'

heightened vulnerability to high temperatures, combined with the USRM temperature data showing the high temperatures on tiers A and H, led the court to find that the Plaintiffs **[\*\*14]** are at substantial risk of serious harm.

The State argues that the totality of the record evidence refutes Dr. Vassallo's opinion. Specifically, the district court discounted the State's arguments that no death-row prisoner has ever suffered a heat-related incident; these prisoners' medical records show no signs of heat-related illness; the prisoners' poor dietary choices and failure to exercise caused their health problems; and the prisoners' suffer high blood pressure all year, not just in the summer months. Thus, the State contends, the prisoners do not suffer an unreasonable risk of serious heat-related injury at all.

These facts fail to show that the district court clearly erred. First, that no one at Angola, including these plaintiffs, has ever had a heat-related incident and that these prisoner's medical records do not show signs of heat-related illness are insufficient. **HN5**[⬆] To prove unconstitutional prison conditions, inmates need not show that death or serious injury has already occurred. *See Helling, 509 U.S. at 33, 113 S. Ct. at 2481* ("That the *Eighth Amendment* protects against future harm to inmates is not a novel proposition."). They need only show that there is a "substantial risk of serious harm." *Gates, 376 F.3d at 333*. Further, Dr. Vassallo provided **[\*\*15]** a reasonable explanation for the lack of past harm to these plaintiffs: "heat stroke is a failure of thermoregulation which is dramatic and catastrophic. It

occurs suddenly . . . . People can suffer suddenly from heat stroke without ever having complained **[\*594]** about the weather." As a result, the district court plausibly concluded that the Plaintiffs here are at a substantial risk of serious harm.[6]

Second, because the Plaintiffs forego exercise and overeat junk food, the State asserts that their ailments and any accompanying risk are their own creation. Prison canteen records confirm these inmates' consumption of unhealthy foods with high sugar and salt content. Although this may be true, the evidence is at best conjectural about the connection between these plaintiffs' conditions and their lifestyle. We are constrained to agree with the district court's finding that, canteen food comprises only part of the prisoners' diets, and their medical conditions arise from a combination of factors, many of which are outside their control. Thus, the **[\*\*16]** district court did not clearly err when, in the face of conflicting evidence, it found that these prisoners are at substantial risk of serious harm.

Finally, that the prisoners suffer year-round high blood pressure is simply irrelevant to the district court's substantial-risk finding. The prisoners' complaint is that their high blood pressure places them at an abnormally high risk of heat stroke during Louisiana's extended hot season. The lower risk in other months does not offset their vulnerability during the summer any more than an allergy to insect bites ceases to exist when the bugs are dormant in winter.

_____

[6] We emphasize, however, that the finding of substantial risk regarding a heat-related injury is tied to the individual health conditions of these inmates.

*HN6*[↑] The second element for *Eighth Amendment* liability requires "prison official[s] [to] have a 'sufficiently culpable state of mind.'" *Farmer, 511 U.S. at 834, 114 S. Ct. at 1977* (quoting *Wilson, 501 U.S. at 297, 111 S. Ct. at 2323*). "In prison conditions cases that state of mind is one of 'deliberate indifference' to inmate health or safety." *Id.* (quoting *Wilson, 501 U.S. at 302-303, 111 S. Ct. at 2326*). Deliberate indifference is itself a two-prong inquiry. An official must both be "aware of facts from which the inference could be drawn that a substantial risk of serious harm exists" and "he must also draw the inference." *Id. at 837, 114 S. Ct. at 1979*. "Whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration **[**17]** in the usual ways, including inference from circumstantial evidence, and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." *Id. at 842, 114 S. Ct. at 1981* (internal citations and quotation marks omitted).

The district court relied on a variety of evidence showing that the State knew of and disregarded a substantial risk to the Plaintiffs. Medical personnel routinely monitor prisoners and administer medication daily. Correctional officers "closely monitor" the temperature on death row, recording the temperature every two hours. Defendant Norwood, moreover, testified that the prison maintains a list of, and monitors more closely, inmates particularly susceptible to heat-related illness. None of the Plaintiffs was on the list, although Norwood personally reviewed the ARPs for each prisoner, inspected each prisoner's medical records,

interviewed both Ball and Code, and admits Magee should have been on the list. Defendant Cain admitted that he was always thinking about "how to overcome the heat" and that he considered adding extra fans and ice on the tiers. Most strikingly, after this suit was filed, and during the court-ordered monitoring period **[**18]** the Defendants surreptitiously installed awnings and began soaking some of the tiers' exterior walls with **[*595]** water in an attempt to reduce the interior temperature. Their trick backfired. Based on these facts, the district court reasonably inferred that the Defendants knew of a substantial risk of serious harm to the Plaintiffs.

Yet the State complains that the deliberate indifference finding is fundamentally flawed because the district court relied solely on the prisoners' administrative remedy requests, which are required under the PLRA. *See* *42 U.S.C. § 1997e(a)*. If that is sufficient to prove deliberate indifference, the State continues, then there is no need for a court to separately analyze the deliberate indifference prong. *HN7*[↑] As a statutory necessity, *see* *Gonzalez v. Seal, 702 F.3d 785, 788 (5th Cir. 2012)*, every case includes an administrative remedy request. Whenever a court finds that a prisoner's complaint was justified—*i.e.*, that there is a substantial risk of harm—the defendant will be guilty of violating the *Eighth Amendment*.

We agree with the Defendants' premise— *HN8*[↑] a request for administrative relief cannot alone prove deliberate indifference. A request for administrative relief is at best only circumstantial evidence that a prison official is aware of facts from **[**19]** which

he can deduce a risk of harm; it is not even particularly strong evidence of that. Because grievances are essentially pleadings, not evidence, they must have independent verification before they become probative. Separating the few meritorious complaints from the mountain of frivolous complaints is as difficult work for prison officials as for federal courts. A legitimate complaint can go unrecognized by even the most diligent official. As a result, a prison administrator who has received an administrative remedy request is not necessarily made aware, without factual corroboration, that there is a substantial risk of serious harm.

Although the State's premise is correct, its conclusion that the district court's deliberate indifference finding is erroneous does not follow. The district court did not base its finding solely on the prisoners' administrative requests, but on the totality of the record evidence. There is more than enough, particularly in light of the State's attempt to cool down the cells with awnings and misting without telling the court, to prove subjective awareness of a substantial risk of serious harm. Therefore, the district court's deliberate indifference finding **[**20]** is not clearly erroneous.

Even if it cannot overcome the district court's factual findings, the State argues that this court's decision in *Gates v. Cook* precludes liability. *Gates* upheld an injunction requiring Mississippi to equip each cell with fans, provide inmates with additional access to ice water, and allow daily showers when the heat index in the cells exceeded 90° F. *376 F.3d at 339*. The State claims to offer these exact remedies year-round.

The district court, however, demonstrated that *Gates* is distinguishable. Where *Gates* approved fans for each cell, each fan in Angola's death row serves two cells. *Ball v. LeBlanc, 988 F. Supp. 2d 639, 680 n.100 (M.D. La. 2013)*. Although a seemingly minor difference, the district court found that "the fans [at Angola] [do] not provide equal amounts of air flow to each cell, nor [do] the fans provide a detectable cooling effect." *Id.* The district court in *Gates* also ordered increased in-cell access to ice. *376 F.3d at 339*. Here, by contrast, inmates have unfettered access to ice only during the one hour a day they can walk the tiers.[7] *Ball, 988 F. Supp. 2d at 680 n. [*596] 100*. When the prisoners are in their cells, they depend on other inmates or guards for ice. *Id.* And while the State allows prisoners to shower once a day, as approved in *Gates*, the water temperature is maintained **[**21]** between 100 and 120° F. for sanitation purposes, thus providing little relief from the heat. *Id.* Given these material differences, *Gates* does not preclude holding that the State violated the *Eighth Amendment*.

Based on its findings of fact, we affirm the district court's conclusion that housing these prisoners in very hot cells without sufficient access to heat-relief measures, while knowing that each suffers from conditions that render him extremely vulnerable to serious heat-related injury, violates the *Eighth Amendment*.

III. Disability Claims

The inmates assert that the State's failure

---

[7] Even then, obtaining ice is no guarantee. The record suggests that the ice machine occasionally breaks down leaving the tier ice chests empty.

to alleviate the heat violates their rights to a reasonable accommodation for their "disabilities" under the ADA and RA.[8] The district court rejected the prisoners' claims because they presented no *evidence* that they are disabled.[9] *Ball, 988 F. Supp. 2d at 687*. The prisoners argue that the district court's conclusion rests on an abbreviated definition of disability and superseded case law. Although the prisoners are correct, there is still no evidence that the prisoners are disabled under the correct definition, so any error **[**22]** was harmless.

**HN11**[⬆] We review the district court's conclusions of law *de novo*, and its factual findings for clear error. *Lightbourn v. Cnty. Of El Paso, Tex., 118 F.3d 421, 426 (5th Cir. 1997)*. If the district court made a legal error that affected its factual findings, "remand is the proper course unless the record permits only one resolution of the factual issue." *Pullman-Standard v. Swint, 456 U.S. 273, 292, 102 S. Ct. 1781, 1792, 72 L. Ed. 2d 66 (1982)*; *see also Aransas Project v. Shaw, 775 F.3d 641, 658 (5th*

---

[8] On appeal, the prisoners also assert a disparate-impact claim. But the prisoners' complaint does not allege a disparate-impact claim and, as far as we can tell, this appeal is the first time the prisoners have asserted such a claim. **HN9**[⬆] "It is a bedrock principle of appellate review that claims raised for the first time on appeal will not be considered." *Stewart Glass & Mirror, Inc. v. U.S. Auto Glass Discount Ctrs., Inc., 200 F.3d 307, 316-17 (5th Cir. 2000)*. Accordingly, we will not address the prisoners' disparate-impact claim.

[9] **HN10**[⬆] To succeed on a failure-to-accommodate claim, a plaintiff must prove: (1) he is a qualified individual with a disability; (2) the disability and its consequential limitations were known by the covered entity; and (3) the entity failed to make reasonable accommodations. *Neely v. PSEG Tex., Ltd. P'ship, 735 F.3d 242, 247 (5th Cir. 2013)*. The ADA applies to prisoners. *Pa. Dep't of Corr. v. Yeskey, 524 U.S. 206, 213, 118 S. Ct. 1952, 1956, 141 L. Ed. 2d 215 (1998)*. The district court found each prisoner failed to prove the first prong—*i.e.*, that they are disabled.

*Cir. 2014)*, *cert. denied*, No. 14-1138, 135 S. Ct. 2859, 192 L. Ed. 2d 895, 2015 U.S. LEXIS 4155, 2015 WL 1255228, at *1 (June 22, 2015).

**HN12**[⬆] Under both the ADA and RA,[10] a person is disabled if **[**23]** he has "a physical or mental impairment that substantially limits one or more major life activities." *42 U.S.C. § 12102(1)(A)*. The statute defines a major life activity in two ways. First, major life activities include, but are not limited to:

> caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, **[*597]** concentrating, thinking, communicating, and working.

*Id. § 12102(2)(A)*. Second, a major life activity includes "the operation of a major bodily function." *Id. § 12102(2)(B)*. Such functions include, but are not limited to:

> the immune system, normal cell growth, digestive, bowel, bladder, neurological, brain, respiratory, circulatory, endocrine, and reproductive functions.

*Id.* The prisoners can prove themselves disabled if their ailments substantially limit either a major life activity or the operation of a major bodily function.

The prisoners point out that the district court considered whether they are disabled only under the first definition of major life activities; it did not consider whether **[**24]**

---

[10] **HN13**[⬆] The RA incorporates the ADA definition of disability by reference. *See 29 U.S.C. § 705(20)(B)*. Accordingly, if the prisoners are disabled, they are disabled under both statutes.

their impairments affect a major bodily function. We agree. The district court quoted only the first definition of a disability, but it overlooked that *HN14*[↑] "a major life activity also includes the operation of a major bodily function." *Id. § 12102(2)(B)*. The district court also partially relied on *Toyota Motor Mfg., Ky., Inc. v. Williams, 534 U.S. 184, 197, 122 S. Ct. 681, 151 L. Ed. 2d 615 (2002)*, which Congress superseded in the Americans with Disabilities Amendments Act of 2008 ("ADAAA"). *Neely v. PSEG Tex., Ltd. P'ship, 735 F.3d 242, 245 (5th Cir. 2013)*.

Although this error may have affected the district court's determination, the question remains whether any evidence supports the prisoners' disability claims. The prisoners argue that "thermoregulation" is a major life activity, there is ample evidence in the record showing their thermoregulatory functions are impaired, and therefore they are disabled.

Assuming *arguendo* that thermoregulation is a major life activity,[11] there is no *evidence* that these prisoners' thermoregulatory systems are actually impaired. According to Dr. Vassallo, thermoregulation is "the capacity of the body to maintain the temperature of 98.6 within half a degree or so." There is no

evidence that the prisoners' ailments have ever caused their body temperatures to rise above 98.6° F. In fact, Dr. Vassallo testified that the prisoners' symptoms are consistent with normal body temperatures, [**25] there is no indication that these prisoners have ever had elevated body temperatures, and there is no evidence that these prisoners ever experienced difficulty in thermoregulating.

That the record is devoid of such evidence is unsurprising. Over the course of the three-day trial, there is hardly any mention of the prisoners' disability claims. The overwhelming majority of the testimony related to the future risk of heatstroke, not the prisoners' present inability to maintain regular body temperature. As a result, the medical testimony focused generally on the risks to individuals with the same ailments [**26] as these prisoners, not on any limitations the prisoners presently experience. The prisoners' counsel, moreover, never asked the three medical experts whether the prisoners' thermoregulatory systems are *actually* impaired, probably because evidence in the record precludes any such assertion. This lapse is [*598] fatal to their disability claims. As this court has said before, *HN15*[↑] although the current definition of disability "expresses Congress's intention to broaden the definition and coverage of the term 'disability,' it in no way eliminated the term from the ADA or the need to prove a disability on a claim of disability discrimination." *Neely, 735 F.3d at 245*.[12]

---

[11] The prisoners urge this court to hold that thermoregulation is a major bodily function (and thus a major life activity) because the ADA's list is non-exhaustive. *See 42 U.S.C. § 12102(2)(B)*. Before the passage of the ADAAA, this court left undecided whether "the regulation of body temperature constitutes a major life activity under the ADA." *EEOC v. Agro Distrib. LLC, 555 F.3d 462, 469 n.8 (5th Cir. 2009)*. Post-ADAAA, no court has held that thermoregulation is a major bodily function, nor do EEOC regulations list thermoregulation as a major bodily function. *29 C.F.R. § 1630.2(i)(1)(ii)*. Accordingly, we take the cautious route and assume without deciding that thermoregulation is a major life activity.

[12] Ball also argues that he is disabled because diabetes impairs his endocrine system and his sight. Although this might be true, that Ball's endocrine system and sight are impaired does not entitle him to relief from the *heat*. Only if Ball's diabetes limits his ability to thermoregulate, can Ball get

The disability claims are insupportable as a matter of law even under the expanded legal definition of disability.

IV. The Injunction

To remedy the *Eighth Amendment* violation, the district court ordered Louisiana to "develop a plan to reduce and maintain the heat index in the Angola death row tiers at or below 88 degrees Fahrenheit." *Ball, 988 F. Supp. 2d at 689*. Effectively, the plan requires the State to install air conditioning throughout death row housing. The State attacks the district court's order in two ways. First, it contends that the requirements for injunctive relief are not present here. Second, it argues that the injunction is overbroad because air conditioning is beyond the measures endorsed in *Gates v. Cook* and facility-wide relief violates the PLRA.

**HN16**[⬆] This court reviews permanent injunctions for abuse of discretion. *Symetra Life Ins. Co. v. Rapid Settlements, Ltd., 775 F.3d 242, 254 (5th Cir. 2014)* (citing *N. Alamo Water Supply Corp. v. City of San Juan, Tex., 90 F.3d 910, 916-17 (5th Cir. 1996))*. An abuse of discretion occurs when the district court "'(1) relies on clearly erroneous factual findings when deciding to grant or deny the permanent injunction[,] (2) relies on erroneous conclusions of law when deciding to grant or deny the permanent injunction, or (3) misapplies the factual or legal conclusions when fashioning its injunctive relief.'" *Id.* (quoting *N. Alamo Water Supply Corp., 90 F.3d at 916-17*).

