| | | |
|---|---|---|
| BERNHARDT TIEDE, II;<br>TEXAS PRISONS COMMUNITY<br>ADVOCATES;<br>BUILD UP, INC., A/K/A JUSTICE<br>IMPACTED WOMEN'S ALLIANCE;<br>TEXAS CITIZENS UNITED FOR<br>REHABILITATION OF ERRANTS; and<br>COALITION FOR TEXANS WITH<br>DISABILITIES,<br><br>   *Plaintiffs,*<br>v.<br><br>BRYAN COLLIER, in his official capacity as<br>Executive Director of Texas Department of<br>Criminal Justice,<br><br>   *Defendant.* | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | Civil Action No.: 1:23-cv-01004-RP |

---

## FIRST AMENDED COMPLAINT

---

"We're not trying to make this lush, we're trying to make it humane. These are third world conditions. We're supposed to run prisons, not concentration camps. These are institutions for incarceration. The incarceration is their punishment. Not cooking them to death."

Lancy Lowry, former head of the Correctional Officers Union.[1]

## I.  INTRODUCTION

1.   Texas prisoners are being cooked to death. Last summer alone, many people died and hundreds more suffered serious heat-related illnesses because of the sweltering temperatures in Texas's prisons.

---

[1] Maurice Chammah, *"Cooking Them to Death": The Lethal Toll of Hot Prisons*, Marshall Project (Oct. 11, 2017, 7:00 AM), https://www.themarshallproject.org/2017/10/11/cooking-them-to-death-the-lethal-toll-of-hot-prisons.

2.      To simply survive, people housed in Texas prisons have had to flood their toilets and lie down in the water on the cell floor to try to cool their bodies.

3.      The overwhelming majority of prisons (roughly 70%) in the Texas Department of Criminal Justice ("TDCJ") system lack air conditioning in the inmate housing units. As a result, approximately 85,000 of the roughly 130,000 TDCJ inmates currently lack air conditioning in their living areas.

4.      During the summer months, those units routinely reach 100° Fahrenheit or higher. For many years now, the extreme heat has wreaked havoc on Texas's prisons, coinciding with a dramatic increase in illnesses and deaths.[2] And as temperatures increase with global climate change, the problem is only getting worse. Last summer was the second hottest on record in Texas, with some TDCJ units reaching an astonishing 149° Fahrenheit.

5.      A U.S. Congressman for Texas put it as plainly as one can: "Being in a 115-degree prison is the definition of cruel and unusual punishment."[3]

6.      This problem is not new. Experts have identified 271 deaths in Texas prisons between 2001 and 2019 that can be attributed to extreme heat exposure. In other words, extreme heat in Texas's unairconditioned prisons caused or contributed to an average of 14 deaths per year from 2001 to 2019.[4]

---

[2] TEX. DEP'T OF CRIM. JUST., STATISTICAL REPORT FISCAL YEAR 2023, https://www.tdcj.texas.gov/documents/Statistical_Report_FY2023.pdf; *TDCJ Air Conditioning Construction Projects*, TEX. DEP'T OF CRIM. JUST., https://www.tdcj.texas.gov/ac/index.html (last updated Mar. 20, 2024).

[3] Paul Flahive, *Texas Congressman Calls for an Investigation as Prisoner Deaths Spike in Heat*, NPR News (Sept. 4, 2023), https://www.npr.org/2023/09/04/1197528854/texas-congressman.

[4] Candice Norwood, *Incarcerated People Endure Sweltering Heat and Freezing Cold Inside Ill-Equipped Facilites*, 19TH, (Oct. 5, 2023, 12:10 PM), https://19thnews.org/2023/10/extreme-temperatures-women-in-prison/.

7.     The problem has become so bad that TDCJ simply stopped attributing inmate deaths to heat-related issues in 2012.[5]

8.     Texas's torturous heat conditions have been consistently cited as cruel and unusual punishment by multiple human rights organizations, the U.S. Department of Justice, the U.S. Congress, the Texas Legislature, correctional staff, doctors, and courts. Despite this, and despite knowing that thousands of peoples' lives are once again at stake as summer approaches, TDCJ has done nothing to lower the temperatures inside the majority of its prisons' housing areas. Instead, TDCJ continues to rely on its constitutionally inadequate policy that it demonstrably knows cannot mitigate the heat.

9.     TDCJ knows that many more people will suffer and die if it their units are not properly cooled. And it knows that these deaths are easily preventable by simply keeping prison cells at a safe temperature.

10.     In 1994, the Texas Commission on Jail Standards adopted a temperature requirement, codified in the Texas Administrative Code, to house inmates safely: Texas jails must be maintained at between 65º and 85º Fahrenheit. *See* 37 Tex. Admin. Code § 261.160. For the past thirty years, this requirement has remained in place for people housed in Texas jails.

11.     Federal prison regulations similarly require temperatures in occupied areas to be set at between 68 to 76 degrees, so that even maximum-security federal prisons in hot climates like Texas, such as USP Beaumont and even prisons housing terrorism suspects at Guantanamo Bay, Cuba, have air conditioning. Fully air-conditioned federal prisons in Texas include not just USP Beaumont, but also FCI Bastrop, FCI Beaumont Medium, FCI Big Spring, FPC Bryan, FMC

---

[5] *Texas Says No Inmates Have Died Due to Stifling Heat in its Prisons Since 2012. Some Data May Suggest Otherwise*, CBS NEWS (July 19, 2023, 7:10 AM), https://www.cbsnews.com/news/texas-prisons-heat-deaths-disputed-claims-inmate-families-worry/.

Carswell, FMC Fort Worth, FDC Houston, FCI Seagoville, FCI Texarkana, and FCI Three Rivers.

12.     TDCJ's current heat-mitigation policy denies this same fundamental right to people incarcerated in Texas prisons—many of whom are sick, elderly, disabled, and susceptible to heat. The current policy is incompatible with basic standards of decency, unnecessarily inflicts cruel and unusual punishment on these individuals, and exposes them to serious risk of harm. In short, the policy violates the Eighth Amendment.

13.     Plaintiffs bring this action to prevent further harm. Plaintiffs ask the Court to declare TDCJ's current heat-mitigation policy unconstitutional, and require TDCJ (through its Executive Director, Bryan Collier) to maintain a temperature between 65º and 85º Fahrenheit inside the housing and occupied areas of TDCJ prisons.

14.     Injunctive and declaratory relief are the only means to address TDCJ's deliberate indifference to the fact that extremely hot, indoor temperatures in prisons constitute cruel and unusual punishment.

## II.  JURISDICTION AND VENUE

15.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question), § 1343 (civil rights), and § 2201 (Declaratory Judgment Act).

16.      Venue is proper in this Court, pursuant to 28 U.S.C. §1391(b)(2), because a substantial part of the events or omissions giving rise to the claims occurred in this judicial district. It is also proper in this Court, pursuant to 28 U.S.C. § 1391(b)(1), because TDCJ has an office located at 209 West 14th Street in Austin, Texas. Because Mr. Collier is sued in his official capacity, his office in Austin is where he "resides" for the purposes of § 1391(b)(1).

### III. PARTIES

17.    Bernhardt Tiede is a 65-year-old man with diabetes and hypertension, who is currently incarcerated at the Estelle Unit, in Huntsville, Texas. Last summer, Mr. Tiede suffered an acute medical crisis and likely Transient Ischemic Attack (TIA) as a result of being housed in a cell known to reach temperatures of 112° Fahrenheit. He continues to have serious health problems and will likely never fully recover. He was transferred to an air-conditioned cell only after this Court granted him two temporary restraining orders and a temporary restraining order extension. But he is not guaranteed any particular housing. So, he may well be housed in an unairconditioned unit this summer also, which would place his life in jeopardy once again.

18.    Texas Prisons Community Advocates ("TPCA") is a Texas Nonprofit Corporation with its principal address at P.O. Box 1974, Fulton, TX 78358. TPCA was created to fight systemic and systematic mistreatment of people incarcerated in TDJC's custody. It is dedicated to serving incarcerated individuals and their families by connecting them to organizational resources, spreading awareness of confinement conditions, and advocating for the advancement of humane conditions within Texas prisons. TPCA's constituents consist of the roughly 130,000 people incarcerated in the Texas state prison system, including every person incarcerated in every TDCJ facility that lacks appropriate temperature control. TPCA frequently works with state legislators and promotes policies that will improve its incarcerated constituents' quality of life. As part of its work, TPCA, including Dr. Amite Dominick, its President and founder, has advocated for safe and humane climate conditions throughout Texas prisons. TPCA's staff engage in constant communication with its incarcerated constituents and have 'team members' inside the prisons, constituents and members whose needs drive the policy goals of the organization. TPCA brings

this lawsuit in its representative capacity on behalf of, and to vindicate the rights of, prisoners who are being housed in inhumane conditions.

19.     Build Up, Inc., is a Nonprofit Corporation registered in New Jersey with a principal place of business at 178 Columbus Ave #237190, New York, NY, 10023. Build Up, Inc. runs Lioness: Justice Impacted Women's Alliance ("Lioness"), an organization dedicated to achieving systematic change within TDCJ and the criminal legal system, led by currently and formerly incarcerated women in Texas. Lioness has roughly 700 members, and both its membership and leadership are composed of currently and previously incarcerated women. The organization's members guide its priorities, one of which is to advocate for the health, safety, and well-being of its incarcerated members, many of whom are in Texas prisons. This includes advocating for appropriate and livable conditions at TDCJ facilities and working to get its members and constituents safe from extreme heat. Lioness brings this lawsuit in its representative capacity on behalf of, and to vindicate the rights of, TDJC prisoners who are being housed in inhumane conditions.

20.     Texas Citizens United for Rehabilitation of Errants, Inc ("TX C.U.R.E."), is a Texas Nonprofit Corporation with its principal business address at 11900 Jollyville Rd., #200804, Austin, TX, 78720, and its registered agent of service in Tyler, Texas. The original organization CURE was founded in 1972 and became a national organization in 1985. It is recognized by the Office of Justice Programs and operates in 27 states. TX C.U.R.E., while incorporated as its own organization, aligns with the national organization's mission in Texas, which is to fight systemic and systematic mistreatment of the incarcerated, and to provide those who are incarcerated with resources they need in and out of prison. TX C.U.R.E. is dedicated to serving incarcerated individuals and their families by connecting them to organizational resources, spreading awareness

of confinement conditions, and advocating for the advancement of humane conditions within Texas prisons. TX C.U.R.E's constituents consist of the roughly 130,000 people incarcerated in the Texas state prison system, including almost 8,000 Veterans, and every person incarcerated in every TDCJ facility that lacks appropriate temperature control. TX C.U.R.E.'s Board consists of formerly incarcerated members, prisoners' mothers and wives, and professional concerned citizens. TX C.U.R.E.'s staff, including formerly incarcerated Vice President Charlie Malouff, engages in constant direct and indirect communication with its incarcerated constituents throughout all of Texas prisons, as well as their family members seeking help with horrendous living conditions in TDCJ facilities. These constituents' needs drive the policy goals of the organization, which include the unconstitutional heat related conditions. TX C.U.R.E. brings this lawsuit in its representative capacity on behalf of, and to vindicate the rights of, prisoners who are being housed in inhumane, extreme heat conditions.

21.     Coalition for Texans with Disabilities, Inc. ("CTD"), is a Domestic Nonprofit Corporation with a principal place of business at 1716 San Antonio St., Austin, TX 78701. CTD is a cross-disability organization that represents all Texans with disabilities. Its board is directly selected from its members, some of whom financially support the organization. The organization's mission is to ensure that persons with disabilities may work, live, learn, play and participate fully in the community of their choice. CTD focuses on the areas of governmental advocacy, public awareness activities, and professional disability consulting to fulfill our mission, and is the largest and oldest member driven cross-disability organization in the state. CTD is frequently involved in state level initiatives that affect the disability community and advocates for policies that protect the well-being, health, and safety all Texans with disabilities and their families, including those currently incarcerated in TDCJ facilities. As such, CTD promotes policies related to mitigating the

extreme heat in Texas prisons. CTD's constituents consist of all persons with a disability in Texas, including all people with disabilities incarcerated in Texas prisons. Given that an estimated 40% of TDCJ prisoners have a disability, CTD's constituents encompass roughly 52,000 of the 130,000 people incarcerated in Texas prisons, including every person with a disability in every TDCJ facility that lacks appropriate temperature control. CTD brings this lawsuit in its representative capacity on behalf of and to vindicate the rights of TDCJ's prisoners with disabilities who are being housed in inhumane conditions directly resulting from the extreme heat.

22.     Plaintiffs TPCA, Lioness, TX C.U.R.E., and CTD are collectively referred to herein as "Organizational Plaintiffs."

