FILED
July 12, 2024
CLERK, U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS
BY: _____klw_____
                      DEPUTY

# UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF TEXAS
# AUSTIN DIVISION

| | |
|---|---|
| BERNHARDT TIEDE, II; <br> TEXAS PRISONS COMMUNITY ADVOCATES; <br> BUILD UP, INC., A/K/A JUSTICE IMPACTED WOMEN'S ALLIANCE; <br> TEXAS CITIZENS UNITED FOR REHABILITATION OF ERRANTS; and <br> COALITION FOR TEXANS WITH DISABILITIES; <br><br> Plaintiffs, <br><br> v. <br><br> BRYAN COLLIER, in his official capacity as Executive Director of the Texas Department of Criminal Justice, <br><br> Defendant. | CIVIL ACTION NO. 1:23-cv-01004-RP |

### *AMICUS CURIAE* BRIEF IN SUPPORT OF
### PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

Non-Party Texas Civil Rights Project ("TCRP") files this Amicus Brief in support of the Motion for a Preliminarily Injunction (Doc. No. 50) filed by Plaintiffs Bernhardt Tiede, II, Texas Prisons Community Advocates, Build Up, Inc., Texas Citizens United for Rehabilitation of Errants, and Coalition for Texans with Disabilities ("Plaintiffs") and would respectfully show the Court as follows:

### I.   INTEREST OF AMICUS CURIAE

The Texas Civil Rights Project ("TCRP") is a non-profit organization of Texas lawyers and advocates who strive to protect and promote the civil rights of all Texans. For more than

thirty years, TCRP has sought to advance the rights of the State's most vulnerable populations through advocacy in and out of the courtroom. TCRP has long fought for the rights of those incarcerated in prisons and jails across the state. For example, TCRP has extensive experience serving as counsel for prisoners and their families in actions arising out of excessive heat in Texas prisons. See Cole v. Collier, No. 14-cv-01698 (S.D. Tex.); McCollum v. Livingston, No. 14-cv-03253 (S.D. Tex.); Martone v. Livingston, No. 13-CV-3369 (S.D. Tex.); Webb v. Livingston, No. 13-cv-00711 (E.D. Tex.); Blackmon v. Kukua, No. C–08–273 (S.D. Tex.); McCoy v. Tex. Dep't Crim. Just., No. C.A. C-05-370 (S.D. Tex.).

TCRP submits this brief in support of Plaintiffs' Motion for Preliminary Injunction (Doc. No. 50) because the issue of excessive heat in prisons is of the utmost importance to TCRP's work. A number of TCRP's clients, partners, and their families are currently incarcerated in facilities operated by the Texas Department of Criminal Justice ("TDCJ").[1] Like all individuals confined by the State, they face a serious and increasing risk with every passing day they are forced to endure the summer's heat. Absent relief from the Court, they will likely face substantial threats to their health—if not their lives. TCRP hopes that its perspective on the potential consequences of the Court's action on this Motion will assist the Court in its consideration.

## II.      SUMMARY OF ARGUMENT

This Court should enter a preliminary injunction, as Plaintiffs seek, to ensure the safety of all individuals presently incarcerated in TDCJ from the effects of extreme heat. Such a measure, requiring reasonable temperature control across the State's prisons, is necessary, narrowly tailored, and as minimally intrusive as possible to end the egregious Eighth Amendment violation underway. All other heat mitigation measures short of temperature control have failed

---

[1] TCRP currently represents individuals incarcerated in eight different TDCJ facilities across the Texas. *See Hope v. Harris,* No. 18-cv-00027 (E.D. Tex.); *Gambill v. Collier*, No. 21-cv-01076 (S.D. Tex.).

to remedy the extreme risk of serious harm. Emergency injunctive relief is ever more necessary as heat indices continue to rise each year, and measures that may previously have been effective no longer suffice to keep those in Texas prisons safe.

