## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
## AUSTIN DIVISION

| | | |
|---|---|---|
| BERNHARDT TIEDE, II;<br>TEXAS PRISONS COMMUNITY<br>ADVOCATES; BUILD UP, INC. A/K/A<br>JUSTICE IMPACTED WOMEN'S<br>ALLIANCE; TEXAS CITIZENS<br>UNITED FOR REHABILITATION OF<br>ERRANTS; and COALITION FOR<br>TEXANS WITH DISABILITIES,<br>　　*Plaintiffs,*<br><br>v.<br><br>BRYAN COLLIER, in his official capacity<br>as Executive Director of Texas<br>Department of Criminal Justice,<br>　　*Defendants.* | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | Civil Action No.:<br>**1:23-CV-01004-RP** |

---

**DEFENDANT'S CROSS-DESIGNATIONS AND OBJECTIONS TO
PLAINTIFFS' DEPOSITION DESIGNATIONS FOR PRELIMINARY INJUNCTION HEARING**

---

# EXHIBIT B

David Sweetin - 7/25/2024

**1**

```
 1          IN THE UNITED STATES DISTRICT COURT
               FOR THE WESTERN DISTRICT OF TEXAS
 2                      AUSTIN DIVISION

 3
    BERNHARDT TIEDE, II;        )
 4  TEXAS PRISONS COMMUNITY     )
    ADVOCATES; BUILD UP,        )
 5  INC., A/K/A JUSTICE         )
    IMPACTED WOMEN'S            )
 6  ALLIANCE; TEXAS             )
    CITIZENS UNITED FOR         )
 7  REHABILITATION of           )
    ERRANTS; and COALITION      )
 8  FOR TEXANS WITH             )
    DISABILITIES,               )
 9          Plaintiffs,  )  Civil Action No.:
                                )  1:23-cv-01004-RP
10                              )
                                )
11  VS.                         )
                                )
12                              )
                                )
13  BRYAN COLLIER, in his       )
    official capacity as        )
14  Executive Director of       )
    Texas Department of         )
15  Criminal Justice,           )
            Defendant.   )
16
17 ****************************************************
18
19        ORAL AND VIDEOTAPED DEPOSITION OF
                    DAVID SWEETIN
20
          CONDUCTED REMOTELY VIA ZOOM
21
                    VOLUME 1
22
                 JULY 25, 2024
23
24 ****************************************************
25
```

**2**

```
 1      ORAL AND VIDEOTAPED DEPOSITION OF DAVID SWEETIN,

 2  produced as a witness at the instance of PLAINTIFFS, and

 3  duly sworn, was taken in the above-styled and -numbered

 4  cause on JULY 25, 2024, from 9:06 a.m. to 6:14 p.m.,

 5  before KELLY E. FISHER, CSR, in and for the State of

 6  Texas, reported by machine shorthand, via Zoom

 7  videoconference connection, pursuant to the Federal

 8  Rules of Civil Procedure and the provisions stated on

 9  the record or attached hereto.
```

**3**

```
 1               APPEARANCES (VIA ZOOM)
 2
    FOR PLAINTIFFS:
 3    Mr. Jeff Edwards
      EDWARDS LAW
 4    603 West 17th Street
      Austin, Texas  78701
 5    512-623-7727
      jeff@edwards-law.com
 6    david@edwards-law.com
      lisa@edwards-law.com
 7    paul@edwards-law.com
 8    and
 9    Ms. Jodi Cole
      LAW OFFICE OF JODI COLE, PLLC
10    203 East Murphy Street
      Alpine, Texas  79830
11    432-837-4266
      jcole@jodicole.com
12
13  FOR DEFENDANT:
      Mr. Michael Carter
14    Ms. Abigail Carter
      OFFICE OF THE ATTORNEY GENERAL OF TEXAS
15    Post Office Box 12548
      Austin, Texas  78711-2548
16    512-463-2080
      michael.calb@oag.texas.gov
17    abigail.carter@oag.texas.gov
      maralayna.ellis@oag.texas.gov
18    shanna.molinare@oag.texas.gov
      james.rheams@oag.texas.gov
19
20  FOR TEXAS DEPARTMENT OF CRIMINAL JUSTICE:
      Ms. Stephanie Greger
21    Ms. Jennifer Childress
      TEXAS DEPARTMENT OF CRIMINAL JUSTICE
22    P.O. Box 13084 Capital Station
      Austin, Texas  78711
23    stephanie.greger@tdcj.gov
      jennifer.childress@tdcj.gov
24
    ALSO PRESENT:
25    Ms. Briana Webb
```

**4**

```
 1              APPEARANCES CONTINUED
 2  ALSO PRESENT:
         Ms. Kelsey Warren
 3       Ms. Lauren McGee
         Ms. Melissa Wiggins
 4       Ms. Meghan Monahan
         Mr. Kyle Faraday
 5       Ms. Aleksandra Chapman
         Mr. James Rheams
 6       Ms. Maralyana Ellis
         Mr. Stephen Pinkston, videographer
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

David Sweetin - 7/25/2024

**Page 5**

<pre>
                    STIPULATIONS
        The attorneys for all parties present stipulate
and agree to the following items:

        That the deposition of DAVID SWEETIN is being
taken pursuant to Notice;

        That the deposition is being taken pursuant to
the Federal Rules of Civil Procedure;

        That the original transcript will be submitted
to the witness' attorney, Mr. Michael Carter;

        That the witness or the witness' attorney will
return the signed transcript to the court reporter
within 30 days of the date the transcript is provided to
the witness' attorney.  If not returned, the witness may
be deemed to have waived the right to make the changes,
and an unsigned copy may be used as though signed.
</pre>

**Page 7**

<pre>
            THE VIDEOGRAPHER:  Today's date is
July 25th, 2024.  The time is 9:06 a.m. Central.  We are
on the record.
            This is the deposition of David Sweetin
representing Texas Department of Criminal Justice.
            You may swear in the witness.
            THE REPORTER:  And first, before we begin,
may I have all parties present state their appearances,
starting with --
            MR. EDWARDS:  Jeff -- Jeff Edwards for the
plaintiffs.
            MR. CALB:  Michael Calb for the Texas
Department of Criminal Justice.  Also with my office is
Kyle Faraday and Megan Monahan, who are some of the law
clerks observing, as well as legal assistant James
Rheams.
            MR. EDWARDS:  And I believe --
            MR. CALB:  I'm sorry.  My apologies.
Also -- also Abigail Carter, another Assistant Attorney
General in the case is in attendance.
            MR. EDWARDS:  And I believe I've got David
James, Lisa Snead, and Paul Samuel from my office.  And
Aleksandra Chapman is also on the case.  Is there anyone
else that I've missed?
            MS. COLE:  Jodi Cole is here too, just
</pre>

**Page 6**

<pre>
                    I N D E X
                                            PAGE
Appearances................................    3

Stipulations...............................    4

WITNESS:  DAVID SWEETIN

EXAMINATION
  By Mr. Edwards...........................    8
REPORTER'S CERTIFICATION...................  326
CHANGES AND CORRECTIONS....................  330
SIGNATURE..................................  331

              E X H I B I T S

  NO.    DESCRIPTION                         PAGE

  1      Deposition notice.................   12

  2      Notes by witness..................   58

  3      TDCJ Air Conditioning
         Construction Projects.............  121
  4      TDCJ Rider 56 temperature
         report............................  140

  5      Highlighted AD-10.64..............  251

  6      Texas Tribune article, "After
         sweltering temperatures killed
         Texas prisoners, lawmakers vote
         to install air conditioning"......  304
  7      TDCJ temperature report
         December 2020.....................  314
</pre>

<pre>
         [REPORTER'S NOTE:  Quotation marks are
         used for clarity and do not necessarily
         indicate a direct quote.]
</pre>

**Page 8**

<pre>
observing, for plaintiffs.
            MS. GREGER:  And Stephanie Greger, General
Counsel for the Texas Department of Criminal Justice.
With me I have Deputy General Counsel Jennifer Childress
and Legal Assistant Melissa Wiggins.
            MR. EDWARDS:  Assuming that's everybody,
Mr. Sweetin, are you ready to start?
            THE WITNESS:  Yes, sir, I'm ready.
            THE REPORTER:  All right.  Mr. Sweetin, if
you would, raise your right hand and be sworn, please.
            (Witness sworn.)
                    DAVID SWEETIN,
having been first duly sworn, testified as follows:
                    EXAMINATION
BY MR. EDWARDS:
    Q.  Would you kindly state your name for the
record, sir.
    A.  David Sweetin.
    Q.  And you understand that you're here to testify
as a corporate representative for the Texas Department
of Criminal Justice, or, in this case, for Bryan Collier
in his official capacity?
    A.  Yes, sir, I understand that.
    Q.  And you understand that the testimony you give
is as if Bryan Collier in his official capacity is
</pre>

**WRIGHT WATSON & ASSOCIATES**
1250 South Capital of Texas Highway, Building 3, Suite 400  Austin, Texas 78746  (512) 474-4363

d1373cb1-2f0a-4b96-9b71-3f7399538ee8

David Sweetin - 7/25/2024

9

1 testifying and that you're representing his interests
2 and the State's interests?
3     A. That is correct.
4     Q. And what have you done to prepare for this
5 deposition today?
6     A. I've reviewed policies that the agency has in
7 place, I've had discussions with counsel, and done a lot
8 of reviewing of documents.
9     Q. I'm going to come back to what it is you've
10 actually reviewed in a little bit more of specifics, but
11 my understanding is that you're here to testify about
12 all of the topics that were on the deposition notice.
13 Is that correct?
14     A. That is correct.
15     Q. And as I understand your testimony from a
16 moment ago, you've reviewed policies that are pertinent
17 to those categories, and you've had discussions with
18 counsel for Mr. Collier in his official capacity?
19     A. That is correct.
20     Q. And did those discussions provide you
21 information upon which you're going to use to testify
22 today?
23     A. Yes.
24     Q. Okay. And who were those discussions with?
25 Like, what are their names?

10

1     A. Mr. Calb and the team that he had on at the
2 time.
3         THE WITNESS: And, Mr. Calb, you'll have to
4 help me with all that was on there in our actual
5 conferences.
6         MR. CALB: Abigail Carter and Shanna
7 Molinare were on the calls.
8     Q. (BY MR. EDWARDS) So I've got Abbie -- Abigail
9 Carter, Shanna Moinare.
10        MR. EDWARDS: And who was the fourth,
11 Michael?
12        MR. CALB: That's it.
13        MR. EDWARDS: Okay.
14     Q. (BY MR. EDWARDS) So, sir, just so the record
15 is clear, the discussions you had with counsel were with
16 Michael Calb, Abigail Carter, and Shanna Molinare?
17     A. Correct.
18        MR. CALB: And so we should also point out
19 that counsel -- the actual TDCJ reps, people from TDCJ
20 general counsel were on the call as well.
21        THE REPORTER: I'm sorry, Michael. Your
22 voice is dropping off.
23        MR. EDWARDS: Kelly, I think -- let me --
24 let me --
25     Q. (BY MR. EDWARDS) In -- in addition, the

11

1 general counsel and the assistant general counsel for
2 TDCJ helped prepare you?
3     A. Correct.
4     Q. And I just wrote that down, but, of course,
5 I've skipped my page. That would be Stephanie Greger,
6 correct?
7     A. Correct.
8     Q. And then I forget the next person. Jennifer --
9        MR. EDWARDS: Do you remember, Michael?
10       MR. CALB: Childress.
11    Q. (BY MR. EDWARDS) And Jennifer Childress also
12 provided you information?
13    A. That is correct.
14    Q. All right. Mr. Sweetin, this is a formal
15 process. You're, you know, appropriately dressed, and I
16 appreciate that. But what I care most about is that we
17 understand each other and that we're not talking past
18 each other. Also, if you don't understand a question,
19 would you please let me know?
20    A. I will do that.
21    Q. And if you answer a question, I'm going to
22 assume that you've understood what I've asked you. Do
23 you think that's fair and reasonable for me to make that
24 assumption?
25    A. I think it's fair, if I don't ask any questions

12

1 with regard to it, it would -- it would lead to me
2 understanding the question, you're right.
3    Q. Okay. And do you think it's reasonable for me
4 and the team of people that are representing the
5 plaintiffs in this case to rely on the testimony you
6 give today during the preliminary injunction trial and a
7 subsequent trial?
8    A. Yes, sir.
9    Q. And you feel you've reviewed enough documents
10 and talked to enough people that you're adequately
11 prepared to fully testify about all the topics on the
12 deposition notice?
13    A. Yes, sir.
14    Q. Okay.
15       MR. EDWARDS: And, Paul, would you pull up
16 Exhibit 1, which is the deposition notice, just so I can
17 confirm that with Mr. Sweetin.
18    Q. (BY MR. EDWARDS) We're going to make this
19 Exhibit 1 to your deposition.
20       (Sweetin Exhibit No. 1 was marked.)
21    Q. (BY MR. EDWARDS) I'm going to flip through it
22 briefly, just to make sure that this is the notice that
23 you reviewed with your counsel.
24       Is this, in fact, the deposition notice
25 that you reviewed?

David Sweetin - 7/25/2024

---

**13**

1    A.  That is it.  Though, I will say that Item
2  No. 1 --
3    Q.  Yes.
4    A.  -- was stricken, is my understanding, so
5  therefore I'm not prepared to speak on number one.
6    Q.  Can I ask you, do you know the answer to No. 1,
7  though?
8         MR. CALB:  Objection; outside the scope.
9    Q.  (BY MR. EDWARDS)  Mr. Sweetin, you can answer.
10   A.  Somewhat.  Because we didn't really discuss it
11  and I didn't make it a point to review or study that --
12   Q.  No, no, I appreciate it.  And we did withdraw
13  the question.  I was just curious.  It has escaped my
14  capacity as a lawyer to figure out why these prisons
15  were ever built in the '90s without air conditioning.
16  Do you actually know the answer?  You as Mr. Sweetin,
17  not as a representative?
18   A.  I only know as my -- my speculation.  I
19  don't -- I don't know the -- as far as what the
20  engineer's thought was at the time.
21   Q.  Well, what -- what do you think the reason is
22  why they built them without air conditioning, despite --
23  well, why do you think they built them without air
24  conditioning in the '90s?
25         MR. CALB:  Objection; beyond the scope.

---

**14**

1    A.  Well, I would say that, during that particular
2  era, there was not a call for air conditioning in penal
3  institutions.  It didn't seem to be a societal issue as
4  it is now, so therefore the design didn't call for
5  anything other than ventilated air.  And I think that
6  coincided with the era that we were in at the time.
7    Q.  (BY MR. EDWARDS)  And I guess, as I'm hearing
8  you, kind of just Mr. Sweetin, your opinion is just,
9  look, the era didn't call for it at the time, that's
10  your thought process, your opinion?
11   A.  Correct.  Air conditioning did not seem to be a
12  priority or a demand during the time that those were
13  designed and subsequently built.
14   Q.  Yeah, I get that.  But it just seems -- it
15  seems like air conditioning was a priority in every
16  other type of public building.  Do you know why it
17  wasn't in -- in the prison systems that were built?
18         MR. CALB:  Objection; beyond the scope.
19   A.  I do not.  Again, I can only speculate.
20   Q.  (BY MR. EDWARDS)  Okay.  No, I appreciate it.
21  I just didn't know if you knew.  Maybe you've had some
22  conversations with people.
23         But you do know, sir, that the county
24  jails, at the time all those prisons were built in the
25  1990s, that they were all air-conditioned.  Right?

---

**15**

1    A.  I don't know.
2         MR. CALB:  Objection; beyond the scope.
3         MR. EDWARDS:  Well, this actually isn't
4  beyond the scope.
5    Q.  (BY MR. EDWARDS)  Are you aware that all county
6  jails in the state of Texas have been air-conditioned
7  for -- you know, by law for decades?
8         MR. CALB:  Objection; beyond the scope.
9         And, Jeff, I'll just point out that you
10  say -- you're asking his knowledge versus the agency's
11  knowledge.  Anything in his knowledge is beyond the
12  scope.
13         MR. EDWARDS:  Again, it's one -- I don't
14  believe this is beyond the scope of the categories in
15  the deposition notice.  But we can debate that later.
16   Q.  (BY MR. EDWARDS)  Sir, do you know that county
17  jails in the state of Texas have all been
18  air-conditioned for decades, or not?
19   A.  I do not know that they've been air-conditioned
20  for decades.  I can tell you that I'm aware there's a
21  standard out there of operation that requires them.  I
22  can't tell you exactly when that came about, and I
23  can -- no more than I can tell you that I know that
24  every state jail out there, or county jail, is
25  air-conditioned.  I don't know that.

---

**16**

1    Q.  You only know that every county jail is
2  required to be air-conditioned by the state of Texas,
3  correct?
4         MR. CALB:  Objection; beyond the scope.
5    A.  As I understand it, yes.
6    Q.  (BY MR. EDWARDS)  Okay.  And to be clear,
7  you're here to testify about all of the topics on
8  Deposition Exhibit No. 1, correct?
9    A.  Yes, sir.
10   Q.  Despite the fact that all county jails are
11  required to be air-conditioned or have temperatures
12  between 65 degrees and 85 degrees, TDCJ and Bryan
13  Collier, in his official capacity, have never adopted a
14  policy that would accomplish that in its prison system,
15  correct?
16   A.  Are you saying ever, or -- I can tell you what
17  our -- what our goal is, and has been, for several years
18  is to obtain air conditioning.  But to say that we have
19  a policy that -- that requires air conditioning for our
20  agency right now, no, there's not a standardized policy
21  that -- that requires that.
22   Q.  Okay.  And I want to break that down.  You say
23  the goal of Mr. Collier is to obtain air conditioning in
24  all of the facilities.  Is that fair?
25   A.  I believe the -- eventually, the goal will be

---

**WRIGHT WATSON & ASSOCIATES**
1250 South Capital of Texas Highway, Building 3, Suite 400  Austin, Texas 78746  (512) 474-4363

d1373cb1-2f0a-4b96-9b71-3f7399538ee8

David Sweetin - 7/25/2024

---

**17**

1 to get there.

2    Q.  Well, that's Bryan Collier's goal, to get

3 there, to get the facilities air-conditioned for the

4 health and safety of the correctional officers working

5 there and the inmates housed there, correct?

6    A.  Correct.

7    Q.  Okay.  And currently, despite the fact that

8 county jails are all required to be air-conditioned or

9 to have temperatures between 65 degrees and 85 degrees,

10 as it stands now, TDCJ and Bryan Collier have made a

11 conscious choice not to adopt such a policy in the Texas

12 Prison System, correct?

13        MR. CALB:  Objection; asked and answered.

14    Q.  (BY MR. EDWARDS)  Sir, Mr. Calb is going to

15 object a lot of times.  Unless he tells you not to

16 answer a question, would you please answer my question?

17    A.  Sure.  Could you repeat that question again,

18 please?

19    Q.  Sure.  And this is about the fourth time

20 I've -- or maybe the third time I've asked it, so

21 just -- I'd please ask you to listen.  You're doing a

22 fine job, okay?  But, again, I should have been a little

23 bit more up front that when Mr. Calb talks, unless he

24 tells you not to answer a question, your obligation is

25 to provide truthful testimony.  And you understand

---

**18**

1 you're under oath, right?

2    A.  Yes, sir, I do.

3    Q.  And you understand that this testimony could be

4 provided to Judge Pittman or to any other jurist that

5 evaluates to this case, correct?

6    A.  Absolutely.

7    Q.  Now, this is my question.  Despite the fact

8 that all county jails are required to be maintained,

9 constructed, and built with air conditioning or -- or a

10 mechanical means to keep temperatures between 65 and

11 85 degrees, a fact that Mr. Collier knows, Mr. Collier

12 and the Department of Criminal Justice have made a

13 conscious choice not to adopt a policy to also make its

14 prisons temperature controlled in a similar way,

15 correct?

16    A.  I disagree with that statement.

17    Q.  Okay.  What do you disagree with about that

18 statement, sir?

19    A.  The fact that we are a State agency and we work

20 under the direction and directions of the State

21 legislature, as well as our Board of Criminal Justice.

22 So for me to say that Mr. Collier has made a conscious

23 choice not to do it, I can't tell you that.

24    Q.  Well, Mr. Collier is able to enact policies at

25 the Texas Department of Criminal Justice, is he not?

---

**19**

1    A.  Yes, sir.

2    Q.  Okay.  He has not, despite his knowledge that

3 all county jails have temperature controls, enacted a

4 similar policy in the prison system, has he?

5    A.  Policies similar to county jails?

6    Q.  Correct.  In terms of air conditioning and

7 temperature controls, he has made a conscious choice,

8 despite knowing about the county jail policy, not to

9 enact and implement a similar policy in the Texas prison

10 system, correct?

11    A.  You're asking me about his choices and I can't

12 testify on behalf of what his choices were, or are.

13    Q.  Well, is there -- there isn't a policy that

14 would require prisons to be -- maintain temperatures

15 between 65 and 85, is there?

16    A.  There is a policy in -- in some units, correct.

17    Q.  Mr. Sweetin, please listen to my question.

18 Okay?

19        There is not a policy or a directive that

20 requires prisons under TDCJ control to be

21 air-conditioned, is there?

22    A.  I have to tell you that we do have prisons that

23 operate under those parameters and --

24        MR. EDWARDS:  Objection; nonresponsive.

25    Q.  (BY MR. EDWARDS)  Is there a policy -- is there

---

**20**

1 a policy, sir, that requires all prisons in TDCJ

2 operation to be air-conditioned?

3    A.  Now you're saying all prisons?  There is not

4 one for all prisons, that is correct.

5    Q.  There could be, if Mr. Collier, or whoever led

6 the Texas Department of Criminal Justice, decided there

7 ought to be, correct?

8    A.  Again, we work under the direction of the State

9 of Texas legislators and our Board of Criminal Justice.

10    Q.  Well, I'm just -- you know, earlier you told me

11 that Mr. Collier was empowered to enact policy at the

12 department.  Did you make a mistake or were you wrong

13 about that?

14    A.  Not at all.  No, Mr. Collier very much has the

15 ability to make that policy.

16    Q.  Okay.  I'm not asking you whether or not he has

17 the funds to fulfill it.  Do you understand the -- look,

18 I don't know why you're fighting me on this.  I think

19 the answer is obvious.  Mr. Collier, despite knowing

20 about the requirement that all county jails are

21 air-conditioned, has not adopted a similar policy in the

22 Texas Prison System, has he?

23    A.  He has not.

24    Q.  Do you know why he has not?

25    A.  I do not.

---

David Sweetin - 7/25/2024

---

**21**

1    Q.  Did you make any efforts to determine why he
2  has not?
3    A.  I did not.
4    Q.  Did you speak to Mr. Collier in preparation for
5  this deposition?
6    A.  I did not.
7    Q.  Did you have the ability to speak to
8  Mr. Collier in preparation for this deposition?
9    A.  Sure.  I always have the ability to speak with
10  Mr. Collier.
11    Q.  So you made a choice not to speak to him, fair?
12    A.  I felt there was not the need, because --
13       (Speaking simultaneously.)
14    Q.  So whether you felt there was a need or not,
15  you made a choice not to talk to him about -- in
16  preparation for this deposition, correct?
17    A.  That is correct.
18    Q.  Okay.  Let's take a step back.  Let me find out
19  about your background.
20       Did you bring a CV with you, sir?
21    A.  No, sir.
22    Q.  Why don't you tell me about your background and
23  what makes you qualified to talk about the topics on
24  Deposition Exhibit No. 1.
25    A.  On Question No. 1?

---

**22**

1    Q.  Tell me about your -- who are you?  What is
2  your background, sir?  I don't -- I've never met you
3  before, and I've met a lot of people at TDCJ, and so I
4  just want to get a feel for who you are and what
5  qualifies you to talk about the various topics, topics 2
6  through 15.
7    A.  Sure.  I started with the agency in 1982, in
8  the correctional officer ranks, worked my way up through
9  the ranking structure, on to become part of the
10  administration team as an assistant warden on multiple
11  units, that included the Price Daniel Unit, that
12  included the East End Unit and the Ferguson Unit, and
13  then went on to become a senior warden where I worked at
14  the Glossbrenner Unit.
15    Q.  Would you tell the name of that unit again,
16  please, sir?  I apologize, I just didn't hear you.
17    A.  The Glossbrenner Unit.
18    Q.  Thank you.
19    A.  From there, I went through the Pack Unit as the
20  senior warden.  From there, I went to the East End Unit
21  as a senior warden.  And from there, I went to the
22  Estelle Unit as a senior warden.
23       That's a -- that's a broad time frame,
24  because that takes me through, essentially, the
25  30 years.  I retired with the agency at 30 years of

---

**23**

1  service in 2012.
2       I stayed out of the agency, working for a
3  private entity, not associated with any prisons or
4  county jails.
5    Q.  What was the name of the private entity?
6    A.  Bauer-Pileco.
7    Q.  And what did that private entity do?
8    A.  We were the manufacturer -- design manufacturer
9  and sales of heavy machinery for foundation improvements
10  throughout the world.
11    Q.  Okay.  How long were you there?
12    A.  Approximately four years.
13    Q.  From 2012 to 2016?
14    A.  Yes, sir.
15    Q.  Okay.  And then where did you go?
16    A.  Then I came back to the agency in the capacity
17  of Deputy Director For Facilities.  Worked in that
18  capacity for about a little over six years.  And then
19  promoted into a director's position where I currently
20  hold, as a Director for the Private Facility Contract
21  Monitoring and Oversight Division.  And I've been doing
22  this for approximately a year and a half.  All total,
23  that gives me about 38-plus years of background and
24  experience with the Texas Department of Criminal Justice
25  in a variety of capacities.  So I feel, for that reason,

---

**24**

1  that qualifies me to speak on these topics.
2    Q.  Okay.  Were any of the facilities that you were
3  an assistant warden or a senior warden in
4  air-conditioned, in the housing areas?
5    A.  Some of the housing areas, yes, sir.
6    Q.  Which ones?
7    A.  The Estelle Unit and the Pack Unit.
8    Q.  What area of the Pack Unit was air-conditioned?
9    A.  Our restricted housing, or segregation housing
10  at the time, was referred to as segregated housing.
11    Q.  And you're aware that the Pack Unit, the vast
12  majority of that housing area was not air-conditioned,
13  right?
14    A.  That is correct.
15    Q.  Are you aware that a federal judge determined
16  that the Pack Unit was operated by the warden and the
17  Department of Criminal Justice with deliberate
18  indifference, in that it failed to protect inmates from
19  the dangers of extreme heat?
20       MR. CALB:  Objection; beyond the scope.
21    A.  I am aware there was a lawsuit associated with
22  the Pack Unit.
23    Q.  (BY MR. EDWARDS)  That wasn't my question, sir.
24  Did you hear my question?
25    A.  Repeat it again, please.

---

**WRIGHT WATSON & ASSOCIATES**
1250 South Capital of Texas Highway, Building 3, Suite 400  Austin, Texas 78746  (512) 474-4363

d1373cb1-2f0a-4b96-9b71-3f7399538ee8

David Sweetin - 7/25/2024

---

**25**

1    Q.  Are you aware that a federal judge determined
2  that the warden, in his official capacity and the lead
3  administrator, head of the agency for the Texas
4  Department of Criminal Justice, in his official
5  capacity, acted with deliberate indifference to the
6  health and safety of the inmates at the Pack Unit?
7        **A.  I don't know specifically what the charge was,**
8  **but I do know that there was a lawsuit that we worked**
9  **through at the Pack Unit.  I didn't read the actual**
10 **lawsuit.  That was long after I had left the Pack Unit,**
11 **so I can't tell you specifically what that -- what those**
12 **documents said.**
13   Q.  Well, you were the Deputy Director For
14 Facilities when the order from the federal Judge, Keith
15 Ellison, came out.  You've never read it, sir?
16       MR. CALB:  Objection; asked and answered.
17       **A.  The Deputy Director For Facilities is not over**
18 **all the CID units.**
19   Q.  (BY MR. EDWARDS)  Unfortunately, we're going to
20 be here a while.  Do you understand that -- here's my
21 request, that you answer the question I ask.  Do you
22 think that that's a reasonable request for me to make to
23 you?
24       **A.  Sure, and I think I'm doing that, sir.**
25   Q.  Okay.  Well, let me -- I'll try again, then.

---

**26**

1  Maybe it's me.
2            Did you ever read Judge Ellison's order
3  finding that TDCJ and its administrators, particularly
4  the head of the agency and the warden at the time, acted
5  with deliberate indifference in the way they failed to
6  protect inmates from the dangers of extreme heat.  Did
7  you ever read that order?
8        **A.  I --**
9        MR. CALB:  Objection; beyond the scope.
10 Objection; asked and answered.
11   Q.  (BY MR. EDWARDS)  Did you say you hadn't read
12 it?
13       **A.  No, sir.  I'm aware of it, but I have not read**
14 **it.**
15   Q.  You don't know what's in it, do you?
16       **A.  Some of it, yes, sir.**
17   Q.  Well --
18       **A.  You're asking me very broad terms, and I --**
19   Q.  I'm just asking if you read it and if you know
20 what's in it.  You say -- How do you know some of the --
21 How do you know some of the things that are in it?  How
22 do you -- Where does that knowledge come from?
23       **A.  Various meetings, adoption of certain**
24 **protocols, reaction to certain requirements.  Our -- our**
25 **operating business going forward from that time.**

---

**27**

1    Q.  Well, one of the important things of that order
2  was that it highlighted the need to provide air
3  conditioning for inmates, right?
4        **A.  That is correct.**
5        MR. CALB:  Objection; beyond the scope.
6    Q.  (BY MR. EDWARDS)  And I hope you are, but I'll
7  ask.  Are you aware that, you know, more than 20 people
8  have died because they were exposed to the heat inside
9  the Texas Prison System since, let's say, 1998?
10       MR. CALB:  Objection; vague.
11       **A.  I am aware that inmates have -- have passed**
12 **away and that there are some that have been credited**
13 **with heat being a cause of the factor, but not the -- or**
14 **associated factor, but not necessarily the causal**
15 **factor.**
16   Q.  (BY MR. EDWARDS)  What does that mean?
17       **A.  That means that there was a series of -- of**
18 **ongoing issues related to deaths.  I don't know of any**
19 **death that is -- is a direct result of heat by itself.**
20 **Heat was -- was named as an associated factor, but not**
21 **necessarily the causal factor.**
22   Q.  Well, do you know that what you just said is
23 patently false and not true?
24       **A.  No, sir.**
25       MR. CALB:  Objection --

---

**28**

1        **A.  I'm speaking under oath.  So if I misspoke,**
2  **then --**
3    Q.  (BY MR. EDWARDS)  Well, that's why I was asking
4  you.  Did you misspeak when you said that there are no
5  circum -- no deaths that were directly caused by
6  exposure to heat?
7        **A.  Is your question, that were directly related to**
8  **heat?**
9    Q.  No.  My question was, is it your -- is it
10 really your testimony, as the representative of the
11 Texas Department of Criminal Justice, that there have
12 been no deaths that were in the Texas Prison System that
13 were directly caused by exposure to extreme heat?
14       **A.  Yes, that is my testimony that --**
15   Q.  Okay.  And my -- my question to you is, you
16 know, knowing that to be not true -- not that you're
17 lying, but that the statement you just uttered is not
18 true, you -- you believe it is true, fair?
19       **A.  Absolutely.**
20   Q.  Okay.  Do you agree that people dying as a
21 consequence of exposure to extreme heat is a terrible
22 thing that needs to be remedied by the Department of
23 Criminal Justice and its executive director?
24       **A.  Yes, I would agree that any death is not a good**
25 **death, anything that's associated with heat would not**

---

**WRIGHT WATSON & ASSOCIATES**
1250 South Capital of Texas Highway, Building 3, Suite 400  Austin, Texas 78746  (512) 474-4363

d1373cb1-2f0a-4b96-9b71-3f7399538ee8

David Sweetin - 7/25/2024

---

**29**

1 necessarily be good.

2    Q.   Well, I'd say it would be pretty terrible and

3 bad.  Would you agree with that?

4    A.   Sure, as if -- as any death would be.

5    Q.   Sure.  Well, I mean, if you know about a

6 dangerous condition in the Texas Prison System, it's the

7 job of the director to -- to fix that dangerous

8 condition, right?

9    A.   That would be a fair statement.

10   Q.   And I have a sense, Mr. Sweetin, that you, on

11 behalf of the agency, would say that all deaths that

12 stem from dangerous or potentially dangerous conditions

13 in the Texas Prison System are very serious and need to

14 be investigated and remedied, if possible, right?

15   A.   As they are, yes, sir.

16   Q.   And, you know, if there was one death or 20

17 deaths, you would tell Judge Pittman, you know, if a

18 dangerous condition that we know about is responsible

19 for killing one person, we ought to do everything in our

20 power to fix that dangerous condition and get rid of it,

21 right?

22        MR. CALB:  Objection; outside the scope.

23   A.   Yes.

24   Q.   (BY MR. EDWARDS)  And would you also tell Judge

25 Pittman that you, as an agency, are doing everything in

---

**30**

1 your power to fix the dangerous condition of extreme

2 heat in the Texas Prison System?

3    A.   Yes, I would agree with that.

4    Q.   And you -- and I believe you are here to testify

5 about policies that the agency has enacted, right?

6    A.   Correct.

7    Q.   And one of those policies is -- I think it's

8 Directive 10.64.

9    A.   Temperature extreme policy, yes, sir.

10   Q.   And I just -- you know, again, on behalf of the

11 agency, you're here to say that that is -- that is the

12 best that the agency can do in terms of protecting

13 inmates from the dangers of extreme heat, fair?

14   A.   With what we have to work with, yes, sir, I

15 agree.

16   Q.   And you're personally aware that a federal

17 judge disagreed with you, and "you" being the agency, at

18 least with regards to the Pack Unit, correct?

19        MR. CALB:  Objection; beyond the scope.

20   A.   Yes, sir.

21   Q.   (BY MR. EDWARDS)  Because your testimony is

22 that Administrative Directive 10.64 is the best the

23 agency can do, you would tell Judge Pittman and anyone,

24 really, that unless ordered to make additional changes,

25 the agency isn't prepared to do more than that, fair?

---

**31**

1 At least at the present time?

2    A.   It's not that the agency is not prepared, but

3 there's a lot more involved with it than just our

4 determination.

5    Q.   You need money, right?

6    A.   It's not only money, no, sir.

7    Q.   Well, if I gave you a billion dollars, you

8 could certainly air-condition the Texas Prison System,

9 right?

10   A.   Eventually, yes, sir.

11   Q.   Sure.  It would take some time to do

12 construction, right?

13   A.   Yes, it would.  Engineering and construction

14 and manufacturing.

15   Q.   You'd have to -- you'd have to design it, build

16 it, and implement it, right?

17   A.   That is correct.  But that's not all.

18   Q.   What else is there?

19   A.   Well, there's also the -- the amount of load

20 that we put on the Texas grid in and of itself.  If we

21 were to air-condition everything tomorrow, the current

22 grid that the State has, we have been told, would have

23 problems trying to supply the amount of demand --

24 electrical demand, that is, to keep that -- keep those

25 up and running without some serious infrastructure

---

**32**

1 upgrades that are out of our control.

2    Q.   Okay.  How many -- there are only about 70

3 prisons that would require air conditioning, right?

4    A.   Yes, sir.

5    Q.   Don't you think in the -- over the next couple

6 years, there are going to be 70 hotels, schools, and

7 buildings built that are going to have air conditioning?

8        MR. CALB:  Objection; beyond the scope.

9    A.   Sure, I would agree with that.

10   Q.   (BY MR. EDWARDS)  Well, and there's going to be

11 a lot more than 70 buildings built in the next couple of

12 years, right?

13        MR. CALB:  Objection; beyond the scope.

14   Q.   (BY MR. EDWARDS)  Right?

15   A.   I don't know what can be built in certain

16 areas, because we have a lot of prisons in rural areas

17 that don't have a lot of structures, a lot of commercial

18 buildings.  So for us to just start throwing

19 air-conditioning in these buildings and expect the grid

20 to demand or the load, we've already been told that if

21 we did it today, or tomorrow, that there's places that

22 it could not withstand.

23   Q.   Well, tell me -- tell me, who told you that the

24 grid could not handle air conditioning a prison unit?

25   A.   That was discussions that the facilities

---

David Sweetin - 7/25/2024

---

33

1 director and --

2    Q.  Names, sir.

3    **A.  Sir?**

4    Q.  What -- who told you this, because it -- okay.

5 Who told you this?

6    **A.  That was the director of engineering.**

7    Q.  What's his name?

8    **A.  It is . . . That is Dale Cox, C-o-x.**

9    Q.  And what is the factual basis for Dale Cox

10 telling you that the grid cannot handle air conditioning

11 the prison system, if that's really true?  What's the

12 foundation of facts behind that?

13   **A.  The facts are a discussion that he has had with**

14 **ERCOT, the Energy Reliability Council -- or Commission.**

15   Q.  So it's your testimony that Mr. Cox spoke with

16 someone at the -- at ERCOT about air conditioning all of

17 the prisons, some of the prisons, a prison?

18   **A.  To the extent of the discussion, I can't tell**

19 **you.  I can only tell you what he conveyed to me, and**

20 **that was that there are areas in the state of Texas that**

21 **would be problematic because of the lack of**

22 **infrastructure.**

23   Q.  Okay.  Well, okay.  But you can't tell me when

24 that conversation happened or the basis -- the factual

25 basis of that conversation, right?

---

34

1    **A.  No, sir.**

2    Q.  And you can't tell me what these infrastructure

3 upgrades would need to be, can you?

4    **A.  No, sir.**

5    Q.  Okay.  And it just strikes me as absurd that

6 the state of Texas, which is bigger than, you know, most

7 regions of the country can't handle air conditioning

8 several prisons.  But that -- you don't believe you can

9 do it now?

10        MR. CALB:  Objection; argumentative.

11   **A.  I'm not saying it can't be done.  What I'm**

12 **testifying to is the fact that if we was -- because your**

13 **original question says, if you gave me a billion**

14 **dollars, could we get them installed.**

15   Q.  (BY MR. EDWARDS)  And your answer was, yes.

16 But then you said, look, you know, it's more complicated

17 than that.  And I said, all right, what are we talking

18 about here.  And you said, well, I've been told we may

19 have some problems in some rural areas.  And I'm trying

20 to get to the bottom of that.  And you said, Dale Cox

21 had a conversation with somebody and told you that it

22 might be difficult in certain rural areas.  Okay?

23        MR. CALB:  Objection; misstates testimony.

24   Q.  (BY MR. EDWARDS)  And I'm trying to figure out

25 what you're talking about and what the facts are.

---

35

1 Because there's going to be testimony in this trial

2 coming up that -- that it is -- that technology is

3 capable of fixing this problem in terms of installing

4 air conditioning.  But I want to kind of figure out from

5 the State of Texas' point of view if you really are

6 going to dispute that.

7        MR. CALB:  Objection; misstates testimony.

8    Q.  (BY MR. EDWARDS)  Are you going to dispute

9 that?

10   **A.  Dispute that it can be done?**

11   Q.  Yes.

12   **A.  It depends on the time frame that we're**

13 **allowed.  It can be done eventually, yes, sir, if all**

14 **proponents are working together to do just that.**

15   Q.  Right.  If you're ordered to install air

16 conditioning in numerous prisons, the agency has the

17 capability of -- of making that happen, fair?

18   **A.  With some outside resources, yes, sir.**

19   Q.  Sure.  With -- with some potential

20 infrastructure upgrades in certain facilities and with

21 money, you would be able to make this happen, correct?

22   **A.  That is correct.**

23   Q.  Okay.  And, you know, do you know the nice

24 thing about money problems, sir?

25        MR. CALB:  Objection; beyond the scope.

---

36

1    Q.  (BY MR. EDWARDS)  Do you know that -- the nice

2 thing about a money problem?

3    **A.  No, sir.**

4    Q.  It's that money can fix a money problem.  Don't

5 you agree?

6        MR. CALB:  Objection; beyond the scope.

7    **A.  Not money only, no, sir.**

8    Q.  (BY MR. EDWARDS)  Money and a little bit of

9 caring can fix most money problems, can't it?

10        MR. CALB:  Objection; beyond the scope.

11   **A.  Money and time, in my opinion.**

12   Q.  (BY MR. EDWARDS)  And the point you're making

13 to Judge Pittman is that it would take time to

14 air-condition numerous prisons in the Texas Prison

15 System, correct?

16   **A.  That is correct.**

17   Q.  Now, I want to be clear.  You know, that would

18 be true whether it's the private sector or the

19 government.  You're not saying, you know, it's

20 government work, we need more time.  You're just saying,

21 as a practical matter it could take, you know, several

22 years to air-condition numerous prison systems.  Is that

23 correct, sir?

24   **A.  Potentially, yes, sir.**

25   Q.  Well, how long would it take, if you wanted to,

---

**WRIGHT WATSON & ASSOCIATES**
1250 South Capital of Texas Highway, Building 3, Suite 400  Austin, Texas 78746  (512) 474-4363

d1373cb1-2f0a-4b96-9b71-3f7399538ee8

David Sweetin - 7/25/2024

---

**37**

1 to air-condition all of the facilities that aren't
2 air-conditioned currently?
3    A.  Total time, I couldn't give you the total time.
4 Being installed and being operational is two different
5 things.  Because there again, we are reliant on being
6 fed the electricity to operate.  And as long as those
7 other entities are in lockstep with us and the
8 infrastructure is in place, then, yes, we can do that.
9    Q.  Sure.  Again --
10    A.  Because we install it doesn't necessarily mean
11 it can be operated.
12    Q.  Well, I just asked you how long it would
13 take -- let's start with, how long would it take you to
14 install air conditioning in all of the prisons that do
15 not have air conditioning currently?
16    A.  I can tell you, we have a plan in place to work
17 in that direction and that goal that is very aggressive.
18 As far as the actual completion time, I cannot tell you
19 that.
20    Q.  Well, I'm going to talk to you about the
21 current plan in place.  And you're talking about the
22 prisons that you're beginning to retrofit and install
23 air conditioning in currently, right?
24    A.  The ones that we already had and the ones that
25 we currently are, yes, sir.

---

**38**

1    Q.  Right.  And you're in the process currently of,
2 you know, making retrofits to install, you know,
3 approximately -- I don't know -- ten to 12 or even
4 13,000, we'll call them cool beds, currently, right?
5    A.  14,000 air-conditioned beds, approximately,
6 yes, sir.
7    Q.  And you're doing that because you want to
8 ameliorate or fix the dangers that extreme heat poses to
9 the inmate population and the correctional officer
10 population, right?
11    A.  We're doing it because we believe it's the
12 right thing to do.
13    Q.  Well, do you believe it's the right thing to
14 do, to air-condition the Texas Prison System?
15        MR. CALB:  Objection; beyond the scope.
16 You're asking him in his individual capacity.
17    A.  If you're asking me my opinion of it, I don't
18 have an opinion.
19    Q.  (BY MR. EDWARDS)  You just told me you're doing
20 it because you believe it's the right thing to do.  Did
21 I misunderstand your testimony, sir.
22    A.  No, sir.  But you just asked me what my opinion
23 was.  I don't have an opinion --
24    Q.  Sir, you just told me you were doing it because
25 it was the right thing to do.  Okay?

---

**39**

1    A.  Then you --
2    Q.  Why is it the right thing to do to
3 air-condition the Texas prisons?
4    A.  I would say the reason it's the right thing to
5 do is because of the increased temperatures that the
6 state is seeing, the increase of medication that -- that
7 inmates are on as opposed to 20 years ago, 30 years ago,
8 40 years ago.  There's a lot of factors that -- that
9 exacerbate the need for wanting to air-condition.  So
10 for that reason, yes, sir, I believe -- we believe --
11 the agency -- that it's the right thing to do.
12    Q.  And what -- look, sir, I believe it's the right
13 thing to do too.  I think we're in agreement on that.
14        You know, and I would -- look, what -- what
15 you're telling me is, it's getting hotter in the state
16 of Texas, and you know that, right?
17    A.  It would appear that we have a heat cycle
18 ongoing, yes, it increases the temperature.  How long it
19 will stay, I don't know, but, yes, sir.
20    Q.  And, again, and any responsible policymaker,
21 when they're faced with hotter temperatures, needs to
22 develop policies to protect the inmates and the officers
23 that work for them from those temperatures, right?
24        MR. CALB:  Objection; beyond the scope.
25    A.  As we do.  We have mitigation factors in place.

---

**40**

1    Q.  (BY MR. EDWARDS)  Sure.  But you've told me,
2 look, the temperatures are getting hotter.  And then you
3 also told me that in the last 20 or 30 years, more
4 inmates are on medications, which make them vulnerable
5 to the heat, right?
6    A.  Correct.
7    Q.  And I believe you had also stated that the --
8 that the population in the Texas Prison System, it's
9 getting older, isn't it, over the last 20 or 30 years.
10 Fair?
11        MR. CALB:  Objection; beyond the scope.
12    Q.  (BY MR. EDWARDS)  I apologize.  I didn't hear
13 you over Mr. Calb's objection.  Was that a yes?
14    A.  That is correct.
15    Q.  Okay.  And you understand that when you get
16 older, you become more vulnerable to the dangers of
17 extreme heat, temperatures above 90, 95 degrees, right?
18    A.  Some do, yes.
19    Q.  Well, it's -- are you aware of studies -- and
20 you're here to talk about studies -- studies that, you
21 know, make it pretty evident that the older you get, the
22 more vulnerable you are to high temperatures and high
23 heat indexes.  Are you aware of that?
24    A.  I would say, as a general rule, yes, I'm aware
25 of that.

---

David Sweetin - 7/25/2024

---

41

1    Q.  So when you say it's the right thing to do, it
2  appears to me that there's some acknowledgment that
3  the -- that the situation is -- is more dangerous for
4  inmates now than 30, 40 years ago.  Is that a fair
5  statement?
6    A.  Depending on the demographics of the inmates
7  that you're looking at.  But as a whole, yes, I would
8  agree with that, with the aging population.
9    Q.  So it is -- you know, it is the goal of the
10 Texas Department of Criminal Justice to air-condition
11 the entire prison system, correct?
12   A.  That is correct, yes, sir.
13   Q.  Is this a fair statement, the Texas Department
14 of Criminal Justice is a very goal-oriented
15 organization?
16       MR. CALB:  Objection; beyond the scope.
17   A.  Yes, sir, I believe we are.
18   Q.  (BY MR. EDWARDS)  So is the only disagreement
19 we have, how quickly you ought to air-condition the
20 Texas prison system?  We think it should be right away
21 and you think it should be over time?
22       MR. CALB:  Objection; misstates testimony,
23 vague.
24   A.  No, sir, it's not what I think, it's based on
25 what I've been told.

---

42

1    Q.  (BY MR. EDWARDS)  Well, that's fair.  You've
2  been told that it's going to take time and some
3  resources in order to accomplish the goal of air
4  conditioning the prison system, correct?
5    A.  That is correct, yes, sir.
6    Q.  And given that it's -- it's the goal of the
7  prison system to provide air conditioning to make the
8  environment safe for the inmates and for the
9  correctional officers, has TDCJ explored any temporary
10 fixes to cool the temperatures down in the Texas prisons
11 that have temperatures in the 90s or 100 degrees?
12   A.  Yes, sir, we have explored that.  And on some
13 units right now, we actually do have temporary
14 air-conditioning systems, along with generation --
15 generative capability for the electricity to power them.
16   Q.  Okay.  So let's drill down on that.  So
17 Director Collier and the agency are aware that -- that
18 there is the possible fix of temporarily
19 air-conditioning units, correct?
20   A.  In theory?  Yes.
21   Q.  Well, not in theory, in reality, right?  Here's
22 the reality.  Someone could make a phone call to a
23 business that rents air conditioners and temporarily
24 install air conditioning at a prison, correct?
25   A.  That is correct.  Providing that the equipment

---

43

1  is available.
2    Q.  Sure.  And that's what you-all did at the Pack
3  Unit, right?
4    A.  Yes, sir, that is correct.  We had --
5    Q.  And you're here to talk -- you're here to talk
6  about the temporary air conditioning that was installed
7  at the Pack Unit, correct?
8    A.  Yes, sir.
9    Q.  And after you were ordered by a federal judge
10 and -- Well, strike that.
11       After you agreed in a settlement following
12 an order from a judge saying the agency was deliberately
13 indifferent to the health and safety of various inmates
14 at the Pack Unit, you agreed to permanently install air
15 conditioning at the Pack Unit, correct?
16   A.  Yes, sir, that is correct.
17   Q.  And are you aware of what TDCJ testified that
18 would cost during the trial in the Pack Unit?
19   A.  For the temporary?
20   Q.  No, for the permanent installation of air
21 conditioning.  Are you aware of what the Texas
22 Department of Criminal Justice told Judge Ellison it
23 would cost to permanently air-condition the Pack Unit?
24   A.  Yes, sir.
25   Q.  How much did the Texas Department of Criminal

---

44

1  Justice tell Judge Ellison it would cost to permanently
2  air-condition the Pack Unit?
3    A.  Approximately 20 million.
4    Q.  I believe it was 22 million, but let's use --
5  approximately 20 million seems like a candid answer.
6       How much did it actually cost to
7  permanently install air conditioning at the Pack Unit?
8    A.  Approximately 8 million.
9    Q.  Well, it cost 4 million.  Isn't that correct,
10 sir?
11   A.  No, sir, I've -- the number I have is 8
12 million, when the books were finally closed on that, it
13 resulted in a total of right at $8 million.
14   Q.  It is your contention that it cost $8 million
15 to air-condition the Pack Unit?
16   A.  That was my understanding, yes, sir.
17   Q.  And where does that -- what is the basis for
18 that?  Because I'll represent to you that I believe it
19 is 4 million.  But it wouldn't be the first time I'm
20 wrong.  Perhaps you're adding other things in there, but
21 I could be wrong.
22       What is the factual basis for you telling
23 the court that it cost $8 million to install air
24 conditioning at the Pack Unit?
25   A.  That was my discussion with Dale Cox yesterday

---

**WRIGHT WATSON & ASSOCIATES**
1250 South Capital of Texas Highway, Building 3, Suite 400  Austin, Texas 78746  (512) 474-4363

d1373cb1-2f0a-4b96-9b71-3f7399538ee8

David Sweetin - 7/25/2024

45

1 to confirm numbers that I was looking at. I am aware
2 that there was a $4 million price that was out there and
3 talked about, but I can tell you that at the close of
4 that project, after everything was in, it totaled 8
5 million.
6     Q.  Well, sir, are you aware that Director Collier
7 testified to the legislature that about a $4 million
8 cost is what we're looking at in terms of air
9 conditioning the Pack Unit?
10    A.  Yes, sir.
11    Q.  He told the legislature it would cost
12 $4 million, correct?
13    A.  Yes, sir.
14    Q.  And you're telling me it actually cost
15 $8 million?
16    A.  I'm telling you, based on my conversation
17 yesterday with Dale Cox, who gave me the final number,
18 that project came in at 8 million.
19    Q.  Okay.  But you don't know what that project
20 entailed, do you?
21    A.  Yes, sir, I do.
22    Q.  Okay.  Well, why don't you walk me through why
23 it cost twice as much as Director Collier said it would
24 cost?
25    A.  Well, that I cannot specifically tell you why

46

1 I'm above the number that --
2              (Speaking simultaneously.)
3     Q.  Well, break down the $8 million.  What -- what
4 money -- what was spent on that $8 million that I
5 understood to be $4 million, based on Director Collier's
6 testimony to the legislature?
7     A.  Well, when you're looking at total cost, you're
8 looking at, obviously, design, conceptual.  You're
9 looking at --
10    Q.  Well, do you know what the $8 million
11 represents, or are you just speculating now?
12    A.  No, sir, I'm giving you that 8 million based on
13 my discussion yesterday.  I can't give you a specific
14 breakdown as to what the 8 million was applied to.  I
15 can just merely tell you what I was told, based on --
16    Q.  Dale Cox told you it came in at $8 million.
17 That's the basis for your testimony today, correct?
18    A.  Correct.
19    Q.  Did you review any documents, any -- any
20 invoices, any construction costs?
21    A.  For the 8 million?  No, sir.
22    Q.  Do you know how many years the Pack Unit was
23 temporarily air-conditioned?
24    A.  Yes, sir.  About -- I can tell you that the
25 temporary air stayed on the unit even after we got the

47

1 permanent resolution or construction in place just to be
2 on the safe side, to ensure that we were able to obtain
3 the temperatures that we were looking for.  And if we
4 had a problem, that we had an immediate solution for
5 that problem.
6     Q.  Right.
7     A.  The time would be close to two years.
8     Q.  Okay.  I think it was -- I think there was
9 temporary air conditioning for about three years.  Is
10 that different than your understanding, sir?
11    A.  Well, that could be right, yes, sir.  I will
12 agree --
13    Q.  And that temporary air conditioning would have
14 been in place from April 2019 until the permanent air
15 conditioning was fully installed, correct?
16    A.  Yes, sir.
17    Q.  And I -- it may have been April of 2018.  I'm
18 not positive of 2018 or '19.  Do you know when the
19 permanent air conditioning was actually installed at the
20 Pack Unit?
21    A.  Yes, sir.  If I refer to my notes here . . .
22              The permanent air install took
23 approximately 15 months.
24    Q.  When was it permanently installed and complete?
25    A.  I don't have the actual date of what we call

48

1 the permanent installation, simply because I -- again,
2 like I said, we --
3     Q.  Look, that's fine.  You don't know when it was
4 permanently installed as you testify here today,
5 correct?
6     A.  That is correct.
7     Q.  And if I ask any more questions about the
8 breakdown of that supposed $8 million, you can't tell me
9 what was spent on particular things.  Fair?
10    A.  Specifics, no, sir.
11    Q.  Okay.  And you didn't -- I mean, again, I don't
12 want to be critical of you, but you didn't ask for
13 documents that would enable you to answer specific
14 questions about the breakdown of cost, what went where
15 and why and how.  Fair?
16    A.  That is correct.
17    Q.  Okay.  And let me come back to the -- here's
18 how I understand -- let's just take the Pack Unit, for
19 example, because that's one of the categories that
20 you're here to testify about today.
21              You would tell Judge Pittman that before
22 the court issued its ruling, TDCJ was unwilling to
23 install temporary air conditioning at the Pack Unit,
24 correct?
25    A.  Unwilling?

David Sweetin - 7/25/2024

---

**49**

1    Q.  Yeah.  I'll represent to you that the warden
2 at the time, Warden Herrera, said that absent a court
3 order, it would not air-condition the Pack Unit.  Do you
4 understand that and accept that fact?

5    A.  Well, I don't know what Mr. Herrera said,
6 Warden Herrera, but I can tell you that we did not have
7 air conditioning in the entire complexion at that time,
8 no, sir.

9    Q.  Right.  Okay.  Well, as you testify here today,
10 you're not aware that Warden Herrera said he was
11 unwilling to implement air conditioning unless he
12 ordered to do so by the court?

13    A.  No, sir, I'm not aware of what Warden Herrera
14 said.

15    Q.  Well, is it your testimony that you believe the
16 Texas Department of Criminal Justice was willing to
17 air-condition the Pack Unit before the court issued its
18 order?

19    A.  I can't speak on that.  I don't know.

20    Q.  All you know is, they didn't air-condition,
21 despite the fact that they were accused of being
22 deliberately indifferent in failing to do so, right?

23    A.  Right.

24    Q.  And you do know that after they were found to
25 be deliberately indifferent for failing to have

---

**50**

1 temperatures that were safe for the inmates, that they
2 did finally agree to install air conditioning, right?

3    A.  Yes, sir.

4    Q.  Okay.  And despite -- and the fact -- whether
5 it's 8 million or 4 million, you'd agree that the
6 ultimate cost for the Pack Unit was well below what TDCJ
7 represented to the court, right?

8    A.  That is correct, yes.

9    Q.  It's between 14 and $18 million below what they
10 represented to the court, right?

11    A.  Yes.  The original price was based on what we
12 knew at the time and the direction that we were going to
13 go --

14    Q.  Not true, sir.  Not true at all.  The original
15 price -- well, do you know what accounted for the
16 inflated numbers that led you to testify and argue to
17 the -- to the judge in the Cole case that it would cost
18 $22 million to install air conditioning at the Pack
19 Unit?

20    A.  I'm aware of what the plan was initially going
21 forward with the installation versus what we ended up
22 doing.

23    Q.  Do you know why the price was so inflated and
24 it turned out to be 14 to $18 million less?

25    A.  Yes, sir.

---

**51**

1    Q.  Please tell Judge Pittman why TDCJ represented
2 to a court that construction of air conditioning would
3 be 14 to $18 million higher than it turned out to be.

4    A.  Because the original plan was to source
5 everything out because, based on what we felt like the
6 design would be and needed to be to accommodate, that we
7 didn't have the in-house resources to tackle that kind
8 of project within a reasonable amount of time.  So that
9 was a -- big factor.

10          Secondly, at the time, we were under the
11 impression and felt strongly that -- that we were being
12 held to a certain requirement within the state of Texas
13 by the SECO agency, which is the -- the State Electrical
14 Commission, that we were going to have to insulate the
15 entire envelope of that unit.  And when I say
16 "envelope," I'm talking about the outer shell, the shell
17 over the -- the unit, the outer skin, if you will.
18 Which was a big factor that, once we got into it, we
19 found out that, through the help of discussions with our
20 engineers, along with the outside engineering firm,
21 along with the SECO group, that that was something that
22 was not applicable to us, and as a result, did not
23 require us to do anything to the envelope of the
24 building.

25          When --

---

**52**

1          (Speaking simultaneously.)

2    Q.  And that made it much cheaper, right?

3    A.  Sir?

4    Q.  That made it much cheaper, didn't it?

5    A.  Yes, sir, it did.

6    Q.  And, in fact, TDCJ isn't obligated to follow
7 building codes when it's doing its retrofits of air
8 conditioning, right?

9    A.  No, sir.  There are codes that we are bound by,
10 there are.

11    Q.  And there are certain ones you're not, correct?

12    A.  That is correct.

13    Q.  And the fact that you don't have to do this
14 insulation you just discussed about makes it quite a bit
15 cheaper to install air conditioning in these facilities,
16 right?

17          MR. CALB:  Objection; asked and answered.

18    A.  Yes, sir, I would agree with that.

19    Q.  (BY MR. EDWARDS)  Okay.  Who did the -- who
20 were the contractors who installed -- let's start with
21 the temporary air conditioning at the Pack Unit.

22    A.  The temporary air was contracted through a
23 group called Spot Cool.  They are a firm that is
24 involved in commercial warehousing refrigeration that
25 seemed to be a good resource for us just because of the

---

David Sweetin - 7/25/2024

---

**53**

1 volume of cubic feet that they work with in trying to
2 refrigerate, we felt that they would do a good job and
3 be able to provide us with the resources that we need.
4      Q.   Did they do a good job?
5      A.   There were some -- there were some hiccups
6 along the way.  But, overall, we got the project done.
7 We got the temporary air in, so it was a success.
8      Q.   Okay.  So, you know, and I don't want to be
9 overly critical, but what I hear you saying is, well,
10 you know, when you're managing any construction project,
11 whether it's redoing a house or building a new house or
12 putting air conditioning in, there's some hiccups along
13 the way, but by and large, they fulfilled their
14 contractual obligations to you.  Is that fair?
15           MR. CALB:  Objection; misstates the
16 testimony.
17      A.   Yes, sir.
18      Q.   (BY MR. EDWARDS)  And did I hear the name
19 right?  Spot Cool?
20      A.   Spot Cooling.
21      Q.   Thank you.  And they gave you an estimate for
22 the cost of installing and using the temporary air
23 conditioning at the Pack Unit?
24      A.   Yes.  We would have gone through the regular
25 contract and procurement processes for the State of

---

**54**

1 Texas, which required us to get that information.
2      Q.   And do you have an understanding of the first
3 year that the temporary air conditioning was installed,
4 do you have a record of how much you spent that first
5 year on temporary, like, installing and running air
6 conditioning?
7      A.   Yes, sir.  That was right at a million dollars.
8 To be specific, it was 974,470.
9      Q.   Well, that was for the total amount of the
10 temporary air conditioning, correct?
11      A.   That was for the rental of the system, which
12 include the air conditions and the generation.
13      Q.   Right.  And that was over several years,
14 correct?
15      A.   That is correct.
16      Q.   Okay.  And so how many -- I think it's over
17 three years, right?
18      A.   Approximately, yes, sir, I would agree with
19 that.
20      Q.   And so I'm doing the math.  And this is very
21 dangerous whenever a lawyer does math, but, you know,
22 roughly $950,000 spread out over three years, you're
23 talking about 300 -- $300,000 or 320 -- 15 or $20,000 a
24 year to temporarily air condition a unit like Pack,
25 right?

---

**55**

1      A.   Roughly, yes, sir.
2      Q.   And the agency has a budget of more than three
3 and a half billion dollars, correct?
4      A.   Yes, sir.
5      Q.   And while 300 -- let's say, $320,000 might
6 sound like a lot to, you know, a person if they had to
7 spend it on their house, you know, that's not that
8 substantial an expense for an agency to -- to incur,
9 right?
10      A.   No, sir.  When you break down what our
11 responsibilities are and what is actually appropriated
12 for certain areas, not all of that 1.3 billion would go
13 to maintenance or construction or air conditioning.
14      Q.   Oh, sure.  And it's 3.5-plus billion, right?
15      A.   Yes, sir.
16      Q.   But I'm just talking about the $320,000 to
17 temporarily air condition a prison.
18           Have you gotten estimates to temporarily
19 air condition other prisons that -- like the Pack Unit?
20      A.   Yes, sir.  We have established some benchmarks
21 over the course of time with regard to the -- sir?
22      Q.   I apologize.  Maybe I said something
23 inadvertently.  I heard you say, you've established some
24 benchmarks over time with what it would cost to
25 temporarily rent A/C and utilize it at your prisons,

---

**56**

1 right?
2      A.   Yes, sir.
3      Q.   Okay.  Is the $320,000 a year typical for most
4 of the prisons that aren't air-conditioned?
5      A.   Based on our calculations on benchmarks that we
6 have established, in order to provide air conditioning
7 for all the units that are without air conditioning
8 would be approximately $800,000.
9      Q.   Per year?
10      A.   Per six months.
11      Q.   And that would be April through October,
12 correct?
13      A.   That is correct.
14      Q.   Okay.  And is that $800,000 per unit, or is
15 that $800,000 total?
16      A.   800,000 total for the agency for that six-month
17 period.  That's approximately -- let's see -- two --
18 200,000 for the equipment and 600,000 -- excuse me --
19 excuse me.  Let me back up.  Let me strike that because
20 I'm talking in thousands and I should be talking in
21 millions.  I apologize for that.
22           So, again, let me say that for the agency
23 to install temporary A/C for the entire agency that is
24 currently without air-conditioning, the rental for a
25 six-month period would be 200 million.  The fuel expense

---

**WRIGHT WATSON & ASSOCIATES**
1250 South Capital of Texas Highway, Building 3, Suite 400  Austin, Texas 78746   (512) 474-4363

d1373cb1-2f0a-4b96-9b71-3f7399538ee8

David Sweetin - 7/25/2024

57

1 for that to go along with those same air-conditioning
2 units would be approximately 600 million. That would
3 bring our total to 800 million per that six-month period
4 of what we call the heat months.
5     Q.  Sir, are you telling me it would be almost as
6 much money to install -- to temporarily A/C these
7 prisons as it would be to permanently install air
8 conditioning in them?
9     A.  Yes.  That's exactly what I'm telling you, yes,
10 sir.
11     Q.  Okay.  So the Pack Unit is not -- it's a very
12 different experience from the Pack Unit, then?
13     A.  No.  The Pack Unit is one of -- of many.  We've
14 got a total of 101 units, and all of them essentially
15 are different in their own right.  There may be certain
16 types that are similar, but what it would require us to
17 provide the temperatures that are necessary would be
18 $800 million for that six-month period.
19     Q.  And what is the -- where are you getting that
20 information?
21     A.  What information is that, sir?
22     Q.  You just told me it costs $800 million to
23 temporarily air condition the system, amongst all the
24 TDCJ facilities.
25     A.  Yes, sir.

58

1     Q.  What is the -- do you have a document that --
2 that you can give me, or your notes that you could show
3 me?
4     A.  Yes, sir.
5     Q.  Okay.  Would you -- would you mark your notes
6 as Exhibit 2 to this deposition, and would you please
7 send your notes to -- to me via email on a break?
8     A.  Sure.
9     Q.  Okay.
10         MR. EDWARDS:  And, Kelly, these
11 notes will be Exhibit 2.
12         (Sweetin Exhibit No. 2 was marked.)
13     Q.  (BY MR. EDWARDS)  And just so I'm clear, you
14 have estimates for every prison system, what it would --
15 every single prison unit, what it would cost to
16 temporarily air condition it for a five-month period,
17 April through October?
18     A.  What I have is the total numbers that the
19 Facilities Division provided me that gave me the numbers
20 on the requirements for the rental and the fuel costs
21 for that six-month period.
22     Q.  Okay.  They just told you what it would be, the
23 Facilities Division just handed you a number and said it
24 would be $800 million to install temporary air
25 conditioning at 70 facilities?

59

1     A.  Yes, sir, based on the benchmarks that they've
2 already established.
3     Q.  You realize that that is astronomically more
4 expensive than what it cost to temporarily air condition the
5 Pack Unit, right?
6     A.  800 million is astronomically greater?  Yes,
7 sir.
8     Q.  Well, it's almost unbelievable.
9         So do you have any factual basis for
10 telling Judge Pittman that it would cost $800 million to
11 install temporary air conditioning throughout the Texas
12 Prison System?
13     A.  Sure.  What I would tell him is that the Pack
14 Unit, after the fact, was relatively easy, considering
15 what we would have to do for the remainders of the
16 units, especially when you look at our system one-type
17 units that were not -- that were designed -- or built in
18 the 1800s and the -- and the low 1900s, clearly there
19 was no -- nothing in mind to accommodate that.  Not that
20 the others were, but it would be even more difficult,
21 because you don't have the -- the necessary space for
22 the plumbs or the space is so broad that there's no way
23 that you could effectively run air condition -- or
24 conditioned air through that space and expect it to end
25 up at the -- at the end user at the desired temperature.

60

1         So all of these unit are unique in how they
2 would have to be vented to supply the air.  Some of them
3 are going to be easier and some are going to be more
4 difficult.
5     Q.  Okay.  That may be true or it may not be true.
6 But I'm trying to figure out a basis for you
7 representing under oath that it would cost $800 million
8 to temporarily air condition the Texas Prison System.
9         And so let's start with, how many -- how
10 many prisons were built in the 1800s that need to be
11 retrofitted?  Do you know?
12     A.  11 units, approximately.
13     Q.  11 units were built in the 1800s?
14     A.  That are -- well, that are over 95 years old.
15     Q.  Well, that -- that's not the 1800s, sir.  You
16 said the 1800s and the 1900s, to be fair to you.
17         There are 11 units that are more than
18 95 years old, which means were built from 1930 and
19 earlier?
20     A.  Between 1849 and 1919, there are 11 units.
21     Q.  Okay.  What are those 11 units?
22     A.  They are what we call our system one units.
23     Q.  Okay.  Just give me the names of the units.
24     A.  I don't have that in front of me right now, but
25 no doubt I can provide it.

16 (Pages 61-64)

David Sweetin - 7/25/2024

---

61

1    Q. Okay. What was the estimate for -- let's start
2  with temporarily air conditioning the system one units?
3    A. Yes, sir. What about it?
4    Q. How much -- how much was the estimate for those
5  11 units?
6    A. The specific breakdown, I do not have here in
7  front of me --
8       (Speaking simultaneously.)
9    Q. As you testify here today, you cannot tell me
10 the names of the 11 units built before 1930 or the cost
11 to temporarily air condition those units, correct?
12   A. I can tell you the cost.
13   Q. Okay. Well, what would be cost be to
14 temporarily air condition those 11 units?
15   A. But not broken down specific by unit. It's
16 not --
17   Q. Sir, I'll ask you again. Are you able to tell
18 me the cost of temporarily air conditioning the 11 units
19 built before 1930?
20   A. Am I right now? No, sir.
21   Q. Did you do any work in order to answer that
22 question?
23   A. Did -- I don't understand your question. Did I
24 do any work. Please explain.
25   Q. Did you ask for a breakdown when this person

---

62

1  told you, just gave you his -- his impression that it
2  would be $800 million to temporarily air condition the
3  prison system?
4    A. There is a breakdown.
5    Q. How do -- do you know that there's a breakdown?
6    A. Sure.
7    Q. Okay. How do you know that there's a breakdown
8  with each prison, with an estimate of each prison?
9    A. Because our agency engineering team would have
10 gone through each unit and developed what that --
11   Q. Well, you say that it would have. Do you know
12 they did?
13   A. Yes. This is not just an arbitrary number that
14 I'm throwing out there. This is based on the --
15   Q. Well, sir, you told a federal judge it would
16 cost $22 million to air condition the Pack Unit, and it
17 didn't come close to that number, okay? So excuse my
18 skepticism. When I hear a number thrown out without any
19 factual basis, without any documentary support at all,
20 excuse my skepticism. So let me begin with this
21 question.
22      You -- you -- of this supposed $800 million
23 for temporary air conditioning, do you have any sort of
24 documentation that would break it down by -- by
25 different prison facilities?

---

63

1    A. I am not looking at that documentation that
2  breaks it down.
3    Q. Do you know what it would cost to temporarily
4  air condition the various prisons that do not have A/C
5  currently? Do you know, by prison?
6       MR. CALB: Objection; asked and answered.
7    A. As an agency, yes, we know.
8    Q. (BY MR. EDWARDS) But you don't know. And
9  you're here to testify about exactly that, aren't you?
10   A. Yes, sir. I've told you I don't have it in
11 front of me.
12   Q. That's -- that's fine. You're assuming that
13 there's a document that supports what Mr. Cox told you
14 was the number, right?
15   A. Correct.
16   Q. You have not personally seen any estimates
17 of -- let's start with temporary air conditioning costs
18 in the Texas prisons, correct?
19   A. Correct.
20   Q. Okay. Did anything prevent you from asking
21 Mr. Cox or anybody else at the agency for that
22 breakdown?
23   A. No, sir.
24   Q. Okay. Have you provided all of the documents
25 upon which you relied in order to testify here today?

---

64

1    A. I can only assume, yes. But they -- there's
2  already one that you asked me to provide for you that I
3  was going off my notes, so you may not have that one.
4  But . . .
5    Q. Well, it's your understanding that all
6  documents upon which you've relied have been provided to
7  the plaintiffs through your lawyers. Is that a fair
8  statement, sir?
9    A. Yes, sir, that is a fair statement.
10   Q. Okay. You would expect there to be a -- your
11 belief, sir, is that the State of Texas actually does
12 have estimates for temporary -- temporary air
13 conditioning in every single one of its facilities?
14   A. Knowing Dale Cox and our engineering team,
15 absolutely, I am testifying that that 800 million is a
16 reliable number.
17   To me, that means that -- that -- that you --
18 the agency has gotten estimates from a number of
19 different contractors for each of the prison units in
20 order to install temporary air conditioning over a
21 period of time in the summers. Is that correct?
22   A. I can't tell you the formula in which he used
23 to come up with the numbers. I can just tell you the
24 numbers that he conveyed to me. And I have --
25   Q. Well --

---

David Sweetin - 7/25/2024

65

1    A.  -- in him and what he provided to know that
2 they're going to be accurate numbers to the best of his
3 ability.
4    Q.  I have no idea what that means.
5            There is no documentation you've ever seen
6 to support the number $800 million being accurate or
7 reliable in terms of installing temporary air
8 conditioning throughout the Texas Prison System per
9 summer, right?
10    A.  I have -- I have not seen that, correct.
11    Q.  Okay.  And nor have you seen a breakdown to
12 suggest that some of the units would be cheaper to
13 install than other units, have you?
14    A.  As some would be more expensive, correct.
15    Q.  You were just told that by Mr. Cox, correct?
16    A.  Not only told that by Mr. Cox, but it's based
17 on my experience in the agency and know what it takes to
18 complete various tasks.  So I'm speaking on behalf of my
19 experience as well.
20    Q.  Well, again, you have no personal knowledge as
21 to how much it costs to temporarily air condition any
22 facility, do you?
23    A.  Off the top of my head, no, sir.
24    Q.  And it only costs $320,000 a year to
25 temporarily air condition the Pack Unit, right?

66

1    A.  Correct.
2    Q.  Now, there are other units that aren't
3 air-conditioned that are constructed similarly to the
4 Pack Unit, correct?
5    A.  Yes, sir, that is correct.
6    Q.  How many units are similar in construction and
7 design to the Pack Unit that do not currently have air
8 conditioning in the housing area?
9    A.  The temporary air conditioning for the units
10 other than Pack --
11    Q.  Were you just handed a document or something,
12 sir?
13    A.  No, sir, I'm looking at my notes.
14    Q.  Did you hear my question, though?
15    A.  Your question --
16    Q.  My question was, how many units are similar in
17 construction and design to the Pack Unit, and what are
18 their names?
19    A.  They are referred to as our fast track units,
20 which --
21    Q.  When you say "fast track unit," what do you
22 mean?
23    A.  That is the category of unit that is specific
24 to that type of design.
25    Q.  And how many -- okay.  So does that mean just a

67

1 dormitory style housing with similar construction --
2 similar -- similarly built with construction one level
3 facilities?
4    A.  Yes, sir, that is correct.
5    Q.  How many prisons are there like that that don't
6 have air conditioning?  Like the Pack Unit?
7    A.  There are -- right now we've got four that are
8 scheduled for --
9    Q.  Just tell me the totals before you tell me what
10 you're doing, okay?
11    A.  There's approximately 11 of the fast track.
12    Q.  You have 11 fast track facilities?
13    A.  Approximately.  I don't have the exact number
14 in front of me, no, sir.
15    Q.  Okay.  Those -- those 11 fast track facilities
16 could be temporarily air-conditioned for about the cost
17 of the Pack Unit.  Is that fair?
18    A.  Yes, sir, that would be a fair assumption.
19 Pretty close.
20    Q.  And as you testify here today, you don't know
21 the names of the 11 fast track facilities.  Is that
22 fair?
23    A.  I can sit here, given enough time, I could go
24 through all of them --
25    Q.  Would you tell me the 11 that you consider to

68

1 be similar fast-track facilities that could be
2 temporarily air-conditioned for 300 or 320, $330,000 a
3 year?
4    A.  Yes, sir.  You've got the Luther Unit; you've
5 got the Powledge Unit; you've got the Terrell Unit;
6 you've got the Jester III, you got Garza West and Garza
7 East.
8    Q.  Okay.
9    A.  You've got -- I believe the Holliday Unit falls
10 under that -- not -- back that up.  That's a close
11 design, but -- but still different.  So that's all that
12 come to mind right now that -- that are --
13    Q.  Can we -- could you do me a favor, sir?  Would
14 you, on a break, find out the information for the other
15 four or five?
16    A.  Sure.
17    Q.  So that you can tell me that information, sir?
18 Is that possible?
19    A.  Yes, sir, it is.
20    Q.  Okay.  Now, are there currently plans this --
21 this summer, are there plans to temporarily
22 air-condition those facilities that are similar to the
23 Pack Unit?
24    A.  Yes, sir, there are plans going forward to have
25 those air-conditioned.

**WRIGHT WATSON & ASSOCIATES**
1250 South Capital of Texas Highway, Building 3, Suite 400  Austin, Texas 78746  (512) 474-4363

d1373cb1-2f0a-4b96-9b71-3f7399538ee8

David Sweetin - 7/25/2024

---

**69**

1   Q.  Well, now, hold on.  Are they being -- there
2   are plans to permanently install air conditioning in
3   portions of these facilities, correct?
4       A.  There are plans in place to provide air
5   conditioning for the inmate-living areas.
6   Q.  And when -- and they're actually -- have they
7   been designed?
8       A.  Yes, sir.
9   Q.  And have those designs been provided to the
10  plaintiffs in this case?
11      A.  That, I couldn't tell you.
12  Q.  Okay.  And have -- has -- those are designs
13  to -- so you're telling me, the current plan is to
14  permanently install air conditioning in all the fast
15  track facilities?
16      A.  Yes, sir, that is -- that is the plan.
17  Q.  And that's -- and that's because the fast track
18  facilities contain inmates that -- and one of the
19  reasons why you're going to install air conditioning in
20  these fast track facilities is because you have the
21  resources to do it and there is a need to protect the
22  inmates and the correctional officers from the dangers
23  of extreme heat, fair?
24      A.  Yes, sir.
25  Q.  Okay.  Now, my understanding, with these fast

---

**70**

1   track facilities, is that the plans call for permanent
2   installation of air conditioning.  Is that your
3   understanding as well?
4       A.  That is correct.
5   Q.  Okay.  And I believe -- you know, do you know
6   how long it will take for permanent -- for permanent
7   installation of air -- Strike that.
8           For the fast track facilities, is it your
9   understanding that the entire -- all the housing areas
10  are going to be air-conditioned?
11      A.  Yes, sir.
12  Q.  Okay.  And do you know when this -- this is --
13  this is going to be accomplished by the Texas Department
14  of Criminal Justice?
15      A.  It will be accomplished utilizing not only our
16  resources internally, but external resources as well.
17  Q.  Sure.  That's -- that's the money that you're
18  going to spend.  I'm not asking about that.
19          When -- when does TDCJ contend the
20  permanent installation of these facilities with regards
21  to air conditioning of the housing areas will be
22  accomplished?
23      A.  At the -- we are on track for end of fiscal
24  year '25.
25  Q.  So it's 2024 now, right?

---

**71**

1       A.  Correct.
2   Q.  And your estimation -- or the agency's
3   estimation is that these 11 fast track facilities will
4   be fully air-conditioned by -- by when in 2025?
5       A.  Not all 11 of them.  But I will tell you that
6   we have some right now that have got temporary air, and
7   we have --
8   Q.  That's not my -- I'm going to go back to that,
9   sir, I promise you, okay?
10      A.  Okay.
11  Q.  When is TDCJ contending that all 11 of these
12  facilities will be fully air-conditioned?
13      A.  I can only tell you that we have four that will
14  be completed in this biennium.
15  Q.  Okay.  So four of the 11 that need to be
16  air-conditioned that TDCJ plans to air-condition will be
17  completed by the end of fiscal year 2025, correct?
18      A.  Yes, sir.
19  Q.  And fiscal year 2025, for Judge Pittman's
20  benefit, ends when exactly?  Is it September 1 of 2025,
21  or is it August 31st, or is it October?  That's what I'm
22  asking.
23      A.  Our -- our fiscal year begins September 1.
24  Q.  Okay.  So by August 31st, 2025, it is your
25  contention -- TDCJ's contention that four of the 11 fast

---

**72**

1   track facilities that need to be air-conditioned, or
2   that TDCJ plans to air-condition will be completed,
3   correct, sir?
4       A.  There will be an additional four completed,
5   that is correct.
6   Q.  Okay.  Which four are set to be completed by --
7   by September 1 of 2025?
8       A.  That would be the Luther Unit.
9   Q.  Okay.
10      A.  That would be the Powledge Unit.
11  Q.  Okay.
12      A.  The Terrell Unit.
13  Q.  Okay.
14      A.  And the Jester III Unit.
15  Q.  Okay.
16      A.  That would be an additional 5,000
17  air-conditioned beds, approximately.
18  Q.  And I assume, given the need to air-condition
19  these -- these 11 facilities, that while the permanent
20  installation is going on, that -- we'll start with the
21  Luther.  The Luther Unit is being temporarily
22  air-conditioned?
23      A.  Right now, the Luther Unit is not under
24  temporary air.  There are nine units, to current date,
25  that are currently utilizing temporary air conditioning.

---

**WRIGHT WATSON & ASSOCIATES**
1250 South Capital of Texas Highway, Building 3, Suite 400  Austin, Texas 78746  (512) 474-4363

d1373cb1-2f0a-4b96-9b71-3f7399538ee8

David Sweetin - 7/25/2024

**73**

1    Q.  Well, I'm going to ask you about all nine, but
2  let's get -- Luther Unit, you're not temporarily air
3  conditioning while you do the permanent install,
4  correct?
5    A.  That is correct.
6    Q.  That's different than the way you did with the
7  Pack Unit, correct?
8    A.  I don't -- not sure I understand your question
9  there.
10    Q.  Well, you temporary -- you installed
11  temporarily -- temporary air conditioning in the Pack
12  Unit until you got the permanent installation in place,
13  correct?
14    A.  That is correct.
15    Q.  And you did that because you were obligated to,
16  but to protect the inmates and the officers in the
17  meantime, right?
18    A.  Correct.
19    Q.  Okay.  Now --
20         MR. CALB:  Jeff, not to cut you off, but
21  can we take a break when you're done with this line of
22  questioning?
23         MR. EDWARDS:  Sure.  Give me, like, five,
24  ten more minutes, then we can take a break.
25    Q.  (BY MR. EDWARDS)  But, sir, I should have

**74**

1  asked.  If you, at any time, feel like you need a break,
2  would you please ask Mr. Calb, and of course we'll take
3  one?
4         Is it okay to go for another five or ten
5  minutes?  I just don't want to lose my train of thought.
6  Is that okay?
7    A.  Yes, sir, I'm good.
8    Q.  Okay.  All right.  The Powledge Unit -- and
9  just so that Judge Pittman -- the Luther Unit is right
10  next to -- next to the Pack Unit, right?
11    A.  It's in close proximity, yes, sir.
12    Q.  So it's a similar temperature, similar
13  humidity, similar -- similar conditions of confinement
14  in terms of exposure to the dangerous temperatures,
15  right?
16    A.  I agree with that, yes, sir.
17    Q.  Well, do you know why the Department has chosen
18  not to -- to eliminate the dangerous condition of
19  extreme heat with temporary air conditioning in the
20  interim before it installs permanent air conditioning at
21  the Luther Unit?
22    A.  Yes, sir.
23    Q.  Why has it chosen not to temporarily
24  air-condition the Luther Unit and eliminate the
25  dangerous condition in the interim?

**75**

1    A.  Well, again, from a financial perspective,
2  if -- if we were to do that -- and the same question
3  would be, well, why don't we do all of them.  And we've
4  already talked about the $800 million cost just to do
5  the temporary air for the six-month period.  So,
6  clearly, the appropriation of funding would be an issue
7  across the board.
8         In addition to that, we -- we have heat
9  mitigation processes and protocols in place to protect
10  the inmates and the staff.  And for those inmates that
11  require additional considerations, be it the heat score,
12  then -- then those are transferred accordingly.
13    Q.  Well, yeah, but that's -- okay.  So what I hear
14  you saying is, look, you're not temporarily air
15  conditioning the Luther Unit the way you did the Pack
16  Unit for monetary reasons, right?
17    A.  That's part of it, yes, sir.
18    Q.  Okay.  You could, for 300, 320, $330,000,
19  temporarily air-condition the Luther Unit for the entire
20  summer, but you've chosen not to, right?
21    A.  For 800 million, I could do the entire agency.
22    Q.  Well, that's temporary.  For $800 million, you
23  could permanently install air conditioning in the entire
24  system, sir.  But we're just talking about the Luther
25  Unit, okay?

**76**

1         You've acknowledged that, similar to the
2  Pack Unit, in terms of exposure to dangerous conditions,
3  for whatever -- do you know why, other than -- Strike
4  that.
5         Let's go to Powledge.  How many -- Powledge
6  is also set to be finished by September 1 of 2025,
7  right?
8    A.  Correct.
9    Q.  Okay.  The agency has chosen not to -- not to
10  install temporary air conditioning in that facility in
11  the -- in the interim, correct?
12    A.  Correct.
13    Q.  The same with Terrell.  The plans are to
14  permanently install air conditioning at the Terrell Unit
15  for all of the facility, correct?
16    A.  Yes, sir, that is correct.
17    Q.  The same with Jester III.  The plans are to
18  permanently install air conditioning there as well,
19  correct?
20    A.  Yes.  But let me also make a point that, before
21  that, you said all of the units.  What I'm referring to
22  here is the living areas specifically.  That doesn't
23  mean that the entire facility would be air-conditioned.
24    Q.  Right, okay.  That's -- that's fair.  I'm
25  talking about the housing areas.

David Sweetin - 7/25/2024

---

**77**

1            You already air-condition, in every
2 facility, the warden's office, right?
3     **A.  Yes, sir.**
4     Q.  You already air-condition, in every facility,
5 the armory where the guns and the bullets are kept,
6 right?
7     **A.  Yes, sir.**
8     Q.  Do you know why TDCJ chooses to air-condition
9 the conference room or the warden's office or the
10 armory, but not the housing area?
11     **A.  I would say the biggest factor is financial.**
12     Q.  Well -- okay.  You answered --
13     **A.  Air conditioning the warden's office or armory**
14 **or conference room is going to be much cheaper than air**
15 **conditioning the entire facility, or at least the living**
16 **quarters of the inmates.**
17     Q.  What's the factual basis for that statement,
18 sir?  Do you really know that that's true?
19     **A.  To me, it would be common sense.**
20     Q.  Okay.  Other than common sense, is there a
21 factual basis for you suggesting to Judge Pittman that
22 it was cheaper to air-condition the armory and the
23 warden's office and the warden's conference room and the
24 common areas that -- that the warden would go to than
25 the housing area?  Do you really know that to be true?

---

**78**

1     **A.  Repeat the question, please.**
2     Q.  Do you really know it to be true that it was
3 cheaper to air-condition the warden's office and his
4 conference room and the armory and other portions of the
5 prisons that were, in fact, air-conditioned at the
6 expense of the housing area?
7     **A.  Yeah.  Based on my experience in working in the**
8 **agency and the Facilities Division for that six-plus**
9 **years, yes, sir, it's obvious to me that air**
10 **conditioning square footage footprints larger than the**
11 **warden's office or conference areas or the armory is**
12 **going to be much less than the footprint in the living**
13 **areas.**
14     Q.  So it's just a square footage issue?
15     **A.  It's the amount of area, total area that you're**
16 **trying to condition, yes.**
17     Q.  All right.  And that's based on your common
18 sense.  You don't really know that to be true, or do
19 you?
20     **A.  That's based on not only common sense, but me**
21 **working in Facilities and being involved in air**
22 **conditioning projects, That's a fair -- fair statement**
23 **to make.**
24     Q.  Okay.  And you're here testifying under oath.
25 You're -- you're -- You think it's -- Okay.  Your point

---

**79**

1 would be that your understanding of why the warden's
2 office is air-conditioned and the armory is
3 air-conditioned, it was just cheaper to air-condition
4 those areas than the housing, fair?
5     **A.  I'm not saying that's the only reason, no, sir.**
6     Q.  Well, but it's a reason.  Is that what you're
7 telling me?
8     **A.  A reason, yes, sir.**
9     Q.  What's another reason?
10     **A.  Another reason would be the -- the initial**
11 **design of the institution or the unit didn't call for**
12 **air conditioning in other places other than areas for**
13 **civilian staff.**
14     Q.  But you know that it's cheaper and more
15 efficient to air-condition an entire space rather than
16 air-condition only portions of it if you subsequently
17 have to retrofit, right?
18            MR. CALB:  Objection; beyond the scope.
19 You're asking his opinion.
20     Q.  (BY MR. EDWARDS)  I mean, you know that to be
21 true, don't you?
22     **A.  Say that again, please?**
23     Q.  You know that it's cheaper and more efficient
24 to air-condition an entire building space rather than
25 only portions of the space, right?  If you're going to

---

**80**

1 eventually air-condition the entirety of it?  Or do you
2 not?
3     **A.  I don't know that I understand your question.**
4     Q.  That's fair.  I asked you -- That -- that's
5 fine.  I asked you to say it.  And we'll -- we'll move
6 on.
7            But I want to make sure that Powledge,
8 there is no -- no plans and a choice has been made by
9 the agency not to -- not to utilize temporary air
10 conditioning while it installs the permanent air
11 conditioning, correct?
12     **A.  Yes, sir.**
13     Q.  Same with Terrell.  There is -- Despite the
14 need -- the acknowledged need for the agency to install
15 air conditioning in order to protect the officers and
16 inmates, there are no plans to install temporary air
17 conditioning prior to the permanent installation being
18 accomplished, correct?
19     **A.  That is correct.  That's not -- I'm --**
20     Q.  The same with Jester III.  Despite the agency's
21 knowledge that there's a need to install air
22 conditioning in order to protect the officers and
23 inmates, there is no -- no plan in place in the interim
24 to temporarily air-condition the Jester III Unit,
25 correct?

---

**WRIGHT WATSON & ASSOCIATES**
1250 South Capital of Texas Highway, Building 3, Suite 400  Austin, Texas 78746  (512) 474-4363
d1373cb1-2f0a-4b96-9b71-3f7399538ee8

David Sweetin - 7/25/2024

---

81

1    **A.    Correct.**

2    Q.    Okay.  Now, the other 11 units you described --

3 and then we'll take a break, sir -- those fast track

4 units.

5    **A.    Yes, sir.**

6    Q.    Is there a plan to air-condition those other

7 seven fast track units you discussed?

8    **A.    Well --**

9    Q.    I'm sorry, what?

10   **A.    The Pack Unit already is air-conditioned.**

11   Q.    But you mentioned 11 fast track units, and you

12 mentioned Garza West and Garza East as well.  Is there a

13 plan to permanently install air conditioning in those

14 units?

15   **A.    Yes.**

16   Q.    And when is -- when is that set to occur?

17   **A.    That will -- those projects will be completed**

18 **on 21 intake units at the end of the calendar year, this**

19 **year.**

20   Q.    Okay.  So Garza West and Garza East are not

21 really similar to the Pack Unit, then.  They're not fast

22 track facilities.  They're intake facilities?

23   **A.    They're what we consider intake, but they're**

24 **similar in design in the sense that they've got the**

25 **metal structure, the outer skin.**

---

82

1    Q.    Okay.  So what you're telling the court and

2 Judge Pittman -- and then we'll take a break -- is these

3 intake facilities, because they have similar, the

4 skin -- the one floor, the metal buildings, etcetera,

5 they're similar to the Pack Unit in terms of cost

6 estimates, fair?  Approximately?

7        MR. CALB:  Objection; misstates testimony.

8    **A.    No.  What I can tell you is, we have a variety**

9 **of projects that will be completed this calendar year.**

10 **Not necessarily all of them are associated with the fast**

11 **track design.**

12   Q.    (BY MR. EDWARDS)  Well, sir, I'm sorry.  You

13 told me that Garza West and Garza East is a fast track

14 design.  Is that correct?

15   **A.    Yes, sir, that's what I've told you.**

16   Q.    Okay.  Your point is that all intake facilities

17 are not fast track designs.  Is that fair?

18   **A.    That is correct.**

19   Q.    Okay.  So when we take a break -- One of the

20 questions I have is, how many of these intake facilities

21 are fast track designs.

22        But with regards to Garza West and Garza

23 East, those are fast track facilities, similar to the

24 Pack Unit, and the cost estimate to complete the air

25 conditioning by the end of this fiscal -- by the end of

---

83

1 this calendar year is similar to what the Pack Unit was,

2 fair?

3    **A.    Close.  Yes, sir, close proximity.  Not much**

4 **more square footage, so --**

5    Q.    Okay.

6    **A.    But, yeah, that would be a fair statement.**

7    Q.    All right.  And last question before we take a

8 break.

9        Are -- Is the agency temporarily air

10 conditioning the housing areas at the Garza West or

11 Garza East Unit in the interim before the permanent

12 install is completed?

13   **A.    Yes, sir.  The Garza West Unit.**

14   Q.    So Garza West has temporary air conditioning?

15   **A.    That is correct.**

16   Q.    Okay.  And Garza East does not?

17   **A.    They are not one of the nine that currently**

18 **have temporary air, no, sir.**

19   Q.    All right.  Well, let's take a break and come

20 back, but -- so Garza West has temporary A/C, and Garza

21 East does not, correct?

22   **A.    Correct.**

23   Q.    Okay.  Let's take a --

24        MR. EDWARDS:  Is a ten-minute break enough,

25 Michael, or would you like more?

---

84

1        MR. CALB:  Let's do 15, so he has the time

2 to --

3        MR. EDWARDS:  15 minutes is fine.  And if

4 you could, in the meantime, could you send the notes to

5 Lisa@Edwards-law.com, Paul@Edwards-law.com, and

6 David@Edwards-law.com, please?

7        MR. CALB:  Yeah.  We're already on it.

8        MR. EDWARDS:  Thank you very much,

9 everybody.  Appreciate it.  We'll take a short break.

10 Thank you, Mr. Sweetin.  Appreciate it.

11        THE VIDEOGRAPHER:  The time is 10:58 a.m.

12 Central.  We are off the record.

13        (Recess 10:58 a.m. - 11:22 a.m.)

14        MR. EDWARDS:  Mr. Sweetin, are you ready to

15 continue?

16        THE WITNESS:  Yes, sir, I'm ready.

17        THE VIDEOGRAPHER:  The time is 11:22 a.m.

18 Central.  We are on the record.

19        MR. EDWARDS:  Yeah, I'm not seeing you.

20 Hold on a second.  Let's see if I can find you.  Give me

21 a second.  I'm not seeing anybody here.  Let's go off

22 the record until I find Mr. Sweetin on my screen here.

23        THE REPORTER:  You're on mute, Stephen.

24        THE VIDEOGRAPHER:  Thank you.

25        The time is 11:22 a.m.  We are off the

---

David Sweetin - 7/25/2024

85

1 record.
2                (Off the record.)
3                THE VIDEOGRAPHER:  The time is 11:23 a.m.
4 Central.  We are on the record.
5      Q.  (BY MR. EDWARDS)  Okay.  Sir, I want to follow
6 up with a few things before we -- before we go back into
7 that -- with regards to, earlier you had said it would
8 cost $800 million to temporarily install air
9 conditioning in Texas prison facilities that don't have
10 it.  Do you recall that?
11      A.  Yes, sir, I do.
12      Q.  And you said that Mr. Cox told you that, true?
13      A.  That is correct.
14      Q.  And that was for all prisons that don't have
15 air conditioning, correct?
16      A.  Yes, sir, that is correct.
17      Q.  Do you know what study was done to determine
18 this amount, if any?
19      A.  Study?  No, sir.
20      Q.  Do you know how much power each particular
21 prison would be short, according to the grid?
22      A.  No, sir, I do not.
23      Q.  Are you aware of a technology that can provide
24 power in the absence of power from the grid?
25      A.  Are you speaking of generators?

86

1      Q.  I mean, you tell me.  I'm just a lawyer.
2      A.  I agree --
3      Q.  Are you aware of a technology that can provide
4 power in the absence of power from the grid?
5      A.  Yes, sir.
6      Q.  And that -- that technology is nothing novel,
7 it's just a generator that I have at my house or that
8 TDCJ could have at any of its facilities, right?
9      A.  Yes, sir, that is correct.
10      Q.  In fact, TDCJ ought to have generators in all
11 of its facilities, given that its responsibility is to
12 care for the custody of hundreds or even in some cases
13 thousands of men and women, right?
14      A.  We do have generators at all units.
15      Q.  Right.  Well, okay.  So when the grid is
16 incapable of providing adequate power, the generator can
17 provide that power.  You know that, don't you?
18           MR. CALB:  Objection; form.
19      Q.  (BY MR. EDWARDS)  Was that a yes?
20      A.  Yes, sir, I know that.
21      Q.  Okay.  And TDCJ uses that technology in all of
22 its facilities as we speak, right?
23      A.  Yes, sir.
24      Q.  And, in fact, natural gas generators could be
25 wheeled out to every prison in the state tomorrow if

87

1 TDCJ wanted to, right?
2      A.  I don't know that, no, sir.
3      Q.  Well, every facility has a generator.  And if
4 that generator went out, you would take steps to
5 immediately replace it, right?
6      A.  Correct.
7      Q.  Okay.  And that's because you understand you
8 have a job and your job is to protect the health and
9 safety of the inmates and the officers at these prisons,
10 right?
11      A.  Yes, sir.
12      Q.  And a lot of people -- a lot fewer than I
13 suspected, but some people have the idea that, you know
14 what?  You did a crime, you don't deserve any
15 protections.  You don't share that view, do you,
16 Mr. Sweetin?
17      A.  What was the question again?
18      Q.  Some people think if you do a -- you commit a
19 crime, you know what?  It doesn't what happens to you in
20 prison.  You at TDCJ do not share that opinion, do you?
21           MR. CALB:  Objection; beyond the scope.
22      A.  No, sir.
23      Q.  (BY MR. EDWARDS)  Okay.  You would tell the
24 legislature, you would tell concerned citizens, that the
25 point of -- of prison is to rehabilitate and provide an

88

1 atmosphere where people can be responsible and
2 accountable for the crimes they've committed, but that
3 they are never punished while in prison, fair?
4      A.  Yes.
5           MR. CALB:  Objection; beyond the scope.
6      Q.  (BY MR. EDWARDS)  And conditions that
7 effectively punish people or cause their lives to be
8 miserable that can be eradicated, they ought to be
9 eradicated by TDCJ, right?
10           MR. CALB:  Objection; beyond the scope.
11      A.  Well, I can -- I can tell you that, as much as
12 you're talking about, the need to do that, you know,
13 you've got a certain percentage of the population that
14 is not interested in air conditioning.  So to say that
15 the -- all of them want it, need it and want it, that's
16 not an accurate statement, because there's some that
17 choose not to have it.
18      Q.  (BY MR. EDWARDS)  Well, that's -- that's their
19 choice.  Would you agree with me that the vast majority
20 of inmates and correctional officers do, in fact, want
21 to live in an air-conditioned environment because it's
22 safer for them to live?
23           MR. CALB:  Objection; beyond the scope,
24 calls for speculation.
25      A.  Yes.

David Sweetin - 7/25/2024

89

1    Q.   (BY MR. EDWARDS)  Okay.  All right.  I don't
2 want to get too bogged down in temporary air
3 conditioning, but I do want to talk about -- you know,
4 categories two, three, four, five, and six, they concern
5 what happened at the Pack Unit and then what -- what
6 else TDCJ is doing in terms of installing and
7 constructing air conditioning, right?
8    A.   Right.
9    Q.   Okay.  Let's talk about that.
10         We've focused a lot on temporary air
11 conditioning.  Now I want to talk about the permanent --
12 did Spot Cool install the permanent air conditioning at
13 the Pack Unit?
14    A.   No, they did not.
15    Q.   What contractor did the permanent installation
16 of air conditioning?
17    A.   That was a combination of -- as far as where we
18 got -- received the components from, there was two
19 different manufacturers.  The actual installation was
20 conducted in-house, which is one of the reasons why
21 there was a significant difference from the original
22 estimate, that we were able to do it with our own
23 resource, with our own staff.
24    Q.   Tell me the manufacturers you got the parts
25 from.

90

1    A.   The manufacturer was Daiken, D-a-i-k-e-n.
2    Q.   Okay.
3    A.   The manufacturer of the compressor and
4 components.
5    Q.   Okay.
6    A.   And then we also used a company called Johnson
7 Air, who manufactured the air handling units, all of
8 them -- both of which had to be combined and assembled,
9 brought together, in order to make the total package for
10 a particular dorm.
11    Q.   Okay.  And, then, you were internally able to
12 do the installation.  And by "you," I mean TDCJ,
13 correct?
14    A.   That is correct.
15    Q.   Okay.  And at least with regards to facilities
16 similar to Pack, the 11 fast track units, in-house you
17 can complete the installation.  Is that correct?
18    A.   If given the right amount of time, yes, sir.
19 If you're telling me or asking me, tomorrow can we do
20 it?  We wouldn't have the resources internally to do
21 everything tomorrow.
22    Q.   And by that, you mean -- you mean the staffing,
23 correct?
24    A.   I mean the technical difficulties that come
25 along with HVAC and having certified technicians and the

91

1 knowledge to be able to work through that, yes, sir, we
2 don't have enough staff that --
3    Q.   Okay.
4    A.   -- that fit that.
5    Q.   And it would just cost a little bit more money
6 if you had to go out in the private sector and have
7 private people do the installation, right?
8    A.   I wouldn't call it a little bit of money.
9 That's a very broad term.
10    Q.   Well, let's do it this way.  It would cost more
11 money, correct?
12    A.   Correct.
13    Q.   Do you know how much more money it would cost?
14    A.   No, sir.
15    Q.   Has the -- has TDCJ gotten an estimate for how
16 much it would cost to permanently install air
17 conditioning if they used the private sector, in all of
18 its facilities?
19    A.   No, sir.  I don't know that --
20    Q.   Okay.
21    A.   -- I've got that -- or we've done that.
22    Q.   That's fine.  No such estimates of -- any
23 estimates for the system been sought by TDCJ?
24    A.   That, I couldn't tell you.  As far as I know,
25 I'm not aware of any.

92

1    Q.   Okay.  Again, that's one of the -- the
2 questions -- one of the topics you're here to testify
3 about.  What did you do to find out whether or not there
4 were any plans to install air conditioning throughout
5 the system?
6    A.   What -- what topic are you talking about?  What
7 number?
8    Q.   Well, I'm talking about two, three, four, five,
9 and six.  But regardless, the question is, what, if
10 anything, did you do to determine whether or not TDCJ,
11 you know, had actually gotten estimates for future
12 installation of the entire system -- installations of
13 permanent air conditioning?
14    A.   Well, I can tell you, based on what we've
15 already presented in our phased approach to installing
16 air-conditioners in these various -- whether it's fast
17 track thousand-bed type or the 2250, all that comes with
18 projects numbers.  Those are not figures or amounts that
19 engineering or facilities just dreams up.  I mean,
20 clearly, they have to do their homework to make the
21 determination as to what the cost factors are going to
22 be that are associated with the installation.
23    Q.   Right.  You said there are 11 fast track
24 facilities, correct?
25    A.   There about.  I don't know if that number is

David Sweetin - 7/25/2024

---

93

1 totally accurate, but, yes, sir.

2    Q.  All right.  Give or take.  So let's say ten to

3 15.  And then how many of the -- what was the other unit

4 that you described?  It's like the Michael Unit

5 prototype.  Is that what you said?

6    A.  You have the thousand-bed prototype.

7    Q.  Okay.

8    A.  The 2250 prototype.

9    Q.  Okay.

10    A.  And then a category that's considered other

11 units, and that's kind of the -- the ones that are --

12 that are built -- designed and built that are not

13 similar to those existing categories.  We kind of throw

14 that in an other category, that still that's not system

15 one units, which are the old red brick type facilities.

16    Q.  Okay.  So you've got about 10 or 11 system

17 ones, right?  Is that correct?

18    A.  Thereabouts, yes, sir.

19    Q.  Okay.  And those are a different category

20 because that's going to require quite a bit of

21 retrograding, because they were never -- they were

22 constructed before air conditioning was commonplace,

23 right?

24    A.  On the fast tracks?

25    Q.  No.  The systems ones.  Right?

---

94

1    A.  Is that what you're referring to, the system

2 ones?

3    Q.  Yes, I'm referring to the system ones.

4    A.  Yes.  As an agency, we work through a phase on

5 what we felt like was the easiest to the most difficult

6 in the installation process.  So, yes, that would

7 be . . .

8    Q.  All right.  So you made a determination that

9 the easiest ones to air-condition are the fast track

10 facilities?

11    A.  Yes, sir.

12    Q.  Okay.  And, then, after that, is it the 2250

13 prototypes?

14    A.  It would be the thousand-bed prototypes, and

15 then the 2250 prototypes, and then some of the others.

16    Q.  How many thousand bed -- how many thousand-bed

17 prototypes are you talking about that you've determined

18 it would be easier to install air conditioning in those

19 facilities?

20    A.  All of them.

21    Q.  Right.  But how many is all of them?  You know,

22 you have -- how many prisons do you have, total?

23    A.  101 facilities total.

24    Q.  Okay.  And, you know, roughly 30 are

25 air-conditioned in their entirety, right?

---

95

1    A.  Roughly, yes, sir.

2    Q.  Okay.  That leaves about 70.  And of these 70,

3 how many fit into the 1,000-bed prototype, that's

4 easiest to air-condition?

5    A.  I don't have the breakdown of the -- of the

6 prototypes in front of me.  I can tell you what we are

7 currently working on and --

8    Q.  Can you give me an idea, percentagewise, of

9 where the -- If there's a thousand, there's 2250, and

10 then there's this other category.  And we've got 10 or

11 11 of these system ones.  How many thousand-bed

12 prototypes are we talking about?  Give me your best

13 estimate, sir.

14    A.  Ten.

15    Q.  About ten.  Okay.

16       And, then, of the 2250 prototypes, how many

17 are we talking about?  Those are the ones that were

18 mostly constructed in the '90s?

19    A.  Well, the thousand-bed prototypes were in the

20 '90s as well.

21    Q.  Okay.  Well, how many of the 2250s are we

22 talking about?  Are there, like, 40 of those?

23    A.  No, sir.  There is, I believe, six of the 2250

24 prototypes.

25    Q.  Okay.  So we got ten fast tracks and six 2250.

---

96

1 And then we've got ten or 11 system ones.  But that only

2 adds up to about 25 to 30 prisons.  What are the other

3 prisons?

4    A.  The others are -- fall into that other category

5 that I was talking about.

6    Q.  Okay.

7    A.  All of which -- a percentage of each of those

8 categories, we're currently working on.

9    Q.  Okay.  I'm just trying to figure out what --

10 what the thought process of the agency is.

11       And what I hear you telling me, but please

12 correct me if I'm wrong, is these 1,000-bed prototypes,

13 they're the easiest, in your estimation, to

14 air-condition.  Is that fair?

15    A.  Yes, sir.

16    Q.  Okay.  And, then, after that, there are about

17 six 2250 prototypes, and they would be the next easiest

18 to air-condition, correct?

19    A.  Not necessarily, no, sir.

20    Q.  Okay.  The best we can do is, the fast tracks,

21 they're the easiest ones.  Okay.

22       All right.  You've got the list of A/C that

23 you're -- the plans and designs for installing permanent

24 air conditioning.  You've told me the names of the

25 contractors who worked there, the installation, the

---

David Sweetin - 7/25/2024

97

1 timeline and the costs.  Let's go through that.
2           You've told me that the people that
3 installed the permanent air conditioning at the Pack
4 were, in fact, TDCJ facilities people, correct?
5     A.  Along with some outside resources.
6     Q.  What were the outside -- who were the outside
7 resources?
8     A.  There was Intech.  They did some of the sheet
9 metalwork.
10    Q.  Okay.
11    A.  Because some of it had to be made, custom made,
12 to accommodate whatever the configuration was.
13    Q.  Okay.
14    A.  There was also a company that was -- that was
15 employed to make the security grates that were installed
16 in the buildings where we cut the holes in to take in
17 the exhaust of the air.
18    Q.  All right.  So, you know, you did most of the
19 installation internally, in-house.  But when you needed
20 more expertise, you went out of house and bid on that
21 and got a reasonable bid.  Is that correct?
22    A.  Yes, sir, that is correct.
23    Q.  Okay.  And Daiken and Johnson Air were the
24 component parts, the air handlers and the compressors,
25 that's where you bought them from, right?

98

1     A.  They were the manufacturers, yes, sir.
2     Q.  Okay.  And that's the Pack Unit.  And, you
3 know, the time it took for you to install that, when
4 did -- you don't know, as you testify here today, when
5 the Pack Unit was -- officially received permanent air
6 conditioning, do you?
7     A.  No, I don't know the actual date.  I can tell
8 you that the project duration took about 15 months.
9     Q.  Okay.  So you think by year three, we were into
10 the -- you know, if the settlement was in 2018, you
11 think that the -- you know, you think permanent
12 installation of air conditioning happened in 2020?
13    A.  The final sign off to say that it's all
14 air-conditioned?  Is that what you're asking me?
15    Q.  Yeah.
16    A.  Yeah, that would be approximate, yes, sir.
17    Q.  Okay.  And do you know who JJ Huffhines is?
18    A.  Huffings?
19    Q.  Yeah.  Or Huffhines.
20    A.  That doesn't ring a bell with me, no, sir.
21    Q.  He's the person that TDCJ contracted with to
22 ensure that the installation of the air conditioning at
23 the Pack Unit was properly installed and was functioning
24 over the last three years.  Do you know anything about
25 him?

99

1     A.  The engineering firm?
2     Q.  Well, he was engaged by TDCJ to conduct
3 inspections of several units, one of which was the Pack
4 Unit.  Do you know anything about him?
5     A.  No, sir, I don't know anything about him.
6     Q.  No one has told -- Mr. Cox has -- no one has
7 told you anything about his role in making sure that
8 the -- the air conditioning installed at Pack and the
9 air conditioning at Styles or Estelle is safe or
10 functional for the inmates?
11    A.  I know that was a typical protocol for a
12 project --
13    Q.  Well, it was anything by typical, sir.  But
14 that's neither here nor there.  You have no idea who
15 Mr. Huffhines is, correct?
16    A.  I've already said that, yes, sir, I do not.
17    Q.  Okay.  All right.  And all of the housing areas
18 at the Pack now have permanent air conditioning,
19 correct?
20    A.  Yes, sir, to the best of my knowledge.
21    Q.  And they all have a backup A/C system as well
22 as an emergency generator system in the event of a power
23 failure, correct?
24    A.  Yes, sir.
25    Q.  And there hasn't been a heat-related illness at

100

1 Pack since that happened, at least based on indoor heat,
2 correct?
3     A.  Not that I'm aware of, no, sir.
4     Q.  And there were heat-related illnesses at Pack
5 prior to the installation of air conditioning, weren't
6 there?
7     A.  That, I couldn't tell you.
8     Q.  Well, if there really -- you're aware that
9 there are heat-related illnesses throughout the Texas
10 Prison System because of the high -- the extreme heat
11 inside the housing areas, right?
12          MR. CALB:  Objection; beyond the scope.
13    Q.  (BY MR. EDWARDS)  Yes, sir.  And the point of
14 installing air conditioning, at least one of them is to,
15 you know, help prevent these illnesses from occurring or
16 deaths from occurring, right?
17    A.  Correct.
18    Q.  Okay.  And you've been -- have you ever been
19 inside a home in Texas that wasn't air-conditioned
20 during July or August?
21    A.  Yes, sir.
22          MR. CALB:  Objection; beyond the scope.
23    Q.  (BY MR. EDWARDS)  It's torturously hot, right?
24    A.  It can get a little uncomfortable, but it's
25 bearable.

David Sweetin - 7/25/2024

---

101

1    Q.  Well, sir, you get a little comfortable, or
2  does it become unbearable for an hour or two?
3    **A.  Well, you asked me if I've ever experienced**
4  **that.  I'm telling you what my experience is.**
5    Q.  Well, I'm asking now, have you ever
6  experienced, in the last three years, going into a home
7  where the air conditioning is out in July or August, in
8  the dead of summer in Texas?
9           MR. CALB:  Objection; beyond the scope.
10   **A.  Yes, sir.**
11   Q.  (BY MR. EDWARDS)  Okay.  It's more than a
12 little uncomfortable, it's really unlivable.  Or do you
13 disagree with that?
14          MR. CALB:  Objection; beyond the scope.
15   **A.  No, it's livable.  Because I lived in my own**
16 **residence.**
17   Q.  (BY MR. EDWARDS)  You've lived in -- in Texas
18 in the last three years in un-air-conditioned space in
19 July or August?
20          MR. CALB:  Objection; beyond the scope.
21   **A.  During the time where we have power outages,**
22 **storms that come through, yes, sir.**
23   Q.  (BY MR. EDWARDS)  Have you lived in Texas in
24 the dead of summer, in July or August, in a
25 non-air-conditioned area for more than a few hours?

---

102

1           MR. CALB:  Objection; beyond the scope.
2    **A.  Yes.**
3    Q.  (BY MR. EDWARDS)  More than a few days?
4    **A.  Yes, sir.**
5           MR. CALB:  Objection; beyond the scope.
6    Q.  (BY MR. EDWARDS)  How long have you lived
7  without air conditioning in July or August in the state
8  of Texas, and where did you live there, sir?
9           MR. CALB:  Objection; beyond the scope.
10   **A.  I'd have to go back and -- and really consider**
11 **it and give you an actual date.**
12   Q.  (BY MR. EDWARDS)  Well, you just testified
13 under oath that you've lived in Texas in July and August
14 in the last two years for several days without air
15 conditioning.
16   **A.  Yes, sir.**
17   Q.  And I'm just curious where you did that, sir?
18          MR. CALB:  Objection; beyond the scope.
19   **A.  At my residence.**
20   Q.  (BY MR. EDWARDS)  Where -- what -- what city?
21          MR. CALB:  Objection; beyond the scope.
22   **A.  The Huntsville area.**
23   Q.  (BY MR. EDWARDS)  Okay.  You lived without air
24 conditioning in Huntsville for two days or more, in July
25 or August, the last two years?

---

103

1    **A.  Yes, sir.**
2    Q.  What was it like?
3           MR. CALB:  Objection; beyond the scope.
4    **A.  Uncomfortable.**
5    Q.  (BY MR. EDWARDS)  Did you -- did you -- did you
6  take steps to fix that problem, or did you continue to
7  live without air conditioning?
8           MR. CALB:  Objection; beyond the scope.
9    **A.  No, I brought in fans to ventilate air.**
10   Q.  (BY MR. EDWARDS)  Did you take steps to fix
11 your broken air-conditioner?
12          MR. CALB:  Objection; beyond the scope.
13   **A.  Those steps were beyond my control.**
14   Q.  (BY MR. EDWARDS)  Okay.  I'm going to ask one
15 last time, then I'll move on.  Did you take steps to get
16 your air conditioning fixed quickly?
17          MR. CALB:  Objection; beyond the scope.
18   **A.  Again, the steps to fix it were beyond my**
19 **control.  I could not fix it.  It was a power issue.**
20   Q.  (BY MR. EDWARDS)  All right.  I'll move on.
21          And though you don't have any documents to
22 back it up, you're telling the court that it cost
23 $8 million to install permanent air conditioning at the
24 Pack Unit, correct?
25          MR. CALB:  Objection; asked and answered.

---

104

1    **A.  Like --**
2    Q.  (BY MR. EDWARDS)  Was that a yes?
3    **A.  Like I testified earlier on, the project cost**
4  **for the Pack project air conditioning was $8 million.**
5    Q.  Okay.  But you don't have any documents to show
6  me to prove that, correct?
7    **A.  I believe our attorneys have provided you that**
8  **document, yes, sir.**
9    Q.  Those are your notes.  You don't have any
10 documents that I could look at to verify the costs.
11 That's just what you were told, right?
12   **A.  No, sir.  I'm -- I'm looking at an official**
13 **document right now.**
14   Q.  Okay.  Tell me what it says.
15   **A.  It says, permanent air condition at Pack.  It's**
16 **a document -- documentation provided, authorization**
17 **packet, closing packet, drawings and specifications,**
18 **costs, timeline, and vendor information for the**
19 **following projects.  Pack --**
20   Q.  What is the cost on that document?
21   **A.  $7,927,670.**
22   Q.  Okay.  And that packet breaks down the cost?
23   **A.  That tells me what's inclusive of.  It**
24 **doesn't give me a specific breakdown, no, sir.**
25   Q.  How much of that was for the compressor?

---

David Sweetin - 7/25/2024

---

**105**

1    A.  Like I said, I do not have --
2    Q.  How much of it was for the air handlers?
3    A.  I do not have the specifics.
4    Q.  How much of that -- did that include the
5 temporary air conditioning, rental and subsequent
6 purchase, or do you know?
7    A.  Yes, sir, that did include it.
8    Q.  Okay.  So it included the $1,100,000 spent on
9 the temporary air conditioning?
10    A.  That was the project cost.
11    Q.  Okay.  So it includes -- the 7.9 million is
12 both temporarily air conditioning and permanently
13 installing air conditioning, correct?
14    A.  That's project cost.
15    Q.  Okay.  And does the project include the
16 temporary and permanent installation of air
17 conditioning?
18    A.  Yes, sir, it does.
19    Q.  And your documents don't break it down,
20 correct?
21    A.  This specific document, no, sir.
22    Q.  Okay.  And you don't know -- you don't have
23 information in order to tell us what the breakdown is,
24 correct?
25    A.  In front of me, no, sir.  I'm not looking at

---

**106**

1 it.
2    Q.  Well, not in front of you or in your brain.
3 You don't know the breakdown and didn't take steps to
4 find out the breakdown, at least for the Pack Unit,
5 correct?
6    A.  I know what it was inclusive of.
7    Q.  Okay.  Right.  But that doesn't tell me
8 anything, and I think you're smart enough to know that.
9         All right.  So in terms of topics two and
10 three, have you told me everything you can about those
11 topics within your knowledge, sir?
12    A.  Let me look at what topic two and three is,
13 just to make sure.
14         Yes, sir.  To the best of my knowledge, I
15 have included the information for two and three.
16    Q.  And do you have a packet that fully explains
17 the designs and the costs of installations that occurred
18 between January 1, 2022, and today?
19    A.  I have a breakdown of -- yes --
20    Q.  And that's topic three, just so we're clear,
21 sir.
22    A.  Okay.
23    Q.  Just one question about the project cost.  Does
24 the project cost include litigation costs with regards
25 to the Pack Unit?

---

**107**

1    A.  No, sir.
2    Q.  Do you know how much TDCJ spent on litigation
3 costs rather than installing air conditioning at the
4 Pack Unit?
5    A.  No, sir.
6         MR. CALB:  Objection; beyond the scope.
7         MR. EDWARDS:  Well, I don't think that one
8 is beyond the scope, but that's fine.
9    Q.  (BY MR. EDWARDS)  If you don't know, you don't
10 know.
11         All right, sir.  Let's go back into -- you
12 were tell me about the four units that -- that are --
13 well, actually, what units were -- were any units
14 air-conditioned between January 1, 2022, and today, were
15 any units fully air-conditioned?  I believe the Hodge
16 Unit may fall into that category.
17    A.  I can tell you the names of the units that are
18 on track to be completed.
19    Q.  And that's -- so I'm not -- I'm not interested
20 in that yet.  Well, actually -- okay.
21         So the units that began, after January 1,
22 2022, but have -- that are on track, you've told me that
23 fiscal -- there are some that are calendar year 2024 and
24 some that are fiscal year 2025.  Is that correct?
25    A.  Correct.

---

**108**

1    Q.  Okay.  Why don't you tell me all the ones that
2 are set to be completed calendar year 2024, which I
3 interpret as December 31st, 2024, unless you tell me
4 differently.
5    A.  What I have is fiscal years 2022 through '23,
6 which would be inclusive of part of '24.  And there's
7 approximately 20 units here listed that are undergoing
8 those A/C installations.
9    Q.  Well, fiscal year 2022 and 2023 are completed,
10 correct?
11    A.  No, sir.
12    Q.  Okay.  Fiscal year 2023 ends when?
13    A.  Well, it's -- as far as our projects, they're
14 not scheduled to be completed until the end of the
15 calendar year.
16    Q.  Okay.  So you have -- you have a list of 20
17 that are going to be completed by calendar year 2023.
18 So that means December 31st, 2023, correct?
19    A.  Projects are currently underway and -- and are
20 subject -- or are due to be completed by the end of this
21 calendar year.
22    Q.  That's fine.  What are they, and -- what are
23 they?  Let's start with, what are the ones that are set
24 to be completed by 2023 calendar year?
25    A.  By 2023 calendar year?  I don't have it broke

---

David Sweetin - 7/25/2024

---

**109**

1  down that way. What I have broke down is the fiscal
2  years between -- that when the 87th legislature
3  appropriated the funding for it, the units that were
4  encompassed in that -- that funding, or that
5  appropriation.

6  Q. Okay. What appropriation are you talking
7  about?

8  A. I'm talking about the -- again, out of the 87th
9  legislature for the State of Texas --

10  Q. How much money was appropriated to specifically
11  deal with air conditioning in the 87th legislature?

12  A. Specifically for air conditioning? Nothing.

13  Q. Nothing. Okay. But TDCJ had spent money
14  during the 87th legislative session to air-condition its
15  prisons because it knew it had to, right?

16  A. We took it upon ourselves to take out of our
17  deferred budget and apply that to these air conditioning
18  projects. That --

19  Q. There's a deferred maintenance budget, correct?

20  A. That is correct.

21  Q. Okay. And how much money did you -- how big is
22  that deferred maintenance budget?

23  A. The budget was -- At that time, it is -- or was
24  105.4 million.

25  Q. Okay. And you understood that there was a

---

**110**

1  dangerous condition in the system that you needed to
2  take steps to help ameliorate, or fix. And how much of
3  that 105.4 million did you use to deal with the problem
4  of extreme heat in the Texas Prison System?

5  A. 15.5 million was committed by the agency to be
6  applied towards adding air conditioning to 21 intake
7  units.

8  Q. Okay. So for Judge Pittman's benefit, an
9  intake unit is -- is it a unit that TDCJ places inmates
10  in when they come from county jails, correct?

11  A. Yes, sir.

12  Q. And those intake units are particularly
13  dangerous places because inmates are coming from
14  air-conditioned county jails into hot houses when it's
15  during the summer, right?

16  A. Which is the reason why they were selected,
17  yes, sir.

18  Q. Okay. So TDCJ recognized that the intake
19  facilities were amongst the more dangerous facilities
20  for its inmate population and made a conscious choice to
21  prioritize air conditioning those facilities. Fair?

22  A. We felt like it was a good prioritization, yes.

23  Q. Well, it didn't feel like it was a good
24  prioritization because it rolled the dice and the intake
25  facilities came up, you know four or five or snake eyes,

---

**111**

1  you understood that numerous people had died at intake
2  facilities, and it made sense to air condition those
3  facilities, right?

4  A. Only reasonable.

5  Q. Right. Okay. Is that -- is there any other
6  reason you chose the intake facilities other than the
7  risks to the inmates?

8  A. No, sir.

9  Q. Okay.

10  A. Well --

11  Q. Just so I'm clear --

12  A. Let me back that up a little bit.

13  Q. Let me -- let me walk -- by December of 2023 --
14  or let's say, January 1, 2024, all intake facilities
15  will be, at least the housing areas, will be fully
16  air-conditioned?

17  A. Say that again, please?

18  Q. Sure. Just so I'm clear, all of the intake
19  facilities that take in inmates from the county jails
20  will be air-conditioned by January 1, 2024?

21  A. Yes, sir --

22  Q. I apologize. Why don't you tell me when all of
23  these intake facilities will be completed in terms of
24  installing air conditioning for the housing areas for
25  all of the inmates?

---

**112**

1  A. It is projected to be completed by the end of
2  the calendar year.

3  Q. Okay. So that means December 31st, 2024. Is
4  that correct, sir?

5  A. Yes, sir.

6  Q. Okay. So these 21 facilities TDCJ identified
7  as housing particularly vulnerable inmates and made a
8  choice to prioritize the installation of air
9  conditioning at these facilities, correct?

10       MR. CALB: Objection; misstates testimony.

11  A. Yes, sir. We selected --

12  Q. (BY MR. EDWARDS) Okay. Now, here's my
13  question. You may have answered it already and I do
14  truly apologize, because I'm trying not to be
15  repetitive.

16       But are these 21 intake facilities
17  currently air-conditioned on a temporary basis until the
18  permanent install is accomplished?

19  A. Yes, sir. We've already covered that, but we
20  can review it again.

21  Q. I'm sorry. Are the 21 intake facilities
22  currently all air-conditioned with temporary air
23  conditioning?

24  A. All of them, no. Some of them, yes.

25  Q. Okay. Of the 21 intake facilities, which ones

---

David Sweetin - 7/25/2024

---

113

1 are -- are -- do you have all the housing areas
2 temporarily air-conditioned, as we speak?
3      A.  I don't have it broke down like that.  But if
4 you give me a minute, that I can -- I can break it down
5 myself.
6      Q.  All right.  Break it down.  Which ones -- which
7 ones have temporary air conditioning currently and which
8 ones don't?
9      A.  The units that temporarily have A/C is a total
10 of nine.  That includes or inclusive of the Briscoe, the
11 Lopez Unit, the Segovia Unit, the Beto Unit, the Garza
12 West Unit, the Holliday Unit, the Middleton Unit, the
13 Murray Unit and the Plane Unit.
14      Q.  Well, why don't you just -- any others?
15      A.  That's all that I'm aware of at this time that
16 are --
17      Q.  Okay.  Mr. Sweetin, I appreciate it.  I just
18 want to repeat them just so I -- so my team kind of
19 understands it.
20      A.  Sure.
21      Q.  Briscoe, Lopez, Segovia, Beto, Garza West,
22 Holliday, Middleton, Murray, and Plane.  Is that
23 correct?
24      A.  That is correct.
25      Q.  Okay.  So that leaves 12 intake facilities

---

114

1 without temporary air conditioning, correct?
2      A.  Yes, sir.
3      Q.  Okay.  Just so I'm clear, what are the 12 that
4 TDCJ has decided not to put temporary air conditioning
5 in while it completes construction?
6      A.  I don't have the specific list of the ones that
7 are not on the list for the current projects.
8      Q.  Okay.  Well, you mentioned Garza East, right?
9      A.  Garza West.
10      Q.  Well, Garza West has the temporary air
11 conditioning, correct?
12      A.  That is correct.
13      Q.  Garza East does not, correct?
14      A.  Not that I'm aware of, no, sir.
15      Q.  Okay.  The Gurney Unit doesn't have temporary
16 air conditioning either, right?
17      A.  No, sir.
18      Q.  That's an intake facility, correct?
19      A.  Yes, sir.
20      Q.  Okay.  And I don't know all of them and you
21 don't know all of them either, but you're telling me
22 there are 21 intake facilities, 12 of which you've
23 chosen not to install temporary air conditioning, and
24 nine of which you have, correct?
25      A.  The numbers aren't necessarily accurate, but

---

115

1 There's some that we do have temporary air with, and we
2 have another 21 units that are in the works right now to
3 get permanent air installed.
4      Q.  Okay.  Well, look, you -- okay.  You're telling
5 me these 21 intake facilities are in the works to get
6 permanent air conditioning, correct?
7      A.  That is correct.
8      Q.  Do any of them have permanent air conditioning
9 installed right now?
10      A.  The ones that are on the list, I've got --
11           THE REPORTER:  It looks like we lost the
12 witness.
13           THE VIDEOGRAPHER:  Do you want to go off
14 the record?
15           MR. EDWARDS:  Well, let's get -- well, I
16 mean, no.  I'd like the answer.
17           Michael, are you there?
18           MR. CALB:  I'm working to get him back on
19 via text.
20           MR. EDWARDS:  Okay, thanks.
21           We can go off the record until he comes
22 back on.
23           THE VIDEOGRAPHER:  The time is 12:04 p.m.
24 Central.  We are off the record.
25           (Recess 12:04 p.m. - 12:09 p.m.)

---

116

1           THE VIDEOGRAPHER:  The time is 12:09 p.m.
2 Central.  We are on the record.
3      Q.  (BY MR. EDWARDS)  Can you answer my question,
4 sir?
5      A.  All right.  What was the question again?
6      Q.  Do you really not remember it?
7      A.  No, sir.
8           MR. EDWARDS:  Kelly, would you repeat the
9 question for Mr. Sweetin?
10           THE REPORTER:  Yes.
11           "Do any of them have permanent air
12 conditioning installed right now?"
13           And the question before that was, "You're
14 telling me these 21 intake facilities are in the works
15 to get permanent air conditioning, correct."
16      Q.  (BY MR. EDWARDS)  And you said, yes.  And then
17 my question was, do any of them have permanent air
18 conditioning installed as we speak -- as of today?
19      A.  As far as permanent A/C, no, sir, I can't tell
20 you if there's any with permanent A/C.  I can tell
21 you --
22           (Speaking simultaneously.)
23      Q.  When are -- when are they set to be completed?
24 You said by December 31st, 2024.  I'm just trying to
25 figure out what that means.

---

WRIGHT WATSON & ASSOCIATES
1250 South Capital of Texas Highway, Building 3, Suite 400  Austin, Texas 78746  (512) 474-4363

d1373cb1-2f0a-4b96-9b71-3f7399538ee8

David Sweetin - 7/25/2024

117

1   A. That means that I've got -- the agency has 21
2   intake units.
3   Q. Uh-huh.
4   A. That have been -- a lot of the necessary
5   funding to install permanent A/C.
6   Q. Okay.
7   A. And those are currently underway.
8   Q. Okay. And absent a court order, you're not
9   going to temporarily air condition those facilities that
10  you're not already temporarily air conditioning,
11  correct?
12  A. I can tell you that --
13  Q. Can you just answer my question, sir? Absent a
14  court order, there's no plan to, and you're not willing
15  to temporarily air condition those facilities, correct?
16         MR. CALB: Objection; argumentative. He
17  was trying to answer.
18  A. Not that I'm not willing, no, sir.
19  Q. (BY MR. EDWARDS) Okay. Well, let me ask you.
20  I would like you to please temporarily air condition
21  those 12 facilities, those 12 intake facilities to
22  protect the men, at least through October 15th. Are you
23  willing to do that, sir?
24  A. With the appropriate funding, yes, sir.
25  Q. Okay. And, you know, what -- what -- how much

118

1   money would that take to -- to air condition those 12
2   facilities, since you're willing to and all it would
3   take is money?
4   A. That's not all it would take, no, sir.
5   Q. Well, I thought you just said, with appropriate
6   funding, you're willing to temporarily air condition
7   those facilities right now?
8   A. But earlier my testimony was, there's other
9   resources that are involved.
10  Q. Fine.
11  A. As you say, okay, tomorrow we're going to
12  install air conditioning in all of them, that doesn't
13  mean that we can complete that with the resources that
14  we have.
15  Q. Well, how long do you think it makes to make a
16  phone call and order some temporary air conditioning out
17  to the Gurney Unit?
18         MR. CALB: Objection; calls for
19  speculation.
20  Q. (BY MR. EDWARDS) Do you know?
21  A. Do I know how long it would take?
22  Q. Yeah.
23  A. No, sir. I don't have the study on that.
24  Q. Well, you don't have to have a study, you have
25  to have a telephone. Has anyone made a phone call to

119

1   any organization that rents air conditioning to
2   temporarily air-condition, let's say, the Gurney Unit or
3   another intake unit?
4   A. Well, as I've stated, we've got the Holliday
5   Unit that is temporarily aired, as well as the ---
6   Q. Do you think that was my question, sir?
7   A. Sir, I'm trying to answer your question to the
8   best of my ability.
9   Q. You're really not. You're trying to answer the
10  question that you want to answer.
11         My question is this: Has anybody made a
12  phone call or done anything to attempt to -- to
13  temporarily air-condition the Gurney Unit?
14  A. Not that I'm aware of, no.
15  Q. Is anything preventing anyone from the Texas
16  Department of Criminal Justice from making a phone call
17  and getting an estimate and actually temporarily air
18  conditioning the Gurney Unit?
19  A. Is anything preventing us from?
20  Q. Yes.
21  A. Potentially, it could be funding. I mean,
22  obviously, you've got to have a funding source.
23  Q. Well, do you -- you don't even know how much it
24  would cost, do you?
25  A. Specifically for Gurney? No, sir.

120

1   Q. If ordered to temporarily --
2         (Speaking simultaneously.)
3   Q. If ordered to do so by the court to temporarily
4   air-condition the intake facilities that are being
5   constructed with air conditioning so that the men or
6   women are protected during the hot summer months in
7   August and September, is that something that TDCJ could
8   do, or would do if ordered to do so?
9   A. I guess, if ordered to do so, we wouldn't have
10  a choice.
11  Q. That's fair. All right, sir.
12         MR. EDWARDS: Paul, would you pull up
13  Exhibit 3. This is actually going to be, I believe,
14  Exhibit 3, Kelly, but correct me if I'm wrong. It's
15  also Exhibit 3 on the outline.
16         THE REPORTER: Correct.
17         MR. CALB: Jeff, before you -- we did find
18  the future rental projections for how much it would cost
19  for each unit, the estimates that TDCJ undertook, the
20  breakdown by unit, which totaled to be 800 million.
21  We're going to send that to you. I don't know why it
22  wasn't done --
23         MR. EDWARDS: Michael, can we go off the
24  record if we're going to take time like this? I mean, I
25  don't --

David Sweetin - 7/25/2024

---

121

1          MR. CALB:  I've actually just sent it to
2 you to continue questioning, or do you want it later?
3          MR. EDWARDS:  Well, yes.  Send it to Paul
4 and Lisa and David, and then they'll get it to me, okay?
5          MR. CALB:  Sure.
6          MR. EDWARDS:  But there is a document with
7 the breakdown?
8          MR. CALB:  Yes.
9          MR. EDWARDS:  All right.
10     Q.  (BY MR. EDWARDS)  Sir, I want to direct you to
11 what's going to be Deposition Exhibit 3.
12          (Sweetin Exhibit No. 3 was marked.)
13     Q.  (BY MR. EDWARDS)  And I'm pretty sure you've
14 seen this.
15          MR. EDWARDS:  What just happened?
16          MR. SAMUEL:  I started sharing my screen --
17          MR. EDWARDS:  I'm back.
18     Q.  (BY MR. EDWARDS)  Sir, this is from TDCJ's
19 website.  Do you see how it says, "TDCJ Air Conditioning
20 Construction Projects" as of June 28th, 2024?
21     A.  Yes, sir.
22     Q.  Okay.  Are these numbers accurate?
23     A.  I can only assume.
24     Q.  You don't know if they're accurate?
25     A.  Specifically, no, I haven't -- I haven't vetted

---

122

1 those numbers out right there to see if they're
2 accurate -- .
3     Q.  Do they seem consistent with what you've been
4 testifying to, what you've been told by general counsels
5 and by Mr. Cox?
6     A.  Yes, sir, it seems similar.
7     Q.  Okay.
8          MR. EDWARDS:  Let's go to the next page of
9 Exhibit 3.
10     Q.  (BY MR. EDWARDS)  This documents indicates
11 that, since 2018, TDCJ has built 8,940
12 air-conditioned -- or housing for 8,940 people in the
13 form of what they call cool beds.  Is that correct?
14     A.  Yes, sir, that's what the document says.
15     Q.  Well, I know that -- is the document accurate?
16     A.  Well, that I can't tell you.
17     Q.  Well, you're here to testify about exactly
18 this.  Do you believe the document is accurate?
19     A.  I have no reason to believe it's not accurate.
20     Q.  Well, that's different.  But that's fine.  You
21 know, this is a document that's put out by TDCJ.  You
22 know, they shouldn't be purposely misleading people,
23 correct?
24     A.  No, we never purposely mislead anybody.
25     Q.  Well, that's not true.  You know that's -- you

---

123

1 know that's false, right?
2     A.  No, sir.
3          MR. CALB:  Objection; argumentative.
4     Q.  (BY MR. EDWARDS)  Are you aware of at any point
5 TDCJ purposely mislead -- being found to have misled a
6 court or a class of people before?
7     A.  No, sir, I'm not aware.
8          MR. CALB:  Objection; beyond the scope.
9     Q.  (BY MR. EDWARDS)  Do you know they have, in
10 fact, misled a court and a class of prisoners before?
11          MR. CALB:  Objection; beyond the scope.
12     A.  No, sir, I'm not aware.
13     Q.  (BY MR. EDWARDS)  Do you know that they did not
14 comply with the settlement agreement which ordered air
15 conditioning for Pack inmates?
16          MR. CALB:  Objection; beyond the scope.
17     Q.  (BY MR. EDWARDS)  You either know or you don't.
18 Do you know that?
19     A.  No, sir.
20     Q.  Okay.  Well, let's go to the beds that they say
21 have been completed.  Your understanding is these beds
22 have been -- these were -- many of these are, in fact,
23 the intake units, right?
24     A.  Yes, sir, they are.
25     Q.  Okay.  Now, it says, cool beds under

---

124

1 construction, Gist State Jail, O'Daniel, Plane, and
2 Young, right?
3     A.  Right.
4     Q.  Okay.  That, to me, means they haven't been
5 completed yet but they're under construction.  Is that
6 what it means to you?
7     A.  Yes, sir, that's what it means.
8     Q.  For the Gist State Jail Unit, is that being
9 temporarily air-conditioned?
10     A.  The Gist Unit apparently is not.
11     Q.  Okay.  The O'Daniel Unit, you're building 38
12 beds there.  Do you see that?
13     A.  Yes, sir.
14     Q.  Those 38 individuals who will eventually be
15 placed into that -- those air-conditioned beds, are they
16 being provided temporary air conditioning currently?
17     A.  No, sir.
18     Q.  The Plane Unit, there's 1148 cool beds under
19 construction that should be completed by the end of this
20 year, correct?
21     A.  Yes, sir.
22     Q.  Are they receiving temporary air conditioning
23 from the agency?
24     A.  Yes, sir.
25     Q.  Okay.  Why are you providing the Plane Unit

---

David Sweetin - 7/25/2024

125

1 temporary air conditioning but not the inmates at the
2 Gist State Jail?
3     A.  It goes back to our formulation, our plan, to
4 give permanent A/C to all of the units in the phased
5 plan that we have worked out.  It makes no sense, in our
6 mind, to apply rental funds that could otherwise be
7 spent towards permanent A/C, because we are
8 accommodating the inmates that -- that are in need of
9 A/C with existing air conditioning beds --
10         (Speaking simultaneously.)
11     Q.  What I hear -- well, okay.  But you've made a
12 decision, with nine facilities, you've told me, to
13 provide temporary air conditioning in those facilities,
14 correct?
15     A.  That is correct.
16     Q.  Yet in numerous other facilities in which
17 you're installing permanent air conditioning, you've
18 made a decision not to provide temporary air
19 conditioning.  And is it just because you lack the
20 resources to provide the temporary air conditioning
21 while you make these permanent installations?  It's just
22 you don't have the money or the resources to install
23 temporary A/C?
24     A.  Well, clearly, appropriated funding is always
25 an issue on where -- where it's going to be paid for,

126

1 how it's going to be paid for.  But at the same time, in
2 our formulation, the -- we did a good -- I guess, if you
3 will, saturation throughout the state that would allow
4 us to be able to ship inmates that required cold beds,
5 or air-conditioned beds, to a location that is as close
6 proximity as we can get.
7     Q.  Well, okay.  Can you tell me, other than money,
8 why you've provided temporary air conditioning at nine
9 facilities but not the remaining intake facilities?
10     A.  Yes, sir.  Like I've stated previously, that
11 the amount of money that it would take to air condition
12 all the non-air-conditioned facilities is much -- it's
13 too close to the actual install costs that it would be.
14 As an agency, as I've previously stated, it's 800
15 million.
16     Q.  Well, I get that --
17     A.  One billion to --
18         (Speaking simultaneously.)
19     Q.  Are you saying it's too expensive to
20 temporarily air condition the other 12 intake facilities
21 while they're -- while permanent air conditioning is
22 being constructed?
23     A.  What I'm saying is, with what the -- the
24 funding that we do have, I think we've made a good
25 decision on --

127

1     Q.  Well, that doesn't -- look, sir, maybe you
2 have, maybe you haven't.  I doubt very much you have.
3 But I mean, you're telling me, you think you made a good
4 decision to not temporarily air condition the Gurney
5 Unit or the Luther Unit, right?
6         MR. CALB:  Objection --
7     A.  I'm telling you, we made a good decision, based
8 on the funding that we had, for air conditioning.
9     Q.  (BY MR. EDWARDS)  Okay.  Why do you think you
10 made a good decision?
11     A.  Because of that $105.4 million that was
12 appropriated for fiscal years '23 and '24 to the agency,
13 that was our overall budget for deferred maintenance,
14 which means, any monies that we take out of that has to
15 sacrifice in order to accommodate the monies for air
16 conditioning.
17     Q.  Okay.  So what I hear you saying is, look, what
18 I hear you --
19         (Speaking simultaneously.)
20     A.  I'm trying to explain, but you won't let me.
21     Q.  Well, Mr. Sweetin, the last thing I want to do
22 is not let you explain.  So by all means, explain.
23     A.  Thank you, sir.  So based on the amount that we
24 felt like would be appropriate to pull away from our
25 otherwise deferred maintenance funding, we weighed that

128

1 out against the air conditioning and we felt like we
2 could get accommodated within that biennium and still be
3 able to maintain proper decorum on the remainder of our
4 facilities and throughout the agency.
5     Q.  Is that the reason why you think you're doing a
6 good job?
7     A.  Yes, sir.
8     Q.  Okay.  Did I let you finish your -- your
9 answer?
10     A.  You did.  Thank you.
11     Q.  All right.  What I assume is, if you had more
12 money, you obviously would provide temporary air
13 conditioning in these facilities.  Fair?
14     A.  Within our scope and ability, yes, sir.
15     Q.  Okay.  And within your scope and ability just
16 means, you know, if you have the money, the time, and
17 the resources to install it, you would.  Fair?
18     A.  Yes, sir, that's fair.
19     Q.  Okay.  And, you know, the Gurney Unit in
20 particular, you know, that's an intake facility where
21 there's been deaths of heatstroke.  Do you know that to
22 be true?
23     A.  No, sir.  Not specific to Gurney, no, sir, I
24 don't know --
25     Q.  Well, in fact, there have been multiple deaths

David Sweetin - 7/25/2024

---

**129**

1  at the Gurney Unit of heatstroke.  Do you know that to
2  be -- I mean, as you testify here today, are you really
3  not aware of that?
4      A.  Specific to Gurney?  No, sir.
5      Q.  Isn't that one of your jobs, to know where
6  people have died of heatstroke?
7      A.  Are you talking about illness, or death?
8      Q.  Well, I'm talking about death right now.
9      A.  Okay.  I'm -- I'm sure there's a document that
10 was provided to you that gave you the breakdown of where
11 the deaths were.  Am I looking at it?  No, sir.  Do I
12 know it off the top of my head?  No, sir.
13     Q.  Do you think it's important to understand, you
14 know, where throughout the state people have died of
15 heatstroke?
16     A.  Yes, sir, every death is important.
17     Q.  Yeah, I hear that.  To me, that means even one
18 death is too many in the system to be -- you know,
19 because of these hot conditions, right?  That's what
20 you're telling the jury -- or Judge Pittman?
21             MR. CALB:  Objection; misstates testimony.
22     A.  Yes, sir.
23     Q.  (BY MR. EDWARDS)  And you're not the head of
24 the agency who gets to make decisions about rectifying
25 dangerous conditions on your own, right?  That would

---

**130**

1  fall to Director Collier and the Board of Criminal
2  Justice?
3      A.  And the legislature, yes, sir.
4      Q.  Sure.  And the legislature was made aware of
5  all these deaths that were happening in the Texas Prison
6  System because of the extreme heat conditions, right?
7      A.  I can't tell you what the legislature knows or
8  doesn't know.
9      Q.  Well, you're here to testify about TDCJ's
10 communications with the legislature, right?
11     A.  Correct.
12     Q.  Okay.  And so I hope you know that the
13 legislature's been made aware of, you know, numerous
14 people dying due to the -- the extremely hot conditions
15 inside the Texas prisons.  Are you, in fact, aware of
16 that?
17     A.  No.  What I can tell you is, when you talk
18 about legislature, you're talking about the whole body
19 of the Texas legislature.  Do we have conversations with
20 the entire body of the legislature?  Yeah, when we go to
21 testify, or a resource witness in regard to something,
22 there are certain legislators that seem to have a --
23 their thumb on the pulse a little bit better than
24 others, and we routinely communicate with.  As far as
25 what the actual conversations are, I can only give you

---

**131**

1  generalities.
2      Q.  Well, what steps did you take to find out what
3  communications TDCJ had between members of the Texas
4  legislature from January 1st, 2022, to the present,
5  about the dangers of high temperatures and heat indexes
6  posed to inmates?
7      A.  Well, I know for a fact that -- that there was
8  money appropriated specifically during the 88th
9  legislature through House Bill 1 that appropriated funds
10 for air conditioning.  So, obviously, at that point in
11 time, there was much communication about it.
12     Q.  Well, look, my understanding is that the Texas
13 legislature was considering passing a bill to
14 air-condition the Texas Prison System.  Is that your
15 understanding as well?
16     A.  Correct.
17     Q.  Okay.  And that TDCJ was in favor of that bill,
18 correct?
19     A.  Yes, sir.
20     Q.  Okay.  And -- and you were in favor of it
21 because you understood that there's a dangerous
22 condition in the system, extreme heat in the housing
23 areas, that, tragically, has killed inmates and caused
24 numerous inmates and officers to suffer heat-related
25 illnesses, right?

---

**132**

1      A.  Yes.
2      Q.  Okay.  And so, again, the position of the
3  agency is, you know, we have a dangerous condition that
4  we're aware of and we need to fix it, but we are
5  unfortunately limited by resources and funds, from your
6  perspective, because the legislature hasn't allocated
7  enough money as of -- as of right now.  Is that fair?
8      A.  Yes, sir.  Without a doubt, with the proper
9  funding from the legislature and the appropriation, we
10 could -- we could do more.
11     Q.  Right.  And -- and this bill that -- that
12 sadly, from the inmates' perspective, the agency's
13 perspective, and certainly the correctional officers'
14 perspective, it passed the House, but it did not become
15 law, correct?
16     A.  That was my understanding, yes, sir.
17     Q.  Okay.  And I believe the -- the head of the
18 committee in the House was a representative named Terry
19 Canales.  Is that consistent with your recall as well?
20     A.  Yes, sir.
21     Q.  Okay.  And certainly, he has communicated with
22 the agency, and the agency has communicated with him
23 about the dangers that the failure to provide air
24 conditioning causes, right?
25     A.  Correct.

---

David Sweetin - 7/25/2024

**133**

1    Q.   Okay.  And, you know, obviously, sir -- and I
2  don't think I'm breaking new ground here -- but the fact
3  that the -- the housing areas are not air-conditioned,
4  that makes it really hard on the correctional officers
5  that are working inside the prisons, right?
6            MR. CALB:  Objection; beyond the scope.
7    A.   Yes, sir, we believe it's harder for everybody.
8    Q.   (BY MR. EDWARDS)  Sure.  But right now I want
9  to focus on the correctional officers, because they have
10  to wear heavy clothing, right?
11    A.   Yes, sir.
12            MR. CALB:  Objection; beyond the scope.
13    Q.   (BY MR. EDWARDS)  And, you know, you're aware
14  that, like, every year, like, 40, 50, maybe even more
15  officers suffer heat-related illnesses because they're
16  working in these hot conditions, right?
17            MR. CALB:  Objection; beyond the scope.
18    A.   Yes, sir, we do have officers that fall under
19  those circumstances.
20    Q.   (BY MR. EDWARDS)  Well, and you're obligated
21  under the law to -- to -- to make disclosures to the
22  legislature concerning how many inmate heat-related
23  illnesses there are and how many officer heat-related
24  illnesses there are, right?
25    A.   That is correct.

**134**

1    Q.   Okay.  And, again, you've told me that TDCJ
2  would never purposely mislead the legislature, so those
3  are publicly filed documents.  It's reasonable for us to
4  rely on those reports as being accurate, right?
5    A.   I would think so, yes, sir.
6    Q.   And you would do more than say you would think
7  so, you would says, you know what?  If we're giving it
8  to the legislature, the agency should stand by that, and
9  you would certainly hope it's accurate, right?
10    A.   Yes, sir.
11    Q.   Okay.  Now, it would seem to me that -- that
12  the heat inside this prison system has a deleterious or
13  bad effect on staffing.  Do you agree with that?
14            MR. CALB:  Objection; beyond the scope.
15    A.   I believe it's a factor, yes, sir.
16    Q.   (BY MR. EDWARDS)  Yeah.  And, again, topic 13
17  talks about communications between TDCJ and the
18  legislature concerning the dangers of high temperatures
19  and the effects of high heat on staffing and inmate and
20  officer safety.  And, again, it seems pretty obvious to
21  me, but, you know, part of the staffing problems at TDCJ
22  are likely due to the fact that they have to work in
23  these 90- to 100-degree temperatures, right?
24            MR. CALB:  Objection; beyond the scope.
25    A.   Yes, sir.

**135**

1    Q.   (BY MR. EDWARDS)  Okay.  And I'm not breaking
2  any new ground with you.  I mean, certainly,
3  correctional officers talk and the head of the union has
4  come out in favor of air conditioning the prison system,
5  right?
6    A.   Yes, sir.
7            MR. CALB:  Objection; beyond the scope.
8    A.   I'm aware of it.
9    Q.   (BY MR. EDWARDS)  And you would tell Judge
10  Pittman it would be better and safer for the
11  correctional officers if the prisons were, in fact,
12  air-conditioned, right?
13            MR. CALB:  Objection; beyond the scope.
14    A.   That would be a fair statement.
15    Q.   (BY MR. EDWARDS)  Okay.
16            MR. CALB:  Jeff, when were you thinking of
17  breaking for lunch?
18            MR. EDWARDS:  Oh, you know, I kind of
19  wasn't, but I'm happy to take a break.
20            Sir, would you like to take a break for
21  lunch or would you rather power through?  It sounds like
22  Michael would prefer to take a break for lunch, which is
23  fine.  Happy to do so.  Do you want to take a half-hour
24  break or do you want longer?
25            MR. CALB:  How much longer are you going to

**136**

1  be going, Jeff?  If we're going to go all afternoon, we
2  would like to take a break.
3            MR. EDWARDS:  Yeah, I'm going to go all
4  afternoon.  Do you want take a half-hour break?  We can
5  take a half-hour break.
6            THE WITNESS:  I'm good to go, unless you
7  want a break.
8            MR. CALB:  Let's do a half-hour break, and
9  then we can power through the afternoon.
10            MR. EDWARDS:  All right.  And, Mr. Sweetin,
11  I appreciate it.  It sounds like you and I are in the
12  flow and we could go forever, but perhaps the court
13  reporter and the videographer and everybody else -- you
14  know.  So let's take a half-hour break, get a sandwich
15  or a water, and we'll resume in a half hour.  Thank you
16  very much.
17            THE VIDEOGRAPHER:  The time is 12:36 p.m.
18  Central.  We are off the record.
19            (Lunch recess 12:36 p.m. - 1:33 p.m.)
20            THE VIDEOGRAPHER:  The time is 1:33 p.m.
21  Central.  We're on the record.
22    Q.   (BY MR. EDWARDS)  Mr. Sweetin, are you ready to
23  continue?
24    A.   Yes, sir, I'm ready.
25    Q.   All right, thanks.  Now, in 2022 and 2023, TDCJ

David Sweetin - 7/25/2024

---

137

1 gave annual reports to the Texas legislature about
2 inmate complaints related to temperature cases --
3 temperature cases of environmental hyperthermia and
4 deaths caused or exacerbated by temperatures, right?
5     A.   Okay.
6     Q.   That directive was pursuant to a rider to the
7 2022-2023 appropriations act, correct?
8     A.   Yes, sir.
9     Q.   And I think that's usually referred to as
10 Rider 56.  Are you comfortable if I refer to it as
11 Rider 56?
12    A.   I am, yes, sir.
13    Q.   Now, the legislature reimposed this reporting
14 requirement in Rider 56 to the appropriations act in the
15 last legislative session.  Isn't that correct?
16    A.   Yes.
17    Q.   Okay.  So TDCJ is currently still tracking this
18 information so that it can report to the legislature at
19 the end of the fiscal year, right?
20    A.   Our executive services branch, yes, sir.
21    Q.   Do you know what the numbers of inmates who
22 have suffered heat-related illnesses are so far this
23 year?
24    A.   No, sir.
25    Q.   Okay.  I'll represent to you that the

---

138

1 December 2023 report to the legislature indicated there
2 were 17 inmate heat-related illnesses in fiscal year
3 2023.  So I think that means, from September 2022
4 through August 31st, 2023, there were 17 inmate
5 heat-related illnesses.  Does that sound correct?
6     A.   Yes, sir.
7     Q.   Okay.  Was the -- and that information is
8 contained in the report that was actually filed with the
9 legislature.  And you understand that, right?
10    A.   Yes, sir, I do.
11    Q.   Was that report correct, now that you've had
12 time to kind of prepare for this deposition and know
13 that you were going to speak about this?
14    A.   I have no reason to think it's incorrect.
15    Q.   Okay.  And as a general matter, your
16 understanding is that TDCJ provides accurate information
17 to the legislature?
18    A.   Yes, sir.
19    Q.   That would certainly be expected, correct?
20    A.   Absolutely.
21    Q.   And fair to say it would be a very large
22 problem if you didn't provide the legislature with
23 accurate information, correct?
24    A.   I would agree with that.
25    Q.   Now, did the Texas Department of Criminal

---

139

1 Justice receive any reports of heat-related illnesses,
2 in fiscal year 2023, that for some reason were not
3 reported to the legislature?
4     A.   I'm not aware of any, no, sir.  Through that
5 document that you're asking about, no, I have no
6 information on that, other than the face of the document
7 itself.
8     Q.   Okay.  Well, the face of the document says that
9 there were 17 inmate heat-related illnesses.  Would you
10 like me to show it to you or do you have it in a way
11 that -- that's what it says, I'll represent to you, but
12 I'm happy to show it to you.  Do you want me to show it
13 to you?
14    A.   Let me see what you're looking at, yes, sir.
15    Q.   Sure.
16         MR. EDWARDS:  Paul, would you put up page 2
17 of the December 2023 report to the legislature, please?
18         MR. SAMUEL:  Yes, one second.
19         MR. EDWARDS:  It's Document No. 5, I
20 believe.
21         And, Kelly, we'll make this the next
22 exhibit since Mr. Sweetin is looking at it.
23         THE REPORTER:  All right.  That will be
24 No. 4.
25         MR. EDWARDS:  Okay.  Exhibit 4, thank you.

---

140

1         (Sweetin Exhibit No. 4 was marked.)
2     Q.   (BY MR. EDWARDS)  Okay.  And you see that this
3 is the report that that was submitted to the legislature
4 which describes inmate heat-related illnesses, right?
5     A.   Yes, sir, that's what I'm looking at.
6     Q.   And, you know, it's not that I'm a despicably
7 good attorney, I'm just reading the number.  It says, 17
8 total heat-related illnesses, exhaustion, dehydration,
9 right?
10    A.   Correct.
11    Q.   Okay.  Then it says, zero heatstrokes, right?
12    A.   Correct.
13    Q.   Okay.  And your understanding, again, is, of
14 course this is correct, right?
15         MR. CALB:  Objection; asked and answered.
16    A.   Yes, sir.  I don't believe the agency would
17 submit, knowingly, inaccurate data.
18    Q.   (BY MR. EDWARDS)  Yeah.  Well, I take this to
19 be -- I mean, again, if you did knowingly submit
20 inaccurate data, you would be the first person to say,
21 that's wrong and, you know -- well, you'd say it's
22 wrong, correct, to do that?
23         MR. CALB:  Objection; beyond the scope if
24 you're asking him his opinion.
25    A.   Yes, sir.  I would agree that we should not

---

David Sweetin - 7/25/2024

141

1 submit inaccurate data, nor would we intentionally.
2    Q.  (BY MR. EDWARDS)  Yeah.  Well, okay.  So how
3 many of those heat-related illnesses, according to this,
4 are in June?
5    A.  It appears to be four.
6    Q.  Okay.  And, to me, that's TDCJ saying to the
7 legislature and, frankly, the public, we're only aware
8 of four heat-related illnesses that have been
9 documented.  Fair?
10    A.  Yes, sir, I agree to that.
11    Q.  And then we've got two in July and eight in
12 August, right?
13    A.  That is correct.
14    Q.  And the department, Texas Department of
15 Criminal Justice, and certainly Bryan Collier would know
16 this, that they have a policy or a practice on reporting
17 heat-related illnesses, right?
18    A.  Yes, sir.
19    Q.  And do you know what the details of that
20 practice are, those reporting requirements?
21    A.  Nothing other than we are required to maintain
22 the statistical data related to such and -- and report
23 it accordingly, according to the directive of the rider.
24    Q.  Right.  Well, my understanding -- again, I've
25 been through the wars a little bit with TDCJ -- is that

142

1 the health-care providers that TDCJ contracts with, UTMB
2 and Texas Tech, you know, provide reports or diagnoses
3 of heat-related -- heat-related diagnoses to you, and
4 then you would use that data to provide this report to
5 the legislature.  Does that sound accurate?
6            Mr. Sweetin, are you with us?
7            MR. EDWARDS:  Is anybody with us?
8            THE VIDEOGRAPHER:  Yes.  It appears he
9 froze.
10            MR. EDWARDS:  Have I frozen, or has
11 Mr. Sweetin frozen?
12            THE VIDEOGRAPHER:  Mr. Sweetin's gone.
13            MR. EDWARDS:  All right.  Well, let's --
14 let's go off the record.
15            THE VIDEOGRAPHER:  The time is 1:41 p.m.
16 Central.  We are off the record.
17            (Off the record.)
18            MR. EDWARDS:  Are we on record now?
19            THE VIDEOGRAPHER:  We are.  The time is
20 1:42 p.m. Central.
21            MR. EDWARDS:  Okay.
22    Q.  (BY MR. EDWARDS)  Mr. Sweetin, my understanding
23 is that TDCJ contracts with health-care providers --
24 University of Texas Medical Branch, Texas Tech -- and
25 that those providers identify heat-related diagnoses --

143

1 heat-related illnesses and they provide that information
2 to TDCJ, and then TDCJ then compiles it into a report
3 for the legislature.  Is that your understanding?
4    A.  Yes, sir, that's my understanding.
5    Q.  Okay.  And, you know, my -- my understanding is
6 that UTMB or -- or Texas Tech, that they provide this
7 information to numerous people at TDCJ.  You know, the
8 director of facilities, yourself; you know, Lannette
9 Linthicum, who runs the health services division; and
10 others.  Is that consistent with your recall?
11    A.  Yes, sir.
12    Q.  Okay.  And, you know, I would assume that
13 Director Collier is made aware of heat-related illnesses
14 as well.  Is that correct?
15    A.  That is correct.
16    Q.  Okay.  Do you know who -- who actually compiles
17 these -- this document, this heat-related illness chart,
18 that then gets sent on to the legislature and is
19 represented to the public as being accurate?
20    A.  That is compiled and drafted by the Executive
21 Services Department for the agency.
22    Q.  But do you know who sends them the information?
23 Would that be the health services division of Texas
24 Department of Criminal Justice?  Would it be Director
25 Collier's office?  Would it be yourself?  Who is

144

1 actually sending the information to executive services?
2    A.  Yeah.  There is, the way I understand it, a
3 requirement by -- by the -- if you look at the policy
4 for emergency action services -- and all of that gets
5 reported to executive services -- all of that is
6 funneled by way of -- of the contracted medical
7 partners.
8    Q.  Well, who makes sure that this information is
9 accurate?
10    A.  The final say-so in this document would come
11 out of the executive services office.
12    Q.  And who runs that?
13    A.  The oversight is provided by Jason Clark.
14    Q.  And Jason Clark, he was the -- the spokesperson
15 for -- you know, he -- he would talk to the media,
16 wouldn't he, about heat-related deaths in the prison
17 system, right?
18            MR. CALB:  Objection; beyond the scope.
19    A.  He would occasionally.  No longer is he in that
20 capacity.  He's our chief of staff right now.  So
21 there's another designated person that would do that
22 now.
23    Q.  (BY MR. EDWARDS)  Gotcha.  And -- and what's
24 her name?  Biffords, is it?  Do you know?
25    A.  Talking about Kate Blifford?

David Sweetin - 7/25/2024

145

1  Q. I believe it's Kate Blifford. She's the person
2  that is now talking to the media, right?
3  A. No, sir. That would be our -- our
4  communications director. That's Amanda Hernandez.
5  Q. Gotcha. Okay. Now -- now, Mr. Clark is -- is
6  Director Collier's chief of staff?
7  A. That is correct.
8  Q. Okay. And he would have conversations with
9  Director Collier about heat-related illnesses, fair?
10 A. Yes, sir, that is fair to say.
11 Q. And your expect -- This may be a little bit
12 outside the scope. But, I mean, your expectation would
13 be that -- that Mr. Clark would be knowledgeable about
14 the litigation that's going on since he advises Director
15 Collier about litigation and about all issues that are
16 pertinent to TDCJ, right?
17         MR. CALB: Objection; beyond the scope.
18 A. I would agree with that.
19 Q. (BY MR. EDWARDS) All right.
20         MR. EDWARDS: All right, you can take
21 that -- that chart down, Paul.
22         Go back to Exhibit 3, which is the --
23 the -- the construction. And let's put up page 2 of
24 that.
25 Q. (BY MR. EDWARDS) And, Mr. Sweetin, my question

146

1  is, other than the facilities locate on this document,
2  are there any other facilities in which TDCJ has plans
3  to -- to design air conditioning in any other
4  facilities?
5  A. Yes, sir. I wouldn't call what we're looking
6  at here the official document per se. And I'm not able
7  to testify on -- to the accuracy of it. I just know
8  that -- that it's apparently the latest that is posted.
9  But, yes, I do have --
10 Q. That's why I'm -- that's why I'm asking you. I
11 mean, as of June 24th -- June 28th, 2024, this is what
12 TDCJ was representing to the public was going on in
13 the -- in the prison system.
14         Is there any other facility that you have a
15 cool bed or air conditioning in design other than what's
16 listed here?
17 A. During 2024?
18 Q. Ever. 2030, 2040, 2050, 2525. I don't care.
19 The question is: What facilities is TDCJ planning on
20 putting up air conditioning in, or additional air
21 conditioning in? And this document makes a
22 representation to the state of Texas, and to my clients,
23 that these are the ones and this is how many. And is
24 this accurate?
25 A. That's not -- it is not accurate as to the

147

1  entire scope of the air-conditioning-phase projects, no,
2  sir.
3  Q. Okay. What is missing from this document?
4  What -- what other facilities are going to be air
5  conditioned?
6  A. Well, our goal is to air-condition all of them
7  as we work through our phased plan.
8  Q. Is there anything in writing saying that you
9  know that you need to air-condition the entire prison
10 system but are going to do it in a phased approach?
11 A. No, sir. My understanding, there is not a
12 requirement for us to do it in a certain amount of time.
13 We -- we are, however, taking it upon ourselves to make
14 the necessary projections as to what we feel like we can
15 accomplish. And, again, it's a very aggressive schedule
16 that -- that we anticipate continuing on with.
17 Q. All right. So as a matter of fact, what's on
18 Exhibit 3, these are the current plans to add air
19 conditioning to the system, what's been completed since
20 2018, what's currently under construction, and what's in
21 design. This is accurate. But you're -- you're saying
22 that the agency knows it needs to go further, fair?
23 A. Yes, sir. We have plans to take it all the way
24 to 3031 [sic]. Fiscal year 3031.
25 Q. And by 2031, do you -- do you plan to have the

148

1  entire system air conditioned?
2  A. Yes, sir. It's my understanding that by 3031,
3  we will be in the last phase of the air-conditioning
4  projects.
5  Q. All right. So just so I understand it,
6  currently Exhibit 3 is what, as of today, the agency has
7  committed to. But what you're telling me is that there
8  is a process in place that Director Collier has approved
9  of and designed and is going to do everything in his
10 power to make happen to get the entire system air
11 conditioned by 2031. Is that correct?
12 A. The end goal is to have it all completed
13 with -- and come within or under ten years.
14 Q. Okay. So it's 2024 now. So I just -- I don't
15 want to quibble. But I want to make sure I understand
16 what the agency's saying it will do.
17         The agency is saying that it will air-
18 condition all of the prison system by 2031, or 2033?
19         MR. CALB: Objection; misstates testimony.
20 A. Well, clearly, when you start trying to project
21 out in years, there's a lot of variables that come into
22 play.
23 Q. (BY MR. EDWARDS) Like what?
24 A. Funding would be the -- the biggest that comes
25 to mind, legislative -- legislative appropriations for

WRIGHT WATSON & ASSOCIATES
1250 South Capital of Texas Highway, Building 3, Suite 400  Austin, Texas 78746  (512) 474-4363

d1373cb1-2f0a-4b96-9b71-3f7399538ee8

David Sweetin - 7/25/2024

149

1 the funding.

2          But what I was saying is we initially set

3 our goal to complete this and be under ten years out.

4     Q.  Okay.  Who -- who was sitting down creating

5 this plan?  Was it Director Collier?

6     A.  It was a combination of folks that --

7     Q.  Who?

8     A.  -- that had discussions on this to include

9 division directors, engineering folks --

10    Q.  But do these guys have names or women have

11 names?

12          MR. CALB:  Objection; argumentative.  Let

13 him -- let him finish the answer.

14    A.  -- discussions with the board of criminal

15 justice, discussions with legislative bodies -- or not

16 bodies, but legislators.  So it -- it spans a variety of

17 people.

18    Q.  (BY MR. EDWARDS)  Okay.  Well, look, the board

19 of criminal justice and the -- Director Collier, and the

20 deputy directors, yourself, the engineering team,

21 they're -- they're -- you've all been communicating

22 about the dangers of heat inside the prison system and

23 the need to install air conditioning; and your goal of

24 doing it over phases, ideally, within ten years.  Is

25 that accurate?

150

1          MR. CALB:  Objection; misstates testimony.

2     A.  No.  Our discussion specifically was what is

3 our phased plan from today's date going out.

4     Q.  (BY MR. EDWARDS)  Okay.  Well, look, what

5 you're telling me is your plan is to air-condition the

6 Texas Prison System within not just ten years, within

7 seven years.  Is that correct?

8     A.  Yes.  Barring any complications, I -- I see us

9 being able to achieve that.

10    Q.  And -- and you understand that the reason that

11 you are implementing the air conditioning is

12 because the -- it is getting hotter, and the increased

13 heat causes severe problems and dangers to the inmate

14 population, especially the older population, as well as

15 the workforce, the correctional officers, right?

16    A.  Yes.

17    Q.  Okay.  And so I just -- I want to make sure I

18 understand.  I mean -- and, obviously, subject to

19 appropriations, you are telling me in no uncertain terms

20 that the agency is committed to air-conditioning the

21 Texas Prison System by the end of fiscal year 2031?

22    A.  Well, what I'm telling you is our goal was to

23 do this and be under ten years.  The projections that I

24 have, that I'm looking at, have -- are projections all

25 the way out to FY 30 and 31, to include --

151

1     Q.  And the projections here --

2          (Speaking simultaneously.)

3     A.  -- design and construction costs and annual

4 operating costs.

5          THE REPORTER:  Designing -- designing what

6 costs?

7          THE WITNESS:  Design and construction

8 costs, as well as annual operating costs.

9     Q.  (BY MR. EDWARDS)  Okay.  And so you would tell

10 Judge Pittman that if you had your way, we will have

11 the -- the dangerous problem of heat-related illnesses

12 and deaths by -- by -- from the heat remedied by 2031.

13 Is that what you're telling me?

14    A.  Can you repeat that question again.

15    Q.  You would tell Judge Pittman, who is the -- the

16 judge in this case, that -- that you, the agency, will

17 have the problem of heat-related illness and deaths from

18 heat remedied by 2031, is that correct --

19          MR. CALB:  Objection --

20    Q.  (BY MR. EDWARDS) -- subject to appropriations?

21    A.  As I stated before, barring any complications,

22 that is correct.

23    Q.  Okay.  And -- and you have a plan in place

24 to -- to ask the legislature for money to accomplish

25 this in phases, a certain amount each biennium.  Is that

152

1 correct?

2     A.  Yes, sir.

3     Q.  Okay.  And -- and, again, your -- your plan,

4 your goal, or your acknowledged need is that you need to

5 air-condition the entire system for the safety of the

6 inmates, as well as your workforce, fair?

7     A.  Part of it --

8          MR. CALB:  Objection.

9     A.  -- yes, sir.

10    Q.  (BY MR. EDWARDS)  Okay.  And you've

11 communicated this to the Texas legislature, correct --

12 or members of the Texas legislature, right?

13    A.  I have not, no, sir.

14    Q.  Well, when I -- I'm not asking you, Mr. Sweetin

15 individually.  I'm asking the department.  Director

16 Collier, the -- the board, whomever.  They've

17 communicated that -- TDCJ's communicated this plan to

18 the -- to members of the legislature, correct?

19    A.  Yes.  There's no doubt that conversations are

20 taking place that -- that would apprise everybody

21 that -- that there is a phase plan in effect, and -- and

22 I can only assume, subsequent agreements.

23    Q.  Okay.  Have you committed this to Mr. Canales?

24    A.  Can't tell you exactly what was communicated to

25 Mr. Canales.  I can tell you that he is an active member

David Sweetin - 7/25/2024

---

153

1  in -- in regard to the air-conditioning process.  So I
2  would say it was safe to say that there's been many
3  conversations with Mr. Canales in regard to the air
4  conditions.
5      Q.  Okay.  So do I have this right?  The lawsuit --
6  the lawsuit that this -- that you're facing now is
7  saying that there are dangerous conditions in the prison
8  and we need them to be fixed; and you're -- and -- and
9  the -- you're saying that we understand they're
10 dangerous conditions, and it is our intent to fix them,
11 but we need until 2031 to realistically do that.  Is --
12 do I hear you correctly?
13          MR. CALB:  Objection; misstates testimony.
14     A.  Yes, sir.  We believe this is a robust plan, an
15 aggressive plan, that would get us to that goal.
16     Q.  (BY MR. EDWARDS)  Yeah.  It'll -- you know, and
17 the beauty of that -- I mean, that -- So is politics the
18 only thing -- Are your impression of politics the only
19 thing that's stopping you from having that goal be to
20 air-condition the system by, let's say, fiscal year
21 2025?
22          MR. CALB:  Objection; vague.
23     A.  No.  As I previously stated, there's -- there's
24 more to it than just the legislative appropriations to
25 be able to complete this task.  It's -- it's about

---

154

1  available resources in the marketplace; it's about
2  available resources internally.
3      Q.  (BY MR. EDWARDS)  All right.  Let's deal with
4  those.  You mentioned it's money, it's available
5  resources internally, and it's available resources
6  externally.  I heard you correctly, right?
7      A.  I would agree with that.
8      Q.  Okay.  And the amount of money it would cost,
9  you -- your estimates are to do this phased-in plan by
10 2031.  How much would it cost you to -- to permanently
11 install air conditioning according to your -- your plans
12 and projections?  Another $600 million?  What?
13     A.  Well, the total projection was over a billion
14 dollars for completion.
15     Q.  Well, but you've done a lot of that already,
16 right?
17     A.  Done some of it, yes, sir.
18     Q.  Okay.  So it's less than that.  And, you know,
19 you -- you'd agree that TDCJ's estimates have been on
20 the high side before, right?
21          MR. CALB:  Objection; misstates testimony.
22          MR. EDWARDS:  No, it doesn't.
23     Q.  (BY MR. EDWARDS)  I mean, you'd agree that
24 TDCJ's estimates of costs to put air conditioning in the
25 prisons have been on the high side before, right?

---

155

1      A.  I would agree that they've been fair estimates
2  based on --
3      Q.  Well, now -- now, sir, I didn't ask you whether
4  or not they were fair estimates.  I will tell you to
5  your face they weren't.  They were fraudulent estimates.
6  But that's neither here nor there.
7          MR. CALB:  Objection --
8      Q.  (BY MR. EDWARDS)  Let's deal with the
9  reality -- let's deal with the reality, sir.
10         TDCJ, in the past, has told courts, okay,
11 incorrectly, that the cost of air conditioning the Pack
12 Unit would be $22 million.  Isn't that correct?
13     A.  If we were --
14         MR. CALB:  Objection; argumentative.
15     A.  If we would have had to construct it like the
16 original submission, which -- as I've already testified,
17 that wasn't the case.  There was quite a few factors
18 that we were able to go around that dropped the price,
19 or the cost, substantially.
20     Q.  (BY MR. EDWARDS)  Sir, you were in --
21     A.  So in regards to our submission, our submission
22 was accurate.
23     Q.  (BY MR. EDWARDS)  Well, is it your testimony
24 that the expert witness you put up in the Cole case,
25 that his estimates were accurate, that it would cost

---

156

1  20 -- $22 million to air-condition the Pack Unit?  Is
2  that your testimony, sir, that you stand by?
3      A.  I can tell you that the $22 million estimate
4  that was provided was based on the specifications at
5  that time.
6      Q.  Okay.  Well, I'm just asking if it's accurate.
7  Because it was found to not be credible by the federal
8  judge who evaluated it.  But do you -- do you despite
9  that finding from Judge Ellison, contend that it was, in
10 fact, an accurate estimate?
11         MR. CALB:  Objection; asked and answered.
12     A.  No, sir.  What I'm saying is --
13     Q.  (BY MR. EDWARDS)  It -- it's fine.
14         (Speaking simultaneously.)
15     Q.  Regardless, you're -- you're saying that --
16     A.  Your -- Let me explain, Mr. Edwards.  You asked
17 me a question, and I'm going to --
18     Q.  Okay.  That's --
19         (Speaking simultaneously.)
20     Q.  -- that -- that -- that's fine.
21     A.  You continue to interrupt.
22     Q.  Well, "continue" might be strong.  But that's
23 fine.  You can -- you can go, sir.
24     A.  With regard to the final product that was
25 installed at the Pack Unit, the specifications changed

---

**WRIGHT WATSON & ASSOCIATES**
1250 South Capital of Texas Highway, Building 3, Suite 400  Austin, Texas 78746  (512) 474-4363

d1373cb1-2f0a-4b96-9b71-3f7399538ee8

David Sweetin - 7/25/2024

157

1 dramatically when you evaluate what the initial
2 specifications were versus what the final specifications
3 were.  So at no time did we submit documents that --
4 that weren't rightfully so.
5      Q.   Well, sir -- sir, here's the thing.  You were
6 ordered to, and had to, install air conditioning.  And
7 after that happened, suddenly the estimates went way
8 down.
9           Now, why they went down, only your -- only
10 your agency really knows, okay?  But the fact is you
11 made a representation to a federal judge that the cost
12 would be $22 million, and then you represented to the
13 legislature it only cost 4 million.  Now you're telling
14 me 8 million.  That is -- those are just factually true,
15 aren't they?
16           MR. CALB:  Objection; argumentative.
17      Q.   (BY MR. EDWARDS)  Okay.  Now, with regards to
18 your current estimates of the phase-in plan that is to
19 be completed by 2031, your estimate is that it's in the
20 neighborhood of a billion dollars, correct?
21      A.   Minus what's already been installed, because
22 that was our original projection.
23      Q.   (BY MR. EDWARDS)  Okay.  So can we shave off
24 $85 million or so?
25           MR. CALB:  Objection; form.

158

1      A.   Okay.
2      Q.   (BY MR. EDWARDS)  Okay.  In any event, it's --
3 it's -- it's -- that's -- look, that's a lot of money,
4 okay?  And -- and I don't deny that.  But Texas is a
5 pretty well-to-do state, isn't it?
6           MR. CALB:  Objection; beyond the scope.
7      Q.   (BY MR. EDWARDS)  Well, strike that.
8           Your agency is a three-and-a-half to four-
9 billion-dollar agency budget-wise, right?
10           MR. CALB:  Objection; asked and answered.
11      Q.   (BY MR. EDWARDS)  Right?
12      A.   Yes.  The low of three billion.
13      Q.   All right.  Nevertheless, we talked about the
14 money.  Your -- your -- your understanding is that the
15 money needs to come from the legislature, right?
16      A.   That is where all of our funding comes from,
17 appropriations --
18      Q.   Sure.
19      A.   -- from the legislature.
20      Q.   And you've also been candid and said, look, if
21 the court orders that air conditioning needs to be
22 installed or orders that the temperatures be brought
23 down to safe levels, you, as an agency, with a respect
24 for federal court system, will do whatever is in your
25 power to effectuate those orders, right?

159

1           MR. CALB:  Objection; misstates testimony.
2           MR. EDWARDS:  You can say "objection;
3 form," Michael.  That's okay, right?  Those are the
4 rules in the western district.
5      Q.   (BY MR. EDWARDS)  Do you need me to reask the
6 question, given the interruption?
7      A.   Yes, sir.  Please do.
8      Q.   Okay.  And, look, candidly, if ordered to
9 comply -- in -- in order to bring temperatures down to
10 safe levels or to place inmates in safe temperatures,
11 you'll do whatever's in your power, as an agency, to
12 comply with federal court rulings, you know, and take
13 advantage of your appellate rights, fair?
14      A.   Yes, sir.
15      Q.   Okay.  Now -- and I assume this plan -- You've
16 provided this plan to -- to complete -- completely air-
17 condition all of the Texas Prison System.  You've
18 provided that to the plaintiffs, correct?
19      A.   Yes, sir.  I can only assume that -- that it
20 was provided --
21           (Speaking simultaneously.)
22      Q.   Right.  That's fine.  And I assume that there
23 have been communications about the reasons why you need
24 to air-condition the prison system.  And that's been
25 communicated via email, text message, electronic

160

1 communications, right?
2      A.   To who?
3      Q.   To various people in -- in -- at high levels.
4 I would assume that -- Director Collier, yourself, other
5 people have communicated about why you're designing
6 the -- the prison system to -- to be fully air
7 conditioned by 2031.  Right?
8      A.   If you're asking me to testify on behalf of
9 what was or was not included in an email, I'm not
10 prepared to give you that information.  I don't --
11      Q.   Fair enough.  You, yourself, are getting emails
12 about heat-related illnesses for the inmates and the
13 correctional officers, right?
14      A.   Getting reports.
15      Q.   Sure.  It's got to break your heart that people
16 are suffering heat-related illnesses based on hot
17 conditions in the Texas Prison System, given that
18 there's a technology that can totally prevent it.
19 Doesn't that hurt your heart to know that?
20           MR. CALB:  Objection; argumentative.
21      A.   Sure.  Nobody, that I'm aware of, enjoys seeing
22 anybody get hurt, whether you're incarcerated or whether
23 you're a civilian.
24      Q.   (BY MR. EDWARDS)  Well, no, I -- look, I
25 appreciate that.  But, I mean, this is a little

David Sweetin - 7/25/2024

161

1 different.  You know there's a solution to this problem
2 of heat-related illnesses from the indoor temperatures
3 and you know that it's air conditioning, right?
4      A.  That's not the only solution.
5      Q.  Well, it is -- it is a solution you know will
6 work.  Isn't -- isn't it a solution you know will work?
7      A.  It possibly could.
8      Q.  Well, it -- it -- it has.  There haven't been
9 any heat-related illnesses at the Pack Unit after you
10 put in air conditioning, right?
11           MR. CALB:  Objection; asked and answered.
12      A.  Not that I'm aware of.
13      Q.  (BY MR. EDWARDS)  Okay.  Are you aware of any
14 heat-related illnesses that have occurred in air-
15 conditioned housing areas in the last 30 years at TDCJ?
16      A.  I couldn't tell you one way or the other.
17      Q.  Well, I'm asking you, Mr. Sweetin.  Are you
18 aware of any heat-related illnesses that occurred in
19 air-conditioned housing areas?
20           MR. CALB:  Objection; asked and answered.
21      A.  I'm not aware of any.
22      Q.  (BY MR. EDWARDS)  Okay.  You are aware of
23 hundreds of heat-related illnesses that have occurred to
24 your correctional officers and to the inmates who -- for
25 inmates who live in these hot housing areas, right?

162

1           MR. CALB:  Objection; form.
2      A.  That is -- is correct.  I get reports that show
3 that --
4      Q.  (BY MR. EDWARDS)  Sure.
5      A.  -- that has happened.
6      Q.  And -- and look, sir.  I listen to you and I
7 hear what you're saying and I . . .
8           You don't want these heat-related illnesses
9 to continue, fair?
10           MR. CALB:  Objection; outside the scope.
11      A.  Yes.  I think that's -- that's a fair
12 statement.
13      Q.  (BY MR. EDWARDS)  And though you know of a
14 solution, you're telling Judge Pittman, look, that
15 solution costs a lot of money and we're doing our best
16 to complete this process within seven to ten years,
17 fair?
18           MR. CALB:  Objection; form.
19      A.  Well, I know another solution would be build
20 brand-new prisons throughout the state of Texas.  But
21 that doesn't mean we're going to be able to do it.
22      Q.  (BY MR. EDWARDS)  You're right.  It's not --
23 The only solution to the problem of dangerously hot
24 prisons isn't retrofitting them with air conditioning.
25 We could build new prisons, right?  Right?

163

1      A.  That potentially could be a solution, yes.
2      Q.  You could use existing prisons that have been
3 decommissioned that are air-conditioned.  You -- you
4 could recommission them and use them.  And there are
5 those in existence, aren't there?
6           MR. CALB:  Objection; beyond the scope.
7      A.  Not to my knowledge.
8      Q.  (BY MR. EDWARDS)  Well, aren't there prisons
9 that have been shut be down by the Texas Department of
10 Criminal Justice in the last ten years that -- that
11 actually were air conditioned?
12      A.  There were some that were shut down that were
13 partially air conditioned.
14      Q.  Okay.  Nevertheless, that's another solution
15 that you could look at.  But regardless, I -- it seems
16 to me that the agency has made a decision that the --
17 the most -- the best way to protect the -- the men and
18 women, inmates and officers, is to use the existing
19 facilities but to, you know, retrofit them with air
20 conditioning.  Is that fair?
21           MR. CALB:  Object to -- objection; form.
22      A.  Let me make sure I understand the question.
23 Can you ask that again?
24      Q.  (BY MR. EDWARDS)  Sure.  Rather than building
25 new prisons, which I'm guessing would have a higher

164

1 cost, the agency's made the decision that to deal
2 with -- to fix these conditions that endanger the
3 officers and the inmates, that the better solution is
4 to, you know, air-condition the existing facilities over
5 a period of time.  In this case, through two -- fiscal
6 year 2031, right?
7      A.  Yes, sir.  I would agree with that.
8      Q.  Okay.  Let's -- let's -- just because don't --
9 we have a limited amount of time, there are -- because
10 of the dangers, TDCJ has some heat policies, right?
11      A.  Yes, sir.
12           MR. CALB:  Objection; form.
13      Q.  (BY MR. EDWARDS)  And you're here to testify
14 about those policies, correct?
15           Oh.  You're here to testify about heat-
16 related policies, right?  Topic 10.
17      A.  Yes, sir.
18      Q.  Okay.  Before I get to Topic 10 -- we've talked
19 about 1708, which is a build to air-condition the prison
20 system.  And you've told me, in no uncertain terms,
21 TDCJ's in favor of that.
22           Now, the other house bill we asked you to
23 talk about was 2950.  That has to do with taking
24 temperatures in the prisons, right?
25           MR. CALB:  Objection; form.

David Sweetin - 7/25/2024

165

1    A. Yes, sir. That's from Mr. Bryant.

2    Q. (BY MR. EDWARDS) Right. Was TD -- it didn't

3 pass. But was TDCJ, as an agency, in favor of, you

4 know, measuring the temperatures inside its facilities?

5    A. In favor of? I don't -- I don't follow your

6 question.

7    Q. Well, the legis -- the proposed legislation

8 would have required TDCJ to take temperatures inside the

9 facilities. Is that something that you think TDCJ ought

10 to be doing?

11    A. I think we ought to do as directed by our

12 legislative body.

13    Q. Well, that kind of passes the buck. I'm asking

14 Mr. Sweetin and the Texas Department of Criminal

15 Justice.

16          It would seem to me that it would be -- it

17 would be necessary for the agency to know how hot it is

18 inside these prisons because if it got to a certain

19 temperature, it could be just catastrophically dangerous

20 for the men and women in your employ and in your custody

21 and care. Right?

22          MR. CALB: Objection; argumentative.

23    A. I would offer that before the temperature

24 requirement came about through legislative requirement,

25 that we were already doing mitigation.

166

1    Q. (BY MR. EDWARDS) Yeah. I'm not -- right now,

2 I'm not talking about alleged mitigation measures, okay?

3 I'm just talking about taking temperatures, okay?

4          You have always taken outside temperatures

5 and noted the outside temperature and the humidity,

6 right, as an agency. Correct?

7          MR. CALB: Objection; form.

8    A. Yes, sir, we have.

9    Q. (BY MR. EDWARDS) And -- and -- and you've used

10 those numbers -- the outdoor temperature, plus the

11 humidity -- to come up with heat indexes to identify

12 potential dangers for your officers and inmates, right?

13    A. We identified temperatures.

14    Q. Sure. Well, and the point of identifying the

15 temp -- the heat indexes is because you're aware that,

16 you know, the various governmental bodies put out charts

17 that show when the heat index reaches a certain level,

18 it becomes more dangerous for the people that are

19 exposed to it, right?

20          MR. CALB: Objection; form.

21    A. Depending on the individual, yes.

22    Q. (BY MR. EDWARDS) Well, the charts are actually

23 for everybody. But -- but I think what you're getting

24 at is there are certain people who are more vulnerable

25 to the heat than others with medical conditions, right,

167

1 or -- or -- or age or obesity, or things like that,

2 right?

3          MR. CALB: Objection; form.

4    A. There are individuals that are more

5 susceptible, yes, sir.

6    Q. (BY MR. EDWARDS) Okay. And just -- and

7 your -- your heat policies take into -- take that into

8 account, right?

9    A. Yes, sir.

10    Q. And, you know, that's not out of the goodness

11 of your heart. Your job is to take care of the people

12 that are in your care -- or your custody and control. And

13 so you understand that you have to have heat policies

14 that protect the men and women in your care, right?

15    A. I disagree with that statement.

16    Q. You disagree with it?

17    A. Yes, sir.

18    Q. You don't think you have to have policy that

19 protect the men and women in your care from the dangers

20 of extreme heat?

21    A. No, I disagree with the fact of -- of you

22 making the -- the reference that we're doing it only

23 because we're told to do it.

24    Q. Oh. No, no. Well, all right. Whether you're

25 told to do it or you're ordered to do it or you're doing

168

1 it because you know it's the right thing and necessary

2 thing to do matters not to me right now, okay?

3          But the point is, the reason that you do it

4 is because you -- you have a responsibility to take care

5 of the people in your custody, right?

6    A. Yes, sir. That's part of our mission.

7    Q. And -- and, look, over time, standards of

8 decency have changed. You now have indoor plumbing in

9 all of your facilities, right?

10          MR. CALB: Objection; form, compound.

11    A. That is correct.

12    Q. (BY MR. EDWARDS) Okay. You didn't always have

13 indoor plumbing in Texas Department of Criminal Justice

14 facilities, did you?

15          MR. CALB: Objection; beyond the scope.

16    A. I can't tell you what -- what was going on in

17 the 1800s, no, sir.

18    Q. (BY MR. EDWARDS) Well --

19    A. I'm not prepared to testify --

20    Q. -- over time, it became the norm that everybody

21 had plumbing; and, therefore, your expectation would be

22 that all of the facilities need to have indoor plumbing,

23 fair?

24          MR. CALB: Objection; beyond the scope.

25    Q. (BY MR. EDWARDS) Okay.

David Sweetin - 7/25/2024

169

```
1              (Speaking simultaneously.)
2      Q.  To the same extent, look, in the 1930s, not
3  everybody had air conditioning, right?
4              MR. CALB:  Objection; form, beyond the
5  scope.
6      A.  Correct.  In 2024, there's still people that
7  don't have it.
8      Q.  (BY MR. EDWARDS)  Yeah.  But the vast majority,
9  you know -- and -- and every public building in the
10 state of Texas, from schools to post offices to county
11 jails to federal prisons, they all have air
12 conditioning.  Hotels.  They all have air conditioning.
13 And you know that, don't you?
14     A.  No, sir, I don't.
15             MR. CALB:  Objection; form.
16     Q.  (BY MR. EDWARDS)  You don't know that -- Well,
17 let's -- let's break it down.  Do you know that all post
18 offices in the state of Texas have air conditioning?
19             MR. CALB:  Objection; beyond the scope.
20     A.  No, sir.  I'm not prare -- prepared to make
21 that testimony.  I have no idea whether or not all the
22 rural post offices have air conditioning or not.  It
23 would be a safe bet to say that there were some out
24 there in in -- in vast outposts that maybe still don't.
25     Q.  (BY MR. EDWARDS)  Are you aware of a single
```

170

```
1  post office that doesn't have air conditioning in 2024?
2              MR. CALB:  Objection; beyond the scope.
3      A.  I personally am not aware, no, sir.
4      Q.  (BY MR. EDWARDS)  Are you aware of a single
5  public school in the state of Texas that doesn't have
6  air conditioning in 2024?
7              MR. CALB:  Objection; beyond the scope.
8      A.  No, sir, I'm not aware.
9      Q.  (BY MR. EDWARDS)  Are you aware of a single
10 county jail in the state of Texas that doesn't have air
11 conditioning?
12             MR. CALB:  Objection; beyond the scope, and
13 to form.
14     A.  What -- what I would like to say here, Mr.
15 Edwards --
16     Q.  (BY MR. EDWARDS)  Can you answer my question
17 before you give a speech?
18             Are you aware of a single county jail in
19 the state of Texas that doesn't have air conditioning?
20     A.  What I'm aware --
21             MR. CALB:  Objection --
22     A.  -- of is the questions that I'm being asked are
23 not anything that I've prepared for.  Nowhere in these
24 documents does it say anything about post offices or
25 schools or hospitals or hotels.  That's what I know.
```

171

```
1      Q.  I'm just -- I'm just asking you.  Are you aware
2  of any county jails that don't have air conditioning in
3  the state of Texas?
4              MR. CALB:  Objection; beyond the scope.
5      A.  I'm not prepared to respond to that.
6      Q.  (BY MR. EDWARDS)  Well, the law requires -- I
7  hope you're prepared to respond to it because it goes to
8  policies that you have.  But if you're not prepared,
9  you're not prepared.
10             Are you aware of any federal prison in the
11 state of Texas that doesn't have air-conditioned housing
12 areas?
13             MR. CALB:  Objection; beyond the scope.
14     A.  I'm not prepared to make a statement one way or
15 the other.
16     Q.  (BY MR. EDWARDS)  Well, sir, you're the
17 director of facilities at the Texas Department of
18 Criminal Justice, correct?
19     A.  No, sir, that is not correct.
20     Q.  Okay.  What is your job title at the Texas
21 Department of Criminal Justice, sir?
22     A.  I am the director of private facilities
23 Contract Monitoring and Oversight Division.
24     Q.  You're a director at the Texas Department of
25 Criminal Justice, correct?
```

172

```
1      A.  That is correct.
2      Q.  You report to Bryan Collier, amongst others?
3      A.  Yes, sir, I do.
4      Q.  Would you agree that the federal prison
5  system -- Well, are you aware of any reason why the
6  federal prison system would have fully air-conditioned
7  housing areas from a penological standpoint?
8              MR. CALB:  Objection; beyond the scope.
9      Q.  (BY MR. EDWARDS)  Strike that.
10             Sir, Mr. Sweetin, you per -- let's ask it
11 you personally, though I think it's within the scope.
12 I'll start with you personally.
13             Do you know whether or not the federal
14 prisons throughout Texas have air-conditioned housing
15 areas?
16             MR. CALB:  Objection; beyond the scope.
17     A.  I'm not here to testify on behalf of what I
18 personally know.  I'm here to testify on behalf of the
19 agency.
20     Q.  (BY MR. EDWARDS)  Please answer my question.
21 If you don't know, you don't know, okay?  You either
22 know it or you don't.
23             Do you know whether or not the federal
24 prisons in the state of Texas are air -- have
25 air-conditioned housing areas?  Do you know that or not?
```

**WRIGHT WATSON & ASSOCIATES**
1250 South Capital of Texas Highway, Building 3, Suite 400  Austin, Texas 78746  (512) 474-4363

David Sweetin - 7/25/2024

173

1         MR. CALB:  Objection; beyond the scope.
2     A.  I have no knowledge of that topic.
3     Q.  (BY MR. EDWARDS)  Have you ever thought to make
4 a phone call to find out?
5         MR. CALB:  Objection; beyond the scope, and
6 to form.
7     A.  No, sir, it never crossed my mind.
8     Q.  (BY MR. EDWARDS)  And that's despite the fact
9 that you know and the agency knows that more than 20
10 people have died from heatstroke because of the hot
11 conditions inside the Texas Prison System?
12         MR. CALB:  Objection --
13     Q.  (BY MR. EDWARDS)  You still haven't bothered to
14 make a phone call to the federal authorities who run
15 prisons in Texas?
16         MR. CALB:  Objection; argumentative.
17     A.  No, sir.  I didn't feel it was necessary to
18 make a call of any --
19     Q.  (BY MR. EDWARDS)  Well, now that I'm telling --
20 Don't you think it would be a good idea to find out
21 if -- if federal prisons have air conditioning in their
22 housing areas?
23         MR. CALB:  Objection; argumentative.  Let
24 him answer.
25     A.  Could you repeat that question?

174

1     Q.  (BY MR. EDWARDS)  You want me to repeat the
2 question?
3     A.  Sure.
4     Q.  Don't you think it would be a good idea to find
5 out if the federal prisons have air-conditioned housing
6 areas?
7         MR. CALB:  Objection; argumentative.
8     A.  Do I think it would be a good idea?
9     Q.  (BY MR. EDWARDS)  Yes.
10     A.  I don't -- I don't see what relevance that
11 would have with regard to what we're doing.  I don't
12 need to know what the feds are doing in regard to air
13 conditioning or their operations, because that's apart
14 and separate from the way we operate and who we answer
15 to.
16     Q.  All right, sir.  Let's talk about heat
17 sensitivity scores.  How are they calculated by the
18 Texas Department of Criminal Justice?
19         MR. CALB:  Objection to form.
20     A.  Could you ask the question again, please?
21     Q.  (BY MR. EDWARDS)  Sure.  Do you know what a
22 heat sensitivity score is?
23     A.  Yes, sir, I do.
24     Q.  Okay.  You're here to talk about Topic 10,
25 correct?

175

1     A.  That is correct.
2     Q.  Okay.  How are heat sensitivity scores
3 calculated by the Texas Department of Criminal Justice,
4 and what are they?
5         MR. CALB:  Objection; form.
6     Q.  (BY MR. EDWARDS)  All right.  Let's start with
7 what are they.  What are heat sensitivity scores?
8     A.  Heat sensitivity scores are scores that are
9 determined by the medical professionals as to whether or
10 not an inmate is more likely to be susceptible to heat-
11 related problems.
12     Q.  Okay.  So it is your testimony on behalf of the
13 Texas Department of Criminal Justice that the
14 health-care providers give a heat sensitivity score,
15 would TDCJ uses to evaluate a person's vulnerability to
16 the extreme heat inside its prisons?
17         MR. CALB:  Objection to form.
18     A.  Yes, sir.  I agree with that.
19     Q.  (BY MR. EDWARDS)  Okay.  So to me that means
20 that the universe -- like, most of the health care is
21 done by University of Texas Medical Branch, and then
22 some is done by Texas Tech as well, right?
23     A.  That is correct.
24     Q.  Okay.  So -- okay.  All right.  So do you know
25 how the University of Texas Medical Branch gives a

176

1 score, a heat score?  Like, is it a number?  What
2 does -- what does it actually mean?
3         MR. CALB:  Objection to form.
4     A.  To us it means that we have to house an inmate
5 according to having a heat score.  That heat score is
6 determined by an algorithm that is produced by the
7 health-care providers that inform us as to whether or
8 not there's a heat score.  Regardless of what the heat
9 score is, if somebody is provided a heat score, then we
10 assign them based on the fact that they are susceptible
11 to heat.
12     Q.  (BY MR. EDWARDS)  Okay.  So is it an algorithm,
13 or is it a decision made by a medical provider?
14     A.  Well, ultimately, it's the medical provider,
15 based on the development of this -- this program.
16     Q.  Okay.  Well, explain the program to me.
17 Because I don't have a clue as to what it is, okay?  So
18 tell me what the algorithm is and how it gives a score
19 to a particular inmate.
20     A.  Sir, I'm not able to tell you what -- the
21 formula to the algorithm.
22     Q.  All right.  Certainly, the heat sensitivity
23 score in the system that TDCJ employs is a policy,
24 procedure, and measure that TDCJ implements to protect,
25 in theory, the inmates from the dangers of heat, right?

David Sweetin - 7/25/2024

177

1            MR. CALB:  Objection to form.

2     A.  Yes, sir.

3     Q.  (BY MR. EDWARDS)  Okay.  And I suppose at

4 its -- at its -- at its most altruistic, it's designed

5 to identify vulner -- the vulnerable population, right?

6     A.  Yes, sir.  I agree with that.

7     Q.  Okay.  And -- and by that, you mean that there

8 are certain types of people, okay, that are, according

9 to TDCJ, more vulnerable than others to periods of

10 extreme heat.  Is that fair?

11    A.  According to the heat score provided, yes.

12    Q.  Okay.  And amongst the -- the medical

13 conditions that make you more vulnerable to the heat,

14 TDCJ has long known about these conditions.  I want to

15 run them -- run through them with you, okay?

16            And so my question -- and I'm just going to

17 go through and just get you to acknowledge yes, no, it

18 makes you more vulnerable to the heat.  You ready?

19            MR. CALB:  Objection to form.

20    Q.  (BY MR. EDWARDS)  You ready?

21            MR. CALB:  And objection; beyond the scope.

22    Q.  (BY MR. EDWARDS)  COPD is a medical condition

23 that makes one more vulnerable to the heat, according to

24 TDCJ, correct?

25    A.  Yes, sir.

178

1            MR. CALB:  Objection; beyond the scope.

2     Q.  (BY MR. EDWARDS)  Was that a yes?

3     A.  Yes, sir.

4     Q.  Okay.  Asthma is a medical condition that makes

5 one more susceptible to the heat, according to TDCJ,

6 correct?

7            MR. CALB:  Objection; beyond the scope.

8     A.  When you say "according to TDCJ," are you

9 referencing a document?

10    Q.  (BY MR. EDWARDS)  Well, you're here to talk

11 about policies and procedures that -- that TDCJ has.

12 And we're talking about the heat sensitivity scores.

13 And I -- and I'm just -- These are well-known medical

14 conditions that make one more vulnerable to the heat,

15 that TDCJ is obviously aware of.  I'm just getting you

16 to confirm that because, again, this is the first

17 deposition I'm taking in this -- in this case.

18            You're aware that asthma makes one more

19 vulnerable to the heat, fair -- or correct?

20            MR. CALB:  Objection; argumentative, beyond

21 the scope.

22    A.  Well, my question is both.  My question was,

23 are you making that assumption, or are you reading

24 something that brings you or draws you --

25    Q.  (BY MR. EDWARDS)  No, I've deposed every --

179

1 I've deposed every leader of the organization and

2 health-care provider that's still in charge of TDCJ, and

3 they've all, to a person, told me that numerous

4 conditions are -- make one more vulnerable to the heat.

5 You're here to testify about that because it -- it is

6 part and parcel of these policies, procedures, and

7 protocols, and measures that you implement.  Amongst

8 others, heat sensitivity scores, okay?

9            And do you acknowledge, sir, like Bryan

10 Collier has acknowledged in the past, that asthma makes

11 one more vulnerable to the heat?

12            MR. CALB:  Objection; beyond the scope,

13 argumentative.

14    A.  Sir, you're asking me to make a decision --

15 or -- or make a statement based on a medical

16 professional.

17    Q.  (BY MR. EDWARDS)  Do you not know?

18    A.  And I'm not prepared to do that.

19    Q.  Do you know, sir?

20    A.  I'm not in a position -- I'm not a medical

21 professional.  I'm can't tell you --

22    Q.  You don't have to be a med -- you don't have --

23    A.  I can't -- I can't tell you --

24    Q.  You don't have to be a medical professional to

25 know --

180

1     A.  Excuse me, Mr. Edwards.

2     Q.  -- what conditions are impacted by the heat.

3 Do you --

4     A.  Excuse me, Mr. Edwards.

5     Q.  -- understand the conditions that make one heat

6 sensitive or vulnerable to the heat as you testify here

7 today?

8            MR. CALB:  Objection; argumentative, and

9 beyond the scope.

10    Q.  (BY MR. EDWARDS)  Sir, do you understand what

11 they are?

12    A.  As I was stating, I am not a medical

13 professional.

14    Q.  Okay.

15    A.  I cannot tell you that because somebody has

16 asthma, they are automatically susceptible to heat.

17    Q.  Well, no kidding.  But isn't -- aren't they --

18 aren't they in your heat-sensitive grouping, someone

19 with asthma?

20            MR. CALB:  Objection; argumentative.

21    A.  I'm not aware of the algorithm, sir.

22    Q.  (BY MR. EDWARDS)  Well, you're here to testify

23 about it.  So as you testify here today, you have no

24 idea what generates a heat-sensitive score such that

25 TDCJ considers them vulnerable.  Is that fair?

David Sweetin - 7/25/2024

181

1    A.  Say that I'm here to testify on behalf of an
2  algorithm.  I don't see a question in there that speaks
3  to an algorithm.
4    Q.  Sir, there is an algorithm that deter -- makes
5  a determination about heat vulnerability.  That's what
6  you testified to.  Or do you need to change your
7  testimony?
8    A.  No, sir.  Everything I've stated was the truth.
9    Q.  You can't tell me who made --
10         (Speaking simultaneously.)
11    Q.  -- designed these algorithms, can you?
12         MR. CALB:  After you get done with this,
13  time for a break.
14         MR. EDWARDS:  Well, no, we're in the middle
15  of some questions here, so I'd ask that we continue
16  along these -- this line of questioning.
17    Q.  (BY MR. EDWARDS)  Can you tell me who designed
18  this algorithm, sir?
19    A.  Specifically, no, sir.
20    Q.  Did you take any steps to find out who designed
21  or how this algorithm was created?
22    A.  That wasn't in the lines of questions, sir.
23    Q.  So is the answer no, you didn't take any steps
24  to find out about how this algorithm was created?
25         MR. CALB:  Objection; beyond the scope.

182

1    A.  No, sir.  You didn't ask me anything about the
2  algorithm.
3    Q.  (BY MR. EDWARDS)  Do you understand that
4  diabetes is a medical condition that impacts one's
5  ability to deal with the heat?
6         MR. CALB:  Objection to form,
7  argumentative, outside the scope.
8    A.  I'm not a doctor, sir.  I can't tell you who's
9  susceptible to what, based on a medical condition.
10    Q.  (BY MR. EDWARDS)  Do you understand that morbid
11  obesity is -- is a condition that makes you more
12  vulnerable to the heat?
13         MR. CALB:  Objection; outside the scope.
14    A.  No, sir.  My studies are not in the medical
15  field.
16    Q.  (BY MR. EDWARDS)  You understand that cirrhosis
17  of the liver is a condition that makes you more
18  susceptible to the heat, or more vulnerable?
19         MR. CALB:  Objection; beyond the scope.
20    A.  No, sir.
21    Q.  (BY MR. EDWARDS)  Do you understand that
22  thyroid dysfunction is something that makes you more
23  vulnerable to -- to the heat?
24         MR. CALB:  Objection; beyond the scope.
25    A.  No, sir.

183

1    Q.  (BY MR. EDWARDS)  Are you aware of that, sir?
2  Sir, can you answer?
3    A.  I did, sir.
4    Q.  Did you say no?
5    A.  I said no, sir.
6    Q.  Okay.  Coronary artery disease.  Do you
7  understand that that is -- that is a condition that
8  makes you more vulnerable to the heat?
9         MR. CALB:  Objection; beyond the scope.
10    A.  No, sir.
11    Q.  (BY MR. EDWARDS)  Do you understand that
12  hypertension is a condition that makes you more
13  vulnerable to the heat?
14         MR. CALB:  Objection; beyond the scope.
15    A.  No, sir.
16    Q.  (BY MR. EDWARDS)  Do you know that age, older
17  than 60, makes you more -- more vulnerable, from an
18  epidemiological perspective, to the heat?
19         MR. CALB:  Objection; beyond the scope.
20    A.  No, sir.
21    Q.  (BY MR. EDWARDS)  Do you understand that taking
22  certain medications make you more vulnerable to the
23  heat, like psychiatric medications?
24         MR. CALB:  Objection; beyond the scope.
25    A.  No, sir.

184

1    Q.  (BY MR. EDWARDS)  You understand that having
2  developmental disabilities makes you more vulnerable to
3  the heat?
4         MR. CALB:  Objection; beyond the scope.
5    A.  No, sir.
6         MR. EDWARDS:  All right.  Let's take -- You
7  asked for a break.  And I appreciate you bearing with
8  me.  Let's -- let's take a five-minute break for
9  Michael.
10         THE VIDEOGRAPHER:  The time is 2:38 p.m.
11  Central.  We are off the record.
12         (Recess.)
13         THE VIDEOGRAPHER:  The time is 2:51 p.m.
14  Central.  We are on the record.
15    Q.  (BY MR. EDWARDS)  We just took a break.  Is
16  that correct?
17    A.  Yes, sir, that is correct.
18    Q.  And you've returned and told me you wanted to
19  make a clarification about the heat sensitivity scores.
20  Is that correct?
21    A.  Make a clarification about the algorithm
22  process, yes, sir.
23    Q.  During the break, did you speak to any
24  attorneys?
25    A.  Yes, sir.

David Sweetin - 7/25/2024

185

1    Q.  Who did you speak to?

2    A.  Michael and Jennifer.

3    Q.  Did you speak about the need to make a

4 clarification of the algorithm process?

5         MR. CALB:  Objection; privilege.

6         Don't answer.

7    Q.  (BY MR. EDWARDS)  On the advice of counsel,

8 you're not going to answer that question, sir?  You just

9 have to say, yes, I'm not going to answer; I'm going to

10 follow my lawyer's advice.  But, for the record, I just

11 have to do this.

12         On the advice of counsel, are you going to

13 follow Mr. Calb's advice and not answer the question?

14    A.  Yes, sir.

15    Q.  Okay.  Did any attorney that you spoke with on

16 the break tell you you needed to change your testimony

17 concerning any aspect of anything you've testified,

18 including the algorithm process?

19         MR. CALB:  Objection; privileged.

20         Please don't answer, Mr. Sweetin.

21    Q.  (BY MR. EDWARDS)  Well, that's one we have a

22 big disagreement about.  If somebody told you to change

23 testimony, I'm entitled to know and the court's entitled

24 to know.

25         MR. EDWARDS:  Are you going to stand on

186

1 advising him not to answer that question, Michael?

2         MR. CALB:  Whether I told him is different

3 than why I told him.  So whether, yes, you can ask that

4 part.

5         MR. EDWARDS:  Well, if you told him to

6 change his testimony, then everything is fair game.

7         MR. CALB:  I didn't tell him to change his

8 testimony.

9    A.  That's not what I was told.  That's not the

10 discussion that was had.

11    Q.  (BY MR. EDWARDS)  Well, okay.  To be clear, you

12 took a break because your lawyer asked for one, right?

13 Right?

14    A.  I don't recall if you asked for it or who did.

15 I don't remember.

16    Q.  I -- I recall your lawyer asking for it.  Do

17 you not recall your lawyer asking for it?

18    A.  I was wrapped up in the moment.  I don't recall

19 who -- who asked --

20    Q.  Fair enough.

21    A.  -- interjected.

22    Q.  During -- during that break, you spoke to two

23 attorneys, correct?

24    A.  That is correct.

25    Q.  And now you have a clarification that you'd

187

1 like to make after discussing with two attorneys

2 something on the break, correct?

3    A.  No.  I have a point of clarification to make

4 sure that I articulated in a manner that you understood.

5    Q.  Okay.  If you feel you need to, after having

6 spoken to the attorneys, make a clarification, by all

7 means make your clarification.

8    A.  All right.  In regard to the algorithm itself,

9 the algorithm, the process of the algorithm was created

10 by the medical partners, along with TDCJ.

11         To the extent that the data is put in -- or

12 installed into the algorithm by the medical

13 professionals in which -- in turn, it provides us with a

14 heat score.  Now, our heat score is what we base our

15 decision for our classification housing assignments,

16 although it's not depicted in the agency policy per se

17 as far as the -- how the algorithm works.  It does give

18 us respect with regard to how we're to house that

19 individual based on the heat score that was provided.

20    Q.  And that is totally different than what you

21 testified under oath about five minutes ago, right?

22    A.  No, sir, that's not totally different.

23    Q.  Okay.  You don't think it's different than you

24 telling me that the medical providers made

25 recommendations and that that was part of the algorithm?

188

1 You don't think it's different than that?

2    A.  I think the medical providers do have input in

3 it.  But they're -- they're not the only ones with

4 input.

5    Q.  Okay.  And your lawyers told you that that was

6 the way it works, right?  That's where you got that

7 information from?

8    A.  No, sir.

9         MR. CALB:  Objection.

10         (Speaking simultaneously.)

11    Q.  (BY MR. EDWARDS)  But where did you get the --

12 You're -- you're here as a 30(b)(6) witness.  And one of

13 the -- two of the people that prepared you are your

14 lawyers.  Where did you get the information about the

15 Algorithm Process A?  Where did you get that

16 information?

17    A.  I've had that information from my experience

18 with -- with the agency.  My issue was making sure that

19 I clarified with you that it came from more than just a

20 proponent, that there was involvement with the agency as

21 well.

22    Q.  Okay.  Well, tell me what goes into the

23 algorithm since you've acknowledged it's part of your

24 policy.

25         MR. CALB:  Objection; misstates testimony.

David Sweetin - 7/25/2024

---

189

```
1       A.  That is medical data that is provided by the
2  medical professionals, that is plugged into the
3  algorithm that --
4       Q.  (BY MR. EDWARDS)  Who created the algorithm?
5               MR. CALB:  Objection; asked and answered.
6       Q.  (BY MR. EDWARDS)  Who created the algorithm?
7  What person?
8       A.  A combination of TDCJ --
9       Q.  Who?
10      A.  -- as well as our medical --
11      Q.  Who?
12      A.  Specifically, I can't tell you who.
13      Q.  Who made it?  You have no idea who at TDCJ
14  created this algorithm, correct?
15      A.  It was a joint effort, yes, sir.
16      Q.  Sir, do you know the identity of any individual
17  involved with creating an algorithm?
18              MR. CALB:  Objection; form.
19      A.  What I know is --
20      Q.  (BY MR. EDWARDS)  Do you know?
21      A.  Do I know -- Repeat the question, please.  You
22  were interrupting.
23      Q.  Do you know the identity of any individual that
24  was involved in creating the algorithm that TDCJ
25  purports to use to assess heat sensitivity or
```

---

190

```
1  vulnerability according to its policies?
2       A.  Any one person, no, sir, I do not know.
3       Q.  Did you take any steps to find out who was
4  involved in the design or creation of this algorithm?
5       A.  In preparation for this, no, sir.
6       Q.  Okay.  Did you ask anyone from health services
7  who created the algorithm or what's in it?
8       A.  I did not.  But that was --
9       Q.  Did you ask -- did you ask Bryan Collier who
10  created the algorithm or what's in it?
11      A.  I was told weeks ago who -- that there was
12  involvement with multiple people.  Not anybody
13  specifically, but multiple partners.
14      Q.  Did you ask Bryan Collier who created the
15  algorithm or what multiple people did?
16              MR. CALB:  Objection to form,
17  argumentative.
18      Q.  (BY MR. EDWARDS)  Did you?
19      A.  I did not.
20      Q.  Did you ask anyone from UTMB, like Owen Murray,
21  who created the algorithm?
22      A.  I did not.
23      Q.  Did anything prevent you from having
24  conversations to find out who created this algorithm and
25  what it's based upon?
```

---

191

```
1               MR. CALB:  Objection; argumentative.
2       A.  No, sir.
3       Q.  (BY MR. EDWARDS)  Okay.  Did anything prevent
4  you from having those conversations or finding out that
5  information?
6       A.  No, sir.
7       Q.  You understand that -- that you're here to talk
8  about policies and procedures and other measures that
9  TDCJ has used since January 1, 2022, and plans to
10  implement this summer to arrest the -- to address the
11  risks that temperatures over 85 degrees Farenheit pose
12  to TDCJ inmates and employees, right?
13      A.  Yes, sir, I'm aware of that.
14      Q.  And you're aware that you're also here to
15  testify about every reason why that TDCJ implemented or
16  plans to implement those policies, procedures, and other
17  measures, right?
18      A.  Mr. Edwards, I didn't ask how they produced the
19  air conditioners either.  But they still got produced,
20  just like the algorithm did.
21      Q.  I'm just -- I'm just getting warmed up, sir.
22              And you're also here to talk about -- and
23  listen to this -- the manner in which TDCJ determines
24  whether inmates are provided air-conditioned housing.
25  You're here to testify about that, right?
```

---

192

```
1       A.  Can you repeat that question.
2       Q.  The manner in which TDCJ determines whether
3  inmates are provided air-conditioned housing, you're
4  here to testify on behalf of the agency about that
5  topic, aren't you?
6       A.  Sure.  Yes, sir.
7       Q.  And you're telling me that the manner in which
8  TDCJ determines this is by an algorithm.  Is that
9  correct?
10      A.  That is correct.
11      Q.  And you have no idea who designed that
12  algorithm, correct?
13              MR. CALB:  Objection; form.
14      A.  Yes, sir, I do.
15      Q.  (BY MR. EDWARDS)  Then, tell me the name of the
16  individual or individuals who designed it.
17      A.  I don't know specifically who the individuals
18  were.  I just know that it was a cooperative effort
19  between our agency staff and the two medical providers.
20      Q.  Can you name a single medical provider involved
21  in creating the algorithm?
22      A.  No, sir.  Again, specifically, I don't know
23  who --
24      Q.  All right.
25      A.  -- the parties are.
```

David Sweetin - 7/25/2024

193

1    Q.   Okay.  Did you take any steps to find out?
2    A.   No, sir.
3    Q.   Did anything prevent you from taking any steps
4  to find out?
5    A.   Other than specifically that the algorithm
6  wasn't in question.
7    Q.   Well, you're aware that TDCJ, by policy, is
8  obligated to work closely with health-care staff to
9  immediately identify inmates at risk from excessive or
10  extreme temperatures, correct?
11    A.   Yes, sir.
12    Q.   Okay.  Bernie Tiede was an inmate that was at
13  risk from excessive or extreme temperatures, wasn't he?
14             MR. CALB:  Objection; form.
15    A.   That was my understanding.  There were
16  occasions where he was subjected to that as a result of
17  medical --
18    Q.   (BY MR. EDWARDS)  Well --
19    A.   -- medications being --
20    Q.   From -- from January 1, 2022, to the present,
21  Mr. Tiede had medical vulnerabilities which made him
22  heat sensitive, right?
23    A.   For periods of time.
24    Q.   Okay.  What periods of time was Mr. Tiede
25  medically sensitive or medically vulnerable, according

194

1  to TDCJ?
2             MR. CALB:  Objection; beyond the scope.
3             MR. EDWARDS:  No, it's not.  It's Topic 12.
4             MR. CALB:  This is housing placements.
5             MR. EDWARDS:  Again, we can agree to
6  disagree, Michael.  But I do disagree.
7             MR. CALB:  I'm not telling him not to
8  answer.
9             You can answer.
10    Q.   (BY MR. EDWARDS)  Can you repeat the question,
11  please?
12    Q.   Yeah.  What periods of time from January 21 --
13  January 1, 2022, to the present do you contend that
14  Bernie Tiede was, in fact, medically vulnerable and
15  ought to have been in air-conditioned housing?
16    A.   My understanding, that there was two separate
17  occasions where he was prescribed medication that would
18  require him, based on our agency policy and protocol, to
19  be housed in air-conditioned housing.
20    Q.   When?
21    A.   Specifically, there was three days in August of
22  '23.
23    Q.   And was he in air-conditioned housing -- Are
24  you telling me that -- that he should not have been in
25  air-conditioned housing when he filed his motion for a

195

1  temporary restraining order?
2             MR. CALB:  Objection; misstates testimony,
3  and to form.
4             MR. EDWARDS:  It's a question.  It's not
5  stating any testimony.
6    A.   What I'm stating is that there were two
7  occasions where he was prescribed medication that -- by
8  our own agency policy and the algorithm, that he would
9  have been assigned to air-conditioned housing.  Required
10  to be assigned.  That doesn't necessarily mean that he
11  was not in air-conditioned housing on some of the other
12  occasions.  But there's only two occasions where that
13  was required.
14    Q.   (BY MR. EDWARDS)  Is it TDCJ's position that he
15  was correctly in non-air-conditioned housing during
16  2022?
17             MR. CALB:  Objection; form, vague.
18    A.   That is correct.  He was -- he was
19  appropriately housed.
20    Q.   (BY MR. EDWARDS)  So it's TDCJ's position,
21  after looking at all the records, that Mr. Tiede was
22  appropriately housed at all times during his custody?
23    A.   That is correct.
24    Q.   And what is that opinion based upon, sir?
25    A.   Based upon our policies, procedures, and

196

1  protocols of the Texas Department of Criminal Justice as
2  well as the --
3    Q.   What protocol?
4             (Speaking simultaneously.)
5    A.   -- (inaudible) based on his health summary for
6  classification.
7    Q.   What protocol are you talking about?  Is he --
8  This algorithm?
9    A.   I'm talking about when somebody is prescribed a
10  medication that allows him to be more heat sensitive,
11  that would be the point in time that he gets placed in
12  housing that is in line with what the medical provider
13  has prescribed.
14    Q.   I mean, it's like I'm deposing two different
15  people here.  One is the person that acknowledges that
16  the dangers of heat are omnipresent and we should do
17  everything in our power to eradicate this dangerous
18  condition, and the other is just an apologist for the
19  organization at any cost.  I -- I haven't seen
20  schizophrenia like this in a while.  But I'll withdraw
21  that comment, sir, okay?
22             Are you -- Can you tell me what medical
23  conditions Bernie Tiede suffered from?  Do you
24  understand what medical conditions he suffered from when
25  he was in un-air-conditioned housing?

David Sweetin - 7/25/2024

197

1                MR. CALB:  Objection; beyond the scope.
2        A.  What I can tell you is the conditions that he
3    had did not require air-conditioned housing.
4        Q.  (BY MR. EDWARDS)  Okay.  Are you aware that he
5    was -- I mean, he was diagnosed with Type II diabetes;
6    he was -- suffered from obesity and COPD, which was
7    diagnosed in 2013.
8                MR. CALB:  Objection; form.
9        Q.  (BY MR. EDWARDS)  Are you saying those
10   conditions didn't warrant placement in air-conditioned
11   housing?
12               MR. CALB:  Objection; beyond the scope,
13   argumentative, and to form.
14       A.  No.  What I'm -- what I'm saying is there was
15   only two occasions, based on his medical records, that
16   required us, as an agency, to put him in
17   air-conditioning or to -- to ensure that he was in
18   air-conditioning, although -- or other times that
19   he was in air-conditioned housing but not because of his
20   medical classification or his health summary for
21   classification.
22       Q.  (BY MR. EDWARDS)  Well, I'm just asking, given
23   that Mr. Tiede suffered from Type II diabetes, obesity,
24   COPD, emphysema, and hyperlipemia, is it -- is it your
25   position that those are not conditions that make you

198

1    medically vulnerable to the heat and warrant
2    air-conditioned housing?
3                MR. CALB:  Objection; beyond the scope,
4    argumentative.
5        A.  No, sir.  Based on our policy and protocols,
6    that if he didn't have the -- the health summary for
7    classification and the restriction from anything other
8    than air-conditioning, there was no reason for us to
9    consider otherwise.
10       Q.  (BY MR. EDWARDS)  Okay.  So you don't think
11   these medical conditions are reasons to place an inmate
12   in air-conditioned housing?
13               MR. CALB:  Objection; beyond the scope.
14               MR. EDWARDS:  It's not beyond the scope.
15   And you can just object; form.
16       Q.  (BY MR. EDWARDS)  You don't think his medical
17   condition, sir, warrants Mr. Tiede being placed in
18   air-conditioned housing, according to your policies?
19       A.  Just because somebody's diagnosed with
20   something, that doesn't necessarily mean to what end of
21   the spectrum that they are.  They could be entry level.
22   In this case, clearly, whatever it was that he was --
23   was diagnosed with was not to the extent that required
24   him to be in air-conditioned housing.
25       Q.  You know, he suffered an acute heat-related

199

1    health crisis in June 2023, a stroke.  Are you aware of
2    that?
3                MR. CALB:  Objection; form.
4        A.  No, sir.
5        Q.  (BY MR. EDWARDS)  Well, regardless if it's
6    heat -- He suffered a stroke in 2023, in June of 2023.
7    Yet despite the fact that he suffered from diabetes,
8    obesity, COPD, emphysema, hyperlipemia, had a stroke
9    which resulted in partial paralysis and some facial
10   disfigurement, he was moved into non-air-conditioned
11   housing on August -- from August 9th through
12   August 17th, 2023.
13               MR. CALB:  Objection; form.
14       Q.  (BY MR. EDWARDS)  I'm sorry.  I apologize.
15               On August 17th, 2023, through
16   September 13th, he was not in air-conditioned housing.
17   Do you have any idea why, given his medical conditions?
18               MR. CALB:  Objection; form.
19       A.  No.  The only thing I can tell you is he was
20   appropriately assigned.
21       Q.  (BY MR. EDWARDS)  Well, you don't have any
22   medical basis for saying that.  You're just saying that
23   the agency contends he was appropriately assigned,
24   right?
25       A.  Yes, sir.

200

1        Q.  Does that mean that people with COPD, diabetes,
2    obesity, and emphysema are appropriately assigned if
3    they're in non-air-conditioned housing during the month
4    of July or August at TDCJ?
5                MR. CALB:  Objection to form.
6        A.  Again, what I can -- I can tell you is, based
7    on medical diagnosis, that's not a automatic conclusion
8    that somebody would be put in air-conditioned housing.
9                I mean, for instance, I could go to my
10   doctor right now and -- and be labeled as obese because
11   I'm overweight based on my -- my frame.
12       Q.  (BY MR. EDWARDS)  And if you were -- You don't
13   seem obese to me.  And I'm not just being kind of
14   Matlocky and cute.  You don't seem obese.  You seem like
15   a good-looking guy, sir -- and though we're going at --
16   it appears, for the last 20 minutes or so.  I respect
17   the process and I respect, you know, what you're doing
18   here.  And I understand your job's not easy, and I can
19   be a bear at times.  I understand that.
20               But, sir, you know, if you are obese, you
21   ought to be in air-conditioned housing.  Don't you
22   agree?
23               MR. CALB:  Objection; form.
24       Q.  (BY MR. EDWARDS)  If you understand the
25   statistics about heat vulnerability, which I assume you

WRIGHT WATSON & ASSOCIATES
1250 South Capital of Texas Highway, Building 3, Suite 400  Austin, Texas 78746  (512) 474-4363

d1373cb1-2f0a-4b96-9b71-3f7399538ee8

David Sweetin - 7/25/2024

---

201

1  do, don't you think obese people ought to be placed in
2  air-conditioned housing at TDCJ?
3              MR. CALB:  Objection to form.
4        A.  No, sir, not necessarily.
5        Q.  (BY MR. EDWARDS)  Even though obesity is a
6  well-known medical vulnerability -- and Judge Pittman
7  will hear about that -- it is TDCJ's position that
8  obesity is not enough to warrant placement in
9  air-conditioned housing, according to its standards.  Is
10 that correct?
11             MR. CALB:  Objection.
12       Q.  (BY MR. EDWARDS)  Okay.
13       A.  That alone does not warrant it.  Yes, sir,
14 that's what I'm saying.
15       Q.  What about that along with emphysema and
16 diabetes and COPD?
17             MR. CALB:  Objection to form.
18       A.  Again, he was appropriately assigned based on
19 what he had going on at the time.
20       Q.  (BY MR. EDWARDS)  All right.  And if Judge
21 Pittman totally disagrees with you that he was
22 appropriately assigned in light of his medical
23 vulnerabilities and instructs the agency that people
24 with similar medical vulnerabilities need to be in
25 air-conditioned housing, would you at least acknowledge

---

202

1  you will put him in air-conditioned housing, or people
2  like him?
3              MR. CALB:  Objection to form.
4        A.  Sure.  I would not disregard anything that an
5  official told me to do if it was within --
6              (Speaking simultaneously.)
7        Q.  (BY MR. EDWARDS)  All right.  Well, I'll
8  represent -- Are you aware that Mr. Tiede had to go to
9  court --
10             (Speaking simultaneously.)
11             MR. CALB:  Objection.  Let him finish his
12 answers.
13             MR. EDWARDS:  I'm sorry.  Okay.  Well, the
14 record will reflect that.
15       Q.  (BY MR. EDWARDS)  Are you aware that Mr. Tiede
16 had to go to court to be moved from un-air-conditioned
17 housing into air-conditioned housing?
18             MR. CALB:  Objection; beyond the scope.
19       A.  I am aware that he went to court, yes, sir.
20       Q.  (BY MR. EDWARDS)  Are you aware that his
21 placement in housing changed as a direct consequence of
22 a judicial ruling in this case?
23       A.  Yes, sir, I'm aware of that.
24       Q.  That before the hearing, okay, he was in
25 air-conditioned housing, and then a federal judge

---

203

1  ordered the agency to place him in -- I'm sorry.
2              Before the hearing, he was in
3  un-air-conditioned, I would submit to you, dangerous
4  housing.  And then after the hearing, he was ordered --
5  I'm sorry -- TDCJ was ordered to place him in
6  air-conditioned and safe housing.  You're aware of that,
7  right?
8        A.  Yes, sir, I'm aware of that.
9        Q.  What -- And then -- and then the agency kept
10 him in air-conditioned housing.  You're aware of that
11 too, right?
12             MR. CALB:  Objection to form.
13       A.  I'm aware that he was assigned to
14 air-conditioned housing during that time frame, yes,
15 sir.
16       Q.  (BY MR. EDWARDS)  Yeah.  Well, after the
17 federal judge ordered the agency to place him in
18 air-conditioned housing, you changed his classification
19 so that he would stay in air-conditioned housing, right?
20             MR. CALB:  Objection to form.
21       A.  No, sir, I wouldn't say that his classification
22 or assignment was changed specifically for
23 air-conditioning.
24       Q.  (BY MR. EDWARDS)  Well, his heat sensitivity
25 score, did it change because of the ruling by the

---

204

1  federal judge?
2              MR. CALB:  Objection; outside the scope.
3        A.  That, I'm not aware of any changes in his heat
4  sensitivity score other than when he was on medication.
5        Q.  (BY MR. EDWARDS)  Well, sir, do you -- Okay.
6              You understand we had to go to court to get
7  him into air-conditioned housing and a federal judge had
8  to force you to put him into air-conditioned housing?
9              MR. CALB:  Objection; form.
10       Q.  (BY MR. EDWARDS)  After that ruling, you, the
11 agency, have kept him in air-conditioned housing.  Why
12 have you kept him in air-conditioned housing?
13       A.  There was no specific reason other than his
14 classification at the time was conducive to wherever he
15 was.  There was not a need to -- to move him at that
16 time.
17             (Speaking simultaneously.)
18       A.  (Inaudible) there was a requirement.
19       Q.  (BY MR. EDWARDS)  Well, you were ordered to
20 place him in air-conditioned housing.  So there sure was
21 a requirement.  You acknowledge that, right?
22       A.  There was then, yes, sir.
23       Q.  Okay.  And, you know, are you prepared to agree
24 to keep him in air-conditioned housing, or do we have to
25 fight about that at trial as well?

---

David Sweetin - 7/25/2024

---

**205**

1            MR. CALB:  Objection to form.
2       A.  No, I will agree to say that we house inmates
3  based on their classification record.  And that's
4  inclusive of their medical record.  If there's
5  restrictions that require them to be placed in certain
6  locations, then, obviously, we accommodate that.
7       Q.  (BY MR. EDWARDS)  All right.  Are there
8  restrictions currently in -- on Bernie Tiede's record
9  that require him to be placed in air-conditioning?
10 Currently.
11      A.  It's my understanding that he has no current
12 requirement.
13      Q.  Okay.  So he is at risk, then, of being moved
14 into un-air-conditioned housing at any moment, fair?
15            MR. CALB:  Objection to form.
16      A.  Possibly, yes, sir.
17      Q.  (BY MR. EDWARDS)  Well, not possibly.  The risk
18 is real, isn't it?
19      A.  It's possible.
20      Q.  Well, okay.  It's possible because TDCJ has
21 determined that this man's condition doesn't make him
22 medically vulnerable to the point that he needs air
23 conditioning, right?
24            MR. CALB:  Objection to form.
25      A.  I will agree to that, yes, sir.

---

**206**

1       Q.  (BY MR. EDWARDS)  And that's despite the fact
2  that he has emphysema, COPD, suffers from obese -- or
3  diabetes and has had a stroke, which has resulted in
4  partial paralysis, it is still the opinion of TDCJ that
5  he's not heat sensitive, warranting air conditioning?
6            MR. CALB:  Objection to form.
7       A.  That is correct.
8       Q.  (BY MR. EDWARDS)  Okay.  And where does --
9  where -- where does your understanding that Mr. Tiede
10 doesn't have heat-sensitive vulnerabilities come from,
11 sir?  Currently.
12            MR. CALB:  Objection; outside the scope.
13            MR. EDWARDS:  No, it isn't.
14            MR. CALB:  What topic covers heat
15 sensitivity?
16            MR. EDWARDS:  We're still on Topic 12, why
17 he was or was not placed in air conditioning.
18            MR. CALB:  You can answer.
19      Q.  (BY MR. EDWARDS)  Okay.  Where does your
20 understanding that Mr. Tiede is not medically vulnerable
21 or heat sensitive such that he should be in air
22 conditioning today?  Where does that come from?
23      A.  Based on the medical classification of the
24 inmate himself.
25      Q.  Okay.  So you'd acknowledge that that

---

**207**

1  classification could just be wrong.  You don't really
2  know if it's right or wrong; you're just saying I accept
3  the classification for this algorithm?
4            MR. CALB:  Objection; outside the scope if
5  you're asking his opinion.
6       Q.  (BY MR. EDWARDS)  Right?
7       A.  Can you repeat the question, please.
8            MR. EDWARDS:  Kelly, would you repeat the
9  exact question to Mr. Sweetin, please.
10            (Requested portion was read.)
11            THE WITNESS:  Kelly, you're muted.  I can't
12 hear you, ma'am.
13            THE REPORTER:  Oh, I apologize.
14            (Requested portion was read.)
15      A.  Yes.  I rely on the -- on the professional
16 medical's decision.
17      Q.  (BY MR. EDWARDS)  Well, again, TDCJ has a
18 policy that prevents medical providers from recommending
19 air-conditioned housing for inmates.  Isn't that
20 correct?
21            MR. CALB:  Objection to form.
22      A.  I'm not aware of any such policy.
23      Q.  (BY MR. EDWARDS)  Sir, there's a housing
24 recommendation form that the agency has used for upwards
25 of decades, okay, that has temperature extremes on it.

---

**208**

1  I hope you're familiar with that.  Are you?
2       A.  What's the title of the form?
3       Q.  I -- I don't know.  Do you really not know that
4  there's a housing recommendation form that TDCJ uses?
5  Are you unfamiliar with this, that has the word
6  "temperature extremes" on it?
7            MR. CALB:  Objection to form.
8       Q.  (BY MR. EDWARDS)  Do you not know about it?
9       A.  Clearly you don't understand the amount of
10 forms that we have in the agency.  I'm asking --
11            (Speaking simultaneously.)
12      Q.  Well, but I'm not the one who's -- I'm not the
13 one who's duty bound to testify about policies and
14 procedures relating to -- to the heat.
15            Are you aware that there is a housing form
16 that TDCJ uses that assigns people bunk restrictions and
17 workplace restrictions?  Are you familiar with that
18 form, or not?
19      A.  Yes, sir, I'm -- I'm familiar with that form.
20      Q.  And on that form there is -- there is a
21 category that says "no temperature extremes."  Do you
22 know that, or are you unaware of that?
23            MR. CALB:  Objection; form.
24      A.  That sounds right.  But in recollection, I
25 can't tell you whether or not it's -- it's there or not.

---

**WRIGHT WATSON & ASSOCIATES**
1250 South Capital of Texas Highway, Building 3, Suite 400  Austin, Texas 78746  (512) 474-4363

d1373cb1-2f0a-4b96-9b71-3f7399538ee8

David Sweetin - 7/25/2024

209

1    Q.  (BY MR. EDWARDS)  That's fine.  The record will
2 reflect that it's either there or it's not, okay?
3             On that -- Nowhere on that phone on which
4 you permit medical providers to put workplace
5 restrictions, bunk restrictions -- top row, bottom row,
6 don't house on the highest row because of heat
7 sensitivity -- nowhere on that form does TDCJ allow
8 medical providers to recommend air-conditioned housing.
9 Do you have any reason to dispute that?
10            MR. CALB:  Objection to form.  Jeff, you
11 want to just show him this document?  He hasn't
12 memorized every document.
13            MR. EDWARDS:  Nope.
14    Q.  (BY MR. EDWARDS)  You can -- you can answer my
15 question, sir.
16    **A.  Is there not a Comments section on that form**
17 **that you're speaking of?**
18    Q.  Is it your understanding that TDCJ's medical
19 providers from UTMB or Texas Tech are, in fact,
20 permitted to recommend air-conditioned housing for --
21 for inmates, or are you -- is your understanding
22 they're not?
23            MR. CALB:  Objection to form.
24    **A.  Again, I would ask in regard to the form that**
25 **you're speaking of is there not a Comments section on**

210

1 **that form.**
2    Q.  (BY MR. EDWARDS)  I have no idea, sir.  Answer
3 my question.
4            Is it your testimony that TDCJ allows
5 medical providers to make recommendations that people be
6 placed in air-conditioned housing, or not?
7            MR. CALB:  Objection; form.
8    **A.  I'm not prepared to testify on that.**
9    Q.  (BY MR. EDWARDS)  Okay.  The -- Your answer is
10 you don't know.  Is that fair?
11    **A.  That is fair.**
12    Q.  Okay.  I'll represent to you that there have
13 been multiple depositions taken in prior cases in which
14 nowhere on that form is -- is a medical provider allowed
15 to recommend air-conditioned housing.  Assuming that to
16 be true, do you know of any information that would
17 dispute that?
18            MR. CALB:  Objection to form.
19    **A.  Again, I would ask what form you're speaking**
20 **of.  But, clearly, you don't want to provide that.**
21 **So . . .**
22    Q.  (BY MR. EDWARDS)  Well, I just don't -- I just
23 don't happen to have it in front of me.  But I don't run
24 a prison system.  I'm just taking a deposition.
25            MR. CALB:  Objection; argumentative.

211

1    Q.  (BY MR. EDWARDS)  I'm representing to you that
2 nowhere on the housing form is there the ability for a
3 medical provider to recommend air-conditioned housing.
4 Do you have any reason to dispute that?
5            MR. CALB:  Objection to form.
6    **A.  Yes, sir, I do if there's a Comments --**
7    Q.  (BY MR. EDWARDS)  Okay.
8    **A.  -- section on there.**
9    Q.  Okay.  So it is your -- your testimony on
10 behalf the agency that there is a -- that would be a
11 Comments section in which medical providers could
12 recommend air-conditioned housing, fair?
13            MR. CALB:  Objection; form.
14    **A.  On this particular form that you're speaking**
15 **of --**
16    Q.  (BY MR. EDWARDS)  Yes.
17    **A.  -- if there is a Comments section on there --**
18 **There's nothing that says comments have to be related to**
19 **anything specific.  Comments are comments.  That's**
20 **exactly what it is.  It's -- it's not any kind of**
21 **category.**
22    Q.  Fair enough.  How exactly is the heat
23 sensitivity score determined?
24            MR. CALB:  Objection as to form.
25    **A.  As I spoke of earlier, the data is input by the**

212

1 **medical department in a particular database that has an**
2 **algorithm that is written to determine what particular**
3 **restrictions are for --**
4    Q.  (BY MR. EDWARDS)  Who at -- who at TDCJ would
5 be able to explain the algorithm?
6    **A.  I'm sure we have multiple staff members that**
7 **would be able to explain it with TDCJ.**
8    Q.  Can you give me one name?
9    **A.  Yes, sir.  Jason Clark.**
10    Q.  If you don't know, you don't know.  That's
11 fine.
12            MR. CALB:  Objection.  Let him answer.
13    Q.  (BY MR. EDWARDS)  Do you know?
14    **A.  Yes, sir.  I said Jason Clark.**
15    Q.  Okay.  So Jason Clark can explain the algorithm
16 process.  Okay.
17            Do you know when the algorithm was created?
18    **A.  Specific date, no, sir.**
19    Q.  Do you know if it was created before, or after
20 litigation finding the agency deliberately indifferent
21 to the health and safety interests of the inmates?
22            MR. CALB:  Objection to form.
23    **A.  No.  Specifically, I don't know when that was**
24 **created.**
25    Q.  (BY MR. EDWARDS)  Okay.  All right.  Other than

**WRIGHT WATSON & ASSOCIATES**
1250 South Capital of Texas Highway, Building 3, Suite 400  Austin, Texas 78746  (512) 474-4363

d1373cb1-2f0a-4b96-9b71-3f7399538ee8

David Sweetin - 7/25/2024

213

1 this algorithm . . .

2          Oh.  Does TDCJ have a heat wave policy?

3    **A.  Can you expand on that, please?**

4    Q.  Well, not really.  I mean, either you do or you

5 don't.

6          Does TDCJ have a heat wave policy?

7          MR. CALB:  Objection to form.

8    **A.  We have policies that address extreme**

9 **temperatures, yes, sir.**

10   Q.  (BY MR. EDWARDS)  No, no.  Well, that's

11 different though.  I understand you have this

12 Administrative Directive 10.64, right?

13   **A.  That is correct.**

14   Q.  And you're prepared to testify about that,

15 right?

16   **A.  Yes, sir.**

17   Q.  And -- But I'm asking you, you know, does the

18 agency make special accommodations during heat waves for

19 inmates?

20   **A.  Well, the policy in and of itself, AD-10.64,**

21 **gives allowances for certain things to be put in place**

22 **and occur when temperatures are elevated.**

23   Q.  Right.  So do you understand what a heat wave

24 is?

25   **A.  Elevated temperatures.**

214

1    Q.  Okay.  And you're -- Okay.  I mean, you

2 understand that heat waves are going to happen in the

3 state of Texas, correct?

4    **A.  Yes, I understand that.**

5    Q.  And you know -- I mean, are there any prisons

6 under your control or guidance or care that aren't going

7 to have temperatures above 90 degrees during the summer?

8    **A.  Above 90 degrees, no, sir.  Almost all of them**

9 **are going to have --**

10   Q.  So category -- Let me make sure I got it right.

11 Category 14.  You see Topic 14?  This can be a fast one.

12 You with me?

13   **A.  Yes, sir.**

14   Q.  The category is the locations and names of all

15 TDCJ prisons in which TDCJ knows or expects that

16 temperatures will exceed 85 degrees Fahrenheit in inmate

17 living areas between May 1 and September 30th, 2024.  Do

18 you see that?

19   **A.  Yes, sir, I do.**

20   Q.  Your answer would be all of the facilities are

21 going to exceed 85 degrees, with the exception of the

22 ones that are fully air-conditioned, fair?

23   **A.  That all of them will?**

24   Q.  Yeah.  That was your testimony.

25   **A.  All 101?**

215

1    Q.  Except for the ones that are air-conditioned.

2    **A.  No, sir, not necessarily.**

3    Q.  Okay.  Which ones do you contend aren't going

4 to exceed 85 degrees?  That's important to me to know.

5          MR. CALB:  Objection; form.

6    **A.  Well, again, we would go back to the benchmark**

7 **data, not being able --**

8    Q.  (BY MR. EDWARDS)  Great.  Tell me which ones.

9    **A.  Excuse me, sir?  I didn't understand your**

10 **question.**

11   Q.  Well, you're here to testify about the

12 locations and names of all the TDCJ prisons which you

13 know will exceed 85 degrees Farenheit in the living

14 areas between May 1 and September 30th, 2024, okay?  And

15 rather than go at all the ones that do, I want to take

16 it from the other way because there are going to be far

17 fewer, okay?  Right?

18          MR. CALB:  Objection to form.

19   **A.  That's a big assumption to make.**

20   Q.  (BY MR. EDWARDS)  Well, why -- then tell me --

21 whichever way -- okay.

22          Again, do you contend that there are any

23 prisons that TDCJ operates in the state of Texas in

24 which the inmate living areas are not going to exceed

25 85 degrees at some point between May 1, 2024, and

216

1 September 30th, 2024?

2    **A.  What I can tell you is based on the benchmark**

3 **data that we have, I can tell you who we expect to**

4 **exceed those temperatures based on a data -- a history**

5 **of data.**

6    Q.  Well, if you know who -- who you expect to

7 exceed the 85-degree threshold, then by -- by -- by

8 reverse, you can tell me who you don't expect to exceed

9 it.  So why don't you tell me who you don't expect to

10 exceed the 85 degrees Farenheit at some point between

11 May 1 and September 30th, 2024.

12          MR. CALB:  Objection to form.

13   **A.  The ones that I don't expect would be the ones**

14 **that are not listed.**

15   Q.  (BY MR. EDWARDS)  Do you have a document

16 that -- that identifies all the prisons that are above

17 85 degrees during this time period?

18   **A.  Yes, sir.  It's my understanding you've been**

19 **provided a document that gives indication as to what the**

20 **top rated temperatures are and based on historic data.**

21   Q.  All of them are higher than 85 degrees that

22 I've looked at, the documents that I've seen.

23          But I'm asking you, are you aware of any

24 that don't -- that didn't exceed 85 during this --

25 during -- that you don't expect any of them to exceed

David Sweetin - 7/25/2024

217

1 85 degrees during this period?

2          MR. CALB:  Objection to form.

3     Q.  (BY MR. EDWARDS)  Is there a single prison that

4 you operate that you don't expect to exceed 85 degrees

5 other than totally air-conditioned ones?

6     **A.  Again, that's a -- Mr. Edwards, that's a big**

7 **reach.**

8     Q.  That's your job, sir.

9          (Speaking simultaneously.)

10    Q.  Did you -- did you take any steps to find --

11         MR. CALB:  Objection.  Let him answer.

12 Argumentative.

13    **A.  Your question was do I know of any.  You're**

14 **asking me to predict the weather and tell you what's**

15 **going to happen between now and whatever time frame you**

16 **specify.  I can't predict the weather, nor will I try.**

17 **What I can tell you is we have a data of certain units**

18 **that we expect will exceed -- have excess or elevated**

19 **temperatures.  And that was --**

20         (Speaking simultaneously.)

21    Q.  And are they --

22         MR. CALB:  Let him answer.

23         MR. EDWARDS:  Hey, Michael, enough, okay?

24 I'm letting him answer.

25    Q.  (BY MR. EDWARDS)  Are they all of the prisons?

218

1          MR. CALB:  You're cutting him off.

2 Repeatedly cutting him off, Jeff.  Please stop doing

3 that.

4          MR. EDWARDS:  Would you let me finish my

5 questions, please?

6     Q.  (BY MR. EDWARDS)  Sir, what prisons do you not

7 expect to reach this 85-degree threshold?  Any?  Can you

8 name one?

9          MR. CALB:  Objection to form,

10 argumentative.

11    **A.  What I can give you is ten units that we expect**

12 **to have excessive temperatures based on historic data.**

13    Q.  (BY MR. EDWARDS)  Sir --

14    **A.  If you'd like me to recite those to you, I'd be**

15 **more than happy to do that.**

16    Q.  Okay.  So it -- Okay.  Again, I want all of the

17 units that you contend are going to be excess of

18 85 degrees this summer from May 1st, 2024, to

19 September 30th, 2024.  What ten do you -- if it's only

20 ten, then that's fine.  What ten?

21         MR. CALB:  Objection to form.

22    **A.  It is the Segovia Unit, the Garza West Unit,**

23 **the Lychner Unit, the Lopez Unit, the Plane Unit, the**

24 **Stevenson Unit, the Gist Unit, the Vance, Briscoe, and**

25 **Dominguez.  And, again, that's based on historic data.**

219

1     Q.  (BY MR. EDWARDS)  Okay.  And based on -- and

2 is -- Did you -- did you look at historical data for the

3 temperatures to determine which ones would be above

4 85 degrees at points during May 1 and September 30th,

5 2024?

6          MR. CALB:  Objection; form.

7     **A.  I looked at the reports that were provided.**

8     Q.  (BY MR. EDWARDS)  Okay.  What reports did you

9 look at?  What document did you look at?  Do you have

10 it it -- do you have it with you?

11    **A.  Specifically, as I was looking at that report,**

12 **I wrote them down in my notes.  But I'm not looking at**

13 **that document right now, no, sir.**

14    Q.  All right.  So you looked at some report and

15 you can't describe it in any way other than it's a

16 report which has some temperature data on it, fair?

17    **A.  No, sir, that's not a fair assumption.**

18    Q.  What -- identify the report for me.

19    **A.  The report is the -- the heat-recording**

20 **temperatures, or logs, recording logs for temperatures**

21 **that's provided to executive services.**

22    Q.  Okay.  So it's the document that is attached to

23 the -- the report that's given to the legislature,

24 right?

25         MR. CALB:  Objection; form.

220

1     Q.  (BY MR. EDWARDS)  That's the document you're

2 looking at, right?

3     **A.  That is the document -- the documentation that**

4 **is collated in order to prepare the document that goes**

5 **to our legislative partners, yes.**

6     Q.  All right.  Is there any prison, other than

7 fully air-conditioned prisons under TDCJ's control, that

8 you don't expect to exceed 85 degrees Farenheit in the

9 inmate living areas?

10         MR. CALB:  Objection; form.

11    **A.  What I can tell you is these ten that I've just**

12 **listed --**

13    Q.  (BY MR. EDWARDS)  You've told me --

14    **A.  -- is a high probability of elevated**

15 **temperatures based on historic data.**

16    Q.  Okay.  Look, you're either going to tell me or

17 you're not.  Are you capable of telling me if there are

18 any prisons in TDCJ's ownership or care that aren't

19 going to be -- in which the inmate housing areas aren't

20 going to be hotter than 85 degrees at times during the

21 summer months between May 1, 2024, and September 30,

22 2024?

23         MR. CALB:  Objection; form.

24    **A.  No, sir, I'm not -- not prepared to tell --**

25    Q.  (BY MR. EDWARDS)  All right.  Did you -- did

David Sweetin - 7/25/2024

### 221

1 you ask anyone for this information in preparation for
2 this deposition?
3     A.  Ask anyone about what, sir?
4     Q.  The information in order for you to answer
5 Topic 14.  Did you do any research and take any steps to
6 find out the information?
7     A.  Yes, sir.
8     Q.  Okay.  Yet you -- and you -- you looked at some
9 temperature data, correct?
10     A.  That is correct.
11     Q.  And you looked at the temperature data that --
12 that is similar to the document that's provided to the
13 legislature, right?
14     A.  I looked at the supporting documents that
15 are --
16     Q.  That -- that's fine.
17         MR. CALB:  Let him finish his answer.
18     Q.  (BY MR. EDWARDS)  And from that -- and from
19 that document, you've given me ten places that you're
20 saying it's going to go hotter than 85 degrees at times
21 during this time period May 1, 2024, and September 30th,
22 2024, right?
23         MR. CALB:  Objection; form.
24     A.  That is correct.  We have ten that we expect,
25 based on historical data, that will be elevated

### 222

1 temperatures.
2     Q.  (BY MR. EDWARDS)  And I'm just asking about
3 temperatures greater than 85 degrees.  It would seem to
4 me, sir, that every -- every prison in the state of
5 Texas, in the summer months, is going to exceed
6 85 degrees.  Do you -- unless it is air-conditioned.  Do
7 you disagree with that?
8         MR. CALB:  Objection to form.
9     A.  It's a possibility.
10     Q.  (BY MR. EDWARDS)  Well, no kidding it's a
11 possibility.  It's almost --
12         MR. CALB:  Objection; argumentative.
13     Q.  (BY MR. EDWARDS)  -- a certainty, though, isn't
14 it, sir?  Well, I'll withdraw that.  That was a little
15 snippy of me.  I apologize.  I think that's a fair
16 criticism.
17         Wouldn't you agree that to a statistical
18 certainty, every prison in the state of Texas is likely
19 to exceed 85 degrees?
20         MR. CALB:  Objection; form.
21     A.  I would agree to that.
22     Q.  (BY MR. EDWARDS)  Okay.  All right.  Let's go
23 back to the heat directive.  It says that TDCJ shall
24 work closely with health-care staff to immediately
25 identify inmates at risk from excessive or extreme

### 223

1 temperatures.  How does TDCJ do this?
2     A.  Let me find that policy specifically that
3 you're talking about.
4     Q.  It's AD-10.64.
5     A.  Yes, sir.  I'm definitely aware of the policy.
6 I'm trying to locate it.
7     Q.  Do you need the policy to answer that question,
8 though?
9         MR. CALB:  Objection; form.  Let him pull
10 up the policy.
11     A.  Well, sir, I can tell you the policies are
12 there for a reason, for our reference.
13     Q.  (BY MR. EDWARDS)  No, they're not there for a
14 reason, for your reference.  They're there to protect
15 inmates from potential dangerous conditions, aren't
16 they?
17         MR. CALB:  Objection; form, argumentative.
18     Q.  (BY MR. EDWARDS)  Aren't they?  Isn't that --
19 isn't that the point of Administrative Directive 10.64,
20 to protect inmates and correctional officers from
21 danger -- a dangerous condition you know about?
22         MR. CALB:  Objection; form.
23     A.  To establish -- to establish the protocols for
24 which we operate under.
25     Q.  (BY MR. EDWARDS)  Okay.

### 224

1     A.  And, again, it's a source of reference for us
2 to make sure that we are doing exactly that.
3     Q.  Sure.  Okay.  You got it in front of you?
4     A.  Yes, sir.  I'm looking at it right now.
5     Q.  All right.  Do you understand that every
6 reasonable effort should be made to prevent injuries
7 related to excessive or extreme temperatures?
8     A.  Yes, sir.
9     Q.  Okay.  And, certainly, air conditioning is a
10 reasonable measure which would help prevent injuries
11 related to excessive or extreme temperatures, correct?
12         MR. CALB:  Objection; form.
13     A.  No, sir, I disagree with that.
14     Q.  (BY MR. EDWARDS)  You don't think it's -- a
15 reasonable effort would include air conditioning?
16         MR. CALB:  Objection to form.
17     A.  No, sir, that's not the spirit and intent of
18 the policy.
19     Q.  (BY MR. EDWARDS)  Well, look, it just says --
20 what does the word "every" mean to you?
21         MR. CALB:  Objection; form.
22     A.  Encompassing all.
23     Q.  (BY MR. EDWARDS)  Okay.  You're saying every
24 reasonable effort shall -- "shall" eliminates
25 discretion, right?  "Shall" says you got to do it all

WRIGHT WATSON & ASSOCIATES
1250 South Capital of Texas Highway, Building 3, Suite 400  Austin, Texas 78746  (512) 474-4363

d1373cb1-2f0a-4b96-9b71-3f7399538ee8

David Sweetin - 7/25/2024

225

1 the time, right?

2    A.  Within our ability.

3    Q.  Sure.  Every reasonable effort shall be made to

4 prevent injuries related to excessive or extreme

5 temperatures in the TDCJ.  That's what this -- that's

6 what the statement says under the word "policy," right?

7    A.  Yes, sir.

8    Q.  Okay.  And it seems like a reasonable effort

9 would be to provide air conditioning to the inmates.  Do

10 you agree with that?

11         MR. CALB:  Objection; form.

12    A.  Again, that goes back to the spirit intent, and

13 intent, of which the policy was written.

14    Q.  (BY MR. EDWARDS)  Okay.  All right.  I don't

15 really know what that means.  But do you feel that

16 you're prepared to fully testify on Topic 10?  Have you

17 done enough preparation?

18    A.  Topic 10, yes, sir.

19    Q.  Okay.  That's policies and procedures that, you

20 know, in theory, are designed to help protect inmates

21 from the dangerous conditions of inside heat, right,

22 amongst other -- and cold?

23         MR. CALB:  Objection; form.

24    Q.  (BY MR. EDWARDS)  Right?

25    A.  Say the question again, please.

226

1    Q.  Yeah.  Isn't 10.64, you know, your policy

2 that's -- the spirit is designed to help protect inmates

3 from the dangers of heat and cold?

4         MR. CALB:  Objection; form.

5    A.  Yes, sir.  That's a fair statement.

6    Q.  (BY MR. EDWARDS)  All right.  Now, temperature

7 logs are supposed to be kept by the agency, right?

8         MR. CALB:  Objection; form.

9    A.  Yes, sir.

10    Q.  (BY MR. EDWARDS)  Okay.

11    A.  That is correct.

12    Q.  How long are they supposed to be kept for?

13         MR. CALB:  Objection to form.

14    A.  In accordance with the retention policy as

15 dictated by the agency's policy on document retention.

16    Q.  (BY MR. EDWARDS)  Well, how long do you keep

17 temperature logs?  I -- I don't have a copy of the

18 record retention schedule with me.  Do you know how long

19 you keep them?

20    A.  For that particular document, no, sir, I do

21 not.

22    Q.  Okay.  Well, let me ask you this way.  Don't

23 you think the agency ought to keep the records for a

24 significant period of time so it can notice trends in --

25 in the temperatures?

227

1         MR. CALB:  Objection to form.

2    A.  Sure.  That's the whole reason for a retention

3 policy.

4    Q.  (BY MR. EDWARDS)  I don't know what you're --

5 Well, or it's to hide the truth.  There are lots of

6 reasons for retention policies.

7         MR. CALB:  Objection; argumentative.

8    Q.  (BY MR. EDWARDS)  I'm asking you why you have a

9 retention policy, sir.  I'm asking you, don't you think

10 it would be a good idea to evaluate the temperature data

11 you collect to discover trends in the temperatures if

12 you really care about protecting the inmates in your

13 care?

14         MR. CALB:  Objection; argumentative, form.

15    A.  Well, I assert to you that we do.  And that's

16 the whole reason why I was able to provide you with a

17 list of ten units based on historic data.  That's

18 exactly what that is, is historic data based on a

19 retention schedule.

20    Q.  (BY MR. EDWARDS)  Well, you gave me the ten

21 hottest units at TDCJ, right?

22         MR. CALB:  Objection; misstates testimony.

23    A.  Yes, sir, that is correct.

24    Q.  (BY MR. EDWARDS)  Okay.  All right.  Why don't

25 you tell me what policies and procedures TDCJ's

228

1 implemented in order to protect inmates from the dangers

2 of extreme heat.

3    A.  Specifically, the AD-10.64 that I'm looking at

4 here, that is the --

5    Q.  Anything else?

6    A.  -- agency directive that we use throughout the

7 agency, throughout each division, to make a determining

8 as to whether or not we're acting appropriately based on

9 the temperatures.

10    Q.  Well, you've had AD-10.64 for decades, right?

11         MR. CALB:  Objection to form.

12    A.  I can't tell you exactly when it was drafted.

13 But suffice it to say that it's been several years in

14 place.

15    Q.  (BY MR. EDWARDS)  Well, you -- you had

16 AD-10.64, or a version of it, when you were found to be

17 deliberately indifferent to the health and safety of

18 inmates at the Pack Unit, right?

19         MR. CALB:  Objection to form.

20    A.  What I know is it's been revised ten different

21 times over the course of the -- life of this policy.

22    Q.  (BY MR. EDWARDS)  Okay.  What changes were made

23 to the policy in order to help protect inmates after you

24 were -- after the agency was found to be deliberately

25 indifferent to the Pack inmates?

David Sweetin - 7/25/2024

---

**229**

1          MR. CALB: Objection to form.

2    Q. (BY MR. EDWARDS) If any.

3    A. Specific to that, I can't tell you.

4    Q. Okay. Can you -- other than us reading this

5 policy, can you tell us any protection that you think is

6 important in terms of mitigation measures that might

7 alleviate the dangers from extreme heat and make it safe

8 for these inmates to actually live in the prison system

9 rather than risk potential death every day in the

10 summer?

11          MR. CALB: Objection; argumentative, and

12 form.

13    Q. (BY MR. EDWARDS) Well, strike -- let me -- let

14 me -- let me deal with that again.

15          You understand that these temperatures that

16 the inmates are exposed to throughout the state of Texas

17 are so high that without adequate protective mitigation

18 measures, they have a very real risk of serious injury.

19 You understand that, right?

20          MR. CALB: Objection to form.

21    A. Can you ask that question again, please?

22    Q. (BY MR. EDWARDS) Sure. You understand, as an

23 agency, that the temperatures that the inmates are

24 exposed to during the summer months are so high and

25 potentially dangerous that they're at very real risk of

---

**230**

1 harm and serious injury, you know, unless, you know,

2 adequate measures are taken to protect them, right?

3          MR. CALB: Objection to form.

4    A. Yes, I will agree with that.

5    Q. (BY MR. EDWARDS) One of the measures that

6 you've long had at the agency is the provision of water,

7 right?

8    A. Yes, sir.

9    Q. Okay. And you understand that -- that the

10 provision of water is a necessary accommodation in order

11 to protect the inmates from this dangerous heat to which

12 you knowingly expose them, right?

13          MR. CALB: Objection; form, argumentative.

14    A. Yes, sir, I'd agree to that.

15    Q. (BY MR. EDWARDS) Okay. And if -- if water's

16 not being brought at -- at a -- at a -- you know, if --

17 if inmates don't have access to cold water, you know, at

18 all times, they're -- they're at an increased danger.

19 And you know that as an agency, right?

20          MR. CALB: Objection; form.

21    A. No, sir. I disagree with that statement.

22    Q. (BY MR. EDWARDS) Okay. Well, you have

23 policies that require correctional officers to make cold

24 water available to inmates at all times, right?

25    A. Make water available?

---

**231**

1    Q. Cold water.

2    A. And what is cold water?

3    Q. You tell me. You're running the prison system.

4    A. I'm asking you --

5    Q. I'll just ask you, is it TDCJ's policy to make

6 cold water available to inmates at all times? Or iced

7 water.

8    A. It is our policy to make sure that there is ice

9 and water available, that is correct.

10    Q. At all times, right?

11    A. At all times?

12    Q. Yes, at all times. Isn't that your policy, or

13 practice?

14    A. Again, you're talking about 24/7, 365 days a

15 year?

16    Q. No, I'm talking about 24/7 during the heat

17 period, during the summer, between April 15th and

18 October 15th. Is that your policy?

19    A. Yes, sir, I agree with that.

20    Q. Okay. And you would acknowledge that, you

21 know, that policy's only as good as the officers who are

22 implementing it, right?

23          MR. CALB: Objection to form.

24    A. Yes, sir, I will agree with that.

25    Q. (BY MR. EDWARDS) For instance, if officers

---

**232**

1 didn't provide water -- ice -- ice-cold water on a

2 consistent, constant basis, that would be problematic;

3 and you, as an agency, would have to rectify that,

4 right?

5          MR. CALB: Objection; form.

6    A. Yes. I agree with that.

7    Q. (BY MR. EDWARDS) Okay. Similarly, you

8 understand that one -- one of the ways that I'm told

9 that you try to ameliorate this dangerous condition of

10 heat is by enabling inmates to take cold showers. Is

11 that correct?

12          MR. CALB: Objection to form.

13    A. That is correct.

14    Q. (BY MR. EDWARDS) And you -- and is it -- is it

15 the policy of TDCJ during the summer months that inmates

16 are to have access to cold showers at all -- at all

17 times?

18          MR. CALB: Objection to form.

19    A. Yes.

20    Q. (BY MR. EDWARDS) And if they're denied access

21 to a cold shower, then, that would be potentially

22 dangerous, right?

23          MR. CALB: Objection to form.

24    A. Potentially, yes, sir.

25    Q. (BY MR. EDWARDS) Okay. And, again, when

---

David Sweetin - 7/25/2024

233

1 you're talking about risk, you're only talking about
2 potential danger, right?  That's the point of risk.  Not
3 everybody dies from extreme heat.  It's just an elevated
4 risk that we've decided, as a society, it's too much
5 risk to account for, so we need to issue some
6 protections.  That's the job of the agency, fair?
7           MR. CALB:  Objection; form.
8     A.  I will agree to that.
9     Q.  (BY MR. EDWARDS)  Okay.  Now, access to air
10 conditioning, is -- is that part of your policy?
11    A.  Yes, sir.  We refer to that as a respite area.
12    Q.  And is it -- is it the case that respite areas
13 have to be available to inmates 24 hours a day, seven
14 days a week during the hotter months?
15    A.  Yes, sir, that is correct.
16    Q.  And that's because you've determined, look,
17 it's an absolute necessity to give people access to air
18 conditioning because you know that without it they're at
19 potential risk of serious harm, right?
20          MR. CALB:  Objection to form.
21    A.  They're given the choice.  It's not an absolute
22 necessity.
23    Q.  (BY MR. EDWARDS)  Well, no, no.  The ac --
24 the -- the access is an absolute necessity.  Whether
25 they choose to take it is up to the inmate, right?

234

1           MR. CALB:  Objection; form.
2     A.  That is correct.
3     Q.  (BY MR. EDWARDS)  Okay.  So if officers are
4 denying cold showers, not bringing water, or not
5 providing access to respite areas, that would be hugely
6 problematic and -- and would endanger the inmates if
7 that were happening, fair?
8           MR. CALB:  Objection; form.
9     A.  That would be in violation of our policy, yes,
10 sir.
11    Q.  (BY MR. EDWARDS)  All right.  And that wouldn't
12 be what you want your prison to -- to -- prisoners to
13 experience, right?
14          MR. CALB:  Objection to form.
15    A.  That is correct.
16    Q.  (BY MR. EDWARDS)  Okay.  Now, can a maximum-
17 custody inmate who needs -- Would you agree that
18 maximum-custody inmates deserve the same protections
19 from the dangers of extreme heat as minimum-custody
20 inmates?
21          MR. CALB:  Objection; form.  Outside the
22 scope.
23    A.  Can you state that question again?  I'm not
24 sure I understood where --
25    Q.  (BY MR. EDWARDS)  Do you agree that maximum-

235

1 custody inmates deserve as much protection from the
2 dangers of extreme heat as minimum-custody inmates?
3           MR. CALB:  Objection; form.  Outside the
4 scope.
5     A.  I believe all of them are equally entitled.
6     Q.  (BY MR. EDWARDS)  Your policies apply to
7 maximum- and minimum-custody inmates equally, fair?
8     A.  Yes, sir.
9     Q.  Okay.  Now, given that it's so important these
10 protective -- these alleged protective measures, on
11 lockdowns you don't give inmates access to cold showers
12 24 hours a day, seven days a week, do you?
13    A.  Yes, sir, they still have access to it.
14    Q.  (BY MR. EDWARDS)  Okay.  So even on a lockdown,
15 even -- when a prison is locked down, the entire unit
16 can go into air-conditioning respite if they want to?
17    A.  The entire unit?
18    Q.  Sure.
19    A.  No, sir.
20    Q.  Okay.  So not everybody has access to -- in a
21 lockdown situation, you don't have the same access to
22 these protective measures, fair?
23    A.  It's fair to say they don't have free and
24 frequent access under lockdown processes, yes, sir.
25

236

1     Q.  Right.  And lockdowns happen a fair amount
2 during the summer months.  Isn't that correct?
3           MR. CALB:  Objection; outside the scope.
4     A.  What's a fair amount?  That's a very broad
5 statement.
6     Q.  (BY MR. EDWARDS)  Well, you know, I don't know.
7 You know lockdowns are going to happen during the summer
8 months.  Is that a reasonable expectation that it's
9 going to happen at certain prisons during the summer?
10          MR. CALB:  Objection; outside the scope.
11    A.  Well, what a reasonable expectation is that we
12 try as much as possible to work around the hot months
13 for the reasons that we're talking about.  That's not to
14 say that some security concern would not elevate to the
15 point where we have to lock down.
16    Q.  (BY MR. EDWARDS)  Look, I'm not -- I'm not
17 saying there's not a reason to do a lockdown.  I'm just
18 saying that it's -- it's likely to happen during the
19 summer months, lockdowns, at many of these prisons,
20 right?
21    A.  No.
22          MR. CALB:  Objection; outside the scope,
23 and form.
24    Q.  (BY MR. EDWARDS)  Is that fair?
25    A.  Not likely, but possible.

David Sweetin - 7/25/2024

237

1    Q.   Okay.  Well, it's -- it's certainly something
2  you know -- you know could happen, right?
3    A.   I know it's something we try to avoid.
4    Q.   Well, it's -- you also try to avoid
5  heat-related illnesses.  But they happen, don't they?
6              MR. CALB:  Objection to form.
7    A.   Yes, sir.
8    Q.   (BY MR. EDWARDS)  And -- and you know, despite
9  the various measures that you've implement, that inmates
10 and officers continue to suffer heat-related illnesses,
11 right?
12             MR. CALB:  Objection to form.
13   A.   Can you restate that question again, please.
14   Q.   (BY MR. EDWARDS)  You know, despite the
15 protective measures you've allegedly implemented, and
16 the policies you've created, that inmates and officers
17 continue to suffer heat-related illnesses.  Isn't that
18 true?
19   A.   We have had some, yes, sir.
20   Q.   Now, you've made -- you, the agency, has
21 made -- have made representations to the public that
22 there have been no heat-related deaths since 2012 in the
23 prison system.  Is that correct?
24   A.   That is correct.
25   Q.   What is the basis for your statements to the

238

1  public and the press that there have been no heat-
2  related deaths in the Texas Prison System since 2012?
3    A.   My assertion regarded -- regarding your
4  question would be that heat was determined to be part of
5  it -- part of the death, but not what -- was not the
6  causal factor.  It was a combination of factors that
7  resulted in the death, heat of which was listed as part
8  of the environment, but it was not specified in the
9  autopsy that it was as a result of the heat.
10   Q.   Okay.  Well, so it's not true that there have
11 been no heat-related deaths since 2012, is it?
12             MR. CALB:  Objection to form.
13   A.   If you're asking me specific to heat, I will
14 tell you there has not been.
15   Q.   (BY MR. EDWARDS)  Okay.  Well, I'm not asking
16 you specific to heat, even though that's also a false
17 statement if you really want to drill down on this.
18             But I'm asking -- you understand that the
19 word "heat-related death" means a death that is related
20 or partly responsible or due to the heat.  You
21 understand that, right?
22   A.   Heat related?  I don't know that I've got a --
23 have ever seen a clear definition of "heat related."
24   Q.   You're the ones who are saying heat-related
25 illnesses and heat-related deaths.  Am I -- am I

239

1  mischaracterizing what you're saying?
2              I mean -- and here's what I'm getting at,
3  sir.  I'm not particularly interested in playing word
4  games or engaging in semantics with the Texas Department
5  of Criminal Justice.  I'm a lawyer and I'm pretty
6  clever.  I could do that.  But I -- I really don't get a
7  sense that you care to play word games either.  Am I
8  right about your integrity?
9              MR. CALB:  Objection; argumentative.
10   Q.   (BY MR. EDWARDS)  You care about protecting the
11 men and woman in your care, don't you?
12             MR. CALB:  Objection to form,
13 argumentative.
14   Q.   (BY MR. EDWARDS)  Well, let me withdraw that.
15             Look, sir, is it the Texas Department of
16 Criminal Justice's position that when they tell the
17 public there are no heat-related deaths, that they're
18 not -- they don't mean that there's no deaths in which
19 heat contributed or was a factor in the death; there are
20 simply no solely, exclusively, "only heat killed that
21 person" deaths.  That's what you mean?
22   A.   What I mean is, when the autopsies are
23 evaluated and read, it shows that heat could have been
24 an associated factor.  It doesn't necessarily mean that
25 it was a result of heat specifically.

240

1    Q.   Well, you're telling the public that no one has
2  died as a consequence of the heat when you inform them
3  that there are no heat-related deaths.  Don't you agree
4  with that?
5              MR. CALB:  Objection to form.
6    A.   No, sir, I don't agree with that.
7    Q.   (BY MR. EDWARDS)  Okay.  When you tell the
8  legislature there's been no heat-related deaths, do you
9  then tell them, but there have been several deaths in
10 which heat was a contributory factor?
11   A.   Anybody has access to the autopsies, as
12 they're -- they're public record.
13   Q.   You think autopsies are public records?
14   A.   To a certain extent, yes, sir.
15   Q.   Well, do you think honesty and candor, when
16 you're talking to legislature, is important?
17             MR. CALB:  Objection; form.
18   A.   Utmost.
19   Q.   (BY MR. EDWARDS)  Did you say "utmost"?
20   A.   Utmost important, yes, sir.
21   Q.   Do you think integrity is important when you're
22 testifying and giving statements to the public?
23             MR. CALB:  Objection to form.
24   A.   Yes, sir.
25   Q.   (BY MR. EDWARDS)  Do you think the agency was

**WRIGHT WATSON & ASSOCIATES**
1250 South Capital of Texas Highway, Building 3, Suite 400  Austin, Texas 78746  (512) 474-4363

d1373cb1-2f0a-4b96-9b71-3f7399538ee8

David Sweetin - 7/25/2024

241

1 being honest when they informed the public that there
2 were no heat-related deaths when they knew that there
3 were deaths in which heat was a contribu -- a
4 contributing factor?
5          MR. CALB:  Objection to form.
6     A.  It was -- it is my testimony at this point in
7 time that -- that the information that we have provided
8 to the officials that have requested it is accurate
9 data.
10    Q.  (BY MR. EDWARDS)  I'm not talking about data
11 now.  I'm talking about spin, or words.  Do you agree
12 that words matter when you're -- when you're talking to
13 people about the consequences of extreme heat?
14          MR. CALB:  Objection to form.
15    Q.  (BY MR. EDWARDS)  Let me withdraw that.
16          Do you agree that the words you use matter
17 when you're talking about the dangers or consequences of
18 extreme heat?
19          MR. CALB:  Objection to form.
20    A.  Just as much as interpretation of the
21 information.
22    Q.  (BY MR. EDWARDS)  Again, "interpretation" is an
23 interesting word.  You're making a choice how you
24 interpret the autopsies that -- or the deaths that occur
25 under your care, aren't you?

242

1          MR. CALB:  Objection; form.
2     A.  We're making a decision based on the
3 information that's provided to us on the autopsy from
4 the medical professionals.
5     Q.  (BY MR. EDWARDS)  And that decision has
6 consequences, doesn't it?
7          MR. CALB:  Objection; form.
8     Q.  (BY MR. EDWARDS)  Doesn't it?
9     A.  What decision would that be?
10    Q.  Well, when you tell the legislature, the
11 public, or people that there haven't been any
12 heat-related deaths and there actually have been, it
13 makes it seem like whatever you're doing is resulting in
14 the lack of heat-related deaths, don't you think?
15          MR. CALB:  Objection; form.
16    A.  No, sir.  I disagree with that.
17    Q.  (BY MR. EDWARDS)  Okay.  So when you said to
18 the -- to the legislature or to reporters there were no
19 heat deaths or no heat-related deaths, you were not
20 purposely intending to mislead those people, right?
21    A.  That is correct.
22    Q.  You would tell -- you would tell the
23 legislature, reporters, the public, that there have, in
24 fact, been deaths in which heat was an important
25 contributory factor, wouldn't you?

243

1          MR. CALB:  Objection; form.
2     A.  Could you explain that again.
3     Q.  (BY MR. EDWARDS)  You would tell members of the
4 press, the legislature, and the public that there have,
5 in fact, been deaths in which heat was a contributing --
6 a contributory factor in the death, correct?
7     A.  True.  I agree with the autopsies that heat was
8 a contributing factor.
9     Q.  Okay.  Well -- and a contributing factor means
10 it was a cause of the death.  One of the causes of the
11 death.  You understand that, right?
12          MR. CALB:  Objection to form.
13    A.  No, sir, I don't -- heat could have been just
14 the environment at the time.  That doesn't necessarily
15 mean it was the reason for the death.  The heat just
16 happened to be circumstantial.
17    Q.  (BY MR. EDWARDS)  No, there's a difference
18 between the heat could have been a possible factor.
19 Every death that happens in these un-air-conditioned
20 prisons could be due to the heat, right?  That's a
21 possibility in every single death, right?
22    A.  And I agree with the assertion that we have no
23 heat deaths.
24    Q.  Okay.  Well, John Castillo is certainly a heat-
25 related death, isn't it?

244

1          MR. CALB:  Objection; form.
2     A.  I'm not familiar with John Castillo.
3     Q.  (BY MR. EDWARDS)  Well, you're here to talk
4 about the circumstances of every death listed in Exhibit
5 A to Mr. Tiede's first set of requests for production to
6 Defendant Bryan Collier, aren't you?
7     A.  Yes, sir.
8     Q.  And you're here to testify whether or not you
9 believe that heat caused or contributed to those deaths,
10 right?
11    A.  Yes, sir.
12    Q.  And you're here to talk about every action that
13 TDCJ took in response to each of those deaths, right?
14    A.  Correct.
15    Q.  Okay.  Well, let's talk about John Castillo.
16 As you testify here today, do you have any idea how he
17 died?
18    A.  Specific to his death, no, sir.
19    Q.  Okay.  You didn't do any research or review any
20 autopsies relating to Mr. Castillo in preparation for
21 this deposition?
22    A.  No, sir.  What was provided to me is based on
23 the documents that we had that -- that assert that we
24 have no deaths that are heat related.
25    Q.  Well, but I guess -- I guess what you're saying

**WRIGHT WATSON & ASSOCIATES**
1250 South Capital of Texas Highway, Building 3, Suite 400  Austin, Texas 78746  (512) 474-4363

d1373cb1-2f0a-4b96-9b71-3f7399538ee8

David Sweetin - 7/25/2024

245

1 is only heat was the cause.  That's what you consider a
2 heat or heat-related death, fair?
3           MR. CALB:  Objection; form.
4      A.  A heat-related death is the sole causal factor
5 of the death.  That is correct.
6      Q.  (BY MR. EDWARDS)  Okay.  So unless it says
7 hyperthermia on the autopsy, you don't consider -- and
8 it only says hyperthermia, you don't consider it a heat-
9 related death, right?
10           MR. CALB:  Objection to form.
11      A.  Yes, sir.  That's -- that's the way we
12 interpret it.
13      Q.  (BY MR. EDWARDS)  Now, that's a dangerous way
14 to interpret autopsies, isn't it?
15           MR. CALB:  Objection to form.
16      A.  I don't believe so, no, sir.
17      Q.  (BY MR. EDWARDS)  Well, do you know if body
18 temperatures are taken when people die as a matter of
19 course at the Texas Department of Criminal Justice, or
20 suffer strokes and fallouts?  Do you know if body
21 temperatures are always taken?
22      A.  Well, I can tell you as a general rule for the
23 correctional side of the house, there's nothing that
24 specifically states or conveys that that is to be
25 ordered.  Now, clearly, once it gets into -- the

246

1 offender inmate gets into the medical department, they
2 very well could ask for a temperature.  Is it standard
3 protocol, no, sir, I'm not aware of standard protocol
4 that requires an internal body temperature.
5      Q.  Well, do you know what vital signs are?
6      A.  I think I do, yes, sir.
7      Q.  What -- what is your understanding of what
8 vital signs are?
9      A.  As it relates to somebody who's alive, it's --
10 it's -- it's the effects or causes to a decline in -- in
11 whether or not somebody's living.  It could be the blood
12 pressure; it could be their breathing capabilities.
13      Q.  Could be their pulse or it could be their
14 temperature, right?  Those are the vital signs, right?
15 Please tell me you know this.
16           MR. CALB:  Objection; argumentative.
17      A.  Yes, sir.
18      Q.  (BY MR. EDWARDS)  Okay.  So, you know, there's
19 going to be testimony from doctors that vital signs are
20 certainly dealing with breathing, respirations, pulse
21 rate, blood pressure, and temperature.  And you
22 understand that, right?
23      A.  Yes, sir, I understand that.
24           MR. CALB:  Objection; form.
25      Q.  (BY MR. EDWARDS)  And -- and you told me

247

1 earlier there's no protocol for taking temperatures of
2 dead people.  But you would agree that there is a
3 protocol for taking temperatures of live people who
4 aren't dead yet, right?
5           MR. CALB:  Objection; form.
6      A.  No, sir, I'm not aware of a protocol that says
7 that they are to take the internal temperature of -- of
8 somebody otherwise.
9      Q.  (BY MR. EDWARDS)  Well, that's one of the vital
10 signs.  That's what doctors do.
11      A.  Okay.  I agree to that, yes, sir.
12      Q.  Okay.
13      A.  Specifically, are you -- you were asking if
14 there's a policy.  No, sir, we don't have a policy
15 specific to that.
16      Q.  Well, yeah.  Well, whether there's a policy or
17 not, it's what's supposed to be done.  And one of the
18 reasons why you might not do it would be to hide the
19 fact that there are, in fact, heat-related deaths in the
20 system.  That's one reason you might not be taking body
21 temperatures.  Is -- is that why you're not always
22 insisting that body temperatures be taken?
23           MR. CALB:  Objection; form.
24      A.  I don't agree with that assertion, no, sir.
25      Q.  (BY MR. EDWARDS)  Why are you not insisting

248

1 that body temperatures be taken if you care about
2 finding out about whether or not there are heat-related
3 deaths at TDCJ prisons?
4           MR. CALB:  Objection; form.
5      A.  Because that's a determination to be made by
6 the medical profession at the time of the evaluation.
7      Q.  (BY MR. EDWARDS)  Does TDCJ care about finding
8 out if people are dying as a direct consequence of the
9 heat or partly as a consequence of the heat?
10      A.  Yes, sir, I would say so.
11      Q.  And if -- and more than 20 people have, in
12 fact, died from the heat, right?
13           MR. CALB:  Objection; form.
14      Q.  (BY MR. EDWARDS)  Right?
15      A.  Are you speaking of a specific time frame?
16      Q.  No.  But do you not know that more than 20
17 people have tied in TDCJ custody from the heat, that
18 TDCJ has agreed to that in prior litigation?
19      A.  That they have -- the deaths were as a result
20 of heat?  No, sir.  We have no heat-related deaths.
21      Q.  Okay.  It's TDCJ testimony that you don't have
22 any heat-related deaths at the TDCJ -- in TDCJ?  That's
23 your testimony?
24      A.  Which is specific to heat, yes, sir.
25      Q.  And -- and as you testify here today, you

David Sweetin - 7/25/2024

249

1 believe that's a truthful answer?

2    A.  Absolutely, yes, sir.

3    Q.  All right.  You don't strike me as someone

4 who's, you know, going to purposely lie to me to my

5 face.  So I just want to follow up on that.

6         Is it really your testimony that there have

7 been no heat-related deaths in the TDCJ system?  Is that

8 really what you're saying?

9         MR. CALB:  Objection; asked and answered.

10    Q.  (BY MR. EDWARDS)  I'll withdraw the -- the

11 first part.  But I want to caution you, sir.  Is it

12 really your testimony that there has -- that there has

13 not been any heat deaths or heat-related deaths at TDCJ?  Is

14 that really your testimony?

15    A.  Could you explain "heat related"?

16    Q.  Deaths caused by the heat.

17    A.  As the causal factor?

18    Q.  Yes.

19    A.  Yes, sir, I'll testify to that.

20    Q.  Okay.  Would you agree with me that if there

21 were deaths that were caused by the heat, okay, solely

22 caused by the heat, would you then agree that that's a

23 serious problem that TDCJ has to take steps to rectify

24 or ameliorate?

25    A.  Which is exactly why we have no heat-specific

250

1 dates -- or deaths.  Excuse me.

2    Q.  Right.  And you're telling me that you -- for

3 the last, I don't know, 20 years or so, you guys have

4 had policies in place to, you know, protect inmates from

5 the heat.  And according to you, there haven't been any

6 heat-related deaths, or heat deaths, solely caused by

7 the heat, right?

8    A.  Yes, sir, that is correct.

9    Q.  Okay.

10    A.  Heat has been a contributing factor, but not

11 the causal factor.

12    Q.  Would you explain to me the difference between

13 a contributing factor and a causal factor according to

14 the Texas Department of Criminal -- Criminal Justice?

15         MR. CALB:  Objection; form.

16    Q.  (BY MR. EDWARDS)  And are you looking at a

17 piece of paper right now, sir?

18    A.  I'm looking at AD-10.64.

19    Q.  Okay.  Are there any notes on your AD-10.64?

20    A.  There are highlights on the 10.64.

21    Q.  Okay.  I'd ask that that be made a deposition

22 exhibit.

23         MR. EDWARDS:  That will be Exhibit 5,

24 Kelly?

25         THE REPORTER:  Yes, sir.

251

1         MR. EDWARDS:  Okay.

2         (Sweetin Exhibit No. 5 was marked.)

3         MR. EDWARDS:  Can you send that to us, with

4 the highlights, please?  Can Jennifer or Sharon -- I --

5 if I'm getting the names wrong, I apologize.  Can you

6 agree to send that in to the -- to Kelly?

7         MR. CALB:  We'll make sure it gets sent.

8         MR. EDWARDS:  Okay.

9    Q.  (BY MR. EDWARDS)  Sir, would you tell me the

10 agency's distinction between "causal" and "contributing"

11 when it comes to heat deaths?

12    A.  Sure.  A contributing factors means that it's

13 one of many or several other factors associated but is

14 not the specific cause of the death.

15    Q.  (BY MR. EDWARDS)  And do you understand, as an

16 agency, that there can be more than one cause of a

17 person's death?

18    A.  Yes, sir, I understand that there are causal

19 factors.

20    Q.  And you understand that heat can cause stress

21 that would lead someone to suffer a heart attack.  Do

22 you understand that?

23    A.  Yes, sir.

24    Q.  Okay.  And your understanding of that is, well,

25 heat could be a contributing factor in that situation,

252

1 but it wasn't the cause of death because the heart

2 attack is really the cause of death.  Is that what I'm

3 hearing from you?

4         MR. CALB:  Objection to form.

5    A.  Sir, what I'm saying is, it's a -- could be a

6 combination of multiple factors.  What -- what I'm

7 telling you is that we have no deaths that were strictly

8 associated or as a result of -- of heat.

9    Q.  (BY MR. EDWARDS)  Well, those are two different

10 things, okay?  You do have deaths that were as a result

11 of heat.  But -- well, strike that.

12         There will be testimony that there have

13 been deaths as a result of heat.  You, as an agency,

14 vehemently deny that, correct?

15    A.  That is correct.  We only --

16    Q.  Okay.  And the basis for your vehement denial

17 is looking at autopsies and reading what is said as

18 cause of death on the autopsies, right?

19    A.  Yes, sir, that is correct.

20    Q.  Okay.  Has the agency done any sort of studies

21 or hired any -- any scientific groups to evaluate

22 whether or not their interpretations are correct?

23    A.  Not to my knowledge, no, sir.

24    Q.  Now, do you acknowledge that you're not a

25 scientist who studies causes of death?

David Sweetin - 7/25/2024

---

253

1    A.  Yes.

2            MR. CALB:  Objection; outside the scope if

3 you're asking about him specifically.

4            MR. EDWARDS:  It's dead-center scope of

5 this deposition.

6            MR. CALB:  I mean, you asked specifically

7 whether he's a scientist.  That's him as a

8 representative of the agency.

9    Q.  (BY MR. EDWARDS)  At no point has TDCJ engaged

10 any scientist to evaluate whether or not the heat is

11 causing deaths in the prison system.  Is that correct?

12    A.  I don't guess I understand your question.

13    Q.  Well, I'll ask it this way.  If you don't

14 understand, you don't understand.

15            Has the Texas Department of Criminal

16 Justice ever hired someone to evaluate whether or not

17 the heat is causing people to die that otherwise

18 wouldn't be dying in the Texas Prison System?

19    A.  No, sir, not to my knowledge that we have hired

20 anybody specific for that, that role.  Although, we do

21 have medical professionals that provide us with the

22 information.

23    Q.  Well, maybe, maybe -- well, no, they don't.

24 But that's neither here nor there.  I'll withdraw that.

25            Don't you think that the agency ought to

---

254

1 hire somebody to evaluate whether or not this dangerous

2 condition is -- is responsible for killing people or

3 harming people?

4            MR. CALB:  Objection; form.

5    A.  That's only if I would agree that our medical

6 professions are -- are inept in their job.  And I don't

7 agree with that.  I think they're very capable of what

8 they do in giving us guidance with regard to factors

9 associated with inmate health.

10            MR. EDWARDS:  Kelly, would you repeat the

11 question I asked Mr. Sweetin, please.

12            (Requested portion was read.)

13    Q.  (BY MR. EDWARDS)  And the "this dangerous

14 condition" I'm talking about is the extreme heat inside

15 the prisons, okay, sir?  What is your answer?

16    A.  My answer was we rely on our medical

17 professionals to provide us advice and information

18 related to such factors.

19    Q.  Well, have you ever asked UTMB to do an

20 evaluation as to whether or not the heat has harmed any

21 of the individuals and caused deaths at any point?

22    A.  No, sir, not to my knowledge.

23    Q.  Have you ever asked Texas Tech to do such a

24 study as to whether or not the heat has harmed any

25 individuals or caused or contributed to any deaths?

---

255

1    A.  Well, what I can tell you is --

2    Q.  That's a yes or no, sir.

3    A.  Okay.  Well, explain "study."  What are you

4 talking about when you say "study"?

5    Q.  I mean evaluate data and -- and put together

6 conclusions as to groups of -- groups of events, you

7 know.  That's what I mean when I say "study."  But I'll

8 defer to scientists as to what they mean, "study."

9    A.  Well, what I can tell you and my interpretation

10 is, we have medical professionals that study the data

11 that is provided.  They evaluate daily operations; they

12 evaluate information that comes to them from outside

13 sources; they have a mortality review committee that

14 evaluates information and data associated with that to

15 see if there's anything that we could do different that

16 would benefit that particular case.  So in that sense,

17 yes, sir, they -- they study the data.

18    Q.  Well, you think isolated mortality review

19 committees are the same thing as studying groups of

20 deaths?  Do you understand the difference between the

21 two?

22            MR. CALB:  Objection to form.

23    A.  No, sir.  I didn't say that.

24    Q.  (BY MR. EDWARDS)  Do you understand the

25 difference between studying lots of deaths and one

---

256

1 death?

2            MR. CALB:  Objection to form.

3    A.  What I can tell you is the --

4    Q.  (BY MR. EDWARDS)  Do you understand the

5 difference between those two -- those two situations,

6 sir?

7            MR. CALB:  Let him answer.

8    A.  Specifically what are you talking about?

9    Q.  (BY MR. EDWARDS)  Do you understand the

10 difference between studying lots of deaths or lots of

11 illnesses versus looking at one or evaluating just one?

12    A.  Sure, that would be a difference.

13    Q.  What would be the difference be in TDCJ's mind?

14    A.  The difference is everybody gets evaluated.

15    Q.  Well, you discover patterns and problems if you

16 evaluate all of the data, not just one-offs, right?

17            MR. CALB:  Objection; form.

18    A.  I didn't specify that we only study ones and

19 twos.  Our medical professionals review the data daily.

20 They have --

21    Q.  (BY MR. EDWARDS)  Then, there are ought to

22 be --

23            MR. CALB:  Let him finish his answer.

24    Q.  (BY MR. EDWARDS)  You're saying your medical

25 providers review the data daily.  That's what I heard

---

**WRIGHT WATSON & ASSOCIATES**

1250 South Capital of Texas Highway, Building 3, Suite 400  Austin, Texas 78746  (512) 474-4363

David Sweetin - 7/25/2024

---

**257**

1 you say, right?  Is that what you said?

2    A.  Yes, sir.  They're reviewing data every day,

3 yes, sir.

4    Q.  Has UTMB ever done an analysis of all of the --

5 the death data to determine whether or not there is a

6 higher incidence of death during the summer months

7 because of the lack of air conditioning?

8    A.  I'm not aware of any, no, sir.

9    Q.  Okay.  You understand that you're here to talk

10 about . . .

11        Other than AD-10.64, are there any other

12 policies that relate to the heat that you've prepared --

13 you to testify about?

14    A.  No, sir.

15    Q.  Okay.  Now, let's look at Topic 9, okay?  Do

16 you see that topic?

17    A.  Yes, sir, I do.

18    Q.  Okay.  I'll read it so that -- so that Judge

19 Pittman understands.  It's all studies, research,

20 publications, warnings, and other information that TDCJ

21 currently has regarding the risks that temperatures over

22 85 degrees pose to TDCJ inmates and employees,

23 including, but not limited to, the risks of heat-related

24 illnesses and death.  You're -- you're here to testify

25 about that, right?

---

**258**

1    A.  Yes, sir, that is correct.

2    Q.  Okay.  Are you fully prepared to testify on

3 behalf of TDCJ as to this topic?

4    A.  I'm fully prepared to tell you what my

5 knowledge is with regard to that particular --

6    Q.  Great.  What did you do to prepare to testify

7 on behalf of TDCJ as to this topic?

8    A.  Studied documents.

9    Q.  What documents did you study?

10    A.  Specifically, I can't tell you off the top of

11 my head.  But I'm quite sure it's the documents that

12 were sent to your office as a result of disclosure.

13    Q.  Well, that doesn't help me, because I'm here to

14 ask you questions.

15        So what studies, if any, did you review in

16 preparation for this topic?  And you appear to be

17 reading something.  Did somebody hand you something?

18    A.  No, sir.  There's nobody in here.

19    Q.  Oh, you're by yourself.  I'm sorry.  I

20 apologize.  It just looked like you were looking down at

21 something.

22        Can you identify any study that you

23 reviewed or were explained in preparation for this

24 topic?

25    A.  Yes.  There's a couple of studies that have

---

**259**

1 been done over the course of time, none of which --

2    Q.  Okay.  What studies did you review?

3        MR. CALB:  Let him finish.

4    A.  If you'll give me some time, I'll look it up.

5 I've got quite a -- quite a few documents.

6    Q.  (BY MR. EDWARDS)  Okay.  Before you look it up,

7 are you capable of identifying a single study you read?

8 And you may not be.  It's okay.

9    A.  No, I don't specifically have the title on top

10 of my head, no, sir.

11    Q.  Before you look it up, can you tell me anything

12 about any of the studies that you purportedly read?

13    A.  Yes, sir.

14    Q.  Okay.  What -- what do you recall from any of

15 the studies that you read?  We'll get into names in a

16 second.  But what -- what are the finer points or the

17 big-picture conclusion?

18    A.  Well, essentially, it was studies that were

19 conducted as a result of -- of deaths related to heat.

20    Q.  What did those studies conclude, if -- if

21 any -- if you recall?

22    A.  I don't recall off the top of my head.

23    Q.  Why don't you take -- take a minute -- Why

24 don't we go off record, and you can take a couple of

25 minutes and find if there's a couple of studies you

---

**260**

1 actually did review.  You can find them, and we can talk

2 about them, okay?  Let's go off the record for a couple

3 of minutes, okay?

4        MR. EDWARDS:  We'll come back in, let's

5 say -- Does three minutes work for everybody?

6        Is that enough time, sir?  You want five?

7        THE WITNESS:  Five is good, yes, sir.

8        MR. EDWARDS:  All right.  Let's take

9 five -- a five-minute break.

10        THE VIDEOGRAPHER:  The time is 4:29 p.m.

11 Central.  We are off the record.

12        (Recess.)

13        THE VIDEOGRAPHER:  The time is 4:38 p.m.

14 Central.  We are on the record.

15    Q.  (BY MR. EDWARDS)  Did you locate any studies

16 that you found that you reviewed?

17    A.  Yes, sir.  I did find two studies that I had

18 reviewed.

19    Q.  Yeah.  They're reports from Dean Rieger, right?

20    A.  This is a report from the -- on the extreme

21 temperatures and COVID-19 in Texas prisons from the --

22 Texas A&M University as a reduction and recovery center.

23    Q.  Okay.  You read that.

24    A.  And, then, another one, JAMA Network is

25 provision of air-conditioned and heat-related mortality

---

**WRIGHT WATSON & ASSOCIATES**
1250 South Capital of Texas Highway, Building 3, Suite 400  Austin, Texas 78746  (512) 474-4363

d1373cb1-2f0a-4b96-9b71-3f7399538ee8

David Sweetin - 7/25/2024

261

1  in Texas prisons.

2    Q.  Okay.  Did -- You reviewed those studies, then,

3  okay.  Did anyone provide you any information about

4  that?

5    A.  Nothing more than the studies themselves.

6    Q.  Okay.  Well, those studies are pretty shocking

7  in terms of the danger that the lack of air conditioning

8  causes inmates in the Texas prison population, aren't

9  they?

10       MR. CALB:  Objection; form.

11    A.  Well, to be honest with you, I didn't give it

12  much credibility.  It's not something that we sanctioned

13  or were involved in to the extent where I feel the

14  veracity of the information is -- is accurate.

15    Q.  (BY MR. EDWARDS)  So you reviewed the -- the

16  Skarha study, which concluded that there were more than

17  200 deaths that the heat was responsible for during a,

18  you know, 19-year period, right?

19    A.  No, sir.  I can't testify on behalf of -- of

20  these two reports that I'm looking at and had access to

21  over the course of my preparation.  Again, it's not

22  something that we sanctioned or -- or were involved in.

23    Q.  All right.  So just to be clear, you reviewed,

24  and the agency has seen and reviewed, the -- the Skarha

25  report in JAMA regarding the provision of air

262

1  conditioning in Texas -- Texans.  And am I stating the

2  agency's position correctly?  You disregarded it because

3  you did not sanction it.  Is that fair?

4       MR. CALB:  Objection; misstates testimony.

5    A.  No, sir, that's not fair.

6    Q.  (BY MR. EDWARDS)  Okay.  I thought you told me

7  that you didn't give it much credit because you weren't

8  responsible for making it happen.  Did I mishear you?

9    A.  Essentially, that was it.  I don't -- I don't

10  know how reliable these studies are, just simply

11  because, again, we were not involved in the studies.

12    Q.  Well, have you asked anybody how reliable the

13  study was?

14    A.  No, sir.

15    Q.  I mean, do you know where Dr. Skarha went to

16  college?

17       MR. CALB:  Objection; form.

18    A.  I don't feel that's relevant, sir.

19    Q.  (BY MR. EDWARDS)  Okay.  Well -- okay.  You

20  just -- Do you understand the conclusions in the -- the

21  Skarha study?

22    A.  No, sir.  I didn't need to understand it.

23  Again, I don't know the -- the extent of their

24  investigation and the reliability of the information

25  that they provided.  For that reason, it's nothing more

263

1  than writing on a piece of paper.

2    Q.  Are you an epidemiologist?

3       MR. CALB:  Objection; form.

4    A.  No, sir.

5    Q.  (BY MR. EDWARDS)  Do you know what epidemiology

6  is?

7    A.  No, sir.

8    Q.  Well, before you disregard an epidemiological

9  study, shouldn't you try to find out what it is?

10       MR. CALB:  Objection; form.

11    A.  No, sir.  Again, I've read lots of documents

12  that are just words on paper.  That doesn't necessarily

13  make them true, accurate, and a reflection of what's

14  actually going on.  So I didn't take any merit with it.

15    Q.  (BY MR. EDWARDS)  Do you know if Director

16  Collier shares your position?

17       MR. CALB:  Objection; form.

18    A.  No, sir, I do not.

19    Q.  (BY MR. EDWARDS)  Your expectation would be he

20  would share your position, but you don't know for sure.

21  Is that fair?

22    A.  No, sir, that's not fair.

23    Q.  Did you ask Director Collier what his position

24  was on the Skarha study?

25    A.  Specific to our discussion here, no, sir.

264

1    Q.  Well, let me read the -- Do you agree or -- do

2  you agree that there's a large body of epidemiologic

3  evidence that heat is associated with an increased risk

4  of mortality?

5       MR. CALB:  Objection; outside the scope if

6  you're asking him personally.

7       MR. EDWARDS:  This is dead center scope of

8  the examination.  Dead center.

9       (Speaking simultaneously.)

10       MR. CALB:  Dead center, Michael.

11       MR. CALB:  (Inaudible) personally.  And

12  That's my -- My only distinction is --

13       MR. EDWARDS:  Kelly --

14       That's fine.  You objected "outside the

15  scope."  It's a spurious, ridiculous objection, but

16  continue to make it.

17       Kelly, would you read the exact question to

18  Mr. Sweetin, please.

19       (Brief pause.)

20       THE REPORTER:  Sorry.

21       MR. EDWARDS:  Or would it be easier if I

22  just repeated it?

23       (Requested portion was read.)

24       MR. CALB:  Objection; outside the scope if

25  you're asking him his opinion.

**WRIGHT WATSON & ASSOCIATES**
1250 South Capital of Texas Highway, Building 3, Suite 400  Austin, Texas 78746   (512) 474-4363

d1373cb1-2f0a-4b96-9b71-3f7399538ee8

David Sweetin - 7/25/2024

265

```
 1    Q.  (BY MR. EDWARDS)  Please answer the question,
 2 sir.
 3    A.  Explain what you're asking.
 4    I'm asking if you agree with the author of this
 5 paper that you reviewed that there is a large body of
 6 epidemiologic evidence that heat is associated with --
 7 with increased risk of mortality.
 8    A.  Well, as I stated prior, I don't have an
 9 opinion on this one way or the other.
10    Q.  Well, don't you think it's time that the
11 Department of Criminal Justice started to have an
12 opinion about the epidemiologic evidence that -- that
13 does, in fact, show that heat is associated with an
14 increased risk of mortality?
15           MR. CALB:  Objection; argumentative, form.
16    A.  I feel like we're taking appropriate measures.
17    Q.  (BY MR. EDWARDS)  Would it concern you, as the
18 Department of Criminal Justice, if there were 13 deaths
19 annually as a consequence of the heat inside the Texas
20 Prison System?
21           MR. CALB:  Objection; form.
22    Q.  (BY MR. EDWARDS)  On average.
23    A.  If it was a heat-specific death?  Is that your
24 question?
25    Q.  I'd like you to just answer my question.  I'm
```

266

```
 1 done with the word games, sir.  I don't have enough time
 2 to play anymore.  Now we're just -- you're getting full
 3 Jeff here, okay?
 4           Does it -- Would it concern you if there
 5 were 13 deaths that were associated with the heat due to
 6 a lack of air conditioning in the Texas Prison System?
 7 Can you please answer my question, sir.
 8    A.  There again, it's -- it's -- I'm not
 9 understanding your -- your question.  Because what I
10 speak on is on behalf of what is related specific to
11 heat.  Again, heat can be a variable in regard to a
12 debt, but that doesn't make it a heat death.
13           If -- if you're asking me if there were 13
14 heat-related deaths specific to heat, yes, sir, that
15 would be a problem.
16    Q.  Why?
17    A.  Because of our preventative measures that we
18 put in place, as well as our --
19    Q.  It would --
20           MR. CALB:  Let him finish.
21    A.  Go ahead.
22    Q.  (BY MR. EDWARDS)  Let me finish for you.  It
23 would be a problem because your preventative measures
24 are worthless.  That's what it would indicate, right?
25           MR. CALB:  Objection; argumentative, form.
```

267

```
 1    A.  Means we could potentially have some problems,
 2 yes, sir.
 3    Q.  (BY MR. EDWARDS)  Well, do you think it's
 4 appropriate for the agency to stick its head in the sand
 5 and ignore studies by competent epidemiologists?
 6           MR. CALB:  Objection; form.
 7    A.  No, sir, it wouldn't be appropriate for us to
 8 stick our heads in the sand on any topic.
 9    Q.  (BY MR. EDWARDS)  It would -- it would be
10 the -- it would be the epitomy of indifference, being
11 made aware of a problem and ignoring it, right?
12           MR. CALB:  Objection; form.
13    A.  I understand there's a difference in medical
14 opinions and people's opinions.  And, again, just
15 because I've got a study here in front of me, that
16 doesn't provide me with any insight as to the accuracy
17 of the data.  So, therefore, I don't have an opinion of
18 it one way or the other.
19    Q.  (BY MR. EDWARDS)  Well, again, isn't it time
20 for you to get an opinion and seek one out?
21           MR. CALB:  Objection to form.
22    A.  Yes, sir.  And I believe we've done that.
23    Q.  (BY MR. EDWARDS)  Okay.  Who gave you an
24 opinion about -- about Dr. Skarha's study, which
25 actually reflects an incidence of 14 deaths annually due
```

268

```
 1 to the heat, not 13.  But who gave you an opinion that
 2 leads you to be able to discount this study?
 3    A.  I wasn't referring to this particular study.
 4    Q.  Okay.  Well, let's talk about this particular
 5 study.  You've read it, or you haven't?  Well,
 6 withdrawn.  You told me you read it.  You told me you
 7 reviewed it in preparation for this deposition, yet
 8 you're disregarding it even though you're not an
 9 epidemiologist.  Why, sir?
10           MR. CALB:  Objection; form.
11    A.  As I previously stated, the information that's
12 provided in the report has not necessarily come from any
13 reliable sources.  And because we were not involved in
14 it, nor did we sanction it, then, for that reason, I
15 have no opinion of it one way or another when it comes
16 to what we're doing.
17    Q.  (BY MR. EDWARDS)  What evidence do you have to
18 suggest that the data that Dr. Skarha relied upon is
19 unreliable?
20           MR. CALB:  Objection; form.
21    A.  No data, sir.
22    Q.  (BY MR. EDWARDS)  There are numerous other
23 studies which indicate that -- that heat and exposure to
24 high heat is extremely dangerous for people.  You
25 don't -- you're not aware of any of these studies?
```

David Sweetin - 7/25/2024

269

1    A.  The studies specifically that we were talking
2  about are the two that are referenced in the -- in the
3  documents.
4    Q.  Well, would a thirtyfold increase in heat-
5  attributed deaths, when compared with estimates in the
6  general U.S. population, cause a responsible
7  administrator some concern?
8              MR. CALB:  Objection; form.
9    A.  Is that an excerpt out of the report?
10    Q.  (BY MR. EDWARDS)  Does it matter?
11    A.  Yes, sir, if you're asking me to --
12    Q.  Yes, it's an excerpt out of the report.
13              (Speaking simultaneously.)
14    Q.  Does that -- does that excerpt cause you
15  concern?
16              THE REPORTER:  Sorry.  You're speaking over
17  each other.
18    Q.  (BY MR. EDWARDS)  Yes, sir, it's an excerpt
19  from the report.  Does that excerpt from the report from
20  Dr. Skarha cause you concern as an agency?
21    A.  No, sir.
22    Q.  So the fact that 13 percent of deaths -- 271
23  deaths that may be attributed to extreme heat during
24  warm months in Texas prisons, without universal air
25  conditioning, between 2001 and 2019 does not cause you

270

1  concern?
2              MR. CALB:  Objection to form.
3    A.  Well, again, I will say that there's not much
4  merit in regard to these particular studies because we
5  don't -- we don't know the -- the reliability of the
6  data that was provided to them during the study.
7    Q.  (BY MR. EDWARDS)  Okay.  So -- all right.
8  Don't you think it's incredibly dangerous to discount or
9  not find out about the efficacy of a study when it's so
10  important to the -- the well-being and safety of the men
11  and women in your custody and control?
12              MR. CALB:  Objection; form.
13    A.  Sir, what I can say is there all -- all kinds
14  of documents that I can pull up that -- and read to you.
15  But that doesn't necessarily mean that they're accurate.
16    Q.  (BY MR. EDWARDS)  Does it mean they're -- does
17  it mean that all studies are inaccurate if they are
18  something that you don't like reading?
19              MR. CALB:  Objection; form.
20    A.  No, sir.
21    Q.  (BY MR. EDWARDS)  Do you consider Texas A&M to
22  be a reliable institution when it comes to putting out
23  papers on the dangers of extreme temperatures?
24    A.  I believe Texas A&M has a good reputation, a
25  solid reputation.

271

1    Q.  Well, the lead author for the study that's --
2  that you've also reviewed, Extreme Temperatures in
3  COVID-19 in Texas Prisons, was J. Carlee Purdum, a PhD
4  from Texas A&M, right?
5    A.  Yes, sir.
6    Q.  And the group that put out this paper was the
7  Hazard Reduction and Recovery Center at Texas A&M,
8  right?
9    A.  It would appear so, yes, sir.
10    Q.  Okay.  It concluded that mitigation measures
11  that purportedly are being used by TDCJ are -- are
12  inconsistently followed throughout the system.  Isn't
13  that really concerning to you?
14              MR. CALB:  Objection to form.
15    A.  No, sir, not at all.
16    Q.  (BY MR. EDWARDS)  And it concluded that
17  22 percent of inmates, not just those surveyed, who were
18  cool-bed priority offenders because of heat sensitivity
19  did not have access to cool beds at the time,
20  August 2020.  Does that concern you?
21    A.  And I'm curious how they would know that.
22    Q.  Well, did you try to find out if that -- did
23  you do anything to try to determine whether or not that
24  conclusion was accurate?
25    A.  No, sir.

272

1    Q.  Okay.  Did you do anything to determine whether
2  or not the conclusion that mitigation measures were
3  inconsistently followed throughout the system?  Did you
4  do anything to examine that?
5    A.  No, sir.
6    Q.  Did you do anything to examine their conclusion
7  that 60 percent of inmates serviced -- surveyed reported
8  wellness checks were not being done?
9    A.  No, sir.
10    Q.  Now, if that were true, that would be terrible
11  and -- and a true danger to the inmates, right?
12              MR. CALB:  Objection; form.
13    A.  Yeah.  If it was substantiated, yes.
14    Q.  (BY MR. EDWARDS)  Well, in order to determine
15  if something's true, you got to investigate it, right?
16              MR. CALB:  Objection; form.
17    A.  That is correct.
18    Q.  (BY MR. EDWARDS)  Did the agency investigate
19  this conclusion from this study, that 60 percent of
20  inmates who were surveyed noted wellness checks not
21  being done?
22    A.  I'm not aware of any type of investigation in
23  regard to either one of these reports.
24    Q.  Okay.  Let's go through another conclusion.
25  43 percent of inmates surveyed reported that in 2020

David Sweetin - 7/25/2024

**273**

1 they had a health crisis disregarded.  That seems
2 concerning to me.  It's not concerning to the agency?
3          MR. CALB:  Objection; form.
4     A.  Not in the form of this report, no, sir.
5     Q.  (BY MR. EDWARDS)  Two-thirds of the inmates who
6 were surveyed said they had no access to cool-down extra
7 showers.  That would concern me.  It doesn't concern
8 you?
9     A.  If that were the case.
10     Q.  And in order -- You did -- and you did nothing
11 to deter -- you, as an agency, did nothing to determine
12 if this conclusion were accurate or not, correct?
13          MR. CALB:  Objection to form.
14     A.  As I stated, I'm not aware of any kind of
15 investigative measures that we conducted on either one
16 of these studies.
17     Q.  (BY MR. EDWARDS)  This -- this report noted
18 that there were almost 1200 grievances between
19 September 2019 and August 2020 just about water and ice
20 being unavailable.  Did you do anything to investigate
21 that conclusion?
22     A.  No, sir.
23     Q.  Don't you think you should have?
24          MR. CALB:  Objection to form.
25     A.  No, sir.

**274**

1     Q.  (BY MR. EDWARDS)  Well, were there 1200
2 grievances about water and ice not being available, or
3 do you know?
4          MR. CALB:  Objection; outside the scope.
5     A.  No, sir.  That's what their assertion is, but I
6 do not know that to be the case.
7     Q.  (BY MR. EDWARDS)  Well, Good Lord.  Did you
8 check the grievances to see if there were that many
9 grievances about a lack of ice and water being
10 available?
11          MR. CALB:  Objection; outside the scope.
12     A.  I'll say it again.  We did no investigative
13 measures in regard to either one of these reports.  We
14 rely on our internal data.
15     Q.  (BY MR. EDWARDS)  Okay.  Well, you know, on
16 July 12th, 2022, Bryan Collier testified to the house
17 appropriations committee about Texas prisons, and
18 Dr. Purdum testified immediately after him about the
19 report while Director Collier was still there.
20          And to your knowledge, nobody investigated
21 the conclusions in the report or the testimony that
22 Dr. Purdum gave?
23     A.  To my knowledge, you are correct.
24     Q.  During that same time period, according to
25 the -- the report, or the study, there were more than, I

**275**

1 think, 1255, but let's give or take ten or 20 grievances
2 about not having access to respite areas.  Nobody at
3 TDCJ investigated this?
4     A.  Again, I don't know that the information is
5 accurate to investigate it.
6     Q.  Well, let's say that there were 1200-plus
7 grievances about not having access to respite areas.
8 That would cause any administrator who cares about the
9 health and well-being of the men in his care and control
10 some serious concern, right?
11     A.  Sure.
12          MR. CALB:  Objection; form.
13     Q.  (BY MR. EDWARDS)  Okay.  47 percent of the
14 people surveyed reported that they were denied access to
15 respite areas.  TDCJ undertook no investigation of that
16 conclusion or that survey result, right?
17     A.  We did not, simply because I don't know how
18 that data was -- they came about that particular data.
19     Q.  Did you talk to the author of the study and ask
20 him or her about how they came to get that data?
21     A.  Again, I'm not aware of any investigative
22 measures that we went through in regard to either one of
23 these reports.
24     Q.  I mean, if you care about the health and
25 well-being of the men and women in your -- in your

**276**

1 custody and control, shouldn't you investigate these
2 things?
3          MR. CALB:  Objection to form.
4     A.  Not necessarily, no, sir.
5     Q.  (BY MR. EDWARDS)  What is it take to get you to
6 conduct an investigation as to whether or not you're
7 actually doing the mitigation measures you report to the
8 legislature and the public you're doing?
9          MR. CALB:  Objection to form, outside the
10 scope.
11     A.  Again, we rely on our internal data and
12 reporting, whether it be inmate grievances, verbal
13 complaints, information passed on from department to
14 department.  Yes, sir, there's -- there's --
15     Q.  (BY MR. EDWARDS)  Look, sir, you've got a
16 doctor, an epidemiologist, pointing out to you that --
17 that more than 200 people died as a consequence --
18 consequence of exposure to heat in the Texas Prison
19 System.  And are you seriously telling me you did
20 nothing to investigate her conclusions?
21          MR. CALB:  Objection; form.
22     A.  What I'm telling you is that we did not
23 authorize or sanction or had any administrative
24 involvement in any -- either one of these reports.  For
25 that reason, I don't know the -- the reliability of the

**WRIGHT WATSON & ASSOCIATES**
1250 South Capital of Texas Highway, Building 3, Suite 400  Austin, Texas 78746  (512) 474-4363

d1373cb1-2f0a-4b96-9b71-3f7399538ee8

David Sweetin - 7/25/2024

277

1 information that was provided other than what's written
2 on the paper.
3    Q.  (BY MR. EDWARDS) Yeah.  Okay.  Do you have any
4 plans to examine the reliability of what's written in
5 the paper in the next couple of days, before you testify
6 at trial?
7    A.  I do not, no, sir.
8    Q.  Okay.  Patrick Womack is an individual who had
9 a 106-degree core body temperature, and his cause of
10 death is hyperthermia due to serotonin syndrome from
11 sertraline toxicity.  Environmental heat is a contrib --
12 is a possible contributory factor.  That's what the
13 autopsy said.
14        Do you know the significance of 106-degree
15 core body temperature, sir?
16    A.  Yes, sir.  I know that it's not good.
17    Q.  I respect understatement as much as the next
18 person.  It's deadly, isn't it?
19        MR. CALB:  Objection; outside the scope.
20    A.  Yes, sir.
21    Q.  (BY MR. EDWARDS) There is going to be
22 testimony that that death was a direct consequence of
23 Mr. Womack's exposure to the heat.  You just don't --
24 don't believe that to be the case, based on the autopsy.
25 Is that correct?

278

1    A.  As I previously stated, the heat was a
2 contributing factor, not the -- not the sole causal
3 factor of the death.
4    Q.  Gotcha.  Well, look, despite whatever measures
5 you're -- you're putting on paper that you're doing in
6 terms of these mitigation measures, you would at least
7 acknowledge that one study that you've reviewed
8 indicates that those are not being done with regularity,
9 correct?
10    A.  Could you explain that question?
11    Q.  Sure.  The Texas A&M study that you've
12 reviewed, the -- the conclusions that I went through
13 with you that ice -- ice and water were not being
14 regularly distributed, that respite areas were not --
15 that people were not being taken to respite areas, air
16 conditioning was denied to people, that's in direct
17 violation of your policies if it were happening, right?
18    A.  Yes, sir, I agree with that, if it was
19 happening.
20    Q.  And, you know, again, I've pointed out two
21 deaths that are causally related to indoor exposure to
22 heat that your response to me is, we're not going to
23 change what we're doing; we're simply going to
24 categorize this as a not-solely-related-to-heat death.
25 Is that -- do I hear you correctly?

279

1        MR. CALB:  Objection; form.
2    A.  Yes, sir.  When we review the autopsy --
3    Q.  (BY MR. EDWARDS) Oh, God.
4    A.  -- based on the medical professional's opinion,
5 that's how we draw our conclusion.
6    Q.  Yeah.  Well, the medical professional's opinion
7 is that heat is a contributing factor in the person's
8 death.  That's what the medical professional's opinion
9 is, right?
10        MR. CALB:  Objection to form.
11    A.  Could possibly be.
12    Q.  (BY MR. EDWARDS) Yeah.  So how dare you
13 represent to the public that there aren't any
14 heat-related deaths when you know that to be false?
15        MR. CALB:  Objection.  It's unnecessarily
16 badgering the witness.
17        MR. EDWARDS:  Well, you know what, it was
18 pretty harsh.  Let me ask it -- I'll withdraw it.  Let
19 me ask it this way.
20    Q.  (BY MR. EDWARDS) Sir, you know that
21 environmental exposure to heat was a contributing factor
22 in multiple deaths.  Given that knowledge, how can you
23 responsibly relay to the public that there haven't been
24 any heat-related deaths when you know that not to be
25 true?

280

1        MR. CALB:  Objection to form.
2    A.  That's our opinion based on our analysis of the
3 data that was provided.
4    Q.  (BY MR. EDWARDS) Okay.  How are we going to
5 get you to change your opinion, TDCJ?  What's it going
6 to take?
7        MR. CALB:  Objection to form.
8    Q.  (BY MR. EDWARDS) Would anything change your
9 opinion, sir?
10    A.  I'm not going to say anything, no, sir.
11    Q.  Well, I -- I've given you evidence that would
12 change your -- most people's opinions in the form of Mr.
13 Castillo and Mr. Womack's autopsy results.  That hasn't
14 changed your opinion, correct?
15    A.  No, sir.
16        MR. CALB:  Objection; form.  (Inaudible.)
17    Q.  (BY MR. EDWARDS) And I've put forward and I've
18 talked to you about the two studies you reviewed that
19 have alarming conclusions.  That hasn't changed your
20 opinion, right?
21    A.  No, sir, it has not.
22    Q.  Okay.  I mean, it sounds to me like your
23 opinion that there haven't been any heat-related deaths
24 isn't going to change unless a court tells you you're
25 wrong and orders you to make changes.  Is that fair?

David Sweetin - 7/25/2024

---

281

1             MR. CALB:  Objection to form.  Misstates
2 testimony.
3     A.  No, sir, that's not fair.
4     Q.  (BY MR. EDWARDS)  Okay.  Well, all right, let's
5 see if you disregard the next autopsy -- next dead
6 person we talk about from the heat.  Do you know who
7 Elizabeth Haggerty is?
8     A.  Yes, sir.
9     Q.  Okay.  The autopsy says that elevated
10 environmental temperatures, i.e., heat stress, obesity
11 and diabetes may be contributed -- contributory factors
12 to her death.  Does that impact your belief that there
13 still have been no heat-related deaths?
14     A.  I believe the keyword there is "may."
15     Q.  Okay.  Well, there's going to be -- there's
16 going to be testimony from a board-certified doctor that
17 it did cause it and it was one of the causes of her death,
18 okay?  That's going to be presented at trial, okay?  If
19 you hear from a doctor that it -- it did cause her
20 death, are you going to disregard that doctor's opinion?
21             MR. CALB:  Objection to form.
22     A.  So you're asking me to disregard the first bit
23 of information we got to go along with this other one?
24     Q.  (BY MR. EDWARDS)  Well, do you know --
25             (Speaking simultaneously.)

---

282

1     Q.  -- do you know if -- Well, all right.  I don't
2 think anything will change your opinion.  But I did want
3 to give you a chance.
4     Ms. Haggerty.  Was a -- was a core body
5 temperature taken?
6     A.  That, I'm not aware of.
7     Q.  Okay.  You know, if heat worsens an underlying
8 condition and contributes to a death, isn't heat
9 partially responsible for that death?
10             MR. CALB:  Objection to form.
11     A.  That's a very broad question that you asked
12 there.  I don't -- I don't --
13     Q.  (BY MR. EDWARDS)  Did you not understand my
14 question?  I'm happy to reask it.
15     A.  Sure.  Why don't you.
16     Q.  Okay.  If a doctor testifies that -- that the
17 heat and Ms. Haggerty's exposure to this extreme heat
18 worsened her underlying medical conditions and
19 contributed to or partly caused her death, you just
20 totally disagree with that, right?
21     A.  No, sir.  I would respect that doctor's
22 opinion.  But that's not the only opinion.
23     Q.  Would you then consider it to be a heat-related
24 death?
25     A.  No, sir.

---

283

1     Q.  Okay.  So you're going to continue to -- Just
2 as of now, despite what I've put forward to you, you're
3 going to continue to tell the public there have been no
4 heat-related deaths, correct?
5     A.  We're going to continue to evaluate the
6 information provided to us, and our interpretation of
7 it, yes, sir.
8     Q.  Well, that's wrong on so many levels, it's hard
9 for me to deal with it.  You just said you're going to
10 evaluate the information you're provided and then make a
11 determination.  Did I hear you correctly?
12     A.  Yes, sir, you did.
13     Q.  But you don't evaluate the information you're
14 given and make determinations.  You completely disregard
15 it.  Isn't that the case?
16             MR. CALB:  Objection; argumentative, form.
17     A.  No, sir, I disagree with that.
18     Q.  (BY MR. EDWARDS)  Well, you completely
19 disregarded Dr. Skarha's study, right?
20             MR. CALB:  Objection to form.
21     A.  That is correct.  I have no --
22     Q.  (BY MR. EDWARDS)  And you've completely
23 disregarded Dr. Purdum's study, right?
24             MR. CALB:  Objection; form.
25     A.  We didn't question the doctor's integrity, or

---

284

1 the professor's integrity.  What was in question was the
2 reliability of the information that --
3     Q.  (BY MR. EDWARDS)  You ignored the --
4     A.  -- that allowed them to arrive at their
5 decision.
6     Q.  Right.  You ignored their conclusions.
7             MR. CALB:  Objection; form.
8     Q.  (BY MR. EDWARDS)  Right?
9     A.  We didn't find any merit in it.
10     Q.  You didn't find my merit in it.  But you didn't
11 evaluate or investigate it.  So how can you credibly say
12 you didn't find any merit in it?
13             MR. CALB:  Objection; form.
14     A.  We didn't.
15     Q.  (BY MR. EDWARDS)  Okay.  I mean, let's talk
16 about Jon Southards.  Do you know who he is?
17     A.  I'm not familiar with that name per se.
18     Q.  Well, that's another person that -- you know,
19 that -- that Mr. Pittman -- or Judge Pittman is going to
20 hear about suffered a heat-related death.
21             Again, what you're telling me is, look,
22 you'll listen to the doctor that says this, but you're
23 not going to make any changes based on the fact
24 that there -- If the court -- Strike that.
25             If the court determines there are three,

---

David Sweetin - 7/25/2024

285

1 four, even five deaths that have been related to the
2 heat, despite your alleged precautions, what are you
3 going to do differently?
4          MR. CALB:  Objection; form.
5     Q.  (BY MR. EDWARDS)  Or are you going to do
6 anything differently?
7     A.  Well, what I can tell you is that there's not a
8 day goes by that we don't evolve in some capacity, some
9 form or fashion.  And that's based on the information
10 that we have at the time.  For me to sit here and tell
11 you that we're not going to take heed or -- or give
12 credibility to somebody's statement or testimony, no.
13 We -- we very much would.
14    Q.  Well, okay.  I'll -- I'll take you at your
15 word, though -- though I'm concerned because you
16 certainly haven't . . .
17          Well, do you agree that -- that actions
18 speak louder than words?
19          MR. CALB:  Objection to form.
20    A.  Yes, sir.
21    Q.  (BY MR. EDWARDS)  Okay.  And what I hear you
22 telling me is, is you're going to lis -- you're telling
23 Judge Pittman that you will listen to the doctors that
24 give testimony at the preliminary injunction hearing and
25 trial, and -- and you will give their -- their testimony

286

1 and evidence due credibility and thought.  Is that what
2 you're telling me?
3          MR. CALB:  Objection; outside the scope.
4     A.  Well, first of all, I don't -- I don't know the
5 people that you're referencing.  I don't know what their
6 credentials or credibility is.  So for me to sit here
7 and tell you what we would do in regard to anything that
8 they say, that's impossible for me to convey to you
9 right now.
10    Q.  (BY MR. EDWARDS)  Okay.  Well, let's say the
11 court makes a conclusion that people have died as a
12 consequence of exposure to the heat.  Is it -- are you
13 going to disregard the judge's conclusions as well, or
14 will you take those conclusions more seriously?
15          MR. CALB:  Objection; outside the scope,
16 form.
17    A.  No.  Just as we've done in the past, when we
18 were instructed to -- to do something, to execute
19 something or change the manner in which we do certain
20 protocols -- have certain protocols, then we go along
21 with it.  We've never not done that when we were
22 directed to do so.
23    Q.  (BY MR. EDWARDS)  All right.  The agency --
24 Other than the two studies you've mentioned, the agency
25 is unfamiliar with any other studies that show that air

287

1 conditioning protects people from the dangers of -- of
2 extreme heat exposure?
3     A.  Yes, sir.  These are the only two that I'm
4 aware of.
5     Q.  Okay.  Well, you're going to -- at the trial,
6 you'll hear about numerous other studies.  But I'll let
7 you hear about them at the trial, I mean, rather than
8 take my word for it.
9          Are you intending to attend the trial, sir?
10         MR. CALB:  Objection to form.
11    A.  It would depend on the schedule, what we have
12 going on and -- and the need for me to be there.  I
13 can't tell you for fact that I would be there right now.
14    Q.  (BY MR. EDWARDS)  Well, I just -- I just need
15 to know whether or not we're going to need to subpoena
16 you for trial or whether you're going to be available
17 for trial.  I mean, I would imagine that you've been
18 told you're going -- You're testifying as the corporate
19 representative of Texas Department of Criminal Justice.
20 My expectation would be that you would be at the trial
21 as the -- as the representative of the agency.  As you
22 testify here today, you don't know that to be the case?
23    A.  Well, what I'm saying is if I'm asked to be
24 there, I will be there.
25    Q.  All right.  That's fair.

288

1          And -- and you don't know whether or not,
2 as of now, you're going to be asked to -- parti -- be
3 at the trial, fair?
4          MR. CALB:  Objection; form, scope.
5     A.  That is correct.
6          MR. EDWARDS:  All right.  Let's take a
7 short break.  I just want to go through some notes.  And
8 I think I'm reaching kind of a conclusion point, so we
9 may not even get to the seven hours.
10         But, sir, again, let's take five minutes.
11 I know it's been a long day.  But I appreciate your -- I
12 don't know -- efforts to -- to answer the questions.  I
13 do.
14         Give me -- give me -- Just give me five
15 minutes, please.
16         Let's go off the record.
17         THE VIDEOGRAPHER:  The time is 5:20 p.m.
18 Central.  We are off the record.
19         (Recess.)
20         THE VIDEOGRAPHER:  The time is 5:30 p.m.
21 Central.  We are on the record.
22         MR. EDWARDS:  Thanks.  I jumped the gun.
23    Q.  (BY MR. EDWARDS)  We were talking earlier about
24 a heat-wave policy, and you weren't really sure whether
25 there was a heat-wave policy.  But I want to direct you

David Sweetin - 7/25/2024

289

1  to -- it's -- it's page 8 of AD-10.64.  And it's Section
2  I.  And I'll represent to you that Judge Ellison and
3  your own expert at the time, a doctor named Dean Rieger,
4  were critical of the agency for not having a heat-wave
5  policy, okay?  Is -- is Section I the heat-wave policy
6  that the agency has adopted in light of that criticism?
7          MR. CALB:  Objection; form.
8          MR. EDWARDS:  What's the basis for that
9  objection?
10         MR. CALB:  Just unclear of what you mean by
11 which criticism.
12         MR. EDWARDS:  I'm sorry.  I didn't hear
13 you.  I apologize.
14         MR. CALB:  That was just a vague question.
15 I objected to form.
16         MR. EDWARDS:  Okay.  All right.
17     Q.  (BY MR. EDWARDS)  You can answer the question,
18 sir.
19     A.  Yes, sir.  I don't know to -- what the
20 rationale was for that to be put in there or exactly
21 when it was put in there.  But it -- clearly something
22 we abide by.
23     Q.  Okay.  Well, just -- let's be clear.  The
24 expert that TDCJ hired was critical of the agency for
25 not having a heat-wave policy prior to 2018.  Do you

290

1  accept that?
2      A.  I don't know that to be a fact.  But I have no
3  reason to disagree with you.
4      Q.  Okay.  Judge Ellison issued an order in which
5  he ordered the agency to develop a heat-wave policy and
6  explain how he agreed with your expert that there should
7  be one.  You'd -- you're unaware of it, but you don't
8  dispute that.  Is that fair?
9          MR. CALB:  Objection; form.
10     A.  Yes, sir, that is fair.
11     Q.  (BY MR. EDWARDS)  Okay.  Nevertheless, this
12 appears to be some sort of heat-wave policy that -- that
13 is instructing the wardens, when there are three days of
14 excessive heat or heat-wave conditions, that -- that
15 they initiate the incident command system.  Do you see
16 that?
17     A.  Yes, sir, I do.
18     Q.  Okay.  And it looks like there are some things
19 that -- you know, that -- that are -- that are changed,
20 like has to do with outside work, like recreation, you
21 know, working in the kitchen, laundry; and then people
22 are suddenly allowed to purchase electrolyte sports
23 drinks.  Do you see that?
24     A.  Yes, sir.
25     Q.  Okay.  Why don't you allow inmates to purchase

291

1  electrolyte sport drinks without it affecting their
2  spending limit during the hot summer months anyway?
3      A.  Well, if I call -- if I recall approp --
4  appropriately, what it speaks to is that the purchase of
5  that not going towards their authorized spend for that
6  particular week.  That's not to say that they cannot be
7  purchased at other times.  It just says that during
8  those implementation of those measures that they will be
9  allowed to -- to spend above and beyond if they have
10 interest in purchasing those electrolyte drinks.
11     Q.  Electrolytes sports drinks, we're just talking
12 about Gatorade or Powerade, right?
13     A.  Yes, sir.
14     Q.  Okay.  What is the authorized spend limit for
15 inmates in TDCJ?
16     A.  I couldn't tell you off the top of my head.
17     Q.  Okay.  How much does Gatorade or Powerade cost?
18         MR. CALB:  Objection to form.  Outside the
19 scope.
20     A.  I have no idea what our commissary is charging
21 for that drink.
22     Q.  (BY MR. EDWARDS)  Is there anything preventing
23 you from allowing inmates to purchase unlimited Gatorade
24 or Powerade or electrolyte drinks during the hot summer
25 months?

292

1      A.  No.
2      Q.  I mean, is there any penological purpose to
3  denying inmates the ability to purchase these
4  electrolyte sports drinks?
5      A.  No, sir.
6      Q.  Okay.  And there's no penological purpose to
7  exposing prisoners or correctional officers to
8  dangerous, hot temperatures, right?
9          MR. CALB:  Objection; form.
10     A.  No, sir.  There's no intended purpose.
11     Q.  (BY MR. EDWARDS)  Okay.  Now, this seems pretty
12 minor, these -- these -- these -- this heat wave -- I
13 mean, is this really all that's done in addition during
14 heat waves in the state of Texas?
15         MR. CALB:  Objection; form.
16     A.  All that's done?  We follow the -- the policy
17 as it's written with regard to --
18     Q.  (BY MR. EDWARDS)  Right.
19     A.  -- to heat.
20     Q.  You're -- are you -- are you aware that during
21 heat waves, it's even more dangers than other times for
22 inmates exposed to these -- to heat waves?
23     A.  Potentially, yes, sir.
24     Q.  Well, sure.  But, I mean, there are -- you
25 don't know them, but there are studies that directly go

David Sweetin - 7/25/2024

293

1 to heat waves being dangerous for people exposed to
2 them. Do you dispute that in any way?
3          MR. CALB: Objection; form.
4     A. I don't have any reason to dispute that.
5     Q. (BY MR. EDWARDS) Okay. Well, it would be nice
6 if TDCJ knew that. But, you know, again, that's fine.
7          This incident command system, it strikes me
8 as something that sounds really awesome but that really
9 is nothing. So I don't know that to be a fact yet, but
10 would you tell me, you know, the significance of
11 initiating the incident command system during heat waves
12 in the state of Texas, if any?
13    A. Yes, sir. It gives it more structure than
14 otherwise would be during non-ICS times of the day.
15    Q. But what -- what structure does it add? It
16 tells people that there's a heat wave going on; so the
17 regional director or deputy division director know about
18 it, right?
19    A. Yes, sir.
20    Q. But they're not directly involved in making
21 sure that the precautions are being followed at the
22 facility, right?
23    A. Sure they are.
24    Q. Okay. Well, I'm just trying -- Like -- okay.
25 Well, are there -- in light of heat waves, are there

294

1 plans to get everybody into air conditioning for a
2 certain period of time during heat waves? According to
3 your policies.
4     A. On an as-needed basis, yes, sir.
5     Q. Well, I would suggest to you that it's needed
6 during heat waves. Do you disagree with that?
7     A. Well, I would tell you that inmates have the
8 right to ask for a respite and --
9     Q. Sure.
10    A. -- and turn out to be --
11    Q. But -- but heat waves -- heat waves are
12 particularly dangerous times. I mean, what if it was a
13 seven-day heat wave? Are there any policies or
14 procedures to evacuate the prison, to get them to a
15 cooler, safer temperature?
16    A. No, sir, just because there's a --
17    Q. Okay --
18    A. -- certain amount of consecutive days, we would
19 continue to follow our -- follow our typical protocol.
20    Q. Are there any plans or procedures in place to
21 rent or install temporary air conditioning during
22 lengthy heat waves?
23    A. No, sir.
24    Q. Don't you think that would be a good idea and
25 make the inmates' lives safer?

295

1          MR. CALB: Objection; form.
2     Q. (BY MR. EDWARDS) During heat waves.
3     A. Well, again, they have access to air
4 conditioning upon request.
5     Q. Okay. But --
6     A. Are you -- If you're saying just as a measure
7 of comfort, no, sir. If -- if there's a medical reason
8 or they're having difficulties or struggles, absolutely
9 they -- they have access to that through the respite.
10    Q. Well, let's -- let's talk about, kind of,
11 standards of decency and how we've evolved as a society,
12 okay?
13         I believe you'd be the first to say that
14 air conditioning is now the norm in our society rather
15 than the exception. Would you agree with that?
16         MR. CALB: Objection; outside the scope.
17    A. It is a comfort.
18    Q. (BY MR. EDWARDS) It's way more than a comfort,
19 okay? High-thread-count sheets are a comfort, okay?
20 That's a comfort, all right? A beach house is a
21 comfort, okay? First class plane rides are a comfort,
22 okay? They're different than necessities, okay? All
23 right. Air conditioning is a necessity for most Texans.
24 Don't you agree with that?
25         MR. CALB: Objection; argumentative,

296

1 outside the scope.
2     A. No, sir, not necessarily.
3     Q. (BY MR. EDWARDS) Does your house have air
4 conditioning?
5          MR. CALB: Objection; outside the scope.
6     A. Yes, sir, it does.
7     Q. (BY MR. EDWARDS) Do the wardens at every
8 single prison in the state of Texas have their offices
9 in air conditioning?
10         MR. CALB: Objection; outside the scope.
11    A. To the best of my knowledge, yes, sir.
12    Q. (BY MR. EDWARDS) Do you know what Dr. Charles
13 Adams suggested under oath? Do you know who Dr. Charles
14 Adams is?
15    A. No, sir, I do not.
16    Q. Well, I asked him why the armory was air
17 conditioned. And do you know what he said?
18         MR. CALB: Objection; outside the scope.
19    A. No, sir, I do not.
20    Q. (BY MR. EDWARDS) Under oath, he said the
21 bullets can't protect themselves. Do you agree with
22 that sentiment, sir?
23         MR. CALB: Objection; form, outside the
24 scope.
25    A. You know it's hard for me to make an opinion

David Sweetin - 7/25/2024

---

**297**

1 based on just that -- what little bit of text you gave
2 me. It --
3    Q. (BY MR. EDWARDS) I mean, is it? Is it hard?
4 Seems pretty callous to me. Do you disagree with that?
5    A. Well, again, I don't know what the context of
6 the conversation was prior to, leading up to, so it's --
7 it's hard for me to base an opinion just based on what
8 little bit of text you gave me.
9    Q. Well, assuming I'm not taking it out of context
10 and playing word games like somebody we know, doesn't
11 that statement seem indifferent to human beings?
12        MR. CALB: Objection; argumentative,
13 outside the scope.
14    A. No, sir, not necessarily.
15    Q. (BY MR. EDWARDS) Does TDCJ have heat policies
16 for pigs?
17    A. No, sir.
18        MR. CALB: Objection; form, outside the
19 scope.
20    A. Not that I'm aware of.
21    Q. (BY MR. EDWARDS) You're not aware that TDCJ
22 has temperature controls and -- and cooling measures
23 implemented when pigs are exposed to certain
24 temperatures? You're completely unaware of that?
25    A. Mr. Edwards, that wasn't your question. You

---

**298**

1 asked me about policy.
2    Q. Okay. I don't mean to parse words, so let's
3 ask it this way. You are, in fact, aware that the TDCJ
4 has cool-down measures in place for pigs exposed to
5 extreme temperatures, correct?
6        MR. CALB: Objection; outside the scope.
7    A. Yes, sir, I am aware of that.
8    Q. (BY MR. EDWARDS) Do you know why they have
9 cool-down procedures for pigs exposed to temp -- high
10 temperatures?
11        MR. CALB: Objection; outside the scope.
12    A. Yes, sir. To keep them cool.
13    Q. (BY MR. EDWARDS) Do you agree that human
14 beings in your custody and control out to have at least
15 as many protections as pigs in your custody and control?
16        MR. CALB: Objection; outside the scope.
17    A. According to our policy, they have the ability
18 to request respite anytime they -- they need it. 24/7.
19    Q. (BY MR. EDWARDS) That wasn't my question.
20        MR. EDWARDS: So let me object as
21 nonresponsive.
22    Q. (BY MR. EDWARDS) But you've done a fantastic
23 job, up until this point, of responding to my questions.
24 So let me ask it again, okay?
25        Do you think that human beings in your --

---

**299**

1 in TDCJ's custody and control ought to have at least as
2 many protections with regards to their health and safety
3 as the pigs that you raise to slaughter?
4        MR. CALB: Objection to form, and outside
5 the scope.
6    A. In my opinion, they have more.
7    Q. (BY MR. EDWARDS) Well, then, would you agree
8 they ought to have more?
9        MR. CALB: Objection; outside the scope,
10 form.
11    A. More than what inmates currently have?
12    Q. (BY MR. EDWARDS) No, more than the pigs have.
13    A. Oh, you're talking about pigs. You didn't
14 specify pigs or inmates.
15    Q. Well, let me ask it again in case you misheard
16 me. Do you think that inmates ought to have as many
17 rights as pigs when it comes to being protected from the
18 dangers of extreme heat?
19        MR. CALB: Objection; outside the scope,
20 form.
21    A. And it's my opinion, as I stated previously,
22 that the inmates do have more than the pigs.
23    Q. (BY MR. EDWARDS) So you would tell Judge
24 Pittman that, of course, human beings are more important
25 than pigs; and even though the pigs are cooled down and

---

**300**

1 get misting at -- at -- when it goes above maybe --
2 probably 90 degrees, you would say that even though the
3 pigs get that protection, your opinion and TDCJ's
4 opinion is that the human beings in your care and
5 control and custody do get more protections than the
6 pigs?
7        MR. CALB: Objection; outside the scope
8 form.
9    A. No. What I would explain to the judge is that
10 the amount of pigs in an enclosed area is more than 20
11 times, sometimes 30 times, as more of -- than what the
12 inmates are -- are in. So, clearly, there's a --
13 because of the heat load and the heat factor, when you
14 have that many pigs in close proximity, it requires the
15 ability to keep them cooler than what they otherwise
16 would be.
17    Q. (BY MR. EDWARDS) Well, okay. You keep them
18 cool. I mean, I applaud -- As an animal rights
19 activists, I suppose, I think that's great. You --
20 you -- you give the pigs access to cooling on demand
21 when it gets to be a certain temperature.
22        You don't air-condition the prisons when it
23 gets to be a certain temperature, do you?
24        MR. CALB: Objection to form.
25    A. No, sir. When it gets to a certain --

---

David Sweetin - 7/25/2024

---

**301**

1    Q. (BY MR. EDWARDS) Okay. Fine.

2    A. -- temperature, no, sir.

3    Q. Not too much more.

4        Do you agree with Director Collier's

5 testimony that temperatures above 95 degrees and

6 100 degrees are known to be dangerous to the inmates

7 exposed to them?

8        MR. CALB: Objection to form.

9    A. Was that, in fact, his testimony?

10   Q. (BY MR. EDWARDS) That was, in fact, his

11 testimony, sir. Do you agree with him?

12   A. I have no reason to doubt him.

13   Q. Okay. Do you know who Clifton Buchanan is?

14   A. Not by name, no, sir.

15   Q. I believe he's the number-two person at the

16 AFSCME Texas correctional employees counsel. That's the

17 union for the correctional officers, right?

18   A. Yes, sir, that is correct.

19   Q. And are you aware that he testified in favor of

20 establishing temperature standards for state prisons and

21 jail facilities, which I believe was the the

22 legislation we talked about earlier?

23   A. Yes, I'm aware that there was testimony on

24 behalf of -- of the correction officers union.

25   Q. Okay. I mean, that -- to me, that suggests

---

**302**

1 that the correctional officers are really in favor of

2 air-conditioning the prisons. Is that fair?

3    A. That would be a fair assertion, yes, sir.

4    Q. Okay. And you're aware that the correctional

5 officers suffer, you know -- Well, can you explain why

6 correctional officers have more documented heat-related

7 illnesses than inmates?

8        MR. CALB: Objection to form.

9    A. Yes, sir.

10   Q. (BY MR. EDWARDS) Why is it TDCJ's belief

11 that -- or why is that?

12   A. Why is it our belief?

13   Q. Well, what is your opinion as to why

14 correctional officers have more documented heat-related

15 illnesses than inmates who are exposed to the heat at

16 all times?

17       MR. CALB: Objection; outside the scope.

18   A. Because the data is what it is. Clearly, we

19 have more problems associated with employees because of

20 the amount of work that they continuously do in that

21 environment.

22   Q. (BY MR. EDWARDS) Or they're not -- or

23 they're -- possibly they're not discouraged from

24 reporting heat-related illnesses the way that prisoners

25 are.

---

**303**

1        MR. CALB: Objection to form, outside the

2 scope.

3    A. Well, possibly because they're wearing the

4 equipment that they're required to wear, thrust vests

5 and whatnot, that increases the withholding of the body

6 temperature.

7    Q. (BY MR. EDWARDS) Make it hotter for them

8 because they're wearing more clothing. Is that -- that

9 the thought process?

10   A. That's exactly right, yes, sir.

11   Q. Okay. TDCJ's aware of newspaper articles that

12 talk about the dangers and sweltering temperatures from

13 the Texas Tribune or NPR or international news media?

14       MR. CALB: Objection; outside the scope.

15   A. Yes, sir, I'm aware that there has been more

16 than a few articles written about Texas Department of

17 Criminal Justice.

18   Q. (BY MR. EDWARDS) Okay.

19       MR. EDWARDS: Paul, can you put up -- it's

20 Tab 20, which is an article called, "After sweltering

21 temperatures killed Texas prisoners, lawmakers vote to

22 install air conditioning" for Mr. Sweetin, please.

23       MR. SAMUEL: Yeah. One second.

24       MR. EDWARDS: Let's make this Exhibit 6 to

25 the deposition.

---

**304**

1        (Sweetin Exhibit No. 6 was marked.)

2    Q. (BY MR. EDWARDS) Sir, this goes to -- directly

3 to the -- the house bill that we talked earlier.

4    A. Okay.

5    Q. Okay. And, again, Representative Terry Canales

6 is somebody that you guys communicate with on a regular

7 basis, given his role on this committee?

8        MR. CALB: Objection; form.

9    A. Yes, sir. He's very much involved in --

10   Q. (BY MR. EDWARDS) Well, here's what -- here's

11 what Representative Canales said, okay? "The reality

12 is, in Texas, we are cooking people in prisons." Does

13 that -- does that comment from a legislator cause you

14 significant concern about the way you're handling

15 prisoner safety with regards to extreme temperatures?

16   A. No, sir. That, in and of itself, no, sir.

17   Q. Okay. Well, if it were true that you were

18 cooking people in prisons, or metaphorically cooking

19 people in prison, you know, that's about as damning a

20 statement as -- as -- as you could make to an

21 administrator who's supposed to protect people, right?

22   A. Correct.

23   Q. Okay. Now, this part I think you may agree

24 with, okay? This, installing air conditioning, is the

25 right thing to do, it is the humane thing to do, and it

---

David Sweetin - 7/25/2024

---

**305**

1  is something we should have done a long time ago.
2          You, as an agency, agree with that, fair?
3          MR. CALB:  Objection; form.
4      **A.  Yes, sir.  I think that's a fair assertion.**
5      Q.  (BY MR. EDWARDS)  I don't know if you know
6  this, but the law is very clear that money is never --
7  or the lack of it is never an execution to allow you to
8  violate The Constitution.  Are you aware of that?
9          MR. CALB:  Objection; outside the scope.
10     **A.  Not in its written form, no, sir, but --**
11     Q.  (BY MR. EDWARDS)  Does that make sense to you
12  that just because you lack the money -- if you're
13  violating The Constitution and exposing people to
14  dangerous conditions when you have an obligation to
15  protect them, that an excuse, "We don't have the money,"
16  really is pretty hollow?  Do you agree with that?
17         MR. CALB:  Objection; outside the scope.
18     **A.  It could be if it was in that person's rightful**
19  **hands to be able to make a difference.**
20     Q.  (BY MR. EDWARDS)  Okay.  Well, here's what Mr.
21  Canales said about what TDCJ was doing and why he, I
22  guess, went forward with the legislation.  Here's what
23  he says.
24         MR. EDWARDS:  And, Paul, can you go to the
25  next page.

---

**306**

1      Q.  (BY MR. EDWARDS)  You see the quote where it
2  begins, "The reality"?
3      **A.  Yes, sir, I see it.**
4      Q.  Would you read that paragraph, just those
5  three -- three lines, to Judge Pittman, please.
6      **A.  "'The reality is what we're doing is**
7  **disgusting.  It's truly disheartening,' Canales told the**
8  **House Corrections Committee last month.  'I don't think**
9  **we have a money problem.  I think we have a give-a-damn**
10  **problem.'"**
11     Q.  Now, that's pretty damning -- a damning
12  critique of the agency in the state of Texas, right?
13         MR. CALB:  Objection; outside the scope.
14     **A.  Yes, sir, I would agree with that.**
15     Q.  (BY MR. EDWARDS)  And I think your response to
16  me would -- to that be would be -- would -- would --
17  would this be a fair characterization of -- of how the
18  agency thinks?  "Sir, we do give a damn.  We are taking
19  steps to make sure this" -- "this system is
20  air-conditioned over the next seven to ten years.  We
21  simply don't have the money, absent a court ordering
22  this to happen.  We can't get it done without those
23  resources."  Would that be a fair way to characterize
24  the agency's position?
25     **A.  No, sir.**

---

**307**

1      Q.  Okay.  So you do have a give-a-damn problem,
2  then?
3      **A.  No, sir.**
4          MR. CALB:  Objection to form.
5      Q.  (BY MR. EDWARDS)  Do you understand why Mr.
6  Canales is saying there's a give-a-damn problem?
7      **A.  No, sir, I do not.**
8      Q.  Well, if you know something is hurting people
9  and you know how to fix it, but you don't fix it,
10  couldn't -- couldn't someone credibly say you don't give
11  a damn?
12         MR. CALB:  Objection; outside the scope.
13     **A.  Well, someone could credibly say that about the**
14  **legislature as well.**
15     Q.  (BY MR. EDWARDS)  Well, you know what, that's a
16  good point.  It's not just the -- it's not just the
17  agency; it's the state of Texas and its representatives
18  that also appear not to give a damn, okay?  Of course
19  the House did pass this legislation, though, right?
20     **A.  Yes, sir.**
21     Q.  Okay.  And did TDCJ go lobby the senate and beg
22  them to pass it as well?
23         MR. CALB:  Objection; outside the scope.
24     **A.  No, sir, not that I'm aware of.**
25     Q.  (BY MR. EDWARDS)  Did Director Collier call up

---

**308**

1  Governor Abbott and say, "Please" pass -- "help pass
2  this legislation"?
3      **A.  I can't testify on behalf of what Mr. Collier's**
4  **conversation may have been.**
5      Q.  Are you aware of anyone at Texas Department of
6  Criminal Justice talking to Lieutenant Governor -- God.
7      **A.  Dan Patrick.**
8      Q.  Thank you.  Lieutenant Governor Patrick or any
9  other senator and saying, "Please pass this; we need
10  this for our own protection, as well as the inmates"?
11     **A.  No, sir.  I -- I can tell you that there --**
12  **quite positive that there was discussions that were had**
13  **with regard to what was needed.  Now, what -- what the**
14  **extent of those conversations were, I couldn't tell you.**
15     Q.  Well, okay.  I'm just asking -- I mean, it
16  seems to me that -- Well, personally, if you were
17  asked by Lieutenant Governor Patrick or Governor Abbott,
18  or any of the senators, would say, "Please give us the
19  money to air-condition the system as soon as possible
20  for the men and women we employ and the inmates."  That
21  would be your statement, right?
22         MR. CALB:  Objection to form; outside the
23  scope.
24     Q.  (BY MR. EDWARDS)  If asked.
25     **A.  Can you repeat the question?**

---

David Sweetin - 7/25/2024

---

**309**

1    Q.  Sure.  You would tell Lieutenant Governor
2 Patrick or Governor Abbott, or any senator, if asked,
3 "Should we provide the money to air-condition the Texas
4 Prison System," you -- you would say, "Yes, please fund
5 us for the good of the men and women working at TDCJ,
6 for the good" -- "for the good it will do in terms of
7 staffing and protecting those men, and for the good it
8 will do to protect the inmates from these dangers."
9 That's who you would say, right?
10         MR. CALB:  Objection; form.
11    A.  I don't know that it would be articulated like
12 that.  But what I can tell you is, yes, sir, if given
13 the appropriate funding to do more than what we're
14 doing, absolutely.  There's no reason why we wouldn't.
15    Q.  (BY MR. EDWARDS)  Okay.  Now, Mr. Canales
16 called your billion-dollar estimate -- he used a word to
17 describe it.  He used the word "ridiculous."  Did you
18 talk to him about that, as an agency?
19    A.  Not that I'm aware of, no, sir.
20    Q.  Do you know why he called your estimate
21 ridiculous?
22    A.  No, sir, I do not.
23    Q.  Would you be comfortable allowing an
24 independent, non-TDCJ agency give an estimate of what it
25 would cost to air-condition the Texas Prison System?

---

**310**

1    A.  Would I be opposed to a third party coming in?
2    Q.  Yeah.
3    A.  I don't see why we would, no, sir.
4    Q.  Okay.  Now, here's -- here's some more from
5 this article.  And then -- then we'll call it a day.
6 You've been -- you've very gracious with your time.
7         Now, in 2019, a Republican on the House
8 Corrections Committee suggested an independent cost
9 study since TDCJ has a history of inflated costs.  But
10 you never got an independent cost study, right?
11         MR. CALB:  Objection; form.
12    A.  I can tell you that to have a third party come
13 in and do it -- do it all, make the -- do the
14 projections on it, no.  But were there -- were there
15 outside parties involved in it, yes, sir.
16    Q.  (BY MR. EDWARDS)  No, no.  Sir, this -- this
17 person on the committee is saying, we'd like an
18 independent cost analysis, not -- not controlled by
19 TDCJ, given the agency's history of inflating the
20 numbers.  In response to that, did the agency conduct or
21 seek out an independent cost analysis?
22    A.  No, sir, not that I'm aware of.
23    Q.  Okay.  Then this -- this article talks about
24 the Purdum study.  And she says, without systemwide
25 cooling, the prison agency won't solve safety and

---

**311**

1 medical problems associated with heat.  Prison
2 populations, her area of expertise, tend to be more
3 vulnerable than people in the free world since prisoners
4 are often older and have more medical ailments that can
5 be exacerbated by heat.  You agree with that, right?
6         MR. CALB:  Objection; outside the scope.
7    A.  I agree that that's her opinion.
8    Q.  (BY MR. EDWARDS)  Do you agree with that -- do
9 you also share that opinion?
10         MR. CALB:  Objection; outside the scope.
11    A.  No, sir.
12    Q.  (BY MR. EDWARDS)  Okay.  You disagree that
13 prison populations tend to be more vulnerable than
14 people in the free world since prisoners are often older
15 and have more medical ailments than can -- that can be
16 exacerbated by the heat.  You don't agree with that?
17         MR. CALB:  Objection; outside the scope.
18    A.  I really don't have a basis to make that
19 determination when -- when you're talking about
20 statistical data comparing to citizens of the state and
21 abroad versus the inmates.
22    Q.  (BY MR. EDWARDS)  Okay.  You don't know.  In
23 order to have some ability to evaluate that statement,
24 you've got to start by doing some evaluation, right?
25         MR. CALB:  Objection; asked and answered.

---

**312**

1    A.  Yes, sir.
2         THE REPORTER:  I'm sorry.  Did you answer?
3    A.  Yes, sir.
4    Q.  (BY MR. EDWARDS)  Okay.  And, then, what she
5 says is, investing in hazard mitigation saves so much
6 money in the long term, we're expecting to see about a
7 tripling of days in Texas that over 100 degrees
8 Fahrenheit, and this issue is only going to get worse
9 and more costly.  And you would acknowledge that that
10 is -- that is a correct factual statement, right?
11         MR. CALB:  Objection; outside the scope.
12    A.  Well, what I do know is temperature extremes
13 are cyclic in the sense that we may be going through a
14 time of elevated temperatures.  But if you'll look at
15 statistical data over the course of time -- and, of
16 course, there's a lot of -- a lot of disagreement back
17 and forth and -- and a lot of opinions one way or the
18 other.  But I believe the statistical data will show
19 that -- that -- that this is in line with what,
20 historically, the world has experienced.
21    Q.  (BY MR. EDWARDS)  Leaving aside the cause of
22 the increase of the world getting hotter, does TDCJ
23 acknowledge that global warming is -- exists and that it
24 is getting hotter?
25         MR. CALB:  Objection; outside the scope.

---

David Sweetin - 7/25/2024

313

1    A.  No.  I don't have an opinion on that one way or
2 the other.
3    Q.  (BY MR. EDWARDS)  Do you, sir, Mr. Sweetin,
4 acknowledge that global warming is occurring and that
5 the climate in Texas is actually getting hotter?
6        MR. CALB:  Objection; outside the scope.
7    A.  Doesn't make any difference what my opinion is.
8    Q.  (BY MR. EDWARDS)  No, that's not true.  It
9 makes a huge difference.
10       Do you understand -- do you agree that it
11 is getting hotter in the state of Texas?
12    A.  During a period of time?
13    Q.  The future being the period of time.
14       MR. CALB:  Objection; outside the scope.
15    A.  I agree that if you look at statistical data,
16 you could see a potential for temperature extremes
17 decreasing.
18    Q.  (BY MR. EDWARDS)  Okay.  All right.  Like, you
19 know, some things are kind of two plus two is four.  But
20 you don't have to believe them, I suppose.
21       Last -- last couple of questions go to this
22 heat sensitivity score.  You have no idea how it's
23 actually calculated, correct?
24    A.  No, sir.
25    Q.  Okay.  As you testify here today, can you tell

314

1 me how many medically vulnerable people, people with
2 comorbidities you acknowledge are affected by the heat,
3 are not currently housed in air condition -- air
4 conditioning?
5        MR. CALB:  Objection; form.
6    A.  No, sir.  I don't have that in data in front of
7 me, nor did I review it.
8    Q.  (BY MR. EDWARDS)  No, and I -- I appreciate
9 that.  You know, I could make an argument that you ought
10 to.  But I -- I don't know for sure that -- As you
11 testify here today, though, you don't know what
12 percentage of people who are medically vulnerable are
13 not currently housed in air conditioning, correct?
14    A.  No, sir, I do not.
15    Q.  Okay.  Let me just ask you real quickly --
16       MR. EDWARDS:  Paul, can you put of
17 Exhibit 4.  And go to page 5 of that exhibit.
18       And, Kelly, we'll make this the next
19 exhibit, okay?
20       (Sweetin Exhibit No. 7 was marked.)
21    Q.  (BY MR. EDWARDS)  It's the December 2020 report
22 to the legislature.  And I want to go to heat-sensitive
23 inmates.  Do you see that?
24    A.  Yes, sir.
25    Q.  How does TDCJ define heat-sensitive inmate?

315

1    A.  Would you like for me to read that to you?
2    Q.  No.  I want to know -- Well, who does TDCJ
3 consider heat-sensitive inmates?
4    A.  What I can tell you is TDCJ considers heat
5 sensitive based on the algorithm that was put together
6 between the cooperative effort of the medical --
7    Q.  Right.
8       (Speaking simultaneously.)
9    Q.  Best you can do is tell me that you don't know
10 it's according to some algorithm that you can't tell me
11 what is involved in, fair?
12    A.  Yes, sir.
13       MR. CALB:  Objection; form.
14    Q.  (BY MR. EDWARDS)  Now, in this paragraph it
15 says approximately 80 percent of the heat-sensitive
16 inmates that -- however TDCJ categorizes them -- have
17 been relocated to air-conditioned beds.  Do you see
18 that?
19    A.  Yes, sir, I see that.
20    Q.  That means 20 percent of heat-sensitive
21 inmates, according to you guys, which may very well be
22 very under inclusive, aren't in air-conditioned beds, at
23 least as of 2020.  Do you agree with that?
24    A.  I'm not sure I agree with that interpretation.
25    Q.  Well, how could you disagree with it?  It says

316

1 approximately 80 percent of the heat-sensitive inmates
2 have been relocated to air-conditioned beds.  What do
3 you think that means?
4       MR. CALB:  Objection; form.
5    Q.  (BY MR. EDWARDS)  What does it mean?
6    A.  If you're asking me to take it down to the
7 basics as to the intent of the author, I'd have to ask
8 the author specifically to know.
9    Q.  Well, look, this is --
10       MR. CALB:  Jeff, we're -- we're at seven
11 hours by my calculations.
12       Stephen, can you give us the exact time of
13 where we are?
14       MR. EDWARDS:  Well, I'm asking a question,
15 and you're on the record.  So I'm going to ask a few
16 more questions, and you do whatever you feel you need to
17 do.
18       MR. CALB:  I'm instructing --
19    Q.  (BY MR. EDWARDS)  Sir, I asked you a question
20 of what this -- what this meant, okay?  And I need you
21 to tell me.  You've disagreed that 80 percent of
22 heat-sensitive inmates being relocated means 20 percent
23 haven't been.  Did I understand your testimony
24 correctly?
25       MR. CALB:  I'm asking you not to answer the

David Sweetin - 7/25/2024

317

1 question, David, until we get a time on where we are in
2 the deposition, how long we've been on the record.
3          THE VIDEOGRAPHER:  I just need one moment
4 to do the calculation.
5          MR. EDWARDS:  And this time should not be
6 counted.
7          THE VIDEOGRAPHER:  7:01.
8          MR. CALB:  Right.  That means that we are
9 done.  And I'm going to ask that we end the deposition.
10 No more questions will be answered.
11          MR. EDWARDS:  Well, I don't -- I don't
12 agree to that.  And so if -- if you're not going to let
13 me ask me several more questions about this, then, we're
14 going to probably have to go to court.  That's your
15 preference?
16          MR. CALB:  My -- my -- We're not agreeing
17 to any more questions.
18          THE REPORTER:  You're not what?
19          MR. EDWARDS:  I'm sorry.  You're refusing
20 to let this witness answer a few more questions?
21          MR. CALB:  We are stopping at the time that
22 you were allotted.  Our position --
23          MR. EDWARDS:  Are you refusing to let this
24 witness answer any more questions, not to go more than
25 five minutes?  Is that you're -- is that what you're --

318

1          MR. CALB:  Our position is you spent over
2 two hours, at least, of this seven-hour deposition
3 outside the scope of the topics; and we are not going to
4 wait a single minute more for you to ask him more
5 questions.  We are done at seven hours.  That's what the
6 rule allows.  We are ending the deposition.  And --
7          MR. EDWARDS:  Okay, that's fine.  We'll
8 take -- we'll take it -- we'll take it up with Judge
9 Pittman.
10     Q.  (BY MR. EDWARDS)  Mr. Sweetin, again, does
11 80 percent add up to 100 percent?
12          MR. CALB:  Mr. Sweetin, please don't answer
13 that question.
14     Q.  (BY MR. EDWARDS)  On the advice of counsel, are
15 you not going to answer that question?
16     **A.  On the advice of counsel, I'm not going to**
17 **answer the question.**
18     Q.  Okay.  And, again --
19          MR. CALB:  (Inaudible.)
20          (Speaking simultaneously.)
21     Q.  -- you've answered no questions that I've asked
22 about heat sensitivity scores and how they're calculated
23 or provided any factual information about that, have
24 you, sir?
25          MR. CALB:  Please don't answer that

319

1 question.
2     Q.  (BY MR. EDWARDS)  And on the advise of counsel,
3 are you not going to answer that question?
4     **A.  That is correct.**
5          MR. EDWARDS:  Okay.  Are you canceling the
6 deposition --
7          (Speaking simultaneously.)
8          MR. CALB:  We're ending this deposition.
9 This deposition is over.
10          MR. EDWARDS:  Are you telling your witness
11 to leave, Michael?
12          MR. CALB:  I'm sorry?  What?
13          MR. EDWARDS:  You're telling your witness
14 to leave and you're ending this deposition?  Because I'm
15 not ending this deposition.
16          MR. CALB:  Correct.
17          (Speaking simultaneously.)
18          MR. EDWARDS:  I have five more minutes of
19 questioning.
20          MR. CALB:  Mr. Sweetin, you're welcome to
21 leave the deposition.  It's over.  And --
22          MR. EDWARDS:  It's not over.  It -- it's
23 not over.  But you're telling him to leave.  And that's
24 fine.
25     Q.  (BY MR. EDWARDS)  Mr. Sweetin, on the advice of

320

1 counsel who's telling you to leave despite the fact that
2 I have not concluded the deposition, are you going to
3 leave?
4     **A.  I'm going to take my advice of counsel.**
5     Q.  (BY MR. EDWARDS)  Okay.
6          MR. EDWARDS:  And, Michael, you're not
7 going to ask him any -- any questions, correct?
8          MR. CALB:  Correct.
9          MR. EDWARDS:  Okay.
10          MR. CALB:  I am going to ask the court
11 reporter for a read-and-sign, please, and for the most
12 expedited version of the transcript available.
13          MR. EDWARDS:  Well, Kelly, we need it
14 yesterday, okay?
15          THE VIDEOGRAPHER:  Gentlemen, before we go
16 off the record -- this is the videographer speaking.
17          Mister --
18          MR. EDWARDS:  We're not going off the
19 record.  He's canceling the -- he's -- he's ending and
20 terminating the deposition against my -- against my
21 wishes.  So the deposition isn't over.  He's -- he's
22 terminated it, though.  And so we'll deal with it when
23 we -- when we talk to Judge Pittman.
24          MR. CALB:  Mr. Sweetin, you may be excused.
25 Unless the court reporter has any questions for him.

**WRIGHT WATSON & ASSOCIATES**
1250 South Capital of Texas Highway, Building 3, Suite 400  Austin, Texas 78746  (512) 474-4363

d1373cb1-2f0a-4b96-9b71-3f7399538ee8

David Sweetin - 7/25/2024

321

1           THE REPORTER:  I do have some spelling
2 questions off the record.
3           THE VIDEOGRAPHER:  I've just got to bring
4 us off the record at some point, some -- in some way.
5           MR. EDWARDS:  And, Michael, I'd urge you to
6 reconsider.  I think you're making a very -- a very bad
7 mistake.
8           MR. CALB:  I think we've gone long enough,
9 Jeff.  Seven hours was what you were allotted.  You used
10 all of it.
11          MR. EDWARDS:  Yeah.  It's a 15-topic
12 corporate rep depo.  This isn't a car-wreck depo or
13 something -- one of your -- one of your deliberate
14 indifference prison cases, okay?
15          MR. CALB:  I would have had a lot more
16 lenience, Jeff, had you not spent most the deposition
17 outside the scope of the topics.  I would --
18          MR. EDWARDS:  That is -- that is so
19 patently false.
20    Q.  (BY MR. EDWARDS)  But regardless, sir, I think
21 he's told you to leave.  And I suspect that that's what
22 you're going to do.  Correct?
23          MR. CALB:  Also, this isn't a deliberate
24 indifference prisoner case.  That's exactly how you said
25 it.

322

1           MR. EDWARDS:  That's an excellent point.
2 It's a little more serious than most.  But that's --
3 that's an excellent point.  Let me -- I'll -- I'll --
4 I'll take that back.
5           MR. CALB:  So do you need any more
6 information from me, or do you want to -- We can ask --
7 For spellings, we'll -- we'll do that in a
8 read-and-sign, I guess, and sort of -- if you want to
9 leave the spellings --
10          MR. EDWARDS:  Just -- just so I'm clear,
11 can -- can you tell me how much time of the seven hours
12 was -- was -- involved Mr. Calb asking for breaks and
13 asking -- and asking for clarifications?  Is that -- is
14 that something you can tell me on the record?
15          THE VIDEOGRAPHER:  Who are you asking?
16          MR. EDWARDS:  Yeah.  How much of the seven
17 hours -- you know, probably five to ten minutes of it --
18 was Mr. Calb asking questions and asking for -- for
19 time?  Do you have any way of calculating that?
20          THE VIDEOGRAPHER:  I -- I personally do
21 not.
22          MR. EDWARDS:  Okay.  All right.  Thank you.
23          THE VIDEOGRAPHER:  And just a reminder --
24          MR. EDWARDS:  Kelly, do you have any way of
25 calculating that?

323

1           THE REPORTER:  Not quickly.
2           MR. EDWARDS:  Okay.  Thank you.  Well --
3 well, okay.  How about unquickly?
4           THE REPORTER:  I just don't know.
5           MR. EDWARDS:  All right.  Okay.  You don't
6 know, you don't know.  Thank you.
7           All right.  Let's -- let's -- Again, he's
8 terminating the deposition.  We'll deal with that later.
9           Kelly, whatever -- You know, we -- we do
10 need -- Unfortunately, we're going to trial on Tuesday,
11 and we need this as soon as possible.
12          What is -- How fast can you get a rough
13 draft to me?
14          THE REPORTER:  Do you want this still on
15 the record, Jeff?
16          MR. EDWARDS:  Well --
17          THE REPORTER:  The videographer --
18          MR. EDWARDS:  Again, I'm not -- I'm not
19 agreeing to go off the record.  He's terminated the
20 deposition, so I'm just talking to you.  What you guys
21 do is up to you.  But, I mean, how -- can you get me a
22 rough draft tomorrow?
23          THE REPORTER:  I will do my best.  It will
24 probably be late in the day.
25          MR. EDWARDS:  Thank you very much for doing

324

1 your best.  I really appreciate it.
2           THE VIDEOGRAPHER:  Mr. Calb, did you want a
3 copy of the video from today?
4           MR. CALB:  Yes, please.
5           THE VIDEOGRAPHER:  And did you want the
6 transcript as well?
7           MR. CALB:  Yes.  And, please, also
8 expedited.  The fastest turnaround we can get.
9           THE VIDEOGRAPHER:  Copy that.  And did you
10 want it synched with the transcript, the video?
11          MR. CALB:  Yes.
12          THE VIDEOGRAPHER:  Okay.
13          And, Mr. Edwards, would you like the video
14 synched with the transcript?
15          MR. EDWARDS:  Well, yeah, I think so.  As
16 of now, yes.
17          And how soon can you get the video to us?
18          THE VIDEOGRAPHER:  It won't be coming from
19 me.  It will be coming from Bishop Legal.  So we'll --
20 I'll send you an email and let you know how soon he can
21 get it to you.
22          MR. EDWARDS:  All right.  I appreciate
23 that.
24          THE VIDEOGRAPHER:  My pleasure.
25          And, then, finally, Mrs. Carter, did you

David Sweetin - 7/25/2024

### 325

```
1 want a video or a copy of the transcript?
2          MS. CARTER: I'll get it from Michael.
3 Thank you.
4          THE VIDEOGRAPHER: Okay. The time is
5 6:14 p.m. Central. We are off the record.
6          (The deposition was concluded.)
7          (Sweetin Exhibit Nos. 1 through 7 marked
8          during this deposition are attached
9          hereto.)
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

### 326

```
1        IN THE UNITED STATES DISTRICT COURT
          FOR THE WESTERN DISTRICT OF TEXAS
2                 AUSTIN DIVISION
3
  BERNHARDT TIEDE, II;        )
4 TEXAS PRISONS COMMUNITY     )
  ADVOCATES; BUILD UP,        )
5 INC., A/K/A JUSTICE         )
  IMPACTED WOMEN'S            )
6 ALLIANCE; TEXAS             )
  CITIZENS UNITED FOR         )
7 REHABILITATION OF           )
  ERRANTS; and COALITION      )
8 FOR TEXANS WITH             )
  DISABILITIES,               )
9        Plaintiffs,         )  Civil Action No.:
                              )  1:23-cv-01004-RP
10                            )
                              )
11 VS.                        )
                              )
12                            )
                              )
13 BRYAN COLLIER, in his      )
   official capacity as       )
14 Executive Director of      )
   Texas Department of        )
15 Criminal Justice,          )
          Defendant.          )
16
17
18 ****************************************************
   REPORTER'S CERTIFICATION
19 REMOTE ORAL AND VIDEOTAPED DEPOSITION OF DAVID SWEETIN
20              VOLUME 1
                JULY 25, 2024
21 ****************************************************
22
23     I, KELLY E. FISHER, Certified Shorthand Reporter in
24 and for the State of Texas, hereby certify to the
25 following:
```

### 327

```
1     That the witness, DAVID SWEETIN, was duly sworn by
2 the officer and that the transcript of the oral
3 deposition is a true record of the testimony given by
4 the witness;
5     I further certify that pursuant to Federal Rules of
6 Civil Procedure Rule 30(e)(1)(A) and (B) as well as Rule
7 30(e)(2) that the signature of the deponent:
8     __x__ was requested by the deponent and/or a party
9 before completion of the deposition and is to be
10 returned within 30 days from date of receipt of the
11 transcript. If returned, the attached Changes and
12 Corrections and Signature pages contain any changes and
13 the reasons therefor;
14     ____ was not requested by the deponent and/or a
15 party before the completion of the deposition.
16     That $_____ is the deposition officer's
17 charges for preparing the original deposition transcript
18 and any copies of exhibits, charged to PLAINTIFFS
19     That pursuant to information given to the
20 deposition officer at the time said testimony was taken,
21 the following includes all parties of record:
22 FOR PLAINTIFFS:
      Mr. Jeff Edwards
23    Mr. David Anthony James
      Ms. Lisa Snead
24    Mr. Paul Samuel
      EDWARDS LAW
25    603 West 17th Street
```

### 328

```
1     Austin, Texas 78701
      512-623-7727
2     jeff@edwards-law.com
      david@edwards-law.com
3     lisa@edwards-law.com
      paul@edwards-law.com
4
      and
5
      Ms. Jodi Cole
6     LAW OFFICE OF JODI COLE, PLLC
      203 East Murphy Street
7     Alpine, Texas 79830
      432-837-4266
8     jcole@jodicole.com
9 FOR DEFENDANT:
      Mr. Michael Carter
10    Ms. Abigail Carter
      OFFICE OF THE ATTORNEY GENERAL OF TEXAS
11    Post Office Box 12548
      Austin, Texas 78711-2548
12    512-463-2080
      michael.calb@oag.texas.gov
13
   FOR TEXAS DEPARTMENT OF CRIMINAL JUSTICE:
14    Ms. Stephanie Greger
      Ms. Jennifer Childress
15    TEXAS DEPARTMENT OF CRIMINAL JUSTICE
      P.O. Box 13084 Capital Station
16    Austin, Texas78711
      stephanie.greger@tdcj.gov
17    jennifer.childress@tdcj.gov
18    I further certify that I am neither counsel for,
19 related to, nor employed by any of the parties in the
   action in which this proceeding was taken, and further
20 that I am not financially or otherwise interested in the
   outcome of the action.
21
22
23    Certified to by me this 29th day of July, 2024.
24
25
```

David Sweetin - 7/25/2024

329

4 KELLY E. FISHER, CSR No. 2834
Expiration Date: 1-31-26
5 WRIGHT WATSON & ASSOCIATES
Firm Registration No. 225
6 1250 S. Capital of Texas Highway
Building 3, Suite 400
7 Austin, Texas 78746
512-474-4363
8 www.wrightwatson.com
9 JOB NO. DSWEETIN_07252024

331

SIGNATURE
3    I, DAVID SWEETIN, have read the foregoing
4 deposition and hereby affix my signature that the same
5 is true and correct, except as noted on the previous
6 page.

8    _____
DAVID SWEETIN

330

1        CHANGES AND CORRECTIONS
2 DAVID SWEETIN - JULY 25, 2024
3 VOLUME 1
4 [DISREGARD IF WAIVED]
5 Reason Codes:  (1) to clarify the record; (2) to conform
  to the facts; (3) to correct a transcription error; (4)
6 other (please explain).
7 PAGE/LINE  CHANGE                    REASON CODE