**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION**

| | | |
|---|---|---|
| **BERNHARDT TIEDE, II; TEXAS PRISONS COMMUNITY ADVOCATES; BUILD UP, INC., A/K/A JUSTICE IMPACTED WOMEN'S ALLIANCE; TEXAS CITIZENS UNITED FOR REHABILITATION OF ERRANTS; and COALITION FOR TEXANS WITH DISABILITIES,** *Plaintiff,* | § § § § § § § § § § § § § | |
| **v.** | § § | **Cause No. 1:23-CV-01004** |
| **BRYAN COLLIER, in his official capacity as Executive Director of Texas Department of Criminal Justice,** *Defendant.* | § § § § § § | |

---

### DEFENDANT'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

---

Plaintiff Bernhardt Tiede II ("Tiede") originally brought this action against the Texas Department of Criminal Justice ("TDCJ") and other state agency officials, including Collier, alleging that Collier had violated his Eighth Amendment right to be free from cruel and unusual punishment by subjecting him to high temperatures in prison. *See generally* ECF No. 1. During the pendency of the suit, four separate activist groups, Texas Prisons Community Advocates ("TPCA"), Build Up, Inc.

A/K/A Justice Impacted Women's Alliance ("Lioness"), Texas Citizens United for Rehabilitation of Errants ("TX CURE"), and Coalition for Texans with Disabilities (collectively, the "Organizational Plaintiffs") joined as Plaintiffs to systematically alter the Texas prison system. ECF No. 57, ¶¶18–22. In doing so, the Organizational Plaintiffs sought a preliminary injunction to require TDCJ to immediately install air-conditioning in all TDCJ prison units statewide. Such a remedy, which has been found unnecessary by federal courts, is physically impossible to implement in the immediate future, would fundamentally alter TDCJ's operations, and cost billions of taxpayer dollars.

Defendant Collier filed a Motion to Dismiss simultaneously arguing that the Organizational Plaintiffs' claims should be dismissed for a number of reasons. ECF Nos. 76, 77. First, the Court lacks jurisdiction because Texas's sovereign immunity has not been abrogated or otherwise waived. Second, the Organizational Plaintiffs lack standing to sue because they have not met the requirements for associational standing. Third, the Organizational Plaintiffs' claims are not ripe—they are based on purely speculative or future harm. And last, the Organizational Plaintiffs have failed to state a claim upon which relief can be granted. The Court denied Collier's Motions to Dismiss on July 14, 2024. ECF No. 95.

A hearing on Plaintiffs' motion for preliminary injunction was held from July 30 to August 2, 2024. ECF Nos. 167, 172-174. Plaintiffs presented the testimony of

13 witnesses, only *one* of whom is currently incarcerated in TDCJ custody, and two individuals who lack *any* personal knowledge about current conditions within TDCJ because they have not been in TDCJ custody since 2018 and 2021. ECF No. 175. Plaintiffs' experts speculated about the risks of heat relying on experimental studies and limited data that did not consider underlying causes of death. Defendant presented testimony and evidence of mitigation measures taken by the agency short of air conditioning that many of Plaintiffs' own experts agreed mitigated the risks of heat exposure. Defendant also presented expert testimony regarding their assessment of those inmates most at risk and their assignment to air-conditioned housing. Finally, Defendant testified to the agency's inability to secure funding for the state wide implementation without support from the legislature.

Plaintiffs failed to meet their burden to obtain a preliminary injunction. Their request for an injunction seeks to enact sweeping, comprehensive, and massively expensive reform to the TDCJ prison system prior to the ultimate conclusion of this suit and substantially alter both the status quo and the cost of operating the Texas prison system. Plaintiffs have not shown a likelihood of success on the merits with respect to the incredibly high burden of deliberate indifference, and *no* Plaintiff has exhausted their claims as required by the Prison Litigation Reform Act ("PLRA"), nor have the Organizational Plaintiffs shown that *all* inmates who they purport to represent will suffer irreparable harm, and their standing to bring this suit remains

unfounded. Further, Collier, the State of Texas, and all tax-payers' public interests would experience harm that vastly outweighs any benefit that the Organizational Plaintiffs and Tiede would receive if this preliminary injunction were granted.

Given the overwhelming evidence of TDCJ's efforts to address heat in its prisons, Plaintiffs are not likely to succeed on the merits of their Eighth Amendment claims. The evidence includes a joint effort by the University of Texas - Medical Branch and TDCJ to implement an innovative algorithm to identify, properly classify, and house inmates sensitive to heat. TDCJ provides training to both inmates and staff on how to prevent heat illness. Access to this information is prevalent on each facility, displayed on posters, and available on a pocket card carried by security staff members. The agency has in place detailed mitigation measures during the summer months. Supplies, such as fans, water cups, water, ice, and cooling towels are provided to inmates, to supplement their access to cold showers, respite areas, commissary water and electrolytes. The agency limits working hours and outdoor activities during the hottest times of the day. TDCJ monitors and audits heat preparedness and compliance with TDCJ heat mitigation policies and procedures and has instituted a Heat Strike Team to intervene when a unit has experienced a series of high-temperature conditions. Since 2018, TDCJ has requested increasing amounts of funding from the Texas Legislature, and as that funding has allowed, has made strategic efforts to add air-conditioned beds. TDCJ received record funding

last year and anticipates similar allocations during the next legislative sessions. In the meantime, TDCJ's Facilities Division has created a phased plan that includes prototype designs of each type of TDCJ facility so that it is prepared to execute on design and installation as funding becomes available. Cumulatively, the evidence shows TDCJ has *deliberately* (1) addressed the dangers posed by high temperatures through its training and mitigation efforts, (2) added air-conditioned beds at units to accommodate those inmates who are at elevated risk, and (3) planned how to add air-conditioned beds in the most meaningful and efficient way.

Thus, the Court should deny Plaintiffs' request for a preliminary injunction, and find and conclude as follows:

## I. DEFENDANT'S PROPOSED FINDINGS OF FACT

<u>PLAINTIFFS' LACK OF STANDING</u>

1. Build Up, Inc. A/K/A Justice Impacted Women's Alliance ("Lioness") is a named Plaintiff in this lawsuit. (Vol. 1-57:25-58:13) [1]

2. Marcie M. Simmons ("Simmons") is the Community Outreach Coordinator for Lioness. (Vol. 1-26:15-24)

3. Simmons was previously incarcerated in TDCJ and released in 2021. (Vol. 1-27:7-9; 50:20-22) [2]

4. Lioness asserts it is an organization comprised of formerly incarcerated and currently incarcerated women, girls, and gender expansive individuals in Texas.

---

[1] The citation "Vol. 1-22:8-18" means: Volume number of transcript followed by the page number followed by line numbers.

[2] Simmons was incarcerated because she was found guilty of theft. (Vol. 1-62:24-63:1)

(Vol. 1-26:20-22)

5. An individual can become a "member" of Lioness by simply letting Lioness know they want to be a member and they are "in." (Vol. 1-51:5-8)

6. Lioness has approximately 700 "members" and 400 are currently purportedly incarcerated in TDCJ. (Vol. 1-51:9-11; 58:14-18)

7. Lioness' "members" do not pay membership dues. (Vol. 1-52:8-9)

8. Lioness' bylaws provide that the organization has *one* sole member: "A. Nicole Campbell." (Vol. 3-9:22-10:6) (referencing Def. Ex. 31 at 2, which was admitted as an offer of proof [3])

9. Lioness' bylaws allow creation of an additional membership class of the Corporation upon express written consent of the sole member in addition to approval by the Board of Directors. (Def. Ex. 31 at 2-3)

10. No evidence was presented to indicate that "A. Nicole Campbell," Lioness's *sole* member is an inmate incarcerated within TDCJ, or that an additional membership class was created prior to Lioness joining this lawsuit.

11. Charlie Malouff ("Malouff") is the Vice-President of TX. C.U.R.E., a non-profit criminal justice advocacy organization. (Vol. 1-176:11-177:5)

12. Malouff was previously incarcerated in TDCJ but was released in mid-2018. (Vol. 1-178:7-15)[4]

13. TX. C.U.R.E. does not have members, instead, it has "constituents." (Vol. 1-202:10-11)

14. TX. C.U.R.E. claims that every person in TDCJ is a "constituent" and there is no way for individuals to "opt in" or "opt out." (Vol. 1-202:19-20)

15. Dr. Amite Dominick ("Dominick") is the founder and President of the Texas Prisons Community Advocates ("TPCA"). (Vol. 2-336:2-6)

---

[3] (Vol. 3-9:5-6)

[4] Malouff was incarcerated because he was found guilty of securing a document by deception. (Vol. 1-178:10-12)

16. TCPA treats their "membership" "like a church," where if someone wants to be a "member," they are put on TCPA's mailing list. (Vol. 2-358:5-10)

17. TCPA does not issue any certificate or card to members confirming their membership. (Vol. 2-358:16-18)

18. TCPA's Certificate of Formation has no provision for determining membership and does not explain the rights or responsibilities of members. (Vol. 2-356:7-8; 356:21-357:7) (referencing Def. Exs. 33-34)

19. TCPA's bylaws do not provide for how an individual can become a member of TCPA or provide any rights, qualifications, or responsibilities of members. (Vol. 2-360:1-10) (referencing Def. Ex. 35)

20. Only existing TCPA board members may vote for other board members. (Vol. 2-361:14-15)

21. Tiede is not a member or constituent of the Organizational Plaintiffs. (Vol. 1-133:22-134:10)

22. Tiede is currently housed in air-conditioning at the Connally Unit, was housed in air-conditioning at the Estelle Unit prior to being moved to the Connally Unit and has spent most of his incarceration since 2016 in air-conditioned housing (Vol. 1-134:7-8; 134:25-135:9)

23. Despite admitting that he has filed grievances before concerning other issues, Tiede did *not* file a grievance *before* filing this lawsuit. (Vol. 1-136:24-25; 145:11-15; 146:1-6) [5]

---

[5] Tiede claims he filed grievances in October and November 2023, all *after* he filed this lawsuit. (Vol.1-142:1-5) Because Tiede is already housed in air-conditioning, his claims are moot. To the extent the Court finds that he is likely to be placed in non-air-conditioned housing, Tiede also has not filed a grievance about this issue and has never made a request to TDCJ not to be returned to

## TDCJ'S HEAT MITIGATION MEASURES

### COOL BEDS AND THE HEAT SCORE SYSTEM

24. Of TDCJ's 101 units, 32 are fully air-conditioned in the housing areas and 55 are partially air-conditioned in the housing areas. (Vol. 3-14:19-25; Vol. 4-76:19-25)

25. TDCJ has approximately 46,000 "cool beds." (Vol. 3-15:21; Vol. 4-154:6-14)

26. TDCJ recognizes some inmates are potentially at a heightened risk of heat-related illnesses because of their age, health conditions, or medications; these inmates are identified through an automated heat sensitivity score that use information from the inmate's electronic health record; and the heat score system was developed to place inmates with certain risk levels or risk conditions into air-conditioned housing or "cool beds." (Vol. 3-54:23-55:1; 91:18-25; 101:14-20) [6]

---

non-air-conditioned housing. (Vol. 1-136:21-23)

