TO: Judge Robert Pitman
    AG Ken Paxton
    Attorney Jeff Edwards

DATE: 8/20/2024

CASE: Tiede v. Collier, 1:23-cv-1004-RP

**FILED**
August 22, 2024
CLERK, U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS

BY: _____CC_____
                DEPUTY

Dear Judge Pitman,

    I hope you will consider the following facts while deciding whether to issue an injunction and during any monitoring period. A few may range wide of the controversy and the Court's jurisdiction, but I think taken together, they will help you place Director Collier's evidence in the proper light regarding efforts to mitigate extreme heat in Texas prisons.

    I. Insufficient Access to Cold Showers
    II. No Access to Clean Ice
    III. No Indigent Electrolyte Drink Mixes
    IV. "Cool" Clothing Prohibited in Hot Areas
    V. No Indigent Multi-Outlets and Few Fans
    VI. Insufficient Capacity in Approved Multi-Outlets
    VII. Unnecessary Disciplinary Lockdowns
    VIII. Chronic Staff Shortage
    IX. Electronic Tablets Not Leveraged to Reduce "Staging" of Inmates in Overheated Areas, Shortening Lockdowns, and to Preserve Grievances About Extreme Heat
    X. Televisions Located in Hot Dayrooms; Personal TVs Prohibited
    XI. Ineffective Drug Testing
    XII. Inmate Extortion Ignored
    XIII. Unit and Cell Preferences Not Allowed

### I. Insufficient Access to Cold Showers

    Almost all TDCJ inmate showers provide only a single temperature, either cold or hot (about 115°F per ACA guidelines). However, this doesn't match even Louisiana State Prison's "Second Heat Remediation Plan" in Ball v. Leblanc, 13-00368 (M.D.La.)(Docs. 251 and 299), that provided "two-valve" controllers allowing inmates to select their preferred water temperature. Collier insteads designates only one shower per section as a "cold" shower, leaving the rest as hot showers. This sole cold shower then has to serve between 48 and 80 inmates, many after mass inmate movements during the heat of the day, or immediately before "rack time." Cold showers are also frequently unavailable due to worn-out valves and clogged drains that result in standing sewage. Cold showers on the second floor are wholly inaccessible to inmates with medical no-climbing or ground-floor restrictions; designating ground-floor cold showers in sections that have only one such shower would then work to deny hot showers to those same inmates.

Collier can install two-valve controllers allowing all inmates to select cold, warm (mixed), or hot showers to mitigate extreme heat and good hygiene regardless of any medical climbing restrictions.

## II. No Access to Clean Ice

Also included in LSP's second plan in Ball was giving each inmate a personal 3-gallon ice chest and a six-pack cooler, to be refilled with ice throughout the day. Collier, however, doesn't allow inmates to have any type of personal ice containers other than drinking cups. In fact, Collier doesn't even have enough ice-making capacity to provide each inmate with clean ice throughout the day. Collier hasn't invested in siting ice machines near inmate housing and, instead, fills unsanitary dayroom water coolers with "block" ice from kitchen freezers. That means no or extremely limited ice deliveries during lockdowns and suspended activity, and no access to cold water from communal coolers outside of dayroom hours. Moreover, and notwithstanding TDCJ Spokesperson Amanda Hernandez's contrary assertion to The Texas Tribune, TDCJ inmates are NEVER provided clean ice unless they buy it from the inmates tasked with filling dayroom coolers, risking disciplinary actions fro prohibited "trafficking and trading." Although anedcdotal, it's believed prison systems other than LSP allow their inmates to buy personal ice chests and "chits" to receive clean ice at designated delivery points.

Collier can install ice-making equipment near inmate housing, sell personal soft-sided and/or open top ice containers in unit stores, and deliver clean ice to each inmate throughout the day during extreme heat.

