**FILED**

December 01, 2025

CLERK, U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS

BY: _____ klw

DEPUTY

**IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION**

| | | |
|---|---|---|
| **BERNHARDT TIEDE, II;** | § | |
| **TEXAS PRISONS COMMUNITY** | § | |
| **ADVOCATES; BUILD UP, INC. A/K/A** | § | |
| **JUSTICE IMPACTED WOMEN'S** | § | |
| **ALLIANCE; TEXAS CITIZENS UNITED** | § | |
| **FOR REHABILITATION OF ERRANTS;** | § | |
| **and COALITION FOR TEXANS** | § | |
| **WITH DISABILITIES**, | § | **CIVIL ACTION NO.: 1:23-CV-01004-RP** |
| *PLAINTIFFS,* | § | |
| V. | § | |
| | § | |
| **BOBBY LUMPKIN, in his official** | § | |
| **capacity as Executive Director of the** | § | |
| **Texas Department of Criminal Justice,** | § | |
| *DEFENDANT.* | § | |

### DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Defendant Bobby Lumpkin submits his Motion for Summary Judgment and Brief in Support and would respectfully show as follows:

TABLE OF CONTENTS

Table of Contents ............................................................................................................... ii

Index of Authorities ........................................................................................................... iv

Introduction ........................................................................................................................1

Legal Standard ................................................................................................................... 2

Argument .............................................................................................................................3

    I.  Plaintiffs Lack Standing. ........................................................................................3

        A.  Associational Plaintiffs cannot derive standing from genuine members and do not satisfy the indicia of membership test................................................................ 4

              1.  Lioness .................................................................................................7

              2.  CTD ................................................................................................... 8

              3.  CURE ................................................................................................. 9

              4.  TPCA .................................................................................................10

        B.  Lioness and CTD cannot establish associational standing. ......................................... 11

        C.  No Plaintiff can establish associational standing by showing indicia of membership. 12

        D.  Because the PLRA restricts relief to plaintiffs with federal rights, plaintiffs lack standing to sue in a representative capacity. ..........................................................14

        E.  Alternatively, the litigation requires the participation of the Associational Plaintiffs' individual members. ...............................................................................15

    II.  Mr. Tiede's claim is moot because Defendant has already provided him all relief sought. ........................................................................................................17

    III.  Plaintiffs have failed to exhaust administrative remedies as required by the PLRA. ..........19

        A.  Mr. Tiede failed to exhaust the grievance process.........................................................21

        B.  Associational Plaintiffs' Members have largely failed to exhaust the grievance process. ....................................................................................................... 22

        C.  Associational Plaintiffs cannot sue on behalf of inmates who have failed to exhaust their administrative remedies. ..........................................................................23

    IV.  Plaintiffs are seeking improper relief..............................................................................25

        A.  System-wide air-conditioning is overbroad relief under the PLRA, 18 U.S.C. § 3626. ........................................................................................ 26

              1.  Plaintiffs ignore acceptable remedies that are less intrusive than air conditioning. ............................................................................27

              2.  Air conditioning provides more relief than is strictly necessary to reduce heat-related risks to an acceptable level. ....................................................... 29

B.   An order requiring Defendant to install air conditioning would be impossible for Defendant to follow.................................................................................................. 30

V.  Plaintiffs fail to meet the heavy burden of showing TDCJ's deliberate indifference. ........32

A.   TDCJ undertakes significant efforts to ensure effective implementation of its heat mitigation strategies.................................................................................................33

B.   TDCJ continually refines its heat mitigation strategies.............................................36

C.   TDCJ's plan to install air conditioning means that Defendant cannot be deliberately indifferent even if current mitigation efforts are insufficient. ....................................36

Conclusion ....................................................................................................................... 40

Certificate Of Service.........................................................................................................41

**INDEX OF AUTHORITIES**

**Cases**                                                                                   **Page(s)**

*Alabama Legislative Black Caucus v. Alabama,*
    575 U.S. 254 (2015) ........................................................................................ 11

*Already, L.L.C. v. Nike, Inc.,*
    568 U.S. 85 (2013) .......................................................................................... 18

*Am. Legal Found. v. F.C.C.,*
    808 F.2d 84 (D.C. Cir. 1987) ........................................................................ 24

*Ass'n for Retarded Citizens of Dallas v. Dallas Cnty. Mental Health & Mental Retardation Ctr.*
    *Bd. of Trustees (ARC),*
    19 F.3d 241 (5th Cir. 1994) ............................................................................ 6

*Assoc. of Am. Physicians & Surgeons, Inc. v. Tex. Med. Bd.,*
    627 F.3d 547 (5th Cir. 2010) .................................................................... 4, 16

*Ball v. LeBlanc,*
    792 F.3d 584 (5th Cir. 2015) ................................................................. passim

*Bargher v. White,*
    928 F.3d 439 (5th Cir. 2019) ........................................................................ 20

*Basel Action Network v. Mar. Admin.,*
    370 F. Supp. 2d 57 (D.D.C. 2005) ................................................................. 7

*Blackmon v. Garza,*
    484 F. App'x 866 (5th Cir. 2012) ................................................................. 27

*Blackmon v. Kukua,*
    758 F. Supp. 2d 398 (S.D. Tex. 2010) .......................................................... 18

*Cadena v. El Paso Cty.,*
    946 F.3d 717 (5th Cir. 2020) ........................................................................ 32

*California v. Texas,*
    593 U.S. 659 (2021) ...................................................................................... 31

*Cantwell v. Sterling,*
    788 F.3d 507 (5th Cir. 2015) ........................................................................ 20

*Celotex Corp. v. Catrett,*
    477 U.S. 317 (1986) ........................................................................................ 3

*City of Austin v. Paxton,*
    943 F.3d 993 (5th Cir. 2019) ................................................................. 23, 31

*Cole v. Collier*,
No. 4:14-CV-1698, 2017 WL 3049540 (S.D. Tex. July 19, 2017) ......................................... 28

*Cooper v. Sherriff*,
929 F.2d 1078 (5th Cir. 1991) .................................................................................................18

*Cullum v. Tex. Dep't of Criminal Justice*,
375 F. App'x 417 (5th Cir. 2010) ...........................................................................................32

*DaimlerChrysler Corp. v. Cuno*,
547 U.S. 332 (2006)...............................................................................................................11

*Davis v. Fed. Election Comm'n*,
554 U.S. 724 (2008) ......................................................................................................... 4, 11

*DeFunis v. Odegaard*,
416 U.S. 312 (1974)...............................................................................................................18

*Dillon v. Rogers*,
596 F.3d 260 (5th Cir. 2010)............................................................................................... 20

*Disability Advocates, Inc. v. New York Coal. for Quality Assisted Living, Inc.*,
675 F.3d 149 (2d Cir. 2012)....................................................................................................7

*Dyer v. Houston*,
964 F.3d 374 (5th Cir. 2020)..................................................................................................32

*Farmer v. Brennan*,
511 U.S. 825 (1994)................................................................................................... passim

*Friends for Am. Free Enter. Ass'n v. Walmart Stores*,
284 F.3d 575 (5th Cir. 2002)............................................................................................15, 17

*Friends of the Earth, Inc. v. Chevron Chem. Co.*,
129 F.3d 826 (5th Cir. 1997) .........................................................................................5, 6, 7

*Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*,
528 U.S. 167 (2000) .............................................................................................................3, 5

*Funeral Consumers All., Inc. v. Serv. Corp. Int'l*,
695 F.3d 330 n.9 (5th Cir. 2012) ...........................................................................................5

*FW/PBS, Inc. v. City of Dallas*,
493 U.S. 215 (1990) .................................................................................................................3

*Ganpat v. E. Pac. Shipping PTE, Ltd.*,
66 F.4th 578 (5th Cir. 2023) ..................................................................................................31

*Garland v. Cargill*,
602 U.S. 406 (2024)............................................................................................................ 24

v

*Gates v. Cook,*
    376 F.3d 323 (5th Cir. 2004) ................................................................................... 26

*Gettman v. Drug Enf't Admin.,*
    290 F.3d 430 (D.C. Cir. 2002) ...................................................................................5

*Gobert v. Caldwell,*
    463 F.3d 339 (5th Cir. 2006) ...................................................................................33

*Gonzalez v. Seal,*
    702 F.3d 785 (5th Cir. 2012) ...................................................................................21

*Green Haven Prison Preparative Meeting of Religious Soc'y of Friends v. New York State Dep't of*
    *Corr. & Cmty. Supervision,*
    16 F.4th 67 (2d Cir. 2021) .......................................................................................25

*Griffin v. Oceanic Contractors, Inc.,*
    458 U.S. 564 (1982) ...........................................................................................24, 25

*Guajardo v. Tex. Dep't of Criminal Justice,*
    363 F.3d 392 (5th Cir. 2004) ...................................................................................23

*Helling v. McKinney,*
    509 U.S. 25 (1993) ...............................................................................................3, 6

*Hendee v. Dewhurst,*
    228 S.W.3d 354 (Tex. App. 2007) ........................................................................... 30

*Hernandez v. Garrison,*
    916 F.2d 291 (5th Cir. 1990) ...................................................................................18

*Hewlett-Packard Co. v. Quanta Storage, Inc.,*
    961 F.3d 731 n.8 (5th Cir. 2020) .............................................................................32

*Hunt v. Cromartie,*
    526 U.S. 541 (1999) ................................................................................................ 2

*Hunt v. Wash. State Apple Advert. Comm'n,*
    432 U.S. 333 (1977) ........................................................................................ passim

*Johnson v. Johnson,*
    385 F.3d 503 (5th Cir. 2004) ................................................................................... 20

*Johnson,*
    322 F.3d at 866 .......................................................................................................23

*Jones v. Bock,*
    549 U.S. 199 (2007) ............................................................................................... 20

*King v. Burwell*,
    576 U.S. 473 (2015) ..................................................................................24, 25

*Leggett v. Lafayette*,
    608 F. App'x 187 (5th Cir. 2015) ..................................................................... 22

*Lewis v. Casey*,
    518 U.S. 343 (1996) .......................................................................................... 11

*Lujan v. Defs. of Wildlife*,
    504 U.S. 555 (1992) ...........................................................................................3

*Maggio v. Zeitz*,
    333 U.S. 56 (1948) .............................................................................................32

*Missouri Prot. & Advocacy Services, Inc. v. Carnahan*,
    499 F.3d 803 (8th Cir. 2007) ............................................................................ 6

*Murphy v. Hunt*,
    455 U.S. 478 (1982) (per curiam) .....................................................................18

*NAACP v. City of Kyle*,
    626 F.3d 233 (5th Cir. 2010) .........................................................................4, 12

*OCA-Greater Houston v. Texas*,
    867 F.3d 604 (5th Cir. 2017) ......................................................................4, 23, 24

*Parent/Prof'l Advocacy League v. City of Springfield*,
    934 F.3d 13 (1st Cir. 2019) ...............................................................................17

*Perttu v. Richards*,
    605 U.S. 460 (2025) ............................................................................... passim

*Pluet v. Fraiser*,
    355 F.3d 381 (5th Cir. 2004) ..............................................................................3

*Porter v. Nussle*,
    534 U.S. 516 (2002) ..................................................................................... 20, 23

*Prison Justice League v. Bailey*,
    697 F. App'x 362 (5th Cir. 2017) .......................................................................15

*Ross v. Blake*,
    578 U.S. 632 (2016) .......................................................................................20, 21

*Sossamon v. Lone Star State of Texas*,
    560 F.3d 316 (5th Cir. 2009) .............................................................................19

*Steward v. Abbott*,
    189 F. Supp. 3d 620 (W.D. Tex. 2016) ..............................................................12

*Stewart v. Murphy*,
    174 F.3d 530 (5th Cir. 1999)..................................................................................................32

*Sup. Ct. of Va. v. Consumers Union of U. S., Inc.*,
    446 U.S. 719 (1980)................................................................................................................31

*Taylor v. Collier*,
    No. 22-20398, 2023 WL 8184869 (5th Cir. Nov. 27, 2023) (per curiam) ..............................18

*Tex. Bankers Assoc. v. Office of the Comptroller*,
    728 F. Supp. 3d 412 (N.D. Tex. 2024) ................................................................................. 4

*TransUnion LLC v. Ramirez*,
    594 U.S. 413 (2021) ..............................................................................................................11

*United States v. Atl. Research Corp.*,
    551 U.S. 128 (2007) ..............................................................................................................25

*United States v. Hinds Cnty. Bd. of Supervisors*,
    128 F.4th 616 (5th Cir. 2025)......................................................................................... 26, 31

*United States v. Texas*,
    599 U.S. 670 (2023) (Gorsuch, J., concurring) ........................................................................15

