**UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**AUSTIN DIVISION**

**FILED**

December 08, 2025

CLERK, U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS

BY: _Christian Rodriguez_

DEPUTY

| | | |
|---|---|---|
| BERNHARDT TIEDE, II; TEXAS PRISONS COMMUNITY ADVOCATES; LIONESS JUSTICE IMPACTED WOMEN'S ALLIANCE; TEXAS CITIZENS UNITED FOR REHABILITATION OF ERRANTS, INC.; AND COALITION FOR TEXANS WITH DISABILITIES, INC., | § § § § § § § § | |
| Plaintiffs, | § § | Civil Action No.: 1:23-cv-01004-RP |
| v. | § § | |
| BOBBY LUMPKIN, | § § | |
| Defendant. | § § § § § | |

**PLAINTIFFS' REDACTED RESPONSE TO**
**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (ECF 251)**

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................................ iv

INTRODUCTION ............................................................................................................... 1

STATEMENT OF ADDITIONAL MATERIAL FACTS ............................................................. 3

I.   THE ORGANIZATIONAL PLAINTIFFS STILL HAVE STANDING TO SEEK
     RELIEF ON BEHALF OF THEIR MEMBERS AND CONSTITUENTS. ...................... 3

     A.   Lioness: Justice Impacted Women's Alliance ("Lioness") ..................................... 3

     B.   Texas Citizens United for Rehabilitation of Errants ("TX C.U.R.E.") .................. 5

     C.   Texas Prisons Community Advocates ("TCPA") ................................................... 8

     D.   Coalition of Texans with Disabilities ("CTD") ..................................................... 10

II.  EXTREME HEAT STILL POSES A SUBSTANTIAL RISK OF SERIOUS
     HARM TO TDCJ INMATES. ............................................................................. 11

III. TDCJ'S HEAT-MITIGATION MEASURES ARE STILL INADEQUATE. ................. 13

     A.   TDCJ Hasn't Meaningfully Changed its Heat-Mitigation Measures Since
          the Preliminary Injunction Hearing. ................................................................. 13

     B.   TDCJ Inmates Have Continued to Suffer from Heat-Related Illnesses. .............. 15

     C.   Inmates Have Continued to Suffer Heat-Related Deaths. .................................... 16

IV.  TDCJ CONTINUES TO TURN A BLIND EYE TO HEAT-RELATED
     INJURIES AND DEATHS AND VIOLATIONS OF ITS OWN MITIGATION
     POLICY. ........................................................................................................ 19

V.   DEFENDANT AGREES THAT AIR CONDITIONING IS THE ONLY
     SOLUTION, BUT TDCJ'S INSTALLATION OF AIR CONDITIONING
     REMAINS CONSTITUTIONALLY INADEQUATE. ................................................ 21

     A.   Defendant agrees that air conditioning is the only effective solution. ................... 21

     B.   TDCJ has not increased the rate at which air conditioning is installed. ............... 22

     C.   TDCJ has refused to take steps that would increase the rate at which air
          conditioning could be installed. ........................................................................ 23

     D.   TDCJ has not identified any reason why it cannot request funding in a
          single biennium to fully air condition the entire system. ..................................... 25

ARGUMENT ............................................................................................................... 26

I.    THE ORGANIZATIONAL PLAINTIFFS HAVE STANDING TO SEEK
RELIEF ON BEHALF OF THEIR MEMBERS AND CONSTITUENTS. .................... 26

    A.    Lioness Is a Voluntary Membership Organization that Seeks to Vindicate
the Rights of Genuine Members Who Have Been Injured by TDCJ. ................... 27

    B.    The Remaining Organizational Plaintiffs Have Sufficient Indicia of
Membership to Assert Claims on Behalf of Their Non-Member
Constituents. ...................................................................................................... 29

        1.    An organization can satisfy the indicia-of-membership standard
even where its constituents do not govern or fund the organization. ........ 29

        2.    There is sufficient evidence to support a finding that each of the
remaining Organizational Plaintiffs satisfies the indicia-of-
membership standard. ............................................................................... 32

    C.    Neither the Organizational Plaintiffs' Claims Nor the Injunctive Relief
They Seek Require the Participation of Individual Members. .............................. 34

II.    THE PLRA'S EXHAUSTION REQUIREMENT DOES NOT APPLY TO THE
ORGANIZATIONAL PLAINTIFFS. ................................................................................. 36

III.    A GENUINE DISPUTE OF MATERIAL FACT EXISTS OVER WHETHER
DEFENDANT IS VIOLATING PLAINTIFFS' EIGHTH AMENDMENT
RIGHTS. ......................................................................................................................... 38

    A.    Plaintiffs have proven the Eighth Amendment's objective standard. ................... 39

    B.    Plaintiffs have also shown that Defendant acted with deliberate
indifference. ....................................................................................................... 39

        1.    Like his predecessor, Defendant knows that inmates face a
substantial risk of serious harm, and the risk is obvious, well-
documented, long-standing, pervasive, and expressly noted by
TDCJ officials in the past. ........................................................................ 40

        2.    Defendant's response to the substantial risk of death and serious
harm from extreme heat is inadequate and unreasonable. ......................... 42

IV.    THE PLRA DOES NOT BAR THE ORGANIZATIONAL PLAINTIFFS'
       REQUESTED RELIEF.................................................................................................. 46

V.    MR. TIEDE'S EIGHTH AMENDMENT CLAIM IS NOT MOOT................................ 49

CONCLUSION............................................................................................................................. 50

## TABLE OF AUTHORITIES

**CASES**

*AARP v. U.S. Equal Emp.Opportunity Comm'n,*
  226 F. Supp. 3d 7 (D.D.C. 2016) ........................................................... 32

*Alabama Legislative Black Caucus v. Alabama,*
  575 U.S. 254 (2015) ............................................................................... 29

*Ass'n for Retarded Citizens of Dall. v. Dall. Cnty. Mental Health & Mental Retardation Ctr. Bd. of Trs.,*
  19 F.3d 241 (5th Cir. 1994) ................................................................... 34

*Ass'n of Am. Physicians & Surgeons, Inc. v. Tex. Med. Bd.,*
  627 F.3d 547 (5th Cir. 2010) ........................................................... 35, 36

*Ball v. LeBlanc,*
  792 F.3d 584 (5th Cir. 2015) ......................................................... passim

*Brown v. Plata,*
  563 U.S. 493 (2011) ..................................................................... 47, 48, 49

*Church of Scientology of Cal. v. Cazares,*
  638 F.2d 1272 (5th Cir. 1981) ............................................................... 36

*City of Mesquite v. Aladdin's Castle, Inc.,*
  455 U.S. 283 (1982) ............................................................................... 50

*Cole v. Collier,*
  No. 4:14-CV-1698, 2017 WL 3049540
  (S.D. Tex. July 19, 2017) ............................................................... passim

*Coones v. Cogburn,*
  No. 24-10777, 2025 WL 2092392
  (5th Cir. July 25, 2025) ................................................................ 40, 41, 42

*DaimlerChrysler Corp. v. Cuno,* 547 U.S. 332 (2006) ............................... 29

*Davis v. Fed. Election Comm'n,*
  554 U.S. 724 (2008) ............................................................................... 29

*Dillon v. Rogers,*
  596 F.3d 260 (5th Cir. 2010) ................................................................. 38

*Doe v. Stincer,*
  175 F.3d 879 (11th Cir. 1999) ............................................................... 31

*Farmer v. Brennan*,
  511 U.S. 825 (1994) ................................................................................ 39, 40

*Favela v. Collier*,
  91 F.4th 1210 (5th Cir. 2024) ............................................................... 15

*Flyers Rts. Educ. Fund, Inc. v. U.S. Dep't of Transp.*,
  957 F.3d 1359 (D.C. Cir. 2020) ................................................. 30, 31, 32, 33

*Friends of the Earth, Inc. v. Chevron Chem. Co.*,
  129 F.3d 826 (5th Cir. 1997) ..................................................... 30, 31, 32, 34

*Gates v. Cook*,
  376 F.3d 323 (5th Cir. 2004) ............................................................ 38, 39, 40

*Green Haven Prison Preparative Meeting of Religious Soc'y of Friends v. N.Y. State Dep't of Corr. & Cmty. Supervision*,
  16 F.4th 67 (2d Cir. 2021) .................................................................... 37, 38

*Hinojosa v. Livingston*,
  807 F.3d 657 (5th Cir. 2015) ...................................................................... 40

*Hosp. Council of W. Pa. v. City of Pittsburgh*,
  949 F.2d 83 (3d Cir. 1991) ........................................................................ 35

*Hunt v. Washington State Apple Advertising Comm'n*,
  432 U.S. 333 (1977) ................................................................... 30, 32, 35, 36

*In re Fin. Oversight & Mgmt. Bd. for P.R.*,
  110 F.4th 295 (1st Cir. 2024) ..................................................... 30, 32, 34

*Ind. Prot. & Advoc. Servs. Comm'n v. Ind. Fam. & Soc. Servs. Admin.*,
  630 F. Supp. 3d 1022 (S.D. Ind. 2022) ...................................................... 32

*Laube v. Haley*,
  234 F. Supp. 2d 1227 (M.D. Ala. 2002) .................................................... 43

*Lewis v. Casey*,
  518 U.S. 343 (1996) ................................................................................... 29

*McCollum v. Livingston*,
  No. 4:14-CV-3253, 2017 WL 608665
  (S.D. Tex. Feb. 3, 2017) .......................................................................... 42

*Or. Advoc. Ctr. v. Mink*,
  322 F.3d 1101 (9th Cir. 2003) ................................................... 30, 31, 32, 34

*Rivera-Rodriguez v. Pereira-Castillo*,
  No. 04-1389(HL), 2005 WL 290160
  (D.P.R. Jan. 31, 2005) .......................................................................................... 37

*Smith v. Sullivan*,
  553 F.2d 373 (5th Cir. 1977) ............................................................................... 39

*Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll. (Harvard Corp.)*,
  397 F. Supp. 3d 126 (D. Mass. 2019) .................................................................. 27

*Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*,
  980 F.3d 157 (1st Cir. 2020),
  *rev'd*, 600 U.S. 181 (2023) ...................................................................... 27, 28, 30

*Tex. Ent. Ass'n, Inc. v. Hegar*,
  10 F.4th 495 (5th Cir. 2021) ................................................................................ 36

*Tiede v. Collier*,
  No. 1:23-CV-1004-RP, 2025 WL 2469118
  (W.D. Tex. Mar. 26, 2025) ............................................................................ passim

*TransUnion LLC v. Ramirez*,
  594 U.S. 413 (2021) ............................................................................................. 29

*Trautmann v. Cogema Min., Inc.*,
  No. 5:04-cv-117, 2006 WL 2716156
  (S.D. Tex. Sept. 20, 2006) ................................................................................... 28

*Tretter v. Pa. Dep't of Corr.*,
  558 F. App'x 155 (3rd Cir. 2014) ........................................................................ 37

*Trivette v. Tenn. Dep't of Corr.*,
  739 F. Supp. 3d 663 (M.D. Tenn. 2024) .............................................................. 37

*Tucker v. Gaddis*,
  40 F.4th 289 (5th Cir. 2022) ................................................................................ 50

*Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*,
  429 U.S. 252 (1977) ............................................................................................. 31

*Warth v. Seldin*,
  422 U.S. 490 (1975) ......................................................................................... 35, 36

*Webb v. Livingston*,
  618 F. App'x 201 (5th Cir. 2015) ........................................................................ 42

*Wormley v. United States*,
  601 F. Supp. 2d 27 (D.D.C. 2009) ...................................................................... 37

*Yates v. Collier*,
  868 F.3d 354 (5th Cir. 2017) ................................................................... 39, 42, 48, 49

**STATUTES**

42 U.S.C. § 1997e ................................................................................................... 37

## INTRODUCTION

Defendant Bobby Lumpkin's motion largely recycles the same arguments that this Court has already rejected. He argues that Organizational Plaintiffs lack standing, but the Court has twice held the opposite. *See Tiede v. Collier*, No. 1:23-CV-1004-RP, 2025 WL 2469118 (W.D. Tex. Mar. 26, 2025); Order, Dkt. No. 95. Defendant contends that the Organizational Plaintiffs failed to exhaust under the Prison Litigation Reform Act, but the Court has rejected that argument too—when it ruled that the PLRA's exhaustion requirement does not apply. And Defendant insists that Plaintiffs have failed to offer any evidence to support their Eighth Amendment claims, ignoring the Court's ruling that TDCJ's decades-long reliance on heat-mitigation measures in the face of hundreds of heat-related inmate deaths is "plainly unconstitutional." *Tiede*, 2025 WL 2469118, at *41. On these points, Defendant offers nothing new, and certainly nothing to justify summary judgment in his favor.

Defendant's new arguments are equally unpersuasive. He suggests that the PLRA bars Plaintiffs' request for inmates to be kept at safe temperatures below 85° F, but he fails to identify any alternative, less-intrusive mitigation measures that would "eliminate[] the constitutional injury" inflicted by extreme heat. *Ball v. LeBlanc*, 792 F.3d 584, 599 (5th Cir. 2015) ("*Ball I*"). And he overlooks his own deposition testimony that "air conditioning is the *only* effective protection from the extreme heat," and "the way to solve this problem is with air conditioning."[1] These admissions should arguably lead to summary judgment in *Plaintiffs'* favor, but at a minimum, they create a genuine dispute of material fact to defeat summary judgment.

Nor is there any evidence to suggest that TDCJ has meaningfully increased the pace at

---

[1] SAMF § V.A., *infra*.

which it is installing air conditioning. In July 2024, TDCJ had only 45,689 cool beds available.[2] As of December 1, 2025, TDCJ has 50,270 cool beds available.[3] This means that only 4,581 new air conditioned beds were installed in the last seventeen months since the hearing—a rate of approximately 3,234 new air conditioned beds per year. This is only slightly more than TDCJ's 3,100 beds-per-year installation rate in 2023 and 2024—which the Court found constitutionally insufficient. *Tiede*, 2025 WL 2469118, at *28, *41. And a total of 5,516 additional inmates were added to TDCJ's incarcerated population over the same period—far surpassing the number of new airconditioned beds.[4]

Contrary to Defendant's argument that TDCJ has "formulated a dedicated plan to accomplish system-wide installation in three phases," (Mot. 2, Dkt. No. 251), the evidence demonstrates that plan is purely hypothetical. TDCJ *still* has not solicited bids for installing permanent air conditioning throughout the system, and Defendant *still* refuses to ask the Texas Legislature for the funds required to accomplish phases two or three of TDCJ's three-phase plan.[5] TDCJ's six-year 89th capital expenditure plan does not reflect the three-phase plan,[6] and according to Mr. Collier, the three-phase plan does not reflect any "commitment" by TDCJ to request those amounts from the Texas Legislature.[7]

At bottom, nothing in Defendant's motion calls the Court's prior rulings into question. The Organizational Plaintiffs still have standing, the PLRA's exhaustion requirement still doesn't apply to them, extreme heat still poses a substantial risk of serious harm to TDCJ

---

[2] *Id.* § V.B., *infra*.

[3] *Id.*

[4] *Id.* § V.B., *infra*.

[5] *Id.* § V.C., *infra*.

[6] *Id.*

[7] *Id.*

inmates in unairconditioned prisons, TDCJ's heat-mitigation measures are still inadequate, and the pace at which TDCJ is installing air conditioned beds is still constitutionally insufficient. As Defendant now concedes, permanent air conditioning is the only effective solution for this constitutional violation, so the only remaining question for the Court to decide is how quickly TDCJ must install it. Summary judgment should be denied.

## STATEMENT OF ADDITIONAL MATERIAL FACTS

### I.    THE ORGANIZATIONAL PLAINTIFFS STILL HAVE STANDING TO SEEK RELIEF ON BEHALF OF THEIR MEMBERS AND CONSTITUENTS.

#### A.    Lioness: Justice Impacted Women's Alliance ("Lioness")

Lioness is a Texas-based nonprofit corporation[8] that seeks to "end the incarceration and systemic devaluation of incarcerated women within the Texas criminal legal justice system."[9] Initially, Lioness was part of Build Up, Inc. a nonprofit organization formed under the laws of New Jersey.[10] On September 4, 2024, Lioness became its own entity independent of Build Up, Inc.[11] No changes were made to Lioness's membership.[12] Thus, in October 2025, this Court granted Plaintiffs leave to amend their complaint to substitute Lioness for Build Up, Inc.[13]

Lioness remains a traditional voluntary organization made up of "formerly incarcerated and currently incarcerated women, girls, [and] gender expansive individuals in Texas."[14] Lioness is governed by a board of directors made up entirely of formerly incarcerated women who are

---

[8] Lioness Certificate of Formation (Sept. 4, 2024), Dkt. No. 227-1.

[9] Ex. 1, Lioness Bylaws § 1.2 [LIONESS 000032]; *accord* Ex. 2, Toon Dep. 17:23–18:6.

[10] *See* First Am. Compl. ¶ 19, Dkt. No. 57.

[11] Dkt. No. 227-1.

[12] Ex. 2, Toon Dep. 33:2-6.

[13] *See* Second Am. Compl., Dkt. No. 240.

[14] *Tiede*, 2025 WL 2469118, at *3; *accord* Ex. 3, Bd. Resolution to Amend Bylaws at 1 [LIONESS 000045]; Ex. 4, Lioness Membership Pol'y; Ex. 5, Email with BuildUp re: membership (Nov. 8, 2022); Ex. 2, Toon Dep. 53:2–15.

also members of the organization.[15] Lioness's membership includes several hundred TDCJ inmates, including many who have been or are assigned to unairconditioned units.[16]

As this Court found, at the time of the preliminary injunction hearing, Lioness had "hundreds of members who joined voluntarily, supported the organization's mission, and were then current TDCJ prisoners assigned to un-airconditioned units."[17] This remains true—Lioness's membership includes more than four hundred inmates, including many who have been or are assigned to unairconditioned units where they are exposed to a substantial risk of harm and death from the extreme heat.[18] Lioness has identified specific members housed in unairconditioned TDCJ units who "have been harmed or are at risk of harm from the extreme heat in TDCJ facilities."[19] For instance, ██████████████████████████████████ ████████████████████████████████████████████████████████ ██████████████████████████████████████████████.[20]

Each of Lioness's members joined the organization voluntarily, support its mission, help guide its priorities, offer input and direction in this litigation, and receive updates about the case.[21] Lioness communicates with its members through correspondence and a quarterly newsletter which is not sent to nonmembers.[22] Lioness's incarcerated members also guide all of the organization's work, by letting Lioness know what's currently going on in their units, and

---

[15] Ex. 2, Toon Dep. 25:12–26:6.

[16] *Id.* at 57:4-23, 65:14–67:18.

[17] *Tiede*, 2025 WL 2469118, at *30.

[18] Ex. 2, Toon Dep. 65:14–67:18.

[19] Ex. L, Toon 2d Decl. ¶¶ 5, 13–23, Dkt. No. 90-1.

[20] Ex. 6, J. Toon Decl. ¶ 2. Members' declarations will be supplemented upon receipt, as it has not yet reached undersigned counsel given the prison mail's slow system, and holiday delayed delivery.

[21] Ex. 2, Toon Dep. 23:20-23, 54:1-21, 59:7-25, 60:13-20.

[22] *Id.* at 22:12-16, 24:4-6.

then Lioness campaigns around those issues.[23] Addressing the extreme heat in TDCJ prisons has been a priority since its inception and remains a priority.[24] Excessive heat was and is a priority because of its board members' "lived experience" in the extreme and dangerous heat, and it remains of paramount importance because its members have "confirmed" that harm from extreme heat and lack of air-conditioning continues.[25] Lioness receives "[a] very large number" of complaints from its incarcerated members "every summer" (including in summer 2025) about the heat in prisons, the lack of air-conditioning, and TDCJ's inadequate heat-mitigation measures.[26] And the volume of those complaints has only increased since 2022.[27] Mr. Collier has acknowledged that, through Jennifer Toon, Lioness "advocate[s] for the people in the Texas prisons," including by advocating for air conditioning.[28]

Lioness is participating in this lawsuit because it is "concerned about incarcerated Texans' health and . . . their life" and because "the majority of [Lioness's] membership is under the direct authority of [TDCJ]."[29] The decision to join the lawsuit was both as a " response to the complaints" Lioness received from its members about the extreme heat, as well as its formerly incarcerated board members' "lived experience" in the TDCJ system.[30]

B.    **Texas Citizens United for Rehabilitation of Errants ("TX C.U.R.E.")**

This Court has confirmed that Texas Citizens United for Rehabilitation of Errants ("TX

---

[23] *Id.* at 61:7-22.

[24] *Tiede*, 2025 WL 2469118, at *3.

[25] *Id.*

[26] *Id.*

[27] *Id.*

[28] Ex. 7, Collier Dep. 36:6-9.

[29] *Tiede*, 2025 WL 2469118, at *3.

[30] *Id.*

C.U.R.E") has associational standing[31] and the evidence developed since then confirms as much.

TX C.U.R.E. is an Austin-based criminal justice advocacy nonprofit.[32] Its mission is to raise awareness about unjust conditions within the Texas prison system, to advocate for the correction of unconstitutional prison conditions, and to advocate for and assist inmates and their families.[33] One of TX C.U.R.E.'s "major policy goals" is "seeking relief from the extreme heat in TDCJ" facilities.[34]

TX C.U.R.E.'s constituents include all of the approximately 132,600 individuals incarcerated in the TDCJ system—including approximately 89,000 individuals who are (or have been) housed in unairconditioned living areas.[35] It has constituents in every unit in TDCJ.[36] TX C.U.R.E. advocates for its incarcerated constituents by communicating with them to try to address specific issues and helping them navigate the internal grievance process.[37] TX C.U.R.E. identified 19 constituents who have written and requested help with excessive heat, lack of air-conditioned housing, and other related issues.[38] All of these constituents have "suffered from exposure to excessive heat" and "are directly affected by TDCJ's lack of temperature control throughout its prisons."[39] ████████████████████████████

---

[31] *Id.* at *30 ("The evidence shows that the remaining Organizational Plaintiffs also meet the requirements for associational standing . . . .").

[32] *Id.* at *3.

[33] Ex. 8, Malouff Dep. 24:16-20, 89:25–90:8; *see also* Ex. 9, Bethel Dep. 12:7-17.

[34] Ex. 8, Malouff Dep. 96:25–97:3.

[35] *Id.* at 66:22-67:2; *Tiede*, 2025 WL 2469118, at *3.

[36] Ex. 8, Malouff Dep. 64:16-19 (explaining that "at least on TDCJ inmate at every TDCJ prison facility [] is being served by one of [TX C.U.R.E.'s] programs").

[37] *Id.* at 24:23–25:3, 80:9–81:5; *see also, e.g.*, Ex. 10, Letter dated Aug. 14, 2023 [TXCURE_000239] (correspondence with inmate regarding heat-related concerns).

[38] *Tiede*, 2025 WL 2469118, at *4.

[39] *Id.*

████████████████████████████████████████████████████████

████████████████████████████████████████ [40]

TX C.U.R.E.'s Board of Directors includes individuals formerly incarcerated in the TDCJ system and loved ones of those who are currently incarcerated.[41] Its staff frequently communicate with its incarcerated constituents and their family members who are seeking help with addressing inhumane conditions in TDCJ's prisons.[42] These incarcerated constituents' needs drive the policy goals of the organization, which include seeking relief from the extreme heat in TDCJ's unairconditioned units.[43] TX C.U.R.E. also corresponds with state officials to bring constituent-highlighted issues to their attention and attempt to resolve those problems, and by testifying in front of the Texas Legislature on heat-related issues.[44] In his October 2025 deposition, Mr. Collier acknowledged that TX C.U.R.E. (through Charlie Malouff) "advocates consistently for people in the Texas prisons," including by advocating for air conditioning.[45]

TX C.U.R.E. joined this lawsuit to serve its constituents by trying to address their continued suffering from the extreme heat in unairconditioned TDCJ facilities.[46] Specifically, TX C.U.R.E. received complaints from prisoners about "mistreatment, lack of air conditioning, lack of respite, and other issues that were unconstitutional" before it joined the lawsuit.[47] Through this lawsuit, TX C.U.R.E. seeks to alleviate the harm to its TDCJ prisoner constituents

---

[40] Ex. 39, B. Malouff Decl. *passim.* Constituents' declarations will be supplemented upon receipt, as it has not yet reached undersigned counsel given the prison mail's slow system, and holiday delayed delivery.

[41] Ex. 8, Malouff Dep. 46:21–47:18, 93:2-18, 95:9-22; *see Tiede*, 2025 WL 2469118, at *3.

[42] Ex. 8, Malouff Dep. 93:21–96:8; *see also Tiede*, 2025 WL 2469118, at *3.

[43] Ex. 8, Malouff Dep. 57:10–58:10, 98:16-25; Ex. 9, Bethel Dep. 71:4–72:1, 82:12–84:4.

[44] Ex. 8, Malouff Dep. 15:9-12, 16:12–17:2, 58:6-10; *see Tiede*, 2025 WL 2469118, at *3.

[45] Ex. 7, Collier Dep. 35:23–36:5.

[46] Ex. 8, Malouff Dep. 57:10–58:10, 98:16-25.

[47] *Id.* at 77:24–78:11.

caused by extreme heat and to bring the conditions in all Texas prisons into constitutional compliance.[48] TX C.U.R.E. is not aware of any constituent (inmate or family) that disapproves of TX C.U.R.E.'s advocacy through this lawsuit.[49]

### C.     Texas Prisons Community Advocates ("TCPA")

This Court has already confirmed that Texas Prisons Community Advocates ("TPCA") has associational standing.[50] The evidence developed since then confirms this holding.

TPCA's mission is to serve incarcerated individuals and their families.[51] TPCA has focused on issues of extreme heat and a lack of air-conditioning in TDCJ prisons from its inception.[52] TPCA's constituents include every prisoner in the TDCJ population.[53] TPCA's board of directors include, or has included, individuals who have been incarcerated in TDCJ facilities or who have family members who have been incarcerated in TDCJ facilities.[54]

TPCA's staff frequently communicate with its incarcerated constituents, and it has approximately 50 volunteer "team members" incarcerated in TDCJ whose needs and concerns drive the policy goals of the organization.[55] TPCA communicates with its incarcerated constituents through various means, including by phone, mail, and emails.[56] TPCA also issues a newsletter to its incarcerated constituents who ask to receive that communication, either

---

[48] *Id.* at 98:16–99:7.

[49] *Id.* at 99:8-14.

[50] *Tiede*, 2025 WL 2469118, at *30.

[51] *Id.* at *4.

[52] Ex. 11, Dominick Dep. 100:1-13; *see also Tiede*, 2025 WL 2469118, at *4.

[53] Ex. 11, Dominick Dep. 100:14-16; *see also Tiede*, 2025 WL 2469118, at *4.

[54] Ex. 11, Dominick Dep. 31:13-20; *see also Tiede*, 2025 WL 2469118, at *4.

[55] Ex. 11, Dominick Dep. 55:11-16 (describing incarcerated volunteers as "liaison point[s]" in their TDCJ units), *id.* at 104:16-22 (TPCA "frequently" communicates with its "incarcerated constituents"), *id.* at 108:8-13 (explaining that TPCA's board considers "what the carceral folks are saying," "what they're reporting to us," and "what they would like to see happen").

[56] *Tiede*, 2025 WL 2469118, at *4.

individually or through a family member.[57] Those incarcerated constituents may submit material for inclusion in the newsletter.[58] TPCA characterizes TDCJ inmates that receive its newsletter to as TPCA's incarcerated "members" of TPCA.[59] TPCA's former Director of Incarcerated Individuals, Brittany Robertson, communicated daily with TDCJ inmates and received "complaints" from them about heat in Texas prisons every day.[60] TPCA's incarcerated constituents have provided monetary donations to TPCA.[61] As of June 2024, TCPA had 1,569 incarcerated members.[62]

TPCA advocates for its incarcerated constituents in numerous ways—including working on bills seeking to require humane temperatures in TDCJ prisons, providing expert testimony about the conditions in TDCJ units before the Texas Legislature, co-authoring research reports about those conditions, conducting advocacy training for system-impacted family members, and organizing community events to raise awareness about the conditions within TDCJ units.[63] Most of TPCA's advocacy work focuses on the effects of extreme heat, lack of air-conditioning, and inadequate heat mitigation measures in Texas prisons.[64] TPCA's founder and president, Dr. Amite Dominick, has also communicated directly with Mr. Collier on behalf of TPCA about

---

[57] Ex. 11, Dominick Dep. 49:11–50:16, 52:2-8, 52:25–53:9; *see also* Ex. 12, Inmate Letter, [TPCA_003332–33].

[58] Ex. 11, Dominick Dep. 52:2-8; *see also Tiede*, 2025 WL 2469118, at *4.

[59] Ex. 11, Dominick Dep. 68:7-19; *see also Tiede*, 2025 WL 2469118, at *4.

[60] *Tiede*, 2025 WL 2469118, at *4.

[61] Ex. 11, Dominick Dep. 107:2-5; *see* Ex. 13, Inmate Letters,  [TPCA_001021–22, TCPA_001795, TPCA_003350].

[62] Ex. 11, Dominick Dep. 63:9-12.

[63] *Id.* at 102:25–104:1; *see also Tiede*, 2025 WL 2469118, at *4.

[64] *Tiede*, 2025 WL 2469118, at *4.

extreme heat and lack of air-conditioning in Texas prisons.[65]

TPCA joined this lawsuit because of the complaints it received from its incarcerated volunteer team members and constituents, and the experience of Dr. Dominick's own ex-husband, who was incarcerated in the TDCJ system.[66] ████████████████████

████████████████████████████████████████████ █

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████ █ █████████████

████████████████████████.[69]

### D.    Coalition of Texans with Disabilities ("CTD")

This Court has already confirmed that the Coalition for Texans with Disabilities ("CTD") has associational standing.[70] The evidence developed since then confirms this holding.

CTD is a nonprofit corporation whose mission is to ensure that persons with disabilities can work, live, learn, play, and participate fully in the community of their choice. CTD seeks to accomplish this mission through government advocacy and public awareness events.[71] CTD considers all Texans living with a disability to be its member-constituents.[72] Because an estimated 40% of TDCJ inmates have a disability, roughly 52,000 of the 130,000 people

---

[65] Ex. 11, Dominick Dep. 104:2-15. Mr. Collier acknowledged that Dr. Dominick "advocates . . . [for] air conditioning" in Texas prisons. Ex. 7, Collier Dep. 35:19-22.
[66] *Tiede*, 2025 WL 2469118, at *4.
[67] Ex. 14, A. Dominick Decl. ¶ 2.
[68] *Id.* ¶ 3.
[69] Constituents' declarations will be supplemented upon receipt, as it has not yet reached undersigned counsel given the prison mail's slow system, and holiday delayed delivery.
[70] *Tiede*, 2025 WL 2469118, at *30.
[71] Ex. 15, Bearden Dep. 21:3-24, 23:6–24:23.
[72] *Id.* at 44:17–45:1, 46:14-16; Ex. 16, CTD Bylaws, Art. III [CTD_000076–82, at -000076–77].

incarcerated in Texas prisons are CTD constituents, including every person with a disability incarcerated in every TDCJ facility that lacks air-conditioning.[73]

CTD communicates with its active members—individuals who have shared their contact information with CTD—through newsletters, social media, speaking engagements at events, and its out-reach to other non-profits.[74] TDCJ inmates or their family members have written to CTD about heat conditions in TDCJ facilities.[75] CTD has directly communicated with TDCJ when advocating on behalf of disabled inmates.[76] It has also held events focused on heat conditions in Texas prisons to raise awareness about those conditions and how they impact disabled individuals.[77] CTD's Bylaws provide that a majority of its board of directors must be comprised of individuals with a disability.[78] CTD brought this lawsuit in its representative capacity on behalf of TDCJ inmates with disabilities who are being housed in inhumane conditions and directly harmed by extreme heat, in order to vindicate their rights.[79]

## II.    EXTREME HEAT STILL POSES A SUBSTANTIAL RISK OF SERIOUS HARM TO TDCJ INMATES.

This Court previously held that "extreme heat in TDCJ's uncooled prisons constitutes a well-established substantial risk of serious harm that constitutes cruel and unusual punishment." *Tiede*, 2025 WL 2469118, at *32. These risks "were uncontested by [Mr.] Collier" at the preliminary injunction hearing, *id.*, and they are uncontested by Defendant now.

---

[73] Ex. 15, Bearden Dep. 81:21–82:7.

[74] *Id.* at 56:9-16.

[75] *See id.* at 29:1-12, 82:17–83:3; *see also id.* at 26:13-20.

[76] *See* Ex. 17, Letter to Tex. Bd. of Pardons & Parole [CTD_000130–42].

[77] *See* Ex. 18, Raise Your Voice! Advocate Connection Program 2024 [CTD_000057–61].

[78] Ex. 16, CTD Bylaws, Art. 4.1.b [CTD_000076–82, at -000077]; Ex. 15, Bearden Dep. 36:23–37:10; *see also id.* at 30:12–31:7.

[79] Ex. 15, Bearden Dep. 70:23–71:14.

During his October 2025 deposition, Defendant testified that:

- "[H]eat waves are a time of grave danger to [TDCJ's] inmates and staff"[80];

- "The heat is a contributing factor to death and illness"[81];

- "[I]nmates confined in temperatures at or above 95 degrees face a serious health risk"[82];

- Inmates in TDCJ's custody "are at risk when they're housed at high environmental temperatures"[83];

- There were three deaths of TDCJ inmates in 2023 "[w]here heat was a contributing factor"[84];

- TDCJ's own training documents state that heat is the "fifth leading cause of serious employee injury"[85]; and

- There were 11 TDCJ employees and 12 inmates with heat-related illnesses in 2025.[86]

Defendant agreed that "23 people died in TDCJ facilities from heat related causes between 1998 and 2012."[87] Like Mr. Collier, Defendant is aware of Dr. Julie Skarha's study, which concluded that, from 2001 to 2019, there were 271 deaths attributable to extreme heat in TDCJ prisons without air conditioning—an average of 14 deaths per year.[88] Like Mr. Collier, Defendant is aware of Dr. Carlee Purdum's study,[89] which concluded that, "despite TDCJ's current heat mitigation policies, nearly every year, there are reports of incarcerated people and

---

[80] Ex. 19, Lumpkin Dep. 99:14-17.

[81] *Id.* at 40:13-18.

[82] *Id.* at 140:13-18.

[83] *Id.* at 228:15-20.

[84] *Id.* at 130:16-21.

[85] *Id.* at 131:17-20.

[86] *Id.* at 27:1-29:7.

[87] *Id.* at 120:2-5.

[88] *Id.* at 123:23-124:4; *see also Tiede*, 2025 WL 2469118, at *9.

[89] Ex. 19, Lumpkin Dep. 174:10-25.

staff falling extremely ill and/or dying from complications from extreme heat in Texas prisons.[90] And like Mr. Collier, Defendant knows that all county jails and federal prisons in Texas are all air conditioned.[91]

## III.     TDCJ'S HEAT-MITIGATION MEASURES ARE STILL INADEQUATE.

Judge Keith Ellison found TDCJ's heat-mitigation measures inadequate in 2017.[92] In 2018, the Texas House Committee on Corrections reached the same conclusion: "Based on the medical information about human health and heat-related health risks, TDCJ cannot rely only on mitigation measures to ensure the well-being of inmates and corrections personnel."[93] In March 2025, this Court found that, that "the uncontroverted evidence shows that [TDCJ's] heat mitigation measures are *still* inadequate, just as Judge Ellison found seven years ago."[94]

Yet little has changed: TDCJ continues to rely on the same heat-mitigation measures, TDCJ inmates continue to die heat-related deaths, and TDCJ staff and inmates continue to experience heat-related illnesses.

### A.     TDCJ Hasn't Meaningfully Changed its Heat-Mitigation Measures Since the Preliminary Injunction Hearing.

In his October 2025 deposition, Mr. Collier did not know if any of TDCJ's heat-mitigation measures had been modified since the preliminary injunction hearing.[95] Mr. Collier was "not aware of anything that changed" in TDCJ's heat mitigation policy since the preliminary injunction hearing.[96]

---

[90] *Tiede*, 2025 WL 2469118, at *19 (quotation marks omitted).
[91] Ex. 19, Lumpkin Dep. 165:1-7.
[92] *See Cole v. Collier*, No. 4:14-CV-1698, 2017 WL 3049540, at *10 (S.D. Tex. July 19, 2017).
[93] *Tiede*, 2025 WL 2469118, at *19.
[94] *Id.* at *37.
[95] Ex. 7, Collier Dep. 63:9-17.
[96] *Id.* at 63:19-24.

TDCJ's heat-mitigation measures are set forth in TDCJ Policy AD-10.64.[97] TDCJ issued a revised version of AD-10.64 (revision 12) on April 14, 2025.[98] Eric Guerrero is the current Director of the TDCJ's Correctional Institutions Division, which is responsible for implementing the heat-mitigation measures in AD-10.64.[99] Mr. Guerrero testified that the most significant difference between the 2024 version of AD-10.64 (which was discussed at the preliminary injunction hearing) and the 2025 version is that TDCJ now requires automated temperature monitoring, rather than using manually recorded temperature logs.[100] The 2025 version also requires wellness checks to be performed on every inmate (rather than certain inmates), adds a few new definitions, and requires additional items be made available for inmates to purchase from the commissary (e.g., cooling towels, cool shirts, gym shorts, shower shoes, bottled water, electrolyte drinks, and sunblock).[101]

TDCJ also changed AD-10.64 to limit access to respite rooms.[102] While the 2024 version of AD-10.64 allowed inmates to "request access to a respite area 24 hours per day, seven days per week, even if they are not feeling ill at the time of the request or the request is made during count time," the 2025 version deleted that provision and replaced it with a suggestion that unit staff "use good correctional judgment to accommodate as many requests for respite as possible and to allow inmates to stay in respite as long as possible."[103] While the 2024 version of AD-

---

[97] Ex. 20, AD-10.64 (rev. 12), TIEDE DEF_367748-367766.

[98] *See* Ex. 21, Guerrero Dep. 77:1-3.

[99] *See id.* at 6:16-19, 62:23-63:18.

[100] *Id.* at 165:9-14; *compare* Ex. 22, AD-10.64 (rev. 11) at TIEDE DEF-00121-138, *with* Ex. 20, AD-10.64 (rev. 12) at TEIDE DEF_367748-766.

[101] *See* Ex. 21, Guerrero Dep. 165:14-23.

[102] *Compare* Ex. 22, AD-10.64 (rev. 11) at TIEDE DEF-00127, *with* Ex. 20, AD-10.64 (rev. 12) at TEIDE DEF_367753.

[103] *Compare* Ex. 22, AD-10.64 (rev. 11) at TIEDE DEF-00127, *with* Ex. 20, AD-10.64 (rev. 12) at TEIDE DEF_367753.

10.64 did not expressly prohibit inmates from bringing tablets into respite rooms, the 2025 version does.[104] Like the 2024 version, however, the 2025 version relies on the same measures this Court has already found inadequate: (i) providing ice water, (ii) allowing inmates to use cooling towels and wear shorts and t-shirts, (iii) fans, and (iv) cold showers.[105]

### B.    TDCJ Inmates Have Continued to Suffer from Heat-Related Illnesses.

In its March 2025 Order, this Court found that TDCJ inmates and staff continued to suffer heat-related illnesses—despite TDCJ's heat mitigation measures.[106] That trend has continued, as TDCJ reported to the Texas Legislature that 29 inmates and 26 staff members had heat-related illnesses in the period from September 2023 to August 2024.[107]

The Court, likewise, found that "scores of TDCJ inmates continue to file grievances about the extreme heat in their unair-conditioned units," with 6,000 heat-related grievances being filed in 2023 alone.[108] Again, that trend has continued: TDCJ inmates filed almost 6,000 heat-related grievances from September 2023 to August 2024,[109] and nearly 4,900 heat-related grievances from September 2024 to August 2025,[110] Mr. Collier admitted that, much like 2023, inmates and staff were still suffering heat related illness in 2024—despite TDCJ's heat mitigation measures and policies.[111]

---

[104] *Compare* Ex. 22, AD-10.64 (rev. 11) at TIEDE DEF-00127, *with* Ex. 20, AD-10.64 (rev. 12) at TEIDE DEF_367753 ("Inmates shall *not* bring tablets.") (emphasis in original).

[105] *Compare* Ex. 22, AD-10.64 (rev. 11) at TIEDE DEF-00127-28, *with* Ex. 20, AD-10.64 (rev. 12) at TEIDE DEF_367754-55.

[106] *Tiede*, 2025 WL 2469118, at *16. In his October 2025 deposition, Mr. Lumpkin had no information about why TDCJ reported only four heat-related illnesses to the Texas Legislature, when UTMB reported 37 to TDCJ that same month. Ex. 19, Lumpkin Dep. 126-127:6.

[107] Ex. 23, FY 2024 Temperature Rider Rep. at TIEDE DEF_87753.

[108] *Tiede*, 2025 WL 2469118, at *8, *16, *18.

[109] Ex. 24, Heat Related Grievances FY24 [TIEDE DEF_452455].

[110] Ex. 25, Heat Related Grievances FY25 [TIEDE DEF_452456].

[111] Ex. 7, Collier Dep. 109:13-18.

A TDCJ prisoner need only "complete that state's two-step grievance process" to exhaust.[112] According to TDCJ's Fiscal Year 2023 report to the Texas Legislature, TDCJ inmates filed 609 Step Two grievances related to the heat in the summer of 2023.[113] Those included grievances regarding TDCJ's inadequate respite measures, the effects of extreme heat, and the need for airconditioned housing.[114]

### C.    Inmates Have Continued to Suffer Heat-Related Deaths.

In March 2025, the Court found that "there is no dispute that high heat has caused or contributed to the deaths of a number of TDCJ inmates in unair-conditioned units, including [summer 2023]."[115] The extreme heat also caused or contributed to the deaths of TDCJ inmates in 2024. As set forth below, Plaintiffs have since confirmed that ███████████████████ ████████████████████████████████████████████████████████ ████████████ None of these deaths were reported to the Texas Legislature.[116]

####    i.    *Ryan Fairchild – Died on August 21, 2024*

███████████████████████████████████████████████████ ███ █████████████████████████████████████████ ████████████████████████████████████████████████████ █████████████████████████████████████████████ ██████████████████████████████████████ █████████████████████

---

[112] *Favela v. Collier*, 91 F.4th 1210, 1212 (5th Cir. 2024).
[113] *Tiede*, 2025 WL 2469118, at *9.
[114] *See, e.g.*, Ex. 39, Sampling of 2023 Grievances.
[115] *Id.* at *15.
[116] *See generally* Ex. 23, FY 2024 Temperature Rider Rep., TIEDE DEF_87749-72.
[117] Ex. 26, Dr. Uribe Rep. 5-6; *see also* Ex. 27, Dr. Vassallo Rep. 7.
[118] Ex. 26, Dr. Uribe Rep. 5-6; *see also* Ex. 27, Dr. Vassallo Rep. 7.
[119] Ex. 26, Dr. Uribe Rep. 5; *see also* Ex. 27, Dr. Vassallo Rep. 7.



*ii.    Jason Wilson  – Found Dead on July 5, 2024*

Jason Wilson was a 46-year-old man housed in an unairconditioned cell in the Coffield Unit.[125] Mr. Wilson was the TPCA team member whose death was discussed at the preliminary injunction hearing by Brittany Robertson—who called for a wellness check and was falsely told that Mr. Wilson was fine, after he had died.[126]

---

[120] Ex. 27, Dr. Vassallo Rep. 7.

[121] *Id.*

[122] Ex. 26, Dr. Uribe Rep. 5; *see also* Ex. 27, Dr. Vassallo Rep. 7.

[123] Ex. 27, Dr. Vassallo Rep. 7; *see also* Ex. 26, Dr. Uribe Rep. 5 ▓▓▓▓▓▓▓▓▓▓▓▓▓ .

[124] Ex. 7, Collier Dep. 134:2-23, 141:16-25.

[125] Ex. 27, Dr. Vassallo Rep. 7; Ex. 26, Dr. Uribe Rep. 5.

[126] *See generally Tiede*, 2025 WL 2469118, at *15.



Although Mr. Wilson died more than a year and a half ago, TDCJ has not produced an OIG report and maintains that it is an open investigation. Mr. Collier did not recall if anyone at investigated whether Coffield inmates were receiving water at the time of Mr. Wilson's death.[133]

    *iii.    Samuel Rucker – Died on August 17, 2024*

---

[127] *See* Ex. 26, Dr. Uribe Rep. 5; *see also* Ex. 27, Dr. Vassallo Rep. 7.

[128] *See* Ex. 26, Dr. Uribe Rep. 5; *see also* Ex. 27, Dr. Vassallo Rep. 7.)

[129] The heat index reached a maximum of 95° F on June 30, 2024. Ex. 28, 2024 CO Temperature Logs at TIEDE DEF_204516. It exceeded 100° F every other day from June 22, 2024 to July 5, 2024. *See id.* at TIEDE DEF_204508-522. Notably, while TDCJ's temperature log from June 30 states that the high temperature was 90° F, AccuWeather.com states that the high was actually 97° F. *See generally* AccuWeather, Monthly (June 2024), https://www.accuweather.com/en/us/tennessee-colony/75861/june-weather/2106943?year=2024.

[130] *See* Ex. 26, Dr. Uribe Rep. 5; *see also* Ex. 27, Dr. Vassallo Rep. 7; *see also* Ex. 28, 2024 CO Temperature Logs at TIEDE DEF_204508-522.

[131] *See* Ex. 26, Dr. Uribe Rep. 5; *see also* Ex. 27, Dr. Vassallo Rep. 7.

[132] Ex. 26, Dr. Uribe Rep. 5; Ex. 27, Dr. Vassallo Rep. 8 ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ ▇▇▇▇▇▇▇▇▇▇▇▇▇▇

[133] Ex. 7, Collier. Dep. 106:14-107:2.

[134] Ex. 26, Dr. Uribe Rep. 5; *see also* Ex. 27, Dr. Vassallo Rep. 8.



Unit temperature logs report triple-digit heat indexes as high as 121° on the date of his death.[137]

## IV. TDCJ CONTINUES TO TURN A BLIND EYE TO HEAT-RELATED INJURIES AND DEATHS AND VIOLATIONS OF ITS OWN MITIGATION POLICY.

In its March 2025 Order, this Court stated that it had "no confidence in the data that TDCJ generates and uses to implement its heat mitigation measures and record the conditions within its facilities," and had "no doubt that TDCJ is undercounting heat-related injuries and deaths, keeping unreliable records about temperature conditions, and inadequately providing heat mitigation measures."[141] Mr. Collier dismissed the 2022 Texas A&M study showing that TDCJ consistently does not follow its own heat mitigation measures as lacking credibility, yet TDCJ has never done or commissioned its own study on the effectiveness of its mitigation protocols.[142]

---

[135] Ex. 26, Dr. Uribe Rep. 5-6; *see also* Ex. 27, Dr. Vassallo Rep. 8.
[136] Ex. 26, Dr. Uribe Rep. 5-6; *see also* Ex. 27, Dr. Vassallo Rep. 8.
[137] Ex. 26, Dr. Uribe Rep. 5-6; *see also* Ex. 27, Dr. Vassallo Rep. 8.
[138] Ex. 26, Dr. Uribe Rep. 5-6; *see also* Ex. 27, Dr. Vassallo Rep. 8.
[139] Ex. 26, Dr. Uribe Rep. 6.
[140] Ex. 27, Dr. Vassallo Rep. 8.
[141] *Tiede*, 2025 WL 2469118, at *25.
[142] Ex. 7, Collier Dep. 82:2-7, 82:23-83:9.

Likewise, although Mr. Collier "did not find significant credibility" with Dr. Skarha's study, which demonstrated the loss of 271 lives between 2001 and 2019 due to heat, TDCJ has never done or commissioned its own study about the number of deaths from heat in its prisons.[143]

Discovery since the hearing confirms that TDCJ continues to turn a blind eye to heat-related injuries and deaths and is still failing to comply with its own heat-mitigation policies:

- TDCJ continues to not take body temperatures or ambient air temperatures when inmates die or are found unresponsive in extreme heat ███████

- At his October 2025 deposition, Mr. Collier still did not "have an opinion about whether or not core body temperatures should be taken if someone dies in the summer months to determine whether or not it was in fact heat related," and never told any of the security or medical staff to take temperatures in death investigations during the summer months[144];

- Even when body temperatures are taken, TDCJ continues to ignore abnormally high body temperatures as indicative of heat-related deaths ███████

- TDCJ continues to refuse to investigate when its heat-mitigation measures are not being followed—as evidenced by the fact that TDCJ did not investigate whether inmates in Mr. Wilson's unit could access water[145];

- Despite the discovery that Defendant's Exhibit 76 in the preliminary injunction hearing was falsified, TDCJ refused to investigate whether the falsification of temperature logs was a system-wide problem—indeed, Mr. Cirrito's investigation didn't even identify who falsified the exhibit[146]; and

- TDCJ tried to cover up its lack of effective heat-mitigation policies by retaliating against a former TDCJ corrections officer, whom Plaintiffs disclosed as a fact witness, finding her to be ineligible for rehire the very next

---

[143] *Id.* at 114:10-14, 115:20-117:3.

[144] *Id.* at 98:1-99:4, 118:6-12, 121:12-16.

[145] SAMF § III.C, *infra*.

[146] Ex. 29, Cirrito Dep. 48:1-21 ("The entirety of my investigation was to determine when [Defendant's Exhibit 76] was falsified."); *see id.* at 48:22-49:25 ("[I]t wasn't important in the investigation to know specifically who was responsible.").

day after Plaintiffs disclosed her as a witness.[147]

## V.    DEFENDANT AGREES THAT AIR CONDITIONING IS THE ONLY SOLUTION, BUT TDCJ'S INSTALLATION OF AIR CONDITIONING REMAINS CONSTITUTIONALLY INADEQUATE

### A.    Defendant agrees that air conditioning is the only effective solution.

This Court held in March 2025 that "air conditioning is the only effective protection from extreme heat."[148] In his October 2025 deposition, Defendant agreed: He testified that "[a]ir conditioning is the only effective protection from the extreme heat."[149] Defendant admits that air conditioning is "necessary in order to protect inmates' health and safety."[150] He understands that "the way to solve this problem is with air conditioning," and that TDCJ has to "get rid of the heat . . . by air-conditioning the system."[151] Defendant agrees that installing permanent air conditioning throughout TDCJ's facilities is feasible,[152] and that TDCJ could install permanent air conditioning throughout the system by 2032 or 2033 if it received sufficient funding from the Legislature.[153]

TDCJ's Director of Engineering, Dale Cox, admitted that the entire system could be air conditioned in 36-51 months—so long as TDCJ has the labor and resources that it needs.[154] And Plaintiffs' experts believe that TDCJ could complete the process between 24 to 36 months from the date of funding allocation, by implementing changes to its current approach.[155]

---

[147] Ex. 30, ███████████████ 327 at TIEDE DEF_482472-73; Ex. 31, Pls.' Fourth Suppl. Disclosure.

[148] *Tiede*, 2025 WL 2469118, at *25 (cleaned up).

[149] Ex. 19, Lumpkin Dep. 184:14-18.

[150] *Id.* at 111:6-9.

[151] *Id.* at 32:2-5, 40:13-18.

[152] *Id.* at 185:5-8.

[153] *See id.* at 206:18-21.

[154] Ex. 32, Cox Dep. 130:5-15.

[155] Ex. 33, Exponent Rep. 5.

**B.    TDCJ has not increased the rate at which air conditioning is installed.**

Even so, TDCJ has not increased the rate at which air conditioning is installed since the preliminary injunction hearing. At the time of the July 2024 preliminary injunction hearing, "[a]pproximately 96,500 of TDCJ's 142,240 beds [were] unair-conditioned."[156] The Court noted that, "even at a rate of 3,100 new air-conditioned beds per year (which is the rate TDCJ averaged in 2023 and 2024), it would take TDCJ 30 years—i.e., until 2054—to install permanent air conditioning throughout the system."[157] The Court found this 30-year timeline constitutionally deficient, as it "exposes over 95,000 inmates to the substantial risk of serious injury or death from unair-conditioned prisons and, assuming normal rates of inmate turnover, would continue to expose hundreds of thousands of inmates to the substantial risk of injury or death from extreme heat over the next two to three decades."[158]

Yet, TDCJ has not increased the pace at which it has installed air-conditioned beds. In June 2024, TDCJ had only 45,689 cool beds available.[159] As of December 1, 2025, TDCJ has 50,270 cool beds available.[160] This means that approximately 4,581 new air conditioned beds have been installed in the last seventeen months since the hearing—a rate of approximately 3,234 new air conditioned beds per year.[161] Since the hearing, TDCJ's incarcerated inmate population has increased by 5,516 inmates, far surpassing the new air-conditioned beds.[162] And

---

[156] *Tiede*, 2025 WL 2469118, at *28.

[157] *Id.*

[158] *Id.* at *38.

[159] Ex. 34, Pls. Prelim. Inj. Hr'g Ex. 151.

[160] Texas Department of Criminal Justice, *TDCJ Air Conditioning Construction Projects* (Dec. 1, 2025), https://www.tdcj.texas.gov/ac/index.html.

[161] *See id.*

[162] Texas Legislative Budget Board, *Felony & Misdemeanor Direct Community Supervision*, https://cjda.lbb.texas.gov/TDCJ (last updated Nov. 2025).

the Legislative Budget Board's most recent inmate population projections "estimate TDCJ's population will reach almost 140,000 by the end of fiscal year 2025, . . . and surpass 150,000 by fiscal year 2028."[163] Thus, at the current rate, it will still take TDCJ at least "30 years—i.e., until 2054—to install permanent air conditioning throughout the system."[164]

### C.     TDCJ has refused to take steps that would increase the rate at which air conditioning could be installed.

Mr. Collier admitted that this Court's March 2025 Order did not change anything with respect to how quickly TDCJ moved or what TDCJ requested from the Legislature in any capacity.[165] Mr. Collier denied that installing air conditioning is TDCJ's "top priority," instead relegating it to a "key priority."[166] According to Defendant, TDCJ *still* has not solicited bids for installing permanent air conditioning throughout the system.[167] Nor has TDCJ "considered grouping [air conditioning installation] projects under one bid for efficiencies of scale or by region for efficiencies of scale."[168]

Although capital expenditure plans are intended to project out six years the money needed for intended projects (i.e., for 2026-2031), TDCJ's most recent capital expenditure plan (the 89th capital expenditure plan) did not reflect any of the projected funding for its three-phase plan.[169] Mr. Collier acknowledged that TDCJ's three-phase plan "isn't TDCJ's appropriations request to the Legislature."[170]

---

[163] Ex. 35, Sunset Advisory Comm'n Staff Rep. with Final Results at 27-28.
[164] *Tiede*, 2025 WL 2469118, at *28.
[165] Ex. 7, Collier Dep. 179:2-21.
[166] *Id.* at 169:2-5.
[167] Ex. 19, Lumpkin Dep. 252:14-17.
[168] *Id.* at 255:15-18.
[169] Ex. 36, 89th Capital Expenditure Plan; *see also* Ex. 7, Collier Dep. 53:21-54:12, 217:19-218:9.
[170] Ex. 7, Collier Dep., 208:24-209-1.

In his October 2025 deposition, Defendant did not know if TDCJ would ask the Texas Legislature for the $620.4 in funding required to complete phase two of TDCJ's three-phase plan,[171] and he refused to commit to requesting that amount.[172] He admitted: "I can't promise it will happen."[173] Mr. Collier, likewise, testified that the three-phase plan does not reflect any "commitment" by TDCJ to request those specific amounts from the Legislature.[174] And Mr. Collier admitted that the Court's March 2025 Order changed nothing with respect to the amount TDCJ asked the Texas Legislature to appropriate for air conditioning.[175]

Plaintiffs' experts have identified several steps that TDCJ has thus far failed to take that would drastically increase the speed and efficiency at which air conditioning could be installed[176]:

- Employing a Design-Build project delivery method that would only require a single procurement process to select one firm to complete both design and construction and allow for critical activities to be run concurrently to create time savings;

- Bundling similar projects into larger project bundles to contract with larger, more capable, nationwide-firms, thereby creating procurement and construction efficiencies;

- Leveraging the existing regional divisions of the TDCJ system to structure the contracts with these larger firms, where different firms can focus on specific regions;

- Establishing a statewide Program Management Office to allow for streamlined processes, reporting, and oversight, which would eliminate additional in-house resources; and

- Provide clear monetary incentives and disincentives for on-time delivery of

---

[171] Ex. 19, Lumpkin Dep. 47:19-24.

[172] *Id.* at 201:16-21 ("I couldn't commit today.").

[173] *Id.* at 203:5-10.

[174] Ex. 7, Collier Dep. 209:20-22.

[175] *Id.* at 179:2-21.

[176] Ex. 33, Exponent Rep. 4-5; *see also* Ex. 37, Carroll Rept. 3-11.

retrofits.

According to Plaintiffs' experts, the "modifications and mitigation strategies outlined above align with standard practices commonly employed across the construction industry to streamline project delivery and reduce delays."[177] Based on their evaluation of TDCJ's current rate, Plaintiffs' experts determined that, "even if TDCJ attempted to follow [its] three-phase plan, doing so with its current methodology for procurement and construction would likely extend the timeline well beyond the expectations in the plan."[178] Those experts have concluded that, if TDCJ continues with the status quo practices and limited funding requests, it will have "a rate of completion that is comparable to the rate TDCJ achieved during the 2023 – 2024 timeframe"— which would mean the system would not be fully air conditioned for decades.[179]

**D.    TDCJ has not identified any reason why it cannot request funding in a single biennium to fully air condition the entire system.**

According to Mr. Collier, the only reason TDCJ "didn't ask for more funding at the last legislative session to install permanent air conditioning" is "because [TDCJ] didn't think it could be obligated" in a single biennium.[180] In other words, Mr. Collier agreed that the funding does not need to be spent in that biennium and the work does not need to be completed in that biennium, but he nevertheless believes that it could not be obligated (i.e., committed under a contract) in that biennium.[181]

But Plaintiffs' procurement expert, Brian Carroll, has opined that "neither Mr. Collier nor anyone else at TDCJ has (to my knowledge) identified a legitimate reason why the full funding

---

[177] Ex. 33, Exponent Rep. 5.

[178] *Id.*

[179] *Id.* at 2.

[180] Ex. 7, Collier Dep. 189:12–190:4.

[181] *See id.* at 180:8-13.

cannot be obligated in a single biennium."[182] He notes that "funding of over $1 billion for other public works projects has been awarded by the Texas Legislature in a single biennium," and that the "the Texas Legislature approved $2.5 billion for border wall funding (i.e., nearly double what TDCJ says it would take to install permanent air conditioning throughout its prisons) in the 2024-25 biennium (the 88th Legislature) [alone]."[183] In Mr. Carroll's view, "TDCJ has not identified any legitimate reason why it continues to request funding for installing air conditioning on a piecemeal basis," and "[d]oing so has unnecessarily increased, and will continue to unnecessarily increase, the time it takes to fully air condition TDCJ's prisons."[184] Plaintiffs' experts believe that this piecemeal approach "guarantee[s] that TDCJ cannot meet [its] proposed timeframe, since it will not have sufficient funds to execute the work."[185]

## ARGUMENT

**I.    THE ORGANIZATIONAL PLAINTIFFS HAVE STANDING TO SEEK RELIEF ON BEHALF OF THEIR MEMBERS AND CONSTITUENTS.**

This Court has twice held that the Organizational Plaintiffs have standing to seek relief on behalf of their members and constituents. First, the Court denied Mr. Collier's Rule 12(b)(1) motion to dismiss and held that "at least one of the Organizational Plaintiffs, Lioness, is a traditional membership organization with hundreds of members who are TDCJ prisoners," and that "the Organizational Plaintiffs' members are not required to participate in this lawsuit individually." (Dkt. No. 95 at 6-10.) Next, the Court concluded that the evidence presented at the preliminary injunction hearing confirmed that "Lioness is a traditional voluntary membership

---

[182] Ex. 37, Carroll Rep. 3.
[183] *Id.*
[184] *Id.*
[185] Ex. 33, Exponent Rep. 37.

organization that has standing to sue on behalf of its members," and "the remaining Organizational Plaintiffs also meet the requirements for associational standing." *Tiede*, 2025 WL 2469118, at *29-30.

While the Court does not need to revisit these holdings,[186] the evidence and additional facts set forth above confirm that the Organizational Plaintiffs have standing to seek relief on behalf of their members and constituents. Indeed, Defendant concedes that at least one Organizational Plaintiff (Lioness) is a traditional membership organization with members currently housed in at least 8 unairconditioned prisons. (Mot. 7-8, 11-12, Dkt. No. 251.) That alone is sufficient to deny summary judgment. (*Cf.* Dkt. No. 95 at 9 ("[T]the Court finds that Plaintiffs meet prong one of the associational standing analysis because at least one Organizational Plaintiff has individual standing to sue.").)

### A. Lioness Is a Voluntary Membership Organization that Seeks to Vindicate the Rights of Genuine Members Who Have Been Injured by TDCJ.

The Court has already determined that Lioness, when it was organized under Build Up, Inc., was a "traditional 'voluntary membership organization with identifiable members'" for purposes of associational standing and this remains true after Lioness's organization as an independent entity. *See Tiede*, 2025 WL 2469118, at *30 (quoting *SFFA*, 600 U.S. at 201).

Defendant admits that Lioness is a voluntary membership organization whose "actual members" are housed in each of TDCJ's women-only facilities, including at least one member in

---

[186] *See, e.g.*, *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll. (Harvard Corp.)*, 397 F. Supp. 3d 126, 184 (D. Mass. 2019), *aff'd sub nom. Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 980 F.3d 157 (1st Cir. 2020), *rev'd*, 600 U.S. 181 (2023) (relying on earlier associational standing analysis when denying Rule 12(b)(1) as part of the court's post-trial conclusions of law) (citing *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll. (Harvard Corp.)*, 261 F. Supp. 3d 99, 110–11 (D. Mass. 2017), *aff'd sub nom. Students for Fair Admissions ("SFFA")*, 980 F.3d, *rev'd*, 600 U.S.) (cited with approval in *Students for Fair Admissions*, 600 U.S.).

each women's facility that lacks air conditioning. (Mot. 11, Dkt. No. 251.) As a result, there is no genuine dispute that Lioness has standing to vindicate the rights of its bona-fide members, provided it otherwise meets the three-part test for associational standing (which it does). "Where, as here, an organization has identified members and represents them in good faith, [the Supreme Court's decisions] do not require further scrutiny into how the organization operates." *SFFA*, 600 U.S. at 201 (stating that the indicia-of-membership analysis "has no applicability" when the plaintiff is "a voluntary membership organization with identifiable members").

That Lioness's current members reside only in TDCJ's women's facilities does not somehow rob Lioness of standing. (*Cf.* Mot. 11-12, Dkt. No. 251 (arguing that the system-wide relief Plaintiffs collectively seek exceeds the injuries sustained by Lioness's members).) Defendant offers no basis for finding that Lioness's members have not been injured.[187] Nor has he provided any basis to find that Lioness's members somehow lack standing to challenge the constitutionality of TDCJ's ineffective heat-mitigation policy—which applies to the facilities in which they reside—or to seek injunctive relief pertaining to conditions in those facilities. That is sufficient to give Lioness standing to seek declaratory and injunctive relief on their behalf.

The authorities Defendant cites do not hold otherwise. (*See* Mot. 11, Dkt. No. 251.) Most

---

[187] Defendant's single-sentence conclusory assertion that Lioness has not shown that any of its members sustained an Eighth Amendment injury (Mot. 14, Dkt. No. 251) is not a "properly supported" argument and, thus, does not satisfy his initial summary-judgment burden. *See Trautmann v. Cogema Min., Inc.*, No. 5:04-cv-117, 2006 WL 2716156, at *3 (S.D. Tex. Sept. 20, 2006). As a result, Plaintiffs are not required to respond to it, and the Court should reject it outright. *Id.* But there is also sufficient evidence in the record to reject that argument on its merits. The Court has already found that Lioness's members "housed in unair-conditioned units in particular face a substantial risk of serious harm and death from the extreme heat, that injury is traceable to Collier's deliberate indifference and refusal to take the necessary steps to protect members from the extreme summer heat, and the injunctive relief sought will redress their injuries." *Tiede*, 2025 WL 2469118, at *29. That evidence was sufficient to establish standing at the time of the preliminary injunction hearing, and it remains sufficient now.

just repeat the basic principles that standing requires an injury-in-fact and must be established for each claim asserted and each form of relief requested.[188] Lioness's standing is consistent with these principles, as it challenges the constitutionality of a systemwide TDCJ policy that directly affects and caused injury to its members and seeks declaratory and injunctive relief its members also have standing to seek. The only other case Defendant cites, *Alabama Legislative Black Caucus v. Alabama*, 575 U.S. 254 (2015), doesn't support a different conclusion. There, the Supreme Court *vacated* the district court's order holding that an organizational plaintiff lacked standing. *Ala.*, 575 U.S. at 253, 269–71. While the district court concluded the plaintiff had not shown it had members with standing to pursue "district-specific claims of racial gerrymandering," the Supreme Court disagreed; testimony that plaintiff's members resided in "almost every county" supported an inference that they resided in all majority-minority districts, including those at issue. *Id.* at 269–70. Nothing in that opinion suggests, as Defendant does, that an organizational plaintiff would somehow lose standing to seek systemwide relief from an unconstitutional systemwide policy simply because its members do not reside in every prison in the state. *Id.*

> ### B.    The Remaining Organizational Plaintiffs Have Sufficient Indicia of Membership to Assert Claims on Behalf of Their Non-Member Constituents.

The Court previously held that the remaining Organizational Plaintiffs—TPCA, CTD, and TX C.U.R.E.—"meet the requirements for associational standing, as they have constituents housed in unair-conditioned units who were effectively members of the organization." *Tiede*, 2025 WL 2469118, at \*30 (quotation marks omitted). That remains true today.

> 1.    An organization can satisfy the indicia-of-membership standard even

---

[188] *See TransUnion LLC v. Ramirez*, 594 U.S. 413, 427 (2021); *Davis v. Fed. Election Comm'n*, 554 U.S. 724, 734 (2008); *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 353 (2006); *Lewis v. Casey*, 518 U.S. 343, 357 (1996).

where its constituents do not govern or fund the organization.

Despite the Court's prior ruling, Defendant contends that TPCA, TX C.U.R.E., and CTD lack associational standing because they cannot prove that the constituents they seek to represent effectively "govern and finance the organization." (Mot. 6-7, 11-12, Dkt. No. 251.) This argument rests on an improperly narrow construction of the indicia-of-membership standard and is contrary to Fifth Circuit law.

Member control and financing are not prerequisites for associational standing. The Supreme Court recently confirmed as much, holding that a voluntary membership organization had associational standing even though it was *not* "controlled and funded by its members" when it filed suit. *SFFA*, 600 U.S. at 200–01. If such features are not needed for a "true" membership organization to have the capacity for associational standing, they cannot be mandatory indicia of membership for a non-membership organization.

This conclusion aligns with a long line of cases in which courts have found that the membership indicia identified in *Hunt* are "illustrative, not exhaustive." *In re Fin. Oversight & Mgmt. Bd. for P.R.*, 110 F.4th 295, 310 (1st Cir. 2024); *see also Flyers Rts. Educ. Fund, Inc. v. U.S. Dep't of Transp.*, 957 F.3d 1359, 1361–62 (D.C. Cir. 2020) (stating it is "quite doubtful" that "the list of 'indicia' identified in *Hunt* was meant to be exhaustive"); *Friends of the Earth, Inc. v. Chevron Chem. Co.*, 129 F.3d 826, 829 (5th Cir. 1997) (finding "no cogent reason" to limit the Court's indicia-of-membership analysis to "the facts of *Hunt*" and citing other indicia beyond control and funding in holding association had standing). Like *SFFA*, these cases also hold that organizational plaintiffs can assert associational standing even if their non-member constituents do not possess "all the indicia of membership that the [Court identified in] *Hunt*." *Or. Advoc. Ctr. v. Mink*, 322 F.3d 1101, 1111 (9th Cir. 2003) (organization had standing where constituents did not fund organization, exert exclusive control over it, or solely select its leaders);

30

*see also Doe v. Stincer*, 175 F.3d 879, 886 (11th Cir. 1999) (same); *Flyers Rts.*, 957 F.3d at 1362 (finding standing where constituents did "not elect the leadership" or have decision-making authority).

The pertinent question when evaluating associational standing is *not* whether an organization satisfies some rigid set of criteria, like being "governed, funded, or elected" by non-member constituents (Mot. 6, Dkt. No. 251 at 6). Rather, it is "to determine whether the nature of the relationship between the [organization] and the relevant interests of [its constituents] satisfie[s] the goals of the constitutional standing requirement." *Friends of the Earth*, 129 F.3d at 828. Those goals are satisfied where, as here, the plaintiff is "sufficiently identified with and subject to the influence of those it seeks to represent as to have a 'personal stake in the outcome of the controversy.'" *Mink*, 322 F.3d at 1111 (quoting *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.,* 429 U.S. 252, 261 (1977)); *accord Flyers Rts.*, 957 F.3d at 1361–62 (organization had standing where it polled members and considered petitions they signed when determining which "policy issues and types of actions" to pursue, such that "member input guides the organization's activity").

Consistent with that purpose, courts look to a variety of organizational features when evaluating a claim of associational standing under the indicia-of-membership standard, including whether its constituents: are a "specialized segment" of the community that is the primary beneficiary of the organization's activities, *Hunt v. Washington State Apple Advertising Comm'n*,

432 U.S. 333, 344 (1977);[189] informally guide or influence its priorities and activities;[190] elect or serve in its leadership;[191] finance its activities;[192] or choose to associate with it.[193] No single feature is dispositive, nor is the list exhaustive. Instead, the court must employ a holistic approach "to determine whether, practically speaking, an organization has the appropriate relationship with non-members to sue on their behalf." *In re Fin. Oversight*, 110 F.4th at 311 (citing *Friends of the Earth*, 129 F.3d at 828).

        2.      There is sufficient evidence to support a finding that each of the remaining Organizational Plaintiffs satisfies the indicia-of-membership standard.

TPCA, TX C.U.R.E., and CTD each satisfy the indicia-of-membership standard because they share a sufficiently close nexus with their constituents to represent their interests. Each of these organizations has a "defined mission" and serves a "discrete" population with a "definable set of common interests" in this action. *AARP*, 226 F. Supp. 3d at 17. The foundational purpose

---

[189] *See also, e.g.*, *Mink*, 322 F.3d at 1111 (finding associational standing where constituents—incapacitated criminal defendants—comprised a "specialized segment" of the community that was the primary beneficiary of the group's activities); *AARP v. U.S. Equal Emp.Opportunity Comm'n*, 226 F. Supp. 3d 7, 17 (D.D.C. 2016) (finding associational standing where an organization with a "defined mission" serves a "discrete, stable membership with a definable set of common interests"); *cf. Ind. Prot. & Advoc. Servs. Comm'n v. Ind. Fam. & Soc. Servs. Admin.*, 630 F. Supp. 3d 1022, 1029 (S.D. Ind. 2022) ("If the core of associational standing is not 'membership' but rather the propriety of collective representation, then the constituent-advocacy group relationship alone might suffice for associational standing, assuming always that there is some underlying injury in fact.").

[190] *Flyers Rts.*, 957 F.3d at 1362 (finding associational standing where constituents had "sufficient amount of interaction" with the association "to influence [its] activities"); *Mink*, 322 F.3d at 1112 (same where constituents "possess the means to influence the priorities and activities the [plaintiff] undertakes").

[191] *Hunt*, 432 U.S. at 344–45.

[192] *Id.*

[193] *Flyers Rts.*, 957 F.3d at 1361–62 (airline passengers became organization's "member[s] . . . by signing up to receive information from the organization"); *Friends of the Earth*, 129 F.3d at 829 (indicia of membership included fact that "members [] voluntarily associated themselves" with the organization).

of TX C.U.R.E. and TPCA is to protect and promote the interests of incarcerated Texans and their families, and these populations are the primary beneficiaries of each organization's activities.[194] Similarly, CTD serves disabled Texans, including those who are incarcerated, and those individuals are the primary beneficiaries of its efforts.[195]

These organizations' constituents also have a "sufficient amount of interaction" with their respective organizations "to influence [its] activities." *Flyers Rts.*, 957 F.3d at 1362. TX C.U.R.E. engages directly with its constituents, including individuals who "have suffered from exposure to excessive heat" in an unairconditioned TDCJ unit.[196] TPCA likewise communicates regularly with its incarcerated constituents and has volunteer "team members" inside TDCJ prisons who work directly with the organization.[197] TPCA has also surveyed incarcerated constituents concerning their experiences with heat-related conditions in TDCJ facilities and the efficacy of, or TDCJ's compliance with, heat-mitigation efforts.[198] CTD likewise engages with its member-constituents through newsletters and social media, and communicates directly with or advocates on behalf incarcerated constituents who reach out to the organization.[199] Both TX C.U.R.E's and TPCA's governing boards include (or have included) individuals who were formerly incarcerated in TDCJ facilities or who have family members that are or were incarcerated in TDCJ units.[200] And there is no dispute that TX C.U.R.E. and TPCA look to the experiences of their incarcerated constituents to guide their priorities and activities. (*Id.*; Mot. 13,

---

[194] SAMF § I.B, *supra*.

[195] *Id.* § I.D, *supra*.

[196] SAMF § I.B, *supra*.

[197] *Id.* § I.C, *supra*.

[198] *Id.*

[199] *Id.* § I.D., *supra*.

[200] *Id.* § I.D., *supra*.

19, Dkt. No. 251.)

Further, that CTD has defined categories of membership beyond inmates with disabilities does not mean CTD fails the indicia-of-membership standard. CTD considers all Texans living with a disability to be member-constituents, including those who are incarcerated.[201] It is thus appropriate to apply the indicia-of-membership test for purposes of this lawsuit, in which CTD seeks to represent the interests of those informal member-constituents. *See In re Fin. Oversight*, 110 F.4th at 312–14 (applying indicia-of-membership test to organizational plaintiff suing on behalf of non-members); *Friends of the Earth*, 129 F.3d at 827–29 (same where organizational plaintiff did not have proper members under its bylaws but "followed a practice of considering all those who gave a donation, as well as those who had a donation made in their name, to be members").

By framing funding and control as the end-all, be-all of associational standing, Defendant not only misstates the law; he also ignores the substantial evidence showing that TX C.U.R.E., TPCA, and CTD are "sufficiently identified with and subject to the influence of those [they] seek[] to represent as to have a personal stake in the outcome of the controversy." *Mink*, 322 F.3d at 1111 (internal quotation marks omitted). Plaintiffs satisfy the indicia-of-membership standard, as this Court has already concluded. *See Tiede*, 2025 WL 2469118, at *29.[202]

### C.    Neither the Organizational Plaintiffs' Claims Nor the Injunctive Relief They

---

[201] SAMF § I.D., *supra*.

[202] Defendant's reliance on *ARC* is misplaced. (Mot. 6, Dkt. No. 251 (citing *Ass'n for Retarded Citizens of Dall. v. Dall. Cnty. Mental Health & Mental Retardation Ctr. Bd. of Trs.*, 19 F.3d 241, 244 (5th Cir. 1994) ("*ARC*")).) The Fifth Circuit denied associational standing in *ARC* with minimal explanation, stating only that the organization's non-member "clients" were "unable to participate in and guide the organization's efforts." 19 F.3d at 244. Here, by contrast, the evidence shows the Organizational Plaintiffs' incarcerated constituents can and *do* "participate in and guide the organization's efforts," rendering *ARC* inapposite. *Id.*

**Seek Require the Participation of Individual Members.**

The third prong of *Hunt*'s three-part test for associational standing is satisfied so long as the organization's claims do not involve member-specific inquiries that would require extensive participation by every injured member. *Ass'n of Am. Physicians & Surgeons, Inc. v. Tex. Med. Bd.*, 627 F.3d 547, 551–53 (5th Cir. 2010). But the need for evidence from *some* individual members—or even a "significant sample"—is not fatal. *Id.*; *Hosp. Council of W. Pa. v. City of Pittsburgh*, 949 F.2d 83, 89–90 (3d Cir. 1991) (Alito, J.) (finding "no ground for denying associational standing" despite need for "some participation" by plaintiff's members because "participation by 'each allegedly injured party' would not be necessary" (quoting *Warth v. Seldin*, 422 U.S. 490, 511 (1975))); *see also Hunt*, 432 U.S. at 343 ("[S]o long as the nature of the claim and of the relief sought does not make the individual participation of *each injured party indispensable* to proper resolution of the cause, the association may be an appropriate representative of its members entitled to invoke the court's jurisdiction." (quoting *Warth*, 422 U.S. at 511 (emphasis added))).

Here, resolving Plaintiffs' claims does not require individualized evidence pertaining to each injured inmate. This Court has already held that the extreme heat in TDCJ's unairconditioned facilities poses a substantial risk of serious harm to "every TDCJ inmate in an unair-conditioned cell," regardless of individual circumstance, and that *all* of TDCJ's heat-mitigation measures are "inadequate," regardless of how consistently (or inconsistently) they are implemented across facilities. *Tiede*, 2025 WL 2469118, at *33, *37. Plaintiffs have (and, if necessary, will continue to) support that claim with evidence of the well-known health risks associated with exposure to extreme heat, the well-documented conditions at TDCJ's uncooled facilities, and Defendant's admitted awareness of both those conditions and the severe health risks they cause. *See id.* at *6-25 (citing voluminous evidence and testimony regarding the risks

of extreme heat). Mr. Collier did not challenge that evidence or testimony at the preliminary

injunction hearing, and Defendant does not challenge it now. Thus, associational standing is still

appropriate because Plaintiffs' claims "can be proven by evidence from representative injured

[inmates]" of facility-wide conditions, "without a fact-intensive-individual inquiry." *Ass'n of

Am. Physicians*, 627 F.3d at 552.

Nor do Plaintiffs seek damages or any other relief that requires any individualized

inquiry: Plaintiffs seek declaratory and injunctive relief that is system-wide. They ask the Court

to: (i) declare that the extreme heat endured by TDCJ inmates in unairconditioned prisons is

"plainly unconstitutional," in violation of the Eighth Amendment (which the Court has already

done); and (ii) order that TDCJ inmates be kept in safe temperatures below 85° F (which the

Court has stated it "foresees" ordering). *Tiede*, 2025 WL 2469118, at *41.

Such relief does not depend on inmates' individual circumstances or the extent of their

specific injuries. *See Tex. Ent. Ass'n, Inc. v. Hegar*, 10 F.4th 495, 505 (5th Cir. 2021)

("Injunctive relief does not make the individual participation of each injured party indispensable

to proper resolution." (internal quotation marks omitted)); *Church of Scientology of Cal. v.

Cazares*, 638 F.2d 1272, 1276–80 (5th Cir. 1981) (individual participation of members not

required where "the claim asserted and the relief requested affect the membership as a whole");

*cf. Warth*, 422 U.S. at 515–16 (rejecting standing where association sought "relief in damages for

alleged injuries to its members" and the "damages claims [were] not common to the entire

membership, *nor shared by all in equal degree*" (emphasis added)). For these reasons, Plaintiffs

satisfy the third prong of the *Hunt* test for associational standing.

## II.    THE PLRA'S EXHAUSTION REQUIREMENT DOES NOT APPLY TO THE ORGANIZATIONAL PLAINTIFFS.

Nor are the Organizational Plaintiffs required to exhaust under the PLRA. As this Court

has already held, "[t]he Organizational Plaintiffs are not persons capable of being incarcerated or detained, so they are not 'prisoners' as the term is defined by the PLRA." *Tiede*, 2025 WL 2469118, at *31 (quoting 42 U.S.C. § 1997e(a), (h)). The PLRA only limits "litigation *by* prisoners, not litigation *about* prisoners by organizations that count prisoners among their members or constituents." *Trivette v. Tenn. Dep't of Corr.*, 739 F. Supp. 3d 663, 697 (M.D. Tenn. 2024). The PLRA's exhaustion requirement thus does not apply to the Organizational Plaintiffs.[203]

Defendant argues that the PLRA's exhaustion requirement applies here based on an atextual reading of the PLRA and a single case. (Mot. 25, Dkt. No. 251 (citing *Green Haven Prison Preparative Meeting of Religious Soc'y of Friends v. N.Y. State Dep't of Corr. & Cmty. Supervision*, 16 F.4th 67, 82-83 (2d Cir. 2021)). In *Green Haven*, the organizational plaintiff was an unincorporated Quaker worship group with only eight members (all of whom were incarcerated), which challenged a prison's change in worship times. 16 F.4th at 73. Because none of the worship group's members had exhausted their administrative remedies—in fact, none of them had commenced the prison's grievance procedure—the Second Circuit held that the incarcerated plaintiff could not "avoid the exhaustion requirement by suing under the banner" of the unincorporated association. *Id.* at 82.

This case is nothing like *Green Haven*. For one thing, none of the Plaintiffs are

---

[203] The Court's prior holding is consistent with ample federal authority. *See, e.g., Tretter v. Pa. Dep't of Corr.*, 558 F. App'x 155, 157 (3rd Cir. 2014) (unpublished) (representative of deceased inmate and administratrix of his estate was not a "prisoner" required to exhaust administrative remedies); *Rivera-Rodriguez v. Pereira-Castillo*, No. 04-1389(HL), 2005 WL 290160, *6 (D.P.R. Jan. 31, 2005) (finding that the plain language of the PLRA excludes family members and guardians of incarcerated minors); *see also Wormley v. United States*, 601 F. Supp. 2d 27, 44 (D.D.C. 2009) (finding PLRA applies only to a "prisoner" and does not require exhaustion by non-prisoners, even for claims related to their earlier detentions).

unincorporated associations—which was critical to the Second Circuit's holding. *Id.* In addition, it is undisputed that at least some of Plaintiffs' members and constituents have exhausted their administrative remedies, making them wholly different from the prisoners who never pursued administrative remedies in *Green Haven*. Indeed, Defendant concedes that at least some Lioness members have fully exhausted their administrative remedies. (Mot. 22-23, Dkt. No. 251.) While Defendant ignores the other Organizational Plaintiffs, which this Court previously found represent tens of thousands of prisoners in unairconditioned cells, *see Tiede*, 2025 WL 2469118, at *3-4, he hasn't even suggested (let alone proven) that none of those organizations' constituents have exhausted their administrative remedies.[204] So even if the PLRA's exhaustion requirement applied (and it doesn't), Defendant's argument would still fail.

## III.    A GENUINE DISPUTE OF MATERIAL FACT EXISTS OVER WHETHER DEFENDANT IS VIOLATING PLAINTIFFS' EIGHTH AMENDMENT RIGHTS.

Nor has Defendant carried his burden on Plaintiffs' Eighth Amendment claims. This Court previously held that the Organizational Plaintiffs were likely to succeed on the merits of those claims. *See Tiede*, 2025 WL 2469118, at *31. The Court concluded that the Organizational Plaintiffs had met the objective standard by showing that "extreme heat in TDCJ's uncooled prisons constitutes a well-established substantial risk of serious harm that constitutes cruel and unusual punishment." *Id.* at *32. And the Court held that the Organizational Plaintiffs had met

---

[204] Failure to exhaust administrative remedies is an affirmative defense, so Defendant—not Plaintiffs—bears the burden of proving a failure to exhaust. *Dillon v. Rogers*, 596 F.3d 260, 266 (5th Cir. 2010). Because the Organizational Plaintiffs brought this suit in a representative capacity, exhaustion by all of their members and constituents is not required. *Cf. Gates v. Cook*, 376 F.3d 323, 330 (5th Cir. 2004) (exhaustion of administrative remedies by a single inmate was sufficient to support class wide relief in an action challenging the conditions of Mississippi's death row). In other words, even if he were correct that the PLRA applies to the Organizational Plaintiffs, Defendant must show that *none* of the Organizational Plaintiffs' members or constituents have exhausted. He hasn't.

the subjective standard by showing that "Collier knows inmates face serious harm from the extreme heat in Texas's unair-conditioned prisons, and that the risk of harm is obvious, well-documented, longstanding, and pervasive, and has been expressly noted by TDCJ officials in the past." *Id.* at *35. What was true in March 2025 remains true today.

A.     **Plaintiffs have proven the Eighth Amendment's objective standard.**

Defendant's motion tellingly says nothing about the Eighth Amendment's objective standard, thereby conceding that it is met. This makes sense, as "[i]t is well-established in the Fifth Circuit that the Eighth Amendment guarantees inmates a right to be free from exposure to extremely dangerous temperatures without adequate remedial measures." *Id.* at *31 (internal quotation marks omitted). And the Fifth Circuit has "repeatedly recognized the serious risk of harm that excessive heat can pose in the prison context absent adequate mitigating measures, and [it has] consistently found evidence sufficient in these cases to support an Eighth Amendment violation, even when certain mitigating measures were available." *Id.*  (quoting *Yates v. Collier*, 868 F.3d 354, 361 (5th Cir. 2017) (brackets in original and quotation marks omitted).) Indeed, the Fifth Circuit has recognized this risk for more than 20 years. *See Gates*, 376 F.3d at 340; *Smith v. Sullivan*, 553 F.2d 373, 381 (5th Cir. 1977) ("If the proof shows the occurrence of extremes of temperature that are likely to be injurious to inmates' health[,] relief should be granted . . . ."). It is thus uncontested that the Eighth Amendment's objective standard is met here.

B.     **Plaintiffs have also shown that Defendant acted with deliberate indifference.**

Nor does Defendant's motion offer anything new regarding the subjective standard. To satisfy that standard, the Organizational Plaintiffs must show Defendant "knows that inmates face a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it." *Farmer v. Brennan*, 511 U.S. 825, 847 (1994). This knowledge can be

inferred "from circumstantial evidence," and the Court "may conclude that [Defendant] knew of a substantial risk from the very fact that the risk was obvious." *Gates*, 376 F.3d at 333, 340 (affirming finding of deliberate indifference "based on the open and obvious nature of these conditions and the evidence that inmates had complained of symptoms of heat-related illness"); *see also Ball I*, 792 F.3d at 595 (affirming finding of deliberate indifference based "on the totality of the record evidence" showing prison official's subjective knowledge). This knowledge may also be shown by evidence that the risk is "longstanding, pervasive, well-documented, or expressly noted by prison officials in the past," and "the circumstances suggest that [Defendant]" was exposed to that information. *Farmer*, 511 U.S. at 842–43. These standards are easily met here.

      1.    Like his predecessor, Defendant knows that inmates face a substantial risk of serious harm, and the risk is obvious, well-documented, long-standing, pervasive, and expressly noted by TDCJ officials in the past.

To begin with, this Court can "infer that Defendant[] knew of the risk" of harm from extreme heat, "given its open and obvious nature." *Coones v. Cogburn*, No. 24-10777, 2025 WL 2092392, at *3 (5th Cir. July 25, 2025) (unpublished). "[T]he brutality of the Texas heat is well known, and Defendant[] [is] reminded of it every time [he] step[s] outside." *Id.*; *see Hinojosa v. Livingston*, 807 F.3d 657, 667 (5th Cir. 2015) ("[T]he open and obvious nature of the dangerously hot conditions would also support an inference of deliberate indifference."). The "open and obvious nature of the extreme heat is enough to infer knowledge" sufficient to satisfy the Eighth Amendment's subjective standard, but "this case presents [far] more." *Coones*, 2025 WL 2092392, at *3.

First, as the Fifth Circuit has acknowledged, "there have been as many as 271 heat deaths in Texas prisons between 2001 and 2019—30 times the national average." *Id.* at *1. And, "[a]s summers continue to get hotter, the problem continues to get worse." *Id.* The same study relied

on by the Fifth Circuit—which was authored by Plaintiffs' experts Dr. Skarha and Dr. Zanobetti—concluded that "there was not a single heat-related death in TDCJ's climate-controlled prisons during this period." *Tiede*, 2025 WL 2469118, at *9. Like Mr. Collier, Defendant is aware of this study, and he is aware of these deaths. (SAMF § II, *supra*.)

Second, Defendant himself has acknowledged that (i) "heat waves are a time of grave danger to [TDCJ's] inmates and staff," (ii) "inmates confined in temperatures at or above 95 degrees face a serious health risk," and (iii) inmates "are at risk when they're housed at high environmental temperatures." (*Id.*) And his predecessor, Mr. Collier, admitted during the preliminary injunction hearing that "he was aware of the several heat-related deaths, multiple heat-related illnesses of inmates, dozens of workers' compensation claims, dozens of staff-related illnesses, and thousands of heat-related grievances from inmates in the last two summers alone." *Tiede*, 2025 WL 2469118, at *35; *see also Coones*, 2025 WL 2092392, at *3 (noting that "Collier and another TDCJ official testified in previous litigation that summer temperatures in prisons are so high that inmates are at serious risk of harm unless adequate measures are taken"). Mr. Collier testified under oath in the *Cole* case that he believed during the summer of 2019 that inmates confined in temperatures of 95° were at a serious health risk.[205] Thus, Defendant is personally aware of the substantial risk of harm faced by TDCJ inmates in unairconditioned prisons.

Third, Defendant is well-aware of the substantial risk of harm from extreme heat, given the numerous lawsuits that have been filed against him, his predecessors, and TDCJ over the last twenty-five years for deaths and serious illnesses caused by extreme heat. *Cf. Coones*, 2025 WL

---

[205] SAMF § II, *supra*.

2092392, at *3 ("Supervisor Defendants are also likely aware of the many lawsuits regarding the extreme heat in Texas prisons."). TDCJ has previously acknowledged heat-related deaths dating back to 1998. As Judge Ellison found:

> It is undisputed that five men died in 1998 from environmentally-caused hyperthermia while incarcerated in TDCJ facilities. Between 1999 and 2010, five more individuals are known to have died from hyperthermia or other heat-related illnesses while incarcerated in Texas prisons. In 2011, Texas experienced an "unprecedented" heat wave, and ten more individuals died from hyperthermia.

*McCollum v. Livingston,* No. 4:14-CV-3253, 2017 WL 608665, at *1 (S.D. Tex. Feb. 3, 2017) (citations omitted). As the Fifth Circuit has recognized, "TDCJ officials are, or have been, defendants in numerous other cases alleging Eighth Amendment violations based on excessive heat in prison." *Yates*, 868 F.3d at 360 (citing several cases). These lawsuits not only placed Defendant on notice of the substantial risk of serious harm Texas inmates face from extreme heat; they also established the obviousness of that risk.

Last, Defendant is well-aware of the substantial risk of serious harm from extreme heat, because of safe-temperature mandates in jails and federal prisons in Texas and in other state prison systems across the country.[206] TDCJ has nevertheless refused to do the same.

>    2.    Defendant's response to the substantial risk of death and serious harm from extreme heat is inadequate and unreasonable.

Despite the long-standing, well-established, and obvious risk of extreme heat to TDCJ's inmates in unairconditioned prisons, Defendant has not taken adequate measures to address it.

The "mere presence of remedial measures" is not a defense to an Eighth Amendment violation. *Webb v. Livingston*, 618 F. App'x 201, 209 n.7 (5th Cir. 2015); *see also Cole*, 2017 WL 3049540, at *41 (rejecting Mr. Collier's argument that TDCJ was not deliberately indifferent

---

[206] SAMF § II.

simply because TDCJ "implemented several mitigating measures since the deaths in 2011 and 2012"). Prison officials cannot "insist upon a course of action that has already proven futile." *Tiede*, 2025 WL 2469118, at *36 (internal quotation marks omitted). Nor can they rely on mitigation measures that have nothing more than a "negligible impact" on the danger posed to inmates from extreme heat. *Laube v. Haley*, 234 F. Supp. 2d 1227, 1251 (M.D. Ala. 2002).

Eight years ago, Judge Ellison held that many of TDCJ's mitigation measures—cold water, respite rooms, and cold showers—"do not stop Plaintiffs from experiencing the symptoms of heat-related illnesses and do not reduce the risk of serious injury or death to a socially acceptable level." *Cole*, 2017 WL 3049540, at *40. Judge Ellison explained that those measures were, "by and large ineffective at reducing the heat stress placed on Plaintiffs' bodies" and were nothing more than "the bare minimum." *Id.* at *40-42. By implementing such measures, Judge Ellison held, Mr. Collier "ignored the risk of harm faced by the population [he] serve[s]" and was thus deliberately indifferent to the substantial risk of serious harm that inmates in the Pack Unit faced from the extreme heat. *Id.* at *42. In its preliminary injunction order, this Court likewise concluded that "the uncontroverted evidence shows that [TDCJ's] heat mitigation measures are *still* inadequate, just as Judge Ellison found seven years ago." *Tiede*, 2025 WL 2469118, at *37 (emphasis in original).

Most troubling to the Court was "the fact that none of these measures prevented (1) the several dozen deaths that Drs. Skarha and Dr. Zanobetti attributed to heat even after heat mitigation measures were implemented, (2) the three heat-related deaths that [Mr.] Collier admits occurred [in summer 2023], (3) the two additional heat-related deaths that Dr. Uribe and Dr. Vassallo testified occurred [in summer 2023], or (4) the 35 heat-related illnesses of TDCJ inmates identified by UTMB that occurred in 2022 and 2023." *Id.* at *38.

Yet Mr. Collier and Defendant have done next to nothing in the last fifteen months. As Mr. Collier did last summer, Defendant points to TDCJ's "heat mitigation strategies" and "mitigation efforts" as his principal defense to Plaintiffs' Eighth Amendment claim. (Mot. 33, Dkt. No. 251.) Defendant tellingly does not identify any new strategies, he simply relies on the old ones that this Court has already found inadequate: "[h]eat strike teams"; the heat score system; providing inmates cold water; and allowing inmates to purchase cooling towels, cool shirts, bottled water, "and the like" at the commissary. (*Id.* at 33-35.) His Motion identifies one change to the heat score system: It was updated "to input an inmate's age above 65 years as *a factor* to trigger a score." (*Id.* at 35 (emphasis added).) And he suggests that TDCJ has gotten better at enforcing these old, ineffective policies, because it has (i) a new version of AD-10.64 (which is nearly identical to the 2024 version), (ii) new digitized temperature monitors, and (iii) "heat safety training" and "heat awareness flyers." (*Id.* at 33-35.)

But TDCJ's mitigation measures *still* have "not stop[ped] [TDCJ inmates] from experiencing the symptoms of heat-related illnesses and [did] not reduce the risk of serious injury or death to a socially-acceptable level." *Cole*, 2017 WL 3049540, at *40. Even with the addition of inmates over 65, only 13,950 TDCJ inmates—or fewer than 10%—have heat scores.[207] Inmates continue to die from the heat, inmates and staff continue to experience heat-related illnesses, and inmates continue to file thousands and thousands of heat-related grievances.[208] Defendant knows that air conditioning is the only effective remedy. In his October 2025 deposition, he testified that "air conditioning is the only effective protection from the

---

[207] Ex. 19, Lumpkin Dep. 108:12-14.
[208] SAMF § III., *supra*.

extreme heat."[209] He agrees that air conditioning is "necessary in order to protect inmates' health and safety."[210] And he understands that "the way to solve this problem is with air conditioning," and that TDCJ has to "get rid of the heat . . . by air conditioning the system."[211]

What Defendant has *not* done "in the face of the substantial risk of harm is also relevant to the Court's analysis." *Cole*, 2017 WL 3049540, at *42. Despite Defendant knowing of the risks extreme heat poses to all inmates and the inadequacy of TDCJ's mitigation measures and acknowledging that permanent air conditioning is the only solution, TDCJ still has not solicited bids for installing permanent air conditioning throughout TDCJ facilities.[212] Mr. Collier admitted that this Court's March 2025 Order did not change anything with respect to how quickly TDCJ moved or what TDCJ requested from the Legislature in any capacity. [213] Sure enough, TDCJ has not meaningfully increased the pace at which air conditioned beds have been installed: Only 4,581 new air conditioned beds have been installed in the fifteen months since the hearing—or a rate of approximately 3,234 new air conditioned beds per year.[214]

In his deposition, Defendant would not commit to asking for the funding required for TDCJ to complete its three-phase plan.[215]  He has not committed to requesting another specific amount from the Texas Legislature for air conditioning.[216] TDCJ still refuses to take many other steps that Plaintiffs' experts have opined would dramatically reduce the time it would take to

---

[209] *Id.* § V.A., *supra*.

[210] *Id.*

[211] *Id.*

[212] SAMF § V.C., *supra*.

[213] *Id.*

[214] *Id.* § V.B., *supra*.

[215] *Id.* § V.C., *supra*.

[216] *Id.*

fully air condition the system.[217] Instead, TDCJ stubbornly insists on using the same piecemeal design-bid-build process. [218]

At TDCJ's current rate of 3,234 new air conditioned beds per year, it will take 25 to 30 years to add air conditioning to all inmate living areas, assuming the Texas Legislature allocates funds to do so. As the Court held, "[t]his slow timeline exposes over 95,000 inmates to the substantial risk of serious injury or death from unairconditioned prisons and, assuming normal rates of inmate turnover, would continue to expose hundreds of thousands of inmates to the substantial risk of injury or death from extreme heat over the next two to three decades." *Tiede*, 2025 WL 2469118, at *38.

Despite a significant risk of harm faced by inmates in unairconditioned TDCJ prisons, Defendant continues to rely on "mitigation measures he knows are inadequate—and which the Court [found] are scientifically inadequate—to reduce the substantial risks of serious harm posed by extreme heat." *Id.* And Defendant "has implemented (or has a plan to implement) the only reasonable mitigation measure that he knows is adequate to reduce or eliminate the risk—air-conditioning—at a pace that disregards the substantial risk of harm the inmates face." *Id.* The motion for summary judgment on Plaintiffs' Eighth Amendment claim should thus be denied.

## IV.    THE PLRA DOES NOT BAR THE ORGANIZATIONAL PLAINTIFFS' REQUESTED RELIEF.

Nor does the PLRA bar Plaintiffs' requested relief. Under the PLRA, although "plaintiffs are not entitled to the most effective available remedy," they are nevertheless "entitled to a remedy that eliminates the constitutional injury." *Ball I*, 792 F.3d at 599 (citation omitted). In other words, the remedy must "reduce[] the risk of harm to a socially acceptable level." *Id.* As

---

[217] *Id.*

[218] *Id.* § V.D., *supra*.

the Supreme Court has held, in ordering a state-wide reduction in California's prison population

due to the unconstitutional conditions caused by overcrowding:

> The population reduction potentially required is nevertheless of unprecedented sweep and extent. Yet so too is the continuing injury and harm resulting from these serious constitutional violations. For years the medical and mental health care provided by California's prisons has fallen short of minimum constitutional requirements and has failed to meet prisoners' basic health needs. Needless suffering and death have been the well-documented result. Over the whole course of years during which this litigation has been pending, no other remedies have been found to be sufficient.
> . . .
>
> This Court now holds that the PLRA does authorize the relief afforded in this case and that the court-mandated population limit is necessary to remedy the violation of prisoners' constitutional rights.

*Brown v. Plata*, 563 U.S. 493, 501-02 (2011).

This Court has held that "*every* TDCJ inmate in an unair-conditioned cell faces a

substantial risk of death or serious bodily injury from the extreme heat, absent the installation of

air conditioning." *Tiede*, 2025 WL 2469118, at *33. The Court determined that "TDCJ's

mitigation measures have not stopped TDCJ inmates from experiencing the symptoms of heat-

related illnesses and did not reduce the risk of serious injury or death to a socially-acceptable

level." *Id.* at *38 (cleaned up). In other words, it held that those measures had consistently failed

to "eliminate[] the constitutional injury." *Ball I*, 792 F.3d at 599.

TDJC has tried all mitigation measures short of air-conditioning. None have prevented

heat-related deaths or illnesses, nor have any reduced the risk of serious harm or death from

extreme heat to a "socially acceptable" level. *Id.*  Mr. Collier did not identify any alternative,

less-intrusive mitigation measures at the hearing, let alone offer any evidence that such measures

would "eliminate[] the constitutional injury" inflicted by extreme heat. *Id.*  Nor has Defendant

done so here. In fact, he admits what this Court has already found: "[A]ir conditioning is the only

effective protection from the extreme heat."[219] Maintaining the inmate living areas at safe

temperatures below 85° F is thus a necessary, narrowly tailored remedy that is no more intrusive

than required to meet the heat crisis in TDCJ's unairconditioned prisons. *Cf. Plata*, 563 U.S. at

500 ("After years of litigation, it became apparent that a remedy for the constitutional violations

would not be effective absent a reduction in the prison system population.").

 Nor is this relief foreclosed by *Ball I*, for three reasons. First, *Yates* flatly rejected the

argument that *Ball I* prohibited an injunction requiring air-conditioning. *Yates*, 868 F.3d at 370

("Relying on our decision in *Ball v. LeBlanc*, Defendants argue that the PLRA categorically

prohibits an injunction requiring that the Pack Unit be air-conditioned. *This is not so*." (emphasis

added)). As the *Yates* court explained, *Ball I* "held that air-conditioning was not appropriate in

that case, because other acceptable and less-intrusive remedies had yet to be tried—not that air-

conditioning was necessarily an impermissible remedy." *Id.*  And the *Yates* court reaffirmed the

district court's assertion that air conditioning inmate housing areas could be ordered if it was

"indeed the least intrusive means of correcting the violation." *Id.* Here, every alternative, less-

intrusive remedy has been tried by TDCJ and has failed to either eliminate the risk of heat-

related illness and death or reduce it to a "socially acceptable" level. *Ball I*, 792 F.3d at 599.

 Second, *Ball I* does not prohibit the Court from imposing a maximum heat index or

temperature. *Ball I* found a maximum heat index unnecessary because the injunction in *Gates*

lacked such a limit, and there was "no showing" in *Ball I* that "the Constitution mandated more

relief for these prisoners for the same prison condition in this case." *Id.* at 600. Here, however,

the Court credited Plaintiffs' unrebutted evidence at the preliminary injunction hearing that

---

[219] SAMF § V.A., *supra.*

temperatures over 85° F pose a substantial risk of serious harm to all inmates—even healthy ones. *Tiede*, 2025 WL 2469118, at *33. Dr. Vassallo testified that exposure to a heat index of 88° F or higher poses a substantial risk of adverse outcomes for everyone, and even Mr. Collier's expert witness agreed that temperatures at and above 90° F expose all inmates to a serious risk of heat-related illness and death, *id.* *39. And in *Yates*, the court confirmed that the *Gates* injunction does not reflect the permissible limits of relief. *Yates*, 868 F.3d at 371 n.8 ("[J]ust because *Gates* affirmed a different injunction on a different record does not speak to whether the Plaintiffs' requested relief in this case would be permissible under the PLRA.").

Third, *Ball I* does not foreclose the systemwide relief Plaintiffs seek. *Ball I* "held that a facility-wide injunction was not appropriate under the PLRA because only the three named plaintiffs were at issue." *Yates*, 868 F.3d at 370. Installing facility-wide air conditioning was *necessarily* overly broad in *Ball I*, because that relief was not "limit[ed] . . . to the particular plaintiffs before the court." *Ball I*, 792 F.3d at 599 ("Ball, Code, and Magee are the only plaintiffs before the court," so "any relief must apply only to them, if possible."). Here, however, the Organizational Plaintiffs represent *every* inmate in the TDCJ system (all of whom face a substantial risk of serious harm), so the Court's relief must be tailored accordingly. *See Plata*, 563 U.S. at 531-32 ("The scope of the remedy must be proportional to the scope of the violation."). Because the constitutional violation is system-wide, nothing short of system-wide relief will suffice. *See id.* ("The order also is not overbroad because it encompasses the entire prison system," given the "systemwide [constitutional] violation").

## V.    MR. TIEDE'S EIGHTH AMENDMENT CLAIM IS NOT MOOT.

Nor is Mr. Tiede's Eighth Amendment claim moot. As this Court recognized, his condition has only worsened since the Court entered its temporary restraining order—he was

diagnosed with a new acute or subacute stroke in his thalamus in April 2024. *See Tiede*, 2025 WL 2469118, at *34. He is now 67 years old, suffers from COPD, diabetes, hypertension, and bleeding on his right retina. *See id.*  Dr. Vassallo offered unrebutted testimony at the preliminary injunction hearing that Mr. Tiede is particularly vulnerable to heat, and that placing him in unairconditioned housing would put him at a substantial risk of death or serious harm. *See id.*

Defendant has finally given Mr. Tiede a heat score which, according to Defendant, makes his "placement in airconditioned housing" a "permanent change." (Mot., ECF 251 at 28.) Unfortunately, however, it is not "absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur." *Tiede*, 2025 WL 2469118, at *34. The Supreme Court has explained that the "test for mootness in cases such as this is a stringent one." *City of Mesquite v. Aladdin's Castle, Inc.*, 455 U.S. 283, 289 n.10 (1982). Because TDCJ can unilaterally change the heat score system at any time to remove Mr. Tiede's heat score, a court order is required to maintain his safety, and his claims are not moot. *See Tucker v. Gaddis*, 40 F.4th 289, 292–93 (5th Cir. 2022) ("TDCJ bears the 'heavy' burden of demonstrating mootness. . . . TDCJ claims that its policy change moots this case. But mere voluntary cessation of allegedly illegal conduct does not moot a case; if it did, the courts would be compelled to leave the defendant free to return to his old ways." (cleaned up)).

## CONCLUSION

As the Court has repeatedly found, the Organizational Plaintiffs have standing to seek relief on behalf of their constituents and members, the PLRA's exhaustion requirement doesn't apply to their claims, they have established that the exposure of TDCJ inmates in unairconditioned cells to extreme heat is "plainly unconstitutional," *Id.* at *41, and the relief they seek is permissible under the PLRA. Nor is Mr. Tiede's Eighth Amendment claim moot, as a court order is still required to maintain his safety. Defendant's motion should be denied.

DATED this 5th day of December, 2025.        Respectfully submitted,

_/s/ Kevin D. Homiak_
Thomas A. Olsen (admitted _pro hac vice_)
Kevin D. Homiak (admitted _pro hac vice_)
WHEELER TRIGG O'DONNELL LLP
370 Seventeenth Street, Suite 4500
Denver, CO 80202-5647
Telephone:    303.244.1800
Facsimile:     303.244.1879
Email:    olsen@wtotrial.com
              homiak@wtotrial.com

Erica Grossman (admitted _pro hac vice_)
HOLLAND, HOLLAND EDWARDS & GROSSMAN, LLC
1437 High Street
Denver, CO 80218
Telephone:    303.860.1331
Email:    erica@hheglaw.com

Jeff Edwards
Texas Bar No. 24014406
David Anthony James
Texas Bar No. 24092572
Lisa Snead
Texas Bar No. 24062204
Paul Samuel
Texas Bar No. 24124463
EDWARDS LAW
603 W. 17th Street
Austin, TX 78701
Telephone:    512.623.7727
Facsimile:     512.623.7729
Email:    jeff@edwards-law.com
              david@edwards-law.com
              lisa@edwards-law.com
              paul@edwards-law.com

Jodi Cole
Texas Bar No. 24045602
LAW OFFICE OF JODI COLE, PLLC
203 East Murphy Street
Alpine, TX 79830
Telephone:     432.837.4266
Facsimile:     512.692.2575
Email:     jcole@jodicole.com

Brandon Duke
Caitlin E. Gernert
Texas Bar No. 24094476
O'MELVENY & MYERS LLP
700 Louisiana St., Suite 2900
Houston, Texas 77002
Telephone:  (832) 254-1500
Facsimile:  (832) 254-1501
Email:          bduke@omm.com
                     cgernert@omm.com


*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE (CM/ECF)

I HEREBY CERTIFY that on December 5, 2025, I electronically filed the foregoing **PLAINTIFFS' REDACTED RESPONSE TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (ECF 251)** with the Clerk of Court using the CM/ECF system which will send notification of such filing to all counsel of record via email.

*/s/ Kevin D. Homiak*
Kevin D. Homiak

# UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
### AUSTIN DIVISION

| | | |
|---|---|---|
| BERNHARDT TIEDE , II; TEXAS PRISONS COMMUNITY ADVOCATES; LIONESS JUSTICE IMPACTED WOMEN'S ALLIANCE; TEXAS CITIZENS UNITED FOR REHABILITATION OF ERRANTS, INC.; AND COALITION FOR TEXANS WITH DISABILITIES, INC., | § § § § § § § § | |
| Plaintiffs, | § § | Civil Action No.: 1:23-cv-01004-RP |
| v. | § § | |
| BOBBY LUMPKIN, | § § § | |
| Defendant. | § § § § § | |

## APPENDIX OF EXHIBITS IN SUPPORT OF PLAINTIFFS' RESPONSE TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

| Exhibit No. | Description |
|---|---|
| 1. | Bylaws for Lioness Justice Impacted Women's Alliance, LIONESS 00032-44 |
| 2. | Excerpts of the Deposition of Jennifer Toon |
| 3. | Board Resolution to Amend Bylaws, LIONESS 000045-68 |
| 4. | Lioness Justice Impacted Women's Alliance Membership Policy, LIONESS 000069-72 |
| 5. | Email with BuildUp re membership dated Nov. 8, 2022 - LIONESS_000073-74 |
| 6. | Declaration of Jennifer Toon (Sealed) |
| 7. | Excerpts of the Deposition of Bryan Collier |
| 8. | Excerpts of the Deposition of Charlie Malouff |
| 9. | Excerpts of the Deposition of Scott Bethel |

| 10. | Letter dated Aug. 14, 2023 -TXCURE_000239 |
| 11. | Excerpts of the Deposition of Amite Dominick |
| 12. | Inmate Letter (Sealed) |
| 13. | Inmate Letters (Sealed) |
| 14. | Declaration of Amite Dominick (Sealed) |
| 15. | Excerpts of the Deposition of Chase Bearden |
| 16. | Coalition of Texans with Disabilities By-Laws, CTD_000076-82 |
| 17. | Letter to Tex. Bd. of Pardons & Parole  - CTD_000130-42 |
| 18. | Raise Your Voice! Advocate Connection Program 2024 - CTD_000057-61 |
| 19. | Excerpts of the Deposition of Bobby Lumpkin |
| 20. | Administrative Directive AD-10.64 (rev. 12), TIEDE DEF_367748-66 |
| 21. | Excerpts of the Deposition of Eric J. Guerrero |
| 22. | Administrative Directive AD-10.64 (rev. 11), TIEDE DEF_00121-38 |
| 23. | TDCJ Monitoring of Temperature and Temperature-Related Deaths Fiscal Year 2024 Report, TIEDE DEF_87749-72 |
| 24. | Administrative Review and Risk Management Heat Related Grievances Sept. 2023 – Aug. 2024, TIEDE DEF_452455 |
| 25. | Administrative Review and Risk Management Heat Related Grievances Sept. 2024 – Aug. 2025, TIEDE DEF_452456 |
| 26. | Dr. Uribe Report (Sealed) |
| 27. | Dr. Uribe Report (Sealed) |
| 28. | TDCJ Temperature Log – Coffield Unit, TIEDE DEF_204508-22 |
| 29. | Excerpts of the Deposition of Christopher W. Cirrito |
| 30. | Former Employee File (Sealed) |
| 31. | Plaintiffs' Fourth Supplemental Disclosures |
| 32. | Excerpts of the Deposition of Dale Cox |

| 33. | Expert Report of Exponent |
|-----|---------------------------|
| 34. | Plaintiffs' Preliminary Injunction Hearing Exhibit 151 - Billy Mitchell Letter |
| 35. | Sunset Advisory Commission Staff Report with Final Results |
| 36. | TDCJ 89th Capital Expenditure Plan by Year, TIEDE DEF_456377-84 |
| 37. | Expert Report of Brian Carroll |
| 38. | Select Grievances, TIEDE DEF_42491-574 |
| 39. | Declaration of Charlie Malouff (Sealed) |

DATED this 5th day of December, 2025.    Respectfully submitted,


/s/ Kevin D. Homiak
Thomas A. Olsen (admitted *pro hac vice*)
Kevin D. Homiak (admitted *pro hac vice*)
WHEELER TRIGG O'DONNELL LLP
370 Seventeenth Street, Suite 4500
Denver, CO 80202-5647
Telephone:    303.244.1800
Facsimile:    303.244.1879
Email:    olsen@wtotrial.com
             homiak@wtotrial.com

Erica Grossman (admitted *pro hac vice*)
HOLLAND, HOLLAND EDWARDS & GROSSMAN, LLC
1437 High Street
Denver, CO 80218
Telephone:    303.860.1331
Email:    erica@hheglaw.com

Jeff Edwards
Texas Bar No. 24014406
David Anthony James
Texas Bar No. 24092572
Lisa Snead
Texas Bar No. 24062204
Paul Samuel
Texas Bar No. 24124463
EDWARDS LAW
603 W. 17th Street
Austin, TX 78701
Telephone:    512.623.7727
Facsimile:    512.623.7729
Email:    jeff@edwards-law.com
             david@edwards-law.com
             lisa@edwards-law.com
             paul@edwards-law.com

Jodi Cole
Texas Bar No. 24045602
LAW OFFICE OF JODI COLE, PLLC
203 East Murphy Street
Alpine, TX 79830
Telephone:    432.837.4266
Facsimile:    512.692.2575
Email:    jcole@jodicole.com

Brandon Duke
Caitlin E. Gernert
Texas Bar No. 24094476
O'MELVENY & MYERS LLP
700 Louisiana St., Suite 2900
Houston, Texas 77002
Telephone:  (832) 254-1500
Facsimile:  (832) 254-1501
Email:        bduke@omm.com
              cgernert@omm.com

*Attorneys for Plaintiffs*

## <u>CERTIFICATE OF SERVICE (CM/ECF)</u>

I HEREBY CERTIFY that on December 5, 2025, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system which will send notification of such filing to all counsel of record via email.


*/s/ Kevin D. Homiak*
Kevin D. Homiak

# EXHIBIT 1

# BYLAWS FOR LIONESS JUSTICE IMPACTED WOMEN'S ALLIANCE

## ARTICLE 1 – NAME, PURPOSES, POWERS, AND OFFICES

**1.1    Name**

The name of this corporation is Lioness Justice Impacted Women's Alliance (the "Corporation").

**1.2    Purposes**

The Corporation is organized and will be operated exclusively for charitable, scientific, and educational purposes within the meaning of Section 501(c)(3) of the Internal Revenue Code (the "Code") and to conduct, accomplish, and carry on its objectives, functions, and purposes or any part thereof set forth in the governing documents of the Corporation as amended from time to time.

Within the scope of the foregoing purposes and not by limitation thereof, the Corporation will work to end the incarceration and systemic devaluation of incarcerated women within the Texas criminal legal justice system through educational campaigns, leadership training, peer-led local support groups, and an educational resource platform. The assets and property of the Corporation are hereby pledged for use in performing its exempt purposes.

The Corporation is additionally organized to promote, encourage, and foster any other similar charitable, scientific, or educational activities; to accept, hold, invest, and reinvest and administer any gifts, legacies, bequests, devises, funds, and property of any sort or nature, and to use, expend, or donate its assets, and all income therefrom, for and to devote the same to, the foregoing purposes of the Corporation; and to do any and all lawful acts and things which may be necessary, useful, suitable, or proper for the furtherance of accomplishment of the purposes of this Corporation. Provided however, no act may be performed which would violate section 501(c)(3) of the Code as it now exists or as it may hereafter be amended.

**1.3    Powers**

The Corporation is a Texas nonprofit corporation and has all the powers, duties, authorizations, and responsibilities as provided by the Texas Business Organizations Code ("TBOC"); provided that the Corporation will neither have nor exercise any power, nor engage directly or indirectly in any activity, that would invalidate its status as a Corporation that is exempt from federal income tax as an organization described in Section 501(c)(3) of the Code.

**1.4    Offices**

The Corporation may have, in addition to its registered office, offices as the Board of Directors may determine or as the affairs of the Corporation may require from time to time.

## ARTICLE 2 – NO MEMBERS

**2.1    Membership**

The Corporation will have no members.

## ARTICLE 3 – BOARD OF DIRECTORS

## 3.1    General Powers

The activities, property, and affairs of the Corporation will be managed by its Board of Directors. The Board of Directors (also referred to as "Board") may exercise all such powers of the Corporation and do all such lawful acts and things as are permitted by law, by the Certificate of Formation, or by these Bylaws, unless otherwise expressly provided herein.

## 3.2    Number and Qualifications

The Board of Directors will consist of at least three (3) directors and the number of directors is to be determined from time to time. The initial directors will be those persons named as directors in the Certificate of Formation.  Decreasing the number of directors will not shorten the term of any incumbent director.

In addition to the regular members of the Board, representatives of other organizations or individuals may serve as ex-officio directors, but will not have voting power, will not count as one of the regular directors, and will not be eligible to serve as an officer.

## 3.3    Term of Office

Directors will hold office for a two-year term and until such director's successor is elected and qualified, or until such director's earlier death, resignation, retirement, disqualification, or removal from office. Any director may be re-elected to serve consecutive terms of office.

## 3.4    Nomination of Directors

The Board will nominate candidates for successor directors. At any meeting at which the election of a director occurs any director may nominate a person with the second of any other director.  In addition to nominations made at meetings, a nominating committee may consider nominees.

## 3.5    Election of Directors

A person who meets any qualification requirements to be a director and who has been nominated may be elected as a director.  Directors will be elected by a majority vote of those directors at a meeting at which a quorum is present.

## 3.6    Duties of Directors

Directors will perform their duties in good faith, with ordinary care, and in a manner they reasonably believe to be in the best interest of the Corporation.  Ordinary care is care that prudent persons in similar positions would exercise under similar circumstances.  In the performance of any duty imposed or power conferred on directors, they may in good faith rely on information, opinions, reports, or statements, including financial statements and other financial data, concerning the Corporation or another person that were prepared or presented by a variety of persons, including officers and employees of the Corporation, professional advisors, or experts such as accountants or attorneys.  A director is not relying in good faith if the director has knowledge concerning a matter in question that renders reliance unwarranted.

## 3.7    Filling of Vacancies

Any vacancy occurring in the Board of Directors resulting from the death, resignation, retirement, disqualification, or removal from office of any director will be filled by the affirmative vote of a majority of the directors present at any meeting of the directors at which a quorum is present. Any director elected or appointed to fill a vacancy will hold office for the remainder of the vacated term and until such director's successor is elected and qualified, or until such director's earlier death, resignation, retirement, disqualification or removal from office.

**3.8    Removal**

Any director may be removed, either for or without cause, by the affirmative vote of a majority of the directors present at any meeting of the directors at which a quorum is present, if notice of the intention to act upon such matter will have been given in the notice of such meeting and if such notice is provided to the director proposed to be removed.

**3.9    Resignation**

Any director may resign at any time by delivering written notice to the Secretary or President of the Board of Directors. Such resignation will take effect upon receipt or, if later, at the time specified in the notice.

**3.10    Directors' Compensation**

The compensation, if any, of all directors of the Corporation shall be fixed from time to time by the Board of Directors. For her or his services as director, any director shall be entitled to compensation and the payment or reimbursement of expenses (including reasonable advances for expenses anticipated in the immediate future) for the performance of personal services which are reasonable and necessary to carry out the exempt purposes of the Corporation, provided that such compensation and reimbursement of reasonable expense shall not be excessive. The Corporation will not loan money or property to, or guarantee the obligation of, any director.

## ARTICLE 4 – NOTICES

**4.1    Notice**

At least five (5) days' written notice must be given to all directors of any meeting of the Board of Directors. Notice of meetings may be given by electronic transmission (i.e., e-mail) if all directors individually and collectively consent in writing. Attendance of a director at a meeting will constitute a waiver of notice of such meeting, except when a director attends a meeting for the express purpose of objecting to a meeting not properly called.

## ARTICLE 5 – MEETINGS

**5.1    Regular & Special Meetings**

The Board will hold at least one meeting a year.

Regular meetings of the Board will be held at such times and places as may be selected by resolution adopted by the Board and communicated by written notice to all directors. Except as otherwise provided

by law, by the Certificate of Formation, or by these Bylaws, any and all business may be transacted at any regular meeting.

Special meetings of the Board may be called by or at the request of the President or a majority of directors. A person or persons authorized to call special meetings of the Board may select any place as the place for holding a special meeting. The person calling a special meeting will notify the Secretary of the information required to be included in the notice of the meeting. The Secretary will give notice to the directors as required in the Bylaws.

## 5.2    Quorum and Manner of Acting

A majority of the number of directors then in office will constitute a quorum for the transaction of business at any meeting of the Board of Directors.

The directors present at a duly called or held meeting at which a quorum is present may continue to transact business even if enough directors leave the meeting so that less than a quorum remains. However, no action may be approved without the vote of at least a majority of the number of directors required to constitute a quorum. If a quorum is present at no time during a meeting, a majority of the directors present may adjourn and reconvene the meeting one time without further notice.

## 5.3    Proxy Voting Prohibited

Proxy voting is not permitted.

## 5.4    Written Consent of Directors

Any action required or permitted to be taken at any meeting of the Board or any committee may be taken without a meeting if a consent in writing setting forth the action to be taken is signed by the number of directors or officers whose vote would be necessary to take action at a meeting at which all such persons entitled to vote were present and voted, as the case may be. Such consent must be filed with the minutes of proceedings of the Board or of the committee. Such consent will have the same force and effect as a vote at a meeting where such directors or officers were present and voted, and may be stated as such in any document.

## 5.4    Action Without a Meeting

Any action that may be taken at a meeting of the Board or a committee may be taken without a meeting if a written consent, stating the action to be taken, is signed by the number of directors necessary to take that action at a meeting in which all the directors are in attendance (including remotely) and voting. Pursuant to 6.205 of the TBOC, or any successor statute, an electronic transmission from a director, or transmitted on behalf of a director, will be considered a signed consent. Unless otherwise stated in the consent, the date of the consent will be the date of transmission. Prompt notice of the action shall be given to each director who did not consent in writing to the action. For the avoidance of doubt, this section allows voting by email and other forms of electronic transmission, so long as the source and date of transmission can be ascertained, and so long as records of the consents can be recorded and maintained.

## 5.5    Alternative Forms of Meetings

Pursuant to 6.205 of the TBOC, or any successor statute, the Board and any Board committees, may hold meetings by using a conference telephone or similar communications equipment, or another suitable electronic communications system, including videoconferencing technology or the Internet (e.g. Zoom), or any combination ("Conferencing Technology"), if the if Conferencing Technology allows each person participating in the meeting to communicate with all other persons participating in the meeting.

If voting is to take place at the meeting, reasonable measures must be implemented to verify that every person voting at the meeting by means of remote communications is sufficiently identified and a record must be kept of any vote or other action taken.

Participation in a meeting pursuant to this Section will constitute presence in person at such meeting, except when a person participates in the meeting for the express purpose of objecting to the transaction of any business on the ground that the meeting was not lawfully called or convened.

**5.6    Minutes**

At meetings of the Board, business will be transacted in such order as the Board may determine from time to time. In the event the Secretary is unavailable, the Board President will appoint a person to act as Secretary at each meeting. The Secretary, or the person appointed to act as Secretary, will prepare minutes of the meetings and place in corporate records.

## ARTICLE 6 – COMMITTEES

**6.1    Committees of Directors**

The Board may establish one or more committees, may delegate specified authority to a committee, and may appoint or remove members of a committee.  A committee will include one or more directors and may include persons who are not directors.  If the Board delegates any of its authority to a committee, the majority of the committee will consist of directors.

**6.2    Advisory Boards or Committees**

Advisory boards or committees not having and exercising the authority, responsibility, or duties of the Board in the management of the Corporation may be designated by a resolution adopted by the directors. Except as otherwise provided in such resolution, members of each such advisory board or committee need not be directors of the Corporation. The President will appoint the members of such advisory boards or committees. Any committee member may be removed by the President whenever in the President's judgment the best interests of the Corporation will be served by such removal.

## ARTICLE 7 – OFFICERS

**7.1    Elected Officers**

The elected officers of the Corporation will include a President and a Secretary, and may include one or more Vice Presidents and/or a Treasurer, as may be determined from time to time by the Board.  Any two (2) or more offices may be held by the same person, except that the President and Secretary will not be the same person.

**7.2    Election**

All officers will be elected by the Board, so far as is practicable, at each annual meeting of the Board.

**7.3     Appointed Officers**

The Board may also appoint one or more Assistant Secretaries and Assistant Treasurers and such other officers and assistant officers and agents as it will from time to time deem necessary, who will exercise such powers and perform such duties as will be set forth in these Bylaws or determined from time to time by the Board.

**7.4     Term of Office; Removal; Filling of Vacancies**

Officers will hold a two-year term. An officer may be re-elected to serve consecutive terms of office. Each elected officer of the Corporation will hold office until such officer's successor is chosen and qualified in such officer's stead or until such officer's earlier death, resignation, retirement, disqualification, or removal from office. Any officer may be removed at any time by the affirmative vote of a majority of the Board. If any office becomes vacant for any reason, the vacancy will be filled by the Board.

**7.5     President**

The President will be the chief executive officer of the Corporation and has general supervision, direction, and control of the business and activities of the Corporation. The President will preside at all meetings of the directors and will be an ex-officio member of all standing committees.

**7.6     Secretary**

The Secretary will keep the minutes of the meetings of the Board in one or more books provided for that purpose, will see that all notices are duly given in accordance with the provisions of these Bylaws or as required by law, will keep custody of the corporate records of the Corporation, will keep a register of the post office address of each director which will be furnished to the Secretary by such directors, and will perform all duties incident to the office of Secretary and such other duties as from time to time may be assigned to them by the President or the Board.

**7.7     Vice President**

In the absence of the President or in the event of the President's inability or refusal to act, the Vice President, if any, will perform the duties of and be subject to all the restrictions of the President. The Vice President will perform such other duties as from time to time may be assigned to them by the President.

**7.8     Treasurer**

The Treasurer, if any, will keep correct and complete books and records of account and make the reports as the Board will require; will receive and give receipts for monies due and payable to the Corporation from any source whatsoever; and will deposit all such monies in the name of the Corporation in such banks, trust companies or other depositories as will be selected by the Board; and, in general, perform all duties incident to the office of Treasurer and such other duties as from time to time may be assigned by the President or by the Board.

**7.9     Additional Powers and Duties**

In addition to the foregoing specially enumerated duties, services and powers, the several elected and appointed officers of the Corporation will perform such other duties and services and exercise such further powers as may be provided by law, the Certificate of Formation or these Bylaws, or as the Board may from time to time determine or as may be assigned by any competent superior officer.

## ARTICLE 8 – STAFF

### 8.1    Key Staff and/or Management Company

The Board may hire an executive director, chief executive officer, and/or a management company ("Management") to serve at the Board's discretion and to carry out whatever tasks the Board from time to time resolves. Management may be paid a fee set by the Board. Subject to such supervisory powers as are vested in the Board, Management will supervise, direct, and control the business of the Corporation. Management may engage in negotiations involving commitments of the resources of the Corporation, as determined by the Board. Management will generally be expected to attend all meetings of the Board, yet does not have a vote on the Board.

## ARTICLE 9 – OPERATIONS

### 9.1    Contracts

The Board may authorize any officer or officers, or agent or agents, of the Corporation, in addition to the officers so authorized by these Bylaws, to enter into any contract or execute and deliver any instrument in the name of and on behalf of the Corporation, and such authority may be general or confined to specific instances.

### 9.2    Checks, Drafts, and Similar Instruments

All checks, drafts or other orders for the payment of money, notes, or other evidences of indebtedness issued in the name of the Corporation will be signed by such officer or officers, agent or agents of the Corporation and in such manner as may from time to time be determined by the Board. Management may dispense the funds of the Corporation in accordance with the annual budget approved by the Board and in furtherance of the purposes of the Corporation as set forth in the Certificate and these Bylaws. Any financial transactions not approved as part of the annual budget that have a value of $5,000 or more will require the prior approval of the Board.

### 9.3    Records

The Corporation will keep correct and complete records of account and will also keep minutes of the proceedings of the Board meetings and Committees.  The Corporation will keep at its principal place of business the original or a copy of its bylaws, including amendments to date certified by the Secretary of the Corporation.

### 9.4    Conflicts of Interest

The Corporation will adopt a conflict of interest policy in the form attached hereto as Schedule A.

### 9.5    Dividends Prohibited

No part of the net income of the Corporation will inure to the benefit of any private individual and no dividend will be paid and no part of the income of the Corporation will be distributed to its directors or officers.

The Corporation may pay compensation in a reasonable amount to its officers for services rendered and may compensate and reimburse its directors as provided in Section 3.10.

## 9.6    Loans to Officers and Directors Prohibited

The Corporation will not make loans to its officers and directors, and any directors voting for or assenting to the making of any such loan, and any officer participating in the making thereof, will be jointly and severally liable to the Corporation for the amount of such loan until repayment thereof.

## 9.7    Fiscal Year

The fiscal year of the Corporation will be January 1 to December 31.

## 9.8    Policies and Procedures

The Corporation may adopt policies and procedures to define operations of the Corporation. The Board must approve the policies and may approve the procedures, in consultation with Management.

## 9.9    Invalid Provisions

If any part of these Bylaws will be held invalid or inoperative for any reason, the remaining parts, so far as is possible and reasonable, will remain valid and operative.

## ARTICLE 10 – INDEMNIFICATION

## 10.1    Limitation of Liability of Directors

A director of the Corporation will not be personally liable to the Corporation for monetary damages for any act or omission in such director's capacity as a director, except that these Bylaws do not authorize the elimination or limitation of the liability of a director to the extent the director is found liable for: (i) a breach of the director's duty of loyalty to the Corporation; (ii) an act or omission not in good faith that constitutes a breach of duty of the director to the Corporation or an act or omission that involves intentional misconduct or a knowing violation of the law; (iii) a transaction from which the director received an improper benefit, whether or not the benefit resulted from an action taken within the scope of the director's office; or (iv) an act or omission for which the liability of a director is expressly provided by an applicable statute. The foregoing elimination of liability to the Corporation will not be deemed exclusive of any other rights, limitations of liability, or indemnity to which a director may be entitled under any other provision of the Certificate or Bylaws, contract or agreement, vote of directors, principle of law, or otherwise. Any repeal or amendment of this Article will be prospective only, and will not adversely affect any limitation on the personal liability of a director of the Corporation existing at the time of such repeal or amendment. In addition to the circumstances in which a director of the Corporation is not personally liable as set forth in the foregoing provisions of this Article, the liability of a director will be eliminated to the full extent permitted by any amendment hereafter enacted to the TBOC or other Texas law that further eliminates or permits the elimination of the liability of a director.

**10.2    Indemnification**

The Corporation will indemnify and protect any director, officer, employee, or agent of the Corporation, or any person who serves at the request of the Corporation as a director, officer, employee, member, manager, or agent of another corporation, partnership, limited liability company, joint venture, trust, employee benefit plan, or other enterprise, to the fullest extent permitted by the laws of the State of Texas.

## ARTICLE 11 – AMENDMENTS TO BYLAWS

**11.1    Powers to Amend**

These Bylaws may be amended or repealed, or new bylaws may be adopted at any annual or special meeting of the Board at which a quorum is present by the affirmative vote of a majority of the directors present at the meeting, provided notice of the proposed amendment, repeal or adoption be contained in the notice of such meeting; and provided further, that the foregoing notice requirement will not prohibit the directors from adopting the proposed amendment, effecting the proposed repeal or adopting the proposed new bylaws, as the case may be, in a modified form which is not identical to that described or set forth in the notice of such meeting.

## ARTICLE 12 – DISSOLUTION

**12.1    Distribution of Assets**

The Corporation pledges its assets for use in performing the Corporation's charitable functions. In the event the Corporation is dissolved, after all liabilities and obligations of the Corporation are paid or provision is made therefore, the Corporation's Board will distribute remaining assets of the Corporation as they will determine but only for tax-exempt purposes to such organization or organizations organized and operated exclusively for charitable or educational purposes and which are exempt under Section 501(c)(3) of the Code. Any of such assets not so disposed of will be disposed of by a court of competent jurisdiction of the county which the principal office of the Corporation is then located, to one or more organizations exempt under Section 501(c)(3) of the Code in a manner which best accomplishes the purposes of the Corporation. No director or officer of the Corporation and no private individual will be entitled to share in the distribution of any assets of the Corporation in the event of its dissolution.

**12.2    Decision Making Authority**

The Corporation's Board will have the sole and exclusive right to vote and make decisions regarding or in any way involving the dissolution, merger, and/or consolidation of the Corporation and decisions regarding the sale of substantially all of the Corporation's assets.

## CERTIFICATION

The undersigned, being the duly elected and qualified President of the Corporation, hereby certifies that the foregoing Bylaws of the Corporation were duly adopted by the Board of Directors of the Corporation.

DocuSigned by:

*Lori Mellinger*    Lori Mellinger                9/17/2024

28532BBF8BEE41D...

President, Date

## SCHEDULE A. CONFLICT OF INTEREST POLICY FOR

## LIONESS JUSTICE IMPACTED WOMEN'S ALLIANCE

### ARTICLE 1 - PURPOSE

The purpose of the Conflict of Interest Policy ("Policy") is to protect Lioness Justice Impacted Women's Alliance's (the "Corporation") interest when it is contemplating entering into a transaction or arrangement that might benefit the private interest of an officer, director, or key employee of the Corporation that might result in a possible excess benefit transaction. This Policy is intended to supplement but not replace any applicable state and federal laws governing conflict of interest applicable to nonprofit and charitable organizations.

### ARTICLE 2 - DEFINITIONS

**2.1.    Interested Person**

Any director, principal officer, or member of a committee with governing board delegated powers, who has a direct or indirect financial interest, as defined below, is an interested person.

**2.2.    Financial Interests**

Financial interests include, but are not limited to:

a. An ownership, investment interest, or compensation arrangement with any entity with which the Corporation has a transaction or arrangement;
b. A compensation arrangement with the Corporation or with any entity or individual with which the Corporation has a transaction or arrangement; or
c. A potential ownership, investment interest, or compensation arrangement with any entity or individual with which the Corporation is negotiating a transaction or arrangement, including a commission or fee, share of the proceeds, the prospect of promotion or profit, or any other form of financial reward.

**2.3.** Compensation includes direct and indirect remuneration as well as gifts or favors that are not insubstantial.

**2.4.** A financial interest is not necessarily a conflict of interest. Under Section 3.2, a person who has a financial interest may have a conflict of interest only if the appropriate governing board or committee decides that a conflict of interest exists.

### ARTICLE 3 – PROCEDURES

**3.1.    Duty to Disclose**

In connection with the actual or potential conflict of interest, an interested person must disclose the existence of their financial interest and all material facts to the directors and members of committees with board-delegated powers considering the proposed transaction or arrangement and will abstain from voting on such matters.

## 3.2.    Determining Whether a Conflict of Interest Exists

After disclosure of the financial interest and all material facts, and after any discussion with the interested person, the interested party will leave the board or committee meeting while the determination of a conflict of interest is discussed and voted upon.  The remaining board or committee members will decide if a conflict of interest exists.

## 3.3.    Procedures for Addressing the Conflict of Interest

a. An interested person may make a presentation at the board or committee meeting, but after such presentation, they will leave the meeting during the discussion of, and the vote on, the transaction or arrangement that results in the conflict of interest.
b. The President or Chair of a committee will appoint a disinterested person or committee to investigate alternatives to the proposed transaction or arrangement, if appropriate.
c. After exercising due diligence, the board or committee will determine whether the Corporation can obtain a more advantageous transaction or arrangement with reasonable efforts from a person or entity that would not give rise to a conflict of interest.
d. If a more advantageous transaction or arrangement is not reasonably attainable under circumstances that would not give rise to a conflict of interest, the board or committee will determine by a majority vote of the disinterested directors whether the transaction or arrangement is in the Corporation's best interest and for its own benefit and whether the transaction is fair and reasonable to the Corporation. The Corporation will make its decision as to whether to enter into the transaction or arrangement in conformity with such determination.

## 3.4.    Violations of the Conflict of Interest Policy

a. If the board or committee has reasonable cause to believe that a person has failed to disclose actual or possible conflicts of interest, it will inform the person of the basis for such belief and afford the member an opportunity to explain the alleged failure to disclose.
b. If, after hearing the response of the person and making such further investigation as may be warranted in the circumstances, the board or committee determines that the person has in fact failed to disclose an actual or possible conflict of interest, it will take appropriate disciplinary and corrective action, including, but not limited to, removal from the Board.

## ARTICLE 4 – RECORDINGS AND PROCEEDINGS

## 4.1.    The minutes of the board and committees with board-delegated powers will contain:

a. The names of the persons who disclosed or otherwise were found to have a financial interest in connection with an actual or possible conflict of interest, the nature of the financial interest, any action taken to determine whether a conflict of interest was present, and the board's or committee's decision as to whether a conflict of interest in fact existed; and
b. The names of the persons who were present for discussions and votes relating to the transaction or arrangement, the content of the discussion, including any alternatives to the proposed transaction or arrangement, and a record of any votes taken in connection therewith.

## ARTICLE 5 – COMPENSATION

## 5.1    A voting member of the governing board who receives compensation, directly or indirectly, from the Corporation for services is precluded from voting on matters pertaining to that member's compensation.

**5.2**    A voting member of any committee whose jurisdiction includes compensation matters and who receives compensation, directly or indirectly, from the Corporation for services is precluded from voting on matters pertaining to that member's compensation.

**5.3**    No voting member of the governing board or any committee whose jurisdiction includes compensation matters and who receives compensation, directly or indirectly, from the Corporation, either individually or collectively, is prohibited from providing information to any committee regarding compensation.

## ARTICLE 6 – ANNUAL STATEMENT

**6.1**    Each director, officer, and committee member with board-delegated powers will annually sign a statement that affirms that such person:

    a.  Has received a copy of the Policy;
    b.  Has read and understands the Policy;
    c.  Has agreed to comply with the Policy; and
    d.  Understands that the Corporation is a charitable organization and that to maintain its federal tax exemption it must engage primarily in activities that accomplish one or more of its tax-exempt purposes.

## ARTICLE 7 – PERIODIC REVIEWS

**7.1**    To ensure the Corporation operates in a manner consistent with charitable purposes and does not engage in activities that could jeopardize its tax-exempt status, periodic reviews will be conducted. The periodic reviews will, at a minimum, include the following subjects:

    a.  Whether compensation arrangements and benefits are reasonable, based on competent survey information and the result of arm's length bargaining.
    b.  Whether partnerships, joint ventures, and arrangements with management organizations conform to the Corporation's written policies, are properly recorded, reflect reasonable investment or payments for goods and services, further charitable purposes and do not result in inurement, impermissible private benefit or in an excess benefit transaction.
    c.  When conducting the periodic reviews, the Corporation may, but need not, use outside advisors. If outside experts are used, their use will not relieve the governing board of its responsibility for ensuring periodic reviews are conducted.

**Conflict of Interest Annual Disclosure Statement, to be signed annually**

By signing the form below, I agree to ALL the statements below:

➢ I serve in of the following function(s) for the Corporation: Director, Board Advisor, Staff, Volunteer, Contractor, or _____(specify other).

➢ I have a received a copy of the Conflict of Interest Policy.

➢ I have READ and UNDERSTAND the Conflict of Interest Policy and know that I can directly contact the Corporation's President on matters that may pertain to a "real or perceived" conflict of interest.

➢ I agree to comply with this Conflict of Interest Policy.

➢ I understand that the corporation is a nonprofit corporation with 501(c)(3) tax exempt status, and that the Corporation, in order to maintain its federal-tax-exemption, must engage primarily in activities that accomplish one or more of its tax-exempt purposes;

| | | | |
|---|---|---|---|
| *Lori Mellinger* | *Alexa Garza* | *Christopher Sederburg* | *Angel Carroll* |
| NAME   Lori Mellinger | Alexa Garza | Christopher Sederburg | Angel Carroll |
| | | | |
| TITLE | | | |
| 9/17/2024 | 9/20/2024 | 9/17/2024 | 9/18/2024 |
| DATE | | | |

**ACCEPTANCE OF NOTICE BY EMAIL**

I agree to accept meeting notice and other Board materials via email at the email address listed below. I agree to meet electronically should the meeting notice include the electronic contact information.

Lori Mellinger          Alexa Garza            Christopher Sederburg   Angel Carroll

lori.mellinger@gmail.com Alexa79tx@gmail.com          Sederburgchris@gmail.com angel@wemeasure.c

Director's Email Address, Date

# EXHIBIT 2



# JUDICIAL SERVICES COURT REPORTING COMPANY

15248 SCENIC LOOP RD
HELOTES, TX 78023
TELE: (210) 681-4885
FAX: (210) 681-4886

**To:**     BRANDON DUKE
O'MELVENY & MYERS LLP
700 LOUISIANA STREET, SUITE 2900
HOUSTON, TEXAS 77002

**From:**   JUDICIAL SERVICES COURT REPORTING
15248 SCENIC LOOP RD
HELOTES, TX 78023

**Date:**   10/15

**Re:**     The deposition of                                    JENNIFER TOON

Greetings,

      To follow is the original deposition transcript of the deposition of   JENNIFER TOON
taken on   September 19, 2025 10:05 AM

Please review, sign, notarize and return the Errata/Changes and Signature Page to our office by
5:00 pm on or before  11/04   via e-mail to jscr@judicialservicessa.com.

Sincerely,

Judicial Services Court Reporting

17

1    experience of conditions at a TDCJ facility that is after 2018?

2        A.    As an incarcerated person?  Do you mean like do I

3    have experience inside of a TDCJ facility having been in one

4    since that time?

5        Q.    Right.  Do you have any personal knowledge of

6    conditions in a TDCJ facility?  By conditions, I mean the

7    conditions that an inmate would experience.

8        A.    Not as an incarcerated person, but I have visited

9    facilities since my release.

10       Q.    Are those visits the only experience of the inside of

11   the TDCJ facility that you have had after 2018?

12             MR. DUKE:  Objection to form.  You can answer.

13       A.    My personal physical experience and knowledge, yes.

14       Q.    (BY MR. TEBO)  Thanks.

15       A.    Mm-hmm.

16       Q.    I'll take that down for now.  For the rest of this

17   deposition, I will concentrate on asking you questions in your

18   capacity as a representative witness for Lioness.  Unless I

19   specify otherwise, when I ask you a question, when I use you or

20   just when I address the question to you, I'm asking for an

21   answer on behalf of Lioness.  Does that sound good?

22       A.    Yes.

23       Q.    What is Lioness's mission as an organization?

24       A.    My mission is to end the incarceration and systematic

25   devaluation of girls, women, and gender expansive people in our

18

1    Texas criminal legal system and to build power in our

2    communities.

3         Q.    One of the first things you said in that response was

4    to end the devaluation.  Do you consider incarceration to be

5    inherently devaluing to a person?

6         A.    Yes.

7         Q.    Is prison abolition one of Lioness's missions?

8                   MR. DUKE:  Objection to form.  You can answer.

9         A.    It is part of our values, yes.

10        Q.    (BY MR. TEBO)  Is prison abolition a goal that

11   Lioness advocates for?

12        A.    Alongside our reform work, yes.

13        Q.    Does Lioness believe that there is a way to

14   incarcerate someone that is not devaluing of that person?

15                  MR. DUKE:  Sorry.  Objection to form.  You can

16   answer if you know.

17        A.    Yes.

18        Q.    (BY MR. TEBO)  Are the issues facing incarcerated

19   women different from the issues facing incarcerated men?

20        A.    Yes.

21        Q.    I'm curious.  Can I ask how they differ?

22        A.    They differ in ways related to the interpersonal

23   relationships in terms of how women respond in ways differently

24   than men do.  For instance, having a lot more gender responsive

25   trauma informed care with women versus more of the kind of -- I

1    protests or rallies.  We do civic engagement training and

2    support.  We educate women how to participate in policy work

3    and we also do healing circles.  So kind of really a lot of I

4    would say two big buckets of advocacy and community peer

5    kinship support.

6         Q.    Does Lioness hold events that current TDCJ inmates

7    attend?

8         A.    No.

9         Q.    Does Lioness conduct any activities that current TDCJ

10   inmates attend?

11        A.    No.  We have no programming on the inside.

12        Q.    Does Lioness communicate with TDCJ inmates?

13        A.    Yes.

14        Q.    How does Lioness communicate with TDCJ inmates?

15        A.    We have someone dedicated to answering all of their

16   correspondence and also we have a quarterly newsletter.

17        Q.    And do you send that correspondence by mail or

18   through any other means?

19        A.    It is through U.S. Postal Service snail mail and also

20   through the Securus e-mail.

21        Q.    Do inmates typically initiate contact with Lioness?

22        A.    Yes.

23        Q.    Does Lioness ever initiate contact with TDCJ inmates?

24        A.    I think we did for sure the first year when we were

25   just a group.  Because from March 8 to 22 until we were signed

23

1   with our fiscally sponsored project at the end of the year, yes

2   we did reach out to people we already knew.

3       Q.   How do inmates learn about Lioness?

4       A.   Well, it doesn't take much in prison.  When somebody

5   hears about something it's -- word of mouth catches on pretty

6   quickly.  And so if one incarcerated person has a P.O. Box

7   address to an organization that could be a good resource then

8   everybody has it.  It is word of mouth.

9       Q.   Aside from the newsletter and individual

10  correspondence, are there any other ways that Lioness interacts

11  with TDCJ inmates?

12      A.   No.

13      Q.   Was that a no?

14      A.   No, we do not.  I mean I have taken tours of the TDCJ

15  facilities and programs so I have been in contact with

16  incarcerated folks on the women's units and they know that I'm

17  the executive director of Lioness so there's been some

18  interaction that way but the predominant form is the newsletter

19  and the correspondence.

20      Q.   How do you decide which inmates to send your

21  newsletter to?

22      A.   It's the ones that have expressed that they want one

23  and so our members.

24      Q.   Does Lioness consider every inmate who expresses a

25  desire to receive Lioness's newsletter to be a member of

1    Lioness?

2        A.    Well, they have to agree with the mission and our

3    community agreements.

4        Q.    So does Lioness send its newsletter to any inmate

5    that is not a member?

6        A.    No.

7        Q.    How is Lioness governed?

8        A.    Lioness is -- are you asking me currently?

9        Q.    Yes, currently.

10        A.    We are currently governed by a board of directors.

11        Q.    Are you on the board of directors?

12        A.    No.

13        Q.    Did you say your title was executive director?

14        A.    Correct, yes.

15        Q.    So the executive director is not on the board of

16    directors?

17        A.    In our governance, no.  We have other board of

18    directors.

19        Q.    How many people are currently on Lioness's board?

20        A.    There are four.

21        Q.    Are any of them currently incarcerated?

22        A.    No.

23        Q.    How often does the board of directors meet?

24        A.    Well, they meet once a year minimum.

25        Q.    And how are they selected?

25

1        A.    So this board of directors was kind of -- this came

2   from our steering committee when we were under fiscal

3   sponsorship.   And when we were under fiscal sponsorship Build

4   Up Inc. required that we had a governance structure.   And that

5   steering committee basically served as a board of directors

6   then.   We just called it a steering committee.   And so that

7   included myself, Ms. Mellinger, Ms. Carroll and Ms. Garza.

8   They were originally on the steering committee.

9        Q.    Now that Lioness is no longer under fiscal

10  sponsorship, as you said, how are its -- how is its board of

11  directors selected?

12       A.    The board of directors is, I believe, selected by

13  nomination, but it is required that they be either a girl,

14  woman, or gender expansive person who has had incarceration

15  experience in the state of Texas.

16       Q.    Do they also have to be a member of Lioness?

17       A.    They are considered also members of Lioness.

18       Q.    Can I ask you to clarify that response a little bit

19  when you said that they are considered members of Lioness?

20  That's not the same as them already having is that the same as

21  them already having been members of Lioness --

22             MR. DUKE:   Objection to form.

23       Q.    (BY MR TEBO) -- before they were nominated?

24             MR. DUKE:   Objection to form.   You can go ahead.

25       A.    Yeah.   I know it sounds confusing because they are

26

1    our actual board of director members which is our governance

2    structure with its own rights and responsibilities and roles.

3    They are members as well, right.  They have always been a

4    member of Lioness even when they were a steering committee

5    member.  They participate in activities the same way a

6    traditional member would, however, just like I do.

7                I consider myself a member of Lioness even though my

8    role is the executive director.  They too consider themselves

9    members because they are this population.  However, legally

10   they are on the board of directors.

11        Q.   (BY MR. TEBO)  Who is allowed to nominate someone to

12   the board of directors?

13        A.   The board.

14        Q.   In other words, the current board nominates

15   replacements?

16        A.   Correct.

17        Q.   And once someone is nominated, is their nomination

18   then voted on and is it voted on by the board?

19        A.   Yes.

20        Q.   So Lioness's membership at large in the sense of

21   everyone who Lioness considers a member.  They don't cast a

22   vote to select the board of directors.  Is that right?

23        A.   We have a board of director governance, not a

24   statutory membership.  We have a traditional membership.

25   However, that traditional membership has targeted decision

33

1    committee became a part of the executive leadership team.

2        Q.    (BY MR. TEBO)    Did Lioness change anything about its

3    membership --

4        A.    No.

5        Q.    -- due to ending the sponsorship?

6        A.    No.

7        Q.    Did Lioness change anything about its mission due to

8    ending the sponsorship?

9        A.    I think when we -- I think the only thing that was

10    different about our mission statement is that we added on the

11    piece about empowering our communities.

12        Q.    Let me circle back a little and ask you more about

13    your duties as executive director.    You said you do not serve

14    on the board of directors.    How would you describe the

15    difference between your duties as executive director and board

16    of directors duties?

17        A.    I would consider that I live in the in-between space

18    between the board of directors and our executive leadership

19    team.    So I'm consulting with the board.    I'm telling them the

20    day-to-day things, expressing concerns and needs.    And then

21    they're the ones that are in terms of our legal structure and

22    our governance and our making sure that our money is good and

23    nobody is stealing and that kind of stuff.    They're in charge

24    of that.    And it's just my duty to provide transparency and

25    essentially whatever direction that they give me, that's the

53

1    membership.

2        Q.    Before Lioness adopted this written membership

3    policy, did it use these three criteria as eligibility

4    requirements for members, for individuals to become members?

5        A.    Yes.

6        Q.    It's just that these criteria were never written

7    down, but they were still followed in practice.    Is that fair

8    to say?

9        A.    Yes.

10       Q.    Before this written policy was adopted and before the

11   official membership form was created, how did individuals

12   affirm alignment with Lioness's mission, vision, values, and

13   community agreements in order to become members?

14       A.    They expressed so, or if there were behaviors or

15   indications that they did not we would ask them?

16       Q.    Does Lioness solicit individuals to become members?

17             MR. DUKE:   Objection to form.   Go ahead.

18       A.    Again, that first year when we were just coming

19   together as a group before our fiscal sponsorship, we were

20   writing people and sending our first newsletter on the inside

21   and asking folks if they were interested.   But as of now,

22   unless other members in their personal life write folks about

23   Lioness, which, you know, I have no way of really knowing that

24   or keeping track of it, we make it clear that you need to

25   contact us.

54

1    Q.    (BY MR. TEBO)    And is everyone who expresses interest

2    in Lioness and also identifies as a girl, woman, gender

3    expansive person and has experienced incarceration in the state

4    of Texas considered a member by Lioness?

5    A.    We consider our members to be the people that we

6    interact with in a very intentional way.    Do we consider every

7    single person that meets these three eligibilities as potential

8    members, as part of our community that we have an expressed and

9    invested interest in their well-being?    I mean, yes, we do, for

10   sure.    But like, we are very, very focused on people that

11   identify as members.

12           I mean, there's 9,000-something women, at least in

13   the system, and while we love all of them and consider them all

14   ours and our family, we are very intentional with the people

15   that we engage with.

16   Q.    Let me drill down a little bit on the people who

17   identify as members as you describe them.    How do you know if

18   someone identifies as a Lioness member?

19   A.    They very proudly tell us.    I mean, through their

20   correspondence, through their interactions with our engagement

21   with them through correspondence.

22   Q.    I'm going to switch documents on you again.    So you

23   should see I just shared two documents into the chat, and

24   before I pull either of those up, I'm going to go back to the

25   second deposition exhibit very briefly.

1    incarcerated membership at the time that it was produced to

2    state defendant?

3        A.    Yes.

4        Q.    Was Lioness's incarcerated membership approximately

5    the same as in this list as at the time that Lioness joined

6    Tiede v. Collier as a plaintiff in May 2024?

7        A.    I haven't compared the two.  I imagine that there's

8    probably more.

9        Q.    Do you think that there would be many more members in

10   this list than were incarcerated members in May 2024?

11                MR. DUKE:    Objection to form.  Go ahead.

12       A.    I mean, I think there is some more, but I mean, I

13   wouldn't say hundreds or anything.  So, like, somewhat of an

14   increase.  I mean, because that was last year, and I know that

15   we've been contacted.  I mean, that was a year ago.

16       Q.    (BY MR. TEBO)  Would you say that this membership

17   list and the list of incarcerated members as of May 2024 is

18   approximately the same?

19       A.    I mean, I don't know what you mean by approximately.

20   I mean, I think the current one has, I would venture to say, I

21   don't know, 50 more, 100 more maybe.  I don't know because I

22   haven't compared the two.  I wouldn't say drastically, but I'm

23   not sure that they would be just almost the same.

24       Q.    I understand.  And related but slightly different,

25   would you say that most everyone who was -- would you say that

59

1      Q.    So as of the time that this list was put together,

2   did any of the inmates on this list sign a membership

3   application to become a Lioness member?

4      A.    No, none of the incarcerated people on this list.  We

5   just didn't collect membership like that.  It was -- again, it

6   was in practice and as people expressed.

7      Q.    Did every individual on this list write you, you

8   being Lioness, a letter or other communication requesting to

9   become Lioness members?

10     A.    Yes, except those that we originally, you know, when

11  we created our group back in 2022 when we were essentially

12  doing outreach to people that we personally knew in our

13  personal networks.  But even then, they were, you know, in

14  agreement that I'd like to correspond.  I'd like to receive the

15  newsletter, and I'd like to be a member.

16     Q.    So every individual on this list was either part of

17  that original group or otherwise directed in communication to

18  Lioness explicitly requesting to be considered a Lioness

19  member?

20     A.    What do you mean by explicit?

21     Q.    I mean a direct request that clearly asks to become a

22  member of Lioness?

23              MR. DUKE:   Objection to form.

24     A.    They made clear to us that they wanted to be a part

25  of the membership.

60

1        Q.    (BY MR. TEBO)  That's not quite an answer to the

2    question that I asked.

3        A.    Yeah.

4        Q.    Did everyone on this list -- did everyone on this

5    list expressly ask to become a member of Lioness?

6                 MR. DUKE:  Objection to form.

7        Q.    (BY MR. TEBO)  And I can make that even clearer.  Did

8    everyone on this list deliver a communication to Lioness,

9    whether verbally or in writing, that either stated -- that

10   stated, can I become a member of Lioness, or something

11   synonymous with that statement?

12                 MR. DUKE:  Same objection.  Go ahead.

13       A.    I mean, I would say yes.  And also it is repeatedly

14   communicated to them if they no longer wish to be a member,

15   please write and tell us.  So they all know that.  And that is

16   explicitly said to them.

17       Q.    (BY MR. TEBO)  Is that sent to them -- how is that

18   sent to them?

19       A.    That is put in our newsletter and that goes to

20   everyone on the membership list.

21       Q.    Does anyone on this list pay dues?

22       A.    No.

23                 MR. DUKE:  Objection to form.

24                 THE WITNESS:  Sorry.

25       A.    No.

61

1          MR. DUKE:  You're fine.

2      Q.  (BY MR. TEBO)  Does Lioness collect any dues?

3      A.  No.

4      Q.  Strike that actually.  Do incarcerated members

5  participate in organizational decisions?

6      A.  What do you mean by that?

7      Q.  Do incarcerated members participate in any decisions

8  that Lioness makes as a group entity?

9      A.  If you're asking if they vote on things, no.  But we

10  use their input and the information that they're sharing with

11  us and their ideas in shaping the direction of the

12  organization.

13      Q.  Does Lioness make decisions in response to requests

14  by incarcerated members?

15      A.  Yes.

16      Q.  What sort of decisions would Lioness take in response

17  to a request from an incarcerated member?

18      A.  If there is something happening at the unit and they

19  ask us to take some sort of action, whether that is

20  participating in an event or a board meeting or contacting a

21  TDCJ official, we decide as a collective if we are going to

22  make the decision to do that.  I mean, they request things all

23  the time freely.

24      Q.  Does Lioness provide parole help or advice to its

25  incarcerated members?

65

1          A.    I mean, looks like there's a lot of noes too.

2          Q.    (BY MR. TEBO)  By my count, there are 261 yeses and

3     158 noes.  Does that sound right to you?

4                MR. DUKE:  Objection to form.

5          A.    If that's what it totals out to be.

6          Q.    (BY MR. TEBO)  Well, I'll represent to you that that

7     is what it totals out to be.  Specifically, there are 261 yes

8     entries and 158 no entries?

9                MR. DUKE:  Objection to form.

10         Q.    (BY MR. TEBO)  Based on this list, at the time that

11    this list was put together, Lioness had 158 incarcerated

12    inmates that were housed without air conditioning?

13         A.    Yes.

14         Q.    Are the individuals on this list all women?

15                MR. DUKE:  Objection to form.

16         A.    This list includes all of our inside members, so that

17    would be anyone identified as a girl, woman, or gender

18    expansive person.

19         Q.    (BY MR. TEBO)  I asked you previously about whether

20    there were any men identifying as women currently members of

21    Lioness, and I think you said no, that there were not.  Am I

22    recalling that correctly?

23         A.    Correct.

24         Q.    Was that true at the time that this list was

25    compiled?

66

1      A.    Yes.

2      Q.    It's true then that all the individuals on this list

3   are biological women?

4                 MR. DUKE:    Objection to form.    But you can

5   answer if you know.

6      A.    These are all individuals housed at women's

7   facilities in TDCJ.

8      Q.    (BY MR. TEBO)    That's not quite an answer to the

9   question I asked.    Are the individuals on this list all

10  biological women?

11                MR. DUKE:    Objection to form.    You can answer if

12  you know --

13     A.    We do not --

14                MR. DUKE:    -- or if TDCJ -- sorry, let me

15  finish.    You can answer if you know or if you are aware that

16  the organization knows the biological, the biology of, I can't

17  remember the exact amount, 400 or 200 something women on this

18  list.

19     A.    We do not know the biology of the women on this list.

20  We know how they identify and that they are incarcerated in

21  TDCJ women's facilities.

22     Q.    (BY MR. TEBO)    All right.    So everyone on this list

23  at the time it was put together was incarcerated in a TDCJ

24  women's facility?

25     A.    Yes.    There might be one or two that were in a county

67

1    jail, but we don't get many county jail folks, but correct.

2    They are individuals housed in TDCJ female facilities.

3        Q.    Are individuals housed in county jails the only

4    possible exception to everyone on this list being housed in a

5    TDCJ women's facility?

6                    MR. DUKE:   Objection to form.   You can answer.

7        A.    Yes.

8        Q.    (BY MR. TEBO)   Do you know how many prison units TDCJ

9    operates?

10       A.    I don't have the -- I don't remember.

11       Q.    Do you know like a ballpark number?

12       A.    It's 100.

13       Q.    I think that's approximately correct.

14       A.    It's a lot.

15       Q.    Something around 100.   How many facilities are

16    members on this list housed in?

17       A.    I would have to count.   I don't know off the top of

18    my head.

19       Q.    Well, I'll go ahead and tell you that I did some

20    counting myself and as far as I could tell based on the unit

21    column, there were 12 different TDCJ units housing members on

22    this list.  Does that sound correct?

23       A.    Yes.

24       Q.    And focusing on this unit column, I'm going to ask

25    you about some of the names.  You see I've just highlighted one

87

<pre>
1                  IN THE UNITED STATES DISTRICT COURT
                 FOR THE WESTERN DISTRICT OF TEXAS
2                          AUSTIN DIVISION

3    BERNHARDT TIEDE, II; TEXAS      )
     PRISONS COMMUNITY ADVOCATES;    )
4    BUILD UP, INC., A/K/A JUSTICE   )
     IMPACTED WOMEN'S ALLIANCE;      )
5    TEXAS CITIZENS UNITED FOR       )
     REHABILITATION OF ERRANTS;      )
6    and COALITION FOR TEXANS WITH   )
     DISABILITIES,                   )
7                    Plaintiffs,     )
                                     )
8    VS.                             )
                                     )  CIVIL ACTION
9                                    )
     BRYAN COLLIER, in his           )  NO.: 1:23-CV-01004-RP
10   official capacity as            )
     Executive Director of Texas     )
11   Department of Criminal          )
     Justice,                        )
12                    Defendants.    )

13

14


15                     REPORTER'S CERTIFICATION

16                  DEPOSITION OF JENNIFER TOON

17                     SEPTEMBER 19, 2025

18

19

20        I, Melissa Hill, Certified Shorthand Reporter in and for

21   the State of Texas, hereby certify to the following:

22        That the witness, JENNIFER TOON, was duly sworn by the

23   officer and that the transcript of the oral deposition is a

24   true record of the testimony given by the witness;

25        That the deposition transcript was submitted on
</pre>

88

1    _October 15th_____ to the witness or to the attorney for the

2    witness for examination, signature and return to me by

3    _November 4th_____;

4        That the amount of time used by each party at the

5    deposition is as follows:

6

7            Mr. Brandon Duke.....00 HOUR(S):04 MINUTE(S)
             Mr. Kyle Tebo.....02 HOUR(S):22 MINUTE(S)
8

9

10       That pursuant to information given to the deposition

11   officer at the time said testimony was taken, the following

12   includes counsel for all parties of record:

13

14           Mr. Brandon Duke, Attorney for Plaintiffs
             Mr. Kyle Tebo, Attorney for Defendant
15               BRYAN COLLIER, in his official capacity as
     Executive Director of Texas Department of Criminal Justice
16

17

18       That $_____ is the deposition officer's charges to

19   the Defendant for preparing the original deposition transcript

20   and any copies of exhibits;

21       I further certify that I am neither counsel for, related

22   to, nor employed by any of the parties or attorneys in the

23   action in which this proceeding was taken, and further that I

24   am not financially or otherwise interested in the outcome of

25   the action.

89

1    Certified to by me this ___15th___ day of ___October___, 2025.

2

3

4

5                              /s/ Melissa Hill
                              _____
6                              Melissa Hill, Texas CSR No. 9487
                              Expiration Date:  06/30/2027
7                              JUDICIAL SERVICES COURT REPORTING
                              Firm Registration No. 774
8                              12790 FM 1560 N, PO BOX 59
                              Helotes, Texas 78023
9                              (210) 681-4885

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

# EXHIBIT 3

Docusign Envelope ID: 3BE7A689-3047-49B7-ABEC-4F6C720D28F1

**BOARD RESOLUTION TO AMEND BYLAWS**

**Lioness Justice Impacted Women's Alliance**
**Board of Directors Resolution**
**Effective Date:** August 1, 2025

---

**WHEREAS,** Lioness Justice Impacted Women's Alliance (the "Corporation") is a Texas-based 501(c)(3) nonprofit organization governed by its Board of Directors and organized under the Texas Business Organizations Code;

**WHEREAS,** the Corporation maintains a defined, voluntary membership base composed of currently and formerly incarcerated girls, women, and gender-expansive people in Texas, consistent with its mission and purpose;

**WHEREAS,** the Corporation maintains it has associational standing to represent its members, including those currently incarcerated in Texas;

**WHEREAS,** The Corporation maintains clear qualifications for Board of Directors

**WHEREAS,** the Corporation desires to amend its Bylaws to:
(1) clarify its non-statutory membership structure under Texas law,
(2) formally authorize the Membership Policy, and
(3) affirm its representational standing and member-led framework;

(4) Clarify of Board of Director qualifications

---

**NOW, THEREFORE, BE IT RESOLVED,** that the Board of Directors hereby adopts the following amendments to the Bylaws of the Corporation:

---

**ARTICLE 2 – MEMBERSHIP**

**2.1 Membership**

The Corporation does not have members as defined by the Texas Business Organizations Code ("statutory members"), and no person shall be deemed a "member" under Chapter 22 of the Code. The Corporation is governed solely by its Board of Directors, which retains all legal authority and fiduciary duties.

However, the Corporation maintains a voluntary, non-statutory membership base composed of identifiable individuals who meet defined eligibility criteria and have

LIONESS 000045

Docusign Envelope ID: 3BE7A689-3047-49B7-ABEC-4F6C720D28F1

affirmatively enrolled through a formal membership process, as outlined in the Corporation's adopted Membership Policy.

These voluntary members do not hold voting rights under state law and shall not have any power to govern the Corporation, bind the Corporation contractually, or elect or remove directors. Their role is limited to participatory engagement, collective advocacy, and non-binding input into organizational priorities. Their involvement reflects the Corporation's mission to be community-led, not a transfer of legal governance.

This non-statutory membership model is maintained for purposes of representation, inclusion, and internal accountability and is consistent with the Corporation's recognition as a traditional voluntary membership organization.

---

## ARTICLE 2.2 – MEMBERSHIP POLICY

The Corporation shall maintain a written Membership Policy that governs the eligibility, enrollment, responsibilities, rights, participation, and removal of members. This policy shall be consistent with the purposes and principles of the Corporation as stated in these Bylaws and shall serve to operationalize the Corporation's commitment to being a member-led organization.

### A. Purpose and Scope

The Membership Policy provides the framework through which individuals join the Corporation as members and remain actively engaged. It outlines:

- Eligibility criteria for membership;
- The process for enrollment and participation;
- Member rights, roles, and decision-making involvement;
- Grounds and procedures for resignation, suspension, or removal;
- The distinction between members and allies;
- Procedures for maintaining member records.

### B. Oversight and Authority

The Membership Policy is approved and may be amended by the Board of Directors in accordance with these Bylaws. The Core Team is responsible for implementing the policy and may issue guidance, procedures, or tools to support its application in day-to-day

LIONESS 000046

Docusign Envelope ID: 3BE7A689-3047-49B7-ABEC-4F6C720D28F1

organizational work, so long as such interpretations remain consistent with the policy and these Bylaws.

## C. Alignment with Legal Structure

The Membership Policy does not create statutory members under Texas law but affirms the Corporation's voluntary membership model. It ensures the continued identification of members with whom the Corporation maintains a representational relationship, in alignment with the Corporation's recognized associational standing.

---

## ARTICLE 2.3 – REPRESENTATIONAL MEMBERSHIP STRUCTURE AND ASSOCIATIONAL STANDING

While the Corporation is governed by its Board of Directors and does not maintain statutory members as defined in the Texas Business Organizations Code, the Corporation maintains a traditional, voluntary membership base composed of identifiable individuals who affirmatively join and participate in the organization. These members form the foundation of Lioness's mission, direction, and advocacy work.

### A. Membership Definition

Members of the Corporation are individuals who:

1. Identify as a girl, woman, or gender-expansive person;

2. Have experienced incarceration in the state of Texas, including juvenile, county, state, federal, or immigration detention;

3. Have voluntarily enrolled and affirming alignment with the Corporation's mission, vision, values, and community agreements;

4. Participate actively in the organization through meetings, events, or decision-making processes.

Membership is documented and maintained through a formal roster and participation records in accordance with Lioness's Membership Policy.

### B. Legal Standing and Representation

The Corporation is recognized as a traditional membership organization with a defined, voluntary membership base. It is organized and operated in a manner that provides its members with:

- A meaningful role in shaping organizational direction;

LIONESS 000047

Docusign Envelope ID: 3BE7A689-3047-49B7-ABEC-4F6C720D28F1

- Access to services and opportunities;
- Representation in public advocacy and legal efforts;
- Participate actively in the organization through meetings, events, or decision-making processes.

The Corporation possesses associational standing to pursue litigation and policy advocacy on behalf of its members, who have standing to sue in their own right. The Corporation acts in good faith as a lead organizational representative in matters directly impacting its members.

Nothing in this section shall be interpreted as creating statutory members or limiting the Board's fiduciary authority. Instead, this section affirms the Corporation's member-led influence in decisions making and its lawful role in protecting and advancing the rights and interests of its defined membership.

## ARTICLE 3 – BOARD OF DIRECTORS

### 3.2 Number and Qualifications
The Board shall consist of no fewer than three (3) directors.

To serve as a voting director of the Corporation, an individual must:

- Identify as a girl, woman, or gender-expansive person; **and**
- Have personally experienced incarceration in Texas (juvenile, county, state, federal, or immigration detention).

The Board may appoint ex officio or advisory members who do not meet these qualifications, but such individuals shall not have voting power and shall not count toward quorum. To ensure the Corporation is led by those directly impacted, all voting Directors must identify as girls, women, or gender-expansive people who have personally experienced incarceration in Texas.

---

LIONESS 000048

Docusign Envelope ID: 3BE7A689-3047-49B7-ABEC-4F6C720D28F1

**FURTHER RESOLVED**, that these amendments shall be effective immediately upon adoption by the Board and shall be incorporated into the official Bylaws of the Corporation.

_____

**CERTIFICATION**

We, the undersigned, hereby certify that the foregoing constitutes the Amended and Restated Bylaws of Lioness Justice Impacted Women's Alliance, duly adopted by resolution of the Board of Directors at a meeting held on July 12, 2025, at which a quorum was present and acting throughout, and that the same are now in full force and effect.

DocuSigned by:

*Lori Mellinger*
2B532BBE8BEE41D

Lori Mellinger, Board President

Date: 8/26/2025

DocuSigned by:

*Alexa Garza*
07D332CF90624C8...

Alexa Garza, Board Secretary

Date: 8/26/2025

LIONESS 000049

Docusign Envelope ID: 3BE7A689-3047-49B7-ABEC-4F6C720D28F1

**Amended and Restated Bylaws of Lioness Justice Impacted Women's Alliance**

*(August 1st, 2025)*

## ARTICLE 1 – NAME, PURPOSES, POWERS, AND OFFICES

### 1.1 Name

The name of this corporation is Lioness Justice Impacted Women's Alliance (the "Corporation").

### 1.2 Purposes

The Corporation is organized and will be operated exclusively for charitable, scientific, and educational purposes within the meaning of Section 501(c)(3) of the Internal Revenue Code (the "Code") and to conduct, accomplish, and carry on its objectives, functions, and purposes or any part thereof set forth in the governing documents of the Corporation as amended from time to time.

Within the scope of the foregoing purposes and not by limitation thereof, the Corporation will work to end the incarceration and systemic devaluation of incarcerated women within the Texas criminal legal justice system through educational campaigns, leadership training, peer-led local support groups, and an educational resource platform. The assets and property of the Corporation are hereby pledged for use in performing its exempt purposes.

The Corporation is additionally organized to promote, encourage, and foster any other similar charitable, scientific, or educational activities; to accept, hold, invest, and reinvest and administer any gifts, legacies, bequests, devises, funds, and property of any sort or nature, and to use, expend, or donate its assets, and all income therefrom, for and to devote the same to, the foregoing purposes of the Corporation; and to do any and all lawful acts and things which may be necessary, useful, suitable, or proper for the furtherance of accomplishment of the purposes of this Corporation. Provided however, no act may be performed which would violate section 501(c)(3) of the Code as it now exists or as it may hereafter be amended.

### 1.3 Powers

The Corporation is a Texas nonprofit corporation and has all the powers, duties, authorizations, and responsibilities as provided by the Texas Business Organizations Code ("TBOC"); provided that the Corporation will neither have nor exercise any power, nor engage directly or indirectly in any activity, that would invalidate its status as a Corporation

LIONESS 000050

Docusign Envelope ID: 3BE7A689-3047-49B7-ABEC-4F6C720D28F1

that is exempt from federal income tax as an organization described in Section 501(c)(3) of the Code.

### 1.4 Offices

The Corporation may have, in addition to its registered office, offices as the Board of Directors may determine or as the affairs of the Corporation may require from time to time.

---

### ARTICLE 2 -MEMBERSHIP

### 2.1 Membership

The Corporation does not have members as defined by the Texas Business Organizations Code ("statutory members"), and no person shall be deemed a "member" under Chapter 22 of the Code. The Corporation is governed solely by its Board of Directors, which retains all legal authority and fiduciary duties.

However, the Corporation maintains a voluntary, non-statutory membership base composed of identifiable individuals who meet defined eligibility criteria and have affirmatively enrolled through a formal membership process, as outlined in the Corporation's adopted Membership Policy.

These voluntary members do not hold voting rights under state law and shall not have any power to govern the Corporation, bind the Corporation contractually, or elect or remove directors. Their role is limited to participatory engagement, collective advocacy, and non-binding input into organizational priorities. Their involvement reflects the Corporation's mission to be community-led, not a transfer of legal governance.

This non-statutory membership model is maintained for purposes of representation, inclusion, and internal accountability and is consistent with the Corporation's recognition as a traditional voluntary membership organization.

---

### ARTICLE 2.2 – MEMBERSHIP POLICY

The Corporation shall maintain a written Membership Policy that governs the eligibility, enrollment, responsibilities, rights, participation, and removal of members. This policy shall be consistent with the purposes and principles of the Corporation as stated in these Bylaws and shall serve to operationalize the Corporation's commitment to being a member-led organization.

### A. Purpose and Scope

LIONESS 000051

Docusign Envelope ID: 3BE7A689-3047-49B7-ABEC-4F6C720D28F1

The Membership Policy provides the framework through which individuals join the Corporation as members and remain actively engaged. It outlines:

- Eligibility criteria for membership;

- The process for enrollment and participation;

- Member rights, roles, and decision-making involvement;

- Grounds and procedures for resignation, suspension, or removal;

- The distinction between members and allies;

- Procedures for maintaining member records.

### B. Oversight and Authority

The Membership Policy is approved and may be amended by the Board of Directors in accordance with these Bylaws. The Core Team is responsible for implementing the policy and may issue guidance, procedures, or tools to support its application in day-to-day organizational work, so long as such interpretations remain consistent with the policy and these Bylaws.

### C. Alignment with Legal Structure

The Membership Policy does not create statutory members under Texas law but affirms the Corporation's voluntary membership model. It ensures the continued identification of members with whom the Corporation maintains a representational relationship, in alignment with the Corporation's recognized associational standing.

---

## ARTICLE 2.3 – REPRESENTATIONAL MEMBERSHIP STRUCTURE AND ASSOCIATIONAL STANDING

While the Corporation is governed by its Board of Directors and does not maintain statutory members as defined in the Texas Business Organizations Code, the Corporation maintains a traditional, voluntary membership base composed of identifiable individuals who affirmatively join and participate in the organization. These members form the foundation of Lioness's mission, direction, and advocacy work.

### A. Membership Definition

Members of the Corporation are individuals who:

5. Identify as a girl, woman, or gender-expansive person;

LIONESS 000052

Docusign Envelope ID: 3BE7A689-3047-49B7-ABEC-4F6C720D28F1

6. Have experienced incarceration in the state of Texas, including juvenile, county, state, federal, or immigration detention;

7. Have voluntarily enrolled and affirming alignment with the Corporation's mission, vision, values, and community agreements;

8. Participate actively in the organization through meetings, events, or decision-making processes.

Membership is documented and maintained through a formal roster and participation records in accordance with Lioness's Membership Policy.

**B. Legal Standing and Representation**

The Corporation is recognized as a traditional membership organization with a defined, voluntary membership base. It is organized and operated in a manner that provides its members with:

- A meaningful role in shaping organizational direction;

- Access to services and opportunities;

- Representation in public advocacy and legal efforts;

- Participate actively in the organization through meetings, events, or decision-making processes.

The Corporation possesses associational standing to pursue litigation and policy advocacy on behalf of its members, who have standing to sue in their own right. The Corporation acts in good faith as a lead organizational representative in matters directly impacting its members.

Nothing in this section shall be interpreted as creating statutory members or limiting the Board's fiduciary authority. Instead, this section affirms the Corporation's member-led influence in decisions making and its lawful role in protecting and advancing the rights and interests of its defined membership.

LIONESS 000053

Docusign Envelope ID: 3BE7A689-3047-49B7-ABEC-4F6C720D28F1

## ARTICLE 3 – BOARD OF DIRECTORS

### 3.1 General Powers

The activities, property, and affairs of the Corporation will be managed by its Board of Directors. The Board of Directors (also referred to as "Board") may exercise all such powers of the Corporation and do all such lawful acts and things as are permitted by law, by the Certificate of Formation, or by these Bylaws, unless otherwise expressly provided herein.

### 3.2 Number and Qualifications

The Board shall consist of no fewer than three (3) directors.

To serve as a voting director of the Corporation, an individual must:

- Identify as a girl, woman, or gender-expansive person; **and**

- Have personally experienced incarceration in Texas (juvenile, county, state, federal, or immigration detention).

The Board may appoint ex officio or advisory members who do not meet these qualifications, but such individuals shall not have voting power and shall not count toward quorum. To ensure the Corporation is led by those directly impacted, all voting Directors must identify as girls, women, or gender-expansive people who have personally experienced incarceration in Texas.

### 3.3 Term of Office

Directors will hold office for a two-year term and until such director's successor is elected and qualified, or until such director's earlier death, resignation, retirement, disqualification, or removal from office. Any director may be re-elected to serve consecutive terms of office.

### 3.4 Nomination of Directors

The Board will nominate candidates for successor directors. At any meeting at which the election of a director occurs, any director may nominate a person with the second of any other director. In addition to nominations made at meetings, a nominating committee may consider nominees.

### 3.5 Election of Directors

A person who meets the qualifications set forth in Section 3.2 and who has been nominated may be elected as a director. Directors will be elected by a majority vote of those directors at a meeting at which a quorum is present.

### 3.6 Duties of Directors

Directors will perform their duties in good faith, with ordinary care, and in a manner they

LIONESS 000054

Docusign Envelope ID: 3BE7A689-3047-49B7-ABEC-4F6C720D28F1

reasonably believe to be in the best interest of the Corporation. Ordinary care is care that prudent persons in similar positions would exercise under similar circumstances. In the performance of any duty imposed or power conferred on directors, they may in good faith rely on information, opinions, reports, or statements, including financial statements and other financial data, concerning the Corporation or another person that were prepared or presented by officers and employees of the Corporation, professional advisors, or experts such as accountants or attorneys. A director is not relying in good faith if the director has knowledge concerning a matter in question that renders reliance unwarranted.

### 3.7 Filling of Vacancies

Any vacancy occurring in the Board of Directors resulting from the death, resignation, retirement, disqualification, or removal from office of any director will be filled by the affirmative vote of a majority of the directors present at any meeting of the directors at which a quorum is present. Any director elected or appointed to fill a vacancy will hold office for the remainder of the vacated term and until such director's successor is elected and qualified, or until such director's earlier death, resignation, retirement, disqualification or removal from office.

### 3.8 Removal

Any director may be removed, either for or without cause, by the affirmative vote of a majority of the directors present at any meeting of the directors at which a quorum is present, if notice of the intention to act upon such matter will have been given in the notice of such meeting and if such notice is provided to the director proposed to be removed.

### 3.9 Resignation

Any director may resign at any time by delivering written notice to the Secretary or President of the Board of Directors. Such resignation will take effect upon receipt or, if later, at the time specified in the notice.

### 3.10 Directors' Compensation

The compensation, if any, of all directors of the Corporation shall be fixed from time to time by the Board of Directors. For services as a director, any director shall be entitled to compensation and the payment or reimbursement of expenses (including reasonable advances for expenses anticipated in the immediate future) for the performance of personal services which are reasonable and necessary to carry out the exempt purposes of the Corporation, provided that such compensation and reimbursement of reasonable expense shall not be excessive. The Corporation will not loan money or property to, or guarantee the obligation of, any director.

LIONESS 000055

## ARTICLE 4 – NOTICES

### 4.1 Notice

At least five (5) days' written notice must be given to all directors of any meeting of the Board of Directors. Notice of meetings may be given by electronic transmission (i.e., e-mail) if all directors individually and collectively consent in writing. Attendance of a director at a meeting will constitute a waiver of notice of such meeting, except when a director attends a meeting for the express purpose of objecting to a meeting not properly called.

---

## ARTICLE 5 – MEETINGS

### 5.1 Regular & Special Meetings

The Board will hold at least one meeting a year.

Regular meetings of the Board will be held at such times and places as may be selected by resolution adopted by the Board and communicated by written notice to all directors. Except as otherwise provided by law, by the Certificate of Formation, or by these Bylaws, any and all business may be transacted at any regular meeting.

Special meetings of the Board may be called by or at the request of the President or a majority of directors. A person or persons authorized to call special meetings of the Board may select any place as the place for holding a special meeting. The person calling a special meeting will notify the Secretary of the information required to be included in the notice of the meeting. The Secretary will give notice to the directors as required in the Bylaws.

### 5.2 Quorum and Manner of Acting

A majority of the number of directors then in office will constitute a quorum for the transaction of business at any meeting of the Board of Directors.

The directors present at a duly called or held meeting at which a quorum is present may continue to transact business even if enough directors leave the meeting so that less than a quorum remains. However, no action may be approved without the vote of at least a majority of the number of directors required to constitute a quorum. If a quorum is present at no time during a meeting, a majority of the directors present may adjourn and reconvene the meeting one time without further notice.

### 5.3 Proxy Voting Prohibited

Proxy voting is not permitted.

LIONESS 000056

Docusign Envelope ID: 3BE7A689-3047-49B7-ABEC-4F6C720D28F1

### 5.4 Written Consent of Directors

Any action required or permitted to be taken at any meeting of the Board or any committee may be taken without a meeting if a consent in writing setting forth the action to be taken is signed by the number of directors or officers whose vote would be necessary to take action at a meeting at which all such persons entitled to vote were present and voted, as the case may be. Such consent must be filed with the minutes of proceedings of the Board or of the committee. Such consent will have the same force and effect as a vote at a meeting where such directors or officers were present and voted, and may be stated as such in any document.

### 5.4 Action Without a Meeting

Any action that may be taken at a meeting of the Board or a committee may be taken without a meeting if a written consent, stating the action to be taken, is signed by the number of directors necessary to take that action at a meeting in which all the directors are in attendance (including remotely) and voting. Pursuant to 6.205 of the TBOC, or any successor statute, an electronic transmission from a director, or transmitted on behalf of a director, will be considered a signed consent. Unless otherwise stated in the consent, the date of the consent will be the date of transmission. Prompt notice of the action shall be given to each director who did not consent in writing to the action. For the avoidance of doubt, this section allows voting by email and other forms of electronic transmission, so long as the source and date of transmission can be ascertained, and so long as records of the consents can be recorded and maintained.

### 5.5 Alternative Forms of Meetings

Pursuant to 6.205 of the TBOC, or any successor statute, the Board and any Board committees, may hold meetings by using a conference telephone or similar communications equipment, or another suitable electronic communications system, including videoconferencing technology or the Internet (e.g. Zoom), or any combination ("Conferencing Technology"), if the Conferencing Technology allows each person participating in the meeting to communicate with all other persons participating in the meeting.

If voting is to take place at the meeting, reasonable measures must be implemented to verify that every person voting at the meeting by means of remote communications is sufficiently identified and a record must be kept of any vote or other action taken.

Participation in a meeting pursuant to this Section will constitute presence in person at such meeting, except when a person participates in the meeting for the express purpose of objecting to the transaction of any business on the ground that the meeting was not lawfully called or convened.

LIONESS 000057

Docusign Envelope ID: 3BE7A689-3047-49B7-ABEC-4F6C720D28F1

### 5.6 Minutes

At meetings of the Board, business will be transacted in such order as the Board may determine from time to time. In the event the Secretary is unavailable, the Board President will appoint a person to act as Secretary at each meeting. The Secretary, or the person appointed to act as Secretary, will prepare minutes of the meetings and place in corporate records.

---

## ARTICLE 6 – COMMITTEES

### 6.1 Committees of Directors

The Board may establish one or more committees, may delegate specified authority to a committee, and may appoint or remove members of a committee. A committee will include one or more directors and may include persons who are not directors. If the Board delegates any of its authority to a committee, the majority of the committee will consist of directors.

### 6.2 Advisory Boards or Committees

Advisory boards or committees not having and exercising the authority, responsibility, or duties of the Board in the management of the Corporation may be designated by a resolution adopted by the directors. Except as otherwise provided in such resolution, members of each such advisory board or committee need not be directors of the Corporation. The President will appoint the members of such advisory boards or committees. Any committee member may be removed by the President whenever in the President's judgment the best interests of the Corporation will be served by such removal.

---

## ARTICLE 7 – OFFICERS

### 7.1 Elected Officers

The elected officers of the Corporation will include a President and a Secretary and may include one or more Vice Presidents and/or a Treasurer, as may be determined from time to time by the Board. Any two (2) or more offices may be held by the same person, except that the President and Secretary will not be the same person.

### 7.2 Election

All officers will be elected by the Board, so far as is practicable, at each annual meeting of the Board.

### 7.3 Appointed Officers

The Board may also appoint one or more Assistant Secretaries and Assistant Treasurers

LIONESS 000058

Docusign Envelope ID: 3BE7A689-3047-49B7-ABEC-4F6C720D28F1

and such other officers and assistant officers and agents as it will from time to time deem necessary, who will exercise such powers and perform such duties as will be set forth in these Bylaws or determined from time to time by the Board.

### 7.4 Term of Office; Removal; Filling of Vacancies

Officers will hold a two-year term. An officer may be re-elected to serve consecutive terms of office. Each elected officer of the Corporation will hold office until such officer's successor is chosen and qualified in such officer's stead or until such officer's earlier death, resignation, retirement, disqualification, or removal from office. Any officer may be removed at any time by the affirmative vote of a majority of the Board. If any office becomes vacant for any reason, the vacancy will be filled by the Board.

### 7.5 President

The President will be the chief executive officer of the Corporation and has general supervision, direction, and control of the business and activities of the Corporation. The President will preside at all meetings of the directors and will be an ex-officio member of all standing committees.

### 7.6 Secretary

The Secretary will keep the minutes of the meetings of the Board in one or more books provided for that purpose, will see that all notices are duly given in accordance with the provisions of these Bylaws or as required by law, will keep custody of the corporate records of the Corporation, will keep a register of the post office address of each director which will be furnished to the Secretary by such directors, and will perform all duties incident to the office of Secretary and such other duties as from time to time may be assigned to them by the President or the Board.

### 7.7 Vice President

In the absence of the President or in the event of the President's inability or refusal to act, the Vice President, if any, will perform the duties of and be subject to all the restrictions of the President. The Vice President will perform such other duties as from time to time may be assigned to them by the President.

### 7.8 Treasurer

The Treasurer, if any, will keep correct and complete books and records of account and make the reports as the Board will require; will receive and give receipts for monies due and payable to the Corporation from any source whatsoever; and will deposit all such monies in the name of the Corporation in such banks, trust companies or other depositories as will be selected by the Board; and, in general, perform all duties incident to the office of

LIONESS 000059

Docusign Envelope ID: 3BE7A689-3047-49B7-ABEC-4F6C720D28F1

Treasurer and such other duties as from time to time may be assigned by the President or by the Board.

### 7.9 Additional Powers and Duties

In addition to the foregoing specially enumerated duties, services and powers, the several elected and appointed officers of the Corporation will perform such other duties and services and exercise such further powers as may be provided by law, the Certificate of Formation or these Bylaws, or as the Board may from time to time determine or as may be assigned by any competent superior officer.

---

## ARTICLE 8 – STAFF

### 8.1 Key Staff and/or Management Company

The Board may hire an executive director, chief executive officer, and/or a management company ("Management") to serve at the Board's discretion and to carry out whatever tasks the Board from time to time resolves. Management may be paid a fee set by the Board. Subject to such supervisory powers as are vested in the Board, Management will supervise, direct, and control the business of the Corporation. Management may engage in negotiations involving commitments of the resources of the Corporation, as determined by the Board. Management will generally be expected to attend all meetings of the Board, yet does not have a vote on the Board.

---

## ARTICLE 9 – OPERATIONS

### 9.1 Contracts

The Board may authorize any officer or officers, or agent or agents, of the Corporation, in addition to the officers so authorized by these Bylaws, to enter into any contract or execute and deliver any instrument in the name of and on behalf of the Corporation, and such authority may be general or confined to specific instances.

### 9.2 Checks, Drafts, and Similar Instruments

All checks, drafts or other orders for the payment of money, notes, or other evidences of indebtedness issued in the name of the Corporation will be signed by such officer or officers, agent or agents of the Corporation and in such manner as may from time to time be determined by the Board. Management may dispense the funds of the Corporation in accordance with the annual budget approved by the Board and in furtherance of the purposes of the Corporation as set forth in the Certificate and these Bylaws. Any financial

LIONESS 000060

Docusign Envelope ID: 3BE7A689-3047-49B7-ABEC-4F6C720D28F1

transactions not approved as part of the annual budget that have a value of $5,000 or more will require the prior approval of the Board.

### 9.3 Records

The Corporation will keep correct and complete records of account and will also keep minutes of the proceedings of the Board meetings and Committees. The Corporation will keep at its principal place of business the original or a copy of its bylaws, including amendments to date certified by the Secretary of the Corporation.

### 9.4 Conflicts of Interest

The Corporation will adopt a conflict of interest policy in the form attached hereto as Schedule A.

### 9.5 Dividends Prohibited

No part of the net income of the Corporation will inure to the benefit of any private individual and no dividend will be paid and no part of the income of the Corporation will be distributed to its directors or officers.

The Corporation may pay compensation in a reasonable amount to its officers for services rendered and may compensate and reimburse its directors as provided in Section 3.10.

### 9.6 Loans to Officers and Directors Prohibited

The Corporation will not make loans to its officers and directors, and any directors voting for or assenting to the making of any such loan, and any officer participating in the making thereof, will be jointly and severally liable to the Corporation for the amount of such loan until repayment thereof.

### 9.7 Fiscal Year

The fiscal year of the Corporation will be January 1 to December 31.

### 9.8 Policies and Procedures

The Corporation may adopt policies and procedures to define operations of the Corporation. The Board must approve the policies and may approve the procedures, in consultation with Management.

### 9.9 Invalid Provisions

If any part of these Bylaws will be held invalid or inoperative for any reason, the remaining parts, so far as is possible and reasonable, will remain valid and operative.

---

## ARTICLE 10 – INDEMNIFICATION

LIONESS 000061

Docusign Envelope ID: 3BE7A689-3047-49B7-ABEC-4F6C720D28F1

### 10.1 Limitation of Liability of Directors

A director of the Corporation will not be personally liable to the Corporation for monetary damages for any act or omission in such director's capacity as a director, except that these Bylaws do not authorize the elimination or limitation of the liability of a director to the extent the director is found liable for:

(i) a breach of the director's duty of loyalty to the Corporation;

(ii) an act or omission not in good faith that constitutes a breach of duty of the director to the Corporation or an act or omission that involves intentional misconduct or a knowing violation of the law;

(iii) a transaction from which the director received an improper benefit, whether or not the benefit resulted from an action taken within the scope of the director's office; or

(iv) an act or omission for which the liability of a director is expressly provided by an applicable statute.

The foregoing elimination of liability to the Corporation will not be deemed exclusive of any other rights, limitations of liability, or indemnity to which a director may be entitled under any other provision of the Certificate or Bylaws, contract or agreement, vote of directors, principle of law, or otherwise. Any repeal or amendment of this Article will be prospective only, and will not adversely affect any limitation on the personal liability of a director of the Corporation existing at the time of such repeal or amendment.

In addition to the circumstances in which a director of the Corporation is not personally liable as set forth in the foregoing provisions of this Article, the liability of a director will be eliminated to the full extent permitted by any amendment hereafter enacted to the TBOC or other Texas law that further eliminates or permits the elimination of the liability of a director.

### 10.2 Indemnification

The Corporation will indemnify and protect any director, officer, employee, or agent of the Corporation, or any person who serves at the request of the Corporation as a director, officer, employee, member, manager, or agent of another corporation, partnership, limited liability company, joint venture, trust, employee benefit plan, or other enterprise, to the fullest extent permitted by the laws of the State of Texas.

---

## ARTICLE 11 – AMENDMENTS TO BYLAWS

### 11.1 Powers to Amend

These Bylaws may be amended or repealed, or new bylaws may be adopted at any annual or special meeting of the Board at which a quorum is present by the affirmative vote of a

LIONESS 000062

Docusign Envelope ID: 3BE7A689-3047-49B7-ABEC-4F6C720D28F1

majority of the directors present at the meeting, provided notice of the proposed amendment, repeal or adoption be contained in the notice of such meeting; and provided further, that the foregoing notice requirement will not prohibit the directors from adopting the proposed amendment, effecting the proposed repeal or adopting the proposed new bylaws, as the case may be, in a modified form which is not identical to that described or set forth in the notice of such meeting.

## ARTICLE 12 – DISSOLUTION

### 12.1 Distribution of Assets

The Corporation pledges its assets for use in performing the Corporation's charitable functions. In the event the Corporation is dissolved, after all liabilities and obligations of the Corporation are paid or provision is made therefore, the Corporation's Board will distribute remaining assets of the Corporation as they will determine but only for tax-exempt purposes to such organization or organizations organized and operated exclusively for charitable or educational purposes and which are exempt under Section 501(c)(3) of the Code. Any of such assets not so disposed of will be disposed of by a court of competent jurisdiction of the county which the principal office of the Corporation is then located, to one or more organizations exempt under Section 501(c)(3) of the Code in a manner which best accomplishes the purposes of the Corporation. No director or officer of the Corporation and no private individual will be entitled to share in the distribution of any assets of the Corporation in the event of its dissolution.

### 12.2 Decision Making Authority

The Corporation's Board will have the sole and exclusive right to vote and make decisions regarding or in any way involving the dissolution, merger, and/or consolidation of the Corporation and decisions regarding the sale of substantially all of the Corporation's assets.

LIONESS 000063

Docusign Envelope ID: 3BE7A689-3047-49B7-ABEC-4F6C720D28F1

**SCHEDULE A – CONFLICT OF INTEREST POLICY FOR LIONESS JUSTICE IMPACTED WOMEN'S ALLIANCE**

---

### ARTICLE 1 – PURPOSE

The purpose of the Conflict of Interest Policy ("Policy") is to protect Lioness Justice Impacted Women's Alliance's (the "Corporation") interest when it is contemplating entering into a transaction or arrangement that might benefit the private interest of an officer, director, or key employee of the Corporation that might result in a possible excess benefit transaction. This Policy is intended to supplement but not replace any applicable state and federal laws governing conflict of interest applicable to nonprofit and charitable organizations.

---

### ARTICLE 2 – DEFINITIONS

#### 2.1 Interested Person

Any director, principal officer, or member of a committee with governing board delegated powers, who has a direct or indirect financial interest, as defined below, is an interested person.

#### 2.2 Financial Interests

Financial interests include, but are not limited to:

a. An ownership, investment interest, or compensation arrangement with any entity with which the Corporation has a transaction or arrangement;

b. A compensation arrangement with the Corporation or with any entity or individual with which the Corporation has a transaction or arrangement; or

c. A potential ownership, investment interest, or compensation arrangement with any entity or individual with which the Corporation is negotiating a transaction or arrangement, including a commission or fee, share of the proceeds, the prospect of promotion or profit, or any other form of financial reward.

**2.3 Compensation** includes direct and indirect remuneration as well as gifts or favors that are not insubstantial.

**2.4** A financial interest is not necessarily a conflict of interest. Under Section 3.2, a person who has a financial interest may have a conflict of interest only if the appropriate governing board or committee decides that a conflict of interest exists.

LIONESS 000064

Docusign Envelope ID: 3BE7A689-3047-49B7-ABEC-4F6C720D28F1

## ARTICLE 3 – PROCEDURES

### 3.1 Duty to Disclose

In connection with the actual or potential conflict of interest, an interested person must disclose the existence of their financial interest and all material facts to the directors and members of committees with board-delegated powers considering the proposed transaction or arrangement and will abstain from voting on such matters.

### 3.2 Determining Whether a Conflict of Interest Exists

After disclosure of the financial interest and all material facts, and after any discussion with the interested person, the interested party will leave the board or committee meeting while the determination of a conflict of interest is discussed and voted upon. The remaining board or committee members will decide if a conflict of interest exists.

### 3.3 Procedures for Addressing the Conflict of Interest

a. An interested person may make a presentation at the board or committee meeting, but after such presentation, they will leave the meeting during the discussion of, and the vote on, the transaction or arrangement that results in the conflict of interest.

b. The President or Chair of a committee will appoint a disinterested person or committee to investigate alternatives to the proposed transaction or arrangement, if appropriate.

c. After exercising due diligence, the board or committee will determine whether the Corporation can obtain a more advantageous transaction or arrangement with reasonable efforts from a person or entity that would not give rise to a conflict of interest.

d. If a more advantageous transaction or arrangement is not reasonably attainable under circumstances that would not give rise to a conflict of interest, the board or committee will determine by a majority vote of the disinterested directors whether the transaction or arrangement is in the Corporation's best interest and for its own benefit and whether the transaction is fair and reasonable to the Corporation. The Corporation will make its decision as to whether to enter into the transaction or arrangement in conformity with such determination.

### 3.4 Violations of the Conflict of Interest Policy

a. If the board or committee has reasonable cause to believe that a person has failed to disclose actual or possible conflicts of interest, it will inform the person of the basis for such belief and afford the member an opportunity to explain the alleged failure to disclose.

LIONESS 000065

Docusign Envelope ID: 3BE7A689-3047-49B7-ABEC-4F6C720D28F1

b. If, after hearing the response of the person and making such further investigation as may be warranted in the circumstances, the board or committee determines that the person has in fact failed to disclose an actual or possible conflict of interest, it will take appropriate disciplinary and corrective action, including, but not limited to, removal from the Board.

## ARTICLE 4 – RECORDINGS AND PROCEEDINGS

**4.1** The minutes of the board and committees with board-delegated powers will contain:

a. The names of the persons who disclosed or otherwise were found to have a financial interest in connection with an actual or possible conflict of interest, the nature of the financial interest, any action taken to determine whether a conflict of interest was present, and the board's or committee's decision as to whether a conflict of interest in fact existed; and

b. The names of the persons who were present for discussions and votes relating to the transaction or arrangement, the content of the discussion, including any alternatives to the proposed transaction or arrangement, and a record of any votes taken in connection therewith.

## ARTICLE 5 – COMPENSATION

**5.1** A voting member of the governing board who receives compensation, directly or indirectly, from the Corporation for services is precluded from voting on matters pertaining to that member's compensation.

**5.2** A voting member of any committee whose jurisdiction includes compensation matters and who receives compensation, directly or indirectly, from the Corporation for services is precluded from voting on matters pertaining to that member's compensation.

**5.3** No voting member of the governing board or any committee whose jurisdiction includes compensation matters and who receives compensation, directly or indirectly, from the Corporation, either individually or collectively, is prohibited from providing information to any committee regarding compensation.

LIONESS 000066

Docusign Envelope ID: 3BE7A689-3047-49B7-ABEC-4F6C720D28F1

## ARTICLE 6 – ANNUAL STATEMENT

**6.1** Each director, officer, and committee member with board-delegated powers will annually sign a statement that affirms that such person:

a. Has received a copy of the Policy;

b. Has read and understands the Policy;

c. Has agreed to comply with the Policy; and

d. Understands that the Corporation is a charitable organization and that to maintain its federal tax exemption it must engage primarily in activities that accomplish one or more of its tax-exempt purposes.

---

## ARTICLE 7 – PERIODIC REVIEWS

**7.1** To ensure the Corporation operates in a manner consistent with charitable purposes and does not engage in activities that could jeopardize its tax-exempt status, periodic reviews will be conducted. The periodic reviews will, at a minimum, include the following subjects:

a. Whether compensation arrangements and benefits are reasonable, based on competent survey information and the result of arm's length bargaining.

b. Whether partnerships, joint ventures, and arrangements with management organizations conform to the Corporation's written policies, are properly recorded, reflect reasonable investment or payments for goods and services, further charitable purposes and do not result in inurement, impermissible private benefit or in an excess benefit transaction.

c. When conducting the periodic reviews, the Corporation may, but need not, use outside advisors. If outside experts are used, their use will not relieve the governing board of its responsibility for ensuring periodic reviews are conducted.

---

LIONESS 000067

Docusign Envelope ID: 3BE7A689-3047-49B7-ABEC-4F6C720D28F1

**CONFLICT OF INTEREST ANNUAL DISCLOSURE STATEMENT**

*To be signed annually*

By signing the form below, I agree to ALL the statements below:

- I serve in one of the following function(s) for the Corporation: Director, Board Advisor, Staff, Volunteer, Contractor, or _____(specify other).

- I have received a copy of the Conflict of Interest Policy.

- I have READ and UNDERSTAND the Conflict of Interest Policy and know that I can directly contact the Corporation's President on matters that may pertain to a "real or perceived" conflict of interest.

- I agree to comply with this Conflict of Interest Policy.

- I understand that the Corporation is a nonprofit corporation with 501(c)(3) tax exempt status, and that the Corporation, in order to maintain its federal tax-exemption, must engage primarily in activities that accomplish one or more of its tax-exempt purposes.

**ACCEPTANCE OF NOTICE BY EMAIL**

I agree to accept meeting notice and other Board materials via email at the email address listed below. I agree to meet electronically should the meeting notice include the electronic contact information.

_____

Board of Director Signature

LIONESS 000068

# EXHIBIT 4

**Lioness Justice Impacted Women's Alliance**
**Membership Policy**
**Effective Date: 8-1-25**

---

## I. Purpose

This Membership Policy defines the rights, responsibilities, and structure of membership within Lioness Justice Impacted Women's Alliance ("Lioness"), a Texas-based 501(c)(3) nonprofit organization.

---

## II. Membership Eligibility

To be eligible for membership, an individual must:

1. Identify as a girl, woman, or gender-expansive person;

2. Have experienced incarceration in the state of Texas, either currently or in the past.

   o This includes incarceration in juvenile facilities, county jails, state prisons, federal prisons, or immigration detention.

   o There is no minimum length of incarceration required.

3. Affirm alignment with the mission, vision, values, and community agreements of Lioness.

---

## III. Membership Rights and Powers

While the Board of Directors holds legal fiduciary duties, it is the membership who helps shape Lioness's overall direction, culture, and work. Members have target decision making power, as determined and facilitated by the Board of Directors and Core Team. Member participation in decision-making is guided by our leadership structure and grounded in shared responsibility, transparency, and trust.

## IV. Member Responsibilities

Members are expected to:

• Uphold the mission, vision, values, and community agreements
• Maintain active engagement with the organization (attend and/or actively participate in at least six (6) meetings and/or events per calendar year)

**V. Member Benefits**

Lioness members are eligible for:

- Full access to Lioness-hosted activities
- Mutual aid and other resources (stipends, travel assistance, etc.) as budgeted
- Participation in virtual and in-person gathering spaces
- Voice in targeted decision-making
- Eligibility to serve in formal leadership roles (Board, Core Team, Lead Organizers, etc.)

---

**VI. Becoming a Member**

To become a Lioness Member, an individual must meet all of the following steps:

1. **Meet Eligibility Criteria**
   The individual must first confirm they meet the eligibility requirements outlined in Section II.

2. **Complete the Membership Form**
   Eligible individuals must fill out and submit the official Lioness Membership Form.

3. **Agree to Mission**
   Members must affirm their alignment with the mission, vision, and values of Lioness and commit to upholding the community agreements.

4. **Participate in the Community**
   Members are expected to attend and actively participate in at least six (6) meetings and/or events per calendar year to remain in good standing.

---

**VII. Resignation, Suspension, or Removal**

Members may resign at any time by notifying the organization.
A member may be suspended or removed if they:

- Violate community agreements
- Does not attend and actively participate in at least six (6) meetings and/or events per calendar year.

All such actions will be reviewed by the Core Team, with recommendations made to the Executive Director.

## VIII. Allies

Lioness defines anyone outside of our formal membership who believes in our mission, vision, values and agrees to follow our community agreements, as an ally. This includes directly or indirectly system-impacted individuals, family members, organizational partners, researchers, and others who seek to advance our goals.

While allies are not eligible for membership, their support is welcomed and deeply valued. Allies may participate in:

- Select Lioness-hosted activities and public events/activities
- Volunteer opportunities
- In-person and virtual gathering spaces

*Participation in the private Facebook group and WhatsApp chats is by invitation/approval only from the Core Team based on active involvement. Ally participation will end at any time if an individual violates community agreements, does not respect the decisions of Lioness members or acts in a way that endangers the safety of others, or integrity of Lioness.*

## IX. Recordkeeping

Lioness maintains a membership roster and participation notes to document and uphold our standing as a member-led organization.

This includes:

- Member names
- Dates of enrollment
- Notes on participation

This ensures our continued accountability to the community we serve. *Identified Allies will be kept on a separate list.*

## X. Amendments

This policy may be amended by the Board of Directors in accordance with Lioness's organizational bylaws.

I, the undersigned, do hereby certify that the foregoing was duly adopted by the Board of Directors of Lioness Justice Impacted Women's Alliance at a meeting held on July 12, 2025 at which a quorum was present and acting throughout. This policy is therefore in full force and effect as of this date.

*Lori Mellinger*

Lori Mellinger, Board President

Lioness Justice Impacted Women's Alliance

# EXHIBIT 5

**Subject:** Re: Questions from Board Member-Lioness JIWA's Fiscal Sponsorship Application
**From:** Jennifer Toon <lionessjiwa@gmail.com>
**Date:** 11/8/2022, 11:39 AM
**To:** Amanda Nasinyama <amanda@buildupinc.org>
**CC:** BUI team email <team@buildupinc.org>

Thanks for the follow up questions! I am more than happy to provide additional information.

Our membership is free and consists of members on the inside (incarcerated) and outside. We keep track of them separately and collect basic data, but most importantly for our incarcerated members we also track their reports about issues of confinement.

Members on the inside reach out to us through our PO Box address which is shared via our bi- monthly newsletter and also through personal networks. Word of mouth is extremely effective when it comes to our incarcerated members. They share newsletters and also refer loved ones to us to be involved on the outside. I will attach our most recent newsletter for you to review.

Members on the outside can contact us through our website and social media. We maintain and actively engage a Facebook group page and members are encouraged to invite other formerly incarcerated girls and women they know to join.

We do hope to provide our members with whatever support BUI is able to provide collectively and individually. We are excited by the prospect of not just having a fiscal sponsor but learning and growing as social justice leaders and eventually into a non-profit with sustainability. We would promote any support from BUI as a benefit of membership.

There is so much we want to do but right now our current priority is the upcoming legislative session in Texas. We foresee our legislative advocacy as being only a small part of what we will be doing but it is still extremely important for us to establish presence in these spaces of power. This will include tracking bills, creating action items around those bills as they relate to our mission, finding ways to get outside members across Texas to the capitol to testify, and creating training for inside and outside members. We are also using this time to network with other organizations where our missions align and provide support in hosting events or other collaborative projects in the community that focus on voter registration and education.

Let me know if there is anything else you need! Have a wonderful day!

Jennifer Toon



On Tue, Nov 8, 2022 at 8:30 AM Amanda Nasinyama <amanda@buildupinc.org> wrote:

> Hi Jennifer,
>
>
> I hope you are doing well.  The Board is currently reviewing your proposal, and one of our Board members had a few questions.

Could you provide more details about your membership structure, how members join, and whether it is unpaid? Do you anticipate BUI, as a fiscal sponsor, providing any support as part of each member's benefits?

Lastly, what are your immediate priorities given Lioness: JIWA's breadth of work?

I should be getting back to you before the end of this week with the Board's decision.

Warm regards,

Amanda

**Amanda Nasinyama**
**Director of Strategic Initiatives | Build Up, Inc.**
**Mobile: +1(347) 809-1178**
amanda@buildupinc.org | LinkedIn: Amanda Nasinyama

**Our mission: Build Up, Inc**. supports, cultivates, and transforms brave, innovative ideas into sustainable solutions for vulnerable and marginalized populations around the globe. Learn more about our work and how you can help these life-changing ideas flourish here.

*Mark it on your calendar: Build Up is out of the office Friday, November 11, in observance of Veteran's Day, and Monday, November 21 – Friday, November 25, for US Thanksgiving Break.*

---

Attachments:

Lioness Newsletter Nov.pdf                                                378 KB

# EXHIBIT 6
# Filed Under Seal

# EXHIBIT 7



CIVIL ACTION NO. 1:23-cv-01004-RP

BERNHARDT TIEDE, II; TEXAS PRISONS COMMUNITY ADVOCATES;

BUILD UP, INC. A/K/A LIONESS:  JUSTICE IMPACTED WOMEN'S ALLIANCE;

TEXAS CITIZENS UNITED FOR REHABILITATION OF ERRANTS;

and COALITION FOR TEXANS WITH DISABILITIES

VS.

BRYAN COLLIER, in his Official Capacity as Executive Director

of Texas Department of Criminal Justice

DEPOSITION OF:

BRYAN COLLIER

DATE:

October 20, 2025



 (855) 693-3767 | (720) 738-1300

✉ schedule@yournextdepo.com

www.pikereporting.com

Case 1:23-cv-01004-RP   Document 258   Filed 12/08/25   Page 140 of 726
The Deposition of BRYAN COLLIER, taken on October 20, 2025
34..37

Page 34

1    A.    No, ma'am.
2        Q.    And what about from the governor's office?  I
3    think I said Governor Abbott, but now anyone from the
4    office, did you ever receive any pushback when you
5    wanted to install permanent air conditioning throughout
6    the facilities in terms of what to ask for from the
7    Legislature?
8        A.    So the way you're asking the question, you're
9    asking if I went to -- I assume you're asking me if I
10   went to those offices and said I need a billion dollars
11   to do everything.  I did not do that.  I went in and
12   requested the amount of funding we were asking for to do
13   what we knew we could accomplish within that cycle.
14           And I don't recall any pushback.
15       Q.    I didn't just mean a billion dollars.  It could
16   have been 300 million or 400 million, just any amount of
17   money where you wanted to ask for it but they are saying
18   no, not right now?
19       A.    No.
20       Q.    With anyone from the governor's office or
21   anyone from the lieutenant governor's office, you never
22   received any pushback for any amount of money you wanted
23   to ask for for air conditioning?
24       A.    Not that I recall.
25       Q.    Now, you -- you know -- or you've met the heads

Page 35

1    of the organizations that are the plaintiffs in this
2    lawsuit; is that right?
3        A.    I believe so.
4        Q.    Amite Dominick at TPCA?
5        A.    Yes.
6        Q.    Jennifer Toon at Lioness?
7           THE REPORTER:  I'm sorry, at T --
8           MS. GROSSMAN:  At TPCA.
9        Q.    You know her?
10       A.    Yes, ma'am.
11       Q.    And Jennifer Toon at Lioness?
12       A.    Yes, ma'am.
13       Q.    Charlie Malouff at Texas Cure?
14       A.    Yes.
15       Q.    Have you talked to them in person?
16       A.    I believe so.
17       Q.    I'm sure they've sent you emails?
18       A.    I wouldn't doubt it at all, yes.
19       Q.    And you don't doubt that Amite Dominick
20   advocates for the people that are incarcerated in Texas
21   prisons to get air conditioning, do you?
22       A.    She advocates for air conditioning.
23       Q.    And you don't doubt that Charlie Malouff
24   advocates consistently for people in the Texas prisons
25   for air conditioning?

Page 36

1        A.    He advocates for a lot.
2        Q.    Yes, he does, yes, he does.  One of them being
3    air conditioning?
4        A.    Could be.  I don't recall.  I wouldn't argue
5    with that.
6        Q.    Okay.  You wouldn't argue that Jennifer Toon
7    does as well advocate throughout -- advocate for the
8    people in the Texas prisons for air conditioning?
9        A.    I wouldn't argue with that either.
10       Q.    And inmates bring lawsuits, they send
11   grievances, they're frequently asking for air
12   conditioning as well; is that fair?
13       A.    I don't know frequently is -- and I don't know
14   that I could answer that yes or no.
15       Q.    And --
16       A.    I don't personally know of frequent grievances
17   or frequent lawsuits about air conditioning.
18       Q.    There's thousands of grievances that were filed
19   in 2023 and 2024 related to heat only; is that fair?
20       A.    I would need to look at the number.  I would
21   not doubt you, but --
22       Q.    Okay.  We'll look at that.  Either way,
23   these -- Charlie Malouff, Amite Dominick, Jennifer Toon,
24   they advocate and complain a lot for air conditioning
25   throughout the prisons; is that fair?

Page 37

1           MR. JOHNSON:  Objection, form.
2        A.    I know they were part of this law --
3    litigation, but as far as a lot, Ms. Dominick, yes, but
4    the others, I'm not certain how often I've heard them
5    talk about air conditioning.
6        Q.    But certainly before this litigation you heard
7    that?
8           MR. JOHNSON:  Objection, form.
9        A.    With Ms. Dominick, yes.
10       Q.    No reason to question that they communicate
11   frequently with people that are in prison about the
12   heat, is there?
13          MR. JOHNSON:  Objection, form.
14       A.    Don't know.
15       Q.    No reason -- you don't have any reason to
16   question that?
17       A.    I don't know the accuracy of their accounts at
18   all.
19       Q.    Inmates certainly submit grievances for the
20   heat, right?
21       A.    Some inmates file grievances related to issues
22   that we flag as heat, so it could be an empty water
23   cooler, it could be not enough ice in a cooler, it could
24   be anything related to mitigation measures or it's just
25   hot.

Pike Reporting Company
410 17th Street, Suite 1350
Denver, CO 80202



(855) 693-3767 | (720) 738-1300
schedule@yournextdepo.com
www.pikereporting.com

Case 1:23-cv-01004-RP   Document 258   Filed 12/08/25   Page 141 of 726
The Deposition of BRYAN COLLIER, taken on October 20, 2023
46..49

Page 46

1    Q.   But that's what TDCJ was trying to do, is
2  measure the -- around the hottest time of the day in the
3  different facilities that are un air-conditioned to
4  report to the Legislature?
5    A.   I believe that would be correct.
6    Q.   So these numbers then should be consistent with
7  the temperature logs that are kept at the facilities
8  that are inside temperatures?
9    A.   These should match up to inside temperatures
10  related to the Kestrel monitoring.
11    Q.   Are the logs done hourly or just at 3:00 p.m.?
12    A.   The log for the Kestrel?
13    Q.   Yes.
14    A.   Is done once a day.
15    Q.   Once a day.
16    A.   (Moving head up and down.)
17    Q.   Now to something I really need your help on,
18  which is the capital expenditure plans.
19    A.   Uh-huh.
20    Q.   I'm going to mark them Exhibit 3.
21         (Exhibit 3 marked.)
22    Q.   I'm going to put on my glasses.
23    A.   Uh-huh.
24    Q.   All right.  So I know that there are capital
25  expenditure plans.  How else would you describe these

Page 47

1  documents?
2    A.   So as part of the process state agencies go
3  through to identify major repair needs, we file a
4  capital expenditure plan.  That's what this reflects,
5  are those significant maintenance projects that need to
6  be accomplished and the timeline we believe they need to
7  be accomplished within.
8    Q.   Okay.  When does deferred maintenance mean?
9    A.   Deferred maintenance, and I can't give you
10  the -- well, literally I would say this is deferred
11  maintenance because we know we may have something that
12  we need to replace in '28, '29, so this -- we're asking
13  or letting the Legislature know that need up front, but
14  where the term came from the legislative process,
15  I'm not sure, it's just always been there.
16         But for us as an agency, it refers to
17  essentially the funding we receive to do major repairs
18  like these.  They match up to your capital improvement
19  plan.  If you need to put a new roof on a facility, if
20  you need to do a new wastewater treatment plant or a new
21  water tower, it would come -- you would have that on
22  your capital improvement plan and you would track that
23  to your funding request when you go into the legislative
24  cycle.
25    Q.   Okay.  So things that you need to repair,

Page 48

1  maintenance, deal with the facilities, are put on this
2  list as specific line items to then ask the Legislature
3  for?
4    A.   Correct.  It matches up -- this is usually not
5  discussed, although it may be in the legislative process
6  where they make sure what you're asking for matches up
7  and they know what they're funding, but they don't go
8  through and pick specific projects and say we'll fund
9  this but not that.
10    Q.   Okay.
11    A.   But essentially they provide that money in that
12  line item of deferred maintenance.  That's where our
13  major repair money comes from.
14    Q.   Okay.  And so for example on Exhibit -- is it
15  3, I believe?
16         THE REPORTER:  3.
17    Q.   (By Ms. Grossman)  This is the 86 -- the first
18  page is the 86 capital expenditure plan of the
19  Department; is that right?
20    A.   Yes, ma'am.
21    Q.   So you're -- am I right that you're preparing
22  this in 2019 but it's for the fiscal years of 2020 and
23  2021?
24    A.   It is -- my memory is, I believe we prepare at
25  a 6-year window.

Page 49

1    Q.   Okay.
2    A.   So we prepared capital improvement projects
3  that we knew we needed to do on a six-year window,
4  provided that information to the Legislature.  It may
5  even go to the comptroller, but I can't remember.
6    Q.   Because I'm just a little -- so I'm confused.
7  Can you explain this six-year window to me a little bit?
8    A.   Sure.  So basically you as an agency are
9  letting the legislature know specific projects that need
10  to be done and the timeline you feel like you need to do
11  it.
12    Q.   Okay.
13    A.   In other words, you may have a roof that has
14  two more years of age on it, we feel like, so we may
15  ask, but it would be in your capital improvement plan to
16  replace the roof.  You may have a plumbing issue.  If
17  you don't get funding in a year for all your capital
18  projects then you have to push those forward and you may
19  pull a project over into another cycle.
20    Q.   Okay.  So then -- so then what's the numbers in
21  2019 reflect, what is that -- there's a blank column in
22  the left that says 11 million.
23    A.   That's what we --
24    Q.   Sorry, one second.  11,816,000, what is that?
25    A.   That's probably what we received.  2019 -- I

Pike Reporting Company
410 17th Street, Suite 1350
Denver, CO 80202


PIKE REPORTING COMPANY
Paving Your Path Through Litigation

(855) 693-3767 | (720) 738-1300
schedule@yournextdepo.com
www.pikereporting.com

Page 50

1 would have to go back and look at documents, but that
2 may be the funding that we received for those projects.
3 And if you keep going down, because it looks like these
4 total out. Let me see, 27. The grand total of the plan
5 at that time -- I'm trying to see -- grand total is 20
6 million 362.
7    Q.  And --
8    A.  Four of four. I don't know -- I don't remember
9 if that's the funding we received for those items in '19
10 or not.
11    Q.  Is it not the leftover money?
12    A.  No, ma'am, it wouldn't be.
13    Q.  Okay.
14    A.  We never had such a thing as leftover money.
15    Q.  I see. Okay. But the 86 -- this plan is when
16 you -- it's projecting out the next six years?
17    A.  Typically, yes, ma'am.
18    Q.  Okay. So then let's just do an example. I see
19 on -- let's see. In Robertson --
20    A.  Uh-huh.
21    Q.  -- add electronic water controls to showers and
22 toilets.
23    A.  Uh-huh.
24    Q.  And then that one -- that number, you projected
25 850,000 to be spent in 2020?

Page 51

1    A.  Yes, ma'am.
2    Q.  850,000 to be spent in 2021?
3    A.  If we received the funding.
4    Q.  And then no money the rest of the years?
5    A.  Wouldn't need it because that was a specific
6 project related to valves. What that project relates to
7 is essentially electronic water controls for the sinks
8 and the toilets to make them more efficient.
9    Q.  So you don't -- okay. So the 2023 and 2024,
10 you wouldn't need it because it would already be
11 completed?
12    A.  Yes, ma'am.
13    Q.  But then if you would need money in 2023 and
14 2024, you would add it to those columns?
15    A.  I believe so, yes, if it was an ongoing thing,
16 but really these are specific projects that are going to
17 have a beginning and ending date.
18    Q.  Okay. So the kitchen renovations, I think
19 that's lining up with the 7,300,000. Is that what
20 you're seeing? It's right below what I just read.
21    A.  I see that, 424, and I see a flag saying design
22 canceled.
23    Q.  Oh, okay. Let's go to a different page then.
24 Let's go to the next page.
25    A.  Uh-huh.

Page 52

1    Q.  I see in the 2024 column there's a 4,500,000,
2 and I think it lines up with the Connally unit to
3 replace the fire alarm system. Is that what you see?
4    A.  I'm -- where are you?
5    Q.  I'm sort of in the middle of the page, Safety,
6 Connally, and it says replace fire alarm system. And
7 then over in the 2024 column is the 4,500,000.
8    A.  I see that, yes, ma'am.
9    Q.  So -- and it's put in the 2024 but not in the
10 2021 category. Like why would that be?
11    A.  Don't know.
12    Q.  But it's -- either it's projected -- it's the
13 money that's projected to be spent in 2024?
14    A.  If received.
15    Q.  If received.
16    A.  This all assumes you have the money. It
17 doesn't equate to actual funding.
18    Q.  Of course, because you can't --
19    A.  Yes, ma'am.
20    Q.  You don't know if you're going to get it,
21 right?
22    A.  Right.
23    Q.  But it's what you intend to spend it on if you
24 get it, and it's what you intend to ask for?
25    A.  Correct.

Page 53

1    Q.  Okay. So then if you look at the last page of
2 86, capital expenditure plans?
3    A.  Uh-huh.
4    Q.  The numbers at the bottom total all the various
5 categories, right?
6    A.  I believe that's right.
7    Q.  And so projected 74,420,000 in 2020 for the
8 capital line items; is that right?
9    A.  I see what you're talking about, yes.
10    Q.  And 2024, for example, 102,300,000?
11       THE REPORTER:  I'm sorry, you'll have to
12 slow down.
13    Q.  (By Ms. Grossman)  2024, for example,
14 102,300,000 --
15    A.  Yes, that's --
16    Q.  -- to spend?
17    A.  Would be the total of those items.
18    Q.  And again, if you get it.
19    A.  That's the items that are projected to be
20 needed and the cost of those items and the total.
21    Q.  Okay. So the 87th capital expenditure plan
22 starts on that next page. I think I'm understanding
23 now. So 20 -- this projects out the next six years,
24 2022, 2023, 2024, 2025 and 2026; is that right?
25    A.  And plus out past '26.

Pike Reporting Company
410 17th Street, Suite 1350
Denver, CO 80202


PIKE
REPORTING
COMPANY
PAVING YOUR PATH THROUGH LITIGATION

(855) 693-3767 | (720) 738-1300
schedule@yournextdepo.com
www.pikereporting.com

Page 54

```
1    Q.   And plus.
2    A.   So '26 and then plus.
3    Q.   Okay.  And 2027?
4    A.   Yes, ma'am, some of that would be in there.
5    Q.   Okay.  Okay.  So the 89th was the recent one?
6    A.   I believe that's right.
7    Q.   And that would be projecting out six years from
8    that?
9    A.   Correct.
10   Q.   So that would -- that would be projecting out
11   to 2031 what TDCJ intends to ask for to the Legislature?
12   A.   That should be about right.
13   Q.   He was saying that we've been going for about
14   an hour, so we might need a break, but -- do you need a
15   break right now?
16   A.   I'm okay if you're --
17   Q.   I'm was going to wait for -- to get through
18   these fun capital expenditure plans.
19   A.   Uh-huh.
20   Q.   Actually, never mind.  I think I asked you
21   those questions, so why don't we take about a
22   five-minute break?
23        VIDEOGRAPHER:  Going off the record.  The
24   time is 10:28.
25        (Brief recess.)
```

Page 55

```
1        VIDEOGRAPHER:  Back on the record.  The
2    time is 10:39.
3    Q.   (By Ms. Grossman)  Briefly back on the capital
4    expenditure plans that project out the next six years,
5    how do you know what you're going to -- what TDCJ will
6    need for the next six years?
7    A.   These items look at things that we typically
8    already have, and looking at lifespan but also the
9    condition of the equipment or the specific piece; in
10   other words, a roof, you may have patched a roof that
11   has leaks but you know that that will last another 24
12   months, but you put that on the plan as something that
13   needs to be replaced based on the age, based on the
14   current condition of that roof.  You might do the same
15   with a boiler or other big item.
16   Q.   Okay.  And then why would it be one year -- why
17   would you want to spend that, how would you know you
18   would need it in 2025 or 2026 versus 2022?
19   A.   Our engineers and facility maintenance staff
20   would identify based on what those needs are and then
21   based on what we -- based -- again, the condition of the
22   equipment, and then when that equipment either needs to
23   be repaired or replaced.  So -- I'm just trying to think
24   of another example, but as you might know that in the
25   next five years you need to replace the air conditioning
```

Page 56

```
1    unit in your home, so you may put that on your capital
2    improvement plan, so to speak, to say in five years I'm
3    going to need to probably get that replaced, or my hot
4    water heater.
5        This is a much bigger scale but these are
6    items that need major renovation or repair, like a
7    kitchen floor --
8    Q.   Uh-huh.
9    A.   -- maybe already cracking and we see issues.
10   We know we can get by another couple of years before we
11   have to replace it, but we're going have replace it, so
12   it would go on that plan as well.
13   Q.   So there are some things that you can project
14   out into the next six years about what you would need to
15   do to -- for repairs or maintenance in the TDCJ
16   facilities?
17   A.   Yes.
18   Q.   Then there are other things that aren't; is
19   that right?
20   A.   There are things that come up, hurricanes,
21   other critical events that can occur that change all
22   that, because you have to do an emergency repair on
23   something that you weren't planning to do.  That can
24   come up and then other things can come up as well.
25   Q.   But anything that you know is going to be
```

Page 57

```
1    needed over the next six years would be reflected in the
2    capital expenditures plans?
3    A.   As it relates to things that you're repairing
4    typically.  So these are, again, items that you are --
5    these are not your wish list, these are your -- things
6    that you're typically repairing and/or addressing a need
7    to fix something that's already in place.
8    Q.   What do you mean by wish list?
9    A.   These are not things that you might want to do.
10   Q.   Okay.
11   A.   These are things that actually keep your
12   current operational status in check because you're
13   repairing equipment or replacing equipment that you
14   already have.
15   Q.   So I'm looking at these capital expenditure
16   plans, and there are some things that say like install
17   fire rated doors on the first page, install fire alarm
18   system.
19   A.   Uh-huh.
20   Q.   Install ADA light and sound equipment.  That
21   would be on the last page of the 86 capital expenditure
22   plan.
23   A.   Uh-huh.
24   Q.   So it also reflects things that you put in, not
25   just things that you repair that already exist; is that
```

Pike Reporting Company
410 17th Street, Suite 1350
Denver, CO 80202


PIKE REPORTING COMPANY
Paving Your Path Through Litigation

(855) 693-3767 | (720) 738-1300
schedule@yournextdepo.com
www.pikereporting.com

Case 1:23-cv-01004-RP    Document 258    Filed 12/08/25    Page 144 of 726
The Deposition of BRYAN COLLIER, taken on October 20, 2025

62..65

Page 62

1  on the effects of heat, the precautions of heat, that's
2  another measure?
3      A.  Yes, ma'am.
4      Q.  The heat stroke teams that come in and audit
5  the facilities, that's a mitigation measure?
6      A.  It's not a mitigation measure, it's an
7  operational oversight measure to help validate that we
8  are doing what we say we do.
9      Q.  Okay.  Not a mitigation measure, just a
10 compliance team -- a team trying to see if you're
11 complying?
12     A.  Yes.
13     Q.  Respite areas is another mitigation measure?
14     A.  Respite areas are provided, yes, as a way to
15 mitigate.
16     Q.  Access to water consistently is mitigation
17 measure?
18     A.  Yes.
19     Q.  Relaxed dress code for the inmates?
20     A.  Yes.
21     Q.  Additional showers when possible?
22     A.  Yes.
23     Q.  And portable fans?
24     A.  Portable, I'm not sure.  I mean, there are
25 personal fans and then --

Page 63

1      Q.  Okay.
2      A.  -- there are obviously fans.  But, yes, both.
3      Q.  I might have meant to say personal fans.
4      A.  Yes.
5      Q.  And these mitigation measures, those are all
6  reflected in the current 2025 heat mitigation policy as
7  well, right?
8      A.  I believe so.
9      Q.  And these are basically the same mitigation
10 measures that were in place last -- or 2024 summer at
11 the hearing; is that right?
12         MR. JOHNSON:  Objection, form.
13     A.  I don't know if they've been modified.  We
14 modified the policy since the hearing or right around
15 the same time, so I don't recall if there's anything
16 that we added.  We could have.  We look at it every year
17 to try to identify if there's something we need to add.
18     Q.  Okay.
19     A.  But I'm not aware of anything that changed.  It
20 may have, but I'm just not specific.
21     Q.  You're not aware of any major mitigation
22 measure that's changed since the hearing; is that fair?
23     A.  Not specific.  Again, and I'm dated at least to
24 the last couple of months.
25     Q.  Yes.  As of August 20 --

Page 64

1      A.  Yes, ma'am.
2      Q.  As of August of this year, okay.  And, I know
3  we -- I know that we share the same goal in styling air
4  conditioning throughout the facilities, and I think
5  Judge Pitman even said that the parties are in agreement
6  that air conditioning permanently -- installing
7  permanent air conditioning throughout the facilities is
8  necessary to protect the health and safety of the
9  inmates.  We agree on that; is that right?
10         MR. JOHNSON:  Objection, form.
11     A.  I agree that's what Judge Pitman said, and I
12 agree that we are -- were -- and I believe the agency
13 still is moving in the direction to install air
14 conditioning everywhere.
15     Q.  Do you disagree that installment of permanent
16 air conditioning is necessary to protect the health and
17 safety of inmates?
18     A.  I believe the adding of air conditioning would
19 be a benefit to the system, a benefit to the staff, a
20 benefit to the inmates.  I believe the mitigation
21 measures, if taken, can help you deal with the
22 temperatures that exist today.
23     Q.  But these -- these are all just mitigation
24 measures.  It doesn't solve the underlying problem,
25 right?

Page 65

1      A.  It allows you to deal with the problem.
2      Q.  But even with mitigation measures, inmates
3  still die; is that right?
4      A.  I don't know specifically any inmate that took
5  all the mitigation measures and still died.  I know
6  we've had inmates that, years and years ago, the
7  mitigation efforts were not in place and we had inmates
8  in 2011 or '12 that passed away due to heat.  We've had
9  heat related, where heat may have been a factor, I think
10 two years ago.  I'm aware of those.  But again, I don't
11 know that they did or didn't do any mitigation measures.
12 I have no way of knowing that.
13     Q.  So the two years ago you're talking about the
14 three inmates where heat was identified as a potential
15 or important or contributory factor in death, right?
16     A.  Correct.
17     Q.  And there were three and we talked about those
18 at the hearing, right?
19     A.  Yes, ma'am.
20     Q.  And so that's when I'm talking about, that's
21 when these mitigation measures, the ones that we talked
22 about, that we just listed, that is reflected in the
23 policy, the 1064 policy.  Those mitigation measures were
24 in place in 2023, right?
25     A.  I believe.

Pike Reporting Company
410 17th Street, Suite 1350
Denver, CO 80202


PIKE REPORTING COMPANY
YOUR PATH THROUGH LITIGATION

(855) 693-3767 | (720) 738-1300
schedule@yournextdepo.com
www.pikereporting.com

Case 1:23-cv-01004-RP   Document 258   Filed 12/08/25   Page 145 of 726
The Deposition of BRYAN COLLIER, taken on October 20, 2023

82..85

Page 82

1 argue with you.

2    Q.    You wouldn't argue, okay.  Has TDCJ ever done
3 or commissioned its own studies on the effectiveness of
4 heat mitigation protocols?

5    A.    Not that I'm aware of.

6    Q.    Why not?

7    A.    Don't think it would be necessary.

8    Q.    You know -- why is that?

9    A.    I don't -- I think we have -- the heat
10 mitigation measures, we have those that are generated by
11 what we know, but also our medical partners know.  We go
12 through a process every year to develop that policy to
13 go back and look at all of those mitigation measures,
14 and can modify at any time if we identify an issue.

15         We also have a system to verify that we're
16 doing what we say we do, and if for any reason any
17 facility doesn't meet the standard, then I get notified
18 of that.  I get notified on all the strike team reports,
19 or did, and I would speak to the warden directly if for
20 any reason there was an issue.

21         I don't think there would be a benefit in
22 getting an outside study.

23    Q.    Do you have any reason to doubt the accuracy of
24 the study, the 2022 Texas A&M study?

25    A.    I don't have much credibility in that study, or

Page 83

1 I didn't find much credibility with it.  I sent it to
2 Mr. Barbee, our research director, and I believe that
3 was his response to me as well.  I think it's a survey.

4    Q.    And just tell me why -- can you elaborate?

5    A.    I trust Mr. Barbee as far as actual research.
6 That was more of a survey document, just asking inmates
7 is it too hot, or other issues.  And knowing inmates as
8 long as I've worked in the system, the accuracy of that
9 would be questionable in my opinion.

10    Q.    So the -- you doubt the accuracy of the survey
11 because it's coming from inmates themselves?

12         MR. JOHNSON:  Objection, form.

13    A.    I doubt it because of what Mr. Barbee told me,
14 that the study in his opinion would not a credible
15 study.

16    Q.    Tell me what Mr. Barbee said.

17    A.    Basically that.

18    Q.    Okay.  Why did he think it wasn't credible?

19         MR. JOHNSON:  Objection, form.

20    A.    I don't recall any more specifics.  We may have
21 had a conversation, but that would be the gist of it.

22    Q.    And it's basically because it's reporting by
23 inmates?

24         MR. JOHNSON:  Objection, form.

25    A.    My opinion, not his opinion.

Page 84

1    Q.    Okay.  Well, either way, one of the things that
2 the study said was that medically vulnerable individuals
3 were not in cool housing.  Do you remember that?

4    A.    I don't.

5    Q.    Any reason to doubt that?

6    A.    No.

7    Q.    Okay.  And I understand you aren't going to
8 testify as to what you find medically vulnerable, but
9 you agree that while high temperatures pose a
10 substantial risk of harm to anyone, medically vulnerable
11 people are even more at risk; is that right?

12    A.    I think there are certain health conditions,
13 medical conditions that can make you vulnerable to heat.

14    Q.    And if obesity, severe cardiac -- hypertension
15 and severe cardiac issues and obesity are some of the
16 those conditions that doctors identify, then medically
17 vulnerable people would be still housed in uncooled
18 cells in the summertime and still die in those cells,
19 right?  We just saw that?

20         MR. JOHNSON:  Objection, form.

21    A.    No.  If the doctors and the universities felt
22 those were conditions that made you medically
23 vulnerable, they could assign a heat score.

24    Q.    Uh-huh.

25    A.    The heat score would then require that you be

Page 85

1 placed in air conditioning.

2    Q.    That was a bad question.  Let me try -- I made
3 a bad question.  If those -- if those individuals,
4 Bradley Sheets and Ricky Barnhart who we looked at --

5         THE REPORTER:  Bradley Schutes?

6         MS. GROSSMAN:  Bradley Sheets and Ricky
7 Barnhart.

8    Q.    (By Ms. Grossman)  If those individuals -- if
9 those conditions would in fact actually make you
10 medically vulnerable to the heat, then medically
11 vulnerable inmates are still housed in uncooled cells in
12 the summertime in prison and dying in those uncooled
13 cells; is that fair?

14         MR. JOHNSON:  Objection, form.

15    A.    In the two autopsies you showed me, I didn't
16 see anything related to heat, so I don't know, again,
17 that those conditions make you heat vulnerable.  And if
18 they did not have a heat score, then that's the process
19 we go through to identify if that's the case.

20    Q.    Okay.  So I'm not saying -- I'm not saying that
21 those were heat deaths, and I'm not trying to get you to
22 agree with that.  I'm just trying to show you that there
23 are people with those conditions that are dying in
24 cooled cells.  We can agree with that?

25    A.    Those individuals died.  I don't know if their

Pike Reporting Company
410 17th Street, Suite 1350
Denver, CO 80202


PIKE REPORTING COMPANY
Your Path Through Litigation

(855) 693-3767 | (720) 738-1300
schedule@yournextdepo.com
www.pikereporting.com

Case 1:23-cv-01004-RP   Document 258   Filed 12/08/25   Page 146 of 726
The Deposition of BRYAN COLLIER, taken on October 22, 2025
98..101

Page 98

1    Q.   So do you disagree with Dean Williams'
2 testimony that core body temperature should be something
3 that is obtained in deaths in the summer months to
4 determine if something is heat related?
5    A.   Don't know how -- I don't know.  I don't
6 remember Dean's testimony, but if that's what he said, I
7 wouldn't agree or disagree.  I would have gone to a
8 doctor, one of our physicians or universities.  If they
9 felt like we needed to take core body temperatures, they
10 would do it.
11    Q.   Have you gone and had that conversation?
12    A.   Not that I recall.
13    Q.   Have you at any -- I mean obviously this was
14 talked about a lot at the hearing in 2024, right?
15    A.   Uh-huh.
16    Q.   Did you then go and talk to the doctors that
17 work with you and say what do you think about core body
18 temperature?  Should we be getting those?
19    A.   I don't recall.
20    Q.   No specific conversation that you remember
21 either way?
22    A.   Either way.
23    Q.   It's fair to say, then, you have never talked
24 to anybody about core body temperatures being an
25 important piece of information in autopsies?

Page 99

1    A.   Not fair to say.  I just said I don't recall.
2    Q.   As you sit here today, you don't have any
3 recollection of those conversations?
4    A.   Correct.
5    Q.   And the hearing and what -- and the discussion
6 about core body temperatures, you know, you heard Dr.
7 Uribe testify, who's a forensic pathology who works a
8 lot in corrections.  Do you remember his testimony?
9    A.   Not specific.
10    Q.   Do you remember doctors from the plaintiff --
11 plaintiffs calling doctors that talked about core body
12 temperatures?
13    A.   I didn't -- I don't remember as much on core
14 body temperatures as maybe you think I do.
15    Q.   You sat -- do you remember Dean Williams'
16 testimony about core body temperatures?
17    A.   Not really.
18    Q.   What's your recollection of the plaintiff's
19 position about core body temperatures related to death
20 investigations?
21         MR. JOHNSON:  Objection, form.
22    A.   I wouldn't -- based on everything that was
23 discussed, and I was there for the whole thing, I don't
24 recall any position one way or another.  I remember core
25 body temperature coming up, but where it landed, I don't

Page 100

1 recall.
2    Q.   And you remember Judge Pitman's order?
3    A.   I do.
4    Q.   And he also talked about core body
5 temperatures, do you remember that?
6    A.   I remember reading it, yes.
7    Q.   Did that prompt you to think that maybe that
8 would be something that should be discussed with the
9 medical team about taking, or also security staff?
10    A.   I think when we had the order, we looked at
11 that along with our health services staff.  I don't know
12 if today they're taking core body temperatures or not.
13    Q.   And Coffield -- is that right?
14    A.   Coffield, yes, ma'am.
15    Q.   Coffield.  It was very, very hot in July of
16 2024, wasn't it?
17         MR. JOHNSON:  Objection, form.
18    A.   I'm sure it was warm, quite warm.
19    Q.   Warm, okay.  Let's look at the temperature
20 logs, please.
21         (Exhibit 9 marked.)
22    Q.   Exhibit 9.
23    A.   What year are we talking about?
24    Q.   2024.  I just pulled the five days surrounding
25 Jason Wilson's death.

Page 101

1    A.   I believe this log is your external temperature
2 log.
3    Q.   Okay.  And I'm not -- okay.
4    A.   I was going back looking for the document that
5 had the internal temperatures, the Kestrel reading.
6    Q.   Sorry.  Actually, that --
7         No, I want the new logs.  I want the new
8 exhibit.
9    A.   Got you.
10    Q.   But actually just to confirm, the inside
11 temperature logs, do they -- do they just measure
12 temperature or also heat index?
13    A.   I can't remember.
14    Q.   Is there -- I mean, I really don't know.  Is
15 there a way for those machines -- what were they called
16 again?
17    A.   Kestrel.
18    Q.   Kestrel.  Is there way for them to measure heat
19 index?
20    A.   There may be, I don't know.
21    Q.   The temperatures that are reported to the
22 Legislature, those are temperatures, not heat index,
23 though, right?
24    A.   I believe that's right.
25    Q.   Okay.  So these are the outside temperatures --

Pike Reporting Company
410 17th Street, Suite 1350
Denver, CO 80202


PIKE REPORTING COMPANY
Your Firm Through Litigation

(855) 693-3767 | (720) 738-1300
schedule@yournextdepo.com
www.pikereporting.com

Case 1:23-cv-01004-RP   Document 258   Filed 12/08/25   Page 147 of 726
The Deposition of BRYAN COLLIER, taken on October 16, 2025

106..109

Page 106

1 discussions about inmates that have died of overdoses,
2 and from the medical perspective -- I know Dr.
3 Linthicum, potentially Dr. Murray and Dr. Shields --
4 DeShields, we've talked about it because they put
5 together kind of a -- what do I say, a campaign to
6 basically try to advise inmates of the danger, because
7 much of the K2 can be laced with Fentanyl and can be
8 very dangerous, and the inmates don't necessarily know
9 that.  Not that K2 is okay either.  Neither are okay.
10 But we have had discussions about them because they have
11 helped to do some campaigns on the unit about staying
12 drug free and the fact you don't know what you're
13 getting.
14     Q.  Based on the -- you know, I know you looked
15 into the wellness check that was reported to have been
16 done on Jason Wilson.  Did you also look into whether or
17 not inmates were getting water in Coffield during the
18 July 4th weekend in 2024?
19     A.  I don't recall if we -- don't know where the
20 strike, if strike team did something after that or not,
21 I don't know.
22     Q.  Any reason to doubt the accuracy of
23 Mr. Wilson's messages to Brittany Robertson?
24     A.  Yeah, his use of narcotics would make me doubt
25 it, but again, I'm not going to argue one way or the

Page 107

1 other, but I wouldn't find him credible if he's smoking
2 dope on the unit.
3     Q.  Okay.  All right.
4     MS. GROSSMAN:  Why don't we take a
5 five-minute break.
6     VIDEOGRAPHER:  Going off the record.  The
7 time is 11:41.
8     (Brief recess.)
9     VIDEOGRAPHER:  Back on the record.  Time
10 is 11:50.
11     Q.  (By Ms. Grossman)  So we were talking about
12 deaths.  I just want to go back to injuries or
13 complaints, sickness from the heat.
14     A.  Uh-huh.
15     Q.  In terms of grievances, much like in 2023,
16 which we discussed at the hearing, despite TDCJ's
17 mitigation measures thousands of inmates still submitted
18 heat related grievances in 2024, right?
19     A.  I would not argue with that.
20     Q.  You stand by what was submitted to the
21 Legislature by TDCJ, right?
22     A.  Yes, ma'am.
23     Q.  Okay.  And then we can also agree that despite
24 the mitigation measures in policies, much like in 2023
25 inmates still suffered heat related illnesses in 2024;

Page 108

1 is that right?
2     A.  I would not argue with that.  If you're looking
3 at a document that has the -- is it in here?
4     Q.  It is.  It is in the temperature report you
5 submitted.
6     I'm not arguing, I just don't have the number
7 in my head, if that's the case.
8     Q.  Do you stand by the numbers in the temperature
9 report?
10     A.  I would.
11     Q.  Okay.  And like 2023, officers are still
12 getting sick from the heat in 2024, right?  They are
13 still illnesses?
14     A.  Again, yes.  If that's what reported, yes,
15 ma'am.
16     Q.  Stand by the numbers of the heat related
17 illnesses for staff in the 2024 report?
18     A.  I have the '23 report.
19     Q.  Okay.  I think --
20     A.  Is it the same?
21     Q.  Do you also have the 2024?  I think it was --
22     MR. JOHNSON:  Exhibit 2.
23     Q.  Exhibit 2.
24     A.  Okay.  Hang on.  I'll get that.
25     Q.  I can tell you that heat related illness in

Page 109

1 that report is on Page 7, as well as staff.
2     A.  Exhibit 2, is it '23 or '24?
3     Q.  It's Exhibit 2.  That's '23.  And then what's
4 --
5     MR. JOHNSON:  This is the exhibit.
6     A.  Duh.
7     Q.  Sorry.
8     A.  I apologize.
9     Q.  Sorry about that.
10     MR. JOHNSON:  Plaintiff's side.
11     Q.  This is why you can pre-mark exhibits.
12     A.  Yeah.  Glad it wasn't a snake.  Yes, ma'am.
13     Q.  Just to clarify the record, in 2024, much like
14 in 2023, despite's TDCJ's heat mitigation measures and
15 policies, inmates and staff were still suffering heat
16 related illness.  Is that fair?
17     A.  Yes.  We reported heat related illnesses in
18 '24.
19     Q.  Okay.  How -- how are the inmates' heat related
20 illnesses tracked?
21     A.  Medical.  When they go to medical for
22 attention, medical would record it and the agency would
23 record it as well.
24     Q.  And is that -- is that just the medical unit in
25 the prison or is that out to a hospital?

Pike Reporting Company
410 17th Street, Suite 1350
Denver, CO 80202


PIKE
REPORTING
COMPANY
Paso Your Path Through Litigation

(855) 693-3767 | (720) 738-1300
schedule@yournextdepo.com
www.pikereporting.com

Case 1:23-cv-01004-RP    Document 258    Filed 12/08/25    Page 148 of 726
The Deposition of BRYAN COLLIER, taken on October 20, 2023

114..117

Page 114

1  beds and we wanted to figure out a process to move those
2  that had the most vulnerability into those beds.
3       Q.  Uh-huh.
4       A.  And the heat score was what was developed.  It
5  wasn't required by the Court.  We offered it as part of
6  the settlement to advise the Court and to let them know
7  we were taking steps to try to keep these people safe,
8  and the heat score is what developed out of that
9  process.
10      Q.  So other than that -- I mean, TDCJ has never
11  done its own study or commissioned a study about the
12  number of deaths and how many people are dying from the
13  heat in the prisons, have they?
14      A.  I don't know of any other study, so to speak.
15      Q.  And as -- remember at the hearing, you received
16  a copy before the hearing of Julie Skarha's study and
17  then we discussed that at the hearing, which as an
18  epidemiologist reported that between 2001 and 2019, 13
19  percent of the 2083 inmate deaths in TDCJ facilities --
20           THE REPORTER:  I'm sorry.
21           MS. GROSSMAN:  13 percent of the 2083
22  inmate deaths in TDCJ facilities without air
23  conditioning, which is the loss of 271 lives, is likely
24  attributable to extreme heat.
25      Q.  (By Ms. Grossman)  Do you remember discussing

Page 115

1  that at the hearing?
2       A.  I do.
3       Q.  And getting a copy of that report before the
4  hearing, too, right?
5       A.  I believe I did.
6           THE REPORTER:  And could you spell her
7  name?
8           MS. GROSSMAN:  Yes.  S-K-H-A-R-A.  I'm
9  sorry, her first name is Julie.
10      Q.  (By Ms. Grossman)  Do you have any factual
11  basis to doubt the accuracy of that study?
12      A.  I didn't evaluate.
13           MR. HOMIAK:  It's S-K-A-R-H.
14           MS. GROSSMAN:  I was wrong.  What is it?
15           MR. HOMIAK:  S-K-A-R-H-A, not S-K-H.
16           MS. GROSSMAN:  Oh, sorry.
17           MR. HOMIAK:  I'll double check.  Go ahead.
18      A.  Do you mind re -- not rephrase, but just ask
19  again.
20      Q.  (By Ms. Grossman)  Do you have any factual
21  basis to doubt the accuracy of that study?
22      A.  So that study, when I got it, I gave it to
23  Mr. Barbee as well to look at.  You had a study.  If I
24  remember, this is very much layman's terms, he did not
25  find significant credibility with the study.

Page 116

1           Had the study matched what autopsies said,
2  that would be different to me, but you have an
3  epidemiologist who says this occurred, yet we have
4  autopsies from medical examiners who do that all the
5  time, and none of those are saying what she's saying is
6  really going on, so I did not -- personally I did not
7  find a lot of credibility with the report, but I trusted
8  Mr. Barbee to really tell me.
9       Q.  What -- and -- am I understanding you correctly
10  that the reason why he didn't give it too much
11  credibility is because the study statistics didn't match
12  the number of heat related deaths reported on autopsy?
13      A.  No, ma'am, you didn't under -- I mean, I didn't
14  say that, but --
15      Q.  Sorry.
16      A.  I just know that he was not impressed or found
17  it credible, and I didn't get into big details about
18  what it was.
19      Q.  Okay.  Did I misstate you?  I wasn't trying to.
20      A.  I'm sorry, just the way that you said it, I was
21  thinking that's not really what I was trying to say, but
22  --
23      Q.  Okay.
24      A.  And he basically said he didn't find the study
25  credible.

Page 117

1       Q.  Okay.
2       A.  As far as the why, I did not go into that
3  detail.
4       Q.  Okay.  So what I was talking about, the
5  autopsies and the number of deaths, what were you trying
6  to say?  What did I get wrong?
7           MR. JOHNSON:  Objection, form.
8       A.  If I had had an equal number of autopsies that
9  said -- it would match what the epidemiologist said,
10  right?  That would seem logical to me.
11           To have an epidemiologist say, yeah, it
12  didn't say it, but this is what caused all these deaths.
13  Yet the medical examiners don't identify that, that's a
14  disconnect for me.  There's no incentive to not say what
15  it is.
16      Q.  There is no incentive to not report a heat
17  related death?
18      A.  Correct.  The medical examiners do the autopsy
19  and I trust the autopsies from the medical.
20      Q.  UTMB is the medical provider of the prison,
21  right?
22      A.  Not the same branch that does the autopsies.
23      Q.  But --
24      A.  But UTMB is one of the medical providers for
25  TDCJ.  Texas Tech Health Science Center would be the

Pike Reporting Company
410 17th Street, Suite 1350
Denver, CO 80202


PIKE
REPORTING
COMPANY
Your Path Through Litigation

(855) 693-3767 | (720) 738-1300
schedule@yournextdepo.com
www.pikereporting.com

Case 1:23-cv-01004-RP    Document 258    Filed 12/08/25    Page 149 of 726
The Deposition of BRYAN COLLIER, taken on October 20, 2023

118..121

Page 118

1  other.
2    Q.   Can you think of a motivation to not take core
3  body temperatures?
4    A.   I don't know if you should or shouldn't.  I'm
5  not a doctor.
6    Q.   As you sit here today, do you have an opinion
7  about whether or not core body temperatures should be
8  taken if someone dies in the summer months to determine
9  whether or not it was in fact heat related?
10         MR. JOHNSON:  Objection, form.  Asked and
11  answered.
12    A.   No, ma'am.
13    Q.   No opinion at all?
14    A.   No.  I believe we should be making every effort
15  to identify the right cause of death.
16    Q.   Okay.
17    A.   And I trust the medical doctors to do that.
18    Q.   Certainly you know my opinion, right?
19    A.   Oh, sure.
20    Q.   You know Dean Williams's opinion, right?
21    A.   According to what you told me.  I didn't
22  remember.
23    Q.   You didn't remember him talking about it?
24    A.   Right.
25    Q.   And you know the Court's opinion?

Page 119

1    A.   I read the order, and I wouldn't argue with any
2  of that.
3    Q.   Okay.
4         MS. GROSSMAN:  Give him a copy.  It's 1.
5  Have I given this -- sorry, has the court order been
6  stamped as an exhibit?
7         MR. JOHNSON:  No.
8         MS. GROSSMAN:  It should be in here.
9    Q.   (By Ms. Grossman)  I want you to be able to see
10  it, I don't want to just read it to you.
11    A.   Sure.
12         MS. GROSSMAN:  This is -- if you could
13  stamp Judge Pitman's order denying the preliminary
14  injunction as Exhibit 10.
15         (Exhibit 10 marked.)
16         THE WITNESS:  Thank you.
17    Q.   (By Ms. Grossman)  Okay.  I'm going
18  specifically to Page 73.
19    A.   Got you.
20         MS. GROSSMAN:  I'll do my best to read
21  this slowly.
22         THE REPORTER:  Thank you.
23    Q.   If you look at the top paragraph.  I'm going to
24  read that into the record, okay?
25    A.   Uh-huh.

Page 120

1    Q.   It says neither heat related deaths nor heat
2  related illnesses have abated since 2019.  TDCJ admitted
3  to three heat related deaths of inmates just last summer
4  alone.  That number is almost certainly an undercount,
5  given the plaintiff's unrebutted evidence of two
6  additional heat related deaths, (neither of which were
7  classified as such by TDCJ), and TDCJ's failure to
8  timely perform autopsies, failure to consistently take
9  core body temperatures, and refusal to classify a death
10  as heat related unless heat was the sole cause of the
11  inmates's death.
12         Did I read that correctly?
13    A.   Yes, ma'am.
14    Q.   So clearly Judge Pitman also agrees that based
15  on the testimony, taking core body temperatures is
16  essential in determining accurately how many heat
17  related deaths there is; is that right?
18         MR. JOHNSON:  Objection, form.
19    A.   I wouldn't argue with what the order says.
20    Q.   All right.  Was it your impression after
21  reading the order that Judge Pitman feels that core body
22  temperatures should be taken?
23         MR. JOHNSON:  Objection, form.
24    A.   I don't know that I would argue one way or the
25  other on that.  I definitely read the order and am

Page 121

1  familiar with what it says, but, again, he talks about
2  unrebutted testimony as well.
3    Q.   Well, just tell me, I don't -- what is your
4  view, based on this order, what Judge Pitman thinks TDCJ
5  should do with respect to taking core body temperatures
6  in the summer months?
7         MR. JOHNSON:  Objection, form.
8    A.   Don't -- I don't make an assumption of that.  I
9  understand exactly the -- he's talking -- or they're
10  talking about core body temperatures, but, again, that
11  goes back to our medical providers.
12    Q.   But you didn't have any discussion with the
13  medical providers about core body temperatures, right?
14    A.   I said that I did not recall.
15    Q.   You didn't remember any?
16    A.   Right.
17    Q.   And the medical providers don't necessarily get
18  copies of court orders, do they?
19    A.   I believe that the medical universities did get
20  a copy of this order.
21    Q.   But the procedure to be followed in inmate
22  deaths, that's a TDCJ policy, right?
23    A.   The process would be a combination of policies
24  within the universities and our health services
25  division, so there's probably multiple policies that

Pike Reporting Company
410 17th Street, Suite 1350
Denver, CO 80202


PIKE
REPORTING
COMPANY
Paving Your Path Through Litigation

(855) 693-3767 | (720) 738-1300
schedule@yournextdepo.com
www.pikereporting.com

Case 1:23-cv-01004-RP   Document 258   Filed 12/08/25   Page 150 of 726
The Deposition of BRYAN COLLIER, taken October 20, 2025

126..129

Page 126

1    THE WITNESS:  Sorry.
2    A.   He was the -- sorry -- director for the Council
3 of State Governments Justice Center Research.  He has
4 worked with key researchers in criminal justice issues,
5 which can cover everything from medical to other
6 components.  But I trust him to look at a study and tell
7 me the validity of the study and do I need to be
8 concerned about that study or not, based on my
9 experience with him and based on what he has done in the
10 past.
11   Q.   And he didn't find it credible and you don't
12 remember as to why?
13   A.   I don't remember the conversation.  He may have
14 told me at the time, but again, right now I don't
15 remember the depth of the conversation.
16   Q.   And you don't believe that those -- that
17 number, right?  Is that fair?
18   A.   No, I don't.
19   Q.   What number do you think is right?
20   A.   For what years?
21   Q.   Well, I'll make it simpler.  Is it -- is what
22 number you think is right connected solely to what the
23 autopsy says is heat related or not?
24   A.   Yes, ma'am.
25   Q.   If core body temperatures are essential to

Page 127

1 determining whether a death is heat related and there is
2 nothing in place to ensure that they are taken, that
3 would undercount the number of deaths, wouldn't it?
4        MR. JOHNSON:  Objection, form.
5    A.   Don't know.
6    Q.   (By Ms. Grossman)  You can see the incentive
7 there to not take the core body temperature, right?
8        MR. JOHNSON:  Objection, form.
9    A.   Don't know.  Again, back to your original
10 hypothetical question.
11   Q.   Well, I'm saying, you can see -- I know you
12 know what I'm saying.  You can see there's an incentive
13 potentially for TDCJ not to take them, right?
14   A.   No.  I don't know that.  Again, I trust the
15 medical providers to -- and they may be taking them.  I
16 don't know if they are or they're not.
17   Q.   Well, you --
18        Okay.  How many people died last summer
19 from heat related -- potential heat related causes based
20 on your understanding?
21   A.   '25 or '24?
22   Q.   2024.
23   A.   I don't recall.  Not saying it didn't, I just
24 don't recall being briefed on anyone.
25   Q.   Okay.  There -- in the -- I think it was

Page 128

1 Exhibit 3, the 2024 temperature lab report.
2    A.   Uh-huh.
3    Q.   Is that right?  I just want to check on that.
4        MR. JOHNSON:  Are you talking about the --
5        MS. GROSSMAN:  The temperature report of
6 the Legislature for 2024.
7        MR. JOHNSON:  It's 2, I think.
8        MS. GROSSMAN:  It's 2?  Okay.
9    A.   I found it this time.
10   Q.   (By Ms. Grossman)  And it was one death that
11 was reported if you look on Page 7.
12   A.   June of -- yes, yes.
13   Q.   Okay.
14   A.   This is the gentleman, the 44 year old man that
15 died at the recreation yard at the Goree Unit while
16 playing soccer.
17   Q.   And he died outside, right?
18   A.   Yes.
19   Q.   I don't remember seeing a core body temperature
20 in that autopsy or investigation, do you?
21   A.   I don't know.
22   Q.   Okay.  Can you think of any reason why a core
23 body temperature wouldn't be required every time a TDCJ
24 inmate dies in the summer when the cause isn't obvious?
25        MR. JOHNSON:  Objection, form.

Page 129

1    A.   I don't have an opinion one way or the other.
2 The medical providers, if they want to -- if they felt
3 like they need to take core body temperatures there's
4 nothing that would block that, and they're the people
5 that would know.
6    Q.   They're the people that would know.  You had no
7 conversations that you remember either way about core
8 body temperatures before or after the hearing?
9    A.   I don't recall conversations.  I didn't say I
10 didn't have, I just don't recall anything specific.
11   Q.   Okay.  I want to look at -- I don't know the
12 answer to this.  The 2025 deaths, were there any deaths
13 that you're aware of from heat related causes?
14   A.   Not that I recall.
15   Q.   Okay.  All right.
16        MS. GROSSMAN:  I'm going to mark this
17 autopsy of Ryan Fairchild as Exhibit 11.
18        (Exhibit 11 marked.)
19   Q.   (By Ms. Grossman)  So if you look at the last
20 page, it says director of TDCJ transmitted.  Do you see
21 that?
22   A.   I do.
23   Q.   Is that still not your fax number?
24   A.   Correct.
25   Q.   Any reason to doubt, though, that you received

Pike Reporting Company
410 17th Street, Suite 1350
Denver, CO 80202


PIKE REPORTING COMPANY
Paving Your Path Through Litigation

(855) 693-3767 | (720) 738-1300
schedule@yournextdepo.com
www.pikereporting.com

Case 1:23-cv-01004-RP   Document 258   Filed 12/08/25   Page 151 of 726
The Deposition of BRYAN COLLIER, taken on October 20, 2023
134..137

Page 134

1   A.   Uh-huh.
2        Q.   -- also reports that he was very hyperthermic,
3   an auxiliary temperature of 108 degrees Fahrenheit, and
4   they state that this was rechecked a couple of times.
5   Do you see that?
6        A.   I do.
7        Q.   That's a very high -- 108 degrees is a very
8   high core body temperature; is that right?
9        A.   Don't know, but I'm not arguing with you.
10       Q.   Well --
11       A.   I don't know what a normal body core
12  temperature is supposed to be, if it's --
13       Q.   You don't?
14       A.   I'm not arguing that that's --
15       Q.   Do you have any opinion whether that's high or
16  not?
17       A.   It's higher than the body temperature of 96.8
18  or 96.2, whatever we're supposed to be, yes.
19       Q.   Do you have any opinion whether or not 108 --
20       A.   I don't know.
21       Q.   -- sorry -- degree body temperature is
22  compatible with life?
23       A.   I do not know.
24       Q.   They also say that he's very hyperthermic.  Do
25  you see that?

Page 135

1        A.   I do.
2        Q.   And what does that mean to you?
3        A.   Condition of the body appeared hyperthermic, so
4   what they saw told them that.
5        Q.   Hyperthermia is a heat related illness, right?
6        A.   Can be, yes, ma'am.
7        Q.   Have you ever asked doctors what a normal core
8   body temperature is?
9        A.   Not that I recall.
10       Q.   Wouldn't that be important information for you
11  to know as the executive director?
12       A.   I don't take core body temperatures.  Medical
13  people do.  So, no, ma'am, not necessarily.
14       Q.   Not to take them, but to know.
15       A.   I guess I would be able to answer your question
16  better today, but other than that, no, ma'am.  I haven't
17  asked a doctor what is a core body temperature supposed
18  to be.
19       Q.   Does this hyperthermic diagnosis and 108 degree
20  core body temperature make you think that perhaps --
21  that had contributed to Mr. Fairchild's death?
22       A.   This, the investigation, and all that was with
23  the medical examiner as part of their investigation of
24  why he died.
25       Q.   Okay.  So, no?  Does that mean -- I'm not

Page 136

1   doubting that.
2        A.   I'm not making a judgment, but I'm saying the
3   autopsy didn't say heat, but they had access to
4   everything you and I are looking at.
5        Q.   I agree with both of those things.  The autopsy
6   didn't say heat, and they were access to everything we
7   were looking at.
8        A.   Right.
9        Q.   But as you sit here today, does that cause you
10  concern that someone died in the un air-conditioned
11  units in Michael --
12       A.   I don't.
13       Q.   -- with a core body temperature of 108?
14       A.   I don't know where he was in Michael.  I don't
15  know if he was housed in air conditioning or not.  I
16  don't know why his body temperature was at that level.
17  If there's another explanation, I don't know that.  I'm
18  not making a judgment one way or the other.
19       Q.   Does it surprise you to learn that the
20  hyperthermia diagnosis and the core body temperature
21  didn't make it into the autopsy?
22       A.   I don't know.  I don't know why it would or why
23  it wouldn't have or why -- you need to ask the medical
24  examiner who did the autopsy.
25       Q.   So if you were still executive director,

Page 137

1   nothing to do here in terms of any followup with respect
2   to this death?
3        A.   Might be worth a question to ask the question
4   of was that part of your investigation, did you see it,
5   what was the justification.
6        Q.   Uh-huh.
7        A.   But again, I wouldn't have necessarily read the
8   autopsy.
9        Q.   Do you have a belief of whether or not he was
10  in cooled or uncooled housing in the Michael Unit given
11  his 108 degree body temperature?
12       A.   No, ma'am, because I've seen it both ways.
13       Q.   What do you mean?
14       A.   You can be in air conditioned housing with an
15  elevated body temperature.
16       Q.   Of 108 degrees?
17       A.   Of a higher temperature.
18       Q.   And again, these are forms that the -- these
19  are the hospital records and the EMS records, these were
20  not medical units in TDCJ filling out the core body
21  temperature, right?
22       A.   I believe that's correct.
23       Q.   And it wasn't mentioned as far as we looked at
24  in the OIG investigation, was it, core body temperature?
25       A.   I didn't believe I saw that.

Pike Reporting Company
410 17th Street, Suite 1350
Denver, CO 80202


PIKE REPORTING COMPANY
Your Firm Through Litigation

(855) 693-3767 | (720) 738-1300
schedule@yournextdepo.com
www.pikereporting.com

Case 1:23-cv-01004-RP   Document 258   Filed 12/08/25   Page 152 of 726
The Deposition of BRYAN COLLIER, taken on October 30, 2025
138..141

Page 138

1    Q.   Okay.  It's going to be hot in August of 2024
2 in Tennessee Colony, is that fair?
3    A.   Fair.  Again I don't know what type housing he
4 was in.
5    Q.   Temperatures of the Michael Unit around the
6 time that Ryan Fairchild died.
7         MS. GROSSMAN:  Could you please mark that
8 as Exhibit 16?
9         THE REPORTER:  14?
10        MS. GROSSMAN:  14, sorry.
11        (Exhibit 14 marked.)
12    Q.   (By Ms. Grossman)  Sorry.  These are the
13 outside temperatures --
14    A.   Yes, ma'am.
15    Q.   -- for the Michael Unit, right?
16    A.   Correct.
17    Q.   What kind of building is the Michael Unit?
18    A.   It is a large brick and concrete structure.
19    Q.   The temperatures inside uncooled cells would be
20 likely around as hot or hotter?
21    A.   Could be less, I don't know.
22    Q.   But not by a substantial amount?
23    A.   Wouldn't be probably that substantial.
24    Q.   So if you look at -- he died on August 21,
25 2024, so this is -- the first day is August 16, 2024,

Page 139

1 right?
2    A.   Right.
3    Q.   So we have temperatures pretty high, very high,
4 3:30 p.m. reaching triple digits at 102; 5:30 p.m., 104.
5 Not out of the triple digits until 7:30 p.m., right?
6    A.   Yes.
7    Q.   And then heat index is 100 percent at 11:30
8 a.m., 110 percent at 2:30 p.m., 121 at 4:30 p.m., and
9 118 at 5:30.  Doesn't get out of the triple digits until
10 9:30 p.m. that day; is that right?
11    A.   You're on the 21st?
12    Q.   Oh, I was on the 16th.
13    A.   I apologize.  Sorry.
14    Q.   Do you want me to repeat --
15    A.   No.  I thought --
16    Q.   I can start over.
17    A.   I thought we were on the 21st.  That's his day
18 of death.
19    Q.   Yes.  So --
20    A.   So on the 16th --
21        THE REPORTER:  I'm sorry.  You're talking
22 over one another.
23        THE WITNESS:  Sorry.
24    Q.   (By Ms. Grossman)  I'm just going to start
25 over.  I'll pick same -- different temperatures, but I

Page 140

1 just want you to be able to see it, okay?
2    A.   You're correct in your -- what you just said.
3    Q.   I'm correct in my initial question?
4    A.   Yes.
5    Q.   Okay.  And then if you look at the 17th.
6 Triple digit temperatures 2:30 p.m., 3:30 p.m., high
7 90s, goes down into the 80s at 89:30 p.m.; is that
8 right?
9    A.   Yes.
10    Q.   And the heat index is 111 at 11:30 a.m., 106 at
11 12:30 p.m., 105 at 2:30 p.m., at 3:30 p.m.  Doesn't get
12 out of the triple digits until 9:30 p.m., right?
13    A.   Correct.
14    Q.   And 8-18-2024, triple digit temperatures of
15 103, 105, 106, between 2:30 p.m. and 6:30 p.m., right?
16    A.   Yes.
17    Q.   And then heat index 104, 11:30 a.m.; 118, 2:30
18 p.m.; 120, 5:30 p.m., 121, 6:30 p.m.  Doesn't leave the
19 triple digits until 9:30 p.m., right?
20    A.   That's correct.
21    Q.   Same pattern on the 19th, is that correct, in
22 terms of the triple digit temperatures in the daytime
23 and the heat index from 103 at 11:30 a.m., in the triple
24 digits, 116, 2:30 p.m.; 115, 5:30 p.m.; 116, 6:30 p.m.;
25 111, 7:30 p.m.  Doesn't leave the triple digits until

Page 141

1 9:30 p.m., right?
2    A.   Correct.
3    Q.   Day before he dies, same pattern, is that fair,
4 2:30 p.m.?
5    A.   Yes.
6    Q.   Yes.  I'll say triple digits of over 100 for
7 much of the day, and the heat index reaching triple
8 digits and then reaching 122 at 2:30 p.m., 117 at 7:30
9 p.m.  Doesn't go down to the 90s until 9:30 p.m., right?
10    A.   Yes.
11    Q.   And then he dies on the 21st?
12    A.   Correct.
13    Q.   Same pattern that day, right, in terms of the
14 heat index and the triple digit temperatures?
15    A.   Yes, ma'am.
16    Q.   Okay.  As you sit here today, from what you've
17 seen in terms of the core body temperatures and the
18 temperatures on the outside of the Tennessee Colony
19 Michael Unit, do you believe that heat might have played
20 a role in Ryan Fairchild's death?
21    A.   According to the autopsy, it did not.  He died
22 at 6:00 in the morning.  I don't know what the
23 temperatures were close to that.  No, ma'am, I don't --
24 wouldn't say, based on reading that, that I think this
25 is a heat death.

Pike Reporting Company
410 17th Street, Suite 1350
Denver, CO 80202


PIKE
REPORTING
COMPANY
Your Path Through Litigation

(855) 693-3767 | (720) 738-1300
schedule@yournextdepo.com
www.pikereporting.com

Case 1:23-cv-01004-RP   Document 258   Filed 12/08/25   Page 153 of 726
The Deposition of BRYAN COLLIER, taken on October 20, 2023

166..169

Page 166

1    We've also, at the same time, purchased a
2  prison that's a 2000 bed facility that is air
3  conditioned.  So that added 2000 more air conditioned
4  beds to the system.
5    We also were funded for a little over $300
6  million to construct 5600 new dorm beds which would be
7  air conditioned as well.
8    Based on the funding we received this
9  session, the remaining funding left in the 85 million
10 that we got last session and the projects, where they
11 are, based on this construction I just described in the
12 new facility, you would have over 90,000 air conditioned
13 beds in the system when those projects are completed.
14    Q.   So are these -- I know -- we can take this one
15 at a time.  Is there anything else that you've done
16 since the hearing --
17    MR. JOHNSON:  Objection.
18    Q.   -- to accomplish permanent air conditioning?
19    A.   That's the most significant pieces I can
20 remember.
21    Q.   Okay.  I want to come back to the 118 million.
22 You said 300 million for new dorm beds.  Are those the
23 new prison facilities that are being built?
24    A.   They will be built adjacent to an existing
25 prison facility that staffs at 100 percent.  So based on

Page 167

1  population trends, our capacity needs are higher over
2  the next four to five years, and we actually have beds
3  but they're in areas where we can't staff.  So we asked
4  the Legislature to fund expansion dormitories.  They
5  will be 400 and -- I think 40 beds each, but essentially
6  5600 of those dorm beds at facilities that are already
7  fully staffed.  Those dorm beds would be air
8  conditioned, but it helps us address the capacity needs
9  of the system.
10    Q.   Okay.
11    A.   And also adds 5600 air conditioned beds.
12    Q.   And I'm trying to understand whether or not
13 this -- so are people going to be moved from current
14 prisons to these new prisons that are air conditioned,
15 or are these for -- to meet population needs of new
16 prisoners?
17    A.   It's essentially one and the same, because,
18 yes, there would be people in a facility today that may
19 go to one of those facilities next week, once it's
20 constructed and done.
21    At the same time, because they're not
22 intake centers, not -- a new population is not
23 necessarily going to come in, but there's a constant
24 flow, ebb and flow of inmates in the system.  So a
25 little bit of both, if that makes any sense.

Page 168

1    Q.   Okay.  What level of priority -- I was going to
2  say is it for you, but was it for you when you were
3  director to get permanent air conditioning installed
4  since the hearing?
5    A.   What do you mean?
6    Q.   You know, you heard Dean Williams testify it's
7  a five alarm fire; we need to tell everybody that it
8  needs to happen right now, not in five years from now,
9  but now.  People need this to protect the health and
10 safety.  You need to be saying -- you need to be really
11 raising a five alarm fire situation, highest priority --
12    A.   Okay.
13    Q.   -- to install permanent air conditioning.  Do
14 you remember that?
15    A.   I do.
16    Q.   Where -- where are you in that priority level?
17    A.   I have lots of priorities.  So air conditioning
18 is one of them.  Reducing contraband and contraband
19 related deaths is one of them.  Reducing suicides is one
20 of them.  Staffing our facilities is one of them.
21 Getting them funding for the maintenance and the upkeep
22 of our existing facilities is one of them.  Getting
23 funding to continue to do our healthcare needs from the
24 universities is significant, and having enough funding
25 to run the agency during the two-year cycle.  They're

Page 169

1  all very important.
2    Q.   Would installing permanent air conditioning be
3  a top priority?
4    A.   I wouldn't say it's the top priority.  I would
5  say it's a key priority.
6    Q.   Okay.
7    A.   But it is not the only thing we can focus on.
8    Q.   I wasn't trying to say only thing.  I'm trying
9  to understand if anything comes above it, or are these
10 just all key priorities?
11    A.   There are more drug-related deaths in the
12 system based upon contraband coming into the system,
13 based upon illegal cell phones and other things like
14 that, that cause death each and every week.  Those are
15 priority.  Air conditioning is as well.  I'm not saying
16 one is better than the other, but there are lots of
17 things that are really important.
18    Q.   Is there a cap on how much money you're allowed
19 to ask for from the Legislature?
20    A.   Not a cap.  What we would do is look at our
21 capacity, what could we do, how much could we
22 essentially get done, because a key piece of that whole
23 process is credibility, and if you get funding you need
24 to know you can get it spent.  If you can't get it
25 spent, you have to return it after the two-year window,

Pike Reporting Company
410 17th Street, Suite 1350
Denver, CO 80202


PIKE REPORTING COMPANY
PAVE YOUR PATH THROUGH LITIGATION

(855) 693-3767 | (720) 738-1300
schedule@yournextdepo.com
www.pikereporting.com

Case 1:23-cv-01004-RP   Document 258   Filed 12/08/25   Page 154 of 726
The Deposition of BRYAN COLLIER, taken October 20, 2025
178..181

Page 178

1    A.   No, ma'am.
2    Q.   They were onboard with it?
3    A.   Yes.  And we were able to fund the whole thing.
4    Q.   What about conversations with Governor Abbott's
5    office?  Any conversations about installing permanent
6    air conditioning since the hearing?
7    A.   We discussed the hearing.  I don't think the
8    discussion included that all of a sudden now we're
9    thinking -- because we were already moving in that
10   direction.  I think they knew we were moving in the
11   direction of adding air conditioning to the system, so I
12   don't recall anything specific more than that.
13   Q.   You're moving in that direction.  Did the order
14   or the hearing change anything with the pace at which
15   you moved?
16   A.   We made sure -- we stretched our capacity to
17   whatever we could possibly do.
18   Q.   Was it the reason that TDCJ changed from a more
19   four-phase plan to the three-phase plan?
20   A.   No, ma'am.
21   Q.   What was that reason?
22   A.   Experience, doing some of the projects that
23   we've been doing, looking at how we could design like
24   facilities and actually potentially be able to use that
25   design on more than one, and looking at, if we expanded

Page 179

1    even further our resources, what could we do.
2    Q.   Did Judge Pitman's order change anything with
3    respect to how quickly you moved or what you asked for
4    from the Legislature with respect to installing
5    permanent air conditioning?
6         MR. JOHNSON:  Objection, form.
7    A.   We were already moving in that direction.
8    Q.   So there's not really a difference; since your
9    testimony at the hearing, nothing really changed from
10   then until now?
11        MR. JOHNSON:  Objection, form.
12   A.   The hearing was in August of '24, right?
13   Q.   July and August?
14   A.   Our legislation appropriation request was
15   already done, which was the one we presented.
16   Q.   So then the answer is no, it didn't change
17   anything?
18   A.   Not at our legislative appropriation request.
19   Q.   In any other capacity?
20        MR. JOHNSON:  Objection, form.
21   A.   Not that I'm aware of.
22   Q.   What about conversations with Lieutenant
23   Governor Patrick's office in terms of installing
24   permanent air conditioning since the hearing?
25   A.   We've had discussions with his office.  Not

Page 180

1    about the -- I'm sure we briefed on the hearing, but on
2    our continued work to try to add air conditioning.
3    Q.   Did you ever receive any pushback or feedback
4    in terms of what you thought it would cost and what you
5    wanted to ask for from the Legislature from anyone in
6    Governor -- the Lieutenant Governor's office?
7    A.   Not that I recall.
8    Q.   At any point have you ever received -- over the
9    years that you've been executive director making these
10   requests to the Legislature, have you received any
11   pushback from anyone in terms of what TDCJ wanted to ask
12   for with respect to installing air conditioning?
13   A.   As to what we asked for, I don't believe so.
14        Representative Canales didn't believe our
15   number, when it was 1.2 billion to do the system, and
16   made public comments about that.
17   Q.   Can you elaborate?  I don't know what you're
18   talking about.
19   A.   He thought we had padded the number, that we
20   were basically trying to have a number so high it would
21   scare people from adding air conditioning.
22   Q.   I see.
23   A.   And it was probably a number that was too low
24   to begin with.
25   Q.   Okay.  But it's not a -- it wasn't pushback,

Page 181

1    saying I don't want give it to you.  It was pushback and
2    you're not really -- you're padding the numbers in order
3    to just scare people off kind of pushback.
4    A.   That's what I would describe --
5         (Reporter interruption for clarification.)
6    Q.   It wasn't pushback in terms of we don't want to
7    give you the funding, or you can never get that.  It was
8    pushback in terms of thinking that TDCJ was padding its
9    numbers so as to scare people off?
10   A.   I would characterize it more that way.
11   Q.   So it's fair to say, then, you've never
12   received any pushback or any discouragement from asking
13   for a certain amount of money to air condition TDCJ
14   prisons?
15   A.   I think that's correct.
16   Q.   I heard you testify at the Legislature when I
17   was there before the corrections committee.
18   A.   Yes, ma'am.
19   Q.   You asked for the 118 million and you got it,
20   right?
21   A.   I did.
22   Q.   I didn't hear you then, and I've listened to
23   some testimony of yours, but by no means all.  Ever talk
24   to the Legislature about people that were dying or
25   getting sick from the heat in prisons; is that

Pike Reporting Company
410 17th Street, Suite 1350
Denver, CO 80202


PIKE REPORTING COMPANY
PAVING YOUR PATH THROUGH LITIGATION

(855) 693-3767 | (720) 738-1300
schedule@yournextdepo.com
www.pikereporting.com

Case 1:23-cv-01004-RP   Document 258   Filed 12/08/25   Page 155 of 726
The Deposition of BRYAN COLLIER, taken on October 20, 2023

186..189

Page 186

1    A.  I'm sure it wouldn't be.  We wouldn't be able
2  to get that done.
3      Q.  Not done, but obligated.
4      A.  Obligated and done being the same in my mind.
5  Sorry.
6      Q.  Oh, okay.  Sorry.  I think that was a
7  disconnect from earlier --
8      A.  Sorry.
9      Q.  -- where I thought you meant done.
10     A.  No, I -- I know projects wouldn't be complete.
11 I understand that.  But at the same time, we did more
12 than the 118 million.  You add another 300 million in
13 new beds that are air conditioned and 110 million in a
14 new facility that's 2000 beds air conditioned that came
15 online at the same time.  So you have capacity needs,
16 but all those were -- in addition, we got air
17 conditioning on top of that.  So I think we had a very
18 good session as it relates to air conditioning.
19     Q.  And the -- other than Ron Hudson is there
20 someone else who you would defer to with respect to how
21 the -- the market or whether it would be possible to
22 obligate a certain amount of money in a timeframe to
23 install permanent air conditioning?
24     A.  So Ron's team on an annual basis, they do
25 basically vendor shows where they try to bring in every

Page 187

1  potential air conditioning vendor there is, to try to
2  increase the number of vendors we have, and that has
3  helped, but knowing their capacity for our existing
4  projects, what vendors are out there, the equipment
5  that's out there, yes, I -- I believe Ron is who I
6  typically would always go to.
7      Q.  Do you think you could have obligated more than
8  118 million?
9      A.  I don't know what that would have looked like.
10 We -- at the time we identified the 118 is what we felt
11 like we could get done.  And "done" being that we could
12 get them obligated.
13     Q.  And who identified that?
14     A.  I think jointly our chief financial officer and
15 Mr. Hudson.
16     Q.  Mr. Steffa and Mr. Hudson?
17     A.  Uh-huh.  Sorry, Ron Steffa and Ron Hudson.
18     Q.  Certainly you -- I mean why would you be able
19 to obligate 500 million or 600 million in two years from
20 now but you couldn't do it in this session?
21         VIDEOGRAPHER:  Could you reattach your
22 microphone, please?
23         MS. GROSSMAN:  I'm sitting on my mic.
24     A.  Some of what we could do in the future depends
25 on what we're doing now.  In other words, and Mr. Hudson

Page 188

1  would explain better than I can.  We are -- we did a
2  design and a request for bid on the McConnell Unit, a
3  maximum security unit, where there are five other ones
4  just like it.  So looking at how we could use those
5  similar type designs means in the next biennium we could
6  put more money at play because we will have designs done
7  on facilities that have like designs.  In other words --
8  we talked about Segovia earlier today.  Segovia is a
9  similar design to Sanchez in El Paso.  Once we design
10 one, we would be able to potentially get funding and run
11 two of those projects at the same time.
12         So I think as Ron and his team looked at
13 the capacity, what would we be able to do, they're
14 looking at the design and what's in production and what
15 are we going to be able to do, and that increases as you
16 go.  It slows down in the end, in a way, because those
17 projects, even if we can get them obligated they're
18 going to take much longer, because then you get to your
19 Coffields, your older units that are going to be much
20 more complicated.
21     Q.  Okay.  Defer to Ron Hudson and Mr. Steffa with
22 respect to the questions I'm asking with -- in terms of
23 how much it would cost or how long it would take from
24 procurement and design to construction, to install
25 permanent air conditioning, you would defer to them?

Page 189

1      A.  Yes, ma'am.  Ron is over contracting and knows
2  all the contracting angles and used to actually direct
3  the contracting in the agency.
4         THE REPORTER:  Could you slow down?
5         THE WITNESS:  I'm sorry.
6      A.  Ron Steffa is over contracting and is over --
7  used to be over directly the contract branch, so from
8  that capacity Ron Steffa, Ron Hudson with his engineers
9  and his team and the experience they have awarding
10 contracts and getting contracts done, that's how they
11 identify that together what we could potentially get
12 done.
13     Q.  And what's preventing you from obligating that
14 money now?
15     A.  Obligating what money?
16     Q.  The funding.  Sorry, the funding that -- what's
17 preventing you from obligating the funding that I asked
18 you perhaps you could have gotten if you asked for more
19 hundreds of millions for the other units?  What's
20 preventing you from obligating that money now?
21         MR. JOHNSON:  Objection, form.
22     A.  All the above that we talked about earlier.
23     Q.  Okay.  So is it fair to say then, is the only
24 reason that you didn't ask for more funding at the last
25 legislative session to install permanent air

Pike Reporting Company
410 17th Street, Suite 1350
Denver, CO 80202


PIKE REPORTING COMPANY
Paving Your Path Through Litigation

(855) 693-3767 | (720) 738-1300
schedule@yournextdepo.com
www.pikereporting.com

Case 1:23-cv-01004-RP   Document 258   Filed 12/08/25   Page 156 of 726
The Deposition of BRYAN COLLIER, taken on October 10, 2025

190..193

Page 190

1  conditioning because you didn't think it could be
2  obligated?
3      A.  Yes.  We didn't feel like we could do more --
4  that's what we felt like we could accomplish.
5      Q.  Is there any other consideration that you gave
6  in not asking for more than 118 million?
7      A.  Not that I'm aware of.
8              MS. GROSSMAN:  We should take a break.
9              THE WITNESS:  Okay.
10             MS. GROSSMAN:  Five minutes.
11             VIDEOGRAPHER:  Going off the record.  Time
12  is 2:32.
13             (Brief recess.)
14             VIDEOGRAPHER:  Back on the record.  Time
15  is 2:45.
16     Q.  (By Ms. Grossman)  I would like to discuss the
17  capital expenditure plan from this last session.
18     A.  Yes, ma'am.
19     Q.  Which was the 89th, right?
20     A.  Uh-huh.
21     Q.  I'm going to hand you this document to be
22  marked as Exhibit 15.
23             (Exhibit 15 marked.)
24     Q.  Now, I apologize.  For some reason the 85th
25  session is at the front, so I think the 89th starts

Page 191

1  at --
2      A.  Uh-huh.
3      Q.  -- Defendants' 456380.
4      A.  Uh-huh.  I got you.
5      Q.  And when was this document created?
6      A.  This document, I'm not sure.
7      Q.  The capital expenditure plan, you said it was
8  August?
9      A.  We update it every year, so it's a -- in a way
10  a living document, but we update it every legislative
11  cycle.
12     Q.  So if it's a living document then if you wanted
13  to amend something it's easy enough to do so?
14     A.  I believe so, because I believe we have amended
15  it, but there's a window of time when that's allowed.
16  If a hurricane happened and we had to change priority or
17  do another project, we can add it to it, but I don't
18  know -- I don't think it's anytime.
19     Q.  Is there -- is there anytime -- I mean, are you
20  aware of any restriction on updating it a month after
21  you submit it to the Legislature if you forgot
22  something?
23     A.  I don't know that we would have updated it if
24  we talked to the Legislature about the issue.  For
25  instance, the facility we purchased in Lubbock or Post,

Page 192

1  the 2000 bed facility, I don't know that we went in and
2  made an adjustment when we asked for that money, and we
3  asked for that money mid session.
4      Q.  And this document was created basically while
5  the hearing was going on, or it was submitted to the
6  Legislature in the -- at the same time; is that true?
7      A.  I believe this is submitted to the Legislature
8  in a similar timeline of the legislative appropriations
9  request, which is in the August time window of the
10  preceding year.
11     Q.  And nothing about the hearing or the Judge's
12  order caused a change in this request; is that fair?
13     A.  Correct.
14     Q.  Okay.  But if you wanted to have changed it,
15  you could just go in and amend it?
16     A.  There are ways to just the capital expenditure
17  plan.  It's typically tied to a funding request.
18     Q.  Okay.  So then this one would have been August
19  of 2024, is that fair?
20     A.  I don't disagree, but I'm not 100 percent sure
21  on when the date was.  I don't see a date on it, so I
22  don't know for sure.
23     Q.  There's not.  I'm not coming -- I'm not making
24  it up from my head or it's not something else I've seen.
25  It's based on your testimony that it's in August of the

Page 193

1  year before --
2      A.  Correct.
3      Q.  -- when you go testify.
4      A.  I apologize.  So this specific document I have
5  my fingers on, I don't know if it was the one we're
6  talking about in August --
7      Q.  Okay.
8      A.  -- or it was updated later, that version or
9  another version, but typically every cycle, biennium, we
10  do the initial capital improvement plan in August.
11         All I meant is I don't know absolute is
12  this the physical document submitted in August of '24.
13     Q.  Okay.  But you do know that nothing was changed
14  in terms of how much air conditioning money you asked
15  for based on the Court's order?
16     A.  I believe that's correct.
17             THE REPORTER:  Based on --
18             MS. GROSSMAN:  The Court's order.
19     Q.  (By Ms. Grossman)  So this one has a column for
20  deferred maintenance, and it's the first time I've seen
21  that.
22     A.  Yes, ma'am.
23     Q.  Is there any reason that there's a deferred
24  maintenance column here but not in the other years that
25  I've seen?

Pike Reporting Company
410 17th Street, Suite 1350
Denver, CO 80202

PIKE REPORTING COMPANY
Your Path Through Litigation

(855) 693-3767 | (720) 738-1300
schedule@yournextdepo.com
www.pikereporting.com

Case 1:23-cv-01004-RP   Document 258   Filed 12/08/25   Page 157 of 726
The Deposition of BRYAN COLLIER, taken on October 20, 2023

198..201

Page 198

1    Q.   I was going with "Gist."  All right, Gist.  The
2  Gist Unit, the plan was to install air conditioning in
3  that housing in fiscal year -- or in some part of the
4  housing in fiscal year 2028.  And that's reflected as
5  $27,100.  Is that fair?
6    A.   And Gist may already be air conditioned.  It
7  may be a replacement or -- yeah, 27,100, that's going to
8  be some -- some dedicated air conditioning money for the
9  Gist Unit in that cycle, but it could be replacing
10  existing air conditioning.
11    Q.   Well if it's reflected in the three-phase plan
12  that was submitted to the Legislature --
13    A.   Is Gist on there?
14    Q.   Yes.
15    A.   Okay.
16    Q.   Okay.  That would be new air conditioning, not
17  replace --
18    A.   If it's reflected there, correct.
19    Q.   Not replacing, right?
20    A.   Yes, that would be.
21    Q.   Okay.  And then Hughes was -- the plan is to --
22  this is on the capital expenditure plan.
23    A.   Uh-huh.
24    Q.   It says to install air conditioning, inmate
25  housing.  And this is reflected in the years -- fiscal

Page 199

1  years 2027 and 2028, right?
2    A.   Uh-huh.  Yeah.
3    Q.   It's 28 million in 2027, $3,000,900 in 2028,
4  right?
5    A.   Yes.  What that would also tell you is that
6  that's probably the cost to do the entire unit.
7    Q.   Okay.
8    A.   So it tells you Estelle and -- was it
9  McConnell?  Yes.  Those two are similar designs and they
10  were less figures.  One was four million, one was I
11  think five.
12    Q.   Thanks.
13    A.   So it would mean -- just trying to explain that
14  this is going to be -- air conditioning projects may or
15  may not include the whole unit.  If it's 28 million, my
16  gut would be it's probably the whole unit.
17    Q.   Okay.
18    A.   Four million is maybe just replacing or adding,
19  you know, housing, three housing areas, four housing
20  areas, whatever they can do.
21    Q.   Either way it's adding or installing air
22  conditioning to some part of the prison unit that didn't
23  previously have it?
24    A.   Correct.
25    Q.   And McConnell, did I just go over McConnell?

Page 200

1  Yes.  Memorial, install -- sorry.
2    A.   You know what --
3    Q.   Go ahead.
4    A.   Never mind.
5    Q.   Go ahead.
6    A.   You should ask somebody better tuned on this
7  than me.  I bet you the four million is design, I bet
8  that's what it was for Estelle, because a design is
9  about 10 percent of your overall construction cost
10  typically.
11    Q.   Okay.
12    A.   So my gut is, when you're seeing those 28
13  million, that's a project already designed.  Four
14  million is probably a design.
15    Q.   Okay.
16    A.   And that's probably what those other two were,
17  the smaller, because those units are similar.
18    Q.   So whatever it is, it's a certain amount of
19  money to either design something in the -- to design
20  something in the future or to construct something in the
21  future, but it's money that TDCJ is telling the
22  Legislature it needs and it intends to use or obligate
23  in these years for certain projects?
24    A.   Correct.
25    Q.   Okay.  If you look at third page for the

Page 201

1  Robertson unit --
2    A.   Uh-huh.
3    Q.   This is TDCJ telling the Legislature that it
4  needs and intends to use the 28 million to install air
5  conditioning in inmate housing in fiscal year 2027; is
6  that right?
7    A.   I'm not with you yet.
8    Q.   Okay.  Sorry.
9    A.   You said Robertson?
10    Q.   It's Robertson.
11    A.   Yes.
12    Q.   Okay.  And with Stiles, which is the last one
13  on that page, TDCJ is saying it needs and intends to use
14  $15,500,000 in 20 -- in fiscal year 2026 for installing
15  air conditioning in the Stiles Unit; is that right?
16    A.   Probably, yes.  Stiles has quite a bit of air
17  conditioning now I think.
18    Q.   Okay.  And then there's another project that's
19  intended to be used or obligated in 2028 for 3,900,000
20  in Stiles, right?
21    A.   I see that, uh-huh.
22         MR. HOMIAK:  Go over this.
23    Q.   I've seen the three-phase plan that you
24  submitted to the Legislature.
25    A.   Uh-huh.

Pike Reporting Company
410 17th Street, Suite 1350
Denver, CO 80202


PIKE REPORTING COMPANY
PAVE YOUR PATH THROUGH LITIGATION

(855) 693-3767 | (720) 738-1300
schedule@yournextdepo.com
www.pikereporting.com

Case 1:23-cv-01004-RP   Document 258   Filed 12/08/25   Page 158 of 726
The Deposition of BRYAN COLLIER, taken on October 20, 2023
202..205

Page 202

1    Q.  I know you gave it to them the day that I was
2  there that you testified for correction -- for
3  corrections.
4    A.  Yes, ma'am.
5    Q.  But had you given it to them before that?
6    A.  Gave it to appropriations and finance before
7  that.
8    Q.  Okay.
9         MS. GROSSMAN:  Let me mark this as Exhibit
10  16, please.
11         (Exhibit 16 marked.)
12    Q.  (By Ms. Grossman)  So in looking at this
13  document, this is TDCJ's plan it's telling the
14  Legislature in terms of installing air conditioning at
15  facilities, right?
16    A.  Yes, ma'am.
17    Q.  And it says -- it looks at also the fiscal
18  years 2026 and 2027 with the 118 million, right?
19    A.  Right.
20    Q.  And it also looks at fiscal years 2028 and
21  2029, where it says it meets --
22    A.  600.
23    Q.  620.4 million, right?
24    A.  Correct.
25    Q.  And then 2031 and 20 -- 2030 and 2031, it says

Page 203

1  TDCJ said it needs 584.6 million to complete the project
2  of installing permanent air conditioning with the last
3  300 facilities, right?
4    A.  Yes, ma'am.
5    Q.  So I don't -- I don't -- here, this is close
6  to -- or this is over a billion dollars in terms of the
7  next legislative sessions that are not reflected
8  anywhere in the 89th capital expenditure plan.  Would
9  you agree on that?
10    A.  I don't know if they are anywhere.  They are in
11  different pieces of it, because we just talked about
12  Byrd.  There's a Byrd in '31.  We just talked about
13  Garza.  It was on there.  We talked about it.  We talked
14  about Michael, Hughes.  So this document wasn't done the
15  same timeline as that document.  When the agency gets
16  ready to go into the next legislative appropriation
17  cycle these may or may not be what they push forward in
18  the capital plan when they make those updates, but some
19  of those are definitely in the capital plan.
20    Q.  Some of the units are.
21    A.  Yeah.
22    Q.  But the money still accounts for the 118
23  million, not the additional close -- over a billion
24  dollars; that's fair?
25    A.  Well, for instance the Byrd Unit, which is down

Page 204

1  in '30, '31, I think that -- if they're designed --
2    Q.  Yeah.
3    A.  -- if I'm not -- I may not be understanding
4  your question.
5    Q.  Go ahead.  No, go ahead.
6    A.  The 118 that we received in essentially
7  September, a month ago, would be part of what would be
8  updated in the capital improvement plan based on where
9  those projects are going to land.  That could even be
10  different from this form that we submitted to the
11  Legislature in -- was it April maybe, April -- based on
12  what we learned during this time.
13         For instance, the McConnell Unit, the bid
14  for air conditioning came back, I want to say near $40
15  million to do the work, and for $40 million we can get a
16  lot of air conditioned beds done, so we made adjustments
17  before I left.
18         They wouldn't necessarily show that yet in
19  the capital improvement plan.
20    Q.  But --
21    A.  So they won't match up, is what I would say,
22  not right now, because these are two different
23  documents, two different time spans, and funding hasn't
24  been appropriated for all of it.
25    Q.  But these documents include funding that hasn't

Page 205

1  been appropriated, hasn't it -- doesn't it?
2    A.  I don't know for sure.  Yes, on the deferred
3  maintenance, yes.  On the air conditioning projects, the
4  ones we talked about, yes.  Some of those were ones that
5  hadn't been funded yet probably.
6    Q.  But it was --
7    A.  I would have to go back and look, but I'm not
8  going to argue there.
9    Q.  It was telling the Legislature what you need
10  funding for, right?
11    A.  It's telling the Legislature what you're going
12  to spend your deferred maintenance funding on.  It's not
13  a budget request.  It just ties the budget request back
14  to specific projects.
15    Q.  Okay.
16    A.  So in '27 when the Legislature meets again,
17  there will be a capital plan that will be updated the
18  fall before that and it would have alignment with what
19  they're asking for in the agency at that time.
20    Q.  Okay.  But nowhere -- I mean I'm looking at the
21  89th legislative capital expenditure plan, and I'm
22  looking at the last page where it totals the numbers in
23  each group of categories that you're asking money for,
24  right?
25    A.  Yes.

Pike Reporting Company
410 17th Street, Suite 1350
Denver, CO 80202


PIKE REPORTING COMPANY
Your Path Through Litigation

(855) 693-3767 | (720) 738-1300
schedule@yournextdepo.com
www.pikereporting.com

Case 1:23-cv-01004-RP    Document 258    Filed 12/08/25    Page 159 of 726
The Deposition of BRYAN COLLIER, taken on October 20, 2023

206..209

Page 206

1    Q.   Okay.  And in order to complete this capital
2  expend -- the three-phase plan that you submitted to the
3  Legislature to complete permanent air conditioning, it
4  would be a billion dollars of air conditioning projects
5  that would have to be reflected in the plan, right?
6    A.   Right.
7    Q.   So I'm saying why -- why aren't those are
8  there?
9    A.   This plan was presented to the Legislature, the
10  four-phase plan presented before that, the Legislature
11  would then say go forth with your three-phase plan; we
12  want you to do it in that manner.
13         That's what we would do.  So we didn't say
14  this is our appropriations request for the next two
15  bienniums.  We said this is how we could get it done.
16    Q.   Okay.
17    A.   In the most expedited fashion over three
18  biennium if you were willing to obligate the funds.
19    Q.   Okay.  So this isn't a promise of what TDCJ is
20  going to ask for or saying it needs?
21    A.   It's our best plan of, if we get the funding,
22  that's as much as we can get done and how long it will
23  take us.  The question was:  How long and how much?
24    Q.   Was this answering someone's question?
25    A.   Yes.

Page 207

1    Q.   Whose question was it answering?
2    A.   The legislative committees.
3    Q.   Wanted to know how long it would take and how
4  you could do it?
5    A.   Yes.  They knew we had presented in '22 that
6  same information, but we had also had three years of
7  work and they wanted to know what would it look like
8  now.
9    Q.   Who wanted to know that?
10    A.   Committees and members.
11    Q.   And so this is TDCJ saying we could do it this
12  way; we could do it in these three bienniums and then we
13  could install permanent air conditioning throughout the
14  facilities?
15    A.   Correct.
16    Q.   And is there any reason that 620 million
17  couldn't be -- which you think could be obligated in
18  2028 and '29 couldn't be obligated in 2026-27?
19    A.   I don't think we would have the capacity to get
20  it done.
21    Q.   Why would you not have the capacity in 2026 to
22  '27 but then you would in 2028 and '29?
23    A.   Go back again.  I apologize.  So for '26-27
24  you're going to have 118 million dollars.  You just
25  started the '26 cycle in September.  So you have $118

Page 208

1  million and you've got all these projects --
2         THE REPORTER:  Could you slow down?
3         THE WITNESS:  Sorry.
4    A.   You have $118 million and you have multiple
5  projects that you will get done over that biennium, some
6  design, some actual work.  That is the capacity we had
7  for that window.  We've talked about that.
8         If I heard you, I don't know if you're
9  asking me could I get 620 now and obligated in '28-29,
10  no, I don't think we would have had the capacity to do
11  that.
12         Now, they could have said we'll give you
13  money and phase it out to you, but, no, I don't think
14  that if they had given us that money that we would have
15  been able to get it obligated in that window.
16    Q.   Did anyone tell you that it wouldn't be able to
17  be obligated in that window?
18    A.   I think based on our experience, we felt like
19  we could not.
20    Q.   And again, would you defer to Mr. Steffa --
21    A.   I would.
22    Q.   -- and Mr. Hudson on those questions?
23    A.   I do.
24    Q.   So, okay.  So this isn't TDCJ's appropriations
25  request to the Legislature then?

Page 209

1    A.   Correct.
2    Q.   It's just answering a question.  It's basically
3  like a thought experiment in how long it could take
4  based on some reality that you understand the world of
5  construction to be?
6    A.   Maybe a little bit better than that.  But at
7  the same time, in '22, we were asked very specifically
8  from the House Appropriations Committee how long would
9  it take and how much money would you need.  That's where
10  the four-phase plan came up.
11         This time they asked if we could update
12  and let them know, based on what progress we had made
13  and what we already know, what would it look like today.
14    Q.   Okay.
15    A.   And stretching everything we have, this is the
16  plan that we came up with.
17    Q.   Okay.
18    A.   That if we were funded, we felt like we could
19  get this done.
20    Q.   But it doesn't reflect any commitment on TDCJ's
21  part to ask for the 620 million, does it?
22    A.   No commitment or nor a failure to have a
23  commitment.  It just says this is what it will take next
24  cycle.  I won't be there for the legislative
25  appropriations request next cycle.

Pike Reporting Company
410 17th Street, Suite 1350
Denver, CO 80202


PIKE REPORTING COMPANY
Your Path Through Litigation

(855) 693-3767 | (720) 738-1300
schedule@yournextdepo.com
www.pikereporting.com

Case 1:23-cv-01004-RP    Document 258    Filed 12/08/25    Page 160 of 726
The Deposition of BRYAN COLLIER, taken October 20, 2023
214..217

Page 214

1  A.  No, ma'am.  I did not go into detail with the
2  capital expenditure plan.  That was updated by
3  Mr. Steffa.
4      Q.  Okay.
5      A.  And Mr. Hudson.
6      Q.  So they update the capital expenditure plan,
7  but it's your job to tell them what could be approved or
8  what we need money for?
9      A.  No, ma'am, not necessarily.
10     Q.  No?
11     A.  The capital improvement plan typically refers
12  to fixing something that's broken or about to be broken,
13  so it's deferred maintenance.
14          The air conditioning projects there would
15  have -- I'm not sure if they matched up exactly with
16  what our LAR was at the time, or like I said earlier, if
17  there's a time difference between the documents.
18     Q.  But I mean it's not just repairing, it's not
19  just deferred maintenance.  It's new projects, too,
20  represented in that 89th capital expenditure plan as
21  well, right?
22     A.  Yes, ma'am.  But the vast majority, probably 90
23  percent are existing infrastructure repairs.
24     Q.  Okay.  And then some of them are also
25  installing air conditioning as well as new?

Page 215

1      A.  Could be, yes, ma'am; or a fire alarm system if
2  you don't have one.
3      Q.  And we looked at many projects that were
4  installing new air conditioning throughout prisons,
5  right?
6      A.  Yes.
7      Q.  That were reflected on that plan?
8      A.  Yes, ma'am.
9          THE REPORTER:  Slow down, please.
10         MS. GROSSMAN:  Okay.
11     Q.  (By Ms. Grossman)  For the 620 million and the
12  584.6 million, that's like five, six times or at least
13  five times more than TDCJ has ever asked for for air
14  conditioning, right?
15     A.  Correct.
16     Q.  Do you feel like there's any legitimacy to the
17  idea that one way money might get appropriated faster if
18  there was a court order?
19     A.  No, ma'am.
20     Q.  Why?
21     A.  Because, one, court order could lead to an
22  appeal, which may or may not be mean it has any impact
23  at all.  So, no, ma'am.
24     Q.  And you -- and do you feel as though the
25  Legislature would be considering that process, the

Page 216

1  appeal process and things like that?
2      A.  I would --
3          MR. JOHNSON:  Objection, form.
4      A.  I would assume they would.
5      Q.  And you -- you don't think a court order would
6  be helpful at all to getting appropriated money from the
7  Legislature?
8      A.  I think -- I think a court order -- a court
9  order on its own, the Legislature may or may -- they're
10  not obligated to that court order.  The agency is the
11  one here.  So the Legislature is not here.
12         I think we're continuing to make good
13  progress.  To me, a court order would not help us in the
14  process.
15     Q.  Why not?
16     A.  Because the next step of that is potentially an
17  appeal, which only delays anything happening, and
18  potentially could mean no funding until that is
19  resolved.
20     Q.  But another option would be that the executive
21  director or someone goes and says to the Legislature:
22  We've just been ordered to do this, clearly we need
23  money to do so.  Right?
24         MR. JOHNSON:  Objection, form.
25     A.  What you would do if you're the executive

Page 217

1  director is you would advise of the status of the case.
2  They would talk to the agency and the Attorney General's
3  Office and then work with us on how they wanted to go
4  forward.
5      Q.  But it's your testimony, though, that you
6  haven't received any pushback for the money you think
7  you need and there's nothing preventing you from asking
8  for all the money that you need and think you could
9  obligate within a specific biennium?
10     A.  As we have, yes.
11     Q.  Do you believe it is Mr. Lumpkin's intent to
12  ask for the 500 million plus and the 600 million plus?
13     A.  I couldn't speculate whatsoever.
14     Q.  It would be speculation, though, because this
15  document is just a response of the Legislature asking,
16  not the TDCJ's plan?
17         MR. JOHNSON:  Objection, form.
18     A.  Say again.
19     Q.  (By Ms. Grossman)  As we've talked about, the
20  three-phase plan is really just a response to a
21  legislative inquiry in how long and could it take and
22  how much money --
23     A.  Right.
24     Q.  -- to get this done.  It's not:  Here is
25  TDCJ -- TDCJ's plan to do something.

Pike Reporting Company
410 17th Street, Suite 1350
Denver, CO 80202


PIKE REPORTING COMPANY
YOUR PATH THROUGH LITIGATION

(855) 693-3767 | (720) 738-1300
schedule@yournextdepo.com
www.pikereporting.com

Case 1:23-cv-01004-RP    Document 258    Filed 12/08/25    Page 161 of 726
The Deposition of BRYAN COLLIER, taken on October 20, 2025

218..221

Page 218

1    A.   I think it says if we're allowed the funding
2    that's what we would do.
3    Q.   Okay.  And there isn't anything on the capital
4    expenditure plan that reflects the request for that
5    funding.  Is that fair?
6    A.   For this funding?
7    Q.   For the funding after the next two bienn -- the
8    next two legislative sessions.
9    A.   Probably correct, yeah.
10   Q.   Okay.  At the hearing -- I want to switch
11   topics.  At the hearing I think you were shown inside
12   temperatures from the Stiles Unit and you were asked
13   questions by your counsel about whether you had any
14   reason to believe that your officers and staff were
15   misrepresenting temperatures in the temperature logs,
16   and you said no at the hearing in those questions from
17   counsel.  Do you remember that?
18   A.   I remember the line of questioning and looking
19   at the document, yes.
20   Q.   And do you remember saying that you didn't have
21   any reason to believe that temperature logs were
22   falsified?
23   A.   I wouldn't argue with that at all.
24   Q.   Okay.  Now, as you sit here today, do you have
25   a reason to believe that your officers or staff have

Page 219

1    misrepresented temperatures in the logs?
2    A.   The officer at the Stiles Unit, in the document
3    that was released in court, through a subsequent
4    investigation, because we began an investigation
5    immediately with our internal auditor doing the
6    investigation, identified that yes, they had falsified
7    temperature logs at the Stiles Unit whenever they
8    were -- either the day of or the day they were asked to
9    submit them in.  And these were the external temperature
10   logs.  But, yes, they had falsified them.
11          We, as a result, developed a process to
12   automate that, to take the human piece out of it, and
13   essentially have a way to automate the temperature
14   collection, which is what I believe we have now.
15   Q.   Oh, okay.  Can you explain a little bit more
16   about that?
17   A.   Probably not the fine detail, but our
18   information technology group worked with weather service
19   and others to be able to capture those temperatures and
20   do it in a way that electronically grabbed it and
21   submitted it centrally, so that the staff -- we took
22   the staff out of the process.
23   Q.   Okay.  When did that happen?
24   A.   We began working on it once we identified
25   what's -- what actually happened.  So the timeline, I

Page 220

1    don't specifically remember, but it was done before I
2    was gone.
3    Q.   Okay.  So 2024 temperatures were still being
4    handwritten; is that right?
5    A.   Up until sometime -- it may have been '25 --
6    Q.   Okay.
7    A.   -- before we actually had the automated process
8    in place.
9    Q.   Is the automated process in place now?
10   A.   I believe so, yes.
11   Q.   How did that investigation -- I was in court
12   that day, but who ordered the investigation?  Can you
13   tell me the process of how that happened with
14   Mr. Cirrito?
15   A.   Sure.  So I talked to the board chair,
16   Mr. Nichols, recommended that we use Chris Cirrito,
17   because he's an internal auditor, he's not staff from
18   the agency.  He then conducted his investigation,
19   briefed us along the way of what he found.  He found
20   that they had falsified the logs and he looked beyond
21   the Stiles Unit, I believe, as well.  I don't believe he
22   found anything past the Stiles Unit, but he identified
23   where staff there -- and I believe he identified even
24   the specific staff that had done that, and that
25   corrective action was taken.  And then we were at the

Page 221

1    same time working to automate the process to get the
2    people out of the process.
3          THE REPORTER:  Could you spell Nichols,
4    the last name?
5          THE WITNESS:  Cirrito?  C-I-R-R-I-T-O, I
6    believe.  Chris, C-H-R-I-S, the first name.
7    Q.   (By Ms. Grossman)  Who -- I mean who?  Did
8    you -- do you know who falsified the logs?
9    A.   There was at least one if not more than one
10   officer at Stiles.  I don't recall if they were still
11   working there or not, but they worked in the control
12   picket area, and they did identify who and when it
13   occurred.
14   Q.   Was there any discipline with those officers?
15   A.   There was corrective action, but I'm not
16   personally aware of what exactly took place, and I can't
17   recall if all the staff were still TDCJ staff.
18   Q.   Did you learn their names at the time?
19   A.   I can't remember.
20   Q.   Do you know if Mr. Cirrito did?
21   A.   I'm sure he would have.
22   Q.   All right.  You're aware of his conclusion that
23   the Stiles Unit leadership encouraged the logs to be
24   falsified, right?
25   A.   I don't recall that.  I recall the

Pike Reporting Company
410 17th Street, Suite 1350
Denver, CO 80202


PIKE
REPORTING
COMPANY
YOUR PATH THROUGH LITIGATION

(855) 693-3767 | (720) 738-1300
schedule@yournextdepo.com
www.pikereporting.com

Case 1:23-cv-01004-RP   Document 258   Filed 12/08/25   Page 162 of 726
The Deposition of BRYAN COLLIER, taken on October 20, 2025
242..245

Page 242

```
 1              CHANGES AND SIGNATURE
 2  PAGE        LINE      CHANGE           REASON
 3  _____
 4  _____
 5  _____
 6  _____
 7  _____
 8  _____
 9  _____
10  _____
11  _____
12  _____
13  _____
14  _____
15  _____
16  _____
17  _____
18  _____
19  _____
20  _____
21  _____
22  _____
23  _____
24  _____
25  _____
```

Page 243

```
 1  _____
 2  _____
 3  _____
 4  _____
 5  _____
 6          I, BRYAN COLLIER, have read the foregoing
 7  deposition and hereby affix my signature that same is
 8  true and correct, except as noted above.
 9
                    _____
10                  BRYAN COLLIER
11  STATE OF TEXAS   )
12  COUNTY OF TRAVIS )
13          Before me,_____, on this
14  the day personally appeared BRYAN COLLIER known to me to
15  be the person whose name is subscribed to the foregoing
16  instrument and acknowledge to me that they executed the
17  same for the purposes and consideration therein
18  expressed.
19          Given under my hand and seal of office
20  this ___ day of _____, 2023.
21
22
23                  _____
                    NOTARY PUBLIC IN AND FOR
24                  THE STATE OF_____
25
```

Page 244

```
 1              UNITED STATES DISTRICT COURT
                FOR THE WESTERN DISTRICT OF TEXAS
 2                    AUSTIN DIVISION
 3  BERNHARDT TIEDE, II;              §
    TEXAS PRISONS COMMUNITY           §
 4  ADVOCATES; BUILD UP, INC. A/K/A    §
    LIONESS:  JUSTICE IMPACTED         §
 5  WOMEN'S ALLIANCE; TEXAS CITIZENS   §
    UNITED FOR REHABILITATION OF       §
 6  ERRANTS; and COALITION FOR         §
    TEXANS WITH DISABILITIES,          §
 7          Plaintiffs,                §
                                       §
 8  VS.                                §
                                       §
 9  BRYAN COLLIER, in his Official     §
    Capacity as Executive Director of  §
10  Texas Department of Criminal       §
    Justice,                           §
11          Defendant.                 §
    ************************************************
12
13              REPORTER'S CERTIFICATION
            ORAL AND VIDEOTAPED DEPOSITION OF
14                  BRYAN COLLIER
                  OCTOBER 20, 2025
15
16  ************************************************
17          I, CAROLINE CHAPMAN, Certified Shorthand
18  Reporter in and for the State of Texas, hereby certify
19  to the following:
20          That the witness BRYAN COLLIER was duly
21  sworn by the officer and that the transcript of the oral
22  deposition is a true record of the testimony given by
23  the witness;
24          That the deposition transcript was
25  submitted on October ___, 2025 to the witness or to the
```

Page 245

```
 1  attorney for the witness for examination, signature, and
 2  return to me within 30 days;
 3          That the amount of time used by each party
 4  at the deposition is as follows:
 5          Honorable Erica Grossman - Four hours and
 6  forty-five minutes.
 7          That pursuant to information given to the
 8  deposition officer at the time said testimony was taken,
 9  the appearance page includes all parties of record.
10          I further certify that I am neither
11  counsel for, related to, nor employed by any of the
12  parties or attorneys in the action in which this
13  proceeding was taken, and further that I am not
14  financially or otherwise interested in the outcome of
15  the action.
16          Certified to by me on October 23, 2025.
17
18          
            CAROLINE CHAPMAN, Texas CSR 467
19          Expiration Date:  03/31/2027
            Pike Reporting
20          410 17th Street, Suite 1350
            Denver, CO  80202
21          Telephone:  (502) 589-2273
            Email:  kati@yournextdepo.com
22
23
24
25
```

Pike Reporting Company
410 17th Street, Suite 1350
Denver, CO 80202

PIKE REPORTING COMPANY
PROUDLY SERVE YOUR FIRM THROUGH LITIGATION

(855) 693-3767 | (720) 738-1300
schedule@yournextdepo.com
www.pikereporting.com

# EXHIBIT 8



# JUDICIAL SERVICES COURT REPORTING COMPANY

15248 SCENIC LOOP RD
HELOTES, TX 78023
TELE: (210) 681-4885
FAX: (210) 681-4886

**To:**     BRANDON DUKE
            O'MELVENY & MYERS LLP
            700 LOUISIANA STREET, SUITE 2900
            HOUSTON, TEXAS 77002

**From:**   JUDICIAL SERVICES COURT REPORTING
            15248 SCENIC LOOP RD
            HELOTES, TX 78023

**Date:**   10/15

**Re:**     The deposition of                    JENNIFER TOON

Greetings,

        To follow is the original deposition transcript of the deposition of    JENNIFER TOON
taken on    September 19, 2025 10:05 AM

Please review, sign, notarize and return the Errata/Changes and Signature Page to our office by
5:00 pm on or before 11/04    via e-mail to jscr@judicialservicessa.com.

Sincerely,

Judicial Services Court Reporting

Page 15

1    yet.  We've had several inquires, but we haven't had to

2    exercise that particular part of the program.  But we

3    do -- that resource network that I was telling you about

4    with the counties, that falls into that program.

5         Q    I see.  Is it fair to say that all the

6    programs you listed, involve delivering services to

7    inmates or family members of inmates?

8         A    Yes, sir.

9         Q    Do your responsibilities as vice president of

10   C.U.R.E. ever involve you testifying before the Texas

11   legislature?

12        A    Yes, sir.

13        Q    How often do you testify in front of the Texas

14   legislature?

15        A    Only on certain bills that directly affect our

16   mission and the inmates' air conditioning is the biggie

17   biggie continuity of care medical to ensure we had a big

18   problem with -- you have a medical issue.  You go into

19   TDCJ and you put into -- go to UTMB or to Texas Tech for

20   an ongoing evaluation.

21             And I'll use a psych situation as an

22   example, you go to one of the two institutions and

23   you're given a diagnosis and you are given specific

24   medications.  And then you go back to the unit and then

25   all of a sudden the local nurse says, there's nothing

584c4712-a58d-4ccf-8455-f5362cfd96be

Page 16

1   wrong with you and takes the medication away from you.

2   You've already been determined to have a psychological

3   issue.

4              You may have a violent tendency.  You've

5   been seen by a board certified specialist, but then a

6   uncertified specialist says there's nothing wrong with

7   you and sends you back to population, creating a

8   problem.  There needs to be a continuity of care.  And

9   so things like that will testify and explain the

10  situation with circumstances that we've had to address

11  as C.U.R.E. with the family or the inmate.

12     Q    Sure.  And that -- that example you just gave

13  was in connection to a specific bill that came before

14  the legislature?

15     A    It was one that was drafted.  I think it

16  was -- it -- it received a bill number, but I don't

17  think it actually got a public hearing.  I know one of

18  the biggie biggies was air conditioning.  There were

19  several bills, several sessions.  I've been actively

20  engaged at the ledge since my release in 2018, mostly

21  with the air conditioning conditions.  The Office of the

22  Independent Ombudsman and air condition are the two

23  biggie biggies.

24     Q    In other words, you have testified before the

25  ledge about heat in Texas prisons and the possibility of

584c4712-a58d-4ccf-8455-f5362cfd96be

Page 17

1    installing air conditioning in Texas prisons?

2         A    Yes.

3         Q    Did you testify about either of those subjects

4    in any of the legislative sessions that have been held

5    this year?

6         A    Yes.

7         Q    Do you remember the dates when you testified?

8         A    No.  Whenever they had a public hearing for

9    that particular bill?

10         Q    Yeah.  If you asked me a particular date when

11    I did or didn't do something, I wouldn't remember

12    either.  That's fair.  Do you remember if you testified

13    before the regular session?

14         A    It was regular session and I -- we haven't had

15    anything on air conditioning in special session.

16         Q    That makes sense.  What -- what made you

17    interested in becoming a part of C.U.R.E.?

18         A    The advocacy, having been there, done that,

19    seen the injustices, the things that go on.  I only

20    really concerned myself with constitutional or

21    unconstitutional issues as they may be, and working to

22    make sure that those that deserve whatever get what they

23    deserve.  We lead the country in wrongful convictions,

24    exonerations.  There's plenty of guys that the

25    punishment doesn't fit the crime.

584c4712-a58d-4ccf-8455-f5362cfd96be

Page 24

1    have to balance all that with your responsibilities to

2    C.U.R.E.  So let me ask you, in an average week how much

3    time do you devote to C.U.R.E.?

4         A    That depends on the families, so I'll say 30

5    to 40 hours and 30 to 40 hours working the other two

6    jobs.

7         Q    Well, thanks so much for taking some time out

8    of that busy schedule to sit this deposition.

9         A    It's important.  I think getting the air

10   conditioning and getting those that need it protected is

11   extremely important.

12        Q    Let me ask you to sort of explain the mission

13   of C.U.R.E. in your own words.

14                   MR. DUKE:  Objection.  Form, but go

15   ahead.

16        A    The mission, in my own words, in short, is to

17   assist the families and the inmates and legislators and

18   the public on what exactly goes on in the criminal

19   justice system, awareness, and to focus on correcting

20   unconstitutional conditions.

21        Q    (BY MR. TEBO) And you've told me a little bit

22   about the activities that C.U.R.E. conducts with TDCJ

23   inmates in prison.  Does C.U.R.E. communicate with TDCJ

24   inmates regularly?

25        A    Yes.  By mail and then through their family

584c4712-a58d-4ccf-8455-f5362cfd96be

Page 25

1    members.   I will constantly get a text or something, my

2    loved one just called me, can you answer this question?

3    I need help.   He needs help.   What's the process?

4         Q    And does C.U.R.E. maintain a mailing list of

5    all the inmates with whom it regularly communicates?

6         A    Not particularly a mailing list, as you would

7    know it.   I have a folder for all of them, we keep all

8    their letters and all their correspondence.   And then

9    the mailing list, if you would refer to that, would be

10   the high value data set that TDCJ puts out.   That is the

11   complete detailed roster of everybody in the system.

12   Where they're at, their number, what their charge was,

13   the date of the offense, and the data projected release,

14   whether or not they were granted parole or not, approved

15   for parole or not.

16        Q    Does TDCJ communicate with every inmate on

17   that, on what you referred to as the high data list --

18   high value data list?

19                  MR. DUKE:   Sorry.   Objection to form.

20        A    Do they communicate with them?

21        Q    (BY MR. TEBO) Does C.U.R.E.?

22                  MR. DUKE:   Same objection.

23        A    Okay.   We don't -- we don't -- we don't

24   communicate regarding the list. It's -- it's public

25   record, and I download it when it -- when it resets

584c4712-a58d-4ccf-8455-f5362cfd96be

Page 46

 1    shipped 500 of us over to the Diboll unit, and the Die

 2    Bow unit had all kinds of problems, I again wrote to

 3    court and through Judge Hughes' office, and again, I was

 4    recognized as an interested party in the lawsuit.

 5         Q    Makes sense.  You testified that you were

 6    incarcerated in -- at a TDCJ -- a string of TDCJ

 7    facilities between 2015 and 2018.  Are you aware that

 8    since 2018, TDCJ has updated its policies regarding

 9    treatment of prisoners related to conditions of --

10    related to heat conditions?

11         A    Yes.  What I see in policy and what I see in

12    practice are two different things.

13         Q    Then you don't have any personal knowledge of

14    being a TDCJ inmate?  Let me rephrase that.  You don't

15    any personal about TDCJ's heat related policies or

16    procedures based on firsthand experience being an

17    inmate?

18         A    No.

19         Q    I'm going to stop sharing my screen.  And I

20    think I'll move on to another topic.  I wanted to ask a

21    little bit more about C.U.R.E.'s organization.  How is

22    C.U.R.E. governed?

23         A    Through our board.

24         Q    Who is on the board?

25         A    We currently have ten people.  We have a

584c4712-a58d-4ccf-8455-f5362cfd96be

Page 47

1    doctor, nursing, we have a licensed counselor, we have a

2    person -- our treasurer has been in the banking business

3    for 30 years, 30 plus years.  We have a wife of an

4    inmate, myself, we have a -- a mother of an inmate that

5    passed while incarcerated.  And we have another member

6    who's a veteran and works at Wayland Baptist University.

7    And we have another member who was a juvenile probation

8    department trainer for over 15 years and he's on our

9    board and he is actively engaged with our youth program.

10   And then we have another person on our board who is a --

11   she's not a girlfriend, but she has his power of

12   attorney and kind of the closest thing to family, so

13   advocate.  I don't know really how to classify her, but

14   she's directly connected to the inmate, directly.  She

15   has his power of attorney and everything that he needs

16   for the outside, helping him for medical, has his HIPAA,

17   all of the things that a family member would have to

18   advocate for somebody.

19        Q    I don't think I heard you mention yourself.

20   Are you on C.U.R.E.'s leadership board?

21        A    Yeah.  I think I said me -- and me.

22        Q    Maybe you did, and I just didn't -- I just

23   didn't hear.  Thanks for that clarification.  How often

24   does the leadership board meet?

25        A    We meet every two weeks.  We used to meet

584c4712-a58d-4ccf-8455-f5362cfd96be

Page 57

1   you described as mentoring and helping with writing are

2   doing that -- do that separately from their involvement

3   with C.U.R.E.?

4        A    Yes, sir.  That's what they do.

5        Q    Do you know how many people are incarcerated

6   in TDCJ facilities, total?

7                  MR. DUKE:  Objection.  Form.

8        A    Somewhere between 135 and 144,000.  I don't

9   know the last number yet.

10       Q    (BY MR. TEBO) Out of that total number,

11  approximately how many does C.U.R.E. regularly interact

12  with through its mission-related activities?

13       A    Well, now we're back to -- if it's advocating,

14  and through the family members, it could be 15 to 50 a

15  day.  We've got a problem with the Stiles Unit.  We've

16  gotta problem with K2 overdoses.  We've got a problem

17  with the inmates yelling for the guards and then the

18  guards not showing up.  And this guy -- we have a 15-day

19  lockdown because Billy Bob was caught smoking and they

20  took him out, but everybody's still being locked down

21  and we're still being punished without our privileges.

22  But then they brought the same guy that they took out

23  back and are expecting the inmates to police the

24  situation.  And this guy just now went out on a

25  stretcher.  What do we do?  So I get those inquiries

584c4712-a58d-4ccf-8455-f5362cfd96be

Page 58

1    almost daily now.

2              Certain units are still having issues and

3    we understand that, yes, you got contraband.   We

4    understand that.   But there's also right and wrong, and

5    then there's also the process of what it takes to have

6    to get resolved.   So some of these issues we have like

7    quarterly meetings with the independent ombudsman's

8    office and not only do we address them there, but if I

9    have certain things that I can verify, then I will write

10   to ombudsman, can somebody please look into this?

11       Q    So I understand you may not have a precise

12   count for the number of inmates who you're interacting

13   with or attempting to help on a -- on a daily basis when

14   that is broadened to include just everyone who is

15   writing to you with their problems. But if you had to

16   estimate a total number for the inmates that you have

17   interacted with, just at all, what approximately, what

18   would that be?

19       A    If you're talking directly, indirectly through

20   the family member, directly that day for whatever the

21   problem, I would say 15 a day, six days a week is a

22   really good average.

23       Q    That would add up to a pretty large number.

24   At the same time, is it fair to say that that number

25   would still be a fraction of the total TDCJ prisoner

Page 64

1    members.

2        Q    When you say 89 prison groups, you don't mean

3    89 distinct TDCJ prison facilities, do you?

4        A    Well, like the Hughes Unit or the Coffield

5    Unit or the Michael Unit, so each one of those has like

6    their own little family Facebook group because they all

7    have that unit in common.

8        Q    I see.  Let me ask then, in terms of the

9    work-life certification program, the health care-related

10   programs, and any other education, like prisoner

11   education or parole aid-related, programs you've kind of

12   described to me throughout the course of this

13   deposition.  How many TDCJ facilities does C.U.R.E.

14   operate those programs in?

15       A    During the families, most of --

16       Q    Does that mean that there is at least one TDCJ

17   inmate at every TDCJ prison facility who is being served

18   by one of those programs?

19       A    Yes.

20       Q    I'm gonna share another document with you,

21   Mr. Malouff, it'll take me a second to upload.  Is it

22   still uploading to the chat?

23                MR. DUKE:  Yeah.  We don't have it yet.

24                MR. TEBO:  Okay.  We can wait a second.

25   In fact, maybe this is a good time -- I don't know,

Page 66

1  produce the membership roles for each and every

2  organizational plaintiff for the fiscal years 2023 to

3  2024 and 2024 to 2025."  Did I read that correctly?

4      A    Yes.

5      Q    And if you look down, can you see the section,

6  subtitled response?

7      A    Yes.

8      Q    Do you see the first sentence where it says,

9  "Our constituent base includes all of the approximately

10 132,600 incarcerated prisoners in the Texas Department

11 of Criminal Justice"?

12     A    Yes.

13     Q    And did I read that first sentence correctly?

14     A    Yes.

15     Q    Would you agree that TD -- would you agree

16 with that statement that C.U.R.E.'s constituent base

17 includes every inmate incarcerated in a TDCJ facility?

18     A    Yes.

19     Q    And a constituent is not the same as a member?

20 Is that what you previously testified?

21     A    Yes.

22     Q    So not every one of the approximately 132,600

23 TDCJ inmates are members of C.U.R.E.; is that right?

24     A    None of them.

25     Q    None of them -- none of them are members of

Page 67

1    C.U.R.E.?

2        A    But they're -- they're constituents.

3        Q    I understand.  Does -- does C.U.R.E. have any

4    members at all?

5        A    No.  Just the board members.

6        Q    Let me ask about something else in this

7    response.  Do you see the third sentence where it says,

8    "Please also see the attorney's eyes only constituent

9    mailing list, C.U.R.E. 28"?  Did I read that correctly?

10       A    Yes.

11       Q    Are you familiar with that constituent mailing

12   list?

13       A    Not having it in front of me, I'm going to

14   speculate that that is probably the -- the -- at the

15   time high value data set from TDCJ, which is that inmate

16   roster that we were talking about.

17       Q    Let me direct your attention to the preceding

18   sentence, the second sentence in this response section,

19   which reads, "Every incarcerated person in TDCJ is a

20   constituent of Texas C.U.R.E. and is identified in

21   C.U.R.E. 27."

22       A    Okay.

23       Q    Did I read that correctly?

24       A    Yes.

25       Q    And do you understand that to refer to what

584c4712-a58d-4ccf-8455-f5362cfd96be

Page 77

1   that to inmates or their family members about Tiede v.

2   Collier?

3                   MR. DUKE:  Objection to form.

4        A     The case itself, no, but the individuals that

5   were having similar air condition-related,

6   medical-related conditions, because they have individual

7   harm and individual issues.  So we deal with them

8   directly based on their given circumstance.

9        Q    (BY MR. TEBO) Did C.U.R.E. seek approval from

10  inmates or their family members before deciding to join

11  Tiede v. Collier as a plaintiff?

12                  MR. DUKE:  Objection to form.

13       A    We don't need any inmates permission.

14       Q    (BY MR. TEBO) In other words, is that a no

15  answer to my question?

16                  MR. DUKE:  Objection to form.

17       A    Yes.  No.

18       Q    (BY MR. TEBO) So just for the sake of the

19  record, let me ask the complete question again.  Did

20  C.U.R.E. seek approval from inmates or their family

21  members before deciding to join Tiede v. Collier as a

22  plaintiff?

23                  MR. DUKE:  Objection.

24       A    We joined in response to the complaints that

25  we were getting from the inmates due to mistreatment,

584c4712-a58d-4ccf-8455-f5362cfd96be

Page 78

1    lack of air conditioning, lack of respite, and other

2    issues that were unconstitutional under those

3    circumstances with those inmates.

4        Q    (BY MR. TEBO) Did you decide to join then on

5    the basis of specific complaints by specific inmates

6    about those conditions?

7        A    No.  It was a decision based on there's too

8    many inmates having this big of a problem and it's not

9    getting resolved and it needs to get resolved, and when

10   TDCJ would not resolve it, we need to bring it to the

11   federal court.

12       Q    After joining Tiede v. Collier, has

13   C.U.R.E. -- has C.U.R.E. ever consulted inmates or their

14   family -- family members before taking legal positions

15   within the litigation?

16       A    No.

17       Q    Does C.U.R.E. keep records of the -- sorry.

18   Does -- does C.U.R.E. keep records of prisoner

19   grievances?

20       A    If they send them to us, yes, we keep a copy.

21       Q    How often -- well, let me ask.  Do prisoners

22   send their grievances to C.U.R.E.?

23       A    Yes.

24       Q    How often?

25       A    That's up to them.  We tell them to make three

584c4712-a58d-4ccf-8455-f5362cfd96be

Page 80

1    is just anyone kind of asking you questions on a -- on a

2    come -- come -- come and go basis, and a narrower

3    category of inmates who participate in C.U.R.E's

4    programming.  Let me ask then, does C.U.R.E. track

5    the -- does C.U.R.E. track inmate grievances for the

6    inmates who participate in its programming?

7            MR. DUKE:  Objection to form.

8        A    If you're filing grievances, you're not really

9    in a program.  If you're filing a grievance, you are

10   looking for advocacy, which really isn't a program,

11   that's part of our mission is to help you advocate and

12   to make sure that your grievance follows the proper

13   procedure.  Did you file it within the 15 days?  Did you

14   identify where the -- what the problem is, the who,

15   what, when, where, how, and why?  Did you take whatever

16   steps?  Did you start it within I-60?  Did you follow

17   the process and procedure to affect the complaint?  And

18   what's the end result that you're trying to do?  Is it

19   something that you eventually going to have to end up

20   filing in 1983, or is it something that can simply be

21   resolved at the local level or through the regional

22   director, like making sure you get ice on the wing when

23   it's 120 degrees?  But the agreement still needs to be

24   filed so that we now have the official record.

25       Q    (BY MR. TEBO) And C.U.R.E. will help with that

Page 81

1    agreement -- will help inmates with that grievance

2    process if inmates -- if inmates ask for it?

3         A    Yes.   And a lot of them do indirectly through

4    their families because of the expeditious form to reach

5    out.

6         Q    So when an inmate asks C.U.R.E. for help

7    navigating the grievance process, will C.U.R.E. track

8    how many of those inmates successfully complete the

9    two-step grievance process?

10        A    No.   But I make sure that after they get to

11   step one, I always tell them, let me know when you get

12   the grievance back.   Sometimes it takes 45, 60, 90 days.

13   And then it's a matter of, was it within policy or they

14   violated policy by having an extended grievance or

15   non-responsive to the grievance.   And so there's always

16   a delay.   You're never going to -- hardly ever -- ever

17   see anything less than 30 days.

18              So it's just a time going process.   And

19   then once the step two is filed, they got 15 days from

20   the time that they received the step one.   But some of

21   the step ones, because of the system, which comes in the

22   "regular mail" is returned, it's 45 or 60 or 90 days

23   out.   So it's like, okay, who did you get the grievance

24   from?   Because when they submit the step two, we get a

25   lot of your time bar because you should have submitted

584c4712-a58d-4ccf-8455-f5362cfd96be

Page 89

1    individuals?

2        A    Correct.

3        Q    Okay.  So that's the reason why you use the

4    word constituents?

5        A    That's -- yes.

6        Q    Okay.  That's -- that's all I care for.

7        A    The -- the focus of C.U.R.E. is inmates and

8    the advocacy for them for their conditions.

9        Q    I'm just trying to understand the word

10   members.

11       A    Okay.  Yes.  Yeah.

12       Q    I think we're talking over each other.  So

13   just to clarify, you push back against the word,

14   members, or traditional membership because of the

15   due-paying aspect that you associate the word membership

16   with?

17       A    Correct.

18       Q    And there is no dues that you require Texas

19   prison inmates to pay to receive services from Texas

20   C.U.R.E.?

21       A    Correct.  We offer no distinction or no

22   benefit or privilege from any particular person.

23       Q    It's up -- well, okay.  Was Texas C.U.R.E.

24   created?

25       A    C.U.R.E. was created to advocate against the

584c4712-a58d-4ccf-8455-f5362cfd96be

Page 90

1    systematic and unconstitutional prison conditions and

2    injustices of the things that happened inside going back

3    30 plus years ago, all the way through today.

4        Q    And you, I believe, testified previously that

5    you personally, and then but also on behalf of Texas

6    C.U.R.E., have advocated on behalf of Texas inmates

7    before the Texas legislature; is that right?

8        A    Yes.

9        Q    Okay.  And has that been at -- and you've done

10   so this past term?

11       A    This past term?

12       Q    Like this year.

13       A    This year.  Actually, in addition to air

14   conditioning --

15       Q    Yeah.

16       A    -- I drafted House Bill 3464, which now went

17   into law September 1st.  We were having an unbelievable

18   problem of K2 and overdose deaths.  And when everybody

19   is on lockdown, how do the drugs continue to get in?

20   And under the sale and manufacturing delivery of drugs

21   it was basically a misdemeanor, but it elevates to a

22   felony based on the quantity.

23              And part of the problem is the quantity

24   going into the drug is not as you see on TV with the

25   cartels where it's tons and tons, but its small amounts,

584c4712-a58d-4ccf-8455-f5362cfd96be

Page 93

1    been there.

2         Q    You were asked questions regarding Texas

3    C.U.R.E.'s Board directors.   Do you recall that?

4         A    Yes.

5         Q    And just to clarify, how many board members

6    are there for Texas C.U.R.E.'s?

7         A    Currently we have ten.

8         Q    And how many of the current board are former

9    inmates?

10        A    Two.

11        Q    How many are former TDCJ inmates?

12        A    One, me.

13        Q    How many have -- currently or have -- how many

14   are family members of current or former Texas inmates?

15        A    Two, direct blood family members or marriage

16   family members, and one, as we discussed, she has the

17   power of attorney, she has the HIPAA, she is the, what

18   did you call it, lack of a better term, caretaker.

19        Q    To Texas prison?

20        A    To the prisoner, yes.

21        Q    And do other Texas Cure board members

22   communicate with inmates in the Texas prison system?

23        A    The -- yes, actually one of them actually went

24   with me to this last unit for the re-entry fair.  We've

25   got a couple more that we're looking to put together.

584c4712-a58d-4ccf-8455-f5362cfd96be

Page 94

1    They will be -- the board members will be engaged in

2    going into the system.  We've got -- three of us are

3    veterans and we'll be going into the veteran dorms and

4    that's separate from the ones going to the re-entry

5    fair.

6        Q    And then so you talked about some of the

7    communication for -- with counsel for the defendant.

8    Can you explain or provide some examples of some of the

9    communications that you've received or Texas C.U.R.E.

10   have received regarding the heat conditions in Texas

11   prisons?

12       A    A lot of it comes from most directly through

13   the family members.  They're not getting respite,

14   they're not getting water, the guards are taking the

15   water, the inmates are not getting the water.  The staff

16   is not making the rounds, guys that are complaining to

17   go to medical are not being allowed to go to medical.

18   We're trying to get grievances, we're not getting

19   grievances.

20            Grievances are not making it to the

21   process, they're not being turned in.  We have issues

22   with some that have heat restrictions that are stuck in

23   population and not getting air conditioning.  How come

24   they're still not in an air conditioned cell.  Some of

25   those that found themselves going to air conditioning,

Page 95

1    had to waver -- sign a waiver saying that they would not

2    sue the state, but the -- they found themselves going to

3    an air conditioned facility, but it ended up they're

4    being locked in segregation and they're been treated as

5    G4, G5 disciplinary inmates, and all they should be

6    doing is getting a cool bet.   So the complaints that

7    they're giving up privileges just to get an air

8    conditioned bed is also a big concern.

9         Q    So would it be fair to say that Texas C.U.R.E.

10   has received a range of communications from inmates

11   regarding the president -- sorry, regarding the heat

12   conditions and need for services related to those

13   conditions in Texas prisons?

14        A    Yes.   Not getting showers.   That's another

15   big -- that's -- that's -- that's one of current.

16        Q    How does Texas C.U.R.E. respond to its

17   communications?

18        A    Through the family member.   Has the grievance

19   been filed?   And then make sure that they file the

20   grievances in violation of whatever the policy, in this

21   case it's AD 1064, the heat policy, and make sure they

22   outline who, what, when, where, how, and why?

23        Q    Has Texas C.U.R.E. received communications

24   about the need to air condition prison units in Texas?

25        A    Yeah.   We've -- we've received complaints from

584c4712-a58d-4ccf-8455-f5362cfd96be

Page 96

1   the inmates, you know, what do we have to do to get air

2   condition?  How do we get air condition?

3        Q    How -- how do I ask this?  How long has Texas

4   C.U.R.E. been receiving these types of communications?

5        A    We've been receiving them ever since I've been

6   with C.U.R.E.

7        Q    So before joining this litigation?

8        A    Oh, absolutely.

9        Q    And the same with respect to the

10  communications regarding the need for services related

11  to heat.  Do you have Texas C.U.R.E. been receiving

12  those from you since your involvement in the

13  organization?

14       A    Oh, yes.

15       Q    Do -- does the board consider these

16  communications when making this, you know,

17  determinations on -- like on behalf of the organization?

18       A    Yes.  Like the role and family needs for how

19  do I get medical, how do I get food stamps, how do I

20  get, which started the family resource process that we

21  have.  The kids, my kids are having a hard time, they're

22  not being allowed to go see their parents, they are

23  being denied access, my kids are really being stressed

24  out at school, so we created the Youth Ambassadors.

25       Q    So is one of the major policy goals of Texas

Page 97

1    C.U.R.E. seeking relief from the extreme heat in TDCJ on

2    air conditioned units?

3         A    Absolutely.

4         Q    And did Texas C.U.R.E. join this lawsuit to

5    serve its constituents?

6         A    Yes.

7         Q    How did they do that?  Right.  And what way

8    did -- sorry, let me -- in what way does Texas C.U.R.E.

9    expect or intend to serve its constituents by joining

10   this lawsuit?

11        A    The outcome of this lawsuit can directly

12   affect a significant number of inmates.  So even though

13   this may be Mr. Tiede's lawsuit, the conditions and

14   circumstances and result under equal protection now

15   affect the masses as well.

16        Q    Okay.  Let's -- I just meant, like, with

17   respect to joining this lawsuit, I believe you testified

18   that you're seeking -- not yours, strike that, let me

19   start over.  I believe that you testified that you

20   understand that Texas C.U.R.E. is seeking to get the

21   Texas prison system air conditioned as part of the

22   relief in this case; is that right?

23        A    Yes.

24        Q    Okay.  How does Texas C.U.R.E., to the extent

25   that you now expect that to serve Texas C.U.R.E'.S

584c4712-a58d-4ccf-8455-f5362cfd96be

Page 98

1    constituents?

2         A    And so in one respect, unless they're going to

3    specifically address him only and assign him to one

4    particular prison and he can never move from that prison

5    or whatever.

6         Q    All right.  I think you're -- I'm not asking

7    about Mr. Tiede.  I'm saying Texas C.U.R.E. has asked

8    the judge --

9         A    Right.

10        Q    -- according to, I believe what you told my

11   colleague, to enter an order to require TDCJ to air

12   condition the prison system; is that right?

13        A    Yes.

14        Q    Is that what T -- Texas C.U.R.E. is seeking?

15        A    Yes.

16        Q    And I guess let me ask this.  What is Texas

17   C.U.R.E. seeking?

18        A    We're seeking all of the units to have air

19   conditioning throughout the unit.

20        Q    Okay.

21        A    Not just in the administrative offices or

22   where there are civilian employees.

23        Q    Is that why Texas C.U.R.E. joined this

24   lawsuit?

25        A    Yes.

584c4712-a58d-4ccf-8455-f5362cfd96be

Page 99

1      Q    Is that what Texas C.U.R.E. believes its

2   constituents need to have it's -- to live in a

3   constitutionally safe environment?

4      A    Yes, across the board.  Any inmate can be

5   housed at one unit today and then shipped to another

6   unit tomorrow.  And it's important that the conditions

7   are constitutionally compliant across the board.

8      Q    Understand.  So have you ever talked to an

9   inmate that disapproves of Texas C.U.R.E. seeking air

10  conditioning through out the prison?

11     A    No.

12     Q    Have you ever talked with a family member that

13  disapproves of this lawsuit?

14     A    No.  It's how do I join?

15              MR. DUKE:  Thank you.  I pass the

16  witness.

17                   FURTHER EXAMINATION

18   BY MR. TEBO:

19     Q    Thanks.  I'll just ask one or two quick

20  questions.  So you previously testified, Mr. Malouff,

21  that C.U.R.E. considers every TDCJ inmate to be a

22  constituent.  Correct?

23     A    Yes.

24     Q    So C.U.R.E. considers an inmate to be one of

25  its constituents even if C.U.R.E. hasn't delivered

584c4712-a58d-4ccf-8455-f5362cfd96be

Page 104

1              UNITED STATES DISTRICT COURT
            FOR THE WESTERN DISTRICT OF TEXAS
2                     AUSTIN DIVISION
   BERNHARDT TIEDE, II;        )
3  TEXAS PRISONS COMMUNITY     )
   ADVOCATES; BUILD UP, INC.   )
4  A/K/A JUSTICE IMPACTED      )
   WOMEN'S ALLIANCE; TEXAS     )
5  CITIZENS UNITED FOR         )
   REHABILITATION OF ERRANTS;  )
6  AND COALITION FOR TEXANS    )
   WITH DISABILITIES,          )
7                              )
        PLAINTIFFS,            )
8                              )
   v.                          )   CIVIL ACTION NO.
9                              )   1:23-CV-01004-RP
                               )
10                             )
   BRYAN COLLIER, IN HIS       )
11 OFFICIAL CAPACITY AS        )
   EXECUTIVE DIRECTOR OF       )
12 TEXAS DEPARTMENT OF         )
   CRIMINAL JUSTICE,           )
13                             )
        DEFENDANT.             )
14 _____

15              REPORTER'S CERTIFICATION

16      ORAL AND VIDEO CONFERENCE DEPOSITION OF

17                   CHARLIE MALOUFF

18                 SEPTEMBER 3, 2025

19 _____

20      I, Abigail Anzek, Certified Shorthand Reporter

21 in and for the State of Texas, hereby certify to the

22 following:

23      That the witness, CHARLIE MALOUFF, was duly

24 sworn by the officer and that the transcript of the oral

25 deposition is a true record of the testimony given by

Page 105

1    the witness;

2            I further certify that pursuant to FRCP Rule

3    30(f)(1) that the signature of the deponent:

4            ___X___ was requested by the deponent or a

5    party before the completion of the deposition and

6    returned within 30 days from date of receipt of the

7    transcript.  If returned, the attached Changes and

8    Signature Page contains any changes and the reasons

9    therefor;

10           _____ was not requested by the deponent or a

11   party before the completion of the deposition.

12           I further certify that I am neither counsel

13   for, related to, nor employed by any of the parties or

14   attorneys in this action in which this proceeding was

15   taken, and further that I am not financially or

16   otherwise interested in the outcome of the action.

17           Certified to by me this  22ND  day of

18   September  , ___2025___ .

19

20

21           /s/ Abigail Anzek
             _____

22           Abigail Anzek, CSR 12627, Exp 9/30/27
             Judicial Services, Firm Registration #774
23           12790 FM 1560 North
             Helotes, TX 78023

24

25

584c4712-a58d-4ccf-8455-f5362cfd96be

# EXHIBIT 9



# JUDICIAL SERVICES COURT REPORTING COMPANY

15248 SCENIC LOOP RD
HELOTES, TX 78023
TELE: (210) 681-4885
FAX: (210) 681-4886

**To:**    BRANDON DUKE
O'MELVENY & MYERS LLP
700 LOUISIANA STREET, SUITE 2900
HOUSTON, TEXAS 77002

**From:**    JUDICIAL SERVICES COURT REPORTING
15248 SCENIC LOOP RD
HELOTES, TX 78023

**Date:**    10/15

**Re:**    The deposition of                    JENNIFER TOON

Greetings,

To follow is the original deposition transcript of the deposition of                    JENNIFER TOON
taken on    September 19, 2025 10:05 AM

Please review, sign, notarize and return the Errata/Changes and Signature Page to our office by
5:00 pm on or before 11/04    via e-mail to jscr@judicialservicessa.com.

Sincerely,

Judicial Services Court Reporting

Page 12

 1      A.  I would say mostly.  I can't think of an

 2  instance where they're not.  But that -- I don't want to

 3  paint myself into a corner and say 100 percent.  But I

 4  don't -- I can't think of a situation where it's not a

 5  wife or a spouse or a child of someone that is

 6  incarcerated.

 7      Q.  So when you say that you "connect with and

 8  help" -- as you testified to earlier -- "inmates," is

 9  that because the inmates contact you?

10              MR. DUKE:  Objection to the form.

11              Go ahead.

12              THE WITNESS:  Did you hear him?  He said,

13  "Objection to form."

14              MR. MICKLE:  Yeah.  I'm able to hear him.

15  Just go ahead and --

16              (Simultaneous crosstalk.)

17              THE WITNESS:  Okay.  He --

18              MR. MICKLE:  -- answer.  That's fine.

19              THE WITNESS:  -- he's -- he was sounding a

20  little scratchy, and Natalie -- okay.  If you -- I

21  won't -- I won't intervene in any way --

22              MR. DUKE:  Just assume they hear --

23              THE WITNESS:  Okay.  Okay.  I'll just

24  assume they hear.  And, I'm sorry, Brandon.

25              They contact us mostly.  It -- sometimes

Page 71

1    Sorry.  I -- I am unaware of a specific claim.  Other

2    than this class action suit, I am unaware of an -- of an

3    additional complaint that we have filed in that way.

4         Q.  (BY MR. MICKLE)  Okay.  If you're unaware of a

5    specific complaint that C.U.R.E. has filed, are you

6    aware of any other complaints that C.U.R.E. has taken

7    from inmates and elevated it to management?

8         A.  Yes.  It -- almost every inmate complains about

9    temperature, conditions.  And we raise that whenever we

10   have an opportunity.  It is very frequent -- you know,

11   one of the things we talked about is what role do

12   members and other constituents play in our

13   considerations when a inmate says to us, "Boy, it really

14   is hot in here, and it really sucks."  We -- we elevate

15   that to whomever we have contact with and -- and make

16   that clear.

17              Further, if inmates, in their

18   correspondence with us, say, "I wish I had access to

19   more materials to help me prepare for my GED," or

20   anything like that, we -- we will allocate some

21   resources to that.

22              So when you asked how -- what role inmates

23   might play -- inmate members might play, it is through

24   those requests and narratives that they send us that we

25   are able to help focus our efforts on things that

2747a0d1-e7d6-4734-996c-a84cfbad92a2

Page 72

1    they -- that matter to them.

2        Q.  Are you familiar with the term "Step 1

3    grievance"?

4        A.  I -- I am -- I am not familiar with that

5    particular term.  No.

6        Q.  Has C.U.R.E. ever sent TDCJ anything that you

7    would refer to as a "demand letter"?

8              MR. DUKE:  Objection to form.

9              THE WITNESS:  I -- I am not aware of that,

10   but I -- but it is certainly possible that such a letter

11   was sent.  I -- I don't know.  That's not something that

12   we have discussed, in my memory, so far.

13       Q.  (BY MR. MICKLE)  So in your time with C.U.R.E.,

14   since the beginning of 2024, it's your testimony that

15   you do not recall sending anything which could generally

16   be called a "demand letter" to TDCJ?

17       A.  Not --

18             MR. DUKE:  Objection to form.

19             THE WITNESS:  -- not as -- not as the

20   president or not that I recall discussing as a group.

21       Q.  (BY MR. MICKLE)  In the same time period, since

22   the beginning of 2024, do you recall C.U.R.E. filing any

23   claims with TDCJ?

24       A.  No.

25       Q.  It's my understanding that, at some point in

2747a0d1-e7d6-4734-996c-a84cfbad92a2

Page 82

1    Mr. Mickle asked.  And Charlie was both in the federal

2    system and in TC -- TDCJ.

3         Q.   Okay.  And --

4         A.   And I will tell you -- just -- I'm sorry.  One

5    more thing, Brandon.

6              The board membership can be fluid, as all

7    volunteer organizations have been.  So Peter Iskar

8    [sic], who you -- we saw on that previous discovery

9    document, he was incarcerated.  We have had members on

10   and off -- right now, we have two -- one board member

11   whose husband is incarcerated, and she's a participant.

12             So the point is -- this Brandon -- that we

13   have a fairly strong representation of people who

14   understand the culture and challenges of people that

15   are -- are incarcerated, in general.

16        Q.   And in what way does that impact or, you know,

17   play into the board member's role or influence the

18   decisions that the board members or the organization

19   makes?

20        A.   So three -- three ways.  One, in the case of

21   those board members -- Charlie in particular -- that

22   have been in these facilities that allows them a level

23   of expertise that other people don't know.  So they've

24   been there, done that, and experienced it.

25             Secondly, it gives us a understanding of

Page 83

1    terminology and position in the prison.  So when we're

2    talking to somebody, we -- we have a better

3    understanding of what role they play and how they might

4    be a part of the -- part of the help and so forth.

5              And then, last, it allows us access to

6    individual inmates through several communications --

7    methods -- that allows them to play a role in what we're

8    doing.  So if they ask about something or ask about

9    whether a program exists, we can take that information

10   and try to -- to initiate something or partner with

11   another entity to get them help that they can use.

12        Q.   Okay.  And then do you also recall discussing

13   receiving communications from inmates, servicing or

14   providing services for inmates and their families?  And

15   then also discussing boats and activities by the

16   organization and decision-making process --

17        A.   Yes -- yes, sir --

18        Q.   -- with Mr. Mickle?

19        A.   -- yes.

20        Q.   In what way does the communications from

21   inmates or their families impact the decision-making by

22   Texas C.U.R.E.?

23        A.   So it drives -- our interaction with them -- we

24   don't want to just do things that we think are

25   important.  So communication with -- and verification,

2747a0d1-e7d6-4734-996c-a84cfbad92a2

Page 84

1    validation, if you will -- of what they're hoping to

2    improve or things that they want to see happen will

3    drive our allocation of resources and our overall width

4    and breath of activity.

5        Q.  Can you provide a specific event?

6        A.  So the --

7                MR. MICKLE:  Sorry, Counsel.  I can't hear

8    the question.

9                MR. DUKE:  Sorry.

10       Q.  (BY MR. DUKE)  Can you provide a example of it?

11               THE WITNESS:  Did you get that?

12               MR. MICKLE:  Yes.

13               THE WITNESS:  Okay.  So several examples.

14   The -- several inmates were -- were -- were not being

15   able to figure out how to complete their GED.  A GED is

16   essential for doing almost anything.  If you want to get

17   a forklift operator's license, you have to have a GED,

18   at a minimum.

19               So we were able to focus some of our

20   resources on providing them some materials -- workbooks,

21   study guides -- to help them complete that activity.  We

22   are, right now, working on -- in collaboration with

23   Wayland Baptist University, based on some inmate

24   requests, to create a certification program that allows

25   them to -- the start point is going to be a leadership

Page 92

```
 1              IN THE UNITED STATES DISTRICT COURT
                FOR THE WESTERN DISTRICT OF TEXAS
 2                        AUSTIN DIVISION

 3   BERNHARDT TIEDE, II;        )
     TEXAS PRISONS COMMUNITY     )
 4   ADVOCATES; BUILD UP,        )
     INC. A/K/A JUSTICE          )
 5   IMPACTED WOMEN'S            )
     ALLIANCE; TEXAS             )
 6   CITIZENS UNITED FOR         )
     REHABILITATION OF           )
 7   ERRANTS; AND COALITION      )   CIVIL ACTION NO:
     FOR TEXANS WITH             )   1:23-CV-01004-RP
 8   DISABILITIES,               )
                                 )
 9        PLAINTIFFS,            )
                                 )
10   VS.                         )
                                 )
11   BRYAN COLLIER, IN HIS       )
     OFFICIAL CAPACITY AS        )
12   EXECUTIVE DIRECTOR OF       )
     TEXAS DEPARTMENT OF         )
13   CRIMINAL JUSTICE,           )
                                 )
14        DEFENDANT.             )
```

15                  REPORTER'S CERTIFICATION
                  DEPOSITION OF SCOTT BETHEL
16                  TAKEN AUGUST 19, 2025

17        I, Natalie Martin, Certified Shorthand Reporter and

18   Notary Public in and for the State of Texas, hereby

19   certify to the following:

20        That the witness, SCOTT BETHEL, was duly sworn by

21   the officer and that the transcript of the oral

22   deposition is a true record of the testimony given by

23   the witness;

24        That the original deposition was delivered to

25   BRANDON J. MICKLE, ESQ;

2747a0d1-e7d6-4734-996c-a84cfbad92a2

Page 93

1          That a copy of this certificate was served on all

2     parties and/or the witness shown herein on

3     _____.

4

5          I further certify that I am neither counsel for,

6     related to, nor employed by any of the parties in the

7     action in which this proceeding was taken, and further

8     that I am not financially or otherwise interested in the

9     outcome of the action.

10         Certified to by me this 2nd day of September, 2025.

11

12

13                    _____

                      Natalie Martin, CSR, RPR, RSR
14                    CSR #11867; Expiration Date:12/31/25
                      JUDICIAL SERVICES COURT REPORTING
15                    Firm Registration No. 774
                      15248 Scenic Loop
16                    Helotes, Texas 78023
                      210-681-4885
17

18

19

20

21

22

23

24

25

2747a0d1-e7d6-4734-996c-a84cfbad92a2

# EXHIBIT 10



# TEXAS C.U.R.E., INC.

## CITIZENS UNITED FOR THE REHABILITATION OF ERRANTS

August 14, 2023

Ms. REDACTED
TDCJ No. REDACTED
Hobby Unit
742 FM 712
Marlin, TX 76661-4685

Greetings Ms. REDACTED
We are in receipt of your letter dated August 4th, 2023.  Please have your Mother contact us at 512.729.1998.

Regarding the conditions, our board consists of formerly incarcerated and we are well versed on the conditions at Hobby and other units.  You and the ladies need to pay attention to the AD 10.64 Heat Directive.  When the unit is not in compliance, you need to file a grievance.  You should make 3 copies of everything official.  1 original, 1 you can send, legal mail, to THE LAW OFFICE OF ROBERT A. McLAUCHLAN, 3575 FAR WEST BLVD., #28492, AUSTIN, TX 78731, and 1 keep as proof you wrote it.   If you suffer any of the heat exhaustion symptoms, you need to go to medical.   If there is no grievance, there is no complaint!

If others are inquiring about the AC project, have them have their families reach out to us, but they must be a next of kin, ie., parent, spouse, child, etc. They cannot be a boyfriend, fiancé or just friend.

Thank you for reaching out.  Hang in there.
Best regards,


Charlie Malouff
Acting Vice-President

CONFIDENTIAL

TXCURE_000239

# EXHIBIT 11



# JUDICIAL SERVICES COURT REPORTING COMPANY

15248 SCENIC LOOP RD
HELOTES, TX 78023
TELE: (210) 681-4885
FAX: (210) 681-4886

**To:**   BRANDON DUKE
O'MELVENY & MYERS LLP
700 LOUISIANA STREET, SUITE 2900
HOUSTON, TEXAS 77002

**From:**   JUDICIAL SERVICES COURT REPORTING
15248 SCENIC LOOP RD
HELOTES, TX 78023

**Date:**   10/15

**Re:**   The deposition of                    JENNIFER TOON

Greetings,

    To follow is the original deposition transcript of the deposition of          JENNIFER TOON
taken on    September 19, 2025 10:05 AM

Please review, sign, notarize and return the Errata/Changes and Signature Page to our office by
5:00 pm on or before  11/04      via e-mail to jscr@judicialservicessa.com.

Sincerely,

Judicial Services Court Reporting

1       A.    Both.

2       Q.    Okay.  So, is there a distinction between president

3    of TPCA and president of the board?

4       A.    I am president of the board.  I am executive

5    director.  Would be equivalent to president of the organization

6    itself.

7       Q.    Okay.  That makes sense.

8       A.    And I'm the founder.  So, I'm the originator.

9       Q.    Okay.  So, you wear many hats.  Is that accurate?

10      A.    Absolutely.

11      Q.    Did you create a board immediately in 2021?

12      A.    That was part of incorporating.  You have to.

13      Q.    And who were those board members?

14      A.    The individuals I mentioned previously.  So, that --

15   the first two board members were Jessica Dickerson and Tanika

16   Solomon.

17      Q.    How did you know Jessica Dickerson?

18      A.    She was a volunteer with TPAA.

19      Q.    Did she have a family member or friend incarcerated?

20      A.    She has a friend who's incarcerated.

21      Q.    How did you know Tanika Solomon?

22      A.    She had worked with me collaboratively with TPAA.

23      Q.    What do you mean by worked with you collaboratively?

24      A.    I met Tanika while we had TPAA.  She was a parole

25   attorney.  So, we had several conversations.  We worked

Page 49

```
 1              MS. GROSSMAN:  Object to form.

 2       A.   Yes.  Yes, we have our carceral members.  We have our

 3  family members -- impacted family members.  We have members of

 4  the public.  Yes.

 5       Q.   (BY MS. CARTER)  So the in-carceral members would be

 6  the inmates that are incarcerated?

 7       A.   Yes.

 8       Q.   And the family members are family members of those

 9  inmates?

10       A.   Yes, and friends, and there's -- there's advocates.

11  There's other members.  That sign up for our newsletter.  We

12  consider those members.

13       Q.   Okay.  So if someone signed up for TPCA's newsletter,

14  you would consider them a member?

15       A.   Our newsletter and our e-mail blast, yes.

16       Q.   So would it have to be both of those things?

17       A.   No, it's an either or.

18       Q.   Okay.  And how many members does TPCA have?

19              MS. GROSSMAN:  Object to form.

20       A.   I really don't know off the top of my head.  That is

21  an ever-revolving door.

22       Q.   (BY MS. CARTER)  Is there anyone in the organization

23  that tracks membership?

24       A.   Yes, we have -- we have tech systems that track.

25       Q.   What are those tech systems?
```

Page 50

1     A.   So when an incarcerated member sends us a letter, and

2     they want to be on our newsletter list, we manage that through

3     Excel.   So we have volunteers who enter that into an Excel

4     sheet.   When a -- so a family member can also submit them

5     online, and that is automatically dumped into our CRM for that.

6          And when a family member signs up for the e-mail

7     blast, that information, some of it is automatically dumped,

8     and some of it happens at various events.   And so the process

9     of getting it from paper to an electronic form is what takes

10    place there.

11    Q.   And who is doing that?

12    A.   Well, so there's some of it's automatic.   So it's

13    automatized.   And then some of it is having volunteers, like,

14    let's say it's an event, people sign up, the sheet gets

15    scanned, the volunteer puts it into that CRM.   Just like, you

16    know, similar to what I mentioned with the carceral members.

17    And then we have carceral members who are volunteers, and we

18    have members of the public who are volunteers.   And then they

19    sign volunteer agreements and NDAs.

20    Q.   Okay.   So is there a difference between member and

21    volunteer?

22    A.   If you're a volunteer --

23          MS. GROSSMAN:  Object to form.  Go ahead.

24    A.   If you're a volunteer, you're absolutely a member.

25    So usually they start as becoming a member, and then they

Page 52

1      A.   Two different processes.

2      Q.   So the newsletter, does that only go to incarcerated

3  inmates?

4      A.   It does now, yes.  So over the years, it's

5  transitioned, but we shifted I think around somewhere around

6  2023 to making it specifically for the incarcerated

7  individuals.  And then they participate in it too.  So they

8  send us things like op-eds and pictures and what have you.

9      Q.   Okay.  So the e-mail blast, does that go to community

10  and family?

11      A.   Yes, because it's e-mail.

12      Q.   Okay.

13      A.   So yes.

14      Q.   So if a family member was to sign up to get an e-mail

15  blast, do you receive information on their family that is an

16  incarcerated individual?

17      A.   If they choose to give it to us.  They don't always

18  choose to give it to us.  Another means of membership is also

19  signing up to our Facebook group.  So we have a private group,

20  and we consider those -- those individuals are definitely

21  members.  And so for some of those groups, they've literally

22  had to tell us that they have an incarcerated individual.  We

23  don't necessarily get the name and contact information unless

24  they share that with us.

25      Q.   Okay.  If they do give you the information of the

Page 53

1  incarcerated individual, does TPCA consider that individual a

2  member?

3      A.    Yes, because they are now signed up for the carceral

4  newsletter, and we are now in communication with them.

5      Q.    So even if the inmate does not directly reach out to

6  TPCA, you will sign them up for the newsletter if you have

7  their information from the family member?

8      A.    Yes, and then if they ask to be removed, we remove

9  them.

10      Q.    Does removing them from the newsletter remove them

11  from membership?

12      A.    Yes.

13      Q.    Okay.  Is there any other way to end membership with

14  TPCA?

15      A.    People pass away.

16      Q.    Okay.  Do you consider inmates that have not signed

17  up for the newsletter or whose family members have not given

18  you their information to sign up for the newsletter members of

19  TPCA?

20            MS. GROSSMAN:  Object to form.

21      A.    I consider them constituents because we still may

22  reach out to them.

23      Q.    (BY MS. CARTER)  Does TPCA see a difference between

24  members and constituents?

25      A.    Yes.

 1      A.   No, not executive leadership.

 2      Q.   Any leadership at all?

 3           MS. GROSSMAN:  I'm sorry.  Was the question like

 4   current inmates or people that were incarcerated?  I just want

 5   to understand.

 6           MS. CARTER:  Does TPCA currently have any

 7   inmates that serve in a leadership position on the departments

 8   that Dr. Dominick described earlier?

 9           MS. GROSSMAN:  Okay.

10      A.   Formalized leadership, no.

11      Q.   (BY MS. CARTER)  Is there informal leadership?

12      A.   In the sense that our incarcerated volunteers are,

13   they're not necessarily considered a leader in the traditional

14   sense within the organization.  But they are leaders at their

15   units, you know, because they're a point.  They're a liaison

16   point.

17      Q.   Do TPCA members that are incarcerated, do they hold

18   elections for issues on the unit?

19      A.   No.

20      Q.   Do the informal leaders or liaisons at the unit have

21   an opportunity to vote on any issue at TPCA?

22      A.   No.

23      Q.   Do family members, do they vote --

24      A.   No.

25      Q.   -- on committees or board members?

Page 63

1    housed in air conditioning?

2        A.   We get information reports -- reports from TDCJ,

3    which identifies which units have air conditioning and which

4    units don't.  We also receive letters from incarcerated

5    individuals that mention that they don't have air conditioning,

6    or letters from family members, or what have you, and that way

7    we can identify.  We don't identify on this particular list,

8    though.

9        Q.   Okay.  Dr. Dominick, is it fair to say that as of

10   June 2024, TPCA had 1,569 incarcerated members?

11                 MS. GROSSMAN:   Object to form.

12       A.   Again, yes.

13       Q.   (BY MS. CARTER)  Again, yes?  Or then?

14       A.   Yeah, you asked me that question before.  So, again,

15   yes.

16                 (Confidential portion ends.)

17       Q.   (BY MS. CARTER)  Okay.  Dr. Dominick, does TPCA track

18   whether inmates file grievances about specific issues?

19       A.   If they send us the information, yes.

20       Q.   Okay.  And how is that tracked?

21       A.   They have to send us the information.  And so, they

22   send out their letters scanned from TDCJ, right?  So, TDCJ

23   scans them.  Then they send them to us, we take those letters,

24   we then scan them, and then we put that information into a

25   spreadsheet and keep the, you know, grievance attachments and

Page 64

1    what have you.

2       Q.   Okay.

3       A.   And the list of newsletters is actually kind of a

4    combination of individuals who've also written us.

5       Q.   And do you have a list of people that are subscribed

6    to the e-mail list?  Is that different than this list,

7    obviously, since these are inmates without e-mail?

8       A.   The e-mail blast that we spoke about before is how

9    individuals sign up for the e-mail blast.  So, yes, there is a

10   list of -- so that we can e-mail them.

11                  MS. CARTER:  Okay.  I'm going to share my screen

12   again.  And Ms. Hill, the exhibits I sent you last night, this

13   would have been 4 but I'm actually going to mark it as 3 if I

14   can figure out this.  Okay.

15                  (Exhibit 3 was marked.)

16       Q.   (BY MS. CARTER)  Okay.  Dr. Dominick, do you see the

17   document on your screen?

18       A.   Yes.

19       Q.   And do you recognize it?

20       A.   Yeah.  It's been a long time since I've looked at it,

21   but yes.

22       Q.   Okay.  Is this the Bylaws of TPCA?

23       A.   That is.  Without me seeing the bottom of it, it

24   looks like it's the version that was submitted to you, which is

25   the older version.  We have another version that was voted on

```
 1      A.   Yes.

 2      Q.   The first sentence says, "The Corporation shall not

 3   have voting or shall not have voting members as that term is

 4   used in the Act and shall have no capital stock."

 5           Is that accurate?

 6      A.   Yes.

 7      Q.   Okay.   And the following sentence is, "However, the

 8   Corporation may have such classes of non-voting members as may

 9   from time to time be prescribed by its Bylaws or by the Board

10   of Directors."

11           Is that correct?

12      A.   Yes.

13      Q.   At this time, do you have such members?

14              MS. GROSSMAN:    Object to form.

15      A.   Yes.

16      Q.   (BY MS. CARTER)   And who are those members?

17      A.   Those members would be the folks that we had

18   previously discussed.   So, it would be the carceral members who

19   sign up for the newsletter and write us.   It would be the

20   family members and then it would be anybody we put on

21   committees.

22      Q.   Okay.

23      A.   And volunteers.

24      Q.   Okay.   And further down where I'm highlighting right

25   now, it says, "Members shall have no voting rights or other
```

Page 100

1        Q.    You testified that TPCA's mission is to serve

2    incarcerated individuals and their families.    Is that right?

3        A.    Yes.

4        Q.    Has TPCA focused on the issues of extreme heat and

5    the lack of air conditioning in TDCJ prisons from its

6    inception?

7        A.    From my advocacy, all the way back in 2015, it's

8    focused on air conditioning.    So all the way through, it's a

9    current theme.    It is the flagship.

10       Q.    Would you say the majority of TPCA's advocacy work

11   focuses on extreme heat, lack of air conditioning, and

12   inadequate heat mitigation measures in the Texas prisons?

13       A.    Absolutely.

14       Q.    Does TDCJ's constituents include all prisoners and

15   all the prisons in the TDCJ population?

16       A.    Yes.

17       Q.    How do you, as the founder and executive director of

18   TPCA, advocate for your incarcerated constituents?    I think you

19   talked about testifying -- we can start -- I think you were

20   talking about testifying before the legislature.    Why don't we

21   start there?

22       A.    Oh, my.    I mean, that's quite an extensive list.

23   That brings me all the way back to standing in line for, you

24   know, visitation and encouraging family members and teaching

25   them about TDCJ policy and the air conditioning issue that goes

1    seven minutes in there with our guests.  They talk about the

2    heat.  They talk about other issues in the prison.  They tell

3    them about how it impacts them as a family member, how they

4    cry, and how they experience anxiety, and what have you.

5              And then we have banners.  We have a prison

6    condition exhibit that has the letters, has the surveys, talks

7    about the news articles.  The average person, because it

8    doesn't impact them, they don't think about it.  This is a

9    lesson in empathy.  This is what it really feels like.

10             For example, when I ask staffers, I'll say, well,

11   how hot do you think it gets in a prison cell?  Knowing that in

12   Texas, we get triple-digit heat all the time, but they may say

13   something like, oh, 90.  Well, first of all, that's not even

14   physically possible to just be the hottest.  We know that it's

15   hotter than that outside.

16             Just bringing it more into their consciousness, more

17   into their awareness and say, no, there are actually documented

18   temperature logs that say 150, and then let me put you in this

19   box and see how quickly you sweat.  Do you want to have another

20   person in here in that toilet-sink combo?  What would you do if

21   I never let you out?

22       Q.   All right.  I know that it's very comprehensive, all

23   that you've done over the years to advocate behalf of your

24   incarcerated constituents or TPCA's incarcerated constituents

25   to mitigate the extreme heat and to get air conditioning.  Just

1    to summarize, you've provided expert testimony about the

2    conditions in TDCJ units before the Texas legislature.  Is that

3    right?

4         A.   Yes.   And then I need to apologize.   I get louder

5    when I get more passionate.   So sorry for raising my voice.

6    I'm not yelling at anybody.

7         Q.   You've worked on bills to require humane temperatures

8    in TDCJ and been to basically every office in the Texas

9    legislature.  Is that right?

10        A.   Yes.  We were the first -- we were involved in

11   getting the very first bills that were ever filed on this

12   topic.

13        Q.   You co-authored research reports about the extreme

14   heat conditions and the deaths in Texas prisons, right?

15              MS. CARTER:   Objection, leading.

16        A.   Yes.

17        Q.   (BY MS. GROSSMAN)  And have you conducted advocacy

18   trainings for criminal justice systems with impacted family

19   members?

20        A.   Yes.

21        Q.   And have you organized community events like the mock

22   cell that you just described to raise awareness --

23        A.   Absolutely.

24        Q.   -- sorry.   To raise awareness about the conditions

25   within TDCJ units?

1      A.    Yes.

2      Q.    Okay.  Have you communicated directly with

3   Mr. Collier on behalf of TPCA about the extreme heat and the

4   lack of air conditioning in Texas prisons?

5      A.    Yes.

6      Q.    I don't want to ask, like, exactly how many times,

7   but a substantial number of times?

8      A.    Well, directly with him, I'd say a few --

9      Q.    Okay.

10     A.    -- where we've had direct conversations.  However,

11   he's always there when I give the testimonies at the

12   legislator's offices, yeah.

13     Q.    And then communicated with members of his staff?

14          MS. CARTER:  Objection, leading.

15     A.    I've communicated with members of his staff as well.

16     Q.    (BY MS. GROSSMAN)  Okay.  And has TPCA staff

17   frequently communicated with his incarcerated constituents?

18     A.    Yes.

19     Q.    And does TPCA have volunteer team members

20   incarcerated in the TDCJ system?

21          MS. CARTER:  Objection, leading.

22     A.    Yes.

23     Q.    (BY MS. GROSSMAN)  Do those incarcerated constituents

24   and members and assigned team members guide the organization's

25   activities and affect the policies that TPCA advocates for?

1    A.   No.

2    Q.   (BY MS. CARTER)   Do the inmates in TDCJ make

3    donations to TPCA?

4              MS. GROSSMAN:   Object to form.

5    A.   Some have.

6    Q.   (BY MS. CARTER)   Would you say all of them have?

7    A.   No.

8    Q.   Do the majority make donations to TPCA?

9    A.   No, it's very, very few.

10   Q.   How do the inmates inside of TDCJ guide your

11   organization's purpose?

12   A.   Oh, on several levels.  They're the ones with the

13   experience.  They're the ones who are reporting to us what

14   their experience is like.  And I think I want to add here

15   formally incarcerated individuals.  We also deal with those.

16   So they are coming from TDCJ and showing up at our events.

17   They are answering our surveys.  They're sending letters.

18   They're reaching out to their family members who then may in

19   turn reach out to us.  So they -- I don't know the right word

20   to say this, except it is their life.  And so we, with empathy

21   and compassion, want to gather their experiences so that we can

22   assist them.

23   Q.   But these individuals don't vote.  Is that correct?

24   A.   No.

25   Q.   Okay.  No, they don't vote or no, that's not correct?

Page 108

```
 1      A.   No, they don't vote --

 2      Q.   Okay.

 3      A.   -- on board members as we established earlier.

 4      Q.   But you don't have any current inmates on committees

 5 either, do you?

 6           MS. GROSSMAN:  Object to form.

 7      A.   The committees are in process of being established

 8 through their communication.  So it's, if there was a decision

 9 that needed to be made by the board, the communication might

10 involve or that decision process would involve a discussion

11 about this is what the carceral folks are saying.  This is what

12 they're reporting to us.  This is what they would like to see

13 happen.

14           But the board are the only voting, at this juncture,

15 at this moment, they're the only ones who are voting.  There

16 are processes and procedures in place for others to have some

17 level of voting in committees once these committees are

18 established.

19      Q.   (BY MS. CARTER)  Okay.  And do you know how many

20 currently incarcerated members TPCA has?

21           MS. GROSSMAN:  Object to form.

22      A.   Not off the top of my head.

23      Q.   (BY MS. CARTER)  Okay.  Could you get that

24 information easily?

25      A.   It would simply be -- so that list is constantly
```

Page 116

```
 1                IN THE UNITED STATES DISTRICT COURT
                  FOR THE WESTERN DISTRICT OF TEXAS
 2                          AUSTIN DIVISION

 3   BERNHARDT TIEDE, II; TEXAS      )
     PRISONS COMMUNITY ADVOCATES;    )
 4   BUILD UP, INC., A/K/A JUSTICE   )
     IMPACTED WOMEN'S ALLIANCE;      )
 5   TEXAS CITIZENS UNITED FOR       )
     REHABILITATION OF ERRANTS;      )
 6   and COALITION FOR TEXANS WITH   )
     DISABILITIES,                   )
 7                                   )
                    Plaintiffs,      )
 8                                   )
     VS.                             )   CIVIL ACTION
 9                                   )
                                     )   NO.: 1:23-CV-01004-RP
10   BRYAN COLLIER, in his           )
     official capacity as            )
11   Executive Director of Texas     )
     Department of Criminal          )
12   Justice,                        )
                                     )
13                    Defendant.     )

14

15

16

17                  REPORTER'S CERTIFICATION

18              DEPOSITION OF DR. AMITE DOMINICK

19                    SEPTEMBER 10, 2025

20

21       I, Melissa Hill, Certified Shorthand Reporter in and for

22   the State of Texas, hereby certify to the following:

23       That the witness, DR. AMITE DOMINICK, was duly sworn by

24   the officer and that the transcript of the oral deposition is a

25   true record of the testimony given by the witness;
```

1      That the deposition transcript was submitted on

2  September 29th                    to the witness or to the attorney for the

3  witness for examination, signature and return to me by

4  October 19th                    ;

5      That the amount of time used by each party at the

6  deposition is as follows:

7

8              Ms. Erica Grossman.....00 HOUR(S):12 MINUTE(S)
               Ms. Abigail Carter.....02 HOUR(S):43 MINUTE(S)
9

10     That pursuant to information given to the deposition

11  officer at the time said testimony was taken, the following

12  includes counsel for all parties of record:

13

14             Ms. Erica Grossman, Attorney for Plaintiffs
               Ms. Abigail Carter, Attorney for Defendant
15                 BRYAN COLLIER, in his official capacity as
   Executive Director of Texas Department of Criminal Justice
16

17

18     That $_____ is the deposition officer's charges to

19  the Defendant for preparing the original deposition transcript

20  and any copies of exhibits;

21     I further certify that I am neither counsel for, related

22  to, nor employed by any of the parties or attorneys in the

23  action in which this proceeding was taken, and further that I

24  am not financially or otherwise interested in the outcome of

25  the action.

Page 118

1    Certified to by me this __29th__ day of __September__, 2025.

2

3

4
                              /s/ Melissa Hill
5                         _____
                          Melissa Hill, Texas CSR No. 9487
6                         Expiration Date:  06/30/2027
                          JUDICIAL SERVICES COURT REPORTING
7                         Firm Registration No. 774
                          12790 FM 1560 N, PO BOX 59
8                         Helotes, Texas 78023
                          (210) 681-4885
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

# EXHIBIT 12
# Filed Under Seal

# EXHIBIT 13
# Filed Under Seal

# EXHIBIT 14
# Filed Under Seal

# EXHIBIT 15

UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF TEXAS

AUSTIN DIVISION

BERNHARDT TIEDE, II;             )
TEXAS PRISONS COMMUNITY          )
ADVOCATES; BUILD UP, INC. A/K/A  )
JUSTICE IMPACTED WOMEN'S         )
ALLIANCE; TEXAS CITIZENS UNITED  )
FOR REHABILITATION OF ERRANTS;   )
AND COALITION FOR TEXANS         )
WITH DISABILITIES,               )
                                 )
     PLAINTIFFS,                 )
                                 )
                                 )
                                 )
                                 )
v.                               )    Civil Action NO.
                                 )    1:23-CV-01004-RP
                                 )
                                 )
                                 )
                                 )
BRYAN COLLIER, IN HIS OFFICIAL   )
CAPACITY AS EXECUTIVE            )
DIRECTOR OF TEXAS DEPARTMENT     )
OF CRIMINAL JUSTICE,             )
                                 )
     DEFENDANT.                  )
                                 )

---

ORAL AND VIDEOCONFERENCE DEPOSITION OF

CHASE BEARDEN

SEPTEMBER 23, 2025

---

     ORAL AND VIDEOCONFERENCE DEPOSITION OF CHASE BEARDEN,

produced as a witness at the instance of the Defendant,

and duly sworn, was taken in the above-styled and

Page 19

1   to state defendants?
2       A   Yes.
3       Q   Scroll down a little bit, do you see this
4   first interrogatory?
5       A   Yes.
6       Q   Does it say, please identify by name, current
7   address, current email, and current phone number, each
8   person that you believe or assert his knowledge of facts
9   relevant to the allegations contained in your complaint?
10      A   I see that.
11      Q   And did I read that correctly?
12      A   Yes.
13      Q   I'm going to scroll down a little bit to the
14  response.  Do you see the bullet point listing the
15  response?
16      A   Yes.
17      Q   Are you listed in that bullet pointed list?
18      A   I am.
19      Q   So does this discovery response identify you
20  as a person with relevant knowledge?
21      A   Yes.
22      Q   What relevant knowledge do you have,
23  Mr. Bearden?
24      A   Of this case?
25      Q   Yes.

Page 20

1       A   I do know that one of our past employees was
2   incarcerated and spent time inside prisons, we had talks
3   about that over time.  Also from testimony that TDCJ
4   gave at different hearings over the years, and also by
5   people that contacted Jennifer Toon in our office at the
6   time to discuss different issues.  We also recently have
7   had a mother reach out of their son who's been dealing
8   with heat illness and trying to get relief in the
9   prison.
10      Q   Do you have any personal knowledge of
11  conditions inside TDCJ prison facilities?
12      A   Can you define personal knowledge, like, since
13  I haven't been inside of one?
14      Q   Do you have any knowledge of conditions inside
15  TDCJ prison facilities that derive from being present in
16  TDCJ prison facilities?
17          MR. FROST:  Objection.  Form.
18      A   Since I have not been inside of a facility, I
19  do not.  Except for what I've been told by Jen Toon and
20  others.
21          MR. FROST:  Counsel, I'm going to ask if
22  you'd clarify if this question is towards Mr. Bearden as
23  a 30b6 representative or in his individual capacity?
24          MR. TEBO:  That's fair.  This previous
25  question and all questions about his personal knowledge

Page 21

1   are directed to him in his personal capacity.
2       Q   (BY MR. TEBO) And I'll go ahead and stop
3   sharing that document, Mr. Bearden.  What is the
4   Coalition's mission as an organization?
5       A   Our mission is to ensure that Texans with
6   disabilities can live, learn, play, and participate in
7   the community of their choice and we do that through
8   governmental advocacy, public awareness events, and
9   trying to work with all Texans.
10      Q   You mentioned governmental advocacy.  Does the
11  Coalition interact with the Texas legislature?
12      A   We do.  Along with state agencies.
13      Q   How does the Coalition interact with the Texas
14  legislature?
15      A   We work with staff members and legislators,
16  talking to them about -- educating them on how issues
17  affect our community and bringing to them information or
18  issues we've heard from constituents of theirs and of
19  other areas, to try and make sure that we are
20  representing as many Texans as we can and making sure
21  this state is a state that we can live in.
22      Q   Does the Coalition ever present testimony --
23  public testimony before the Texas legislature?
24      A   We do at different times, yes.
25      Q   Have you yourself ever testified before the

Page 22

1   legislature?
2       A   I have.
3       Q   Have you ever testified about heat in TDCJ
4   prisons before the legislature?
5       A   I have -- I have not.
6       Q   Has anyone else from the Coalition ever
7   testified about heat in TDCJ prisons before the
8   legislature?
9       A   Jen Toon has, but she did it as herself at the
10  time.
11      Q   So no one has testified before the legislature
12  about heat in TDCJ prisons on behalf of the Coalition?
13      A   No.
14      Q   I'm sorry.  Was your response yes?
15      A   No.  She did not write down our name.  She
16  wrote down herself because at the time her grant would
17  not allow her to be able to testify under CTD's name.
18      Q   Just to get a clear question and answer, I'll
19  go ahead and restate my question.  Is it true that no
20  one on behalf of the Coalition has testified before the
21  legislature about heat in TDCJ prisons?
22          MR. FROST:  Objection.  Form?
23      A   As you define it, no.
24      Q   (BY MR. TEBO) Are you saying no in the sense
25  that -- so it is your testimony that no one has

Page 23

1　testified before the Texas legislature about heat in
2　TDCJ prisons on behalf of the Coalition?
3　　　A　Jen testified as herself and we do allow
4　people to testify on issues that affect them and she was
5　up there testifying yes, but no, not as the Coalition.
6　　　Q　Aside from governmental advocacy, what sort of
7　activities does the Coalition conduct to further its
8　mission?
9　　　　　MR. FROST: Objection. Form.
10　　A　We have a Raise Your Voice events where people
11　can talk about issues they've dealt with. We bring up
12　what's going on in the legislature so that they know
13　when they can take action and they can reach out to
14　legislators and to help them be able to speak on their
15　own behalf. We spend time serving on work groups and
16　different councils, trying to improve access across the
17　board.
18　　　Q　(BY MR. TEBO) What is the Raise Your Voice
19　event?
20　　A　Raise Your Voice is basically a roundtable
21　where we can sit down and talk with people, we do it
22　virtually. When it's not a legislative year, we do them
23　about once a month. When it's the session we try and do
24　one each Monday where we can talk about what issues are
25　coming up and allow people to be able to take action if

Page 24

1　they want or so that they know, basically since things
2　move so quickly in the legislature.
3　　　　　This is a -- basically we try and do a
4　snapshot of each week so that they know what's coming up
5　as best we can. Outside of that, it could just be a
6　topic issue area that we've been working on or that's
7　been brought to our attention, like the budget or access
8　to medications. I know we did one on heat in prisons, I
9　think we did two at different times. So, it allows
10　people to have that discussion and talk about what
11　issues they see.
12　　　Q　What is the intended audience of a Raise Your
13　Voice event?
14　　　　　MR. FROST: Objection. Form.
15　　A　It could be any person that signs up to come
16　to that event that day. We publish it out to everyone
17　that we have an email for. We also put it out through
18　social media and other organizations so that they can
19　let their members and constituents know. They could
20　be -- we've had, you know, I think, legislative staffers
21　in the past. We've had family members, we've had people
22　with disabilities at different organizations, anybody's
23　invited to participate.
24　　　Q　(BY MR. TEBO) Does the Coalition conduct
25　activities that are not related to political advocacy?

Page 25

1　　　A　We host a film festival through the arts,
2　doing public awareness, which was actually last weekend.
3　We had 112, I think, films sent from around the world.
4　We distill that down to one night, and it's to show the
5　positive side of disability across the -- the world, and
6　they're mostly shorts.
7　　　　　We also have an open mic night that one
8　of our -- our director of communications hosts for
9　people with disabilities to be able to write and do
10　poetry. Sometimes those are virtual, sometimes those
11　are in person and it gives people a different option and
12　way to be able to tell their story and advocate.
13　　　　　We've also gone to the top of Mount
14　Everest in 2003. We took the largest group of people
15　with disabilities and that was actually during a
16　legislative session which Governor Perry brought up
17　quite a few times at the time, and so did many
18　legislators, but we ended up having the first person
19　with a single arm amputation summit along with one of
20　the largest groups to make it from the start of their
21　track to base camp. And a big part of that was to show
22　that with the right access and the right support, people
23　can do -- do anything.
24　　　Q　Did you climb Mount Everest as part of that
25　trip you're describing?

Page 26

1　　　A　I was actually, right before I was going to
2　start, and I couldn't afford what it was going to cost
3　to go, so my boss at the time at St. David's, asked if
4　St. Davids would do it, and they didn't just say no, but
5　legal got back and said, hell no, someone will die on
6　the trip, and so no, I did not get to go. I wish I
7　would have, but it ended up being an amazing trip, and
8　you can watch it, Team Everest '03, it's on Amazon, I
9　think.
10　　　Q　That's the thing about us lawyers, we're
11　always ruining the fun.
12　　　A　I will tell you.
13　　　Q　Do TDCJ inmates participate in the Coalition's
14　activities?
15　　　A　Well, I don't know if they would be able to
16　log on from there. Most of the time, these are done
17　virtual. I do know that one parent has reached out, and
18　I do that there have been past inmates that have. But I
19　wouldn't be sure what kind of access they'd be allowed
20　to have.
21　　　Q　When the Coalition hosts its activities
22　virtually, does it use Zoom?
23　　　A　We do.
24　　　Q　Does the collision -- let me re-ask that a
25　little bit. Has the Coalition ever held an event that

Page 27

1 is targeted at TDCJ inmates?
2 A When you mean targeted, like, set up so that
3 someone would register as just an inmate?
4 Q I'll ask two questions. Has the Coalition
5 ever conducted an event for which TDCJ inmates were the
6 target audience?
7 MR. FROST: Objection. Form.
8 A Not that they would be directly. I mean, we
9 host an event on heat. If they were allowed to
10 participate, I don't -- that would have been up to them.
11 We don't ask people if they're inmates or not when they
12 participate in our events.
13 Q (BY MR. TEBO) Has the Coalition ever taken
14 special measures to facilitate the participation of TDCJ
15 inmates in one of its events?
16 A I know Jen has gone to visit inmates when --
17 at a -- I think it was a graduation after the first
18 group of people from HB30 graduated. I'm trying to
19 remember when that was. That was early on, like in
20 maybe 2022, somewhere in there. But she attended two
21 different graduations at one of the units.
22 Q Could you clarify what you mean by an HB30
23 graduation?
24 A Oh, sorry. It was the bill HB30 that passed
25 that allowed inmates who went to the adult side of

Page 28

1 prison before they were 18 and that needed any kind of
2 special education up to age 22, that they created a
3 curriculum that allowed them to finish their high
4 school, I guess, leveled diploma. And that was one of
5 the first graduations, I guess, of the group and she was
6 able to attend -- attend one or two of those.
7 Q Did the Coalition sponsor these graduation
8 events?
9 A No. Those were hosted there at the unit.
10 Q Did TDCJ sponsor the graduation events?
11 A I suspect they did, it was their graduation.
12 Q When Jennifer Toon visits a TDCJ facility,
13 does she always represent herself as affiliated with the
14 Coalition?
15 MR. FROST: Objection. Form.
16 A I believe for those two she did and as
17 herself.
18 Q (BY MR. TEBO) I suppose the question I asked
19 you was a little bit different. Whenever Jennifer Toon
20 visits TDCJ -- a TDCJ facility, does she always
21 represent herself as affiliated with the Coalition?
22 MR. FROST: Objection. Form.
23 A I don't know what she does always because she
24 also works with other groups. And she's no longer an
25 employee of ours, so I suspect she doesn't.

Page 29

1 Q (BY MR. TEBO) Does the Coalition communicate
2 with TDCJ inmates?
3 A We have gotten letters in the mail from them.
4 Q Has the Coalition responded to any of the
5 letters it has received from TDCJ inmates?
6 A Jen has, yes. We also responded to a --
7 Q And do you know --
8 A Oh, I'm sorry.
9 Q Oh no. Please, go ahead.
10 A I was also going to say we responded to a
11 parent that reached out this month about her son having
12 heat illness issues.
13 Q Does the Coalition ever take the initiative in
14 communicating with TDCJ inmates?
15 MR. FROST: Objection. Form.
16 A I'm unclear on how you're asking that. Do we
17 send, like, blanket mail to them, or?
18 Q (BY MR. TEBO) Does -- does the Coalition ever
19 initiate communication with TDCJ inmates?
20 A I'm not sure how we would do that. I don't
21 know if Jennifer ever reached out to someone she already
22 knew that was there. That's -- but we don't typically
23 just blanket send out messages to TDCJ inmates, no.
24 Q You mentioned that Jennifer Toon had replied
25 to some correspondence from TDCJ inmates a second ago.

Page 30

1 Right?
2 A Yes.
3 Q Do you know whether she signed her responses
4 with her position at the Coalition?
5 A I do not know.
6 Q Do you know whether her responses identified
7 herself as affiliated with the Coalition?
8 A I do not know, but they were sending the
9 letter to the Coalition of Texans with disabilities, so
10 I suspect they would realize when she responded that she
11 was responding back.
12 Q How does the Coalition define the term
13 disability?
14 A It's a very broad term. It could be, you
15 know, anything that affects your daily life. It could
16 be someone that's dealing with cancer, it could someone
17 who's visually impaired, it could be developmental
18 disability. Disability is a very broad definition for
19 us, we're willing to work with anybody that it's
20 affecting their life to be able to live independently.
21 But yeah, there's a lot of different definitions out
22 there that you can probably choose from, but we look at
23 it in a very broad definition.
24 But we don't just stop there, it's also
25 working with their families or caregivers or the

Page 31

1  community, in addressing it. And a disability can be,
2  like me, where you see the wheelchair coming in and,
3  yeah you know I got a disability, or it could be a
4  hidden disability and I could just be someone dealing
5  with a significant disease state in their system that
6  affects them. You know, people with severe migraines,
7  you could look at it in so many different ways.
8       Q  Given that the Coalition tends to adopt a
9  broad definition of disability, is there -- are there
10  any conditions that -- are there any conditions that
11  come to mind as definitely not counting as a disability?
12           MR. FROST: Objection. Form.
13       A  Could you give me an example?
14       Q  (BY MR. TEBO) Let me ask you a different
15  question. Does the Coalition view a criminal conviction
16  just by itself as a disability?
17       A  No.
18       Q  Does the Coalition view carceral status just
19  by itself as a disability?
20       A  Could you define what that means?
21       Q  Of course. Carceral status, the state of
22  being incarcerated -- the state of a prisoner. So let
23  me -- let me re-ask you with that definition in mind.
24  Does the Coalition view being incarcerated in a prison
25  just by itself as disability?

Page 32

1       A  No.
2       Q  I'm going to share another document with you,
3  if I can pull it up. Do you see a new document on my
4  screen?
5       A  I do.
6       Q  Have you seen this document before?
7       A  I have.
8       Q  Could you tell me what it is?
9       A  It's our Articles of Incorporation for the
10  Coalition of Texans with disabilities.
11       Q  Did you tell me that you reviewed this
12  document in preparation for today's deposition?
13       A  I have.
14       Q  Could you tell me when this document became
15  effective?
16       A  It's stamped January 8, 1979.
17       Q  And are -- are these the Articles of
18  Incorporation that are currently in effect?
19       A  Yes.
20       Q  I have to say it -- it looks like it was
21  created in 1979.
22       A  Yes.
23       Q  I'm going to scroll down a little bit to
24  Article 6. Do you see that on your screen?
25       A  I do.

Page 33

1       Q  I'm going to read Article 6, and you can tell
2  me if I've read it correctly. The members of the
3  corporation shall consist of individuals with
4  disabilities, organizations of individuals of
5  disabilities, and friends and advocates of improved
6  services for individuals with disabilities. Did I read
7  that correctly?
8       A  You did.
9       Q  To the best of your knowledge, does the
10  Coalition limit its membership to individuals with
11  disabilities, organizations of individuals with
12  disabilities, and friends and advocates of improved
13  services for individuals with disabilities?
14           MR. FROST: Objection. Form.
15       A  When you mean limit, can you explain?
16       Q  (BY MR. TEBO) Does the member -- do the
17  members of the corporation, exclusively consist of
18  individuals with disabilities, organizations of
19  individuals with disabilities, and friends and advocates
20  of improved services for individuals with disabilities?
21       A  Are we exclusive to that? I would say, yeah,
22  I mean, our membership does have people with
23  disabilities. It is organizations of individuals and
24  their friends and advocates.
25       Q  That's probably the only question I have about

Page 34

1  the articles. I'm going to show you yet another
2  document. You see another document on my screen?
3       A  I do.
4       Q  Have you seen it before?
5       A  I have.
6       Q  Could you tell me what it is?
7       A  It is our bylaws.
8       Q  Are the bylaws on your screen the current
9  bylaws of the collision?
10       A  Yes.
11       Q  Do you see a date underneath -- do you see a
12  date at the top of the document?
13       A  Not at the top, but below bylaws when it was
14  last amended.
15       Q  Could you read that date for me?
16       A  It was last amended December 15, 2023. Would
17  you like to know what was amended?
18       Q  No. I would just like to know whether that is
19  accurate --
20       A  Yeah.
21       Q  -- is December 15, 2023 the last time that the
22  Coalition's bylaws were amended?
23       A  Yes.
24       Q  How is the Coalition governed?
25       A  We have a 12-member board.

Page 35

1    Q   How often does the board meet?
2    A   It usually tries to meet in-person, around our
3  film festival once a year, and then try and meet
4  quarterly when we can. It doesn't always happen during
5  a legislative year, just due to timing.
6    Q   Are you on the board?
7    A   I'm the executive director. I report to the
8  board.
9    Q   I'm going to scroll down a little bit to
10  Article 4. Is Article 4 captioned Board of Directors?
11    A   Yes.
12    Q   And the board of directors govern the
13  Coalition?
14    A   Yes.
15    Q   Do you see Clause 41A?
16    A   Yes.
17    Q   Does Clause 41A express an importance that the
18  composition of the Board of Directors reflects the
19  population of Texas in certain specified terms?
20    A   Yes.
21    Q   Why is it important --
22    A   Oh okay. Sorry.
23    Q   Well, I'm just sort of curious, why is it
24  important to the Coalition that the composition of its
25  board reflect the population of Texas and the terms

Page 36

1  specified in Clause 41A?
2    A   Well, I think it's good to go back to when CTD
3  was created. Back in the late '70s, it was the
4  disability, it was a large movement around disability.
5  Every state started designing Coalitions like ours, and
6  the idea behind it, the majority of the people that
7  started CTD all had disabilities.
8        And they wanted to have that
9  representation of a mix of people that had different
10  types of disabilities or that represented, you know,
11  family and parents with disabilities to the best of
12  their ability because at the end of the day, you don't
13  want just able-bodied people who have never dealt with
14  disability to be making decisions and policy
15  recommendations on the behalf of those who actually live
16  it every day.
17        And so the idea behind it is, you know,
18  making sure we have people that walk, the walk that deal
19  with this. Our board president does, I would say a
20  majority, if I believe currently a majority of our board
21  either has a significant disability or a family or a
22  child with a disability.
23    Q   Do the bylaws require a majority of the board
24  of directors to have a disability?
25    A   As to be --

Page 37

1        MR. TEBO: Form.
2    A   -- at least half of the board, and it's not
3  just a personal disability, it can also be a parent of a
4  child with a disability, so.
5    Q   (BY MR. TEBO) So for the purposes of complying
6  with that requirement, how does the Coalition define
7  disability?
8    A   The same way we did earlier in a very broad
9  term. If it affects your daily life, you know, it could
10  be in any of those instances.
11    Q   So and considering eligibility to the board of
12  directors, would the Coalition require -- will the
13  Coalition treat -- I'll strike that question. For the
14  purposes of considering eligibility to the board of
15  directors, would the Coalition exclusively treat
16  medically diagnosed conditions as disabilities?
17        MR. FROST: Objection. Form.
18    A   Trying to figure out what you're asking here.
19  Are you asking like if someone who has a medical
20  diagnosis of AIDS, would that qualify them? Yes. I
21  mean, it would, we don't do a litmus test where we
22  actually ask them directly what their disability is,
23  usually it's very evident because most people who want
24  to advocate on disability issues is very open about it.
25        But I think a medical diagnoses that

Page 38

1  affects your health is cancer, considered a disability
2  and are you living with that? Yes, that would affect
3  people dramatically. And I think that would be maybe
4  considered more of a hidden disability than you would a
5  physical disability like myself or the governor.
6    Q   (BY MR. TEBO) How are members of the board
7  selected?
8    A   The board actually looks at people that are
9  out in the community that are already participating with
10  some of the work we do, and looks at regional areas.
11  People can, you know, suggest it, we've also had people
12  who've wanted to serve on the board that reached out,
13  and then the board goes through a process of seeing
14  who's eligible when they're having elections, and they
15  go through a process. But, you know, a lot of times
16  people will reach out to us, and these are usually
17  people who are already very involved in advocacy and
18  outreach. In some way shape or form and have been
19  working with us over the years.
20    Q   As part of that process, are board members
21  elected to be to the board?
22    A   Yes.
23    Q   And do the bylaws specify that board members
24  are elected by a vote of members with at least one year
25  good standing?

## Page 43

1  amount for individuals or anything. We'd much rather
2  them participate if they can. When you look at the
3  disability community, it's one of the poorest
4  demographics, so we've done everything we can to move
5  towards just finding ways to allow them to be able to
6  participate and, not have to deal with the cost of
7  living.
8      Q   How much revenue did the Coalition collect
9  last year?
10     A   I think we were close to a little over a
11 million. When you add in, we have a consumer-directed
12 services department, which is kind of a -- the state
13 allows for people in Medicaid that get attendant care to
14 choose a CDS option and we handle the taxes and paying
15 upfront and get reimbursed, but it allows them to be
16 able to hire and fire their attendant through Medicaid
17 instead of going through an agency, which just sends any
18 kind of attendant to your house. It gives people more
19 control, it's an option, we do that. Between that, the
20 fundraising we do, and everything else, we probably came
21 in around a little over a million.
22     Q   So the Coalition gets reimbursed for
23 facilitating attendant care for Medicaid patients?
24     A   We don't do the attendant care. We just
25 reimburse the attendant they've hired, well, we pay up

## Page 44

1  front, and then we are reimbursed through the HMOs that
2  are in the state Medicaid plan that are part of the STAR
3  Plus and STAR Kids program. So, like, United Health
4  Care would reimburse us after we've made a claim.
5      Q   Does the Coalition consider itself to be a
6  membership organization?
7      A   We do have members, and I think for us, we
8  look at members, well, actually, can you define what
9  you, I mean, what you see as a member, just so we're on
10 the same page?
11     Q   Well, I think I'd prefer to hear you define
12 what you mean by member.
13     A   Okay.
14         MR. FROST: Objection. Form.
15     Q   (BY MR. TEBO) So let me -- let me re-ask the
16 question and, I mean, just answer it as best you can.
17 Does the Coalition consider itself to be a membership
18 organization?
19         MR. FROST: Objection. Form.
20     A   I think we see all people with disabilities as
21 our members in our constituents, but we do have some
22 that are probably more -- more active and that are
23 willing to give us all of their information and want to
24 get a newsletter all the time, and we have others who
25 just participate when they decide to. I think we look

## Page 45

1  at membership as having a disability.
2      Q   (BY MR. TEBO) I'm going to -- do you still see
3  the bylaws on my screen, Mr. Bearden?
4      A   Yep, I do.
5      Q   I'm going to scroll up a little bit to
6  Article 3. Is Article 3 captioned membership?
7      A   Yes.
8      Q   Are you familiar with Article 3 of the bylaws?
9      A   Yes.
10     Q   Does Article 3 distinguish between two types
11 of membership?
12     A   It does.
13     Q   And one is membership, simpliciter, and the
14 other is honorary membership; is that right?
15     A   Yes.
16     Q   Is the first category of membership, just
17 membership plain and simple, limited to the Board of
18 Directors?
19     A   I believe so. As it's written.
20     Q   What is the difference between membership
21 versus honorary membership?
22     A   Honestly, we haven't gone by using those terms
23 and so long. I'm not sure we just -- we have continued
24 to work on a policy or a belief that our membership is
25 all Texans with disabilities and those participating.

## Page 46

1  But if you wanted to go by that, I could read it as it
2  is. They created classes of membership, such as
3  disability member organizations, affiliate members, and
4  individual members. It may create any other class of
5  member that it sees fit, but such members shall not have
6  any voting rights or control over the officers or
7  directors. So.
8      Q   Are the only members who are able to vote for
9  leadership positions like officers and directors, the
10 board of -- the members on the board of directors?
11     A   Yes.
12     Q   Has the board created other classes of
13 honorary members besides the three you listed?
14     A   I think the board has continued to operate as
15 members being, you know, any person with a disability or
16 their family member.
17     Q   Not quite the question I asked you. Do you
18 know whether the board has created a fourth class of
19 honorary member?
20         MR. FROST: Objection. Form.
21     A   They have not put it in their bylaws.
22     Q   (BY MR. TEBO) Could you explain, give me a
23 little bit of explanation about these three classes of
24 honorary member? The first type, Disability Member
25 Organization, does the Coalition have any disability

Page 55

1    Q   Do you know how recently the Coalition has had
2    a membership form?
3    A   I do not.
4    Q   Does the Coalition have a written membership
5    policy aside from Article III of its bylaws?
6    A   A written?  No.
7    Q   And I believe I asked you earlier how an
8    individual becomes an honorary, becomes a member of the
9    Coalition.  And you gave me some examples.  Did you say
10   that an individual might become a member by registering
11   for the Coalition's newsletter or attending events?
12   A   Yes.  Or reaching out and contacting us.
13   Q   Do individuals often reach out and ask to
14   become members?
15           MR. FROST: Objection. Form.
16   A   No. I mean, I guess if you're asking if they
17   reach out, call us or send a letter saying, can I become
18   a member? Here's my information, no. Usually when they
19   reach out to us, it's because they have a specific
20   problem and they're needing our help.
21   Q   (BY MR. TEBO) Does the Coalition consider
22   everyone who attends one of its events to be a member?
23           MR. FROST: Objection. Form.
24   A   Yes.
25   Q   (BY MR. TEBO) Earlier you told me a little bit

Page 56

1    about a type of event the Coalition holds called Raise
2    Your Voice.  Did I get that right?
3    A   Yes.
4    Q   Does the Coalition consider everyone who has
5    attended a Raise Your Voice event to be one of its
6    members?
7           MR. FROST: Objection. Form.
8    A   Yes.
9    Q   (BY MR. TEBO) How does the Coalition
10   communicate with its members?
11   A   We use newsletters, we use social media, we
12   talk at events, reach out to other non-profits.
13   Q   How often does the Coalition send a
14   newsletter?
15   A   I think we try and do one every month to six
16   weeks.
17   Q   Going to -- I want to share two documents with
18   the chat.  But I'm going to quickly return to my second
19   deposition exhibit.  Do you see the Coalition's
20   discovery responses on my screen?
21   A   Yes.
22   Q   Scroll down a little bit.  Do you see
23   Request No. 4 on my screen?
24   A   Yes.
25   Q   I'm going to read the request and you can tell

Page 57

1    me if I've read it correctly.  "Please produce the
2    membership roles for each and every organizational
3    plaintiff for the fiscal years 2023 to 2024, and 2024 to
4    2025."  Did I read that correctly?
5    A   Yes.
6    Q   And do you see the response further down?  I'm
7    going to read the response and you can tell me if I've
8    read it correctly.  "The current membership roles
9    disclosed herewith at CTD '19 to '20."  Did I read that
10   correctly?
11   A   Okay. Yes.
12   Q   I'm going to pull up another document.  Do you
13   see an excel spreadsheet on my screen?
14   A   I do.
15           MR. FROST: I'm going to object that. I
16   believe it's been marked as attorney's eyes only.
17   Q   (BY MR. TEBO) Well, Counsel, I'm not going to
18   ask questions about any of the personal identification
19   information on this document. But if you feel a need to
20   mark this part of the deposition as confidential, you
21   can interrupt my questioning and say so.  Does that
22   sound good to you?
23           MR. FROSS: I would ask that you
24   establish that the witness didn't see this information
25   under the protective order.

Page 58

1           MR. TEBO: Under what productive order?
2    Sorry.
3           MR. FROSS: The protective order in this
4    case that says, provides, you know, who can and can't
5    view information marked as attorney's eyes only. I
6    could point you to, it's part three, sub part eight, if
7    you want to look at it.
8           MR. TEBO: And what are you requesting
9    exactly?
10          MR. FROSS: I'm requesting that you do
11   not show information, mark his attorney's eyes only, to
12   people who may or may not be able to view it under the
13   protective order.
14          MR. TEBO: Are you saying that the
15   witness is not able to view?
16          MR. FROSS: I'm saying you haven't
17   established whether or not the witness is able to view.
18          MR. TEBO: I mean, he's a party witness.
19   This is produced by the party that he is both an
20   employee and a witness for.  So I believe he is able to
21   view it.
22          MR. FROST: All right. Then I'll just
23   ask that the record, this part be more confidential.
24          MR. TEBO: All right. I don't join you
25   in making that request because I'm not going to ask any

Page 67

1    A   Not that familiar, no.
2    Q   Are you familiar with the Texas prisons
3  community advocates?
4    A   Just from what I read in the order.
5    Q   Do you know Mr. Tiede?
6    A   I do not personally.
7    Q   Does the Coalition cooperate with Lioness
8  Justice Impacted Women's Alliance?
9    A   Say that again, I'm sorry.
10   Q   You said that you were familiar with Lioness.
11  Right?
12   A   Yes.
13   Q   And Lioness is short for Lioness Justice
14  Impacted Women's Alliance.  Right?
15   A   Yes.
16   Q   Does the Coalition cooperate with that entity?
17       MR. FROST:  Objection.  Form.
18   A   We have worked with Jen over there, yes.
19   Q   (BY MR. TEBO) And because Lioness Justice
20  Impacted Women's Alliances is kind of a mouthful, I'll
21  just refer to it as Lioness.  Would you understand that?
22   A   Yes.
23   Q   Does the Coalition give financial resources to
24  Lioness?
25   A   No.

Page 68

1    Q   How does the Coalition cooperate with Lioness?
2       MR. FROST:  Objection.  Form.
3    A   I know she's hosted an event -- hosted a Raise
4  your Voice for us where she came on and spoke about heat
5  issues in prisons.  And we can reach out to her when we
6  have questions about anything criminal justice wise.  I
7  would have liked to have kept her at CTD, but
8  unfortunately we couldn't and she moved on, so we still
9  have access by calling and having an open communication
10  line when we need.
11   Q   (BY MR. TEBO) Is it fair to say that you know
12  Jennifer Toon personally?
13   A   Yes.
14   Q   You've met her?
15   A   Yes.
16   Q   How did -- did she use to be affiliated with
17  the Coalition?
18   A   She became one of our policy fellows.
19   Q   What did she do as a policy fellow?
20   A   She worked on mental health and criminal
21  justice issues along with other kind of CTD things that
22  we work on, Raise your Voice events, participating in
23  the community.
24   Q   As a -- is policy fellow a compensated
25  position?

Page 69

1    A   Yes.
2    Q   And was she compensated while she was a policy
3  fellow?
4    A   Yes.
5    Q   Do you know which years she was a policy
6  fellow?
7    A   She started, I believe, in 2020 sometime,
8  2021, early.  And then left in, sometime in '24, I
9  think.
10   Q   At a single time, how many policy fellows does
11  the Coalition employ?
12   A   I would like a lot more, but usually about two
13  is the max we have grant funding for, or that we can
14  afford to cover on our own.
15   Q   Who provides grant funding for Coalition
16  policy fellows?
17   A   We've received funding from St. David's
18  Foundation over the years, TCDD, the Hogg Foundation.  I
19  think -- where else?  I think that's been about it and
20  then any fundraising we can do to cover times when we
21  can't get anything.
22   Q   I want to circle back a little bit to the
23  response you gave about how the Coalition advocates for
24  issues.  Did you testify that the Coalition sometimes
25  presents to governmental bodies?

Page 70

1    A   Yes.
2    Q   Has the Coalition contacted TDCJ?
3    A   Directly?
4    Q   Yes.
5    A   On this issue?
6    Q   On any issue.
7    A   I don't know if Jen did or not.
8    Q   Have you?
9    A   I have not.  I have emailed with a TDCJ
10  employee that I know as a friend.
11   Q   Did you email him about heat in prisons?
12   A   I did not email her on this.
13   Q   Has the Coalition emailed TDCJ regarding air
14  conditioning in prisons?
15   A   Not that I know of.
16   Q   Has the Coalition initiated any contact with
17  TDCJ regarding air conditioning in prisons?
18   A   Not that I know of.
19   Q   If the Coalition had contacted TDCJ about air
20  conditioning in prisons during the time you have been
21  executive director, would you know about that?
22   A   I would think so.
23   Q   How did the Coalition decide to join Tiede v.
24  Collier?
25   A   It was an issue that Jen had talked about

Page 71

1  before in the past and we were contacted by a friend of
2  ours at Disability Rights Texas, to see if we had
3  interest in helping -- look at that and if it affected,
4  you know, any of our people. I know they knew that Jen
5  has been working on different issues and had lived
6  experience, so then I reached out to Jen and asked her
7  if this was something that we should be involved with,
8  and she said yes, so we ended up meeting with the board
9  and having the lawyers meet with the board to have that
10  discussion.
11      Q   When was the Coalition contacted by Disability
12  Rights Texas about interest in joining Tiede v. Collier?
13      A   I'd have to go back and look and get you that
14  information.
15      Q   Do you know approximately when?
16      A   Definitely, before we joined. I can't
17  remember if it was a month or I'm not sure.
18      Q   I think this might be another good place to
19  take a break. Does that sound all right to you,
20  Mr. Bearden?
21          THE WITNESS: Yes, sounds great.
22          MR. FROST: And we just got lunch. So if
23  this could be maybe 30 minutes or a little longer,
24  that'd be great.
25          MR. TEBO: We can do that. Do you want

Page 72

1  to go off the record?
2          MR. FROST: Yeah, let's go off the
3  record.
4          THE VIDEOGRAPHER: Off the record,
5  12:08 p.m.
6          (Break Taken)
7          THE VIDEOGRAPHER: We are back on the
8  record at 12:44 p.m.
9      Q   (BY MR. TEBO) Mr. Bearden, do you remember me
10  asking a little bit about how the Coalition became
11  involved with Tiede v. Collier?
12      A   Yes.
13      Q   Did you testify that the Coalition was
14  contacted by Texas Disabilities Rights?
15      A   By Disability Rights Texas? The name --
16  mentioned it, yes.
17      Q   Who specifically from Disability Rights Texas
18  contacted you?
19      A   I'll have to go back and get that name for
20  you.
21      Q   You don't recall off the top of your head?
22      A   Not recalling off the top of my head.
23      Q   Do you know why Disability Rights Texas did
24  not become involved with Tiede v. Collier itself?
25      A   I do not.

Page 73

1      Q   Why did Disability Rights Texas think that the
2  Coalition would be interested in becoming involved with
3  Tiede v. Collier?
4          MR. FROST: Objection. Form.
5      A   I can't speak to why, but I suspect it's
6  because Jen was working on criminal justice issues.
7      Q   (BY MR. TEBO) Has the Coalition become
8  involved in litigation related to prison conditions
9  before?
10      A   No. Not that I'm aware of, I'm sorry. None
11  that I am aware of.
12      Q   And you testified previously, did you not,
13  that prior to joining this lawsuit, the Coalition did
14  not reach out to TDCJ concerning heat in Texas prisons;
15  is that right?
16      A   That I know of, yes.
17      Q   So prior to joining this lawsuit, the
18  Coalition did not contact TDCJ about TDCJ's heat
19  mitigation policies or procedures?
20      A   Not that I know of.
21      Q   Prior to joining this lawsuit, did the
22  Coalition contact TDCJ about any conditions in Texas
23  prisons?
24      A   Not that I know of.
25      Q   So is it fair to say that the Coalition made

Page 74

1  no attempt to resolve the claims that it is asserting in
2  this lawsuit with TDCJ prior to forming -- prior to
3  joining the litigation?
4          MR. FROST: Objection. Form.
5      A   I know we participated in hearings and went to
6  different legislative hearings on it.
7      Q   (BY MR. TEBO) Are you saying that the
8  Coalition attended legislative hearings concerning heat
9  in Texas prisons?
10      A   Yes.
11      Q   But the Coalition -- did the Coalition present
12  at those hearings?
13      A   Jen spoke, but she did on her behalf.
14      Q   Was -- did those hearings provide an
15  opportunity for the Coalition to engage with TDCJ
16  officials?
17          MR. FROST: Objection. Form.
18      A   There's always a possibility that she spoke to
19  someone in the crowd. I know I've spoken to legislators
20  and staffers on different issues while standing around
21  in the hallways but I do not know if she did directly.
22      Q   (BY MR. TEBO) Do you know the date of the
23  hearings that you're referring Ms. Toon having attended?
24      A   I do not.
25      Q   And it's your testimony that Ms. Toon did not

Page 79

1    A    If the person has given us their information,
2    yes.
3    Q    Well, is it fair to say that you need an
4    address in order to send a newsletter?
5    A    No. Because it could go through email.
6    Q    In that case, would you need an email address?
7    A    Yes. But they could also download it online,
8    I believe.
9    Q    Has the Coalition ever sent an email address
10   that is identifiably associated with the TDCJ facility?
11   A    Not that I know of.
12   Q    And do you recall the lists of members that I
13   showed you previously?
14   A    Yes.
15   Q    Do you recall that, that list contained email
16   addresses for all or most of the members?
17         MR. FROST: Objection. Form.
18   A    I believe it does.
19   Q    (BY MR. TEBO) I can go ahead and pull it back
20   up just to --
21   A    Yeah.
22   Q    -- refresh your memory. Give me a second.
23         MR. FROST: I'm going to object that
24   you're misstating the witnesses prior to testimony. He
25   testified that that was a list of the addresses and

Page 80

1    emails which were available, not all or most of the
2    members.
3    Q    (BY MR. TEBO) Mr. Bearden, do you see the list
4    of members on my screen?
5    A    I do.
6    Q    And I'm not going to speak aloud any of the
7    email addresses, or names that are on the list or
8    anything like that. But do you see that the list
9    contains email addresses for each individual member?
10   A    I do.
11   Q    Is every email address to which the Coalition
12   sends its newsletter on this list?
13   A    I believe so.
14   Q    Does the Coalition ever send its newsletter by
15   postal service?
16   A    I don't think we have in a long, long time.
17   Q    It's only an electronic newsletter?
18   A    Pretty much, now it just goes out through
19   email.
20         MR. TEBO: That's much more convenient if
21   I say so myself, I hate getting a bunch of physical
22   mail. All right. Mr. Bearden, that -- is it from me on
23   my direct questioning. Before I hand you over to your
24   counsel, let me just thank you for your time. I know --
25   I think we joked at one point in this that lawyers are

Page 81

1    no fun and this may not have been the most thrilling
2    three hours of your life, but I do appreciate you for
3    taking the time to answer my questions. Thanks very
4    much.
5          THE WITNESS: Thank you. I appreciate
6    the work you all do.
7          MR. TEBO: Absolutely. I pass the
8    witness.
9          THE WITNESS: Thank you.
10         EXAMINATION
11   Q    (BY MR. FROST) Mr. Bearden, you just testified
12   that the Coalition will be okay with air conditioning
13   units to the federal standards. Do you remember that?
14   A    Yes.
15   Q    If you were to learn that the federal
16   government did not mandate a temperature for federal
17   prisons, would that change your testimony?
18   A    Yes.
19   Q    How would it change your testament?
20   A    That we want to see that AC is put in prisons.
21   Q    We spent a lot of time today talking about
22   membership, who does the Coalition represent?
23   A    We represent all Texans with disabilities.
24   Q    Would this include Texans who were disabled in
25   prison?

Page 82

1    A    Yes.
2    Q    Do you know whether there are Texans with
3    disabilities in TDCJ facilities?
4    A    Yes.
5    Q    Do you how many?
6    A    I Believe the DOJ put for about 40 percent of
7    Texans.
8    Q    Does the Coalition represent individuals like
9    Ms. Jennifer Toon?
10   A    Yes.
11   Q    Is she disabled?
12   A    Yes, she has a disability.
13   Q    Was she in prison?
14   A    Yes.
15   Q    Was she imprisoned in a TDCJ facility?
16   A    Yes.
17   Q    Does the Coalition ever get communications
18   from prisoners?
19   A    Yes.
20   Q    Are these prisoners in TDCJ facilities?
21   A    Yes.
22   Q    Does the Coalition ever receive communications
23   complaining about heat in prison?
24   A    Yes.
25   Q    Does the Coalition ever receive

Page 83

1  communications, complaining about heat in TDCJ
2  facilities?
3      A   Yes.
4      Q   I want to ask you a little bit about the
5  bylaws. Do you remember talking about those earlier?
6      A   Yes.
7      Q   How often do you consult these bylaws?
8      A   About once a year.
9      Q   Why do you consult the bylaws?
10     A   To make sure we do the elections portion
11 correct.
12     Q   Is there anything else you consult the bylaws
13 for?
14     A   No.
15     Q   Do you ever consult the Bylaws to determine
16 membership?
17     A   I don't, no.
18     Q   Do you remember the part of the bylaws that
19 talks about the board of directors setting a minimum
20 financial contribution?
21     A   Yes.
22     Q   Do you know what that minimum financial
23 contribution is today?
24     A   I know it's been zero for quite some time, I
25 just don't remember when.

Page 84

1      Q   Do you know of any reason why your members
2  would need to participate in this litigation personally?
3      A   No.
4          MR. FROST: No Further questions.
5          FURTHER EXAMINATION
6      Q   (BY MR. TEBO) Mr. Bearden, I just have like
7  one or two more questions. And for you and then, I
8  think we can probably call it a day. Same way your
9  counsel asked you whether the Coalition represents
10 disabled Texans in TDCJ prisons, and you answered yes;
11 is that right?
12     A   Yes.
13     Q   Does that answer include inmates who have
14 never heard of the Coalition?
15     A   Yes.
16     Q   Does that answer include inmates who have
17 never attended an event put on by the Coalition?
18     A   Yes.
19          MR. TEBO: No further questions from me.
20 Thank you.
21          THE WITNESS: Thank you.
22          MR. FROST: I'm good too. Can go off the
23 record.
24          THE VIDEOGRAPHER: We are off the record
25 at 1:02 p.m.

Page 85

1              (Proceedings concluded at
2          1:02 p.m.)
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

# EXHIBIT 16

# COALITION OF TEXANS WITH DISABILITIES

1716 San Antonio Street - Austin, Texas 78701
512/478-3366 V/TTY

# BY-LAWS

Last Amendment: December 15, 2023

## Article I Name

1.1 Name

The name of this Texas not-for-profit Corporation is the Coalition of Texans with Disabilities, herein referred to as the Coalition.

## Article II Mission Statement

2.1 Mission Statement

The Coalition of Texans with Disabilities is a statewide coalition of individuals and organizations who represent cross-disability issues and concerns of people with disabilities and who are working together to eliminate <u>all</u> barriers to equal and full participation in life. The mission of CTD is to ensure that people with disabilities may live, learn, work, play and participate fully in their community of choice.

## Article III Membership

3.1 Membership

Membership consists of the Board of Directors.

3.2 Honorary Memberships

The Board has created classes of "Membership" such as Disability Member Organizations, Affiliate Members, and Individual Members, and may create any other class of member that it sees fit, but such "members" shall not have any voting rights or control over the officers or directors.

3.2.A. A Disability Member Organization may be either a national, regional, state, or local or student organization or enterprise which:

    1.    Has activities and/or services and membership, if any, or governing body consisting primarily of persons in one or more of the following groups:

        a.    People with physical, intellectual, developmental, sensory and/or psychiatric disabilities

        b.    Relatives, advocates, or spokespersons of people with these disabilities

1

CTD 000005

CONFIDENTIAL                                                                                     CTD_000076

      c.     Governing body or ownership must consist of 51% persons with disabilities

3.2.B. Affiliate Member Organization may be either a national, regional, state, local or student organization which wishes to support the work of the Coalition and does not meet the qualifications for a Disability Member Organization.

3.2.C. An Individual Member may be any person who is interested in supporting the work of the Coalition.

3.2.D. Minimum annual contribution levels for each of the above stated categories of membership shall be established by the Board of Directors.

3.2.E. Honorary Memberships shall be effective upon receipt of the annual contribution payment of dues and effective through the same date the following year.

3.2.F. Honorary Membership status shall cease when:

1.     An Honorary member no longer meets the requirements for membership as set forth in this article

2.     An Honorary member acts contrary to the purpose of the Coalition

3.     An Honorary member resigns from the Coalition upon written notice and returns all property belonging to the Coalition.

4.     A member ceases to meet the minimum financial contribution set forth by the Board of Directors.

## Article IV Board of Directors

4.1. Composition

4.1.A.    The Coalition of Texans with Disabilities will make a good faith effort to have the composition of the Board reflect the population of Texas in terms of types of disabilities, geographic representation, ethnic heritage and income levels.

4.1.B.    The Board of Directors shall consist of the officers of the Coalition, the President who shall be chairperson, the Vice-President, the Treasurer, the Secretary and eight elected Directors At Large.  The eight Directors At Large shall represent separate geographic regions of Texas, which shall be divided into eight regions.  The officers shall be elected from the Directors At Large with each officer continuing to represent the geograghic region during the term as officer.  The officers and directors shall be elected by a vote of members of one (1) year standing; missing 3 consecutive Board Meetings in the immediate year prior to an election will disqualify any Board Member from participating in said election. A majority of the Board of Directors shall be comprised of persons with disabilities and/or parents of persons with disabilities.

4.2.   Term

CTD 000006

The term for elected Officers and Directors of the Board shall be for two (2) years. The President of the Board shall be limited to two terms, each term being two years. Upon serving two terms, that member must wait one term of office before being eligible to serve as President again.

## 4.3 Elections

Elections for Board President and Secretary will be held during the Board Meeting in the 3rd quarter of even numbered years and the election of the Vice President and the Treasurer shall be held during the Board Meeting in the 3rd quarter of odd numbered years. Representatives of Regions 1, 3, 5, and 7 shall be elected during the Board Meeting in the 3rd quarter of even number years and representatives of Regions 2, 4, 6, and 8 shall be elected during the Board Meeting in the 3rd quarter of odd numbered years.

## 4.4 Power

The Board of Directors shall be responsible for employing an executive director, evaluating the performance of the executive director, and setting a job description and compensation for the executive director.

    a. It is the Coalition's policy to maintain separation between the policymaking and fiscal responsibilities of the Board and the management responsibilities of the executive director and the staff of the Coalition.

    b. The executive director is responsible for carrying out the business of the Coalition. The responsibilities of the executive director are:

      1. employing, directing, evaluating the performance of, and setting compensation for the staff

      2. directing the administrative functions and all other management responsibilities

      3. contracting for services and materials necessary to fulfill the mission of the Coalition

      4. providing administrative support and information to the Board as required for the Board to fulfill its policymaking and budget responsibilities

      5. purchasing Officers and Directors Liability Insurance

      6. such other responsibilities that are necessary to fulfill duties delegated by the Board, and in keeping with not-for-profit corporation rules necessary to maintain our status with the IRS as a 501-c-3 tax exempt corporation.

## 4.5 Chairperson

The chairperson of the Board shall set Board meeting agendas and preside over all Board meetings. He/she shall report on actions of the Board in the Coalition Annual Report.

CTD 000007

4.6 Meetings

The Board of Directors shall make a good faith effort to schedule regular, quarterly meetings, with meeting places to be determined.  Board members shall attend every meeting.

4.5.A Board Member Attendance

If a Board member is absent from consecutive meetings, the Chairperson may call a special vote of the Board to determine if that Board member shall lose their seat on the Board and be replaced by a new Board member.

4.5.B Scheduling of Meetings

Meetings of the Board of Directors shall be called by the President.  Notice of the Board meetings must be given at least fourteen (14) days prior to the holdings of that meeting. Emergency meetings of the Board may be called by the President or upon request of any three members of the Board.

4.5 Quorum

A quorum of the Board shall consist of one-half (1/2) of the Board. Board elections for members or officers require votes from 2/3s of all eligible Board Members.  These Board Members need not be present at the Board Meeting and may vote by email or giving their proxy to another Board Member by email or written correspondence.

## **Article V Officers**

5.1 Designation

The officers of the Coalition shall be President, Vice-President, Treasurer, and Secretary, who shall be elected from a slate presented by the Nominating Committee.  A majority of the Officers shall be individual members of the Coalition.  The President and Vice-President shall be persons with disabilities or parents of persons with disabilities.  The President shall serve for only one consecutive term except under such circumstances as outlined in Section B below.  All terms of office shall commence upon election or designation and acceptance and shall continue until their successors are elected.

5.2 Vacancy

A vacancy in any office or Board position shall be filled by the Board for the unexpired term of the office, except the office of President shall be filled by the Vice-President.

5.3 Removal

Any officer or Board member may be removed for cause by a vote of two-thirds (2/3) of the Board whenever, in its sole judgment, the best interest of the Coalition will be served.

5.4 President

The President shall be the principal officer of the Coalition, the Chairperson of the Board of Directors, voting only in case of a tie, and official spokesperson of the Board.

CTD 000008

5.5 Vice-President

The Vice-President shall have such duties as the Board of Directors shall see fit to assign, and shall serve as President in the absence of the President.

5.6 Treasurer

The Treasurer shall be the Board's fiscal officer and may execute documents as the Board's financial representative.

5.7 Secretary

The Secretary shall attend and keep accurate records of all meetings of the Board of Directors.

## **Article VI Committees**

6.1. Ad Hoc Committees

The President shall appoint Board members to Ad Hoc committees as needed to conduct the business of the Coalition. Ad Hoc or Working Committees may include but are not limited to Nominations, Bylaws, Fiscal/Budget, or Development.

6.2. Executive Committee

There shall be an Executive Committee to be composed of the President, Vice President, Treasurer and Secretary. The Executive Committee shall have the authority to make the decisions for the Board during the interval between Board meetings only when the issue cannot wait until the next Board meeting and is within the Coalition's existing goals and objectives. All actions taken by the Executive Committee will be ratified in a subsequent meeting of the Board of Directors.

6.3 Fiscal/Budget Committee

A Fiscal/Budget Committee shall be formed as a Standing Committee of the Board, to oversee budget and fiscal activities for which it is responsible. The Treasurer of the Board shall assume the role of Committee Chair.

6.4 Nominating Committee
The Board of Directors shall establish a nominating committee. Committee members may volunteer or be appointed by the Board President; the Chair of the committee may be appointed by the Board President or by members of the committee. The nominating committee must be comprised of at least 3 members of the Board of Directors.

6.4.A Nominating Committee Terms

Members will serve one year terms and may serve up to 3 consecutive terms.

6.4.B Nomination Procedure

CTD 000009

1.The board member application is developed by the nominating committee and provided to each board member candidate for submission and review by the nominating committee.  The nominating committee may request an interview with candidates as part of the nomination process.  The nominating committee must approve all prospective candidates with a unanimous vote prior to submitting its recommendations to the full Board of Directors.

2. Upon presentation of each candidate to the full board for approval, a 2/3 majority of the board membership must vote affirmatively for the candidate to become a board member.  Board members may submit their vote electronically.
At any time in the nomination and approval process, the Board may conduct interviews, may reject any or all applicants, and will uphold the mission of the organization.

## Article VII Dissolution of the Coalition

7.1 Dissolution

Upon dissolution of the Corporation, any assets remaining will be distributed to (a) non-profit organization(s) having a mission similar to the Coalition's historic mission.

## Article VIII Finance

8.1 Ownership

All assets and funds of the Coalition shall be owned exclusively by the Coalition.

8.2 Primary Support

The Coalition will seek financial support from both public and private sources.

8.3. Additional Support

The Board of Directors, acting for the Coalition, may accept gifts and/or grants to the Coalition.

8.4 Inurement

This Corporation is not organized for profit, and no part of the net earnings of this corporation shall inure to the benefit of any member of the Board of Directors or any other individual except that this corporation may make payments of reasonable compensation for services rendered.

## Article IX Fiscal Year

9.1 Fiscal Year

CTD 000010

The fiscal year for the Coalition shall be from January 1st through December 31st of <u>the same</u> each year.

## Article X Amendment Procedures

10.1 Amendments

These bylaws may be amended by a proposed amendment that must be presented at a Board meeting with adoption at the following Board meeting by a two-thirds (2/3) vote of the quorum.

CTD 000011

# EXHIBIT 17

**REDACTED**

October 21, 2024

**Texas Board of Pardons and Paroles** ATTN: Board Rules
P.O. Box 13401, Austin, Texas 78711-3401
bpp_pio@tdcj.texas.gov

**Texas Department of Criminal Justice (TDCJ) – Correctional Institutions Division**
**Office of the Ombudsman,** ATTN: Bobby Lumpkin
PO Box 99, Huntsville, Texas 77342-0099
io@tdcj.texas.gov

**VIA EMAIL**

RE: Denial letter from the Texas Board of Pardons and Paroles, dated July 10, 2024, regarding inmate REDACTED TDCJ-CID # REDACTED .

To whom it may concern:

1.     This letter formally challenges the Texas Board of Pardons and Paroles' (BPP or "Board") decision to administratively close inmate REDACTED 's Emergency Medical Reprieve (EMR) request. The Board's decision is based on an outdated and legally obsolete version of Texas Administrative Code (TAC) § 143.34, making the closure of the EMR request legally indefensible. Furthermore, the Board's use of incorrect and misleading language, not present in the current version of Rule § 143.34 represents a clear misapplication of the law and a violation of inmate REDACTED 's constitutional rights.

2.     On July 10, 2024, in response to inmate REDACTED 's EMR request, the Board administratively closed the request, citing an "inability to meet all Board requirements." The Board relied on photocopies of outdated versions of BPP Rules § 143.31 and § 143.34, which align with TAC §§ 143.31 and 143.34 and were rendered obsolete following their amendment on May 9, 2018.

3.     The primary Board requirement referenced was the outdated and misrepresented version of Rule § 143.34(a), which stated, "[t]he offender is not terminal or totally disabled and is receiving adequate medical care within the Texas Department of Corrections medical facilities." However, this version of the rule is no longer valid, as it was amended in 2018, removing any requirement for the inmate to receive adequate medical care within TDCJ facilities.

4.     A review of the Texas Board of Pardons and Paroles Rules, as revised on May 17, 2024, confirms that the current version of Rule § 143.34 aligns with the amended TAC § 143.34 from May 9, 2018. The updated rule no longer includes subsections (a) and (b), nor does it require that an inmate be receiving adequate medical care within TDCJ medical facilities.

5.     The revised rule now reads: "The Board will consider a written application for an indefinite medical emergency reprieve in instances such as terminal illness or total disability. Prior to consideration of the application for emergency medical reprieve, the Board may require written verification of the terminal illness or total disability by the attending physician." The current rule clearly defines eligibility based solely

CONFIDENTIAL

CTD_000130

on the presence of a terminal illness or total disability, without the additional conditions found in the outdated version used by the Board.[1]

6.    Even the Emergency Medical Reprieve Application (EMR-10) submitted for inmate ▮REDACTED▮ , which includes the updated version of Rule § 143.34 in its checklist, demonstrates the correct application of the law. Therefore, it is perplexing and legally unjustifiable that the Board's review of ▮REDACTED▮ 's EMR request and subsequent decision were based on outdated legal standards that no longer apply.

### Challenge to the Board's Misleading Claim Regarding Offender's Terminal Status and Misapplication of Rule § 143.34

7.    The Board's assertion that "the offender is not terminal" is both misleading and legally irrelevant under the current version of Texas Administrative Code § 143.34, as amended on May 9, 2018. The rule does not require an inmate to be classified as "terminally ill" in the sense suggested by the Board but instead requires the presence of a "terminal illness." Inmate ▮REDACTED▮ 's medical condition meets this requirement unequivocally.

8.    Both the Emergency Medical Reprieve Application (EMRA) and BPP Directive (BPP-DIR) 143.350 (dated February 6, 2020) define "terminally ill" as "[a] medical condition that is incurable and will inevitably result in death within six months regardless of life-sustaining treatment." This definition is derived from TDCJ's Correctional Managed Health Care Policy Manual § G-51.8, which defines a "terminal condition."[2] However, these definitions are intended for internal use and general guidance within the Board's operations and are not official legal standards mandated by law or rule for EMR consideration.

9.    A review of the Texas Board of Pardons and Paroles Rules (as revised on May 17, 2024) and the Texas Administrative Code reveals no specific legal definition for "terminally ill" or "terminal illness." Instead, Rule § 143.34 simply requires the presence of a "terminal illness", without imposing the strict six-month prognosis or life-sustaining treatment criteria cited by the Board in its decision. The law's intent is to offer relief based on the existence of a terminal illness, not to impose additional hurdles that are neither supported by statutory language nor required by law.

10.    The distinction between "terminally ill" and "terminal illness" is critical in this case. While both terms refer to a condition that will result in death, "terminally ill" refers to the individual's current state, while "terminal illness" refers to the underlying disease or condition. Rule § 143.34 requires only that an inmate suffer from a terminal illness, not that they be classified as terminally ill with a specific life expectancy of six months or less.

---

[1] https://www.tdcj.texas.gov/bpp/rules/2024-0517_Rules.pdf

[2] TDCJ's Correctional Managed Health Care Policy Manual (CMHC), § G-51.8, defines a "terminal condition" as "an incurable or irreversible condition caused by injury or illness that in the physician's opinion would produce death within six months or less, regardless of the use of life sustaining treatment, if the condition runs its normal course. The application of life sustaining procedures would serve only to postpone the moment of the patient's death."

CONFIDENTIAL

CTD_000131

11.  Inmate [REDACTED] is not required to be "terminally ill" by the Board's narrower internal definition but simply to have a terminal illness,[3][4] which he undoubtedly does.

12.  In August 2018, inmate [REDACTED] was diagnosed with pancreatic cancer, which is universally regarded as a terminal illness due to its aggressive progression and poor survival rates. Even with surgical intervention (such as the Whipple procedure), pancreatic cancer remains one of the deadliest forms of cancer. According to the National Cancer Institute, pancreatic cancer accounts for 8.5% of all cancer-related deaths despite making up only 3.3% of new cancer cases, with a five-year survival rate of just 12.8%.[5] These statistics unequivocally confirm that pancreatic cancer is a terminal illness, which qualifies inmate [REDACTED] under Rule § 143.34.

13.  By relying on an incorrect interpretation of the law, the Board has introduced false and misleading criteria into the evaluation process, thereby undermining the fairness and accuracy of its decision-making. The requirement for inmate [REDACTED] to be "terminally ill" as defined by BPP-DIR 143.350 instead of simply having a "terminal illness" as required by TAC § 143.34 is a clear misapplication of the law. This misinterpretation invalidates the basis for denying [REDACTED] s Emergency Medical Reprieve request.

**Challenge to the Board's Misleading Claim Regarding Offender's Disability Status and Disregard of 42 U.S.C. § 12102(1)**

14.  The Board's assertion that "the offender is not totally disabled" is misleading and factually incorrect. This mischaracterization fails to recognize the specific criteria set forth in the law regarding disability status.

15.  The instructions for the Emergency Medical Reprieve Application (EMRA) and BPP Directive (BPP-DIR) 143.350 define "totally disabled" as "a severe, chronic disability that is likely to continue indefinitely and results in substantial functional limitations." However, this definition lacks clarity, as it does not provide specific meanings for critical terms such as "severe," "chronic," "disability," "likely to continue indefinitely," or "substantial functional limitations." Furthermore, this definition serves primarily for general information and internal Board instructions rather than being recognized legal definitions.

16.  The absence of precise definitions for these key terms can lead to inconsistent application of the standards, which jeopardizes the fairness and transparency of decisions related to disability status. The subjective and vague nature of the terms opens the door for varying interpretations, potentially resulting in arbitrary and inconsistent decisions. This lack of clarity denies inmate [REDACTED] a fair assessment regarding his eligibility for medical reprieve, thereby infringing upon his constitutional rights.

17.  A review of TDCJ policies, the Texas Board of Pardons and Paroles Rules as revised on May 17, 2024, and the Texas Administrative Code reveals that there is no specific legal definition for "totally disabled." Additionally, the examination of these documents does not yield definitions for the terms "severe," "likely to continue indefinitely," or "substantial functional limitations." However, definitions for "chronic

---

[3] Texas Health and Safety Code (THSC), § 489.001(2) defines a "terminal illness" as "an advanced stage of a disease with an unfavorable prognosis that, without life-sustaining procedures, will soon result in death or a state of permanent unconsciousness from which recovery is unlikely."

[4] National Institute of Health defines "terminal illness' as "an irreversible or incurable disease condition from which death is expected in the foreseeable future."

[5] https://seer.cancer.gov/statfacts/html/pancreas.html

CONFIDENTIAL                                                                                                CTD_000132

illnesses" are found in the Correctional Managed Health Care Policy Manual, and "disability" is defined in TDCJ's Executive Directive PD 14 (rev. 7), which aligns with the Americans with Disabilities Act (ADA). Thus, it is necessary to refer to other Texas and federal laws, as well as established medical definitions, to ensure a fair and consistent application of the term "totally disabled."

18.    While "totally disabled" lacks a specific legal definition outside of EMRA general information and BPP internal instructions, Texas Health and Safety Code § 166.0465(a) defines "disability" by referencing the Americans with Disabilities Act of 1990, codified at 42 U.S.C. § 12102(1). This statute states that a "disability" encompasses any physical or mental impairment[6] that substantially limits[7] one or more major life activities[8], a history of such an impairment, or being regarded as having such an impairment.

19.    Inmate ▮REDACTED▮'s current medical condition, following his diagnosis of pancreatic cancer and subsequent Whipple procedure (pancreaticoduodenectomy), clearly meets the "disability" criteria outlined in 42 U.S.C. § 12102(1). He exhibits physical impairments that substantially limit multiple major life activities.

20.    The Whipple procedure is an irreversible surgical operation that involves the removal of the head of the pancreas, part of the small intestine (duodenum), the gallbladder, the bile duct, nearby lymph nodes, and a portion of the stomach. This extensive surgery has significantly impacted several major life activities, including digestion, mobility, and overall physical strength. While the procedure may be life-sustaining, it introduces a range of long-term challenges that severely limit ▮REDACTED▮'s daily functioning.

21.    According to 42 U.S.C. § 12102(2)(A)-(B), major life activities affected by ▮REDACTED▮'s condition include, but are not limited to, caring for oneself, performing manual tasks, eating, sleeping, walking, standing, lifting, bending, and working. Additionally, his major bodily functions—specifically, digestive, endocrine, and circulatory systems—are significantly impaired. The Whipple procedure has led to chronic fatigue, digestive issues, food intolerances, and the potential for developing diabetes, all of which profoundly affect ▮REDACTED▮'s ability to perform essential activities and maintain normal bodily functions.

---

[6] The sixth edition of the *Guides to the Evaluation of Permanent Impairment*, published by the American Medical Association (AMA), defines impairment as "a significant deviation, loss, or loss of use of any body structure or body function in an individual with a health condition, disorder, or disease." (Rondinelli RD, Genovese E, Bringham CR, eds. *Guides to the Evaluation of Permanent Impairment*. 6th ed. Chicago, Ill: American Medical Association; 2008.)

[7] The term "substantially limits" shall be interpreted consistently with the findings and purposes of the ADA Amendments Act of 2008. *Id.* § 12102(4)(B). "'An impairment is a disability . . . if it substantially limits the ability of an individual to perform a major life activity as compared to most people in the general population. An impairment need not prevent, or significantly or severely restrict, the individual from performing a major life activity in order to be considered substantially limiting.'" *Weaving v. City of Hillsboro*, 763 F.3d 1106, 1111 (9th Cir. 2014) (quoting 29 C.F.R. § 1630.2(j)(1)(ii)).

[8] Major life activities are defined in 42 U.S.C. § 12102(2)(A)-(B) and include caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, working, and the operation of a major bodily function such as the immune system, normal cell growth, digestive, bowel, bladder, neurological, brain, respiratory, circulatory, endocrine, and reproductive functions.

CONFIDENTIAL

CTD_000133

22.  For example, [REDACTED] experiences significant digestive issues and food intolerances, impacting his ability to eat and increasing the risk of malnutrition without adequate nutritional intervention.[9] [10]. His chronic pain and fatigue disrupt his sleep and daily functioning. Physical weakness and chronic fatigue further hinder his ability to care for himself and perform manual tasks. His capacity to walk, stand, lift, and bend is compromised due to diminished physical strength and stamina. The surgery has also adversely affected the operation of major bodily functions, particularly within his digestive and endocrine systems, leading to complications that exacerbate his overall health.

23.  The severity of inmate [REDACTED]'s condition and its profound impact on essential life activities clearly demonstrate that he meets the criteria for "total disability." This warrants immediate reconsideration of his eligibility for an emergency medical reprieve under TAC § 143.34.

**Challenge to the Board's Misrepresentation of Medical Care Requirements and Rule § 143.34**

24.  The Board of Pardons and Paroles' (BPP) inclusion of a requirement for adequate medical care within TDCJ facilities in its decision regarding inmate [REDACTED] is both inappropriate and legally unfounded. This stipulation was explicitly removed from Texas Administrative Code (TAC) § 143.34 following its amendment on May 9, 2018. The revised version of the rule no longer mandates the provision of adequate medical care as a condition for granting emergency medical reprieves.

25.  By referencing this outdated and irrelevant criterion, the BPP misrepresents the current legal standards applicable to EMR requests. This misapplication not only undermines the fairness and transparency of the evaluation process but also infringes upon the rights of inmates seeking medical reprieves. The legal framework established under TAC § 143.34 is designed to ensure that inmates receive fair treatment based on their medical conditions, not on arbitrary and obsolete standards. This failure to align with current legal requirements violates the principles of due process and equal protection under the law, which are fundamental rights guaranteed to all individuals, including those incarcerated.

**TDCJ's Gross Negligence and Failure to Meet Legal Standards for Long-Term Medical and Nutritional Care**

26.  The Texas Department of Criminal Justice (TDCJ) has exhibited gross negligence in its management of inmate [REDACTED]'s medical care, particularly regarding the specialized medical and nutritional support required following his Whipple procedure for pancreatic cancer. This continued failure to provide adequate post-operative care not only jeopardizes [REDACTED]'s health but also constitutes a clear violation of his constitutional rights. Furthermore, it reflects TDCJ's failure to fulfill its obligations under both federal and state law, which mandate that inmates receive appropriate medical care and nutritional support.

27.  TDCJ has been fully aware of [REDACTED]'s post-Whipple procedure condition and the medical vulnerabilities it entails. It is common medical knowledge that Whipple patients are at high risk of malnutrition and require consistent nutrient supplementation to maintain life. Furthermore, the extreme heat conditions in the Terrell Unit have been repeatedly documented in both internal and public complaints, and the dangers these conditions pose—especially for vulnerable inmates—are well-known. TDCJ's conscious decision to disregard these clear risks, despite their awareness of [REDACTED]'s condition

---

[9] Whipple procedure: 9 things to know - MD Anderson Cancer Center.  https://www.mdanderson.org/ cancerwise/ whipple-procedure-and-pancreatic-cancer-treatment-9-things-to-know.h00-159459267.html.

[10] Nutrition after the Whipple Procedure: What You Need To Know About …. https://columbiasurgery.org/news/ 2013/11/27/nutrition-after-whipple-procedure-what-you-need-know-about-micronutrient.

CONFIDENTIAL

and the life-threatening complications that accompany malnutrition and extreme heat, constitutes deliberate indifference as defined in *Farmer v. Brennan*.

28.  The U.S. Supreme Court, in *Brown v. Plata* (563 U.S. 493, 2011), ruled that prison officials are obligated to provide medical care that is reasonably commensurate with modern medical science. [REDACTED]'s post-Whipple care, including dietary supplementation and replenishment of essential nutrients like B12, calcium, magnesium, potassium, and fat-soluble vitamins A, D, E, and K are basic medical interventions supported by customary practice. TDCJ's failure to provide this care, combined with life-threatening heat exposure, falls egregiously below the standard of care expected even in a correctional setting. By denying [REDACTED]'s EMR, BPP endorses these substandard conditions in direct violation of his constitutional right to be free from cruel and unusual punishment.

29.  The neglect displayed by TDCJ in addressing [REDACTED]'s unique medical needs is not only a breach of the standards established in *Estelle v. Gamble*, 429 U.S. 97 (1976), which prohibits deliberate indifference to an inmate's serious medical needs, but it also contravenes the obligations set forth in Texas Government Code §§ 501.051 and 501.146, which require that inmates receive healthcare that meets the same standards available to non-incarcerated individuals. The ramifications of this negligence extend beyond [REDACTED]'s immediate health concerns, highlighting systemic failures within TDCJ that could potentially affect the well-being of other inmates requiring similar medical attention.

30.  In addition to the failures specific to [REDACTED]'s case, the TDCJ has come under scrutiny for widespread systemic issues concerning inmate healthcare. A 2024 report by the Texas Sunset Advisory Commission revealed that TDCJ consistently fails to meet established standards of care for its inmate population, with particular deficiencies in accountability and oversight of its healthcare services. The report highlights that inmates requiring complex medical care, such as [REDACTED], are particularly vulnerable to substandard treatment. These systemic failures underscore the gross negligence in TDCJ's management of inmate healthcare, further demonstrating its inability to provide the long-term, specialized care inmate [REDACTED] requires following his Whipple procedure. This aligns with TDCJ's documented pattern of neglect, as reflected in [REDACTED]'s own experience, where critical nutritional and medical needs have repeatedly gone unmet, endangering his health and violating his constitutional rights. This report not only supports the evidence of [REDACTED]'s inadequate medical treatment but also reflects the widespread nature of these failures across the system.

**Gross Negligence and Deliberate Indifference**

31.  Under Texas law, gross negligence[11] is defined as "an entire want of care" that demonstrates a conscious disregard for the rights or safety of others. TDCJ's pattern of behavior—including its failure to provide essential medical care, neglect of dietary needs, disregard for inmate [REDACTED]'s life-threatening allergies, and continued exposure to extreme heat, despite inmate [REDACTED]'s medically documented vulnerabilities —clearly exemplifies this legal standard.

- *Failure to Provide Nutritional Support:* Following [REDACTED]'s Whipple procedure, he requires specialized nutrition to prevent malnutrition. Medical literature emphasizes that post-Whipple patients necessitate enhanced nutritional support, including additional food and vital vitamin and mineral supplementation. Despite this critical need, TDCJ has reduced [REDACTED]'s prescribed food portions, and in January 2024, further cut the remaining meal sizes by half, failing to provide essential dietary supplements. This negligence poses a direct risk to his health and life.

---

[11] Texas Civil Practice & Remedies Code, § 41.001(11), Gross Negligence Definition.

CONFIDENTIAL                                                                                          CTD_000135

- *Failure to Monitor Micronutrient Deficiencies:* The Whipple procedure can lead to significant malabsorption of essential vitamins and minerals. Standard medical practice mandates that post-Whipple patients undergo regular testing for critical nutrients such as B12, calcium, and fat-soluble vitamins A, D, E, and K.[12] [13]. TDCJ's failure to routinely conduct these tests reflects a reckless disregard for ▇REDACTED▇'s well-being, especially given that malnutrition—previously necessitating hospitalization—is common among such patients.

- *Provision of Allergenic Food:* Despite ▇REDACTED▇'s documented allergy to peanut butter, TDCJ has repeatedly served him this food, thereby endangering his health. Serving allergenic food to an inmate with a known allergy constitutes negligence that exceeds acceptable medical practices, amounting to gross misconduct.

- *Misdiagnoses and Dismissal of Serious Symptoms:* ▇REDACTED▇'s health has deteriorated to the point where symptoms such as extreme fatigue and weight loss mirror those that previously led to his hospitalization for malnutrition. Medical staff have misdiagnosed these recurrent symptoms as heat exhaustion and dismissed his complaints, often mocking his condition instead of addressing the underlying nutritional deficiencies. This behavior not only reflects a lack of professional judgment but also demonstrates a complete disregard for ▇REDACTED▇'s health,[14] [15], exemplifying deliberate indifference as established in *Estelle v. Gamble* (429 U.S. 97, 1976).

- *Failure to Administer Prescribed Medications and Nutritional Supplementation:* Inmate ▇REDACTED▇ was prescribed life-saving medications and nutritional supplementation to be taken indefinitely after his surgery. TDCJ has repeatedly failed to provide these necessary medications and nutritional support,[16] despite being fully aware of the severe consequences of such omissions. This neglect has exacerbated ▇REDACTED▇'s condition and represents a clear violation of his right to adequate medical and nutritional care,[14] as established in both federal and state law.

**Legal Precedent and Eighth Amendment Violations**

32.   The U.S. Supreme Court has consistently affirmed that deliberate indifference to an inmate's serious medical needs constitutes cruel and unusual punishment, in violation of the Eighth Amendment, as established in *Estelle v. Gamble* (429 U.S. 97, 1976). In *Helling v. McKinney* (509 U.S. 25, 1993), the Court further held that prison officials must take reasonable steps to prevent future harm when they are aware of substantial risks to an inmate's health. The continued failure to provide nutritional supplementation and exposure of inmate ▇REDACTED▇ to extreme heat, despite his medically documented vulnerabilities, clearly constitutes such a substantial risk. Deliberate indifference occurs when prison officials act—or fail to act—despite being aware of substantial risks to an inmate's health, as delineated in *Farmer v. Brennan* (511 U.S. 825, 1994) and *Rogers v. Evans* (792 F.2d 1052, 1058, 11th Cir. 1986). Importantly, this standard

---

[12] Mayo Clinic, *Whipple Procedure: Post-Operative Care Guidelines*, Mayo Foundation for Medical Education and Research, 2021.

[13] Shukla, P.J., *Nutritional Deficiencies in Post-Pancreatic Surgery Patients*, Journal of Gastrointestinal Surgery, 2020.

[14] Texas Government Code § 501.051, Inmate Health Care Requirements.

[15] Texas Government Code § 501.146, Standards for Health Care Delivery in Prisons.

[16] Mayo Clinic, *Post-Whipple Nutritional Guidelines*, Mayo Foundation for Medical Education and Research, 2021.

CONFIDENTIAL

CTD_000136

does not necessitate proof of intent to inflict pain;[17] rather, it requires that the conduct demonstrate a knowing indifference to serious medical needs.[18]

33.   Inmate [REDACTED]'s medical records unequivocally indicate that his post-pancreaticoduodenectomy condition demands specialized care, including medications, nutritional supplementation, pain management, and regular medical oversight. TDCJ's repeated denial of these essential medical services, along with its failure to adhere to basic medical standards, rises to the level of deliberate indifference.

34.   A recent Sunset Advisory Commission Staff Report dated September 2024 highlights TDCJ's insufficient preparedness to address the healthcare needs of special populations, leading to increased costs and risks for the state. This ongoing challenge is compounded by a history of federal oversight and litigation related to inadequate inmate healthcare, underscoring the serious consequences of capacity and staffing shortages. These issues threaten inmates' access to essential medical appointments, heightening health risks and exposing TDCJ to potential legal liabilities. Inmate [REDACTED]'s situation exemplifies these deficiencies, as his need for specialized care—including medications, nutritional supplementation, and regular medical oversight—remains unmet due to TDCJ's systemic failures.

35.   Under Texas Government Code §§ 501.051 and 501.146, TDCJ is required to provide health care services to inmates at a level that is commensurate with that provided to non-inmates. TDCJ's persistent failure to deliver even the most basic care—such as administering prescribed medications and ensuring proper nutrition—constitutes a clear violation of this statutory requirement.

36.   Courts define "adequate medical care" as services that are "reasonably commensurate with modern medical science" and of a quality "acceptable within prudent professional standards."[19] Such care must adequately address both routine and emergency medical, dental, and psychological needs.[20]

37.   TDCJ's treatment of inmate [REDACTED] also contravenes the standard established in *Helling v. McKinney* (509 U.S. 25, 1993), which mandates that prison officials take reasonable steps to prevent future harm

---

[17] *Hicks v. Frey*, supra 992 F.2d at 1455. In *Weeks v. Chaboudy*, 984 F.2d 185 (6th Cir. 1993), prison staff argued that they lacked actual knowledge of the injury that the inmate suffered. The district court found that "Dr. Chaboudy, by virtue of his long tenure at the facility, should have known that his refusal to admit the plaintiff to the infirmary would result in the conditions which he did in fact endure ..." The Sixth Circuit stated that "the squalor in which Weeks was forced to live as a result of being denied a wheelchair was clearly foreseeable by Dr. Chaboudy." *Id.* at 187.

[18] See *Boretti v. Wiscomb*, supra 930 F.2d at 1154-55; *Byrd v. Wilson*, 701 F.2d 592, 595 (6th Cir. 1983) (per curiam) (deliberate refusal on the part of prison officials to provide an inmate with prescribed medication may demonstrate the state of mind of deliberate indifference); *Milteor v. Beorn*, 896 F.2d 848 (4th Cir. 1990) (failure to provide the care that a treating physician himself believes is necessary could be found to be conduct which surpasses negligence and constitutes deliberate indifference (citation omitted)); *Weeks v. Chaboudy*, supra 984 F.2d at 187; *Ancata v. Prison Health Services, Inc.,* 769 F.2d 700, 704 (11th Cir. 1985) (when the need for medical treatment is obvious, medical care that is so cursory as to amount to no treatment at all may constitute deliberate indifference); *Brown v. Hughes*, 894 F.2d 1533, 1537 (11th Cir.) (per curiam), cert. denied, 496 U.S. 928 (1990) (delay in access to medical care that is "tantamount to `unnecessary and wanton infliction of pain,' " may constitute deliberate indifference to an inmate's serious medical needs (quoting *Estelle,* 429 U.S. at 104)).

[19] *United States v. DeCologero*, 821 F.2d 39, 43 (1st Cir. 1987); See also *Fernandez v. United States*, 941 F.2d 1488, 1493-94 (11th Cir. 1991) (citing to DeCologero).

[20] *Tillery v. Owens*, 719 F.Supp. 1256, 1301 (W.D.Pa. 1989), aff'd, 907 F.2d 418 (3d Cir. 1990); accord, *Ramos v. Lamm,* 639 F.2d 559, 574 (10th Cir. 198), cert denied, 450 U.S. 1041 (1981).

CONFIDENTIAL

CTD_000137

when they are aware of substantial risks to an inmate's health. The recurrence of [REDACTED] 's malnutrition symptoms highlights TDCJ's failure to implement even basic precautions to protect his health, despite its knowledge of his medical history.[21]

38.   Inmate [REDACTED] 's medical needs are significantly more complex than those of the general prison population. TDCJ's indifference is evident in its failure to provide consistent medical care, including necessary medications, pain management, nutritional support through supplemental meals and electrolytes, and regular monitoring for nutrient deficiencies and other medical issues.

- *Substandard Nutrition:* Texas prisons have faced ongoing criticism for serving nutritionally inadequate meals, particularly during lockdowns. These "Johnny Sacks" typically consist of meager portions, such as peanut butter sandwiches and processed meats, with little to no fresh vegetables or fruits. Inmates often receive unappetizing meals like hot dogs without buns, mushy food combinations, and stale bread, which do not meet even basic nutritional standards, let alone the specialized needs of inmate [REDACTED] , who is considered totally disabled under TDCJ definitions.[22]

- *Nutritional Deficiencies:* Extended lockdowns exacerbate these issues, leading to irregular meal deliveries and insufficient food in both quantity and quality. Peanut butter, a staple in the Johnny Sacks, is sometimes watered down, and meals lack essential nutrients like fresh produce and proteins, leaving inmates hungry and at risk of vitamin deficiencies.[23]

39.   Although TDCJ claims that inmate [REDACTED] receives dietary supplements, these alone are insufficient to meet the nutritional requirements following a Whipple procedure. Patients often need specific dietary adjustments to ensure adequate nutrition.

40.   Inmate [REDACTED] has been housed in the Terrell Unit, which lacks air conditioning—conditions that worsen his health by causing excessive sweating and the loss of vital micronutrients, such as sodium, potassium, magnesium, and calcium. Despite these losses, TDCJ has failed to replenish these nutrients, providing only water and half rations or Johnny Sacks that offer little to no nutritional value. [REDACTED] has also been denied access to potable water and cold showers, both essential for regulating his body temperature and managing excessive sweating.

- *Lack of Nutritional Adjustments:* Despite [REDACTED] 's medical condition requiring a tailored diet, TDCJ treats him like any other inmate, providing standard meals and Johnny Sacks that lack essential nutrients, particularly potassium and magnesium, which are critical for replenishing what is lost through sweating, especially in non-air-conditioned environments.

- *Denied Access to Potable Water:* The absence of potable water poses additional risks. Non-potable water can lead to gastrointestinal issues, further impairing [REDACTED] 's ability to absorb critical nutrients and maintain hydration—an especially dangerous situation given his history of malnutrition and post-Whipple condition.

---

[21] *Rhodes v. Chapman*, 452 U.S. 337, 347, 101 S.Ct. 2392 (1981); accord *Wilson v. Seiter*, 501 U.S. at 298; see also *Ellis v. Butler*, 890 F.2d 1001, 1003 n1 (8th Cir. 1989) ("medical condition need not be an emergency in order to be considered serious under *Estelle*.")

[22] Keri Blakinger, "Coronavirus Has Made Texas Prison Food Even More Gross," The Marshall Project, May 2020

[23] Brant Bingamon, "Prisoners Report Going Hungry Amidst State Lockdown," Austin Chronicle, September 2023

CONFIDENTIAL

CTD_000138

41. The extreme and dangerous conditions at the Terrell Unit, where inmate REDACTED is housed, exacerbate his declining health. The facility's lack of air conditioning subjects him to unbearable heat, worsening his fragile condition through excessive sweating and dehydration. Numerous lawsuits across the TDCJ system have cited violations of the Eighth Amendment's prohibition against cruel and unusual punishment due to the lack of climate control. *Tiede v. Collier*[24], a 2024 lawsuit filed by Texas inmates, highlights how extreme heat in non-air-conditioned prisons poses severe health risks, especially for those with pre-existing medical conditions. For someone recovering from a Whipple procedure and suffering from malnutrition, the absence of air conditioning and proper hydration is a direct threat to inmate REDACTED 's compromised health. Despite this, TDCJ has failed to implement corrective measures, denying REDACTED access to cold showers, sufficient water, and electrolytes, further compounding the environmental dangers. This disregard for inmate REDACTED s well-being violates constitutional protections and reflects TDCJ's continued failure to provide basic human necessities.

42. Inmate REDACTED 's medical condition places him at even greater risk than the plaintiffs in *Tiede*. REDACTED 's post-Whipple surgery recovery involves not only compromised digestion but also the malabsorption of vital nutrients, which requires careful dietary and medical management to prevent life-threatening malnutrition. TDCJ's failure to provide the necessary replenishment of essential nutrients—combined with the exacerbating effects of extreme heat—puts REDACTED at imminent risk of organ failure, dehydration, and further deterioration of his already fragile condition. Unlike the general risks to health posed by extreme heat, inmate REDACTED 's condition makes even minor temperature fluctuations or delays in hydration a potential death sentence. By failing to address these critical needs, TDCJ's gross negligence in managing REDACTED s care is not only a violation of his constitutional rights but a direct threat to his life. BPP's refusal to grant REDACTED s Emergency Medical Reprieve (EMR) despite his critical condition represents a continuation of this deliberate indifference, prioritizing outdated policies over the preservation of life itself.

43. Before his diagnosis of pancreatic cancer, inmate REDACTED endured over six weeks of severe, untreated abdominal pain.[25] In July 2018, he informed TDCJ medical staff of significant abdominal discomfort, accompanied by alarming symptoms such as widespread itching, pale stool, dark urine, fever, and chills. These symptoms are well-documented indicators of serious underlying conditions; however, TDCJ medical staff failed to recognize their severity and provide appropriate medical care.

44. As REDACTED 's condition deteriorated, he exhibited visible signs of medical distress, including dark circles around his eyes, drastic weight loss (from 250 pounds to an emaciated state), and pronounced jaundice in his skin and eyes. These symptoms, easily recognizable as critical health issues by any competent medical professional, were disregarded by TDCJ staff. Despite presenting classic signs of jaundice—an easily identifiable condition—even first-year medical residents would recognize—TDCJ misdiagnosed REDACTED as dehydrated. Instead of conducting necessary diagnostic tests, they returned him to his unit without adequate treatment, further exacerbating his condition.[26]

---

[24] *Tiede v. Collier*, No. 1:23-CV-1004-RP (W.D. Tex. Jun. 14, 2024) (finding that TDCJ's failure to mitigate extreme heat conditions in prisons poses a life-threatening risk to inmates and violates the Eighth Amendment)

[25] *Borretti v. Wiscomb*, 930 F.2d 1150, 1154-55 (6th Cir. 1991) ("[A] prisoner who suffers pain needlessly when relief is readily available has a cause of action against those whose deliberate indifference is the cause of his suffering.")

[26] Texas Occupations Code Chapter 164, Section 164.051(a)(6) (authorizing disciplinary action against a physician who fails to practice medicine in an acceptable professional manner consistent with public health and welfare).

CONFIDENTIAL

CTD_000139

45. In August 2018, after observing her father's alarming physical state, [REDACTED]'s daughter, Kayla, insisted that he be taken to a hospital. [REDACTED]'s mother, Ursula, also intervened, contacting relevant authorities to report his deteriorating condition. It was only after these external pressures that inmate [REDACTED] was taken to Hospital Galveston, where he was diagnosed with pancreatic cancer—a diagnosis that could have been made much earlier had TDCJ adhered to basic medical protocols.

46. TDCJ's delay in diagnosing and treating [REDACTED]'s condition, despite clear signs of a life-threatening illness, demonstrates gross negligence and deliberate indifference to his serious medical needs. The failure to recognize and act upon the obvious symptoms of pancreatic cancer constitutes a violation of [REDACTED]'s Eighth Amendment rights under *Estelle v. Gamble* and *Farmer v. Brennan*. This delay in medical care not only jeopardized inmate [REDACTED]'s health but also significantly reduced his chances of receiving timely, life-saving treatment.

47. During a recent family visit, inmate [REDACTED] was observed being wheeled out by a guard who exhibited clear indifference to his deteriorating condition. Slumped in the wheelchair, with his feet dragging limply, inmate [REDACTED]'s physical decline was unmistakable. His eyes reflected distress, and his neck showed signs of tension. Concerned about his alarming state and considerable weight loss, his family again insisted that he be taken to the hospital. Despite having previously been hospitalized for malnutrition [REDACTED] was now denied treatment for symptoms that closely mirrored those leading to his initial hospitalization. In July 2023, [REDACTED] was admitted to Galveston Hospital for dehydration and malnutrition; a year later, he exhibits the same concerning symptoms. On two occasions, he was transported by stretcher to the medical area, only to have nursing staff dismiss his condition as stable based solely on vital signs, ignoring his deteriorating health. Their failure to conduct a thorough assessment, compounded by their dismissive attitude, resulted in inadequate care, violating his right to proper medical treatment. This pattern of neglect not only jeopardizes inmate [REDACTED]'s health but also reveals a disturbing lack of compassion from the medical staff.

48. Inmate [REDACTED] has developed severe anxiety due to the persistent lack of essential medical and nutritional care. His profound fear, worsened by the traumatic experience of lying next to his deceased roommate for over ten hours, underscores his extreme vulnerability in prison. This incident highlights the psychological harm inflicted by TDCJ's indifference. The compounded neglect of his physical and mental well-being constitutes cruel and unusual punishment, violating the Eighth Amendment, and necessitates immediate medical intervention.

49. TDCJ's failure to adhere to established medical protocols, its neglect in providing essential medical care, and its blatant disregard for inmate [REDACTED]'s documented medical needs illustrate a systemic inability to manage his complex, long-term condition. These ongoing failures have placed [REDACTED]'s life in imminent danger, rendering the Board's denial of his Emergency Medical Reprieve (EMR) not only unjustified but a direct threat to his survival. Immediate reconsideration of the EMR is imperative to ensure that [REDACTED] receives the specialized medical attention and care that TDCJ is demonstrably incapable of providing.

50. The legal precedents established in Estelle v. Gamble, Farmer v. Brennan, and Helling v. McKinney reaffirm the constitutional obligation of prison officials to provide adequate medical care and to take reasonable measures to protect inmates from foreseeable harm. The facts surrounding inmate [REDACTED]'s case unmistakably demonstrate that TDCJ has failed to meet these constitutional standards, thereby subjecting him to cruel and unusual punishment in violation of the Eighth Amendment. Given [REDACTED]'s status as totally disabled and the overwhelming evidence indicating TDCJ's inability to provide constitutionally adequate care, the Board must urgently reconsider its denial of [REDACTED]'s EMR.

CONFIDENTIAL

51. By failing to provide essential medical treatment, appropriate nutritional care, and necessary environmental adjustments—including access to air conditioning and potable water—TDCJ has not only violated REDACTED 's constitutional rights but also its statutory obligations under Texas Government Code §§ 501.051, 501.067, and 501.146. REDACTED 's complex medical needs demand long-term, specialized care that TDCJ is demonstrably unqualified to deliver. This ongoing pattern of neglect underscores the necessity for the Board to reevaluate REDACTED 's EMR and grant him the necessary reprieve to obtain appropriate medical attention outside of TDCJ's facilities.

52. Inmate REDACTED s life hangs in the balance due to TDCJ's continuous failures to meet even the most fundamental standards of medical care. The conditions at the Terrell Unit, coupled with TDCJ's repeated denials of adequate medical and nutritional support, have resulted in life-threatening complications, including severe malnutrition, heightened anxiety, and deteriorating physical health. These failures provide irrefutable evidence that TDCJ is incapable of delivering the requisite care mandated by law, making the reconsideration of REDACTED s EMR not just warranted but essential for preserving his life.

53. TDCJ's inadequate care of REDACTED is not an isolated incident but rather part of a broader systemic crisis within the Texas prison system. The Texas Sunset Advisory Commission's 2024 report has identified ongoing failures in the oversight and accountability of TDCJ's healthcare programs, contributing to widespread neglect and constitutional violations. These systemic failures, coupled with TDCJ's documented mismanagement of inmate healthcare, reveal a pattern of deliberate indifference that has been the subject of numerous legal challenges, including the recent lawsuit addressing dangerous heat conditions in Texas prisons. This pervasive issue calls into question TDCJ's ability to fulfill its obligations under both state and federal law, including Texas Government Code §§ 501.051 and 501.146, which mandate that inmates receive care equivalent to that provided to the general public. This pattern not only demands immediate reconsideration of REDACTED 's case but also underscores the urgent need for systemic reform to prevent further constitutional violations within TDCJ's facilities.

54. By continuing to deny REDACTED the Emergency Medical Reprieve (EMR) he urgently needs, the Texas Board of Pardons and Paroles not only risks violating REDACTED 's constitutional rights but also exposes itself and the state of Texas to substantial legal liability. Should this gross negligence persist, the Board may face accountability in federal court under precedents established in *Estelle v. Gamble* and *Farmer v. Brennan*, where Eighth Amendment violations have led to court-mandated relief. Moreover, the financial burden of litigation, compounded by potential damages awarded for pain and suffering and the ongoing risk of harm, could far exceed the cost of providing appropriate care.

55. In light of the overwhelming evidence that TDCJ is unable to meet its constitutional obligations, REDACTED 's case exemplifies a clear instance where judicial oversight may be necessary, akin to the intervention seen in *Brown v. Plata,* where federal courts acted to rectify systemic failures in inmate healthcare. The refusal to grant REDACTED s Emergency Medical Reprieve not only demonstrates a profound disregard for human life but also positions the Texas Board of Pardons and Paroles to face similar judicial scrutiny. Immediate reconsideration is not merely a health issue—it is a legal imperative.

Sincerely,



CONFIDENTIAL

CTD_000141

**CC:**

**American Civil Liberties Union (ACLU)**
125 Broad Street, 18th Floor New York, NY 10004
acluinfo@aclu.org

**Texas Board of Pardons and Paroles – Clemency Section**
8610 Shoal Creek Blvd., Austin, Texas 78757
bpp-clemency@tdcj.texas.gov

**Texas Board of Pardons and Paroles** ATTN: Correctional Managed Health Care Committee
8610 Shoal Creek Blvd., Austin, Texas 78757
bpp_pio@tdcj.texas.gov

**Office of Inspector General,** ATTN: Cris W. Love,
PO Box 13084, Capitol Station, Austin, Texas 78711
oig@tdcj.texas.gov

**Texas Citizens United for Rehabilitation of Errants, Inc. (TX-CURE)**
PO Box 635323 Nacogdoches, Texas 75963-5323
info@texascure.org

**Coalition for Texans with Disabilities, Inc. (CTD)**
1716 San Antonio St Austin, Texas 78701
info@txdisabilities.org

**Texas Prisons Community Advocates (TPCA)**
P.O. Box 1974 Fulton, Texas 78358
info@TPCAdvocates.org

**Build Up, Inc.**
178 Columbus Ave New York City, NY 10023
hello@buildupinc.org

CONFIDENTIAL

CTD_000142

# EXHIBIT 18



advocate connection program
# 2024

Hi RYV folks!

Thanks to y'all who could join us for Monday's discussion on heat in Texans prisons and why this matters for Texans with disabilities. It was great to have our former policy fellow **Jennifer Toon** (now with the Texas After Violence Project, TAVP) back to lead the discussion, along with another leader pushing for changing in the Texas criminal justice system, **Marci Marie Simmons** of Lioness Justice Impacted Women's Alliance.

A recap of Monday's call is below, but first, here are some opportunities to get involved with CTD and our partners:

**Party to Power the Disability Vote!**

Tuesday, Sept. 10, join REV UP Texas to get out the disability vote in the 2024 November elections! Attend virtually, or in person with a local REV UP partner.

**Cinema Touching Disability Film Festival**

Sept. 27 & 28, join CTD in Austin for two nights of live entertainment, featured guests, community, and great disability cinema! Line up is live and tickets are on sale now!

LEARN MORE & ATTEND

MORE INFO & TICKETS

**Recap of our call on extreme heat conditions in Texas prisons**

How hot is extreme heat?

Temperatures reach dangerous levels, **up to 130 degrees**, inside the concrete & metal buildings of the Texas Department of Criminal Justice (TDCJ) facilities.

Also note that there are over 100 units in state system, with 130,000 people incarcerated in them. **70% of these units do not have climate control**. Some are considered by TDCJ to be "partially air-conditioned," but this doesn't necessarily mean that the parts of the

CONFIDENTIAL

facility where people are housed or spend most of their time, are air conditioned.

Heat, health, and disability

Heat this high endangers the **health, mental well-being, and lives of incarcerated people and staff** in general. Extreme heat particularly endangers people with disabilities and older people, who may have conditions that make them more vulnerable to heat-related illnesses. Last summer, KUT reported on a study that named heat as the cause of 271 deaths in Texas prisons.

In just one example of how this plays out, Marci recalled a woman from her unit who used a wheelchair. Incarcerated individuals are not allowed to help each other, even to hold a door open for someone. So that meant that this woman had to work physically harder to get from place to place, sometimes remaining in the heat longer, than her ambulatory peers. Marci also noted the effect this had on her own mental health, not to mention that of the woman in her story.

The 19th News ran a story earlier this year with many more examples of how the heat can be detrimental to incarcerated people, specifically, with chronic health conditions and mental health concerns.

If you're interested in learning more about the rules against helping each other (the criminalization of care) keep an eye out for a research project that TAVP is working on right now with Texas A&M University. Related, Lioness and A&M have already released a research project about how disasters and emergencies affect the mental health of incarcerated women.

Advocating to bring climate control to Texas prisons

In **federal** prisons, including those in Texas, climate control measures are already in place, with requirements to keep temperatures between 65 and 85 degrees. Advocates have worked hard to bring similar requirements to **state-run** facilities, supporting legislative measures to install **air conditioning** in all Texas prison units. They are often met with an attitude that heat and discomfort are part of the punishment of being in prison. However, we're not talking about making prisons comfortable, but habitable. Consider the people who die from heat related illnesses in prison that were not sentenced to death. In addition, Jen and Marci asked, how can rehabilitation happen when you're in survival mode?

Lawsuit filed in response to state's inaction

Earlier this year, Lioness, CTD, and others joined a lawsuit against TDCJ, arguing that the heat violates incarcerated people's constitutional rights by subjecting them to cruel and unusual punishment. The state has disputed this claim.

At a preliminary injunction hearing in July, the judge decided not to grant the state's

request to throw out the suit and instead, let it proceed. This is a good sign.

You can read more about the lawsuit in these articles (in addition to those linked above):

- The Texas Observer: "There Have to be Limits" Lawsuit Urges Scorching Prisons to Cool Down
- Texas Standard: An inmate's body temp was 107.5 when he died. The state of Texas says heat did not kill him.
- Newsweek: Texas Prisoners Fake Suicide Attempts To Escape Heat: Lawsuit

Get involved!

In addition to following Lioness Justice Impacted Women's Alliance and the Texas After Violence Project and staying updated about the lawsuit, here are a few ways you can use your voice to address extreme heat in Texas prisons:

- **Contact your legislators (especially your State Senator)**! Tell your state representatives that you support climate control in Texas all prisons. You can look up your reps here. Note that last session, the House actually passed climate control in their draft of the state budget, but the Senate stripped it out. If you can only contact one lawmaker, make it your state Senator!
- **Submit public comments to the board of TDCJ**! There are 2 public meetings each year. Look up the schedule and how to submit comments.
- **Engage with people in your communities about this issue**! Just raising awareness among your networks can help change harmful attitudes about incarcerated Texans. As RYV participant Lynn pointed out on our call, social media is full of people with cruel opinions, so choose your battles wisely!

View the saved chat and transcript (raw, not edited) from Monday's call.

Our **next RYV call will be Monday, September 9**, on school vouchers, student safety, and other back-to-school topics, with Steven Aleman from Disability Rights Texas. Want to invite someone new to Raise Your Voice? Feel free to forward the registration link.

Thanks and see you soon!
Laura

Laura Perna
CTD Communications Director

**About RAISE YOUR VOICE**

Since 2016, CTD's RYV! events are designed to provide a functional understanding of our state's legislative process while connecting emerging and seasoned advocates. These sessions also give CTD insight into the needs and concerns of Texans with disabilities outside our usual circles.

**Raise Your Voice in 2024**

In 2024, we'll hold a bi-weekly discussion of policy developments and ways to take action during the interim legislative session. Each week, you can expect:

- CTD's advocacy team, partners, interns, and other self-advocates to give a brief update of what we're working on,
- Details about steps you can take during the week to advance priorities for Texans with disabilities,
- Interaction with CTD staff and each other (in main room, breakout rooms, and chat),
- CARTS will be provided,
- These calls will NOT be recorded. If you are registered, you will still receive the follow up email with an overview of our discussion and action items.

# Thanks to our 2024 Raise Your Voice! sponsors!









CTD_000060









GRAIL

| Donate | Subscribe to CTD Newsletter |

**Contact Us**

info@txdisabilities.org | 512-478-3366

Unsubscribe or Manage Your Preferences

CONFIDENTIAL

CTD_000061

# EXHIBIT 19

```
              UNITED STATES DISTRICT COURT
           FOR THE WESTERN DISTRICT OF TEXAS
                    AUSTIN DIVISION.
```

BERNHARDT TIEDE, II; TEXAS     )
PRISONS COMMUNITY              )
ADVOCATES; BUILD UP, INC.,     )
A/K/A JUSTICE IMPACTED         )
WOMEN'S ALLIANCE; TEXAS        )
CITIZENS UNITED FOR            ) Civil Action No.
REHABILITATION OF ERRANTS;     ) 1:23-CV-1004-RP
and COALITION FOR TEXANS       )
WITH DISABILITIES,             )
        Plaintiffs,            )
                               )
VS.                            ) Civil Action No.
                               ) 1:16-cv-00917
BRYAN COLLIER, in his          )
official capacity as           )
Executive Director of          )
Texas Department of            )
Criminal Justice,              )
        Defendant.             )


          ------------------------------------

               THE ORAL VIDEO DEPOSITION OF

                      BOBBY LUMPKIN

                   October 14, 2025

          ------------------------------------


     ORAL VIDEO DEPOSITION OF BOBBY LUMPKIN, produced as a

witness at the instance of Plaintiff and duly sworn, was

taken in the above-styled and numbered cause on October

14, 2025, from 9:44 a.m. to 4:56 p.m., before Tabitha

Morrow, CSR in and for the State of Texas, reported by

machine shorthand, at 300 W. 15th Street, Austin, Texas

pursuant to the Federal Rules of Civil Procedure.

Bobby Lumpkin - 10/14/2025

1        Q.   And Cynthia Martinez did not provide you a

2   document for you to look at?

3        A.   No.

4        Q.   Okay.  And what heat illnesses did she report

5   to you in your phone call in preparation for this

6   deposition?

7        A.   That there had been 11 employee and 12 inmate

8   illnesses this year, events.

9        Q.   Eleven employee.  Thank you.

10       A.   Um-hum.

11       Q.   And 12 --

12       A.   Inmates.

13       Q.   -- you said 12 inmates?

14       A.   Yes.

15       Q.   And did you review anything beyond what she

16   told you, that there had been 11 employee heat illnesses

17   and 12 inmate heat illnesses?

18       A.   Did I review after my call with her?

19       Q.   Did she go into detail about what type of heat

20   illnesses these were?

21       A.   No.

22       Q.   Okay.  So it was just kind of a summary cursory

23   call like, hey, how many illnesses have there been; I'm

24   going to be deposed?

25       A.   I don't know if I told her I was going to be

Bobby Lumpkin - 10/14/2025

1  deposed.  I asked how many illnesses there have been.

2      Q.  Okay.  And what -- did you talk about anything

3  else with Cynthia Martinez?

4      A.  No.

5      Q.  Okay.  And did you ask what types of illnesses

6  these were?

7      A.  No, I didn't have a need to because I'm

8  notified as those illnesses happen throughout the year.

9      Q.  Okay.  When did these heat illnesses happen?

10  Let's start with the inmates.

11      A.  Exact dates?

12      Q.  Well, give me the months.

13      A.  I don't have that information in front of me to

14  give you the exact months.  I'm sure it's something we

15  can provide.

16      Q.  Do you --

17      A.  Sir?

18      Q.  Do you know the period of time these 12 heat

19  illnesses happened?

20      A.  Within the calendar year of 2025.

21      Q.  Is that within the summer of 2025?

22      A.  I would say the majority of those probably are.

23      Q.  Do you know?

24      A.  Yes, I know the majority of those probably are

25  within the summer months of 2025.

Bobby Lumpkin - 10/14/2025

1      Q.  Do you know if all of them are?

2      A.  No, I do not.

3      Q.  Okay.  Same question with the employee

4  illnesses, heat related illnesses.  Do you know when

5  those occurred?

6      A.  In calendar year '25, mainly in the summer

7  months.

8      Q.  And when you say mainly in the summer months,

9  do you have an actual factual basis to support that or

10  is it just, look, during the summer is when it gets

11  hotter; therefore, you really do believe that's when

12  these would have occurred?

13      A.  I would say that when I'm notified normally has

14  been in the summer months.  When exactly, no, I don't

15  have that with me today.

16      Q.  Okay.  But just so I'm clear, the executive

17  director of TDCJ is notified about every single heat

18  related illness that occurs?

19      A.  Yes.

20      Q.  And they are notified by whom?

21      A.  Notified by Emergency Action Center, Cynthia

22  Martinez, also notified by Eric Guerrero, the Correction

23  Institutional Divisions Director, unless it happens in

24  another division.  I may be notified by him and notified

25  by that division, as well.

Bobby Lumpkin - 10/14/2025

1 | work inside the Texas Department of Criminal Justice.

2 |     Q.  You understand that the way to solve this

3 | problem is with air conditioning, right?

4 |           MR. JOHNSON:  Objection; form.

5 |     A.  Yes.

6 |     Q.  Okay.  And you'd agree that if you know the

7 | solution to a problem and the solution can end suffering

8 | and death and illness that the agency and you especially

9 | as a director ought to do whatever you can in your power

10 | to achieve that solution, right?

11 |           MR. JOHNSON:  Objection; form.

12 |     A.  I don't understand your question.

13 |     Q.  Sure.  I'm going to repeat it and if you still

14 | don't understand it, I'll do better.

15 |           MR. EDWARDS:  Would you mind repeating that

16 | question, Ms. Morrow, to Director Lumpkin?

17 |           (Last question read back.)

18 |     A.  I'm trying to understand the question within

19 | that statement.

20 |     Q.  What do you not understand about that question,

21 | sir?

22 |     A.  I can share with you, as I mentioned earlier,

23 | air conditioning the system is a priority.

24 |     Q.  Sure.

25 |     A.  It was a priority before I was executive

Bobby Lumpkin - 10/14/2025

1  to fix it, fair?

2              MR. JOHNSON:  Objection; form.

3      A.  It is a priority and we are doing our very best

4  to fix it and to mitigate until we're able to fix it.

5      Q.  Sure.  And this is what I understand you're

6  doing.  A, you have come to the realization that there

7  is a very real danger that the heat causes and as a

8  consequence of that you have come to the determination

9  that you have to air-condition the housing areas of your

10 prison system, correct?

11             MR. JOHNSON:  Objection; form.

12     A.  The heat is a contributing factor, yes.

13     Q.  The heat is a contributing factor to death and

14 illness and as a consequence of that you have to get rid

15 of the heat and the way to get rid of it is by

16 air-conditioning the system, right?

17             MR. JOHNSON:  Objection; form.

18     A.  Yes.

19     Q.  And that is a priority of the agency and a

20 priority of Director Bobby Lumpkin, correct?

21     A.  Yes.

22     Q.  And I think what even Judge Pitman said is in

23 order to achieve that goal it's going to take time and

24 resources, and you would agree with that, right?

25     A.  Yes, I do.

Bobby Lumpkin - 10/14/2025

1    Q.   Okay.   And so phase one would have been this

2    $118 million?

3    A.   I believe that's correct.

4    Q.   Okay.   And then is there a commitment in the

5    agency to request all of the money that is allotted for

6    in this phase two plan?

7    A.   There's a commitment from the agency to

8    continue those discussions with appropriations with

9    finance as we build the LAR and what monies are

10   available to seek out for such things as

11   air-conditioning.

12   Q.   Okay.   So I think on the plan it's somewhere in

13   the neighborhood of 500 or $600 million.   Is that

14   consistent --

15   A.   I believe 600 roughly, yes.

16   Q.   Roughly.   Okay, so that's what you -- in order

17   -- in order for the agency to meet this plan, this

18   three-phase plan, it would require the legislature to

19   appropriate 600-ish million dollars?

20   A.   As part of phase two, yes; 655 I believe, yes.

21   Q.   Okay.   And, okay.   You know, is that what the

22   TDCJ is going to ask for or are they going to ask for

23   less or more or do you know?

24   A.   Right now I do not know.   Again, those

25   discussions will happen in calendar year '26 as we build

Bobby Lumpkin - 10/14/2025

1    Q.   Now, are there -- are there temperatures that
2  you're aware of, we'll call them heat indexes, that are
3  just too hot for you to safely run the prison?
4    A.   There's temperatures that, as they rise, we
5  make sure our mitigation efforts are applied as we
6  talked about in 10.64, as we train our staff, as we send
7  heat strike teams out to unannounced check on those
8  items that are important as the temperature rises, yes.
9    Q.   Sure.  But, you know, when you get into 110
10  heat index, 115, 120, 125 heat indexes, what you're
11  personally aware of through your logs, those conditions
12  happen in your prisons on occasion, right?
13    A.   We have seen those, yes.
14    Q.   And you're aware that heat waves are -- heat
15  waves are a time of grave danger to inmates and staff,
16  right?
17    A.   Yes.
18    Q.   Is there a temperature that TDCJ has said, you
19  know what, it's too hot; that we would need to
20  temporarily air-condition the facility or move people
21  out?
22    A.   Has a temperature been established?  No.
23    Q.   Has any thought gone into that?
24    A.   No.
25    Q.   Would any -- does -- is anything that you know

Bobby Lumpkin - 10/14/2025

1  necessary as a matter of inmate health and safety,

2  right?

3                    MR. JOHNSON:  Objection; form.

4       A.  Does it help mitigate the heat?  Absolutely,

5  air-conditioned beds.

6       Q.  It's necessary in order to protect inmates'

7  health and safety.  You need to get it air-conditioned,

8  right?

9       A.  Yes.

10      Q.  All right.  And do you agree with the court's

11 finding that high temperatures pose a substantial risk

12 of serious harm to anyone?

13      A.  Could be a contributing factor, yes.

14      Q.  Sure.  And that would include young and healthy

15 individuals.  It can also be a contributing factor to

16 them suffering, right?

17      A.  It depends if they have other medical issues,

18 yes.

19      Q.  Okay.  And do you agree with the court's

20 finding that even young healthy people are at

21 substantial risk of heat exhaustion, heat rash,

22 dehydration, heat cramps, heat syncope and heatstroke as

23 well as heart attacks, asthma attacks, kidney failure

24 and an increase in the risk of suicide when exposed to a

25 heat index above 88 degrees?

1      A.  I have no reason to dispute it.

2      Q.  Okay.  And then do you agree with the court's

3  finding that 23 people died in TDCJ facilities from heat

4  related causes between 1998 and 2012?

5      A.  To the best of my knowledge, yes.

6      Q.  Okay.  Do you know -- well, do you agree with

7  the court's finding that TDCJ has underestimated the

8  number of heat related deaths at TDCJ?

9      A.  Do I agree with that?

10     Q.  Yeah.

11     A.  No.

12     Q.  What is the factual basis for your disagreement

13  with the court on that issue?

14     A.  I'm not a medical examiner or have the medical

15  expertise to rule one way or the other.

16     Q.  Well, I understand that.  But the court

17  listened to medical experts talk about why there was

18  undercounting of heat related deaths and heat related

19  injuries.  Do you recall that testimony?

20     A.  I recall some testimony, yes.

21     Q.  The court found that credible.  Do you --

22  you're the head of the agency.  Do you agree that

23  underreporting of heat related injuries and deaths would

24  be a serious problem?

25     A.  If underreported, sure.

Bobby Lumpkin - 10/14/2025

1  right?

2              MR. JOHNSON:  Objection; form.

3      A.  Yes.

4      Q.  Now, here's my -- is the reason that TDCJ

5  didn't do anything to investigate the epidemiological

6  evidence in those studies because it already knew that

7  there was an increased risk of heat related illness or

8  death from being present inside unair-conditioned TDCJ

9  facilities?

10             MR. JOHNSON:  Objection; form.

11     Q.  (BY MR. EDWARDS)  Is that why they didn't

12  investigate it, if you don't know?

13             MR. JOHNSON:  Objection; form.

14     A.  I don't know that, but heat being a

15  contributing factor and need to expand air-conditioned

16  beds and mitigate, yes.

17     Q.  So what I think I hear you saying is, look, you

18  are aware the court found TDCJ didn't investigate the

19  epidemiology involved in those studies, but the point of

20  those studies is to indicate that there's an emergency

21  and that's how we're treating the situation.  Fair?

22     A.  I'm not following your question.

23     Q.  I guess it's -- well, look, there was a study

24  that indicated that for a period of roughly 20 years --

25  I don't know the exact time period -- there were 271

Bobby Lumpkin - 10/14/2025

 1  deaths as a consequence of exposure to extreme heat.

 2  That's the Skarha study.  You know about that study,

 3  right?

 4      A.  I know a study that states that, yes.

 5      Q.  Sure.  Did TDCJ to your knowledge ever

 6  investigate that study?

 7      A.  I don't know.

 8      Q.  Okay.  You weren't the executive director when

 9  that study was provided to Director Collier, right?

10      A.  I was not.

11      Q.  Okay.  You don't recall -- do you recall

12  Director Collier talking about that study with you?

13      A.  Yes.

14      Q.  Was he concerned about it?

15      A.  We take any information, whether concerned or

16  not, I mean, we still look at it not only on the surface

17  but what the study may say to look at the validity of

18  it.

19      Q.  Right.  You're not an epidemiologist, right?

20      A.  No, I'm not.

21      Q.  Neither is Director Collier, right?

22      A.  Not that -- he's not, that I know of.

23      Q.  Okay.  Do you recall asking for the underlying

24  data or talking to any epidemiologists about that study?

25      A.  Not that I -- not that I know of.

Bobby Lumpkin - 10/14/2025

1  saying since 2012.

2       Q.  Uh-huh.

3       A.  Is that also in context with the three deaths

4  of 2023 and the death of 2024?

5       Q.  Yes.

6       A.  So when we had knowledge of that you're

7  asking --

8       Q.  Let's take the three deaths -- the three deaths

9  that you agree.  There are really five deaths, but the

10  three deaths you agree were really heat related in 2023,

11  right?

12            MR. JOHNSON:  Objection; form.

13       Q.  (BY MR. EDWARDS)  Now, let me get rid of my

14  suggestion that there were five, though that's what the

15  court found.  Let's start this question.

16            You agree that there were three heat

17  related deaths in 2023?

18       A.  Where heat was a contributing factor, yes.

19       Q.  Yes.  Indoor heat was a contributing factor,

20  right?  Indoor extreme heat was a contributing factor?

21       A.  Heat was a contributing factor, yes.

22       Q.  Right.  Are you -- you are aware that your

23  spokespeople told the press after that that there had

24  been no heat related deaths in the prison system.

25       A.  I do not know that.

Bobby Lumpkin - 10/14/2025

1    Q.  Okay.  Well, if it's true, that's

2    reprehensible, right?

3    A.  It would need to be looked into, yes.

4    Q.  Well, it's true, so are you going to look into

5    it?

6    A.  Yes.

7    Q.  How will you look into it?

8    A.  How will I look into it?  I'll review the time

9    lines and I don't know that staff intently told the

10   public that there were no deaths --

11   Q.  Okay.

12   A.  -- in a reckless manner.

13   Q.  You would need to investigate as to whether or

14   not they did that on the direct order of Bryan Collier

15   or they were just acting on their own?

16   A.  Sure.

17   Q.  Okay.  All right.  You're aware that TDCJ's own

18   training documents provide that heat is the fifth

19   leading cause of serious employee injury?

20   A.  I believe it states something to that, yes.

21   Q.  Okay.  Do you agree with the court that

22   Elizabeth Hagerty died from indoor heat inside TDCJ on

23   June 28, 2023?

24   A.  I know there was a contributing factor of heat,

25   yes.

Bobby Lumpkin - 10/14/2025

1  people with medical vulnerabilities into air-conditioned

2  cells.  That's every warden's job or every -- every

3  correctional officer who comes across someone with one

4  of these known medical conditions or on one of these

5  known medical medications, if they see somebody in an

6  unair-conditioned cell they need to sound their own

7  alarm and say, no, that's not right; we need to get you

8  to a different cell.  Right?

9      A.  Yes.

10     Q.  Okay.  Now, this is directly out of the order,

11 but I think it's important because I just want to make

12 sure that you and Director Collier are on the same page.

13          The order states five years ago Collier

14 testified in Texas federal court that inmates confined

15 in temperatures at or above 95 degrees face a serious

16 health risk.  That's very consistent with your

17 understanding as well, right?

18     A.  Yes.

19     Q.  Okay.  And this is from David Sweetin who was

20 testifying on behalf of the agency.  This is what

21 doctor -- Judge Pitman wrote that he said.  He, being

22 Mr. Sweetin on behalf of the agency, acknowledged that

23 extreme heat poses danger, has killed inmates and has

24 caused numerous inmates and officers to suffer heat

25 related illnesses.  And that's your understanding as

Bobby Lumpkin - 10/14/2025

1    Q.  Okay.  Do you know that all county jails are

2 air-conditioned?

3    A.  Yes.  In Texas I know that.  I can't speak for

4 other states.

5    Q.  Thank you for clarifying.  Do you know that all

6 federal prisons in Texas are air-conditioned?

7    A.  I believe I've heard that before, yes.

8    Q.  Can you think of a good reason why all county

9 jails would be air-conditioned and all federal prison

10 facilities would be air-conditioned, but TDCJ would

11 deliberately and knowingly expose inmates to

12 unair-conditioned facilities?

13             MR. JOHNSON:  Objection; form.

14    A.  No, I do not know.

15    Q.  Take a minute.  Can you think of any good

16 reason why TDCJ would still have unair-conditioned

17 facilities?

18    A.  As compared to county jail facilities?

19    Q.  Or federal prison facilities.

20    A.  No.  The question for both, no, I cannot answer

21 why federal and county jails and TDCJ are different.  I

22 can speak a little bit to county jails just from

23 correctional knowledge.

24    Q.  Okay.  Do you think that federal prisoners

25 deserve better, safer protections than state prisoners?

Bobby Lumpkin - 10/14/2025

1      A.  Yes.

2      Q.  And if you don't -- if the measures don't

3  reduce the substantial risk of heat then they're not --

4  they're not effective, right?

5      A.  Right, if they don't.

6      Q.  Okay.  And are you aware of the Purdum study or

7  the Purdum analysis involving mitigation measures in

8  Texas prisons?

9      A.  Yes.

10      Q.  I would expect you to say that the Purdum study

11  alerted you to serious problems in the way mitigation

12  measures were being employed in the prison system?

13      A.  My understanding through surveys that's what

14  they -- from I think around 300 that were surveyed,

15  roughly.

16      Q.  Well, and from those surveys 60 percent -- 66

17  percent said they didn't have access to ice of those

18  surveyed.  That's an incredibly big concern, right?

19      A.  Yes, if that is true.

20      Q.  Okay.  And 61 percent didn't have access to

21  cool down showers.  That's hugely concerning, right?

22      A.  If there's not access, yes.

23      Q.  And you received this study or this analysis,

24  right?

25      A.  Yes.

Bobby Lumpkin - 10/14/2025

1    A.  Yes.

2    Q.  Now, here Judge Pitman is kind of coming to his

3  conclusion I think where he, after saying that the

4  agency -- not necessarily you in particular, but through

5  you, I suppose -- is violating the constitution and

6  endangering the men and women in his care.  He

7  concludes, look -- and you can look at this on page 56

8  -- air conditioning is the only effective protection

9  from extreme heat.  And I think, to be fair to you, you

10  agree with that, don't you?

11    A.  You said page 56?

12    Q.  Page 56, bold F.

13    A.  Okay.

14    Q.  "Air conditioning is the only effective

15  protection from the extreme heat."  And you'd say, yes,

16  that's true as far as would go extreme heat inside,

17  right?

18    A.  Right.

19    Q.  All right.  And then if you look on page 59,

20  sir.  And again, I do feel I'm being more redundant than

21  maybe not the normal, but a little bit redundant, but I

22  want to be careful here.

23            Judge Pitman basically concludes, I don't

24  know if it's findings of fact or conclusions of law, but

25  air conditioning the entire TDCJ system is feasible.

Bobby Lumpkin - 10/14/2025

1  And you agree with that right?

2      A.  Say that again?  I'm sorry.

3      Q.  I've broken it up into two.  I promise I'll

4  read the second part, okay?

5              According to Judge Pitman, air conditioning

6  the entire TDCJ system is feasible.  You would agree

7  with that?

8      A.  Yes, time and resources.

9      Q.  You're one step ahead of me.  And he says, "Air

10  conditioning the entire TDCJ system is feasible, but

11  takes time and resources," right?

12      A.  Yes.

13      Q.  So really the question or a question that the

14  court will have is how much time, since we're going to

15  order you to air-condition, how much time would be

16  reasonable to give you and how much resources do you

17  need?  Those are the questions, right?

18      A.  Yes.

19      Q.  And you've developed a plan I think or it's a

20  piece of paper, but I'll call it -- do you think it's

21  fair to call it plan, this phased development for air

22  conditioning?

23      A.  Yes.

24      Q.  Okay.  Can you tell me what number it is?

25              I want to make sure I give it to you, sir.

Bobby Lumpkin - 10/14/2025

1   with a court order.  Fair?

2           MR. JOHNSON:  Objection; form.

3       A.  Not necessarily.

4       Q.  Well, you're sure you'll get it, right, because

5   you're going to follow court orders, right?

6           MR. JOHNSON:  Objection; form.

7       A.  I am, but I didn't understand your question as

8   being exactly that.  I thought you said that's the only

9   way that I would follow this.

10      Q.  Oh, no, no, no.  I'm sorry.

11      A.  I misunderstood you.

12      Q.  I apologize.  A way to ensure that you would

13  have to follow it would be with a court order; is that

14  fair?

15      A.  Obviously, yes.

16      Q.  Okay.  And then, you know, I think, I think

17  what I hear you say is you would hope -- well, can you

18  commit right now to at least asking the legislature for

19  $620 million in the next session?

20      A.  I couldn't commit today.  It depends on what

21  the economic climate would be when the LAR is submitted.

22      Q.  What does it matter what the economic climate

23  is when people's lives are on the line?

24      A.  It's not what my decision is based on, yea or

25  nay; again, going by what money was available to make a

Bobby Lumpkin - 10/14/2025

1   on behalf of the men and women in your charge that you

2   care for or even the officers that you employ that this

3   is what will happen, correct?

4       A.  That I can't -- what was the word you used?

5       Q.  You can't promise the court this will happen,

6   right?

7       A.  I can't promise it will happen.  I can show

8   that the agency continues to add beds and is serious

9   about this being a prioritization.

10      Q.  Got you.  And I think you would tell the court,

11  look, our aspirational plan is proof that we are serious

12  about fixing this problem, right?

13      A.  Yes.

14      Q.  Okay.  Well, again, I don't want to be too

15  lovey-dovey here, but about the best thing that can

16  happen for the people in your employ and the men and

17  women in your care is for the court to order you to

18  follow this plan, right?

19              MR. JOHNSON:  Objection; form.

20      A.  You're asking me if that's the best thing that

21  could happen?

22      Q.  For the men and women in your care and the

23  people that you employ, isn't that the best thing that

24  could happen?

25      A.  That if was ordered versus if it's actually

Bobby Lumpkin - 10/14/2025

1    Q.  Okay.  And so I guess let me ask you this:  If
2    you got $620 million, phase two fiscal year '28-'29 is
3    feasible?
4    A.  Yes.  As mentioned, several of these are
5    prototypes --
6    Q.  Sure.
7    A.  -- that have similar design.
8    Q.  And I'm going to talk to you more about that,
9    because I've always been confused as to why you didn't
10   do the prisons that are right next to each in the same
11   kind of construction.  Why Pack and Luther don't get
12   done together, why prison X that's right next to prison
13   Y doesn't get done together, why you couldn't do a
14   design of -- why one design for the 2,250 isn't good for
15   all 2,250's since their the same basic construction
16   design.  Okay.  Anyway, I don't even know -- I'll
17   withdraw that.
18          All right.  In terms of feasibility you
19   would tell the court if the money's appropriated this is
20   feasible.
21   A.  Yes.
22   Q.  And you would even tell the court -- like
23   here's what's going to come down the road, sir; I just
24   want to let you know.  The team of us, you know, have
25   consultants and design teams who are looking at this and

Bobby Lumpkin - 10/14/2025

1    process assigned scores; it's all based on the algorithm
2    as we discussed.
3             Of course, if there is someone that is
4    suffering from a heat illness or diagnosed with a heat
5    illness that medical is notifying security, the duty
6    warden, the warden that there is an instance such as
7    that.
8        Q.  So that's people that actually suffer heat
9    illnesses.  I'm more focused on people that are at risk,
10   okay?
11       A.  Um-hum.
12       Q.  It sounds like the sole thing that TDCJ does is
13   work with its healthcare providers with this heat score.
14       A.  Yes.
15       Q.  Okay.  And I guess you'd agree that all the
16   human beings in your custody and care are at risk when
17   they're housed at high environmental temperatures.  It's
18   just that certain conditions we've talked about today
19   you're at an elevated risk, right?
20       A.  Yes, higher temperatures do cause a risk.  Yes.
21       Q.  Okay.  Do you know the meaning of this HSL, the
22   health service liaison facility -- the "Health services
23   liaison cannot request reassignment of an offender to an
24   air conditioned or climate controlled facility."  Do you
25   know what that means?

Bobby Lumpkin - 10/14/2025

1  A.  The only thing I would -- I don't know if

2  that's right, because I would add the 85 million from

3  the 88th, where does that fall in with the phase one?

4  Q.  I don't know.

5  A.  Right.  So that's why I can't speculate

6  exactly.

7  Q.  You would say it could be $200 million less or

8  maybe it's only $115 million less?

9  A.  Could be.

10  Q.  So somewhere between 115 million and $200

11  million less is what was actually asked for and

12  appropriated?

13  A.  From what I see, yes.

14  Q.  Okay.  Does it remain true that TDCJ has not

15  solicited bids for installing permanent air conditioning

16  throughout all prisoner housing areas?

17  A.  Yes.

18  Q.  Do you know if your website summarizing cool

19  bed construction in TDCJ is accurate and correct?

20  A.  To the best of my knowledge, we update it

21  often; it is.

22  Q.  In looking at the construction projects on when

23  it's completed, it looks like it will add 37,274

24  air-conditioned beds to the system.  Is that your

25  understanding?

Bobby Lumpkin - 10/14/2025

1      Q.  Only money though, right?

2      A.  It could take staff, as well.

3      Q.  Okay.  Time and resources, right?

4      A.  Time and resources.

5      Q.  All right.  Let's look at tab 58.  All right.

6  I don't know if I need exhibits for this, David.

7          So is this true, that TDCJ is currently

8  releasing out bids for each single facility or unit for

9  installation of air conditioning?

10     A.  Releasing out bids for each?

11     Q.  Yeah, like each unit.  Is each unit its own

12  bid?

13     A.  I'm not sure.  I would have to defer to

14  Mr. Steffa.

15     Q.  Do you know if TDCJ has ever considered

16  grouping certain projects under one bid for efficiencies

17  of scale or by region for efficiencies of scale?

18     A.  Not that I know of.

19     Q.  Do you think that would be a good idea?

20     A.  I guess I would have to know more context.

21     Q.  Well, let's put it this way:  If grouping

22  projects achieved efficiencies of scale which speeded

23  the process up or made it cheaper, that would be a good

24  idea, right?

25     A.  Not an engineer or the chief financial officer

Bobby Lumpkin - 10/14/2025

```
                  UNITED STATES DISTRICT COURT
              FOR THE WESTERN DISTRICT OF TEXAS
                       AUSTIN DIVISION

BERNHARDT TIEDE, II; TEXAS     )
PRISONS COMMUNITY              )
ADVOCATES; BUILD UP, INC.,     )
A/K/A JUSTICE IMPACTED         ) Civil Action No.
WOMEN'S ALLIANCE; TEXAS        ) 1:23-cv-01004-RP
CITIZENS UNITED FOR            )
REHABILITATION OF ERRANTS;     )
and COALITION FOR TEXANS       )
WITH DISABILITIES,             )
          Plaintiffs,          ) Civil Action No.
                               ) 1:16-cv-00917
VS.                            )
                               )
BRYAN COLLIER, in his          )
official capacity as           )
Executive Director of          )
Texas Department of            )
Criminal Justice,              )
          Defendant.           )
```

I, TABITHA MORROW, Certified Shorthand

Reporter in and for the State of Texas, Registered

Professional Reporter, hereby certify to the following:

That the witness, BOBBY LUMPKIN, was duly sworn,

and that the transcript of the oral deposition is a true

record of the testimony given by the witness;

That the deposition transcript was submitted

electronically on _____ to the witness c/o

Mr. Wade A. Johnson for examination, signature, and

return to Wright Watson & Associates by _____;

That pursuant to information given to the

deposition officer at the time said testimony was taken,

the following includes counsel for all parties of record

Bobby Lumpkin - 10/14/2025

1  and the amount of time used by each party at the time of

2  the deposition:

3  ATTORNEYS FOR PLAINTIFFS:
        MR. JEFF EDWARDS (5 hours, 37 minutes)
4      MR. DAVID ANTHONY JAMES
        MS. LISA SNEAD

5

ATTORNEY FOR DEFENDANT:
6      MR. WADE A. JOHNSON
        MS. ABIGAIL K. CARTER
7      MR. BRANDON J. MICKLE
        MS. LAUREN MCGEE

8

9      I further certify that I am neither counsel for,

10 related to, nor employed by any of the parties or

11 attorneys in the action in which this proceeding was

12 taken, and further that I am not financially or

13 otherwise interested in the outcome of the action;

14     Certified to by me this 24th day of October, 2025.

15

16     _____
        Tabitha Morrow, CSR, RPR
17     TEXAS CSR No. 4593
        Method: Machine Shorthand
18     Expiration:  04/30/26

19     WRIGHT WATSON & ASSOCIATES
        Firm Registration No. 225
20     1250 S. Capital of Texas Highway
        Building 3, Suite 400
21     Austin, Texas 78746
        (512)474-4363

22

23

24

25

**WRIGHT WATSON & ASSOCIATES**

# EXHIBIT 20



| | |
|---|---|
| **TEXAS DEPARTMENT** | **NUMBER:** AD-10.64 (rev. 12) |
| **OF** | **DATE:** April 14, 2025 |
| **CRIMINAL JUSTICE** | **PAGE:** 1 of 19 |
| | **SUPERSEDES:** AD-10.64 (rev. 11) May 1, 2024 |

# ADMINISTRATIVE DIRECTIVE

**SUBJECT:** **EXCESSIVE AND EXTREME TEMPERATURE CONDITIONS IN THE TDCJ**

**AUTHORITY:** Tex. Gov't Code §§ 493.001, 493.006; BP-02.08, "Statement of Internal Controls"

Reference: TDCJ *Risk Management Program Manual*; CMHC D-27.2, "Heat Stress"

**APPLICABILITY:** Texas Department of Criminal Justice

**POLICY:**

The Texas Department of Criminal Justice (TDCJ) shall establish guidelines for unit operations to mitigate risk during excessive or extreme temperatures. Every reasonable effort shall be made to prevent injuries related to excessive or extreme temperatures in the TDCJ.

The TDCJ shall work closely with health care staff to immediately identify inmates at risk from excessive or extreme temperatures. Incidents related to excessive or extreme temperatures shall be reported to TDCJ administration.

**DEFINITIONS:**

The following terms are defined for the purpose of this directive and are not intended to be applicable to other policies or procedures.

"Extreme Cold" refers to a period of abnormally cold and dangerous temperatures or wind chills that can result in negative impacts to people.

"Extreme Cold Warning" is a warning issued by the National Weather Service when dangerously cold air temperatures or wind chill values are expected or occurring. The criteria for this warning varies from place to place.

"Extreme Heat" refers to a period of abnormally hot and dangerous temperatures, with or without high humidities, that can result in negative impacts to people.

**TIEDE DEF_367748**

"Extreme Heat Advisory" is an advisory issued by the National Weather Service for dangerous heat conditions that are not expected to reach warning criteria.

"Extreme Heat Warning" is a warning issued by the National Weather Service when extremely dangerous heat is expected or occurring. The criteria for this warning varies from place to place.

"Heat Index," is a measure of how hot it actually feels when the relative humidity is added to the actual air temperature.

"Heat Wave" is a period of abnormally and uncomfortably hot and unusually humid weather. Typically a heat wave lasts two or more days.

"Relative Humidity" is a dimensionless ratio, expressed in percent, of the amount of atmospheric moisture present relative to the amount that would be present if the air were saturated. Since the latter amount is dependent on temperature, relative humidity is a function of both moisture content and temperature.

"Wellness Check" is conducted when a staff member responsible for the supervision of inmates, during routine security rounds or other inspections, visually monitors or observes each inmate to identify any visible signs of temperature-related illness or distress.

"Wind Chill" is a quantity expressing the effective lowering of the air temperature caused by the wind, especially as affecting the rate of heat loss from an object or human body, or as perceived by an exposed person.

## PROCEDURES:

TDCJ inmates may be assigned to work in conditions of extreme heat or extreme cold when such work is essential to the continued operation of TDCJ and cannot be reasonably delayed or rescheduled, which may only be approved by the warden and applicable departmental supervisors.

Before requiring inmates to work in extreme heat or extreme cold, the warden and applicable departmental supervisors shall ensure appropriate measures are taken to prevent excessive or extreme temperature-related injuries, including consulting health care staff to identify specific hazards. In all cases of temperature-related incidents or injuries, unit health care staff and the unit risk manager shall be notified immediately. Staff shall remove a distressed inmate from the environment as quickly as possible to receive proper medical treatment.

I.    Monitoring Procedures

    Procedures and exposure charts, Wind Chill Index (Attachment A), and Heat and Humidity Index (Attachment B) are provided to assist unit administration in determining safe conditions and risk categories in extreme temperatures.

    A.    Units shall monitor and announce over the radio the temperature, heat index or wind chill, and risk category once every hour between 12:30 a.m. and 11:30 p.m.

**TIEDE DEF_367749**

Temperature information is available through the following sources:

1. The National Oceanic and Atmospheric Administration (NOAA) website (www.noaa.gov);

2. NOAA Weather Radio;

3. The National Weather Service;

4. Local weather radio and television stations; and

5. Onsite weather instrumentation.

B. TDCJ shall automate the recording of the temperature, humidity, and heat index every hour using data collected.

C. The Office of Emergency Management (OEM) shall maintain the automated temperature logs in accordance with the TDCJ records retention schedule.

D. OEM shall monitor weather alerts and disseminate to relevant divisions warnings or notices of affected counties of heat waves, extreme heat advisories, extreme heat warnings, extreme cold warnings, and other temperature-related events.

II. Extreme Cold Conditions

A. Determination

Using the current temperature, humidity, and wind chill, in addition to any other reliable weather information, the warden shall use the Wind Chill Index to assess the risk.

B. Special Precautions

1. Appropriate clothing for inmates working in cold weather includes thermal underwear, insulated jackets, cotton or leather gloves, insulated hoods, work shoes, and socks. Appropriate clothing shall be issued when the Wind Chill Index indicates any danger of exposure injury.

2. If additional guidance is needed, health care staff, the unit risk manager, or the assistant unit risk manager shall be consulted to assist in determining appropriate clothing and footwear needed to prevent cold injury.

3. Care shall be taken to prevent perspiration, which could soak clothing and thus compromise the insulating value of the clothing.

4. Layers of clothing shall be removed or added according to the temperature and level of physical activity.

C.     Symptoms of Hypothermia

    1.     Hypothermia is a condition occurring when the body loses heat faster than it can produce heat. With the onset of hypothermia, blood vessels in the skin tighten to conserve vital internal body heat, affecting the hands and feet first.

    2.     Involuntary shivers will begin if the body continues to lose heat. This reaction is the way the body produces more heat and is usually the first real warning sign of hypothermia.

    3.     Further heat loss produces speech difficulty, forgetfulness, loss of manual dexterity, collapse, and possibly death.

III.     Extreme Heat Conditions

A.     Determination

Using the current temperature, humidity, and heat index, in addition to any other reliable weather information, the warden shall use the Heat and Humidity Index (Attachment B) to assess the risk.

B.     Special Precautions

    1.     At any point when the Heat and Humidity Index indicates the possibility of risk, the warden shall instruct the appropriate staff to follow the precautionary measures identified in the Heat and Humidity Index.

    2.     If additional guidance is needed prior to exposing inmates to extreme heat conditions in the work area, health care staff, the unit risk manager, or assistant unit risk manager shall be consulted to evaluate the hazards of the current temperatures and humidity, including indoor work areas such as a boiler room or kitchen.

    3.     The hazard of sunburn and other results of ultraviolet (UV) radiation exposure shall also be closely monitored. Inmates shall be provided and required to wear clothing appropriate for the temperatures and hazards imposed by UV radiation. For example, light-colored hats may be worn in high heat and direct sunlight.

    4.     Drinking water and cups shall always be available to inmates. Inmates will be permitted to have one cup in their possession. High water intake shall be encouraged during periods of extreme heat and depending on an inmate's state of acclimatization to hot weather conditions, liquids containing sodium may also be provided.

Inmates and staff working in a heat index above 90°F shall be provided access to and encouraged to consume water before their work assignment and as

needed during the workday. An intake of at least 16 ounces of fluids per hour of work should be maintained.

Under extreme heat conditions, work should be interrupted frequently, and inmates should be encouraged to drink fluids even when not thirsty.

5.    Inmates newly assigned to jobs that require work under conditions with a heat index of 90°F or greater must be acclimatized before assuming a full workload. These inmates shall work no more than four hours at a time, separated by at least one hour of rest in a cooler environment, for the first week. After the first week, inmates newly assigned to jobs may assume a normal work schedule. Acclimatization can be lost in as little as two weeks; therefore, if inmates are away from a hot work environment for more than two weeks, they shall be reacclimatized. Acclimatization is not necessary for individuals assigned to the same job when temperatures vary with seasonal changes.

6.    TDCJ and health care staff shall work together to identify inmates susceptible to temperature-related illness due to medical conditions. As inmates arrive at intake facilities, a staff member from the medical department shall conduct an initial screening to determine if the inmate has any conditions or is on any medication that would make the inmate more susceptible to heat.

C.    Symptoms

1.    Heat cramp symptoms include:

    a.    Painful, intermittent, and involuntary muscle spasms following hard physical work in a hot environment; and

    b.    Cramps usually occurring after heavy perspiration and often beginning after strenuous physical work.

2.    Heat exhaustion symptoms include:

    a.    Profuse perspiration, weakness, rapid pulse, dizziness, and headaches;

    b.    Cool skin, sometimes pale and clammy, with perspiration;

    c.    Normal or subnormal body temperature; and

    d.    Possible nausea, vomiting, and unconsciousness.

3.    Heatstroke symptoms include:

    a.    Diminished or absent perspiration (sweating);

    b.    Hot, dry, and flushed skin; and

TIEDE DEF_367752

      c.     Increased body temperatures, which, if left untreated, may lead to delirium, convulsions, seizures, and possibly death. **Medical care is emergently needed.**

IV.   Preventive Care and Precautions for Heat

    A.    Before April 15th of each year, wardens shall review with unit maintenance staff the status of HVAC units, shower temperatures, fans, ice machines, ventilation systems, exhaust fans, respite areas throughout the unit, and any onsite weather instrumentation used by the unit. Wardens shall coordinate with unit maintenance staff to prioritize maintenance work orders for these areas and immediately address any deficiencies.

    B.    Inmates shall be assessed for medical and mental impairments by qualified health care staff who will assign each inmate appropriate restrictions related to physical activities, transportation, and work. Appropriate limitations and restrictions shall be assigned and entered in the Restrictions Module in the electronic health record (EHR), which is automatically transmitted to the TDCJ computerized system Health Summary for Classification (HSIN) screen.

    C.    Once an inmate is identified as heat-sensitive, health care staff shall notify unit countroom staff and update the inmate's HSIN accordingly. Countroom staff shall then make any necessary changes to the inmate's housing or work assignment and notify correctional staff if an adjustment is necessary.

    D.    During each security round, staff shall conduct wellness checks for inmates. Staff shall immediately seek care for all inmates requesting medical assistance or exhibiting signs of illness or distress.

    E.    Inmates shall be allowed access to respite areas during periods of extreme heat. Unit staff should use good correctional judgment to accommodate as many requests for respite as possible and to allow inmates to stay in respite as long as possible. Inmates who do not live in or work in air-conditioning may be given priority.

       1.    Inmates requesting access to a respite area are not required to be seen by health care staff unless they are exhibiting signs or symptoms of a heat-related illness.

       2.    Inmates may bring to a respite area cups, water, other hydrating drinks such as electrolyte sports drinks and electrolyte powders, cooling rags, and reading materials. Inmates shall *not* bring tablets.

       3.    The warden may designate any area with air conditioning for respite. Signs in English and Spanish shall be posted informing inmates of the areas designated as respite areas.

       4.    The warden or designee shall determine the order of use for respite areas while maintaining the safety and security of the unit.

5.     Inmates shall not be permitted to choose the respite area to which they will have access.

F.     Representatives from various divisions shall meet annually to review best practices concerning preventive care and precautions against excessive or extreme temperatures. The executive director shall issue by email a "Seasonal Preparedness Directive" to ensure readiness for extreme weather conditions. The Correctional Institutions Division (CID) director shall also inform unit wardens of additional mandatory compliance measures in the prevention of cold- and heat-related injuries and illness.

G.     Training will be conducted at units as outlined in Section VIII.

H.     Units shall place posters in housing areas reminding inmates of heat precautions and the importance of water intake and replace all posters that have been damaged or destroyed;

I.     Inmates shall be allowed to purchase the following commissary items without affecting their spending limit: cooling towels, cool shirts, gym shorts, shower shoes, bottled water, electrolyte sports drinks, electrolyte powder, fans, and sunblock.

J.     Units shall transport psychiatric inpatient inmates to other facilities via air-conditioned transfer vehicles only;

K.     Units shall ensure all staff currently have, or are provided with an FN-1181, Employee Information Pocket Card, obtained through the Prison Store and available at the units, and that the cards are carried on their person at all times while on duty;

L.     In situations where the heat index is above 90ºF, units shall initiate the following steps:

1.     Provide additional chilled water in inmate dorms, housing areas, recreational areas, and during meal times;

2.     Transport inmates during the coolest hours of the day, when possible;

3.     Allow inmates to use and carry cooling towels;

4.     Allow inmates to wear shorts and t-shirts in dayrooms and recreational areas;

5.     Prioritize work orders and ensure maintenance for air-conditioning units, HVAC systems, fans, blowers, and showers in inmate housing areas;

6.     Allow additional showers for inmates when possible. Lower the water temperature for single showers in each inmate housing area;

7.     Allow fans for inmates in all custody levels, including restrictive housing and disciplinary status where electrical outlets are available. Ensure a fan program is in place for the permanent issuance of fans to indigent inmates. Fans shall only be confiscated if altered or stolen.

8.   Reduce kitchen and dish room operations as needed. Units may exercise flexibility by serving cold cuts or other food that does not require heating; and

9.   Minimize laundry operations during afternoon hours. To the extent possible, begin washing and drying in the earlier, cooler hours of the morning in order to be completed by noon.

M.   Once the heat index is above 90°F and continues to rise, TDCJ shall continuously work to increase its efforts to monitor compliance with heat mitigation measures. This includes increased activity by TDCJ Heat Strike Teams and unit staff. Additionally, wardens shall use good correctional judgment to identify other unit operations that may be modified, such as restricting or cancelling outside work and recreation.

V.   Heat Strike Teams

The Heat Strike Team consists of agency experts in diverse fields within the Administrative Review and Risk Management (ARRM) Division. This team is tasked with conducting unannounced assessments across TDCJ facilities to ensure strict adherence to AD-10.64.

A.   To achieve this purpose, the Heat Strike Team shall:

1.   Identify units with findings in the Seasonal Preparedness Checklist.

2.   Thoroughly evaluate reports from facilities flagged for deficiencies, such as nonoperational fans, incomplete staff training, or restricted access to respite areas. These findings are critical in shaping the focus of assessments.

3.   Highlight units with heat-related grievances by utilizing grievance records to identify trends or recurring complaints, such as inadequate cooling resources or limited hydration availability, which may indicate systemic issues that require immediate attention.

4.   Focus on units with the highest indoor temperatures.

5.   Assemble a varied team of professionals with expertise in facility operations, risk assessment, and compliance to ensure that evaluations are robust and effective.

6.   Conduct thorough assessments at priority units. Ensure all findings are documented in actionable reports that provide clear recommendations for improvement.

B.   Heat assessments will emphasize the following key areas:

1.   Training

Review the understanding of Seasonal Preparedness training for both staff and inmates. Verify staff familiarity with key practices to prevent and respond to

heat-related illnesses. Assess whether inmates have received appropriate education on hydration, the use of respite areas, and other protective measures.

2.  Staff Readiness

    a.  Conduct thorough spot checks to ensure staff members carry Employee Information Pocket Cards (FN-1181 rev. 11/24), which provide critical guidelines for recognizing heat-related illnesses and responding to emergencies.

    b.  Assess staff understanding of the content through interviews or hypothetical scenario-based drills designed to test knowledge. For example, staff may be asked how to recognize and respond to symptoms of heatstroke or dehydration.

    c.  Ensure staff understand how to rapidly respond to situations, including identifying high-risk inmates, initiating emergency medical care, and accessing respite. Additionally, staff shall be able to demonstrate clear communication strategies for guiding inmates to hydration stations or respite areas in an orderly and efficient manner.

3.  Signage and Awareness

    a.  Inspect facilities to ensure sufficient signage is displayed in accessible, high-traffic areas. Signs must include clear instructions for recognizing heat symptoms, accessing respite areas, and staying hydrated.

    b.  Assess whether signage is displayed in both English and Spanish and whether it uses visual cues, such as diagrams or icons, for accessibility.

4.  Air Circulation

    a.  Inspect fans and vents to ensure operation, cleanliness, and positioning for optimal airflow. Fans must be strategically placed to address heat-prone areas, such as inmate housing, hallways, and dayrooms.

    b.  Assess whether the number of fans adequately meets the needs of the facility, particularly in units without air conditioning.

5.  Temperature Management

    a.  Verify that Kestrel devices are used consistently to monitor indoor temperatures, as directed by CID leadership.

    b.  Ensure weather conditions are announced hourly as required, and verify outdoor weather instrumentation is functional if used by the unit.

c.  Check that chilled water is readily available at all times for both staff and inmates. Evaluate whether ice machines are properly maintained and whether kitchens are stocked with an adequate supply of ice to meet demand. If ice or chilled water is unavailable, verify that alternate measures are in place, such as portable coolers, bottled water, or additional hydration stations, to ensure adequate access to cooling resources.

6.  Respite Measures

a.  Confirm respite areas are clearly marked, accessible at all hours, and equipped with sufficient resources, such as seating and fans.

b.  Evaluate the availability of cool showers for inmates and ensure shower temperatures are consistently lowered in extreme heat conditions. Confirm all shower controls are clearly marked to differentiate cold and hot water settings, ensuring ease of use and preventing accidental exposure to excessively high temperatures.

7.  Inmate Work and Recreation Adjustments

a.  Confirm inmate workers are provided regular breaks and are dressed appropriately for the temperatures. This includes wearing t-shirts, shorts, hats, and sunglasses, ensuring comfort and safety during work activities.

b.  Confirm recreation schedules to ensure outdoor activities are conducted during the coolest hours of the day to reduce heat-related risks.

8.  Comprehensive Inspections by Unit Risk Managers

Verify that Unit Risk Managers are conducting weekly comprehensive inspections, which include checking for operational issues with fans, ice machines, and other cooling equipment, as well as monitoring adherence to established heat mitigation protocols. Risk Managers will work closely with unit administration during the weekly inspections to address any concerns immediately and ensure alignment on corrective actions.

9.  Inmate Transportation Protocols

Confirm that transport vehicles are equipped with appropriate cooling measures.

10.    Housing Assignments and Screening

    a.    Ensure that heat-sensitivity is carefully considered when making housing assignments, giving priority to air-conditioned areas for inmates with higher heat sensitivity scores.

    b.    Confirm that during intake, each inmate is screened for heat sensitivity, assigned a heat score, and provided with a cup.

11.    Evaluate Commissary Supplies

Ensure heat-related products, such as cooling towels, fans, and electrolyte powders, are adequately stocked in commissaries. Assess whether these items are accessible to all custody levels. Ensure a fan program is in place to provide issuance of fans to indigent inmates, ensuring equitable access to cooling resources. Fans may only be confiscated if they are altered or stolen, and alternative arrangements shall be made for the affected inmates to maintain adequate cooling options.

12.    Coordinate with Facility Teams

Work closely with food service and maintenance teams to confirm equipment, such as ice machines, fans, and generators, are regularly serviced and in good working condition. Provide recommendations to address any maintenance backlogs.

VI.    Inmates with Heat Sensitivity Scores

The TDCJ recognizes some inmates are potentially at a heightened risk of heat-related illnesses because of their age, health conditions, or medications. These inmates are identified through an automated heat sensitivity score that uses information from the inmate's EHR. Note that inmates identified as Pack Unit Class Members shall be managed in accordance with AD-03.05, "Inmates Identified as Pack Unit Class Members."

A.    Heat sensitivity scores are updated automatically at least daily and as changes occur to the information in EHR. For newly received inmates, health services staff use an intake heat sensitivity form to screen inmates as soon as they arrive. When new inmates receive their physical examination, their score is updated automatically. Inmates who have a heat sensitivity score receive priority placement in a housing area that is air-conditioned.

B.    For returning inmates, intake staff shall verify any previous heat sensitivity score(s) prior to placement in a housing area. If an inmate has previously received a heat sensitivity score, the inmate shall be housed in a cool bed until the physical examination is completed and their score can be updated.

C.    Except as provided in subsection (F), inmates who have a heat sensitivity score may refuse air-conditioned housing. During their unit classification committee hearing or

by submitting a form I-60, Inmate Request to Official, an inmate may request to complete an Inmate Refusal of Cool Bed (A/C Housing Assignment) Form (Attachment C). Inmate Refusal of Cool Bed Forms are signed by the inmate and the warden with a witness present. However, an inmate who signs a refusal may still be housed in air-conditioned housing at the TDCJ's discretion.

D.    Heat sensitive inmates who refuse cool bed housing will continue to have a heat sensitivity score and will have an indicator of the refusal on their HSIN screen.

E.    Heat sensitive inmates who refuse cool bed housing shall be monitored for an increase in their heat sensitivity score and those whose score has increased shall be required to complete a new refusal form if they continue to refuse air-conditioned housing.

F.    Inmates assigned to the Developmental Disabilities Program, in an infirmary, in an inpatient mental health, or a specialized mental health program may not refuse air-conditioned housing.

VII.    Emergency Treatment

Staff shall monitor and seek care for inmates requesting medical assistance or exhibiting signs of illness during periods of excessive or extreme temperatures.

A.    In all cases of temperature-related incidents or injuries, the first aid process shall be immediately initiated by correctional or other unit staff.

1.    If an injury is sustained in extreme cold conditions, staff shall:

a.    Bring the distressed inmate out of the cold and restrict any further duties or activities until the severity of the injury is evaluated.

b.    Remove any wet clothing and insulate the inmate with dry, warm blankets or clothing, ensuring all constricting items of clothing and footwear are removed from injured areas and the injured areas are covered.

c.    If frostbite exists, gently heat the affected area with warm water or towels, a heating pad, or hot water bottles. Do not rub the affected area or rupture blisters.

d.    If a lower extremity is affected, treat by slightly elevating the affected area.

e.    If the inmate is conscious, encourage consumption of warm, sweetened liquids.

f.    If necessary, initiate lifesaving measures.

g.    If evacuation from cold requires travel on foot, do not treat the affected area until the inmate reaches medical help.

h.    Transport the inmate to medical care as soon as possible and continue treatment after arriving at the site or when the inmate is delivered to health care staff's care.

2.    If an injury is sustained in extreme heat conditions, staff shall:

a.    Immediately try to decrease the inmate's temperature by placing the inmate in a cool area.

b.    Force oral fluid intake only if the inmate is conscious and able to safely swallow.

c.    Remove heavy clothing or excess layers of clothing and saturate remaining lightweight clothing with water. Position the inmate in the shade, allowing air movement past the inmate, and if necessary, fan the inmate to create air movement.

d.    If ice is available, place ice packs in armpit and groin areas.

e.    Take all these measures while moving the inmate in the most expeditious means available to continue with and obtain proper medical treatment.

f.    Ensure, whenever health care staff are on-site, treatment is continued as directed by the physician or health care staff.

B.    Notification

1.    Health care staff, the warden, and the unit risk manager shall be immediately notified regarding all cases of temperature-related incidents or injuries. If there is no on-site health care staff, 911 shall be immediately called.

2.    Any temperature-related incident or injury shall be reported to the Emergency Action Center in accordance with AD-02.15, "Operations of the Emergency Action Center and Reporting Procedures for Serious or Unusual Incidents."

3.    All heat-related illnesses shall be evaluated by staff to include the conditions surrounding the inmate, such as water intake, location, and what the inmate was doing before becoming ill. Any "cluster illnesses" or illnesses occurring in inmates in the same housing areas shall be documented and reported to the CID director.

VIII.    Training

The TDCJ shall continue to make a deliberate and ongoing effort to integrate excessive or extreme temperature mitigation into the agency's operational culture. This includes long-range planning efforts and the development of targeted training materials.

A.    Annual Training

1.    A standardized training program shall be developed by the TDCJ in conjunction with the University of Texas Medical Branch Clinical Education Department. Each unit, and any department with staff responsible for the supervision of inmates, shall be provided a copy of the training program materials to facilitate the required training.

   a.    The training shall be given in a group setting, when possible.

   b.    All units shall conduct an annual standardized training program using unit-based health care staff.

   c.    The facility health administrator for each unit shall submit documentation of extreme heat and extreme cold temperature training for TDCJ staff, health care staff, and inmates to the Health Services Division Office of Health Services Monitoring annually by April 15th (heat) and October 1st (cold).

2.    Each warden and department head shall ensure training in the prevention of injuries due to excessive or extreme temperatures is provided by unit health care staff to all supervisors designated by the warden. Extreme heat training shall be completed no later than April 15th, and cold weather training shall be completed in September of each year.

   a.    Supervisors shall train staff responsible for the supervision of inmates and work-assigned inmates.

   b.    Unit administration shall ensure, through the unit risk manager, that inmates who are not work-assigned are trained.

   c.    All inmates shall be notified of heat and cold awareness via Peer Education training, dayroom bulletin boards, and other common use areas, or through publications such as the I-204, "Incoming Inmate Heat, Cold, Safe Prisons/PREA, and Suicide Prevention" flyer; *The Echo*; or the TDCJ *Offender Orientation Handbook*.

3.    Training shall be documented as outlined in the TDCJ *Risk Management Program Manual*. Documentation of completed training shall be maintained by the facility health administrator. Copies of all rosters from staff training shall be provided to the human resources representative and unit risk manager. The unit risk manager shall forward a copy of the training roster to the

respective regional risk manager. Training rosters for privately operated facilities shall also be forwarded to the private facilities operations manager.

The regional risk manager shall forward the total number of staff and inmates trained to the Risk Management Central Office.

B.    Pre-Service, On-the-Job, and In-Service Training

1.    Staff shall be provided with training regarding excessive or extreme temperature conditions as part of the Correctional Professional Development Program's pre-service training.

2.    Additional training shall be provided during the Correctional Professional Development Program's on-the-job training phase and during annual in-service training.

C.    Additional Training

1.    Staff Training

a.    Each unit shall be provided with training materials to facilitate ongoing excessive or extreme temperature conditions training sessions.

b.    The Training and Leader Development Division (TLDD) shall coordinate an annual review of the training materials to ensure the information is accurate and up to date.

c.    This training shall be conducted on a regular and frequent basis during shift turnout, departmental meetings, or other similar times.

d.    Human Resources staff shall ensure the training is documented in the TDCJ Learning Management System. The CID shall ensure documentation is completed, forwarded, and maintained by the operations manager for all privately operated facilities.

e.    Heat and cold training shall be conducted within the timeframes listed in section VIII.A.1.c of this directive. Unit, CID, and TLDD leadership may determine if further training is necessary based on forecasted temperatures and weather conditions.

2.    Inmate Training

a.    Inmates shall be provided with training regarding excessive or extreme temperature conditions as part of the inmate Peer Education Program during intake and upon transfer to their unit of assignment.

b.    Each unit shall be provided with training materials to facilitate ongoing excessive or extreme temperature conditions training sessions.

    (1)    The TLDD shall coordinate an annual review of the training materials to ensure the information is accurate and up to date.

    (2)    The training video shall be played on dayroom and common area TVs on a regular and frequent basis and shall be available on inmate tablets at all times.

    (3)    The unit risk manager shall ensure the training is documented within the Individualized Treatment Plan for each inmate.

    (4)    Inmates shall be provided with an I-204, "Incoming Inmate Heat, Cold, Safe Prisons/PREA, and Suicide Prevention" flyer and provided with unit-specific heat mitigation measures upon arrival at a new unit.

    c.    Heat and cold training shall be conducted within the timeframes listed in section VIII.A.1.c of this directive. Unit and CID leadership may determine if further training is necessary based on forecasted temperatures and weather conditions.

## IX.    Inmate Deaths

Inmate deaths during periods of excessive or extreme temperatures, when the cause of death is unknown, shall be documented as cause pending until ruled otherwise by an autopsy or subsequent evaluation. TDCJ medical partners are encouraged to take core body temperatures of deceased inmates at the time of death. When an autopsy is conducted, the listed cause of death and any contributory factors will be the final determination as to whether the death was heat related. An administrative incident review is required for all inmate deaths, except natural cause attended deaths, in accordance with AD-02.15, during a period of excessive or extreme temperatures until affirmatively reclassified as a natural death. Inmate deaths during periods of excessive or extreme temperatures must be reported to the Office of the General Counsel.

_____

Bryan Collier*
Executive Director

_____

* Signature on File

**TIEDE DEF_367763**

# WIND CHILL INDEX

| Wind Speed in MPH | ACTUAL THERMOMETER READING (°F) | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | 50 | 40 | 30 | 20 | 10 | 0 | -10 | -20 | -30 | -40 |
| | EQUIVALENT TEMPERATURE (°F) | | | | | | | | | |
| CALM | 50 | 40 | 30 | 20 | 10 | 0 | -10 | -20 | -30 | -40 |
| 5 | 48 | 37 | 27 | 16 | 6 | -5 | -15 | -26 | -36 | -47 |
| 10 | 40 | 28 | 16 | 4 | -9 | -21 | -33 | -46 | -58 | -70 |
| 15 | 36 | 22 | 9 | -5 | -18 | -36 | -45 | -58 | -72 | -85 |
| 20 | 32 | 18 | 4 | -10 | -25 | -39 | -53 | -67 | -82 | -96 |
| 25 | 30 | 16 | 0 | -15 | -29 | -44 | -59 | -74 | -88 | -104 |
| 30 | 28 | 13 | -2 | -18 | -33 | -48 | -63 | -79 | -94 | -109 |
| 35 | 27 | 11 | -4 | -20 | -35 | -49 | -67 | -82 | -98 | -113 |
| 40 | 26 | 10 | -6 | -21 | -37 | -53 | -69 | -85 | -100 | -116 |
| Over 40 MPH (little added effect) | CAT 1 (for properly clothed person) | | | | CAT 2 | | | CAT 3 | | |
| | | | | | (Danger from freezing or exposed flesh) | | | | | |

**Category 1 (Little Danger):** Risk of possible hypothermia with prolonged exposure, absent mitigating measures. Staff and inmates are encouraged to wear appropriate clothing, adding or removing layers according to the temperature and level of physical activity. The warden shall make appropriate determinations based on the Wind Chill Index, the National Weather Service, and NOAA radio and media regarding the safety of working conditions during such temperatures.

**Category 2 (Increasing Danger):** Increasing risk of hypothermia and possible death from freezing or exposed flesh, absent mitigating measures. Staff and inmates are encouraged to wear appropriate clothing. Outside work and recreation may be restricted.

**Category 3 (Great Danger):** High risk of hypothermia and possible death from freezing or exposed flesh, absent mitigating measures. Staff and inmates are encouraged to wear appropriate clothing. Outside work and recreation may be restricted.

AD-10.64 (rev. 12)
Attachment B
Page 18 of 19

# NOAA's National Weather Service
# Heat and Humidity Index

| | | ACTUAL AIR TEMPERATURE (°F) | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | CAT 1 | | | | | CAT 2 | | | | CAT 3 | | | | | CAT 4 | |
| | | 80 | 82 | 84 | 86 | 88 | 90 | 92 | 94 | 96 | 98 | 100 | 102 | 104 | 106 | 108 | 110 |
| RELATIVE HUMIDITY (%) | 40 | 80 | 81 | 83 | 85 | 88 | 91 | 94 | 97 | 101 | 105 | 109 | 114 | 119 | 124 | 130 | 136 |
| | 45 | 80 | 82 | 84 | 87 | 89 | 93 | 96 | 100 | 104 | 109 | 114 | 119 | 124 | 130 | 137 | |
| | 50 | 81 | 83 | 85 | 88 | 91 | 95 | 99 | 103 | 108 | 113 | 118 | 124 | 131 | 137 | | |
| | 55 | 81 | 84 | 86 | 89 | 93 | 97 | 101 | 106 | 112 | 117 | 124 | 130 | 137 | | | |
| | 60 | 82 | 84 | 88 | 91 | 95 | 100 | 105 | 110 | 116 | 123 | 129 | 137 | | | | |
| | 65 | 82 | 85 | 89 | 93 | 98 | 103 | 108 | 114 | 121 | 126 | 130 | | | | | |
| | 70 | 83 | 86 | 90 | 95 | 100 | 105 | 112 | 119 | 126 | 134 | | | | | | |
| | 75 | 84 | 88 | 92 | 97 | 103 | 109 | 116 | 124 | 132 | | | | | | | |
| | 80 | 84 | 89 | 94 | 100 | 106 | 113 | 121 | 129 | | | | | | | | |
| | 85 | 85 | 90 | 96 | 102 | 110 | 117 | 126 | 135 | | | | | | | | |
| | 90 | 86 | 91 | 98 | 105 | 113 | 122 | 131 | | | | | | | | | |
| | 95 | 86 | 93 | 100 | 108 | 117 | 127 | | | | | | | | | | |
| | 100 | 87 | 95 | 103 | 112 | 121 | 132 | | | | | | | | | | |

**Category 1 (Caution):** Risk of possible fatigue with prolonged exposure, absent mitigation measures. Staff shall encourage high water intake and look for signs of exhaustion. Staff and inmates are encouraged to utilize respite areas as needed. Inmate workers should be provided with five-minute rest breaks every hour.

**Category 2 (Extreme Caution):** Risk of heat-related illness with prolonged exposure, absent mitigation measures. Staff shall encourage high water intake and monitor and seek care for inmates exhibiting signs of illness. Staff and inmates are encouraged to utilize respite areas as needed. Inmate workers shall be interrupted frequently (such as five-minute rest breaks every half hour) and encouraged to drink fluids even if they are not thirsty. Staff may reduce work pace by one-third.

**Category 3 (Danger):** Risk of heatstroke possible and heat-related illness likely, absent mitigation measures. Staff shall encourage high water intake and monitor and seek care for inmates exhibiting signs of illness. Staff and inmates are encouraged to utilize respite areas as needed. Staff may restrict outside work and recreation or reduce work pace by one-half and shall interrupt inmate work *more* frequently (such as 10-minute breaks every half hour). Inmates shall be encouraged to drink fluids even if they are not thirsty.

**Category 4 (Extreme Danger):** High risk of heatstroke, absent mitigation measures. Staff shall encourage high water intake and monitor and seek care for inmates exhibiting signs of illness. Staff and inmates are encouraged to utilize respite areas as needed. Staff may restrict outside work and recreation or further reduce work pace and shall interrupt inmate work *more* frequently. Inmates shall be encouraged to drink fluids even if they are not thirsty.

AD-10.64 (rev. 12)
Attachment C
Page 19 of 19

# TEXAS DEPARTMENT OF CRIMINAL JUSTICE
## INMATE REFUSAL OF COOL BED (A/C HOUSING ASSIGNMENT)

I, _____ [printed inmate name], TDCJ-ID Number: _____,

understand and acknowledge that by signing below I am declining the Cool Bed or Air-Conditioned (A/C) Housing Assignment. I understand that a Cool Bed or A/C Housing Assignment is highly recommended based on my medical condition(s), medical diagnosis(es), or due to medications that place me at a higher risk for heat related illness or death.

By signing below, I understand and acknowledge that potential or possible outcomes for refusing the Cool Bed or A/C Housing Assignment include but are not limited to the following:

- Heat Cramps, Heat Exhaustion, and Heatstroke; and
- Worsening of my diagnosed medical condition(s) up to and including death.

By signing below, I understand and acknowledge the risks of refusing a Cool Bed or A/C Housing Assignment. Despite knowing these risks, I choose to decline a Cool Bed or A/C Housing Assignment. I acknowledge these risks and assume full responsibility for any and all consequences that may arise from my refusal of a Cool Bed or A/C Housing Assignment up to and including death.

I understand that I may request these or similar services in the future in the event my medical condition(s) or medical diagnosis(es) changes.

_____        _____
Signature of Inmate / TDCJ–ID #                 Date

_____        _____
Signature of Warden                             Date

_____
Printed Name of Warden

_____        _____
Signature of Witness                            Date

_____
Printed Name of Witness / Job Title

TIEDE DEF_367766

# EXHIBIT 21

```
 1                UNITED STATES DISTRICT COURT
 2            FOR THE WESTERN DISTRICT OF TEXAS
 3                     AUSTIN DIVISION
 4   BERNHARDT TIEDE, II;          )
     TEXAS PRISONS COMMUNITY       )
 5   ADVOCATES; BUILD UP, INC.,    )
     A/K/A JUSTICE IMPACTED        )
 6   WOMEN'S ALLIANCE; TEXAS       )
     CITIZENS UNITED FOR           )
 7   REHABILITATION OF ERRANTS;    )
     AND COALITION FOR TEXANS      )
 8   WITH DISABILITIES,            )
                                   )
 9            Plaintiffs,          )
                                   )
10   vs.                          )   Civil Action No.
                                  )   1:23-cv-01004-RP
11   BRYAN COLLIER, in his         )
     official capacity as          )
12   Executive Director of the     )
     Texas Department of           )
13   Criminal Justice,             )
                                   )
14            Defendants.          )
15
16
17   ***************************************************
18            VIDEOTAPED ORAL DEPOSITION OF
19                ERIC JAMES GUERRERO
20                 AUGUST 8, 2025
21                (Reported Remotely)
22   ***************************************************
23
24
25
```

                                              Page 1

1    A.  Good.  Good morning.
2    Q.  Can you please just state and spell your
3 full name for the record?
4    A.  Yes, sir.  Eric James Guerrero, E-r-i-c,
5 middle name J-a-m-e-s, last name Guerrero,
6 G-u-e-r-r-e-r-o.
7    Q.  And, Mr. Guerrero, where do you currently
8 reside?  Just a city and state is fine.
9    A.  Huntsville, Texas.
10    Q.  And your current employer is the Texas
11 Department of Criminal Justice?
12    A.  Yes, sir.
13    Q.  And we're all right by referring to that
14 as TDCJ today, right?
15    A.  Yes.  Yes.
16    Q.  And then specifically you are currently
17 the director of the Correctional Institutions
18 Division; is that right?
19    A.  Yes.
20    Q.  And is it all right if we just refer to
21 that as CID throughout our time today?
22    A.  Yes, sir.
23    Q.  Okay.  What's your business address?
24    A.  My business address, I don't know off the
25 top of my head.  I think we go by P.O. Box 99,

1 TDCJ?
2    A.  Yes, sir.
3    Q.  Okay.  Have you ever testified in a
4 courtroom or hearing before?
5    A.  Yes, sir.
6    Q.  And when was that?
7    A.  It's late '90s, mid '90s.  I'm not sure
8 exactly.  '96, '97, around that time frame.
9    Q.  And what was the nature of that testimony?
10    A.  It was an individual who claimed an
11 employee, an officer used excessive force on them.
12    Q.  Do you remember where that was?
13    A.  Corpus Christi.
14    Q.  Federal -- Federal Court?
15    A.  I believe so.
16    Q.  Were you the individual that was accused
17 of the use of excessive force?
18    A.  No, sir.
19    Q.  Why were you -- why did you testify?
20    A.  I was a responding officer.
21    Q.  So you have been -- you have done this a
22 couple times, four or five times.  But I'll still
23 going the run through some of the ground rules here
24 just to make sure we're on the same page if that's
25 all right.

1 Huntsville, Texas.  I think there is a physical
2 address.  I don't know it off the top of my head.
3    Q.  Okay.  And where are you currently?
4    A.  I'm here at the Brad Livingston
5 Administrative Headquarters.
6    Q.  Are you in an office or a conference room?
7    A.  Office.
8    Q.  Is there anyone in the room physically
9 with you right now?
10    A.  No, sir.
11    Q.  All right.  Mr. Guerrero, have you -- have
12 you ever been deposed before?
13    A.  Yes.
14    Q.  How many times?
15    A.  I believe maybe four or five times.  At
16 least -- at least four times, if I recall.
17    Q.  And what were the nature of those
18 depositions -- well, what were the nature of the
19 cases in which you were deposed?
20    A.  I don't recall the cases.  I know one was
21 this -- either this year in 2025 or 2024.  It was
22 a -- I believe it was a drug-related death, but I
23 don't recall the ones prior to that.
24    Q.  So have all of them -- have all these
25 depositions been related to your work as -- work for

1        Do you understand that you have sworn to
2 provide truthful and complete responses to my
3 questions today just as if you were in front -- in a
4 court of law in front of a judge?
5    A.  Yes.
6    Q.  And are you aware of any reason why you
7 can't give truthful and complete responses to my
8 questions today?
9    A.  No, sir.
10    Q.  We have our court reporter here with us
11 today, Ms. Munroe, and her job is to take down
12 everything that you, I and Mr. Mickle from the
13 Attorney General's Office says today.
14        So I'm going do my very best to speak as
15 slowly as I can.  I'm sure I'm not going always
16 going to do that and Ms. Munroe will assuredly let
17 me know if that's the case.  But I just ask that you
18 do the same to make her job as easy as possible.
19    A.  Yes, sir.
20    Q.  And in that same vain, in normal
21 conversation it's -- people talk over each other all
22 the time.  But here because Ms. Munroe has to get
23 everything down that everybody says, I would ask
24 that you wait until I finish asking my question
25 before you answer.

3 (Pages 6 - 9)

1 you're asking?
2    Q.   Yes.  Let me rephrase.
3        You're responsible for ensuring that your
4 division is implementing the procedures that's in
5 the policy; is that right?
6            MR. MICKLE:  Objection; form.
7    A.   Well, in AD-10.64 multiple divisions have
8 a responsibility, not just me as the director over
9 CID, ensuring that everything is followed.  Heat
10 strike teams, that falls under the ARRM division.
11 Health services is a -- I don't want to say health
12 services.
13       You have two universities that does our
14 medical care, University of Texas Medical Branch,
15 Texas Health Science Center.  They are overseen by
16 our health services division.  They have a
17 responsibility in 10.64.
18       There might be other departments or
19 divisions that have a role ensuring the policy is
20 being enforced.  But CID, me as the director,
21 there's things that -- in the policy that other
22 division has responsibility for.
23    Q.   Are there aspects of the policy that CID
24 is responsible for ensuring are implemented?
25    A.   Yes.

1    Q.   And what are those?
2    A.   The mitigation efforts, we have a
3 responsibility -- a shared responsibility with the
4 classification inmate transportation division to
5 ensure that inmates that are needed to be put in a
6 cool bed is put in a cool bed.
7        You know, working with our training
8 leadership development division to ensure our new
9 cadets are being trained.  And not just the new
10 cadets, but even the ones that are tenured and have
11 to go through annual in-service, they are trained
12 over mitigation efforts.
13       So there's different divisions,
14 departments we work with to ensure that certain part
15 of that policy is being followed.  But mitigation
16 efforts, training, that's a dual responsibility that
17 the CID division would have and then just checking
18 our processes out there in the field.
19    Q.   We'll talk more about these in detail
20 after the break.
21       But what -- when you say "heat mitigation
22 efforts," what are you referring to?
23    A.   So, you know -- so, first, like for the
24 fans that we have in the housing area.  So we have
25 fans that -- in housing areas where if they're not

1 operational, we work with the facilities division or
2 the maintenance department on the unit to ensure
3 that they are operational.
4        We discuss with the units that if they
5 need additional fans.  We talk about ensuring that
6 inmates are allowed to wear shorts or T-shirts in
7 the dayroom, having respite areas available to the
8 inmate population and for the staff, to ensure that
9 we have certain items in the commissary department.
10 If it's cool towels, some electrolytes, the ability
11 for them to purchase fans through commissary, having
12 cool showers, offering them -- the inmate population
13 more showers, if needed.
14       Providing cups to inmates that come
15 through intake that might not have a cup.  Even if
16 inmates are incarcerated, they don't have a cup,
17 that we can provide them a cup so they can have for
18 drinking water.
19       So there's different mitigation efforts
20 that we ensure that is being followed.
21    Q.   Okay.  So you said that one of these
22 mitigation efforts is providing working -- providing
23 fans, right?
24    A.   Yes, sir.
25    Q.   Another is dress code, right?

1            MR. MICKLE:  Objection; form.
2    A.   Yes, sir.
3    Q.   Another is providing respite areas,
4 correct?
5    A.   Yes.
6    Q.   Another is making sure that there are
7 certain items in the commissary available for
8 purchase; is that right?
9    A.   Yes.
10    Q.   Another is providing cool showers, right?
11    A.   Correct.
12    Q.   Another is providing cups for water,
13 right?
14    A.   Yes.
15    Q.   Are there any -- are these heat mitigation
16 efforts required under department policy?
17            MR. MICKLE:  Objection; form.
18    A.   Yes.
19    Q.   What is that policy?
20    A.   Administrative Directive 10.64.
21    Q.   Okay.  Are there any other heat mitigation
22 efforts that are required under Administrative
23 Directive 10.64 other than fans, relaxed dress code,
24 respite areas, items in the commissary, cool showers
25 and cups of water?

17 (Pages 62 - 65)

1  divisions. As the proponent, this policy, if I
2  recall, is signed by the executive director, so he
3  or whoever the executive director at the time is has
4  the final say-so of how the policy is written. But
5  as who is taking the role, that could vary from
6  policy to policy and who is the proponent.
7      Q.  I'm going to jump to the next revision,
8  which is on the page Bates stamped TIEDE DEF_00105.
9      Can you identify this page of the document
10 for me?
11     A.  Yes, sir, it's AD-10.64 Revision 10.
12     Q.  And when was it issued?
13     A.  May 28 of 2020.
14     Q.  And does that mean it superseded and
15 replaced the prior revision?
16     A.  Yes, sir.
17     Q.  And then I'm going to jump to the page
18 Bates stamped TIEDE DEF_00121.
19     Can you identify this page of the
20 document?
21     A.  Yes, sir. It's Revision 11 of AD-10.64
22 written on May 1, 2024.
23     Q.  To clarify, do you know it was written on
24 that date or do you know if it was issued or became
25 effective on that date?

Page 74

1      Q.  Okay. Mr. Guerrero, before I went off the
2  record, you said that TDCJ has issued a revision to
3  AD-10.64 this year; is that right?
4      A.  Yes, sir.
5      Q.  Would you recognize that document if I
6  were to show it to you?
7      A.  Yes, I would.
8      Q.  Sharing my screen, I'm marking for
9  identification purposes Deposition Exhibit 4A which
10 is TIEDE DEF 367747 through 367766, and I'm sharing
11 my screen now.
12     Mr. Guerrero, can you see my screen?
13     (Exhibit 4A marked.)
14     A.  Yes.
15     Q.  Do you recognize the first page of this
16 document?
17     A.  I recognize it, yes, sir.
18     Q.  And then I'm going to scroll quickly
19 through the remainder of the document to make -- so
20 that you can see.
21     A.  (Reviewed document.)
22     Q.  Okay. Mr. Guerrero, do you recognize the
23 rest -- the remainder of this document?
24     A.  Yes, sir.
25     Q.  What is it?

Page 76

1      MR. MICKLE: Objection; form.
2      A.  It was effective May 1, 2024.
3      Q.  And did it replace the prior revision?
4      A.  Yes, sir, it did, Revision 10.
5      Q.  Do you know if there is a policy for
6  reviewing AD-10.64 on a regular interval?
7      A.  Our current policy that was signed off
8  on -- or effective April of 2025, I believe written
9  in that current policy, it does say that this
10 specific policy will be reviewed annually.
11     Q.  Do you know -- it's okay if you don't.
12     Do you know if that revision from -- you
13 said April 1st, 2025. Do you know if that document
14 has been produced in this case?
15     A.  It was actually April 14th of 2025, but I
16 do not know if it was produced or not.
17     MR. HINOJOSA: Can we go off the
18 record for a quick second?
19     MR. MICKLE: Sure.
20     THE VIDEOGRAPHER: Everybody stand by.
21 Stand by. We're going off the record at 1:02. We're
22 off the record.
23     (Recess 1:02 p.m. to 1:07 p.m.)
24     THE VIDEOGRAPHER: We are back on the
25 record at 1:07.

Page 75

1      A.  It's our AD-10.64 policy for the agency.
2      Q.  And when was it issued?
3      A.  April 14th, 2025, Revision 12.
4      Q.  Was CID involved in putting together this
5  revision to AD-10.64?
6      A.  Yes.
7      Q.  In what way?
8      A.  Had interaction with other divisions on
9  the specific revisions, had multiple meetings again
10 with other divisions.
11     Q.  Do you know when TDCJ decided to issue a
12 revision to this policy that was issued on May 1st
13 of 2024?
14     MR. MICKLE: Objection; form.
15     A.  I know we -- if I remember, we started to
16 discuss a revision, I believe, in March to make some
17 changes to this policy needed.
18     Q.  Do you know -- when did you first learn
19 about putting together Revision 12 to AD-10.64?
20     MR. MICKLE: Objection; form.
21     A.  It was sometime in March. I don't recall
22 the specific date.
23     Q.  Do you -- do you know if it was before or
24 after March 26th of 2025?
25     A.  I don't. I don't remember.

Page 77

Veritext Legal Solutions
800-336-4000

1 Mr. Collier, the director of the TDCJ, himself
2 acknowledged that he wants air conditioning in all
3 TDCJ facilities and recognized that air conditioning
4 is the best solution to reduce temperatures in TDCJ
5 facilities.
6        Do you agree with the director?
7        MR. MICKLE:  Objection; form.
8    A.  Yes, I do.
9        MR. HINOJOSA:  Let's take a quick
10 three-minute break.  I just want to make sure there's
11 nothing I missed.  I promise, I'm about to pass you
12 off.
13        THE VIDEOGRAPHER:  We're going off the
14 record at 4:03.  We're off the record.
15        (Recess 4:03 p.m. to 4:09 p.m.)
16        THE VIDEOGRAPHER:  We're back on the
17 record at 4:09.
18    Q.  Mr. Guerrero, thank you so much for your
19 time today.  I just have a few things I want to
20 recap and then I'll hand you off to Mr. Mickle.
21        We talked a lot about the heat mitigation
22 methods and I just want to make sure we're on the
23 same page about certain things.
24        Under the Revision 11 of AD-10.64 that was
25 in place as of March of this year, you testified

Page 162

1    A.  Yes.  And in what they're allowed to wear
2 in the dayrooms, shorts and --
3    Q.  Dress code.  The lax dress code above
4 certain temperatures.  Okay.
5        I just wanted to put that in the bucket.
6 That was 2025, March of 2025?
7    A.  4.
8    Q.  And then you have testified today that the
9 only change to the heat mitigation measures since
10 March of 2025 in this --
11    A.  2024, March of 2024.
12    Q.  Well, the new revision, Revision 12 was
13 issued in April of this year, correct?
14    A.  Yes.
15    Q.  And so all of those things I just listed,
16 those were under the last policy and those were in
17 place when the Court -- or those were in place in
18 August of 2024, right?
19    A.  Correct.
20    Q.  When the hearing for the preliminary
21 injunction took place, right?
22    A.  Yes.
23    Q.  And those -- those are the policies that
24 were -- the heat mitigation measures in place in
25 March of 2025 when Judge Pitman issued his order,

Page 164

1 that the heat mitigation measures were respite
2 rooms, availability of water and ice, cold showers,
3 fans, the heat score system, training for staff and
4 providing certain items in the commissary; is that
5 right?
6    A.  You said Revision 11.  Is that the 2025
7 revision?
8    Q.  That was the 2024.
9    A.  Okay.
10   Q.  Would you like me to repeat?
11   A.  No.  No.  No.  I just wanted clarification
12 which policy you were talking about.
13        The only other -- you know, we did -- we
14 have posters that are posted in the housing area.
15 We even have posters posted in the bathroom areas
16 that you can look at the color of your urine to see
17 if you're hydrated or not.  And acclimation of
18 inmates coming in from county jails.  That was in
19 place for sure last year and for a few years.
20   Q.  So just to be clear these things, respite
21 rooms, water and ice, cold showers, fans, heat
22 score, training, certain items in the commissary,
23 sign posted, acclimation, those are the heat
24 mitigation measures in place as of March 2025; is
25 that right?

Page 163

1 correct?
2    A.  Correct.
3        MR. MICKLE:  Objection; form.
4    A.  Correct.
5    Q.  And then in March of 2025, TDCJ started
6 the process of putting together the new revision to
7 AD-10.64, correct?
8    A.  Yes.
9    Q.  And under this new revision to the policy,
10 you testified that the only change to the heat
11 mitigation measures was the automation of
12 temperature readings in the units; is that right?
13        MR. MICKLE:  Objection; form.
14   A.  Yes.  Automation is the one that -- and
15 some added definitions.  Extreme heat advisory I
16 think was added, a few of the definitions was added.
17 I think clarity on -- that wellness checks are done.
18 You know, there's not just a heat restriction list.
19 We do wellness checks on every inmate, not just
20 certain inmates.  That was a change.
21        I'm sure -- I think we added a few items
22 in the commissary.  But overall those are things
23 that I can recall that was changed from last year.
24   Q.  Okay.  So that's basically the -- this is
25 what I'm trying to ask, the opportunity -- I want to

Page 165

42 (Pages 162 - 165)

1  STATE OF TEXAS   )
2  COUNTY OF DALLAS )
3      I, Michelle L. Munroe, Certified Shorthand
4  Reporter in and for the State of Texas, certify that
5  the foregoing deposition of ERIC JAMES GUERRERO was
6  reported stenographically by me at the time and place
7  indicated, said witness having been placed under oath
8  by me, and that the deposition is a true record of
9  the testimony given by the witness;
10     That the amount of time used by each party at
11 the deposition is as follows:
12  Mr. Hinojosa -   4 hours, 16 minutes
13     I further certify that I am neither counsel for
14 nor related to any party in this cause and am not
15 financially interested in its outcome.
16     Given under my hand on this the 22nd day
17 of August, 2025.
18
19
20
21     *Michelle L. Munroe*
       Michelle L. Munroe, CSR No. 6011
22     Commission expires 1-31-26
       Firm Registration #571
23     VERITEXT LEGAL SOLUTIONS
       300 Throckmorton Street, Suite 1600
24     Fort Worth, Texas  76102
       817.336.3042  telephone
25
                                              Page 170

1  Brandon Mickle,brandon.mickle@oag.texas.gov
2           August 22, 2025
3  RE: Bernhardt Tiede, II, Et Al. v. Collier, Bryan
4  DEPOSITION OF: Eric James Guerrero (# 7533833)
5      The above-referenced witness transcript is
6  available for read and sign.
7      Within the applicable timeframe, the witness
8  should read the testimony to verify its accuracy. If
9  there are any changes, the witness should note those
10 on the attached Errata Sheet.
11     The witness should sign and notarize the
12 attached Errata pages and return to Veritext at
13 errata-tx@veritext.com.
14     According to applicable rules or agreements, if
15 the witness fails to do so within the time allotted,
16 a certified copy of the transcript may be used as if
17 signed.
18         Yours,
19         Veritext Legal Solutions
20
21
22
23
24
25
                                              Page 171

44 (Pages 170 - 171)

# EXHIBIT 22



| | | |
|---|---|---|
| **TEXAS DEPARTMENT** | **NUMBER:** | **AD-10.64 (rev. 11)** |
| **OF** | **DATE:** | **May 1, 2024** |
| **CRIMINAL JUSTICE** | **PAGE:** | **1 of 18** |
| | **SUPERSEDES:** | **AD-10.64 (rev. 10)** **May 8, 2020** |

# ADMINISTRATIVE DIRECTIVE

**SUBJECT:** **EXCESSIVE AND EXTREME TEMPERATURE CONDITIONS IN THE TDCJ**

**AUTHORITY:** Tex. Gov't Code §§ 493.001, 493.006; BP-02.08, "Statement of Internal Controls"

Reference: TDCJ *Risk Management Program Manual*; CMHC D-27.2, "Heat Stress"

**APPLICABILITY:** Texas Department of Criminal Justice

**POLICY:**

The Texas Department of Criminal Justice (TDCJ) shall establish guidelines to assist unit administration in adapting inmate housing areas and work assignments during excessive or extreme temperatures. Guidelines for outside recreation are found in the *Recreation Program Procedures Manual*.

Every reasonable effort shall be made to prevent injuries related to excessive or extreme temperatures in the TDCJ. TDCJ inmates may be required to work in conditions of excessive heat or extreme cold when situations occur requiring specific work be completed regardless of the temperature or weather conditions. The decision to require inmates to work in excessive heat or extreme cold temperatures shall be made by the warden and applicable departmental supervisors in order to address the conditions specific to the area in which the facility is located.

The TDCJ shall work closely with health care staff to immediately identify inmates at risk from excessive or extreme temperatures. Incidents related to excessive or extreme temperatures shall be reported to TDCJ administration.

**DEFINITIONS:**

The following terms are defined for the purpose of this policy and are not intended to be applicable to other policies or procedures.

"Excessive Heat" occurs from a combination of significantly higher than normal temperatures and high humidity.

"Excessive Heat Warning" is a warning issued by the National Weather Service within 12 hours of the onset of the following criteria: temperature of at least 105ºF for more than three hours per day for two consecutive days, or heat index of 113ºF or greater for any period.

"Extreme Cold" refers to temperatures at or below freezing for an extended period.

"Heat Index," also referred to as the "apparent temperature," is a measure of how hot it actually feels when the relative humidity (RH) is added to the actual air temperature.

"Heat Restriction List" is a list of inmates with restrictions related to physical activities, transportation, and work that have been entered in the Restrictions Module of the electronic health record (EHR) and transmitted to the TDCJ computerized system HSIN screen.

"Heat Wave" is three or more days of excessively hot and unusually humid weather where the temperature reaches at least 105ºF or the heat index reaches 113ºF.

"Relative Humidity" is a dimensionless ratio, expressed in percent, of the amount of atmospheric moisture present relative to the amount that would be present if the air were saturated. Since the latter amount is dependent on temperature, relative humidity is a function of both moisture content and temperature.

"Risk Category" means the TDCJ has received notice of a Heat Advisory, Special Weather Statement, or Excessive Heat Warning issued by the National Weather Service.

"Wellness Check" is when a correctional officer performing routine security rounds goes to an inmate's cell or bunk to visually inspect or observe the inmate due to the inmate previously being identified as having a condition or being on a medication that makes the inmate more susceptible to temperature-related issues.

"Wind Chill" is a quantity expressing the effective lowering of the air temperature caused by the wind, especially as affecting rate of heat loss from an object or human body, or as perceived by an exposed person.

## PROCEDURES:

Before requiring inmates to work in excessive or extreme temperature conditions, the warden and applicable departmental supervisors shall ensure appropriate measures are taken to prevent excessive or extreme temperature-related injuries, including consulting health care staff to identify specific hazards. In all cases of temperature-related incidents or injuries, unit health care staff and the unit risk manager shall be immediately notified. Staff shall remove the distressed inmate from the environment as quickly as possible to receive proper medical treatment.

I.   Monitoring Procedures

Procedures and exposure charts, Wind Chill Index (Attachment A), and Heat and Humidity Index (Attachment B), are provided to assist unit administration in determining safe conditions and applicable risk categories in excessive or extreme temperatures.

A.   Unit staff shall monitor and announce over the radio the temperature, heat index or wind chill, and risk category once every hour between 12:30 a.m. and 11:30 p.m. The outside air temperature, humidity or wind speed, and heat index or wind chill shall be documented 24 hours a day on the Temperature Log (Attachment C).

B.   Temperature Log

1.   The warden shall designate a central location to maintain the Temperature Log.

2.   The wind chill or heat index shall be documented on the Temperature Log.

3.   Temperature information is available through the following:

a.   The National Oceanic and Atmospheric Administration (NOAA) website (www.noaa.gov);

b.   NOAA Weather Radio;

c.   Local weather radio and television stations; or

d.   Onsite weather instrumentation.

4.   Temperature Logs shall be maintained in accordance with the TDCJ *Records Retention Schedule.*

5.   At the beginning of each month, each warden shall send the previous month's Temperature Log to the respective regional office within the Correctional Institutions Division (CID).

II.   Extreme Cold Conditions

A.   Determination

1.   The warden shall use the Wind Chill Index, the local news and weather media, and weather conditions recorded by instruments located at the unit to determine the safety of cold weather working conditions.

2.   Appropriate clothing for inmates working in cold weather includes thermal underwear, insulated jackets, cotton or leather gloves, insulated hoods, work

shoes, and socks. Appropriate clothing shall be issued even when the Wind Chill Index indicates little danger of exposure injury.

3.  If additional guidance is needed, health care staff, the unit risk manager, or the assistant unit risk manager shall be consulted to assist in determining appropriate clothing and footwear needed to prevent cold injury.

4.  Care shall be taken to prevent perspiration, which could soak clothing and thus compromise the insulating value of the clothing.

5.  Layers of clothing shall be removed or added according to the temperature and level of physical activity.

B.  Symptoms of Hypothermia

1.  Hypothermia is a condition occurring when the body loses heat faster than it can produce heat. With the onset of hypothermia, blood vessels in the skin tighten to conserve vital internal body heat, affecting the hands and feet first.

2.  Involuntary shivers will begin if the body continues to lose heat. This reaction is the way the body produces more heat and is usually the first real warning sign of hypothermia.

3.  Further heat loss produces speech difficulty, forgetfulness, loss of manual dexterity, collapse, and possibly death.

III.  Excessive Heat Conditions

A.  Determination

1.  The warden shall use the Heat and Humidity Index, the local news and weather media, and weather conditions recorded by instruments located at the unit to confirm temperature and humidity conditions to determine if an excessive heat condition is occurring.

2.  When the National Weather Service issues an excessive heat warning or notice of an impending heat wave, the TDCJ Office of Emergency Management shall send the applicable division directors an email notification. When excessive heat conditions last for more than three consecutive days, the division directors and warden(s) of units in the affected area(s) shall immediately implement the additional precautionary measures outlined in Section IV.I of this directive.

3.  At any point when the Heat and Humidity Index indicates the possibility of heat exhaustion, the warden shall instruct the appropriate staff to immediately initiate the precautionary measures identified in the Heat and Humidity Index.

4.    If additional guidance is needed, health care staff, the unit risk manager, or assistant unit risk manager shall be consulted before exposing inmates to excessive heat conditions in the work area to evaluate the hazards of the current temperatures and humidity, including indoor work areas, such as a boiler room. The hazard of sunburn and other results of ultraviolet (UV) radiation exposure shall also be closely monitored. Inmates shall be provided and required to wear clothing appropriate for the temperatures and hazards imposed by UV radiation. For example, light-colored hats can be worn in high heat and direct sunlight.

5.    Drinking water and cups shall always be available to inmates in conditions of excessive heat. A cup will be provided to all indigent and newly received inmates, and any inmate who does not have a personal cup. Inmates will be permitted to have one cup in their possession. High water intake shall be encouraged during periods of excessive heat and depending on an inmate's state of acclimatization to hot weather conditions, liquids containing sodium may also be used. Inmates and staff working at apparent air temperatures above 90ºF shall be provided access to and encouraged to consume water before their work assignment and as needed during the workday and should maintain an intake of at least 16 ounces of fluids per hour of work. Under excessive heat conditions, work should be interrupted every 15-20 minutes, and inmates should be encouraged to drink fluids even if they are not thirsty.

6.    Inmates newly assigned to jobs that require strenuous work under conditions with an apparent air temperature of 90ºF or greater must be acclimatized before assuming a full workload. These inmates shall work no more than four hours at a time, separated by at least one hour of rest in a cooler environment, for the first week. After the first week, inmates newly assigned to jobs may assume a normal work schedule. Acclimatization can be lost in as little as two weeks; therefore, if inmates are away from a hot work environment for more than two weeks, they shall be reacclimatized. Acclimatization is not necessary for individuals assigned to the same job when temperatures vary with seasonal changes.

7.    TDCJ and health care staff shall work together to identify inmates susceptible to temperature-related illness due to medical conditions. As inmates arrive at intake facilities, a staff member from the medical department shall conduct an initial screening to determine if the inmate has any conditions or is on any medication that would make the inmate more susceptible to heat. If health care staff determines an inmate has a condition or is on a medication that would make the inmate more susceptible to heat, correctional staff shall perform wellness checks on the inmate as outlined in Section IV.C-D.

B.    Symptoms

    1.    Heat cramp symptoms include:

        a.    Painful, intermittent, and involuntary muscle spasms following hard physical work in a hot environment; and

        b.    Cramps usually occurring after heavy perspiring, and often beginning after hard physical work.

    2.    Heat exhaustion symptoms include:

        a.    Profuse perspiration, weakness, rapid pulse, dizziness, and headaches;

        b.    Cool skin, sometimes pale and clammy, with perspiration;

        c.    Normal or subnormal body temperature; and

        d.    Possible nausea, vomiting, and unconsciousness.

    3.    Heatstroke symptoms include:

        a.    Diminished or absent perspiration (sweating);

        b.    Hot, dry, and flushed skin; and

        c.    Increased body temperatures, which if uncontrolled may lead to delirium, convulsions, seizures, and possibly death. **Medical care is emergently needed.**

IV.    Preventive Care and Precautions

A.    Before April 15th of each year, wardens shall review with unit staff the status of HVAC units, shower temperatures, fans, ice machines, ventilation systems, exhaust fans, and respite areas throughout the unit. Wardens shall coordinate with unit maintenance staff to prioritize maintenance work orders for these areas and immediately address any deficiencies.

B.    Inmates shall be assessed for medical and mental impairments by qualified health care staff who will assign each inmate appropriate restrictions related to physical activities, transportation, and work. Appropriate limitations and restrictions shall be assigned and entered in the Restrictions Module in the electronic health record (EHR), which is automatically transmitted to the TDCJ computerized system HSIN screen.

C.    Once an inmate is identified as at-risk, health care staff shall notify unit countroom staff and update the inmate's HSIN accordingly. Countroom staff shall then make any

necessary changes to the inmate's housing or work assignment and notify correctional staff if an adjustment is necessary.

D.  During each security round, staff shall use the Heat Restriction List to conduct wellness checks for inmates on that list. Staff shall immediately seek care for all inmates requesting medical assistance or exhibiting signs of illness, even if they are not listed on the Heat Restriction List.

E.  Inmates shall be allowed access to respite areas during periods of excessive heat.

1.  Inmates may request access to a respite area 24 hours per day, seven days per week, even if they are not feeling ill at the time of the request or the request is made during count time.

2.  Inmates requesting access to a respite area are not required to be seen by health care staff unless they are exhibiting signs or symptoms of a heat-related illness.

3.  Inmates shall be permitted to stay in the respite area as long as necessary and may bring cups, hydrating drinks such as water and electrolyte sports drinks, electrolyte packets, cooling rags, and reading materials.

4.  The warden may designate any area with air conditioning for respite. Signs in English and Spanish shall be posted informing inmates of the areas designated as respite areas.

5.  The warden or designee shall determine the order of use for respite areas, ensuring areas capable of accommodating the greatest number of inmates are utilized first, while maintaining the safety and security of the unit.

6.  Inmates shall not be permitted to choose the respite area to which they will have access.

F.  Representatives from various divisions shall meet annually to review best practices concerning preventive care and precautions with excessive or extreme temperatures. An email message titled, "Seasonal Preparedness Directive," shall be sent from the executive director. The CID director and the Private Facility Contract Monitoring/Oversight Division (PFCMOD) director shall inform unit wardens of additional mandatory compliance measures in the prevention of cold- and heat-related injuries and illness.

G.  Training will be conducted at units as outlined in Section VII.

H.  In situations where the heat index is above 90ºF, units will initiate the following steps:

1.  Provide additional water, ice, and cups in inmate dorms, housing areas, recreational areas, and during meal times;

2.  Transport psychiatric inpatient inmates to other facilities via air-conditioned transfer vehicles only;

3.  Transport inmates during the coolest hours of the day, when possible;

4.  Allow inmates to use and carry cooling towels;

5.  Allow inmates to wear shorts and t-shirts in dayrooms and recreational areas;

6.  Prioritize work orders and ensure maintenance for air-conditioning units, HVAC systems, fans, blowers, and showers in inmate housing areas;

7.  Ensure all staff currently have, or are provided with an FN-1181, Employee Information Pocket Card, obtained through the Prison Store and available at the units, and that the cards are carried on their person while at the unit;

8.  Allow additional showers for inmates when possible. Lower the water temperature for single temperature showers in inmate housing areas;

9.  Place posters in housing areas reminding inmates of heat precautions and the importance of water intake, ensuring all posters that have been damaged or destroyed are replaced; and

10. Allow fans for inmates in all custody levels, including restrictive housing and disciplinary status where electrical outlets are available. Ensure a fan program is in place for the permanent issuance of fans to indigent inmates. Fans shall only be confiscated if altered or stolen.

I.  In addition to the precautions outlined in Section IV.H of this directive, the warden shall instruct the appropriate staff to immediately implement the following precautionary measures when excessive heat or heat wave conditions last more than three consecutive days:

1.  Initiate the Incident Command System (ICS) and immediately notify the appropriate regional director and the appropriate deputy division director for CID units, or the appropriate deputy director for the PFCMOD for privately operated units, and the emergency management coordinator of the impending excessive heat conditions;

2.  Restrict, and potentially cancel, outside work and recreation;

3.  Reduce kitchen and dish room operations as needed. Inmates may be served cold cuts and other food items that do not require heating;

4. Minimize laundry operations during afternoon hours. To the extent possible, begin washing and drying in the earlier, cooler hours of the morning in order to be completed by noon; and

5. Allow inmates to purchase electrolyte sports drinks from the unit commissary without affecting their spending limit.

J. When the excessive heat warning ends, the warden may deactivate the ICS, with the approval of the appropriate regional director for CID units, or the appropriate deputy director for PFCMOD for privately operated units. The emergency management coordinator shall be notified when the ICS is deactivated.

After deactivating the ICS for an excessive heat warning, the warden shall assess the unit's readiness to return to normal operations, taking into consideration any actions that could improve operations during future incidents of a similar nature and identifying any training needs.

V. Inmates with Heat Sensitivity Scores

The TDCJ recognizes some inmates are potentially at a heightened risk of heat-related illnesses because of their age, health conditions, or medications. These inmates are identified through an automated heat sensitivity score that uses information from the inmate's EHR.

A. Heat sensitivity scores are updated daily with changes to the EHR. For newly received inmates, health services staff use an intake heat sensitivity form to screen inmates as soon as they arrive. When new inmates receive their physical examination, their score is updated automatically. Inmates who have a heat sensitivity score receive priority placement in a housing area that is air-conditioned. Inmates identified as Pack Unit Class Members shall be managed in accordance with AD-03.05, "Inmates Identified as Pack Unit Class Members."

B. For returning inmates, intake staff will verify any previous heat sensitivity score(s) prior to placement in a housing area. If an inmate has previously received a heat sensitivity score, the inmate will be housed in a cool bed until the physical examination is completed and their score can be updated.

C. Except as provided in subsection (F), inmates who have a heat sensitivity score may refuse air-conditioned housing. During their unit classification committee hearing or by submitting a form I-60, Inmate Request to Official, an inmate may request to complete an Inmate Refusal of Cool Bed (A/C Housing Assignment) Form (Attachment D). Inmate Refusal of Cool Bed Forms are signed by the inmate and the warden with a witness present. However, an inmate who signs a refusal may still be housed in air-conditioned housing at the TDCJ's discretion.

D.  Heat sensitive inmates who refuse cool bed housing will continue to have a heat sensitivity score and will have an indicator of the refusal on their Health Summary for Classification (HSIN) screen.

E.  Heat sensitive inmates who refuse cool bed housing will be monitored for an increase in their heat sensitivity score and those whose score has increased will be required to complete a new refusal form if they continue to refuse air-conditioned housing.

F.  Inmates assigned to the Developmental Disabilities Program, in an infirmary, or in an inpatient mental health or a specialized mental health program may not refuse air-conditioned housing. Inmates identified as Pack Unit Class Members shall be managed in accordance with AD-03.05, "Inmates Identified as Pack Unit Class Members."

VI.  Emergency Treatment

Staff shall monitor and seek care for inmates requesting medical assistance or exhibiting signs of illness during periods of excessive or extreme temperatures.

A.  In all cases of temperature-related incidents or injuries, the first aid process shall be immediately initiated by correctional or other unit staff.

1.  If an injury is sustained in extreme cold conditions, staff shall:

a.  Bring the distressed inmate out of the cold and restrict any further duties or activities until the severity of the injury is evaluated.

b.  Remove any wet clothing and insulate the inmate with dry, warm blankets or clothing, ensuring all constricting items of clothing and footwear are removed from injured areas and the injured areas are covered.

c.  If frostbite exists, gently heat the affected area with warm water or towels, a heating pad, or hot water bottles. Do not rub the affected area or rupture blisters.

d.  If a lower extremity is affected, treat by slightly elevating the affected area.

e.  If the inmate is conscious, encourage consumption of warm, sweetened liquids.

f.  If necessary, initiate lifesaving measures.

g.  If evacuation from cold requires travel on foot, do not treat the affected area until the inmate reaches medical help.

h.    Transport the inmate to medical care as soon as possible and continue treatment after arriving at the site or when the inmate is delivered to health care staff's care.

2.    If an injury is sustained in excessive heat conditions, staff shall:

a.    Immediately try to decrease the inmate's temperature by placing the inmate in a cool area.

b.    Force oral fluid intake only if the inmate is conscious and able to safely swallow.

c.    Remove heavy clothing or excess layers of clothing; saturate remaining lightweight clothing with water. Position the inmate in the shade, allowing air movement past the inmate, and if necessary, fan the inmate to create air movement.

d.    If ice is available, place ice packs in armpit and groin areas.

e.    Take all these measures while moving the inmate in the most expeditious means available to continue with and obtain proper medical treatment.

f.    Ensure, whenever health care staff are on-site, treatment is continued as directed by the physician or health care staff.

B.    Notification

1.    Health care staff and the unit risk manager shall be immediately notified regarding all cases of temperature-related incidents or injuries. If there is no on-site health care staff, 911 shall be immediately called.

2.    Any temperature-related incident or injury shall be reported to the Emergency Action Center in accordance with AD-02.15, "Operations of the Emergency Action Center and Reporting Procedures for Serious or Unusual Incidents."

3.    All heat-related illnesses shall be evaluated by staff to include the conditions surrounding the inmate, such as water intake, location, and what the inmate was doing before becoming ill. Any "cluster illnesses" or illnesses occurring in inmates in the same housing areas shall be documented and reported to the CID director or the PFCMOD director.

VII.    Training

    A.    Annual Training

        1.    A standardized training program shall be developed by the TDCJ in conjunction with the University of Texas Medical Branch Clinical Education Department. Each unit shall be provided a copy of the training program in the form of a DVD to facilitate the required training.

            a.    The training shall be given in a group setting, when possible.

            b.    All units shall conduct an annual standardized training program using unit-based health care staff.

            c.    The facility health administrator for each unit shall submit documentation of excessive heat and extreme cold temperature training for TDCJ staff, health care staff, and inmates to the Health Services Division Office of Health Services Monitoring annually by April 15th (heat) and October 1st (cold).

        2.    Each warden shall ensure training in the prevention of injuries due to excessive or extreme temperatures is provided by unit health care staff to all supervisors designated by the warden. Excessive heat training shall be completed no later than April 15th, and cold weather training shall be completed in September of each year.

            a.    Supervisors shall train staff and work-assigned inmates.

            b.    Unit administration shall ensure, through the unit risk manager, that inmates who are not work-assigned are trained.

            c.    All inmates shall be notified of cold and heat awareness via Peer Education training, dayroom bulletin boards, and other common use areas, or through publications such as the I-204, "Incoming Inmate Heat, Cold, Safe Prisons/PREA, and Suicide Prevention" flyer; *The Echo*; or the TDCJ *Offender Orientation Handbook*.

        3.    Training shall be documented as outlined in the TDCJ *Risk Management Program Manual*. Documentation of completed training shall be maintained by the facility health administrator. Copies of all rosters from staff training shall be provided to the human resources representative and unit risk manager. The unit risk manager shall forward a copy of the training roster to the respective regional risk manager. Training rosters for privately operated facilities shall also be forwarded to the office of the director of the PFCMOD.

The regional risk manager shall forward the total number of staff and inmates trained to the Risk Management Central Office.

B.    Pre-Service, On-the-Job, and In-Service Training

    1.    Staff shall be provided with training regarding excessive or extreme temperature conditions as part of the Pre-Service Training Academy.

    2.    Additional training shall be provided during the On-the-Job Training Program and annual In-Service Training sessions.

C.    Additional Training

    1.    Staff Training

        a.    Each unit shall be provided with a DVD to facilitate ongoing excessive or extreme temperature conditions training sessions.

        b.    The training DVD shall be reviewed annually by the Communications Department to ensure the information is accurate and up to date.

        c.    This training shall be conducted on a regular and frequent basis during shift turnout, departmental meetings, or other similar times.

        d.    Human Resources staff shall ensure the training is documented in the TDCJ Learning Management System. PFCMOD shall ensure documentation is completed and maintained for all privately operated facilities.

        e.    Heat training shall be conducted beginning in March and ending in November. If the need arises based on forecasted temperatures, training may be conducted before March and after November.

        f.    Cold training shall be conducted beginning in September and ending in February. If the need arises based on forecasted temperatures, training may be conducted before September and after February.

    2.    Inmate Training

        a.    Inmates shall be provided with training regarding excessive or extreme temperature conditions as part of the inmate Peer Education Program during intake and upon transfer to their unit of assignment.

        b.    Each unit shall be provided with a DVD to facilitate ongoing excessive or extreme temperature conditions training sessions.

(1)     The training DVD shall be reviewed annually by the Communications Department to ensure the information is accurate and up to date.

(2)     The training DVD shall be played on dayroom and common area TVs on a regular and frequent basis.

(3)     The unit risk manager shall ensure the training is documented within the Individualized Treatment Plan for each inmate.

(4)     Inmates shall be provided with an I-204, "Incoming Inmate Heat, Cold, Safe Prisons/PREA, and Suicide Prevention" flyer and provided with unit-specific heat mitigation measures upon arrival at a new unit.

c.     Heat training shall be conducted beginning in March and ending in November. If the need arises based on forecasted temperatures, training may be conducted before March and after November.

d.     Cold training shall be conducted beginning in September and ending in February. If the need arises based on forecasted temperatures, training may be conducted before September and after February.

VIII.    Reporting of Inmate Deaths

Inmate deaths during periods of excessive or extreme temperatures, when the cause of death is unknown, shall be documented as cause pending until ruled otherwise by an autopsy or subsequent evaluation. An administrative incident review is required for all inmate deaths, except natural cause attended deaths, in accordance with AD-02.15, during a period of excessive or extreme temperatures until affirmatively reclassified as a natural death. Inmate deaths during periods of excessive or extreme temperatures must be reported to the Office of the General Counsel.

_____
Bryan Collier*
Executive Director

_____
* Signature on File

# WIND CHILL INDEX

| Wind Speed in MPH | ACTUAL THERMOMETER READING (ºF) | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | 50 | 40 | 30 | 20 | 10 | 0 | -10 | -20 | -30 | -40 |
| | EQUIVALENT TEMPERATURE (ºF) | | | | | | | | | |
| CALM | 50 | 40 | 30 | 20 | 10 | 0 | -10 | -20 | -30 | -40 |
| 5 | 48 | 37 | 27 | 16 | 6 | -5 | -15 | -26 | -36 | -47 |
| 10 | 40 | 28 | 16 | 4 | -9 | -21 | -33 | -46 | -58 | -70 |
| 15 | 36 | 22 | 9 | -5 | -18 | -36 | -45 | -58 | -72 | -85 |
| 20 | 32 | 18 | 4 | -10 | -25 | -39 | -53 | -67 | -82 | -96 |
| 25 | 30 | 16 | 0 | -15 | -29 | -44 | -59 | -74 | -88 | -104 |
| 30 | 28 | 13 | -2 | -18 | -33 | -48 | -63 | -79 | -94 | -109 |
| 35 | 27 | 11 | -4 | -20 | -35 | -49 | -67 | -82 | -98 | -113 |
| 40 | 26 | 10 | -6 | -21 | -37 | -53 | -69 | -85 | -100 | -116 |
| Over 40 MPH (little added effect) | CAT 1 (for properly clothed person) | | | | CAT 2 | | | CAT 3 | | |
| | | | | | (Danger from freezing or exposed flesh) | | | | | |

**Category 1 (Little Danger):** Risk of possible hypothermia with prolonged exposure, absent mitigating measures. Staff and inmates are encouraged to wear appropriate clothing, adding or removing layers according to the temperature and level of physical activity. The warden shall make appropriate determinations based on the Wind Chill Index, the local news and weather media, and weather conditions recorded by instruments located at the unit regarding the safety of working conditions during such temperatures.

**Category 2 (Increasing Danger):** Increasing risk of hypothermia and possible death from freezing or exposed flesh, absent mitigating measures. Staff and inmates are encouraged to wear appropriate clothing. Outside work and recreation shall be restricted.

**Category 3 (Great Danger):** High risk of hypothermia and possible death from freezing or exposed flesh, absent mitigating measures. Staff and inmates are encouraged to wear appropriate clothing. Outside work and recreation shall be restricted.

AD-10.64 (rev. 11)
Attachment B
Page 16 of 18

# NOAA's National Weather Service
# Heat and Humidity Index

| RELATIVE HUMIDITY (%) | ACTUAL AIR TEMPERATURE (°F) | | | | | | | | | | | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | | CAT 1 | | | | CAT 2 | | | | CAT 3 | | | | | CAT 4 | |
| | | 80 | 82 | 84 | 86 | 88 | 90 | 92 | 94 | 96 | 98 | 100 | 102 | 104 | 106 | 108 | 110 |
| 40 | | 80 | 81 | 83 | 85 | 88 | 91 | 94 | 97 | 101 | 105 | 109 | 114 | 119 | 124 | 130 | 136 |
| 45 | | 80 | 82 | 84 | 87 | 89 | 93 | 96 | 100 | 104 | 109 | 114 | 119 | 124 | 130 | 137 | |
| 50 | | 81 | 83 | 85 | 88 | 91 | 95 | 99 | 103 | 108 | 113 | 118 | 124 | 131 | 137 | | |
| 55 | | 81 | 84 | 86 | 89 | 93 | 97 | 101 | 106 | 112 | 117 | 124 | 130 | 137 | | | |
| 60 | | 82 | 84 | 88 | 91 | 95 | 100 | 105 | 110 | 116 | 123 | 129 | 137 | | | | |
| 65 | | 82 | 85 | 89 | 93 | 98 | 103 | 108 | 114 | 121 | 126 | 130 | | | | | |
| 70 | | 83 | 86 | 90 | 95 | 100 | 105 | 112 | 119 | 126 | 134 | | | | | | |
| 75 | | 84 | 88 | 92 | 97 | 103 | 109 | 116 | 124 | 132 | | | | | | | |
| 80 | | 84 | 89 | 94 | 100 | 106 | 113 | 121 | 129 | | | | | | | | |
| 85 | | 85 | 90 | 96 | 102 | 110 | 117 | 126 | 135 | | | | | | | | |
| 90 | | 86 | 91 | 98 | 105 | 113 | 122 | 131 | | | | | | | | | |
| 95 | | 86 | 93 | 100 | 108 | 117 | 127 | | | | | | | | | | |
| 100 | | 87 | 95 | 103 | 112 | 121 | 132 | | | | | | | | | | |

**Category 1 (Caution):** Risk of possible fatigue with prolonged exposure, absent mitigation measures. Staff shall encourage high water intake and look for signs of exhaustion. Staff and inmates are encouraged to utilize respite areas as needed. Inmate workers shall be provided with five-minute rest breaks every hour.

**Category 2 (Extreme Caution):** Risk of heat-related illness with prolonged exposure, absent mitigation measures. Staff shall encourage high water intake and monitor and seek care for inmates exhibiting signs of illness. Staff and inmates are encouraged to utilize respite areas as needed. Inmate workers shall be provided with five-minute rest breaks every one-half hour, and staff shall encourage inmates to lie down with feet up during such breaks. Staff shall also reduce work pace by one-third.

**Category 3 (Danger):** Risk of heat stroke possible and heat-related illness likely, absent mitigation measures. Staff shall encourage high water intake and monitor and seek care for inmates exhibiting signs of illness. Staff and inmates are encouraged to utilize respite areas as needed. Staff shall restrict outside work or reduce work pace by one-half to two-thirds, provide 10-minute rest breaks every one-half hour, and encourage inmates to lie down with feet up during such breaks.

**Category 4 (Extreme Danger):** High risk of heat stroke, absent mitigation measures. Staff shall encourage high water intake and monitor and seek care for inmates exhibiting signs of illness. Staff and inmates are encouraged to utilize respite areas as needed. Outside work and recreation shall be restricted.

AD-10.64 (rev. 11)
Attachment C
Page 17 of 18

# TEXAS DEPARTMENT OF CRIMINAL JUSTICE
## Temperature Log

### Unit: _____

| Date: | Outside Air Temperature | Humidity or Wind Speed | Heat Index or Wind Chill* | Person Recording |
|---|---|---|---|---|
| 12:30 a.m. | | | | |
| 1:30 a.m. | | | | |
| 2:30 a.m. | | | | |
| 3:30 a.m. | | | | |
| 4:30 a.m. | | | | |
| 5:30 a.m. | | | | |
| 6:30 a.m. | | | | |
| 7:30 a.m. | | | | |
| 8:30 a.m. | | | | |
| 9:30 a.m. | | | | |
| 10:30 a.m. | | | | |
| 11:30 a.m. | | | | |
| 12:30 p.m. | | | | |
| 1:30 p.m. | | | | |
| 2:30 p.m. | | | | |
| 3:30 p.m. | | | | |
| 4:30 p.m. | | | | |
| 5:30 p.m. | | | | |
| 6:30 p.m. | | | | |
| 7:30 p.m. | | | | |
| 8:30 p.m. | | | | |
| 9:30 p.m. | | | | |
| 10:30 p.m. | | | | |
| 11:30 p.m. | | | | |

\* Temperatures between 51 and 79 degrees Fahrenheit (ºF) are not represented on the Wind Chill Index (Attachment A) or the Heat and Humidity Index (Attachment B). Indicate (N/A) in these fields when applicable.

# TEXAS DEPARTMENT OF CRIMINAL JUSTICE
## INMATE REFUSAL OF COOL BED (A/C HOUSING ASSIGNMENT)

I, _____ [printed inmate name], TDCJ-ID Number: _____, understand and acknowledge that by signing below I am declining the Cool Bed or Air-Conditioned (A/C) Housing Assignment. I understand that a Cool Bed or A/C Housing Assignment is highly recommended based on my medical condition(s), medical diagnosis(es), or due to medications that place me at a higher risk for heat related illness or death.

By signing below, I understand and acknowledge that potential or possible outcomes for refusing the Cool Bed or A/C Housing Assignment include but are not limited to the following:

- Heat Cramps, Heat Exhaustion, and Heat Stroke; and
- Worsening of my diagnosed medical condition(s) up to and including death.

By signing below, I understand and acknowledge the risks of refusing a Cool Bed or A/C Housing Assignment. Despite knowing these risks, I choose to decline a Cool Bed or A/C Housing Assignment. I acknowledge these risks and assume full responsibility for any and all consequences that may arise from my refusal of a Cool Bed or A/C Housing Assignment up to and including death.

I understand that I may request these or similar services in the future in the event my medical condition(s) or medical diagnosis(es) changes.


_____    _____
Signature of Inmate / TDCJ–ID #                     Date


_____    _____
Signature of Warden                                 Date

_____
Printed Name of Warden


_____    _____
Signature of Witness                                Date

_____
Printed Name of Witness / Job Title

**TIEDE DEF_00138**

# EXHIBIT 23

ATTORNEYS EYES ONLY

# Texas Department of Criminal Justice



# Monitoring of Temperature and Temperature-Related Deaths Fiscal Year 2024 Report

## December 2024

TIEDE DEF_87749

ATTORNEYS EYES ONLY

# Texas Board of Criminal Justice

P.O. Box 13084
Austin, Texas 78711
Phone (512) 475-3250

**Eric J.R. Nichols, Chairman**
Austin, Texas

**Honorable Faith Johnson, Vice-Chair**
Dallas, Texas

**Rodney Burrow, M.D., Secretary**
Pittsburg, Texas

**Honorable Molly Francis, Member**
Dallas, Texas

**Ambassador Sichan Siv, Member**
San Antonio, Texas

**General Bill Welch, Member**
Austin, Texas

**Pastor Nate Sprinkle, Member**
Richmond, Texas

**Sydney Zuiker, Member**
Houston, Texas

**Tom Fordyce, Member**
Huntsville, Texas

# Texas Department of Criminal Justice

P.O. Box 99
Huntsville, Texas 77342-0099
Phone (936) 437-2101

**Bryan Collier, Executive Director**



TIEDE DEF_87750

**ATTORNEYS EYES ONLY**

# Table of Contents

**Introduction** ........................................................................................................................ 1

**Inmate Complaints Related to Temperature** ......................................................... 1

    *Step 1 Grievances* ............................................................................................................ 1

    *Step 2 Grievances* ............................................................................................................ 1

**Heat-Related Illnesses or Death Caused by or Exacerbated by Temperature** ............ 2

    *Inmate Heat-Related Illnesses/Death* ............................................................................ 2

    *Staff Heat-Related Illnesses/Death* ................................................................................ 3

**Procedures Used to Review Inmate Deaths** .......................................................... 3

    *Clinical Summary and Review of an Inmate's Death* ...................................................... 3

    *Joint Mortality Review Committee* .................................................................................. 3

    *Office of the Inspector General (OIG) Review* ................................................................ 4

    *TDCJ Death Review* ........................................................................................................ 4

    *Cause of Death* ............................................................................................................... 4

**Agency Procedures Used to Manage Temperature and Mitigate Excessive Heat** ......... 4

    *Seasonal Preparedness* .................................................................................................. 4

    *Heat Mitigation Protocols* .............................................................................................. 5

    *Heat-Sensitive Inmates* .................................................................................................. 7

    *Cool Beds* ....................................................................................................................... 7

**Appendix** .......................................................................................................................... 8

    *April - September 2024 Temperatures* .......................................................................... 8



**TIEDE DEF_87751**

**ATTORNEYS EYES ONLY**

# Introduction

Pursuant to Article V, Agency Rider 56, in the Fiscal Year (FY) 2024-2025 General Appropriations Act, the Texas Department of Criminal Justice (TDCJ) is required to annually report on inmate complaints related to temperature, cases of environmental hyperthermia or death caused by temperature or exacerbated by temperature, and agency procedures used to manage temperature and mitigate excessive heat in TDCJ facilities.

# Inmate Complaints Related to Temperature

Inmates may utilize the agency's Grievance Program to report complaints related to temperature. The program provides a means for identifying issues and facilitating corrective action, thereby contributing to a safer environment for staff and inmates.

The two-step grievance process provides inmates with a mechanism to resolve issues or concerns that arise while incarcerated. The Grievance Program is administered through the agency's Administrative Review and Risk Management Division, which reports to the Executive Director of the TDCJ.

## Step 1 Grievances

A Step 1 grievance is investigated and responded to at the unit level. Inmates filed 4,936 Step 1 grievances related to temperature in FY 2024.

| Grievances Related to Temperature (Step 1 Grievance Form) | FY 2024 | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Sept | Oct | Nov | Dec | Jan | Feb | Mar | Apr | May | June | July | Aug | Total |
| Mitigation Efforts / Housing | 241 | 50 | 13 | 22 | 10 | 17 | 39 | 57 | 165 | 333 | 436 | 438 | **1821** |
| Fans / Air Conditioning | 227 | 157 | 112 | 85 | 80 | 134 | 121 | 210 | 260 | 269 | 281 | 304 | **2240** |
| Temperature | 25 | 2 | 1 | 5 | 4 | 0 | 5 | 9 | 43 | 122 | 107 | 92 | **415** |
| Medical / Heat Restriction | 30 | 25 | 13 | 15 | 26 | 14 | 20 | 31 | 82 | 50 | 93 | 61 | **460** |
| **Total** | **523** | **234** | **139** | **127** | **120** | **165** | **185** | **307** | **550** | **774** | **917** | **895** | **4936** |

## Step 2 Grievances

A Step 2 grievance is an appeal of the Step 1 grievance and is investigated by the agency's central administration. Inmates filed 829 Step 2 grievances related to temperature in FY 2024.

**TIEDE DEF_87752**

**ATTORNEYS EYES ONLY**



| Grievances Related to Temperature (Step 2 Grievance Form) | FY 2024 | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Sept | Oct | Nov | Dec | Jan | Feb | Mar | Apr | May | June | July | Aug | Total |
| Mitigation Efforts / Housing | 57 | 56 | 37 | 7 | 4 | 4 | 6 | 1 | 8 | 9 | 31 | 61 | **281** |
| Fans / Air Conditioning | 36 | 42 | 47 | 30 | 29 | 13 | 18 | 23 | 35 | 31 | 37 | 29 | **370** |
| Temperature | 25 | 13 | 9 | 1 | 0 | 0 | 2 | 1 | 3 | 5 | 9 | 17 | **85** |
| Medical / Heat Restriction | 7 | 8 | 10 | 6 | 3 | 5 | 7 | 3 | 16 | 10 | 7 | 11 | **93** |
| **Total** | **125** | **119** | **103** | **44** | **36** | **22** | **33** | **28** | **62** | **55** | **84** | **118** | **829** |

## Heat-Related Illnesses or Death Caused by or Exacerbated by Temperature

Inmate heat-related illnesses and deaths are reported to the agency's Emergency Action Center (EAC). "Heat-Related Illness" is when an individual is diagnosed with heat exhaustion, heat stroke, heat syncope, or heat cramps regardless of treatment, or is diagnosed with a heat-related illness and receives intravenous fluids. The EAC provides a communications link between the Texas Board of Criminal Justice (TBCJ), units/departments, and administrative staff to report serious and unusual incidents. Information gathered is used to keep administration informed, provide risk assessments, and promote safety and security. Additionally, all inmate deaths are reviewed by a mortality review committee.

During FY 2024, there was one death determined to be most likely heat-related for inmates and zero heat-related deaths for staff. There were 29 heat-related illnesses for inmates and 26 for staff.

On June 7, 2024, at 4:45 p.m. a 44-year-old male inmate collapsed in the recreation yard of the Goree Unit in Huntsville, Texas, while playing soccer. Staff responded and began life saving measures. Resuscitative efforts were initiated at 4:47 p.m. but were ultimately unsuccessful and he was pronounced deceased at 5:20 p.m. The final autopsy diagnosis stated, "in the absence of toxicants or anatomic findings to explain the death, and with the information from the scene, it is our opinion that this is most likely a heat related death. The manner of death is accident. Mild cardiomegaly is a potential contributory factor."

## Inmate Heat-Related Illnesses/Death

| Inmate Heat Related Illnesses/Death | FY 2024 | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Sept | Oct | Nov | Dec | Jan | Feb | Mar | Apr | May | June | July | Aug | Total |
| Heat Cramps | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 3 | 1 | 0 | **6** |
| Heat-Related Illness, Exhaustion, Dehydration | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 1 | 5 | 3 | 6 | **17** |
| Heat Stroke | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | **1** |
| Heat Syncope | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 | 2 | 0 | 1 | **5** |
| Death Caused or Exacerbated by Temperature | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | **1** |
| **Total** | **2** | **0** | **0** | **0** | **0** | **0** | **0** | **1** | **5** | **11** | **4** | **7** | **30** |

**TIEDE DEF_87753**

**ATTORNEYS EYES ONLY**

# Staff Heat-Related Illnesses/Death

| Staff Heat Related Illnesses/Death | FY 2024 | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Sept | Oct | Nov | Dec | Jan | Feb | Mar | Apr | May | June | July | Aug | Total |
| Heat Cramps | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | **0** |
| Heat-Related Illness, Exhaustion, Dehydration | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 3 | 7 | 2 | 11 | **24** |
| Heat Stroke | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | **1** |
| Heat Syncope | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | **1** |
| Death Caused or Exacerbated by Temperature | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | **0** |
| **Total** | **1** | **0** | **0** | **0** | **0** | **0** | **0** | **0** | **3** | **8** | **2** | **12** | **26** |

# Procedures Used to Review Inmate Deaths

## Clinical Summary and Review of an Inmate's Death

Every inmate who expires within the TDCJ has a clinical summary of death entered into the health record by a facility medical provider within 30 days. The Death Summary includes the following information: a brief summary of medical history and physical examination; outpatient course, which includes a summary of sick call visits and chronic care clinics; emergency room visits to include those at the facility of assignment and/or offsite hospitals; inpatient courses to include infirmary care and/or offsite hospitalizations; list of medication(s) the inmate was receiving at the time of death; terminal events, both clinical and historical, that led up to the death and a description of the medical procedures utilized by staff in the agonal event; and autopsy findings, if available.

Each death on a facility is reviewed by the facility practice manager within 30 days. Deaths occurring offsite are reviewed by the referring management team. If the medical management is determined to be improper or questionable, the case is forwarded to the chairman of the appropriate Peer Review Committee. A copy of the death review will be scanned into the electronic health record and sent to the Regional District Medical Director.

## Joint Mortality Review Committee

A Joint Mortality Review Committee reviews each inmate death. This mortality review is in addition to any unit-level death review that is performed. Membership of the Committee includes at least one physician/advanced practice provider and other licensed healthcare staff except dentists as designated by each of the joint medical directors from the Texas Tech University Health Sciences Center (TTUHSC), University of Texas Medical Branch (UTMB), and the TDCJ Health Services Division. Meetings of the Committee occur at least monthly via teleconference or video conference. At least two physician/advanced practice providers must be present for a meeting.

TIEDE DEF_87754

**ATTORNEYS EYES ONLY**

# Office of the Inspector General (OIG) Review

The OIG conducts independent investigations into all deaths in custody, which include relevant conditions and circumstances including environmental conditions. Any death in custody identified as potentially being caused by heat or identified by medical examiners as being a contributing factor, are reported to OIG and TDCJ executive staff, and additional investigative activities may occur as directed. A copy of the last 72 hours of a deceased inmate's health records is provided by medical personnel to OIG immediately upon request from an OIG investigator. All custodial deaths must be reported by OIG to the Attorney General's office.

# TDCJ Death Review

TDCJ Executive Services in coordination with the EAC and Health Services Division, track and monitor all EAC death notifications, custodial death reports, autopsies, and death certificates. These records are reviewed for any language or indications that heat could have played a role in the death of an individual. Any descriptions or findings that indicate heat may have been a contributing factor are noted for further review by the Health Services Division.

# Cause of Death

An inmate's cause of death is determined by the final autopsy results, conducted by an independent medical examiner, and the death certificate issued by the Bureau of Vital Statistics.

# Agency Procedures Used to Manage Temperature and Mitigate Excessive Heat

## Seasonal Preparedness

The well-being of inmates and staff is a top priority for the TDCJ, and the agency remains committed to making sure that both are safe during temperature extremes.

Prior to the start of summer, representatives from all TDCJ divisions meet to review best practices concerning preventive care and precautions. Following this meeting, the annual Seasonal Preparedness Directive is distributed to all unit wardens to inform them of additional mandatory compliance measures in the prevention of heat-related illnesses.

TIEDE DEF_87755

**ATTORNEYS EYES ONLY**

The Seasonal Preparedness Directive includes specific precautions and actions relating to training; inmate transport; outside activity; inmate intake; inmate housing assignments; inmate housing areas; inmate fans; cooling items available for purchase from commissary; and unit maintenance, including verification that ice machines are working properly. The agency requires that all preventive maintenance and/or necessary repairs to cooling equipment must be completed prior to the start of summer.

## Heat Mitigation Protocols

The agency utilizes an array of protocols to mitigate the impact of excessive heat, including:

- As inmates arrive on intake facilities, a staff member from the medical department conducts an initial screening to ascertain if the inmate has any conditions, or is on any medication, that will make them more susceptible to the heat. Throughout the inmate's incarceration, reassessments of heat risk are performed with each healthcare encounter through a program that calculates certain conditions or medications that are present in the electronic health record.  Heat sensitivity is considered when making housing assignments;

- The agency makes air-conditioned respite areas available for inmates 24 hours per day, seven days per week. Inmates are permitted to stay in the respite area as long as necessary. Inmates requesting access to a respite area are not required to be seen by medical staff unless they are exhibiting signs or symptoms of a heat-related illness;

- Water is available at all times and additional ice water and cups are provided in inmate housing areas, recreational areas, and during meal times;

- Psychiatric inpatient inmates are transported to other facilities via air-conditioned transfer vehicles only, and inmates are transported during the coolest hours of the day, when possible;

- Inmates can utilize and carry cooling towels, and wear shorts and t-shirts in dayrooms and recreational areas;

- Inmates are allowed additional showers when possible, and the water temperature is lowered for single-temperature showers in inmate housing areas;

- Posters are placed in housing areas reminding inmates of heat precautions and the importance of water intake. Outside activity (work hours) is restricted

TIEDE DEF_87756

ATTORNEYS EYES ONLY



in accordance with agency policy. All inmates and staff working in areas of extreme heat such as field, maintenance, and yard squads are provided frequent water breaks;

- Portable fans are allowed for inmates in all custody levels, including restrictive housing and disciplinary status;

- The fans in TDCJ facilities are used to draw air through the structure and exhaust outside. Full advantage of the fresh air exchange system or prevailing winds is taken to assist in the movement of air as applicable. Air flow is increased by using blowers, normally used to move hot air in the winter, when appropriate. Ribbons are attached to vents to ensure blowers are functioning appropriately. Window screens are cleaned so as not to restrict air flow;

- Staff and inmates are trained regarding excessive temperature conditions. Refresher training is provided on a regular and frequent basis throughout the duration of the excessive heat period;

- TDCJ staff and medical personnel coordinate to promptly identify and communicate needs of inmates susceptible to temperature-related illnesses due to medical conditions. Security staff conduct wellness checks for inmates identified as sensitive to heat during normal security checks of the housing areas;

- All heat-related illnesses are evaluated, to include the conditions surrounding the incident, such as water intake, location, and what the inmate was doing before becoming ill. Additionally, "cluster illnesses," or illnesses occurring in inmates in the same housing areas, are tracked and reported; and

- Additional precautionary measures are taken when excessive heat conditions last for three or more consecutive days. Such conditions require activation of the Incident Command System (ICS). The ICS provides a system for the effective management of personnel and resources that respond to the incident as it escalates. Once ICS is deactivated, the unit officials conduct a debriefing to evaluate unit operations during the excessive heat warning to identify any areas requiring improvement.

**ATTORNEYS EYES ONLY**

## Heat-Sensitive Inmates

The TDCJ identifies inmates who are at the highest level of risk for heat injury and works to relocate those individuals into existing air-conditioned beds within the system. Inmates are identified through an automated scoring system that uses information from their electronic health record. On August 31, 2024, 11,735 inmates had a heat score within TDCJ. The TDCJ also continues to evaluate its policies, practices, and procedures to ensure the safety of those inmates identified as potentially having an increased sensitivity to heat.

## Cool Beds

The system currently has 32 prisons with full air-conditioning and many others with partial air-conditioning, which total approximately 46,100 air-conditioned beds, including the addition of more than 6,800 air-conditioned beds between 2019-2023. An additional 4,800 air-conditioned beds will be added in 2024-25, bringing the total number of air-conditioned beds in the system to approximately 48,200. The legislature authorized $85.7 million dollars in the 2024-2025 biennium, which will add approximately 14,000 more air-conditioned beds to the system, taking the agency to over 62,000 air-conditioned beds to house inmates with heat vulnerabilities.

The agency's FY26-27 Legislative Appropriations Request included exceptional items of $240 million to construct 12 expansion dorms capable of housing 4,800 inmates. These additional 4,800 beds will be air conditioned.  Also, funding for major repairs and restoration of facilities includes a total of $118 million to install air conditioning of approximately 11,400 additional cool beds.  If approved, these additional cool beds will bring the agency total to over 78,000.

**TIEDE DEF_87758**

**ATTORNEYS EYES ONLY**

## Appendix

## April - September 2024 Temperatures

Rider 56 requires the TDCJ to measure and record indoor temperatures. During the months of April through September, every TDCJ operated facility that is not fully air-conditioned will take and log the temperature inside a cell or another inmate housing area at 3:00 p.m. daily.

The daily temperature log information for the months of April - September 2024 in an excel spreadsheet format is as follows:

**TIEDE DEF_87759**

ATTORNEYS EYES ONLY
WORKING PAPERS

# Office of Quality Assurance
## Senate Bill 1, Rider 56
## Monthly Temperatures

## April 2024

| | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 | 18 | 19 | 20 | 21 | 22 | 23 | 24 | 25 | 26 | 27 | 28 | 29 | 30 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Allred** | 79.9 | 76.9 | 75.9 | 79.3 | 78.2 | 81.3 | 76.5 | 78.1 | 78.3 | 77.4 | 77.9 | 79.1 | 80.5 | 82.1 | 85.4 | 80.8 | 86.1 | 79.9 | 78.0 | 70.4 | 73.1 | 76.8 | 80.1 | 80.6 | 83.4 | 80.5 | 84.1 | 82.5 | 81.3 | 85.1 |
| **Beto** | 78.6 | 74.6 | 72.5 | 73.6 | 78.5 | 76.7 | 76.8 | 76.1 | 70.5 | 69.1 | 72.2 | 74.0 | 74.5 | 73.8 | 80.7 | 76.5 | 77.8 | 78.6 | 70.1 | 69.9 | 73.9 | 75.7 | 77.0 | 75.5 | 80.5 | 75.2 | 73.3 | 76.1 |
| **Boyd** | 80.4 | 75.0 | 74.3 | 77.4 | 80.8 | 81.2 | 79.2 | 81.5 | 74.2 | 72.6 | 73.3 | 78.2 | 77.3 | 78.0 | 80.7 | 77.0 | 81.8 | 84.6 | 76.2 | 73.8 | 72.8 | 74.9 | 77.8 | 79.2 | 79.1 | 79.8 | 82.0 | 74.5 | 77.8 | 82.5 |
| **Bradshaw** | 80.2 | 74.5 | 75.1 | 76.1 | 80.3 | 82.7 | 80.6 | 78.1 | 69.9 | 69.8 | 76.8 | 80.2 | 80.2 | 78.5 | 81.0 | 81.2 | 79.7 | 79.6 | 79.3 | 73.0 | 78.2 | 75.2 | 81.2 | 81.8 | 78.5 | 80.1 | 77.9 | 76.7 | 78.1 | 82.2 |
| **Briscoe** | 77.8 | 82.8 | 76.8 | 78.2 | 81.7 | 82.7 | 79.8 | 78.9 | 89.5 | 78.4 | 83.9 | 81.6 | 86.1 | 84.8 | 87.3 | 81.8 | 84.9 | 85.8 | 81.6 | 82.5 | 76.3 | 77.3 | 77.9 | 83.4 | 82.4 | 85.5 | 77.8 | 80.1 | 86.6 | 92.5 |
| **Byrd** | 76.5 | 72.3 | 74.4 | 73.2 | 74.2 | 77.4 | 76.5 | 75.7 | 75.2 | 73.4 | 74.6 | 74.1 | 74.9 | 75.2 | 77.8 | 79.9 | 78.2 | 79.2 | 76.5 | 72.2 | 70.1 | 72.3 | 73.5 | 74.8 | 76.1 | 79.2 | 79.9 | 80.7 | 78.5 | 78.3 |
| **Clemens** | 78.8 | 79.2 | 77.0 | 74.1 | 75.5 | 78.4 | 77.9 | 79.4 | 80.8 | 77.9 | 76.1 | 77.4 | 75.5 | 81.7 | 77.6 | 78.7 | 79.4 | 79.8 | 86.0 | 81.3 | 70.2 | 76.9 | 75.3 | 80.6 | 78.2 | 77.2 | 75.6 | 95.5 | 85.1 |
| **Clements** | 66.0 | 62.5 | 63.6 | 65.2 | 67.4 | 65.9 | 64.5 | 64.4 | 62.0 | 60.2 | 61.7 | 63.1 | 67.0 | 70.0 | 70.6 | 69.4 | 71.6 | 69.0 | 67.4 | 67.0 | 65.0 | 64.8 | 66.8 | 67.3 | 68.0 | 69.2 | 69.8 | 67.0 | 69.1 | 70.6 |
| **Coffield** | 87.8 | 77.3 | 76.9 | 77.9 | 79.0 | 80.6 | 78.9 | 83.9 | 76.7 | 75.2 | 76.6 | 77.1 | 77.6 | 79.7 | 84.5 | 79.4 | 86.3 | 84.1 | 74.9 | 76.6 | 76.5 | 77.3 | 77.5 | 81.7 | 81.4 | 82.6 | 84.3 | 83.2 | 81.8 | 82.4 |
| **Cole** | 81.7 | 78.1 | 77.7 | 78.2 | 78.4 | 78.2 | 80.5 | 79.7 | 75.1 | 72.6 | 77.5 | 78.1 | 78.9 | 82.1 | 73.4 | 85.9 | 89.3 | 87.9 | 78.3 | 68.5 | 72.8 | 75.3 | 78.4 | 80.7 | 83.1 | 74.1 | 84.1 | 77.4 | 79.8 | 82.5 |
| **Connally** | 86.7 | 76.5 | 75.0 | 78.5 | 78.1 | 75.8 | 80.2 | 81.2 | 82.6 | 77.1 | 78.8 | 79.0 | 78.3 | 79.7 | 84.6 | 82.8 | 85.3 | 89.0 | 89.4 | 87.1 | 75.1 | 77.0 | 75.1 | 79.9 | 83.1 | 85.3 | 87.2 | 85.7 | 90.9 | 89.7 |
| **Crain** | 80.1 | 71.5 | 78.1 | 80.1 | 84.7 | 74.2 | 79.4 | 81.9 | 72.6 | 70.7 | 75.7 | 77.1 | 81.7 | 84.7 | 81.0 | 80.2 | 80.0 | 84.7 | 75.8 | 70.5 | 78.0 | 78.2 | 76.8 | 78.8 | 78.6 | 81.4 | 81.8 | 87.5 | 82.5 |
| **Dalhart** | 76.7 | 76.9 | 76.6 | 76.4 | 76.1 | 75.3 | 76.7 | 76.8 | 76.3 | 76.8 | 76.7 | 76.3 | 78.3 | 79.2 | 77.8 | 77.8 | 78.8 | 77.5 | 77.2 | 76.8 | 76.2 | 78.9 | 78.4 | 77.7 | 77.9 | 77.1 | 77.5 | 78.0 |
| **Daniel** | 71.6 | 77.1 | 74.6 | 76.1 | 73.2 | 76.0 | 70.1 | 77.1 | 75.2 | 67.5 | 76.7 | 77.2 | 77.0 | 76.8 | 75.0 | 75.2 | 74.6 | 76.8 | 78.2 | 68.4 | 74.8 | 78.6 | 76.9 | 73.7 | 72.2 | 74.2 | 75.9 | 76.4 | 76.4 | 77.2 |
| **Dominguez** | 81.8 | 80.9 | 77.2 | 79.4 | 80.4 | 77.8 | 80.7 | 80.0 | 87.3 | 77.5 | 79.4 | 80.5 | 83.6 | 83.4 | 81.2 | 85.5 | 84.0 | 81.7 | 80.1 | 73.3 | 77.5 | 77.0 | 79.3 | 81.1 | 82.1 | 81.3 | 82.1 | 82.1 | 87.7 | 83.0 |
| **Ellis** | 79.7 | 77.7 | 75.3 | 76.3 | 78.3 | 79.7 | 79.8 | 74.1 | 78.9 | 76.3 | 75.5 | 78.5 | 78.4 | 79.9 | 80.4 | 81.4 | 84.0 | 82.0 | 80.0 | 80.5 | 73.1 | 77.5 | 76.5 | 77.1 | 80.7 | 79.9 | 81.1 | 83.5 | 83.0 | 84.1 |
| **Estelle** | 81.4 | 79.6 | 74.6 | 76.5 | 77.2 | 77.4 | 77.7 | 78.4 | 76.4 | 71.0 | 77.2 | 77.4 | 77.5 | 77.1 | 78.7 | 79.2 | 83.6 | 80.5 | 78.6 | 76.0 | 70.0 | 76.9 | 73.2 | 83.3 | 83.8 | 77.6 | 86.9 | 82.0 | 81.8 | 83.5 |
| **Ferguson** | 79.5 | 77.1 | 75.4 | 78.9 | 81.3 | 81.1 | 78.8 | 79.9 | 77.7 | 72.3 | 76.5 | 77.9 | 78.7 | 86.1 | 88.9 | 81.7 | 80.5 | 84.2 | 86.1 | 79.2 | 74.1 | 74.4 | 75.7 | 80.7 | 80.6 | 80.2 | 82.9 | 82.9 | 81.1 | 83.8 |
| **Formby** | 77.3 | 73.3 | 77.2 | 79.3 | 78.9 | 76.0 | 73.3 | 73.9 | 66.9 | 73.3 | 74.9 | 78.9 | 81.5 | 81.9 | 82.6 | 82.1 | 82.4 | 71.6 | 71.6 | 67.5 | 74.7 | 76.7 | 80.4 | 74.8 | 79.6 | 80.6 | 78.7 | 77.2 | 80.5 | 81.4 |
| **Garza East** | 84.4 | 85.4 | 81.7 | 87.1 | 87.1 | 79.5 | 84.1 | 80.1 | 88.7 | 77.6 | 84.4 | 85.2 | 84.1 | 83.8 | 85.7 | 85.6 | 87.4 | 91.1 | 87.4 | 88.6 | 76.9 | 80.7 | 82.8 | 88.1 | 82.3 | 86.6 | 92.1 | 90.1 |
| **Garza West** | 83.7 | 88.0 | 83.0 | 88.4 | 84.2 | 81.8 | 86.4 | 84.5 | 88.3 | 79.7 | 85.2 | 84.7 | 85.6 | 86.6 | 83.3 | 91.9 | 96.3 | 94.6 | 91.2 | 90.4 | 80.5 | 79.7 | 80.5 | 85.2 | 86.0 | 89.5 | 88.3 | 88.4 | 96.7 | 93.9 |
| **Gist** | 79.3 | 80.2 | 78.1 | 79.9 | 83.9 | 79.9 | 78.8 | 78.1 | 79.0 | 79.4 | 81.3 | 81.6 | 78.8 | 80.1 | 78.6 | 84.6 | 82.6 | 79.3 | 74.5 | 75.1 | 76.8 | 84.3 | 86.4 | 80.4 | 84.2 | 79.8 | 72.1 | 85.0 |
| **Goodman** | 83.0 | 82.0 | 76.2 | 78.4 | 82.6 | 83.3 | 84.3 | 71.6 | 74.3 | 74.4 | 78.5 | 79.0 | 79.3 | 77.8 | 81.3 | 82.7 | 84.2 | 80.6 | 83.5 | 70.8 | 73.2 | 78.4 | 78.9 | 79.3 | 84.5 | 86.0 | 84.6 | 77.7 | 83.0 |
| **Goree** | 77.6 | 77.8 | 76.6 | 77.4 | 77.7 | 79.1 | 80.4 | 76.4 | 77.6 | 78.6 | 78.0 | 79.1 | 80.4 | 84.5 | 83.7 | 83.5 | 76.9 | 77.2 | 77.0 | 75.6 | 75.0 | 73.9 | 79.7 | 76.5 | 80.0 | 80.6 | 80.6 |
| **Hightower** | 77.6 | 83.8 | 74.9 | 80.7 | 83.3 | 76.9 | 79.2 | 75.7 | 78.3 | 75.8 | 80.4 | 77.6 | 79.1 | 79.3 | 78.6 | 78.7 | 77.4 | 81.2 | 80.9 | 77.6 | 72.2 | 75.3 | 75.6 | 80.0 | 78.6 | 77.9 | 80.4 | 80.7 | 81.4 |
| **Hilltop** | 74.0 | 76.8 | 76.9 | 77.0 | 77.3 | 74.2 | 74.5 | 76.6 | 74.5 | 71.1 | 77.6 | 77.0 | 75.2 | 74.7 | 76.3 | 76.4 | 75.7 | 75.1 | 78.3 | 71.3 | 70.2 | 69.2 | 75.0 | 73.5 | 73.8 | 73.1 | 74.5 | 73.9 | 73.8 | 76.7 |
| **Hobby** | 81.0 | 75.7 | 74.8 | 74.5 | 79.0 | 76.9 | 76.6 | 75.8 | 71.6 | 74.9 | 76.5 | 76.0 | 75.8 | 76.7 | 78.8 | 80.9 | 77.5 | 73.6 | 71.8 | 73.2 | 74.9 | 78.3 | 78.3 | 79.2 | 80.0 | 76.6 | 76.4 | 74.8 |
| **Holliday** | 83.1 | 80.2 | 77.1 | 78.5 | 79.8 | 82.5 | 79.5 | 82.6 | 85.0 | 77.8 | 78.0 | 77.8 | 76.1 | 78.1 | 81.0 | 81.5 | 81.4 | 81.2 | 83.7 | 77.1 | 73.7 | 72.4 | 73.4 | 80.1 | 84.4 | 83.9 | 85.6 | 85.9 | 79.5 | 80.0 |
| **Hughes** | 80.1 | 77.1 | 80.0 | 77.6 | 80.4 | 75.4 | 78.0 | 78.4 | 72.7 | 71.2 | 73.8 | 77.5 | 77.7 | 80.4 | 78.9 | 79.3 | 78.2 | 82.0 | 73.9 | 75.8 | 70.7 | 76.6 | 76.6 | 76.4 | 75.6 | 77.0 | 80.1 | 78.2 | 80.8 | 84.2 |
| **Huntsville** | 80.2 | 77.7 | 77.0 | 78.7 | 80.7 | 80.4 | 81.0 | 73.9 | 81.9 | 75.2 | 75.2 | 77.8 | 77.9 | 78.6 | 78.7 | 80.5 | 79.6 | 82.3 | 80.5 | 73.6 | 70.0 | 77.4 | 73.6 | 77.6 | 78.3 | 83.1 | 81.2 | 82.0 | 81.2 | 82.6 |
| **Hutchins** | 80.1 | 74.9 | 75.8 | 80.1 | 82.0 | 79.6 | 80.2 | 76.1 | 72.2 | 76.9 | 79.4 | 80.5 | 81.3 | 80.1 | 82.1 | 84.6 | 82.6 | 76.9 | 76.3 | 76.8 | 80.9 | 79.1 | 76.8 | 83.3 | 78.4 | 82.9 | 82.8 |
| **Jester III** | 80.7 | 79.9 | 76.9 | 77.7 | 79.6 | 77.9 | 81.5 | 81.6 | 80.1 | 77.8 | 76.9 | 79.1 | 79.0 | 81.0 | 81.4 | 82.3 | 82.7 | 86.7 | 85.2 | 86.2 | 78.0 | 77.6 | 78.2 | 82.2 | 80.4 | 80.4 | 84.3 | 84.5 | 80.9 | 86.3 |
| **Jordan** | 77.0 | 76.5 | 76.0 | 79.1 | 76.9 | 75.1 | 71.6 | 75.1 | 78.2 | 77.0 | 77.2 | 77.8 | 80.2 | 78.6 | 78.7 | 77.7 | 79.1 | 76.8 | 77.0 | 76.6 | 78.4 | 78.2 | 79.5 | 79.4 | 79.2 | 77.8 | 78.8 | 78.9 | 78.4 |
| **Lewis** | 80.1 | 81.0 | 76.3 | 76.4 | 79.2 | 80.1 | 82.7 | 79.3 | 75.6 | 74.7 | 79.1 | 78.8 | 84.0 | 78.8 | 81.5 | 83.0 | 82.1 | 83.8 | 83.4 | 76.9 | 77.3 | 77.1 | 83.2 | 79.5 | 79.9 | 81.8 | 84.0 | 82.2 | 82.4 | 81.2 |
| **Lopez** | 86.4 | 87.9 | 79.9 | 82.3 | 84.5 | 83.8 | 80.8 | 85.2 | 83.6 | 85.6 | 83.2 | 85.2 | 91.4 | 88.9 | 93.1 | 91.0 | 84.8 | 87.4 | 86.7 | 75.7 | 72.7 | 81.8 | 89.5 | 83.3 | 87.3 | 98.1 | 89.8 | 89.9 | 86.9 |
| **Luther** | 77.6 | 76.5 | 76.8 | 78.4 | 75.8 | 78.5 | 80.4 | 79.6 | 77.5 | 74.8 | 73.6 | 74.9 | 74.7 | 76.5 | 81.6 | 86.5 | 82.8 | 80.9 | 82.0 | 79.7 | 76.7 | 76.9 | 80.7 | 79.0 | 78.9 | 79.7 | 89.2 | 85.6 | 82.6 |
| **Lychner** | 84.9 | 83.1 | 78.1 | 80.3 | 83.3 | 80.1 | 86.3 | 82.2 | 78.2 | 77.1 | 81.2 | 80.0 | 79.6 | 80.8 | 85.7 | 86.4 | 85.7 | 82.9 | 75.7 | 76.7 | 78.0 | 85.1 | 77.6 | 83.8 | 88.9 | 86.1 | 83.6 | 84.7 |
| **Lynaugh** | 76.6 | 75.6 | 76.7 | 79.1 | 78.8 | 77.9 | 77.5 | 77.1 | 74.0 | 77.7 | 78.4 | 77.1 | 80.5 | 79.3 | 80.9 | 84.6 | 67.9 | 75.0 | 78.2 | 77.8 | 79.4 | 80.4 | 79.7 | 82.7 | 83.6 | 80.6 | 80.9 |
| **Mcconnell** | 81.1 | 79.2 | 75.6 | 79.8 | 82.5 | 78.6 | 80.1 | 79.3 | 83.7 | 74.3 | 76.8 | 79.9 | 81.5 | 81.6 | 79.7 | 80.7 | 84.2 | 83.1 | 84.1 | 84.9 | 73.8 | 73.9 | 75.3 | 79.5 | 82.4 | 83.3 | 84.6 | 83.5 | 85.7 | 85.6 |
| **Memorial** | 79.2 | 79.5 | 75.1 | 76.0 | 75.4 | 77.7 | 78.4 | 82.0 | 76.1 | 77.5 | 77.7 | 78.6 | 79.2 | 78.4 | 81.0 | 82.9 | 82.2 | 69.7 | 72.5 | 75.2 | 77.4 | 76.9 | 77.0 | 78.6 | 81.2 | 78.6 | 80.2 |
| **Michael** | 79.9 | 73.9 | 77.9 | 78.0 | 78.4 | 81.3 | 80.4 | 78.1 | 74.5 | 72.9 | 73.3 | 75.6 | 75.1 | 75.3 | 80.0 | 77.1 | 81.3 | 81.5 | 78.6 | 75.9 | 69.7 | 70.9 | 74.9 | 75.2 | 76.2 | 79.9 | 82.8 | 78.8 | 76.3 | 80.9 |
| **Middleton** | 85.8 | 77.4 | 79.0 | 84.0 | 87.6 | 84.9 | 79.7 | 84.5 | 77.1 | 77.6 | 82.8 | 82.0 | 87.7 | 89.7 | 89.3 | 84.4 | 87.1 | 81.0 | 71.0 | 66.4 | 69.8 | 77.0 | 80.1 | 80.4 | 81.6 | 81.3 | 84.3 | 80.1 | 82.5 | 88.0 |
| **Montford** | 76.0 | 76.5 | 75.3 | 77.1 | 78.6 | 77.3 | 74.5 | 75.0 | 77.0 | 76.9 | 75.9 | 79.9 | 80.6 | 83.6 | 82.1 | 79.1 | 82.9 | 76.7 | 76.4 | 78.7 | 77.3 | 77.1 | 83.6 | 77.1 | 81.6 | 80.7 | 79.5 | 78.9 | 78.8 | 85.1 |
| **Moore, C.** | 84.9 | 68.4 | 78.6 | 78.4 | 81.7 | 79.2 | 79.1 | 82.1 | 74.9 | 72.0 | 76.9 | 81.2 | 81.6 | 81.7 | 82.3 | 81.9 | 83.3 | 84.3 | 83.2 | 77.4 | 60.5 | 77.3 | 77.8 | 82.0 | 79.6 | 80.5 | 73.9 | 73.2 | 80.8 | 87.5 |
| **Murray** | 77.9 | 72.5 | 79.0 | 74.1 | 80.2 | 73.3 | 75.8 | 77.4 | 77.4 | 71.1 | 74.1 | 78.3 | 78.4 | 77.5 | 80.9 | 82.5 | 80.1 | 82.2 | 74.7 | 72.3 | 77.9 | 74.0 | 79.2 | 80.2 | 79.4 | 79.7 | 79.6 | 85.5 | 86.7 |
| **O'Daniel** | 80.0 | 76.8 | 76.7 | 77.3 | 79.8 | 72.4 | 76.6 | 75.1 | 73.3 | 67.1 | 77.2 | 71.9 | 77.1 | 79.4 | 78.5 | 77.3 | 80.6 | 82.5 | 76.7 | 75.8 | 71.6 | 77.0 | 75.2 | 75.1 | 75.4 | 72.4 | 77.8 | 76.1 | 77.1 | 84.3 |

TIEDE DEF_87760

ATTORNEYS EYES ONLY
WORKING PAPERS

# Office of Quality Assurance
## Senate Bill 1, Rider 56
## Monthly Temperatures

### April 2024

| | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 | 18 | 19 | 20 | 21 | 22 | 23 | 24 | 25 | 26 | 27 | 28 | 29 | 30 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Plane | 79.0 | 82.1 | 79.1 | 78.5 | 82.3 | 78.4 | 87.4 | 78.4 | 80.6 | 78.4 | 81.6 | 81.5 | 81.0 | 83.0 | 80.2 | 89.1 | 85.7 | 81.6 | 81.3 | 76.5 | 71.5 | 75.0 | 81.5 | 85.3 | 80.9 | 80.2 | 78.5 | 81.7 | 81.9 | 82.3 |
| Polunsky | 76.5 | 77.8 | 73.8 | 75.9 | 76.3 | 82.0 | 80.3 | 77.4 | 76.8 | 77.4 | 75.2 | 75.7 | 79.0 | 79.1 | 77.0 | 82.0 | 79.2 | 80.4 | 81.0 | 79.4 | 74.4 | 73.3 | 75.7 | 80.3 | 77.1 | 79.4 | 79.9 | 80.4 | 79.6 | 84.6 |
| Powledge | 79.2 | 77.7 | 75.6 | 77.3 | 78.3 | 78.0 | 77.6 | 78.7 | 75.4 | 70.0 | 75.0 | 76.2 | 75.8 | 77.8 | 78.9 | 79.2 | 82.2 | 83.2 | 81.2 | 70.6 | 69.9 | 70.5 | 72.2 | 79.9 | 78.5 | 78.7 | 83.9 | 81.4 | 78.8 | 80.1 |
| Ramsey | 81.0 | 79.4 | 73.2 | 78.7 | 79.2 | 76.1 | 83.6 | 78.6 | 79.2 | 75.9 | 76.1 | 78.1 | 78.1 | 78.2 | 80.1 | 81.0 | 79.9 | 79.8 | 81.8 | 84.1 | 76.6 | 77.3 | 78.5 | 78.8 | 78.7 | 79.2 | 82.1 | 81.9 | 83.6 | 82.1 |
| Roach | 79.1 | 77.2 | 70.8 | 76.7 | 76.8 | 74.9 | 77.9 | 72.0 | 71.8 | 68.7 | 79.1 | 72.1 | 77.5 | 79.8 | 72.4 | 76.8 | 78.4 | 74.5 | 70.6 | 67.6 | 68.8 | 70.3 | 76.3 | 72.6 | 73.8 | 75.9 | 79.6 | 79.6 | 78.3 | 81.0 |
| Robertson | 77.6 | 77.0 | 77.1 | 76.1 | 79.6 | 78.2 | 75.5 | 79.4 | 72.1 | 69.6 | 76.9 | 75.3 | 77.9 | 80.0 | 79.6 | 80.4 | 83.7 | 79.0 | 76.5 | 74.2 | 76.1 | 79.6 | 77.7 | 78.5 | 77.7 | 79.0 | 85.0 | 77.3 | 79.3 | 79.8 |
| Sanchez | 74.9 | 70.2 | 70.3 | 81.9 | 80.0 | 80.0 | 76.5 | 76.7 | 69.4 | 78.0 | 79.2 | 81.0 | 80.7 | 79.5 | 79.4 | 79.2 | 82.4 | 84.7 | 80.5 | 78.7 | 71.8 | 81.3 | 86.6 | 83.8 | 80.6 | 75.6 | 74.8 | 70.0 | 77.5 | 80.0 |
| Segovia | 86.1 | 86.6 | 78.6 | 84.7 | 83.5 | 82.5 | 83.5 | 76.1 | 86.9 | 85.8 | 85.6 | 85.1 | 86.6 | 87.0 | 86.3 | 88.6 | 87.0 | 86.7 | 88.1 | 87.0 | 76.2 | 71.4 | 80.1 | 85.6 | 85.7 | 86.6 | 90.8 | 90.5 | 88.4 | 88.8 |
| Smith | 69.5 | 63.1 | 65.3 | 75.0 | 70.5 | 70.7 | 66.8 | 68.5 | 61.4 | 60.5 | 66.0 | 68.2 | 71.2 | 72.5 | 73.2 | 75.5 | 75.7 | 71.3 | 65.5 | 59.5 | 62.9 | 66.9 | 66.7 | 66.6 | 70.4 | 72.4 | 72.5 | 71.0 | 71.5 | 74.6 |
| Stevenson | 82.1 | 81.6 | 75.8 | 78.5 | 79.2 | 77.8 | 80.5 | 80.0 | 82.1 | 78.6 | 79.3 | 78.9 | 80.9 | 81.7 | 82.7 | 83.0 | 86.7 | 84.3 | 83.5 | 88.1 | 79.0 | 78.1 | 77.1 | 81.0 | 80.5 | 82.5 | 84.3 | 84.3 | 88.7 | 86.6 |
| Stiles | 77.1 | 78.6 | 76.9 | 77.2 | 78.3 | 77.3 | 78.2 | 78.0 | 77.3 | 77.0 | 77.2 | 76.9 | 79.0 | 80.3 | 79.8 | 81.2 | 71.2 | 70.2 | 72.2 | 74.4 | 77.7 | 79.0 | 78.6 | 71.6 | 70.7 | 76.3 | 79.6 |
| Stringfellow | 80.8 | 79.0 | 74.5 | 75.6 | 79.8 | 78.2 | 81.3 | 81.3 | 81.1 | 77.4 | 77.3 | 77.5 | 79.2 | 79.2 | 80.9 | 81.2 | 81.4 | 81.8 | 84.5 | 83.1 | 75.2 | 73.5 | 75.8 | 79.8 | 79.6 | 79.3 | 81.3 | 81.8 | 81.2 | 83.3 |
| Telford | 73.2 | 75.9 | 76.4 | 70.3 | 73.6 | 77.1 | 77.2 | 75.6 | 69.4 | 70.4 | 71.0 | 74.4 | 77.5 | 76.5 | 74.5 | 74.6 | 78.5 | 73.2 | 66.5 | 69.1 | 69.9 | 74.8 | 75.5 | 78.3 | 75.3 | 79.0 | 74.6 | 78.1 | 78.3 |
| Terrell | 81.4 | 82.3 | 75.7 | 81.7 | 82.7 | 77.9 | 82.6 | 80.7 | 82.3 | 76.8 | 79.7 | 78.5 | 80.2 | 82.0 | 81.7 | 82.0 | 82.9 | 81.7 | 84.2 | 82.7 | 73.2 | 74.5 | 75.1 | 81.8 | 80.7 | 81.4 | 84.1 | 82.0 | 82.3 | 84.3 |
| Torres | 72.3 | 77.6 | 77.2 | 84.7 | 83.5 | 79.8 | 81.4 | 77.8 | 84.7 | 79.7 | 82.2 | 80.0 | 80.8 | 82.3 | 82.5 | 81.5 | 87.1 | 81.0 | 80.7 | 83.2 | 73.8 | 77.2 | 76.9 | 79.8 | 82.2 | 86.1 | 87.3 | 84.5 | 84.8 | 83.1 |
| Vance | 83.9 | 81.2 | 77.7 | 79.9 | 82.1 | 79.6 | 82.9 | 80.5 | 79.7 | 75.5 | 80.6 | 80.8 | 82.8 | 82.7 | 80.3 | 82.7 | 82.0 | 86.5 | 85.6 | 85.2 | 73.2 | 78.1 | 77.2 | 84.5 | 82.4 | 84.4 | 84.9 | 85.8 | 81.8 | 86.5 |
| Wainwright | 80.2 | 78.7 | 77.0 | 77.8 | 79.8 | 78.2 | 77.9 | 79.6 | 74.6 | 71.6 | 76.4 | 77.8 | 79.1 | 81.0 | 77.2 | 80.2 | 80.6 | 83.8 | 81.5 | 76.3 | 75.0 | 73.6 | 74.5 | 74.8 | 78.6 | 81.6 | 83.6 | 83.7 | 77.8 | 79.5 |
| Wallace | 78.1 | 77.8 | 78.3 | 80.1 | 81.3 | 80.6 | 78.2 | 77.4 | 77.9 | 77.2 | 79.6 | 81.3 | 85.3 | 84.7 | 82.4 | 84.7 | 80.5 | 80.2 | 72.4 | 60.1 | 74.9 | 75.2 | 82.1 | 83.0 | 80.9 | 82.2 | 81.5 | 83.1 | 85.7 |
| Wheeler | 76.8 | 76.0 | 75.9 | 76.0 | 76.3 | 74.5 | 74.8 | 76.6 | 61.8 | 77.0 | 77.6 | 77.3 | 77.6 | 78.4 | 74.5 | 73.5 | 81.2 | 71.7 | 69.7 | 69.7 | 73.2 | 74.5 | 79.3 | 72.9 | 76.2 | 78.5 | 74.6 | 71.3 | 74.3 | 73.2 |
| Woodman | 78.5 | 71.8 | 77.8 | 79.0 | 82.1 | 73.3 | 81.8 | 77.7 | 74.5 | 69.9 | 77.6 | 76.6 | 81.6 | 81.2 | 80.8 | 82.3 | 80.7 | 84.8 | 68.0 | 64.5 | 69.4 | 71.6 | 74.2 | 79.0 | 77.8 | 74.7 | 79.0 | 75.6 | 80.8 | 82.8 |
| Wynne | 79.1 | 77.5 | 73.8 | 76.7 | 77.5 | 80.1 | 79.0 | 82.1 | 77.3 | 75.3 | 74.9 | 79.8 | 79.6 | 79.8 | 82.4 | 84.2 | 80.7 | 82.5 | 84.6 | 71.6 | 72.1 | 77.0 | 78.2 | 79.4 | 81.7 | 83.4 | 84.5 | 81.6 | 83.4 | 84.6 |
| Young | 77.1 | 82.2 | 75.7 | 79.3 | 83.3 | 76.8 | 79.1 | 77.6 | 78.7 | 77.7 | 80.9 | 79.6 | 79.0 | 78.6 | 78.5 | 79.0 | 78.8 | 79.2 | 81.7 | 79.8 | 71.2 | 73.1 | 77.9 | 78.7 | 77.4 | 78.3 | 80.8 | 80.0 | 78.1 | 80.4 |

# Office of Quality Assurance
## Senate Bill 1, Rider 56
## Monthly Temperatures

## May 2024

| | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 | 18 | 19 | 20 | 21 | 22 | 23 | 24 | 25 | 26 | 27 | 28 | 29 | 30 | 31 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Allred | 80.3 | 79.2 | 81.6 | 80.2 | 77.1 | 81.5 | 79.1 | 80.6 | 77.1 | 78.1 | 78.9 | 75.9 | 79.1 | 79.8 | 83.7 | 78.8 | 78.5 | 80.5 | 86.5 | 85.6 | 83.5 | 81.1 | 88.1 | 86.3 | 91.0 | 85.1 | 84.7 | 85.1 | 84.6 | 78.5 | 81.8 |
| Beto | 79.7 | 74.4 | 73.3 | 74.5 | 74.4 | 76.5 | 79.1 | 80.4 | 83.7 | 78.9 | 77.2 | 70.1 | 72.3 | 75.2 | 80.4 | 75.6 | 75.2 | 83.5 | 83.8 | 82.8 | 84.4 | 83.8 | 78.5 | 84.6 | 83.7 | 83.4 | 86.8 | 78.3 | 81.1 | 82.4 | 77.4 |
| Boyd | 82.3 | 79.2 | 79.6 | 81.6 | 81.3 | 81.7 | 85.5 | 84.9 | 87.7 | 82.8 | 83.8 | 72.8 | 74.5 | 83.2 | 81.7 | 75.6 | 77.7 | 84.2 | 85.4 | 85.9 | 87.5 | 87.0 | 79.4 | 86.6 | 87.0 | 87.5 | 89.2 | 81.6 | 86.3 | 84.0 | 79.1 |
| Bradshaw | 85.0 | 80.9 | 80.7 | 78.2 | 78.3 | 79.8 | 85.4 | 83.5 | 79.8 | 79.0 | 79.4 | 75.4 | 75.4 | 80.2 | 84.8 | 77.9 | 79.2 | 83.9 | 84.6 | 85.8 | 91.4 | 89.3 | 76.8 | 89.5 | 85.9 | 91.6 | 88.0 | 76.3 | 83.7 | 83.2 | 81.5 |
| Briscoe | 79.8 | 94.7 | 85.6 | 83.0 | 73.5 | 93.1 | 85.7 | 94.5 | 88.9 | 84.9 | 85.0 | 85.8 | 77.2 | 88.2 | 89.7 | 94.2 | 88.1 | 98.3 | 90.3 | 92.2 | 90.3 | 93.5 | 94.1 | 93.7 | 95.6 | 91.8 | 92.3 | 95.0 | 91.0 | 89.4 | 88.2 |
| Byrd | 78.7 | 74.9 | 72.9 | 77.1 | 77.3 | 76.3 | 77.2 | 83.1 | 81.9 | 77.2 | 72.8 | 72.4 | 74.1 | 80.2 | 77.2 | 77.3 | 75.8 | 80.2 | 84.6 | 79.8 | 84.1 | 79.5 | 88.5 | 89.6 | 87.1 | 87.7 | 79.9 | 83.0 | 81.1 | 76.1 | |
| Clemens | 84.2 | 80.5 | 81.7 | 81.7 | 77.2 | 81.5 | 82.7 | 82.0 | 92.1 | 88.4 | 77.1 | 89.7 | 79.2 | 82.0 | 85.9 | 83.8 | 79.8 | 81.7 | 85.9 | 85.0 | 91.4 | 82.1 | 84.7 | 87.3 | 86.5 | 86.4 | 85.1 | 82.5 | 81.2 | 84.7 | 85.4 |
| Clemens | 71.5 | 71.0 | 71.0 | 69.0 | 68.0 | 70.6 | 71.2 | 73.4 | 72.3 | 71.5 | 68.1 | 70.1 | 71.5 | 78.0 | 74.5 | 70.6 | 74.5 | 81.4 | 70.6 | 78.4 | 76.9 | 77.0 | 81.0 | 74.9 | 77.8 | 77.4 | 78.2 | 78.7 | 74.1 | 74.2 | 73.5 |
| Coffield | 81.8 | 87.4 | 79.1 | 82.8 | 82.7 | 86.7 | 90.5 | 94.6 | 87.3 | 83.5 | 81.2 | 78.3 | 79.3 | 81.4 | 83.3 | 77.8 | 81.1 | 86.6 | 93.3 | 87.8 | 96.8 | 87.3 | 81.8 | 86.7 | 86.3 | 87.1 | 88.7 | 82.8 | 83.6 | 90.3 | 78.9 |
| Cole | 80.2 | 84.1 | 88.9 | 87.1 | 81.2 | 87.7 | 81.7 | 75.9 | 79.3 | 80.2 | 80.9 | 72.8 | 81.6 | 80.1 | 87.2 | 74.5 | 80.6 | 91.4 | 91.5 | 85.7 | 88.9 | 79.2 | 85.3 | 95.4 | 84.8 | 90.1 | 90.3 | 75.1 | 81.7 | 69.4 | 84.1 |
| Connally | 88.9 | 87.1 | 85.9 | 84.0 | 79.0 | 91.4 | 95.7 | 96.7 | 88.5 | 91.6 | 86.4 | 95.1 | 76.2 | 85.8 | 86.5 | 86.4 | 76.9 | 83.7 | 86.0 | 95.3 | 98.5 | 98.0 | 99.1 | 100.9 | 100.6 | 104.3 | 99.0 | 103.3 | 95.1 | 98.6 | 92.3 |
| Crain | 78.4 | 79.7 | 76.3 | 74.3 | 80.8 | 80.2 | 87.0 | 88.3 | 92.7 | 80.2 | 82.4 | 69.2 | 79.6 | 80.5 | 83.4 | 73.3 | 80.7 | 85.0 | 87.6 | 86.9 | 85.0 | 87.7 | 80.4 | 85.3 | 88.8 | 88.0 | 84.4 | 89.4 | 89.2 | 81.0 | |
| Dalhart | 80.7 | 79.2 | 77.9 | 77.3 | 77.5 | 76.7 | 77.2 | 77.3 | 77.8 | 78.3 | 77.9 | 78.3 | 77.9 | 79.3 | 79.5 | 77.3 | 78.0 | 80.1 | 80.0 | 80.1 | 79.7 | 78.3 | 78.5 | 79.2 | 79.7 | 80.4 | 80.5 | 83.1 | 80.1 | 82.4 | 79.8 |
| Daniel | 76.9 | 77.8 | 78.1 | 73.9 | 74.2 | 72.6 | 76.7 | 77.0 | 77.6 | 77.1 | 74.9 | 71.9 | 77.1 | 77.4 | 76.9 | 76.5 | 76.6 | 77.1 | 79.2 | 80.1 | 80.4 | 81.2 | 82.4 | 80.8 | 81.9 | 81.4 | 82.5 | 78.8 | 71.5 | 77.9 | 79.8 |
| Dominguez | 81.5 | 82.7 | 83.6 | 81.8 | 82.2 | 85.1 | 89.9 | 86.4 | 88.8 | 88.9 | 85.1 | 88.2 | 77.2 | 84.8 | 84.9 | 79.5 | 83.9 | 89.8 | 89.7 | 92.3 | 92.4 | 88.8 | 88.1 | 91.5 | 88.7 | 100.3 | 85.6 | 84.6 | 86.9 | 85.3 | |
| Ellis | 74.3 | 75.8 | 74.2 | 75.4 | 76.8 | 81.7 | 87.8 | 84.8 | 83.7 | 77.3 | 84.5 | 78.7 | 75.3 | 84.4 | 83.6 | 80.8 | 77.3 | 82.7 | 86.5 | 86.8 | 89.2 | 84.5 | 82.2 | 85.6 | 88.9 | 87.9 | 87.7 | 79.8 | 88.1 | 87.1 | 78.5 |
| Estelle | 83.2 | 78.1 | 75.1 | 75.4 | 80.6 | 83.1 | 83.6 | 83.1 | 84.6 | 82.8 | 80.9 | 77.8 | 84.8 | 81.9 | 81.0 | 78.4 | 81.0 | 85.6 | 91.5 | 85.1 | 86.8 | 87.9 | 87.2 | 93.4 | 93.8 | 82.8 | 78.3 | 81.6 | 83.8 | 78.6 | |
| Ferguson | 84.1 | 87.1 | 78.5 | 79.6 | 82.4 | 82.4 | 86.3 | 84.3 | 85.9 | 83.6 | 81.0 | 75.3 | 79.0 | 81.8 | 83.7 | 80.1 | 82.8 | 82.5 | 87.5 | 86.2 | 88.4 | 88.7 | 85.2 | 89.9 | 89.8 | 87.9 | 89.4 | 80.1 | 84.6 | 87.4 | 80.1 |
| Formby | 84.7 | 81.5 | 78.2 | 67.9 | 74.8 | 81.9 | 83.7 | 82.4 | 77.9 | 82.1 | 76.8 | 73.5 | 78.5 | 80.6 | 82.5 | 80.6 | 80.1 | 84.5 | 77.7 | 83.1 | 82.9 | 79.0 | 85.7 | 81.4 | 84.2 | 82.7 | 81.6 | 81.4 | 84.6 | | |
| Garza East | 85.6 | 84.6 | 88.0 | 90.6 | 87.8 | 94.0 | 92.1 | 92.4 | 96.1 | 90.6 | 82.3 | 86.4 | 79.2 | 92.9 | 89.9 | 80.6 | 74.1 | 92.3 | 95.2 | 94.6 | 94.2 | 91.6 | 92.2 | 94.4 | 94.7 | 92.2 | 95.2 | 96.9 | 94.6 | 94.6 | 91.4 |
| Garza West | 88.5 | 85.3 | 88.9 | 87.1 | 85.1 | 89.0 | 94.0 | 94.9 | 92.7 | 83.5 | 91.5 | 78.0 | 78.8 | 94.9 | 94.0 | 86.0 | 80.6 | 94.7 | 97.6 | 96.9 | 96.3 | 95.3 | 95.1 | 97.2 | 98.3 | 96.9 | 101.5 | 99.7 | 95.7 | 95.8 | 100.3 |
| Gist | 83.3 | 73.6 | 73.8 | 82.8 | 80.9 | 84.9 | 86.1 | 87.1 | 84.7 | 86.2 | 84.2 | 78.6 | 83.5 | 85.3 | 89.8 | 78.9 | 77.7 | 91.6 | 91.9 | 90.1 | 87.8 | 87.6 | 89.7 | 89.4 | 91.4 | 88.2 | 93.7 | 79.5 | 87.8 | 84.2 | 79.5 |
| Goodman | 84.0 | 72.9 | 73.9 | 77.6 | 79.8 | 89.9 | 85.5 | 87.5 | 82.6 | 81.7 | 68.6 | 84.6 | 83.5 | 84.9 | 82.8 | 79.3 | 87.8 | 87.9 | 86.4 | 79.7 | 86.4 | 85.1 | 82.8 | 86.7 | 84.8 | 87.5 | 87.3 | 87.7 | 81.6 | 82.5 | 77.9 |
| Goree | 82.3 | 75.9 | 78.7 | 76.1 | 79.9 | 83.1 | 88.0 | 91.0 | 92.9 | 82.0 | 79.9 | 75.7 | 74.0 | 79.0 | 82.8 | 82.0 | 76.0 | 83.4 | 83.2 | 87.0 | 95.5 | 94.5 | 93.5 | 94.0 | 98.0 | 95.1 | 96.6 | 83.5 | 87.8 | 88.5 | 80.9 |
| Hightower | 82.1 | 75.8 | 72.6 | 80.5 | 77.3 | 81.4 | 83.1 | 82.3 | 82.6 | 81.9 | 80.4 | 78.7 | 78.6 | 83.7 | 82.3 | 80.0 | 81.5 | 86.1 | 85.9 | 85.7 | 85.3 | 86.9 | 84.8 | 87.5 | 87.3 | 82.7 | 79.9 | 84.6 | 84.4 | 81.7 | |
| Hilltop | 88.0 | 75.3 | 72.6 | 73.0 | 81.2 | 78.6 | 85.7 | 88.6 | 85.0 | 78.0 | 76.3 | 75.8 | 71.7 | 77.4 | 77.8 | 74.7 | 76.7 | 79.8 | 82.7 | 83.3 | 81.8 | 83.2 | 75.1 | 80.6 | 95.4 | 97.1 | 91.5 | 83.7 | 81.3 | 84.2 | 76.5 |
| Hobby | 78.9 | 75.9 | 75.3 | 77.0 | 76.1 | 79.6 | 81.8 | 83.5 | 85.4 | 81.8 | 83.4 | 75.1 | 74.3 | 76.3 | 80.0 | 78.5 | 75.4 | 80.0 | 84.2 | 84.7 | 87.0 | 81.0 | 83.7 | 86.6 | 87.1 | 83.7 | 88.3 | 85.5 | 84.6 | 83.7 | 81.2 |
| Holliday | 82.3 | 83.5 | 77.1 | 84.1 | 86.2 | 93.8 | 94.2 | 94.3 | 94.1 | 84.1 | 80.1 | 73.9 | 78.6 | 79.3 | 86.6 | 75.6 | 80.2 | 86.4 | 88.5 | 90.3 | 87.1 | 95.6 | 87.1 | 88.6 | 91.6 | 87.6 | 87.5 | 78.5 | 85.1 | 86.0 | 78.2 |
| Hughes | 79.7 | 78.1 | 77.0 | 77.4 | 80.0 | 82.0 | 85.0 | 85.9 | 83.9 | 80.4 | 80.7 | 72.6 | 78.6 | 82.4 | 83.6 | 71.6 | 81.0 | 85.0 | 85.5 | 87.5 | 85.7 | 82.2 | 82.9 | 77.4 | 87.4 | 86.2 | 86.0 | 89.1 | 83.5 | 79.5 | 84.7 |
| Huntsville | 82.3 | 77.8 | 73.3 | 79.6 | 79.1 | 80.8 | 85.5 | 83.2 | 84.8 | 80.0 | 81.9 | 77.5 | 77.3 | 81.0 | 84.2 | 80.5 | 77.3 | 85.0 | 85.3 | 86.6 | 86.1 | 87.8 | 85.8 | 88.7 | 88.5 | 88.7 | 79.4 | 85.6 | 86.8 | 80.4 | |
| Hutchins | 83.3 | 82.5 | 83.5 | 82.6 | 82.0 | 83.8 | 88.0 | 87.5 | 87.7 | 84.7 | 83.2 | 73.1 | 81.2 | 84.5 | 86.3 | 74.9 | 83.2 | 85.7 | 86.2 | 87.7 | 86.4 | 84.7 | 87.8 | 87.3 | 89.5 | 91.1 | 81.5 | 85.5 | 76.8 | 83.7 | |
| Jester III | 84.0 | 78.7 | 81.1 | 85.8 | 80.2 | 85.5 | 92.5 | 91.0 | 89.6 | 84.4 | 80.9 | 87.5 | 80.0 | 84.5 | 86.0 | 83.6 | 78.2 | 82.9 | 91.5 | 90.6 | 93.9 | 89.2 | 91.6 | 94.3 | 90.2 | 91.2 | 97.5 | 78.5 | 92.4 | 92.9 | 80.6 |
| Jordan | 79.2 | 77.1 | 76.2 | 71.2 | 76.5 | 78.0 | 78.2 | 78.0 | 74.7 | 78.0 | 79.2 | 80.2 | 78.2 | 80.1 | 82.6 | 82.1 | 81.1 | 81.6 | 78.6 | 79.3 | 77.7 | 80.4 | 78.7 | 80.4 | 81.2 | 80.4 | 80.6 | 80.6 | | | |
| Lewis | 84.2 | 72.4 | 87.1 | 78.6 | 83.7 | 83.2 | 85.6 | 89.5 | 87.1 | 82.5 | 81.2 | 69.2 | 82.0 | 82.4 | 82.0 | 81.2 | 75.0 | 85.0 | 84.1 | 89.6 | 94.0 | 95.5 | 92.7 | 94.8 | 98.4 | 95.2 | 98.5 | 79.6 | 91.4 | 91.2 | 79.9 |
| Lopez | 87.7 | 90.5 | 89.0 | 83.1 | 88.6 | 87.2 | 89.3 | 92.1 | 96.7 | 92.0 | 87.6 | 90.4 | 94.7 | 92.4 | 88.1 | 86.8 | 85.3 | 90.5 | 94.5 | 90.8 | 97.0 | 94.5 | 96.5 | 95.0 | 93.9 | 95.5 | 93.0 | 94.9 | 89.8 | 94.6 | 89.8 |
| Luther | 82.5 | 79.4 | 79.1 | 81.9 | 82.9 | 81.1 | 94.6 | 83.5 | 95.6 | 81.7 | 80.5 | 75.4 | 83.1 | 81.8 | 80.1 | 78.2 | 79.4 | 82.5 | 82.7 | 85.0 | 85.3 | 85.8 | 87.0 | 90.1 | 86.4 | 86.8 | 81.2 | 83.5 | 86.0 | 78.0 | |
| Lychner | 83.9 | 78.1 | 78.7 | 85.8 | 81.1 | 88.0 | 88.5 | 88.2 | 87.6 | 82.2 | 85.5 | 76.4 | 87.4 | 90.5 | 85.0 | 80.1 | 87.7 | 89.3 | 90.9 | 90.2 | 91.1 | 94.1 | 88.7 | 90.7 | 93.1 | 79.9 | 90.6 | 90.8 | 85.9 | | |
| Lynaugh | 80.6 | 86.6 | 81.6 | 84.3 | 78.6 | 80.3 | 84.8 | 83.6 | 85.0 | 76.8 | 76.1 | 84.6 | 80.4 | 84.2 | 82.5 | 80.6 | 85.0 | 86.7 | 85.7 | 86.5 | 85.1 | 87.1 | 87.4 | 85.3 | 86.0 | 92.1 | 83.1 | 85.0 | 87.2 | 89.5 | |
| Mcconnell | 82.0 | 82.6 | 83.4 | 84.7 | 82.3 | 84.5 | 87.4 | 87.6 | 90.8 | 87.1 | 82.6 | 86.9 | 78.5 | 80.9 | 84.0 | 82.8 | 76.7 | 84.9 | 87.5 | 89.9 | 90.4 | 89.8 | 88.8 | 91.6 | 91.2 | 87.6 | 93.0 | 90.8 | 89.2 | 89.2 | 87.6 |
| Memorial | 80.3 | 76.9 | 83.4 | 84.4 | 82.0 | 82.3 | 81.6 | 81.9 | 84.4 | 80.3 | 80.1 | 79.7 | 81.6 | 84.0 | 81.1 | 85.3 | 85.3 | 83.3 | 82.3 | 83.3 | 86.3 | 83.4 | 84.6 | 84.2 | 84.1 | 85.3 | 74.6 | 84.4 | 85.0 | 83.2 | |
| Michael | 83.0 | 81.1 | 78.5 | 82.7 | 82.2 | 83.2 | 87.1 | 84.6 | 92.1 | 81.3 | 81.8 | 77.6 | 79.9 | 80.3 | 80.1 | 80.7 | 79.9 | 83.3 | 84.8 | 83.1 | 84.8 | 86.2 | 80.5 | 83.7 | 84.1 | 84.8 | 85.8 | 83.7 | 87.7 | 84.4 | 79.8 |
| Middleton | 85.5 | 85.3 | 82.9 | 79.4 | 80.1 | 82.3 | 82.1 | 84.1 | 94.8 | 85.9 | 85.8 | 84.3 | 73.6 | 80.2 | 87.5 | 90.2 | 91.0 | 86.6 | 85.1 | 89.0 | 90.7 | 94.0 | 96.1 | 88.8 | 86.7 | 78.4 | 87.1 | | | | |
| Montford | 85.1 | 82.6 | 81.9 | 77.1 | 77.7 | 80.7 | 79.0 | 81.1 | 80.0 | 78.2 | 56.8 | 62.3 | 79.9 | 82.2 | 92.1 | 85.5 | 85.3 | 81.9 | 80.1 | 80.9 | 88.7 | 87.1 | 84.6 | 85.3 | 83.8 | 84.2 | 80.5 | 86.1 | | | |
| Moore, C. | 90.5 | 90.1 | 86.9 | 91.0 | 82.2 | 89.1 | 87.9 | 89.7 | 82.7 | 80.6 | 85.2 | 74.6 | 77.3 | 81.2 | 91.5 | 84.6 | 78.8 | 83.4 | 89.3 | 85.6 | 93.4 | 93.9 | 81.5 | 86.2 | 70.2 | 83.5 | | | | | |
| Murray | 84.3 | 83.9 | 80.6 | 82.6 | 80.1 | 79.7 | 84.6 | 89.2 | 89.1 | 75.2 | 77.5 | 71.2 | 81.6 | 84.9 | 79.9 | 74.5 | 83.0 | 80.7 | 81.2 | 80.2 | 78.2 | 88.3 | 84.1 | 86.1 | 97.3 | 85.0 | 91.2 | 83.0 | 82.8 | 85.7 | |
| O'Daniel | 78.1 | 75.9 | 75.5 | 73.4 | 74.9 | 80.1 | 85.6 | 94.7 | 89.2 | 78.5 | 73.0 | 81.6 | 80.6 | 73.9 | 76.3 | 81.5 | 84.1 | 83.1 | 84.0 | 76.3 | 92.3 | 96.4 | 96.3 | 103.1 | 83.1 | 82.6 | 85.3 | 79.9 | | | |
| Plane | 84.0 | 74.9 | 70.1 | 83.2 | 79.5 | 85.6 | 88.5 | 85.7 | 85.7 | 83.6 | 80.4 | 79.3 | 77.9 | 80.1 | 80.3 | 82.5 | 78.8 | 92.3 | 90.4 | 85.5 | 83.9 | 84.0 | 88.0 | 88.0 | 90.0 | 91.0 | 85.8 | 89.0 | 90.2 | 86.0 | |
| Polunsky | 83.2 | 74.8 | 74.1 | 77.3 | 78.1 | 85.6 | 91.5 | 83.5 | 83.8 | 83.1 | 81.4 | 76.6 | 77.2 | 78.6 | 80.3 | 81.7 | 78.7 | 84.5 | 84.6 | 86.5 | 87.5 | 87.4 | 87.3 | 88.0 | 84.9 | 87.8 | 86.6 | 84.6 | 84.5 | 78.0 | |
| Powledge | 81.9 | 72.7 | 81.2 | 80.5 | 83.1 | 80.2 | 83.0 | 84.4 | 86.9 | 83.1 | 82.6 | 77.3 | 79.3 | 80.7 | 77.9 | 73.8 | 81.1 | 85.9 | 88.9 | 84.1 | 87.4 | 77.5 | 86.7 | 86.5 | 88.7 | 89.3 | 84.1 | 78.9 | 84.5 | 82.7 | |

TIEDE DEF_87762

ATTORNEYS EYES ONLY
WORKING PAPERS

# Office of Quality Assurance
## Senate Bill 1, Rider 56
## Monthly Temperatures

### May 2024

| | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 | 18 | 19 | 20 | 21 | 22 | 23 | 24 | 25 | 26 | 27 | 28 | 29 | 30 | 31 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Ramsey | 87.2 | 77.9 | 80.1 | 83.9 | 79.3 | 89.1 | 91.2 | 81.9 | 96.7 | 84.8 | 82.1 | 90.1 | 80.6 | 83.5 | 88.4 | 91.4 | 76.4 | 82.0 | 85.7 | 85.6 | 87.2 | 87.1 | 87.3 | 94.3 | 101.4 | 89.9 | 90.0 | 80.0 | 86.5 | 87.7 | 85.5 |
| Roach | 79.2 | 79.6 | 71.4 | 72.4 | 70.6 | 78.6 | 78.4 | 77.1 | 76.5 | 77.3 | 75.3 | 73.2 | 75.5 | 77.7 | 79.5 | 74.3 | 77.6 | 80.1 | 83.6 | 84.8 | 84.2 | 77.9 | 82.1 | 80.6 | 85.3 | 84.1 | 80.4 | 82.6 | 81.1 | 80.2 | 79.1 |
| Robertson | 84.3 | 80.4 | 78.6 | 77.7 | 80.2 | 79.6 | 79.0 | 83.7 | 78.8 | 76.2 | 75.9 | 71.8 | 79.9 | 78.5 | 81.7 | 73.7 | 74.9 | 83.2 | 84.9 | 89.0 | 83.9 | 83.8 | 81.7 | 85.5 | 87.5 | 89.7 | 89.7 | 84.1 | 81.5 | 77.4 | 81.9 |
| Sanchez | 79.8 | 78.1 | 77.6 | 79.0 | 78.9 | 76.8 | 79.1 | 79.9 | 78.6 | 80.5 | 80.2 | 78.2 | 80.0 | 82.5 | 81.9 | 79.8 | 80.0 | 80.2 | 80.4 | 82.3 | 82.1 | 82.9 | 82.0 | 80.2 | 83.0 | 81.6 | 83.6 | 88.3 | 89.6 | 88.0 | 85.5 |
| Segovia | 88.2 | 88.8 | 88.6 | 87.1 | 87.5 | 88.3 | 89.8 | 94.0 | 95.5 | 88.7 | 84.0 | 89.2 | 93.7 | 89.5 | 90.1 | 91.4 | 81.0 | 88.5 | 92.0 | 94.2 | 94.9 | 94.0 | 92.3 | 95.4 | 94.8 | 95.0 | 93.5 | 95.5 | 88.9 | 93.6 | 90.5 |
| Smith | 73.9 | 76.0 | 74.9 | 73.1 | 69.3 | 74.9 | 72.8 | 76.0 | 74.6 | 73.8 | 72.6 | 70.9 | 74.2 | 77.1 | 75.2 | 74.3 | 70.5 | 78.6 | 82.0 | 80.2 | 81.2 | 78.0 | 81.7 | 74.9 | 83.0 | 83.7 | 83.6 | 82.5 | 80.5 | 80.6 | 79.2 |
| Stevenson | 84.6 | 80.8 | 82.6 | 84.7 | 82.5 | 83.5 | 87.8 | 88.5 | 89.4 | 88.7 | 83.8 | 86.6 | 82.6 | 84.2 | 86.2 | 83.8 | 79.3 | 86.8 | 88.4 | 88.0 | 89.7 | 90.5 | 90.2 | 92.0 | 92.8 | 91.4 | 95.4 | 87.7 | 87.7 | 91.4 | 87.5 |
| Stiles | 81.8 | 74.8 | 75.1 | 78.2 | 78.1 | 80.7 | 81.0 | 82.6 | 82.0 | 83.9 | 81.3 | 80.0 | 81.6 | 81.0 | 84.3 | 82.3 | 79.3 | 84.7 | 83.3 | 83.6 | 84.3 | 84.4 | 87.0 | 85.7 | 87.9 | 87.0 | 89.5 | 84.8 | 83.3 | 84.8 | 78.4 |
| Stringfellow | 82.7 | 79.0 | 81.0 | 84.0 | 78.7 | 83.8 | 83.3 | 85.4 | 86.4 | 83.9 | 79.4 | 80.3 | 77.8 | 81.7 | 88.0 | 81.1 | 74.1 | 82.8 | 84.5 | 85.0 | 86.1 | 82.4 | 88.4 | 88.7 | 88.1 | 88.7 | 86.4 | 72.7 | 85.0 | 87.7 | 80.7 |
| Telford | 80.2 | 78.6 | 84.6 | 80.7 | 75.2 | 79.4 | 84.1 | 81.2 | 85.2 | 82.1 | 79.7 | 71.0 | 73.5 | 82.3 | 81.3 | 74.1 | 78.7 | 81.8 | 83.9 | 82.2 | 85.3 | 81.3 | 81.2 | 83.2 | 84.0 | 84.7 | 87.7 | 74.3 | 78.4 | 79.3 | 79.4 |
| Terrell | 84.2 | 79.7 | 81.4 | 84.5 | 78.8 | 85.4 | 86.0 | 87.4 | 87.7 | 86.6 | 80.3 | 81.6 | 81.1 | 85.5 | 87.5 | 83.8 | 75.2 | 86.0 | 87.5 | 88.2 | 88.6 | 88.0 | 89.5 | 89.5 | 91.3 | 90.7 | 91.4 | 83.7 | 86.6 | 88.8 | 84.8 |
| Torres | 82.6 | 81.5 | 89.5 | 84.0 | 82.1 | 83.6 | 83.7 | 84.0 | 87.7 | 85.0 | 81.1 | 83.4 | 82.5 | 82.9 | 87.5 | 86.9 | 89.2 | 86.4 | 86.4 | 90.5 | 88.3 | 90.7 | 90.5 | 86.4 | 91.4 | 89.4 | | | | | |
| Vance | 83.2 | 75.3 | 79.0 | 89.1 | 81.2 | 86.1 | 87.2 | 87.6 | 88.7 | 84.3 | 80.8 | 84.9 | 78.3 | 84.7 | 90.8 | 82.2 | 75.3 | 86.3 | 89.6 | 88.7 | 90.6 | 90.5 | 92.1 | 91.5 | 92.8 | 92.1 | 92.2 | 82.0 | 89.3 | 90.9 | 83.0 |
| Wainwright | 83.5 | 78.3 | 73.8 | 79.9 | 80.7 | 85.8 | 86.0 | 86.0 | 86.2 | 86.4 | 82.2 | 74.3 | 77.9 | 82.0 | 82.0 | 82.5 | 80.7 | 83.5 | 85.5 | 85.6 | 84.5 | 97.9 | 83.5 | 84.8 | 85.5 | 86.5 | 86.7 | 85.5 | 90.6 | 94.1 | 78.9 |
| Wallace | 84.9 | 88.5 | 76.7 | 76.1 | 79.5 | 82.7 | 81.4 | 85.7 | 84.2 | 80.0 | 70.7 | 74.4 | 81.0 | 82.5 | 80.1 | 79.6 | 80.7 | 84.3 | 84.5 | 86.4 | 84.7 | 85.3 | 86.5 | 87.1 | 88.7 | 86.8 | 91.4 | 88.4 | 88.9 | 80.5 | 91.4 |
| Wheeler | 74.5 | 73.5 | 74.3 | 72.6 | 73.5 | 74.4 | 76.9 | 73.3 | 73.8 | 73.4 | 78.8 | 70.6 | 77.3 | 74.3 | 75.6 | 75.6 | 76.1 | 87.1 | 86.6 | 80.1 | 84.1 | 78.3 | 82.1 | 77.8 | 82.1 | 85.8 | 86.8 | 81.9 | 81.4 | 80.6 | 75.2 |
| Woodman | 77.6 | 77.4 | 74.2 | 74.5 | 78.7 | 81.8 | 85.7 | 86.8 | 86.7 | 80.3 | 82.1 | 72.1 | 78.4 | 84.2 | 87.7 | 60.6 | 79.9 | 85.2 | 86.2 | 86.4 | 83.0 | 87.5 | 78.6 | 85.6 | 91.1 | 90.3 | 91.7 | 79.7 | 85.0 | 80.7 | 82.3 |
| Wynne | 86.9 | 76.7 | 75.5 | 83.3 | 80.7 | 83.2 | 95.3 | 85.3 | 86.4 | 83.2 | 80.3 | 74.1 | 76.1 | 80.0 | 84.7 | 81.5 | 75.9 | 84.0 | 86.4 | 88.9 | 87.9 | 82.9 | 87.5 | 88.9 | 89.4 | 89.0 | 88.7 | 75.5 | 85.0 | 87.3 | 78.5 |
| Young | 80.5 | 73.4 | 79.4 | 82.7 | 76.8 | 82.6 | 84.4 | 84.4 | 84.0 | 84.4 | 77.6 | 82.6 | 82.6 | 86.4 | 86.5 | 82.5 | 75.3 | 86.4 | 86.9 | 86.4 | 86.8 | 87.0 | 87.1 | 87.3 | 88.1 | 87.6 | 90.5 | 80.0 | 84.5 | 88.0 | 80.6 |

TIEDE DEF_87763

ATTORNEYS EYES ONLY
WORKING PAPERS

# Office of Quality Assurance
## Senate Bill 1, Rider 56
## Monthly Temperatures

### June 2024

| | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 | 18 | 19 | 20 | 21 | 22 | 23 | 24 | 25 | 26 | 27 | 28 | 29 | 30 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Allred | 81.6 | 78.2 | 81.6 | 82.3 | 85.5 | 86.7 | 95.0 | 91.3 | 93.6 | 83.5 | 79.1 | 86.3 | 90.2 | 88.6 | 90.1 | 92.9 | 92.9 | 90.1 | 95.8 | 85.3 | 90.2 | 89.6 | 92.6 | 93.2 | 96.6 | 100.1 | 94.5 | 92.6 | 93.0 | 92.1 |
| Beto | 82.6 | 80.8 | 82.8 | 82.6 | 80.2 | 85.1 | 85.1 | 87.8 | 87.1 | 85.2 | 84.8 | 82.8 | 84.8 | 84.8 | 88.7 | 88.1 | 87.2 | 86.0 | 81.8 | 84.6 | 84.7 | 86.4 | 87.2 | 88.0 | 91.6 | 88.4 | 86.6 | 88.6 | 89.5 | 90.3 |
| Boyd | 84.9 | 87.9 | 85.4 | 87.5 | 86.0 | 87.5 | 87.9 | 89.1 | 87.5 | 88.0 | 86.3 | 83.5 | 86.5 | 88.1 | 87.4 | 89.0 | 89.9 | 88.1 | 85.2 | 87.7 | 89.3 | 88.8 | 90.0 | 90.9 | 90.5 | 91.4 | 90.4 | 93.4 | 90.9 | 91.6 |
| Bradshaw | 84.5 | 88.4 | 84.5 | 76.0 | 85.0 | 88.5 | 85.4 | 94.0 | 91.1 | 87.5 | 89.2 | 89.1 | 87.4 | 88.1 | 90.5 | 87.1 | 90.5 | 83.5 | 82.2 | 87.8 | 91.7 | 82.7 | 84.3 | 94.6 | 85.2 | 79.5 | 90.5 | 87.6 | 90.0 | 91.0 |
| Briscoe | 90.5 | 95.4 | 93.7 | 95.5 | 93.9 | 93.5 | 95.3 | 98.7 | 92.1 | 92.3 | 98.3 | 93.6 | 93.2 | 91.3 | 94.5 | 95.6 | 93.6 | 91.7 | 83.0 | 90.2 | 88.0 | 87.4 | 96.5 | 89.6 | 92.5 | 93.5 | 93.5 | 92.2 | 98.3 | 92.7 |
| Byrd | 81.4 | 81.3 | 82.3 | 84.9 | 81.7 | 86.6 | 87.1 | 86.0 | 86.8 | 82.1 | 80.8 | 82.1 | 81.6 | 82.1 | 81.0 | 80.4 | 79.6 | 79.1 | 81.6 | 82.1 | 82.6 | 85.6 | 84.8 | 88.4 | 88.1 | 85.5 | 80.4 | 83.9 | 90.8 | 88.9 |
| Clemens | 80.0 | 85.4 | 81.6 | 84.6 | 79.4 | 86.6 | 87.1 | 83.1 | 81.6 | 82.6 | 85.9 | 84.4 | 82.4 | 85.5 | 82.6 | 83.4 | 82.2 | 81.7 | 86.5 | 86.7 | 85.2 | 81.9 | 84.3 | 87.2 | 83.2 | 84.5 | 83.2 | 81.8 | 81.8 | 98.2 |
| Clements | 74.6 | 78.4 | 82.3 | 82.4 | 78.5 | 80.5 | 80.4 | 84.0 | 83.7 | 75.6 | 75.1 | 76.5 | 80.7 | 80.1 | 81.0 | 82.0 | 81.5 | 81.0 | 78.6 | 74.6 | 75.1 | 78.7 | 82.0 | 83.2 | 86.0 | 82.5 | 83.5 | 83.6 | 83.2 | 88.2 |
| Coffield | 89.0 | 93.0 | 82.6 | 84.7 | 81.7 | 84.7 | 87.4 | 88.0 | 88.8 | 84.7 | 85.2 | 89.4 | 87.0 | 87.3 | 85.5 | 89.2 | 88.0 | 83.0 | 85.9 | 88.3 | 88.8 | 89.7 | 90.2 | 90.4 | 91.4 | 89.6 | 90.3 | 91.3 | 91.6 | |
| Cole | 80.5 | 80.1 | 74.0 | 80.1 | 85.3 | 89.4 | 88.5 | 94.4 | 94.8 | 94.8 | 83.3 | 85.5 | 86.3 | 84.2 | 95.1 | 93.8 | 87.4 | 87.9 | 86.5 | 84.5 | 91.0 | 92.1 | 95.8 | 93.7 | 92.0 | 91.1 | 91.5 | 90.7 | 93.2 | 93.9 |
| Connally | 88.9 | 95.7 | 98.0 | 91.0 | 86.1 | 89.7 | 95.5 | 96.9 | 97.6 | 95.4 | 92.1 | 89.3 | 90.3 | 93.4 | 93.2 | 90.6 | 93.8 | 89.3 | 82.7 | 82.0 | 87.9 | 89.7 | 89.5 | 89.2 | 90.7 | 93.2 | 90.7 | 90.5 | | |
| Crain | 86.0 | 89.9 | 88.3 | 92.5 | 88.9 | 90.9 | 89.7 | 94.5 | 93.5 | 89.9 | 79.1 | 84.9 | 89.4 | 91.6 | 90.7 | 92.5 | 97.4 | 89.8 | 86.1 | 86.9 | 93.3 | 91.1 | 90.1 | 94.9 | 97.5 | 92.8 | 99.1 | 96.4 | 94.2 | 93.5 |
| Dalhart | 81.1 | 82.6 | 83.0 | 83.1 | 82.3 | 86.3 | 83.8 | 83.7 | 81.7 | 79.1 | 81.2 | 84.9 | 85.1 | 82.3 | 80.2 | 85.2 | 86.5 | 83.5 | 79.8 | 81.5 | 75.4 | 85.5 | 86.3 | 89.2 | 89.1 | 89.4 | 88.3 | 87.2 | 86.4 | 87.9 |
| Daniel | 82.3 | 85.3 | 84.4 | 86.2 | 85.8 | 86.9 | 87.2 | 86.4 | 86.1 | 82.4 | 81.2 | 83.0 | 84.5 | 85.3 | 85.8 | 86.2 | 86.7 | 90.7 | 84.5 | 78.9 | 83.1 | 83.4 | 84.8 | 86.8 | 88.4 | 89.7 | 88.4 | 89.7 | 88.1 | 90.2 |
| Dominguez | 87.8 | 91.7 | 88.9 | 89.7 | 89.3 | 89.4 | 88.9 | 88.8 | 87.8 | 89.7 | 86.9 | 87.5 | 86.1 | 92.1 | 90.3 | 93.2 | 89.4 | 88.7 | 81.8 | 83.0 | 87.0 | 88.1 | 86.4 | 88.6 | 86.1 | 88.9 | 99.7 | 88.2 | 88.4 | |
| Ellis | 78.8 | 86.9 | 84.1 | 80.9 | 81.6 | 88.3 | 88.2 | 87.3 | 89.2 | 85.2 | 90.3 | 88.5 | 83.9 | 87.9 | 88.6 | 85.1 | 88.6 | 88.8 | 85.1 | 88.4 | 87.2 | 89.5 | 90.5 | 89.4 | 92.5 | 88.3 | 83.0 | 92.1 | 90.1 | 90.4 |
| Estelle | 82.5 | 86.2 | 83.9 | 86.8 | 83.0 | 82.2 | 87.8 | 88.7 | 86.8 | 87.3 | 85.2 | 86.0 | 85.6 | 85.1 | 87.1 | 85.1 | 87.0 | 86.1 | 84.1 | 84.9 | 86.4 | 87.2 | 88.7 | 87.6 | 87.1 | 88.9 | 87.3 | 90.9 | 87.8 | 89.5 |
| Ferguson | 85.9 | 87.1 | 86.6 | 87.2 | 84.0 | 87.3 | 89.4 | 88.0 | 88.0 | 88.4 | 87.7 | 88.8 | 88.9 | 90.2 | 89.9 | 88.7 | 88.7 | 88.4 | 87.2 | 88.0 | 90.2 | 89.9 | 91.7 | 91.8 | 90.8 | 89.7 | 91.2 | 90.7 | 92.1 | |
| Formby | 86.4 | 86.3 | 89.1 | 86.5 | 84.7 | 91.1 | 88.5 | 91.8 | 87.3 | 77.9 | 81.7 | 88.8 | 89.7 | 90.7 | 85.0 | 89.1 | 87.3 | 88.2 | 79.3 | 75.8 | 82.7 | 88.4 | 87.6 | 89.0 | 95.1 | 92.5 | 89.3 | 91.5 | 88.5 | 89.5 |
| Garza East | 96.1 | 96.1 | 91.2 | 91.7 | 88.1 | 96.7 | 96.6 | 96.0 | 96.3 | 92.2 | 99.4 | 99.5 | 96.5 | 94.5 | 97.3 | 96.7 | 90.4 | 78.6 | 89.2 | 91.6 | 96.8 | 93.3 | 93.6 | 96.6 | 93.6 | 92.3 | 96.5 | 97.9 | | |
| Garza West | 96.0 | 97.7 | 95.1 | 97.8 | 89.9 | 100.8 | 99.3 | 98.1 | 96.3 | 96.5 | 97.0 | 100.7 | 99.6 | 99.8 | 93.7 | 97.6 | 80.4 | 83.7 | 95.6 | 96.3 | 94.4 | 96.8 | 97.4 | 96.2 | 98.0 | 93.3 | 98.4 | 97.4 | | |
| Gist | 76.8 | 90.8 | 88.9 | 88.6 | 80.2 | 91.0 | 91.3 | 88.9 | 89.1 | 93.7 | 90.5 | 92.1 | 91.2 | 92.4 | 91.1 | 81.4 | 93.2 | 92.2 | 93.5 | 93.2 | 91.3 | 86.2 | 92.9 | 94.8 | | | | | | |
| Goodman | 89.1 | 94.2 | 94.6 | 76.7 | 81.1 | 86.0 | 88.1 | 89.8 | 87.5 | 89.3 | 85.1 | 87.9 | 86.9 | 85.7 | 83.7 | 85.9 | 85.4 | 83.2 | 85.7 | 88.2 | 82.7 | 85.1 | 86.4 | 88.7 | 88.7 | 86.2 | 91.3 | 91.4 | 86.3 | 78.4 |
| Goree | 87.2 | 90.5 | 91.7 | 91.3 | 82.5 | 83.9 | 86.6 | 88.6 | 87.7 | 97.1 | 91.3 | 87.0 | 92.4 | 87.1 | 90.0 | 89.8 | 93.5 | 94.3 | 88.5 | 92.8 | 93.5 | 93.3 | 92.7 | 94.0 | 96.7 | 95.0 | 93.3 | 89.5 | 88.5 | |
| Hightower | 80.9 | 86.8 | 86.5 | 88.2 | 82.0 | 85.5 | 88.0 | 88.5 | 86.3 | 88.7 | 86.8 | 87.7 | 88.7 | 89.8 | 87.4 | 88.9 | 86.1 | 83.2 | 88.2 | 86.3 | 88.1 | 86.3 | 87.0 | 90.8 | 88.8 | 89.4 | 89.8 | 90.1 | 90.4 | 89.3 |
| Hilltop | 85.4 | 87.3 | 90.3 | 85.9 | 88.6 | 85.0 | 86.3 | 87.5 | 83.7 | 85.2 | 82.0 | 79.2 | 83.3 | 86.1 | 84.2 | 84.4 | 84.7 | 83.3 | 84.1 | 82.5 | 82.0 | 85.0 | 89.0 | 87.1 | 86.4 | 82.0 | 89.0 | 89.7 | 91.3 | 94.8 |
| Hobby | 83.8 | 86.6 | 84.3 | 87.3 | 84.5 | 86.2 | 88.1 | 88.9 | 86.9 | 89.6 | 87.7 | 85.5 | 87.5 | 89.2 | 89.6 | 89.7 | 89.6 | 87.8 | 85.3 | 86.9 | 90.7 | 90.9 | 90.9 | 91.6 | 91.5 | 90.5 | 91.2 | 92.1 | | |
| Holliday | 80.3 | 84.9 | 87.5 | 87.4 | 87.4 | 81.5 | 86.1 | 88.6 | 92.7 | 88.4 | 84.5 | 88.4 | 89.6 | 86.2 | 88.1 | 86.7 | 87.3 | 86.4 | 82.9 | 87.4 | 88.2 | 89.8 | 91.4 | 86.2 | 89.1 | 90.4 | 86.5 | 92.3 | 91.3 | 91.4 |
| Hughes | 83.1 | 84.3 | 82.5 | 89.1 | 84.8 | 85.7 | 87.4 | 88.6 | 87.0 | 85.4 | 76.4 | 81.5 | 87.2 | 85.2 | 87.6 | 88.8 | 84.8 | 85.2 | 84.0 | 84.3 | 87.6 | 86.4 | 86.3 | 88.8 | 86.4 | 88.7 | 83.4 | 87.1 | 87.5 | |
| Huntsville | 85.5 | 86.1 | 84.0 | 88.8 | 83.8 | 89.0 | 88.6 | 90.8 | 89.7 | 88.6 | 85.3 | 87.3 | 85.9 | 91.2 | 88.8 | 90.7 | 89.5 | 88.2 | 82.8 | 89.9 | 88.4 | 87.2 | 89.8 | 90.2 | 92.3 | 91.4 | 85.0 | 89.8 | 91.4 | 92.0 |
| Hutchins | 79.1 | 84.4 | 84.7 | 87.2 | 86.2 | 89.7 | 91.1 | 90.9 | 91.1 | 90.9 | 91.2 | 91.0 | 92.1 | 94.6 | 92.0 | 93.5 | 94.6 | 92.0 | 93.5 | 94.0 | 93.6 | 95.9 | 94.5 | 95.1 | | | | | | |
| Jester III | 85.2 | 93.8 | 86.0 | 85.5 | 80.2 | 89.7 | 88.0 | 91.5 | 93.7 | 89.2 | 90.1 | 89.4 | 93.1 | 93.1 | 91.9 | 97.5 | 86.1 | 85.6 | 80.0 | 86.2 | 88.5 | 88.8 | 90.3 | 90.0 | 90.3 | 91.6 | 90.4 | 89.9 | 91.9 | 90.2 |
| Jordan | 80.3 | 81.3 | 83.9 | 85.0 | 83.0 | 83.9 | 84.6 | 84.9 | 81.1 | 74.0 | 80.7 | 82.3 | 87.9 | 87.8 | 84.7 | 87.8 | 84.9 | 85.2 | 83.8 | 84.9 | 85.1 | 85.3 | 87.1 | 90.7 | 91.6 | 88.7 | 90.2 | 90.9 | 88.9 | 92.7 |
| Lewis | 92.4 | 86.7 | 85.3 | 81.7 | 81.7 | 87.3 | 89.5 | 96.2 | 94.1 | 97.1 | 89.3 | 87.7 | 87.7 | 87.0 | 93.2 | 89.1 | 86.1 | 86.7 | 92.1 | 92.0 | 96.7 | 95.2 | 94.1 | 96.7 | 98.1 | 89.6 | 99.1 | 99.6 | 100.6 | 100.6 |
| Lopez | 94.4 | 94.3 | 91.6 | 91.6 | 93.7 | 94.4 | 94.7 | 89.2 | 88.9 | 94.4 | 93.4 | 93.5 | 96.0 | 92.6 | 92.4 | 94.5 | 95.5 | 88.3 | 87.9 | 88.7 | 83.9 | 88.8 | 88.9 | 91.2 | 91.8 | 90.2 | 92.8 | 89.0 | | |
| Luther | 83.2 | 84.4 | 86.3 | 87.5 | 82.3 | 84.7 | 86.2 | 88.8 | 85.2 | 86.5 | 86.0 | 83.0 | 86.1 | 87.9 | 86.5 | 86.2 | 86.9 | 85.1 | 81.5 | 83.5 | 85.4 | 86.3 | 85.8 | 87.7 | 88.2 | 88.5 | 89.3 | 88.6 | 89.6 | 88.5 |
| Lychner | 86.6 | 93.3 | 82.2 | 92.2 | 84.0 | 93.7 | 95.0 | 94.5 | 95.6 | 93.1 | 92.3 | 93.5 | 93.7 | 92.3 | 91.8 | 91.8 | 93.2 | 90.1 | 92.4 | 88.1 | 93.3 | 91.1 | 94.3 | 94.7 | 94.8 | 96.5 | 98.2 | 97.6 | 97.9 | |
| Lynaugh | 85.1 | 84.2 | 88.8 | 85.2 | 86.4 | 90.0 | 89.5 | 84.6 | 88.2 | 89.5 | 88.6 | 89.0 | 86.0 | 86.1 | 84.0 | 78.6 | 78.8 | 81.8 | 89.8 | 89.0 | 94.0 | 91.5 | 88.5 | 94.2 | 91.0 | 91.9 | 93.0 | 91.6 | 92.1 | |
| Mcconnell | 89.9 | 90.8 | 90.3 | 90.9 | 90.8 | 98.1 | 89.9 | 91.3 | 92.1 | 89.1 | 91.5 | 90.5 | 90.7 | 91.3 | 89.4 | 93.1 | 91.4 | 90.3 | 80.0 | 84.1 | 88.1 | 88.5 | 88.7 | 90.0 | 89.8 | 92.6 | 91.1 | 93.0 | 91.6 | 92.1 |
| Memorial | 80.9 | 81.8 | 86.1 | 86.0 | 79.3 | 84.2 | 89.7 | 87.2 | 82.5 | 84.7 | 82.6 | 85.6 | 87.6 | 88.8 | 88.2 | 85.0 | 88.0 | 86.6' | 88.0 | 87.1 | 87.3 | 84.9 | 88.4 | 86.4 | 86.6 | 90.5 | 79.9 | | | |
| Michael | 87.3 | 83.7 | 81.5 | 84.5 | 82.2 | 84.7 | 84.6 | 87.4 | 85.9 | 84.9 | 85.9 | 85.2 | 85.5 | 87.0 | 86.0 | 85.9 | 87.9 | 84.7 | 86.3 | 87.9 | 89.4 | 89.3 | 91.0 | 90.0 | 90.7 | 90.0 | 90.9 | 90.8 | | |
| Middleton | 86.4 | 89.3 | 91.6 | 95.8 | 91.9 | 95.1 | 94.4 | 88.0 | 93.8 | 85.9 | 81.8 | 88.3 | 92.1 | 96.4 | 91.6 | 89.9 | 88.5 | 91.6 | 92.3 | 90.6 | 95.3 | 95.1 | 96.5 | 97.2 | 97.7 | 98.1 | 96.2 | 96.4 | | |
| Montford | 83.6 | 88.4 | 89.3 | 88.7 | 88.4 | 91.7 | 90.7 | 91.7 | 91.5 | 80.3 | 83.2 | 85.8 | 92.8 | 90.5 | 87.7 | 91.0 | 91.3 | 92.2 | 84.5 | 76.3 | 86.9 | 87.3 | 88.6 | 89.7 | 91.7 | 91.7 | 92.8 | 93.7 | 92.7 | 88.4 |
| Moore, C. | 84.2 | 81.6 | 78.0 | 83.6 | 85.6 | 91.7 | 90.4 | 91.5 | 93.4 | 84.3 | 90.4 | 92.3 | 91.3 | 91.1 | 87.0 | 92.1 | 89.0 | 91.5 | 91.0 | 94.5 | 96.6 | 94.6 | 94.0 | 95.3 | 96.1 | 95.1 | 96.3 | 95.1 | | |
| Murray | 88.1 | 95.9 | 84.5 | 84.3 | 83.0 | 86.2 | 94.9 | 84.9 | 92.7 | 96.0 | 79.7 | 80.3 | 84.7 | 87.1 | 95.4 | 87.7 | 88.1 | 89.3 | 83.7 | 84.1 | 86.7 | 87.3 | 96.1 | 96.1 | 89.6 | 89.1 | 91.1 | 90.1 | 86.3 | 86.5 |
| O'Daniel | 86.8 | 93.2 | 94.8 | 98.4 | 98.0 | 92.2 | 93.7 | 95.7 | 89.3 | 92.8 | 84.9 | 88.4 | 95.0 | 92.2 | 90.3 | 85.3 | 98.3 | 88.1 | 79.8 | 81.2 | 82.5 | 88.4 | 88.3 | 89.5 | 88.6 | 90.9 | 98.3 | 94.7 | 98.3 | |

TIEDE DEF_87764

ATTORNEYS EYES ONLY
WORKING PAPERS

# Office of Quality Assurance
## Senate Bill 1, Rider 56
## Monthly Temperatures

### June 2024

| | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 | 18 | 19 | 20 | 21 | 22 | 23 | 24 | 25 | 26 | 27 | 28 | 29 | 30 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Plane** | 77.2 | 77.0 | 91.0 | 97.1 | 84.9 | 93.0 | 95.7 | 90.6 | 98.7 | 97.0 | 92.5 | 88.9 | 88.9 | 89.0 | 99.7 | 97.3 | 89.0 | 88.7 | 88.0 | 89.8 | 89.2 | 96.2 | 91.2 | 91.8 | 90.8 | 90.8 | 91.4 | 92.3 | 89.1 | 90.1 |
| **Polunsky** | 82.9 | 84.3 | 85.6 | 87.3 | 82.0 | 86.9 | 91.2 | 89.2 | 87.9 | 89.9 | 88.0 | 88.1 | 88.6 | 87.6 | 89.3 | 89.1 | 88.8 | 88.1 | 86.3 | 87.7 | 89.2 | 88.7 | 89.1 | 90.4 | 90.7 | 91.2 | 88.8 | 90.7 | 92.8 | 91.2 |
| **Powledge** | 82.4 | 84.1 | 82.8 | 81.9 | 75.3 | 88.9 | 88.9 | 88.5 | 87.5 | 86.7 | 86.9 | 90.7 | 88.5 | 89.5 | 85.6 | 88.1 | 88.3 | 86.6 | 84.6 | 87.8 | 89.4 | 89.2 | 89.1 | 89.8 | 92.1 | 92.2 | 90.0 | 90.3 | 90.2 | 91.1 |
| **Ramsey** | 93.4 | 98.4 | 88.2 | 89.3 | 79.8 | 87.8 | 98.9 | 99.7 | 98.3 | 100.1 | 89.3 | 89.4 | 89.3 | 90.1 | 98.2 | 100.4 | 98.1 | 95.3 | 81.8 | 85.4 | 87.1 | 88.7 | 100.3 | 102.2 | 103.2 | 103.9 | 89.5 | 91.2 | 91.7 | 90.4 |
| **Roach** | 81.2 | 80.1 | 84.5 | 83.4 | 84.2 | 85.8 | 88.0 | 89.6 | 88.3 | 80.1 | 79.7 | 81.6 | 84.0 | 84.9 | 85.5 | 86.0 | 87.0 | 84.8 | 81.8 | 82.0 | 84.7 | 86.2 | 89.2 | 89.8 | 91.0 | 92.2 | 88.7 | 89.8 | 90.6 | 97.5 |
| **Robertson** | 82.1 | 88.2 | 82.9 | 90.4 | 87.6 | 89.0 | 91.6 | 91.1 | 90.1 | 76.9 | 77.6 | 83.3 | 87.2 | 87.5 | 82.1 | 87.9 | 88.3 | 88.2 | 83.6 | 83.1 | 87.2 | 89.7 | 90.0 | 91.2 | 98.1 | 99.6 | 93.5 | 98.4 | 93.1 | 93.2 |
| **Sanchez** | 86.0 | 88.5 | 87.3 | 83.8 | 88.0 | 94.7 | 93.3 | 86.7 | 81.3 | 85.4 | 84.7 | 84.3 | 94.3 | 90.5 | 85.9 | 84.9 | 84.6 | 84.4 | 91.8 | 81.3 | 84.3 | 83.4 | 86.0 | 85.1 | 90.4 | 87.0 | 93.2 | 90.0 | 89.5 | 82.8 |
| **Segovia** | 93.7 | 94.9 | 93.8 | 93.9 | 95.5 | 96.2 | 93.4 | 94.0 | 90.8 | 91.7 | 93.2 | 92.5 | 94.0 | 90.5 | 92.9 | 94.2 | 94.6 | 88.5 | 82.0 | 88.1 | 89.5 | 86.0 | 88.1 | 91.9 | 91.2 | 94.6 | 85.6 | 91.4 | 92.6 | 90.6 |
| **Smith** | 77.8 | 82.1 | 85.9 | 82.6 | 82.5 | 84.9 | 86.3 | 87.0 | 87.7 | 82.0 | 80.9 | 81.7 | 85.6 | 84.8 | 87.2 | 87.7 | 88.5 | 88.2 | 85.6 | 81.5 | 81.2 | 83.9 | 84.7 | 87.7 | 89.9 | 89.7 | 91.2 | 91.7 | 92.2 | 91.7 |
| **Stevenson** | 88.2 | 90.7 | 90.6 | 90.2 | 86.5 | 89.5 | 90.7 | 91.4 | 90.7 | 91.8 | 91.4 | 86.8 | 89.2 | 90.4 | 89.9 | 91.4 | 91.1 | 89.0 | 84.3 | 85.6 | 88.7 | 86.2 | 90.0 | 90.0 | 90.5 | 91.0 | 90.0 | 96.2 | 90.8 | 91.0 |
| **Stiles** | 79.0 | 84.2 | 85.2 | 86.2 | 81.9 | 85.0 | 85.4 | 88.1 | 88.7 | 87.3 | 86.6 | 85.6 | 87.0 | 88.0 | 88.4 | 89.1 | 86.5 | 84.5 | 86.1 | 86.4 | 84.0 | 87.5 | 87.3 | 88.2 | 87.3 | 89.0 | 88.0 | 87.2 | 88.6 | 89.0 |
| **Stringfellow** | 84.3 | 86.4 | 85.6 | 87.2 | 80.6 | 86.7 | 86.8 | 88.9 | 86.6 | 88.9 | 89.3 | 87.2 | 88.8 | 90.2 | 88.3 | 89.7 | 88.0 | 87.3 | 81.7 | 84.7 | 86.6 | 88.3 | 87.5 | 89.0 | 83.6 | 89.6 | 91.3 | 91.7 | 91.1 | 92.0 |
| **Telford** | 82.4 | 84.3 | 84.6 | 74.5 | 83.2 | 84.3 | 84.6 | 87.1 | 86.4 | 81.4 | 83.1 | 84.7 | 86.0 | 88.0 | 85.2 | 87.3 | 85.6 | 86.8 | 84.7 | 87.0 | 88.1 | 88.9 | 90.1 | 98.8 | 79.5 | 88.0 | 98.5 | 99.2 | 92.6 | |
| **Terrell** | 91.9 | 86.1 | 89.8 | 90.6 | 79.4 | 89.2 | 90.9 | 88.7 | 88.9 | 89.7 | 90.5 | 88.6 | 90.7 | 91.1 | 90.4 | 90.5 | 88.6 | 88.3 | 81.2 | 86.6 | 88.2 | 87.2 | 88.9 | 89.9 | 91.1 | 90.2 | 91.4 | 92.3 | 93.5 | 92.6 |
| **Torres** | 87.4 | 85.2 | 90.0 | 91.7 | 90.7 | 90.2 | 91.4 | 91.6 | 91.4 | 86.1 | 88.4 | 87.0 | 89.4 | 91.6 | 90.0 | 91.4 | 89.7 | 89.5 | 84.7 | 82.4 | 83.6 | 88.1 | 90.5 | 92.1 | 88.1 | 89.3 | 89.8 | 91.7 | 90.4 | 91.0 |
| **Vance** | 86.1 | 91.5 | 90.9 | 91.2 | 79.5 | 94.0 | 94.0 | 91.0 | 91.9 | 91.1 | 91.4 | 88.6 | 91.5 | 92.6 | 90.8 | 94.3 | 92.3 | 90.4 | 83.7 | 89.1 | 93.3 | 92.7 | 92.8 | 94.5 | 93.2 | 92.5 | 93.2 | 92.0 | 94.8 | 95.6 |
| **Wainwright** | 83.2 | 83.1 | 84.5 | 87.6 | 84.9 | 86.5 | 87.4 | 90.5 | 87.6 | 84.4 | 88.4 | 82.8 | 85.6 | 85.3 | 87.9 | 87.8 | 89.3 | 86.7 | 86.4 | 88.4 | 86.7 | 87.0 | 89.1 | 90.5 | 88.7 | 87.9 | 91.2 | 89.1 | 89.7 | 89.2 |
| **Wallace** | 87.2 | 88.1 | 94.0 | 93.7 | 90.9 | 94.7 | 92.5 | 91.4 | 87.7 | 83.8 | 87.4 | 94.9 | 92.1 | 91.8 | 88.1 | 88.1 | 81.3 | 84.3 | 83.4 | 86.0 | 90.3 | 90.7 | 96.1 | 90.3 | 90.3 | 93.9 | 92.1 | 91.3 | | |
| **Wheeler** | 75.6 | 77.6 | 85.6 | 89.3 | 86.5 | 89.6 | 91.1 | 86.2 | 80.1 | 77.2 | 76.2 | 79.4 | 84.6 | 82.6 | 81.9 | 82.3 | 80.3 | 80.3 | 72.9 | 74.6 | 74.6 | 82.6 | 87.0 | 82.1 | 82.7 | 91.0 | 80.1 | 81.0 | 82.7 | 87.3 |
| **Woodman** | 86.8 | 80.7 | 84.2 | 85.8 | 86.1 | 89.5 | 90.3 | 75.7 | 90.0 | 87.7 | 74.7 | 84.0 | 85.7 | 87.3 | 88.1 | 88.6 | 87.8 | 88.3 | 89.0 | 88.5 | 88.8 | 91.6 | 87.3 | 92.7 | 92.7 | 94.3 | 92.3 | 95.1 | 94.1 | |
| **Wynne** | 85.7 | 84.2 | 86.6 | 88.6 | 83.7 | 88.6 | 90.1 | 93.2 | 88.9 | 88.2 | 88.8 | 86.7 | 90.3 | 90.1 | 88.5 | 89.9 | 89.5 | 87.8 | 85.0 | 87.9 | 88.5 | 89.6 | 90.4 | 94.1 | 91.6 | 91.5 | 83.0 | 92.0 | 93.0 | 92.6 |
| **Young** | 85.0 | 87.9 | 88.0 | 87.8 | 75.5 | 88.4 | 90.2 | 89.9 | 85.4 | 91.2 | 89.6 | 90.2 | 91.1 | 90.0 | 90.4 | 90.0 | 87.3 | 85.6 | 81.8 | 87.6 | 88.3 | 88.8 | 89.5 | 88.6 | 90.6 | 84.8 | 91.4 | 90.4 | 91.2 | 90.7 |

TIEDE DEF_87765

# Office of Quality Assurance
## Senate Bill 1, Rider 56
## Monthly Temperatures

## July 2024

| | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 | 18 | 19 | 20 | 21 | 22 | 23 | 24 | 25 | 26 | 27 | 28 | 29 | 30 | 31 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Allred | 93.1 | 94.9 | 94.5 | 94.6 | 77.8 | 85.0 | 87.9 | 85.5 | 86.5 | 89.6 | 91.0 | 90.8 | 90.0 | 92.0 | 92.9 | 94.5 | 89.2 | 88.5 | 87.7 | 87.3 | 88.5 | 83.7 | 86.1 | 88.3 | 88.6 | 87.0 | 86.5 | 82.5 | 93.1 | 91.6 | 93.5 |
| Beto | 90.4 | 91.7 | 88.2 | 89.7 | 90.2 | 87.9 | 89.7 | 76.1 | 81.6 | 82.6 | 85.1 | 84.5 | 82.1 | 84.2 | 88.3 | 87.8 | 88.7 | 84.1 | 85.3 | 83.2 | 78.8 | 87.3 | 79.3 | 82.3 | 85.5 | 87.7 | 86.8 | 87.5 | 84.7 | 85.1 | |
| Boyd | 92.8 | 92.1 | 91.8 | 90.9 | 92.3 | 89.7 | 90.7 | 76.8 | 85.7 | 88.8 | 89.0 | 88.8 | 86.7 | 87.8 | 89.8 | 89.9 | 90.8 | 86.4 | 89.4 | 87.9 | 84.1 | 82.1 | 78.4 | 84.4 | 81.7 | 80.9 | 83.1 | 86.7 | 88.4 | 89.7 | 89.5 |
| Bradshaw | 94.5 | 90.5 | 88.9 | 93.3 | 86.8 | 84.2 | 81.6 | 77.0 | 84.4 | 84.5 | 82.6 | 84.0 | 82.4 | 81.2 | 88.5 | 88.8 | 86.5 | 81.1 | 88.0 | 83.9 | 89.3 | 75.2 | 75.6 | 82.1 | 79.3 | 75.4 | 86.2 | 88.4 | 90.1 | 85.5 | 89.8 |
| Briscoe | 92.6 | 95.3 | 93.4 | 92.6 | 91.5 | 94.9 | 91.2 | 94.6 | 94.6 | 89.7 | 96.5 | 90.8 | 87.4 | 94.2 | 91.3 | 89.7 | 92.8 | 92.4 | 94.3 | 92.3 | 97.4 | 90.6 | 88.9 | 88.0 | 91.1 | 90.2 | 88.3 | 90.3 | 99.1 | 89.2 | 93.0 |
| Byrd | 87.5 | 92.0 | 87.6 | 88.7 | 88.2 | 87.5 | 84.2 | 78.2 | 83.1 | 82.9 | 79.5 | 80.7 | 82.2 | 84.4 | 81.5 | 85.5 | 84.9 | 82.4 | 82.6 | 85.9 | 82.8 | 76.8 | 75.2 | 87.1 | 75.4 | 76.8 | 76.2 | 75.6 | 87.8 | 82.0 | 87.0 |
| Clemens | 86.9 | 87.1 | 82.1 | 88.2 | 87.2 | 84.5 | 81.0 | 82.6 | 87.2 | 82.4 | 82.4 | 83.0 | 81.7 | 83.4 | 83.9 | 84.3 | 79.9 | 84.9 | 84.0 | 83.6 | 80.9 | 80.4 | 78.7 | 79.4 | 80.4 | 87.2 | 80.9 | 83.3 | 84.2 | 83.7 | 86.1 |
| Clemens | 84.2 | 83.2 | 77.3 | 81.8 | 79.2 | 79.0 | 78.2 | 78.7 | 76.9 | 81.4 | 80.6 | 84.3 | 84.1 | 84.9 | 83.2 | 83.0 | 79.0 | 79.2 | 80.2 | 79.6 | 78.3 | 81.1 | 80.9 | 81.8 | 81.5 | 80.5 | 82.5 | 84.7 | 86.8 | 87.5 | 88.2 |
| Coffield | 92.6 | 91.6 | 91.4 | 91.2 | 91.1 | 89.3 | 91.2 | 80.4 | 82.8 | 88.7 | 88.2 | 88.0 | 85.7 | 85.8 | 88.2 | 89.2 | 89.5 | 83.6 | 86.1 | 85.5 | 84.6 | 82.8 | 79.4 | 82.6 | 81.5 | 80.5 | 82.5 | 84.7 | 86.8 | 88.0 | 88.7 |
| Cole | 95.3 | 94.1 | 95.2 | 94.1 | 89.3 | 91.6 | 85.3 | 84.5 | 89.7 | 87.2 | 93.2 | 90.0 | 91.3 | 91.3 | 95.3 | 95.2 | 82.5 | 73.1 | 86.1 | 87.6 | 85.9 | 84.1 | 84.5 | 86.1 | 85.8 | 85.2 | 85.6 | 87.4 | 89.4 | 93.1 | 93.1 |
| Connally | 90.2 | 90.7 | 90.3 | 90.4 | 90.5 | 91.3 | 92.2 | 90.2 | 90.8 | 88.4 | 96.7 | 83.2 | 96.4 | 95.5 | 94.5 | 96.9 | 99.8 | 92.5 | 97.8 | 89.3 | 89.9 | 96.3 | 95.3 | 86.7 | 83.6 | 85.3 | 83.4 | 81.9 | 88.1 | 98.9 | 89.0 |
| Crain | 95.6 | 94.5 | 93.0 | 92.8 | 95.5 | 92.1 | 92.4 | 86.9 | 90.9 | 93.2 | 91.2 | 91.7 | 89.3 | 92.0 | 95.2 | 92.7 | 93.1 | 92.2 | 87.4 | 82.7 | 86.9 | 85.5 | 85.9 | 88.2 | 87.5 | 90.8 | 91.1 | 92.5 | | | |
| Dalhart | 84.7 | 89.8 | 88.1 | 81.6 | 81.7 | 83.1 | 82.3 | 80.9 | 83.1 | 82.3 | 83.1 | 83.3 | 85.0 | 86.1 | 85.6 | 87.3 | 86.4 | 86.3 | 87.5 | 83.6 | 85.2 | 82.1 | 82.0 | 83.7 | 85.1 | 83.8 | 83.1 | 84.7 | 87.3 | 89.1 | 89.7 |
| Daniel | 89.4 | 90.2 | 90.7 | 91.1 | 71.2 | 79.1 | 81.4 | 80.1 | 82.6 | 83.8 | 84.1 | 85.1 | 87.4 | 88.2 | 88.9 | 89.1 | 90.3 | 86.3 | 86.7 | 83.4 | 85.0 | 83.3 | 84.6 | 85.9 | 87.5 | 87.9 | 88.7 | 87.8 | 88.8 | 86.7 | 89.1 |
| Dominguez | 87.3 | 90.5 | 88.7 | 89.3 | 91.4 | 92.5 | 85.4 | 86.1 | 84.1 | 87.4 | 84.6 | 83.9 | 84.4 | 87.5 | 88.0 | 88.7 | 85.3 | 85.4 | 89.7 | 91.4 | 89.2 | 83.0 | 83.9 | 88.6 | 83.7 | 84.6 | 83.7 | 88.3 | 86.1 | 87.5 | 87.5 |
| Ellis | 93.7 | 94.1 | 89.2 | 91.6 | 91.5 | 91.6 | 85.7 | 79.2 | 84.6 | 88.7 | 86.8 | 87.3 | 86.5 | 86.2 | 90.1 | 89.2 | 93.2 | 86.5 | 85.5 | 85.8 | 87.7 | 76.6 | 73.8 | 85.0 | 72.1 | 81.1 | 81.1 | 83.2 | 89.1 | 89.7 | 89.3 |
| Estelle | 89.1 | 89.2 | 86.7 | 90.0 | 91.0 | 91.2 | 86.2 | 76.5 | 82.1 | 87.2 | 85.5 | 86.1 | 84.3 | 84.6 | 84.8 | 84.7 | 88.0 | 84.9 | 83.2 | 87.4 | 83.0 | 80.4 | 82.3 | 79.6 | 81.0 | 81.8 | 94.9 | 86.5 | 82.5 | 81.8 | 83.6 |
| Ferguson | 93.5 | 91.8 | 92.3 | 89.1 | 90.9 | 87.3 | 87.4 | 78.0 | 85.5 | 87.8 | 89.9 | 86.9 | 88.0 | 87.8 | 90.2 | 90.4 | 90.7 | 87.3 | 86.7 | 86.3 | 85.2 | 82.7 | 80.5 | 84.5 | 80.2 | 81.6 | 82.9 | 86.3 | 90.1 | 89.7 | 90.2 |
| Formby | 89.4 | 90.3 | 89.0 | 89.5 | 82.0 | 86.7 | 88.0 | 82.1 | 87.3 | 86.7 | 86.8 | 88.1 | 85.5 | 83.4 | 89.8 | 90.0 | 87.6 | 82.1 | 87.9 | 88.3 | 88.1 | 86.6 | 85.4 | 85.2 | 87.9 | 88.3 | 86.1 | 86.3 | 91.2 | 90.2 | 89.3 |
| Garza East | 94.7 | 94.7 | 93.2 | 93.6 | 93.8 | 96.5 | 91.9 | 92.5 | 97.2 | 86.7 | 85.5 | 85.6 | 89.5 | 90.4 | 94.5 | 92.6 | 95.9 | 88.4 | 92.6 | 93.0 | 94.5 | 92.1 | 92.1 | 89.3 | 83.8 | 80.2 | 87.2 | 77.0 | 92.3 | 92.9 | 92.8 |
| Garza West | 98.0 | 99.5 | 98.7 | 98.4 | 97.0 | 95.1 | 95.2 | 96.5 | 94.5 | 87.1 | 96.1 | 96.5 | 98.9 | 95.3 | 96.1 | 96.5 | 98.9 | 95.5 | 96.3 | 98.4 | 94.9 | 92.0 | 90.9 | 85.1 | 91.2 | 81.9 | 95.8 | 81.9 | 96.8 | | |
| Gist | 96.4 | 95.7 | 90.0 | 93.4 | 94.6 | 84.7 | 84.6 | 80.0 | 92.8 | 93.2 | 85.7 | 84.0 | 88.0 | 91.4 | 91.3 | 96.2 | 87.8 | 89.1 | 89.7 | 88.2 | 85.9 | 86.5 | 83.1 | 81.2 | 80.3 | 84.5 | 82.5 | 89.9 | 94.2 | 92.6 | 93.5 |
| Goodman | 73.6 | 87.2 | 86.6 | 86.7 | 89.7 | 84.4 | 79.4 | 77.1 | 87.4 | 89.9 | 86.4 | 87.5 | 83.5 | 87.0 | 89.3 | 88.0 | 86.1 | 86.1 | 88.2 | 86.9 | 82.2 | 83.7 | 78.1 | 79.1 | 79.9 | 77.1 | 86.1 | 85.5 | 81.5 | 82.3 | |
| Goree | 96.5 | 92.8 | 92.2 | 96.6 | 94.1 | 96.0 | 84.5 | 76.9 | 83.3 | 84.4 | 84.8 | 83.6 | 84.4 | 86.5 | 93.2 | 95.9 | 97.1 | 89.4 | 90.1 | 86.5 | 83.7 | 78.9 | 78.1 | 83.9 | 78.1 | 80.1 | 82.2 | 83.7 | 86.1 | 95.5 | 93.2 |
| Hightower | 91.4 | 91.2 | 90.4 | 88.1 | 90.1 | 89.1 | 84.8 | 78.9 | 85.9 | 84.4 | 79.6 | 83.3 | 84.7 | 89.4 | 89.3 | 87.3 | 85.3 | 87.3 | 88.6 | 87.0 | 84.5 | 82.9 | 80.5 | 79.2 | 83.3 | 82.6 | 89.5 | 89.3 | 89.7 | 90.3 | |
| Hilltop | 85.0 | 88.8 | 89.2 | 88.7 | 89.6 | 87.0 | 92.7 | 84.1 | 85.2 | 86.2 | 87.5 | 87.0 | 85.5 | 86.1 | 87.2 | 91.5 | 88.1 | 84.5 | 85.6 | 87.2 | 80.3 | 80.8 | 79.5 | 80.3 | 81.2 | 80.4 | 83.3 | 82.8 | 87.7 | 94.5 | 90.0 |
| Hobby | 91.4 | 91.2 | 90.5 | 91.1 | 91.4 | 89.5 | 90.1 | 85.2 | 84.7 | 87.9 | 89.2 | 88.5 | 86.1 | 86.5 | 89.9 | 86.5 | 83.9 | 79.9 | 82.5 | 82.6 | 82.7 | 83.3 | 85.0 | 88.9 | 90.2 | 90.2 | | | | | |
| Holliday | 90.1 | 91.1 | 89.7 | 89.1 | 91.5 | 88.6 | 90.8 | 84.0 | 86.8 | 87.7 | 94.1 | 83.2 | 83.8 | 88.4 | 91.6 | 88.6 | 83.2 | 89.6 | 85.5 | 86.4 | 84.5 | 84.2 | 79.1 | 79.9 | 81.1 | 82.3 | 86.6 | 86.2 | 87.8 | | |
| Hughes | 87.2 | 89.1 | 91.8 | 89.9 | 91.4 | 86.0 | 88.8 | 84.3 | 85.6 | 85.6 | 90.5 | 83.1 | 85.8 | 91.3 | 90.1 | 86.4 | 85.9 | 87.0 | 87.5 | 90.5 | 84.4 | 79.4 | 79.6 | 84.0 | 83.2 | 83.1 | 85.3 | 86.6 | 85.6 | 89.0 | 83.0 |
| Huntsville | 91.6 | 91.6 | 90.0 | 90.8 | 91.5 | 90.3 | 84.9 | 78.2 | 85.0 | 89.5 | 90.7 | 86.8 | 85.4 | 89.9 | 90.1 | 90.5 | 91.2 | 86.1 | 88.3 | 90.0 | 80.5 | 80.1 | 75.7 | 78.1 | 79.0 | 80.9 | 84.2 | 88.0 | 90.4 | 90.6 | |
| Hutchins | 95.5 | 96.5 | 96.2 | 94.3 | 91.1 | 91.6 | 92.9 | 85.1 | 88.8 | 90.4 | 92.2 | 91.3 | 93.4 | 88.0 | 90.1 | 89.4 | 89.3 | 84.4 | 85.3 | 83.4 | 86.6 | 88.6 | 84.1 | 87.5 | 88.3 | 90.4 | 91.1 | 90.5 | | | |
| Jester III | 90.0 | 94.1 | 93.3 | 97.8 | 96.1 | 87.2 | 80.7 | 81.4 | 92.1 | 91.5 | 85.6 | 84.9 | 85.6 | 84.9 | 90.1 | 92.6 | 89.6 | 81.4 | 85.6 | 87.5 | 88.4 | 86.1 | 81.7 | 85.3 | 79.1 | 79.1 | 77.5 | 83.5 | 86.9 | 88.3 | 89.7 |
| Jordan | 86.7 | 85.9 | 84.9 | 86.9 | 80.1 | 83.9 | 82.3 | 81.3 | 81.0 | 82.1 | 83.4 | 84.5 | 85.2 | 87.1 | 90.8 | 91.7 | 89.1 | 86.2 | 84.6 | 85.5 | 82.4 | 81.2 | 81.7 | 83.6 | 82.8 | 85.5 | 81.3 | 83.6 | 87.8 | 88.8 | 91.2 |
| Lewis | 97.1 | 100.4 | 101.2 | 96.7 | 99.5 | 95.5 | 89.1 | 83.6 | 87.3 | 92.5 | 92.7 | 93.5 | 83.0 | 86.6 | 96.0 | 89.1 | 97.1 | 91.2 | 87.0 | 91.6 | 91.8 | 84.1 | 77.9 | 77.0 | 79.9 | 77.4 | 87.9 | 82.0 | 92.4 | 97.1 | 98.1 |
| Lopez | 89.7 | 91.8 | 93.2 | 93.2 | 89.8 | 88.4 | 88.7 | 96.7 | 81.3 | 81.9 | 85.6 | 89.9 | 88.9 | 88.3 | 89.2 | 89.7 | 88.9 | 92.9 | 92.0 | 91.0 | 84.7 | 87.9 | 81.2 | 85.2 | 82.6 | 84.1 | 85.9 | 91.3 | 89.5 | 91.3 | |
| Luther | 90.8 | 89.9 | 89.4 | 87.8 | 89.6 | 89.5 | 87.5 | 82.3 | 81.7 | 85.6 | 88.6 | 87.5 | 80.5 | 81.5 | 84.5 | 98.2 | 87.8 | 88.7 | 84.3 | 85.7 | 81.6 | 87.2 | 86.1 | 80.9 | 81.2 | 77.8 | 78.6 | 78.7 | 81.0 | 86.0 | 87.7 |
| Lychner | 94.6 | 96.2 | 93.1 | 92.3 | 92.6 | 81.3 | 86.8 | 87.3 | 93.6 | 93.4 | 88.9 | 83.1 | 89.9 | 90.9 | 89.3 | 94.0 | 90.9 | 95.1 | 91.0 | 90.4 | 89.4 | 82.5 | 84.7 | 85.3 | 83.7 | 93.0 | 94.6 | 94.8 | | | |
| Lynaugh | 87.3 | 96.6 | 92.9 | 92.7 | 88.6 | 90.4 | 89.3 | 84.7 | 88.3 | 84.5 | 85.8 | 85.3 | 84.4 | 87.5 | 83.5 | 90.2 | 85.3 | 82.1 | 87.1 | 86.0 | 77.2 | 77.4 | 82.7 | 84.2 | 84.4 | 87.3 | 88.2 | 88.9 | 89.9 | 92.2 | |
| Mcconnell | 92.1 | 91.8 | 90.5 | 90.8 | 91.2 | 91.1 | 86.2 | 89.2 | 90.2 | 87.2 | 85.6 | 88.5 | 88.7 | 86.6 | 89.1 | 89.4 | 89.9 | 89.1 | 89.5 | 88.8 | 88.5 | 88.2 | 81.1 | 84.2 | 85.0 | 84.2 | 83.5 | 80.4 | 85.6 | 88.9 | 89.2 |
| Memorial | 88.1 | 89.3 | 89.7 | 87.7 | 86.5 | 91.7 | 87.1 | 80.7 | 84.7 | 87.1 | 85.7 | 85.6 | 80.0 | 88.6 | 81.8 | 88.4 | 87.3 | 82.3 | 79.6 | 82.2 | 77.9 | 74.1 | 81.1 | 86.7 | 87.4 | 88.4 | | | | | |
| Michael | 90.8 | 91.0 | 90.5 | 92.1 | 90.6 | 89.3 | 89.4 | 82.5 | 83.7 | 86.4 | 86.7 | 87.2 | 85.1 | 86.8 | 89.8 | 87.4 | 88.5 | 90.6 | 85.3 | 84.5 | 83.2 | 81.2 | 84.3 | 83.1 | 81.6 | 82.9 | 84.9 | 88.2 | 89.2 | 90.5 | |
| Middleton | 97.0 | 97.8 | 99.7 | 98.3 | 82.3 | 92.5 | 95.0 | 90.2 | 88.6 | 92.2 | 92.0 | 93.7 | 96.8 | 97.5 | 95.9 | 91.6 | 87.7 | 85.9 | 86.8 | 83.5 | 80.1 | 81.9 | 85.9 | 89.4 | 87.1 | 89.3 | 89.2 | 90.3 | 90.1 | 91.7 | 93.5 |
| Montford | 90.4 | 92.5 | 93.2 | 94.6 | 81.7 | 83.4 | 90.6 | 82.7 | 85.1 | 86.2 | 86.8 | 89.2 | 88.6 | 90.4 | 92.4 | 91.0 | 91.6 | 87.7 | 85.9 | 86.8 | 83.5 | 80.1 | 81.9 | 85.9 | 89.4 | 87.1 | 89.3 | 89.2 | 90.3 | 90.5 | |
| Moore, C. | 97.8 | 94.6 | 96.9 | 97.4 | 91.4 | 91.3 | 86.4 | 85.1 | 88.7 | 93.0 | 94.2 | 94.9 | 95.2 | 96.6 | 96.1 | 97.6 | 84.7 | 81.8 | 89.0 | 92.2 | 81.3 | 86.2 | 78.3 | 87.8 | 89.6 | 88.5 | 88.3 | 90.8 | 90.6 | 90.5 | |
| Murray | 88.6 | 97.5 | 94.2 | 89.1 | 89.6 | 82.8 | 83.5 | 82.9 | 84.9 | 87.3 | 85.4 | 88.0 | 84.0 | 83.4 | 87.2 | 86.9 | 87.4 | 83.4 | 86.2 | 84.1 | 82.3 | 82.4 | 83.0 | 83.5 | 80.1 | 82.7 | 83.2 | 84.6 | 82.3 | 84.7 | 86.3 |
| O'Daniel | 97.8 | 97.4 | 94.7 | 94.0 | 96.0 | 89.5 | 95.1 | 89.9 | 86.4 | 83.5 | 85.4 | 84.0 | 83.4 | 87.2 | 86.9 | 87.4 | 83.4 | 84.4 | 86.6 | 88.8 | 89.9 | 89.2 | 84.8 | 85.8 | 89.9 | 99.7 | 93.2 | | | | |
| Plane | 93.6 | 89.0 | 92.8 | 92.1 | 90.5 | 87.6 | 88.1 | 85.1 | 90.9 | 90.4 | 86.3 | 81.5 | 87.2 | 97.1 | 91.7 | 90.7 | 88.1 | 95.4 | 87.3 | 87.1 | 99.4 | 85.8 | 85.8 | 80.0 | 79.4 | 82.4 | 88.7 | 90.1 | 89.7 | 88.7 | 90.5 |
| Polunsky | 92.1 | 91.3 | 92.5 | 91.1 | 91.4 | 89.5 | 85.9 | 79.8 | 85.2 | 89.8 | 89.0 | 84.8 | 86.0 | 86.5 | 90.5 | 90.5 | 91.3 | 86.0 | 87.9 | 88.0 | 89.1 | 82.5 | 83.0 | 83.6 | 78.8 | 81.2 | 80.2 | 83.0 | 84.3 | 86.0 | 90.8 |
| Powledge | 91.6 | 91.9 | 92.6 | 91.9 | 90.8 | 99.8 | 99.7 | 82.0 | 82.1 | 85.4 | 89.6 | 84.3 | 92.8 | 95.8 | 94.9 | 86.3 | 89.6 | 85.7 | 85.1 | 82.5 | 83.0 | 85.1 | 82.9 | 83.0 | 84.3 | 86.0 | 87.5 | 89.9 | 90.8 | | |

TIEDE DEF_87766

ATTORNEYS EYES ONLY
WORKING PAPERS

# Office of Quality Assurance
## Senate Bill 1, Rider 56
## Monthly Temperatures

### July 2024

| | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 | 18 | 19 | 20 | 21 | 22 | 23 | 24 | 25 | 26 | 27 | 28 | 29 | 30 | 31 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Ramsey** | 92.6 | 92.3 | 92.6 | 92.4 | 90.2 | 92.4 | 87.2 | 81.8 | 86.4 | 88.4 | 83.3 | 82.5 | 85.6 | 86.6 | 87.0 | 88.5 | 89.3 | 84.8 | 86.2 | 87.6 | 82.0 | 86.1 | 91.1 | 84.2 | 80.6 | 82.2 | 81.9 | 83.8 | 87.9 | 98.9 | 94.2 |
| **Roach** | 91.1 | 91.8 | 90.6 | 93.0 | 74.6 | 80.0 | 84.5 | 80.1 | 84.4 | 86.9 | 87.2 | 88.7 | 88.9 | 90.9 | 90.7 | 91.9 | 89.2 | 87.4 | 86.0 | 88.8 | 87.3 | 84.7 | 83.5 | 86.1 | 88.0 | 88.8 | 87.0 | 87.3 | 92.6 | 90.9 | 90.7 |
| **Robertson** | 93.4 | 94.4 | 93.5 | 93.8 | 82.5 | 89.8 | 90.1 | 85.4 | 87.4 | 88.8 | 89.6 | 90.5 | 89.9 | 95.0 | 92.6 | 93.2 | 95.6 | 89.4 | 89.0 | 92.1 | 87.5 | 84.0 | 86.5 | 94.3 | 87.4 | 88.7 | 92.8 | 89.0 | 99.7 | 90.2 | 92.7 |
| **Sanchez** | 87.2 | 83.2 | 84.3 | 87.8 | 85.2 | 83.9 | 90.0 | 83.8 | 82.9 | 85.4 | 85.3 | 87.6 | 84.2 | 85.9 | 89.3 | 90.0 | 89.2 | 79.4 | 86.4 | 83.2 | 81.5 | 77.7 | 81.1 | 87.8 | 83.1 | 82.0 | 84.6 | 86.6 | 87.8 | 89.9 | 88.9 |
| **Segovia** | 92.3 | 90.2 | 91.2 | 93.2 | 91.8 | 91.8 | 91.8 | 92.1 | 94.3 | 83.3 | 78.4 | 89.1 | 90.4 | 92.1 | 90.9 | 89.7 | 91.2 | 91.1 | 88.9 | 91.0 | 86.9 | 86.3 | 91.2 | 81.2 | 87.3 | 84.8 | 84.9 | 88.9 | 81.2 | 91.8 | 90.4 |
| **Smith** | 90.7 | 91.1 | 91.8 | 92.3 | 79.7 | 79.9 | 89.5 | 78.3 | 80.5 | 81.5 | 83.5 | 85.8 | 86.1 | 86.9 | 87.6 | 88.5 | 88.6 | 84.1 | 85.0 | 84.2 | 83.8 | 78.4 | 78.0 | 82.8 | 83.2 | 84.8 | 85.5 | 85.5 | 86.9 | 87.5 | 89.0 |
| **Stevenson** | 91.2 | 92.0 | 91.8 | 93.1 | 91.1 | 91.6 | 89.0 | 87.7 | 92.5 | 90.2 | 89.3 | 87.6 | 85.6 | 88.9 | 89.3 | 90.2 | 91.8 | 89.3 | 87.9 | 91.3 | 91.2 | 86.3 | 81.3 | 87.1 | 86.7 | 86.1 | 85.7 | 86.5 | 89.2 | 90.5 | 89.8 |
| **Stiles** | 89.5 | 89.5 | 87.8 | 88.5 | 89.3 | 87.2 | 87.3 | 81.6 | 86.5 | 87.7 | 85.3 | 86.4 | 86.6 | 85.9 | 87.5 | 90.0 | 86.0 | 85.8 | 86.4 | 86.0 | 84.2 | 85.8 | 86.4 | 82.0 | 80.4 | 81.6 | 81.0 | 81.6 | 87.0 | 89.9 | 88.7 |
| **Stringfellow** | 90.6 | 92.7 | 89.6 | 91.6 | 90.3 | 93.5 | 87.8 | 80.1 | 85.7 | 86.6 | 83.7 | 82.3 | 86.4 | 88.6 | 87.7 | 90.3 | 90.7 | 86.7 | 85.4 | 88.0 | 84.6 | 87.3 | 83.0 | 81.1 | 76.8 | 80.0 | 79.8 | 81.6 | 83.9 | 87.6 | 90.2 |
| **Telford** | 90.2 | 91.0 | 92.5 | 92.6 | 90.9 | 89.2 | 89.1 | 79.9 | 82.3 | 87.0 | 86.5 | 86.3 | 87.8 | 87.5 | 88.9 | 89.6 | 89.5 | 84.2 | 83.8 | 85.4 | 84.5 | 83.2 | 82.3 | 85.5 | 82.6 | 79.4 | 81.0 | 84.4 | 86.7 | 85.9 | 88.1 |
| **Terrell** | 92.5 | 93.0 | 92.5 | 84.5 | 92.9 | 92.0 | 84.0 | 81.5 | 87.2 | 88.2 | 83.4 | 82.9 | 82.8 | 88.7 | 88.5 | 90.5 | 90.3 | 85.3 | 87.7 | 87.1 | 81.0 | 88.2 | 84.3 | 80.7 | 77.9 | 77.9 | 79.5 | 85.5 | 90.2 | 90.3 | 92.3 |
| **Torres** | 90.7 | 90.2 | 91.5 | 91.7 | 89.9 | 90.0 | 91.0 | 92.6 | 84.6 | 93.3 | 91.4 | 91.3 | 81.6 | 86.8 | 89.6 | 90.1 | 89.7 | 83.8 | 89.3 | 83.8 | 91.3 | 88.3 | 83.8 | 85.7 | 88.4 | 89.3 | 87.7 | 84.6 | 82.5 | 88.7 | 90.1 |
| **Vance** | 94.5 | 95.5 | 93.8 | 95.7 | 94.9 | 85.3 | 83.8 | 81.2 | 90.4 | 91.5 | 89.1 | 83.4 | 87.6 | 90.7 | 92.9 | 93.1 | 91.5 | 84.5 | 89.5 | 91.0 | 91.9 | 90.1 | 86.4 | 87.5 | 79.7 | 83.5 | 81.2 | 87.7 | 92.0 | 91.9 | 94.8 |
| **Wainwright** | 90.0 | 90.1 | 89.0 | 90.8 | 89.3 | 89.1 | 88.0 | 89.3 | 84.6 | 84.4 | 89.1 | 85.0 | 86.4 | 86.6 | 86.4 | 89.6 | 86.7 | 84.9 | 83.8 | 89.9 | 83.7 | 80.6 | 82.2 | 83.2 | 78.8 | 81.1 | 83.5 | 85.7 | 86.7 | 90.5 | 90.8 |
| **Wallace** | 90.4 | 90.3 | 94.1 | 93.8 | 81.4 | 87.6 | 86.0 | 86.2 | 91.0 | 87.0 | 88.7 | 91.7 | 91.2 | 90.1 | 92.6 | 93.6 | 92.4 | 87.2 | 88.2 | 88.3 | 88.0 | 83.7 | 85.0 | 87.7 | 89.2 | 91.3 | 91.2 | 91.3 | 92.3 | 90.3 | 92.0 |
| **Wheeler** | 83.8 | 81.9 | 82.4 | 89.0 | 74.7 | 81.9 | 81.0 | 77.0 | 84.5 | 82.7 | 83.1 | 83.7 | 80.9 | 81.7 | 82.0 | 83.0 | 85.3 | 83.1 | 88.5 | 85.5 | 80.7 | 72.7 | 80.6 | 82.2 | 81.5 | 83.1 | 81.2 | 85.2 | 81.6 | 84.3 | 83.6 |
| **Woodman** | 91.3 | 90.7 | 95.2 | 91.1 | 90.4 | 92.9 | 92.7 | 85.2 | 92.1 | 91.4 | 86.4 | 86.8 | 88.2 | 92.1 | 92.0 | 90.5 | 86.2 | 85.6 | 86.0 | 90.5 | 81.5 | 82.8 | 82.5 | 87.7 | 83.7 | 83.5 | 87.2 | 84.8 | 89.8 | 90.6 | 92.8 |
| **Wynne** | 94.6 | 92.2 | 91.5 | 91.1 | 91.5 | 88.8 | 82.4 | 76.1 | 87.1 | 87.9 | 89.1 | 85.2 | 86.7 | 86.5 | 89.5 | 89.8 | 90.2 | 86.6 | 88.6 | 88.4 | 89.3 | 83.9 | 80.2 | 84.2 | 76.4 | 78.9 | 80.4 | 84.9 | 89.3 | 90.0 | 90.9 |
| **Young** | 93.8 | 92.3 | 90.6 | 90.9 | 92.6 | 90.5 | 90.4 | 80.2 | 89.6 | 90.7 | 81.8 | 83.1 | 88.6 | 89.8 | 87.8 | 91.4 | 80.9 | 85.6 | 99.0 | 89.7 | 81.6 | 82.6 | 91.6 | 78.7 | 77.7 | 80.7 | 76.7 | 86.0 | 90.0 | 90.0 | 90.2 |

TIEDE DEF_87767

# Office of Quality Assurance
## Senate Bill 1, Rider 56
## Monthly Temperatures

## August 2024

| | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 | 18 | 19 | 20 | 21 | 22 | 23 | 24 | 25 | 26 | 27 | 28 | 29 | 30 | 31 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Allred | 94.0 | 94.1 | 92.3 | 92.3 | 92.2 | 94.2 | 94.2 | 94.7 | 85.2 | 82.4 | 88.0 | 91.7 | 93.7 | 93.3 | 94.5 | 95.2 | 97.2 | 96.7 | 96.6 | 94.6 | 92.7 | 92.9 | 95.4 | 94.3 | 96.1 | 92.9 | 91.6 | 92.1 | 91.4 | 88.8 | 86.5 |
| Beto | 87.4 | 88.3 | 85.1 | 86.0 | 86.1 | 86.3 | 86.4 | 86.3 | 86.6 | 86.8 | 86.9 | 85.8 | 88.4 | 89.5 | 90.6 | 88.9 | 89.1 | 88.7 | 90.3 | 88.2 | 88.9 | 87.4 | 86.8 | 87.1 | 87.7 | 85.3 | 84.4 | 85.4 | 83.7 | 84.3 | |
| Boyd | 90.1 | 92.1 | 91.1 | 91.4 | 91.1 | 91.6 | 93.1 | 93.2 | 94.2 | 93.9 | 98.1 | 91.8 | 91.9 | 92.3 | 92.9 | 92.4 | 92.7 | 94.2 | 93.8 | 96.4 | 92.8 | 92.6 | 91.1 | 90.2 | 90.8 | 90.7 | 89.4 | 87.2 | 87.4 | 88.0 | 86.3 |
| Bradshaw | 88.5 | 95.0 | 89.1 | 84.5 | 89.9 | 87.1 | 90.8 | 92.3 | 89.1 | 90.1 | 90.3 | 87.1 | 88.4 | 86.3 | 88.7 | 88.0 | 83.5 | 79.1 | 92.4 | 90.1 | 87.1 | 87.9 | 91.2 | 85.2 | 87.7 | 85.0 | | | | | |
| Briscoe | 93.7 | 94.0 | 94.4 | 93.1 | 94.6 | 94.7 | 92.1 | 93.7 | 95.0 | 96.8 | 96.4 | 95.1 | 96.8 | 96.8 | 95.1 | 90.8 | 92.9 | 94.1 | 94.7 | 94.2 | 100.4 | 99.2 | 97.2 | 96.0 | 94.5 | 96.3 | 95.6 | 97.6 | 92.0 | 98.2 | 89.3 |
| Byrd | 86.8 | 88.0 | 89.0 | 89.7 | 83.6 | 85.8 | 86.9 | 92.1 | 85.9 | 90.6 | 90.3 | 86.4 | 82.7 | 85.8 | 83.5 | 84.6 | 85.2 | 85.9 | 83.7 | 86.3 | 89.7 | 91.4 | 91.9 | 88.9 | 85.8 | 85.3 | 79.0 | 82.5 | 79.1 | 82.4 | 80.3 |
| Clemens | 86.4 | 88.3 | 87.1 | 84.5 | 86.1 | 88.3 | 86.7 | 88.3 | 88.5 | 85.1 | 88.6 | 85.2 | 88.0 | 86.7 | 86.3 | 84.8 | 86.3 | 84.0 | 88.1 | 89.3 | 84.4 | 88.8 | 83.1 | 88.3 | 84.8 | 83.7 | 83.7 | 85.3 | 88.2 | 84.4 | |
| Clemens | 89.2 | 87.5 | 88.2 | 85.5 | 88.0 | 88.1 | 90.4 | 88.3 | 82.4 | 78.4 | 81.2 | 84.3 | 86.0 | 87.3 | 86.5 | 87.5 | 86.6 | 91.1 | 89.4 | 89.4 | 96.8 | 91.1 | 91.6 | 90.8 | 90.9 | 87.3 | 84.4 | 84.5 | 82.5 | 80.9 | 78.6 |
| Coffield | 87.8 | 88.8 | 88.7 | 89.7 | 88.0 | 89.6 | 89.5 | 89.9 | 90.4 | 89.7 | 88.8 | 88.3 | 89.0 | 90.4 | 90.0 | 90.5 | 90.4 | 90.7 | 90.9 | 91.6 | 89.8 | 89.6 | 90.5 | 88.6 | 88.8 | 88.3 | 88.0 | 86.0 | 84.6 | 83.2 | 84.7 |
| Cole | 96.2 | 91.4 | 91.5 | 91.2 | 94.2 | 93.7 | 96.6 | 95.3 | 89.4 | 90.6 | 88.7 | 91.4 | 95.1 | 94.6 | 93.5 | 97.1 | 94.3 | 97.2 | 94.7 | 95.8 | 91.4 | 91.8 | 91.8 | 95.1 | 94.4 | 94.1 | 94.9 | 95.6 | 93.5 | 91.4 | 87.8 | 89.4 |
| Connally | 88.3 | 91.8 | 97.7 | 91.4 | 90.8 | 90.1 | 93.7 | 92.3 | 91.0 | 91.3 | 90.1 | 91.6 | 91.5 | 91.3 | 91.6 | 90.9 | 90.4 | 91.2 | 91.4 | 92.1 | 93.3 | 94.5 | 91.5 | 91.4 | 91.2 | 84.7 | 82.7 | 88.0 | 85.6 | 89.0 | 88.2 |
| Crain | 93.7 | 97.0 | 93.4 | 96.5 | 94.3 | 94.9 | 95.3 | 97.0 | 95.2 | 92.5 | 94.5 | 92.5 | 94.4 | 93.1 | 96.4 | 95.1 | 95.5 | 96.4 | 97.8 | 96.8 | 98.7 | 98.8 | 92.7 | 92.2 | 92.2 | 90.8 | 90.0 | 92.0 | |
| Dalhart | 89.7 | 88.2 | 87.9 | 85.4 | 85.1 | 86.7 | 88.7 | 84.2 | 79.3 | 73.6 | 85.4 | 88.9 | 89.5 | 87.4 | 84.9 | 88.1 | 88.4 | 90.2 | 85.1 | 89.4 | 86.5 | 85.9 | 88.3 | 88.8 | 87.9 | 86.5 | 85.7 | 85.4 | 85.1 | 82.9 | 80.7 |
| Daniel | 90.5 | 90.7 | 88.9 | 89.8 | 90.6 | 91.6 | 92.0 | 92.3 | 87.8 | 88.7 | 90.1 | 91.4 | 91.9 | 88.9 | 89.1 | 89.9 | 92.1 | 92.7 | 91.6 | 92.2 | 93.2 | 94.1 | 94.5 | 93.1 | 92.3 | 91.8 | 90.9 | 89.9 | 89.3 | 88.9 | 83.1 |
| Dominguez | 88.1 | 89.3 | 91.2 | 91.5 | 91.4 | 90.3 | 91.2 | 93.0 | 92.8 | 91.0 | 94.7 | 89.4 | 89.1 | 88.5 | 90.5 | 90.2 | 90.8 | 89.4 | 92.1 | 95.0 | 94.3 | 90.1 | 89.5 | 90.3 | 86.2 | 84.9 | 85.0 | 85.6 | 89.6 | 91.0 | |
| Ellis | 92.4 | 90.1 | 87.3 | 90.7 | 88.3 | 89.7 | 94.3 | 91.3 | 92.3 | 90.5 | 91.0 | 91.4 | 90.3 | 90.6 | 91.1 | 87.3 | 87.4 | 93.1 | 85.1 | 93.7 | 88.7 | 93.3 | 90.5 | 85.8 | 87.3 | 85.5 | 85.0 | 86.7 | 80.3 | 86.0 | 85.7 |
| Estelle | 90.2 | 89.9 | 93.4 | 96.5 | 84.8 | 86.8 | 90.8 | 89.2 | 87.4 | 88.3 | 87.1 | 86.5 | 91.3 | 89.3 | 86.5 | 85.3 | 89.5 | 89.9 | 91.9 | 89.1 | 86.4 | 90.0 | 90.6 | 89.4 | 82.6 | 84.5 | 83.0 | 83.8 | 83.0 | 82.9 | |
| Ferguson | 89.5 | 91.1 | 92.5 | 92.7 | 91.5 | 92.3 | 92.8 | 92.4 | 95.2 | 92.5 | 91.2 | 91.3 | 93.3 | 91.6 | 92.5 | 93.9 | 93.6 | 93.9 | 92.3 | 95.4 | 93.5 | 94.1 | 90.8 | 91.0 | 91.2 | 89.0 | 82.4 | 88.6 | 80.8 | 85.6 | 86.9 |
| Formby | 93.7 | 89.3 | 87.0 | 86.7 | 87.9 | 89.8 | 91.4 | 93.3 | 84.7 | 87.3 | 90.1 | 88.6 | 87.9 | 91.2 | 87.1 | 86.3 | 90.1 | 92.3 | 91.1 | 92.3 | 91.6 | 88.1 | 89.6 | 92.7 | 91.0 | 88.3 | 87.9 | 84.3 | 87.6 | 74.8 | 80.4 |
| Garza East | 95.8 | 96.9 | 95.1 | 95.4 | 95.3 | 94.1 | 96.1 | 93.1 | 95.4 | 96.1 | 94.5 | 96.7 | 96.1 | 95.7 | 94.5 | 95.7 | 95.6 | 96.3 | 96.1 | 95.5 | 97.1 | 97.7 | 91.7 | 95.1 | 95.2 | 82.2 | 83.7 | 85.6 | 91.0 | 92.4 | 91.6 |
| Garza West | 97.8 | 98.8 | 97.1 | 98.6 | 98.6 | 100.0 | 101.6 | 99.4 | 100.5 | 101.2 | 100.5 | 100.2 | 99.9 | 99.6 | 101.0 | 101.6 | 101.5 | 100.4 | 99.6 | 98.4 | 101.7 | 101.1 | 93.5 | 98.1 | 97.7 | 80.0 | 91.5 | 89.3 | 94.5 | 96.7 | 97.2 |
| Gist | 93.4 | 94.8 | 95.4 | 91.7 | 95.2 | 96.3 | 97.0 | 91.7 | 92.6 | 94.0 | 95.0 | 89.2 | 94.6 | 96.3 | 92.3 | 93.3 | 93.3 | 96.1 | 92.1 | 92.8 | 95.2 | 89.8 | 88.5 | 87.8 | 85.4 | 87.3 | 86.0 | | | | |
| Goodman | 89.5 | 91.0 | 95.3 | 84.0 | 90.4 | 89.7 | 88.7 | 86.9 | 85.5 | 86.0 | 88.8 | 89.3 | 90.0 | 89.7 | 93.3 | 90.2 | 92.5 | 84.4 | 90.9 | 88.8 | 85.7 | 90.4 | 89.0 | 87.8 | 86.4 | 94.8 | 86.4 | 77.9 | 75.7 | | |
| Goree | 86.5 | 83.9 | 88.0 | 83.4 | 93.8 | 93.6 | 94.4 | 92.1 | 96.7 | 87.6 | 88.9 | 92.1 | 96.5 | 98.0 | 95.4 | 91.9 | 95.8 | 93.5 | 84.9 | 96.0 | 98.9 | 88.3 | 90.5 | 90.0 | 86.9 | 85.8 | 86.2 | 83.7 | 78.6 | 81.0 | 81.6 |
| Hightower | 90.0 | 90.7 | 91.2 | 91.4 | 89.6 | 88.5 | 90.2 | 95.7 | 92.5 | 87.4 | 88.7 | 92.2 | 88.2 | 90.3 | 91.6 | 92.9 | 90.3 | 92.3 | 93.4 | 93.0 | 92.1 | 90.1 | 90.9 | 89.4 | 82.0 | 81.9 | 89.8 | 86.7 | 84.4 | 84.7 | |
| Hilltop | 86.2 | 94.3 | 88.8 | 92.8 | 97.6 | 88.7 | 92.1 | 92.8 | 90.5 | 86.9 | 89.3 | 88.4 | 89.9 | 89.2 | 97.3 | 91.1 | 92.5 | 95.3 | 92.3 | 94.1 | 98.5 | 96.0 | 93.0 | 88.0 | 89.1 | 88.2 | 86.0 | 86.3 | 88.5 | 85.5 | 82.1 |
| Hobby | 87.7 | 89.3 | 89.4 | 91.0 | 89.8 | 90.5 | 90.6 | 91.2 | 90.3 | 91.8 | 90.9 | 90.3 | 91.4 | 91.8 | 92.4 | 92.9 | 93.3 | 95.3 | 95.4 | 93.8 | 91.0 | 91.4 | 89.3 | 86.7 | 88.0 | 94.6 | 87.2 | 85.7 | 88.8 | | |
| Holliday | 86.9 | 88.7 | 87.0 | 89.1 | 88.8 | 87.9 | 89.8 | 90.1 | 88.3 | 88.9 | 88.9 | 89.4 | 90.2 | 90.7 | 91.7 | 93.2 | 88.6 | 90.2 | 92.8 | 93.3 | 92.9 | 95.2 | 88.7 | 90.1 | 91.4 | 84.8 | 73.3 | 90.4 | 70.5 | 88.2 | 84.4 |
| Hughes | 84.6 | 92.2 | 89.4 | 86.5 | 89.9 | 89.9 | 92.8 | 86.1 | 89.4 | 92.2 | 91.1 | 89.2 | 92.2 | 94.1 | 92.8 | 92.9 | 92.3 | 94.3 | 89.2 | 89.3 | 92.5 | 93.5 | 90.6 | 92.0 | 90.0 | 84.6 | 85.4 | 88.0 | 82.0 | 89.0 | |
| Huntsville | 92.1 | 90.5 | 90.6 | 92.2 | 90.5 | 92.1 | 93.0 | 92.4 | 92.7 | 92.2 | 90.8 | 91.6 | 91.5 | 93.1 | 89.3 | 88.0 | 94.2 | 93.4 | 89.8 | 90.8 | 93.0 | 92.3 | 93.1 | 88.9 | 88.3 | 85.5 | 80.4 | 87.2 | 84.8 | 85.8 | 83.0 |
| Hutchins | 92.9 | 93.9 | 88.6 | 92.5 | 91.4 | 92.9 | 95.3 | 95.4 | 94.7 | 94.7 | 94.9 | 94.3 | 95.1 | 96.5 | 96.9 | 94.3 | 94.3 | 93.8 | 95.1 | 92.4 | 93.7 | 91.9 | 91.5 | 90.5 | 88.3 | 88.7 | 91.9 | 89.3 | | | |
| Jester III | 92.4 | 89.8 | 89.5 | 90.5 | 91.1 | 92.1 | 91.1 | 93.4 | 95.1 | 89.5 | 92.9 | 90.7 | 91.3 | 99.1 | 99.2 | 91.8 | 93.5 | 92.3 | 93.5 | 92.9 | 94.6 | 94.3 | 99.4 | 91.5 | 90.1 | 85.2 | 84.2 | 87.7 | 87.8 | 83.5 | 85.1 |
| Jordan | 90.4 | 87.1 | 84.3 | 84.9 | 84.5 | 86.4 | 87.6 | 87.2 | 77.3 | 78.1 | 81.7 | 89.9 | 86.2 | 86.4 | 87.5 | 88.5 | 86.9 | 90.4 | 86.2 | 86.9 | 87.3 | 88.9 | 86.6 | 88.9 | 88.8 | 89.1 | 83.5 | 83.4 | 85.9 | 81.7 | 79.5 |
| Lewis | 93.3 | 99.1 | 98.2 | 97.2 | 97.5 | 77.6 | 96.5 | 92.3 | 98.4 | 98.6 | 94.6 | 97.0 | 99.7 | 99.2 | 98.6 | 99.4 | 99.8 | 96.4 | 90.1 | 92.8 | 92.7 | 97.6 | 97.2 | 91.5 | 93.9 | 84.6 | 86.4 | 94.2 | 84.6 | 84.2 | 91.3 |
| Lopez | 91.1 | 95.2 | 91.3 | 95.5 | 95.2 | 90.7 | 92.6 | 92.4 | 94.9 | 91.2 | 89.3 | 95.3 | 94.4 | 92.8 | 89.0 | 93.8 | 91.8 | 91.2 | 91.8 | 92.8 | 90.9 | 90.9 | 96.1 | 92.1 | 92.0 | 90.9 | 90.9 | 86.6 | 92.1 | 90.1 | 92.5 |
| Luther | 86.5 | 87.5 | 88.9 | 89.8 | 88.7 | 88.2 | 88.0 | 89.3 | 88.3 | 87.2 | 87.2 | 87.3 | 89.2 | 87.1 | 88.2 | 88.0 | 90.9 | 89.3 | 89.7 | 88.5 | 89.5 | 90.3 | 88.3 | 86.5 | 85.8 | 83.8 | 80.7 | 88.6 | 81.5 | 81.8 | 83.1 |
| Lychner | 93.8 | 95.5 | 95.0 | 93.3 | 94.0 | 94.1 | 95.1 | 97.9 | 97.4 | 95.3 | 95.8 | 98.0 | 91.3 | 98.5 | 95.8 | 100.3 | 98.6 | 97.7 | 98.4 | 97.3 | 98.4 | 97.7 | 96.0 | 97.1 | 99.9 | 88.7 | 84.3 | 95.2 | 87.3 | 90.0 | 89.1 |
| Lynaugh | 86.6 | 89.9 | 86.7 | 89.7 | 85.1 | 85.7 | 88.3 | 88.3 | 88.9 | 86.1 | 86.8 | 89.8 | 89.9 | 91.7 | 90.7 | 88.5 | 88.8 | 84.9 | 89.7 | 88.9 | 92.6 | 92.3 | 85.5 | 91.0 | 83.8 | 84.4 | 87.9 | 84.9 | 82.1 | | |
| Mcconnell | 88.8 | 90.0 | 89.0 | 89.2 | 89.1 | 90.7 | 91.8 | 90.7 | 89.9 | 89.3 | 92.8 | 91.0 | 92.0 | 92.6 | 91.2 | 92.7 | 91.1 | 92.1 | 94.1 | 95.2 | 91.0 | 91.8 | 91.3 | 86.0 | 84.1 | 89.0 | 89.5 | 88.0 | 90.7 | | |
| Memorial | 87.9 | 85.0 | 84.6 | 86.7 | 86.4 | 88.6 | 87.4 | 86.7 | 87.5 | 85.8 | 88.7 | 84.1 | 87.1 | 86.0 | 86.3 | 88.5 | 90.1 | 87.2 | 86.6 | 87.3 | 88.1 | 89.3 | 88.2 | 87.6 | 78.1 | 83.1 | 85.6 | 83.4 | 81.7 | 84.0 | |
| Michael | 88.9 | 90.2 | 89.7 | 90.2 | 87.1 | 89.5 | 89.0 | 89.9 | 89.6 | 88.5 | 90.3 | 89.5 | 89.3 | 90.3 | 90.9 | 90.7 | 89.3 | 91.1 | 88.7 | 89.4 | 89.1 | 88.4 | 86.5 | 85.5 | 84.4 | 87.0 | | | | | |
| Middleton | 94.0 | 97.2 | 98.0 | 96.8 | 97.0 | 97.8 | 99.0 | 102.2 | 96.1 | 96.4 | 97.8 | 99.5 | 98.1 | 98.6 | 97.7 | 99.9 | 99.0 | 100.8 | 99.0 | 101.2 | 99.9 | 101.7 | 102.9 | 98.6 | 93.2 | 91.2 | 89.2 | 90.4 | 85.2 | 89.9 | |
| Montford | 93.5 | 94.1 | 92.6 | 91.4 | 92.1 | 93.9 | 88.2 | 96.9 | 91.3 | 87.5 | 93.9 | 90.3 | 92.1 | 92.6 | 95.5 | 93.3 | 91.1 | 92.4 | 94.6 | 92.4 | 94.9 | 91.7 | 92.3 | 92.6 | 88.6 | 88.6 | 88.7 | 77.1 | 82.7 | | |
| Moore, C. | 95.6 | 93.3 | 95.1 | 95.3 | 95.3 | 95.9 | 97.9 | 90.0 | 91.4 | 90.6 | 94.3 | 94.7 | 96.6 | 94.8 | 94.9 | 95.4 | 97.0 | 93.5 | 93.3 | 94.7 | 94.3 | 94.1 | 97.2 | 97.5 | 93.3 | 94.0 | 89.0 | 91.3 | | | |
| Murray | 89.2 | 85.3 | 88.6 | 86.7 | 89.2 | 99.3 | 94.5 | 91.1 | 90.2 | 89.5 | 98.9 | 95.5 | 99.7 | 85.8 | 86.8 | 86.2 | 86.4 | 96.6 | 95.4 | 99.2 | 93.4 | 91.2 | 90.7 | 94.2 | 85.7 | 91.1 | 95.0 | 92.7 | 93.3 | 85.3 | 86.2 |
| O'Daniel | 94.8 | 99.6 | 95.4 | 92.8 | 97.6 | 94.7 | 90.2 | 96.3 | 91.1 | 92.7 | 89.5 | 95.5 | 93.8 | 95.1 | 94.5 | 92.7 | 92.1 | 94.0 | 92.6 | 97.7 | 96.1 | 94.7 | 98.3 | 94.2 | 91.0 | 86.0 | 90.7 | 85.3 | 91.0 | 91.6 | 89.5 |
| Plane | 89.1 | 93.3 | 86.8 | 90.8 | 90.4 | 89.5 | 90.6 | 90.6 | 91.2 | 92.1 | 93.2 | 90.9 | 89.4 | 91.7 | 90.8 | 90.8 | 92.0 | 96.0 | 91.3 | 90.0 | 89.1 | 90.5 | 91.4 | 96.0 | 79.7 | 78.2 | 88.2 | 86.9 | 84.9 | 84.2 | |
| Polunsky | 89.8 | 90.4 | 91.9 | 90.1 | 92.4 | 90.2 | 91.4 | 92.9 | 91.4 | 90.6 | 91.4 | 90.9 | 91.3 | 91.7 | 91.5 | 92.9 | 91.9 | 93.9 | 93.2 | 93.0 | 93.3 | 92.7 | 91.8 | 91.6 | 88.3 | 88.5 | 80.6 | 86.4 | 85.3 | | |
| Powledge | 89.3 | 88.7 | 91.7 | 89.3 | 89.1 | 90.7 | 90.7 | 91.1 | 89.3 | 89.1 | 89.9 | 90.3 | 89.5 | 90.0 | 90.9 | 89.7 | 92.1 | 89.9 | 89.7 | 92.1 | 89.0 | 91.7 | 90.3 | 88.8 | 88.9 | 85.9 | 87.7 | 86.5 | 85.2 | 86.5 | |

TIEDE DEF_87768

ATTORNEYS EYES ONLY
WORKING PAPERS

# Office of Quality Assurance
## Senate Bill 1, Rider 56
## Monthly Temperatures

### August 2024

| | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 | 18 | 19 | 20 | 21 | 22 | 23 | 24 | 25 | 26 | 27 | 28 | 29 | 30 | 31 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Ramsey** | 90.2 | 90.8 | 91.8 | 87.9 | 90.2 | 91.2 | 92.3 | 90.9 | 93.2 | 100.1 | 101.3 | 91.5 | 81.9 | 91.6 | 90.1 | 91.7 | 92.3 | 92.4 | 92.1 | 93.6 | 92.8 | 92.6 | 92.3 | 91.5 | 91.2 | 85.5 | 83.5 | 86.8 | 85.4 | 83.5 | 84.6 |
| **Roach** | 96.4 | 93.1 | 92.1 | 92.6 | 91.6 | 89.2 | 93.1 | 94.9 | 89.0 | 82.9 | 92.0 | 91.1 | 94.3 | 93.9 | 97.8 | 91.4 | 91.7 | 92.1 | 93.5 | 92.7 | 95.6 | 92.6 | 95.7 | 93.5 | 95.8 | 92.0 | 89.1 | 89.0 | 88.9 | 84.3 | 83.2 |
| **Robertson** | 95.1 | 97.3 | 94.8 | 95.6 | 93.0 | 94.9 | 99.6 | 98.3 | 92.6 | 95.2 | 95.7 | 93.7 | 95.2 | 95.4 | 96.3 | 98.2 | 99.3 | 98.2 | 98.3 | 98.3 | 99.5 | 101.8 | 99.1 | 97.1 | 92.1 | 90.8 | 89.8 | 89.0 | 88.4 | 87.9 | 85.5 |
| **Sanchez** | 86.4 | 92.2 | 88.5 | 85.6 | 86.0 | 89.5 | 86.9 | 90.2 | 87.3 | 85.5 | 91.5 | 89.9 | 91.3 | 88.4 | 88.7 | 90.5 | 86.5 | 87.7 | 91.2 | 88.1 | 92.7 | 95.0 | 88.3 | 87.6 | 86.2 | 85.9 | 81.3 | 81.8 | 85.6 | 85.3 | 79.6 |
| **Segovia** | 91.9 | 92.5 | 92.0 | 90.4 | 94.5 | 95.3 | 95.1 | 94.2 | 91.9 | 95.3 | 88.6 | 92.7 | 94.3 | 94.2 | 95.8 | 93.4 | 93.4 | 93.2 | 91.9 | 93.2 | 97.7 | 94.2 | 94.5 | 89.8 | 94.2 | 87.1 | 91.2 | 89.5 | 87.1 | 89.7 | 92.8 |
| **Smith** | 89.6 | 90.2 | 89.5 | 88.1 | 86.3 | 87.0 | 89.2 | 90.3 | 88.5 | 88.3 | 89.2 | 89.2 | 89.7 | 89.0 | 90.5 | 89.7 | 90.5 | 91.2 | 90.5 | 90.0 | 91.2 | 92.1 | 91.6 | 90.9 | 89.9 | 89.5 | 87.2 | 86.1 | 85.6 | 84.6 | 82.6 |
| **Stevenson** | 89.5 | 89.3 | 91.3 | 92.3 | 90.3 | 90.5 | 92.5 | 91.4 | 92.4 | 92.0 | 92.3 | 91.7 | 91.6 | 91.4 | 90.5 | 92.0 | 91.7 | 92.5 | 92.2 | 93.2 | 94.2 | 93.5 | 92.4 | 92.0 | 93.4 | 86.8 | 90.6 | 88.9 | 87.5 | 89.5 | 89.3 |
| **Stiles** | 89.5 | 89.3 | 91.5 | 91.0 | 89.1 | 90.2 | 92.1 | 90.2 | 89.8 | 93.0 | 92.0 | 89.8 | 88.6 | 90.4 | 90.8 | 90.0 | 91.2 | 92.0 | 89.0 | 91.8 | 90.2 | 89.5 | 91.3 | 90.3 | 90.2 | 83.0 | 84.9 | 85.5 | 82.5 | 81.8 | 83.4 |
| **Stringfellow** | 93.9 | 92.3 | 92.8 | 89.9 | 91.2 | 89.5 | 91.0 | 87.4 | 84.2 | 87.7 | 92.8 | 89.1 | 89.8 | 90.6 | 92.1 | 91.6 | 90.1 | 91.7 | 91.6 | 91.6 | 88.6 | 88.6 | 89.4 | 89.7 | 87.3 | 83.7 | 81.9 | 87.1 | 83.8 | 81.8 | 81.3 |
| **Telford** | 87.1 | 88.9 | 88.0 | 87.7 | 88.8 | 89.5 | 90.7 | 88.0 | 87.8 | 89.1 | 85.7 | 89.4 | 91.6 | 89.5 | 90.3 | 91.4 | 89.5 | 91.3 | 90.2 | 87.8 | 88.6 | 86.3 | 86.1 | 87.4 | 88.7 | 87.3 | 90.0 | 89.0 | 87.9 | 86.1 | 86.3 |
| **Terrell** | 91.7 | 92.6 | 89.4 | 90.1 | 91.2 | 92.0 | 92.9 | 93.1 | 93.7 | 96.0 | 96.0 | 93.0 | 92.3 | 91.7 | 91.3 | 91.7 | 92.1 | 93.0 | 93.1 | 93.2 | 93.4 | 93.0 | 92.7 | 88.9 | 91.8 | 84.8 | 81.7 | 87.3 | 86.5 | 78.8 | 85.6 |
| **Torres** | 87.9 | 90.7 | 90.4 | 89.5 | 90.3 | 91.1 | 90.0 | 88.0 | 88.9 | 90.9 | 90.9 | 89.2 | 91.1 | 92.4 | 92.5 | 92.2 | 92.4 | 91.7 | 93.3 | 96.8 | 96.2 | 94.4 | 92.5 | 92.6 | 93.9 | 89.0 | 90.5 | 87.1 | 87.2 | 85.5 | |
| **Vance** | 94.1 | 94.2 | 92.4 | 95.7 | 94.8 | 95.4 | 95.2 | 96.1 | 96.5 | 92.6 | 93.2 | 94.0 | 93.5 | 96.5 | 95.8 | 95.1 | 95.8 | 95.6 | 94.6 | 95.0 | 97.1 | 97.1 | 95.8 | 95.6 | 94.8 | 86.7 | 87.6 | 90.0 | 89.5 | 74.7 | 89.1 |
| **Wainwright** | 88.8 | 90.8 | 90.6 | 90.2 | 89.7 | 90.1 | 92.1 | 88.4 | 89.4 | 87.6 | 87.6 | 88.0 | 89.0 | 89.9 | 87.7 | 86.7 | 88.6 | 90.0 | 89.9 | 89.8 | 89.3 | 89.3 | 88.0 | 90.4 | 88.5 | 87.5 | 85.5 | 86.4 | 84.1 | 81.4 | 82.8 |
| **Wallace** | 93.4 | 94.1 | 95.3 | 94.0 | 93.2 | 97.0 | 97.1 | 94.5 | 92.0 | 91.3 | 96.1 | 92.3 | 93.3 | 94.2 | 94.8 | 92.8 | 94.6 | 95.7 | 95.5 | 95.3 | 94.9 | 95.1 | 95.4 | 94.2 | 93.2 | 89.6 | 86.1 | 88.2 | 88.3 | 89.5 | |
| **Wheeler** | 83.4 | 86.5 | 84.7 | 82.7 | 83.7 | 86.3 | 87.9 | 88.5 | 80.6 | 81.7 | 84.2 | 82.4 | 85.8 | 82.0 | 81.7 | 82.5 | 84.5 | 84.6 | 83.7 | 84.7 | 85.1 | 81.7 | 86.0 | 87.2 | 85.8 | 79.6 | 77.8 | 80.3 | 77.9 | 73.8 | 79.7 |
| **Woodman** | 88.7 | 93.8 | 89.7 | 91.7 | 93.0 | 94.2 | 91.3 | 94.2 | 92.3 | 94.1 | 94.9 | 93.1 | 94.6 | 93.9 | 92.0 | 93.9 | 95.4 | 93.2 | 96.8 | 100.6 | 99.6 | 100.1 | 96.1 | 92.1 | 90.3 | 90.1 | 89.6 | 92.2 | 91.7 | 89.0 | 90.2 |
| **Wynne** | 89.1 | 92.0 | 91.8 | 92.0 | 90.9 | 93.3 | 92.3 | 93.3 | 92.1 | 91.3 | 92.0 | 92.7 | 93.0 | 92.1 | 92.6 | 93.1 | 93.5 | 94.3 | 94.0 | 94.2 | 93.4 | 93.3 | 92.6 | 91.6 | 91.4 | 86.2 | 83.9 | 87.5 | 81.1 | 85.2 | 84.5 |
| **Young** | 91.7 | 92.6 | 95.5 | 90.2 | 94.2 | 91.4 | 92.0 | 93.4 | 93.5 | 91.1 | 91.0 | 89.1 | 91.2 | 93.1 | 91.2 | 94.3 | 93.1 | 96.1 | 94.6 | 96.1 | 95.7 | 94.7 | 90.1 | 92.4 | 93.0 | 86.1 | 81.7 | 89.6 | 82.7 | 79.8 | 85.2 |

ATTORNEYS EYES ONLY
WORKING PAPERS

# Office of Quality Assurance
## Senate Bill 1, Rider 56
## Monthly Temperatures

## September 2024

| | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 | 18 | 19 | 20 | 21 | 22 | 23 | 24 | 25 | 26 | 27 | 28 | 29 | 30 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Allred | 89.4 | 85.1 | 81.0 | 80.5 | 83.9 | 85.8 | 82.6 | 81.2 | 79.4 | 82.1 | 84.1 | 85.2 | 88.7 | 92.7 | 88.7 | 86.9 | 86.2 | 87.7 | 89.2 | 91.7 | 90.4 | 89.2 | 78.1 | 84.1 | 80.7 | 82.7 | 82.0 | 82.1 | 82.2 | 81.4 |
| Beto | 83.4 | 84.5 | 83.7 | 81.6 | 84.5 | 82.7 | 81.2 | 80.6 | 79.1 | 80.5 | 81.6 | 80.4 | 82.2 | 83.5 | 84.2 | 82.7 | 81.7 | 83.1 | 85.7 | 85.8 | 87.1 | 84.9 | 80.9 | 81.8 | 78.9 | 79.7 | 79.1 | 77.9 | 78.8 | 80.7 |
| Boyd | 88.2 | 89.3 | 88.5 | 85.7 | 87.2 | 86.0 | 85.0 | 82.5 | 82.0 | 82.5 | 82.1 | 76.5 | 90.2 | 89.7 | 91.8 | 87.7 | 88.2 | 89.1 | 89.5 | 92.1 | 90.2 | 91.3 | 82.8 | 85.2 | 82.1 | 82.8 | 82.9 | 83.0 | 82.9 | 88.6 |
| Bradshaw | 81.5 | 83.7 | 79.8 | 81.7 | 82.2 | 80.0 | 81.2 | 78.9 | 81.2 | 81.8 | 75.1 | 82.7 | 83.9 | 85.9 | 83.3 | 85.5 | 86.1 | 87.0 | 88.4 | 92.8 | 93.3 | 85.1 | 81.9 | 85.0 | 80.1 | 77.8 | 77.8 | 80.7 | 84.4 | 84.4 |
| Briscoe | 91.1 | 98.3 | 86.8 | 88.7 | 88.8 | 95.1 | 90.7 | 87.8 | 87.7 | 91.8 | 93.0 | 97.0 | 93.6 | 98.2 | 91.5 | 94.3 | 95.6 | 98.0 | 92.7 | 92.4 | 88.3 | 90.2 | 90.9 | 96.3 | 98.7 | 85.1 | 88.1 | 90.2 | 94.0 | 90.6 |
| Byrd | 81.5 | 78.5 | 83.8 | 83.4 | 77.6 | 81.3 | 73.5 | 73.6 | 76.4 | 81.4 | 78.2 | 78.7 | 87.7 | 88.9 | 87.7 | 87.5 | 87.6 | 87.3 | 87.5 | 87.7 | 83.0 | 88.9 | 86.5 | 86.2 | 85.4 | 84.3 | 84.1 | 82.7 | 82.4 | 81.7 |
| Clemens | 81.2 | 80.2 | 81.4 | 83.5 | 83.1 | 84.7 | 83.6 | 80.6 | 78.7 | 85.0 | 85.1 | 80.5 | 83.5 | 84.4 | 88.6 | 83.6 | 83.0 | 87.9 | 87.2 | 83.4 | 84.4 | 82.5 | 85.5 | 84.2 | 82.3 | 80.9 | 82.2 | 82.9 | 81.2 | |
| Clemons | 79.0 | 78.6 | 76.8 | 77.9 | 78.1 | 76.8 | 77.6 | 78.4 | 79.0 | 79.7 | 78.1 | 79.1 | 78.8 | 84.4 | 80.1 | 82.0 | 80.9 | 80.6 | 84.1 | 84.9 | 80.2 | 71.8 | 68.5 | 72.5 | 73.3 | 75.5 | 77.3 | 77.5 | 77.6 | 77.7 |
| Coffield | 84.3 | 86.0 | 84.7 | 85.4 | 84.7 | 84.4 | 82.5 | 78.2 | 77.8 | 82.3 | 85.3 | 77.1 | 86.3 | 87.2 | 83.8 | 83.2 | 84.7 | 88.0 | 87.7 | 87.3 | 83.2 | 81.3 | 80.2 | 79.9 | 79.7 | 81.1 | 81.2 | 80.8 | | |
| Cole | 88.1 | 85.6 | 77.8 | 78.8 | 88.2 | 80.2 | 83.1 | 82.1 | 84.1 | 86.4 | 80.2 | 83.8 | 86.4 | 85.5 | 86.8 | 84.4 | 85.1 | 91.3 | 98.1 | 92.6 | 87.9 | 88.0 | 82.3 | 87.4 | 80.9 | 82.5 | 82.9 | 82.5 | 84.4 | 86.0 |
| Connally | 86.8 | 87.5 | 90.2 | 85.0 | 83.2 | 92.0 | 86.0 | 82.6 | 84.1 | 86.0 | 86.8 | 88.1 | 88.7 | 89.7 | 89.7 | 87.8 | 89.1 | 90.2 | 88.3 | 89.6 | 88.9 | 89.7 | 83.3 | 88.7 | 89.4 | 87.0 | 87.5 | 87.6 | 86.6 | 88.1 |
| Crain | 83.5 | 84.4 | 83.9 | 79.5 | 86.2 | 88.4 | 86.9 | 83.6 | 84.1 | 83.8 | 84.7 | 88.4 | 90.5 | 96.2 | 91.1 | 90.9 | 89.1 | 95.7 | 94.6 | 96.3 | 91.1 | 91.4 | 83.1 | 87.4 | 80.2 | 81.1 | 85.4 | 86.4 | 88.5 | 87.4 |
| Dalhart | 79.8 | 80.9 | 81.4 | 79.8 | 79.8 | 76.5 | 81.4 | 82.8 | 81.7 | 88.3 | 82.8 | 81.5 | 83.1 | 84.1 | 84.8 | 83.4 | 84.3 | 83.7 | 84.8 | 82.4 | 78.3 | 72.6 | 72.4 | 77.0 | 79.4 | 81.5 | 81.3 | 80.2 | 82.3 | 82.4 |
| Daniel | 80.7 | 70.9 | 73.4 | 74.5 | 77.5 | 79.1 | 79.4 | 80.0 | 79.5 | 78.9 | 80.0 | 80.5 | 81.2 | 81.7 | 81.5 | 83.5 | 83.2 | 84.2 | 85.4 | 84.8 | 83.5 | 84.3 | 75.3 | 72.8 | 77.9 | 77.5 | 80.4 | 80.1 | 78.1 | 78.9 |
| Dominguez | 88.6 | 84.6 | 88.5 | 91.0 | 85.5 | 89.4 | 85.0 | 84.1 | 82.5 | 85.7 | 87.5 | 86.4 | 88.6 | 85.5 | 86.6 | 87.5 | 89.8 | 88.1 | 88.0 | 89.9 | 87.3 | 88.6 | 89.7 | 85.5 | 84.6 | 86.0 | 87.2 | 85.2 | | |
| Ellis | 86.1 | 86.8 | 88.8 | 86.7 | 81.4 | 81.5 | 84.2 | 81.8 | 83.4 | 79.3 | 80.4 | 89.3 | 88.1 | 90.3 | 84.2 | 88.0 | 88.7 | 87.7 | 86.5 | 88.4 | 85.6 | 82.7 | 75.3 | 83.7 | 88.3 | 82.3 | 85.3 | 88.1 | | |
| Estelle | 80.5 | 82.1 | 89.2 | 84.9 | 83.8 | 82.3 | 83.3 | 82.7 | 80.3 | 82.5 | 78.7 | 79.1 | 80.0 | 83.2 | 89.2 | 84.8 | 87.4 | 87.1 | 87.7 | 86.6 | 84.6 | 86.3 | 83.8 | 85.7 | 84.2 | 81.8 | 83.0 | 82.1 | 82.2 | 79.1 |
| Ferguson | 85.0 | 88.0 | 90.4 | 85.5 | 84.9 | 87.0 | 82.6 | 81.8 | 86.8 | 87.5 | 82.8 | 80.4 | 87.2 | 89.3 | 89.9 | 88.0 | 86.8 | 90.0 | 89.8 | 92.3 | 91.1 | 91.0 | 88.7 | 89.6 | 85.0 | 84.0 | 82.5 | 82.7 | 81.7 | 86.8 |
| Formby | 80.2 | 73.9 | 81.6 | 80.6 | 82.9 | 81.3 | 82.5 | 83.5 | 81.5 | 82.5 | 83.6 | 83.3 | 87.3 | 89.2 | 84.9 | 85.8 | 85.4 | 87.0 | 88.1 | 87.5 | 81.4 | 67.2 | 77.4 | 81.1 | 77.7 | 81.5 | 84.6 | 82.4 | 80.4 | 83.5 |
| Garza East | 91.5 | 89.1 | 89.6 | 85.9 | 88.2 | 86.5 | 90.1 | 87.5 | 86.8 | 88.3 | 89.2 | 95.0 | 91.5 | 94.9 | 84.8 | 92.1 | 92.2 | 94.2 | 91.4 | 91.1 | 91.7 | 89.8 | 91.7 | 90.7 | 93.7 | 87.3 | 89.1 | 91.6 | 92.1 | 90.9 |
| Garza West | 97.0 | 92.2 | 95.3 | 84.7 | 92.2 | 90.5 | 93.9 | 87.9 | 90.4 | 96.1 | 93.8 | 97.6 | 99.1 | 99.6 | 89.1 | 96.6 | 97.4 | 98.0 | 89.0 | 93.7 | 96.6 | 92.8 | 97.3 | 96.2 | 96.5 | 93.0 | 95.1 | 95.0 | 94.1 | 97.3 |
| Gist | 91.7 | 88.2 | 98.4 | 96.0 | 94.5 | 90.4 | 88.3 | 89.1 | 87.6 | 86.8 | 86.5 | 91.1 | 92.5 | 93.3 | 93.1 | 91.3 | 92.3 | 93.4 | 93.0 | 91.2 | 90.8 | 91.2 | 94.4 | 94.6 | 86.4 | 83.2 | 87.6 | 92.0 | 89.9 | |
| Goodman | 80.5 | 81.7 | 88.6 | 85.6 | 81.2 | 78.2 | 81.2 | 80.9 | 83.4 | 77.8 | 74.8 | 74.4 | 86.5 | 89.4 | 80.0 | 80.6 | 82.1 | 88.5 | 89.3 | 88.6 | 88.8 | 85.7 | 86.8 | 84.3 | 77.0 | 82.9 | 82.0 | 83.4 | 83.6 | 86.7 |
| Goree | 81.3 | 87.3 | 85.5 | 81.1 | 80.5 | 77.6 | 80.1 | 77.3 | 77.9 | 78.3 | 80.2 | 79.3 | 80.0 | 84.6 | 84.2 | 83.6 | 81.5 | 82.2 | 83.3 | 84.6 | 87.0 | 87.5 | 86.5 | 84.9 | 82.6 | 79.7 | 80.0 | 82.6 | 85.9 | |
| Hightower | 84.4 | 87.7 | 89.3 | 86.1 | 83.2 | 80.5 | 83.5 | 83.1 | 85.3 | 83.3 | 91.5 | 82.0 | 87.9 | 90.1 | 89.2 | 90.0 | 89.9 | 91.5 | 87.6 | 83.2 | 93.0 | 85.4 | 86.8 | 90.9 | 86.6 | 86.1 | 87.5 | 86.1 | 88.5 | 87.9 |
| Hilltop | 86.1 | 83.1 | 82.6 | 80.0 | 81.4 | 83.0 | 80.1 | 79.3 | 83.4 | 79.5 | 83.3 | 82.0 | 85.6 | 91.8 | 98.3 | 88.7 | 85.2 | 87.9 | 88.7 | 90.9 | 88.4 | 87.2 | 79.1 | 86.4 | 76.1 | 77.6 | 78.6 | 81.2 | 79.7 | 79.9 |
| Hobby | 89.0 | 87.2 | 86.2 | 82.2 | 84.7 | 84.5 | 84.7 | 81.5 | 83.6 | 79.9 | 82.3 | 81.4 | 83.0 | 89.3 | 92.1 | 85.7 | 88.7 | 87.8 | 89.0 | 91.7 | 88.9 | 88.3 | 84.7 | 87.7 | 80.7 | 81.3 | 81.2 | 81.3 | 83.8 | 84.1 |
| Holliday | 86.3 | 90.2 | 91.8 | 87.8 | 82.4 | 82.2 | 86.7 | 80.6 | 81.7 | 83.3 | 81.5 | 81.7 | 84.3 | 86.3 | 87.9 | 84.4 | 92.6 | 87.9 | 86.0 | 86.4 | 85.8 | 86.7 | 89.1 | 85.2 | 88.1 | 88.9 | 82.1 | 88.2 | 82.2 | 83.7 |
| Hughes | 89.0 | 87.2 | 79.2 | 81.1 | 85.1 | 84.8 | 84.9 | 82.7 | 78.4 | 81.8 | 84.7 | 78.4 | 81.6 | 84.7 | 84.9 | 86.8 | 88.8 | 88.5 | 89.5 | 89.6 | 80.9 | 84.2 | 80.5 | 79.8 | 79.5 | 80.8 | 83.7 | 84.3 | | |
| Huntsville | 86.4 | 86.3 | 85.5 | 81.4 | 83.7 | 82.3 | 82.9 | 81.1 | 82.1 | 82.2 | 80.1 | 79.7 | 85.2 | 89.9 | 87.2 | 86.9 | 86.9 | 89.5 | 87.7 | 86.9 | 89.3 | 86.5 | 85.8 | 85.9 | 86.5 | 81.6 | 85.3 | 82.8 | 85.1 | 85.3 |
| Hutchins | 87.8 | 89.2 | 79.5 | 80.7 | 86.4 | 88.2 | 85.3 | 82.3 | 82.6 | 85.3 | 80.1 | 81.4 | 89.4 | 89.0 | 88.0 | 87.2 | 90.7 | 91.4 | 92.4 | 91.9 | 89.9 | 82.6 | 85.8 | 81.0 | 83.0 | 74.5 | 85.3 | 84.5 | 86.5 | |
| Jester III | 85.2 | 84.0 | 83.3 | 87.9 | 82.6 | 82.5 | 83.9 | 82.9 | 84.1 | 84.8 | 83.1 | 83.1 | 92.4 | 90.2 | 88.0 | 89.1 | 88.8 | 88.4 | 89.8 | 88.6 | 89.1 | 92.7 | 87.5 | 87.1 | 84.2 | 83.8 | 85.1 | 85.0 | 82.4 | 85.7 |
| Jordan | 80.6 | 79.4 | 78.6 | 80.4 | 81.8 | 78.9 | 79.5 | 81.5 | 79.4 | 79.4 | 79.8 | 80.5 | 83.6 | 83.7 | 82.6 | 84.1 | 84.2 | 83.2 | 86.3 | 87.6 | 80.1 | 77.1 | 77.1 | 82.0 | 79.7 | 78.7 | 78.8 | 78.8 | 82.0 | 80.0 |
| Lewis | 94.7 | 95.6 | 87.4 | 94.1 | 82.0 | 87.4 | 85.2 | 81.2 | 83.0 | 80.9 | 84.1 | 79.6 | 88.4 | 96.2 | 91.5 | 90.1 | 92.2 | 92.9 | 95.8 | 98.6 | 93.5 | 89.3 | 89.0 | 87.1 | 89.8 | 83.2 | 87.1 | 83.2 | 84.1 | 88.2 |
| Lopez | 93.6 | 87.2 | 86.2 | 84.3 | 83.6 | 84.3 | 90.7 | 88.7 | 78.2 | 83.6 | 90.5 | 90.2 | 89.7 | 90.3 | 83.6 | 86.6 | 90.1 | 89.7 | 91.9 | 89.9 | 89.7 | 87.1 | 89.3 | 88.7 | 88.9 | 86.7 | 87.3 | 87.0 | 97.2 | 92.2 |
| Luther | 81.6 | 86.0 | 86.9 | 84.7 | 82.2 | 81.7 | 81.1 | 80.5 | 81.7 | 82.5 | 80.0 | 80.6 | 83.4 | 89.1 | 86.3 | 84.3 | 86.1 | 87.0 | 87.4 | 87.1 | 87.5 | 87.2 | 84.9 | 86.3 | 85.0 | 83.7 | 81.5 | 82.5 | 83.3 | 84.2 |
| Lychner | 87.7 | 90.4 | 92.9 | 91.1 | 87.3 | 81.5 | 91.4 | 87.8 | 90.2 | 86.8 | 87.2 | 87.0 | 93.5 | 95.5 | 95.3 | 91.8 | 93.5 | 92.3 | 97.6 | 95.9 | 96.5 | 95.7 | 92.7 | 93.9 | 93.7 | 90.2 | 92.2 | 91.8 | 90.2 | 91.8 |
| Lynaugh | 81.6 | 78.9 | 72.9 | 79.7 | 84.4 | 76.6 | 77.5 | 77.6 | 78.7 | 78.3 | 81.5 | 84.1 | 80.9 | 78.7 | 83.4 | 80.2 | 88.7 | 86.9 | 86.1 | 79.4 | 81.7 | 79.8 | 81.2 | 80.5 | 74.0 | 77.9 | | | | |
| Mcconnell | 90.2 | 89.4 | 88.5 | 86.2 | 87.0 | 83.8 | 86.3 | 84.7 | 84.2 | 86.3 | 88.1 | 87.8 | 87.3 | 89.8 | 85.0 | 86.8 | 87.7 | 88.9 | 85.5 | 85.5 | 87.7 | 87.6 | 89.1 | 89.7 | 88.0 | 83.9 | 89.5 | 87.5 | 88.5 | 87.8 |
| Memorial | 84.5 | 81.2 | 80.7 | 82.6 | 85.5 | 84.5 | 84.5 | 82.4 | 82.2 | 81.7 | 84.2 | 84.7 | 84.2 | 83.4 | 83.6 | 85.1 | 80.3 | 86.1 | 86.7 | 87.7 | 86.9 | 85.1 | 83.3 | 84.1 | 83.5 | 83.9 | 84.3 | 82.7 | 84.3 | 82.6 |
| Michael | 88.3 | 88.1 | 86.4 | 87.0 | 85.7 | 87.2 | 85.1 | 80.9 | 80.9 | 81.8 | 82.6 | 79.4 | 83.1 | 88.2 | 86.9 | 85.8 | 85.3 | 85.0 | 85.7 | 87.9 | 87.5 | 86.7 | 85.4 | 82.5 | 82.6 | 79.8 | 80.9 | 81.5 | 83.2 | |
| Middleton | 81.4 | 77.1 | 74.6 | 76.4 | 85.6 | 80.0 | 85.5 | 85.1 | 83.2 | 82.4 | 83.2 | 84.4 | 90.1 | 90.9 | 91.5 | 88.5 | 91.2 | 88.5 | 92.5 | 91.3 | 89.2 | 88.5 | 72.9 | 83.8 | 83.8 | 82.3 | 85.5 | 85.9 | 82.5 | 82.6 |
| Montford | 82.6 | 75.9 | 72.5 | 71.4 | 78.2 | 82.3 | 80.5 | 81.7 | 83.4 | 80.7 | 81.9 | 80.3 | 85.7 | 86.2 | 82.0 | 81.9 | 86.3 | 82.6 | 92.2 | 89.5 | 85.5 | 77.7 | 80.0 | 87.5 | 79.3 | 85.6 | 86.4 | 81.6 | 79.7 | 80.6 |
| Moore, C. | 90.2 | 88.9 | 79.2 | 80.1 | 90.2 | 80.1 | 87.3 | 82.9 | 83.7 | 82.5 | 89.8 | 89.4 | 87.2 | 84.5 | 87.4 | 91.2 | 93.7 | 94.4 | 91.3 | 92.5 | 85.4 | 83.0 | 83.3 | 82.9 | 82.5 | 86.7 | 85.7 | | | |
| Murray | 82.6 | 80.6 | 85.5 | 80.5 | 83.7 | 84.4 | 76.9 | 75.7 | 75.7 | 79.2 | 81.1 | 78.2 | 86.5 | 83.1 | 83.7 | 85.2 | 80.0 | 81.7 | 85.1 | 93.3 | 85.1 | 84.3 | 82.9 | 83.7 | 77.3 | 75.1 | 81.1 | 80.5 | 75.9 | 84.2 |
| O'Daniel | 87.5 | 88.5 | 83.5 | 79.5 | 83.5 | 86.0 | 82.0 | 79.0 | 79.1 | 84.9 | 86.1 | 86.3 | 90.1 | 91.0 | 87.8 | 87.0 | 88.7 | 91.9 | 88.3 | 92.6 | 94.3 | 92.0 | 83.0 | 87.0 | 80.0 | 82.0 | 79.1 | 80.6 | 82.3 | 83.4 |

TIEDE DEF_87770

ATTORNEYS EYES ONLY
WORKING PAPERS

# Office of Quality Assurance
## Senate Bill 1, Rider 56
## Monthly Temperatures

### September 2024

| | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 | 18 | 19 | 20 | 21 | 22 | 23 | 24 | 25 | 26 | 27 | 28 | 29 | 30 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Plane** | 88.6 | 89.0 | 90.3 | 83.9 | 83.5 | 81.7 | 83.4 | 81.8 | 84.8 | 85.3 | 81.2 | 82.9 | 85.5 | 91.7 | 89.2 | 86.5 | 88.1 | 88.8 | 86.0 | 88.0 | 90.6 | 91.2 | 86.2 | 86.8 | 88.4 | 86.7 | 85.9 | 87.0 | 86.0 | 86.9 |
| **Polunsky** | 85.1 | 88.3 | 89.5 | 88.4 | 83.0 | 77.4 | 84.1 | 83.5 | 82.0 | 83.5 | 74.6 | 72.9 | 84.7 | 88.3 | 87.3 | 87.1 | 85.5 | 88.1 | 89.1 | 88.6 | 89.4 | 89.5 | 87.9 | 87.3 | 84.9 | 85.0 | 84.0 | 84.4 | 84.5 | 85.6 |
| **Powledge** | 86.1 | 86.3 | 86.6 | 86.1 | 86.3 | 85.2 | 84.8 | 80.6 | 79.4 | 79.9 | 82.9 | 79.5 | 82.4 | 87.9 | 88.2 | 87.2 | 84.5 | 86.1 | 89.6 | 86.6 | 86.9 | 88.6 | 84.3 | 85.0 | 83.5 | 81.4 | 79.8 | 79.3 | 79.3 | 82.2 |
| **Ramsey** | 86.7 | 83.2 | 81.3 | 81.9 | 81.5 | 82.8 | 84.1 | 83.4 | 87.2 | 84.0 | 82.2 | 84.3 | 87.5 | 89.3 | 87.7 | 89.2 | 89.1 | 89.1 | 91.2 | 90.0 | 89.4 | 89.3 | 91.9 | 88.6 | 85.2 | 85.3 | 84.7 | 86.3 | 86.0 | 85.9 |
| **Roach** | 84.1 | 82.1 | 80.9 | 80.7 | 84.2 | 82.8 | 80.0 | 80.2 | 80.1 | 78.6 | 77.9 | 79.0 | 82.6 | 86.1 | 82.6 | 87.2 | 87.7 | 86.5 | 89.9 | 89.3 | 88.8 | 75.8 | 74.6 | 79.2 | 78.5 | 79.7 | 79.2 | 79.2 | 79.4 | 79.7 |
| **Robertson** | 80.2 | 76.7 | 68.4 | 71.5 | 81.2 | 82.8 | 82.0 | 81.0 | 81.2 | 80.5 | 83.0 | 81.8 | 87.1 | 89.3 | 89.6 | 87.6 | 89.5 | 86.1 | 89.5 | 89.8 | 88.1 | 86.7 | 74.9 | 82.5 | 83.4 | 82.6 | 82.5 | 81.5 | 80.6 | 82.5 |
| **Sanchez** | 79.9 | 74.8 | 76.6 | 78.8 | 82.1 | 80.9 | 85.4 | 85.8 | 81.5 | 85.2 | 84.3 | 85.6 | 86.6 | 83.7 | 87.3 | 82.4 | 83.2 | 85.3 | 86.5 | 85.4 | 84.2 | 82.5 | 84.3 | 87.3 | 85.0 | 85.0 | 83.9 | 84.0 | 76.5 | 83.0 |
| **Segovia** | 90.3 | 88.9 | 82.5 | 87.6 | 83.2 | 83.3 | 87.5 | 86.0 | 80.9 | 80.2 | 91.3 | 92.8 | 87.2 | 89.7 | 87.0 | 86.5 | 88.8 | 91.6 | 91.7 | 90.9 | 89.9 | 90.8 | 91.0 | 92.6 | 92.0 | 88.2 | 92.0 | 93.0 | 93.3 | 92.5 |
| **Smith** | 81.4 | 76.3 | 73.9 | 74.9 | 77.5 | 78.9 | 78.7 | 79.3 | 79.1 | 78.9 | 79.1 | 79.9 | 81.6 | 84.0 | 83.5 | 82.6 | 82.3 | 83.2 | 86.0 | 85.3 | 84.0 | 79.2 | 75.2 | 77.7 | 78.2 | 77.8 | 79.2 | 79.5 | 80.3 | 79.8 |
| **Stevenson** | 89.1 | 88.1 | 87.6 | 88.3 | 85.9 | 86.8 | 88.2 | 84.3 | 87.7 | 87.6 | 87.8 | 88.0 | 90.1 | 90.4 | 89.0 | 91.2 | 90.0 | 90.9 | 91.8 | 93.5 | 90.8 | 91.1 | 91.0 | 92.8 | 87.0 | 87.7 | 86.3 | 84.9 | 86.6 | 86.7 |
| **Stiles** | 83.5 | 85.1 | 87.3 | 83.4 | 81.4 | 83.0 | 87.2 | 82.1 | 83.4 | 83.0 | 84.6 | 83.1 | 87.1 | 83.5 | 86.8 | 88.0 | 89.3 | 88.6 | 88.7 | 88.6 | 86.5 | 88.1 | 86.4 | 83.8 | 86.5 | 85.7 | 85.2 | 85.5 |  |  |
| **Stringfellow** | 83.2 | 85.3 | 78.6 | 84.2 | 80.2 | 81.0 | 83.2 | 79.3 | 84.0 | 80.2 | 82.1 | 83.2 | 83.3 | 87.3 | 87.1 | 88.3 | 88.6 | 90.6 | 84.5 | 88.5 | 85.8 | 84.5 | 81.2 | 87.2 | 84.0 | 83.1 | 84.1 | 83.1 | 84.0 | 80.2 |
| **Telford** | 81.4 | 85.6 | 86.7 | 82.8 | 85.3 | 84.8 | 83.2 | 79.5 | 80.2 | 84.3 | 79.4 | 79.1 | 84.6 | 81.2 | 81.5 | 80.5 | 84.3 | 84.1 | 85.1 | 88.3 | 87.1 | 85.2 | 80.2 | 82.2 | 80.1 | 79.9 | 78.8 | 79.8 | 82.9 | 81.7 |
| **Terrell** | 81.7 | 82.4 | 84.2 | 86.0 | 83.0 | 82.2 | 90.2 | 80.6 | 84.5 | 83.0 | 81.5 | 85.4 | 89.4 | 91.1 | 87.4 | 90.8 | 90.4 | 90.7 | 91.0 | 91.1 | 90.5 | 87.2 | 84.7 | 88.0 | 84.1 | 86.0 | 86.3 | 87.2 | 87.8 | 85.6 |
| **Torres** | 89.3 | 85.0 | 84.0 | 87.5 | 84.8 | 88.6 | 85.2 | 84.6 | 84.1 | 85.6 | 88.1 | 83.4 | 89.8 | 88.4 | 88.3 | 92.1 | 88.5 | 90.0 | 93.5 | 88.7 | 85.8 | 86.7 | 87.5 | 88.7 | 91.6 | 85.3 | 87.9 | 87.6 | 88.7 | 87.9 |
| **Vance** | 86.6 | 90.2 | 86.5 | 87.9 | 84.5 | 83.3 | 87.5 | 85.9 | 88.2 | 83.0 | 80.5 | 86.0 | 91.5 | 94.5 | 91.0 | 92.2 | 92.0 | 93.0 | 93.3 | 93.6 | 93.9 | 92.5 | 92.6 | 91.7 | 88.1 | 86.8 | 86.1 | 89.4 | 85.5 | 90.3 |
| **Wainwright** | 83.5 | 87.2 | 87.9 | 84.0 | 84.3 | 84.5 | 82.5 | 79.8 | 81.9 | 81.9 | 81.8 | 80.2 | 84.2 | 90.7 | 87.0 | 84.4 | 85.5 | 87.1 | 89.9 | 89.6 | 89.6 | 90.0 | 88.7 | 85.4 | 79.7 | 82.8 | 80.7 | 81.4 | 82.9 | 86.0 |
| **Wallace** | 83.5 | 75.8 | 72.9 | 73.1 | 74.6 | 76.3 | 84.1 | 80.1 | 88.9 | 78.3 | 84.7 | 88.9 | 86.4 | 88.9 | 86.4 | 81.2 | 84.5 | 85.1 | 88.3 | 88.7 | 89.1 | 95.0 | 91.4 | 89.7 | 75.0 | 83.9 | 84.0 | 84.9 | 83.8 | 83.3 |
| **Wheeler** | 79.3 | 72.5 | 74.5 | 73.4 | 74.5 | 74.2 | 77.6 | 76.7 | 77.2 | 77.8 | 74.6 | 78.6 | 76.7 | 79.7 | 82.7 | 82.5 | 82.8 | 80.5 | 79.2 | 76.7 | 76.4 | 67.9 | 70.8 | 74.9 | 78.1 | 73.8 | 72.7 | 74.3 | 71.3 | 72.5 |
| **Woodman** | 85.2 | 81.4 | 84.4 | 80.6 | 86.8 | 88.4 | 87.5 | 83.9 | 85.5 | 84.9 | 86.1 | 87.8 | 91.2 | 95.4 | 89.3 | 90.0 | 89.1 | 90.0 | 93.2 | 92.1 | 89.4 | 89.7 | 77.6 | 89.8 | 81.1 | 82.7 | 86.1 | 91.6 | 88.7 | 88.9 |
| **Wynne** | 85.1 | 88.6 | 89.8 | 85.8 | 83.3 | 82.0 | 83.7 | 81.0 | 81.9 | 83.9 | 81.2 | 82.1 | 86.8 | 88.5 | 90.4 | 87.6 | 88.2 | 89.2 | 90.2 | 89.7 | 88.7 | 88.6 | 87.7 | 87.2 | 85.5 | 84.0 | 83.9 | 84.5 | 85.9 | 87.5 |
| **Young** | 85.0 | 81.7 | 83.0 | 84.0 | 80.2 | 84.7 | 86.5 | 85.5 | 86.1 | 83.9 | 88.0 | 88.4 | 88.8 | 92.0 | 91.1 | 88.9 | 91.6 | 91.4 | 91.6 | 92.8 | 92.1 | 86.1 | 80.7 | 89.7 | 87.4 | 88.4 | 89.2 | 90.7 | 90.1 | 91.4 |

TIEDE DEF_87771

ATTORNEYS EYES ONLY



www.tdcj.texas.gov

TIEDE DEF_87772

# EXHIBIT 24

Administrative Review and Risk Management
Heat Related Grievances
September 2023 - August 2024

| Step 1 Grievances | September | October | November | December | January | February | March | April | May | June | July | August | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| PERSONAL FAN NOT WORKING/TAKEN AWAY/NO OUTLET IN HOUSING AREA/ETC | 204 | 145 | 106 | 64 | 52 | 90 | 90 | 122 | 153 | 139 | 175 | 188 | 1528 |
| RESPITE NOT AVAILABLE/DENIED/CUT SHORT/ETC | 63 | 12 | 1 | 2 | 1 | 0 | 8 | 5 | 68 | 161 | 228 | 257 | 806 |
| NO COLD WATER/ICE AVAILABLE | 138 | 35 | 11 | 20 | 9 | 17 | 30 | 49 | 77 | 124 | 161 | 134 | 805 |
| EXHAUST/VENTILATION FAN NOT WORKING OR NOT TURNED ON | 8 | 5 | 3 | 4 | 3 | 39 | 19 | 59 | 76 | 90 | 46 | 69 | 421 |
| MEDICAL RESTRICTIONS NOT BEING MET | 23 | 16 | 8 | 7 | 12 | 10 | 16 | 27 | 76 | 47 | 73 | 51 | 366 |
| EXCESSIVE HEAT | 25 | 2 | 1 | 5 | 4 | 0 | 5 | 9 | 43 | 122 | 107 | 92 | 415 |
| NO COLD SHOWERS AVAILABLE | 40 | 3 | 1 | 0 | 0 | 0 | 1 | 3 | 20 | 48 | 47 | 47 | 210 |
| WANTS HEAT RESTRICTIONS REMOVED | 7 | 9 | 5 | 8 | 14 | 4 | 4 | 4 | 6 | 3 | 20 | 10 | 94 |
| PERSONAL FAN NOT PROVIDED | 13 | 7 | 1 | 4 | 25 | 3 | 11 | 9 | 16 | 37 | 26 | 25 | 177 |
| A/C ON UNIT NOT WORKING OR NOT TURNED ON | 2 | 0 | 2 | 13 | 0 | 2 | 1 | 20 | 15 | 3 | 34 | 22 | 114 |
| **TOTAL** | 523 | 234 | 139 | 127 | 120 | 165 | 185 | 307 | 550 | 774 | 917 | 895 | 4936 |

| Step 2 Grievances | September | October | November | December | January | February | March | April | May | June | July | August | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| RESPITE NOT AVAILABLE/DENIED/CUT SHORT/ETC | 31 | 30 | 22 | 5 | 2 | 2 | 2 | 0 | 0 | 3 | 18 | 30 | 145 |
| PERSONAL FAN NOT WORKING/TAKEN AWAY/NO OUTLET IN HOUSING AREA/ETC | 28 | 40 | 42 | 30 | 25 | 13 | 18 | 21 | 29 | 25 | 24 | 23 | 318 |
| NO COLD WATER/ICE AVAILABLE | 22 | 19 | 10 | 2 | 2 | 2 | 3 | 1 | 8 | 6 | 7 | 24 | 106 |
| EXCESSIVE HEAT | 25 | 13 | 9 | 1 | 0 | 0 | 2 | 1 | 3 | 5 | 9 | 17 | 85 |
| MEDICAL RESTRICTIONS NOT BEING MET | 7 | 7 | 7 | 3 | 0 | 3 | 4 | 3 | 13 | 8 | 7 | 9 | 71 |
| WANTS HEAT RESTRICTIONS REMOVED | 0 | 1 | 3 | 3 | 3 | 2 | 3 | 0 | 3 | 2 | 0 | 2 | 22 |
| A/C ON UNIT NOT WORKING OR NOT TURNED ON | 0 | 1 | 1 | 0 | 3 | 0 | 0 | 1 | 0 | 0 | 8 | 2 | 16 |
| NO COLD SHOWERS AVAILABLE | 4 | 7 | 5 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 6 | 7 | 30 |
| PERSONAL FAN NOT PROVIDED | 3 | 1 | 0 | 0 | 0 | 0 | 0 | 1 | 1 | 0 | 1 | 1 | 8 |
| EXHAUST/VENTILATION FAN NOT WORKING OR NOT TURNED ON | 5 | 0 | 4 | 0 | 1 | 0 | 0 | 0 | 5 | 6 | 4 | 3 | 28 |
| **TOTAL** | 125 | 119 | 103 | 44 | 36 | 22 | 33 | 28 | 62 | 55 | 84 | 118 | 829 |

# EXHIBIT 25

Administrative Review and Risk Management
Heat Related Grievances
September 2024 - August 2025

| Step 1 Grievances | September | October | November | December | January | February | March | April | May | June | July | August | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| PERSONAL FAN NOT WORKING/TAKEN AWAY/NO OUTLET IN HOUSING AREA/ETC | 136 | 140 | 92 | 93 | 109 | 136 | 141 | 150 | 165 | 166 | 206 | 236 | 1770 |
| RESPITE NOT AVAILABLE/DENIED/CUT SHORT/ETC | 65 | 23 | 0 | 0 | 1 | 0 | 3 | 15 | 54 | 179 | 167 | 213 | 720 |
| NO COLD WATER/ICE AVAILABLE | 42 | 59 | 16 | 30 | 22 | 25 | 29 | 35 | 60 | 80 | 126 | 102 | 626 |
| EXHAUST/VENTILATION FAN NOT WORKING OR NOT TURNED ON | 7 | 12 | 3 | 20 | 24 | 11 | 13 | 34 | 46 | 26 | 33 | 38 | 267 |
| MEDICAL RESTRICTIONS NOT BEING MET | 20 | 10 | 7 | 7 | 4 | 15 | 12 | 29 | 66 | 52 | 42 | 29 | 293 |
| EXCESSIVE HEAT | 12 | 7 | 2 | 1 | 4 | 4 | 2 | 16 | 37 | 52 | 32 | 52 | 221 |
| NO COLD SHOWERS AVAILABLE | 6 | 4 | 0 | 0 | 0 | 0 | 0 | 5 | 17 | 26 | 34 | 44 | 136 |
| WANTS HEAT RESTRICTIONS REMOVED | 5 | 11 | 4 | 3 | 4 | 7 | 9 | 17 | 9 | 17 | 6 | 8 | 100 |
| PERSONAL FAN NOT PROVIDED | 0 | 3 | 2 | 6 | 1 | 5 | 5 | 5 | 25 | 42 | 33 | 18 | 145 |
| A/C ON UNIT NOT WORKING OR NOT TURNED ON | 5 | 2 | 1 | 1 | 0 | 1 | 3 | 4 | 4 | 8 | 12 | 0 | 41 |
| **TOTAL** | **298** | **271** | **127** | **161** | **169** | **204** | **217** | **310** | **483** | **648** | **691** | **740** | **4319** |

| Step 2 Grievances | September | October | November | December | January | February | March | April | May | June | July | August | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| RESPITE NOT AVAILABLE/DENIED/CUT SHORT/ETC | 23 | 15 | 4 | 4 | 2 | 5 | 0 | 1 | 1 | 7 | 9 | 10 | 81 |
| PERSONAL FAN NOT WORKING/TAKEN AWAY/NO OUTLET IN HOUSING AREA/ETC | 34 | 27 | 24 | 16 | 13 | 8 | 15 | 23 | 18 | 28 | 20 | 22 | 248 |
| NO COLD WATER/ICE AVAILABLE | 18 | 6 | 1 | 2 | 3 | 2 | 2 | 4 | 4 | 4 | 4 | 9 | 59 |
| EXCESSIVE HEAT | 10 | 6 | 5 | 2 | 1 | 2 | 1 | 1 | 1 | 4 | 2 | 10 | 45 |
| MEDICAL RESTRICTIONS NOT BEING MET | 13 | 4 | 4 | 4 | 1 | 1 | 1 | 0 | 3 | 8 | 13 | 10 | 62 |
| WANTS HEAT RESTRICTIONS REMOVED | 0 | 0 | 1 | 3 | 5 | 1 | 2 | 4 | 5 | 5 | 0 | 0 | 26 |
| A/C ON UNIT NOT WORKING OR NOT TURNED ON | 1 | 2 | 0 | 0 | 2 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 6 |
| NO COLD SHOWERS AVAILABLE | 3 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 1 | 2 | 7 |
| PERSONAL FAN NOT PROVIDED | 1 | 0 | 1 | 2 | 1 | 0 | 0 | 0 | 1 | 0 | 1 | 0 | 7 |
| EXHAUST/VENTILATION FAN NOT WORKING OR NOT TURNED ON | 4 | 12 | 1 | 0 | 1 | 0 | 1 | 1 | 0 | 2 | 12 | 4 | 38 |
| **TOTAL** | **107** | **72** | **41** | **33** | **29** | **19** | **23** | **34** | **33** | **59** | **64** | **65** | **579** |

# EXHIBIT 26
# Filed Under Seal

# EXHIBIT 27
# Filed Under Seal

# EXHIBIT 28

AD-10.64 (rev. 11)
Attachment C
Page 17 of 18

## TEXAS DEPARTMENT OF CRIMINAL JUSTICE
### Temperature Log

Unit: Coffield

Cl-22-24

| Date: | Outside Air Temperature | Humidity or Wind Speed | Heat Index or Wind Chill* | Person Recording |
|---|---|---|---|---|
| 12:30 a.m. | 78°/₀ | 72% Calm | 79% | K. Morin |
| 1:30 a.m. | 79% | 71% Calm | 80% | K. Morin |
| 2:30 a.m. | 77°/₀ | 71% Calm | 84% | K. Morin |
| 3:30 a.m. | 76° | 72° Calm | NA | K. Morin |
| 4:30 a.m. | 75° | 72° Calm | 90% Calm | K. Morin |
| 5:30 a.m. | 75° | 72° Calm | 90% Calm | K. Morin |
| 6:30 a.m. | 74° | 72° Calm | 91% Calm | K. Morin |
| 7:30 a.m. | 74° | 80% calm | 88° | Stringfield |
| 8:30 a.m. | 80° | 81% calm | 84° | Stringfield |
| 9:30 a.m. | 84° | 73% calm | 90° | Stringfield |
| 10:30 a.m. | 87° | 62% 4mph | 93° | Stringfield |
| 11:30 a.m. | 91° | 54% 5mph | 98° | Stringfield |
| 12:30 p.m. | 93° | 53% 7mph | 102° | Stringfield |
| 1:30 p.m. | 93° | 53% 4mph | 100° | Stringfield |
| 2:30 p.m. | 94° | 49% 4mph | 102° | Stringfield |
| 3:30 p.m. | 96° | 46% 4mph | 104° | Stringfield |
| 4:30 p.m. | 96° | 46% 4mph | 104° | Stringfield |
| 5:30 p.m. | 96° | 46% 4mph | 104° | Stringfield |
| 6:30 p.m. | 96° | 46% 4mph | 104° | Stringfield |
| 7:30 p.m. | 94° | 50% 4mph | 102 Cat 2 | K. Morin |
| 8:30 p.m. | 92° | 56% 2mph | 102 Cat 2 | K. Morin |
| 9:30 p.m. | 88° | 60% 1mph | 95% Cat 2 | K. Morin |
| 10:30 p.m. | 85° | 72% 2mph | 95% Cat 2 | K. Morin |
| 11:30 p.m. | 81° | 84% 0 | 87 Cat 1 | K. Morin |

* Temperatures between 51 and 79 degrees Fahrenheit (°F) are not represented on the Wind Chill Index (Attachment A) or the Heat and Humidity Index (Attachment B). Indicate (N/A) in these fields when applicable.

TIEDE DEF_204508

AD-10.64 (rev. 11)
Attachment C
Page 17 of 18

## TEXAS DEPARTMENT OF CRIMINAL JUSTICE
### Temperature Log

6/23/24

Unit: _Coffield_

| Date: | Outside Air Temperature | Humidity or Wind Speed | | Heat Index or Wind Chill* | Person Recording |
|---|---|---|---|---|---|
| 12:30 a.m. | 81° | 84% Cat | | 87° | K Morin |
| 1:30 a.m. | 81° | 84% Cat | | 87° | K Morin |
| 2:30 a.m. | 80° | 86% Cat | | 76° | K Morin |
| 3:30 a.m. | 79° | 85% | | 77° 4mph | K Morin |
| 4:30 a.m. | 78° | 83% | | 78° 5mph | K Morin |
| 5:30 a.m. | 77° | 85% | | 72 5mph | K Morin |
| 6:30 a.m. | 77 | 85 | 2 | 72 | Morin |
| 7:30 a.m. | 78 | 82 | 2 | 72 | stevenson |
| 8:30 a.m. | 81 | 75 | 3 | 85 | Stevenson |
| 9:30 a.m. | 85 | 66 | 7 | 91 | Stevenson |
| 10:30 a.m. | 88 | 60 | 4 | 94 | Stevenson |
| 11:30 a.m. | 91 | 58 | 2 | 100 | Stevenson |
| 12:30 p.m. | 93 | 55 | 2 | 103 | Stevenson |
| 1:30 p.m. | 94 | 53 | 5 | 104 | Stevenson |
| 2:30 p.m. | 94 | 52 | 8 | 104 | Stevenson |
| 3:30 p.m. | 96 | 50 | 4 | 107 | Stevenson |
| 4:30 p.m. | 95 | 46 | 2 | 102 | Stevenson |
| 5:30 p.m. | 95 | 49 | 6 | 104 | Stevenson |
| 6:30 p.m. | 95 | 80 | 6 | 105 | Stevenson |
| 7:30 p.m. | 94 | 52% | 5 | 104 | Bland |
| 8:30 p.m. | 91 | 60% | 2 | 102 | Bland |
| 9:30 p.m. | 87 | 73% | 2 | 94 | Bland |
| 10:30 p.m. | 85 | 78% | 0 | 91 | Bland |
| 11:30 p.m. | 83 | 98% | 0 | 89° | Bland |

* Temperatures between 51 and 79 degrees Fahrenheit (°F) are not represented on the Wind Chill Index (Attachment A) or the Heat and Humidity Index (Attachment B). Indicate (N/A) in these fields when applicable.

TIEDE DEF_204509

AD-10.64 (rev. 11)
Attachment C
Page 17 of 18

## TEXAS DEPARTMENT OF CRIMINAL JUSTICE
### Temperature Log

6/24/24 _____ Unit: Coffield _____

| Date: | Outside Air Temperature | Humidity or Wind Speed | | Heat Index or Wind Chill* | Person Recording |
|---|---|---|---|---|---|
| 12:30 a.m. | 82 | 86% | 0 | 78° | Bland |
| 1:30 a.m. | 78° | 87% | 0 | 74° | Bland |
| 2:30 a.m. | 78 | 68% | 0 | 73° | Bland |
| 3:30 a.m. | 77 | 88% | 4 | 73° | Bland |
| 4:30 a.m. | 74 | 90% | 3 | 72 | Bland |
| 5:30 a.m. | 74 | 91% | 4 | 72 | Bland |
| 6:30 a.m. | 77°F | 90% | 4mph | 73°F | OGUNBIYI |
| 7:30 a.m. | 78°F | 88% | 4mph | 74°F | OGUNBIYI |
| 8:30 a.m. | 82°F | 82% | 4mph | 89°F CAT. 1 | OGUNBIYI |
| 9:30 a.m. | 86°F | 75% | 6mph | 97°F CAT 2 | OGUNBIYI |
| 10:30 a.m. | 89°F | 66% | 5mph | 100°F CAT2 | OGUNBIYI |
| 11:30 a.m. | 92°F | 56% | 9mph | 102°F CAT 2 | OGUNBIYI |
| 12:30 p.m. | 93°F | 55% | 6mph | 104°F CAT 2 | OGUNBIYI |
| 1:30 p.m. | 94°F | 52% | 8mph | 106°F CAT 3 | OGUNBIYI |
| 2:30 p.m. | 95°F | 51% | 9mph | 104°F CAT 2 | OGUNBIYI |
| 3:30 p.m. | 96°F | 48% | 7mph | 106°F CAT 3 | OGUNBIYI |
| 4:30 p.m. | 96°F | 47% | 11mph | 105°F CAT 2 | OGUNBIYI |
| 5:30 p.m. | 96°F | 49% | 8mph | 106°F CAT 3 | OGUNBIYI |
| 6:30 p.m. | 95°F | 49% | 7mph | 104°F CAT 2 | OGUNBIYI |
| 7:30 p.m. | 93°F | 55% | 5mph | 102° | Bland |
| 8:30 p.m. | 90°F | 62% | 2 | 100° | Bland |
| 9:30 p.m. | 87°F | 68% | 2 | 96° | Bland |
| 10:30 p.m. | 85° | 74% | 3 | 93° | Bland |
| 11:30 p.m. | 83 | 89% | 4 | 90° | Bland |

* Temperatures between 51 and 79 degrees Fahrenheit (°F) are not represented on the Wind Chill Index (Attachment A) or the Heat and Humidity Index (Attachment B). Indicate (N/A) in these fields when applicable.

TIEDE DEF_204510

## TEXAS DEPARTMENT OF CRIMINAL JUSTICE
### Temperature Log

6/25/24

Unit: Cotfield

| Date: | Outside Air Temperature | Humidity or Wind Speed | | Heat Index or Wind Chill* | Person Recording |
|---|---|---|---|---|---|
| 12:30 a.m. | 81° | 81% | 4 | 86° | Bland |
| 1:30 a.m. | 81° | 82% | 4 | 84° | Bland |
| 2:30 a.m. | 80° | 85% | 4 | 75 | Bland |
| 3:30 a.m. | 79° | 85% | 4 | 78 | Bland |
| 4:30 a.m. | 78° | 88% | 4 | 73 | Bland |
| 5:30 a.m. | 77 | 89% | 5 | 73 | Bland |
| 6:30 a.m. | 77°F | 89% | 5mph | 74°F | Bland |
| 7:30 a.m. | 78°F | 89% | 5mph | 75°F | Ogunbiyi C |
| 8:30 a.m. | 82°F | 82% | 10 mph | 89°F CAT 1 | Ogunbiyi C |
| 9:30 a.m. | 87°F | 69% | 7mph | 97°F CAT 2 | Ogunbiyi C |
| 10:30 a.m. | 87°F | 69% | 7mph | 97°F CAT 2 | Ogunbiyi C |
| 11:30 a.m. | 91°F | 61% | 11mph | 102°F CAT 2 | Ogunbiyi C |
| 12:30 p.m. | 94°F | 55% | 10mph | 106°F CAT3 | Ogunbiyi C |
| 1:30 p.m. | 95°F | 54% | 11mph | 108°F CAT3 | Ogunbiyi C |
| 2:30 p.m. | 94°F | 54% | 9mph | 105°F CAT 2 | Ogunbiyi C |
| 3:30 p.m. | 96°F | 49% | 10mph | 106°F CAT 3 | Ogunbiyi C |
| 4:30 p.m. | 97°F | 49% | 12mph | 109°F CAT 3 | Ogunbiyi C |
| 5:30 p.m. | 97°F | 49% | 9mph | 109°F CAT 3 | Ogunbiyi C |
| 6:30 p.m. | 96°F | 50% | 10 mph | 107°F CAT 3 | Ogunbiyi C |
| 7:30 p.m. | 95°F | 57% | 5mph | 106° | Bland |
| 8:30 p.m. | 93 | 60% | 6mph | 102° | Bland |
| 9:30 p.m. | 90 | 76% | 9mph | 101° | Bland |
| 10:30 p.m. | 88 | 73% | 7mph | 98° | Bland |
| 11:30 p.m. | 85 | 75% | 6mph | 93 | Bland |

* Temperatures between 51 and 79 degrees Fahrenheit (°F) are not represented on the Wind Chill Index (Attachment A) or the Heat and Humidity Index (Attachment B). Indicate (N/A) in these fields when applicable.

AD-10.64 (rev. 11)
Attachment C
Page 17 of 18

6/20/24

# TEXAS DEPARTMENT OF CRIMINAL JUSTICE
## Temperature Log
### Unit: Coffield

| Date: | Outside Air Temperature | Humidity or Wind Speed | | Heat Index or Wind Chill* | Person Recording |
|---|---|---|---|---|---|
| 12:30 a.m. | 84° | 78% | 5 | 91° | Bland |
| 1:30 a.m. | 83° | 79% | 6 | 91° | Bland |
| 2:30 a.m. | 82° | 81% | 6 | 87° | Bland |
| 3:30 a.m. | 81° | 83% | 7 | 86° | Bland |
| 4:30 a.m. | 80° | 84% | 8 | 84° | Bland |
| 5:30 a.m. | 80° | 85% | 7 | 75° | Bland |
| 6:30 a.m. | 80 | 86% | 4 | 76 | Bland |
| 7:30 a.m. | 80°F | 85% | 6 mph | 84°F CAT. 1 | OGUNBIYI |
| 8:30 a.m. | 82°F | 81% | 6 mph | 89°F CAT. 1 | OGUNBIYI |
| 9:30 a.m. | 85°F | 77% | 9 mph | 95°F CAT. 2 | OGUNBIYI |
| 10:30 a.m. | 88°F | 68% | 11 mph | 99°F CAT. 2 | OGUNBIYI |
| 11:30 a.m. | 88°F | 68% | 7 mph | 99°F CAT. 2 | OGUNBIYI |
| 12:30 p.m. | 91°F | 64% | 5 mph | 102°F CAT. 2 | OGUNBIYI |
| 1:30 p.m. | 92°F | 60% | 4 mph | 104°F CAT. 2 | OGUNBIYI |
| 2:30 p.m. | 96°F | 55% | 4 mph | 111°F CAT. 3 | OGUNBIYI |
| 3:30 p.m. | 80°F | 74% | 12 mph | 71°F | OGUNBIYI |
| 4:30 p.m. | 84°F | 69% | 9 mph | 90°F CAT. 1 | OGUNBIYI |
| 5:30 p.m. | 87°F | 62% | 7 mph | 93°F CAT. 2 | OGUNBIYI |
| 6:30 p.m. | 88°F | 55% | 4 mph | 94°F CAT. 2 | OGUNBIYI |
| 7:30 p.m. | 88° | 57% | 6 | 93° | Faulk |
| 8:30 p.m. | 84° | 68% | 4 | 89° | Faulk |
| 9:30 p.m. | 82° | 71% | 4 | 86° | Faulk |
| 10:30 p.m. | 80° | 75% | 5 | 83° | Faulk |
| 11:30 p.m. | 79° | 79% | 4 | 71° | Faulk |

* Temperatures between 51 and 79 degrees Fahrenheit (°F) are not represented on the Wind Chill Index (Attachment A) or the Heat and Humidity Index (Attachment B). Indicate (N/A) in these fields when applicable.

TIEDE DEF_204512

AD-10.64 (rev. 11)
Attachment C
Page 17 of 18

## TEXAS DEPARTMENT OF CRIMINAL JUSTICE
### Temperature Log

Unit: 6/27/24

| Date: | Outside Air Temperature | Humidity or Wind Speed | Heat Index or Wind Chill* | Person Recording |
|-------|------------------------|------------------------|---------------------------|------------------|
| 12:30 a.m. | 80° | 79% 4mph | 84° | Adeloy |
| 1:30 a.m. | 80° | 78% 4mph | 73° | Adeloy |
| 2:30 a.m. | 79° | 78% 4mph | 71° | Adeloy |
| 3:30 a.m. | 78° | 82% 5mph | 72° | Adeloy |
| 4:30 a.m. | 78° | 83% 5mph | 71° | Adehel |
| 5:30 a.m. | 77° | 85% 4mph | 73° | Adehoe |
| 6:30 a.m. | 77° | 87% 5mph | 72° | Adeloy |
| 7:30 a.m. | 78° | 87% 4mph | 74° | Stingfiel |
| 8:30 a.m. | 82° | 83% 4mph | 89° | Stringw |
| 9:30 a.m. | 86° | 77% 2mph | 98° | Stringo |
| 10:30 a.m. | 86° | 77% 2mph | 98° | Shurfe |
| 11:30 a.m. | 91° | 67% 4mph | 109° | Stringw |
| 12:30 p.m. | 94° | 61% 4mph | 115° | Strn |
| 1:30 p.m. | 93° | 63% 4mph | 109° | Strik |
| 2:30 p.m. | 99° | 62% 4mph | 111° | Strik |
| 3:30 p.m. | 94° | 60% 6mph | 110° | Stringfiel |
| 4:30 p.m. | 95° | 59% 6mph | 111° | Stringfiel |
| 5:30 p.m. | 95° | 58% 8mph | 108° | Stingfiel |
| 6:30 p.m. | 94° | 59% 64mph | 109° | Stringfiel |
| 7:30 p.m. | 91° | 64% 6mph | 104° | Adeloy |
| 8:30 p.m. | 87° | 68% 5mph | 96° | Adeloy |
| 9:30 p.m. | 84° | 72% 4mph | 91° | Adeloy |
| 10:30 p.m. | 83° | 77% 3mph | 90° | Adeloy |
| 11:30 p.m. | 82° | 79% 3mph | 88° | Adeloy |

* Temperatures between 51 and 79 degrees Fahrenheit (°F) are not represented on the Wind Chill Index (Attachment A) or the Heat and Humidity Index (Attachment B). Indicate (N/A) in these fields when applicable.

TIEDE DEF_204513

AD-10.64 (rev. 11)
Attachment C
Page 17 of 18

## TEXAS DEPARTMENT OF CRIMINAL JUSTICE
### Temperature Log

Unit: __Coffield__          06/28/24

| Date: | Outside Air Temperature | Humidity or Wind Speed | Heat Index or Wind Chill* | Person Recording |
|---|---|---|---|---|
| 12:30 a.m. | 80° | 79% 4mph | 84° | Adebin |
| 1:30 a.m. | 80° | 78% 4mph | 73° | Adebin |
| 2:30 a.m. | 79° | 78% 4mph | 71° | Adebin |
| 3:30 a.m. | 78° | 82% 5mph | 72° | Adebin |
| 4:30 a.m. | 78° | 83% 5mph | 71° | Adebin |
| 5:30 a.m. | 77° | 85% 4mph | 72° | Adebin |
| 6:30 a.m. | 77° | 87% 5mph | 72° | Adebin |
| 7:30 a.m. | 78° | 87% 5mph | 74° | STingle |
| 8:30 a.m. | 82° | 82% 7mph | 89° | STingle |
| 9:30 a.m. | 86° | 72% 10mph | 95° | STingle |
| 10:30 a.m. | 90° | 67% 9mph | 95° | STingle |
| 11:30 a.m. | 90° | 68% 9mph | 95° | STingle |
| 12:30 p.m. | 91° | 62% 9mph | 95° | STingle |
| 1:30 p.m. | 96° | 56% 9mph | 112° | STingle |
| 2:30 p.m. | 98° | 52% 8mph | 115° | STingle |
| 3:30 p.m. | 98° | 50% 9mph | 112° | STingle |
| 4:30 p.m. | 98° | 50% 12mph | 110° | STingle |
| 5:30 p.m. | 97° | 49% 10mph | 109° | STingle |
| 6:30 p.m. | 97° | 49% 10mph | 109° | STingle |
| 7:30 p.m. | 95° | 54% 9mph | 108° | Adebin |
| 8:30 p.m. | 90° | 62% 5mph | 100° | Adebin |
| 9:30 p.m. | 86° | 71% 4mph | 95° | Adebin |
| 10:30 p.m. | 85° | 76% 7mph | 94° | Adebin |
| 11:30 p.m. | 84° | 77% 6mph | 92° | Adebin |

\* Temperatures between 51 and 79 degrees Fahrenheit (°F) are not represented on the Wind Chill Index (Attachment A) or the Heat and Humidity Index (Attachment B). Indicate (N/A) in these fields when applicable.

TIEDE DEF_204514

AD-10.64 (rev. 11)
Attachment C
Page 17 of 18

## TEXAS DEPARTMENT OF CRIMINAL JUSTICE
### Temperature Log

6/29/24

Unit: Coffield

| Date: | Outside Air Temperature | Humidity or Wind Speed | Heat Index or Wind Chill* | Person Recording |
|-------|------------------------|------------------------|---------------------------|------------------|
| 12:30 a.m. | 83° | 81% 6mph | 91° | Adebiyi |
| 1:30 a.m. | 82° | 82% 6mph | 89° | Adebiyi |
| 2:30 a.m. | 81° | 84% 7mph | 87° | Adebiyi |
| 3:30 a.m. | 81° | 84% 8mph | 87° | Adebiyi |
| 4:30 a.m. | 81° | 84% 6mph | 87° | Adebiyi |
| 5:30 a.m. | 80° | 87% 5mph | 74° | Adebiyi |
| 6:30 a.m. | 80° | 87% 5mph | 74° | Adebiyi |
| 7:30 a.m. | 81° | 86% 6mph | 87° | Stringfield |
| 8:30 a.m. | 83° | 81% 11mph | 91° | Stringfield |
| 9:30 a.m. | 87° | 78% 10mph | 98° | Stringfield |
| 10:30 a.m. | 89° | 69% 11mph | 102° | Stringfield |
| 11:30 a.m. | 93° | 64% 11mph | 110° | Stringfield |
| 12:30 p.m. | 94° | 58% 14mph | 111° | Stringfield |
| 1:30 p.m. | 96° | 56% 9mph | 112° | Stringfield |
| 2:30 p.m. | 97° | 52% 9mph | 111° | Stringfield |
| 3:30 p.m. | 97° | 51% 7mph | 110° | Stringfield |
| 4:30 p.m. | 99° | 49% 7mph | 114° | Stringfield |
| 5:30 p.m. | 98° | 49% 7mph | 111° | Stringfield |
| 6:30 p.m. | 98° | 49% 7mph | 111° | Stringfield |
| 7:30 p.m. | 95° | 55% 5mph | 108° | Adebiyi |
| 8:30 p.m. | 91° | 66% 5mph | 106° | Adebiyi |
| 9:30 p.m. | 88° | 72% 9mph | 101° | Adebiyi |
| 10:30 p.m. | 86° | 75% 7mph | 97° | Adebiyi |
| 11:30 p.m. | 85° | 76% 6mph | 95° | Adebiyi |

\* Temperatures between 51 and 79 degrees Fahrenheit (°F) are not represented on the Wind Chill Index (Attachment A) or the Heat and Humidity Index (Attachment B). Indicate (N/A) in these fields when applicable.

**TIEDE DEF_204515**

## TEXAS DEPARTMENT OF CRIMINAL JUSTICE
## 24 hour Temperature Log

Unit: __Coffield Unit__

Date: __6-30-2024__

| | Outside Air Temperature | Humidity or Wind Speed | Heat Index or Wind Chill | Person Recording |
|---|---|---|---|---|
| 6:30 a.m. | 73 | Calm | 75 | Smth |
| 7:30 a.m. | 73 | Calm | 73 | Smth |
| 8:30 a.m. | 75 | Calm | 76 | Smth |
| 9:30 a.m. | 82 | Calm | 85 | Smth |
| 10:30 a.m. | 85 | Calm | 89 | Smth |
| 11:30 a.m. | 87 | Calm | 90 | Smth |
| 12:30 p.m. | 88 | Calm | 90 | Smth |
| 1:30 p.m. | 88 | Calm | 92 | Smth |
| 2:30 p.m. | 89 | Calm | 91 | Smth |
| 3:30 p.m. | 89 | Calm | 92 | Smth |
| 4:30 p.m. | 90 | Calm | 95 | Smth |
| 5:30 p.m. | 90 | Calm | 95 | Smt |
| 6:30 p.m. | 87 | alm | 93 | Smth |
| 7:30 p.m. | 87° | Calm | 93 | Aphmyn |
| 8:30 p.m. | 83° | Calm | 87 | Aphmyn |
| 9:30 p.m. | 79° | calm | 82 | Aphmyn |
| 10:30 p.m. | 78° | Calm | 80 | Aphmyn |
| 11:30 p.m. | 78° | Calm | 79° | Aphmyn |
| 12:30 a.m. | 76° | Calm | 76° | Aphmyn |
| 1:30 a.m. | 75° | Calm | 74° | Aphmyn |
| 2:30 a.m. | 75° | Calm | 74° | Aphmyn |
| 3:30 a.m. | 75° | Calm | 74° | Aphmyn |
| 4:30 a.m. | 75° | Calm | 74° | Aphmyn |
| 5:30 a.m. | 75° | calm | 74° | Aphmyn |

\*   Temperatures and Wind Chill Index/Heat Index to be announced over the radio

\*\*   Temperatures between 51 and 69 degrees Fahrenheit (°F) are not represented on the Wind Chill Index (Attachment A) or the Heat and Humidity Matrix (Attachment B). Indicate (N/A) in these fields when applicable.

TIEDE DEF_204516

## TEXAS DEPARTMENT OF CRIMINAL JUSTICE
### Temperature Log

6/31/14    Unit: Coffield

| Date: | Outside Air Temperature | Humidity or Wind Speed | Heat Index or Wind Chill* | Person Recording |
|---|---|---|---|---|
| 12:30 a.m. | 84° | 78% 9mph | 93° | Adebiyi |
| 1:30 a.m. | 84° | 80% 9mph | 93° | Adebiyi |
| 2:30 a.m. | 82° | 82% 6mph | 89° | Adebiyi |
| 3:30 a.m. | 82° | 82% 6mph | 89° | Adebiyi |
| 4:30 a.m. | 80° | 82% 1mph | 84° | Adebiyi |
| 5:30 a.m. | 79° | 85% 0mph | 73° | Adebiyi |
| 6:30 a.m. | 78° | 87% 2mph | 74° | Adebiyi |
| 7:30 a.m. | 81° | 84% calm | 87° | Stringfield |
| 8:30 a.m. | 82° | 82% 4mph | 89° | Stringfield |
| 9:30 a.m. | 87° | 72% 4mph | 98° | Stringfield |
| 10:30 a.m. | 87° | 72% 4mph | 98° | Stringfield |
| 11:30 a.m. | 88° | 69% 4mph | 99° | Stringfield |
| 12:30 p.m. | 92° | 60% 4mph | 104° | Stringfield |
| 1:30 p.m. | 95° | 55% 6mph | 108° | Stringfield |
| 2:30 p.m. | 97° | 50% 6mph | 110° | Stringfield |
| 3:30 p.m. | 98° | 47% 6mph | 110° | Stringfield |
| 4:30 p.m. | 99° | 47% 4mph | 112° | Stringfield |
| 5:30 p.m. | 99° | 46% 3mph | 111° | Stringfield |
| 6:30 p.m. | 98° | 46% 4mph | 109° | Stringfield |
| 7:30 p.m. | 95° | 54% 5mph | 108° | Adebiyi |
| 8:30 p.m. | 91° | 64% 4mph | 104° | Adebiyi |
| 9:30 p.m. | 88° | 70% 2mph | 100° | Adebiyi |
| 10:30 p.m. | 85° | 77% 1mph | 95° | Adebiyi |
| 11:30 p.m. | 83° | 83% 4mph | 92° | Adebiyi |

* Temperatures between 51 and 79 degrees Fahrenheit (°F) are not represented on the Wind Chill Index (Attachment A) or the Heat and Humidity Index (Attachment B). Indicate (N/A) in these fields when applicable.

TIEDE DEF_204517



AD-10.64 (rev. 11)
Attachment C
Page 17 of 18

## TEXAS DEPARTMENT OF CRIMINAL JUSTICE
### Temperature Log

Unit: _Coffield_

7-1-24

| Date: | Outside Air Temperature | Humidity or Wind Speed | Heat Index or Wind Chill* | Person Recording |
|---|---|---|---|---|
| 12:30 a.m. | 83° | 82% 4mph | 91° | Adebayo |
| 1:30 a.m. | 81° | 86% 0mph | 87° | Adebayo |
| 2:30 a.m. | 80° | 87% 0mph | 76° | Adebayo |
| 3:30 a.m. | 80° | 87% 0mph | 76° | Adebayo |
| 4:30 a.m. | 80° | 86% 0mph | 74° | Adebayo |
| 5:30 a.m. | 79° | 85% 0mph | 73° | Adebayo |
| 6:30 a.m. | 79° | 83% 0mph | 73° | Adebayo |
| 7:30 a.m. | 81° | 81% 0mph | 81° | Shabazz |
| 8:30 a.m. | 84° | 77° 0mph | 92° | Shabazz |
| 9:30 a.m. | 89° | 70° 6mph | 100° | Shabazz |
| 10:30 a.m. | 91° | 63° 5mph | 104° | Shabazz |
| 11:30 a.m. | 94° | 56° 3mph | 108° | Shabazz |
| 12:30 p.m. | 97° | 51° 4mph | 110° | Shabazz |
| 1:30 p.m. | 97° | 51° 7mph | 110° | Shabazz |
| 2:30 p.m. | 99° | 47° 4mph | 112° | Shabazz |
| 3:30 p.m. | 99° | 45° 6mph | 111° | Shabazz |
| 4:30 p.m. | 100° | 44° 6mph | 112° | Shabazz |
| 5:30 p.m. | 99° | 45° 7mph | 111° | Shabazz |
| 6:30 p.m. | 99° | 46° 6mph | 111° | Shabazz |
| 7:30 p.m. | 92°F | Miles per hour 60% 11mph | 104° Cat 2 | Akinyele |
| 8:30 p.m. | 87°F | 70% 7mph | 97° | Akinyele |
| 9:30 p.m. | 85°F | 75% 5mph | 94 | Akinyele |
| 10:30 p.m. | 82°F | 78% 4mph | 88° | Akinyele |
| 11:30 p.m. | 82°F | 79% 4mph | 88° | Akinyele |

\* Temperatures between 51 and 79 degrees Fahrenheit (°F) are not represented on the Wind Chill Index (Attachment A) or the Heat and Humidity Index (Attachment B). Indicate (N/A) in these fields when applicable.

**TIEDE DEF_204518**



AD-10.64 (rev. 11)
Attachment C
Page 17 of 18

## TEXAS DEPARTMENT OF CRIMINAL JUSTICE
### Temperature Log

Unit: _____ Co _____

7/2/24

| Date: | Outside Air Temperature | Humidity or Wind Speed | | Heat Index or Wind Chill* | Person Recording |
|---|---|---|---|---|---|
| 12:30 a.m. | 81°F | 81% | 3Mph | 86° | Akinyele |
| 1:30 a.m. | 80°F | 82% | 3 | 74° | Akinyele |
| 2:30 a.m. | 79°F | 85% | 4 | 73° | Akinyele |
| 3:30 a.m. | 78°F | 87% | 3 | 74° | Akinyele |
| 4:30 a.m. | 78°F | 88% | 2 | 74° | Akinyele |
| 5:30 a.m. | 78°F | 88% | 0 | 74° | Akinyele |
| 6:30 a.m. | 77 | 89 | 6 | 73 | Akinyele |
| 7:30 a.m. | 79 | 88 | 6 | 74 | Stevenson |
| 8:30 a.m. | 83 | 90 | 6 | 91 | Stevenson |
| 9:30 a.m. | 87 | 71 | 6 | 98 | stevenson |
| 10:30 a.m. | 89 | 60 | 9 | 104 | srevenson |
| 11:30 a.m. | 95 | 55 | 6 | 108 | stevenson |
| 12:30 p.m. | 96 | 54 | 9 | 110 | Stevenson |
| 1:30 p.m. | 96 | 50 | 9 | 107 | stevenson |
| 2:30 p.m. | 96 | 51 | 9 | 108 | stevenson |
| 3:30 p.m. | 96 | 51 | 11 | 108 | stevenson |
| 4:30 p.m. | 98 | 47 | 9 | 110 | Stevenson |
| 5:30 p.m. | 98 | 47 | 9 | 110 | Stevenson |
| 6:30 p.m. | 96 | 52 | 8 | 109 | Stevenson |
| 7:30 p.m. | 95°F | 55% Miles per hour 7Mph | | 108° Cat 3 | Akinyele |
| 8:30 p.m. | 92°F | 62% 4Mph | | 106° Cat 3 | Akinyele |
| 9:30 p.m. | 88°F | 73% 6Mph | | 99° Cat 2 | Akinyele |
| 10:30 p.m. | 87°F | 74% 6Mph | | 97° Cat 2 | Akinyele |
| 11:30 p.m. | 86°F | 75% 5Mph | | 97° Cat 2 | Akinyele |

\* Temperatures between 51 and 79 degrees Fahrenheit (°F) are not represented on the Wind Chill Index (Attachment A) or the Heat and Humidity Index (Attachment B). Indicate (N/A) in these fields when applicable.

TIEDE DEF_204519

AD-10.64 (rev. 11)
Attachment C
Page 17 of 18

## TEXAS DEPARTMENT OF CRIMINAL JUSTICE
### Temperature Log

07/03/24    Unit: Coffield

| Date: | Outside Air Temperature | Humidity or Wind Speed | Heat Index or Wind Chill* | Person Recording |
|-------|------------------------|------------------------|---------------------------|------------------|
| 12:30 a.m. | 84°F | 76%  4 Mph | 94°  Cat 2 | Akinyele |
| 1:30 a.m. | 83°F | 78%  4 Mph | 90°  Cat 1 | Akinyele |
| 2:30 a.m. | 83°F | 76%  4 Mph | 90°  Cat 1 | Akinyele |
| 3:30 a.m. | 81°F | 82%  2 Mph | 86°  Cat 1 | Akinyele |
| 4:30 a.m. | 79°F | 85%  4 Mph | 73° | Akinyele |
| 5:30 a.m. | 79°F | 86%  4 Mph | 74° | Akinyele |
| 6:30 a.m. | 78°F | 87%  2 Mph | 72° | Akinyele |
| 7:30 a.m. | 78°F | 86%  4 Mph | 74°F | Ogunbiyi |
| 8:30 a.m. | 83°F | 77%  8 mph | 90°F  CAT. 1 | Ogunbiyi |
| 9:30 a.m. | 87°F | 68%  8mph | 96°F  CAT. 2 | Ogunbiyi C. |
| 10:30 a.m. | 89°F | 62%  7mph | 98°F  CAT. 2 | Ogunbiyi |
| 11:30 a.m. | 93°F | 53%  8mph | 102°F  CAT. 2 | Ogunbiyi |
| 12:30 p.m. | 95°F | 47%  7 mph | 103°F  CAT 2 | Ogunbiyi |
| 1:30 p.m. | 96°F | 45%  9 mph | 104°F  CAT. 2 | Ogunbiyi |
| 2:30 p.m. | 97°F | 44%  7 mph | 104°F  CAT. 2 | Ogunbiyi |
| 3:30 p.m. | 98°F | 43%  10 mph | 107°F  CAT. 3 | Ogunbiyi |
| 4:30 p.m. | 97°F | 43%  11 mph | 104°F  CAT. 2 | Ogunbiyi |
| 5:30 p.m. | 97°F | 43%  9 mph | 104°F  CAT. 2 | Ogunbiyi |
| 6:30 p.m. | 96°F | 45%  7 mph | 104°F  CAT. 2 | Ogunbiyi |
| 7:30 p.m. | 95°F | 51%  7 mph | 105°F  CAT 2 | Gbeddy |
| 8:30 p.m. | 90°F | 59%  5mph | 99°F  CAT 2 | Gbeddy |
| 9:30 p.m. | 87°F | 67%  6 mph | 96°F  CAT 2 | Gbeddy |
| 10:30 p.m. | 86°F | 70%  5mph | 95°F  CAT 2 | Gbeddy |
| 11:30 p.m. | 84°F | 75%  6 mph | 92°F  CAT 2 | Gbeddy |

* Temperatures between 51 and 79 degrees Fahrenheit (°F) are not represented on the Wind Chill Index (Attachment A) or the Heat and Humidity Index (Attachment B). Indicate (N/A) in these fields when applicable.

**TIEDE DEF_204520**

AD-10.64 (rev. 11)
Attachment C
Page 17 of 18

## TEXAS DEPARTMENT OF CRIMINAL JUSTICE
### Temperature Log

Unit: _Coffield_

07/04/24

| 07/04/24 Date/ | Outside Air Temperature | Humidity or Wind Speed | Heat Index or Wind Chill* | Person Recording |
|---|---|---|---|---|
| 12:30 a.m. | 83°F | 80% 6mph | 92°F CAT2 | Gbeddy |
| 1:30 a.m. | 81°F | 82% 6mph | 86°F CAT1 | Gbeddy |
| 2:30 a.m. | 81°F | 82% 7mph | 86°F CAT1 | Gbeddy |
| 3:30 a.m. | 80°F | 82% 5mph | 84°F CAT1 | Gbeddy |
| 4:30 a.m. | 79°F | 83% 5mph | 75°F CAT1 | Gbeddy |
| 5:30 a.m. | 79°F | 85% 3mph | 75°F CAT1 | Gbeddy |
| 6:30 a.m. | 78°F | 86% 0mph | 74°F CAT1 | Gbeddy |
| 7:30 a.m. | 80°F | 85% 4mph | 73°F | OGUNBIYI |
| 8:30 a.m. | 83°F | 80% 8mph | 91°F CAT2 | OGUNBIYI |
| 9:30 a.m. | 86°F | 72% 9mph | 95°F CAT. 2 | OGUNBIYI |
| 10:30 a.m. | 86°F | 68% 11mph | 94°F CAT.2 | OGUNBIYI |
| 11:30 a.m. | 90°F | 62% 9mph | 100°F CAT.2 | OGUNBIYI |
| 12:30 p.m. | 93°F | 58% 9mph | 105°F CAT.2 | OGUNBIYI |
| 1:30 p.m. | 95°F | 53% 9mph | 107°F CAT3 | OGUNBIYI |
| 2:30 p.m. | 96°F | 49% 6mph | 106°F CAT 3 | OGUNBIYI |
| 3:30 p.m. | 97°F | 47% 9mph | 107°F CAT.3 | OGUNBIYI |
| 4:30 p.m. | 96°F | 48% 9mph | 106°F CAT.3 | OGUNBIYI |
| 5:30 p.m. | 95°F | 52% 6mph | 106°F CAT.3 | OGUNBIYI |
| 6:30 p.m. | 96°F | 49% 10mph | 106°F CAT.3 | OGUNBIYI |
| 7:30 p.m. | 93°F | 55% 4mph | 103°F CAT 2 | Omuenya |
| 8:30 p.m. | 92°F | 58% 2mph | 103°F CAT 2 | Omuenya |
| 9:30 p.m. | 88°F | 66% 0mph | 102°F CAT 2 | Omuenya |
| 10:30 p.m. | 84°F | 77% 0mph | 92°F CAT2 | Omuenya |
| 11:30 p.m. | 82°F | 83% 0mph | 89°F CAT1 | Omuenya |

* Temperatures between 51 and 79 degrees Fahrenheit (°F) are not represented on the Wind Chill Index (Attachment A) or the Heat and Humidity Index (Attachment B). Indicate (N/A) in these fields when applicable.

TIEDE DEF_204521

## TEXAS DEPARTMENT OF CRIMINAL JUSTICE
## 24 hour Temperature Log

Unit:  Coffield Unit

Date: 7/5/24

| | Outside Air Temperature | Humidity or Wind Speed | | Heat Index or Wind Chill | | Person Recording |
|---|---|---|---|---|---|---|
| 6:30 a.m. | 78°F | 87% | 4mph | 74°F | | Onuuga |
| 7:30 a.m. | 80° | 74% | 3 | 84° | CAT1 | Montroy |
| 8:30 a.m. | 82° | 79% | 6 | 88° | CAT1 | Montroy |
| 9:30 a.m. | 86° | 72% | 6 | 95° | CAT2 | Montroy |
| 10:30 a.m. | 88° | 98%66% | 4 | 98° | CAT2 | Montroy |
| 11:30 a.m. | 92° | 55% | 4 | 101° | CAT2 | Montroy |
| 12:30 p.m. | 94° | 53% | 5 | 104° | CAT2 | Montroy |
| 1:30 p.m. | 96° | 44% | 5 | 103° | CAT2 | Montroy |
| 2:30 p.m. | 98° | 44% | 5 | 107° | CAR3 | Montroy |
| 3:30 p.m. | 99° | 44% | 8 | 110° | CAT3 | Montroy |
| 4:30 p.m. | 100° | 39% | 8 | 108° | CAT3 | Montroy |
| 5:30 p.m. | 93° | 57% | 14 | 105° | CAT2 | Montroy |
| 6:30 p.m. | 90° | 58% | 16 | 98° | CAT2 | Konugal |
| 7:30 p.m. | 84° | 69% | 11 | 90° | CAT1 | Konugal |
| 8:30 p.m. | 82° | 86° | 9 | 86° | Cat1 | Konugal |
| 9:30 p.m. | 82° | 86 | 9 | 76 | Cat1 | Konugal |
| 10:30 p.m. | 80 | 79 | 8 | 75 | Cat1 | Konugal |
| 11:30 p.m. | 80° | 77° | 5 | 72 | Cal | Konugal |
| 12:30 a.m. | 82°F | 81% | 2mph | 89°F CAT1 | | Onuuga |
| 1:30 a.m. | 81°F | 84% | 4mph | 87°F CAT1 | | Onuuga |
| 2:30 a.m. | 81°F | 81% | 5mph | 86°F CAT1 | | Onuuga |
| 3:30 a.m. | 80°F | 82% | 3mph | 84°F CAT1 | | Onuuga |
| 4:30 a.m. | 79°F | 83% | 0mph | 73°F | | Onuuga |
| 5:30 a.m. | 78°F | 84% | 5mph | 74°F | | Onuuga |

\* Temperatures and Wind Chill Index/Heat Index to be announced over the radio

\*\* Temperatures between 51 and 69 degrees Fahrenheit (°F) are not represented on the Wind Chill Index (Attachment A) or the Heat and Humidity Matrix (Attachment B). Indicate (N/A) in these fields when applicable.

TIEDE DEF_204522

# EXHIBIT 29

Page 1

```
 1              IN THE UNITED STATES DISTRICT COURT
                 FOR THE WESTERN DISTRICT OF TEXAS
 2                        AUSTIN DIVISION

 3
    BERNHARDT TIEDE, II;        )
 4  TEXAS PRISONS COMMUNITY     )
    ADVOCATES; LIONESS JUSTICE)
 5  IMPACTED WOMEN'S ALLIANCE;)
    TEXAS CITIZENS UNITED FOR )
 6  REHABILITATION OF ERRANTS,)
    INC.; AND COALITION FOR    )
 7  TEXANS WITH DISABILITIES, )
    INC.,                      )
 8  Plaintiffs                 )
                               )
 9  vs.                        )  1:23-CV-01004-RP
                               )
10  BOBBY LUMPKIN,             )
    Defendant.                 )
11

12                      ORAL DEPOSITION OF

13              CHRISTOPHER WESLEY CIRRITO

14                      October 15, 2025

15

16      ORAL DEPOSITION OF CHRISTOPHER WESLEY CIRRITO,

17  produced as a witness at the instance of the Plaintiffs

18  and duly sworn, was taken in the above-styled and

19  numbered cause on October, 15, 2025, from 11:05 a.m to

20  1:33 p.m., before Tina C. Fuller, Certified Shorthand

21  Reporter in and for the State of Texas, reported by

22  computerized stenotype machine via Zoom Video

23  Conferencing, pursuant to the Federal Rules of Civil

24  Procedure and the provisions stated on the record or

25  attached hereto.
```

Christopher Cirrito
10/15/2025

Page 46

1    A.    Yes.  Yes, some -- some -- some wording
2 of that specific nature, yes.
3    Q.    Okay.  And your conclusion was that she had
4 worked with Mr. Sayed to falsify these logs.
5    A.    Not to -- not worked with him to falsify these
6 logs.  I don't know specifically who filled out these
7 logs because she said, you know, some of them they copied
8 over because they had coffee on them.  So specific to a
9 falsified log, I -- I do not know who created the July
10 the 12th, 2022, log.
11   Q.    And you never determined who did that.
12   A.    No, I did not.
13   Q.    Is it your suspicion that it was either
14 Ms. Smith or Mr. Sayed or both of them?
15   A.    No.  It -- from -- again, in my report, it --
16 it is -- from context, it is likely that there were more
17 people in -- in the room.
18   Q.    Do you -- did you reach any conclusions about
19 those individuals' identities or their titles?
20   A.    No, I did not.
21   Q.    Did they tell you who else was involved?
22   A.    No, they did not.
23   Q.    Did you ask them who else was involved?
24   A.    No, they did not -- no, I -- I did not.
25   Q.    Why not?

Page 47

1    A.    Because I had already determined that the log
2 was clearly falsified and very strong evidence under
3 the cir- -- of the circumstances of which it occurred.
4    Q.    Do you have a sense of how many other people
5 were involved in falsifying the logs?
6    A.    No, I do not have any -- any idea.
7    Q.    Okay.  So fair to say that you concluded that
8 some group of individuals at the Stiles Unit falsified
9 temperature logs, but their names, their positions and
10 their involvement remain unknown?
11   A.    Yes.  I -- I believe so, yes.
12   Q.    Okay.  I think it's a good time for us to take
13 our first break.
14          MR. HOMIAK:  Are we off the record,
15 Ms. Fuller?
16          THE REPORTER:  Yes.
17          (Recess from 12:03 to 12:11.)
18   Q.    (By Mr. Homiak) So, Mr. Cirrito, I'm going to
19 pick up where we left off.  So you were able to
20 determine -- and I want to make sure I understand your
21 testimony.  You were able to determine that Ms. Smith and
22 Mr. Sayed were involved in the group or were in the group
23 that was involved in falsifying the documents; is that
24 correct?
25   A.    Yes.

Page 48

1    Q.    But you did not determine who actually
2 falsified the July 12th, 2022, temperature log from the
3 Stiles Unit?
4    A.    No, I did not.
5    Q.    And you did not ask Mr. Sayed or Ms. Smith who
6 was or who were the individuals who actually falsified
7 the July 12th, 2022, temperature log; is that right?
8    A.    To my knowledge, correct.  Yes, that's right.
9    Q.    And you don't know how many people were
10 involved in falsifying that log or the others that you
11 raised concerns about in your report; is that right?
12   A.    That is correct.
13   Q.    So you don't even know how widespread the
14 problem was at the Stiles Unit in July of 2022; is that
15 right?
16   A.    The entirety of my investigation was to
17 determine when it was falsified.  My recollection of the
18 transcripts and the comments of the Judge were related to
19 some version of whether it was falsified for the Court or
20 whether it was falsified in a previous -- for some
21 previous business engagement.
22   Q.    Okay.  So you saw your mission and the scope of
23 your investigation as really just determining when the
24 log or logs were falsified rather than who falsified the
25 logs.

Page 49

1    A.    Correct, the circumstances of when the
2 falsifications occurred.
3    Q.    And from -- from your perspective, it was not
4 important who or how many TDCJ employees were involved in
5 falsifying those logs.
6    A.    Not to answer that question, no.
7    Q.    And it was not important to you or to your
8 investigation what the titles of those individuals were;
9 is that right?
10   A.    I would say yes, because it wasn't important in
11 the investigation to know specifically who was
12 responsible.
13   Q.    And at no point after you submitted your report
14 to Mr. Collier and TDCJ leadership did anyone ask you to
15 look into -- actually, let me -- let me start over.
16          At any point after you submitted your
17 report to TDCJ leadership in November of 2024, did
18 Mr. Collier or anyone else ask you to determine who had
19 actually falsified the temperature logs?
20   A.    No.
21   Q.    At any point after you submitted your report to
22 Mr. Collier and TDCJ leadership, did anyone ask you to
23 determine how widespread the problem of falsified
24 temperature logs was?
25   A.    No.

Christopher Cirrito
10/15/2025

Page 98

```
1                  MR. HOMIAK:  E-tran just means electronic.
2                  MR. JOHNSON:  Yeah, if that's what it
3 means, yeah.  If it's something else then --
4                  THE REPORTER:  Mr. Lindsey?  Anything else
5 for the record?
6                  MR. LINDSEY:  I'm all set.  Thank you.
7                  MR. HOMIAK:  Thank you so much for your
8 time.
9
10                 (WITNESS EXCUSED)
11                 (SIGNATURE WAIVED)
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 100

```
1 30(f)(1) that the signature of the deponent:
2       ____ was requested by the deponent or a party
3 before the completion of the deposition and returned
4 within 30 days from date of receipt of the transcript.
5 If returned, the attached Changes and Signature Page
6 contains any changes and the reasons therefor;
7       __X__ was not requested by the deponent or a
8 party before the completion of the deposition.
9       I further certify that I am neither attorney
10 nor counsel for, related to, nor employed by any of the
11 parties to the action in which this testimony was taken.
12 Further, I am not a relative or employee of any attorney
13 of record in this cause, nor am I financially or
14 otherwise interested in the outcome of the action.
15     Certified to me on this 29th day of October, 2025.
16
17
18           Tina C. Fuller, CSR
             Texas CSR 3633
19           Expiration:  07/30/2027
             Lexitas Firm Registration No. 539
20           100 N.E. Loop 410, Suite 955
             San Antonio, Texas 78216
21           210-481-7575
             Expires: 12/31/2026
22
23
24
25
```

Page 99

```
1           IN THE UNITED STATES DISTRICT COURT
              FOR THE WESTERN DISTRICT OF TEXAS
2                   AUSTIN DIVISION
3
  BERNHARDT TIEDE, II;          )
4 TEXAS PRISONS COMMUNITY       )
  ADVOCATES; LIONESS JUSTICE)
5 IMPACTED WOMEN'S ALLIANCE;)
  TEXAS CITIZENS UNITED FOR )
6 REHABILITATION OF ERRANTS,)
  INC.; AND COALITION FOR   )
7 TEXANS WITH DISABILITIES, )
  INC.,                     )
8 Plaintiffs                )
                            )
9 vs.                       )  1:23-CV-01004-RP
                            )
10 BOBBY LUMPKIN,           )
   Defendant.               )
11
12
13         REPORTER'S CERTIFICATION
14              ORAL DEPOSITION
15                    OF
16         CHRISTOPHER WESLEY CIRRITO
17
18       I, TINA C. FULLER, Certified Shorthand Reporter
19 in and for the State of Texas, hereby certify to the
20 following:
21       That the witness, CHRISTOPHER WESLEY CIRRITO,
22 was duly sworn by the officer and that the transcript of
23 the oral deposition is a true record of the testimony
24 given by the witness.
25       I further certify that pursuant to FRCP Rule
```

# EXHIBIT 30
# Filed Under Seal

# EXHIBIT 31

# UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
## AUSTIN DIVISION

| | | |
|---|---|---|
| BERNHARDT TIEDE, II;<br>TEXAS PRISONS COMMUNITY<br>ADVOCATES;<br>BUILD UP, INC. a/k/a LIONESS: JUSTICE<br>IMPACTED WOMEN'S ALLIANCE; TEXAS<br>CITIZENS UNITED FOR REHABILITATION<br>OF ERRANTS; and<br>COALITION FOR TEXANS WITH<br>DISABILITIES,<br><br>   Plaintiffs,<br><br>v.<br><br>BOBBY LUMPKIN, in his official capacity as<br>Executive Director of Texas Department of<br>Criminal Justice,<br><br>   Defendant. | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | Civil Action No.: 1:23-cv-01004-RP |

---

## PLAINTIFFS' FOURTH SUPPLEMENTAL DISCLOSURES

---

Plaintiffs, by and through their attorneys, make the following fourth supplemental disclosures:

### A.    Individuals likely to have discoverable information that the Plaintiff may use to support their claims:

1.    Italia Rosas Campuzano, 7915 Friars Court Lane, Klein, Texas 77379, 281-220-7118. Ms. Campuzano is a former correctional officer at TDCJ. Ms. Campuzano will testify about matters set forth in the Complaint and Motion for Injunction, including but not limited to: her experiences working as a TDCJ correctional officer without air conditioning during the summer months, injuries and illness she experienced and witnessed among inmates and other correctional

officers; temperatures in the units; and her experiences as an officer as it relates to the issues and claims in the case.

Respectfully submitted this 6th day of October, 2025.

/s/ Erica Grossman
Erica Grossman (*pro hac vice*)
HOLLAND, HOLLAND EDWARDS & GROSSMAN
1437 High Street
Denver, CO 80218
Email:    erica@hheglaw.com

Jeff Edwards, Texas Bar No. 24014406
Mike Singley, Texas Bar No. 00794642
David Anthony James, Texas Bar No. 24092572
Lisa Snead, Texas Bar No. 24062204
Paul Samuel, Texas Bar No. 24124463
EDWARDS LAW
603 W. 17th Street
Austin, TX 78701
Email:    jeff@edwards-law.com
          mike@edwards-law.com
          david@edwards-law.com
          lisa@edwards-law.com
          paul@edwards-law.com

Thomas A. Olsen (*pro hac vice*)
Kevin D. Homiak (*pro hac vice*)
WHEELER TRIGG O'DONNELL LLP
370 Seventeenth Street, Suite 4500
Denver, CO 80202-5647
Email:    olsen@wtotrial.com
          homiak@wtotrial.com

Jodi Cole, Texas Bar No. 24045602
LAW OFFICE OF JODI COLE, PLLC
203 East Murphy Street
Alpine, TX 79830
Email:    jcole@jodicole.com

Brandon Duke, Texas Bar No. 24094476
Caitlin Gernet
O'MELVENY & MYERS LLP

2

700 Louisiana St., Suite 2900
Houston, Texas 77002
Email:     bduke@omm.com
             cgernet@omm.com

Kristen L. McGough
WINSTON STRAWN LLP
1901 L Street, N.W.
Washington, DC 20036
Email:     KMcGough@winston.com

**ATTORNEYS FOR PLAINTIFFS**

**CERTIFICATE OF SERVICE**

By my signature above, I certify that a true and correct copy of the above and foregoing legal instrument has been forwarded on October 6, 2025 by email as follows:

Assistant Attorneys General
Office of the Attorney General

Abigail Carter: Abigail.carter@oag.texas.gov
Lauren Elizabeth McGee: Lauren.McGee@oag.texas.gov
Marlayna Marie Ellis: Marlayna.ellis@oag.texas.gov
Zachary Louis Rhines: Zachary.rhines@oag.texas.gov
Brandon Mickle: Brandon.mickle@oag.texas.gov
Wade Johnson: wade.johnson@oag.texas.gov
Kyle Tebo: kyle.tebo@oag.texas.gov

*/s/ Brooke Thiele-LaForest*
Brooke Thiele-LaForest

# EXHIBIT 32

```
1              UNITED STATES DISTRICT COURT
             FOR THE WESTERN DISTRICT OF TEXAS
2                      AUSTIN DIVISION
3      BERNHARDT TIEDE, II;        )
       TEXAS PRISONS COMMUNITY     )
4      ADVOCATES; BUILD UP, INC.   )
       A/K/A JUSTICE IMPACTED      )
5      WOMEN'S ALLIANCE; TEXAS     )
       CITIZENS UNITED FOR         )
6      REHABILITATION OF           )
       ERRANTS; and COALITION      )
7      FOR TEXANS WITH             )
       DISABILITIES,               )
8                                  ) Civil Action No.
           Plaintiffs,             ) 1:23-cv-01004-RP
9                                  )
       v.                          )
10                                 )
       BRYAN COLLIER, in his       )
11     official capacity as        )
       Executive Director of       )
12     Texas Department of         )
       Criminal Justice,           )
13                                 )
           Defendant.              )
14
15     ********************************************************
16          REMOTE ORAL AND VIDEOTAPED DEPOSITION OF
17                         DALE COX
18                      JULY 29, 2025
19     ********************************************************
20
21
22
23
24
25
```

                                                    Page 1

1  A. Yes.
2  Q. Procurement of construction, 12 months. So
3 that comes to 33 months, correct?
4  A. Yes.
5  Q. And then 18 months for construction, that's
6 51 months. My apologies on that math. I'm a lawyer,
7 but I'm not also an engineer, so my apologies.
8     So just to recap, if TDCJ had all the
9 resources it needed and all the labor it needed, it
10 could get all of these units air conditioned in
11 somewhere between 36 months and 51 months, based on
12 your experience as an engineer and in the engineering
13 department of TDCJ. Is that right?
14     MS. McGEE: Objection, form.
15  A. Yes.
16  Q. (BY MR. HINOJOSA) Okay.
17     MR. HINOJOSA: I think now is a good time
18 to go ahead and take a break.
19     MS. McGee: Okay. Thank you.
20     THE VIDEOGRAPHER: Okay. That concludes
21 media 4. Off the record at 2:24 p.m.
22     (Break from 2:24 p.m. to 2:52 p.m.)
23     THE VIDEOGRAPHER: This is media number
24 5. Back on the record at 2:52 p.m.
25  Q. (BY MR. HINOJOSA) Okay. Mr. Cox, we were

Page 130

1 just talking about timelines. I want to come back to
2 the issue of funding. I'm going to mark another exhibit
3 here.
4     My mouse is not cooperating with me.
5 Apologies, give me one second.
6     Okay. I am marking for identification
7 purposes Deposition Exhibit 6.
8     (Exhibit 6 marked.)
9     MR. HINOJOSA: Ms. McGee, if you can let
10 me know when you have access to that.
11     MS. McGEE: There we go. Yeah, it just
12 popped up. Thank you.
13     MR. HINOJOSA: All right.
14  Q. (BY MR. HINOJOSA) So Mr. Cox, we were talking
15 before the break the timelines about how the 88th
16 Legislature earmarked $85.7 million for air conditioning
17 spending. Do you recall that?
18  A. Yes.
19  Q. Do you know if TDCJ requested specific
20 earmarked spending from the 89th Legislature that just
21 happened for air-conditioning units?
22  A. No.
23  Q. You don't know one way or the other?
24  A. No.
25  Q. Okay. I am going to go ahead and share my

Page 131

1 screen here.
2     Okay. Can you see this document?
3  A. Barely. A little bit more.
4  Q. How about now?
5  A. Good.
6  Q. Okay. Have you -- so this is two pages. Let
7 me just scroll slowly through these to let you look at
8 them, and then I will ask you about them.
9  A. Okay.
10  Q. Okay. Have you had a chance to take it in?
11  A. Yes.
12  Q. Have you seen either one of the pages in this
13 document before?
14  A. Yes.
15  Q. Okay. Let's take this first page. When have
16 you seen this first page?
17  A. Early part of this year, February, March
18 timeframe.
19  Q. Do you know -- do you recall where you saw it,
20 how you saw it?
21  A. Kind of in conjunction with that other page we
22 were looking at while ago with them listed in the
23 tabular format. This is a different way to present that
24 same information.
25  Q. Okay. You didn't write this document, did

Page 132

1 you?
2  A. No. I had input to it, but I did not -- I
3 don't remember writing this.
4  Q. Okay.
5  A. Especially the second page.
6  Q. Okay. All right. So let's talk about that.
7 Have you seen this page before?
8  A. I don't recall seeing all that. No, I do not
9 recall it.
10  Q. Okay. I will represent to you, Mr. Cox, that
11 these are two handouts that executive director Collier
12 brought to the Texas State House of Representatives
13 Corrections Committee hearing regarding HB 3006 on April
14 16, 2025.
15     MS. McGEE: Objection, form.
16  Q. (BY MR. HINOJOSA) So I want to talk about the
17 second page first. We may come back to the first page,
18 but this is really the one I want to talk about right
19 now.
20     Here in the third paragraph, it says TDCJ's
21 Legislative Appropriations Request for the FY2026-27
22 biennium includes an exceptional item request of $118
23 million for the installation of air conditioning and
24 exceptional item request to construct 14 expansion dorms
25 on the existing facilities in areas where there is a

Page 133

34 (Pages 130 - 133)

1              REPORTER'S CERTIFICATE
2         The undersigned Certified Shorthand Reporter
3    licensed in the State of Texas does hereby certify:
4         I am authorized to administer oaths or
5    affirmations, and prior to being examined, the witness
6    was duly administered an oath by me.
7         I am not a relative or employee or attorney or
8    counsel of any of the parties, nor am I a relative or
9    employee of such attorney or counsel, nor am I
10   financially interested in the outcome of this action.
11        I am the deposition officer who
12   stenographically recorded the testimony in the foregoing
13   deposition, and the foregoing transcript is a true
14   record of the testimony given by the witness.
15        Before completion of the deposition, review of
16   the transcript [X] was [ ] was not requested.  If
17   requested, any changes made by the deponent (and
18   provided to the reporter) during the period allowed are
19   appended hereto.
20        In witness whereof, I have subscribed my name
21   this July 31, 2025.
22
23        _Julie C. Brandt_
24        Julie C. Brandt, CSR, RMR, CRR
25        TX CSR No. 4018, Exp. 10/31/25

Page 218

1    lauren.mcgee@oag.texas.gov
2              July 31, 2025
3    RE: Bernhardt Tiede, II, Et Al. v. Collier, Bryan
4    DEPOSITION OF: Dale Cox (# 7511963)
5       The above-referenced witness transcript is
6    available for read and sign.
7       Within the applicable timeframe, the witness
8    should read the testimony to verify its accuracy. If
9    there are any changes, the witness should note those
10   on the attached Errata Sheet.
11      The witness should sign and notarize the
12   attached Errata pages and return to Veritext at
13   errata-tx@veritext.com.
14      According to applicable rules or agreements, if
15   the witness fails to do so within the time allotted,
16   a certified copy of the transcript may be used as if
17   signed.
18            Yours,
19            Veritext Legal Solutions
20
21
22
23
24
25

Page 219

56 (Pages 218 - 219)

# EXHIBIT 33

# E$^x$ponent®

*x*



Civil Action No.:1:23-CV-01004-RP

BERNHARDT TIEDE, II
v.
TEXAS DEPARTMENT OF CRIMINAL JUSTICE

TDCJ's Inmate Housing Air Conditioning Implementation Analysis

# E$^x$ponent®

**Civil Action No.: 1:23-cv-01004-RP**

**BERNHARDT TIEDE, II**

**v.**

**TEXAS DEPARTMENT OF CRIMINAL JUSTICE**

**TDCJ's Inmate Housing Air Conditioning Implementation Analysis**

*Prepared For:*

**Kevin Homiak**
**Wheeler Trigg O'Donnell, LLP**
**370 Seventeenth Street, Suite 4500**
**Denver, CO 80202**

*Prepared By:*

**Michael Barry, Ph.D., P.E., CFEI**
**TX License 153574**

**Craig Steigerwalt, MBA,**
**PMP, CCM, PSP**

**Shannon Ramey, CFEI**

**Exponent, Inc.**
**1075 Worchester St.**
**Natick MA 01760**

**Exponent, Inc.**
**1075 Worchester St.**
**Natick MA 01760**

**Exponent, Inc.**
**650 S Lucile St.**
**Seattle, WA 98108**

**November 3, 2025**

# Contents

|  |  | Page |
|---|---|---|
| List of Figures |  | iii |
| List of Tables |  | v |
| List of Acronyms |  | vi |
| Limitations |  | vii |
| I. | Executive Summary | 1 |
| II. | Background | 7 |
| III. | Overview of TDCJ's Plan | 11 |
| IV. | TDCJ's Current Process and Recent Air-Conditioning Retrofits | 19 |
| V. | Proposed Modifications to TDCJ's Process | 38 |
| VI. | Conclusion | 57 |
| VII. | Documents and Data Considered | 61 |

| Appendix A | Michael Barry, Ph.D., P.E., CFEI, Craig Steigerwalt, MBA, PMP, CCM, PSP, and Shannon Ramey, CFEI – Curricula Vitae |
| Appendix B | Michael Barry, Ph.D., P.E., CFEI – Testifying Experience |
| Appendix C | Craig Steigerwalt, MBA, PMP, CCM, PSP – Testifying Experience |
| Appendix D | Shannon Ramey, CFEI – Testifying Experience |



# List of Figures

**Page**

Figure 1.     Map showing the six different regions of the TDCJ.     7

Figure 2.     Approximate locations of 73 TDCJ facilities lacking air conditioning within inmate housing areas.     8

Figure 3.     Intake facilities to which TDCJ allocated funds to add air conditioning during FYs '22 – '23.     19

Figure 4.     TDCJ's actual completion dates for FY '22 – '23 facility upgrades from Figure 3.     20

Figure 5.     TDCJ's planned completion dates for FY '24 – '25 facility upgrades.     22

Figure 6.     Typical arrangement of a Design-Bid-Build project delivery method.     23

Figure 7.     Process map showing the steps of a typical Design-Bid-Build approach to construction contracting.     28

Figure 8.     TDCJ Air Conditioning Projects update as of September 1, 2025.     30

Figure 9.     Durations of TDCJ completed projects, highlighting time from Work Request initiated until Construction End.     32

Figure 10.     Durations from construction bid posting to end of proposed performance period for construction on TDCJ bids for inmate housing HVAC services.     34

Figure 11.     Statement within TDCJ proposals pertaining to liquidated damages.     35

Figure 12.     Snip of HTX's proposal schedule for the Boyd unit, highlighted by Exponent to show critical activities.     42

Figure 13.     Typical timeline arrangement of a Design-Bid-Build project delivery method vs. CMAR.     44

Figure 14.     TDCJ's planned approach for design and construction with 2,250-bed prototype facilities.     45

Figure 15.     Typical contracting arrangement of a Design-Build project delivery method.     46

Figure 16.     Typical timeline of a Design Build delivery method, highlighting time savings compared to a Design-Bid-Build method.     46

Figure 17.     Schedule Performance comparison of the three project delivery methods addressed within this report.     47

Figure 18.     Cost performance measures comparing Design-Build, CMAR, and Design-Bid-Build.     48

Figure 19.     HTX outlined benefits to bundling within their Added Value Proposal.     52

Figure 20.     Scatter chart of timelines of both completed projects and projects under construction, comparing project costs vs. construction duration.     59



Figure 21.    TDCJ 2,250-bed prototype facilities with Exponent forecasted construction
             durations.                                                                    60



# List of Tables

**Page**

Table 1    TDCJ's four-phase air-conditioning plan for inmate housing areas.    9

Table 2    TDCJ's reported beds that will be funded for air conditioning shown by FY through their phased approach.    16

Table 3    TDCJ's reported/proposed design spend ($) shown by FY.    17

Table 4    TDCJ's reported/proposed construction spend ($) shown by FY.    17

Table 5    Table of TDCJ completed projects using In-house Design (IHD) vs. Outside Architect/Engineers (OAE) along with their associated scopes of work.    25

Table 6    List of Awarded Contractors for recently-bid TDCJ projects.    28

Table 7    Contractor information with third-party contractors being utilized by TDCJ.    29

Table 8    Table of TDCJ completed projects showing equipment delivery duration, construction duration, and duration of construction after major equipment delivery (reported as CDs).    31

Table 9    TDCJ performance data highlighting Equipment Delivery Durations in CDs.    41



# List of Acronyms

| | |
|---|---|
| A/E | Architecture and Engineering |
| B.K. Mechanical | B.K. Mechanical Services, Inc. |
| CMAA | Construction Management Association of America |
| CD | Calendar Day |
| CMAR | Construction Manager at Risk |
| D-B | Design-Build |
| D-B-B or DBB | Design-Bid-Build |
| DMI | DMI Corp. |
| FHWA | Federal Highway Association |
| FY | Fiscal Year |
| HTX | HTX Industries, LLC |
| HVAC | Heating, Ventilation, and Air Conditioning |
| IHD | In-house Design |
| James Lane | James Lane Air Conditioning Co., LLC |
| MWR | Major Work Request |
| NTP | Notice to Proceed |
| OAE | Outside Architect/Engineers |
| PgMO | Program Management Office |
| PMO | Program Management Organization |
| R.E.C. | R.E.C. Industries, Inc. |
| RFP | Request for Proposals |
| TDCJ | Texas Department of Criminal Justice |
| WBS | Work Breakdown Structure |



# Limitations

At the request of Wheeler Trigg O'Donnell LLP (WTO), Exponent, Inc. (Exponent) examined issues associated with TDCJ's current and ongoing air conditioning retrofits at its un-air-conditioned units.  As requested by WTO, Exponent considered the overall timelines associated with TDCJ's past, current, and future work providing air conditioning retrofits in its units. Exponent's evaluation included a review of documents, relevant industry guidance, and literature. The scope of services performed during this investigation may not adequately address the needs of other users of this report, and any re-use of this report or its findings, conclusions, or recommendations presented herein are at the sole risk of the user. The opinions and comments formulated during this assessment are based on observations and information available at the time of the investigation. No guarantee or warranty as to future life or performance of any reviewed condition is expressed or implied.

The findings presented herein are made to a reasonable degree of engineering certainty. We have made every effort to accurately and completely investigate all areas of concern identified during our investigation. If new data becomes available or there are perceived omissions or misstatements in this report regarding any aspect of those conditions, we ask that they be brought to our attention as soon as possible so that we have the opportunity to fully address them. In addition, we reserve the right to supplement any referenced documents, to use any materials and documents as exhibits, and to review any future analyses or testimony of any fact witness or expert witness in this matter.

## Compensation

In calendar year 2025, Exponent is compensated at a rate of $450, $425, and $475 per hour for the time of Michael Barry, Craig Steigerwalt, and Shannon Ramey, respectively. Exponent's compensation is not contingent on our opinions in this matter, the outcome of this action, nor any part of this litigation. As of the date of this report, Exponent has collectively billed approximately 220 hours for a total compensation of approximately $80,000.



# I.   Executive Summary

At the request of Wheeler Trigg O'Donnell LLP (WTO), Exponent conducted an investigation of issues associated with TDCJ's current and ongoing air conditioning retrofits at its un-air-conditioned units.  As requested by WTO, Exponent considered the overall timeline associated with TDCJ's past, current, and future work providing air conditioning retrofits in its units. Exponent's evaluation included a review of documents, relevant industry guidance, and literature.

TDCJ recently provided phased plans to the Texas Legislature that outlined an overall timeline for completion of air conditioning retrofits at all its facilities that lack inmate housing air conditioning. TDCJ's current timeline associated with these phased plans is approximately eight years. Based on a review of documentation regarding TDCJ's recently completed and ongoing work implementing air-conditioning retrofits, Exponent concluded that, on its current trajectory, TDCJ will not be able to meet this approximately 8-year timeline.

Mr. Dale Cox, Director of Engineering for TDCJ, testified that with full access to necessary resources and labor, the agency could install air conditioning across all its units within a timeframe of 36 to 51 months (approximately 3 to 4.25 years). Mr. Cox's projected timeline was grounded in TDCJ's current Design-Bid-Build construction method and did not factor in any potential modifications to that process in the future.

Based on a review of TDCJ's completed and ongoing air-conditioning retrofit projects, Exponent identified several contributing factors that likely introduced delays or bottlenecks in TDCJ's implementation process. These factors are broadly tied to the limitations and procedural complexities inherit within TDCJ's Design-Bid-Build construction delivery method. By mitigating these factors and implementing alternative construction delivery methods (such as Construction Manager at Risk and Design-Build), TDCJ can accelerate its project timelines and enhance their overall efficiency in completing air-conditioning retrofits.

The completion of air-conditioning retrofits at TDCJ facilities will likely occur in one of four ways:



a. **Status Quo (>10 years).** TDCJ will continue with limited funding requests and with a rate of completion that is comparable to the rate TDCJ achieved during the 2023 – 2024 timeframe.

b. **TDCJ's Phased Approach (~8 years).** TDCJ will request and receive the necessary funding and will implement the scope of work and associated timing outlined in its phased plans that were submitted to the Texas Legislature.

c. **TDCJ's Director Cox Timeline (36 – 51 months).** TDCJ will request and receive the necessary funding and will implement the scope of retrofits for all facilities in a manner that reduces any delays within TDCJ's existing process to an absolute minimum. Through this approach, TDCJ will manage to meet the timeline provided by its Director of Engineering, Mr. Cox.

d. **Improved TDCJ Methods Lead to Accelerated Timeline (24 – 36 months).** TDCJ will request and receive the necessary funding and will implement alternative construction delivery methods and other improvements recommended in this report to accelerate the range of timing outlined by TDCJ's Director, Mr. Cox.

Based on our education, background, training, experience, analysis, and review of the relevant materials, Exponent offers the following opinions to a reasonable degree of scientific and engineering certainty. If additional information becomes available, we reserve the right to modify or amend these findings.

1. In 2022, the Texas House Appropriations Committee (Committee) requested that TDCJ identify how it would propose to air condition the entire system.

   a. In response, TDCJ developed a four-phase plan for the next four fiscal year biennia (2024-2031) that Mr. Collier, Executive Director of TDCJ, presented to the Committee in July 2022.

   b. In August of 2024, Mr. Collier testified during the preliminary injunction hearing that TDCJ believed that the four phases represented the design and construction



that could be accomplished over approximately ten years to air condition all of the beds within the prison system that lacked air conditioning.

c.   In advance of the most recent Texas legislative session, the Texas legislature asked TDCJ to update the four-phase plan to reflect what had been accomplished since 2022 and what remained. TDCJ updated the four-phase plan to a three-phase plan with each phase corresponding to one Texas legislative biennium.  The six-year timing associated with the three biennia in the plan corresponds to a roughly eight-year interval for completion of construction, as funds may be earmarked for construction within the final biennium, even if construction is not completed until the subsequent biennium.

2.   In recent years, TDCJ has completed retrofits to install permanent air conditioning in some existing facilities. These documented retrofits show that TDCJ's process has led to overly extended timelines on these projects. Factors and bottlenecks contributing to extended completion timelines include:

a.   Reliance on in-house TDCJ engineers and maintenance personnel;

b.   Extended timelines for procuring construction contractors (i.e., awarding of bid to contractor);

c.   Use of traditional project delivery methods where others should be implemented;

d.   Piecemeal, project-by-project approach to contracting;

e.   Contracting with local, smaller firms for design and construction;

f.   Limited use of available efficiencies with respect to "prototype" units by not bundling like-facilities together for bid by a single contractor; and

g.   Below market implementation of incentives and disincentives for motivating contractors to perform.



3.      Mr. Cox, Director of Engineering at TDCJ, testified that based on his experience as an engineer and his time in the Engineering department of TDCJ, all the units could be air conditioned in 36 - 51 months, so long as TDCJ had all the resources and labor it needed.

4.      In arriving at this estimate, Mr. Cox provided ranges of timing associated with the four main steps of the design and construction process employed by TDCJ. These main steps are:

    a.   procurement of design;

    b.   design;

    c.   procurement of construction; and

    d.   construction.

5.      TDCJ's design and construction process described by Mr. Cox is representative of a Design-Bid-Build process, which is one of several project delivery systems for accomplishing the design and construction of a project. In a Design-Bid-Build process, each of the four mains steps occur sequentially, thus delaying the start of each step until completion of the predecessor step (rather than in parallel).

    a.   There are other project delivery methods, such as Construction Manager at Risk and Design-Build. Both of these alternative processes involve overlap of, or even elimination of, the steps associated of a typical Design-Bid-Build process.

6.      To mitigate the above-listed factors and other factors, TDCJ can revise its construction contracting strategy. Modifications that TDCJ can implement include:

    a.   Employing a Design-Build project delivery method that would only require a single procurement process to select one firm to complete both design and construction and allow for critical activities to be run concurrently to create time savings;



b.  Bundling similar projects into larger project bundles to contract with larger, more capable, nationwide-firms, thereby creating procurement and construction efficiencies;

c.  Leveraging the existing regional divisions of the TDCJ system to structure the contracts with these larger firms, where different firms can focus on specific regions;

d.  Establishing a statewide Program Management Office to allow for streamlined processes, reporting, and oversight, which would eliminate additional in-house resources; and

e.  Provide clear monetary incentives and disincentives for on-time delivery of retrofits.

The modifications and mitigation strategies outlined above align with standard practices commonly employed across the construction industry to streamline project delivery and reduce delays.

7.  Based on Mr. Cox's testimony that all units could be permanently air conditioned within a 36 to 51-month timeframe, it is feasible for TDCJ to achieve a significantly shorter timeline, potentially between 24 and 36 months from the date of funding allocation, by implementing strategic changes to its current approach. This would require adopting a comprehensive contracting strategy that prioritizes and incentivizes rapid construction, avoids a piecemeal execution, and treats the initiative as a unified program rather than a collection of individual projects.

8.  Based on TDCJ's actual stated intentions and actual rate of construction, if TDCJ does what it has said it will do, then it will likely not achieve the three-phase plan. Moreover, even if TDCJ attempted to follow the three-phase plan, doing so with its current methodology for procurement and construction would likely extend the timeline well beyond the expectations in the plan.



It should be noted that this Executive Summary section does not contain all of our technical evaluations, analyses, conclusions, and recommendations. Hence, the main body of this report is at all times the controlling document.



# II.  Background

1.    TDCJ is the state agency that manages the state prison system throughout the State of Texas. TDCJ operates approximately 101 correctional facilities across the State, consisting of prisons, state jails, transfer facilities, medical facilities, intermediate sanction facilities, etc. These facilities are spread out across the State and broken into six regions by TDCJ, as highlighted in Figure 1.



Figure 1.        Map showing the six different regions of the TDCJ. [1]

2.    According to a presentation provided to the Committee on July 12, 2022 by Bryan Collier, then Executive Director of TDCJ, 69%, or approximately 73, TDCJ units lacked air conditioning in all housing areas.[2] Though TDCJ designated 55% of its facilities as partially air-conditioned in 2022, this designation includes facilities that have only a few air-conditioned beds.[3] For example, units that TDCJ considered "partially air conditioned" in 2024 include the Boyd Unit, Hobby Unit, Lynaugh Unit, C. Moore Unit,

---

[1]    https://www.tdcj.texas.gov/divisions/vs/employee_support_services.html. October 2025.

[2]    [69501] Texas House Appropriations Committee Presentation: Air Conditioning in TDCJ Facilities July 12, 2022 (slide 2); [47641-47642] Cost Estimate by Facility.pdf

[3]    [368415] HVAC Cost Estimate Update.xlsx.

Roach Unit, Stevenson Unit, Torres Unit, and Wallace Unit, each of which had only seven air conditioned beds, but over 1,000 beds without air conditioning.[4]

3.  The 73 facilities identified by TDCJ in 2022 as not fully air-conditioned are distributed throughout the six TDCJ regions as shown in Figure 2. Though reported bed numbers vary, TDCJ's HVAC Cost Estimate Update produced in August 2025 indicates that TDCJ has a total capacity of 155,988 beds.[5]



Figure 2.     Approximate locations of 73 TDCJ facilities lacking air conditioning within inmate housing areas.

4.  In 2022, the Committee directed TDCJ to outline its strategy to air condition the entire correctional system. In response, TDCJ developed a four-phase plan spanning the next four biennia (2024 – 2031), which Mr. Collier presented to the Committee in July 2022.[6] Mr. Collier testified during the preliminary injunction hearing in August 2024 that the four phases in that plan represented the design and construction that TDCJ believed could

---

[4]  Defendant's Objections and Responses to Plaintiff's First Set of Interrogatories, Answer to Interrogatory 2 (July 22, 2024); [48258-48260] Units AC NonAC Cells Dorms (ROG #2).pdf.

[5]  [368415] HVAC Cost Estimate Update.

[6]  Deposition of Bryan Collier, pp.177-178; [69504] Texas House Appropriations Committee Presentation: Air Conditioning in TDCJ Facilities July 12, 2022 (slide 5).



be accomplished over approximately ten years to air condition all of the un-air-conditioned beds within the prison system.[7]

5.    TDCJ's plan involves a four-phase implementation starting in FYs 2024 – 2025 and completing funding allocations by the end of FY 2031 as depicted in Table 1.

Table 1    TDCJ's four-phase air-conditioning plan for inmate housing areas.[8]

| Phases | Estimated Cost | Facilities | | Beds | Annual Operating Cost |
|---|---|---|---|---|---|
| Phase 1 - FY2024-25 Intake Facilities | $225.9 million | Design and Construction (16) | | 24,825 | $4.2 million |
| | | Design Only (20) | | | |
| Phase 2 - FY2026-27 Prototypes (Built 1980s-1990s) | $319.3 million | Design and/or Construction (30) | | 37,289 | $12.2 million |
| | | Design Only (12) | | | |
| Phase 3 - FY2028-29 Older Units (Pre-1987) | $322.4 million | Design Only (11) | | 28,841 | $16.0 million |
| | | Construction Only (12) | | | |
| Phase 4 - FY2030-31 Oldest Units (Pre-1950) | $237.3 million | Design and Construction (4) | | 22,820 | $19.8 million |
| | | Construction Only (11) | | | |

6.    In response to persistent concerns and the lawsuit filed against TDCJ by inmate Bernhardt "Bernie" Tiede, II, (who is alleging, along with several organizations representing Texas prisoners, that temperatures in uncooled TDCJ prison units in the summer months endanger the lives and health of TDCJ prisoners) U.S. District Judge Robert Pittman ruled in March of 2025 that the conditions within TDCJ as they relate to the lack of air conditioning were "*plainly unconstitutional.*"[9]

7.    In his order, Judge Pittman found that, "*at TDCJ's average rate of installing air-conditioned beds since 2018 (1,376 beds per year), it would take 70 years—i.e., until 2094—to install air conditioning throughout TDCJ,*" and that "*even at a rate of 3,100 new air-conditioned beds per year (which is the rate TDCJ averaged in 2023 and 2024), it would take TDCJ 30 years—i.e. until 2054—to install permanent air conditioning throughout the system.*"[10]  Judge Pittman held that "*TDCJ's current plan to install*

---

[7]    Deposition of Bryan Collier, p.177 and [47641-47642] Cost Estimate by Facility.pdf

[8]    TIEDE_DEF_69504.

[9]    BERNHARDT TIEDE, II v. TEXAS DEPARTMENT OF CRIMINAL JUSTICE. ECF 202 at 90.

[10]    BERNHARDT TIEDE, II v. TEXAS DEPARTMENT OF CRIMINAL JUSTICE. ECF. 202 at 63.

*permanent air conditioning—which on the most generous timeline, would not be complete for another 25 years—is insufficient under the Eighth Amendment.*" [11]

8.      Judge Pittman stated that "[he] foresees Plaintiffs being entitled to permanent relief in the form of expeditious installation of permanent air conditioning in all TDCJ facilities [and he] implore[d Mr. Collier to] take to the necessary steps to be prepared for this result."[12]

9.      Following Judge Pittman's Order, the Texas Legislature held its 89th session, in which it appropriated money for the 2026 – 2027 biennium, which corresponds to the second phase in TDCJ's 2022 plan.

---

[11]   BERNHARDT TIEDE, II v. TEXAS DEPARTMENT OF CRIMINAL JUSTICE. ECF No. 202 at 90.

[12]   BERNHARDT TIEDE, II v. TEXAS DEPARTMENT OF CRIMINAL JUSTICE. ECF No. 202 at 90.



# III. Overview of TDCJ's Plan

10.     TDCJ's four-phase plan presented to the Committee in July 2022 suggested air conditioning 113,785 un-air-conditioned beds across 73 facilities or units across four biennia as follows:

a.  **Phase 1 – FY 2024 – 2025**: The first phase prioritized facilities that receive inmates from county jails and facilities with higher concentrations of inmates with special needs.[13] This phase provided for both the complete design and construction of air conditioning for 16 facilities and the design alone for 20 additional facilities at an estimated cost of $225.9 million.[14] The 16 facilities would add 24,825 air-conditioned beds when completed.[15]

b.  **Phase 2 – FY 2026 – 2027**: The second phase prioritized "prototype" facilities built in the 1980s and 1990s that had similar layouts. This proposed phase included constructing air conditioning at the twenty facilities designed in the previous biennium, designing and constructing air conditioning at another ten facilities, and designing air conditioning at an additional twelve facilities for future construction.[16] The estimated cost of this phase was $319.3 million which was anticipated to add 37,289 air-conditioned beds.[17]

c.  **Phase 3 – FY 2028 – 2029**: The third phase prioritized "older" units built between 1950 – 1987 that had unique layouts.[18] This phase called for constructing air conditioning at the twelve facilities designed in the previous biennium and designing

---

[13]  [69497] Draft: Four-Phases for the Installation of Climate Control Equipment.

[14]  [69497] Draft: Four-Phases for the Installation of Climate Control Equipment; [69504] Texas House Appropriations Committee Presentation: Air Conditioning in TDCJ Facilities July 12, 2022 (slide 5); [47641-47642] Cost Estimate.

[15]  [69497] Draft: Four-Phases for the Installation of Climate Control Equipment; [69504] Texas House Appropriations Committee Presentation: Air Conditioning in TDCJ Facilities July 12, 2022 (slide 5).

[16]  [69504] Texas House Appropriations Committee Presentation: Air Conditioning in TDCJ Facilities July 12, 2022 (slide 5); [47641-47642] Cost Estimate.

[17]  [69497] Draft: Four-Phases for the Installation of Climate Control Equipment; [69504] Texas House Appropriations Committee Presentation: Air Conditioning in TDCJ Facilities July 12, 2022 (slide 5).

[18]  [69497] Draft: Four-Phases for the Installation of Climate Control Equipment.

air conditioning at eleven additional facilities for future construction.[19] This phase was estimated to cost $322.4 million and was anticipated to add 28,841 air-conditioned beds.[20]

d. **Phase 4 – FY 2030 – 2031:** The final phase addressed TDCJ's fifteen oldest facilities, each built before 1950. This proposed phase planned for the construction of air conditioning at the eleven facilities designed in the previous biennium and the design and construction of air conditioning at the remaining four facilities.[21] TDCJ estimated this final phase would cost $237.3 million and would air condition the final 22,820 beds lacking air conditioning.

11.    TDCJ presented its four-phase plan in the middle of TDCJ's FYs '22 – '23 biennium. During that biennium, TDCJ used $15.5 million of its deferred maintenance budget to add air conditioning to roughly 21 different buildings across 13 TDCJ units that were primarily used for intake.[22] These projects added 6,793 air-conditioned beds, though 16 of the 21 buildings were not complete until after the end of the biennium.[23] The last intake buildings funded for the addition of air conditioning during the '22 - '23 biennium were completed in April and May of 2025.[24]

12.    Despite telling the Committee in July 2022 that air conditioning the entire prison system within the next ten years required allocating approximately $225.9 million to Phase 1 of its plan for FYs '24 – '25, TDCJ reported in July 2024 that it was allocating just under $86 million to air conditioning for the '24 – '25 biennium.[25] TDCJ also deviated from its originally suggested units for Phase 1 and instead identified four "Fast Track" facilities that TDCJ believed could be air conditioned relatively quickly, along with three "1,000

---

[19]    [69497] Draft: Four-Phases for the Installation of Climate Control Equipment; [69504] Texas House Appropriations Committee Presentation: Air Conditioning in TDCJ Facilities July 12, 2022 (slide 5).

[20]    [69497] Draft: Four-Phases for the Installation of Climate Control Equipment; [69504] Texas House Appropriations Committee Presentation: Air Conditioning in TDCJ Facilities July 12, 2022 (slide 5).

[21]    [69504] Texas House Appropriations Committee Presentation: Air Conditioning in TDCJ Facilities July 12, 2022 (slide 5).

[22]    [69489] Install Air Conditioning in Facilities (July 22, 2024).

[23]    [382348-382349] Schedule Docs re Proj Retrofit or AC.pdf.

[24]    [382348-382349] Schedule Docs re Proj Retrofit or AC.pdf.

[25]    [47641-47642] Cost Estimate by Facility.pdf; [69489] Installing Air Conditioning in Facilities (July 22, 2024).

prototype" units, two buildings at two of the "2,250 prototype" units, and eight other units or sub-units.[26]

a. **Fast Track**: TDCJ allocated $36,930,700 to add air conditioning to the Luther, Powledge, Terrell, and Jester III Units, adding 5,009 air-conditioned beds to the system when construction is completed.[27] Though FY 2025 has ended, these four projects remain under construction.[28]

b. **1000 Prototype**: TDCJ allocated $32,730,900 to add air conditioning to the Hightower, Stevenson, and Boyd units, adding 4,140 air-conditioned beds to the system when they are completed.[29] These three projects also remain under construction.[30]

c. **2250 Prototype**: Notably, TDCJ allocated $10,000,000 to add air conditioning at only one building on the Stiles Unit (Building 8) and one building on the Polunsky Unit (Building 3).[31] These two buildings will add air conditioning to only 864 beds out of the 5,000+ un-air-conditioned beds at these two units.[32] These two projects also remain under construction.[33]

d. **Other:** TDCJ also allocated $6,295,000 to add air conditioning to the remaining un-air-conditioned beds at five units—Goodman (612), O'Daniel (38), Young (98), Bartlett (1,049), and Gurney (2,128). Of these, the Goodman and Gurney Units remain under construction.[34] TDCJ's allocation would also add air conditioning to

---

26   [47641-47642] Cost Estimate;[69489] Install Air Conditioning in Facilities (July 22, 2024).

27   [69489] Install Air Conditioning in Facilities (July 22, 2024).

28   TDCJ Air Conditioning Construction Projects (September 1, 2025), https://www.tdcj.texas.gov/ac/index.html.

29   [69489] Install Air Conditioning in Facilities (July 22, 2024).

30   TDCJ Air Conditioning Construction Projects (September 1, 2025), https://www.tdcj.texas.gov/ac/index.html.

31   [69489] Install Air Conditioning in Facilities (July 22, 2024).

32   [69489] Install Air Conditioning in Facilities (July 22, 2024); [368415] HVAC Cost Estimate Update.

33   TDCJ Air Conditioning Construction Projects (September 1, 2025), https://www.tdcj.texas.gov/ac/index.html.

34   TDCJ Air Conditioning Construction Projects (September 1, 2025), https://www.tdcj.texas.gov/ac/index.html.



single buildings or areas at the Byrd, Lopez, and Sanchez Units.[35] When complete, these units will add 4,146 air-conditioned beds.[36]

13.   The difference in the funding TDCJ reported needing for Phase 1 of its plan, for FY '24 – '25, in order to meet its projected full-system completion timeline ($225.9 million), and the amount it actually dedicated to air conditioning (approx. $86 million) was $139.9 million. This difference not only resulted in 10,666 fewer beds ultimately air conditioned with this funding; it also meant that TDCJ did not complete the design of 20 additional facilities for construction in the following biennium, as TDCJ represented to the Texas Legislature it would do, further delaying future construction.

14.   Similarly, TDCJ told the Texas Legislature that it would need $319.3 million for Phase 2 of its plan, for FYs '26 – '27. However, TDCJ asked for and received from the Texas Legislature only $118.2 million to install air conditioning across eleven units and one additional partial unit in FYs '26 – '27.[37] When construction is complete, these units will add 17,905 air-conditioned beds to the system.[38]

15.   Each of the eleven units to be fully air conditioned using the $118 million funded during the '26 - '27 fiscal years are among those TDCJ considers "prototype" facilities built during the late 1980s and early 1990s.[39]

16.   Once again, the difference in funding between what TDCJ represented would be done in Phase 2 of its plan and what TDCJ actually asked for and received ($201.1 million) not only means that 19,384 fewer beds will be air conditioned at the end of FY '27 compared to TDCJ's projections in its plan; it also means TDCJ will not be moving ahead with design for twelve additional full units for construction in the following biennium.

---

[35]   [69489] Install Air Conditioning in Facilities (July 22, 2024); [368415] HVAC Cost Estimate Update; *see also* TDCJ Air Conditioning Construction Projects (September 1, 2025), https://www.tdcj.texas.gov/ac/index.html.

[36]   [69489] Install Air Conditioning in Facilities (July 22, 2024).

[37]   [47641-47642] Cost Estimate by Facility.pdf; [368418] Installing Air Conditioning in Facilities.

[38]   [368418] Installing Air Conditioning in Facilities.

[39]   [368418] Installing Air Conditioning in Facilities; Defendant's Exhibit 79 from the Preliminary Injunction Hearing in August 2024 (dated August 2, 2024).

17.     In his recent deposition, Mr. Collier testified that when planning for FYs '26 – '27, the Committee asked TDCJ to update the original four-phase plan from July 2022 to reflect the funds that had actually been appropriated with how TDCJ would propose to fully air condition the system.[40]

18.     TDCJ's updated proposal is comprised of a three-phase plan that sets out the $118.2 million TDCJ was appropriated in '26 – '27 and then proposes a plan for TDCJ to fund the design and construction of the remaining un-air-conditioned units in the '28 – '29 and '30 – '31 fiscal years.[41] This plan requires TDCJ to ask for and receive $620.4 million in the '26 – '27 biennium and $584.6 million in the '30 - '31 biennium to air condition the remaining 79,145 un-air-conditioned beds—which represents about 5.2 times and 4.9 times of the highest amount TDCJ has requested and received thus far in one biennium (i.e., $118.2 million), respectively.

19.     Though these amounts represent a significant scaling up of TDCJ's air-conditioning efforts, TDCJ's executive director, Bobby Lumpkin, testified that if TDCJ received the $620.4 million and $584.6 million in the next two biennia that TDCJ could actually complete construction to air condition the entire system by around 2033.[42]

20.     Mr. Lumpkin, however, would not commit to asking the Texas Legislature for these funds.[43] TDCJ, therefore, would not commit to the timing associated with either the three-phase or four-phase plan.

21.     In essence, TDCJ's original four-phase plan and its more recent three-phase plan both suggest addressing the easier, less expensive facilities first and the harder facilities towards the later years. Since approximately 2022, TDCJ's implementation of air conditioning retrofits has largely adhered to the same guiding principle—prioritizing the addition of cooling systems in facilities that are simpler and more cost-effective to upgrade. According to Everett "Dale" Cox, Director of Engineering at TDCJ, TDCJ's

---

[40]   Deposition of Bryan Collier, p. 209; [368418] Installing Air Conditioning in Facilities.

[41]   [368418] Installing Air Conditioning in Facilities. (TDCJ's overall cost estimate also rose from $1.1 billion in 2022 to $1.3 billion.)

[42]   Deposition of Bobby Lumpkin, pp. 204-205.

[43]   Deposition of Bryan Collier, p. 201.

Ex™

plan is to "*make sure that [TDCJ] can use that money to air condition as many beds as possible*," emphasizing the need to get as many beds as they could up front with the allocated funding.[44]

22.    Table 2 shows the breakdown of air-conditioned beds reported to be added or proposed to be added during four biennia periods according to the four-phase plan with reported beds for FY '24 – '25 and FY '26 – '27 reflecting construction based on funds actually allocated during those fiscal years and beds for FY '28 – '29 and '30 – '31 based on TDCJ's three-phase plan.[45] As indicated, TDCJ is proposing a substantial jump in the number of completed beds for FY '28 – '29. The number of air-conditioned beds in FY '28 – '29 is approximately 2.5-times the number of air-conditioned beds in FY '26 – '27.

Table 2    TDCJ's reported beds that will be funded for air conditioning shown by FY through their phased approach.

| | AC BEDS CONSTRUCTION (# BEDS) | | | | |
| | FY 24-25 | FY 26-27 | FY 28-29 | FY 30-31 | TOTALS |
|---|---|---|---|---|---|
| Fast Track Total | 4,931 | 0 | 0 | 0 | 4,931 |
| Transfer Total | 9,335 | 12,830 | 10,109 | 0 | 32,274 |
| Medical Total | 516 | 0 | 0 | 0 | 516 |
| 1000 Bed Prototype Total | 4,140 | 2,376 | 12,822 | 1,732 | 21,070 |
| 2250 Prototype Total | 864 | 2,447 | 21,587 | 0 | 24,898 |
| System I Total | 0 | 252 | 0 | 32,895 | 33,147 |
| TOTALS | 19,786 | 17,905 | 44,518 | 34,627 | 116,836 |

23.    As part of their development of the plans to install permanent air conditioning throughout their facilities, TDCJ developed detailed cost projections that include a breakdown by design and construction phases of each facility.[46] Cost estimates for design and construction phases in the plan are shown in Table 3 and Table 4, respectively, with cost estimates in FYs '24 – '25 and FYs '26 – '27 reflecting funds TDCJ received for air conditioning and cost estimates in FYs '28 – '29 and '30 – '31 based on TDCJ's three-phase plan. Similar to the increase in number of air-conditioned beds in FY '28 - '29,

---

44    Deposition of Dale Cox, p. 158.

45    [368415] HVAC Cost Estimate Updates.xlsx.

46    [368415] HVAC Cost Estimate Updates.xlsx.

there is a large increase in expenditure with respect to both design and construction phases in FY '28 - '29 in the four-phase plan.

Table 3    TDCJ's reported/proposed design spend ($) shown by FY.[47]

| | FORECASTED DESIGN SPEND ($) | | | | | |
| | FY 24-25 | FY 26-27 | FY 28-29 | FY 30-31 | | TOTALS |
|---|---|---|---|---|---|---|
| Fast Track Total | $ 1,699,100 | $ - | $ - | $ - | $ | 1,699,100 |
| Transfer Total | $ 419,490 | $ 4,699,629 | $ 3,702,927 | $ - | $ | 8,822,046 |
| Medical Total | $ 2,721 | $ - | $ - | $ - | $ | 2,721 |
| 1000 Bed Prototype Total | $ 2,772,800 | $ 1,241,631 | $ 6,932,189 | $ 993,454 | $ | 11,940,074 |
| 2250 Prototype Total | $ 1,350,000 | $ 1,700,000 | $ 15,300,000 | $ - | $ | 18,350,000 |
| System I Total | $ - | $ - | $ 55,602,419 | $ - | $ | 55,602,419 |
| TOTALS | $ 6,244,111 | $ 7,641,260 | $ 81,537,534 | $ 993,454 | $ | 96,416,360 |

Table 4    TDCJ's reported/proposed construction spend ($) shown by FY. [48]

| | FORECASTED CONSTRUCTION SPEND ($) | | | | | |
| | 24-25 | 26-27 | 28-29 | 30-31 | | TOTALS |
|---|---|---|---|---|---|---|
| Fast Track Total | $ 23,706,400 | $ - | $ - | $ - | $ | 23,706,400 |
| Transfer Total | $ 20,334,958 | $ 46,996,290 | $ 37,029,267 | $ - | $ | 104,360,515 |
| Medical Total | $ 391,300 | $ - | $ - | $ - | $ | 391,300 |
| 1000 Bed Prototype Total | $ 53,341,263 | $ 34,489,760 | $ 192,560,796 | $ 27,595,956 | $ | 307,987,775 |
| 2250 Prototype Total | $ 8,400,000 | $ 27,089,000 | $ 309,320,123 | $ - | $ | 344,809,123 |
| System I Total | $ - | $ 2,000,000 | $ - | $ 556,024,185 | $ | 558,024,185 |
| TOTALS | $ 106,173,921 | $ 110,575,050 | $ 538,910,186 | $ 583,620,141 | $ 1,339,279,298 | |

24.    Mr. Cox, who had input into developing TDCJ's plans, worked for a number of years as a design engineer, including owning his own consulting firm. Mr. Cox joined TDCJ in 2017 as an Engineer IV, where his "*primary responsibilities were to perform electrical engineering design work, provide signed and sealed construction documents, and then oversee the construction of those projects to make sure they met the engineering design requirements.*" Mr. Cox was promoted to Engineer V in early 2018 and was promoted to Engineer VI and Director of Engineering in 2020. Mr. Cox was the Director of Engineering at TDCJ when the four-phase approach was drawn up and provided to the Texas Legislature.

25.    Mr. Cox testified that based on his experience as an engineer and his time in the engineering department of TDCJ, all of the inmate housing units could be air conditioned

---

47    [368415] HVAC Cost Estimate Update.xlsx
48    [368415] HVAC Cost Estimate Update.xlsx

in 36 – 51 months so long as TDCJ had all the resources and labor it needed.[49] In arriving at this overall estimate, Mr. Cox broke down the complete design and construction process into the main steps from project initiation to building completion. These main steps are procurement of design, completion of design, procurement of construction, and completion of construction. Mr. Cox estimated the timing associated with each of these steps to generate his overall estimated timing.

---

[49]    Deposition of Dale Cox, p. 130.

E𝓍™

# IV. TDCJ's Current Process and Recent Air-Conditioning Retrofits

26.     TDCJ has recently completed or nearly completed multiple air-conditioning retrofits in
its facilities, which allows us to evaluate these projects and identify several causes of
delays and bottlenecks within TDCJ's current processes. The projects that have been
completed thus far are relatively small in scope. They typically consist of installing air
conditioning in a specific building or cell block (rather than a full unit) and range from a
few hundred thousand dollars to around five million dollars.[50]

27.     In July 2024, TDCJ summarized its past air conditioning construction by biennia from
FYs '18 – '23, detailing the funds TDCJ allocated towards air conditioning construction
and the beds added by the funds allocated during those biennia. The funds TDCJ
allocated for construction of air-conditioned beds in FY '22 – '23, which are shown in
Figure 3, were used to add air conditioning to the intake buildings at several units which
collectively had a capacity of roughly 6,700 beds.

## Fiscal Years 2022-23

The 87th Legislature appropriated TDCJ $105.4 million in deferred maintenance funding, $15.5 million of which the agency committed to add air conditioning to 21 intake units expanding air conditioning capacity to over **6,700** beds. These projects are currently underway and will be completed by the end of the calendar year:

| Facility | Beds | Facility | Beds |
|---|---|---|---|
| Bradshaw C Bldg. | 512 | Middleton C Bldg. | 432 |
| Dominguez C Bldg. | 460 | Middleton F Bldg. | 108 |
| Formby Z bldg. | 197 | Plane A Bldg. | 464 |
| Garza West B Bldg. | 432 | Plane B Bldg. | 462 |
| Gist A Bldg. | 464 | Plane C Bldg. | 460 |
| Holliday K Bldg. | 154 | Plane D Bldg. | 230 |
| Holliday D & E Bldg. | 432 | Plane E Bldg. | 230 |
| Hutchins C Bldg. | 230 | Plane F Bldg. | 230 |
| Johnston B1-B3 | 612 | Sanchez D Bldg. | 84 |
| Lychner C Bldg.. | 116 | Woodman D Bldg. | 84 |
| | | Woodman J Bldg. | 400 |

Figure 3.     Intake facilities to which TDCJ allocated funds to add air conditioning during FYs '22 – '23.

---

50     [380892] 8.15 ROGs Workers Compl. Date.xlsx.

28.     The July 2024 summary stated that the 21 projects to add air conditioning in miscellaneous buildings throughout TDCJ's intake facilities "*are currently underway and will be completed by the end of the calendar year*,"[51] referring to the end of 2024.

29.     Due to delays, roughly half of those projects were not finished until well after the end of FY '23, with three units actually being completed in early to mid-2025 (Formby – Z Building, Plane – A Building, and Plane – B Building). This information is shown in Figure 4.



Figure 4.      TDCJ's actual completion dates for FY '22 – '23 facility upgrades from Figure 3.[52]

30.     In addition to having been provided data on completed projects, we also have reviewed Request for Proposal (RFP)/bid information on air-conditioning projects that TDCJ commenced during FY '24 – '25 (corresponding in time to Phase 1 of the four-phase plan), including several "Fast Track" units. As discussed earlier within this report, the project durations associated with the Fast Track facilities are stretched across multiple years and have not been completed as of September 2025.[53]

---

[51]   Exhibit 4. Deposition of Dale Cox.

[52]   [380892] 8.15 ROGs Workers Compl Date.xlsx.

[53]   Based upon bid and contract information provided with TDCJ's and Texas's procurement website. (https://www.txsmartbuy.gov/esbd). October 2025.



31.     Similar to the projects in FYs '22 – '23, the Phase 1 projects also are experiencing delays. While it should be noted that TDCJ has not publicly committed to completing the Phase 1 projects within FY '24 – '25, the way TDCJ reports this information makes it appear as if they will be completed during that timeframe, potentially misleading timelines. For example, data provided shows forecasted spending for both design and construction throughout the Phases, which stops in FY '30 – '31, making it appear that spending will complete by the end of that biennium.[54] [55]

32.     Of the four Fast Track facilities identified in Figure 5 (Luther, Powledge, Terrell, and Jester III) funded during the FY '24 – '25 biennia, all four are currently contracted to be completed in November 2026.[56] Of the three 1,000-bed prototype facilities (Hightower, Stevenson, and Boyd), only Hightower is scheduled to be completed in 2026 (specifically, November 2026). Both Boyd and Stevenson are scheduled to be completed in 2027.[57] Of the two 2,250-bed prototypes (Stiles and Polunsky), which consist of only providing air conditioning in one building per unit (Stiles – Building 8 and Polunsky – Building 3), representing much smaller scopes, both are scheduled to be completed in mid-2026. Information regarding construction completion durations for the Gurney and Goodman units was not found online or provided to us for review.

---

[54]   [368415] HVAC Cost Estimate Update.xlsx.

[55]   [69489] Installing Air Conditioning in TDCJ Facilities (July 22, 2024) (listing 17 projects under "Fiscal Years 2024-25" and noting that this construction will "provide over 14,000 additional air-conditioned beds to the state prison system," suggesting those beds would be completed within that biennium); [368418] "Installing Air Conditioning in Facilities" (describing the hypothetical projects that would be funded under each biennia and reporting that the funds "will install" air conditioning, suggesting completion during each biennia.).

[56]   Information related to TDCJ HVAC construction bids, with information found on Texas's procurement website (https://www.txsmartbuy.gov/esbd). Completion date calculated using contract time performance period within proposal and the date of award.

[57]   Similar to above, information related to TDCJ HVAC construction bids, with information found on Texas's procurement website (https://www.txsmartbuy.gov/esbd). Completion date calculated using contract time within proposal and the date of award.





Figure 5.        TDCJ's planned completion dates for FY '24 – '25 facility upgrades.[58]

33.     As illustrated above, during both the FY '22 – '23 and FY '24 – '25 biennia, TDCJ's
        projects have extended their construction timelines beyond the designated fiscal periods,
        resulting in project durations that carry over into subsequent years. After reviewing data
        from the smaller completed projects and the facility-wide projects currently underway,
        we can see what is driving the longer project durations, which will continue to hinder
        future projects unless changes are made to TDCJ's processes.

34.     Likely causes of such delays and bottlenecks in the current process include reliance on in-
        house personnel for design, extended procurement processes for construction contracts,
        drawn-out board approval for contract awards, lengthy material procurement built into
        the construction contracts, and an overall lack of emphasis or attention to shortening
        schedule durations by TDCJ.

35.     As described in testimony given by Mr. Cox and Ron Hudson, current Chief Operations
        Officer at TDCJ, and verified through review of project records, TDCJ has relied on a
        Design-Bid-Build project delivery method as its standard contracting strategy for
        construction projects for both completed projects as well as projects currently underway.
        In a typical Design-Bid-Build delivery method, the owner engages designers to "*prepare
        the design of the project, including construction drawings, and specifications.*"[59] Once

---

[58]  Completion date calculated using contract time performance period within proposal and the date of award. Information was
      not available related to Boyd, O'Daniel, Young, Lopez, Byrd, Sanchez, and Bartlett facilities within Texas's procurement
      website (https://www.txsmartbuy.gov/esbd). Goodman unit excluded from the analysis due to completion date falling in Aug-
      25 and unavailability of closeout documents.

[59]  CMAA. An Owner's Guide to Project Delivery Methods. Section 3.1 Design-Bid-Build (D-BB). August 2012.

E*™

completed, a bid package is created—similar to TDCJ's RFP packages—and is "*presented to interested contractors, who prepare and submit their bids for the work.*"[60] The contractor selected will then execute a contract with the owner to construct the project in accordance with the provided design. If needed, the contractor will engage additional subcontractors to perform scope of the work that either they themselves cannot provide or scope that can be done more efficiently by others.

36.    The contractual arrangement for a Design-Bid-Build approach is shown in Figure 6. This depicts how an owner typically selects and contracts with two separate entities—one for design, and one for construction. These entities, for both design and construction, may consist of internal staff or be outsourced to third-party contractors. If a contractor were to utilize subcontractors for specialty trades, they would contract directly with the contractor and thus report up through them.



Figure 6.       Typical arrangement of a Design-Bid-Build project delivery method.[61]

37.    In its Design-Bid-Build delivery system, TDCJ generally uses licensed engineers to create and develop detailed plans and specifications specific to each project. This complete set of plans and specifications helps guide the construction process and serves as the basis for competitive bidding on the construction contract.

38.    One of the contributing factors to delays in TDCJ's earlier projects was its reliance on in-house personnel for design services. For projects that have been completed since 2018,

---

[60]    CMAA. An Owner's Guide to Project Delivery Methods. Section 3.1 Design-Bid-Build (D-BB). August 2012.

[61]    Revisiting Project Delivery Performance. Construction Industry Institute and Charles Pankow Foundation. January 2019.

Ex™

TDCJ relied on in-house design personnel to complete designs for the majority of its air-conditioning retrofit projects (Table 5).[62] While this may have created efficiencies early on with the projects consisting of smaller scopes, this approach loses efficiencies as projects become larger in size, requiring more effort from the limited in-house staff.

---

[62]   [380892] 8.15 ROGs Workers Compl. Date.xlsx



Table 5    Table of TDCJ completed projects using In-house Design (IHD) vs. Outside Architect/Engineers (OAE) along with their associated scopes of work.[63]

| Unit | Title | Design Method | Type of AC system Installed |
|------|-------|---------------|------------------------------|
| Hilltop | Replace Ventilation System – 3dr Floor Bldg. 1269 | IHD | DX-split-condenser on roof-use existing |
| Pack | Install Air Conditioning System - Unit Wide | OAE | DX-split-air rotation-no existing ductwork |
| Pack | Install HVAC Units - Trusty Camp | IHD | DX-split-no ductwork |
| Lewis | Install HVAC Units & Concrete Pads - J5 Bldg. | IHD | DX-split-air rotation-no ductwork |
| Murray | Install HVAC Units & Concrete Pads - F Bldg. | IHD | DX-split-air rotation-no ductwork |
| Stiles | Install HVAC Units & Concrete Pads - Bldg. 19 | IHD | DX-split-air rotation-no ductwork |
| Jester III | Install Air Conditioning - 1 & 2 Dorms | IHD | DX-unitary package-new ductwork |
| Hodge | Install Permanent Air Conditioning - J1-J4 Dorms | OAE | Air Source Chilled Water-new CW air handlers-new ductwork |
| Bradshaw PP | Install Air Conditioning System - C Bldg. (I) | IHD | DX-split-use existing ductwork |
| Dominguez | Install Air Conditioning System - C Bldg. Dorms | IHD | DX-unitary package-new ductwork |
| Formby | Install Air Conditioning System - Z Bldg. | IHD | DX-split-use existing ductwork |
| Garza West | Install Air Conditioning System - B Bldg. | IHD | DX-unitary package-new ductwork |
| Gist | Install Air Conditioning System - A Bldg. Dorms | IHD | DX-unitary package-use existing ductwork |
| Holliday | Install Air Conditioning System - D & E Bldgs. (I) | IHD | DX-unitary package-use existing ductwork |
| Holliday | Install Air Conditioning System - K Bldg. Dorms 1-8 | IHD | DX-unitary package-use existing ductwork |
| Hutchins | Install Air Conditioning System - C Bldg. Dorms 5-8 | IHD | DX-unitary package-new ductwork |
| Johnston | Install Air Conditioning System - Bldgs. B1, B2, B3, Pods 1-9 | IHD | DX-unitary package-new ductwork |
| Lychner | Install Air Conditioning System - C Bldg. Dorms 2 & 3 | IHD | DX-unitary package-new ductwork |
| Middleton | Install Air Conditioning System - C Bldg. Dorms | IHD | DX-unitary package-new ductwork |
| Middleton | Install Air Conditioning System - F Bldg. Dorms 1 & 2 | IHD | DX-unitary package-new ductwork |
| Plane | Install Air Conditioning System - A Bldg. | IHD | DX-unitary package-new ductwork |
| Plane | Install Air Conditioning System - B Bldg. | IHD | DX-unitary package-use existing ductwork |
| Plane | Install Air Conditioning System - C Bldg. | IHD | DX-unitary package-new ductwork |
| Plane | Install Air Conditioning System - F Bldg. | IHD | DX-unitary package-new ductwork |
| Plane | Install HVAC Units - Inmate Housing D Bldg. 1-4 | IHD | DX-unitary package-new ductwork |
| Plane | Install HVAC Units - Inmate Housing E Bldg. | IHD | DX-unitary package-use existing ductwork |
| Sanchez | Install Air Conditioning System - D Bldg. Dorms 3 & 4 | IHD | DX-unitary package-use existing ductwork |
| Woodman | Install Air Conditioning System - D Bldg. K Dorms | IHD | DX-unitary package-use existing ductwork |
| Woodman | Install Air Conditioning System - J Bldg. | IHD | DX-split-use existing ductwork |
| Bartlett PP | Install HVAC - Inmate Housing | IHD | DX-split-use existing ductwork |
| Young | Install HVAC - Inmate Housing | IHD | DX-split-no ductwork |
| Byrd | Install HVAC - B Cell Block | IHD | DX-split-use existing ductwork |
| Lopez | Install HVAC Units - Z Bldg. | IHD | DX-split-use existing ductwork |
| O'Daniel | Install HVAC - Restrictive Housing | IHD | DX-split-use existing ductwork |
| Sanchez | Install HVAC units – Z Bldg. | IHD | DX-split-use existing ductwork |

39.     At his deposition, Mr. Cox testified that using in-house personnel is an efficiency and cost saving measure compared to hiring outside engineering contractors.[64] Since in-house personnel are already on TDCJ's payroll, the costs associated with their labor is greatly

---

63    [380892] 8.15 ROGs Worker Compl Date.xlsx

64    Deposition of Dale Cox, p. 81.



reduced.[65] In addition, Mr. Cox also testified that these in-house personnel could leverage their familiarity TDCJ policies and procedures when executing modifications to facilities.[66]

40.    Mr. Cox also testified that, as contracts grow in size and complexity, it is less likely that in-house design services would be used.[67] Mr. Cox's testimony is consistent with TDCJ's more recent trend of relying on third-party architectural and engineering (A/E) firms to provide design services.  The increasing reliance on third-party firms is a positive trend, as these firms have far more capacity to get larger, more complex design projects done quickly.

41.    In December 2022, TDCJ awarded numerous contracts to A/E firms for design services.[68] It also appears that these contracted vendors, including Jacobs Engineering Group (Jacobs), Parkhill Smith and Cooper, Inc., and Huitt Zollars, Inc., were being awarded HVAC design work order contracts through Major Work Requests (MWR) for specific facilities.[69] Based on a limited review, it appears that TDCJ is now awarding MRWs to larger, well-qualified firms in the design industry.

42.    Through issuance of MWRs, the A/E vendors create design drawings which are being used for the basis for constructing air-conditioning systems within inmate housing. Once the design is complete, RFPs are then issued with that design to secure a construction contractor through TDCJ's Contracts and Procurement group.[70] It is not clear whether construction RFPs are released immediately after the completion of design or if there is a gap between the two stages. According to Mr. Hudson, the RFP process, which

---

65   Deposition of Dale Cox, p. 170.

66   Deposition of Dale Cox, p. 170.

67   Deposition of Dale Cox, p. 81.

68   https://www.tdcj.texas.gov/divisions/bfd/contracts_contracts_current.html. Numerous A/E Services contracts appeared to have been awarded which show contract effective/start dates between December 2022 – February 2023, including vendors Chesney Morales Partners Inc., RPS Infrastructure Inc., Huitt-Zollars Inc., Negrete & Kolar Architects LLP, Parkhill Smith & Cooper Inc., Johnston LLC, Stanley Consultants Inc., The Chadwell Group, Fincher Engineering Inc., Amtech Solutions Inc., Jacobs Engineering Group Inc., etc.

69   Assumption based on design drawings contained within HVAC construction RFP documents that show plans designed by certain vendors.

70   Deposition of Ron Hudson, p. 71.



commences with the release of the RFP to potential bidders and ends with proposals being submitted and evaluated, can take anywhere from six to nine months.[71]

43.    Once a construction vendor is selected, approval needs to be given by the Texas Board of Criminal Justice (Review Board). This approval by the Review Board needs to occur prior to contract award. This process is required for any contract over the value of $1,000,000.[72] [73]According to Mr. Hudson, this process can take "*anywhere from six to nine months to go through the [Review Board approval] process*."[74]

44.    Once the Review Board gives its approval, a construction contract can be awarded, or executed with, a construction contractor. This involves having both TDCJ and the contractor execute a contract to perform a defined scope of work. Once a contract is awarded, TDCJ can then issue a Notice to Proceed (NTP). The NTP authorizes the contractor to begin work as outlined in the contract documents and marks the beginning of the performance period. In many cases, the NTP is issued soon after the contract award is finalized; however, delays can occasionally occur before it is formally released. Information on TDCJ historical durations between contract award and NTP was not identified in the documents reviewed by Exponent.

45.    Once the NTP is issued, the project enters the pre-construction phase, which primarily involves initiating the material procurement process. This is triggered through submittal documents and the issuance of purchase orders for specific project related materials. For the list of completed projects, the duration of this period ranges from four days to over 600 days.[75] According to Mr. Hudson's testimony, this material procurement process, from purchase order to site delivery, typically "*takes four to five months, sometimes at Goodman [facility] seven or eight months*." [76]

---

[71]    Deposition of Ron Hudson, p. 71.

[72]    Deposition of Dale Cox, p. 58.

[73]    TDCJ Contract Management Handbook. April 2022.

[74]    Deposition of Ron Hudson, p. 72.

[75]    [380892] 8.15 ROGs Workers Compl Date.xlsx

[76]    Deposition of Ron Hudson, p. 166.



46. On most projects, key construction activities were not performed until needed material and equipment arrived, leaving in some cases a large gap between NTP and initiation of construction activities. The process outlining the steps, from the issuance of final design through construction, is shown in Figure 7.



Figure 7.    Process map showing the steps of a typical Design-Bid-Build approach to construction contracting.

47. Thus far, a limited pool of recurring contractors has consistently received contract awards from TDCJ across the State, as illustrated in Table 6.

Table 6    List of Awarded Contractors for recently-bid TDCJ projects.

| UNIT | SOLICATION NUMBER | AWARDED CONTRACTOR |
|------|-------------------|--------------------|
| Boyd | 696-FD-24-P040 | R.E.C. Industries Inc |
| Goodman | 696-FD-24-P032 | DMI Corp. |
| Gurney | 696-FD-25-P041 | James Lane Air Conditioning Co LLC |
| Hightower | 696-FD-24-P039 | HTX Industries, LLC |
| Jester III | 696-FD-25-P001 | HTX Industries, LLC |
| Luther | 696-FD-24-P042 | HTX Industries, LLC |
| Michael | 696-FD-23-B017 | R.E.C. Industries Inc |
| Powledge | 696-FD-24-P043 | James Lane Air Conditioning Co., LLC |
| Polunsky | 696-FD-25-P013 | HTX Industries, LLC |
| Stevenson | 696-FD-24-P041 | R.E.C. Industries Inc |
| Stiles - Air handler, valves, ductwork. | 696-FD-24-P037 | HTX Industries, LLC |
| Stiles Bldg. 8 | 696-FD-25-P014 | B.K. Mechanical Services, Inc. |
| Terrell | 696-FD-24-P038 | B.K. Mechanical Services, Inc. |

48. As identified above, the contractors that consistently appear to be awarded contracts are HTX Industries, LLC (HTX), R.E.C. Industries, Inc. (R.E.C.), B.K. Mechanical Services, Inc. (B.K. Mechanical), James Lane Air Conditioning Co., LLC (James Lane), and DMI Corp. (DMI). While each one of these contractors is in headquartered in Texas, with only a few appearing to have satellite offices located throughout the State, most (if not all) of these firms would fall into the smaller, local HVAC subcontractor category due to their number of employees and smaller annual revenues. HTX, for instance, who appears to



have won roughly five inmate housing air conditioning projects over the past year,[77] averages only around $9 million in billable revenue a year[78] and has only roughly 38 full-time employees.[79] B.K. Mechanical also only has roughly 21 full-time employees and averages under $2 million in revenue a year. Similarly, James Lane and DMI, while slightly larger, also have low head counts (115 and 50, respectively), and together have averaged under $30 million in revenue a year as shown in Table 7.

Table 7    Contractor information with third-party contractors being utilized by TDCJ.[80]

| Company | # of Employees | Average Yearly Revenue (Last 5 years) |
|---|---|---|
| BK Mechanical | 21 | $ 1,344,779.00 |
| DMI Mechanical | 50 | $ 29,051,410.00 |
| James Lane Air Conditioning | 115 | $ 25,000,000.00 |
| HTX Industries | 38 | $ 9,000,000.00 |

49.    Based on data published on TDCJ's website, as of September 1, 2025, approximately 12,827 beds have reportedly been cooled since 2018. This is illustrated on Figure 8 which displays TDCJ's updated "dashboard" available on TDCJ's website.

---

[77]  Hightower, Jester III, Luther, Polunsky, Stiles Bldg. 8.
      https://www.tdcj.texas.gov/divisions/bfd/contracts_contracts_current.html. October 2025.

[78]  TIEDE_DEF0387629.

[79]  TIEDE_DEF0387631.

[80]  TIEDE_DEF0421894, TIEDE_DEF0421895, TIEDE_DEF0393657, TIEDE_DEF0393660, TIEDE_DEF0393042, TIEDE_DEF0393043. Information for R.E.C. was unable to be found throughout documentation.





| COOL BEDS COMPLETED SINCE 2018 | | COOL BEDS UNDER CONSTRUCTION | | COOL BEDS IN PROCUREMENT | | COOL BEDS IN DESIGN | |
|---|---|---|---|---|---|---|---|
| 12,837 | | 12,753 | | 8,040 | | 16,481 | |
| Allred | 480 | Boyd | 1,372 | Briscoe | 1,384 | Beto | 792 |
| Bartlett | 1,049 | Goodman | 612 | Dominguez | 1,606 | Bradshaw | 1,276 |
| Bradshaw | 512 | Gurney | 2,128 | Gist | 994 | Byrd | 434 |
| Byrd | 15 | Hightower | 1,384 | Hutchins | 1,836 | Estelle | 468 |
| Dominguez | 460 | Jester III | 953 | Lopez | 878 | Holliday | 1,486 |
| Formby | 197 | Luther | 1,316 | Pam Lychner | 1,954 | Garza East | 1,928 |
| Garza West | 432 | Polunsky | 432 | Segovia | 1,224 | Garza West | 1,796 |
| Gist | 464 | Powledge | 1,137 | | | McConnell | 2,540 |
| Hilltop | 26 | Stevenson | 1,384 | | | Memorial | 390 |
| Hodge | 989 | Stiles | 432 | | | Middleton | 1,430 |
| Holliday | 584 | Terrell | 1,603 | | | Murray | 992 |
| Hutchins | 230 | | | | | Sanchez | 794 |
| Jester III | 164 | | | | | Stringfellow | 319 |
| Johnston | 612 | | | | | | |
| Lewis Unit | 282 | | | | | | |
| Lopez | 197 | | | | | | |
| Lychner | 116 | | | | | | |
| Middleton | 540 | | | | | | |
| Murray | 282 | | | | | | |
| O'Daniel | 34 | | | | | | |
| Pack | 1,361 | | | | | | |
| Plane | 2,088 | | | | | | |
| Sanchez | 276 | | | | | | |
| Stiles | 774 | | | | | | |
| Telford | 95 | | | | | | |
| Woodman | 480 | | | | | | |
| Young | 98 | | | | | | |

Figure 8.        TDCJ Air Conditioning Projects update as of September 1, 2025.[81]

50.    When examining the data provided by the smaller completed projects, mostly identified under "Cool Beds Completed Since 2018," TDCJ required a substantial amount of time to complete these projects. A majority of the completed project construction duration in Calendar Days (CD) can be found on TDCJ's provided table shown in Table 8.[82] As shown, many of projects construction durations are well over a year and a half. While many of these also have long durations for equipment delivery durations, many still have long durations from the date of equipment delivery to the date of construction end.

---

[81]    https://www.tdcj.texas.gov/ac/index.html. October 2025.

[82]    [3808292] 8.15 ROGs Worker Compl Date.xlsx.

Eℯ𝓍™

Table 8    Table of TDCJ completed projects showing equipment delivery duration, construction duration, and duration of construction after major equipment delivery (reported as CDs).[83]

| Unit | Title | Equip. Delivery Duration (Days) | Constr. Duration (Days) | Days from Equipment Delivery to Project Complete |
|------|-------|--------------------------------|-------------------------|-------------------------------------------------|
| Hilltop | Replace Ventilation System – 3dr Floor Bldg. 1269 | 74 | 197 | 123 |
| Pack | Install Air Conditioning System - Unit Wide | 147 | 195 | 48 |
| Pack | Install HVAC Units - Trusty Camp | 25 | 168 | 143 |
| Lewis | Install HVAC Units & Concrete Pads - J5 Bldg. | 78 139 | 730 | 591 |
| Murray | Install HVAC Units & Concrete Pads - F Bldg. | 60 90 | 202 | 112 |
| Stiles | Install HVAC Units & Concrete Pads - Bldg. 19 | 79 171 | 403 | 232 |
| Jester III | Install Air Conditioning - 1 & 2 Dorms | 131 | 390 | 259 |
| Hodge | Install Permanent Air Conditioning - J1-J4 Dorms | 77 92 50 | 442 | 365 |
| Bradshaw PP | Install Air Conditioning System - C Bldg. (I) | 183 | 382 | 199 |
| Dominguez | Install Air Conditioning System - C Bldg. Dorms | 167 | 603 | 436 |
| Formby | Install Air Conditioning System - Z Bldg. | 42 | 464 | 422 |
| Garza West | Install Air Conditioning System - B Bldg. | 185 | 524 | 339 |
| Gist | Install Air Conditioning System - A Bldg. Dorms | 451 | 657 | 206 |
| Holliday | Install Air Conditioning System - D & E Bldgs. (I) | 505 | 701 | 196 |
| Holliday | Install Air Conditioning System - K Bldg. Dorms 1-8 | 496 | 677 | 181 |
| Hutchins | Install Air Conditioning System - C Bldg. Dorms 5-8 | 161 | 546 | 385 |
| Johnston | Install Air Conditioning System - Bldgs. B1, B2, B3, Pods 1-9 | 401 | 526 | 125 |
| Lychner | Install Air Conditioning System - C Bldg. Dorms 2 & 3 | 312 | 553 | 241 |
| Middleton | Install Air Conditioning System - C Bldg. Dorms | 393 | 523 | 130 |
| Middleton | Install Air Conditioning System - F Bldg. Dorms 1 & 2 | 395 | 525 | 130 |
| Plane | Install Air Conditioning System - A Bldg. | 196 | 652 | 456 |
| Plane | Install Air Conditioning System - B Bldg. | 584 | 668 | 84 |
| Plane | Install Air Conditioning System - C Bldg. | 384 | 697 | 313 |
| Plane | Install Air Conditioning System - F Bldg. | 423 | 698 | 275 |
| Plane | Install HVAC Units - Inmate Housing D Bldg. 1-4 | 523 | 561 | 38 |
| Plane | Install HVAC Units - Inmate Housing E Bldg. | 447 | 470 | 23 |
| Sanchez | Install Air Conditioning System - D Bldg. Dorms 3 & 4 | 273 | 392 | 119 |
| Woodman | Install Air Conditioning System - D Bldg. K Dorms | 161 | 689 | 528 |
| Woodman | Install Air Conditioning System - J Bldg. | 609 | 683 | 74 |
| Bartlett PP | Install HVAC - Inmate Housing | 31 123 153 | 367 | 336 |
| Young | Install HVAC - Inmate Housing | 13 | 181 | 168 |
| Byrd | Install HVAC - B Cell Block | 92 | 381 | 289 |
| Lopez | Install HVAC Units - Z Bldg. | 4 | 744 | 740 |
| O'Daniel | Install HVAC - Restrictive Housing | 55 | 453 | 398 |
| Sanchez | Install HVAC units – Z Bldg. | 78 | 331 | 253 0 |

51.    As indicated above, the material procurement activities appear to be a factor in driving longer project durations. These activities typically include submittals, approvals, the issuance of purchase orders, and the eventual delivery of the material (often after a lead time). As mentioned earlier, by utilizing the Design-Bid-Build delivery method, the material procurement process doesn't commence until after an NTP is issued. As also

---

83    [3808292] 8.15 ROGs Worker Compl Date.xlsx.

Ex™

outlined earlier, critical construction activities do not typically commence until those materials have arrived on site, effectively preventing contractors from starting construction after they are issued NTP. Of the completed project data that we have been provided, roughly 50% of the construction durations for each projects was attributed to time spent waiting for materials.

52.    In addition to the table provided to us for review showing critical dates from authorization date through construction complete, we were also provided with closeout packages for some of these facilities which enabled us to cross reference and verify some of the critical dates highlighted in other TDCJ documents. Some of the key milestone dates we were able to pull were NTP, Construction Start, and Construction End. We graphed those durations between milestones in Figure 9 to highlight the long durations between NTP to Construction Start, and Construction Start to Construction End.



Figure 9.    Durations of TDCJ completed projects, highlighting time from Work Request initiated until Construction End.[84]

53.    Closeout data consistently shows that the duration from NTP to Construction Start averages well over a year. A significant portion of this delay is attributable to the time spent waiting for key materials to be procured and delivered to the site.

---

[84]    Information was pulled from CLOSEOUT documents provided to us for review, showing historical project documentation.

54.     Moving back to TDCJ's updated dashboard in Figure 8, TDCJ is also reporting that approximately 12,753 cooled beds are "Currently Under Construction." While we were unable to confirm that the number of beds is accurately depicted, we were able to find construction RFP/bid information on the State of Texas's Procurement website for a number of the facilities currently listed under the 'Cool Beds Under Construction" category.[85] Available online resources for these projects typically include RFP solicitations, bidder notices, terms and conditions, construction drawings, and technical specifications.[86]

55.     From the available information, we were able to pull information on those projects related to RFP/bid release dates, dates of site visits, due dates of proposals, dates of actual contract awards, and TDCJ's estimated contract durations. We were also able to determine how long it took, or is planned to take, between RFP/bid posting to site walk, days from site walk to proposals/bids being due, days from due date to contract award, and duration from contract award to TDCJ's contractual estimate of construction durations. That information is shown below in Figure 10 in graph format.

---

[85]     https://www.txsmartbuy.gov/esbd. October 2025.

[86]     HVAC RFP/bid Information was also available for Boyd and Briscoe facilities online, but key dates for Contract Award and planned Contract Durations were not able available, so those two facilities were excluded from the Figure.

E𝒳™



Figure 10.    Durations from construction bid posting to end of proposed performance period for construction on TDCJ bids for inmate housing HVAC services.[87]

56.    The graph in Figure 10 highlights two important points. The first relates to the duration it has taken for the twelve projects from the date proposals/bids being submitted until the time TDCJ awards a contract to the winning bidder. On average, that duration is approximately 149 CDs, roughly five months, with some units taking over 200 CDs (Goodman, Hightower, Jester III, Michael). Although it is reasonable to expect a waiting period between soliciting bids and executing the contract, an average waiting period of five months is not reasonable. From earlier highlighted testimony from Mr. Hudson, a portion of this duration appears to include the time for Review Board approval.

57.    In the case of the Goodman Unit, the duration from bid submission to contract award spanned approximately 180 CDs—the same length of time allocated for the actual construction and upgrade activities as outlined in the RFP documents. This indicates that the procurement process alone consumed as much time as the entire planned construction phase.

58.    In addition to the time TDCJ takes to execute a contract, of the twelve on-going projects listed in Figure 10 with publicly available bid information, the average planned construction duration is roughly 408 calendar days, extending well beyond a single year.

---

87    RFP/Bid information found online through posted documents. https://www.txsmartbuy.gov/esbd. October 2025.

In other words, TDCJ's contracts to provide air conditioning within inmate housing for these projects assume it will take well over a year to complete construction. From using information from completed projects,[88] it is reasonable to assume these durations would also include time for material procurement.

59.  Although precise data on the impact of material procurement on the duration of ongoing construction projects is unavailable, historical records from completed projects indicate that, on average, approximately 40% of construction time is lost due to delays in material availability. This inefficiency is largely attributed to the Design-Bid-Build delivery method, which often postpones procurement activities until after the design and bidding phases are completed.

60.  As part of the proposal documents being incorporated into TDCJ's construction contracts governing these projects, TDCJ is including language pertaining to liquidated damages for contractors who do not finish construction within TDCJ's allotted construction window. Liquidated damages, which denote a predetermined amount of money specified in a contract that one party agrees to pay the other if they fail to complete a project on time, are a mechanism for owners to ensure a project's schedule is adhered to. In other words, it is a way to disincentivize contractors for delays on a project.

61.  In all the proposals we have reviewed concerning the air conditioning of inmate housing, TDCJ includes liquidated damages set at $470 per day of delay. The statement within the proposals is show below in Figure 11. Given the scale of these multi-million-dollar construction contracts, this relatively modest amount is unlikely to serve as a meaningful deterrent or significantly influence contractor behavior.

> **LIQUIDATED DAMAGES - FAILURE TO COMPLETE WITHIN CONTRACT TIME**:
>
> A.  If the Contractor fails to complete the Work within the time specified in the Contract, or any extension, the Contractor shall pay to the TDCJ as liquidated damages, the sum of $470.00 for each available Day of delay.

Figure 11.    Statement within TDCJ proposals pertaining to liquidated damages.[89]

---

88  [380892] 8.15 ROGs Workers Compl. Date.xlsx

89  RFP/Bid Solicitation information for TDCJ Solicitation Number 696-FD-24-P040 for providing AC within the Boyd Unit.

62.     When Mr. Lumpkin was asked within his deposition if this was enough incentive for the contractors to perform and if he agrees TDCJ should have a liquidated damages provision which encourages people to complete projects on time, his response was *"[i]t would be something to review, sure."[90]*

63.     Given the response by Mr. Lumpkin, as well as the consistently low liquidated damages values for each of these projects, it is evident that TDCJ is not making its project timelines a priority. For projects of this scale, involving multi-million-dollar investments and occurring within conditions described as "unconstitutional" for inmates, a flat rate of $470 per day appears unreasonably low. It falls short of industry standards for large-scale initiatives, where liquidated damages are generally aligned with the project's value and inherent risks. Liquidated damages are often applied when "*the delay of a project completion is critical for the program or will cost the [owner] an unforeseen expense.*" [91] Applying a uniform, minimal rate of liquidated damages to projects of varying scope and complexity diminishes the effectiveness of such penalties and fails to underscore the urgent need for air conditioning in inmate housing.

64.     In addition to having inadequate disincentives (i.e., liquidated damages) for finishing late, TDCJ also does not appear to offer any incentives for contractors to finish early. Given the urgent need to quickly install permanent air conditioning throughout inmate housing, it would be expected that more of an emphasis on finishing early would be given to these projects, but that does not appear to be the case. None of the contracts we have reviewed for installing air conditioning appear to contain a bonus or other provision for finishing a project early.

65.     TDCJ's ongoing, piecemeal approach to its projects—doing each project individually—is also inadequate. By utilizing this approach, TDCJ is planning, procuring, and independently executing each and every project. The disadvantages to approaching projects this way is apparent with the longer timelines due to repeated processes for procurement and approvals. TDCJ has an established a framework for categorizing and

---

[90]    Deposition of Bobby Lumpkin ROUGH_DRAFT, p. 257.

[91]    Guidelines for Liquidated Damages. University of California. Facilities Manual.

E𝑥™

organizing facilities based on specific characteristics and regional groupings, which can facilitate bundling of TDCJ projects.

66.    Despite TDCJ generating a phased approach that estimates the amount of funding required for future air-condition retrofits in TDCJ facilities, TDCJ has not asked the Texas Legislature for the funding levels outlined in TDCJ's own phased plan (even though the Texas Legislature provided the full $118 million when requested by TCDJ).[92] Mr. Collier expressed concerns regarding funding and the rate at which future work can be accomplished. Mr. Collier's description of asking the Legislature for funding appears bound by self-imposed limits. When asked if there is a cap on the amount of money that TDCJ can ask for from the Texas Legislature, he answered, "*Not a cap. What we would do is look at our capacity, what could we do, how much could we essentially get done, because a key piece of that whole process is credibility, and if you get funding you need to know you can get it spent. If you can't get it spent, you have to return it after the two-year window, whatever you haven't already spent or have expended.*"[93]  In effect, Mr. Collier is hesitant to ask the Texas Legislature for the full amount of funding needed for fear that TDCJ may not be able to accomplish the work covered by that funding, which would result in TDCJ losing "*credibility*."[94]

67.    The effect of this concern is to guarantee that TDCJ cannot meet their proposed timeframe, since it will not have sufficient funds to execute the work. Furthermore, this approach to requesting funding illuminates an additional flaw in TDCJ's current approach: the biennium funding structure creates constraints around contract initiation and approval. A potential solution is to create fewer and larger contracts that avoid procedural delays associated with contracting on a unit-by-unit basis for separate design and construction processes (see Section V for further discussion).

---

[92]  Deposition of Dale Cox, p. 135.

[93]  Deposition of Bryan Collier, pp. 169-170.

[94]  Deposition of Bryan Collier, p. 172.

E*x*™

# V.  Proposed Modifications to TDCJ's Process

68.  As discussed in earlier sections, TDCJ's current strategy for implementing permanent air conditioning in inmate housing is hindered by several bottlenecks and inefficiencies that impact the overall pace and effectiveness of project delivery. These range from their current use of the Design-Bid-Build delivery system to the way materials are procured, the lack of bundling of like projects, and the lack of sufficient incentives to motivate contractors to expedite the completion of the scope of work.

69.  As such, the following section presents potential modifications to TDCJ's current methodology for designing and constructing air-conditioning retrofits in the facilities remaining to be air conditioned as set out in TDCJ's current, three-phase plan. These proposed modifications aim to enhance the efficiency and pace at which these projects are completed. TDCJ can also implement more fundamental changes to their overall process, such as by switching their current project delivery method and introducing bundling of like buildings and projects into a more programmatic approach to capitalize on efficiencies of scale.

70.  As mentioned above, TDCJ has mainly relied on a Design-Bid-Build project delivery method to construct their projects. According to a publication from the Construction Management Association of America (CMAA), one of the key disadvantages of using a Design-Bid-Build approach is that the process may have a longer duration compared to other delivery methods.[95] Given Judge Pittman's ruling that the conditions in TDCJ's facilities are unconstitutional, any unnecessary delays in completing air-conditioning retrofits cannot be justified as a consequence of a specific contracting method.

71.  One of the ways TDCJ's current Design-Bid-Build approach has contributed to delays is in the procurement of construction phase of the work, which includes the RFP process, selection of a contractor, and approval from the Review Board. This construction bid phase is a structural feature of the Design-Bid-Build process, where the completed design

---

[95]  CMAA. An Owner's Guide to Project Delivery Methods. Section 3.1 Design-Bid-Build (D-BB). August 2012.

package is bid on by contractors. At the conclusion of the RFP process, a contractor's bid is selected for the work. According to Mr. Hudson:

> *Once we get it design complete, we take those design complete prints, we take those and we do what they call a -- a contract requisition that goes to contracts and procurement. So at that point, we turn it over to contracts and procurement. Then they go through their process of what they call the RFP, which is called a request for proposal. So that **takes anywhere from six to nine months** through contracts and procurement for them to do all of their paperwork[...].* [96]

72. Based on documents from TDCJ's recently completed air-conditioning retrofit projects,[97] Mr. Hudson's assessment of time for securing a construction contractor (from RFP/bid release to notice of award) is generally accurate. TDCJ's construction bid phase, however, does not end with the selection of the winning bid. Once the vendor is selected based on TDCJ's selection criteria, that selection goes to the Review Board for approval and financing. According to Mr. Hudson (emphasis added):

> *[...]once they make the award, then we take that to the board. We've got to get a board's approval and **that takes, like I said, anywhere from six to nine months to go through that process**. So from the -- so from the time that we plan it, we're identifying the unit, to where we initiate the design, we -- we -- we go through that whole process of the design to where we procurement, you're looking at now anywhere **from a year and a half to two years for that whole process to take place**.* [98]

73. Consequently, the procedural Design-Bid-Build approach currently employed by TDCJ contributes to significant delays in the overall construction timeline set forth in TDCJ's plan. The Design-Bid-Build structure of TDCJ projects necessitates an RFP process that can commence only after full completion of the design. Furthermore, the process of seeking Review Board approval after selection of a winning bid adds an additional procedural step that can take as long as the RFP process itself. Relying solely on a Design-Bid-Build delivery method will likely lead to embedding these sorts of inefficiencies into the schedule of each individual project.

---

[96] Deposition of Ron Hudson, p. 71.

[97] Provided through Closeout documents produced by TDCJ and [380892] 8.15 ROGs Workers Compl Date.xlsx.

[98] Deposition of Ron Hudson, pp. 71-72.



74.     Another bottleneck in utilizing the Design-Bid-Build method relates to when critical equipment or materials are procured. Under this delivery method, long-lead materials are not ordered until a contractor has been formally contracted. Due to the sequencing of TDCJ's Design-Bid-Build process—where the contractor is brought on board only after the design is finalized, the RFP process is completed, and the Review Board grants approval—the procurement of critical equipment is often significantly delayed. As a result, long-lead materials identified early in the design phase may not be ordered until much later, hindering project momentum and contributing to extended timelines. This effect is evident in TDCJ's recent air-conditioning retrofit projects, where it appears some long-lead items are not being procured until after a construction contract is awarded (Table 9).



Table 9      TDCJ performance data highlighting Equipment Delivery Durations in CDs.[99]

| Unit | Title | Date Awarded | Equip. Delivery Date | Equip. Delivery Duration (Days) | Project Complete Date | Constr. Duration (Days) | Days from Equipment Delivery to Project Complete |
|---|---|---|---|---|---|---|---|
| Hilltop | Replace Ventilation System – 3dr Floor Bldg. 1269 | Sep-20 | Nov-20 | 74 | Mar-21 | 197 | 123 |
| Pack | Install Air Conditioning System - Unit Wide | Nov-19 | Apr-20 | 147 | Jun-20 | 195 | 48 |
| Pack | Install HVAC Units - Trusty Camp | Oct-18 | Nov-18 | 25 | Apr-19 | 168 | 143 |
| Lewis | Install HVAC Units & Concrete Pads - J5 Bldg. | Jan-20 | Apr-20 | 78 | Jan-22 | 730 | 591 |
| | | Jan-20 | Jun-20 | 139 | | | |
| Murray | Install HVAC Units & Concrete Pads - F Bldg. | Jul-20 | Sep-20 | 60 | Jan-21 | 202 | 112 |
| | | Jul-20 | Oct-20 | 90 | | | |
| Stiles | Install HVAC Units & Concrete Pads - Bldg. 19 | Dec-19 | Mar-20 | 79 | Jan-22 | 403 | 232 |
| | | Dec-19 | Jun-20 | 171 | | | |
| Jester III | Install Air Conditioning - 1 & 2 Dorms | Jul-21 | Nov-21 | 131 | Aug-22 | 390 | 259 |
| Hodge | Install Permanent Air Conditioning - J1-J4 Dorms | Jul-20 | Sep-20 | 77 | Sep-21 | 442 | 365 |
| | | Jul-20 | 10/1/2020 | 92 | | | |
| | | Jul-20 | Aug-20 | 50 | | | |
| Bradshaw PP | Install Air Conditioning System - C Bldg. (I) | May-22 | Oct-22 | 183 | May-23 | 382 | 199 |
| Dominguez | Install Air Conditioning System - C Bldg. Dorms | Feb-22 | Aug-22 | 167 | Oct-23 | 603 | 436 |
| Formby | Install Air Conditioning System - Z Bldg. | Feb-24 | Mar-24 | 42 | May-25 | 464 | 422 |
| Garza West | Install Air Conditioning System - B Bldg. | Apr-22 | Oct-22 | 185 | Sep-23 | 524 | 339 |
| Gist | Install Air Conditioning System - A Bldg. Dorms | Sep-22 | Nov-23 | 451 | Jun-24 | 657 | 206 |
| Holliday | Install Air Conditioning System - D & E Bldgs. (I) | Jun-22 | Oct-23 | 505 | May-24 | 701 | 196 |
| Holliday | Install Air Conditioning System - K Bldg. Dorms 1-8 | May-22 | Sep-23 | 496 | Mar-24 | 677 | 181 |
| Hutchins | Install Air Conditioning System - C Bldg. Dorms 5-8 | May-22 | Oct-22 | 161 | Nov-23 | 546 | 385 |
| Johnston | Install Air Conditioning System - Bldgs. B1, B2, B3, Pods 1-9 | Jun-22 | Aug-23 | 401 | Dec-23 | 526 | 125 |
| Lychner | Install Air Conditioning System - C Bldg. Dorms 2 & 3 | Jul-22 | Jun-23 | 312 | Feb-24 | 553 | 241 |
| Middleton | Install Air Conditioning System - C Bldg. Dorms | Feb-22 | Mar-23 | 393 | Jul-23 | 523 | 130 |
| Middleton | Install Air Conditioning System - F Bldg. Dorms 1 & 2 | Feb-22 | Mar-23 | 395 | Jul-23 | 525 | 130 |
| Plane | Install Air Conditioning System - A Bldg. | Mar-24 | Sep-24 | 196 | Dec-25 | 652 | 456 |
| Plane | Install Air Conditioning System - B Bldg. | Feb-23 | Sep-24 | 584 | Dec-24 | 668 | 84 |
| Plane | Install Air Conditioning System - C Bldg. | Sep-22 | Sep-24 | 384 | Aug-23 | 697 | 313 |
| Plane | Install Air Conditioning System - F Bldg. | Jul-22 | Sep-23 | 423 | Jun-24 | 698 | 275 |
| Plane | Install HVAC Units - Inmate Housing D Bldg. 1-4 | Aug-22 | Jan-24 | 523 | Mar-24 | 561 | 38 |
| Plane | Install HVAC Units - Inmate Housing E Bldg. | Aug-22 | Nov-23 | 447 | Nov-23 | 470 | 23 |
| Sanchez | Install Air Conditioning System - D Bldg. Dorms 3 & 4 | Mar-22 | Dec-22 | 273 | Apr-23 | 392 | 119 |
| Woodman | Install Air Conditioning System - D Bldg. K Dorms | Dec-21 | May-22 | 161 | Oct-23 | 689 | 528 |
| Woodman | Install Air Conditioning System - J Bldg. | Dec-21 | Aug-23 | 609 | Oct-23 | 683 | 74 |
| Bartlett PP | Install HVAC - Inmate Housing | Jan-25 | Mar-25 | 31 | Jan-26 | 367 | 336 |
| | | | Jun-25 | 123 | | | |
| | | | Jul-25 | 153 | | | |
| Young | Install HVAC - Inmate Housing | Aug-24 | Aug-24 | 13 | Feb-25 | 181 | 168 |
| Byrd | Install HVAC - B Call Block | Aug-24 | Nov-24 | 92 | Aug-25 | 381 | 289 |
| Lopez | Install HVAC - Z Bldg. | Dec-23 | Dec-23 | 4 | Dec-25 | 744 | 740 |
| O'Daniel | Install HVAC - Restrictive Housing | Jul-24 | Aug-24 | 55 | Oct-25 | 453 | 398 |
| Sanchez | Install HVAC units – Z Bldg. | Oct-24 | Jan-25 | 253 | Sep-25 | 331 | 253 |
| | | Jan-25 | | 78 | | | 0 |

75.     As indicated in Table 9, it appears that critical project equipment delivery for these TDCJ projects commenced only after construction contracts were awarded, which had the effect of further delaying construction.

76.     A specific example of procurement of critical equipment potentially causing a delay in construction is illustrated in a schedule attached by HTX within their proposal for the Boyd RFP. While HTX was not awarded this project, they were one of the two short-listed vendors for the project and have been awarded other similar inmate housing air-conditioning projects throughout the past year. In their proposed schedule, HTX outlines activities under the General Conditions Work Breakdown Structure (WBS) for key

---

99    [380892] 8.15 ROGs Workers Compl Date.xlsx.

activities, as shown on Figure 12. The schedule highlights key activities such as NTP (start, 08.04.2025) as well as key procurement activities. What appears to be on the critical path are the activities for "Delivery: Electrical Equipment" and "Delivery: Modular Chiller Plant." Both activities have durations of 252 days and were scheduled to start shortly after NTP.

| WBS | TASK | LEAD | START | END | DAYS |
|---|---|---|---|---|---|
| **1** | **General Conditions** | | | | |
| 1.1 | Approval - Notice to Proceed | | Mon 8/04/25 | Mon 8/04/25 | 1 |
| 1.2 | Procurement: MCP | | Mon 8/04/25 | Fri 8/08/25 | 5 |
| 1.3 | Procurement: Mechanical Equipment | | Fri 8/08/25 | Tue 8/12/25 | 5 |
| 1.4 | Procurement: Electrical Equipment | | Mon 8/04/25 | Fri 8/08/25 | 5 |
| 1.5 | Submittals | | Mon 8/11/25 | Wed 8/20/25 | 10 |
| 1.6 | Submittal Evaluation/Approval | | Wed 8/20/25 | Fri 8/29/25 | 10 |
| 1.7 | Release Equipment to Manufacture | | Fri 8/29/25 | Fri 8/29/25 | 1 |
| 1.8 | Delivery: AHUs and ARUs | | Mon 9/01/25 | Mon 4/13/26 | 224 |
| 1.9 | Delivery: Electrical Equipment | | Mon 9/01/25 | Mon 5/11/26 | 252 |
| 1.10 | Delivery: Modular Chiller Plant | | Mon 9/01/25 | Mon 5/11/26 | 252 |
| 1.11 | Mobilization to Job site | | Mon 8/25/25 | Mon 8/25/25 | 1 |
| 1.12 | Delivery: Mechanical/Electrical Material | | Wed 8/27/25 | Fri 9/12/25 | 17 |
| 1.13 | Substantial Completion | | Mon 10/26/26 | Mon 10/26/26 | 1 |
| 1.14 | Punch List | | Mon 10/26/26 | Wed 11/04/26 | 10 |
| 1.15 | Demobilization | | Wed 11/04/26 | Wed 11/04/26 | 1 |
| 1.16 | Final Completion | | Wed 11/04/26 | Wed 11/04/26 | 1 |
| **2** | **Site Work** | | | | |
| 2.1 | Locate Existing Utilities | | Mon 8/25/25 | Wed 9/03/25 | 10 |
| 2.2 | Excavation | | Mon 9/01/25 | Thu 10/30/25 | 60 |
| 2.3 | Installation of U/G CHW Piping | | Tue 9/02/25 | Fri 10/31/25 | 60 |
| 2.4 | Installation of U/G Sanitary Sewer Pipe | | Tue 9/02/25 | Thu 9/11/25 | 10 |
| 2.5 | Installation of U/G DCW Pipe | | Tue 9/02/25 | Thu 9/11/25 | 10 |
| 2.6 | Installation of U/G Natural Gas Pipe | | Mon 9/15/25 | Mon 9/29/25 | 15 |
| 2.7 | Installation of U/G Electrical | | Tue 9/02/25 | Thu 10/16/25 | 45 |
| 2.8 | Form New Equipment Pads | | Mon 10/27/25 | Mon 11/10/25 | 15 |
| 2.9 | Pour/Finish Concrete | | Mon 11/10/25 | Fri 11/14/25 | 5 |
| 2.10 | Install Modular Central Plant | | Mon 5/11/26 | Wed 5/20/26 | 10 |
| 2.11 | Install Emergency Generators | | Mon 5/11/26 | Mon 5/25/26 | 15 |
| 2.12 | MCP Startup | | Wed 5/20/26 | Fri 5/29/26 | 10 |
| 2.13 | Emergency Generators Startup | | Mon 5/25/26 | Fri 5/29/26 | 5 |
| 2.14 | Functional Testing | | Mon 6/01/26 | Fri 6/05/26 | 5 |
| 2.15 | MCP Testing, Adjusting and Balancing | | Mon 6/01/26 | Fri 6/05/26 | 5 |
| **3** | **Construction, Building J1** | | | | |
| 3.1 | Locate Existing Openings - Fill w/Concrete | | Mon 5/11/26 | Fri 5/15/26 | 5 |
| 3.2 | Sawcut New Floor Openings | | Mon 5/18/26 | Fri 5/22/26 | 5 |
| 3.3 | Install AHU Rail Supports | | Mon 5/18/26 | Fri 5/22/26 | 5 |
| 3.4 | Install Steel Reinforcements | | Mon 5/18/26 | Wed 5/27/26 | 10 |
| 3.5 | Remove Ductwork | | Mon 5/25/26 | Tue 5/26/26 | 2 |
| 3.6 | Install AHUs | | Mon 5/25/26 | Fri 5/29/26 | 5 |
| 3.7 | Install Duct Heaters | | Mon 5/25/26 | Wed 5/27/26 | 3 |
| 3.8 | Install Relief Fans | | Wed 5/27/26 | Thu 5/28/26 | 2 |
| 3.9 | Install Louvers | | Wed 5/27/26 | Thu 5/28/26 | 2 |

Figure 12.    Snip of HTX's proposal schedule for the Boyd unit, highlighted by Exponent to show critical activities.[100]

---

[100]  TIEDE_DEF0387824.

77.    These "Delivery" activities appear as critical path activities because the schedule represents that construction activities, shown under WBS Category 3 titled "Construction, Building J1," do not start until those deliveries are complete (05.11.2026). Under this proposed schedule, HTX was expected to be given notice to proceed, yet have to wait 252 days to start critical construction activities until key equipment arrived. This sort of delay is due to the sequence of operations that is inherent in a Design-Bid-Build delivery system. Because the contractors are only engaged several months after the design is complete, the procurement of long lead-time equipment does not occur until they are selected and have a notice to proceed, which delays construction activities while the contractor awaits delivery of the critical equipment.

78.    According to Mr. Hudson, TDCJ is aware of other delivery methods for construction and that these methods may provide benefits in terms of expediting schedules. In his deposition, Mr. Hudson mentions that in the future TDCJ intends to rely on one of these alternate delivery methods: Construction Manager at Risk (CMAR). Mr. Hudson specifically refers to how the CMAR process can lead to faster processes.  When discussing the CMAR delivery system as it relates to the design for the McConnell Unit, Mr. Hudson states:

> *Once we get that in full design, we can take that design and use it as a site -- site adaptability across the other ten units. So what our plan is when we get more funding, we will take the McConnell Unit, we will take that design, we'll issue an RFP that will -- that will do what they call a construction manager at risk, and we will hire a – a outside mechanical company and a design team at the same time. As they site adapt all of these units at the same time, we'll move that process faster.*[101]

79.    A critical difference between the CMAR delivery method and a Design-Bid-Build delivery method is that CMAR engages a construction contractor earlier in the process, typically overlapping with engineering during the design phase. This earlier involvement of a contractor allows coordination and advice from the contractor to be built into the design of the facility. According to CMAA, in addition to providing these pre-construction services to the owner, utilizing a CMAR approach also allows construction

---

[101]   Deposition of Ron Hudson, pp. 72-73.

E𝑥™

to potentially begin prior to having a complete design package.[102] One aspect of construction beginning during the ongoing design phase is that long lead-time equipment or materials are likely to be procured much earlier in the process, thus eliminating the lengthy equipment delays observed in TDCJ's completed air-conditioning retrofits. A schematic comparing the overall structure of Design-Bid-Build and CMAR is shown in Figure 13. Similar to a Design-Bid-Build, in a CMAR method the owner still executes two separate contracts with both a designer and a contractor.



Figure 13.     Typical timeline arrangement of a Design-Bid-Build project delivery method vs. CMAR.[103]

80.     It appears that Mr. Hudson anticipates some of the above-mentioned efficiencies associated with employing CMAR when a competed prototype design can be relied on as a basis for other similar prototypes. For example, Mr. Hudson states that "*[a]s they site adapt all of these units at the same time, we'll move that process faster.*"[104] This concept may make sense for a CMAR approach, since the first completed design may be used as a basis for engaging with the contractor for a different project, even when the design for that project is not yet complete. In this specific case, it appears Mr. Hudson is stating that with the completed design available for the McConnell Unit (a 2,250-bed prototype), TDCJ will be able to expedite the design on the remaining 2,250-bed prototype units.

---

[102] CMAA. An Owner's Guide to Project Delivery Methods. Section 3.2 Construction Management at Risk (CMAR) August 2012.

[103] Post-Disaster Infrastructure Delivery for Resilience. Sustainability 2021, 13, 3458. https://doi.org/10.3390/su13063458. November 1, 2025.

[104] Deposition of Ron Hudson, p. 73.

81.    Despite this potential pathway to achieving efficiencies in the completion of 2,250-bed prototypes, it does not appear that any of these efficiencies have been incorporated into TDCJ's phased plan. Figure 14 shows the years for design and construction of the 2,250-bed prototypes as outlined in TDCJ's most recent cost estimate update and three-phased plan. Although Mr. Hudson mentioned in his deposition that the construction of the 2,250-bed prototypes could be expedited due to early completion of McConnell's design, TDCJ's plan shows that both design and construction for a majority of the 2,250-bed prototypes won't commence until FYs '28 – '29.

| UNIT | GROUP | FISCAL YEAR DESIGN | | | | FISCAL YEAR CONSTRUCTION | | | |
|------|-------|--------|--------|--------|--------|--------|--------|--------|--------|
| | | FY2024-25 | FY2026-27 | FY2028-29 | FY2030-31 | FY2024-25 | FY2026-27 | FY2028-29 | FY2030-31 |
| ALLRED | 2250 PROTOTYPE | | | X | | | | X | |
| CLEMENTS | 2250 PROTOTYPE | | | X | | | | X | |
| CONNALLY | 2250 PROTOTYPE | | | X | | | | X | |
| HUGHES | 2250 PROTOTYPE | | | X | | | | X | |
| MCCONNELL | 2250 PROTOTYPE | X | X | | | | X | | |
| MICHAEL | 2250 PROTOTYPE | | | X | | | | X | |
| POLUNSKY | 2250 PROTOTYPE | | | X | | X | | X | |
| ROBERTSON | 2250 PROTOTYPE | | | X | | | | X | |
| STILES | 2250 PROTOTYPE | | | X | | X | | X | |
| TELFORD | 2250 PROTOTYPE | | | X | | | | X | |

Figure 14.    TDCJ's planned approach for design and construction with 2,250-bed prototype facilities.[105]

82.    An even more expeditious process for TDCJ to use is the Design-Build (D-B) project delivery method. Under Design-Build contracting methodology, a single entity would be contracted and responsible for both the design and construction of a project, streamlining communication and accelerating timelines. According to CMAA,[106] under this system the owner contracts with a Design-Build team. This team can be a joint venture of a contractor and a designer, a contractor with a designer as a subconsultant, a designer-led team with a contractor as a subcontracted entity, or a single firm capable of performing both design and construction. The contractual arrangement between owner and D-B contractor is shown below in Figure 15, indicating a single contract and single point of contact.

---

105    [368415] HVAC Cost Estimate Update; *see also* [368418] Installing Air Conditioning in Facilities.
106    CMAA. An Owner's Guide to Project Delivery Methods. Section 3.3 Design-Build (D-B). August 2012.



Figure 15.     Typical contracting arrangement of a Design-Build project delivery method.[107]

83.   There are various potential advantages to the D-B method. These typically include shortened durations for design and construction compared to a Design-Bid-Build system or a CMAR system. It would also create a single point of accountability between TDCJ and the vendor.

84.   Utilizing a Design-Build delivery method would integrate design and construction under a single contract, allowing for greater collaboration and efficiency. The design-build team is typically selected early, enabling design and construction activities to proceed concurrently, as shown in Figure 16. This overlap means that long-lead items can be identified and ordered earlier, potentially allowing any needed site work to begin while design details are still being finalized, and potential issues can be addressed proactively by a unified team. As a result, Design-Build projects usually have far shorter timelines, reduced administrative burden, and fewer delays due to miscommunication or scope gaps between designer and builder.



Figure 16.     Typical timeline of a Design Build delivery method, highlighting time savings compared to a Design-Bid-Build method.[108]

---

[107]  Revisiting Project Delivery Performance. Construction Industry Institute and Charles Pankow Foundation. January 2019.

[108]  https://www.gbateam.com/is-design-build-right-for-my-project/. November 1, 2025.

85.  According to industry research, on average, Design-Build projects are typically delivered 13% faster during construction and 61% faster from design through final completion when compared to CMAR projects. In addition, Design-Build projects are delivered 36% faster during construction than Design-Bid-Build and 102% faster over the entire project duration.[109] This is indicated in Figure 17.

| Performance Measure | DB vs. CMR | CMR vs. DBB | DB vs. DBB |
|---|---|---|---|
| Schedule Growth | 3.9% less | 2.2% more | 1.7% less |
| Construction Speed | 13% faster | 20% faster | 36% faster |
| Delivery Speed | 61% faster | 25% faster | 102% faster |

Figure 17.    Schedule Performance comparison of the three project delivery methods addressed within this report.[110]

86.  In addition to helping with schedule durations, the Design-Build delivery method has proven to provide better cost control as compared to the Design-Bid-Build and CMAR delivery methods, which is yet another advantage of utilizing the method. According to data, Design-Build projects have been found to be 0.3% less expensive than a Design-Bid-Build method and 1.9% less expensive than a CMAR method as shown in Figure 18.[111] Although the cost metrics may not reflect substantial savings, they underline an important point in which the reductions in schedule duration are being achieved without adversely affecting overall project costs.

---

[109]  Revisiting Project Delivery Performance. Construction Industry Institute and Charles Pankow Foundation. January 2019.

[110]  Revisiting Project Delivery Performance. Construction Industry Institute and Charles Pankow Foundation. January 2019

[111]  Revisiting Project Delivery Performance. Construction Industry Institute and Charles Pankow Foundation. January 2019

E𝑥™

| Performance Measure | DB vs. CMR | CMR vs. DBB | DB vs. DBB |
|---|---|---|---|
| Unit Cost | 1.9% less | 1.6% more | 0.3% less |
| Cost Growth | 2.4% less | 1.4% less | 3.8% less |

Figure 18.     Cost performance measures comparing Design-Build, CMAR, and Design-Bid-Build.

87.     TDCJ's current method for delivering construction is based on a Design-Bid-Build methodology, but there are other methodologies they can employ. Some features of these alternative methodologies can directly address the cause of delays that TDCJ has experienced in their recent air-conditioning retrofits. Modifying their approach to future projects does not require TDCJ to completely abandon their Design-Bid-Build methodology. Instead, it can employ a mix of delivery methodologies in the pursuit of whatever strategies maximize the rate of completed construction. Their implementation of this strategy may be assisted by working with project manager teams that can oversee these different project types on TDCJ's behalf. The installation of air conditioning can be expedited significantly by using primarily (if not exclusively) Design-Build contracts for installing permanent air conditioning.

88.     Regardless of whether TDCJ employs Design-Bid-Build, CMAR, or Design-Build delivery method, a further potential for efficiency in completing construction would be achieved if TDCJ shifts from their current project-by-project (or unit-by-unit) approach and adopts a more bundled, programmatic project management approach.  This approach involves a more structured and coordinated strategy for managing and executing a series of related projects under a unified framework. Instead of treating each project as a standalone effort, this approach views them as components of a broader program with shared goals, resources, and oversight. Exponent has observed some aspects of bundling projects with regard to design only,[112] we have not seen such bundling on the construction contracting side.

---

[112]  For example, via larger blanket A/E contracts.

89.    According to studies and industry publications, project bundling, or programmatic project delivery, offers an accelerated solution for addressing multiple projects of similar scope. The similar scope of the planned TDCJ air-conditioning retrofits provide an appropriate platform for such a bundling approach. According to an article by the Federal Highway Association (FHWA), bundling projects "*streamlines design, contracting, and construction…allow[ing] agencies to capitalize on economics of scale to increase efficiency.*"[113]

90.    The FHWA article[114] identifies that project budling is "*a proven practice that draws upon efficiencies found through project delivery streamlining, as well as benefits from alternative (i.e. CMAR and D-B) and traditional (i.e. D-B-B) contracting methods.*" The article goes on to notes that a bundled contract can "*cover a single county, district, or State, and it may be tiered to allow a combination of work types*" and that bundling construction contracts "*saves procurement time, leverages design expertise, and builds momentum[…].*" These two issues – saving procurement time and leveraging design expertise – are two critical factors TDCJ must incorporate to install permanent air conditioning as quickly as possible.

91.    As described earlier within this report, TDCJ is divided into six separate regions, each of which is responsible for overseeing facilities within different geographical areas. The established structure of the TDCJ system thus provides a natural platform for implementing a bundling approach. If bundled specifically by region, it will allow TDCJ to streamline management, staffing, logistics, and program implementation across the large footprint throughout the State. TDCJ's clearly defined regional structure presents a strategic opportunity to optimize its approach to cooling inmate housing across facilities. This opportunity would allow TDCJ to take a more programmatic approach, rather than continue with a building- or unit-level approach.

92.    As highlighted earlier within this report, both TDCJ's construction funded in FYs '24 – '25 and FYs '26 – '27, as well as the future phases of the three-phase plan,

---

[113]  Federal Highway Administration. Project Bundling. https://www.fhwa.dot.gov/innovation/everydaycounts/.

[114]  Federal Highway Administration. Project Bundling. https://www.fhwa.dot.gov/innovation/everydaycounts/.

Ex™

already consider the similar styles and designs of existing units, such as the 1,000-bed prototype and the 2,250-bed prototype. However, rather than bundling several single-project contracts (or at least consolidated contracts) for efficiency, TDCJ is contracting each prison, or sometimes building, individually, even when several prisons are funded for design and/or construction at the same time. Thus, TDCJ still has to go through separate, sequential processes for bidding, procurement, sourcing, resource allocation, etc., for both the design and construction phases for each unit. Even if all of these separate activities occur during the same time period (as outlined in the three-phase plan), the separate contracting for installing air conditioning in a single unit or building prevents the potential efficiencies that most likely would have been gained via bundling these units together.

93.    An additional benefit of consolidating and bundling projects together is the potential to attract larger, more experienced contractors, which have more resources to devote to their projects compared to smaller firms. Bundling similar projects—particularly within defined geographic regions—could attract large-scale contractors by offering scopes of work that align with their capacity, bonding strength, and experience managing complex, multi-site efforts. Bundling projects by the TDCJ's regions would allow each region to be accountable for its own facilities, as well.  Given TDCJ's similar infrastructure and well-defined geographical regions, a program-based/bundling approach is logical, highly advantageous, and likely far more efficient.

94.    The bidding documents for the HVAC construction at the Boyd Unit illustrate the deficiencies in TDCJ's current project-by-project approach and the upside of bundling projects together. TDCJ only received two bids for the Boyd Unit project, one from R.E.C.) and another from HTX. [115] HTX was the apparent low bidder at roughly $17 million while R.E.C. came in slightly higher at roughly $19 million.[116] When both companies were asked to provide best and final pricing, HTX informed TDCJ that if they were to bundle Boyd with two other projects, they would reduce their price by

---

[115]  TIEDE_DEF0386910.

[116]  TIEDE_DEF0386913.

$1.5 million.[117] This demonstrates how bundling multiple projects together can increase efficiencies, not just in terms of project execution but also by reducing the administrative burden of contracting individually for each project. TDCJ ultimately turned down HTX's proposal, but HTX's proposed bundling approach could have led to greater efficiency in execution and resource management and served as an example for future bundling of TDCJ projects.

95.     As part of HTX's best and final pricing negotiation, they presented TDCJ with a value-added proposal, highlighting how strategic bundling of a few units (Boyd, Stevenson, and Hightower) would not only create cost savings for TDCJ but also create numerous efficiencies in terms of centralized oversight, faster streamlined procurement, and improved reliability to name just a few of the benefits. The full list of key benefits of strategic bundling in which HTX outlined can be found in Figure 19.

---

[117]  TIEDE_DEF0386961.

E𝓍™

1. **Substantial Cost Savings**
   - **Total Reduction:** HTX Industries is offering a discount of **$1.5 million** across all three projects (**$500,000 per project**).
   - **Cost Efficiency Without Quality Compromise:** The savings allow TDCJ to reallocate budget funds while maintaining high construction and operational standards.
   - **Competitive Pricing Through Strategic Supplier Relationships:** HTX's long-standing partnership with major OEMs allows for better pricing on materials and labor.

2. **Economies of Scale in General Conditions & Project Management**
   - **Centralized Oversight:** Managing all three projects under one contractor streamlines supervision, communication, and administrative processes.
   - **Reduced Overhead Costs:** Consolidated procurement, scheduling, and personnel management minimize redundancies and maximize efficiency.
   - **Enhanced Workforce Coordination:** By utilizing shared labor and equipment across all three sites, the execution process becomes more seamless and cost-effective.

3. **Standardized Fabrication & Equipment**
   - **Uniform System Design:** Standardized fabrication ensures each facility receives an identical system, reducing design & engineering complexity and potential modifications.
   - **Faster Procurement & Installation:** Bulk purchasing lowers costs and accelerates material acquisition, reducing project delays.
   - **Improved Reliability & Compatibility:** Using the same infrastructure across all three projects minimizes inconsistencies in construction quality.

4. **Maintenance & Operational Efficiencies**
   - **Standardized Equipment Across Facilities:** Simplifies long-term maintenance since all three locations will use the same systems and components.
   - **Lower Inventory & Spare Parts Costs:** By using common spare parts, TDCJ can **reduce storage needs and associated costs**.
   - **Easier Staff Training & Technical Support:** Maintenance personnel will only need to be trained on a single system, improving efficiency in troubleshooting and repairs.

5. **Optimized Project Schedule & Execution**
   - **Coordinated Scheduling:** HTX Industries' ability to manage all three projects simultaneously results in a synchronized timeline that minimizes delays.
   - **Streamlined Logistics & Resource Allocation:** Efficient planning ensures the best use of labor, materials, and equipment across all locations.
   - **Minimized Disruptions to TDCJ Operations:** With enhanced organization, the construction phase can progress smoothly without interfering with facility operations.

Figure 19.     HTX outlined benefits to bundling within their Added Value Proposal.[118]

96.   Despite HTX being the lowest bid and presenting the value-added proposal, TDCJ decided against HTX and awarded the Boyd Unit construction contract to R.E.C.[119] Exponent has not observed an explanation from TDCJ or other evidence for why the HTX proposal was rejected by TDCJ.

97.   Located approximately 100 miles south of Dallas, the Boyd Unit is situated within a 50-mile radius of several other TDCJ facilities in need of air-conditioning upgrades,

---



including Powledge, Gurney, Michael, Coffield, and Beto. All facilities are part of TDCJ's larger plan for getting air conditioning within inmate housing and would be ideal candidates to bundle for better pricing. Instead, it appears TDCJ's approach is to continue with a unit-by-unit approach.

98.   Under a bundled and more programmatic approach, TDCJ could organize a designated team to provide oversight over all of the projects and coordinate project implementation. This would have many benefits for TDCJ: optimizing resources, avoiding duplication of efforts, and saving costs. Throughout the management industry, this centralized organization unit is known as a Program Management Office, or PgMO. Similar to that of a Project Management Organization (PMO), a PgMO is designed to manage a program, or a group of similar projects that are coordinated to achieve benefits not available from managing them individually. Unlike a traditional PMO that focuses on individual projects, a PgMO operates at a higher level, ensuring that all projects within a program contribute to broader organizational goals.

99.   There are numerous advantages for having TDCJ establish a PgMO. These would include strategic alignment, streamlined oversight, efficient resource allocation, and better risk management across the facilities. Most importantly, it would create resource efficiencies throughout TDCJ, potentially alleviating bottlenecks that are being experienced today. For any instances in recent air-conditioning retrofits where TDCJ's actions resulted in a delay, implementing a PgMO structure could help mitigate those delays by removing the project's reliance on TDCJ personnel or procedures.

100.   If TDCJ were to adjust their approach to be more programmatic, it would allow for shared resources, reducing duplication and improving cost-effectiveness. Mr. Collier stated in his deposition the reason TDCJ can't move any faster is due to resource constraints with available vendors.[120] By adjusting their approach to be run more like a program by grouping projects under larger umbrellas, it would allow a designated team to provide coordinated oversight which would create efficiencies on numerous levels. By managing these projects under one program, it would allow TDCJ to manage

---

[120] Deposition of Bryan Collier, p. 173.

interdependencies between projects, ensuring resource availability and availability to those more critical facilities.

101.    A programmatic approach would also enable TDCJ to complete its pending projects more quickly. TDCJ's designated team would be able to avoid or mitigate the bottlenecks and roadblocks present in TDCJ's current approach. For example, given the similarities in numerous facilities, the team could attempt to expedite design as well as procurement, so projects aren't delayed as contractors wait for critical materials to arrive. In addition, design teams could review critical long-lead items from past projects and apply those lessons to future projects with similar layouts or scopes and potentially commence the material procurement process months earlier than has been done in the past. This proactive approach can help streamline the material procurement process—one of the primary sources of inefficiency in current construction practices.

102.    Another modification that could be implemented by TDCJ is a more strategic approach towards incentives and disincentives related to construction durations. While TDCJ is currently including liquidated damages clauses within their construction contracts, they are doing so at a consistent and relatively low daily rate which does not appear to align with the risk of not providing air conditioning to inmate housing units. TDCJ should consider reevaluating its current daily liquidated damages rate of $470 and aligning it more closely with the level of risk associated with not completing cooled beds in a timely manner throughout each project. A more dynamic approach—such as scaling the damages based on the number of inmate beds to be air-conditioned—would better reflect the urgency and impact of delayed completion, particularly for larger or higher-priority facilities. For example, as TDCJ moves into the 2,250-bed prototype units, most which have over 2,500 beds needing to be cooled, they should consider utilizing a much higher liquidated damages rate compared to a transfer facility, which may only require a few hundred beds to be cooled. This adjustment would reinforce the critical importance of timely delivery and incentivize contractors to meet deadlines proportionate to the scope of each project.



103.    In addition to utilizing a more strategic approach towards disincentives, TDCJ could also
implement an incentive program for contractors who finished before the contractual
construction end date. Common in the construction industry for critical projects,
introducing incentives into the contract for early completion has been proven in cases to
be effective in reducing the contract completion time.[121] While implementing a potential
incentive program will undoubtedly incur costs, it will promote a greater sense of
urgency in project execution by offering meaningful incentives to contractors. This
approach can help accelerate timelines and improve overall performance, ultimately
supporting the timely delivery of critical infrastructure improvements.

104.    A further tactic that may be employed by TDCJ for obtaining additional flexibility in how
they procure and deliver construction would be to classify the retrofits as some form of
emergency. The current process for implementing retrofits in TDCJ's facilities has
generally been described by Mr. Cox and Mr. Hudson in the context of the normal
procedure for delivering construction at TDCJ, however, in light of Judge Pittman's
ruling, which deemed TDCJ's facilities "*plainly unconstitutional*," a type of emergency
designation may more appropriately reflect the urgency of upgrading TDCJ's facilities.

105.    As previously noted, TDCJ is handling each project individually, resulting in a separate
RFP being issued for every single one. According to TDCJ's Contract Management
Handbook:

> *A complex service requisition will require an RFP/RFO to be issued and
> that process could take from six to nine months. The contract specialist
> must develop an Acquisition Plan, which is an estimated timeline of the
> complete procurement process from beginning to end and a Source
> Selection plan which details how a solicitation will be awarded based on
> best value to the agency.* [122]

This "complex service requisition" appears to be how TDCJ is classifying a majority of
their HVAC construction contracts, in which TDCJ releases an RFP to potential bidders
and requests proposals be submitted at a later time. As discussed above, TDCJ has

---

[121] An Analysis of the Use of Incentive/Disincentive Contracting Provisions for early Project Completion. Texas Transportation Institute. May 1986.

[122] TDCJ Contract Management Handbook. April 2022.

generally been taking six to nine months to solicit bids, review them, and select an HVAC contractor.

106.     TDCJ's Contract Management Handbook states that TDCJ does have can employ expedited procedures for emergencies, typically utilized for natural or man-made disasters. According to their Handbook:

> *In the event of a declared disaster the Contracts and Procurement Department will do everything necessary to provide the goods and services the agency requires either through expedited purchasing using ADPICS or through manual processes in the event of system failure due to the disaster.*[123]

While it is unclear if this language may apply to TDCJ's air-conditioning retrofits process, it does demonstrate when emergencies arise, there are potentially mechanisms that allow for modified processes to address the urgent nature of handling the emergency.

---

[123]   TDCJ Contract Management Handbook. April 2022, p. 12.

# VI. Conclusion

107.    In 2024, Judge Pittman ruled that the conditions in TDCJ facilities are "*plainly unconstitutional*" and also that the 2023 – 2024 completion rate of air-conditioning retrofits was unacceptably slow in terms of remediating the dangerous conditions.[124]

108.    TDCJ's most recent plan for air conditioning all inmate housing areas (set out in three phases) is based on its assessment that all of the remaining units still lacking air conditioning in 2026 could be air conditioned within the next eight years, or by 2033. That plan, however, relies on TDCJ implementing its standard practices for designing and constructing facilities.

109.    Based on a review of TDCJ's recent air-conditioning retrofits, it is not on a trajectory to meet this 8-year time horizon, even if the agency received all the necessary funds set forth in the plan. In addition to being contingent upon receiving hundreds of millions more dollars in FYs '28 – '29 and FYs '30 – '31 than TDCJ has ever received in the past for air-conditioning, multiple aspects of TDCJ's construction contracting process and strategy make it likely that TDCJ will fall short of the hypothetical 8-year deadline.

110.    However, by implementing alternative processes that are known within the industry to reduce total design and construction durations, TDCJ can complete the air conditioning installation far more efficiently. Mr. Cox estimated a 36 – 51-month timeline for installing air conditioning statewide, which assumes that TDCJ will use the same unit-by-unit and Design-Bid-Build approaches. If TDCJ adopts the recommendations in this report, it can improve upon the methodology that Mr. Cox assumed in his estimate of timing. By shifting its approach to a methodology that improves speed of delivery, TDCJ can improve upon the estimate provided by Mr. Cox and thus install permanent air conditioning throughout all the units within 24 to 36 months from the date on which funding is allocated to TDCJ.

---

[124]    BERNHARDT TIEDE, II v. TEXAS DEPARTMENT OF CRIMINAL JUSTICE. ECF 202.

111.    If TDCJ continues to follow the same process, it will continue to hit headwinds. As described above, though TDCJ has not followed the four-phase plan in terms of amount of funding or proposed scale of design and construction, TDCJ has generally followed the approach of air conditioning the newer facilities first and saving the older facilities with more unique layouts for last. As TDCJ continues to follow this approach, their estimated construction expenditures rise significantly, meaning that the planned construction work will be more expensive, most likely as a result of larger scopes of work, especially with the System 1 facilities assigned to FYs '30 – '31 in both the three-phase and four-phase plans.

112.    As such, if TDCJ continues to perform as they are today with the larger, more complex projects in later years, it will experience extremely long construction durations, on top of its already lengthy process, unless things change. Using the information from previous projects completed, as well as forecasted timelines from projects currently under construction, we created a trendline showing the connection between construction duration and construction pricing. The data set used and trendline are shown below in Figure 20.



# EXHIBIT 34

Dear Charlie,                                           7/1/24

    I'm writing you today to give you some knowledge of what's going on inside the walls and also for some advice since you were so good at it on Pack Unit Trustee Camp. Where your favorite two people worked Warden Henner and Big Booty Judy aka Sgt. Wilson. 😊

    My name is of course Billy Mitchell my TDCJ# then was 2071040 but, now it's 2467338. I was at Pack with you in Two dorm in 89 bunk. Worked at Buffalo Ranch and then in the Kitchen with those nice ladies eecept for Mrs. Douglass. Am I bringing back any "bad" memories for you? I'm sure there were quite a few. I hope you now know who I am you did of Course write a few "Grievances" for me against Wilson she didn't like me either.

    First thing I would like to know is what happened to all TDPD units having AC? I'm here at Choice Moore and it's already getting up to 101° in the dorm. A man has a Thermometer in the dorm. in Case you need to know. They have 5 fans in the dorm with one exhaust

Plaintiffs' Exhibits

Ex. 151

1065
/18

$11.80
16

far that may or may not work. So I'm wondering if there is any way for me to use the "Pack Law Suit" to my advantage to be moved to one of the A/C'ed units that TDCJ has put in since 2019. I was at Pack from 2016 to 2019 went through all of the paperwork that needed to be signed. So is there any kind of help you can advise me about or if you would like to know anything else about what goes on here I would be more than happy to help you out.

Also would like to tell you you look alot better in something other than all "WHITE." I saw your interview on "Real Vida" I will continue to pray that the Courts dismiss your Charges and your Slate will be Clean and you will get Money for wrongful Conviction and for your time at TDCJ.

Look forward to hearing from you. You can contact my daughter at (254) 721-3627 (Kaitlynn) if you need to ask her anything or to give her a message for me. Thanks Again & God Bless You and family

Sincerly
Billy Mitchell

# EXHIBIT 35

# SUNSET ADVISORY COMMISSION

## STAFF REPORT WITH FINAL RESULTS

**Texas Department of Criminal Justice**

**Correctional Managed Health Care Committee**

**Windham School District**

**Board of Pardons and Paroles**

**2024-25**
**89TH LEGISLATURE**



# SUNSET ADVISORY COMMISSION



**Representative
Keith Bell**
*Chair*

**Senator
Tan Parker**
*Vice Chair*

**Representative Terry Canales**

**Senator César Blanco**

**Representative Lacey Hull**

**Senator Mayes Middleton**

**Representative Stan Kitzman**

**Senator Angela Paxton**

**Representative Matt Shaheen**

**Senator Kevin Sparks**

**Jeff Austin III, Public Member**

**Roger Elswick, Public Member**

**Eric Beverly**
*Executive Director*

---

*Cover photo: The Texas State Capitol was completed in 1888. With the Goddess of Liberty atop the dome, the Texas State Capitol Building is 19 feet taller than the U.S. Capitol Building in Washington, D.C. The photo shows the south facade of the Capitol. Photo Credit: Janet Wood*

# TEXAS DEPARTMENT OF CRIMINAL JUSTICE

# CORRECTIONAL MANAGED HEALTH CARE COMMITTEE

# WINDHAM SCHOOL DISTRICT

# BOARD OF PARDONS AND PAROLES

SUNSET STAFF REPORT WITH FINAL RESULTS

2024-25

89TH LEGISLATURE

# How to Read Sunset Reports

For each agency that undergoes a Sunset review, the Sunset Advisory Commission publishes three versions of its staff report on the agency. These three versions of the staff report result from the three stages of the Sunset process, explained in more detail at sunset.texas.gov/how-sunset-works. The current version of the Sunset staff report on this agency is noted below and can be found on the Sunset website at sunset.texas.gov.

## Sunset Staff Report

The first version of the report, the Sunset Staff Report, contains Sunset staff's recommendations to the Sunset Commission on the need for, performance of, and improvements to the agency under review.

## Sunset Staff Report with Commission Decisions

The second version of the report, the Sunset Staff Report with Commission Decisions, contains the original staff report as well as the commission's decisions on which statutory recommendations to propose to the Legislature and which management recommendations the agency should implement.

## CURRENT VERSION: Sunset Staff Report with Final Results

The third and final version of the report, the Sunset Staff Report with Final Results, contains the original staff report, the Sunset Commission's decisions, and the Legislature's final actions on the proposed statutory recommendations.

# Table of Contents

<div align="right">Page</div>

## Final Results

.................................................................................................... A1

## Sunset Commission Decisions

.................................................................................................... A9

## Summary of Sunset Staff Report

.................................................................................................... 1

## TDCJ at a Glance

.................................................................................................... 9

## Committee at a Glance

.................................................................................................... 13

## Windham at a Glance

.................................................................................................... 15

## BPP at a Glance

.................................................................................................... 19

## Issues/Recommendations

1   A Changing Workforce and Inmate Population Make Multiple TDCJ
    Facilities Almost Impossible to Adequately Staff........................................ 23

2   TDCJ's Policies and Practices Contribute to and Inadequately Address
    Its Staffing Crisis ...................................................................................... 37

3   Uncoordinated Strategic Planning and Outdated Data Systems and
    Practices Hinder TDCJ from Effectively Modernizing to Address
    Technology and Staffing Challenges........................................................... 57

4   The State Lacks Sufficient Oversight and Strategic Planning for
    Inmate Rehabilitation Programs ................................................................. 73

| Page

## Issues/Recommendations (continued)

5    Critical Statutory and Structural Deficiencies Strain an Already Overextended Parole System, Creating Unnecessary Barriers to Effective Supervision............................................................................................... 93

6    BPP Does Not Ensure Its Decision-Making Processes are Fair, Consistent, Transparent, and Data-Informed........................................... 109

7    The State Has a Continuing Need for the Texas Department of Criminal Justice ........................................................................................ 129

8    Texas Criminal Justice Entities' Statutes and Processes Do Not Reflect Some Standard Elements of Sunset Reviews............................... 137

## Appendices

Appendix A — Texas Department of Criminal Justice
       Historically Underutilized Businesses Statistics ..................................... 143

Appendix B — Texas Department of Criminal Justice
       Equal Employment Opportunity Statistics............................................ 145

Appendix C — TDCJ Facilities Map ............................................................... 149

Appendix D — Windham School District
       Equal Employment Opportunity Statistics............................................ 153

Appendix E — Board of Pardons and Paroles
       Equal Employment Opportunity Statistics............................................ 157

Appendix F — TDCJ Facility Types................................................................ 161

Appendix G — Select Federal Litigation History ............................................ 163

Appendix H — Sunset Model for Evaluating Facilities for Closure............................ 165

Appendix I — Survey Methodology ................................................................ 169

Appendix J — Rehabilitation Program Evaluations......................................... 173

Appendix K — BPP Parole Guidelines Matrix and Factors ............................ 175

Appendix L — Texas Criminal Justice Entities Reporting Requirements ...................... 177

Appendix M — Staff Review Activities............................................................ 181

# FINAL RESULTS

## Senate Bill 2405 Parker (Canales)

## Summary

The Texas Department of Criminal Justice (TDCJ) and the other adult criminal justice entities subject to this Sunset review — the Board of Pardons and Paroles (BPP), Windham School District, and Correctional Managed Health Care Committee — are once again at a critical point. This review occurred in the context of these entities confronting serious challenges in executing their mission to safely confine, supervise, and provide services for adults convicted of certain crimes in Texas. To help TDCJ and its counterparts prevent current problems from becoming unmanageable, widespread crises in the coming years, SB 2405 addresses current problems with facilities and staffing by requiring TDCJ to plan for its future facility and capacity needs. Additionally, the bill requires TDCJ to improve rehabilitation program planning and evaluation to better support the successful outcomes necessary for inmates to safely reenter the community. The bill also makes improvements to BPP's processes with the goal of improved fairness, consistency, and transparency and eases burdens on the often underappreciated parole staff who serve a critical public safety role in Texas' communities. Finally, the bill continues TDCJ for 12 years. The other criminal justice entities are not subject to abolishment through the Sunset Act and will be reviewed alongside TDCJ again in 12 years.

The following material summarizes results of the Sunset review of Texas Criminal Justice Entities, including management actions directed to the entities that did not require legislative action.

## ISSUE 1 — A Changing Workforce and Inmate Population Make Multiple TDCJ Facilities Almost Impossible to Adequately Staff.

**Recommendation 1.1, Adopted as Modified** — Require TDCJ to create a long-term facilities plan that identifies facility and capacity needs.

**Recommendation 1.2, Not Adopted** — Require TDCJ to develop a phased plan to close facilities with persistent staffing challenges.

**Recommendation 1.3, Adopted** — Eliminate the requirement for TDCJ to maintain state jails in nine regions from statute.

**Recommendation 1.4, Adopted** — Eliminate unit maximum capacities from statute.

## ISSUE 2 — TDCJ's Policies and Practices Contribute to and Inadequately Address Its Staffing Crisis

**Recommendation 2.1, Adopted** — Direct TDCJ to consolidate and expand its existing workforce retention and support functions under one department to better support employees and systematically identify root causes of turnover. (Management action – nonstatutory)

**Recommendation 2.2, Adopted** — Direct TDCJ to conduct job task analyses for key roles, clarify task prioritization, and tailor evaluations, hiring objectives, and training materials as needed. (Management action – nonstatutory)

**Recommendation 2.3, Adopted** — Direct TDCJ to provide additional guidance in policy on appropriate use of disciplinary and corrective actions for both subordinates and supervisors. (Management action – nonstatutory)

**Recommendation 2.4, Adopted** — Direct TDCJ to clarify and streamline its process for employees to file formal workplace issues and consider creating an avenue for anonymous complaints. (Management action – nonstatutory)

**Recommendation 2.5, Adopted** — Direct TDCJ to revise and expand the scope of its performance evaluation process. (Management action – nonstatutory)

**Recommendation 2.6, Adopted** — Direct TDCJ to strengthen policies and processes for employees to seek out, participate in, and track trainings as a path to advancement within the agency. (Management action – nonstatutory)

**Recommendation 2.7, Adopted** — Direct TDCJ to update and standardize its telework policy. (Management action – nonstatutory)

**Recommendation 2.8, Adopted** — Direct TDCJ to more consistently collect and analyze feedback from both current and separating staff. (Management action – nonstatutory)

## Issue 3 — Uncoordinated Strategic Planning and Outdated Data Systems and Practices Hinder TDCJ from Effectively Modernizing to Address Technology and Staffing Challenges.

**Recommendation 3.1, Adopted** — Direct TDCJ to establish an office of modernization and strategic initiatives. (Management action – nonstatutory)

**Recommendation 3.2, Adopted** — Direct TDCJ to develop a plan to prioritize improving its data collection and analysis, focusing on correctional and parole functions. (Management action – nonstatutory)

**Recommendation 3.3, Adopted** — Direct TDCJ to establish and maintain a report that enables users to view an array of indicators on prison health and safety. Additionally, this management action will include the following other components:

- Direct TDCJ to track and report key metrics and performance indicators related to transferring inmates from county jails to TDCJ facilities and certifying commitment documents. As part of this management action, TDCJ will track information on the number of and reasons why "pen packets" require corrective actions. TDCJ will also track the number of days it takes to review packets for certification and report on instances the agency goes beyond the statutorily required five days to certify the packets or request corrective action. TDCJ will regularly report this information on the public-facing dashboard, including its average intake time in days and time it takes counties to correct, and advise counties how to submit packets successfully.

- Direct TDCJ to include as part of the agency's public-facing dashboard health and safety indicator information regarding the immigration status and other related statistical information of incarcerated individuals in TDCJ custody.

- Direct TDCJ to include statistical information regarding parolees in the information that the agency will publish and develop a public-facing dashboard for. This information will include any data regarding subsequent arrests, revocations, and dually supervised individuals who are on probation and parole. This information also will include statistical and general data relating to parole and mandatory supervision, including the names of releasees and data recorded relating to parole and mandatory supervision services, as contemplated in Section 508.313(b) of the Texas Government Code. (Management action – nonstatutory)

**Recommendation 3.4, Adopted** — Direct TDCJ to establish administrative directives for the data governance program plan established by the Data Management Office. (Management Action – nonstatutory)

**Recommendation 3.5, Adopted** — Direct TDCJ to develop a written plan to phase out paper-based processes, reduce manual data processes, and identify opportunities for automation. As part of its planning to implement this management action direct TDCJ to include considerations necessary to make additional common processes and information available on inmate tablets:

- Information necessary to understand the status of and decisions around custody level classification, including promotion to G1 custody level or trusty status.

- Information related to an inmate's institutional record that could impact a parole outcome, including the inmate's disciplinary record and progress towards completing an individual treatment plan (ITP), as applicable.

- Parole status letters. (Management action – nonstatutory)

**Recommendation 3.6, Adopted** — Direct TDCJ to evaluate its process for reviewing external research requests. Additionally, TDCJ, along with the Windham School District, will explore data-sharing agreements with any Education Research Center established under Section 1.005 of the Texas Education Code. (Management action – nonstatutory)

## ISSUE 4 — The State Lacks Sufficient Oversight and Strategic Planning for Inmate Rehabilitation Programs.

**Recommendation 4.1, Adopted as Modified** — Require TDCJ to comprehensively inventory rehabilitation and reentry programs, conduct biennial program evaluations, and recommend changes to programs when needed.

**Recommendation 4.2, Adopted as Modified** — Require TDCJ to develop a strategic plan for rehabilitation and reentry programs in conjunction with Windham and report on implementation status biennially.

**Recommendation 4.3, Adopted** — Require TDCJ to track parole-voted program voting data and use these data to inform strategic program planning.

**Recommendation 4.4, Adopted** — Require TDCJ to prioritize parole-voted program decisions.

**Recommendation 4.5, Adopted** — Require TDCJ, BPP, and Windham to collaborate in developing evidence-based ITP and parole-voted program criteria and to develop and maintain associated program lists.

**Recommendation 4.6, Adopted** — Require TDCJ to revise the ITP to include a comprehensive, plain language list of program participation information with clear distinctions between evidence-based and non-evidence-based program participation.

**Recommendation 4.7, Adopted** — Remove volunteer and faith-based program reporting requirement for wardens.

**Recommendation 4.8, Adopted as Modified** — Require TDCJ staff to report on volunteer and faith-based program data and ensure volunteer and faith-based programming needs are met at each facility.

**Recommendation 4.9, Adopted** — Direct TDCJ to merge the Rehabilitation Programs Division and the Reentry and Integration Division. (Management action – nonstatutory)

**Recommendation 4.10, Adopted** — Direct BPP to make parole-voted program decisions independent of TDCJ program placement practices. (Management action – nonstatutory)

**Recommendation 4.11, Adopted** — Direct TDCJ to develop volunteer program assessment criteria and regular monitoring and assessment policies to ensure sufficient volunteer program oversight and strategic use of volunteer resources. (Management action – nonstatutory)

**Recommendation 4.12, Adopted as Modified** — Modify language in the General Appropriations Act to direct TDCJ to transfer administration and management of postsecondary correctional education to Windham through a memorandum of understanding. Additionally, this provision allows for the use of funds for additional purposes. This change specifies Windham may use funds for costs of attendance including tuition, books, course materials, and fees, and for other direct costs that benefit students' postsecondary education such as information technology, program startups, and program enhancements. (Change in appropriation)

## Issue 5 — Critical Statutory and Structural Deficiencies Strain an Already Overextended Parole System, Creating Unnecessary Barriers to Effective Supervision.

**Recommendation 5.1, Adopted** — Abolish the PO salary career ladder and require TDCJ to establish it in rule.

**Recommendation 5.2, Adopted as Modified** — Abolish statutory maximum parole caseload ratios and require TDCJ to establish them in rule.

**Recommendation 5.3, Not Adopted** — Require TDCJ and BPP to evaluate post-release special conditions that may be temporarily modified by POs and require TDCJ and BPP to establish corresponding modification processes in rule.

**Recommendation 5.4, Not Adopted** — Prohibit the Parole Division from making recommendations of additional special conditions prior to release.

**Recommendation 5.5, Adopted** — Direct the Parole Division to report supervision trends and workload impacts of supervision conditions to BPP annually. (Management action – nonstatutory)

# ISSUE 6 — BPP Does Not Ensure Its Decision-Making Processes are Fair, Consistent, Transparent, and Data-Informed.

**Recommendation 6.1, Adopted as Modified** — Require BPP to collect and analyze data for release decisions, special conditions, and revocations and incorporate the findings into training for voters and staff.

**Recommendation 6.2, Adopted** — Require BPP to provide training for Medically Recommended Intensive Supervision (MRIS) process voters.

**Recommendation 6.3, Adopted** — Require BPP to establish a process in rule for assessments of an inmate's prognosis for MRIS cases. Additionally, this provision specifies that if an inmate qualifies for MRIS due to medical factors, one or more health care practitioners will conduct a review and provide MRIS voters a written report on the inmate's condition and medical evaluation that specifically describes how the inmate's illnesses and treatments will affect their cognitive and physical abilities and limitations.

**Recommendation 6.4, Adopted** — Require BPP to establish in rule the factors considered in MRIS decisions.

**Recommendation 6.5, Adopted** — Require BPP and TDCJ's Parole Division to create a special conditions working group consisting of voters and Parole Division staff representatives.

**Recommendation 6.6, Adopted** — Direct BPP to develop formal and detailed internal processes to address variations from parole guidelines. (Management action – nonstatutory)

**Recommendation 6.7, Adopted** — Direct the agency to review its Institutional Parole Officer (IPO) interview procedures and take action to increase effectiveness and consistency. As part of this management action, should BPP decide interviews continue to be necessary, the agency will create a baseline list of standard questions to build from instead of scripted questions, work with TDCJ to make the standardized list of interview questions available to inmates and the public in its Parole in Texas report, and publish the questions to inmate tablets through the "FYI" application and in prison libraries. As part of this management action, BPP should work with TDCJ to review the information provided to the public and inmates regarding the parole and clemency processes and ensure it is clear and accessible. (Management action – nonstatutory)

**Recommendation 6.8, Adopted** — Direct the agency to review its case summary preparation processes and take action to address inefficiencies. (Management action – nonstatutory)

**Recommendation 6.9, Adopted** — Direct BPP to work with the Texas Correctional Office on Offenders with Medical or Mental Impairments (TCOOMMI) to establish a method to videoconference with an inmate who qualifies for MRIS due to a medical condition. (Management action – nonstatutory)

**Recommendation 6.10, Adopted** — Direct BPP to identify and address barriers to completing noncapital clemency applications and post relevant guidance on its website. (Management action – nonstatutory)

# ISSUE 7 — The State Has a Continuing Need for the Texas Department of Criminal Justice.

**Recommendation 7.1, Adopted** — Continue the Texas Department of Criminal Justice and Texas Board of Criminal Justice for 12 years.

**Recommendation 7.2, Adopted** — Direct TDCJ to eliminate the Private Facility Contract Monitoring and Oversight Division and reallocate existing resources elsewhere within the agency. (Management action – nonstatutory)

## Issue 8 — Texas Criminal Justice Entities' Statutes and Processes Do Not Reflect Some Standard Elements of Sunset Reviews.

**Recommendation 8.1, Adopted** — Update for the committee the standard across-the-board requirement regarding grounds for removal of a board member.

**Recommendation 8.2, Adopted** — Update for TDCJ, BPP, and the committee the standard across-the-board requirement related to board member training.

**Recommendation 8.3, Adopted** — Update for BPP the standard across-the-board requirement related to developing and maintaining a complaints system and making information on complaint procedures available to the public.

**Recommendation 8.4, Adopted** — Abolish three of TDCJ's reports, adjust the deadlines for three others, and continue all other reporting requirements for TDCJ, the committee, Windham, and BPP.

**Recommendation 8.5, Adopted** — Continue the Judicial Advisory Council and the TCOOMMI advisory committee.

**Recommendation 8.6, Adopted** — Remove the Advisory Committee on Agriculture from statute.

**Recommendation 8.7, Adopted** — Update TDCJ's statute to reflect the requirements of the person-first respectful language initiative.

**Recommendation 8.8, Adopted** — Direct Windham to adopt a rule review plan. (Management action – nonstatutory)

## New Issues Added by the Sunset Commission

**Annual Training For Counties, Adopted** — Require TDCJ to provide annual trainings to counties on how to submit commitment documents, known as "pen packets."

**Expedited Training For Correctional Officers, Adopted** — Direct TDCJ to explore expedited training pathways for qualified correctional officer (CO) candidates, including former COs, COs from other states, members of the military, and law enforcement personnel. As part of this management action, TDCJ should establish an expedited training curriculum, rather than the normal six weeks, for qualified candidates as defined by the agency. (Management action – nonstatutory)

**Postsecondary Education, Adopted**

- Update Chapter 19 of the Texas Education Code with the following two changes:

  - Reflect education practitioner norms by updating terminology, including replacing "inmate" with "student," "vocational training" with "career and technical education," "GED" with "high school equivalency program," and "ESL" with "English as a second language program."

  - Facilitate Windham's new role of overseeing postsecondary education by authorizing data sharing with other agencies and regulatory entities.

- Direct Windham School District to explore Texas State Technical College (TSTC) and community college partnerships generally. This management action directs the district to consider partnership opportunities between Windham and TSTC, and any other community colleges as applicable, to expand postsecondary career and technical education (CTE) at locations experiencing CTE program shortages due to instructor staffing or availability of specific high-demand programs. (Management action – nonstatutory)

**Texas Board of Criminal Justice Experience Requirements, Adopted** — Require that at least two members of the Texas Board of Criminal Justice board possess significant business or corporate experience.

# Provisions Added by the Legislature

**Assaults by Staff** — Require TDCJ's executive director to refer all assaults on inmates by TDCJ staff to law enforcement.

**Compensatory Time** — Require TDCJ to credit employees' unused compensatory time as vacation leave.

**Complaint Notice** — Require TDCJ to provide a notice, instead of a written copy, of the department's policies and procedures relating to complaint investigation and resolution.

**Criminal Justice Policy Council** — Remove the defunct Criminal Justice Policy Council from statute and require the State Auditor's Office instead of the council to examine records and operations of the criminal justice system every five years.

**MRIS Statute Improvements** — Streamline the statute, authorize BPP to expand medical eligibility by rule, and update the composition of panels.

**Nonsubstantive Statutory Changes** — Update statute related to the TDCJ board's duties and the board-reporting entities, including the Office of the Independent Auditor, Office of the Independent Ombudsman, and Office of the Inspector General. Additionally, update outdated agency, division, and office name references and terms and align statute with TDCJ's existing organizational structure and operations.

**Parole Staff Qualifications** — Authorize TDCJ to establish a process to waive parole staff qualifications.

**Postsecondary Higher Education** — Codify part of TDCJ's General Appropriations Act Rider 26, which as updated from a Sunset recommendation specifies that Windham administers postsecondary education, by requiring releasees to repay postsecondary tuition and fees. Additionally, establish a Postsecondary Education Advisory Board to advise Windham and TDCJ regarding postsecondary education programs. Additionally, require Windham to evaluate postsecondary education programs, require Windham to disaggregate reported evaluation results by sex, and require the report to include information about students who complete training in a regulated industry who were denied industry licensure.

**Prison Maximum Capacity** — Update the process for TDCJ to increase prison facility maximum capacities, including removing the governor and attorney general from the review process when TDCJ updates capacity. Additionally, authorize TDCJ's board, instead of the attorney general, to allow TDCJ to exceed 100 percent of unit capacity in certain situations.

**Reporting Requirement Changes** — Clarify requirements of and move due dates for some required reports from September 1, 2026, to December 1, 2026, including the initial long-term facilities plan.

# Fiscal Implication Summary

Overall, the Sunset review of TDCJ will result in $1,469,752 savings over two fiscal years and $151,008,000 savings over five fiscal years. The Sunset Commission's management actions will result in savings to General Revenue of about $734,876 annually, and starting in fiscal year 2028, savings of about $49,111,430 annually to TDCJ if the agency successfully implements the provisions in SB 2405. Otherwise, though several management actions and bill provisions will not have a significant fiscal impact to the state, some will result in costs and savings that will depend on implementation and cannot be determined at this time.

SB 2405 requires TDCJ to reduce rehabilitation program placement timelines by 50 percent and eliminate program placement delays starting September 1, 2027. Based on Sunset staff's calculations using agency-provided data, successfully implementing this bill provision will likely result in a total savings of $147,334,290 by the end of fiscal year 2030. Savings associated with this could be returned to General Revenue or appropriated back to the agency for other functions beginning in fiscal year 2028.

The management action adopted by the Sunset Commission to merge the Rehabilitation Programs Division and the Reentry and Integration Division will result in a small cost savings to the state of about $202,213 in salary and benefits for each of the next five fiscal years and the reduction of at least one full-time equivalent employee.

The management action adopted by the Sunset Commission to eliminate the Private Facility Contract Monitoring and Oversight Division will result in a small cost savings of about $532,663 in salary and benefits for each of the next five fiscal years and a reduction of three full-time equivalent employees.

### Texas Department of Criminal Justice

| Fiscal Year | Savings to the General Revenue Fund | Savings to TDCJ from Reduction in Parole Voted Placement Times | Savings to TDCJ from Elimination of Program Placement Delays | Change in FTEs From 2023 |
|---|---|---|---|---|
| 2026 | $734,876 | $0 | $0 | -4 |
| 2027 | $734,876 | $0 | $0 | -4 |
| 2028 | $734,876 | $29,540,544 | $19,570,886 | -4 |
| 2029 | $734,876 | $29,540,544 | $19,570,886 | -4 |
| 2030 | $734,876 | $29,540,544 | $19,570,886 | -4 |

# Sunset Commission Decisions

## Summary

The following material summarizes the Sunset Commission's decisions on the staff recommendations for the Texas Criminal Justice Entities, as well as modifications and new recommendations developed in response to testimony at the public hearing.

The Texas Department of Criminal Justice (TDCJ) and the other adult criminal justice entities subject to this Sunset review — the Board of Pardons and Paroles (BPP), Windham School District, and Correctional Managed Health Care Committee — are once again at a critical point. This review occurred in the context of these entities confronting serious challenges in executing their mission to safely confine, supervise, and provide services for adults convicted of certain crimes in Texas, and the Sunset Commission's recommendations would help TDCJ and its counterparts prevent current problems from becoming unmanageable, widespread crises in the coming years.

While the sheer size and complexity of Texas' sprawling prison system is unique, TDCJ faces the same national trend as its peers in other states — hiring people to work in corrections is difficult. The uncomfortable reality is some of Texas' prisons are located in places where hiring sufficient correctional staff is nearly impossible, so the commission determined TDCJ must concurrently plan for the future to locate or expand facilities in places where the agency can adequately staff them while also greatly improving internal human resources functions and processes to retain existing staff.

The Sunset Commission also found TDCJ to be in significant need of modernization. Without better strategic planning and data practices, the agency will continue to reactively lurch from emergency to emergency. Additionally, TDCJ's approach to rehabilitation programs, many of which inform BPP's determination of the potential for an inmate to safely reenter the community, suffer from deficiencies that undermine the Legislature's significant investment in these programs. To overcome these deficiencies, the commission recommends requiring enhanced rehabilitation planning and evaluation to better ensure beneficial program outcomes.

The Sunset Commission also took a close look at the parole system — both the processes by which BPP decides whether to grant early release to eligible inmates and the processes by which TDCJ's parole officers supervise releasees. Sunset focused on improved fairness, consistency, and transparency of BPP's decision-making processes and also found the need for more efficient TDCJ parole processes to ease burdens on the often underappreciated parole staff who serve a critical public safety role in Texas' communities.

Despite finding considerable areas for improvement across the criminal justice entities under review, Sunset determined that Texas continues to benefit from TDCJ's oversight and management of a system in which a single state agency supports probation and directly provides incarceration and parole supervision. Accordingly, the commission recommends continuing TDCJ for 12 years and aligning its Sunset review to coincide with that of the other criminal justice entities.

# Issue 1

## A Changing Workforce and Inmate Population Make Multiple TDCJ Facilities Almost Impossible to Adequately Staff.

**Recommendation 1.1, Adopted as Modified** — Require TDCJ to create a long-term facilities and staffing plan that identifies future needs and makes recommendations to organize resources and capacity accordingly. Additionally, require TDCJ to include as part of the long-term facilities and staffing plan a phased plan to close facilities with persistent staffing challenges. This inclusion would merge the planning from Recommendation 1.2 to close facilities with persistent staffing challenges into the overall long-term planning in Recommendation 1.1. All other requirements and considerations from Recommendation 1.2 would be included in Recommendation 1.1 as part of this recommendation.

**Recommendation 1.2, Not Adopted** — Require TDCJ to develop a phased plan to close facilities with persistent staffing challenges.

**Recommendation 1.3, Adopted** — Eliminate the requirement for TDCJ to maintain state jails in nine regions from statute.

**Recommendation 1.4, Adopted** — Eliminate unit maximum capacities from statute.

# Issue 2

## TDCJ's Policies and Practices Contribute to and Inadequately Address Its Staffing Crisis.

**Recommendation 2.1, Adopted** — Direct TDCJ to consolidate and expand its existing workforce retention and support functions under one department to better support employees and systematically identify root causes of turnover. (Management action – nonstatutory)

**Recommendation 2.2, Adopted** — Direct TDCJ to conduct job task analyses for key roles, clarify task prioritization, and tailor evaluations, hiring objectives, and training materials as needed. (Management action – nonstatutory)

**Recommendation 2.3, Adopted** — Direct TDCJ to provide additional guidance in policy on appropriate use of disciplinary and corrective actions for both subordinates and supervisors. (Management action – nonstatutory)

**Recommendation 2.4, Adopted** — Direct TDCJ to clarify and streamline its process for employees to file formal workplace issues and consider creating an avenue for anonymous complaints. (Management action – nonstatutory)

**Recommendation 2.5, Adopted** — Direct TDCJ to revise and expand the scope of its performance evaluation process. (Management action – nonstatutory)

**Recommendation 2.6, Adopted** — Direct TDCJ to strengthen policies and processes for employees to seek out, participate in, and track trainings as a path to advancement within the agency. (Management action – nonstatutory)

**Recommendation 2.7, Adopted** — Direct TDCJ to update and standardize its telework policy. (Management action – nonstatutory)

**Recommendation 2.8, Adopted** — Direct TDCJ to more consistently collect and analyze feedback from both current and separating staff. (Management action – nonstatutory)

# Issue 3

## Uncoordinated Strategic Planning and Outdated Data Systems and Practices Hinder TDCJ from Effectively Modernizing to Address Technology and Staffing Challenges.

**Recommendation 3.1, Adopted** — Direct TDCJ to establish an office of modernization and strategic initiatives. (Management action – nonstatutory)

**Recommendation 3.2, Adopted** — Direct TDCJ to develop a plan to prioritize improving its data collection and analysis, focusing on correctional and parole functions. (Management action – nonstatutory)

**Recommendation 3.3, Adopted as Modified** — Direct TDCJ to establish and maintain a report that enables users to view an array of indicators on prison health and safety. Additionally, this management action would include the following other components:

- Direct TDCJ to track and report key metrics and performance indicators related to transferring inmates from county jails to TDCJ facilities and certifying commitment documents. As part of this, direct TDCJ to track information on the number of and reasons why "pen packets" require corrective actions. TDCJ would also track the number of days it takes to review packets for certification and report on instances the agency goes beyond the statutorily required five days to certify the packets or request corrective action. TDCJ would regularly report this information on the public-facing dashboard as part of this recommendation, including its average intake time in days and time it takes counties to correct, and advise counties how to submit packets successfully.

- Direct TDCJ to include as part of the agency's public-facing dashboard health and safety indicator information regarding the immigration status and other related statistical information of incarcerated individuals in TDCJ custody.

- Direct TDCJ to include statistical information regarding parolees in the information that the agency will publish and develop a public-facing dashboard for as part of this recommendation. This information would include any data regarding subsequent arrests, revocations, and dually supervised individuals who are on probation and parole. This information also would include statistical and general data relating to parole and mandatory supervision, including the names of releasees and data recorded relating to parole and mandatory supervision services, as contemplated in Section 508.313(b) of the Texas Government Code. (Management action – nonstatutory)

**Recommendation 3.4, Adopted** — Direct TDCJ to establish administrative directives for the data governance program plan established by the Data Management Office. (Management Action – nonstatutory)

**Recommendation 3.5, Adopted as Modified** — Direct TDCJ to develop a written plan to phase out paper-based processes, reduce manual data processes, and identify opportunities for automation. As part of its planning to implement this recommendation, direct TDCJ to include considerations necessary to make additional common processes and information available on inmate tablets:

- Information necessary to understand the status of and decisions around custody level classification, including promotion to G1 custody level or trusty status.

- Information related to an inmate's institutional record that could impact a parole outcome, including the inmate's disciplinary record and progress towards completing an individual treatment plan (ITP), as applicable.

- Parole status letters. (Management action – nonstatutory)

**Recommendation 3.6, Adopted as Modified** — Direct TDCJ to evaluate its process for reviewing external research requests. Additionally, direct TDCJ, along with the Windham School District, to explore data sharing agreements with any Education Research Center established under Section 1.005 of the Texas Education Code. (Management action – nonstatutory)

# ISSUE 4

## The State Lacks Sufficient Oversight and Strategic Planning for Inmate Rehabilitation Programs.

**Recommendation 4.1, Adopted** — Require TDCJ to comprehensively inventory rehabilitation and reentry programs, conduct biennial program evaluations, and recommend changes to programs when needed.

**Recommendation 4.2, Adopted** — Require TDCJ to develop a strategic plan for rehabilitation and reentry programs in conjunction with Windham and report on implementation status biennially.

**Recommendation 4.3, Adopted** — Require TDCJ to track parole-voted program voting data and use these data to inform strategic program planning.

**Recommendation 4.4, Adopted** — Require TDCJ to prioritize parole-voted program decisions.

**Recommendation 4.5, Adopted** — Require TDCJ, BPP, and Windham to collaborate in developing evidence-based ITP and parole-voted program criteria and to develop and maintain associated program lists.

**Recommendation 4.6, Adopted** — Require TDCJ to revise the ITP to include a comprehensive, plain language list of program participation information with clear distinctions between evidence-based and non-evidence-based program participation.

**Recommendation 4.7, Adopted** — Remove volunteer and faith-based program reporting requirement for wardens.

**Recommendation 4.8, Adopted** — Require TDCJ staff responsible for rehabilitation and reentry programs and services to report on volunteer and faith-based program data and ensure volunteer and faith-based programming needs are met at each facility.

**Recommendation 4.9, Adopted** — Direct TDCJ to merge the Rehabilitation Programs Division and the Reentry and Integration Division. (Management action – nonstatutory)

**Recommendation 4.10, Adopted** — Direct BPP to make parole-voted program decisions independent of TDCJ program placement practices. (Management action – nonstatutory)

**Recommendation 4.11, Adopted** — Direct TDCJ to develop volunteer program assessment criteria and regular monitoring and assessment policies to ensure sufficient volunteer program oversight and strategic use of volunteer resources. (Management action – nonstatutory)

**Recommendation 4.12, Adopted as Modified** — Modify language in the General Appropriations Act to direct TDCJ to transfer administration and management of postsecondary correctional education to Windham through a memorandum of understanding. Additionally, this recommendation would express the will of the Sunset Commission that the Legislature consider allowing the use of funds for additional purposes. This change would specify Windham may use funds for costs of attendance including tuition, books, course materials, and fees, and for other direct costs that benefit students' postsecondary education such as information technology, program startups, and program enhancements. (Change in appropriation)

# ISSUE 5

## Critical Statutory and Structural Deficiencies Strain an Already Overextended Parole System, Creating Unnecessary Barriers to Effective Supervision.

**Recommendation 5.1, Adopted** — Abolish the PO salary career ladder and require TDCJ to establish it in rule.

**Recommendation 5.2, Adopted** — Abolish statutory maximum parole caseload ratios and require TDCJ to establish them in rule.

**Recommendation 5.3, Not Adopted** — Require TDCJ and BPP to evaluate post-release special conditions that may be temporarily modified by POs and require TDCJ and BPP to establish corresponding modification processes in rule.

**Recommendation 5.4, Adopted** — Prohibit the Parole Division from making recommendations of additional special conditions prior to release.

**Recommendation 5.5, Adopted** — Direct the Parole Division to report supervision trends and workload impacts of supervision conditions to BPP annually. (Management action – nonstatutory)

# ISSUE 6

## BPP Does Not Ensure Its Decision-Making Processes are Fair, Consistent, Transparent, and Data-Informed.

**Recommendation 6.1, Adopted** — Require BPP to report outcomes by panel for release decisions, special conditions, and revocations and incorporate the findings into training for voters and staff.

**Recommendation 6.2, Adopted** — Require BPP to provide training for MRIS voters.

**Recommendation 6.3, Adopted as Modified** — Require BPP to establish a process in rule for assessments of an inmate's prognosis for MRIS cases. Additionally, this recommendation would specify if an inmate qualifies for MRIS due to medical factors, one or more health care practitioners would conduct a review and provide MRIS voters a written report on the inmate's condition and medical evaluation that specifically describes how the inmate's illnesses and treatments will affect their cognitive and physical abilities and limitations.

**Recommendation 6.4, Adopted** — Require BPP to establish in rule the factors considered in MRIS decisions.

**Recommendation 6.5, Adopted** — Require BPP and TDCJ's Parole Division to create a special conditions working group consisting of voters and Parole Division staff representatives.

**Recommendation 6.6, Adopted** — Direct BPP to develop formal and detailed internal processes to address variations from parole guidelines. (Management action – nonstatutory)

**Recommendation 6.7, Adopted as Modified** — Direct the agency to review its Institutional Parole Officer (IPO) interview procedures and take action to increase effectiveness and consistency. As part of this recommendation, should BPP decide interviews continue to be necessary, direct the agency to create a baseline list of standard questions to build from instead of scripted questions, work with TDCJ to make the standardized list of interview questions available to inmates and the public in its Parole in Texas report, and publish the questions to inmate tablets through the "FYI" application and in prison libraries. As part of this recommendation, also direct BPP to work with TDCJ to review the information provided to the public and inmates regarding the parole and clemency processes and ensure it is clear and accessible. (Management action – nonstatutory)

**Recommendation 6.8, Adopted** — Direct the agency to review its case summary preparation processes and take action to address inefficiencies. (Management action – nonstatutory)

**Recommendation 6.9, Adopted** — Direct BPP to work with TCOOMMI to establish a method to videoconference with an inmate who qualifies for MRIS due to a medical condition. (Management action – nonstatutory)

**Recommendation 6.10, Adopted** — Direct BPP to identify and address barriers to completing noncapital clemency applications and post relevant guidance on its website. (Management action – nonstatutory)

# Issue 7

## The State Has a Continuing Need for the Texas Department of Criminal Justice.

**Recommendation 7.1, Adopted** — Continue the Texas Department of Criminal Justice and Texas Board of Criminal Justice for 12 years.

**Recommendation 7.2, Adopted** — Direct TDCJ to eliminate the Private Facility Contract Monitoring and Oversight Division and reallocate existing resources elsewhere within the agency. (Management action – nonstatutory)

# Issue 8

## Texas Criminal Justice Entities' Statutes and Processes Do Not Reflect Some Standard Elements of Sunset Reviews.

**Recommendation 8.1, Adopted** — Update for the committee the standard across-the-board requirement regarding grounds for removal of a board member.

**Recommendation 8.2, Adopted** — Update for TDCJ, BPP, and the committee the standard across-the-board requirement related to board member training.

**Recommendation 8.3, Adopted** — Update for BPP the standard across-the-board requirement related to developing and maintaining a complaints system and making information on complaint procedures available to the public.

**Recommendation 8.4, Adopted** — Abolish three of TDCJ's reports, adjust the deadlines for three others, and continue all other reporting requirements for TDCJ, the committee, Windham, and BPP.

**Recommendation 8.5, Adopted** — Continue the Judicial Advisory Council and the TCOOMMI advisory committee.

**Recommendation 8.6, Adopted** — Remove the Advisory Committee on Agriculture from statute.

**Recommendation 8.7, Adopted** — Update TDCJ's statute to reflect the requirements of the person-first respectful language initiative.

**Recommendation 8.8, Adopted** — Direct Windham to adopt a rule review plan. (Management action – nonstatutory)

## ADOPTED NEW RECOMMENDATIONS

### Annual Training For Counties
- Require TDCJ to provide annual trainings to counties on how to submit commitment documents, known as "pen packets."

### Expedited Training For Correctional Officers
- Direct TDCJ to explore expedited training pathways for qualified correctional officer (CO) candidates, including former COs, COs from other states, members of the military, and law enforcement personnel. As part of this recommendation, TDCJ should establish an expedited training curriculum, rather than the normal six weeks, for qualified candidates as defined by the agency. (Management action – nonstatutory)

### Postsecondary Education
- Update Chapter 19 of the Texas Education Code with the following two changes:
  - Reflect education practitioner norms by updating terminology, including replacing "inmate" with "student," "vocational training" with "career and technical education," and "GED" with "high school equivalency certificate."
  - Facilitate Windham's new role of overseeing postsecondary education by authorizing data sharing with the Texas Higher Education Coordinating Board.
- Direct Windham School District to explore Texas State Technical College (TSTC) and community college partnerships generally. This recommendation directs the district to consider partnership opportunities between Windham and TSTC, and any other community colleges as applicable, to expand postsecondary career and technical education (CTE) at locations experiencing CTE program shortages due to instructor staffing or availability of specific high-demand programs. (Management action – nonstatutory)

**Texas Board of Criminal Justice Experience Requirements**

- Require that at least two members of the Texas Board of Criminal Justice board possess significant business or corporate experience.

# Fiscal Implication Summary

Overall, the Sunset Commission's recommendations would result in savings to General Revenue of about $734,876 annually, and starting in fiscal year 2028, savings of about $49,111,430 annually to TDCJ. Otherwise, though several recommendations would not have a significant fiscal impact to the state, some would result in costs and savings that will depend on implementation and cannot be determined at this time.

The recommendation to require TDCJ to reduce program placement timelines by 50 percent and eliminate program placement delays starting September 1, 2027, would result in a total savings of $147,334,290 by the end of fiscal year 2030. Savings associated with this recommendation could be returned to General Revenue or appropriated back to the agency for other functions beginning in fiscal year 2028. The recommendation to merge the Rehabilitation Programs Division and the Reentry and Integration Division would result in a small cost savings to the state of about $202,213 in salary and benefits for each of the next five fiscal years and the reduction of at least one full-time equivalent employee.

The recommendation to eliminate the Private Facility Contract Monitoring and Oversight Division would result in a small cost savings of about $532,663 in salary and benefits for each of the next five fiscal years and a reduction of three full-time equivalent employees.

### Texas Department of Criminal Justice

| Fiscal Year | Savings to the General Revenue Fund | Savings to TDCJ from Reduction in Parole Voted Placement Times | Savings to TDCJ from Elimination of Program Placement Delays | Change in FTEs from 2023 |
|---|---|---|---|---|
| 2026 | $734,876 | $0 | $0 | -4 |
| 2027 | $734,876 | $0 | $0 | -4 |
| 2028 | $734,876 | $29,540,544 | $19,570,886 | -4 |
| 2029 | $734,876 | $29,540,544 | $19,570,886 | -4 |
| 2030 | $734,876 | $29,540,544 | $19,570,886 | -4 |

# SUMMARY OF SUNSET STAFF REPORT

As the criminal justice system works through the final lingering effects of the COVID-19 pandemic on court backlogs, the Texas Department of Criminal Justice (TDCJ) along with the other adult criminal justice entities subject to this Sunset review — the Board of Pardons and Paroles (BPP), Windham School District, and Correctional Managed Health Care Committee — are once again at a critical point. This Sunset review occurred in the context of both TDCJ's systemwide prison lockdown due to unprecedented levels of contraband and violence and inmate population projections that exceed TDCJ's operational capacity, raising basic questions about TDCJ's ability to handle its current and future realities. The state's criminal justice entities are confronting serious challenges in executing their mission to safely confine, supervise, and provide services for adults convicted of certain crimes in Texas. This Sunset review therefore seeks to best position TDCJ and its counterparts so that they are able to prevent current problems from becoming unmanageable, widespread crises in the coming years.

> Sunset seeks to position TDCJ to be able to prevent problems from becoming widespread crises.

While the sheer size and complexity of Texas' sprawling prison system is unique, TDCJ faces the same national trend as its peers in other states — hiring people to work in corrections is difficult. The Legislature and TDCJ have long recognized correctional officers, who play a vital frontline role overseeing incarcerated adults, as deserving of additional attention and resources for recruitment and retention. Yet the uncomfortable reality the Sunset review found is some of Texas' prisons are located in places where hiring sufficient correctional staff is nearly impossible. As that reality is unlikely to change, TDCJ is forced to spend significantly on transporting staff around the state and maintaining facilities that hold thousands of vacant, unusable beds. Furthermore, while difficulty hiring correctional staff isn't unique to this state, the agency has not done enough to mitigate this problem. Serious and systemic deficiencies in human resources functions, which form the backbone of effective agency operations, contribute to agencywide hiring and retention problems, with more than half of TDCJ divisions at a vacancy rate of at least 20 percent in fiscal year 2023. This staffing crisis extends to parole officers who supervise releasees in Texas communities and several other critical divisions. Ultimately, the Sunset review found TDCJ must concurrently plan for the future to locate or expand facilities in places where the agency can adequately staff them while also greatly improving internal human resources functions and processes to retain existing staff.

The Sunset review also found TDCJ to be in significant need of modernization, as decades-old technology and paper-based and manual processes limit the agency's ability to effectively and efficiently leverage its $3.9 billion annual budget. But the lack of modernization is not limited to technology. Without better strategic planning and data practices, the agency will continue to reactively lurch from emergency to emergency. Additionally, TDCJ's approach

to rehabilitation programs, many of which inform BPP's determination of the potential for an inmate to safely reenter the community, suffer from deficiencies that undermine the Legislature's significant investment in these programs. To overcome these deficiencies, this review recommends requiring enhanced rehabilitation planning and evaluation to better ensure beneficial program outcomes rather than simply encouraging participation regardless of efficacy.

This Sunset review also took a close look at the parole system — both the processes by which BPP decides whether to grant early release to eligible inmates and the processes by which TDCJ's parole officers supervise releasees. Given the high stakes of inmates reentering the community and the discretionary nature of making such decisions, BPP voters understandably take a cautious approach. As it has in previous reviews of BPP, Sunset focused on improved fairness, consistency, and transparency of BPP's decision-making processes. Separately, the review also found the need for more efficient TDCJ parole processes to ease burdens on the often underappreciated parole staff who serve a critical public safety role in Texas' communities.

This review did not have findings or recommendations in two key areas: probation and correctional health care. TDCJ's role in probation is limited to maintaining standards for and providing funding to local Community Supervision and Corrections Departments (CSCDs). Overall, Sunset staff found TDCJ adequately performs this function, and many ideas for changes to probation largely amounted to calls for increased funding. To this end, TDCJ has requested through its 2026-27 Legislative Appropriations Request additional funding to support both CSCD staff salaries and supervision activities. Additionally, this review found the Correctional Managed Health Care Committee's role, which primarily is to develop a statewide managed healthcare plan, to be functioning adequately. TDCJ works effectively with its contracted partners at the Texas Tech University Health Sciences Center and University of Texas Medical Branch to deliver healthcare services as the Legislature intended.

Despite finding considerable areas for improvement across the criminal justice entities under review, Sunset staff determined that Texas continues to benefit from TDCJ's oversight and management of a system in which a single state agency supports probation and directly provides incarceration and parole supervision. Accordingly, Sunset staff recommends continuing TDCJ for 12 years and aligning its Sunset review to coincide with that of the other criminal justice entities.

The following material highlights Sunset staff's key recommendations for the Texas Department of Criminal Justice, Board of Pardons and Paroles, Windham School District, and Correctional Managed Health Care Committee.

## Sunset Staff Issues and Recommendations

## Issue 1

A Changing Workforce and Inmate Population Make Multiple TDCJ Facilities Almost Impossible to Adequately Staff.

TDCJ is forced to rely on inefficient and costly staffing models and policies just to maintain operations at its facilities due to staffing shortages. In the last five years, these staffing shortages have reduced TDCJ's number of usable beds by the thousands, resulting in TDCJ idling buildings and entire facilities. At the same time, the number of inmates with special needs is increasing, and the latest inmate population

projections indicate the total inmate population will soon outgrow the agency's bed capacity. Given these challenges, the state needs new planning processes to continue to safely and sustainably house its inmates.

**Key Recommendations**

- Require TDCJ to create a long-term facilities and staffing plan that identifies future needs and makes recommendations to organize resources and capacity accordingly.

- Require TDCJ to develop a phased plan to close facilities with persistent staffing challenges.

# ISSUE 2

## TDCJ's Policies and Practices Contribute to and Inadequately Address Its Staffing Crisis.

High vacancy and turnover rates persist across many TDCJ divisions and have a significant operational impact on the agency despite efforts the agency and state leaders have made to address these problems. The resulting staffing crisis is extremely costly to the state, diminishes public safety and safety within correctional facilities, and severely strains staff who are expected to fill in operational gaps left by vacancies. At the same time, poor accountability for supervisors has enabled a persistent agency culture problem that exacerbates the difficult working conditions TDCJ employees face. Furthermore, TDCJ provides inadequate services to support staff, particularly in the areas of workplace issue resolution, performance evaluations, and clear paths for professional advancement within the agency.

**Key Recommendations**

- Direct TDCJ to consolidate and expand its existing workforce retention and support functions under one department to better support employees and systematically identify root causes of turnover.

- Direct TDCJ to conduct job task analyses for key roles, clarify task prioritization, and tailor evaluations, hiring objectives, and training materials as needed.

- Direct TDCJ to provide additional guidance in policy on the appropriate use of disciplinary and corrective actions for both subordinates and supervisors.

- Direct TDCJ to revise and expand the scope of its performance evaluation process.

- Direct TDCJ to strengthen policies and processes for employees to seek out, participate in, and track trainings as a path to advancement within the agency.

# ISSUE 3

## Uncoordinated Strategic Planning and Outdated Data Systems and Practices Hinder TDCJ from Effectively Modernizing to Address Technology and Staffing Challenges.

TDCJ is in significant need of targeted strategic planning and modernization, but a reactive and unfocused approach to modernization has resulted in incomplete reforms. Furthermore, TDCJ's existing data

systems and practices are siloed, inefficient, and too frequently paper-based, which requires manual data entry, resulting in gaps and errors in data as well as wasted valuable staff time. Establishing a systematic accounting of the agency's modernization needs, improving coordination between the agency's divisions leading modernization initiatives, and standardizing a prioritization process for such efforts would position the agency to be better prepared to respond to its current and future challenges.

**Key Recommendations**

- Direct TDCJ to establish an office of modernization and strategic initiatives.

- Direct TDCJ to establish and maintain a report that enables users to view an array of indicators on prison health and safety.

- Direct TDCJ to develop a written plan to phase out paper-based processes, reduce manual data processes, and identify opportunities for automation.

- Direct TDCJ to establish administrative directives for the data governance program plan established by the Data Management Office.

# Issue 4

## The State Lacks Sufficient Oversight and Strategic Planning for Inmate Rehabilitation Programs.

Limited program oversight and evaluation, paired with a lack of strategic planning, create potential public safety risks and costly program placement timelines. TDCJ does not maintain a comprehensive inventory of its rehabilitation programs and reported a varying number of them throughout the Sunset review. TDCJ also does not evaluate the majority of its rehabilitation programs, preventing the agency from sufficiently determining which programs are effective. Moreover, the lack of systemwide strategic planning and oversight around programming creates lengthy program placement timelines for parole-contingent programs, and the agency's divisional structure around these programs is inefficient. These placement times limit rehabilitation opportunities prior to release and unduly extend parole-voted release timelines, costing the state millions of dollars annually by having TDCJ continue to house, feed, and provide health care to individuals who would otherwise be released.

**Key Recommendations**

- Require TDCJ to comprehensively inventory rehabilitation and reentry programs, conduct biennial program evaluations, and recommend changes to programs when needed.

- Require TDCJ to develop a strategic plan for rehabilitation and reentry programs in conjunction with Windham and report on implementation status biennially.

- Require TDCJ to track parole-voted program voting data and use this data to inform strategic program planning.

- Direct TDCJ to merge the Rehabilitation Programs Division and the Reentry and Integration Division.

# Issue 5

## Critical Statutory and Structural Deficiencies Strain an Already Overextended Parole System, Creating Unnecessary Barriers to Effective Supervision.

In recent years, parole officer (PO) vacancy rates have jumped to 21 percent, an outcome POs primarily attribute to low pay, unmanageable caseloads, and agency cultural issues. While TDCJ has prioritized PO pay increases in its 2026-27 Legislative Appropriations Request, other statutory and structural factors limit the agency's ability to improve PO staffing conditions without resorting to risky supervision practices such as hybrid virtual supervision of high-risk releasees. In partnership with BPP and relevant stakeholders, TDCJ needs greater flexibility to adjust its PO salary career ladder, caseload structure, and supervision conditions to meet the challenges of a changing workforce and projected increases in the supervised population in the coming years.

### Key Recommendations

- Abolish the PO salary career ladder and require TDCJ to establish it in rule.

- Abolish statutory maximum parole caseload ratios and require TDCJ to establish them in rule.

- Require TDCJ and BPP to evaluate post-release special conditions that may be temporarily modified by POs, and require TDCJ and BPP to establish corresponding modification processes in rule.

- Direct the Parole Division to report supervision trends and workload impacts of supervision conditions to BPP annually.

# Issue 6

## BPP Does Not Ensure Its Decision-Making Processes are Fair, Consistent, Transparent, and Data-Informed.

BPP's main responsibilities are to make release and release revocation decisions, impose conditions on releasees, and make clemency recommendations. While discretion is inherent to these decisions, partial noncompliance with statute governing parole guidelines poses a potential risk to public safety, increases costs for the state, and raises questions about inconsistent outcomes across regions. The agency also could better collect and analyze data to inform its own processes, ensuring parole voters have the information necessary to best make decisions about which inmates are well suited to release. Finally, the review found several areas for improvement in the agency's Medically Recommended Intensive Supervision (MRIS) process.

### Key Recommendations

- Require BPP to report outcomes by panel for release decisions, special conditions, and revocations and incorporate the findings into training for voters and staff.

- Require BPP to provide training for MRIS voters and to establish in rule the factors considered in MRIS decisions.

- Direct the agency to review its Institutional Parole Officer interview procedures and take action to increase effectiveness and consistency.

# ISSUE 7

## The State Has a Continuing Need for the Texas Department of Criminal Justice.

Texas has a continuing need for TDCJ to protect the public's safety by incarcerating and supervising individuals convicted of certain crimes by the courts. Through its support of probation functions and direct administration of incarceration, rehabilitation, and parole functions, TDCJ continues to be the most appropriate agency to oversee Texas' adult criminal justice system. TDCJ and its counterparts at BPP, Windham, and the committee, all of which are subject to review but not abolishment through the Sunset act, all serve a vital public safety role. Sunset staff found considerable problems and areas for improvement across TDCJ but no reason to deviate from a standard 12-year continue recommendation. Sunset also recommends eliminating a division that is no longer necessary.

### Key Recommendations

- Continue the Texas Department of Criminal Justice and Texas Board of Criminal Justice for 12 years.

- Direct TDCJ to eliminate the Private Facility Contract Monitoring and Oversight Division and reallocate existing resources elsewhere within the agency.

# ISSUE 8

## Texas Criminal Justice Entities' Statutes and Processes Do Not Reflect Some Standard Elements of Sunset Reviews.

Certain processes and statutory provisions of the criminal justice entities under review do not align with standard Sunset review elements derived from direction traditionally provided by the Sunset Commission, statutory requirements added by the Legislature to the criteria for review in the Sunset Act, or general law provisions imposed on state agencies. Specifically, this review identified changes needed to conform statutes for TDCJ, BPP, and the committee to standard Sunset language generally applied to all state agencies. The review also found changes needed to address statutorily required reports of the four entities and the need for TDCJ's advisory committees.

### Key Recommendations

- Update for the committee the standard across-the-board requirement regarding grounds for removal of a board member.

- Update for TDCJ, BPP, and the committee the standard across-the-board requirement related to board member training.

- Update for BPP the standard across-the-board requirement related to developing and maintaining a complaints system and making information on complaint procedures available to the public.

- Abolish three of TDCJ's reports, adjust the deadlines for three others, and continue all other reporting requirements for TDCJ, the committee, Windham, and BPP.

- Continue the Judicial Advisory Council and TCOOMMI advisory committee and remove the Advisory Committee on Agriculture from statute.

# Fiscal Implication Summary

Overall, the recommendations in this report would result in savings to General Revenue of about $734,876 annually, and starting in fiscal year 2028, savings of about $49,111,430 annually to TDCJ. Otherwise, though several recommendations in this report would not have a significant fiscal impact to the state, some recommendations would result in costs and savings that will depend on implementation and cannot be determined at this time.

*Issue 4* – Based on the statutorily required program placement reduction goals described in Recommendation 4.2, TDCJ would be required to reduce program placement timelines by 50 percent and eliminate program placement delays starting September 1, 2027, which would result in a total savings of $147,334,290 by the end of fiscal year 2030. Savings associated with this recommendation could be returned to General Revenue or appropriated back to the agency for other functions beginning in fiscal year 2028. Recommendation 4.9 to merge the Rehabilitation Programs Division and the Reentry and Integration Division would result in a small cost savings to the state of about $202,213 in salary and benefits for each of the next five fiscal years and the reduction of at least one full-time equivalent employee.

*Issue 7* – Recommendation 7.2 to eliminate a division no longer necessary would result in a small cost savings of about $532,663 in salary and benefits for each of the next five fiscal years and a reduction of three full-time equivalent employees.

### Texas Department of Criminal Justice

| Fiscal Year | Savings to the General Revenue Fund | Savings to TDCJ from Reduction in Parole Voted Placement Times | Savings to TDCJ from Elimination of Program Placement Delays | Change in FTEs from 2023 |
|---|---|---|---|---|
| 2026 | $734,876 | $0 | $0 | -4 |
| 2027 | $734,876 | $0 | $0 | -4 |
| 2028 | $734,876 | $29,540,544 | $19,570,886 | -4 |
| 2029 | $734,876 | $29,540,544 | $19,570,886 | -4 |
| 2030 | $734,876 | $29,540,544 | $19,570,886 | -4 |

# TDCJ at a Glance

Created in 1989 by consolidating Texas' adult probation, incarceration, and parole supervision functions, the Texas Department of Criminal Justice (TDCJ) works with the Board of Pardons and Paroles (BPP), Windham School District, and the Correctional Managed Health Care Committee to confine, supervise, and provide services for adults convicted of certain crimes in Texas. To fulfill its mission, TDCJ performs the following key functions:

- Assists local Community Supervision and Corrections Departments (CSCDs) that supervise individuals on probation.

- Provides confinement, rehabilitation, and services for reintegration of inmates in state jails and prisons.

- Supervises individuals released from confinement to TDCJ supervision in the community.

## Key Facts

- **Governance.** The Texas Board of Criminal Justice governs TDCJ's operations and, in a separate capacity, serves as the Board of Trustees for Windham. The governor appoints TDCJ's nine-member board with the advice and consent of the Senate and designates the board chair.[1] Board members serve staggered, six-year terms.

  Statute requires the board to employ and supervise an executive director.[2] Board policy makes the board responsible for appointing and overseeing the inspector general, director of the State Counsel for Offenders, director of Internal Audit, Prison Rape Elimination Act ombudsman, and independent ombudsman, all of whom directly report to the board.[3]

- **Funding.** As shown in the chart, in fiscal year 2023 TDCJ operated on a budget of about $3.9 billion, mostly from general revenue. TDCJ also receives general revenue dedicated funds, federal grant funds, revenue from interagency contracts, revenue generated from the sale of agricultural products, and revenue generated from the sale of manufactured products through the agency's Texas Correctional Industries (TCI) program.

### TDCJ Revenue - FY 2023



Coronavirus Relief Fund (Federal) $25.4 Million (8%)
GR Dedicated - $515,000 (<1%)
Other Federal Funds $34.7 Million (11%)
Commissary Sales Receipts $156.7 Million (52%)
TCI Contracts and Receipts $61.9 Million (21%)
Other $302.4 Million (8%)
General Revenue $3.6 Billion (92%)
Economic Stabilization Fund $834,000 (<1%)
Interagency Contracts $7.8 Million (3%)
Appropriated Receipts $14.6 Million (5%)

**Total: $3.9 Billion**

TDCJ spent $3.9 billion in fiscal year 2023, most of which was for incarceration and healthcare services. Although it is a separate state agency, BPP is funded through TDCJ's appropriations, as reflected in the *TDCJ Expenditures* chart.

### TDCJ Expenditures - FY 2023



Correctional Managed Health Care $787.8 Million (20%)
Board of Pardons and Paroles - $27.8 Million (1%)
Parole System - $169.7 Million (4%)
Administration - $101 Million (2%)
Community Supervision - $245.5 Million (6%)
Special Needs Offenders - $29 Million (1%)
Incarceration $2.6 Billion (66%)
Total $3.9 Billion

Appendix A describes TDCJ's use of historically underutilized businesses in purchasing goods and services for fiscal years 2021 to 2023.

- **Staffing.** At the end of fiscal year 2023, TDCJ employed 31,179 staff, including 21,231 correctional staff, 17,361 of which were correctional officers.[4] Staff also works in offices in Huntsville and Austin, parole offices, and regional offices across the state. Appendix B compares the percentages of minorities and women in TDCJ's workforce to the statewide civilian labor force for the past three fiscal years.

- **Managed population.** At the end of fiscal year 2023, the agency oversaw 530,718 people — 326,005 probationers, 129,653 inmates, and 75,060 releasees.[5] TDCJ confines individuals convicted of first-, second-, and third-degree felonies in prisons and state jails and confines individuals convicted of state jail felonies in state jails.[6]

- **Facilities.** TDCJ uses 101 state correctional facilities, 100 of which it owns. The agency operates 93, and private contractors operate eight. Appendix C shows the 65 communities in which all correctional facilities are located. In addition to prisons and state jails, which are often referred to as "units," facility types include Substance Abuse Felony Punishment facilities, which confine qualified inmates and provide them with substance abuse treatment, and Intermediate Sanction Facilities, which confine low-risk releasees who have violated their release conditions. TDCJ locates and houses inmates based on offense, sentence length, healthcare needs, and a number of other factors.[7]

- **Community supervision.** Instead of prison confinement, a judge may sentence individuals convicted of certain crimes to community supervision, or "adult probation," which allows them to serve their sentences in the community. Texas has 122 CSCDs that supervise 326,005 probationers, including both felons and misdemeanants. Local district court and county court-at-law judges establish and oversee CSCDs. Community supervision officers perform all supervision duties, including meeting with probationers, developing supervision plans, and ensuring probationers comply with the terms of their supervision.

TDCJ's Community Justice Assistance Division (CJAD) provides state funding to CSCDs, develops supervision standards to which CSCDs must adhere, and monitors CSCDs' programs and budgets. In fiscal year 2023, CJAD disbursed about $244 million in state funding to CSCDs and awarded additional grant funds to nonprofits for Battering Intervention and Prevention Programs. The Judicial Advisory Council advises CJAD and the board on community supervision issues.

- **Incarceration.** TDCJ confines inmates and works to safely maintain custody, provide basic necessities such as food and health care, and offer programs and services that support rehabilitation and prepare inmates for eventual release into the community.

<u>Confinement and security.</u> TDCJ's oversight begins once an inmate is transferred to a TDCJ facility from county jail. TDCJ intakes and assesses an average of 1,036 inmates from counties every week. The agency conducts an intake assessment to classify inmates and determine initial custody levels, housing assignments, and job placements. Over the course of an inmate's sentence, TDCJ may change an inmate's housing arrangement or transfer them to another facility based on security, health, or programming reasons as the inmate's needs change.

TDCJ staff may file disciplinary reports against inmates for violating agency policy. In fiscal year 2023, TDCJ held just over 182,000 disciplinary hearings. Sanctions from disciplinary hearings can range from lost or limited privileges to a change in custody level. Correctional officers may also use force when necessary to maintain order, in accordance with TDCJ's Behavioral Intervention Plan, formerly referred to as the Use of Force Plan. In fiscal year 2023, TDCJ reported about 11,000 uses of the Behavioral Intervention Plan. The Office of the Inspector General investigates all criminal allegations within or related to TDCJ facilities such as sexual assault. In fiscal year 2023, the inspector general investigated around 12,000 criminal cases.

<u>Basic services.</u> TDCJ provides inmates with basic necessities such as food and laundry services. About 40 percent of the food inmates consume is produced from the 111,000 acres of agricultural land TDCJ manages. Many inmates work at one of TDCJ's 36 prison-based factories, training programs, and warehouses, which produce and store goods for inmate use, such as clothing, towels, and mattresses, and goods for sale such as office furniture to other state and governmental entities and institutions of higher education in Texas. The agency also transports inmates who are reassigned to other units or for court appearances or medical appointments. In fiscal year 2023, TDCJ moved an average of 6,802 inmates within the system every week using its 2,520-vehicle fleet.

<u>Health services.</u> The agency contracts with the University of Texas Medical Branch (UTMB) and Texas Tech University Health Sciences Center to provide constitutionally required health care to inmates in units, in regional clinics and hospitals, and at UTMB's Hospital Galveston. TDCJ staff monitors the quality of and access to care provided to inmates through audits, investigations, and complaint and grievance resolution. The agency also coordinates medical and mental health services through the Texas Correctional Office on Offenders with Medical or Mental Impairments (TCOOMMI). TCOOMMI assists in providing continuity of care services for inmates moving between probation, incarceration, release, and parole. TCOOMMI also coordinates the early medical release program, known as Medically Recommended Intensive Supervision, with BPP.

<u>Inmate complaint resolution.</u> Statute allows inmates to file grievances with TDCJ about any issue related to their incarceration.[8] The Office of the Independent Ombudsman investigates non-criminal, non-medical complaints from the public, government officials, and TDCJ inmates and acts as a centralized point of contact for outside inquiries about operations or inmate concerns.

<u>Rehabilitation and reentry services.</u> TDCJ operates rehabilitation programs, such as substance abuse and sex offender treatment, to reduce recidivism of inmates released from prison and prevent future victimization. Inmates who BPP places into a program as a condition of release receive priority placement in most programs. However, TDCJ offers several programs not connected with parole decisions, some of which are facilitated by agency chaplains or volunteers from the community.

TDCJ provides reentry services, such as assisting inmates with acquiring identification documents, prior to release. The agency also provides inmates with personalized information packets tailored to the area in which they will live, along with reentry case plans.

- **Release and parole supervision.** In fiscal year 2023, 12,888 individuals fully served their terms of incarceration and were released through flat discharge, primarily from one of TDCJ's 17 prisons that serve as release facilities, as well as from state jails and other facilities. In the same year, BPP voted to release 22,455 inmates on parole after considering a variety of factors, including completion of rehabilitation programming. The BPP Agency at a Glance provides more detail about early release and the parole decision-making process.

    Once released to parole supervision, TDCJ supervises releasees for the remainder of their original sentence to ensure compliance with release terms and any special conditions of release that BPP imposed. In fiscal year 2023, TDCJ employed about 1,100 parole officers. Those managing only regular cases had an average caseload of 80 releasees while officers managing high-need cases had an average case load between 18 and 68. When releasees violate their terms of supervision or commit a new crime, parole officers may apply sanctions or initiate the parole revocation process. If sanctions do not result in compliance, the parole officer issues a warrant, commonly known as a "blue warrant," for the releasee's arrest, which sometimes results in a revocation hearing and decision from BPP.

- **Victim services.** TDCJ has dedicated staff that provide direct services to crime victims, including families, by issuing notifications of inmates status in the post-conviction phase and by providing support and information.[9] The agency also gives victims the opportunity to receive apology letters from inmates and to meet with the inmate responsible for their victimization.[10] In addition, this staff offers support services to TDCJ employees who have experienced stress or trauma.[11]

---

[1]    All citations to Texas statutes are as they appear on http://www.statutes.legis.texas.gov/. Section 492.002, Texas Government Code.

[2]    Section 492.013(b), Texas Government Code.

[3]    Texas Department of Criminal Justice (TDCJ), "Inspector General Policy Statement," Number BP-01.07 (rev. 8), June 24, 2022; TDCJ, "State Counsel for Offenders Policy Statement," Number BP-13.69 (rev. 11), June 24, 2022; TDCJ, "Internal Audit Division Policy Statement," Number BP-14.02 (rev. 12), June 24, 2022; TDCJ, "Prison Rape Elimination Act Ombudsman Policy Statement," Number BP-02.09 (rev. 3), June 24, 2022; TDCJ, "Independent Ombudsman Policy Statement," Number BP-01.08 (rev. 2), June 24, 2022.

[4]    Legislative Budget Board, *TDCJ Monthly Correctional Population Report*, web page last modified April, 2024, accessed online May 21, 2024, https://www.lbb.texas.gov/CJDA/_site/TDCJ.html.

[5]    TDCJ, "FY2023 Statistical Report," accessed online February 20, 2024, https://www.tdcj.texas.gov/documents/Statistical_Report_FY2023.pdf.

[6]    Ibid.

[7]    TDCJ, *Unit Directory*, accessed online December 21, 2023, https://www.tdcj.texas.gov/unit_directory/index.html.

[8]    Section 501.008, Texas Government Code.

[9]    Chapter 56A, Texas Code of Criminal Procedure.

[10]    Article 56A.602, Texas Code of Criminal Procedure.

[11]    TDCJ, "Employee Support Services," accessed online May 24, 2024, https://www.tdcj.texas.gov/divisions/vs/employee_support_services.html.

# Committee at a Glance

The Legislature created the Correctional Managed Health Care Committee in 1993 to establish a managed healthcare system and control costs by negotiating contracts with healthcare providers. In 2011, the Legislature transferred the authority to contract with and monitor healthcare providers from the committee to the Texas Department of Criminal Justice (TDCJ). In 2013, the Legislature abolished the committee as a standalone entity and reconstituted it as a committee administratively attached to TDCJ. To fulfill its mission, the committee performs the following key functions:

- Develops and approves a managed healthcare plan for all TDCJ inmates.

- Develops statewide policies for the delivery of correctional health care.

- Coordinates cost containment initiatives.

- Resolves disputes between TDCJ and university providers and ensures TDCJ appropriately monitors providers.

- Provides clinical expertise and assistance in identifying system needs related to inmate health care.

## Key Facts

- **Governance.** The volunteer committee consists of nine voting members and one non-voting member, as shown in the following table.[1] The governor selects the committee chair, who must be both a public member and a physician.[2] The six governor-appointed members serve four-year terms, and all other members serve at the will of their appointing authority.[3]

### Correctional Managed Health Care Committee

| Position | Appointed By |
|---|---|
| One staff member from TDCJ | TDCJ |
| One physician representative from the University of Texas Medical Branch (UTMB) | UTMB |
| One physician representative from the Texas Tech University Health Sciences Center (TTUHSC) | TTUHSC |
| Two physicians employed full time by a medical school other than either UTMB or TTUHSC | Governor |
| Two licensed mental health professionals | Governor |
| Two public members not affiliated with TDCJ or with any contracting entity, at least one of whom is licensed to practice medicine in Texas | Governor |
| The state Medicaid director, or a person employed full time by the Health and Human Services Commission (non-voting) | State Medicaid director |

- **Funding and staffing.** The committee receives no state appropriations and does not have staff. Instead, TDCJ provides all of the committee's administrative support. A General Appropriations Act rider allows members of the committee to be reimbursed from TDCJ's managed healthcare budget for travel expenses.[4] In fiscal year 2023, TDCJ spent $2,092 on travel expenses for the committee.

- ***Managed Healthcare Plan* and university providers.** The committee creates and annually updates the *Managed Healthcare Plan*. This plan provides a general description of the types of healthcare services and treatments UTMB and TTUHSC provide to inmates at TDCJ facilities and off-site locations. The committee also provides clinical expertise and assistance to TDCJ in identifying system needs related to the healthcare program and ensuring quality and consistent delivery of services across the state and by different providers. UTMB and TTUHSC manage a statewide provider network, provide pharmacy services, and conduct reviews to ensure services are provided in an appropriate and cost-effective manner. UTMB's service area covers approximately 80 percent of the inmate population while TTUHSC covers approximately 20 percent.

---

[1]   All citations to Texas statutes are as they appear on http://www.statutes.legis.texas.gov/. Section 501.133, Texas Government Code.

[2]   Section 501.137, Texas Government Code.

[3]   Section 501.136, Texas Government Code.

[4]   Texas Department of Criminal Justice, Rider 42, p. V-16, Article V, Chapter 1170 (HB 1), Acts of the 88th Legislature, Regular Session, 2023 (General Appropriations Act).

# WINDHAM AT A GLANCE

The Windham School District provides educational programs and services in the correctional setting of the Texas Department of Criminal Justice (TDCJ). Statute establishes goals for Windham to reduce recidivism and the cost of confinement or imprisonment, increase the success of former students in obtaining and maintaining employment, and incentivize inmates to behave in positive ways during confinement or imprisonment.[1] To accomplish these goals, Windham performs the following key functions:

- Provides academic, technical, and life skills programs to eligible students.

- Analyzes and evaluates the effectiveness of its programs.

- Manages libraries and recreational resources in correctional facilities.

## Key Facts

- **Governance.** The nine-member, governor-appointed Texas Board of Criminal Justice also serves as Windham's Board of Trustees.[2] In this capacity, the board provides general oversight of the school district and hires Windham's superintendent.

- **Funding.** As shown in the chart below, Windham received more than $70 million in total revenue in fiscal year 2023, including about $59 million of General Revenue funding from the Texas Education Agency's Foundation School Program and the Rider 8 Instructional Materials Allotment via a pass-through grant. Funding is based on the number of "contact hours," or hours of face-to-face instruction students receive. Windham also receives funding from TDCJ to support its wellness and recreation programs and library services. Federal and state grants support special education, career and technical education, and supplemental education services.



**Windham Revenue - FY 2023**

Total $70.3 Million

TDCJ Contracts - $5.6 Million (8%)
Federal & State Grants - $4.3 Million (6%)
Local (Interest Income) - $1.2 Million (2%)
TEA Funding* $59.2 Million (84%)

\* The Foundation School Program accounts for $58.1 million, and $1.1 million is from the Instructional Materials Allotment (Rider 8).

In fiscal year 2023, Windham's expenditures totaled more than $66 million, as shown in the *Windham Expenditures* chart on the following page. Like other school districts, Windham carries a fund balance reflecting unspent operating funds. At the end of fiscal year 2023, Windham's fund balance was nearly $24 million, which the school district attributes to the COVID-19 pandemic and does not anticipate sustaining in the long term. The school district spent an average of $16 per student per day on programming and services in fiscal year 2022.[3] Windham relies on TDCJ to coordinate the data submission regarding its use of historically underutilized businesses in purchasing goods and services, as covered in Appendix A.

**Windham Expenditures - FY 2023**



- **Staffing.** The superintendent is Windham's chief executive officer and is responsible for supervising daily operations. In fiscal year 2023, Windham had 915 total staff, including 62 principals and 433 certified teachers. Staff works at Windham's central office in Huntsville and at Windham campuses in 90 TDCJ-run and eight private units across the state. Appendix D compares the percentages of minorities and women in Windham's workforce to the statewide civilian labor force for the past three fiscal years.

- **Windham students.** In fiscal year 2023, the average age was 36 years for all Windham students and 22 years for students enrolled in high school programs. Windham prioritizes younger inmates for enrollment in programs and also considers individual educational needs and remaining time on a prospective student's sentence. Windham staff administers an initial basic educational and reading test upon intake, which helps inform a student's individualized treatment plan. In fiscal year 2023, Windham enrolled a total of 47,462 students, and about 69 percent of releasees in that year participated in Windham programs during their incarceration.[4]

- **Academic programs.** Windham provides literacy and adult secondary education courses, including for students working toward a high school diploma or equivalency certificate. Windham provides English language instruction and special education services to students as needed. In fiscal year 2023, 3,254 students earned their high school diploma or equivalency certificate through Windham programs. Students also achieved 5,072 literacy level gains in reading, 3,621 gains in language, and 4,564 gains in math.

- **Technical programs.** Windham offers courses in 40 occupational fields, such as cosmetology and truck driving, for which students can apply or obtain certifications while incarcerated. Additionally, Windham partners with TDCJ and external employers to offer on-the-job training, supplemental training, and Department of Labor apprenticeship programs. In fiscal year 2023, 17,933 Windham students participated in classes or apprenticeships and earned a total of 19,253 industry certifications, on-the-job training certificates, and occupational licenses.

- **Life skills programs.** Windham offers three life skills courses to help participants successfully navigate reintegration into their communities after incarceration. Topics include parenting, self-esteem, stress and anger management, résumé building, and interviewing. The Board of Pardons and Paroles may require an inmate to complete a life skills program, such as Changing Habits and Achieving New Goals to Empower Success, to obtain parole. Among releasees in fiscal year 2023, 16,398 completed life skills courses.

- **Students under 22 years.** Windham provides students in this age group supplemental services in academic and work-readiness programming through federal grants. Eligible students with disabilities may receive special education accommodations for coursework.[5] In fiscal year 2023, nearly 3,300 students were eligible for supplemental services, and 554 students received special education services.

- **Libraries, recreation, and media.** Through a memorandum of understanding with TDCJ, Windham provides recreational resources such as exercise equipment, televisions, and arts and crafts supplies to each TDCJ-run facility to promote health and wellness. Windham also publishes and disseminates *The ECHO*, a newspaper written by and for individuals in TDCJ custody, and operates unit libraries at TDCJ-run and private facilities.

---

[1]    All citations to Texas statutes are as they appear on http://www.statutes.legis.texas.gov/. Section 19.003, Texas Education Code.

[2]    Section 19.004, Texas Education Code.

[3]    Legislative Budget Board, *Criminal and Juvenile Justice Uniform Cost Report – Fiscal Years 2021 and 2022*, February 2023, p. 6, accessed online August 26, 2024, https://www.lbb.texas.gov/Documents/Publications/Policy_Report/7455_Uniform_Cost_Feb_2023.pdf. The Legislative Budget Board's calculation of Windham's average per-student, per-day expenditure on programming and services was not available for fiscal year 2023 at the time of this report's publication.

[4]    Windham School District, *Elevating Expectations: Annual Performance Report School Year 2022-2023*, 2024, p. 5, accessed online September 1, 2024, https://wsdtx.org/about-windham/reports/annual-performance-reports/#flipbook-df_18745/1/.

[5]    34 Code of Federal Regulations, Part B, Subpart B, Section 300.111 (2023).

# BPP at a Glance

Established in 1929, the Board of Pardons and Paroles (BPP) is a constitutionally created agency responsible for making clemency recommendations and determining which eligible inmates to release early from the custody of the Texas Department of Criminal Justice (TDCJ). To accomplish its goals, BPP performs the following key functions:

- Determines whether eligible inmates may be placed on supervised release from prison, as described in the textbox below.

- Determines the conditions an individual must meet before and during supervised release.

- Revokes or modifies the conditions of an individual's supervised release when needed.

- Recommends the resolution of requests for clemency to the governor, including pardons, commutations of a sentence, reprieves, remissions of a fine, or forfeitures.[1]

The various types of supervised release are broadly referred to as "parole," whereby inmates serve the remainder of their sentences in the community under TDCJ supervision. Parole eligibility is based on several factors, including time served, the type of crime committed, and the calculation of good conduct time, or "good time." TDCJ credits good time to an inmate for participation in work, educational, or treatment programs while incarcerated.[2] The term "releasee" applies to an individual released from confinement to TDCJ supervision in the community.

### Types of Supervised Release

- **Parole.** Statute authorizes BPP to grant certain inmates the privilege of early release from prison to serve the remainder of their sentence in the community under TDCJ supervision. Parole may depend on BPP setting conditions such as completing a rehabilitation program prior to release.

- **Mandatory supervision.** Statute grants inmates who committed certain offenses before September 1, 1996, automatic release from prison when together their calendar time served and good time credit equal the length of their sentence.[3] BPP may set the conditions of release.

- **Discretionary mandatory supervision (DMS).** Statute authorizes BPP to approve or deny mandatory supervision for certain offenses committed on or after September 1, 1996.[4]

- **Medically recommended intensive supervision (MRIS).** Statute makes inmates with certain offenses eligible for early release if BPP determines they no longer pose a threat to public safety due to age, disability, or illness.[5]

## Key Facts

- **Governance.** The governor appoints BPP's seven full-time board members with the advice and consent of the Senate and designates the presiding officer.[6] Members serve staggered six-year terms, must be representative of the general public, and must have resided in Texas for two years.[7] The presiding officer is responsible for hiring full-time parole commissioners, of which BPP currently has 15. Seven regional board offices across Texas are staffed with one board member and generally two parole commissioners, comprising a parole panel. Parole panels review and make decisions about most cases, but the board

has some exclusive duties, including parole reviews for inmates with certain offenses as well as clemency recommendations and policymaking. The board offices are shown in the accompanying map, with stars representing the two headquarter locations.



- **Funding.** Funded through TDCJ's appropriations, BPP received nearly $30 million in General Revenue and $395,000 in grants in fiscal year 2023 and spent about $28 million. BPP's biggest expenditure of about $13 million was on institutional parole operations, as shown below. The pie chart shows expenditures on each program in fiscal year 2023. The agency transfers any lapsed funds from vacant positions to TDCJ. In fiscal year 2023, the amount of lapsed funds BPP transferred to TDCJ was $2.2 million. BPP relies on TDCJ to coordinate its use of historically underutilized businesses in purchasing goods and services, as covered in Appendix A.



- **Staffing.** The chief of staff and board administrator oversee BPP's daily operations under the direction of the presiding officer. In fiscal year 2023, BPP employed 445 total staff, including 243 in the Institutional Parole Operations Division, which assists parole panels by interviewing and compiling information on parole-eligible inmates; 61 across the seven regional board offices, which accounts for voters and administrative assistants; and 56 in the Hearing Operations Division, which holds parole revocation hearings and makes recommendations to parole panels on revocation decisions. The remaining staff consists of 47 administrative employees, 16 in both the Information Technology and General Counsel Divisions, and six in the Victim Liaison Program. In addition to the seven regional offices, BPP has seven institutional parole offices and 19 hearing offices. Appendix E compares the percentages of minorities and women in BPP's workforce to the statewide civilian labor force for the past three fiscal years.

- **Parole decisions and conditions.** Parole panels rely on Institutional Parole Officers (IPOs) to gather information for use in voting. IPOs conduct interviews and compile summaries of each case. Members of a panel then independently consider and vote on each case assigned to the panel, taking into account externally validated parole guidelines.[8] The table shows BPP's approval rates for the various types of parole in fiscal year 2023.

**BPP Approval Rates - FY 2023**

| | Eligible Inmates | Approved Inmates | Approval Rate |
|---|---|---|---|
| Parole | 64,775 | 22,455 | 34.7% |
| DMS | 14,495 | 6,347 | 43.8% |
| MRIS | 289 | 27 | 9.3% |

In addition to approving release, parole panels determine the conditions of release. Conditions may include requiring an inmate to complete programming before release, such as a TDCJ rehabilitation program, or after release, such as sex offender treatment or psychological counseling in the community. Once TDCJ releases the inmate, its Parole Division supervises the releasee for the remainder of their sentence. The TDCJ at a Glance includes additional information on rehabilitation and reentry services and parole supervision.

- **Parole revocations.** Parole panels may continue, revoke, or modify parole status if a releasee violates a parole condition or commits a new offense. BPP uses a graduated sanctions approach, which can include imposing additional conditions, placing the releasee in a short-term sanction facility, or returning them to TDCJ custody. Releasees facing revocation and reincarceration have the right to due process through a revocation hearing conducted by a hearing officer, many of which occur via videoconference. In fiscal year 2023, violations of parole conditions and new offenses resulted in 11,632 revocation hearings and 4,458 revocations by parole panels. The accompanying chart shows the breakdown of revocations by violation type in fiscal year 2023.



**Revocations by Violation Type FY 2023**

- **Victim support.** The Victim Liaison Program provides support to victims who elect to participate in the parole review process. Statute entitles victims, legal guardians of a victim, or close relatives of a deceased victim to certain rights within the criminal justice system, including submitting a written statement or providing a statement in-person to a parole panel during an inmate's parole review.[9] Staff can accompany victims for in-person statements and provide other support services such as explaining the panel's vote to the victim. In fiscal year 2023, the program served approximately 2,900 individuals.

- **Clemency recommendations.** The seven-member board is responsible for reviewing clemency requests through a formal application process and making recommendations to the governor, who makes the final decision. A majority of the board must agree to make a clemency recommendation. In fiscal year 2023, the board considered clemency applications for 156 noncapital cases and seven capital cases. The board made three noncapital clemency recommendations to the governor, all of which he approved.

1    All citations to Texas statutes are as they appear on http://www.statutes.legis.texas.gov/. Section 508.050, Texas Government Code.

2    Section 498.003, Texas Government Code.

3    Section 508.147, Texas Government Code.

4    Chapter 263 (HB 1433), Acts of the 74th Texas Legislature, Regular Session, 1995; Section 508.149(b), Texas Government Code; 37 Texas Administrative Code (TAC), Part 5, Chapter 145, Subchapter A, Section 145.14 (1997) (Board of Pardons and Paroles, *Action upon Review; Release to Mandatory Supervision*).

5    Section 508.146, Texas Government Code.

6    Sections 508.031 and 508.035(a), Texas Government Code.

7    Sections 508.037 and 508.032, Texas Government Code.

8    Section 508.144, Texas Government Code.

9    Section 508.153, Texas Government Code.

# ISSUE 1

A Changing Workforce and Inmate Population Make Multiple TDCJ Facilities Almost Impossible to Adequately Staff.

## Background

The Texas Department of Criminal Justice (TDCJ) has 101 facilities across the state with nearly 154,000 beds. However, the agency's capacity to actually house inmates in those beds depends on several factors. By rule, the agency should not use more than 96 percent of its total "online," or usable, bed capacity to house inmates. The remaining four percent is intended to give the agency flexibility to move inmates among facilities as needed and avoid overcrowding.[1] The table defines the various terms used to describe the agency's capacity, with quantities as of June 2024.[2]

**Capacity Definitions**

| Category | Description | Quantity |
|---|---|---|
| Total Bed Capacity | Total number of beds within TDCJ facilities, including temporarily offline (idled) beds. | 153,987 |
| Online Bed Capacity | Total number of beds available to house incarcerated individuals, not including idled beds. | 140,127 |
| Operational Capacity | 96 percent of the online bed capacity. | 134,522 |

TDCJ houses two categories of inmates: prison inmates, who have committed first-, second-, or third-degree felonies and have sentences ranging from two years to life; and state jail felons, who have committed less severe felonies with sentences ranging from 180 days to two years.[3] TDCJ assigns inmates a custody level based on information gathered during intake and their behavior while confined. The agency uses custody level to determine each inmate's housing type and freedom of movement. TDCJ has 23 facilities categorized as maximum security that house a higher proportion of high-security inmates than other facilities that also house these inmates.

The Correctional Institutions Division (CID) assigns inmates to particular facilities based on a variety of factors, including medical needs, custody level, programming needs or preferences, work placement, status as a state jail felon, and other housing restrictions such as gang affiliations. TDCJ operates nine types of confinement facilities, as summarized in Appendix F.

TDCJ confines certain subpopulations of inmates with medical and other special needs. These subpopulations include elderly inmates, typically aged 55 and up in correctional settings, inmates with mental health or chronic medical conditions, and mobility-impaired inmates. Many inmates in these subpopulations require specific care and accommodations which TDCJ fulfills with the special bed types outlined in the table on the following page. These special beds can be located within several of the nine types of confinement facilities. In addition to these housing types, many inmates with special needs require accommodations such as "cool beds," or beds in areas with HVAC installed, or bottom bunks.

As discussed further in Issue 2, the agency has experienced crisis-level vacancy rates among correctional staff for several years in many of its facilities. In 2018, in response to rising vacancies, TDCJ began transporting correctional officers (COs) from higher- to lower-staffed facilities. Additionally, as inmate populations decreased during the COVID-19 pandemic, the agency took beds offline by idling buildings and entire facilities with the highest vacancy rates. When TDCJ idles facilities, it must continue performing a basic level of maintenance on the idled facilities to keep those beds ready to repopulate if necessary.

**Special Bed Types, End of FY 2023**

| Bed Type | Description | Census[4] |
|---|---|---|
| Infirmary Beds | Used for inmates who require inpatient care involving observation or management but do not merit admission to a hospital. Infirmary beds operate similarly to a nursing home, providing short-term and chronic care. | 701 |
| Sheltered Housing Unit (SHU) Beds | Used for inmates with medical needs that cannot be met in a standard prison environment but do not require infirmary care. | 577 |

## Findings

**While TDCJ's staffing crisis is agencywide, continuing to maintain and rely on particularly hard-to-staff facilities is costly and unsustainable.**

TDCJ's statewide correctional staffing crisis, which is discussed in detail in Issue 2, is especially severe for facilities in locations where certain demographic and geographic factors limit the agency's ability to recruit and retain staff. The agency invests significant resources into maintenance and alternative staffing models at these hard-to-staff facilities, applying a temporary solution to a problem unlikely to improve in certain areas of the state. These short-term solutions to address severe staffing shortages can create safety risks for staff and the public and are not a viable long-term strategy to maintain the agency's operational capacity.

- **Severe vacancy rates at many facilities.** While correctional best practice is that staff vacancy rates remain below 10 percent, in fiscal year 2023, TDCJ's vacancy rate among correctional staff was nearly 28 percent agencywide and much higher at certain facilities.[5] At the end of that year, 22 facilities had more than 40 percent of correctional positions vacant, including six facilities with more than half of correctional positions vacant, as shown in the table on the following page. These vacancy rates are even higher for just COs, with some units operating with up to 70 percent of CO positions unfilled. Agency data indicate vacancy rates have progressively worsened at certain facilities over the last ten years. For example, Sunset staff analyzed a random sample of CO shift turnout rosters from one facility and found it frequently operates with a vacancy rate over 60 percent after accounting for employees on leave or otherwise absent from work. Moreover, Sunset staff learned some facilities have operated with as little as 25 percent of the staff they need on a given day. In practice, this forces TDCJ staff to supervise thousands of inmates with fewer than half of the security staff they need, which has potentially dire consequences for staff, inmates, and others, as discussed further in Issue 2.

Some units are operating with up to 70% of CO positions unfilled.

**TDCJ Units with the Highest Vacancy Rates, FYs 2014-23**

| Unit | FY 14 | FY 15 | FY 16 | FY 17 | FY 18 | FY 19 | FY 20 | FY 21 | FY 22 | FY 23 |
|------|-------|-------|-------|-------|-------|-------|-------|-------|-------|-------|
| D | 13.92% | 16.63% | 18.68% | 22.28% | 25.83% | 31.61% | 45.86% | 47.09% | 52.72% | 55.43% |
| E | 20.05% | 27.19% | 16.19% | 22.15% | 28.87% | 29.84% | 38.86% | 43.44% | 52.59% | 53.55% |
| G | 20.83% | 27.01% | 11.45% | 20.63% | 28.72% | 31.43% | 36.77% | 41.62% | 48.52% | 52.77% |
| B | 27.39% | 16.67% | 16.24% | 30.70% | 31.82% | 44.91% | 41.67% | 43.46% | 51.69% | 53.89% |
| W | 15.71% | 17.84% | 8.70% | 8.74% | 11.16% | 15.65% | 15.78% | 27.85% | 43.78% | 49.90% |
| J | 11.53% | 17.13% | 10.14% | 17.38% | 28.15% | 27.57% | 32.74% | 35.61% | 45.14% | 47.98% |
| C | 24.36% | 16.85% | 6.88% | 20.15% | 14.34% | 12.04% | 25.37% | 44.11% | 47.40% | 51.74% |
| A | 1.53% | 3.89% | 9.16% | 7.50% | 19.92% | 23.16% | 32.68% | 42.24% | 59.09% | 56.57% |
| R | 13.56% | 8.47% | 9.40% | 10.17% | 25.66% | 5.08% | 16.10% | 32.48% | 41.96% | 48.68% |
| O | 40.14% | 21.35% | 12.43% | 27.69% | 23.22% | 36.43% | 36.29% | 52.55% | 51.85% | 48.67% |

- **Costly, inefficient, and burdensome staff transport models.** In the face of staffing shortages in hard-to-staff areas of the state, TDCJ relies on costly and operationally inefficient staffing models to support basic operations, a practice the agency recognizes is not sustainable in the long term. TDCJ uses three staff transport models, as outlined in the table below, including Uber and hotel models that regularly distribute staff from well-staffed facilities to those with high vacancies. For example, TDCJ transports staff from the Dominguez State Jail in San Antonio to the Dalhart Unit in Texas' panhandle, a distance of nearly 600 miles. TDCJ does not systematically track costs associated with its staff transport models but estimated it spent $14 million on lodging and rental vehicles alone in fiscal year 2023. The agency could not provide an estimate of other costly aspects of these staffing models such as gas and maintenance for agency vehicles, staff per diems, administrative time to track and coordinate staffing needs, and overtime specifically related to the staff transport models, though the agency did spend $277 million overall on CO and sergeant overtime in fiscal year 2023. These staffing models are not only costly relative to full permanent staffing at facilities but can also be incredibly disruptive and fatiguing for staff, leading to dissatisfaction, burnout, and costly employee turnover, as discussed further in Issue 2.

> TDCJ spent $277 million on CO and sergeant overtime in fiscal year 2023.

**Staff Transport Models**

| Model | Description |
|-------|-------------|
| Uber Model | Staff are transported from one facility to another for a shift within one day. Officers receive compensation for travel time as well as time on the facilities. Common receiving locations include facilities in Beaumont, New Boston, and Tennessee Colony. |
| Hotel Model | Staff are transported from one facility to another for an overnight stay in a hotel, with a stay of one to two weeks. The agency uses this model to support a facility that is either farther away or requires more sustained support than can be provided using the Uber model. Common receiving locations include facilities in Amarillo, Dalhart, and New Boston. |
| Mobile Correctional Officer Team (MCOT) | Staff commit to a year-long travel assignment, during which they work at a number of facilities for varying lengths of time. About 90 percent of MCOT officers are new academy graduates. TDCJ deploys these officers to supplement staff shortages, aid in implementing special projects, and during emergencies. |

Furthermore, transported COs are not always as effective as the permanent staff on a facility. While many TDCJ facilities were designed based on one of several facility prototypes, every facility is somewhat unique, whether because of its physical layout, standard operating procedures, inmate population, or cultural norms. Many facilities have undergone decades of repairs and renovations, often retrofitted with new security features that may differ among vendors. Transported staff may have to learn how to operate another facility's infrastructure, even something as granular as a security door, because it differs from their home facility. Inmate populations can also vary significantly across facilities. For example, staff from the Montford Unit in Lubbock, a facility that primarily houses inmates with severe medical or mental health needs, regularly rotates to support the Clements Unit, a large maximum-security facility in Amarillo. Staff members transporting to a facility for one day or for a week or two at a time must quickly learn and adapt to a new environment and system, which can be difficult for both them and the facility's permanent staff. Sunset staff learned from COs that, while the help is appreciated and needed, transported officers are sometimes more prone to mistakes, more reticent to take on difficult assignments, and in some cases, less invested in their tasks and the overall success of the facility. Given limited capacity, most receiving facilities provide little unit-specific training to transported COs, and TDCJ has not provided clear guidance for receiving facilities and supervisors on how to best utilize such staff, further exacerbating these challenges. Overall, the staff transport models are costly and an unsustainable short-term solution to what has become a pervasive and long-term problem in hiring and retaining COs at hard-to-staff locations.

- **Correctional staffing crisis unlikely to improve at hard-to-staff locations.** While the agency's staffing shortages go beyond correctional staff, correctional staff continues to be TDCJ's biggest hiring and retention challenge. In particular, many TDCJ facilities are in areas of the state with a limited labor pool from which the agency can hire qualified COs. Sunset staff identified the 27 hardest-to-staff facilities based on a vacancy rate of 40 percent or higher or the receipt of COs through the staff transport models discussed above. For these 27 facilities, Sunset staff conducted an analysis of county-level demographic and economic data to identify facilities where correctional staffing challenges are most likely to continue. For example, several facilities with the highest vacancy rates are in counties with low unemployment rates, low rates of high school credential attainment, and median household incomes well above the midpoint salary for a new CO, according to Sunset staff's analysis of U.S. Census Bureau data. A low unemployment rate is associated with a limited labor pool, and a high school credential is a minimum qualification to be a CO, suggesting an insufficient number of local candidates are even minimally qualified. Among the 27 hardest-to-staff facilities, six are located in counties with an unemployment rate of less than 4.1 percent, the statewide average as of July 2024, and six are located in counties with median household incomes more than $20,000 above the midpoint annual salary for new COs, which

**TDCJ transports staff to address excessive staff vacancy rates, but the practice is costly and unsustainable.**

**Several facilities with the highest vacancy rates are in counties with low unemployment rates.**

is $40,914.[6] As the state has attracted more major employers, labor market competition has exacerbated TDCJ's recruitment and retention challenges, as have local population declines in some locations. Additionally, nearly a fifth of respondents to a Sunset survey of correctional staff said their commute is greater than one hour, suggesting some facilities are located far from their labor source.

- **Costly, aging infrastructure leads to inefficient maintenance spending.** TDCJ continues to invest in hard-to-staff facilities and spends significant resources to maintain idled facilities. TDCJ's large deferred maintenance cost estimates total more than $1.1 billion for fiscal year 2024, and the future needs the agency has projected include costs associated with many facilities that have critically high vacancy rates. This arrangement forces TDCJ to sink money into facilities that likely cannot be adequately staffed in the long term. From fiscal year 2024 on, the agency has identified almost $500 million in deferred maintenance costs for the 27 facilities identified by Sunset staff as the hardest to staff, $207 million of which is for facilities constructed before 1970, including one facility constructed in 1917. The accompanying table lists the five short-staffed facilities with the highest deferred maintenance costs, which total nearly $279 million.

**Largest Deferred Maintenance Needs**

| Facility | Deferred Maintenance Total |
|----------|---------------------------|
| W | $110,930,000 |
| F | $64,862,000 |
| E | $36,425,000 |
| I | $33,940,000 |
| G | $32,830,000 |

Additionally, significant maintenance needs indicate that existing infrastructure is outdated or in need of repair, which can compromise security and worsen conditions in facilities for both staff and inmates. Critical security infrastructure that does not work properly can compound existing challenges and the safety risks COs face in an already taxing environment, as discussed further in Issue 2. Respondents to a Sunset survey of correctional staff indicated significant problems and concerns with the conditions of TDCJ facilities, as summarized in the textbox.

**Sunset CO Survey Responses**

- 87 percent of respondents indicated the facilities they work in are in need of significant repairs.
- 40 percent of respondents disagreed or strongly disagreed they feel safe in TDCJ facilities.
- Among staff who work in units without HVAC, 80 percent reported this makes their job more difficult.

**Texas' inmate population may soon outgrow the agency's current operating capacity, yet the state lacks a regular and rigorous planning process to adequately evaluate long-term facility needs.**

- **Population projected to exceed operational capacity.** Texas' inmate population is expected to significantly increase in the next five to 10 years as courts resume full functioning after the COVID-19 pandemic. TDCJ, already unable to meet its own safety standards for basic staffing levels, cannot realistically expect to maintain the staffing levels necessary to supervise a larger population.[7] As seen in the graph on the following page, the Legislative Budget Board's (LBB) most recent inmate population

projections, released in July 2024, estimate TDCJ's population will reach almost 140,000 by the end of fiscal year 2025, about 7,000 higher than TDCJ's current operating capacity, and surpass 150,000 by fiscal year 2028.[7] While TDCJ has nearly 14,000 beds not currently counted in its online capacity, these beds were either idled or closed due to TDCJ's inability to adequately staff them.[9] The reality of the economic and demographic factors described earlier indicate TDCJ will likely not be able to adequately and safely staff these beds should it need to reopen them. For example, the short-staffed Clements Unit in Amarillo, which had a vacancy rate of about 55 percent in fiscal year 2023 and has idled multiple buildings within the facility due to staffing shortages, is located right next to the Neal Unit, another large facility which was completely idled in 2020 due to high vacancy rates. TDCJ cannot provide enough staff to fully operate the more than 3,500 beds at the Clements Unit. It is therefore highly unlikely TDCJ will be able to open the approximately 1,700 beds in its neighboring facility again. Although these beds sit unoccupied and appear to be a resource, TDCJ acknowledges the state cannot operate under the assumption they can be easily made available if needed.



**TDCJ Correctional Institution Average End-of-Month Population and Capacity, FYs 2018-28**

- **Current long-term planning process is inadequate.** Historically, the Legislature has primarily relied on LBB's inmate population projections and the agency's total and online bed capacities to plan for any changes to TDCJ's operations and physical footprint, such as additional capacity build which last occurred in the 1990s. However, TDCJ's capacity challenges are different now than in past years when facility overcrowding and lack of bed space were the primary concerns. During the COVID-19 pandemic, declines in output from courts reduced the number of individuals TDCJ received into custody, temporarily masking the impacts of severe staffing

challenges which began for the agency in 2016 and worsened during the pandemic. With inmate intake now rising as courts have resumed full functioning and are working through a post-pandemic backlog, TDCJ is facing the increasingly urgent challenge to manage a growing inmate population with far fewer COs and other staff.

Statute does not direct TDCJ to develop a long-term plan to ensure the agency has adequate bed capacity and facilities to meet the needs of inmates, staff working in facilities, and the agency as a whole. The state would benefit from more regular and robust planning outside of the biennial budget process to ensure TDCJ's needs are met and the state is prepared to house and attend to its inmate population into the future, especially given TDCJ's staffing challenges and a rising inmate population. As explained in the textbox, another large state with significant facility needs and staffing challenges recently initiated a legislatively driven long-term planning study.[10] Texas would benefit from a similarly more comprehensive planning initiative.

> **Florida Department of Corrections Master Plan**
>
> Between 2022 and 2023, the Florida Department of Corrections worked with external consultants to develop a 20-year master plan for its facilities to address growing inmate populations, aging facilities, and staffing challenges.
>
> The final report, which is available to the public, recommended expanding capacity, reopening idled capacity, creating new incentives and programs to address persistent staffing challenges, closing aging, hard-to-staff facilities, modernizing infrastructure, and expanding infrastructure for inmates with special medical needs.

In its Legislative Appropriations Request for fiscal years 2026-27, TDCJ requested funding to build expansion dorms, as discussed in the textbox, at already well-staffed facilities to help address its capacity challenge.[11] In contrast to new prisons recently constructed in other states that have around 4,000 beds and cost over $1 billion, these requested expansion dorms would add 4,800 beds to TDCJ's current capacity at the cost of $240 million. This request demonstrates that capacity can be added at a lower price and is a step in the right direction but underscores the need to consider a variety of factors to ensure future investments are more sustainable. While TDCJ's rules contemplate a planning process that includes analysis of the local workforce from which the agency could recruit, the rule is only for when the agency is constructing entirely new facilities and therefore has not applied to TDCJ since the 1990s.[12]

> **Expansion Dorms**
>
> TDCJ is requesting funding to build 12 expansion dorms, which are additional buildings constructed at existing units. These proposed buildings would consist only of inmate housing areas and would not contain additional features such as a laundry, kitchen, or manufacturing facilities.

## TDCJ is underprepared for the healthcare and facility needs of its special needs populations, increasing both costs and potential risk for the state.

As the inmate population has aged over the past decade, the number of inmates with special mental or physical health needs in TDCJ custody has also risen. TDCJ faces a difficult logistical challenge in placing these individuals in facilities that can appropriately provide for their medical, physical, and programming

needs. At the same time, staffing shortages and new transportation policies may constrain the agency's ability to provide inmates with adequate access to care in the future.

- **Growing special needs populations.** Despite a decrease in the overall inmate population during the COVID-19 pandemic, the population of elderly inmates in the TDCJ system has increased by around 40 percent since the last Sunset review in 2013, as shown in the graph below. Elderly inmates, those aged 55 years and older, require access to TDCJ's healthcare resources four to five times more frequently than younger inmates and are more likely to have chronic, expensive-to-treat illnesses such as cancer and coronary artery disease. From fiscal year 2021 to 2023, the elderly population accounted for approximately 15 percent of the total inmate population, yet TDCJ spent as much or more on specialty care such as dialysis or outpatient hospital services for elderly inmates than it did for the rest of the inmate population.[13] In that same time period, TDCJ's mental health caseload increased by over 21 percent, and inmates with mental health conditions accounted for nearly 27 percent of the total inmate population.[14]



**TDCJ Population 55 and Older, FYs 2006-23**

- **Limited specialized housing.** To provide cost-effective care and accommodations for special needs populations, TDCJ uses specialized housing such as sheltered housing and infirmary beds. However, the agency is operating at nearly maximum capacity for these housing types, and combined with staffing shortages, these challenges increase the cost to provide necessary care and can make it difficult to provide adequate, timely care to inmates.

Limited capacity in specialized housing also constrains the agency's ability to move inmates to lower-cost beds, as seen in the graphic on the following page. About 63 percent of infirmary bed occupants are long-term patients with chronic illnesses, meaning fewer step-down housing beds are available

for inmates recovering from acute conditions. Some of these long-term patients could be housed in lower-cost sheltered housing, but with this housing type also at maximum capacity, TDCJ has insufficient space to do so. Without additional specialized housing, TDCJ will continue to be forced to house inmates in higher-cost beds than may be medically necessary.

**TDCJ Special Housing Overview**



- **Increased liability risk.** As discussed in Appendix G, Texas has a history of extensive federal oversight and costly litigation for providing inadequate health care for inmates. Capacity and staffing shortages create new potential liabilities for the state. Inmates who require specialty care can receive that care either through telehealth, in-person visits to medical facilities operated by TDCJ's healthcare partners — the University of Texas Medical Branch and Texas Tech University Health Sciences Center — including Hospital Galveston or the Western Regional Medical Facility (WRMF), or in-person visits to community hospitals. As of fiscal year 2023, the agency has reverted to its policy of having a minimum of three officers accompany all inmate transports between TDCJ-operated facilities and Hospital Galveston and WRMF and a minimum of three officers per inmate transported to a community hospital. This policy intends to provide additional safety for the public after the Lopez escape, an event discussed further in Issue 2. However, it can place a significant burden on already understaffed facilities that struggle to dedicate so many officers to duties away from the facility. While Sunset staff did not find evidence of this occurring systemically, there were instances where, lacking sufficient correctional staff and vehicles necessary to transport all inmates with off-unit medical appointments, correctional staff have had to select which inmates to transport to their appointments. The agency has not provided its staff guidance on how to respond to this challenge. Similarly, while Sunset staff did not find evidence of this occurring systemically, on days when a facility has particularly low

> TDCJ must continue to ensure staff vacancies do not impact access to medical care.

CO turnout due to leave or other absences, facilities have closed on-unit clinics because they lack the capacity to securely accompany inmates to their clinic appointments. During the review, Sunset staff learned of inmates missing medical appointments due to a lack of TDCJ staff available to safely escort them. A persistent inability to ensure inmates have access to the appointments they need would not only elevate health and safety risks for inmates but would also put the state at higher risk for litigation.

**The state has an opportunity to give TDCJ additional flexibility and clarity in managing facilities and inmates by removing outdated sections of statute.**

TDCJ faces the complicated and difficult task of placing inmates throughout the system based on a range of diverse factors and evaluating its capacity for a growing inmate population while also dealing with crisis-level staffing shortages, as discussed earlier in this issue. In light of these challenges, the state has an opportunity to give the agency more flexibility in how it houses state jail felons and more clarity regarding unit maximum capacities.

- **Evolving management of state jail felons.** TDCJ's statutory requirement to maintain state jails in nine regions is out of date and not in alignment with how the agency manages state jail felons in practice.[15] When the Legislature created state jails in the 1990s, it intended for these facilities to have a close relationship with local Community Supervision and Corrections Departments (CSCDs) by giving state jail felons combined sentences that included both probation and incarceration in state jail facilities. Additionally, the Legislature intended for CSCDs to play a role in providing programming to state jail felons. Today, however, CSCDs do not provide any programming for state jail felons in TDCJ custody, and in fiscal year 2023, only one state jail felon was placed in TDCJ custody as a condition of their probation.[16] Due to the almost total non-use of CSCDs by TDCJ for the management of state jail felons, no need exists for statute to require the agency to house state jail felons near local CSCDs.

  Furthermore, the population of state jail felons in TDCJ custody has consistently declined since the agency's last Sunset review.[17] Currently, every state jail houses more regular CID prison inmates than state jail felons, and five state jail facilities do not house any state jail felons. Removing the regional requirement in statute would provide the agency flexibility to house state jail felons in a more logistically efficient manner and align with sentencing trends and legislative changes that have already reduced the distinction and separation between state jail felons and the rest of the inmate population TDCJ confines.

- **Outdated unit maximum capacities in statute.** In the 1990s, the Legislature codified each TDCJ facility and their maximum capacities in statute.[18] These capacity numbers have long been out of date, and statute does not include facilities constructed after 1991. As of 2006, the agency has operated based on unit maximum capacities established in rule, which the agency's board

*Five state jail facilities do not house any state jail felons.*

is able to update as needed to remain consistent with the realities on the ground.[19] The statutory maximum capacities are not only unnecessary but could also be confusing for the public.

# Sunset Staff Recommendations

## *Change in Statute*

### 1.1    Require TDCJ to create a long-term facilities and staffing plan that identifies future needs and makes recommendations to organize resources and capacity accordingly.

This recommendation would require TDCJ to prepare and submit a 10-year plan that identifies its facility and capacity needs and includes recommendations for how the state can house inmates in facilities that can be appropriately staffed. Specifically, this recommendation would require TDCJ to:

- Examine the agency's ability and the cost to operate each facility based on current and future staffing levels, with consideration of demographic and economic trends and facility repair needs.

- Evaluate how the agency will distribute or consolidate inmates efficiently based on capacity and factors such as custody level, medical needs, and other special needs.

- Evaluate any facility retrofitting necessary to accommodate the needs of the agency's inmate population.

- Evaluate the future capacity build necessary to manage the projected inmate population, how that capacity build could be done in well-staffed parts of the state on land the agency already owns, and proposed timelines for implementation.

- Consider the various regional needs of the state while developing this plan, including any ancillary or community benefits associated with TDCJ facilities.

As part of this recommendation, TDCJ would seek approval from its board for the plan and present it to the governor, lieutenant governor, speaker of the House of Representatives, and legislative appropriations and oversight committees by September 1, 2026, and every four years thereafter. The agency may partner with an external consultant to develop this plan as needed.

This plan would arm state policymakers with the information they need to appropriately plan for TDCJ's future needs as the agency grapples with an ongoing staffing crisis and a growing inmate population.

### 1.2    Require TDCJ to develop a phased plan to close facilities with persistent staffing challenges.

This recommendation would require the agency to develop a phased plan to close facilities with persistent staffing challenges, particularly if TDCJ is able to bring more capacity online either by building expansion dorms as requested in the agency's 2026-27 Legislative Appropriations Request or by reducing staffing vacancies. To identify potential facilities for closure, TDCJ should consider a range of factors impacting the agency's ability to staff facilities as well as the ongoing costs to operate and maintain them. Sunset staff developed an example model as a potential starting point for this assessment, described further in Appendix H. In the example model, Sunset staff evaluated the agency's hardest-to-staff facilities using a series of metrics that provide insight into each facility's staffing challenges, capacity and type of capacity, available labor pool from which to hire, and cost to operate. TDCJ would have the discretion to use its

expertise to conduct its own analysis for potential facility closure, but its methodology should include at least the following factors:

- Vacancy rates

- Unit capacity

- County-level demographic and economic data

- Unit-deferred maintenance costs

- Receipt of COs via the staff transport models

- Number of cool beds

- Maximum security status

The plan should include estimated savings from reduced maintenance needs and any potential land sales. TDCJ would be required to submit this plan to its board for approval by September 1, 2026, and every four years thereafter.

### 1.3  Eliminate the requirement for TDCJ to maintain state jails in nine regions from statute.

This recommendation would remove the requirement for TDCJ to maintain state jails in nine regions, giving the agency flexibility to place state jail felons throughout its facilities in a more efficient manner. Without the need to house state jail felons according to region, the agency would have the discretion to centralize state jail felons into fewer regions. This recommendation could also help the agency concentrate programming specifically aimed at the state jail felon population in fewer facilities.

### 1.4  Eliminate unit maximum capacities from statute.

This recommendation would remove unit maximum capacities from statute and instead require TDCJ to maintain the updated unit maximum capacities in rule. This change would allow TDCJ to remain in compliance while enabling the agency and its board to adapt to changing inmate populations and capacity.

## Fiscal Implication

Recommendations to develop the long-term staffing and facilities plan and the facility closure plan could be implemented with existing resources, but the exact fiscal impact depends on how the agency implements them. The agency could realize savings from reduced staff transport and less required maintenance on idled, partially idled, and closed facilities. The agency could also generate revenue from the sale of the land if TDCJ decides to close facilities.

1    37 Texas Administrative Code (TAC), Part 6, Chapter 152, Subchapter B, Section 152.27 (2018) (Texas Department of Criminal Justice, Unit and System Capacity Standards).

2    Legislative Budget Board (LBB), "LBB Monthly Correctional Population Report," accessed online August 15, 2024, https://www.lbb. texas.gov/CJDA/_site/Home.html.

3    All citations to Texas statutes are as they appear on http://www.statutes.legis.texas.gov/. Section 12.35, Texas Penal Code.

4    Correctional Managed Health Care Committee, *Financial Report on Inmate Health Care, Fourth Quarter FY2023*, p. 5, accessed online August 31, 2024, https://www.tdcj.texas.gov/divisions/cmhc/docs/cmhcc_financial_reports/FY23_4th_Qtr_Report.pdf.

5    The American Correctional Association, a nationally recognized accrediting body that publishes standards and best practices for correctional institutions, states that units should not experience vacancy rates over 10 percent for any 18-month period. American Correctional Association, "Section 1C: Personnel, Staffing Requirements, Standard 5 ACI-1C-05," *Performance-Based Standards and Expected Practices for Adult Correctional Institutions*, 5th ed. Alexandria, VA, 2021, p. 21.

6    U.S. Bureau of Labor Statistics, "Local Area Unemployment Statistics," accessed online August 31, 2024, https://www.bls.gov/lau/. U.S. Census Bureau, "QuickFacts," accessed online August 31, 2024, https://www.census.gov/quickfacts/.

7    LBB, *Adult and Juvenile Correctional Population Projections, Fiscal Years 2024 to 2028*, p. 3, accessed online August 15, 2024, https:// www.lbb.texas.gov/Documents/Publications/Memorandum/TDCJ_TJJD_070924Memo.pdf.

8    Ibid.

9    Ibid.

10    State of Florida Department of Management Services, *Final Multi-Year Master Plan (FAR-D16)*, accessed online August 15, 2024, https://floridapolicyproject.com/wp-content/uploads/2024/02/FL-DMS-Final-Multi-Year-Master-Plan-FAR-D16.pdf.

11    Texas Department of Criminal Justice (TDCJ), "Legislative Appropriations Request, Fiscal Years 2026-2027," September 6, 2024, accessed online September 23, 2024, https://docs.lbb.texas.gov/Main/DocDisplay.aspx."

12    37 TAC, Part 6, Chapter 155, Subchapter B, Section 155.23 (2017) (Texas Department of Criminal Justice, S*ite Selection Process for the Location of Additional Facilities*).

13    Correctional Managed Health Care Committee, *Financial Report on Correctional Managed Health Care – Quarterly Report FY2021 – Fourth Quarter*, pp.5-6, accessed online August 15, 2024, https://www.tdcj.texas.gov/divisions/cmhc/docs/cmhcc_financial_reports/FY21_4th_ Qtr_Report.pdf. Correctional Managed Health Care Committee, *Financial Report on Correctional Managed Health Care – Quarterly Report FY2022 – Fourth Quarter*, pp.5-6, accessed online August 15, 2024, https://www.tdcj.texas.gov/divisions/cmhc/docs/cmhcc_financial_reports/ FY22_4th_Qtr_Report.pdf. Correctional Managed Health Care Committee, *Financial Report on Correctional Managed Health Care – Quarterly Report FY2023 – Fourth Quarter*, pp.5-6, accessed online August 15, 2024, https://www.tdcj.texas.gov/divisions/cmhc/docs/cmhcc_financial_ reports/FY23_4th_Qtr_Report.pdf.

14    Ibid.

15    Section 507.003, Texas Government Code.

16    TDCJ, *Statistical Report Fiscal Year 2023*, p. 16, accessed online August 15, 2024, https://www.tdcj.texas.gov/documents/Statistical_ Report_FY2023.pdf.

17    TDCJ, "Publications," accessed online August 15, 2024, https://www.tdcj.texas.gov/publications/statistical_reports.html.

18    Section 499.101, Texas Government Code.

19    37 TAC, Part 6, Chapter 152, Subchapter B, Section 152.25 (2018) (Texas Department of Criminal Justice, *Maximum Rated Capacity of Individual Units*).

# ISSUE 2 | TDCJ's Policies and Practices Contribute to and Inadequately Address Its Staffing Crisis.

## Background

Employees of the Texas Department of Criminal Justice (TDCJ) play a vital role in protecting the public by overseeing adults who are incarcerated or under state supervision. Two categories of employees are especially critical to this function: correctional and parole staff, as summarized in the table. Correctional officers (COs) and supervisors provide and oversee inmates' secure confinement and rehabilitation in TDCJ facilities. Parole officers (POs), with oversight from supervisors, monitor and assist individuals released from confinement to TDCJ supervision in the community, referred to as releasees. Both correctional facilities and parole offices have oversight from regional and divisional senior leaders.

During the 2024-25 biennium, TDCJ is authorized to employ nearly 40,000 full-time equivalents (FTEs).[1] At the end of fiscal year 2023, the agency employed about 31,000 staff, or 78 percent of its staffing allocation. As shown in the chart, CO positions, which are the agency's largest staffing section, make up the majority of staff vacancies, which have increased in recent years. Vacancies among other staff have grown more moderately and vary widely across TDCJ's departments, divisions, and regions.

**Correctional and Parole Employee Types**

| Employee Type | Correctional | Parole |
|---|---|---|
| Officers | CO I-V | PO I-II |
| Supervisors | Sergeant<br>Lieutenant<br>Captain<br>Major<br>Assistant warden<br>Warden | Unit Supervisor<br>Parole Supervisor<br>Assistant Regional Director |
| Senior leaders | Regional Director<br>Division Deputy<br>Division Director | Regional Director<br>Division Deputy<br>Division Director |



**Number of Vacant Positions FYs 2014-23**

Legend: Correctional Officers, All Other Staff

Several divisions participate in staff recruitment, retention, development, management, and support. The table on the following page describes each division's current role; however, ownership of these functions has shifted in recent years. Most recently, CO recruitment transferred back to the Human Resources Division (HR) from the Training and Leader Development Division (TLDD), where the function was transferred in 2021.

**Divisions Involved in Staffing and Retention**

| Division | Description |
|---|---|
| Human Resources Division (HR) | Conducts all recruiting, hiring, and administrative HR functions, with staff located at a central office and career center in Huntsville as well as at field offices in correctional facilities, parole offices, and other departments statewide. |
| Training and Leader Development Division | Develops and delivers formal staff training, including officer academies and in-service as well as technical and leadership trainings. |
| Research and Development Department | Conducts a monthly survey of COs and other research to gain insight on key challenges and opportunities to better support and retain staff. |
| Communications Department | Supports hiring efforts by coordinating advertising and developing recruitment materials. |
| Victim Services Division | Provides employee support and wellness services to staff across the agency, including to victims of crimes committed within and outside the agency. |
| Business and Finance Division | Processes staff payroll, including any changes to salaries, reimbursements, or other payments. Reviews and authorizes any changes to position classifications. |

Sunset staff separately surveyed correctional staff, parole staff, and all other TDCJ employees, as summarized in Appendix I, to collect insights about their work experiences and potential factors driving retention challenges such as working conditions, workload, coworker relationships, and training. In September 2023, TDCJ began issuing a monthly retention and wellness survey to COs across correctional facilities to gather similar insights.

## Findings

**High vacancy and turnover rates have significant consequences for staff, inmates, and the public and cost the state millions of dollars.**

High vacancy and turnover rates persist across many TDCJ divisions and have a significant operational impact on the agency despite numerous recent efforts the agency and state leaders have made to address these problems. Notably, upon TDCJ's request outside of the legislative cycle, state leaders issued a 15 percent pay raise to COs, effective July 1, 2022, to address all-time high vacancy and turnover rates. This pay raise was followed by a 5 percent increase for all state employees in both 2023 and 2024.[2] By the end of fiscal year 2023, the CO vacancy rate had dropped slightly yet remained high at nearly 28 percent, as shown in the chart.[3] Similarly, the PO (I-II) vacancy rate has been steadily rising since fiscal year 2020, most recently exceeding 21 percent.



**Correctional and Parole Officer Vacancy Rates FYs 2014-23**

Fiscal Year (2014–2023); x-axis: -5% to 30%

Legend: Parole officers, Correctional officers

Correctional and parole staffing is a nationwide challenge, but TDCJ's staffing challenges are far from isolated to these divisions. As shown in the table, nearly two-thirds of TDCJ's 14 other divisions had vacancy rates of at least 20 percent in fiscal year 2023. These challenges can be even more severe in certain departments within divisions; for example, several HR field offices are unstaffed or have just one employee.

Contributing to high vacancy rates is a persistently high rate of employee turnover, as calculated using the equation developed by the State Auditor's Office (SAO) shown in the textbox. TDCJ's overall turnover rate has declined somewhat since 2021, but at 26 percent remained the third highest among Texas state agencies employing more than 1,000 staff in fiscal year 2023.[4] In key positions, turnover rates were even higher. As shown in the chart, among COs, turnover reached a peak of 41 percent in fiscal year 2021, and by fiscal year 2023 had returned to around pre-pandemic levels at 31 percent. Preliminary agency data indicate turnover decreased further in fiscal year 2024. Among POs, turnover has climbed rapidly and remained high over the last three fiscal years, reaching 32 percent in fiscal years 2022 and 2023. For both officer populations, SAO data show the proportion of voluntary separations has generally increased over the last five fiscal years relative to involuntary separations like dismissal for cause and resignation in lieu of termination.[5]

High turnover and resulting high vacancy rates typically increase workload and worsen work quality and workplace conditions, leading to more turnover in a vicious cycle. Moreover, with an increasing number of employees eligible to retire, retention of other experienced staff with valuable institutional knowledge has become even more important. For an agency charged with a critical custodial and public safety function, the staffing crisis has brought significant costs and risks to the state, agency employees, and inmates.

### Divisional Vacancy Rates - FY 2023

| Division | Vacancy Rate |
|---|---|
| Rehabilitation Programs | 31% |
| General Counsel | 26% |
| Reentry and Integration | 26% |
| Victim Services | 25% |
| Facilities | 23% |
| Community Justice Assistance | 23% |
| Business & Finance | 20% |
| Health Services | 20% |
| Human Resources | 20% |

**SAO State Employee Turnover Rate Calculation**

$$\left( \frac{\text{Number of separations during the fiscal year}}{\substack{\text{Average number of classified employees} \\ \text{during the fiscal year}}} \right) \times 100$$



**Correctional and Parole Officer Turnover Rates, FYs 2019-23**

Parole Officers (I-II) — Correctional Officers (I-V)

- **Exorbitant costs.** TDCJ receives minimal return on a significant training investment because of costly staff turnover. The agency estimates pre-service training costs on average $9,300 per new CO hire and about $7,000 (online) to $12,000 (in-person) per new PO hire, and advertising costs are about $770 per applicant.[6] However, new CO and PO hires often leave

the agency within a year. In the last 10 fiscal years, TDCJ has hired about 74,000 COs — nearly three times the size of the entire CO workforce — yet about 72,000 separated from the agency in the same period, meaning about $725 million of the agency's initial hiring and training investments did not provide lasting value.

Short staffing has also led to sharp increases in overtime spending. As shown in the *Overtime Paid Out* chart, TDCJ paid out $308 million in overtime in fiscal year 2023 alone, including $277 million to COs and sergeants and $2.2 million to POs.[7] As discussed further in Issue 1, TDCJ transports staff around the state to assist facilities with critical staffing vacancies and, in fiscal year 2023, spent $14.1 million on vehicle rental and hotel costs alone for this effort.[8]



**Overtime Paid Out, FYs 2014-23**

Additionally, TDCJ sometimes rehires retired employees to bring their experience back to the agency. With staffing shortages in key areas and critical losses of institutional knowledge due to turnover and retirements, TDCJ has increased its use of this practice to help bridge the gap. When state employees who retired on or after September 1, 2009, return to work, agencies must pay the Employee Retirement System a surcharge equal to the amount of the state's pension contribution for an active employee.[9] As shown in the *Pension Contributions Paid Out* chart, TDCJ's surcharge payments have steadily increased over the last 10 fiscal years, totaling $9 million in fiscal year 2023 alone.



**Pension Contributions Paid Out
FYs 2014-23**

- **Dangerous facilities.** Forty percent of respondents to Sunset's correctional staff survey said they feel unsafe in TDCJ facilities, and many facilities are so critically understaffed they cannot operate by the agency's own safety standards. TDCJ's staffing plans identify the roles minimally necessary to operate each facility safely, called "Priority One" positions, an example of which is described in the *Correctional Housing Rovers* textbox on the following page. Some portion of Priority One positions routinely go unfilled in several critically understaffed facilities. Priority Two positions, which further aid in the safe functioning of the facility and typically support inmate rehabilitation programming and recreation, often go entirely unfilled in these facilities.

### Correctional Housing Rovers

Each inmate housing area, such as a cellblock or wing of a dormitory, has a certain number of officers, informally called "housing rovers," dedicated to security functions. Whenever these Priority One positions are left unfilled, rovers assigned to nearby housing areas must cover the unfilled areas — sometimes totaling hundreds of inmates at a time. Functionally, this means inmates are not being supervised as closely as TDCJ has deemed minimally necessary to ensure the safety and security of facilities, impacting both staff and inmates. Reducing inmate supervision and assistance with basic needs can lead to increases in violence, self-harm, and other dangerous incidents. Furthermore, in the event of such an incident, an officer's nearest help might be a building away, out of earshot and behind security doors.

A Sunset staff analysis found facilities are more dangerous now than a decade ago. As shown in the chart, in fiscal year 2023 the agency recorded more than 2,000 adverse events, surpassing a pre-COVID-19 high, and these events have been rising as a percentage of the inmate population over the last 10 years. Even while the inmate population decreased, the amount of contraband such as drugs, weapons, and cellphones found in TDCJ facilities has increased significantly over the last 10 years, which can contribute to conflict and violence in prisons. Nearly 70 percent of respondents to Sunset's correctional staff survey indicated they have experienced or witnessed an adverse event, nearly half of whom said they are exposed to these events daily or weekly. A majority of respondents indicated adverse events make their jobs more difficult and negatively impact their physical or mental health. Also at risk for these events are others who work in facilities, including food and laundry service staff, chaplains, medical providers, employees of the Windham School District and the Board of Pardons and Paroles, vendors, and volunteers.



**Adverse Events*, FYs 2014-23**

\* Adverse events include inmate assaults, sexual assaults, or homicides against other inmates or staff, inmate or staff suicides, escape attempts, and escapes.

- **Excessive overwork.** Vacancies inhibit TDCJ's ability to fulfill its statutory mission, and large proportions of staff in various divisions reported in Sunset surveys working beyond their normal hours, as shown in the table. Overworked and exhausted staff tend to be less operationally aware and effective, potentially compromising safety in facilities and elevating burnout across the agency. Many critically understaffed TDCJ facilities have a rotating schedule of monthly mandatory

### Percentage of Staff Who Report Working Beyond Normal Hours Regularly

| Staff Type | Daily or Weekly | Monthly | Total |
|---|---|---|---|
| Correctional | 60% | 18% | **78%** |
| Parole | 29% | 37% | **66%** |
| All other | 20% | 12% | **32%** |

overtime due to staffing shortages. Separately, as discussed in Issue 1, some correctional staff and parole staff must travel on a rotating basis to assist understaffed facilities or offices, either for the day or for up to two weeks at a time, which many view as disruptive to their families and personal lives. Internal policy prohibits staff from working more than 16 hours a day or 10 days in a row. However, since fiscal year 2019, documented violations of the 10-day rule doubled and violations of the 16-hour rule increased more than tenfold to 9,000 violations per month on average. Moreover, nearly half of correctional staff Sunset surveyed said they are not regularly afforded breaks on duty despite these long shifts and are often on their feet and in areas without climate control. While some staff proactively seek overtime, half of the respondents to Sunset's correctional staff survey said the amount of extra time they must work negatively impacts officer safety, and more than 40 percent of respondents said it negatively impacts the safety of inmates and the public.

> Since FY 2019, documented violations of the 16-hour rule increased more than tenfold.

TDCJ employees ineligible to earn overtime pay instead earn compensatory paid time off, which lapses after two years.[10] However, staff across the agency reported difficulty taking time off, and data indicate many staff forfeited significant amounts of this earned time due to expiration, essentially donating those hours to the state involuntarily. In fiscal year 2023, the relatively small proportion of correctional staff who earn compensatory time lost the equivalent of 95 years of time to expiration, and eligible parole staff lost more than six years.[11]

- **Risks to public safety.** Consistently overworked staff can become overstretched and less operationally aware and therefore might take more opportunities to cut corners, which can lead to public safety breaches, an example of which is explained in the textbox. Insufficient staffing without adjustments to responsibilities makes it nearly impossible to complete certain tasks. Employees consistently expressed concern that the staffing models TDCJ has adopted to deal with crisis-level vacancy rates, including requiring excessive overtime and travel, create conditions where mistakes and harmful oversights are more likely to happen. Similarly, critically understaffed parole offices and excessive caseloads can compromise the thoroughness and frequency of POs' supervision services and in some cases have forced TDCJ to adopt more minimal supervision approaches. As discussed further in Issue 5, in several instances where releasees committed acts of violence, TDCJ identified lapses in parole supervision that contributed to these incidents.[13]

### Escape of Inmate Lopez

In 2022, inmate Gonzalo Lopez escaped TDCJ custody during a medical transport and brutally murdered five family members in Leon County while on the run. A criminal justice consulting firm investigated the escape and found it was strongly linked to critical short-staffing, with nearly a third of the unit's Priority One positions unfilled that day.[12] Staff failed to follow multiple security protocols that ultimately enabled the escape, including inadequate strip searches, failure to search the inmate's property bag, poorly applied restraints, and other shortcuts. Contributing to the problem was a lack of oversight from supervisory security staff who had not been conducting regular inspections or rounds to ensure their employees' adherence to policy.

- **Delays in core staff services.** As of April 2024, TDCJ was overdue on performance evaluations for 14,453 individuals — nearly half of its current employees — with an average of 14 months overdue and some more than 80 months overdue. TDCJ's significant backlog of annual performance evaluations impacts staff both developmentally and financially, since employees must have a current evaluation meeting certain standards for career ladder progressions and other salary increases. Furthermore, the agency has failed for over a year to provide certain staff with a raise associated with a promotion, reclassification of a position, or progression on a career ladder, even for positions with automatic progression timelines like COs. As of April 2024, 110 promotions across the agency had been outstanding for more than six months, with the average and maximum time and amount overdue summarized in the table. Several staff also reported months-long delays in receiving pay for time adjustments that require manual entry such as overtime hours, which can total hundreds of dollars per week.

**Overdue Promotion Pay**

| Average (per person) | Max |
|---|---|
| 25 months overdue | 53 months overdue |
| $2,889 outstanding | $8,308 outstanding |

Resolution times for employee complaints and grievances, two avenues for employees to elevate workplace issues as explained further on page 47, have also increased over the last 10 years, averaging more than three months for complaints and two months for grievances in fiscal year 2023. Furthermore, HR lacks a system or formalized guidelines for prioritizing incoming complaints or grievances according to risk or severity. In practice, HR generally prioritizes criminal allegations, Equal Employment Opportunity Act (EEO) complaints, and those requiring an external referral but mostly processes and screens all other issues as they come in. This process does not appropriately direct the division's limited resources to the highest-risk or most serious issues.



**Days to Resolve Complaints and Grievances FYs 2014-23**

### Agency culture and poor management decisions drive staff departures agencywide.

A Sunset staff analysis of agency data indicated TDCJ's primary staffing challenge is retention, and a broad range of factors impact the agency's ability to retain staff. Difficult working conditions are inherent to correctional or parole settings where, for relatively low pay, staff encounter grim realities

**Average Ratio of New Hires to Separations FYs 2014-23**

| Division | Ratio |
|---|---|
| Manufacturing, Agribusiness, and Logistics Division | 1:1.7 |
| Facilities Division | 1:1.7 |
| Reentry and Integration Division | 1:1.4 |
| HR Division | 1:1.2 |
| Rehabilitation Programs Division | 1:1.2 |

and difficult or dangerous situations on a regular basis. Notably, a federal report found COs are nearly twice as likely as police officers to experience workplace violence.[14] Respondents to Sunset's surveys of correctional and parole staff highlighted the toll that difficult working conditions take on their physical and mental health. Yet other divisions throughout the agency have high attrition rates as well. The table shows how some divisions lose on average nearly two employees for every new hire, which is incredibly costly to the state.

- **Unfair and punitive leadership culture.** In survey responses and numerous conversations with TDCJ employees, Sunset staff learned about a highly biased and punitive leadership culture, where many supervisors insufficiently support staff or even misuse their power. Comments consistently indicated a pervasive culture of disrespect, callousness, and unfair treatment from supervisors. Staff spoke of rampant favoritism and "cliques," whereby supervisors privilege some staff while giving others worse assignments, publicly humiliating certain staff, and administering more severe or retaliatory discipline often for little apparent cause. While particularly prevalent in correctional facilities and parole offices, the dynamic is not limited to those environments; non-officer staff in several divisions also highlighted how some supervisors create a hostile workplace, micromanage, and demean or belittle staff, all with little accountability. Sunset staff worked closely with data analysts at the Texas Legislative Council to analyze 10 fiscal years of agency data on workplace issue filings (complaints and grievances) and found the vast majority related to mistreatment or other issues with colleagues, as shown in the accompanying textbox. Nearly 60 percent of all issue filings were related to these issues and took place in correctional facilities. TDCJ's executive leaders are aware that this dynamic is one of the agency's top challenges.

**Top Complaint and Grievance Topics, FYs 2014-23\***

**Complaints**
- Hostile Work Environment (33%)
- Workplace Behavior (33%)
- Discrimination (30%)

**Grievances**
- Supervisor or Coworker Issues (48%)
- Disciplinary or Corrective Action (32%)

\* Data analysts at the Texas Legislative Council summarized 10 years of agency data (fiscal years 2014-23) on 38,879 employee complaints and 9,603 grievances, summarizing all cases by issue category and location which Sunset staff manually grouped for simplicity. Where a single complaint or grievance cited multiple issue categories, each category was counted separately for that complaint or grievance to quantify each category's volume of issues. Cases noted to have been "created in error" or that included other errors impeding analysis were excluded from the dataset.

- **Unrealistic expectations and unclear priorities.**

  <u>Immense workload.</u> Despite the difficulty — and sometimes physical impossibility — of completing all required tasks with such severe staffing shortages, TDCJ has failed to adjust expectations to the new realities of

current staffing levels. In the face of crisis-level staffing at many correctional facilities, parole offices, and other departments, employees are often tasked with more than they can reasonably perform within normal working hours. For example, a correctional housing rover responsible for 300 inmates across multiple housing areas would have just six seconds to perform a security check on each inmate, which TDCJ policy requires every 30 minutes. Even assuming there are no interruptions or inmate needs to attend to, this would be nearly impossible and is just one of the many recurring tasks rovers must perform throughout their shift. Furthermore, officers from across the facility are regularly pulled to cover unfilled Priority One positions, leaving their primary duties undone. Despite widespread staffing shortages, supervisors assigning positions on understaffed facilities have received limited guidance from executive or senior leaders about what tasks to prioritize or how to adjust the requirements set out in policy.

> A correctional staffer responsible for 300 inmates has just six seconds to check on each inmate.

While COs receive basic training on all key roles within facilities, COs employed by or transported to an understaffed correctional facility could be expected to cover any number of the roles on a facility with little supplemental training on short notice. About 50 non-supervisory, non-facility-specific CO roles have official "post orders," or memoranda outlining key duties, examples of which are shown in the textbox. TDCJ's implicit expectation is that COs be familiar with and ready to fulfill dozens of roles they may not regularly perform and which may differ from similar roles at their home facility, as discussed in Issue 1.

**Example CO Post Orders**

- Back gate officer
- Corridor control officer
- Disciplinary hearing officer
- Food service officer
- Inmate intake officer
- Inmate visitation officer
- Key control officer
- Public medical transport officer
- Restrictive housing officer

As discussed further in Issue 5, high turnover among POs and clerical staff has driven up both POs' caseloads and the quantity and diversity of tasks they must complete for most cases. Completing basic supervision requirements for a high caseload can be incredibly time intensive, including substantial desk work, in-person engagements with releasees, and hours of driving per week. High turnover among POs forces already overloaded officers to assume more cases, and turnover among clerical staff has also forced more administrative tasks on POs such as processing new releasee intakes and referrals. Some within TDCJ leadership acknowledge the job is nearly impossible to complete within a 40-hour work week, yet staff indicated some regional managers and supervisors criticize or even discipline officers for "poor time management" when their workload requires overtime.

Pressure to perform promotes deception and creates risk. During the review, Sunset staff repeatedly heard from employees about a culture trickling down from upper levels of agency leadership of "doing more with less" and "making it work," coupled with a reluctance to report bad news up the chain of command. Under this dynamic, the crush of tasks described above creates a lose-lose scenario for officers and other staff who risk punishment for admitting failure to complete all required tasks, feel they must deceive supervisors or falsify recordkeeping, and wind up

having to make high-stakes prioritization decisions. For example, some COs in understaffed facilities reported feeling conflicted about whether to leave their post to intervene on behalf of a coworker during an incident with an inmate, risking punishment if another incident were to occur on their own abandoned post. Placing this pressure on staff is unfair, can be detrimental to morale, and may result in decisions that entail higher risk or do not align with the best interests of the facility, department, or agency.

Insufficient prioritization exercise. In fiscal year 2023, TDCJ leadership tasked each division to identify its core competencies, intending to bring clarity and consistency to how key tasks are performed across the agency. However, the agency could have taken better advantage of this opportunity to identify core tasks for key staff positions and streamline where possible, recognizing the reality of TDCJ's insufficient staffing to complete all tasks required by policy. In identifying broad, divisional core competencies, the exercise provided no guidance to employees in understaffed facilities, offices, and departments about how to prioritize their tasks, particularly when staffing is at a critical level or an emergent incident occurs. The effort did not result in workload reductions and in some cases added to staff's workload through additional tasks or trainings. Moreover, without direction to establish specific outcome metrics or goals, divisional leaders' success in adhering to the core competencies is unmeasurable.

- **Poor supervisor accountability.** During the review, Sunset staff learned TDCJ historically has embraced a strictly hierarchical culture that insufficiently holds upper-level staff accountable. As one of the largest state agencies in Texas, TDCJ's decentralized structure and footprint necessitates strong accountability mechanisms to promote effective and fair leadership. Stronger accountability mechanisms, such as those described in the textbox, are essential for improving the agency's culture. Executive leaders acknowledged ample evidence of common problems, yet survey responses and conversations with staff indicated leaders' efforts to address these problems have not been effective. While TDCJ's disciplinary policy explicitly holds supervisors to a higher standard of conduct, unfairness and mistreatment were among the most consistent themes across Sunset's surveys and meetings with staff as well as in agency workplace issue data. Moreover, critical incidents often result in lower-level staff facing the most severe discipline. For example, in a sample of recent escapes and other public safety incidents, COs, POs, and lower-level supervisors, including sergeants and lieutenants, were more likely to lose their jobs, whereas upper-level supervisors were more likely to receive probation, suspension, or demotion, in some cases accompanied by transfer to another facility.[15] Senior leaders at the regional and divisional levels experienced no discipline for these incidents despite their charge to oversee safe facility operations. This accountability double standard contributes to a culture of impunity for problematic supervisors who violate or fail to enforce agency

> **Examples of Supervisor Accountability Mechanisms**
>
> - Complete timely and thorough performance evaluations of supervisors.
>
> - Monitor or periodically audit supervisors' reasonable adherence to policy, staff development, and retention efforts.
>
> - Monitor supervisors who are the subject of repeated workplace issue filings from junior staff.
>
> - Require thorough documentation of cause for disciplinary actions taken.

policy, mistreat staff, or abuse their power. TDCJ executive leaders have tried to address cultural issues among supervisors primarily by expanding leadership training programs; however, many of these programs rightfully target the agency's most promising, not problematic, leaders.

- **Problematic disciplinary policy and application.** TDCJ is in the process of revising its policy PD-22, which outlines employee rules of conduct and progressive disciplinary actions for violations as well as a process for hearings and appeals. Under the current policy, half of all COs, 20 percent of all POs, and nearly a quarter of all other staff have received at least one disciplinary action during their tenure with the agency. These data suggest the current policy is either not particularly effective in deterring violations or, as many staff suggested, it is overused and overly punitive. As shown in the table, probation made up 55 percent of disciplinary sanctions imposed in fiscal year 2023, since the current policy requires imposing probation concurrently with other sanctions such as suspension. Throughout the agency's history, the policy has lacked clarity and provided limited options for disciplinary alternatives, including non-punitive behavior correction or professional development. Certain aspects of the policy are subjective while others are quite inflexible, creating a tension agency leaders have acknowledged between a desire to standardize application and the need for some flexibility. Some of the policy's 53 rule violations include broad and poorly defined categories such as "insubordination," which is concerning given evidence of supervisors misusing their discretion.[16] Given the impacts associated with disciplinary sanctions, including disqualification for some raises and most promotions, avoiding unfair, unjustified, or overly punitive use of the policy is critical.[17]

**Disciplinary Sanctions Imposed – FY 2023**

| | |
|---|---|
| Probation | 4,192 |
| Reprimand Only | 1,342 |
| No Discipline Imposed | 1,156 |
| Suspension without Pay | 363 |
| Recommended for Dismissal | 353 |
| Reduction in Pay | 126 |
| Demotion | 83 |
| **TOTAL** | **7,615** |

- **Inefficient and problematic process to elevate workplace issues.** Agency data suggest staff is fundamentally confused about how best to elevate workplace issues and may be discouraged from doing so given a complex, burdensome process and unreliable anonymity.

<u>Confusingly bifurcated.</u> As summarized in the table, TDCJ has two channels with separate forms for filing workplace issues: complaints, which include EEO issues, and grievances.[18] TDCJ employees frequently use the wrong form, use both forms for the same issue, or submit complaints in other informal formats — from email to a piece of paper — and HR has adopted procedures to accept and correct them. Staff's confusion creates inefficiencies on the back end for HR staff, who must identify the appropriate channel and

**Channels to Elevate Workplace Issues**

| Issue Type | Description |
|---|---|
| Complaints | About employment matters, including violations of federal EEO rules related to protected characteristics such as race or sex, and other matters (non-EEO). HR screens all complaints to confirm if any EEO rule violations are present, then either investigates and resolves the issue internally or refers the issue to the appropriate TDCJ division or external entity for resolution. |
| Grievances | About employment matters, excluding certain issue categories.[19] HR screens grievances for any EEO rule violations that might require separate filing as a complaint, then sends the grievance back to the facility, office, or department for resolution, with two opportunities for the grievant to appeal the resolution. |

any errors with the filing, return forms as needed for correction or refiling, and administratively consolidate any duplicative filings.

<u>Needlessly complex and burdensome.</u> Staff struggles to comply with an overly detailed and restrictive grievance policy. An analysis of 10 fiscal years of agency data found TDCJ rejected or returned about half of grievances for noncompliance with policy. More than a third of rejected or returned grievances cited multiple reasons for not processing the grievances, such as inappropriate requested relief, ineligibility, and untimely filing, suggesting staff is fundamentally confused about the policy. Under the policy, employees can only submit one grievance per individual and per employment-related matter, but when employees submit multiple forms related to one issue, HR staff often identifies and consolidates them on the back end, creating inefficiencies.[20] Additionally, the policy outlines that a request to sanction another employee is improper and grounds for rejection, despite such a request having no bearing on the validity of the issue.[21] Nearly a third of all grievances rejected or returned in the last 10 fiscal years cited this reason.

<u>Lack of confidentiality.</u> TDCJ's grievance policy also risks exposing grievants to colleagues in their chain of command because it requires employees to submit grievances through their facility, office, or department grievance contact, not the agency's central HR division. As discussed above, many CO and PO respondents to Sunset's surveys worry about retaliation from supervisors or coworkers if they submit a grievance, citing a concern that the process may not be reliably anonymous. Agency data also suggest the grievance process is underused, with about four times fewer grievances filed than complaints in the last 10 years, despite grievances affording a more robust appeal process, potentially reflecting staff's retaliation concerns.

**TDCJ has been unable to create a positive, growth-oriented, and sustainable employee experience, contributing to high turnover rates.**

In an increasingly competitive job market, TDCJ will not be able to better support and retain employees unless the agency prioritizes fundamental staff development functions and strives to offer more flexibility and other non-monetary benefits.

- **Inadequate performance evaluations.** TDCJ's annual performance evaluations are perfunctory and do not adequately guide an employee's growth and development. Many evaluation criteria relate narrowly to an employee's physical ability to perform basic requirements, are unrelated to performance, or are broad and difficult to evaluate, examples of which are highlighted in the textbox on the following page. TDCJ's evaluations lack more nuanced and meaningful dimensions of job performance, including tasks the agency identified as core competencies for COs such as count procedures, searches, and restraints. Specific and measurable core competencies, particularly by role, could be used to evaluate more precise aspects of performance. In

**Margin notes:**

TDCJ rejected or returned about half of staff's grievances for noncompliance with policy.

Many evaluation criteria relate narrowly to an employee's physical ability to perform basic requirements.

addition, the existing process does not meaningfully evaluate key criminal justice-specific aspects of performance such as a rehabilitative focus or general aspects of performance such as attitude, coworker relationships, and proactivity. Moreover, TDCJ's evaluations reflect only the impressions of a direct supervisor, excluding input from other colleagues with diverse perspectives on an employee's performance, and do not typically result in actionable steps such as trainings, goal setting, or other professional development.

> **Sample of CO Evaluation Criteria**
> - "Climbing stairs and ladders while searching for escaped inmates."
> - "Hearing calls for and calling for help."
> - "Carrying an injured or unconscious inmate or employee various distances to safety up or down stairs and ladders."
> - "Receives on-the-job training."

- **Unclear or restricted paths to advancement.** Although TDCJ has been expanding its training offerings, staff across the agency currently has little visibility on available trainings and how they relate to potential advancement opportunities, including open roles within their division or across the agency. Furthermore, while some management training is required for certain promotions, many of TDCJ's more proactive management trainings require a supervisor's nomination to participate, limiting access to these opportunities. While in-person training programs have limited physical capacity, the agency already has some online courses, is working to expand those offerings, and has requested additional funding to continue these efforts in its 2026-27 Legislative Appropriations Request.[22] By removing barriers and outlining a clearer roadmap for employees to track training progress toward requirements or goals, TDCJ could better motivate staff and clarify paths for a meaningful and enduring career at the agency.

  Better tying advancement to trainings would also promote fairness in selections for leadership roles. Sunset staff observed and repeatedly heard about a dynamic in which promotions for senior leadership roles are based in large part on personality, tenure, and loyalty to the agency rather than particular training, experience, or fitness for the role. Survey respondents and other agency staff spoke of having to be "invited" to apply for certain leadership roles, which might discourage highly qualified but less tenured staff or exclude external candidates from applying.

- **Limited and outdated remote work policy.** TDCJ's remote work policy is outdated and non-standard for employees in similar roles across the agency, missing opportunities where feasible to provide flexibility many workers have come to desire or expect in the wake of the pandemic. While some divisions have developed their own policies authorizing telework, the agencywide policy requires several layers of approval — up through the agency's executive director — and requires establishing set weekly days and hours to telework rather than allowing a flexible hybrid schedule.[23] TDCJ staff indicated the agency could provide this flexibility more consistently to increase job satisfaction without compromising output, as described in the textbox on the following page. Expanding this privilege and clarifying agency policy could help retain existing staff and serve as a recruitment tool.

> Expanding remote work could help retain existing staff and serve as a recruitment tool.

### Opportunities for Remote Work

On Sunset's parole staff survey, nearly 70 percent of respondents agreed or strongly agreed they would be able to complete their work remotely when not doing in-person visits to releasees, yet only about half of eligible POs currently have that option. POs are ineligible for remote work until one year after their hire date.

Among non-officer staff, more than half of respondents to Sunset's survey agreed they would be able to complete at least part of their work remotely and it would make them happier in their job, yet only 20 percent are allowed to do so.

**TDCJ could better use data to identify root causes of turnover and facilitate hiring.**

While outdated technology and cumbersome manual processes plague TDCJ, as discussed further in Issue 3, the agency does not consistently use the data it collects to understand and better address its staffing crisis. Data analytics was among HR's self-identified core competencies; however, the agency has not systematically used data to inform its recruitment and retention efforts. For example, while TDCJ now regularly surveys COs about retention and wellness, the agency has not made efforts to collect similar insights from other critical or high-turnover positions, including POs and HR and IT division staff. Furthermore, the agency has not effectively used existing sources of employee sentiment data to gather insights to inform retention strategies. For example, TDCJ issues the optional SAO exit survey to each voluntarily separating employee but does not consistently mine the surveys for actionable insights. Prior to a Sunset request in early 2024, HR only retained individual exit surveys and did not keep records of the aggregate data SAO compiles on a quarterly basis showing trends across surveys. TDCJ could also gain more detailed insights by creating its own exit survey or standardizing questions in retention or exit interviews. Additionally, while TDCJ maintains data on the nature of employee complaints and grievances, analyzing these data would enable TDCJ to identify common issues arising across the workplace that the agency could address more proactively.

*Improved tracking and analysis of hiring data would provide valuable insights TDCJ currently is missing.*

In addition, as a large agency where some candidates apply for multiple positions at once or would be qualified for various roles across divisions, TDCJ misses opportunities to ensure hiring and resourcing decisions reflect the best interests of the agency. TDCJ lacks an applicant tracking system to store candidate data such as location preferences and automate key steps in the hiring process, meaning HR staff processes tens of thousands of applications per year manually. As a result, HR cannot track applications through the process or provide updates to either candidates or hiring division staff. Consequently, when candidates apply for multiple positions simultaneously, HR, TLDD, and the relevant divisions are unable to coordinate to avoid duplicating interviews or negotiate to determine who should hire which candidates for the agency's priorities and best interest. Moreover, job candidates who are not selected for the role to which they applied are not consistently directed to consider similar positions at TDCJ or other roles in the agency's highest-need areas.

# Sunset Staff Recommendations

## *Management Action*

### 2.1   Direct TDCJ to consolidate and expand its existing workforce retention and support functions under one department to better support employees and systematically identify root causes of turnover.

This recommendation would direct TDCJ to evaluate all divisions and personnel with relevant staffing and retention duties and consolidate key functions into a single department whose sole focus is workforce retention and support. This department would oversee existing retention-oriented initiatives, including employee recognition, financial incentives, state-owned housing, and other benefits. The department also would develop new initiatives such as structured mentorship, peer support, or other retention and wellness supports. In addition to existing functions that would be part of this department, TDCJ should also perform, at a minimum, the following additional workforce retention and support functions:

- Analyze data collected from staff surveys, focus groups, workplace issue filings, and other sentiment-gathering efforts to mine for insights and develop data-driven employee retention and support initiatives.

- Monitor core staff services, including timely completion of annual performance evaluations and implementation of pay adjustments, trends in workplace issue filings and sentiment data, and efforts to address critical turnover problems, and provide biannual progress reports to TDCJ executive staff and the board.

- Evaluate the effectiveness and ongoing need for existing employee retention and wellness supports.

- Develop and implement standard operating procedures for voluntarily separating employees, such as a TDCJ-specific exit survey or interview questions or a discussion of other open TDCJ positions.

This department would assist TDCJ in ensuring better coordination and centralization of workforce retention and support. The recommendation would enable the agency to more holistically identify management problems that lead to employee turnover and make better informed and systematic efforts to address them. TDCJ would be directed to establish this department by September 1, 2025, and provide its first biannual report by December 1, 2025, and first follow-up report by June 1, 2026. TDCJ should publish these reports on its website.

### 2.2   Direct TDCJ to conduct job task analyses for key roles, clarify task prioritization, and tailor evaluations, hiring objectives, and training materials as needed.

This recommendation would direct TDCJ to study the scope of tasks for key roles such as POs, HR, and IT staff, similar to an effort the agency has only recently begun for COs with help from academic partners. Given the prevalence of both critical understaffing and emergent situations at TDCJ, the analysis should clarify which tasks or positions should be prioritized under those circumstances, streamlining staffing plans and employee expectations to better match realities on the ground. As part of this recommendation, TDCJ should consider and plan for how to use technology like applicant tracking software to reduce inefficiencies and make better use of staff resources, including through the automation plan recommended in Issue 3. The agency could consider working with a research institution or other external consultant to help conduct the analysis. The recommendation would also direct the agency to use the results of the analysis to revise job descriptions and performance evaluations for the studied roles as well as tailor training and hiring objectives as needed, completing this effort for key roles by September 1, 2026.

### 2.3 Direct TDCJ to provide additional guidance in policy on appropriate use of disciplinary and corrective actions for both subordinates and supervisors.

As TDCJ finalizes revisions to its disciplinary policy, this recommendation would direct the agency to ensure it adequately emphasizes behavior correction rather than rigidly punitive action and allows for more flexibility to consider context and extenuating circumstances. Specifically, the policy should make clear when it is appropriate or preferred for a supervisor to pursue non-disciplinary corrective actions and expand upon what those actions could include such as remedial training or a performance improvement plan process. The policy should ensure all conduct standards and violations are clearly defined and require more thorough documentation of cause for disciplinary action.

As part of this recommendation, TDCJ could consider whether certain levels of disciplinary action should continue to disqualify or exclude staff members from promotions, salary increases, or other opportunities. The agency could also consider removing low-level disciplinary actions from an employee's record when the employee completes the assigned corrective action or demonstrates satisfactory correction in their behavior or performance. To support the new policy, the agency should expand its existing remedial training and coaching curricula as resources allow.

With careful attention to avoid reinforcing or expanding an overly punitive culture, the recommendation would also direct TDCJ to clarify how supervisors will practically be held to a higher conduct standard and how subordinates may seek recourse for their supervisors' violations in a way that protects their identity. Furthermore, as TDCJ rolls out new initiatives for accountability and security such as its body camera program, the agency should consider updating the policy or adopting rules about how these programs fit into the agency's disciplinary procedures.

As part of this recommendation, the agency could consider implementing a temporary measure whereby the workforce retention and support department described in Recommendation 2.1 periodically audits disciplinary actions to ensure fairness and consistent application across facilities and departments of the agency and reports to TDCJ leadership on a regular basis. A clearer and more inclusive policy would encourage supervisors to coach their subordinates to improve performance and ensure disciplinary and corrective actions are more fairly assigned and not used as threats.

### 2.4 Direct TDCJ to clarify and streamline its process for employees to file formal workplace issues and consider creating an avenue for anonymous complaints.

This recommendation would direct TDCJ to revise the process by which employees may elevate formal workplace issues with the goal of emphasizing clarity, simplicity, and confidentiality when needed and to develop guidelines for prioritizing the highest-risk filings. To protect confidentiality, employees should be allowed to submit filings directly to the central HR office rather than going through a local contact, and the agency should consider creating online forms as an alternative to paper. The agency should also collect data on workplace issues in a standardized manner to facilitate analysis, including data on the subject and location of the issue, resolution method, and any follow-up actions taken.

The agency should also implement a separate process for employees to formally file anonymous complaints rather than just formal workplace complaints and ensure employees have a clear understanding regarding the different purposes of each. An anonymous complaints process would allow the agency to identify systemic issues with workplace culture without an expectation to directly investigate or resolve an individual's issue. This recommendation would allow TDCJ to provide an outlet for management issues staff may be afraid to submit as formal complaints and also allow the agency to more systemically identify management problems that may contribute to high turnover.

## 2.5   Direct TDCJ to revise and expand the scope of its performance evaluation process.

This recommendation would direct TDCJ to develop qualitative and quantitative measures that better reflect performance and work quality and ensure employees are not unfairly held accountable for aspects of their work that fall outside their control. TDCJ should also remove current evaluation criteria that do not meaningfully assess performance quality such as those related to the employee's basic capability to perform required job functions. As part of this recommendation, TDCJ could also consider incorporating feedback from additional colleagues in performance evaluations as relevant, including from subordinates and peers, and to the extent possible. The agency could also consider requiring employees to develop concrete professional development goals with timelines, such as completion of proactive training opportunities, as part of their performance evaluation process.

This recommendation would also direct TDCJ to incorporate turnover as a performance measure on the evaluations of supervisors and senior leaders, taking into account external factors potentially impacting staffing such as local demographics, as discussed in Issue 1. The agency should use these employees' performance evaluations to identify areas with high turnover and possible contributing factors that these leaders could directly address. This recommendation would help TDCJ recognize supervisors who adopt effective strategies to increase retention and replicate those practices agencywide as well as identify those who need additional training or resources devoted to improving retention. This approach would also incentivize regional leaders to solve workplace issues within their regions, possibly with the help of the workforce retention and support department described in Recommendation 2.1.

This recommendation would direct TDCJ to prioritize revising and then completing performance evaluations for correctional and parole staff, completing an initial round by September 1, 2027, incorporating components identified in the job task analyses directed under Recommendation 2.2. The agency could consider implementing a temporary measure whereby the workforce retention and support department periodically audits performance evaluations, particularly of supervisors and senior leaders, to ensure the new criteria and additional inputs are being appropriately incorporated.

## 2.6   Direct TDCJ to strengthen policies and processes for employees to seek out, participate in, and track trainings as a path to advancement within the agency.

This recommendation would direct TDCJ to more clearly link advancement opportunities to trainings and ensure training opportunities are available for employees to pursue proactively where possible. As part of this recommendation, the agency could consider developing internal certifications or other training tracks and developing or acquiring a tool for employees to track their training progress toward advancement goals such as new assignments, merit salary increases, and promotions. The learning management system and additional training resources included in the agency's 2026-27 Legislative Appropriations Request would support these goals.[24] This recommendation would direct the agency to leverage existing online trainings to develop initial tracks and continue to expand training offerings as resources allow.

## 2.7   Direct TDCJ to update and standardize its telework policy.

This recommendation would direct TDCJ to revise its telework policy, building on the practices of divisions across the agency that have implemented more consistent teleworking opportunities for staff. The agency should aim to extend teleworking or hybrid work flexibility to more employees where operationally feasible and with appropriate checks in place. As part of this recommendation, the agency should consider updating the policy to enable staff not typically permitted to telework, including correctional staff, the opportunity to complete required trainings or other administrative tasks from home when possible since both connectivity and time constraints make it difficult to complete these tasks within TDCJ facilities.

Given its limited resources to attract and retain strong candidates, particularly in certain hard-to-staff locations, the agency could better utilize this no-cost benefit with a more inclusive and expansive policy.

## 2.8  Direct TDCJ to more consistently collect and analyze feedback from both current and separating staff.

This recommendation would direct TDCJ to collect more feedback from staff about retention and wellness challenges and opportunities, expanding beyond correctional staff surveys to solicit input from parole and other staff categories as resources allow. The agency should emphasize anonymous feedback mechanisms to promote candid responses and curtail fears of retaliation. The recommendation would also direct TDCJ to better analyze trends from data the agency already collects, including workplace issue filings, exit interviews, and surveys. The agency should also consider implementing periodic "retention interviews" with staff to mitigate issues in their current role or discuss whether any other areas of the agency might be of interest.

# Fiscal Implication

Overall, these recommendations are designed to contribute to improved retention, saving an estimated $7,770-12,770 in advertising and upfront training costs alone for each CO or PO retained, with additional savings from retaining other agency staff. The recommendations' exact fiscal impact to the state depends on how the agency implements them and therefore cannot be estimated.

Recommendation 2.1 would require consolidating certain functions the agency already performs within one clear chain of command and carrying out new functions. TDCJ might choose to hire additional employees to accomplish these directives, but the impact of any new salaries and benefits depends on implementation and cannot be estimated. Investing these resources could help reduce the agency's significant overall turnover costs, and with reduced turnover, ultimately help TDCJ better complete its vital public safety mission. For example, losing just 500 fewer COs per year — less than 10 percent of the 6,652 COs lost in fiscal year 2023 — would save the agency more than $5 million.

Recommendation 2.2 could likely be achieved with existing resources if the agency is able to engage an external research partner, such as a university or another government agency, to assist in conducting the job task analysis. Purchasing an applicant tracking system or hiring an external research partner such as a consultant could bring additional costs that cannot be estimated at this time. Directives to revise TDCJ's evaluation, hiring, and training materials could be accomplished with existing resources.

Recommendations 2.3 to 2.8, which direct TDCJ to revise internal policies and practices, could be accomplished with existing resources as well and therefore would have no fiscal impact to the state.

---

1    Texas Department of Criminal Justice (TDCJ), Article V, Page V-6, Chapter 1170 (HB 1), Acts of the 88th Legislature, Regular Session, 2023 (General Appropriations Act).

2    TDCJ, "Legislative Updates: Pay Increases for All COs and Employees," accessed online August 18, 2024. https://www.tdcj.texas.gov/news/pay_increases_effective_July_1.html#:~:text=In%20April%202022%2C%20state%20leadership,the%20next%20two%20fiscal%20years; Article IX, Page IX-110, Chapter 1170 (HB 1), Acts of the 88th Legislature, Regular Session, 2023 (General Appropriations Act); Chapter 458 (SB 30), Acts of the 88th Legislature, Regular Session, 2023.

3    The Legislature slightly reduced the agency's budget allocation for CO positions in 2015 due to high vacancy rates. Prior to the change, the FTE cap for COs was calculated assuming 97.5% of TDCJ's ideal CO staffing level but was adjusted down to assume just 94.0% of TDCJ's ideal CO staffing level.

4    State Auditor's Office (SAO), *An Annual Report on Classified Employee Turnover for Fiscal Year 2023*, January 2024, p. 18, accessed online August 14, 2024, https://sao.texas.gov/Reports/Main/24-702.pdf.

5    SAO, "E-Class Search Criteria," accessed online August 14, 2023, https://sao.texas.gov/Apps/eclass/Search/.

6    The agency could not estimate total costs related to new hires, including additional training.

7    Sergeants are the only correctional supervisors eligible to earn overtime. Lieutenants and above are eligible to earn compensatory time. Parole officers are eligible to receive overtime while parole supervisors are eligible to earn compensatory time.

8    The agency does not track other costs associated with staff transport, including transport-related overtime, vehicle maintenance, and gas.

9    All citations to Texas statutes are as they appear on http://www.statutes.legis.texas.gov/. Section 812.206, Texas Government Code.

10   Chapter 432 (HB 1914), Acts of the 88th Texas Legislature, Regular Session, 2023.

11   Based on a 40-hour work week.

12   CGL, *Lopez Escape Review*, September 2022, accessed online August 14, 2024, https://www.scribd.com/document/613221613/CGL-Lopez-Report#from_embed.

13   TDCJ and Board of Pardons and Paroles (BPP), "Nestor Hernandez and Zeric Jackson Investigative Report," December 28, 2022, p. 1, accessed online August 18, 2024, https://gov.texas.gov/uploads/files/press/Hernandez_Jackson_Response_to_the_Governor.pdf.

14   Erika Harrell et al., *Indicators of Workplace Violence, 2019*, Bureau of Justice Statistics, Office of Justice Programs, U.S. Department of Justice; Bureau of Labor Statistics, Office of Safety, Health, and Working Conditions, U.S. Department of Labor; and National Institute for Occupational Safety and Health, Centers for Disease Control and Prevention, U.S. Department of Health and Human Services, 2022, p. 22, accessed online September 13, 2024, https://bjs.ojp.gov/content/pub/pdf/iwv19.pdf.

15   TDCJ and BPP, "Nestor Hernandez and Zeric Jackson Investigative Report," December 28, 2022, accessed online August 18, 2024, https://gov.texas.gov/uploads/files/press/Hernandez_Jackson_Response_to_the_Governor.pdf.

16   TDCJ, *Personnel Manual*, "General Rules of Conduct and Disciplinary Action Guidelines for Employees (PD-22)," last revised November 1, 2021, accessed online August 14, 2024, https://www.tdcj.texas.gov/Divisions/hr/hr-policy/pd-22.pdf.

17   TDCJ, *Personnel Manual*, "Employee Awards and Recognition (PD-53)," last revised August 1, 2015, pp. 5-6, accessed online August 14, 2024, https://www.tdcj.texas.gov/Divisions/hr/hr-policy/pd-53.pdf; TDCJ, Personnel Manual, "Merit Salary Increases (PD-90)," last revised May 1, 2024, p. 4, accessed online August 14, 2024, https://www.tdcj.texas.gov/Divisions/hr/hr-policy/pd-90.pdf.

18   TDCJ, *Personnel Manual*, "Discrimination in the Workplace (PD-31)," last revised September 1, 2021, accessed online August 14, 2024, https://www.tdcj.texas.gov/Divisions/hr/hr-policy/pd-31.pdf; TDCJ, *Personnel Manual*, "Employee Grievance Procedures (PD-30)," last revised June 24, 2022, accessed online August 14, https://www.tdcj.texas.gov/Divisions/hr/hr-policy/pd-30.pdf.

19   TDCJ's grievance policy (PD-30) outlines some "non-grievable" issues such as administrative separation, reclassification, and pending disciplinary action.

20   TDCJ, *Personnel Manual*, "Employee Grievance Procedures (PD-30)," last revised June 24, 2022, p. 8, accessed online August 14, https://www.tdcj.texas.gov/Divisions/hr/hr-policy/pd-30.pdf.

21   Ibid.

22   TDCJ, "Legislative Appropriations Request, Fiscal Years 2026-2027," September 6, 2024, accessed online September 23, 2024, https://docs.lbb.texas.gov/Main/DocDisplay.aspx.

23   TDCJ, *Personnel Manual*, "Teleworking (PD-94)," last revised December 1, 2020, accessed online August 14, 2024, https://www.tdcj.texas.gov/Divisions/hr/hr-policy/pd-94.pdf.

24   TDCJ, "Legislative Appropriations Request, Fiscal Years 2026-2027," September 6, 2024, accessed online September 23, 2024, https://docs.lbb.texas.gov/Main/DocDisplay.aspx.

| ISSUE 3 | Uncoordinated Strategic Planning and Outdated Data Systems and Practices Hinder TDCJ from Effectively Modernizing to Address Technology and Staffing Challenges. |
|---|---|

## Background

The Texas Department of Criminal Justice's (TDCJ) information technology (IT) infrastructure consists of at least 70 applications originally built on mainframe technology that comprise its inmate management system. These applications are essential to the operational work of TDCJ but use an outdated coding language which, coupled with significant changes to TDCJ's processes over the past few decades, has made TDCJ's data management system increasingly out of date with current operational practices and more complicated and time consuming for TDCJ staff to use. Examples of applications include those that calculate an inmate's time served or time remaining and those that manage an inmate's work or rehabilitative programming assignments. TDCJ's Parole Division uses a separate web-based data management system for its parole operations, and various divisions use siloed Microsoft Access databases or Excel spreadsheets to conduct and document TDCJ operations not covered by its main data management systems. In addition to electronic data management, TDCJ relies on many paper-based and manual processes to keep track of information on agency operations.

In 2022, TDCJ awarded Microsoft a contract to replace the mainframe with a cloud-based system known as the Corrections Information Technology System (CITS). The original launch date for phase one of CITS was August 2024, but the project has experienced significant implementation delays. As TDCJ prepares to shift to CITS, the agency is largely relying on a temporary cloud-based technology to move and store data between systems.

Separate from the initative to acquire a new data management system, TDCJ announced a strategic plan in 2022 to help the agency achieve its long-term goals by the end of this decade, known internally as the 2030 Plan. The plan includes goals to improve various aspects of TDCJ's operations and strategic iniatives the agency plans to pursue to meet these goals. Technology initiatives make up one of seven key areas in the plan the agency has targeted for improvements.

## Findings

**TDCJ's scattershot, reactive, and halting approach to strategic planning leads to incomplete reforms and limited modernization.**

TDCJ is in need of significant modernization, as defined in the textbox on the following page. Siloed, decades-old technology and paper-based processes form the backbone of the agency's increasingly complex operations. Additionally, critical aging infrastructure and staffing challenges, as discussed in Issues 1 and 2, make it all the more important for TDCJ to identify and operationalize strategic initiatives to increase operational efficiencies and optimize staff processes. While some modernization initiatives will have upfront costs, the agency can implement others with existing resources, and overall modernization

> Decades-old technology and paper-based processes form the backbone of TDCJ's increasingly complex operations.

efforts will lead to long-term savings for the agency and reduce burdens on staff. The agency's executive staff is aware of the need for modernization, but TDCJ lacks clear and repeatable processes for prioritizing strategic initiatives, coordinating initiatives across divisions, and ensuring initiatives are fully implemented to meet that need.

> ### What is Modernization?
>
> A state agency modernizes by updating its procedures and practices to reflect changing needs, resource constraints, and best practices. Many such efforts will require updates to the agency's use of data and technological capabilities, but other modernization efforts may only require a re-evaluation of how the agency conducts operations. For example, TDCJ recently changed the number of times it counts all inmates in its prisons from eight times a day to six. TDCJ reported making this change both as a result of overworked correctional officers being asked to do too many tasks and research across the correctional field indicating that this decrease in the number of counts per day would not impact the safety or security of prisons.

- **Internal strategic initiatives lack consistent coordination, follow-through, and accountability and are often derailed by emergencies despite the predictable volatility of corrections environments.** The agency's internal modernization initiatives — either as part of the agency's broader 2030 Plan, the CITS data modernization transition, or standalone strategic initiatives — receive different amounts of attention and follow-through. Executive staff regularly does not provide specific goals or outcome metrics to which staff can be held accountable, and the agency does not sufficiently track or ensure the implementation of all initiatives.

  <u>Unfocused strategic initiatives and lack of prioritization.</u> As an agency with an abundance of processes requiring modernization, TDCJ must prioritize the initiatives it can actually implement and will provide the greatest benefit to the agency's overworked staff. TDCJ's 2030 Plan, which originated in 2022, includes many much-needed strategies to help modernize the agency but lists goals of significantly varying importance without clear prioritization as well as goals that are overly broad or ambitious. As a result, the 2030 Plan comes across as a wish list for the agency rather than achievable and actionable initiatives. For example, one overly broad goal is for TDCJ to "be voted by employees as the number one employer in Texas" while another more modest goal is to develop a citizens' academy. The former seeks to solve the agency's biggest challenge — as discussed in Issue 2 — in just six years. Becoming the number one employer will likely require a number of well-defined initiatives with clear metrics by which the agency can measure progress to transform the agency's culture in that time period. The latter would require the agency to develop a single program, which TDCJ has already done. While proposing aspirational goals can be an effective leadership strategy, such goals must be backed by proportional prioritization and resources. Additionally, while TDCJ announced the 2030 plan in October 2022, TDCJ only started conducting quarterly meetings with division leadership on the implementation of projects in

*TDCJ's 2030 Plan comes across as a wish list rather than achievable and actionable initiatives.*

summer 2024. Sufficient planning and prioritization is especially urgent for initiatives that require an IT component. While TDCJ is working to transition to a new data management system, TDCJ's IT staff has limited capacity to take on other initiatives. TDCJ division leaders or executive staff submit projects to IT staff, but IT and executive staff lack guidance on how and when to make the decision on whether to move forward with an initiative. Oftentimes, the prioritization of strategic initiatives comes down to a negotiation between different division leaders and executive staff instead of involving an accounting of the overall needs and capacity of the agency that staff dedicated to tracking and implementing strategic initiatives could provide.

Lack of coordination. TDCJ does not have a clear process for ensuring sufficient coordination between divisions when proposing or implementing strategic initiatives, in part because there is no staff responsible for globally tracking and prioritizing strategic initiatives across divisions. TDCJ does have one staff member assigned to tracking implementation of 2030 projects, but other initiatives outside the 2030 umbrella are not always consistently tracked, and the agency lacks sufficient coordination across divisions for these efforts. For example, most agency initiatives require an IT component, but TDCJ's IT staff is not always brought in early in the planning process. Specifically, several initiatives laid out in TDCJ's 2030 Plan would similarly require an IT component, but TDCJ staff reported that they did not have to consult with IT staff on the agency's capacity to actually implement these initiatives, resulting in planning of limited value. Additionally, TDCJ staff often proposes a modernization initiative for a single division when attempting to develop a process or system that could benefit multiple agency divisions. For example, IT staff reports having built distinct case management databases for different divisions of TDCJ, even when it would have been more efficient to create one database and customize it for different divisional needs. IT staff is working to better identify cross-divisional needs to avoid such an outcome, but clearer processes and staff dedicated to identifying and prioritizing strategic initiative needs across divisions would eliminate both siloed and duplicative efforts.

Organizational structure does not provide consistent oversight of strategic initiatives. As an agency with significant modernization needs, TDCJ should have a single entity responsible for identifying, prioritizing, and tracking the implementation of strategic initiatives. Additionally, frequent critical incidents inherent to operating a corrections system make it crucial for the agency to have an organizational structure that can simultaneously perform the day-to-day operations of the agency and move modernization efforts forward. TDCJ's executive leadership — including the executive director, deputy executive director, chief of staff, and leadership from different TDCJ divisions assigned to specific modernization efforts — are all involved with ensuring the implementation of initiatives. During the review, Sunset staff observed the executive staff as often very involved with running the

> Sufficient planning and prioritization is especially urgent for initiatives that require an IT component.

> IT built distinct databases for different divisions instead of creating one database and customizing it.

day-to-day operations of the state's correctional system, which given the high-risk nature of the work is understandable. However, agency staff repeatedly asserted that responding to emergencies takes up all of TDCJ's bandwidth and, in the process, new initiatives and long-term strategy fall to the wayside. Notable recent crises include the COVID-19 pandemic, high-profile escapes, and a systemwide lockdown in September 2023. While these incidents understandably require much of the agency's resources to address, the agency does not adequately plan for or maintain an organizational structure that accounts for the reality that critical incidents are a norm within correctional environments. Other large organizations might designate certain executive staff to operations and others to strategic growth, for example. At TDCJ, a similar approach, such as dedicating staff to track the progress and effectiveness of new initiatives, could better ensure follow-through with strategic initiatives. Without such accountability mechanisms, these initiatives are not always implemented timely or completely. The textbox provides an example of a modernization effort within TDCJ's Parole Division that is still unresolved after a decade, despite having a significant impact on parole officer's (POs) workload.

### Correcting a Parole Contact Report

In 2014, an audit found that a report TDCJ generates to tell POs how often they must make different types of contact with each parolee on their caseload was inaccurate. The number of required contacts with parolees varies depending on factors including risk, but when the Texas Risk Assessment System was launched in 2014, the report was never updated to indicate the impact of risk on how often a PO had to make contact with a parolee each month. As a result, POs have to manually open each case file and determine if they have met their contact requirements. In 2022, the Parole Division received a grant from the Bureau of Justice Assistance (BJA) that would fix this report, but after 22 months of inaction from TDCJ, BJA threatened to pull the funding. In 2024, TDCJ was able to provide BJA with the required information and is now working to secure a contract to fix the report, over 10 years after the need for this one modernization effort was identified.

- **TDCJ does not effectively use outside researchers to help guide the agency's modernization.** TDCJ allows anyone to apply to conduct external research on TDCJ operations but evaluates all proposals to ensure that the research is scientifically sound and will not cause harm or significant disruptions to TDCJ staff or inmates. In this context, research is a systematic investigation designed to develop or contribute to general knowledge and can include program evaluations and outcome studies. Research may be academic or biomedical in nature and may include the collection of new data or the use of existing data pertinent to the employees, clients, or operations of TDCJ.[1] External research can provide TDCJ with valuable information on topics such as efficacy of rehabilitative programs, factors that may lead to adverse events such as suicides or assaults, or reasons for staff separations. Research on these topics can also help TDCJ use modern tools to address longstanding challenges and cover topics that the agency has an interest in but that TDCJ's small Research and Development Department (R&D) does not have staff capacity to study. To ensure the agency is getting the most out of external research, however, TDCJ must have objective and consistent policies to evaluate research proposals and should develop a process for soliciting external research requests when appropriate.

*Not using outside research and expertise at times results in missed opportunities.*

<u>Informal assessments of the value of external researchers.</u> TDCJ does not have clear, objective factors for determining whether an external research project would provide value to the agency, and the approval process is overly reliant on subjective assessments from agency leadership. Starting in 2021, TDCJ's executive leadership tasked R&D with reviewing external research requests. In response, the department created a more formalized process, yet it still relies on informal assessments from TDCJ's executive leadership on whether the research provides a benefit to the agency. This limits TDCJ from obtaining objective information on topics such as the outcomes of its programs and using such information to improve operations.

> TDCJ denies most outside research requests.

<u>Culture resistant to outside researchers.</u> TDCJ is resistant to using outside researchers, even when it may be appropriate to do so, leading to missed opportunities to gather information that could help improve operational outcomes and staff efficiencies. For example, TDCJ has an ongoing research collaboration with Rice University's Texas Policy Lab to conduct research on topics TDCJ finds valuable such as a machine learning project that would help the agency better assess risk. The policy lab pitched a project to catalogue and evaluate all of TDCJ's programming in early 2023, but TDCJ leadership twice denied the request even though it is a project the agency finds valuable and would fill a gap in the agency's evaluation of its programming, as explained in Issue 4. TDCJ's R&D Department is just now starting to get underway with a comparable project. Overall, in fiscal year 2023, TDCJ received 32 external research requests. The agency approved six and denied 23, with the remaining three requests withdrawn or still under review.

<u>No institutional review board.</u> TDCJ lacks an institutional review board (IRB), a body responsible for guarding the welfare of human subjects recruited to participate in research. In contrast, other data-rich state agencies in Texas like the Health and Human Services Commission and Department of State Health Services — as well as juvenile and adult correctional systems in other states like Florida and North Carolina — use IRBs to screen external research requests.[2] Other states like Washington have IRBs that serve a number of state agencies, including their corrections agencies.[3] With an IRB, TDCJ could establish a more objective, scientifically and ethically based process for vetting research proposals while also protecting human subjects.

> TDCJ's data practices result in missed opportunities to analyze its own practices.

**Significant data quality challenges lead to errors and gaps in information that create inefficiencies and limit TDCJ's ability to identify and address ongoing problems.**

TDCJ has outdated and inadequate data management systems and processes that lead to errors and gaps in data for day-to-day operations of prisons and the parole system.

- **Incomplete data.** The ways in which TDCJ collects and reports data often do not contain the level of data that would best allow the agency to

identify and address consistent problems that impact inmates and staff. During the course of the review, Sunset staff found numerous examples of incomplete data.

Use of force. TDCJ was able to provide Sunset with data on the number of use-of-force incidents, as defined in the textbox, broken down by correctional facility. However, the agency was unable to provide the type of use of force, such as excessive force or provoked use of force, for each incident. TDCJ explained the data are not tracked by these different categories due to the agency's reporting structure. For example, a facility review might find that the use of force was provoked, but a subsequent review by central administrative staff or the Office of the Inspector General (OIG) might reclassify the use of force as non-provoked. Tracking the type of use of force after the final review, however, could help TDCJ identify trends in use of force over time and at different correctional facilities and then use that information to improve processes or staff training.

> **Use of Force**
>
> In certain circumstances, TDCJ correctional staff is authorized to use force against inmates to achieve compliance or maintain a safe and secure environment. Guidelines for TDCJ's use-of-force policy are laid out in the agency's behavioral intervention plan that establishes an expectation for staff to attempt de-escalation before using force against an inmate in most circumstances. TDCJ documented 10,851 uses of force in fiscal year 2023.

Employee complaints and grievances. TDCJ does not label or track the types of issues or locations for employee complaints in a consistent manner, which can lead to difficulties in complaint categorization. The agency lacks set complaint categories or locations for agency staff to enter into the employee complaints data application, leading to inconsistencies and errors. Employee complaints and grievances also contain incomplete data such as missing dates related to intake, referral or decision, and closure. In some cases, the agency included a referral or decision date, but the data did not include an actual referral or decision. Incomplete data on employee complaints and grievances prevent TDCJ from better identifying and targeting issues that may contribute to the agency's employee retention challenges.

> **Universal Request Forms**
>
> I-60s are universal request forms inmates can send to anyone working at TDCJ to make requests on any issue. Common types of requests inmates make through I-60s include work assignment changes, changes to visitation, or changes in housing placement. Requests through I-60s can have a significant impact on an inmate's experience and rehabilitation while in TDCJ custody.

Universal request forms. TDCJ does not track any information about its universal request forms for its inmates, as described in the textbox, including how many inmates submit universal request forms and to whom. TDCJ expressed a desire to put the paper-based form on inmates' tablets, which TDCJ provided to inmates in all correctional facilities by 2023, but it has not yet done so. A comprehensive view of the number and types of requests made at different facilities or even by region could help TDCJ identify problems or needs and dispatch resources or develop changes to procedure as appropriate.

- **Unreliable data.** Limitations in TDCJ's data management systems often cause the agency to be unsure of the reliability of its data, which can obscure the size and scope of serious issues that occur within the agency and make

it difficult to appropriately remediate such issues. The agency has some quality control processes to improve data reliability, but these processes are not standardized and are not always consistently followed, limiting their usefulness. TDCJ lacks master data management processes to ensure that data in its master records are consistent and correct, resulting in time-intensive processes to clean data any time it is pulled from the system and preventing TDCJ from having a single source of truth for data requests. During the review, Sunset staff found several examples of unreliable data.

Time credit appeals. Inmates can dispute the amount of time TDCJ reports they must serve until discharge or parole eligibility, as described in the textbox. TDCJ began tracking the number of time credit appeals in 2015 but does not track the results of these appeals, reporting that the outcomes are too varied to do so. However, comprehensive data on how many time credit appeals contained an error and basic information on why the error occurred could help TDCJ identify and address the causes of time calculation errors, which is especially important when there is a growing inmate population with fewer staff to manage them, as described in Issues 1 and 2.

> **Time Credit Appeal**
>
> Inmates may appeal any potential issues with the time TDCJ reports they are required to serve. Common reasons for time credit appeals include missing information on time served in county jails and overturned inmate disciplinary cases that restore an inmate's good time. TDCJ staff will investigate the issue, identify any problems with an inmate's time calculation, and make corrections to an inmate's time as needed. TDCJ received nearly 3,100 appeals in fiscal year 2023.

Staffing data. The data TDCJ collects and reports internally about staffing levels at different prisons are not always accurate and complete and often exist only on paper, which limits comprehensive analysis. Each correctional facility has different staffing numbers to track, including its number of authorized and filled positions. The actual number of correctional officers who are available to work on a particular day varies due to illness or other types of leave so daily data points include staff who are initially assigned to work a shift, staff who actually cover that shift, and staff who work beyond the assigned shift. The number of unfilled positions at a facility might change significantly during a shift as staff does not show up for a shift, staff is asked to stay beyond their original shift, or staff is sent over from other facilities. TDCJ does track some information about the deployment of correctional officers to short-staffed units through its staffing command center, but individual prisons often only report these nuances on paper shift rosters, and the agencywide staffing data available to agency leadership often do not reflect the daily reality at prisons. Without this granular level of data, and due to the agency's reliance on a paper-based roster system, TDCJ cannot accurately assess and address its staffing challenges at different prisons.

> The number of unfilled positions at a facility might change significantly during a shift.

- **Data not in usable forms.** TDCJ does not have a comprehensive view of key system indicators and basic metrics such as staff turnover, changes in prison population, or adverse events that would allow TDCJ leadership to identify trends in different prisons or regions. Even if TDCJ addressed the gaps and errors in its data, the agency is not set up to review key metrics

over time at different prisons. Cumbersome and siloed databases, many of which date back to the 1990s, and the use of spreadsheets and hand counts to track information prevent TDCJ staff from effectively collecting and tracking important data and information about its prisons. Due to the technical and process limitations noted above, as well as staff's considerable workload, TDCJ is unable to look at comprehensive information about different prisons, regions, and the whole system in a single location. Similarly, while TDCJ has data on several different indicators relevant to the safety and security of staff and inmates, these data are not centrally located. Because TDCJ leadership does not have a consistent and comprehensive view of key indicators in prisons, staff is often reacting to problems as they occur. An overview of indicators such as staffing, assaults and other violent incidents, contraband, grievances, complaints handled by the independent ombudsman, and disciplinary cases at different correctional facilities and regions could help TDCJ identify trends and deploy resources as appropriate in a systematic rather than piecemeal manner.

*Leadership needs better data insights into what is occurring at prisons.*

**TDCJ's inefficient, siloed, and outdated data governance leads to errors that can hinder the agency's ability to ensure safety to inmates, staff, and the public.**

- **Limited and informal communication.** More formalized communication and coordination between the entities responsible for TDCJ's data governance would ensure that distinct initiatives to improve data governance occur in coordination and without duplication. As shown in the table on the following page, three main staffing groups within TDCJ deal with cross-divisional data: the Data Management Office (DMO) in TDCJ's IT Division, the statistical section of TDCJ's Executive Administrative Services, and the R&D Department. While the statistical section and R&D communicate semi-regularly, it is largely just regarding projects on which R&D is working. Conversely, during the review, Sunset staff learned the statistical section and R&D have limited interactions with DMO. TDCJ intends to establish a data governance council as a part of DMO's data governance plan. The data governance council would include these three entities along with other staff and would be responsible for managing, escalating, and resolving data governance issues. TDCJ approved the data governance plan in August 2024, but the data governance council has yet to convene.

*Inefficient paper-based processes drive day-to-day operations.*

- **Overreliance on paper-based processes.** As it has for decades, TDCJ continues to rely on paper-based processes that require significant staff resources and often result in errors and lost data. Most basic correctional tasks within a prison are performed using paper-based processes, including the count of inmates that occurs six times a day, the I-60 form, inmate grievances, and inmate discipline. Additionally, many of TDCJ's administrative processes, such as transferring information about incoming inmates from the counties to TDCJ, rely heavily on paper-based processes. Respondents to Sunset's survey of non-correctional staff reported that their jobs require significant amounts of paper-based processes and manual

data entry, as shown in the textbox. During conversations with TDCJ staff, Sunset staff repeatedly learned of concerns that reliance on paper for these important processes render them more prone to error. The massive scale of TDCJ's operations and the necessary processes to support the agency create opportunity for error as well. While data on the universal I-60 request systems are not tracked, as discussed above, in fiscal year 2023 there were over 244,000 inmate disciplinary cases and nearly 127,000 inmate grievances. Sunset learned from stakeholders that TDCJ's reliance on paper for the I-60 and grievance processes make it too easy for forms to be lost or destroyed.

> **Non-Correctional Staff Reliance on Paper-Based Processes**
>
> - 76% reported that their job requires a lot of paper-based processes.
> - 46% reported that they have to perform duplicate data entry due to paper-based processes.
> - 45% reported that systems for data input have technological limitations that make their job more difficult.

**TDCJ Entities that Serve Data Governance Functions**

| Data Management Office | Statistical Section | Research & Development Department |
|---|---|---|
| - Housed in TDCJ's Information Technology Division.<br>- Established in 2021 as required by SB 475 (87R).[4]<br>- Helps ensure data projects from TDCJ's different operational divisions are using data in secure and appropriate ways.<br>- Develops policies for TDCJ's data management.<br>- Develops a data governance plan for the agency.<br>- Assists on data management preparations during the transition to CITS. | - Longstanding staffing section housed in TDCJ's Executive Administrative Services Division.<br>- Collects, reconciles, and combines data from disparate data systems throughout the agency.<br>- Uses verified data to create statistical reports for an array of stakeholders within and outside the agency.<br>- Identifies data errors and reports on an ad hoc basis significant and consistent errors to either the Information Technology Division (for programming errors) or the division from which the data originated (for human errors). | - Housed in TDCJ's Executive Administrative Services Division.<br>- Established in 2019 by TDCJ's executive director.<br>- Conducts data analysis to address specific problems as requested by TDCJ leadership.<br>- Uses data to make recommendations or establish strategic initiatives. |

Technology and TDCJ culture. Technological and fiscal limitations admittedly necessitate the continued use of some paper-based processes. However, TDCJ too quickly defaults to a cultural inertia of doing things the way they have always been done. During the review, Sunset staff observed a deep resistance to eliminating paper-based processes and moving towards digitization. For example, TDCJ does not allow correctional staff on facilities to use basic tools such as Microsoft Excel to conduct inmate counts nor does the agency even have that tool available to correctional officers, instead relying on a paper-based process. Similarly, TDCJ intake staff print out copies of inmate packets they receive from the counties via email to then manually enter that information into TDCJ's data system.

Staff relies on the print packets as a workflow tool to keep track of which staff is assigned to conduct manual data entry for which inmates, instead of keeping track of data entry workflow electronically. Additionally, the agency has tried to move to using more digital signatures, but various divisions have expressed discomfort with such a change. Without digital signatures, agency staff must print out hard copies of records, gather signatures, and then often immediately scan documents back into a database, resulting in an inefficient process that introduces more opportunities for error.

Discrete digitization projects. Some TDCJ staff is working on digitizing discrete paper-based processes for some TDCJ divisions, but the agency is not systematically reviewing and identifying paper-based processes best suited for digitization. Such a review could help all divisions identify processes most beneficial for the agency if digitized and create a timeline to do so with consideration of the ease of implementation, use of staff resources, and whether the process will be affected by the transition to TDCJ's new data system. Given the agency's limited resources, such a systematic review could help the agency identify processes to digitize that have the lowest barrier to implementation and the highest long-term potential savings.

- **Manual data processes lead to duplication and data errors, wasting limited staff time and creating operational errors.** TDCJ's numerous databases, some of which document the same types of information, often have difficulty communicating with one another. This requires staff to enter and update the same information in multiple databases, resulting in conflicting data or time-intensive reconciliation processes to ensure accuracy. TDCJ does not use a designated master data record, indicating the agency has not established the data infrastructure to support a single source of truth for data systems and reporting. TDCJ staff also conducts manual data entry multiple times as a form of quality control, which is very time- and labor-intensive and not ideal during the agency's staffing crisis, as covered in Issue 2.

Intake and classification. Much of the initial data entry at TDCJ is done by the intake staff before an inmate is transferred from jail to a TDCJ facility, including manual entry of biographic, sentence, and background information. Classification staff uses this information to make important determinations about an inmate's level of supervision and needs, which will determine custody levels, facility placement, and access to different services. Incorrect intake data entry can cause serious problems, potentially leading TDCJ to house inmates who should not be bunked together for security reasons in the same cell, bar inmates from certain rehabilitative classes, classify inmates at an inappropriate risk level, or even input inmate sentences incorrectly. As a quality control process, TDCJ leadership required duplicate data entry, resulting in two intake staff inputting the same data for each inmate. CID leadership established this quality control process after a series of audits in the mid-2000s identified consistent time calculation errors that caused TDCJ to incorrectly release inmates or fail to identify inmates who should be eligible for parole. Over the past ten fiscal years,

Staff regularly manually enter the same information into multiple databases.

TDCJ identified 34 inmates wrongly released over the last 10 years.

TDCJ identified 34 inmates who were wrongly released. This system had flaws, as nothing prevented intake staff from copying the first intake data entry and pasting it into the second. However, as of 2024, intake staff has stopped this manual quality control process, reporting that release staff identifies and corrects any errors that intake staff made when an inmate is preparing for release. Despite the high risk associated with intake data entry errors, intake staff is not changing its current processes, as delays from the launch of TDCJ's new cloud-based system and increases in the number of inmates coming from county jails puts additional pressure on its workload.

> **Manual data processes and associated data entry errors create risk in the corrections environment.**

<u>Violence and sexual abuse investigations.</u> Staff working at correctional facilities reports allegations of serious incidents in prisons into TDCJ's Emergency Action Center (EAC), and EAC staff enters that information into the EAC database. OIG investigates incidents reported to the EAC that are criminal in nature, entering data on alleged criminal incidents such as sexual assaults into OIG's internal database. Separately, staff from TDCJ's Correctional Institutional Division (CID) enters allegations of certain incidents — including sexual abuse, violence, and extortion — into a database to launch an administrative investigation. These administrative investigations can result in TDCJ making decisions to ensure the safe functioning of correctional facilities such as job or housing changes or designating an inmate as an alleged perpetrator. TDCJ created this CID database for administrative investigations in 2020 because an audit found the previous process caused various reporting errors. Still, the current manual process requires significant staff time for data input and quality control. The process also requires frequent reviews to ensure an investigation does not fall through the cracks, and staff reports spending months reconciling data between the EAC database and CID's administrative database for an annual report because the data never align.

<u>Time scan application.</u> In 2024, TDCJ's IT staff built a time scan application for corrections staff intended to eliminate paper timesheets and overtime forms. While the agency has reduced its reliance on paper overtime forms, the application does not tie into the payroll system, requiring duplicative data entry that creates more opportunities for error. TDCJ leadership was interested in IT staff connecting the two systems, but the project would require a significant amount of IT staff resources and would likely be made obsolete by TDCJ's pending transition in the next biennium to the state's Centralized Accounting Payroll/Personnel System (CAPPS), again reflecting a scattershot planning and decision-making process.

> **Staff spends months reconciling data between databases for one report because the data never align.**

<u>Career ladder progression.</u> For all career ladder progressions beyond correctional officers, for whom promotions are based on months of service, TDCJ's HR staff must manually identify when an employee has hit the required minimum experience for a career ladder progression and check for any and all additional eligibility requirements. These requirements vary by position type, making it more difficult for staff to ensure they identify all employees who are eligible for career ladder progression. For other types

of merit increases, human resources staff must follow a similar process to identify eligible staff and cross reference all eligibility requirements. Automatic identification and notification of staff eligible for progression could assist with addressing the agency's dire retention rates and reduce HR staff workload.

- **The data system transition is not going well and on its own will not fix TDCJ's data problems.** As shown in the table, in preparation for its transition to CITS, TDCJ temporarily shifted from an outdated mainframe platform and DB2 database to a cloud-based system known as Micro Focus, which does not contain any significant changes to applications. CITS would also be a cloud-based system but would replace the majority of the inmate management applications, changing how TDCJ collects, stores, and uses data.

### TDCJ's Different Data Systems

| Old Data System: Mainframe | Current Data System: Micro Focus | Future Data Systems: CITS & CAPPS |
|---|---|---|
| • Hosted through a mainframe services contract with the Department of Information Resources. <br><br> • Used outdated COBOL programming. <br><br> • Some divisions of TDCJ also relied on access databases and web-based applications to supplement data on the mainframe. | • Cloud-based system. <br><br> • Represents a "lift and shift" of the mainframe, where applications were moved off the mainframe and housed in the cloud-based system. <br><br> • Some applications received minor changes, typically only when coding changes were necessary to ensure applications functioned in the cloud. <br><br> • An intermediary (and temporary) step necessary for the transition from the mainframe to CITS. <br><br> • Some discrete applications and Access databases are not housed on Micro Focus. | • Cloud-based systems. <br><br> • Represents a major overhaul of TDCJ's applications. <br><br> • Changes are intended to improve the usability of applications, reduce errors, decrease manual data entry, and increase communication between databases. <br><br> • In the long term, TDCJ plans for all operational applications and databases to be housed in CITS. <br><br> • TDCJ is planning for all financial and HR data to be housed in CAPPS or other cloud-based systems. |

TDCJ leadership hopes the transition to CITS will address many longstanding data issues and help modernize the agency, but the agency does not have a consistent strategic plan for identifying and fixing procedures that cause gaps and errors.

<u>Problematic transition delayed TDCJ operations.</u> A problematic first phase of the data system transition impeded operations for TDCJ, the Windham School District, and the Board of Pardons and Paroles (BPP), raising concerns that the agency is not adequately prepared for the more complicated shift to CITS or other modern centralized systems. The agency's contractors, which include Microsoft, told TDCJ's IT staff that the shift would not seriously disrupt TDCJ's operations, especially when compared to the much more in-depth overall shift that transitioning to CITS will entail. When TDCJ launched Micro Focus in early January 2024,

it had conducted 16 weeks of testing with 200 users and synced the data into the new cloud-based database several times. Yet when Micro Focus launched, it almost immediately crashed; the system could not handle the user load, and several technical issues presented further complications. Three months of troubleshooting passed before Micro Focus was largely working as intended, with four to five weeks of very limited functionality. During this period, TDCJ had to prioritize certain divisions' access to the agency's data systems used for daily operations while others had to rely on paper-based or other back-up processes for the entire period. Some classification and intake staff, who rely on daily access to applications to calculate inmates' sentences and whose duties are essential to the smooth functioning of inmate intake from county jail, described the rollout as a disaster and reported that the switch resulted in a significant slowdown in their work at a time when TDCJ was already struggling to keep up with the intake process.

Outlook of current phase unclear. Similar to the unexpected difficulties with the transition to Micro Focus, TDCJ has run into problems with the CITS transition. The project and its initial launch have been delayed. In the face of this unclear outlook, TDCJ must think systematically about how to improve its data management and analytics practices to support the staff who uses these systems daily. The agency must comprehensively think about what other changes in data management it needs to make instead of treating a new system as a catch-all solution.

> The transition to a new inmate management system is not going well.

Limited initial launch of CITS. While CITS could address some of TDCJ's data governance issues, the first phase of the launch will not be comprehensive, and TDCJ needs to plan for databases and processes that will not be a part of CITS for several years. Phase one of CITS is supposed to include a retooled inmate management system and replacement of some access databases, but many aspects of TDCJ's data will not be included in the initial launch. Perhaps most notably, parole is excluded from the initial phase of CITS, and the agency intends for an update of the parole data system to be part of the second phase. TDCJ will need additional appropriations to complete future phases of CITS.

## Sunset Staff Recommendations

### *Management Action*

### 3.1  Direct TDCJ to establish an office of modernization and strategic initiatives.

This recommendation would direct TDCJ to establish an office that would identify, prioritize, and implement initiatives aimed at modernizing the agency by December 31, 2025. This office would ensure TDCJ is consistently identifying the modernization needs of the agency, prioritizing the implementation of initiatives that are feasible and will have the largest impact on improving TDCJ operations, and ensuring collaboration across divisions to eliminate duplication of efforts. As part of this recommendation, TDCJ should locate its existing R&D Department — which often works to identify causes of complex problems within TDCJ and propose novel solutions — under this office. The office should perform the following duties:

- Work with TDCJ's divisions and executive leadership to identify potential strategic initiatives or other modernization efforts the agency can undertake.

- As appropriate, coordinate with external entities such as BPP, Windham, Community Supervision and Corrections Departments, court systems, and other relevant stakeholders to identify opportunities for collaboration on modernization efforts and other strategic initiatives that can improve the functioning of Texas' correctional system.

- Work with executive leadership to prioritize the implementation of strategic initiatives based on the impact they will have on staff resources and the agency's capacity to implement the initiative.

- Consult with TDCJ's IT staff on any initiatives that may include an IT component to ensure the agency has sufficient resources to implement the strategic initiative.

- Assist in the coordination of the implementation of strategic initiatives and modernization efforts across divisions.

- Track the implementation of all active strategic initiatives.

- Deliver recommendations on how TDCJ could solicit outside researchers to work on targeted projects that would benefit the agency as well as how the agency can better leverage ongoing relationships with research entities.

### 3.2    Direct TDCJ to develop a plan to prioritize improving its data collection and analysis, focusing on correctional and parole functions.

This recommendation would direct TDCJ staff, in coordination with the agency's board, to develop a plan to improve the agency's data collection, quality, management, analysis, and proper designation of master data sets. This recommendation would help the agency reduce burden on staff by identifying and prioritizing data collection and analysis processes that can be easily improved and require significant staff time. This recommendation would also help agency operations by identifying and improving data collection processes that frequently lead to inaccurate data. In developing this plan, TDCJ should consult with correctional and parole staff regarding what data and potential tools could improve both their day-to-day work and the agency's ability to make strategic decisions over the long term. TDCJ should consider what data problems the agency expects to be addressed by CITS and identify any process improvements the agency can implement now. TDCJ should annually update this plan to include changes to data collection and analysis practices as well as changes to the agency's data management systems. TDCJ staff should present this plan and its annual updates to the agency's board for comments and approval. TDCJ should complete the first version of this plan by September 1, 2026, and present it to the board at the next board meeting.

### 3.3    Direct TDCJ to establish and maintain a report that enables users to view an array of indicators on prison health and safety.

The report should include but not be limited to staffing levels, assaults, uses of force, contraband discoveries, and self-harm events. This report should allow users to select a specific correctional facility, facility type, or region or to view indicators statewide. TDCJ should use information from existing reports to create this comprehensive view of prison performance indicators. This recommendation would allow TDCJ executive staff, regional staff, and leadership at correctional facilities to easily identify trends, including concerning changes in indicators that may be evidence of problems or challenges the agency needs to address. As a part of this recommendation, TDCJ should develop a visual dashboard to display these

indicators. This dashboard should be publicly available on the agency's website for indicators the agency determines would not represent a risk to the safety and security of prisons, staff, inmates, or the public. This dashboard should be updated on a regular basis to reflect current conditions in facilities.

### 3.4   Direct TDCJ to establish administrative directives for the data governance program plan established by the Data Management Office.

This recommendation would direct TDCJ to establish the following governing bodies suggested in the data governance program plan: Data Governance Operations, Data Governance Council, and Data Governance Executive Committee. This recommendation would ensure a more coordinated assessment of TDCJ's data governance needs. As part of this recommendation, TDCJ should establish written administrative directives which delineate the duties and compositions of these three governing bodies, as guided by the data governance program plan and Data Management Office. These administrative directives should include guidance on how often each of these governing bodies should meet. Until the data governance council is established and meeting regularly, representatives from TDCJ's Data Management Office, statistical section, and R&D would be directed to meet at least quarterly to review existing data governance initiatives, determine the necessary collaboration and coordination between divisions on data governance issues to reduce duplication of effort and data errors, and identify any emergent or urgent data governance needs for the agency.

### 3.5   Direct TDCJ to develop a written plan to phase out paper-based processes, reduce manual data processes, and identify opportunities for automation.

As a part of this recommendation, TDCJ should prioritize paper-based processes that can be phased out with TDCJ's existing technology and identify processes that require significant staff resources to support. Additionally, TDCJ should focus on making available common processes such as the I-60, inmate grievances, and ombudsman complaint forms on inmate tablets and maintain paper-based processes only for the few inmates who are not given tablets or cannot use them. This recommendation would increase the efficiency of these processes for the agency and its staff by reducing the number of lost forms and human errors endemic to the current system. Placing forms or establishing processes on inmate tablets would also make it easier for TDCJ to centrally store and analyze data from these forms. This plan should also study what staff positions and duties could be eliminated through these efficiencies and the savings that could be generated for the agency. When considering what processes to digitize or automate, the agency should prioritize processes that would have the greatest impact on reducing staff duties while requiring limited resources to implement. The agency should also prioritize processes that would not be digitized or automated by the transition to CITS or another data management system such as CAPPS to avoid duplication of effort.

### 3.6   Direct TDCJ to evaluate its process for reviewing external research requests.

TDCJ should evaluate its process for reviewing external research requests and document what factors the agency will use to determine if the requests would provide value to the agency and if the agency has the capacity to accommodate the research. TDCJ should publish these factors on its website. TDCJ should also establish a process for identifying discrete research questions the agency has an interest in and soliciting outside researchers to help the agency answer these questions. As a part of this recommendation, TDCJ should explore the creation of an IRB to help the agency establish a more objective process for vetting research proposals and protecting human research subjects. As part of this recommendation, TDCJ should consult with HHSC and DSHS on the makeup and duties of their IRBs.

## Fiscal Implication

These recommendations would not have a fiscal impact to the state, and TDCJ could implement them with existing resources. Certain initiatives the office of modernization and strategic initiatives might implement and the plan to eliminate paper-based processes would likely include upfront costs but could also lead to long-term savings for the agency.

---

[1]    Texas Department of Criminal Justice, "External Research," accessed online September 1, 2024, https://www.tdcj.texas.gov/divisions/eas/external_research.html.

[2]    Texas Health and Human Services Commission (HHSC), "Institutional Review Board (IRB2)," accessed online August 28, 2024, https://www.hhs.texas.gov/about/records-statistics/institutional-review-board-irb2; HHSC "Institutional Review Board," accessed online August 28, 2024, https://www.dshs.texas.gov/sites/default/files/irb/IrbPolicy.pdf; Florida Department of Juvenile Justice, "Institutional Review Board (IRB) Requests, accessed online August 28, 2024, https://www.djj.state.fl.us/research/institutional-review-board-irb-requests; North Carolina Department of Public Safety, "A Guide to the Research Approval Process," accessed online August 28, 2024, https://www.ncdps.gov/rpguide/download.

[3]    Washington State Department of Social and Health Services, "Human Research Review Section," accessed online August 28, 2024, https://www.dshs.wa.gov/ffa/human-research-review-section.

[4]    All citations to Texas statutes are as they appear on http://www.statutes.legis.texas.gov/. Section 2054.137, Texas Government Code.

# ISSUE 4

## The State Lacks Sufficient Oversight and Strategic Planning for Inmate Rehabilitation Programs.

## Background

In the 1990s, the Legislature altered the mission of the Texas Department of Criminal Justice (TDCJ) to eliminate any mention of punishment and instead directed TDCJ to promote positive change in inmate behavior through rehabilitation and reintegration efforts.[1] As reflected in this revised mission, most inmates do not serve life sentences and instead return to the community after a finite period of time. The Board of Pardons and Paroles (BPP) ultimately decides whether an inmate is sufficiently rehabilitated to release, but TDCJ is responsible for rehabilitating and preparing inmates to safely and successfully reenter those communities.

This shift in purpose is also reflective of a watershed moment in national correctional research circles that swung approaches to rehabilitation programming from a "nothing works" approach to an evidence-based and evidence-informed understanding that rehabilitation programming with therapeutic integrity has discernible and measurable impacts, both in terms of increased public safety and cost-reduction outcomes.[3] The 2006 Sunset review of TDCJ reinforced this point by finding that TDCJ could not adequately address inmate rehabilitation needs and achieve cost-saving recidivism reduction outcomes without a significant investment by the state in rehabilitation and reentry programming.[4] Today, this rehabilitation and reintegration mission is primarily carried out by three entities: TDCJ's Rehabilitation Programs Division (RPD) and Reentry and Integration Division (RID), and Windham School District.

> ### TDCJ Rehabilitation and Reentry Programs
>
> - **Required parole-voted programs.** BPP can require rehabilitation programming such as substance use treatment or sex offender treatment prior to an inmate's release on parole.
>
> - **Required ITP programs.** Statute requires TDCJ to establish an individual treatment plan (ITP) for each inmate that includes a plan for and record of an inmate's institutional progress. As part of this plan, TDCJ identifies rehabilitation and reentry program needs based on risks and needs assessments.[2]
>
> - **Elective TDCJ-led programs.** TDCJ offers a wide variety of elective rehabilitation and reentry programming, including faith-based, behavioral change, and substance use treatment programs.
>
> - **Elective volunteer and peer-led programs.** Volunteers develop and lead many programs within TDCJ facilities. Many rehabilitation programs are also led by inmates, referred to as peer-led programs. Examples of these programs include faith-based, anger management, and peer recovery support programs.

Separate from Windham's education courses, TDCJ offers a variety of rehabilitation programs, participation in which may be required for some programs and voluntary for others, as explained in the textbox. The Legislature appropriated over $191 million annually for rehabilitation, reentry, and education programming in the correctional setting in fiscal years 2024 and 2025.[5]

## Findings

**TDCJ's failure to comprehensively inventory and evaluate rehabilitation programs poses a risk to individuals who are incarcerated and the communities to which they will return.**

TDCJ provided various estimates — ranging from 97 to 3,000 — for the number of its rehabilitation programs.

- **No comprehensive program inventory.** TDCJ does not maintain a comprehensive list of active rehabilitation programs or program enrollments, limiting TDCJ's oversight of programs operating within its facilities. During the review, TDCJ staff provided various estimates — ranging from 97 to 3,000 — of the number of active rehabilitation programs operating within its facilities. However, because the agency does not maintain a comprehensive program inventory, the agency could not provide a definitive count. After numerous requests, TDCJ provided Sunset staff with a list of 672 distinct programs six days before publication of this report. Of those programs, TDCJ tracks only a fraction of program enrollments, focusing mainly on parole-voted and individual treatment plan (ITP) programs. Most notably, TDCJ staff said the agency does not monitor volunteer- or peer-led programs, going so far as to say these programs are impossible to track or control. The agency does not distinguish between programs claiming rehabilitative and reentry effects and programs with less measurable goals, the latter of which applies to many volunteer- and peer-led programs. In contrast, other states such as Washington require corrections agencies to maintain updated program inventories and submit evaluative reports of programs claiming rehabilitative or reentry effects to their legislatures to ensure sufficient program oversight and effective use of state dollars.[6]

- **Limited program evaluation.** While statute requires TDCJ to maintain a program evaluation capability to determine the effectiveness of rehabilitation and reintegration programs and services, the agency does not comprehensively assess rehabilitation programs and cannot demonstrate programs are effective in reducing recidivism and improving reentry outcomes.[7] As explained in the accompanying textbox, previous Sunset reviews have found that TDCJ and Windham should routinely evaluate all education and rehabilitation programs to ensure they effectively reduce reincarceration and parole revocation.[9] However, while TDCJ routinely evaluates a select sample of rehabilitation programs, the agency does not evaluate most programs, including some parole-voted and ITP-required programs, and instead produces a biennial report that includes evaluations of just 13 programs. While some volunteer- and peer-led programs may not claim rehabilitative or reentry effects and may not be appropriate to evaluate, many other

### Previous Sunset Findings

In 2006, the Sunset Commission found TDCJ should conduct routine program evaluations of all rehabilitation programs designed to reduce reincarcerations and revocations and report the findings to the Legislature.[8] Since then, TDCJ has evaluated a select sample of rehabilitation programs biennially.

In 2013, the Sunset Commission also found Windham could not prove its programs reduced recidivism or incarceration costs or improved inmate behavior or employability because it did not consistently evaluate the effectiveness of its programs.[10] As a result, the Legislature required Windham to conduct biennial program evaluations to measure whether its academic, career and technical, and life skills programs reduce recidivism and meet its other statutory goals.[11] Windham published its first biennial report in 2015 and has since partnered with various universities to conduct descriptive statistical and correlational analyses of programming to help produce the report.[12]

agency-, volunteer-, and peer-led programs allege these effects without research-informed or research-based evaluations to support these claims.

Additionally, TDCJ's program evaluation criterion is restricted to recidivism rates despite research suggesting that other metrics, such as prison misconduct, post-release employment rates, and cost avoidance, also determine correctional program performance.[13] Unlike TDCJ, Windham evaluates programs based on a wide range of metrics, as described in the *Windham Statutorily Required Program Evaluation Metrics* textbox.[14] While RPD's mission expressly contemplates providing "evidence-based rehabilitation programs," the scant number of programs TDCJ actually evaluates suggests the agency is not meeting this part of its mission.[15] TDCJ has conducted risk assessments and strengths, weaknesses, opportunities, and threats (SWOT) reviews for some of its other programs; however, the agency did not provide evidence that these assessments include evaluations of program effectiveness or public safety impacts. Moreover, without ongoing evaluation of all programs claiming rehabilitative or reentry effects to determine which rehabilitation programs work, TDCJ and the Legislature cannot allocate resources accordingly.

> **Windham Statutorily Required Program Evaluation Metrics**
>
> - Institutional disciplinary violations
> - Subsequent arrests, convictions, or confinements
> - Cost of confinement
> - Educational achievement
> - High school equivalency examination passage
> - Type of training services provided
> - Type of employment obtained upon release
> - Whether employment was related to training
> - Difference between earnings on the date employment is obtained following release and earnings on the first anniversary of that date
> - Employment retention factors

- **Adverse program outcomes.** Rather than ensuring program efficacy, TDCJ takes an "any programming is better than none" approach, focusing on operating as many distinct programs as possible and encouraging widespread inmate participation regardless of program effects. During the review, Sunset staff learned that part of the logic of this approach is to keep inmates occupied, thereby reducing prison disturbances and increasing institutional safety. While correctional professionals and researchers have long recognized that limiting idle time does sustain safer prisons, this is not the primary goal of rehabilitation programs and does not absolve TDCJ of basic program oversight responsibilities.[16] Established research shows correctional programs lacking evidentiary basis and effective implementation decrease recidivism reduction effects, wasting state dollars that could be spent on more effective rehabilitation programs and risking adverse outcomes in the process.[17]

TDCJ's limited program evaluations demonstrate a wide range of program outcomes, from high levels of efficacy to consistent underperformance. The agency's biennial rehabilitation programs report assesses program outcomes by comparing two- and three-year recidivism rates of program participants against recidivism rates of comparison groups that are selected based on their similarity to the program completers. The table in Appendix J shows the difference in recidivism rates between program participants

and comparison groups as presented in TDCJ's rehabilitation reports since fiscal year 2013. Some programs, such as the In-Prison Therapeutic Community and the DWI program, have demonstrated effectiveness by yielding consistent decreases in recidivism rates for a decade. Likewise, the Prison Fellowship Academy, a faith-based rehabilitation program formerly known as the Innerchange Freedom Initiative, has had reduced or neutral recidivism effects across most years.[18]

> Some programs are so ineffective that participants are more likely to reoffend than nonparticipants.

In contrast, the Pre-Release Substance Abuse Program (PRSAP), an ITP and parole-voted program, has had consistently higher rates of recidivism among program participants since at least the last Sunset review, meaning participation in this program is at best ineffective and at worst may be so harmful as to increase the likelihood of recidivism. Going back even further, a 2007 report from the State Auditor's Office found that inmates who completed PRSAP were slightly more likely to be re-arrested or re-incarcerated within two years of release than nonparticipants.[19] Over the last 10 years, BPP has required over 20,000 individuals to complete PRSAP prior to release on parole. In 2020, TDCJ altered the curriculum and structure of this program to address the program's consistent underperformance. TDCJ has not yet evaluated the recidivism effects of the revised program but will conduct this evaluation in fiscal year 2025.

Adverse outcomes are not necessarily due to flaws in curriculum or instruction and may be attributed to program implementation. TDCJ staff reported PRSAP enrollments are more than double what they should be to achieve optimal program outcomes. Research supports this explanation, suggesting even programs with strong theoretical foundations often fail due to shortcomings in program implementation.[20] Other programs, such as the Serious and Violent Offender Reentry Initiative (SVORI), also yield adverse program outcomes according to TDCJ's evaluations. External research shows SVORI to be an efficacious, cost-effective program when administered in other states, with a 90 percent chance the program will produce benefits greater than program costs.[21] Continued program evaluation following program modifications is necessary to determine why PRSAP and SVORI consistently underperform within TDCJ facilities.

> One program's enrollments are more than double what they should be to achieve optimal outcomes.

In contrast, statute requires Windham to not only evaluate the effectiveness of its programs but also adjust programs as necessary.[22] Windham complies with this requirement by including in its biennial report a detailed list of program changes following program evaluations.[23] TDCJ should similarly use program evaluation results to modify and improve rehabilitation programs.

- **Abdication of responsibility for program outcomes.** During the review, TDCJ and BPP have denied responsibility for rehabilitation program outcomes even as both agencies make decisions annually affecting tens of millions of state rehabilitation programming dollars. Multiple TDCJ staff stated program outcomes and efficacy are not the agency's responsibility, arguing instead that rehabilitation programs work if the inmate "wants

it to work." For its part, BPP staff suggested that TDCJ, not BPP, has the expertise to assess inmate rehabilitation progress and needs despite BPP's statutory responsibility to consider an inmate's "progress in any programs" when making parole decisions.[24] BPP also determines whether rehabilitation programming is needed prior to release on supervision and has required over 130,000 individuals to complete programming prior to release since fiscal year 2015. Although BPP staff has recently started learning more about TDCJ's rehabilitation programs, Sunset staff found parole voters have limited awareness of options and outcomes of RPD, RID, and Windham programs, suggesting BPP would benefit from more regular communication with these entities. Statute requires BPP to release an inmate only when a parole panel believes an inmate is able and willing to fulfill the obligations of a law-abiding citizen and if the release will not increase risk to the public.[25] Moreover, BPP's vision statement emphasizes its role in maximizing the "restoration of human potential," but the agency cannot fulfill its statutory responsibilities or self-imposed vision without holding both TDCJ and itself accountable for rehabilitation programming.[26]

> Parole voters have limited awareness of program options and outcomes.

**Insufficient strategic planning and oversight results in a costly and inefficient approach to programming that strains resources and limits rehabilitation opportunities prior to release.**

RPD, RID, and Windham are all responsible for rehabilitation and reentry programs but lack a cohesive strategy guiding program administration, oversight, and resources throughout the correctional system. This approach creates avoidable and costly oversight issues.

- **Lack of program strategy and alignment.** The current rehabilitation and reentry program structure requires significant levels of cooperation and coordination between RPD, RID, and Windham to succeed. However, inefficient processes and a lack of cooperation among the entities results in program redundancies and overlaps, wasting resources and confusing inmates and staff alike.

  <u>RPD and RID.</u> Both of these TDCJ divisions offer rehabilitation and reentry-targeted programming, but only RID has specialized medical and program oversight expertise that allows this division to manage the Texas Correctional Office on Offenders with Medical or Mental Impairments (TCOOMMI). RID is also statutorily required to evaluate reentry and reintegration programs and services and publish these findings in a biennial report.[27] RID internal policy requires intensive oversight of TCOOMMI programs and contracted services through monthly and quarterly program performance reporting and compliance reviews and audits.[28] RPD has no such expertise in facilitating or conducting program evaluations. Combining these divisions would yield greater program alignment and oversight, both in terms of program outcomes and cost effectiveness.

  <u>Postsecondary education.</u> RPD is unable to dedicate sufficient resources to effectively administer the postsecondary education program and capitalize

> Inefficient processes and a lack of cooperation results in program redundancies and overlaps.

on expanded Pell Grant opportunities. Therefore, the program would be better placed at Windham. Research shows that inmates who participate in education programs while incarcerated are 43 percent less likely to reoffend and have a 13 percent higher likelihood of obtaining employment upon release than non-participants. Moreover, the direct costs of education in corrections environments are much lower than the costs of reincarceration, making secondary and postsecondary education a critical rehabilitative investment.[29] In Texas' system, these functions are split, with Windham administering secondary education and RPD administering postsecondary.

**Windham School District is well-suited to offer postsecondary education instead of TDCJ.**

However, RPD has limited resources to dedicate to postsecondary programming, with only three staff responsible for an average of nearly 7,000 annual program enrollments over the last five years. RPD relies on Windham to provide both classroom space for postsecondary courses and pre-enrollment academic advising. RPD staff also lacks the educational expertise of Windham staff. The federal and state reinstatement of Pell Grant eligibility for inmates in July 2023 has underscored how RPD lacks the resources to guide institutions through the verified prison education program process under the new Pell Grant requirements, risking the waste of funding opportunities and potential increased recidivism.[30]

- **Costly parole-voted program placement timelines.** TDCJ's lack of systemwide strategic planning around programming results in the agency needing a lengthy amount of time to place inmates in parole-voted programs. These protracted placement times limit rehabilitation opportunities prior to release and unduly extend parole-voted release timelines, costing the state tens of millions of dollars by having TDCJ continue to house, feed, and provide health care to individuals who would otherwise be released.

<u>Insufficient strategic planning drives program placement times.</u> Lack of oversight and strategic planning limits TDCJ's ability to expand capacity for parole-voted rehabilitation programs. During the review, TDCJ staff acknowledged that many rehabilitation programs are duplicative, spreading resources thin while creating lengthy program placement timelines for select programs. Although TDCJ has successfully reduced wait times in some areas, the agency has struggled to replicate that success across the system. For example, while TDCJ has eliminated DWI program waitlists by front-loading these programs, average program placement times for another similar substance use program — the Pre-Release Therapeutic Community Program — averaged over 146 days in fiscal year 2023.

**Average program placement times for one substance abuse program averaged over 146 days.**

TDCJ staff indicates that, even with the risks and needs assessments it uses for parole-voted program placements, many low-risk inmates take up limited program space in programs they may not actually need because most programs are built for high-risk individuals. This practice creates an overreliance on specific intensive therapeutic programs, which leads to long program placement timelines and avoidable adverse outcomes resulting from programs exceeding ideal capacity. In response to this problem, TDCJ began piloting a substance use education program in July 2024 that aims to

better address the needs of low-risk inmates with parole-voted programming requirements, reserving space in intensive substance use programs for inmates with higher assessed risks and needs. However, TDCJ does not assess its programming offerings more globally to determine whether other programs would benefit from both consolidation and a tiered approach within a limited set of proven programs.

With increased oversight and a clear strategic plan, TDCJ could assess whether the agency is making the best use of limited program resources such as licensed treatment providers and ensuring parole-voted program waitlists and program placement times are limited. TDCJ would also be able to evaluate opportunities to expand program capacity and eligibility by incorporating technology-based solutions. TDCJ is already experimenting with this approach through its non-parole-voted In-Prison Substance Use Treatment Program, a voluntary program led virtually by a licensed chemical dependency counselor.

Impact of program placement timelines on parole decisions. The information TDCJ provides to BPP about program placement timelines impacts BPP's decisions around rehabilitation programs, in some cases creating potential risk to the public when inmates are released without first receiving programming. When BPP voters conditionally approve someone for parole pending completion of rehabilitation programming, BPP voters generally select a start date on which the inmate will begin a BPP-specified program. BPP policy directs voters to select a start date that provides TDCJ time to place the inmate in programming, essentially creating a buffer between the date of BPP's approval vote and the specified date by which TDCJ should place the inmate in the designated program.[31] This buffer is based on the minimum amount of time TDCJ reports it needs to transfer inmates to a facility where the BPP-voted program is offered as well as reported program waitlists based on program capacity and demand. TDCJ provides a monthly report on program capacity and waitlists to BPP, the length of which are often reported to be under 30 days. However, actual average program placement times ranged as high as 146 days in fiscal year 2023. In fiscal year 2023, this BPP-established buffer between the parole vote and the BPP-voted program start date averaged 64 days, or a little over two months. BPP voters report including a two-month buffer is standard practice.

Following the parole decision, the inmate must remain confined until program completion and passage of the BPP-voted "release no earlier than" date, the earliest date TDCJ can release an inmate following program completion. If an inmate completes the program early, BPP voters can adjust this "release no earlier than" date.[32] However, as noted above, program placements often extend beyond the BPP-specified program start date. BPP voters select "release no earlier than" dates based on the built-in placement buffer and the program length. For example, if BPP voters determined an inmate needed to complete a six-month rehabilitation program prior to release on parole, they would specify a program start date two months

TDCJ places low-risk inmates in programs designed for high-risk inmates.

BPP builds in extra time to account for TDCJ's ability to get inmates into programming.

from the parole vote to account for the placement buffer and a "release no earlier than" date six months after the program start date, creating a minimum eight-month release timeline.

This timeline proves particularly challenging for discretionary mandatory supervision-eligible inmates with projected release dates. Projected release dates place a clock on BPP decisions by requiring the inmate to complete BPP-voted programming prior to the projected release date.[33] The combined impact of program placement buffers and delays beyond BPP-specified program start dates limits the programming an inmate can realistically complete before the projected release date, sometimes resulting in inmates who are released without completing programming. While BPP still has the option to attach post-release supervision conditions related to programming, this approach limits rehabilitation opportunities prior to inmate release — an outcome with which BPP voters expressed dissatisfaction to Sunset staff. Moreover, as Issue 5 explains, post-release supervision conditions create considerable challenges for the parole officers responsible for monitoring individuals released from confinement to TDCJ supervision in the community.

| Parole-voted program placement practices cost the state over $588.5 million between FYs 2015-23. |

Lengthy program placement timelines. BPP-specified program start dates consider the time that TDCJ reports is needed to place inmates in programming. However, TDCJ does not assess program placement timelines and associated costs for all program placements to understand the actual burden of the time it takes to get inmates into programming. Sunset staff analyzed TDCJ-provided data related to program placements for fiscal years 2015-23 by evaluating both average program placement and aggregate total placement times. The Sunset staff analysis found parole-voted program placements cost the state over $588.5 million between fiscal years 2015-23 based on the LBB-assessed cost per day and the actual days lapsed between the parole vote and actual program placement, year by year. Overall program placement times averaged between 50-60 days for fiscal years 2022 and 2023. As shown in the chart, the annual cost of parole-voted program placements for fiscal years 2022 and 2023 was $78.6 million and $75.7 million, respectively. This cost calculation only includes the cost to house, feed, and provide medical care to these inmates based on the number of days lapsed between a parole vote and actual program placement.



**Annual Cost of Parole-Voted Program Placement Timelines\* FYs 2015-23**

Total: $588.5 Million

* Costs include program placements within the TDCJ-established placement buffer and delayed placements beyond BPP-voted start dates.

Sunset Advisory Commission                                    September 2024

As shown in the chart, *Comparison of Average Parole-Voted Buffer Times and Actual Placement Times*, on average TDCJ places individuals as close to the end of the BPP-voted buffer time as possible because it sees little reason to place individuals sooner. Sunset staff learned TDCJ has long held that the agency is not required to ensure individuals enroll in programming as soon as possible or even that inmates complete parole-voted programming prior to their release eligibility date precisely because it is a "release no earlier than" date, not a required release date. However, TDCJ bears the cost of these lengthy program placement timelines when it cannot afford to do so. As Issue 1 and Issue 2 explain, TDCJ's bed capacity is strained by its staffing and retention problem, and lengthy programming placements come at a monetary cost of tens of millions of dollars every year. These costs could be reduced with increased oversight and strategic planning around rehabilitation programs.



**Comparison of Average Parole-Voted Buffer Times and Actual Placement Timelines FYs 2015-23**

■ Average Length of Actual Parole-Voted Program Placement Timelines
■ Average Length of Built-In Parole-Voted Buffer Times

<u>Parole-voted program placement delays.</u> TDCJ does not track reasons for parole-voted program placement delays beyond BPP-voted program start dates, further limiting the agency's ability to plan strategically for rehabilitation programming. The accompanying chart shows average program placement delays beyond BPP-voted start dates for fiscal years 2015-23. Eight days before the publication of this review, TDCJ acknowledged the existence of program placement delays, reporting overall average program placement delays of approximately 45 days. The averages shown in the chart are based on combined program placement delays rather than individual program placement delay averages, which ranged as high as 69 days beyond the BPP-voted start date for fiscal year 2023. As discussed previously, BPP already calculates program start dates by including a buffer based on TDCJ's reported program placement times, meaning TDCJ influences specified program start dates yet still neglects to comply with its own reported timelines.



**Average Length of Parole-Voted TDCJ Program Placement Delays, FYs 2015-23**

In contrast, Windham's average placement delays into its parole-voted Changing Habits and Achieving New Goals to Empower Success (CHANGES) program averaged zero days for every year between fiscal years 2015-23. During this time period, Windham placed nearly 33,000 parole-voted inmates in this program, or 25 percent of all parole-voted inmates. As shown in the *Parole-Voted Program Enrollments* chart, CHANGES enrollments exceeded all other individual program enrollments for fiscal years 2015-23. On average, Windham placed parole-voted inmates in CHANGES within three days of a parole vote. While the CHANGES program requires a certified teacher rather than a licensed counselor like many other programs, Windham's strategic planning and oversight effectively shorten program placement timelines. Windham has invested in extensive instructor cross-training to ensure this program is offered at the majority of its 98 campuses, eliminating the need for unit transfers and expanding program capacity and access. Windham also continuously tracks program capacity, placement, and vacancies and meets with principals annually to discuss changes in inmate population needs at each campus.

### Parole-Voted Program Enrollments
### FYs 2015-23



| Program | Enrollments |
| --- | --- |
| CHANGES: Life Skills Program | 32,729 |
| In-Prison Therapeutic Community | 31,084 |
| Pre-Release Substance Abuse Program | 20,139 |
| Pre-Release Therapeutic Community | 11,550 |
| DWI Program | 9,118 |
| Sex Offender Treatment Program, 9 months | 9,012 |
| Sex Offender Education Program | 6,394 |
| Life Skills | 3,844 |
| Female Cognitive Pre-Release Program | 3,524 |
| Serious and Violent Offender Reentry Initiative | |
| Innerchange Freedom Initiative | |
| Sex Offender Treatment Program, 18 months | |
| Voyager: Life Skills Program | |
| Pre-Release Behavioral Change Program | |

Even so, program placement delays may occur due to reasons beyond TDCJ's control, as explained in the textbox on the following page. However, TDCJ staff confirmed program placement delays without extenuating circumstances occur regularly, but because TDCJ does not track reasons for these delays, it cannot determine underlying causes or opportunities

to reduce these delays. As shown in the chart below, parole-voted program placement delays cost the state over $133.1 million between fiscal years 2015-23, or 22 percent of the overall cost to place inmates in parole-voted programming. Program placement delays cost $25.7 million and $19.6 million for fiscal years 2022 and 2023, respectively. Sunset staff witnessed one case in which an inmate had exceeded a parole-voted start date by 174 days with no extenuating circumstances and was still pending placement, bypassing the "release no earlier than date." That one individual situation cost the state approximately $13,483 as a result. The $133 million cost of program placement delays calculation does not include actual program costs or the costs per day once TDCJ placed an inmate in programming. The calculation is instead limited to the cost to house, feed, and provide medical care to these inmates based on the number of actual days lapsed between the parole-voted start date and actual program placement.[34] Until TDCJ tracks the reasons for program placement delays, the agency will be unable to control or reduce placement delay-driven costs and capacity impacts or better understand where extenuating circumstances exist.

### Extenuating Circumstances

A 2020 audit conducted by TDCJ's Internal Audit Division found, of a sample of 3,388 inmates voted into TDCJ and Windham parole-voted programs, the two entities collectively placed 26 percent in programming after the BPP-voted start date. The audit evaluated a sample of 200 of these delayed placements and found 73 percent were delayed due to extenuating circumstances such as bench warrants, temporary medical restrictions, or enrollments in college or career and technical courses.

However, it is unclear why these extenuating circumstances would result in such significant program placement delays for TDCJ programs alone; as noted, Windham program placements do not experience the delays seen in TDCJ-administered programming. Furthermore, this audit did not separately analyze TDCJ and Windham program placements, obscuring the impact of extenuating circumstances on parole-voted program placement delays for each entity.



**Annual Cost of Parole-Voted TDCJ Program Placement Delays, FYs 2015-23**

**Total: $133.1 Million**

### Lack of ITP and parole-voted program processes force BPP voters to make parole decisions based on incomplete information.

- **No ITP program criteria or processes.** ITPs provide limited program information and listings despite statute requiring TDCJ to include in ITPs comprehensive program participation information.[35] This provision

resulted from a 2013 Sunset Commission directive that TDCJ use the ITP to comprehensively capture an inmate's risks and needs information and their participation in all state-funded and volunteer programs.[36] Moreover, TDCJ lacks criteria for determining which programs to list on the ITP as required. TDCJ staff was unable to explain why the agency considered some programs ITP programs, noting only that ITP programs are "evidence-based" even when the program had never been evaluated or had proven ineffective. Statute also requires TDCJ to submit the ITP when BPP considers an inmate's case for release, indicating the ITP is meant to help inform BPP's parole decision making.[37] As discussed in Issue 6, BPP's inadequate case summary and parole interview processes mean BPP relies on TDCJ to provide and highlight information about effective rehabilitation programming to make informed evaluations of an individual's rehabilitative progress, determine whether to approve parole, and determine whether to require rehabilitation programming prior to release. While TDCJ should make a distinction between evidence-based and non-evidence-based programs when identifying ITP program needs and communicating rehabilitation progress to BPP, statute clearly directs TDCJ to provide a complete list of rehabilitation program participation to BPP as part of the ITP.

**ITPs provide limited information despite statute requiring them to include comprehensive program participation information.**

- **No parole-voted program criteria or processes.** Neither BPP nor TDCJ have clear criteria or processes for adding or removing programs from the parole-voted programs list, which potentially subjects inmates to ineffective or harmful programming. BPP rules outline parole-voted programming options, but neither agency maintains a corresponding policy dictating which programs are eligible to be considered parole-voted in the first place or provide any reasoning or criteria that determines why some programs are considered parole-voted programs over others.[38] BPP defers to TDCJ on programming decisions, including which programs are considered parole-voted programs, without ensuring programs are efficacious or necessary. While BPP cannot control TDCJ's program evaluation process, it still needs to account for removing programs found to be ineffective or adding programs based on changing circumstances.

### TDCJ would benefit from increased oversight and better strategic management of volunteer programs.

- **Limited evaluation of volunteer programs.** Volunteers play a vital rehabilitation role within TDCJ facilities but have insufficient oversight, creating risk for TDCJ and the public. Additionally, TDCJ staff acknowledged during the review that the agency could be more strategic in its use of volunteers by encouraging volunteers to execute or support existing programs rather than create new ones. However, the agency does not sufficiently evaluate volunteer programs and rarely denies volunteer program requests. As of fiscal year 2023, TDCJ had around 27,500 registered volunteers.

Given the potential for poor programming to have adverse effects, such as increasing the likelihood of recidivism, insufficient oversight of prison volunteer programs also presents considerable risk. While RID thoroughly assesses volunteer-led programs for veterans prior to implementation, RPD has largely subjective requirements for volunteer-led programs. In fiscal year 2023, TDCJ approved 274 new volunteer programs and denied eight program proposals — a denial rate of only 2.8 percent.

This approach is a stark departure from TDCJ's attitude toward external researchers requesting to conduct research in TDCJ facilities, proposals that go through rigorous evaluation. In the last three years, TDCJ has denied 33 of 48 received research requests, a denial rate of 69 percent, mostly due either to what TDCJ asserts was a lack of value to the agency or the strain these researchers would put on TDCJ facilities and staff. However, in fiscal year 2023 alone, volunteers logged almost 204,000 volunteer hours within TDCJ facilities — a staggering number that no doubt both benefits TDCJ and places a demand on staff time. These cost-benefit effects are not dissimilar to those associated with allowing qualified individuals to conduct research that could help inform TDCJ operations without cost to the state.

> TDCJ has largely subjective requirements for volunteer-led programs.

- **Insufficient oversight.** TDCJ has limited visibility into and an acknowledged inability to control the activities of volunteers and the content of volunteer-led programs. Statute requires TDCJ wardens to identify volunteer and faith-based organizations that facilitate inmate programming and submit an annual report to the agency's board summarizing the volunteer and faith-based programs within the facility they oversee.[39] Wardens do not regularly submit this report and instead are better served by focusing on key duties. However, an annual report to the agency's board summarizing volunteer and faith-based programs would help ensure accountability if handled not by wardens but by a division already responsible for overseeing volunteers and volunteer-led programs. By soliciting input from wardens on volunteer program needs, TDCJ could better ensure each facility still benefits from volunteer and faith-based programs and better prevent the continued operation of programs that have adverse outcomes.

> TDCJ is unable to control the activities of volunteers and the content of volunteer-led programs.

## Sunset Staff Recommendations

### *Change in Statute*

**4.1  Require TDCJ to comprehensively inventory rehabilitation and reentry programs, conduct biennial program evaluations, and recommend changes to programs when needed.**

This recommendation would require TDCJ to develop and maintain an inventory of active programs, provide oversight of the programs offered within TDCJ facilities, and use this information to improve program offerings. TDCJ's inventory would cover volunteer and peer-led programs and include the following information: program goals, program capacity and enrollments, and units where the program is offered. This inventory would be updated continuously and made publicly available on TDCJ's website to ensure sufficient program oversight and accountability of active program offerings.

As part of this recommendation, TDCJ would be required to work with qualified researchers — internal or external — to develop criteria for programs claiming to have rehabilitative or reentry effects and use these criteria to evaluate these programs. TDCJ would be required to then collect results-based performance data for all programs claiming to have rehabilitative or reentry effects, including volunteer and peer-led programs, and evaluate whether the programs are meeting the agency's established criteria. TDCJ would be required to collect and analyze data related to institutional disciplinary violations, rearrests, reincarcerations, employment, and cost of confinement. TDCJ would use these data to produce and compare recidivism and other correctional impact trends over time and make changes to programs when needed. For programs not claiming rehabilitative or reentry effects, TDCJ would create a separate correctional elective programs category for non-evidence-based and non-evidence-informed programs. TDCJ would not be required to evaluate these programs using the criteria listed above but would still be responsible for providing program oversight.

Under this recommendation, TDCJ would be authorized to establish any necessary memorandums of understanding with other entities to obtain and share data as necessary to perform these evaluations, encouraging coordination and limiting duplication of effort. In the event that TDCJ's evaluations reveal poor program performance, this recommendation would allow TDCJ to make structural or programmatic adjustments to improve program performance.

This recommendation would also require TDCJ to compile and analyze program performance data and report findings to its board, BPP, the speaker of the House of Representatives, the lieutenant governor, legislative committees of jurisdiction, and the governor biennially by December 1 of each even-numbered year.

## 4.2 Require TDCJ to develop a strategic plan for rehabilitation and reentry programs in conjunction with Windham and report on implementation status biennially.

This recommendation would require TDCJ and Windham to develop a joint strategic plan by September 1, 2026, for the future of rehabilitation and reentry programs to increase program efficiencies and accountability while reducing program costs. This strategic plan should include clear program objectives and timelines with goals to:

- Increase program efficiencies.

- Reduce program redundancies.

- Incorporate new evidence-based and evidence-informed program approaches.

- Incorporate technology-based solutions, including through the automation plan recommended in Issue 3.

Additionally, this plan should include clear steps and timelines that would eliminate parole-voted program placement delays and reduce overall program placement timelines by at least 50 percent by September 1, 2027. In developing this plan, TDCJ should also evaluate therapeutic service contracts and obligations and renegotiate as needed to meet current and projected program needs. The agency should develop this strategic plan in tandem with the existing statutory annual reentry report.

As part of this recommendation, TDCJ and Windham should provide a biennial report with updates on the plan's implementation status to TDCJ's board, BPP, the speaker of the House of Representatives, the lieutenant governor, legislative committees of jurisdiction, and the governor. TDCJ and Windham should

also update this strategic plan every five years. This recommendation would facilitate a more proactive approach to rehabilitation and reentry programming with increased accountability and substantially reduced costs.

### 4.3 Require TDCJ to track parole-voted program voting data and use these data to inform strategic program planning.

This recommendation would require TDCJ to track data related to program placements and vote revision transmittal requests, which would increase TDCJ's visibility into placement delays and inform strategic planning. TDCJ would be required to collect and analyze parole-voted program data on a rolling basis that includes:

- Number of inmates waiting for program placement.

- Actual program placement waitlist times.

- Reasons for program enrollment delays beyond BPP-voted start dates.

- Vote revision requests related to program ineligibility, placement delays, and other factors that may affect parole release timelines.

- Number of inmates unable to complete parole-voted programs prior to the "release no earlier than" date.

TDCJ would be required to use these data to calculate program waitlist times, track and reduce program enrollment timelines, and work to eliminate program placement delays. TDCJ should include these data and related analysis in the strategic plan required by Recommendation 4.2. This recommendation would allow TDCJ to identify opportunities for increased program placement efficiencies and reduced placement costs.

### 4.4 Require TDCJ to prioritize parole-voted program decisions.

This recommendation would statutorily require TDCJ to prioritize parole-voted program placements, ensure programming capacity meets programming needs, and expand programming access in alignment with the strategic plan required under Recommendation 4.2.

### 4.5 Require TDCJ, BPP, and Windham to collaborate in developing evidence-based ITP and parole-voted program criteria and to develop and maintain associated program lists.

This recommendation would require TDCJ, BPP, and Windham to develop evidence-based program criteria specific to required ITP and parole-voted programs. As part of this recommendation, TDCJ, BPP, and Windham would be required to create clear processes designed to: evaluate programs to be added to the ITP and parole-voted program lists, assess current programs, and remove programs that do not meet established criteria. TDCJ, BPP, and Windham should not include non-evidence-based or non-evidence-informed programs on either list.

BPP, TDCJ, and Windham would also be required to coordinate on programming options through regular meetings. TDCJ and Windham would present programming options and program evaluation results to BPP as part of this process. While TDCJ and Windham should provide parole-voted programming recommendations, BPP would be required to make the final decision on which programs are considered

parole-voted programs. TDCJ and Windham would make the final decision on which programs are considered required ITP programs beyond the required parole-voted programs identified by BPP.

### 4.6 Require TDCJ to revise the ITP to include a comprehensive, plain language list of program participation information with clear distinctions between evidence-based and non-evidence-based program participation.

This recommendation would require TDCJ to revise its ITP to include a comprehensive list of program participation in accordance with statute and previous Sunset recommendations. Since TDCJ acknowledges the agency does not include a comprehensive record of program participation in the ITP as statute mandates, under this recommendation TDCJ would be required to do so by September 1, 2026.[40] This recommendation would require TDCJ to capture an inmate's participation in all programs, including a plain language list of both state-funded and intensive volunteer programs and program enrollment and completion dates as part of this revised version of the ITP. This recommendation would expand existing statutory requirements by requiring TDCJ to make distinctions between required evidence-based ITP program participation per Recommendation 4.5 and non-evidence-based correctional elective program participation, as defined in Recommendation 4.1. Per statute, TDCJ should continue to submit an updated version of the ITP complete with program information to BPP at the time of BPP's consideration of the inmate's case for release.

### 4.7 Remove volunteer and faith-based program reporting requirement for wardens.

This recommendation would remove the volunteer and faith-based program reporting requirement for wardens from statute. This recommendation would ensure wardens do not have additional volunteer reporting and recruiting responsibilities on top of current duties.

### 4.8 Require TDCJ staff responsible for rehabilitation and reentry programs and services to report on volunteer and faith-based program data and ensure volunteer and faith-based programming needs are met at each facility.

This recommendation would require TDCJ staff responsible for rehabilitation and reentry programs and services to ensure volunteer and faith-based programming needs are met at each facility. Under this recommendation, TDCJ staff should solicit feedback from wardens and unit-level chaplains on volunteer and faith-based programming needs for each facility. TDCJ rehabilitation and reentry programs and services staff should also take over the related statutorily required reporting requirement and, rather than creating a separate report, include this information in the annual rehabilitation and reentry report required under Recommendation 4.1.

### *Management Action*

### 4.9 Direct TDCJ to merge the Rehabilitation Programs Division and the Reentry and Integration Division.

This recommendation would direct TDCJ to combine RPD and RID to create a single division responsible for rehabilitation and reentry programs and services, thereby reducing program inefficiencies and meeting the rehabilitation and reentry goals established in the strategic plan required under Recommendation 4.2. As part of this merger, TDCJ would give executive decision-making responsibility to current RID leadership due to the division's established program evaluation and contract management expertise. As described in Issue 8, with the dissolution of TDCJ's Private Facility Contract Monitoring and Oversight Division, RID and RPD would need to absorb contract monitoring responsibilities for contracted services

such as in-prison therapeutic community (IPTC) and other counseling and treatment services. TDCJ budgeted over $23 million in fiscal year 2024 alone for IPTC contracted services — a substantial contract that would benefit from RID's established contract management oversight processes under TCOOMMI.

RID leadership should restructure this combined division as needed to meet the strategic goals established under Recommendations 4.1 and 4.2. RID leadership would also be directed to oversee the rehabilitation and reentry program inventory and support the separate TDCJ division or external entity responsible for evaluating rehabilitation and reentry programs under Recommendation 4.1.

### 4.10 Direct BPP to make parole-voted program decisions independent of TDCJ program placement practices.

In recognition of the need to preserve BPP's independence, this recommendation would direct BPP to alter formal and informal agency policies to prohibit voters from considering TDCJ-reported program placement timelines when making programming decisions such as setting program start dates and release eligibility dates. This recommendation would allow BPP voters to make programming decisions without being constrained by TDCJ logistics while Recommendation 4.4 would require TDCJ to prioritize those decisions through improved strategic planning related to rehabilitation programs.

### 4.11 Direct TDCJ to develop volunteer program assessment criteria and regular monitoring and assessment policies to ensure sufficient volunteer program oversight and strategic use of volunteer resources.

This recommendation would direct TDCJ to develop volunteer program assessment criteria for all facilities to increase volunteer program oversight and reduce the risk of adverse program outcomes. Under this recommendation, TDCJ would be directed to evaluate volunteer programs to ensure a program serves an established need within a TDCJ facility and does not duplicate preexisting rehabilitation, reentry, or other correctional elective programs available at the facility. As part of this evaluation, TDCJ should ensure programs do not provide services that should be provided or overseen by a licensed professional if the volunteer is unlicensed. Programs led by licensed volunteers should still be evaluated by the appropriately licensed TDCJ staff. Volunteer programs claiming rehabilitative or reentry outcomes would be subject to criteria and evaluation as established under Recommendation 4.1.

Volunteer programs should be evaluated by non-unit level staff responsible for rehabilitation and reentry programs and services upon receipt of program proposals. Once implemented, volunteer programs would be subject to unannounced program audits conducted by non-unit level rehabilitation and reentry staff at set intervals.

### *Change in Appropriations*

### 4.12 Modify language in the General Appropriations Act to direct TDCJ to transfer administration and management of postsecondary correctional education to Windham through a memorandum of understanding.

This recommendation would modify Rider 26 (Postsecondary Education Program) of TDCJ's bill pattern in the General Appropriations Act to require TDCJ to transfer administration and management of postsecondary education in corrections to Windham. TDCJ and Windham should establish a memorandum of understanding to accomplish this administrative transfer and ensure Pell Grant opportunities are not limited or lost due to this handover. As part of its biennial evaluation and report, Windham would be required to meet reporting requirements, which include: a list of postsecondary program partners, postsecondary enrollment data, Pell Grant utilization data, and recidivism and

employment outcomes. Windham should also work with TDCJ to develop clear criteria for institutions interested in becoming approved prison education programs eligible to administer Pell Grants under Title IV of the Higher Education Act as amended in 2020. Windham would also be required to assist interested institutions with the prison education program application process. This recommendation would improve correctional postsecondary education by utilizing Windham's educational expertise and established program oversight and evaluation processes.

## Fiscal Implication

Overall, these recommendations are designed to create program efficiencies and improved rehabilitative and reentry outcomes and could result in significant cost savings to the state. Based on the statutorily required program placement reduction goals described in Recommendation 4.2, TDCJ would be required to reduce program placement timelines by 50 percent and eliminate program placement delays starting September 1, 2027. As shown in the chart below, this measure would result in a total savings of $147,334,290 by the end of fiscal year 2030. Savings associated with these recommendations could be returned to General Revenue or appropriated back to the agency for other functions beginning in fiscal year 2028.

| Fiscal Year | Cost Savings: 50% Reduction in Parole-Voted Program Placement Buffer Times | Cost Savings: Elimination of Program Placement Delays | |
|---|---|---|---|
| 2026 | $0 | $0 | Development of Strategic Plan |
| 2027 | $0 | $0 | Strategic Plan Preparation |
| 2028 | $29,540,544 | $19,570,886 | Strategic Plan Implementation |
| 2029 | $29,540,544 | $19,570,886 | |
| 2030 | $29,540,544 | $19,570,886 | |
| Total Cost Savings | $88,621,632 | $58,712,658 | |
| | | $147,334,290 | |

Combining RID and RPD, as detailed in Recommendation 4.9, would result in a small cost savings to the state of about $202,213 in salary and benefits for each of the next five fiscal years and the reduction of at least one full-time equivalent employee. Additional savings resulting from this division merger may be possible depending on the agency's implementation of this recommendation. All other recommendations could be implemented using existing resources.

### Texas Department of Criminal Justice

| Fiscal Year | Savings to the General Revenue Fund | Change in FTEs from 2023 |
|---|---|---|
| 2026 | $202,213 | -1 |
| 2027 | $202,213 | -1 |
| 2028 | $202,213 | -1 |
| 2029 | $202,213 | -1 |
| 2030 | $202,213 | -1 |

1       All citations to Texas statutes are as they appear on http://www.statutes.legis.texas.gov/. Section 1.02(a), Chapter 785 (HB 2335), Acts of the 71st Texas Legislature, Regular Session, 1989; Section 493.001, Texas Government Code.

2       Section 508.152 (b), (b-1), Texas Government Code.

3       Grant Duwe, *The Use and Impact of Correctional Programming for Inmates on Pre- and Post-Release Outcomes*, National Institute of Justice, June 2017, pp. 3-5, accessed online August 1, 2024, https://www.ojp.gov/pdffiles1/nij/250476.pdf.

4       Sunset Advisory Commission (SAC), *Criminal Justice Agencies Sunset Staff Report*, Austin: Texas Sunset Advisory Commission, October 2006, pp. 5-18.

5       Texas Department of Criminal Justice (TDCJ), Article V, Page V-6, HB 1, Acts of the 88th Legislature, 2023 (General Appropriations Act); Texas Education Agency, Item B.2.4. Strategy: Windham School District, Article V, p. III-2, HB 1, Acts of the 88th Legislature, 2023 (General Appropriations Act).

6       Washington State Institute for Public Policy, "Adult Corrections Inventory," accessed online May 6, 2024, https://www.wsipp.wa.gov/CurrentProjects; Section 610 (c)(i), p. 585, Chapter 475 (SB 5187), Acts of the 68th Washington Legislature, Regular Session, 2023 (Operating Budget).

7       Section 493.0083, Texas Government Code.

8       SAC, *Texas Department of Criminal Justice, Board of Pardons and Paroles, Correctional Managed Health Care Committee Staff Report*, Austin: Texas Sunset Advisory Commission, October 2006, p. 16.

9       TDCJ, *Evaluation of Offenders Released in Fiscal Year 2007 That Completed Rehabilitation Tier Programs*, April 2011, p. 1, accessed online July 16, 2024, https://static.texastribune.org/media/documents/Evaluation_of_Rehabilitation_Programs_-_April_2011.pdf; SAC, C*riminal Justice Agencies Sunset Staff Report*, Austin: Texas Sunset Advisory Commission, October 2006, p. 16.

10      SAC, *Texas Criminal Justice Agencies Sunset Final Report with Legislative Action*, Austin: Texas Sunset Advisory Commission, July 2013, pp. 59-61.

11      SAC, *Texas Criminal Justice Agencies Sunset Final Report with Legislative Action*, Austin: Texas Sunset Advisory Commission, July 2013, p. 8b; Section 19.0041, Texas Education Code.

12      Windham School District, *Windham School District 2023 Biennial Evaluation and Report*, 2023, accessed online July 16, 2024, https://Windhamtx.org/about-Windham/reports/biennial-evaluations/.

13      Grant Duwe, *The Use and Impact of Correctional Programming for Inmates on Pre- and Post-Release Outcomes*, National Institute of Justice, June 2017, p. 22, accessed online August 1, 2024, https://www.ojp.gov/pdffiles1/nij/250476.pdf.

14      Section 19.0041, Texas Education Code.

15      TDCJ, "Rehabilitation Programs Division," accessed online May 10, 2024, https://www.tdcj.texas.gov/divisions/rpd/index.html.

16      Correctional Association of New York, "Doing Idle Time - An Investigation of Inmate Idleness in New York's Prisons and Recommendations for Change," February 1984, p. 2; Grant Duwe, Valerie Clark, and Susan McNeeley, "The Association Between Idleness and Post-Release Employment, Recidivism and Mortality," Minnesota Department of Corrections, October 2023, pp. 2-3, accessed online August 1, 2024, https://mn.gov/doc/assets/Idleness%20and%20Post-Release%20Outcomes_DOC%20Website%20October%202023_tcm1089-598502.pdf.

17      Edward J. Latessa and Alexander Holsinger, "The Importance of Evaluating Correctional Programs: Assessing Outcome and Quality," Corrections Management Quarterly, 2(4), 1998, p. 27-28; Grant Duwe, The Use and Impact of Correctional Programming for Inmates on Pre- and Post-Release Outcomes, National Institute of Justice, June 2017, pp. 4-5, accessed online August 1, 2024, https://www.ojp.gov/pdffiles1/nij/250476.pdf.

18      Prison Fellowship, "Innerchange Freedom Initiative," accessed online August 1, 2024, https://www.prisonfellowship.org/about/reentry-support/innerchange-freedom-initiative/.

19      State Auditor's Office, *An Audit Report on Selected Rehabilitation Programs at the Department of Criminal Justice*, March 2007, p. 2, accessed online August 1, 2024, https://sao.texas.gov/reports/main/07-026.pdf.

20    Grant Duwe, *The Use and Impact of Correctional Programming for Inmates on Pre- and Post-Release Outcomes*, National Institute of Justice, June 2017, pp. 4-5, accessed online August 1, 2024, https://www.ojp.gov/pdffiles1/nij/250476.pdf; National Institute of Justice Staff, "Lessons Learned from 30 Years of Prison Programs," Corrections Today, January 2012, pp. 109-110, accessed online August 1, 2024, https://www.ojp.gov/sites/g/files/xyckuh241/files/media/document/239775.pdf.

21    Washington State Institute for Public Policy, "Serious and Violent Offender Reentry Initiative," accessed online May 3, 2024, https://www.wsipp.wa.gov/BenefitCost/Program/728.

22    Section 19.0041, Texas Education Code.

23    Windham School District, *Windham School District 2023 Biennial Evaluation and Report*, 2023, pp. 1-3, accessed online July 16, 2024, https://Windhamtx.org/about-Windham/reports/biennial-evaluations/.

24    Section 508.144(a)(3), Texas Government Code.

25    Section 508.141(d) and (e)(2), Texas Government Code.

26    Board of Pardons and Paroles (BPP), "Vision Statement," accessed online September 15, 2024, https://www.tdcj.texas.gov/bpp/AboutUs.htm#:~:text=MISSION%20STATEMENT%3A&text=Determine%20which%20prisoners%20are%20to,clemency%20matters%20to%20the%20Governor.

27    Section 501.092(b)(7) and (i), Texas Government Code.

28    TDCJ PGP-01.10, "Program Management and Oversight," September 1, 2017, p. 1-6, accessed online May 7, 2024, https://www.tdcj.texas.gov/documents/rid/TCOOMMI_PGP_0110_Program_Management_Oversight.pdf.

29    Rand Corporation, *How Effective is Correctional Education, and Where Do We Go from Here? The Results of a Comprehensive Evaluation*, p. xv-xvi, 2014, accessed online May 10, 2024, https://www.rand.org/content/dam/rand/pubs/research_reports/RR500/RR564/RAND_RR564.pdf.

30    Section 483(t)(3), Appropriations Act, H.R. 133, 2020; Federal Student Aid, "Prison Education Programs," accessed online August 5, 2024, https://fsapartners.ed.gov/knowledge-center/topics/prison-education-programs; Alliance for Higher Education in Prison, *Higher Education in Texas Prisons: A Collective Conversation and Networking*, p. 11, 2024, accessed online August 6, 2024, https://edtrust.org/wp-content/uploads/2014/09/Texas-HEP-Convening-Brief.pdf; Federal Student Aid, "Prison Education Programs," accessed online July 10, 2024, https://fsapartners.ed.gov/knowledge-center/topics/prison-education-programs.

31    BPP, "BPP-DIR. 145.300: Action Upon Review - Approval," October 14, 2022, p. 2, accessed online September 15, 2024, https://www.tdcj.texas.gov/bpp/policies_directives/DIR_145.300.pdf.

32    Ibid, p. 3.

33    Mary McCaffity, "A Primer on the Parole Process," *Texas District & County Attorneys Association*, July-August 2018, accessed online July 20, 2024, https://www.tdcaa.com/journal/a-primer-on-the-parole-process/#:~:text=All%20offenders%20serving%20time%20for,to%20equal%20their%20entire%20sentence; BPP, "Parole/Mandatory Supervision Information: Parole Panel Voting Options," accessed online July 20, 2024, https://www.tdcj.texas.gov/bpp/what_is_parole/vote-options.htm; TDCJ, *Parole Division and the Board of Pardons and Paroles, Parole in Texas*, 2022, p. 9, accessed online July 20, 2024, https://www.tdcj.texas.gov/bpp/publications/PIT_English.pdf.

34    Legislative Budget Board (LBB), *Criminal and Juvenile Justice Uniform Cost Report: Fiscal Years 2021 and 2022*, February 2023, p. 4, accessed online May 29, 2024, https://www.lbb.texas.gov/Documents/Publications/Policy_Report/7455_Uniform_Cost_Feb_2023.pdf; LBB, *Criminal and Juvenile Justice Uniform Cost Report: Fiscal Years 2019 and 2020*, January 2021, p. 5, accessed online May 29, 2024, https://www.lbb.texas.gov/documents/publications/policy_report/6292_cjda_uniform_cost.pdf; LBB, *Criminal and Juvenile Justice Uniform Cost Report: Fiscal Years 2017 and 2018*, January 2019, p. 4, accessed online May 29, 2024, https://www.lbb.texas.gov/Documents/Publications/Policy_Report/4911_Criminal_Juvenile_Uniform_Cost_Jan_2019.pdf; LBB, *Criminal and Juvenile Justice Uniform Cost Report: Fiscal Years 2015 and 2016*, January 2017, p. 4, accessed online May 29, 2024, https://www.lbb.texas.gov/Documents/Publications/Policy_Report/3137_UniformCosts_2017.pdf.

35    Section 508.152 (b-1)(1), Texas Government Code.

36    SB 213, Acts of the 83rd Legislature, Regular Session, 2013; SAC, *Texas Criminal Justice Agencies Sunset Final Report with Legislative Action*, Austin: Texas Sunset Advisory Commission, July 2013, pp. 8a, 41.

37    Section 508.152 (b)(2), Texas Government Code.

38    37 Texas Administrative Code, Part 5, Chapter 145, Subchapter A, Section 145.12 (2023) (Board of Pardons and Paroles, *Action upon Review*).

39    Section 501.009, Texas Government Code.

40    Section 508.152(b-1)(1), Texas Government Code.

| ISSUE 5 | Critical Statutory and Structural Deficiencies Strain an Already Overextended Parole System, Creating Unnecessary Barriers to Effective Supervision. |

## Background

Parole supervision ensures public safety and reduces recidivism through effective reintegration of releasees, or individuals released from confinement to Texas Department of Criminal Justice (TDCJ) supervision in the community. The Board of Pardons and Paroles (BPP) determines whether to release eligible inmates on parole or mandatory supervision as well as the conditions of release, which can include special conditions as described in the textbox.[1] Once BPP believes an inmate is able and willing to fulfill the obligations of a law-abiding citizen and is likely to successfully reintegrate into the community without increased risk to the public, TDCJ's Reentry and Integration Division and Parole Division work together to provide comprehensive reentry planning services and process the inmate's release.[2]

### Parole Special Conditions

BPP may impose special release conditions for any releasee. Common special conditions include:

- Educational attainment requirements
- Psychological counseling
- Substance use treatment
- Alcoholics Anonymous and Narcotics Anonymous attendance
- Drug monitoring such as urinalysis
- Sex offender requirements
- Electronic monitoring
- Super Intensive Supervision Program or GPS-enabled electronic monitoring

Upon release, the Parole Division assigns a parole officer (PO) to each releasee within the region their approved residence is located. This PO is responsible for ensuring each releasee assigned to their caseload meets parole requirements in accordance with supervision conditions imposed by BPP. Additional PO duties include:

- Performing initial residence investigations.
- Installing and overseeing electronic monitoring equipment.
- Performing residential visits and compliance checks.
- Administering urinalysis tests.
- Facilitating, observing, and documenting BPP-imposed classes and treatment.
- Writing violation reports.
- Requesting pre-revocation warrants.
- Preparing for and participating in parole revocation hearings.
- Facilitating emergency management and check-ins during natural disasters and other major events.

The Parole Division was authorized to hire 1,495 PO positions and supervised 75,953 releasees as of May 2024. The Parole Division assigns POs cases to supervise based on caseload type, which is determined based on the types of special conditions imposed by BPP, and a risks- and needs-informed supervision level.

## Findings

**TDCJ's parole officer staffing shortage shows no signs of abating amid an agencywide staffing crisis.**

- **PO staffing shortages and turnover.** Like correctional officers (COs), POs are in short supply in Texas. However, unlike COs, the PO shortage is relatively new, and TDCJ has found recruiting and retaining POs to be a challenge. As shown in the following graph, PO vacancies started to increase rapidly in fiscal year 2019. As of May 2024, PO vacancies jumped to over 300, creating a PO vacancy rate of about 21 percent. Issue 2 discusses agencywide staffing shortages and retention problems in more detail.



**Parole Officer Staffing and Vacancy Trends FYs 2014-23**

- **Factors driving PO staffing shortages.** Some factors driving PO staffing shortages and turnover are specific to the Parole Division and how POs understand their place within TDCJ. Sunset staff conducted a parole staff survey and received over 400 responses. Survey responses conveyed an overwhelming sentiment among POs that too much is expected of them while they are paid too little.

PO pay. POs consider pay, which starts at $44,704 as of fiscal year 2024, to be the single greatest driver of staffing shortages. Approximately 90 percent of respondents disagreed or strongly disagreed the current pay structure for POs is adequate, and 87 percent of respondents said the pay was too low for their cost of living. POs also complained about the rigidity of the statutory PO career ladder, which restricts annual salary increases and caps pay increases at 10 years of employment.[3]

Unmanageable caseloads and increased workload. At a recent agency townhall, numerous POs expressed frustration regarding high caseloads. In the parole staff survey, many officers reported that, while they find their work meaningful, workload expectations resulting from high caseloads are entirely unrealistic. During the review, TDCJ staff reported that the extensive administrative requirements placed on POs limit their ability to establish human connections with releasees — the part of the job many POs find most fulfilling. Moreover, more than half of survey respondents disagreed or strongly disagreed that Parole Division management listens to the concerns POs raise about caseload challenges. Managing caseloads has only grown more difficult for POs with the added demands resulting from the agency requiring POs to travel to understaffed offices, as discussed in Issue 2.

> More than half of survey respondents disagreed that management listens to PO caseload concerns.

Punitive leadership culture. Issue 2 describes the staffing impacts of TDCJ's agencywide cultural struggles, including those in the Parole Division. Numerous POs reported the prevalence of verbally abusive and unprofessional supervisors, and more than half of respondents to Sunset's parole staff survey agreed or strongly agreed they worry about retaliation from supervisors if they submit a workplace grievance. POs also reported feeling worried they would be blamed for critical incidents involving releasees with little consideration of the role that division policies, staffing challenges, and leadership culture play in these incidents.

IT and technology limitations. Many POs report technology and IT limitations significantly increase their workload. POs report that their workload demands are made worse by the agency's outdated equipment, such as dysfunctional laptops and a lack of automated systems, and paper-based processes, which create inefficient supervision practices. This situation is exacerbated by TDCJ's broken parole contact tracking system, discussed on page 60 and in more detail in Issue 3.

- **Deprioritization of POs.** POs expressed frustration that the Parole Division is not an agency priority, a perception largely resulting from TDCJ's recent prioritization of CO pay and staffing initiatives over parallel efforts to improve PO staffing and retention. Over 45 percent of respondents to the parole staff survey indicated they do not feel supported and valued by TDCJ leadership, suggesting low morale among POs.

> POs report that their workload demands are made worse by TDCJ's outdated equipment.

Insufficient PO pay increases and statutory career ladder limitations. Historically, TDCJ has included parallel requests for CO and PO pay increases in its biennial Legislative Appropriations Requests (LAR). The table on the following page shows years in which TDCJ requested CO and PO pay increases.[4] In April 2022, however, TDCJ requested a 15 percent pay raise for COs following record CO vacancy and turnover rates.[5] While TDCJ followed up by requesting a 15 percent pay increase for POs during the subsequent legislative session, the Legislature passed a 10 percent statewide salary increase for all state employees, including COs and POs, resulting in an overall 25 percent pay increase for COs and

**Statewide CO and PO Salary Gap, FYs 2014-26**

| Fiscal Year | CO Starting Salaries | PO Starting Salaries | Salary Difference |
|---|---|---|---|
| 2014 | $29,220 | $35,879 | $6,659 |
| 2018 | $32,335 | $39,718 | $7,383 |
| 2022 | $38,847 | $41,704 | $2,857 |
| 2024 | $44,674 | $44,704 | $30 |
| 2025 | $47,674 | $47,704 | $30 |
| *2026* *(Projected)* | *$52,441* | *$54,860* | *$2,419* |

* Based on TDCJ's fiscal year 2026-27 LAR request.

a 10 percent increase for POs.[6] As shown in the table, this statewide increase narrowed the gap between the starting salaries of COs and POs, who the agency has historically paid significantly more, despite requiring a higher education level and a different skillset for POs. Moreover, between fiscal years 2014-25, CO starting salaries increased by 63 percent while PO salaries only increased by 33 percent. In its most recent LAR, TDCJ has requested salary increases of 15 percent for POs and 10 percent for COs to address staffing concerns.[7] If granted, CO salaries will have increased by nearly 80 percent since fiscal year 2014 while PO salaries will have grown by about 50 percent.[8] Notably, the cost of increasing CO salaries is significantly higher than the cost of increasing PO salaries owing to the sheer number of COs compared to POs.[9] The continuation of the 2022 CO pay increase cost exceeded $374 million for the 2024-25 biennium while the biennial PO pay increase cost was approximately $24 million for the same initial percentage increase.[10]

Statutory caps on annual salary increases further restrict TDCJ's ability to right-size PO pay as POs progress through their career. As noted above, POs are frustrated by the statutory career ladder, which limits annual salary increases to one-tenth of the difference between a PO's current salary and the minimum annual salary in the next highest classification.[11] This translates to annual salary increases of less than $300, even after the statewide and PO-specific salary increases described above.[12] As of fiscal year 2024, POs with 10 years of experience make only about $5,000 more than the starting salary shown in the table above, topping out at a salary under $50,000.

A statutory career ladder greatly limits TDCJ's ability to adjust parole officer salaries.

Less emphasis on PO staffing challenges. TDCJ leadership has publicly acknowledged CO staffing shortages while placing less emphasis on the impact of PO staffing vacancies. Issue 2 describes the 2022 escape of inmate Gonzalo Lopez, who escaped TDCJ custody during a medical transport. Following this incident, a public report commissioned by TDCJ and produced by the criminal justice consulting firm CGL attributed security lapses in part to "short staffing resulting from unsustainably high vacancy rates."[13] Conversely, in a joint TDCJ-BPP investigative report following two high-profile murders involving releasees in 2022, which are discussed further on page 102, TDCJ cited lapses in PO supervision with no mention of PO staffing shortages.[14]

Delayed parole technology advances. In 2022, TDCJ awarded Microsoft the contract to replace its dated IT system with the cloud-based Corrections Information Technology System (CITS). Although TDCJ is working through this transition on the correctional institutions side, parole operations will not benefit from this upgrade until TDCJ requests additional funding

to implement a later phase of this transition. TDCJ has not requested or secured the appropriations to begin the parole portion of its CITS transition and will likely not begin implementing this second phase until at least 2028. As Issue 3 explains, TDCJ has also failed since 2014 to remedy a broken parole contact system designed to assist POs with supervision contact requirements. While TDCJ secured a Bureau of Justice Assistance (BJA) grant to fix this system in 2022, BJA threatened to pull funding after 22 months due to TDCJ inaction.

- **New supervision strategies.** To its credit, the Parole Division has made several changes and embraced new supervision strategies in an effort to improve staffing and reduce workload. To expand PO recruitment, the Parole Division recently relaxed the minimum education requirements from a bachelor's degree to an associate's degree with two years' work experience. However, this move has been extremely controversial among experienced POs, and vacancies have remained above 21 percent despite this change. The division also created an administrative caseload with virtual contact requirements for low-risk releasees and piloted a task-based supervision approach in which POs are responsible for specific tasks rather than set caseloads. While an evaluation of the pilot by TDCJ's Research and Development Division found 0.8 percent fewer arrests, 5 percent fewer parole violations, and 3.7 percent fewer warrants issued for releasees in participating parole offices, it did not show evidence of an impact on staffing losses. While decreases in violations and warrants are a positive sign, whether this decline was due to improved outcomes or less effective supervision is unclear. Because this is a novel supervision approach, Sunset staff could not identify external research indicating the likelihood of one explanation over another. However, the 0.8 percent reduction in arrests is notable and may suggest some improvement in supervision outcomes.

TDCJ is trying to innovate its supervision practices because of PO vacancies and excessive workload.

### Unrealistic and outdated statutory maximum parole caseload ratios create unachievable expectations while limiting visibility into risky supervision practices.

In an effort to hold TDCJ accountable for growing PO caseloads, the Legislature set maximum caseload ratios in 2007 that remain unchanged today.[15] In practice, TDCJ has never been able to comply with these requirements, and caseloads continue to grow beyond the statutory maximums with some high-risk caseloads nearly double the maximum allowed by statute, as shown in the table on the following page. Research shows excessively large caseloads with unrealistic workload demands negatively impact supervision quality, creating ineffective POs and supervision agencies in the process.[16] The American Probation and Parole Association (APPA) recommends supervision agencies implement caseload standards as a best practice, but because TDCJ's maximum caseload ratios are fixed in statute, the agency lacks flexibility to adjust them to incorporate risk-informed goals or caseload structures that account for changing supervision practices and new approaches. Moreover, rather than holding TDCJ to specified standards, these maximum caseload ratios obscure public

TDCJ has never been able to meet statutory maximum parole caseload ratios.

visibility into actual parole caseload sizes and supervision practices, even when these practices create risk in communities where TDCJ supervises releasees.

**TDCJ Parole Caseloads**

| Parole Case Type | Statutory Maximum Caseloads | TDCJ Internal Policy Maximum Caseloads | FY 24 Actual Average Caseloads |
|---|---|---|---|
| Regular | 60 active releasees | 55-200 active releasees | 83.5 active releasees |
| Special Needs Offender | 35 active releasees | 45-54 active releasees | 49.1 active releasees |
| Substance Abuse Treatment | 35 active releasees | 55-66 active releasees | 65.7 active releasees |
| Sex Offender | 24 active releasees | 30-36 active releasees | 33.2 active releasees |
| Electronic Monitoring | 20 active releasees | 25-30 active releasees | 30.8 active releasees |
| Super-Intensive Supervision Program | 11 active releasees | 15-18 active releasees | 19.8 active releasees |

- **Unachievable statutory caseload ratios.** TDCJ has never been able to meet statutory maximum caseloads, which range from 11 active super-intensive supervision program (SISP) releasees to 60 active, non-specialized, regular releasees per officer, as shown in the previous table. This statutory approach acknowledges the differing workloads between regular releasees, who are generally considered lower risk and demand less PO time, and specialized caseload releasees, who require more time to monitor. Rather than meeting statutory caseload requirements, TDCJ maintains its own internal caseload ratio policy and submits an annual report to the Legislative Budget Board (LBB) explaining statutory compliance barriers, including the number of additional POs TDCJ would need to meet the prescribed caseload ratios. In a 2020 study, TDCJ stated it would need an additional 703 POs at a cost of approximately $61 million annually to comply with maximum statutory caseload ratios.[17] When TDCJ conducted that study, the agency employed 250 more POs than it does now. Today, the number of additional POs needed, inclusive of vacancies, to meet statutory caseload ratios is closer to 950 — nearly double the Parole Division's current PO staff. While the supervised population has decreased from 83,703 in 2020 to 75,953 in 2024, LBB projects the supervised population will increase substantially in the coming years, as discussed further on page 99.[18] If PO staffing continues to decrease as the supervised population increases, statutory maximum caseloads will only become more unrealistic.

> The number of POs needed to meet statutory ratios is nearly double the current PO staff.

<u>Overall caseload trends.</u> In 2018, the average regular caseload size was about 76 releasees. Today, the average is nearly 84 releasees, as shown in the chart on the following page. While the population POs supervise has decreased, resulting in the lowest supervision population in a decade, caseloads have continued to grow as PO vacancies have rapidly increased. This trend also holds true for high-risk caseloads such as sex offender, electronic monitoring, and SISP caseloads. In fiscal year 2024, more than one-third of POs had average caseloads above the statutory maximums.

Sunset Advisory Commission                                    September 2024



**Regular Caseloads, FYs 2018-24**

Regional caseload trends. Regionally, parole caseload sizes vary significantly, reflecting the different staffing challenges faced by each region. As of May 2024, Region IV, which includes San Antonio and Austin, had average regular caseloads as high as 98 releasees and substance abuse caseloads of nearly 66. Region IV also has the highest overall number of vacant caseloads — caseloads which should be filled by POs but are not due to staffing vacancies and POs on leave — and the second highest rate of vacant caseloads at nearly 37 percent. Region V, which includes much of West Texas, had average regular caseloads of 83 and the highest vacant caseload rate at nearly 64 percent as of May 2024. The chart shows vacant caseload rates by region. However, even regions with relatively low vacant caseload rates such as Regions I and II were unable to comply with the maximum caseload ratios prescribed by statute for any caseload type; as of May 2024, Region II had the lowest average regular caseload size at just over 78 active releasees, well above the 60 active releasee maximum required by statute.



**Vacant Caseloads Rates By Region FY 2024**

Parole population projections. According to LBB projections, as shown in the chart on the following page, supervised populations are expected to exceed 80,000 by fiscal year 2025 and exceed 83,000 by 2026.[19] If PO staffing continues to decline at the same rate as the past two years, TDCJ will have fewer than 1,000 POs responsible for supervising a significantly larger population by 2026.



**Supervision Population and Parole Officer Staffing Changes FYs 2014-28**

- **Obsolete statutory caseload ratios. The nature of supervision has changed significantly in the past two decades, rendering the 2007 caseload maximums even more removed from today's parole reality.**

  <u>Parole paradigm shift.</u> Best practices in parole increasingly focus on the quality of interactions between POs and releasees rather than the quantity of interactions. Traditional approaches to parole supervision have emphasized surveillance, treatment, and enforcement, but researchers and corrections practitioners suggest increasing levels of these activities do not always yield more successful parole outcomes.[20] Depending on the person, imposing either too many or too few supervision requirements can lead to unsuccessful outcomes. Research shows that over-supervising low-risk releasees can actually increase supervision failure rates.[21]

  Supervision agencies should use risks and needs assessments for caseload design, such as the Texas Risk Assessment System (TRAS) described in the textbox, to tailor resources based on risk, allowing supervision agencies to increase the size of regular, low-risk caseloads. While the statutory maximum caseloads take this approach into account to some degree, APPA standards now suggest effective caseloads can range as high as 200:1 for low-risk individuals.[22] Conversely, research also suggests supervision agencies should ensure high-risk caseload ratios remain low, allowing for increased office sessions, field visits, employer contacts, telephone check-ins, and treatment.[23] Departing from statutory guidelines, TDCJ has implemented this research-based approach and altered caseload sizes accordingly. However, as PO staffing levels continue to decrease, even meeting these standards has proven difficult and will only be harder to do as the supervised population grows.

---

**Risks- and Needs-Informed Caseload Standards**

In line with a research-based approach, TDCJ implemented the **Texas Risk Assessment System (TRAS)** in 2014 to evaluate releasees' risks and needs, allowing the Parole Division to ensure releasees receive the appropriate level of supervision. APPA's 2024 standards direct corrections agencies to use risks and needs assessments such as TRAS to inform caseload standards. However, the Legislature set statutory maximum caseload ratios before TDCJ developed TRAS, meaning these caseload ratios are not risk-informed or compliant with national parole standards.

New supervision approaches. Despite statute disallowing adjustments to caseload structure even when adjustments meet national standards, TDCJ's Parole Division continues exploring new approaches.[24] In alignment with APPA standards, releasees on administrative-only caseloads receive minimal supervision but must still comply with supervision contact standards and other requirements. Similarly, the division intends to create an entirely virtual caseload for low-risk releasees and is in the process of piloting the task-based supervision approach described previously.



**District Parole Office (DPO) Vacant Caseload Rates - FY 2024**

- **Vacancies encourage risky supervision practices.** While research and APPA national standards may support many of the initiatives TDCJ has implemented, the agency has also been forced to make significant departures from research-supported best practices due to PO staffing shortages. TDCJ recently implemented a new approach for chronically understaffed parole offices, or offices with consistent vacant caseload rates of 25 percent or greater. Of 67 offices statewide, 35 are chronically understaffed. This policy directs these offices to conduct virtual home visits rather than in-person visits every other month for all releasees, including high-risk releasees with violent and sex offense records. The accompanying chart shows the 35 chronically understaffed offices operating under this new hybrid supervision policy. While research supports virtual supervision approaches for low-risk releasees, APPA national standards state that high-risk individuals should be monitored closely on small caseloads to yield reduced recidivism outcomes.[25] Research also shows merely providing supervision for the sake of supervision, rather than focusing on the quality and appropriateness of supervision and parole interventions, has little effect on recidivism.[26] Under these staffing conditions, however, POs have little time to do more than compliance checks, and the quality of even these compliance checks is arguably compromised by taking a virtual approach to supervising high-risk releasees.

### Parole Absconders Definition

Parole Division policy defines an absconder as "[a] client who is no longer residing in an approved residence or has failed to report after being released from a detention facility and, after completing a thorough investigation, the current whereabouts of the client remain unknown."

### 2022 High-Profile Murder Cases Involving Releasees

**Nestor Hernandez.** On October 22, 2022, Nestor Hernandez fatally shot two Methodist Hospital employees following an argument with his girlfriend, who had just given birth to their child. Hernandez was on parole supervision after being released from a TDCJ facility on October 20, 2021. He was originally convicted of aggravated robbery with serious bodily injury and sentenced to eight years imprisonment on May 20, 2015. Upon release, BPP and TDCJ placed Hernandez on electronic monitoring. Hernandez was ultimately charged with capital murder.

**Zeric Jackson.** On November 3, 2022, Zeric Jackson fatally shot a man at the home of Jackson's girlfriend. Jackson was on parole supervision after being released from a TDCJ facility on May 6, 2022. He was originally convicted of aggravated robbery and sentenced to 18 years imprisonment on March 30, 2007. Upon release, BPP and TDCJ placed Jackson on SISP monitoring. Jackson is ultimately charged with capital murder.

Additionally, a 2016 internal audit found Parole Division staff did not sufficiently comply with absconder identification policy, as defined in the textbox.[27] The report emphasized the importance of PO efforts to meet risk-informed contact standards yet cited several PO deficiencies in observing and documenting contacts with releasees. This audit was conducted when PO staffing vacancies were 20 percentage points lower than they are today and before policy allowed for virtual supervision of high-risk releasees, and even then the division struggled to identify and prevent abscondence. Today, Texas has over 12,000 parole absconders, nearly half of whom absconded within the last two years.

Responses from Sunset's survey of parole staff indicate concerns about the effectiveness of this virtual approach, and two 2022 high-profile murder cases explained in the accompanying textbox underscore this risk. Following these incidents, Governor Abbott requested TDCJ and BPP conduct an investigation into these events involving releasees on electronic monitoring and SISP.[28] While the agency had not yet implemented virtual supervision approaches for high-risk releasees at the time of these incidents, both individuals would have been eligible for virtual supervision under the new policy.

In both cases, TDCJ identified lapses in supervision, such as not properly documenting interactions and failing to monitor GPS coordinates, and fired several lower-level staff, including the POs responsible for supervising the releasees. TDCJ also recommended a series of administrative actions, including unannounced field audits, and introduced its task-based pilot program.[29] TDCJ and BPP recommended criminalizing tampering with or removing electronic monitoring bracelets, which became law in 2023.[30] At the time of these incidents, the PO vacancy rate was already over 12 percent and the average statewide electronic monitoring and SISP caseloads were 30 and 18, respectively — far higher than the maximums prescribed by statute. The investigation did not analyze the role caseload and workload demands prompted by staffing shortages played in these incidents. However, as PO staffing shortages continue to drive supervision approaches, TDCJ risks deviating further from statutory caseload maximums and evidence-based best practices.

- **Limited visibility into PO staffing needs and supervision practices.** As noted previously, TDCJ regularly reports to LBB calculations of the number of POs needed to meet the statutory caseload ratios outlined in statute. Despite years of reporting, TDCJ has never included these additional position requests in its LAR and the Parole Division has never been able to comply with statute as a result. While the Parole Division

has developed internal caseload ratios and has been working to develop new supervision approaches, it has done so without a clear sense of either the actual caseload ratios needed to ensure public safety or the number of POs needed to implement those caseload ratios. Moreover, TDCJ has not addressed root causes of recent PO vacancies or presented a revised supervision strategy to the Legislature. Instead, the agency is in the process of fundamentally altering how parole supervision works, not on the basis of research or APPA national standards but rather scarce staffing resources.

### Inefficient special condition processes undermine BPP discretion and increase strain on parole officers and releasees.

- **Impact of increased supervision conditions.** Widespread application of special conditions puts an immense strain on POs, as shown in the textbox, taking up valuable time that could be spent monitoring more high-risk releasees.[31] In fiscal year 2022 alone, TDCJ reported BPP imposed or approved over 320,000 special conditions for inmates releasing to parole supervision and releasees already on supervision. Many respondents to the parole staff survey indicated that special conditions are overapplied, citing the prevalence of unnecessary tasks like weekly urinalysis requirements and counterproductive electronic monitoring conditions for releasees with mental health designations. Other POs noted cases where electronic monitoring is imposed on releasees in nursing homes who are completely incapacitated. Regardless of the releasee's practical inability to reoffend, POs must still observe electronic monitoring contact requirements, which necessitate monthly in-person visits, when BPP imposes this special condition. Numerous respondents also noted that substance use treatment requirements, referred to as Special Condition S, are frequently imposed on releasees who do not have substance use problems. As of August 2024, BPP had applied Special Condition S to over 68,000 releasees, or approximately 90 percent of the supervised population statewide.

> **Impact of Supervision Conditions**
>
> Nationwide, the main factor increasing PO workload beyond staffing shortages is the growth in supervision conditions in recent decades. Parole supervision professionals often have little say in imposed conditions, meaning extensive monitoring and enforcement requirements fall on POs with little consideration for whether these conditions are relevant, evidence-informed, or realistic for either the releasee or the PO.

Additionally, a 2023 internal audit found pervasive deficiencies in the Parole Division's documentation of program referrals. Referrals include any documentation of substance use support or treatment attendance such as peer support recovery like Alcoholics Anonymous, substance treatment, and other requirements. Substance use treatment and counseling are common components of Special Condition S.[33] Parole Division policy requires POs to document referrals to ensure releasees adhere to BPP-imposed supervision conditions. Without such documentation, the Parole Division has no way of knowing whether the releasee is adhering to these conditions. The internal audit found numerous instances in which this documentation had been falsified or was missing entirely, raising concerns that the Parole Division's struggle to comply is driven in part by the prevalence of supervision conditions as well as ongoing PO staffing shortages.

- **Limited ability of POs to modify post-release parole conditions.** Upon release, the Parole Division can also request imposing, withdrawing, or modifying special conditions through a BPP transmittal request.[33] Identical to a normal BPP vote, a three-member BPP voter panel determines whether to grant the Parole Division's request to change a releasee's supervision conditions. The post-release special condition modification process uses information voters do not have access to at the original parole approval vote. Parole supervision often requires long-term interpersonal interaction between the PO and the releasee, meaning the supervising PO is often in the best position to evaluate the releasee's behavioral patterns and their individual needs for special conditions. However, TDCJ policy prohibits the withdrawal or modification of certain special conditions, including Special Condition S.[34] Another key requirement of Special Condition S is alcohol use and urinalysis monitoring, a condition POs can already impose without BPP involvement for any releasee, regardless of whether BPP has imposed Special Condition S, through random drug testing.[36] Given the unique insight POs have into an individual releasee's risks and needs, POs need greater flexibility to temporarily alter special conditions as warranted, particularly for conditions that cannot be removed through the transmittal process like Special Condition S albeit with divisional oversight to ensure needed special conditions are enforced appropriately.

> Parole officers have valuable insights about releasees that currently are not shared with BPP.

- **Inefficient and inappropriate checks on BPP voter pre-release decisions.** The Parole Division undermines BPP's authority by requesting imposition of additional special conditions prior to release, increasing the workload on its own POs in the process. Once BPP has approved an inmate's release on parole, the non-PO Parole Division staff analyzes the case, including an evaluation of the BPP-prepared case summary, to determine whether additional special supervision conditions should be imposed beyond conditions BPP voters have already identified. This case analysis is a time-intensive process consisting of reviewing the exact same information voters had access to at the original parole vote. The division then sends a vote revision transmittal request to BPP which voters often approve in deference to the Parole Division's assumed expertise, resulting in the increased imposition of thousands of special conditions.

## Sunset Staff Recommendations

### *Change in Statute*

#### 5.1   Abolish the PO salary career ladder and require TDCJ to establish it in rule.

This recommendation would remove the statutory PO salary career ladder and require TDCJ to establish one in rule, reevaluating the career ladder as needed. This recommendation would ensure PO career advancement and attendant salaries are appropriate to meet TDCJ's parole staffing needs. In developing this career ladder, TDCJ should consult with relevant stakeholders to review the current salary structure and align the new career ladder with projected future needs.

## 5.2 Abolish statutory maximum parole caseload ratios and require TDCJ to establish them in rule.

This recommendation would remove the statutory maximum parole caseload ratios and require TDCJ to establish such ratios in rule and reevaluate these ratios as needed to ensure caseload policies are transparent, achievable, and informed by research-supported supervision practices. In developing these initial and subsequent maximum caseload ratios, TDCJ would be required to conduct a combined PO job task analysis and workload study in alignment with Recommendation 2.2. TDCJ would also be required to coordinate with relevant stakeholders to review current supervision practices and caseload approaches and submit a report to its board, BPP, the speaker of the House of Representatives, the lieutenant governor, legislative committees of jurisdiction, and the governor on proposed supervision approaches and parole caseload maximum ratios by September 1, 2026. This report should include an evaluation of current caseload vacancies based on assessed PO staffing needs as well as pilot project evaluation results of any proposed supervision approach changes prior to statewide implementation.

## 5.3 Require TDCJ and BPP to evaluate post-release special conditions that may be temporarily modified by POs and require TDCJ and BPP to establish corresponding modification processes in rule.

This recommendation would require TDCJ and BPP to jointly evaluate and identify broadly applied post-release special conditions that would benefit from greater flexibility. Through rulemaking, TDCJ and BPP would authorize POs to temporarily adjust eligible post-release special conditions for a period of six months, as needed. Under this recommendation, TDCJ and BPP would work together to develop this process and establish it in rule. Together, TDCJ and BPP should:

- Identify special conditions eligible for temporary modification.

- Determine releasee eligibility requirements related to supervision performance and other relevant factors.

- Establish a minimum amount of time between date of release on supervision and special condition modification eligibility.

- Develop documentation standards and oversight mechanisms to ensure any temporary alteration of enforced special conditions is warranted and necessary.

- Revise the release contract mandated under existing statute to include a provision explicitly allowing for this special condition modification process.[36]

- Develop a release contract modification process requiring TDCJ to provide a modified contract to the releasee and obtain the releasee's signature and agreement to the modified conditions each time an initial or renewed temporary condition modification takes place.

Any temporary special condition modification should be based on TRAS or other assessments produced by a risks- and needs-assessment instrument, POs' on-the-ground evaluation of releasee risks and needs, and other relevant factors as determined by the agencies. After a period of six months following special condition modification, TDCJ should evaluate releasee supervision performance and determine whether to sustain the temporary modification of enforced special conditions, revert to the original BPP-imposed special condition, or petition BPP for permanent removal of the condition. Any imposition or permanent removal of special conditions would still require BPP approval in accordance with existing statute.[37] As part of this recommendation, TDCJ should track all special condition modifications.

### 5.4  Prohibit the Parole Division from making recommendations of additional special conditions prior to release.

This recommendation would prohibit TDCJ from reviewing BPP special condition voting decisions and recommending imposition of additional special conditions prior to an individual's release on parole. This recommendation would create greater efficiencies and help prevent over-application of special conditions.

### *Management Action*

### 5.5  Direct the Parole Division to report supervision trends and workload impacts of supervision conditions to BPP annually.

This recommendation would direct TDCJ's Parole Division to report supervision trends and associated workload impacts to BPP on an annual basis in an effort to ensure supervision conditions are not over-applied and remain achievable. As part of this recommendation, TDCJ should track special condition applications and produce a report analyzing special condition trends. This special condition report should be used by the special conditions working group created under Recommendation 6.5 to inform efficacy evaluations of special conditions. Alternatively, if the Sunset Advisory Commission does not adopt Recommendation 6.5, TDCJ and BPP should meet annually to discuss any special condition data trends and the ongoing effectiveness and appropriateness of imposing special conditions.

## Fiscal Implication

Overall, these recommendations would not have a fiscal impact to the state. The PO workload study required in Recommendation 5.2 could be accomplished within existing resources if the study is conducted internally by TDCJ's Research and Development Division or through the engagement of an external research partner such as a university or other government agency, as described in Issue 2. Hiring an external research partner such as a consultant could bring additional costs that cannot be estimated at this time. All other recommendations could be implemented with existing resources.

1    All citations to Texas statutes are as they appear on http://www.statutes.legis.texas.gov/. Section 508.0441, Texas Government Code; Texas Department of Criminal Justice (TDCJ) and Board of Pardons and Paroles (BPP), *Parole in Texas*, 2022, p. 21, accessed online May 14, 2024, https://www.tdcj.texas.gov/bpp/publications/PIT_English.pdf.

2    Section 508.141(e)(2), Texas Government Code; Section 508.141(d), Texas Government Code.

3    Section 508.1131, Texas Government Code.

4    TDCJ, "Legislative Appropriations Request, Fiscal Years 2026-2027," September 6, 2024, accessed online September 23, 2024, https://docs.lbb.texas.gov/Main/DocDisplay.aspx.

5    TDCJ, "Legislative Updates: Pay Increases for All COs and Employees," accessed online August 22, 2024, https://www.tdcj.texas.gov/news/pay_increases_effective_July_1.html#:%7E:text=In%20April%202022%2C%20state%20leadership,the%20next%20two%20fiscal%20years.

6    TDCJ, "Legislative Appropriations Request, Fiscal Years 2026-2027," September 6, 2024, accessed online September 23, 2024, https://docs.lbb.texas.gov/Main/DocDisplay.aspx; Spencer Grubbs, "Regular Session Wrap-Up of Texas' 88th Legislature," Texas Comptroller of Public Accounts, December 2023, accessed online August 26, 2024, https://comptroller.texas.gov/economy/fiscal-notes/archive/2023/dec/session.php.

7    TDCJ, "TBCJ Approves Agency's 2025 Operating Budget, Legislative Appropriations Request for 2026-27 Biennium," accessed online August 26, 2024, https://www.tdcj.texas.gov/news/ED_LAR_Update_FY26-27.html.

8    Legislative Budget Board (LBB), "Texas Department of Criminal Justice: Correctional Officer Staffing," July 2024, accessed online August 28, 2024, https://www.lbb.texas.gov/CJDA/_site/TDCJ.html.

9    Ibid.

10    TDCJ, "Legislative Appropriations Request For Fiscal Years 2024-2025," August 26, 2022, p. 49, accessed online August 26, 2024, https://www.lbb.texas.gov/Agency_Docs.aspx?Session=88.

11    Section 508.1131(c), Texas Government Code.

12    TDCJ, "Parole Officer Career Ladder," July 1, 2023, accessed online August 30, 2024, https://www.tdcj.texas.gov/divisions/hr/hr-home/posalary.html.

13    CGL, *Lopez Escape Review*, September 2022, p. 1, accessed online August 18, 2024, https://static.texastribune.org/media/files/5f7b6e32d3e14ab4e09c395923bb0460/CGL%20Lopez%20Report.pdf; Associated Press, "Numerous Security Lapses Led to Escape of Texas Inmate Who Then Killed 5, Reviews Say," CBS News, December 9, 2022, accessed online August 18, 2024, https://www.cbsnews.com/news/gonzalo-lopez-numerous-security-lapses-escape-texas-inmate-killed-5/.

14    TDCJ and BPP, "Nestor Hernandez and Zeric Jackson Investigative Report," December 28, 2022, accessed online August 18, 2024, https://gov.texas.gov/uploads/files/press/Hernandez_Jackson_Response_to_the_Governor.pdf.

15    Section 508.1142, Texas Government Code.

16    Matthew T. DeMichele, "Probation and Parole's Growing Caseloads and Workload Allocation: Strategies for Managerial Decision Making," American Probation and Parole Association, May 4, 2007, p. 18, accessed online May 14, 2024, https://www.appa-net.org/eweb/docs/appa/pubs/SMDM.pdf; American Probation and Parole Association, *National Standards for Community Supervision*, June 2024, p. 75, accessed online August 16, 2024, https://www.appa-net.org/eweb/docs/APPA/APPAs_National_Standards_for_Community_Corrections.pdf.

17    TDCJ, "Parole Officer Caseload Study," September 2020, p. 5, accessed online May 14, 2024, https://www.tdcj.texas.gov/documents/pd/Parole_Officer_Caseload_Study.pdf.

18    LBB, *Adult/Juvenile Correctional Population Projections, Fiscal Years 2024-2028*, July 9, 2024, p. 4, accessed online August 16, 2024, https://www.lbb.texas.gov/Documents/Publications/Memorandum/TDCJ_TJJD_070924Memo.pdf.

19    Ibid.

20    Matthew T. DeMichele, "Probation and Parole's Growing Caseloads and Workload Allocation: Strategies for Managerial Decision Making," American Probation & Parole Association, May 4, 2007, pp. 7, 59-61, accessed online May 14, 2024, https://www.appa-net.org/eweb/docs/appa/pubs/SMDM.pdf.

21    American Probation and Parole Association, *National Standards for Community Supervision*, June 2024, p. 54, accessed online August 16, 2024, https://www.appa-net.org/eweb/docs/APPA/APPAs_National_Standards_for_Community_Corrections.pdf.

22    Ibid, p. 77.

23    Ibid, p. 78.

24    Section 508.1142, Texas Government Code.

25    American Probation and Parole Association, *National Standards for Community Supervision*, June 2024, pp. 77-78, accessed online August 16, 2024, https://www.appa-net.org/eweb/docs/APPA/APPAs_National_Standards_for_Community_Corrections.pdf.

26    James Bonta, Tanya Rugge, Terri-Lynne Scott, Guy Bourgon, and Annie K. Yessine, "Exploring the Black Box of Community Supervision," *Journal of Release Rehabilitation*, vol. 47(3), July 2008, p. 248-270; Erin Jacobs, Valentine Louisa Treskon, Cindy Redcross, "Implementing the Next Generation of Parole Supervision: Findings from the Changing Attitudes and Motivation in Parolees Pilot Study," U.S. Department of Justice, May 2022, p. 1, accessed online May 14, 2024, https://www.ojp.gov/pdffiles1/nij/grants/304755.pdf.

27    TDCJ, "PD-POP-4.1.1: Processing Violations of the Rules and Conditions of Release," September 1, 2023, accessed online August 22, 2024, https://www.tdcj.texas.gov/documents/pd/04.01.01_parole_policy.pdf.

28    TDCJ and BPP, "Nestor Hernandez and Zeric Jackson Investigative Report," December 28, 2022, p. 1, accessed online August 18, 2024, https://gov.texas.gov/uploads/files/press/Hernandez_Jackson_Response_to_the_Governor.pdf; Bethany Erickson, "Report: Ankle Monitoring Didn't Stop Dallas Murder Suspects," *D Magazine*, January 10, 2023, accessed online August 18, 2024, https://www.dmagazine.com/frontburner/2023/01/report-ankle-monitoring-didnt-stop-dallas-murder-suspects/; Associated Press, "Man Sentenced to Life for Fatally Shooting 2 Dallas Hospital Workers After His Girlfriend Gave Birth," U.S. News & World Report, November 9, 2023, accessed online August 18, 2024, https://www.usnews.com/news/us/articles/2023-11-09/man-sentenced-to-life-for-fatally-shooting-2-dallas-hospital-workers-after-his-girlfriend-gave-birth.

29    TDCJ and BPP, "Nestor Hernandez and Zeric Jackson Investigative Report," December 28, 2022, p. 5, accessed online August 18, 2024, https://gov.texas.gov/uploads/files/press/Hernandez_Jackson_Response_to_the_Governor.pdf.

30    Section 38.112, Texas Penal Code.

31    Matthew T. DeMichele, "Probation and Parole's Growing Caseloads and Workload Allocation: Strategies for Managerial Decision Making," American Probation and Parole Association, May 4, 2007, p. 6, 59-60, accessed online May 14, 2024, https://www.appa-net.org/eweb/docs/appa/pubs/SMDM.pdf.

32    BPP, "BPP-POL. 145.259: Special Condition "S" (Substance Abuse)," October 19, 2023, pp. 2-3, accessed online September 16, 2024, https://www.tdcj.texas.gov/bpp/policies_directives/POL_145.259.pdf

33    TDCJ, "PD-POP 3.2.7: Imposition, Withdrawal, and Modification of Special Conditions Through the Offender Information Management System," November 30, 2023, accessed online April 12, 2024, https://www.tdcj.texas.gov/documents/pd/03.02.07_parole_policy.pdf.

34    Ibid, pp. 4-5.

35    BPP, "BPP-POL. 145.259: Special Condition "S" (Substance Abuse)," October 19, 2023, p. 2, accessed online September 16, 2024, https://www.tdcj.texas.gov/bpp/policies_directives/POL_145.259.pdf; TDCJ, "PD/POP-2.2.25: Imposing Mandated Special Conditions," August 8, 2019, p. 3, accessed online September 16, 2024, https://www.tdcj.texas.gov/documents/pd/02.02.25_parole_policy.pdf.

36    Section 508.154, Texas Government Code.

37    Section 508.221, Texas Government Code.

# ISSUE 6

## BPP Does Not Ensure Its Decision-Making Processes are Fair, Consistent, Transparent, and Data-Informed.

## Background

The Board of Pardons and Paroles (BPP) decides whether to release eligible inmates on parole, determines what sanctions to apply to releasees who violate parole, and considers clemency applications. The term "releasee" applies to an individual released from confinement to supervision in the community by the Texas Department of Criminal Justice (TDCJ). The textbox lists BPP's activities in fiscal year 2023.

The governor appoints the seven parole board members. The board's presiding officer has hired 15 parole commissioners to assist with voting on release and revocation decisions. Each of the seven regional offices consists of a board member, administrative staff, and typically two parole commissioners. Parole panels, which are composed of the board member and two parole commissioners from one regional office, make most parole, discretionary mandatory supervision (DMS), and revocation decisions.[1] The BPP at a Glance contains more information about types of supervised release. Parole decisions involving certain violent offenses require a two-thirds majority vote by only board members, not panels.[2]

> **BPP's Activities - FY 2023**
>
> - Reviewed 79,270 inmates for parole and discretionary mandatory supervision and approved 28,802 (36.3%).
> - Created 77,484 case summaries.
> - Interviewed 4,426 attorneys or family members.
> - Held 19,519 hearings.
> - Revoked parole for 4,458 releasees.
> - Considered 289 inmates for Medically Recommended Intensive Supervision and approved 27 (9.3%).
> - Received 575 clemency applications, considered 163, and made a clemency recommendation for three.

Voters do not convene to vote. Instead, for release decisions, an institutional parole officer (IPO) reviews the inmate's files, interviews the inmate, and compiles various information into a "case summary." For revocation decisions, BPP staff compile the releasee's parole violation information into a hearing packet. The lead voter reviews the inmate's case summary or hearing packet, records a vote, and sends the file to the second voter. The second voter then reviews the file along with the lead voter's notes and records a vote. The second voter sends the file to the third voter for the deciding vote only if the first two voters disagree.

While the Legislature authorizes voter discretion, it has also imposed multiple requirements for this discretion and the process of decision making to encourage consistency and ensure public safety. For example, statute requires BPP to develop and maintain parole guidelines that equally weigh an inmate's likelihood of a favorable parole outcome and the severity of their offense, establish a range of recommended approval rates based on the guidelines, and implement the guidelines.[3] In another example, statute outlines specific factors the agency must consider for Medically Recommended Intensive Supervision (MRIS), a form of early release for certain elderly or ill inmates.[4] BPP carries out its functions with an annual budget of about $30 million and 445 employees.

## Findings

**BPP's partial noncompliance with statute governing parole guidelines poses a potential risk to public safety, increases costs for the state, and raises questions about inconsistent outcomes across regions.**

Statute requires BPP to develop research-based parole guidelines that are the basic criteria on which a parole decision is made and modify them as needed to help voters make decisions that equally consider an individual's likelihood of a favorable parole outcome and the severity of the individual's offense.[5] The agency consults with an external expert to create a recidivism risk level based on an individual's static factors that do not change and dynamic factors that can change.[6] Voters rank the severity of each offense as low, moderate, high, or highest.[7] The agency then uses a matrix to combine these two components, as shown in Appendix K, to create the seven-level parole guidelines, with Level 1 indicating the highest risk of recidivism and highest offense severity and Level 7 indicating the lowest.

Statute requires BPP to establish and maintain a range of recommended approval rates for each guideline level to encourage consistency in its decision making.[8] Statute also requires BPP to annually review the extent to which the guidelines and recommended rates align with panel decisions and predict successful parole outcomes and to annually report to state leadership on variations from recommended approval rates.[9]

- **Lack of actions addressing variations.** BPP's parole guidelines variations pose a potential risk to public safety and increase costs for the state by unnecessarily straining TDCJ's bed and staffing capacity. The Legislature requires the agency to address variations from the guidelines and approval ranges because variations pose two problems: approving inmates for parole at a higher rate than recommended could result in releasees reoffending and posing a public safety risk, and approving inmates for parole at a lower rate than recommended could result in the state continuing to pay to house, feed, and tend to the medical needs of release-ready inmates who likely would be successful on parole according to the agency's risk assessment.

Statute requires the agency to explain the variations in its annual report and list the actions it has taken or will take to address them.[10] However, the actions BPP has listed in recent years to address the variations are vague, describe existing duties of the agency, and have not effectively stopped variations from occurring. For example, from fiscal years 2018 to 2023, the only action the agency listed to address the variations was, "continually evaluating offense severity and adjusting as appropriate."[11] In another example, in fiscal years 2016 and 2017, the agency reported that voting issues would be discussed at voter training.[12] BPP has more actions at its disposal such as developing formal internal procedures for out-of-range voting at individual, regional, and state levels and even updating the guidelines if the problem is with the tool itself, like the agency did

*BPP deviations from parole guidelines come with potential risk to the public and costs to TDCJ.*

in fiscal year 2014.[13] The agency has elected not to explore these options in recent years. Additionally, voters receive a report at the end of every month showing how their voting records compared to the recommended rates. Despite explaining in the annual parole guidelines report that the variations are partly due to the timing and frequency of these reports, the agency has not made any adjustments to this procedure.[14]

The table below shows the frequency of these variations from fiscal years 2015 to 2023.[15] The agency deviated from the approval ranges in at least one level in eight of the nine years represented in the table. Variations in Level 4 and 5 are the most significant due to the large number of inmates categorized in those levels, and the table shows that the agency has particularly struggled to meet those ranges in addition to the range for the lowest risk and offense severity category, Level 7. During these nine fiscal years, Level 4 and 5 inmates accounted for between 55 percent and 65 percent of all inmates considered for parole that year. BPP's average variation from the Level 4 guideline and Level 5 guideline was 2 percent and 1.4 percent, respectively. These percentages may be small, but they equal 4,900 inmates in this time period, leading to increased costs and diminished prison capacity. BPP's frequent challenges in meeting the range for Level 7, resulting in an average variation of 1.8 percent or 256 inmates, also suggest panel voters could be releasing more inmates with a high chance of success on parole and a low offense severity.

> Deviations from minimum recommended approval rates from 2015 to 2023 increased TDCJ costs and diminished prison capacity.

### BPP Guideline Variations, FYs 2015-23

| Guideline Level | Recommended Approval Rate | FY 15 | FY 16 | FY 17 | FY 18 | FY 19 | FY 20 | FY 21 | FY 22 | FY 23 |
|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 0%-20% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 100%* | 9.09% | 12.34% | 7.86% |
| 2 | 15%-35% | 27.64% | 30.23% | 28.61% | 26.28% | 26.60% | 31.16% | 29.06% | 28.23% | 23.65% |
| 3 | 25%-40% | 36.09% | 37.37% | 35.70% | 30.38% | 32.57% | 38.32% | 36.16% | 36.46% | 28.35% |
| 4 | 30%-45% | 27.47% | 28.53% | 28.09% | 26.59% | 28.40% | 31.47% | 32.19% | 33.08% | 29.09% |
| 5 | 35%-50% | 35.35% | 33.81% | 33.97% | 32.00% | 33.68% | 36.70% | 37.70% | 38.12% | 34.43% |
| 6 | 45%-70% | 46.18% | 44.17% | 46.47% | 45.10% | 48.82% | 51.13% | 50.32% | 50.90% | 45.66% |
| 7 | 65%-100% | 67.02% | 64.29% | 67.72% | 66.89% | 73.03% | 73.27% | 64.64% | 62.99% | 60.71% |

\* In this year, the agency approved two out of two Level 1 inmates, resulting in a variation. Due to the small sample size, however, this variation is negligible.

- **No regional data.** BPP does not collect and report regional release outcomes data for each of its parole panels, preventing the agency from comparing regional parole panel approval rates to the recommended rates as required by law.[16] This lack of data prevents BPP and the state from fully accounting for all the contributing factors to TDCJ's capacity issues and raises concerns about fairness in the parole review process across BPP's seven regional offices. In its parole guidelines annual report, BPP provides summary statewide release outcomes by parole guideline level. The report also

provides information for each individual voter that shows, by guideline level, the number of times that they voted and how many times they voted to approve release, which the report groups by regional office; however, the parole guidelines annual report does not show any data about actual parole panel outcomes. Parole panel outcomes are not determined by a single voter. A parole panel decision requires a consensus of two voters. A BPP board directive establishes panels with a specified order of voting, so one office in reality has multiple panels consisting of the same three voters but with different voting sequences. Thus, inferring the actual approval rate for a region based on how individual panel members voted separately is impossible. In addition, statute requires the board to meet annually to review and discuss the parole guidelines and provides that the board must consider how the parole guidelines serve the needs of parole decision making and the extent to which the parole guidelines reflect parole panel decisions and predict successful parole outcomes. Without parole panel outcomes data to evaluate, BPP is unable to fully comply with its statutory obligations.

Because BPP lacks its own in-house data analysis capacity, TDCJ provided Sunset staff regional voting data. However, due to its lack of technological capacity, TDCJ was not able to pull results for any paper-voted parole cases in fiscal year 2023 and was only able to provide information for most, but not all, electronically voted cases. TDCJ and BPP staff estimated that electronic cases represent about 70 percent of all parole cases. Sunset staff reviewed BPP's fiscal year 2023 parole guidelines annual report where BPP reported that it considered 64,775 parole cases.[17] Based on that figure, the 36,062 electronic cases that TDCJ provided information about would represent 56 percent of total cases. As a result, while the accompanying table shows how each board office's overall approval rate ranged from 33 percent to nearly 45 percent for electronic cases, this table and chart on the following page are incomplete pictures because paper-voted and some electronically voted case data were not available by region.

**Regional Parole Approvals
(Electronic Cases Only) - FY 2023**

| Board Office | Electronic Cases Reviewed | Number Approved | Rate |
|---|---|---|---|
| Amarillo | 5,060 | 1,670 | 33.0% |
| Angleton | 6,093 | 2,351 | 38.6% |
| Austin* | 730 | 672 | 92.1% |
| Gatesville | 4,942 | 2,206 | 44.6% |
| Huntsville | 7,154 | 2,776 | 38.8% |
| Palestine | 6,016 | 1,988 | 33.0% |
| San Antonio | 6,067 | 2,389 | 39.4% |
| **Total** | **36,062** | **14,052** | **39.0%** |

\* The numbers for Austin do not align with other regions because the Austin board office is a specialty panel that receives a specific type of offense.

BPP regional board offices are assigned to make parole release decisions for inmates housed in specific TDCJ correctional facilities. Regional variations in parole approval rates can have a disparate impact on bed availability and correctional officer staff capacities for the correctional facilities assigned to those regional offices. The lack of visibility into BPP's regional approval rates obscures the effect that differences in regional voting outcomes have on TDCJ's facility-level capacities. For example, correctional facilities assigned to Amarillo and Palestine may have a lower release rate than correctional facilities assigned to San Antonio and Gatesville, constraining TDCJ's flexibility in making inmate housing decisions.

Furthermore, the regional variations evident in electronic cases potentially undermine the expectation for fairness among inmates, victims, and family members, and the failure to report them is nontransparent. The variations, in other words, could suggest release decisions may be driven more by the arbitrarily assigned region of an inmate's facility rather than the inmate's rehabilitation and risk to public safety. The accompanying chart, which compares the approval rates for electronically voted cases in fiscal year 2023 by guideline level, suggests a Level 4 inmate in the Palestine and Angleton regions has a lower chance of approval than a Level 4 inmate in the Huntsville or San Antonio regions. The disparity in approval outcomes is even greater for Level 7 inmates. In the Amarillo region, the electronic case approval rate was nearly 30 percentage points lower than the approval rates of Angleton and Gatesville and 15 percentage points below the recommended range. While BPP attributes differences in parole voting outcomes to regional factors, including a higher number of maximum security facilities or higher numbers of female inmates, the parole guidelines already consider an inmate's custody level as one of 10 factors when calculating the inmate's parole guidelines risk level and weight male and female risk factors differently. The parole guideline levels allow for direct comparison, regardless of facility type, sex, or other factors.

> BPP is not complying with a statutory change the Legislature enacted through a previous Sunset bill.



**Rate of Parole Approval by Guideline Level
(Electronic Cases Only) - FY 2023**

Legend: Amarillo, Angleton, Gatesville, Huntsville, Palestine, San Antonio

## Inefficient and ineffective case summary processes give IPOs too much discretion and fail to gather information necessary to inform voters about which inmates are well suited to release.

To make release decisions, panels review case summaries and interview victims or other interested parties. IPOs create these case summaries first by reviewing inmates' information in paper files or in various electronic TDCJ inmate information systems and manually inputting or summarizing the information into the case summary template. Then, they interview the inmates to complete remaining sections of the template. The template includes information such as

the inmate's arrest history, periods of incarceration, classification and housing assignments, medical and psychological information, institutional behavior, any self-reported problems or addictions, and an analysis of the interview. IPOs act as the eyes and ears of the voters who do not have time to interact with every inmate up for parole or DMS, but the lead voter may choose to interview the inmate if needed. Every voter on the panel can also access all available files on inmates if needed. The flowchart below shows the information-gathering and decision-making process for parole and DMS voting.

**Parole Review Process**



BPP does not establish thorough guidelines for and guardrails on IPO interviews or address inefficient information-gathering practices, undermining the usefulness of the case summary. As the immense volume of cases necessitates voters' reliance on hundreds of IPOs and the case summaries they produce, improvements to the case summary process would better help voters make sound, well-informed release decisions.

● **Deficient procedures for IPO interviews.**

<u>Non-substantive and unstandardized interview questions.</u> A BPP administrative directive lists the types of information included in the case summary document but lacks standard interview questions to ensure IPOs consistently obtain information voters find useful for release consideration that is relevant to the specific case. The administrative directive also does not provide direction for IPOs when conducting interviews. After preparing the case summary based on information contained in the inmates' files, IPOs interview inmates to complete any remaining sections of the case summary template and fill out risk assessment instruments. The *Examples of Template Content* textbox shows the typical components of the template that IPOs ask inmates about. Rather than using the interview as an opportunity to learn about topics unavailable in the inmates' files, IPO questions typically focus on rehashing details of an inmate's criminal and substance use history. While rationales for offenses and substance use history can help color a picture of the inmate's past and help voters assess specific programming needs, these limited interview topics relitigate an offense a court has already ruled on and ask inmates to recall information from years past that they may not accurately remember. Potentially reflecting this missed opportunity, some voters reported to Sunset staff a feeling that some questions are unnecessary. Additionally, when voters directly communicate with IPOs about case summaries, sometimes suggesting how to conduct interviews, they potentially introduce additional inconsistency into the process.

> **Examples of Template Content**
>
> **Criminal history**
>
> - Whether the inmate agrees with the contents of an offense report.
> - The inmate's version of events, if they disagree with the offense report.
> - The inmate's rationale for committing the offense.
>
> **Alcohol and drug use history**
>
> - The types of alcohol or drugs used.
> - Methods and frequency of use.
> - Ages at which the inmate used each substance.
> - How much each substance cost at the time or the amount of each substance.

<u>Subjective and discretionary interview analyses.</u> In the interview analysis section of the case summary, IPOs must discuss the inmate's level of grooming, level of cooperation and general attitude, level of accountability for the offense, favorable and unfavorable factors for release, programming needs, and supervision needs. Many of these determinations are subject to the IPO's discretion and risk invoking bias. Others are simply out of the inmate's control such as whether they showed up on time, which can be affected by staffing levels at the correctional facility or other factors. Moreover, asking IPOs to make subjective judgements on these criteria risks encroaching on the role and decision-making authority of voters. In conversations with Sunset staff, voters indicated varying levels of interest in the content of interview analyses, and TDCJ's internal auditor found that overall interview analyses could deliver more useful information to voters. Furthermore, writing an interview analysis is required for assault, weapons-related, or sex-related offenses but optional for all others, even

> Accurate and objective information is important as most voters never meet inmates considered for release.

though IPOs conduct interviews for most case summaries. Sunset staff found no discernable trend for when a case summary has an interview analysis when the analysis is optional, and IPOs do not always complete this section even when the analysis is required. Because of these practices, while the case summary is meant to be a collection of verified facts, IPO discretion is determining which information is relayed to voters and when.

Audits do not assess interview quality or accuracy. BPP does not record, transcribe, or audit interviews, limiting the reliability of interview analyses prepared by IPOs and the usefulness of the interviews themselves. Instead, IPO supervisors audit the written interview analysis. However, rather than reviewing if the interview analysis uncovers new information about the inmate, the audits assess whether the analysis mentions the inmate's appearance and behavior during the interview, their recommendations for the level of supervision, strengths and weaknesses of the inmate regarding their potential to have a successful supervision, and criminal history — information already detailed in another section of the case summary. Supervisors have no way of determining whether these interview analyses are accurate, not just because they are subjective but also because no transcript of the interview exists. Agency policy merely encourages supervisors to observe interviews periodically and as needed during quarterly visits, and the audit procedure only requires supervisors to pull completed case summaries for the quarterly audit.

> Rather than reviewing if interviews uncover new information, audits assess information already in case summaries.

- **High administrative and clerical burden.** Case summary preparation is a time-consuming process that requires a large number of IPOs to perform many tasks, including interviewing the inmate and navigating multiple electronic windows and files. Highly clerical case summary development procedures result in an ineffective use of agency resources that could be used for a more rigorous and high-quality assessment of inmate information. Institutional parole operations make up nearly half of BPP's $28 million expenditures and more than half of the agency's 445 employees.

  In a fiscal year 2023 report, TDCJ's internal auditor found opportunities for automating many steps in case summary preparation in the future. However, opportunities for reducing the workload of IPOs already exist, and the *Unnecessary Manual Tasks* textbox provides examples. Duplicative tasks such as these add complexity to training and onboarding IPOs, which is already a three-month process, recently reduced from six months due to the division's turnover challenges. They also distract from the IPO's role as a factfinder for the voters.

### Unnecessary Manual Tasks

- To gather information on an inmate's parole violation, an IPO currently looks at parole revocation documentation and three different electronic windows, all of which contain the same information, and then manually enters the data in the case summary template.

- To summarize an inmate's participation in programming for the case summary, IPOs refer to an electronic window, which the voter already has access to when voting. The IPO then prints out that TDCJ window, signs it, and scans the sheet for the voter to access when voting. This process unnecessarily duplicates information in three different places and is a waste of the IPO's limited time.

The rationale behind having IPOs check multiple sources to obtain information is to ensure accuracy in case summary information. In reality, the agency requires IPOs to spend too much time performing rote tasks to transfer information to the case summary template, preventing IPOs from performing the more important task of checking for accuracy. Automating and streamlining such clerical tasks would enable IPOs to focus more on verifying information such as inmates' self-reported claims so that the voter can weigh all case summary information more confidently.

### MRIS processes are underdeveloped and not data-informed, risking inconsistent and uninformed MRIS decision making and an increased strain on TDCJ resources.

The Correctional Managed Health Care Committee establishes the procedures for screening MRIS-eligible inmates.[18] The Texas Correctional Office on Inmates with Medical or Mental Impairments (TCOOMMI) housed within TDCJ receives MRIS referrals and screens for whether the inmate first meets the statutory requirements for eligibility, as summarized in the textbox *MRIS Eligibility*.[19] Healthcare providers from TDCJ's medical partners for the provision of healthcare services to inmates — the University of Texas Medical Branch (UTMB) and the Texas Tech University Health Sciences Center (TTUHSC) — then indicate on a screening form whether the inmate meets a medical criterion for MRIS, also provided in the textbox.[20] If inmates are eligible based on a diagnosis, the diagnosis must be confirmed by a licensed physician or psychiatrist.[21]

> **MRIS Eligibility**
>
> Inmates with one or more of the following criteria may be eligible to be considered for MRIS:
>
> - Terminal illness (life expectancy of less than six months)
> - Elderly (65 or older)
> - Physical disability
> - Developmental or intellectual disability
> - Mental illness
> - Needs long-term care
> - Organic brain syndrome
> - Persistent vegetative state
>
> Inmates sentenced to death or life without parole and non-U.S.-citizens with an active Immigration and Customs Enforcement detainer are not eligible for MRIS. Sex offenders must have organic brain syndrome or be in a vegetative state to be eligible.

BPP approves or denies MRIS based on a medical or mental health summary that describes the inmate's current conditions, photos of the inmate at intake and at present, and the inmate's case summary. While for regular release considerations, IPOs can help voters virtually interview hospitalized inmates, they do not do so for MRIS reviews. Instead of a typical parole panel, a designated panel made up of the board chair and two other voters reviews MRIS cases.[22] Statute requires the panel to base the consideration on whether the inmate constitutes a threat to public safety in their current medical condition.[23]

- **Lack of appropriate voter training.** Unlike other areas of voting, BPP lacks a standardized, formal training for MRIS voters either on voting procedures or about the MRIS program itself, undermining panel members' preparation for deciding such cases.

_Confusion over statutory guidance._ Sunset staff encountered MRIS voter confusion about the statutory requirement to assess an inmate's threat to public safety based only on the inmate's condition and medical evaluation.[24] Voters reported to Sunset staff that they routinely consider additional factors such as protest letters, time served, number of previous MRIS reviews, the inmate's eligibility for regular parole or DMS, and whether the case involves consecutive sentences, but they were not able to articulate how these factors indicate the degree of an inmate's threat to public safety. Considering aspects of an MRIS case beyond the medical assessment risks voters making decisions that are not in line with what the Legislature envisioned for the MRIS program.[25]

| Voters need more training to ensure sound decisions in release considerations for MRIS. |

_No clinical training._ Neither statute nor board policy requires MRIS voters to have a clinical background or medical expertise or to receive training on how to interpret medical information. Sunset staff learned voters sometimes rely on a medical dictionary to understand the medical summary. The medical summary provides a static description of an inmate's condition such as medical history, current diagnoses, and level of mobility. However, without a clinically informed perspective, MRIS voters may be unable to fully account for the confluence of multiple medical and treatment-related factors or how a prognosis impacts an inmate's ability to reoffend, preventing voters from being able to assess whether an inmate's condition still enables them to be a threat to public safety. As of the third quarter in fiscal year 2024, five MRIS releasees had absconded, which means TDCJ cannot locate the releasees because they left their approved residence. Conversely, inmates have died from their conditions shortly after they have been denied MRIS, and others have been approved for MRIS only to die before release.

| TDCJ sends BPP status reports on MRIS releasees, but BPP does not view the reports. |

_Unawareness of MRIS supervision._ MRIS voters are not knowledgeable about the MRIS program beyond the MRIS review phase. MRIS voters gave Sunset staff conflicting answers about which BPP panel is responsible for graduated sanctions and modifying conditions for MRIS releasees once they return to the community. Voters rely on their knowledge of supervision practices to confidently vote for or against regular parole and DMS and impose special conditions or graduated sanctions; MRIS voters cannot make the most informed release decisions without a similar knowledge of MRIS supervision.

- **No use of data.** BPP does not use data to better understand MRIS outcomes, preventing panel members from voting knowledgably on MRIS cases. Statute requires TDCJ to send BPP status reports on MRIS releasees, but BPP does not look at the reports to inform decision making.[26] Voters could use this report — which includes information on releasees' MRIS category, current conditions of releasees and months since release, revocations, and absconders — to determine if they need to modify conditions for MRIS releasees, as intended by statute. The agency could use this information to develop and improve MRIS voter training on decision making as well.

As the chart shows, the rate of MRIS approvals has generally declined since fiscal year 2016 despite an aging inmate population, an increase in the number of inmates presented for MRIS consideration, and a recent pandemic that would have increased the risk of death for MRIS-eligible inmates.[27] BPP was not aware of this trend nor could the agency explain it, a fact suggestive of BPP's lack of data tracking and analysis of the MRIS program.



**MRIS Considerations and Approval Rates History FYs 2013-23**

- **Confusion surrounding processes in rule.** Agency rules state that for MRIS-eligible extraordinary cases, or cases that require the full seven-member board to vote, the three-member MRIS panel first makes the determination on whether the inmate is a threat to public safety and then the full seven-member board votes if the panel finds that they are not a threat.[28] However, Sunset staff learned that the full board does not vote these cases. Additionally, agency rules suggest that BPP provides the reasons for the decision, but TCOOMMI creates the decision letter containing reasons. Sunset staff heard from voters that they would like to provide reasons for their MRIS decisions. The confusion about and potential misalignment between rules and actual processes further suggest that BPP's MRIS program is underdeveloped.

> BPP's MRIS voting process does not adhere to its own rules.

- **Increased strain on TDCJ resources.** Though the exact healthcare costs of MRIS-eligible inmates are unknown, many of these inmates occupy high-demand infirmary beds. For more on infirmary bed capacity, see Issue 1. TDCJ has infirmary beds at UTMB's Hospital Galveston, but an underdeveloped MRIS program contributes to the high demand for those beds. As of August 2024, 57 infirmary patients were identified as MRIS-eligible. The high demand for infirmary beds pressures TDCJ to use in-patient beds in community hospitals for inmates receiving acute care. To secure these beds, TDCJ must station correctional officers at those hospitals, diverting staff from the facility during a staffing crisis, thereby exacerbating staff and inmate safety concerns at understaffed facilities and risking adverse events in the community hospitals. For example, in

a 10-month span in fiscal year 2024, TDCJ had two separate incidents wherein correctional officers misplaced their guns at community hospitals. [29]

### BPP misses an opportunity to enhance the consistency and effectiveness of its decisions by neglecting to evaluate decision making for graduated sanctions and special conditions.

BPP voters do not simply vote "yes" or "no." For example, parole approval is often conditional upon the inmate completing a treatment program prior to release, and voters must also record in their vote any special parole conditions they wish to impose on the individual such as electronic monitoring. For revocations, voters have three options: to continue without modification, modify, or revoke. When modifying parole, BPP uses a graduated sanctions approach, which includes options for escalating punitive actions corresponding to the severity of the parole violation. For example, voters may send a releasee to a short-term sanction facility or impose a special condition instead of revoking parole.

When a releasee violates their parole conditions or commits a new offense, TDCJ's Parole Division notifies BPP to schedule a revocation hearing. During a hearing, a BPP hearing officer documents any evidence and testimony in the hearing packet and recommends a decision to the panel. Then, an analyst completes a desk review of the allegations, evidence, and testimonies and makes an additional recommendation to the panel which may or may not concur with that of the hearing officer. If a releasee waives their hearing, only the desk review occurs. Panels can take recommendations of hearing officers and analysts into account but are not bound by them.

<div style="float:left; font-style:italic; text-align:right;">

BPP and TDCJ's Parole Division do not work together to evaluate the effectiveness of special conditions.

</div>

- **No data on votes or recommendations.** BPP does not evaluate votes by panels on special conditions, graduated sanctions, or revocations for consistency. Tracking these decisions could enhance consistency and fairness in the parole review and revocation process as well as assist the agency in evaluating the effectiveness of its voter training. BPP also does not evaluate recommendations by hearing officers or analysts for consistency or assess whether these recommendations are useful to panels. BPP instead could track these recommendations, identify trends, and make necessary adjustments to its annual training, improving the process for voters.

- **No regular assessment of special conditions.** Statute requires BPP to determine the conditions of supervision and requires TDCJ's Parole Division to ensure releasees meet these conditions. [30] BPP and the Parole Division collaborate and communicate on special conditions as needed, but they do not regularly assess the effectiveness of special conditions on addressing releasee needs like gainful employment, substance use and mental health treatment, permanent housing, and other measures of parole success. The dynamic and evolving field of parole supervision necessitates that the two entities work together to ensure special conditions both effectively enhance public safety and reasonably allow releasees to be successful on supervision.

**BPP does not leverage data and resources to improve the noncapital clemency application process, resulting in a high rate of incomplete applications and increasing staff's workload.**

The board considers applications for clemency — the process by which the governor may reduce an inmate's sentence, grant a pardon, or delay a punishment — for capital cases, where the death penalty is or could be the sentence, and for noncapital cases, where the death penalty is not the sentence.[31] A grant of clemency could mean a full pardon after conviction or successful completion of a term of deferred adjudication community supervision, conditional pardon, pardon based on innocence, commutation of sentence, or a reprieve. In capital cases, clemency could include a commutation of sentence to life in prison or a reprieve of execution.[32] In both capital and noncapital cases, the board can vote only on whether to recommend clemency, not to approve or deny it. If the board recommends clemency, the governor makes the final decision.[33] A death warrant or order of execution automatically initiates BPP's pre-application process for capital clemency. For noncapital clemency, petitioners themselves initiate the application process.

The agency's failure to systematically track barriers to applying for noncapital clemency may unduly diminish the program's accessibility while creating additional work for the agency's clemency staff. The BPP staff that prepares clemency files only sends complete applications to the board for a vote, resulting in the agency rejecting the vast majority of applications in fiscal year 2023 for being administratively incomplete; only 15 percent of applications BPP received that year were complete. BPP does not track reasons for incomplete applications and was only able to identify commonly missing application components in fiscal year 2023 in response to a Sunset staff information request. The most commonly missing components in fiscal year 2023 were trial official letters, offense reports, certified court documentation, and Request for Application letters, all of which are issues BPP could preemptively address by providing additional clarity on its website and official communications. BPP's current approach requires staff to request missing documents from each individual with an incomplete application and delays decisions for applicants.

> About 85% of noncapital clemency applications BPP received in 2023 were incomplete.

## Sunset Staff Recommendations

### *Change in Statute*

**6.1   Require BPP to report outcomes by panel for release decisions, special conditions, and revocations and incorporate the findings into training for voters and staff.**

This recommendation would require BPP to collect outcomes data for each three-voter panel and report additional information on parole, DMS, MRIS, special conditions, and graduated sanctions and use these findings to continuously improve training. BPP would coordinate with TDCJ to collect and analyze data to evaluate outcomes and trends. As part of this recommendation, BPP would determine a method for evaluating consistency of decision making in revocation decisions and then collect, analyze, and report the necessary data. This recommendation would also require BPP to use the outcomes data to inform training for voters, hearing officers, and analysts. In addition, this recommendation would

direct BPP to comply with its current requirement to compare regional approval rates to the agency's recommended approval rates.

Beginning on September 1, 2026, BPP would report the following information in one of its existing reports:

- **Annual parole guidelines report.**

    Parole. Comparison of regional three-member panel approval rates to the recommended approval rates and an explanation of wide variations.

    Special conditions. Regional imposition rates for each special condition imposed during release decisions and an explanation of wide variations.

- **Annual report on the agency's activities.**

    MRIS. Approval numbers and rates over a 10-year period, explanation of 10-year trends, historical revocation rate, and types, if any, of modifications of conditions or graduated sanctions.

    Graduated sanctions. Evaluation of consistency in graduated sanctions and revocations.

    Special conditions. Evaluation of consistency in special conditions imposed as an outcome of a revocation hearing.

    Recommendations by hearing officer and analysts. Rates of consensus between voting outcomes and hearing officer recommendations and voting outcomes and analyst recommendations for special conditions and graduated sanctions.

This recommendation would enhance transparency by requiring the agency to report on other aspects of its decision making and to evaluate trends, the consistency of its decisions, and the degree of alignment between recommendations and votes. These evaluations would give BPP greater insight into regional voting patterns, which may allow TDCJ to better anticipate facility capacity. Lastly, incorporating these findings into existing training would allow BPP to meet specific training needs of its voters, hearing officers, and analysts.[34]

## 6.2   Require BPP to provide training for MRIS voters.

This recommendation would require BPP to develop and provide training on a regular basis for board members and parole commissioners who vote on MRIS cases. This recommendation would require BPP to provide comprehensive and detailed training to newly assigned MRIS voters and a condensed version of that training for biennial supplemental training. BPP would train voters who review MRIS cases on the following topics:

- Background information on the MRIS program during initial training.

- Statutory requirements for MRIS consideration or pertinent rules during initial and supplemental training.

- Interpreting medical conditions and treatment of MRIS-eligible inmates during initial and supplemental training.

- Graduated sanctions for MRIS releasees during initial and supplemental training.

- MRIS supervision during initial and supplemental training.

- Imposing and modifying special conditions on MRIS releasees during initial and supplemental training.

Voters currently on an MRIS panel would undergo initial training, and BPP would also inform MRIS voters thereafter of any changes to the initial training. BPP would develop the training using available data on MRIS and in consultation with TDCJ's Parole Division and a practicing physician and psychiatrist, as needed, to ensure that MRIS voters are fully equipped with the appropriate knowledge to make informed MRIS decisions that comply with statute.

### 6.3    Require BPP to establish a process in rule for assessments of an inmate's prognosis for MRIS cases.

This recommendation would require BPP to define in rule the process for evaluating cases involving inmates who qualify for MRIS due to a medical condition. Under this recommendation, if an inmate qualifies for MRIS due to medical factors, one or more health care practitioners would conduct a review and provide MRIS voters a written report on the inmate's condition and medical evaluation that specifically addresses how the inmate's illnesses and treatments will affect their ability to constitute a threat to public safety. The healthcare practitioners would write the report in plain language that a nonmedical professional would understand. BPP would establish in rule the specific contents of the report. To comply with this recommendation, BPP should consider the following:

- Redacting any identifying information of a reviewer other than the specialty of the reviewer to prevent jeopardizing the health or safety of the reviewer.

- Consulting other entities, such as TCOOMMI, TDCJ's Parole Division, UTMB, TTUHSC, and the Correctional Managed Health Care Committee, to establish the contents of the report.

This recommendation would not authorize healthcare practitioners to make decisions about the MRIS cases they evaluate, and the report would enhance the medical or mental summary currently provided by a healthcare practitioner for inmates who qualify due to a medical or mental condition.[35] Enhancing the quality of clinical information for MRIS voters would better equip them to make the critical decisions with which they have been tasked.

### 6.4    Require BPP to establish in rule the factors considered in MRIS decisions.

This recommendation would require BPP to determine and establish in rule a list of factors that are relevant or statutorily required for MRIS decisions in addition to the inmate's condition and medical evaluation. In rule, BPP would define threat to public safety and then list the factors that it determines MRIS voters should consider. This recommendation would give voters additional guidance and ensure the agency considers appropriate factors when rendering MRIS decisions.

### 6.5    Require BPP and TDCJ's Parole Division to create a special conditions working group consisting of voters and Parole Division staff representatives.

This recommendation would require BPP and TDCJ to create a working group responsible for assessing the impact and effectiveness of special conditions that includes both voters and representatives from TDCJ's Parole Division. This working group would be part of the effort toward greater communication between the two entities recommended in Issue 5. As part of this recommendation, the group would meet annually to discuss the efficacy of special conditions with input from the field, assess the continuing

need for special conditions, and identify modifications that the board should consider making. This recommendation would reinforce the current collaboration between BPP and the Parole Division, ensure the continuation of this collaboration, and allow the two entities to adapt to evolving best practices in parole supervision.

### Management Action

**6.6    Direct BPP to develop formal and detailed internal processes to address variations from parole guidelines.**

This recommendation would direct the agency to create internal processes to address individual, regional, and statewide variations from parole guidelines. BPP cites the infrequency and timing of voter reports to be a challenge in meeting the guidelines. Accordingly, this recommendation would direct BPP to consider providing more frequent voter reports and the presiding officer to refer to and initiate an already existing internal process when the agency identifies variations. Finally, as part of this recommendation, the agency should include in its annual parole guidelines report a more specific and concrete list of actions it has taken or will take to address variations.

**6.7    Direct the agency to review its IPO interview procedures and take action to increase effectiveness and consistency.**

This recommendation would direct the agency to review and take action to improve its IPO interview procedures. To do so, the agency should first establish, through consultation with the voters, the types of information about inmates voters need to make release decisions. Then, the agency should evaluate whether IPO interviews are the most effective method of obtaining such information. The agency should complete these steps by September 1, 2025. If BPP determines IPO interviews are necessary to gather the information voters need, the agency should create a standard list of topics or scripted questions IPOs must ask inmates, track interview no-shows, and consider recording IPO interviews for the voters' reference. BPP should audit interviews as well.

If the agency determines IPO interviews are worth the time and resources they require, this recommendation would direct the agency to reexamine its procedures for interview analyses. It should establish what types of information voters need from an interview analysis to make release decisions and determine whether current procedures meet the voters' needs. The agency should also consider reducing IPO discretion by requiring interview analyses for all cases if it determines that the analyses are necessary. Eliminating the IPO interview would eliminate a time-consuming task for IPOs, reducing their workload and training requirements. However, if the agency decides to continue the IPO interview, this recommendation would improve the objectivity and utility of the information IPOs gather and relay to voters.

**6.8    Direct the agency to review its case summary preparation processes and take action to address inefficiencies.**

This recommendation would direct BPP to identify elements of case summary development that can be automated and plan for their automation. It would also direct the agency to identify inefficient processes that can be addressed currently or in the near future without major IT solutions and eliminate the identified inefficiencies. For example, the agency should consider instructing IPOs to give voters a copy of an inmate's TDCJ individualized treatment plan (ITP) instead of having IPOs create a summary of the ITP to help guide decision making. The agency should identify inefficiencies that can be addressed in the short term and eliminate them by September 1, 2025. Lastly, BPP should consider transitioning the IPO's role from data entry to information quality assurance while considering the impact of this

transition on IPO training requirements. This recommendation would move the agency toward completely eliminating all clerical IPO tasks, freeing up IPOs to perform more useful functions.

### 6.9 Direct BPP to work with TCOOMMI to establish a method to videoconference with an inmate who qualifies for MRIS due to a medical condition.

This recommendation would direct BPP to establish a method to videoconference with an inmate who is eligible for MRIS based on a medical condition prior to rendering a decision. Videoconferencing with the eligible inmate would give voters an opportunity to directly observe the inmate and interview them if possible, providing information that is in addition to the written summary of the inmate's conditions. This opportunity would give voters better information and thus more confidence in their decision making.

### 6.10 Direct BPP to identify and address barriers to completing noncapital clemency applications and post relevant guidance on its website.

This recommendation would direct the agency to track barriers to completing noncapital clemency applications and use its website to reduce the most common barriers. BPP should identify and address barriers and use that information to publish a detailed webpage to help clemency petitioners submit complete applications by September 1, 2025. This recommendation would reduce the administrative burden on the clemency section staff and increase the accessibility of the noncapital clemency application process.

## Fiscal Implication

Overall, these recommendations could have a fiscal impact to the state depending on how the agency implements them, but the exact cost cannot be estimated at this time.

Recommendations 6.1 through 6.6, 6.9, and 6.10 expand upon currently existing agency duties or practices and could be accomplished with existing resources or lapsed funding from vacant positions if needed. These recommendations would have no fiscal impact to the state.

Recommendations 6.7 and 6.8 to improve institutional parole operations could generate a cost savings in the long term depending on how the agency implements them. As of July 2024, the agency had 141 IPOs working on creating case summaries, spending a large amount of time on manual tasks and interviews that require several months of training and onboarding. If these recommendations result in large reductions in IPO workload, they may allow the agency to further reduce the length of IPO training and onboarding or even downsize its IPO division. However, the agency may decide to continue conducting interviews or assign other tasks to IPOs as clerical tasks decrease. Therefore, the fiscal impact cannot be estimated.

[1]   All citations to Texas statutes are as they appear on http://statutes.legis.texas.gov/. Section 508.045, Texas Government Code.

[2]   Section 508.046, Texas Government Code.

[3]   Sections 508.144(a)(2), 508.144(a)(4), and 508.144(5), Texas Government Code.

[4]   Section 508.146(a), Texas Government Code.

[5]   Sections 508.144(a-c), Texas Government Code.

[6]   Board of Pardons and Paroles (BPP), "Revised Parole Guidelines," web page last modified January 31, 2024, accessed online August 16, 2024, https://www.tdcj.texas.gov/bpp/parole_guidelines/parole_guidelines.html.

[7]   Ibid.

[8]   Section 508.144(a)(4), Texas Government Code.

9    Section 508.144(b) and 508.1445, Texas Government Code.

10    Section 508.1445(b)(3), Texas Government Code.

11    BPP, *Annual Parole Guidelines Report FY 2018*, 2018, p. 9; BPP, *Annual Parole Guidelines Report FY 2019*, 2019, p. 9; BPP, *Annual Parole Guidelines Report FY 2020*, 2020, p. 9; BPP, *Annual Parole Guidelines Report FY 2021*, 2021, p. 9; BPP, *Annual Parole Guidelines Report FY 2022*, 2022, p. 9; BPP, *Annual Parole Guidelines Report FY 2023*, 2023, p. 9.

12    BPP, *Annual Parole Guidelines Report FY 2016*, 2016, p. 9; BPP, *Annual Parole Guidelines Report FY 2017*, 2017, p. 9.

13    BPP, *Annual Parole Guidelines Report FY 2014*, 2014, p. 17.

14    BPP, *Annual Parole Guidelines Report FY 2023*, 2023, p. 9; BPP, *Annual Parole Guidelines Report FY 2022*, 2022, p. 9; BPP, *Annual Parole Guidelines Report FY 2021*, 2021, p. 9; BPP, *Annual Parole Guidelines Report FY 2020*, 2020, p. 9; BPP, *Annual Parole Guidelines Report FY 2019*, 2019, p. 9; BPP, *Annual Parole Guidelines Report FY 2018*, 2018, p. 9; BPP, *Annual Parole Guidelines Report FY 2017*, 2017, p. 9; *Annual Parole Guidelines Report FY 2016*, 2016, p. 9.

15    BPP, *Annual Parole Guidelines Report FY 2023*, 2023, p. 9; BPP, *Annual Parole Guidelines Report FY 2022*, 2022, p. 9; BPP, *Annual Parole Guidelines Report FY 2021*, 2021, p. 9; BPP, *Annual Parole Guidelines Report FY 2020*, 2020, p. 9; BPP, *Annual Parole Guidelines Report FY 2019*, 2019, p. 9; BPP, *Annual Parole Guidelines Report FY 2018*, 2018, p. 9; BPP, *Annual Parole Guidelines Report FY 2017*, 2017, p. 9; BPP, *Annual Parole Guidelines Report FY 2016*, 2016, p. 9; BPP, *Annual Parole Guidelines Report FY 2015*, 2015, p. 9.

16    Sections 508.144(b)(2) and 508.1445(b)(2), Texas Government Code.

17    BPP, *Annual Parole Guidelines Report FY 2023*, 2023, p. 9.

18    Correctional Managed Health Care Committee, *Correctional Managed Health Care Policy Manual*, Number A-08.6, 2018.

19    Section 508.146, Texas Government Code.

20    Correctional Managed Health Care Committee, *Correctional Managed Health Care Policy Manual*, Number A-08.6, 2018, pp. 2-3.

21    Ibid.

22    Section 508.146(e), Texas Government Code.

23    Section 508.146(a)(2), Texas Government Code.

24    Ibid.

25    Texas House of Representatives, House Research Organization, *HB 772 Bill Analysis*, April 4, 2001, p. 3, accessed online August 25, 2024, https://hro.house.texas.gov/pdf/ba77R/HB0772.PDF.

26    Section 508.146(c), Texas Government Code.

27    Brendan Saloner et al., "COVID-19 Cases and Deaths in Federal and State Prisons," JAMA vol. 324(6), July 8, 2020, pp. 602603, https://doi.org/10.1001/jama.2020.12528;

28    37 Texas Administrative Code (TAC), Part 5, Chapter 145, Subchapter A, Section 145.15(d) (2002) (Board of Pardons and Paroles, *Action upon Review; Extraordinary Vote (SB 45)*); 37 Texas Administrative Code (TAC), Part 5, Chapter 145, Subchapter A, Section 145.18(d) (2016) (Board of Pardons and Paroles, *Action upon Review; Extraordinary Vote (HB 1914)*).

29    Alex Egan, Morgan Riddell, and Josh Gorbutt, "TDCJ Admits Officer Lost Gun at St. Joseph Hospital in Bryan," KBTX, September 25, 2023, accessed online August 22, 2024, https://www.kbtx.com/2023/09/25/tdcj-admits-officer-lost-gun-st-joseph-hospital-bryan/; Morgan Riddell, "TDCJ Officer Lost Gun at Bryan Hospital While Inmate Received Care, Located by Staff," KBTX, June 26, 2024, accessed online August 22, 2024, https://www.kbtx.com/2024/06/26/tdcj-officer-lost-gun-bryan-hospital-while-inmate-received-care-located-by-staff/.

30    Section 508.041(a)(2) and 508.112, Texas Government Code.

31    Section 48.01, Texas Code of Criminal Procedure.

32    BBP, "What is Clemency?," web page last modified January 2, 2019, accessed online August 31, 2024, https://www.tdcj.texas.gov/bpp/exec_clem/exec_clem.html.

33    Section 11(b), Article IV, Texas Constitution.

34    Sections 508.0362, 508.042, and 508.041, Texas Government Code.

35    Correctional Managed Health Care Committee, *Correctional Managed Health Care Policy Manual*, Number A-08.6, 2018, pp. 2-3.

# ISSUE 7 | The State Has a Continuing Need for the Texas Department of Criminal Justice.

## Background

Created in 1989 by consolidating Texas' adult probation, incarceration, and parole supervision functions, the Texas Department of Criminal Justice (TDCJ) works with the Correctional Managed Health Care Committee, Windham School District, and Board of Pardons and Paroles (BPP) to confine, supervise, and provide services for adults convicted of crimes in Texas. To fulfill its mission, TDCJ performs the following key functions:

- Assists local Community Supervision and Corrections Departments (CSCDs) that supervise individuals on probation.

- Provides confinement, rehabilitation, and services for reintegration of inmates in state jails and prisons.

- Supervises individuals released from confinement to TDCJ supervision in the community.

In fiscal year 2023, TDCJ had a staff of about 31,000, including nearly 17,400 correctional officers, and operated on appropriations of approximately $3.9 billion. The Texas Board of Criminal Justice governs TDCJ's operations and consists of nine members appointed by the governor to serve staggered, six-year terms.[1] TDCJ and its board will be abolished on September 1, 2025, unless continued by the Legislature.[2] Statute requires the Sunset Commission to review the committee and Windham in conjunction with TDCJ but does not subject either entity to abolishment through the Sunset Act.[3] Statute also requires the Sunset Commission to review BPP in conjunction with TDCJ, but because BPP is a constitutionally created agency, it is not subject to abolishment.[4]

## Findings

**Texas has a continuing need to protect the public by supervising and incarcerating individuals convicted of crimes.**

Texas has a continuing need for TDCJ to protect the public's safety by incarcerating and supervising individuals convicted of certain crimes by the courts.

- **Probation.** Adult community supervision, commonly known as "probation," diverts individuals from incarceration by allowing judges to have individuals convicted of criminal offenses serve their sentences in the community with access to rehabilitation services instead of going directly to prison.[5] Locally controlled CSCDs, rather than the state, monitor probationers to attempt to ensure they comply with supervision terms, have access to rehabilitation services, and do not commit new crimes. As of fiscal year 2023, Texas has 122 CSCDs that serve a key public safety role by supervising about 326,000 probationers, including both felons and misdemeanants.

  > As of FY 2023, Texas' 122 CSCDs supervised about 326,000 probationers.

  TDCJ's Community Justice Assistance Division supports this activity by providing state funding to CSCDs, developing supervision standards to

which CSCDs must adhere, and monitoring CSCDs' programs and budgets. TDCJ disbursed about $244 million in state funding to CSCDs in fiscal year 2023, which is distributed based on both statutory formulas and a grant scoring methodology. As of fiscal year 2023, state funding through TDCJ represents about 67 percent of CSCDs' budgets, an increase from about 63 percent at the time of the agency's last Sunset review in 2013.



**Felony Community Supervision Revocation Rates, FYs 2013-22**

Community supervision revocation rates are one measure of the effectiveness of these functions. The accompanying graph shows the rates of revocation of supervision for felony probationers from fiscal years 2013 to 2022.[6]

- **Incarceration.** The state has a continuing need to protect public safety by confining certain individuals convicted of criminal offenses and sentenced to prisons, state jails, and other correctional facilities. As of fiscal year 2023, TDCJ confined about 130,000 inmates in 101 correctional facilities across the state. The agency does so at a cost of approximately $77.49 per inmate per day in state-run facilities through confinement, working to safely maintain custody, providing basic necessities, and providing programs and services to rehabilitate and prepare inmates for reentry into the community.[7] As of fiscal year 2021, the most recent year for which federal and other state systems' data were available, TDCJ's cost per inmate per day figures aligned with or were below that of other large states and were comparable to the federal system, as shown in the table. The American Correctional Association audits TDCJ facilities with standards on public safety, human treatment, and effective operation. TDCJ received agencywide accreditation in 2014, and the association re-audits facilities once every three years. TDCJ also complies with federal Prison Rape Elimination Act (PREA) standards, and the U.S. Department of Justice audits and certifies facilities for PREA compliance once every three years.

**Average Cost Per Day - FY 2021**

| State | Inmate Population | Average Cost Per Day* |
|---|---|---|
| California | 101,441 | $290.77 |
| Federal Bureau of Prisons | 157,314 | $120.10 |
| Florida | 80,417 | $77.53 |
| Texas | 133,772 | $77.02 |
| Georgia | 47,010 | $73.79 |

\*    Each state and the federal system calculate these figures differently, so these figures are provided as points of comparison but have numerous caveats making direct comparisons difficult.

Within its facilities, TDCJ provides rehabilitation programming and reentry services, along with Windham's education programs, to prepare inmates for reentry into society. Recidivism rates are one measure of the effectiveness of these activities and the agency's efforts to protect public safety. The graph on the following page shows the most recent data for the rate of reincarceration for inmates in a TDCJ facility within a three-year period after release.[8]

Differences in how states define and calculate reincarceration complicate interstate comparisons. Additionally, reincarceration outcomes are highly influenced by a host of complex factors such as the state's sentencing and parole laws and, for individuals released in 2019, the COVID-19 pandemic. That said, Texas' reincarceration rates are generally lower than or comparable to other large states, as shown in the table.[9]



**Reincarceration Rates Within Three Years of Release, FYs 2015-19**

- **Parole.** As a separate, independent agency, BPP can vote to release and set conditions for certain eligible inmates before the end of their sentences to serve the remainder of a sentence in the community. Statute also grants some inmates release to mandatory supervision, which is automatic release from prison to supervision for inmates who committed certain eligible offenses before September 1, 1996, and whose calendar time served and good conduct time, or "good time," credit together equal the length of their sentence. TDCJ credits good time to an inmate for participation in work, educational, or treatment programs while incarcerated.[10] Upon release, TDCJ's Parole Division staff supervises releasees, who are individuals released from confinement to TDCJ supervision in the community for the remainder of their original sentence, to ensure compliance with release terms and any special conditions of release that BPP imposed. In fiscal year 2023, TDCJ's parole officers provided supervision for approximately 75,000 individuals. As part of supervision activities, parole officers identify releasees for whom BPP may vote to revoke release for noncompliance. Revocation rates are one measure of the effectiveness of these functions. The accompanying graph shows revocation rates for fiscal years 2013 to 2022.[11]

**Other States' Reincarceration Rates - Release Year 2019**

| State | Three-Year Reincarceration Rate |
|---|---|
| Arizona | 31.0% |
| California | 16.8% |
| New York | 24.8% |
| Florida | 21.0% |
| Pennsylvania | 38.0% |
| Texas Prison | 14.7% |
| Texas State Jail | 20.5% |



**Parole Revocation Rates, FYs 2013-22**

**TDCJ continues to be the most appropriate agency to oversee Texas' adult criminal justice system.**

As detailed in the other issues of this report, Sunset staff found considerable problems and areas for improvement across TDCJ such as how the agency performs planning for its facilities, staffing, and rehabilitative programming for inmates. However, the review found that Texas continues to benefit from the coordination, communication, and administrative efficiencies offered by TDCJ's oversight and management of a system in which a single state agency has a role supporting probation and is directly involved in incarceration and parole. TDCJ remains the only agency with the structure and expertise to carry out these necessary functions associated with the sprawling Texas adult criminal justice system. While other states offer different models of managing the criminal justice system, the size and scope of TDCJ's operation necessitates continuing the agency and its board under the existing structure. Despite the challenges the agency faces, Sunset staff concluded, as it has in past reviews of TDCJ, few benefits would come from drastically altering the structure of consolidated probation, parole, and incarceration functions.

> Few benefits would come from drastically altering the state's consolidated probation, parole, and incarceration functions.

No other state agency is well situated to take on existing duties carried out by TDCJ. Although the Texas Juvenile Justice Department (TJJD) also focuses on confining, supervising, rehabilitating, and reintegrating individuals, adult and youth populations have different rights, needs, and risks. Perhaps most notably, federal law requires juvenile facilities to maintain strict staff-to-youth supervision ratios, unlike the flexibility TDCJ has for its staff-to-inmate ratios in correctional facilities.[12] Meanwhile, TJJD's staffing shortage is even more severe than that of TDCJ, suggesting a consolidation would likely only compound rather than alleviate the state's correctional staffing crisis.[13] Given the magnitude of the challenges the two systems face and their distinct programming and regulatory requirements, Sunset staff determined few if any administrative efficiencies would be gained with an alternative administrative structure.

**The Private Facility Contract Monitoring and Oversight Division is no longer necessary.**

TDCJ's Private Facility Contract Monitoring and Oversight Division (PFCMOD) is responsible for the oversight and monitoring of contracts at mostly TDCJ-owned but privately operated facilities, including four prisons, three state jails, and one multi-use treatment facility that houses a range of inmates and programs. The division also monitors contracts for providers of treatment programs at TDCJ facilities, such as at substance abuse felony punishment facilities or for in-prison treatment programs. Examples of programs the agency contracts out and monitors through this division are listed in the textbox. Contract monitoring is the division's core function. To a lesser extent, it also supports the

**Contracted Programs and Facilities**

- Cognitive Treatment Program
- Driving While Intoxicated Treatment
- In-Prison Therapeutic Community
- Privately Operated Prisons and State Jails
- Residential Reentry Centers
- Substance Abuse Felony Punishment
- State Jail Substance Abuse Program
- Transitional Treatment Centers

request for proposal portion of the procurement process. TDCJ's Business and Finance Division (BFD) is responsible for the bid, award, and management of the actual contract. As of fiscal year 2023, PFCMOD oversaw 62 contracts with 29 vendors, together valued at over $1.3 billion for the lifetime of the contracts.

At the time of the previous Sunset review in 2013, TDCJ had ongoing contracts with private companies to operate 16 facilities that provided beds for about 17,000 individuals. Since then, the decreasing number of privately operated facilities in Texas has resulted in a decrease to eight facilities providing beds for about 7,500 individuals as of the end of fiscal year 2024. In addition, statute prohibits TDCJ from housing maximum-security inmates at a privately operated facility. Due to changes in the private corrections market, PFCMOD is increasingly monitoring contracts for about 15,000 programming slots at nearly 100 facilities rather than larger, more complicated contracts covering entire facilities. The lower number of major, high-dollar contracts covering privately operated facilities has lessened the need for an entirely separate division to conduct these functions.

Meanwhile, the potential for communication lapses and operational deficiencies remain as TDCJ continues to deal with the complex reality of managing such a large system. During the review, Sunset staff learned about occasional challenges with communication and aligning directives and policy updates between agency-operated and privately operated facilities. For example, during the systemwide lockdown and in previous lockdowns, TDCJ struggled to timely inform the private facilities to also lock down, and private facilities were confused about extraction procedures when TDCJ adjusted the procedures following the death of a correctional officer, creating risk for staff at those facilities. Additionally, the Parole Division occasionally lacks critical information about incidents occurring at the privately run Residential Reentry Centers, which would be relevant to a releasee's status and success while being supervised.

> The number of private prisons operating in Texas has decreased since the previous Sunset review.

These challenges suggest the agency would benefit from aligned points of contact to ensure consistency in operations and standards and ensure contract monitors maintain subject matter expertise. At other large agencies, divisions with the most regular and consistent interactions with vendors are commonly the ones conducting contract monitoring, suggesting TDCJ's divisions directly affected by and in most frequent contact with private vendors could help mitigate some of the challenges described above. Given the importance of contract monitoring and oversight, TDCJ would be better suited to place PFCMOD's functions and resources within the divisions they are most closely aligned with, including BFD and the divisions responsible for correctional institutions, rehabilitation programming, and parole.

## Sunset Staff Recommendations

### *Change in Statute*

**7.1   Continue the Texas Department of Criminal Justice and Texas Board of Criminal Justice for 12 years.**

This recommendation would continue TDCJ and its board until September 1, 2037, for the standard 12-year period. Because the committee, Windham, and BPP are all subject to Sunset review at the same time as TDCJ, they would also come under review again in 2037.

### *Management Action*

**7.2   Direct TDCJ to eliminate the Private Facility Contract Monitoring and Oversight Division and reallocate existing resources elsewhere within the agency.**

This recommendation would direct TDCJ to eliminate PFCMOD, a division that is no longer necessary, by September 1, 2025, and reallocate existing resources as it deems most appropriate to align functions elsewhere within the agency. As part of this recommendation, three full-time equivalent positions would be eliminated, and other division functions would be transferred to and managed in the budgets of divisions to which they are reassigned.

## Fiscal Implication

Continuing TDCJ would require an annual appropriation from the Legislature, which was about $3.9 billion in fiscal year 2023. Recommendation 7.2 to eliminate PFCMOD would result in a small cost savings to the state of about $532,663 in salary and benefits for each of the next five fiscal years and a reduction of three full-time equivalent employees.

### Texas Department of Criminal Justice

| Fiscal Year | Savings to the General Revenue Fund | Change in FTEs From 2023 |
|---|---|---|
| 2026 | $532,663 | -3 |
| 2027 | $532,663 | -3 |
| 2028 | $532,663 | -3 |
| 2029 | $532,663 | -3 |
| 2030 | $532,663 | -3 |

[1]    All citations to Texas statutes are as they appear on http://www.statutes.legis.texas.gov/. Section 492.002, Texas Government Code.

[2]    Section 492.012, Texas Government Code.

[3]    Section 501.132, Texas Government Code and Section 19.0022, Texas Education Code.

[4]    Section 508.051, Texas Government Code.

[5]    Article 42A.001(1), Texas Code of Criminal Procedure.

[6]    Legislative Budget Board (LBB), "Statewide Criminal and Juvenile Justice Recidivism and Revocation Rates," January 2019, January 2021, and February 2023, pp. 14, 18, and 21.

[7]    LBB, "Criminal and Juvenile Justice Uniform Cost Report," Fiscal Years 2021 and 2022, released February 2023, p. 4.

[8]    LBB, "Statewide Criminal and Juvenile Justice Recidivism and Revocation Rates," February 2023, pp. 35-36.

[9]    California Department of Corrections and Rehabilitation, "Recidivism Report," February 2024, p. vii; Council of State Governments, "50 States, 1 Goal," April 2024, p. 4; LBB, "Statewide Criminal and Juvenile Justice Recidivism and Revocation Rates," February 2023, pp. 35-36; New York State Corrections and Community Supervision, "2019 and 2020 Releases from Custody," p. 2.

[10]    Section 498.003, Texas Government Code.

[11]    LBB, "Statewide Criminal and Juvenile Justice Recidivism and Revocation Rates," January 2019, January 2021, and February 2023, pp. 13, 17 and 21.

[12]    28 Code of Federal Regulations, Section 115.313(c) (2023).

[13]    Texas Sunset Advisory Commission, "Texas Juvenile Justice Department and Office of the Independent Ombudsman, Sunset Staff Report with Final Results," June 2023, pp. 17-36.

# ISSUE 8

## Texas Criminal Justice Entities' Statutes and Processes Do Not Reflect Some Standard Elements of Sunset Reviews.

## Background

Over the years, Sunset reviews have included a number of standard elements derived from direction traditionally provided by the Sunset Commission, from statutory requirements added by the Legislature to the criteria for review in the Sunset Act, or from general law provisions imposed on state agencies. This review identified changes needed to conform statutes for the Texas Department of Criminal Justice (TDCJ), Board of Pardons and Paroles (BPP), and Correctional Managed Health Care Committee to standard Sunset language generally applied to all state agencies. The review also found changes needed to address statutorily required reports of the Windham School District and the other three entities mentioned above, address the need for advisory committees, and update statute to reflect the state's person-first respectful language initiative. Finally, the review identified changes needed at Windham to address statutorily required rule review.

- **Sunset across-the-board provisions (ATBs).** The Sunset Commission has developed a set of standard recommendations that it applies to all state agencies reviewed unless an overwhelming reason exists not to do so.[1] These ATBs reflect an effort by the Legislature to enact policy directives to prevent problems from occurring, instead of reacting to problems after the fact. ATBs are statutory administrative policies adopted by the Sunset Commission that contain "good government" standards. The ATBs reflect review criteria contained in the Sunset Act designed to ensure open, responsive, and effective government.

- **Reporting requirements.** The Sunset Act establishes a process for the Sunset Commission to consider if reporting requirements of agencies under review need to be continued or abolished.[2] The Sunset Commission has interpreted these provisions as applying to reports that are specific to the agency and not general reporting requirements that extend well beyond the scope of the agency under review. Reporting requirements with deadlines or that have expiration dates are not included, nor are routine notifications or notices, or posting requirements.

- **Advisory committees.** Under the Sunset Act, an agency's advisory committees are abolished on the same day as the agency unless expressly continued by law, but continuing the agency does not automatically continue its advisory committees by extension.[3] Additionally, other law provides that a statutory advisory committee expires four years after the date it was established unless either: (1) statute exempts the advisory committee from that provision, or (2) the agency sets a later date for expiration in rule.[4] Agencies may also have authority in rule to create advisory committees, some of which may be subject to the same four-year limitation. As a result, Sunset must sometimes determine whether an advisory committee should be continued.

- **Person-first respectful language.** Statute requires Sunset to consider and recommend, as appropriate, statutory revisions in accordance with the person-first respectful language outlined in general law.[5] The stated intent of the law is to try to affect society's attitudes toward people with disabilities by changing the way the language refers to them. Sunset only changes language that occurs in chapters of law that are opened by the Sunset Commission's recommendations.

- **Four-year rule review.** The Sunset Act directs the Sunset Commission to assess each agency's rulemaking process, including the extent to which agencies encourage public participation in rulemaking.[6] As part of this assessment, Sunset considers an agency's compliance with statutory requirements in the Administrative Procedure Act, including an agency's review and consideration of the continuing need for each of its rules every four years from the date each rule took effect.[7]

## Findings

**Statutes for TDCJ, BPP, and the committee do not reflect standard language typically applied across the board during Sunset reviews.**

- **Grounds for removal.** While the committee's statute has the standard provision relating to grounds for removal of board members, because the committee no longer has its own staff, statute contains outdated language regarding the personnel responsible for initiating the removal process. Updating the statutory basis and process for removing a member of a policymaking body who does not maintain the qualifications, has a conflict of interest, or has neglected duties can help ensure the sound function of the policymaking body.

Statutes do not contain newer board member training requirements.

- **Board member training.** Statutes for TDCJ, BPP, and the committee contain standard language requiring board members to receive training and information necessary for them to properly discharge their duties. However, statutes do not contain newer requirements for all topics the training must cover, such as a discussion of the scope of, and limitations on, the entities' rulemaking authority. Statutes also do not require the entities to create a training manual for all members or specify that members must attest to receiving and reviewing the training manual annually.

- **Complaint information.** BPP's statute contains standard language requiring the agency to maintain complete information on complaints and make information on complaint procedures available to the public. However, BPP's statute does not specify the agency may not inform parties of the status of complaints if doing so would jeopardize an ongoing investigation. Including this provision would help ensure complaints are fully investigated to protect the public.

**TDCJ has three reporting requirements that are no longer necessary while all other reporting requirements continue to be necessary.**

State law requires TDCJ to produce 17 reports specific to the agency. Many of TDCJ's reporting requirements continue to be useful, but some are no longer necessary, and some have due dates that should be adjusted without adjusting the substance of the report. Additionally, the committee's one required report,

Windham's two reports, and BPP's two reports continue to serve a useful purpose. Appendix L lists reporting requirements for all four entities and Sunset staff's analysis of their need.

Three of TDCJ's required reports are no longer needed. Statute requires TDCJ to assess long-term administrative segregation and maximum security needs and report the results to the Legislative Criminal Justice Board, which no longer exists.[8] While assessing security within facilities is an important task, the Legislature would be better served by TDCJ more comprehensively reporting on an overall assessment of long-term facility needs as described in Issue 1. Similarly, a requirement for TDCJ to report results of an outdated study on a subset of inmates is no longer necessary. Additionally, the information from a required report the agency's Texas Correctional Office on Offenders with Medical or Mental Impairments (TCOOMMI) produces regarding the provision of services to wrongfully imprisoned persons could instead be included in TCOOMMI's biennial report.

Finally, to ease the administrative burden on TDCJ and provide information to the Legislature farther in advance of each session, the due dates for three other reports should be adjusted to December 1 of each even-numbered year.

> Some deadlines for TDCJ reports could be aligned to give the Legislature more timely information.

### TDCJ continues to need two of its statutory advisory committees but one has expired by operation of law.

The Sunset Act directs the Sunset Commission to evaluate the need for an agency's advisory committees.[9] TDCJ has three advisory committees in statute that directly advise the agency: the Advisory Committee on Agriculture, Judicial Advisory Council, and TCOOMMI advisory committee.[10]

Of the three committees, TDCJ has established clear expiration dates in rule for the Judicial Advisory Council and TCOOMMI advisory committee but not for the Advisory Committee on Agriculture. General law requires agencies to establish in rule the purpose and tasks of its advisory committees and to describe the manner in which the committee will report to the agency.[11] As such, the Advisory Committee on Agriculture is effectively abolished unless the agency reauthorizes it.[12] Additionally, the agency requested travel reimbursement in its 2024-25 Legislative Appropriations Request without having established this committee in rule, after it was effectively abolished.

> TDCJ requested travel reimbursement funding for an advisory committee that had already effectively been abolished.

### TDCJ's statute does not use appropriate language when referring to persons with disabilities.

The governing statutes for TDCJ contain terms that are not consistent with the person-first respectful language initiative. The agency's Sunset bill should revise the statutes to use person-first respectful language.

**Windham does not comply with the statutory requirement to review its administrative rules every four years.**

Statute requires state agencies to review their rules every four years and determine whether the reasons for initially adopting each rule continue to exist.[13] However, Windham has not complied with that requirement by not conducting a review of its rules since 2016. The agency's noncompliance with this requirement results in stakeholders and members of the public potentially having to comply with rules that may not accurately reflect current law and agency practice.

# Sunset Staff Recommendations

## *Change in Statute*

### 8.1  Update for the committee the standard across-the-board requirement regarding grounds for removal of a board member.

The recommendation would clarify in statute that the TDCJ executive director is responsible for initiating the process for removing a committee member when a ground for removal exists, replacing outdated language for the committee, which lacks its own staff.

### 8.2  Update for TDCJ, BPP, and the committee the standard across-the-board requirement related to board member training.

This recommendation would require TDCJ, BPP, and the committee to develop a training manual that each board member attests to receiving annually and require existing member training to include information about the scope of, and limitations on, each entity's rulemaking authority. The training should provide clarity that the Legislature sets policy, and agency boards and commissions have rulemaking authority necessary to implement legislative policy.

### 8.3  Update for BPP the standard across-the-board requirement related to developing and maintaining a complaints system and making information on complaint procedures available to the public.

This recommendation would update the statutory language requiring BPP to develop and maintain a complaints system and make information on complaint procedures available to the public by specifying BPP may not notify complaint parties of the status of complaints if doing so would jeopardize an ongoing investigation.

### 8.4  Abolish three of TDCJ's reports, adjust the deadlines for three others, and continue all other reporting requirements for TDCJ, the committee, Windham, and BPP.

This recommendation would eliminate the following TDCJ reports: the *Assessment of Unit Design and Security Systems*, *Sex Offender Recidivism Report*, and *Services for Wrongfully Imprisoned Persons Annual Report*. As part of this recommendation, TDCJ would include in the *Biennial TCOOMMI Report* the information the agency previously reported through the *Services for Wrongfully Imprisoned Persons Annual Report*. Additionally, the recommendation would amend the due dates for the following reports to December 1 of each even-numbered year: the *Biennial TCOOMMI Report*, *Evaluation of the Reentry and Reintegration Plan*, and *AIDS and HIV Report*. TDCJ's remaining 14 reporting requirements as well

as reporting requirements for the committee, Windham, and BPP would be continued without changes because they provide useful information both to state leadership and the public.

### 8.5   Continue the Judicial Advisory Council and the TCOOMMI advisory committee.

This recommendation would continue the Judicial Advisory Council and the TCOOMMI advisory committee for 12 years.

### 8.6   Remove the Advisory Committee on Agriculture from statute.

This recommendation would remove the Advisory Committee on Agriculture from statute because it has expired by operation of law and is no longer needed.

### 8.7   Update TDCJ's statute to reflect the requirements of the person-first respectful language initiative.

This recommendation would direct the Texas Legislative Council to revise TDCJ's governing statutes to conform to the person-first respectful language requirements found in Chapter 392, Texas Government Code.

### *Management Action*

### 8.8   Direct Windham to adopt a rule review plan.

This recommendation would direct Windham to develop and adopt a rule review plan to help ensure compliance with the statutory requirement to regularly review its rules every four years, including determining whether the initial reasons for adopting the rules continue to exist.[14] The plan should include a schedule indicating when each chapter of rules will be reviewed so all rules are reviewed timely. Windham would adopt and submit the plan to its board by September 1, 2025.

## Fiscal Implication

These recommendations would not have a fiscal impact to the state. While the recommendations would require effort, they relate to basic management responsibilities and several update provisions already required by statute. The entities could implement these changes with existing resources.

[1]    Available at: https://www.sunset.texas.gov/across-board-policies.

[2]    All citations to Texas statutes are as they appear on http://www.statutes.legis.texas.gov/. Sections 325.0075, 325.011(13), and 325.012(a)(4), Texas Government Code.

[3]    Section 325.013, Texas Government Code.

[4]    Section 2110.008, Texas Government Code.

[5]    Section 325.0123(b), Texas Government Code.

[6]    Section 325.011(8), Texas Government Code.

[7]    Section 2001.039, Texas Government Code.

[8]    Section 494.011, Texas Government Code, and Chapter 876 (SB 1428), Acts of the 74th Texas Legislature, Regular Session, 1995.

[9]    Section 325.013, Texas Government Code.

[10]   Sections 493.003(b) and 497.111, Texas Government Code, and Section 614.002, Texas Health and Safety Code.

[11]   Section 2110.005, Texas Government Code.

[12]   Section 2110.008, Texas Government Code.

[13]   Section 2001.039, Texas Government Code.

[14]   Ibid.

# APPENDIX A | Texas Department of Criminal Justice Historically Underutilized Businesses Statistics, FYs 2021-23

The Legislature has encouraged state agencies to increase their use of historically underutilized businesses (HUBs) to promote full and equal opportunities for all businesses in state procurement. The Legislature also requires the Sunset Commission to consider agencies' compliance with laws and rules regarding HUB use in its reviews.[1]

The following material shows trend information for the Texas Department of Criminal Justice's (TDCJ) use of HUBs in purchasing goods and services. The Board of Pardons and Paroles and Windham School District rely on TDCJ to coordinate the use of historically underutilized businesses in purchasing goods and services. The agency maintains and reports this information under guidelines in statute.[2] In the charts, the dashed lines represent the goal for HUB purchasing in each category, as established by the Office of the Comptroller of Public Accounts. The diamond lines represent the percentage of agency spending with HUBs in each purchasing category from fiscal years 2021-23. Finally, the number in parentheses under each year shows the total amount the agency spent in each purchasing category.

The agency exceeded statewide purchasing goals for the heavy construction category in each of the last three fiscal years and for the special trade category in fiscal year 2023. The agency met or nearly met the statewide purchasing goals for the special trade category in fiscal years 2021 and 2022. The agency fell below the statewide goals for spending in the building construction, professional services, other services, and commodities categories in each of the last three fiscal years.



The agency exceeded the statewide goal for HUB spending in heavy construction in each of the last three fiscal years.



The agency failed to meet the statewide goal for HUB spending in building construction in each of the last three fiscal years.

September 2024 ........................................................................................... Sunset Advisory Commission

## *Appendix A*



**Special Trade**

The agency met or nearly met the statewide goal for HUB spending in special trade in fiscal years 2021 and 2022 and exceeded the goal in fiscal year 2023.



**Professional Services**

The agency failed to meet the statewide goal for HUB spending in professional services in each of the last three fiscal years.



**Other Services**

The agency failed to meet the statewide goal for HUB spending in other services in each of the last three fiscal years.



**Commodities**

The agency fell just short of the statewide goal for HUB spending in commodities in each of the last three fiscal years.

---

1    All citations to Texas statutes are as they appear on http://www.statutes.legis.texas.gov/. Section 325.011(9)(B), Texas Government Code.

2    Chapter 2161, Texas Government Code.

# APPENDIX B | Texas Department of Criminal Justice Equal Employment Opportunity Statistics, FYs 2021-23

In accordance with the requirements of the Sunset Act, the following material shows trend information for the employment of minorities and women in all applicable categories by the Texas Department of Criminal Justice.[1] The agency maintains and reports this information under guidelines established by the Texas Workforce Commission.[2] In the charts, the dashed lines represent the percentages of the statewide civilian workforce for African Americans, Hispanics, and women in each job category.[3] These percentages provide a yardstick for measuring agencies' performance in employing persons in each of these groups. The diamond lines represent the agency's actual employment percentages in each job category from fiscal years 2021-23.

The agency met or exceeded the statewide percentages for African Americans and fell below the statewide percentage for Hispanics in every year in each category over the last three fiscal years. The agency exceeded the statewide civilian percentages for women in every year in three categories, fell below in fiscal year 2021 in two categories, and fell below in fiscal year 2022 in one category. The agency did not have any employees in the protective services category.



In each of the last three fiscal years, the agency exceeded the statewide civilian workforce percentages for African Americans but failed to meet the percentages for Hispanics. The agency met or slightly exceeded the percentages for women in fiscal years 2022 and 2023 but fell just short in fiscal year 2021.

## *Appendix B*

### Professional



In each of the last three fiscal years, the agency exceeded the statewide civilian workforce percentages for African Americans and women but fell just short of the percentages for Hispanics.

### Technical



In each of the last three fiscal years, the agency exceeded the statewide civilian workforce percentages for African Americans but failed to meet the percentages for Hispanics. The agency met the percentages for women in fiscal year 2023 but failed to meet the percentages in fiscal years 2021 and 2022.

Sunset Advisory Commission

September 2024

***Appendix B***

## Administrative Support



In each of the last three fiscal years, the agency exceeded the statewide civilian workforce percentages for African Americans and women but failed to meet the percentages for Hispanics.

## Service/Maintenance



In each of the last three fiscal years, the agency exceeded the statewide civilian workforce percentages for African Americans and women but failed to meet the percentages for Hispanics.

September 2024                                                Sunset Advisory Commission

## *Appendix B*

### Skilled Craft



In each of the last three fiscal years, the agency met or nearly met the statewide civilian workforce percentages for African Americans, fell just short of the percentages for women, and failed to meet the percentages for Hispanics.

---

[1]    All citations to Texas statutes are as they appear on http://www.statutes.legis.texas.gov/. Section 325.011(9)(A), Texas Government Code.

[2]    Section 21.501, Texas Labor Code.

[3]    Based on the most recent statewide civilian workforce percentages published by the Texas Workforce Commission.

---

Sunset Advisory Commission                                                    September 2024

# APPENDIX C | TDCJ Facilities Map

This map shows each community with at least one TDCJ facility, and the text below lists each facility by the community in which the facility is located.



## *Appendix C*

| Region I | Region II | Region III |
|---|---|---|

**Region I**

**1. Cleveland**

Bell Pre-Release Facility

**2. Diboll**

Diboll Pre-Release Facility

Duncan Unit

**3. Huntsville**

Byrd Unit

Ellis Unit

Estelle Unit

Goree Unit

Holliday Unit

Huntsville Unit

Wynne Unit

**4. Jasper**

Goodman Unit

**5. Livingston**

Polunsky Unit

**6. Lovelady**

Wainwright Unit

**7. Midway**

Ferguson Unit

**8. Woodville**

Lewis Unit

**Region II**

**9. Bonham**

Cole State Jail

C. Moore Unit

**10. Bridgeport**

Bridgeport Unit (PF)

**11. Dallas**

Hutchins State Jail

**12. Henderson**

Bradshaw State Jail (PF)

East Texas Multi-Use Facility (Co-Gender) (PF)

**13. Jacksboro**

Lindsey State Jail (PF)

**14. New Boston**

Telford Unit

**15. Overton**

B. Moore Unit (PF)

**16. Palestine**

Powledge Unit

**17. Rusk**

Hodge Developmental Disabilities Program Unit

Skyview Psychiatric Facility (Co-Gender)

**18. Teague**

Boyd Unit

**19. Tennessee Colony**

Beto Unit

Coffield Unit

Michael Unit

**20. Venus**

Estes Pre-Release Facility

**21. Winnsboro**

Johnston Substance Abuse Felony Punishment Facility

**Region III**

**22. Beaumont**

Gist State Jail

LeBlanc Pre-Release Facility

Stiles Unit

**23. Brazoria**

Clemens Unit

**24. Dayton**

Henley State Jail (Female)

Hightower Unit

Plane State Jail / Santa Maria Baby Bonding Program (Female)

**25. Dickinson**

Young Medical Facility (Female)

**26. Galveston**

Hospital Galveston Medical Facility (Co-Gender)

**27. Houston**

Kegans Intermediate Sanction Facility

**28. Humble**

Lychner State Jail

**29. Richmond**

Jester III Unit

Scott Psychiatric Facility

Vance Unit

**30. Rosharon**

Memorial Unit

Ramsey Unit

Stringfellow Unit

Terrell Unit

(PF) Private Facility

## *Appendix C*

### Region IV

**31. Beeville**

Garza East Unit
Garza West Unit
McConnell Unit

**32. Cotulla**

Cotulla Unit

**33. Cuero**

Stevenson Unit

**34. Dilley**

Briscoe Unit

**35. Edinburg**

Lopez State Jail
Segovia Pre-Release Facility

**36. El Paso**

Sanchez State Jail

**37. Fort Stockton**

Fort Stockton Unit
Lynaugh Unit

**38. Hondo**

Ney Unit
Torres Unit

**39. Kenedy**

Connally Unit

**40. Raymondville**

Willacy County State Jail (PF)

**41. San Antonio**

Dominguez State Jail

**42. San Diego**

Glossbrenner Substance Abuse
Felony Punishment Facility

### Region V

**43. Amarillo**

Clements Unit

**44. Childress**

Roach Unit

**45. Colorado City**

Wallace Unit / San Angelo Work
Camp

**46. Dalhart**

Dalhart Unit

**47. Iowa Park**

Allred Unit

**48. Lamesa**

Smith Unit

**49. Lubbock**

Montford Psychiatric Facility
Western Regional Medical Facility

**50. Pampa**

Baten Intermediate Sanction
Facility
Jordan Unit

**51. Plainview**

Formby State Jail
Wheeler State Jail

**52. Snyder**

Daniel Unit

**53. Tulia**

Mechler Unit

### Region VI

**54. Abilene**

Middleton Unit
Robertson Unit

**55. Austin**

Travis County State Jail

**56. Breckenridge**

Sayle Substance Abuse Felony
Punishment Facility

**57. Brownwood**

Havins Pre-Release Facility

**58. Bryan**

Hamilton Pre-Release Facility

**59. Burnet**

Halbert Substance Abuse Felony
Punishment Facility (Female)

**60. Gatesville**

Crain Unit (Female)
Hilltop Unit (Female)
Hughes Unit
Murray Unit (Female)
O'Daniel Unit (Female)
Woodman State Jail (Female)

**61. Kyle**

Kyle Unit (PF)

**62. Lockhart**

Coleman Unit (PF) (Female)

**63. Marlin**

Hobby Unit (Female)
Marlin Unit (Female)

**64. Navasota**

Luther Unit
Pack Unit

**65. San Saba**

San Saba Unit

(PF) Private Facility

Texas Criminal Justice Agencies Staff Report
       Appendix C

# APPENDIX D | Windham School District Equal Employment Opportunity Statistics, FYs 2021-23

In accordance with the requirements of the Sunset Act, the following material shows trend information for the employment of minorities and women in all applicable categories by the Windham School District.[1] The agency maintains and reports this information under guidelines established by the Texas Workforce Commission.[2] In the charts, the dashed lines represent the percentages of the statewide civilian workforce for African Americans, Hispanics, and women in each job category.[3] These percentages provide a yardstick for measuring the agency's performance in employing persons in each of these groups. The diamond lines represent the agency's actual employment percentages in each job category from fiscal years 2021-23.

In the last three fiscal years, the agency did not meet the statewide civilian percentages for Hispanics in any category or year. However, the agency met or exceeded statewide civilian percentages for African Americans and women in each year in all categories except technical and skilled craft. The agency did not have any employees in the protective services category, and the service/maintenance category had too few employees to conduct a meaningful comparison to the overall civilian workforce.

### Administration



In each of the last three fiscal years, the agency exceeded the statewide civilian workforce percentages for African Americans and women but failed to meet the percentages for Hispanics.

## *Appendix D*

### Professional



In each of the last three fiscal years, the agency exceeded the statewide civilian workforce percentages for African Americans and women but failed to meet the percentages for Hispanics.

### Technical

In each of the last three fiscal years, the agency failed to meet the statewide civilian workforce percentages for Hispanics and women. The agency exceeded the percentages for African Americans in fiscal years 2022 and 2023 but failed to meet the percentage in fiscal year 2021.

## *Appendix D*

### Administrative Support



In each of the last three fiscal years, the agency exceeded the statewide civilian workforce percentages for African Americans and women but failed to meet the percentages for Hispanics.

### Skilled Craft



The agency failed to meet the statewide civilian workforce percentages for all three reported groups in each of the last three fiscal years. However, the agency had few employees in this category.

---

[1]    All citations to Texas statutes are as they appear on http://www.statutes.legis.texas.gov/.  Section 325.011(9)(A), Texas Government Code.

[2]    Section 21.501, Texas Labor Code.

[3]    Based on the most recent statewide civilian workforce percentages published by the Texas Workforce Commission.

Sunset Advisory Commission                                                September 2024

# APPENDIX E | Board of Pardons and Paroles Equal Employment Opportunity Statistics, FYs 2021-23

In accordance with the requirements of the Sunset Act, the following material shows trend information for the employment of minorities and women in all applicable categories by the Board of Pardons and Paroles.[1] The agency maintains and reports this information under guidelines established by the Texas Workforce Commission.[2] In the charts, the dashed lines represent the percentages of the statewide civilian workforce for African Americans, Hispanics, and women in each job category.[3] These percentages provide a yardstick for measuring the agency's performance in employing persons in each of these groups. The diamond lines represent the agency's actual employment percentages in each job category from fiscal years 2021-23.

In each of the last three fiscal years, the agency met or nearly met the statewide civilian workforce percentages for Hispanics in the administration and professional job categories but failed to meet the percentages in the technical, administrative support, and service/maintenance job categories. The agency met or exceeded statewide civilian percentages for women in all categories and fiscal years except for technical in 2021 and 2022. The agency also met or nearly met the statewide civilian percentages for African Americans in most fiscal years for all job categories except for technical and administrative support. The agency did not have any employees in the skilled craft or protective services categories.

### Administration



The agency met or exceeded the statewide civilian workforce percentages for African Americans in fiscal years 2021 and 2022 but fell just short in 2023. The agency exceeded the statewide civilian workforce percentages for women in each of the last three fiscal years. The agency exceeded the percentage for Hispanics in fiscal year 2023 but fell just short in fiscal years 2021 and 2022.

## *Appendix E*

### Professional




The agency exceeded the statewide civilian workforce percentages for African Americans and women in each of the last three fiscal years. The agency nearly met the percentages for Hispanics in each of the last three fiscal years.

### Technical



The agency failed to meet the statewide civilian workforce percentages for Hispanics in each of the last three fiscal years. The agency exceeded the percentage for African Americans in fiscal year 2021 but failed to meet the percentages in fiscal years 2022 and 2023. The agency failed to meet or fell just short of the percentages for women in fiscal years 2021 and 2022 but exceeded the percentage in fiscal year 2023.

## *Appendix E*

### Administrative Support



In each of the last three fiscal years, the agency exceeded the statewide civilian workforce percentages for women but failed to meet or fell just short of the percentages for African Americans and Hispanics.

### Service/Maintenance



In each of the last three fiscal years, the agency exceeded the statewide civilian workforce percentages for women but failed to meet the percentages for Hispanics. The agency exceeded the percentages for African Americans in fiscal years 2022 and 2023 but fell just short in fiscal year 2021.

---

[1]     All citations to Texas statutes are as they appear on http://www.statutes.legis.texas.gov/.  Section 325.011(9)(A), Texas Government Code.

[2]     Section 21.501, Texas Labor Code.

[3]     Based on the most recent statewide civilian workforce percentages published by the Texas Workforce Commission.

# APPENDIX F | TDCJ Facility Types

| Type | Description | Number* |
|------|-------------|---------|
| Prison | Houses inmates convicted of capital, first-, second-, and third-degree felonies, which are typically high-level drug and property offenses and violent crimes. Sentences range from two years to life and include death row. | 62 State |
| State Jail | Houses inmates convicted of state jail felonies, which are usually drug and property offenses. Sentences range from 75 days to two years. State jails also house lower-security prison inmates. | 13 State 3 Private |
| Substance Abuse Felony Punishment Facility (SAFP) | Provides an intensive therapeutic community program for individuals with substance abuse problems. Individuals are usually placed in these facilities as a condition of community supervision or as a modification of parole. | 8 State 2 Private |
| Pre-Release Facility | Provides an intensive treatment program for inmates in a therapeutic community setting. Inmates within seven months of release are eligible to receive pre-release services. | 7 State |
| Intermediate Sanctions Facility (ISF) | Provides an alternative to incarceration for individuals who violate the conditions of community supervision or parole. Individuals housed in these facilities receive cognitive or substance abuse treatment. | 4 State 2 Private |
| Psychiatric Facility | Provides inpatient mental heath treatment for inmates. | 3 State |
| Medical Facility | Provides inpatient hospital care, acute care, and specialty clinics for inmates. | 2 State |
| Developmental Disability Program Facility | Provides housing for inmates in the Developmental Disability Program, which provides specific housing and programming for inmates with intellectual disabilities or impaired adaptive functioning. | 1 State |
| Multi-Use | Provides several housing types in one facility, including SAFP, ISF, and a DWI treatment program. | 1 Private |

\* Number as of May 2024. The total number of facilities listed here is larger than the number of facilities listed in the TDCJ Agency At A Glance because some facilities encompass multiple confinement types (e.g., a state jail might have an ISF as well).

# APPENDIX G | Select Federal Litigation History

Certain cases in federal court established precedent regarding inmate welfare that inform many of the Texas Department of Criminal Justice's (TDCJ) current processes around capacity management, health care, inmate safety, and inmate welfare. While oversight of TDCJ by the federal courts ended in 2003, much of the agency's structure and operations today still reflect the reforms established by the following cases:

- **Estelle v. Ruiz, 503 F. Supp. 1265 (S.D. Tex. 1980).** In 1972, a TDCJ inmate filed a class action lawsuit against the agency, initiating a decades-long reformation of Texas prisons under the supervision of the federal courts.[1] The courts ruled that TDCJ had violated the 8th Amendment protection against cruel and unusual punishment through overcrowding, inadequate security, unsafe working conditions, inadequate health care, and overly severe and arbitrary disciplinary procedures. In the resulting settlement, TDCJ agreed to limit the inmate population to below 96 percent of online capacity, separate high-security inmates from lower-security inmates, improve medical treatment, and hire more guards.[2]

- **Estelle v. Gamble, 429 US 97 (1976).** In 1976, a TDCJ inmate alleged improper medical care for an injury sustained during a prison work assignment. In response, the U.S. Supreme Court ruled that deliberate indifference to serious medical needs of prisoners constitutes cruel and unusual punishment as outlined by the 8th amendment, although this inmate's claims did not rise to that level.[3]

- **United States v. DeCologero, 821 F.2d 39 (1st Cir. 1987).** In 1987, an inmate of the Federal Bureau of Investigations alleged improper medical care while he was in custody. The U.S. Court of Appeals confirmed inmates have a right to adequate medical care, which it defined as "reasonably commensurate with modern medical science and of a quality acceptable within prudent professional standards," but ruled that inmates cannot insist they receive "the most sophisticated care that money can buy."[4]

---

[1]    The Texas Politics Project, "Cruel and Unusual Punishment: Ruiz," accessed online August 28, 2024, https://texaspolitics.utexas.edu/archive/html/just/features/0505_01/ruiz.html.

[2]    Ibid.

[3]    Justia U.S. Supreme Court Center, "Estelle v. Gamble, 429 U.S. 97 (1976)," accessed online August 28, 2024, https://supreme.justia.com/cases/federal/us/429/97/ .

[4]    Casetext, "U.S. v. DeCologero," accessed online August 28, 2024, https://casetext.com/case/us-v-decologero-5.

# APPENDIX H | Sunset Model for Evaluating Facilities for Closure

## Summary

As referenced in Recommendation 1.2 of Issue 1, Sunset staff created a model as an example of how the Texas Department of Criminal Justice (TDCJ) could create a methodology to inform facility closure decisions. This model started with a short-list of the hardest-to-staff facilities within TDCJ by selecting all facilities that, in fiscal year 2023, either experienced a vacancy rate above 40 percent or received staff from the hotel or Uber staff transport models discussed in Issue 1. Sunset staff then evaluated these facilities using a series of metrics that provide insight into each facility's staffing challenges, capacity and type of capacity, available labor pool from which to hire, and cost to operate. Based on these factors, each facility was given a score, with the highest total scores indicating facilities that are the most difficult to operate in terms of cost and staffing and therefore the best facilities to close to improve the agency's operational efficiency as it wrestles with the staffing and capacity challenges highlighted throughout this report.

## Methodology

The text below describes each metric, why that metric is important, and how the score was determined. The model uses a score for each facility between zero and three for each metric. Wherever possible, Sunset staff used quartiles to group the data to determine scores. When the data could not be appropriately grouped with quartiles, Sunset staff used alternate grouping methods to determine scores. The higher a facility's total score, the higher it would be rated as a potential candidate for closure. Given that this tool is an example, Sunset staff deidentified the facilities to allow TDCJ the discretion to conduct its own analysis and draw its own conclusions.

- **Current operating capacity.**[1] This metric reflects the total number of beds available to house inmates. Each time the agency closes a facility, it likely would replace that operational capacity elsewhere in the system. Therefore, facilities with less operational capacity earned a higher score.

- **Vacancy rate.** This metric reflects the average vacancy rate for correctional staff in fiscal year 2023. As discussed extensively throughout the report, high vacancy rates among correctional staff lead to high costs to the state, operational challenges, and potential risks for public safety. Therefore, facilities with higher correctional staff vacancy rates earned a higher score.

- **Cool beds.** This metric reflects the total number of "cool beds," or beds with air conditioning. The agency is engaged in a systematic effort to increase the number of available cool beds at its disposal, and closing facilities with a large number of cool beds would work against this initiative. Therefore, facilities with fewer or no cool beds earned a higher score.

- **Idled capacity.** This metric reflects the number of idled beds. The agency idles beds in facilities it has determined are difficult to staff. Therefore, facilities with more idled capacity earned a higher score.

- **Percent of population without a HS diploma.**[2] This metric reflects the percentage of adults over the age of 25 without a high school diploma or equivalent achievement in the county where a facility is located. TDCJ requires applicants for CO positions to have a high school credential attainment.[3] Therefore, facilities in counties with a higher percentage of adults without a high school credential attainment received a higher score.

*Appendix H*

- **Difference between MHI and CO II midrange salary.**[4] This metric reflects the difference between the median household income in the county where a facility is located and the midrange salary for CO IIs, which is the initial starting role for every new CO once training is complete. The difference between the median household income and the CO II midrange salary points towards the agency's ability to offer a competitive salary in the area in which the facility is located. Therefore, facilities in counties with a larger difference received a higher score.

- **Unemployment rate.**[5] This metric reflects the unemployment rate in the county where a facility is located. A larger unemployment rate indicates a larger available labor pool from which to hire correctional staff. Therefore, facilities in counties with lower unemployment rates received a higher score.

- **Population change.**[6] This metric reflects the percentage change in population in the county where a facility is located over a 10-year period. A declining population indicates a shrinking available labor pool from which to hire correctional staff. Therefore, facilities in counties with larger population decreases received a higher score.

- **Deferred maintenance costs.** This metric reflects the total cost of deferred maintenance needs identified by the agency for fiscal year 2024 and the future needs the agency has projected. More costly maintenance needs indicate that a facility will be more expensive to maintain into the future. Therefore, facilities with more expensive deferred maintenance needs received a higher score.

- **Average staff received via hotel model.** This metric reflects the average number of COs received each month in calendar year 2023 through the hotel model. As discussed in Issue 1, transporting COs to hard-to-staff units is operationally and financially inefficient. Therefore, facilities that received more staff through the hotel model received a higher score.

- **Average staff received via Uber model.** This metric reflects the average number of COs received each month in calendar year 2023 through the Uber model. As discussed in Issue 1, transporting COs to hard-to-staff facilities is operationally and financially inefficient. Therefore, facilities that received more staff through the Uber model received a higher score.

- **Max security.** This metric reflects whether TDCJ classifies a facility as maximum security. Maximum-security facilities tend to have more extensive security infrastructure to house a higher proportion of high custody level inmates, conditions which would be expensive to replicate elsewhere in the system. Therefore, facilities without maximum-security designations received a higher score.

## Conclusions

By using the Sunset evaluation model, facilities A and B are the best candidates for closure based on their small capacity, a small local labor pool, utilization of the staff transport models, and absence of maximum security-level infrastructure. That being said, this model is intended just as an example of the type of analysis TDCJ should conduct when evaluating the future viability of operating its hard-to-staff facilities. The agency should consider these factors as well as any others it deems relevant, and it should use its expertise to determine how to weight any scores as necessary.

Sunset Advisory Commission                                                                 September 2024

## *Appendix H*

| Unit | Current Operating Capacity | Vacancy Rates | Cool Beds | Idled Capacity | Percent of Population Without HS Diploma | Difference Between MHI and CO II Midrange Salary | Unemployment Rate | Population Change | Deferred Maintenance Cost | Average Staff Received Hotel Model | Average Staff Received Uber Model | Max Security | Raw Score |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| A | 3 | 3 | 2 | 1 | 3 | 2 | 3 | 2 | 1 | 2 | 0 | 3 | 25 |
| B | 3 | 3 | 2 | 2 | 1 | 3 | 3 | 3 | 1 | 1 | 0 | 3 | 25 |
| C | 3 | 3 | 2 | 0 | 2 | 0 | 2 | 3 | 1 | 0 | 2 | 3 | 21 |
| D | 0 | 3 | 0 | 2 | 3 | 0 | 3 | 2 | 2 | 3 | 2 | 0 | 20 |
| E | 0 | 3 | 2 | 0 | 1 | 2 | 2 | 2 | 3 | 0 | 3 | 0 | 18 |
| F | 1 | 0 | 2 | 1 | 1 | 2 | 3 | 2 | 3 | 0 | 3 | 0 | 18 |
| G | 1 | 3 | 0 | 2 | 0 | 2 | 3 | 1 | 3 | 2 | 0 | 0 | 17 |
| H | 3 | 1 | 2 | 2 | 1 | 2 | 1 | 1 | 1 | 0 | 0 | 3 | 17 |
| I | 1 | 2 | 2 | 0 | 2 | 1 | 3 | 3 | 3 | 0 | 0 | 0 | 17 |
| J | 2 | 2 | 2 | 0 | 3 | 3 | 0 | 2 | 3 | 0 | 0 | 0 | 17 |
| K | 3 | 2 | 2 | 1 | 1 | 0 | 3 | 2 | 0 | 0 | 0 | 3 | 17 |
| L | 3 | 0 | 2 | 0 | 3 | 1 | 3 | 1 | 0 | 1 | 0 | 3 | 17 |
| M | 3 | 2 | 2 | 0 | 0 | 3 | 3 | 0 | 0 | 0 | 0 | 3 | 16 |
| N | 3 | 1 | 0 | 0 | 2 | 1 | 0 | 3 | 0 | 0 | 0 | 3 | 15 |
| O | 2 | 2 | 0 | 2 | 3 | 0 | 1 | 3 | 0 | 2 | 0 | 0 | 15 |
| P | 1 | 0 | 0 | 0 | 2 | 1 | 3 | 3 | 1 | 0 | 2 | 0 | 13 |
| Q | 0 | 0 | 1 | 0 | 1 | 2 | 2 | 2 | 2 | 0 | 3 | 0 | 13 |
| R | 3 | 2 | 0 | 0 | 2 | 0 | 0 | 3 | 0 | 0 | 0 | 3 | 13 |
| S | 1 | 1 | 0 | 1 | 0 | 1 | 2 | 1 | 2 | 3 | 1 | 0 | 13 |
| T | 2 | 1 | 0 | 2 | 0 | 3 | 1 | 0 | 0 | 0 | 0 | 3 | 13 |
| U | 3 | 3 | 0 | 0 | 0 | 3 | 3 | 0 | 0 | 0 | 0 | 3 | 13 |
| V | 1 | 0 | 0 | 0 | 1 | 1 | 1 | 0 | 2 | 2 | 3 | 0 | 11 |
| W | 2 | 3 | 2 | 0 | 1 | 0 | 0 | 0 | 3 | 0 | 0 | 0 | 11 |
| X | 0 | 1 | 0 | 0 | 3 | 2 | 1 | 2 | 2 | 0 | 0 | 0 | 11 |
| Y | 0 | 1 | 0 | 0 | 0 | 3 | 1 | 0 | 3 | 0 | 0 | 0 | 8 |
| Z | 0 | 0 | 0 | 0 | 2 | 1 | 0 | 0 | 2 | 0 | 2 | 0 | 7 |
| AA | 0 | 0 | 0 | 0 | 2 | 0 | 0 | 2 | 2 | 1 | 0 | 0 | 7 |

September 2024                                                    Sunset Advisory Commission

# *Appendix H*

---

1    Texas Department of Criminal Justice (TDCJ), "Unit Directory," accessed online August 31, 2024, https://www.tdcj.texas.gov/unit_directory/index.html.

2    U.S. Census Bureau, "QuickFacts," accessed online August 31, 2024, https://www.census.gov/quickfacts/.

3    TDCJ, "TDCJ Correctional Officer Eligibility Criteria," accessed online September 3, 2024, https://www.tdcj.texas.gov/divisions/hr/coinfo/emp-co.html.

4    U.S. Census Bureau, "QuickFacts," accessed online August 31, 2024, https://www.census.gov/quickfacts/; Texas State Auditor's Office, "Salary Schedule A – Annual Salary Rates: Effective July 1, 2023 to August 31, 2023," accessed online August 31, 2024, https://hr.sao.texas.gov/CompensationSystem/SchedulePartial?scheduleType=2023A; Texas State Auditor's Office, "State Classification Job Description – Correctional Officer," accessed online August 31, 2024, https://hr.sao.texas.gov/Compensation/JobDescriptions/R4502.pdf.

5    Texas Labor Market Information, "Local Area Unemployment Statistics (LAUS) – County LAUS," accessed online August 31, 2024, https://texaslmi.com/Home/PopularDownloads.

6    U.S. Census Bureau, "QuickFacts," accessed online August 31, 2024, https://www.census.gov/quickfacts/.

# APPENDIX I | Survey Methodology

Sunset staff conducted four surveys during the review, including three of Texas Department of Criminal Justice (TDCJ) staff to better understand employee experiences. A data scientist with a doctorate in criminology and justice policy developed the surveys using validated survey questions where possible.

Over three weeks in May 2024, Sunset surveyed correctional staff, parole staff, and all other TDCJ employees, as well as staff of Community Supervision and Corrections Departments (CSCD), who are not TDCJ employees. Respondents comprised a representative sample of TDCJ and CSCD staff. Brief profiles on the respondents to each survey are below.

## Correctional Staff Survey Respondents

A total of 1,515 correctional staff completed the survey. Since correctional officers (COs) do not have TDCJ email addresses, Sunset distributed the survey using personal email addresses TDCJ provided, and additionally engaged a professional correctional employees association to share the survey with its members. The following charts summarize results from the optional demographic questions.



**Regional Affiliation***

Region 5 14%
Region 6 18%
Region 4 8%
Other** 2%
Region 1 14%
Region 3 32%
Region 2 12%

\* TDCJ organizes its facilities across six regions.

\*\* Other includes Mobile Correctional Officer Team staff, multi-use facility staff, and employees who were either unsure of their region or opted not to share it.



**Job Classification**

Respondents (y-axis: 0 to 500)

CO II ~90, CO III ~70, CO IV ~460, CO V ~265, Sergeant of COs ~157, Lieutenant of COs ~65, Captain of COs ~27, Major of COs ~32, Warden (Assistant, I, II) ~73, Other* ~73

\* Other includes CO Is and administrative staff members who oversee unit-based laundry, food, and supply operations.

## *Appendix I*



**Tenure at TDCJ**

## Parole Staff Survey Respondents

A total of 404 parole staff completed the survey, which Sunset distributed using TDCJ email addresses. The charts below summarize results from the optional demographic questions.



**Job Classification**



**Regional Affiliation***

\* TDCJ organizes its PO offices across five regions.

\*\* Other includes employees who were either unsure of their region or opted not to share it.



**Tenure at TDCJ**

Sunset Advisory Commission                                    September 2024

## *Appendix I*

## All Other TDCJ Staff Survey Respondents

A total of 2,649 TDCJ staff completed the survey, which Sunset distributed using TDCJ email addresses. The chart below summarizes results from the optional demographic questions.



## CSCD Staff Survey Respondents

A total of 239 CSCD staff completed the survey, which Sunset distributed using email addresses TDCJ provided. The chart below summarizes results from the optional demographic questions.



*   Other includes community supervision directors, informational technology officers, and support staff.

# APPENDIX J | Rehabilitation Program Evaluations

TDCJ's biennial rehabilitation program evaluations assess program outcomes by comparing two- and three-year recidivism rates of program participants released three years prior against recidivism rates of comparison groups selected based on their similarity to the program completers. Program figures can be interpreted as follows:

- Negative figures indicate program participation reduced recidivism, meaning these programs were effective.
- Neutral figures, highlighted in pink, indicate program participation had no effect on recidivism, meaning these programs were not effective but were also not harmful.
- Positive figures, highlighted in red, indicate program participation increased recidivism, meaning these programs were ineffective and potentially harmful.

| Rehabilitation Program | FY 13 Recidivism Effects | | FY 15 Recidivism Effects | | FY 17 Recidivism Effects | | FY 19 Recidivism Effects | | FY 21 Recidivism Effects | | FY 23 Recidivism Effects | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2-Year | 3-Year | 2-Year | 3-Year | 2-Year | 3-Year | 2-Year | 3-Year | 2-Year | 3-Year | 2-Year | 3-Year |
| DWI | -2.18% | -4.57% | -1.83% | -3.68% | -6.52% | -5.29% | -4.73% | -5.85% | -6.56% | -7.32% | -3.67% | -5.58% |
| Female Cognitive Pre-Release Program (FCPRP) | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | -3.55% | -10.13% | 0.00% | -1.83% |
| Innerchange Freedom Initiative (IFI)* | 0.88% | -3.54% | -2.08% | -4.17% | -5.64% | -11.03% | -5.95% | -8.87% | 0.00% | 0.57% | N/A | N/A |
| In-Prison Therapeutic Community (IPTC) with Aftercare | -6.70% | -8.25% | -6.00% | -8.31% | -4.44% | -2.55% | -3.91% | -4.30% | -5.74% | -4.48% | -1.57% | -4.38% |
| Pre-Release Substance Abuse Program (PRSAP) | 0.52% | 0.37% | 2.64% | 2.71% | 2.45% | 3.55% | 1.57% | 2.46% | 0.41% | 1.50% | 2.40% | 0.54% |
| Pre-Release Therapeutic Community (PRTC) | 0.40% | 0.22% | -2.89% | -4.19% | 2.32% | 5.53% | -1.00% | -1.82% | -0.49% | 1.78% | -0.59% | -2.24% |
| Prison Fellowship Academy (PFA)* | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | -3.77% | -6.60% |
| Pre-Release Therapeutic Community (PRTC) – Cognitive | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | -3.25% | -4.97% | -2.32% | -4.65% |

## *Appendix J*

| Rehabilitation Program | FY 13 Recidivism Effects | | FY 15 Recidivism Effects | | FY 17 Recidivism Effects | | FY 19 Recidivism Effects | | FY 21 Recidivism Effects | | FY 23 Recidivism Effects | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2-Year | 3-Year | 2-Year | 3-Year | 2-Year | 3-Year | 2-Year | 3-Year | 2-Year | 3-Year | 2-Year | 3-Year |
| Substance Abuse Felony Punishment with Aftercare (Combined Parole and Probation) | -15.50% | -16.67% | -17.40% | -17.39% | -9.34% | -8.04% | -8.88% | -10.42% | -13.83% | -13.24% | N/A | N/A |
| Substance Abuse Felony Punishment – Parole with Aftercare | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | -2.92% | -5.11% |
| Substance Abuse Felony Punishment – Probation with Aftercare | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | 3.77% | 5.02% |
| Serious and Violent Offender Reentry Initiative (SVORI) | 8.07% | 1.48% | 2.98% | -2.18% | -3.57% | -4.05% | -0.77% | 0.71% | 4.66% | 11.34% | 8.44% | 3.61% |
| Sex Offender Education Program (SOEP) | -3.00% | -5.32% | 0.23% | -0.20% | 0.02% | -1.41% | -2.16% | -2.60% | -2.94% | -4.49% | 0.00% | -1.66% |
| Sex Offender Treatment Program, 9 months (SOTP-9) | N/A | N/A | N/A | N/A | 1.31% | 2.33% | -0.42% | -1.07% | -1.17% | -1.41% | -0.12% | -2.12% |
| Sex Offender Treatment Program, 18 months (SOTP-18) | -1.92% | -4.17% | 1.33% | 2.67% | -2.99% | -3.03% | -1.49% | -0.14% | 3.12% | 0.00% | 0.00% | 0.00% |

\* Innerchange Freedom Initiative is now known as the Prison Fellowship Academy.



# APPENDIX K | BPP Parole Guidelines Matrix and Factors

The matrix, available on the agency's website, assigns a parole guideline level to each combination of risk level and offense severity:

| Offense Severity | Male Risk Level | | | | Female Risk Level | | |
|---|---|---|---|---|---|---|---|
| | Highest (10+) | High (7-9) | Moderate (4-6) | Low (3 or less) | High (10+) | Moderate (6-9) | Low (5 or less) |
| Highest | 1 | 2 | 2 | 3 | 2 | 2 | 3 |
| High | 2 | 3 | 4 | 4 | 3 | 4 | 4 |
| Moderate | 2 | 3 | 5 | 6 | 3 | 5 | 6 |
| Low | 3 | 4 | 6 | 7 | 4 | 6 | 7 |

The board determines and posts to the agency's website offense severity rankings and calculates risk level by totaling the number of points for each of the following factors:

| Type | Factor | | Points |
|---|---|---|---|
| Static | Age at First Commitment | 26 years or older | 0 |
| | | 18 to 25 years | 1 |
| | | 17 years or younger | 2 |
| Static | History of Revocations | No revocations | 0 |
| | | Had one revocation | 1 |
| | | Had more than one revocation | 2 |
| Static | Other Incarcerations | None | 0 |
| | | One to two | 1 |
| | | Three or more | 2 |
| Static | Employment History | Employed six months prior to prison | 0 |
| | | None or less than six months | 1 |
| Static | Commitment Offense | All others | 0 |
| | | All property-related offenses | 2 |
| Dynamic | Current Age | Males 57+ | -2 |
| | | Males 49-56 | 0 |
| | | Males 29-48 | 1 |
| | | Males 22-28 | 2 |
| | | Males 21 and younger | 3 |
| | | Females 50+ | -2 |
| | | Females 37-49 | 0 |
| | | Females 36 and younger | 1 |
| Dynamic | Security Threat Group | Not a member | 0 |
| | | Member | 3 |

September 2024                                                              Sunset Advisory Commission

## *Appendix K*

| Type | | Factor | Points |
|------|--|--------|--------|
| Dynamic | Completed Education or Job Training During Incarceration | Completed | -1 |
| | | Did not complete | 0 |
| Dynamic | Disciplinary Conduct | Goodtime awarded | 0 |
| | | Demoted in class below entry status OR lost goodtime in last 18 months OR zero balance of goodtime | 1 |
| Dynamic | Current Custody Level | G1 – G3 and P1 – P3 | 0 |
| | | G4 – G5, P4 – P5, Administrative Segregation, all others | 1 |

# APPENDIX L | Texas Criminal Justice Entities Reporting Requirements

### Texas Department of Criminal Justice

| Report Title | Legal Authority | Description | Recipient | Sunset Evaluation |
|---|---|---|---|---|
| 1. AIDS and HIV Report | Section 501.054(h), Texas Government Code | Reports on the implementation of and participation in AIDS and HIV testing programs. | Legislature | Continue and modify due date to December 1 of even-numbered years |
| 2. Assessment of Unit Design and Security Systems | Section 494.011, Texas Government Code | Reports on an assessment of long-term administrative segregation and maximum security needs. | Legislative Criminal Justice Board | Abolish – this board no longer exists |
| 3. Child Protective Services Conservatorship Report | Section 501.023(b), Texas Government Code | Reports on a summary of information of inmates who have been in the conservatorship of the state's child protective services system. | Governor, Lieutenant Governor, and Legislature | Continue |
| 4. Correctional Managed Health Care Report | Section 501.1471, Texas Government Code | Reports on correctional health care expenditures, data, and other information. | Governor and Legislative Budget Board | Continue |
| 5. Equal Opportunity Employment Policy | Section 493.007(d), Texas Government Code | Reports on the implementation of an equal employment opportunity policy. | Governor and Commission on Human Rights | Continue |
| 6. Evaluation of the Reentry and Reintegration Plan | Section 501.092(i), Texas Government Code | Reports on the effectiveness of reentry and reintegration services provided to inmates. | Lieutenant Governor, Speaker of the House, and the House and Senate committees of primary jurisdiction | Continue and modify due date to December 1 of even-numbered years |
| 7. Family Violence Pretrial Diversion Pilot Program | Section 509.018(d), Texas Government Code | Reports on a summary of the status and results of the pilot program, an analysis of its effectiveness and funding, and any recommendations from the agency for improvements. | Governor, Lieutenant Governor, Speaker of the House, and Legislature | Continue |
| 8. HUB Report | Section 493.012(b), Texas Government Code | Reports on the level of historically underutilized business participation in board and agency contracts. | Governor and Legislature | Continue |
| 9. Management-Employee Meetings Report | Section 493.027(b), Texas Government Code | Reports on the results of meetings with organizations that represent TDCJ employees in disciplinary or grievance matters. | Criminal Justice Legislative Oversight Committee | Continue |
| 10. Parole Caseload Report | Section 508.1142(b), Texas Government Code | Reports on situations when TDCJ is unable to meet statutory caseload guidelines for parole officers and the amount of money necessary to meet the guidelines. | Legislative Budget Board | Continue and modify as explained in Issue 5 of this staff report |

### *Appendix L*

| Report Title | Legal Authority | Description | Recipient | Sunset Evaluation |
|---|---|---|---|---|
| 11. Parole Division Salary Payment Report | Section 508.114(a), Texas Government Code | Reports on proportional salary payments for parole officers or supervisors who also serve as a community supervision and corrections department officer. | Governor and Legislature | Continue |
| 12. Reentry and Integration Division and Parole Division - Joint Report | Section 501.103, Texas Government Code | Reports on several key metrics and outcome measures covering the two divisions' activities. | Governor, Lieutenant Governor, Speaker of the House, the House and Senate committees of primary jurisdiction, and Reentry Task Force | Continue |
| 13. Report on Program Policies and Female Offenders | Section 501.027(b), Texas Government Code | Reports on policies that increase and promote female inmates' access to programming. | Governor, Lieutenant Governor, Speaker of the House, the House and Senate committees of primary jurisdiction, and Reentry Task Force | Continue |
| 14. Safe Prisons and Prison Rape Elimination Act Program | Section 501.176, Texas Government Code | Reports on investigation and monitoring activities and statistics related to sexual assault. | Governor, Lieutenant Governor, Speaker of the House, the House and Senate committees of primary jurisdiction, Board of Criminal Justice, TDCJ Executive Director, State Auditor, and Comptroller | Continue |
| 15. Services to Wrongfully Imprisoned Persons | Section 614.021(c), Texas Health and Safety Code | Reports on services provided to assist wrongfully imprisoned persons discharged from TDCJ in accessing services. | Legislature | Abolish – instead include the same information in the Biennial TCOOMMI Report required under Section 614.009, Texas Health and Safety Code |
| 16. Sex Offender Recidivism Report | Section 501.062(c), Texas Government Code | Reports on recidivism rate comparisons for sex offenders who have undergone an orchiectomy and those who have not. | Legislature | Abolish – TDCJ reported 2004 was the last time an offender received this procedure |
| 17. Biennial Texas Correctional Office on Offenders with Medical or Mental Impairments (TCOOMMI) Report | Section 614.009, Texas Health and Safety Code | Reports on TCOOMMI's activities, including program evaluations, during the biennium preceding the report. | Governor, Lieutenant Governor, Speaker of the House, and Board of Criminal Justice | Continue and modify due date to December 1 of even-numbered years |

## *Appendix L*

### Correctional Managed Health Care Committee

| Report Title | Legal Authority | Description | Recipient | Sunset Evaluation |
|---|---|---|---|---|
| 1. Student Loan Repayment Assistance | Section 501.156(d), Texas Government Code | Reports on any funds used by the committee for its statutorily authorized repayment assistance program. | Governor and Legislative Budget Board | Continue |

### Windham School District

| Report Title | Legal Authority | Description | Recipient | Sunset Evaluation |
|---|---|---|---|---|
| 1. Program Evaluation Report | Section 19.0041, Texas Education Code | Reports on several metrics covering data collected for each person who participates in Windham programs. | Governor, Legislature, and Windham Board of Trustees | Continue |
| 2. Annual Strategic Plan Report | Section 19.010, Texas Education Code | Reports on district activities under its strategic plan, including the mission, goals, and programmatic activity. | Governor, Lieutenant Governor, Speaker of the House, Windham Board of Trustees, and Texas Education Agency | Continue |

### Board of Pardons and Paroles

| Report Title | Legal Authority | Description | Recipient | Sunset Evaluation |
|---|---|---|---|---|
| 1. Board and Parole Commissioner Activity Report | Section 508.036(a)(5), Texas Government Code | Reports on activities of the board and parole commissioners, release decisions, and the use of parole guidelines. | Governor and Legislature | Continue |
| 2. Parole Guidelines Report | Section 508.1445, Texas Government Code | Reports on the application and use of parole guidelines. | Lieutenant Governor, Speaker of the House, the House and Senate committees of primary jurisdiction, and the Criminal Justice Legislative Oversight Committee | Continue |

September 2024                                                    Sunset Advisory Commission

# APPENDIX M | Staff Review Activities

During the review of the Texas Department of Criminal Justice (TDCJ), Correctional Managed Health Care Committee, Windham School District, and Board of Pardons and Paroles (BPP), Sunset staff engaged in the following activities that are standard to all Sunset reviews. Sunset staff worked extensively with agency personnel; attended board and committee meetings; interviewed board and committee members; met with staff from key legislative offices; conducted interviews and solicited written comments from interest groups and the public; reviewed agency documents and reports, state statutes, legislative reports, previous legislation, and literature; researched the organization and functions of similar state agencies in other states; and performed background and comparative research.

In addition, Sunset staff performed the following activities unique to these agencies.

- Visited several types of TDCJ facilities, including prisons, state jails, an intake unit, sheltered housing, a parole office, a residential reentry center, and a Substance Abuse Felony Punishment Facility.

- Visited facilities providing medical care to inmates, including the Texas Tech University Health Sciences Center operation at the Western Region Medical Facility in Lubbock and the University of Texas Medical Branch prison hospital in Galveston.

- Surveyed current TDCJ staff and Community Supervision and Corrections Department (CSCD) directors and spoke extensively with current and former TDCJ staff and CSCD directors.

- Toured Windham classes and observed focus groups of teachers and principals.

- Observed rehabilitation programming classes operated by both TDCJ and private contractors.

- Attended a Texas Correctional Office on Offenders with Medical or Mental Impairments Advisory Committee meeting and a Reentry Task Force meeting.

- Observed parole revocation hearings, institutional parole officer interviews, and voting performed by BPP board members and parole commissioners.

- Participated in a ride-along with a parole officer.

- Attended Judicial Advisory Council and Probation Advisory Committee meetings.

- Attended a TDCJ-sponsored community engagement summit and several stakeholder engagement meetings.

# Sunset Staff Review of the

## *Texas Department of Criminal Justice*
## *Correctional Managed Health Care Committee*
## *Windham School District*
## *Board of Pardons and Paroles*

─────── REPORT PREPARED BY ───────

Darren McDivitt, *Project Manager*

Tejas Bommakanti

Will Bucknall

Jamie Kim

Sadie Smeck

Katherina Wierschke

Janet Wood

Erick Fajardo, *Project Supervisor*

─────────────────────

Eric Beverly
*Executive Director*

*Sunset Advisory Commission*

| **Location** | **Mail** |
| --- | --- |
| Robert E. Johnson Bldg., 6th Floor | PO Box 13066 |
| 1501 North Congress Avenue | Austin, TX 78711 |
| Austin, TX 78701 | |

| **Website** | **Email** |
| --- | --- |
| www.sunset.texas.gov | sunset@sunset.texas.gov |

**Phone**
(512) 463-1300

# EXHIBIT 36

| Type | Unit | Description | Deferred Maintenance | FY2025 | FY2026 | FY2027 | FY2028 | FY2029 | FY2030+ | Total |
|---|---|---|---|---|---|---|---|---|---|---|
| Safety | Administration | Replace Roof | $19,105,900 | - | - | - | - | - | $19,105,900 | $19,105,900 |
| | Allred | Add Equipment to Emergency Power - Restrictive Housing | $1,512,000 | - | - | $1,512,000 | - | - | - | $1,512,000 |
| | B. Moore | Replace Roof - Multiple Locations | $ - | - | - | - | - | $2,552,000 | - | $2,552,000 |
| | Bell | Replace Roof - Multiple Locations | $3,100,000 | - | - | - | - | - | $3,100,000 | $3,100,000 |
| | | Add Equipment to Emergency Power - Inmate Housing | $263,500 | - | - | $263,500 | - | - | - | $263,500 |
| | Beto | Add Equipment to Emergency Power - Inmate Housing | $821,500 | - | - | $821,500 | - | - | - | $821,500 |
| | | Replace Locking System | $3,132,000 | - | - | - | - | $3,132,000 | - | $3,132,000 |
| | | Install Emergency Generators - Wells | $82,500 | - | - | - | - | - | $82,500 | $82,500 |
| | Bradshaw | Install Fire Alarm System - Chapel | $94,300 | - | - | - | - | - | $94,300 | $94,300 |
| | Bridgeport | Add Equipment to Emergency Power - Inmate Housing | $551,000 | - | - | - | - | $551,000 | - | $551,000 |
| | | Repair Fire Main - Boiler Room | $186,000 | - | - | - | - | - | $186,000 | $186,000 |
| | Briscoe | Replace Roof - Kitchen | $486,000 | - | - | $486,000 | - | - | - | $486,000 |
| | Byrd | Replace Roof - Warehouse | $423,400 | - | - | - | - | $423,400 | - | $423,400 |
| | | Install Backup Power - Unit Wide | $2,852,000 | - | - | - | - | - | $2,852,000 | $2,852,000 |
| | | Install Fire Alarm System - Bachelor Officers' Quarters | $248,000 | - | - | - | - | - | $248,000 | $248,000 |
| | | Install Fire Alarm System - Warehouse | $248,000 | - | - | - | - | - | $248,000 | $248,000 |
| | Chase Field | Replace Roof - Multiple Locations | $1,178,000 | - | - | - | - | - | $1,178,000 | $1,178,000 |
| | | Repair Roof - Regional Distribution Warehouse | $50,000 | - | $50,000 | - | - | - | - | $50,000 |
| | | Repair Roof | $249,300 | - | - | - | - | - | $249,300 | $249,300 |
| | | Replace Roof - Metal Shop | $248,000 | - | - | - | - | - | $248,000 | $248,000 |
| | | Replace Roof - Main Building | $1,364,000 | - | - | - | - | - | $1,364,000 | $1,364,000 |
| | | Replace Roof | $229,400 | - | - | - | - | - | $229,400 | $229,400 |
| | | Replace Roof - Water Plant | $310,000 | - | - | - | - | - | $310,000 | $310,000 |
| | | Install Emergency Generator - Multiple Buildings | $373,300 | - | - | - | - | - | $373,300 | $373,300 |
| | | Install Emergency Power - Regional Office | $78,600 | - | - | - | - | - | $78,600 | $78,600 |
| | | Replace Roof - Bachelor Officers' Quarters | $1,178,000 | - | - | - | - | - | $1,178,000 | $1,178,000 |
| | Clemens | Add Equipment to Backup Generator - Gym | $216,000 | - | - | $216,000 | - | - | - | $216,000 |
| | | Replace Roof - Main Building | $5,893,600 | - | - | - | - | - | $5,893,600 | $5,893,600 |
| | | Replace Roof - Chapel and Library | $707,300 | - | - | - | - | - | $707,300 | $707,300 |
| | | Replace Roof - Medical | $349,700 | - | - | - | - | - | $349,700 | $349,700 |
| | | Install Emergency Power - Multiple Locations | $558,000 | - | - | - | - | - | $558,000 | $558,000 |
| | | Add Equipment to Emergency Power - Trusty Camp | $285,900 | - | - | - | - | $285,900 | - | $285,900 |
| | Clements | Replace Roof - Multiple Locations | $18,560,000 | - | - | - | - | $18,560,000 | - | $18,560,000 |
| | | Add Equipment to Emergency Power - Restrictive Housing | $270,000 | - | - | $270,000 | - | - | - | $270,000 |
| | | Replace Roof | $1,624,000 | - | - | - | - | $1,624,000 | - | $1,624,000 |
| | Coffield | Install Backup Power - Unit Wide | $448,700 | - | - | - | - | - | $448,700 | $448,700 |
| | Coleman | Replace Roof - Multiple Locations | $ - | - | - | - | - | $16,396,600 | - | $16,396,600 |
| | | Add Equipment to Emergency Power - Inmate Housing | $400,600 | - | - | - | - | $400,600 | - | $400,600 |
| | Connally | Add Equipment to Emergency Power - Restrictive Housing | $290,000 | - | - | $290,000 | - | - | - | $290,000 |
| | | Add Equipment to Backup Generator - Kitchen Renovation | $406,000 | - | - | - | - | $406,000 | - | $406,000 |
| | Cotulla | Add Equipment to Backup Generator - Kitchen Renovation | $434,000 | - | - | - | - | - | $434,000 | $434,000 |
| | | Repair Roof - Unit Wide | $7,886,400 | - | - | - | - | - | $7,886,400 | $7,886,400 |
| | Crain | Replace Roof - Multiple Locations | $1,433,600 | - | - | - | - | $1,433,600 | - | $1,433,600 |
| | | Add Equipment to Emergency Power - Inmate Housing | $989,200 | - | - | - | - | $989,200 | - | $989,200 |
| | | Install Fire Alarm System - Inmate Housing | $692,600 | - | - | $692,600 | - | - | - | $692,600 |
| | | Repair Roof - Hackberry | $474,000 | - | - | - | - | - | $474,000 | $474,000 |
| | | Replace Roof - Inmate Housing | $744,000 | - | - | - | - | - | $744,000 | $744,000 |
| | Dominguez | Add Equipment to Emergency Power - Trusty Camp | $80,400 | - | - | - | - | $80,400 | - | $80,400 |
| | | Add Equipment to Backup Generator - Kitchen Renovation | $406,000 | - | - | - | - | $406,000 | - | $406,000 |
| | Duncan | Repair Roof | $522,000 | - | - | - | - | $522,000 | - | $522,000 |
| | Ellis | Add Equipment to Emergency Power - Inmate Housing | $948,000 | - | - | - | - | $948,000 | - | $948,000 |
| | | Replace Roof - Maintenance Building | $50,500 | - | - | - | - | $50,500 | - | $50,500 |
| | | Replace Roof - Shop Building | $516,500 | - | - | - | - | $516,500 | - | $516,500 |
| | | Repair Roof - Bus Barn | $693,800 | - | - | - | - | - | $693,800 | $693,800 |
| | | Replace Roof - Chair Factory | $837,200 | - | - | - | - | - | $837,200 | $837,200 |
| | Estes | Add Equipment to Emergency Power - Inmate Housing | $656,000 | - | - | - | - | $656,000 | - | $656,000 |
| | Ferguson | Repair Roofs - Multiple Locations | $999,000 | - | $999,000 | - | - | - | - | $999,000 |
| | | Add Equipment to Emergency Power - Inmate Housing | $2,900,000 | - | - | - | - | $2,900,000 | - | $2,900,000 |
| | | Replace Roof - Main Building | $11,780,000 | - | - | - | - | - | $11,780,000 | $11,780,000 |
| | Ft. Stockton | Add Equipment to Backup Generator - Kitchen Renovation | $406,000 | - | - | - | - | $406,000 | - | $406,000 |
| | Garza East | Replace Roof - Trusty Camp | $434,000 | - | - | - | - | - | $434,000 | $434,000 |
| | | Replace Fire Alarm System - Trusty Camp | $558,000 | - | - | $558,000 | - | - | - | $558,000 |
| | | Replace Fire Escape Stairways | $248,000 | - | - | - | - | - | $248,000 | $248,000 |
| | Glossbrenner | Add Equipment to Emergency Power - Inmate Housing | $64,400 | - | - | - | - | $64,400 | - | $64,400 |
| | Goree | Add Equipment to Emergency Power - Inmate Housing | $1,052,900 | - | - | - | - | $1,052,900 | - | $1,052,900 |
| | Gurney | Add Equipment to Emergency Power - Inmate Housing | $78,400 | - | - | - | - | - | $78,400 | $78,400 |
| | Hamilton | Repair Roofs - Unit Wide | $356,700 | - | - | - | - | - | $356,700 | $356,700 |
| | Henley | Replace Roof - Inmate Housing | $2,256,200 | - | - | - | $2,256,200 | - | - | $2,256,200 |
| | Hightower | Install Generator with Automatic Transfer Switch - Gym | $115,200 | - | - | $115,200 | - | - | - | $115,200 |
| | Hilltop | Replace Roof - Multiple Locations | $122,200 | - | - | - | - | - | $122,200 | $122,200 |
| | | Add Equipment to Emergency Power - Inmate Housing | $257,900 | - | - | - | - | $257,900 | - | $257,900 |
| | | Replace Roof | $261,600 | - | - | - | - | - | $261,600 | $261,600 |

TIEDE DEF_456377

| Type | Unit | Description | Deferred Maintenance | FY2025 | FY2026 | FY2027 | FY2028 | FY2029 | FY2030+ | Total |
|---|---|---|---|---|---|---|---|---|---|---|
| Safety | Hughes | Replace Roof - Multiple Locations | $ 17,632,000 | $ - | $ - | $ - | $ 17,632,000 | $ - | $ - | $ 17,632,000 |
| | Huntsville | Replace Roof - Multiple Locations | $ 118,600 | $ - | $ - | $ - | $ - | $ - | $ 118,600 | $ 118,600 |
| | | Replace Roof - Main Building | $ 10,370,700 | $ - | $ - | $ - | $ 9,332,300 | $ - | $ 1,038,400 | $ 10,370,700 |
| | | Install Emergency Generator - Information Technology Building | $ 496,000 | $ - | $ - | $ - | $ - | $ - | $ 496,000 | $ 496,000 |
| | | Install Fire Alarm System | $ 7,453,300 | $ - | $ - | $ 7,453,300 | $ - | $ - | $ - | $ 7,453,300 |
| | | Install Generator - Maintenance | $ 217,000 | $ - | $ - | $ - | $ - | $ - | $ 217,000 | $ 217,000 |
| | | Relocate Generator - Conference Center | $ 124,000 | $ - | $ - | $ - | $ - | $ - | $ 124,000 | $ 124,000 |
| | Jester III | Add Equipment to Emergency Power - Inmate Housing | $ 1,224,600 | $ - | $ - | $ 1,224,600 | $ - | $ - | $ - | $ 1,224,600 |
| | Jordan | Install Generator with Automatic Transfer Switch - Generator Pad | $ 89,200 | $ - | $ - | $ - | $ 89,200 | $ - | $ - | $ 89,200 |
| | Kegans | Add Equipment to Emergency Power - Inmate Housing | $ 739,100 | $ - | $ - | $ - | $ - | $ 739,100 | $ - | $ 739,100 |
| | | Repair Roof - Unit Wide | $ 287,100 | $ - | $ - | $ - | $ - | $ - | $ 287,100 | $ 287,100 |
| | Kyle | Replace Roof - Multiple Locations | $ 4,013,100 | $ - | $ - | $ - | $ - | $ - | $ 4,013,100 | $ 4,013,100 |
| | | Add Equipment to Emergency Power - Inmate Housing | $ 150,200 | $ - | $ - | $ - | $ - | $ 150,200 | $ - | $ 150,200 |
| | Lindsey | Add Equipment to Emergency Power - Inmate Housing | $ 1,014,800 | $ - | $ - | $ - | $ - | $ 1,014,800 | $ - | $ 1,014,800 |
| | Lopez | Install Emergency Power - Multiple Locations | $ 434,000 | $ - | $ - | $ - | $ - | $ - | $ 434,000 | $ 434,000 |
| | Luther | Replace Roof - Main Building | $ 2,339,300 | $ - | $ - | $ - | $ - | $ - | $ 2,339,300 | $ 2,339,300 |
| | Lynaugh | Add Equipment to Backup Generator - Kitchen Renovation | $ 161,200 | $ - | $ - | $ - | $ - | $ - | $ 161,200 | $ 161,200 |
| | Marlin | Add Equipment to Backup Generator - Inmate Housing | $ 500,400 | $ - | $ - | $ 500,400 | $ - | $ - | $ - | $ 500,400 |
| | | Add Equipment to Backup Generator - Kitchen Renovation | $ 434,000 | $ - | $ - | $ - | $ - | $ - | $ 434,000 | $ 434,000 |
| | | Replace Roof - Main Building | $ 924,500 | $ - | $ - | $ - | $ - | $ - | $ 924,500 | $ 924,500 |
| | McConnell | Add Equipment to Emergency Power - Restrictive Housing | $ 325,100 | $ - | $ - | $ 325,100 | $ - | $ - | $ - | $ 325,100 |
| | Mechler | Repair Roof | $ 46,600 | $ - | $ - | $ - | $ - | $ - | $ 46,600 | $ 46,600 |
| | Memorial | Repair Roof - Cold Storage | $ 218,200 | $ - | $ 218,200 | $ - | $ - | $ - | $ - | $ 218,200 |
| | | Add Equipment to Emergency Power - Inmate Housing | $ 1,065,300 | $ - | $ - | $ - | $ - | $ 1,065,300 | $ - | $ 1,065,300 |
| | | Install Emergency Power - Chapel | $ 248,000 | $ - | $ - | $ - | $ - | $ - | $ 248,000 | $ 248,000 |
| | | Install Emergency Power - Inside Gym | $ 248,000 | $ - | $ - | $ - | $ - | $ - | $ 248,000 | $ 248,000 |
| | Michael | Replace Roof - Multiple Locations | $ 13,500,000 | $ - | $ - | $ 13,500,000 | $ - | $ - | $ - | $ 13,500,000 |
| | | Install High Mast Lighting | $ 5,220,000 | $ - | $ - | $ - | $ 5,220,000 | $ - | $ - | $ 5,220,000 |
| | | Install Fire Alarm System - Packing Plant | $ 71,200 | $ - | $ - | $ - | $ - | $ 71,200 | $ - | $ 71,200 |
| | | Replace Roof - Packing Plant | $ 6,200,000 | $ - | $ - | $ - | $ - | $ - | $ 6,200,000 | $ 6,200,000 |
| | | Install Emergency Power - Packing Plant | $ 9,300,000 | $ - | $ - | $ - | $ - | $ - | $ 9,300,000 | $ 9,300,000 |
| | Middleton | Add Equipment to Backup Generator - Kitchen Renovation & Commissary | $ 99,200 | $ - | $ - | $ - | $ - | $ - | $ 99,200 | $ 99,200 |
| | Montford | Add Equipment to Backup Generator - Kitchen Renovation | $ 406,000 | $ - | $ - | $ - | $ - | $ 406,000 | $ - | $ 406,000 |
| | Multiple | 88th Legislature Funding | $ 31,097,152 | $ 31,097,152 | $ - | $ - | $ - | $ - | $ - | $ 31,097,152 |
| | Murray | Add Equipment to Backup Generator - Kitchen Renovation | $ 150,800 | $ - | $ - | $ - | $ - | $ 150,800 | $ - | $ 150,800 |
| | Ney | Add Equipment to Backup Generator - Kitchen Renovation | $ 58,000 | $ - | $ - | $ - | $ - | $ 58,000 | $ - | $ 58,000 |
| | O'Daniel | Add Equipment to Emergency Power - Inmate Housing | $ 837,900 | $ - | $ - | $ - | $ - | $ 837,900 | $ - | $ 837,900 |
| | | Replace Roof | $ 319,700 | $ - | $ - | $ - | $ - | $ - | $ 319,700 | $ 319,700 |
| | | Replace Roof and HVAC Equipment - Inmate Housing | $ 2,268,000 | $ - | $ - | $ 2,268,000 | $ - | $ - | $ - | $ 2,268,000 |
| | Pack | Replace Roof - Multiple Locations | $ 19,085,800 | $ - | $ - | $ 19,085,800 | $ - | $ - | $ - | $ 19,085,800 |
| | Polunsky | Add Equipment to Emergency Power - Restrictive Housing | $ 290,000 | $ - | $ - | $ - | $ - | $ 290,000 | $ - | $ 290,000 |
| | | Replace Roof | $ 93,200 | $ - | $ - | $ - | $ - | $ - | $ 93,200 | $ 93,200 |
| | Powledge | Add Equipment to Emergency Power - Inmate Housing | $ 505,500 | $ - | $ - | $ 505,500 | $ - | $ - | $ - | $ 505,500 |
| | | Install Fire Alarm System - Inmate Housing | $ 1,535,700 | $ - | $ - | $ 1,535,700 | $ - | $ - | $ - | $ 1,535,700 |
| | Ramsey | Repair Roof - North Houston Parole Building | $ 326,200 | $ - | $ 326,200 | $ - | $ - | $ - | $ - | $ 326,200 |
| | | Add Equipment to Emergency Power - Inmate Housing | $ 517,600 | $ - | $ - | $ - | $ - | $ 517,600 | $ - | $ 517,600 |
| | Roach | Replace Roof | $ 103,000 | $ - | $ - | $ - | $ - | $ - | $ 103,000 | $ 103,000 |
| | Robertson | Add Equipment to Emergency Power - Restrictive Housing | $ 349,200 | $ - | $ - | $ - | $ - | $ 349,200 | $ - | $ 349,200 |
| | Sanchez | Add Equipment to Backup Generator - Kitchen Renovation | $ 75,400 | $ - | $ - | $ - | $ - | $ 75,400 | $ - | $ 75,400 |
| | Sayle | Add Equipment to Emergency Power - Inmate Housing | $ 422,200 | $ - | $ - | $ - | $ - | $ 422,200 | $ - | $ 422,200 |
| | Scott | Repair Showers - Unit Wide | $ 622,500 | $ - | $ - | $ - | $ - | $ - | $ 622,500 | $ 622,500 |
| | Segovia | Add Equipment to Emergency Power - Inmate Housing | $ 72,800 | $ - | $ - | $ - | $ - | $ 72,800 | $ - | $ 72,800 |
| | | Replace Roof | $ 1,592,200 | $ - | $ - | $ - | $ - | $ - | $ 1,592,200 | $ 1,592,200 |
| | Stevenson | Replace Roof - Food Service | $ 434,100 | $ - | $ - | $ - | $ 434,100 | $ - | $ - | $ 434,100 |
| | | Add Equipment to Backup Generator - Kitchen Renovation | $ 870,000 | $ - | $ - | $ - | $ - | $ 870,000 | $ - | $ 870,000 |
| | Stiles | Repair Walkway Roof | $ 157,700 | $ - | $ - | $ - | $ 157,700 | $ - | $ - | $ 157,700 |
| | Stringfellow | Replace Roof and HVAC Equipment - Bachelor Officers' Quarters | $ 918,000 | $ - | $ - | $ - | $ 918,000 | $ - | $ - | $ 918,000 |
| | | Install Roof Access - Main Building | $ 50,000 | $ - | $ - | $ - | $ 50,000 | $ - | $ - | $ 50,000 |
| | | Install Emergency Power - Main Building | $ 620,000 | $ - | $ - | $ - | $ - | $ - | $ 620,000 | $ 620,000 |
| | Telford | Add Equipment to Emergency Power - Restrictive Housing | $ 290,000 | $ - | $ - | $ - | $ - | $ 290,000 | $ - | $ 290,000 |
| | | Replace Sprinkler System | $ 176,300 | $ - | $ - | $ - | $ - | $ - | $ 176,300 | $ 176,300 |
| | Terrell | Replace Roof - Multiple Locations | $ 1,131,200 | $ - | $ - | $ - | $ - | $ - | $ 1,131,200 | $ 1,131,200 |
| | | Add Equipment to Emergency Power - Inmate Housing | $ 1,017,900 | $ - | $ - | $ 1,017,900 | $ - | $ - | $ - | $ 1,017,900 |
| | | Install Generator - Fuel Depot | $ 109,900 | $ - | $ - | $ - | $ - | $ - | $ 109,900 | $ 109,900 |
| | Travis Co. | Add Equipment to Emergency Power - Inmate Housing | $ 628,900 | $ - | $ - | $ 628,900 | $ - | $ - | $ - | $ 628,900 |
| | Vance | Replace Roofs - Employee Housing | $ 378,000 | $ - | $ - | $ 378,000 | $ - | $ - | $ - | $ 378,000 |
| | Wainwright | Add Equipment to Emergency Power - Inmate Housing | $ 205,400 | $ - | $ - | $ - | $ - | $ 205,400 | $ - | $ 205,400 |
| | | Add Emergency Power - Multiple Locations | $ 1,392,000 | $ - | $ - | $ - | $ - | $ 1,392,000 | $ - | $ 1,392,000 |
| | Wynne | Replace Roof - Multiple Locations | $ 3,720,000 | $ - | $ - | $ - | $ - | $ - | $ 3,720,000 | $ 3,720,000 |
| | | Add Equipment to Emergency Power - Inmate Housing | $ 265,800 | $ - | $ - | $ - | $ - | $ 265,800 | $ - | $ 265,800 |
| **Safety Total** | | | **$ 265,987,952** | **$ 31,097,152** | **$ 30,375,000** | **$ 35,557,700** | **$ 25,108,200** | **$ 64,644,900** | **$ 98,649,000** | **$ 284,936,552** |
| Security | Allred | Install Fence to Expansion Cell Block | $ 192,600 | $ - | $ - | $ - | $ - | $ - | $ 192,600 | $ 192,600 |
| | | Install Shower Locks | $ 124,000 | $ - | $ - | $ - | $ - | $ - | $ 124,000 | $ 124,000 |

TIEDE DEF_456328

Texas Department of Criminal Justice
89th Capital Expenditure Plan by Year - Category

| Type | Unit | Description | Deferred Maintenance | FY2025 | FY2026 | FY2027 | FY2028 | FY2029 | FY2030+ | Total |
|---|---|---|---|---|---|---|---|---|---|---|
| Security | Bell | Repair/Replace Exterior Walls and Windows - Unit Wide | $ 1,984,000 | $ - | $ - | $ - | $ - | $ - | $ 1,984,000 | $ 1,984,000 |
| | Beto | Install Monitored Pulse Fence Detection System - Perimeter | $ 5,430,200 | $ - | $ - | $ - | $ - | $ - | $ 5,430,200 | $ 5,430,200 |
| | | Add Fencing and Doors to Back Stairway - Inmate Housing | $ 410,400 | $ - | $ - | $ 410,400 | $ - | $ - | $ - | $ 410,400 |
| | Clemens | Install Monitored Pulse Fence Detection System - Perimeter | $ 5,430,200 | $ - | $ - | $ - | $ - | $ - | $ 5,430,200 | $ 5,430,200 |
| | | Replace Locking System | $ 974,200 | $ - | $ - | $ 974,200 | $ - | $ - | $ - | $ 974,200 |
| | | Replace Windows and Frames - Multiple Locations | $ 19,282,000 | $ - | $ - | $ - | $ - | $ - | $ 19,282,000 | $ 19,282,000 |
| | | Install Additional Fencing and Lighting | $ 102,600 | $ - | $ - | $ - | $ - | $ - | $ 102,600 | $ 102,600 |
| | Clements | Replace Locking System | $ 694,400 | $ - | $ - | $ - | $ - | $ - | $ 694,400 | $ 694,400 |
| | | Replace Food Tray Slots - Restrictive Housing | $ 434,000 | $ - | $ - | $ - | $ - | $ - | $ 434,000 | $ 434,000 |
| | | Replace Locking System - Inmate Housing | $ 4,960,000 | $ - | $ - | $ - | $ - | $ - | $ 4,960,000 | $ 4,960,000 |
| | Coffield | Install Additional Fencing | $ 120,900 | $ - | $ - | $ - | $ - | $ - | $ 120,900 | $ 120,900 |
| | | Install Food Slots | $ 310,000 | $ - | $ - | $ - | $ - | $ - | $ 310,000 | $ 310,000 |
| | | Replace Food Tray Slots - Restrictive Housing | $ 198,900 | $ - | $ - | $ - | $ - | $ - | $ 198,900 | $ 198,900 |
| | Cole | Upgrade Perimeter Lighting | $ 50,000 | $ - | $ - | $ - | $ - | $ - | $ 50,000 | $ 50,000 |
| | Dalhart | Replace Concertina Wire - Perimeter | $ 116,600 | $ - | $ - | $ - | $ - | $ - | $ 116,600 | $ 116,600 |
| | Daniel | Replace Locking System | $ 376,700 | $ - | $ - | $ - | $ - | $ - | $ 376,700 | $ 376,700 |
| | Diboll | Replace Locking System | $ 815,900 | $ - | $ - | $ - | $ - | $ 815,900 | $ - | $ 815,900 |
| | | Replace Concertina Wire - Perimeter | $ 270,000 | $ - | $ - | $ 270,000 | $ - | $ - | $ - | $ 270,000 |
| | Dominguez | Install Microwave Intrusion Detection System - Perimeter | $ 378,000 | $ - | $ - | $ 378,000 | $ - | $ - | $ - | $ 378,000 |
| | Ellis | Install Monitored Pulse Fence Detection System - Perimeter | $ 4,729,600 | $ - | $ - | $ 4,729,600 | $ - | $ - | $ - | $ 4,729,600 |
| | | Replace Lighting - Inmate Housing | $ 50,000 | $ - | $ - | $ 50,000 | $ - | $ - | $ - | $ 50,000 |
| | | Replace Windows and Frames - Multiple Locations | $ 43,400,000 | $ - | $ - | $ - | $ - | $ - | $ 43,400,000 | $ 43,400,000 |
| | Estelle | Upgrade Door Controls and Monitoring System - High Security | $ 6,456,400 | $ - | $ 6,456,400 | $ - | $ - | $ - | $ - | $ 6,456,400 |
| | | Install Monitored Pulse Fence Detection System - Perimeter | $ 5,430,200 | $ - | $ - | $ - | $ - | $ - | $ 5,430,200 | $ 5,430,200 |
| | | Replace Locking System | $ 980,400 | $ - | $ - | $ - | $ - | $ 980,400 | $ - | $ 980,400 |
| | Estes | Install Additional Fencing | $ 270,000 | $ - | $ - | $ 270,000 | $ - | $ - | $ - | $ 270,000 |
| | | Replace Locking System - Unit Wide | $ 2,728,000 | $ - | $ - | $ - | $ - | $ - | $ 2,728,000 | $ 2,728,000 |
| | Ferguson | Install Monitored Pulse Fence Detection System - Perimeter | $ 4,729,600 | $ - | $ - | $ 4,729,600 | $ - | $ - | $ - | $ 4,729,600 |
| | Ferguson | Install Fence - Visitation | $ 50,000 | $ - | $ - | $ - | $ - | $ - | $ 50,000 | $ 50,000 |
| | Garza East | Replace Security Control System - Multiple Locations | $ 643,800 | $ - | $ - | $ - | $ - | $ 643,800 | $ - | $ 643,800 |
| | Garza West | Install Microwave Intrusion Detection System - Perimeter | $ 434,000 | $ - | $ - | $ - | $ - | $ - | $ 434,000 | $ 434,000 |
| | | Replace Security Control System - Multiple Locations | $ 603,200 | $ - | $ - | $ - | $ - | $ 603,200 | $ - | $ 603,200 |
| | Gist | Install Microwave Intrusion Detection System - Perimeter | $ 434,000 | $ - | $ - | $ - | $ - | $ - | $ 434,000 | $ 434,000 |
| | | Install Additional Razor Wire - Unit Wide | $ 78,500 | $ - | $ - | $ - | $ - | $ - | $ 78,500 | $ 78,500 |
| | Glossbrenner | Install Upgraded Exterior Lighting - Unit Wide | $ 186,000 | $ - | $ - | $ - | $ - | $ - | $ 186,000 | $ 186,000 |
| | | Upgrade Perimeter Lighting - Multiple Locations | $ 434,000 | $ - | $ - | $ - | $ - | $ - | $ 434,000 | $ 434,000 |
| | Gurney | Replace Control Panels and Intercoms - Unit Wide | $ 963,500 | $ - | $ - | $ - | $ - | $ - | $ 963,500 | $ 963,500 |
| | Hilltop | Install Razor Wire - Perimeter | $ 94,700 | $ - | $ - | $ - | $ - | $ - | $ 94,700 | $ 94,700 |
| | Hobby | Install Additional Perimeter Fence | $ 582,200 | $ - | $ - | $ - | $ - | $ - | $ 582,200 | $ 582,200 |
| | Hodge | Install Monitored Pulse Fence Detection System - Perimeter | $ 5,430,200 | $ - | $ - | $ - | $ - | $ - | $ 5,430,200 | $ 5,430,200 |
| | Holliday | Install Microwave Intrusion Detection System - Perimeter | $ 434,000 | $ - | $ - | $ - | $ - | $ - | $ 434,000 | $ 434,000 |
| | | Replace Fencing - Perimeter | $ 169,700 | $ - | $ - | $ - | $ - | $ - | $ 169,700 | $ 169,700 |
| | Hughes | Add Razor Wire - Multiple Locations | $ 55,100 | $ - | $ - | $ - | $ - | $ 55,100 | $ - | $ 55,100 |
| | Huntsville | Install Microwave Intrusion Detection System - Perimeter | $ 434,000 | $ - | $ - | $ - | $ - | $ - | $ 434,000 | $ 434,000 |
| | | Replace Windows - Main Building | $ 327,700 | $ - | $ - | $ - | $ - | $ - | $ 327,700 | $ 327,700 |
| | | Renovate Catwalks - Pickets | $ 967,200 | $ - | $ - | $ - | $ - | $ - | $ 967,200 | $ 967,200 |
| | | Repair/Replace South Wall - Perimeter | $ 9,920,000 | $ - | $ - | $ - | $ - | $ - | $ 9,920,000 | $ 9,920,000 |
| | Hutchins | Replace Locking System | $ 1,125,700 | $ - | $ - | $ - | $ - | $ - | $ 1,125,700 | $ 1,125,700 |
| | | Install Microwave Intrusion Detection System - Perimeter | $ 378,000 | $ - | $ - | $ 378,000 | $ - | $ - | $ - | $ 378,000 |
| | | Upgrade Perimeter Lighting | $ 270,000 | $ - | $ - | $ 270,000 | $ - | $ - | $ - | $ 270,000 |
| | Jester III | Install Additional Lighting - Unit Wide | $ 2,232,000 | $ - | $ - | $ - | $ - | $ - | $ 2,232,000 | $ 2,232,000 |
| | Jordan | Install Microwave Intrusion Detection System - Perimeter | $ - | $ - | $ - | $ 378,000 | $ - | $ - | $ - | $ 378,000 |
| | | Replace Razor Wire - Multiple Locations | $ 186,000 | $ - | $ - | $ - | $ - | $ - | $ 186,000 | $ 186,000 |
| | Kegans | Repair Windows and Walls - Unit Wide | $ 50,000 | $ - | $ - | $ - | $ - | $ - | $ 50,000 | $ 50,000 |
| | Kyle | Upgrade Perimeter Lighting | $ 221,300 | $ - | $ - | $ - | $ - | $ - | $ 221,300 | $ 221,300 |
| | LeBlanc | Install Microwave Intrusion Detection System - Perimeter | $ 434,000 | $ - | $ - | $ - | $ - | $ - | $ 434,000 | $ 434,000 |
| | | Install Razor Wire - Perimeter Fence | $ 155,300 | $ - | $ - | $ - | $ - | $ - | $ 155,300 | $ 155,300 |
| | Lewis | Upgrade Door Controls and Monitoring System - High Security | $ 5,220,000 | $ - | $ - | $ - | $ - | $ 5,220,000 | $ - | $ 5,220,000 |
| | | Install Monitored Pulse Fence Detection System - Perimeter | $ 4,729,600 | $ - | $ - | $ 4,729,600 | $ - | $ - | $ - | $ 4,729,600 |
| | | Replace Locking System | $ 1,357,800 | $ - | $ - | $ - | $ - | $ - | $ 1,357,800 | $ 1,357,800 |
| | Lopez | Replace Concertina Wire - Perimeter | $ 310,000 | $ - | $ - | $ - | $ - | $ - | $ 310,000 | $ 310,000 |
| | Lychner | Install Microwave Intrusion Detection System - Perimeter | $ 378,000 | $ - | $ - | $ 378,000 | $ - | $ - | $ - | $ 378,000 |
| | | Replace Intercom System | $ 434,000 | $ - | $ - | $ - | $ - | $ - | $ 434,000 | $ 434,000 |
| | Memorial | Replace Cell Door Tray Slots - Multiple Locations | $ 433,500 | $ - | $ - | $ 433,500 | $ - | $ - | $ - | $ 433,500 |
| | | Replace Windows - Unit Wide | $ 47,607,100 | $ - | $ - | $ - | $ - | $ - | $ 47,607,100 | $ 47,607,100 |
| | | Install Additional Perimeter Lights | $ 310,000 | $ - | $ - | $ - | $ - | $ - | $ 310,000 | $ 310,000 |
| | | Install Lighting and Perimeter Fence - Trusty Camp | $ 310,000 | $ - | $ - | $ - | $ - | $ - | $ 310,000 | $ 310,000 |
| | Michael | Replace Food Tray Slots - Multiple Locations | $ 781,800 | $ - | $ - | $ 781,800 | $ - | $ - | $ - | $ 781,800 |
| | | Reinforce Inside/Outside Perimeter Fence | $ 65,400 | $ - | $ - | $ 65,400 | $ - | $ - | $ - | $ 65,400 |
| | | Repair Fencing | $ 186,000 | $ - | $ - | $ - | $ - | $ - | $ 186,000 | $ 186,000 |
| | | Replace Ballistic Glass - Unit Wide | $ 292,700 | $ - | $ - | $ - | $ - | $ - | $ 292,700 | $ 292,700 |
| | | Replace Locking System - Unit Wide | $ 21,080,000 | $ - | $ - | $ - | $ - | $ - | $ 21,080,000 | $ 21,080,000 |
| | Middleton | Install Microwave Intrusion Detection System - Perimeter | $ 434,000 | $ - | $ - | $ - | $ - | $ - | $ 434,000 | $ 434,000 |

TIEDE DEF_456379

| Type | Unit | Description | Deferred Maintenance | FY2025 | FY2026 | FY2027 | FY2028 | FY2029 | FY2030+ | Total |
|---|---|---|---|---|---|---|---|---|---|---|
| Security | Multiple | 88th Legislature Funding | 16,921,618 | 16,921,618 | - | - | - | - | - | 16,921,618 |
| | Murray | Install Additional Razor Wire - Perimeter and Back Dock | 88,000 | - | - | - | - | - | 88,000 | 88,000 |
| | Pack | Install Microwave Intrusion Detection System - Perimeter | 434,000 | - | - | - | - | - | 434,000 | 434,000 |
| | Plane | Install Additional Razor Wire - Perimeter Fence | 186,000 | - | - | - | - | - | 186,000 | 186,000 |
| | Polunsky | Install Monitored Pulse Fence Detection System - Perimeter | 4,729,600 | - | - | 4,729,600 | - | - | - | 4,729,600 |
| | | Replace Door Control System - Unit Wide | 3,990,900 | - | - | - | - | - | 3,990,900 | 3,990,900 |
| | | Install Additional Light Pole | 116,000 | - | - | - | - | 116,000 | - | 116,000 |
| | | Replace Razor/Barb Wire - Unit Wide | 434,000 | - | - | - | - | - | 434,000 | 434,000 |
| | Powledge | Install Microwave Intrusion Detection System - Perimeter | 434,000 | - | - | - | - | - | 434,000 | 434,000 |
| | Ramsey | Replace Windows and Frames - Multiple Locations | 24,800,000 | - | - | - | - | - | 24,800,000 | 24,800,000 |
| | Roach | Install Security Glass - Multiple Locations | 80,100 | - | - | - | - | 80,100 | - | 80,100 |
| | | Replace Razor Wire - Unit Wide | 186,000 | - | - | - | - | - | 186,000 | 186,000 |
| | Robertson | Replace Food Tray Slots - Multiple Locations | 245,200 | - | - | 245,200 | - | - | - | 245,200 |
| | | Repair Doors and Windows - Multiple Locations | 50,000 | - | - | - | - | - | 50,000 | 50,000 |
| | | Replace Gate - Restrictive Housing | 310,000 | - | - | - | - | - | 310,000 | 310,000 |
| | | Replace Gates | 344,800 | - | - | - | - | - | 344,800 | 344,800 |
| | San Saba | Install Razor Wire - Perimeter | 102,000 | - | - | - | - | - | 102,000 | 102,000 |
| | Scott | Install Microwave Intrusion Detection System - Perimeter | 434,000 | - | - | - | - | - | 434,000 | 434,000 |
| | | Replace Light Poles - Multiple Locations | 58,300 | - | - | - | - | - | 58,300 | 58,300 |
| | Segovia | Replace Doors for Inmate Housing - Multiple Locations | 72,600 | - | - | - | - | - | 72,600 | 72,600 |
| | Skyview | Install Monitored Pulse Fence Detection System - Perimeter | 5,430,200 | - | - | - | - | - | 5,430,200 | 5,430,200 |
| | Smith | Install Monitored Pulse Fence Detection System - Perimeter | 4,729,600 | - | - | 4,729,600 | - | - | - | 4,729,600 |
| | | Replace Locking System | 694,400 | - | - | - | - | - | 694,400 | 694,400 |
| | | Replace Fencing - Back Gate | 248,000 | - | - | - | - | - | 248,000 | 248,000 |
| | Stevenson | Install Microwave Intrusion Detection System - Perimeter | 434,000 | - | - | - | - | - | 434,000 | 434,000 |
| | Stiles | Construct Holding Cells - Restrictive Housing | 53,000 | - | - | 53,000 | - | - | - | 53,000 |
| | | Repair Fencing - Unit Wide | 1,054,000 | - | - | - | - | - | 1,054,000 | 1,054,000 |
| | | Replace Control Panels and Locking Systems - Unit Wide | 3,224,000 | - | - | - | - | - | 3,224,000 | 3,224,000 |
| | Stringfellow | Replace Windows and Bars - Multiple Locations | 3,720,000 | - | - | - | - | - | 3,720,000 | 3,720,000 |
| | Telford | Replace Cell Door Tray Slots - Multiple Locations | 813,100 | - | - | 813,100 | - | - | - | 813,100 |
| | Torres | Install Microwave Intrusion Detection System - Perimeter | - | - | - | 378,000 | - | - | - | 378,000 |
| | | Replace Concertina Wire - Multiple Locations | 534,500 | - | - | - | - | - | 534,500 | 534,500 |
| | Travis Co. | Install Microwave Intrusion Detection System - Perimeter | 434,000 | - | - | - | - | - | 434,000 | 434,000 |
| | | Install Razor Wire - Perimeter | 133,000 | - | - | - | - | - | 133,000 | 133,000 |
| | Vance | Install Additional Lighting - Unit Wide | 558,000 | - | - | - | - | - | 558,000 | 558,000 |
| | Wainwright | Install Monitored Pulse Fence Detection System - Perimeter | 5,430,200 | - | - | - | - | - | 5,430,200 | 5,430,200 |
| | | Install Perimeter Fence and Lights - Trusty Camp | 434,000 | - | - | - | - | - | 434,000 | 434,000 |
| | Wynne | Install Monitored Pulse Fence Detection System - Perimeter | 5,430,200 | - | - | - | - | - | 5,430,200 | 5,430,200 |
| | | Replace Light Fixtures - Unit Wide | 864,000 | - | - | 864,000 | - | - | - | 864,000 |
| | | Replace Windows - Multiple Locations | 50,000 | - | - | - | - | - | 50,000 | 50,000 |
| | Young | Replace Windows - Multiple Locations | 50,000 | - | - | - | - | - | 50,000 | 50,000 |
| **Security Total** | | | **310,989,118** | **16,921,618** | **6,456,400** | **31,038,600** | **-** | **8,514,500** | **248,814,000** | **311,745,118** |
| Infrastructure | Administration | Renovate Administrative Building | 124,700 | - | - | - | - | - | 124,700 | 124,700 |
| | | HVAC System Efficiency Upgrades - Main Building | 5,984,800 | - | 5,984,800 | - | - | - | - | 5,984,800 |
| | Allred | Kitchen Renovation | 50,000 | - | - | - | - | - | 50,000 | 50,000 |
| | | Renovate Plumbing - Expansion Cell Block | 50,000 | - | - | 50,000 | - | - | - | 50,000 |
| | | Install Water Control Devices - Inmate Housing | 7,316,000 | - | - | - | - | - | 7,316,000 | 7,316,000 |
| | | Install Steam Lines | 1,392,000 | - | - | - | - | 1,392,000 | - | 1,392,000 |
| | | Install Locker Doors - Cool Bed Bunks | 173,600 | - | - | - | - | - | 173,600 | 173,600 |
| | Bell | Renovate Inmate Housing | 248,000 | - | - | - | - | - | 248,000 | 248,000 |
| | Bell | Replace Showers - Inmate Housing | 378,000 | - | - | 378,000 | - | - | - | 378,000 |
| | Beto | Kitchen Renovation | 948,600 | - | - | 948,600 | - | - | - | 948,600 |
| | | Renovate Inmate Housing | 699,900 | - | - | 699,900 | - | - | - | 699,900 |
| | | Repair Pipe Chases - Unit Wide | 2,430,000 | - | - | 2,430,000 | - | - | - | 2,430,000 |
| | | Construct Parking Lot | 310,000 | - | - | - | - | - | 310,000 | 310,000 |
| | | Construct Waste Water Treatment Facility | 19,716,000 | - | - | - | - | - | 19,716,000 | 19,716,000 |
| | | Refurbish Waste Water Treatment Plant | 1,696,100 | - | - | - | - | 1,696,100 | - | 1,696,100 |
| | | Repair Showers - Main Building | 290,000 | - | - | - | - | 290,000 | - | 290,000 |
| | | Install Water Control Devices - Inmate Housing | 7,316,000 | - | - | - | - | - | 7,316,000 | 7,316,000 |
| | | Install Electrical For Welding School | 281,700 | - | - | - | - | - | 281,700 | 281,700 |
| | | Install Ground Storage Tank - Wellhouse | 496,000 | - | - | - | - | - | 496,000 | 496,000 |
| | | Replace Air Handlers - Unit Wide | 4,714,600 | - | - | - | - | - | 4,714,600 | 4,714,600 |
| | | Replace Main Power Source | 316,200 | - | - | - | - | - | 316,200 | 316,200 |
| | Boyd | Repave Perimeter Road | 52,100 | - | - | - | - | - | 52,100 | 52,100 |
| | | Install Electrical Circuit Boards - Inmate Housing | 203,400 | - | - | - | - | - | 203,400 | 203,400 |
| | Briscoe | Renovate Inmate Housing | 298,000 | - | - | - | - | - | 298,000 | 298,000 |
| | Byrd | Install HVAC - Inmate Housing | - | - | 5,000,000 | - | - | - | - | 5,000,000 |
| | | Install Water Control Devices - Inmate Housing | 7,316,000 | - | - | - | - | - | 7,316,000 | 7,316,000 |
| | | Install Steam System - Boiler Room | 141,600 | - | - | - | - | - | 141,600 | 141,600 |
| | Chase Field | Repair Roads and Parking Lots - Multiple Locations | 7,720,600 | - | 7,720,600 | - | - | - | - | 7,720,600 |
| | | Asbestos Abatement and Renovations - Bachelor Officers' Quarters | 78,900 | - | - | 78,900 | - | - | - | 78,900 |
| | | Asbestos Abatement and Renovation | 92,800 | - | - | - | - | - | 92,800 | 92,800 |
| | | Repair Doors | 50,000 | - | - | - | - | - | 50,000 | 50,000 |

TIEDE DEF_456380

| Type | Unit | Description | Deferred Maintenance | FY2025 | FY2026 | FY2027 | FY2028 | FY2029 | FY2030+ | Total |
|---|---|---|---|---|---|---|---|---|---|---|
| Infrastructure | Chase Field | Repair Employee Swimming Pool | 186,000 | - | - | - | - | - | 186,000 | 186,000 |
| | | Renovate Power Distribution System | 50,000 | - | - | - | - | - | 50,000 | 50,000 |
| | | Asbestos Abatement and Kitchen Renovation | 111,000 | - | - | - | - | - | 111,000 | 111,000 |
| | | Install Region Ice House - Warehouse | 1,488,000 | - | - | - | - | - | 1,488,000 | 1,488,000 |
| | | Replace Window Units - Bachelor Officers' Quarters | 434,000 | - | - | - | - | - | 434,000 | 434,000 |
| | Clemens | Demolish Swimming Pool - Clubhouse | 216,000 | - | - | 216,000 | - | - | - | 216,000 |
| | | Relocate Utility Lines | 486,000 | - | - | - | 486,000 | - | - | 486,000 |
| | | Replace Gas Lines and Water Supply Lines - Unit Wide | 1,624,000 | - | - | - | 1,624,000 | - | - | 1,624,000 |
| | | Construct Waste Water Treatment Facility | 19,716,000 | - | - | - | - | - | 19,716,000 | 19,716,000 |
| | | Install Water Control Devices - Inmate Housing | 7,316,000 | - | - | - | - | - | 7,316,000 | 7,316,000 |
| | | Repair Concrete Structure - Crawl Space | 1,488,000 | - | - | - | - | - | 1,488,000 | 1,488,000 |
| | | Refurbish Water Tower - Water Treatment Plant | 386,900 | - | - | - | - | - | 386,900 | 386,900 |
| | Clements | Replace Cooler Doors and Door Heaters | 189,000 | - | - | 189,000 | - | - | - | 189,000 |
| | | Create Culinary Classroom | 162,000 | - | - | 162,000 | - | - | - | 162,000 |
| | | Replace Air Handling Units | 1,057,200 | - | - | - | - | 1,057,200 | - | 1,057,200 |
| | | Install Water Control Devices - Inmate Housing | 7,316,000 | - | - | - | - | - | 7,316,000 | 7,316,000 |
| | | Replace Lavatory Systems - Multiple Buildings | 248,000 | - | - | - | - | - | 248,000 | 248,000 |
| | | Install Asphalt on Parking Lots and Road | 558,000 | - | - | - | - | - | 558,000 | 558,000 |
| | | Replace Flooring - Extension Cell Block Kitchen | 55,100 | - | - | - | - | - | 55,100 | 55,100 |
| | | Install HVAC Systems - Inmate Housing | 2,852,000 | - | - | - | 2,852,000 | - | - | 2,852,000 |
| | Coffield | Repair Floor and Beams - Main Building | 324,000 | - | 324,000 | - | - | - | - | 324,000 |
| | | Install Showers - Multiple Locations | 1,204,100 | - | - | 1,204,100 | - | - | - | 1,204,100 |
| | | Construct Waste Water Treatment Facility | 19,716,000 | - | - | - | - | - | 19,716,000 | 19,716,000 |
| | | Install Water Control Devices - Inmate Housing | 7,316,000 | - | - | - | - | - | 7,316,000 | 7,316,000 |
| | | Construct Additional Covered Recreation Yards - Restrictive Housing | 1,054,000 | - | - | - | - | - | 1,054,000 | 1,054,000 |
| | | Replace Office Building - Dog Kennel | 53,400 | - | - | - | - | - | 53,400 | 53,400 |
| | | Replace Siding - Multiple Locations | 270,700 | - | - | - | - | - | 270,700 | 270,700 |
| | | Redesign Oxidation Ditch | 1,246,200 | - | - | - | - | - | 1,246,200 | 1,246,200 |
| | | Repair Perimeter Road and Parking Lot | 1,743,300 | - | - | - | - | - | 1,743,300 | 1,743,300 |
| | | Replace Sewer Lines – Employee Housing | 806,000 | - | - | - | - | - | 806,000 | 806,000 |
| | | Refurbish Lift Station - Wastewater Treatment Plant | 313,900 | - | - | - | - | - | 313,900 | 313,900 |
| | | Partial Kitchen Renovation | 992,000 | - | - | - | - | - | 992,000 | 992,000 |
| | Cole | Renovate Food Service | 188,800 | - | - | 188,800 | - | - | - | 188,800 |
| | | Upgrade Power to Transformers - Multiple Locations | 248,000 | - | - | - | - | - | 248,000 | 248,000 |
| | Coleman | Replace Ceilings - Multiple Locations | 1,160,000 | - | - | - | 1,160,000 | - | - | 1,160,000 |
| | Connally | Install Water Wells and Treatment Facility | 13,020,000 | - | - | - | - | - | 13,020,000 | 13,020,000 |
| | Cotulla | Replace Showers - Inmate Housing | 911,100 | - | - | - | - | 911,100 | - | 911,100 |
| | | Repair Perimeter Road and Parking Lots | 1,703,600 | - | - | - | - | - | 1,703,600 | 1,703,600 |
| | Crain | Upgrade A/C Unit - Inmate Housing | 131,900 | - | - | 131,900 | - | - | - | 131,900 |
| | | ADA Modifications - Training Academy | 50,000 | - | - | 50,000 | - | - | - | 50,000 |
| | | Install Water Control Devices - Inmate Housing | 7,316,000 | - | - | - | - | - | 7,316,000 | 7,316,000 |
| | Dalhart | Install Canopy - Backdoor | 162,000 | - | - | 162,000 | - | - | - | 162,000 |
| | | Install Water Control Devices - Inmate Housing | 7,316,000 | - | - | - | - | - | 7,316,000 | 7,316,000 |
| | | Repair Entryway Road | 50,000 | - | - | - | - | - | 50,000 | 50,000 |
| | Daniel | Install Water Control Devices - Inmate Housing | 7,316,000 | - | - | - | - | - | 7,316,000 | 7,316,000 |
| | | Install Region Ice House - Warehouse | 1,488,000 | - | - | - | - | - | 1,488,000 | 1,488,000 |
| | Dominguez | Expand Main Parking Lot | 407,100 | - | - | 407,100 | - | - | - | 407,100 |
| | | Install Capacitor Bank | 86,800 | - | - | - | - | - | 86,800 | 86,800 |
| | Duncan | Construct ADA Complaint Slab and Walkway | 108,000 | - | - | 108,000 | - | - | - | 108,000 |
| | | Repair Parking Lot | 434,000 | - | - | - | - | - | 434,000 | 434,000 |
| | Ellis | Replace Boilers | 4,454,800 | - | - | 4,454,800 | - | - | - | 4,454,800 |
| | | Install Wiring for Egg Vault | 216,000 | - | - | 216,000 | - | - | - | 216,000 |
| | | Construct Waste Water Treatment Facility | 19,716,000 | - | - | - | - | - | 19,716,000 | 19,716,000 |
| | | Construct Awning - Recreation Yard | 372,000 | - | - | - | - | - | 372,000 | 372,000 |
| | | Repair Pavement and Drainage | 186,700 | - | - | - | - | - | 186,700 | 186,700 |
| | | Repair Road - Unit Entrance | 558,000 | - | - | - | - | - | 558,000 | 558,000 |
| | Estelle | Install HVAC - Inmate Housing | | - | - | 4,000,000 | - | - | - | 4,000,000 |
| | | Replace Grease Trap - Kitchen Renovation | 450,800 | - | - | 450,800 | - | - | - | 450,800 |
| | | Construct Waste Water Treatment Facility | 19,716,000 | - | - | - | - | - | 19,716,000 | 19,716,000 |
| | | Replace Ground Storage Tank | 986,000 | - | - | - | - | 986,000 | - | 986,000 |
| | | Repair Roads - Unit Wide | 1,054,000 | - | - | - | - | - | 1,054,000 | 1,054,000 |
| | | Efficiency Upgrades to MEP System - Main Building | 1,488,000 | - | - | - | - | - | 1,488,000 | 1,488,000 |
| | | Refurbish Mechanical System - Regional Medical Facility | 10,055,200 | - | 10,055,200 | - | - | - | - | 10,055,200 |
| | Estes | Repair Showers - Dayroom Areas | 1,062,700 | - | - | - | - | - | 1,062,700 | 1,062,700 |
| | Ferguson | Construct Waste Water Treatment Facility | 19,716,000 | - | - | - | - | - | 19,716,000 | 19,716,000 |
| | | Install Water Control Devices - Inmate Housing | 7,316,000 | - | - | - | - | - | 7,316,000 | 7,316,000 |
| | | Install Septic System - Dog Kennel | 434,000 | - | - | - | - | - | 434,000 | 434,000 |
| | | Repair Parking Lots | 434,000 | - | - | - | - | - | 434,000 | 434,000 |
| | | Repair Perimeter Roads | 682,000 | - | - | - | - | - | 682,000 | 682,000 |
| | | Resurface Perimeter Roads and Parking Lots | 1,323,900 | - | - | - | - | - | 1,323,900 | 1,323,900 |
| | Ferguson | Repair Employee Swimming Pool | 186,000 | - | - | - | - | - | 186,000 | 186,000 |
| | Formby | Install Water Control Devices - Inmate Housing | 7,316,000 | - | - | - | - | - | 7,316,000 | 7,316,000 |
| | Garza East | Renovate Trusty Camp - Multiple Buildings | 324,000 | - | - | 324,000 | - | - | - | 324,000 |

TIEDE DEF_456381

| Type | Unit | Description | Deferred Maintenance | FY2025 | FY2026 | FY2027 | FY2028 | FY2029 | FY2030+ | Total |
|---|---|---|---|---|---|---|---|---|---|---|
| Infrastructure | Garza East | Replace Doors - Kitchen Renovation | $ 55,900 | $ - | $ - | $ 55,900 | $ - | $ - | $ - | $ 55,900 |
| | | Replace Faucets - Unit Wide | $ 186,000 | $ - | $ - | $ - | $ - | $ - | $ 186,000 | $ 186,000 |
| | Garza West | Kitchen Renovation | $ 50,000 | $ - | $ - | $ - | $ - | $ - | $ 50,000 | $ 50,000 |
| | | Renovate Inmate Housing - Unit Wide | $ 284,100 | $ - | $ - | $ 284,100 | $ - | $ - | $ - | $ 284,100 |
| | | Install Water Metering Devices - Unit Wide | $ 68,200 | $ - | $ - | $ - | $ - | $ - | $ 68,200 | $ 68,200 |
| | | Replace Medium Voltage Distribution System | $ 1,860,000 | $ - | $ - | $ - | $ - | $ - | $ 1,860,000 | $ 1,860,000 |
| | | Renovate Building -Inmate Housing | $ 50,000 | $ - | $ - | $ - | $ - | $ - | $ 50,000 | $ 50,000 |
| | Gist | Install HVAC - Inmate Housing | $ 27,100 | $ - | $ - | $ - | $ 27,100 | $ - | $ - | $ 27,100 |
| | | Install Capacitor Bank | $ 86,800 | $ - | $ - | $ - | $ - | $ - | $ 86,800 | $ 86,800 |
| | | Replace Medium Voltage Distribution System | $ 1,860,000 | $ - | $ - | $ - | $ - | $ - | $ 1,860,000 | $ 1,860,000 |
| | Glossbrenner | Pave Roads - Multiple Locations | $ 1,191,200 | $ - | $ - | $ - | $ - | $ - | $ 1,191,200 | $ 1,191,200 |
| | | Renovate Building - Inmate Housing | $ 50,000 | $ - | $ - | $ - | $ - | $ - | $ 50,000 | $ 50,000 |
| | Goree | Resurface Road - Multiple Locations | $ 112,500 | $ - | $ 112,500 | $ - | $ - | $ - | $ - | $ 112,500 |
| | | Install Water Control Devices - Inmate Housing | $ 7,316,000 | $ - | $ - | $ - | $ - | $ - | $ 7,316,000 | $ 7,316,000 |
| | Gurney | Replace Medium Voltage Distribution System | $ 1,860,000 | $ - | $ - | $ - | $ - | $ - | $ 1,860,000 | $ 1,860,000 |
| | | Install Air Conditioning System - Inmate Housing | $ 931,000 | $ - | $ - | $ - | $ 931,000 | $ - | $ - | $ 931,000 |
| | Halbert | Repave Perimeter Road | $ 1,533,900 | $ - | $ - | $ - | $ - | $ - | $ 1,533,900 | $ 1,533,900 |
| | Havins | Install Capacitor Bank | $ 86,800 | $ - | $ - | $ - | $ - | $ - | $ 86,800 | $ 86,800 |
| | Henley | Repair Main Road | $ 614,700 | $ - | $ - | $ - | $ - | $ - | $ 614,700 | $ 614,700 |
| | Hilltop | Asbestos Abatement and Renovation Training Academy | $ 1,404,000 | $ - | $ - | $ 1,404,000 | $ - | $ - | $ - | $ 1,404,000 |
| | | Install Water Control Devices - Inmate Housing | $ 7,316,000 | $ - | $ - | $ - | $ - | $ - | $ 7,316,000 | $ 7,316,000 |
| | | Renovate Training Academy | $ 71,800 | $ - | $ - | $ - | $ - | $ - | $ 71,800 | $ 71,800 |
| | | Replace Gas Lines - Unit Wide | $ 4,712,000 | $ - | $ - | $ - | $ - | $ - | $ 4,712,000 | $ 4,712,000 |
| | | Repave Road and Parking Lot | $ 95,500 | $ - | $ - | $ - | $ - | $ - | $ 95,500 | $ 95,500 |
| | Holliday | Install Water Control Devices - Inmate Housing | $ 7,316,000 | $ - | $ - | $ - | $ - | $ - | $ 7,316,000 | $ 7,316,000 |
| | | Install Capacitor Bank | $ 86,800 | $ - | $ - | $ - | $ - | $ - | $ 86,800 | $ 86,800 |
| | | Install Air Conditioning - Inmate Housing | $ 14,880,000 | $ - | $ - | $ - | $ 14,880,000 | $ - | $ - | $ 14,880,000 |
| | Hughes | Install HVAC - Inmate Housing | $ 3,000,900 | $ - | $ - | $ 28,000,000 | $ 3,000,900 | $ - | $ - | $ 31,000,900 |
| | | Repair Ductwork - Restrictive Housing | $ 75,600 | $ - | $ - | $ 75,600 | $ - | $ - | $ - | $ 75,600 |
| | | Install Water Control Devices - Inmate Housing | $ 7,316,000 | $ - | $ - | $ - | $ - | $ - | $ 7,316,000 | $ 7,316,000 |
| | | Facility Condition Assessment - Unit Wide | $ 186,000 | $ - | $ - | $ - | $ - | $ - | $ 186,000 | $ 186,000 |
| | | Modify Inmate Housing Cells - Multiple Buildings | $ 179,800 | $ - | $ - | $ - | $ - | $ - | $ 179,800 | $ 179,800 |
| | | Repave Parking Lots and Roads - Unit Wide | $ 2,161,900 | $ - | $ - | $ - | $ - | $ - | $ 2,161,900 | $ 2,161,900 |
| | Huntsville | Repair North Wall - Infirmary Building | $ 270,000 | $ - | $ - | $ 270,000 | $ - | $ - | $ - | $ 270,000 |
| | | Replace Steam Traps and Lines | $ 65,200 | $ - | $ - | $ 65,200 | $ - | $ - | $ - | $ 65,200 |
| | | Construct Parking Lot | $ 268,500 | $ - | $ - | $ - | $ - | $ - | $ 268,500 | $ 268,500 |
| | | Install Water Control Devices - Inmate Housing | $ 7,316,000 | $ - | $ - | $ - | $ - | $ - | $ 7,316,000 | $ 7,316,000 |
| | | Decommission and Demolition of Warehouse | $ 558,000 | $ - | $ - | $ - | $ - | $ - | $ 558,000 | $ 558,000 |
| | | Renovate Plumbing | $ 165,600 | $ - | $ - | $ - | $ - | $ - | $ 165,600 | $ 165,600 |
| | | Resurface Parking Lot | $ 1,276,900 | $ - | $ - | $ - | $ - | $ - | $ 1,276,900 | $ 1,276,900 |
| | Hutchins | Renovate Inmate Housing - Unit Wide | $ 50,000 | $ - | $ - | $ - | $ - | $ - | $ 50,000 | $ 50,000 |
| | | Replace Doors and Frames - Unit Wide | $ 558,000 | $ - | $ - | $ - | $ - | $ - | $ 558,000 | $ 558,000 |
| | | Replace Medium Voltage Distribution System | $ 1,860,000 | $ - | $ - | $ - | $ - | $ - | $ 1,860,000 | $ 1,860,000 |
| | | Renovate Building - Administration Visitation | $ 50,000 | $ - | $ - | $ - | $ - | $ - | $ 50,000 | $ 50,000 |
| | Jester III | Construct Water Treatment Plant | | $ - | $ - | $ - | $ - | $ - | $ 14,607,200 | $ 14,607,200 |
| | | Kitchen Renovation | $ 558,000 | $ - | $ - | $ - | $ - | $ - | $ 558,000 | $ 558,000 |
| | | Construct Waste Water Treatment Facility | $ 19,716,000 | $ - | $ - | $ - | $ - | $ - | $ 19,716,000 | $ 19,716,000 |
| | | Install Water Control Devices - Inmate Housing | $ 7,316,000 | $ - | $ - | $ - | $ - | $ - | $ 7,316,000 | $ 7,316,000 |
| | | Asbestos Abatement - Multiple Locations | $ 74,700 | $ - | $ - | $ - | $ - | $ 74,700 | $ - | $ 74,700 |
| | Johnston | Repave Parking Lot - Front Entrance | $ 479,900 | $ - | $ - | $ - | $ - | $ - | $ 479,900 | $ 479,900 |
| | Jordan | Install Water Control Devices - Inmate Housing | $ 7,316,000 | $ - | $ - | $ - | $ - | $ - | $ 7,316,000 | $ 7,316,000 |
| | | Renovate Warehouse | $ 570,400 | $ - | $ - | $ - | $ - | $ - | $ 570,400 | $ 570,400 |
| | | Repair and Resurface Roads and Parking Lots | $ 434,000 | $ - | $ - | $ - | $ - | $ - | $ 434,000 | $ 434,000 |
| | LeBlanc | Repair Main Road and Parking Lot | $ 310,000 | $ - | $ - | $ - | $ - | $ - | $ 310,000 | $ 310,000 |
| | Lewis | Replace Boilers | $ 1,291,100 | $ - | $ - | $ - | $ - | $ 1,291,100 | $ - | $ 1,291,100 |
| | | Repair Roads and Parking Lot | $ 558,000 | $ - | $ - | $ - | $ - | $ - | $ 558,000 | $ 558,000 |
| | Luther | Construct Waste Water Treatment Facility | $ 19,716,000 | $ - | $ - | $ - | $ - | $ - | $ 19,716,000 | $ 19,716,000 |
| | Lychner | Construct Additional Parking Area | $ 372,000 | $ - | $ - | $ - | $ - | $ - | $ 372,000 | $ 372,000 |
| | | Replace Medium Voltage Distribution System | $ 1,860,000 | $ - | $ - | $ - | $ - | $ - | $ 1,860,000 | $ 1,860,000 |
| | Lynaugh | Structural Repairs to Inmate Housing - Multiple Locations | $ 17,280,000 | $ - | $ 17,280,000 | $ - | $ - | $ - | $ - | $ 17,280,000 |
| | | Replace Plumbing - Multiple Locations | $ 155,300 | $ - | $ - | $ - | $ - | $ 155,300 | $ - | $ 155,300 |
| | Marlin | Install Capacitor Bank | $ 86,800 | $ - | $ - | $ - | $ - | $ - | $ 86,800 | $ 86,800 |
| | McConnell | Install HVAC - Inmate Housing | | $ - | $ 28,000,000 | $ - | $ - | $ - | $ - | $ 28,000,000 |
| | | Repair Plumbing - Unit Wide | | $ - | $ - | $ 269,600 | $ - | $ - | $ - | $ 269,600 |
| | | HVAC System Efficiency Upgrades - Restrictive Housing | $ 6,208,500 | $ - | $ - | $ - | $ 6,208,500 | $ - | $ - | $ 6,208,500 |
| | | Replace Plumbing Controls and Fixtures - Inmate Housing | $ 16,240,000 | $ - | $ - | $ - | $ - | $ 16,240,000 | $ - | $ 16,240,000 |
| | | Renovate Building - Inmate Housing | $ 50,000 | $ - | $ - | $ - | $ - | $ - | $ 50,000 | $ 50,000 |
| | Mechler | Replace Insulation - Unit Wide | $ 120,600 | $ - | $ - | $ 120,600 | $ - | $ - | $ - | $ 120,600 |
| | | Install Water Control Devices - Inmate Housing | $ 7,316,000 | $ - | $ - | $ - | $ - | $ - | $ 7,316,000 | $ 7,316,000 |
| | | Construct Awning - Recreation Yard | $ 186,000 | $ - | $ - | $ - | $ - | $ - | $ 186,000 | $ 186,000 |
| | Memorial | Construct Water Treatment Plant | | $ - | $ - | $ - | $ - | $ - | $ 14,607,200 | $ 14,607,200 |
| | | Install HVAC - Inmate Housing | | $ - | $ - | $ 4,000,000 | $ - | $ - | $ - | $ 4,000,000 |
| | | Replace Flooring and Restrooms - Bachelor Officers' Quarters | $ 50,000 | $ - | $ - | $ 50,000 | $ - | $ - | $ - | $ 50,000 |

TIEDE DEF_456382

| Type | Unit | Description | Deferred Maintenance | FY2025 | FY2026 | FY2027 | FY2028 | FY2029 | FY2030+ | Total |
|---|---|---|---|---|---|---|---|---|---|---|
| Infrastructure | Memorial | Repair Main Shower Area - Inmate Housing | $ 232,000 | $ - | $ - | $ - | $ 232,000 | $ - | $ - | $ 232,000 |
| | | Construct Waste Water Treatment Facility | $ 19,716,000 | $ - | $ - | $ - | $ - | $ - | $ 19,716,000 | $ 19,716,000 |
| | | Install Water Control Devices - Inmate Housing | $ 7,316,000 | $ - | $ - | $ - | $ - | $ - | $ 7,316,000 | $ 7,316,000 |
| | | Repair Road - Back Gate | $ 331,100 | $ - | $ - | $ - | $ - | $ - | $ 331,100 | $ 331,100 |
| | | Replace Pavement - Entrance Road | $ 706,800 | $ - | $ - | $ - | $ - | $ - | $ 706,800 | $ 706,800 |
| | Michael | Construct Elevated Storage Tank | $ 8,100,000 | $ - | $ 8,100,000 | $ - | $ - | $ - | $ - | $ 8,100,000 |
| | | Repair Showers - Inmate Housing | $ 748,700 | $ - | $ - | $ 748,700 | $ - | $ - | $ - | $ 748,700 |
| | | Renovate Restrictive Housing Building | $ 50,000 | $ - | $ - | $ 50,000 | $ - | $ - | $ - | $ 50,000 |
| | | Renovate Inmate Housing | $ 350,000 | $ - | $ - | $ 350,000 | $ - | $ - | $ - | $ 350,000 |
| | | Renovate Trusty Camp | $ 216,000 | $ - | $ - | $ 216,000 | $ - | $ - | $ - | $ 216,000 |
| | | Construct Waste Water Treatment Facility | $ 19,716,000 | $ - | $ - | $ - | $ - | $ - | $ 19,716,000 | $ 19,716,000 |
| | | Resurface Floor - Food Service | $ 82,500 | $ - | $ - | $ - | $ - | $ 82,500 | $ - | $ 82,500 |
| | | Install Water Control Devices - Inmate Housing | $ 7,316,000 | $ - | $ - | $ - | $ - | $ - | $ 7,316,000 | $ 7,316,000 |
| | | Replace Wall - Shipping Dock | $ 310,000 | $ - | $ - | $ - | $ - | $ - | $ 310,000 | $ 310,000 |
| | | Reroute and Relocate Pumps and Suction Lines - Lift Stations | $ 55,000 | $ - | $ - | $ - | $ - | $ - | $ 55,000 | $ 55,000 |
| | | Resurface Perimeter Roads and Parking Lots | $ 3,432,400 | $ - | $ - | $ - | $ - | $ - | $ 3,432,400 | $ 3,432,400 |
| | Middleton | Install Capacitor Bank | $ 86,800 | $ - | $ - | $ - | $ - | $ - | $ 86,800 | $ 86,800 |
| | | Repair Perimeter Road | $ 1,054,000 | $ - | $ - | $ - | $ - | $ - | $ 1,054,000 | $ 1,054,000 |
| | | Repair/Resurface Perimeter Road | $ 1,739,500 | $ - | $ - | $ - | $ - | $ - | $ 1,739,500 | $ 1,739,500 |
| | Montford | Install Water Control Devices - Inmate Housing | $ 7,316,000 | $ - | $ - | $ - | $ - | $ - | $ 7,316,000 | $ 7,316,000 |
| | | Replace Overhead Door - Maintenance | $ 186,000 | $ - | $ - | $ - | $ - | $ - | $ 186,000 | $ 186,000 |
| | Moore, C. | Renovate Inmate Housing | $ 76,400 | $ - | $ - | $ - | $ - | $ - | $ 76,400 | $ 76,400 |
| | | Repair Plumbing - Inmate Housing | $ 270,000 | $ - | $ - | $ 270,000 | $ - | $ - | $ - | $ 270,000 |
| | Multiple | 88th Legislature Funding | $ 69,841,672 | $ 69,841,672 | $ - | $ - | $ - | $ - | $ - | $ 69,841,672 |
| | | Repair BOQ Housing | | | | | | | | $ 5,000,000 |
| | Murray | Install HVAC - Inmate Housing | $ 6,121,300 | $ - | $ 2,500,000 | $ 2,500,000 | $ 6,121,300 | $ - | $ - | $ 11,621,300 |
| | | Renovate Inmate Housing | $ 50,000 | $ - | $ 5,500,000 | $ - | $ - | $ - | $ 50,000 | $ 50,000 |
| | Neal | Install Water Control Devices - Inmate Housing | $ 7,316,000 | $ - | $ - | $ - | $ - | $ - | $ 7,316,000 | $ 7,316,000 |
| | Ney | Repair Perimeter Road and Parking Lot | $ 1,355,500 | $ - | $ - | $ - | $ - | $ - | $ 1,355,500 | $ 1,355,500 |
| | O'Daniel | Install Water Control Devices - Inmate Housing | $ 7,316,000 | $ - | $ - | $ - | $ - | $ - | $ 7,316,000 | $ 7,316,000 |
| | | Repave Perimeter Road | $ 1,364,000 | $ - | $ - | $ - | $ - | $ - | $ 1,364,000 | $ 1,364,000 |
| | Pack | Replace Substation Transformers | $ 1,414,800 | $ - | $ 1,414,800 | $ - | $ - | $ - | $ - | $ 1,414,800 |
| | | Drill Test Wells | $ 324,000 | $ - | $ - | $ 324,000 | $ - | $ - | $ - | $ 324,000 |
| | | Construct Shed over Filtration System | $ 58,000 | $ - | $ - | $ - | $ 58,000 | $ - | $ - | $ 58,000 |
| | | Install Water Softeners - Multi. Locations | $ 124,000 | $ - | $ - | $ - | $ - | $ - | $ 124,000 | $ 124,000 |
| | | Replace Temporary Ductwork - Inmate Housing | $ 396,600 | $ - | $ - | $ 396,600 | $ - | $ - | $ - | $ 396,600 |
| | Plane | Renovate Inmate Housing | $ 432,000 | $ - | $ - | $ 432,000 | $ - | $ - | $ - | $ 432,000 |
| | | Replace Freezer Doors - Food Service | $ 64,800 | $ - | $ - | $ 64,800 | $ - | $ - | $ - | $ 64,800 |
| | | Repair Pipe Chases - Multiple Locations | $ 378,000 | $ - | $ - | $ 378,000 | $ - | $ - | $ - | $ 378,000 |
| | | Install Capacitor Bank | $ 86,800 | $ - | $ - | $ - | $ - | $ - | $ 86,800 | $ 86,800 |
| | | Replace Medium Voltage Distribution System | $ 1,860,000 | $ - | $ - | $ - | $ - | $ - | $ 1,860,000 | $ 1,860,000 |
| | Polunsky | Repair Plumbing and Electrical | $ 129,600 | $ - | $ - | $ 129,600 | $ - | $ - | $ - | $ 129,600 |
| | | Repair Cell Walls - Unit Wide | $ 178,300 | $ - | $ - | $ 178,300 | $ - | $ - | $ - | $ 178,300 |
| | | Install Water Control Devices - Inmate Housing | $ 6,844,000 | $ - | $ - | $ - | $ - | $ 6,844,000 | $ - | $ 6,844,000 |
| | | Repair Perimeter Road | $ 233,200 | $ - | $ - | $ - | $ - | $ - | $ 233,200 | $ 233,200 |
| | Powledge | Construct Waste Water Treatment Facility | $ 19,716,000 | $ - | $ - | $ - | $ - | $ - | $ 19,716,000 | $ 19,716,000 |
| | | Refurbish Elevated Storage Tank | $ 86,300 | $ - | $ - | $ - | $ - | $ 86,300 | $ - | $ 86,300 |
| | Ramsey | Renovate Water Tower | $ 1,296,000 | $ - | $ 1,296,000 | $ - | $ - | $ - | $ - | $ 1,296,000 |
| | | Renovate Electrical - Mechanical Room | $ 50,000 | $ - | $ - | $ 50,000 | $ - | $ - | $ - | $ 50,000 |
| | | Replace Doors - Kitchen Renovation | $ 162,000 | $ - | $ - | $ 162,000 | $ - | $ - | $ - | $ 162,000 |
| | | Install Water Control Devices - Inmate Housing | $ 7,316,000 | $ - | $ - | $ - | $ - | $ - | $ 7,316,000 | $ 7,316,000 |
| | | Replace Bridge | $ 1,740,000 | $ - | $ - | $ - | $ - | $ 1,740,000 | $ - | $ 1,740,000 |
| | | Reconstruct Awning - Firing Range | $ 65,800 | $ - | $ - | $ - | $ - | $ - | $ 65,800 | $ 65,800 |
| | | Install Hydropneumatic Tank Booster Station | $ 1,860,000 | $ - | $ - | $ - | $ - | $ 1,860,000 | $ - | $ 1,860,000 |
| | | Refurbish Inmate Housing | $ 1,044,000 | $ - | $ - | $ - | $ - | $ 1,044,000 | $ - | $ 1,044,000 |
| | Roach | Renovate Inmate Housing | $ 216,000 | $ - | $ - | $ 216,000 | $ - | $ - | $ - | $ 216,000 |
| | | Install Water Control Devices - Inmate Housing | $ 7,316,000 | $ - | $ - | $ - | $ - | $ - | $ 7,316,000 | $ 7,316,000 |
| | Robertson | Install HVAC - Inmate Housing | | $ - | $ - | $ 28,000,000 | $ - | $ - | $ - | $ 28,000,000 |
| | | Install Capacitor Bank | $ 86,800 | $ - | $ - | $ - | $ - | $ - | $ 86,800 | $ 86,800 |
| | Rudd | Install HVAC - Inmate Housing | $ 1,128,200 | $ - | $ - | $ - | $ 1,128,200 | $ - | $ - | $ 1,128,200 |
| | | Install Water Control Devices - Inmate Housing | $ 7,316,000 | $ - | $ - | $ - | $ - | $ - | $ 7,316,000 | $ 7,316,000 |
| | San Saba | Install Water Softeners - Unit Wide | $ 108,000 | $ - | $ - | $ 108,000 | $ - | $ - | $ - | $ 108,000 |
| | Sanchez | Kitchen Renovation | $ 50,000 | $ - | $ - | $ - | $ - | $ 50,000 | $ - | $ 50,000 |
| | | Repair Plumbing | $ 50,000 | $ - | $ - | $ 50,000 | $ - | $ - | $ - | $ 50,000 |
| | Scott | Install Fuel Depot | $ 80,600 | $ - | $ - | $ - | $ - | $ - | $ 80,600 | $ 80,600 |
| | Segovia | Repair Perimeter Road and Parking Lot | $ 1,520,200 | $ - | $ - | $ - | $ - | $ - | $ 1,520,200 | $ 1,520,200 |
| | | Renovate Officers' Dining Room | $ 50,000 | $ - | $ - | $ - | $ - | $ - | $ 50,000 | $ 50,000 |
| | Skyview | Replace Air Handling Units - Inmate Housing | $ 1,120,600 | $ - | $ - | $ - | $ - | $ 1,120,600 | $ - | $ 1,120,600 |
| | | Install Water Control Devices - Inmate Housing | $ 7,316,000 | $ - | $ - | $ - | $ - | $ - | $ 7,316,000 | $ 7,316,000 |
| | Smith | Structural Repairs to Inmate Housing - Multiple Locations | $ 724,400 | $ - | $ - | $ - | $ - | $ - | $ 724,400 | $ 724,400 |
| | | Renovate Inmate Housing | $ 50,000 | $ - | $ - | $ - | $ - | $ - | $ 50,000 | $ 50,000 |
| | | Install Water Control Devices - Inmate Housing | $ 7,316,000 | $ - | $ - | $ - | $ - | $ - | $ 7,316,000 | $ 7,316,000 |
| | Stiles | Install HVAC - Inmate Housing | $ 8,800,900 | $ - | $ 15,500,000 | $ 3,000,900 | $ - | $ - | $ - | $ 18,500,900 |

TIEDE DEF_456383

Texas Department of Criminal Justice
89th Capital Expenditure Plan by Year - Category

| Type | Unit | Description | Deferred Maintenance | FY2025 | FY2026 | FY2027 | FY2028 | FY2029 | FY2030+ | Total |
|---|---|---|---|---|---|---|---|---|---|---|
| Infrastructure | Stiles | Install Water Control Devices - Inmate Housing | $ 7,316,000 | $ - | $ - | $ - | $ - | $ - | $ 7,316,000 | $ 7,316,000 |
| | | Replace Shower Floors - Unit Wide | $ 120,800 | $ - | $ - | $ - | $ - | $ - | $ 120,800 | $ 120,800 |
| | | Repair Inside Perimeter Road | $ 748,100 | $ - | $ - | $ - | $ - | $ - | $ 748,100 | $ 748,100 |
| | | Repair Outside Perimeter Road | $ 105,100 | $ - | $ - | $ - | $ - | $ - | $ 105,100 | $ 105,100 |
| | Stringfellow | Refurbish Water Tower | $ 1,508,000 | $ - | $ - | $ - | $ - | $ 1,508,000 | $ - | $ 1,508,000 |
| | | Install Water Control Devices - Inmate Housing | $ 7,316,000 | $ - | $ - | $ - | $ - | $ - | $ 7,316,000 | $ 7,316,000 |
| | | Install Serving Line - Main Building Kitchen Renovation | $ 310,000 | $ - | $ - | $ - | $ - | $ - | $ 310,000 | $ 310,000 |
| | Telford | Structural Repair - Restrictive Housing | $ 580,000 | $ - | $ - | $ - | $ - | $ 580,000 | $ - | $ 580,000 |
| | | Install Water Control Devices - Inmate Housing | $ 7,316,000 | $ - | $ - | $ - | $ - | $ - | $ 7,316,000 | $ 7,316,000 |
| | | Facility Condition Assessment - Unit Wide | $ 186,000 | $ - | $ - | $ - | $ - | $ - | $ 186,000 | $ 186,000 |
| | | Resurface Road and Fire Lane | $ 744,000 | $ - | $ - | $ - | $ - | $ - | $ 744,000 | $ 744,000 |
| | | Replace Chillers - Restrictive Housing | $ 992,000 | $ - | $ - | $ - | $ - | $ - | $ 992,000 | $ 992,000 |
| | | Install A/C Unit - Inmate Housing | $ 16,740,000 | $ - | $ - | $ - | $ 16,740,000 | $ - | $ - | $ 16,740,000 |
| | Terrell | Construct Water Treatment Plant | $ - | $ - | $ - | $ - | $ 13,664,800 | $ - | $ - | $ 13,664,800 |
| | | Construct Waste Water Treatment Facility | $ 18,444,000 | $ - | $ - | $ - | $ 18,444,000 | $ - | $ - | $ 18,444,000 |
| | | Connect Wash Rack to Sanitary Sewer | $ 290,000 | $ - | $ - | $ - | $ - | $ 290,000 | $ - | $ 290,000 |
| | | Install Grit Trap - Southern Regional Mechanical | $ 273,000 | $ - | $ - | $ - | $ - | $ - | $ 273,000 | $ 273,000 |
| | | Repair Perimeter Road and Parking Lot | $ 1,128,000 | $ - | $ - | $ - | $ - | $ - | $ 1,128,000 | $ 1,128,000 |
| | | Install Coolers | $ 1,088,500 | $ - | $ - | $ - | $ - | $ - | $ 1,088,500 | $ 1,088,500 |
| | Torres | Replace Plumbing Controls and Fixtures - Inmate Housing | $ 2,108,000 | $ - | $ - | $ - | $ - | $ - | $ 2,108,000 | $ 2,108,000 |
| | | Install Water Meters - Unit Wide | $ 124,000 | $ - | $ - | $ - | $ - | $ - | $ 124,000 | $ 124,000 |
| | Vance | Install Water Control Devices - Inmate Housing | $ 7,316,000 | $ - | $ - | $ - | $ - | $ - | $ 7,316,000 | $ 7,316,000 |
| | Wainwright | Construct Water Treatment Plant | $ 12,722,400 | $ - | $ 12,722,400 | $ - | $ - | $ - | $ - | $ 12,722,400 |
| | | Replace Plumbing | $ 3,780,000 | $ - | $ - | $ 3,780,000 | $ - | $ - | $ - | $ 3,780,000 |
| | | Replace Water Supply and Sewer Lines - Unit Wide | $ 3,672,000 | $ - | $ - | $ 3,672,000 | $ - | $ - | $ - | $ 3,672,000 |
| | | Repair Flooring - Pipe Chase | $ 2,088,000 | $ - | $ - | $ - | $ - | $ 2,088,000 | $ - | $ 2,088,000 |
| | | Replace Boiler System - Power House | $ 3,471,300 | $ - | $ - | $ - | $ - | $ 3,471,300 | $ - | $ 3,471,300 |
| | | Install Water Control Devices - Inmate Housing | $ 7,316,000 | $ - | $ - | $ - | $ - | $ - | $ 7,316,000 | $ 7,316,000 |
| | | Replace Electrical - Unit Wide | $ 9,920,000 | $ - | $ - | $ - | $ - | $ - | $ 9,920,000 | $ 9,920,000 |
| | | Replace Entry Road and Perimeter Road | $ 1,488,000 | $ - | $ - | $ - | $ - | $ - | $ 1,488,000 | $ 1,488,000 |
| | Wallace | Install Water Control Devices - Inmate Housing | $ 7,316,000 | $ - | $ - | $ - | $ - | $ - | $ 7,316,000 | $ 7,316,000 |
| | | Repair Horse Barn | $ 248,000 | $ - | $ - | $ - | $ - | $ - | $ 248,000 | $ 248,000 |
| | Wheeler | Install HVAC - Inmate Housing | $ 279,000 | $ - | $ - | $ - | $ 279,000 | $ - | $ - | $ 279,000 |
| | | Install Water Control Devices - Inmate Housing | $ 7,316,000 | $ - | $ - | $ - | $ - | $ - | $ 7,316,000 | $ 7,316,000 |
| | Willacy Co. | Construct Pavilion with Lighting - Main Recreation Yard | $ 1,185,900 | $ - | $ - | $ - | $ - | $ - | $ 1,185,900 | $ 1,185,900 |
| | | Replace Flooring - Kitchen Renovation and Inmate Housing | $ 121,000 | $ - | $ - | $ - | $ - | $ - | $ 121,000 | $ 121,000 |
| | Woodman | Install Capacitor Bank | $ 86,800 | $ - | $ - | $ - | $ - | $ - | $ 86,800 | $ 86,800 |
| | Wynne | Replace Air Handlers - Computer Recovery | $ 486,000 | $ - | $ - | $ 486,000 | $ - | $ - | $ - | $ 486,000 |
| | | Construct Parking Lot | $ 298,400 | $ - | $ - | $ 298,400 | $ - | $ - | $ - | $ 298,400 |
| | | Install Water Control Devices - Inmate Housing | $ 7,316,000 | $ - | $ - | $ - | $ - | $ - | $ 7,316,000 | $ 7,316,000 |
| | | Asbestos Abatement - Windham Administration Building | $ 82,500 | $ - | $ - | $ - | $ - | $ 82,500 | $ - | $ 82,500 |
| | | Install Above Ground Storage Tanks - Fuel Depot | $ 699,000 | $ - | $ - | $ - | $ - | $ - | $ 699,000 | $ 699,000 |
| | | Install Region Ice House - Warehouse | $ 1,488,000 | $ - | $ - | $ - | $ - | $ - | $ 1,488,000 | $ 1,488,000 |
| | | Replace Refrigeration Equipment - Cold Storage Warehouse | $ 249,100 | $ - | $ - | $ - | $ - | $ - | $ 249,100 | $ 249,100 |
| | Young | Install Ground Storage Tank - Dialysis | $ 486,000 | $ - | $ - | $ 486,000 | $ - | $ - | $ - | $ 486,000 |
| | | Construct Building - Back Gate | $ - | $ - | $ - | $ 54,000 | $ - | $ - | $ - | $ 54,000 |
| **Infrastructure Total** | | | $ 882,504,472 | $ 69,841,672 | $ 121,510,300 | $ 95,331,300 | $ 91,262,800 | $ 42,262,400 | $ 628,684,800 | $1,048,893,272 |
| Information Technology | Agency | Enterprise Banking System | $ - | $ 8,125,000 | $ 1,145,000 | $ 1,145,000 | $ 1,145,000 | $ 1,145,000 | $ 1,145,000 | $ 13,850,000 |
| | | Enterprise Inventory System | $ - | $ - | $ 4,732,500 | $ 460,000 | $ 460,000 | $ 460,000 | $ 460,000 | $ 6,572,500 |
| **Information Technology Total** | | | $ - | $ 8,125,000 | $ 5,877,500 | $ 1,605,000 | $ 1,605,000 | $ 1,605,000 | $ 1,605,000 | $ 20,422,500 |
| Beeville Warehouse | McConnell | Construct Beeville Warehouse | $ - | $ - | $ 33,000,000 | $ - | $ - | $ - | $ - | $ 33,000,000 |
| **Beeville Warehouse Total** | | | $ - | $ - | $ 33,000,000 | $ - | $ - | $ - | $ - | $ 33,000,000 |
| Construct New BOQ | Clemens | Construct BOQ Housing | $ - | $ - | $ 6,600,000 | $ - | $ - | $ - | $ - | $ 6,600,000 |
| **Construct New BOQ Total** | | | $ - | $ - | $ 6,600,000 | $ - | $ - | $ - | $ - | $ 6,600,000 |
| Construct New Expansion Dorms | Multiple | Construct Expansion Dorms | $ - | $ - | $ 240,000,000 | $ - | $ - | $ - | $ - | $ 240,000,000 |
| **Construct New Expansion Dorms Total** | | | $ - | $ - | $ 240,000,000 | $ - | $ - | $ - | $ - | $ 240,000,000 |
| **Grand Total** | | | $1,459,481,542 | $ 125,985,442 | $ 443,819,200 | $ 163,532,600 | $ 117,976,000 | $ 116,530,500 | $ 977,753,700 | $1,945,597,442 |

TIEDE DEF_456384

# EXHIBIT 37

## EXPERT REPORT OF BRIAN CARROLL

November 3, 2025

Kevin Homiak
Wheeler Trigg O'Donnell LLP
370 17th Street, Suite 4500
Denver, CO 80202

Dear Mr. Homiak,

Per your request, below is a summary of my opinions in the matter of Bernhardt Tiede, et al. vs. Bobby Lumpkin, et al, case number 1:23-CV-01004-RP in the U.S. District Court for the Western District of Texas.

## I.      QUALIFICATIONS

My name is Brian K. Carroll. I am the Managing Shareholder of Sanderford & Carroll, P.C. with over twenty-five years of construction litigation experience in Texas. I am also an Adjunct Professor of Construction Law at Baylor University Law School and have been a lecturer on contracts and ethics at the University of Texas Cockrell School of Engineering. I am board certified in Construction Law by the Texas Board of Legal Specialization, past president of the American Subcontractors Association, and past Journal Editor of the State Bar of Texas's Construction Law Section.

I received my Juris Doctor from Baylor Law School and am a Master's of Science candidate in Construction Science at Texas A&M University in College Station. My undergraduate degree is a Bachelor's of Science in Architectural Engineering from the University of Texas at Austin.  I worked as a graduate engineer for the Texas Department of Transportation and two private firms with experience on multiple large highway projects for the Department of Transportation and local Texas governments.

I charge $300 per hour for all deposition and trial testimony. I have not been deposed or offered trial testimony in the last five years.

## II.     MATERIALS PROVIDED

Texas Procurement And Contract Management Guide - Version 4.0
TDCJ's Contract Management Handbook
Mr. Collier's Responses to Plaintiffs' Interrogatories
Boroweic, Jeff, et al. *Design-Build Highway Projects: A Review of Practices and Experiences Final Report*, Texas A&M Transportation Institute (Nov. 2016)
Deposition of Bryan Collier
Deposition of Dale Cox (Director of Engineering at TDCJ)
Deposition of Ron Hudson (Chief Operations Officer at TDCJ)
Relevant Texas Statutes and Regulations
Project Sheet - ADP SH 249

Project Sheet - ADP SH 99 H and I
Project Sheet - ADP Southern Gateway
Project Sheet - ADP SH 360
Project Sheet - ADP SH 183 Managed Lanes
Project Sheet - ADP SH 71
Project Sheet - ADP Border West Express (BWE)
Project Sheet - ADP Energy Sector
Project Sheet - ADP Loop 1604
Project Sheet - ADP US 77
Other materials as referenced in the footnotes

## III.    SUMMARY OF OPINIONS

I have been retained by the Plaintiffs to give an opinion on the Texas state procurement process; TDCJ's current approach to soliciting, evaluating, and selecting contractors for installing permanent air conditioning throughout the inmate housing areas in TDCJ's prisons; and ways to expedite the process for soliciting, selecting, and completing contracts to install permanent air conditioning throughout the inmate housing areas in TDCJ's prisons.

TDCJ is doing four things that are unnecessarily delaying the installation of permanent air conditioning throughout its inmate housing areas. First, TDCJ has refused to request from the Texas Legislature the full funding necessary to install permanent air conditioning throughout its prisons—or, for that matter, anything close to the full funding. Second, TDCJ appears to be artificially limiting its vendor pool. Third, TDCJ is using unnecessarily time-consuming and complex procurement processes. And fourth, TDCJ is soliciting, evaluating, and agreeing to contracts for the construction of air conditioning on a piecemeal basis—rather than systemwide or in geographic batches of facilities. Each of these is addressed in more detail below.

### A.    TDCJ has failed to request from the Texas Legislature the full funding required to install permanent air conditioning throughout TDCJ's prisons.

First, TDCJ has refused to request the full funding from the Texas Legislature for installing permanent air conditioning throughout its prisons. TDCJ estimates that it will cost approximately $1.3 billion[1] to complete this project. Yet based on its own documentation, TDCJ has never requested more than $118 million in a single biennium specifically for installing air conditioning.[2] In fact, Mr. Collier admitted that Judge Pitman's order changed nothing with respect to the amount the TDCJ asked the Texas Legislature to appropriate for air conditioning.[3] This is despite the fact that, according to Mr. Collier, TDCJ has never "received any pushback

---

[1] Mr. Collier's Response to Interrogatory No. 19.

[2] B. Collier Tr. at 59:23-25 (Mr. Collier testifying that he believed TDCJ requested $118 million for installing air conditioning for the 2026-2027 biennium).

[3] B. Collier Tr. at 179:2-21.

from anyone in terms of what TDCJ wanted to ask for with respect to installing air conditioning."[4]

According to Mr. Collier, the only reason TDCJ "didn't ask for more funding at the last legislative session to install permanent air conditioning" is "because [TDCJ] didn't think it could be obligated" in a single biennium.[5] Mr. Collier agreed that the funding does not need to be spent in that biennium and the work does not need to be completed in that biennium, but he nevertheless believes that it could not be obligated (i.e., committed under a contract) in that biennium.[6] But neither Mr. Collier nor anyone else at TDCJ has (to my knowledge) identified a legitimate reason why the full funding cannot be obligated in a single biennium. In fact, TDCJ's current three-phase hypothetical plan contemplates that $620.4 million can be obligated in the FY2028-29 biennium, and that $584.6 million can be obligated in the FY2030-31 biennium,[7] which underscores that there is no cap (at least not for less than $620.4 million) on what amount can be obligated in a single biennium. Furthermore, funding of over $1 billion for other public works projects has been awarded by the Texas Legislature in a single biennium.[8] In fact, the Texas Legislature approved $2.5 billion for border wall funding (i.e., nearly double what TDCJ says it would take to install permanent air conditioning throughout its prisons) in the 2024-25 biennium (the 88th Legislature).[9, 10]

TDCJ has not identified any legitimate reason why it continues to request funding for installing air conditioning on a piecemeal basis, rather than to install permanent air conditioning throughout the system. There is none. Doing so has unnecessarily increased, and will continue to unnecessarily increase, the time it takes to fully air condition TDCJ's prisons.

**B.    TDCJ is arbitrarily limiting its vendor pool.**

Second, TDCJ appears to be arbitrarily limiting its pool of vendors. TDCJ states that it "faces challenges with a limited vendor pool" for installing permanent air conditioning.[11] In the last legislative session, in response to a series of questions from Representative Brian Harrison on the Committee on Corrections about how much money it would take to fully fund air conditioning in all of TDCJ, such that they "dealt with the issue" and "we don't have to every session keep dealing with this issue," Mr. Collier answered that it would be $1.3 billion but

---

[4] B. Collier Tr. at 180:8-13.

[5] B. Collier Tr. at 189:23-190:7.

[6] B. Collier Tr. at 170:7-171:15.

[7] TIEDE DEF_368418.

[8] *See* Part III.E., below.

[9] https://www.lbb.texas.gov/Documents/Appropriations_Bills/88/Final/Info_ProgramListing_88R.pdf.

[10] https://www.texastribune.org/2024/07/03/texas-mexico-border-wall-greg-abbott-progress-cost/.

[11] Mr. Collier's Response to Interrogatory No. 20.

clarified that "the hiccup would be, even if you said today . . . here's a check for $1.3 [billion], I can assure you I couldn't come back to you in 2027 and say we've got it done. There's not enough contract capacity, there's not enough vending capacity, to pull that project done in that amount of time that I'm aware of, but we'd sure try."[12]

If Mr. Collier is referring to a lack of contractors in Texas that can do this work, there is no requirement that TDCJ has to select Texas firms for this work. To be sure, there is a Texas preference statute, which says that state agencies like TDCJ must "shall first give first preference to services offered by a Texas bidder that is owned by a service-disabled veteran who is a Texas resident and shall give second preference to services offered by other Texas bidders," with the following requirements: (1) the services meet state requirements regarding the service to be performed and expected quality; and (2) the cost of the service does not exceed the cost of other similar services of similar expected quality that are offered by a non-Texas bidder.[13] And Texas law requires state contractors "to purchase products and materials produced in this state when they are available at a price and time comparable to products and materials produced outside this state."[14]

TDCJ's explanation is flawed for two reasons. To begin with, it's not at all clear that TDCJ has exhausted all Texas-based contractors, as TDCJ has produced no evidence to even suggest (let alone prove) as much. And even if it had, nothing in Texas law says that design or construction must be completed by a Texas-based contractor or include only products and materials produced in Texas. If TDCJ has a "limited vendor pool" in Texas,[15] then state law authorizes TDCJ to solicit bids from out-of-state contractors. So any of the national design-build firms (or other firms across the country) could be selected to complete this work while complying with Texas law.

The process for an out-of-state company to become an approved vendor is also relatively straightforward. Vendors register online with the Comptroller's office for inclusion on the State's Centralized Master Bidder's List ("CMBL").[16] Registration requires an EIN and an annual $70 registration fee.[17] Registered vendors are then tracked via the state's Vendor Performance Tracking System ("VPTS") to monitor vendor performance.[18] Vendors may be removed from the CMBL based on poor performance. So, Texas's vendor registration system is such that approval is the default. State agencies may also solicit bids from vendors not registered on the CMBL.[19]

---

[12] House of Corrections, 89th Legislature, HB 3006, Bryan Collier at 1:07:08-108:13, *available at* https://house.texas.gov/videos/21748.

[13] Texas Government Code § 2155.444(e).

[14] Texas Government Code § 2155.4441.

[15] Mr. Collier's Response to Interrogatory No. 20.

[16] https://comptroller.texas.gov/purchasing/vendor/registration/.

[17] *Id.*

[18] Tex. Admin. Code § 20.509.

[19] Tex. Admin. Code § 20.107(h); Tex. Gov't Code § 2155.269.

Thus, whether a national design-build firm is currently registered as a state-approved vendor should not be a barrier either.

### C.    TDCJ is using unnecessarily time-consuming and complex procurement processes.

Third, TDCJ has chosen to use unnecessarily time-consuming and complex procurement processes for the installation of permanent air conditioning. TDCJ has argued that it could take years for this process because it "must adhere to specific competitive procurement processes as generally described in the State's Procurement and Contract Management Guide," and the necessary designs "take 12-18 months to complete."[20] But TDCJ has failed to select the most expeditious process to complete the work, and TDCJ appears to suggest that all of this work must be completed in a linear, rather than a parallel, manner.

Texas Government Code § 2269 provides state agencies like TDCJ with various approved procurement methodologies for construction and repair of buildings. They range from traditional design-bid-build methods (commonly referred to as "hard bidding") to construction manager-at-risk ("CMAR") methods to Design-Build ("D/B") approaches. These approaches have varying degrees of owner control over the design professionals and differ in terms of project delivery speed. For this particular application, using a D/B approach would overcome many of the delays inherent in the TDCJ's current proposed timeline.

Here's a helpful graphic to understand the differences between a common D/B approach and a common design-bid-build approach[21]:



---

[20] Mr. Collier's Response to Interrogatory No. 20.

[21] Boroweic, Jeff, et al. *Design-Build Highway Projects: A Review of Practices and Experiences Final Report*, Texas A&M Transportation Institute (Nov. 2016).

Several studies have confirmed that using a D/B process rather than a Design-Bid-Build approach typically leads to substantial time savings. A study completed by the Kentucky Transportation Cabinet concluded that "[a]verage schedule growth was over 65 percent less compared to the design-bid-build method."[22] The Florida Department of Transportation, likewise, compared seven projects that used a design-bid-build approach to seven similar resurfacing projects that used a D/B process, and they concluded that the former took a combined total of 5,992 days, while the latter took only 1,452 days, saving over 12 years in total.[23] "The shortened project delivery, according to the FDOT, is the true savings of the design-build method."[24] Finally, a study completed by the University of Nevada, Las Vegas compared sixteen Design-Bid-Build projects to six D/B projects. It found statistically significant differences in the overall project time: "The mean project delivery speed per lane distance and construction speed per lane distance for design-build projects was significantly faster than that for design-bid-build projects, indicating that design-build projects are delivered and constructed faster than design-bid-build projects."[25] While these studies concerned highway projects, these efficiencies are inherent in the D/B approach as compared to the design-bid-build approach, regardless of what is being constructed. So they should apply equally to designing and constructing air conditioning in prisons.

For recent air conditioning installations like at the Boyd Unit, TDCJ appears to be using a design-bid-build method. Under this process, TDCJ has to undergo a procurement process—bidding, evaluation—to first select an architect. That architect develops a set of plans and specifications—signed, sealed, construction-ready documents. Once that's done, TDCJ takes the design and puts it out to the marketplace for construction bids via one of the methods allowed by § 2269. TDCJ receives and evaluates the bids, and selects a contractor—which is then released to perform the work.

This process is unnecessarily time-consuming. Mr. Cox testified that, in calculating a hypothetical timeline for such a project, TDCJ must include the "time for procurement of both design and construction."[26] Procurement alone for the design phase "can take up to six months,"[27] followed by a 12-15 month design period. Only after the design is completed can it be used for construction procurement.[28] After that, construction procurement can take another 9-12 months,[29] and the construction itself cannot be completed until the construction contract

---

[22] *Design-Build Highway Projects: A Review of Practices and Experiences Final Report* at 24.

[23] *Id.* at 25.

[24] *Id.*

[25] *Id.* at 26.

[26] D. Cox Tr. 126:4-5.

[27] D. Cox Tr. 126:9-11.

[28] D. Cox Tr. 126:17-21.

[29] D. Cox Tr. 126:19:24.

procurement process is completed. This is a design-bid-build process, as it includes two different procurement processes and can take up to 33 months before construction even begins.

Under the D/B approach, TDCJ would instead issue a simplified design criteria document for bidders to respond to.[30] These are typically not complicated documents and, in this instance, would generally describe the temperature requirements, estimated budget and time of performance goals for the D/B firm to meet.[31] TDCJ would publish a list of criteria that would be used on every project for which the D/B firm would be selected.

Selection of the D/B proposal would be qualification based and involve the following steps[32]:

1.    TDCJ would need to evaluate each D/B firm's experience, technical competence, and capability to perform, the firm's past performance, and "other appropriate factors submitted by the firm in response to the request for qualifications," but TDCJ cannot consider "cost-related or price-related" factors.

2.    Each D/B firm must certify to TDCJ that each architect or engineer that is a member of the firm was selected based on demonstrated competence and qualifications, in the manner provided by § 2254.004.

3.    TDCJ shall qualify a maximum of five responders to submit proposals that contain additional information and, if TDCJ chooses, to interview for final selection.

4.    TDCJ shall evaluate the additional information submitted by the firms on the basis of the selection criteria stated in the request for qualifications and the results of any interview.

5.    TDCJ may request additional information regarding demonstrated competence and qualifications, considerations of the safety and long-term durability of the project, the feasibility of implementing the project as proposed, the ability of the offeror to meet schedules, or costing methodology—which means an offeror's policies on subcontractor markup, definition of general conditions, range of cost for general conditions, policies on retainage, policies on contingencies, discount for prompt payment, and expected staffing for administrative duties. Costing methodology does not include a guaranteed maximum price or bid for overall design or construction.

TDCJ would have to select the D/B firm "that submits the proposal offering the best value for [TDCJ] on the basis of the published selection criteria and on its ranking

---

[30] *See generally* Tex. Gov't Code Ann. § 2269.306.

[31] Tex. Gov't Code Ann. § 2269.306(c)

[32] Tex. Gov't Code Ann. § 2269.307.

evaluations."[33] TDCJ must then attempt to negotiate a contract with that firm and, if TDCJ is unable to reach an agreement, it must "formally and in writing, end all negotiations with that firm and proceed to negotiate with the next firm in the order of the selection ranking until a contract is reached or negotiations with all ranked firms end."[34] That firm would not have to deliver a payment or performance bond for the design portion for the contract, but it would for the construction portion of the contract.[35]

The D/B process approved under § 2269.301, *et seq.* would allow one contractor to run each project, which would complete both the design and the construction.[36] A D/B firm must include an architect or engineer "and a construction contractor,"[37] and this team would work together to rapidly deliver a complete permanent air conditioning solution to TDCJ. As the Texas Department of Transportation describes it, this approach "allow[s] for design, construction, utility relocation, and maintenance to occur simultaneously under a single contract."[38] This resolves the concern expressed by Mr. Collier in his deposition that the design process would have to be completed before the project could be released for construction. Because both aspects of the work are performed together, TDCJ would obtain the benefit of a streamlined design process that is optimized to be constructed because the design professionals and contractor are working together via a collaborative process.

The fact that the D/B approach contemplates that all (or nearly all) of the work would be completed by contractors—not TDCJ employees—addresses, or at least mitigates, TDCJ's claimed concern that it cannot complete this work faster because of insufficient internal resources. Among other things, TDCJ would no longer have to serve as the middleman between the construction and design contractors, and the D/B firm could provide comprehensive project management. To be sure, the D/B approach requires TDCJ to "select or designate an architect or engineer independent of the design-build firm to act as [TDCJ's] representative for the duration of the project."[39] This representative would have final say over the design, since the D/B firm would have to "submit all design elements for review and determination of scope compliance" to TDCJ either "before or concurrently with construction."[40] But typically, this D/B approach requires far less time spent by the agency supervising or managing the project than either a CMAR or design-bid-build approach.

---

[33] Tex. Gov't Code Ann. § 2269.308(a).

[34] Tex. Gov't Code Ann. § 2269.308(b)-(c).

[35] Tex. Gov't Code Ann. § 2269.311.

[36] Tex. Gov't Code Ann. § 2269.301.

[37] Tex. Gov't Code Ann. § 2269.304.

[38] https://www.txdot.gov/business/road-bridge-maintenance/alternative-delivery.html#types.

[39] Tex. Gov't Code Ann. § 2269.305.

[40] Tex. Gov't Code Ann. § 2269.309.

The construction would also be completed by the same D/B contractor. There is no reason that this work cannot be successfully contracted to outside providers, as TxDOT has demonstrated this for years utilizing outside contractors to allow more work to be constructed faster, but still maintaining the same level of quality taxpayers expect to be delivered for their tax dollars. Because the D/B method incorporates both phases, the process is far faster than traditional Design-Bid-Build methods employed by TDCJ. In other words, rather than two separate procurement processes (one for design and one for construction), the D/B method would only have one procurement process (which would include both design and construction).

TDCJ also appears to be considering using a CMAR approach to install air conditioning in at least some TDCJ prisons.[41] Mr. Hudson said that, once TDCJ "get[s] more funding" from the Legislature, it will take the design from the McConnell Unit and "issue an RFP that will . . . do what they call a construction manager at risk, and [TDCJ] will hire [an] outside mechanical company and a design team at the same time."[42] That team will then "site adapt" the McConnell Unit's permanent air conditioning design for ten other similar units, and the "mechanical company, along with the design company, can . . . work hand in hand now . . . on [the installation] process at the same time."[43]

This testimony shows that TDCJ is not required to use the Design-Bid-Build methods that it has traditionally used, but can instead use other procurement methods provided by Texas procurement law. The CMAR method is typically faster than a design-bid-build method, and the D/B method is typically faster than both.

The CMAR method allows a government agency to "contract[] with an architect or engineer for design and construction phase services and contracts separately," with a construction manager-at-risk serving as the general contractor and providing consultation during the design and construction, rehabilitation, alteration, or repair of a facility.[44] So TDCJ would still have to conduct two procurement processes that lead to two contracts with two companies (a design firm and a construction company). There is, however, some overlap in the design and construction phases—which makes CMAR more efficient than a design-bid-build approach.

By contrast, the D/B approach involves one procurement process that leads to one contract with one company. Because the same company handles both design and construction, the design and construction work happen in parallel, rather than consecutively/sequentially. Supplies and labor are contracted for and obtained while parts of the design are still being finalized. And, unlike with the CMAR method, there's no back-and-forth between different companies (with the construction manager-at-risk serving as the middleman), which saves time and reduces coordination costs. For these reasons, the CMAR—while an improvement over a

---

[41] R. Hudson Tr. at 72:23-74:19.

[42] R. Hudson Tr. at 73:1-6.

[43] R. Hudson Tr. at 73:6-7.

[44] Tex. Gov't Code Ann. § 2269.309.

design-bid-build approach—is still unnecessarily complex and time-consuming as compared to the D/B approach.[45]

    **D.**    **TDCJ is unnecessarily using procurement processes on a unit-by-unit basis, rather than state-wide or in regional batches.**

Fourth, TDCJ is soliciting, evaluating, and selecting contracts for installing permanent air conditioning on a unit-by-unit (or in some cases, building-by building) basis, rather than doing them statewide or, at a minimum, in regional batches. It would be more efficient to complete these projects in regional batches. It would encourage larger companies to solicit bids, contractors (regardless of size) would benefit from the ability to order and plan materials and labor in bulk, and allow TDCJ to manage one contract for that region (rather than one per building or unit). Further, to the extent that Texas's diverse geography impacts the cooling capacity needs of an HVAC system, the regional approach eliminates this concern—panhandle units might need a differently designed system than units on the Gulf coast, but within each geographic region the cooling capacity needs would be similar.

While TDCJ has recently prioritized designs of facilities it describes as "prototype units," potentially expediting the design stages of subsequent units of the same prototype, it is still using unit-by-unit procurement processes for their air conditioning installation contracts. And, at least according to Mr. Hudson, even when TDCJ does an initial design of a prototype facility, it still has to sign new procurement contracts with design firms to "adapt" the original prototype design to each unit.[46] This unit-by-unit procurement process unnecessarily prolongs the overall design and construction process, and an approach under which the design-build contracts were negotiated statewide or at least with regional batches of facilities would be far more efficient.

Let's say, for the sake of argument, that TDCJ does a separate design-bid-build process for each of the approximately 70 units that are currently not fully air conditioned. That would require TDCJ to do 140 procurement processes for these 70 units (one process for design and one for construction at each unit). Switching to the D/B approach would cut this number in half, so that only one process would be required per unit (rather than two). Bundling these facilities would further reduce the number of procurement processes. So, for instance, if TDCJ grouped the facilities into bundles of five units and used the D/B approach, it could use only 14 or 15 procurement processes, rather than around 140—a nearly 90% reduction in the number of

---

    [45] TDCJ may also be able to use the emergency purchase process. An emergency purchase occurs when an agency "must make [a] procurement quickly to prevent a hazard to life, health, safety, welfare, or property or to avoid undue additional cost to the state." (Texas Procurement And Contract Management Guide - Version 4.0 at p. 31.) The decision to declare an emergency purchase "is the sole responsibility of the agency," and the agency need only provide "a written determination of the basis for the emergency and for the selection of a particular vendor shall be included in the procurement file." (*Id.*) The Texas Administrative Code specifically authorizes the use of emergency purchases for "an emergency purchase of goods or services," 34 Tex. Admin. Code § 20.82(d)(2)(B), so this would at least arguably apply to the purchase of air conditioning installation services—especially given Judge Pitman's ruling that the current system is "plainly unconstitutional."

    [46] R. Hudson Tr. at 72:23-73:22.

procurement processes, which would almost certainly lead to a substantial savings of time, based primarily on the significant amount of time TDCJ currently spends on procurement processes.

> **E.    The $1.3 billion required to fully air condition TDCJ prisons is in line with similar D/B contracts awarded by the Texas agencies.**

Assuming that TDCJ uses a bundled B/D approach, the $1.3 billion needed to fully air condition TDCJ prisons could be divided into several large contracts—rather than many small contracts (its current approach). So, for instance, it could enter into 10 bundled contracts that average $130 million each or 15 bundled contracts that average approximately $87 million each. If it did one bundled contract per region, then it could have six contracts that average approximately $216 million per contract.

The size of the contracts is in line with other D/B contracts entered into by Texas agencies:

- State Highway 249 Extension project, which included construction of 40 new bridges and a total contract value of $636 million. The beginning of the procurement process to execution of the contract took 26 months.[47]

- State Highway 99, which covered 208 miles of roadway and built or substantially reconstructed 84 bridges, for a total cost of $1.017 billion. Procurement initiation to contract execution took 35 months.[48]

- I-35 Southern Gateway, significantly widening I-35 over 197 lane miles for a cost of $659 million. Procurement took 13 months to complete.[49]

- State Highway 360 toll project, covering 90 lane miles at a cost of $354 million. Procurement took 14 months to complete.[50]

- State Highway 183 Managed Lanes project, covering 266 lane miles at a cost of $858 million. Procurement took 20 months to complete.[51]

- State Highway 71 Express Lanes project, which added two new toll lanes and new overpasses at intersections with FM 973 and SH 130, at a cost of $110 million. Procurement took only 9 months to complete.[52]

---

[47] Project Sheet - ADP SH 249

[48] Project Sheet - ADP SH 99 H and I

[49] Project Sheet - ADP Southern Gateway

[50] Project Sheet - ADP SH 360

[51] Project Sheet - ADP SH 183 Managed Lanes

[52] Project Sheet - ADP SH 71

- Loop 375 Border Highway Extension, adding two lanes in each direction over 36 lane miles for a cost of $574 million. Procurement took just 13 months to complete.[53]

- Energy Sector Roadway Repair, a reconstruction of roadways and bridges spanning 550+ lane miles at a cost of $189 million. Procurement took only six months.[54]

- A contract with Southwest Valley Constructors Company approved by the Texas Facilities Commission on September 29, 2022, in an amount not to exceed $167,000,000 "for the Texas Border Project in various locations in proximity to the Texas section of the US-Mexico border."[55]

- A contract with BFBC of Texas, LLC approved by the Texas Facilities Commission on September 29, 2022, in an amount not to exceed $140,000,000 "for the Border Infrastructure Project in various locations in proximity to the Texas section of the US-Mexico border."[56]

- Several other contracts with the Texas Facilities Commission, including one for nearly $350 million for border wall construction.[57]

---

[53] Project Sheet - ADP Border West Express (BWE)

[54] Project Sheet - ADP Energy Sector

[55] https://web.tfc.texas.gov/government/programs-construction-projects/texas-border-wall-construction-status.

[56] https://web.tfc.texas.gov/government/programs-construction-projects/texas-border-wall-construction-status.

[57] https://www.tfc.texas.gov/divisions/commissionadmin/prog/internal-procurement-1/sb20/files-co/Posillico%2022-112%20Amend%2013%20Redacted.pdf. The totals awarded to each firm are: $347 million to Posillico Civil; $290 million to BFBC, a subsidiary of Montana-based Barnard Construction; $249 million to Southwest Valley Constructors, owned by Kiewit; $254 million to Fisher Sand & Gravel; and $138 million to Galveston-based SLSCO, Ltd. The agency has also spent $23 million on the outside firms hired to consult on and manage the project; $43 million for steel bollards; and almost $14 million to buy land to build the wall on. *See generally* https://www.texasobserver.org/abbott-lobbies-for-more-money-as-border-wall-burns-through-budget/.

**IV.    CONCLUSION**

My opinions above are all given to a reasonable degree of certainty and are based on my 23 years of experience as a construction attorney and as an adjunct law professor in the area of Texas construction law. These opinions are illustrative and not exhaustive, and I reserve the right to amend, modify, or supplement my report if any additional information is provided to me.

Executed this 3rd day of November, 2025.

*/s/ Brian K. Carroll*
Brian K. Carroll

# EXHIBIT 38



**Texas Department of Criminal Justice**

# STEP 2

**OFFENDER GRIEVANCE FORM**

2023093591

Offender Name: _Jewell Thomas_    TDCJ # _2350417_

Unit: _McConnell_    Housing Assignment: _8-K-30B_

Unit where incident occurred: _McConnell_

**OFFICE USE ONLY**

Grievance #: _2023093591_

UGI Recd Date: _2 0 JUN 2023_

HQ Recd Date: _JUN 2 8 2023_

Date Due: _7-30-23_

Grievance Code: _003 598_

Investigator ID #: _I0352_

Extension Date: _____

Date Retd to Offender: _____

*You must attach the completed Step 1 Grievance that has been signed by the Warden for your Step 2 appeal to be accepted. You may not appeal to Step 2 with a Step 1 that has been returned unprocessed.*

**Give reason for appeal (Be specific).** *I am dissatisfied with the response at Step 1 because...*

From the outset I noted on the top of my Step1 grievance that my complaint was specifically a "STAFF GRIEVANCE NOT MEDICAL". Despite this notation the Grievance Investigator routed my concerns to the medical dept. A seperate grievance had been created for the medical dept but that grievance was returned to me as being redundant. There should have been one grievance for a STAFF complaint which is grievance number 2023093591 and another grievance for a Medical complaint. Even if this had been inadvertently been routed to the wrong audience the Practice Manager still should have brought my concerns to Administration, since providing respite is a security issue not a medical issue. I continue to suffer daily with the extreme heat inside my prison cell. In recent weeks and days I continue to be denied respite in violation of Administrative Directive 10.64 Americans with Disabilities and Rehabilitation Acts with Deliberate indifference, in violation of the Eighth Amendment. The attached grievance requested reasonable accomodations for both respite and my living conditions. Reasonable accomodations continue to be denied. As mentioned Elbert Holmes, Placido Samaniego and Isaac Kwarteng collectively continue to allow the staff to be deliberately indifferent to my serious medical needs. The Clinic/Practice Manager made a conscience choice not to get the Wardens Involved despite mentioning their names in the Step1 grievance. My heat restrictions can not possibly

**YOUR SIGNATURE IS REQUIRED ON BACK OF THIS FORM        (OVER)**

I-128 Front (Revised 11-2014)

be specific to work for two or three reasons alone. First, my prescribe blood pressure medications can not be mixed with the excessive heat. Second, my Diabetes can not be mixed with the excessive heat and Third, my Schizo affective Disorder can not be mixed with the excessive heat. I am requesting at the Step 2 stage that Administration at the McConnell Unit be Notified immediately. I am also requesting That both the Step 1 and Step 2 be copied and forwarded to All Wardens at McConnell.

**Offender Signature:** _Jewell Tidmar_                **Date:** June 13, 2023

---

**Grievance Response:**

A review of the Step 1 medical grievance has been completed regarding your complaints of being denied appropriate housing and adequate housing in respite areas. You stated you have multiple disabilities which prevent you from walking, standing, bend, stoop, or squat without pain. You said due to your diabetes, it is difficult to remain hydrated. You asked to be moved to an air-conditioned cell or transfer to a unit to meet your needs.

Review of the electronic health record indicated your Heat Sensitivity Score Index is P00. You do not meet the criteria for air-conditioned housing. You have been seen by the medical providers. Your treatment care plan is current. All medications are available to you as prescribed.

Heat restrictions are work restrictions and not life restrictions. The Heat Sensitivity Score is a complex matrix that takes your medical condition into consideration, but it is not a guarantee to have air-conditioned housing. Your grievance was sent for medical investigation due to the fact you listed the physician and multiple medical issues in your complaint. Medical has no purview over security issues. If you wish to file a complaint against security, you will need to refrain from including any medical information to ensure your complaint is investigated by the correct office. Appellate review supports the response offered at Step 1. No further investigation is warranted at this time.

**STEP II MEDICAL GRIEVANCE PROGRAM**
**OFFICE OF PROFESSIONAL STANDARDS**
Signature: **TDCJ HEALTH SERVICES DIVISION**                07/05/2023
                                                           **Date:** _____

---

**Returned because:**     *Resubmit this form when corrections are made.*

| | OFFICE USE ONLY |
|---|---|
| ☐ 1. Grievable time period has expired. | **Initial Submission**     CGO Initials: _____ |
| ☐ 2. Illegible/Incomprehensible. * | Date UGI Recd: _____ |
| ☐ 3. Originals not submitted. * | Date CGO Recd: _____ |
| ☐ 4. Inappropriate/Excessive attachments. * | (check one) ___ Screened ___ Improperly Submitted |
| ☐ 5. Malicious use of vulgar, indecent, or physically threatening language. * | Comments: _____ |
| ☐ 6. Inappropriate. * | Date Returned to Offender: _____ |
| | **2nd Submission**     CGO Initials: _____ |
| | Date UGI Recd: _____ |
| | Date CGO Recd: _____ |
| | (check one) ___ Screened ___ Improperly Submitted |
| | Comments: _____ |
| | Date Returned to Offender: _____ |
| **CGO Staff Signature:** _____ | **3rd Submission**     CGO Initials: _____ |
| | Date UGI Recd: _____ |
| | Date CGO Recd: _____ |
| | (check one) ___ Screened ___ Improperly Submitted |
| | Comments: _____ |
| | Date Returned to Offender: _____ |

I-128 Back (Revised 11-2014)

Offender Grievance Operations Manual
Appendix G

TIEDE DEF_42492

# Texas Department of Criminal Justice

## STEP 1
### OFFENDER GRIEVANCE FORM

OFFICE USE ONLY

Grievance #: 2023043591
Date Received: 04/17/23
Date Due: 5/27/23
Grievance Co 003.5196
Investigator ID #: 2925
Extension Date:
Date Retd to Offender: 1 3 JUN 2023

Offender Name: Jewell Thomas   TDCJ # 2350417

Unit: McConnell   Housing Assignment: 8-K-30B

Unit where incident occurred: McConnell

➤ STAFF GRIEVANCE NOT MEDICAL

You must try to resolve your problem with a staff member before you submit a formal complaint. The only exception is when appealing the results of a disciplinary hearing.

Who did you talk to (name, title)? Sr. Warden Elbert Holmes/Deputy Warden Samaniego When? April 15, 2023

What was their response? They both said they will look into it while on the recreation Yard

What action was taken? No Action  "EMERGENCY GRIEVANCE"

State your grievance in the space provided. Please state who, what, when, where and the disciplinary case number if appropriate

Sr. Warden Elbert Holmes, Deputy Warden Placido Samaniego and Medical Director Isaac Kwarteng has a policy and practice of allowing inmate-patients with heat restrictions medical needs to go unattended in violation of Administrative Directive 10.64 Americans w/ Disabilities and Rehabilitain Acts and Eighth Amendment violations. Multiple complaints have been made since March 2022 regarding my "Heat Restrictions" I am heat restricted due to my Disabilities and Pre-existing medical conditions. My concerns have not been met or adequately addressed leaving my health and safety at a potentially grave risk in violation of Equal Protection Laws. I am requesting respite, a way to elevate my leg during respite and a chair which can Properly support my body while sitting during respite sessions unlimiting sessions at anytime during months April-October 2023 Medical Orders from Medical Director to provide the reasonable accomodations, Additional reasonable accomodations are access to restrooms due to the frequent urination and thirst for my Diabetes. I suffer from physical disabilities that cause me to not be able to sit for long periods due to pain and leg swollen. I am not able to sit, stand, bend, stoop and squat with success for short periods of time due to my disabilities. The unconstitutional extreme and excessive heat with my Diabetes causes my body to constantly fight to stay hydrated, I am unable to sweat properly, I am unable to stand walk lift w/o feeling chest pains and fatigue during extreme indoor temps, feels like I will lose coordination and fallover. I am experiencing dizziness trouble concentrating, thinking, reading with Diabetes and extreme temps There is interference with the operation of several of my major bodily systems including circulatory, endocrine, digestive and

I-127 Front (Revised 11-2010)    YOUR SIGNATURE IS REQUIRED ON BACK OF THIS FORM    (OVER)

✳ Please repair window ✳ Window will not open ✳    Appendix F

TIEDE DEF_42493

respiratory. When my hypertension is uncontrolled due to excessive heat there is difficulty breathing with chest pains. Trouble sleeping, respiratory system impaired. Schizoaffective disorder impair thermoregulatory system. Palpitations occur w/ excessive indoor heat. My prescribed blood pressure medications should not be mixed w/ excessive heat. I am also requesting as a reasonable accomodation to be housed in an A/C single cell. So far there are no "Wellness Checks". Additional symptoms so far are heat cramps. I am requesting Grievance Investigators to provide me with the Grievance Number associated with this grievance on the attached I-60. Sick calls are ongoing regarding the excessive heat in my living area with associated symptoms to the attention of Kwarteng.

**Action Requested to resolve your Complaint.** Provide me with a A/C cell or transfer me to a facility that can meet My heat restricted needs OR meet the reasonable accomodations outlined above.

**Offender Signature:** _Jewell Thomas_  **Date:** April 17, 2023

**Grievance Response:**

Inmate Thomas Jewell TDCJ # 2350417 you were last evaluated by physical therapy on 01-19-2023, per that note they made no recommendations about it was noted that you walked without aid of an assistive device such as a cane or walker. You were given medical shoes and an insert for your left leg. Medical cannot issues passes for things like chairs to elevate legs, nor do we issue passes for respite. Your heat restrictions are specific to work, you currently do not have any restrictions that would qualify you for a transfer off this unit for a medical condition. On the date this grievance was filed you were seen by a unit provider and had no urgent or emergent complaints at the time. On 05-16-2023 you were seen by the medical director for your chronic care clinic and expressed no urgent or emergent complaints at that appointment.

**Signature Authority:** _Crystal Bryack C.M._  **Date:** 4/8/23

If you are dissatisfied with the Step 1 response, you may submit a Step 2 (I-128) to the Unit Grievance Investigator within 15 days from the date of the Step 1 response. State the reason for appeal on the Step 2 Form.

**Returned because:**   *Resubmit this form when the corrections are made.

- [ ] 1. Grievable time period has expired.
- [ ] 2. Submission in excess of 1 every 7 days. *
- [ ] 3. Originals not submitted. *
- [ ] 4. Inappropriate/Excessive attachments. *
- [ ] 5. No documented attempt at informal resolution. *
- [ ] 6. No requested relief is stated. *
- [ ] 7. Malicious use of vulgar, indecent, or physically threatening language. *
- [ ] 8. The issue presented is not grievable.
- [ ] 9. Redundant. Refer to grievance #_____
- [ ] 10. Illegible/Incomprehensible. *
- [ ] 11. Inappropriate. *

**UGI Printed Name/Signature:** _____

**Application of the screening criteria for this grievance is not expected to adversely Affect the offender's health.**

**Medical Signature Authority:** _____

I-127 Back (Revised 11-2010)

**OFFICE USE ONLY**

Initial Submission    UGI Initials:_____

Grievance #:_____

Screening Criteria Used:_____

Date Recd from Offender:_____

Date Returned to Offender:_____

2nd Submission    UGI Initials:_____

Grievance #:_____

Screening Criteria Used:_____

Date Recd from Offender:_____

Date Returned to Offender:_____

3rd Submission    UGI Initials:_____

Grievance #:_____

Screening Criteria Used:_____

Date Recd from Offender:_____

Date Returned to Offender:_____

Appendix F

TIEDE DEF_42494



**Texas Department of Criminal Justice**

# STEP 2    OFFENDER
## GRIEVANCE FORM

**OFFICE USE ONLY**

Grievance #: 2023123601

UGI Recd Date: JUL 2 1 2023

HQ Recd Date: _____

Date Due: 8 30 23

Grievance Code: 200

Investigator ID#: I 2897

Extension Date: OCT 0 9 2023

Offender Name: Maes Bryan A.    TDCJ # 01454430

Unit: TL    Housing Assignment: 8 K 53B

Unit where incident occurred: TL

*You must attach the completed Step 1 Grievance that has been signed by the Warden for your Step 2 appeal to be accepted. You may not appeal to Step 2 with a Step 1 that has been returned unprocessed.*

Give reason for appeal (Be Specific).    *I am dissatisfied with the response at Step 1 because...*    I am dissatisfied
with the response to my step 1 because it is obvious
the warden did in fact failed to investigate my complaint
A call to the medical department will prove I am
indeed in danger by not being housed on a air condit-
ioned building during these hot months. As is stated
in my step 1 I am no extreme heat no extreme
humidity and no direct sunlight restricted. My cell
gets No relief from heat & humidity since the
hot summer weeks have begun and its caused me
health problems Please help me. Every day gets worse
I think something is wrong with my lungs it feels
suffocating this heat is scary mixed with my meds-

I-128 Front (Revised 11-2010)    **YOUR SIGNATURE IS REQUIRED ON BACK OF THIS FORM**    (OVER)

Appendix G

**Offender Signature:** ~~D. Mees~~    **Date:** 7-20-23

**Grievance Response:**

An investigation has been conducted by the Central Grievance Office. Your housing assignment has been and will continue to be appropriate and in compliance with all your current medical restrictions. As of 10/12/2023, all restrictions were lifted for the exception of ground floor only and lower bunk only. Records show you do not have a heat score. If you feel you need air-conditioned housing due to medical reasons, you will need to discuss your restrictions with Medical. However, as of this moment Classification has followed all restrictions Medical has on your heath summary pertaining to housing Records also show you are no longer assigned to PL. As of 10/05/2023 you are assigned to FE. No further action is warranted by this office.

*R. W. Pederson*

**Signature Authority:** _____    **Date:** _____    NOV 0 2 2023

**Returned because:**    *Resubmit this form when corrections are made.*

- ☐ 1. Grievable time period has expired.
- ☐ 2. Illegible/Incomprehensible.*
- ☐ 3. Originals not submitted. *
- ☐ 4. Inappropriate/Excessive attachments.*
- ☐ 5. Malicious use of vulgar, indecent, or physically threatening language.*
- ☐ 6. Inappropriate.*

**CGO Staff Signature:** _____

**OFFICE USE ONLY**

**Initial Submission**    **CGO Initials:** _____
Date UGI Recd: _____
Date CGO Recd: _____
(check one) ____ Screened ____ Improperly Submitted
Comments: _____
Date Returned to Offender: _____

**2nd Submission**    **CGO Initials:** _____
Date UGI Recd: _____
Date CGO Recd: _____
(check one) ____ Screened ____ Improperly Submitted
Comments: _____
Date Returned to Offender: _____

**3rd Submission**    **CGO Initials:** _____
Date UGI Recd: _____
Date CGO Recd: _____
(check one) ____ Screened ____ Improperly Submitted
Comments: _____
Date Returned to Offender: _____

**I-128 Back** (Revised 11-2010) .

**Appendix G**

**Texas Department of Criminal Justice**

# STEP 1    OFFENDER GRIEVANCE FORM

| OFFICE USE ONLY |
| --- |
| Grievance #: 2023123601 |
| Date Received: JUN 2 7 2023 |
| Date Due: 8-6-23 |
| Grievance Code: 200 |
| Investigator ID #: I2894 85 |
| Extension Date: |
| Date Retd to Offender JUL 1 7 2023 |

Offender Name: Maes, Bryan    TDCJ # 01454430

Unit: Polunsky    Housing Assignment: 8-K-53B ✓

Unit where incident occurred: Polunsky

You must try to resolve your problem with a staff member before you submit a formal complaint. The only exception is when appealing the results of a disciplinary hearing.

Who did you talk to (name, title)? Lt. Simons    When? 6-24-23

What was their response? You should grieve it.

What action was taken? None so far.

State your grievance in the space provided. Please state who, what, when, where and the disciplinary case number if appropriate.

My name is Bryan A. Maes # 1454430 And I am on medications Geodon and Claritin or Loratidine, I have three different restrictions because of these medications No work in direct sunlight. No temperature extremes. No humidity extremes. I am also restricted to one row and lower bunk because of these meds. I have already fallen out twice on this month once in my cell and once in the shower due to heat exhaustion the second time could have been fatal. I do not want to die because of heat exhaustion I do my part and hydrate my body thoroughly but these medications I am on dehydrate me cause dizziness and drowsiness. I feel fine and can breath normal in air conditioned buildings but the building I am currently housed on has no air conditioning and is full of suffocating heat and humidity. I sweat in my sleep. On the 21st of June at around 11am I fainted in my cell then 8J18 I know this because I awoke in the polunsky emergency room around 11:30am On the 22nd of June '23 at around 3:30pm on J pod 3 row shower I layed down due to feeling very exhausted and hot but again became unresponsive I was taken to the infirmary once again this time having to be given I.V.s of fluids. I pray no one else is experiencing this, even with 2 fans on 1 row right now, with my medications the heat is causing me very scary exhaustion. I am a 53 but G5 and I am waiting on a parole answer please help me. Thank You.

I-127 Front (Revised 1-2010)    **YOUR SIGNATURE IS REQUIRED ON BACK OF THIS FORM**    (OVER)

Appendix F

TIEDE DEF_42513

Action Requested to resolve your Complaint. *To be housed on a airconditioned building until the temperature cools down.*

Offender Signature. _____ Date: 6-26-23

Grievance Response: *An investigation was conducted. Chief of Classification Walton was contacted and stated that you are not listed as a "Heat" inmate, therefore, you are not eligible to be transferred to an A/C unit. You are required to consult with medical for your concerns. Your status must be changed by medical prior to being eligible for a transfer. No further action is warranted.*

**B. JACKSON, WARDEN**                                     JUL 24 2023

Signature Authority: _____ Date: _____

If you are dissatisfied with the Step 1 response, you may submit a Step 2 (I-128) to the Unit Grievance Investigator within 15 days from the date of the step 1 response. State the reason for appeal on the Step 2 Form.

Returned because:    *Resubmit this form when the corrections are made.*

☐ 1. Grievable time period has expired.
☐ 2. Submission in excess of 1 every 7 days.
☐ 3. Originals not submitted.
☐ 4. Inappropriate/Excessive attachments.
☐ 5. No documented attempt at informal resolution.
☐ 6. No requested relief is stated.
☐ 7. Malicious use of vulgar, indecent, or physically threatening language.
☐ 8. The issue presented is not grievable.
☐ 9. Redundant, Refer to grievance log number _____
☐ 10. Illegible/Incomprehensible.
☐ 11. Inappropriate.

OFFICE USE ONLY

Initial Submission    UGI Initials _____
Grievance Code _____
Date Recd from Offender _____
Date Returned to Offender _____

2nd Submission    UGI Initials _____
Grievance Code _____
Date Recd from Offender _____
Date Returned to Offender _____

3rd Submission    UGI Initials _____
Grievance Code _____
Date Recd from Offender _____
Date Returned to Offender _____

TIEDE DEF_42514



**Texas Department of Criminal Justice**

# STEP 2     OFFENDER
GRIEVANCE

OFFICE USE ONLY

Grievance #: 2023124419

UGI Recd Date: JUL 2 6 2023

HQ Recd Date: JUL 3 1 2023

Date Due: 9.5.23

Grievance Code: 100/598

Investigator ID#: [illegible]

Extension Date: OCT 1 4 2023

Offender Name: Ricky Steele     TDCJ # 2098014

Unit: Sm     Housing Assignment: C 205 B

Unit where incident occurred: Sm

*You must attach the completed Step 1 Grievance that has been signed by the Warden for your Step 2 appeal to be accepted. You may not appeal to Step 2 with a Step 1 that has been returned unprocessed.*

Give reason for appeal (Be Specific).   *I am dissatisfied with the response at Step 1 because:*

It does not adequately address the clear evident that my life is in danger because of the excessive heat as outlined in my step 1. I am still experiencing all signs and symptoms CMHEP D-27.2 states are part of Heat stress, Heat cramps, Heat Exhaustion, and Death. I still have all the previously stated predisposing medical conditions I am still on anti/psychotic drugs, and per CMHEP D-27.2, procedures, VI- "In general, offenders on antipsychotic drugs should not be allowed to work or recreate in environments where the Apperent air temperature is 95°F or higher." The Dayroom is recreation and I am forced to come out for shower, Chow, and Inslin. And now while awaiting an answer to this step 1. I was given a job change and am now forced to work in the chow hall, where temperatures far exceed 95°F, or be written up for refusing to work (optional, if you requested to be in the Kitchen, do not write the underlined sentance) In this unprecedented heat we're experiencing in Texas, temperatures have reached as high as 120°F and have been consistently been above 100°F for the last month. If, per CMHEP, Procedures, VI- "Decisions about the suitability of Work assignments and recreation (Dayroom) areas for these offenders will be made by facility medical staff," then smith unit medical Department, as well as Unit Classification, are continuing to violate my right not to be exposed to extreme, unsafe heat per the 8th and 14th Amendments 42 use 1983 ADA, Rehabilitation Act, and Cole V. Collier, 2018 US DCt" final order and judgement Approving classification settlement and Attorney's fee's I have a constitutional right to be free of substantial risk posed by extreme heat. I am requesting smith unit medical Dept and classification, to cease and desist deliberately and indifferently violating my right not ~~be exposed to extreme~~ to be xposed to extreme, unsafe heat and house me in a "Cooled bed" facility.

I-128 Front (Revised 11-2010)     YOUR SIGNATURE IS REQUIRED ON BACK OF THIS FORM     (OVER)

Appendix G

TIEDE DEF_42515

**Offender Signature:** _Ricky Blake_    **Date:** _7-25-23_

**Grievance Response:**

Your claims have been investigated by this office. Your Step-1 was appropriate and addressed your concerns. Records indicate that you have been transferred to the Allred Unit however, if these problems continue you are encouraged to submit a sick call. No further action is warranted by this office.

OCT 05 2023

**Signature Authority:** _J. Back_    **Date:**

**Returned because:**    *Resubmit this form when corrections are made.*

- ☐ 1. **Grievable time period has expired.**
- ☐ 2. **Illegible/Incomprehensible.***
- ☐ 3. **Originals not submitted. ***
- ☐ 4. **Inappropriate/Excessive attachments.***
- ☐ 5. **Malicious use of vulgar, indecent, or physically threatening language.**
- ☐ 6. **Inappropriate.***

**CGO Staff Signature:** _____

**OFFICE USE ONLY**

**Initial Submission**    CGO Initials: _____

Date UGI Rec'd: _____

Date CGO Rec'd: _____

(check one) ___ Screened    ___ Improperly Submitted

Comments: _____

Date Returned to Offender: _____

**2ⁿᵈ Submission**    CGO Initials: _____

Date UGI Rec'd: _____

Date CGO Rec'd: _____

(check one) ___ Screened    ___ Improperly Submitted

Comments: _____

Date Returned to Offender: _____

**3ʳᵈ Submission**    CGO Initials: _____

Date UGI Rec'd: _____

Date CGO Rec'd: _____

(check one) ___ Screened    ___ Improperly Submitted

Comments: _____

Date Returned to Offender: _____

I-128 Back (Revised 11-2010)    Appendix G

## Texas Department of Criminal Justice

### STEP 1    OFFENDER GRIEVANCE FORM

| OFFICE USE ONLY |
|---|
| Grievance #: 2023124419 |
| Date Received: JUN 29 2023 |
| Date Due: 8/8/23 |
| Grievance Code: 200    598 |
| Investigator ID #: 1905 |
| Extension Date: _____ |
| Date Retd to Offender: JUL 13 2023 |

Offender Name: Fleeks Ricky                TDCJ # 2044014

Unit: Sm        Housing Assignment: C 203 B

Unit where incident occurred: Sm

---

You must try to resolve your problem with a staff member before you submit a formal complaint. The only exception is when appealing the results of a disciplinary hearing.

Who did you talk to (name, title)? Smith Unit medical and classification     When? Past 3 months, multiple times in the

What was their response? none, indifference, "we have nothing to do with you being housed in "cool bed

What action was taken? none, I am still exposed to extreme heat

State your grievance in the space provided. Please state who, what, when, where and the disciplinary case number if appropriate

I am in fear for my life because of the excessive heat my repeated attempts at informally resolving this issue have deliberately and indifferently been rebuffed and disregarded. The Smith unit medical Department and classification refuse to hear my pleas for help to get me back into a "cool bed" facility. Per LMHCP D-27.2) Heat stress, Heat camps, Heat Exhaustion, and Death are the dangers dangers to my health, well-being, and life. I currently experience weakness, anxiety, fatigue, thirst, dizziness, headache, and nausea. The signs I am in danger are profuse perspiration, rapid pulse, incoordination, confusion, and Heat syncope - Jaddso and collapse. I am in danger of Heat stress due to my preexisting medical conditions. Per LMHCP D-27.2) Attch B: Common co-morbidities that may affect to increase, that I suffer from are "Asthma, Diabetes, seizure, psychiatric conditions, Allergies high Blood pressure, cardiovascular issues" LMHCP D-27.2) procedures: VI. "In general, offenders on anti-psychotic drugs should not be allowed to work or recreate & Per Disciplinary Rules and procedures manual "Recreation" (includes Dayroom) in environment where the apparent air temperature is 95°F or higher". It has consistently been 95°F or higher in the last month and since this is the beginning of summer, it will likely stay at or above current temperatures for the foreseeable future. I must come out to this Dayroom (Recreation area) for my 2 minum chow and to shower, and so there is no way to keep my body temperature cool enough to avoid all the aforementioned Heat Related Health dangers. I am currently on multiple medications to deal with my co morbidities. They are as follows: most of these medications carry Heat Restrictive warnings. my comorbidities combined with the medications to deal with them, should automatically have me in a "cool bed" facility. LMHCP D27.2 Procedures: VI. "Decisions must be made by a facility medical staff" Smith Unit medical Dept department and classification are violating my constitutional right to be free of substantial risk caused by extreme heat per the 5th and 14th Ammendments (U.S.), 42 USC § 1985) ADA Rehabilitation act and Cole v. Collier, 2018 US Dist. "Final order and Judgement happening

---

I-127 Front (Revised 11-2010)    **YOUR SIGNATURE IS REQUIRED ON BACK OF THIS FORM**    (OVER)

Appendix F

TIEDE DEF_42517

Class Action settlement and Attorney's Fees."

med's / HALOPERIDOL 1mg TABLET / CITALOPRAM 40 mg TABLET / DIPHENHYDRAMINE 50 mg CAPSULE

ALBUTEROL HFA INH 6.7G 200 pf / LISINOPRIL 5mg TABLET / NOVOLIN N 100u/ml 10mL VIAL /

NOVOLIN R 100u/ml 10mL VIAL / NOVOLIN R 100u/ml SS 10ML VIAL

**Action Requested to resolve your Complaint.**

for South Unit medical Dept and classification to cease and desist deliberately and indifferently

withholding right not to be exposed to extreme unsafe heat and house me in a cool bed "Facility

Offender Signature: _Ricky Clack_          Date: 6-28-23

**Grievance Response:**

Your complaint has been noted; however, your heat sensitivity score was removed on 3/14/23. Therefore, you no longer require climate control housing and are housed appropriately in general population. The HSS is based on several mitigating factors, and you do not meet the criteria at this time. If you feel your medical needs are not being met or having heat related illness issues, you will need to submit a sick call. No further action is warranted by this office.

Signature Authority: _Warden Parker_          C Parker PW          Date: 7-12-23

If you are dissatisfied with the Step 1 response, you may submit a Step 2 (I-128) to the Unit Grievance Investigator within 15 days from the date of the Step 1 response. State the reason for appeal on the Step 2 Form.

**Returned because:**          *Resubmit this form when the corrections are made.

- [ ] 1. Grievable time period has expired.
- [ ] 2. Submission in excess of 1 every 7 days. *
- [ ] 3. Originals not submitted. *
- [ ] 4. Inappropriate/Excessive attachments. *
- [ ] 5. No documented attempt at informal resolution. *
- [ ] 6. No requested relief is stated. *
- [ ] 7. Malicious use of vulgar, indecent, or physically threatening language. *
- [ ] 8. The issue presented is not grievable.
- [ ] 9. Redundant. Refer to grievance #
- [ ] 10. Illegible/Incomprehensible. *
- [ ] 11. Inappropriate. *

UGI Printed Name/Signature:

Application of the screening criteria for this grievance is not expected to adversely Affect the offender's health.

Medical Signature Authority:

I-127 Back (Revised 11-2010)

**OFFICE USE ONLY**

Initial Submission          UGI Initials: _____

Grievance #: _____

Screening Criteria Used: _____

Date Recd from Offender: _____

Date Returned to Offender: _____

2nd Submission          UGI Initials: _____

Grievance #: _____

Screening Criteria Used: _____

Date Recd from Offender: _____

Date Returned to Offender: _____

3rd Submission          UGI Initials: _____

Grievance #: _____

Screening Criteria Used: _____

Date Recd from Offender: _____

Date Returned to Offender: _____

Appendix F

**TIEDE DEF_42518**



**Texas Department of Criminal Justice**

# STEP 2

**OFFENDER
GRIEVANCE FORM**

**OFFICE USE ONLY**

Grievance #: 2023124665

UGI Recd Date: AUG 1 5 2023

HQ Recd Date: AUG 2 8 2023

Date Due: 9-24-23

Grievance Code: 24-003-398
10352

Investigator ID#:

Extension Date:

Offender Name: Sears, Richard A.    TDCJ # 02401314

Unit: Estelle    Housing Assignment: K 2 2046

Unit where incident occurred: Estelle Medium Custody
— Please see attachment evidence I-60 request —

*You must attach the completed Step 1 Grievance that has been signed by the Warden for your Step 2 appeal to be accepted. You may not appeal to Step 2 with a Step 1 that has been returned unprocessed.*

**Give reason for appeal (Be Specific).**    *I am dissatisfied with the response at Step 1 because...*

Step 1 response is contradictory to evidence stated and present. Duly noted by Dr. Roberts; Heat score, medication, and condition[s] i.e. grand 4/1 seizures.

Initially, your filing Step 1, I spoke with Dr. Roberts, immediately thereafter. When informed me he placed a request/notification in my med file to be reassigned to air-conditioned housing. It was over-ridden by a senior physician at UTMB, he claimed because of my Custody level being 64, but said he would request it again because of my heat score and I having just had "SPI" removal concurred with by SCC and Asst. Warden Metcalf. Therefore my Custody level was to be upgraded.

Attached is another correspondence to that effect. Because it is a process, having begun on 30 June 2023, as yet to be satisfactorily completed.

The fact that medical can only allow me to cool-down after having a grand-4/1 seizure episode during my sleep. Lack of staff on the wing when it occurred. And me being dressed only in boxer shorts, bare feet. I defer/decline from persisting to have an EMR team being a gurney to escort me. Just to sit there (infirmary) in the A/C and cool-down. Then have to walk back down the hall half naked and bare foot!

The acknowledgement of my medical condition and the mere fact I'm notifying and requesting aid should make cooler housing available. To await for my condition to worsen, with no change in rising heat indexes, is counter-productive and unduly made hardship to my conditions of confinement.

I-128 Front (Revised 11-2010)    **YOUR SIGNATURE IS REQUIRED ON BACK OF THIS FORM**    (OVER)

Appendix G

TIEDE DEF_42555

**Offender Signature** _[signature]_                    **Date:** w/o 14th Aug /2023

**Grievance Response:**

In your Step 1 medical grievance you stated, you have been denied appropriate cool bed housing for your medical condition of grand mal seizures. You are requesting to be rehoused immediately for this issue.

Please be advised you have a heat sensitivity score of P00 and heat restrictions for work only, the heat restrictions do not apply to your housing. There is no documentation found to show you meet the criteria for cool bed housing at this time. Any issues you have with your housing must be addressed with the warden or your unit classification department as medical has no authority over your housing. The Step 2 appellate review supports the Step 1 response.

There is no further action warranted for this issue through the appellate review. You are advised to submit a Sick Call Request if you feel your condition has changed to warrant further evaluation.

STEP II MEDICAL GRIEVANCE PROGRAM
OFFICE OF PROFESSIONAL STANDARDS                    09/19/2023
TDCJ HEALTH SERVICES DIVISION

**Signature Authority:** _____    **Date:** _____

**Returned because:**    *Resubmit this form when corrections are made.*

☐ 1. **Grievable time period has expired.**

☐ 2. **Illegible/Incomprehensible.***

☐ 3. **Originals not submitted. ***

☐ 4. **Inappropriate/Excessive attachments.***

☐ 5. **Malicious use of vulgar, indecent, or physically threatening language.***

☐ 6. **Inappropriate.***

**CGO Staff Signature:** _____

**OFFICE USE ONLY**

Initial Submission          CGO Initials: _____

Date UGI Recd: _____

Date CGO Recd: _____

(check one) ___ Screened    ___ Improperly Submitted

Comments: _____

Date Returned to Offender: _____

2nd Submission          CGO Initials: _____

Date UGI Recd: _____

Date CGO Recd: _____

(check one) ___ Screened    ___ Improperly Submitted

Comments: _____

Date Returned to Offender: _____

3rd Submission          CGO Initials: _____

Date UGI Recd: _____

Date CGO Recd: _____

(check one) ___ Screened    ___ Improperly Submitted

Comments: _____

Date Returned to Offender: _____

I-128 Back (Revised 11-2010)                              Appendix G

TIEDE DEF_42556



**Texas Department of Criminal Justice**

# STEP 1

**OFFENDER GRIEVANCE FORM**

OFFICE USE ONLY

Grievance #: 2023124465

Date Received: JUN 29 2023

Date Due: 8/8/23

Grievance Code: ~~003~~ 003 S90

Investigator ID #: I2957

Extension Date: AUG 0 1 2023

Date Retd to Offender: AUG 0 1 2023

Offender Name: Sears, Richard A.   TDCJ # 02401214

Unit: Estelle   Housing Assignment: K2 - 204 b

Unit where incident occurred: Estelle Medium Custody

---

You must try to resolve your problem with a staff member before you submit a formal complaint. The only exception is when appealing the results of a disciplinary hearing.

Who did you talk to (name, title)? Sgt. Burkes / Mjr. Metcalf   When? Several occasions

What was their response? "You need to file a grievance or get with medical staff."

What action was taken? No action taken. This is an EMERGENCY MEDICAL ISSUE.

---

State your grievance in the space provided. Please state who, what, when, where and the disciplinary case number if appropriate

This grievance is against the Administration for failing to provide safe, and secure housing as medically required in regards to Heat Directive A.D. 10.64 for respite to heat sensitivities; a serious medical need. And 8th Amend right to be safe from conditions of confinement that causes a substantial risk of serious injury or death.

Being qualified under ANA due to epileptic seizures and medications thereto; severe temps, heat indexes above 100 degrees for consecutive weeks permit me A/C restricted housing. It is dangerous and damaging to my health as precluded by doctors orders in my medical file. Updated April/2023 my physiological condition places me at increased risk of heat-related illness, injury, or even death.

This is an Emergency Medical issue due to the medications I take that impede the ability to thermoregulate my body temperatures. Resulting in heat syncope (fainting), heat cramps and heat exhaustion in fear of stroke. I feel constant dizziness and weak. Mentally delirious. Confused mental state, prohibiting reading. Escalating seizures (grand mal). Enabling me to call for help. Since I have been tending to my illness stemming heat myself.

To stand deliberately indifferent; absent any adequate remedial or ameliorative measures in opposition to my complaints for proper housing is in direct violation of my protected rights as a prisoner. Extremely dangerous temps are presently prevalent (over 100 degrees). In which I am directly affected. I need to move, now, to adequate (cooler housing) cold-cell available housing. Until at least the duration of these extremely hot temps. Being confined in cement brick cells (3 tier) with window (bottom tier) and NO HVAC ventilation on the roof to allow out the heat from the building being cooked all day from the sun. Is a virtual "slow bake" mechanism all night, posing unreasonable risk of serious damage to my future health or safety. In today's society this is intolerable. Having knowledge that harm will come to me by this restricted housing makes the

---

I-127 Front (Revised 11-2010)   **YOUR SIGNATURE IS REQUIRED ON BACK OF THIS FORM**   (OVER)

Appendix F

*CuRRENt Administration culpable. This is an attempt at resolution, informally or as exhaustion of State Remedies.*

---

**Action Requested to resolve your Complaint.** *Immediate Rehousing by acknowledgement of stated issues*

**Offender Signature** _____ **Date:** *Thur. 29th June 2023*

**Grievance Response:**

REVIEW OF YOUR MEDICAL RECORDS REVEALS THAT YOU HAVE NOT SUBMITTED ANY COMPLAINTS TO MEDICAL IN THE PAST 90 DAYS. YOU ALSO DO NOT MEET THE CRITERIA FOR CLIMATE CONTROL HOUSING. YOUR RESTRICTIONS HAVE BEEN REVIEWED AND ARE APPROPRIATE. IF YOUR SITUATION HAS CHANGED OR IF YOU ARE HAVING ISSUES, PLEASE SUBMIT A SCR LISTING YOUR SIGNS AND SYMPTOMS AND YOU WILL BE SCHEDULED ACCORDINGLY. ALL OTHER HOUSING QUESTIONS MAY BE DIRECTED TO UNIT CLASSIFICATION. NO FURTHER ACTION IS WARRANTED AT THIS TIME.

Jamie Williams, Senior Business Manager.

**Signature Authority:** _Jamie Willi___ **Date:** 7/21/23

If you are dissatisfied with the Step 1 response, you may submit a Step 2 (I-128) to the Unit Grievance Investigator within 15 days from the date of the Step 1 response. State the reason for appeal on the Step 2 Form.

**Returned because:** *Resubmit this form when the corrections are made.

| | 1. Grievable time period has expired.
| | 2. Submission in excess of 1 every 7 days. *
| | 3. Originals not submitted. *
| | 4. Inappropriate/Excessive attachments. *
| | 5. No documented attempt at informal resolution. *
| | 6. No requested relief is stated. *
| | 7. Malicious use of vulgar, indecent, or physically threatening language. *
| | 8. The issue presented is not grievable.
| | 9. Redundant. Refer to grievance #_____
| | 10. Illegible/Incomprehensible. *
| | 11. Inappropriate. *

**UGI Printed Name/Signature:** _____

**Application of the screening criteria for this grievance is not expected to adversely Affect the offender's health.**

**Medical Signature Authority:** _____

**I-127 Back (Revised 11-2010)**

OFFICE USE ONLY

Initial Submission    UGI Initials:_____
Grievance #: _____
Screening Criteria Used: _____
Date Recd from Offender: _____
Date Returned to Offender: _____
2nd Submission    UGI Initials:_____
Grievance #: _____
Screening Criteria Used: _____
Date Recd from Offender: _____
Date Returned to Offender: _____
3rd Submission    UGI Initials:_____
Grievance #: _____
Screening Criteria Used: _____
Date Recd from Offender: _____
Date Returned to Offender: _____

Appendix F

TIEDE DEF_42558



**Texas Department of Criminal Justice**

# STEP 2    OFFENDER GRIEVANCE FORM

**OFFICE USE ONLY**

Grievance #: 2023137026

UGI Rec'd Date: AUG 23 2023

HQ Rec'd Date: AUG 24 2023

Date Due: _____

Grievance Code: 2001398

Investigator ID#: _____

Extension Date: _____

Offender Name: Curtis Ellis    TDCJ # 2431084

Unit: Powledge    Housing Assignment: 11-027

Unit where incident occurred: Powledge

---

You must attach the completed Step 1 Grievance that has been signed by the Warden for your Step 2 appeal to be accepted. You may not appeal to Step 2 with a Step 1 that has been returned unprocessed.

---

**Give reason for appeal (Be Specific).**    *I am dissatisfied with the response at Step 1 because...*

First, It is 7:30pm 8/21/23 I was just handed this response by officer on 3rd. It is dated Aug 3rd as you will see. Being that this is not my fault I hope you will proceed.
I am dissatisfied because I have all these restrictions dealing with heat on paper from medical, however you say I dont ~~meet~~ meet the score. It's kinda paradoxical then. Why all the restrictions? Evidently someones taking precautions.
Particuly, I'm being denied ~~still~~ still everything that I spoke of in my Step 1 Report. I'm even denied cool down showers on some days. ~~Any~~ Problem I have dealing with heat I have problems getting seen. Only my sick calls are answered. I'm being unproperly cared for. You say I'm ~~appropriately~~ appropriately housed, whats appropriate about an inmate with my health problems being forced to be

---

I-128 Front (Revised 11-2010)    **YOUR SIGNATURE IS REQUIRED ON BACK OF THIS FORM**    (OVER)

Appendix G

TIEDE DEF_42563

in this setting with no air with temps
inside here in excess of 110 not
including index. If it's 108 outside it's
worse in here. It's unconstitional. I don't like
feeling sick and hopless for no reason! Thank you!!

**Offender Signature:** _C. Eit_                **Date:** 8/21/23

**Grievance Response:**

**Signature Authority:** _____    **Date:** _____

**Returned because:**    *Resubmit this form when corrections are made.

☒ 1. Grievable time period has expired. 8·21 16th day

☒ 2. Illegible/Incomprehensible.*

☒ 3. Originals not submitted. *

☒ 4. Inappropriate/Excessive attachments.*

☒ 5. Malicious use of vulgar, indecent, or physically threatening language.

☒ 6. Inappropriate.*

_J. Back_

**CGO Staff Signature:** _____

<table>
<tr><td colspan="2">**OFFICE USE ONLY**</td></tr>
<tr><td>**Initial Submission**</td><td>**CGO Initials:** JB</td></tr>
<tr><td colspan="2">Date UGI Recd: 8-23</td></tr>
<tr><td colspan="2">Date CGO Recd: 8-24</td></tr>
<tr><td colspan="2">(check one) ✓ Screened _____ Improperly Submitted</td></tr>
<tr><td colspan="2">Comments: Time exp.</td></tr>
<tr><td colspan="2">Date Returned to Offender: _____</td></tr>
<tr><td>**2nd Submission**</td><td>**CGO Initials:** _____</td></tr>
<tr><td colspan="2">Date UGI Recd: _____</td></tr>
<tr><td colspan="2">Date CGO Recd: _____</td></tr>
<tr><td colspan="2">(check one) ____ Screened ____ Improperly Submitted</td></tr>
<tr><td colspan="2">Comments: _____</td></tr>
<tr><td colspan="2">Date Returned to Offender: _____</td></tr>
<tr><td>**3rd Submission**</td><td>**CGO Initials:** _____</td></tr>
<tr><td colspan="2">Date UGI Recd: _____</td></tr>
<tr><td colspan="2">Date CGO Recd: _____</td></tr>
<tr><td colspan="2">(check one) ____ Screened ____ Improperly Submitted</td></tr>
<tr><td colspan="2">Comments: _____</td></tr>
<tr><td colspan="2">Date Returned to Offender: _____</td></tr>
</table>

I-128 Back (Revised 11-2010)

Appendix G

TIEDE DEF_42564

Texas Department of Cr~ ~ustice

**STEP 1** ~~~DER GRIEVANCE FORM~~

| OFFICE USE ONLY |
| --- |
| Grievance #: 2023137020 |
| Date Received: JUL 2 8 2023 |
| Date Due: 9-6-23 |
| Grievance Code: 800/598 |
| Investigator ID #: 7161 |
| Extension Date: |
| Date Retd to Offender: AUG 0 3 2023 |

Offender Name: Curtis Ellis    TDCJ 0431084
Unit: Powledge    Housing Assignment 11-07+
Unit where incident occurred: Powledge

You must try to resolve your problem with a staff member before you submit a formal complaint. The only exception is when appealing the results of a disciplinary hearing.

Who did you talk to (name, title)? Med Staff    When? Multplexs

What was their response? Write a grievance

What action was taken? NON!

State your grievance in the space provided. Please state who, what, when, where and the disciplinary case number if appropriate.

I have major health issues. All heat VESTRICTiONS one bp and Deter history. It is very hot I dont do well in heat last time power went out my bp was 168/108 I was told "its high but your fine" "we have a protocall wite a grievance" I was throwing up and was very weak however fortunately I made it through some time I am denied the right to respite. today was another bad day for me, the power went out again. I feel I will not make it through the summer in these conditions. These is no A/C and I'm not being propery caret for people fall out here all the time. Staff dont care.
Help me!!

TIEDE DEF_42565

**Action Requested to resolve your Complaint.** Reclassify me to medical unit

Or medical area where there is AC

**Offender Signature:** _____  **Date:** 7/13/23

**Grievance Response:**

Your grievance has been investigated. It was found that you were not assigned a heat score by medical. If you feel this is in error, you can submit a sick call to medical so that your medical records can be reviewed. You are currently housed appropriately. No further action is warranted.

*Spencer Lucas, AW*

**Signature Authority:** _____  **Date:** AUG 0 3 2023

If you are dissatisfied with the Step 1 response, you may submit a Step 2 (I-128) to the Unit Grievance Investigator within 15 days from the date of the Step 1 response. State the reason for appeal on the Step 2 Form.

**Returned because:**     *Resubmit this form when the corrections are made.

☐ 1. Grievable time period has expired.
☐ 2. Submission in excess of 1 every 7 days. *
☐ 3. Originals not submitted. *
☐ 4. Inappropriate/Excessive attachments. *
☐ 5. No documented attempt at informal resolution. *
☐ 6. No requested relief is stated. *
☐ 7. Malicious use of vulgar, indecent, or physically threatening language.
☐ 8. The issue presented is not grievable.
☐ 9. Redundant. Refer to grievance # _____
☐ 10. Illegible/Incomprehensible. *
☐ 11. Inappropriate. *

**UGI Printed Name/Signature:** _____

**Application of the screening criteria for this grievance is not exp... to adversely Affect the offender's health.**

**Medical Signature Authority:** _____

I-127 Back (Revised 11-2010)

| OFFICE USE ONLY | |
|---|---|
| Initial Submission | UGI Initials: |
| Grievance #: | |
| Screening Criteria Used: | |
| Date Recd from Offender: | |
| Date Returned to Offender: | |
| 2nd Submission | UGI Initials: |
| Grievance #: | |
| Screening Criteria Used: | |
| Date Recd from Offender: | |
| Date Returned to Offender: | |
| 3rd Submission | UGI Initials: |
| Grievance #: | |
| Screening Criteria Used: | |
| Date Recd from Offender: | |
| Date Returned to Offender: | |

Appendix F

TIEDE DEF_42566



**Texas Department of Criminal Justice**

# STEP 2    OFFENDER GRIEVANCE FORM

OFFICE USE ONLY

Grievance #: 2023120023

UGI Recd Date: AUG 1 0 2023

HQ Recd Date: AUG 2 1 2023

Date Due: 9-19-23

Grievance Code: 2001398

Investigator ID#: 1-8308

Extension Date: OCT 2 9 2023

Offender Name: John T. Patrick    TDCJ # 2082541

Unit: Beto I    Housing Assignment: J.1.34B

Unit where incident occurred: Beto I

*You must attach the completed Step 1 Grievance that has been signed by the Warden for your Step 2 appeal to be accepted. You may not appeal to Step 2 with a Step 1 that has been returned unprocessed.*

**Give reason for appeal (Be Specific).**    *I am dissatisfied with the response at Step 1 because.*

The WARDEN Falsely Claimed I do NOT have Heat Restrictions
When in fact I have Heat Related Restrictions. See
Medical Records 4.5.23 AS.18 19a No direct Sunlight
20a No Temperature Extremes.
If things have changed I'm Patrick's medical Records
have been altered after filing this Grievance

I-128 Front (Revised 11-2010)    **YOUR SIGNATURE IS REQUIRED ON BACK OF THIS FORM**    (OVER)

Appendix G

TIEDE DEF_42571

**Offender Signature:** _John + Atruc_    **Date:** 8. 7. 23

**Grievance Response:**

An investigation has been conducted by the Central Grievance Office. Your grievance has been reviewed and investigated. A statement from Classifications states you are housed appropriately. Most TDCJ correctional facilities are not air-conditioned. Therefore, assignments to air-conditioned housing are prioritized based upon heat sensitivity. Numerous measures are taken to mitigate the effect of heat in all housing areas. If you require access to medical care, respite areas, or other heat mitigation measures, contact the nearest staff member for assistance. There are multiple respite areas available for offenders. Be advised, a heat score is produced by an algorithm and not any person. However, if you are having a medical issue, you are required to fill out an I-60 for a sick call to be seen by a provider. No further action by this office is warranted.

_H. M. Pedersen_

OCT 0 8 2023

**Signature Authority:** _____    **Date:** _____

**Returned because:** *Resubmit this form when corrections are made.*

☐ 1. Grievable time period has expired.

☐ 2. Illegible/Incomprehensible.*

☐ 3. Originals not submitted. *

☐ 4. Inappropriate/Excessive attachments.*

☐ 5. Malicious use of vulgar, indecent, or physically threatening language.

☐ 6. Inappropriate.*

**CGO Staff Signature:** _____

| OFFICE USE ONLY | |
|---|---|
| **Initial Submission** | **CGO Initials:** _____ |
| Date UGI Recd: _____ | |
| Date CGO Recd: _____ | |
| (check one) ____ Screened ____ Improperly Submitted | |
| Comments: _____ | |
| Date Returned to Offender: _____ | |
| **2ⁿᵈ Submission** | **CGO Initials:** _____ |
| Date UGI Recd: _____ | |
| Date CGO Recd: _____ | |
| (check one) ____ Screened ____ Improperly Submitted | |
| Comments: _____ | |
| Date Returned to Offender: _____ | |
| **3ʳᵈ Submission** | **CGO Initials:** _____ |
| Date UGI Recd: _____ | |
| Date CGO Recd: _____ | |
| (check one) ____ Screened ____ Improperly Submitted | |
| Comments: _____ | |
| Date Returned to Offender: _____ | |

I-128 Back (Revised 11-2010)

Appendix G

TIEDE DEF_42572

J 12

## Texas Department of Criminal Justice

# STEP 1

## OFFENDER GRIEVANCE FORM

208844

**OFFICE USE ONLY**

Grievance #: 2023120623

Date Received: JUN 2 0 2023

Date Due: 7.30.23

Grievance Code: 2001598

Investigator ID #: 2743

Extension Date: _____

Date Retd to Offender: JUL 2 8 2023

Offender Name: John T. Patrick    TDCJ # 2083541

Unit: BMT    Housing Assignment: J·1· 34 R

Unit where incident occurred: BFTD I

---

You must try to resolve your problem with a staff member before you submit a formal complaint. The only exception is when appealing the results of a disciplinary hearing.
Who did you talk to (name, title)? Sgt / Knight    When? 6-9-23
What was their response? BFTD I NOT A HEAT RESTRICTED UNIT
What action was taken? No Action was or can be under circumstances.

---

State your grievance in the space provided. Please state who, what, when, where and the disciplinary case number if appropriate

I file this grievance because BFTD I unit is not in compliance with Heat Protocol or Settlement concerning Heat Restricted inmate. I, John T. Patrick am a Heat Restricted inmate. I was assigned to Estelle High Security, a Heat Restricted Housing area, until my Heat Restriction was taking "illegally" and I was transferred to the most out of compliance to TDCJ - CID rules unit in the Texas Prison System, BFTD I as retaliation for Civil Action No. 4:21-CV-01254, filed on Estelle Senior Warden et. al. My Restriction were appropriately re-issued due to Hypertension, a Blood Pressure normally 140 (high) and sometimes 160+, high Cholesterol and Poor Circulation. There is no Heat Restricted housing on BFTD I but for Intake inmates at the South Gym. The cellblocks are above 95° degrees Required. There is only 1 fan on the Block which must circulate air on all three (3) rows and each row is over 75 ft long. There is no ventilation in the chowhall or showers or they refuse to turn it on so I nearly pass out from over heating before I can be fed out of these locations which takes more than 1/2 hour and all doors are closed and felt "no fans in either area. I am not allowed access to respite because the posted policies are not followed by any officers of African descent and is not ordered by rank or administrative officials. Furthermore, due to shortness of staff, there isn't usually no

---

1-127 Front (Revised 1 -2010)    **YOUR SIGNATURE IS REQUIRED ON BACK OF THIS FORM**    (OVER)

Appendix F

picket office to open the doors eventhough we are locked in our cells at every count, which takes 2 hrs or more, and the doors are not re-opened for several hours. At the 2:00pm count is during the hottest part of the day and I am forced to be in this 100° cell for several hours. Cold water isn't always available because they do not have enough ice and only 2 25 gallon coolers on a block with a capacity of 198 inmates. This is a dire situation for any inmate but is a dangerous situation for a 59 yr. old with my health conditions.

**Action Requested to resolve your Complaint.** Housed in heat restricted housing area with temperatures in range of settlement policies

**Offender Signature:** John T. Petruk     **Date:** 6·16·23

**Grievance Response:**

Your grievance has been reviewed. You are housed appropriately based on your housing restrictions which do not include a heat restriction. No further action is warranted from this office.

**Signature Authority:** _____ Traci Shirley, AW     **Date:** 7·27·23

If you are dissatisfied with the Step 1 response, you may submit a Step 2 (I-128) to the Unit Grievance Investigator within 15 days from the date of the Step 1 response. State the reason for appeal on the Step 2 Form.

**Returned because:** *Resubmit this form when the corrections are made.

- ☐ 1. Grievable time period has expired.
- ☐ 2. Submission in excess of 1 every 7 days. *
- ☐ 3. Originals not submitted. *
- ☐ 4. Inappropriate/Excessive attachments. *
- ☐ 5. No documented attempt at informal resolution. *
- ☐ 6. No requested relief is stated. *
- ☐ 7. Malicious use of vulgar, indecent, or physically threatening language. *
- ☐ 8. The issue presented is not grievable.
- ☐ 9. Redundant, Refer to grievance # _____
- ☐ 10. Illegible/Incomprehensible. *
- ☐ 11. Inappropriate. *

**UGI Printed Name/Signature:** _____

**Application of the screening criteria for this grievance is not expected to adversely Affect the offender's health.**

**Medical Signature Authority:** _____

I-127 Back (Revised 11-2010)

| OFFICE USE ONLY | |
|---|---|
| Initial Submission | UGI Initials: _____ |
| Grievance #: _____ | |
| Screening Criteria Used: _____ | |
| Date Recd from Offender: _____ | |
| Date Returned to Offender: _____ | |
| 2nd Submission | UGI Initials: _____ |
| Grievance #: _____ | |
| Screening Criteria Used: _____ | |
| Date Recd from Offender: _____ | |
| Date Returned to Offender: _____ | |
| 3rd Submission | UGI Initials: _____ |
| Grievance #: _____ | |
| Screening Criteria Used: _____ | |
| Date Recd from Offender: _____ | |
| Date Returned to Offender: _____ | |

Appendix F

TIEDE DEF_42574

# EXHIBIT 39
# Filed Under Seal