IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

BERNHARDT TIEDE, II, et al.,                §
                                            §
            Plaintiffs,                      §
                                            §
v.                                          §            1:23-CV-1004-RP
                                            §
BOBBY LUMPKIN,                              §
                                            §
            Defendant.                      §

## ORDER

Before the Court is Defendant Bobby Lumpkin's ("Defendant" or "Lumpkin") Motion for

Summary Judgment. (Dkt. 251). Plaintiffs Bernhardt Tiede, II ("Tiede"); Prisons Community

Advocates ("TPCA"); Lioness Justice Impacted Women's Alliance ("Lioness"); Texas Citizens

United for Rehabilitation of Errants ("TX C.U.R.E."); and Coalition for Texans with Disabilities

("CTD") (collectively, "Plaintiffs")[1] filed a Response, (Dkt. 257), and Defendant filed a Reply, (Dkt.

262). On March 2, 2026, the Court, pursuant to Federal Rule of Civil Procedure 56(e), ordered

supplemental briefing on the specific issue of Tiede's exhaustion under the Prison Litigation Reform

Act ("PLRA"). (Dkt. 285). Pursuant to that Order, Plaintiffs filed a further Response, (Dkt. 292),

and Defendant filed a further Reply, (Dkt. 295). Having considered the parties' arguments, the

factual record, and the relevant law, the Court will grant Defendant's Motion in part and deny it in

part.

## I. BACKGROUND

Tiede originally filed suit on August 24, 2023. (Compl., Dkt. 1). He initially sued Bryan

Collier ("Collier"), then the Executive Director of the Texas Department of Criminal Justice,

("TDCJ"); the TDCJ; Kenneth Paxton; and the Texas Office of Attorney General (collectively,

---

[1] Together, TPCA, Lioness, TX C.U.R.E., and CTD are referred to as the "Organizational Plaintiffs."

"Original Defendants"). Tiede was then—and is currently—incarcerated at the TDCJ Estelle Unit in Huntsville, Texas. (Compl., Dkt. 1, at 3; 2d Am. Compl., Dkt 240, at 5). Tiede was then sixty-five years old, with multiple health conditions, including diabetes, hypertension, and chronic obstructive pulmonary disease ("COPD"). (*Id.* at 5, 40).[2] In August 2023, Tiede reported that while housed in a cell without air conditioning, he suffered from stroke symptoms that were exacerbated by heat and necessitated transportation by ambulance to an emergency room. (Compl., Dkt. 1, at 1; *see also* Am. Compl., Dkt. 57, at 40; 2d Am. Compl., Dkt. 240, at 40). He asserted that fans and periodic deliveries of ice water and cold cloths were insufficient to provide relief from temperatures that exceed 110 degrees Fahrenheit in un-air-conditioned cells. (Compl., Dkt. 1, at 1). Following his stroke, TDCJ moved Tiede to an air-conditioned cell on August 9, 2023, but returned him to un-air-conditioned housing only eight days later. (2d Mot. TRO, Dkt. 7, at 5).

On August 28, 2023, following his return to an un-air-conditioned cell, Tiede moved for a temporary restraining order requesting that the Original Defendants move him to an air-conditioned housing unit. (2d TRO Mot., Dkt. 7). United States Magistrate Judge Mark Lane granted the motion on September 13, 2023. (Dkt. 17). On September 14, 2023, this Court entered an Amended Temporary Restraining Order (the "Amended TRO") ordering the Original Defendants to return Tiede to air-conditioned housing for fourteen days, (Dkt. 19), which the Court then extended an additional thirty days. (Dkt. 27).

On April 22, 2024, Tiede moved to amend his complaint, (Dkt. 48), and on April 25, 2024, he filed a Motion for Preliminary Injunction, (Dkt. 50), based on the updated facts included in his proposed amended complaint. The Court granted the motion to amend on May 7, 2024. (Dkt. 56). The First Amended Complaint removed four of the five Original Defendants (leaving only Collier),

---

[2] The Court previously took judicial notice of Tiede's age and date of birth. (Am. TRO, Dkt. 19, at 4 n.4 (indicating that Tiede's date of birth is August 2, 1958). As such, Tiede is now sixty-seven years old.

and three of Tiede's four legal arguments (leaving only an Eighth Amendment conditions of confinement argument), and added the four Organizational Plaintiffs. (Am. Compl., Dkt. 57). Tiede and the Organizational Plaintiffs brought Section 1983 claims under the Eighth Amendment against Collier in his official capacity, seeking declaratory and injunctive relief on behalf of the entire TDCJ inmate population. (*Id.* at 53–59).

On May 29, 2024, Collier filed an Amended Motion to Dismiss Plaintiffs' Amended Complaint Pursuant to Rule 12(b)(1), (Dkt. 76), and an Amended Motion to Dismiss Plaintiffs' Amended Complaint Pursuant to Rule 12(b)(6), (Dkt. 77). Plaintiffs filed responses in opposition to the motions to dismiss, (Dkts. 87, 88), and Collier filed replies, (Dkts. 91, 92). On June 14, 2024, the Court denied the two motions to dismiss, (Dkts. 76, 77). (Order, Dkt. 95).

Meanwhile, Collier filed a response in opposition to the Motion for Preliminary Injunction, (Dkt. 52), and Plaintiffs filed a reply, (Dkt. 90). From July 30, 2024, through August 2, 2024, the Court held a hearing on Plaintiffs' Motion for Preliminary Injunction, (Dkt. 50). (See Min. Entries, Dkts. 167, 172, 173, 174). Plaintiffs presented thirteen witnesses. (Witness List, Dkt. 175). Collier presented eight witnesses, including Lumpkin, then the Correctional Institution Division Director of TDCJ. (*Id.*; Prelim. Inj. Final Hr'g Tr. (August 1, 2024) at 12:1–4). At the hearing, the Court admitted 125 exhibits. (Exhibit List, Dkt. 190).

On March 26, 2025, the Court issued an order denying Plaintiffs' Motion for Preliminary Injunction. (Dkt. 202). In that Order, the Court concluded that, while "[t]his case concerns the plainly unconstitutional treatment of some of the most vulnerable, marginalized members of our society" and "Plaintiffs . . . met their burden of establishing a likelihood of success on the merits that Collier is violating the Eighth Amendment's prohibition against cruel and unusual punishment," the scope of the remedy was unsuited to a preliminary injunction, in that installing temporary air conditioning would divert resources away from a permanent solution. (*Id.* at 90–91). At that time,

the Court "implored [Collier to] take to the necessary steps to be prepared" for the likely outcome

that Plaintiffs would be "entitled to permanent relief in the form of expeditious installation of

permanent air conditioning in all TDCJ facilities." (*Id.* at 90).

On August 18, 2025, Plaintiffs moved to amend their complaint to substitute one

organizational plaintiff as the proper party in interest based on a change in organizational structure,[3]

(Dkt. 227), and on September 25, 2025, Defendant filed a Motion to Substitute Party because Collier

had been replaced as TDCJ Director by Lumpkin, making Lumpkin the proper defendant in the

action, (Dkt. 233). On October 1, 2025, the Court granted Defendant's motion to substitute

Lumpkin for Collier, (Text Order Dated October 1, 2025), and on October 6, 2025, granted

Plaintiffs' Motion to Amend their Complaint, (Dkt. 239). As a result, on October 6, 2025, Plaintiffs'

Second Amended Complaint was filed. (Dkt. 240). On October 21, 2026, Defendant filed an

Answer to the Second Amended Complaint, (Dkt. 244), and on December 1, 2025, he filed the

Motion for Summary Judgment that is the subject of this Order. (Dkt. 251).

## II. LEGAL STANDARD

### A. Summary Judgment

Summary judgment is appropriate under Rule 56 of the Federal Rules of Civil Procedure

only "if the movant shows there is no genuine dispute as to any material fact and that the movant is

entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is genuine only if the

evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson v.*

*Liberty Lobby, Inc.*, 477 U.S. 242, 254 (1986). "A fact issue is 'material' if its resolution could affect the

outcome of the action." *Poole v. City of Shreveport*, 691 F.3d 624, 627 (5th Cir. 2012).

