**UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION**

| | | |
|---|---|---|
| LIONESS JUSTICE IMPACTED WOMEN'S ALLIANCE; TEXAS PRISONS COMMUNITY ADVOCATES; TEXAS CITIZENS UNITED FOR REHABILITATION OF ERRANTS, INC., | § § § § § § | |
| Plaintiffs, | § § | Civil Action No.: 1:23-cv-01004-RP |
| v. | § § | |
| BOBBY LUMPKIN, in his official capacity as Executive Director of Texas Department of Criminal Justice, | § § § § | |
| Defendant. | § § | |

**PLAINTIFFS' PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW
FOR PERMANENT INJUNCTION TRIAL**

**TABLE OF CONTENTS**

INTRODUCTION ........................................................................................................... 1

FINDINGS OF FACT.................................................................................................... 1

I.     THE ORGANIZATIONAL PLAINTIFFS HAVE STANDING TO SEEK
RELIEF ON BEHALF OF THEIR INCARCERATED MEMBERS AND
CONSTITUENTS............................................................................................... 1

     A.     Lioness Justice Impacted Women's Alliance ("Lioness")...................................... 1

           *1.*     *Lioness's membership structure* ................................................................. 2

           *2.*     *Lioness has approximately 400 incarcerated members, including
over 100 members in unair-conditioned facilities.* ..................................... 4

           *3.*     *Lioness communicates with its incarcerated members every day.* ............. 6

           *4.*     *Advocating for air conditioning is germane to Lioness's purpose.* ............ 7

           *5.*     *Lioness seeks systemwide relief.* ................................................................ 9

     B.     Texas Prisons Community Advocates ("TPCA")..................................................... 9

           *1.*     *TPCA's membership structure* ................................................................. 10

           *2.*     *TPCA communicates with its incarcerated members every day.* .............. 11

           *3.*     *TPCA has over two thousand incarcerated members, including
members in unair-conditioned facilities.* ................................................... 13

           *4.*     *Advocating for air conditioning is germane to TPCA's purpose.* ............ 14

     C.     Texas Citizens United for Rehabilitation of Errants ("TX C.U.R.E.")................. 15

           *1.*     *TX C.U.R.E.'s organizational structure and constituents* ....................... 16

           *2.*     *TX C.U.R.E. communicates with its constituents constantly.* ................... 17

           *3.*     *TX C.U.R.E.'s constituents are suffering in unair-conditioned
TDCJ facilities.* ......................................................................................... 18

           *4.*     *Advocating for air conditioning is germane to TX C.U.R.E.'s
purpose.* ..................................................................................................... 19

II.     IF THE PLRA'S EXHAUSTION REQUIREMENT APPLIES, AT LEAST SOME OF PLAINTIFFS' MEMBERS AND CONSTITUENTS EXHAUSTED THEIR REMEDIES. ........................................................................................ 20

III.     EXTREME HEAT POSES A SUBSTANTIAL RISK OF SERIOUS HARM TO TDCJ INMATES. .............................................................................................. 22

    A.     The Health Risks of Extreme Heat Are Well-Established, Well-Documented, and Widely Known. ........................................................ 22

    B.     Texas Prisons are Hot and Getting Hotter. ........................................... 27

    C.     TDCJ Has Repeatedly Acknowledged the Risk that Extreme Heat Poses to TDCJ Inmates. ............................................................... 29

    D.     Publicly Available, Peer-Reviewed Research Studies Have Warned Mr. Collier and Director Lumpkin That Hundreds of TDCJ Inmates Continue to Die from Extreme Heat. .................................. 32

    E.     TDCJ Admits that Multiple TDCJ Inmates Died from Extreme Heat in Summer 2023. ........................................................................... 36

       1.     *Elizabeth Hagerty – June 30, 2023* ............................................. 36

       2.     *John Castillo – August 5, 2023* ................................................... 39

       3.     *Patrick Womack – August 21, 2023* ........................................... 41

    F.     At Least Seven More TDCJ Inmates Died from Extreme Heat from 2023 to 2025 ................................................................................... 44

       1.     *John Southards – June 28, 2023* .................................................. 44

       2.     *Armando Gonzales – August 23, 2023* ....................................... 47

       3.     *Jason Wilson – July 5, 2024* ....................................................... 51

       4.     *Ryan Fairchild – August 21, 2024* .............................................. 55

       5.     *Bradley Sheets – June 22, 2024* .................................................. 60

       6.     *Wayne Straway – July 29, 2025* .................................................. 62

       7.     *Keith Pursifull – August 9, 2025* ................................................ 63

    G.     TDCJ is Undercounting and Underreporting Heat-Related Deaths. ..................... 66

       1.     *TDCJ does not require taking deceased inmates' body temperatures or environmental temperatures in their cells.* ..................... 66

2. *UTMB pathologists typically lack crucial information about inmates and the circumstances surrounding their death when they perform autopsies.* .................................................. 71

3. *TDCJ only considers a death heat-related if hyperthermia is listed as the only cause of death.* ........................................... 73

H. TDCJ is Undercounting Inmates' Heat-Related Illnesses. .................................. 75

I. TDCJ Staff Continue to Suffer Heat-Related Injuries. ....................................... 78

IV. TDCJ'S HEAT-MITIGATION MEASURES ARE STILL INADEQUATE. ................. 80

A. TDCJ's Understaffing Crisis Prevents the Agency from Consistently Implementing Its Heat-Mitigation Measures. ......................................................... 86

B. Even with Full Staffing, TDCJ's Heat-Mitigation Measures Would Still Be Inadequate. ............................................................................................................ 92

1. *Respite rooms are an inadequate remedy.* .................................................. 92

2. *Cold showers are an inadequate remedy.* .................................................. 96

3. *Access to cold water is inconsistent and does not reduce the long-term effects of the heat on TDCJ inmates.* ................................................. 99

4. *Fans are inadequate and counter-productive in extreme heat.* .............. 100

5. *Welfare checks are inadequate.* ............................................................... 101

C. TDCJ's Flawed Temperature Logs Raise Serious Concerns About Whether It Is Complying with Its Own Heat-Mitigation Policy. ......................... 102

1. *TDCJ's temperature logs are the foundation of its heat-mitigation measures.* ..................................................................................................... 103

2. *TDCJ presents falsified handwritten logs at the preliminary injunction hearing.* .................................................................................... 104

3. *Mr. Cirrito's flawed investigation of the falsified logs.* .......................... 105

4. *TDCJ's digital logs are equally flawed.* ................................................... 109

5. *TDCJ abandons digital logs and returns to handwritten logs.* ............... 112

D. TDCJ's Heat Strike Teams Do Not Consistently or Reliably Identify When Units Are Failing to Comply with AD 10.64. ......................................... 113

iii

V.      TDCJ'S HEAT SCORE SYSTEM IS STILL ARBITRARY, INADEQUATE,
        AND INEFFECTIVE.................................................................................. 116

VI.     AIR CONDITIONING IS THE ONLY EFFECTIVE PROTECTION FROM
        EXTREME HEAT. .................................................................................. 124

VII.    TDCJ'S INSTALLATION OF AIR CONDITIONING REMAINS
        CONSTITUTIONALLY INADEQUATE................................................. 128

        A.      TDCJ's installation of air-conditioned beds has not kept up with inmate
                population growth. ......................................................................... 128

        B.      TDCJ still has no concrete timeline for fully air conditioning the system. ........ 130

        C.      TDCJ's capital expenditure plans and legislative appropriations requests
                underscore that air conditioning is not a priority. ................................. 134

        D.      TDCJ has refused to take steps that would increase the rate at which air
                conditioning could be installed. ....................................................... 137

                1.      TDCJ has chosen the slowest available project delivery method. .......... 138

                2.      TDCJ has spent an inordinate amount of time waiting on long-lead
                        materials. ......................................................................... 141

                3.      TDCJ is not bundling any of its air conditioning contracts.................... 142

        E.      Inmate opt-outs do not demonstrate that inmates do not want air
                conditioning. ............................................................................... 143

        F.      Other Prisons Set a Temperature Maximum....................................... 145

VIII.   TDCJ'S CLAIMED OBSTACLES FOR PERMANENTLY AIR
        CONDITIONING THE SYSTEM ARE CONTRADICTED BY THE
        EVIDENCE........................................................................................... 146

IX.     TDCJ CAN FULLY AIR CONDITION THE SYSTEM BY DECEMBER 31,
        2029................................................................................................... 149

X.      TDCJ CAN EXPEDITIOUSLY INSTALL TEMPORARY AIR
        CONDITIONING SYSTEMWIDE. ......................................................... 151

CONCLUSIONS OF LAW ......................................................................... 152

I.      PLAINTIFFS HAVE STANDING TO SEEK RELIEF ON BEHALF OF THEIR
        MEMBERS AND CONSTITUENTS........................................................ 152

        A.      Lioness is a Traditional Voluntary Membership Organization........................... 153

B.    TX C.U.R.E. and TPCA Have Sufficient Indicia of Membership to Assert Claims on Behalf of their Non-Member Constituents. ................................ 156

    1.    *An organization need not be funded or controlled by its constituents to satisfy the indicia-of-membership standard.*................... 156

    2.    *TPCA satisfies the indicia-of-membership test.* ...................................... 160

    3.    *TX C.U.R.E. satisfies the indicia-of-membership test.*............................ 163

C.    Neither the Plaintiffs' Claims Nor the Injunction Relief They Seek Requires the Individual Participation of Plaintiffs' Members or Constituents.................................................................................................. 165

II.    THE PRISON LITIGATION REFORM ACT'S ("PLRA") EXHAUSTION REQUIREMENT DOES NOT BAR THIS LAWSUIT. ................................................ 167

A.    The PLRA's exhaustion requirement does not apply to Plaintiffs. .................... 167

B.    Even if the exhaustion requirement applied, Director Lumpkin has not met his burden of proving that none of Plaintiffs' members or constituents exhausted.................................................................................................. 170

III.    PLAINTIFFS HAVE SHOWN A VIOLATION OF THE EIGHTH AMENDMENT................................................................................................ 171

A.    TDCJ Inmates Face a Substantial Risk of Serious Harm from the Extreme Heat in Texas's Unairconditioned Prisons.......................................... 173

B.    Plaintiffs Have Shown Deliberate Indifference. ................................................ 179

    1.    *Director Lumpkin knows that inmates face a substantial risk of serious harm from the extreme heat, and the risk is obvious, well-documented, long-standing, and was expressly noted by TDCJ officials in the past.* ............................................................................... 180

    2.    *TDCJ's response to the substantial risk of death and serious harm from extreme heat in unair-conditioned prisons is inadequate and unreasonable.*......................................................................... 184

    3.    *The Fifth Circuit's decision in* Parker *did not overrule* Farmer*'s reasonableness standard.*......................................................... 194

IV.    PLAINTIFFS HAVE SATISFIED THE OTHER FACTORS FOR A PERMANENT INJUNCTION. ...................................................................... 198

A.    TDCJ Prisoners Will Suffer Irreparable Harm Absent Permanent Injunctive Relief................................................................................. 198

B.      The Remaining Factors Favor Ordering Permanent Injunctive Relief. .............. 201

C.      The PLRA Does Not Bar The Relief Ordered. .................................................. 205

## INTRODUCTION

Pursuant to the Court's Order (Dkt. No. 333), Plaintiffs submit the following proposed Findings of Fact and Conclusions of Law for the Permanent Injunction Trial.

## FINDINGS OF FACT[1]

### I.    THE ORGANIZATIONAL PLAINTIFFS HAVE STANDING TO SEEK RELIEF ON BEHALF OF THEIR INCARCERATED MEMBERS AND CONSTITUENTS.

The Court has repeatedly found that Plaintiffs have standing to seek relief on behalf of their incarcerated members.[2] While the Court does not need to revisit these determinations,[3] the evidence presented at the permanent injunction trial further confirms the Court's previous findings.

#### A.    Lioness Justice Impacted Women's Alliance ("Lioness")

Lioness is a Texas-based nonprofit organization founded in 2022 by and for women, girls, and gender-expansive people who have experienced incarceration in Texas.[4] Its mission is

---

[1] Per the parties' agreement on the record at the December 10, 2025 status conference, the Court may consider any evidence and testimony introduced in connection with Plaintiffs' Emergency Motion for Preliminary Injunction and Request for Expedited Briefing (Dkt. No. 50) in deciding Plaintiffs' request for permanent injunction. (*See* Hr'g Tr. (Dec. 10, 2025) 7:20-9:7 (Johnson) ("We agree on that point.").)

[2] *Tiede v. Collier*, No. 1:23-CV-1004-RP, 2024 WL 3016562, at *5 (W.D. Tex. June 14, 2024) ("*Tiede I*") (denying Collier's motion to dismiss on, among other things, standing grounds); *Tiede v. Collier*, 796 F. Supp. 3d 275, 321-23 (W.D. Tex. 2025) ("*Tiede II*") (finding Plaintiffs had standing while denying their motion for preliminary injunction); *Tiede v. Lumpkin*, No. 1:23-CV-1004-RP, 2026 WL 751904, at *10-11 (W.D. Tex. Mar. 16, 2026) ("*Tiede III*") (denying Lumpkin's motion for summary judgment).

[3] *See, e.g.*, *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.* ("*SFFA II*"), 397 F. Supp. 3d 126, 184 (D. Mass. 2019) (relying on earlier associational standing analysis when denying Rule 12(b)(1) as part of the court's post-trial conclusions of law) (citing *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.* ("*SFFA I*"), 261 F. Supp. 3d 99, 110–11 (D. Mass. 2017)) (cited with approval in *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.* ("*SFFA III*"), 600 U.S. 181, 199 (2023)).

[4] Trial Tr. (Apr. 1, 2026) 148:1-7 (Toon). Hereinafter, "Trial Tr." refers to the final transcript from the 2026 permanent injunction trial, and "Prelim. Inj. Hr'g Tr." refers to the final transcript from the 2024 preliminary injunction hearing.

to end the incarceration and systematic devaluation of its population while building power in its communities.[5] Initially, Lioness was part of Build Up, Inc. a nonprofit organization formed under the laws of New Jersey.[6] On September 4, 2024, Lioness became its own entity independent of Build Up, Inc.[7] No changes were made to Lioness's membership or membership criteria.[8] Thus, in October 2025, this Court granted Plaintiffs leave to amend their complaint to substitute Lioness for Build Up, Inc.[9]

Jennifer Toon, Lioness's cofounder and Executive Director, was herself incarcerated at TDCJ facilities from age 15 to 25 and again from approximately age 30 to 40; she was released on December 13, 2018.[10] Marci Simmons, Lioness's Director of Communications, was incarcerated in TDCJ facilities from 2011 to 2021 and spent every summer of her incarceration in unair-conditioned facilities.[11] Ms. Simmons testified at the preliminary injunction hearing and the permanent injunction trial, and Ms. Toon testified at the permanent injunction trial. Their testimony was unrebutted.

### 1.    *Lioness's membership structure*

Lioness has a written membership policy,[12] which was adopted in August 2025.[13] That policy formalizes membership criteria and processes that Lioness had followed since its

---

[5] *Id.* at 148:3-7 (Toon), 286:14-19 (Simmons); Pls.' Trial Ex. 535 at 1 (Lioness Bylaws and Amended Bylaws).
[6] *See* First Am. Compl. ¶ 19, Dkt. No. 57; Trial Tr. (Apr. 1, 2026) 153:12-154:4 (Toon).
[7] Lioness Certificate of Formation, Dkt. No. 227-1; *see also* Trial Tr. (Apr. 1, 2026) 153:25-154:4 (Toon).
[8] Trial Tr. (Apr. 1, 2026) 154:20-24, 158:1-4 (Toon).
[9] *See* Second Am. Compl., Dkt. No. 240.
[10] Trial Tr. (Apr. 1, 2026) 148:21–149:1, 152:14-16 (Toon).
[11] *Id.* at 277:1-11 (Simmons).
[12] *See generally* Pls.' Trial Ex. 536 (Lioness Membership Policy).
[13] Trial Tr. (Apr. 1, 2026) 158:13-16 (Toon).

founding.[14] The organization's membership criteria did not change when the written policy was adopted.[15] To become a member, an incarcerated person writes to Lioness expressing interest, receives and returns a membership form that includes Lioness's mission, vision, values, and community agreements, and then begins corresponding with Lioness's Director of Member Relations, Diane Thompson.[16]

Membership is voluntary and Lioness does not charge dues, recognizing that its community members typically lack financial resources—as incarcerated individuals in Texas are not compensated for their labor, and formerly incarcerated members are rebuilding their lives with limited means.[17] Incarcerated members occasionally donate financially to Lioness despite those constraints; the organization's first donation came from an incarcerated individual.[18] Lioness has bylaws[19] and has a board of directors comprised entirely of individuals who satisfy its membership criteria, and who were all previously incarcerated in TDCJ facilities.[20]

Incarcerated members do not serve on Lioness's board—because the practical barriers to their participation are insurmountable. Ms. Toon explained that there is not "a really feasible way" to hold an effective board meeting with incarcerated members—phone access in prison is unreliable, TDCJ's rules prohibit third-party calls, and the moment a third party joins a call "that call could be terminated, and then, that person would be removed from the call list."[21] Ms. Simmons confirmed this: "[Y]ou can't just hold a board meeting with incarcerated members"—it

---

[14] *Id.* at 157:17-23 (Toon).
[15] *Id.* at 158:1-4 (Toon).
[16] *Id.* at 162:7-13 (Toon).
[17] *Id.* at 163:8-25 (Toon), 292:11-20 (Simmons).
[18] *Id.* at 163:2-7 (Toon).
[19] *See generally* Pls.' Trial Ex. 535 (Lioness Bylaws and Amended Bylaws).
[20] Trial Tr. (Apr. 1, 2026) 156:16-159:11 (Toon).
[21] *Id.* at 159:16-160:5 (Toon).

3

is "[a]bsolutely not" possible to schedule phone calls with incarcerated individuals reliably, and she has been denied permission to visit Lioness members at TDCJ facilities "several times" without explanation.[22]

TDCJ challenged Lioness's standing on the ground that none of the members on the membership list had joined by submitting the formal written membership form, which was adopted after the litigation commenced.[23] But Ms. Toon testified that those members made clear through their ongoing correspondence with Ms. Thompson that they were members of Lioness—in other words, the membership criteria did not change; the policy simply formalized criteria that were already in place.[24] The written policy also was not adopted in response to this litigation.[25]

### 2. Lioness has approximately 400 incarcerated members, including over 100 members in unair-conditioned facilities.

Lioness has approximately 500 members, of whom approximately 300-400 are currently incarcerated in TDCJ facilities.[26] Lioness has had members in every TDCJ women's only facility, including members in at least eight unair-conditioned units.[27] Lioness maintains a written membership list[28]—reflecting approximately 416 members incarcerated in TDCJ facilities at the time it was prepared.[29] The affidavit of Mr. Rheams of the Office of the Attorney General, admitted at trial as Defendant's Exhibit 2 and validated as accurate by TDCJ's Timothy

---

[22] *Id.* at 290:15-291:2 (Simmons).
[23] *Id.* at 190:6-16 (Toon).
[24] *Id.* at 157:17-23, 158:2-4, 190:10-16 (Toon).
[25] *Id.* at 158:10-12 (Toon).
[26] *Id.* at 160:7-12 (Toon).
[27] *Id.* at 161:1-9 (Toon); Pls.' Trial Ex. 62 (Lioness Members Inside Data).
[28] *See generally* Pls.' Trial Ex. 62 (Lioness Members Inside Data).
[29] Trial Tr. (Apr. 1, 2026) 160:21-25, 189:7-13 (Toon).

Fitzpatrick, established that of Lioness's 416 incarcerated members, 329 remained in TDCJ custody, and approximately 118 of those members are housed in unair-conditioned units.[30]

Lioness members continue to suffer from exposure to extreme heat each summer in TDCJ's unair-conditioned facilities.[31] Complaints from incarcerated members about extreme heat are constant—increasing in volume during the summer months.[32] Lioness has received correspondence from its incarcerated members raising concerns—and expressing fear—about extreme heat in unair-conditioned prisons before it joined this lawsuit and continuously since.[33]

The conditions those members face are severe: Ms. Simmons testified that, during her incarceration at the Lane Murray Unit, women would simulate suicide attempts in order to gain access to the air-conditioned crisis management center—which inmates referred to as "the icehouse"—because it was the only reliable way to get relief from the heat.[34] In July 2023, two Lioness members who wrote to alert the organization of five inmate deaths in the Lane Murray Unit over a one-week period, including the death of Elizabeth Hagerty.[35] They specifically reported that "[t]he cell-block officers had refused [Ms. Hagerty] water, in an already death-trap environment, with a pre-existing medical such as Elizabeth had should be enough to place her in a 'cool' bed, as the Heat Litigation specifies."[36] These two Lioness members were specifically reaching out to Lioness for relief from the extreme heat in unair-conditioned prisons, writing: "We don't want to die!!!!!"[37]

---

[30] *Id.* at 161:4-9, 161:18-23 (Toon); Def.'s Trial Ex. 2 ¶ 16 (Rheams Decl.).
[31] Trial Tr. (Apr. 1, 2026) 175:4-6 (Toon).
[32] *Id.* at 174:25–175:3 (Toon).
[33] *Id.* at 296:25–297:12 (Simmons).
[34] Prelim. Inj. Hr'g Tr. (July 30, 2024) 35:23-36:8 (Simmons).
[35] Pls.' Trial Ex. 544 at 1, 9 (Donations and Complaints to Lioness (4.9.26)); Def.'s Trial Ex. 39 at 2, 4 (Lioness Inside Member List).
[36] Pls.' Trial Ex. 544 at 1, 9 (Donations and Complaints to Lioness (4.9.26)).
[37] *Id.* at 1 (Donations and Complaints to Lioness (4.9.26)).

Lioness's members currently housed in air-conditioned facilities can be moved to unair-conditioned facilities at any time.[38] As Ms. Toon explained, TDCJ inmates can "get transferred at the drop of a hat for reasons we don't always understand, and so, the only way that I feel and [Lioness] feels that will protect all our members is that everything be air-conditioned."[39] Even if all air-conditioned beds currently in the design phase were completed, "there would still be thousands of . . . female-assigned inmates in TDCJ's housing" without air conditioning.[40] According to Ms. Toon, as long as TDCJ has unair-conditioned beds, it is likely that Lioness members will be housed in units with them.[41]

>    3.    *Lioness communicates with its incarcerated members every day.*

Lioness's Director of Member Relations, Diane Thompson, corresponds with incarcerated members every day—receiving six to ten electronic messages per day and approximately ten physical letters per week—and Lioness responds to every communication.[42] Ms. Simmons independently corroborated this volume, testifying that Lioness receives five to eight letters per day from incarcerated members—over a thousand per year—and that Ms. Thompson responds to every single one.[43] Communicating with Lioness's incarcerated members is Ms. Thompson's entire job.[44] Lioness also publishes a quarterly newsletter that it has been sending to its incarcerated members since its founding.[45]

---

[38] Trial Tr. (Apr. 1, 2026) 161:25–162:6 (Toon).
[39] *Id.* at 198:16-20 (Toon).
[40] *Id.* at 198:7-10 (Toon).
[41] *Id.* at 161:25–162:3 (Toon).
[42] *Id.* at 164:1-6 (Toon).
[43] *Id.* at 288:4-23 (Simmons).
[44] *Id.* at 288:22-25 (Simmons).
[45] *Id.* at 172:1-4 (Toon).

Incarcerated members regularly communicate conditions of confinement—including heat conditions—to Lioness, which uses that information to inform its advocacy with TDCJ officials and the Texas Legislature.[46] Ms. Simmons confirmed that Lioness's advocacy work is guided "almost a hundred percent" by input from its currently incarcerated members.[47]

   4. *Advocating for air conditioning is germane to Lioness's purpose.*

Air conditioning Texas's prisons has been a priority for Lioness since it was founded—"from day one."[48] Ms. Simmons confirmed that extreme heat in Texas prisons was on Lioness's radar before the organization was even formed, because its formerly incarcerated members "lived" in the extreme heat and "experienced" it themselves.[49] Before joining this litigation, Lioness advocated for air conditioning in TDCJ facilities through legislative hearings, rallies, protests, vigils, and direct communications with TDCJ officials.[50]

Lioness was not founded to file this lawsuit or any other lawsuit and had never participated in any litigation before joining this case.[51] The decision to join this lawsuit was not easy—Lioness weighed the risk of retaliation by TDCJ against its most vulnerable members, including those still incarcerated and those on parole, and against the "very real risks of [its] members' health, including the chance of that their lives [would] be lost."[52] The decision to join the lawsuit was ultimately "a direct response to the concerns that Lioness received for members currently incarcerated in unair-conditioned TDCJ facilities."[53] Since Lioness joined the case in

---

[46] *Id.* at 164:7-168:11 (Toon); *see also* Pls.' Trial Exs. 62 (Lioness Members Inside Data), 544 (Donations and Complaints to Lioness (4.9.26)).

[47] Trial Tr. (Apr. 1, 2026) 288:22-289:1 (Simmons).

[48] *Id.* at 174:10-12 (Toon).

[49] *Id.* at 296:20-24 (Simmons).

[50] *Id.* at 169:4-21, 173:11-15 (Toon), 296:1-14 (Simmons).

[51] *Id.* at 297:22-298:5 (Simmons).

[52] *Id.* at 298:2-7 (Simmons).

[53] *Id.* at 298:8-13 (Simmons).

May 2024, no Lioness member has objected to the organization's participation in this lawsuit.[54]

Lioness does not stand to gain anything financially from the lawsuit—the only benefit it stands

to gain is relief for its members from the harm they are experiencing from extreme heat in unair-

conditioned prisons.[55]

The genuineness and longevity of Lioness's advocacy was confirmed by several

witnesses. Professor Michele Deitch—a corrections policy expert with nearly 40 years of

experience—testified that Lioness, TPCA, and TX C.U.R.E., are "very well-known in the field"

of inmate advocacy, and "fixtures at the [Texas] legislature" on issues relating to prison

conditions, including air conditioning.[56] Mr. Collier confirmed the same, agreeing that all three

organizations are "fixtures at the legislature in terms of testifying about air conditioning," and

that Ms. Toon "advocates for inmates."[57] Director Lumpkin testified that he knows Ms. Toon

personally, that she regularly attends TDCJ's open meetings, speaks "very thoughtful[ly]" about

the challenges facing the agency, and that TDCJ takes her input "to heart."[58] Ms. Toon

confirmed that Lioness is a "fixture" in Texas prison advocacy circles—and that she has

communicated directly with several TDCJ officials about the extreme heat in unair-conditioned

prisons, including with Regional Director Jennifer Cozby, Correctional Institutions Division

Director Eric Guerrero, and Director Lumpkin himself.[59]

---

[54] *Id.* at 177:23-25 (Toon), 298:14-16 (Simmons).
[55] *Id.* at 177:2-5 (Toon), 298:17-299:1 (Simmons).
[56] Trial Tr. (Mar. 31, 2026) 78:8-10 (Deitch).
[57] *Id.* at 179:1-20 (Collier).
[58] *Id.* at 340:1-341:4 (Lumpkin).
[59] Trial Tr. (Apr. 1, 2026) 174:4-7 (Toon).

### 5.     *Lioness seeks systemwide relief.*

Ms. Toon confirmed that the relief Lioness seeks—a court order requiring TDCJ to install air conditioning in all of its housing units—is institutional and systemwide in nature.[60] She testified that the absence of any TDCJ policy requiring its units to be air conditioned or temperature-controlled is not specific to women's units, but rather a "systemwide failure to provide or require temperature-controlled units."[61] Ms. Simmons agreed: The lack of air conditioning in Texas prisons is "a systemwide [problem] that is … causing people's health at risk [and] taking lives," and the "only way" to change that is through a court order—at which point "lives would be saved."[62]

### B.     Texas Prisons Community Advocates ("TPCA")

TPCA is a nonprofit organization founded in 2021 by Dr. Amite Dominick, who has served as its President since its inception.[63] Dr. Dominick holds a doctorate in psychology from Loma Linda University, with an emphasis on social and experimental psychology and taught at the university level for nearly 20 years.[64] She first became involved in prison advocacy in 2015, when her ex-husband was incarcerated in the TDCJ system at the unair-conditioned Gurney Unit—and she saw extreme heat's effects on him.[65] She testified at both the preliminary injunction hearing and the permanent injunction trial, and her testimony was unrebutted. Brittany

---

[60] *Id.* at 175:23-176:1 (Toon).
[61] *Id.* at 175:17–176:18 (Toon).
[62] *Id.* at 298:22–299:1 (Simmons).
[63] *Id.* at 232:18-24 (Dominick).
[64] *Id.* at 233:6-12 (Dominick); Prelim. Inj. Hr'g Tr. (July 31, 2024) 337:10-25 (Dominick).
[65] Trial Tr. (Apr. 1, 2026) 233:8-235:16, 267:17-18 (Dominick).

Robertson served as TPCA's Director of Incarcerated Individuals when she testified at the preliminary injunction hearing.[66]

### 1. TPCA's membership structure

TPCA's mission is to amplify the voices of impacted individuals, empower them toward advocacy, and hold TDCJ accountable.[67] TPCA was founded specifically to address the crisis of extreme heat in Texas's unair-conditioned prisons.[68]

TPCA considers all of TDCJ's more than 141,000 inmates and their families to be its constituents[69]—which includes tens of thousands of inmates currently housed in unair-conditioned units.[70] TPCA has different levels of membership.[71] Its broadest membership consists of anyone actively interacting with TPCA—writing in, receiving the newsletter, or on the email blast list.[72] As of 2026, TPCA had over 2,000 incarcerated individuals actively interacting with it as members, and approximately 5,000 non-incarcerated members on its email list.[73] TPCA also maintains a mailing list of its incarcerated members.[74]

A subset of TPCA's membership consists of volunteers incarcerated in the TDCJ system—called "core team members."[75] Incarcerated individuals who wish to become core team members write to TPCA expressing interest in volunteering.[76] An outside volunteer screens those

---

[66] Prelim. Inj. Hr'g Tr. (July 31, 2024) 363:21-23 (Robertson).
[67] Trial Tr. (Apr. 1, 2026) 241:11-14 (Dominick).
[68] *Id.* at 241:17-21 (Dominick).
[69] *Id.* at 246:10–247:7, 247:8–10 (Dominick).
[70] *Id.* at 246:12–14 (Dominick).
[71] *Id.* at 247:11-17 (Dominick).
[72] *Id.*
[73] *Id.* at 247:19-248:5 (Dominick).
[74] *Id.* at 248:9-17 (Dominick); *see, e.g.*, Pls.' Trial Ex. 146 (TPCA Mailing List of Incarcerated Individuals).
[75] Trial Tr. (Apr. 1, 2026) 250:1-3 (Dominick).
[76] *Id.* at 251:3-4 (Dominick).

requests, and if capacity exists, sends the incarcerated individual an onboarding packet and a volunteer agreement[77] via Securus.[78] TPCA has approximately a dozen incarcerated core team members—those who have received and responded to their packets.[79] Examples of their communications with TPCA were submitted as Plaintiffs' Trial Exhibit 147.[80]

TPCA does not charge membership dues, as its members cannot afford them[81]—in part, because individuals incarcerated in TDCJ facilities are not compensated for their labor.[82] Despite that, incarcerated members occasionally donate to TPCA.[83] TPCA is funded through donations and grants, with incarcerated members contributing a small portion.[84] TPCA has a formal board of directors that includes formerly incarcerated individuals.[85] Incarcerated individuals do not serve on the board because they cannot participate in board meetings due to TDCJ rules prohibiting third-party calls—an incarcerated individual who participated in a group call could lose phone and visitation privileges as a result.[86]

### 2. TPCA communicates with its incarcerated members every day.

TPCA communicates with its incarcerated constituents and their families every day through mail, telephone, and electronic messaging, and through a regular newsletter and email

---

[77] *Id.* at 251:4-252:8 (Dominick); *see generally* Pls.' Trial Ex. 543-A1 (example onboarding message).

[78] As Dr. Dominick explained, "Securus is a system that's used for various prisons where you can communicate through e-messaging and phone calls." (Trial Tr. (Apr. 1, 2026) 252:3–5).

[79] Trial Tr. (Apr. 1, 2026) 250:4-6, 270:25–271:1 (Dominick).

[80] *Id.* at 250:7-9 (Dominick).

[81] *Id.* at 248:18-249:3 (Dominick).

[82] *Id.* at 248:25–249:3 (Dominick), 292:14-20 (Simmons).

[83] *Id.* at 253:22-255:7 (Dominick); *see generally* Pls.' Trial Ex. 543-B (Pages from 543 Donations and Complaints Regarding TPCA Constituents).

[84] Trial Tr. (Apr. 1, 2026) 253:20-21, 274:3-11 (Dominick).

[85] *Id.* at 253:6-9 (Dominick).

[86] *Id.* at 253:8-19 (Dominick).

distribution reaching some 5,000 recipients.[87] Dr. Dominick confirmed that correspondence from incarcerated members is constant: "I don't think I've ever gone to our mailbox and there wasn't a piece of mail in there."[88] TPCA has also sent surveys to incarcerated members to identify which issues they most want TPCA to focus on.[89] TPCA issues a newsletter to incarcerated members, and those members may submit material for inclusion.[90] Incarcerated members use what little money they have to communicate with TPCA through Securus—and TPCA spends its own money to respond.[91]

TPCA solicits and is guided by the concerns of its incarcerated constituents—input its founder described as "everything" in shaping the organization's priorities[92]— and it carries out its work through a group of incarcerated and free-world volunteers.[93] Incarcerated members consistently complain about the extreme heat in TDCJ prisons every day[94]—it is "the primary thing" TPCA hears from them.[95] TPCA has also surveyed inmates about their experiences with heat.[96] Brittany Robertson, TPCA's former Director of Incarcerated Individuals, communicated daily with TDCJ inmates through tablets, phone calls, e-messaging, and paper.[97] She personally received heat complaints from incarcerated members every day in the summer.[98]

---

[87] *Id.* at 247:13–14, 248:5, 252:4, 255:7–12 (Dominick).
[88] *Id.* at 256:1–6 (Dominick).
[89] *Id.* at 260:15–22 (Dominick).
[90] *Id.* at 255:13–16 (Dominick).
[91] *Id.* at 255:19–23 (Dominick).
[92] *Id.* at 260:15–17 (Dominick).
[93] *Id.* at 250:1–15 (Dominick).
[94] *Id.* at 256:1–4 (Dominick).
[95] *Id.* at 256:7–9 (Dominick).
[96] *Id.* at 255:13–15 (Dominick).
[97] Prelim. Inj. Hr'g Tr. (July 31, 2024) 363:22–364:7 (Robertson).
[98] *Id.* at 364:2–7 (Robertson).

　　　　3.　　*TPCA has over two thousand incarcerated members, including members in unair-conditioned facilities.*

TPCA's incarcerated members suffer from exposure to extreme heat in TDCJ's unair-conditioned facilities every summer. The evidence of that suffering is not abstract: Jason Wilson was a TPCA core team member who died in July 2024 from extreme heat while incarcerated at the unair-conditioned Coffield Unit.[99]

Mr. Wilson regularly corresponded with Ms. Robertson from 2022 to 2024. Starting in May 2024, Ms. Robertson received increasingly dire messages from Wilson about extreme heat and inadequate water distribution at the Coffield Unit.[100] His last message to Ms. Robertson was on July 3, 2024.[101] On July 7, 2024, after receiving urgent messages from other inmates about Mr. Wilson, Ms. Robertson called the Coffield Unit three times to request a wellness check.[102] On the final call, she was told that "a wellness check was done" on Mr. Wilson, and "everything was okay."[103] In reality, he had already been dead for two days—his death was reported on July 5, 2024.[104] As set forth in more detail below, Plaintiffs' experts Dr. Vassallo and Dr. Uribe concluded that Mr. Wilson's death was heat-related.[105] Mr. Wilson was an active TPCA core

---

[99] Trial Tr. (Apr. 1, 2026) 262:10-18 (Dominick); Prelim. Inj. Hr'g Tr. (July 31, 2024) 365:8-9 (Robertson).

[100] Prelim. Inj. Hr'g Tr. (July 31, 2024) 365:16-370:8 (Robertson); *see generally* Pls.' Trial Ex. 137 (Jason Wilson Emsg).

[101] Prelim. Inj. Hr'g Tr. (July 31, 2024) 370:7-8 (Robertson).

[102] *Id.* at 371:24-372:2 (Robertson).

[103] *Id.* at 372:12 (Robertson); Pls.' Trial Ex. 214 at 00:03:40-00:03:55 (Follow Up Call on Wellness Check for Jason Wilson).

[104] Prelim. Inj. Hr'g Tr. (July 31, 2024) 375:4-6 (Robertson); *see generally* Pls.' Trial Ex. 152 (Wilson Death Report).

[105] *See* Findings of Fact § III.F.3., *infra.*

team member when he died.[106] He had fully exhausted his administrative remedies before he died and before TPCA joined this case in May 2024.[107]

4.      *Advocating for air conditioning is germane to TPCA's purpose.*

The extreme heat in TDCJ's facilities has been central to TPCA's work from the outset; it is "the birthing point of the whole organization."[108] Dr. Dominick has been personally and professionally engaged in advocating for air conditioning in TDCJ facilities since 2015—eight years before this lawsuit was filed by Bernhardt Tiede, II in 2023.[109] Before founding TPCA, she was a board member at TX C.U.R.E. and founded Texas Prisons Air Conditioning Advocates, which she dissolved when she created TPCA.[110] TPCA co-authored the first bills ever filed in the Texas Legislature on the topic of extreme heat in Texas's unair-conditioned prisons in 2019.[111]

Since 2019, Dr. Dominick has testified before the Texas Legislature at every hearing on air conditioning, met with the Texas Sunset Advisory Commission ("Sunset Commission")[112] on multiple occasions, and organized a full media campaign encouraging incarcerated individuals and their families to engage with the Sunset Commission process.[113] She has spoken directly with former Director Collier about the need for air conditioning, and has seen both Director Lumpkin and Director Collier at legislative hearings where she testified.[114]

---

[106] Trial Tr. (Apr. 1, 2026) at 264:7-265:6 (Dominick).
[107] *See* Findings of Fact § II., *infra*.
[108] Trial Tr. (Apr. 1, 2026) 241:15–21 (Dominick).
[109] *Id.* at 241:4-7 (Dominick).
[110] *Id.* at 237:21-238:21 (Dominick).
[111] *Id.* at 257:23-258:4 (Dominick).
[112] The Sunset Commission is a legislative body that reviews the performance and efficiency each state agency every 12 years and makes recommendations for reform and whether to re-authorize the agency. (Trial Tr. (Mar. 31, 2026) 54:9-17 (Deitch).)
[113] Trial Tr. (Apr. 1, 2026) 257:18–258:14, 260:3-12 (Dominick).
[114] *Id.* at 259:5-12 (Dominick).

TPCA also has a substantial history of heat-related awareness campaigns—including rallies, webinars and trainings, heated mock-cell demonstrations, and its "Beat The Heat" and "85 To Stay Alive" campaigns.[115] TPCA has held its mock-cell demonstrations held since 2019—which replicate prison cell conditions during summer heat to give lawmakers, students, and community members a visceral understanding of what TDCJ inmates experience.[116] At the most recent mock cell event in Houston in the summer of 2025, Dr. Dominick herself overheated and was taken away by an ambulance.[117]

TPCA's decision to join this lawsuit was not made lightly and was driven entirely by what TPCA was hearing from its incarcerated members, "their suffering, and their need"[118] for safe conditions. TPCA receives no financial benefit from participating in this litigation.[119] The only thing TPCA stands to gain is relief for its members from the harm they are experiencing in unair-conditioned prisons—the same relief its members have been demanding since before this lawsuit was filed.[120] No incarcerated TPCA constituent or member has objected to TPCA's participation.[121] To the contrary, some of most meaningful correspondence Dr. Dominick has received comes from constituents and members that say simply: "[K]eep fighting for us."[122]

### C.    Texas Citizens United for Rehabilitation of Errants ("TX C.U.R.E.")

TX C.U.R.E. is a 501(c)(3) nonprofit criminal justice advocacy organization based in Austin, Texas.[123] Its mission is to "advocate, educate the inmates, the families, the legislature

---

[115] *Id.* at 235:18–236:1, 241:22–25, 243:19–246:9 (Dominick).
[116] *Id.* at 243:24–246:9 (Dominick).
[117] *Id.* at 246:8–9 (Dominick).
[118] *Id.* at 261:1–2 (Dominick).
[119] *Id.* at 261:22–24 (Dominick).
[120] *Id.* at 261:25–262:5 (Dominick).
[121] *Id.* at 261:12–15 (Dominick).
[122] *Id.* at 261:17-21 (Dominick).
[123] Prelim. Inj. Hr'g Tr. (July 30, 2024) 177:18–19 (Malouff).

and the public about issues within the prison system."[124] Charlie Malouff has served as Texas CURE's Vice President and day-to-day operations manager since 2022.[125] Mr. Malouff served six years in the Air Force and seven years in the Coast Guard, both honorably, and worked in civilian law enforcement for a total of 29 years—including as a chief of police.[126] He was himself incarcerated in unair-conditioned facilities at TDCJ at various points from 2015 through June 1, 2018—approximately three-and-a-half years—including in the Byrd, Holliday, Pack, Michael, Darrington, Dominguez, Torres, Walls, and Estelle Units.[127] Mr. Malouff testified at both the preliminary injunction hearing and the permanent injunction trial, and his testimony was unrebutted.

### 1.    *TX C.U.R.E.'s organizational structure and constituents*

TX C.U.R.E. does not have formal "members." Instead, it has organized itself around "constituents."[128] TX C.U.R.E.'s constituents including every inmate in TDCJ and their family members.[129] TX C.U.R.E. has constituents in every TDCJ unit.[130] TX C.U.R.E. does not collect dues from anyone—it is funded "[s]trictly [through] grants."[131]

Although TX C.U.R.E. does not use the term "members," its constituents exhibit all of the traditional indicia of organizational membership: They actively communicate with TX C.U.R.E. about the issues they face, their concerns drive the organization's policy agenda, the

---

[124] Trial Tr. (Apr. 1, 2026) 200:6–9 (Malouff),
[125] *Id.* at 200:10-12 (Malouff).
[126] Prelim. Inj. Hr'g Tr. (July 30, 2024) 177:16-178:15 (Malouff).
[127] *Id.* at 178:16-179:25 (Malouff); Trial Tr. (Apr. 1, 2026) 217:16-18 (Malouff).
[128] Trial Tr. (Apr. 1, 2026) 202:3-8 (Malouff).
[129] *Id.*
[130] *Id.* at 203:9-11 (Malouff).
[131] *Id.* at 227:11 (Malouff).

organization advocates on their behalf with TDCJ and the legislature, they receive newsletters and correspondence from TX C.U.R.E., and they support its participation in this litigation

TX C.U.R.E.'s board of directors reflects the community it serves. It currently has eight members, including a retired brigadier general who serves as president, a banking professional, a doctor in nursing, a licensed counselor supervisor, a mother whose son died in prison, and two formerly incarcerated individuals.[132] No currently incarcerated individual serves on the board—not by choice, but because it is "impractical": Incarcerated individuals cannot set their own schedules, cannot participate in board meetings, and when Mr. Malouff was incarcerated himself, no exceptions were made to prison rules to accommodate such participation.[133]

### 2.    *TX C.U.R.E. communicates with its constituents constantly.*

The organization determines its priorities based on the issues its constituents raise.[134] TX C.U.R.E. maintains a mailing list of incarcerated constituents with whom it has had direct correspondence[135]—reflecting approximately 75 incarcerated individuals with whom it has had direct correspondence, and 222 unique entries total.[136]

TX C.U.R.E. learns about conditions inside TDCJ through direct letters from inmates, through Facebook family groups dedicated to TDCJ issues, through phone calls from family members relaying what their incarcerated loved ones are experiencing, and through direct messages at all hours of the day—starting at "two or three in the morning" and continuing "all day long."[137] The issues constituents raise span the range of prison conditions—medical care,

---

[132] *Id.* at 203:15-21 (Malouff).
[133] *Id.* at 204:2-14 (Malouff).
[134] *Id.* at 204:19–205:5, 207:25–208:1 (Malouff).
[135] *See generally* Def.'s Trial Ex. 243 (Inmate Master Mailing List 6-8-24).
[136] Trial Tr. (Apr. 1, 2026) 228:25-229:6 (Malouff).
[137] *Id.* at 205:11-20 (Malouff).

grievance access, food—but from April through October, extreme heat and the need for air conditioning rank consistently rank as the highest issues on TX C.U.R.E.'s priority list.[138]

Mr. Malouff has received approximately three file cabinet drawers full of letters complaining about heat or the need for air conditioning over the years.[139] He spends over 40 hours a week communicating with the organization's constituents about these issues.[140] TX C.U.R.E. responds to letters within 72 hours and to other messages as they come in.[141] TX C.U.R.E. also communicates with the families of incarcerated constituents—who serve as "the link, they're the lifeline to that inmate" when direct contact is impossible.[142] The issues TX C.U.R.E.'s constituents raise guide what the organization advocates for.[143]

> 3. *TX C.U.R.E.'s constituents are suffering in unair-conditioned TDCJ facilities.*

TX C.U.R.E.'s constituents suffer from exposure to extreme heat in TDCJ's unair-conditioned facilities in the summer.[144] Mr. Malouff knows this from his own personal experience. During his incarceration at the Byrd Unit—one of several unair-conditioned facilities where he was housed—he observed a digital thermometer near the officers' picket that read 129° on one occasion, 114° on another, and 118° on another.[145] He described the heat as "horrible"—he "felt dehydrated," and "like it just literally sucks the oxygen right out of you."[146]

---

[138] *Id.* at 204:19–205:5, 207:25–208:1 (Malouff).
[139] *Id.* at 208:21-23 (Malouff).
[140] *Id.* at 208:7-9 (Malouff).
[141] *Id.* at 208:4-6 (Malouff).
[142] *Id.* at 208:14-17 (Malouff).
[143] *Id.* at 204:15-18 (Malouff).
[144] *Id.* at 206:4–9, 207:4–14 (Malouff).
[145] Prelim. Inj. Hr'g Tr. (July 30, 2024) 179:15-180:2 (Malouff).
[146] *Id.* at 179:25-180:2 (Malouff).

Mr. Malouff was at the Pack Unit when it became the subject of a court-ordered air-conditioning installation in the *Cole* litigation—and witnessed temporary air conditioning installed in fewer than 90 days.[147] Today, the entire Pack Unit is permanently air-conditioned.[148] That experience—watching a court order produce rapid installation of temporary air conditioning at a red brick prison unit in fewer than 90 days—is part of what drives his advocacy for air conditioning and TX C.U.R.E.'s participation in this lawsuit.[149]

TX C.U.R.E.'s incarcerated constituents complain to the organization about their exposure to extreme heat in TDCJ's un-air-conditioned facilities, and heat is among the biggest problems they face.[150] At trial, Mr. Malouff specifically identified a constituent named Billy Mitchell—a former fellow inmate at Pack, who wrote to Mr. Malouff in his role as Vice President of Texas CURE to complain about heat and the need for air conditioning at the Choice Moore Unit.[151]

> **4.    *Advocating for air conditioning is germane to TX C.U.R.E.'s purpose.***

Obtaining air conditioning in TDCJ facilities has been a major policy goal of TX C.U.R.E. since its inception.[152] After personally advocating for air conditioning during his incarceration, Mr. Malouff has continued that work through TX C.U.R.E. since his release— "June 2nd, I became an advocate."[153] He has testified before the Texas Legislature at every

---

[147] Trial Tr. (Apr. 1, 2026) 217:25–218:5 (Malouff); *Cole v. Collier*, No. 4:14-CV-1698, 2017 WL 3049540 (S.D. Tex. July 19, 2017).
[148] Trial Tr. (Apr. 1, 2026) 218:9-11 (Malouff).
[149] *Id.* at 212:4-10, 215:23-216:5 (Malouff).
[150] *Id.* at 206:4–9, 207:4–14 (Malouff).
[151] *Id.* at 206:17-207:3 (Malouff); *see generally* Pls.' Trial Ex. 151 (Billy Mitchell Letter).
[152] Trial Tr. (Apr. 1, 2026) 200:16–21 (Malouff).
[153] *Id.* at 212:7-10 (Malouff).

hearing on air conditioning—three times per session at a minimum—and has spoken to countless Texas state representatives and senators about the issue across multiple sessions.[154]

TX C.U.R.E.'s decision to join this lawsuit was a direct response to constituents' concerns and Mr. Malouff's own experience[155]—and it was approved unanimously by the organization's board.[156] TX C.U.R.E. stands to gain nothing financially from this lawsuit,[157] and no constituent has objected to TX C.U.R.E.'s participation in this lawsuit.[158]

## II.    IF THE PLRA'S EXHAUSTION REQUIREMENT APPLIES, AT LEAST SOME OF PLAINTIFFS' MEMBERS AND CONSTITUENTS EXHAUSTED THEIR REMEDIES.

Neither Mr. Collier nor Director Lumpkin established at the preliminary injunction hearing or permanent injunction trial that every member or constituent of Plaintiffs failed to exhaust. To the contrary, the Court finds that, even if the PLRA's exhaustion requirement applies, at least one member or constituent of each Plaintiff exhausted TDCJ's two-step administrative grievance process before Plaintiffs joined this lawsuit in May 2024.

This finding rests in significant part on Director Lumpkin's own evidence. Director Lumpkin introduced the affidavit of Mr. Rheams from the Office of the Attorney General as Defendant's Exhibit 2, which TDCJ Director of Classification Timothy Fitzpatrick authenticated at trial.[159] That affidavit states that "a total of 12 Lioness Incarcerated Members fully exhausted both their Step 1 and Step 2 administrative remedies."[160] Mr. Rheams, likewise, determined that

---

[154] *Id.* at 209:20-210:3, 213:14-18 (Malouff); *see generally* Pls.' Trial Exs. 77-79 (Mr. Malouff's legislative submissions).
[155] Prelim. Inj. Hr'g Tr. (July 30, 2024) 192:15-194:24 (Malouff).
[156] Trial Tr. (Apr. 1, 2026) 215:23–216:5 (Malouff).
[157] *Id.* at 216:9-11 (Malouff)
[158] *Id.* at 208:25-209:2 (Malouff).
[159] Trial Tr. (Apr. 2, 2026) 298:8–301:11 (Fitzpatrick).
[160] Def.'s Trial Ex. 2 ¶ 17 (Rheams Decl.).

"of the [twelve] Lioness members that had fully exhausted their administrative remedies for heat-related grievances," eleven "are still in TDCJ custody"—four of whom are in unair-conditioned housing.[161] At least two of the members he identified as in air-conditioned housing do not have heat scores, so they can be moved into unair-conditioned housing at any time.[162]

The broader record corroborates that at least some of Plaintiffs' constituents and members exhausted before Plaintiffs joined the case. Mr. Malouff testified that Christopher Flores, who was incarcerated in the Stiles Unit, is a "constituent of TX C.U.R.E."[163] Mr. Fores's grievances were also introduced into evidence, confirming that he exhausted by March 2023.[164] As described above, Jason Wilson was a TPCA core team member who died a heat-related death in an unair-conditioned cell in July 2024.[165] His grievances were also admitted into evidence, confirming that he exhausted by April 2023.[166]

Director Lumpkin introduced Defendant's Exhibit 53, a summary reflecting at least some of the inmates who completed TDCJ's grievance process (and therefore exhausted their remedies) before May 1, 2024.[167] And thousands of heat-related grievances reflecting both Step 1 and Step 2 of TDCJ's grievance process—and thus full exhaustion—were admitted into

---

[161] *Id.* ¶ 18. A TDCJ prisoner need only "complete that state's two-step grievance process" to exhaust. *Favela v. Collier*, 91 F.4th 1210, 1212 (5th Cir. 2024).

[162] Def.'s Trial Ex. 204 (Inmates with Heat Scores as of Feb. 23, 2026 ) (listing all inmates with a heat score and omitting Britney Gulley and Vanessa Cameron, two Lioness members listed on the Rheams Decl., Def.'s Trial Ex. 2, as having exhausted).

[163] Trial Tr. (Apr. 1, 2026) 203:11–14 (Malouff).

[164] *See generally* Pls.' Trial Ex. 269 (Texas Prison Letter Chris Flores).

[165] *See* Findings of Fact § III.F.3., *infra*.

[166] *See generally* Pls.' Trial Ex. 138 (Mr. Wilson's grievances).

[167] *See generally* Def.'s Trial Ex. 53 (TDCJ Heat Related Grievances May 2022 to May 2024). Mr. Echessa agreed that Defendant's Trial Exhibit 53 does not include "the entire universe of an inmate's complaint" but is merely "a summary of it." (Trial Tr. (Apr. 2, 2026) 90:23–91:1 (Echessa).) Asked whether Defendant's Trial Exhibit 53 "reflect[s] the inmates who have completed the grievance process prior to May 1, 2024," Mr. Echessa answered: "Yes, ma'am." (*Id.* at 83:16–20 (Echessa).)

evidence without any objection as Plaintiffs' Exhibits 285A through 285K.[168] All of these

grievances were filed before Plaintiffs joined this lawsuit on May 7, 2024[169]—and the

overwhelming majority were filed before Mr. Tiede filed this lawsuit on August 24, 2023.[170]

Because the Court has found that every TDCJ inmate is a constituent of TPCA and TX

C.U.R.E., the inmates who exhausted their administrative remedies (as reflected in this

evidence), necessarily include constituents of those organizations. The Court therefore finds that

at least one member or constituents of each Plaintiff exhausted TDCJ's administrative grievance

process.

### III.    EXTREME HEAT POSES A SUBSTANTIAL RISK OF SERIOUS HARM TO TDCJ INMATES.

#### A.    The Health Risks of Extreme Heat Are Well-Established, Well-Documented, and Widely Known.

According to the National Weather Service ("NWS"), heat "is one of the leading

weather-related killers in the United States, resulting in hundreds of fatalities each year."[171] The

NWS published a chart that illustrates how exposure to high heat indexes—a function of

temperature and humidity—increases the risk of heat-related illnesses, which TDCJ has adopted

into its heat policy[172]:

---

[168] *Id.* at 315:10–14, 324:14–21.

[169] *See* First Am. Compl., Dkt. No. 57.

[170] *See* Compl., Dkt. No. 1.

[171] "Heat Safety Tips and Resources," National Weather Service, *available at* https://www.weather.gov/safety/heat. Under Rule 201 of the Federal Rules of Evidence, the Court may take judicial notice of a fact that is not subject to reasonable dispute because it can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned. As it previously did in its March 2025 Order, the Court finds that extreme heat's status as one of the leading weather-related killers in the United States is such a fact, and that the National Weather Service is a source whose accuracy cannot reasonably be questioned.

[172] Prelim. Inj. Hr'g Tr. (July 31, 2024) 21:6-23:17 (Vassallo); *see generally* Pls.' Trial Ex. 24 (NWS Heat Index Chart); Pls.' Trial Ex. 332 at 6-7 (CMHC Policy Manual D-27.2 Heat Stress (eff. Apr. 16, 2025)); Def.'s Trial Ex. 41 at 19 (AD 10.64 – Revision 12).

**NOAA's National Weather Service**
**Heat Index**
Temperature (°F)

| Relative Humidity (%) | 80 | 82 | 84 | 86 | 88 | 90 | 92 | 94 | 96 | 98 | 100 | 102 | 104 | 106 | 108 | 110 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 40 | 80 | 81 | 83 | 85 | 88 | 91 | 94 | 97 | 101 | 105 | 109 | 114 | 119 | 124 | 130 | 136 |
| 45 | 80 | 82 | 84 | 87 | 89 | 93 | 96 | 100 | 104 | 109 | 114 | 119 | 124 | 130 | 137 | |
| 50 | 81 | 83 | 85 | 88 | 91 | 95 | 99 | 103 | 108 | 113 | 118 | 124 | 131 | 137 | | |
| 55 | 81 | 84 | 86 | 89 | 93 | 97 | 101 | 106 | 112 | 117 | 124 | 130 | 137 | | | |
| 60 | 82 | 84 | 88 | 91 | 95 | 100 | 105 | 110 | 116 | 123 | 129 | 137 | | | | |
| 65 | 82 | 85 | 89 | 93 | 98 | 103 | 108 | 114 | 121 | 128 | 136 | | | | | |
| 70 | 83 | 86 | 90 | 95 | 100 | 105 | 112 | 119 | 126 | 134 | | | | | | |
| 75 | 84 | 88 | 92 | 97 | 103 | 109 | 116 | 124 | 132 | | | | | | | |
| 80 | 84 | 89 | 94 | 100 | 106 | 113 | 121 | 129 | | | | | | | | |
| 85 | 85 | 90 | 96 | 102 | 110 | 117 | 126 | 135 | | | | | | | | |
| 90 | 86 | 91 | 98 | 105 | 113 | 122 | 131 | | | | | | | | | |
| 95 | 86 | 93 | 100 | 108 | 117 | 127 | | | | | | | | | | |
| 100 | 87 | 95 | 103 | 112 | 121 | 132 | | | | | | | | | | |

**Likelihood of Heat Disorders with Prolonged Exposure or Strenuous Activity**

☐ Caution  ☐ Extreme Caution  ☐ Danger  ☐ Extreme Danger

The NWS correlates heat index ranges to risk levels for the general population:

- **Caution** (light yellow; heat index 80–90°): "Fatigue possible with prolonged exposure and/or physical activity."

- **Extreme Caution** (mustard yellow; heat index 91–104°): "Sunstroke, muscle cramps, and/or heat exhaustion possible with prolonged exposure and/or physical activity."

- **Danger** (orange; heat index 105–125°): "Sunstroke, muscle cramps, and/or heat exhaustion likely. Heatstroke possible with prolonged exposure and/or physical activity."

- **Extreme Danger** (red; heat index >126°): "Heat stroke likely."

Expert testimony and scientific studies presented at the preliminary and permanent injunction hearings confirm that high temperatures pose a substantial risk of serious harm to anyone. Dr. Vassallo credibly testified that a heat index of 88° or higher poses a substantial risk of adverse health outcomes in all inmates—even young, healthy people.[173] Those risks include heat exhaustion, heat rash, dehydration, heat cramps, heat syncope, and heat stroke—the last of

---

[173] Prelim. Inj. Hr'g Tr. (July 31, 2024) 23:2-38:24 (Vassallo); Trial Tr. (Mar. 30, 2026) 185:23-186:7 (Vassallo); Pls.' Trial Exs. 10, 15, 23, 42, 54, 70 (journal articles concerning heat injury risks).

which carries a "high mortality rate" and can have lasting negative health consequences.[174] Dr. Antonella Zanobetti, Plaintiffs' environmental epidemiology expert, likewise, opined that increased temperatures increase the risks of hospitalization, illness, and mortality.[175] And the defense's own internal medicine expert, Dr. Jane Leonardson, agreed that people who are exposed to severe environmental heat in the range of 90° to 105° are at serious risk of illness and death.[176]

Plaintiffs' forensic psychiatry expert, Dr. Jhilam Biswas, offered unrebutted testimony that high heat exacerbates mental illness: In high heat, people with mental health disorders exhibit higher rates of suicidality, agitation, irritation, anxiety, impulsivity, and slowing of cognitive processing.[177] High heat makes it harder to sleep and decreased sleep exacerbates symptoms of mental health disorders[178]—for instance, individuals with bipolar disorder can be become more manic, suicidal feelings can be heightened, individuals with schizophrenia can become more irritable and agitated.[179] Extreme heat also directly "causes physiological stress on the body," affects our serotonergic and dopaminergic pathways, and increases our stress hormones like cortisol—which, in turn, "dis-regulate[s] mood."[180]

---

[174] Prelim. Inj. Hr'g Tr. (July 31, 2024) 15:15-17:20, 32:20-37:23 (Vassallo); *see generally* Pls.' Trial Exs. 15, 275 (journal articles concerning heat injury risks).

[175] Prelim. Inj. Hr'g Tr. (July 30, 2024) 75:13-23, 79:1-9 (Zanobetti); *see generally* Pls.' Trial Exs. 46, 73, 75 (Journal articles concerning heat injury risks).

[176] Prelim. Inj. Hr'g Tr. (Aug. 1, 2024) 143:12-16 (Leonardson); Trial Tr. (Apr. 7, 2026) 70:16-18 (Leonardson).

[177] Prelim. Inj. Hr'g Tr. (July 31, 2024) 167:24-170:20, 177:17-179:9 (Biswas); Trial Tr. (Mar. 30, 2026) 276:8-24 (Biswas); *see generally* Pls.' Trial Exs. 11, 35, 76, 103 (journal articles concerning heat injury risks).

[178] Prelim. Inj. Hr'g Tr. (July 31, 2024) 177:12-178:7 (Biswas); Trial Tr. (Mar. 30, 2026) 279:14-18 (Biswas).

[179] Trial Tr. (Mar. 30, 2026) 279:20-280:4 (Biswas).

[180] *Id.* at 277:8-18 (Biswas).

As heat increases, there are more psychiatric emergencies, emergency room visits, and mortality in the general population.[181] High heat causes mental health episodes requiring hospitalization.[182] And in high heat, suicidality increases "by … a significant amount" among inmates.[183] Dr. Biswas cited a study, which looked at prisons in Louisiana, and found that suicide watch incidents increased by 29% when the temperature increased from 80° to 89°, and increased by 37% when the temperature increased from 90° to 103°.[184]

People with mental illnesses are particularly vulnerable to high heat. Estimates from the federal Substance Abuse and Mental Health Services Administration indicate that 37%—i.e., more than one in three—inmates have a diagnosable mental illness at any given time.[185] When housed in extreme heat, they are "more likely to die or experience worse morbidity than individuals without mental illness."[186] Dr. Biswas cited one study, which showed that people with schizophrenia had a 200% higher risk of death when exposed to extreme heat.[187]

In addition to individuals with mental illnesses, people with substance abuse disorders and individuals taking psychotropic medications are particularly vulnerable to high heat.[188] According to Dr. Biswas, "these illnesses impact the brain, which means that it impacts the

---

[181] *Id.* at 277:18-278:1 (Biswas); *see generally* Pls.' Trial Ex. 465 (Meadows Study).

[182] Prelim. Inj. Hr'g Tr. (July 31, 2024) 180:15-181:15 (Biswas); *see generally* Pls.' Trial Ex. 33 (Risk Characterization of Hospitalizations).

[183] Prelim. Inj. Hr'g Tr. (July 31, 2024) 178:8-14, 182:6-183:19 (Biswas); *see generally* Pls.' Trial Ex. 91 (Extreme Heat and Suicide Watch).

[184] Trial Tr. (Mar. 30, 2026) 280:16-281:6 (Biswas); *see generally* Pls.' Trial Ex. 91 (Extreme Heat and Suicide Watch).

[185] Prelim. Inj. Hr'g Tr. (July 31, 2024) 168:10-23 (Biswas).

[186] *Id.* at 177:1-16 (Biswas); Pls.' Trial Ex. 103 at 13 (Mental Illness and Increased Vulnerability).

[187] Prelim. Inj. Hr'g Tr. (July 31, 2024) 170:15-20 (Biswas).

[188] *Id.* at 181:2-15, 187:9-191:18 (Biswas); *see generally* Pls.' Trial Exs. 43, 44, 50 (journal articles regarding medication-related hyperthermia).

25

ability to make good decisions for yourself, or self-awareness, or insight and judgment."[189] They often cannot ask for help or take care of themselves.[190] So being in an incarcerated setting "where you can't make decisions for yourself and then need to directly ask for help is particularly hard" for them.[191] Dr. Biswas thus credibly concluded that "exposure to periods of extreme heat cause[s] a substantial risk of serious harm" to TDCJ inmates, by increasing the incidence of and exacerbating existing mental health conditions.[192]

Former TDCJ inmates' firsthand accounts further illustrate the catastrophic impact extreme heat has on inmates' health and well-being. For example, Ms. Simmons, who was incarcerated in unair-conditioned units for ten years, testified that she lost her appetite, could not sleep, and became weaker and more lethargic because of the heat.[193] She saw several other inmates become lethargic, pass out, and suffer heat-induced seizures.[194] She also saw "lots of women that [she] was housed with" require medical attention and be taken away in ambulances "very frequently" during the summer.[195]

According to Ms. Simmons, she and her fellow inmates tried to cool off by dousing themselves with water from the toilets in their cells.[196] Ms. Simmons did this "[m]ore times than [she could] count."[197] Other women in Ms. Simmons's unit would even "inflict harm" on

---

[189] Trial Tr. (Mar. 30, 2026) 283:15-19 (Biswas).
[190] *Id.* at 284:14-19 (Biswas).
[191] *Id.* at 283:21-23 (Biswas).
[192] Prelim. Inj. Hr'g Tr. (July 31, 2024) 185:13-20 (Biswas).
[193] Prelim. Inj. Hr'g Tr. (July 30, 2024) 28:25-29:6 (Simmons).
[194] *Id.* at 33:14-34:9 (Simmons).
[195] *Id.* at 34:10-17 (Simmons).
[196] *Id.* at 31:3-24, 35:15-36:8 (Simmons).
[197] *Id.* at 31:17-24 (Simmons).

themselves and "make it look like a suicide attempt" to "get into the air-conditioned crisis management center" and "get a break from the heat."[198]

Mr. Malouff was also housed in unair-conditioned TDCJ units over multiple summers. He testified that the heat was "horrible"—you felt "dehydrated," and it "literally sucks the oxygen right out of you."[199] He witnessed two inmates go from "sweating profusely" to "no sweat" to "discoloration" to "kind of [] queasiness" and then pass out before finally receiving medical attention.[200] To Mr. Malouff, it looked like "they were having a heat stroke."[201] Mr. Malouff also said that inmates in administrative segregation would "fairly regularly" start fires in their unit, so that the corrections officers would respond by flooding the unit and the inmates could lay down on the ground in the pools of water.[202]

## B.    Texas Prisons are Hot and Getting Hotter.

Dr. Linda Mearns, a climatologist and researcher at the National Center for Atmospheric Research, has opined that "increasing temperatures, increasing extreme temperatures, and more frequent heat waves" are among the most certain expectations for future climate trends, including those in Texas.[203] "This most likely will result in an increasing heat index, and number of hours per day with extreme heat index values."[204] In other words, "[t]he trend of summer temperatures throughout Texas is certainly towards warmer temperatures [and] increasing heat index."[205] In particular, Texas "is expected to increase in mean annual temperature between 4.5° and 8.5° F by

---

[198] *Id.* at 35:17-36:8 (Simmons).
[199] *Id.* at 179:24-180:2 (Malouff).
[200] *Id.* at 181:23-182:9 (Malouff).
[201] *Id.* at 182:7-8 (Malouff).
[202] *Id.* at 180:3-19, 182:24-183:2 (Malouff).
[203] Mearns Decl. ¶ 23, Dkt. No. 50-5.
[204] *Id.* ¶¶ 12-14, 23.
[205] *Id.* ¶ 18.

the end of the 21st century."[206]  Neither Mr. Collier nor Director Lumpkin disputed Dr. Mearns's

opinions, and the Court finds them credible.

In addition, TDCJ officials have consistently recognized that its prisons are hot in the

summers. Mr. Collier's Rule 30(b)(6) designee, David Sweetin, agreed that temperatures in

every prison in Texas are likely to exceed 85° each summer.[207] Mr. Collier conceded that

summers are hot in Texas, they've been hot for years, they are likely to continue to be hot, and

that it is hot inside Texas prisons without air conditioning.[208] He acknowledged that it "certainly"

makes sense to him that the heat index could reach 113° in Texas in August.[209] TDCJ logs from

2023 to 2025 have shown outdoor heat indexes as high as 134°, and indoor temperatures above

85° nearly every day from May 1 to September 30.[210] This testimony is also consistent with

TDCJ's own prison temperature logs, which documented heat indexes outside of its prisons as

high as 134°.[211]

Testimony from current and former TDCJ inmates further confirmed these high

temperatures. For example, Ms. Simmons testified that, in the summer of 2022, she observed a

thermometer in the Dr. Lane Murray Unit, a TDCJ unit for women in Gatesville, reading 136°.[212]

---

[206] *Id.* ¶ 20.

[207] Pls.' Dep. Designations for Prelim. Inj. Hr'g 4, Dkt. No. 155 (214:1-4, 222:17-21).

[208] Prelim. Inj. Hr'g Tr. (Aug. 2, 2024) 204:24-205:18 (Collier); Trial Tr. (Mar. 31, 2026) 104:22-105:6 (Collier).

[209] Prelim. Inj. Hr'g Tr. (Aug. 2, 2024) 217:12-14 (Collier).

[210] *See generally* Def.'s Trial Ex. 100 (TDCJ 2023 Rider 56 Report); Def.'s Trial Ex. 72 (TDCJ 2024 Rider 56 Report); Def.'s Trial Ex. 214 (TDCJ 2025 Rider 55 Report).

[211] *See generally* Def.'s Hr'g Ex. 76 (Stiles Temp Logs 07-2022); Pls.' Trial Exs. 306-A through 306-F (425534 TDCJ Automated Temp Logs - 5.1.2025-9.1.2025 and excerpts from the same). Defendant used two different sets of exhibits—one for the preliminary injunction hearing, and another for the permanent injunction trial. Accordingly, Plaintiffs will refer to Defendant's preliminary injunction exhibits as "Def.'s Hr'g Ex.," and Defendant's trial exhibits as "Def.'s Trial Ex."

[212] Prelim. Inj. Hr'g Tr. (July 30, 2024) 30:2-20 (Simmons).

During his incarceration in the Byrd Unit, a unit for men in Huntsville, Ms. Malouff observed a digital temperature monitor reading 129° one day, 114° on another, and 118° on another.[213] And scores of TDCJ inmates continue to file grievances about the high heat in their unair-conditioned units: Over the past three summers, there were nearly 15,000 heat-related grievances submitted by TDCJ inmates.[214] Based on the foregoing, the Court finds that the inmate housing areas in Texas's unair-conditioned prisons are unreasonably dangerous due to the extreme heat during the summer months.

### C.  TDCJ Has Repeatedly Acknowledged the Risk that Extreme Heat Poses to TDCJ Inmates.

This Court previously held in March 2025 that "extreme heat in TDCJ's uncooled prisons constitutes a well-established substantial risk of serious harm that constitutes cruel and unusual punishment." *Tiede II*, 796 F. Supp. 3d at 325. That remains true, and TDCJ has repeatedly admitted as much.

Director Lumpkin has testified that, with regard to TDCJ inmates dying from extreme heat, "[o]ne death is too many,"[215] and "[a]nything above zero is concerning."[216] Although still a gross underestimation, TDCJ has repeatedly acknowledged that "23 people died in TDCJ facilities from heat related causes between 1998 and 2012."[217] Both Mr. Collier and Director Lumpkin acknowledged there were ten heat-related deaths of inmates in the summer of 2011

---

[213] Prelim. Inj. Hr'g Tr. (July 30, 2024) 179:15-23 (Malouff).

[214] Pls.' Trial Ex. 102 at 1 (2023 Report to the Legislature) (5,811 heat-related grievances); Pls.' Trial Ex. 279 at 1-2 (2024 Report to the Legislature) (5,765 heat-related grievances); Pls.' Trial Ex. 280 at 1-2 (2025 Report to the Legislature) (4,898 heat-related grievances).

[215] Trial Tr. (Mar. 31, 2026) 237:18-23 (Lumpkin).

[216] Lumpkin Dep. 173:11-14, Dkt. No. 337-1.

[217] *Id.* at 120:2-5; *see also Cole*, 2017 WL 3049540, at *1.

alone.[218] Mr. Collier and Director Lumpkin both agree that heat has caused or contributed to the deaths of TDCJ inmates in the past,[219] and Director Lumpkin acknowledged that "extreme heat inside the Texas prison system has caused very serious injuries and death."[220] Mr. Collier's 30(b)(6) designee acknowledged that extreme heat is a dangerous condition in the TDCJ system that "has killed inmates, and [has] caused numerous inmates and officers to suffer heat-related illnesses."[221] TDCJ's own documents confirm the same: When inmates refuse a cool-bed housing assignment, they must sign a form that expressly acknowledges that being housed without air conditioning puts them at risk for heat cramps, heat exhaustion, and heatstroke, and at risk of worsening of their medical condition, "up to and including death"[222]:

> By signing below, I understand and acknowledge that potential or possible outcomes for refusing the Cool Bed or A/C Housing Assignment include but are not limited to the following:
> - Heat Cramps, Heat Exhaustion, and Heatstroke; and
> - Worsening of my diagnosed medical condition(s) up to and including death.
>
> By signing below, I understand and acknowledge the risks of refusing a Cool Bed or A/C Housing Assignment. Despite knowing these risks, I choose to decline a Cool Bed or A/C Housing Assignment. I acknowledge these risks and assume full responsibility for any and all consequences that may arise from my refusal of a Cool Bed or A/C Housing Assignment up to and including death.

---

[218] Prelim. Inj. Hr'g Tr. (Aug. 2, 2024) 207:22-208:2 (Collier); Lumpkin Dep. 83:23-84:23, Dkt. No. 337-1.

[219] Prelim. Inj. Hr'g Tr. (Aug. 2, 2024) 207:9-208:2 (Collier); Lumpkin Dep. 83:23-84:3, 130:16-21 (there were three inmate deaths in 2023 "[w]here heat was a contributing factor), Dkt. No. 337-1; Trial Tr. (Mar. 31, 2026) 247:25-248:1 (Lumpkin) (extreme heat has caused "some [inmate] deaths and illnesses and injuries").

[220] Lumpkin Dep. 232:3-6, Dkt. No. 337-1.

[221] Trial Tr. (Mar. 31, 2026) 232:3-5 (Lumpkin); *see also* Pls.' Dep. Designations for Prelim. Inj. Hr'g 3, Dkt. No. 155 (131:12-132:8, 161:22-162:5).

[222] Trial Tr. (Mar. 31, 2026) 112:24-113:10 (Collier); Pls.' Trial Ex. 325 at 20 (TDCJ AD 10.64 – Revision 12).

Mr. Collier and Director Lumpkin have also admitted that inmates confined in temperatures at or above 95° face a serious health risk.[223] Director Lumpkin has "long known that there is a danger from extreme heat inside the Texas prison system, and that danger extends to the men and women in [TDCJ's] care, as well as the correctional officers working for [him]."[224] He knows that "heat waves are a time of grave danger to [TDCJ's] inmates and staff,"[225] "[t]he heat is a contributing factor to death and illness,"[226] and inmates "are at risk when they're housed at high environmental temperatures."[227] Mr. Collier knows that TDCJ's policies and training state that "extreme heat is dangerous and can make people sick and can be fatal,"[228] and Director Lumpkin knows that heat is the "fifth leading cause of serious employee injury."[229] And Director Lumpkin admitted that he has read this Court's March 2025 Order— which found that high temperatures pose a substantial risk of serious harm to even young, healthy individuals—and that the Order states, "in no uncertain terms, [that] the agency is violating the Constitution."[230]

TDCJ's Executive Director is notified every time there is a heat-related illness in a TDCJ facility.[231] Director Lumpkin knows that "there have been hundreds of heat related illnesses [of inmates] over the course of the last 20 years in the Texas prison system."[232] He "know[s] about

---

[223]  Duke Decl., Dkt. No. 50-15, Ex. 4, *Cole v. Collier*, Sept. 10, 2019 Hr'g Tr. 49:22–25; Lumpkin Dep. 140:13-18, Dkt. No. 337-1; *see also* Trial Tr. (Mar. 31, 2026) 238:21-239:1 (Lumpkin) (confirming his deposition testimony).
[224] Trial Tr. (Mar. 31, 2026) 229:25-230:5 (Lumpkin).
[225] Lumpkin Dep. 99:14-17, Dkt. No. 337-1.
[226] *Id.* at 40:13-18.
[227] *Id.* at 228:15-20.
[228] Trial Tr. (Mar. 31, 2026) 112:14-17 (Lumpkin).
[229] Lumpkin Dep. 131:17-20, Dkt. No. 337-1.
[230] Trial Tr. (Mar. 31, 2026) 249:15–22 (Lumpkin).
[231] Lumpkin Dep. 31:8-16, Dkt. No. 337-1.
[232] *Id.* at 85:3-9; *Cole*, 2017 WL 3049540, at *20 (TDCJ has identified hundreds of inmates diagnosed with heat-related illnesses since 2011.).

employee injuries as well as inmate injuries over the last several years due to the extreme heat,"[233] that there were at least 80 workers' compensation claims related to the heat in 2022 and 2023,[234] and that workers' compensation claims of TDCJ employees related to the heat are an "ongoing problem."[235] He is aware that there were 11 TDCJ employees and several inmates with heat-related illnesses in 2025 alone.[236] He also knows that TDCJ inmates have filed "thousands of grievances related to the extreme heat" in just "the last several years."[237] Specifically, TDCJ's reports to the Texas Legislature stated that inmates filed more than 15,000 heat-related grievances between 2023 and 2025 alone.[238]

Both Director Lumpkin and Mr. Collier have thus repeatedly acknowledged and agreed that extreme heat in TDCJ's unair-conditioned prisons poses a substantial risk of serious harm to TDCJ inmates. TDCJ did not present any credible evidence to the contrary in either the preliminary injunction hearing or at the permanent injunction trial.

**D.    Publicly Available, Peer-Reviewed Research Studies Have Warned Mr. Collier and Director Lumpkin That Hundreds of TDCJ Inmates Continue to Die from Extreme Heat.**

In 2022, Plaintiffs' experts Dr. Zanobetti and Dr. Skarha published an epidemiological study on the association between extreme heat and mortality among inmates in Texas prisons

---

[233] Trial Tr. (Mar. 31, 2026) 248:10-14 (Lumpkin).
[234] Lumpkin Dep. 148:23-149:2, Dkt. No. 337-1.
[235] *Id.* at 149:6-7.
[236] *Id.* at 27:1-29:7.
[237] Trial Tr. (Mar. 31, 2026) 248:2-10 (Lumpkin).
[238] Pls.' Trial Ex. 102 at 1 (2023 Report to the Legislature) (5,811 heat-related grievances); Pls.' Trial Ex. 279 at 1-2 (Monitoring of Temperature and Temperature-Related Deaths Fiscal Year 2024 Report) (5,765 heat-related grievances); Pls.' Trial Ex. 280 at 1-2 (Monitoring of Temperature and Temperature-Related Deaths Fiscal Year 2025 Report) (4,898 heat-related grievances).

with and without air conditioning.[239] They found an increased risk of mortality in Texas prisons without air conditioning during times of high heat, whereas there was no increase in risk of mortality in Texas prisons with air conditioning during that same period.[240] As compared to days when the heat index is 85°, the risk of dying in a Texas prison without air conditioning increased by 5% when the heat index is 95°, 10% when the heat index is 100°, and 15% when the heat index is 105°.[241] In other words, a one-degree increase above 85° corresponds to a 0.7% increase in the risk of mortality.[242]

Dr. Zanobetti and Dr. Skarha concluded there were 271 deaths attributable to extreme heat in Texas prisons without air conditioning from 2001 to 2019—an average of 14 deaths per year.[243] According to Dr. Vassallo, however, this is likely an underestimate, as it does not account for the impact of heat on underlying illnesses.[244] The same study concluded that not a single heat-related death occurred in TDCJ's climate-controlled prisons during this period.[245] Dr. Skarha and Dr. Zanobetti testified that, absent air conditioning, inmates in TDCJ's un-air-conditioned prisons will continue to die from the extreme heat.[246]

Both Mr. Collier and Director Lumpkin are aware of the 2022 study by Dr. Skarha and

---

[239] *See generally* Pls.' Trial Exs. 70 (Provision of Air Conditioning and Heat-Related Mortality), 75 (Heat Related Mortality).

[240] *Id.*

[241] Prelim. Inj. Hr'g Tr. (July 30, 2024) 158:18-160:6 (Skarha); Pls.' Trial Ex. 70 at 5 (Provision of Air Conditioning and Heat-Related Mortality).

[242] Pls.' Trial Ex. 70 at 5 (Provision of Air Conditioning and Heat-Related Mortality) (explaining that the figure "shows the association between same-day daily maximum heat index above 85 °F and the percentage change in the risk of daily all-cause mortality by AC status").

[243] Prelim. Inj. Hr'g Tr. (July 30, 2024) 90:22-91:4 (Zanobetti), 160:7-15 (Skarha); *see generally* Pls.' Trial Ex. 70 (Provision of Air Conditioning and Heat-Related Mortality).

[244] Prelim. Inj. Hr'g Tr. (July 31, 2024) 38:3-24 (Vassallo).

[245] *See generally* Pls.' Trial Ex. 70 (Provision of Air Conditioning and Heat-Related Mortality).

[246] Prelim. Inj. Hr'g Tr. (July 30, 2024) 84:21-85:2 (Zanobetti), 163:3-7 (Skarha).

Dr. Zanobetti.[247] Both are also aware of Dr. Carlee Purdum's study, which concluded that "despite TDCJ's current heat mitigation policies, nearly every year, there are reports of incarcerated people and staff falling extremely ill and/or dying from complications from extreme heat in Texas prisons."[248]

Despite this, TDCJ has never commissioned a study to determine whether there is a connection between the absence of air conditioning and inmate deaths. Mr. Collier confirmed that no such study was ever undertaken.[249] When he received the Skarha study in November 2022, he forwarded it to TDCJ's research director Andy Barbee—a criminal-justice researcher who Mr. Collier confirmed is not a medical doctor or medical researcher[250] Mr. Collier took no action in response.[251] Director Lumpkin likewise received the study, offered methodological critiques, and forwarded it to Mr. Barbee—but commissioned no independent analysis to test or validate its findings.[252]

The defense's statistics expert, Dr. Scott Cunningham—retained specifically to critique the Skarha study—acknowledged that the question the study addresses is "a question of real consequence" and "applaud[e]d" Dr. Skarha for completing the study.[253] Before reviewing the Skarha study, Dr. Cunningham and his colleagues "thought that heat was causing mortality in prisons."[254] Yet TDCJ limited his analysis to critiquing the study's methodology; he was not asked to determine whether extreme heat actually increases inmate mortality, he did not try to

---

[247] Lumpkin Dep. 123:23-124:4, Dkt. No. 337-1; *see also Tiede II*, 796 F. Supp. 3d at 307.
[248] *Tiede II*, 796 F. Supp. 3d at 306 (quotation marks omitted).
[249] Trial Tr. (Mar. 31, 2026) 144:8-14 (Collier).
[250] *Id.* at 189:4–20 (Collier); Collier Dep. 124:19–125:9, Dkt. No. 332-5.
[251] Prelim. Inj. Hr'g Tr. (Aug. 2, 2024) 244:10-245:11 (Collier).
[252] *Id.* at 188:23-189:17 (Collier).
[253] Trial Tr. (Apr. 7, 2026) 152:18-154:6 (Cunningham).
[254] *Id.* at 123:17-20 (Cunningham).

determine whether air conditioning reduces mortality, and he offered no opinion on whether people in Texas prisons have suffered heat-related illness.[255]

Dr. Cunningham's work also had several flaws. His analysis covered deaths only from 2005 to 2019—a shorter period than Dr. Skarha's 2001 to 2019 window.[256] He also conceded that the sample size he used—1,789 deaths—was insufficient to reach conventional statistical power, which he acknowledged required approximately 2,250 deaths.[257] When asked whether his dataset was "too small to ever" detect the effect he was evaluating, he confirmed that it was[258]— meaning that the analytical framework he used to criticize the Skarha study was, by his own admission, incapable of producing a statistically significant result. Perhaps most importantly, his analysis did not include any post-2019 data—so it did not include any analysis of the ten heat-related deaths of inmates from 2023 to 2025, which were discussed at length at trial.[259] And Dr. Cunningham's critiques were primarily focused on Dr. Skarha's analysis of deaths in *air-conditioned* facilities,[260] rather than her comparison between the incidence of mortality in air-conditioned and un-airconditioned facilities.

The Court finds it significant that TDCJ retained an expert to attack a study identifying a statistically significant association between the absence of air conditioning and inmate deaths, yet never retained an expert—nor has it undertaken any internal effort—to actually determine whether that association exists. More importantly, neither Director Lumpkin nor Mr. Collier ever mounted a *Daubert* challenge to Dr. Skarha's or Dr. Zanobetti's opinions—and, in fact, Director

---

[255] *Id.* at 127:3-128:6 (Cunningham).
[256] *Id.* at 130:5-131:5 (Cunningham).
[257] *Id.* at 135:1-6 (Cunningham).
[258] *Id.*
[259] *Id.* at 126:6-127:2 (Cunningham).
[260] Prelim. Inj. Hr'g Tr. (Aug. 1, 2024) 141:15–25 (Leonardson).

35

Lumpkin stipulated that the Court could consider all evidence and testimony presented in conjunction with the preliminary injunction motion.[261] The Court will therefore consider Dr. Skarha's and Dr. Zanobetti's opinions in light of Dr. Cunningham's criticisms and will not exclude any of the three experts' opinions outright.

### E.    TDCJ Admits that Multiple TDCJ Inmates Died from Extreme Heat in Summer 2023.

After publicly denying that any inmate had died from the extreme heat in Texas prisons since 2011, TDCJ has now conceded that there were three heat-related custodial deaths in the summer of 2023.[262] Mr. Collier admitted that "there were three inmate deaths where elevated temperatures were cited in the final autopsies as a possible contributing factor"[263] and reported the following three deaths to the Texas Legislature as heat-related: Elizabeth Hagerty, John Castillo, and Patrick Womack.[264] Mr. Collier also acknowledged that he was briefed on any autopsy that identifies heat as a contributing factor, and that he would have "probably" read the autopsy reports, as well.[265]

####    1.    *Elizabeth Hagerty – June 30, 2023*

---

[261] *See* Findings of Fact, n.1, *infra*. By stipulating that the Court could consider these opinions, Director Lumpkin waived any right to challenge their admissibility on appeal. *See, e.g., United States v. Gaskin*, 364 F.3d 438, 460 n.8 (2d Cir. 2004) ("Where a party questions whether sound scientific methodology provides a basis for an expert opinion, it may move to preclude the admission of the opinion. Gaskin made no such motion; instead, he stipulated to the admissibility of the expert opinion. Under such circumstances, he cannot complain on appeal that the opinion lacks foundation.")

[262] Pls.' Trial Ex. 102 at 5 (TDCJ Temperature Report); Trial Tr. (Mar. 31, 2026) 121:20-122:21 (Collier).

[263] *See generally* Pls.' Trial Ex. 254 (Mr. Collier's Resps. to First Set of Interrogs.).

[264] Pls.' Trial Ex. 102 at 5 (TDCJ Temperature Report); Trial Tr. (Mar. 31, 2026) 122:8-15 (Collier).

[265] Prelim. Inj. Hr'g Tr. (Aug. 2, 2024) 211:17-212:2 (Collier).

Elizabeth Hagerty was a 37-year-old female housed in an unair-conditioned cell in the Dr. Lane Murray Unit.[266] At 12:10 a.m. on June 30, 2023, after Ms. Hagerty failed to respond to an officer conducting the unit count, the officer found Ms. Hagerty unresponsive in her cell.[267] Less than forty minutes later, she was pronounced dead.[268,] At the time she was found unresponsive, the temperature in her cell was 95.7°.[269] No core body temperature was documented. Dr. Vassallo testified that the fact that no temperature was taken is "completely inexcusable and not up to any medical standard."[270]

Ms. Hagerty had a medical history of obesity, hypercholesterolemia, diabetes, asthma, substance abuse, and unspecified mood disorder.[271] At the time of her death, her medications included (1) albuterol (a bronchodilator for asthma), (2) atorvastatin (to treat elevated cholesterol), (3) citalopram (a selective serotonin reuptake inhibitor to treat anxiety and depression), and (4) carbamazepine (an anticonvulsant).[272] SSRIs like citalopram and anticonvulsants like carbamazepine increase the risk of medical complications when exposed to heat.[273] A week before she died, Ms. Hagerty submitted a sick-call complaining about the heat and a heat rash on her entire body.[274] Four days later, she was seen again by medical staff and complained of two days of abdominal cramps and more than 20 episodes of vomiting.[275] Medical

---

[266] Pls.' Trial Ex. 169-A at 2 (Elizabeth Hagerty AIG Report).
[267] *Id.* at 1 (Elizabeth Hagerty AIG Report).
[268] *Id.* at 6 (Elizabeth Hagerty AIG Report).
[269] *Id.* at 11 (Elizabeth Hagerty AIG Report).
[270] Trial Tr. (Mar. 30, 2026) 128:6-8 (Vassallo).
[271] Pls.' Trial Ex. 169-A at 29 (Elizabeth Hagerty AIG Report).
[272] *Id.* at 27 (Elizabeth Hagerty AIG Report).
[273] Trial Tr. (Apr. 8, 2026) 114:13–20, 115:11–16 (Felicella); *see* Def.'s Trial Ex. 55 at 9 (Heat Stress Policy).
[274] Pls.' Trial Ex. 169 at 6 (Elizabeth Hagerty Death Packet).
[275] *Id.*

staff advised Ms. Hagerty to drink water.[276] According to a letter written to Lioness by two of its incarcerated members, before her death, Ms. Hagerty had a sign hanging in her cell-block window that read "Please give me water," yet correctional officers refused to do so.[277]

Dr. Michelle Felicella, a UTMB pathologist, performed an autopsy on Ms. Hagerty's body five days after her death.[278] Other than a heat rash, the autopsy revealed no significant anatomical findings, but noted hyponatremia (low sodium).[279] Dr. Felicella determined that this was the result of dehydration from her recent gastrointestinal illness, which was likely due to COVID-19.[280] According to the autopsy report, hyponatremia caused Ms. Hagerty's death, although elevated environmental temperatures were noted to be a potential contributory factor.[281] Dr. Felicella testified that she believed heat played a role in Ms. Hagerty's death.[282] Mr. Collier admitted that he knew in 2023 that Ms. Hagerty died after complaining of heat rash, and that UTMB doctors had concluded that heat may have been a contributing factor in her death.[283]

Plaintiffs' experts Dr. Vassallo and Dr. Uribe gave unrebutted testimony that Ms. Hagerty's death was heat-related.[284] Specifically, Dr. Vassallo opined that the heat exacerbated Ms. Hagerty's obesity, diabetes, asthma, and COVID-19, and the extreme heat caused her hyponatremia found on autopsy.[285] Dr. Vassallo and Dr. Uribe credibly testified that Ms. Hagerty

---

[276] *Id.*; Pls.' Trial Ex. 169-A at 24 (Elizabeth Hagerty AIG Report).
[277] Pls.' Trial Ex. 544 at 9 (Donations and Complaints to Lioness (4.9.26)).
[278] Pls.' Trial Ex. 169 at 4 (Elizabeth Hagerty Death Packet).
[279] *Id.* at 11 (Elizabeth Hagerty Death Packet).
[280] *Id.*
[281] *Id.* at 12 (Elizabeth Hagerty Death Packet).
[282] Trial Tr. (Apr. 8, 2026) 52:7-14 (Felicella).
[283] Prelim. Inj. Hr'g Tr. (Aug. 2, 2024) 216:5-9 (Collier).
[284] Prelim. Inj. Hr'g Tr. (July 31, 2024) 61:3-5 (Vassallo), 302:11-13, 302:23–303:13 (Uribe).
[285] *Id.* at 61:6-8 (Vassallo); Trial Tr. (Mar. 30, 2026) 128:13-133:20 (Vassallo).

would not have died if she had been in an air-conditioned cell,[286] and their opinions were unrebutted.

### 2.    *John Castillo – August 5, 2023*

John Castillo was a 33-year-old male housed in an unair-conditioned cell in the Alfred D. Hughes Unit, a TDCJ prison in Gatesville.[287] At 10:42 p.m. on August 6, 2023, Mr. Castillo's roommate notified a corrections officer that Mr. Castillo was sitting on the floor leaning against the bottom bunk with his head tilted backward.[288] He was unresponsive but still breathing.[289] The officer entered the cell and attempted to communicate with Mr. Castillo, but he remained unresponsive.[290] The officer noted that Mr. Castillo's breathing was shallow, and that his body temperature appeared elevated.[291] He was taken to the medical unit, where a nurse reported he was "HOT TO THE TOUCH."[292] His core body temperature was 107.5°.[293] He was pronounced dead at 11:33 p.m.[294]

The ambient temperature inside the Hughes Unit was 94.4° on the day Mr. Castillo died.[295] The outside temperature logs recorded triple-digit temperatures and heat indexes for the week leading up to Mr. Castillo's death.[296] Fans were on in his unit, and he had access to water.[297] In fact, he was seen on TDCJ surveillance footage going to the water cooler 23 times in

---

[286] Prelim. Inj. Hr'g Tr. (July 31, 2024) 61:9-12, 133:21-134:5 (Vassallo), 303:6-9, 309:7-12 (Uribe).

[287] Pls.' Trial Ex. 161-B at 2 (Castillo AIR Updated).

[288] *Id.* at 2-3 (Castillo AIR Updated).

[289] *Id.*

[290] *Id.* at 2 (Castillo AIR Updated).

[291] *Id.* at 2-3 (Castillo AIR Updated).

[292] *Id.* at 27 (Castillo AIR Updated).

[293] *Id.* at 64 (Castillo AIR Updated); Pls.' Trial Ex. 161 at 12 (Castillo Death Packet Updated).

[294] Pls.' Trial Ex. 161-B at 3 (Castillo AIR Updated).

[295] Pls.' Trial Ex. 102 at 17 (TDCJ Temperature Report).

[296] Pls.' Trial Ex. 304-10, at 120-127 (Hughes Temperature Logs).

[297] Pls.' Trial Ex. 161 at 12 (Castillo Death Packet Updated).

the 24 hours before his death.[298] He had a medical history of epilepsy and depression.[299] At the time of his death, his medications included (1) oxybutynin (to treat bladder control disorders), (2) phenytoin (an antiseizure medication), and (3) sertraline (an SSRI), medications that made him more susceptible to heat stroke.[300] According to TDCJ's Administrative Incident Review, Mr. Castillo was last seen by medical staff on June 23, 2023, for treatment of depression.[301] The provider did not document any recent seizure activity or complaints of seizures.[302]

Dr. Felicella performed an autopsy on Mr. Castillo's body six days after his death.[303] She could not identify an anatomic cause of death.[304] Bleeding in his tongue, aspiration pneumonitis, and the absence of antiseizure medications in post-mortem toxicology tests suggested that Mr. Castillo had a seizure around the time of his death.[305] Based on these findings, Dr. Felicella opined that Mr. Castillo's cause of death was seizure disorder, "with high environmental temperature … as an important contributory factor."[306] Dr. Felicella testified that she believed heat played a role in his death.[307]

The autopsy report stated that, while seizures can result in hyperthermia, "it is well-established that hyperthermia can also induce seizures in susceptible individuals."[308] And she concluded that "[t]he degree of hyperthermia seen in this patient is much greater than would be

---

[298] *Id.*
[299] *Id.*
[300] *Id.*; Trial Tr. (Mar. 30, 2026) 117:11-19 (Vassallo).
[301] Pls.' Trial Ex. 161-B at 35 (Castillo AIR Updated).
[302] *Id.*
[303] Pls.' Trial Ex. 161 at 4 (Castillo Death Packet Updated).
[304] *Id.* at 12 (Castillo Death Packet Updated).
[305] *Id.*
[306] *Id.*
[307] Trial Tr. (Apr. 8, 2026) 52:1-14 (Felicella).
[308] Pls.' Trial Ex. 161 at 12 (Castillo Death Packet Updated).

expected in the setting of seizures alone."[309] Mr. Collier admitted to having read the report from the autopsy of Mr. Castillo, and to knowing in 2023 that UTMB doctors had concluded that heat was an important contributory factor in Mr. Castillo's death.[310]

Dr. Vassallo and Dr. Uribe agreed that Mr. Castillo's death was heat-related.[311]And they credibly testified that Mr. Castillo would not have died if he had been in an air-conditioned cell.[312] Dr. Vassallo testified that Mr. Castillo suffered a "heat stroke death" and there was no evidence that Mr. Castillo died from any other medical condition other than heat stroke.[313] She testified that seizures do not usually cause 107.5° temperatures, and the death investigation showed that Mr. Castillo was dropped on his head when he was being moved by staff, causing a laceration—information that was not provided to Dr. Felicella.[314] Dr. Vassallo's and Dr. Uribe's opinions about Mr. Castillo were unrebutted.

### 3.    Patrick Womack – August 21, 2023

Patrick Womack was a 50-year-old male housed in restrictive housing in the unair-conditioned H.H. Coffield Unit in Anderson County.[315] Mr. Womack was found unresponsive in his cell around 1:33 p.m. on August 21, with a core body temperature of 106.9°.[316]

According to the OIG investigation, inmates reported that Mr. Womack was denied a respite shower the night before he died and not checked on during count.[317] On the night of

---

[309] *Id.*
[310] Prelim. Inj. Hr'g Tr. (Aug. 2, 2024) 213:11-23, 214:12-215:6 (Collier).
[311] Prelim. Inj. Hr'g Tr. (July 31, 2024) 51:19-52:2 (Vassallo), 316:18-21 (Uribe).
[312] *Id.* at 56:12-15 (Vassallo), 288:11-15, 309:7-12 (Uribe).
[313] Trial Tr. (Mar. 30, 2026) 119:14-20, 120:20-121:1 (Vassallo).
[314] *Id.* at 117:21-119:7 (Vassallo).
[315] Pls.' Trial Ex. 200 at 6 (Womack Death Packet Updated); Pls.' Trial Ex. 200-B at 1 (Womack AIR Updated).
[316] Pls.' Trial Ex. 200-B at 2 (Womack AIR Updated); Pls.' Trial Ex. 200 at 6 (Womack Death Packet Updated).
[317] Pls.' Trial Ex. 200-B at 3, 8, 42 (Womack AIR Updated).

August 20, 2023, Mr. Womack asked a correctional officer for a cooldown shower, but the officer said there were not enough staff and refused to give him one.[318] One inmate stated about these heat conditions: "Nothing unusual for Coffield the excuse is always we are under-staffed the next day after he died we didn't have cold water. The whole day. This place ain't for humans of course people are going to Die!!!"[319] Video surveillance on August 21, 2023, shows Mr. Womack passing water bottles under his cell door at 9:19 a.m., but he did not respond to a correctional officer's count at 10:07 a.m.[320] At 11:34 a.m., the commissary manager tried to talk to Mr. Womack, but he did not respond.[321] The manager said that he appeared to be asleep on his stomach.[322] When corrections officers discovered Mr. Womack two hours later, the outdoor temperature was 104°, and the heat index was 113°.[323] TDCJ reported to the Texas Legislature that the indoor temperature at the Coffield Unit was 99.1° at 3:00 p.m. on August 20 and 96.6° at 3:00 p.m. on August 21.[324] In the four days leading up to Mr. Womack's death, the outside temperatures and heat index at Coffield were in the triple digits every day, with temperatures reaching 109° and heat indexes at 116°.[325]

Mr. Womack had an extensive history of mental illness, including antisocial behavior, impulse control disorder, and major depressive disorder with suicidal ideation.[326] His

---

[318] *Id.*

[319] *Id.* at 42 (Womack AIR Updated).

[320] *Id.* at 3 (Womack AIR Updated).

[321] *Id.*

[322] *Id.*

[323] Pls.' Trial Ex. 200 at 6 (Womack Death Packet Updated).

[324] Pls.' Trial Ex. 102 at 17 (TDCJ Temperature Report).

[325] Pls.' Trial Ex. 304-20 at 139-143 (Coffield Temperature Logs).

[326] Pls.' Trial Ex. 200 at 6 (Womack Death Packet Updated).

medications included (1) benztropine (an anticholinergic); (2) haloperidol (an antipsychotic); and (3) sertraline (an SSRI), medications that made him more susceptible to heat stroke.[327]

A UTMB pathologist performed an autopsy on Mr. Womack's body ten days after his death.[328] The body showed evidence of advanced decomposition.[329] Post-mortem toxicology showed that Mr. Womack had potentially toxic serum sertraline levels of 2500 ng/ml, which can cause hyperthermia.[330] The UTMB pathologist stated: "Classic heat stroke caused by elevated environmental temperatures can also occur in combination with drug-induced hyperthermia."[331] She then opined that Mr. Womack's cause of death was hyperthermia due to sertraline toxicity with environmental heat as a contributory factor.[332]

Dr. Vassallo and Dr. Uribe offered unrebutted testimony that Mr. Womack's death was heat-related,[333] and Dr. Vassallo credibly testified that he died of a heat stroke.[334] Dr. Vassallo and Dr. Uribe also opined that sertraline toxicity absent environmental heat stress would not have caused a core body temperature of 106.9°.[335] Dr. Vassallo and Dr. Uribe testified that Mr. Womack would not have died if he had been in an air-conditioned cell,[336] and their opinions were unrebutted.

---

[327] *Id.*

[328] *Id.* at 4 (Womack Death Packet Updated).

[329] *Id.* at 6 (Womack Death Packet Updated).

[330] *Id.* at 11 (Womack Death Packet Updated).

[331] *Id.*

[332] *Id.*

[333] Prelim. Inj. Hr'g Tr. (July 31, 2024) 69:16-25 (Vassallo), 304:11-13, 305:18-21 (Uribe).

[334] *Id.* at 69:16-25 (Vassallo); Trial Tr. (Mar. 30, 2026) 127:13-20 (Vassallo).

[335] Prelim. Inj. Hr'g Tr. (July 31, 2024) 67:8-69:14 (Vassallo explaining that a sertraline level of 2500 ng/ml would not necessarily have caused death and not have caused core body temperature to increase to 106.9°.); *id.* at 304:16-305:14 (Uribe testifying that sertraline cannot increase the body temperature to 106.9°.); Trial Tr. (Mar. 30, 2026) 125:17-127:12 (Vassallo).

[336] Prelim. Inj. Hr'g Tr. (July 31, 2024) 70:4-7 (Vassallo), 305:15-17, 309:7-12, 332:2-5 (Uribe).

**F.    At Least Seven More TDCJ Inmates Died from Extreme Heat from 2023 to 2025**

Dr. Vassallo and Dr. Uribe also credibly testified that at least seven other TDCJ inmates died from the extreme heat from 2023 to 2025:

*1.    John Southards – June 28, 2023*

John Southards was a 36-year-old male housed in restrictive housing in an unair-conditioned cell in the Estelle Unit in Huntsville.[337] During security rounds on June 28, 2023, an officer found him laying down in his cell and having trouble breathing.[338] The officer called for assistance at 11:06 p.m.[339] Mr. Southards was moved to the infirmary, where resuscitation efforts continued. At the time, staff described him as diaphoretic (sweating heavily) and hot to the touch.[340] He was pronounced dead at 11:58 p.m.[341] The UTMB pathologist who performed the autopsy on Mr. Southards asked TDCJ for his core body temperature near the time of his death, but none was taken or recorded.[342] The ambient temperature in his cell was 85.7° with a heat index of 96.2° at 3:00 a.m.[343]

Mr. Southards had a significant psychiatric history, including depression, anxiety, psychosis, and suicidal ideation with multiple suicide attempts.[344] His medical history was only significant for intermittent asthma and gastroesophageal reflux. His medications included

---

[337] Pls.' Trial Ex. 192-B at 2 (Southards AIR Updated).
[338] *Id.*
[339] *Id.*
[340] Pls.' Trial Ex. 192-A at 83 (Southards OIG Report Updated).
[341] *Id.*
[342] *Id.* at 19, 83, 88 (Southards OIG Report Updated).
[343] *Id.* at 88 (Southards OIG Report Updated).
[344] *Id.*

44

(1) haloperidol (an antipsychotic), (2) oxybutynin (for bladder dysfunction), (3) venlafaxine (an SSRI), and (4) Benadryl (an antihistamine and anticholinergic).[345]

Dr. Felicella performed an autopsy on Mr. Southards's body six days after his death.[346] The findings included heat rash on his upper extremities.[347] Although additional anatomical findings were described, none were considered a contributing factor in Mr. Southards's death.[348] Dr. Felicella concluded that diphenhydramine toxicity caused Mr. Southards's death, but stated "there is insufficient evidence to support heat-related stress as a contributory cause of death, given the lack of core body temperature data. However, the possibility cannot be excluded."[349] She also noted that there was "no documented information to suggest suicidal intent."[350] On December 8, 2023, TDCJ investigators determined that Mr. Southards had committed suicide and closed their investigation.[351] Dr. Vassallo testified that failing to take Mr. Southards's temperature was "inexplicable and un-excusable."[352]

Dr. Vassallo and Dr. Uribe opined that heat stroke caused Mr. Southards's death.[353] Both medical experts testified that Mr. Southards could not have died from diphenhydramine toxicity (i.e., a Benadryl overdose), because he was sweating when he was found, and Benadryl inhibits sweating.[354] Based on her own clinical experience and medical literature, Dr. Vassallo testified

---

[345] *Id.* at 68, 83 (Southards OIG Report Updated).
[346] *Id.* at 81 (Southards OIG Report Updated).
[347] *Id.* at 88 (Southards OIG Report Updated).
[348] *Id.*
[349] *Id.*
[350] *Id.*
[351] *Id.* at 41 (Southards OIG Report Updated).
[352] Trial Tr. (Mar. 30, 2026) 134:16-23 (Vassallo).
[353] Prelim. Inj. Hr'g Tr. (July 31, 2024) 61:18-64:22 (Vassallo), 296:19-21 (Uribe).
[354] Prelim. Inj. Hr'g Tr. (July 31, 2024) 63:15-22 (Vassallo), 297:1-14 (Uribe); Trial Tr. (Mar. 30, 2026) 135:17-138:25 (Vassallo).
[354] Trial Tr. (Mar. 30, 2026) 138:20-140:19 (Vassallo).

that "[y]ou absolutely cannot sweat and be dead from Benadryl or dying from Benadryl."[355] Dr. Vassallo and Dr. Uribe further concluded that the amount of Benadryl in Mr. Southards's system was not lethal.[356] Dr. Vassallo and Dr. Uribe both credibly testified that Mr. Southards would not have died if he had been in an air-conditioned cell.[357]

Director Lumpkin called Dr. Felicella at trial, in part, to defend her conclusion that Mr. Southards died from diphenhydramine toxicity—but she agreed that his death was the first instance where she had ever encountered what she believed to be a fatal Benadryl overdose.[358] Dr. Felicella agreed that she had to rely on a "[v]ery imperfect" science to reconstruct Mr. Southards' vitreous fluid electrolyte levels after five days of decomposition, which leads to unpredictable redistribution of substances from the organs into the body's blood and fluid levels.[359] Dr. Felicella also agreed that the rate of postmortem distribution of medications such as Benadryl is simply unknown, so she does not know if Mr. Southards' blood contained enough Benadryl to be potentially lethal.[360] Dr. Felicella further agreed that the environmental heat in his cell increased Mr. Southards' risk of death compared to the average person because he was taking Benadryl—whether he was overdosing or not.[361] Dr. Felicella agreed this was true of anyone taking anticholinergic medications.[362]

Defense expert Dr. Everitt testified that he could not diagnose Mr. Southards with heat stroke since no body temperature was taken or reported, but agreed that the heat and a hot

---

[355] *Id.*
[356] Prelim. Inj. Hr'g Tr. (July 31, 2024) 64:3-19 (Vassallo), 297:15-17 (Uribe).
[357] Prelim. Inj. Hr'g Tr. (July 31, 2024) 64:23-65:1 (Vassallo), 297:23-298:2, 309:7-12 (Uribe).
[358] Trial Tr. (Apr. 8, 2026) 77:8–10, 88:8–15 (Felicella).
[359] *Id.* at 91:16–22 (Felicella).
[360] *Id.* at 92:11–93:2 (Felicella).
[361] *Id.* at 93:3–94:3 (Felicella).
[362] *Id.* at 94:7–11 (Felicella).

environment would have had "a contributory effect" on Mr. Southard's death.[363] Dr. Everitt also

agreed that "Benadryl produces strong anticholinergic effects," including "suppressing sweat."[364]

He testified that he has never treated a patient with a deadly Benadryl overdose who was

sweating, is not aware of any studies or medical literature indicating that a person with a deadly

Benadryl overdose can still sweat, and believes that "whether a person with a deadly Benadryl

overdose can still sweat is a better question for a toxicologist," given their "area of specialty."[365]

### 2.    Armando Gonzales – August 23, 2023

Armando Gonzales was a 42-year-old transgender female housed in the Alfred D.

Hughes Unit, a men's prison in Gatesville.[366] At 10:00 p.m. on August 21, 2023, Ms. Gonzales

was found unresponsive but breathing in her cell. After the incident command system was

activated, medical staff found Ms. Gonzales lying on her left side, in a pool of vomit.[367] The

autopsy noted that the "air-conditioning was out in the unit," and that the ambient temperature in

Ms. Gonzales's cell at the time she was found was between 97° and 100°.[368] The outside

temperatures at the Hughes Unit were as high as 104° just a few hours before Ms. Gonzales was

found unresponsive, and the heat index was in triple digits throughout the day.[369]

Ms. Gonzales was taken to the onsite emergency room, where her rectal temperature was

documented as 109.4° on repeated measurements.[370] Ms. Gonzales was transferred by ambulance

to a hospital where she was hyperthermic and in shock. Despite multiple attempts over a 48-hour

---

[363] Trial Tr. (Apr. 6, 2026) 99:19-22, 102:24-103:6 (Everitt).
[364] *Id.* at 98:17-20 (Everitt).
[365] *Id.* at 98:23-99:18 (Everitt).
[366] Pls.' Trial Ex. 168-A at 2 (Gonzales AIR Updated).
[367] *Id.* at 8 (Gonzales AIR Updated).
[368] Pls.' Trial Ex. 168 at 6, 11 (Gonzales Death Packet Updated).
[369] Pls.' Trial Ex. 304-10 at 143 (Hughes temperature logs)
[370] Pls.' Trial Ex. 168 at 6 (Gonzales Death Packet Updated).

period, medical providers could not resuscitate her, and she was pronounced dead at 5:32 a.m. on August 23, 2023.[371]

Ms. Gonzales had been diagnosed with Hepatitis C and manic depressive disorder with psychosis; she also had a history of substance abuse.[372] She had cirrhosis of the liver,[373] and her medications included: (1) aripiprazole (to treat bipolar disorder); (2) citalopram (an SSRI); (3) spironolactone (a diuretic to treat fluid retention); (4) estradiol (a hormone); and (5) bupropion (to treat depression).[374] These medications made her more sensitive to heat.[375]

A UTMB pathologist performed an autopsy on Ms. Gonzales's body thirteen days after she died.[376] The anatomic examination revealed lung hemorrhage and pneumonia, reflecting Ms. Gonzales's clinical illness.[377] Post-mortem toxicology was positive for midazolam, a sedative hypnotic benzodiazepine drug; and fentanyl, an opioid analgesic.[378] However, Ms. Gonzales tested negative for opiates and benzodiazepines upon admission to the hospital; both the urine and blood test came back negative for all illicit substances.[379] The pathologist noted, however, that "the levels of drug may be altered by the long post mortem interval and severe degree of autolysis of tissues seen in this patient."[380] He nevertheless opined that Ms. Gonzales's death was

---

[371] *Id.*

[372] *Id.* at 5-6 (Gonzales Death Packet Updated).

[373] *Id.*

[374] *Id.* at 6 (Gonzales Death Packet Updated).

[375] Trial Tr. (Mar. 30, 2026) 123:7-16 (Vassallo).

[376] Pls.' Trial Ex. 168 at 4 (Gonzales Death Packet Updated).

[377] *Id.*

[378] *Id.* at 11 (Gonzales Death Packet Updated).

[379] *Id.* at 6; Pls.' Trial Ex. 168-C at 70, 82 (Gonzales Death Investigation).

[380] Pls.' Trial Ex. 168 at 11 (Gonzales Death Packet Updated).

caused by multidrug toxicity with opioid overdose and drug-related hyperthermia.[381] Mr. Collier received this autopsy report, as well.[382]

Dr. Vassallo testified that Ms. Gonzales did not die from a drug overdose.[383] She explained that multiple medications (including opioids) are used in the intensive care unit to sedate patients who have suffered medical incidents like heat stroke, which could explain the toxicology results.[384] Ms. Gonzales had a negative toxicology upon admission to the hospital, and Dr. Vassallo explained that the medications found on autopsy were the result of being intubated at the hospital when they tried to save her life, not self-administered.[385]

Most importantly, Dr. Vassallo opined that it is "unquestionable" that opioids like fentanyl do not cause hyperthermia.[386] Instead, they cause _hypo_thermia—i.e., *decreased* body temperature.[387] Thus, in Dr. Vassallo's expert opinion, fentanyl could not have caused Ms. Gonzales's 109.4° body temperature, and severe environmental heat stroke caused her death.[388] Dr. Uribe agreed that Ms. Gonzales's death was heat-related.[389] Dr. Vassallo and Dr. Uribe both credibly testified that Ms. Gonzales would not have died if she had been in an air-conditioned cell.[390]

Director Lumpkin did not offer expert testimony rebutting the fact that Ms. Gonzales died of heat stroke. In fact, Dr. Felicella agreed that the autopsy report was incorrect, and that Drs.

---

[381] *Id.*

[382] *Id.* at 15 (Gonzales Death Packet Updated).

[383] Prelim. Inj. Hr'g Tr. (July 31, 2024) 54:15-56:7 (Vassallo).

[384] *Id.*

[385] Trial Tr. (Mar. 30, 2026) 121:23-124:21 (Vassallo).

[386] Prelim. Inj. Hr'g Tr. (July 31, 2024) 54:22-55:24 (Vassallo).

[387] *Id.* at 54:22-55:3, 55:21-24 (Vassallo).

[388] *Id.* at 56:3-5 (Vassallo).

[389] *Id.* at 291:10-292:6 (Uribe).

[390] *Id.* at 56:6-11 (Vassallo), 292:7-9, 309:7-12 (Uribe).

Vassallo and Uribe were correct that Ms. Gonzales died from environmental hyperthermia—not drug abuse.[391] Defense expert Dr. Everitt, likewise, agreed with Plaintiffs' experts that "Ms. Gonzales suffered a classic heat stroke" and would not have died if she were housed in air-conditioned housing.[392] Dr. Everitt also agrees that opiates and benzodiazepines do not cause 109° body temperature and are both common medications that hospitals administer to patients who need to be sedated for intubation.[393] Dr. Everitt would also "defer to a toxicologist" on whether "a fatal amount of a drug is usually found on the blood panel and the urine panel" at a hospital.[394]

Plaintiffs' corrections expert Dean Williams—who has led two state corrections agencies (Colorado and Alaska)—testified that core body temperatures of 106° or 107° would be "cause for alarm across the [state government], … not just in the corrections system."[395] If he saw even "one death where [he] knew the core body temperature was in range of 106 degrees, 107 degrees, … [he] would pull the fire alarm for [the] department."[396] As set forth in more detail below, Mr. Collier did not do so. Like every other death in this section, Ms. Gonzales's death was not reported to the Texas Legislature as heat-related.[397]

---

[391] Trial Tr. (Apr. 8, 2026) 62:7–64:21 (Felicella) (discussing Pls.' Trial Ex. 168-C (Gonzales Office of Inspector General File)).

[392] Trial Tr. (Apr. 6, 2026) 97:9-19 (Everitt).

[393] *Id.* at 92:24-94:18 (Everitt).

[394] *Id.* at 97:1-8 (Everitt).

[395] Prelim. Inj. Hr'g Tr. (July 31, 2024) 233:24–234:5 (Williams).

[396] *Id.* at 233:10-18 (Williams).

[397] *See generally* Pls.' Trial Ex. 102 (2023 Report to the Legislature).

### 3.    Jason Wilson – July 5, 2024[398]

Jason Wilson was a 46-year-old man with a history of obesity who was housed in the unair-conditioned restrictive housing wing of the Coffield Unit, a prison in Tennessee Colony.[399] He was a core team member with TPCA who went by the nickname "Blue."[400] As set forth above, he sent multiple e-messages to Ms. Robertson of TPCA in the days before his death, complaining that there was not enough staff, and that cold water was not being passed out during the hottest parts of the day.[401]As an inmate in restrictive housing, Mr. Wilson was locked in his cell, alone, for 23 hours per day.[402] In the days leading up to his death and on the day he died, with temperatures in the high 90s and triple-digit heat indexes consistently recorded outside the prison.[403]

In the early morning on July 5, 2024, Mr. Wilson was found unresponsive, in rigor mortis, lying on his left side on the floor of his cell.[404] His body was already cold, and he had ants crawling on him.[405] EMS pronounced him dead on scene.[406] No core body temperature was taken.[407] When Ms. Robertson called Mr. Wilson's unit to check on him on July 7, 2024, a TDCJ employee told her that Mr. Wilson was doing okay, even though he had, in fact, died two days

---

[398] Pls.' Trial Ex. 412-D at 1 (Jason Wilson Autopsy Report).
[399] Pls.' Trial Ex. 412-A at 2-3 (Jason Wilson OIG Report); Trial Tr. (Mar. 31, 2026) 132:15-18 (Collier).
[400] Trial Tr. (Apr. 1, 2026) 262:6-18 (Dominick).
[401] Pls.' Trial Ex. 137 at 5-9 (Jason Wilson Emsg); Trial Tr. (Apr. 1, 2026) 262:22-263:15, 264:15-20 (Dominick).
[402] Trial Tr. (Mar. 31, 2026) 132:19-133:5 (Collier); Trial Tr. (Apr. 2, 2026) 262:2–7 (Fitzpatrick).
[403] Pls.' Trial Ex. 412-B at 7-12 (Coffield temperature logs).
[404] Pls.' Trial Ex. 412-D at 3 (Jason Wilson Autopsy Report).
[405] Trial Tr. (Mar. 30, 2026) 149:1-4 (Vassallo).
[406] Pls.' Trial Ex. 412-D at 3 (Jason Wilson Autopsy Report).
[407] Trial Tr. (Mar. 30, 2026) 43:9-11 (Williams), 148:25-149:1 (Vassallo).

earlier.[408] After Mr. Wilson's death, another inmate wrote to Ms. Robertson that "no officer came and checked on the pod that we were house[d] all night on July 4 til the next morning when they found Jason dead."[409] The correctional officer assigned to Mr. Wilson's wing the night before his death did not complete his last security check, and thus did not check on Mr. Wilson.[410] The officer said he failed to complete a full security check because he was "tired due to the heat" and overwhelmed by handling double duties, as the shift was short-staffed.[411]

A UTMB pathologist performed an autopsy on Mr. Wilson's body eleven days after he died,[412] meaning the body was not delivered until nine or ten days after his death.[413] This delivery period is when the remains are in TDCJ's custody or the custody of its contract funeral home.[414] The anatomic examination revealed rigor mortis in all extremities and advanced decomposition throughout the body.[415] Post-mortem toxicology was positive for synthetic cannabinoids and fentanyl.[416] The pathologist initially attributed Mr. Wilson's death to two causes: acute ischemic change in basal ganglia medullary neurons and synthetic cannabinoid toxicity.[417]

---

[408] Prelim. Inj. Hr'g Tr. (July 31, 2024) 372:10-16, 374:3-5; *see generally* Pls.' Trial Exs. 137 (Jason Wilson Emsg), 152 (Wilson Death Report), 214 at 00:03:40-00:03:55 (Follow Up Call on Wellness Check for Jason Wilson), 264 (Coffield Emsg 2024).

[409] Pls.' Trial Ex. 264 at 8 (Coffield Emsg 2024).

[410] Prelim. Inj. Hr'g Tr. (July 31, 2024) 372:10–16, 374:3–5; *see generally* Pls.' Trial Exs. 137 (Jason Wilson Emsg), 152 (Wilson Death Report), 264 (Coffield Emsg 2024); Pls.' Trial Ex. 412-D at 10 (Jason Wilson Autopsy Report); Trial Tr. (Mar. 30, 2026) 229:3-19 (Uribe).

[411] Pls.' Trial Ex. 412-D at 68 (Jason Wilson Autopsy Report); Trial Tr. (Mar. 30, 2026) 229:3-19 (Uribe).

[412] Pls.' Trial Ex. 412-D at 1 (Jason Wilson Autopsy Report).

[413] Trial Tr. (Apr. 8, 2026) 115:17–24 (Felicella).

[414] *Id.* at 129:16–130:1 (Felicella).

[415] Pls.' Trial Ex. 412-D at 1 (Jason Wilson Autopsy Report).

[416] *Id.* at 7 (Jason Wilson Autopsy Report).

[417] Pls.' Trial Ex. 412-A at 101 (Jason Wilson OIG Report).

On December 22, 2025 (nearly a year-and-a-half after his death), Mr. Wilson's death certificate was amended to remove the first cause—acute ischemic change—leaving synthetic cannabinoid toxicity as the sole cause.[418] Dr. Vassallo testified that acute ischemic change in basal ganglia medullary neurons is a type of stroke that is consistent with a heat death, whereas death due to synthetic cannabinoid toxicity is not.[419] In other words, the amendment removed the cause that was consistent with a heat death and retained only the cause inconsistent with a heat death.[420] Mr. Williams testified that, in his many years serving as a prison director, he had never seen an inmate's death certificate amended over a year after the inmate died.[421] He testified that this is something that he would never "remotely allow [his corrections] departments to request," and that it was "highly unusual."[422] He was also suspicious of the fact that it took over a year for Mr. Wilson's death investigation to be completed, saying that he did "not find that timeframe anywhere acceptable."[423] Director Lumpkin never explained these anomalies.

Dr. Vassallo disagreed with the pathologist's amended cause of death.[424] She explained that, at the time of the autopsy, the pathologist did not have any information about the environmental temperatures that Mr. Wilson was exposed to, which "is critical to a medical examiner being able to ascertain the cause of death" and any contributing factors.[425] Moreover, Dr. Vassallo testified that, based on her experience treating thousands of people with synthetic

---

[418] *Id.* at 31 (Jason Wilson OIG Report).
[419] Trial Tr. (Mar. 30, 2026) 151:16-152:12 (Vassallo).
[420] *Id.* at 152:8-12 (Vassallo).
[421] *Id.* at 44:23-45:1 (Williams).
[422] *Id.* at 45:1-46:3 (Williams).
[423] *Id.* at 46:18-47:3 (Williams). TDCJ did not provide the death investigation to Plaintiffs for over a year, insisting it was still an open investigation. Pls.' Trial Ex. 412-E (open investigation affidavit).
[424] Trial Tr. (Mar. 30, 2026) 146:12-17 (Vassallo).
[425] *Id.* at 146:19-147:2 (Vassallo).

cannabinoids in their system and her review of the scientific literature, these drugs tend to cause a person to be hypotonic, sedated, and quiet, and do not generally elevate body temperature.[426] In fact, neither she nor her colleagues have ever seen a single case of synthetic cannabinoids causing heat stroke, nor has one ever been reported in the medical or scientific literature.[427] Dr. Vassallo further explained that the simple presence of synthetic cannabinoids in the blood does not—on its own—mean that it is the cause of death.[428]

Drs. Vassallo and Uribe reviewed the temperature logs from the Coffield Unit for the days leading up to Mr. Wilson's death, and observed temperatures reaching triple-digit heat indexes for multiple days in a row preceding his death, including a high of 107° on the day before.[429] Dr. Vassallo credibly testified that the cumulative stress from exposure to extreme heat over multiple days can exacerbate underlying health conditions, such as obesity, which Mr. Wilson had.[430] In Dr. Vassallo's opinion, the prolonged and extreme environmental heat Mr. Wilson was exposed to contributed to his death.[431] Dr. Vassallo also credibly testified that Mr. Wilson would have lived if he had been housed in air conditioning.[432] Dr. Uribe agreed that Mr. Wilson's death was heat-related.[433] In forming his opinions about the cause of Mr. Wilson's death, defense expert Dr. Everitt was not provided with Mr. Wilson's death investigation, the emails where Mr. Wilson reported not getting cold water, or any temperatures.[434] When

---

[426] *Id.* at 148:2-24, 150:7-25 (Vassallo).
[427] *Id.* at 148:17-24 (Vassallo).
[428] *Id.* at 147:22-148:3 (Vassallo).
[429] *Id.* at 149:5-150:6 (Vassallo), 230:11-19 (Uribe); *see also* Pls.' Trial Ex. 412-B (Coffield Temp Logs 06.25-07.05).
[430] Trial Tr. (Mar. 30, 2026) 149:18-24 (Vassallo); Trial Tr. (Apr. 6, 2026) 111:14-17 (Everitt).
[431] Trial Tr. (Mar. 30, 2026) 149:22-150:4 (Vassallo).
[432] *Id.* at 150:4-6 (Vassallo).
[433] *Id.* at 231:7-13 (Uribe).
[434] Trial Tr. (Apr. 6, 2026) 112:4-113:11 (Everitt).

confronted with that information, Dr. Everitt admitted that environmental heat "definitely could have played a role" in his death.[435]

During the preliminary injunction hearing, Mr. Collier told the Court that TDCJ handled Wilson's wellness check in an unprofessional manner, and found the emails about not having access to cold water very concerning.[436] Nevertheless, Mr. Collier did not conduct any investigation into the circumstances surrounding Mr. Wilson's death.[437] Mr. Williams testified that TDCJ should have reported Mr. Wilson's death as heat-related to the Texas Legislature[438]— TDCJ did not do so.[439]

### 4.    Ryan Fairchild – August 21, 2024

Ryan Fairchild was a 42-year-old man housed in the unair-conditioned Michael Unit, a prison in the Tennessee Colony.[440] On August 20, 2024, at about 7:00 p.m., he was found unresponsive in the day room of the Unit laying in a pool of his own vomit, in respiratory distress, and suffering from "unexplained hyperthermia."[441] Surveillance video footage showed that, prior to his death, Mr. Fairchild used TDCJ's heat mitigation measures, including visiting the cold water cooler multiple times and sitting on a bench in front of a fan; he then suddenly

---

[435] *Id.* at 114:23-115:1 (Everitt).

[436] Prelim. Inj. Hr'g Tr. (Aug. 2, 2024) 241:19-242:2 (Collier).

[437] Pls.' Trial Ex. 438 at 9 at Req. for Produc. & Resp. No. 9 (Def.'s Resps. to Pls.' Third Set of RFPs); Pls.' Trial Ex. 279 at 7 (TDCJ 2024 Annual Report to the Texas Legislature).

[438] Trial Tr. (Mar. 30, 2026) 47:4-11 (Williams).

[439] Trial Tr. (Apr. 1, 2026) 265:2-6 (Dominick); Trial Tr. (Mar. 31, 2026) 140:2-4 (Collier); Trial Tr. (Mar. 30, 2026) 151:1-3 (Vassallo), 231:7-13 (Uribe).

[440] Pls.' Trial Ex. 358-A at 1 (Ryan Fairchild Autopsy); Pls.' Trial Ex. 358-B at 1 (Ryan Fairchild Emergency Handoff).

[441] Pls.' Trial Ex. 358-C at 1, 7 (Ryan Fairchild OIG); Pls.' Trial Ex. 358-B at 12 (Ryan Fairchild Emergency Handoff).

began to convulse before falling to the floor.[442] He laid on the floor for nearly two hours before correctional staff responded to him, a delay that Mr. Williams described as "striking."[443]

Mr. Fairchild was transferred to Palestine Regional Medical Center, where he was described as "very hyperthermic" with an axillary body temperature measuring as high as 108° on multiple rechecks.[444] No core body temperature was taken, but both Dr. Vassallo and Dr. Everitt testified that an axillary body temperature taken from an armpit tends to be *lower* than an individual's core body temperature—indicating that Mr. Fairchild's core body temperature may have been higher than 108°.[445]  He was later transferred via care flight to UT Health in Tyler, Texas, and pronounced dead on the morning of August 21, 2024.[446]

Both sides' experts agree that Mr. Fairchild had a medical history significant for essential hypertension, type 2 diabetes, major depressive disorder, heart issues, and obesity, all of which can make an individual more heat-susceptible.[447] Mr. Fairchild was prescribed, among other medicines, propranolol, furosemide, bupropion, benztropine, aripiprazole, and amlodipine.[448] Propranolol, furosemide, benztropine, aripiprazole (an antipsychotic), and amlodipine predispose

---

[442] Pls.' Trial Ex. 358-C at 2-3, 7-8 (Ryan Fairchild OIG).
[443] Trial Tr. (Mar. 30, 2026) 32:25-33:11 (Williams).
[444] Pls.' Trial Ex. 358-B at 10, 21 (Ryan Fairchild Emergency Handoff).
[445] Trial Tr. (Mar. 30, 2026) 144:22-145:11 (Vassallo); Trial Tr. (Apr. 6, 2026) 105:13-17 (Everitt).
[446] Pls.' Trial Ex. 358-C at 1 (Ryan Fairchild OIG).
[447] Trial Tr. (Mar. 30, 2026) 143:18-144:7, 204:20-21 (Vassallo); Trial Tr. (Apr. 6, 2026) 103:13-21 (Everitt); Trial Tr. (Apr. 7, 2026) 238:24-239:9 (De La Cruz), 47:2–4 (Leonardson); Trial Tr. (Apr. 8, 2026) 113:20–114:8 (Felicella); Pls.' Trial Ex. 358-A at 1 (Ryan Fairchild Autopsy); *see generally* Pls.' Trial Ex. 334 (CMHC D-27.2 Attachment B).
[448] Pls.' Trial Ex. 358-A at 1, 5 (Ryan Fairchild Autopsy).

a person to medical complications in extreme heat according to TDCJ policy,[449] and bupropion likewise places a person at increased risk from the heat.[450]

A UTMB pathologist performed an autopsy on Mr. Fairchild's body nine days after his death.[451] However, his body had been embalmed prior to autopsy.[452] That destroyed the evidentiary value of his vitreous fluid, which can provide circumstantial evidence of hyperthermia and hypothermia—both symptoms that can be caused by heat.[453] The embalming also made it impossible to perform toxicology testing on Mr. Fairchild's body.[454] His remains also were not delivered to UTMB until more than a week after his death, which would have similarly resulted in the degradation of vitreous fluid evidence.[455]

Dr. Felicella agreed that autopsies have limitations which are exacerbated in cases like Mr. Fairchild's—where the autopsy is delayed and the body is embalmed, as either of these processes will undermine vitreous fluid evidence.[456] Mr. Williams testified that, in his experience running two states' prison systems, he had never seen a body embalmed prior to autopsy, especially not one where there was an ongoing investigation into the cause of death.[457] Mr. Williams testified that the embalming alone in these circumstances would have caused a "reckoning" with his staff regarding their protocol in death investigations[458]—but there is no

---

[449] Pls.' Trial Ex. 333 (CMHC D-27.2 Attachment A - Drugs Associated with Heat Stress); Trial Tr. (Apr. 8, 2026) 125:19–24 (Felicella); Trial Tr. (Mar. 30, 2026) 143:18-25 (Vassallo).
[450] Trial Tr. (Apr. 7, 2026) 239:23–240:7 (De La Cruz).
[451] Pls.' Trial Ex. 358-A at 1 (Ryan Fairchild Autopsy).
[452] *Id.* at 2, 5, 10 (Ryan Fairchild Autopsy); Trial Tr. (Mar. 30, 2026) 226:13–228:1 (Uribe); Trial Tr. (Apr. 8, 2026) 129:16–130:1 (Felicella).
[453] *Id.* at 2, 5, 10 (Ryan Fairchild Autopsy); Trial Tr. (Mar. 30, 2026) 226:13–228:1 (Uribe); Trial Tr. (Apr. 8, 2026) 129:16–130:1 (Felicella).
[454] Pls.' Trial Ex. 358-A at 1 (Ryan Fairchild Autopsy).
[455] *Id.* at 1, 3 (Ryan Fairchild Autopsy); Trial Tr. (Mar. 30, 2026) 228:2–18 (Uribe).
[456] Trial Tr. (Apr. 8, 2026) 90:24–91:3, 91:9–15 (Felicella).
[457] Trial Tr. (Mar. 30, 2026) 35:9-22 (Williams).
[458] Trial Tr. (Mar. 30, 2026) 35:11-22 (Williams).

evidence of any such "reckoning" having occurred at TDCJ regarding the circumstances surrounding Mr. Fairchild's death.

The TDCJ's OIG Report on the investigation into Mr. Fairchild's death noted that "there were no signs or indications that [Mr.] Fairchild used drugs or that any violence had occurred."[459] Apparently due to the lack of information, the UTMB's pathologist team admitted they could find "no anatomical cause of death" and simply described him as experiencing a natural "sudden cardiac death."[460] TDCJ did not record or report the temperature in the dayroom where Mr. Fairchild was found unresponsive, and did not take or report Mr. Fairchild's extremely hyperthermic temperature to investigators or the UTMB medical examiner.[461]

The day of Mr. Fairchild's death, TDCJ staff logged the outdoor heat index at 5:30 p.m. to be 122º.[462] The log does not reflect that TDCJ logged the heat index for 6:30 p.m., but the ambient temperature and humidity they recorded correspond to a heat index of 131º at 6:30 p.m.[463] TDCJ reported that the ambient temperature somewhere inside the Michael Unit over four hours earlier at 3:00 p.m. was 90.9º.[464] The Michael Unit had similar indoor temperatures and recorded that the outdoor heat index had exceeded 110º every day since August 16, 2024.[465]

---

[459] Pls.' Trial Ex. 358-C at 2 (Ryan Fairchild OIG).
[460] Pls.' Trial Ex. 358-A at 10 (Ryan Fairchild Autopsy).
[461] Pls.' Trial Ex. 358-C at 2 (Ryan Fairchild Death Investigation); Trial Tr. (Apr. 8, 2026) 121:8-22 (Felicella).
[462] Pls.' Trial Ex. 358-D at 5 (Michael Unit Temperature Logs); *see* Trial Tr. (Mar. 30, 2026) 223:23–224:7 (Uribe).
[463] Pls.' Trial Ex. 358-D at 5 (Michael Unit Temperature Logs); *see also* National Weather Service, *Heat Index Calculator,* https://www.weather.gov/epz/wxcalc_heatindex.
[464] Pls.' Trial Ex. 279 at 13, 22 (TDCJ Legislative Report FY 2024).
[465] *Id.* at 1-55 (Michael Unit Temperature Logs); Pls.' Trial Ex. 279 at 22 (TDCJ Legislative Report FY 2024).

Dr. Vassallo agreed with the pathologist that Mr. Fairchild died of a heart attack, but explained that his cardiac risk factors were not the sole cause of it.[466] She testified that a heart attack does not cause an axillary temperature of 108°; rather, that temperature can cause a heart attack.[467] Dr. Vassallo noted that the autopsy report did not mention Mr. Fairchild's axillary temperature of 108°, which is "clearly heat stroke," or that Mr. Fairchild was exposed to triple-digit heat indexes as high as 122° in the days before his death—indicating that the pathologist was unaware of that information when they conducted the autopsy.[468]

Dr. Felicella agreed that must have been the case; if the pathologist had that "very important" information, they would have documented it in the autopsy report.[469] Drs. Vassallo and Uribe testified that such information was essential to rendering an accurate opinion as to cause of death, including whether heat was a contributing factor.[470]

Dr. Vassallo credibly testified Mr. Fairchild died from heat stroke.[471] Dr. Uribe also credibly testified that environmental heat contributed to Mr. Fairchild's death.[472] In giving an opinion regarding Mr. Fairchild's death, Dr. Everitt did not have the death investigation report, the medical records showing his 108° axillary temperature and diagnosis of hyperthermia, or any temperature log information.[473] When shown this information, however, Dr. Everitt testified that heat "played a contributing factor" in Mr. Fairchild's death.[474] Dr. Felicella likewise testified

---

[466] Trial Tr. (Mar. 30, 2026) 142:13-143:2 (Vassallo).
[467] *Id.*
[468] *Id.* at 142:6-143:17 (Vassallo), 224:11–22 (Uribe); *see generally* Pls.' Trial Ex. 358-D (Michael Unit Temperature Logs).
[469] Trial Tr. (Apr. 8, 2026) 121:22-122:21 (Felicella).
[470] Trial Tr. (Mar. 30, 2026) 143:6-17 (Vassallo), 224:11-225:6 (Uribe).
[471] *Id.* at 141:24-142:1, 145:23-146:2 (Vassallo).
[472] *Id.* at 225:14-23 (Uribe).
[473] Trial Tr. (Apr. 6, 2026) 103:25-105:2, 107:13-15 (Everitt).
[474] *Id.* at 111:1-9 (Everitt).

that, based on Mr. Fairchild's autopsy report, there is "no explanation for [his] hyperthermia," and she could not rule out environmental heat as a contributing factor in his death.[475] Dr. Uribe also credibly testified that the pathologist conducting the autopsy would not have been able to determine whether heat played a role in Mr. Fairchild's death without the environmental and core body temperature information contained in TDCJ's records and the Palestine Regional Medical Center records.[476]

From Mr. Williams's perspective, "the most troubling aspect" of Mr. Fairchild's death investigation is that "[n]owhere in the inspector general's report, the investigator's report, is there any mention . . . of the body temperature of Mr. Fairchild at the time he was found or . . . thereafter, or any ambient temperature."[477] Mr. Williams credibly testified that if he had been the Executive Director of TDCJ at the time of Mr. Fairchild's death, he would have reported it to the Texas Legislature as heat-related.[478] Mr. Williams testified that you do not "have to be a doctor in a medical field to know that a temperature of 108 degrees is beyond life sustaining."[479] Drs. Vassallo and Uribe further credibly testified that if Mr. Fairchild had been housed in air conditioning, he would have lived.[480]

### 5.    Bradley Sheets – June 22, 2024

Bradley Sheets was a 66-year-old male in custody in the Coffield Unit located in Tennessee Colony.[481] He suffered from high blood pressure, diabetes, and obesity—conditions

---

[475] Trial Tr. (Apr. 8, 2026) 125:7-9, 126:12-14 (Felicella).
[476] Trial Tr. (Mar. 30, 2026) 224:23–225:6 (Uribe).
[477] *Id.* at 34:4-9 (Williams).
[478] *Id.* at 38:12-15 (Williams); Trial Tr. (Mar. 31, 2026) 131:22-24 (Collier).
[479] Trial Tr. (Mar. 30, 2026) 38:4-15 (Williams).
[480] *Id.* at 145:19-22 (Vassallo), 225:24-226:12 (Uribe).
[481] Pls.' Trial Ex. 400-A at 1 (Bradley Sheets Autopsy); Pls.' Trial Ex. 400-B at 2-3 (Bradley Sheets OIG); Trial Tr. (Apr. 2, 2026) 160:16-21 (Echessa).

that made him heat-sensitive.[482] Mr. Sheets was prescribed Atenolol for his high blood pressure.[483] Despite having these known heat sensitivities, Mr. Sheets did not have a heat score and was not housed in air-conditioned housing.[484]

Mr. Sheets was discovered unresponsive in his unair-conditioned cell at around 11:00 a.m. and pronounced dead on scene shortly thereafter.[485] Video footage showed that he was last seen going to the shower at 9:22 p.m. on June 21, 2024, and was found unresponsive by other inmates on his mattress on the floor at 11:04 a.m. the next day.[486]

Mr. Sheets was less than two weeks away from being released from prison when he died.[487] The pathologist determined that his cause of death was "[a]therosclerotic and hypertensive cardiovascular disease."[488] However, no core body temperature was taken, and the autopsy did not mention the environmental conditions that Mr. Sheets was exposed to in the days before his death, which included heat indexes in the high 90s.[489] Dr. Vassallo agreed that cardiovascular disease caused Mr. Sheets's death, but explained that his age combined with his underlying cardiovascular issues meant that he "f[ell] perfectly into that group of people that get into trouble with heat."[490] Dr. Vassallo credibly testified that his death was heat-related.[491]

---

[482] Trial Tr. (Mar. 30, 2026) 152:22-25, 154:17-23 (Vassallo).

[483] *Id.* at 152:22-153:3 (Vassallo).

[484] Pls.' Trial Ex. 400-B at 3 (Bradley Sheets OIG); Trial Tr. (Mar. 30, 2026) 152:22-153:3 (Vassallo); *see generally* Pls.' Trial Ex. 327 (At Hand Population Scoring Worksheet (Apr. 8, 2024) [49985]).

[485] Pls.' Trial Ex. 400-B at 2-3 (Bradley Sheets OIG).

[486] *Id.* at 22, 30, 37 (Bradley Sheets OIG).

[487] *Id.* at 3 (Bradley Sheets OIG).

[488] Pls.' Trial Ex. 400-A at 5 (Bradley Sheets Autopsy).

[489] *See generally id.*; Trial Tr. (Mar. 30, 2026) 153:6-7, 153:22-154:9 (Vassallo).

[490] Trial Tr. (Mar. 30, 2026) 153:6-154:16 (Vassallo).

[491] *Id.* at 152:19-21 (Vassallo).

###### 6.    *Wayne Straway – July 29, 2025*

Wayne Straway was a 35-year-old male with obesity who was housed in the Ellis unit in Huntsville.[492] He was found unresponsive on his bunk in his cell at about 2:15 p.m. with a rectal core body temperature of 106°.[493] Mr. Straway was declared dead on scene.[494] The outdoor temperature logs indicate the temperature was in the 90s for the days leading up to Mr. Straway's death, and the heat indexes that Mr. Straway was exposed to in the days leading up to his death were in the triple digits—the type of cumulative heat exposure that can contribute to death.[495]

The pathologist conducting his autopsy attributed Mr. Straway's death to synthetic cannabinoid toxicity and methamphetamine.[496] However, both the environmental and Mr. Straway's core body temperature were omitted from the autopsy report, indicating that the pathologist was not aware of that information at the time of the autopsy.[497]

Drs. Vassallo and Uribe credibly testified that environmental heat was a contributing factor in Mr. Straway's death.[498] They explained that, while methamphetamine intoxication can cause heat stroke alone, that is generally because the individual is agitated and active as a result of such intoxication, actions which there is no evidence of in Mr. Straway's case.[499] There is evidence, however, of Mr. Straway being exposed to a hot environment which can exacerbate

---

[492] Pls.' Trial Ex. 403-B at 57 (Wayne Straway EMR); Trial Tr. (Mar. 30, 2026) 159:20-22 (Vassallo).

[493] Trial Tr. (Mar. 30, 2026) 157:20-23 (Vassallo); Pls.' Trial Ex. 403-B at 105 (Wayne Straway EMR); Pls.' Trial Ex. 403-A at 3 (Wayne Straway Autopsy).

[494] Pls' Trial Ex. 403-B at 61 (Wayne Straway EMR).

[495] Trial Tr. (Mar. 30, 2026) 160:12-22 (Vassallo); *see generally* Pls.' Trial Ex. 306-A (TDCJ Automated Temp Logs - 5.1.2025-9.1.2025).

[496] Pls.' Trial Ex. 403-A at 2 (Wayne Straway Autopsy).

[497] Trial Tr. (Mar. 30, 2026) 157:20-158:1, 214:9-13 (Vassallo), 237:18-21 (Uribe); Pls.' Trial Ex. 403-A (Wayne Straway Autopsy).

[498] Trial Tr. (Mar. 30, 2026) 160:23-25 (Vassallo), 237:22-238:6 (Uribe).

[499] *Id.* at 158:5-159:12 (Vassallo), 239:9-15 (Uribe).

and contribute to any elevated core body temperature attributable to methamphetamine toxicity.[500] Dr. Uribe credibly testified that methamphetamine use is more dangerous in extreme heat conditions. [501] Dr. Vassallo credibly testified that, if Mr. Straway had been house in air conditioning, he may have survived.[502]

Dr. Everitt testified that Mr. Straway's obesity made him "more susceptible to heat stroke."[503] He acknowledged that Mr. Straway's rectal temperature of 106° is "way above [Dr. Everitt's] threshold for heat stroke."[504] Dr. Everitt, likewise, admitted that he did not review any temperature logs in connection with Mr. Straway's death when he initially reached his opinions.[505] After being informed of Mr. Straway's core body temperature and environmental temperature, he agreed that heat "could have contributed to [Mr. Straway's] death."[506]

> 7.    *Keith Pursifull – August 9, 2025*

Keith Pursifull was a 29-year-old male housed in the Wainwright Unit in Houston County.[507] He was found unresponsive and not breathing in his single-man, administrative segregation cell just after 8:00 a.m., lying face up underneath his lower bunk.[508] No shock was advised, and neither CPR or Narcan were successful.[509] Mr. Pursifull was announced deceased

---

[500] *Id.* at 158:5-159:12 (Vassallo), 238:4-13 (Uribe).

[501] *Id.* at 238:7–13 (Uribe).

[502] *Id.* at 159:13-19 (Vassallo).

[503] Trial Tr. (Apr. 6, 2026) 116:1-7 (Everitt).

[504] *Id.* at 116:8-17 (Everitt).

[505] *Id.* at 116:18-117:6 (Everitt).

[506] *Id.* at 117:7-11 (Everitt).

[507] Pls.' Trial Ex. 581 at 1 (Keith Pursifull Autopsy (Redacted)); Pls.' Trial Ex. 395 at 36 (Keith Pursifull EMR).

[508] Pls.' Trial Ex. 581 at 4 (Keith Pursifull Autopsy (Redacted)); Trial Tr. (Apr. 2, 2026) 15:16-16:1 (Vassallo).

[509] Pls.' Trial Ex. 581 at 4 (Keith Pursifull Autopsy (Redacted)); Pls.' Trial Ex. 395 at 18 (Keith Pursifull EMR).

just before 9:00 a.m.[510] His core body temperature was taken a few minutes later, and it read 105.4°.[511] Investigators found no evidence of any immediate drug use, injuries from foul play, or contraband in Mr. Pursifull's cell.[512] Vomit, however, was found in his cell single-man cell, which is consistent with heat stroke.[513] The heat index reached the triple digits for multiple days in a row before Mr. Pursifull's death.[514] Mr. Pursifull was extremely mentally ill, which made him more susceptible to heat.[515] Dr. Vassallo credibly testified that the medical literature demonstrates that individuals with mental illness like those that Mr. Pursifull suffered from are "two to four times more likely to succumb to heat stroke and heat-related illnesses" due to their inability to follow instructions, ask for help, and care for their own wellbeing.[516] Further, Mr. Pursifull was on an antipsychotic medication that made him even more heat-sensitive, Risperidone.[517]

Although the UTMB pathologist wrote in the autopsy report that Mr. Pursifull died a "[s]udden, unexpected death," the cause of that death was "undetermined" at the time of Mr. Pursifull's autopsy.[518] Initial postmortem toxicology testing identified "a possible synthetic cannabinoid" *below reportable levels* in Mr. Pursifull's urine and blood—meaning that it was a

---

[510] Pls.' Trial Ex. 581 at 4 (Keith Pursifull Autopsy (Redacted)); Pls.' Trial Ex. 395 at 18 (Keith Pursifull EMR).

[511] Pls.' Trial Ex. 395 at 18 (Keith Pursifull EMR); Trial Tr. (Apr. 2, 2026) at 11:13-19 (Vassallo).

[512] Pls.' Trial Ex. 581 at 4 (Keith Pursifull Autopsy (Redacted)); Trial Tr. (Apr. 2, 2026) at 12:22-13:4 (Vassallo).

[513] Trial Tr. (Apr. 2, 2026) at 31:18-32:6 (Vassallo).

[514] *See generally* Pls.' Trial Ex. 581-A (Excerpt from 306-A - August 6, 2025 thru August 9, 2025 at Wainwright); Trial Tr. (Mar. 30, 2026) 234:8-18 (Uribe); Trial Tr. (Apr. 2, 2026) 8:8-9:4 (Vassallo).

[515] Trial Tr. (Apr. 2, 2026) 9:24–11:7 (Vassallo); Pls.' Trial Ex. 581 at 2, 4 (Keith Pursifull Autopsy (Redacted)).

[516] Trial Tr. (Apr. 2, 2026) 10:10-11:7 (Vassallo).

[517] *Id.* at 10:3-5 (Vassallo).

[518] Pls.' Trial Ex. 581 at 2-3 (Keith Pursifull Autopsy (Redacted)).

*negative* result.[519] Nonetheless, additional toxicology testing was ordered to further investigate the potential presence of synthetic cannabinoids, possibly because the pathologist was "stumped" as to Mr. Pursifull's cause of death.[520] Notably, neither Mr. Pursifull's core body temperature nor the environmental temperatures leading up to his death were mentioned in the autopsy report, indicating that the pathologist did not have that information at the time of the autopsy.[521] Without that information, a pathologist cannot come to a correct conclusion regarding an individual's cause of death.[522] To this day, Mr. Pursifull's cause of death remains undetermined by UTMB Health because no amended toxicology or autopsy report has been provided to Plaintiffs or the Court. Nor has an OIG Report.

Dr. Uribe credibly testified that, because of Mr. Pursifull's core body temperature of 105.4° and the extreme temperatures he was exposed to before his death, heat should be considered in his death.[523] Dr. Vassallo testified that Mr. Pursifull's death was "definitely a heat stroke death, no doubt," and he would have survived had he been housed in air conditioned housing.[524] Dr. Vassallo testified that there was "absolutely" no way that the presence of synthetic cannabinoids below the reporting limit would have contributed to Mr. Pursifull's death, adding that cannabinoids are known to lower—not raise—body temperatures.[525] Drs. Vassallo's and Uribe's opinions were unrebutted.

---

[519] *Id.*; Trial Tr. (Apr. 2, 2026) 13:8-22 (Vassallo).
[520] Pls.' Trial Ex. 581 at 2-3 (Keith Pursifull Autopsy (Redacted)); Trial Tr. (Apr. 2, 2026) 13:8-22 (Vassallo).
[521] *See generally* Pls.' Trial Ex. 581 (Keith Pursifull Autopsy (Redacted)); Trial Tr. (Apr. 2, 2026) 12:19-21, 13:8-22 (Vassallo).
[522] Trial Tr. (Apr. 2, 2026) 17:9-18:9 (Vassallo).
[523] Trial Tr. (Mar. 30, 2026) 235:16-22 (Uribe).
[524] Trial Tr. (Apr. 2, 2026) 9:5-15, 16:8-25, 18:10-18, 30:6-31:5 (Vassallo).
[525] *Id.* at 15:5-13 (Vassallo).

**G.      TDCJ is Undercounting and Underreporting Heat-Related Deaths.**

Based on the available evidence, the Court concludes that high heat has caused or contributed to the deaths of numerous TDCJ inmates in unair-conditioned units, including in 2023, 2024, and 2025. In addition, three TDCJ practices have likely led to heat-related deaths of TDCJ inmates being undercounted and unreported.

1.      *TDCJ does not require taking deceased inmates' body temperatures or environmental temperatures in their cells.*

First, TDCJ does not consistently take the body temperatures of inmates found dead or unresponsive, it does not consistently take the temperatures of inmates' cells in those circumstances, and it has no policy requiring that those temperatures be taken.[526] According to the medical literature, "[a] rectal temperature should be obtained in *all* patients suspected of heat stroke."[527] Dr. Vassallo affirmed that a core body temperature is "absolutely fundamental" to determining whether a death is heat-related, and failing to take a core body temperature violates the standard of care.[528] In fact, taking a temperature is so "fundamental to being a doctor" that the entire point of one oral board examination question is for the examinee to recognize that the temperature is missing from the data presented.[529] Dr. Vassallo said it succinctly: "[Y]ou're not going to have any heat deaths if you never take the [inmate's] temperature."[530]

Dr. Uribe agreed that taking a core body temperature is "essential," because it is a "quick way to establish one or more things that are possibly going wrong" with the body—especially in

---

[526] Pls.' Dep. Designations for Prelim. Inj. Hr'g 5, Dkt. No. 155 (245:17-246:4).
[527] Pls.' Trial Ex. 275 at 5 (Severe nonexertional hyperthermia (classic heat stroke)) (emphasis added).
[528] Prelim. Inj. Hr'g Tr. (July 31, 2024) 52:8-10, 57:21-58:6 (Vassallo).
[529] *Id.* at 58:2-6 (Vassallo).
[530] Trial Tr. (Mar. 30, 2026) 170:3-5, 225:8-13 (Vassallo).

a "particularly hot or cold environment."[531] He testified that the "documentation of the core body temperature is critically important from a post mortem perspective."[532] "[T]he core body temperature [triggers] the diagnosis of hyperthermia," and the pathologist then has to figure out "why does this person have such an elevated core temperature"—for instance, was it "because they were exposed to heat for a prolonged period of time," or "[w]ere they … on certain drugs or medications?"[533] Dr. Uribe opined that routinely failing to take core body temperatures could lead to heat being underreported as a contributing cause of inmate deaths.[534]

Dr. Felicella confirmed that a core body temperature taken near the time of death is "the most reliable way" to either rule in or rule out environmental hyperthermia as a cause of death.[535] Without it, "it is extremely difficult to get to the level of certainty that you want before you make an autopsy finding."[536] Director Lumpkin's own thermophysiology expert, Dr. Nicholas Ravanelli, likewise testified that a core body temperature is "essential" to assessing whether someone is in a state of hyperthermia.[537] Without it, "you cannot say one way or the other whether" an inmate was experiencing heat-related stress at the time of death.[538] Dr. Everitt, likewise, testified that in order to diagnose heat stroke, a core body temperature is a "requirement."[539] Dr. Everitt would not diagnose heat stroke without a core body temperature

---

[531] Prelim. Inj. Hr'g Tr. (July 31, 2024) 298:18-299:23 (Uribe); Trial Tr. (Mar. 30, 2026) 268:15–23 (Uribe).

[532] Prelim. Inj. Hr'g Tr. (July 31, 2024) 299:24-300:18 (Uribe); Trial Tr. (Mar. 30, 2026) 244:12–22 (Uribe).

[533] Prelim. Inj. Hr'g Tr. (July 31, 2024) 300:3-13 (Uribe).

[534] *Id.* at 300:19-24 (Uribe); Trial Tr. (Mar. 30, 2026) 225:7–13 (Uribe).

[535] Trial Tr. (Apr. 8, 2026) 67:15-68:3, 94:12-18 (Felicella).

[536] *Id.* at 94:18-95:1 (Felicella).

[537] *Id.* at 28:21-24 (Ravanelli).

[538] *Id.* at 28:25-21:4 (Ravanelli).

[539] Trial Tr. (Apr. 6, 2026) 88:15-19 (Everitt).

because such a diagnosis requires a "definitive diagnostic capability," like a core body temperature.[540]

Mr. Williams confirmed that a proper prison death investigation should include measuring ambient temperature of the cell or the living area where the individual died, the heat index, and the individual's core body temperature.[541] A high core body temperature is "not just a clue," but "strong evidence that people are dying of heat stroke."[542] Indeed, Mr. Williams could only think of one reason *not* to take an individual's core body temperature: to avoid legal liability.[543]

Dr. Felicella confirmed that, "most of the time" when performing an autopsy on a TDCJ inmates, she is not provided any information regarding the inmate's body temperature,[544] even though most of the time, UTMB pathologists request that temperature information for summer deaths in TDCJ.[545] A similar gap exists for cell temperatures. Dr. Felicella testified that pathologists are "[s]ometimes" given "indoor temperatures" that turn out to be recorded at locations "very far away from where the person was housed"—making them of limited to no value.[546]

This pattern was seen in many of the heat deaths the Court reviewed. Mr. Fairchild's temperature was not recorded anywhere in his OIG investigation report—even though he was found unresponsive and later found to have had an axillary temperature of 108°.[547] No skin

---

[540] *Id.* at 88:15-89:12 (Everitt).
[541] Prelim. Inj. Hr'g Tr. (July 31, 2024) 246:7-23, 251:20-24 (Williams).
[542] *Id.* at 251:2-19 (Williams).
[543] *Id.* at 248:25-250:21 (Williams).
[544] Trial Tr. (Apr. 8, 2026) 96:6-9 (Felicella).
[545] *Id.* at 118:2–24, 131:9–132:10 (Felicella).
[546] *Id.* at 67:23-68:1 (Felicella).
[547] Trial Tr. (Mar. 30, 2026) 34:5-10 (Williams).

temperature, no core body temperature, and no ambient temperature were taken at or near the time of Mr. Wilson's death.[548] Nor was any core body temperature taken for Mr. Southards, Ms. Hagerty, or Mr. Sheets.[549] Dr. Vassallo agreed that the lack of core body temperatures or environmental temperatures for many of the TDCJ inmates' deaths she reviewed was "highly disturbing."[550]

Nor has TDCJ enacted a policy requiring its staff to take or document body temperatures or ambient cell temperatures when an inmate is found unresponsive or dies in custody during the summer months. Mr. Collier admitted that TDCJ does not require ambient temperatures to be taken as part of death investigations.[551] Mr. Williams testified that TDCJ's heat-mitigation policy "[d]oes [not] adequately require the collection of facts necessary to determine whether a death is heat-related."[552] That policy does not require TDCJ staff or medical providers to document inmates' temperatures or the temperatures in their cells when they are found dead or unresponsive.[553] Instead, it only "encourage[s]" medical providers "to take core body temperatures of deceased inmates at the time of death."[554]

Mr. Collier tried to defend the absence of a TDCJ policy on the basis that taking a body temperature is "a medical decision" that is outside the director's authority to require.[555] But Mr. Williams—a former director of two state correctional systems—disagreed and said that the director of a prison system can require all staff to take inmates' temperatures and cell

---

[548] *Id.* at 43:8-12 (Williams).
[549] *See* Findings of Fact §§ III.E.1., III.F.1., III.F.5. *supra*.
[550] Trial Tr. (Apr. 2, 2026) 17:18-25 (Vassallo).
[551] Trial Tr. (Mar. 31, 2026) 129:13-130:14 (Collier).
[552] Trial Tr. (Mar. 30, 2026) 50:8-12 (Williams).
[553] *See generally* Pls.' Trial Ex. 325 (TDCJ AD 10.64 – Revision 12).
[554] *Id*. at 17 (TDCJ AD 10.64 – Revision 12).
[555] Trial Tr. (Mar. 30, 2026) 48:25–49:3 (Williams).

temperatures, and that doing so "is not a highly sophisticated medical practice."[556] As director, Mr. Williams had "the authority and the ability to make sure all facts are gathered, including gathering core body temperatures and gathering heat indexes and gathering ambient temperatures" in death investigations.[557] He testified that prison directors are "directly responsible" for "getting accurate reporting of the deaths or the bad incidents, critical incidents" that occur in the system.[558] Based on his review of TDCJ inmate death investigations and leading two state corrections systems, Mr. Williams believes TDCJ is underreporting heat-related deaths.[559] Despite this, TDCJ "did not change [its] protocol" to require these temperatures to be collected.[560]

The Court concludes that TDCJ's failure to implement a requirement that staff or medical providers take inmates' body temperatures or the temperatures of inmates' cells—which has persisted despite decades of heat-related litigation, dozens of heat-related deaths of inmates, and a finding by this Court of a "plainly unconstitutional" system—is not a mere oversight. It is a deliberate institutional choice, and its predictable and documented consequence is the systematic undercounting and underreporting of heat-related inmate deaths. As Mr. Williams testified, "[t]here's a purposeful omission" by TDCJ "of the most important and relevant data about why people are dying"—*i.e.*, body temperatures and cell temperatures—and it is "[v]ery troubling."[561]

---

[556] *Id.* at 48:10-49:13 (Williams).
[557] Prelim. Inj. Hr'g Tr. (July 31, 2024) 251:2-24 (Williams).
[558] Trial Tr. (Mar. 30, 2026) 29:1-7 (Williams).
[559] *Id.* at 30:13-25, 90:25-91:8 (Williams).
[560] Trial Tr. (Mar. 31, 2026) at 151:19 (Collier).
[561] Trial Tr. (Mar. 30, 2026) 65:16-66:8 (Williams).

   2.  *UTMB pathologists typically lack crucial information about inmates and the circumstances surrounding their death when they perform autopsies.*

  Second, TDCJ is not providing UTMB pathologists other key information they need to identify inmates' deaths as heat-related. The information gap between TDCJ and UTMB pathologists is not limited to inmates' body or cell temperatures. According to Dr. Felicella, UTMB pathologists rely on the Office of Inspector General for "information from the circumstances of the death and other outside circumstances of deaths not reflected either in the remains that are presented" to them or in the electronic medical records.[562] According to Dr. Felicella, UTMB pathologists usually request body temperature information for deaths of TDCJ inmates during the summer.[563] "Most of the time," that information is not provided.[564] The record demonstrates that UTMB pathologists sought core body temperature and environmental temperatures for Mr. Southards,[565] Mr. Wilson,[566] and Ms. Hagerty[567]—but none was provided. In addition, Dr. Felicella has "personally never received" a final OIG death investigation report[568] or the TDCJ administrative incident review[569] for the hundreds of inmate deaths she has been involved with—despite the significant amount of information contained in those reports.

  At the time of trial, there were 55 OIG death investigations for 2025 deaths that Plaintiffs' counsel tried to investigate and obtain that were still pending, even though autopsy reports were already completed for up to 50 of them. [570] As demonstrated by Dr. Felicella's

---

[562] Trial Tr. (Apr. 8, 2026) 96:10-18 (Felicella).
[563] *Id.* at 131:15–132:10 (Felicella).
[564] *Id.*
[565] Pls.' Trial Ex. 192-E at 2, 5, 9, 13, 18 (Felicella Emails re Southard).
[566] Pls.' Trial Ex. 412-A at 23 (Jason Wilson OIG Report).
[567] Pls.' Trial Ex. 169 at 6 (Hagerty Death Packet UPDATED).
[568] Trial Tr. (Apr. 8, 2026) 99:25–100:4 (Felicella).
[569] *Id.* at 110:3–13 (Felicella).
[570] *See generally* Pls.' Trial Ex. 339 (OIG Open Investigations [516514-516516]); Trial Tr. (Apr. 8, 2026) 103:2–11 (Felicella).

testimony, any information gathered during the OIG death investigation will not be provided to the pathologists, nor will it be included in the autopsy reports for these inmates—as those reports have already been completed.[571]

In Mr. Fairchild's case, the pathologist requested outside medical records "multiple times" but they were never sent—leaving the pathologist without information that might have been material to the cause-of-death determination.[572] Neither the OIG nor TDCJ Health Services followed up to ask the pathologist to reevaluate the autopsy in light of that missing information.[573] In Mr. Wilson's case, Dr. Felicella confirmed that because she had reviewed only the autopsy report and the preliminary OIG report, she had no opinion about "the importance or the non-importance of environmental temperatures in Mr. Wilson's death because of the lack of information."[574] In John Skinner's case (a 45 year old who died an unexpected death), the UTMB pathologist noted that there was "not sufficient evidence to suggest heat played a role in his death," but concluded that a "heat-related death cannot be entirely excluded" because of the "limited available information and lack of core body temperature."[575] This autopsy was sent to Mr. Collier.[576]

In another case where Dr. Felicella herself conducted the autopsy, TDCJ actively prevented UTMB staff from even collecting a core body temperature from inmate Hector Reyes even though he had died mere minutes earlier on the McConnell Unit.[577] In the inmate deaths

---

[571] Trial Tr. (Apr. 8, 2026) 104:5-105:1, 106:3-18 (Felicella).
[572] *Id.* at 122:13-21 (Felicella).
[573] *Id.* at 123:25-124:6 (Felicella).
[574] *Id.* at 117:4-9, 119:5-9 (Felicella).
[575] Pls.' Trial Ex. 191 at 4, 11, 16 (Skinner Death Packet UPDATED).
[576] *Id.*
[577] Pls.' Trial Ex. 398-B at 5 (Hector Reyes EMR); Trial Tr. (Apr. 8, 2026) 129:3–20, 131:9–14 (Felicella).

Mr. Williams reviewed, he consistently saw that the full circumstances surrounding an inmate's death were not reported to UTMB pathologists.[578]

The Court finds that this structural information gap—in which pathologists performing autopsies on inmates who die in the Texas summer regularly lack body temperature data, ambient cell temperature data, complete OIG investigation files, and outside medical records—systematically prevents the accurate identification of heat-related deaths and corroborates the Court's finding that TDCJ's publicly reported heat-death figures are unreliable and almost certainly undercounts.

> 3.    *TDCJ only considers a death heat-related if hyperthermia is listed as the only cause of death.*

Third, TDCJ only considers a death "heat-related" if the autopsy report lists hyperthermia as the sole cause of death.[579] In other words, heat must be the "sole causal factor" of the inmate's death for TDCJ to consider it "heat-related."[580] But, according to Dr. Vassallo, there is no medical distinction between identifying heat as a "contributing factor" or a "heat-related death."[581] Dr. Vassallo testified that, "if a death is found to have heat as a contributing cause, [she] as a medical professional [would] consider that to be a heat-related death."[582] Dr. Vassallo concluded that, if you "only considered deaths in which heat was found to be the sole cause and did not consider [deaths] where heat was found to be a contributing factor," you would undercount heat-related deaths.[583] Dr. Uribe agreed.[584] This is particularly true, given that TDCJ

---

[578] Trial Tr. (Mar. 30, 2026) 40:23-41:4 (Williams).
[579] Pls.' Dep. Designations for Prelim. Inj. Hr'g 5, Dkt. No. 155 (244:25-245:12); Pls.' Trial Ex. 325 at 17 (TDCJ AD 10.64 – Revision 12).
[580] Pls.' Dep. Designations for Prelim. Inj. Hr'g 5, Dkt. No. 155 (244:25-245:12).
[581] Prelim. Inj. Hr'g Tr. (July 31, 2024) 71:21-72:19 (Vassallo).
[582] *Id.* at 72:1-5 (Vassallo).
[583] *Id.* at 72:6-16 (Vassallo).
[584] *Id.* at 308:25-309:6 (Uribe).

frequently does not provide the pathologists the inmates' body temperatures or cell temperatures.[585]

Mr. Williams explained that it is not appropriate for a prison director to rely exclusively on autopsy findings to determine what deaths to report as heat-related because the autopsy is only a "piece of information to tell you about how someone died … it is only a slice of the pie and you have to see the entire pie to know how that autopsy report either first in or doesn't fit in with the other circumstances and context of that person's demise."[586] When he was investigating deaths while running the Alaska corrections system, he saw situations where the medical examiner reported a "cardiac event"—which was not wrong, but was missing the context and reason behind the cardiac event, because the complete picture was not communicated to the medical examiner.[587]

Dr. Uribe also testified that the standard of care for pathologists requires that an autopsy be performed within 48 hours of an individual's death.[588] The autopsies for every death listed above was performed outside of this window: (i) Elizabeth Hagerty (5 days); (ii) John Castillo (6 days); (iii) Patrick Womack (10 days); (iv) John Southards (6 days); (v) Armando Gonzales (13 days); (vi) Jason Wilson (11 days); (vii) Ryan Fairchild (9 days); (viii) Bradley Sheets (6 days); (ix) Wayne Straway (6 days); and (x) Keith Pursifull (9 days).[589] Dr. Uribe explained that the timeliness of an autopsy is important because decomposition (autolysis) affects the accuracy of the results, particularly toxicology and laboratory values.[590] Dr. Uribe further opined that a

---

[585] Trial Tr. (Mar. 30, 2026) 167:3-168:18 (Vassallo).
[586] *Id.* at 39:3-14 (Williams).
[587] *Id.* at 40:19-25 (Williams).
[588] Prelim. Inj. Hr'g Tr. (July 31, 2024) 292:14-293:1 (Uribe).
[589] *See* Findings of Fact §§ III.E.-F., *supra*.
[590] Prelim. Inj. Hr'g Tr. (July 31, 2024) 294:5-295:9 (Uribe).

systemic pattern of delayed autopsies would likely result in TDCJ underreporting heat as a cause of death.[591]

### H.    TDCJ is Undercounting Inmates' Heat-Related Illnesses.

In addition to heat-related deaths, TDCJ inmates also continue to develop heat-related illnesses. In fact, Mr. Collier admitted at the permanent injunction trial that, despite heat-mitigation measures being in place, inmates suffered heat-related deaths and illness from 2023 to 2025.[592] In his interrogatory responses, Mr. Collier identified more than a dozen inmates diagnosed with heat exhaustion, heat stroke, or hyperthermia between May 5, 2023, and September 17, 2023.[593] Mr. Collier, likewise, reported to the Texas Legislature that 17 TDCJ inmates developed heat-related illnesses in 2023 alone[594]:

| Inmate Heat-Related Illnesses | FY 2023 | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Sept | Oct | Nov | Dec | Jan | Feb | Mar | Apr | May | June | July | Aug | Total |
| Heat Cramps | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Heat related Illness, Exhaustion, Dehydration | 0 | 1 | 0 | 0 | 0 | 0 | 1 | 0 | 1 | 4 | 2 | 8 | 17 |
| Heat Stroke | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Total | 0 | 1 | 0 | 0 | 0 | 0 | 1 | 0 | 1 | 4 | 2 | 8 | 17 |

And in 2024, according to TDCJ's own report, 29 inmates developed heat-related illnesses, and one died[595]:

| Inmate Heat Related Illnesses/Death | FY 2024 | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Sept | Oct | Nov | Dec | Jan | Feb | Mar | Apr | May | June | July | Aug | Total |
| Heat Cramps | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 3 | 1 | 0 | 6 |
| Heat-Related Illness, Exhaustion, Dehydration | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 1 | 5 | 3 | 6 | 17 |
| Heat Stroke | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 1 |
| Heat Syncope | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 | 2 | 0 | 1 | 5 |
| Death Caused or Exacerbated by Temperature | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 1 |
| Total | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 5 | 11 | 4 | 7 | 30 |

---

[591] *Id.* at 295:10-19 (Uribe).
[592] Trial Tr. (Mar. 31, 2026) 119:9-122:21 (Collier).
[593] Pls.' Trial Ex. 206 (Mr. Collier's Resp. to Interrog. No. 8).
[594] *See generally* Pls.' Trial Ex. 102 (TDCJ Temperature Report).
[595] *See generally* Def.'s Trial Ex. 72 (TDCJ Dec 2024 Rider 56 Report).

These numbers are almost certainly undercounts, since at least one report from UTMB identified 35 TDCJ inmates with heat-related illnesses in a single month (June 2023).[596] Mr. Collier acknowledged that he was aware of UTMB's June 2023 heat-related illness report, but claimed (without further explanation) that the data UTMB reported to TDCJ contained "significant inaccuracies."[597]

Notably, in 2025, TDCJ reported zero heat-related inmate deaths and just six heat-related inmate illnesses or injuries[598]:

| Inmate-Related | Sept | Oct | Nov | Dec | Jan | Feb | Mar | Apr | May | June | July | Aug | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Heat Cramps | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 1 |
| Heat-Related Illness, Exhaustion, Dehydration | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 | 2 | 5 |
| Heat Stroke | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Heat Syncope | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Death Caused or Exacerbated by Temperature | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Total | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 2 | 2 | 6 |

Those numbers, too, are undercounts. Leonard Echessa, TDCJ's Deputy Division Director for the Administrative Review & Management Division, testified to several emails and documents that demonstrate that there were multiple errors in TDCJ's accounting of heat-related illnesses and injuries suffered by both employees and inmates in 2025.[599]

Evidence presented at trial showed that at least three additional inmate heat-related illnesses were excluded from the injuries reported to the Texas Legislature. On July 25, 2025, Director Lumpkin received an email titled "DAILY OFFSITE BED DETAIL 2025-07-25" that indicated "S.S." an inmate housed on the Hutchins Unit was admitted to Methodist Charlton

---

[596] Pls.' Trial Exs. 84-85 (Pulvino email and attachment).

[597] Prelim. Inj. Hr'g Tr. (Aug. 2, 2024) 225:10-228:3 (Collier).

[598] Pls.' Trial Ex. 280 at 7 (TDCJ 2025 Rider 55 Report).

[599] Trial Tr. (Apr. 2, 2026) 122:9-130:22, 132:3-136:19, 137:9-139:14 (Echessa) (referencing Pls.' Trial Ex. 280 (TDCJ 2025 Rider 55 Report); Pls.' Trial Ex. 303 at 7 (TDCJ Inmate Heat Injuries Report (2024-2025) [516457-67]); Pls.' Trial Ex. 292 (TDCJ Workers Comp Packets (2025)); Pls.' Trial Ex. 583 (Edward Andrew Email (July 25, 2025))).

Medical Center hospital in Dallas and diagnosed with "Elevated CK, Heat exhaustion, Syncope."[600] TDCJ's documentation of the 11 inmates whose injuries were reported to the Texas Legislature excluded inmate S.S. and also reported zero instances of inmates who suffered Heat Syncope in July 2025.[601] Similarly, TDCJ's injury report to the Texas Legislature excluded inmate S.T., a 49-year-old female inmate "at the Coleman Unit" who was "seen by medical and diagnosed with heat exhaustion" on July 15, 2025.[602] Also missing from TDCJ's 2025 legislative report was Robert Wallace, an inmate who died on June 8, 2025.[603] Two days before his death, on June 6, 2025, at 3:17 a.m., Mr. Wallace was documented by correctional staff as having "altered mental status" and reporting he overheated and vomited.[604] Later that same day, at 10:12 p.m., Mr. Wallace was evaluated again after suffering nausea, vomiting, fatigue, and being over-heated.[605] Neither instance of Mr. Wallace's two heat-related illnesses on the same day were reported to the Texas Legislature.[606]

---

[600] Pls.' Trial Ex. 583 at 4 (Edward Andrew Email (July 25, 2025)); Trial Tr. (Apr. 2, 2026) 132:5-133:13 (Echessa).

[601] *Compare* Pls.' Trial Ex. 280 at 7 (TDCJ 2025 Rider 55 Report) *with* Pls.' Trial Ex. 303 at 6 (TDCJ Inmate Heat Injuries Report (2024-2025) [516457-67]) *and* Pls.' Trial Ex. 583 at 4 (Edward Andrew Email (July 25, 2025)).

[602] Trial Tr. (Apr. 2, 2026) 134:15-22, 170:2-4 (Echessa); Pls.' Trial Ex. 280 at 7 (TDCJ 2025 Rider 55 Report); Pls.' Trial Ex. 303 at 6 (TDCJ Inmate Heat Injuries Report (2024-2025) [516457-67]); Pls.' Trial Ex. 584 at 3 (Cynthia Martinez Email (Sept. 18, 2025)).

[603] *See* Pls.' Trial Ex. 303 at 6 (TDCJ Inmate Heat Injuries Report (2024-2025) [516457-67]); Pls.' Trial Ex. 406-B at 1 (Robert Wallace EMR); Trial Tr. (Apr. 2, 2026) 146:5-22 (Echessa).

[604] Pls.' Trial Ex. 406-B at 51 (Robert Wallace EMR); Trial Tr. (Apr. 2, 2026) 143:9-144:11 (Echessa).

[605] Pls.' Trial Ex. 406-B at 46 (Robert Wallace EMR); Trial Tr. (Apr. 2, 2026) 142:2-143:8 (Echessa).

[606] Trial Tr. (Apr. 2, 2026) 146:5-22 (Echessa); Pls.' Trial Ex. 280 at 7 (TDCJ 2025 Rider 55 Report).

### I.      TDCJ Staff Continue to Suffer Heat-Related Injuries.

The substantial risk of serious harm the extreme heat poses to TDCJ inmates is also demonstrated by the effects of extreme heat on TDCJ staff. TDCJ's own training documents confirm that heat-related illness is the fifth-leading cause of serious injuries among TDCJ employees.[607] One document specifically recognizes that "[n]o one is immune from suffering a heat-related illness, from the fittest employee to those who may be prone to medical conditions."[608] It warns that "[i]ncreased body temperatures, if left uncontrolled, may lead to delirium, convulsions, seizures, and possibly even death."[609] And it suggests treating the person by moving them "out of direct sunlight [and] into … [an] air-conditioned environment if possible."[610]

In 2022 and 2023, TDCJ staff filed nearly 80 workers' compensation claims related to the heat.[611] These are some of the employee statements[612]:

- "Overheated, got dizzy, fell down and could not move or respond."

- "I was sitting in my office and started to feel unwell and overheated. I felt liek [sic] I could not breath [sic]."

- "I was counting the wings at Beto when I became over heated. Reported to Capt. Kimberly Henslee. She then sent me to the chapel where I began to throw up, then Capt. Henslee sent me home."

- "Driving home from work (Torres Unit/Food Service) after being exposed to excessive heat in the food service dept. Had a stroke on the way home."

- "Heat from unit really got to me, extremely overheated causing me to get sick, really dizzy, headache, messing wiht [sic] my diabetes."

---

[607] Def.'s Hr'g Ex. 13-D at 15 (Pre-Service Training Lesson Plan).
[608] *Id.*
[609] *Id.* at 16.
[610] *Id.* at 15.
[611] Pls.' Trial Ex. 207 (Mr. Collier's Resp. to Interrog. No. 10).
[612] *Id.*

- "While performing officer duty at the O.M. gate, too much heat."

- "Heat exhaustion, dehydration."

- "Heat exhaustion."

- "It happened because of the heat and I was dehydrated."

- "In C Row top felt light headed, requested water, after drinking three bottles I got dizzy and felt like I was going to pass out, left side of the body went numb."

- "While watching my workers in the bath house, I got overheated, very weak, confused and unable to respond. Also, I was dry heaving and felt nauseated, I vomited blood."

- "Was working in high heat when I started to feel dizzy, then later felt chest pain and body aches."

Ms. Simmons testified that she saw "at least five" corrections officers in her unit pass out in the high heat.[613] Mr. Collier acknowledged during the preliminary injunction hearing that TDCJ correctional officers continue to suffer from heat-related illnesses.[614]

TDCJ reported 35 instances of heat-related illnesses of TDCJ staff to the Texas Legislature in 2023.[615] And in 2024, TDCJ reported 26 instances of heat-related illnesses and injuries of TDCJ staff to the legislature.[616] In 2025, TDCJ reported to the Texas Legislature that only 11 employees suffered heat-related illnesses.[617] Again, this is almost certainly an undercount—as worker's compensation records from the summer of 2025 showed that at least three TDCJ employees, Shaniqua Adams, Tremaine Brown, and John Canton, suffered heat-related illnesses but were not included within the count TDCJ reported to the Texas

---

[613] Prelim. Inj. Hr'g Tr. (July 30, 2024) 39:16-18 (Simmons).

[614] Prelim. Inj. Hr'g Tr. (Aug. 2, 2024) 229:4-231:11 (Collier).

[615] *See generally* Pls.' Trial Ex. 102 (TDCJ Temperature Report).

[616] Def.'s Trial Ex. 72 at 8 (TDCJ 2024 Rider 56 Report)

[617] Pls.' Trial Ex. 280 at 7 (TDCJ 2025 Rider 55 Report).

Legislature.[618] Mr. Canton suffered a heat-related illness when he "[o]ver heated" with "[n]o water available" on the C block of the Wynne Unit on May 16, 2025 while Mr. Brown experienced fatigue and nausea after serving "chow" to inmates in the 11 building at Alfred Hughes Unit on August 7, 2025 and suffered heat exhaustion.[619] None of these were reported to the Legislature.

## IV.    TDCJ'S HEAT-MITIGATION MEASURES ARE STILL INADEQUATE.

In 2017, Judge Keith Ellison concluded that "the mitigation measures put in place by TDCJ are insufficient to combat the substantial risk of serious injury or death faced by the inmates at the [Wallace] Pack Unit during the summer months."[620] Judge Ellison explained that, "[s]ince the 12 heat-related deaths in 2011 and 2012, TDCJ has implemented, and attempted to implement, many of the mitigation measures discussed by the Fifth Circuit in *Ball v. LeBlanc*."[621] In Judge Ellison's view, however, these measures did not "reduce the substantial risk of heat-related illness faced by all of the men at the Pack Unit, and particularly not the men with heat sensitivities."[622] The following year, the Texas House Committee on Corrections reached the same conclusion: "Based on the medical information known about human health and heat-related health risks, TDCJ cannot rely only on mitigation factors to assure the well-being of inmates and corrections personnel."[623]

---

[618] Trial Tr. (Apr. 2, 2026) 125:6-18, 125:25-128:15 (Echessa); Pls.' Trial Ex. 303 at 9-11 (TDCJ Inmate Heat Injuries Report (2024-2025) [516457-67]); Pls.' Trial Ex. 292 at 2, 37, 61 (TDCJ Workers Comp Packets (2025)); Pls.' Trial Ex. 280 at 7 (TDCJ 2025 Rider 55 Report).
[619] Pls.' Trial Ex. 292 at 37, 61 (TDCJ Workers Comp Packets (2025)).
[620] *Cole*, 2017 WL 3049540, at *10.
[621] *Id.*
[622] *Id.*
[623] Pls.' Trial Ex. 34 at 58 (Interim Report 2018 by the House Committee).

In July 2022, a study authored by Dr. Carlee Purdum and published by Texas A&M concluded that, "despite [TDCJ's] current heat mitigation policies, nearly every year, there are reports of incarcerated people and staff falling extremely ill and/or dying from complications from extreme heat in Texas prisons."[624] That study warned that "[i]ncreasing annual temperatures and the increase of days over 100° in Texas will continue to exacerbate the degradation of health for both incarcerated people and staff" in the TDCJ system.[625] The study based its conclusions on survey responses from TDCJ inmates:

- 66% said they did not have access to ice.[626]

- 61% said they did not have access to cool-down showers.[627]

- 60% said wellness checks weren't happening regularly.[628]

- 47% reported being denied access to respite areas.[629]

- 29% said that they knew of at least one heat-related death in their own unit or another.[630]

- 11% said they did not receive access to cold water, and the respondents who reported receiving access to cold water described "a pattern of persistent inconsistency."[631]

TDCJ presented no evidence at either the preliminary injunction hearing or the permanent injunction trial that these survey results were inaccurate—nor has TDCJ completed its own

---

[624] Pls.' Trial Ex. 55 at 3-4 (Extreme Temperatures and Covid19).

[625] *Id.* at 4 (Extreme Temperatures and Covid19).

[626] *Id.* at 22 (Extreme Temperatures and Covid19).

[627] *Id.* at 27-28 (Extreme Temperatures and Covid19).

[628] Prelim. Inj. Hr'g Tr. (Aug. 2, 2024) 237:16-238:4 (Collier); Pls.' Trial Ex. 55 at 14 (Extreme Temperatures and Covid19).

[629] Pls.' Trial Ex. 55 at 31-33 (Extreme Temperatures and Covid19).

[630] Prelim. Inj. Hr'g Tr. (Aug. 2, 2024) 235:11-17 (Collier); Pls.' Trial Ex. 55 at 18 (Extreme Temperatures and Covid19).

[631] Prelim. Inj. Hr'g Tr. (Aug. 2, 2024) 240:16-241:18 (Collier); Pls.' Trial Ex. 55 at 20 (Extreme Temperatures and Covid19).

surveys in the years since this study was published to determine whether inmates are consistently receiving the agency's heat-mitigation measures.

At least some of TDCJ's heat-mitigation measures were in place during the years of Dr. Skarha's study, yet heat-related deaths continued unabated.[632] According to Dr. Skarha, if mitigation measures were effective in preventing heat-related deaths in Texas prisons without air conditioning, she would have expected to see no effect from heat on mortality in those facilities.[633] But she did see an effect, even while TDCJ's mitigation measures were in place.[634]

Mr. Collier also personally acknowledged having received Dr. Purdum's and Dr. Skarha's studies in 2022 and being aware of their findings.[635] He said that he had TDCJ's "research director" Mr. Barbee "look at" the Skarha study,[636] but he did not recall having asked anyone at UTMB or anyone with an epidemiology degree to review that study.[637] Mr. Collier acknowledged that, "despite TDCJ's heat mitigation policies and measures, heat was a factor in at least three [inmates'] death[s]" in summer 2023.[638] He admitted that 17 TDCJ inmates suffered heat-related illnesses in summer 2023, despite TDCJ's heat-mitigation measures.[639] And he recognized that, despite TDCJ's heat-mitigation policies and measures, TDCJ inmates submitted nearly 6,000 heat-related grievances in 2023 alone.[640]

---

[632] Pls.' Trial Exs. 70 & 75 (Skarha articles regarding air conditioning in prisons).
[633] Prelim. Inj. Hr'g Tr. (July 30, 2024) 172:24-173:7 (Skarha).
[634] Id. at 173:9-11 (Skarha).
[635] Prelim. Inj. Hr'g Tr. (Aug. 2, 2024) 234:8-235:23, 243:10-245:11 (Collier).
[636] Id. at 244:6-245:11 (Collier).
[637] Id. at 244:21-245:11 (Collier).
[638] Id. at 221:8-12 (Collier).
[639] Id. at 222:4-7, 224:10-14 (Collier); see generally Pls.' Trial Ex. 102 (TDCJ Temperature Report).
[640] Prelim. Inj. Hr'g Tr. (Aug. 2, 2024) 221:13-222:3 (Collier); Pls.' Trial Ex. 102 at 4 (TDCJ Temperature Report).

Mr. Collier's Rule 30(b)(6) designee testified that TDCJ did not give the Texas A&M study or Dr. Skarha's study "much credibility," because TDCJ did not "sanction" them and was not "involved" in them.[641] Mr. Collier's designee called Dr. Skarha's study "nothing more than writing on a piece of paper."[642] Mr. Collier's designee testified that TDCJ did not do anything to investigate the findings of either study.[643]

Mr. Williams testified at the preliminary injunction hearing that, if he received something like the Skarha study, he would not ignore it and it would instead have raised "high alarms" with him.[644] In Mr. Williams's view, not responding to deaths, scientific studies, staff illnesses, and inmate illnesses puts people's health and safety at risk.[645] Mr. Collier's corrections expert, John Baldwin, agreed that if he received a study from a credible source alerting him to dangerous conditions in his prison system, he would review the study.[646] In fact, he acknowledged that receiving a study like Dr. Skarha's, showing 14 people died every year from extreme heat in unair-conditioned housing, would cause him concern, and he would review and evaluate a study like that.[647] Likewise, Mr. Baldwin acknowledged that, if he received information like what was contained in Dr. Purdum's study, he would investigate it.[648] And Mr. Morales testified that "any reasonable person in [his] position . . . or in Mr. Collier's position" would look into the Purdum study's findings.[649]

---

[641] Pls.' Dep. Designations for Prelim. Inj. Hr'g 4, Dkt. No. 155 (260:15-261:14).
[642] *Id.* at 5 (262:19-263:1).
[643] *Id.* at 6 (270:21-274:23, 283:18-284:14).
[644] Prelim. Inj. Hr'g Tr. (July 31, 2024) 240:23-241:24 (Williams).
[645] *Id.* at 242:23:243:2 (Williams).
[646] Prelim. Inj. Hr'g Tr. (Aug. 2, 2024) 54:24-55:3 (Baldwin).
[647] *Id.* at 55:18-23 (Baldwin).
[648] *Id.* at 59:13-60:11 (Baldwin).
[649] Prelim. Inj. Hr'g Tr. (Aug. 1, 2024) 278:16-280:13 (Morales).

In March 2025, this Court found that, that "the uncontroverted evidence shows that [TDCJ's] heat mitigation measures are *still* inadequate, just as Judge Ellison found seven years ago."[650] Specifically, this Court held that[651]:

- TDCJ's "[r]espite areas are inadequate and ineffective";

- "Cold showers do not guard against the health risks of constant extreme heat";

- "Fans are inadequate and can be counter-productive in extreme heat"; and

- "Access to cold water is inconsistent and does not reduce the long-term effects of the heat on TDCJ inmates."

Both Mr. Collier and Director Lumpkin read this Court's March 2025 Order,[652] yet TDCJ has made no meaningful changes to its heat-mitigation measures since then. Professor Deitch confirmed that the heat-mitigation measures "are the same" in Revision 12 of AD 10.64 (the version in effect at the time of the permanent injunction trial), as they were in Revision 11 (the version in effect at the time of the preliminary injunction hearing): respite rooms, cold showers, fans, cold water, and welfare checks.[653] Mr. Collier was "not aware of anything that changed" in AD 10.64 since the preliminary injunction hearing[654]—Mr. Williams agreed.[655]

In opining that TDCJ's heat mitigation measures are effective, no defense expert actually analyzed whether the measures were adequately implemented, or whether the measures were effective at preventing illness and death in the prisons. Defense expert Dr. David DeGroot limited his opinion to whether TDCJ's heat mitigation measures were effective as written in the policy; he did not evaluate whether or not TDCJ actually implemented these measures

---

[650] *Tiede II*, 796 F. Supp. 3d at 331 (emphasis in original).

[651] *Id.* at 310, 312-13.

[652] Trial Tr. (Mar. 31, 2026) 163:17-19 (Collier), 249:15-19 (Lumpkin).

[653] *Id.* at 66:23-67:4 (Deitch).

[654] *Id.* at 117:13–118:1 (Collier).

[655] Trial Tr. (Mar. 30, 2026) 61:7-10 (Williams).

sufficiently or consistently.[656] Likewise, Mr. Ishee did not review any temperature logs, death investigations, or staffing levels.[657] Further, Dr. Everitt did not conduct any investigation or analysis into whether TDCJ's heat-mitigation measures are consistently implemented—his opinion is limited to only the measures as they are "written down."[658]

Consistent with its prior ruling as to TDCJ's heat-mitigation measures in Revision 11 of AD 10.64, as set forth in more detail below, the Court finds that TDCJ's heat-mitigation measures in Revision 12 of AD 10.64 are substantively the same as Revision 12—and, in the case of respite rooms, have gotten worse. Those measures are still inadequate, both in theory and in practice, to address the substantial risk of serious harm posed by extreme heat in TDCJ's unair-conditioned prisons. Inmate deaths and heat-related illnesses and injuries continued during summers when, as Director Lumpkin's witnesses testified and TDCJ documents indicate, TDCJ policy required the implementation of all of TDCJ's heat mitigation measures.[659] The Court finds, further, that TDCJ knows the measures are inadequate, and that its continued reliance on them exhibits deliberate indifference to the dangerous heat conditions in its prisons. As Director Lumpkin admitted: "If the director knows his job is to fix it and knows there's a problem and has been told there's a problem and then decides not to fix it, that would be the definition of indifference on the part of the director."[660]

---

[656] Trial Tr. (Apr. 2, 2026) 229:17-230:15 (DeGroot).
[657] Trial Tr. (Apr. 6, 2026) 272:19-274:10, 285:7-286:10 (Ishee).
[658] *Id.* at 117:20-118:4 (Everitt).
[659] *See generally* Pls.' Trial Exs. 324 (TDCJ AD 10.64 – Revision 11), 325 (TDCJ AD 10.64 – Revision 12); Trial Tr. (Mar. 31, 2026) 119:9–12, 120:10–13, 121:5–8 (Collier).
[660] Lumpkin Dep. 181:18-182:14, Dkt. No. 337-1.

### A.    TDCJ's Understaffing Crisis Prevents the Agency from Consistently Implementing Its Heat-Mitigation Measures.

Before examining each measure individually, the Court begins with the systemic problem that prevents TDCJ from consistently implementing any heat-mitigation measure. Every measure in TDCJ's current policy—respite rooms, cold showers, fans, welfare checks, and ice water distribution—requires sufficient staff to implement it.[661] Professor Deitch's testimony on this point was unrebutted: "You need staff in order to be able to take people to respite rooms, take them to showers, bring them to medical, et cetera."[662] She said: "[S]taffing has everything to do with whether or not" TDCJ's heat-mitigation "measures can be implemented appropriately."[663] That was true with the measures in Revision 11 of AD 10.64, and it remains true with the measures in Revision 12.[664]

Despite the need for sufficient staff to implement its heat-mitigation measures, TDCJ is "dangerously understaffed."[665] TDCJ's current vacancy rate for "filled positions" (i.e., someone is "hired for that position") is about 21%—meaning that nearly one in five positions (or 5,155 positions in total) is unfilled.[666] If you take out the employees in training, that number rises to about 25%.[667] A "safe" prison staff vacancy rate, according to Professor Deitch, is below 10%.[668]

---

[661] Trial Tr. (Mar. 31, 2026) 67:5-7 (Deitch); *see also* Trial Tr. (Apr. 6, 2026) 285:7-11 (Ishee) (agreeing that "virtually every one of TDCJ's heat mitigation measures in AD 10.64 requires staff to have some role in that process").
[662] Trial Tr. (Mar. 31, 2026) 66:23-67:9 (Deitch).
[663] Prelim. Inj. Hr'g Tr. (July 31, 2024) 152:6-18 (Deitch).
[664] Trial Tr. (March 31, 2026) 67:14-16 (Deitch).
[665] *Id.* at 53:11-20 (Deitch).
[666] *Id.* at 54:3-6, 60:10-21 (Deitch).
[667] *Id.* at 54:6-8 (Deitch).
[668] *Id.* at 53:21–54:2 (Deitch).

TDCJ admits that it is facing an understaffing crisis. Mr. Collier has called staffing a "big problem"[669] and a "huge" issue,[670] and TDCJ has told the Texas Legislature that staffing is the agency's "most significant major issue."[671] When asked to sum up her concerns about TDCJ's current vacancy rate being so high, Professor Deitch said: "That's just not a safe way to operate an institution."[672] Director Lumpkin's corrections expert, Mr. Ishee, didn't review or analyze any of TDCJ's staffing data, but he agreed that "[p]oor staffing has a significant effect on a prison system."[673]

TDCJ's understaffing crisis is not new. Mr. Collier admitted at trial that the agency has "been working with staffing issues [for] quite some time"[674] and that staffing was "a problem" for the entire time he ran the agency.[675] At the end of fiscal year 2023, TDCJ's agency-wide vacancy rate was nearly 28%, with some units operating at less than 50% staffing and some units with up to 70% corrections officer positions unfilled.[676] TDCJ has tried to address the problem through salary increases—raising corrections officer pay by 39% between 2020 and 2025[677]— but the vacancy rate has improved only incrementally (about 7%),[678] which Professor Deitch testified suggests that "there's something about the working conditions, whether it's the overtime people have to work, or the more dangerous conditions, or the discomfort involved in working those facilities including the fact that they are extremely hot."[679] Consistent with that conclusion,

---

[669] Prelim. Inj. Hr'g Tr. (Aug. 2, 2024) 254:10-20 (Collier).
[670] Trial Tr. (Mar. 31, 2026) 207:4-7 (Collier).
[671] Pls.' Trial Ex. 266 at 303-304 (TDCJ Self Evaluation Report).
[672] Trial Tr. (Mar. 31, 2026) 60:20-21 (Deitch).
[673] Trial Tr. (Apr. 6, 2026) 285:17-286:10 (Ishee).
[674] Trial Tr. (Mar. 31, 2026) 214:22-23 (Collier).
[675] *Id.* at 141:7-10 (Collier).
[676] *Id.* at 56:23-57:11 (Deitch).
[677] *Id.* at 62:2-12 (Deitch).
[678] *Id.* at 56:23-54:5, 60:10-21, 62:2-12 (Deitch).
[679] *Id.* at 62:13-23 (Deitch).

80% of corrections staff in unair-conditioned TDCJ units reported in surveys by the Sunset Commission that the lack of air conditioning makes their job more difficult.[680]

Based on her research and conversations with current and former TDCJ staff, Professor Deitch has concluded that "the extreme heat inside [TDCJ's] unair-conditioned prisons contributes to the agency's understaffing crisis."[681] Ms. Simmons similarly observed that, while she was incarcerated, corrections officers avoided duty posts in unair-conditioned facilities,[682] conducted fewer rounds—sometimes coming through the unit only for count time[683]—and took more vacations during summer months.[684] Mr. Collier acknowledged that installing air conditioning would help "significantly" with recruiting and retaining staff and would make TDCJ's "work environment much better."[685]

TDCJ's understaffing crisis has also created an inexperienced and overworked workforce. TDCJ's turnover rate is 35%, and 63% of TDCJ's corrections officers have been with the agency for three years or less.[686] Professor Deitch testified that this creates a cascading problem: "It means you have a much smaller midlevel group of individuals that can handle supervisory responsibilities" and "less consistency in day-to-day operations because you don't have that experienced supervisory staff."[687] The vacancy rates also require TDCJ staff "to work overtime in order to fill these priority positions"[688]—indeed, 78% of TDCJ correctional staff

---

[680] *Id.* at 62:24-63:4 (Deitch).
[681] *Id.* at 63:5-9 (Deitch).
[682] Prelim. Inj. Hr'g Tr. (July 30, 2024) 38:19-22 (Simmons).
[683] *Id.* at 38:8-16 (Simmons),
[684] *Id.* at 43:3-4 (Simmons).
[685] Trial Tr. (Mar. 31, 2026) 205:16-24 (Collier).
[686] Pls.' Trial Ex. 577 at 87 (Safe Inside Report); *see also* Trial Tr. (Mar. 31, 2026) 61:3-19 (Deitch).
[687] Trial Tr. (Mar. 31, 2026) 61:17-25 (Deitch).
[688] *Id.* at 57:22-58:2 (Deitch).

surveyed by the Sunset Commission reported that they regularly worked overtime hours.[689] TDCJ policy prohibits staff from working more than 16 hours a day or 10 days in a row, but since fiscal year 2019, "documented violations of the 10-day rule [have] doubled and violations of the 16-hour rule [have] increased more than tenfold to 9,000 violations per month on average."[690] Nearly half of the TDCJ correctional staff the Sunset Commission surveyed "said they are not regularly afforded breaks on duty despite these long shifts."[691]

These overlapping trends have led to more dangerous prisons. According to the Sunset Commission, "[o]verworked and exhausted [TDCJ] staff tend to be less operationally aware and effective, potentially compromising safety in facilities and elevating burnout across the agency."[692] Such staff "can become overstretched and less operationally aware and therefore might take more opportunities to cut corners, which can lead to public safety breaches."[693] TDCJ employees surveyed by the Sunset Commission "consistently expressed concern that the staffing models TDCJ had adopted to deal with crisis-level vacancy rates, including requiring the excessive overtime and travel, create conditions where mistakes and harmful oversights are more likely to happen."[694] 40% of the correctional staff surveyed "said they feel unsafe in TDCJ facilities, and many facilities are so critically understaffed they cannot operate by the agency's own safety standards."[695]

Understaffing also prevents staff from implementing the agency's heat-mitigation measures. Corrections officers are responsible for conducting security or welfare checks on

---

[689] Pls.' Trial Ex. 282 at 63 (Sunset Commission Report).
[690] *Id.* at 64 (Sunset Commission Report).
[691] *Id.*
[692] *Id.* at 63 (Sunset Commission Report).
[693] *Id.* at 64 (Sunset Commission Report).
[694] *Id.*
[695] *Id.* at 62 (Sunset Commission Report).

inmates at least every 30 minutes, escorting inmates to respite rooms and cold showers, distributing ice water, and carrying out every other component of TDCJ's heat mitigation protocol.[696] TDCJ's understaffing crisis directly prevents the agency from performing these functions consistently: When a unit is short-staffed, "most of those checks cannot be conducted on a timely basis—where they are conducted in a very superficial way or there's falsification of records so that people show that they're conducting the checks, but they're not. They simply can't keep up with that kind of schedule."[697]

Because of the agency's staffing crisis, respite areas are "crowded and uncomfortable," "packed with inmates," and "almost nonexistent."[698] Ms. Simmons testified that one of her units "never had respite available" after midnight,[699] and would occasionally not open respite until after 10:00 a.m. because staff weren't available to open it[700] When Ms. Simmons was in a higher-security cell, respite was only available once a day around 8:00 or 9:00 p.m.[701] Mr. Malouff testified that the respite room at the Pack Unit was located in a separate building a "quarter, half mile" away,[702] that he was required to submit a written respite request and wait as long as half an hour to an hour for a staff member to arrive,[703] and that his requests were sometimes ignored entirely.[704]

---

[696] Trial Tr. (Mar. 31, 2026) 63:18-64:7, 65:15-19 (Deitch).
[697] *Id.* at 64:8-14 (Deitch).
[698] Austin Chronicle Article, Dkt. No. 50-35.
[699] Prelim. Inj. Hr'g Tr. (July 30, 2024) 41:1-11 (Simmons).
[700] *Id.* at 41:3-7 (Simmons).
[701] *Id.* at 41:7-11 (Simmons).
[702] *Id.* at 185:8-13 (Malouff).
[703] *Id.* at 185:14-186:3 (Malouff).
[704] *Id.* at 186:4-6 (Malouff).

The same is true for cold showers. Ms. Simmons testified that cold showers were not available in her unit at all for several hours during count time or from 10:00 p.m. to 7:00 a.m.[705] Even when they were available, her unit had only one cold shower for "80 to 125 women" who "need[ed] to get relief from the heat."[706] And, as discussed, the night before he died, Mr. Womack's request for a respite shower was denied.[707] One of Mr. Womack's fellow inmates noted that this denial was "nothing unusual for [the] Coffield [Unit]," and that the "excuse is always we are understaffed."[708]

Understaffing undermines the regular provision of ice water, too. Ms. Simmons testified that there was rarely enough ice water to meet the demand of the women in her unit, as they would only receive one cooler for a dorm with 124 women.[709] Mr. Malouff testified that, while he was incarcerated, it could take up to eight hours for TDCJ staff to refill the water cooler in his unit.[710] Individuals incarcerated in TDCJ also reported to Ms. Robertson that they went "eight to nine hours at a time with no water" in July 2024, and Mr. Wilson repeatedly noted the shortage of water—and the fact that inmates in his unit would only receive water once per day—in his communications with Ms. Robertson in the weeks before he died.[711]

Based on the foregoing evidence and testimony, the Court finds that TDCJ's understaffing crisis prevents the agency from consistently implementing any of its heat mitigation measures.[712] The sworn testimony of Professor Deitch, Ms. Simmons, and Mr.

---

[705] *Id.* at 49:12-14 (Simmons).
[706] *Id.* at 49:14-17 (Simmons).
[707] Pls.' Trial Ex. 200-B at 2, 42 (Womack AIR updated).
[708] *Id.* at 42 (Womack AIR updated).
[709] Prelim. Inj. Hr'g Tr. (July 30, 2024) 48:16-25 (Simmons).
[710] *Id.* at 187:4-10 (Malouff).
[711] *See generally* Pls.' Trial Exs. 137 & 264 (Jason Wilson e-messages).
[712] Trial Tr. (Mar. 31, 2026) 53:15-20 (Deitch); *see also* Prelim. Inj. Hr'g Tr. (July 31, 2024) 152:6-18 (Deitch).

Malouff; the findings of the Texas Sunset Commission; and the admissions of TDCJ's own current and former leadership collectively establish that the agency does not have—and has not had for years—the staffing necessary to implement its heat-mitigation measures consistently or adequately.

**B.      Even with Full Staffing, TDCJ's Heat-Mitigation Measures Would Still Be Inadequate.**

Even if TDCJ had sufficient staffing to implement each measure consistently, those measures, either individually or collectively, still would not remedy the substantial risk of serious harm from extreme heat in TDCJ's unair-conditioned prisons.

*1.      Respite rooms are an inadequate remedy.*

To begin with, respite rooms provide only temporary, intermittent relief from a continuous, 24-hour exposure risk. Inmates in unair-conditioned TDCJ facilities are not exposed to extreme heat for discrete periods during the day—they are often exposed continuously, including overnight and during the hours when respite areas are unavailable. Dr. Vassallo testified that the heat risk facing TDCJ inmates is not transient, but cumulative: "People are in these conditions all day, 24/7, and anytime day or night, they may be affected by the heat or feel that they need respite."[713] As Dr. Vassallo testified in the *Cole* case, when inmates are not in air conditioning, "they are subjected to the temperatures … which are risky and cause harm, including sickness, morbidity, and mortality."[714] Thus, even if TDCJ inmates get "three or four or five hours" in respite—which is unlikely, given the evidence that inmates can have as little as

---

[713] Trial Tr. (Mar. 30, 2026) 99:21-100:2 (Vassallo).
[714] *Bailey v. Livingston*, Hr'g on Prelim. Inj. 135:9-136:15, Dkt. No. 50-42.

15 minutes in respite[715]—that still leaves "19 or 20 hours in these heat conditions."[716] In Dr.

Vassallo's view, "it's the total accumulated heat stress for the 20 hours you're in the [extreme]

temperatures" that "matters" from a risk perspective.[717]

The scientific literature confirms the distinction between intermittent and permanent air

conditioning: One study found there were 10% more deaths among individuals who merely

visited an air-conditioned location compared to those who had air conditioning in their homes

full-time.[718] Formerly incarcerated individuals reached the same conclusion. From Mr. Malouff's

perspective, the respite rooms were not effective at reducing the effects of the heat on him

because "it was short-term," "it really didn't do anything for you, and as soon as you left, you

went right back into that heat."[719] Ms. Simmons's experience was similar—she was not allowed

to stay in respite for "very long periods of time," and she thought they were ineffective at

reducing the physical effects of heat.[720]

TDCJ's respite room system also puts the onus primarily on inmates to identify when

they are starting to experience symptoms of a heat-related illness. The issue with that, according

to Dr. Vassallo, is that individuals often "don't know they are in trouble" from the heat, so they

can "start having cognitive problems from heat illness before they realize they need to go to [a

respite room]."[721] In other words, "the rapidity, the speed at which heatstroke strikes means that

---

[715] Prelim. Inj. Hr'g Tr. (July 30, 2024) 41:15-17 (Simmons) (Ms. Simmons was only permitted to stay in respite rooms for 15 minutes to an hour), 186:10-14 (Malouff) (Mr. Malouff was only permitted to stay in respite rooms for 15-20 minutes).
[716] Dkt. No. 50-42 at 135:16-18.
[717] Prelim. Inj. Hr'g Tr. (July 31, 2024) 43:1-12 (Vassallo).
[718] *Id.* at 40:16-41:19 (Vassallo); *see generally* Pls.' Trial Ex. 13 (Prognostic Factors in Heat Wave-Related Deaths).
[719] Prelim. Inj. Hr'g Tr. (July 30, 2024) 186:15-21 (Malouff).
[720] *Id.* at 47:23-48:13 (Simmons).
[721] Dkt. No. 50-42 at 135:19-136:15.

checking people that are walking around, somebody is sleeping in their bed, everything looks fine …, and they can still suffer a heatstroke without the correction staff realizing they're in trouble."[722] This is consistent with the medical literature on heat stroke, which notes that patients experiencing heat stroke may only initially complain of "weakness, lethargy, nausea, or dizziness," and "[t]he presentation of older adults with heat stroke may be subtle and nonspecific early in the course of the disease."[723] Defense expert Dr. David DeGroot confirmed that a defining characteristic of heat stroke is "altered mental status," meaning that by the time the condition has fully developed, the inmate is "not capable of refusing to consent" to treatment—let alone capable of requesting a respite room.[724]

Inmates with mental illnesses are even less capable of identifying when they need help. Dr. Biswas estimated that 37% of people incarcerated in U.S. prisons have mental illnesses,[725] and Brian Nichols, the Chairman of the Texas Board of Criminal Justice, which oversees TDCJ, testified that "around 37 percent of the total TDCJ population has been diagnosed with at least one form of mental illness."[726] With a population of approximately 141,135 inmates as of February 2026,[727] that would mean more than 51,000 TDCJ inmates have at least one form of mental illness.

According to Dr. Biswas, people with serious mental illness "lack insight and judgment" into their own condition, rendering them unable "to ask for help" or make decisions for

---

[722] *Id.* at 135:23-136:5.
[723] Pls.' Trial Ex. 275 at 4 (Severe Nonexertional Hyperthermia (Classic Heat Stroke) in Adults).
[724] Trial Tr. (Apr. 2, 2026) 221:12-13 (DeGroot).
[725] Trial Tr. (Mar. 30, 2026) 282:21-283:7 (Biswas).
[726] Trial Tr. (Apr. 6, 2026) 184:2-12 (Nichols).
[727] *See generally* Pls.' Trial Ex. 281-B (State Correctional Institution Population & System Capacity).

themselves.[728] Dr. Vassallo testified that people with mental illness are "two to four times more likely to succumb to heat stroke and heat-related illness," in part because they cannot take any of the steps necessary to protect themselves—like "asking for anything that they might need [or] calling for help."[729] Indeed, Dr. Vassallo opined that is exactly what happened to Keith Pursifull: He was mentally ill such that he was not consistently taking his medications, making funny sounds, not able to follow instructions, throwing feces and urine, and "always naked in [his] cell."[730] She said that exposing someone like Mr. Pursifull to extreme heat—when they "cannot advocate or take any kind of behavioral actions to try to get help"—is "going to be deadly."[731] It was no surprise to her that he died from heat stroke after being kept in an unair-conditioned cell in extreme heat for at least several days.[732]

The changes in Revision 12 to AD 10.64 will likely further reduce inmates' access to respite rooms. The prior version of AD 10.64 (Revision 11) permitted inmates to request respite at any time and to remain in respite "as long as necessary."[733] Revision 12, however, removed the 24/7 access language, changed "as long as necessary" to "as long as possible," and vested decisions about respite room access in corrections officers applying "good correctional judgment."[734] The Court credits Dr. Vassallo's unrebutted opinion that "[t]his is a bad change" that is medically unsound, because the "decision to allow someone respite if they need it is a

---

[728] Trial Tr. (Mar. 30, 2026) 283:24-285:8 (Biswas).
[729] Trial Tr. (Apr. 2, 2026) 10:17-11:7 (Vassallo).
[730] *Id.* at 10:11-23 (Vassallo).
[731] *Id.* at 16:19-25 (Vassallo).
[732] *Id.* at 8:4-9:4, 18:10-14 (Vassallo).
[733] Trial Tr. (Mar. 30, 2026) 96:1-12 (Vassallo); *see also* Pls.' Trial Ex. 324 (TDCJ AD 10.64 – Revision 11).
[734] Trial Tr. (Mar. 30, 2026) 96:1-12 (Vassallo); *compare generally* Pls.' Trial Ex. 324 (TDCJ AD 10.64 – Revision 11), *with* Pls.' Trial Ex. 325 (TDCJ AD 10.64 – Revision 12).

medical decision."[735] And inmates "should have free access to respite whether they're feeling ill or hot. Now you have a custody officer who can limit that access to respite and who is not medically trained and, therefore, it's a bad change and it's very much more limiting."[736]

Based on the foregoing evidence and testimony, the Court concludes that TDCJ's respite room policy, which provides only temporary relief (as little as 15-20 minutes), is often inaccessible, and relies on either inmates or corrections officers to realize when inmates need relief, is inadequate even in theory to address the substantial risk of harm posed by extreme heat.

### 2.    *Cold showers are an inadequate remedy.*

Cold showers are inadequate for many of the same reasons. Like respite rooms, cold showers are frequently unavailable. Ms. Simmons testified that  cold showers were not available in her unit at all for several hours during count time or from 10:00 p.m. to 7:00 a.m.[737] Even when they were available, her unit had only one cold shower for "80 to 125 women" who "need[ed] to get relief from the heat."[738] And, as discussed above, the night before he died, Mr. Womack's request for a respite shower was denied.[739] One of Mr. Womack's fellow inmates noted that this denial was "nothing unusual for [the] Coffield [Unit]," and that the "excuse is always we are understaffed." [740]

Even if TDCJ provided inmates sufficient access to cold showers, the relief provided from showers is, much like that provided by respite areas, temporary and fleeting. Dr. Vassallo testified that cold showers only work "while you're wet" and while you are experiencing

---

[735] Trial Tr. (Mar. 30, 2026) 98:23-99:10 (Vassallo).
[736] *Id.*
[737] Prelim. Inj. Hr'g Tr. (July 30, 2024) 49:12-14 (Simmons).
[738] *Id.* at 49:14-17 (Simmons).
[739] Pls.' Trial Ex. 200-B at 2, 42 (Womack AIR updated).
[740] *Id.* at 42 (Womack AIR updated).

"evaporative cooling."[741] As soon as you are dry, "you are no longer being cooled by that

shower."[742] In other words, the shower will only "fix" the problem—i.e., extreme heat—"for

about ten minutes" until the inmate "dries off."[743] Dr. Vassallo also discussed a metanalysis of

various heat-mitigation measures, which concluded that increased cold showers or baths did not

lead to a "statistically significant" difference in mortality rates from high heat.[744] In short, Dr.

Vassallo believes that even "taking frequent [cold] showers doesn't help" address the substantial

risk of serious harm posed by extreme heat.[745]

Dr. Vassallo's testimony that cold showers do not adequately address the substantial risk

of serious harm was also unrebutted. TDCJ did not present any witness who testified in either the

preliminary injunction hearing or the permanent injunction trial that cold showers are effective at

*preventing* heat illness or adequately addressing the substantial risk of serious harm from

extreme heat. The defense's heat-illness expert, Dr. Everitt, testified on direct examination that a

cool shower would be "highly effective"[746] at dissipating excess heat—but he limited that

opinion to the treatment of someone already "actively overheating"[747] or already "suffering from

potential heat stroke."[748] He confirmed on cross-examination that air conditioning—not cold

---

[741] Prelim. Inj. Hr'g Tr. (July 31, 2024) 113:3-20 (Vassallo).

[742] *Id.* at 113:19-20 (Vassallo).

[743] *Id.* at 135:5-21 (Vassallo).

[744] *Id.* at 42:7-14 (Vassallo); Pls.' Trial Ex. 13 at 5-6 (Prognostic Factors in Heat Wave Related Deaths).

[745] Prelim. Inj. Hr'g Tr. (July 31, 2024) 117:18-25 (Vassallo). Although Dr. Vassallo endorsed cold showers as a heat-mitigation measure in prior litigation, she explained that her opinion has changed because "we have more literature that shows taking frequent showers doesn't help" and because she observed, through subsequent experience working with prisons, that access to cold showers is not provided "reliably" due to understaffing. *Id.* at 117:18-118:25 (Vassallo).

[746] Trial Tr. (Apr. 6, 2026) 67:15-23 (Everitt).

[747] *Id.* at 61:20-22 (Everitt).

[748] *Id.* at 119:6-10 (Everitt).

showers—is "the most effective way to prevent" heat stroke.[749] The remaining TDCJ witnesses went no further than to note that inmates appreciate access to cooler showers and that cold showers form part of AD 10.64.

Nor is there any evidence that TDCJ's cold showers are actually cold enough to provide even temporary protection against extreme heat. In her preliminary injunction testimony, Dr. Vassallo testified that whether a shower lowers body temperature depends on "how cold it is"— noting that 55° is the temperature at which athletes use ice tubs for recovery.[750] Dr. DeGroot, likewise, testified that the gold standard for treating heat stroke—which he described as a medical emergency requiring "rapid cooling"— is whole-body immersion in ice water.[751] But AD 10.64 does not require the water be cooled to a specific temperature—it instructs staff only to generally "[l]ower the water temperature of single showers in each inmate housing area."[752] TDCJ has presented no evidence that cold showers ever (much less usually) approach 55°, the temperature of ice water, or any other specific temperature. In fact, the only available evidence indicates that the water temperature of cold showers is much closer to unheated tap water. Mr. Collier testified that cold showers are only "a little cooler" than that of normal showers,[753] and Ms. Simmons described a cold shower as one where "they turned the heat off."[754]

The Court finds that TDCJ's cold shower mitigation measure is not calibrated to reach any specific therapeutic temperature, and that cold showers—even if consistently available at the temperature of ice water—would still be an inadequate response to the substantial risk of serious

---

[749] *Id.* at 119:11-16 (Everitt).
[750] Prelim. Inj. Hr'g Tr. (July 31, 2024) 113:5-9 (Vassallo).
[751] Trial Tr. (Apr. 2, 2026) 213:5-214:12 (DeGroot).
[752] Pls.' Trial Ex. 325 at 8 (TDCJ AD 10.64 – Revision 12).
[753] Trial Tr. (Mar. 31, 2026) 115:5-12 (Collier).
[754] Prelim. Inj. Hr'g Tr. (July 30, 2024) 48:20-22 (Simmons).

harm from extreme heat because they provide only temporary relief, depend on an inmate or officer recognizing symptoms of heat illness before cognitive impairment makes that impossible, and have not otherwise been shown to prevent heat illness in a population exposed to dangerous heat conditions at all hours of the day.

### 3. Access to cold water is inconsistent and does not reduce the long-term effects of the heat on TDCJ inmates.

The provision of ice water suffers from many of the same theoretical deficiencies as cold showers and respite rooms. Like cold showers and respite rooms, ice water provides only temporary relief from a continuous exposure risk—and, like those measures, its effectiveness depends on consistent delivery by staff and consistent access by inmates, neither of which the record supports.

Dr. Vassallo opined that "the provision of additional ice [water], on its own, does not mitigate the risk of heat-related illness"[755]—explaining that meaningfully lowering core body temperature through cold water requires pumping "liters and liters of cold water into the stomach and then[] pump[ing] it out," not simply drinking it.[756] Dr. DeGroot similarly cautioned that hydration is "almost to its detriment, overemphasized [as] important"— acknowledging that maintaining hydration does not independently protected against heat illness, even though it supports the body's sweating mechanism.[757]

The scientific literature confirms that conclusion. A meta-analysis introduced into evidence at the preliminary injunction hearing found "insufficient data to assess" the protective effect of extra fluid intake during heat waves, and affirmatively cautioned that "encouragement

---

[755] Pls.' Trial Ex. 113 ¶ 41 (Vassallo Declaration).
[756] Prelim. Inj. Hr'g Tr. (July 31, 2024) 112:17-113:2 (Vassallo).
[757] Trial Tr. (Apr. 2, 2026) 194:7-9 (DeGroot).

to drink additional water during a heat wave has recently been associated with severe hyponatremia"—a potentially fatal condition caused by dangerously low sodium levels.[758] The Court therefore finds that the provision of ice water is not an adequate response to the substantial risk of serious harm from extreme heat in TDCJ's unair-conditioned facilities.

### 4.    *Fans are inadequate and counter-productive in extreme heat.*

Fans are inadequate and even counterproductive in the extreme heat. Dr. Vassallo has opined that "providing additional fans does nothing to address the health risks of the extreme temperatures"[759]—because they "don't change the temperature in the room."[760] Further, Dr. Vassallo testified that it is widely accepted, including by the Center for Disease Control and World Health Organization, that once ambient temperatures reach 90° and higher, fans are unhelpful and can actually increase ambient temperatures by blowing hot air, like a convection oven.[761] Defense expert Dr. DeGroot further admitted that there is an "upper limit" above which fans "will not only be ineffective but perhaps detrimental," because moving hot air can "cause greater heat gain," and that fans lose effectiveness as humidity rises.[762] In fact, when the heat index exceeds 99°, "fans elevate the risk of heat-related illness, increasing the heat load on the body by moving hot air across the skin."[763] In other words, "increased wind speeds of hot air can actually raise the skin temperature and thus produce opposite results by increasing core body temperature."[764]

---

[758] Pls.' Trial Ex. 13 at 5-6 (Prognostic Factors in Heat Wave Related Deaths).
[759] Pls.' Trial Ex. 113 ¶ 41 (Vassallo Declaration).
[760] Prelim. Inj. Hr'g Tr. (July 31, 2024) 42:1-2 (Vassallo).
[761] Trial Tr. (Mar. 30, 2026) at 162:6-163:1 (Vassallo).
[762] Trial Tr. (Apr. 2, 2026) 204:19-205:12 (DeGroot).
[763] Pls.' Trial Ex. 113 ¶ 41 (Vassallo Declaration).
[764] Pls.' Trial Ex. 13 at 5-6 (Prognostic Factors in Heat Wave Related Deaths).

This is consistent with guidance from the U.S. Environmental Protection Agency, which warns: "[U]sing a portable electric fan alone when heat index temperatures exceed 99° actually *increases* the heat stress the body must respond to by blowing air that is warmer than the ideal body temperature over the skin surface."[765] It is also consistent with the scientific literature: A metanalysis introduced at trial found that using fans during a heat wave did not produce a "statistically significant" difference in mortality rates.[766] As Dr. Uribe noted, fans were also present and working in Mr. Castillo's unit when he died—so the fact that he "was drinking water and had access to working fans did not prevent his death from heat."[767]

5.    *Welfare checks are inadequate.*

Nor are welfare checks adequate to address the risk of heat-related illnesses or death, or to prevent those illnesses or deaths from occurring. Even a welfare check conducted precisely on schedule—every 30 minutes, by an adequately staffed, appropriately trained, experienced corrections officer—cannot reliably detect heat stroke. As described in more detail above, the symptoms of heat stroke can be subtle and non-obvious to either the inmate or someone observing them. According to Dr. Vassallo, heat stroke can develop with devastating speed: An inmate who is walking and interacting normally can be dead within hours.[768] Individuals often "don't know they are in trouble" from the heat, so they can "start having cognitive problems from heat illness before they realize they need" any sort of assistance.[769] In other words, "the rapidity, the speed at which heatstroke strikes means that checking people that are walking

---

[765] Excessive Heat Events Guidebook (Mar. 2016), U.S. Env't Prot. Agency, at 37, Dkt. No. 50-28 (emphasis added).

[766] Pls.' Trial Ex. 13 at 5-6 (Prognostic Factors in Heat Wave Related Deaths).

[767] Prelim. Inj. Hr'g Tr. (July 31, 2024) 289:13-25 (Uribe).

[768] Dkt. No. 50-42 at 135:19-136:15.

[769] *Id.*

around, somebody is sleeping in their bed, everything looks fine …, and they can still suffer a heatstroke without the correction staff realizing they're in trouble."[770]

Mr. Wilson's death illustrates the consequences of this failure in concrete terms. Mr. Wilson was found convulsing on the floor of an unair-conditioned TDCJ facility, where — according to the OIG investigator's review of the video—he had been lying unnoticed for approximately two hours before staff responded.[771] The last documented security check at his cell had been performed hours before he was found, and the officer assigned to his wing walked past his cell twice without completing a full security check.[772] TDCJ staff subsequently told a TPCA member who called to check on Mr. Wilson that he was fine—two days after he had died.[773] Again, no evidence was presented at either the preliminary injunction hearing or at trial that welfare checks reduce—much less prevent—the risks of heat-related illness of death, even when performed every 30 minutes on every inmate.

The Court accordingly finds that welfare checks, even if conducted as policy requires, are not an adequate means of detecting or preventing heat-related illness in a population continuously exposed to extreme temperatures in unair-conditioned prisons.

C. **TDCJ's Flawed Temperature Logs Raise Serious Concerns About Whether It Is Complying with Its Own Heat-Mitigation Policy.**

In its March 2025 Order, the Court found that it had "no confidence in the data that TDCJ generates and uses to implement its heat mitigation measures and record the conditions within its facilities," and the Court had "no doubt" that TDCJ was "keeping unreliable records about

---

[770] *Id.* at 135:23-136:5.
[771] Trial Tr. (Mar. 30, 2026) 33:6-11 (Williams).
[772] *Id.* at 229:5-11 (Uribe).
[773] Prelim. Inj. Hr'g Tr. (Aug. 2, 2024) 238:14-239:8 (Collier); Pls.' Trial Ex. 214 at 00:03:40-00:03:55 (Follow Up Call on Wellness Check for Jason Wilson).

temperature conditions" and "inadequately providing heat mitigation measures."[774] The evidence presented at the permanent injunction trial—including falsified logs submitted at the preliminary injunction hearing, the agency's obviously inadequate investigation of those logs, its attempt to use digital logs with thousands of errors, and its subsequent return to handwritten logs—further confirms those findings and underscores the severity of TDCJ's data-collection problems and the widespread effect that problem has on the agency's ability to implement its heat-mitigation measures.

      *1.      TDCJ's temperature logs are the foundation of its heat-mitigation measures.*

According to TDCJ policy, units are only required to provide inmates access to respite areas "during periods of extreme heat,"[775] and they are only required to provide inmates other heat mitigation measures—cold showers, relaxed clothing requirements, fans, and "chilled water"—"where the heat index is above 90°F."[776] It "may be possible that a unit is doing some of [these things] before" the heat index exceeds 90°, but the units are "not required to" by TDCJ policy.[777] The heat index reading that triggers those measures comes entirely from TDCJ's temperature and heat index logs.[778] As Mr. Ishee acknowledged, the automated logs are "what the agency relies on to determine when the heat index has crossed [the 90° threshold]," so if those logs are showing the wrong heat index, TDCJ policy would not require mitigation

---

[774] *Tiede II*, 796 F. Supp. 3d at 316.

[775] "Extreme heat" does not have a temperature or heat index threshold in the current version of AD 10.64. It is instead defined as "a period of abnormally hot and dangerous temperatures, with or without high humidities, that can result in negative impacts to people." Pls.' Trial Ex. 325 at 2, 5 (TDCJ AD 10.64 – Revision 12).

[776] *Id.* at 8 (TDCJ AD 10.64 – Revision 12); *see also* Trial Tr. (Apr. 2, 2026) 97:7-11, 97:17-98:5 (Echessa).

[777] Trial Tr. (Apr. 2, 2026) 98:6-9 (Echessa).

[778] *Id.* at 97:12-16 (Echessa).

measures to be implemented.[779] In other words, TDCJ's temperature logs are the foundation of nearly all of the agency's heat-mitigation measures: If those logs are inaccurate or incomplete, that raises the possibility that TDCJ is not even complying with its own heat-mitigation policy.

> 2.    *TDCJ presents falsified handwritten logs at the preliminary injunction hearing.*

In an attempt to rebut testimony from Plaintiffs' witnesses, Mr. Collier's counsel discussed at the preliminary injunction hearing a manual temperature log reporting the outside air temperature, humidity, and heat index at the Mark W. Stiles Unit for July 2022.[780] During the direct examination of Mr. Collier, his counsel focused on the outside temperature at the unit on July 12, 2022, which was logged at a consistent 79° from 12:30 a.m. to 4:30 p.m.[781]

After having consulted an authoritative source on the matter during the hearing, this Court took judicial notice that, on July 12, 2022, the temperature actually reached a high of 96° in Beaumont, Texas (where the Stiles Unit is located), despite TDCJ's log indicating that the temperature never exceeded 87°.[782] Additionally, the log recorded the heat index as being *lower* than the ambient temperature, despite the 90% humidity.[783] And the temperatures included in the log for that day were noted as being recorded by different people, despite being written in the same handwriting.[784] Because of these discrepancies, the Court determined that the temperature log for July 12, 2022 was fabricated.[785]

---

[779] Trial Tr. (Apr. 6, 2026) 283:16-284:5 (Ishee).
[780] Prelim. Inj. Hr'g Tr. (Aug. 2, 2024) 195:12-15, 217:20-219:1 (Collier) (admitting Def.'s Ex. 76 into evidence).
[781] Def.'s Hr'g Ex. 76 at 12 (Stiles temperature log July 2022).
[782] Prelim. Inj. Hr'g Tr. (Aug. 2, 2024) 276:16-277:8 (Collier).
[783] *Id.* at 277:10-15 (Collier).
[784] *Id.* at 277:16-19 (Collier).
[785] *Id.* at 278:20-279:1 (Collier).

The logs for several other days in Defendant's Exhibit 76 have similar discrepancies—including July 1 & 2, 2022 ("Wheeler" is in different handwriting, despite purportedly being entered by the same person); July 6, 2022 (similar handwriting for entries purportedly by different people); July 7, 2022 (similar handwriting and pen for entries purportedly by different people); July 13, 2022 (similar handwriting and pen for entries purportedly by different people); and July 14, 2022 (same).[786] The Court asked Mr. Collier's counsel on August 2, 2024 (the last day of the hearing) to provide an explanation for these discrepancies, and Mr. Collier's counsel agreed to "get right on [it]."[787]

### 3. Mr. Cirrito's flawed investigation of the falsified logs.

Several months passed, and neither Mr. Collier nor his counsel provided the Court the promised explanation. Plaintiffs served written discovery requests on January 24, 2025, which sought all materials related to the investigation of the falsified log.[788] Mr. Collier responded to those requests on February 24, 2025—and, for the first time, revealed the results of the investigation.[789] Even so, Mr. Collier did not inform the Court of the results of the investigation until March 18, 2025—nearly four months after the report was issued—and only after Plaintiffs conferred with Mr. Collier regarding a motion for order to show cause as to why sanctions should not be ordered.[790]

The final report was dated November 8, 2024, and concluded that Defendant's Exhibit 76 was, in fact, falsified.[791] The investigator (Chief Executive Auditor Chris Cirrito) concluded:

- The July 12, 2022 temperature log was "not reflective of actual events";

---

[786] Def.'s Hr'g Ex. 76 *passim* (Stiles temperature logs July 2022).
[787] Prelim. Inj. Hr'g Tr. (Aug. 2, 2024) 287:2-10 (Collier).
[788] Pls.' Mot. for an Order to Show Cause 7, Dkt. No. 200.
[789] *Id.*
[790] *See generally* Def. & OAG's Advisory to the Ct., Dkt. No. 199.
[791] *See generally* Pls.' Trial Ex. 447 (Cirrito Report).

- The logs were falsified in response to an agency-wide effort to collect temperature logs in response to open records requests in the summer of 2022[792];

- The July 12, 2022 log was falsified twice, by two different people, with one uploaded to a shared drive and the other maintained in the unit file[793];

- "Numerous logs" for other dates have indicators of falsification, including logs that showed temperature irregularities[794]; and

- It is "unlikely [the staff] would have [falsified the logs] without knowledge and/or consent of unit administrators."[795]

The report also noted that "[b]oth the Unit Risk Manager and Administrative Directive 10.20 Officer have since been promoted and, according to the testimony of their superiors, are valued employees."[796]

Mr. Cirrito did not identify who actually falsified the logs.[797] He did not determine why the logs were falsified.[798] And he did not determine how widespread the falsification issue was.[799] He said it was "not important who or how many TDCJ employees were involved in falsifying those logs," nor was it important to know even "what the titles of those individuals were."[800] Mr. Cirrito said that nobody asked him to determine who had actually falsified the logs or how widespread the problem was.[801]

---

[792] *Id.* at 2 (Cirrito Report).
[793] *Id.*
[794] *Id.*
[795] *Id.* at 3 (Cirrito Report).
[796] *Id.*
[797] *See generally id.*
[798] *Id.*
[799] *Id.*
[800] Trial Tr. (Apr. 6, 2026) 281:2-13 (Ishee); *see also* Trial Tr. (Mar. 30, 2026) 54:18-56:3 (Williams).
[801] Trial Tr. (Apr. 6, 2026) 280:21-282:23 (Ishee).

Instead, he saw the scope of his investigation "as really just determining when the log or logs were falsified."[802] When asked on cross-examination, Mr. Collier did not dispute Mr. Cirrito's testimony that "the entirety of his investigation was to determine whether the exhibit was falsified," and that Mr. Cirrito "was not instructed to find out the names of the individuals or why it happened."[803] Mr. Collier did not ask Mr. Cirrito to perform a systemwide investigation.[804]

These omissions are all the more glaring in light of Mr. Cirrito's conclusion that the falsification was carried out in response to a systemwide email informing "all units to upload all temperature logs to a share drive" and asking them to "ensure an IOC justification is submitted for each missing date and scanned in order with that month's logs."[805] In Mr. Cirrito's view, the "use of the word 'justification' may have induced a perceived pressure related to being unable to locate logs."[806] Despite the likelihood that such "pressure" would have led to systemwide falsification of logs, no systemwide investigation was ever undertaken by Mr. Cirrito—nor was any evidence presented that such an investigation was undertaken by anyone else.

Mr. Ishee and Chairman Nichols both confirmed the investigation's deficiencies. Mr. Ishee confirmed that Mr. Cirrito's testimony concerned him as a corrections expert,[807] and when asked whether an investigation that fails to determine who falsified a temperature log, why they falsified it, or how widespread the problem was "isn't much of an investigation at all," he answered: "I would have concerns about the thoroughness."[808] Chairman Nichols admitted that

---

[802] *Id.* at 280:21-281:1 (Ishee).
[803] Trial Tr. (Mar. 31, 2026) 148:10-19 (Collier).
[804] *Id.* at 147:20-148:13 (Collier).
[805] Pls.' Trial Ex. 447 at 2-3 (Cirrito Report).
[806] *Id.*
[807] Trial Tr. (Apr. 6, 2026) 282:5-283:21 (Ishee).
[808] *Id.* at 282:22-23 (Ishee).

107

the individuals who actually falsified the logs were never identified, confirmed he could point to no documentation showing the unit administrators were ever formally disciplined, and agreed that the unit risk administrator was promoted.[809] The Court pressed Chairman Nichols about why he refused to "assign a motive" to the falsification of the logs—observing that the falsified temperature was "significantly below what the real number was" and that "in the context of PR or this litigation or anything else that was to [TDCJ's] advantage," the choice of a lower number was not coincidental.[810] Chairman Nichols declined to assign a motive, but ultimately conceded: "It is wrong, it is incorrect, and the fact that it was used in a court proceeding, a falsified record, is horrifying to me. And I apologize to this Court that that ever happened."[811]

Mr. Williams summed up why these failures were so concerning: "There is a consistency [by TDCJ] to not find the things that [it doesn't] want to know."[812] The Court agrees. A temperature log was falsified and submitted to a federal court in a case involving inmates dying and getting sick from extreme heat. The falsification was carried out in response to a systemwide directive—raising the obvious question of why it was done and how many other units did the same—but the investigation intentionally avoided answering that question. The employees who falsified the logs were never identified. At least two of the supervising employees involved were promoted. No one was disciplined in any documented way. And the scope of the problem remains unknown—not because it could not be determined, but because TDCJ chose not to investigate it. It is difficult for the Court to see these failures as anything other than a clear

---

[809] *Id.* at 197:10-198:12 (Nichols).
[810] *Id.* at 235:12-236:4 (Court).
[811] *Id.* at 237:3-7 (Nichols).
[812] Trial Tr. (Mar. 30, 2026) 56:14-18 (Williams).

endorsement by TDCJ leadership for the agency's employees to continue to engage in such intentionally false recordkeeping.

### 4.    TDCJ's digital logs are equally flawed.

Following the falsification of the Stiles Unit handwritten logs and the Court's order for Mr. Collier to investigate the issue, TDCJ replaced its manual logging system with an automated system that pulled weather data from federal NOAA weather stations and entered it hourly into a centralized SharePoint log.[813] The automated logs—which cover May 1 through September 1, 2025—were produced to Plaintiffs and admitted into evidence as Plaintiffs' Exhibits 306-A through 306-F. Plaintiffs' Exhibit 306-A is a PDF that has thousands of pages of hourly temperature, humidity, and heat index data for every TDCJ unit.[814]

The automated system proved to be no more reliable than the handwritten logs they replaced. Plaintiffs' Exhibit 306-A contains more than 53,260 entries—approximately 17% of all entries in the log—where the weather data timestamp differs from the entry timestamp by more than two hours.[815] Frozen readings and repeated values appear throughout.[816] Thousands of entries simply say "[n]o data available" where the heat index should be.[817] The practical consequence is identical to falsification: If the logs are reporting a heat index below 90° when the actual heat index is above it, AD 10.64 does not require heat-mitigation measures to be implemented.

---

[813] Trial Tr. (Apr. 2, 2026) 100:2-11 (Echessa).
[814] *See generally* Pls.' Trial Ex. 306-A (425534 TDCJ Automated Temp Logs - 5.1.2025-9.1.2025); Trial Tr. (Apr. 2, 2026) 102:3-102:11 (Echessa).
[815] *See generally* Pls.' Trial Ex. 306-A (425534 TDCJ Automated Temp Logs - 5.1.2025-9.1.2025).
[816] *Id.*
[817] *Id.*

Three examples highlighted at trial illustrate exactly that consequence. At the Garza West Unit in May 2025, the automated system locked at 11:15 a.m. on May 16 and continuously reported the same temperature, relative humidity, and heat index—85.46°, 63.36%, and 91.25°, respectively—for an entire week, pulling stale data from that single moment in time even as actual conditions changed hour-by-hour for seven days.[818] Though TDCJ conducted a "heat strike" visit to the Garza West Unit on May 19, 2025, to "ensure strict adherence to AD 10.64"[819] and allegedly checked the log on the date of their visit, the heat strike team failed to notice that the temperature log had been reporting incorrect and identical information hourly continuously for three days.[820] Instead, the heat strike team documented Garza West "passed" its heat strike team visit with no deficiencies.[821]

At the Bartlett Unit, a glitch beginning May 20, 2025 caused the system to report a static heat index of 76.62° for a full week—well below the 90° threshold that triggers mandatory heat mitigation measures under AD 10.64.[822] During the same period, Travis State Jail in the adjacent county to the south was correctly reporting a heat index of 102.07°—a difference of more than 25°.[823] Under AD 10.64, Travis State Jail was required to implement mandatory heat mitigation measures during this period; Bartlett was not, because its logs reported a heat index that had not crossed the threshold.[824] Mr. Echessa agreed that the discrepancy between Bartlett's reported

---

[818] Trial Tr. (Apr. 2, 2026) 103:6-104:13 (Echessa).
[819] *See id.* at 57:1-6 (Echessa).
[820] *Id.* at 100:22-101:11 (heat strike checklist for each facility includes ensuring outside temperature and heat index logs were kept and reviewed by unit administration during each visit), 103:6-105:15 (Echessa).
[821] *Id.* at 110:22-111:2 (Echessa).
[822] *Id.* at 106:23-108:4 (Echessa).
[823] *Id.* at 110:1-6 (Echessa).
[824] *Id.* at 110:7-16 (Echessa).

heat index and the conditions in the adjacent county "should have been obvious" to unit leadership reviewing the logs.[825] Yet no evidence was presented that they ever detected it—let alone fixed the issue or reported it to TDCJ leadership. Likewise, the glitch at the Bartlett Unit should have been caught during the "heat strike" team visit to the Bartlett Unit on May 23, 2025; yet, as with the Garza West heat strike visit just days before, the heat strike team failed to notice that the temperature logs were reporting incorrect, identical data for days.[826] Instead, the heat strike team "passed" the Bartlett Unit with no deficiencies on its heat strike team visit.[827]

A third glitch affected four women's facilities simultaneously— Hilltop, Crain, Murray, and Woodman—for six consecutive days in August 2025. All four units reported an identical heat index of 79.1° throughout the glitch period, even as the summer conditions in Texas made that reading plainly implausible.[828] When the glitch resolved, the true heat index was 102.03°—well above the threshold at which heat-mitigation measures were required to be implemented.[829] The four facilities collectively house more than 2,000 unair-conditioned female inmates.[830] Not one person at any of the four facilities corrected the data or reported the glitch during the six days it persisted.[831] Nor did the heat strike team notice the glitch when they conducted a visit to the Hilltop Unit on August 28, 2025—the sixth day of the glitch affecting all of the female TDCJ units in the area—and "passed" that unit with no deficiencies on its heat strike team visit.[832]

---

[825] *Id.* at 110:12-16 (Echessa).
[826] *Id.* at 106:2-107:24 (Echessa).
[827] *Id.* at 111:3-5 (Echessa).
[828] *Id.* at 112:1-113:10 (Echessa); *see, e.g.*, Pls.' Tr. Ex. 306A at 1614–15 (Hilltop Logs).
[829] *Id.* at 113:14-23 (Echessa).
[830] *Id.* at 113:11-15 (Echessa).
[831] *Id.* at 114:7-10 (Echessa).
[832] *Id.* at 111:6-114:10 (Echessa).

### 5.    *TDCJ abandons digital logs and returns to handwritten logs.*

The automated system was abandoned at some point after it became clear it was pulling data from NOAA stations miles away from rural facilities—producing data that was "not going to work" for accurate unit-level temperature monitoring.[833] It is unclear when, but TDCJ told units to revert to their manual handwritten process while running the failed automated system concurrently. TDCJ is now piloting a new system called Room Alert—which involves sensors on poles outside the warden's office—but as of trial it remained in testing, unvalidated, and running concurrently with the handwritten logs it is intended to replace.[834]

* * * *

The Court finds TDCJ's history with its temperature and heat index logs deeply concerning. TDCJ first relied on handwritten logs that were falsified by its own employees. It conducted an investigation that failed to identify who falsified the logs, how widespread the problem was, or why they were falsified. It promoted at least two supervisors who were implicated, did not produce the investigation report until it was requested in discovery, and did not file it with the Court. The agency then replaced the handwritten system with an automated one that produced systematic glitches affecting thousands of temperature readings across multiple facilities simultaneously—but did not timely identify those issues. It then reverted to the handwritten system whose integrity had already been compromised. And it is now piloting a replacement system that was not yet validated as of the date of trial.

Mr. Hudson acknowledged the through line: "We shouldn't be relying on a human to create a log that creates errors."[835] The Court agrees—and finds that TDCJ's temperature logging

---

[833] Trial Tr. (Apr. 9, 2026) 236:24-237:11 (Hudson).
[834] *Id.* at 237:21-239:3 (Hudson).
[835] *Id.* at 238:19-22 (Hudson).

system, in each of its iterations, has failed to provide the reliable data that its own heat mitigation policy requires to protect the inmates in its care.

**D.**    **TDCJ's Heat Strike Teams Do Not Consistently or Reliably Identify When Units Are Failing to Comply with AD 10.64.**

TDCJ's heat strike team—the agency's primary mechanism for monitoring compliance with its own heat-mitigation policy—is also structurally incapable of detecting the failures documented above. The heat strike team consists of supervisors from the Administrative and Risk Management Division who visit units and evaluate compliance using a standardized checklist.[836] In 2025, TDCJ committed to visiting all 103 units at least once during the summer season, with some units visited twice or three times at the agency's discretion.[837] Even accepting that commitment at face value, two or three annual compliance visits—each of which was conducted on a single day, reviewing logs only for that day—provides no assurance that a unit is complying with AD 10.64 on any of the other days of the summer.

The team's fundamental limitation is the narrow scope of its review. For instance, when heat strike teams evaluate temperature logs during compliance visits, they check only the logs *for the day of the visit*—not any other day.[838] When asked directly whether team members go back to check what was happening in the days before their visit, Mr. Echessa confirmed: "When we go there, we're checking for what's going on today."[839] This methodology guaranteed that the glitches documented above would go undetected: at Garza West, Garza East, and Bartlett, the automated system had been reporting the identical temperature, humidity, and heat index—hour

---

[836] Trial Tr. (Apr. 2, 2026) 50:1-8 (Echessa).
[837] *Id.* at 51:23-52:7 (Echessa).
[838] *Id.* at 115:1-5 (Echessa).
[839] *Id.* at 115:8-9 (Echessa).

after hour—for the entire day the team was present as well as several days before, and the team did not notice.[840]

The same limitation applies to the team's evaluation of heat mitigation measures themselves: The heat strike team can only verify whether measures were being implemented at the moment of their visit—not on any other day of the summer. Mr. Echessa acknowledged that he did not know whether Bartlett was implementing required heat-mitigation measures on May 24, 2025—the day after the heat strike team left—because he was not there.[841] The heat strike team's compliance certification, in other words, covers only the day it visits. These certifications are, however, far from reliable for even the day of the heat strike visit—evidence at trial showed at least one instance of heat strike team members copying information from one heat strike visit to another such that two units were reported as having identical commissary inventories of 59 fans; 9,809 sets of electrolytes; 48 cooling towels; 65 bottles of Hydro-Core; and 29 cool t-shirts as well as 129 fans sold in the last thirty days.[842]

Perhaps most troubling, however, is the fact that heat-related deaths of inmates did not trigger a heat strike team visit. Despite leading the heat strike team, Mr. Echessa was unaware of every heat-related death documented at trial. He did not know that Bradley Sheets died on June 22, 2024 at the Coffield Unit.[843] He did not know that Jason Wilson died on July 5, 2024, also at the Coffield Unit—three weeks after Sheets died in the same facility.[844] He was unaware that Ryan Fairchild was found on August 21, 2024, at the Michael Unit with a temperature of 108°.[845]

---

[840] *Id.* at 115:10-19 (Echessa).
[841] *Id.* at 117:22-118:2 (Echessa).
[842] Def.'s Trial Ex. 36 at 201, 205 (TDCJ Heat Strike Team Reports 2025); Trial Tr. (Apr. 2, 2026) 119:6-121:11 (Echessa).
[843] Trial Tr. (Apr. 2, 2026) 160:16-18 (Echessa).
[844] *Id.* at 161:4-7 (Echessa).
[845] *Id.* at 161:8-18 (Echessa).

He did not know that Keith Pursifull died on August 9, 2025, at the Wainwright Unit with a temperature of 105.4°.[846] And he did not know that Wayne Straway died on July 29, 2025, at the Ellis Unit with a temperature of 106°.[847]

In no instance was the heat strike team notified of a heat-related death or dispatched to conduct an additional compliance visit in response to one.[848] TDCJ conducted no additional heat strike visits to the Coffield Unit or any other unit in Tennessee Colony after three people died there in the summer of 2024.[849] The team's visit to the Wainwright Unit later in August 2025—sixteen days after Mr. Pursifull's death—was planned in advance and was not triggered by his death.[850] The Ellis Unit passed its heat strike visit on June 3, 2025—three weeks before Wayne Straway died there.[851]

The Court finds that a compliance monitoring system whose administrator is unaware of a single heat-related death of an inmate in the facilities he monitors, that is not notified when an inmate dies in the summer heat, that conducts no follow-up visits in response to deaths, and that certifies units as compliant days or weeks before—and after—those deaths, is not a meaningful one. The Court further finds that the Wainwright Unit's "perfect heat strike visit score"[852] on August 25, 2025 (sixteen days after Keith Pursifull died there on August 9, 2025), and the Ellis Unit "pass[ing] its heat strike … [visit] with flying colors"[853] on June 3, 2025 (three weeks before Wayne Straway died there on July 29, 2025), confirm that a passing heat strike visit

---

[846] *Id.* at 162:6 (Echessa).
[847] *Id.* at 164:3-16 (Echessa).
[848] *See, e.g.*, *id.* at 160:2-8, 161:24-162:4, 163:13-20 (Echessa).
[849] *Id.* at 161:24-162:4 (Echessa).
[850] *Id.* at 163:13-20 (Echessa).
[851] *Id.* at 164:17-20 (Echessa).
[852] *Id.* at 164:21-23 (Echessa).
[853] *Id.* at 164:17-20 (Echessa).

115

provides no assurance that TDCJ's heat mitigation measures are actually being implemented in accordance with AD 10.64—much less that those heat-mitigation measures adequately address the substantial risk of serious harm that inmates face from extreme heat in unair-conditioned cells.

## V.    TDCJ'S HEAT SCORE SYSTEM IS STILL ARBITRARY, INADEQUATE, AND INEFFECTIVE.

In 2014, Collier was sued by a group of inmates at one TDCJ prison, the Pack Unit.[854] That case, *Cole v. Collier,* also concerned excessive heat conditions.[855] The case ultimately settled, and as part of the 2018 settlement, TDCJ contracted with an outside medical expert to create a method of determining which inmates most needed air-conditioned housing.[856] In other words, the heat score system was not designed through a comprehensive medical assessment of which inmates are most vulnerable to heat—it originated from a litigation settlement.[857]

A "heat score" is generated using the ICD codes, which also populate the "problem list" seen within the inmate's electronic medical records.[858] Inmates are given a preliminary heat score upon intake,[859] and inmates then receive a starting heat score after the 30-day intake process has concluded.[860] If an inmate has a heat score of one or above, an inmate is placed in a cool bed.[861] Heat scores are updated multiple times a day, and TDCJ reviews a report of changes

---

[854] *See generally Cole*, 2017 WL 3049540.

[855] *See generally id.*

[856] Prelim. Inj. Hr'g Tr. (Aug. 2, 2024) 163:3–9.

[857] Trial Tr. (Apr. 7, 2026) 25:20-22 (Leonardson), 82:17–83:2, 91:17–92:23 (Cunningham).

[858] Prelim. Inj. Hr'g Tr. (Aug. 1, 2024) 92:17–93:12, 94:3-23, 98:15–99:1, 111:4–9 (Leonardson); Trial Tr. (Apr. 7, 2026) 26:8-27:19 (Leonardson).

[859] Prelim. Inj. Hr'g Tr. (Aug. 1, 2024) 160:6–10 (Fitzpatrick).

[860] *Id.* at 160:6–161:19 (Fitzpatrick).

[861] *Id.* at 196:12–13 (Fitzpatrick).

in heat scores and a report of all inmates with heat scores, which are both generated at 10 p.m. every night.[862]

This Court held in March 2025 that TDCJ's heat score system is "arbitrary, inadequate, and ineffective,"[863] and that remains true today. The heat score is under-inclusive. Although every one of the more than 140,000 TDCJ inmates "face[s] a substantial risk of serious harm from the extreme heat in unair-conditioned facilities,"[864] only approximately 19,636 TDCJ inmates (i.e., less than 15%) have a heat score.[865] The overwhelming majority (i.e., more than 80%) of the 100,853 inmates who meet uncontroverted medical criteria for heat sensitivity do not have a heat score.[866] And the majority (i.e., at least half) of the estimated 37,000-51,000 TDCJ inmates with at least one diagnosed mental illness[867] do not have one either.

As Dr. Felicella testified, "problem lists"—which TDCJ uses to identify which inmates receive a heat score—"are problematic because they are often incomplete."[868] Plaintiffs' experts Dr. Vassallo and Dr. Biswas both opined that the list of conditions that qualify an individual for a heat score is "under-inclusive,"[869] and defense expert Dr. DeGroot agreed.[870] Individuals with

---

[862] *Id.* at 170:22–171:6 (Fitzpatrick).

[863] *Tiede II*, 796 F. Supp. 3d at 308.

[864] *Id.* at 308-09; *see also* Prelim. Inj. Hr'g Tr. (July 31, 2024) 127:7-11 (Vassallo).

[865] *See generally* Def.'s Trial Ex. 204 (Inmates with Heat Scores as of Feb. 23, 2026).

[866] *See generally* Pls.' Trial Ex. 437-A (Def.`s Resps. to Pls.' Second Set of Interrogs. [Redacted]); Def.'s Trial Ex. 204 (Inmates with Heat Scores as of Feb. 23, 2026); Def.'s Trial Ex. 55 at 9, 12 (Heat Stress Policy); Trial Tr. (Apr. 7, 2026) 47:2–4 (Leonardson) (agreeing obesity renders a person more vulnerable to heat), 249:6–11 (De La Cruz) (same); *see also id.* at 239:3–9 (De La Cruz) (agreeing hypertension renders a person more vulnerable to heat).

[867] Trial Tr. (Apr. 6, 2026) 184:2-12 (Nichols) (estimating that 37% of TDCJ inmates have a diagnosed mental illness); Trial Tr. (Mar. 31, 2026) 260:17-21 (Lumpkin) (estimating that 37,000 inmates have a diagnosed mental illness).

[868] Trial Tr. (Apr. 8, 2026) 145:18-25 (Felicella).

[869] Trial Tr. (Mar. 30, 2026) 110:10-11 (Vassallo), 299:20-22 (Biswas).

[870] Trial Tr. (Apr. 2, 2026) 234:2-10 (DeGroot).

diabetes do not automatically receive a heat score.[871] Dr. Leonardson acknowledged that it would "behoove[]" TDCJ to house all diabetics in air conditioning, because TDCJ "cannot tell which [diabetics] are going to have a problem" with the heat, and "there does appear to be a disproportionate number [of diabetics] in the heat injury groups."[872] Individuals with COPD, asthma, emphysema, kidney disease, hypertension, Parkinson's, ALS, obesity, anxiety, depression, and psychosis are more sensitive to the heat,[873] yet those individuals do not automatically receive a heat score, either.[874] In Dr. Vassallo's opinion, any of those conditions should automatically qualify an individual for a heat score.[875]

The heat-score system has an even deeper structural problem: According to Dr. Biswas, even if every inmate diagnosed with a heat-sensitive condition automatically received a heat score, that would still be underinclusive because so many mental illnesses go undiagnosed in the prison population.[876] Dr. Biswas testified that much of the incarcerated population's mental illness is "underdiagnosed or never diagnosed at all," in part because of the stigma attached to a mental-illness diagnosis in the carceral setting, and that this "huge undiagnosed population" does not receive a heat score—so TDCJ does not identify these inmates as heat-vulnerable even though their symptoms are exacerbated by the heat.[877]

---

[871] Trial Tr. (Apr. 7, 2026) 51:20–52:1 (Leonardson); *see generally* Pls.' Trial Ex. 329 (At Hand Population Heat Scoring).

[872] Trial Tr. (Apr. 7, 2026) 52:2-9 (Leonardson).

[873] Trial Tr. (Mar. 30, 2026) 110:12-113:7 (Vassallo), 299:9-19 (Biswas).

[874] *See generally* Pls.' Trial Ex. 329 (At Hand Population Heat Scoring); Pls.' Trial Ex. 334 (TDCJ's list of heat-sensitive comorbidities).

[875] Trial Tr. (Mar. 30, 2026) 110:14-112:21 (Vassallo).

[876] *Id.* at 300:15-301:19 (Biswas).

[877] *Id.* at 300:17–25, 316:17–317:7 (Biswas).

So even if the heat score captured everyone who was diagnosed with a heat-sensitive medical condition or mental illness, it still would not capture every inmate with that condition or illness.

The medication gaps are equally serious. Dr. Vassallo explained that several classes of prescription drugs "impair thermoregulation," including: (1) cardiovascular drugs, (2) diuretics, (3) sympathomimetics or vasoconstrictors (such as nasal decongestants like Sudafed), (4) anticholinergics, and (5) SSRIs.[878] TDCJ's own list of "DRUGS ASSOCIATED WITH HEAT STRESS" includes anticonvulsants, antipsychotics, antidepressants, SSRIs, beta blockers, calcium channel blockers, diuretics, antihistamines, ACE inhibitors, anti-Parkinson's drugs, monoamine oxidase inhibitors, and muscle relaxers.[879] Dr. Vassallo testified that *every* drug on TDCJ's "drugs associated with heat stress" list should automatically qualify an individual for a heat score without needing an accompanying comorbidity.[880] None does except for, in the most recent iteration of the score, "Highly Active Anticholinergic[s]" prescribed for more than four days,[881] discussed below.

Dr. Leonardson confirmed that no one at TDCJ or UTMB has analyzed the deaths of inmates to determine whether the conditions those inmates suffered trigger a heat score—the most obvious data available for designing a system to protect those vulnerable to the heat.[882] Dr.

---

[878] Vassallo Decl. ¶ 37, Dkt. No. 50-2.

[879] *See generally* Pls.' Trial Ex. 333 (CMHC D-27.2 Attachment A - Drugs Associated with Heat Stress); *see also* Trial Tr. (Mar. 30, 2026) 107:9-20 (Biswas).

[880] Trial Tr. (Mar. 30, 2026) 107:11-108:15, 110:10-11 (Vassallo). Dr. De La Cruz also agreed that every drug on TDCJ's list of "drugs associated with heat stress" has "the potential to cause heat stress or sensitivity … to some degree." Trial Tr. (Apr. 7, 2026) 260:2-6, 260:14-19 (De La Cruz).

[881] *See generally* Def.'s Trial Ex. 206 (At Hand Heat Score Feb. 2, 2026); Trial Tr. (Mar. 30, 2026) 107:2-108:15 (Vassallo).

[882] Trial Tr. (Apr. 7, 2026) 57:20-59:1 (Leonardson).

Leonardson admitted that the number of inmates with heat scores turns not on the number of inmates who are vulnerable to heat, but on how many air-conditioned beds are available. Asked why diabetes had not been added to the heat score, she said: "Because we cannot house them until the new beds are online …."[883] Asked whether that meant that TDCJ will not put hypertension on the list until it gets 50,000 more beds, she did not dispute it.[884]

TDCJ's modifications to the heat-score system since the preliminary injunction hearing were minimal. Dr. Leonardson testified that, among other changes, TDCJ now automatically assigns all inmates over 65 a heat score.[885] TDCJ also added inmates who are on "highly active anticholinergic" medications for four days or longer.[886] Dr. Vassallo testified that the latter addition has no medical or scientific basis. She explained: "[A]ny anticholinergic medication will interfere with sweat gland function and it will do that immediately," so "[y]ou don't need to be on a medication for four days before sweat glands stop working sufficiently."[887] Defense pharmacology expert Dr. De La Cruz confirmed that the term "highly active anticholinergic"— or "HAAC"—is not one he has "seen … [b]efore," and that he is "not familiar with" HAAC as a recognized pharmacological term.[888] As a result, neither he or any of TDCJ's other medical witnesses could identify which drugs fall within that category.[889] Whatever this caveat means, it causes over one thousand inmates on anticholinergics to remain excluded from the heat score.[890]

---

[883] *Id.* at 47:20-21 (Leonardson).
[884] *Id.* at 54:12-55:3 (Leonardson).
[885] *Id.* at 42:1-5 (Leonardson).
[886] *Id.* at 42:11-43:16 (Leonardson), 257:12-19 (De La Cruz); Trial Tr. (Mar. 30, 2026) 101:16-23 (Vassallo), 297:16-25 (Biswas).
[887] Trial Tr. (Mar. 30, 2026) 103:3-10 (Vassallo).
[888] Trial Tr. (Apr. 7, 2026) 257:12-19, 259:1-4 (De La Cruz).
[889] *Id.* at 42:11–21 (Leonardson), 259:7-11 (De La Cruz); Trial Tr. (Apr. 8, 2026) 114:21–25 (Felicella).
[890] Adding "highly active anticholinergics" evidently increased the heat score population by

*(Footnote cont'd on next page)*

Director Lumpkin offered witnesses who attempted to dispute the language of the written policies with the argument that treating medical providers could circumvent policy by simply asking the Office of the TDCJ Health Services Liaison[891] to move their patients into air conditioning,[892] but this testimony is not credible for four reasons. First, this assertion directly contradicts the written TDCJ policy instructing that "HSL cannot request reassignment of an inmate to an air-conditioned or climate-controlled facility," unlike other housing types like single-level facilities, wheelchair accessible facilities, and facilities with extended clinic hours— all restrictions that can be requested by a Health Services Liaison if ordered by a medical provider.[893] Second, both of Director Lumpkin's witnesses who testified on this issue testified to hearsay, as neither is involved in communications with treating medical providers; they simply repeated what they were told.[894] Third, Mr. Fitzpatrick claimed there was a code, ACHRI, for

about 2,600, compared to the more than 4,000 inmates prescribed anticholinergics without a heat score the previous summer. *Compare generally* Pls.' Trial Ex. 312 (TDCJ Heat UTMB Medical Diagnosis, Sheet 1) (filtered by anticholinergic, Column X, identifying 4,132 inmates not housed in a cool bed on May 16, 2025 per Pls.' Trial Ex. 437-A at 3), *with generally* Def.'s Trial Ex. D-204 (Inmates with Heat Scores as of Feb. 23, 2026) (19,637 inmates, including opt-outs, with a heat score as of Feb. 23, 2026—after the new anticholinergic parameter as added on Feb. 2, 2026 per Def.'s Trial Ex. 206); *and* Def.'s Trial Ex. D-203 at 19 (TDCJ Resp to Webb ROG) (13,972 inmates with active heat score who have not opted out on Oct. 1, 2025); *and generally* Def.'s Trial Ex. 4 (Fitzpatrick Affdvt CB Refusals Tracking) (3,038 active opt-outs on Sep. 30, 2025).

[891] The Office of the TDCJ Health Services Liaison is composed of TDCJ-employed nurses that communicate with actual treating providers, but do not provide treatment themselves, to coordinate with TDCJ's security officials about issues such as housing assignments. Def.'s Trial Ex. 89 at 1 (CMHC A-08.4, Inmate Medical and Mental Health Classification); Trial Tr. (Apr. 2, 2026) 278:18–25, 309:5–13 (Fitzpatrick).

[892] Prelim. Inj. Hr'g Tr. (Aug. 1, 2024) 103:1–10 (Leonardson); Trial Tr. (Apr. 2, 2026) 277:5–278:6, 279:11–280:2, 298:1–4 (Fitzpatrick); Trial Tr. (Apr. 7, 2026) 36:24–37:14 (Leonardson).

[893] Def.'s Trial Ex. 138 at 2 (Health Services Liaison Facility Types List); *see also* Pls.' Trial Ex. 39 at 1-2 (Guidelines for Completing the Health Summary for Classification Form) (examples of housing restrictions medical providers can request and HSL can fulfill).

[894] Prelim. Inj. Hr'g Tr. (Aug. 1, 2024) 89:8–12 (Leonardson); Trial Tr. (Apr. 7, 2026) 16:3–11 (Leonardson); Trial Tr. (Apr. 6, 2026) 27:17–28:7 (Fitzpatrick).

121

this process that stood for "AC high-risk" Inmate,[895] but in fact ACHRI stands for AC "Heat Related Illness," and it is limited to 273 inmates who previously suffered a heat-related illness, as determined by TDCJ Health Services Liaison.[896] Finally, when the TDCJ Health Services Liaison responds to inmate grievances about not being assigned to air conditioning despite medical recommendations for heat, they do not notify the medical provider of this supposed method to circumvent policy—they tell the inmate "medical has no authority" to help them.[897] Moreover, ACHRI is admittedly not reflected in any policy[898] and TDCJ's use of ACHRI is incomplete as many inmates who are diagnosed still do not receive the benefit.[899]

Recent heat-related deaths of TDCJ inmates underscore the inadequacy of the heat score system. Mr. Castillo apparently did not have a heat score, even though he had epilepsy and was taking an antiseizure medication and an SSRI at the time of his death.[900] Nor did Ms. Hagerty (a

---

[895] Trial Tr. (Apr. 2, 2026) 277:12–14, 308:4–11 (Fitzpatrick); Trial Tr. (Apr. 6, 2026) 27:11–28:7 (Fitzpatrick).

[896] Pls.' Trial Ex. 589 at 5-8 (Affidavit of Michael Franks); Trial Tr. (Apr. 6, 2026) 29:13–30:2, 41:20–22 (Fitzpatrick).

[897] Pls.' Trial Ex. 285-A at 175 (Step 2 Grievances 1 of 9) ("[T]he Respiratory Therapist noted you would benefit from cool bed housing. Please be advised medical has no authority over housing or transfers. This issue must be addressed with the warden or Head of Classification at your unit of assignment."); Trial Tr. (Apr. 2, 2026) 314:10–317:10 (Fitzpatrick).

[898] Trial Tr. (Apr. 2, 2026) 308:6–11, 328:20–21 (Fitzpatrick).

[899] *See, e.g.*, Pls.' Trial Ex. 169-D at 99 (Hagerty OIG) ("recent complaints of possible heat-related skin rash"); Trial Tr. (Apr. 6, 2026) 36:22–37:7 (Fitzpatrick) (agreeing Hagerty did not have ACHRI code if she died in an un-air-conditioned cell), 37:19–39:5 (Fitzpatrick) (agreeing S.S. did not receive ACHRI code if he was in custody on November 10, 2025 despite being hospitalized for heat illness), 40:4–23, 41:2–9 (Fitzpatrick) (C.P. did not receive ACHRI code despite being hospitalized for heat illness); Pls.' Trial Ex. 583 at 4 (Edward Andrew Email (July 25, 2025)) (bottom row, S.S.); *see generally* Def.'s Trial Ex. 5 (Brock Affidavit of TDCJ Inmates Housing in Air Conditioning as of Nov. 10, 2025) (no S.S. present); *see generally* Pls.' Trial Ex. 591 (S. Smith Inmate Information Screenshot) (S.S. still in custody); Pls.' Trial Ex. 592 at 3 (Cynthia Martinez Email (Sept. 26, 2025)) (bottom row, C.P.); *see generally* Def.'s Trial Ex. 5 (Brock Affidavit of TDCJ Inmates Housing in Air Conditioning as of Nov. 10, 2025) (no C.P. present); *see generally* Pls.' Trial Ex. 593 (C. Perez Inmate Information Screenshot) (C.P. still in custody).

[900] Pls.' Trial Ex. 161 at 12 (Castillo Death Packet Updated).

122

diabetic with an unspecified mood disorder, who was prescribed an SSRI),[901] Mr. Womack (who had major depressive disorder and took an SSRI),[902] or Mr. Southards (who took an SSRI and an anticholinergic).[903] Director Lumpkin confirmed that, in his understanding of how the heat score system is supposed to work, any inmate with those conditions should have had a heat score and be in an air-conditioned cell—and that if that were not the case, TDCJ "would immediately investigate."[904] Given the conditions and medications documented in each inmate's records, Director Lumpkin agreed that the heat score system was "arbitrary, ineffective and inadequate" as to Ms. Hagerty, Mr. Womack, and Mr. Southards.[905] Yet, according to Dr. Leonardson, TDCJ's plan remains "to wait until TDCJ builds the beds necessary before [the agencies] put those people who are obese, hypertensive and diabetic into that cool environment," rather than include those admittedly at-risk inmates in the heat score algorithm.[906]

\* \* \* \*

Given the foregoing, the Court concludes that TDCJ's heat-score system remains inadequate, arbitrary, ineffective, and underinclusive—just as it was when the Court issued its preliminary injunction order. A system that only ensures air conditioning for a small fraction of those who face a substantial risk of serious harm from the extreme heat—and that does so not based primarily on TDCJ's own list of heat-sensitive conditions or medications, but on the number of air-conditioned beds available—is not an adequate remedy. Nor can it even be

---

[901] Pls.' Trial Ex. 169-A at 27 (Hagerty AIG Updated).
[902] Pls.' Trial Ex. 200 at 6 (Womack Death Packet Updated).
[903] Pls.' Trial Ex. 192-A at 65 (Southards OIG Report Updated).
[904] Lumpkin Dep. 148:10-22, Dkt. No. 337-1.
[905] *Id.* at 180:6-12.
[906] Trial Tr. (Apr. 7, 2026) 70:19–71:4 (Leonardson).

123

effective in theory, given the significant number of mental health illnesses of inmates that remain undiagnosed.

## VI.    AIR CONDITIONING IS THE ONLY EFFECTIVE PROTECTION FROM EXTREME HEAT.

This Court held in March 2025 that "air conditioning is the only effective protection from extreme heat."[907] This remains true today, and the point is no longer in dispute. Director Lumpkin admits that "[a]ir conditioning is the only effective protection from the extreme heat."[908] He admits that air conditioning is "necessary in order to protect inmates' health and safety."[909] And he understands that "the way to solve this problem is with air conditioning," and that TDCJ has to "get rid of the heat … by air-conditioning the system."[910] Mr. Collier conceded that, if TDCJ had air conditioning, it could "do away with" its heat-mitigation measures entirely.[911] Systemwide air conditioning is TDCJ's "goal,"[912] and Director Lumpkin agrees that "you need to air condition the prison system."[913] The Court likewise credits the testimony of the many witnesses—Plaintiffs' experts, defense experts, and fact witnesses—who agreed with Mr. Collier.

Dr. Vassallo explained that TDCJ inmates are "still dying" from extreme heat despite the mitigation measures, because those measures "do[] not remove the heat."[914] Dr. Vassallo opined that having working air conditioning has been "associated with an 80% reduction in the risk of death due to heat and cardiovascular disease and a 66% reduction in mortality due to

---

[907] *Tiede II*, 796 F. Supp. 3d at 316.
[908] Lumpkin Dep. 184:14-18, Dkt. No. 337-1.
[909] *Id.* at 111:6-9.
[910] *Id.* at 32:2-5, 40:13-18.
[911] Prelim. Inj. Hr'g Tr. (Aug. 2, 2024) 264:8-10 (Lumpkin).
[912] Trial Tr. (Apr. 9, 2026) 241:5–242:1 (Hudson).
[913] Trial Tr. (Mar. 31, 2026) 237:19–23 (Lumpkin).
[914] Prelim. Inj. Hr'g Tr. (July 31, 2024) 39:4-12 (Vassallo).

cardiovascular disease."[915] "In one study, it was estimated that 50% of the deaths related to a heat wave could have been prevented with a working air conditioner. Lack of air-conditioning was reported in 91% of deaths in one report."[916] Dr. Vassallo opined that this data is "directly applicable [to] the Texas prisons."[917] In her view, "excess morbidity and mortality in TDCJ facilities resulting from the extreme heat of the Texas summers can only be combated by bringing the temperature in the prisons down."[918] "[P]utting everyone" in the TDCJ system "in air-conditioned housing [is] the only way to eliminate the heat risk and the deaths and illnesses."[919] Or, as Dr. Vassallo put it, if "[y]ou remove the heat" with air conditioning, then "nobody dies [from the] heat."[920]

Dr. Biswas agreed that "air conditioning is the absolute comprehensive way to reduce mental illness symptoms in the carceral setting due to heat," and it is "the only way to reduce psychiatric risk due to heat."[921] She testified that hydration and other measures do not address the root problem, because they do not "lower your core body temperature."[922] She said: "[T]o lower your core body temperature, you need air conditioning and that is the most comprehensive thing you can do to reduce this serious exacerbation of mental illness we see in these populations in heat."[923]

---

[915] Pls.' Trial Ex. 113 at ¶ 40 (Vassallo Declaration).
[916] *Id.*
[917] *Id.*
[918] *Id.* (emphasis in original).
[919] Prelim. Inj. Hr'g Tr. (July 31, 2024) 71:11-14 (Vassallo).
[920] *Id.* at 39:9-12 (Vassallo).
[921] Trial Tr. (Mar. 30, 2026) 323:2-7 (Biswas).
[922] *Id.* at 296:24-297:3 (Biswas).
[923] *Id.*

Professor Deitch offered unrebutted testimony that "[t]he only staff independent way to mitigate the heat problem is through air conditioning."[924] When asked if there is any other heat mitigation measure that she is familiar with in her nearly 40 years as a corrections expert that TDCJ has not tried, she answered: "No."[925] Other than releasing inmates from custody altogether, she could identify no alternative.[926]

Mr. Williams characterized TDCJ's heat-mitigation measures as measures that "accepts the fact that … people are going to die" from heat rather than fixing the underlying problem — which, he explained, "can't be fixed by other means" than air conditioning.[927] "The fix is air conditioning,"[928] and the "cure" is to air-condition the system.[929] When asked whether there is any other heat mitigation measure that would stop inmates dying and getting sick from the heat in the summer months, his answer was simple: "No. I don't think so."[930]

Defense witnesses confirmed the same. Dr. Everitt confirmed that air conditioning is "the most effective way to prevent" heat stroke, stating: "If you have it available, it's probably where I prefer to be or where I would prefer a patient to be is an air-conditioned area …."[931] Paul Morales—TDCJ's 31-year corrections veteran and correctional risk management expert— confirmed that "air conditioning units would eliminate the risk of injury from the heat."[932] John Baldwin—Mr. Collier's corrections expert at the preliminary injunction hearing—confirmed that air conditioning "completely eliminates the danger of high heat in Texas prisons," and that both

---

[924] Trial Tr. (Mar. 31, 2026) 67:20-21 (Deitch).
[925] *Id.* at 67:22–68:3 (Deitch).
[926] *Id.* at 68:1-3 (Deitch).
[927] Prelim. Inj. Hr'g Tr. (July 31, 2024) 255:3-256:1 (Williams).
[928] Trial Tr. (Mar. 30, 2026) 61:21 (Williams).
[929] Prelim. Inj. Hr'g Tr. (July 31, 2024) 255:21–256:1 (Williams).
[930] Trial Tr. (Mar. 30, 2026) 62:2-11 (Williams).
[931] Trial Tr. (Apr. 6, 2026) 119:11-16 (Everitt).
[932] Prelim. Inj. Hr'g Tr. (Aug. 1, 2024) 276:8-12 (Morales).

he and Mr. Collier know "the solution is air conditioning."[933] And Mr. Collier himself confirmed that installing air conditioning is "the only way" he knows to "reduce the temperatures" in TDCJ prisons.[934]

Mr. Collier's Rule 30(b)(6) designee, David Sweetin, testified that installing air conditioning "is the right thing to do, it is the humane thing to do, and it is something [TDCJ] should have done a long time ago."[935] Mr. Sweetin testified that it is "the right thing to do because of the increased temperatures that the state is seeing, the increase of medication that . . . inmates are on as opposed to 20 years ago, 30 years ago, 40 years ago," and because "[t]here's a lot of factors that exacerbate the need for wanting to air condition" TDCJ facilities.[936] Mr. Sweetin was not aware of any heat-related illnesses at the Pack Unit since air conditioning was installed there.[937] And he was not aware of any heat-related illnesses that have occurred in air-conditioned housing in the TDCJ system in the last 30 years.[938]

Mr. Malouff was incarcerated at the Pack Unit when Judge Ellison ordered temporary air conditioning installed. He described TDCJ's heat mitigation measures as providing only short-term relief: "It was short-term, it really didn't do anything for you, and as soon as you left, you went right back into that heat."[939] The temporary air conditioning that arrived under the court order was different: From his perspective, it was "effective at reducing the effects of the heat" on him, and "absolutely" effective at reducing its effects on his fellow inmates.[940] Moreover, for

---

[933] Prelim. Inj. Hr'g Tr. (Aug. 2, 2024) 31:16-19 (Baldwin).
[934] *Id.* at 255:17-20 (Collier).
[935] Pls.' Dep. Designations for Prelim. Inj. Hr'g 7, Dkt. No. 155 (304:23-305:4).
[936] *Id.* at 2 (38:13-39:11).
[937] *Id.* at 2-3 (99:25-100:3, 161:8-12).
[938] *Id.* (99:25-100:3, 161:13-21).
[939] Prelim. Inj. Hr'g Tr. (July 30, 2024) 186:19-21 (Malouff).
[940] *Id.* at 187:24–188:5 (Malouff).

more than 30 years—since 1994—state-wide regulations adopted by the Texas Commission on

Jail Standards have required all jails in Texas to maintain indoor temperatures between 65° and

85°.[941]

The Court finds that this record—built from the testimony of witnesses on both sides of

this litigation—establishes without genuine dispute that air conditioning is the only measure that

eliminates the risk of heat-related death and illness in TDCJ's unair-conditioned facilities. Nor

has either Mr. Collier or Director Lumpkin identified (let alone presented any evidence of) a

less-intrusive alternative to air conditioning that would reduce the risk of death or serious bodily

injury to a socially acceptable level.

## VII.    TDCJ'S INSTALLATION OF AIR CONDITIONING REMAINS CONSTITUTIONALLY INADEQUATE.

### A.    TDCJ's installation of air-conditioned beds has not kept up with inmate population growth.

TDCJ has not increased the rate of air conditioning installation at a pace sufficient to

address the constitutional violation this Court identified in its March 2025 Order. At the time of

the July 2024 preliminary injunction hearing, "[a]pproximately 96,500 of TDCJ's 142,240 beds

[were] unair-conditioned."[942] Then, the Court noted that, "even at a rate of 3,100 new air-

conditioned beds per year (which is the rate TDCJ averaged in 2023 and 2024), it would take

TDCJ 30 years—i.e., until 2054—to install permanent air conditioning throughout the

system."[943] The Court found this 30-year timeline constitutionally deficient, as it "exposes over

95,000 inmates to the substantial risk of serious injury or death from unair-conditioned prisons

and, assuming normal rates of inmate turnover, would continue to expose hundreds of thousands

---

[941] 37 Tex. Admin. Code §§ 259.160, 260.154, 261.255.
[942] *Tiede II*, 796 F. Supp. 3d at 320.
[943] *Id.*

of inmates to the substantial risk of injury or death from extreme heat over the next two to three decades."[944] Director Lumpkin agreed that a 25-year timeline to fully air condition the system is "unacceptable,"[945] and his corrections expert Mr. Ishee said a 23-year timeline would be "too slow," "too long," and "too much time."[946]

Yet TDCJ has not increased the pace of installation sufficiently to alter the constitutional calculus. In June 2024, TDCJ had only 45,689 cool beds available.[947] As of March 25, 2026, TDCJ had 52,438 cool beds available.[948] This means that TDCJ installed approximately 6,749 new air-conditioned beds in the 21-month period between June 2024 and March 2026—a rate of approximately 3,857 new air-conditioned beds per year.[949] It also means that 88,697 TDCJ inmates are still without air-conditioned beds.[950] If inmate population remains flat and TDCJ continues at a rate of 3,857 new air-conditioned beds per year, it would take TDCJ roughly 23 years to fully air condition the system.[951]

This already inadequate 23-year timeline does not account for TDCJ's recent or estimated inmate population growth. Since June 2024, TDCJ's inmate population has increased by 7,006 inmates—from 134,129 to 141,135.[952] Over that same period, TDCJ added only 6,749 new air-conditioned beds[953]—meaning TDCJ's inmate population grew by 257 more people than the

---

[944] *Id.* at 332.
[945] Lumpkin Dep. 214:18-22, 215:4-12, Dkt. No. 337-1.
[946] Trial Tr. (Apr. 6, 2026) 301:22-25, 302:21-303:2 (Ishee).
[947] *See generally* Pls.' Trial Ex. 150 (TDCJ's Cool Bed Dashboard – June 28, 2024).
[948] *See generally* Def.'s Trial Ex. 254 (TDCJ AC Dashboard - March 25 2026).
[949] Trial Tr. (Apr. 6, 2026) 297:13-17 (Ishee).
[950] *Id.* at 298:4-8 (Ishee).
[951] *Id.* at 298:9-11 (Ishee).
[952] Trial Tr. (Mar. 31, 2026) 70:17-71:2 (Deitch); *compare generally* Pls.' Trial Ex. 281-A (LBB Inmate Population – June 2024), *with* Pls.' Trial Ex. 281-B (LBB Inmate Population – February 2026).
[953] Trial Tr. (Apr. 6, 2026) 297:13-17 (Ishee).

number of new air-conditioned beds it added, and the gap between inmates and air-conditioned beds actually widened. TDCJ's inmate population is expected to grow substantially for the foreseeable future: The Legislative Budget Board's most recent projections estimate that TDCJ's inmate population will increase by nearly 10,000 additional inmates by August 2027—for a total of 151,116 inmates.[954] This means that TDCJ would need to add roughly 10,000 new air-conditioned beds between April 2026 and August 2027 just to keep up with the projected pace of population growth[955]—a rate that it has never achieved.

If that were not enough, the Legislative Budget Board's inmate population projections assume "that Texas state policy stays the same"—in other words, that "no new laws are passed that make it more likely for people to go to prison or that increase [prison] sentences."[956] But Professor Deitch anticipates the Texas Legislature making significant policy changes in the next legislative session that will make TDCJ's inmate population growth rate increase even more.[957] She testified that "[a]ll indications are that there's probably going to be … a number of tough-on-crime bills, efforts to keep people in longer, send more people to prison, [and] maybe reduce parole rates"—"all of which will result in a faster growing [inmate] population."[958]

**B.      TDCJ still has no concrete timeline for fully air conditioning the system.**

In its March 2025 Order, the Court found: "Despite knowing of the risk extreme heat poses to all inmates and the inadequacy of TDCJ's mitigation measures, Collier has no concrete

---

[954] Trial Tr. (Mar. 31, 2026) 74:22-24 (Deitch); *see generally* Pls.' Trial Ex. 283 (Professor Deitch's Demonstrative).
[955] Trial Tr. (Mar. 31, 2026) 76:12-16 (Deitch).
[956] *Id.* at 77:4-11 (Deitch).
[957] *Id.* at 77:10-21 (Deitch).
[958] *Id.* at 77:12-24 (Deitch).

timeline for installing permanent or temporary air conditioning in TDCJ inmate living areas."[959]

That remains true today.

Mr. Collier candidly admitted: The Court's March 2025 Order did not change "what [TDCJ] asked for in terms of funding from the Legislature, how quick[ly] [TDCJ] moved, or in any other capacity."[960] Instead, TDCJ has presented a series of hypothetical plans that it has shown no intention of following through with.

At the preliminary injunction hearing, TDCJ presented a "Four-Phase[]" plan to install air conditioning, which estimated that it would cost $1.1 billion to fully air condition the system and require TDCJ to request $319 million in the second phase of the plan (for the FY'26-FY'27 biennium).[961] TDCJ requested a fraction of that—$118 million.[962] Then, TDCJ presented a three-phase plan to install air conditioning.[963] But, in his October 2025 deposition, Director Lumpkin refused to commit to requesting the $620.4 in funding identified in phase two of the three-phase plan.[964] He admitted: "I can't promise it will happen."[965] Mr. Collier, likewise, testified that the three-phase plan does not reflect any "commitment" by TDCJ to request those specific amounts from the Legislature,[966] and he acknowledged that the three-phase plan "isn't TDCJ's appropriations request to the Legislature."[967]

---

[959] *Tiede II*, 796 F. Supp. 3d at 332.
[960] Trial Tr. (March 31, 2026) at 164:18-23 (Collier).
[961] Pls.' Trial Ex. 323 at 1 (TDCJ's Four-Phase Plan); Def.'s Trial Ex. 23 at 1 (TDCJ's Four-Phase Plan).
[962] *See generally* Pls.' Trial Ex. 580 (FY 2026-27 Appropriations Requested for Air Conditioning TDCJ Facilities).
[963] Def.'s Trial Ex. 20 (TDCJ's Three-Phase Plan); Def.'s Mot. for Summ. J. 12, Dkt. No. 251.
[964] Lumpkin Dep. 201:16-21, Dkt. No. 332-4 ("I couldn't commit today.").
[965] *Id.* at 203:5-9.
[966] *Id.* at 209:20-23.
[967] *Id.* at 208:24-209-1.

At trial, Director Lumpkin presented a two-phase plan to fully air condition the system—Defendant's Exhibit 256.[968] But the testimony of TDCJ's own witnesses confirms that TDCJ never had any such plan. Chairman Nichols testified that Defendant's Exhibit 256, as well as its prior iterations, was "like a how could something potentially be done"— "something a little bit more than swag"—and that "calling that a plan" was "not the right word to use."[969] Director Lumpkin confirmed that Defendant's Exhibit 256 is "not really a commitment"—but instead "kind of an aspirational plan or a hope."[970] He confirmed the plan "is aspirational," that "[t]here's not any mandatory direction out there" to air condition the system, and that he "can't promise" the Court it will happen.[971] Mr. Ishee initially characterized Defendant's Exhibit 256 as "intentional and disciplined" and "realistic"—but confirmed on cross-examination that his opinion was formed without the benefit of hearing Chairman Nichols's testimony about the document, and that he did not know Director Lumpkin had not committed to any specific completion date.[972] The date on which his entire opinion that the document was realistic depended—i.e., 2033—is a date no TDCJ official has ever committed to.[973]

Indeed, neither Director Lumpkin nor Mr. Collier has ever committed to any specific deadline for installing air conditioning systemwide, or to requesting the amount of money from the Legislature. Director Lumpkin acknowledged that without a court order, he "can't commit"

---

[968] Even the two-phase plan changed dramatically over the span of two weeks. Defendant's Trial Exhibit 228 is dated March 2, 2026, and required a total of $1,492,500,000 to fully air condition the system, Defendant's Trial Exhibit 256 is dated March 15, 2026, and required a total of $1,505,000,000 to fully air condition the system—a difference of $12.5 million. No witness ever explained the reason for the significant difference in such a short period of time.

[969] Trial Tr. (Apr. 6, 2026) 221:1-222:24 (Nichols).

[970] Trial Tr. (Mar. 31, 2026) 242:18-20 (Lumpkin).

[971] Lumpkin Dep. 202:20-203:7, Dkt. No. 337-1.

[972] Trial Tr. (Apr. 6, 2026) 303:3-6, 306:23–307:7 (Ishee).

[973] *Id.* at 305:14-306:4 (Ishee).

to obtaining the money necessary to air condition the system or "even asking for the amount of money" he knows to be necessary.[974] Mr. Williams testified that TDCJ has never has communicated the level of crisis to the Texas Legislature or reported the number of heat-related deaths.[975] He made clear that Mr. Collier should have requested the full funding to air condition the entire system in the last legislative session, because it is a "five-alarm fire" where "[p]eople are dying" and "[s]taff are suffering."[976]

Neither Mr. Collier nor Director Lumpkin told the Legislature that fully air conditioning the system was an emergency requiring $1.3 billion right away.[977] And Mr. Collier admitted he never asked the Legislature for the amount of money he knew was necessary to fully air condition the system.[978] The most TDCJ has ever requested from the Legislature for air conditioning in a single biennium is $118 million—less than 10% of the approximately $1.5 billion it now estimates the full project will cost.[979] This is despite the fact that, according to Mr. Collier, TDCJ has never received any pushback from the Legislature, the Governor's office, or anyone else with regard to the amount of funding it could request for air conditioning.[980] Nor did anyone ever tell Mr. Collier that there was a "cap or limit" on what funding TDCJ could request from the Legislature for air conditioning.[981]

According to Director Lumpkin, TDCJ *still* has not solicited bids for installing permanent air conditioning throughout the system.[982] TDCJ has never solicited bids for installing permanent

---

[974] Trial Tr. (Mar. 31, 2026) 242:8-14 (Lumpkin).
[975] Trial Tr. (Mar. 30, 2026) 58:15-59:6 (Williams).
[976] *Id.* at 59:11-20 (Williams).
[977] Lumpkin Dep. 52:10-11, 52:19-53:3, Dkt. No. 337-1.
[978] Trial Tr. (Mar. 31, 2026) 161:15-163:16 (Collier).
[979] Trial Tr. (Mar. 30, 2026) 334:18-22 (Carroll).
[980] Trial Tr. (Mar. 31, 2026) 161:15–162:16 (Collier).
[981] *Id.* at 162:2–4 (Collier).
[982] Trial Tr. (Mar. 31, 2026) 169:12-18 (Collier).

or temporary air conditioning throughout the system.[983] TDCJ has never "considered grouping [air conditioning installation] projects under one bid for efficiencies of scale or by region for efficiencies of scale."[984] TDCJ has never asked its engineering consultants to study how to improve its procurement process to install air conditioning faster.[985] And neither Director Lumpkin nor Mr. Collier has ever sought outside help to speed up the process in any way.[986] In fact, TDCJ's own engineering expert, Jared Higgins—who has worked with TDCJ on air conditioning projects for approximately 20 years—confirmed that he has never even had a conversation with Director Lumpkin, Dale Cox (TDCJ's Director of Engineering), or Ron Hudson (Chief Operations Officer and former Facilities Director) about increasing the speed of TDCJ's air-conditioning projects.[987]

### C.    TDCJ's capital expenditure plans and legislative appropriations requests underscore that air conditioning is not a priority.

TDCJ's capital expenditure plan—submitted to the Legislature in September 2024, one month after this Court's preliminary injunction ruling—tells the same story. The capital expenditure plan is TDCJ's official representation to the Legislature and state agencies of what capital projects it has identified and plans to pursue. Mr. Steffa confirmed that it "presents kind of a big picture of capital needs for the legislature to know what's coming,"[988] and that this Court is entitled to treat those documents as "accurate representations of TDCJ's needs and plans at the

---

[983] Lumpkin Dep. 252:14-17, Dkt. No. 337-1 (admitting TDCJ never solicited bids for permanent air conditioning); Trial Tr. (Apr. 9, 2026) 281:21-23 (Hudson) (admitting TDCJ never solicited bids for temporary air conditioning).
[984] Lumpkin Dep. 255:15-18, Dkt. No. 337-1.
[985] *Id.* at 51:16-20 (Higgins).
[986] Lumpkin Dep. 54:13-16, 57:5-22, Dkt. No. 337-1.
[987] Trial Tr. (Apr. 9, 2026) 50:3-13 (Higgins).
[988] *Id.* at 135:8-10 (Steffa).

time they were submitted."[989] TDCJ's most recent capital expenditure plan contains no funding for air conditioning projects in 2029, 2030, or beyond.[990] The only future funding reflected beyond the current biennium is just under $49 million—a fraction of the approximately $1.5 billion needed to complete systemwide air conditioning.[991]  The absence of those projects from the capital expenditure plan is TDCJ's official representation to the Legislature that it has not identified systemwide air conditioning as planned capital work beyond the current biennium.

TDCJ's spending history confirms the pattern. In FY'18-FY'19, TDCJ had no air conditioning projects in its capital expenditure plan at all, and spent only $1.2 million of the $40 million it received for major repairs and renovations—approximately 3%—on air conditioning.[992] In FY'22-FY'23, TDCJ again had no air conditioning projects in its capital expenditure plan, received $105.4 million for deferred maintenance, and spent only $15.5 million—approximately 14%—on air conditioning.[993] When the Legislature issued interim charges in March 2022 directing the House Appropriations Committee to make funding recommendations for phased installation of climate control equipment in state correctional facilities—six months after TDCJ had received $105.4 million for deferred maintenance—TDCJ's response was to present a four-phase cost estimate document to legislative committees in July 2022, while simultaneously preparing a LAR for FY'24-FY'25 that identified only $22.5 million in air conditioning projects—approximately one-tenth of what the four-phase document

---

[989] *Id.* at 155:21-156:4 (Steffa).
[990] *Id.* at 223:18-21, 224:14-16 (Hudson).
[991] *Id.* at 224:17-20 (Hudson).
[992] *Id.* at 163:6-8, 165:24–166:7 (Steffa); *see generally* Def.'s Trial Ex. 233 (TDCJ Install AC FY18 to FY26-FY27).
[993] Trial Tr. (Apr. 9, 2026) 180:1-23 (Steffa).

said would be needed in the first two biennia alone.[994]

The contrast between TDCJ's air conditioning spending and its other capital priorities is stark. For FY'24-FY'25, TDCJ asked the Legislature for (and received) $35 million for the Bryan Collier Leadership and Training Center—more than the entire amount of all air conditioning projects that existed in TDCJ's system at the time.[995] By October 2024, the actual cost of the Collier Center had reached nearly $57 million—while TDCJ had only $3.6 million in ongoing inmate air conditioning projects at the same moment.[996] The Collier Center also includes an air-conditioned mock prison cell.[997]

Meanwhile, TDCJ was spending approximately $7 million on agricultural buildings at the Wainwright Unit to ensure that poultry was housed in safe temperatures.[998] TDCJ's own documentation specifies that "[t]he regulation of air-flow within a poultry house is of great importance because excessive moisture and heat buildup can adversely affect the overall productivity of a laying flock" and that "great care must be taken to maintain a comfortable environment for the flock," with the optimal temperature range for laying hens being 45° to 75°.[999] While TDCJ was spending nearly $7 million to maintain a comfortable environment for chickens, it had only $3.6 million ongoing for inmate air conditioning projects.[1000] Unlike its

---

[994] *Id.* at 184:3-190:15 (Steffa); *see generally* Pls.' Trial Exs. 323 (TDCJ's Four-Phase Plan), 596 (88th Capital Expenditure Plan).

[995] Trial Tr. (Apr. 9, 2026) 194:13-198:18 (Steffa); *see generally* Pls.' Trial Ex. 297 (TDCJ Legislative Appropriations Request (FY24-25)).

[996] Trial Tr. (Apr. 9, 2026) 199:25-205:13 (Steffa); *see generally* Pls.' Trial Exs. 571 (TDCJ AC vs Non-AC Spreadsheet & Affidavit), 598 (24.10.11 TBCJ Committee Meeting Minutes).

[997] Trial Tr. (Apr. 9, 2026) 207:10-22 (Steffa).

[998] *Id.* at 201:17-202:3 (Steffa); *see generally* Pls.' Trial Ex. 598 (24.10.11 TBCJ Committee Meeting Minutes).

[999] Pls.' Trial Ex. 209 at 5 (Mr. Collier's Resp. to Req. for Produc. No. 17); Trial Tr. (Apr. 9, 2026) 202:8-25 (Steffa).

[1000] Trial Tr. (Apr. 9, 2026) 204:14-205:13 (Steffa).

chicken coops, TDCJ has never implemented an optimal—or even required—a maximum temperature for its inmate housing areas.[1001]

TDCJ's legislative documents further demonstrate that, once TDCJ identifies a priority for a capital expenditure related to safety, infrastructure, or security, the project is created and appears on TDCJ's capital expenditure plan project list from biennium to biennium until the project is completed. For example, evidence at trial showed that TDCJ had identified replacing the roofs at the Jester III Unit and installing or replacing fire alarms in the Ellis Unit at least as early as 2016 in preparation for FY'18-FY'19.[1002] When they were not completed in the then-current biennium, the projects appeared on successive capital expenditure plan project lists in FY'20-FY'21 and FY'22-FY'23.[1003] TDCJ did not follow this same process for air conditioning.

### D.    TDCJ has refused to take steps that would increase the rate at which air conditioning could be installed.

TDCJ has also consistently refused to take steps that would increase the rate at which air conditioning is installed in its facilities. As Mr. Cox acknowledged, the agency's current approach to installing air conditioning is "not working."[1004] The record establishes three different aspects to TDCJ's approach that are unnecessarily delaying the installation of air-conditioned beds.

---

[1001] Lumpkin Dep. 99:18-24, Dkt. No. 337-1; Trial Tr. (Apr. 1, 2026) 175:17-19 (Toon).
[1002] Pls.' Trial Ex. 298 at 3 (TDCJ Capital Expenditure Plans for 85th through 89th Legislative Sessions); Trial Tr. (Apr. 9, 2026) 174:12-22, 176:24-177:5 (Steffa).
[1003] Pls.' Trial Ex. 298 at 15-16 (TDCJ Capital Expenditure Plans for 85th through 89th Legislative Sessions); Trial Tr. (Apr. 9, 2026) 174:23-175:5, 177:6-13 (Steffa).
[1004] Trial Tr. (Apr. 8, 2026) 213:8-9 (Cox).

*1.    TDCJ has chosen the slowest available project delivery method.*

A "project delivery method" refers to the process by which an owner selects and contracts with companies to complete design and construction work.[1005] According to Plaintiffs' procurement law expert, Brian Carroll, Texas procurement law authorizes several delivery methods—including design-bid-build, CMAR, and design-build—that TDCJ could use to design and install air conditioning.[1006]

According to Mr. Cox, TDCJ has exclusively used a design-bid-build project delivery method to design and install air conditioning in its prisons.[1007] Under design-bid-build, TDCJ must complete two entirely separate procurement processes—one for design and one for construction—for each prison.[1008] The processes run sequentially—not simultaneously—so TDCJ cannot even begin the construction procurement process until the design is completed.[1009] This sequential process means that procurement alone can take "six to twenty-four months."[1010] Mr. Cox confirmed that the average construction procurement lag is approximately six months— meaning six months of idle time between completing design and beginning construction—during which no beds are being added.[1011] And under design-bid-build, long-lead equipment such as chillers cannot be ordered until after the construction contract is awarded—meaning that waiting period cannot begin until after that six-month procurement gap has already elapsed.[1012]

---

[1005] Trial Tr. (Mar. 30, 2026) 335:24–336:5 (Carroll).
[1006] *Id.* at 336:5-7, 339:5-7 (Carroll).
[1007] Trial Tr. (Apr. 8, 2026) 216:17-24 (Cox); Trial Tr. (Mar. 30, 2026) 340:18-21 (Carroll).
[1008] Trial Tr. (Mar. 30, 2026) 337:4-338:12 (Carroll); Trial Tr. (Apr. 1, 2026) 31:14-16 (Steigerwalt).
[1009] Trial Tr. (Mar. 30, 2026) 337:9-13 (Carroll).
[1010] *Id.* at 337:18-23 (Carroll).
[1011] Trial Tr. (Apr. 8, 2026) 211:1-4 (Cox).
[1012] *Id.* at 212:13-17 (Cox).

Mr. Carroll believes that design-bid-build is "absolutely the slowest possible way to get a project delivered,"[1013] because of the delays caused by using two different procurement processes instead of one. As Director Lumpkin acknowledged, the use of design-bid-build was an intentional decision: TDCJ "made a choice to – to stagger" its design and construction stages,[1014] rather than running them concurrently. But neither he nor any other TDCJ witness ever explained why TDCJ made this choice.

By contrast, design-build allows the design and construction phases to be awarded to one firm in a single contract.[1015] According to Mr. Carroll, design-bid-build involves "two contracts and two processes," while design-build involves "one contract, [and] one process with the design and installation under the same roof."[1016] A study by the Construction Industry Institute of 212 projects showed design-build projects were delivered 102% faster than design-bid-build, at slightly lower cost and with fewer change orders.[1017] The Texas A&M Transportation Institute reached the same conclusion, finding design-build achieves quicker, cheaper, and higher quality delivery across projects of all types.[1018] Both Mr. Carroll and Mr. Steigerwalt testified that design-build is well-suited to renovation and retrofit projects and is widely used by Texas state agencies—including the Texas Department of Public Safety and the University of Texas at Arlington.[1019]

Mr. Carroll confirmed he has "seen no evidence" that TDCJ has ever used or even considered using design-build for its air conditioning projects, and "no reason" why it could

---

[1013] Trial Tr. (Mar. 30, 2026) 339:18-19 (Carroll).
[1014] Lumpkin Dep. 49:19-22, Dkt. No. 337-1 (citation modified).
[1015] Trial Tr. (Mar. 30, 2026) 338:4-12 (Carroll).
[1016] *Id.* at 338:13-17 (Carroll).
[1017] Trial Tr. (Apr. 1, 2026) 43:6-12 (Steigerwalt).
[1018] Trial Tr. (Mar. 30, 2026) 343:11-14 (Carroll).
[1019] *Id.* at 345:23-346:1 (Carroll).

not.[1020] Mr. Steigerwalt confirmed the same.[1021] Mr. Carroll testified that design-build is one of the statutorily permissible procurement methods available to TDCJ,[1022] and Mr. Cox and Director Lumpkin agreed.[1023] Mr. Cox confirmed that TDCJ has nevertheless not conducted a formal, coordinated analysis of whether design-build would be feasible for its HVAC projects.[1024]

CMAR—which stands for "construction manager at risk"—is a third project delivery method that "fits somewhere in between" design-bid-build and design-build.[1025] According to Mr. Carroll, it still requires two procurement processes (one for design and one for construction), but "bring[s] a little bit of benefit" of design-build, because the construction manager "can be selected a little earlier in the [design] process"—rather than waiting until the design is completed.[1026] Mr. Cox prefers CMAR over both design-bid-build and design-build.[1027] Mr. Cox confirmed that CMAR has, in TDCJ's limited experience, sped up delivery and improved contractor quality.[1028] But Mr. Cox acknowledged that every air conditioning project currently under construction uses design-bid-build,[1029] and that TDCJ's experience with CMAR is "limited"— having used it on only two non-air conditioning projects to date.[1030]

The Court finds that TDCJ's exclusive use of design-bid-build—the slowest available project delivery method—for every air conditioning project in its system, despite having never

---

[1020] *Id.* at 348:4-17 (Carroll).
[1021] Trial Tr. (Apr. 1, 2026) 44:12-13 (Steigerwalt).
[1022] Trial Tr. (Mar. 30, 2026) 339:5-7 (Carroll).
[1023] Trial Tr. (Apr. 8, 2026) 201:17-18 (Cox); Trial Tr. (Mar. 31, 2026) 229:18-230:5 (Lumpkin).
[1024] Trial Tr. (Apr. 8, 2026) 200:20-21 (Cox).
[1025] Trial Tr. (Mar. 30, 2026) 338:20-339:4 (Carroll).
[1026] *Id.*
[1027] Trial Tr. (Apr. 8, 2026) 193:24-194:6 (Cox).
[1028] *Id.* at 159:7-12 (Cox).
[1029] *Id.* at 216:17-24 (Cox).
[1030] *Id.* at 160:25–161:3 (Cox).

formally analyzed faster alternatives and having available to it by statute methods that its own witnesses acknowledge would deliver results more quickly, reflects an institutional choice that is inconsistent with the urgency this constitutional violation demands.

### 2.  TDCJ has spent an inordinate amount of time waiting on long-lead materials.

More than half of the construction duration on TDCJ's completed air-conditioning projects has been spent waiting for long-lead materials—custom equipment like chillers and air-handling units that can take five to seven months or more to deliver after being ordered.[1031] Mr. Cox confirmed this, noting that chilled water modular systems currently carry lead times of 40 to 50 weeks, and that even DX equipment—which has improved—was running 20 to 24 weeks at peak.[1032] Mr. Cox said that ensuring "the equipment is available to purchase and get delivered in time … has been a big issue ever since COVID."[1033]

This is another problem that would be drastically improved by using design-build. Under design-build, the contractor is involved in design from the outset and can identify and order long-lead materials as soon as specifications are set—dramatically compressing the waiting periods that currently idle construction crews for months.[1034] Plaintiffs' expert Shannon Ramey—a licensed Professional Engineer with extensive HVAC contracting experience—confirmed that design-build's ability to surface and resolve constructability issues early, combined with earlier contractor involvement in equipment selection, directly addresses the long-lead material bottleneck that is the single largest source of delay in TDCJ's current construction timelines.[1035]

---

[1031] Trial Tr. (Apr. 1, 2026) 38:18-21 (Steigerwalt).
[1032] Trial Tr. (Apr. 8, 2026) 169:2-12 (Cox).
[1033] *Id.* at 163:20-22 (Cox).
[1034] Trial Tr. (Apr. 1, 2026) 48:1-10 (Steigerwalt); Trial Tr. (Mar. 30, 2026) 351:8-16 (Carroll).
[1035] Trial Tr. (Apr. 1, 2026) 125:18-126:3 (Ramey).

### 3. *TDCJ is not bundling any of its air conditioning contracts.*

Using the design-bid-build project delivery method, TDCJ currently uses two procurement processes per unit: one for designing air conditioning and another for installing it.[1036] This results in smaller contracts in the $10 to $20 million range.[1037] Mr. Carroll testified that national construction companies—which have the capacity and labor pools to complete this work at scale—typically pursue contracts of $100 million and above, and that TDCJ's unit-by-unit approach effectively limits its vendor pool to smaller, local contractors willing to work at that scale in remote Texas locations.[1038] Mr. Cox confirmed this, acknowledging that HTX Industries—one of TDCJ's primary air conditioning contractors—has fewer than 100 employees,[1039] and that bundling contracts into the $100 to $150 million range would attract "a higher level quality of contractor."[1040]

Mr. Cox confirmed that bundling is "a definite strategy we want to pursue,"[1041] yet TDCJ has not pursued it to date. Mr. Carroll confirmed there is no legal restriction preventing TDCJ from bundling contracts,[1042] and he has seen no evidence that TDCJ has ever done so or considered doing so.[1043]

Bundling would also reduce procurement overhead dramatically. Mr. Carroll testified that bundling ten units into one design-build contract would eliminate nineteen separate procurement

---

[1036] Trial Tr. (Mar. 30, 2026) 337:4-338:12 (Carroll); Trial Tr. (Apr. 1, 2026) 31:14-16 (Steigerwalt).

[1037] Trial Tr. (Mar. 30, 2026) 349:7-8 (Carroll).

[1038] *Id.* at 348:18-349:3, 349:24–350:3 (Carroll).

[1039] Trial Tr. (Apr. 8, 2026) 223:17-20 (Cox).

[1040] *Id.* at 176:3-10 (Cox).

[1041] *Id.*

[1042] Trial Tr. (Mar. 30, 2026) 351:21 (Carroll).

[1043] *Id.* at 352:1 (Carroll).

steps.[1044] Mr. Ramey confirmed that bundling provides an additional operational benefit—allowing contractors to redistribute labor between project sites during delays at any individual site rather than losing that workforce to other jobs entirely.[1045] HTX Industries itself submitted a proposal to bundle three current projects—Hightower, Boyd, and Stevenson—into a single contract, offered a $1.5 million discount to do so, and outlined the scheduling and administrative efficiencies that would result.[1046] TDCJ did not accept the proposal.[1047] Those three projects remain unbundled.[1048]

### E.    Inmate opt-outs do not demonstrate that inmates do not want air conditioning.

At trial, TDCJ pointed to the thousands of inmates who have "opted out" of air conditioning, presumably to suggest that inmates either do not want—or do not need—air-conditioning housing. But the evidence told a different story.

In April 2025 alone—the same month TDCJ implemented modifications to its heat-score system—2,011 inmates opted out of their heat score.[1049] Of those, 1,892 opted out within the first eight days, before TDCJ had moved them to an air-conditioned cell.[1050] The opt-out form does not give inmates an opportunity to explain why they opted out of an air-conditioned cell,[1051] and TDCJ has conducted no systematic analysis of why inmates were choosing to remain in unair-conditioned facilities.[1052] But the reasons are not difficult to understand: Opt-outs were driven by

---

[1044] *Id.* at 350:9-13 (Carroll).
[1045] Trial Tr. (Apr. 1, 2026) 134:4-20 (Ramey).
[1046] *Id.* at 54:17-55:6 (Steigerwalt).
[1047] *Id.* at 54:20-55:6 (Steigerwalt).
[1048] Trial Tr. (Apr. 8, 2026) 215:4-6 (Cox).
[1049] Trial Tr. (Apr. 6, 2026) 9:25–10:5 (Fitzpatrick).
[1050] *Id.* at 10:9-11:12 (Fitzpatrick).
[1051] Pls.' Trial Ex. 325 at 20 (TDCJ AD 10.64 – Revision 12).
[1052] Trial Tr. (Apr. 6, 2026) 13:15-22 (Fitzpatrick).

fear of being separated from family, losing programming and work assignments, and spending months in isolated, transient cells in restrictive housing units[1053]—with Mr. Fitzpatrick confirming that some inmates spend over three months in "transient" (i.e., restrictive) housing units.[1054]

Furthermore, Mr. Fitzpatrick's office that administers the opt-outs statewide[1055] has no medical expertise[1056] or ability to explain each inmate's risk from the heat,[1057] yet they not only accept but affirmatively solicit opt-outs *en masse*.[1058] These have included inmates with developmental disabilities[1059] and numerous other medical problems[1060] that are—other than age—unknown to the security officials convincing inmates to opt-out.[1061]

---

[1053] *See generally* Pls.' Trial Ex. 285-G (inmate grievances asking for their heat scores to be removed); Trial Tr. (Apr. 6, 2026) 14:2–13, 15:16–16:9 (Fitzpatrick).

[1054] Trial Tr. (Apr. 6, 2026) 19:18–20:11, 23:12–24:8, 25:4-15 (Fitzpatrick); Pls.' Trial Ex. 285-G at 231, 233-240 (S2 Grievances 7 of 9) (grievance enumerating the conditions of transient status including a dirty cell, rats, limited movement, and restricted access to the phone).

[1055] Pls.' Trial Ex. 437-A at 3 (Def.`s Resps. to Pls.' Second Set of Interrogs. [Redacted]) ("TDCJ inmates with a heat sensitivity score could opt out of a cool bed placement beginning June 4, 2024."); Def.'s Trial Ex. 41 at 11-12 (AD 10.64 – Revision 12); Trial Tr. (Apr. 2, 2026) 295:1–12 (Fitzpatrick).

[1056] Trial Tr. (Apr. 2, 2026) 258:17–18, 265:9–21, 331:22–332:19, 333:4–25 (Fitzpatrick); Trial Tr. (Apr. 6, 2026) 27:17–28:7 (Fitzpatrick).

[1057] Trial Tr. (Apr. 2, 2026) 340:13–341:2, 342:8–343:24 (Fitzpatrick) (discussing an example opt-out shown on Pls.' Trial Ex. 437-A (row 32,771), Pls.' Trial Ex. 587, and Pls.' Trial Ex. 588, agreeing classification would not be trained to explain why a 65-year-old inmate's COPD made them more susceptible to the heat during the opt-out process).

[1058] Trial Tr. (Apr. 6, 2026) 11:22–12:8 (Fitzpatrick).

[1059] *See generally* Pls.' Trial Ex. 312-A (Excerpt from Pls.' Trial Ex. 312, Def.'s Resp. to Interrog. No. 21 from Pls.' Second Set of Interrogs.) (listing eighteen inmates with developmental disabilities who opted out as of May 16, 2025); Trial Tr. (Apr. 2, 2026) 337:12–15, 339:23–340:1 (Fitzpatrick).

[1060] *See generally* Pls.' Trial Ex. 312-B (Excerpt from Pls.' Trial Ex. 312, Def.'s Resp. to Interrog. No. 21 from Pls.' Second Set of Interrogs.) (listing seventy-nine inmates over 65, with COPD, and with hypertension who opted out as of May 16, 2025); Trial Tr. (Apr. 2, 2026) 336:6–341:2 (Fitzpatrick) (confirming one example from the list is an inmate who opted out).

[1061] Trial Tr. (Apr. 2, 2026) 268:14–18, 339:14–340:12 (Fitzpatrick) (discussing an example opt-out shown on Pls.' Trial Ex. 437-A (row 7850), Pls.' Trial Ex. 585, and Pls.' Trial Ex. 586,

*(Footnote cont'd on next page)*

144

Mr. Malouff, likewise, testified that TX C.U.R.E.'s constituents have raised concerns about where TDCJ locates its cool beds: because the designated cool beds are "back in solitary confinement, ad seg," an inmate who accepts one faces conditions that "become punitive" and must give up privileges and freedoms.[1062] As Mr. Malouff explained, constituents "didn't want those cool beds because they were in restrictive housing and they would lose their privileges."[1063] Thus, the number of opt-outs—without more—is not, as Director Lumpkin contends, meaningful or even significant; it says nothing about inmates' need for, interest in, or willingness to live in air-conditioned housing, all else being equal.

### F.    Other Prisons Set a Temperature Maximum.

As alluded to above, since 1994, state-wide regulations adopted by the Texas Commission on Jail Standards have required all jails in Texas to maintain indoor temperatures between 65° and 85°.[1064] Other buildings in Texas must maintain a temperature suitable for the comfort of the residents (e.g., between 71° and 81°).[1065] North Carolina's administrative code for its jail system requires "heating, ventilation, and air conditioning systems that are capable of maintaining temperatures in confinement units at not less than 68 degrees Fahrenheit during the heating season and not more than 85 degrees Fahrenheit during the cooling season."[1066] Tennessee requires that local correctional facilities "have a temperature of not less than sixty-five (65) degrees Fahrenheit and not more than eighty (80) degrees Fahrenheit."[1067] And, while

---

agreeing classification would not know the inmate had hypertension and a developmental disability, or that he was prescribed diuretic and calcium channel blocker medications).

[1062] Trial Tr. (Apr. 1, 2026) 213:14–214:8 (Malouff).

[1063] *Id.*

[1064] 37 Tex. Admin. Code §§ 259.160, 260.154, 261.255.

[1065] *See* 26 Tex. Admin. Code § 554.321(a-b).

[1066] ECF 50-1, D. Williams Decl. (Apr. 11, 2024) ¶ 19 (referencing 10A N.C. Admin. Code 14J.1217).

[1067] *Id.* ¶ 20 (referencing Tenn. Comp. R. & Regs. 1400-01-.04).

there are no requirements under federal law, the Bureau of Prisons operations manual says that target temperatures should be 76° in the summer and 68° in the winter, with the caveat that facilities may be a few degrees higher or lower.[1068] TDCJ has nevertheless refused to implement the same (or similar) standards.

## VIII.    TDCJ'S CLAIMED OBSTACLES FOR PERMANENTLY AIR CONDITIONING THE SYSTEM ARE CONTRADICTED BY THE EVIDENCE.

TDCJ has suggested that it cannot obligate the full funding needed for systemwide air conditioning in a single legislative biennium. The record does not support that argument. Mr. Carroll explained that "obligat[ing]" funds in a procurement context means simply putting work under contract—"[t]he contract just has to be signed."[1069] Mr. Carroll testified that construction does not have to be completed within the biennium for funds to be properly obligated,[1070] and Mr. Collier agreed.[1071] As Mr. Carroll put it: The agency "just need[s] to put pen to paper during that biennium"[1072]—Mr. Collier agreed.[1073] Mr. Carroll confirmed he is not aware of any procurement reason why TDCJ could not request the full $1.5 billion in a single biennium.[1074] Nor is the amount itself unprecedented: The Texas Facilities Commission obligated $2.5 billion in a single biennium for the border wall project.[1075] If any appropriated funds went unobligated at the end of the biennium, they would simply be returned to the state treasury with no negative consequence to TDCJ.[1076]

---

[1068] *Id.* ¶ 16.
[1069] Trial Tr. (Mar. 30, 2026) 334:5-7 (Carroll).
[1070] *Id.* at 334:8-14 (Carroll).
[1071] Trial Tr. (Mar. 31, 2026) 166:19-20, 168:6-7 (Collier).
[1072] Trial Tr. (Mar. 30, 2026) 334:15-17 (Carroll).
[1073] Trial Tr. (Mar. 31, 2026) 166:19-20 (Collier).
[1074] Trial Tr. (Mar. 30, 2026) 335:15-19 (Carroll).
[1075] *Id.* at 335:7-14 (Carroll).
[1076] *Id.* at 334:21-25 (Carroll).

Even crediting TDCJ's own estimate that system-wide permanent air conditioning would cost approximately $1.5 billion, that sum is a small fraction of the resources the State has projected as available: the Comptroller's Certification Revenue Estimate for the 2026–27 biennium projected roughly $203.63 billion in General Revenue-related funds available, which would support general-purpose spending of $198.97 billion.[1077] That is expected to result in an ending General Revenue-related certification balance of $4.66 billion.[1078] Further, the Comptroller's Certification Revenue Estimate projects an Economic Stabilization Fund balance of about $28.5 billion at the close of the biennium.[1079] Thus, fully funding system-wide air conditioning would cost roughly 5% of the projected rainy-day economic fund alone, and well under 1% of total funds available for general-purpose spending (and less than one-third of the projected general revenue surplus).

TDCJ has also suggested that insufficient contractor capacity would prevent faster installation even with full funding. The record does not support that argument either. Mr. Carroll—who has 25 years of experience in the construction industry and works regularly with large national construction companies—testified that "[t]here is massive capacity in the construction industry in the U.S. at this time."[1080] According to Mr. Carroll, the reason national

---

[1077] Kelly Hancock, *2026-2027 Certification Revenue Estimate*, Texas Comptroller of Public Accounts, i (Oct. 14, 2025), https://comptroller.texas.gov/about/media-center/news/20251014-acting-texas-comptroller-kelly-hancock-releases-2026-27-certification-revenue-estimate-1760381701256. Under Rule 201 of the Federal Rules of Evidence, that Court may take judicial notice of a fact that is not subject to reasonable dispute because it can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned. The Court finds that the available fund balances and budget surplus as estimated by the Texas Comptroller of Public Accounts is such a fact, and that the Texas Comptroller of Public Accounts is a source whose accuracy cannot reasonably be questioned.
[1078] *Id.*
[1079] *Id.*
[1080] Trial Tr. (Mar. 30, 2026) 348:13-17 (Carroll).

147

contractors are not bidding on TDCJ's projects is not lack of capacity—it is that TDCJ's unit-by-unit contracts, in the $10 to $20 million range, are too small to attract them.[1081] A national company "is not going to come to Texas for a" $10 to $20 million contract—"[t]hey're chasing large projects of large scope and scale nationally …."[1082]

Mr. Carroll confirmed he has seen no evidence that TDCJ has ever solicited bids from national companies for systemwide air conditioning, and no evidence of HVAC work with national companies at all.[1083] Mr. Ramey said he regularly communicates with large HVAC contractors including Hermanson, McKinstry, McDonald-Miller, and RK Mechanical and confirmed that sufficient contracting capacity exists to complete the installation within Steigerwalt's estimated timeframe.[1084] And TDCJ's own engineering expert, Mr. Higgins—who expressed concern about contractor availability—confirmed on cross-examination that he did not conduct any analysis of contractor capacity as part of his expert review.[1085]

To the extent that any labor constraints exist, there is a straightforward solution: Bundling contracts into the $100 to $150 million range—as Mr. Carroll, Mr. Ramey, and Mr. Cox all confirmed is feasible—would expand the contractor pool and directly address the capacity concern TDCJ now raises.[1086] As a result, the Court does not see—and TDCJ has not presented sufficient evidence to suggest—that labor constraints would prevent it installing systemwide air conditioning by the deadline set forth in this order.

---

[1081] *Id.* at 348:18-349:8 (Carroll).
[1082] *Id.* at 348:21-25 (Carroll).
[1083] *Id.* at 348:4-12 (Carroll).
[1084] Trial Tr. (Apr. 1, 2026) 133:2-134:3 (Ramey).
[1085] Trial Tr. (Apr. 9, 2026) 46:7-9 (Higgins).
[1086] Trial Tr. (Mar. 30, 2026) 332:21-23 (Carroll); Trial Tr. (Apr. 1, 2026) 134:4-20 (Ramey); Trial Tr. (Apr. 8, 2026) 176:3-10 (Cox).

## IX.    TDCJ CAN FULLY AIR CONDITION THE SYSTEM BY DECEMBER 31, 2029.

Plaintiffs' request that TDCJ complete the installation of air conditioning systemwide by the end of 2029 is achievable—in fact, it is grounded in the defense's own engineering estimate.

TDCJ's Director of Engineering, Dale Cox, estimated in his deposition that completing systemwide air conditioning would take between 36 and 51 months under his proposed approach—the low end of which, measured from the date of trial in April 2026, places completion well within the Court's December 31, 2029 deadline.[1087] Mr. Cox confirmed this 36-51-month estimate at trial, noting that it is "a very doable timeframe" and "not unreasonable."[1088] Mr. Steigerwalt credited Mr. Cox's estimate,[1089] and testified that by implementing design-build, bundling, and earlier long-lead material procurement—three well-established, well-documented industry methods—TDCJ could compress that timeline to 24 to 36 months.[1090] Mr. Steigerwalt was unequivocal: These methods are "well-established, well-known, well-documented, well—there's reports on everything on how to do these and how to execute these."[1091] Yet TDCJ still has not adopted them, or even evaluated if they would speed up the rate at which it is installing air-conditioned beds.

Defense construction expert, Christopher Caddell, confirmed on cross-examination that design-build is faster than design-bid-build on project timeline and that retrofitting air conditioning into a prison system is a "complex project[]" for which collaborative methods like design-build or CMAR can provide benefits by involving contractors early in the design

---

[1087] Cox Dep. 130:5-15, Dkt. No. 332-8.
[1088] Trial Tr. (Apr. 8, 2026) 163:19–22 (Cox).
[1089] Trial Tr. (Apr. 1, 2026) 19:22-25 (Steigerwalt).
[1090] *Id.* at 20:1-17, 57:3-5 (Steigerwalt).
[1091] *Id.* at 57:3-5 (Steigerwalt).

phase.[1092] Mr. Cox himself confirmed on direct examination that CMAR—which he prefers over design-bid-build—has, in TDCJ's limited experience with it, sped up delivery and improved contractor quality.[1093] And he confirmed that bundling is "a definite strategy we want to pursue."[1094]

Mr. Higgins offered a somewhat longer estimate of 48 to 72 months with full funding and current market conditions.[1095] That estimate, however, was based on TDCJ's current approach—design-bid-build, unit-by-unit procurement—rather than the methods that Mr. Steigerwalt, Mr. Cox, and Mr. Caddell all agreed would be faster.[1096] But even under Mr. Higgins's estimate, the 48 months on the low end—measured from April 2026—places systemwide completion in April 2030, less than four months after the deadline plaintiffs request.

The Court also notes that Mr. Higgins acknowledged a significant financial interest in TDCJ maintaining its current project delivery model: His firm does 95% of its work through design-bid-build, TDCJ accounts for 20% of his personal workload, and he confirmed that if TDCJ switched to design-build he would "likely lose out on design opportunities."[1097] He also confirmed he has never had a conversation with Mr. Cox, Mr. Hudson, or Director Lumpkin about increasing the speed of TDCJ's air-conditioning projects.[1098] So while his timeline has some weight, the Court gives more weight to Mr. Cox's 36- to 51-month timeline.

The Court finds that the December 31, 2029 deadline is supported by TDCJ's own engineering estimate, using the same procurement approach that TDCJ has already adopted, is

---

[1092] Trial Tr. (Apr. 9, 2026) 83:8-13, 84:20-24, 92:2-4 (Caddell).

[1093] Trial Tr. (Apr. 8, 2026) 159:7-12 (Cox).

[1094] *Id.* at 176:3-10 (Cox).

[1095] Trial Tr. (Apr. 9, 2026) 27:2-4 (Higgins).

[1096] *Id.* at 46:16-18 (Higgins).

[1097] *Id.* at 48:25-49:14; 49:3-17 (Higgins).

[1098] *Id.* at 50:3-13 (Higgins).

not at risk from a lack of sufficient labor supply, and is the appropriate deadline for completing systemwide air conditioning given the ongoing and substantial risk of harm extreme heat poses to TDCJ inmates in unair-conditioned units.

## X.    TDCJ CAN EXPEDITIOUSLY INSTALL TEMPORARY AIR CONDITIONING SYSTEMWIDE.

TDCJ also agrees that installing temporary air-conditioning is feasible, and if ordered by the Court to install temporary air conditioning, it would do so.[1099] Mr. Collier also acknowledged that it is feasible to install temporary air conditioning systemwide.[1100] Mr. Hudson, likewise, agreed that temporary air conditioning "can be installed i[n] every TDCJ facility."[1101]

Mr. Malouff, who was in the Pack Unit when TDCJ installed temporary air-conditioning in response to Judge Ellison's order, offered unrebutted testimony that it took TDCJ 60 to 90 days to install it.[1102] TDCJ also installed temporary air conditioning at several units in response to Governor Abbott's statewide order for undocumented immigrants to be arrested on state criminal charges and incarcerated in TDCJ facilities—which was called "Operation Lone Star."[1103] Because these individuals had not been convicted, TDCJ had to comply with the Texas Board of Jail Standards—which, among other things, require that indoor temperatures be between 65° and 85°.[1104] To comply with Governor Abbott's order, TDCJ installed temporary air conditioning in the Briscoe, Segovia, and Lopez Units.[1105] Mr. Hudson said it took about 30 to 45 days to install temporary air conditioning in each of those units.[1106] He said that, if it could

---

[1099] Dkt. No. 155 ECF 155, TDCJ 30(b)(6) Dep. at 42:16-43:4, 120:3-10.

[1100] Prelim. Inj. Hr'g Tr. (Aug. 2, 2024) 258:13-16 (Collier).

[1101] *Id.* at 137:9-11 (Hudson).

[1102] Prelim. Inj. Hr'g Tr. (July 30, 2024) 187:18-23 (Malouff).

[1103] Prelim. Inj. Hr'g Tr. (Aug. 2, 2024) 126:20-128:4 (Hudson).

[1104] *Id*. at 127:14-21 (Hudson), 259:8-260:4 (Collier).

[1105] *Id.* at 127:22-128:4 (Hudson).

[1106] Trial Tr. (Apr. 9, 2026) 281:21–25 (Hudson).

perform such installations without coordinating through the Texas Department of Emergency Management (which organized Operation Lone Star), TDCJ "could do it even faster than 30 to 45 days."[1107] He added that separate, temporary air-conditioning installations at intake facilities—which were not under Operation Lone Star—took only "a couple of weeks."[1108] TDCJ did not have to go through a design phase to comply with Governor Abbott's order for Operation Lone Star.[1109]

## CONCLUSIONS OF LAW

To obtain a permanent injunction, a party must show that: (1) it has succeeded on the merits; (2) a failure to grant the injunction will result in irreparable injury; (3) the injury outweighs any damage that the injunction will cause the opposing party; and (4) the injunction will not disserve the public interest. *See Valentine v. Collier*, 993 F.3d 270, 280 (5th Cir. 2021). As set forth in more detail below, Plaintiffs have met their burden on all of these factors.

## I.     PLAINTIFFS HAVE STANDING TO SEEK RELIEF ON BEHALF OF THEIR MEMBERS AND CONSTITUENTS.

The Supreme Court has established a three-part test for associational standing, explaining that:

> [A]n association has standing to bring suit on behalf of its members when: (a) its members would otherwise have standing to sue in their own right; (b) the interest it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.

*Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977).

---

[1107] *Id*. at 282:18–24 (Hudson).
[1108] *Id.* at 282:4–8 (Hudson)
[1109] Prelim. Inj. Hr'g Tr. (Aug. 2, 2024) 156:15-18 (Hudson).

The Court has repeatedly held that Plaintiffs "meet the requirements of associational standing."[1110] While the Court does not need to revisit these determinations,[1111] the evidence presented at the permanent injunction trial further confirms them.

### A.    Lioness is a Traditional Voluntary Membership Organization.

To begin with, Lioness is still a traditional "voluntary membership organization with identifiable members"[1112]—and Director Lumpkin has never claimed otherwise. *SFFA III*, 600 U.S. at 201. As the Court recognized at the summary judgment stage, there was "no assertion by Defendant that Lioness is not a traditional membership organization, nor that at least one of its members would have standing to sue in their own right, nor that the interests that this litigation seeks to protect are not germane to Lioness's purpose." *Tiede III*, 2026 WL 751904, at *4. That remains true. Regardless, the evidence shows that Lioness has hundreds of members who joined voluntarily, support the organization's mission, and are current TDCJ prisoners assigned to un-air-conditioned units.[1113] Lioness has had members in every TDCJ women's only facility, including members in at least eight unair-conditioned units.[1114] Indeed, the evidence Director Lumpkin himself introduced at trial confirms as much: The affidavit of Mr. Rheams of the Office of the Attorney General, offered as Defendant's Exhibit 2 and validated as accurate by TDCJ's

---

[1110] *Tiede I*, 2024 WL 3016562, at *5 (denying Collier's motion to dismiss on, among other things, standing grounds); *Tiede II*, 796 F. Supp. 3d at 321-23 (finding Plaintiffs had standing while denying their motion for preliminary injunction); *Tiede III*, 2026 WL 751904, at *10 (denying Lumpkin's motion for summary judgment).

[1111] *See, e.g.*, *SFFA II*, 397 F. Supp. 3d at 184 (relying on earlier associational standing analysis when denying Rule 12(b)(1) as part of the court's post-trial conclusions of law) (citing *SFFA I*, 261 F. Supp. 3d at 110–11) (cited with approval in *SFFA III*, 600 U.S. at 199).

[1112] *See* Findings of Fact § I.A., *supra*.

[1113] *See id.*

[1114] *See id.* § I.A.2, *supra*.

Timothy Fitzpatrick, established that 329 of Lioness's members are in TDCJ custody and approximately 118 of those members are housed in unair-conditioned units.[1115]

Lioness's members would also have standing to sue in their own right. Members housed in un-air-conditioned units in particular face a "substantial risk of serious harm and death" from the extreme heat; that injury is traceable to Director Lumpkin's deliberate indifference and his refusal to take the steps necessary to protect members from the extreme summer heat; and the injunctive relief sought will redress their injuries. *See Crawford v. Hinds Cnty. Bd. of Supervisors*, 1 F.4th 371, 375 (5th Cir. 2021) (listing elements for Article III standing). Given Lioness's extensive history of prison-heat advocacy and the reported frequency with which the organization hears concerns about extreme heat from its members incarcerated in the TDCJ system, this suit is clearly germane to its purpose.[1116] Lioness joined the lawsuit in response to daily correspondence from its incarcerated members, and no member has objected to its participation in this lawsuit.[1117]

Under *SFFA III*, that is all that is required to establish associational standing. 600 U.S. at 201; *see also VanDerStok v. Garland*, 680 F. Supp. 3d 741, 762 (N.D. Tex. 2023), *vacated in part on other grounds*, 86 F.4th 179 (5th Cir. 2023) (relying on affidavits from organizations' leadership describing membership to find that they are traditional membership organizations); *Nat'l Rifle Ass'n of Am., Inc. v. Bureau of Alcohol, Tobacco, Firearms & Explosives*, 728 F. Supp. 3d 394, 405 (N.D. Tex. 2024) (same). "Where, as here, an organization has identified members and represents them in good faith, [the Supreme Court's decisions] do not require further scrutiny into how the organization operates." *SFFA III*, 600 U.S. at 201. Lioness is

---

[1115] *See id.*
[1116] *See* Findings of Fact § I.A.4, *supra*.
[1117] *See id.*

therefore a traditional voluntary membership organization that has standing to sue on behalf its members.

That Lioness's current members reside only in TDCJ's women's facilities does not deprive the organization of standing. (*Cf.* Dkt. No. 251 at 11–12.) As the Court has already recognized, Director Lumpkin's contrary position improperly "substitute[s] a question of remedy—the appropriate scope of relief—for one of standing." *Tiede III*, 2026 WL 751904, at *5. As a general matter, "standing requirements do not bar a plaintiff who is harmed by a government policy from challenging that policy simply because the policy has an application beyond the plaintiff." *Id.* The Supreme Court has said the same. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561–62 (1992) (a plaintiff who is himself "an object of the action (or forgone action) at issue" ordinarily has standing, because "there is ordinarily little question that the action or inaction has caused him injury, and that a judgment preventing or requiring the action will redress it"). As the Court previously held, "the harm that Lioness alleges TDCJ's heat-mitigation policy causes its members gives Lioness standing to challenge that policy, and the fact that Lioness does not have members in every TDCJ facility does not take that standing away." *Tiede III*, 2026 WL 751904, at *5.[1118] Lioness challenges the same systemwide policy here,[1119] so the

---

[1118] In its order denying Director Lumpkin's motion for summary judgment, the Court cited multiple cases and distinguished each of the cases on which Director Lumpkin relied to argue that Lioness lacked standing to seek systemwide relief—*TransUnion LLC v. Ramirez*, *DaimlerChrysler Corp. v. Cuno*, *Lewis v. Casey*, and *Alabama Legislative Black Caucus v. Alabama*. *See Tiede III*, 2026 WL 751904, at *5–6. The Court adopts that analysis again here but, for the sake of brevity, does not restate it.

[1119] Lioness challenged TDCJ's systemwide heat-mitigation policy in the operative complaint. (*See generally* Dkt. No. 240 at 4.) Lioness's representatives confirmed at the permanent injunction trial that the organization is still challenging that same systemwide policy. (*See* Findings of Fact, Section I.A.5., *supra*.)

155

Court's prior analysis applies with equal force, and "the scope of Lioness's membership is not a bar to its standing to pursue this case." *Id.* *6.[1120]

> **B.    TX C.U.R.E. and TPCA Have Sufficient Indicia of Membership to Assert Claims on Behalf of their Non-Member Constituents.**

The Court previously held that the two remaining Plaintiffs—TPCA and TX C.U.R.E.— "satisfy the indicia of membership test" based on the summary judgment record. *Tiede III*, 2026 WL 751904, at *9. The trial record confirms that holding.

> 1.    *An organization need not be funded or controlled by its constituents to satisfy the indicia-of-membership standard.*

Member control and financing are not prerequisites for associational standing. The Supreme Court recently confirmed as much, holding that a voluntary membership organization had associational standing even though it was not "controlled and funded by [its] members" when it filed suit. *SFFA III*, 600 U.S. at 200–01. If such features are not needed for a "true" membership organization to have the capacity for associational standing, they cannot be mandatory indicia of membership for a non-membership organization. *See Tiede III*, 2026 WL 751904, at *9 ("It is difficult to understand how one organization would not be required to have its members fund or direct it to qualify as a traditional membership organization, but another organization—to demonstrate its equivalency to a traditional membership organization—would

---

[1120] Because Lioness is a traditional voluntary membership organization, the "indicia of membership" analysis applicable to non-traditional membership organizations need not be addressed. *See SFFA III*, 600 U.S. at 200–01; *La Unión del Pueblo Entero v. Abbott*, 614 F. Supp. 3d 509, 526 (W.D. Tex. 2022). The Court took that approach at the summary judgment stage. *See Tiede III*, 2026 WL 751904, at *4, *6; *cf. AARP v. U.S. Equal Emp. Opportunity Comm'n*, 226 F. Supp. 3d 7, 17 (D.D.C. 2016) (declining to decide whether AARP was a "traditional membership organization" where it satisfied the "indicia of membership" criteria). But even if Lioness were subject to the indicia-of-membership test, it would satisfy that test, too: Its members voluntarily associate with the organization and brought this suit through Lioness in direct response to concerns within the scope of the organization's central purpose. (*See* Findings of Fact § I.A., *supra*.)

have to make that showing."). And, given that inmates can neither make wages nor participate in board meetings while incarcerated in the TDCJ system,[1121] such requirements would essentially bar all prison advocacy groups from ever bringing lawsuits challenging conditions of confinement.

This conclusion aligns with a long line of cases holding that the membership indicia identified in *Hunt* are "illustrative, not exhaustive." *In re Fin. Oversight & Mgmt. Bd. for P.R.*, 110 F.4th 295, 310 (1st Cir. 2024); *see also Flyers Rts. Educ. Fund, Inc. v. U.S. Dep't of Transp.*, 957 F.3d 1359, 1361–62 (D.C. Cir. 2020) (it is "quite doubtful" that "the list of 'indicia' identified in *Hunt* was meant to be exhaustive"); *Friends of the Earth, Inc. v. Chevron Chem. Co.*, 129 F.3d 826, 828-29 (5th Cir. 1997) (finding "no cogent reason" to limit the indicia-of-membership analysis to "the facts of *Hunt*" and relying on indicia beyond control and funding). Like *SFFA III*, these cases hold that organizational plaintiffs can assert associational standing even if their non-member constituents do not possess "all the indicia of membership that the [Court identified in] *Hunt*." *Or. Advoc. Ctr. v. Mink*, 322 F.3d 1101, 1111 (9th Cir. 2003) (organization had standing where constituents did not fund the organization, exert exclusive control over it, or solely select its leaders); *see also Doe v. Stincer*, 175 F.3d 879, 886 (11th Cir. 1999) (same); *Flyers Rts.*, 957 F.3d at 1362 (finding standing where constituents did "not elect the leadership" or have decision-making authority).

The pertinent question when evaluating associational standing is *not* whether an organization satisfies some rigid set of criteria—like being governed, funded, or elected by non-member constituents. Rather, it is "to determine whether the nature of the relationship between the [organization] and the relevant interests of [its constituents] satisfie[s] the goals of the

---

[1121] *See id.* §§ I.A.1., I.B.1., & I.C.1., *supra*.

constitutional standing requirement." *Friends of the Earth*, 129 F.3d at 828. Those goals are satisfied where, as here, the plaintiff is "sufficiently identified with and subject to the influence of those it seeks to represent as to have a 'personal stake in the outcome of the controversy.'" *Mink*, 322 F.3d at 1111 (quoting *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.,* 429 U.S. 252, 261 (1977)); *accord Flyers Rts.*, 957 F.3d at 1361–62 (organization had standing where it polled members and considered petitions they signed when determining which "policy issues and types of actions" to pursue, such that "member input guides the organization's activity"). Simply put, "the *Hunt* test is a functional analysis of an organization's relationship with its constituents"—"not a narrow inquiry about funding and governing the organization." *Tiede III*, 2026 WL 751904, at *8. This functional approach is also reflected in how other district courts in the Fifth Circuit have applied the indicia of membership test. *See*, *e.g.*, *Texas v. Bureau of Alcohol, Tobacco, Firearms, & Explosives*, 737 F. Supp. 3d 426, 438 (N.D. Tex. 2024) ("[N]onprofit legal defense and educational foundation" supported by gun owners had standing where members received "information about its activities through a quarterly newsletter and regular emails about its activities" and "regularly communicat[ed] their views to [the organization] about issues on which [it] should focus."); *Concerned Citizens Around Murphy v. Murphy Oil USA, Inc.*, 686 F. Supp. 2d 663, 676 (E.D. La. 2010); *Env't Conservation Org. v. City of Dallas*, No. 3-03-CV-2951-BD, 2005 WL 1771289, at *2 (N.D. Tex. July 26, 2005) ("No court has ever required an organization to satisfy each and every indicia of membership. Rather, it is enough that members possess sufficient indicia to satisfy the purposes that undergird the concept of associational standing – that the organization is sufficiently identified with and subject to the influence of those it seeks to represent as to has a 'personal stake in the outcome of the controversy.") (citation modified).

158

Consistent with that purpose, courts look to a variety of organizational features when evaluating associational standing under the indicia-of-membership standard, including whether its constituents are a "specialized segment" of the community that is the primary beneficiary of the organization's activities, *Hunt*, 432 U.S. at 344;[1122] informally guide or influence its priorities and activities;[1123] elect or serve in its leadership;[1124] finance its activities;[1125] or choose to associate with it.[1126] No single feature is dispositive, nor is this list exhaustive. Instead, the court must employ a holistic approach "to determine whether, practically speaking, an organization has the appropriate relationship with non-members to sue on their behalf." *In re Fin. Oversight*, 110 F.4th at 311 (citing *Friends of the Earth*, 129 F.3d at 828). Under this holistic analysis, both TPCA and TX C.U.R.E. satisfy the indicia-of-membership test.

---

[1122] *See also, e.g.*, *Mink*, 322 F.3d at 1111 (finding associational standing where constituents—incapacitated criminal defendants—comprised a "specialized segment" of the community that was the primary beneficiary of the group's activities); *AARP*, 226 F. Supp. 3d at 17 (finding associational standing where an organization with a "defined mission" serves a "discrete, stable membership with a definable set of common interests"); *cf. Ind. Prot. & Advoc. Servs. Comm'n v. Ind. Fam. & Soc. Servs. Admin.*, 630 F. Supp. 3d 1022, 1029 (S.D. Ind. 2022) ("If the core of associational standing is not 'membership' but rather the propriety of collective representation, then the constituent-advocacy group relationship alone might suffice for associational standing, assuming always that there is some underlying injury in fact.").

[1123] *Flyers Rts.*, 957 F.3d at 1362 (finding associational standing where constituents had "sufficient amount of interaction" with the association "to influence [its] activities"); *Mink*, 322 F.3d at 1112 (same where constituents "possess the means to influence the priorities and activities the [plaintiff] undertakes").

[1124] *Hunt*, 432 U.S. at 344–45.

[1125] *Id.*

[1126] *Flyers Rts.*, 957 F.3d at 1361–62 (airline passengers became organization's "member[s] … by signing up to receive information from the organization"); *Friends of the Earth*, 129 F.3d at 829 (indicia of membership included fact that "members [] voluntarily associated themselves" with the organization).

## 2.    *TPCA satisfies the indicia-of-membership test.*

TPCA considers all of TDCJ's more than 141,000 inmates, together with their families, to be its constituents.[1127] It communicates with its incarcerated constituents and their families through mail, telephone, and electronic messaging, and through a regular newsletter and email distribution reaching some 5,000 recipients.[1128] TPCA solicits and is guided by the concerns of its incarcerated constituents—input Dr. Dominick described as "everything" in shaping the organization's priorities—and it carries out its work through a group of incarcerated and free-world volunteers, or "core team members."[1129]

Its incarcerated constituents also help finance the organization through donations, notwithstanding the financial hardships of incarceration.[1130] The extreme heat in TDCJ's facilities has been central to TPCA's work from the outset—it was, in Dr. Dominick's words, "the birthing point of the whole organization."[1131] The organization was founded because of the extreme heat Dr. Dominick's ex-husband endured while incarcerated in Texas prisons.[1132] TPCA hears from its constituents about extreme heat in Texas prisons on a daily basis, has surveyed them about their experiences with heat, and includes among its constituents inmates currently housed in un-air-conditioned units.[1133] TPCA also has a substantial history of heat-related advocacy—including legislative advocacy, rallies, webinars and trainings, heated mock-cell

---

[1127] *See* Findings of Fact § I.B., *supra*.
[1128] *See* Findings of Fact § I.B.2., *supra*.
[1129] *See id.*
[1130] *See id.* § I.B.1., *supra*.
[1131] *See id.* § I.B.4., *supra*.
[1132] *See id.* § I.B., *supra*.
[1133] *See id.* § I.B.2, *supra*.

demonstrations, and its "Beat The Heat" and "85 To Stay Alive" campaigns.[1134] TPCA joined this litigation in direct response to its constituents' suffering and input.[1135]

The Court previously held that: "Given TPCA's extensive communication with inmates at TDCJ facilities, stated goal to have the concerns of inmates guide the organization's activities, and network of incarcerated volunteers to facilitate that process, and activities like conducting surveys, the Court further concludes that, in a very real sense, TPCA represents its incarcerated constituents and provides the means by which they express their collective views and protect their collective interests." *Tiede III*, 2026 WL 751904, at *9. The unrebutted evidence presented at trial confirms these conclusions. In addition, TPCA serves a specialized segment of the population—*i.e.*, the segment of inmates incarcerated in TDCJ facilities—which is the primary beneficiary of its activities. *See Hunt*, 432 U.S. at 344.

These connections also distinguish TPCA from the organization in *ARC*, where the Fifth Circuit concluded that "clients . . . [were] unable to participate in and guide the organization's efforts." *Association for Retarded Citizens of Dallas v. Dallas County Mental Health & Mental Retardation Center Board of Trustees*, 19 F.3d 241, 244 (5th Cir. 1994). TPCA also has constituents who "voluntarily associated themselves" with the organization, either through receiving (and submitting information for) TPCA's newsletter, by volunteering as team members, paying to communicate with TPCA through Securus, or making donations.[1136] *See Friends of the Earth*, 129 F.3d at 829; s*ee also Concerned Citizens*, 686 F. Supp. 2d at 676 (relevant factors that "members 'chip[ped] in' to cover expenses" and "pa[id] for [organizational] activities through their own volunteer efforts."). Given TPCA's extensive

---

[1134] *See id.* § I.B., *supra*.
[1135] *See id.* § I.B., *supra*.
[1136] *See id.* § I.B., *supra*.

history of prison-heat advocacy and the reported frequency with which the organization hears concerns about heat from inmates, this "suit clearly is within [TPCA's] central purpose, and thus within the scope of reasons that individuals join[ ] the organization." *Friends of the Earth*, 129 F.3d at 829. Dr. Dominick also confirmed TPCA receives no financial benefit from participating in the lawsuit and has no other "reasons for instituting [the] suit other than asserting its members' interests,"[1137] *Concerned Citizens*, 686 F. Supp. 2d at 677, and that no TPCA constituent has objected to the organization's participation in the lawsuit.[1138]

As the Court has previously held, the fact that only a few inmates have donated to TPCA does not mean the organization lacks "sufficient indicia of membership." *Tiede III*, 2026 WL 751904, at *8. Trial testimony established that individuals in Texas are not compensated for their labor and cannot participate in board meetings.[1139] "[G]iven the realities of incarceration, the Court views TPCA's receipt of some donations from inmates and the organization's consistent efforts to solicit the views of inmates as evidence supporting associational standing, not evidence of its absence." *Tiede III*, 2026 WL 751904, at *10. As was the case at the summary judgment stage, the picture painted by the evidence presented at trial is that TPCA is "an organization actively dedicated to a specific population and working to gather the concerns of that population and channel those concerns into advocacy, including this litigation." *Id.* That is precisely the kind of organization that *Hunt* suggests has associational standing. *See* 432 U.S. at 342, 344–45 (explaining that the commission, though advertising, market research, public education campaigns, and scientific research, "serve[d] a specialized segment of the State's economic

---

[1137] *See id.* at § I.B.4., *supra*.
[1138] *See id.* at § I.B.4., *supra*.
[1139] *See id.* § I.A.1., *supra*; *id.* at § I.B.1, *supra*.

community which is the primary beneficiary of its activities, including the prosecution of this kind of litigation").

        3.        *TX C.U.R.E. satisfies the indicia-of-membership test.*

TX C.U.R.E.'s mission is to "advocate, educate the inmates, the families, the legislature and the public about issues within the prison system,"[1140] and obtaining air conditioning in TDCJ's prisons has been a major policy goal since the organization's inception.[1141]

TX C.U.R.E.'s constituents are all inmates in TDCJ and their families—which includes constituents in every TDCJ unit.[1142] TX C.U.R.E. maintains a mailing list of incarcerated constituents with whom it has had direct correspondence—reflecting approximately 75 incarcerated individuals with whom it has had direct correspondence, and 222 unique entries total.[1143] The organization communicates with incarcerated constituents and their families regularly and at length, responding to heat-related concerns as they arise—work to which Mr. Malouff devotes more than forty hours per week.[1144] The organization determines its priorities by reference to the issues its constituents raise—among which extreme heat ranks highest from April to October[1145]—and it is governed by a board that includes formerly incarcerated individuals and the mother of an inmate who died in custody.[1146] TX C.U.R.E.'s decision to join this lawsuit was a direct response to constituents' concerns and Mr. Malouff's own experience.[1147]

---

[1140] *See id.* § I.C., *supra.*
[1141] *See id.* § I.C.4., *supra.*
[1142] *See id.* § I.C.1., *supra.*
[1143] *See id.* § I.C.2., *supra.*
[1144] *See id.*
[1145] *See id.*
[1146] *See id.* § I.C.1., *supra.*
[1147] *See id.* § I.C.4., *supra.*

Like TPCA, TX C.U.R.E. has a consistent and substantial history of advocacy on issues related to heat in Texas prisons.[1148] After personally advocating for air conditioning during his incarceration, Mr. Malouff has continued that work through TX C.U.R.E. since his release.[1149] He has testified before the Texas Legislature at every hearing on air conditioning—three times per session at minimum—and has spoken to every representative and senator about the issue across multiple sessions.[1150]

As with TPCA, the Court previously held at the summary judgment stage that TX C.U.R.E. "serves a specialized segment of the population as the primary beneficiary of its activities, including this litigation—helping to 'express their collective views' and 'protect their collective interests.'" *Tiede III*, 2026 WL 751904, at *10 (quoting *Hunt*, 432 U.S. at 344). That conclusion is reinforced by the evidence presented at trial. It, likewise, remains true that the lawsuit is "within TX C.U.R.E.'s central purpose," there is no evidence that the organization had "reasons for instituting the suit other than asserting its members' interests," and there is no evidence that any of the organization's members objected to it participating in the lawsuit.[1151] *Tiede III*, 2026 WL 751904, at *10 (citation omitted). This lawsuit is clearly within TX C.U.R.E.'s central purpose and the scope of reasons for which individuals join the organization. *See Friends of the Earth*, 129 F.3d at 829. The Court therefore concludes that TX C.U.R.E. has sufficient indicia of membership to establish associational standing.

---

[1148] *See id.*
[1149] *See id.*
[1150] *See id.*
[1151] *See* Findings of Fact § I.C.4., *supra.*

**C.      Neither the Plaintiffs' Claims Nor the Injunction Relief They Seek Requires the Individual Participation of Plaintiffs' Members or Constituents.**

The third prong of *Hunt*'s three-part test for associational standing is satisfied so long as the organization's claims do not involve member-specific inquiries that would require extensive participation by every injured member. *Ass'n of Am. Physicians & Surgeons, Inc. v. Tex. Med. Bd.*, 627 F.3d 547, 551–53 (5th Cir. 2010). This prong is "solely prudential," and it focuses on "matters of administrative convenience and efficiency." *Id.* at 550-51.

"[R]equests for declaratory or injunctive relief"—like Plaintiffs here—"rarely require individual determinations." *Tex. Ass'n for Rts. of Unemployed v. Serna*, 663 F. Supp. 3d 703, 711 (W.D. Tex. 2023). "[T]he fact that an organization's claim requires participation by some members does not mean that associational standing is inappropriate." *Tiede III*, 2026 WL 751904, at *12. And the need for evidence from *some* individual members—or even a "significant sample"—is not fatal. *Id.*; *Hosp. Council of W. Pa. v. City of Pittsburgh*, 949 F.2d 83, 89–90 (3d Cir. 1991) (Alito, J.) (finding "no ground for denying associational standing" despite need for "some participation" by plaintiff's members because "participation by 'each allegedly injured party' would not be necessary" (quoting *Warth v. Seldin*, 422 U.S. 490, 511 (1975))); *see also Hunt*, 432 U.S. at 342-43 ("[S]o long as the nature of the claim and of the relief sought does not make the individual participation of *each injured party indispensable* to proper resolution of the cause, the association may be an appropriate representative of its members, entitled to invoke the court's jurisdiction." (quoting *Warth*, 422 U.S. at 511 (emphasis added))).

Here, resolving Plaintiffs' claims does not require individualized evidence pertaining to each injured inmate. The Court reached that conclusion at the summary judgment stage, holding that "the commonality between the Organizational Plaintiffs' members outweighs the variation

165

between facilities and individuals," and that the violations alleged "can be shown through representative individuals without requiring 'the individual participation of each injured party.'" *Tiede III*, 2026 WL 751904, at \*12 (quoting *Hunt*, 432 U.S. at 343). The trial record confirms that conclusion.

Plaintiffs presented overwhelming unrebutted evidence that extreme heat in TDCJ's un-air-conditioned facilities poses a substantial risk of serious harm to every TDCJ inmate, regardless of individual circumstances[1152]; and that all of TDCJ's heat-mitigation measures are inadequate, regardless of how consistently (or inconsistently) they are implemented across facilities.[1153] Plaintiffs have supported that claim with evidence of the well-known health risks of exposure to extreme heat, the well-documented conditions at TDCJ's uncooled facilities, and Mr. Collier's and Director Lumpkin's awareness of those conditions and the deaths and severe health risks they cause.[1154] Thus, associational standing is still appropriate because Plaintiffs' claims "can be proven by evidence from representative injured [inmates]" of facility-wide conditions, "without a fact-intensive-individual inquiry." *Ass'n of Am. Physicians*, 627 F.3d at 552.

Nor do Plaintiffs seek damages or any other relief that requires any individualized inquiry. Plaintiffs seek only systemwide declaratory and injunctive relief. They ask the Court to: (i) declare that the extreme heat endured by TDCJ inmates in unair-conditioned prisons violates the Eighth Amendment (which the Court has already done); and (ii) order that TDCJ inmates be kept at a heat index below 85°. *Tiede II*, 796 F. Supp. 3d at 336.

Such relief does not depend on inmates' individual circumstances or the extent of any inmates' specific injuries. *See Tex. Ent. Ass'n, Inc. v. Hegar*, 10 F.4th 495, 505 (5th Cir. 2021)

---

[1152] *See* Findings of Fact § II., *supra*.
[1153] *See id.* § IV., *supra*.
[1154] *See generally id.* § III., *supra*.

("Injunctive relief does not make the individual participation of each injured party indispensable to proper resolution." (internal quotation marks omitted)); *Church of Scientology of Cal. v. Cazares*, 638 F.2d 1272, 1276–80 (5th Cir. 1981) (individual participation of members not required where "the claim asserted and the relief requested affect the membership as a whole"); *cf. Warth*, 422 U.S. at 515–16 (rejecting standing where association sought "relief in damages for alleged injuries to its members" and the "damages claims [were] not common to the entire membership, *nor shared by all in equal degree*" (emphasis added)). For these reasons, each of the Plaintiffs continue to satisfy the third prong of the *Hunt* test for associational standing.

## II.    THE PRISON LITIGATION REFORM ACT'S ("PLRA") EXHAUSTION REQUIREMENT DOES NOT BAR THIS LAWSUIT.

### A.    The PLRA's exhaustion requirement does not apply to Plaintiffs.

Plaintiffs are not required to exhaust under the PLRA. The PLRA provides that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, *by a prisoner* confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a) (emphasis added). The statute defines a "prisoner" as "any person incarcerated or detained in any facility who is accused of, convicted of, sentenced for, or adjudicated delinquent for, violations of criminal law or the terms and conditions of parole, probation, pretrial release, or diversionary program." *Id.* § 1997e(h).

By its terms, the exhaustion requirement applies only to a "prisoner," and Plaintiffs are not prisoners. As the Court has twice held, "[t]he Organizational Plaintiffs are not persons capable of being incarcerated or detained, so they are not 'prisoners' as the term is defined by the PLRA." *Tiede II*, 796 F. Supp. 3d at 323 (quoting 42 U.S.C. § 1997e(a), (h)); *accord Tiede III*, 2026 WL 751904, at *13–14. The PLRA limits "litigation *by* prisoners, not litigation *about*

167

prisoners by organizations that count prisoners among their members or constituents." *Trivette v. Tenn. Dep't of Corr.*, 739 F. Supp. 3d 663, 697 (M.D. Tenn. 2024) (emphases in original).[1155] The exhaustion requirement therefore does not apply to Plaintiffs.

As the Court has already held, *Green Haven* does not require a different result. *See Tiede III*, 2026 WL 751904, at *14. The plaintiff there was an unincorporated association of eight members, all incarcerated at a single facility, suing in the organization's name—including two incarcerated individuals who also sued in their individual capacities. *See Green Haven Prison Preparative Meeting of Religious Soc'y of Friends v. N.Y. State Dep't of Corr. & Cmty. Supervision*, 16 F.4th 67, 73, 82 (2d Cir. 2021). On those facts, the Second Circuit held only that "the [i]ncarcerated [p]laintiffs may not avoid the exhaustion requirement simply by forming an organization and then suing in the name of that organization." *Id.* at 82.

This case bears no resemblance to *Green Haven*. Plaintiffs here are not ad hoc, nominal "associations" of prisoners formed solely to evade the exhaustion requirement. Rather, they are large, long-standing organizations that—as both Professor Deitch and former Director Collier acknowledged at trial—have been "fixtures" at the Texas legislature for years in advocating on

---

[1155] Several federal courts have reached the same conclusion. *See, e.g., Tretter v. Pa. Dep't of Corr.*, 558 F. App'x 155, 157 (3rd Cir. 2014) (unpublished) (representative of deceased inmate and administratrix of his estate was not a "prisoner" required to exhaust administrative remedies); *Ala. Disabilities Advoc. Program v. Wood*, 584 F. Supp. 2d 1314, 1316 (M.D. Ala. 2008) ("As ADAP is not a 'person' and has neither been incarcerated nor detained, the prisoner-litigation sections of the PLRA do not apply."); *Dunn v. Dunn*, 219 F. Supp. 3d 1163, 1176 (M.D. Ala. 2016) (ruling that the PLRA's exhaustion requirement did not apply to protection and advocacy organization, in lawsuit where the organization had associational standing to assert claims on behalf of constituent prisoners regarding constitutionally inadequate mental-health treatment); *Rivera-Rodriguez v. Pereira-Castillo*, No. 04-1389(HL), 2005 WL 290160, *6 (D.P.R. Jan. 31, 2005) (finding that the plain language of the PLRA excludes family members and guardians of incarcerated minors); *see also Wormley v. United States*, 601 F. Supp. 2d 27, 44 (D.D.C. 2009) (finding PLRA applies only to a "prisoner" and does not require exhaustion by non-prisoners, even for claims related to their earlier detentions).

the conditions of confinement in Texas prisons generally and on the need for air conditioning in Texas prisons in particular.[1156] They are led by individuals who were themselves formerly incarcerated in TDCJ or who have incarcerated loved ones, and they count incarcerated individuals among their members and constituents.[1157] As was the case at the summary judgment stage, there was "no suggestion" at trial—much less any evidence to prove—that Plaintiffs were "formed merely to skirt the PLRA's requirements on a technicality." *Tiede III*, 2026 WL 751904, at *14.[1158]

Applying the exhaustion requirement to Plaintiffs would not advance Congress's purpose in enacting § 1997e. Congress enacted the PLRA in part out of concern about the volume of prison-conditions suits, with the goal of "filter[ing] out . . . frivolous claims." *Porter v. Nussle*, 534 U.S. 516, 524–25 (2002). Permitting a single suit for injunctive relief by well-established advocacy organizations on behalf of their members or constituents adheres to the PLRA's aim of "reduc[ing] the quantity and improv[ing] the quality of prisoner suits." *Id.* Indeed, even the notice function that exhaustion is designed to serve—giving prison officials "a fair opportunity . . . to address the problem" before suit is filed[1159]—has already been fully satisfied here, given that TDCJ received thousands of heat-related grievances from Plaintiffs' members and constituents concerning the very conditions at issue in this case before Plaintiffs joined it.[1160] "Neither *Green Haven*'s concern with small groups of inmates forming nominal organizations to skirt exhaustion

---

[1156] *See* Findings of Fact § I.A.4., *supra*.

[1157] *See generally id.* § I., *supra*.

[1158] *See* Findings of Fact § I.A., *supra* (Lioness was founded in 2022); *id.* § I.B. (TPCA was founded in 2021), *supra*; *id.* § I.C., *supra*.

[1159] *See Johnson v. Johnson*, 385 F.3d 503, 522 (5th Cir. 2004) ("[T]he grievance must provide administrators with a fair opportunity under the circumstances to address the problem that will later form the basis of the suit.").

[1160] *See* Findings of Fact § II., *supra*.

nor the purposes of the PLRA provide any reason to depart from the plain meaning of the statute here." *Tiede III*, 2026 WL 751904, at *14. The Court therefore concludes that Plaintiffs are not "prisoners" within the meaning of § 1997e and are not subject to the PLRA's exhaustion requirement. 42 U.S.C. § 1997e(h).

> **B.      Even if the exhaustion requirement applied, Director Lumpkin has not met his burden of proving that none of Plaintiffs' members or constituents exhausted.**

Even if the PLRA's exhaustion requirement applied, it would not bar Plaintiffs' claim. Failure to exhaust is an affirmative defense for which Director Lumpkin bears the burden of proof. *Dillon v. Rogers*, 596 F.3d 260, 266 (5th Cir. 2010). Because Plaintiffs brought this suit in a representative capacity, it is not necessary for all of Plaintiffs' members and constituents to exhaust. *Cf. Gates v. Cook*, 376 F.3d 323, 330 (5th Cir. 2004) (exhaustion of administrative remedies by a single inmate was sufficient to support class-wide relief in an action challenging the conditions of Mississippi's death row). Instead, if the exhaustion requirement applied, Director Lumpkin would have had to show that ***none*** of Plaintiffs' members or constituents exhausted. *Cf. id.* He has never argued—let alone proven—as much.

In fact, Director Lumpkin's own evidence forecloses this defense. The affidavit he introduced at trial—and authenticated by his employee, Mr. Fitzpatrick—as Defendant's Exhibit 2 establishes that "a total of 12 Lioness Incarcerated Members fully exhausted both their Step 1 and Step 2 administrative remedies," including several members who are still in unair-conditioned facilities and others who are in air-conditioned facilities, have no score, and can therefore be moved to an unair-conditioned facility at any time.[1161] Plaintiffs also presented

---

[1161] *See* Findings of Fact § II., *supra*.

unrebutted evidence that at least one member of TX C.U.R.E. and one member of TPCA exhausted their administrative remedies.[1162]

The broader grievance record also confirms the point. Director Lumpkin introduced a summary of some inmate heat-related grievances reflecting inmates who completed TDCJ's grievance process, and Plaintiffs introduced into evidence (without objection) thousands of heat-related grievances reflecting completion of TDCJ's two-step grievance process and thus full exhaustion by hundreds of TDCJ inmates before Plaintiffs joined this suit.[1163] Those inmates are constituents of TPCA and TX C.U.R.E.,[1164] and they exhausted their administrative remedies.[1165]

That Defendant's Trial Exhibit 53 catalogs at least hundreds of inmates—who are members or constituents of Plaintiffs—who completed the grievance process for heat-related grievances, and that the grievances themselves were substantively admitted into evidence (without objection) as Plaintiffs' Trial Exhibits 285A through 285K, forecloses any contention that no member or constituent of Plaintiffs exhausted. So even if the PLRA's exhaustion requirement applied, Plaintiffs satisfied it.

## III.    PLAINTIFFS HAVE SHOWN A VIOLATION OF THE EIGHTH AMENDMENT

Plaintiffs have succeeded on the merits of their Eighth Amendment claim. The Eighth Amendment prohibits cruel and unusual punishment, and requires prison officials to provide humane conditions of confinement and to take reasonable measures to guarantee the safety of those in their custody. *Farmer v. Brennan*, 511 U.S. 825, 832 (1994). "[T]he Constitution does

---

[1162] *See id.*
[1163] *See id.*
[1164] *See id.*
[1165] *See id.*

not mandate comfortable prisons, but neither does it permit inhumane ones." *Ball v. LeBlanc*, 792 F.3d 584, 592 (5th Cir. 2015) ("*Ball I*") (quotation marks omitted).

"[T]he standards against which a court measures prison conditions are the evolving standards of decency that mark the progress of a maturing society and not the standards in effect during the time of the drafting of the Eighth Amendment." *Gates*, 376 F.3d at 332–33 (quoting *Estelle v. Gamble*, 429 U.S. 97, 102 (1976)) (quotation marks omitted). In other words, what is cruel or unusual is not set in stone but is instead based on what is "socially acceptable," *Ball I*, 792 F.3d at 599, and consistent with "[a] sufficient national consensus," *Roper v. Simmons*, 543 U.S. 551, 562 (2005).

To establish an Eighth Amendment violation, Plaintiffs must show (1) the heat poses an substantial risk of serious harm (the objective component), and (2) Director Lumpkin acted with deliberate indifference to the risk posed (the subjective component). *See, e.g.*, *Hinojosa v. Livingston*, 807 F.3d 657, 669 (5th Cir. 2015); *Ball I*, 792 F.3d at 592. This is not the first time the Court has assessed these standards in this case. In denying Plaintiffs' motion for a preliminary injunction on remedial grounds, the Court held that Plaintiffs were likely to succeed on the merits of their Eighth Amendment claim. *See Tiede II*, 796 F. Supp. 3d at 324-332. The Court concluded that Plaintiffs had satisfied the objective standard by showing that "extreme heat in TDCJ's uncooled prisons constitutes a well-established substantial risk of serious harm that constitutes cruel and unusual punishment." *Id.* at 325. And the Court concluded that Plaintiffs had satisfied the subjective standard by showing that "Collier knows inmates face serious harm from the extreme heat in Texas's unair-conditioned prisons, and that the risk of harm is obvious, well-documented, longstanding, and pervasive, and has been expressly noted by TDCJ officials in the past." *Id.* at 328.

What was likely on the preliminary injunction record is now established with the full trial record. Having considered the evidence presented at trial, the Court finds that Plaintiffs have shown a violation of the Eighth Amendment, as set forth below.

### A.    TDCJ Inmates Face a Substantial Risk of Serious Harm from the Extreme Heat in Texas's Unairconditioned Prisons.

As this Court has previously held, "[i]t is well-established in the Fifth Circuit that the Eighth Amendment guarantees inmates a right to be free from exposure to extremely dangerous temperatures without adequate remedial measures." *Id.* at 324 (quoting *Yates v. Collier*, 868 F.3d 354, 359 (5th Cir. 2017)) (citation modified). The Fifth Circuit has "repeatedly recognized the serious risk of harm that excessive heat can pose in the prison context absent adequate mitigating measures, and [it has] consistently found evidence sufficient in these cases to support an Eighth Amendment violation, even when certain mitigating measures were available." *Yates*, 868 F.3d at 361. The Fifth Circuit has recognized this risk for more than twenty years. *See Gates*, 376 F.3d at 340.

In *Gates*, the Fifth Circuit held that inmates in the Mississippi Department of Corrections (the "MDOC") faced a substantial risk of serious harm based on the MDOC's failure to "provide fans, ice water, and daily showers when the heat index is 90 degrees or above." *Id.* at 334, 339–40. In *Ball I*, the Fifth Circuit affirmed the district court's finding that the heat within a prison housing area posed a substantial risk of serious harm to inmates, where the heat index ranged from 81.5° to 107.79° and surpassed 100° on five or more days during a roughly two-week period. 792 F.3d at 590–94. The Fifth Circuit did so even though those inmates had continued access to potable water and ice. *Id.* at 590, 592. And in *Cole*, the district court found that extremely hot conditions at TDCJ facilities (a heat advisory warned that the heat index could reach "near or above 108" degrees) constituted a substantial risk of serious harm sufficient to

173

satisfy the Eighth Amendment's objective test. 2017 WL 3049540, at *39 (Ellison, J.). In the more than two decades since *Gates*, the Fifth Circuit has repeatedly acknowledged the serious risk of harm that excessive heat poses in the prison context. *See Yates*, 868 F.3d at 359; *see also Hinojosa*, 807 F.3d at 669; *Coones v. Cogburn*, No. 24-10777, 2025 WL 2092392, at *1 (5th Cir. July 25, 2025) (unpublished) (finding the Eighth Amendment's objective component satisfied when plaintiff's cell did not have air conditioning, "many parts of his unit reached temperatures in the 90s and 100s throughout the day" in the summer, and his unit "did not use fans, ice water, or daily showers to combat the heat").

The trial evidence again confirms that extreme heat in TDCJ's uncooled prisons constitutes a well-established substantial risk of serious harm that constitutes cruel and unusual punishment. Approximately 88,697 of TDCJ inmates are still without air-conditioned beds.[1166] In the summers of 2023 to 2025, TDCJ logs have shown outdoor heat indexes as high as 134°, and indoor temperatures above 85° nearly every day from May 1 to September 30.[1167] This evidence is consistent with testimony from current and former prisoners, who have observed temperature readings in their units exceeding 110° and 130°.[1168] TDCJ agrees that outdoor temperatures at every Texas prison are expected to exceed 85° each summer, and that the temperatures prisoners are exposed to inside unair-conditioned prisons are so high and dangerous that adequate mitigation measures are required.[1169]

As the Court previously found, the heat "will only get worse with climate change." *Tiede II*, 796 F. Supp. 3d at 325. As Dr. Mearns explains, increasing extreme temperatures and more

---

[1166] *See* Findings of Fact § VII.A., *supra*.
[1167] *See id.* § III.B., *supra*.
[1168] *See id.*
[1169] *See id.*

frequent heat waves are likely to continue, which "will result in an increasing heat index, and number of hours per day with extreme heat index values."[1170] Director Lumpkin offered no evidence to the contrary—and, in fact, his predecessor, Mr. Collier acknowledged that summers are hot in Texas, have been hot for years, and are likely to continue to be hot.[1171]

It is undisputed that heat "is one of the leading weather-related killers in the United States, resulting in hundreds of fatalities each year."[1172] As set forth above, a heat index of 88° or higher poses a substantial risk of adverse health outcomes for everyone—even young, healthy people.[1173] Those risks include heat exhaustion, heat rash, dehydration, heat cramps, heat syncope, and heat stroke—the last of which carries a "high mortality rate" and can have lasting negative health consequences for those people who do not die.[1174] High heat also exacerbates mental illness.[1175] People with mental health disorders exhibit higher rates of suicidality, agitation, impulsivity, and slowing of cognitive processing when exposed to high heat, and mental health episodes requiring hospitalization increase under these conditions.[1176]

These risks "were uncontested by Collier" at the preliminary injunction stage, *Tiede II*, 796 F. Supp. 3d at 325, and they are uncontested by Director Lumpkin now. Mr. Collier and Director Lumpkin have also admitted that inmates confined in temperatures at or above 95° face a serious health risk.[1177] Director Lumpkin admitted he has "long known that there is a danger from extreme heat inside the Texas prison system, and that danger extends to the men and

---

[1170] *See* Findings of Fact § III.B., *supra*.
[1171] *See id.*
[1172] *Id.* § III.A., *supra*.
[1173] *Id.*
[1174] *Id.*
[1175] *Id.*
[1176] *Id.*
[1177] *Id.* § III.C., *supra*.

women in [TDCJ's] care, as well as the correctional officers working for [him]."[1178] He knows that "heat waves are a time of grave danger to [TDCJ's] inmates and staff,"[1179] "[t]he heat is a contributing factor to death and illness,"[1180] and inmates "are at risk when they're housed at high environmental temperatures."[1181] He knows that TDCJ's policies and training state that "extreme heat is dangerous and can make people sick and can be fatal,"[1182] and that heat is the "fifth leading cause of serious employee injury."[1183]

Director Lumpkin knows that "there have been hundreds of heat related illnesses [of inmates] over the course of the last 20 years in the Texas prison system."[1184] He "know[s] about employee injuries as well as inmate injuries over the last several years due to the extreme heat,"[1185] that there were at least 80 workers' compensation claims related to the heat in 2022 and 2023,[1186] and that workers' compensation claims of TDCJ employees related to the heat are an "ongoing problem." [1187] He is aware that there were eleven TDCJ employees and several inmates with heat-related illnesses in 2025 alone.[1188] And he knows that TDCJ inmates have filed "thousands of grievances related to the extreme heat" in just "the last several years."[1189]

TDCJ's reports to the Texas Legislature confirm that inmates filed more than 15,000 heat-related grievances between 2023 and 2025 alone.[1190] TDCJ's own training documents

---

[1178] *Id.*
[1179] *Id.*
[1180] *Id.*
[1181] *Id.*
[1182] *Id.*
[1183] *Id.*
[1184] *Id.*
[1185] *Id.*
[1186] *Id.*
[1187] *Id.*
[1188] *Id.*
[1189] *Id.*
[1190] *Id.*

176

acknowledge that "[i]ncreased body temperatures, if left uncontrolled, may lead to delirium, convulsions, seizures, and possibly even death."[1191] TDCJ's heat-mitigation policy (AD 10.64) even requires an inmate who refuses a cool-bed housing assignment to sign a form expressly acknowledging that being housed without air conditioning puts him at risk for heat cramps, heat exhaustion, and heat stroke, and at risk of worsening of his medical condition, including death.[1192] Mr. Collier's 30(b)(6) designee testified that extreme heat is a dangerous condition in the TDCJ system that "has killed inmates, and [has] caused numerous inmates and officers to suffer heat-related illnesses."[1193] And Mr. Collier's internal medicine expert, Dr. Leonardson, agreed that people exposed to severe environmental heat between 90° to 105° are at serious risk of illness and death.[1194] There is thus ample evidence from witnesses on both sides of the case that extreme heat in unair-conditioned prisons poses a substantial risk of serious harm to TDCJ inmates.

Plaintiffs need not prove "that death or serious injury has already occurred" to satisfy the Eighth Amendment's objective standard. *Ball I*, 792 F.3d at 593 (citation omitted). They need only show "a substantial risk of serious harm" from the extreme heat. *Id.* at 594. Even so, Plaintiffs' experts Dr. Skarha and Dr. Zanobetti established that 271 deaths were attributable to extreme heat in Texas prisons without air conditioning between 2001 to 2019, or an average of 14 deaths per year.[1195] Dr. Skarha and Dr. Zanobetti concluded that a one-degree temperature increase above 85° corresponds to a 0.7% increase in the risk of mortality.[1196]

---

[1191] *Id.* § III.I., *supra*.
[1192] *Id.* § III.C., *supra*.
[1193] *Id.*
[1194] *Id.* § III.A., *supra*.
[1195] Findings of Fact § III.D., *supra*.
[1196] *Id.*

Neither heat-related deaths nor heat-related illnesses have abated since 2019. TDCJ admitted to three heat-related deaths of inmates in the summer of 2023,[1197] and Plaintiffs' experts credibly testified that another seven inmates died heat-related deaths in the summers of 2023 to 2025.[1198] The number of deaths Plaintiffs presented is also certainly an undercount, given TDCJ's failure to timely perform autopsies, failure to consistently take core body temperatures, and refusal to classify a death as "heat-related," unless heat was the sole cause of the inmate's death.[1199] Plaintiffs, likewise, presented testimony from Dr. Zanobetti and Dr. Skarha that inmates in unairconditioned Texas prisons will continue to die from the heat unless these facilities are air conditioned.[1200]

The heat also continues to cause inmates and staff to suffer heat-related illnesses. In its annual reports to the Texas Legislature, TDCJ acknowledged that 50 inmates suffered heat-related illnesses in the summers between 2023 and 2025: 17 in 2023, 29 in 2024, and 6 in 2025.[1201] These numbers, too, are likely undercounts—given evidence presented at the preliminary injunction hearing that UTMB reported 35 inmates with heat-related illnesses in June 2023 alone.[1202] TDCJ's reports to the Legislature also noted that 72 staff suffered heat-related illnesses over the same period: 35 in 2023, 26 in 2024, and 11 in 2025.[1203]

Notably, these deaths and heat-related illnesses and injuries occurred during a summer when, as Director Lumpkin's witnesses testified and TDCJ documents indicate, TDCJ policy required the implementation of all of TDCJ's heat mitigation measures—including the heat score

---

[1197] *Id.* § III.E., *supra*.
[1198] *Id.* § III.F., *supra*.
[1199] *Id.* § III.G., *supra*.
[1200] *Id.* § III.D., *supra*.
[1201] *Id.*
[1202] *Id.*
[1203] *Id.* § III.I., *supra*.

system, access to respite areas, distribution of ice water, cool showers, fans, relaxed dress code, and welfare checks.[1204] Even in theory, TDCJ's mitigation measures are ineffective because they provide only temporary relief[1205] for a continuous problem that has cumulative effects on the body.[1206] In some instances—such as using fans when the temperature reaches a certain threshold—the mitigation measures actually *increase* the risk of heat-related illness, injury, or death.[1207] And even if the mitigation measures were effective in theory, inmates have severely limited access to these resources in practice due to TDCJ's persistent, severe understaffing crisis—which has left more than one in five positions at the agency unfilled.[1208]

Based on this evidence, Plaintiffs have shown that every TDCJ inmate in an unair-conditioned cell faces a substantial risk of death or serious bodily injury from the extreme heat, absent the installation of air conditioning.

### B.    Plaintiffs Have Shown Deliberate Indifference.

To satisfy the subjective standard of an Eighth Amendment claim, Plaintiffs must first show that Director Lumpkin "knows that inmates face a substantial risk of serious harm." *Farmer*, 511 U.S. at 847. This knowledge can be inferred "from circumstantial evidence," and the Court "may conclude that [Director Lumpkin] knew of a substantial risk from the very fact that the risk was obvious." *Gates*, 376 F.3d at 333, 340 (affirming finding of deliberate indifference "based on the open and obvious nature of these conditions and the evidence that inmates had complained of symptoms of heat-related illness"); *see also Ball I*, 792 F.3d at 595 (affirming finding of deliberate indifference based "on the totality of the record evidence"

---

[1204] *Id.* §§ III.H. & IV., *supra*.
[1205] *Id.* § IV.B., *supra*.
[1206] *Id.* § III.A., *supra*.
[1207] *Id.* § IV.B.4., *supra*.
[1208] *Id.* § IV.A., *supra*.

showing prison official's subjective knowledge). This knowledge may also be shown by

evidence that the risk is "longstanding, pervasive, well-documented, or expressly noted by prison

officials in the past," and "the circumstances suggest that [Director Lumpkin]" was exposed to

that information. *Farmer*, 511 U.S. at 842–43. The trial record establishes that knowledge here.

Deliberate indifference also requires that the official, knowing of the risk, "disregards

that risk by failing to take reasonable measures to abate it." *Id.* at 847. An official who responds

reasonably to a known risk is not liable, *see id.* at 844–47, but one who continues to use

measures he knows to be inadequate is, *see Webb v. Livingston*, 618 F. App'x 201, 209 n.7 (5th

Cir. 2015) (prison officials are required to implement mitigation measures that "adequate[ly] ….

protect inmates from the extreme heat"). The Court previously found, on the preliminary

injunction record, that Plaintiffs were likely to establish both elements of the deliberate

indifference test. *See Tiede II*, 796 F. Supp. 3d at 328. The trial record, likewise, confirms that

Director Lumpkin is deliberately indifferent to the substantial risk of serious harm posed by

extreme heat in Texas's unair-conditioned prisons. The Court addresses each element in turn.

       *1.*     *Director Lumpkin knows that inmates face a substantial risk of serious harm from the extreme heat, and the risk is obvious, well-documented, long-standing, and was expressly noted by TDCJ officials in the past.*

To begin with, this Court can "infer that [Director Lumpkin] knew of the risk" of harm

from extreme heat, "given its open and obvious nature." *Coones*, 2025 WL 2092392, at *3.

"[T]he brutality of the Texas heat is well known, and [Defendant Lumpkin] [is] reminded of it

every time [he] step[s] outside." *Id.*; *see Hinojosa*, 807 F.3d at 667 ("[T]he open and obvious

nature of the dangerously hot conditions would also support an inference of deliberate

indifference."). The "open and obvious nature of the extreme heat is enough to infer knowledge"

sufficient to satisfy the Eighth Amendment's subjective standard, but "this case presents [far]

more." *Coones*, 2025 WL 2092392, at *3.

First, Director Lumpkin's own testimony establishes his knowledge directly. Working at TDCJ and alongside Mr. Collier for many years, he has "long known that there is a danger from extreme heat inside the Texas prison system, and that danger extends to the men and women in [TDCJ's] care, as well as the correctional officers working for [him]."[1209] He knows that "heat waves are a time of grave danger to [TDCJ's] inmates and staff,"[1210] "[t]he heat is a contributing factor to death and illness,"[1211] and inmates "are at risk when they're housed at high environmental temperatures."[1212] Director Lumpkin has acknowledged that "extreme heat inside the Texas prison system has caused very serious injuries and death."[1213] Director Lumpkin acknowledged that 23 people died in TDCJ facilities from heat-related causes between 1998 and 2012, including 10 heat-related deaths in the summer of 2011 alone.[1214] He knows that TDCJ's policies and training state that "extreme heat is dangerous and can make people sick and can be fatal,"[1215] and that heat is the "fifth leading cause of serious employee injury."[1216] He knows that TDCJ inmates have filed "thousands of grievances related to the extreme heat" in just "the last several years."[1217] And he admitted that he has read this Court's March 2025 Order—which found that high temperatures pose a substantial risk of serious harm to even young, healthy individuals—and that the Order states, "in no uncertain terms, [that] the agency is violating the Constitution."[1218] Director Lumpkin has thus repeatedly confirmed under oath that he is

---

[1209] Findings of Fact § III.C., *supra*.
[1210] *Id.*
[1211] *Id.*
[1212] *Id.*
[1213] *Id.*
[1214] *Id.*
[1215] *Id.*
[1216] *Id.*
[1217] *Id.*
[1218] *Id.*

personally aware of the substantial risk of serious harm that TDCJ inmates face in unair-conditioned prisons.

Second, the risks of extreme heat in Texas's un-air-conditioned prisons "have been expressly noted by [TDCJ] officials in the past," and Director Lumpkin knows that information. *Farmer*, 511 U.S. at 842–43. Mr. Collier admitted during the preliminary injunction hearing that "he was aware of the several heat-related deaths, multiple heat-related illnesses of inmates, dozens of workers' compensation claims, dozens of staff-related illnesses, and thousands of heat-related grievances from inmates in the last two summers alone." *Tiede II*, 796 F. Supp. 3d at 328; *see also Coones*, 2025 WL 2092392, at *3 (noting that "Collier and another TDCJ official testified in previous litigation that summer temperatures in prisons are so high that inmates are at serious risk of harm unless adequate measures are taken"). And Mr. Collier testified under oath that inmates confined in temperatures at or above 95° face a serious health risk.[1219]  Thus, Director Lumpkin is personally aware of the substantial risk of harm faced by TDCJ inmates in unair-conditioned prisons.

Third, the risk is "longstanding, pervasive, [and] well-documented." *Farmer*, 511 U.S. at 842–43. As the Fifth Circuit has acknowledged, "there have been as many as 271 heat deaths in Texas prisons between 2001 and 2019—30 times the national average." *Coones*, 2025 WL 2092392, at *1. And, "[a]s summers continue to get hotter, the problem continues to get worse." *Id.* The same study relied on by the Fifth Circuit—authored by Dr. Skarha and Dr. Zanobetti—concluded that "there was not a single heat-related death in TDCJ's climate-controlled prisons during this period." *Tiede II*, 796 F. Supp. 3d at 329. Like Mr. Collier, Director Lumpkin is

---

[1219] Findings of Fact § III.C., *supra*.

182

aware of this study, and he is aware of these deaths.[1220]

Fourth, Director Lumpkin is well-aware of the substantial risk of harm from extreme heat, given the numerous lawsuits that have been filed against him, his predecessors, and TDCJ over the last twenty-five years for deaths and serious illnesses caused by extreme heat—which demonstrate that this is a long-standing and pervasive problem. *Cf. Coones*, 2025 WL 2092392, at *3 ("Supervisor Defendants are also likely aware of the many lawsuits regarding the extreme heat in Texas prisons."). TDCJ has previously acknowledged heat-related deaths dating back to 1998. As Judge Ellison found:

> It is undisputed that five men died in 1998 from environmentally-caused hyperthermia while incarcerated in TDCJ facilities. Between 1999 and 2010, five more individuals are known to have died from hyperthermia or other heat-related illnesses while incarcerated in Texas prisons. In 2011, Texas experienced an "unprecedented" heat wave, and ten more individuals died from hyperthermia.

*McCollum v. Livingston*, No. 4:14-CV-3253, 2017 WL 608665, at *1 (S.D. Tex. Feb. 3, 2017) (citations omitted). As the Fifth Circuit has recognized, "TDCJ officials are, or have been, defendants in numerous other cases alleging Eighth Amendment violations based on excessive heat in prison." *Yates*, 868 F.3d at 360; *see also Webb*, 618 F. App'x at 204 (per curiam) (considering case involving the "heat-related deaths of five prisoners who died while housed in facilities operated by the [TDCJ]"); *Valigura v. Mendoza*, 265 F. App'x 232, 233–34 (5th Cir. 2008) (per curiam) (deciding appeal involving prisoner who alleged that "temperatures in the bunk area reached into the nineties and hundreds due to poor ventilation"). These lawsuits not only placed Director Lumpkin on notice of the substantial risk of serious harm Texas inmates face from extreme heat; they also established the obviousness of that risk.

Last, Director Lumpkin is well-aware of the substantial risk of serious harm from

---

[1220] Findings of Fact § III.C., *supra*.

extreme heat, because of safe-temperature mandates in jails and federal prisons in Texas and in other state prison systems across the country. Since 1994, state-wide regulations adopted by the Texas Commission on Jail Standards have required all jails in Texas to maintain indoor temperatures between 65° and 85°.[1221] Tennessee and North Carolina have, likewise, adopted temperature limits for their prisons.[1222] TDCJ has nevertheless refused to do the same. This range departs significantly upward from the temperatures required inside other government buildings in Texas to maintain "comfortable" levels (e.g., between 68° and 78°).[1223]

> 2.    *TDCJ's response to the substantial risk of death and serious harm from extreme heat in unair-conditioned prisons is inadequate and unreasonable.*

Despite the long-standing, well-established, pervasive, and obvious risk of extreme heat to TDCJ's inmates in unairconditioned prisons, TDCJ has not taken adequate or reasonable measures to address it.

The "mere presence of remedial measures" is not a defense to an Eighth Amendment violation. *Webb*, 618 F. App'x at 209 n.7; *see also Cole*, 2017 WL 3049540, at *41 (rejecting Mr. Collier's argument that TDCJ was not deliberately indifferent simply because TDCJ "implemented several mitigating measures since the deaths in 2011 and 2012"). Prison officials cannot "insist upon a course of action that has already proven futile." *Tiede II*, 796 F. Supp. 3d at 330 (citation omitted). They must instead implement mitigation measures that "adequate[ly] …. protect inmates from the extreme heat." *Webb*, 618 F. App'x at 209 n.7, and they must "take reasonable measures" to guarantee inmates' safety. *Farmer*, 511 U.S. at 832; *see also Cole*, 2017 WL 3049540, at *41 ("[T]he effectiveness of the measures implemented by TDCJ is relevant to

---

[1221] *Id.* § VI., *supra*.
[1222] Findings of Fact § VII.F, *supra*.
[1223] *Id.*

the Court's analysis.").

Nine years ago, Judge Ellison held that many of the mitigation measures TDCJ relies on now—cold water, respite rooms, and cold showers—"do not stop Plaintiffs from experiencing the symptoms of heat-related illnesses and do not reduce the risk of serious injury or death to a socially-acceptable level." *Cole*, 2017 WL 3049540, at *40. Judge Ellison explained that those measures were "by and large ineffective at reducing the heat stress placed on Plaintiffs' bodies" and were nothing more than "the bare minimum." *Id.* at *40-*42. By implementing such measures, Judge Ellison held, Mr. Collier "ignored the risk of harm faced by the population [he] serve[s]" and was thus deliberately indifferent to the substantial risk of serious harm that inmates in the Pack Unit faced from the extreme heat. *Id.* at *42.

In its preliminary injunction order, this Court likewise concluded that "the uncontroverted evidence shows that [TDCJ's] heat mitigation measures are *still* inadequate, just as Judge Ellison found seven years ago." *Tiede II*, 796 F. Supp. 3d at 331. Most troubling to the Court was "the fact that none of these measures prevented (1) the several dozen deaths that Drs. Skarha and Dr. Zanobetti attributed to heat even after heat mitigation measures were implemented, (2) the three heat-related deaths that [Mr.] Collier admits occurred [in summer 2023], (3) the two additional heat-related deaths that Dr. Uribe and Dr. Vassallo testified occurred [in summer 2023], or (4) the 35 heat-related illnesses of TDCJ inmates identified by UTMB that occurred in 2022 and 2023." *Id.* at 332.

Since the preliminary injunction hearing, heat-related illnesses and deaths at unair-conditioned TDCJ facilities have persisted. Mr. Collier, who was Director until the end of summer 2025, conceded that, despite the agency's heat-mitigation measures being in place, three inmates died in 2023, and inmates and TDCJ staff continued to suffer heat-related illnesses in

185

2024 and 2025.[1224] The trial record confirms that TDCJ's mitigation measures remain inadequate, and that TDCJ continues to rely on them despite knowing they do not remedy the harm from the heat.[1225]

Director Lumpkin has identified no new heat-mitigation measures. TDCJ instead continues to rely on the same measures the Court found inadequate in March 2025.[1226] Mr. Collier was "not aware of anything that changed in TDCJ's heat-mitigation policy since the preliminary injunction hearing."[1227] The principal change Director Lumpkin identifies to the heat-score system is that an inmate's being over the age of 65 now automatically triggers a score.[1228] He otherwise points to a new version of AD 10.64 that is materially identical to the prior version—with the exception of a respite room policy that has gotten *more* restrictive, welfare checks must now be performed on every inmate (rather than a list of heat-sensitive inmates), and digitized temperature monitors that proved so error-plagued that TDCJ has discontinued them.[1229]

These mitigation measures *still* have "not stop[ped] [TDCJ inmates] from experiencing the symptoms of heat-related illnesses and [did] not reduce the risk of serious injury or death to a socially-acceptable level." *Cole*, 2017 WL 3049540, at *40. Even with the addition of inmates over 65, fewer than 20,000 TDCJ inmates—or less than 15% of the more than 140,000 inmates incarcerated in the system—have a heat score.[1230] That alone "is reason enough to find the system inadequate." *Tiede II*, 796 F. Supp. 3d at 331. "Nor does the system even accomplish its

---

[1224] Findings of Fact §§ III.E., III.H, and III.I, *supra*.
[1225] *Id.* § IV., *supra*.
[1226] *Id.*
[1227] *Id.*
[1228] *Id.* § V., *supra*.
[1229] *Id.* § IV., *supra*.
[1230] Findings of Fact § V., *supra*.

purported goal of protecting especially vulnerable, heat-sensitive inmates," *id.*, as the great majority of the 100,853 inmates who meet uncontroverted medical criteria for heat sensitivity do not have a heat score,[1231] and at least half of the tens of thousands of TDCJ inmates with a diagnosed mental illness do not have one either.[1232] And "many of the medical conditions and medications that [TDCJ's] own policies identify as affecting heat tolerance are [still] not incorporated into [the] heat score."[1233] *Tiede II*, 796 F. Supp. 3d at 331.

Most telling, however, Director Lumpkin's admission that air conditioning is the only effective remedy for the risks of harm from extreme heat. In his October 2025 deposition, he testified that "[a]ir conditioning is the only effective protection from the extreme heat."[1234] He agrees that air conditioning is "necessary in order to protect inmates' health and safety."[1235] And he understands that "the way to solve this problem is with air conditioning," and that TDCJ must "get rid of the heat . . . by air conditioning the system."[1236] Mr. Collier has likewise conceded that, if TDCJ had air conditioning systemwide, it could "do away with" its heat-mitigation measures entirely.[1237] Given these concessions, it is now undisputed that air conditioning is the only effective remedy for the substantial risk of serious harm posed by extreme heat.

What TDCJ has not done "in the face of the substantial risk of harm is also relevant to the Court's analysis." *Cole*, 2017 WL 3049540, at *42. This Court previously held that a 30-year timeline to install permanent air conditioning was constitutionally deficient, because it "expose[d] over 95,000 inmates to the substantial risk of serious injury or death from unair-

---

[1231] *Id.*
[1232] *Id.*
[1233] *Id.*
[1234] Findings of Fact § VI., *supra*.
[1235] *Id.*
[1236] *Id.*
[1237] *Id.*

conditioned prisons and, assuming normal rates of inmate turnover, would continue to expose hundreds of thousands of inmates to the substantial risk of injury or death from extreme heat over the next two to three decades." *Tiede II*, 796 F. Supp. 3d at 332.

TDCJ has only fallen further behind since the preliminary injunction hearing. In the eighteen months between the preliminary injunction hearing and trial, TDCJ added only 6,749 cool beds—a rate of roughly 3,857 cool beds per year.[1238] In the meantime, TDCJ's inmate population grew by more than 7,000 inmates, so TDCJ added 257 more inmates than air-conditioned beds.[1239] Even worse, TDCJ would need to add another 10,000 air-conditioned beds between trial and August 2027 just to keep up with the pace of population growth—a rate it has never achieved.[1240] Professor Deitch testified that, given the bills expected to be introduced (and passed) in the next legislative session, TDCJ's inmate growth trends are expected to worsen.[1241]

Even if TDCJ's population remained flat and TDCJ continued at its current rate of 3,857 cool beds per year, fully air-conditioning the remaining un-air-conditioned beds would take approximately 23 years—i.e., until 2049.[1242] "[A]ssuming normal rates of inmate turnover," that timeline would still "expose hundreds of thousands of inmates to the substantial risk of injury or death from extreme heat over the next two . . . decades." *Tiede II*, 796 F. Supp. 3d at 332. Director Lumpkin agreed that a 25-year timeline to fully air condition the system is "unacceptable,"[1243] and his corrections expert, Mr. Ishee, testified that a 23-year timeline would be "too slow," "too long," and "too much time."[1244] And even crediting TDCJ's most optimistic

---

[1238] Findings of Fact § VII.A., *supra*.
[1239] *Id.*
[1240] *Id.*
[1241] *Id.*
[1242] *Id.*
[1243] Findings of Fact § VII.A., *supra*.
[1244] *Id.*

timeline—under which it reaches roughly 70,000 air-conditioned beds by the end of summer 2027[1245]—TDCJ's expected population growth to 151,116 inmates by August 2027[1246] would still leave roughly 81,116 inmates without air-conditioned beds.

In its preliminary injunction order, the Court implored TDCJ to "obtain sufficient funding and demonstrate to the Court a plan for achieving the goal of providing sufficient air conditioning for the inmates of TDCJ in a timely manner"—but TDCJ did neither. *Tiede II*, 796 F. Supp. 3d at 336. Mr. Collier candidly admitted that the Court's preliminary injunction order did not change "what [TDCJ] asked for in terms of funding from the Legislature, how quick[ly] [TDCJ] moved, or in any other capacity."[1247]

The evidence supports that concession. Neither Mr. Collier nor Director Lumpkin told the Legislature that fully air conditioning the system was an emergency requiring $1.3 billion right away.[1248] Mr. Collier never asked the Legislature for the amount of money he knew was necessary to fully air condition the system.[1249] Neither Director Lumpkin nor Mr. Collier has ever committed to any specific deadline for installing air conditioning systemwide, or to requesting the amount of money from the Legislature.[1250] This is despite the fact that, according to Mr. Collier, TDCJ has never received any pushback from the Legislature, the Governor's office, or anyone else with regard to the amount of funding it could request for air conditioning,[1251] and nobody ever told Mr. Collier that there was a "cap or limit" on what

---

[1245] This was the projection given by Director Lumpkin's counsel in his opening statement. (*See* Trial Tr. (Mar. 30, 2026) 23:18–20.)
[1246] Findings of Fact § VII.A., *supra*.
[1247] Findings of Fact § VII.B., *supra*.
[1248] *Id.*
[1249] *Id.*
[1250] *Id.*
[1251] *Id.*

funding TDCJ could request from the Legislature for air conditioning. [1252]

TDCJ still has not solicited bids for installing permanent air conditioning throughout its facilities.[1253] TDCJ has never "considered grouping [air conditioning installation] projects under one bid for efficiencies of scale or by region for efficiencies of scale."[1254] It has never asked its engineering consultants to study how to improve its procurement process to install air conditioning faster.[1255] TDCJ continues to use the slowest project delivery method available.[1256] And neither Director Lumpkin nor Mr. Collier has ever sought help from outside consultants to accelerate the process.[1257]

TDCJ's phased plans only further underscore the lack of a concrete timeline. TDCJ presented a "four-phase plan" at the preliminary injunction hearing, but promptly ignored it. That plan required TDCJ to ask for $319 million in the last biennium for air conditioning; TDCJ instead sought nearly one third of that (i.e., $118 million).[1258]  While Director Lumpkin's motion for summary judgment claimed that "TDCJ has operationalized its commitment to air conditioning in the three-phase plan that it submitted to the 89th Legislature," and TDCJ is "actively working to complete its three-phase plan,"[1259] the testimony at trial showed the opposite. By trial, TDCJ had abandoned its three-phase plan altogether, replacing it with a "two-phase plan" (that changed by more than $12 million in just two weeks)[1260]–Defendant's Exhibit 256. No TDCJ witness committed to the two-phase plan: Chairman Nichols said that "plan" was

[1252] *Id.*
[1253] *Id.*
[1254] *Id.*
[1255] *Id.*
[1256] *Id.*
[1257] *Id.*
[1258] *Id.*
[1259] Dkt. no. 251 at 37.
[1260] Findings of Fact § VII.B., *supra.*

not the right word to use and described it as "something a little bit more than swag" and "kind of an aspirational plan or hope."[1261]

The trial record also establishes that TDCJ intentionally obscures the very harm it is obligated to address.[1262] TDCJ has no policy requiring its staff or medical providers to take or record an inmate's core body temperature or the temperature of the inmate's cell when an inmate is found dead or unresponsive during the summer months, and it routinely fails to do so;[1263] it delays autopsies well beyond the medically appropriate 48-hour window;[1264] and it routinely fails to provide its pathologists the body temperatures, environmental temperatures, complete investigation files, and outside medical records that the pathologists themselves request and need in order to determine whether a death was heat-related.[1265] Mr. Collier admitted that TDCJ does not require ambient temperatures to be taken in death investigations.[1266] And he admitted that, while TDCJ "encourage[s]" medical staff to take inmates' body temperatures, neither security staff nor medical staff are required to take them—and TDCJ "did not change [its] protocol" even after this litigation began.[1267]

That the missing data is essential is not in dispute: Witnesses for both sides—including Director Lumpkin's own experts—testified that a core body temperature is fundamental to, and a "requirement" for, determining whether a death is heat-related.[1268] Rather than accurately gathering information and reporting the findings, TDCJ then conceals the true number of heat-

---

[1261] *Id.*
[1262] *See generally id.* § III.G., *supra*.
[1263] *Id.* § III.G.1., *supra*.
[1264] *Id.* § III.G.3., *supra*.
[1265] *Id.* § III.G.2., *supra*.
[1266] *See Id.* § III.G.1., *supra*.
[1267] *See id.*
[1268] *Id.*

related deaths from the Texas Legislature, the very people that allocate the necessary funding for air conditioning.[1269] Despite decades of litigation, public attention, and legislative scrutiny regarding heat-related deaths and illnesses in Texas's un-air-conditioned prisons, these failures have persisted.

The Court does not find these failures inadvertent. An agency that knows extreme heat is killing inmates and making them sick—as Director Lumpkin concedes TDCJ knows[1270]—yet declines to collect the most important data for identifying when and how those deaths and illnesses occurred has intentionally chosen to avoid knowing the full scope of a risk it is constitutionally required to abate. A deliberate decision to look away is itself evidence of deliberate indifference. *See Farmer*, 511 U.S. at 843 n.8 (a prison official does "not escape liability if the evidence showed that he merely refused to verify underlying facts that he strongly suspected to be true, or declined to confirm inferences of risk that he strongly suspected to exist.") As Mr. Williams put it, the result is the "purposeful omission of the most important and relevant data about why people are dying"[1271] in TDCJ prisons. The predictable and documented consequence, as Mr. Williams and the medical experts testified, is the systematic undercounting of heat-related inmate deaths.[1272] That choice both reflects and reinforces deliberate indifference: It deprives TDCJ's own decisionmakers, this Court, and the Texas Legislature of the data that would document the lethality of the conditions, and it allows TDCJ to continue characterizing heat-related deaths and illnesses as something else. And it exemplifies TDCJ's "current attitudes

---

[1269] *Id.* § III.G., *supra*.
[1270] *Id.* § III.C., *supra*.
[1271] *Id.* § III.G.1., *supra*.
[1272] *Id.*

and conduct" while the litigation was pending. *Farmer*, 511 U.S. at 846. A response which understates the risk—rather than accurately measuring and addressing it—is not reasonable.

\* \* \* \*

In sum, as with his predecessor, Director Lumpkin continues to rely on "mitigation measures he knows are inadequate—and which the Court finds are scientifically inadequate—to reduce the substantial risks of serious harm posed by extreme heat." *Tiede II*, 796 F. Supp. 3d at 332. And he "has implemented (or has a plan to implement) the only reasonable mitigation measure that he knows is adequate to reduce or eliminate the risk—air[-]conditioning—at a pace that disregards the substantial risk of harm the inmates face." *Id.* He refuses to implement policies to ensure the timely, comprehensive, or accurate collection of information related to heat-related deaths and illnesses. He has not presented a concrete plan for timely installing air conditioning, refused to commit to a deadline by which the system will be fully air conditioned, refused to commit to requesting any specific amount of funding, and refused to commit to his own attorneys' plan for completing systemwide air conditioning. Nor has his agency even increased the rate at which TDCJ has installed air-conditioned beds enough to even keep up with inmate population growth. While the Court recognizes that Director Lumpkin "want[s] the same thing" as Plaintiffs[1273]—i.e., systemwide air conditioning—"mere goals" in the absence of any concrete or adequate plan, commitments, or actions "do[es] not satisfy the Eighth Amendment." *Tiede*, 796 F. Supp. 3d at 333. The Court therefore concludes that TDCJ's response to the substantial risk of death and serious harm from extreme heat is inadequate and unreasonable, and that Director Lumpkin has acted with deliberate indifference to that risk.

---

[1273] Trial Tr. (Apr. 9, 2026) 307:21-25 (Kercher).

193

        3.       *The Fifth Circuit's decision in* Parker *did not overrule* Farmer*'s reasonableness standard.*

The Fifth Circuit's recent decision in *Parker* does not change or supplant the well-established standard by which TDCJ's conduct must be judged once the subjective knowledge component of deliberate indifference is proven.

As the Court explained above, *Farmer* itself supplies the pertinent standard. In *Farmer*, the U.S. Supreme Court held that "a prison official may be held liable under the Eighth Amendment for denying humane conditions of confinement only if he knows that inmates face a substantial risk of serious harm and disregards that risk by failing to take *reasonable measures* to abate it." 511 U.S. at 847 (emphasis added). Thus, under *Farmer*, reasonableness is the touchstone. *See id.* at 844-45, 847. A prison official's duty is to ensure inmates' "reasonable safety," and an official does not escape liability merely by identifying *any* response—no matter how inadequate. *Id.* at 844

This Circuit has applied *Farmer* to materially identical conditions. In *Gates*, the Fifth Circuit affirmed an Eighth Amendment violation arising from extreme summer heat in an unair-conditioned unit, compounded for inmates whose mental illness and psychotropic medications impaired their ability to regulate body temperature—the same prison conditions at issue here. 376 F.3d at 333–34, 339–40. *Gates* applied *Farmer*'s reasonableness standard and confirmed that a prison official's response must be "reasonable" to avoid responsibility; not just any response will do. *See id.* at 332–34 (citing *Farmer*, 511 U.S. at 932). *Gates* also rejected the contention that a prison can avoid liability by pointing to some ongoing or intended remediation: Assurances that officials were "already meeting, intending to meet, or attempting to meet" the standard did "not suffice to moot the issue," because "voluntary cessation of a challenged

194

practice does not deprive a federal court of its power to determine the legality of the practice." *Id.* at 337.

More recently, this Circuit applied *Farmer*'s reasonableness standard in *Hinds County*. *United States v. Hinds Cnty. Bd. of Supervisors*, 120 F.4th 1246, 1261 (5th Cir. 2024) (*Hinds County I*), *op. revised & superseded by* 128 F.4th 616 (5th Cir. 2025) (*Hinds County II*). There, the Fifth Circuit affirmed a finding of deliberate indifference, even though the County defendant had a plan to raise officer pay and claimed to be hiring additional staff. *Id.* at 1260–61.[1274] The trial court found that "the County did not take *reasonable steps* to remedy the prison-violence issue," and the Fifth Circuit agreed. *Hinds County II*, 128 F.4th at 630 (emphasis added). It again confirmed that prison officials must take "reasonable measures" to avoid Eighth Amendment liability. *Id.* (quoting *Farmer*, 511 U.S. at 832).

*Parker* applied *Farmer*'s reasonableness standard. Like *Gates* and *Hinds County*, *Parker* confirmed that prison officials "may be found free from liability if they *responded reasonably* to the risk." *Parker v. Hooper*, 171 F.4th 736, 758 (5th Cir. 2026) (quoting *Farmer*, 511 U.S. at 844; citing *Hinds County I*, 120 F.4th at 1261) (emphasis added).[1275] *Parker* did not hold—and could not hold, consistent with *Farmer* and its Fifth Circuit progeny—that a prison escapes liability simply because the defendant "want[s] the same thing" as the plaintiff,[1276] or merely by undertaking some response to a known risk, no matter how inadequate. Nor did it purport to overrule decades of Fifth Circuit case law applying *Farmer*'s reasonableness standard to Eighth

---

[1274] This same language was included in the court's superseding opinion. *See Hinds County II*, 128 F.4th at 630.

[1275] The language *Parker* quoted from *Hinds County I* was left unaltered in *Hinds County II*.

[1276] In his closing, Director Lumpkin's counsel said: "This court's order in the preliminary injunction phase said that plaintiffs and defendants *want the same thing*. I think under *Parker*, that probably forecloses the liability finding at this point." (Trial Tr. (Apr. 9, 2026) 307:21-25 (Kercher) (emphasis added).)

195

Amendment claims. *See, e.g.*, *Webb*, 618 F. App'x at 209 n.7 (the "mere presence of remedial measures would not end the inquiry, as such measures must be adequate"); *Hinds County II*, 128 F.4th at 630; *Gates*, 376 F.3d at 340; *Ball I*, 792 F.3d at 592–93; *Gobert v. Caldwell*, 463 F.3d 339, 346 (5th Cir. 2006). So it does not require the Court to depart from *Farmer* here.

*Parker* does, however, present a stark contrast between remediation efforts by prison officials that satisfy the Eighth Amendment and the conduct of TDCJ here. In *Parker*, prison officials for the Louisiana State Penitentiary, after being found liable, made sweeping, transformational changes to remediate the violation. Among other things, they (i) "immediately began renovating their facilities, upgrading personnel, and improving standards of care"; (ii) installed a facility-wide electronic medical-record system; (iii) doubled physician staffing; (iv) increased nurse practitioners; (v) upgraded nurse staffing in the acute-care unit; (vi) revised staffing such that an nurse and EMT were present 24/7, with a nurse practitioner either present in the unit or on-call on prison grounds 24/7; (vii) adopted a web-based medical service where nurse practitioners were available through telemedicine; (viii) overhauled sick-call procedures such that each patient was being seen within one day by an EMT; (ix) expanded onsite specialty clinics from four to thirteen, with telemedicine consultations available; (x) instituted new internal oversight procedures for prison medical care; and (xi) were reaccredited by the ACA at 100% of mandatory standards. *Id.* at 741, 755, 758-60.

The error *Parker* identified was the trial court's refusal to credit those significant "watershed" "innovations and improvements" and "robust" remedies, treating them as categorically "not enough." *Id.* at 754-55, 761. On that record, the defendants' demonstrated "concern and sincerity"—as shown through their conduct—negated deliberate indifference. *Id.* at 758 (quoting *Farmer*, 511 U.S. at 844 (quotations omitted)).

196

Here, however, TDCJ has not undertaken "robust" systemwide "improvements" or "innovations" that this Court has declined to credit—either before (or during) this litigation. In its preliminary injunction order, this Court found that TDCJ was inflicting cruel and unusual punishment on inmates by exposing them to extreme heat, "implored" Mr. Collier to take steps to prepare to fully air condition all TDCJ facilities, found that TDCJ's rate of installing air conditioning was insufficient, and made clear its expectation that TDCJ "demonstrate to the Court a plan for achieving the goal of providing sufficient air conditioning for the inmates of TDCJ in a timely manner" at the trial in this case. *See Tiede II*, 796 F. Supp. 3d at 325-336.

Since then, TDCJ has continued to rely on the same heat-mitigation measures the Court found inadequate; continued to conceal critical facts surrounding inmate deaths; continued to inaccurately report the number of heat-related deaths to the public and the Texas Legislature; refused to ask the Texas Legislature for anything close to the funding that TDCJ was capable of using in the FY'26-'27 biennium to install air conditioning, much less the funding needed to fully air condition the system; refused to commit to asking the Texas Legislature for any specific amount for air conditioning in the next legislative session; failed to adopt even one of several different methods that would increase the pace at which air conditioning can be installed; has not installed air conditioning at a rate that kept up with the pace of inmate population growth, and did not present the Court with anything approaching a concrete plan for expeditiously installing air conditioning.[1277] As even Mr. Cox recognized, the agency's current approach to installing air conditioning is just "not working."[1278] Unlike *Parker*, that is not "robust," systemwide reform;

---

[1277] *See generally* Findings of Fact §§ III.-VII., *supra*.

[1278] *Id.* § VII.D., *supra*.

197

that is business as usual. TDCJ's failures "demonstrate the continuance of [TDCJ's] disregard [of a known risk] during the [pendency] of the litigation." *Parker*, 171 F.4th at 754, 756.

As the Court has already found, given the substantial risk of serious harm from extreme heat in unair-conditioned prisons, TDCJ's response is inadequate and unreasonable.[1279] *Gates* forecloses the argument that *any* response by prison officials is sufficient, and *Farmer* supplies the rule that still applies: Officials who know of a substantial risk of serious harm and fail to take "reasonable measures" to abate it are deliberately indifferent. *Farmer*, 511 U.S. at 847. Whatever latitude *Parker* may afford a defendant engaged in genuine, ongoing reform, it offers none to TDCJ—which has refused to take reasonable measures at all.

## IV.    PLAINTIFFS HAVE SATISFIED THE OTHER FACTORS FOR A PERMANENT INJUNCTION.

"[S]uccess on the merits does not, by itself, entitle a party to injunctive relief." *United States v. Texas*, 794 F. Supp. 3d 427, 452 (W.D. Tex. 2025). "Plaintiffs must still establish that the remaining elements necessary for a permanent injunction—irreparable injury, a balance of hardships favoring relief, and consistency with the public interest—are also satisfied." *Id.* In the prison context, the PLRA also imposes additional conditions that must be satisfied before a permanent injunction can be issued. *See generally* 18 U.S.C. § 3626(a)(1)(A). As set forth in more detail below, all of these requirements have been met here.

### A.    TDCJ Prisoners Will Suffer Irreparable Harm Absent Permanent Injunctive Relief.

The irreparable harm prong requires Plaintiffs to show that their members and constituents are suffering "harm for which there is no adequate remedy at law." *Daniels Health Scis., L.L.C. v. Vascular Health Scis., L.L.C.*, 710 F.3d 579, 585 (5th Cir. 2013). Harm is

---

[1279] Conclusions of Law § III.B.2., *supra*.

irreparable "if it cannot be undone through monetary remedies." *Dennis Melancon, Inc. v. City of New Orleans*, 703 F.3d 262, 279 (5th Cir. 2012) (citation modified). "When an alleged deprivation of a constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary." *Tiede II*, 796 F. Supp. 3d at 333 (citation omitted); *see, e.g.*, *Elrod v. Burns*, 427 U.S. 347, 373 (1976) ("The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury."); *U.S. Navy SEALs 1-26 v. Biden*, 578 F. Supp. 3d 822, 838-40 (N.D. Tex. 2022) (holding that "because [Plaintiffs'] injuries are inextricably intertwined with Plaintiffs' loss of constitutional rights, … Plaintiffs have suffered irreparable harm") (citations omitted).

This Court previously found at the preliminary injunction stage that "TDCJ inmates housed in unair-conditioned prisons will experience irreparable harm, absent court intervention." *Tiede II*, 796 F. Supp. 3d at 333. That remains true today.

TDCJ's own public reports to the Texas Legislature from 2023 identify that, at minimum, three TDCJ inmates died that summer as a result of the extreme heat in their unairconditioned living areas last summer.[1280] Plaintiffs' evidence, including the testimony of Drs. Vassallo and Uribe, demonstrate that extreme heat has injured and killed at least seven more TDCJ inmates across the summers of 2023, 2024, and 2025.[1281] Dr. Zanobetti and Dr. Skarha, likewise, concluded there were 271 deaths attributable to extreme heat in Texas prisons without air-conditioning from 2001 to 2019—an average of 14 deaths per year.[1282] TDCJ itself has acknowledged that "23 people died in TDCJ facilities from heat related causes between 1998 and

---

[1280] *See* Findings of Fact § III.E., *supra*.
[1281] *See id.* § III.F., *supra*.
[1282] *See id.* § III.D., *supra*.

2012,"[1283] including ten deaths in the summer of 2011 alone.[1284] The symptoms inmates suffer—standing alone—are constitutionally significant injuries justifying injunctive relief. *See Blackmon v. Garza*, 484 F. App'x 866, 872 (5th Cir. 2012) (headaches, dizziness, nausea, lightheadedness, difficulty catching breath, and blurred vision, even without medical documentation of the symptoms, are sufficient injuries).[1285]

"The record evidence shows that exposure to the risks of extreme heat itself is also irreparable injury." *Tiede*, 796 F. Supp. 3d at 333 (citing *Ball I*, 792 F.3d at 593-94). These risks are undisputed. Dr. Vassallo testified that exposure to a heat index of 88° or higher poses a substantial risk of adverse outcomes for everyone[1286]; Dr. Biswas testified that extreme heat exacerbates mental illness[1287];  Dr. Leonardson agreed that temperatures at and above 90° expose inmates to a serious risk of heat-related illness and death[1288]; and Mr. Collier and Director Lumpkin have both admitted that inmates confined in temperatures at or above 95° face a serious health risk.[1289]

TDCJ's air-conditioning installation has not even kept up with the rate of inmate population growth—the agency has only fallen further behind. Cumulatively, hundreds of thousands of inmates will be exposed to extremely high temperatures in TDCJ's unair-conditioned prisons in the 23 years it will take to air condition all inmate living areas at the agency's current rate of installation. In the meantime, "TDCJ inmates will continue to suffer

---

[1283] *See id.* § III.C., *supra*.
[1284] *See id.*
[1285] *See  id.* § III.H., *supra*.
[1286] *See  id.* § III.A., *supra*.
[1287] *See id.*
[1288] *See id.*
[1289] *See id.* § III.C., *supra*.

scores of heat-related deaths and injuries until air conditioning is installed." *Tiede II*, 796 F. Supp. 3d at 333.

The Court again finds there is no adequate remedy at law for these constitutional violations, as they will continue absent systemwide permanent air conditioning. Plaintiffs are at "a significant threat of injury from the impending action," this "injury is imminent," and "money damages would not fully repair the harm." *Humana, Inc. v. Jacobson*, 804 F.2d 1390, 1394 (5th Cir. 1986).

### B.    The Remaining Factors Favor Ordering Permanent Injunctive Relief.

Courts "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Amoco Prod. Co. v. Village of Gambell, Alaska*, 480 U.S. 531, 542 (1987). When the state or one of its officials is a party, as is the case here, the balance of hardship is considered in tandem with the public's interest. *Nken v. Holder*, 556 U.S. 418, 435 (2009); *United States v. Abbott*, No. 23-50632, 2024 WL 3580743, at *11 (5th Cir. July 30, 2024).

TDCJ has tried to defend the unconstitutional and inhumane living conditions based on the lack of money at its disposal, and the Texas Legislature not having funded state-wide air-conditioning in TDCJ prisons. But TDCJ has never requested anything close to the full amount required to air condition the system, and the most it has ever requested is approximately a tenth of what is required. Mr. Collier has admitted, however, that the TDCJ has never received any pushback from the Legislature, the Governor's office, or anyone else with regard to the amount of funding it could request for air conditioning.[1290] And, according to Mr. Collier, there is no

---

[1290] Findings of Fact § VII.B., *supra*.

"cap or limit" on what TDCJ can request for air conditioning.[1291] But even if TDCJ had presented evidence of legislative intransigence, "inadequate resources can never be an adequate justification for depriving any person of his constitutional rights." *Smith v. Sullivan*, 553 F.2d 373, 378 (5th Cir. 1977) (internal citation omitted); *see also Rufo v. Inmates of Suffolk Cnty. Jail*, 502 U.S. 367, 396 (1992) (O'Connor, J., concurring) ("[T]he lack of resources can never excuse a failure to obey constitutional requirements."); *see also Gates v. Collier*, 501 F.2d 1291, 1319 (5th Cir. 1974) (collecting cases where "the defenses of fund shortage and the inability of the district court to order appropriations by the state legislature, have been rejected by the federal courts").

Ultimately, TDCJ's obligation "to eliminate existing unconstitutionalities does not depend upon what the Legislature may do, or upon what the Governor may do, or, indeed, upon what [he] may actually be able to accomplish." *Wyatt v. Aderholt*, 503 F.2d 1305, 1315 (5th Cir. 1974). As Justice Blackmun explained more than thirty years ago, the Eighth Amendment "sets minimal standards governing the administration of punishment in this country, and thus it is no answer to the complaints of the brutalized inmate that the resources are unavailable to protect him from what, in reality, is nothing less than torture." *Farmer*, 511 U.S. at 853-54 (Blackmun, J., concurring) (citation omitted).

> The Court also agrees with *Berge*, which found that:
>
> It is no defense for defendants to argue that the taxpayers may object to providing air conditioning to state prisoners. Defendants constructed a facility in which inmates are subjected to temperatures that can pose a serious risk to their well-being, particularly if they are taking medications or have health conditions that prevent their bodies from adjusting to high heat. If air conditioning is the only means of avoiding that risk, that is a function of defendants' decisions to build the facility as they did. Leaving inmates vulnerable to serious health consequences or death is not a reasonable alternative.

---

[1291] *Id.*

*Jones El v. Berge*, No. 00-C-421-C, 2003 WL 23109724, at \*1 (W.D. Wis. Nov. 26, 2003), *aff'd sub nom* 374 F.3d 541 (7th Cir. 2004); *see also Ensley Branch, N.A.A.C.P. v. Seibels*, 31 F.3d 1548, 1574 (11th Cir. 1994) ("The Constitution does not put a price on constitutional rights, in terms either of time or money. The rights guaranteed by the Constitution are to be made effective in the present." (citation omitted)); *Battle v. Anderson*, 594 F.2d 786, 792 (10th Cir. 1979) ("Constitutional treatment of human beings confined to penal institutions . . . is not dependent upon the willingness or the financial ability of the state to provide decent penitentiaries.").

Even setting aside that cost is no defense, the balance of hardships weighs decisively in Plaintiffs' favor. On one side of the ledger is a substantial risk of serious illness and death to tens of thousands of incarcerated persons; on the other is a capital expenditure that is a small fraction of the resources the State itself has identified as available. The Comptroller's Certification Revenue Estimate for the 2026–27 biennium projected roughly $203.63 billion in General Revenue-related funds available, which would support general-purpose spending of $198.97 billion.[1292] That is expected to result in an ending General Revenue-related certification balance of $4.66 billion.[1293] Further, the Comptroller's Certification Revenue Estimate projects an Economic Stabilization Fund balance of about $28.5 billion at the close of the biennium.[1294] Thus, fully funding system-wide air conditioning would cost roughly 5% of the projected rainy-day economic fund alone, and well under 1% of total funds available for general-purpose spending (and less than one-third of the projected general revenue surplus).[1295] Accordingly, TDCJ's constraint is one of institutional will, not fiscal capacity—the same point that underlies

---

[1292] Findings of Fact § VIII., *supra*.
[1293] *Id.*
[1294] *Id.*
[1295] *Id.*

the Court's deliberate-indifference finding—and it forecloses any contention that the equities weigh against relief.

The public interest, likewise, favors entering a permanent injunction. As this Court has held, "it is in all parties' best interest, and the public's, to move as quickly as possible to install permanent air conditioning." *Tiede II*, 796 F. Supp. 3d at 336. And "[i]t is always in the public interest to prevent the violation of a party's constitutional rights." *Jackson Women's Health Org. v. Currier*, 760 F.3d 448, 458 n.9 (5th Cir. 2014) (quoting *Awad v. Ziriax,* 670 F.3d 1111, 1132 (10th Cir. 2012)). Preserving inmates' health "is in the public interest," whereas allowing "in-custody inmate death[s] is necessarily not in the public interest."[1296] *See also Lawson v. Kelly*, 58 F. Supp. 3d 923, 935 (W.D. Mo. 2014) ("[T]he public interest is always served when the Constitution is obeyed."). Keeping inmates in extreme temperatures for extended periods of time serves no legitimate penological purpose. *Cf. Madrid v. Gomez*, 889 F. Supp. 1146, 1172 (N.D. Cal. 1995) ("Leaving inmates in outdoor cages for any significant period—as if animals in a zoo—offends even the most elementary notions of common decency and dignity. It also fails to serve any legitimate penological purpose in any kind of weather, much less cold and rainy weather."). Instead, it "can only be considered punishment for punishment's sake." *Jones'El*, 164 F. Supp. 2d at 1117.

Because the Court has found that the rights of TDCJ inmates housed in unair-conditioned prisons are being violated by the extreme heat, the two remaining factors—a balance of hardships favoring relief and the public interest—weigh in favor of granting permanent injunctive relief.

---

[1296] Am. TRO 4, Dkt. No. 19.

C.       The PLRA Does Not Bar The Relief Ordered.

Nor does the PLRA bar the Court's injunctive relief. The PLRA did not strip the courts of their power to remedy unconstitutional conditions simply because the remedy would require systemic change. The U.S. Supreme Court has said that courts "must not shrink from their obligation to enforce the constitutional rights of *all* persons, including prisoners." *Brown v. Plata*, 563 U.S. 493, 511 (2011) (quotation marks omitted and emphasis added). "A prison that deprives prisoners of basic sustenance, including adequate medical care, is incompatible with the concept of human dignity and has no place in civilized society," and "[c]ourts may not allow constitutional violations to continue simply because a remedy would involve intrusion into the realm of prison administration." *Id.*

Prospective relief with respect to prison conditions must be "narrowly drawn," must "exten[d] no further than necessary to correct the violation of the Federal right," and must be "the least intrusive means necessary to correct the violation of the Federal right." 18 U.S.C. § 3626(a)(1)(A). When determining whether these requirements are met, the Court must "give substantial weight to any adverse impact on public safety or the operation of a criminal justice system caused by the relief." *Id.* The Court makes each of these findings below.

Under the PLRA, "plaintiffs are not entitled to the most effective available remedy," but they are nevertheless "entitled to a remedy that eliminates the constitutional injury." *Ball I*, 792 F.3d at 599. In other words, the remedy must "reduce[] the risk of harm to a socially acceptable level." *Id.* As the Supreme Court has held, in ordering a state-wide reduction in California's prison population due to the unconstitutional conditions caused by overcrowding:

> The population reduction potentially required is nevertheless of unprecedented sweep and extent. Yet so too is the continuing injury and harm resulting from these serious constitutional violations. For years the medical and mental health care provided by California's prisons has fallen short of minimum constitutional requirements and has failed to meet prisoners' basic health needs. Needless

205

suffering and death have been the well-documented result. Over the whole course of years during which this litigation has been pending, no other remedies have been found to be sufficient.

….

This Court now holds that the PLRA does authorize the relief afforded in this case and that the court-mandated population limit is necessary to remedy the violation of prisoners' constitutional rights.

*Plata*, 563 U.S. at 501-02.

The Court has concluded that Plaintiffs have established a systemwide violation of the Eighth Amendment in TDCJ's unair-conditioned prisons. Extreme heat in unairconditioned prisons, even with the TDCJ's mitigation measures in place, exposes all TDCJ inmates to a substantial risk of serious injury or death. And TDCJ's heat-mitigation measures—and the current rate at which it is installing air-conditioned beds—do not "eliminate[] the constitutional injury" or "reduce[] the risk of harm to a socially acceptable level." *Ball I*, 792 F.3d at 599.

Mr. Collier admitted that, despite heat-mitigation measures being in place, inmates suffered heat-related deaths and illness from 2023 to 2025.[1297] Plaintiffs presented testimony from Dr. Vassallo and Dr. Uribe—both at the preliminary-injunction hearing and at trial—that numerous inmates who died in TDCJ's unair-conditioned facilities, died from the heat and would not have died had they been housed in air-conditioned cells.[1298] Dr. Skarha and Dr. Zanobetti, likewise, testified that TDCJ inmates will continue to die in unair-conditioned cells each summer unless the temperatures in TDCJ's prisons are reduced. *See Plata*, 563 U.S. at 535 (in fashioning "injunctive relief to remedy serious constitutional violations in the prisons[,] … [c]ourts can, and should, rely on relevant and informed expert testimony when making factual findings"). It is not "socially acceptable" for any inmate to die from the heat for lack of air

---

[1297] Findings of Fact § III.H., *supra*.
[1298] *See generally id.* § III., *supra*.

206

conditioning—let alone five in a single summer, ten over the last three summers, and likely

many more in the next few decades at TDCJ's current rate of air-conditioning installation. *Ball I*,

792 F.3d at 599.

Unlike in *Parker* or *Ball I*, there are no other remedies or mitigation measures for TDCJ

to try. TDCJ has tried every measure short of air conditioning. None have prevented heat-related

deaths or illnesses, nor have any reduced the risk of serious harm or death from extreme heat to a

"socially acceptable" level. *Id.* And the trial record forecloses any contention that a less-intrusive

remedy would suffice.

Director Lumpkin himself concedes that "air conditioning is the only effective protection

from the extreme heat."[1299] Witnesses on both sides agree. Plaintiffs' experts testified that air

conditioning is the only measure that removes the underlying risk: Dr. Vassallo explained that

mitigation measures do "not remove the heat," so inmates are "still dying," and that "the only

way to eliminate the heat risk and the deaths and illnesses" is air-conditioned housing; Dr.

Biswas testified that air conditioning is "the only way to reduce psychiatric risk due to heat,"

because other measures do not lower an inmate's core body temperature; and Mr. Williams

testified that the problem "can't be fixed by other means" and that "[t]he fix is air

conditioning."[1300] Professor Deitch—drawing on nearly four decades as a corrections expert—

testified that "the only staff[-]independent way to mitigate the heat problem is through air

conditioning," and that, short of releasing inmates from custody, she could identify no alternative

---

[1299] *Id.* § VI., *supra*.
[1300] *Id.*

TDCJ had not already tried.[1301] And defense expert Dr. Everitt confirmed that air conditioning is "the most effective way to prevent" heat stroke.[1302]

No witness identified a less-intrusive alternative that would reduce the risk of heat-related death or serious injury to a socially acceptable level. Nor has Director Lumpkin presented any evidence that installing air conditioning systemwide will have "any adverse impact on public safety or the operation of a criminal justice system." *Ball I*, 792 F.3d at 598-99. To the contrary, the unrebutted evidence establishes that extreme heat in unair-conditioned prisons not only poses a substantial risk of serious harm to all inmates, but also contributes to TDCJ's severe understaffing crisis.[1303]

That TDCJ has formally identified only a subset of inmates as heat-sensitive—and assigned heat scores to some of them—does not narrow the scope of the constitutional violation or the relief required. The trial evidence established that extreme heat poses a substantial risk of serious harm to everyone, including young and healthy individuals, so the risk is not confined to those with a heat score.[1304] And the unrebutted evidence is that there are over 100,000 inmates that either have medical conditions or are prescribed medications that render them heat-sensitive—more than 80% of whom do not have a heat score.[1305] Moreover, the Court credits Dr. Biswas's testimony that a "huge" portion of the incarcerated population suffers from mental illness that is "underdiagnosed or never diagnosed at all"—and that this undiagnosed population, precisely because it is undiagnosed, receives no heat score and is never identified by TDCJ as

---

[1301] *Id.*

[1302] *Id.*

[1303] Findings of Fact § IV.A., *supra*.

[1304] *Id.* § III., *supra*.

[1305] *Id.* § V., *supra*.

heat-vulnerable.[1306] Heat sensitivity thus cannot even be reliably or consistently identified inmate-by-inmate: Any individualized remedy would necessarily omit the substantial undiagnosed heat-sensitive population the system cannot see, leaving them exposed to the same substantial risk. Because the risk extends systemwide and even those taking heat-sensitive medications or with heat-sensitive conditions cannot be consistently, fully, or accurately identified, only systemwide relief in the form of air conditioning will correct the constitutional violation. *See Plata*, 563 U.S. at 531 ("The scope of the remedy must be proportional to the scope of the violation.").

The Court's order is not foreclosed by *Ball I*, for three reasons. First, *Yates* flatly rejected the argument that *Ball I* prohibited an injunction requiring air-conditioning. *Yates*, 868 F.3d at 370 ("Relying on our decision in *Ball v. LeBlanc*, Defendants argue that the PLRA categorically prohibits an injunction requiring that the Pack Unit be air-conditioned. *This is not so*." (emphasis added)). As the *Yates* court explained, *Ball I* "held that air-conditioning was not appropriate in that case, because other acceptable and less-intrusive remedies had yet to be tried—not that air-conditioning was an impermissible remedy." *Id.* And the *Yates* court reaffirmed the district court's assertion that air conditioning inmate housing areas could be ordered if it was "indeed the least intrusive means of correcting the violation." *Id.* (quoting *Cole v. Livingston*, No. 4:14-CV-1698, 2016 WL 3258345, at *10 (S.D. Tex. June 14, 2016) (Ellison, J.)). Here, every alternative, less-intrusive remedy has been tried by TDCJ and has failed to either eliminate the risk of heat-related illness and death or reduce it to a "socially acceptable" level. *Ball I*, 792 F.3d at 599. There is no other mitigation measure for TDCJ to try.

---

[1306] *Id.*

209

Second, *Ball I* found a maximum heat index unnecessary on its record, given that the injunction in *Gates* lacked such a limit, and there was "no showing" in *Ball I* that "the Constitution mandated more relief for these prisoners for the same prison condition in this case." *Id.* at 592, 600. Here, however, Plaintiffs presented unrebutted evidence that a heat index over 85° poses a substantial risk of serious harm. Dr. Skarha and Dr. Zanobetti found a one-degree increase above a heat index of 85° corresponds to a 0.7% increase in the risk of mortality,[1307] and Dr. Vassallo determined that a heat index of 88° or higher poses a substantial risk of adverse health outcomes for everyone—even young, healthy people.[1308] The Court sets the maximum heat index at 85° because that is what the record shows is necessary to reduce the risk of serious harm and death to a constitutionally acceptable level—not to a comfortable one. A higher cap would leave inmates exposed to the measurable excess mortality the evidence documents in the range between 85° and 88°[1309] And in *Yates*, the court confirmed that the *Gates* injunction does not reflect the permissible limits of relief. *Yates*, 868 F.3d at 371 n.8 ("Of course, just because *Gates* affirmed a different injunction on a different record does not speak to whether the Plaintiffs' requested relief in this case would be permissible under the PLRA.").

Third, *Ball I* "held that a facility-wide injunction was not appropriate under the PLRA because only the three named plaintiffs were at issue." *Id.* at 370. In other words, installing facility-wide air conditioning was necessarily overly broad in *Ball I*, because that relief was not "limit[ed] … to the particular plaintiffs before the court." *Ball I*, 792 F.3d at 599 ("Ball, Code, and Magee are the only plaintiffs before the court," so "any relief must apply only to them, if

---

[1307] Findings of Fact § III.D., *supra*.
[1308] *Id.* § III.A., *supra*.
[1309] *Id.*

possible."). Here, however, Plaintiffs' members and constituents include *every* inmate in the TDCJ system[1310]—all of whom face a substantial risk of serious harm from extreme heat—so the Court's relief must be tailored accordingly. *See Plata*, 563 U.S. at 531-32 ("The scope of the remedy must be proportional to the scope of the violation."). Because the constitutional violation is systemwide, nothing short of systemwide relief will suffice. *See id.* ("The order also is not overbroad because it encompasses the entire prison system," given the findings of a "systemwide [constitutional] violation" and "systemwide deficiencies").

The Court is mindful that it cannot "micromanage[]" prisons, and must "maintain a delicate balance among the prerogatives of public institutions, the demands of federalism, and the judiciary's limited remedial role." *Parker*, 171 F.4th at 761; *see also Valentine*, 993 F.3d at 294 (Oldham, J., concurring) ("[F]ederalism concerns are particularly acute in the context of prison management" and "[f]ederal judges are particularly ill-equipped to manage state prisons."). The "fundamental purpose" of the PLRA "was to extricate [federal courts] from managing state prisons." *Guajardo v. Tex. Dep't of Crim. Just.*, 363 F.3d 392, 394 (5th Cir. 2004) (quotations omitted).[1311] But this order does not seek to impose day-to-day judicial oversight over TDCJ prisons. Rather, it does only what is necessary to remedy the constitutional violation caused by extreme heat in unair-conditioned prisons: It orders a remedy (maintaining a heat index at or below 85° in the summer months) and a deadline (December 31, 2029), leaving TDCJ to decide how, in what sequence, and by what means to achieve it—with the most limited

---

[1310] Findings of Fact § III., *supra*.

[1311] *Accord Cagle v. Hutto*, 177 F.3d 253, 257 (4th Cir. 1999) ("[T]he fundamental purpose of the PLRA … was to remove the federal district courts from the business of supervising the day-to-day operation of state prisons."); *Imprisoned Citizens Union v. Ridge*, 169 F.3d 178, 189 (3d Cir. 1999) (stating that Congress' intent in enacting the PLRA was "to minimize prison micro-management by federal courts and to conserve judicial resources").

211

form of judicial supervision that the Court could devise (a quarterly report). Only if TDCJ fails to comply with these orders will additional court intervention be required.

Possible alternative remedies do not share these features. Implementing a heat score system under which *every* inmate with a heat-sensitive medical condition or taking a heat-sensitive medication would be identified and automatically placed in air-conditioned housing would require the Court to dictate, supervise, and inspect the delivery of medical care throughout TDCJ's prisons—including when, how, and to whom TDCJ conducts screening, manages medications, and provides treatment; that would be an ongoing intrusion into precisely the medical and administrative judgments the courts are least suited to direct. *Cf. Plata*, 563 U.S. at 531 ("This Court has rejected remedial orders that unnecessarily reach out to improve prison conditions other than those that violate the Constitution."); *Valentine*, 993 F.3d at 294 (Oldham, J., concurring) (criticizing the "district court's highly reticulated, 17-point management plan for the Pack Unit"). Such a remedy would likely require TDCJ to have at least 100,000 air-conditioned beds.[1312] And, as the Court has found, such a regime could never succeed: It would necessarily omit the large undiagnosed population the system cannot identify.[1313]

The same is true of any remedy premised on achieving full (or even safe) staffing levels in TDCJ prisons. TDCJ's current heat-mitigation measures—welfare checks, escorting inmates to respite areas, and distributing water and ice—are all staff-dependent, and they are only as reliable as TDCJ's ability to deploy personnel it does not have, with its 21% staffing level. A remedy built on achieving full staffing—or even "safe staffing," which according to Professor Deitch, is below 10%[1314]—would require the Court to address the staffing crisis itself. Given that

---

[1312] Findings of Fact § V., *supra*.
[1313] *Id.*
[1314] *Id.* § IV.A, *supra*.

TDCJ was only able to achieve a 7% improvement in staffing levels (from 28% to 21%) with a 39% increase in pay,[1315] this would be no small task. The Court would have to direct how TDCJ recruits, hires, compensates, supervises, and retains staff—an intrusion into core personnel decisions that would far exceed that of a one-time order to install systemwide air conditioning by a specific date. Such a remedy would also be less effective at addressing the constitutional violation than air conditioning—as it would not fix the theoretical flaws of the heat-mitigation measures, which the Court has already described.[1316] Dictating when, how, or under what circumstances audits must be performed, inmates' temperatures or cell temperatures must be taken, or any other mitigation measures must be conducted would require far more judicial oversight and intrusion into prison management than the relief ordered here.

Maintaining the inmate living areas at or below a heat index of 85° is thus a necessary, narrowly tailored remedy that is no more intrusive than required to meet the extreme heat crisis in TDCJ's unairconditioned prisons. *Cf. Plata*, 563 U.S. at 500 ("After years of litigation, it became apparent that a remedy for the constitutional violations would not be effective absent a reduction in the prison system population."). This is the least intrusive means necessary to correct the violation. 18 U.S.C. § 3626(a)(1)(A); *Ball I*, 792 F.3d at 599. And, unlike the district court's order in *Parker*, this order does not appoint multiple special masters or micromanage the prison system. Rather, it complies with the requirements and spirit of the PLRA, which allows for "the possibility of prison reform while harmonizing it with judicial restraint and states' legitimate institutional concerns." *Parker*, 171 F.4th at 754.

---

[1315] *Id.*

[1316] *Id.* § IV., *supra.*

A completion deadline—and a mechanism for the Court to ensure it is met—are, likewise permitted and necessary under the PLRA. Without a date certain for completion, an injunction directing TDCJ to install air conditioning would correct nothing: At its current pace of installing 3,857 cool beds per year, TDCJ will not fully air condition the system for at least 23 years—assuming that inmate population growth remains flat.[1317] During that time, hundreds of thousands of inmates will continue to be exposed to the substantial risk of serious harm from extreme heat in unair-conditioned prisons. Relief that permits a constitutional violation to persist for at least two decades—and perhaps in perpetuity, given TDCJ's projected inmate population growth—would not "correct the violation of the Federal right." 18 U.S.C. § 3626(a)(1)(A). It would ratify it.[1318] A deadline is therefore not an intrusion into prison administration but the very thing that makes the relief corrective rather than illusory—and is the least intrusive means of ensuring the violation is actually remedied, because it fixes the end TDCJ must achieve while leaving it to the agency to determine how to do so.

The December 31, 2029 deadline is achievable, and is grounded in TDCJ's own estimate. TDCJ's Director of Engineering, Dale Cox, estimated in his July 2025 deposition that completing systemwide air conditioning would take between 36 and 51 months under his proposed approach—the low end of which, measured from the date of trial, places completion well within the Court's December 31, 2029 deadline.[1319] Mr. Cox confirmed his 36- to 51-month estimate at trial, noting that it is "a very doable timeframe" and "not unreasonable."[1320] Plaintiffs' experts, likewise, testified that adopting various measures—including contract-

---

[1317] Findings of Fact § VII.A., *supra*.

[1318] Even TDCJ's own corrections expert agreed that a twenty-three-year timeline "is too long" to allow these unconstitutional conditions to continue. (*See* Findings of Fact § VII.A., *supra*.)

[1319] *See id.* § IX., *supra*.

[1320] *See id.*

bundling that Mr. Cox described as "a definite strategy [TDCJ] want[s] to pursue" and using a design-build project delivery method—would shorten that timeline to 24 to 36 months.[1321] And, most importantly, the deadline accomplishes the goal that TDCJ shares—systemwide air conditioning[1322]—on a constitutionally permissible timeline.

Although Rule 65 ordinarily requires a court to describe in reasonable detail the acts required by its injunction, the Supreme Court has held that in cases against state prisons a district court must give "adequate consideration to the views of state prison authorities." *Lewis v. Casey*, 518 U.S. 343, 362 (1996). Thus, rather than "dictat[ing] precisely what course the State should follow," the Court orders Director Lumpkin to "devis[e] a Constitutionally sound" plan. *Id.* The Court therefore orders Director Lumpkin to submit a plan within 60 days of the date of this Order that will (i) ensure that, by December 31, 2029, the heat index in all TDCJ inmate living areas throughout the system will be maintained at or below a head index of 85° during the summer months (defined by TDCJ to be April 15 to October 15); and (ii) describe the form and content of quarterly reports that TDCJ will submit to the Court (on the last day of each quarter) that fully apprise the Court of TDCJ's progress towards meeting the December 31, 2029 deadline.

The PLRA also prohibits the Court from ordering prospective relief that "requires or permits a government official to exceed his . . . authority under State or local law or otherwise violates State or local law unless (i) Federal law requires such relief to be ordered in violation of State or local law; (ii) the relief is necessary to correct the violation of a Federal right; and (iii) no other relief will correct the violation of the Federal right." 18 U.S.C. § 3626(a)(1)(B).

---

[1321] *See id.*
[1322] *Id.*

The Court concludes that the relief it orders today does not require Director Lumpkin to exceed his authority under Texas law; however, if it is determined that he does not have the authority to comply with this order, the Court concludes that federal law requires the relief to be ordered, as the relief is necessary to correct the violation of TDCJ inmates' rights, and no other relief will correct this violation.

Based on the foregoing, it is ORDERED that:

1. Plaintiffs' request for permanent injunction is granted;

2. Director Lumpkin shall, within 60 days from the date of this order, submit a plan to the Court that will (i) ensure that, by December 31, 2029, the heat index in all TDCJ inmate living areas throughout the system will be maintained at or below 85° at all times during the summer months from April 15 to October 15, and (ii) describe the form and content of quarterly reports that TDCJ will submit to the Court (on the last day of each quarter) that fully apprise the Court of TDCJ's progress towards meeting the December 31, 2029 deadline; and

3. Within 14 days from the date of Director Lumpkin's submission of the above-referenced plan, Plaintiffs may file a response to his submission, if they so choose.

Based on Director Lumpkin's submission and Plaintiffs' response (if any), the Court will conduct any further proceedings and enter any further orders it deems necessary to ensure that the constitutional injury is remedied effectively and expeditiously—including a final order that will be entered within the time period prescribed by 18 U.S.C. § 3626(a)(1)(A). That order will also specify when and under what circumstances the Court may order further relief if the quarterly reports are incomplete (i.e., they fail to provide sufficient information for the Court to be apprised of the agency's progress towards meeting the December 31, 2029 deadline) or inaccurate.

_____

ROBERT PITMAN
UNITED STATES DISTRICT JUDGE

216

DATED: June 5, 2026

Respectfully submitted,

/s/ Kevin D. Homiak

Brandon Duke
Texas Bar No. 24094476
O'MELVENY & MYERS LLP
700 Louisiana St., Suite 2900
Houston, Texas 77002
Telephone:  (832) 254-1500
Facsimile:  (832) 254-1501
Email:        bduke@omm.com

Molly B. Shuminer
Jeremy J. Marshall
Texas Bar No. 24116106
O'MELVENY & MYERS LLP
401 West 4th Street, Suite 3300
Austin, TX 78701-5056
Email:    mshuminer@omm.com
                jmarshall@omm.com

Jeff Edwards
Texas Bar No. 24014406
Michael Singley
Texas Bar No. 00794642
David Anthony James
Texas Bar No. 24092572
Lisa Snead
Texas Bar No. 24062204
EDWARDS LAW
603 W. 17th Street
Austin, Texas 78701
Telephone: 512.623.7727
Facsimile: 512.623.7729
Email:    jeff@edwards-law.com
              michael@edwards-law.com
              david@edwards-law.com
              lisa@edwards-law.com

Thomas A. Olsen (admitted *pro hac vice*)
Kevin D. Homiak (admitted *pro hac vice*)
Joe Henry "Hank" Legan (admitted *pro hac vice*)
Marissa Joers (admitted *pro hac vice*)
Audrey K. Pham (admitted *pro hac vice*)
Kai Thompson (admitted *pro hac vice*)
Michael Krantz  (admitted *pro hac vice*)
WHEELER TRIGG O'DONNELL LLP
370 Seventeenth Street, Suite 4500
Denver, Colorado 80202-5647
Telephone:    303.244.1800
Facsimile:    303.244.1879
Email:          olsen@wtotrial.com
                    homiak@wtotrial.com
                    blatt@wtotrial.com

Erica Grossman (admitted *pro hac vice*)
HOLLAND, HOLLAND EDWARDS & GROSSMAN,
LLC
1437 High Street
Denver, Colorado 80218
Telephone:    303.860.1331
Email:          erica@hheglaw.com

Jodi Cole
Texas Bar No. 24045602
LAW OFFICE OF JODI COLE, PLLC
203 East Murphy Street
Alpine, Texas 79830
Telephone:    432.837.4266
Facsimile:    512.692.2575
Email:          jcole@jodicole.com

*Attorneys for Plaintiffs*

217

## CERTIFICATE OF SERVICE (CM/ECF)

I HEREBY CERTIFY that on June 5, 2026, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system which will send notification of such filing to all counsel of record.


*/s/ Kevin D. Homiak*