The court did not abuse its discretion by deciding to issue an injunction. The State's **[**28]** first argument is that an injunction is improper because conditions to which these prisoners were subjected do not violate the *Eighth Amendment*. This contention fails in light of our sustaining the district court's *Eighth Amendment* analysis. Moreover, in *Gates* as in other cases, **HN17**[⬆] courts have upheld injunctions in *Eighth Amendment* cases alleging unreasonably risky exposure to extreme temperatures. *See Graves v. Arpaio, 623 F.3d 1043, 1045 (9th Cir. 2010)* (per curiam) (leaving an injunction in place requiring a prison to keep inmates on certain medications in cells with temperatures below 85 degrees); *Jones-El v. Berge, 374 F.3d 541, 542 (7th Cir. 2004)* (upholding order to install air conditioning in Wisconsin's "supermax" prison).

The scope of the injunction is another matter. **HN18**[⬆] The PLRA greatly limits a court's ability to fashion injunctive relief. Before a district court can award such relief, it must find that "such relief is narrowly drawn, extends no further than necessary to correct the violation of the Federal right, and is the least intrusive means necessary to correct the violation." *18 U.S.C. § 3626(a)(1)(A)*. The court must also "give substantial weight to any adverse impact on public safety or the operation of a criminal justice system caused by the relief." *Id.* If, after making the necessary **[*599]** findings and weighing the adverse impact on the criminal justice **[**29]** system, the court still feels injunctive relief is required, such relief "shall extend no further than necessary to correct the violation of the Federal right of a particular plaintiff or

---

the only relief he requested—an order requiring Louisiana to keep the prison at or below 88 degrees. As for that claim—that Ball's diabetes impairs **[**27]** thermoregulation—there is no evidence in the record.

plaintiffs." *Id.*

The district court's injunction violates the PLRA in two ways. First, the district court ordered a type of relief—air conditioning—that is unnecessary to correct the *Eighth Amendment* violation. **HN19**[⬆] Under the PLRA, plaintiffs are not entitled to the most effective available remedy; they are entitled to a remedy that eliminates the constitutional injury. *See Westefer v. Neal, 682 F.3d 679, 683-84 (7th Cir. 2012)* (vacating an injunction under the PLRA because it exceeded what was required under the *Due Process Clause*). In *Eighth Amendment* cases, plaintiffs can only obtain a remedy that reduces the risk of harm to a socially acceptable level. Some risk is permissible and perhaps unavoidable. Here Plaintiffs' own expert, Dr. Vassallo, explained that there are many acceptable remedies short of facility-wide air conditioning. For example, the Defendants could divert cool air from the guards' pod into the tiers; allow inmates to access air conditioned areas during their tier time; allow access to cool showers at least once a day; provide ample supply of cold drinking water and ice at all times; **[**30]** supply personal ice containers and individual fans; and install additional ice machines. These are precisely the types of remedies this court endorsed in *Gates v. Cook* and that the PLRA requires. *See 376 F.3d at 339-40*. Accordingly, on remand the district court must limit its relief to these types of remedies.

The district court also erred because it awarded relief facility-wide, instead of limiting such relief to Ball, Code, and Magee. The district court apparently understood that it could not order facility-wide relief. At the start of trial, the district court said:

> This is not, contrary to widespread belief, an effort to require the state to install air-conditioning for all of the tiers that house all death row inmates. I think the application for injunctive relief made clear that it's only these three inmates that are of issue. And so, of course, the evidence in this case will pertain to any facts that are relevant as to these three . . . . plaintiffs and these three plaintiffs only. This is not a class action lawsuit. This is not, again, an effort to seek relief for anyone other than these three inmates.

It is unclear why the district court changed its mind when it fashioned the injunction. **HN20**[⬆] The PLRA **[**31]** limits relief to the particular plaintiffs before the court. *18 U.S.C. § 3626(a)(1)(A)*. This is not a class action; Ball, Code, and Magee are the only plaintiffs before the court. As a result, any relief must apply only to them, if possible. *Brown v. Plata, 563 U.S. 493, 131 S. Ct. 1910, 1940, 179 L. Ed. 2d 969 (2011)* (holding that **HN21**[⬆] "the scope of the order must be determined with reference to the constitutional violations established by the specific plaintiffs before the court"); *Gates, 376 F.3d at 339* (vacating an injunction that purportedly applied to prisoners outside the class of plaintiffs because "it exceeds the scope of the litigation"); *see also Graves, 623 F.3d at 1049-50* & n.2 (noting that if the district court can limit relief to an affected class-member, it must do so under the PLRA).

Nevertheless, the district court ordered relief to all 85 death-row inmates because

"the Defendants may move any death row inmate to a different tier and/or cell at any time." *Ball, 988 F. Supp. 2d at 688-89*. Essentially, it felt the only way to provide effective relief to these three plaintiffs is to provide facility-wide relief. The district [*600] court's determination, however, is erroneous. Even assuming that air conditioning is an acceptable remedy here—and it is not—it is possible to provide air conditioning solely to these three inmates. As the Defendants acknowledged **[**32]** at oral argument, Plaintiffs could be placed in cells next to the officers' pod, which are cooler than those farther down the tiers. Louisiana could also air condition one of the four tiers for the benefit of prisoners susceptible to heat-related illness. When coupled with an order not to move the Plaintiffs from these cells unless certain conditions are met, these options could adequately remedy the Plaintiffs' constitutional violation. Moreover, the *Gates*-type remedies available on remand—increased access to water, ice, cold showers, etc.—ought to (and must) be tailored to these three prisoners.

Because the district court's injunction provides an unnecessary type of relief and applies beyond these three Plaintiffs, it violates the PLRA. Accordingly, the district court abused its discretion.

Finally, we note the substantial disparity between the relief ordered in *Gates* and the scope of the injunction in this case. The *Gates* court did not mandate a maximum heat index applicable in the Mississippi prison. It required particular heat measures, including fans, ice water, ice, and showers, "if the heat index reaches 90 degrees or above." *Gates, 376 F.3d at 336*.

The injunction here requires relief that is far **[**33]** more extensive, applies even during months when there is no heat risk to the Plaintiffs, covers the entire facility, and of course is expensive. Since *Gates* upheld an injunction providing narrower relief, and there is no showing that the Constitution mandated more relief for these prisoners for the same prison condition in this case, on remand the court must craft relief more closely aligned with *Gates* as well as consistent with the PLRA.

## CONCLUSION

For the foregoing reasons, we **AFFIRM** the district court's resolution of the *Eighth Amendment* and disability claims, but **VACATE** and **REMAND** the district court's injunction for reconsideration under the principles stated here.

**Dissent by:** REAVLEY

## Dissent

REAVLEY, Circuit Judge, dissenting.

I agree with almost all of the opinion, but I would affirm the injunction which in principal only orders the heat index in the Angola death row tiers to be maintained below 88 degrees.

**End of Document**

🔴 Warning
As of: August 29, 2023 8:56 PM Z

## *Hinojosa v. Livingston*

United States Court of Appeals for the Fifth Circuit

November 18, 2015, Filed

No. 14-40459

### Reporter

807 F.3d 657 *; 2015 U.S. App. LEXIS 20016 **

Ramona Hinojosa, Individually As A Wrongful Death Beneficiary And As The Heir To The Estate Of Albert Hinojosa, Plaintiff - Appellee, V. Brad Livingston; Rick Thaler; William Stephens, Defendants - Appellants.

**Prior History: [**1]** Appeal From The United States District Court For The Southern District Of Texas.

*Hinojosa v. Livingston, 2014 U.S. Dist. LEXIS 40773 (S.D. Tex., Mar. 27, 2014)*

## Core Terms

inmates, qualified immunity, heat, allegations, conditions, Defendants', policies, discovery, district court, deliberate indifference, prison official, heat-related, temperatures, vulnerable, prison, remedial measure, suicide, complaint alleges, facilities, measures, housing, intake, quotation, marks, clearly established law, extreme temperatures, cases, substantial risk, arrived, stroke

## Case Summary

### Overview

HOLDINGS: [1]-A complaint pled facts permitting an inference that the prison officials were liable for an *Eighth Amendment* violation where it alleged that they knowingly subjected a prisoner to dangerous heat conditions in conscious disregard for the serious risk posed; [2]-The complaint alleged facts that overcame qualified immunity where the right not to be subjected to extremely dangerous temperatures without adequate ameliorative measures was well-established; [3]-Further clarification of the facts was necessary to rule on qualified immunity where what the officials knew, when they knew it, and whether they investigated and considered possible remedial measures were necessary to determine whether they acted reasonably; [4]-Because a discovery order complied with judicial precedent, the appellate court lacked jurisdiction to consider the officials' interlocutory appeal.

### Outcome
Appeal dismissed.

## LexisNexis® Headnotes

Civil Procedure > Appeals > Appellate Jurisdiction > Collateral Order Doctrine

807 F.3d 657, *657; 2015 U.S. App. LEXIS 20016, **1

*HN1*[↓]    **Appellate       Jurisdiction,
Collateral Order Doctrine**

Under *28 U.S.C.S. § 1291*, the United
States Court of Appeals for the Fifth Circuit
has jurisdiction to review final decisions of
the district courts in the Fifth Circuit circuit.
Generally, this class of decisions does not
include discovery orders. However, judicial
precedent interprets *§ 1291* to include a
grant of authority to review a small class of
collateral orders traditionally considered
non-final. Under this collateral order
doctrine, the Fifth Circuit has jurisdiction
under *§ 1291* to entertain appeals from
decisions that (1) conclusively determine
the disputed question, (2) resolve an
important issue completely separate from
the merits of the action, and (3) are
effectively unreviewable on appeal from a
final judgment. A district court's order
denying qualified immunity is one such
order. So too is an order deferring the
district court's qualified immunity ruling and
providing for limited discovery if the order
fails to comply with our precedent, because
one of the most salient benefits of qualified
immunity is protection from pretrial
discovery. If, however, such an order
complies with our precedent, we lack
jurisdiction to review it.

defer its qualified immunity ruling if further
factual development is necessary to
ascertain the availability of that defense.
First, the district court must determine that
the plaintiff's pleadings assert facts which,
if true, would overcome the defense of
qualified immunity. Thus, a plaintiff seeking
to overcome qualified immunity must plead
specific facts that both allow the court to
draw the reasonable inference that the
defendant is liable for the harm he has
alleged and that defeat a qualified
immunity defense with equal specificity.
When reviewing a complaint that meets
this standard, the district court may defer
its qualified immunity ruling and order
limited discovery if the court remains
unable to rule on the immunity defense
without further clarification of the facts.
Such a discovery order must be narrowly
tailored to uncover only those facts needed
to rule on the immunity claim. The Fifth
Circuit may review the order under the
collateral order doctrine when a district
court fails to find first that the plaintiff's
complaint overcomes a defendant's
qualified immunity defense, when the court
refuses to rule on a qualified immunity
defense, or when the court's discovery
order exceeds the requisite narrowly
tailored scope.

Civil Rights Law > Protection of
Rights > Immunity From
Liability > Defenses

*HN2*[↓]    **Immunity From Liability,
Defenses**

The United States Court of Appeals for the
Fifth Circuit has established a careful
procedure under which a district court may

Constitutional Law > Bill of
Rights > Fundamental Rights > Cruel &
Unusual Punishment

*HN3*[↓]  **Fundamental Rights, Cruel &
Unusual Punishment**

The *Eighth Amendment to the United
States Constitution* prohibits the infliction of
cruel   and   unusual   punishments.   *U.S.*

807 F.3d 657, *657; 2015 U.S. App. LEXIS 20016, **1

*Const. amend. VIII*. This prohibition, made applicable to the states through the *Fourteenth Amendment*, does not mandate comfortable prisons, but neither does it permit inhumane ones.

It is by the *Fourteenth Amendment*, and that provision alone, that the *Eighth Amendment's* guarantee applies against the States; the *Eighth Amendment* does not apply of its own force to the States.

Civil Rights Law > Protection of Rights > Prisoner Rights > Confinement Conditions

Constitutional Law > Bill of Rights > Fundamental Rights > Cruel & Unusual Punishment

*HN4*[⤓]  **Prisoner Rights, Confinement Conditions**

To plead an *Eighth Amendment* violation based on the conditions of an inmate's confinement, a plaintiff must allege conditions that pose a substantial risk of serious harm. The plaintiff must also allege that the defendant prison officials were deliberately indifferent to the inmate's health or safety. This requires more than an allegation of mere negligence, but less than an allegation of purpose or knowledge. Rather, a prison official acts with deliberate indifference when he knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.

Constitutional Law > Bill of Rights > Fundamental Rights > Cruel & Unusual Punishment

*HN5*[⤓]  **Fundamental Rights, Cruel & Unusual Punishment**

Civil Rights Law > Protection of Rights > Immunity From Liability > Defenses

*HN6*[⤓]  **Immunity From Liability, Defenses**

In the context of a qualified immunity defense, whether a risk is substantial and the threatened harm is serious represents an objective test; whether prison officials consciously disregarded the risk represents a subjective one. Furthermore, whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence, and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious. For instance, if an *Eighth Amendment* plaintiff presents evidence showing that a substantial risk of inmate attacks was long-standing, pervasive, well-documented, or expressly noted by prison officials in the past, and the circumstances suggest that the defendant-official being sued had been exposed to information concerning the risk and thus must have known about it, then such evidence could be sufficient to permit a trier of fact to find that the defendant-official had actual knowledge of the risk.

Civil Rights Law > Protection of

807 F.3d 657, *657; 2015 U.S. App. LEXIS 20016, **1

Rights > Prisoner Rights > Confinement Conditions

Constitutional Law > Bill of Rights > Fundamental Rights > Cruel & Unusual Punishment

**HN7**[⬇️] **Prisoner Rights, Confinement Conditions**

The United States Court of Appeals for the Fifth Circuit has held that exposing an inmate to extreme cell temperatures can constitute cruel and unusual punishment.

Civil Rights Law > Protection of Rights > Immunity From Liability > Defenses

**HN8**[⬇️] **Immunity From Liability, Defenses**

A public official is entitled to qualified immunity unless the plaintiff demonstrates that (1) the defendant violated the plaintiff's constitutional rights and (2) the defendant's actions were objectively unreasonable in light of clearly established law at the time of the violation. A government official's conduct violates clearly established law when, at the time of the challenged conduct, the contours of a right are sufficiently clear that every reasonable official would have understood that what he is doing violates that right.

Civil Rights Law > Protection of Rights > Prisoner Rights > Confinement Conditions

Constitutional Law > Bill of Rights > Fundamental Rights > Cruel &

Unusual Punishment

**HN9**[⬇️] **Prisoner Rights, Confinement Conditions**

The United States Court of Appeals for the Fifth Circuit's precedent clearly establishes that the *Eighth Amendment* guarantees inmates a right to be free from exposure to extremely dangerous temperatures without adequate remedial measures. In light of this precedent, a prison official acts unreasonably when he, either directly or through his policy, subjects an inmate to extremely dangerous temperatures without adequate remedial measures in conscious disregard of the risk posed by those temperatures.

Civil Rights Law > Protection of Rights > Prisoner Rights > Confinement Conditions

Constitutional Law > Bill of Rights > Fundamental Rights > Cruel & Unusual Punishment

**HN10**[⬇️] **Prisoner Rights, Confinement Conditions**

The United States Court of Appeals for the Fifth Circuit has made very clear that inmates have a right, under the *Eighth Amendment*, not to be subjected to extreme temperatures without adequate remedial measures, and Defendants have not alerted us to any contrary authority. While the Fifth Circuit has not had occasion to give an exhaustive list of acceptable remedial measures, it has held that the provision of fans, ice water, and daily showers can suffice.