23.     Defendant Collier is the Executive Director of the Texas Department of Criminal Justice. As such, he is responsible for all TDCJ policies, and is the commanding officer of all correctional officers, guards, and TDCJ employees and contractors. By law, Defendant Collier is responsible for protecting the constitutional rights of all persons held in TDCJ custody. At all times described herein, Mr. Collier was acting under color of state law. He is sued in his official capacity for declaratory and injunctive relief. Defendant Collier is located in Austin, Texas as TDCJ is headquartered there.

## IV.  FACTS

### A.     Temperatures Inside Texas Prisons are Dangerously High Each Summer.

24.     According to the National Weather Service ("NWS"), "heat is the number one weather-related killer in the United States." More than a hundred people die from exposure to extreme heat each year, and thousands are injured. On average, heat kills more people in the United States each year than hurricanes, tornadoes, floods, or lightning combined.

25.     Texas is notorious for its extreme heat and brutal summers, with temperatures routinely in the triple digits. Texas has experienced increasing annual temperatures and is only getting hotter. Last summer was the second-hottest on record in the state.

26.     The majority of TDCJ's prisons, however, do not have air-conditioning throughout the facility. Predictably, inadequate air-conditioning and ventilation causes temperatures inside units to regularly reach 110º Fahrenheit. As a result, Texas prisoners are in far greater danger, and die far more frequently, from the heat than other Texans and people in other states.

27.     As all Texans know, however, it is not just the temperature but also the humidity that contributes to heat. The heat index is a measure of "apparent temperature," based on ambient temperature and humidity, which the NWS says closely approximates how air temperature is "felt" by the human body. The NWS published a chart that illustrates how exposure to high heat indexes increases the risk of heat-related illnesses.



28.     The NWS correlates heat index ranges to risk levels for the general population:

    a.      Caution (light yellow; heat index 80–90º Fahrenheit): "Fatigue possible with prolonged exposure and/or physical activity."

    b.      Extreme Caution (mustard yellow; heat index 91–104º Fahrenheit): "Sunstroke, muscle cramps, and/or heat exhaustion possible with prolonged exposure and/or physical activity."

    c.      Danger (orange; heat index 105–125º Fahrenheit): "Sunstroke, muscle cramps, and/or heat exhaustion likely. Heatstroke possible with prolonged exposure and/or physical activity."

    d.      Extreme Danger (red; heat index >126º Fahrenheit): "Heat stroke likely."

29.     The NWS warns that exposure to heat indexes greater than 105º Fahrenheit "may cause increasingly severe heat disorders with continued exposure or physical activity."

30.     According to the NWS, the American Medical Association, the Environmental Protection Agency ("EPA"), and the Center for Disease Control and Prevention ("CDC"), "[m]aintaining a consistent internal body temperature, generally 98.6° [Fahrenheit], is essential to normal physical functioning." Excessive heat can "stress the body's ability to maintain this ideal internal temperature. If individuals fail or are unable to take steps to remain cool and begin to experience increasing internal temperatures, they increase their risk of experiencing a range of potential adverse health outcomes."

31.     The CDC, NWS, and EPA all recognize that sudden exposure to heat contributes to a variety of illnesses, including cardiovascular disease, and increases the likelihood of both illness and death.

32.     Heat can also cause or aggravate other illnesses, sometimes triggering dire medical emergencies such as heart attacks. According to the World Health Organization ("WHO"), "heat increases death rates from cardiovascular and respiratory disease by placing extra stress on an

already stressed system." Similarly, the National Institute for Occupational Safety & Health ("NIOSH") warns that extreme heat is a risk factor for cardiovascular disease and death.

33. TDCJ indisputably knows the dangers of extreme heat. Every summer for more than 20 years, TDCJ has had a front-row seat to thousands of inmates and correctional officers falling ill and needlessly suffering from heat-related causes.

34. TDCJ's own Heat Policy acknowledges the dangers associated with "Excessive Heat," including heat cramps, heat exhaustion, and heatstroke. It also acknowledges that certain people are more vulnerable to heat conditions due to their individual disabilities or medical conditions.

35. TDCJ has also incorporated the NWS chart above into its policies for the last decade. Like the NWS chart, TDCJ knows that as the heat index increases, the risk of increasingly severe heat-related illnesses goes up. When the heat index exceeds 90° Fahrenheit, heat exhaustion becomes possible. Above 105 degrees, heat stroke becomes possible. Above 130° Fahrenheit, heat stroke is imminent.

36. The ventilation system in many of TDCJ's units cannot lower the indoor heat index below the outdoor heat index and cannot ensure that temperatures inside the housing areas are safe. Rather, the ventilation system simply brings in fresh hot air from the outside, while pumping out stale hot air from the inside, much the same way a vent system in a car does not provide any comfort.

37. TDCJ knows there is little difference between the indoor and outdoor temperatures in the prisons. In fact, for extensive periods of the summer months, the temperatures are actually hotter inside than outside – similar to how a garage is often hotter than the outside air in the summer.

38.    In 2018 and 2019, the heat index for dozens of TDCJ units exceeded 100º Fahrenheit[6]:



39.    According to TDCJ's own records, there are documented heat indexes in the prisons as high as 150º Fahrenheit:



    [6] J. Carlee Purdum, P.H.D. et al., *Extreme Temperatures and Covid19 in Texas Prisons*, TEX. A&M U. HAZARD REDUCTION & RECOVERY CTR. 18 (2022), https://tamucoa.b-cdn.net/app/uploads/2022/07/22-01R.pdf.

40.     Both the NWS and TDCJ charts show that prisoners living in uncooled units are exposed to indoor heat indexes that put inmates at risk of heat exhaustion, heat cramps, and heat stroke almost every day of the summer.

41.     "With our prisons not having air conditioning, it's a really dangerous situation," Texas A&M University researcher J. Carlee Purdum testified before the state legislature in the summer of 2022. "When we have a heat wave such as this summer, it can potentially lead to disastrous consequences."[7]

42.     Extreme heat and high humidity limit the human body's ability to temperature regulate. In response to excessive heat, heart rate increases and peripheral blood vessels dilate or open. The dilation of peripheral blood vessels in the skin helps to dissipate heat and maintain normal core body temperature. But when heat is extreme and peripheral blood vessels are maximally dilated, the body may no longer be able to effectively dissipate heat the body's core temperature begins to rise, causing morbidity and mortality.

43.     While some people who have medical conditions or take certain medications may be less able to compensate for excessive environmental heat through vasodilation, even young healthy people are vulnerable to heat related illness and death.

44.     Perspiration is the second primary mechanism the body employs to regulate core body temperature. When perspiration on the skin's surface evaporates, heat energy is consumed from converting water to steam. This removes heat from the skin and cools the body. But higher humidity decreases evaporation and impairs this cooling mechanism.

---

[7] Josh Marcus, *Temperature Inside Baking Texas Prisons With No AC Regularly Hits 110 Degrees, Study Finds*, INDEPENDENT (Jul. 26, 2022, 8:10 PM), https://www.independent.co.uk/independentpremium/us/texas-prison-heat-climate-change-air-conditioning-b2132464.html (quoting Dr. J. Carlee Purdum).

45.     Excessive perspiration due to extreme heat and humidity, however, can also result in dehydration. Because nearly 80% of the human body is made of water, dehydration can result in multiorgan failure and death.

46.     Again, while some people have medical conditions or take medications that impair sweating, even a young healthy person's ability to sweat has limits, so everyone is vulnerable to heat related illness and death from prolonged exposure to excessive heat.

47.     Medical disorders resulting directly from heat also affect all people, even young, healthy people like many of the inmates in TDCJ facilities. These disorders include heat cramps, heat syncope, heat exhaustion, and heat stroke. Heat stroke, the most severe complication of extreme heat, can result in permanent impairment and even death.

48.     Heat cramps are caused by muscle spasms and are most common in the abdomen, arms, and legs. They are extremely painful and can persist for hours.

49.     Heat syncope is a loss of consciousness or collapse resulting from heat exposure. This occurs when the body's heart rate increases and peripheral blood vessels dilate in response to extreme heat. Peripheral vasodilation may result in a decreased blood flow to the brain. Absent adequate blood flow to the brain, a person loses consciousness.

50.     Symptoms of heat exhaustion, according to NIOSH, include fatigue; heavy sweating; nausea; dizziness; elevated body temperature; and fast, shallow breathing. According to the Mayo Clinic and TDCJ's own training materials, heat exhaustion can quickly progress to heat stroke if the person does not cool down quickly enough.

51.     NIOSH describes heat stroke as "the most serious heat-related disorder," where "the body temperature can rise to 106 degrees Fahrenheit or higher within 10 to 15 minutes." Symptoms often include hot, dry skin; hallucinations; chills; headaches; confusion; and slurred

speech. "Heat stroke can cause death or permanent disability if emergency treatment is not given." According to resources published by the Mayo Clinic, "[i]n a period of hours, untreated heatstroke can cause damage to your brain, heart, kidneys and muscles." In extreme temperatures, heat-related illnesses can arise and exacerbate quickly to cause death. According to NIOSH, "[t]he different forms of heat-related illness . . . increase in severity as heat strain increases. This allows for a quick, deadly progression from heat exhaustion to heat stroke."

52.    Notably, the NWS and TDCJ charts are designed to predict the risk to the average person from extreme heat. In other words, they predict the risk that extreme heat poses to "healthy" people—not those who have an increased risk of heat-related illness or injury due to medical conditions, medications, disabilities, or age.

53.    Thus, all people, including young healthy people, are at substantial risk of suffering serious medical disorders and death resulting directly from the heat—a fact well-documented and well-established in the medical literature. This is critically important because there is overwhelming evidence that young healthy people, thousands of whom are incarcerated in TDCJ prisons, die of heat stroke.

54.    Despite these well-known consequences of extreme heat,[8] TDCJ continues to house over 80,000 inmates in temperatures exceeding 100º Fahrenheit for several months each year.

**B.    People With Medical Conditions That Impair Cooling are at Additional Risk.**

55.    Extreme heat is particularly dangerous for individuals housed in Texas prisons who have pre-existing medical conditions, mental health conditions and disabilities, or are over the age of sixty-five.

56.    The most recent nationwide study performed by the U.S. Department of Justice

---

[8] TEX. DEP'T OF CRIM. JUST., STATISTICAL REPORT FISCAL YEAR 2023, https://www.tdcj.texas.gov/documents/Statistical_Report_FY2023.pdf.

estimates that nearly 40% or 52,000 individuals incarcerated in TDCJ prisons nationwide have at least one disability.[9] The most commonly reported type of disability among prisoners was cognitive disability (23%), followed by ambulatory (12%) and visual (11%) disabilities.[10]

57.     Based on this data, there are disabled constituents in every TDCJ facility.

58.     As TDCJ knows, tens of thousands of people in prison suffer from underlying medical conditions that put them at much greater risk of heat-related illness, injury, or death—including, but not limited to, those who:

- suffer from cardiovascular disease, respiratory disease, diabetes mellitus, mental health disorders (all discussed below), cirrhosis of the liver, autoimmune disease, and endocrine disease; or,

- are treated with commonly used classes of medications that increase heat sensitivity; or,

- are over age 65.[11]

59.     Hypertension, or high blood pressure, is a major risk factor for heart disease and stroke, which are the leading causes of death in the United States. Nearly half of the adult population in the United States suffer from hypertension (119 million people), and hypertension is more common in black men than any other demographic.[12]

60.     Like all people with cardiovascular disease, people with hypertension have greater heat intolerance. This is because they cannot effectively dilate their peripheral blood vessels to

---

[9] Laura M. Maruschak et al., *Disabilities Reported by Prisoners*, U.S. DEP'T OF JUST., OFF. OF JUST. PROGRAMS, BUREAU OF JUST. STAT. (Mar. 2021), https://bjs.ojp.gov/content/pub/pdf/drpspi16st.pdf.

[10] *Id.*

[11] *Drugs Associated with Heat Stress*, TEX. DEP'T OF CRIM. JUST., CORR. MANAGED HEALTH CARE POL'Y MANUAL, https://www.tdcj.texas.gov/divisions/cmhc/docs/cmhc_policy_manual/D-27.02_Attachment_A.pdf (last reviewed Jan. 2024).

[12] *High Blood Pressure: Facts About Hypertension*, CTRS. FOR DISEASE CONTROL & PREVENTION, https://www.cdc.gov/bloodpressure/facts.htm (last reviewed July 6, 2023).

dissipate heat, and because they are often treated with medications that themselves increase heat sensitivity.