The extreme heat crisis affects every individual who lives or works in a Texas prison, and therefore requires system-wide relief. Aside from those with underlying medical conditions and other medical risk factors, individuals in solitary confinement face heightened risks from rising temperatures. Moreover, the drastic staffing shortages in TDCJ disproportionately affect those in solitary confinement, compounding the impact of dangerous heat conditions. Only an injunction requiring temperature control across all of TDCJ can protect those in TDCJ custody from the Eighth Amendment violation resulting from TDCJ's constitutionally inadequate response to deadly summer heat.

### III.   ARGUMENT

#### a. A Preliminary Injunction Requiring Reasonable Temperature Control is a Necessary and Tailored Remedy.

Under the Prison Litigation Reform Act ("PLRA"), an injunction must "be narrowly drawn, extend no further than necessary to correct the harm the court finds requires preliminary relief, and be the least intrusive means necessary to correct that harm." 18 U.S.C § 3626(a)(2). A Court must consider potential impacts on public safety from an injunction. It is well-established in the Fifth Circuit "that the Eighth Amendment guarantees inmates a right to be free from exposure to extremely dangerous temperatures without adequate remedial measures." *Yates v. Collier*, 868 F.3d 354, 360 (5th Cir. 2017) (citing *Hinojosa v. Livingston*, 807 F.3d 657, 669 (5th Cir. 2015)); *see also id.* at 361 ("[W]e have repeatedly recognized the serious risk of harm that excessive heat can pose in the prison context absent adequate mitigating measures, and we have consistently found evidence sufficient in these cases to support an Eighth Amendment violation, even when certain

mitigating measures were available"). As such, the issue at hand is not whether an Eighth Amendment violation exists, but rather what measures this Court should order to remedy the Eighth Amendment violation currently in progress.

When the Fifth Circuit has previously grappled with the issue of extreme heat in prisons, it has confirmed that such conditions pose serious risks to the health of incarcerated individuals, requiring injunctive relief. For example, in *Gates v. Cook*, the Court upheld a permanent, class-wide injunction requiring the Mississippi Department of Corrections to "provide fans, ice water, and daily showers when the heat index [rose to] 90 degrees or above." *Gates v. Cook*, 376 F.3d 323, 339, 344 (5th Cir. 2004). The Court determined that the extreme heat conditions in that case presented a substantial risk of serious harm to incarcerated individuals. *Id*. at 340. Plaintiffs here are likewise exposed to dangerous temperatures in TDJC.

Where intermediate heat mitigation measures have failed to alleviate the harms from excessive heat, temperature control may be a necessary measure to alleviate Eighth Amendment concerns consistent with Fifth Circuit law. In *Ball v. LeBlanc*, 792 F.3d 584, 598-99 (5th Cir. 2015), the Fifth Circuit made clear that prisons must first be allowed to implement other heat mitigation measures before a court may order implementation of temperature control. *Id.* Yet the mere presence of remedial measures does not end a court's inquiry; the remedial measures must be adequate. *Webb v. Livingston*, 618 F. App'x. 201, 209 n.7 (5th Cir. 2015). Here, TDJC *has* explored all measures short of air conditioning. The data is clear that the mitigation measures currently available have failed to eliminate the substantial risk of serious harm from extreme heat. Skarha et al., *Provision of Air Conditioning and Heat-Related Mortality in Texas Prisons*, JAMA NETWORK OPEN (Nov. 1, 2022), https://pubmed.ncbi.nlm.nih.gov/36322085. Therefore, temperature control

is a necessary, narrowly tailored remedy no more intrusive than required to meet the heat crisis in Texas prison.