[6] As part of the 2018 settlement in the *Cole v. Collier* litigation, TDCJ contracted with an outside medical expert, Dr. Reiger, who helped TDCJ evaluate how they could identify the more vulnerable inmates who could best use air-conditioned housing. (Vol. 4-163:3-9) Dr. Reiger helped TDCJ develop such a method, which resulted in the heat score system, by reviewing factors of the cases of heat illnesses and deaths from 2010-2011 to incorporate that information with the subclass of the *Cole* settlement. (Vol. 4-163:14-21) Ultimately, categories of inmates who were most at risk were created, and those categories were agreed to by the *Cole* litigation Plaintiffs, who also had medical experts, before the settlement was approved. (Vol. 4-164:2-9) The heat score system has been updated since the 2018 settlement because UTMB and TTUHSC have the ability to add conditions, like muscular dystrophy and multiple sclerosis, if providers feel like they are conditions that render individuals heat vulnerable or if medication changes have that effect. (Vol. 4-164:12-165:6)

27. The University of Texas Medical Branch Correctional Managed Care ("UTMB-CMC") and Texas Tech Health Sciences Center ("TTHSC") provide medical care for incarcerated individuals in TDCJ; UTMB is heavily involved in quality endeavors, auditing, and making sure that UTMB is providing the level of care that they are contracted to provide. (Vol. 3-54:7-13; 84:19-23)

28. Dr. Jane Leonardson ("Dr. Leonardson") has an M.D. from Northwestern University where she completed her residency in internal medicine and was later Board Certified in internal medicine and clinical informatics, that is recognized by the American Board of Specialties and is related to the management and understanding of clinical technical assets, which is the data going in and out of an electronic health record and the accuracy in reporting. (Vol. 3-80:9-14; 81:2-8) [7]

29. Dr. Leonardson worked for UTMB for 26 years before going part-time in 2022, where she was in patient-facing roles as a physician for 16 years, served as a regional director overseeing medical providers at 25 prison units, and became the Chief Medical Information Officer in 2014. (Vol. 3-83:23-84:2; 85:6-23) [8]

30. In Dr. Leonardson's opinion, it is not the heat itself that is dangerous but the

---

[7] The Court recognized Dr. Leonardson as an expert in internal medicine and clinical informatics. (Vol. 3-83:17-18)
[8] Currently, Dr. Leonardson's title is Director of Clinical Informatics, where she, as a physician, serves in a consulting role about the design, accuracy, and results concerning electronic health records. (Vol. 3-89:14-90:4) As part of her job in informatics, Dr. Leonardson assists in creating algorithms. (Vol. 3-81:16-20)

body's response to heat that can be dangerous, which is why people with certain medical conditions that put them at a significantly higher risk of living in a hot environment should be moved to a cooler environment. (Vol. 3-129:12-14; 144:1-4) [9]

31. Inmates can go to the medical department to be seen by a provider or they can be visited by medical providers when providers move and visit patients throughout the unit; this happens often if the unit is on lockdown; additionally, inmates can file a sick call request, and nurses are responsible for triaging that request within 24-hours, but it is usually much faster. (Vol. 3-87:11-20; 88:10-89:4)

32. The electronic health record scans for algorithm changes several times a day and looks at every single person who is incarcerated and their medical record to look for new criteria that gives them a point. (Vol. 3-96:22-97:2; 111: 6-9) [10]

33. Thus, the algorithm is based on facts entered by a [UTMB or TTHSC] doctor that would assign an inmate a heat score, and if an inmate receives a heat score,

---

[9] Dr. Leonardson noted her belief that TDCJ shares this belief and has demonstrated they are doing this and believes their intent is to continue doing so. (Vol. 3-129:17-18) In the entire history of TDCJ, there have been deaths from the heat, but Dr. Leonardson believes that measures have been taken to prevent heat deaths going forward. (Vol. 3-120:25-121:2)

[10] The Office of Health Informatics manages how things are put into the electronic health record, how they are managed in electronic health record, and the output of the electronic health record. (Vol. 3-89:14-90:4) The Health Informatics Office was tasked with identifying which diagnoses codes qualified for a diagnosis that had been added to the heat score algorithm so that providers could just enter the diagnoses code into the electronic health record as usual and it would trigger a point on the algorithm, while also providing information to TDCJ without disclosing private health information, so TDCJ could make accurate housing decisions. (Vol. 3-92:9-94:23)

they are placed in an air-conditioned bed. (Vol. 3-24:2-11; 91:1-6) [11]

34. Every inmate who receives a heat score is placed in an air-conditioned bed. (Vol. 3-24:20-25:2; 56:1-3; 100:4-7; 178:21-23)

35. TDCJ does *not* assign inmates heat scores because they lack the medical expertise to engage in such practice and rely on the algorithm created by contracted medical experts and TDCJ *cannot* alter an inmate's heat score; similarly, TDCJ staff cannot instruct the UTMB Health Informatics Office to remove a heat score. (Vol. 3-24:12-16; 99:18-21; 162:2-4)

36. TDCJ has approximately 12,289 inmates with heat scores. (Vol. 3-25:3-5; Vol. 4-154:6-14)

37. There is an excess of approximately 33,000 beds compared to individuals with heat scores, which are available to inmates who do not have heat scores. (Vol. 3-25:9-11; 166:4-5)

38. If a provider believes that a patient who does not have a heat score can ultimately be affected negatively by living in a non-air-conditioned environment, the provider can call the Health Services Liaison ("HSL") and ask HSL to evaluate

---

[11] The algorithm has changed in the years since it was first developed to include more than just the terms of the original settlement agreement. (Vol. 3-104:8-21) UTMB has added conditions to the algorithm that are universally considered to put individuals at risk for heat-related vulnerability. (Vol. 3-150:10-12) For example, UTMB has added myasthenia and MS to the heat score algorithm. (Vol. 3- 105:5-15) Dr. Leonardson has made recommendations to TDCJ to make changes to the heat score system, and TDCJ has "promptly enacted them." (Vol. 3-116:11-19)

the patient for a cool bed. (Vol. 3-102:8-20) [12]

39. Additionally, individuals who might not have a heat score, but have suffered heat-related illness, will be placed in an air-conditioned bed for the rest of their incarceration. (Vol. 3-167:10-168:3)[13]

40. Developmentally disabled inmates who are in the DDP mental health program are in cool beds regardless of if they have a heat score. (Vol. 3-187:5-16)

41. The Hodge Unit, which is specifically for mentally ill inmates, is fully air-conditioned, and other mental health units within TDCJ are also air-conditioned. (Vol. 3-188:5-17)

42. Wardens have discretion to place individuals in cool beds even though they might not have a heat score. (Vol. 3-180:14-181:5)

*TDCJ IMMEDIATELY PLACES INDIVIDUALS WITH A HEAT SCORE IN A COOL BED*

43. Timothy Fitzpatrick ("Fitzpatrick") is the TDCJ Director of Classification and Records, who oversees the intake of individuals coming into TDCJ, is responsible for conducting their physical processing and assigning them custody and unit

---

[12] HSL is a group made up of nurses that work for TDCJ who communicate with UTMB and other medical providers servicing the prison system. (Vol. 3-103:1-10) However, HSL cannot request reassignment of an inmate to a *specific* unit with air-conditioning. (Vol. 3-183:16-186:6) (referencing Def. Ex. 72)

[13] UTMB's Utilization Review Division determines whether an inmate was sent off the unit for something related to heat or if heat was related to an emergency room visit or hospitalization, such as dehydration, and those patients are reported to TDCJ, and those individuals are sent to a cool bed. (Vol. 3-102:15-24)

assignments and is responsible for all transfers between TDCJ facilities. (Vol. 3-155:1-2; 157:22-158:19) [14]

44. When an inmate first comes into TDCJ custody, they are seen by medical staff. (Vol. 3-159:1-9)

45. The intake process takes 30 days; during intake processing, an inmate receives a preliminary heat score, which is given by nursing staff at the intake facility based on a screening mechanism that evaluates the information provided by the county the inmate was previously detained in; and if an inmate receives a heat score during intake, they are immediately placed in a cool bed until their final physical exam. (Vol. 3-159:24; 160:6-161:4)

46. Although TDCJ and the Classification Department do not receive specific medical information about inmates' medical needs, they receive two reports daily that alert them to individuals with heat scores: the heat score list and the heat score change list. (Vol. 3-166:18-25; 168:7-17)

47. The heat change report tells the Classification Department if anyone has received a heat score since the prior day, and if they need to be placed in an AC bed; once an individual receives a hea score, they will be moved to a cool bed that very day and scheduled for transportation to a different unit immediately if that cool bed

---

[14] The Court recognized Fitzpatrick as an expert in corrections. (Vol. 3-157:10-14)

does not also meet their other classification or programming needs. (Vol. 3-169:25-171:4) (referencing Def. Ex. 30) (Vol. 3-172:1-6; 174:22-175:10) [15]

48. When an inmate is transported throughout the state, if they are assigned a heat score and need to stay overnight at a different unit, they will go through a "hub" that has air-conditioned beds and all TDCJ transport vehicles are air-conditioned. (Vol. 3-46:9-22; 178:14-15; Vol. 4-161:21-162:6)

49. Although heat scores can change depending on information inputted into the electronic health record, an inmate who loses their heat score will not immediately be removed out of a cool bed because TDCJ has excess cool beds. (Vol. 3-165:1-21)

### HEAT MITIGATION MEASURES AND HEAT PREPAREDNESS

50. Bobby Lumpkin ("Lumpkin") has worked for TDCJ for 33 years and is currently the Director of the Correctional Institutions Division of TDCJ; he is responsible for ensuring TDCJ's day-to-day operations are being carried out pursuant to TDCJ's policies and procedures. (Vol. 3-11:17-12:4; 13:7-20)

51. Lumpkin sends out a seasonal preparedness directive every year prior to the summer months, that discusses TDCJ's heat mitigation measures and AD 10.64,

---

[15] Because of inmate's various classification levels, not every housing unit is created equal or can accommodate each individual's needs. (Vol. 3-164:6-9) However, when the TDCJ Classification Department makes housing and classification decisions, medical considerations take precedence over everything else. (Vol. 3-162:5-8)

which is TDCJ's policy regarding excessive and extreme heat temperatures and provides direction on how to mitigate extreme temperatures during the summer months. (Vol. 3-14:3-11; 16:17-17:15; 18:4-20; 19:10-19) (referencing Def. Exs. 1, 53)

52. TDCJ uses a seasonal preparedness checklist prior to the summer months to ensure the facilities, staff, and inmate population are prepared for extreme heat. (Vol. 3-39:12-40:9) (referencing Def. Ex. 9)

53. The checklists require every unit to respond to 15 checklist items concerning access to heat mitigation measures, whether staff and inmates are trained on heat mitigation and precaution measures, whether equipment is in working condition, and generally if AD 10.64's requirements are being implemented; the checklist has both a methodology and comment section for the unit to explain how they verified the information, such as "inspected equipment," or why something is not taking place, such as "need replacement cards for staff." (*see for e.g.,* Def. Ex. 9 at 8-12)

54. TDCJ provides inmates with access to respite, cold showers, fans, ice water, and a reusable cup to use to drink from and refill with water. (Vol. 3-17:10-11; 30:4-17; Vol. 4-169:5-12)

55. Respite areas are air-conditioned areas inmates can access to cool down; inmates can verbally request to go to respite from correctional staff or supervisors; and

there are around 800 respite areas across TDCJ's 101 units. (Vol. 3-27:15-28:4; Vol. 4-168:9-11)