## III. No Indigent Electrolyte Drink Mixes

Inmates use cold water from dayroom coolers for electrolyte drink mixes during extreme heat (and when the coolers are accessible and are filled with sufficient ice and water) that are purchased in unit stores for 15¢ each, but this isn't possible for thousands of inmates who are indigent, inmates on lockdown or suspended activity, or if commissary is out-of-stock or employees decide to not run store. Collier tried to compensate for this during extended COVID lockdowns by including electrolyte drink mixes in sack meals, but he hasn't instituted any permanent plan to do the same during annual extreme heat. (Even LSP provides its inmates with electrolyte drinks.)

(Implicating many failures of Collier and the TBCJ to normalize and rehabilitate inmates, and "change offender behavior" are their refusal to pay wage to any inmate despite the Legislature's repeated approvals by enacting the Texas Correctional Industries Program, the federally sanctioned PIECP, and wages for prison and agribusiness jobs. Collier's and the Board's decisions to not pay wages to inmates, or allow earning from private enterprises, undermines penalogical interests in good conduct and rehabilitation and denies payments for court costs, restitution, child support, general revenue, and basic health and hygiene items (electrolyte, deoderant) sold in unit stores.)

Collier can issue electrolyte drink mixes to all inmates during extreme heat like he does weekly with toilet paper, soap, and razors. Furthermore, Collier can work with the Board to begin paying wages to inmates under existing laws to allow inmates to buy their own electrolyte drink mixes.

### IV. "Cool" Clothing Prohibited in Hot Areas

All inmates, regardless of disciplinary custody level, are allowed by Collier to wear commissary-purchased gym shorts and "cool" shirts in their cells, dayrooms, and recreation yards to help mitigate overheating through evaporative cooling. But all inmates must remain fully dressed in heavy, full-length "state" clothes elsewhere inside the unit and on transport buses. That means overheated hallways, chow halls, non-A/C chapels, kitchens, laundries, and many-hours'-long store lines (often without any sunshade). The only exceptions are when, for officer safety, male inmates are stripped to nothing but a thin pair of thin boxer shorts to be marched through hallways (and sometimes into air-conditioned areas) from High-Security wings and during semi-annual "comprehensive searches." This protects officers by limiting inmates' ability to conceal dangerous contraband, hide fight injuries, and secret unrecorded gang tattoos.

Although Collier has produced some light-weight state shirts for inmates, actual distribution is rare because laundry supervisors are reluctant to issue new clothes in order to boost their budget savings. Also, inmates often keep and wash their own state clothes to avoid getting exchanges that are dirty, worn out, and/or sized wrong.

Collier can allow inmates to wear approved personal "cool" clothes in non-A/C areas during extreme heat, protecting staff and inmates, increasing security, and reducing demand on laundry needs.

### V. No Indigent Multi-Outlets and Few Fans

As noted above, inmate cannot earn wages from prison work notwithstanding the Legislature's and the Governor's multiple authorizations. Collier does not operate a program to distribute to indigent inmates "recycled" (i.e. confiscated from other inmates) multi-outlets (power strips) and electric fans. Some unit property officers supply indigent fans inconsistently, but only if they have spare recycled units in their property rooms. (Recycled inmate property is most-often used to settle inmate grievances for property lost or destroyed by staff.) Collier will not supply indigent multi-outlets or buy fans for inmates during extreme heat. Texas CURE operates an indigent fan program; but it is limited by donation amounts and inmates may receive only one fan per lifetime. Electric fans sold by Collier last an average of 3-5 years before becoming unusable due to motor failure.

Collier can issue to each indigent inmate a multi-outlet and two electric fans during extreme heat, charging the cost for purchased units to the inmate's trust account for reimbursement like is currently done with indigent stationary and postage, and medical co-pays.