*Uzuegbunam v. Preczewski*,
    592 U.S. 279 (2021)..............................................................................................................15

*Valentine v. Collier*,
    956 F.3d 797 (5th Cir. 2020)......................................................................................... 16, 32

*Valentine v. Collier*,
    978 F.3d 154 (5th Cir. 2020)............................................................................................. passim

*Vote.org v. Callanen*,
    39 F.4th 297 n.2 (5th Cir. 2022) ........................................................................................5, 12

*Walker v. U.S. Dep't of Hous. & Urban Dev.*,
    912 F.2d 819 (5th Cir. 1990) ................................................................................................31

*Warth v. Seldin*,
    422 U.S. 490 (1975)..................................................................................................4, 5, 15, 16

*Whole Woman's Health v. Jackson*,
    595 U.S. 30 (2021)......................................................................................................... 31, 33

*Woodford v. Ngo*,
    548 U.S. 81 (2006) ........................................................................................................20, 21, 22

*Wright v. Hollingsworth*,
    260 F.3d 357 (5th Cir. 2001)................................................................................................. 20

*Yeates v. Collier*,
    868 F.3d 354 ...................................................................................27, 30

**Constitutional Provisions & Statutes**

U.S. Const. amend. VIII..............................................................................3

18 U.S.C. § 3626...............................................................................ii, 1, 26

18 U.S.C. § 3626(a)(1) .......................................................................25, 26

18 U.S.C. § 3626(a)(1)(A) ........................................................................14

42 U.S.C. § 1997e ......................................................................................1

42 U.S.C. § 1997e(a) ...........................................................................19, 20

**Rules & Regulations**

Fed. R. Civ. P. 1 ......................................................................................38

Fed. R. Civ. P. 4 ......................................................................................36

Fed. R. Civ. P. 56(a) ................................................................................. 2

Fed. R. Civ. P. 65(d)(2)(C) ......................................................................31

Fed. R. Civ. P. Rule 56 ............................................................................. 2

Fed. R. Civ. P. 5 ......................................................................................36

Fed. R. Civ. P. 5(a) ..................................................................................41

## INTRODUCTION

The Texas Department of Criminal Justice ("TDCJ") keeps custody of more than 135,000 inmates confined in 103 carceral units. This case, challenging the conditions of confinement throughout that vast prison network, has been brought by one individual inmate and four groups, only one of which has genuine members who are currently incarcerated. That organization, Lioness, cannot possibly invoke standing for Plaintiffs' system-wide claim. Its incarcerated members number at a fraction of one percent of the total prison population and are housed in just eight of TDCJ's sixty-seven units that are currently lack air conditioning in all housing areas.[1] The other plaintiff organizations do not have incarcerated members, and while they describe the entire prison population as "constituents," their modest footprint at TDCJ belies that ambitious claim. Consequently, no plaintiff has standing.

The global nature of Plaintiffs' claims also runs afoul of the Prison Litigation Reform Act of 1996 ("PLRA"). *See* 18 U.S.C. § 3626; 42 U.S.C. § 1997e. The PLRA requires inmates to exhaust available administrative remedies before litigating, restricts prison litigation to plaintiffs with "Federal rights," and limits remedies to the minimum necessary to correct Eighth Amendment violations. These limitations militate against the viability of a lawsuit that implicates thousands of inmates—almost none of whom have exhausted—filed by organizations that lack federal rights themselves and seeks the most comprehensive relief available.

These jurisdictional and statutory barriers aside, the sweeping scope of Plaintiffs' suit burdens them with proving that TDCJ officials are deliberately indifferent to the effects of excessive heat on inmates in every unairconditioned unit. Prison units are built following many different designs and prison management and staffing are decentralized. No two units are identical in terms of heat mitigation. Accordingly, the Court cannot generalize from heat injuries that occur in a

---

[1] TDCJ facilities that do not have fully airconditioned housing areas are nonetheless equipped with air conditioning in at least certain areas, including respite rooms that are available to inmates. However, Defendant will refer to units that do not fully air condition inmate housing as "unairconditioned units" hereinafter.

scattered subset of units. Plaintiffs' system-wide challenge requires a unit-by-unit analysis that Plaintiffs have not prepared and cannot make good on at trial.

Finally, prison officials do not violate the Eighth Amendment when they make earnest efforts to correct unconstitutional conditions. *Farmer v. Brennan*, 511 U.S. 825, 844 (1994). TDCJ expects to air condition its entire system by 2033. To that end, TDCJ has formulated a dedicated plan to accomplish system-wide installation in three phases. *See* Ex. 1. That plan is well underway: TDCJ received $118 million from the Legislature earmarked for new air conditioning, and installation has begun at twenty-two units since 2023. *See infra* at 36-40. Therefore, even if the Court is not swayed by any other argument, it should still grant summary judgment on the grounds that Defendant is diligently implementing the very heat mitigation measure that Plaintiffs request for relief.

Plaintiffs' only complaint against the three-phase plan is its timeline. However, they do not provide an alternative plan but instead suggest that TDCJ make changes to its procurement process that Plaintiffs' experts estimate will save approximately one year. Further, Plaintiffs fault TDCJ for delivering funding requests to the Legislature that TDCJ's leadership believes legislators will find credible rather than asking for the full funding amount of system-wide installation all at once. But even if Plaintiffs "identif[y] lapses in TDCJ's response to" prison heat, "[t]he Eighth Amendment does not mandate perfect implementation," much less a particular timeline. *Valentine v. Collier*, 978 F.3d 154, 165 (5th Cir. 2020). TDCJ has adopted a plan that it is confident it can fulfill and that Plaintiffs agree will remedy excessive heat once finished. That is enough to remove any genuine dispute that Mr. Lumpkin is not deliberately indifferent to the risks posed by heat in TDCJ prisons.

Accordingly, the Court should grant summary judgment for Mr. Lumpkin.

### LEGAL STANDARD

***Summary Judgment:*** Summary judgment is appropriate when the pleadings and the evidence demonstrate that "there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Hunt v. Cromartie*, 526 U.S. 541, 552 (1999). Rule 56 "mandates the entry of summary judgment…against a party who fails to make

a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

**The Eighth Amendment:** "[T]he treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment," *Helling v. McKinney*, 509 U.S. 25, 31 (1993), which prohibits "cruel and unusual punishments." U.S. Const. amend. VIII. "To be tantamount to the infliction of cruel and unusual punishment, prison conditions must pose 'an unreasonable risk of serious damage' to a prisoner's health—an objective test—and prison officials must have acted with deliberate indifference to the risk posed—a subjective test." *Ball v. LeBlanc*, 792 F.3d 584, 592 (5th Cir. 2015) (citing *Helling*, 509 U.S. at 33-35).

## ARGUMENT

### I.    Plaintiffs Lack Standing.

"[S]tanding is perhaps the most important of the jurisdictional doctrines." *FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 231 (1990) (internal quotation omitted). A plaintiff must demonstrate that it has standing to sue at the time the complaint is filed. *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 189 (2000) ("standing accessed at the time the action commences"); *Pluet v. Fraiser*, 355 F.3d 381, 385 (5th Cir. 2004). To establish standing, a plaintiff must show: (1) an actual or imminent, concrete and particularized "injury-in-fact"; (2) that is fairly traceable to the challenged action of the defendant (causation); and (3) that is likely to be redressed by a favorable decision (redressability). *Friends of the Earth*, 528 U.S. at 167, 180-81. Even as a case develops, a plaintiff must show he met these elements "at the outset of the litigation." *Id.* at 180.

As "an indispensable part of the plaintiff's case" standing "must be supported in the same way as any other matter on which the plaintiff bears the burden of proof." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992) (citations omitted). This means that Plaintiffs' burden needs to meet "the manner and degree of evidence required at the successive stages of the litigation," *id.*, and

3

consequently "the proof required to establish standing increases as the suit proceeds." *Davis v. Fed. Election Comm'n*, 554 U.S. 724, 734 (2008).

### A.    Associational Plaintiffs cannot derive standing from genuine members and do not satisfy the indicia of membership test.

"An association or organization can establish an injury-in-fact through either of two theories, appropriately called 'associational standing' and 'organizational standing.'" *OCA-Greater Houston v. Texas*, 867 F.3d 604, 610 (5th Cir. 2017) (citation omitted). Either the association sues in its own name to assert "whatever rights and immunities the association itself [] enjoy[s]." *Warth v. Seldin*, 422 U.S. 490, 511 (1975), or, under a theory of associational standing, it "bring[s] suit on behalf of its members." *Tex. Bankers Assoc. v. Office of the Comptroller*, 728 F. Supp. 3d 412, 419 (N.D. Tex. 2024). Here, CURE, CTD, TPCA, and Lioness have each invoked the putative injuries of inmates whom they consider constituents or members, and none sue to vindicate any interests they hold as corporate entities. ECF 240 at 5-8 (asserting that each organization "brings this lawsuit in its representative capacity on behalf of…prisoners"). Accordingly, the plaintiff organizations all exclusively rely on associational standing.

Associational standing "is derivative of the standing of the association's members, requiring that they have standing" in order for an associational plaintiff to have standing. *OCA-Greater Houston*, 867 F.3d at 610. An association has standing to sue to vindicate its members' interests when "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Assoc. of Am. Physicians & Surgeons, Inc. v. Tex. Med. Bd.*, 627 F.3d 547, 550 (5th Cir. 2010) (citing the *Hunt* factors from *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977)). The first two prongs are Article III requirements whereas the last is prudential. *Id.*

To satisfy the first prong of the *Hunt* standard, an association must demonstrate the independently viable standing of at least some of its members. *See e.g.*, *NAACP v. City of Kyle*, 626 F.3d 233, 237 (5th Cir. 2010) (finding that membership organization lacked associational standing

4

because no "specific member" had been affected by the challenged ordinance). When an association has members in the ordinary sense—individuals "who join[] voluntarily to support [the association's] mission," *id.* at 201—it establishes standing by showing "that its members, or any one of them, are suffering immediate or threatened injury as a result of the challenged action of the sort that would make out a justiciable case had the members themselves brought suit." *Warth*, 422 U.S. at 511.

By contrast, a "non-membership organization" usually "cannot contend that it has associational standing." *Vote.org v. Callanen*, 39 F.4th 297, 303 n.2 (5th Cir. 2022). However, following *Hunt*, an organization that "is not a traditional voluntary membership organization"— even one that "has no members at all"—can establish associational standing by proving that it "represents" individuals it claims as constituents "and provides the means by which they express their collective views and protect their collective interests." *Hunt*, 432 U.S. at 342, 344-45 (ruling that state commission had standing to sue on behalf of in-state apple producers). The alignment between the organization and its claimed constituents must be so close as to "effectively" make the latter members in the traditional sense. *SFFA*, 600 U.S. at 200 (describing the holding of *Hunt* as "the Commission had standing because the apple growers and dealers it represented were *effectively* members of the Commission.") (emphasis in original); *see also Gettman v. Drug Enf't Admin.*, 290 F.3d 430, 435 (D.C. Cir. 2002) ("In determining whether an organization that has no members in the traditional sense may nonetheless assert associational standing, the question is whether the organization is the functional equivalent of a traditional membership organization.")

To decide whether an organization without members nonetheless has associational standing, courts examine the claimed constituency for "indicia of membership." *Friends of the Earth, Inc. v. Chevron Chem. Co.*, 129 F.3d 826, 828 (5th Cir. 1997) (citing *Hunt*, 432 U.S. at 344-45). These include whether "members elect leadership, serve as the organization's leadership, and finance the organization's activities, including the case's litigation costs." *Funeral Consumers All., Inc. v. Serv. Corp. Int'l*, 695 F.3d 330, 344 n.9 (5th Cir. 2012) (quoting *Hunt*, 432 U.S. at 344-45). In

5

particular, "[t]he Court in *Hunt* looked to who elected the governing body of the organization and who financed its activities." *Friends of the Earth*, 129 F.3d at 829.