---

[3] As the Court explained when granting the Motion to Amend, when the Organizational Plaintiffs joined the suit, "Lioness . . . was an unincorporated organization under the umbrella of Build Up, [but] has since incorporated . . . This change means that Lioness's membership, which gave Build Up its status as a real party in interest, is now solely Lioness's and no longer subsumed into Build Up's membership." (Dkt. 239, at 1).

The party moving for summary judgment bears the initial burden of "informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "[T]he moving party may [also] meet its burden by simply pointing to an absence of evidence to support the nonmoving party's case." *Boudreaux v. Swift Transp. Co.*, 402 F.3d 536, 544 (5th Cir. 2005). The burden then shifts to the nonmoving party to establish the existence of a genuine issue for trial. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585–87 (1986); *Wise v. E.I. Dupont de Nemours & Co.*, 58 F.3d 193, 195 (5th Cir. 1995). After the nonmovant has been given the opportunity to raise a genuine factual issue, if no reasonable juror could find for the nonmovant, summary judgment will be granted. *Miss. River Basin Alliance v. Westphal*, 230 F.3d 170, 175 (5th Cir. 2000). Courts must view the summary judgment evidence in the light most favorable to the nonmovant. *Rosado v. Deters*, 5 F.3d 119, 123 (5th Cir. 1993).

## B. Standing

Under Article III of the U.S. Constitution, federal court jurisdiction is limited to cases and controversies. U.S. Const. art. III, 2, cl. 1; *Raines v. Byrd*, 521 U.S. 811, 818 (1997). A key element of the case-or-controversy requirement is that a plaintiff must establish standing to sue. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992). To establish Article III standing, a plaintiff must demonstrate that she has (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *See Lujan*, 504 U.S. at 560–61. Only one plaintiff must have standing "to satisfy Article III's case-or-controversy requirement." *Rumsfeld v. Forum for Acad. & Inst. Rights, Inc.*, 547 U.S. 47, 52 n.2 (2006)).

"The party invoking federal jurisdiction bears the burden of establishing these elements," and "each element must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence required at the successive

stages of the litigation." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992). "In response to a summary judgment motion . . . the plaintiff . . . must 'set forth' by affidavit or other evidence 'specific facts,' Fed. R. Civ. P. 56(e), which for purposes of the summary judgment motion will be taken to be true." *Id.*

### C. Eighth Amendment

The Eighth Amendment to the Constitution prohibits "cruel and unusual punishment." U.S. Const. amend. XII. The Constitution "does not mandate comfortable prisons." *Blackmon v. Garza*, 484 F. App'x 866, 868–69 (5th Cir. 2012) (quoting *Rhodes v. Chapman*, 452 U.S. 337, 349 (1981)). However, "prison officials must provide humane conditions of confinement; prison officials must ensure that inmates receive adequate food, clothing, shelter, and medical care, and must take reasonable measures to guarantee the safety of the inmates." *Blackmon*, 484 F. App'x at 868–69 (quoting *Farmer v. Brennan*, 511 U.S. 825, 832 (1994), & *Hudson v. Palmer*, 468 U.S. 517, 526–27 (1984)) (internal quotations omitted). What is cruel or unusual is not set in stone, but rather, is based on what is "socially acceptable," *Ball v. LeBlanc*, 792 F.3d 584, 599 (5th Cir. 2015) [hereinafter "*Ball I*"], or what is consistent with "[a] sufficient national consensus," *Roper v. Simmons*, 543 U.S. 551, 562 (2005). In other words, the extreme deprivation of any "minimal civilized measure of life's necessities" violates the Eighth Amendment. *Davis v. Scott*, 157 F.3d 1003, 1006 (5th Cir. 1998) (citation omitted).

"To be tantamount to the infliction of cruel and unusual punishment, prison conditions must pose 'an unreasonable risk of serious damage' to a prisoner's health—an objective test—and prison officials must have acted with deliberate indifference to the risk posed—a subjective test." *Ball I*, 792 F.3d at 592 (citing *Helling v. McKinney*, 509 U.S. 25, 33–35 (1993)). To satisfy the Eighth Amendment's subjective standard, plaintiffs must show that it is substantially likely that a defendant prison official "knows that inmates face a substantial risk of serious harm and disregards that risk by

failing to take reasonable measures to abate it." *Farmer*, 511 U.S. at 847. This knowledge can be inferred "from circumstantial evidence," and courts "may conclude that a prison official knew of a substantial risk of serious harm from the very fact that the risk was obvious." *Gates v. Cook*, 376 F.3d 323, 333, 340 (affirming finding of deliberate indifference "based on the open and obvious nature of these conditions and the evidence that inmates had complained of symptoms of heat-related illness"); *see also Ball I,* 792 F.3d at 595 (affirming finding of deliberate indifference based "on the totality of the record evidence" showing prison official's subjective knowledge). This knowledge may also be shown by evidence that the risk is "longstanding, pervasive, well-documented, or expressly noted by prison officials in the past," and "the circumstances suggest that the defendant-official" was exposed to that information. *Farmer*, 511 U.S. at 842–43.

### III. DISCUSSION

In his motion for summary judgment, Defendant raises arguments on (1) standing for the Organizational Plaintiffs, (2) mootness for Tiede, (3) exhaustion under the PLRA for all Plaintiffs, (4) the scope of relief, and (5) the deliberate indifference standard for an Eighth Amendment violation. The Court addresses each set of arguments in turn.

### A. Standing

Defendant argues that none of the Organizational Plaintiffs have standing to bring this suit. (Mot. Summ. J., Dkt. 251, at 13). The Organizational Plaintiffs claim associational standing— standing to represent their members or putative members. (2d Am. Compl., Dkt. 240, at 56–57; Resp., Dkt. 257, at 27). The Supreme Court has established a three-part test for associational standing, explaining that:

> an association has standing to bring suit on behalf of its members when: (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.

*Hunt v. Washington State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977).

To begin with the most straightforward analysis, there is no assertion by Defendant that Lioness is not a traditional membership organization, nor that at least one of its members would have standing to sue in their own right, nor that the interests that this litigation seeks to protect are not germane to Lioness's purpose.[4] (*See* Mot. Summ. J., Dkt. 251, at 17, 20–21). The question of participation by individual members, which Defendant raises for all of the Organizational Plaintiffs, is discussed below. Instead, Defendant's Lioness-specific objections to standing center on Defendant's understanding of "the disparity between Lioness's limited membership and the breadth of this lawsuit." (*Id.* at 20).

The summary judgment evidence indicates that Lioness has members in every TDCJ women's-only facility, including members in at least eight un-air-conditioned units. (*Id.* at 17). Defendant contends that the fact that Lioness's members are housed in a subset of TDCJ facilities bars Lioness from challenging TDCJ's lack of air-conditioning and related heat-mitigation approaches system-wide. (*Id.* at 20–21). Plaintiffs respond that they are challenging system-wide policies and have shown that those policies harm Lioness's members. (Resp., Dkt. 257, at 28). Lioness—alongside the other Plaintiffs—alleges in the Second Amended Complaint that:

> TDCJ's current heat-mitigation policy denies this same fundamental right [of air-conditioning] to people incarcerated in Texas prisons . . . The current policy is incompatible with basic standards of decency, unnecessarily inflicts cruel and unusual punishment on these individuals, and exposes them to serious risk of harm. In short, the policy violates the Eighth Amendment. . . . Plaintiffs asks the Court to declare TDCJ's current heat-mitigation policy unconstitutional, and require TDCJ . . . to

---

[4] Defendant, at the conclusion of his arguments on standing, does make the single-sentence assertion that "Lioness has also failed to demonstrate that any one of its members has suffered an Eighth Amendment injury due to excessive heat." (Mot. Summ. J., Dkt. 251, at 23). Defendant does not support or explain this contention, nor does it appear in his general discussion of Lioness's standing, (*id.* at 20–21). However, to the extent that Defendant contends that Lioness's individual members would lack standing to pursue claims because they have not shown injury-in-fact, the Court concludes that the uncontroverted evidence that Lioness has more than 100 members housed in un-air-conditioned units, (*id.* at 8), combined with the significant evidence in the record about the harms of extreme heat, is sufficient to find that, at this stage, Lioness has members who have suffered an injury-in-fact.

maintain a temperature between 65° and 85° Fahrenheit inside the housing and occupied areas of TDCJ prisons.