807 F.3d 657, *657; 2015 U.S. App. LEXIS 20016, **1

Civil Rights Law > Protection of Rights > Immunity From Liability > Defenses

## *HN11*[⬇] Immunity From Liability, Defenses

When reviewing a well-pleaded complaint and a defendant's motion to dismiss on the basis of qualified immunity, a district court may defer its qualified immunity ruling and order limited discovery when the court remains unable to rule on the immunity defense without further clarification of the facts. In other words, a district court may elect the defer-and-discover approach when the defendant's immunity claim turns at least partially on a factual question that must be answered before a ruling can issue.

Civil Rights Law > Protection of Rights > Immunity From Liability > Defenses

## *HN12*[⬇] Immunity From Liability, Defenses

The qualified immunity inquiry requires the district court to evaluate whether the defendants acted with deliberate indifference by subjectively disregarding a known risk, and whether their actions were objectively reasonable despite the alleged deliberate indifference. Furthermore, the defendants' subjective knowledge is a question of fact, which the United States Court of Appeals for the Fifth Circuit has recognized is peculiarly within their knowledge and possession.

Civil Rights Law > Protection of

Rights > Immunity From Liability > Defenses

## *HN13*[⬇] Immunity From Liability, Defenses

The qualified immunity defense requires the district court to determine whether the defendants acted reasonably at the time of the alleged constitutional violation, and this determination is complicated when the deliberate indifference standard must be reconciled with the second prong's objective reasonableness standard. The reasonableness analysis must be different from the deliberate-indifference analysis, because otherwise, a successful claim of qualified immunity in this context would require defendants to demonstrate that they prevail on the merits, thus rendering qualified immunity an empty doctrine. In light of these complexities, the United States Court of Appeals for the Fifth Circuit has observed that additional facts are particularly important when evaluating the reasonableness prong of the qualified immunity test.

Civil Procedure > Appeals > Appellate Jurisdiction > Collateral Order Doctrine

Civil Rights Law > Protection of Rights > Immunity From Liability > Defenses

## *HN14*[⬇] Appellate Jurisdiction, Collateral Order Doctrine

A district court is empowered to defer its qualified immunity ruling and issue a discovery order. However, the breadth of the ordered discovery is critically important. Qualified immunity is immunity not only

807 F.3d 657, *657; 2015 U.S. App. LEXIS 20016, **1

from judgment, but also from suit; one of the most salient benefits of qualified immunity is protection from pretrial discovery. In determining whether to review a collateral order, the United States Court of Appeals for the Fifth Circuit therefore must determine whether the discovery that the district court ordered was narrowly tailored to uncover only those facts needed to rule on the immunity claim.

**Counsel:** For Ramona Hinojosa, Individually As A Wrongful Death Beneficiary And As The Heir To The Estate Of Albert Hinojosa, Plaintiff - Appellee: Jeff S. Edwards, Scott Charles Medlock, Edwards Law, Austin, Tx.

For Brad Livingston, Rick Thaler, William Stephens, Defendants - Appellants: Demetri Anastasiadis, Assistant Attorney General, Office Of The Attorney General, Law Enforcement Defense Division, Austin, Tx.

For Promise Of Justice Initiative, Amicus Curiae: Elizabeth Claire O'kane Compa, Promise Of Justice Initiative, New Orleans, La.

**Judges:** Before Reavley, Jones, And Elrod, Circuit Judges. Jones, Circuit Judge, Dissenting.

**Opinion by:** Jennifer Walker Elrod

## Opinion

 **[*661]**   JENNIFER WALKER ELROD, Circuit Judge:

In this interlocutory appeal, Brad Livingston, Rick Thaler, and William Stephens (collectively "Defendants")

challenge an order of the district court that deferred ruling on their motion to dismiss on the basis of qualified immunity and ordered limited discovery. Because the district court correctly concluded that the complaint was sufficient and that further factual development was needed to rule on Defendants' qualified immunity defense, and **[**2]** because the discovery that the district court ordered was narrowly tailored to the facts needed to rule on the defense, we lack jurisdiction over this appeal and dismiss.

I.

On August 29, 2012, Albert Hinojosa died of complications from heatstroke while he was incarcerated at the Garza West Unit of the Texas Department of Criminal Justice ("TDCJ").[1] Shortly after midnight, an inmate reported that Hinojosa had fallen out of his bed and was convulsing. A correctional officer found Hinojosa on the floor of his cell. He was unresponsive, and his skin was hot to the touch. The officer's supervisor called for an ambulance, but Hinojosa was pronounced dead twenty minutes after it arrived. An autopsy concluded that he "was vulnerable to the effects of environmental hyperthermia due to pre-existing natural disease, and likely suffered a seizure followed by fatal cardiac arrhythmia."

Hinojosa's mother and sole heir, Ramona Hinojosa, sued numerous prison officials and employees, the TDCJ, the University

---

[1] For purposes of this appeal, we take the complaint's factual allegations as true and view them in the light most favorable to the plaintiff. *See Atteberry v. Nocona Gen. Hosp., 430 F.3d 245, 252 (5th Cir. 2005).*

of Texas Medical Branch ("UTMB"), and an official **[\*\*3]** of UTMB, alleging that they were responsible for her son's death.[2] She asserted claims under *42 U.S.C. § 1983*, the Americans with Disabilities Act of 1990 ("ADA") and the ADA Amendments Act, *42 U.S.C. § 12131 et seq.*, and the Rehabilitation Act of 1973, *29 U.S.C. § 794*. Only the *§ 1983* claim is at issue in this appeal. Hinojosa's mother premised her *§ 1983* claim on an asserted *Eighth Amendment* violation, alleging that the conditions in which Defendants housed Hinojosa posed a substantial risk of serious harm, and that Defendants acted with deliberate indifference toward Hinojosa's health and safety needs.

The complaint alleges that at the time of his death, Hinojosa was forty-four years old and obese, and he suffered from hypertension, diabetes, depression, and schizophrenia—conditions that made him susceptible to heat-related illnesses. According **[\*662]** to the complaint, Hinojosa took various medications for his ailments, a common side-effect of which is that they render patients more vulnerable to the heat. The complaint alleges that, as reflected in TDCJ policies, Defendants knew that these conditions **[\*\*4]** and medications put affected prisoners at an increased risk of heat-related illness. Indeed, according to the complaint, from 2007 until Hinojosa's death, thirteen other men had died from heat-related causes in TDCJ prisons. Many of these individuals allegedly suffered from ailments—and had been prescribed medications—similar to

Hinojosa's. Moreover, the complaint alleges that like many of the other deceased prisoners, Hinojosa had recently been moved from a climate-controlled county jail,[3] and he died shortly after his arrival at a non-air-conditioned TDCJ transfer facility before he had much time to acclimatize to the high temperatures of the new environment. The complaint alleges that TDCJ policies acknowledged the importance of acclimatization to reduce the risk of heatstroke, but TDCJ did not have any housing assignment policy for newly arrived inmates to help them acclimatize.

According to the complaint, although certain parts of the Garza West Unit have air conditioning, those portions used to house inmates do not, and the Unit's windows are sealed shut. The complaint alleges **[\*\*5]** that summer temperatures inside the Unit routinely exceed 90°F, and even 100°F. The complaint specifically alleges that the day before Hinojosa died, the temperature at the Unit surpassed 100°F, and in twenty-seven of the twenty-eight days preceding his death, the temperature rose above 95°F. According to the complaint, while TDCJ policies dictate that inmates with heat-sensitive conditions not work or recreate in environments where the apparent air temperature is 95°F or higher, they do not address housing assignments for such inmates. In addition, according to the complaint, inmates sometimes wait up to ten days to receive their intake physical examination after their transfer to TDCJ custody. These physicals provide the first opportunity to detect and

---

[2] Ramona Hinojosa passed away during the pendency of this appeal, and Rene Arturo Hinojosa—Ramona's grandson and Albert's nephew—is now pursuing this suit as representative of Ramona's estate.

[3] By law, the indoor temperature of Texas county jails generally must be kept between 65°F and 85°F. *See 37 Tex. Admin. Code §§ 259.160*, *260.154*.

treat inmates' heat-sensitive medical problems, and the complaint alleges that TDCJ will not allow newly arrived inmates to labor outdoors until they have received an intake physical. But what is true for work is not true for housing, the complaint asserts. According to the complaint, before they receive their intake physicals, newly arrived inmates may not labor outdoors in high temperatures, but they are nonetheless housed in high **[**6]** indoor temperatures along with the rest of the inmate population.

The complaint alleges that despite their awareness of numerous prior heat-related fatalities, Defendants took no corrective action. Under policies that Defendants allegedly implemented and could have changed, no housing accommodation was made for newly arrived inmates or inmates with heat-sensitive medical conditions. The complaint asserts that Thaler and Stephens routinely reviewed reports of heat-related injuries and deaths and regularly discussed those incidents in meetings with their deputies. According to the complaint, however, they made no changes to inmates' accommodations, failed to ensure that inmates timely received intake physicals, and failed to implement any other protective procedures. Livingston also took no action, the complaint alleges, even though he approved cooling measures for barns housing pigs that TDCJ raises for slaughter. The complaint also alleges that **[*663]** Livingston took part in the decision not to employ medical staff at the Garza West Unit during night hours, and that all three supervisory Defendants were responsible for an alleged lack of adequate training that correctional officers

received. **[**7]**

**II**.

Defendants moved to dismiss the § 1983 claim against them on the basis of qualified immunity. They argued that as the top three security administrators of TDCJ,[4] they were not personally responsible for— and did not personally participate in—any decisions regarding Hinojosa's housing or medical needs, and they did not violate clearly established law.

After hearing argument on the motion, the district court orally denied it from the bench. In its later-issued written order explaining its reasoning, the district court held that the complaint alleged facts which, if true, would permit the inference that the defendants were liable for the alleged harm and would defeat the qualified immunity defense. However, **[**8]** the district court determined that further factual development was necessary for it to rule on the defense, because "[t]here remain significant questions to be answered as to the details of the TDCJ Defendants' knowledge, actions, omissions and/or policies in regards to TDCJ prison operations in times of extreme heat." Therefore, the district court deferred ruling on the qualified immunity defense and ordered discovery "limited to the personal knowledge and personal conduct of each

---

[4] As detailed in the complaint, at the time of Hinojosa's death, Brad Livingston was the executive director of TDCJ, Rick Thaler was the director of TDCJ's Correctional Institutions Division, and William Stephens was the deputy director of the Correctional Institutions Division. The complaint asserts that in their capacities, Livingston, Thaler, and Stephens exercised administrative authority over all TDCJ employees working in TDCJ institutions, including those working in the Garza West Unit.

807 F.3d 657, *663; 2015 U.S. App. LEXIS 20016, **8

Defendant as it relates to Albert Hinojosa and the circumstances leading to his death." Defendants then initiated this interlocutory appeal.

## III.

The parties disagree over whether we have jurisdiction to review the district court's order. *HN1*[↑] Under *28 U.S.C. § 1291*, we have jurisdiction to review "final decisions" of the district courts in our circuit. Generally, this class of decisions "does not include discovery orders." *Backe v. LeBlanc, 691 F.3d 645, 647-48 (5th Cir. 2012)*. However, the Supreme Court has interpreted *§ 1291* to include a grant of authority to review a "small class" of collateral orders traditionally considered non-final. *See Cohen v. Beneficial Indus. Loan Corp., 337 U.S. 541, 545-47, 69 S. Ct. 1221, 93 L. Ed. 1528 (1949)*. Under this collateral order doctrine, we have jurisdiction under *§ 1291* to entertain appeals from decisions that "[1] conclusively determine the disputed **[**9]** question, [2] resolve an important issue completely separate from the merits of the action, and [3] [are] effectively unreviewable on appeal from a final judgment." *Texas v. Caremark, Inc., 584 F.3d 655, 657-58 (5th Cir. 2009)* (alterations in original) (quoting *Will v. Hallock, 546 U.S. 345, 349, 126 S. Ct. 952, 163 L. Ed. 2d 836 (2006))*. A district court's order denying qualified immunity is one such order. *Zapata v. Melson, 750 F.3d 481, 484 (5th Cir. 2014)*; *Backe, 691 F.3d at 648*. So too is an order deferring the district court's qualified immunity ruling and providing for limited discovery if the order fails to comply with our precedent, because

"[o]ne of the most salient benefits of qualified immunity is protection from pretrial discovery." *Backe, 691 F.3d at [*664] 648*. If, however, such an order complies with our precedent, we lack jurisdiction to review it. *Zapata, 750 F.3d at 485*; *Backe, 691 F.3d at 648*.

Thus, to determine whether we have jurisdiction over this interlocutory appeal, we must determine whether the district court's order complied with our precedent for issuing such orders. *HN2*[↑] "[T]his court has established a careful procedure under which a district court may defer its qualified immunity ruling if further factual development is necessary to ascertain the availability of that defense." *Backe, 691 F.3d at 648*. First, the district court must determine "that the plaintiff's pleadings assert facts which, if true, would overcome the defense of qualified immunity." *Id.* (quoting *Wicks v. Miss. State Emp't Servs., 41 F.3d 991, 994 (5th Cir. 1995))*. "Thus, **[**10]** a plaintiff seeking to overcome qualified immunity must plead specific facts that both allow the court to draw the reasonable inference that the defendant is liable for the harm he has alleged and that defeat a qualified immunity defense with equal specificity." *Id.* When reviewing a complaint that meets this standard, the district court may defer its qualified immunity ruling and order limited discovery if "the court remains 'unable to rule on the immunity defense without further clarification of the facts.'" *Id.* (quoting *Lion Boulos v. Wilson, 834 F.2d 504, 507 (5th Cir. 1987))*. Such a discovery order must be "narrowly tailored to uncover only those facts needed to rule on the immunity claim." *Id.* (quoting *Lion Boulos, 834 F.2d at 507-08*). "[W]e may review the

order under the collateral order doctrine when a district court fails to find first that the plaintiff's complaint overcomes a defendant's qualified immunity defense, when the court refuses to rule on a qualified immunity defense, or when the court's discovery order exceeds the requisite 'narrowly tailored' scope." *Id.* (internal citations omitted); *see also Zapata, 750 F.3d at 485*.

## IV.

## A.

We first ask whether the complaint pleads facts that, if true, would permit the inference that Defendants are liable under *§ 1983* for an *Eighth Amendment* violation and would overcome **[**11]** their qualified immunity defense. We conclude that it does.

### i.

**HN3**[⬆] The *Eighth Amendment to the United States Constitution* prohibits the infliction of "cruel and unusual punishments." *U.S. Const. amend. VIII*. This prohibition, made applicable to the States through the *Fourteenth Amendment*,[5] *see* **[*665]** *Robinson v. California, 370 U.S. 660, 666-67, 82 S. Ct. 1417, 8 L. Ed. 2d 758 (1962)*, "does not mandate comfortable prisons, but neither does it permit inhumane ones." *Ball v. LeBlanc, 792 F.3d 584, 592 (5th Cir. 2015)* (quoting *Farmer v. Brennan, 511 U.S. 825, 832, 114 S. Ct. 1970, 128 L. Ed. 2d 811 (1994)).* **HN4**[⬆] To plead an *Eighth Amendment* violation based on the conditions of an inmate's confinement, a plaintiff must allege conditions that "pos[e] a substantial risk of serious harm." *Farmer, 511 U.S. at 834*. The plaintiff must also allege that the defendant prison officials were deliberately indifferent to the inmate's health or safety. *Id.* This requires more than an allegation of mere negligence, but less than an allegation of purpose or knowledge. *Id. at 835-36*. Rather, a prison official acts with deliberate indifference when he "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id. at 837*.