61.     Chronic obstructive pulmonary disease ("COPD") is the term for a group of incurable diseases that impede airflow to the lungs, causing profound difficulty breathing. Sixteen million people in the United States suffer from COPD. These diseases include chronic bronchitis and emphysema. People with COPD experience shortness of breath, chest pain, wheezing, and debilitating coughs. Heat exacerbates COPD for several reasons, some incompletely understood. When the body's heart rate increases in response to heat, more blood goes to the lungs. This means a greater demand for gas exchange, which is problematic in patients with COPD because their ability to move air in and out of the lungs is already compromised. Additionally, evolving research shows that diseased lungs and airways are further weakened by high temperatures, exacerbating respiratory compromise. This effect may last for up to two days after exposure to high temperatures.[13]

62.     Asthma is an inflammatory disease that narrows small airways, impairing lung function and making breathing difficult. Asthma affects 22 million adults in the United States and the highest rate of disease is among Black people. Like COPD, heat and humid air can trigger asthma symptoms, worsening respiratory compromise.[14]

63.     Diabetes Mellitus is a disease that impairs the body's ability to absorb and use sugar or glucose from the blood. Glucose is the primary source of energy for all cells in the body, so impaired glucose utilization compromises the function of numerous organ systems including the

---

[13] Supaksh Gupta et al., *Effects of Ambient Temperature on COPD Symptoms and Exacerbations in the Subpopulations & Intermediate Outcome Measures in COPD Study (SPIROMICS) Cohort*, 58 Eur.Respiratory J. (2021).

[14] *Asthma: Data, Statistics, and Surveillance*, Ctrs. for Disease Control & Prevention, https://www.cdc.gov/asthma/asthmadata.htm (last reviewed Mar. 29, 2023).

cardiovascular and nervous systems. In diabetes, this particularly affects peripheral blood vessels and nerves. When the small peripheral vessels and nerves are damaged, the peripheral vessels cannot effectively dilate, and the skin loses its ability to sweat. Thus, diabetics can lose their ability to dissipate heat and cannot cool their core body temperatures, making them particularly vulnerable to heat stroke. Thirty-eight million adults or 14.7% of the adult population in the United States has diabetes. This number increases with age such that 29.2% of adults over the age of 65 are diabetic.[15]

64.     Fifty-seven million or 22.8% of adults in the United States suffer from mental illnesses.[16] These include psychiatric disorders and mood disorders, such as anxiety and depression. Mental illnesses impair a person's ability to reason. And studies have proved that people with such impairment are at increased risk of death from extreme heat.

65.     Numerous classes of medications increase heat sensitivity because they impair the usual physiologic methods for dissipating heat and normalizing core body temperature. These include, but are not limited to, antihypertensives, diuretics, anticholinergics, selective serotonin reuptake inhibitors ("SSRIs"). Even over-the-counter nasal decongestants and allergies medications increase the risk of heat-related illness because they impair vasodilatation and/or sweating. Thus, people taking any of those medications are at increased risk for heat-related illnesses.

---

[15] *Diabetes: National Diabetes Statistics Report*, CNTRS. FOR DISEASE CONTROL & PREVENTION, https://www.cdc.gov/diabetes/data/statistics-report/index.html (last reviewed Nov. 29, 2023).

[16] *Mental Illness*, NAT'L INST. OF MENTAL HEALTH, https://www.nimh.nih.gov/health/statistics/mental-illness (last updated Mar. 2023).

**C. The TDCJ Knows that Extreme Heat Has Killed Texas Prisoners for More than Twenty-Five Years.**

66. The risk of death and serious illness that extreme heat poses to TDCJ inmates in unairconditioned cells is obvious, long-standing, pervasive, and well-documented.

67. Since at least 1999, Texas courts have acknowledged the link between excessive heat and deaths in TDCJ prisons. *See Ruiz v. Johnson*, 37 F. Supp. 2d 855, 904 (S.D. Tex. 1999).

68. As Judge Keith P. Ellison found in a case arising out of the death of TDCJ prisoner Larry McCollum:

> It is undisputed that five men died in 1998 from environmentally-caused hyperthermia while incarcerated in TDCJ facilities. Between 1999 and 2010, five more individuals are known to have died from hyperthermia or other heat-related illnesses while incarcerated in Texas prisons. In 2011, Texas experienced an "unprecedented" heat wave, and ten more individuals died from hyperthermia. McCollum was the second individual to die of heat-related illness during the summer of 2011.

*McCollum v. Livingston,* No. 4:14-CV-3253, 2017 WL 608665, at *6-7 (S.D. Tex. Feb. 3, 2017) (footnotes and citations omitted).

69. Although this is a gross underestimation, even TDCJ has admitted that at least 22 prisoners died in TDCJ facilities from heat-related causes between 1998 and 2012.

| Name | Age | Prison | Date of Death | Body Temp. | Facts |
|------|-----|--------|---------------|------------|-------|
| Archie White | 48 | Robertson | June 29, 1998 | 104.2 | Obese, hypertensive, schizophrenic, prescribed tricyclic antidepressants and other medications known to increase risk of heat-stroke |
| Anselmo Lopez | 41 | Eastham | July 14, 1998 | Unk | Prescribed psychotropic medications for Schizophrenia |
| James Moore | 47 | Unk | July 30, 1998 | 104.1 | History of paranoid schizophrenia and hypertension, prescribed psychotropic medications, beta-blockers and diuretics |
| Charles Finke, Jr. | 38 | Huntsville | Aug. 8, 1999 | 106 | Prescribed anti-depressants, recently arrived from air-conditioned facility |
| John Cardwell | 39 | Allred | Aug. 4, 2001 | 108.5 | Prescribed diuretics and psychotropics, spent 2 weeks in ICU, recently arrived |

| | | | | | |
|---|---|---|---|---|---|
| Ricky Robertson | 37 | Darrington | July 16, 2004 | 108 | Bipolar with depression, prescribed psychotropic medications, |
| James Shriver | 47 | Byrd | Aug. 8, 2007 | Unk | History of hypertension, prescribed Psychotropics |
| Dionicia Robles | 54 | Byrd | Aug. 13, 2007 | Unk. | Prescribed psychotropics, incarcerated less than one month |
| Douglas Hudson | 62 | Gurney | July 25, 2011 | 105 | History of hypertension, prescribed medication "known to interfere with heat dissipation," died after 5 days |
| Larry McCollum | 58 | Hutchins | July 28, 2011 | 109.4 | Diabetic, prescribed diuretic, found 2:00 am, died 1 week after arrival |
| Thomas Meyers | 46 | Coffield | Aug. 3, 2011 | 105.6 | History of hypertension, prescribed Psychotropics |
| Robert Webb | 50 | Hodge | Aug. 4, 2011 | Unk. | Developmentally disabled, prescribed psychotropics, found unresponsive 3:30 am |
| Alexander Togonidze | 44 | Michael | Aug. 8, 2011 | 106+ | Diabetic, prescribed psychotropics, previously complained of heat-related illnesses, collapsed 8:00 am |
| Charles Cook | 53 | Hodge | Aug. 8, 2011 | 107.9 | Developmentally disabled, prescribed psychotropics, found unresponsive at 3:00 am |
| Michael Martone | 57 | Huntsville | Aug. 8, 2011 | 106.5 | Prescribed psychotropics |
| Kelly Marcus | 36 | Connally | Aug. 12, 2011 | Unk. | Obese, prescribed diuretic, found 3:30 am |
| Kenneth Wayne James | 52 | Gurney | Aug. 13, 2011 | 108 | Prescribed diuretic, died 3 days after arrival |
| Daniel Alvarado | 44 | Beto | Aug. 20, 2011 | 105.2 | HIV+, prescribed psychotropics, found unresponsive at 9:20 am, incarcerated nine days |
| Rodney Adams | 45 | Gurney | Aug. 3, 2012 | 109.9 | Prescribed psychotropics, died 1 day after arrival |
| Albert Hinojosa | 44 | Garza West | Aug. 27, 2012 | Unk. | Died at transfer facility shortly after arrival, found after midnight |

70.     In fact, it is likely that there are many more heat-related injuries and deaths than TDCJ has acknowledged, because hyperthermia is known to be an underreported cause of death by medical examiners and pathologists. It is also unknown how many more prisoners succumbed to heart attacks and other ailments in which heat was a contributing factor.

71.     Each summer people suffer and die without TDCJ changing its policies to actually protect the majority of people entrusted to its care from the heat.

72.     2011 was a particularly hot summer in Texas—the hottest on record—with approximately fifty days above 100º Fahrenheit.[17]

73.     Predictably, this heat wave led to multiple deaths in TDCJ prisons.

74.     Larry Eugene McCollum suffered heat stroke and died at the Hutchins State Jail in Dallas in July 2011. Mr. McCollum, who was 58 years-old when he died, was serving a short sentence related to writing a bad check. Prison logs showed that the day before his death, the outside air temperature was above 90º Fahrenheit for at least nine hours and above 100º Fahrenheit for at least six hours—peaking at 107º Fahrenheit and remaining at 106º Fahrenheit degrees at 6:30 p.m., when the last recording of the day was taken. Humidity never fell below 40% that day. A chart provided by the University of Texas Medical Branch at Galveston and used by TDCJ, estimated the heat index was about 150º Fahrenheit. After collapsing, Mr. McCollum arrived at the hospital with a body temperature above 109º Fahrenheit. An autopsy conducted by the Southwestern Institute of Forensic Sciences concluded he died of hyperthermia, due to housing "in a hot environment without air conditioning."

75.     Douglas Hudson suffered a heat stroke on July 24, 2011 at the Gurney Unit. He was there only four days before he died. Mr. Hudson, who suffered from depression and hypertension, arrived at the Gurney Unit on July 20, 2011. He was serving a short prison sentence for driving while intoxicated. In the 38 days before Mr. Hudson's death, the temperature in the prison exceeded 100º Fahrenheit on 30 days. When he received medical attention, his body

---

[17] Erin Douglas &Yuriko Schumacher, *Texas Just Recorded its Second Hottest Summer on Record*, Tex. Tribune (Sept. 7, 2023, 5:00 AM), https://www.texastribune.org/2023/09/07/texas-hottest-summer-2023/.

temperature was 105º Fahrenheit. He was eventually taken by ambulance to Palestine Regional Medical Center, but it was too late—he died the next day.

76.     A little over a week later, on August 3, 2011, Thomas Meyers, 46 years-old, died at the Coffield Unit from heat stroke. Mr. Meyer's body temperature was 105.6º Fahrenheit by the time he received medical attention.

77.     The next day, Robert Webb, 50, died at the Hodge Unit from heat stroke. Mr. Webb suffered from developmental disabilities and depression, and was prescribed medication that made him extremely susceptible to heat stroke.

78.     On August 8, 2011, *three* people died in Texas prisons from the heat: Alexander Togonidze, 44, died from heat stroke at the Michael Unit, Charles Cook, 53, died from heat stroke at the Hodge Unit, and Michael Martone, 57, died from heat stroke at the Huntsville Unit.

79.     Mr. Togonidze had been seen by medical staff for heat-related problems due to his diabetes and mental illnesses each summer he was in TDCJ custody but was still not given a cooled cell. In the days preceding Mr. Togonidze's death, the Tennessee Colony area had endured 39 consecutive days where the temperature exceeded 100º Fahrenheit, soaring as high as 116º Fahrenheit. On August 7, 2011, the day before he died, the heat index was over 136º Fahrenheit. Shortly before 8:00 am on the morning of August 8, 2011, Mr. Togonidze collapsed on the floor of his cell. His body temperature exceeded 106º Fahrenheit. The autopsy concluded that he had died of hyperthermia—heat stroke—which had caused "severe organ damage."

80.     On the day Mr. Martone died, the heat in Huntsville was sweltering—a high of 101º Fahrenheit, with up to 87% humidity. The heat index was near 110º Fahrenheit. It was the eighth consecutive day of temperatures over 100º Fahrenheit. Mr. Martone began convulsing and

collapsed. He was pronounced dead shortly after arriving at the hospital. At the time of his death, Mr. Martone's body temperature was 108° Fahrenheit.

81.     A few days later on August 12, 2011, Kelly Marcus, 36, died from heat stroke at the Connally Unit.

82.     On August 13, 2011, Kenneth Wayne James died less than three days after arriving at the Gurney Unit. At the time of his death, Mr. James was 52 years old, overweight, and suffered from hypertension. During the few days Mr. James spent at the Gurney Unit, outdoor temperatures had reached 106° Fahrenheit, with inside readings exceeding 101° Fahrenheit. Mr. James became critically ill, weak, dizzy, disoriented, could not stand up, and urinated on himself. His body temperature reached a shocking 108° Fahrenheit, causing his organs to shut down. An autopsy concluded he died of "environmental hyperthermia-related classic heat stroke" due to "lack of air conditioning, chronic illness, and use of diuretics and beta blockers."

83.     The next year, on August 3, 2012, Rodney Adams died at the Gurney Unit from heat stroke. At the time of his death, Mr. Adams was 45 years old. He had been convicted of driving while intoxicated and sentenced to serve four-years. Mr. Adams arrived at the Gurney Unit from the air-conditioned Wise County Jail on August 2, 2012. He died a little more than twenty-four hours later. While there, outdoor temperatures reached 103° Fahrenheit, with temperature readings taken inside the prison exceeding 102° Fahrenheit. Mr. Adams, who was prescribed medications that substantially increased his risk of heat-related illness, began to feel dizzy, falling backwards on to his bunk. That afternoon, officers had recorded a temperature of 103° Fahrenheit inside Mr. Adams' dorm, without considering the effect of humidity. In less than two days, Mr. Adams suffered a heat stroke, was vomiting, and his body began convulsing. TDCJ recorded an outside heat index of 113° Fahrenheit before Mr. Adams collapsed. Mr. Adams' body temperature

was a shocking *109.9º Fahrenheit.* An autopsy concluded he died of "hyperthermia," resulting in multisystem organ failure.