In *Cole v. Collier,* No. 4:14-CV-1698, 2017 WL 3049540, at *10, *39 (S.D. Tex. July 19, 2017), the U.S. District Court for the Southern District of Texas granted a preliminary injunction calling for air conditioning in the Wallace Pack Unit, based on its findings that mitigation measures such as respite areas, cool-down showers, and wellness checks that had been in place for more than two years had failed to decrease heat-related illnesses. Additionally, the Court found that TDJC knew or should have known that the mitigation measures it implemented were ineffective given the extreme heat in the unit. *Id.* at *42. In its decision, the Court held that granting a preliminary injunction was consistent with *Ball* because the previously-implemented mitigation measures were insufficient to protect against a substantial risk of serious harm. *Id.* at *39.

Although TDJC has implemented heat mitigation measures across Texas prisons, these measures have proven to be insufficient to meet the mounting dangers of heat exposure to the tens of thousands of individuals incarcerated in TDCJ. Last year, at least forty-one people died in uncooled prisons during the state's record-breaking heat wave; a 2022 study found that at least fourteen people died annually because of heat. Pooja Salhotra & William Melhado, *Texas Inmates Are Being 'Cooked to Death' in Extreme Heat, Complaint Alleges*, Tex. Trib. (Apr. 22, 2024, 7:00 PM), https://www.texastribune.org/2024/04/22/texas-prisons-heat-deaths. TDCJ must do more to protect the individuals in its custody and care. Temperature control is the necessary and tailored remedy required to adequately eliminate the substantial risk of imminent and potentially lethal harm.

> i. *Mitigation measures have failed to remedy the Eighth Amendment violation caused by excessive heat.*

Although TDCJ has implemented mitigation measures such as fans, cool-down showers, and respite areas, such measures have been insufficient to protect those held in TDCJ's prisons, and those who work in the same facilities, from heat-related illness and death, as the Eighth Amendment requires. *Enhanced Heat Protocols*, Tex. Dep't Crim. Just. https://tdcj.texas.gov/offender_info/enhanced_heat_protocols.html (last visited July 2, 2024). The poor design, impracticability, and dysfunctional administration of these measures make them effectively useless. Individuals who are indigent may be forced to go without protective items, such as electrolyte mix, that are only guaranteed for purchase at the commissary's steep markup. *See id.* Faulty machinery and appliances render the mitigation measures largely unreliable. Khaàliq Shakur, *What It's Like to Be Cooked Alive in a Texas Prison*, PRISON JOURNALISM PROJECT (Oct. 1, 2023), https://prisonjournalismproject.org/2023/10/01/what-scorching-summer-feels-like-texas-prison/. Constant breakdowns or malfunctions of showers and ice machines leave prisoners with minimal access to water, the chief mitigation measure upon which TDCJ relies on to keep individuals cool and hydrated. *Id.*

First-hand accounts from individuals incarcerated in TDCJ illustrate the deficiencies in TDCJ's existing heat mitigation strategies. In late 2023, one individual incarcerated in the Lane Murray Unit in Gatesville, Texas, noted difficulties in accessing ice water, writing that "[incarcerated people are] supposed to have access to ice, but faulty ice machines mean inmates sometimes go hours in the summer without cold water." *Id.* Another person at Lane Murray confirmed that the "ice machine is broken more than it works" and she has "waited nine hours for ice-cold water." Kwaneta Harris, *'I Wasn't Sentenced to Be Cooked': Heat Desperation in a Texas Prison*, PRISM (July 12, 2023), https://prismreports.org/2023/07/12/heat-desperation-texas-

prison/. One person incarcerated at the Jim Ferguson Unit in Midway, Texas, was unable to access cool-down showers because his row's nonfunctional shower barely dripped with room-temperature water. Jolie McCullough, *"It's a Living Hell": Scorching Heat in Texas Prisons Revives Air-Conditioning Debate*, Tex. Trib. (Aug. 24, 2022, 5:00 AM), https://www.texastribune.org/2022/08/24/texas-prisons-air-conditioning/. TDCJ continues to point to mitigation methods as an effective remedy, but the limited availability of these resources, coupled with the regular breakdowns and malfunctions, make them insufficient to avoid harms prohibited by the Eight Amendment.