56. In addition to designated respite areas, many other areas where inmates frequent are air-conditioned, such as the education, vocation, and medical departments, law library, and work areas. (Vol. 3-29:10-30:3)

57. All of TDCJ's buses and vans are air-conditioned and TDCJ transports inmates during the coolest hours of the day. (Vol. 3-46:9-22; Vol. 4-173:13-14; 209:19-20)

58. TDCJ adjusts the temperature in its showers, so inmates have access to cool showers; inmates in the general population, who live in dormitory housing, have access to more frequent showers; inmates in more restrictive custodies also have access to cool showers during normal operations or can request to take a cool shower. (Vol. 3-52:22-53:1) [16]

59. TDCJ has 400 ice machines across its 101 units; ice water is available in inmate's living, recreation, and work areas, and for inmates in restrictive custody, individuals go cell-to-cell to provide water and ice; additionally, those that are housed in cells, even in restrictive housing, have sinks with running water inside their cells. (Vol. 3-31:3-32:1; Vol. 4-168:6-8; 168:25-169:2)

---

[16] The majority of TDCJ's inmate population are in the "general population," and they generally have more freedom to access respite and cool showers. (Vol. 3-53:3-20)

60. TDCJ also provides inmates and staff training on the effects of heat and how to mitigate the effects of heat. (Vol. 4-167:1-9)

61. Cody Ginsel ("Ginsel") is the Director of Correctional Professional Development for TDCJ's Training and Leadership Development Division who has 35 years of experience working in corrections and has worked at TDCJ for 33 years. (Vol. 3-221:19-22; 222:22; 224:2-5)[17]

62. In his role, Ginsel oversees all six regional academies where TDCJ trains all new correctional officers and oversees the leadership development academy where TDCJ provides leadership development for correctional, uniformed staff. (Vol. 3-224:9-21) [18]

63. Cadets are individuals coming into the TDCJ system to become officers; all cadets must go through TDCJ's pre-service training to become officers unless they are returning employees within the last three years and had already completed the training and curriculum program. (Vol. 3-225:23-25; 226:4-9)

64. TDCJ Cadets are trained in heat preparedness and receive two to five hours of base training in heat preparedness and an additional one to two hours every day during their employment while at the academy. (Vol. 3-226:13-229:11)

---

[17] The Court recognized Ginsel as an expert in correctional professional development. (Vol. 3-225:7-11)

[18] Ginsel also assists the individuals who write the training curriculum and reviews and approves that curriculum. (Vol. 3-224:25-225:6)

(referencing Def. Ex. 13-C)

65. Heat preparedness training is repetitive to ensure cadets understand the importance of what they are being taught, learn how to recognize the signs and symptoms of those that may be experiencing heat-related illnesses in themselves and the individuals they work with and how to prepare their bodies to work in the heat; they are also put through training scenarios of individuals suffering heat illness, so they can understand firsthand how to respond. (Vol. 3-218: 7-19; 231:19-21)

66. Officers are trained to identify possible symptoms of heat illness in other officers and inmates; cadets are also trained on how to help prevent heat illness by drinking plenty of fluids before coming to work, drinking plenty of water during their shift, and are provided with ice water and cooling towels during shifts. (Vol. 3-230:8-231:21)

67. Cadets are also trained on AD 10.64 and the Seasonal Preparedness Directive and are provided and required to carry on their person a pocket card to remind them of heat-related illness symptoms; all TDCJ staff are required to carry this pocket card to help them recognize the signs and symptoms of heat illness, as well as the treatment and prevention of heat illness. (Vol. 3-42:19-43:7) (referencing Def. Ex. 12); (Vol. 3-229:12-23)

68. The pocket card includes information about the signs and symptoms of heat

cramps, heat exhaustion, and heat stroke, discusses the prevention and treatment of heat illness, and identifies individuals who may be more at-risk for heat illness. (*See* Def. Ex. 12 at 2)

69. Cadets who do not demonstrate understanding of what is taught are provided additional training including possibly being recycled back into a new training class and if they continue to struggle, they may be separated. (Vol. 3-235:18-236:9)

### TDCJ'S COMPLIANCE WITH HEAT MITIGATION MEASURES

70. Lumpkin has personally been on all of the facilities to ensure that heat mitigation measures are taking place, but deputy directors, regional directors, and correctional officers also conduct site visits; Lumpkin also speaks with his staff on the units day-to-day to ensure heat mitigation measures are taking place. (Vol. 3-33:16-34:25)

71. The food service and supply departments ensure that the units have adequate supplies, such as ice, water containers, black cups, and that equipment is running properly. (Vol. 3-33:16-34:13)

72. TDCJ and the Independent Ombudsman's office conduct site visits and audits of facilities to ensure heat mitigation measures are being carried out; the Independent Ombudsman is a division within the Texas Board of Criminal Justice that investigates any allegations or concerns of constituents, legislators, or inmates and

has 24-hour access to TDCJ's facilities and can make unannounced visits. (Vol. 3-49:3-22)

73. TDCJ also conducts investigations into allegations that mitigation measures are not taking place and relies on information obtained through "strike teams." (Vol. 3-38:12-25)[19]

74. Heat strike teams are groups of TDCJ employees tasked with unannounced visits to individual units where they evaluate a unit's compliance with heat related procedures and mitigation protocols by using an audit tool, talking with offenders and staff, visiting all housing and work locations, ensuring the unit has adequate ice and water, looking at respite and how often the inmates get breaks while working, and ensuring all employees are carrying their pocket cards. (Vol. 3-262:1-265:19) [20]

75. After a heat strike team visits a unit, the team drafts a report detailing the unit's compliance with heat-related protocols. In doing so, the heat strike team notates any deficiencies in that unit and recommends any corrective action. (Vol. 3-

---

[19] Inmates can communicate to TDCJ that mitigation measures are not taking place through correspondence, emails, and the grievance process. (Vol. 3-50:17-51:5) The grievance process allows an inmate to submit any concerns they have with a facility's operation, whether that be access to healthcare, heat mitigation, or complaints about staff. (Vol. 3-51:7-21) Once the grievance department receives a grievance, they investigate the complaint by gathering information and statements from those with knowledge or investigate the processes complained about. (Vol. 3-51:22-52:4)

[20] TDCJ's Administrative Review and Risk Management ("ARRM") is primarily tasked with independent oversight and risk management related to each unit. (Vol. 3-260:5-19)

265:22-266:13)

76. If a heat strike team notices a more systemic issue regarding heat protocols, it will notify TDCJ executive leadership. (Vol. 3-268:25-269:2)

## TDCJ'S PLANS TO GAIN ADDITIONAL FUNDING AND ADD ADDITIONAL AIR-CONDITIONING

77. Ron Hudson is the Facilities Director for TDCJ and has been working for the agency for 32 years. (Vol. 4-69:8-12)

78. Hudson is an expert in facilities management. (Vol. 4-77:11-15)

79. The Facilities Division of TDCJ employs 1,200 employees across the state to oversee the maintenance at 101 units to ensure timely management of safe and secure operations, including an engineering department that oversees all engineering projects; budget department that oversees all the programming budgets to ensure each unit has adequate funding; and a risk assessment department that conducts 35-40 audits a year of the units' maintenance operations. (Vol. 4-71:4-23; 72:3-15)

80. Projects over one million dollars are overseen by the project administration department that work with companies to ensure the installation of these projects are built according to the engineering specifications and outside agency regulations; and TDCJ currently has over 20 projects that are each over one million dollars that must be submitted for approval by the Texas Board of Criminal Justice. (Vol. 4-72:17-73:9)

81. The Facilities Division's engineering department employs a lead engineer, two deputy engineers, seven additional engineers, and two architects internally; they also contract with 18 outside engineering firms to manage roughly 350 projects whether in design or in construction. (Vol. 4-75:3-15)

82. Four of the 18 outside engineering firms are contracted to work on the air-conditioning projects to design the HVAC system as well as the backup generators and ensuring the units have enough electrical power. (Vol. 4-76:4-11)

83. In 2024, the Facilities Division has spent over $1 million in logistical upgrades to the Pack Unit HVAC system because they rushed into the project without completing a full design. (Vol. 4-76:13-17)

84. During the 88th legislative session, TDCJ received $85 million ear-marked for air-conditioning projects. This was the first time the agency received funding specifically for air-conditioning. Of those funds, the Facilities Division has already awarded $6.7 million for the designs of the next phase of units. (Vol. 4-78:8-13)

85. The Facilities Division receives appropriated funds from the legislature each session placed for its deferred maintenance budget. (Vol. 4-79:11-13)

86. In 2018-2019, the Facilities Division only received $40 million in deferred maintenance funding for the *entire* agency, and *no* funds were ear-marked for air-conditioning. (Vol. 4-79:11-13; 114:12-18)

87. In 2020-2021, the Facilities Division received $54 million in deferred maintenance funding for the *entire* agency, and *no* funds were ear-marked for air-conditioning. (Vol-4 79:18-21; 114:23-115:3)

88. The deferred maintenance budget funds all of the Facilities Division's projects like air-conditioning, wastewater treatment plants, refurbishing water wells, and renovating kitchens for over 37 million square feet of TDCJ facilities. (Vol. 4-79:19-80:6)

89. The Facilities Division identifies projects yearly for the deferred maintenance budget which are put on a list to accomplish once the budget gets funded; once projects are completed, they are taken off the list, but the budget decreases. (Vol. 4-80:11-20)

90. The current new roof project at the Hughes Unit will cost in excess of $20 million. When TDCJ replaces or repairs a roof, even if the replacement or repair is necessitated by a hurricane or other natural disaster, the costs come out of the deferred maintenance budget. (Vol. 4-82:19-83:18)

91. One of the engineering firms currently on the contract list designed a prison in Utah that would mirror TDCJ's 2250 model, a maximum-security unit with six housing locations; the cost to build that design today is well in excess of over one billion dollars. (Vol. 4-81:7-14)

92. The last unit at TDCJ was built in 1997. (Vol. 4-80:21-22)

93. Expansion cell blocks were built at the Allred and Clements Units in the early 2000s; those cell blocks were built with air-conditioning. (Vol. 4-82:2-6)

94. Operation Lonestar utilizes the Briscoe and Segovia Units, which are the only fully temporarily air-conditioned units in TDCJ; they received separate funding from the Texas Department of Emergency Management ("TDEM") and the Legislature's Operation Lonestar Funding. (Vol. 4-84:6-12; 267:17-268:5)

95. The Beto Unit currently has portions of its housing areas that are temporarily air-conditioned because those areas function as an intake facility for inmates coming from county jails. (Vol. 4-84:14-25)

96. There are currently plans to air-condition the A, B, C, and D wings of the Beto Unit; the design for that plan will cost $1.2 million. (Vol. 4-84:23-85:4)

97. TDCJ rents temporary air-conditioning throughout the state when there is an HVAC system down in a housing location that cannot be fixed by the Facilities Division in a timely manner. (Vol. 4-85:10-17)

98. The Pack Unit was temporarily air-conditioned by temporarily installing permanent air-conditioning units. (Vol. 4-86:4-12)

99. TDCJ bought permanent air-conditioning equipment for $900,000 that was installed until the permanent air-conditioning solution could be created and implemented. (Vol. 4-86:11-14)