## VI. Insufficient Capacity in Approved Multi-Outlets

Collier allows inmates to possess two electric fans, a clock radio, a reading lamp, a hotpot (kettle), an electronic tablet, and an electric typewriter (no word processing or printing from inmate tablets like in other prison systems). Some inmate also have electric medical devices like C-PAP machines. Collier provides to most inmates only one electrical socket (cellmates share a duplex outlet), and permits inmates to buy 2-way multi-outlets allowing simultaneous use of two appliances. But 20 years ago, inmates could buy 4-way multi-outlets. (In fact, 4-ways are allowed in many other prison systems; and at least two companies—ClearTech and Hiteker—manufacture clear, prison-safe 4-way multi-outlets.) If a TDCJ inmate needs to operate both of his authorized fans because of extreme heat, he must do so in silence (no radio or tablet charging) and darkness (no reading lamp), and without using an electric medical device.

Collier presumably restricts the use of 4-ways to reduce electric breakers tripping from overloads, leaving inmates without power for up to several days. But this avoids the two primary root causes for repeated and extended outages: inmates arcing—or "popping"—sockets to ignite drugs and start fires; and staff ambivalence to inmate suffering. It also doesn't account for the elimination of "stingers" (immersion heaters), the misuse of which commonly overloaded circuits and tripped breakers. Now, even when most or all inmate sharing a circuit own 3-AMP hotpots, breakers are rarely if ever tripped unless there is a "smoker" on the line. (Most circuits are 20-AMP, and shared by eight inmates.) Collier's policy encourages inmates to make and use unauthorized and dangerous 4-ways to run appliances during extreme heat.

## VII. Unnecessary Disciplinary Lockdowns

Collier conducts two "comprehensive searches" per year on each unit, often lasting up to a month each time. Every inmate is removed to the gym—nearly naked—and all of his property (including privileged legal and media correspondence) is closely examined by staff to detect contraband. The rest of the time he's locked in his cell with only a 10-minute shower three times a week. This is because Collier erroneously uses the progressive disciplinary lockdown procedure (outlined in AD-03.31)—designed to alleviate excess violence and dangerous contraband—instead of a suspended activity plan that would allow daily dayroom time, including access to cold showers and dayroom water coolers. Such a plan would also ease officers' burdens to "run" showers and cold water and clean dayrooms full of lockdown-related garbage (meal sacks and food scraps). Inmate are already accustomed to limited cell ingress/egress due to chronic staff shortages and the extended operation of Collier's COVID lockdown plan. During extreme heat, inmates on lockdown are denied access to respite and cold showers because ranking officers don't perform security checks, and when they do, they cite "no movement on lockdown."

Collier can implement a "rolling" suspended activity plan for all comprehensive searches to protect inmates and staff during extreme heat.

## VIII. Chronic Staff Shortage

In a recent interview published by The Echo—the prison newspaper—Collier admitted his knowledge of a chronic staff shortage lasting for decades. He's even attempted to improve staffing numbers by rotating officers to critical units and increasing pay. But he's also manipulated the percentage of open positions by eliminating unfilled jobs across the system. Despite Collier's efforts, however, attrition rates remain stubbornly high. A key detraction of officers' scheduling is that they usually work four days on and four days off. Younger Texans, who are generally more willing to accept lower government wages in exchange for career benefits, must sacrifice family time and other endevours that rely on a fixed scedule.

Collier has not tried a 12-hour unit operational schedule, placing most inmate activities during M-F 0600-1800, and assigning the majority of line officers to staggered 8-hour shifts that support them having families and live outside of prison. The ACA has already granted Collier an exception to feed only two meals per weekend day on "brunch" units; it will likely do the same for the other units upon Collier's request. The chronic staff shortage results in inmates being refused access to cold water, cold showers, and air-conditioned respite areas.

Collier can implement a 12-hours unit schedule to improve staff hiring and retention to better protrect inmates during extreme heat.

## IX. Electronic Tablets Not Leveraged to Reduce "Staging" of Inmates in Overheated Areas, Shortening Lockdowns, and to Preserve Grievances About Extreme Heat

Collier has given to nearly all inmates electronic tablets provided by Securus Technologies. Securus operated tablet programs throughout the nation. As relevant here, many of those programs make available to inmates internal prison policies, educational resources, digital document creation, storage, and printing, and electronic inmate grievances. But not Collier.