In its preliminary injunction opinion, the Court treated the effective equivalence test as "satisfied when a group serves a 'specialized segment' of the community that is 'the primary beneficiary of its activities,'" *id.* at 67 (quoting *Hunt*, 432 U.S. at 344), and applying that logic, found the Associational Plaintiffs' dedication to serving "incarcerated Texans and their families" or—in the case of CTD—"incarcerated Texans with disabilities" sufficient for them to sue on behalf of all TDCJ's 135,000 inmates. *Id.*

However, this approach is not followed by the Fifth Circuit which has rejected associational standing even for federally-authorized protection and advocacy organizations when these fail to demonstrate adequate indicia of membership. *See Ass'n for Retarded Citizens of Dallas v. Dallas Cnty. Mental Health & Mental Retardation Ctr. Bd. of Trustees (ARC)*, 19 F.3d 241, 244 (5th Cir. 1994) (denying standing to "Advocacy, Inc." and restricting their role in the litigation to amicus curiae). The associational plaintiff in *ARC* had a "statutory mandate [] to protect and advocate the rights of disabled individuals," *id.* at 244, committing it to the interests of a discrete community. Nonetheless, the Fifth Circuit dismissed for lack of standing "because most of its 'clients'… are unable to participate in and guide the organization's efforts." *Id.*

That binding precedent accords with the Supreme Court's emphasis on examining whether putative constituents govern and finance the organization invoking associational standing. *See SFFA*, 600 U.S. at 200-01 (explaining *Hunt*'s standing ruling was premised on its finding that the Commission's constituents "alone elect[ed] the members of the Commission," "alone ... serve[d] on the Commission," and "alone finance[d] its activities"). Returning to *Hunt* itself, while the Court adverted to the Commission's representation of a "specialized segment," the *Hunt* Court did not regard that as alone sufficient for standing. 432 U.S. at 344-45; *see also SFFA*, 600 U.S. at 200-01. Consequently, courts routinely deny standing to focused advocacy organizations when they are not governed, funded or elected by their so-called constituents. *See e.g.*, *ARC*, 19 F.3d at 244 (5th Cir. 1994); *Missouri Prot. & Advocacy Services, Inc. v. Carnahan*, 499 F.3d 803, 809-11 (8th Cir.

2007); *Disability Advocates, Inc. v. New York Coal. for Quality Assisted Living, Inc.*, 675 F.3d 149, 158-59 (2d Cir. 2012) (denying standing because "there is scant evidence in the record that the individuals with mental illness whom DAI purports to represent have the power to elect its directors, make budget decisions, or influence DAI's activities or litigation strategies."); *Basel Action Network v. Mar. Admin.*, 370 F. Supp. 2d 57, 69-70 (D.D.C. 2005) (environmental advocacy organization failed to "demonstrate[] sufficient 'indicia of membership'" because there was "no showing" that constituents "play any role in selecting [its] leadership, guiding [its] activities, or financing those activities").

Here, none of the Associational Plaintiffs has standing to bring this suit. Inmates do not serve in leadership roles in any of the plaintiff associations, exercise control over their decision-making, nor financially contribute to them. Lioness and CTD are voluntary membership organizations, but CTD has no incarcerated members, and Lioness' incarcerated membership is confined to a handful of women-only facilities. That is woefully insufficient to confer standing for a system-wide suit. CURE and TPCA do not have members; accordingly, CURE and TPCA can establish standing only if the inmates they claim to represent are functionally their members. *Friends of the Earth*, 129 F.3d at 828. While both CURE and TPCA ambitiously claim to represent the entire TDCJ prison population, inmates do not display classic indicia of membership with respect to either organization, and there are few ties between these organizations and the inmate population writ large. Accordingly, CURE and TPCA are not the effective equivalent of membership associations and lack standing.

### 1. Lioness

Lioness was founded in 2022 by women who were formerly incarcerated in TDCJ facilities. Ex. 2 at 11:2-19. Jennifer Toon, Lioness's founder and executive director, testified that Lioness seeks to "end the incarceration and systemic devaluation of girls, women, and gender expansive people in our Texas criminal legal system." *Id.* at 17:23-18:2. In keeping with this mission, Lioness restricts its membership to "individual[s] [who] have experienced…incarceration in the state of Texas" and "identify as a girl, woman, or gender expansive person." *Id.* at 52:4-20. Individuals join

Lioness by completing a membership form. *Id.* at 51:7-25. Ms. Toon testified that although Lioness is open to accepting as members "biological men [who] identify as women or girls," it does not currently have any. *Id.* at 47:16-24, 48:5-15, 65:19-66:21. Ms. Toon also testified that Lioness is selective with the people it considers to be its members. *Id.* at 54:1-15. Furthermore, Lioness does not consider every incarcerated woman to be one of its members. *Id.*

Lioness has identified 419 members who were incarcerated in a TDCJ unit at the time Lioness joined this litigation. *Id.* at 63:19-25. According to Ms. Toon, of these, 261 had airconditioned housing assignments, leaving 158 members in unairconditioned housing who could claim to suffer from excessive heat. *Id.* at 64:10-65:13. Defendant's counsel cross-referenced Lioness's membership list with TDCJ's internal data and found that 118 inmates on the list were housed in unairconditioned housing. *See* Exs. 3, 4 and 5 at 16.[2] Currently, all Lioness's incarcerated members are biological women, Ex. 2 at 47:4-24, and, per TDCJ policy, they are only assignable to TDCJ's 12 women's units.[3] *Id.* at 66:22-67:7 (testifying that Lioness's incarcerated members are all either held in a TDCJ women's facility or county jail). Lioness has at least one member in each of TDCJ's 12 women-only facilities. *Id.* at 68:12-24, 69:4-11. Lioness members assigned to unairconditioned housing were incarcerated in the Lane Murray, Hobby, Carol Young, Crane, Hilltop, Mountain View, Woodman, and Plain units. *Id.* at 69:12-18, 70:4-11. Aside from those 8 units, Lioness has members housed in airconditioned housing in the Coleman, Halbert, Marlin, and Skyview units. *Id.*

    2. **CTD**

---

[2] Exhibit 3 is the list of Lioness's purported members, as produced by Plaintiffs. Exhibit 4 is a true and correct copy of cool bed assignments at TDCJ. Exhibit 5 is an affidavit of James Rheam comparing Exhibit 3 to Exhibit 4. This analysis was performed by defense counsel to comply with the Court's Order maintaining Plaintiffs' designation of Lioness's membership list as attorneys' eyes only. See ECF 246.

[3] Unit Directory, Texas Dep't of Crim. Just., https://www.tdcj.texas.gov/unit_directory/ (last visited Nov. 19, 2025).

CTD's executive director, Chase Bearden, testified that the organization seeks "to ensure that Texans with disabilities can live, learn, play and participate in the community of their choice." Ex. 6 at 21:2-9. To that end, CTD offers "public awareness events" and engages in governmental advocacy. *Id.* at 21:2-22:2. CTD does not regularly engage in prison advocacy, *id.* at 22:3-23:5, has never presented concerns regarding prison heat to TDCJ or the Legislature, *id.*, *id.* at 70:16-22, and has never been involved in prison litigation prior to joining *Tiede v. Collier*. *Id.* at 73:7-11.

CTD has an ambiguous membership policy. Mr. Bearden explained that CTD's bylaws set out a membership policy that creates different tiers of membership, *id.* at 45:2-19, but that CTD's broadest view of its membership encompasses any individual who provides their personal information after attending one of CTD's events. *Id.* at 61:2-8. Consequently, as of the period 2023-2024, CTD recorded 1641 'members' who had provided their personal information. *Id.* at 59:16-60:1, 63:24-64:11. However, when asked Mr. Bearden could not identify a single incarcerated member, *id.* at 62:7-23. Even under CTD's broad definition of membership, it has no members incarcerated in Texas prisons.

### 3. CURE

CURE's vice president, Charles Malouff, testified that CURE offers educational and assistance programs that "involve delivering services to inmates or [their] family members." Ex. 7 at 12:11-15:8. Mr. Malouff testified that at a given time between 50 and 100 inmates participate in CURE's myriad programs, *id.* at 36:2-10, and he estimated that CURE had helped 700 TDCJ inmates through its programming since CURE's inception. *Id.* at 37:20-38:7. CURE corresponds with TDCJ inmates, and Mr. Malouff testified as of June 8, 2024, the number of inmates it corresponded with by mail amounted to 222. *Id.* at 73:16-74:3. CURE does not keep a tally of the number of inmates it corresponds with using other modes of communication. *Id.* at 75:1-4.

When asked if CURE solicits inmates to join as members, Mr. Malouff forthrightly said CURE "do[es]n't have members, so there's nothing for you [sic] to sign up to." *Id.* at 55:5-8. Mr. Malouff subsequently confirmed that CURE does not "have any members at all." *Id.* at 67:3-5. Instead, CURE regards TDCJ inmates as its "constituents" and considers its constituency to

include the entire TDCJ prison population. *Id.* at 67:11-24. Nonetheless, CURE does not have any inmates serving in leadership positions. *Id.* at 75:16-20. Nor do inmates "ever vote to decide who will serve on CURE's leadership board." *Id.* at 75:10-15. CURE's leadership board approves high-level decisions, including new programs, while leaving the "day-to-day decision-making" to Mr. Malouff. *Id.* at 48:4-49:9. Except for one, isolated donation that he recalled, Mr. Malouff testified that inmates do not financially contribute to CURE. *Id.* at 51:17-52:6, 52:15-54:6. Further, Mr. Malouff testified that CURE did not seek approval from inmates before joining *Tiede v. Collier*, *id.* at 77:9-17, nor does the group consult with inmates before making litigation decisions. *Id.* at 78:12-16.

### 4. TPCA

TPCA claims to represent the entire TDCJ prison population. Amite Dominick, TPCA's founder and president, testified that TPCA considers its "constituents [to] include all prisoners and all the prisons in the TDCJ population." Ex. 8 at 101:14-16. However, inmates do not vote for TPCA's leadership, *Id.* at 54:1-17, nor have they ever served in leadership roles. *Id.* at 54:24-55:10. Rather, TPCA is managed by a leadership board that fills vacancies by a vote among board members. *Id.* at 37:15-38:14. Inmates do not vote to decide TPCA business. *Id.* at 55:17-22. Inmates do not pay dues and only "very, very few" have made donations to TPCA. 106:24-107:9. While Dr. Dominick stated that "inmates inside of TDCJ guide [TPCA's] purpose…on several levels," she clarified that this guidance takes the form of communication that "gather[s] their experiences" "with empathy and compassion" but does not involve allowing inmates a vote in decision-making. *Id.* at 107:10-108:1.

TPCA keeps a list of inmates to whom it sends a periodic newsletter. *Id.* at 56:12-14. During her deposition, Dr. Dominick occasionally referred to the inmates on this mailing list as "members," *Id.* at 49:10-12, but she testified that inmates are placed on the mailing list without being asked if they "want to be a member of TPCA." *Id.* at 57:1-3. In fact, Dr. Dominick testified that TPCA also sends its newsletter to inmates who have never asked to receive the newsletter, *id.* at 52:14-53:9 (testifying that inmates' family members sometimes sign them up to receive the

newsletter), and that sometimes TPCA sends out its newsletter cold. *Id.* at 57:4-13 (testifying that TPCA has "reached out to [inmates] via our newsletter" and separately that inmates have "inadvertently received" the newsletter). TPCA removes names from the list only when a recipient explicitly asks to be removed. *Id.* at 53:5-9, 59:10-19.

### B.      Lioness and CTD cannot establish associational standing.

Lioness and CTD are the only plaintiffs with actual members. However, neither organization's members are sufficient to establish standing in this case. In particular, Lioness' members are only housed in exactly 8 unairconditioned units, yet this lawsuit seeks system-wide relief. *See* Ex. 5. The disparity between Lioness' limited membership and the breadth of this lawsuit fatally undermines Lioness' standing.

"Standing is not dispensed in gross…a plaintiff must demonstrate standing…for each form of relief that is sought." *Davis*, 554 U.S. at 734 (quotation omitted). Plaintiffs only have standing to pursue their particular injuries. *TransUnion LLC v. Ramirez*, 594 U.S. 413, 426-28 (2021). Consequently, courts dismiss claims that are not keyed to the particularized injuries that plaintiffs have established. *See e.g.*, *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 353 (2006) (rejecting "ancillary standing" for injuries that overlapped with but were distinct from those proved by plaintiffs); *Lewis v. Casey*, 518 U.S. 343, 357 (1996) (holding "[t]he remedy must of course be limited to the inadequacy that produced the injury in fact that the plaintiff has established."); *see also Alabama Legislative Black Caucus v. Alabama*, 575 U.S. 254, 268-71 (2015) (redistricting case) (affirming district court ruling that to establish standing for a statewide claim associational plaintiff needed to show it had injured members in *every* district).

Lioness' claims far exceed the scope of its putative injuries. Lioness members are, at most, injured by excessive heat in the 8 unairconditioned units where they are confined. *See* Ex. 5. Conditions in other TDCJ units do not affect Lioness' membership. Nonetheless, Lioness' claims challenge conditions in every unairconditioned facility.  Just as the association plaintiff in *Alabama, supra*, needed to prove it had affected members in every district prior to bringing a statewide claim, here Lioness must show it has at least one injured member in each TDCJ prison to establish

11

standing on their claims as pleaded. Lioness cannot meet that burden. Similarly, permitting Lioness to continue litigating conditions at every unairconditioned TDCJ facility infringes on the rule that plaintiffs generally must "assert only his own legal rights and interests," not those of third-parties. *Vote.Org*, 39 F.4th at 303.