(2d Am. Compl., Dkt. 240, at 4).

As a general matter, standing requirements do not bar a plaintiff who is harmed by a government policy from challenging that policy simply because the policy has an application beyond the plaintiff. In fact, the Supreme Court has explained that the objects of a government policy—for example, here, inmates directly affected by a prison system's policy—generally have standing to challenge such a policy. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561–62 (1992) ("When the suit is one challenging the legality of government action or inaction, the nature and extent of facts that must be averred (at the summary judgment stage) . . . to establish standing depends considerably upon whether the plaintiff is himself an object of the action (or forgone action) at issue. If he is, there is ordinarily little question that the action or inaction has caused him injury, and that a judgment preventing or requiring the action will redress it."). Defendant seems to substitute a question of remedy—the appropriate scope of relief—for one of standing. Here, the harm that Lioness alleges TDCJ's heat-mitigation policy causes its members gives Lioness standing to challenge that policy, and the fact that Lioness does not have members in every TDCJ facility does not take that standing away.

Nor do the cases that Defendant cites on this point suggest that the injuries to Lioness's members in every un-air-conditioned women-only TDCJ facility cannot support standing to challenge TDCJ's system-wide heat-mitigation policies. Specifically, Defendant cites four cases to illustrate that "claims must be keyed to the particularized injuries that plaintiffs have established." (Mot. Summ. J., Dkt. 251, at 20). At the outset, the Court notes that the claims here are keyed to the particularized injuries that Plaintiffs have established: harm from extreme heat and TDCJ's policies for extreme heat. However, the Court briefly addresses each cited authority in turn.

First, from the Supreme Court's broader explanation of the limits on Congress's ability to create standing for non-concrete injuries in *TransUnion LLC v. Ramirez*, 594 U.S. 413, 426–28 (2021), Defendant cites a discussion of the lack of standing for "unharmed plaintiffs" because of the "concrete-harm requirement." But there is no assertion here that Lioness does not have members who are housed in un-air-conditioned units and therefore suffer the concrete harm of being exposed to extreme heat.

Second, Defendant cites *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 353 (2006), where the Supreme Court held that plaintiffs' status as municipal taxpayers did not give them standing to challenge a state franchise tax—in other words, that standing for one kind of possible injury (municipal) did not confer standing for an entirely separate kind of harm (state). This is not parallel to the situation here, where there is one kind of harm at issue—exposure to extreme heat—in one system—TDCJ's prisons—and, again, where there is evidence that Lioness's members are housed in un-air-conditioned units in that system.

Third, Defendant points to *Lewis v. Casey*, 518 U.S. 343, 358 (1996), a prison class-action suit where the only actual injury a named plaintiff had suffered was due to a lack of illiteracy services. The Supreme Court therefore concluded that remedies included in a lower court injunction that were not connected to illiteracy (*e.g.*, services for non-English speakers) were beyond the proper scope of that injunction. *Id.* ("If inadequacies of this character exist, they have not been found to have harmed any plaintiff in this lawsuit, and hence were not the proper object of this District Court's remediation."). Again, that situation is unlike the situation here, where members of Lioness have suffered exactly the kind of injury that is the focus of this suit.[5]

---

[5] In *Lewis*, with standing established as to the "inadequacy that caused [the plaintiff's] injury," (illiteracy services), the Court next looked to the extent to which factual findings showed that impacts from that inadequacy were widespread enough to justify system-wide relief. *Id.* at 359 ("[W]as that inadequacy widespread enough to justify systemwide relief?"). This was not a question of standing, but about the scope of relief. *Id.* (explaining that the Court had turned to "remediation of the inadequacy that caused [the named

Fourth and finally, Defendant cites *Alabama Legislative Black Caucus v. Alabama*, 575 U.S. 254, 268–71 (2015), a redistricting case where the Supreme Court held that a district court had improperly concluded that available evidence did not support an inference that the plaintiff organization had members in "all of the districts . . . or in any of the [four] specific districts it challenged." Instead, the Supreme Court held that there was sufficient evidence of organizational membership in every relevant district to allow the case to move forward. *Id.* at 270–71 (explaining that "[t]o be sure, the District Court had an independent obligation to confirm its jurisdiction, even in the absence of a state challenge . . . [b]ut, in these circumstances, elementary principles of procedural fairness required that the District Court, rather than acting *sua sponte,* give the Conference an opportunity to provide evidence of member residence."). This was a conclusion about how the district court should have weighed the standing evidence and proceeded, not a broad statement about standing requirements. Moreover, even if the cited portions of *Alabama Legislative Black Caucus* were understood as suggesting that the organization was required to have members in every affected district to support standing in that case, that would be a statement about "district-specific claims" in the specific context of racial gerrymandering, where the individualized nature of the harm requires claims to be brought district-by-district. *See id.* at 263 ("Our district-specific language makes sense in light of the nature of the harms that underlie a racial gerrymandering claim."). Here, again, Plaintiffs' allegations are about the same kind of harm—exposure to extreme heat—shared by inmates across the TDCJ system. The Court concludes, therefore, that the scope of Lioness's membership is not a bar to its standing to pursue this case.

---

plaintiff's] injury."). And while in *Lewis*, the Court concluded that, with only two instances of harm shown, system-wide relief was inappropriate, here, where the challenge is to a system-wide policy and where there is significant evidence of violations across all un-air-conditioned TDCJ facilities, the answer to that question is decidedly different.

### 1. Indicia of Membership

The other Organizational Plaintiffs—TPCA, TX C.U.R.E., and CTD[6]—are not asserting standing based on traditional organizational membership. (*See* Resp., Dkt. 257, at 29–30). However, an organization that "is not a traditional voluntary membership organization"—even an organization that "has no members at all"—can establish associational standing if its constituents have sufficient "indicia of membership." *Hunt*, 432 U.S. at 342, 344. The Fifth Circuit has described this inquiry into indicia of membership as "a functional analysis to determine whether the nature of the relationship between the [organization] and the relevant interests of the individual [constituents] satisfie[s] the goals of the constitutional standing requirement." *Friends of the Earth, Inc. v. Chevron Chem. Co.,* 129 F.3d 826, 828 (5th Cir. 1997).

In *Hunt*, the Supreme Court considered apple growers and dealers' relationship to a state apple advertising commission—which had no members and to which the growers and dealers were legally required to financially contribute. *Hunt*, 432 U.S. at 342, 344–45. The Court explained that the commission, though advertising, market research, public education campaigns, and scientific research, "serve[d] a specialized segment of the State's economic community which is the primary beneficiary of its activities, including the prosecution of this kind of litigation." *Id.* at 344. Because "[i]n a very real sense, the [organization] represent[ed] the [constituents] and provide[d] the means by which they express[ed] their collective views and protect[ed] their collective interests," the Court

---

[6] There is some indication that CTD could be considered a traditional membership organization, with the organization considering "active members" to be "individuals who have shared their contact information with CTD." (Resp., Dkt. 257, at 11; *see also* Mot. Summ. J., Dkt. 251, at 18). However, in this suit, CTD is proceeding on behalf of its "member-constituents," who it "considers [to be] all Texas living with a disability." (*Id.* at 10). And in their briefing on Defendant's Motion for Summary Judgment, Plaintiffs argue that CTD satisfies the indicia-of-membership test. (Resp., Dkt. 257, at 29–34). The Court will therefore analyze CTD's standing as that of a non-traditional-membership organization. However, the Court notes that it does not appear that CTD would have standing as a traditional membership organization, because there is no indication that any of its active members, *i.e.*, individuals who have participated in events or shared their contact information, are incarcerated, and therefore none of them would have standing to sue on their own behalf. (*See* Mot. Summ. J. Ex. 6, Dkt. 252, at 686).

concluded that "it would exalt form over substance" to deny associational standing. *Id.* at 345. In reaching this conclusion, the Court—in addition to the factors noted above—discussed three "indicia of membership in an organization" that helped show the appropriate relationship between the commission and its constituents, noting that the constituents "alone elect the members of the Commission; . . . alone may serve on the Commission; . . . alone finance its activities." *Id.* at 344.