**HN6**[⬆] Whether a risk is substantial and

---

[5] In their initial brief, Defendants argue that "[a] prison conditions claim by a prisoner convicted of a crime is governed by the Eighth and not the *Fourteenth Amendment*," and "[b]ecause the Complaint does not claim that Hinojosa **[**12]** was a pre-trial detainee, the *Fourteenth Amendment* claim should have been dismissed." Defendants misunderstand the complaint's invocation of the *Fourteenth Amendment*. The complaint invokes the *Fourteenth Amendment* simply because **HN5**[⬆] it is by that provision—and that provision alone—that the *Eighth Amendment's* guarantee applies against the States; the *Eighth Amendment* does not apply of its own force to the States. *See Robinson, 370 U.S. at 666-67* (holding that the *Fourteenth Amendment* makes the *Eighth Amendment's* guarantee applicable against the States and concluding that the state law challenged in that case "inflicts a cruel and unusual punishment *in violation of the Fourteenth Amendment*") (emphasis added); *see also McDonald v. City of Chicago, 561 U.S. 742, 765, 130 S. Ct. 3020, 177 L. Ed. 2d 894 (2010)* (noting that the Court has "held that incorporated *Bill of Rights* protections 'are all to be enforced against the States *under the Fourteenth Amendment* according to the same standards that protect those personal rights against federal encroachment'") (emphasis added) (quoting *Malloy v. Hogan, 378 U.S. 1, 10, 84 S. Ct. 1489, 12 L. Ed. 2d 653 (1964)).* Indeed, contrary to Defendants' argument, nothing in the complaint or in Plaintiff's briefs suggests any intention to bring a pre-trial detention conditions-of-confinement claim.

the threatened harm is serious represents an objective test; whether prison officials consciously disregarded the risk represents a subjective one. *Ball, 792 F.3d at 592*. Furthermore, "[w]hether a prison official had the requisite **[**13]** knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence, and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." *Farmer, 511 U.S. at 842* (internal citation omitted). For instance, "if an *Eighth Amendment* plaintiff presents evidence showing that a substantial risk of inmate attacks was longstanding, pervasive, well-documented, or expressly noted by prison officials in the past, and the circumstances suggest that the defendant-official being sued had been exposed to information concerning the risk and thus 'must have known' about it, then such evidence could be sufficient to permit a trier of fact to find that the defendant-official had actual knowledge of the risk." *Id. at 842-43* (internal quotation marks omitted).

**HN7**[⬆] We have held that exposing an inmate to extreme cell temperatures can constitute cruel and unusual punishment. *See, e.g., Ball, 792 F.3d at 592*; *Gates v. Cook, 376 F.3d 323, 339-40 (5th Cir. 2004)*; *Blackmon v. Garza, 484 F. App'x 866, 869 (5th Cir. 2012)*; *see also Smith v. Sullivan, 553 F.2d 373, 381 (5th Cir. 1977)* (noting that the *Eighth Amendment* is implicated by "extremes of temperature that are likely to be injurious to inmates' health"). In *Gates*, we affirmed an injunction requiring state prison officials to provide ice water, fans, and daily showers **[**14]** when the heat index was

90°F or above. *376 F.3d at 339-40*. The evidence in *Gates* showed that "summer temperatures . . . average[d] in the nineties with high humidity," ventilation measures were inadequate to afford relief from the heat, "[t]he probability of heat-related illness [was] extreme," and inmates taking certain medications were especially susceptible to the heat. *Id. at 334*. In holding that the district court had properly identified an *Eighth Amendment* violation, we noted that an expert had testified that heat-related deaths were "very likely," and **[*666]** that a finding of deliberate indifference was justified "based on the open and obvious nature of these conditions and the evidence that inmates had complained of symptoms of heat-related illness." *Id. at 339-40*.

Similarly, in *Blackmon*, we held that prison officials were not entitled to judgment as a matter of law where the evidence showed extreme temperatures in the facility, the plaintiff inmate was particularly susceptible to heat-related injury because of his age and medication, and the prison officials were aware of the danger but took arguably inadequate remedial measures. *484 F. App'x at 870-73*. Most recently, in *Ball*, we held that an injunction requiring heat-reduction measures was supported by an *Eighth Amendment* violation where **[**15]** an expert testified that the plaintiff inmates were particularly susceptible to the heat because of their medical conditions and treatments, and the evidence showed that during a monitoring period, the heat index at the facility ranged from 81.5°F to 107.79°F, with temperatures ranging from 78.26°F to 92.66°F. *792 F.3d at 596*. Prison officials had violated the *Eighth Amendment* even though they

argued that no inmate at the subject facility "ha[d] ever suffered a heat-related incident" and the plaintiffs' "medical records show[ed] no signs of heat-related illness." *Id. at 593*. This is because, "[t]o prove unconstitutional prison conditions, inmates need not show that death or serious injury has already occurred. They need only show that there is a substantial risk of serious harm." *Id.* (internal quotation marks and citation omitted).

**ii**.

Here, the complaint alleges an *Eighth Amendment* violation. The complaint alleges that Defendants subjected Hinojosa to dangerous heat conditions in conscious disregard of the serious risk that the heat posed for prisoners who, like Hinojosa, suffered from certain medical conditions, took certain medications, and had recently been transferred from air-conditioned jails to non-climate-controlled facilities. As to conditions posing **[**\*\*16**]** a substantial risk of serious harm, the complaint alleges that temperatures in the Garza West Unit routinely exceeded 90°F, and even 100°F, and that Defendants' policies subjected inmates to these dangerous temperatures. It asserts that Hinojosa died in his cell in the early morning due to complications following a heatstroke, and that the temperature had risen above 100°F during the previous day. The complaint also alleges that inmates are provided "grossly inadequate amounts of water" to cope with the heat. These allegations plainly suffice to set forth conditions constituting a substantial risk of serious harm to inmates with medical conditions and prescriptions like

Hinojosa's. *See Ball, 792 F.3d at 594*; *Gates, 376 F.3d at 339-40*; *Blackmon, 484 F. App'x at 870-71*.

Moreover, to support its claim that Defendants were aware of the heat risk and consciously disregarded it, the complaint alleges that from 2007 until Hinojosa's death, thirteen other men had died from heat-related causes in TDCJ prisons under similar circumstances, and TDCJ had previously been sued by inmates complaining of the heat.[6] Ten of these thirteen deaths **[**\*667**]** occurred in 2011, the year before Hinojosa's. Furthermore, the complaint alleges that Defendants took no action despite their knowledge **[**\*\*17**]** of these deaths, of the extreme temperatures in TDCJ facilities, of the vulnerability of recently transferred inmates with conditions and medications similar to Hinojosa's, and of the importance of timely intake physicals. It also alleges that TDCJ policies themselves recognized the risk of heat to inmates like Hinojosa, and Defendants provided training (albeit inadequate training) regarding extreme temperatures, suggesting their awareness of the risk.

The complaint specifically asserts that

_____

[6] The complaint refers to the following heat-condition cases brought by inmates: *Ruiz v. Johnson, 37 F. Supp. 2d 855 (S.D. Tex. 1999)*, *rev'd and remanded sub nom. Ruiz v. United States, 243 F.3d 941 (5th Cir. 2001)*; *Valigura v. Mendoza, 265 F. App'x 232 (5th Cir. 2008)*; *Blackmon v. Kukua, 758 F. Supp. 2d 398 (S.D. Tex. 2010)*, *rev'd and remanded sub nom. Blackmon v. Garza, 484 F. App'x 866 (5th Cir. 2012)*. It also refers to a pending lawsuit, *McCollum v. Livingston*, No. 3:12-cv-2037 (N.D. Tex.), which arose from one of the deaths described in the complaint. In its order, the district court took notice that additional wrongful death lawsuits similar to the present one have been filed against TDCJ and Defendants, and it cited one of them, *Webb v. Livingston, No. 6:13-cv-711, 2014 U.S. Dist. LEXIS 34081 (E.D. Tex.)*.

Thaler and Stephens routinely reviewed reports of heat-related injuries and deaths, discussing them in meetings with their deputies. According to the complaint, while Thaler [**18] and Stephens maintain that they remind regional directors and wardens to take heat-safety precautions, Thaler and Stephens in fact do no such thing. The complaint also asserts that Livingston personally approved cooling measures to protect the swine that TDCJ raises for slaughter, and Plaintiff argues that this allegation shows that Livingston was aware of the heat risk to inmates. The complaint also describes a letter that a state representative sent to Livingston, expressing concern about the high temperatures and asking that TDCJ take preventative measures.

These allegations, if true, would establish that Defendants were "aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and . . . also dr[ew] the inference." *Farmer, 511 U.S. at 837*; *see also* *id. at 842-43* (observing that deliberate indifference can be inferred merely from the obviousness of the risk, such as when prior incidents are pervasive or well-documented and circumstances suggest that the defendant was aware of them); *cf. also Ball, 792 F.3d at 594-95* (holding that the defendants were aware of the risk posed by high temperatures even though they argued no inmate had ever suffered a heat-related incident at the subject facility). In any [**19] event, the open and obvious nature of the dangerously hot conditions would also support an inference of deliberate indifference. *See Gates, 376 F.3d at 340*.

Defendants argue that the complaint fails to plead deliberate indifference because it does not allege that they were aware of Hinojosa's specific medical history and needs. However, their lack of knowledge of Hinojosa's individual susceptibility to heat-related dangers cannot defeat an *Eighth Amendment* claim. The complaint alleges that Defendants were aware of the risk to recently transferred inmates with conditions and medications like Hinojosa's and yet took no action. Prison officials cannot escape liability in a conditions-of-confinement case like this one by arguing that, while they allegedly were aware of and consciously disregarded a substantial risk of serious harm to a discrete class of vulnerable inmates, they were not aware that the particular inmate involved in the case belonged to that class. *See Farmer, 511 U.S. at 843* (in a case alleging prison conditions that created a risk of violence, holding that "it does not matter whether the risk comes from a single source or multiple sources, any more than it matters whether a prisoner faces an excessive risk of attack for reasons personal [**20] to him *or because all prisoners in his situation face such a* [*668] *risk*") (emphasis added); *id. at 844* (observing that where prison violence is widespread, "it would obviously be irrelevant to liability that the officials could not guess beforehand precisely who would attack whom"); *Helling v. McKinney, 509 U.S. 25, 33, 113 S. Ct. 2475, 125 L. Ed. 2d 22 (1993)* (noting that the *Eighth Amendment* is implicated—and *§ 1983* liability may be triggered—when prison officials allow inmates to be exposed to infectious disease, "even though the possible infection might not affect all of those exposed"). Furthermore, even assuming *arguendo* that Defendants'

ignorance of Hinojosa's medical history could be relevant, the complaint alleges dangerous conditions that we have previously held to be unconstitutional for general inmate populations. *See Gates, 376 F.3d at 339-40*.

In sum, then, the complaint adequately alleges an *Eighth Amendment* violation based on Hinojosa's conditions of confinement. Nevertheless, Defendants contend that the complaint does not properly allege *their responsibility* for the asserted constitutional violation because *§ 1983* does not contemplate supervisory liability. They argue that they cannot be held liable for the alleged failures of medical personnel and subordinate corrections officers because they did not personally participate in **[**21]** those failures.

The premise of Defendants' argument is undoubtedly correct. In *Monell v. Department of Social Services*, the Supreme Court held that claims against local governments premised on a theory of *respondeat superior* liability are not cognizable under *§ 1983*. *436 U.S. 658, 691-94, 98 S. Ct. 2018, 56 L. Ed. 2d 611 (1978)*. Relying on *Monell*, "we have held that supervisory officials may not be found vicariously liable for the actions of their subordinates under *§ 1983*." *Doe v. Taylor Indep. Sch. Dist., 15 F.3d 443, 452 (5th Cir. 1994)* (en banc); *see also Thompson v. Steele, 709 F.2d 381, 382 (5th Cir. 1983)* (citing *Monell* for the proposition that "*§ 1983* does not give a cause of action based on the conduct of subordinates," and observing that "[p]ersonal involvement is an essential element of a civil rights cause of action"). Indeed, the Supreme

Court squarely held in *Ashcroft v. Iqbal* that *§ 1983* claims against supervisory officials cannot be premised merely upon their knowledge of subordinates' actions. *556 U.S. 662, 677, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009)*. Instead, under *§ 1983*, "each Government official, his or her title notwithstanding, is only liable for his or her own misconduct." *Id.*

But Defendants misread the complaint. The complaint does not seek to hold Defendants vicariously liable for the actions of their subordinates. Rather, it seeks to hold them liable for their own actions in promulgating—and failing to correct—intake and housing **[**22]** policies that exposed Hinojosa and other inmates like him to extreme temperatures without adequate remedial measures. "A supervisory official may be held liable . . . if . . . he implements unconstitutional policies that causally result in the constitutional injury." *Porter v. Epps, 659 F.3d 440, 446 (5th Cir. 2011)* (internal quotation marks omitted). To the extent that Defendants appear to argue they had no hand in the formation of the intake and housing policies described in the complaint, they raise a factual dispute inappropriate for resolution on a motion to dismiss. The complaint specifically alleges that Defendants promulgated and had the power to change the policies that allegedly caused Hinojosa's death. Moreover, while it is true that the complaint contains allegations regarding the conduct of Defendants' subordinates, these allegations seek only to establish direct liability against **[*669]** those subordinates who were also named as defendants in the complaint, not vicarious liability against Livingston, Thaler, and Stephens.

iii.

The complaint alleges facts that, if true, not only would establish Defendants' liability for an *Eighth Amendment* violation, but also would be sufficient to overcome a qualified immunity defense. **HN8**[↑] "A public official is **[**23]** entitled to qualified immunity unless the plaintiff demonstrates that (1) the defendant violated the plaintiff's constitutional rights and (2) the defendant's actions were objectively unreasonable in light of clearly established law at the time of the violation." *Porter, 659 F.3d at 445*. "A Government official's conduct violates clearly established law when, at the time of the challenged conduct, '[t]he contours of [a] right [are] sufficiently clear' that every 'reasonable official would have understood that what he is doing violates that right.'" *Ashcroft v. al-Kidd, 563 U.S. 731, 131 S. Ct. 2074, 2083, 179 L. Ed. 2d 1149 (2011)* (quoting *Anderson v. Creighton, 483 U.S. 635, 640, 107 S. Ct. 3034, 97 L. Ed. 2d 523 (1987))*. **HN9**[↑] Our precedent clearly establishes that the *Eighth Amendment* guarantees inmates a right to be free from exposure to extremely dangerous temperatures without adequate remedial measures. *See, e.g., Gates, 376 F.3d at 339-40*; *Blackmon, 484 F. App'x at 869*; *see also Smith, 553 F.2d at 381*. In light of this precedent, a prison official acts unreasonably when he, either directly or through his policy, subjects an inmate to extremely dangerous temperatures without adequate remedial measures in conscious disregard of the risk posed by those temperatures.

Defendants argue, however, that the complaint cannot surmount the qualified immunity hurdle because there is no clearly established right to an air-conditioned cell or to around-the-clock **[**24]** medical care. Defendants' argument again misreads the complaint and confuses right with remedy. While the complaint does allege that TDCJ cells are not air-conditioned and that TDCJ fails to employ medical staff during nighttime hours, it does not claim that the *Eighth Amendment* requires such accommodations. Rather, the right that it asserts is the right to be free from exposure to extremely dangerous temperatures without adequate remedial measures. The complaint's description of the lack of remedial measures does not purport to be an exhaustive list of the *Eighth Amendment's* basic requirements. It is simply a description of several ways in which Defendants could have addressed the risk, but instead chose not to do so. The right that it asserts, however, is the well-established *Eighth Amendment* right not to be subjected to extremely dangerous temperatures without adequate ameliorative measures.

Defendants also contend that the Supreme Court's recent decision in *Taylor v. Barkes, 135 S. Ct. 2042, 192 L. Ed. 2d 78 (2015)*, bolsters their qualified immunity argument. It does not. In *Barkes*, survivors of an inmate who committed suicide brought suit against, *inter alia*, the commissioner of the Delaware Department of Corrections and the institution's warden. *Id. at 2043*. When the inmate had arrived at the **[**25]** facility, a nurse administered an intake mental health evaluation, which revealed only two out of seventeen possible suicide risk factors. *Id.* Following established protocol, the nurse gave the inmate a routine referral

to mental health services but did not activate any special suicide-prevention measures. *Id.* The inmate was placed alone in a cell and hanged himself the next day. *Id.* The plaintiffs claimed that the commissioner and warden violated the inmate's *Eighth Amendment* **[*670]** right "by failing to supervise and monitor the private contractor that provided the medical treatment—including the intake screening—at the Institution." *Id.* The Supreme Court held that the defendants were entitled to qualified immunity because no decision of the Court "even discusses suicide screening or prevention protocols," the Third Circuit's own case law did not clearly recognize such a right, and other circuits had generally "suggested that such a right did *not* exist." *Id. at 2044-45.* In sum, the Court found, even if the alleged shortcomings existed, "no precedent on the books . . . would have made clear to petitioners that they were overseeing a system that violated the Constitution." *Id. at 2045.*

Here, by contrast, assuming Hinojosa's allegations **[**26]** to be true, our precedent put Defendants on notice that they were "overseeing a system that violated the Constitution." *Id. HN10*[⬆] Our circuit has made very clear that inmates have a right, under the *Eighth Amendment*, not to be subjected to extreme temperatures without adequate remedial measures, and Defendants have not alerted us to any contrary authority. *See, e.g., Gates, 376 F.3d at 339-40; see also Smith, 553 F.2d at 381; Blackmon, 484 F. App'x at 869.* While we have not had occasion to give an exhaustive list of acceptable remedial measures, we have held that the provision of fans, ice water, and daily showers can

suffice. *See Gates, 376 F.3d at 339-40; see also Ball, 792 F.3d at 599* (approving remedies short of full air-conditioning such as the diversion of cool air from prison staff areas into inmate areas, allowing inmates to access air conditioning during specified times, and the provision of cool daily showers, cold ice water, personal ice containers, and individual fans).