84.     A few weeks later, on August 27, 2012, Albert Hinojosa, suffered a painful heat stroke and died less than 48 hours after he arrived at the Garza West Unit. Mr. Hinojosa was disabled as a result of his hypertension, obesity, diabetes, depression, and schizophrenia. The day before he died, the temperature spiked to over 100º Fahrenheit. An autopsy, after ruling out all other causes, found that Hinojosa died of hyperthermia.

85.     Since these waves of deaths—with ten alone in the summer 2011—rather than fix the heat problem by cooling the prisons, TDCJ has attempted to cover up and drastically minimize the obvious danger and inhumane conditions created by its inadequate heat-mitigation policies.

86.     According to the agency, there hasn't been a heat-related death in any Texas prison since 2012.[18]

87.     "The idea that there have been no heat-related deaths since 2012 is just false." Brown University researcher Julie Skarha concluded.[19]

88.     Remarkably, between 2001 and 2019, 13% of the 2,083 inmate deaths in TDCJ facilities without air conditioning —the loss of *271 lives* in Texas prisons— is likely attributable to extreme heat, according to research scientists at Brown and Harvard University. Not a single heat-related death occurred in TDCJ's climate-controlled prisons, scientists noted.[20]

---

[18] *Texas Says No Inmates Have Died Due to Stifling Heat in its Prisons Since 2023, supra* note 5.

[19] Flahive, *supra* note 3; Julianne Skarha et al., *Provision of Air Conditioning and Heat-Related Mortality in Texas Prisons*, JAMA NETWORK (Nov. 2, 2022), https://jamanetwork.com/journals/jamanetworkopen/fullarticle/2798097 (herein after "Skarha Heat Mortality Study").

[20] *Id.*

89.     This measured 13% rate of heat-related mortality in TDCJ's non-airconditioned facilities is 30% higher than the percentage of heat-related mortality in the general population.

90.     In Texas prisons without air-conditioning, a one-degree increase above 85º Fahrenheit corresponds to a 0.7% increase in the risk of mortality. An "extreme heat" day—defined as days above the 90th percentile heat index for the prison location—spikes that number up to a 15.1% increase in the risk of mortality.[21]



91.     Dr. Antonella Zanobetti, Principal Research Scientist in Environmental Health at Harvard University, whose team was part of this recent study examining whether heat was associated with an increased risk of mortality in Texas prisons, concluded that: ***an extreme heat day was associated with a 15% increase in mortality in prison facilities without AC***.

**D.     TDCJ Knows that Extreme Heat Continues to Kill Dozens of Prisoners in TDCJ Facilities Each Year.**

92.     Of course, TDCJ and Mr. Collier know and have long known that heat-related deaths and illnesses continue to plague Texas prisons. TDCJ encounters the heat crisis as well as heat related staffing shortages every summer; has defended numerous heat related death lawsuits

---

[21] *Id.*

and class actions; and is the subject of investigations, government hearings, and intense media attention related to this humanitarian crisis.

93.     Heat deaths haven't magically stopped. TDCJ has simply stopped reporting or admitting them after the multiple wrongful death lawsuits and national news coverage.

94.     Quintero Jones died of heat related causes on July 31, 2015 in the McConnell Unit. At the time of his death, Mr. Jones was thirty-seven years old. He had been diagnosed with asthma and hypertension. The day he died, the heat index reached 110° Fahrenheit. Due to the heat, Mr. Jones experienced a severe asthma attack. Inmates began banging on the doors for help, while Mr. Jones collapsed on the floor, vomiting, and gasping for air. The autopsy specifically concluded Mr. Jones died of "exacerbation of asthma."

95.     On July 19, 2018, Robert Earl Robinson, 54, died at the Michael Unit from heat stroke. According to the in-custody death report sent to the Texas Attorney General's Office, Mr. Robinson died from "environmental hyperthermia" (fatal heat stroke). The report stated that Mr. Robinson was found unresponsive by security staff and taken to a hospital, where he was pronounced dead.[22]

96.     The summer of 2023 goes down as Texas' second hottest ever, just behind 2011, with long stretches of brutal heat waves.[23]

97.     Once again, the heat likely caused dozens of peope to die, and thousands of others to suffer.[24]

---

[22] Jolie McCullough, *After Sweltering Temperatures Killed Texas Prisoners, Lawmakers Vote to Install Air Conditioning*, Tex. Tribune (May 14, 2021, 12:00 PM), https://www.texastribune.org/2021/05/14/texas-prison-air-conditioning-legislature/.

[23] Douglas, *supra* note 17.

[24] McCullough, *supra* note 22.

98.     According to the Texas Attorney General's Custodial Death Reports, over a hundred people died in Texas prisons between June and August 2023.

99.     Studies from researhers at Texas A&M University and Harvard University would indicate that the heat caused or contributed to a significant portion of these deaths.[25]

100.    Thus, contrary to what TDCJ reports, numerous people died in stifling, uncooled prisons of either heart-related or unknown causes during Texas' relentless and record-breaking heat wave last summer. More than a dozen of the dead were in their twenties and thirties, and at least a quarter of those died of cardiac arrest, classic indicators that these deaths were heat-related.[26]

101.    "When TDCJ insists that they haven't had a death from heat-related causes in 12 years, that's a bald-faced lie," said Tona Southards-Naranjo, whose 37-year-old son died in the Estelle Unit on June 28, 2023. The day he passed away, Ms. Southards-Naranjo talked to her son several times. "He was complaining that it was so hot. 'Turn your fan on, baby,' I said. He said, 'I can't, Mama, it makes it hard for me to breathe.'" The heat index outside the prison reached 116 degrees that day, according to TDCJ heat logs. When she viewed her son's body after he died, it was covered in heat rash "from the top of his head to the backs of his knees." "[A] judge sentenced my son to 20 years, but the TDCJ sentenced him to death."[27]

---

[25] Brant Bingamon, *Texas Prisons Are Cooking People Alive. Are We Okay With That? Part 1 in a series about heat in prison*, AUSTIN CHRON. (Aug. 11, 2023), https://www.austinchronicle.com/news/2023-08-11/texas-prisons-are-cooking-people-alive-are-we-okay-with-that. (herein after "Bingamon, *Texas Prisons Are Cooking People Alive. Are We Okay With That*").

[26] Jolie McCullough, *As the Death Toll in Stifling Texas Prisons Climbs, Congressional Democrats Ask For Investigation*, Tex. Tribune (Aug. 21, 2023, 11:00 AM), https://www.texastribune.org/2023/08/21/texas-prison-heat-deaths/.

[27] Bingamon, *Texas Prisons Are Cooking People Alive. Are We Okay With That, supra* note 25.

102.     In June 2023, to prepare for her imminent release, 37-year-old Elizabeth Hagerty was transferred from an air-conditioned prison to the un-air conditioned Dr. Lane Murray Unit. Ms. Hagerty had diabetes, hypertension, and asthma. She had no access to water, and she developed a heat rash and trouble breathing. Ms. Hagerty died on June 28, 2023, when it was 100° Fahrenheit outside. In one letter written to Lioness, two incarcerated women said that Ms. Hagerty had a sign in her cell window that read, "please give me water," but she was ignored.[28] Ms. Hagerty's cause of death listed "Elevated environmental temperatures (Heat Stress)" as a contributory factor.

103.     On June 11, 2023, Dustin Thomas Davis, 43 years-old, died in Waco Texas. He had a body temperature of 108° Fahrenheit. The cause of death listed "Hyperthermia" as a significant condition.

104.     Luis Sanchez was 50 years old when he died in the Luther Unit on June 12, 2023, where the outside heat index was 104° Fahrenheit. TDCJ's report said Mr. Sanchez was found dead in his cell after suffering from cardiac arrest.[29]

105.     About a week later, on June 20, 2023, 34-year-old Randy Butler died in the Byrd Unit from cardiac arrest the morning after a day when the area heat index reached 114° Fahrenheit. Sixty-nine-year-old Michael Dixon was found unresponsive in his Stiles Unit cell, where the heat index was around 108° Fahrenheit.[30]

---

[28] Norwood, *supra* note 4.

[29] Jolie McCullough, *Inmates are Dying in Stifling Texas Prisons, but the State Seldom Acknowledges Heat as a Cause of Death*, Tex. Tribune (July 3, 2023, 9:31 AM), https://www.texasstandard.org/stories/texas-prison-heat-deaths.

[30] *Id.*

106.    35-year-old Tommy McCullough died just a few weeks later. He was exhausted and thirsty, living in the stifling Huntsville prison as the record-breaking and relentless heat wave tore across Texas. People in the prison reported that temperatures inside reached 130º Fahrenheit. Mr. McCullough got up to work and collapsed, dying of what TDCJ claims to be "cardiac arrest."[31]

107.    Mr. McCullough was one of at least nine prisoners to die of a reported heart attack or cardiac arrest in uncooled prisons where the region's outdoor heat indexes were consistently above 100º Fahrenheit last summer.[32]

108.    On the same day Mr. McCullough died, 73-year-old Jerry Jernigan also died of a 'heart attack' at the Smith Unit in West Texas, where temperatures in the area reached 102º Fahrenheit.[33]

109.    On August 5, 2023, John Castillo, 42 years old, died in Gatesville, Texas from "Epilepsy/Seizure Disorder, with high environmental temperature (Heat Stress/Hyperthermia) as an important contributory factor."

110.    On August 22, 2023, Patrick Neil Womack, 50 years old, died in Tennessee Colony from "Hyperthermia due to Serotonin Syndrome from Sertraline Toxicity," with "environmental heat" listed as a "contributory factor."

111.    Instead of acknowledging the deaths caused by its failure to mitigate the summer heat, TDCJ has falsely attributed its heat-related deaths to other causes. For example, as Charlie Malouff, Vice President of TX C.U.R.E. testified to the Texas Legislature in 2021, TDCJ inflated

---

[31] *Id.*

[32] *Id.*

[33] *Id.*

its number of deaths attributable to the COVID-19 pandemic in order to avoid reporting heat-related deaths and any subsequent pressure to install air conditioning in its prisons.

112.     In a 2022 Texas A&M Study, people in prison collectively confirmed that TDCJ hides and distorts the true number of heat-related deaths and illness. 29% of the incarcerated participants answered that they knew of at least one heat-related death in their own unit or at another, reporting *inter alia*:

- "I don't know real name. We called him Russia (2012)." (Michael Unit)

- "Many, many, but I don't know their names. It's very hot in this even at night. People pass out all time from heat." (Coffield Unit)

- "Yes, but they were 'seizures.'" (Lane Murray)

- "We are told it was a heart attack, but yes, it is heat. there are never so many heart attacks in the cooler times of year." (Polunsky Unit)

- "Most heat related deaths aren't reported or are lied about." (Allred Unit)

- "There were 9 heat related deaths on Lane Murray Unit Summer 2019, The unit tried to hide the facts." (Carole Young Medical Facility)

- "TDCJ conceals that info from us." (Hughes Unit)

- "I know that on Coffield alone there were 19 heat-related deaths. In 2018, 6 people beat to death, 13 suicides." (Michael Unit)

- "Three [heat-deaths], but they said suicide. Don't know names.. they weren't getting water in seg in 2017 and 2018." (Lane Murray)[34]

---

[34] J. Carlee Purdum, P.H.D. et al., *Extreme Temperatures and Covid19 in Texas Prisons*, TEX. A&M U. HAZARD REDUCTION & RECOVERY CTR. 18 (2022), https://tamucoa.b-cdn.net/app/uploads/2022/07/22-01R.pdf.

113.    The A&M Study warned: "[I]ncreasing annual temperatures and the increase of days over 100 degrees in Texas will continue to exacerbate the degradation of health for both incarcerated people and staff" in the TDCJ system.[35]

114.    Unfortunately, these horrific deaths are just several examples among many that happened over the years due to extreme heat inside prisons, and they are a harbinger of increasing deaths and injuries, as deadly temperatures and prolonged heat waves only get worse.