Understaffing also impacts access to mitigation measures. At many Texas prisons, incarcerated individuals are required to stay in their cells, on "lockdowns," when units are short-staffed—as they regularly are. It is then up to already overloaded officers to decide if and when to distribute water or allow prisoners to access respite areas. One incarcerated person has described the conditions as so bad that "[it's] gotten to the point where we see an officer walk in, and tell by who it is, what kind of day we're going to have, if we're going to have water, if we're going to be allowed to take a shower, if we're going to be allowed out to the dayroom in front of the big fan." Mose Buchele, *'Why Didn't They Just Kill Us?' Three Women Talk About Life in a Texas Prison Without AC*, High Plains Pub. Radio (Aug. 21, 2023, 4:30 AM), https://www.hppr.org/hppr-news/2023-08-21/why-didnt-they-just-kill-us-three-women-talk-about-life-in-a-texas-prison-without-ac. A policy this vulnerable to bad actors means existing mitigation measures often fall short, with potentially deadly consequences.

> ii. *Emergency injunctive relief providing temperature control is necessary as climate change causes heat indices to continue to rise, and other heat mitigation strategies prove insufficient.*

More frequent, severe, and prolonged heat waves exacerbate the already extreme temperatures that individuals incarcerated in TDCJ facilities face. *Cole*, 2017 WL 3049540, at *31 n.27. Worsening climate conditions will continue to place prisoners at an increasing risk for heatstroke and other heat related illnesses. *Id*. At present, ninety percent of Texas facilities are located in areas with more than fifty days per year of ninety-plus-degree heat indices. *Climate Carceralism: The Future of Climate-Linked Prison Labor*, 137 HARV. L. REV. 706, 716 (2023). Future years will only see more people subjected to increasingly higher temperatures. Accordingly, the strategies for addressing extreme heat that may once have been appropriate no longer suffice. Nor is slicing and dicing a remedy to apply to only certain facilities, or certain individuals, acceptable where the harm threatens nearly every person incarcerated or employed in a Texas prison.

As temperatures continue to trend upwards, the heat mitigation measures discussed above, which prisons and courts have come to rely on, will become increasingly less effective. As such, temperature control is necessary, and the least-intrusive means possible, to remedy the Eighth Amendment violation that Plaintiffs challenge.

### b. The Heat Crisis Pervades All Corners of TDCJ, Requiring Immediate, Systemic Relief.

Individuals across TDCJ are vulnerable to extreme temperatures, whether or not they have underlying medical conditions, take heat-sensitive medications, are of advanced age, or have other risk factors that increase their heat vulnerability. TDCJ's deficient operations place even otherwise healthy individuals at serious risk from extreme heat. Individuals in solitary confinement are just one subset of TDCJ's population who suffer disproportionately from TDCJ's failures—the effects

of which are magnified further by the severe understaffing in Texas prisons. Such a widespread risk requires an equally far-reaching remedy under the Eighth Amendment.

> i. *Excessive heat has particularly dangerous effects on individuals in solitary confinement.*

TDCJ's widespread use of solitary confinement exacerbates the impact of dangerous heat conditions across the system. Texas holds thousands of individuals in solitary confinement, and holds more individuals in solitary confinement for three years or more than every other state and the federal government combined. Tex. C.R. Project, *Solitary Confinement in Texas: A Crisis with No End* 1 (2023), https://t.ly/SdFvR. According to TDCJ's own data, as of December 2022, its solitary confinement population reached nearly 4,500 people. *Id.* In solitary confinement, TDCJ officers control every aspect of a person's life—every movement, every possession, every meal. *Id.* at 9. Prisoners spend at least twenty-two hours per day locked alone in a cell. *Id.* at 1. When they are allowed out, it is only for recreation, usually in a slightly larger cage, showers one at a time, or the rare medical appointment. *Id.* at 5, 9. During those times out of their cells, they must be handcuffed and escorted by at least one officer, if not multiple officers. *Id.* at 9, 11, 15, 17. This highly restrictive operation means, in practice, that people rarely leave their cells. *Id.* at 15. Indeed, it is not uncommon for some individuals to go months, even years, without setting foot outdoors. *Id.* at 4, 5, 15.