100. The fuel for the generators to keep the temporary air-conditioning running in

all units 24/7 for seven months annually would cost $600 million. (Vol. 4-86:22-87:14; 90:9-91:6)

101.    The overall cost to install temporary air-conditioning equipment and fuel for generators for seven months would be $700-800 million. (Vol. 4-91:22-92:3)

102.    TDCJ has 17 "System One" units, like the Coffield Unit, that were built without air-conditioning and with open windows that span entire walls to allow for airflow. (Vol. 4-89:4-9)

103.    Installing temporary air-conditioning, even permanent air-conditioning temporarily, at the Pack Unit was simple because it was only one unit. (Vol. 4-92:16-19)

104.    Some units were built in the early 1900s, and the Walls Unit was built in the mid-1800s, so investigatory work is required before the Facilities Division can start a full design of a project. (Vol. 4-93:7-25)

105.    The Facilities Division has one of each unit type in design because if there is already an approved design for each unit type, it can use those designs for other like-units and move past the design stage into construction faster. (Vol. 4-97:4-11) (referencing Def. Exs. 78-79)

106.    TDCJ cannot simply begin to install air-conditioning unit by unit without designing it because once a project goes over a certain dollar amount, because it is a public building in Texas, it must be designed by an engineer and architect

who first have to approve that project. (Vol. 4-97:20-25)

107. There are only four units that are the same style as the Pack Unit: Luther, Powledge, Jester III, and Terrell. (Vol. 4-103:10-12) (referencing Def. Exs. 78-79)

108. TDCJ is prioritizing designing units that fall into different categories to make it easier to move forward with future air conditioning projects. (Vol. 4-104:5-105:1)

109. TDCJ is on track to have three more units fully air-conditioned in housing areas by the end of 2024. (Vol. 4-106:8-9)

110. The design stage for air-conditioning one unit can take a year. (Vol. 4-106:10-24)

111. Aside from installing air-conditioning at units, the Facilities Division is also responsible for maintaining the HVAC systems at existing units including projects to replace chillers at the Michael Unit where one project will cost a little over $4 million and the other a little over $3 million. (Vol. 4-109:21-110:11)

112. A water chiller is a type of air-conditioning system. (Vol. 4-154:11-13)

113. The cost estimate to fully air-condition the housing areas at a 2250 Unit is between $25-30 million. (Vol. 4-110:4-11)

114. TDCJ would need 65,000 tons of air-conditioning to install air-conditioning in housing units across the entire system. (Vol. 4-154:14-17)

115. The Facilities Division also completes summer prep as part of the A.D. 10-64 process where by March 31 of each year, staff evaluate every piece of equipment on their unit and ensure that it is working properly; if it is not, staff must put the equipment on a list which is tracked to get materials procured and installed by April 15. (Vol. 4-110:16-25)

116. There are HVAC licensed technicians on all of the units to perform maintenance; if the issue requires something more than unit or regional staff to diagnose the problem or repair process, the Facilities Division will send a vendor to the unit to repair, and if the repair cannot be completed in a timely manner, the Facilities Division will rent equipment for that housing location. (Vol. 4-111:6-19)

117. In past years, the Facilities Division has budgeted around $3-4 million on rental equipment, but in this year *alone,* the Facilities has spent $13 million on rental equipment for air-conditioning. (Vol. 4-111:22-112:4)

118. For the 2020-2021 fiscal year, TDCJ received a total of $54 million in its deferred maintenance budget, of which the Facilities Division spent $13.4 million on air-conditioning 3,407 beds. (Vol. 4-115:1-7)

119. For the 2022-2023 fiscal year, TDCJ received a total of $105.4 million and spent $15.5 million on air conditioning. (Vol. 4-115:8-16)

120. For the 2024-2025 fiscal year, the 88th Legislature ear-marked $85.7 million

dollars for air-conditioning, which was the *first time* the legislature had ever ear-marked funds for air-conditioning. (Vol. 4-116:12-23)

121.   TDCJ must have the entire ear-marked funds amount awarded by August 31, 2025, or they will lose the money. (Vol. 4-116:24-117:6)

122.   The Legislature did not appropriate enough funds to TDCJ to enact the Four Phase Plan Collier presented in 2022 detailing the funding necessary to fully air-condition the system. (Vol. 4-152:23-153:6)

123.   TDCJ has not asked for a bid to install air-conditioning in all housing units because they do not have the funding; if TDCJ was awarded one billion dollars this session for air-conditioning, they could not award it within the biennium as required. (Vol. 4-153:13-18)

124.   Installing permanent HVAC in one unit, after nine months to a year in the design phase, could take one year or longer. (Vol. 4-155:25-156:4)

125.   The air-conditioning project is currently the Facilities Division's number one priority. (Vol. 4-74:14-16)

126.   Hudson regularly speaks with Collier to discuss the Facilities Division's plans and costs for air-conditioning. (Vol. 4-74:21-75:1)

127.   Bryan Collier is the Executive Director of the Texas Department of Criminal Justice and has been employed by TDCJ for 39 years. (Vol. 4-159:1-4)

128.   The Executive Director of TDCJ is appointed by the Texas Board of Criminal

Justice ("TBCJ") and the TBCJ is appointed by the Governor. (Vol. 4-159:24)

129.  The TDCJ Health Services Division is responsible for coordinating the contract with UTMB and TTUHSC and serve on the Correctional Managed Health Committee that oversees healthcare in the system. (Vol. 4-161:7-17)

130.  The *Cole v. Collier* settlement occurred in 2018 and required TDCJ to air-condition the Wallace Pack Unit by first temporarily air-conditioning the unit from April 15 to October 15 each year. (Vol. 4-162:6-24)

131.  A recent change to A.D. 10.64 includes ensuring that if an inmate was released from TDCJ custody with a heat score, and they return to custody, they are assigned a heat score at re-entry. (Vol. 4-170:24-171:6)

132.  Most of TDCJ's funding is appropriated from the General Appropriations Act. (Vol. 4-174:1-2)

133.  Appropriations from the Legislature must be obligated or spent within a two-year window during the biennium. (Vol. 4-175:19-24)

134.  TDCJ petitions the Legislature each legislative session, but even when the legislature is not in session, Collier meets with the legislative offices every other month to discuss any funding issues or short falls. (Vol. 4-176:17-24)

135.  TDCJ presented a plan in 2022 to the House Appropriations Committee to propose how the agency could air-condition the whole system; the proposed plan was a  four-phase plan that included amounts the agency could accomplish in the

two-year biennium resulting in a 10-year plan. (Vol. 4-77:13-23)

136.    The first phase of the four-phase plan asked for $225,860,000 to air-condition 24,825 beds. (Vol. 4-179:14-180:4)

137.    The following session, TDCJ received $85 million ear-marked for air-conditioning which was the first time in history, but it did not fully fund even the first phase of the four-phase project. (Vol. 4-180:9-181:4)

138.    As a state agency, TDCJ cannot take a position for or against legislation, but can testify on bills to the Legislature and work with the authors of previous air-conditioning bills to ensure the Legislature understands TDCJ's needs. (Vol. 4-184:7-14)

139.    TDCJ is currently developing its legislative appropriation requests which will include a request of well north of the $85 million they received last session ear-marked for air-conditioning. (Vol. 4-185:5-9)

140.    A "Rider" is like a passed bill, but it is actually a requirement that passes through an agency's budget—for example in 2019, a Rider was passed that required TDCJ to begin taking temperatures, so TDCJ developed a report to provide those temperatures based on the Rider's instructions. (Vol. 4-186:15-18)

141.    While Plaintiffs purport that TDCJ arbitrarily decides which deaths to report to the legislature, the distinction between a "death caused by heat" and a "death where heat was a contributing factor" is made in the Rider language authored by

the Legislature and given to TDCJ—the Rider required TDCJ to report certain deaths, either a death caused by heat or death where heat was a contributing factor. (Vol. 4-186:4-13)

142. The temperature requirement Rider was modified in 2021 to include reports of deaths caused by heat and deaths where heat was a contributing factor. (Vol. 4-186:23-187:5)

143. The Rider explicitly requires reporting on the following: environmental hyperthermia, death caused by heat, and deaths exacerbated by heat. (Vol. 4-186:6-9)

144. When Collier becomes aware of certain studies or journal articles, including the JAMA Article and Purdham A&M Study, he sends them to TDCJ's Research Director, Andy Barbee, to assess. (Vol. 4-188:3-11)

145. UTMB and TTUHSC have the authority to ask that first responders take core body temperatures of inmates who may be experiencing heat illness or injury. (Vol. 4-247:4-12)

146. There is not a fund or budget appropriation to comply with court orders or settlements regarding air-conditioning; any facilities project comes out of the deferred maintenance budget unless it received outside funding. (Vol. 4 266:15-267:8)

147. Despite Plaintiffs contentions that TDCJ could immediately temporarily air-

condition other units because they were able to at the Briscoe and Segovia Units, the Texas Division of Emergency Management initially funded the Operation Lonestar air-conditioning project installation for the first two years, and the Legislature funds Operation Lonestar who maintains the project. (Vol. 4 267:13-268:2)

148.   John Skinner's autopsy stated there is not sufficient evidence to suggest heat played a role in his death, however, given the limited available information and lack of core body temperature, heat related death cannot be entirely excluded. (Vol. 4-249:22-250:13)

149.   Notably, the temperature inside Skinner's cell at the time of his death was 85.3 degrees. (Vol. 4-269:8-11)

150.   TDCJ relies on UTMB and county medical examiners to perform autopsies of all in-custody deaths. (Vol. 4-269:15-20)

151.   As a result of inconsistencies in UTMB reporting, TDCJ and UTMB met in the summer of 2023 to discuss heat illness and injury reporting which ultimately resulted in the decision to add heat syncope and heat cramps to the report to the legislature even though it wasn't required. (Vol. 4-270:20-271:15)

*JOHN BALDWIN'S EXPERT OPINION*

**Baldwin:**

152.   Defendant proffered John Baldwin ("Baldwin") as an expert in corrections.

(Vol. 4-18:17-20)

153.   Baldwin was formerly the Director of the Iowa Department of Corrections and the Illinois Department of Corrections. (Vol. 4-15:5-8)

154.   Baldwin testified that there were about 49,000 people incarcerated in Illinois and 8,500 in Iowa. (Vol. 4-18:8-13)

155.   Baldwin worked in corrections for 42 years. (Vol. 4-18:14-16)

156.   According to Baldwin, TDCJ's efforts to air-condition the system have been successful because they have been able to dramatically expand the number of air-conditioned beds and are planning for a substantial increase that will eventually create a fully-air-conditioned system. (Vol. 4-20:6-17)

157.   As noted by Baldwin, there are challenges getting money from the legislature and unfortunately there are people who do not want to spend money on prisons, so it takes a lot of credibility to show the legislature that money is needed.  (Vol. 4-21:15-25)

158.   In Baldwin's opinion, Director Collier has been forthcoming with the legislature which is demonstrated by the amount of money he has been able to obtain. (Vol. 4-22:7-9)

159.   Baldwin has never seen a Department of Corrections obtain the amount of funds TDCJ has received from the legislature for a single project. (Vol. 4-22:19-21)

160. In Baldwin's opinion, TDCJ is not ignoring the problem of heat in Texas prisons because they have requested substantial funding for cool beds, has a very specific policy about what to do when it's hot, requires staff and offenders to take training, and tries to mitigate the heat. (Vol. 4-23:2-19)