Collier has made a very few law library and educational resources available on tablets, but nowhere near the existing digital holdings. Therefore, any time inmates need to access those documents, they must walk to a separate building, traversing hot hallways after being "staged" in overheated dayrooms and then forced to wait for a session to beging, usually outside in the heat. By making all resources available, Collier could immediately eliminate a great number of inmate "staging," movement, and exposure to extreme heat in non-A/C areas.

For over a year, Collier has operated a Digital Mail Processing Center in Dalls where inmate mail is opened and scanned, then forwarded to unit mailrooms for screening and "release" to inmate tablets. This creates multiple advantages for Collier. Mailed drugs are reduced, as well as physical papers that must be searched, inventoried, stored, and transported by staff several times per year. But, if an inmate wants his existing, previously-approved papers scanned, he must mail them to

the DMPC at his own cost. Many inmates can't afford this, and Collier will neither allow the use of TDCJ's internal systems that transport "truck mail" and inmate property from unit to unit for this, nor existing Securus scanners installed in each unit's mailroom. The security need to examine inmate's excess physical papers—including legal documents—slows comprehensive searches, unnecessarily extending the length os misused disciplinary lockdowns that place inmates at an increased risk to their safety during extreme heat.

Collier employs a paper-only inmate grievance system. Like the mischaracterized heat deaths revealed during discovery, this allows Collier's investigators to "disappear" grievances about denial of respite, expensive maintenance issues, and other matters related to Collier's failures to sufficiently and properly mitigate the effects of extreme heat. Besides not addressing the complaints, hidden paper grievances also skew reporting to lawmakers, courts, and the media. Sucurus (Collier's selected tablet vendor) offers electronic inmate grievances through its Comm. Center platform (already on TDCJ tablets) that would generate traceable grievance numbers upon submission. Collier supposedly accepts inmate grievances on plain paper without use of the printed form. He could simply point the Comm. Center to the email box for the unit or central grievance offices.

Collier can better utilize his tablet program to limit inmate's unnecessary exposure to extreme heat, reduce inmate property and shorten disciplinary lockdowns used for comprehensive searches, and improve accountable and recordkeeping in the inmate grievance program for heat-related complaints.

## X. Televisions Located in Hot Dayrooms; Personal TVs Prohibited

Collier has worked with the TBCJ and the Windham School District (which manages the inmate recreation program) to install TVs in all dayrooms for recreation. WSD has also installed personal-size TVs in cells on two units—The Walls and Ramsey I—because they don't have conventional dayrooms. WSD pays for the recreation program from inmate commissary receipts, including programming and wiring serving dayrooms and cells.

At least two manufacturers—RCA and Hiteker—make secure, prison-safe TVs that feature see-through cabinets (to ease inspection for contraband) and no speakers (to reduce noise). But despite the deployment of personal TVs on TDCJ units, and there prevalance in other prisons as a behaviour management tool, Collier has not authorized inmates to buy them through unit stores or from outside vendors. This is possibly because Securus "rents" movies and TV at around 7¢ a minute. An inmate watching just one hour per day would have to spend over $1,500 a year.

Collier, working with the Board and Windham, can ensure store revenue is appropriated to expand and maintain TV equipment and appropriate programming so inmates can watch TVs in their cells (where they're confined most of the time anyway because of staff shortages) under their personal fans, rather than getting stuck in overheated dayrooms.