CTD is a membership organization that has no incarcerated members. CTD describes itself as a conventional membership organization, albeit ambivalently. Ex. 6 at 44:5-45:1. In other recent lawsuits, CTD has more clearly identified itself as "a membership organization" with "individual members." *See e.g.*, Decl. of Dennis Borel, Dkt. 70-2 at 1-2, *Steward v. Abbott*, 189 F. Supp. 3d 620, 631-32 (W.D. Tex. 2016); *Steward*, 189 F. Supp. 3d at 631-32 (finding CTD "met the injury-in-fact requirement for associational standing" based on member injury). To invoke associational standing an organization needs to show it has members that face a cognizable injury. *City of Kyle*, 626 F.3d at 237. Because CTD does not have incarcerated members, it cannot establish standing to challenge conditions in TDCJ prisons.

C.     **No Plaintiff can establish associational standing by showing indicia of membership.**

None of the Plaintiffs are de facto membership associations that can assert standing based on their representation of TDCJ inmates.

A contrast with the Washington State Apple Advertising Commission in *Hunt* is instructive. There, fruit producers and sellers were required by law to affiliate with the Commission, and as a result, the Commission included every industry-relevant business. The sole difference between the Commission and a normal trade association was that participation in the Commission was compelled. *Hunt*, 432 U.S. at 345. Thus, the Commission's industry constituents did not 'sign up' to join the Commission—a hallmark of a "*voluntary* membership association." *SFFA*, 600 U.S. at 200 (emphasis added). On all other fronts, however, the Commission functioned as a member-controlled trade association, leading the *Hunt* Court to conclude that "it would exalt form over substance to differentiate between the Washington Commission and a traditional trade association." *Hunt*, 432 U.S. at 345.

The Plaintiff organizations, here, could hardly be more different. Whereas the *Hunt* commission included every producer and seller as a compelled member, Plaintiffs' contacts with the population they claim to represent amount to a meagre fraction. Just counting correspondence, CURE lingers in the low hundreds—the only firm number that CURE produced is 222, Ex. 7 at 74:16-75:3—while TPCA sits at 1569—much of it one-way. Ex. 8 at 53:5-9. CTD's correspondence with inmates comes out to a round zero. Ex. 6 at 29:18-23. Other figures do not buttress this record. Mr. Malouff estimated that CURE serves between 50 and 100 inmates at a time through its programs and has served 700 over the last couple of years. Ex. 7, 35:8-25. None of the Associational Plaintiffs appear to have contacts with inmates in all of TDCJ's 103 units. TDCJ cares for more than 135,000 inmates. An organization does not serve as "the means by which [constituents] express their collective views and protect their collective interests" just for having 1% of its target population on an email listserv. *Hunt*, 432 U.S. at 344.

The quality of inmate participation in the Plaintiff organizations is as paltry as the quantity. Neither CURE nor TPCA exhibit indicia of membership. Inmates do not participate in CURE's decision-making, funding or leadership. While Mr. Malouff testified that CURE is dedicated to serving TDCJ inmates, he clarified that CURE's un-incarcerated leadership decides the organization's activities, including litigation conduct. Dr. Dominick's testimony tells the same story for TPCA. Inmates do not fund TPCA, occupy leadership positions, vote for those who do, or otherwise steer TPCA's activities. Ex. 8 at 106:24-107:2; 54:24-55:10; 107:23-108:2. When asked to describe how inmates guide TPCA's activities, Dr. Dominick merely said TPCA "gathers [their] experiences." *Id.* at 108:10-109:1. TPCA and CURE listen to inmate concerns but act on them at the discretion of their free-world leadership. In short, inmates do not drive either organization's operations or decision making.

Nor could Lioness or CTD attempt to salvage their standing by offering an 'indicia of membership' theory. To begin, "[t]he indicia of membership analysis employed in *Hunt* has no applicability" in cases where the plaintiff is "a voluntary membership organization with identifiable

13

members." *SFFA*, 600 U.S. at 201. Lioness clearly describes itself as an association with voluntary members, Ex. 2 at 26:20-27:2, as does CTD, though less clearly. Ex. 6 at 44:5-45:1.

Moreover, CTD does not exhibit any indicia of membership because it has no contacts with TDCJ's prison population. Mr. Bearden testified that CTD's board of directors chooses its executive leadership, *id.* at 40:11-24, and that the board in turn fills its own vacancies by internal vote. *Id.* at 38:6-39:5. None of CTD's leadership are inmates, *id.* at 40:25-41:5, and therefore inmates do not participate in CTD's decision-making. *Id.* at 39:16-25. Mr. Bearden further testified that CTD has never consulted with TDCJ inmates regarding this litigation. *Id.* at 40:1-10. Inmates do not appear to financially contribute to CTD. *See id.* at 42:23-43:7. Mr. Bearden is not aware that any TDCJ inmate has ever attended a CTD event—including virtual attendance. *Id.* at 26:13-28:11. It is simply untenable to argue that CTD has standing when its own testimony shows that it has no connection to the inmate population.

Accordingly, none of the Associational Plaintiffs has standing. CTD is a voluntary membership association that lacks a single member with a case-relevant injury. CURE and TPCA adopt a paternal regard for TDCJ's prison population but fail the 'indicia of membership' test. Lioness has incarcerated members but still lacks standing because its system-wide claim surpasses its limited membership, all of whom are confined in only 8 unairconditioned units. Further, Lioness has also failed to demonstrate that any one of its members has suffered an Eighth Amendment injury due to excessive heat.

### D. Because the PLRA restricts relief to plaintiffs with federal rights, plaintiffs lack standing to sue in a representative capacity.

The PLRA provides an additional reason to reject the Associational Plaintiffs' standing. The Act provides that "[p]rospective relief in any civil action with respect to prison conditions shall extend no further than necessary to correct the violation of the Federal right of a particular plaintiff or plaintiffs." 18 U.S.C. § 3626(a)(1)(A). "[P]articular plaintiff or plaintiffs" refers to the named plaintiffs before the court. *See Ball v. LeBlanc*, 792 F.3d 584, 599 (5th Cir. 2015) (stating that "[t]he PLRA limits relief to the particular plaintiffs before the court.") (citing 18 U.S.C. §

14

3626(a)(1)(A)). Allowable prospective relief in conditions of confinement cases is thus limited to named plaintiffs whose "Federal right[s]" have been infringed. However, associations generally do not have Eighth Amendment rights and, when they sue vicariously, are *ipso facto* seeking to remedy the rights of their members. *Warth*, 422 U.S. at 511. Thus, when associations request prospective relief on behalf of their members "the Federal right of a particular plaintiff" is not at bar. Having no federal rights of their own, associational plaintiffs are precluded under § 3626 from obtaining prospective relief in conditions of confinement cases.

This restraint on prospective relief means that Associational Plaintiffs' alleged injuries are not redressable. *See Uzuegbunam v. Preczewski*, 592 U.S. 279, 291 (2021) (explaining that redressability, an "irreducible component of standing," requires the availability of an effective judicial remedy). Under § 3626, prospective relief can only be granted in cases brought by plaintiffs whose own federal rights have been infringed. Redressability is lacking where "federal courts do not have authority to redress [plaintiffs'] injuries." *United States v. Texas*, 599 U.S. 670, 704 (2023) (Gorsuch, J., concurring). The PLRA limits prospective relief to plaintiffs who pursue their own federal rights and therefore precludes associational plaintiffs from bringing claims for prospective relief in conditions of confinement challenges.

**E.    Alternatively, the litigation requires the participation of the Associational Plaintiffs' individual members.**

If the Court disagrees with the foregoing and concludes that plaintiff organizations represent inmates, it should still dismiss Associational Plaintiffs for lack of standing because their claims require the participation of their individual members.

"To satisfy the [prudential] prong, a party must show that 'the nature of the case does not require the participation of the individual affected members as plaintiffs to resolve the claims or prayers for relief at issue.'" *Prison Justice League v. Bailey*, 697 F. App'x 362, 363 (5th Cir. 2017) (*Friends for Am. Free Enter. Ass'n v. Walmart Stores*, 284 F.3d 575, 577-78 (5th Cir. 2002)). "[T]he participation of [] individual members will [] thwart associational standing" when an association's

claims require "a fact-intensive-individual inquiry." *Ass'n of Am. Physicians & Surgeons, Inc. v. Tex. Med. Bd.*, 627 F.3d 547, 552 (5th Cir. 2010).

The Court previously ruled that "[w]hile TDCJ prisoners have varying sensitivity to extreme heat, there is sufficient commonality between their experiences" and concluded that "the Organizational Plaintiffs' members are not required to participate in this lawsuit individually." Dkt. 95 at 9-10; *but see Ball*, 792 F.3d at 594 n.6 ("emphasiz[ing] . . . that the finding of substantial risk regarding a heat-related injury is tied to the *individual health conditions of these inmates*"). But Defendant respectfully points out that inmate susceptibility to heat is only half the equation. TDCJ units differ in ways that impact the Eighth Amendment analysis. While TDCJ endeavors to provide adequate heat mitigation everywhere, the implementation of TDCJ's heat policies are primarily handled by prison officials at each unit. This means that heat mitigation efforts vary due to differences among units in the amount and type of mitigation resources, staffing levels, security concerns, and unit design.

Because of this variation, inmates experience (at least) 67 different levels of heat-related risk and accordingly do not share the "commonality" required for them to sit out this litigation. An inmate faces unacceptable heat conditions only if "after accounting for the protective measures TDCJ has taken," he is subject to a "substantial risk of serious harm" that amounts to "cruel and unusual punishment." *Valentine v. Collier*, 956 F.3d 797, 801 (5th Cir. 2020). Accordingly, Eighth Amendment injuries cannot be "shared by all in equal degree," *Warth*, 422 U.S. at 515-16, because inmates at certain facilities may enjoy more effective heat mitigation than other inmates. *Id.* (rejecting associational standing for claims where injury and relief alleged were "not common to the entire membership"). The participation of inmates confined in every facility is therefore required to resolve Plaintiffs' claims.

Plaintiffs only way to stave off this conclusion would be to provide evidence of the conditions at every unairconditioned unit. Plaintiffs did not show anything close to this at the preliminary injunction hearing. Instead, they attempted to show that TDCJ's mitigation efforts were ineffective primarily based on "testimony from current and former TDCJ inmates" held at

16

only a handful of facilities. ECF 187 at 46, 47-48, 50-52. That scattered evidence leaves the effectiveness of heat mitigation at the vast majority of TDCJ's 67 unairconditioned units totally unaddressed. Consequently, if Plaintiffs had members at each unit, their participation would be necessary to resolve the system-wide claims at issue.

Separately, the prudential prong does not focus exclusively on the plaintiff's claims; the defendant's need for member-specific evidence to prove an affirmative defense also requires member participation. *See Friends for Am. Free Enter.*, 284 F.3d at 577 (finding that member participation was required in part because defendant's ability "to assert the affirmative defense of justification" turned on contracts involving specific members).

Consequently, the claims asserted require the participation of individual members in the lawsuit for Defendant to be able to raise the defense of exhaustion under § 1997e of the PLRA. As the First Circuit has held, an exhaustion requirement precludes meeting the third, prudential prong of associational standing. *Parent/Prof'l Advocacy League v. City of Springfield*, 934 F.3d 13, 34 (1st Cir. 2019) ("[I]t would not make sense to allow the organizations here to escape the exhaustion requirement for the [individuals] they are purportedly representing."). As Defendant argues below, the PLRA's exhaustion requirement bars suit by associations whose inmate members have not exhausted, *see infra* at 23-25, but the exhaustion requirement also prevents associations from invoking associational standing to litigate the claims of inmates *tout court* because an exhaustion defense "require[s] individualized proof" regarding each member.[4]

## II.   Mr. Tiede's claim is moot because Defendant has already provided him all relief sought.

In April 2025 the algorithm that determines an inmate's heat score was updated so that every inmate over the age of 65 is now assigned a heat score. Ex. 24. This change moots Mr. Tiede's

---

[4] The significant pains that Defendant and Defendant's counsel have already taken to investigate the number of Lioness members who have exhausted their remedies underscores this point. The only saving grace has been the fact that the inmates Lioness claims as members have largely ignored prison grievance remedies.

claim for relief. Due to the update, Mr. Tiede now has a heat score, for life, based on his age. Ex. 10 at 103:12-104:15. A non-zero heat score guarantees an inmate will be assigned to air-conditioned housing unless he opts out. Thus, Mr. Tiede will be housed in air conditioning for the remainder of his sentence unless he chooses to opt out.