The Fifth Circuit's application of the *Hunt* non-traditional-membership test reflects the Supreme Court's focus on the substance of the relationship between organizations and their constituents, not limited to the facts of *Hunt* or the specific indicia identified in that case. In *Friends of the Earth*, the Fifth Circuit, as noted above, described the *Hunt* test as "a functional analysis" focused on the "nature of the relationship"—and stated that the defendant had "provided no cogent reason to limit the . . . analysis of the 'membership' requirement . . to the facts of *Hunt*." 129 F.3d at 828–29. There, the circuit court considered some indicia identified in *Hunt* (election of the governing body and financing) but also noted that, unlike in *Hunt*, "members [had] voluntarily associated themselves with [the organizational plaintiff]" and considered whether the "suit [was] clearly within [the organization's] central purpose, and thus within the scope of reasons that individuals join[] the organization." *Id.* at 829. And in *Ass'n for Retarded Citizens of Dallas v. Dallas Cnty. Mental Health & Mental Retardation Ctr. Bd. of Trs.*, 19 F.3d 241, 244 (5th Cir. 1994) [hereinafter "*ARC*"], the Fifth Circuit—while not directly addressing any of the indicia identified in *Hunt*— found no standing because the constituents of the organization at issue could not "participate in and guide the organization's efforts." ("The organization bears no relationship to traditional membership groups because most of its 'clients'—handicapped and disabled people—are unable to participate in and guide the organization's efforts.").[7]

---

[7] The Fifth Circuit has made more direct reference to the indicia identified in *Hunt* twice when describing the *Hunt* test without applying it—*i.e.*, in dicta—both times in footnotes. Even across those two cases, different sets of factors were extracted from *Hunt*. *Compare Students for Fair Admissions, Inc. v. Univ. of Texas at Austin*, 37

This functional approach is also reflected in how other district courts within the Fifth Circuit have applied the indicia of membership test. For example, in considering the standing of "a nonprofit legal defense and educational foundation" "supported by gun owners across the country," the United States District Court for the Northern District of Texas recently found that members "receiv[ing] information about its activities through a quarterly newsletter and regular emails about its activities," "regularly communicat[ing] their views to [the organization] about issues on which [it] should focus," and "voluntarily fund[ing] [the organization]" were sufficient indicia of membership to support standing. *Texas v. Bureau of Alcohol, Tobacco, Firearms, & Explosives*, 737 F. Supp. 3d 426, 438 (N.D. Tex. 2024), *appeal docketed*, No. 24-10612 (5th Cir. July 9, 2024).

Likewise, the United States District Court for the Eastern District of Louisiana, in carefully considering the associational standing of an informally-organized nonprofit advocacy organization, reiterated that the "analysis is not formalistic" and that "[a]gain, the purpose of the indicia of membership test is to help ensure that the association provides the means by which represented individuals 'express their collective views and protect their collective interests,'" and identified a broad range of relevant factors. *Concerned Citizens Around Murphy v. Murphy Oil USA, Inc.*, 686 F. Supp. 2d 663, 676 (E.D. La. 2010). The court found that—even with no formal membership list maintained and where members were only "linked through informal networks"—there were

---

F.4th 1078, 1084 n.7, 1085 (5th Cir. 2022) (describing in a footnote that "[u]nder the indicia-of-membership test, we consider whether an organization's purported 'members' (1) elect the organization's leaders, (2) serve in the organization's leadership, (3) finance the organization's activities, (4) associate voluntarily with the organization, and (5) provide sworn testimony of membership," but concluding that "applying an indicia of membership test [here] is unwarranted.") *with Funeral Consumers All., Inc. v. Serv. Corp. Int'l*, 695 F.3d 330, 344 n.9 (5th Cir. 2012) (describing in a footnote that "[i]f the association seeking standing does not have traditional members . . . the association establishes its standing by proving that it has 'indicia of membership': its members elect leadership, serve as the organization's leadership, and finance the organization's activities, including the case's litigation costs. . . The organization must represent the individuals it claims as members and provide 'the means by which [those individuals] express their collective views and protect their collective interests,'" but deciding the case on the grounds of injury and not reaching membership.). The Court does not conclude from these passing descriptions that—contrary to the Fifth Circuit's actual application of *Hunt*—the test of non-traditional membership organizations is rigidly focused on the indicia identified in *Hunt*.

sufficient indicia of membership where, among other involvements, "members 'chip[ed] in' to cover expenses" and "'pa[id]' for [organizational] activities through their own volunteer efforts." *Id.* at 676. The court also noted that "there is no indication in the record that [the organization] has any dissenting members with respect to this litigation," "[n]or is there any indication that [the organization] is unresponsive to its members. Indeed, [the organization] could not operate without the input, participation and support of its member-volunteers." *Id.*

The *Concerned Citizens* court also identified factors in the caselaw that might cut against finding sufficient indicia of membership—distinguishing the organization in that case from groups that had "no continuing relationship" with supporters or that "serve[d] 'no discrete, stable group of persons with a definable set of common interests," and further noting that, because "there [was] no evidence in the record that . . . [the organization] ha[d] reasons for instituting [the] suit other than asserting its members' interests," it was unlike organizations that "may have reasons for instituting a suit . . . other than to assert the rights of [their] supporters." *Id.* at 677 (cleaned up).

These applications again confirm that the *Hunt* test is a functional analysis of an organization's relationship with its constituents, not a narrow inquiry about funding and governing the organization. *See also Riverkeeper v. Taylor Energy Co., LLC,* 113 F. Supp. 3d 870, 876 (E.D. La. 2015) ("This is a holistic test. The purpose is to determine whether an organization provides the means by which members 'express their collective views and protect their collective interests.'"); *Env't Conservation Org. v. City of Dallas,* No. 3-03-CV-2951-BD, 2005 WL 1771289, at *2 (N.D. Tex. July 26, 2005) ("No court has ever required an organization to satisfy each and every indicia of membership. Rather, it is enough that members possess sufficient indicia to satisfy the purposes that undergird the concept of associational standing—'that the organization is sufficiently identified with and subject to the influence of those it seeks to represent as to have a 'personal stake in the outcome of the controversy.'").

15

The Court also notes that the Supreme Court has relatively recently clarified the requirements of associational standing for traditional membership organizations, explaining that groups do not need to be funded or controlled by their members to qualify as a "genuine membership organizations." *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.,* 600 U.S. 181, 200–01 (2023). While this clarification does not, of course, directly speak to organizations that are not traditional membership organizations, it sheds light on what it could mean for such an organization to show that it "is the functional equivalent of a traditional membership organization." *See Fund Democracy, LLC v. S.E.C.,* 278 F.3d 21, 25 (D.C. Cir. 2002). It is difficult to understand how one organization would not be required to have its members fund or direct it to qualify as a traditional membership organization, but another organization—to demonstrate its equivalency to a traditional membership organization—would have to make that showing. The Court takes this as further evidence that the *Hunt* inquiry is not narrowly focused on the indicia identified in that case.

Turning to the Organizational Plaintiffs here, the Court concludes that summary judgment evidence shows that two of the non-traditional-membership Organizational Plaintiffs—TPCA and TX C.U.R.E.—satisfy the indicia of membership test. The Court also concludes, however, that summary judgment evidence shows that CTD does not satisfy that test.

TPCA considers its constituents to be "every prisoner in the TDCJ population." (Resp., Dkt. 257, at 8). TPCA communicates with inmates through phone, mail, and email. (*Id.*). TPCA issues a newsletter to inmates incarcerated across the TDCJ system, who can submit material to be included in the newsletter. (*Id.* at 8–9). TPCA also solicits the views and concerns of inmates held in TDCJ facilities through its "team members," roughly fifty incarcerated volunteers who "drive the policy goals of the organization." (*Id.* at 8). TDCJ inmates have also, at least on occasion, provided financial donations to TPCA. (Ex. 13 to Resp., Inmate Letters, Dkt. 256-3, at 13–16). And issues related to heat in TDCJ facilities have been central to TPCA's work "from its inception." (Resp.,

Dkt. 257, at 8). A former TPCA staff member stated that, while working for TPCA, she communicated daily with TDCJ inmates and received complaints about prison heat from them every day. (*Id.* at 9). TPCA has surveyed inmates about their experiences of extreme heat in Texas. (*Id.* at 33). And TPCA has a substantial history of advocacy on the issue of heat in Texas prisons, including promoting bills requiring temperature control, providing expert testimony before the Texas Legislature, organizing events, authoring reports, and conducting trainings for family members of inmates. (*Id.*). TPCA asserts that it joined this lawsuit "because of the complaints it received from its own incarcerated volunteer team members and constituents," and its founder and president's ex-husband's experience of incarceration in TDCJ facilities. (*Id.* at 10). TPCA has also identified specific volunteer team members incarcerated in un-air-conditioned facilities. (*Id.*).