A reasonable prison official in our circuit knows that during times of extreme heat, he must afford these remedies—or remedies like them—to satisfactorily address the risk of heat-related illnesses and fatalities. However, the complaint alleges that TDCJ did not provide enough drinking water or personal fans during times of extreme heat, and that **[**27]** the water that was provided was only lukewarm. The complaint also alleges that Defendants knew that prisoners such as Hinojosa were particularly vulnerable to the heat, and that through the intake and housing policies that they promulgated, they failed to ensure that such prisoners received any meaningful relief. If true, this would defeat a qualified immunity defense, because it would establish that Defendants subjected Hinojosa to extreme temperatures without adequate remedial measures, in violation of our circuit's clearly established law.

**B**.

Having determined that the complaint's factual allegations, if true, would establish Defendants' liability for an *Eighth Amendment* violation and overcome a qualified immunity defense, we next ask whether further clarification of the facts

was necessary for the district court to rule on the qualified immunity defense. We easily conclude that it was.

*HN11*[↑] When reviewing a well-pleaded complaint and a defendant's motion to dismiss on the basis of qualified immunity, a district court may defer its qualified immunity ruling and order limited discovery when "the court remains 'unable to rule on the immunity defense without further clarification of the facts.'" *Backe, 691 F.3d at 648* (quoting **[\*\*28]** *Lion Boulos, 834 F.2d at 507*). In other words, a district court may elect the defer-and-discover approach "when the defendant's immunity claim turns at least partially on a factual question" that must be answered before a ruling can issue. *Lion Boulos, 834 F.2d at 507*.

**[\*671]** Here, the district court held that it was unable to rule on Defendants' qualified immunity claim because factual development was needed as to their "knowledge, actions, omissions and/or policies in regards to TDCJ prison operations in times of extreme heat." In particular, the district court concluded that:

[I]t is necessary to know when and how the TDCJ Defendants learned about specific prisoner deaths, including the death of Albert Hinojosa, and/or serious injury related to extreme heat; whether the TDCJ Defendants ordered that conditions be monitored or a study conducted regarding extreme heat and inmate safety; their familiarity with Fifth Circuit case law addressing the dangers of heat within the context of the *Eighth Amendment* and whether or not policies were implemented or changed in accordance with such direction; whether the TDCJ has

performed any studies into the costs of reducing extreme temperatures within the dorms via more efficient systems, engineering modifications, or other facility **[\*\*29]** upgrades; whether the TDCJ Defendants personally consulted with UTMB officials in regards to the transportation and housing of at-risk inmates during the summer months; whether the TDCJ Defendants considered that at-risk inmates be maintained in air-conditioned facilities when in transport; and whether the TDCJ Defendants received copies of notes, memoranda, emails, or other correspondence from TDCJ wardens concerning heat-related issues at their units and any administrative responses thereto.

The district court considered these factual issues to be "particularly important when evaluating the second prong of the qualified immunity test—the reasonableness of the TDCJ Defendants' actions in light of the clearly established constitutional right to be free from extreme temperatures."

The factual questions of what Defendants knew, when they knew it, and whether they investigated and considered possible remedial measures, are undoubtedly necessary to answer before determining whether Defendants acted reasonably in light of clearly established law. Of course, as detailed above, Defendants' knowledge is central to the deliberate indifference element of Plaintiff's *Eighth Amendment* claim. However, their knowledge **[\*\*30]** is also highly relevant to qualified immunity, because it bears heavily on the reasonableness of their actions.

807 F.3d 657, *671; 2015 U.S. App. LEXIS 20016, **30

As we recently observed in a similar interlocutory appeal from a district court's discovery order, *HN12*[↑] the qualified immunity inquiry requires the district court to "evaluate whether [the defendants] acted with deliberate indifference by subjectively disregarding a known risk, and whether [their] actions were objectively reasonable despite the alleged deliberate indifference." *Webb v. Livingston, No. 14-40579, 618 Fed. Appx. 201, 2015 U.S. App. LEXIS 12445, 2015 WL 4385287, at *5 (5th Cir. July 17, 2015)* (unpublished) (internal citation omitted) (holding that a district court's defer-and-discover order in a similar wrongful death case against Livingston, Thaler, and Stephens complied with our precedent for issuing such orders, and dismissing for lack of jurisdiction). Furthermore, Defendants' "subjective knowledge is a question of fact, which this court has recognized is peculiarly within [their] knowledge and possession." *Id.* (internal quotation marks omitted); *see also Gates, 376 F.3d at 333* ("Whether a prison official had the requisite knowledge of a substantial risk is a question of fact . . . ."); *Schultea v. Wood, 47 F.3d 1427, 1431 (5th Cir. 1995)* (recognizing that the establishment of qualified immunity "depend[s] on facts peculiarly within the knowledge and control of the defendant" **[**31]** (quoting *Gomez v. Toledo, 446 U.S. 635, 641, 100 S. Ct. 1920, 64 L. Ed. 2d 572 (1980))*.

**[*672]** *HN13*[↑] The qualified immunity defense requires the district court to determine whether Defendants acted reasonably at the time of the alleged constitutional violation, and "[t]his determination is complicated when, as here, the deliberate indifference standard must be reconciled with the second prong's objective reasonableness standard." *Webb, 2015 U.S. App. LEXIS 12445, 2015 WL 4385287, at *6*. The reasonableness analysis must be different from the deliberate-indifference analysis, because "[o]therwise, a successful claim of qualified immunity in this context would require defendants to demonstrate that they prevail on the merits, thus rendering qualified immunity an empty doctrine." *Id.* (quoting *Hare v. City of Corinth, 135 F.3d 320, 328 (5th Cir. 1998)*. "In light of these complexities, we have observed that '[a]dditional facts . . . are particularly important when evaluating the [reasonableness] prong of the qualified immunity test.'" *Id.* (quoting *Morgan v. Hubert, 335 F. App'x 466, 473 (5th Cir. 2009)*. That holds true in this case. The district court did not err in determining that factual development was needed to rule on Defendants' qualified immunity defense.

**C.**

Our foregoing discussion establishes that *HN14*[↑] the district court was empowered to defer its qualified immunity ruling and issue a discovery order. However, the breadth of the ordered discovery is critically important. **[**32]** Qualified immunity is immunity not only from judgment, but also from suit; "[o]ne of the most salient benefits of qualified immunity is protection from pretrial discovery." *Backe, 691 F.3d at 648*. We therefore must determine whether the discovery that the district court ordered was "narrowly tailored to uncover only those facts needed to rule on the immunity claim." *Id.* (quoting *Lion Boulos, 834 F.2d at 507-08*). While this

presents a somewhat close question, we conclude that the district court's discovery order was appropriately tailored.

The district court ordered discovery "limited to the personal knowledge and personal conduct of each Defendant as it relates to Albert Hinojosa and the circumstances leading to his death." The district court elaborated that:

> Such discovery may include Defendants' knowledge of extreme temperatures at the Garza West Unit, including knowledge of any prisoner complaints to prison officials about the temperature in the dorms or cells for the months of May through September for the years of 2010, 2011, and 2012. Plaintiff may inquire as to each Defendant's personal knowledge, if any, in regards to the effects of extreme heat on pre-existing medical conditions of hypertension, diabetes, depression, and schizophrenia, **[\*\*33]** whether Defendants are familiar with the medications generally prescribed to treat such conditions, and whether Defendants have knowledge or training concerning medications and extreme heat. Plaintiff may inquire as to any policies and procedures in place at the Garza West Unit, as well as TDCJ system-wide policies or procedures, adopted or in place to address prison operations when temperatures are considered to constitute extreme heat.

Defendants contend that this discovery is overbroad because it relates to a three-year period, encompasses system-wide TDCJ policies and conditions rather than those only at the Garza West Unit, and covers complaints by inmates without

medical conditions like Hinojosa's. Defendants also seize on the discovery order's observation that factual development was necessary as to "whether the TDCJ Defendants considered that at-risk inmates be maintained in air-conditioned facilities **[\*673]** when in transport," apparently interpreting this line to authorize discovery as to whether TDCJ inmate-transportation vehicles are equipped with air conditioning. Defendants also dismiss as "irrelevant" their general knowledge about prison heat, whether they conducted studies or **[\*\*34]** consulted with UTMB officials, TDCJ policies regarding operations during extreme temperatures, when and how they learned of other inmate deaths, their familiarity with our precedent, their receipt of correspondence from wardens regarding heat-related issues, and whether policies were implemented or changed. Finally, Defendants contend that they have already provided "extensive discovery" in other similar cases, making the district court's discovery order unnecessary.

As a preliminary matter, we do not agree that the district court's order authorizes discovery regarding inmate transportation in TDCJ vehicles. The district court observed that discovery was needed to determine "whether the TDCJ Defendants personally consulted with UTMB officials in regards to the transportation and housing of at-risk inmates during the summer months," and "whether the TDCJ Defendants considered that at-risk inmates be maintained in air-conditioned facilities when in transport." In making this observation, the district court appears to have used the words "transportation" and "transport" to mean the movement of

inmates into a transfer facility, such as the Garza West Unit, and then through the prison system. **[**35]** The transportation of inmates in non-air-conditioned TDCJ vehicles has never been at issue in this case, and in any event, the district court's order never discusses the matter. Moreover, the complaint specifically alleges that inmates are most vulnerable when moved from air-conditioned county jails into non-climate-controlled transfer facilities, like the Garza West Unit, because of the temperature change and lack of opportunity to acclimatize. Viewed alongside the nature of the complaint's allegations, Defendants' strained reading of the district court's use of the words "transportation" and "transport" is mistaken.

We also disagree with Defendants' assertion that much of the ordered discovery was "irrelevant." The complaint sets out an *Eighth Amendment* claim by alleging deliberate indifference to dangerous heat conditions in TDCJ facilities. Assuming that the complaint's allegations are true, to be entitled to qualified immunity, Defendants must show either that they were not deliberately indifferent to the heat risk, or that their actions were reasonable in light of clearly established law. What Defendants knew about prison heat and its risks (especially for vulnerable inmates with medical conditions **[**36]** like Hinojosa's), when and how Defendants acquired such knowledge, whether Defendants investigated the risk and explored possible remedial measures, and whether Defendants adopted policies to respond to the heat risk are factual issues highly relevant to evaluating the reasonableness of Defendants' actions. In addition, we reject Defendants' contention that their provision of extensive discovery in other similar cases renders superfluous any discovery in the instant case. If anything, this fact cuts in the other direction, suggesting that the plaintiff in this case will similarly be able to discover a great deal of relevant material. Regardless, discovery for one plaintiff in one case is not superfluous simply because other plaintiffs in other cases have had an opportunity to conduct it.[7]

 **[*674]** Defendants' strongest argument concerns the discovery order's breadth and timeframe, inasmuch as it allows discovery regarding TDCJ system-wide policies or procedures and Defendants' knowledge of any inmates' heat-related **[**37]** complaints during a three-year period. Hinojosa died in the summer of 2012. With the exception of two inmate deaths dating back to 2007 and one other death in 2012, the other alleged inmate deaths all took place during the summer of 2011. In addition, the complaint focuses its allegations on TDCJ transfer facilities, like the Garza West Unit, where inmates typically arrive from air-conditioned county jails. However, the district court's order permits discovery not only into Defendants' knowledge of policies and procedures in place at the Garza West Unit and other similar transfer facilities, but also system-wide TDCJ policies and procedures. Furthermore, while the complaint focuses on Hinojosa's vulnerability to the heat due to his conditions and medications, the

---

[7] Nothing in our opinion should be construed to prevent Defendants from asking the district court to consolidate discovery proceedings with the discovery proceedings in other related cases.

district court's order allows discovery regarding Defendants' knowledge of all inmates' heat-related complaints, not simply those of vulnerable inmates like Hinojosa.

Defendants advance a colorable argument that these discovery items are broader than necessary, but ultimately we are not persuaded. In a vacuum, the most relevant time period for discovery would seem to begin with the summer of 2011, during which ten TDCJ inmates **[**38]** allegedly perished from heat-related causes. However, we cannot say with any certainty that discovery into Defendants' knowledge of inmate complaints dating back to the summer of 2010 would be unnecessary. According to the complaint, by the summer of 2010, two inmates had already died from heat-related causes. Whether Defendants knew about inmate complaints during the summer of 2010 would shed light on the reasonableness of their actions. Likewise, while Defendants' knowledge of heat-related policies and procedures in place at the Garza West Unit and similar transfer facilities is more probative than their knowledge of policies and practices at other TDCJ facilities, we cannot say that discovery as to the latter is unnecessary. Defendants' knowledge of any heat-related TDCJ policy or procedure (or lack thereof) would bear on whether they acted reasonably in promulgating (or declining to change) the alleged policies for which the complaint seeks to hold them responsible. The same holds true for the district court's authorization to discover Defendants' knowledge of complaints by all inmates rather than simply complaints by those inmates with medical vulnerabilities. *See Gates, 376 F.3d at 340* (observing **[**39]**

that prior complaints by other inmates are probative of deliberate indifference). Both are relevant to the reasonableness of Defendants' actions, and we cannot say that discovery regarding the former—though perhaps less probative than the latter—is unnecessary.

To the extent we might have any lingering doubt about the breadth of the discovery order, we note that the district court was careful to state that discovery will be "limited to the personal knowledge and personal conduct of each Defendant as it relates to Albert Hinojosa and the circumstances leading to his death." This provides an outer boundary for all of the specific discovery items that follow, and those items should be interpreted with that boundary in mind. If Plaintiff requests discovery that is irrelevant to Defendants' knowledge and personal conduct regarding Hinojosa and the circumstances leading to his death, Defendants can seek **[*675]** enforcement of the plain language in the district court's order that prohibits such discovery.

## V.

Because, as set forth above, the district court's order complies with our precedent, we DISMISS this interlocutory appeal for want of jurisdiction. We express no opinion on how the district court **[**40]** should rule on Defendants' qualified immunity defense.

**Dissent by:** JONES

## Dissent

JONES, Circuit Judge, dissenting:

No one doubts the tragedy of a prisoner's life lost to heat stroke during a hot Texas summer. The question here, however, is not whether better prison policies or procedures might theoretically have prevented Hinojosa's death in the Garza West transfer unit of the Texas Department of Criminal Justice ("TDCJ"). As in all cases of qualified immunity, the question is whether the three top officials of the TDCJ ("Executive Defendants"), whose 111 institutions supervise over 150,000 prisoners at a time, must endure litigation and potential personal liability in damages for this prisoner's death because of some arguably defective "condition of confinement." *See Mullenix v. Luna, 577 U.S. __, 136 S. Ct. 305, 193 L. Ed. 2d 255, 2015 WL 6829329 (2015)* (summarily reversing Fifth Circuit denial of qualified immunity to police officer because his conduct did not violate clearly established law under the circumstances he confronted). I would also reverse the district court order denying qualified immunity on the pleadings. *See Mitchell v. Forsyth, 472 U.S. 511, 526, 105 S. Ct. 2806, 2815, 86 L. Ed. 2d 411 (1985)* ("Unless the plaintiff's allegations state a claim of violation of clearly established law, a defendant pleading qualified immunity is entitled *to dismissal* before the **[**41]** commencement of discovery.") (emphasis added).