**E.    Thousands of Texas Prisoners Are Being Tortured by the Extreme Heat.**

115.    Because of the miserable conditions created by the heat, those who don't die still suffer torturous conditions during the summer. The extreme heat causes prisoners to experience a punishing wave of heat-related illnesses—including severe heat rash, cramping, disorientation, dehydration, chest pain, vomiting, and total collapse.[36]

116.    In 2018 alone, at least 79 incarcerated people and prison staff members reported heat-related illnesses between January and October.[37] TDCJ processed more than 5,700 heat-related grievances between September 2020 and August 2021.[38]

117.    As a testament to their desperation, some people routinely sleep on the concrete floor because lying on the concrete is marginally cooler than laying in their bunks. Many spend

---

[35] Claire Colbert, *Temperatures inside Texas prison units regularly reach 110 degrees, new report says*, CNN.com (published July 23, 2022), https://www.cnn.com/2022/07/23/us/texas-prison-temperatures-report/index.html.

[36] Brant Bingamon, *The State Claims No One Is Dying From 120+°F in Prisons, Part 2: The state's response to the prison heat crisis,* Austin Chron. (Aug. 18, 2023), https://www.austinchronicle.com/news/2023-08-18/the-state-claims-no-one-is-dying-from-120-plus-df-heat-in-prisons/ (quoting Angela Gonzalez whose husband is housed in the Jim Ferguson Unit).

[37] Purdum, P.H.D. et al., *supra* note 34 at 2.

[38] Hannah Grabenstein, *'I Thought I Was Going to Die There.' What's it's Like to Live with Rising Temperatures in Prison*, PBS NewsHour (Aug. 19, 2022, 4:26 PM), https://www.pbs.org/newshour/nation/i-thought-i-was-going-to-die-there-what-its-like-to-live-with-rising-temperatures-in-prison.

their summer days avoiding any exertion that could bring on heat-related illness (including walking to the chow hall for meals), and instead try to endure the incessant heat by drinking and spraying themselves with arsenic-laced water.

118.  To simply survive, people have flooded their cells with toilet water, soaking their clothes and lying on the wet concrete floor for relief.

119.  Others, desperate for the guards' attention, have lit fires or taken to screaming in unison for water or for help with an inmate who had passed out. "There's just no relief here, there ain't none," said 41-year-old Luke King, an inmate in Huntsville, Texas. "If somebody goes down, we start beating on the lockers and doors yelling, 'Man down!'" "With the heat, he said, that has been happening 'at least daily.'"[39]

120.  Marci Marie Simmons remembers the thermostat reading 136º Fahrenheit when she was incarcerated in a TDCJ facility last summer. "Mentally, it's a struggle," said Simmons, now the community outreach coordinator for Lioness. "Physically, your body is in pure survival mode during the summer months." Ms. Simmons recounted a cook once smuggling an egg into the dayroom outside her dorm to test whether it would actually fry on the floor. It did. "I remember thinking, 'If it's hot enough to cook this egg, what is this heat doing to the inside of my body?'" she said.[40]

121.  Incarcerated for nearly 16 years, 35-year-old Mr. Martire was expecting to be released in a few weeks. But it was so hot that day, "like sitting in a convection oven" he recalled, that he wondered if he would make it that long. His entire body was covered in sweat, he said, and

[39] J. David Goodman, *'Man Down!':Surviving the Texas Heat in Prisons Without Air-conditioning*, N.Y. TIMES (June 29, 2003), https://www.nytimes.com/2023/06/29/us/texas-prisons-heat.html.

[40] Matt Houston, *Texas Inmates Using Toilet Water to Cool Off in Prisons Without A/C, According to Woman's Viral Testimony*, WFAA (Aug. 29, 2023, 5:50 PM), https://www.wfaa.com/article/news/local/texas-inmates-toilet-water-cool-viral-testimony-air-conditioning-prisons/287-963c65be-2d21-411b-8de3-d111d3cb092e.

he felt so lightheaded that he had to brace himself against a wall. At one point, he simply passed out. "It's kind of weird getting woken up with fingers in your eyes and not knowing how you got there," Mr. Martire said of the efforts to revive him by pressing on pressure points around his eyes. He was eventually moved to an air-conditioned emergency medical area. "They kept me there for two hours, drinking ice water, salt water, taking my temperature, making sure I was still alive," he said.[41]

122.    Hope Thommen said her boyfriend, incarcerated in central Texas, likened his ordeal to being in "a chicken coop in the heat with no shade." He told her that other inmates had set fire to sheets and mattresses, "trying to get the guards attention because they're hot." "From the minute he wakes up he says, 'I feel like I'm dying,'" Ms. Thommen added.[42]

123.    Various people who have spent time housed in these brutal prison temperatures have chronicled their torture, *inter alia*, as follows:

- "[T]he heat was like being suffocated, like took your breath away. . . . I had a really bad seizure. And I had hit my head really hard. And I still just couldn't I couldn't bring the temperature down. I was vomiting and diarrhea. I thought I was on die that day." (Brittany Pokorski, worked in Texas prisons for 11 years.[43])

- "I would be so hot that my vision would blur. I couldn't hear for some reason. I would flood the toilet. And I would lay in about an inch of cold running water." (Jason Crawford, spent over 14 years in the Texas prison system.[44])

- "Heat related seizures are very common in the summer months in prison. And I don't mean common like one a day. I mean common like three or four a day. (Marcie Marie Simmons, spent over a decade in the Texas prison.[45])

---

[41] Goodman, *supra* note 39.

[42] *Id.*

[43] John Yang et al., *People in Prison Struggle to Survive Unrelenting Heat Without Air Conditioning*, PBS NEWS WEEKEND (July 15, 2023, 5:40 PM), https://www.pbs.org/newshour/show/prison-inmates-struggle-to-survive-unrelenting-heat-without-air-conditioning.

[44] *Id.*

[45] *Id.*

- "I'm 47. I have a hard time breathing. My chest - I wake up numb sometimes. You know, I put in for medical about this. Just trying to keep out of people's way. Just lay there and sweat. . . . I really feel, to be honest, like we're jerky. We're slowly being cooked, you know, and it's frustrating." (Joseph Garza, Dominguez Prison.[46])

- "It feels like you're walking around in hell," said Gary Crawford, a 44-year-old inmate from Houston who was sharing a dormitory with dozens of other inmates on a day when the temperature in the jail had reached 91° Fahrenheit.[47]

- "You know, we're human. We make mistakes. And that's supposed to be a situation where you teach us, or help us to learn right from wrong, right? And then re-integrate us into the public. . .but it's not a torture mechanism." (Hayley Barna.[48])

- "Remember that we're humans. I did commit a crime … I'm still being punished. But this is torture. If that's what they wanted to do ... why didn't they just kill us?"[49]

124. During the summer months, family members of those who are incarcerated spend their days terrified that their loved ones will die from the extreme heat. Norma Buentrostro feels anxious and helpless during these months with her son in prison: "In a metal building you're talking about maybe 120, 130 degrees or even higher, is inhuman. I—my heart aches when I see him…Because it is—I can't. I can't help him."[50]

125. Amy Broadnax's daughter is incarcerated at the William P. Hobby Unit in Marlin, Texas. The first thing she does in the morning during summertime, she says, is check the weather

---

[46] Flahive, *supra* note 3.

[47] David Montgomery, *In a Sweltering Texas Jail, Cool Towels but No Air-Conditioners*, N.Y. TIMES (Aug. 26, 2022), https://www.nytimes.com/2022/08/26/us/texas-prisons-heat-air-conditioning.html.

[48] Grabenstein, *supra* note 38.

[49] Mose Buchele, '*Why Didn't They Just Kill Us?' Three Women Talk About Life in a Texas Prison Without AC*, KUT NEWS (Aug. 18, 2023, 5:01 AM), https://www.kut.org/crime-justice/2023-08-18/texas-prisons-heat-air-conditioning.

[50] Yang et al., *supra* note 43.

app on her phone: "If it's over 80 degrees, I know my daughter's going to have a hard day. She might die."[51]

126.　Samantha Woods' daughter is incarcerated at the Dr. Lane Murray Unit, with consistent soaring temperatures of 120–130º Fahrenheit in her cell. Ms. Woods says that her daughter repeatedly called her in tears last summer, describing fellow inmates collapsing and having seizures. "They're dropping like flies," Ms. Woods said. "And my daughter tells me, 'Mom, there are people in here that are too old. There are people that are mentally ill, that should be in another unit. There's people that have major medical issues, they're in wheelchairs, they're on walkers.' And with TDCJ, the narrative is so twisted. They say they have special units for the elderly. Well, I see them every single time I visit my daughter."[52]

127.　In a 2022 Texas A&M Study, incarcerated people frequently described experiencing symptoms of heat exhaustion and/or heat stroke:[53]

| | |
|---|---|
| **Heat Stroke and Heat Exhaustion** | *"Yes, symptoms of a heat stroke in the dayroom when it's so small."* (Eastham Unit) <br><br> *"I'm on #20 (heatstroke); Asthma."* (Ellis Unit) <br><br> *"I regularly experience heat exhaustion."* (Hughes Unit) <br><br> *"I was taken to the infirmary after fainting from heat exhaustion."* (Luther Unit) |
| **Passing Out from Heat** | *"I fainted four times in my cell and no reports were filed and I received no medical attention."* (Wayne Scott Unit) <br><br> *"I have passed out twice, on Michael and Allred."* (Ferguson Unit) |

___

---

[51] Norwood, *supra* note 4.

[52] Bingamon, *Texas Prisons Are Cooking People Alive. Are We Okay With That, supra* note 25.

[53] Purdum, P.H.D. et al., *supra* note 34 at 14.

35

| | |
|---|---|
| | *"Working out in fields in 100 plus heat. No cold water. Passing out."* (Hobby Unit) |
| | *"I got cramps, nausea, I even passed out."* (Hughes Unit) |
| **Difficulty Breathing** | *"I get frequent headaches and light headed and lack of air to breath, muscle cramps…"* (Jordan Unit) |
| | *"Yes, when it's too hot I can't take a deep breath."* (Ellis Unit) |
| | *"I could not breathe."* (Wayne Scott Unit) |
| **Nausea and Vomiting** | *"I get dizzy/nauseated, vomiting."* (Allred Unit) |
| | *"Yes (dizziness, nausea, feeling faint)."* (Carole Young Unit) |
| | *"I get hives/rash; extreme lethargy; nauseas, passing out."* (Lane Murray Unit) |
| **Disorientation** | *"Severe migraines, dizziness, disorientation, feeling faint, over- heating, passing out."* (Carole Young Unit) |
| | *"I get very lethargic and disoriented in the summer heat"* (Lane Murray Unit) |
| | *"I get dizzy and weak when it's too hot."* (Carole Young Unit) |
| | *"Dizziness, headache & Lethargy/Fatigue."* (Estelle Unit) |
| **Cramping** | *"I struggle with the heat so bad… I can't eat… I can't gain weight… I suffer from the heat… I get dizzy and headaches… I am weak. I have diarrhea too with leg cramps at night. I have even passed out a few times."* (Hobby Unit) |
| **Heat Rash** | *"In the early spring months, summer months, heat rash covers my legs and ankles and groin area of my body."* (Coffield Unit) |
| | *"Severe heat rash, nausea, no big deal."* (Michael Unit) |
| | *"Every summer I battle with heat rash and it's maddening!!!"* (Stringfellow Unit) |

| | *"I always break out in a rash…"* (Estelle Unit) |
|---|---|

128. In addition to being tortured by hot temperatures, many people with medical or mental conditions and disabilities that make them more vulnerable to heat face the difficult choice of taking their critical medications or potential death. As Dr. Amite Dominick, President and founder of TPCA explained: "You have individuals who literally are making a choice over the summer, 'should I take my diabetic medicine. Or should I not? I might die if I take my medicine because I can't sweat. But I might die from the diabetes.'" Dr. Dominick said that incarcerated people with schizophrenia also sometimes avoid taking antipsychotic medications that help control their symptoms because the medications make people more vulnerable to heat-related illnesses. "Now we've got a psychotic episode that has to be managed by staff and there's not enough staff to manage them in the first place," she added.[54]

129. Also in the 2022 A&M Study, people in prison described how their medical conditions made them more vulnerable to heat, and how those conditions were routinely aggravated[55]:

| | |
|---|---|
| **Medication Interference** | *"I had heat related illness which required medical attention. I became dizzy, lost weight, chest pain, headache, diarrhea, sweating and intolerance to heat- due to medications."* (Jester 3)<br><br>*"The meds I take makes you overheat."* (Michael Unit)<br><br>*"I have extreme heat restrictions due to my medications."* (Lane Murray) |
| | *"I suffer dehydration and heat effect, psych medication."* (Stiles Unit) |

[54] Samantha Harrington, *Extreme Heat Can be a Death Sentence in Texas Prisons*, YALE CLIMATE CONNECTIONS (Sept. 29, 2023), https://yaleclimateconnections.org/2023/09/extreme-heat-can-be-a-death-sentence-in-texas-prisons/.