Adding excessive heat to these already torturous conditions can be a death sentence. Individuals in solitary confinement are trapped in their cages, unable to access the meager mitigation measures on which TDCJ hangs its hat. *Id.* at 9. Take water: People confined to solitary confinement cells rely on water or ice that officers pass out down their halls. *Id*. Because they cannot leave their cells, they must wait on inconsistent and infrequent distribution, that depends entirely on the availability of staff for this assignment. *Id.* If no officers are present for any period

of time, there is no way to get cold water or ice. Even the sinks in many cells are unreliable sources of water. In some cells, the sinks lack temperature controls—when the hot water works, it is impossible to turn off. *Id.* at 14. Many people resort to flooding their cells with toilet water to stay cool, but this practice is unsanitary, and the in-cell toilets too are often broken. *Id.* at 17.

Although TDCJ claims that showers are available for relief from heat, in solitary confinement, prisoners can only shower one at a time, and only when staff are available to escort them. *Id.* at 15. When they do get the privilege of a shower, prisoners are escorted to a rarely-cleaned, porta-potty-sized metal box and locked inside until a staff member decides to let them out. *Id.* If an officer is called away, a person may be left waiting for hours. The showers themselves have poor ventilation, and can be suffocatingly hot, especially in the middle of the day. *Id.*

There is virtually no airflow in many solitary confinement cells, and people struggle to breathe in the heat. *Id.* at 14. While there may be vents in the walls, those vents are often broken. *Id.* Many windows are sealed with plastic, so there is no relief available from outdoor air flow, which itself could be ninety or one hundred degrees. *Id.* For some, the only source of air is through the small tray slots in their cell doors, used to pass in meals. *Id.* But it is against TDCJ policy to prop open their tray slots, meaning prisoners can face disciplinary action for simply trying to breathe. *Id.*

In these high-security conditions where prisoners are not allowed in the presence of other incarcerated individuals under any circumstances, any respite areas are virtually nonfunctional. Even assuming staff allowed any individual to spend time in an air-conditioned area, waiting for one's turn, among hundreds of people, would take too long to provide any meaningful relief. *See id generally.*

As of May 2024, nine of the eleven TDCJ facilities with the highest concentrations of solitary confinement have no air-conditioned beds whatsoever.[2] *Id.* The Telford Unit, the sole facility in this group to provide any air-conditioned accommodations, further illustrates the inadequacy of TDCJ's current meager efforts. *Id.* Out of a total capacity of 2,019 beds at Telford, only ninety-five are air-conditioned. *Id.* This translates to a mere four percent of the incarcerated population at this facility having access to air-conditioned housing, leaving the remaining ninety-six percent to cope with potentially hazardous heat levels without any relief. *Telford (TO)*, Tex. Dep't Crim. Just., https://www.tdcj.texas.gov/unit_directory/to.html (last visited July 2, 2024). The effects of heat are magnified at facilities, such as Telford, that regularly house hundreds of people in solitary confinement. Tex. C.R. Project, *Solitary Confinement in Texas: A Crisis with No End* 1-2 (2023), https://t.ly/SdFvR.