161. In Baldwin's opinion, TDCJ's heat scoring system is working well because once a person is identified as needing a cool bed, they get a cool bed. (Vol. 4-26:17-25)

162. In Baldwin's opinion, no mitigation measure is ever going to prevent all heat illnesses, even with air-conditioning. (Vol. 4-23:22-24:11)

163. In Baldwin's opinion, the conditions within TDCJ do not "shock the conscious" because the reality is that it is hot in Texas and you have to mitigate it until there's a solution, which is what Collier is doing. (Vol. 4-29:10-20)

164. TDCJ is doing everything in its power to AC the system. (Vol. 4-67:9-12)

165. In Baldwin's professional opinion, it is not possible for TDCJ to immediately install temporary air-conditioning system wide. (Vol. 4-67:17-19)

## PLAINTIFFS DID NOT DEMONSTRATE THAT *ALL* INMATES ARE AT RISK OF HEAT-ILLNESS OR REQUIRE AIR-CONDITIONED HOUSING

### *DR. ZANOBETTI*

166. Plaintiffs' own expert, Dr. Antonella Zanobetti ("Dr. Zanobetti"), acknowledged there are other ways to mitigate the effects of heat besides air-conditioning; the goal of heat mitigation is to lower the core body temperature,

which can be done by taking a cold shower and drinking ice water. (Vol. 1-87:5-17)

167.    Another expert for Plaintiffs, Julie Skarha ("Dr. Skarha"), agreed that the purpose of heat mitigation methods is to lower the core body temperature and conceded that air-conditioning is just one of many methods that can be effective to mitigate heat. (Vol. 1-164:14-25)

168.    Dr. Zanobetti conducted a study purportedly examining the association between temperature and deaths, focusing on the mortality rates in Texas prisons for inmates with and without air-conditioning, memorialized in an article titled "Provision of Air Conditioning and Heat-Related Mortality in Texas Prisons." (Vol. 1-82:20-83:10) (referencing Plaintiffs' Exhibit 75)

169.    Dr. Zanobetti only analyzed data of deaths that occurred from 2001 to 2019. (Vol. 1-87:18-21)[21]

170.    Dr. Zanobetti claimed that the study found an increased risk of death, "mostly," in un-air-conditioned Texas prisons. (Vol. 1-83:12-19)

171.    Based on her study, Dr. Zanobetti asserted it was inaccurate to say that no prisoner has died in Texas prisons since 2012, but her reasoning was speculative, claiming "some have died… for sure probably are due to heat" and "that there

---

[21] Notably, Dr. Zanobetti did not review any data from 2019-present, after the implementation of the heat score system. (Vol. 1-88:12-13)

should be also some heat-related deaths." (Vol. 1-83:20-23; 84:3-4)

172.    Despite having access to the mortality data for each individual year, the breakdown by year was not included in Dr. Zanobetti's study. (Vol. 1-87:25-88:8)

173.    Because the data was not separated by year, Dr. Zanobetti conceded that it was possible that the mortality data she reviewed could have been higher during a certain timeframe, as "there can be differences by year." (Vol. 1-89:11-17)

174.    Dr. Zanobetti agreed that her study would be termed "quasi experimental" because the data is "somewhat predetermined." (Vol. 1-91:19-24)

175.    Dr. Zanobetti's study looked at all-cause mortality. (Vol. 1-92:15-17)

176.    The data Dr. Zanobetti reviewed specifically listed the cause of each individual death, but she did not include the mortality cause information in her study. (Vol. 1-92:15-25)

177.    Dr. Zanobetti stated she "cannot remember" how many deaths were caused by or related to heat between 2001-2019. (Vol. 1-92:21-23)

178.    Because Dr. Zanobetti's study looked at all-cause mortality, she agreed that inmate deaths could have resulted of from any number of ailments unrelated to heat, such as cancer, slipping and falling, or inmate violence. (Vol. 1-93:4-17)

179.    Dr. Zanobetti's study assumed that if an individual was housed in a majority air-conditioned unit, that individual was exposed to air-conditioning immediately

prior to their death, and similarly assumed they were not exposed to air-conditioning immediately prior to their death if they were housed in a majority non-air-conditioned unit, and did not consider whether the inmate could have been exposed to air-conditioning in other areas, such as a respite room, chapel, gymnasium, or the other areas that were typically air-conditioned. (Vol. 1-94:1-21)

180.    Dr. Zanobetti's study also failed to account for whether the inmates took any other heat mitigation measures prior to their death. (Vol. 1-95:1-18)

181.    Dr. Skarha, who participated in the Dr. Zanobetti study, stated that she has not looked at data from 2020 to present. (Vol. 1-151:17-20; 171:15-18) (referencing Plaintiffs' Exhibit 70)

*DR. DOMINICK*

182.    Dr. Dominick was involved in the study entitled "Extreme Temperatures and COVID 19 in the Texas Prisons" where she sent out surveys; however, only 309 surveys were analyzed. (Vol. 2-350:24-351:11)

183.    Researchers involved in the TAMU study could not verify the truth or accuracy of any statements made in response to the survey questions. (Vol. 2-353:4-355:2)

*PROFESSOR DEITCH*

184.    Plaintiffs proffered Michele Deitch ("Deitch") as an expert on the topic of

prison conditions and prison policy. (Vol. 2-143:15-144:3)

185.   Deitch was appointed as a monitor for the *Ruiz* class action litigation consent decree involving conditions in the Texas prison system from 1987-1990. (Vol. 2-138:7-23)

186.   The *Ruiz* conditions of confinement consent decree did not require air-conditioning Texas prisons, nor did it involve heat. (Vol. 2-155:21-156:6)

187.   Deitch conceded that ABA standards on prisons do not require air-conditioning. (Vol. 2-156:7-12)

188.   The last time Deitch visited a Texas prison was pre-2020. (Vol. 2-156:18-23)

189.   Deitch stated that TDCJ's plans to add at least 20,000 more air-conditioned beds in the next two years was "good news." (Vol. 2-157:20-23)

190.   Deitch stated that TDCJ's plans to air-condition all 2250's style units would be "fantastic." (Vol. 2-158:16-20)

*DEAN WILLIAMS*

191.   Dean Williams ("Williams") was the Commissioner of Corrections for Alaska for three years and the Executive Director of Department of Corrections in Colorado for four years. (Vol. 2-223:3-19)

192.   In 2022, Alaska had approximately 4,700 inmates for both its prison and jail populations. (Vol. 2-262:20-263:11) (referencing Def. Ex. 51)

193.   In 2022, Colorado's prison population was approximately 17,168. (Vol. 2-

263:14-17) (referencing Def. Ex. 51)

194.    Williams agreed that the needs and the scale of the Texas prison system are different than Alaska and Colorado, where Texas had almost 139,000 inmates in its prison population for 2020.  (Vol. 2-263:18-22) (referencing Def. Ex. 51)

195.    Most of Williams' career was spent in juvenile corrections. (Vol. 2-222:12-13)

196.    The largest juvenile facility Williams managed consisted of 200 juvenile offenders. (Vol. 2-261:10-11)

197.    Williams has never been to a Texas prison. (Vol. 2-267:23-25)

198.    If one person died in his custody from heat, Williams said he would want to figure out exactly what happened. (Vol. 2-268:24-25)

199.    If an individual died in his custody from heat, Williams would want an autopsy performed by independent medical professionals, family notification, body transfer certificate, photos documenting the death, an independent administrative review, all things which TDCJ does. (Vol. 2-269:1-270:13)[22]

200.    Williams agreed that all the current measures and plans TDCJ is taking and has in place to air-condition the prison system are good. (Vol. 2-273:24-276:12)

201.    Although Williams had concerns over the timeline TDCJ's plan to implement

---

[22] Williams also said he would like a core body temperature to be taken upon death. (Vol. 2-270:15-23) However, TDCJ staff does not take core temperatures because TDCJ relies on their medical providers to take core body temperatures when responding to an inmate's immediate medical needs. Vol. 4-246:5-15; 247:23-248:4.

system-wide air-conditioning, he offered only vague suggestions of what he would do if he were in Collier's position, such as "do everything I can do [to] implore others to have the same concern," "talk to as many people," put a "plan in place to fix it." (Vol. 2-273:15-21; 275:8-9)

202. But Collier has done these things. (Vol. 4-180:9-20; 258:7-12)

203. Despite Plaintiffs repeated implications to the contrary, Williams testified that TDCJ was not using heat as a form of punishment. (Vol. 2-277:4-8)

### DR. VASALLO

204. Plaintiff's proffered Dr. Susi Vasallo ("Dr. Vasallo") as a medical expert in the areas of toxicology, emergency room medicine and, also, heat and medicine and the effects on the human body, but she is admittedly not a medical examiner, nor has she received any training to perform autopsies. (Vol.2-13:7-10; 119:16-25)

205. Dr. Vasallo has testified in heat litigation in Louisiana, New York, Wisconsin, and Mississippi. (Vol. 2-76:1-10).

206. Dr. Vasallo testified that she does not know whether states other than Texas have a heat score system in place to assess an individual's risk to heat exposure. (Vol. 2-76:11-15; 77:1-5)

207. Dr. Vasallo admitted she is not familiar with TDCJ's heat score system. ( Vol. 2-74:20-23)

208. Dr. Vasallo did not review the TDCJ heat score system policy. (Vol.2-75:2-

4, 19-21)

209.    Dr. Vasallo has not visited any TDCJ units since visiting the Pack Unit, now air-conditioned, in 2014. (Vol. 2-102:22-25)

210.    Dr. Vasallo claims that while there is still a risk in certain environmental conditions where even young people can die of heat, young and healthy people are at less of a risk than people who are old and sick. (Vol. 2-83:5-18; 20-25).

211.    The younger population is significantly less at risk for morbidity and mortality than older population when exposed to heat. (Vol. 2-90:7-10).

212.    Whether young, healthy people are at substantial risk of serious harm or death depends on temperature. (Vol. 2-84:1-3).

213.    Dr. Vasallo testified that some people will die when the heat index is less than 88 degrees and that some people when die when its hotter than 88 degrees. (Vol. 2-84:22-85:10)

214.    Admittedly, all Dr. Vasallo could say is that the older an individual is, the more conditions an individual has, the more likely an individual is to succumb to the heat or to succumb to that condition. (Vol. 2-86:18-21)

215.    Dr. Vasallo could not draw a line with a particular temperature or a particular person. (Vol. 2-86:21-22)

216.    The Skharra study did not break down the numbers into every individual who died so the individuals' causes of death are unknown, and yet, Dr. Vasallo

testified she would not have wanted to know what any of the individuals died of. (Vol. 2-96:11-19; 97:18-20).

217.   The consumption of drugs can cause heatstroke or cause internal temperatures to rise because those substances increase the muscular activity of an individual, or cause the individual's blood vessels to constrict like with cocaine, or Benadryl where it stops the sweating process. (Vo. 2-99:11-100:5).

218.   Similarly, Meth and other amphetamines affect the body's ability to thermoregulate. (Vol. 2-100:6-7)

219.   Hyperthermia is not heatstroke, and an individual can die of hyperthermia even while housed in air-conditioning. (Vol. 2-105:10-15).

220.   Dr. Vasallo has not examined Bernhardt Tiede, but does testify to her review of his medical record. (Vol. 2-107:4-7; 108:3-4).