Disciplinary management concerns can be addressed by installing traps (cheap frequency filters) on wires serving areas housing inmates in lower custody levels, blocking entertainment programming and incentivizing improved behavior and promoting a safer environment for all inmates and staff. Many other prison systems allow their inmates to buy personal TVs, likely because they recognize the positive effect they have on offender management. Any concerns Collier may have about the value of personal TVs (around $200 should be compared with typewriters Collier sells to inmates for $360. Dayroom TV programming is necessarily limited to only a few channels to reduce violence. Personal TVs would allow Collier to better avoid disparities between cultural groups by expanding channel selections fo in-cell viewing based on disciplinary custody level. See <u>Miranda v. Lumpkin</u>, 2:21cv271 S.D.Tex

Collier can sell secure, prison-safe personal TVs to inmates to keep them out of overheated dayrooms, protecting them during extreme heat.

## XI. Ineffective Drug Testing

Inmates are prohibited by state law and prison rules from using or possessing drugs or alcohol in prison. But things have gotten so bad that Collier was forced to call a snap, statrewide lockdown and establish a "snitch" line in 2023 to root out an employee drug ring and try to reduce K2. He also instituted scanning and destruction of physical inmate mail. All at great expense to everyone. But he has not taken basic steps implemented in other prisons to improve drug and alcohol detection and discourage their abuse by inmates:

entered agreements with outside law enforcement agencies to run fresh K9s randomly through parking lots, employee search areas, and inside prison units.

deployed breatalyzers and saliva test kits to reduce testing costs and allow cross-gender test observations.

give inmates the chance to admit drug use before presumptive testing and charge "dirty" inmates the actual costs of testing performed.

Collier can improve drug and alcohol testing to reduce the deadly effect when combined with extreme heat, and improve safety overall.

## XII. Inmate Extortion Ignored

Collier has "added cold beds," but it's really just a smokescreen. All he's actually done is redesignate existing single-cell ad-seg housing as gen-pop housing. Doing so has added some protection for medically vulnerable inmates, but Collier ignores clear signs of need and allows fragile inmates to refuse cold beds without investigating extortion by other inmates. There are inmates who are barely ambulatory (some issued BOTH a cane and walker) and elderly that are housed far away from chow halls and infirmaries; so far, in fact, they often don't get to eat the prepared meal (saving Collier money) and forced to et personal food. Infirm inmates are extorted by younger, stronger inmates for protection, and are told to refuse cold beds. When that happens, Collier turns a blind eye because it's cheaper and easier.

Collier can institute a no-refuse policy for inmates who are at an increased risk due to extreme heat and better investigate extortion of those attempting to refuse.

### XIII. Unit and Cell Preferences Not Allowed

In other state prison systems, inmates are allowed to lodge their unit of assignment preferences and with whom they like to be celled. Nothing is guaranteed and other factors have priority (medical hardships, education, needed workers, security), but these options allow prisoners to limit conflict and violence in their housing (which often endangers other inmates and employees), and be housed on a unit close to family. Collier already allows unit transfers for medical hardship reasons, but if an inmate wants to get close to family otherwise, he must hire an outside "consultant." Many inmates are assigned to a unit for no particular reason. They should be allowed to transfer to another approved unit as space and transport capacity allows.

A lot of inmate violence starts in closed cells far from cameras and staff. It would be much safer for all to allow inmates to select who they want to cell with, even if it requires a lawsuit waiver against TDCJ. Cell selection is often done now, but it requires payments to highly-placed inmates and administrators, which present serious risks to the safety and security of the institution as a whole.

Collier can allow inmates to transfer to preferred units and pick their cellies to reduce overall violence in the systems and improve safety and security for all inmates and staff.

Most of these aren't free, but Collier still hasn't done any of them to reduce the deadly effect of extreme heat and violence in TDCJ. I pray you will consider Collier's lack of attention to these areas while drafting any injunction and during any monitoring period.

Sincerely

*Cesar Santelises*
Cesar Santelises

Cesar Santelises
1923094
Telford Unit
3899 St Hwy 98
New Boston, Tx 75570

legal mail

SCREENED BY CSO

AUG 22 2024

19 AUG 2024 PM 3

Judge Robert Pitman
US District Judge
501 W 5th Street Ste 1100
Austin, Tx 78701