Further, TDCJ cannot alter an inmate's heat score, nor can TDCJ unilaterally remove the 65+ criterion, since all changes to the heat score algorithm require approval by the University of Texas Medical Branch. Ex. 11, Day 3, at 91:10-92:23 (Leonardson). Therefore, Mr. Tiede has already obtained the relief he is seeking and there is no substantial likelihood that Defendant will re-assign him to unairconditioned housing. Therefore, his claims are moot.

A federal court may not hear a case unless a live controversy exists at all stages of review. *See DeFunis v. Odegaard*, 416 U.S. 312, 316 (1974). "A case becomes moot—and therefore no longer a 'Case' or 'Controversy' for purposes of Article III—when the issues presented are no longer live or the parties lack a legally cognizable interest in the outcome." *Already, L.L.C. v. Nike, Inc.*, 568 U.S. 85, 91 (2013) (quoting *Murphy v. Hunt*, 455 U.S. 478, 481 (1982) (per curiam)). And receiving the relief requested moots a plaintiff's claim for injunctive relief because nothing else remains for a court to remedy. *Taylor v. Collier*, No. 22-20398, 2023 WL 8184869, at *3 (5th Cir. Nov. 27, 2023) (per curiam).

Transfer of an inmate out of the conditions at issue typically moots the inmate's claims for injunctive relief. *See, e.g.*, *Blackmon v. Kukua*, 758 F. Supp. 2d 398, 405 (S.D. Tex. 2010); *Cooper v. Sheriff*, Lubbock County, Tex., 929 F.2d 1078, 1084 (5th Cir. 1991) (transfer to another prison rendered moot prisoner's claims for injunctive relief ); *Hernandez v. Garrison*, 916 F.2d 291, 293 (5th Cir. 1990) (transfer to another correctional facility rendered moot inmate's eighth amendment claims, including overcrowding and denial of medical treatment). In *Blackmon*, the court concluded that an inmate's transfer to another facility rendered the inmate's case moot because the inmate failed to give any indication that his transfer would be revoked or that he would once again be exposed to excessive heat. 758 F. Supp. 2d at 405. The district court reached this conclusion despite the inmate's transfer being "entirely within the discretion of TDCJ officials." *Id*. Here, TDCJ has

18

no discretion to disregard Mr. Tiede's heat score which entitles him to airconditioned housing per policy.

Mr. Tiede enjoys relief that fully resolves the injuries he has alleged, placement in airconditioned housing. ECF 240 at 53-56. And Mr. Tiede's positive heat score makes this a permanent change. As Mr. Lumpkin unequivocally stated in his deposition, Mr. Tiede is guaranteed airconditioned housing for the remainder of his sentence. Ex. 10 at 104:1-24.

Because Mr. Tiede's cool bed assignment follows from a formal change to the heat score algorithm, his injuries cannot reasonably be expected to recur. TDCJ does not unilaterally determine what criteria in the algorithm triggers a non-zero heat score, so Defendant cannot reset Mr. Tiede's heat score to make him assignable to unairconditioned housing. Further, as a "formally announced change[] to official government policy," the updates to the heat score algorithm must be presumed sincere. *Sossamon v. Lone Star State of Texas*, 560 F.3d 316, 325 (5th Cir. 2009). In fact, *Sossamon* is highly apposite. In that case, the Fifth Circuit held that TDCJ had mooted claims challenging inmate worship restrictions by modifying its applicable statewide policies. *Id.* at 325-26. Similarly, here, the relevant statewide policy has been modified in such a way as to guarantee Mr. Tiede air conditioning. The changes to the heat score criteria concern more inmates than Mr. Tiede and have generated new heat scores for thousands of inmates throughout the TDCJ system. Ex. 10 at 104:1-6, 278:10-14 ("seven thousand, roughly"). Plaintiffs cannot seriously insist that they were made strategically just to end Mr. Tiede's participation in this suit.

Accordingly, Mr. Tiede faces no risk of being moved to unairconditioned housing at the whims of TDCJ officials. Because there is no longer a live controversy between the parties, Tiede's claims are moot and should be dismissed for want of subject matter jurisdiction.

## III.   Plaintiffs have failed to exhaust administrative remedies as required by the PLRA.

The PLRA requires inmates to exhaust "such administrative remedies as are available" prior to filing suit in federal court to challenge prison conditions. 42 U.S.C. § 1997e(a). Section 1997e(a) provides that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by an inmate confined in any jail, prison, or other

correctional facility until such administrative remedies as are available are exhausted." *Id.* Compliance with § 1997e's exhaustion requirement "is mandatory, and courts have zero discretion to hear unexhausted claims." *Valentine*, 978 F.3d at 160 (citing *Jones v. Bock*, 549 U.S. 199, 211 (2007)); *Porter v. Nussle*, 534 U.S. 516, 525 (2002) (calling § 1997e(a) a "mandatory" "prerequisite to suit."). The Supreme Court has "reject[ed] every attempt to deviate" from the PLRA's rigid exhaustion requirement by emphasizing that it has no "special circumstances" exception. *Ross v. Blake*, 578 U.S. 632, 635, 639-40 (2016); *see also Jones*, 549 U.S. at 211 (2007) (stating that "[t]here is no question that exhaustion is mandatory under the PLRA and that unexhausted claims cannot be brought in court").

To satisfy the exhaustion requirement, inmates must properly exhaust their available remedies in conformance with the procedures adopted by the particular institution. *Woodford v. Ngo*, 548 U.S. 81, 93-95 (2006); *Bargher v. White*, 928 F.3d 439, 447 (5th Cir. 2019). TDCJ fields inmate complaints using a two-step process that allows inmates to file an initial grievance (step one) within 15 days of the incident at issue and an appeal (step two) within 15 days if TDCJ's response does not satisfy the aggrieved inmate. Ex. 12 at 73-74. TDCJ makes grievance forms available throughout its prison system. *Id.* at 73. Step one forms direct inmates to write a description of their grievance, and TDCJ classifies grievances by subject matter and compiles the number of grievances related to heat. Ex. 25 at 92. The Fifth Circuit has repeatedly affirmed the adequacy of TDCJ's two-step process. *See e.g.*, *Wright v. Hollingsworth*, 260 F.3d 357, 358 (5th Cir. 2001); *Johnson v. Johnson*, 385 F.3d 503, 515 (5th Cir. 2004).

An inmate's failure to exhaust gives rise to an affirmative defense. *Perttu v. Richards*, 605 U.S. 460, 469 (2025) (citing *Jones*, 549 U.S. at 216). To succeed, a defendant must show (1) administrative remedies were available and (2) the inmate failed to exhaust the administrative remedies. *Cantwell v. Sterling*, 788 F.3d 507, 508-09 (5th Cir. 2015). Substantial compliance with this process is not enough to exhaust remedies under the PLRA. *See Dillon v. Rogers*, 596 F.3d 260, 268 (5th Cir. 2010) ("Under our strict approach, we have found that mere 'substantial compliance' with administrative remedy procedures does not satisfy exhaustion ...").

20

Remedies are "available" as long as they are "'capable of use' to obtain 'some relief for the action complained of.'" *Ross*, 578 U.S. at 642 (quoting *Booth*, 532 U.S. at 738). Because "pre-filing exhaustion" is "mandatory," the Fifth Circuit has emphasized that "[d]istrict courts have no discretion to excuse an inmate's failure to properly exhaust the prison grievance process before filing their complaint." *Gonzalez v. Seal*, 702 F.3d 785, 788 (5th Cir. 2012). Therefore, a case "must be dismissed if available administrative remedies were not exhausted." *Id.*

"The PLRA's exhaustion requirement is no-nonsense," *Valentine*, 978 F.3d at 160, and none of the Plaintiffs meet it. To Mr. Tiede § 1997e(a) applies straightforwardly. As "a prisoner confined in…[a] correctional facility" he cannot challenge the conditions of his confinement without first completing the two-step process. Mr. Tiede did not submit any grievances in the years prior to this suit. Consequently, the Court must dismiss him as a plaintiff.

The exhaustion requirement prevents suit by the Associational Plaintiffs as well. Lioness is the only organization with genuine inmate members, and only four of Lioness' incarcerated members—all confined at the Lane Murray unit—fully exhausted their administrative remedies by filing both Step 1 and Step 2 of the TDCJ Grievance process. Exs. 13, 5.[5] Associational Plaintiffs are thus litigating on behalf of tens of thousands of inmates who did not exhaust their administrative remedies prior to filing suit. Allowing Associational Plaintiffs to proceed would frustrate the purpose of the PLRA, which Congress enacted "to eliminate unwarranted federal-court interference with the administration of prisons" and "afford corrections officials…opportunity to address complaints internally." *Woodford*, 548 U.S. at 93.

### A.    Mr. Tiede failed to exhaust the grievance process.

A diligent search of TDCJ records confirmed that Mr. Tiede has not exhausted his administrative remedies. Ex. 14. In fact, Mr. Tiede has not filed any step one or step two grievances

---

[5] Exhibit 3 is Lioness's list of purported members. Exhibit 13 is a list of all step 2 grievances filed between May 2, 2022 and May 1, 2024 for heat-related issues. Exhibit 5 was created by defense counsel to compare Exhibit 3 to Exhibit 13.

as of the beginning of this litigation. *Id.* Thus, he could not possibly have exhausted his administrative remedies prior to filing suit in August 2023 or by the amended complaint filing date, May 7, 2024. ECF 1, 57. Grievance forms are available at all units across the state, including the Estelle and Coffield units where Mr. Tiede has been incarcerated. Ex. 12 at 73.

Even if Mr. Tiede was not subjectively aware of the proper grievance procedure, that would not excuse his failure to exhaust. Mr. Tiede was provided adequate information through the Offender Orientation Handbook on how to properly submit grievances, and he could have gone to the Law Library or a grievance investigator to help him through the process. *Id.* at 73-75; *see also Leggett v. Lafayette*, 608 F. App'x 187, 191 (5th Cir. 2015) (holding that a plaintiff's subjective unawareness of grievance procedures does not excuse a failure to exhaust when the plaintiff had "avenues for discovering the procedural rules governing his grievances") (internal citations omitted).

Because Mr. Tiede failed to properly exhaust his administrative remedies, his claims are barred under the PLRA and must be dismissed. Even if the Court decides that the PLRA's exhaustion requirement does not apply to Associational Plaintiffs, it must still dismiss Mr. Tiede for his conspicuous failure to exhaust his remedies.

**B.    Associational Plaintiffs' Members have largely failed to exhaust the grievance process.**

Exactly four Lioness members confined in unairconditioned housing completed TDCJ's grievance process. Defendant's counsel cross-referenced Lioness's membership rolls of incarcerated members with TDCJ grievance records and found exactly twelve Lioness members who had pursued a heat-related grievance through step two as of the date Lioness joined. Ex. 5 at 17. Out of these, one member has been discharged after completing her sentence and seven are already housed in air conditioning—the relief sought in this case. *Id.* at 12. Only four Lioness members currently in unairconditioned housing assignments pursued a heat-related grievance through step two. All four inmates are housed in a single prison, the Lane Murray unit. *Id.* Accordingly, Lioness's members have largely ignored or chosen not to utilize the administrative

remedies available to them. Because no other Plaintiff has incarcerated members, Lioness's members are the only inmates relevant to the exhaustion requirement.

### C. Associational Plaintiffs cannot sue on behalf of inmates who have failed to exhaust their administrative remedies.

Permitting Plaintiffs' suit to go forward frustrates Congress's purpose in enacting § 1997e. The "fundamental purpose" of the PLRA "was to extricate [federal courts] from managing state prisons." *Guajardo v. Tex. Dep't of Criminal Justice*, 363 F.3d 392, 394 (5th Cir. 2004). The exhaustion requirement also serves to "reduce the quantity and improve the quality of prisoner suits" by "filter[ing] out [] frivolous claims." *Porter*, 534 U.S. at 524-25 (citation omitted). To achieve both these ends—state control of prisons and filtering frivolous suits—Congress made exhaustion a mandatory bar to suit. *Johnson*, 322 F.3d at 866.

Conversely, setting aside the exhaustion requirement for associational plaintiffs undermines the PLRA's dual purpose. If § 1997e(a) does not prohibit associations of prisoners from litigating prison conditions, then any group of inmates can bypass their need to exhaust merely by associating. The requirements to form an association for standing purposes are not exacting. *See SFFA*, 600 U.S. at 201. So, on a narrow reading of § 1997e, two inmates avoid the PLRA's exhaustion requirement so long as they present themselves as an association united by a shared interest in improving prison conditions. If § 1997e truly has no application to associational plaintiffs, only the friendless prisoner need exhaust his remedies.