Based on this evidence, the Court concludes that TPCA serves a specialized segment of the population—*i.e.*, the segment of inmates incarcerated in TDCJ facilities—which is the primary beneficiary of its activities. *See Hunt*, 432 U.S. at 344. Given TPCA's extensive communication with inmates at TDCJ facilities, stated goal to have the concerns of inmates guide the organization's activities, and network of incarcerated volunteers to facilitate that process, and activities like conducting surveys, the Court further concludes that, "[i]n a very real sense, [TPCA] represents [its incarcerated constituents] and provides the means by which they express their collective views and protect their collective interests." *See id.* at 345. That connection also makes TPCA unlike the organization in *ARC*, where the Fifth Circuit concluded that "clients . . . [were] unable to participate in and guide the organization's efforts." *ARC*, 19 F.3d at 244. The Court also notes that TPCA has constituents who "voluntarily associated themselves" with the organization, either through receiving TPCA's newsletter or by volunteering as team members. *See Friends of the Earth*, 129 F.3d at 829; *see also Concerned Citizens*, 686 F. Supp. 2d at 676 (relevant factors that "members 'chip[ed] in' to cover expenses" and "'pa[id]' for [organizational] activities through their own volunteer efforts."). Given

TPCA's history of prison-heat advocacy and the reported frequency with which the organization hears concerns about heat from inmates, this "suit is clearly within [TPCA's] central purpose, and thus within the scope of reasons that individuals join[] the organization." *See Friends of the Earth*, 129 F.3d at 829. Likewise, there is no evidence that TPCA had "reasons for instituting [the] suit other than asserting its members' interests." *See Concerned Citizens*, 686 F. Supp. 2d at 677.

The Court is unconvinced by Defendant's suggestion that, because "very, very few" inmates have made donations to TPCA and because those individuals do not "vote in decision-making," TPCA does not have sufficient indicia of membership. (Mot. Summ. J., Dkt. 251, at 19). Given that the purpose of the *Hunt* inquiry is to understand the relationship between the organization and its constituents, these facts must be considered in the context of an organization that works with constituents who are in prison. The significant financial restrictions of incarceration—in Texas, inmates are not paid for their work—necessarily serve as a barrier to incarcerated constituents funding a nonprofit. Likewise, the inherent restrictions on physical movement and the significant restrictions on communication involved in incarceration necessarily serve as barriers to forms of participation like attending board meetings or voting on organizational actions. Under these circumstances, given the realities of incarceration, the Court views TPCA's receipt of some donations from inmates and the organization's consistent efforts to solicit the views of inmates as evidence supporting associational standing, not evidence of its absence. The picture that the summary judgment evidence paints is of an organization actively dedicated to a specific population and working to gather the concerns of that population and channel those concerns into advocacy, including this litigation; in other words, the kind of organization that *Hunt* suggests has associational standing. *See Hunt*, 432 U.S. at 342, 344–45 (explaining that the commission, though advertising, market research, public education campaigns, and scientific research, "serve[d] a specialized segment

of the State's economic community which is the primary beneficiary of its activities, including the prosecution of this kind of litigation.").

Like TPCA, TX C.U.R.E. considers its constituents to be all inmates in TDCJ's system. (Resp., Dkt. 257, at 6). The organization states that it communicates regularly with incarcerated constituents. (*Id.* at 7). TX C.U.R.E. runs programs that serve inmates at every TDCJ facility. (*Id.* at 6 n.36, quoting Charlie Malouff, TX C.U.R.E.'s vice president, as saying that "at least on[e] TDCJ inmate at every TDCJ prison facility [] is being serviced by one of [TX C.U.R.E.'s] programs."). TX C.U.R.E. asserts that its "incarcerated constituents' needs drive the policy goals of the organization, which include seeking relief from the extreme heat in TDCJ's unairconditioned units." (*Id.* at 7). Specifically, TX C.U.R.E. identified nineteen constituents who have communicated directly with the organization about the problem of extreme heat and states that it joined the lawsuit in response to complaints about lack of air-conditioning and other heat-related concerns. (*Id.* at 6, 7). As far as the organization is aware, no constituents have disapproved of its participation in this lawsuit. (*Id.* at 8). And, like TPCA, TX C.U.R.E. has a consistent and substantial history of advocacy on issues related to heat in Texas prisons. (*Id.* at 6–7).

As with TPCA, the Court concludes that TX C.U.R.E. serves a specialized segment of the population as the primary beneficiary of its activities, including this litigation—helping to "express their collective views" and "protect their collective interests." *See Hunt*, 432 U.S. at 344. That conclusion is reinforced by the organization's statements that it joined this litigation in response to concerns that had been raised by its constituents, and its identification of specific past constituent complaints about heat. This lawsuit is also clearly within TX C.U.R.E.'s central purpose and the scope of reasons for which individuals join the organization. *See Friends of the Earth*, 129 F.3d at 829. Likewise, there is no reason to conclude that TX C.U.R.E. had "reasons for instituting [the] suit other than asserting its members' interests." *See Concerned Citizens*, 686 F. Supp. 2d at 677. Nor have

any of TX C.U.R.E.'s constituents objected to its participation. In sum, the Court concludes that TX C.U.R.E. displays sufficient indicia of membership to support associational standing.

CTD "considers all Texans living with a disability to be its member-constituents." (Resp., Dkt 257, at 10). As Plaintiffs point out, "an estimated 40% of TDCJ inmates have a disability, [so] roughly 52,000 of the 130,000 people incarcerated in Texas prisons" fit into this category of constituents. (*Id.* at 10–11). However, while CTD generally communicates with its constituents, including through newsletters, summary judgment evidence suggests that CTD has limited contact with any TDCJ inmates—and has possibly had no direct contact with inmates about issues of heat. (*Id.* at 11; Resp. Ex. 15, Dkt. 255-3, at 170 (suggesting that CTD's constituent communications about heat in prisons may be limited to one letter from a family member of an inmate). CTD also has a limited history of advocacy on the issue of heat in prisons; while the organization introduced evidence of a past heat-related event, its executive director admitted that CTD has never, for example, submitted testimony on heat issues to the Texas Legislature. (Resp. Ex. 18, Dkt. 255-3, at 202–06; Mot. Summ. J. Ex. 6, Dkt. 252, at 669–70). Moreover, CTD's executive director testified that the organization joined the litigation largely because of concerns of a past employee, albeit an employee who was formerly incarcerated—in contrast to TPCA and TX C.U.R.E., who indicated that they have consistently heard concerns about heat from constituents, and that those concerns led them to join this litigation. (*Compare* Resp. Ex. 15, Dkt. 255-3, at 175–76 *with* Resp., Dkt. 257, at 7, 10).

Based on the evidence of limited communication with inmates on the issue of heat, the Court cannot conclude that, by participating in this litigation, "[i]n a very real sense, [CTD is] represent[ing] [its constituents] and provid[ing] the means by which they express their collective views and protect their collective interests." *See Hunt*, 432 U.S. at 345. The summary judgment evidence shows an organization motivated by real concern, but not one that is serving as the vehicle

for its constituents' collective views. Moreover, CTD's limited history of activity on the issue of heat in prisons makes it is difficult to conclude that this "suit is clearly within [CTD's] central purpose, and thus within the scope of reasons that individuals join[] the organization." *See Friends of the Earth*, 129 F.3d at 829. That is not to say, of course, that an organization could not address a new area of concern while still representing its constituents—but in conjunction with CTD's limited connection to incarcerated constituents, CTD's lack of past activity weakens its claim that CTD is directly representing its constituent's concerns by bringing this litigation. As a result, the Court concludes that CTD does not display the kind of indicia of membership required for a non-traditional membership organization to have associational standing. The Court will therefore dismiss CTD from this lawsuit for lack of standing.