The majority opinion here violates the clearly established law of qualified immunity by holding that under "clearly established" constitutional law, these officials may have been deliberately indifferent to the vaguely specified conditions under which Hinojosa succumbed. This is because there is no allegation that they directly participated in any way in the management of this prison unit, and the plaintiff herself makes significant countervailing allegations about TDCJ policies, training, and procedures designed to address the risks of high temperatures. If the majority opinion is correct, then the top TDCJ officials might also be personally liable for any other injury-causing "condition of confinement"— a salmonella outbreak in a prison unit's food service, the crash of a prison transport bus, a mishandled hurricane evacuation,[1] slippery prison showers, or even heart attacks or prison suicides.

The implications for suicide prevention would be obvious, except that the majority opinion is squarely at odds with the Supreme Court's decision in *Taylor v. Barkes*, which held *as a matter of law* that the top official of the Delaware prison system **[**42]** and the particular institution's warden violated no "clearly established law" by failing to oversee "proper implementation of adequate suicide prevention protocols." *135 S. Ct. 2042, 2044, 192 L. Ed. 2d 78 (2015)* (per curiam). In so doing, the Court overruled a Third Circuit decision denying summary judgment. Statistically, far more prisoner deaths are caused by suicide than heat stroke,[2] and **[*676]** the Court did not deny

---

[1] *Cf. **Spotts v. United States, 613 F.3d 559 (5th Cir. 2010)***.

[2] Hinojosa's complaint alleges that between 2007 and 2012, 13 TDCJ prisoners died of heat stroke (prior to Hinojosa's own death). During the period from 2001 to 2013, 326 prisoners died in TDCJ custody as a result of suicide—an average of approximately 25 deaths a year, more than eight times the average number of deaths per year alleged in this case (less than 3). *See* Margaret Noonan et al., U.S. Dep't of Justice, Mortality in Local Jails and State Prisons, **[**43]** 2000-2013 — Statistical Tables 25 tbl.25 (2015), *available at*

that generally, the prisons are responsible for the protection of inmates. *See, e.g., Farmer v. Brennan, 511 U.S. 825, 114 S. Ct. 1970, 128 L. Ed. 2d 811 (1994)*. Yet, the Supreme Court summarily reversed, holding that no court opinion has placed beyond doubt a prisoner's right to the proper implementation of adequate suicide prevention protocols, much less "identif[ied] any minimum screening procedures or prevention protocols that facilities must use." *Taylor, 135 S. Ct. at 2044-45*.

By the lights of *Taylor, Mullenix*, and many other Supreme Court decisions, the majority opinion is indefensible for two primary reasons. First, it defines the allegedly "clearly established right" of Hinojosa in an overbroad and ambiguous way, the antithesis of what qualified immunity stands for. Qualified immunity is due these officials as a matter of law. Second, it affords credence to pleadings that are insufficient under *Iqbal*[3] to raise a question about these officials' liability under any circumstances. The pleadings thus failed to state a claim under *Rule 12(b)(6)*.[4]

---

*http://www.bjs.gov/content/pub/pdf/mljsp0013st.pdf*.

[3] *Ashcroft v. Iqbal, 556 U.S. 662, 678, 129 S. Ct. 1937, 1949, 173 L. Ed. 2d 868 (2009)*.

[4] Additionally, the majority opinion condones abusive discovery that has already amassed thousands of pages of documents, plus depositions against these defendants, rendering their ultimate exoneration a hollow victory. This discovery far exceeds the case at hand, as it covers a lengthy time frame and the entirety of the TDCJ prison system. Qualified immunity, after all, is "*immunity from suit*, and extends beyond just a defense to liability to include all aspects of civil litigation." *Jacquez v. Procunier, 801 F.2d 789, 791 (5th Cir. 1986)*; *see also Iqbal, 556 U.S. at 685, 129 S. Ct. at 1953* ("The basic thrust of the qualified-immunity doctrine is to free officials [**44] from the concerns of litigation, including avoidance of disruptive discovery.") (internal quotation marks omitted).

## I. BACKGROUND

A brief synopsis of the relevant pleadings and the majority's characterization of the alleged constitutional violations is important. Hinojosa was transferred to the Garza West transfer unit, which houses well over 2,000 inmates, in August 2012. He was middle aged and obese and was under medication for hypertension, diabetes, and schizophrenia. Within two days of his arrival at this non-air conditioned facility, another prisoner in his dorm room observed him going into convulsions late at night and called for medical help. It took about two hours for "emergency" assistance to arrive, and Hinojosa was pronounced dead shortly thereafter. No facts are pled about remediation within the prison unit for heat conditions other than an alleged gross deficiency of drinking water and personal (not institutional) fans.

Hinojosa's lawsuit included as defendants not only the three top officials of the TDCJ, appellants here, but also the head of the Correctional Managed Care Program at the University of Texas Medical Branch-Galveston, which is responsible for medical care [**45] of most TDCJ inmates, regional administrators, and wardens. Relevant to these top officials, the majority opinion culls from the plaintiff's pleadings as follows: TDCJ policies "reflect" the officials' knowledge that prisoners with medical conditions and treatment like Hinojosa's are unusually susceptible to excessive heat. TDCJ "policies" acknowledge the importance of acclimating inmates "to reduce [*677] the risk of heatstroke" as they transfer from air

conditioned county jails to TDCJ, "but TDCJ did not have any housing assignment policy for newly arrived inmates to help them acclimatize [sic]." More precisely put, TDCJ "policies" specify that (a) newly arrived inmates with heat-sensitive conditions may not work or engage in recreation in high temperature conditions, and (b) no newly arrived inmates may labor outdoors until they have had an intake physical exam, which may not occur for up to ten days. "[T]hey are nonetheless housed in high indoor temperatures along with the rest of the inmate population." These defendants' "policies" made no accommodation for newly arrived inmates or inmates with heat-sensitive medical conditions. These defendants "failed to ensure that inmates timely received **[\*\*46]** intake physicals, and failed to implement any other protective procedures." Livingston allegedly "took part in the decision not to employ medical staff at the Garza West Unit during night hours, and . . . all three supervisory Defendants were responsible for an alleged lack of adequate training that correctional officers received."

The majority omit mentioning many other allegations in the plaintiff's complaint directed to proving liability on the part of the medical defendants and wardens who were situated closer to or at Garza West. These telling allegations include:

• Dr. Owen Murray of the UTMB's Correctional Managed Care Program "oversees the medical, mental health and dental services provided to prisoners [in] . . . the Garza West Unit." (Pl.'s Compl. at ¶ 13.)

• "Murray is responsible for ensuring that TDCJ facilities serviced by UTMB provide adequate health care to prisoners, that prisoners have access to adequate health care, that infirmaries at units . . . are adequately staffed to handle medical conditions and emergencies that occur, and for formulating policies to ensure that prisoners receive adequate care, that serious medical needs are not treated with deliberate indifference, **[\*\*47]** and that prisoners are not subjected to dangerous conditions as a consequence of their health issues and medical needs." (*Id.* at ¶ 31.)

• "Murray has not instituted any practice or policy concerning safely housing inmates known to be especially vulnerable to the heat." (*Id.* at ¶ 41.)

• "As the wardens and regional director, respectively, Guterrez and Kennedy are directly responsible for training the front-line officers charged with protecting prisoners' lives." (*Id.* at ¶ 73.)

• "[A]fter . . . two men died in 2007, Dr. Murray instituted no changes to UTMB's intake and housing practices, and continued to leave vulnerable prisoners at risk of heat stroke system-wide." (*Id.* at ¶ 78.)

• "Despite . . . ten deaths in 2011, Dr. Murray and UTMB continued to house vulnerable inmates in extremely hot temperatures without any protections. And he did this knowing that some areas of TDCJ units, including at Garza West Unit, have air conditioned spaces available." (*Id.* at ¶ 89.)

According to the majority and the plaintiff,

807 F.3d 657, *677; 2015 U.S. App. LEXIS 20016, **47

this is an *Eighth Amendment* "conditions of confinement" case in which liability is based on an objective standard of constitutionally inhumane prison conditions and a subjective standard embodying the defendants' **[\*\*48]** deliberate indifference to those conditions. *Ball v. LeBlanc, 792 F.3d 584, 592 (5th Cir. 2015)*. In such circumstances, it is unnecessary to demonstrate that top officials of TDCJ either **[\*678]** personally participated in or knew about Hinojosa's imprisonment so long as they knew generally of the risk of high heat to particularly vulnerable prisoners. Consequently, according to the majority, these defendants are not being sued "in their supervisory capacity," but rather for "their own actions in promulgating—and failing to correct—intake and housing policies that exposed Hinojosa and other inmates like him to extreme temperatures without adequate remedial measures."

The defendants' qualified immunity defense is rejected by the majority because the "right that [the complaint] asserts . . . is the well-established *Eighth Amendment* right not to be subjected to extremely dangerous temperatures without adequate ameliorative measures." The majority concede that "[w]hile we have not had occasion to give an exhaustive list of acceptable remedial measures, we have held that the provision of fans, ice water, and daily showers can suffice." *See Gates v. Cook, 376 F.3d 323, 339-40 (5th Cir. 2004)*.[5] The majority conclude that

immunity cannot be awarded on the pleadings because "[a] reasonable prison official in our circuit knows **[\*\*49]** that during times of extreme heat, he must afford these remedies—or remedies like them—to satisfactorily address the risk of heat-related illnesses and fatalities." The majority finds sufficient to overcome qualified immunity the allegations that "Defendants knew that prisoners such as Hinojosa were particularly vulnerable to the heat, and that through the intake and housing policies that they promulgated, they failed to ensure that such prisoners received any meaningful relief." In short, the Defendants, under these allegations "subjected Hinojosa to extreme temperatures without adequate remedial measures, in violation of our circuit's clearly established law."

The majority finally condone a long list of discovery inquiries allegedly relevant to how much these defendants knew about heat-related **[\*\*50]** issues in TDCJ. According to the majority, such discovery (which has already encompassed thousands of papers and depositions in similar pending cases) bears on defendants' knowledge, which is allegedly relevant both to their subjective states of mind and the objective reasonableness of their actions for liability and qualified immunity purposes.

## II. QUALIFIED IMMUNITY

The panel majority should have proceeded along the same lines as the Court in *Taylor v. Barkes*. In *Taylor*, the Third Circuit

---

[5] *See also **Ball, 792 F.3d at 600*** (approving remedies including diversion of cool air from prison staff areas, allowing inmates to access air conditioning during specified times, plus cool daily showers, cold ice water, personal ice containers, and individual fans). *Ball*, however, cannot be a basis for

rejecting qualified immunity, because that opinion was issued in 2015, three years and more after the events here in dispute.

807 F.3d 657, *678; 2015 U.S. App. LEXIS 20016, **50

approached qualified immunity by determining first that the plaintiffs had alleged a cognizable theory of supervisory liability, but the Supreme Court declined to consider that issue. *Taylor, 135 S. Ct. at 2043*. Instead, the Court reversed the lower court because "an incarcerated person's right to the proper implementation of adequate suicide prevention protocols" is not a clearly established constitutional right. *Id. at 2044*.

*Taylor* succinctly expressed the basic standards for qualified immunity:

"Qualified immunity shields government officials from civil damages liability unless the official violated a statutory or constitutional right that was clearly established at the time of the challenged conduct." *Reichle v. Howards, 132 S. Ct. 2088, 2093, 182 L. Ed. 2d [*679] 985 (2012)*. "To be clearly established, [**51] a right must be sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Id.* (brackets and internal quotation marks omitted). "When properly applied, [qualified immunity] protects all but the plainly incompetent or those who knowingly violate the law." *Ashcroft v. al-Kidd, 563 U.S. 731, 131 S. Ct. 2074, 2085, 179 L. Ed. 2d 1149 (2011)* (internal quotation marks omitted). "We do not require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate." *Id. at 2083*.

*135 S. Ct. at 2044* (parallel citations omitted). Here, as in *Taylor*, the Executive Defendants were neither plainly

incompetent nor knowing lawbreakers. The alleged actions of the Executive Defendants were not objectively unreasonable in light of the clearly established law at the time of the violation, and they are entitled to immunity from suit.

The majority assert the right that was "clearly established" at the time of Hinojosa's death is the right to "be free from exposure to extremely dangerous temperatures without adequate remedial measures." This "right" is a tautology. Under this formulation, what "reasonable but mistaken judgment" could the Executive Defendants have made about what the law requires? [**52] *See al-Kidd, 131 S. Ct. at 2085*. If this is the "clearly established right," then qualified immunity would cease to exist: if adequate remedial measures were in place, there would be no constitutional violation; if reasonable remedial measures fell short of being adequate, there would be liability. *See Morgan v. Swanson, 659 F.3d 359, 372 (5th Cir. 2011)* (en banc) ("Further, the Supreme Court has held that generalizations and abstract propositions are not capable of clearly establishing the law.")

This broad definition of the "clearly established right," which the majority opinion repeats three times in its discussion of qualified immunity and again in purporting to distinguish *Taylor*, is far more general than the precise policy deficiencies charged against the Executive Defendants—intake, housing, and medical policies geared to inmates with heat sensitive medical conditions. Yet only "clearly established law" that is tailored to the specific facts confronted by a

defendant suffices to deprive him of qualified immunity. *Brosseau v. Haugen, 543 U.S. 194, 198, 125 S. Ct 596, 599, 160 L. Ed. 2d 583 (2004)* (per curiam) ("It is important to emphasize that this inquiry 'must be undertaken in light of the specific context of the case, not as a broad general proposition.'") (quoting *Saucier v. Katz, 533 U.S. 194, 201, 121 S. Ct. 2151, 2156, 150 L. Ed. 2d 272 (2001)).

This overbreadth is a significant error in the majority's analysis. **[**53]** The right to be free from extreme temperatures without adequate remedial measures is too generalized to be of any use to the Executive Defendants in deciding what actions they should or should not take regarding system-wide policies. The qualified immunity doctrine is "highly context-sensitive." *McClendon v. City of Columbia, 305 F.3d 314, 332 n.13 (5th Cir. 2002)* (en banc) (per curiam). And the Supreme Court has repeatedly and frequently instructed—recently with some exasperation—that courts should not "define clearly established law at a high level of generality." *al-Kidd, 131 S. Ct. at 2084*. Instead, the right must be defined so that it is "beyond debate" that "every reasonable official would have understood that what he is doing violates that right." *Id. at 2083* (internal quotation marks omitted) (quoting *Anderson v. Creighton, 483 U.S. 635, 640, [*680] 107 S. Ct. 3034, 3039, 97 L. Ed. 2d 523 (1987)).* The Supreme Court's guidance underlines the real world implications of the qualified immunity analysis. General principles are of limited use to prison officials who must often make difficult policy choices in highly fact-dependent situations. Because reasonable mistakes are inevitable in these settings,

the "clearly established" requirement protects mistaken judgments.

Here, it would not have been clear to a reasonable official in the position of the Executive Defendants that **[**54]** his conduct was unlawful in the situation confronted. Certainly it would not be "beyond debate" that the failure to establish specific intake, medical, or housing policies other than those in place when Hinojosa died would result in an *Eighth Amendment* violation. Assuming *arguendo* the majority's characterization of the right at issue, all that has been fairly established by this court's precedent is that in the face of high temperatures, some measures must be adopted to provide "relief," *Smith v. Sullivan, 553 F.2d 373, 381 (5th Cir. 1977)*, including, in limited circumstances, extra fans, ice water, and daily showers,[6] *Gates, 376 F.3d at 336*. *But see Woods v. Edwards, 51 F.3d 577, 581 (5th Cir. 1995)* (per curiam) ("While the temperature in extended lockdown may be uncomfortable, that alone cannot support a finding that the plaintiff was subjected to cruel and unusual punishment in violation of the *Eighth Amendment*.")