[55] Purdum, P.H.D. et al., *supra* note 34 at 10.

| | |
|---|---|
| **Mental Illness** | *"I take mental health medication with heat restrictions."* (Michael Unit)<br><br>*"I currently take psych meds (Lithium and Zoloft) that require no direct sunlight and heat restrictions…"* (Coffield Unit) |
| **Cardiac Vulnerabilities** | *"High blood pressure, I don't sweat when temp is above 95."* (Lane Murray Unit)<br><br>*"Yes, high blood pressure. I also take oxybutynin. It dries me out."* (Stiles Unit)<br><br>*"High blood pressure, high cholesterol, suffered two pass outs, heat exhaustion."* (Boyd Unit)<br><br>*"I have congestive heart failure, COPD [Chronic Obstructive Pulmonary Disease], thyroid and blood pressure."* (Wynne Unit) |
| **Asthma** | *"My asthma acts up in the summer heat."* (Luther Unit)<br><br>*"I have asthma which gets worse in the heat and humidity, and I have to work outside despite several attempts to change my job."* (Stringfellow Unit) |
| **Diabetes** | *"I want to make you all aware of the inhumane living conditions we're living under… Temperatures and heat indexes have been in the 90's and 100's lately… I personally have Type II diabetes, asthma, and high blood pressure and I shouldn't even be assigned housing on this row but they don't really care about the inmate's health."* (McConnell Unit)<br><br>*"Diabetic, Asthamatic, Pysch meds."* (Allred Unit)<br><br>*"71 years old and diabetes, heart problems."* (Michael Unit) |
| **Multiple Sclerosis** | *"Multiple Sclerosis, I can't be in extreme heat."* (Michael Unit) |
| **Epilepsy** | *"I have epileptic seizures and a VERY recent brain injury and surgery that causes my heat problems to be magnified many times."* (McConnell Unit)<br><br>*"Take depression meds and have meds for asthma and epilepsy seizures."* (Robertson Unit) |
| | |

| | |
|---|---|
| **Cancer** | *"I have had three heart attacks, CHF S/P cancer, emphysema, COPD- have had brain surg from aneurism."* (Lane Murray Unit) |
| **Pregnancy** | *"I got sick [from heat] at 30 weeks pregnant... I was big and pregnant with no air conditioning and one working fan that didn't reach my bunk ..."* (Carole Young Unit) |
| **PTSD** | *"I have PTSD from four combat tours of Iraq and Afghanistan. The heat is a trigger."* (Clements Unit) |
| **Lupus** | *"I have Lupus Miliaris Disseminatus Faciei, the heat causes pain to it."* (Eastham Unit) |

130.    So unbearable are conditions for prisoners that many consider taking their own lives. Lance Lowry, former head of the Texas Correctional Officer's Union, said that the number of attempted suicides among prisoners usually rises with the temperatures in the summer—93º Fahrenheit in March versus 130º Fahrenheit in August, for example—and that prisoners avoid taking psychotropic medications, thus increasing the risk of psychotic breaks that put everyone (including staff) at risk. "I don't have love for these people," Mr. Lowry commented. But "the incarceration is their punishment, not cooking them to death."[56]

**F.    Bernhardt Tiede Suffered an Acute Medical Crisis From The Extreme Heat in June 2023 and is Likely to Suffer Serious Illness or Death This Summer if Not Guaranteed a Cool Cell.**

131.    Mr. Tiede is a 65-year-old man with multiple conditions that make him especially vulnerable to heat-related illness and death—including, diabetes, hypertension, hyperlipidemia, and COPD.

---

[56] Chammah, *supra* note 1.

132.     Mr. Tiede is housed at the Estelle Unit in Huntsville, Texas. Like all people housed in the non-cooled TDCJ prisons during the summer months, he lived in sadistic conditions.

133.     Last summer, Mr. Tiede's prison cell regularly reached temperatures of 110 to 112° Fahrenheit.

134.     In June 2023, Mr. Tiede suffered an acute heat related health crisis and a likely TIA resulting in permanent partial paralysis and facial disfigurement, ongoing chronic ear infections, and persistent chronic health conditions related to heat exposure.

135.     Appallingly, even after Mr. Tiede had to be taken to the hospital by ambulance from heat-related illness, he was returned to the same oven-like cell, where he suffered from paralysis, acquired a severe ear infection, and required a walker to ambulate. Mr. Tiede continues to suffer from ongoing facial paralysis, significant issues with his vision, and a general marked decline in health.

136.     TDCJ actually fought to keep Mr. Tiede in these cruel and deadly conditions.

137.     While this Court granted a temporary injunction on September 14, 2023, TDCJ continues to oppose his basic request that he not be housed under dangerous and deadly conditions. Thus, as summer approaches, Mr. Tiede faces the same danger he faced last summer.

138.     Dr. Jeanette Cross, M.D., who treated Mr. Tiede in the past, concluded that Mr. Tiede's recent medical records indicate that he likely had a TIA as a result of the brutal heat last summer. She further emphasized that given his age and medical vulnerability, if TDCJ continues to oppose him being guaranteed air-conditioned housing, it is reasonable to expect Tiede to experience a heat-related crisis or death.

139.     Mr. Tiede urgently needs a medical examination by specialists to determine the full extent of his injuries.

140.    While Mr. Tiede was moved to a cool cell last summer, under the Court's order, TDCJ is still able to move him to a non-cool cell at their discretion, or to unilaterally determine that his heat sensitivity score no longer requires a cool cell.

141.    Accordingly, TDCJ's voluntary conduct does not moot Mr. Tiede's request for a permanent injunction, as it is by no means "clear that the allegedly wrongful behavior could not reasonably be expected to recur." *Sossamon v. Texas*, 560 F.3d 316, 325 (5th Cir. 2009), *aff'd*, 563 U.S. 277 (2011).

### G.    TDCJ Also Knows that Extreme Heat is Causing Its Staff to Experience Heat-Related Illnesses.

142.    The substantial risk of serious harm to TDCJ inmates from extreme heat is also obvious, long-standing, pervasive, and well-documented in the countless reports and workers' compensation claims made by TDCJ staff. [57]

143.    Each summer, corrections officers are injured by extreme temperatures, get headaches, and collapse from heat exhaustion. An employee at one prison said the heat was so intense that his work clothes were often soaked through with sweat, and that he had witnessed a colleague being taken away in an ambulance last summer.[58]

144.    Excessive temperatures inside prisons has been a problem for employees and guards, said Jeff Ormsby, the Executive Director of the American Federation of State, County and Municipal Employees Texas Corrections, a union representing prison workers. "It's been really bad. We've had several people call and say they're quitting because of the heat," Mr. Ormsby reported. "It's a messed-up situation. The working conditions are horrific. The assaults go up in

---

[57] Brant Bingamon, *Lobbying to Save Lives in Texas Prisons, It'll Cost $500 Million to Get A/C in Prisons.* AUSTIN CHRON. (Aug. 25, 2023), https://www.austinchronicle.com/news/2023-08-25/lobbying-to-save-lives-in-texas-prisons/.

[58] Goodman, *supra* note 39.

the summer because of the heat. It's just a stress factor."[59] The corrections officers' union has thus made several public requests for air conditioning in TDCJ prisons—all of which have been ignored.

145.    Clifton Buchanan, Deputy Director of the Texas Correctional Employee Council, told the Texas State Legislature last year: "Many TDCJ staff suffer from heat exhaustion every single year."[60] According to Mr. Buchanan, "[c]ountless" TDCJ employees quit their jobs during the summer months due to the "unbearable" and "intolerable" working conditions.[61]

146.    TDCJ has paid hundreds of thousands of dollars in workers compensation claims for heat-related illnesses and injuries among staff over the years.[62] And "[t]he heat is considered a major cause of TDCJ's ongoing staffing crisis"[63] and "40% turnover rate within the first year of employment" for prison guards.[64]

147.    Beyond the physical threats, extreme temperatures can also increase irritability and epidsodes of violence in prisons, among prisoners and officers alike. The brutal summer heat has been linked to increased use-of force-incidents by corrections officers.[65]

---

[59] *Id.*

[60] *Relating to the Temperature at Which a Facility Operated by the Texas Department of Criminal Justice is Maintained: Hearing on H.B. 1708 Before the H. Comm. on Corr.*, 2023 Leg., 88th Sess. 40:51 (Tex. 2023), https://tlchouse.granicus.com/MediaPlayer.php?view_id=78&clip_id=24240 (hereinafter "Texas Prison Heat Bill Hearing").

[61] *Id.* at 41:47.

[62] Chammah, *supra* note 1.

[63] Bingamon, *supra* note 57.

[64] Texas Prison Heat Bill Hearing, supra note 60 at 30:15, (statement of Terry Canales, H. Rep. and Sponsor of H.B. 1708); McCullough, *supra* note 26.

[65] Purdum, P.H.D. et al., *supra* note 34 at 16.

148.     The lack of air conditioning in Texas prisons also "put[s] the correctional officers in danger, because they [must deal] with a population of people that are hot and angry and frustrated." Texas Bill Hearing, Statement of Terry Canales.

149.     Michele Deitch, Director of the Prison and Jail Innovation Lab at the University of Texas traced a statewide lockdown in September following a rise in violence and illegal contraband directly to the heat. The resulting lockdown restricted most inmates to their cells for 24 hours for more than a week as the heat continued to surge.[66]

## H.     TDCJ Is Deliberately Indifferent to the Obvious, Long-Standing, Pervasive, and Well-Documented Risk of Harm to Prisoners in the TDCJ System.

150.     All of these dangerous conditions are obvious, long-standing, well-documented, and well-known throughout the TDCJ system.

151.     Mr. Collier admitted that he knew and believed during the summer of 2019 that people confined in temperatures of 95° Fahrenheit were at a serious health risk.[67]

152.     Mr. Collier and all TDCJ officials unquestionably know that the extreme heat will continue to torture, injure, and kill people, but steadfastly refuse to cool the prisons.

153.     In stark contrast, the wardens' and administrative offices in prisons are air-conditioned.

154.     Given the documented deaths and heat-related illnesses of TDCJ inmates and workers' compensation claims of TDCJ staff dating back at least 25 years, neither Mr. Collier, nor anyone else in the Texas State Government, can credibly maintain that extreme temperatures are not dangerous and deadly, nor can they deny that the prisons need cooling.

---

[66] Norwood, *supra* note 4.

[67] *Cole v. Collier*, Sep. 10, 2019 Hearing Transcript, at 49:22–25.

155.    In fact, the Texas Commission on Jail Standards has required Texas jails to maintain indoor temperatures between 65° and 85° Fahrenheit since 1994. *See* 37 Tex. Admin. Code § 259.160. Yet, despite the fact that the state requires counties to protect inmates in jails from extreme heat, TDCJ refuses to provide this basic, constitutional right to its prisoners.

156.    There are even Texas laws that protect animals from extreme heat in ways that these prisoners are denied. The Safe Outdoor Dogs Act mandates "adequate shelter to protect dogs from extreme temperatures, inclement weather and standing water."[68]

157.    Tellingly, in 2013, TDCJ authorized an agency contractor to build six "climate controlled" buildings for pigs as part of its agriculture program, which provides food for inmates across the state. TDCJ's detailed policies require that pigs live in a "comfortable" environment with ventilation. Misters begin to cool the pigs when the temperature goes above 74° Fahrenheit to keep the pigs "comfortable." TDCJ policy requires temperatures be kept no higher than 85° Fahrenheit to ensure "pig comfort." TDCJ policies even establish an "upper critical limit" for pigs at 95° Fahrenheit because temperatures above 95° Fahrenheit, according to TDCJ policies, negatively affect pigs' "health," and "some form of cooling" is required above this "critical limit."

158.    Even so, TDCJ has no similar policies to protect humans in their custody. TDCJ has shown more willingness to protect pigs than the human beings they incarcerate.

159.    Following the jail heat requirements, Representative Terry Canales of Edinburg filed bills to also require that Texas prison facilities be kept between 65° Fahrenheit and 85° Fahrenheit, which passed in the House.

---

[68] S.B. 474, 87th Leg., Reg. Sess. (Tex. 2021), https://capitol.texas.gov/BillLookup/Text.aspx?LegSess=87R&Bill=SB474.

160.    "The reality is, in Texas, we are cooking people in prisons," Rep. Terry Canales said on the floor when presenting his bill. "What we're asking for is to be humane—we don't even allow people to treat dogs like this."[69]

161.    Rep. Canales added: "This is the right thing to do, it is the humane thing to do, and it's something we should have done a long time ago." "The reality is what we're doing is disgusting. It's truly disheartening."[70] "The truth is the state is paying millions of dollars a year in heat-related lawsuits and we're facing chronic corrections-officer shortages," he added. "It's not conservative. Being in prison in and of itself is a punishment. But nobody is signed up to be tortured."[71]

162.    Last year, fourteen Congressman on the House Oversight Committee, petitioned to investigate states like Texas for their repeated failures to expand air conditioning in the prisons. "They've been dragging their feet on this for years. And now that it's getting so darn hot, I think the public sees just how inhumane this is," one committee member stated.[72]

163.    Major newspapers, including the *New York Times*, *Houston Chronicle*, and *Austin American-Statesman*, have opined that TDCJ should end the practice of failing to air condition inmate housing areas.[73]

---

[69] Texas Prison Heat Bill Hearing, *supra* note 60 at 32:29, (statement of Terry Canales, H. Rep. and Sponsor of H.B.1708).