> ii. *Staffing shortages in TDCJ exacerbate the heat crisis, especially for those in solitary confinement.*

For prisoners in solitary confinement, the impact of understaffing is magnified—particularly when it comes to surviving extreme heat. It is common for one officer alone to be assigned to supervise three entire wings, totaling up to 180 people. *Id.* at 9. Not only are the staffing needs higher in these units, where officers must provide escorts whenever someone leaves their cell, but the demands on staff in these units cause vacancy rates to rise, creating a vicious cycle of unfilled posts. *Id.* Staffing shortages also force many units to go on repeated lockdowns, as discussed above. In effect, a lockdown turns every cell into solitary confinement with a roommate, with individuals confined to their cells sometimes for weeks on end. Reflecting on his experience at the Memorial Unit in Rosharon, Texas, one incarcerated individual stated that in his prison, "the

---

[2] These facilities are the Jim Ferguson Unit, J. Dale Wainwright Unit, H. H. Coffield Unit, Barry B. Telford Unit, James V. Allred Unit, William G. McConnell Unit, Memorial Unit, William P. Clements Unit, French Robertson Unit, Mark W. Michael Unit, and Allan B. Polunsky Unit. *Id.* at 2 n.14.

lockdown completely eliminated prisoners' access to respite cooling areas, cooling showers and cold water. It's compelled staff members, who are already overworked and underpaid, to increase their workload in the sweltering heat by performing job details normally handled by prisoners." Jeremy Busby, *Texas prisoner: Lockdown is only making prisons' problems worse*, Hous. Chron. (Sept. 16, 2023, 6:35 AM) https://www.houstonchronicle.com/opinion/outlook/article/texas-prisoner-lockdown-jail-problems-18369399.php.

The effects of understaffing reach incarcerated individuals throughout the entire Texas prison system. From 2020 to 2022 alone, staff vacancies in TDCJ nearly doubled, rising from 4,300 to more than 7,600. Jolie McCullough, *Chronically Understaffed Texas Prisons Set Stage for Prison Bus Escape and Massacre of Family*, Tex. Trib. (Dec. 9, 2022, 3:00 PM), https://www.texastribune.org/2022/12/09/texas-prison-escape-review/. During the same time period, the vacancy rate in Texas prisons across was approximately thirty-two percent. *Id*. According to data provided to TCRP by TDCJ, as of December 2022, twenty-one of the eighty-eight state-run prisons had staff vacancy rates of at least fifty percent, with one prison reaching *seventy-one percent* vacant positions.[3] Twenty-eight prisons had at least one hundred vacant positions, and sixteen facilities had at least two hundred vacancies. *Id*. Of all the prisons in Texas, only nineteen facilities were fully staffed. *Id*.

When staff vacancies are this high, there are not enough officers to carry out all of the tasks necessary to keep prisoners safe. In excessive heat conditions, incarcerated individuals rely on staff to distribute ice and water, escort them to and from showers, and facilitate any access they may be given to respite areas. Tex. C.R. Project, *Solitary Confinement in Texas: A Crisis with No*

---

[3] According to public data provided under the Texas Public Information Act. *See also* Molly Petchenik, *Abolitionist Prison Litigation*, 133 Yale L.J. Forum, 5 (Nov. 22, 2023), https://www.yalelawjournal.org/pdf/PetchenikYLJForumEssay_sds5h327.pdf.

*End* 9 (2023), https://t.ly/SdFvR. Officers must divide their time between distributing ice and escorting individuals, one by one, to showers; responding to heat-related emergencies and maintaining their own health in the heat. *Id.* In April 2024, one incarcerated individual in Texas, explained: "Those of us in solitary would get handcuffed and escorted a few feet to the shower stall. This required a sufficient number of guards. But, when staffing declined, showers did too—down to three times a week." Cesar Hernandez, *When My Texas Prison Couldn't Fill Jobs, I Didn't Get a Shower for a Month*, Prison Journalism Project (Apr. 18, 2024), https://prisonjournalismproject.org/2024/04/18/what-happens-prison-chronically-short-staffed/. When a prisoner does make it to a shower, they may then spend hours locked in the metal box if staff get called away to another pressing job. Tex. C.R. Project, *Solitary Confinement in Texas: A Crisis with No End* 15 (2023), https://t.ly/SdFvR. Under normal temperature conditions, understaffing has been so severe that it is not unusual go ten days without a shower. *Id.* In a heat wave, when TDCJ purportedly relies on showers as respite to keep people alive, this breakdown in operations can be deadly. When such extreme understaffing and overuse of solitary confinement encounter extreme heat, the result is a severe and widespread risk to prisoner life that necessitates emergency relief in the form of temperature control.