221.   Tiede, currently in air-conditioned housing, was only housed in the main building at the Estelle Unit (un-air-conditioned) because all safekeeping inmates at Estelle Unit were housed in the main building for their security level. (Vol. 1-135:15-16)

222.   Tiede is now in air-conditioned housing because he is a safekeeping inmate at the Connally Unit; safekeeping inmates at the Connally Unit are housed in an area that is air-conditioned. (Vol. 4-253:19-24)

223.   Tiede admits that he was housed in air-conditioning at Estelle for one week,

before any court intervention, because he had been prescribed prednisone. (Vol. 1-144:15-18)

224.    Tiede admits that he has experienced medical decline in the last year despite being housed in air-conditioned housing. (Vol.1-139:7-13).

225.    Dr. Vasallo conceded that hyperlipidemia, hypertension, and diabetes together, all diagnoses that Mr. Tiede has, make an individual more likely to have a stroke. (Vol. 2-109:2-4)

226.    Tiede himself testified that he was aware that having diabetes, high cholesterol, and high blood pressure can lead to a stroke, unrelated to heat. (Vol.1-139:3-23).

227.    Dr. Vasallo conceded that air-conditioning does not eliminate the risk of stroke to zero percent. (Vol. 2-111:23-24).

228.    Dr. Vasallo testified that Tiede did not have a heat stroke. (Vol. 2-112:10-12)

229.    Even Tiede admits that no medical professional ever told him that he suffered a heat stroke or that any of his medical conditions are the result of heat. (Vol.1-141:2-6)

230.    Dr. Vasallo testified that all inmates whose medical condition or age puts them at an especially high risk of heat-related illness should be housed in a cool environment whenever the ambient air temperature or the heat index exceeds 88 degrees, but she did not review TDCJ's heat score system that purports to do just

that. (Vol. 2-75:2-4, 19-21; 116:19-24).

231.    Dr. Vasallo is aware that TDCJ does not perform autopsies. (Vol. 2-120:1-6)

232.    The autopsies that Dr. Vasallo reviewed were performed by UTMB. (Vol. 2-120:1-6)

233.    Dr. Vassallo has no reason to doubt that the medical examiners are certified or their physical, pathological, or toxicological findings. (Vol. 2-120:7-13)

234.    Dr. Vasallo did not review autopsies where inmates died in the summer months but were housed in air-conditioned housing; she only reviewed autopsies of those who died in un-air-conditioned housing. (Vol. 2-122:22-123:1).

235.    Dr. Vassallo testified to what mitigation measures besides air conditioning were necessary to mitigate the risks of heat such as free access to ice, something to drink, cold showers available a couple times a day, fans, and towels. (Vol. 2-133:14-134:25)

236.    Louisiana did not institute system wide air conditioning as a result of the *Ball* case in which Dr. Vasallo testified. (Vol. 2-136:10-13)

*DR. BISWAS*

237.    Plaintiffs proffered Dr. Jhilam Biswas ("Dr. Biswas") as an expert in forensic psychiatry in the psychiatric treatment of individuals in the criminal justice system to testify about how mental health disorders are adversely affected as a result of heat conditions and the effect of heat on individuals who are prescribed

psychotropic medications. (Vol. 2-164:11-14; 165:7-14) [23]

238.    Dr. Biswas's specialty in "forensics and the law" requires her to do mental evaluations for criminal responsibility, competency to stand trial, and to aid in sentencing. (Vol. 2-163:5-22)

239.    Dr. Biswas has only treated mentally ill patients on the East Coast. (Vol. 2-162:3-6;12-14;20-21; 200:18-23)

240.    Dr. Biswas has never treated a patient in a Texas prison. (Vol. 2-201:2-4)

241.    Dr. Biswas has never done a site visit to any of the Texas prisons. (Vol. 2-201:5-7)

242.    Dr. Biswas did not know how TDCJ housed its mentally ill population, or whether any mentally ill inmates were in air-conditioned housing. (Vol. 2-206:10-14; 207:11-17; 209:24-210:9)

243.    Dr. Biswas has never given an expert opinion on the effects of heat on mentally ill inmates. (Vol. 2-163:5-22)

244.    Dr. Biswas conceded that Texas and Massachusetts, where Dr. Biswas practices, are not comparable when it comes to temperature because Texas has hotter temperatures and more hot days. (Vol. 2-200:5-11)

245.    Dr. Biswas could not say that the risk of heat for mentally ill inmates included

---

[23] Defendant objected to Dr. Biswas's testimony as she had not shown herself qualified as an expert on heat or the effects of heat on mentally ill individuals solely by being a psychiatrist. (Vol. 2-164:15-25; 165:15-24) The Court acknowledged the objection and allowed the testimony subject to a later determination of Dr. Biswas's expertise. (Vol. 2-165:25-166:2)

death, only that the risk was more mental illness which she believes ultimately might result in a "shorter lifespan," such as suicide. (Vol. 2-210:13-17)

246.    Dr. Biswas said that air conditioning is the "best method" but conceded other heat mitigation measures, such as respite, could reduce some risk of heat exposure to mentally ill inmates. (Vol. 2-212:23-5; 215:7-10)

247.    Dr. Biswas could not quantify in any way the amount of risk mentally ill individuals might face from exposure to heat. (Vol. 2-218:2-7)

248.    Dr. Biswas conceded that determining mentally ill inmates' risk factors is an "individualized assessment." (Vol. 2-206:11-13; 219:1-15)

*DR. URIBE*

249.    Plaintiffs proffered Dr. Paul Uribe as an expert in medicine and forensic pathology. (Vol. 2-286:17-19)

250.    The deaths of John Castillo, Elizabeth Hagerty, and Patrick Womack were reported to the Legislature as "Death Exacerbated by Temperature." Ex. Pl. 102 at 5. "There were three deaths where elevated temperatures were cited in the final autopsies as a possible contributing factor." Ex. Pl. 102 at 5.

251.    Dr. Uribe did not physically examine the bodies of any of the deceased inmates he rendered opinions on. (Vol. 2-315:7-15)

252.    "There is no diagnostic finding at autopsy that is consistent with a heat casualty or a heat-related death. There's no diagnostic finding where you open

up a body and you have a finding, and you go that's it. That's diagnostic of a heat casualty." (Vol. 2-301:2-6)

253. There is no postmortem test that can identify hyperthermia. (Vol. 2-301:12-13)

254. Diagnosis of hyperthermia is based on reports from EMS and first responders. (Vol. 2-301:13-15)

255. Inmate John Castillo died on August 5, 2023. (Ex. Pl. 161 at 1)

256. At his time of death, Mr. Castillo's core body temperature was 107.5 F. (Ex. Pl. 161 at 12)

257. Mr. Castillo suffered from epilepsy, but his antiepileptic medication (phenytoin) was not detected in his blood postmortem. (Ex. Pl. 161 at 12)

258. Dr. Uribe agreed that individuals who suffer from a seizure disorder are more likely to have a seizure if they are not taking their prescribed medication. (Vol. 2-322:6-10)

259. Dr. Uribe agreed that someone who suffered a seizure may have diminished mental faculties after seizing, which would inhibit their ability to request respite. (Vol. 2-322:16-323:4)

260. The final certificate of death lists Mr. Castillo's immediate cause of death as epilepsy seizure disorder and high environmental temperature as an important contributory factor. (Ex. Pl. 161 at 12)

261.    The pathologist who conducted Mr. Castillo's autopsy noted that while seizures can increase body temperature and cause hyperthermia, Mr. Castillo's core body temperature of 107.5 F is much greater than would be expected in the setting of seizures alone. (Ex. Pl. 161 at 12)

262.    Mr. Castillo was prescribed sertraline, a selective serotonin reuptake inhibitor, which can on its own, even without high external temperatures, cause issues with thermoregulation. (Ex. Pl. 161 at 12)

263.    Dr. Uribe agreed that the sun is usually down by 10:42 pm, Mr. Castillo's time of death. As a result, the hottest part of the day is over. (Vol. 2-319:2-11)

264.    Inmate Armando Gonzales died on August 23, 2023. (Ex. Pl. 168 at 1)[24]

265.    Dr. Uribe believed that Ms. Gonzales would have likely survived if she had not been housed in a hot environment. (Vol. 2-291:6-9).

266.    At the time of Ms. Gonzales's death, the air temperature was 97-100 F. (Ex. Pl. 168 at 6)

267.    When Ms. Gonzales arrived at the unit infirmary, her temperature was 106 F with a core temperature of 109.4 F. (Ex. Pl. 168 at 6)

---

[24] Armando Gonzales was a phenotypic male who identified as female. As such, she will be referred to as Ms. Gonzales. (Ex. Pl. 168 at 4).

268.	Dr. Uribe believed heat played a role in Ms. Gonzales's death because her core body temperature at the time of death was 109 F and the autopsy revealed no anatomic cause of death. (Vol. 2-291:15-19).

269.	Postmortem toxicology revealed Ms. Gonzales had fentanyl and midazolam in her blood. (Ex. Pl. 168 at 11)

270.	Neither fentanyl nor midazolam were medications prescribed to Ms. Gonzales. (Ex. Pl. 168 at 6) ("routine medications included aripiprazole 30 mg qhs, citalopram 20 mg qd, estradiol 1 mg x 2 qd, spironolactone 25 mg x 2 qd, and buspirone HCL 16 mg x 2 bid.").

271.	Dr. Uribe conceded that there is not a definitive toxic level of fentanyl, and an individual can take very little and die, while others take large amounts and survive. (Vol. 2-324:13-22) As such, it was possible for Ms. Gonzales to die of fentanyl toxicity even if housed in air conditioning.

272.	Dr. Uribe conceded he could not separate out the effects of fentanyl and midazolam versus the elevated temperature only that he believed the medications did not cause the 109 F body temperature. (Day 2, 325: 11-14)

273.	Fentanyl is an opioid. (Ex. Pl. 168 at 4)

274.	Opioids have sedative effects and can "impair alertness, perception of hot weather, and judgment." (Ex. Pl. 273 at 23)

275. The certificate of death indicates Ms. Gonzales' immediate cause of death as "toxicity due to opioid fentanyl." (Ex. Pl. 168 at 18).