Such a result would utterly vitiate § 1997e's role of gatekeeping prison litigation. Associational plaintiffs can bring uncolorable lawsuits as easily as individuals—associational standing simply is the standing of individual members with the added requirement of a connection to the association's purpose. *OCA-Greater Houston*, 867 F.3d at 610. So, removing the PLRA's exhaustion bar for associational plaintiffs would reopen the floodgates to the torrent of inmate litigation that beset federal courts prior to the enactment of § 1997e. *See Valentine*, 993 F.3d at 293 (noting that "*more than twenty-five percent* of suits filed in federal district court were brought by

23

prisoners" in 1995, two years prior to the PLRA's enactment) (citation omitted) (emphasis added). The PLRA would cease to be an effective filter of low-quality lawsuits.

Similarly, allowing associations to dodge exhaustion diminishes the protection that Congress meant § 1997e to provide state prison officials. The absence of an exhaustion requirement for a broad category of conditions-of-confinement litigants would expose state prisons to as broad a range of lawsuits.

"Congress presumably does not enact useless laws." *Garland v. Cargill*, 602 U.S. 406, 427 (2024) (quotation omitted). A construction that would nullify a statute's purpose is not viable when another reading is plausible. *See King v. Burwell*, 576 U.S. 473, 498 (2015) (concluding that "Congress passed the Affordable Care Act to improve health insurance markets, not to destroy them. If at all possible, we must interpret the Act in a way that is consistent with the former, and avoids the latter."); *see also* Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts 63 (2012) (explaining the "presumption against ineffectiveness" holds that "[a] textually permissible interpretation that furthers rather than obstructs the document's purpose should be favored."). "[I]nterpretations of a statute which would produce absurd results are to be avoided if alternative interpretations consistent with the legislative purpose are available." *Griffin v. Oceanic Contractors, Inc.*, 458 U.S. 564, 575 (1982).

The text of § 1997e(a) is susceptible to two constructions. While a narrower reading restricts the exhaustion requirement to suits filed by individual inmates, the predicate language "action…brought…by a prisoner" can also be understood to include lawsuits where inmates are vicariously represented. The Court should adopt the more expansive construction because only it honors Congress's purpose in enacting the PLRA.

The statutory meaning hangs on "action…brought…by a prisoner." In vicarious lawsuits the real parties in interest are the members whose rights and injuries are being litigated, not the association itself. *OCA-Greater Houston*, 867 F.3d at 610. An associational plaintiff's claims belong to its members and in litigating those claims the association represents its members. *Am. Legal Found. v. F.C.C.*, 808 F.2d 84, 90-91 (D.C. Cir. 1987). That "theoretical identity," *id.* at 91, between

24

genuine associational plaintiffs and their members should inform the text of § 1997e(a). An Eighth Amendment "action brought by [Associational Plaintiff] is brought to vindicate the rights of its members, and those members, as prisoners...may not avoid the exhaustion requirement simply by forming an organization and then suing in the name of that organization." *Green Haven Prison Preparative Meeting of Religious Soc'y of Friends v. New York State Dep't of Corr. & Cmty. Supervision*, 16 F.4th 67, 82-83 (2d Cir. 2021) (dismissing associational plaintiff because its members failed to exhaust).

The other way of reading "action…brought…by a prisoner"—as referring exclusively to suits filed by individual inmate plaintiffs—"threatens to render the entire provision a nullity." *United States v. Atl. Research Corp.*, 551 U.S. 128, 137 (2007). If the exclusive reading is the plain meaning of the text, then § 1997e(a) is one of the "rare cases" where "the literal application of a statute will produce a result demonstrably at odds with the intentions of its drafters, and those intentions must be controlling." *Griffin*, 458 U.S. at 571. The Court must construe § 1997e(a) to encompass actions filed by associational plaintiffs that rely on the complaints of incarcerated members because that is the only textually responsible gloss that preserves the statute's purpose.

"A fair reading of legislation demands a fair understanding of the legislative plan." *King*, 576 U.S. at 498. The only sensible interpretation is that § 1997e(a) requires exhaustion for suits filed by associational plaintiffs that litigate the complaints of their incarcerated members.

## IV.    Plaintiffs are seeking improper relief.

Ordering TDCJ to install permanent air conditioning throughout its system would be improper for three reasons. *First*, system-wide air conditioning offers more relief "than necessary to correct the violation of the Federal right of a particular plaintiff" and falls short of "the least intrusive" remedy. 18 U.S.C. § 3626(a)(1). Accordingly, by mandating universal air conditioning this Court would exceed the limits that Congress has placed on relief for prison conditions. *Second*, TDCJ would find an installation order impossible to fulfill. As a state agency, TDCJ fully depends on the Texas Legislature for funding and does not have discretion over its allocated budget. TDCJ cannot undertake the significant expense of air conditioning installation without receiving money

from the Legislature earmarked for that purpose. Consequently, TDCJ's ability to follow an installation order turns on the willingness of a nonparty to grant adequate funds. *Third*, in a similar vein, the Court cannot order TDCJ to repurpose state funds in TDCJ's immediate control for installation. Such an order would direct TDCJ to violate state law, which requires state agencies to spend only for the purposes authorized by the Legislature's appropriations, and thereby infringe Texas's authority over its fiscal affairs.

### A.     System-wide air-conditioning is overbroad relief under the PLRA, 18 U.S.C. § 3626.

"Under the PLRA, federal courts may neither grant nor approve prospective relief 'unless the court finds that such relief is narrowly drawn, extends no further than necessary to correct the violation of the Federal right, and is the least intrusive means necessary to correct the violation of the Federal right.'" *United States v. Hinds Cnty. Bd. of Supervisors*, 128 F.4th 616, 625 (5th Cir. 2025) (quoting 18 U.S.C. § 3626(a)(1)). "[P]laintiffs are not entitled to the most effective available remedy." *Ball*, 792 F.3d at 589. Rather, "[i]n Eighth Amendment cases, plaintiffs can only obtain a remedy that reduces the risk of harm to a socially acceptable level. Some risk is permissible and perhaps unavoidable." *Id*.

The Fifth Circuit has observed that § 3626 limits both the type of remedies permitted in conditions of confinement suits, as well as their scope. *Id*. at 598-99. *Ball* reversed a lower court's order that required prison officials to air condition an entire unit both because "air conditioning [] is unnecessary to correct the Eighth Amendment violation" and because the district court "awarded relief facility-wide, instead of limiting such relief to" the individual plaintiffs. *Id*.

In rejecting air conditioning as permissible relief, *Ball* indicated the feasibility of alternative forms of heat relief. *Ball*'s reasoning built on the Fifth Circuit's earlier ruling in *Gates v. Cook* where the Court endorsed a suite of specific heat mitigation measures—"fans, ice water, and daily showers"—during the summer months or alternatively "when the heat index is 90 degrees or above." 376 F.3d 323, 339 (5th Cir. 2004) (affirming in part injunction directing prison officials to offer specified mitigation measures); *Ball*, 792 F.3d at 600 ("The *Gates* court did not mandate a

maximum heat index applicable in the Mississippi prison. It required particular heat measures, including fans, ice water, ice, and showers"). Since *Gates*, the Fifth Circuit has restricted relief in prison heat cases to these manageable heat mitigation strategies and consistently rejected air conditioning as a necessary corrective to high heat. *See Blackmon v. Garza*, 484 F. App'x 866, 872 (5th Cir. 2012) (cautioning that "we do not suggest that the remedial measures required by the *Gates* court are insufficient to address the risks of high heat and humidity"); *id.* at 872 n.6 ("We also note that, like the *Gates* court, we do not suggest that air conditioning is mandatory to meet the requirements of the Eighth Amendment.").

*Yates v. Collier* added a modest qualification to this otherwise unequivocal caselaw by ruling that "the PLRA [does not] categorically prohibit[] an injunction requiring that the [challenged] Unit be air-conditioned." 868 F.3d 354, 370. But *Yates* adheres to the Fifth Circuit's unwillingness to permit air conditioning as a remedy for prison heat when alternatives are feasible. Following *Ball*, *Yates* cautions that "air-conditioning [is] not appropriate" if "other acceptable and less-intrusive remedies ha[ve] yet to be tried." *Id.* at 370. *Yates* treats air conditioning as a last-resort that may not be awarded if other "acceptable remedies short of…air-conditioning…could possibly cure the Eighth Amendment violation." *Id.* (quoting *Ball*, 792 F.3d at 598-99) (quotation marks omitted).

System-wide installation violates both of § 3626's limitations to the type and scope of permissible remedies.

### 1. Plaintiffs ignore acceptable remedies that are less intrusive than air conditioning.

Just as in *Ball*, here "there are many acceptable remedies short of [system]-wide air conditioning." 792 F.3d at 598-99. TDCJ maintains that its current mitigation policies adequately address excessive heat. However, if the Court agrees with Plaintiffs that existing heat mitigation is not adequate, Plaintiffs must show that TDCJ could not sufficiently enhance its current mitigation efforts by 1) providing more of the mitigation resources it currently uses, 2) offering new mitigation measures short of air conditioning, or 3) offering air conditioning to the most heat-sensitive portion

27

of its prison population. The PLRA prohibits the Court from ordering system-wide installation while such less intrusive measures remain untried.

One salient possibility that Plaintiffs ignore is that partial rather than system-wide air conditioning can effectively reduce heat risk to an acceptable level. High heat does not affect all inmates alike, as Plaintiffs' experts readily agree. Ex. 16 at 4-5; Ex. 17 Biswas, at 3-4. Thus, rather than providing air conditioning to the entire prison population, TDCJ could offer air conditioning to inmates with diagnosed heat vulnerabilities while it continues to provide *Gates*-style heat mitigation to healthy inmates. Even *Cole v. Collier* stopped short of ordering air conditioning for "young and healthy inmates, given the mandate that any relief ordered be narrowly drawn [and] extend no further than necessary to correct the harm." *Cole v. Collier*, No. 4:14-CV-1698, 2017 WL 3049540, at *45 (S.D. Tex. July 19, 2017). Acknowledging the strictures of the PLRA, the district court limited that drastic relief to "the heat-sensitive subclass," ordering all other inmates receive "a fully functioning respite program." *Id.*

Indeed, TDCJ is already moving in this direction. The April 2025 updates to the heat score criteria rectify the potential shortcomings that the Court identified previously by generating scores for every inmate aged 65 and older. Ex. 10 at 105:24-106:6. As TDCJ progresses through its three-phase plan, its growing stock of cool beds will permit a larger share of inmates to be placed in airconditioned housing, which will improve the availability of TDCJ's other mitigation resources as transferring high-risk inmates to airconditioned housing will lower the demand for respite. In combination, partial air conditioning and *Gates*-style remedies are mutually reinforcing.

Moreover, Defendant respectfully points out that the Court's preliminary injunction ruling implies the possibility of less burdensome alternatives to system-wide air conditioning. The Court determined TDCJ's mitigation measures were inadequate because they were inconsistently provided. ECF 202 at 46-56. Based on the record then available, the Court expressed "substantial doubt…whether TDCJ is complying with its own heat-mitigation policy," *id.* at 53, concluding that "TDCJ is…inadequately providing heat mitigation measures." *Id.* at 56. Similarly, the Court credited evidence that access to respite areas, cool-off showers and cold water is sporadic. *See id.* at

28

46-49, 51-52, 52-53. The Court also found TDCJ's "heat score system [to be] arbitrary, inadequate, and ineffective" because, at the time, it did not assign heat scores to certain inmates whose medical profile made them likely to be vulnerable to heat. *Id.* at 44, 46 (recapitulating the range of inmates who might not receive a heat score based on Dr. Leonardson's testimony).

However, to the extent the Court determined that TDCJ's mitigation measures failed because they were undersupplied or underinclusive, expanded provision of the same measures is a plausible alternative to the immediate system wide installation of air conditioning. At the very least, the Court cannot infer that TDCJ's heat mitigation tools were ineffective at preventing heat-related illness based on heat incidents that occurred before these measures were consistently provided.

To be sure, in its preliminary injunction opinion, the Court gave weight to Dr. Vassallo's testimony that inmates sometimes underestimate their need for heat relief. ECF 202 at 49-50. However, that testimony suggests steps to make heat mitigation more proactive as much as more drastic interventions like air conditioning. TDCJ already educates inmates about heat-related risks using live and video instruction. *See* Ex. 15 at § VIII. This training warns inmates that heat symptoms can develop suddenly and advises them to take precautions. *Id.* If the Court finds that inmate training does not suffice, it must still consider less intrusive ways to counteract inadvertent heat illness.

## 2. Air conditioning provides more relief than is strictly necessary to reduce heat-related risks to an acceptable level.