### 2. The PLRA's Limitations on Prospective Relief as a Bar to Standing

As is discussed in further detail below, the PLRA limits the scope of prospective relief by providing that "[p]rospective relief in any civil action with respect to prison conditions shall extend no further than necessary to correct the violation of the Federal right of a particular plaintiff or plaintiffs." 18 U.S.C. § 3626(a)(1)(A). Defendant argues that this limitation "precludes organizational plaintiffs from bringing claims for prospective relief in conditions of confinement cases," because the organizations are not asserting their own federal rights and therefore the "'Federal right of a particular plaintiff' is not at bar." (Mot. Summ. J., Dkt. 251, at 24). Notably, Defendant does not cite any authority for this interpretation of the PLRA. (*Id.*). Nonetheless, Defendant argues that, as a result of the PLRA's limiting language, organizational claims for prospective relief are "not redressable." (*Id.*).

However, as Defendant recognizes, (*see* Mot. Summ. J., Dkt. 251, at 24)[8], when associations sue on behalf of their members, they are asserting the rights of those members. *See, e.g.*, *Am. All. for Equal Rts. v. Fearless Fund Mgmt., LLC*, 103 F.4th 765, 771 (11th Cir. 2024) ("An organization may vindicate the rights of its members by suing on their behalf.") (citing *Students for Fair Admissions*, 600 U.S. at 199–200). This, after all, is the point of *Hunt's* requirement that an organization's "members would otherwise have standing to sue in their own right": it is the rights of those members that are allegedly being violated, and their rights that are being vindicated by any prospective relief. *See Hunt*, 432 U.S. at 343. The Court therefore concludes that the "Federal right of a particular plaintiff or plaintiffs" encompasses the rights of organizations' members when organizations bring suits on behalf of those members, and that the Organizational Plaintiffs' claims are not barred due to lack of redressability.[9] 18 U.S.C. § 3626(a)(1)(A).

### 3. Participation of Individual Members

Defendant argues that, even if the Organizational Plaintiffs can show sufficient indicia of membership to allow for associational standing, they cannot meet the third, prudential prong of the *Hunt* test because the litigation requires the participation of their individual members. (Mot. Summ.

---

[8] Elsewhere, Defendant also asserts that "in vicarious lawsuits the real parties in interest are the members whose rights and injuries are being litigated, not the organization itself . . . An associational plaintiff's claims belong to its members and in litigation those claims the association represents its members." (*Id.* at 33 (citing *OCA-Greater Houston*, 867 F.3d at 610 and *Am. Legal Found. v. F.C.C.*, 808 F.2d 84, 90-91 (D.C. Cir. 1987)).
[9] Defendant suggests that this reading of the PLRA cannot co-exist with the conclusion that the PLRA does not require organizational plaintiffs to exhaust administrative remedies, discussed *infra* Section III.C. (Reply, Dkt. 162, at 6). However, the two PLRA provisions at issue not only have entirely distinct functions, they also use notably different language. The exhaustion provision of the PLRA refers to "a prisoner," and further defines "prisoner" as "any person incarcerated or detained in any facility who is accused of, convicted of, sentenced for, or adjudicated delinquent for, violations of criminal law or the terms and conditions of parole, probation, pretrial release, or diversionary program." 42 U.S.C. § 1997e(a), (h). By contrast, when limiting the scope of relief, the PLRA uses "plaintiff"—a term not defined in the statute. This supports the conclusion that, when interpreting the PLRA's scope-of-relief provision, our general understanding of the term plaintiff should apply, including the general rule that plaintiff organizations with associational standing are asserting the rights of their members. By contrast, the PLRA's use of "prisoner" in its exhaustion provision suggests that that provision is limited to the specific statutory definition of that term—a person incarcerated or detained in any facility.

J., Dkt. 252, at 24–26). Defendant's argument here is that heat risk varies by individual and that heat exposure varies across TDCJ facilities—and that, as a result, there is too much individual variation in heat risk to conclude that the injury of unacceptable heat conditions is common across TDCJ's facilities. (*Id.* at 25). Defendant argues that "participation of inmates confined in every facility is therefore required to resolve Plaintiffs' claims." (*Id.*).

As the Fifth Circuit has explained, Hunt's "third prong is solely prudential." *Ass'n of Am. Physicians & Surgeons, Inc. v. Texas Med. Bd.*, 627 F.3d 547, 550 (5th Cir. 2010) (citing *United Foods & Commercial Workers Union Local 751 v. Brown Grp., Inc.*, 517 U.S. 544, 555 (1996)). "The third prong focuses importantly on 'matters of administrative convenience and efficiency.' . . . Courts assess this prong by examining both the relief requested and the claims asserted." *Id.* While "[i]n general, 'an association's action for damages running solely to its members would be barred for want of the association's standing to sue,'" here, as in *Association of American Physicians*, Plaintiffs "seek[] declaratory and injunctive relief." *Id.* "[R]equests for declaratory or injunctive relief rarely require individual determinations." *Texas Ass'n for Rts. of Unemployed v. Serna*, 663 F. Supp. 3d 703, 711 (W.D. Tex. 2023).

Moreover, the fact that an organization's claim requires participation by some members does not mean that associational standing is inappropriate. *See Hosp. Council of W. Pa. v. City of Pittsburgh*, 949 F.2d 83, 89 (3d Cir. 1991) ("[A]n association may assert a claim that requires participation by some members.") (cited with approval in *Ass'n of Am. Physicians*, 627 F.3d at 551–52). Instead, if "claims can be proven by evidence from representative injured members, without a fact-intensive-individual inquiry," associational standing is allowed. *Ass'n of Am. Physicians*, 627 F.3d at 552. For example, the Fifth Circuit has found organizational standing where, on allegations of "systematic" abuses that "may have violated or chilled [plaintiff's] members' constitutional rights," plaintiff could establish "a pattern with evidence from . . . a small but significant sample" of impacted individuals.

*Id.* There, the Fifth Circuit also noted that "[b]ecause [the plaintiff] also seeks only equitable relief from these alleged violations, both the claims and relief appear to support judicially efficient management if associational standing is granted." *Id.*

Here, Plaintiffs are likewise seeking only equitable relief. There is no concern with calculating damages based on individualized injuries. And Defendant's argument that variation in conditions from facility-to-facility and inmate-to-inmate makes individual participation necessary ignores the significant evidence of a high level of risk at all facilities, for all inmates housed in un-air-conditioned cells. The extensive evidence produced at the preliminary injunction hearing led the Court to conclude that "every TDCJ inmate in an un[-]air-conditioned cell faces a substantial risk of death or serious bodily injury from the extreme heat," (Order Den. Prelim. Inj., Dkt. 202, at 74), and the evidence at the summary judgment stage continues to support the conclusion that there is a uniformly high degree of heat-related risk for every individual housed in an un-air-conditioned cell. (*See, e.g.*, Resp., Dkt. 257, at 12). As a result, the Court concludes that the commonality between the Organizational Plaintiffs' members outweighs the variation between facilities and individuals and that the violations alleged by Plaintiffs can be shown through representative individuals without requiring "the individual participation of each injured party." *See Hunt*, 432 U.S. at 343. It is therefore administratively convenient and efficient for this case to proceed through the Organizational Plaintiffs. Moreover, because the Court concludes, below, that the PLRA's exhaustion requirement does not apply to the Organizational Plaintiffs, Defendant's argument that individual members must participate to address exhaustion member-by-member, (Mot. Summ. J., Dkt. 251, at 26), is unavailing.