Further limiting these cases' applicability to the Executive Defendants' qualified immunity is that all were confined to particular inmates or particular sections of prisons. *Gates*, for instance, was an injunction limited to Mississippi's **[**55]** death row; *Smith* an injunction placed upon the El Paso County Jail. This distinction is

---

[6] Another case says prison officials should take steps to "address the risks of high heat." *See Blackmon v. Garza, 484 F. App'x 866, 872 (5th Cir. 2012)*. But as an unpublished and non-precedential opinion, *Blackmon* supplies no clearly established law.

critical because the Supreme Court has admonished that the clearly established law should generally be derived from cases that "squarely govern[]" the facts presented. *Brosseau, 543 U.S. at 201, 125 S. Ct. at 600.* Measures that are necessary or appropriate to address high temperatures at one prison unit may not be constitutionally required at another. Compare, at just one analytical level, the needs of medical units, low security units, and high security units. It makes no sense to extrapolate from a couple of fact-dependent prison conditions cases the constitutional requirements for TDCJ's policies covering its 111 statewide units. Indeed, even the majority opinion concedes there is no "exhaustive list of acceptable remedial measures" in prior cases, leaving only "remedies like them" as the vague constitutional baseline. In other words, not one of the housing and intake policies advocated in the complaint and the majority opinion are required or even mentioned in this court's clearly established law.[7] It is disingenuous to conclude **[\*681]** that it would have been clear to any reasonable Executive Defendant that his conduct violated an established **[\*\*56]** constitutional right.[8]

Moreover, the plaintiff's complaint demonstrates that the Executive Defendants acted reasonably under these circumstances. The complaint discusses that TDCJ policies recognized the risk of heat stroke. (*See* Pl.'s Compl. at ¶¶ 19, 48-50.) The complaint discusses that TDCJ training covers the risk of heat stroke. (*Id.* at ¶¶ 71-72.) The complaint avers that TDCJ policy requires the provision of a certain amount of water per day. (*Id.* at ¶ 60.) The complaint specifies that, under current policies, all prisoners arriving at Garza West were forbidden to labor outdoors until they had a physical exam, and those with heat-sensitive conditions could neither labor nor engage in recreation in high temperature conditions. (*Id.* at ¶¶ 65, 123.)

The plaintiff's mere dissatisfaction with the specificity and breadth of policy and training does not render the policies objectively unreasonable for the purposes of qualified immunity. *See, e.g., Whitt v. Stephens Cty., 529 F.3d 278, 284 (5th Cir. 2008).* The Supreme Court has cautioned **[\*\*58]** against second-guessing the specificity and coverage of existing policy and training in the context of *§ 1983* damages actions because every time a state actor violates a constitutional right, "a

---

[7] The plaintiff frequently complains about the lack of air conditioning in Garza West. (*See, e.g.,* Pl.'s Compl. at ¶ 35 ("Though extreme indoor temperatures at the Garza West Unit in the summer are well known to TDCJ and UTMB officials, TDCJ's leadership, including Kennedy, Stephens, Thaler, and Livingston, has taken no steps to air condition prisoner housing areas at the Garza West Unit.").) It is unlikely that such a remedy could be undertaken by the Executive Defendants without legislative approval due to the cost. In addition, to the extent this court's precedents speak about more comprehensive heat remedies, they reject that air conditioning must be installed to ensure cool prisons. *See Ball, 792 F.3d at 599*; *Blackmon, 484 F. App'x at 872 n.6*.

[8] And this is "[a]ssuming for the sake of argument that a right

can be 'clearly established' by circuit precedent despite disagreement in the courts of appeals." *Barkes, 135 S. Ct. at 2045.* Otherwise, any right "clearly established" in our case law must be compared against the pronouncements of other courts of appeals that have had occasion to consider hot temperatures in the prisons. *See, e.g., Chandler v. Crosby, 379 F.3d 1278, 1297-98 (11th Cir. 2004)* (finding no constitutional violation where temperatures ranged from 80 to 95 degrees ("not unconstitutionally excessive") **[\*\*57]** and the prison's remedial measures were a ventilation system, prison cells not in direct sunlight, prisoners not compelled to wear heavy clothing or perform laborious tasks, and prisoners with access to running water and a drinking cup).

807 F.3d 657, *681; 2015 U.S. App. LEXIS 20016, **57

§ 1983 plaintiff will be able to point to something the [state] 'could have done' to prevent the unfortunate incident." *Connick v. Thompson, 563 U.S. 51, 131 S. Ct. 1350, 1363, 179 L. Ed. 2d 417 (2011)* (quoting *City of Canton v. Harris, 489 U.S. 378, 392, 109 S. Ct. 1197, 1206, 103 L. Ed. 2d 412 (1989))*.

In fact, as the complaint recognizes, the state did do something to address potential adverse medical consequences of high temperatures: these defendants rely on the University of Texas Medical Branch-Galveston in formulating policies and taking actions relating to the health and medical safety of prisoners. (Pl.'s Compl. at ¶¶ 13, 15, 31, 143.) Our case law allows prison officials to defer to medical professionals on a wide range of health issues. *See, e.g., Brauner v. Coody, 793 F.3d 493, 501 (5th Cir. 2015)*. Because our cases have sometimes held prison officers liable for *not* seeking professional medical attention for prisoners, few things seem *more* reasonable than relying on the judgment of a well-respected medical organization to address health and safety policies concerning the prevention and treatment of heat stroke. *See, e.g., Thompson v. Upshur Cty., 245 F.3d 447, 457-64 (5th Cir. 2001)* (reviewing cases and holding that a jail official violated clearly established law by failing **[\*\*59]** to "arrang[e] for professional medical assistance for . . . serious medical need"); *Domino v. Tex. Dep't of Criminal Justice, 239 F.3d 752, 756 (5th Cir. 2001)* (calling decisions to provide medical treatment a "classic example of a matter for medical judgment"); *see also Lee v. Young, 533 F.3d 505, 511 (7th Cir. 2008)* ("[I]n determining the best way to handle **[\*682]**

an inmate's medical needs, prison officials who are not medical professionals are entitled to rely on the opinions of medical professionals.").

It is not clearly established that TDCJ needed to have more specific policies regarding how to deal with heat-vulnerable prisoners during high heat conditions. It is certainly reasonable for the Executive Defendants to rely on subordinates, be they doctors or wardens or prison guards, to take the necessary steps to address problems that arise on an individual or unit level. *See Johnson v. Johnson, 385 F.3d 503, 526 (5th Cir. 2004)* ("Like all prison officials, these supervisory defendants have a duty to take reasonable measures to protect inmates. Yet given the size of the operation that they oversee, they cannot be expected to intervene personally" in every threat that arises.) (citation omitted). Without more definitive court rulings, it is not objectively unreasonable when prison policies and training exist to avert heat-related illness, but they ultimately prove inadequate **[\*\*60]** to address every conceivable situation.

Contrary rules would implicate a core function of qualified immunity: government efficiency and effectiveness. *See Harlow v. Fitzgerald, 457 U.S. 800, 814, 102 S. Ct. 2727, 2736, 73 L. Ed. 2d 396 (1982)* (describing one of qualified immunity's chief concerns as "the diversion of official energy from pressing public issues"). Imagine if TDCJ's Executive Director had to personally oversee the amount and temperature of water afforded to prisoners at all 111 TDCJ facilities or else face the risk of personal liability. (*See* Pl.'s Compl. at ¶ 60 ("Throughout the system . . . the

jugs did not contain enough water for each prisoner to drink enough to protect them from the heat, and are frequently filled with lukewarm water."). Such a rule would reduce government functioning to a crawl while high-level officials micromanaged their subordinates for fear that mistakes would subject them to "punitive and compensatory" judgments in federal court. (*See id.* at ¶¶ 8-10.)

This leads us back to *Taylor v. Barkes*, which should control this case, but which the majority confine to a dismissive paragraph. *Taylor* also originated in tragedy: a jail suicide. *135 S. Ct. at 2043*. The plaintiffs sued the head of the Delaware Department of Corrections and the prison warden for **[**61]** failing to prevent the suicide by not properly supervising the medical personnel who administered the suicide screening protocol. *Id.* Denying summary judgment, the Third Circuit found it clearly established that a "particular vulnerability to suicide" was a serious medical need encompassed within the *Eighth Amendment*. *Barkes v. First Corr. Med., Inc., 766 F.3d 307, 328-29 (3d Cir. 2014)*, *rev'd sub nom., Taylor, 135 S. Ct. at 2044*. The Third Circuit then pivoted to conclude that such a finding "place[d] it beyond debate that appropriate suicide-preventive measures are a required component of the Constitution's command that prison administrators provide adequate mental and physical health care for inmates." *Id. at 329* (citation and internal quotation marks omitted).

A unanimous Supreme Court summarily reversed and granted qualified immunity as a matter of law. *Id. at 2044*. The Court held that even under Third Circuit precedent, a

right "to the proper implementation of adequate suicide prevention protocols" was not clearly established. *Id.* The Court recognized that the Third Circuit's cases may establish that where prison officials "know . . . of the particular vulnerability to suicide of an inmate, they have an obligation not to act with reckless indifference to that vulnerability." *Id. at 2045* (internal quotation marks omitted) **[*683]** (quoting **[**62]** *Colburn v. Upper Darby Twp., 838 F.2d 663, 669 (3d Cir. 1988))*. But such cases *did not* clearly establish "that detention facilities must implement particular procedures to identify such vulnerable inmates, let alone specify what procedures would suffice" or "identify any minimum screening procedures or prevention protocols that facilities must use." *Id.* In this light, the Court concluded, "*even if the [jail's] suicide screening and prevention measures contained the shortcomings that respondents allege, no precedent on the books . . . would have made clear to petitioners that they were overseeing a system that violated the Constitution." Id.* (emphasis added).

The parallels between *Taylor* and this case are obvious. Like the Third Circuit majority, the majority here affirm an *Eighth Amendment* right of medically vulnerable inmates not to be subjected to extreme temperatures without adequate remedial measures. Like the Third Circuit majority, the panel majority here approve a claim that these defendants were deliberately indifferent to the inmate's serious medical needs because their policies failed to provide certain "adequate remedial measures" or "measures like those" mentioned in prior circuit case law. Moreover, as in *Taylor*, it is alleged that the

Executive **[\*\*63]** Defendants knew their system was inadequate because thirteen other inmates died from heatstroke in five years before Hinojosa's death. The *Taylor* plaintiffs also explicitly alleged that the Delaware prison officials "were aware that the suicide rate in the Delaware prisons was above the national average." Third Am. Compl. at ¶ 54(i), *Barkes v. First Corr. Med., Inc., No. 06-104-LPS, 2012 U.S. Dist. LEXIS 98983, 2012 WL 2914915 (D. Del. July 17, 2012)*.

The majority's analytical mistake in this decision is the same mistake made by the Third Circuit. Simply substituting "heat stroke" for "suicide" in the Supreme Court's language proves my point. Paraphrasing *Taylor*,

[Fifth Circuit] cases may establish that where prison officials "know . . . of the particular vulnerability to [heat stroke] of an inmate, they have an obligation not to act with reckless indifference to that vulnerability." *Taylor, 135 S. Ct. at 2045* (internal quotation marks omitted). But that *does not* clearly establish "that detention facilities must implement procedures to identify such vulnerable inmates, let alone specify what procedures would suffice" or "identify *any* minimum screening procedures or prevention protocols that facilities must use." *Id.* (emphasis added). Thus, "even if [TDCJ's heat vulnerability and heat **[\*\*64]** stroke] screening and prevention measures contained the shortcomings that respondents allege, no precedent on the books [in August 2012] would have made clear to petitioners that they were overseeing a system that violated the Constitution."

*Id.*

No prior Fifth Circuit case comes close to giving these Executive Defendants fair notice that they needed additional system-wide housing, medical, or intake policies to avoid running afoul of the Constitution and exposing themselves to personal liability. This court should grant the Executive Defendants' motion to dismiss.

## III. SUFFICIENCY OF PLEADING EXECUTIVE DEFENDANTS' LIABILITY

Underlying all qualified immunity cases is the question "whether the plaintiff has asserted a violation of a constitutional right at all." *Siegert v. Gilley, 500 U.S. 226, 231-32, 111 S. Ct 1789, 1793, 114 L. Ed. 2d 277 (1991)*. The plaintiff must assert the constitutional violation in a complaint containing "sufficient factual matter, **[\*684]** accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal, 556 U.S. at 678, 129 S. Ct. at 1949 (2009)* (quoting *Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570, 127 S. Ct. 1955, 1974, 167 L. Ed. 2d 929 (2007))*. A complaint consisting of "labels and conclusions" or "naked assertion[s] devoid of further factual enhancement" will not suffice. *Id., 129 S. Ct. at 1950* (alteration in original) (internal quotation marks omitted) (quoting *Twombly, 550 U.S. at 555, 557, 127 S. Ct. at 1965-66*). Instead the plaintiff must plead enough **[\*\*65]** facts to "nudge[] [the] claims . . . across the line from conceivable to plausible." *Id. at 680, 129 S. Ct. at 1951* (internal quotation marks omitted) (quoting *Twombly, 550 U.S. at 570, 127 S. Ct. at 1960*).

To assert a violation of the *Eighth*

*Amendment* for deliberate indifference to an inmate's health or safety, the plaintiff's complaint must plausibly allege that "prison conditions . . . pose[d] an unreasonable risk of serious damage" to the plaintiff and that prison officials "acted with deliberate indifference to the risk posed." *Ball, 792 F.3d at 592* (internal quotation marks omitted). Deliberate indifference is not mere negligence; the plaintiff must allege more than that the Executive Defendants should have known about the risk. *See Farmer, 511 U.S. at 835-36, 114 S. Ct. at 1978.* Instead, the plaintiff must plead that the Executive Defendants actually knew about the risk and failed to respond reasonably in the face of it. *See id. at 844-45, 114 S. Ct. at 1982-83*; *see also Johnson, 385 F.3d at 524* ("Finally—and significantly . . .—there is no liability if the official responded reasonably to the risk, even if the harm ultimately was not averted.") (internal quotation marks omitted); *cf. Taylor, 135 S. Ct. at 2045* (characterizing Third Circuit cases as holding that where prison officials "know . . . of the particular vulnerability to suicide of an inmate, they have an obligation not to act with reckless indifference to that **[**66]** vulnerability.").

Despite its length, the plaintiff's complaint here is rife with bare conclusional allegations against the Executive Defendants and irrelevant specific allegations. The complaint fails to plead their knowledge of unconstitutional conditions at Garza West and in fact demonstrates that they acted reasonably to provide "adequate remedial measures."

A. Generalized, conclusional allegations

The Supreme Court has made plain that,

"[a]bsent vicarious liability, each Government official, his or her title notwithstanding, is only liable for his or her own misconduct." *Iqbal, 556 U.S. at 677, 129 S. Ct. at 1949.* When the plaintiff's complaint uses blanket terms covering all the defendants, by lumping them together or calling them collectively "TDCJ," these allegations are properly disregarded unless the reference to the Executive Defendants can be clearly inferred. *Accord. Weiland v. Palm Beach Cty. Sheriff's Office, 792 F.3d 1313, 1323 & n.14 (11th Cir. 2015)* (describing this form of "shotgun pleading" as a "sin" consisting of "asserting multiple claims against multiple defendants without specifying which of the defendants are responsible for which acts or omissions"). For instance, the plaintiff alleges that "Defendants provide grossly inadequate amounts of water to help prisoners survive the extremely-high temperatures **[**67]** indoors." (Pl.'s Compl. at ¶ 60.) It is not a plausible inference that TDCJ Executive Director Brad Livingston, all the way from his Huntsville office, personally provides grossly inadequate amounts of water to prisoners in Beeville, Texas. All such allegations should have been disregarded.

The complaint against the Executive Defendants depends on three propositions **[*685]** that they allegedly knew. First, excessive heat can be deadly.[9] Second, excessive heat can be even riskier for those with certain medical conditions.[10]

---

[9] *See* Pl.'s Compl. at ¶ 18 ("As each of the Defendants have long known and discussed internally at high-level TDCJ and UTMB leadership meetings well before 2012, temperatures this elevated cause the human body to shut down."); *id.* at ¶ 94 ("Livingston, Thaler, [and] Stephens . . . knew extreme temperatures can be deadly.").