[70] McCullough, supra note 22. In April 2023, the Texas House of Representatives voted to cool the prisons, using only a small fraction of the $32.7 billion in extra funds the Legislature had, but the Senate refused a hearing. Jolie McCullough, *Texas House Budgets $545 Million for Prison Air Conditioning. The Senate Hasn't Offered Anything*, Tex. Tribune (Apr. 11, 2023, 5:00 AM), https://www.texastribune.org/2023/04/11/texas-prisons-air-conditioning/.

[71] Goodman*, supra* note 39.

[72] Flahive, *supra* note 3.

[73] Goodman, *supra* note 39.

164. And yet, despite the epidemic of heat-related deaths last summer, all of which would have been prevented with air conditioning, TDCJ's 2024 summer heat plan remains the same: subject prisoners, including those who are disabled and medically vulnerable, to the life-threatening risks of prolonged exposure to extreme heat.

165. Instead of implementing the obvious solution to cool the units, TDCJ has instituted limited and largely ineffective mitigating factors, such as extra water, showers, and short access for heat-sensitive people to cool ("respite") areas—all of which are woefully inadequate, inconsistently followed, and, due to constant staffing issues, impossible to maintain.

166. "What's being done is that TDCJ tries to identify the most vulnerable and get them into those cooled units. But the reality is, is that there are so many vulnerable people inside the units and working in the units that it's really impossible at this point in time to get everyone who needs to be in air-conditioned units into them. And also, we know that it doesn't take being extremely medically vulnerable to experience heat-related illness and potential death."[74]

167. According to TDCJ's "Heat Mitigation Policy," prisoners may request access to "respite" air-conditioned areas during periods of excessive heat. But often the respite area is no such thing. The respite room "fits 18 people and it has a tiny portable A/C unit in it that does nothing. And the room is packed with inmates. So the body heat coming off them is ridiculous."[75]

168. Other available heat mitigation strategies have proven to be inadequate. Fans are useless and often only make things worse, as they blow scorching air. The CDC does not even recommend using fans above 95º Fahrenheit, as they increase heat stress by blowing air that is

---

[74] Cristela Jones, *New Study Details How Extreme Heat is Affecting Texas Prisons*, TEX. STANDARD (Jul. 29, 2022, 12:54 PM), https://www.texasstandard.org/stories/texas-prisons-extreme-heat-tamu-study/ (quoting Dr. J. Carlee Purdum).

[75] Bingamon, *supra* note 36 (quoting Angela Gonzalez whose husband is housed in the Jim Ferguson Unit).

warmer than the body temperature. Moreover, far from lowering the temperature in the housing areas, widespread use of fans actually increases the temperature inside, making housing areas hotter and more dangerous.

169.    Additional showers inherently have a limited and short-term effect on heat risk. Constant showers in a prison where a large number of inmates live in housing areas without showers, also presents security concerns. With short-staffing already a constant problem, officers need to be taken away from normal duty stations to supervise inmates who are showering.

170.    Even water proves hard to come by: "One of the biggest issues that I have is officers treating us as though water is a privilege"; "Even when we're passing out water, we're having to funnel the water through the grates [of the cell doors]. What I mean by funnel is, we take our toothpaste and most of us cut the tops off that and use that as a funnel. Or you take a panty liner and you use that to funnel water through the door. Because we don't have the officers or the means to open the door, to be able to get people water, to be able to [let] people out."[76]

171.    Regardless, even if water was freely available, no amount of ice, water, fans, or brief access to air-conditioned "respite" rooms will prevent deaths, illness, and suffering this summer.

172.    "The state is playing Russian roulette," Officer Lowry has said. "There will be another heat wave, and people will die."[77]

173.    Sure enough, there will certainly be another heat wave. Texas has exhibited increasing temperatures for at least the past 20 years, and the punishing heat is forecast to worsen.

---

[76] Buchele, *supra* note 49.

[77] Chammah, *supra* note 1.

Due to climate change, heat waves are becoming more common, severe, and longer in duration than they would otherwise.

174.    Linda Mearns, a climatologist and researcher at the National Center for Atmospheric Research, has opined: "Increasing temperatures and increasing extreme temperatures and heat waves are among the most certain expectations about future climate, and this applies to the region of Texas. Moreover, it is consistent with the trends we are observing now. This most likely will result in an increasing heat index, and number of hours per day with extreme heat index values."

175.    And yet, it doesn't take a climatologist to predict the imminent death and sickness. It's the same pattern in TDCJ year after year. Everyone in the non-cooled prison units lives terrified of summer: "With climate change and record-breaking heat every day and heat domes and heat waves. . . . We sit around here and talk about — "Are we going to be alive in five years?"[78]

176.    Without this Court's intervention, many more people will suffer and die.

**E.    Maintaining Safe Temperatures Is the Least Intrusive (and Only) Means to Stop the Needless Deaths, Illness, and Suffering in Texas Prisons.**

177.    Cooling the units to safe temperatures is the only remedy which does not compromise the safety of prisoners or adversely impact the operation of any of the prison units. No mitigation measures short of climate control in the prison housing areas can adequately protect people from these extreme temperatures.

178.    Prison experts, medical experts, scientists, legislators, people in prison, correctional officers, and Mr. Collier all agree that, "without systemwide cooling," prisoners will inevitably suffer heat-related illnesses and injuries and be placed at increased risk of imminent death.[79]

---

[78] Buchele, *supra* note 49.

[79] McCullough, *supra* note 22.

179.    As toxicology expert, Dr. Susi Vassallo, has concluded:

Any one held in an unairconditioned prison in Texas during the summer months is at substantial risk of serious harm. That people are held in unairconditioned spaces in the Texas summers and the deaths from heat stroke in the prisons are unnecessary and unconscionable examples.

Heat-related illness and death are preventable. The risks are well known, and so is the solution. Simple measures such as access to air conditioning are essential to decreased morbidity and mortality. ***Air conditioning is not a luxury but a lifesaver***.

To be sure***, excess morbidity and mortality in TDCJ facilities resulting from the extreme heat of the Texas summers can only be combatted by bringing the temperature in the prisons down***.

180.    TDCJ's current Heat Policy is constitutionally inadequate, because all available mitigating measures have not, and will not, stop deaths, illness, and torturous conditions. According to Dr. Vassallo, respite rooms, extra water or showers, and useless fans, do "nothing to address the health risks of the extreme temperatures." TDCJ knows that a cold washcloth and ice chips will not remedy relentless triple digit temperatures, yet they nevertheless refuse to change their policy.

181.    Following hearings in 2018, the House Corrections Committee Interim Report unequivocally concluded TDCJ's heat-mitigation strategy was insufficient: "Based on the medical information known about human health and heat-related health risks, TDCJ cannot rely only on mitigation factors to assure the well-being of inmates and corrections personnel. The state has a responsibility to assure the well-being of inmates and corrections personnel."[80]

182.    A policy to *mitigate* the effects of heat makes sense only if the heat itself cannot be predicted or controlled. TDCJ's heat response amounts to a hospital triage policy during wartime or mass casualty event, where responders must decide who to treat and in what priority order. It

---

[80] H. Comm. on Corr., Tex. H.R., Interim Rep., 85th Leg. (2018), https://www.house.texas.gov/_media/pdf/committees/reports/85interim/Corrections-Committee-Interim-Report-2018.pdf.

does nothing to address the underlying cause of heat-related illness and death—the heat itself. Unlike responders during wartime, TDCJ can control the heat. It simply refuses to do so.

183.     Indeed, all mitigation policies are inherently borne from conditions that are not easily controlled by eradicating the underlying problem, such as COVID. Imagine the absurdity of a COVID mitigation policy that ignored the solution of "ending COVID." TDCJ's heat policy is no different.

184.     As Dean Williams, the former Executive Director of the Colorado Department of Corrections, has explained:

> [M]itigation policies are rationalized short term fixes, not long-term solutions to the underlying problem. The tendency I have seen in government is to use emergency mitigations as the solution. It glosses over the core issue and the usually sets up more profound costs, loss of life, and painful mistakes. Any heat mitigation policy that only aims to mitigate expected dangerous conditions without addressing the underlying cause, would never be adequate to meet humane or constitutional standards, as it risks serious harm or death.

185.     The dangerous Texas summers are predictable. Heat-related deaths and sicknesses are predictable. And they have been for over 25 years. TDCJ can and must cool the prisons, like virtually every other building housing people in Texas, including jails and animal facilities.

186.     Mr. Williams has stated:

> In my leadership of two state correctional systems and several juvenile correctional facilities, I would never tolerate long term temperatures outside the norms. Certainly facilities have systems that fail, or unexpected conditions crop up. The issue here, however, is the apparent acceptance that prolonged exposure to heat can be justified as a strategy to punish. It is not.

> Letting people suffer or die in prisons because of dangerous temperatures disregards our basic humanity, let alone the safety standard to keep people safe that is likely addressed in nearly all statutory expectations of a correctional leader.

> Cooling prisons to safe temperatures, such as between 65–85 degrees as required by the Texas Commission on Jail Standards, and states like North Carolina, is the only long-term solution that does not compromise the safety and lives of prisoners and staff. No mitigation measures short of maintaining safe temperatures in the

prison housing areas can adequately protect people from these extreme temperatures.

187.     There is no legitimate, penological purpose or constitutional basis for TDCJ to treat inmates incarcerated in state prisons differently from inmates incarcerated in county jails who are not exposed to extreme temperatures. Only a minority of states don't cool their prisons. Prisons in neighboring states, including Arkansas, Oklahoma, and New Mexico, are all air conditioned. Federal prison regulations similarly require temperatures in occupied areas to be set at between 68 to 76 degrees, so that even maximum-security federal prisons in hot climates like Texas, such as USP Beaumont and even prisons housing terrorism suspects at Guantanamo Bay, Cuba, have air conditioning. Fully air-conditioned federal prisons in Texas include not just USP Beaumont, but also FCI Bastrop, FCI Beaumont Medium, FCI Big Spring, FPC Bryan, FMC Carswell, FMC Fort Worth, FDC Houston, FCI Seagoville, FCI Texarkana, and FCI Three Rivers. In fact, the comment to the American Correctional Association standards instructs prisons to be able to "mechanically lower" temperatures in inmate housing areas, which obviously most TDCJ Units cannot do.

188.     The suggestion that people in prison deserve these conditions underlies any opposition to air conditioning and is often blatantly stated.

189.     State Sen. John Whitmire once defended Texas's refusal to provide air conditioning for prisons in 2011 by candidly admitting "[w]e don't' want to."[81] "Texans are not motivated to air-condition inmates," he said. "These people are sex offenders, rapists, murderers."[82]

---

[81] Chammah, *supra* note 1.

[82] Manny Fernandez, *Two Lawsuits Challenge the Lack of Air-Conditioning in Texas Prisons*, N.Y. TIMES (June 26, 2012), https://www.nytimes.com/2012/06/27/us/two-lawsuits-challenge-the-lack-of-air-conditioning-in-texas-prisons.html.

190.    In support of his bills, Rep. Canales told the House Corrections Committee. "I don't think we have a money problem. I think we have a give-a-damn problem."[83]

191.    In reality, the real disagreement between Plaintiffs and Defendant lies not in whether extreme heat in prisons is dangerous. This is not a question of knowledge—everyone knows it's hot, everyone knows about the heat-related deaths and injuries. The real dispute boils down to whether TDCJ should have to fix it. And what society will tolerate.

192.    "Improving ventilation and cooling systems in prisons . . . doesn't require a breakthrough in quantum physics [but] it requires seeing incarcerated people as fellow humans worthy of being treated with decency and respect," said Jeff Goodell, author of *The Heat Will Kill You First: Life and Death on a Scorched Planet.*[84]

193.    "Not wanting to," not "giving a damn," or not feeling like spending money to stop killing and torturing people does not pass constitutional muster.

194.    There have to be limits to what we accept in a civilized society. Society cannot tolerate more summers of concealed, unexplained deaths and torturous conditions. Family members should not have to find their loved ones cooked alive, covered in heat rash. Even in these polarized times, there must be some universal agreement as to what constitutes torture.

195.    If cooking someone to death does not amount to cruel and unusual punishment, then nothing does.

---

[83] McCullough, *supra* note 22. In April 2023, the Texas House of Representatives voted to cool the prisons, using only a small fraction of the $32.7 billion surplus in available Legislature funds, but the Senate refused a hearing. Jolie McCullough, *Texas House Budgets $545 Million for Prison Air Conditioning. The Senate Hasn't Offered Anything*, The Texas Tribune (Apr. 11, 2023, 5:00 AM), https://www.texastribune.org/2023/04/11/texas-prisons-air-conditioning/.