      iii. *Only a system-wide intervention can protect the individuals in TDCJ's care from deadly summer heat.*

As the discussion of solitary confinement illustrates, TDCJ's very operations place people at heightened risk from extreme heat in ways that department policies fail to take into account. Every person in prison is vulnerable to extreme heat—regardless of underlying health conditions, age, or other risk factors. While it is well-recognized that individuals with preexisting medical issues are at heightened risk for heat-related illnesses, *Cole*, 2017 WL 3049540, at *14, the broader prison population is also significantly affected by extreme temperatures. The structural and

operational realities of Texas prisons mean that the effects of extreme heat are pervasive, impacting everyone within the facility regardless of their health status. Simply put, there is no way to selectively cool only those with preexisting conditions or other risk factors without also addressing the broader environment in which every person lives and works.

Correctional officers and other TDCJ staff are similarly exposed to these extreme conditions. Tex. C.R. Project, *Solitary Confinement in Texas: A Crisis with No End* 10 (2023), https://t.ly/SdFvR. Their ability to perform their duties effectively is compromised by the heat, leading to increased stress and fatigue, and diminished job performance. Incarcerated individuals have remarked that "they're burning out the staff, and it heightened tensions." *Id.* These troublesome factors create a feedback loop in which the adverse effects of heat on staff exacerbate the conditions for incarcerated individuals, which in turn makes the environment even more challenging. Texas State Representative Gene Wu, has summarized the truth of this situation: "The number of people who are willing to work in a brutal environment where there is just unbelievable heat every single day, where you're understaffed, overworked and underpaid—who wants to do that?" Paul Flahive, *The Severe Beating of a Texas Inmate Underscores Staffing and Training Crisis*, WUNC (Nov. 8, 2023, 5:09 AM), https://www.wunc.org/2023-11-08/the-severe-beating-of-a-texas-inmate-underscores-staffing-and-training-crisis.

TDCJ cannot put an end to the Eighth Amendment violation underway short of implementing a system-wide remedy. Climate control measures are narrowly tailored to address the specific harms at play. Nothing less can provide for the safety and well-being of both incarcerated individuals and the staff who oversee them.

### IV.  CONCLUSION

For the reasons set forth above, TDCJ is currently engaged in conduct that violates the Eighth Amendment. As yearly death tolls reveal, all efforts to mitigate the effects of extreme heat short of temperature control have failed to keep those incarcerated in TDCJ safe. Therefore, temperature control is the necessary, narrowly tailored, and minimally intrusive measure the Eighth Amendment demands. To protect the safety, and life, of every individual incarcerated in the Texas prisons, this Court should grant a preliminary injunction as sought by Plaintiffs, requiring Defendant to immediately implement temperature control across TDCJ.

Respectfully submitted,

*/s/ Lauren Brogdon*

Lauren Brogdon
State Bar No. 24082736
Lauren.brogdon@haynesboone.com
HAYNES AND BOONE, L.L.P.
1221 McKinney Street, Suite 4000
Houston, TX 77010
Telephone:   (713) 547-2000
Facsimile:   (713) 547-2600

Molly Petchenik
State Bar No. 24134321
molly@texascivilrightsproject.org
Dustin Rynders
State Bar No. 24048005
dustin@texascivilrightsproject.org
TEXAS CIVIL RIGHTS PROJECT
1405 Montopolis Dr.
Austin, TX 78741
Telephone:   (512) 474-5073
Facsimile:   (512) 474-0726

**COUNSEL FOR TEXAS CIVIL RIGHTS PROJECT**