276. Inmate Elizabeth Hagerty died on June 30, 2023. (Ex. Pl. 169 at 1)

277. Ms. Hagerty was a 37-year-old female with comorbidities of obesity, diabetes, and asthma. (Vol. 2-302:16-18; Ex. Pl. 169 at 6)

278. Prior to her death Ms. Hagerty had a gastrointestinal illness with nausea and vomiting. (Ex. Pl. 169 at 6, Vol. 2-302:18-19)

279. Ms. Hagerty tested positive for COVID postmortem. (Vol. 2-302:19-20; Ex. Pl. 169 at 6)

280. The certificate of death indicates Ms. Hagerty's immediate cause of death as "severe hyponatremia due to a recent gastrointestinal illness." (Ex. Pl. 169 at 25)

281. Dr. Uribe stated he believed that Ms. Hagerty would have survived if she had not been housed in a hot environment. (Vol. 2-303:6-9)

282. However, Dr. Uribe also testified that someone could become dehydrated from stomach problems with or without COVID and with or without air conditioning. (Vol. 2-326:23-327:4)

283. The pathologist who conducted the autopsy on Ms. Hagerty indicated Ms. Hagerty's hyponatremia was most likely related to her recent gastrointestinal illness. (Ex. Pl. 169 at 11)

284. There was no core body temperature for Ms. Hagerty. (Ex. Pl. 169 at 6)

285.  Inmate Jon Southards died on June 28, 2023. (Ex. Pl. 192 at 1)

286.  There was no core body temperature taken on Mr. Southards at his time of death, but he was diaphoretic (heavily sweating) and feeling hot to the touch. (Vol. 2-297:1-2; Ex. Pl. 192 at 6)

287.  The postmortem toxicology report revealed Mr. Southards had a diphenhydramine (Benadryl) level of 6300 ng/ml. (Ex. Pl. 192 at 11)

288.  Concentrations of diphenhydramine greater than 5,000 ng/ml are considered potentially lethal. (Ex. Pl. 192 at 11)

289.  Mr. Southards prescribed medications included Duloxetine DR 30 mg daily, venlafaxine 150 mg daily, oxybutynin 5mg twice daily, diphenhydramine 50 mg twice daily, Haldol 5 mg twice daily, and tolnaftate cream. Duloxetine, venlafaxine, oxybutynin, and diphenhydramine were kept on person. (Ex. Pl. 192 at 6)

290.  Dr. Uribe testified he believed heat directly contributed to Mr. Southards' death despite the fact that there was no core body temperature taken and Dr. Uribe testifying that there is no postmortem test for hyperthermia. (Vol. 2-296: 20-21; 301: 12-15)

291.  "A temperature above 40.5 C (or 105 F) is generally considered to be consistent with severe hyperthermia." (Ex. Pl. 275 at 1)

292.  Dr. Uribe testified that average human body temperature is 98 F. (Vol. 2-327:22-25)

293.  At the time of Mr. Southards death, his cell temperature was 85.7 F with a heat index of 96.2 F. (Ex. Pl. 192 at 11)

294.  When asked how Mr. Southards's body temperature would increase to the point of hyperthermia while his surrounding environment were just over 10 degrees below average body temperature, Dr. Uribe stated there were many factors that needed to be looked at, including whether the individual was able to dissipate heat. (Vol. 2-328:9-24)

295.  Dr. Uribe agreed that someone could suffer hyperthermia even at temperatures below average body temperature if they were unable to dissipate heat. (Vol. 2-329:10-13)

296.  Dr. Uribe agreed that one of the main ways humans dissipate heat is through sweating. (Vol. 2-329:21-23)

297.  Dr. Uribe conceded that if someone takes a large amount of diphenhydramine, their ability to sweat would be impeded, and they would not be able to dissipate heat to reduce their body temperature. (Vol. 2-329:24-330:3)

298.  The certificate of death indicates Mr. Southards immediate cause of death as diphenhydramine toxicity. (Ex. Pl. 192 at 30)

299.  Inmate Patrick Womack died on August 21, 2023. (Ex. Pl. 200 at 1)

300. Mr. Womack's core temperature at his time of death was 106 F. (Ex. Pl. 200 at 4)

301. Postmortem toxicology revealed toxic levels of sertraline (2500 ng/ml) and metabolite desmethylsertraline (1200 ng/ml). (Ex. Pl. 200 at 4)

302. The pathologist who conducted Mr. Womack's autopsy noted "The sertraline levels found in the blood were well within the range described in fatal cases of sertraline toxicity or mixed drug toxicity including sertraline. Sertraline, a selective serotonin reuptake inhibitor (SSRI), is a known cause of drug induced hyperthermia." Symptoms of serotonin syndrome include core temperatures over 106 F. (Ex. Pl. 200 at 11)

303. Dr. Uribe testified that if Mr. Womack had not been housed in a hot environment he would have survived. (Vol. 2-305:15-17)

304. SSRIs are known to increase heat-related morbidity through drug-induced temperature abnormalities. (Ex. Pl. 275 at 22-24)

305. The certificate of death indicates Mr. Womack's immediate cause of death as serotonin syndrome, hyperthermia from sertraline toxicity. (Ex. Pl. 200 at 1)

## II. PROPOSED CONCLUSIONS OF LAW

### INITIAL ISSUES

1. Preliminary injunction orders are reviewed pursuant to an abuse of discretion standard unless the decision is grounded in erroneous legal principles. *Sepulvado*

*v. Jindal*, 729 F.3d 413, 417 (5th Cir. 2013). Conclusions of law are subject to de novo review, but findings of fact are reviewed under a clearly erroneous standard. *Id*.

2. The predicate findings of a substantial risk of serious harm and officials' deliberate indifference to the risk are factual findings reviewed for clear error. *Ball*, 792 F.3d at 592 (court's cites omitted).

3. A finding is clearly erroneous if it is without substantial evidence to support it, the court misinterpreted the effect of the evidence, or this court is convinced that the findings are against the preponderance of credible testimony. *Id*.

4. The court reviews de novo whether the facts so found violate the Eighth Amendment. *Id*.

**STANDING**

5. "An association has standing to bring claims on behalf of its members when (1) individual members would have standing, (2) the association seeks to vindicate interests germane to its purpose, and (3) neither the claim asserted nor the relief requested requires the individual members' participation." *Students for Fair Admission, Inc. v. Univ. of Tex. at Austin*, 37 F.4th 1078, 1084 (5th Cir. 2022).

6. To establish associational standing, "[t]he first prong requires that <u>at least one member</u> of the association have standing to sue in his or her own right." *Nat'l Rifle Ass'n of Am., Inc. v. Bureau of Alcohol, Tobacco, Firearms, & Explosives*,

700 F.3d 185, 191 (5th Cir. 2012) (emphasis added) (citing *Tex. Democratic Party v. Benkiser*, 459 F.3d 582, 587–88 (5th Cir. 2006)).

7.  To establish standing, the Plaintiff must show that they have suffered an injury in fact, there must be a causal connection between the injury and the conduct complained of, and the injury must be the type that can be redressed by a favorable decision. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61(1992).

8.  Because there is no evidence that "A Nicole Campbell," the sole member of Build Up, Inc., a/k/a Lioness, is currently incarcerated in TDCJ facility without air-conditioning, she has suffered no injury in fact and does not have individual standing. [25]

9.  Plaintiffs presented no evidence that a favorable ruling would result in TDCJ being appropriated sufficient funds or having access to resources to effectuate the installation of air conditioning systemwide. *Id*. at 562.

## PROCEDURAL BARS

10. The PLRA requires inmates to exhaust "such administrative remedies as are available" before filing suit in federal court to challenge prison conditions. 42 U.S.C. § 1997e(a). This exhaustion obligation is mandatory. *Booth v. Churner,* 532 U.S. 731, 741 n.6 (2001). There is no "special circumstances" exception to

---

[25] Previously, this Court held that at least one of the Organizational Plaintiffs, Lioness, had a traditional membership organization and had members with individual standing and therefore met the requirements of associational standing. *See* ECF No. 95 at 7-10. None of the other Organizational Plaintiffs have purported themselves to be traditional membership groups.

the PLRA's exhaustion requirement. *Valentine v. Collier,* 956 F.3d 797, 804–05 (2020) ("*Valentine I*"). The Supreme Court has "reject[ed] every attempt to deviate" from the PLRA's rigid exhaustion requirement. *Ross v. Black*, 136 S. Ct. 1850, 1855 (2016).

11. Section 1997e(a) requires administrative exhaustion regardless of the relief sought, as long as the grievance tribunal has authority to take some responsive action. *Booth*, 531 U.S. at 740-41. Section 1997e(a)'s "exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle*, 534 U.S. 516, 532 (2002).

12. To exhaust administrative remedies, prisoners must properly exhaust their institutional administrative remedies in conformance with those procedures adopted by the particular institution. *Woodford v. Ngo*, 548 U.S. 81, 93-95 (2006).

13. The Supreme Court has held a prisoner must complete the administrative review process in accordance with the applicable rules as a precondition to bringing suit in federal court. *Woodford*, 548 U.S. at 90.

14. In the Fifth Circuit, a "strict approach" is taken to the exhaustion requirement. *Days v. Johnson*, 322 F.3d 863, 866 (5th Cir. 2003).

15. TDCJ provides a formal two-step procedure for processing administrative

grievances and provides inmates with detailed instructions on how to properly exhaust the grievance procedures. *Johnson v. Johnson*, 385 F.3d 503, 515-16 (5th Cir. 2004).

16. The inmate must properly complete both the Step 1 complaint and Step 2 appeal to properly exhaust TDCJ's administrative remedies. *See Wright v. Hollingsworth*, 260 F.3d 357, 358 (5th Cir. 2001).

17. TDCJ inmates must pursue a grievance through both steps to satisfy the exhaustion requirement. *See Johnson*, 385 F.3d at 515 (citing *Wright*, 260 F.3d at358).

18. Mere substantial compliance with the grievance process is not sufficient. *Dillon v. Rogers*, 596 F.3d 260, 268 (5th Cir. 2010).

19. Organizational Plaintiffs have not shown that the members they purport to represent have exhausted their administrative remedies.

20. Likewise, Tiede admits that he failed to exhaust his administrative remedies prior to filing suit as required by the PLRA.

## PRELIMINARY INJUNCTION STANDARD

306. A federal court may grant a preliminary injunction "to preserve the status quo and thus prevent irreparable harm until the respective rights of the parties can be ascertained during a trial on the merits." *City of Dallas v. Delta Air Lines, Inc*., 847 F.3d 279, 285 (5th Cir. 2017) (restating and agreeing with the district court's

framework in determining whether to grant a preliminary injunction).

307.  A court should grant a preliminary injunction pursuant to Federal Rule of Civil Procedure 65(a) if the movant establishes the following: "(1) a substantial likelihood of success on the merits, (2) a substantial threat of irreparable injury if the injunction is not issued, (3) that the threatened injury if the injunction is denied outweighs any harm that will result if the injunction is granted, and (4) that the grant of an injunction will not disserve the public interest." *Robinson v. Hunt Cnty*., Texas, 921 F.3d 440, 451 (5th Cir. 2019) (quoting *Speaks v. Kruse*, 445 F.3d 396, 399-400 (5th Cir. 2006)).

308.  The Fifth Circuit has cautioned that granting a preliminary injunction "*is an extraordinary and drastic remedy*, not to be granted routinely, but only when the movant, by a clear showing, carries the burden of persuasion." *White v. Carlucci*, 862 F.2d 1209, 1211 (5th Cir. 1989) (quoting *Holland Am. Ins. Co. v. Succession of Roy*, 777 F.2d 992, 997 (5th Cir. 1985)) (emphasis added); *see also Sepulvado v. Jindal*, 729 F.3d 413, 417 (5th Cir. 2013); *Mississippi Power & Light Co. v. United Gas Pipe Line Co*., 760 F.2d 618, 621 (5th Cir. 1985) ("The decision to grant a preliminary injunction is to be treated as the exception rather than the rule.").

309.  In cases involving prisoners, courts are particularly reluctant to grant requests for a preliminary injunction, as "judicial restraint is especially called for in

dealing with the complex and intractable problems of prison administration." *Wagner v. Campuzano*, No. 1:12-CV-205-C, 2013 WL 12147778, at *1 (N.D. Tex. May 31, 2013).