*Ball* did not solely rely on the availability of alternatives but also rejected air conditioning for providing greater respite than was necessary to "reduce[] the risk of harm to a socially acceptable level." 792 F.3d at 599. "Some risk is permissible," *id.*, so less-intrusive heat mitigation strategies do not violate the Eighth Amendment by leaving inmates subject to some degree of heat-related risk. Consequently, permissible relief lowers heat risks only to a socially acceptable level, which nonetheless entails a residual probability of heat injury.

Plaintiffs are seeking maximal relief, despite the PLRA curtailing remedies to the necessary minimum. There is scarcely any remedy more totalistic than an affirmative injunction that orders

29

permanent air conditioning for every inmate. Plaintiffs argue that air conditioning fully removes the health risks posed by summer heat. Ex. 11, Day 2, at 103:22-105:5 (Vassallo). Thus, on Plaintiffs' own argument, the Court could not award more efficacious relief than that Plaintiffs have requested.

Acceptable risk is not zero risk. While the Eighth Amendment "guarantees inmates a right to be free from exposure to extremely dangerous temperatures *without* adequate remedial measures," *Yates*, 868 F.3d at 360 (emphasis added), it does not provide a right to be free from excessive heat completely. Plaintiffs' insistence that acceptable conditions completely prevent heat-related injuries changes the Eighth Amendment standard from "an unreasonable risk of serious damage to...[inmate] health," *Ball*, 792 F.3d at 592, to *any* risk of serious damage. Because "[s]ome risk is permissible," an inmate can be exposed to high heat and the concomitant risks without that constituting an Eighth Amendment violation. *Id.* at 599.

Because the Eighth Amendment tolerates acceptable levels of heat-related risk, relief that eliminates the risks posed by prison heat is not "necessary to correct the violation." *Id.*

### B.    An order requiring Defendant to install air conditioning would be impossible for Defendant to follow.

TDCJ's discretion to spend its budget is tightly constrained as state law makes the Legislature master of the purse. The Texas Constitution requires that "[n]o money shall be drawn from the Treasury but in pursuance of specific appropriation made by law; nor shall any appropriation of money be made for a longer term than two years." Tex. Const. art. VIII, § 6. TDCJ therefore must allocate appropriations to the purposes the Legislature budgets them for. *See Hendee v. Dewhurst*, 228 S.W.3d 354, 359-60 (Tex. App. 2007) (declaring "[a]n 'appropriation' refers to a legislative enactment authorizing state funds to be expended for particular purposes."). TDCJ lacks authority to borrow, tax, or otherwise raise funds on its own.

The Legislature only recently began appropriating limited funds to TDCJ for installing air conditioning. Although TDCJ began requesting funds for the installation of air-conditioning as far back as 2017, the agency did not receive such funding until fiscal years 2024-2025, when the 88th

Legislature allocated $85 million earmarked for the installation of air conditioning. Ex. 18 at 80:6-14. In 2025, the 89th Legislature granted a further $118 million to fund installation for fiscal years 2026-2027. Ex. 10 at 44:12-14; 52:2-4. Plaintiffs do not dispute that the total cost of air conditioning the TDCJ system exceeds these currently appropriated amounts. Outside of newly appropriated funds from the Legislature, TDCJ has no means to finance further installation projects. And an order mandating system-wide installation does not equate to more funding.

The Court's order will not bind the Texas Legislature. First, "remedies ordinarily operate with respect to specific parties," *California v. Texas*, 593 U.S. 659, 672 (2021) (citation omitted), and the Legislature is a nonparty. *See also Ganpat v. E. Pac. Shipping PTE, Ltd.*, 66 F.4th 578, 585 (5th Cir. 2023) (stating that the only nonparties who may be bound by injunctions are "'persons who are in active concert or participation'" with parties") (quoting Fed. R. Civ. P. 65(d)(2)(C)); *Whole Woman's Health v. Jackson*, 595 U.S. 30, 44 (2021). Consequently, an order entered in this case will not obligate the Legislature. Just as importantly, legislative and sovereign immunity protects state legislators from judicial process, *Sup. Ct. of Va. v. Consumers Union of U. S., Inc.*, 446 U.S. 719, 731-34 (1980) (discussing legislative immunity), and *Ex Parte Young*'s exception to Eleventh Amendment sovereign immunity does not apply to officials with purely legislative duties. *City of Austin v. Paxton*, 943 F.3d 993, 998 (5th Cir. 2019).

Nor can federal courts override state fiscal law by forcing state agencies to ignore legislatively imposed earmarks on their budgets. Courts cannot "dictate the state's authority over [prison facilities] by controlling the purse strings" of state correctional agencies. *Hinds Cnty. Bd. of Supervisors*, 128 F.4th at 628. *Hinds* affirmed that the prison conditions at issue violated the Eighth Amendment but reversed the district court's decision that gave an appointed receiver control over a county prison's budget and finances. *Id.* at 637-39. The *Hinds* Court went beyond need-narrowness-intrusiveness analysis and determined that disposing "power over [] budget and related financial matters" *per se* exceeds the scope of judicial authority as it would "assume responsibility that should be left for the [state] legislature." *Id.* at 638 (quoting *Valentine*, 993 F.3d at 294-95) (quotation marks omitted). Unconstitutional prison conditions do not justify court

orders that would alter a state legislature's appropriations decisions. *Id.*; *see also Walker v. U.S. Dep't of Hous. & Urban Dev.*, 912 F.2d 819, 829 (5th Cir. 1990) (rejecting judicial authority to order HUD to spend funds outside of congressional appropriations because "Congress's actions on appropriations are not subject to judicial invalidation").

"[A] district court must [] ensure that it is possible to comply with its orders." *Hewlett-Packard Co. v. Quanta Storage, Inc.*, 961 F.3d 731, 744 n.8 (5th Cir. 2020) (clarifying that this principle applies *before* contempt proceedings when a court enters its initial order) (citing M*aggio v. Zeitz*, 333 U.S. 56, 69 (1948)). A federal court cannot command the Legislature to apportion more money for improving prison conditions nor take control of the budget that the Legislature has allocated TDCJ. An injunction mandating system-wide installation would order TDCJ to spend money it does not have and cannot get. The Court cannot equitably enter such an impossible remedy. The Court should dismiss for failure to request proper relief.

## V.    Plaintiffs fail to meet the heavy burden of showing TDCJ's deliberate indifference.

"Deliberate indifference is itself a two-prong inquiry." *Ball*, 792 F.2d at 594. Deliberate indifference entails that "the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer*, 511 U.S. at 837. Plaintiffs must meet both showings to prove prison officials were deliberately indifferent.

"Deliberate indifference is an extremely high standard to meet." *Valentine*, 956 F.3d at 801 (quoting *Cadena v. El Paso Cty.*, 946 F.3d 717, 728 (5th Cir. 2020)). Negligence is not enough: "[d]eliberate indifference is a mental state more blameworthy than negligence, equating to subjective recklessness under criminal law." *Cullum v. Tex. Dep't of Criminal Justice*, 375 F. App'x 417, 419 (5th Cir. 2010) (citing *Farmer*, 511 U.S. at 834-36). "Deliberate indifference encompasses only the unnecessary and wanton infliction of pain repugnant to the conscience of mankind." *Stewart v. Murphy*, 174 F.3d 530, 534 (5th Cir. 1999) (internal quotation marks and citation omitted). Even inmate deaths do not by themselves prove deliberate indifference. *Valentine*, 978 F.3d at 163-64 (noting that at least one inmate died despite TDCJ's COVID-19 mitigation efforts). Thus, "a

32

negligent or even a grossly negligent response to a substantial risk of serious harm" does not show deliberate indifference. *Dyer v. Houston*, 964 F.3d 374, 381 (5th Cir. 2020) (collecting cases).

Moreover, prison officials are not deliberately indifferent when they "respond[] reasonably to the risk, even if the harm ultimately was not averted." *Farmer*, 511 U.S. at 844; *Gobert v. Caldwell*, 463 F.3d 339, 346 (5th Cir. 2006) (stating that "[a] prison official acts with deliberate indifference only if…he disregards that risk by failing to take reasonable measures to abate it."). An "imperfect" remedial response satisfies the Eighth Amendment. *Valentine*, 978 F.3d at 158, 162-65.

Far from turning a blind eye, TDCJ addresses the inevitable risks of excessive heat with robust heat mitigation measures. *See* Ex. 15. Defendant is not deliberately indifferent because TDCJ's leadership diligently monitors compliance with its heat mitigation policies across individual units. Ex. 19 at 7-10. TDCJ constantly improves on its mitigation strategies and has significantly upgraded its mitigation efforts in recent years. Finally, Defendant cannot be deliberately indifferent because TDCJ is executing its own plan to install permanent air conditioning throughout its prisons.

## A.    TDCJ undertakes significant efforts to ensure effective implementation of its heat mitigation strategies.

Administrative Directive 10.64 ("AD-10.64") sets out TDCJ's procedures for responding to extreme environmental temperatures, including heat mitigation. Ex. 15. AD-10.64 instructs wardens to regularly assesses the risk affecting their unit's particular geographic area using a comprehensive rubric that directs them to consider the current temperature, humidity, heat index in the area, and other reliable weather information. *See* Ex. 15, at § III.A. Wardens must take specific precautions based on the level of risk. *Id.* at Att. B.

In aid of its heat readiness, TDCJ has adopted a more accurate system to record temperatures at each unit. Unit staff now record temperature using "kestrels," digitized monitors. Ex. 18 at 40:3-7. Unit staff check indoor temperatures daily using the kestrels, and the records are kept indefinitely. *Id.* at 41:17-42:25.

Certain precautions remain in place during the summer months regardless of the level of risk on a given day. Before April 15th of every year, wardens and maintenance staff at each unit review and if necessary, perform repairs. Ex. 15 at § IV.A.. Inmates also have access to tangible aids to help them regulate their body temperature in case of excessive heat. Each inmate has a reusable plastic cup for water, and coolers with ice water are provided in all housing areas, recreation yards, and work areas. *Id.* at § III.B.4. TDCJ staff are trained to regularly encourage inmates to drink water throughout the day, even if they are not thirsty. *Id.* Other items such as cooling towels, cool shirts, bottled water, and the like are available to inmates at the commissary. *Id.* at § IV.I. TDCJ staff also designate certain areas within each unit as respite areas where inmates can access air conditioning. *Id.* at § IV.E.

TDCJ also provides heat safety training to inmates and staff. Inmates receive annual training as well as training during intake and upon transfer to a new unit. *Id.* at VIII. The training video is played frequently on dayroom and common area TVs and is always available on inmate tablets. *Id.* at § VIII.C.2.b(2). All staff receive heat safety training during their pre-service, on-the-job, and in-service training. *Id.* at § VIII.B. Additionally, heat awareness flyers are posted in common use areas to ensure inmates always have access to necessary safety information to prevent heat illness or injury. *Id.* at § VIII.A.2.c.

TDCJ's leadership oversees these mitigation efforts and works to ensure they are effectively implemented at each unit. TDCJ's Administrative Review and Risk Management Division sends out "heat strike teams" that perform unannounced assessments of units' mitigation measures. Ex 19 at 7-10; Ex. 15 at § V. Heat strike teams show up unannounced to perform a comprehensive assessment of the unit focusing on all key operational areas. Ex. 19 at 7-10. Mr. Echessa's affidavit outlines the items that audit teams check when they perform an onsite inspection. Ex. 19 at 10-11; *see also* Ex. 15 at § VA.

During a heat strike team visit, the strike team will speak with inmates and staff, and thoroughly examine every housing area, work assignment, and other location within the unit. Ex. 11, Day 3, at 263:8-18 (Morales). The team then submits a report to TDCJ senior leadership

34

summarizing the team's findings at each unit. *See id.*, Day 3, at 268:10-269:2 (Morales). During the 2025 summer season alone, the heat strike team conducted 191 assessments, including at least one at every TDCJ facility as well as follow-up assessments of facilities that did not initially pass. Ex. 19 at 12. During this same timeframe, the heat strike team conducted interviews of approximately 5,000 staff and 5,400 inmates. Ex. 19 at 12. Any non-perfect audit checklist resulted in a failing score. *Id.* Deficiencies were flagged for TDCJ executive leadership to ensure they were immediately remedied by unit staff. *Id.* Of the 103 units operational at the time, only 13 failed, and upon reinspection, audit personnel found those units had remedied the deficiencies in their mitigation measures. *Id.*

TDCJ relies on its medical partners to manage the heat score system, which identifies inmates who are especially vulnerable to excessive heat. A numeric heat score is automatically generated based on inmates' personal medical information. TDCJ's medical partners have identified certain medical conditions or certain medications that might make an inmate heat sensitive requiring air-conditioned housing. Ex. 15 at § VI. If an inmate has any non-zero positive score, then the inmate is housed in an air-conditioned bed. *Id.* § VI.B. The heat score algorithm was developed by medical professionals and is currently managed by a team under the direction of Dr. Jane Leonardson at UTMB-CMC. *See* Ex. 11, Day 3, at 91:10-92:23 (Leonardson). The heat score was updated this year to input an inmate's age above 65 years as a factor to trigger a score. *See* Ex. 15.