### B. Mootness

After the preliminary injunction hearing, the Court found that Tiede faces a substantial risk of serious harm if he is moved to an un-air-conditioned cell. (Order Den. Prelim. Inj., Dkt. 202, at

10–12). Tiede was—and is—at a heighted risk from his age, diabetes, hypertension, cardiovascular disease, COPD, and the fact that he had already had a transient ischemic attack, or small stroke, in June 2023 due to heat exposure and suffered another stroke in April 2024. (*Id.* at 10–11). Credible medical expert testimony suggested that "placing Tiede in un-airconditioned housing would put him at substantial risk of death or serious harm." (*Id.* at 11). There is no evidence that Tiede's health risk from extreme heat has lessened since that time; in fact, his April 2024 stroke occurred after the Court entered a TRO requiring TDCJ to house Tiede in an air-conditioned cell in September 2023, (Dkt. 19), meaning that Tiede is likely more vulnerable to extreme heat now than when he was last in un-air-conditioned housing. Tiede is also, of course, older than he was when the Court entered its TRO or at the time of the preliminary injunction hearing. It is clear that relocating Tiede to un-air-conditioned housing would immediately threaten his health, risking death or serious harm.

However, since the preliminary injunction hearing—at which time TDCJ would not commit to keeping Tiede in air-conditioned housing, (Order Den. Prelim. Inj., Dkt. 202, at 12)—TDCJ has amended its heat-score policy. (Mot. Summ. J., Dkt. 251, at 26–27). Heat scores are the metric that TDCJ uses to assign inmates to air-conditioned cells; inmates with heat scores qualify for cool beds, *i.e.*, beds in proximity to partial or full air conditioning. (*See* Order Den. Prelim. Inj., Dkt. 202, at 5). The change to TDCJ's heat-score algorithm means that "every inmate over the age of 65 is now assigned a heat score." (Mot. Summ. J., Dkt. 251, at 26). TDCJ asserts that "all changes to the heat score algorithm require approval by the University of Texas Medical Branch," meaning that the agency cannot "unilaterally remove the 65+ criterion." (*Id.* at 27). As a result, TDCJ asserts that "Tiede now has a heat score, for life, based on his age." (*Id.*). In deposition testimony, Defendant agreed that, due to this policy change, Tiede, along with "anybody else 65 or older," "will be in air-conditioned housing for the remainder of his sentence," and that "[Tiede] will stay and be

maintained in air[-]conditioned housing for the rest of his time in the system." (Mot. Summ. J., Ex. 10, Dkt. 252 at 744).

In general, "[i]t is well settled that 'a defendant's voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice.'" *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.,* 528 U.S. 167, 189 (2000). Moreover, the general standard for mootness due to voluntary cessation is that "[a] case might become moot if subsequent events made it absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur." *Id.* However, the Fifth Circuit has indicated that "government actors in their sovereign capacity and in the exercise of their official duties are accorded a presumption of good faith." *Sossamon v. Lone Star State of Texas*, 560 F.3d 316, 325 (5th Cir. 2009), *aff'd sub nom. Sossamon v. Texas,* 563 U.S. 277 (2011). As a result, "[w]ithout evidence to the contrary, we assume that formally announced changes to official governmental policy are not mere litigation posturing," and government actors have a "lighter burden to make 'absolutely clear' that the [wrongful] condition cannot 'reasonably be expected to recur.'" *Id.* Specifically in the context of prison policies, the Fifth Circuit has held that a sworn affidavit that a policy has been changed is sufficient evidence to moot a case, further noting that, for a system-wide change, "the fact that the change in policy is now state-wide obviates any concern that local prison officials might change their minds on a whim or that [the plaintiff] might be transferred to a facility with different rules." *Id.* And while it is true that the Fifth Circuit has not always found that prison policy changes moot related litigation, the case that Plaintiffs cite in support of non-mootness involved a prison policy change that did not directly grant the relief sought, but instead merely allowed the plaintiff to *apply* for that relief, with TDCJ explicitly stating that it would "reserve the question" for future consideration. *Tucker v. Gaddis*, 40 F.4th 289, 293 (5th Cir. 2022).

Under these precedents, the Court concludes that TDCJ's statewide policy change, guaranteeing inmates of Tiede's age access to an air-conditioned bed, moots Tiede's claim for permanent injunctive relief by granting him the relief sought. Given the presumption of good faith that applies under *Sossamon*, the Court assumes that TDCJ's policy change is not mere litigation posturing and therefore that Tiede cannot be reasonably expected to be re-housed in an un-air-conditioned cell. *See Sossamon*, 560 F.3d at 325. That TDCJ would have to work with the University of Texas Medical Branch to reverse the policy change supports this conclusion. As a result, despite the clear evidence that Tiede is at immediate risk of serious injury or death should he be returned to an un-air-conditioned cell, the Court concludes that his claim here must be dismissed as moot.

### C. Exhaustion of Administrative Remedies

The PLRA directs that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). The PLRA further provides that "[a]s used in this section, the term 'prisoner' means any person incarcerated or detained in any facility who is accused of, convicted of, sentenced for, or adjudicated delinquent for, violations of criminal law or the terms and conditions of parole, probation, pretrial release, or diversionary program." 42 U.S.C. § 1997e(h). Defendant argues that this provision requires every member of the Organizational Plaintiffs to have exhausted administrative remedies—and that Organizational Plaintiffs cannot make such a showing and are therefore barred from bringing this suit—and further argues that Tiede is barred from this suit by his failure to exhaust administrative remedies. (Mot. Summ. J., Dkt. 252, at 28–34).

The Court does not discuss Tiede's exhaustion, having already found that his claim is now moot and that the Court is therefore without jurisdiction over it. As to the Organizational Plaintiffs, the Court has previously held that the PLRA's exhaustion requirement does not apply to the

Organizational Plaintiffs, because "[t]he Organizational Plaintiffs are not persons capable of being incarcerated or detained, so they are not 'prisoners' as the term is defined by the PLRA." (Order Denying Preliminary Injunction, Dkt. 202, at 68) (citing 42 U.S.C. §§ 1997e(a), (h); *Alabama Disabilities Advoc. Pgm. v. Wood*, 584 F. Supp. 2d 1314, 1316 (M.D. Ala. 2008); *Dunn v. Dunn*, 219 F. Supp. 3d 1163, 1176 (M.D. Ala. 2016)).

Defendant cites *Green Haven Prison Preparative Meeting of Religious Soc'y of Friends v. New York State Dep't of Corr. & Cmty. Supervision*, 16 F.4th 67, 82–83 (2d Cir. 2021) to suggest that a contrary reading is required. (Mot. Summ. J., Dkt. 251, at 34). However, *Green Haven* involved an unincorporated organization formed entirely of eight inmates, all housed at one facility, suing in the organization's name—including two incarcerated plaintiffs who were also suing as individuals—leading the court there to conclude that "the [i]ncarcerated [p]laintiffs may not avoid the exhaustion requirement simply by forming an organization and then suing in the name of that organization." *Green Haven*, 16 F.4th at 82. That is a far cry from the situation before the Court here: there is no suggestion that the Organizational Plaintiffs—long-standing, large-scale groups, comprised of both incarcerated and non-incarcerated members—formed merely to skirt the PLRA's requirements on a technicality.

Nor does this conclusion "frustrate[] Congress's purpose in enacting § 1997e." (Mot. Summ. J., Dkt. 251, at 32). Congress enacted the PLRA at least in part out of concern about the number of suits about prison conditions, with the goal of "filter[ing] out [] frivolous claims." *Porter v. Nussle*, 534 U.S. 516, 524–25 (2002). But it is perfectly plausible to conclude that allowing litigation by organizations, which aggregate claims on behalf of their members, is consistent with the goal of "reduc[ing] the quantity and improv[ing] the quality of prisoner suits." *Id.* Neither *Green Haven*'s concern with small groups of inmates forming nominal organizations to skirt exhaustion nor the purposes of the PLRA provide any reason to depart from the plain meaning of the statute here. The

Organizational Plaintiffs are not "prisoners" and therefore are not governed by the PLRA's exhaustion requirement. *See* 42 U.S.C. § 1997e(a).

### D. Scope of Relief under the PLRA

Defendant argues that "system-wide air-conditioning is overbroad relief under the PLRA." (Mot. Summ. J., Dkt. 251, at 35). The relevant provision of the PLRA provides that:

> Prospective relief in any civil action with respect to prison conditions shall extend no further than necessary to correct the violation of the Federal right of a particular plaintiff or plaintiffs. The court shall not grant or approve any prospective relief unless the court finds that such relief is narrowly drawn, extends no further than necessary to correct the violation of the Federal right, and is the least intrusive means necessary to correct the violation of the Federal right. The court shall give substantial weight to any adverse impact on public safety or the operation of a criminal justice system caused by the relief.