[10] *See* Pl.'s Compl. at ¶ 22 ("It was well known to TDCJ and

Third, the Executive Defendants knew that it could be extremely hot in the units of the Texas prison system, including at Garza West.[11] These bare accusations of knowledge are "not entitled to the assumption of truth." *See Iqbal, 556 U.S. at 680, 129 S. Ct. at 1951* (rejecting a similar allegation that defendant "knew of [and] condoned . . . [the] harsh conditions of confinement") (internal quotation marks omitted). In a case charging a former Texas prison director with liability for an inmate-on-inmate murder, this court long ago rejected similar allegations of knowledge and condonation, declaring that even when coupled with "conclusory allegations and . . . technical buzz words" they flunked the minimal pleading standard. **[**68]** *See Jacquez v. Procunier, 801 F.2d 789, 792 (5th Cir. 1986)* (Reavley, J.). Thus, allegations that there was a substantial risk to vulnerable inmates from the heat and the Executive Defendants were aware of it merely track the elements of a deliberate indifference claim but do not alone suffice to allege an *Eighth Amendment* violation. *See Iqbal, 556 U.S. at 678, 129 S. Ct. at 1949* ("A pleading that offers . . . a formulaic recitation of the elements of a cause of action will not do.") (internal quotation marks omitted).

The conclusory and threadbare nature of these allegations is to be expected, of course. The Executive **[**70]** Defendants oversee an entity that houses, clothes, feeds, and cares for 150,000 people a day across 111 different facilities. There is no allegation that the Executive Defendants played any direct role in the management of the Garza West unit, much less in Hinojosa's intake or incarceration. *See id. at 679, 129 S. Ct. at 1950* ("Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense."). That is the nature of large, complex organizations and the reason why prisoner lawsuits are almost always directed at a unit's **[*686]** warden or individual guards, not the TDCJ Executive Director and his immediate subordinates. Because the Executive Defendants do not bear vicarious liability for the actions or inaction of subordinates, it is more challenging for a plaintiff plausibly to allege facts showing these defendants' deliberate indifference.

Consequently, this court has uniformly affirmed dismissal or otherwise rejected personal liability for high-ranking prison officials when knowledge is based only on

---

UTMB leadership, including the Defendants, that people with certain medical conditions, like diabetes or hypertension, or who take certain medications, like antipsychotics or diuretics, are much more vulnerable to extreme temperatures."); *id.* at ¶ 37 ("Defendants TDCJ, Livingston, Thaler, [and] Stephens . . . know many prisoners have medical conditions that make the extreme heat deadly."); *id.* at ¶ 52 ("TDCJ **[**69]** and UTMB officials, including Livingston, Thaler, [and] Stephens . . . know prisoners in TDCJ custody suffer from these disabilities, and are at increased risk of heat-related injury and death."); *id.* at ¶ 67 ("To put it simply, TDCJ officials, such as . . . Thaler, Stephens, . . . and Livingston . . . know that TDCJ and UTMB fail to immediately identify prisoners with heat-sensitive medical conditions and know that this failure endangers prisoners[.]").

[11] *See* Pl.'s Compl. at ¶ 92 ("Livingston, Thaler, [and] Stephens . . . knew indoor temperatures in TDCJ facilities regularly exceeded 90 degrees during the hot Texas summers"); *id.* at ¶ 93 ("Livingston, Thaler, [and] Stephens . . . knew inmate living areas at the Garza West Unit were not air conditioned and that the apparent temperatures routinely skyrocketed during the hot Texas summers and routinely exceeded 90 degree indoors."); *id.* at ¶ 97 ("Thaler, Stephens, and Livingston are aware that daily temperature readings are taken at the prison and that these readings are routinely above 90 [degrees] at all times during the summer months.").

system-wide problems. In addition to *Jacquez*, this court, in *Walker v. Livingston*, rejected a **[**71]** theory of Livingston's liability for an inmate's murder based on knowledge and condonation of systemic deficiencies. We concluded that there were no allegations of "any facts or any sort of knowledge on the part of these defendants that would suggest any reason to believe there was any likelihood of actual subjective awareness on their respective parts of the specific risk to [the plaintiff]." *381 F. App'x 477, 480 (5th Cir. 2010)*; *see also Lott v. Edenfield, 542 F. App'x 311, 315 (5th Cir. 2013)*; *Hinojosa v. Johnson, 277 F. App'x 370, 379 (5th Cir. 2008)*. In sum, allegations that the Executive Defendants knew generally of risks in the prison system from high temperatures do not make it plausible they were deliberately indifferent to the unconstitutional conditions in Garza West.[12]

## B. Specific Allegations

To shore up otherwise insufficient general allegations, the complaint relies on several facts designed to allow an inference of the Executive Defendants' deliberate indifference. First, thirteen other TDCJ prisoners died from heat stroke between 2007 and 2012. Second, several lawsuits have been pursued against TDCJ for alleged **[**72]** heat-related injuries. Third, TDCJ policies recognize the risk of heat stroke. Fourth, pigs receive more air conditioning than prisoners. Fifth, a Texas state representative sent a letter to TDCJ

in 2011 expressing concern about the high temperatures and asking that TDCJ take preventative measures. Finally, as the majority opinion asserts, the "open and obvious nature of the dangerously hot conditions would also support an inference of deliberate indifference."

Arguably the most substantial factual allegation is that the Executive Defendants knew that thirteen other prisoners with various medical conditions died from heat stroke between 2007 and 2012. According to the complaint, these deaths were "regularly discussed" at meetings attended by Thaler and Stephens (but evidently not Livingston). Again, the complaint pleads little more than that the Executive Defendants "knew" a fact, instead of pleading how they knew and the significance of that knowledge. *See Jacquez, 801 F.2d at 792* (dismissing a complaint against Texas prison director where plaintiff "omit[ted] any explanation of how or in what way the defendants knew" of an imminent attack against one inmate) (internal quotation marks omitted). That the deaths were **[**73]** "regularly discussed" at high-level meetings is nothing if not vague about the nature or extent of the discussion. *See Bosarge v. Miss. Bureau of Narcotics, 796 F.3d 435, 443 (5th Cir. 2015)* ("[S]ome allegations, while not stating ultimate legal conclusions, are nevertheless so threadbare or speculative that they fail to cross the line between the conclusory and the factual.") (alteration in original) (internal quotation marks omitted) (quoting *Penalbert-Rosa [*687] v. Fortuno-Burset, 631 F.3d 592, 595 (1st Cir. 2011)*).

Even accepting that the Executive

---

[12] This court's injunctive cases relating to prison heat conditions involved, unlike this case, executive defendants' personal knowledge of the adverse conditions and dangers to particular prisoners. *See, e.g., Ball, 792 F.3d at 594-95*; *Gates, 376 F.3d at 335*.

807 F.3d 657, *687; 2015 U.S. App. LEXIS 20016, **73

Defendants were aware of these deaths, this allegation lacks the context necessary to evaluate it. In a prison system housing over 150,000 inmates at any given time, it is hardly plausible that thirteen deaths over six years from a single cause raise awareness of a substantial risk to the inmate population.[13] While we must view well-pleaded facts in the light most favorable to the plaintiff, this does not discharge the plaintiff's burden to provide the factual information and context necessary to evaluate his complaint. *See, e.g., Burgis v. N.Y.C. Dep't of Sanitation, 798 F.3d 63, 70 (2d Cir. 2015); McTigue v. City of Chi., 60 F.3d 381, 383 (7th Cir. 1995)* (statistics without context are "insufficient to satisfy even the loose requirements of notice pleading"); *cf. Hazelwood Sch. Dist. v. United States, 433 U.S. 299, 312, 97 S. Ct. 2736, 2744, 53 L. Ed. 2d 768 (1977)* ("Statistics . . . come in infinite variety . . . . Their usefulness depends on all of the surrounding facts and circumstances.") (brackets omitted) [**74] (quoting *Int'l Bhd. of Teamsters v. United States, 431 U.S. 324, 340, 97 S. Ct. 1843, 1856-57, 52 L. Ed. 2d 396 (1974))*.

---

[13] Statistics publicly available from the Justice Department indicate that between 2007 and 2012, almost 2,600 prisoners died while in TDCJ custody. Including Hinojosa's death, this means that 0.5% of Texas prisoner deaths during this time period resulted from heat stroke. *See* Noonan et al., *supra* note 2, at 25 tbl.25. As noted above, during the period from 2001 to 2013, 326 prisoners died in TDCJ custody as a result of suicide and 54 as a result of homicide—an average of approximately 25 and 4 deaths a year, respectively, more than the average number of deaths per year alleged in this case (less than 3). Yet, our precedents have emphasized that both suicide and violence are part of prison life. *See Domino, 239 F.3d at 756* (suicide); *Newton v. Black, 133 F.3d 301, 307 (5th Cir. 1998)* (violence). Presumably, this court would not allow a plaintiff to plead that the Executive Defendants were deliberately indifferent to a personal threat to them by homicide or suicide based solely on these comparatively more common occurrences.

Relatedly, the complaint alleges that it is even more plausible that the Executive Defendants were deliberately indifferent to the danger to Hinojosa because he shared some medical characteristics with prisoners who had already died of heat stroke. But the story [**75] here is mixed. The complaint alleges that only four of the 14 decedents (including Hinojosa) were hypertensive and that three of the 14 were diabetic.[14] Ten of the 14 (including Hinojosa) were prescribed a psychotropic drug and three of the 14 (not including Hinojosa) were prescribed a diuretic. The ages of those who died ranged from 36 to 62, but Hinojosa was among the youngest at 44. The places of death vary, too, including the Coffield Unit and Mitchell Units in Tennessee Colony (300 miles away from Garza West), several TDCJ locations in Huntsville (over 250 miles away), the Hodge Unit in Rusk (over 300 miles away), the Hutchins State Jail in Dallas (over 300 miles away), and the Connally Unit in Kenedy (30 miles away). In short, no clear picture emerges from the profiles of the men who had already died. Consequently, it is hardly plausible to draw the inference of the Executive Defendants' deliberate indifference to a prisoner in Hinojosa's position at Garza West.

[*688] The fact that TDCJ had been sued previously, and generally unsuccessfully, by inmates complaining of extreme temperatures does not create plausible

---

[14] It has been estimated that during a recent period under study approximately 19.2% and 4.2% of the male population of the Texas prison system are afflicted with hypertension and diabetes, respectively. *See* Amy J. Harzke et [**76] al., *Prevalence of Chronic Medical Conditions Among Inmates in the Texas Prison System*, 87 J. Urb. Health 486, 491 tbl.1 (2010).

807 F.3d 657, *688; 2015 U.S. App. LEXIS 20016, **76

inferences against these defendants. We have held in a similar context that the assertions in pleadings are "not . . . particularly strong evidence" to show defendants' knowledge. *Ball, 792 F.3d at 595*. Furthermore, the cases the plaintiff discusses in the complaint are all distinguishable. In *Valigura*, a lawsuit involving Garza East, this court indeed said that "temperatures into the nineties and hundreds are allegations that are sufficiently serious to" violate the *Eighth Amendment*. *Valigura v. Mendoza, 265 F. App'x 232, 236 (5th Cir. 2008)* (per curiam). A jury, however, apparently disagreed that those conditions existed at Garza East and rendered a complete defense verdict after a two-day trial. *See* Jury Verdict at 1, *Valigura v. Mendoza*, No. 2:05-CV-513 (S.D. Tex. Aug. 19, 2008). Livingston himself was dismissed as a defendant in *Blackmon v. Kukua* because the district court found he had no knowledge of the extreme temperatures that were complained of. *758 F. Supp. 2d 398, 411 (S.D. Tex. 2010)*. In *Ruiz*, a decision reversed by this court, there is only a passing **[\*\*77]** mention of expert testimony that heat was a danger. *Ruiz v. Johnson, 37 F. Supp. 2d 855, 904 (S.D. Tex. 1999)*, rev'd and remanded sub nom., *Ruiz v. United States, 243 F.3d 941 (5th Cir. 2001)*.

The remaining factual allegations fail to nudge this complaint toward plausibility. The fact that TDCJ policies recognized the risk of heat stroke does not mean that the Executive Defendants were deliberately indifferent to heat levels in the prisons. Cooling measures approved for TDCJ's swine herd add a melodramatic flair but are irrelevant to human inmates' conditions of confinement. And a letter from a single state representative "expressing concern" about high temperatures does not lead to an inference of knowledge, either. The complaint quotes from the letter that temperatures inside prison cells "do not fall below 100 degrees at night," but his charge is flatly contradicted by the plaintiff's own pleadings.[15] A letter containing dubious facts and otherwise just "expressing . . . concern" over prison conditions is too weak to support the proposition that unconstitutional conditions were such a pervasive problem that the Executive Defendants had actual notice of the substantial risk to Hinojosa.

Finally, the majority, perhaps recognizing the complaint's deficiencies, throw their hands up in the air: "In any event, the open and obvious nature of the dangerously hot conditions would also support an inference of deliberate indifference." This is ordinarily the language of negligence, not deliberate indifference. A cognizable *Eighth Amendment* claim arises only if the Executive Defendants acted unreasonably in the face of "open and obvious" conditions. *Cf. Farmer, 511 U.S. at 843-44, 114 S. Ct. at 1982-83*. And reasonable measures, even if ultimately inadequate to prevent the injury, do not support a finding of deliberate indifference. *See Johnson, 385 F.3d at 526*. As I explained in the discussion of qualified immunity, the plaintiff's own pleadings acknowledge that reasonable measures had been taken to prevent heat-related injuries: prisoners at Garza West could not perform outdoor

---

[15] *See* Pl.'s Compl. at ¶ 139 ("Though it was late at night when Hinojosa suffered the heat stroke, the indoor **[\*\*78]** heat index was still 92 degrees.").

labor before they had intake physicals; prisoners vulnerable to heat could not labor outdoors or engage in recreation before they had intake physicals; management of prison health measures was delegated to the professional medical oversight of the UTMB-Galveston; and extra water (though allegedly **[*689]** in inadequate quantities) was prescribed during hot conditions. **[**79]**

When a court evaluates the legal sufficiency of a complaint, it reviews the allegations holistically, as alleged facts are all judicial admissions. *See Ikossi-Anastasiou v. Bd. of Supervisors of La. State Univ., 579 F.3d 546, 550 (5th Cir. 2009)*. The facts pled here should preclude a deliberate indifference claim against the Executive Defendants because the complaint includes reasonable policy measures to avert the very injury suffered by Hinojosa. *See Brauner, 793 F.3d at 499, 502* (holding there was no deliberate indifference on the part of prison officials where the plaintiff's own pleadings were "replete with examples of attentive and varied treatment from his physicians" and "supervisory diligence" on the part of the assistant warden).

A final irony proves the injustice of footing this claim on broad allegations about the Executive Defendants' (a) knowledge of "open and obvious" dangers from excessive heat in the prisons and (b) failure to implement more policies and training. The majority is allowing potential liability on a more lenient basis than would be required for the actual treatment Hinojosa received at Garza West. In an inmate suicide case, this court granted qualified immunity to the treating physician while carefully noting the critical difference between medical malpractice and *Eighth Amendment* deliberate **[**80]** indifference:

> Deliberate indifference is an extremely high standard to meet. It is indisputable that an incorrect diagnosis by prison medical personnel does not suffice to state a claim for deliberate indifference. *Johnson v. Treen, 759 F.2d 1236, 1238 (5th Cir. 1985)*. Rather, the plaintiff must show that the officials "refused to treat him, ignored his complaints, intentionally treated him incorrectly, or engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical needs." *Id.* Furthermore, the decision whether to provide additional treatment "is a classic example of a matter for medical judgment." *Estelle [v. Gamble, 429 U.S. 97, 107, 97 S. Ct. 285, 293, 50 L. Ed. 2d 251 (1976).*]

*Domino, 239 F.3d at 756*.

How can it be that the standards for imposing liability on the Executive Defendants have become, in the majority's eyes, easier to meet than those for imposing liability on the medical staff or duty guards? Especially after *Iqbal*, the plaintiff has not provided the careful factual allegations to meet the burden of pleading, with plausibility, that three of the highest-ranking officials in the Texas prison system were deliberately indifferent to Hinojosa's vulnerability to heat in the conditions he faced at Garza West.

I dissent.

**End of Document**