[84] Nina Lakhani, *Prisoners in Texas and Florida Face Biggest Risk of Increasingly Deadly Heat*, GUARDIAN (Mar. 5, 2024), https://www.theguardian.com/us-news/2024/mar/05/prisons-heat-deaths-texas-florida.

196.    As the summer of 2024 quickly approaches, thousands of prisoners unquestionably face more deaths and suffering, both of which are highly preventable but sadly inevitable absent this Court's intervention.

197.    This Court must therefore declare TDCJ's current heat-mitigation policy constitutionally inadequate and require TDCJ (through its Executive Director, Mr. Collier) to maintain a temperature between 65º and 85º Fahrenheit inside the housing and occupied areas of TDCJ prisons.

## V.   CAUSES OF ACTION

### CLAIM 1: VIOLATION OF 42 U.S.C. § 1983 – EIGHTH AMENDMENT
### (Plaintiff Tiede Against Defendant Collier in his Official Capacity)

198.    Plaintiff incorporates the previous paragraphs as if alleged herein, and further pleads:

199.    The Eighth Amendment to the United States Constitution prohibits "cruel and unusual punishment." U.S. CONST. amend. VIII. TDCJ "must provide humane conditions of confinement; prison officials must ensure that inmates receive adequate food, clothing, shelter, and medical care, and must take reasonable measures to guarantee the safety of the inmates." *Blackmon v. Garza,* 484 F. App'x 866, 868–69 (5th Cir. 2012) (quoting *Farmer v. Brennan*, 511 U.S. 825, 832 (1994).

200.    Injunctive relief is appropriate to address this "unsafe, life-threatening condition in the[] prison[s]," including heat. *See Helling v. McKinney*, 509 U.S. 25, 33 (1993) (affirming entry of injunctive relief to address inmate's exposure to environmental tobacco smoke); *Yates v. Collier*, 868 F.3d 354, 360 (5th Cir. 2017) "We have repeatedly upheld district court findings that the heat levels within these prisons violate the Eighth Amendment, and we have done so in the context of a class action in at least one case."); *Gibson v. Moskowitz*, 523 F.3d 657 (6th Cir. 2008);

*Jones-El v. Berge*, 374 F.3d 541 (7th Cir. 2004); *Graves v. Arpaio*, 623 F.3d 1043 (9th Cir. 2010) (affirming an injunction requiring indoor temperatures be kept below 85° Fahrenheit).

201.    "It is well-established in [the Fifth Circuit] 'that the Eighth Amendment guarantees inmates a right to be free from exposure to extremely dangerous temperatures without adequate remedial measures.'" *Yates*, 868 F.3d at 360 (*quoting Hinojosa v. Livingston*, 807 F.3d 657, 669 (5th Cir. 2015)). The Fifth Circuit has "repeatedly recognized the serious risk of harm that excessive heat can pose in the prison context absent adequate mitigating measures, and [it has] consistently found evidence sufficient in these cases to support an Eighth Amendment violation, even when certain mitigating measures were available." *Id.* at 361. *See also Ball v. LeBlanc*, 792 F.3d 584 (5th Cir. 2015) (affirming necessity of injunctive relief to protect inmates from high indoor temperatures); *Gates v. Cook*, 376 F.3d 323, 339 (5th Cir. 2004) (same); *Webb v. Livingston*, 618 Fed. Appx. 201, 209 n.7 (5th Cir. 2015) ("[T]he mere presence of remedial measures would not end the inquiry, as such measures must be adequate.").

202.    The risk to Mr. Tiede from extreme heat in unairconditioned TDCJ facilities is obvious, "longstanding, pervasive, [and] well-documented" for nearly 25 years. *Farmer*, 511 U.S. at 842.

203.    Pursuant to 42 U.S.C. § 1983, Defendant Collier, in his official capacity, has been and is deliberately indifferent to the substantial risk of serious harm to prisoners in all of the non-climate controlled TDCJ prisons, including Mr. Tiede, by his choice to expose prisoners to high apparent temperatures inside the housing areas, and unnecessarily and wantonly cause Mr. Tiede pain and suffering.

204.    The extreme heat in the unairconditioned housing areas of the Estelle Unit—and the other unairconditioned housing areas which Mr. Tiede could be housed in by TDCJ—during

summer months poses an unreasonable risk to the health of Mr. Tiede, who also suffers from multiple medical conditions that make him more susceptible to heat related illness and death.

205. Defendant Collier is aware that extreme heat in TDCJ facilities' housing areas poses substantial risk of serious injury to inmates, including Plaintiff Tiede. Defendant's knowledge is demonstrated by his own prior statements, numerous public warnings about the risk posed by extreme temperatures from government agencies, TDCJ policies and practices, as well as the well-documented history of deaths and injuries, including Mr. Tiede's heat-related medical crisis last summer.

206. Mr. Collier is acting with deliberate indifference to Plaintiff Tiede's constitutional right to be free from cruel and unusual punishment by refusing to provide safe housing areas that protect Mr. Tiede from exposure to extreme heat. Defendant's deliberate indifference to Mr. Tiede's risk of serious medical problems puts Mr. Tiede at substantial risk of serious bodily injury including, but not limited to, heat stroke, heat cramps, and heat exhaustion, as well as the myriad symptoms associated with these conditions.

207. Mr. Collier's policies, practices, acts, and omissions violate the Cruel and Unusual Punishments Clause of the Eighth Amendment, made applicable to the States through the Fourteenth Amendment to the United States Constitution.

208. As a proximate result of Mr. Collier's unconstitutional policies, practices, acts, and omissions, Plaintiff Tiede has suffered and will continue to suffer immediate and irreparable injury, including physical injury, risk of physical injury, and risk of death.

209. Mr. Tiede faces an enhanced and ongoing risk of injury or death from extreme heat and death, absent a permanent injunction.

## CLAIM 2: VIOLATION OF 42 U.S.C. § 1983 – EIGHTH AMENDMENT
### (Organizational Plaintiffs Against Defendant Collier in his Official Capacity)

210.    Plaintiffs incorporate the previous paragraphs as if alleged herein, and further plead:

211.    Pursuant to 42 U.S.C. § 1983, Executive Director Collier, in his official capacity is deliberately indifferent to the substantial risk of serious harm to prisoners, as evident by his choice to expose prisoners to high apparent temperatures inside the housing areas, and unnecessarily and wantonly cause the Plaintiffs pain.

212.    The high indoor apparent temperatures at the majority of TDCJ Units pose an unreasonable risk to prisoners' health.

213.    Neither the claim nor the relief requires that the Organizational Plaintiffs' members or constituents participate in the litigation. All prisoners are similarly subjected to TDCJ's policy and practice of failing to regulate high apparent indoor temperatures in the majority of indoor housing areas—where any prisoner may currently live or be moved to at any time under TDCJ policy. Indeed, the participation of all affected individuals (many thousands) would be impracticable. Common questions of law and fact exist as to all people incarcerated in non-cooled Prison Units, as well as all people at risk of being incarcerated in them, like Mr. Tiede. Disposition of this matter with Organizational Plaintiffs will provide substantial benefits and efficiencies to the parties and the Court. Litigating this case on behalf of representative organizations will reduce the risk of repetitious litigation relating to the Defendant's conduct.

214.    The risk to the constituents and members of the Organizational Plaintiffs from extreme heat in unairconditioned TDCJ facilities is obvious, "longstanding, pervasive, [and] well-documented" for nearly 25 years. *Farmer*, 511 U.S. at 842.

215.    The Organizational Plaintiffs' claims arise from the same conduct by TDCJ (exposing them to unsafe temperatures in the housing areas), are based not only on identical legal theories, but also seek identical remedies (injunctive and declaratory relief requiring TDCJ to maintain the temperatures at its Units to safe levels). The un-cooled housing areas all reach roughly similar dangerous temperature levels; the high indoor apparent temperatures threaten all inmates' well-being.

216.    Mr. Collier is aware that extreme heat in the facilities' housing areas poses substantial risk of serious injury to prisoners. Mr. Collier's knowledge is demonstrated by TDCJ policies and practices, as well as the well-documented history of deaths and injuries to inmates and employees in the Prisons. Defendant remains indifferent to the risk, failing to take obvious steps to mitigate it.

217.    In light of his own statements, the numerous public warnings about the risk posed by extreme temperatures from government agencies, scientific studies of the risk, warnings within TDCJ's own policy, and the history of inmate and staff injuries, Mr. Collier knows of the risk of heat-related illness, injury, or death that exists in the un-cooled prison facilities.

218.    Mr. Collier is acting with deliberate indifference to prisoners' constitutional right to be free from cruel and unusual punishment by refusing to provide safe housing areas that protect inmates from exposure to extreme heat, which annually causes deaths and injuries.

219.    Mr. Collier's deliberate indifference to the risk of serious medical problems puts prisoners at substantial risk of serious bodily injury including, but not limited to, heat stroke, heat cramps, and heat exhaustion, as well as the myriad symptoms associated with these conditions.

220.     Mr. Collier's policies, practices, acts, and omissions violate the Cruel and Unusual Punishments Clause of the Eighth Amendment, made applicable to the States through the Fourteenth Amendment to the United States Constitution.

221.     As a proximate result of Mr. Collier's unconstitutional policies, practices, acts, and omissions, people in prison have suffered and will continue to suffer immediate and irreparable injury, including physical injury, risk of physical injury, and risk of death.

222.     Without permanent injunctive relief, Mr. Collier will continue the same perilous practices and conduct, disregarding the Constitution, and endangering the lives and the welfare of current and future prisoners, causing every person in hot prison units to suffer each summer.

223.     The Organizational Plaintiffs do not seek damages, except as may be incidental to declaratory or injunctive relief.

## PRAYER FOR INJUNCTIVE AND DECLARATORY RELIEF

THEREFORE, Plaintiffs respectfully request that the Court award the following relief:

A. Remedy ongoing violations of law and the Constitution by granting declaratory and injunctive relief, as set out in this First Amended Complaint, on behalf of the individual and Organizational Plaintiffs in their representative capacity;

B. Declare TDCJ's current Heat Policy to be constitutionally inadequate under the Eighth Amendment to the U.S. Constitution;

C. Enjoin Defendant to maintain a safe indoor temperature in all TDCJ facilities of between 65° to 85° Fahrenheit inside each of the prison housing and occupied areas, or enter other injunctive relief sufficient to protect the health and safety of the prisoners and to prevent cruel and unusual suffering from extreme heat conditions.

D. Declare the conditions under which TDCJ houses people to be unconstitutional.

E.  Find that Plaintiffs are the prevailing parties in this case and award them attorneys' fees, court costs, expert costs, and litigation expenses pursuant to 42 U.S.C. § 1988, and 42 U.S.C. § 12205.

F.  Grant such other and further relief as appears reasonable and just, to which Plaintiffs may be entitled, separately or collectively.

DATED this 22nd day of April, 2024.          Respectfully submitted,

*/s/ Jeff Edwards*
Jeff Edwards
Texas Bar No. 24014406
David Anthony James
Texas Bar No. 24092572
Lisa Snead
Texas Bar No. 24062204
Paul Samuel
Texas Bar No. 24124463
Edwards Law
603 W. 17th Street
Austin, TX 78701
Telephone:     512.623.7727
Facsimile:     512.623.7729
Email:    jeff@edwards-law.com
           david@edwards-law.com
           lisa@edwards-law.com
           paul@edwards-law.com

Attorneys for Plaintiffs Bernhardt Tiede, II
TPCA, TX C.U.R.E., Lioness, and Coalition for
Texans with Disabilities

Jodi Cole
Texas Bar No. 24045602
Law Office of Jodi Cole, PLLC
203 East Murphy Street
Alpine, TX 79830
Telephone:     432.837.4266
Facsimile:     512.692.2575
Email:    jcole@jodicole.com


Erica Grossman (*pro hac vice*)
Holland, Holland Edwards & Grossman, LLC
1437 High Street
Denver, CO 80218
Telephone:     303-860-1331
Facsimile:     303-862-6506
Email:    erica@hheglaw.com

Thomas A. Olsen (*pro hac vice*)
Kevin D. Homiak (*pro hac vice*)
Ellen R. Blatt (*pro hac vice*)
Wheeler Trigg O'Donnell LLP
370 Seventeenth Street, Suite 4500
Denver, CO 80202-5647
Telephone:     303.244.1800
Facsimile:     303.244.1879
Email:   olsen@wtotrial.com
            homiak@wtotrial.com
            blatt@wtotrial.com

Brandon Duke
Winston & Strawn, LLP
800 Capitol Street, Suite 2400
Houston, TX 77002
Telephone:     713-651-2600
Email:   bduke@winston.com

## **CERTIFICATE OF SERVICE**

By my signature above, I certify that a true and correct copy of the foregoing has been served on all counsel of record through the Electronic Case File System of the Western District of Texas.