310. The Prison Litigation Reform Act (PLRA) even instructs that "[p]rospective relief in any civil action with respect to prison conditions shall extend no further than necessary to correct the violation of the Federal right of a particular plaintiff or plaintiffs." 18 U.S.C. § 3626(a)(1)(A).

311. Likewise, injunctive relief that seeks to change, rather than to preserve, the status quo, "is particularly disfavored and should not be issued unless the facts and law clearly favor the moving party." *Martinez v. Mathews*, 544 F.2d 1233, 1243 (5th Cir. 1976) (citation omitted).

312. When altering the status quo may prejudice an important "public interest," a court "'should pay particular regard for the public consequences in employing the extraordinary remedy of injunction.'" *Salazar v. Buono*, 559 U.S. 700, 714 (2010) (quoting *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982)). "Only in rare instances is the issuance of a mandatory preliminary injunction proper." *Martinez*, 544 F.2d at 1243.

313. Any time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury. *Maryland v. King*, 133 S. Ct. 1, 3 (2012) (Roberts, C.J., in chambers) (quoting *New Motor*

*Vehicle Bd. of Cal. v. Orrin W. Fox Co*., 434 U.S. 1345, 1351 (1977) (Rehnquist, J., in chambers)).

314.    The Texas Legislature assigned the prerogatives of prison policy to TDCJ. See, e.g., Chapter 493-508, Tex. Gov't Code.

315.    The Supreme Court has repeatedly warned that "it is 'difficult to imagine an activity in which a State has a stronger interest, or one that is more intricately bound up with state laws, regulations, and procedures, than the administration of its prisons.'" *Woodford v. Ngo*, 548 U.S. 81, 94 (2006) (quoting *Preiser v. Rodriguez*, 411 U.S. 475, 491–92 (1973)); see also *Missouri v. Jenkins*, 495 U.S. 33, 51 (1990).

316.    "The history of equity jurisdiction is the history of regard for public consequences in employing the extraordinary remedy of the injunction." *R.R. Comm'n of Tex. v. Pullman Co*., 312 U.S. 496, 500 (1941). Accordingly, federal courts often consider two factors—the balance of the equities and the public interest—together. *See, e.g., Winter v. Nat. Res. Def. Council, Inc*., 555 U.S. 7, 26–31 (2008); *see also Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982).

317.    Indeed, the Fifth Circuit has gone so far as to hold that when an "injunction prevents the State from effectuating the Legislature's choice" to "assign[] the prerogatives of prison policy to TDCJ," such injunction may "impose[]

irreparable injury" upon TDCJ. *Valentine I*, 956 F.3d at 803 (quoting *Woodford v. Ngo*, 548 U.S. 81, 94 (2006)).

318.   Courts "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Amoco Prod. Co. v. Village of Gambell, Alaska*, 480 U.S. 531, 542 (1987).

319.   "In exercising their sound discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982)

## DELIBERATE INDIFFERENCE

320.   To show a violation of the Eighth Amendment, inmates must prove that they were exposed "to a substantial risk of serious harm" and "that prison officials acted or failed to act with deliberate indifference to that risk." *Carlucci v. Chapa*, 884 F.3d 534, 538 (5th Cir. 2018) (quoting *Gobert v. Caldwell*, 463 F.3d 339, 345–46 (5th Cir. 2006)); *see also Farmer*, 511 U.S. at 825, 834.

321.   "Deliberate indifference is an <u>extremely</u> high standard to meet." *Domino v. Tex. Dep't of Crim. Just.*, 239 F.3d 752, 756 (5th Cir. 2001) (emphasis added).

322.   The deliberate indifference test has both an objective prong and a subjective one." *Estrada v. Nehls*, 524 F.Supp. 3d 578, 594 (S.D. Tex. 2021) (Hanen, J.), aff'd, No. 21-20160, 2022 WL 2113614, at *3 (5th Cir. June 13, 2022) (per curiam); *see also Farmer*, 511 U.S. at 837 (noting that a prison official's liability

for deliberate indifference requires "the official [to] be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference").

323. The presence of a substantial risk is an objective inquiry. *Petzold v. Rostollan*, 946 F.3d 242, 249 (5th Cir. 2019); under the objective prong, the inmate must first prove "an objective exposure to a substantial risk of harm[.]" *Valentine v. Collier*, 993 F.3d 270, 281 (5th Cir. 2021) ("*Valentine II*").

324. To prove the subjective prong of the deliberate indifference test, the inmate must establish that the prison official "had subjective knowledge that the inmate faced a substantial risk of harm [to the inmate's health and safety] and … [consciously] disregarded the risk." *Id.*

325. Under the deliberate indifference standard, prison officials are not liable if (1) "they were unaware of even an obvious risk to inmate health or safety," (2) "they did not know of the underlying facts indicating a sufficiently substantial danger," (3) "they knew of the underlying facts but believed (albeit unsoundly) that the risk to which the facts gave rise was insubstantial or nonexistent," or (4) "they knew of a substantial risk to inmate health or safety . . . [and] responded reasonably to the danger, even if the harm was not ultimately averted." *Farmer*, 511 U.S. at 844–45.

326.	As the Fifth Circuit held in reversing a district court's order granting a preliminary injunction against TDCJ related to its response to the COVID-19 pandemic, to prove the subjective prong of deliberate indifference, the inmate(s) bringing the Eighth Amendment claim were required to establish that Defendants "subjectively believe the measures they are taking are inadequate." *Valentine I*, 956 F.3d at 802–03. Reversing the district court's preliminary injunction, the Fifth Circuit emphasized "[a]lthough the district court might do things differently, mere 'disagreement' with TDCJ's medical decisions does not establish deliberate indifference." *Id*.

327.	Deliberate indifference requires the defendant to have a subjective 'state of mind more blameworthy than negligence, akin to criminal recklessness.' *Valentine v. Collier*, 956 F.3d 797, 802 (5th Cir. 2020) ("*Valentine I*") (quoting *Farmer*, 511 U.S. at 835, 839-40) (internal citations omitted).

328.	The evidence must show over the course of the timeline that officials "knowingly and unreasonably disregard[ed] an objectively intolerable risk of harm, and that they will continue to do so; and finally, to establish eligibility for an injunction, the inmate must demonstrate the continuance of that disregard during the remainder of the litigation and into the future." *Valentine II,* 993 F.3d at 282.

329. In *Valentine II,* the Fifth Circuit held that, while TDCJ's system for combating the spread and effects of COVID-19 during the height of the pandemic "was far from perfect," the injunction evidence did not permit the conclusion that the prison officials recklessly ignored a substantial risk of harm. 993 F.3d at 282–89 (discussing the various remedial measures taken and reversing the district court's conclusion that the flaws or purported insufficiencies in these measures were constitutionally deficient).

330. Plaintiffs have failed to meet this standard. TDCJ takes the threat of heat seriously based on their continued development of heat mitigation measures, including the unique heat score system. Further, TDCJ has demonstrated that it is doing everything within its power and the funding provided to it by the Legislature to combat this harm in its diligent plan to air-condition the system.

## RELIEF

331. "Under the PLRA, plaintiffs are not entitled to the most effective available remedy; they are entitled to a remedy that eliminates the constitutional injury." *Ball v. LeBlanc*, 792 F.3d 584, 599 (5th Cir. 2015) ("Ball I").

332. "In Eighth Amendment cases, plaintiffs can only obtain a remedy that reduces the risk of harm to a socially acceptable level." *Ball v. LeBlanc*, 792 F.3d 584, 599 (5th Cir. 2015) ("Ball I"). "Some risk is permissible and perhaps unavoidable." Id. "While federal courts can certainly enter injunctions to prevent

Eighth Amendment violations, they are not to micromanage state prisons." *Gates v. Cook*, 376 F.3d 323, 338 (5th Cir. 2004) (*citing Bell v. Wolfish*, 441 U.S. 520, 562 (1979)).

333. The Fifth Circuit has repeatedly held that (1) "air conditioning is not an acceptable remedy and [is] unnecessary to correct the Eighth Amendment violation"; and (2) "any consideration of a maximum heat index" is "plainly foreclosed." *Ball v. LeBlanc*, 881 F.3d 346, 348 n.2, 352, 355 (5th Cir. 2018) ("*Ball II*") (quotations omitted) (reversing and remanding injunction ordering air conditioning and maximum heat index); *Ball I*, 792 F.3d at 599–600 (vacating and remanding injunction ordering air conditioning and maximum heat index).

334. The Fifth Circuit majority clearly held that air conditioning and a maximum heat index are not permissible remedies "**regardless of any new evidence presented**." *Ball II*, 881 F.3d at 355, 356 n.2 (Higginson, J., dissenting) (emphasis added) (characterizing majority opinion).

335. The Fifth Circuit clarified that "*Yates v. Collier*, 868 F.3d 354, 370–71 & n.8 (5th Cir. 2017), [does not] leave[ ] open the possibility of mandated air conditioning." *Ball v. LeBlanc*, 881 F.3d 346, 348 n.2 (5th Cir. 2018) ("*Ball II*"). "*Yates* interpreted *Ball I* as holding that air conditioning was not appropriate in that case because other acceptable and less-intrusive remedies had yet to be tried." *Id*. (quotation omitted). But "the only relevant holding in Yates regards

class certification, an issue not present here." *Id*. In class certification, "Section 3626(a)(1)(A)," the PLRA's core limitation on injunctive relief, does not apply. *Yates*, 868 F.3d at 371 (holding that 18 U.S.C. § 3626(a)(1)(A) "does not alter the requirements for certifying a class action under Rule 23(b)(2)").

336.   The PLRA's limitations on injunctive relief certainly apply in the present case, and the drastic costs of air conditioning every TDCJ facility must be considered relative to that of other remedies. *Ball II*, 881 F.3d at 353 & n.11 (holding that $500 cost of evaporative cooler "is sufficiently inexpensive to satisfy our concerns relating to the PLRA" when compared "to the approximately $100,000 that would be required to air-condition Plaintiffs' portion of Tier C").

337.   Thus, Plaintiffs' request for relief is barred by the PLRA.

## CONCLUSION

This Court denies Plaintiffs' Motion for Preliminary Injunction for all of the foregoing reasons.

SIGNED this _____ day of _____, 2024.


_____
THE HONORABLE ROBERT PITMAN
UNITED STATES DISTRICT JUDGE


Respectfully submitted,

**KEN PAXTON**
Attorney General of Texas

**BRENT WEBSTER**
First Assistant Attorney General

**RALPH MOLINA**
Deputy First Assistant Attorney General

**JAMES LLOYD**
Deputy Attorney General for Civil Litigation

**SHANNA E. MOLINARE**
Chief, Law Enforcement Defense Division

*/s/ Abigail K. Carter*
**ABIGAIL K. CARTER**
Assistant Attorney General
Texas State Bar No. 24126376
Abigail.Carter@oag.texas.gov
Office of the Attorney General
P.O. Box 12548
Austin, Texas 78711-2548
(512) 463-2080 / Fax (512) 370-9814

**ATTORNEYS FOR COLLIER**

## CERTIFICATE OF SERVICE

I, **ABIGAIL K. CARTER**, Assistant Attorney General of Texas, do hereby certify that a true and correct copy of the above and foregoing has been served directly to all counsel on record by the Electronic Case Files System of the Western District of Texas on August 22, 2024.

_/s/ Abigail K. Carter_
**ABIGAIL K. CARTER**
Assistant Attorney General