Inmates can refuse air-conditioned housing by signing an opt-out form in the presence of the warden and one witness. *Id.* at § VI.C. Any inmate opting out is required to complete a new opt-out form upon each increase in the inmate's heat score. *Id.* at § VI.E. Inmates assigned to specialized programs related to mental health or developmental disabilities may not refuse air-conditioned housing. *Id.* at § VI.F. And even if an inmate does not have a heat score, he may still qualify for appropriate restrictions for physical activities, transportation, and work. *Id.* at § IV.B.

Deliberate indifference is an incredibly high standard. It contemplates prison officials who refuse to take action to protect against a known risk. Defendant has done just the opposite. By

monitoring diligently supervising heat mitigation, Defendant has not acted with conscious disregard to the risk of excessive heat.

### B.    TDCJ continually refines its heat mitigation strategies.

Defendant's approach to heat mitigation is not stagnant. As Mr. Lumpkin testified, TDCJ's approach is "constant consultation with our medical experts, mental health experts[,] . . . the heat score and . . . mitigation practices that are within 10.64." Ex. 10 at 115:13-16. TDCJ's heat mitigation efforts have significantly improved in recent years. Ex. 19 at 3. TDCJ has implemented new tools and protocols to better protect both staff and inmates. *Id.*

These changes have been instrumental in reducing the number of heat-related illnesses and deaths across the system. *Id.* at 4. During Fiscal Year 2025 TDCJ recorded 13 instances of heat related injuries to inmates down from 25 in Fiscal Year 2024. *Id.* at 5. These improvements are not the result of chance. The are the product of deliberate, sustained efforts by leadership and staff at all levels of the agency. *Id.* Each year, TDCJ's strategies become more effective, more consistent, and more ingrained in its operations. *Id.*

Annual reviews are built into TDCJ's heat mitigation protocol. Each year, prior to the beginning of the summer season, representatives from all units and other TDCJ directors and management personnel meet to prepare for the onset of summer heat. Ex. 11, Day 3, at 16:17-17:15 (Lumpkin). The executive director emails an updated Seasonal Preparedness Directive, which advises unit wardens on how to ensure readiness for extreme temperatures. Ex. 15 at § IV.F. During the meeting, officials "review best practices concerning preventative care and precautions against excessive or extreme temperatures." *Id.*

TDCJ is constantly improving its approach to prison heat.

### C.    TDCJ's plan to install air conditioning means that Defendant cannot be deliberately indifferent even if current mitigation efforts are insufficient.

Mr. Lumpkin cannot be deliberately indifferent if for no other reason than because under his direction TDCJ is implementing the exact relief that Plaintiffs assert will remedy excessive heat. "[P]rison officials who act reasonably [to cure unconstitutional conditions] cannot be found liable

under the Cruel and Unusual Punishments Clause." *Farmer*, 511 U.S. at 844. The parties agree that permanent air conditioning will adequately mitigate risks to inmate health. Because TDCJ is expeditiously working to install permanent air conditioning throughout its prison network—the very relief Plaintiffs seek—Mr. Lumpkin cannot be liable under the Eighth Amendment.

TDCJ has operationalized its commitment to air conditioning in the three-phase plan that it submitted to the 89th Legislature. Ex. 1; Ex. 20 at 39:23-40:12. The plan sets the goal of fully air conditioning the TDCJ system by 2033, and to that end, envisions having all installation projects funded and in procurement by the 2030-31 biennium. Ex. 1. In 2025, the 89th Legislature approved a $118 million tranche that will fully fund the first phase and is expected to provide more than 18,000 new air-conditioned beds, which will bring the total number of air-conditioned beds to more than 80,000.[6] Mr. Lumpkin testified that "close to 40,000 beds [were] either in design, procurement, construction" and that under the three-phase plan, TDCJ will have completed system-wide installation within one or two years after 2031, provided TDCJ acquires the appropriate funding from the Legislature. Ex. 10 at 41:17-43:4, 205:2-9.

Ron Hudson, TDCJ's Chief Operations Officer, described the progress that TDCJ continues to make, testifying that "[s]ince 2024 or since the [preliminary injunction] hearing we currently have installed 4,000 beds already. We've got another 12,700 in construction. Have another 8,000 beds in procurement. And another 16,000 beds are in design. That's over 40,000 beds in two years that we are moving forward with. So, I think we are moving towards a goal of permanently air conditioning this whole -- this -- the whole agency. And we are expeditiously doing it as fast as we can right now." Ex. 20 at 115:2-9.

Plaintiffs do not dispute the sincerity of TDCJ's commitment to system-wide installation or that TDCJ is actively working to complete its three-phase plan. Ex. 10 at 103:4-8; Ex. 18 at 31:9-

---

[6] TDCJ updated the status of "TDCJ Air Condition Projects" on September 1, 2025. See TDCJ Air Conditioning Construction Projects, Texas Dep't of Crim. Just., https://www.tdcj.texas.gov/ac/index.html (last updated Oct. 30, 2025).

13. Nor do they appear to dispute TDCJ's $1.3 billion total cost estimate.

Instead, Plaintiffs' principal criticism of TDCJ's installation program appears to be its pace. Plaintiffs' expert witnesses argue that TDCJ's policy of awarding construction contracts through a "design-bid-build" process slows overall project timelines. *See generally* Ex. 21, Report of Michael Barry, Craig Steigerwalt, and Shannon Ramey (the "Exponent Experts"); Ex. 22, Report of Brian Carroll. On their view, TDCJ could accelerate installation if it were to shift to a more efficient procurement method. The Exponent Experts argue that a "design-build" procurement process is an optimal replacement for TDCJ's current "design-bid-build" process. Ex. 21 at 1, 4, 22-24, 38-44, 45-48, 57. The Exponent Experts also lodge a litany of other perceived defects against TDCJ's construction practices but emphasize that the "bottlenecks in TDCJ's implementation process…are broadly tied to the limitations and procedural complexities inherent within TDCJ's design-bid-build construction delivery method." *Id.* at 1.

In lieu of eight years, the Exponent Experts optimistically believe that the TDCJ system can be fully airconditioned "between 24 and 36 months from the date of funding allocation." Ex. 21 at 5. The Exponent Experts premise this opinion on an isolated piece of deposition testimony from Dale Cox, TDCJ's facilities director. *Id.* Mr. Cox testified that "in a perfect world" TDCJ could install air conditioning in all its units in 36 to 51 months. Ex. 23 at 128:3-10. The Exponent Experts take Mr. Cox's off-the-cuff estimate at face value and reason that if TDCJ can overhaul its system within 36 to 51 months using its current procurement practices, it could achieve even faster results by switching to a streamlined design-build procurement method. *See e.g.*, Ex. 21 at 5 ("Based on Mr. Cox's testimony that all units could be permanently air conditioned within a 36 to 51-month timeframe, it is feasible for TDCJ to achieve a significantly shorter timeline…by implementing strategic changes to its current approach."). Thus, instead of using their independent judgment to estimate a reasonable timeline for system-wide installation, the Exponent Experts rely on Mr. Cox's testimony as providing a default timeframe, which they then adjust by the amount of time they

38

estimate would be saved by swapping procurement methods.[7]

Since Mr. Cox's idealized timeline does not reflect a considered evaluation of the needs of system-wide installation, the Exponent Experts' piggy-back estimate does not provide a reliable timeline. Rather, the only comprehensive estimate of time remains the eight-year in TDCJ's three-phase plan. At most, the Exponent Report offers evidence that TDCJ could shrink this timeline by modifying the construction procurement process. The Exponent Experts calculate the time saved by changing procurement and adopting the other cost-saving measures they recommend would be 12-15 months. Ex. 21 at 57. Understood in the light most favorable to Plaintiffs, the upshot of the Exponent Experts' testimony is that major changes to TDCJ's construction delivery policies could shorten the timeline by approximately one year.

However, an Eighth Amendment defendant must only take "reasonable" corrective steps, not the most expeditious or most effective. *Valentine*, 978 F.3d at 163-64. "The Eighth Amendment does not mandate perfect implementation … [a]nd 'prison officials who act reasonably cannot be found liable under the Cruel and Unusual Punishment Clause.'" *Id.* at 165 (citing *Farmer*, 511 U.S. at 844). Indeed, even when measures are unsuccessful, it does not mean they are unconstitutional. *Id.* The deliberate indifference standard only examines whether prison officials "act reasonably" not whether they "could have done more." *Id.*

Therefore, Plaintiffs' experts' arguments that TDCJ's timeline is too slow are not only dubious they are also irrelevant. Their proposals offer ways to "optimize," Ex.21 at 58, 62; Ex. 22 at 9, "streamline," Ex. 21 at 14, 54, 58, 60, 62, 63; Ex. 22 at 9, "enhance," Ex. 21 at 10, 47, the installation process. But the Eighth Amendment does not hold prison officials to best practices. Plaintiffs' hang ups with TDCJ's installation efforts that revolve around the perceived inefficiency

---

[7] Plaintiffs' experts also do not consider the possibility that Mr. Cox's "perfect world" timeline assumes procurement flexibility as well as boundless funding and labor. The deposing attorney did not ask Mr. Cox if his 36-51 months estimate assumed a perfectly smooth procurement process. *See* Ex. 23 at 128:11-21.

of its favored procurement and construction methods do not enter into the deliberate indifference analysis.

The three-phase plan presupposes not only TDCJ's tried-and-true open bidding procurement but the need for adequate funding from the Legislature. Mr. Collier highlighted the need to request appropriations that TDCJ is confident it can fully obligate within one biennial budget cycle, *see* Ex. 18 at 185:7-186:5, and that TDCJ is confident it will receive from the Legislature in the first place. *Id*. at 184:14-17. The three-phase plan spreads the total $1.3 billion cost across three biennia corresponding to three formal funding requests for $118.2 million, $620.4 million, $584.6 million. Ex. 1 at 1. Plaintiffs suggest that TDCJ should request the entire funding amount at once, but these installments are amounts that TDCJ believes the Legislature will treat as serious proposals. Further, Defendant notes in passing that TDCJ cannot submit new appropriations requests until the 90th Legislature convenes in 2027. TDCJ anticipates receiving the next $620 million tranche at that time which will fund the majority of the remaining installation work.

TDCJ is making great strides towards system-wide air conditioning using a plan that reflects its deep institutional experience of building, operating and maintaining prisons. That three-phase plan contemplates a fully airconditioned system by 2033, and Mr. Lumpkin testified that installation could be completed in 2032. Ex. 10 at 205:2-9. This major undertaking demonstrates—if nothing else does—that Defendant has not acted with deliberate indifference towards the risks posed by excessive heat.

### CONCLUSION

For the foregoing reasons the Court should grant summary judgment for Defendant.

40

Date: November 21, 2025

**KEN PAXTON**
Attorney General of Texas

**BRENT WEBSTER**
First Assistant Attorney General

**RALPH MOLINA**
Deputy First Assistant Attorney General

**AUSTIN KINGHORN**
Deputy Attorney General for Civil Litigation

**RYAN G. KERCHER**
Chief, Special Litigation Division

**OFFICE OF THE ATTORNEY GENERAL OF TEXAS**
Special Litigation Division
P.O. Box 12548, Capitol Station
Austin, Texas 78711-2548
Telephone: (512) 936-1700
Fax: (512) 457-4410
Wade.Johnson@oag.texas.gov
Kyle.Tebo@oag.texas.gov
Abigail.Carter@oag.texas.gov
Brandon.Mickle@oag.texas.gov
Lauren.McGee@oag.texas.gov

Respectfully submitted.

*/s/ Wade A. Johnson*
**WADE A. JOHNSON**
Special Counsel
Texas State Bar No. 24062197

**KYLE S. TEBO**
Special Counsel
Texas State Bar No. 24137691

**ABIGAIL K. CARTER**
Assistant Attorney General
Texas State Bar No. 24126376

**BRANDON J. MICKLE**
Assistant Attorney General
Texas State Bar No. 24123140

**LAUREN MCGEE**
Assistant Attorney General
Texas State Bar No. 24128835

**COUNSEL FOR DEFENDANT**

## CERTIFICATE OF SERVICE

Pursuant to Federal Rule of Civil Procedure 5(a), I hereby certify that on November 21, 2025, a true and correct copy of the foregoing has been electronically served using the CM/ECF system to all counsel and parties of record.

*/s/ Wade A. Johnson*
**WADE A. JOHNSON**

41