18 U.S.C. 3626(a)(1)(A). Defendant argues that, as a result, the Court must consider less-intrusive mitigation strategies, because "air-conditioning provides more relief than is strictly necessary to reduce heat-related risks to an acceptable level." (Mot. Summ. J., Dkt. 251, at 37–39).

The Fifth Circuit has clearly stated that when a "district court has yet to fashion any prospective relief," "the [prospective relief] provisions of the [PLRA] have yet to be triggered." *Williams v. Edwards*, 87 F.3d 126, 133 (5th Cir. 1996); *see also Yates v. Collier*, 868 F.3d 354, 370 (5th Cir. 2017) (explaining that the Fifth Circuit "held that the PLRA is not implicated at all until the district court actually sets its hand to fashioning injunctive relief," and that "[b]ecause the district court has not yet come to the point of awarding injunctive relief, the provisions of Section 3626(a)(1) have yet to be triggered.") (cleaned up). As a result, while the § 3626(a)(1)(A) will certainly apply to any prospective relief the Court might award in this case, the appropriate scope of theoretical future relief is not a dispositive issue on summary judgment.

Defendant's argument that "an order requiring Defendant to install air conditioning would be impossible for Defendant to follow," (Mot. Summ. J., Dkt. 251, at 39), also goes to the

appropriate scope and formulation of remedies and not to whether there are genuine issues of material fact such that the case can proceed to trial. However, the Court will note, first, that Plaintiffs have suggested that there are various steps that TDCJ could take to increase the speed of its installation of air conditioning, (*see* Resp., Dkt. 257, at 23–25), and, second, that lack of resources is generally not a defense to a claim for prospective relief seeking to remedy Eighth Amendment violations. *See Peralta v. Dillard*, 744 F.3d 1076, 1083 (9th Cir. 2014) ("Lack of resources is not a defense to a claim for prospective relief because prison officials may be compelled to expand the pool of existing resources in order to remedy continuing Eighth Amendment violations."); *Wright v. Rushen*, 642 F.2d 1129, 1134 (9th Cir.1981) ("[C]osts cannot be permitted to stand in the way of eliminating conditions below Eighth Amendment standards."); *Campbell v. Cauthron*, 623 F.2d 503, 508 (8th Cir. 1980) ("We cannot permit unconstitutional conditions to exist simply because prison officials cannot or will not spend the money necessary to fulfill constitutional requirements."); *Austin v. Wilkinson*, 502 F. Supp. 2d 660, 665 (N.D. Ohio 2006) ("Moreover, it is well-settled that where a constitutional violation is shown, federal courts can order governmental entities to implement remedial measures. Case law makes this clear: 'Orders to responsible public officials to prepare and submit plans for remedying constitutional violations are not uncommon. . . . [I]n the prisoner context the courts have authority to order local officials to take costly measures to cure constitutional violations.'") (quoting *Inmates of Allegheny County Jail v. Wecht,* 874 F.2d 147, 150 (3d Cir.1989).). Defendant's concerns about the scope of possible relief do not warrant dismissal.

### E. Deliberate Indifference

"Deliberate indifference," the second, subjective prong of the test Eighth Amendment liability, "is itself a two-prong inquiry. An official must both be 'aware of facts from which the inference could be drawn that a substantial risk of serious harm exists' and 'he must also draw the inference.'" *Ball I*, 792 F.3d at 594. As the Fifth Circuit has clarified, "[w]hether a prison official had

the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence, and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." *Id.*

Defendant argues that there is insufficient evidence of his knowledge to support a finding of deliberate indifference, and that TDCJ's heat mitigation efforts and efforts to install air conditioning both preclude such a finding. (Mot. Summ. J., Dkt. 251, at 41–49; Reply, Dkt. 262, at 7–11). Defendant points out that he and Plaintiffs "disagree on the number of heat-related injuries that have occurred at TDCJ" and suggests that "the only fatalities that Plaintiffs have shown Defendant knew were heat-related occurred in 2023"—and that, because these deaths post-date the filing of this lawsuit, he cannot be deliberately indifferent for relying on mitigation measures before they had occurred. (Mot. Summ. J., Dkt. 251, at 8, 8 n.1). However, this argument ignores the possibility that "a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." *Ball I*, 792 F.3d at 594. Plaintiffs have introduced evidence of a long-standing pattern of heat-related deaths and serious injuries at un-air-conditioned TDCJ facilities; acknowledgements by TDCJ officials of the risk from heat; numerous heat-related lawsuits; and thousands of heat-related grievances. (Resp., Dkt. 257, at 41). The Court concludes that there is, at a minimum, a genuine issue of material fact as to whether the heat risks in TDCJ's facilities are so obvious as to support a finding of deliberate indifference. *See Gates*, 376 F.3d at 333 ("a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious.").

Plaintiffs have also introduced evidence that Defendant has largely continued to rely on heat-mitigation measures that have proved ineffective in the past. (Resp., Dkt. 257, at 13–15). While Defendant argues that "TDCJ's heat mitigation efforts have significantly improved in recent years," (Mot. Summ. J., Dkt. 251, at 45), Plaintiffs contend that TDCJ has made only minor changes to its

policy, such as requiring automated temperature monitoring, (Resp., Dkt. 257, at 14). Moreover, Plaintiffs show that even TDCJ's own reporting to the Texas Legislature reflects continuing high numbers of heat-related illnesses and that thousands of heat-related grievances continue to be filed every year. (*Id.* at 15). Again, the Court concludes that this is at least sufficient to show that there is a genuine issue of material fact as to whether TDCJ's continued reliance on mitigation measures reflects deliberate indifference to the risks of extreme heat.

Defendant argues that the existence of a "three-phase plan" with "the goal of fully air conditioning the TDCJ system by 2033," alongside TDCJ's actions taken under that plan, including securing partial funding from the Legislature, means that Plaintiffs cannot show that he is deliberate indifferent to the risks of extreme heat. (Mot. Summ. J., Dkt. 251, at 46). However, Plaintiffs contend that "TDCJ has not increased the rate at which air conditioning is installed since the preliminary injunction hearing," suggesting that at TDCJ's rate of installation averaged from 2023 to 2024, it would still take until 2054 for the TDCJ system to be fully air-conditioned. (Resp., Dkt. 257, at 22). The Parties disagree about whether and how to credit "in progress" cool beds, which TDCJ argues show an increased pace of installation and therefore a lack of indifference. (Reply, Dkt. 262, at 11). Plaintiffs also suggest that TDCJ could—and must—take steps to increase its pace of installation, including by soliciting bids for installing permanent air-conditioning throughout the system and exploring opportunities for efficiencies of scale. (Resp., Dkt. 257, at 23). Plaintiffs' experts suggest "that TDCJ could complete the process [of installing air-conditioning] between 24 to 36 months from the date of funding allocation, by implementing changes to its current approach." (*Id.* at 21). Defendant disagrees with this assessment, arguing that TDCJ is installing air-conditioning as quickly as it realistically can. (Mot. Summ. J., Dkt. 251, at 45–49; Reply, Dkt. 262 at 10–11). However, disagreements about the pace of TDCJ's installation of air-conditioning and the feasibility of increasing that pace again point to the existence of genuine issues of material fact as to whether

TDCJ's current approach to air-conditioning is so inadequate as to constitute deliberate indifference. As a result, granting summary judgment on the issue of deliberate indifference would be inappropriate.

## IV. CONCLUSION

For these reasons, Defendant's Motion for Summary Judgment, (Dkt. 251), is **GRANTED IN PART**. Defendant's Motion is **GRANTED** insofar as Plaintiffs Bernhardt Tiede II and Coalition for Texans with Disabilities are **DISMISSED WITHOUT PREJUDICE**. Defendant's Motion for Summary Judgment is otherwise **DENIED**.

**SIGNED** on March 16, 2026.

_____
ROBERT PITMAN
UNITED STATES DISTRICT JUDGE