# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF TEXAS
# AUSTIN DIVISION

| | |
|---|---|
| TEXAS CITIZENS UNITED FOR REHABILITATION OF ERRANTS, INC., et al., <br><br>     *Plaintiffs*, <br><br> v. <br><br> BOBBY LUMPKIN, in his official capacity as Executive Director of the Texas Department of Criminal Justice, <br><br>     *Defendant.* | <br><br><br><br><br><br> CIVIL CASE NO 1:23-CV-1004-RP |

## DEFENDANT'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

TABLE OF CONTENTS

**Proposed Findings of Fact** ............................................................................................... 1

I.   Responsibility for all aspects of Texas's prisons requires TDCJ to balance numerous complex priorities. ................................................................................. 1

    A.  TDCJ's executive structure and oversight. ........................................................ 1

    B.  TDCJ partners with universities to provide health care services and guidance to protect the health and welfare of its population. ........................................ 3

    C.  The size and scale of the TDCJ's system is vast. .............................................. 3

    D.  TDCJ diligently works to address and overcome staffing issues. ..................... 4

    E.  TDCJ prioritizes transparency by making itself available for public comment. ............ 5

    F.  TDCJ manages many major threats to inmate safety. ....................................... 5

    G.  TDCJ relies on Legislative appropriations to fund its operations and often experiences funding shortfalls that it must overcome. .................................... 6

II.  TDCJ's heat mitigation measures and medical partnerships with universities effectively manage heat-related risk. ................................................................. 9

    A.  Thermoregulatory and heat-related illness basics. ......................................... 9

    B.  TDCJ diligently prepares for the onset of summer temperatures. ............... 12

    C.  TDCJ's heat mitigation measures mirror national standards and are effective. ......... 12

        i.    Hydration. ............................................................................................. 13

        ii.   Respite. ................................................................................................. 14

        iii.  Cool Showers. ....................................................................................... 15

        iv.  Fans and cooling towels. ...................................................................... 15

        v.   Clothing changes and commissary items. ........................................... 16

        vi.  Work and recreation modifications. .................................................... 16

        vii. Education ............................................................................................... 17

        viii.Heat score. ............................................................................................ 18

        ix.  Response. ............................................................................................. 19

        x.   Overall. ................................................................................................. 19

    D.  TDCJ's heat mitigation practices set the standard for North Carolina. ....... 20

    E.  TDCJ continues to review and improve heat mitigation policies. ............... 21

    F.  TDCJ measures, records, and reports to the Legislature indoor temperatures taken daily at each unit having unairconditioned housing. ......................... 22

G. During the summer months, TDCJ announces over the radio at each unit the outdoor heat index. .................................................................................................. 22

H. Executive Directors Collier and Lumpkin amplified TDCJ's heat mitigation by inaugurating heat strike team audits. ........................................................................ 25

III. The Heat Score System identifies those individuals most at risk for heat illness and injury and prioritizes their placement into air-conditioned housing. ................................ 31

A. Classification. ........................................................................................................... 31

B. Heat score. ................................................................................................................. 38

IV. Plaintiffs' expert, Dean Williams, criticisms of TDCJ's practices are uninformed and baseless. ...................................................................................................................... 44

V. The death records that Plaintiffs rely upon do not show deaths caused by heat. ............. 45

A. TDCJ reports heat-related deaths to the Legislature based on the cause of death conclusion noted in autopsy reports prepared by TDCJ's medical partners. ................................................................................................................... 45

B. TDCJ's expert, Dr. De La Cruz, opines how pharmacological factors present in medical records and/or autopsy findings he reviewed are known to cause death in air-conditioned environments independent of external temperature. ........... 49

C. Inmate death reviews. ............................................................................................... 55

    i.   Hector Reyes ......................................................................................................... 55

    ii.  Jon Southards ....................................................................................................... 55

    iii. Robert Clincy........................................................................................................ 58

    iv. Armando Gonzales ............................................................................................. 59

    v.  Ryan Fairchild........................................................................................................ 60

    vi. John Skinner ........................................................................................................ 62

    vii. Wayne Straway ................................................................................................... 63

    viii.Jason Wilson........................................................................................................ 64

    ix. Samuel Rucker ..................................................................................................... 65

D. Plaintiffs' experts make unsubstantiated and contradictory definitive conclusions. ............................................................................................................... 65

    i.   Dr. Susi Vassallo .................................................................................................. 65

    ii.  Dr. Jhilam Biswas................................................................................................. 69

E. The studies on which Plaintiffs rely do not show that prison heat caused elevated fatalities. ..................................................................................................... 71

VI. TDCJ's leadership is diligently moving towards air conditioning all inmate housing areas. ................................................................................................................... 73

A. TDCJ is committed to installing air conditioning. ...................................................... 73

B. Temporary air conditioning is not practical or cost effective. .................................... 74

C. TDCJ has received significant funding appropriations from the Texas Legislature to support its goal of installing new air conditioning. ............................... 74

D. TDCJ funding requests for new air conditioning projects are measured by the number of projects that TDCJ can execute in the following biennium. ...................... 76

E. Many obstacles and complexities arise when retrofitting operational Texas prisons. ........................................................................................................................ 77

F. TDCJ has made significant progress since receiving its first tranche of dedicated air conditioning funding. .............................................................................80

G. TDCJ is in the midst of scaling up its air conditioning installation. ........................ 84

VII. The design and construction project delivery methods TDCJ uses are reasonable. ........................................................................................................................ 87

A. The traditional design-bid-build method works for TDCJ. ...................................... 87

B. TDCJ's expert, Chris Caddell, supports TDCJ's choice of the design-bid-build for the air conditioning retrofit projects. .......................................................... 88

C. TDCJ's expert, Jared Higgins, also supports TDCJ's choice of the design-bid-build project delivery method for TDCJ's air conditioning retrofit projects. ............. 93

D. Plaintiffs' experts advocate that TDCJ should use the design build method without any consideration of the multiple factors that need to be evaluated in selecting a project delivery method. ........................................................................ 99

    i. Brian Carroll. ..................................................................................................... 99

    ii. Exponent. .........................................................................................................101

VIII. Plaintiffs' members have not exhausted the administrative remedies available to them. ........................................................................................................................ 104

IX. Plaintiffs do not represent the entire TDCJ inmate population. ................................... 106

A. Lioness. ..................................................................................................................... 106

B. Texas CURE. ............................................................................................................. 108

C. TPCA. ........................................................................................................................ 109

**Proposed Conclusions of Law** ................................................................................................ 112

I. Plaintiffs have not proven that extreme heat renders the conditions of confinement in TDCJ prisons cruel and unusual. ........................................................................112

A. Legal Standard. ..........................................................................................................112

B. TDCJ inmates generally do not face a substantial risk of serious harm from high heat. ....................................................................................................................115

C. Inmate fatalities have been determined to have been caused by factors other than heat...............................................................................................117

D. Plaintiffs' other evidence of severe heat risk fares no better....................121

E. Director Lumpkin has not acted with deliberate indifference towards the risks that extreme heat poses to inmate health and safety..................................124

    i. TDCJ's heat mitigation measures are a reasonable remedial response. ............126

        a. Defendant is not indifferent because TDCJ's heat mitigation practices reflect standard approaches to managing heat risk. ....................126

        b. Defendant is not indifferent because TDCJ's heat mitigation measures are effective...........................................................127

        c. Defendant is not indifferent because TDCJ continually upgrades its heat mitigation practices. ..................................................129

        d. TDCJ's practices recording body temperatures of distressed inmates is not negligent. ...............................................................131

    ii. Heat-related injuries do not establish deliberate indifference............................134

    iii. TDCJ's air conditioning installation efforts negate a finding of deliberate indifference...............................................................................135

        a. TDCJ's commitment to systemwide air conditioning is sincere. .................135

        b. TDCJ has made marked progress installing air conditioning. .......................136

        c. Evidence that TDCJ's approach to HVAC installation is suboptimal does not show that Defendant is indifferent................................................139

II. Plaintiffs do not have standing. ...............................................................................140

A. Legal Standard.....................................................................................140

B. Lioness .................................................................................................143

C. TPCA and TX C.U.R.E.........................................................................145

III. Plaintiffs are barred from litigating by the PLRA's Exhaustion Requirement, 42 U.S.C. § 1997e.....................................................................................................148

A. Legal Standard.....................................................................................148

B. Plaintiffs have failed to exhaust their remedies.......................................151

IV. Plaintiffs requested relief is overbroad under the PLRA and does not satisfy the balance of the equities. ...........................................................................................152

A. Legal Standard.....................................................................................152

    i. The PLRA ...........................................................................................152

B. Systemwide air-conditioning is not the least intrusive or minimum necessary means to mitigate the effects of extreme heat. .........................................153

C.  An order that requires TDCJ to expend funds that have not been allocated violates the PLRA and principles of federalism. ...................................................... 154

Certificate of Service ..................................................................................................157

---

**PROPOSED FINDINGS OF FACT**

---

**I. Responsibility for all aspects of Texas's prisons requires TDCJ to balance numerous complex priorities.**

**A.    TDCJ's executive structure and oversight.**

1.    The Texas Board of Criminal Justice (TBCJ) is the governing body of TDCJ and the following independent reporting entities: the Office of the Independent Auditor, the Office of the Independent Ombudsman, the Office of the Inspector General, the Office of the PREA Ombudsman, and the Independent Office of Inmate Counsel. Def. Ex. 147 (the Board Policy). TBCJ consists of nine board members that are appointed by the Governor. 4/6/26 Tr. at 127:16–22, 129:3–5 (Nichols). The TBCJ Board Policy lays out the core responsibilities. 4/6/26 Tr. at 139:3–11, Def. Ex. 147 (Nichols).

2.    The Office of the Inspector General is the law enforcement entity that investigates criminal activity within TDCJ, whether such activity is committed by inmates, staff, or prison visitors. 3/31/26 Tr. at 267:11–19 (Lumpkin). The Office of the Inspector General reports to TBCJ, not TDCJ's Executive Director. 3/31/26 Tr. at 267:10–268:5 (Lumpkin). The reporting structure of the Office of the Inspector General guarantees that impartial investigations are conducted because the Office of the Inspector General does not report to TDCJ's Executive Director. 3/31/26 Tr. at 268:6–18 (Lumpkin). The Executive Director of TDCJ does not have the power to shut down an investigation by the Office of the Inspector General. 3/31/26 Tr. at 268:19–23 (Lumpkin). The Executive Director does not have the final say in what is reported following an investigation by the Office of the Inspector General. 3/31/26 Tr. at 269:21–23 (Lumpkin).

3.    TBCJ appoints and employs an Executive Director for TDCJ, employs a director for each independent reporting entity, approves the operating budget and the request for appropriations for TDCJ and independent reporting entities, appoints members of advisory committees, adopts rules, develops and implements policies, and applies for and accepts gifts or grants. Def. Ex. 147.

4.      The Executive Director of TDCJ is responsible for the oversight of TDCJ, which includes the State of Texas prison system as well as the adult parole supervision system. 3/31/26 Tr. at 180:11–181:1 (Collier).

5.      TBCJ also serves as trustee of the Windham School District, a state-wide school district that provides educational, cognitive, life skills, career and technical education to inmates. 4/6/26 Tr. at 129:6–16 (Nichols). Because of programs like this, TDCJ has one of the lowest recidivism rates in the country at 17%. 3/31/26 Tr. at 339:20–22 (Lumpkin). TDCJ has classrooms at every facility which tend to be air-conditioned. 4/6/26 Tr. at 148:13–149:5 (Nichols).

6.      TBCJ must approve the purchase of contracts over $1,000,000. Def. Ex. 147 at Tiede Def_516803. In evaluating such contracts, TBCJ ensures that the right people and the right practices are in place so that taxpayer funds are used appropriately. 4/6/26 Tr. at 146:16–147:5 (Nichols). To do so, TBCJ educates itself on such expenditure by reviewing materials provided to TBCJ and hearing presentations at the TBCJ meetings. 4/6/26 Tr. at 146:16–147:5 (Nichols). TBJC makes sure that funds are being spent properly towards the mission objectives of TDCJ in a responsible and measured way. 4/6/26 Tr. at 146:16–147:5 (Nichols).

7.      The board members of TBCJ also make routine visits to TDCJ's facilities to oversee TDCJ's practices, including heat mitigation efforts. 3/31/26 Tr. at 264:25–266:6 (Lumpkin); 4/6/26 Tr. at 157:1–21, 159:17–19 (Nichols). During these visits the Board will review the heat mitigation practices to make sure protocols are being followed. 4/6/26 Tr. at 159:17–161:18 (Nichols).

8.      The Chairman, who often visits TDCJ's units, believes that TDCJ's heat mitigation efforts are effective because TDCJ has the right policies and leadership in place with the full intention of maintaining the health and welfare of TDCJ's populations, especially during hot summer months. 4/6/26 Tr. at 162:16–164:1 (Nichols).

9.      It cannot be argued that TDCJ officials are being deliberately indifferent to the health and welfare of TDCJ's population as it relates to heat exposure. 4/6/26 Tr. at 174:4–15, 184:13–23 (Nichols).

2

**B.     TDCJ partners with universities to provide health care services and guidance to protect the health and welfare of its population.**

10.     The people who operate TDCJ's prison system are not medical professionals, so TDCJ has medical partners who provide the correctional managed healthcare across the TDCJ system. 4/6/26 Tr. at 152:4–153:22 (Nichols). TDCJ's medical partners are The University of Texas Medical Branch (UTMB) and Texas Tech University Health Science Center (Texas Tech). 3/31/26 Tr. at 309:12–17 (Lumpkin).

11.     TDCJ has contracts with UTMB and Texas Tech to provide medical services to TDCJ's population. 4/6/26 at 153:23–154:1 (Nichols). UTMB covers the southern and eastern portions of the State and Texas Tech covers more northern and western parts. 4/6/26 Tr. at 154:2–13 (Nichols). UTMB operates the prison hospital in Galveston, providing medical services to approximately two-thirds of the State's prisoners. 3/31/26 Tr. at 309:18–25 (Lumpkin).

12.     Layered on top of TDCJ's medical partners is another separate entity from TDCJ consisting of a ten-member committee driven by medical professionals with a public membership component. 4/6/26 Tr. at 152:4–153:22 (Nichols). This is the Correctional Managed Healthcare Committee (CMHC), which performs a vital role in ensuring the health and welfare of TDCJ's population. 4/6/26 Tr. at 151:15–152:3 (Nichols). This committee ensures that TDCJ has input from the medical professionals to drive how TDCJ implements its policies to protect the health and welfare of the population. 4/6/26 Tr. at 152:22–153:22 (Nichols).

13.     TDCJ's medical partners provide input on TDCJ's heat score and review the requirements of the heat score at least once on an annual basis. 3/31/26 Tr. at 310:2–9, 311:13–19 (Lumpkin).

14.     TDCJ's medical partners also are responsible for determining when there has been a heat-related illness or death. 3/31/26 Tr. at 311:2–5 (Lumpkin).

**C.     The size and scale of the TDCJ's system is vast.**

15.     The Executive Director of TDCJ is responsible for running the day-to-day operations of the department, including: 104 prisons, 67 parole offices, 120 probation offices.

3

3/31/26 Tr. at 263:18–264:4 (Lumpkin). The Executive Director has the responsibility of overseeing 33,000 TDCJ employees, 141,000 inmates, 75,000 former inmates currently on parole, and more than a quarter of a million former inmates currently on probation, TDCJ's executive staff, and TDCJ's operational budget. 3/31/26 Tr. at 263:18–264:4 (Lumpkin).

16.    TDCJ feeds 141,000 male and female prisoners three meals a day. 3/31/26 Tr. at 319:7–15 (Lumpkin). In the past year alone, the cost of meat products has risen 20%, the cost of dairy products has risen 27%, the cost of utilities, specifically water, at an increase of 23%, and the cost of TDCJ's substance abuse contracts have risen 25–27%. 3/31/26 Tr. at 319:16–21, 320:13–21 (Lumpkin).

17.    Contrary to the testimony of Plaintiffs' expert witness, Dr. Deitch, TDCJ's actual capacity is approximately 158,000 beds, with a prison population of approximately 141,000 inmates. 3/31/26 Tr. at 349:3–350:2 (Lumpkin).

**D.    TDCJ diligently works to address and overcome staffing issues.**

18.    TDCJ works hard to combat staffing issues such as advocating for pay increases, wellness initiatives, housing, town hall meetings, and creating a culture of professionalism. 3/31/26 Tr. at 209:8–210:16 (Collier).

19.    TDCJ has made numerous efforts to reduce the staffing vacancies, where they exist, including raising pay, which has led to the highest number of correctional officers within TDCJ since 2021, as well as an average gain in correctional officers of 200 per month. 3/31/26 Tr. at 341:5–342:19 (Lumpkin).

20.    TDCJ also deliberately hires people better suited for the correctional officer jobs, which is reflected by the increase in the number of applications it reviews before hiring someone. 3/31/26 Tr. at 343:4–10 (Lumpkin).

21.    TDCJs staffing levels are monitored at its staffing command center. 3/31/26 Tr. at 210:25–212:1 (Collier). When staffing levels become an issue, TDCJ will grant overtime and move staff around to cover shortfalls. 3/31/26 Tr. at 210:25–212:1 (Collier), 3/31/26 Tr. at 351:2–352:5

(Lumpkin). TDCJ also has mobile correctional officers that can be dispatched around the State as needed. 3/31/26 Tr. at 210:25–212:1 (Collier).

22.     Contrary to the testimony of Plaintiffs' expert witness, Dr. Deitch, TDCJ's understaffed prison units do not work at the deficit of the unfilled staff positions but are instead supplemented with "mobile correctional officers" who travel to understaffed units and fill out their staffing ranks. 3/31/26 Tr. at 350:6–351:1 (Lumpkin).

### E.     TDCJ prioritizes transparency by making itself available for public comment.

23.     Transparency is very important to TDCJ. 3/31/26 Tr. at 335:3–336:11 (Lumpkin). TDCJ takes several actions to increase transparency, including holding: discussion sessions with prison advocacy groups; responding to emailed communications from the public with immediacy; public comment sessions to hear ideas, concerns, and issues; and family summits that include presentations from TDCJ's leadership. 3/31/26 Tr. at 336:12–338:6 (Lumpkin).

### F.     TDCJ manages many major threats to inmate safety.

24.     TDCJ faces many challenges in addition to mitigating heat to care for its population including healthcare, food service, funding, contraband, violence, mental health, and day-to-day operations. 3/31/26 Tr. at 181:2–25 (Collier).

25.     TDCJ has other issues it must deal with to protect the health and safety of the inmate population such as combatting the influx of illegal contraband that kills many members of TDCJ's population. 4/6/26 Tr. at 164:2–165:11 (Nichols). TDCJ has programs and policies in place to help prevent some of these issues and enhance the rehabilitation of TDCJ's population. 4/6/26 Tr. at 164:2–165:11 (Nichols).

26.     What is most adversely affecting the health and welfare of TDCJ's population is not exposure to indoor heat, it is exposure to dangerous drugs combined with mental health issues as well as the resulting violence and incidents of self-harm among our population. 4/6/26 Tr. at 173:14–174:3 (Nichols).

27.    Illicit drugs being smuggled into TDCJ facilities is a constant threat. 3/31/26 Tr. at 346:22–348:2 (Lumpkin).

**G.    TDCJ relies on Legislative appropriations to fund its operations and often experiences funding shortfalls that it must overcome.**

28.    TDCJ's budget is set bi-annually during each legislative session, the most recent one happening in the 89th legislature session. 3/31/26 Tr. at 312:4–14 (Lumpkin). TDCJ obtains funding through the Legislative Appropriations Request (LAR) process. 4/9/26 Tr. at 114:15–18 (Steffa).

29.    The first step of the LAR process is for the legislative budget board and governor's office to issue joint instructions to the agencies on how to complete the LAR. 4/9/26 Tr. at 115:2–20 (Steffa). These instructions are accompanied by a joint policy letter which outlines the legislative priorities for the biennium as well as the percentage of base amount the agency can begin with. 4/9/26 at 115:2–20 (Steffa). Often, agencies are able to begin the LAR process with 100% base amount, but on occasions they are required to start the LAR process with 95% of the base amount. 4/9/26 Tr. at 116:24–117:6 (Steffa).

30.    In addition to base amount, TDCJ makes specific requests for exceptional items. Exceptional item requests are anything requested above base amount. 4/9/26 at 116:22–23 (Steffa).

31.    The CFO, budget department, COO, and chief programs office work with the different divisions within TDCJ to determine what exceptional item requests will be needed and the priority of each. 4/9/26 Tr. at 118:4–11 (Steffa).

32.    The exceptional items must be approved by the Texas Board of Criminal Justice. Once approved, the exceptional items can become part of the LAR. 4/9/26 Tr. 118:9–16 (Steffa).

33.    The legislative appropriations process by which TDCJ requests funding from the legislature begins in the spring before the legislative year. 3/31/26 Tr. at 159:21–25, 193:2–13 (Collier).

34.    During the legislative appropriations request process TDCJ has meetings with the Governor's Office, Lieutenant Governor's Office, Speaker's Office, and appropriations

committees and senate finance to make sure they are all aware of what TDCJ is trying to push forward with in its legislative appropriation request. 3/31/26 Tr. at 192:15–193:1 (Collier).

35.    Once the legislative appropriation request is finalized and submitted, TDCJ's executive team testifies and makes presentations at committee hearings on a regular basis. 3/31/26 Tr. at 193:2–13 (Collier).

36.    TDCJ also regularly gives legislators tours of its facilities to educate them on TDCJ's operations. 3/31/26 Tr. at 193:14–20 (Collier).

37.    The legislative approval review process, part of TDCJ's work ahead of asking for its bi-annual budget allotment, affects how TDCJ asks for money to install air conditioning because it requires that TDCJ evaluate other competing financial priorities, such as the cost of medical services, fuel and food. 3/31/26 Tr. at 318:19–319:6 (Lumpkin).

38.    The agency has many basic needs that are funded by what is considered baseline funding. 3/31/26 Tr. at 189:21–191:10 (Collier). TDCJ runs at a deficit between every biennial budgeting session, at an amount of a couple hundred million. 3/31/26 Tr. at 313:11–314:4 (Lumpkin).

39.    During the budgeting process, TDCJ first looks at whether the baseline funding appropriated to TDCJ in the last legislative session covered all day-to-day operations for the prior biennium or if there was a shortfall that needs to be made heading into the new legislative session. 3/31/26 Tr. at 189:21–191:10 (Collier).

40.    TDCJ typically has a shortfall in funds for the costs associated with healthcare, overtime, and other things TDCJ has had to do to keep appropriate staffing levels. 3/31/26 Tr. at 189:21–191:10 (Collier). Beyond the baseline funding, TDCJ looks at what it wants to ask the Legislature for that is above and beyond what funding is in the base budget. 3/31/26 Tr. at 189:21–191:10 (Collier). This includes, for example, repairs that need to be done or air conditioning. 3/31/26 Tr. at 189:21–191:10 (Collier).

41.    TDCJ often does not receive funding appropriations for the amounts requested. 3/31/26 Tr. at 160:18–25 (Collier).

7

42.    Texas is a pay-as-you-go state which means the Texas comptroller can only certify appropriations up to the amount projected to be available. 4/9/26 Tr. at 124:1–2 (Steffa). When TDCJ is required to start the LAR process with only 95% of the base amount, the first exceptional item will be for the 5% necessary to equal 100% base. 4/9/26 Tr. at 117:7–15 (Steffa).

43.    The Legislature can only appropriate the amount set by the Comptroller. The Legislature has a budget it must stick with, or the appropriations will not be certified by the Comptroller. 4/9/26 Tr. at 124:7–12 (Steffa).

44.    The General Appropriations Act (GAA) identifies the funding that has been approved for each agency and how the funding is allocated. Riders are directions that place instructions and limitations for the funds. 4/9/26 Tr. at 125:15–23 (Steffa).

45.    Funds appropriated for capital projects also require capital authority to be granted to allow the agency to spend the funds. 4/9/26 Tr. at 131:4–8 (Steffa).

46.    Supplemental appropriations requests are intended to be used when there is a shortfall towards the end of the biennium. 4/9/26 Tr. at 129:9–22 (Steffa). A supplemental request can be submitted to the legislature when it is back in session to seek money needed to get the agency through the remainder of the biennium. Supplemental appropriations are under the same Comptroller certification requirements as the GAA and must fall within the budget constraints that come with pay as you go. 4/9/26 Tr. at 130:4–14 (Steffa).

47.    TDCJ cannot make a supplemental appropriations request for the cost of installation of air conditioning across the system. 4/9/26 Tr. at 130:15–24 (Steffa).

48.    TDCJ cannot simply move money appropriated for certain areas, reallocate it to pay for installing system wide air conditioning, and then run back to the Legislature begging for more money to keep TDCJ's basic functions running. 4/9/26 Tr. at 128:25–129:6, 142:4–144:1 (Steffa). First, doing so would undoubtedly damage the relationship and trust between TDCJ and the legislature which is vital for productive communication. 4/9/26 Tr. 141:12–17 (Steffa). Second, it would be fiscally irresponsible because they would knowingly be shorting areas of need that must be maintained such as utilities, food, medical care, and employee pay. 4/9/26 Tr. at 143:22–144:1

(Steffa). Third, TDCJ has limited authority to transfer funds between needs. 4/9/26 Tr. at 132:23–133:11 (Steffa). Fourth, when funds are appropriated by the GAA, they are not deposited into a TDCJ account. 4/9/26 Tr. at 125:24–126:8 (Steffa). Funds appropriated in the GAA are held by the Comptroller who then issues a warrant for payment when TDCJ has a bill. 4/9/26 Tr. at 126:3–8 (Steffa) The Comptroller verifies any movement or use of funds as compliant with the GAA and riders. 4/9/26 Tr. at 132:9–17, 143:8–13 (Steffa).

49.     Funding, of course, also plays a significant role in how and when new air conditioning can be installed. 3/31/26 Tr. at 206:12–14 (Collier). And it will take a significant amount of funding to install air conditioning throughout. 3/31/26 Tr. at 206:15–207:3 (Collier).

50.     TDCJ must manage requests for air conditioning projects with other competing priorities, such as contraband detection and healthcare costs. 3/31/26 Tr. at 206:15–207:3 (Collier). Installing air conditioning is a focal point for TDCJ, but at the same time, TDCJ has lots of competing, very important, critical issues that it must also push forward with the legislature. 3/31/26 Tr. at 206:15–207:3 (Collier).

51.     Contrary to Plaintiffs' expert witness testimony, there is no process pursuant to Texas Government Code § 401.601 by which Bobby Lumpkin, as Executive Director of TDCJ, can request all the funding necessary for installing air conditioning, nor has Bobby Lumpkin ever heard of any other Executive Director of TDCJ requesting money like this. 3/31/26 Tr. at 324:7–325:16 (Lumpkin).

## II. TDCJ's heat mitigation measures and medical partnerships with universities effectively manage heat-related risk.

### A.     Thermoregulatory and heat-related illness basics.

52.     TDCJ retained two experts to evaluate TDCJ's heat mitigation practices— Dr. DeGroot and Dr. Everitt.

53.     Dr. DeGroot is a thermoregulatory physiologist. 4/2/26 Tr. at 172:24–173:1 (DeGroot). He is a Lt. Col. who works at the Martin Army Community Hospital at Fort Benning and serves as the Director of the Army Heat Center. 4/2/26 Tr. at 173:13–22 (DeGroot).

54.    The Army Heat Center was created in 2019 to identify, develop, and disseminate best practices for prevention, treatment, and return to duty of heat illness casualties. 4/2/26 Tr. at 173:23–174:3 (DeGroot). He has published approximately 50 peer-reviewed papers related to heat and was the Department of Defense representative that served on the National Advisory Committee to revise the National Heat Safety in the Workplace Rules that are published by OSHA. 4/2/26 Tr. at 175:2–17 (DeGroot). He has conducted multiple studies and articles in the field of heat illness prevention and treatment. 4/2/26 Tr. at 175:18–21 (DeGroot). Dr. DeGroot has also worked with the New York Fire Department, the Department of Energy, US Customs and Border Protection, and the NCAA to advise on best practices to prevent heat illness. 4/2/26 Tr. at 175:22–176:2 (DeGroot).

55.    The primary focus of Dr. DeGroot's work at the Army Heat Center is developing heat mitigation measures. 4/2/26 Tr. at 176:13–18 (DeGroot). Additionally, he runs the education program which disseminates standards and measures pertaining to heat and conducts research and assists with clinical care of those who have suffered from heat illness. 4/2/26 Tr. at 176:19–177:4 (DeGroot).

56.    Dr. DeGroot is an expert in the areas of thermoregulatory physiology and heat mitigation. 4/2/26 Tr. at 177:5–10 (DeGroot), Def. Ex. 92.

57.    Dr. Everitt is a medical doctor board certified in emergency medicine and EMS medicine. 4/6/26 Tr. at 44:21–24 (Everitt). EMS medicine is the practice of out-of-hospital medicine and overseeing the care that paramedics provide. 4/6/26 Tr. at 45:1–8 (Everitt). He is Chief Medical Officer for Allegiance Mobile Health and adjunct faculty at the University of Texas San Antonio Medical School working with resident physicians in the ER. 4/6/26 Tr. at 47:17–25 (Everitt).

58.    Dr. Everitt has contributed to and written guidelines for the South Texas Regional Advisory Council, STRAC, for heat management in both the prehospital and hospital settings. These guidelines were relied upon by the Governor's Council on Trauma and made into a white

paper to advise the State on how heat stroke should be managed in the prehospital setting. 4/6/26 Tr. at 48:1–14 (Everitt).

59.    Dr. Everitt has extensive experience dealing with heat related illnesses including being the first responder in the largest heat-related emergency in Texas that resulted in over 50 heat stroke deaths. 4/6/26 Tr. at 45:12–24 (Everitt), Def. Ex. 211.

60.    Dr. Everitt is an expert in the areas of emergency medicine, EMS, and heat-related illness response. 4/6/26 Tr. at 49:15–19 (Everitt).

61.    Heat is lost from the body when sweat evaporates from the skin surface. 4/2/26 Tr. at 191:3–12 (DeGroot). The rate and amount of evaporation are functions of the speed of air movement over the skin and the difference between the water vapor pressure of the air at ambient temperature and the water vapor pressure of the wet skin. Def. 180 at Tiede Def_518086.

62.    There are two main types of heat stroke: classic heat stroke and exertional heat stroke. 4/2/26 Tr. at 180:19–181:17 (DeGroot). Classic heat stroke tends to be environmental and occurs when someone is in a hot environment they cannot escape. Heat stroke caused by drugs can also be classic heat stroke depending on the circumstances. Exertional heat stroke involves an element of physical work which causes metabolism to produce heat. 4/2/26 Tr. at 181:8–13 (DeGroot), 4/6/26 Tr. at 55:21–56:20 (Everitt). Importantly, both classic and exertional heat stroke are treated by cooling. 4/6/26 Tr. at 56:21–57:8 (Everitt).

63.    Heat illness is not a diagnosis, but an umbrella term for heat cramps, heat exhaustion, and heat stroke. 4/2/26 Tr. at 179:15–180:1 (DeGroot).

64.    While heat cramps, heat exhaustion, and heat stroke may be viewed as a continuum of severity, they are not a continuum of pathophysiology, meaning a heat exhaustion that is not immediately recognized and treated appropriately does not become heat stroke. 4/2/26 Tr. 180:1–9 (DeGroot).

65.    Thermoregulatory physiology applies to all humans, regardless of health. 4/2/26 Tr. 184:9–16.

11

### B.    TDCJ diligently prepares for the onset of summer temperatures.

66.     Advance Directive 10.64 is a policy that deals with extreme cold and extreme heat mitigation efforts that TDCJ has in place. 4/6/26 Tr. at 147:17–22 (Nichols).

67.     AD 10.64 has been through a process of continuous improvement, with input from TDCJ, the TBCJ, stakeholders, advocacy groups, members of the legislature, and others to take all good information TDCJ possibly can to continue to improve upon this directive and provide mitigation against extreme cold and heat. 4/6/26 Tr. at 147:23–148:12 (Nichols).

### C.    TDCJ's heat mitigation measures mirror national standards and are effective.

68.     The National Institute for Occupational Safety and Health (NIOSH) publishes Criteria for a Recommended Standard: Occupational Exposure to Heat and Hot Environments. Def. Ex. 180. Recommendations in the publication consider "information on heat-related illnesses, risk factors affecting heat-related illness, physiological responses to heat, effects of clothing on heat exchange, and recommendations for control and prevention." Def. Ex. 180 at Tiede Def_517955.

69.     NIOSH defines acclimatization to mean "the physiological changes that occur in response to a succession of days of exposure to environmental heat stress and reduce the strain caused by the heat stress of the environment; and enable a person to work with greater effectiveness and with less chance of heat injury." Def. Ex. 180 at Tiede Def_517971, 518016.

70.     The United States Army also recognizes the importance of acclimatization in reducing the risk of heat illness especially for new recruits who may come from cooler or less humid parts of the county or who are not yet accustomed to the level of physical exertion demanded in military training. See Def. Ex. 160 Clinical Practice Guideline for the Prevention, Diagnosis, and Management of Exertional Heat Illness ("CPG"). As a result, the first few weeks of basic training include a slow and steady increase in level of training and exposure. 4/2/26 Tr. at 188:16–189:8 (DeGroot); Def. Ex. 160 at Tiede Def_517788, 517792.

71.     Acclimatization occurs when the body is exposed to a certain climate over time and physiologically adapts to deal better with the climate. 3/30/26 Tr. at 246:9–16 (Uribe). Acclimatization is associated with reduced risk of heat-related illness and death. Def. Ex. 180 at

Tiede Def_517960–518142, 3/30/26 Tr. at 246:9–247:4 (Uribe), 4/2/26 Tr. at 189:19–190:3 (DeGroot), 4/6/26 Tr. at 58:1–11 (Everitt).

72.    TDCJ mitigation measures include acclimatization both for inmates who will be working in conditions with a heat index of 90°F or greater, inmates just coming into the TDCJ system who will not be housed in a/c, and for those inmates who were acclimated, were removed from exposure to the hot environment for two weeks or more and are returning. Def. Ex. 41 at Tiede Def_367752. Because acclimatization allows for physiological adaptation and reduces an individual's risk of heat-illness and death, it is an effective mitigation measure. Def. Ex. 180 at Tiede Def_518013–15.

### i. Hydration.

73.    Hydration is an important mitigation strategy because the body's ability to dissipate heat decreases with dehydration. 4/2/26 Tr. at 194:5–23 (DeGroot). Specifically, adequate hydration helps ensure someone has enough fluid to sweat efficiently, and drinking cold water can help cool the core. 4/6/26 Tr. at 66:20–67:10 (Everitt), 4/2/26 Tr. at 194:17–195:12 (DeGroot). Fluids do not need to be icy and cold to hydrate. 4/2/26 Tr. at 195:8–12 (DeGroot). Ensuring that water lost in sweat and urine is replaced through hydration reduces the risk of heat-related illness. Def. Ex. 180 at Tiede Def_518060.

74.    NIOSH recommends those working in hot environments have access to cool potable water and be encouraged to drink water regularly and that individual drinking cups should be provided. Def Ex. 180 at Tiede Def_517991–92. The US Military Clinical Practice Guidelines similarly recommend removing barriers to drinking and ensuring cool water access with adequate time to drink. Def. Ex. 160 at Tiede Def_517792.

75.    In alignment with NIOSH and CPG recommendations, TDCJ AD 10.64 mandates drinking water and cups shall always be available to all inmates. Def. Ex. 41 at Tiede Def_367751–52. Inmates can take their cups to the dining hall and recreational areas for drinking water in those areas. 3/31/26 Tr. at 290:22–291:4 (Lumpkin). High water intake shall be encouraged during

periods of extreme heat and depending on an inmate's state of acclimatization to hot weather, liquids containing sodium may also be provided. TDCJ ensures inmates have access to hydration in respite by allowing inmates to bring cups, water, or other hydrating drinks such as electrolyte sports drinks and electrolyte powders. Def. Ex. 41 at Tiede Def_357753. TDCJ further mandates the provision of child water in inmate dorms, housing areas, recreational areas, and during mealtimes when the heat index is above 90°F. Def. Ex. 41 at Tiede Def_367752.

### ii. Respite.

76. NIOSH recommends heat stress be controlled by allowing those exposed to hot temperatures to take breaks in cool areas such as in air conditioning. Def. Ex. 180 at Tiede Def_517991.

77. Every TDCJ prison has multiple respite rooms. For example, Hightower facility utilizes at least six separate parts of the facility as respite rooms open to inmates. 3/31/26 Tr. at 292:3–17 (Lumpkin).

78. Some of the fully air-conditioned prisons have respite rooms available to neighboring prisons to allow outside prisoners to be transported to respite. 3/31/26 Tr. at 293:9–21 (Lumpkin).

79. There are approximately 1,000 respite rooms within TDCJ prisons. 3/31/26 Tr. at 291:11–15 (Lumpkin).

80. Administrative Directive 10.64 requires that inmates shall be allowed access to respite. TDCJ staff must use good correctional judgment when accommodating requests as 3/31/26 Tr. at 279:3–13 (Lumpkin).

81. It is important to note that while access to respite is critical, TDCJ must use good correctional judgment in accommodating requests. Def. Ex. 41 at Tiede Def_367753–54. There may be times when security concerns prevent access to respite. 3/31/26 Tr. at 280:2–9 (Lumpkin).

14

### iii.  Cool Showers.

82.    The fastest way to cool someone is by utilizing cold water. 4/2/26 Tr. at 213:15–16 (DeGroot), 4/6/26 Tr. at 61:14–22 (Everitt).

83.    Cool showers are highly effective at dissipating excess heat. 4/6/26 Tr. at 67:15–23 (Everitt).

84.    TDCJ provides cool showers when the heat index is above 90°F. At least one shower will have a reduced water temperature, and inmates can request and should be granted additional showers. Def. Ex. 41 at Tiede Def_367754.

### iv.  Fans and cooling towels.

85.    Fans can be an effective tool for increasing evaporation of sweat which results in cooling. 4/2/26 Tr. at 196:13–22 (DeGroot), 4/6/26 Tr. at 52:7–8 (Everitt).

86.    Fans can be less effective at cooling in high humidity which is why having a multifactorial heat mitigation program such as the one implemented by TDCJ is so important. 4/2/26 Tr. at 204:13–205:23 (DeGroot).

87.    Administrative Directive 10.64 follows recommendations laid out by NIOSH and CPG. When heat index is above 90°F, all inmates, regardless of custody level, can have a fan. If an inmate cannot afford a fan, a fan will be provided through the indigent fan program. 3/31/26 Tr. at 282:4–6 (Lumpkin), Def. Ex. 41 at Tiede Def_367754.

88.    TDCJ uses several types of fans inside of their prison units, including personal fans for use in cell or dorm rooms, fans suspended above a dayroom or work area, barrel fans, "Big A" fans, and swamp fans which are also called Cool Breeze fans because they can provide a cool mist. 3/31/26 Tr. at 288:18–289:14 (Lumpkin).

89.    Until a few years ago, one of the plaintiff organizations in this case, Texas CURE, donated fans to TDCJ to freely give to inmates. 3/31/26 Tr. at 281:17–25 (Lumpkin).

90.    Inmates are permitted to have two fans per inmate in their cell. 3/31/26 Tr. at 282:1–3 (Lumpkin).

15

91.    In all thirty-six summers for which Bobby Lumpkin has worked for TDCJ, he has never seen an inmate turn in their personal fan during the summer. 3/31/26 Tr. at 345:13–17 (Lumpkin).

### v.    Clothing changes and commissary items.

92.    Changes to clothing to maximize skin exposure increase cooling. 4/2/26 Tr. at 197:7–23. (DeGroot)

93.    Clothing interferes with heat loss from the skin because skin temperature increases with an increase in clothing. Def. Ex. 180 at Tiede Def_518003. CPG recommends modification of clothing worn in order to reduce heat strain. Def. Ex. 160 at Tiede Def_517793.

94.    Administrative Directive 10.64 allows inmates to wear shorts and t-shirts, including in dayrooms and recreational areas when the heat index is above 90°F. Def. Ex. 41 at Tiede Def_367754.

95.    Administrative Directive 10.64 requires that inmates "shall be allowed to purchase the following commissary items without affecting their spending limit: cooling towels, cool shirts, gym shorts, shower shoes, bottled water, electrolyte sports drinks, electrolyte powder, fans and sunblock." 3/31/26 Tr. at 281:1–8 (Lumpkin), Def. Ex. 41 at Tiede Def_367754.

96.    Many of the items that Administrative Directive 10.64 permits an inmate to purchase without any effect on their spending limits are given out for free, including Gatorade and fans. 3/31/26 Tr. at 281:9–22 (Lumpkin).

### vi.    Work and recreation modifications.

97.    The CPG dictates the timing and frequency of outside training and activities to be modified to limit exposure to heat. This includes scheduling training to begin in the early morning hours. Additionally, work-rest ratios should be used allowing those who physically exert frequent breaks in the shade and access to rehydration. The level of exertion and rate of work should also be decreased. Def. Ex. 160 at Tiede Def_517792, 4/2/26 Tr. at 187:25–188:15 (DeGroot).

16

98.    NIOSH provides similar suggestions including scheduling hot jobs for cooler parts of the day such as early morning or late evening, alter work/rest schedules to allow more rest time, provide cool areas such as air conditioning or shade for rest and increase worker's water intake. Def. Ex. 180 at Tiede Def_518057.

99.    AD 10.64 mirrors the guidelines in the CPG and NIOSH. Specifically, TDCJ will reschedule work and recreational time to occur at cooler times of the day, and inmates are encouraged to take frequent breaks. Def. Ex 41.

100.    Additional measures falling under the prison warden's purview, pursuant to Administrative Directive 10.64, are to instruct the kitchen to serve sack meals versus hot meals when the kitchen and dish rooms are warmer. 3/31/26 Tr. at 284:14–21 (Lumpkin).

### vii.    Education

101.    Education plays an important role in heat mitigation because understanding the importance of adequate hydration, recognizing early signs and symptoms of heat illness, and early intervention steps can allow cooling of the body before harm occurs. 4/2/26 Tr. at 199:4–16 (DeGroot).

102.    NIOSH recommends that a heat stress training program should be in place for all who work in hot environments and their supervisors. The training should include prevention and first air of heat-related illnesses. Def. Ex. 180 at Tiede Def_518060.

103.    CPG recommends posting heat casualty prevention information where it is easily accessible such as posting hydration assessment posters near latrines as well as training all services members on recognition and initial field treatment of heat illness. Def. Ex. 160 at Tiede Def_517791.

104.    Administrative Directive 10.64 requires units to place posters in housing areas reminding inmates of heat precautions and the importance of water intake. Def. Ex. 66 at Tiede Def_68001. If a poster is damaged or destroyed it must be replaced. Def. Ex. 41 at Tiede

17

Def_367754. One of the posters required is a hydration poster educating inmates on how they can self-evaluate their hydration based on urine color. Def. Ex. 66 at Tiede Def_68002.

105.    All inmates are provided with training regarding excessive or extreme temperature conditions through the Peer Education Program both upon intake and upon transfer to their unit of assignment. Def. Ex. 41 at Tiede Def_367762. A training video regarding excessive or extreme temperature conditions is played regularly in dayrooms and common areas and is available anytime on inmate tablets. Def. Ex. 41 at Tiede Def_367763. Additionally, inmates are given a flyer and provided with information on unit-specific mitigation measures whenever they arrive at a new unit. Def. Ex. 41 at Tiede Def_367763.

106.    TDCJ staff receive yearly training on heat preparedness and prevention measures including the mitigation measures outlined in Administrative Directive 10.64. Def. Ex. 41 at Tiede Def_367761–62.

107.    All TDCJ staff are provided with and carry a heat pocket card which outlines heat mitigation measures, symptoms of heat illness, and emergency response steps, and is an important education tool. 4/2/26 Tr. at 206:9–207:4 (DeGroot), Def. Ex. 66 at Tiede Def_67998–99.

### viii.   Heat score.

108.    Identifying those individuals at an increased risk of heat illness is an important mitigation strategy. It is well recognized that certain medical conditions, medications, and biological factors such as increased age can decrease heat tolerance and increase likelihood of heat related illness if the individual is in a hot environment without a way to manage heat. Def. Ex. 180 at Tiede Def_518061–62.

109.    An important mitigation measure is identifying which individuals have low heat tolerance or are at higher risk of heat related illness. Def. Ex. 180 at Tiede Def_518027, 518062; 4/2/26 Tr. at 206:9–207:4 (DeGroot).

110.    TDCJ medical partners evaluate every new inmate to screen for heat vulnerabilities. Administrative Directive 10.64(B)(6), Def. Ex. 41 at Tiede Def_367752.

18

### ix. Response.

111.    While Plaintiff's expert, Dr. Vassallo, argued TDCJ could submerse those suffering from heat illness in ice-water, that action is strongly cautioned against by Dr. DeGroot. 3/30/26 Tr. at 130:12–17 (Vassallo), 4/2/26 Tr. at 214:9–215:11 (DeGroot). It is recognized that immersing someone in ice water is an effective way to rapidly reduce core temperature. 4/2/26 Tr. at 214:9–215:11 (DeGroot), 4/6/26 Tr. at 67:10–14 (Everitt). Immersion is so effective at reducing core temperature that someone with an increased core temperature can be easily overcooled and end up hyperthermic very quickly which is why whole-body immersion cannot be done without continuous core temperature monitoring. 4/2/26 Tr. at 214:13–215:11 (DeGroot).

112.    All medical experts except for Dr. Vassallo agreed that CPR takes priority over obtaining a core body temperature. 3/30/26 Tr. at 244:23–245:13 (Uribe), 4/2/26 Tr. at 217:10–25, 219:1–5 (DeGroot); 4/6/26 Tr. at 63:15–64:10 (Everitt).

113.    Core body temperature should only be taken by a trained medical professional. 4/2/26 at Tr. 218:1–12; 219:25–220:1 (DeGroot); 4/6/26 Tr. at 64:11–16 (Everitt).

### x. Overall.

114.    TDCJ Administrative Directive 10.64 is the policy addressing extreme heat inside of TDCJ's facilities. 3/31/26 Tr. at 269:24–270:7 (Lumpkin).

115.    Administrative Directive 10.64 has mandatory actions to be taken in every TDCJ prison unit when the heat index is above 90°F, including: (1) providing additional chilled water in inmate dorms, housing areas, recreational areas, and during meal times; (2) transport inmates during the coolest hours of the day when possible; (3) allow inmates to use cool towels; (4) allow inmates to wear shorts and t-shirts in dayrooms and recreational areas; (5) prioritize work orders and ensure maintenance for air conditioning units, HVAC systems, fans, blowers, and showers in inmates housing areas; (6) allow additional showers for inmates when possible; (7) fan usage; and, (8) reducing kitchen and dish room operations as needed when the temperature in those areas may be warm. 3/31/26 Tr. at 282:7–284:21 (Lumpkin), Def. Ex. 41.

19

116.    Administrative Directive 10.64 is a comprehensive program that includes several effective heat mitigation measures and is in line with NIOSH and CPG recommendations. 4/2/26 Tr. at 201:3–11, 209:10–17 (DeGroot), 4/6/26 Tr. at 59:15–25 (Everitt).

117.    Even if an individual is at higher risk for heat illness, mitigation measures can be effective at preventing heat illness. Specifically, Administrative Directive 10.64 is a multifactorial plan, and the combination of multiple mitigation measures add up to reducing the risk of heat illness. 4/6/26 Tr. at 61:4–13 (Everitt).

**D.    TDCJ's heat mitigation practices set the standard for North Carolina.**

118.    Todd Ishee is an expert in the field of prison management and prison practices. 4/6/26 Tr. at 243:20–25 (Ishee).

119.    Ishee was retained by TDCJ to review the heat mitigation practices within TDCJ, and also to share his expertise stemming from his experience installing air conditioning on a system wide basis while he was the head of the North Carolina state prison system. 4/6/26 Tr. at 244:14–18 (Ishee).

120.    Ishee has thirty-six years of experience in correctional systems. 4/6/26 Tr. at 245:7–19 (Ishee). While leading the North Carolina state prison system, Ishee oversaw the planning, funding, and installation of the system's un-airconditioned facilities, comprising approximately 40% of that system's prisons. 4/6/26 Tr. at 246:11–15 (Ishee).

121.    Ishee looked at Texas' heat mitigation efforts, copying many of them for use in the North Carolina state prison system because he considered those mitigation efforts to be best practices. 4/6/26 Tr. at 246:20–249:1, 266:8–17 (Ishee).

122.    Unlike Plaintiffs purported correctional expert witness, Dean Williams, Ishee has been in approximately twenty TDCJ prison units. 4/6/26 Tr. at 256:5–11 (Ishee).

123.    Ishee disagrees with many of Dean Williams' conclusions, including Dean Williams' opinion that TDCJ built prisons without air conditioning to punish staff and inmates. 4/6/26 Tr. at 261:2–262:17 (Ishee).

E.    **TDCJ continues to review and improve heat mitigation policies.**

124.    TDCJ consulted with experts in heat mitigation, including Dr. DeGroot, to learn how its heat mitigation measures could be improved. 4/2/26 Tr. at 224:5–23 (DeGroot).

125.    Some recommendations TDCJ is looking into include the use of ice sheets which Dr. DeGroot explained are an effective way to cool someone quickly. Ice sheets involve dunking regular bed sheets in ice water and then applying them to the bare skin. Scientific literature shows the use of ice sheets results in a 100% survival rate. 4/2/26 Tr. at 213:21–24, 215:17–20 (DeGroot).

126.    TDCJ Administrative Directive 10.64 is the policy addressing extreme heat inside of TDCJ's facilities. 3/31/26 Tr. at 269:24–270:7 (Lumpkin). It was first implemented in 1986. 3/31/26 Tr. at 272:1–5 (Lumpkin). This policy has been updated periodically over the last 35 years and consistently for the past several years, with an annual target completion of April. 3/31/26 Tr. at 270:23–271:8 (Lumpkin).

127.    Director Lumpkin places great importance on Administrative Directive 10.64 because it is the policy that mitigates heat through heat scores, it is the policy that provides transparency and review through auditing, and it ensures that the well-being TDCJ's prisoners and staff. 3/31/26 Tr. at 270:4–14 (Lumpkin).

128.    All TDCJ employees must follow AD 10.64; compliance is not optional. 3/31/26 Tr. at 276:3–9 (Lumpkin). The word "shall" is used more than one hundred times in the language of AD 10.64. 3/31/26 Tr. at 276:10–13 (Lumpkin).

129.    TDCJ does not have, and has never had, a policy of not providing air conditioning to inmates as Plaintiffs claim. 3/31/26 Tr. at 270:18–22 (Lumpkin).

130.    The updates to Administrative Directive 10.64 come from TDCJ's internal subject matter experts, comprised of almost two dozen individuals including executive staff. 3/31/26 Tr. at 271:9–25 (Lumpkin).

131.    Director Lumpkin has contributed to several of the changes in 10.64 over the years, including creation of the black reusable tumbler cup which all inmates use to drink ice water, and

facilitating the movement of fans, ice, and water into the prison units. 3/31/26 Tr. at 272:9–25 (Lumpkin).

**F.    TDCJ measures, records, and reports to the Legislature indoor temperatures taken daily at each unit having unairconditioned housing.**

132.    In accordance with Article V, Texas Department of Criminal Justice Rider 56 of the Fiscal Year (FY) 2024–2025 General Appropriations Act as passed by the 88th Texas Legislature, TDCJ measures, records, and reports to the Legislature the indoor temperature for the months April through September. 3/31/26 Tr. at 276:23–277:4 (Lumpkin); Def. Exs. 72, 100, 136, 214. Specifically, TDCJ measures the temperature inside a cell or another inmate housing that is not air conditioned at 3:00 p.m. daily. Def. Exs. 72, 100, 136, and 214.

133.    Between April 1st and September 30th of each year, indoor prison unit temperatures are taken at least two different ways: first, in an unairconditioned portion of the unit's housing area, specifically in a cell or dorm area, a handheld infrared digital temperature reader is used to take the indoor temperature; second, temperatures are taken in airconditioned areas of units with automatic Kestrel meters. 3/31/26 Tr. at 276:22–277:6. (Lumpkin).

134.    As reflected in the 2025 Rider 55 Report to the Legislature, the hottest temperature inside any TDCJ facility was one hundred degrees, as recorded at the Garza West prison. 3/31/26 Tr. at 286:20–287:15 (Lumpkin), Def. Ex. 214. Collier trusts the accuracy of the indoor temperature logs. 3/31/26 Tr. at 110:25–111:8 (Collier).

**G.    During the summer months, TDCJ announces over the radio at each unit the outdoor heat index.**

135.    Administrative Directive 10.64 requires that TDCJ Units shall monitor and announce over the radio the outdoor temperature and heat and humidity index, or wind chill, and risk category once every hour between 12:30 a.m. and 11:30 p.m. Def. Ex. 41 at Tiede Def_367749. The "heat index" is a measure how hot it actually feels when the relative humidity is added to the actual air temperature. 3/31/26 Tr. at 346:8–13 (Lumpkin), Def. Ex. 41 at Tiede Def_367749. Administrative Directive 10.64 also requires that TDCJ automate the recording of the outside

22

temperature, humidity, and heat index every hour using data collected. Def. Ex. 41 at Tiede Def_367750.

136.    After TDCJ discovered the incident with inaccurate outdoor temperature logs from the Stiles Unit at the preliminary injunction hearing, this issue was investigated and TDCJ immediately began revising its process to significantly improve and automate the method by which TDCJ collects and records outdoor temperature logs. 3/31/26 Tr. at 110:25–111:8, 147:20–148:9 (Collier).

137.    The issue with the falsified outdoor temperature logs was referred to the independent auditor to investigate. 4/6/26 Tr. at 136:8–137:4 (Nichols). TBCJ's Chairman, Nichols, made sure that the right set of eyes were on the investigation. 4/6/26 Tr. at 136:8–137:4 (Nichols).

138.    The result of the investigation was that there was evidence that temperature logs at that unit on limited basis had been falsified and appropriate corrective action would be necessary. The Chairman made sure that proper corrective action had been taken. 4/6/26 Tr. at 136:22–137:4 (Nichols).

139.    The individual having responsibility for this area is no longer with the agency and the individuals who were involved in the activity of creating the logs were counseled about their conduct. 4/6/26 Tr. at 190:15–191:16 (Nichols).

140.    TDCJ also began implementing new technology to address the issue with the outdoor temperature logs to automate the process thereby removing any human error that could happen. 4/9/26 Tr. at 236:12–239:3 (Hudson).

141.    First, TDCJ's IT department, along with other team members, put together a program called environmental monitoring hosted on a SharePoint site that would pull weather data from NOAA for prison locations across the State and automatically update the system. 4/9/26 Tr. at 236:12–239:3 (Hudson). Under Rule 201 of the Federal Rules of Evidence, the Court took judicial notices that the NOAA's National Weather Service is a source whose accuracy cannot be reasonably questioned. ECF No. 202 at 12 n.65.

142.    After going live with that program, TDCJ quickly learned that this program was not sufficient as it had missing data and the information was coming from locations miles away from many of the prison units in rural areas. 4/9/26 Tr. at 236:12–239:3 (Hudson).

143.    Accordingly, TDCJ continued using manual outdoor temperature logging in conjunction with the program while looking for a better solution. 4/9/26 Tr. at 237:3–237:11 (Hudson).

144.    After conducting additional research into a more reliable automated solution, TDCJ identified and settled on a third-party system called Room Alert which TDCJ is currently piloting. 4/9/26 Tr. at 237:12–238:14 (Hudson). The Room Alert system automatically records outdoor temperatures onsite at each unit. 3/31/26 Tr. at 237:20–238:14 (Lumpkin).

145.    The Room Alert system is set up on a pole outside the Warden's office and has two sensors. 4/9/26 Tr. at 237:22–238:6 (Hudson). There is a primary sensor and secondary sensor set up on the pole to sense the outside temperatures, humidity, and heat index at the unit. 4/9/26 Tr. at 238:1–238:6 (Hudson).

146.    The Room Alert system automatically creates ongoing reports of these readings. 03/31/26 Tr. at 278:20–24 (Lumpkin), 4/9/26 Tr. at 236:12–239:3 (Hudson).

147.    Outdoor temperatures are logged in two different ways. First, manual logs are still generated and maintained. 3/31/26 Tr. at 278:12–279:2 (Lumpkin). Second, Room Alert logs the temperature automatically, and that information is uploaded and cannot be tampered with by anyone, thereby eliminating the risk of human error. 3/31/26 Tr. at 278:12–279:2 (Lumpkin).

148.    In addition, the Room Alert system also has an alert function to provide progressive alerts to over 600 individuals at TDCJ on their phones when the temperature at a unit reaches a 91-, 103- and 120-degree heat index. 4/9/26 Tr. at 236:12–239:3 (Hudson).

149.    TDCJ is still utilizing the manual system to make sure both systems are running concurrently at the same time until the Room Alert system is fully operational and determined accurate. 4/9/26 Tr. at 236:12–239:3 (Hudson).

150.     As long as the manual logs continue being utilized, the heat strike team continues to review those logs for accuracy when it performs an audit at a unit. 4/9/26 Tr. at 236:12–239:3 (Hudson).

151.     Additionally, TDCJ continues to utilize proven mitigation measures including using good correctional judgment in order to get as many inmates into respite as possible, using the heat score process at intake for inmates who are entering from or returning to TDCJ from the free world, and adjusting the work schedules so inmates are working earlier in the day when it is cooler. 3/31/26 Tr. at 273:11–274:19 (Lumpkin).

**H.     Executive Directors Collier and Lumpkin amplified TDCJ's heat mitigation by inaugurating heat strike team audits.**

152.     TDCJ has taken measures to ensure that the heat mitigation practices and policies set forth in Advance Directive 10.64 are consistently implemented. 3/31/26 Tr. at 185:2–5 (Collier). These include assigning a risk management office at each facility to check that 10.64 protocols daily and creating a heat strike team to go and do random audits of TDCJ facilities to verify the protocols are being followed. 3/31/26 Tr. at 185:6–25 (Collier).

153.     Before April 15 each year, the Administrative Review and Risk Management Division (ARRM) ensures all of the onboarding and training on the seasonal preparedness checklist occurred. 4/2/26 Tr. at 58:3–8 (Echessa), Def. Ex. 69. While the heat strike team is most active in the summer months, it also identifies units flagged for deficiencies such as non-operational fans, incomplete staff training, or restricted access to respite areas to ensure these are remedied before April 15 each year. 4/2/26 Tr. at 57:15–58:8 (Echessa).

154.     Outside of the heat strike team, ARRM also oversees the unit risk managers who compile the heat illness and injury reports documented by medical providers. 4/2/26 Tr. at 81:3–82:17 (Echessa). During the summer season, the unit risk managers on each unit complete the seasonal preparedness checklist once a week and the results are reported to the central office of risk management. 4/2/26 Tr. at 59:7–14 (Echessa).

155.    TDCJ's "heat strike team" is comprised of staff in the ARRM tasked with looking at all unit operations, specifically when it comes to heat mitigation, and the thirteen checklist items to ensure that TDCJ's facilities are compliant with Administrative Directive 10.64. 3/31/26 Tr. at 294:6–12 (Lumpkin). The role of the heat strike team is outlined in Section V of the TDCJ Administrative Directive 10.64 (AD 10.64). 4/2/26 Tr. at 56:17–57:6 (Echessa), Def. Ex. 41. Units are audited each summer regardless of the temperature that day. 4/2/26 Tr. at 167:3–12 (Echessa).

156.    The purpose of TDCJ's heat strike team is to ensure that TDCJ is fully complying with the heat mitigation requirements within Administrative Directive 10.64, and to provide transparency when corrective measures need to be taken to remedy any failure to comply. 3/31/26 Tr. at 294:13–18 (Lumpkin).

157.    Collier appointed Echessa, who has been with TDCJ for thirty-four years and currently serves as Deputy Director in ARRM, to lead the heat strike team. 3/31/26 Tr. at 185:22–186:14 (Collier), 4/2/26 Tr. at 45:6–12 (Echessa). Collier instructed Echessa to verify that TDCJ was doing what it says we do and hold TDCJ accountable. 3/31/26 Tr. at 185:22–186:14 (Collier).

158.    Heat strike team audits are carried out without any prior forewarning to the prison unity about to be inspected. 3/31/26 Tr. at 294:25–295:15 (Lumpkin). In order to pass a heat strike inspection, a prison unit must score 100% on all thirteen items on the checklist mandated by Administrative Directive 10.64. 3/31/26 Tr. at 295:19–24 (Lumpkin).

159.    The heat strike team is made up of supervisors from ARRM that perform unannounced audits at units using a checklist to verify and enforce compliance with the heat mitigation efforts the agency has put in place. 4/2/26 Tr. at 49:23–50:8 (Echessa). Three members from the heat strike team attend each unit's audit. 4/2/26 Tr. at 60:21–25 (Echessa). There is one leader for each audit who is responsible for gathering all the information collected by each member and inputting it into a report that is ultimately provided to the Executive Director and CID leadership. 4/2/26 Tr. at 61:1–8 (Echessa).

160.    The heat strike team visits the warden's office to let them know they are there for an audit before going to the risk manager's office to verify all of the training documents and seasonal preparedness checklists have been completed. 4/2/26 Tr. at 62:20–63:14 (Echessa).

161.    The heat strike team verifies that the units have the necessary signage on the walls and in high traffic areas. 4/2/26 Tr. at 61:21–62:6 (Echessa). Def. Ex. 66.

162.    The heat strike team checks for availability of respite areas, ensures every employee has their heat information cards, and verifies the commissary inventory of heat-related items like t-shirts, shorts, electrolytes, and bottled water. 4/2/26 Tr. at 63:17–25 (Echessa).

163.    The number of respite areas varies based on the size and age of the unit. 4/2/26 Tr. at 78:6–11 (Echessa).

164.    Some of the units even use the administration buildings as respite areas for inmates to access air conditioning for parts of the day. 4/2/26 Tr. at 79:6–8 (Echessa).

165.    At food service, the heat strike team ensures there are enough fans circulating air, ensures that the water is chilled, verifies that the ice machines are operational with enough ice, and checks the freezers for the designated ice bag storage. 4/2/26 Tr. at 64:5–17 (Echessa).

166.    The property and supply division inventories how much ice each unit maintains—for example, the Bell Unit had 54 bags of ice at the time of their heat strike audit. 4/2/26 Tr. at 64:18–25 (Echessa), Def. Ex. 40.

167.    The heat strike team verifies that the property and supply division is stocked with tumblers, fans, and water coolers, and ensures that if they do not, those items are on order. 4/2/26 Tr. at 65:2–5 (Echessa).

168.    Following the property and supply division, the team goes to maintenance to ensure there are work orders open for any equipment that needs maintenance. 4/2/26 Tr. at 71:3–10 (Echessa).

169.    The heat strike team also ensures that inmates who are working are properly dressed to mitigate heat and have access to respite. 4/2/26 Tr. at 65:16–21 (Echessa).

170.    The team ensures that recreation is being conducted at the coolest time of the day and that ice coolers are available on the recreation yard. 4/2/26 Tr. at 65:21–25 (Echessa).

171.    In the inmate living areas the team meets with staff members to ensure staff have inmate heat scores and those inmates are housed in air conditioning. 4/2/26 Tr. at 66:2–6 (Echessa).

172.    While in the living areas, the team inspects the indoor temperature machines to ensure they are working and have batteries in case the existing batteries' power goes out. 4/2/26 Tr. at 66:6–10 (Echessa).

173.    The team looks at fans in the living areas to ensure they can circulate air and that vents are clean and working. 4/2/26 Tr. at 66:11–14 (Echessa).

174.    The team also speaks with inmates to ask them about access to respite and available water, as well as any other issues with heat. 4/2/26 Tr. at 66:15–20 (Echessa).

175.    The heat strike team spoke to 5,000 inmates during the summer of 2025, with Echessa speaking to over 1,000. 4/2/26 Tr. at 67:3–7 (Echessa).

176.    The team inspects the back gate of the prison to interview the back gate officer to find out are they checking what time the vehicles come, whether the buses have cool water for the inmates to drink, whether they have paper towels for inmates to use. 4/2/26 Tr. at 67:16–25 (Echessa).

177.    The heat strike team audits the intake department, the medical department, and the classifications division to ensure that during intake inmates are screened by medical who determine whether the inmates have heat scores and then ensure those inmates are placed in air-conditioned housing by classifications. 4/2/26 Tr. at 68:1–16 (Echessa).

178.    After completing the audit, the heat strike team meets with the warden to debrief and ensure any changes that need to be made are remediated. 4/2/26 Tr. at 70:10–25 (Echessa). Some of the deficiencies can be remedied while the audit team is on site, but it does not change the score, and a Warden is not allowed to change the score of the audit. 4/2/26 Tr. at 71:17–18, 72:7–16 (Echessa).

179.    If, after a heat strike inspection, a prison unit does not pass then they are later revisited by the heat strike team for another inspection on a date unknown to the prison unit. 3/31/26 Tr. at 307:6–24 (Lumpkin). If in the initial audit a unit was missing something or was deficient in some area, that is the first thing to be reviewed to ensure it was remedied upon the second audit. 4/2/26 Tr. at 72:3–6 (Echessa).

180.    The scores from heat strike audits are also compiled and provided to the Executive Director, Chief Financial Officer, Chief Programs Officer, Chief Operations Officer, Director of Correctional Institutions Division, Correctional Institutions Divisions deputy directors, Facilities Directors, and Facilities deputies. 4/2/26 Tr. at 71:19–24 (Echessa). Executive Director Bobby Lumpkin personally contacts any failing unit's warden to ensure compliance is thereafter immediately achieved. 3/31/26 Tr. at 302:7–23 (Lumpkin).

181.    Hudson testified that when the heat strike team identifies an issue with the facilities, such as an issue with cold showers or fans, the facilities department would promptly resolve the issue, and Hudson would often drive to the facility to put eyes on the issue because he knew the Executive Director would be requesting an update. 4/9/26 Tr. at 234:21–236:11 (Hudson).

182.    The heat strike team has evolved since it was first created under the Office of Emergency Management in 2023 when the audits were initially based on the number of grievances and periods of high recorded heat. 4/2/26 Tr. at 50:9–21 (Echessa), Def. Ex. 30. From 2023 to 2024, the heat strike team grew from around four members to twenty-five members. 4/2/26 Tr. at 53:15–18 (Echessa). From 2024 to 2025, the heat strike team grew to fifty-eight members. 4/2/26 Tr. at 54:13–15 (Echessa), Def. Ex. 146.

183.    Due to this growth, the heat strike team was able to audit every unit—some twice or even three times—making the total number of audits 191 during the summer of 2025. 4/2/26 Tr. at 50:22–23, 51:19–52:2, 54:13–15 (Echessa). The heat strike team conducted 191 visits during the summer 2025, meaning that the teams were at each unit 2–3 times. 4/2/26 Tr. at 157:3–11 (Echessa). Additionally, the unit risk managers conduct the seasonal preparedness checklist that is reviewed by the central office weekly. 4/2/26 Tr. at 157:3–11 (Echessa). Out of 191 reports

29

completed in 2025, one report appears to have duplicative language from another report that Echessa did not previously know about. 4/2/26 Tr. at 166:15–167:24 (Echessa).

184.    In 2025, more than 90% of TDCJ's prison units passed their heat strike inspection on the first inspection; only fourteen out of more than one hundred units did not pass their first inspection. 3/31/26 Tr. at 309:3–9 (Lumpkin). In 2025, fourteen units were identified by the heat strike teams as not passing the audit. 4/2/26 Tr. at 79:9–14 (Echessa). Units that failed the heat strike team visits are required to submit a corrective action plan to the CID Leadership explaining how they have remedied their deficiencies. 4/2/26 Tr. at 85:3–18 (Echessa).

185.    The heat strike team increased to sixty-six members in 2026. 4/2/26 Tr. at 60:5–11 (Echessa). With this increased staff, TDJC started training earlier this year, and intends to complete more audits this summer than previous years and began auditing units before April 15. 4/2/26 Tr. at 59:19–25; 88:4–16, 20–23 (Echessa). In fact, by April 2, 2026, eight heat strike audits had already been completed. 4/2/26 Tr. at 59:19–25 (Echessa).

186.    Echessa believes that short staffing is not prohibitive of accomplishing heat mitigation measures because several units that are not fully staffed have passed the heat strike team audit on their first visit including the Ferguson, Gib Lewis, and Clements Units. 4/2/26 Tr. at 85:19–86:24 (Echessa).

187.    Echessa sees successful units utilize scheduling, planning ahead of the summer season, and strategizing to make sure they have inventory and supplies ordered to have extra in case things break down. 4/2/26 Tr. at 87:14–24 (Echessa).

188.    Echessa admits there are issues but believes that finding deficiencies and addressing them, not hiding them, is the purpose of the heat strike team. 4/2/26 Tr. at 155:20–156:4 (Echessa).

189.    Echessa believes the agency's response in combatting heat has created a new culture, and the best way to ensure that culture spreads is by communication—and example of which is the agency's commitment to combatting heat is the heat strike team where the teams go to a particular unit and observe processes on some units that worked well and share those processes with units that are struggling with those processes. 4/2/26 Tr. at 49:3–22 (Echessa).

### III. The Heat Score System identifies those individuals most at risk for heat illness and injury and prioritizes their placement into air-conditioned housing.

#### A. Classification.

190.    Tim Fitzpatrick is the Director of Classifications and Records Department, which is responsible for receiving documentation from all 254 counties in the state to schedule and admit all new individuals who have been sentenced to the custody of the TDCJ. 4/2/26 Tr. at 256:23–25, 257:4–9 (Fitzpatrick).

191.    The Classifications Department conducts the physical intake processing at all of the intake sites around the agency, calculates the inmate's time to ensure the intent of the court when they were sentenced is properly entered into the system, review and place detainers and warrants, and ultimately conduct all releasing operations. 4/2/26 Tr. at 257:10–17 (Fitzpatrick).

192.    The Classifications Department also process all transfers between the facilities around the agency and oversees all unit-based classification staff who are responsible every day for conducting classifications decisions at every one of the 104 units. 4/2/26 Tr. at 257:17–21 (Fitzpatrick).

193.    In making a housing assignment, classification is a robust, complex system that takes into account correctional professionals' discretion, medical input, and a vast array of other things, including charges, sentences, institutional adjustment, and other factors—ultimately, at a high level, security needs, medical needs, treatment and rehabilitative needs. 4/2/26 Tr. at 258:8–16 (Fitzpatrick).

194.    Intake is a 30-day process from start to finish including the first day getting photographs, haircuts and shaves, identification card issuance, fingerprinting and iris scans, testing phase including IQ testing, adverse childhood testing, and drug screenings, orientation phase including videos, pamphlets, tablet issuance, followed by a full sociological screening before the individuals go to medical and mental health staff for assessment. 4/2/26 Tr. at 259:19–261:22 (Fitzpatrick).

31

195.    Classification custody is decided on by a three-person panel known as the Unit Classifications Committee. 4/2/26 Tr. at 262:17–20 (Fitzpatrick).

196.    The chairperson of the committee is a major, assistant warden, or warden, then there is a classification representative, usually the chief of classification, and the third voting representative is someone from a different division, potentially a chaplain, a case manager, or reentry case manager. 4/2/26 Tr. at 265:12–21 (Fitzpatrick).

197.    Individual custody can be based on a criminal charge, institutional adjustment, gang affiliations, or conduct inside of a county jail or within TDCJ institutions once they arrive. 4/2/26 Tr. at 262:13–17 (Fitzpatrick).

198.    On the first day of intake, inmates are immediately seen by nursing staff after being searched by security. 4/2/26 Tr. at 262:24–263:3 (Fitzpatrick).

199.    The medical staff ask the inmates a series of questions to make an intake assessment, review the Texas Uniform Health Summary Update that every county provides upon the physical admission of individuals into TDCJ's custody including certain medications and diagnoses. 4/2/26 Tr. at 263:3–16 (Fitzpatrick).

200.    Medical staff then input that information from the assessment into the electronic health record which is pulled into an algorithm that generates a preliminary heat score and other certain factors that Classification might need to know about such as a wheelchair restriction. 4/2/26 Tr. at 263:25–264:8 (Fitzpatrick).

201.    Inmates are assessed for medical and mental impairments by qualified healthcare staff who assign each inmate appropriate restrictions related to physical activity, transportation and work. 4/2/26 Tr. at 264:17–21 (Fitzpatrick).

202.    Those restrictions are assigned and entered into the restrictions module in the electronic health record which is automatically transmitted to the TDCJ computerized system health summary for classifications screen ("HSIN"). 4/2/26 Tr. at 264:21–24 (Fitzpatrick).

203.    Once an inmate is identified as heat sensitive, healthcare staff shall notify unit count room staff and update the inmate's HSIN accordingly. 4/2/26 Tr. at 265:2–5 (Fitzpatrick).

204.    University medical partners' healthcare staff and TDCJ classification staff have an interactive relationship, but TDCJ does not manage the inmate's electronic health record. 4/2/26 Tr. at 265:6–8, 267:2–7 (Fitzpatrick).

205.    TDCJ partners with the Universities who oversee all inmate care within TDCJ facilities: the University of Texas Medical Branch that services about 80% of TDCJ facilities, and Texas Tech University Health Sciences Center, which services about 20% of TDCJ facilities in the northwestern part of the state. 4/2/26 Tr. at 267:12–18 (Fitzpatrick).

206.    The assignment to cool bed housing is explained in TDCJ's AD 10.14. 4/2/26 Tr. at 267:19–21 (Fitzpatrick).

207.    The algorithm captures information from the electronic health record and inputs it into TDCJ's HSIN screens and other screens within TDCJ's inmate management system where the operators, including Classification Department staff, specifically, can see the information that is actionable. 4/2/26 Tr. at 268:8–14 (Fitzpatrick).

208.    Classification staff cannot see someone's specific diagnosis, as that would be inside their electronic health record, but they can see the actionable outcomes, such as whether an individual is heat sensitive. 4/2/26 Tr. at 268:8–22 (Fitzpatrick).

209.    There are two different types of heat scores—a preliminary one that is given during the initial intake phase and the final score which is commonly referred to as the "at hand" heat score. 4/2/26 Tr. at 269:13–16 (Fitzpatrick); Def. Exs. 203, 206.

210.    Inmates who receive an initial heat score at the intake facility are placed into cool bed pending the outcome of an at-hand score assessment and issuance of the at-hand score which can take place on about day three or four of the intake process. 4/2/26 Tr. at 270:23–271:6 (Fitzpatrick).

211.    For any inmates that have previously been in TDCJ custody and are returning, Classification Department receives that prior score and distributes it to the intake facilities, so they already know ahead of time that the returning individual has a heat score. 4/2/26 Tr. at 271:18–272:6 (Fitzpatrick).

212.    Even though TDCJ describes the score issued by the At Hand Score as final, it is not permanent, it can change based on any change to their age, medication, or health status and it is tracked daily. 4/2/26 Tr. at 273:18–274:3 (Fitzpatrick).

213.    TDCJ's At Hand Heat Score system was last updated on February 2, 2026. 4/2/26 Tr. at 272:15–20 (Fitzpatrick), Def. Ex. 206.

214.    Classification is unable to access the algorithm to add or remove conditions on the algorithm because it is managed by UTMB. 4/2/26 Tr. at 274:9–16 (Fitzpatrick).

215.    Two major changes have been made to the algorithm in the last two years including in April 2025 when it was updated to include any individual 65 years of age or older as a standalone condition, and again in February 2026 when it was updated to include highly active anticholinergic medications as a standalone medication. 4/2/26 Tr. at 274:17–275:8 (Fitzpatrick).

216.    An inmate's score is communicated to TDCJ in a few different ways including in the inmate management system, MicroFocus, on different screens that classification and security staff can access, as well as the heat sensitivity list that is passed out to correctional staff working in each living area that includes a column that states an inmate's heat score. 4/2/26 Tr. at 275:13–276:2 (Fitzpatrick).

217.    This information is accessed thousands of times a day, daily, across the agency. 4/2/26 Tr. at 276:13–16 (Fitzpatrick).

218.    An ACHRI (AC High Risk) code is a Classifications code created for the process in place where a unit-level provider can evaluate a patient and recommend an ACHRI code be placed to be housed in air-conditioned housing if that inmate does not have a heat score via the algorithm. 4/2/26 Tr. at 277: 12–21 (Fitzpatrick).

219.    The code was developed to give discretionary options to the medical providers to place an inmate in air-conditioned housing for the entirety of their incarceration. 4/2/26 Tr. at 277:25–278:6 (Fitzpatrick).

220. The Health Servies Liaison ("HSL") is a group within TDCJ Health Services Division that serves as the liaison between TDCJ and their medical partners. 4/2/26 Tr. at 278:18–25, 279:19–20 (Fitzpatrick).

221. A unit-level provider with a recommendation for the ACHRI code will send that recommendation to the Chief Medical Officer (CMO) of their university who reviews each recommendation from the field. Once approved, the CMO sends that approval to HSL. 4/2/26 Tr. at 279:12–21 (Fitzpatrick).

222. Once HSL has received the approval from the CMOs they forward that to the Classifications Department who place the code. 4/2/26 Tr. at 279:19–21 (Fitzpatrick).

223. HSL does not have any authority to reject a recommendation by the CMO. 4/2/26 Tr. at 279:22–24 (Fitzpatrick).

224. Approximately 275 ACHRI codes have been recommended for inmates to be housed in air-conditioned housing for the entirety of their incarceration. 4/2/26 Tr. at 280:16–18 (Fitzpatrick).

225. TDCJ operates three inpatient psychiatric units where inmates assigned to those units are under treatment by one of TDCJ's medical partners. 4/2/26 Tr. at 280:19–281:5 (Fitzpatrick).

226. Inpatient psychiatric units are fully air-conditioned. 4/2/26 Tr. at 281:10–15 (Fitzpatrick).

227. Inmates are housed at those inpatient psychiatric units upon orders from unit level providers for their transfer and admittance into an inpatient setting and can only be discharged upon medical provider recommendation. 4/2/26 Tr. at 281:8–20 (Fitzpatrick).

228. Anytime housing changes are made for inmates with a heat score they are reported up to the headquarters level. 4/2/26 Tr. at 282: 5–10 (Fitzpatrick).

229. Fitzpatrick receives four reports a day specific to heat scores including the current report, the change report, the opt-out reports, and an internal report every morning about movement and placement. 4/2/26 Tr. at 283:9–19 (Fitzpatrick).

230.    The heat sensitivity score current report is generated daily and disseminated to the same recipients indicating the current inmates with a heat score each day. 4/2/26 Tr. at 283:14–18 (Fitzpatrick), Def. Ex. 204.

231.    There were 15,789 inmates with heat scores who chose to live in air-conditioned housing as of April 1, 2026. 4/2/26 Tr. at 291:5–8 (Fitzpatrick), Def. Ex. 204.

232.    Inmates with a heat score, who have not been identified by medical as being unable to choose this option nor those with an ACHRI code, are allowed to choose not to be housed in air-conditioned housing through the opt-out process. 4/2/26 Tr. at 293:8–20, 294:5–13, 297:23–25 (Fitzpatrick); Def. Ex. 41 at Tiede Def_367766.

233.    There are over 19,000 inmates with heat scores, but over 4,000 inmates have chosen to opt-out of air-conditioned housing. 4/2/26 Tr. at 291:12–15 (Fitzpatrick), Def. Ex. 204.

234.    If an inmate who previously opted out has a change in health condition that triggers their heat score to increase, Classification is alerted through the change report, and that inmate will have the choice to opt in or opt out again, but the old previous opt out does not carry over when a score increases. 4/2/26 Tr. at 295:16–296:16 (Fitzpatrick).

235.    Opt-out forms are tracked on the heat sensitivity score refusal daily tracking sheet, as well as the current score report. 4/2/26 Tr. at 297:3–9 (Fitzpatrick), Def. Ex. 203.

236.    The cool bed opt-out form must be requested by the inmate; it is not given out automatically when an inmate receives a heat score. 3/31/26 Tr. at 333:3–9 (Lumpkin).

237.    Inmates have multiple opportunities to speak with a physician prior to signing a cool bed opt-out form. 3/31/26 Tr. at 333:10–25 (Lumpkin).

238.    The heat sensitivity score change report is generated daily and disseminated to classification, every unit warden and chief of classification as well as others indicating any change to an inmate's score whether it's losing, gaining, or just going up or down in score. 4/2/26 Tr. at 282:14–22 (Fitzpatrick). Def. Ex. 203.

239.    The current report may contain somewhere around 19,000 lines of data that may not all be actionable, whereas the change report could include anywhere from 100 to 200 lines of data that would be actionable changes. 4/2/26 Tr. at 284:12–16 (Fitzpatrick), Def. Ex. 204.

240.    Currently, TDCJ is averaging about 150 changes to the current report each day, meaning potentially 150 moves need to occur. 4/2/26 Tr. at 284:17–22 (Fitzpatrick).

241.    An example of when a change is not actionable is when someone may gain a score, but they are already housed in an air-conditioned cell making them already appropriately housed. 4/2/26 Tr. at 285:18–24 (Fitzpatrick).

242.    Action is first taken by the unit classification group at the unit level, if possible. 4/2/26 Tr. at 287:17–24 (Fitzpatrick). For example, if the individual receiving a heat score resides in a unit that has partial air conditioning, that individual's move from a non-cool bed into a cool bed is coordinated by classification at the same unit. 4/2/26 Tr. at 287:17–24 (Fitzpatrick). While the unit classification is responsible for housing moves within the same facility, the State Classification is responsible for moves between facilities. 4/2/26 Tr. at 287:17–24 (Fitzpatrick). Thus, if the individual receiving a heat score resides in a non-air-conditioned unit, the State Classification Committee gets involved to coordinate the move of that individual to another unit having air conditioning. 4/2/26 Tr. at 287:17–24 (Fitzpatrick).

243.    Before determining a final location if an inmate's change in heat score necessitates a move, Classification considers their medical needs as determined by agency partners, security needs, sentence, custody, any known enemies, and any rehabilitative needs like college or vocation. 4/2/26 Tr. at 288:12–289:6 (Fitzpatrick).

244.    Fitzpatrick verified whether certain inmates who were members of Plaintiff Organizations were already housed in air-conditioned housing. 4/2/26 Tr. at 298:10–21 (Fitzpatrick), Def. Ex. 2.

245.    Fitzpatrick recognized Exhibit 39 as Lioness's membership logs that he used to verify the information in Defendant's Exhibit 2. 4/2/26 Tr. at 301:6–11 (Fitzpatrick), Def. Ex. 39. Of Lioness's alleged 416 incarcerated members, only 329 are still in custody. 4/2/26 Tr. at 300:19–

25 (Fitzpatrick). Only 118 of those 329 Lioness members were housed in un-air-conditioned housing. 4/2/26 Tr. at 301:1–5 (Fitzpatrick), Def. Ex. 5.

246.    Fitzpatrick personally believes TDCJ is prioritizing housing as many inmates in air-conditioned housing as possible through creative solutions like changing the cells within the expansion cell block that are completely air conditioned from single cell to multi-occupancy. 4/2/26 Tr. at 302:18–303:2 (Fitzpatrick).

247.    TDCJ was able to use that same model within their "12-Buildings" and reclassify completely air-conditioned housing from single cell to multioccupancy to increase the number of air-conditioned beds. 4/2/26 Tr. at 303:3–12 (Fitzpatrick).

248.    TDCJ also recently purchased the Dalby Unit which added 1,906 air-conditioned beds to house General Population Level 1, 2 and 4 inmates including some program populations as well. 4/2/26 Tr. at 303:19–304:2 (Fitzpatrick).

## B.    Heat score.

249.    TDCJ hired an outside expert to develop a heat score process to identify vulnerabilities to heat. 3/31/26 Tr. at 143:15–144:17 (Collier).

250.    TDCJ reviews the heat score process every year and there is no restriction on anyone to add or not add categories to the heat score. 3/31/26 Tr. at 144:18–145:6 (Collier).

251.    Both the UTMB and Texas Tech contracts require that the medical professionals at these organizations evaluate the heat score sensitivity system every year to help TDCJ implement programs to protect the health and welfare of the population. 4/6/26 Tr. at 154:18–155:21, 156:3–19; Def. Ex. 75 at Tiede Def_492536; Def. Ex. 78 at Tiede Def_492465.

252.    If one of the medical experts that TDCJ relies upon identifies an area that should be covered by the heat score process, they can certainly add it. 3/31/26 Tr. at 144:18–145:6 (Collier).

253.    Dr. Jane Leonardson is a medical doctor who works for the University of Texas Medical Branch Correctional Managed Care as the Director of Clinical Informatics. 4/7/26 Tr. at 8:16–9:1 (Leonardson), Def. Ex. 265.

254.    Dr. Leonardson is an expert in internal medicine and clinical informatics. 4/7/26 Tr. at 12:7–12 (Leonardson).

255.    Dr. Leonardson attended medical school and completed her residency at Northwestern University before becoming board certified in Internal Medicine in 1991. 4/7/26 Tr. at 9:5–13 (Leonardson). Def. Ex. 265.

256.    Internal medicine is the general version of all the subspecialties, including cardiology, infectious disease, pulmonology, gerontology, and allergies. 4/7/26 Tr. at 9:21–10:4 (Leonardson).

257.    Dr. Leonardson became additionally board certified in Clinical Informatic in 2016. 4/7/26 Tr. at 9:11–13 (Leonardson). Def. Ex. 265.

258.    Clinical informatics in general is the management of medical or health data to ensure it is accurate and available. 4/7/26 Tr. at 10:5–11 (Leonardson).

259.    Dr. Leonardson had received a scholarship from the Illinois Department of Public Health, so she completed her scholarship payback by first practicing at the Cook County Jail for two years treating patients. 4/7/26 Tr. at 12:13–22 (Leonardson).

260.    Dr. Leonardson first began working for UTMB in August 1995. 4/7/26 Tr. at 13:3–4 (Leonardson).

261.    Dr. Leonardson's first role was as a staff physician at the Stiles Unit and Pam Lychner State Jail, then solely the staff physician at Pam Lychner, before becoming the Medical Director. 4/7/26 Tr. at 14:18–22 (Leonardson).

262.    The primary care physicians for UTMB are in the field seeing patients in TDCJ prisons and can consult any specialist at UTMB if they have questions or a patient referral. 4/7/26 Tr. at 13:15–20 (Leonardson).

263.    While working in the units as staff physician and Medical Director, Dr. Leonardson recalls that the units were not air-conditioned—only the medical department. 4/7/26 Tr. at 15:3–9 (Leonardson).

39

264.   Dr. Leonardson served as a district physician which later became known as Regional Physician leader overseeing 25 units, as well as serving on multiple committees. 4/7/26 Tr. at 16:14–22 (Leonardson).

265.   Dr. Leonardson has served on the pharmacy and therapeutics committee, the mortality and morbidity committee, the peer review committee, policy and procedure committee, as well as serving as the chair of an Ad Hoc committee on Hepatitis C. 4/7/26 Tr. at 17:5–10 (Leonardson).

266.   Dr. Leonardson shifted away from patient-facing roles in 2014 when she became the Chief Medical Information Officer. 4/7/26 Tr. at 16:3–11 (Leonardson).

267.   Dr. Leonardson works largely with the electronic health record, while the informaticists in her office do the coding to ensure the electronic health record is accurate, reportable, and is available to the right people. 4/7/26 Tr. at 10:11–15 (Leonardson).

268.   Dr. Leonardson was the Chief Medical Information Officer from 2016 to 2022 where most of her work was being the physician or clinical voice in the design of UTMB's electronic health record. 4/7/26 Tr. at 11:7–10 (Leonardson).

269.   UTMB redesigned their electronic health record to ensure there is no burnout due to the technical designers not knowing what providers need, how they think, or how they look at clinical information. 4/7/26 Tr. at 11:10–16 (Leonardson).

270.   Dr. Leonardson designed the electronic health record for clinical ease and to make clinical entry obvious, so the data is output properly. 4/7/26 Tr. at 11:25–12:6 (Leonardson).

271.   Dr. Leonardson is asked regularly if the heat score is working properly, and she will personally review patients' charts that providers are concerned about to look at the algorithm to ensure it is working properly. 4/7/26 Tr. at 57:14–17 (Leonardson).

272.   The pharmacy and therapeutics committee determines the formulary, which is the list of medication or drugs that are preferred and meet certain data-driven requirements. 4/7/26 Tr. at 17:11–22 (Leonardson).

273.    Doctors of Pharmacy ("PharmDs") make up the bulk of the pharmacy and therapeutics committee and assess whether a new class of drugs that arises needs to be added to the formulary by looking at the latest data showing whether this something that is better supported, whether there a better way to do things, and reporting it to the Clinical Informatics Group. 4/7/26 Tr. at 18:2–10 (Leonardson).

274.    The clinical informatics group manages the front end of the electronic health record meaning what shows up when a provider looks at the computer or what needs to be shown when a provider pulls a report, as well as training on the electronic health record. 4/7/26 Tr. at 19:19–25 (Leonardson).

275.    The programmers manage the back end of the electronic health record. 4/7/26 Tr. at 19:10–18 (Leonardson).

276.    TDCJ Security Staff do not have access to the electronic health record. 4/7/26 Tr. at 23:13–14 (Leonardson).

277.    The heat score was initially created to pull out the actual charting and data of a patient on the back end of the electronic health record to generate a priority list for air-conditioned housing without divulging HIPAA protected information. 4/7/26 Tr. at 23:2–24:9 (Leonardson).

278.    A heat score is generated when a patient is seen by a provider or nurse, charting is entered into the electronic health record, and on the back end, UTMB's algorithm generates a score based on certain condition codes (ICD codes), and this score is translated to TDCJ through their inmate management system. 4/7/26 Tr. at 27:3–19, 32:5–10 (Leonardson).

279.    Very quickly after the heat score was first created, UTMB knew it had drugs on the formulary that needed to be changed because of their heat sensitivity—for example, tricyclic antidepressants were removed from the formulary, meaning they could not be prescribed, because they were anticholinergic and they were replaced with safer antidepressants. 4/7/26 Tr. at 24:20–25:3 (Leonardson).

280.    The intake heat score system was initially tallied up on paper, but that process was automated so that the score could change any time drugs changed at intake. 4/7/26 Tr. at 25:4–16 (Leonardson).

281.    Myasthenia gravis and multiple sclerosis were also added to the heat score conditions list because they are taught to physicians in medical school as conditions affected by heat. 4/7/26 Tr. at 25:16–19 (Leonardson).

282.    In 2025, UTMB added every inmate over the age of 65 and in 2026 all anticholinergic medications were added when patients have been prescribed for four days or more. 4/7/26 Tr. at 25:20–22 (Leonardson).

283.    The intake score has different conditions than the At Hand score because TDCJ's medical partners don't always know how long patients who come from county had been in county, whether they were in withdrawal, and whether they are acclimated. 4/7/26 Tr. at 27:23–28:4 (Leonardson). Def. Ex. 205.

284.    The At Hand score, while sometimes referred to as final, is not final, as it reassesses daily and could change anytime a patient is seen, or their medications change, or they turn 65 or receive a new diagnosis. 4/7/26 Tr. at 29:4–17 (Leonardson). Def. Ex. 206.

285.    The criteria that trigger a heat score is determined through a group effort across the system including physicians from both UTMB and Texas Tech and regular meetings with TDCJ leadership to discuss how to best coordinate getting the right people into existing cool beds. 4/7/26 Tr. at 33:9–15, 33:23–34:3 (Leonardson).

286.    The discussions over medication on the heat score condition list heavily involve Pharmacy —the PharmD group were responsible for defining what was or was not a highly active anticholinergic. 4/7/26 Tr. at 33:9–15 (Leonardson).

287.    TDCJ does not have access to the document developed by the PharmDs that defines what medications are highly active anticholinergics. 4/7/26 Tr. at 55:22–56:5, 60:3–6 (Leonardson).

42

288.    Anticholinergic describes a set of side effects that affect the cholinergic receptor—those drugs are more drying and sedating. 4/7/26 Tr. at 34:7–14 (Leonardson).

289.    Dr. Leonardson is currently working with the pharmacy group to request a review of all of the medications on the formulary for verification that they are collecting everything in the heat score and none of the preferred medications have changed. 4/7/26 Tr. at 33:16–22 (Leonardson).

290.    The utilization review group transmits information like a heat injury that was treated at an outside hospital for reporting to the quality reporting group, who then shares that report with the Health Services Liaison who ensures patients who have previously suffered a heat injury are appropriately housed in air-conditioned housing. This system operates outside of the heat score system. 4/7/26 Tr. at 38:1–14, 39:2–5 (Leonardson).

291.    The medical partners want to identify those inmates who may have suffered a heat illness or injury before because they believe it is safer to house them in a cool area since they have shown they are prone to heat injury. 4/7/26 Tr. at 39:6–10 (Leonardson).

292.    Dr. Leonardson testified it is her and TDCJ's priority to accurately accommodate inmates who are most at risk for heat illness and injury. 4/7/26 Tr. at 39:22–40:5 (Leonardson).

293.    As TDCJ brings more cool beds online, UTMB plans to add diabetics and hypertension as the next groups added to the heat score conditions list. 4/7/26 Tr. at 40:17–24 (Leonardson).

294.    Hypertension diagnoses are encompassed by diabetes and heart disease, as well as 50% of everyone over the age of 50 years old, and almost everyone over 65 years old, so the heat score system is already catching a large percentage of hypertensives even though that diagnosis is not on the heat score. 4/7/26 Tr. at 54: 18–23 (Leonardson).

295.    Dr. Leonardson believes that the purpose of the heat score system is to identify the inmates most at risk for heat injury and illness. 4/7/26 Tr. at 41:1–5 (Leonardson).

**IV. Plaintiffs' expert, Dean Williams, criticisms of TDCJ's practices are uninformed and baseless.**

296.    Williams has testified either three or four times as an expert witness in correctional management for plaintiffs. 3/30/26 Tr. at 66:9–15 (Williams). However, Williams has never testified as an expert witness in correctional management for a defendant in a case like the one at issue, here. 3/30/26 Tr. at 66:16–18 (Williams).

297.    Williams does not have a degree in prison management. [unlike Todd Ishee] 3/30/26 Tr. at 66:21–23 (Williams). Thus, the only basis of Williams' opinions in this case stems from his experience within the prison systems of Alaska and Colorado. 3/30/26 Tr. at 66:24–67:2 (Williams).

298.    The basis of Williams' expert testimony in this case was his work experience, and he has never worked in a prison without air conditioning. 3/30/26 Tr. at 73:19–74:1 (Williams). Williams never had to install air conditioning on a system-wide basis of any prison for which he was the leader. 3/30/26 Tr. at 68:22–69:9 (Williams). That said, Williams believes that TDCJ's cost estimate of $1.3 billion to air condition the entire system is "pretty accurate." 3/30/26 Tr. at 92:3–12 (Williams).

299.    When Williams was the leader of Colorado's Dept. of Corrections, he requested money for a very important heating project related to keeping inmates safe from freezing temperatures, but he did not get the money, nor did he ever again ask the Colorado legislature for the money, because the issue of receiving the money after requesting it was beyond his control. 3/30/26 Tr. at 70:8–71:3 (Williams).

300.    The only TDCJ prison Williams has ever visited was air conditioned, and he has never asked to visit an un-airconditioned TDCJ prison. 3/30/26 Tr. at 72:5–73:3 (Williams). He was invited to visit but did not go to a TDCJ prison in August of 2025. 3/31/26 Tr. at 343:14–344:19 (Lumpkin).

301.    Williams' expert testimony in this case is not based on medical opinions. 3/30/26 Tr. at 75:2–7 (Williams). Williams has never seen TDCJ's heat mitigation measures in

action, measures which include respite rooms, ten-pound blocks of ice, water coolers full of ice water, fans or the indigent fan program. 3/30/26 Tr. at 75:8–76:7 (Williams). Williams does, however, believe TDCJ's mitigation efforts, including respite rooms, cool water, fans, and cold showers would be helpful dealing with the heat. 3/30/26 Tr. at 85:3–86:9 (Williams).

302.    When Williams was the leader of Alaska's Dept. of Corrections, there were approximately only 4,500 inmates and 1,800 employees under his direction. 3/30/26 Tr. at 76:12–17 (Williams).

303.    Despite previously claiming that he "would be requiring body temperatures, skin or core temperatures to be taken as soon as possible" if he were in TDCJ's director, Williams admitted that he would not be asking TDCJ employees to take temperatures if such a task was "beyond their scope" as non-medical personnel. 3/30/26 Tr. at 47:21–24, 87:1–21, 88:8–11 (Williams).

## V. The death records that Plaintiffs rely upon do not show deaths caused by heat.

### A. TDCJ reports heat-related deaths to the Legislature based on the cause of death conclusion noted in autopsy reports prepared by TDCJ's medical partners.

304.    Depending on the legislative session, either Rider 55 or Rider 56 requires action on TDCJ's behalf: (1) that TDCJ record the daily temperature at 3:00 pm, every day, between April 1st and September 30th of each year; (2) that TDCJ report any grievances, injuries, or deaths attributed to the heat. 3/31/26 Tr. at 325:17–326:11 (Lumpkin).

305.    For FY 2022, TDCJ reported zero heat-related deaths for inmates or staff. Def. Ex. 136 at 2. TDCJ reported 11 heat-related illnesses for inmates and 24 heat-related illnesses for staff. Def. Ex. 136 at 2.

306.    For FY 2023, TDCJ reported no deaths caused by heat for inmates or staff but noted three deaths where elevated temperatures were cited in the final autopsies as a possible contributing factor. Def. Ex. 100 at 2. TDCJ reported 17 heat-related illnesses for inmates and 35 heat-related illnesses for staff. Def. Ex. 100 at 2–3.

307.    For FY 2024, TDCJ reported one death determined to be most likely heat-related for inmates and zero heat-related deaths for staff. Def. Ex. 72 at 2. The deceased inmate collapsed

in the recreation yard of the Goree Unit in Huntsville, Texas, while playing soccer. Def. Ex. 72 at 2. Staff responded and began life saving measures. Resuscitative efforts were initiated at 4:47 p.m. but were ultimately unsuccessful and he was pronounced deceased at 5:20 p.m. Def. Ex. 72 at 2. The final autopsy diagnosis stated, "in the absence of toxicants or anatomic findings to explain the death, and with the information from the scene, it is our opinion that this is most likely a heat related death. The manner of death is accident. Mild cardiomegaly is a potential contributory factor." Def. Ex. 72 at 2. TDCJ reported 29 heat-related illnesses for inmates and 26 for staff. Def. Ex. 72 at 2–3.

308.    For FY 2025, TDCJ reported zero heat-related deaths for inmates or staff. Def. Ex. 214 at 2. TDCJ reported six heat-related illnesses for inmates and eleven for staff. Def. Ex. 214 at 2.

309.    The Office of Inspector General, which is an independent entity that reports to TBCJ, investigates every death in the TDCJ system. 3/31/26 Tr. at 124:23–125:5 (Collier).

310.    The results of these investigations are reported through a process administered by the Texas Attorney General and aspects of TDCJ's reporting process with the Legislature. 4/6/26 Tr. at 137:12–19 (Nichols).

311.    TDCJ does not conduct autopsies on deceased inmates; their medical partners perform the autopsies. 3/31/26 Tr. at 346:2–7 (Lumpkin). TDCJ officials are not medical personnel and do not make determinations as to cause of death. 4/6/26 Tr. at 177:22–178:19 (Nichols). Therefore, TDCJ reports heat-related deaths to the legislature based on cause of death identified in the autopsy. 4/6/26 Tr. at 177:22–178:19 (Nichols), 3/31/26 Tr. at 139:6–10 (Collier).

312.    The reports provided to the legislature are based on the best information that TDCJ has from TDCJ's internal processes as well as its medical partners. 4/6/26 Tr. at 213:2–9 (Nichols). TDCJ has no way of knowing that anything that may happen in the future is going to change its analysis of what it is telling the legislature on a particular day. 4/6/26 Tr. at 216:4–15 (Nichols).

313.    TDCJ personnel running the prison system do not have the ability to make the call on a cause of death. 4/6/26 Tr. at 177:22–178:19 (Nichols). TDCJ rightfully assumes the accuracy of the cause of death identified in the autopsy. 4/6/26 Tr. at 177:22–178:19 (Nichols).

314.    TDCJ has no knowledge based on autopsy and death investigations that there is some emergency or rapid situation where numerous individuals are dying because of exposure to indoor heat in housing areas in TDCJ facilities. 4/6/26 Tr. at 178:25–179:21 (Nichols).

315.    Dr. Felicella is Associate Professor of Pathology and the Director of Autopsy Services at the University of Texas Medical Branch ("UTMB"). 4/8/26 Tr. at 37:7–10 (Felicella). Dr. Felicella is board certified in anatomic pathology, clinical pathology, and neuropathology, and is also a medical examiner for Galveston County, Texas. 4/8/26 Tr. at 39:9–11, 39:19–21 (Felicella). Dr. Felicella is an expert in the areas of medical examination and autopsy pathology. 4/8/26 Tr. at 41:22–41:1 (Felicella).

316.    Dr. Felicella refers to and follows guidelines provided by the National Association of Medical Examiners ("NAME"), which sets out standards for determining appropriate cause and manner of death. 4/8/26 Tr. at 43:12–18 (Felicella), Def. Ex. 158.

317.    It is standard practice to indicate if heat played a role in a death in an autopsy report. 4/8/26 Tr. at 52:15–17 (Felicella), Def. Ex. 142.

318.    It is not uncommon for incomplete background information and medical history to be available. 4/8/26 Tr. at 47:11–48:8 (Felicella).

319.    Well-trained and highly experienced medical examiners may disagree and come to completely different conclusions in an autopsy. 4/8/26 Tr. at 46:17–25 (Felicella).

320.    UTMB has three different weekly conferences that include residents and all pathologists as well as a monthly conference with all medical examiners in the department including the Chief Medical Examiner of Galveston County. These conferences are a forum to discuss difficult cases and get others' opinions. 4/8/26 Tr. at 48:9–22 (Felicella).

321.    There is no objective finding on autopsy that is specifically diagnostic of hyperthermia. 3/30/26 Tr. at 243:23–244:1 (Uribe).

47

322.    In determining whether environmental temperature played a role in someone's death, medical examiners look for a core body temperature over 105°F, with the understanding that there are other things that can cause an increase in core body temperature. 4/8/26 Tr. at 61:16–62:6 (Felicella). Core body temperature is the ideal temperature to look at to support heat as a contributing factor, second would be ambient temperature of where the individual was located, an indoor temperature not taken where the individual was located is less helpful, and least helpful is the outdoor temperature unless the person died outside. 4/8/26 Tr. at 67:15–68:3 (Felicella).

323.    The cause and manner of death are the best opinion of the medical examiner based on the information available to them during examination which can include information received before the physical autopsy, information discovered during the physical autopsy, toxicology results, any medical history available, and interviews with witnesses. 3/30/26 Tr. at 242:21–243:9 (Uribe); 4/8/26 Tr. at 45:25–46:10, 46:11–17 (Felicella).

324.    Even after reviewing all available information, it is still possible to have a cause or manner of death be undetermined. 3/30/26 Tr. at 242:5–13 (Uribe), 4/8/26 Tr. at 47:2–10 (Felicella).

325.    In 2023, TDCJ reported three deaths whereby the autopsy report indicated heat was a contributing factor. The three deaths were those of John Castillo, Elizabeth Hagerty, and Patrick Womack. Def. Ex. 100 at Tiede Def_0108152.

326.    Dr. Felicella conducted the autopsies of Castillo and Hagerty and believes heat contributed to their deaths. 4/8/26 Tr. at 52:4–14 (Felicella).

327.    Dr. Felicella believed heat contributed to the death of Hagerty which is why she indicated such on Hagerty's autopsy report. 4/8/26 Tr. at 52:4–14 (Felicella), Pl. Ex. 169-D at Tiede Def_70850.

328.    Felicella similarly believed that heat was a contributory factor to the death of Castillo and indicated such in his autopsy report. Pl. Ex. 161 at Tiede Def_14426.

329.    Dr. Aaronson at UTMB conducted the autopsy of Womack. She noted heat as a possible contributing factor to his death. Pl. Ex. 200 at Tiede Def_17452.

B.     **TDCJ's expert, Dr. De La Cruz, opines how pharmacological factors present in medical records and/or autopsy findings he reviewed are known to cause death in air-conditioned environments independent of external temperature.**

330.     Dr. Austin De La Cruz is a Doctor of Pharmacy (PharmD) having received his degree from Texas Tech University Health Sciences Center in 2014 and has been practicing for twelve years. 4/7/26 Tr. at 156: 22–157:3 (De La Cruz).

331.     Dr. De La Cruz has board certification in psychiatric pharmacy, which encompasses the study of psychiatric-related medications and neurology-related medications. 4/7/26 Tr. at 157:5–7 (De La Cruz). Dr. De La Cruz is an expert in pharmacology and medication safety. 4/7/26 Tr. at 157:17–24 (De La Cruz). Dr. De La Cruz described his experience as the study of psychiatric-related medications and substance abuse disorders, including how to use those medications safely and effectively. 4/7/26 Tr. at 157:9–12 (De La Cruz).

332.     Dr. De La Cruz currently serves as a Clinical Associate Professor at the University of Houston College of Pharmacy, as a faculty member in nurse practitioner program at the University of St. Thomas and Texas Tech University Health Sciences Center, as Clinical Instructor at Baylor College of Medicine, and as a clinical psychiatric pharmacy specialist at the Michael E. DeBakey Veterans' Affairs Medical Center. 4/7/26 Tr. at 158:2–12 (De La Cruz).

333.     As the clinical psychiatric pharmacists at the VA, Dr. De La Cruz's main role is to see patients, assess their mental health-related conditions, either by referral from a prescriber or psychiatrist, when the patient needs to start on a new mental health medication or to optimize the current medication that is on board. 4/7/26 Tr. at 158:13–23 (De La Cruz). Dr. De La Cruz sees similar diagnoses at the VA Hospital as those and the medications he reviewed in this case. 4/7/26 Tr. at 159:2–13 (De La Cruz).

334.     A pharmacologist's main role is to study the medication looking at the point of entry when that medication enters our system until the point of exit when that medication is fully metabolized, including the efficacious, the well-known cause benefits, and the negative toxicology-related consequences. 4/7/26 Tr. at 160:4–9 (De La Cruz).

49

335.    Dr. De La Cruz reviewed the medical records and/or autopsy findings of approximately eleven deceased TDCJ inmates in this case. 4/7/26 Tr. at 185:1–4 (De La Cruz).

336.    Dr. De La Cruz opined that pharmacology is absolutely relevant to understanding what occurred in an overdose, and that mental health medications are the most commonly overdosed substance class after analgesics and common household products. 4/7/26 Tr. at 162:17–163:1 (De La Cruz)

337.    Dr. De La Cruz testified that it is well established in the medical literature that multiple classes of medications can lead to hyperthermia independently, regardless of the external environment. These medications can interrupt vasodilation, inhibit sweating, and cause thermoregulation changes with effects seen more commonly at supra-therapeutic doses but also possible at lower doses with certain agents. 4/7/26 Tr. at 165:3–15 (De La Cruz).

338.    Dr. De La Cruz explained that different medications in the same class are not equivalent; each has its own unique chemical makeup, binds to unique receptors in a unique way, and carries different benefits, adverse effects, and monitoring parameters. Accordingly, medications in the same class that can cause a similar adverse effect cannot be grouped as equivalent. 4/7/26 Tr. at 165:19–166:4 (De La Cruz).

339.    Dr. De La Cruz testified that mechanism of action does not equal inevitability, explaining the fact that a medication has a mechanism capable of affecting thermoregulation does not mean that a heat-related event will necessarily occur in any given patient. 4/7/26 Tr. at 173:24–174:7 (De La Cruz).

340.    Dr. De La Cruz described the anticholinergic mechanism relevant to thermoregulation: acetylcholine serves as a neurotransmitter that signals sweat glands to produce sweat, and anticholinergic medications block that signaling and thereby reduce or inhibit sweating. 4/7/26 Tr. at 167:18–168:4 (De La Cruz).

341.    Dr. De La Cruz testified that "anticholinergic" is not a drug class but rather a property shared to varying degrees by medications in many different classes. He explained that anticholinergic activity exists on a spectrum, and characterizing all medications with any

50

anticholinergic property simply as "anticholinergics" is pharmacologically inaccurate. 4/7/26 Tr. at 170:10–16, 171:6–16 (De La Cruz).

342.    Dr. De La Cruz confirmed that the claim that there is no such thing as a "highly active anticholinergic" is incorrect and contrary to well-established medical literature. 4/7/26 Tr. at 172:17–173:9 (De La Cruz). Anticholinergic medications are a spectrum: some are full agonists at the relevant receptors, some are partial agonists, and some are antagonists, and binding affinities differ significantly among agents. 4/7/26 Tr. at 172:17–173:9 (De La Cruz).

343.    Dr. De La Cruz testified that it would be inaccurate to state that all anticholinergic medications will cause drug-induced hyperthermia. 4/7/26 Tr. at 173:10–174:7 (De La Cruz). Many medications have anticholinergic properties without producing heat-related events, and the clinical relevance of a mechanism must be distinguished from a merely theoretical risk. 4/7/26 Tr. at 173:10–174:7 (De La Cruz).

344.    Dr. De La Cruz testified that clinically meaningful temperature dysregulation with severe hyperthermia is very rare with antipsychotic medications at prescribed maintenance doses. 4/7/26 Tr. at 174:13–20 (De La Cruz). It is primarily observed only at very extreme doses outside the normal reference range and in the setting of overdose. 4/7/26 Tr. at 174:13–20 (De La Cruz).

345.    Dr. De La Cruz reviewed an international pharmacovigilance study (Def. Ex. 168) examining adverse drug reactions across 77 countries involving 3.5 million case reports. Of those millions of reports, the study identified approximately 524 cases of antipsychotic-associated hyperthermia and approximately 480 cases of hypothermia — figures Dr. De La Cruz characterized as not clinically significant in terms of prescribing decisions. 4/7/26 Tr. at 175:20–176:3 (De La Cruz). Def. Ex. 168.

346.    Dr. De La Cruz testified that risk-benefit analysis must inform prescribing decisions, and that the risk of a heat-related adverse effect occurring in approximately 0.01% of the population on antipsychotics must be weighed against the substantial risk of undertreating patients with severe major depression and histories of suicidal ideation and attempts. 4/7/26 Tr. at 176:4–11 (De La Cruz).

347.    Dr. De La Cruz testified that approximately 80 million individuals in the United States are currently prescribed antipsychotic medications, and the CDC reports approximately 700 total heat-related deaths per year in the United States — a figure that encompasses all heat deaths and is not limited to medication-related deaths. He characterized the thermoregulatory risk of antipsychotics at therapeutic doses as a theoretical or "paper" risk rather than a clinically significant one at the population level. 4/7/26 Tr. at 206:2–23 (De La Cruz).

348.    As specific examples, Dr. De La Cruz testified that risperidone and aripiprazole — atypical antipsychotics used by patients he reviewed — present only a low to moderate risk of thermoregulatory disruption, and that risk is primarily associated with excessive doses beyond the normal therapeutic range. 4/7/26 Tr. at 207:7–23 (De La Cruz).

349.    Dr. De La Cruz testified that haloperidol, a first-generation (typical) antipsychotic, carries a slightly higher (low-to-moderate) anticholinergic risk than atypical antipsychotics because it binds the M3 acetylcholine receptor more tightly, but even this risk is substantially lower than that of medications conventionally classified as anticholinergics. 4/7/26 Tr. at 207:24–208:7 (De La Cruz).

350.    Dr. De La Cruz testified that SSRIs have fewer anticholinergic properties than antipsychotics because they do not bind the acetylcholine muscarinic M3 receptor as tightly. 4/7/26 Tr. at 205:9–14 (De La Cruz).

351.    Dr. De La Cruz explained that SSRIs are not purely serotonin-specific: they also bind histamine receptors, norepinephrine receptors, acetylcholine receptors, and adrenergic alpha receptors, and this multi-receptor activity must be understood when evaluating potential adverse effects at elevated doses. 4/7/26 Tr. at 171:14–172:11 (De La Cruz).

352.    Dr. De La Cruz testified that synthetic cannabinoids (commonly called K2 or Spice in the correctional setting) are extremely potent, lethal, and chemically variable. The DEA has identified between 200 and 400 synthetic cannabinoids but estimates there are likely well over a thousand distinct compounds, with new formulations constantly emerging to evade Schedule I classification. 4/7/26 Tr. at 177:7–19, 178:4–7 (De La Cruz).

52

353.     Dr. De La Cruz testified that different batches of synthetic cannabinoids are likely not chemically identical, that illicit manufacturers operate without any oversight or manufacturing protocols, and that the products are frequently combined with other lethal substances. 4/7/26 Tr. at 177:18–23 (De La Cruz).

354.     Dr. De La Cruz identified 5F-ADB as one of the most commonly encountered and most lethal synthetic cannabinoids. Medical literature establishes that 5F-ADB is approximately 290 times more potent than marijuana, is a full agonist at CB1 receptors rather than a partial agonist, and has been associated with cardiac arrest, respiratory distress, sudden death, and seizures. 4/7/26 Tr. at 179:3–6, 180:2–19 (De La Cruz).

355.     Dr. De La Cruz testified that synthetic cannabinoids could interfere with chemical signaling in the brainstem medulla — the area responsible for the respiratory drive — causing respiratory distress and potentially death. 4/7/26 Tr. at 181:21–182:7 (De La Cruz).

356.     Dr. De La Cruz reviewed a study of synthetic cannabinoid-involved deaths in Florida state prisons (Def. Ex. 173), which documented approximately 50 deaths from synthetic cannabinoids between March 2017 and November 2018. 4/7/26 Tr. at 181:3–13, Def. Ex. 173.

357.     Dr. De La Cruz testified that the fact that a particular synthetic cannabinoid does not reach a given laboratory's reporting threshold does not mean it is not lethal. Toxicology assays typically cover only a fraction of the known or suspected synthetic cannabinoid compounds, and labs cannot keep pace with the constantly changing chemical formulations. 4/7/26 Tr. at 199:23–200:9 (De La Cruz).

358.     Dr. De La Cruz testified that illicit fentanyl is one of the most potent and lethal opioids and causes death by suppressing the carbon dioxide-sensing mechanism in the medulla, thereby eliminating the respiratory drive. According to CDC data, opioid overdose causes approximately 100,000 deaths per year in the United States, with fentanyl accounting for roughly 80% of those deaths. 4/7/26 Tr. at 182:9–183:4 (De La Cruz).

359.     Dr. De La Cruz testified that a lethal amount of fentanyl can be as small as the tip of a pen. 4/7/26 Tr. at 183:8–9 (De La Cruz).

360.    Dr. De La Cruz reviewed literature (Def. Ex. 174) demonstrating that synthetic cannabinoid receptor agonists exacerbate fentanyl-induced respiratory depression and confer resistance to naloxone rescue—the primary life-saving intervention for opioid overdose. He characterized the combination as an additive or synergistic effect that substantially increases mortality risk. 4/7/26 Tr. at 183:14–184:22 (De La Cruz).

361.    Dr. De La Cruz defined a polysubstance overdose as an event in which multiple substances combine to increase lethality beyond what each would cause alone. He distinguished additive effects (drug one plus drug two equals three) from synergistic effects (drug one plus drug two equals ten). 4/7/26 Tr. at 197:10–16, 198:6–9 (De La Cruz).

362.    Dr. De La Cruz testified that elevated body temperature is not exclusive to external environmental heat and can occur in air-conditioned environments through several independent mechanisms: (a) serotonin syndrome from antidepressant overdose; (b) neuroleptic malignant syndrome from antipsychotic medications; (c) seizures, in which violent repeated muscle contractions generate massive internal heat; and (d) infection or sepsis, where the body naturally raises its temperature to fight a pathogen. 4/7/26 Tr. at 185:17–186:17 (De La Cruz).

363.    Dr. De La Cruz testified that all of the studies cited in Dr. Biswas' report were population-based studies which did not analyze individual patient cases, and Dr. De La Cruz opined that population-based studies, while helpful for identifying trends, cannot establish causation or substitute for individual patient-level analysis. 4/7/26 Tr. at 203:13–24, 204:10–11, 205:1–6 (De La Cruz).

364.    Dr. De La Cruz testified that Dr. Biswas mischaracterized the New Orleans heat wave study she cited in her report. The study involved only eight patients, six of whom were on psychotropic medications, but four of those six had overdosed on cocaine — a fact Dr. De La Cruz opined was the actual driver of the 25% mortality rate, not psychotropic medication use. 4/7/26 Tr. at 209:17–210:10 (De La Cruz).

365.    Dr. De La Cruz testified that Dr. Biswas' claim that patients with mental health disorders have impaired insight or cognitive limitations that would prevent them from seeking

assistance applied to none of the specific patients he reviewed, none of whom had mild, moderate, or severe cognitive impairment limiting their ability to make decisions or communicate. 4/7/26 Tr. at 208:11–209:5 (De La Cruz).

366.     Dr. De La Cruz confirmed that considering all pharmacological options, including lethal combinations of regulated and illicit drugs, is essential to evaluating mortality in the cases he reviewed, and that Dr. Vassallo and Dr. Uribe failed to take those very factors into account in their reports. 4/7/26 Tr. at 263:10–24 (De La Cruz).

367.     Dr. De La Cruz confirmed that overdoses of the substances identified in the cases he reviewed, including synthetic cannabinoids, fentanyl, and diphenhydramine at lethal concentrations, are known to cause death in air-conditioned environments independent of external temperature, and that the conditions and substances he identified in these cases have high mortality rates independent of environmental temperature. 4/7/26 Tr. at 211:7–10, 212:12–18 (De La Cruz).

368.     Dr. De La Cruz confirmed that he agreed that heat-related illness is real and can be fatal, and that he did not dispute the pathologists' findings that heat was a contributing factor in the three TDCJ deaths reported in 2023 that were flagged as potentially heat-related. His opinions were directed at other pharmacological factors present in the specific cases he reviewed. 4/7/26 Tr. at 163:13–164:7 (De La Cruz).

### C.     Inmate death reviews.

#### i.  Hector Reyes

369.     Reyes, mentioned by Plaintiffs, voluntarily opted out of a cool bed prior to his death in TDCJ. 3/31/26 Tr. at 354:6–16 (Lumpkin).

#### ii.  Jon Southards

370.     Southards passed away on June 28, 2023, at 11:58 pm. He was housed without air conditioning at the Estelle unit. Pl. Ex. 192-A at Tiede Def_32370. Southards was found down with ICS initiated at 11:06 p.m. Pl. Ex. 192-A at Tiede Def_32396. CPR was initiated, and he was shocked three separate times. Pl. Ex. 192-A at Tiede Def_32396. No core temperature was taken.

Toxicology revealed a diphenhydramine concentration of 6,300 ng/ml. Pl. 192-A, Tiede Def_32457. NMS Labs reports the average blood concentration in fatal overdoses in adults is 15,000 ng/ml. Pl. 192-A, Tiede Def_32458. Other literature indicates blood concentrations of diphenhydramine above 5,000 ng/ml can be fatal. Pl. 192-A, Tiede Def_32456.

371.     Despite opining that heat contributed to Southards's death, Dr. Uribe admitted that NMS Labs, which he trusted, found a level of 6,300 ng/ml which is within lethal range for adults. Dr. Uribe further acknowledged that it is possible for a diphenhydramine concentration of 6,300 ng/ml to be fatal regardless of whether or not an individual is in air conditioning. 3/30/26 Tr. at 253:14–254:4 (Uribe).

372.     Dr. Uribe noted that diphenhydramine is an anticholinergic which can impact an individual's ability to sweat, and Mr. Southards was sweating profusely when he was found down in his cell which is not typically considered to be a side effect of diphenhydramine. 3/30/26 Tr. at 253:14–254:4 (Uribe). However, Dr. Uribe conceded that profuse sweating while on diphenhydramine was possible. 3/30/26 Tr. at 253:21–254:4 (Uribe).

373.     Dr. Nicholas Ravanelli, PhD is a thermophysiologist at the Heat Resilience and Performance Center at the National University of Singapore. 4/8/26 Tr. at 6:17–22 (Ravanelli). Prior to working at the Heat Resilience and Performance Center, Dr. Ravanelli was a thermophysiology researcher and was assistant professor at Lakehead University in Ontario, Canada. 4/8/26 Tr. at 7:2–17 (Ravanelli), Pl. Exs. 476, 477. His research focuses on how the body sweats in response to heat stress. 4/8/26 Tr. at 9:2–7 (Ravanelli). He is recognized as an expert in thermophysiology. 4/8/26 Tr. at 9:8–12.

374.     The general belief that diphenhydramine prohibits or reduces sweating is the result of consensus statements drawn from understandings of the pharmacokinetics of anticholinergics, and there is almost no scientific evidence to support this belief. 4/8/26 Tr. at 19:2–20 (Ravanelli). Dr. Ravanelli conducted two studies to examine the effects of 50 mg diphenhydramine on sweat response. Pl. Exs. 476, 477. Both studies show that 50 mg of diphenhydramine did not attenuate sweating. 4/8/26 Tr. at 26:2–8 (Ravanelli). Studies have not been conducted to test the sweating

response when an individual is given an overdose of diphenhydramine because doing so would be unethical. 4/8/26 Tr. at 18:4–8 (Ravanelli).

375.    Core temperature is essential in assessing whether someone is in a state of hyperthermia. Without core temperature, you cannot say one way or the other whether someone had experienced heat-related stress. 4/8/26 Tr. at 28:21–29:8 (Ravanelli).

376.    However, Dr. Everitt has personally responded to a call where an individual was overdosing on diphenhydramine and, despite being in air conditioning, was sweating profusely. 4/6/26 Tr. at 75:13-76:8 (Everitt).

377.    Dr. De La Cruz testified that diphenhydramine (Benadryl) is pharmacologically characterized as a "dirty drug" meaning that at overdose levels it loses selectivity for its primary histamine receptor and begins binding serotonin receptors in a manner similar to an SSRI, inhibiting serotonin reuptake and causing excess serotonin. This can produce serotonin syndrome with symptoms including diaphoresis, muscular rigidity, myoclonus, and autonomic instability with hyperthermia independent of the external environment. 4/7/26 Tr. at 191:14–192:22 (De La Cruz).

378.    Dr. De La Cruz reviewed multiple case reports of diphenhydramine overdose producing profuse sweating, and specifically reviewed a case study, which reported diaphoresis, myoclonus, and muscular rigidity (signs of serotonin syndrome) in a diphenhydramine overdose case. 4/7/26 Tr. at 187:19–21, 188:5–11 (De La Cruz); Def. Ex. 170.

379.    Dr. De La Cruz rejected the opinion of plaintiffs' expert Dr. Vassallo that diphenhydramine overdose cannot produce sweating as an example of "availability bias," the methodological error of assuming that because a clinician has not personally observed a phenomenon it does not exist. He testified that reliance on case reports and broader medical literature beyond one's individual clinical experience is essential to sound pharmacological methodology. 4/7/26 Tr. at 191:1–8 (De La Cruz).

380.    Southards had a significant psychiatric history including severe major depression, multiple prior suicide attempts, and a history of substance use. A suicide attempt by carbamazepine

57

overdose had occurred approximately two weeks before his death. 4/7/26 Tr. at 186:23–187:7 (De La Cruz).

381.    Toxicology findings from Southards' autopsy revealed: (a) diphenhydramine at 6.3 micrograms per milliliter, a level above established lethal thresholds; (b) carbamazepine, which had not been prescribed to him; and (c) desmethylsertraline, a metabolite of sertraline, indicating ingestion of sertraline at concentrations higher than prescribed. Diphenhydramine was the only substance found that had been prescribed to him. 4/7/26 Tr. at 187:9–17, 188:14–17 (De La Cruz).

382.    Dr. De La Cruz testified that Southards' diphenhydramine level of 6.3 micrograms per milliliter exceeded the lethal threshold established in published literature. He disagreed with plaintiffs' expert Dr. Uribe′s characterization of this level as being at the "low end" of the lethal range, testifying that there is no clinically meaningful "low end" of a lethal concentration — once the lethal threshold is crossed, mortality risk is substantially elevated. 4/7/26 Tr. at 188:20–189:8 (De La Cruz).

383.    Dr. De La Cruz opined that at lethal diphenhydramine concentrations sufficient to trigger serotonin syndrome, hyperthermia and diaphoresis will occur regardless of the external environmental temperature. He further opined that the concurrent presence of carbamazepine and sertraline, neither of which was prescribed, provided additional independent pharmacological explanations for the diaphoresis and other clinical findings. 4/7/26 Tr. at 193:25–194:13, 226:24–227:7 (De La Cruz).

384.    Southards was found in possession of ten 50-milligram diphenhydramine capsules. His hoarding behavior had been noted prior to his death. The pathologist′s autopsy findings were consistent with overdose. 4/7/26 Tr. at 187:15-17, 189:23–190:4 (De La Cruz).

### iii.  Robert Clincy

385.    Clincy passed away on July 18, 2025, at 7:15 a.m. Pl. Ex. 349 at Tiede Def_492693. Clincy was housed without air conditioning at the Huges Unit. He had hypertensive cardiovascular disease, was obese, and had a history of high blood pressure with poor compliance with blood

pressure checks and blood pressure medications. Pl. Ex. 349 at Tiede Def_492700; 4/8/26 Tr. at 56:1–9, 56:18–25 (Felicella). His cause of death was determined to be hypertensive cardiovascular diseases with obesity as an important contributing factor. Pl. Ex. 349 at Tiede Def_492694.

386.    Autopsy revealed Clincy had cardiomegaly with left ventricular hypertrophy. 4/8/26 at 54:14–19, 55:4–10 (Felicella); Pl. Ex. 349 at Tiede Def_492693.

387.    A heart that is enlarged with hypertrophy does not function properly and predisposes one to an abnormal heartbeat which can be fatal. 3/30/26 Tr. at 258:19–259:9 (Uribe). Hypertension is a common cause of cardiomegaly. 4/8/26 Tr. at 55:11–23 (Felicella).

388.    The high indoor temperature on the day Clincy passed was 88.3. Importantly, Clincy passed at 7:15 a.m. when the temperature tends to be lower. Pl. Ex. 349 at Tiede Def_492693.

389.    Medical examiners must have evidence to support determinations made in an autopsy. 4/8/26 Tr. at 57:24–58:1 (Felicella). Dr. Felicella agrees with the findings in Clincy's autopsy and would not have ruled Clincy's death as being heat-related because there is no evidence to indicate it was heat-related. 4/8/26 Tr. at 57:9–23 (Felicella).

### iv.  Armando Gonzales

390.    Gonzales passed away on August 23, 2023, at 5:35 a.m. Pl. Ex. 168 at Tiede Def_15009. She was housed without air conditioning at the Hughes unit. Pl. Ex. 168-C at Tiede Def_70577. She was found in his cell on August 22, 2023, with an ICS call at 7:54 p.m. Pl. Ex. 168-A at Tiede Def_06083. Her rectal temperature was measured to be 109.4°F. Pl. Ex. 168-A at Tiede Def_06083. She was in the hospital for two days before passing. Pl. Ex. 168-A at Tiede Def_06065–6. Autopsy reported Gonzales's cause of death to be toxicity due to the opioid fentanyl. Pl. Ex. 168-A at Tiede Def_06106.

391.    Neither fentanyl nor midazolam are associated with hyperthermia, and both are commonly administered in the medical setting when a patient is going to be intubated. 3/30/36 Tr. at 261:9–13 (Dr. Uribe), 4/6/26 Tr. at 94:4–15 (Dr. Everitt). Furthermore, a urine drug screen

conducted upon her arrival at the hospital did not indicate the presence of fentanyl or midazolam, although the specific testing panel is unknown. Pl. Ex. 168-C at Tiede Def_70616.

392. Gonzales's roommate reported Gonzales was crushing and snorting lines of Effexor and Benadryl before becoming ill. Pl. Ex. 168-C at Tiede Def_70577. Effexor is an antidepressant medication. 3/30/26 Tr. at 261:14–17 (Dr. Uribe). Effexor abuse can cause seizures, severe heart issues, ECG changes, and serotonin syndrome. 3/30/26 Tr. at 261:22–25 (Dr. Uribe). Serotonin syndrome specifically causes very high temperatures. 3/30/26 Tr. at 262:1–262:8 (Dr. Uribe).

393. Gonzales had a documented history of substance abuse. Witness accounts from fellow inmates recorded in the OIG report indicated that Gonzales had appeared impaired earlier on the day of her collapse, frequently used K2, and would use whatever substances she could access. 4/7/26 Tr. at 197:1–2, 197:17–198:2 (De La Cruz).

394. Orange discoloration of the fingertips, a known indicator of K2 use, was observed at the time of Gonzales's death. Dr. De La Cruz noted this finding is routinely identified by pathologists as a marker of potential synthetic cannabinoid use. 4/7/26 Tr. at 198:14–18 (De La Cruz).

395. Dr. De La Cruz reported that cellmate accounts indicated Gonzales had been snorting venlafaxine (Effexor) and diphenhydramine (Benadryl). He opined that the combination of venlafaxine (a serotonin-norepinephrine reuptake inhibitor) and diphenhydramine at elevated doses could significantly increase serotonin levels and produce hyperthermic potential independent of the environment. 4/7/26 Tr. at 197:1–7, 198:23–199:3 (De La Cruz)

396. Dr. Felicella did not conduct Gonzales's autopsy but reviewed the autopsy and opined that she would have ruled Gonzales's death to be heat-related. 4/8/26 Tr. at 62:7–64:4 (Dr. Felicella)

### v. Ryan Fairchild

397. Fairchild passed away on August 21, 2024, at 6:06 am. Pl. Ex. 358-A. The cause of death was found to be sudden cardiac death with liver fibrosis and hypertensive kidney disease as

potential contributory factors. Pl. Ex. 358-A at Tiede Def_363308. Fairchild was housed without air conditioning at Michael Unit. No core temperature was taken, but EMS measured an axillary temperature of 108°F. Pl. Ex. 358-B at Tiede Def_363289. Fairchild was seen going to the water cooler several times and sitting in front of the fan in the dayroom before falling over. Pl. Ex. 358-C at Tiede Def_363203.

398.    Fairchild's body was embalmed before autopsy occurred. Pl. Ex. 358-A at Tiede Def_363397. Embalming has little to no effect on a medical examiner's ability to examine anatomical features but does impact the ability to test blood and vitreous fluid. 3/30/26 Tr. at 226:18–227:2 (Uribe).

399.    Autopsy revealed Fairchild had cardiomegaly with biventricular hypertrophy. Pl. Ex. 358-A at Tiede Def_363306. Fairchild's heart was 570g, with a normal heart weighing between 270–360g. Pl. Ex. 358-A at Tiede Def_363306. Biventricular hypertrophy is a thickening of the walls of the heart, commonly caused by high blood pressure. 3/30/26 Tr. at 258:9–18 (Uribe), 4/6/26 Tr. at 80:17–81:4 (Everitt). A heart that is enlarged with hypertrophy does not function properly and predisposes the individual to an abnormal heartbeat which can be fatal. 3/30/26 Tr. at 258:19–259:9 (Uribe), 4/6/26 Tr. at 81:5–10 (Everitt).

400.    Fairchild was transported by EMS to Palestine Regional Medical Center and was then transported by Life Flight to UT Health Tyler. Pl. Ex. 358-C at Tiede Def_363201. The first vital signs recorded for Fairchild at Palestine RMC were at 10:24 p.m. Pl. Ex. 358-B at Tiede Def_363290. His blood pressure was critically low at just 46/18, and his temperature was 102.3. Pl. Ex. 358-B at Tiede Def_363290. Just under two hours later, while still under emergency medical care, Fairchild's blood pressure remained critically low at 67/33, but his temperature increased to 105.6. Pl. Ex. 358-B at Tiede Def_363290. Laboratory results indicate Fairchild had a high white blood cell count. Pl. Ex. 358-B at Tiede Def_363286. Dr. Everitt opined that seeing a patient whose temperature rises despite receiving medical care, along with critically low blood pressure and high which blood cell count is indicative of sepsis. 4/6/26 Tr. at 84:16–24 (Everitt). Sepsis can cause

61

low blood pressure, increased white cell counts, and hyperthermia which can remain elevated despite active cooling measures. 4/6/26 Tr. at 82:20–83:7 (Everitt).

401.    Plaintiffs incorrectly interpret the term "hyperthermia" in the disposition summary from Palestine RMC to mean environmental hyperthermia or heat stroke. Dr. Everitt countered that hyperthermia in a medical chart means increased temperature and is not synonymous with heat stroke. 4/6/26 Tr. at 120:3–121:3 (Everitt).

402.    Fairchild presented with findings upon hospital admission consistent with possible sepsis, including white blood cell counts, lymphocytes, and neutrophils above normal ranges. After leaving his cell his body temperature continued to rise, and he was started on broad-spectrum antibiotics, Vancomycin and Meropenem, consistent with sepsis protocol. 4/7/26 Tr. at 194:18–195:15 (De La Cruz).

403.    Dr. De La Cruz testified that plaintiffs' experts Dr. Uribe and Dr. Vassallo failed to note in their reports that Fairchild was on sepsis protocol which he considered crucial information for a complete clinical picture. 4/7/26 Tr. at 195:16–19 (De La Cruz).

404.    Fairchild had multiple comorbidities of note, including hypertension, Type II diabetes, major depressive disorder, obesity, and chronic venous stasis. He was prescribed multiple medications with varying potential for thermoregulatory effects, including propranolol (beta blocker), furosemide (diuretic), bupropion, benztropine, aripiprazole, and amlodipine. 4/7/26 Tr. at 239:3–9, 239:24–240:20 (De La Cruz).

405.    Fairchild's autopsy revealed significantly enlarged cardiomegaly (heart weight approximately 570 grams versus a normal 300 grams), renal dysfunction, and liver dysfunction, all of which the pathologist identified as contributing factors to his death. 4/7/26 Tr. at 242:3–10 (De La Cruz).

### vi.  John Skinner

406.    Skinner passed away on July 30, 2023, at 10:30 p.m. He was housed without air conditioning at the Wainwright Unit. Pl. Ex. 191 at Tiede Def_16890. An autopsy was conducted

62

by Dr. Felicella. Pl. Ex. 191 at Tiede Def_16876. After careful review of the clinical history, scene investigation, autopsy findings, and toxicology results, there was no clear cause of death. The cause and manner of death were undetermined. Pl. Ex. 191 at Tiede Def_16883.

407.    There was no core temperature to indicate hyperthermia and the ambient temperature in his cell at the time of death was 85.3°F, just 0.3° above what Plaintiffs claim is a safe temperature, 85°F. Pl. Ex. 191 at Tiede Def_16883.

### vii.    Wayne Straway

408.    Straway passed away on July 29, 2025, at 2:41 p.m. Pl. Ex. 403-A at Tiede Def_493160. He was housed without air conditioning at the Ellis Unit. Pl. Ex. 403-B at Tiede Def_509096. Straway had a core body temperature of 106°F. Pl. Ex. 403-B at Tiede Def_509096. Straway's toxicology report showed the presence of two different types of synthetic cannabinoids, as well as methamphetamine. Pl. Ex. 403-A at Tiede Def_493160.

409.    Synthetic cannabinoids do not have the same effect as cannabinoids. Responses to synthetic cannabinoids are highly variable but include hyperactivity, violence, hyperthermia, abnormal behaviors, altered mental status, sudden cardiac collapse, and arrhythmias. 3/30/36 Tr. at 251:17–252:5 (Uribe), 4/6/26 Tr. at 71:5–72:10 (Everitt), 4/8/26 Tr. at 66:13–67:4 (Felicella). Patients on synthetic cannabinoids can show signs of heat stroke and hyperthermia even when the environmental temperature is below 80. 3/30/26 Tr. at 263:16–19, 263:22–264:1 (Uribe); 4/6/26 Tr. at 71:5–72:10 (Everitt); 4/8/26 Tr. at 66:13–67:4 (Felicella). Patients can die from synthetic cannabinoids regardless of environmental temperature. 3/30/26 Tr. at 252:6–14 (Uribe), 4/6/26 Tr. at 79:12–24 (Everitt).

410.    Methamphetamine is a powerful stimulant that can cause hyperthermia. 3/30/26 Tr. at 263:19–21 (Dr. Uribe), 4/6/26 Tr. at 72:15–23 (Everitt). Methamphetamine by itself can cause heat stroke. 3/30/26 Tr. at 238:25–239:8 (Uribe). In addition to causing hyperactivity, altered mental status, violent behavior, and aggression which can all increase metabolic heat production, methamphetamine is also sympathomimetic which means it can increase body

temperature by releasing endorphins that generate heat. 4/6/26 Tr. at 72:15–23, 73:12–19 (Everitt). Ingestion of synthetic cannabinoids and methamphetamine have an additive effect meaning the body's response to both chemicals would be greater than its response to just one. 4/6/26 Tr. at 72:24–73:11 (Everitt). As a first responder, Dr. Everitt treated patients on synthetic cannabinoids and methamphetamine with a core temperature of 106 or higher. 4/6/26 Tr. at 74:12–15 (Everitt).

411.    Straway's toxicology screening revealed three substances at lethal levels: (a) 5F-ADB, a synthetic cannabinoid; (b) MDMB-4en-PINACA, an additional synthetic cannabinoid; and (c) methamphetamine at a concentration of approximately 6.3 milligrams per liter, which is more than twenty times above the lethal threshold of 0.3 milligrams per liter. 4/7/26 Tr. at 201:20–202:13 (De La Cruz).

412.    Dr. De La Cruz opined that the combination of two independent lethal synthetic cannabinoids, each capable of causing cardiac arrest, respiratory distress, seizures, and sudden death, compounded further by methamphetamine at more than twenty times the lethal threshold constituted an independently life-threatening pharmacological picture. 4/7/26 Tr. at 202:18–31 (De La Cruz).

413.    Plaintiff's experts automatically assume that because Straway was housed without air conditioning and because his core body temperature was 106°F, he must have died from environmental heat, ignoring the admitted fact that both synthetic cannabinoids and methamphetamine can cause hyperthermia. 3/30/26 Tr. at 160:4–25 (Vassallo).

414.    Furthermore, Dr. Uribe acknowledged that a patient experiencing hyperthermia from methamphetamine would exhibit all the symptoms expected from environmental hyperthermia. 3/30/26 Tr. at 238:18–24.

### viii.  Jason Wilson

415.    Wilson passed away on July 5, 2024, at 8:23 a.m. Pl. Ex. 412-A at Tiede Def_517530. He was housed without air conditioning in administrative segregation at the Coffield Unit. Pl. Ex. 412-A at Tiede Def_517502. Inmates in restrictive housing have access to a faucet in their cell and

64

also have access to ice water delivered to them face-to-face by inmates or staff. 3/31/26 Tr. at 133:14–18 (Collier).

416.    Wilson's toxicology report was positive for both synthetic cannabinoids (K2) and fentanyl. Wilson had an extensive history of substance use disorders, had been seen repeatedly in mental health treatment programs, had a prior overdose attempt using acetaminophen, and had a documented history of medication hoarding. 4/7/26 Tr. at 199:8–14 (De La Cruz).

### ix. Samuel Rucker

417.    Dr. De La Cruz testified that Plaintiffs' experts' recantation of their prior opinion that inmate Rucker died as a result of heat was significant, because their original opinion had been stated with certainty without accounting for all relevant pharmacological puzzle pieces—a methodological error consistent with the deficiencies he identified across their opinions for the other deaths as well. 4/7/26 Tr. at 211:24–212:9 (De La Cruz).

### D. Plaintiffs' experts make unsubstantiated and contradictory definitive conclusions.

### i. Dr. Susi Vassallo

418.    Dr. Vassallo is not a medical examiner or pathologist, despite this, she opined on at least 10–20 causes of death in autopsies selected by Plaintiffs' counsel. 3/30/26 Tr. at 207:9–16 (Vassallo).

419.    Dr. Vassallo has never practiced medicine or provided treatment to inmates inside of a correctional facility. 3/30/26 Tr. at 177:5–8 (Vassallo).

420.    Dr. Vassallo admits it would not be good correctional judgment to allow an inmate to visit respite during a riot. 3/30/26 Tr. at 180:13–15, 23–25 (Vassallo).

421.    Dr. Vassallo does not know what temperature range the risk of heat-related illness materially increases, and that the temperature range could be different for anyone. 3/30/26 Tr. at 186:24–187:2, 187:13–15 (Vassallo).

422.    Dr. Vassallo does not know why Plaintiffs are seeking relief in the form of the temperature being kept between 65 and 85 degrees. 3/30/26 Tr. at 187:16–18 (Vassallo).

423.    Dr. Vassallo admits that she has always said some people are more at risk for heat illness and injury than others. 3/30/26 Tr. at 191:4–9 (Vassallo).

424.    Dr. Vassallo admits that exposure to risk depends on the person's health and their ability to have some degree of time every day in air-conditioned space. 3/30/26 Tr. at 193:13–22 (Vassallo).

425.    Dr. Vassallo claims that heat exhaustion and heat stroke are the vast minority of the injuries and heat illnesses caused by the heat. 3/30/26 Tr. at 195:4–7 (Vassallo).

426.    The New England Journal of Medicine found that those who spent some time in air conditioning were at about a 10% less risk of death than those that did not in Chicago over the course of three days of a heat emergency. 3/30/26 Tr. at 195:9–24 (Vassallo).

427.    Dr. Vassallo admits she did not review the 122 death records on Plaintiffs' exhibit list, nor did she choose the autopsies she did review which were provided by Plaintiffs' counsel. 3/30/26 Tr. at 201:20–25, 202:1–6 (Vassallo).

428.    Dr. Vassallo admits she did not do a full medical history evaluation of the decedents' whose autopsies she reviewed. 3/30/26 Tr. at 216:2–4 (Vassallo).

429.    Dr. Vassallo admits that she assumed all of the records that Plaintiffs' counsel provided her were of inmates who were not housed in air conditioning, but that assumption was incorrect. 3/30/26 Tr. at 202:13–16, 202:24–203:4 (Vassallo).

430.    Dr. Vassallo admits that she had to withdraw her previous opinion that "heat was surely a contributing factor" in the death of Samuel Rucker because her assumption that he died in an un-air-conditioned cell at the Michael Unit was incorrect. 3/30/26 Tr. at 202:19–203:7 (Vassallo).

431.    Dr. Vassallo admits that despite not having performed the autopsy on Mr. Rucker, and noting that he had a history of hypertension, heat failure, type II diabetes, sleep apnea and clinical obesity, she still disagreed with the pathologist who actually performed the autopsy that Mr. Rucker's cause of death was cardiac arrest. 3/30/26 Tr. at 203:11–25, 204:1–9 (Vassallo).

66

432.    Dr. Vassallo admits she based her opinion on Mr. Rucker's death on the unit temperature logs initially, which she admits she also relied on in reviewing the other 20 autopsies. 3/30/26 Tr. at 204:10–13 (Vassallo).

433.    Dr. Vassallo admits that in her initial opinion on Mr. Rucker's death she had considered other comorbidities like heart problems, diabetes, and obesity like she had in other deaths, where she said those inmates would not have died had they been housed in air conditioning. 3/30/26 Tr. at 204:14–16, 206:20–24 (Vassallo).

434.    Dr. Vassallo admits that air conditioning did not eliminate Mr. Rucker's risk of death from the independent fatality rates associated with hypertension, heat failure, type II diabetes, sleep apnea and clinical obesity. 3/30/26 Tr. at 207:3–8 (Vassallo).

435.    Dr. Vassallo admits that obesity and diabetes also contributed to Elizabeth Hagerty's death. 3/30/26 Tr. at 132:16–17 (Vassallo).

436.    Dr. Vassallo admits that heat acted on Hagerty's existing health conditions to cause her death, not cause heat stroke. 3/30/26 Tr. at 133:24–134:1 (Vassallo).

437.    Dr. Vassallo admits that Jon Southards had an elevated level of Benadryl at the time of his death. 3/30/26 Tr. at 137:4 (Vassallo).

438.    Dr. Vassallo admits that Southards had stored Benadryl pills "lined up all over the place," in his cell before his death. 3/30/26 Tr. at 137:11–13 (Vassallo).

439.    Dr. Vassallo claims you absolutely cannot sweat if you are altered from Benadryl. 3/30/26 Tr. at 138:24–25, 140:8–10 (Vassallo).

440.    Dr. Vassallo admits that the autopsy of Jason Wilson demonstrated the presence of synthetic cannabinoids in the body. 3/30/26 Tr. at 146:12–13 (Vassallo).

441.    Synthetic cannabinoids have street names like K2 and spice. 3/30/26 Tr. at 148:14–16 (Vassallo).

442.    Dr. Vassallo admits it is possible that synthetic cannabinoids can elevate your body temperature. 3/30/26 Tr. at 147:17–20 (Vassallo).

67

443.    Dr. Vassallo admits that people such as Bradley Sheets, who was 66 years old, had high blood pressure, diabetes and obesity, are at great risk of dying, by both morbidity and mortality, of their underlying conditions. 3/30/26 Tr. at 152:23–25, 153:7–10 (Vassallo).

444.    Dr. Vassallo says only that she "cannot rule out" that heat caused Mr. Sheets's death, despite not having a core body temperature or physical evidence indicating so. 3/30/26 Tr. at 153:11–12 (Vassallo).

445.    Dr. Vassallo admits that she did not review the indoor temperature logs on the date of Mr. Sheets's death that show it was 88 degrees inside Mr. Sheet's cell. 3/30/26 Tr. at 211:10–19 (Vassallo).

446.    Dr. Vassallo admits that she was not aware Amando Gonzales was observed snorting Effexor and Benadryl before death, and she is unaware of the toxic levels associated with either Effexor or Effexor and Benadryl in combination. 3/30/26 Tr. at 208:13–209:7 (Vassallo).

447.    Dr. Vassallo admits that she did not include in her report that it was 85.7 degrees inside the prison on the day that John Southards died. 3/30/26 Tr. at 209:8–13 (Vassallo).

448.    Dr. Vassallo admits that she knew of Ryan Fairchilds significant cardiovascular history and that his heart was double the normal size but did not reconcile that his white blood cell count was high in forming her opinion on his cause of death. 3/30/26 Tr. at 209:17–25 (Vassallo).

449.    Dr. Vassallo admits that in her report she wrote that Wayne Straway would not have died if he had been housed in air-conditioning, but in trial clarified she meant he *may not* have died. 3/30/26 Tr. at 213:5–13 (Vassallo).

450.    Dr. Vassallo admits she ignored Mr. Fairchild had obesity in forming her opinion on the cause of his death. 3/30/26 Tr. at 213:14–21 (Vassallo).

451.    Dr. Vassallo admits that the inmates she opined would not have died if they were housed in air conditioning, had some of the same comorbidities as Samuel Rucker who died during the summer in air conditioning. 3/30/26 Tr. at 213:22–214:3 (Vassallo).

452.    Dr. Vassallo does not believe TDCJ should overrule the independent pathologist when reporting cause of death to the legislature. 3/30/26 Tr. at 214:4–8 (Vassallo).

453.    Dr. Vassallo admits she is not diagnosing the inmates whose records she reviewed. 3/30/26 Tr. at 214:17–21 (Vassallo).

454.    Dr. Vassallo claims she has no concerns with her own failure to include certain medical factors in reaching her opinions on inmates' deaths. 3/30/26 Tr. at 215:9–12 (Vassallo).

455.    Dr. Vassallo admits she cannot actually rule out causes of deaths besides heat. 3/30/26 Tr. at 216:8–11 (Vassallo).

### ii.   Dr. Jhilam Biswas

456.    Dr. Biswas is not licensed to practice medicine in Texas. 3/30/26 Tr. at 303:19–20 (Biswas).

457.    Dr. Biswas only treats between 2 and 5 incarcerated individuals a year at Brigham Women's Hospital. 3/30/26 Tr. at 303:7–12 (Biswas).

458.    Dr. Biswas did not review any of the inmates' medical records to reach her opinion. 3/30/26 Tr. at 308:11–13 (Biswas).

459.    Dr. Biswas admits that she does not understand how the heat score works, nor does she know whether medical providers are looking at the chart and tallying points to assign a score themselves. 3/30/26 Tr. at 305:13–20 (Biswas).

460.    Dr. Biswas admits that she did not review any medication list or criteria list utilized by UTMB to create the heat score. 3/30/26 Tr. at 306:6–9 (Biswas).

461.    Dr. Biswas admits that she does not know whether inmates prescribed certain stimulants, antidopaminergics and serotonergic medications are already in air-conditioned housing due to other conditions on the heat score. 3/30/26 Tr. at 316:2–14 (Biswas).

462.    Dr. Biswas admits she does not know whether the inmates whose records she was provided with actually suffered from the psychiatric comorbidities she has testified about. 3/30/26 Tr. at 310:13–16 (Biswas).

463.    Dr. Biswas admits she did not request any data to reflect TDCJ's actual population of inmates with mental illness diagnoses or on specific medications. 3/30/26 Tr. at 311:2–4 (Biswas).

464.    Dr. Biswas admits that she didn't review any information about the rates of suicidality in TDCJ during the summer months. 3/30/26 Tr. at 318:11–13 (Biswas).

465.    Dr. Biswas admits that the Cloud study she relied on does not associate high core body temperature with suicidality. 3/30/26 Tr. at 318:14–21 (Biswas).

466.    Dr. Biswas admits she does not know whether the Louisiana prisons part of the Cloud study employed any of TDCJ's heat mitigation measures. 3/30/26 Tr. at 319:15–21 (Biswas)

467.    Dr. Biswas admits that anticholinergic medications can treat a range of diagnoses even outside the psychiatric realm. 3/30/26 Tr. at 308:5–10 (Biswas).

468.    Dr. Biswas admits that antimuscarinic medications would already be encompassed on the heat score because all antimuscarinics are anticholinergic. 3/30/26 Tr. at 315:1–8 (Biswas).

469.    Dr. Biswas admits that stress, like anxiety, irritability, and sleep disturbance occur even in climate-controlled settings. 3/30/26 Tr. at 311:9–25 (Biswas).

470.    Dr. Biswas admits that TDCJ already houses inmates with a bipolar disorder diagnosis in air-conditioned housing. 3/30/26 Tr. at 312:8–10 (Biswas).

471.    Dr. Biswas admits that schizophrenia is a chronic diagnosis, but that she does not know whether patients would be on medications to treat a schizophrenia diagnosis for less than four days. 3/30/26 Tr. at 312:15–23, 313:7–9 (Biswas).

472.    Dr. Biswas admits that if someone is undiagnosed for a condition, they are not on the medication to treat that condition. 3/30/26 Tr. at 300:17–19 (Biswas).

473.    Dr. Biswas admits that if patients are undiagnosed, then TDCJ doesn't know that they are at risk of heat illness. 3/30/26 Tr. at 316:20–23 (Biswas).

474.    Dr. Biswas admits that serotonin syndrome tends to be underdiagnosed syndrome that can occur with people who are taking too many SSRIs or taking SNRIs like Effexor and Lyrica and Cymbalta. 3/30/26 Tr. at 289:11–15 (Biswas).

475. Neuroleptic Malignant Syndrome ("NMS") is an unpredictable, uncommon fatal side effect of using antipsychotic medications, which can occur in both air-conditioned and non-airconditioned environments. 3/30/26 Tr. at 290:3–23, 320:14–16 (Biswas).

476. Dr. Biswas admits that access to water allows you to sweat more easily and dissipates heat, and that sweating and dissipation of sweat can lower body temperature. 3/30/26 Tr. at 322:7–15 (Biswas).

477. Dr. Biswas admits that the CDC recommends cold showers to cool the body and reduce heat. 3/30/26 Tr. at 322:16–20 (Biswas).

### E. The studies on which Plaintiffs rely do not show that prison heat caused elevated fatalities.

478. TDCJ performed an internal evaluation of the publications on which Plaintiffs rely that claim to show prison heat causes elevated fatalities. 3/31/26 Tr. at 188:9–13 (Collier).

479. Collier had Andy Barbee, TDCJ's Director of Research, reviewed the report entitled "Extreme Temperatures and COVID-19 in Texas Prisons," written by Amite Dominic and others. 3/31/26 Tr. at 188:14–189:6 (Collier). Barbee did not consider the information in this article credible based on the type of survey that it was. 3/31/26 Tr. at 189:7–10 (Collier).

480. Collier and Barbee also reviewed the 2022 JAMA Network Open (JNO) article written by Dr. Julie Skarha titled "Provision of Air Conditioning and Heat-Related Mortality in Texas Prisons," and found the methods used were not what he would consider significant research and were therefore not credible. 3/31/26 Tr. at 189:11–20 (Collier).

481. Dr. Scott Cunningham was retained by the TDCJ, alongside Drs. Christoper Cornwell and Jonathan Seward, to evaluate the 2022 article entitled "Provision of Air Conditioning and Heat-Related Mortality in Texas Prisons" authored by Plaintiffs' expert witness, Dr. Skarha, et al. 4/7/26 Tr. at 81:1–2 (Cunningham).

482. Dr. Cunningham is an expert in the fields of statistics and causal inference. 4/7/26 Tr. at 80:14–18. Dr. Cunningham is a Visiting Professor of Formal Theory Methods at Harvard University, and also the Ben H. Williams Professor of Economics at Baylor University.

71

4/7/26 Tr. at 74:22–25 (Cunningham). Dr. Cunningham has published approximately twenty-five articles within his fields of statistics, causal inference, and econometrics, as well as three books on economics and causal inference. 4/7/26 Tr. at 76:12–77:4 (Cunninham).

483.    Dr. Cunningham's team's opinion on Dr. Skarha's article is that it is not able to be recreated, which is a requirement of any reliable research. 4/7/26 Tr. at 87:12–101:21 (Cunningham).

484.    One of the biggest critiques of the JNO article's conclusions is that Dr. Skarha impermissibly combined treatment and control group units. 4/7/26 Tr. at 120:7–15 (Cunningham). Dr. Skarha also incorrectly interpreted what a p-value is when explaining it in her deposition. 4/7/26 Tr. at 114:5–23 (Cunningham).

485.    Dr. Skarha had a research design for studying the effects of heat, but not for studying the effects of air conditioning, contrary to the purported findings of the article. 4/7/26 Tr. at 86:10–13 (Cunningham). While the case-crossover design method used by Dr. Skarha might be appropriate for studying heat, that method is not appropriate for studying air conditioning. 4/7/26 Tr. at 84:6–10 (Cunningham).

486.    Dr. Cunningham utilized a methodology called replicability to test Dr. Skarha's results, and determine if they were "fragile" results, meaning that there is a coding mistake, and the result was a discovery that there were missing data sets. 4/7/26 Tr. at 87:14–88:18 (Cunningham).

487.    In order to get the results that Dr. Skarha claims, she would need a much larger data set than she had in her study, which further demonstrated that her study was "underpowered" and "not replicable." 4/7/26 Tr. at 92:8–93:8 (Cunningham).

488.    By removing just three of the air-conditioned prisons, all of which are hospitals, the conditional logistic progression in Dr. Skarha's study goes "wild" and her conclusions become both unreliable and "underpowered." 4/7/26 Tr. at 89:4–22 (Cunningham).

489.    Dr. Cunningham could not recreate Dr. Skarha's air conditioning finding because she did not include either the data, or the instructions, on how to do so despite requests from

Defendant which included a subpoena. 4/7/26 Tr. at 100:9–101:21 (Cunningham). Dr. Cunningham testified that, even if he had received Dr. Skarha's files, which he never did, and even if he had the best data set possible, as represented by the "BJS data" set, he still could not recreate Dr. Skarha's results. 4/7/26 Tr. at 98:6–24 (Cunningham).

490.    Dr. Skarha's poor documentation of the "air-conditioning construction" process was one of the reasons why her article departs from the accepted methods for a study like the one she attempted. 4/7/26 Tr. at 98:25–100:6 (Cunningham).

491.    Dr. Cunningham's conclusion on Dr. Skarha's decision to collapse different air conditioning data sets causes him to both question whether the case crossover method is appropriate, and also whether 100 people doing the same study would get the same result. 4/7/26 Tr. at 105:24–107:3 (Cunningham).

492.    In sum, Dr. Cunningham's opinion of the JNO article is that it is (a) not convincing, and (b) having read this article more than any other article in his career, he does not think that her finding that heat is killing people in TDCJ is supported by any evidence. 4/7/26 Tr. at 123:3–124:10 (Cunningham).

## VI. TDCJ's leadership is diligently moving towards air conditioning all inmate housing areas.

### A.  TDCJ is committed to installing air conditioning.

493.    In 2017, after becoming Executive Director in 2016, Collier made installation of air conditioning a priority for TDCJ. 4/9/26 Tr. at 246:6–247:1 (Hudson). Collier did so by educating the legislature and others. 3/31/26 Tr. at 204:24–205:15 (Collier). Collier also appointed Hudson to the Facilities Division in 2022 and tasked him managing TDCJ's goal of air conditioning all TDCJ housing areas. 4/9/26 Tr. at 241:2–14 (Hudson).

494.    Installing air-conditioning throughout TDCJ's housing areas will benefit TDCJ's population and staff as well as reducing the enormous amount of energy and time TDCJ spends on heat mitigation and all other protocols around heat. 3/31/26 Tr. at 204:4–23 (Collier). It will also help TDCJ with retention and recruitment of staff and allow TDCJ to focus on other functions by

73

freeing up time spent administering heat protocols such as respite. 3/31/26 Tr. at 205:25–206:8 (Collier).

495. Collier wanted all TDCJ housing units to be air conditioned, so this became Hudson's number one goal and remains such today. 4/9/26 Tr. at 241:10–242:1 (Hudson). TDCJ remains committed to accomplishing this goal. 4/9/26 Tr. at 242:15–17 (Hudson).

496. Hudson was recently promoted to TDCJ's Chief Operations Officer and is still actively involved with TDCJ's air conditioning projects. 4/9/26 Tr. at 234:16–20 (Hudson). In fact, Hudson spends 80–90% of his time working with engineering to come up with plans for how TDCJ could install air conditioning in the most efficient and cost-effective manner which has and will continue to evolve as TDCJ learns more about these projects. 4/9/26 Tr. at 242:2–14 (Hudson).

497. TBCJ is also supportive of TDCJ's goal to install air conditioning in all housing areas. 4/6/26 Tr. at 165:12–14 (Nichols).

### B. Temporary air conditioning is not practical or cost effective.

498. Temporary air conditioning is not a viable solution on a large scale due to the ongoing costs involved. 4/9/26 Tr. at 239:7–240:11 (Hudson).

499. TDCJ put together an estimate for future rental projections for temporary air conditioning. 4/9/26 Tr. at 240:12–15 (Hudson), Def. Ex. 24. As of September 5, 2025, TDCJ estimates it would cost approximately $168 million for delivery, rental fees, and fuel costs to provide temporary air conditioning to all non-air-conditioned housing units. Def. Ex. 24.

500. Even if temporary air conditioning were a possible solution, TDCJ does not have the funding to provide this solution, and doing so would stop all permanent air conditioning projects as TDCJ could not do both at the same time. 4/9/26 Tr. at 240:20–241:4 (Hudson).

### C. TDCJ has received significant funding appropriations from the Texas Legislature to support its goal of installing new air conditioning.

501. Prior to the last two legislative sessions, TDCJ provided the Legislature with information pertaining to heat-related illnesses and where heat was a contributing factor to a death, as well as presenting a plan to the legislature on how TDCJ could air condition the entire system.

3/31/26 Tr. at 165:3–10 (Collier). Specifically, the four-phase and three-phase plans were presented to the Appropriations Committee prior to the last two legislative sessions as opportunity for TDCJ to educate the Legislators on a roadmap of how TDCJ could install air conditioning systemwide if the funds were allocated. 3/31/26 Tr. at 170:11–24; 171:21-24 (Collier).

502.    In 2022, going into the 88th Legislative Session, TDCJ prepared a four-phase plan to present to the Legislature. 3/31/26 Tr. at 170:8–13 (Collier). On July 12, 2022, Collier made a presentation to the House Appropriations Committee to provide an overview of what it would take to install air conditioning throughout TDCJ's system—the four-phase plan. 3/31/26 Tr. at 196:24–197:9, Ex. 25. (Collier)

503.    In this four-phase plan, TDCJ estimated that the cost for each phase of the plan would be $225,860,032, $319,321,794, $322,397,186, and $237,300,578, respectively, for a total of $1,104,879,589 with an estimated annual operating cost once fully implemented of $20 million. 3/31/26 Tr. at 198:2–6 (Collier), Def. Ex. 23.

504.    Ultimately, the 88th Legislature appropriated $85.7 million specifically for new air conditioning. 3/31/26 Tr. at 196:14–19 (Collier), 3/31/26 Tr. at 317:25–318:4 (Lumpkin).

505.    In 2025, prior to the 89th Legislative Session, TDCJ presented a three-phase plan to the Legislature. 3/31/26 Tr. at 170:8–13 (Collier). The three-phase plan provides a roadmap of how TDCJ could air condition the remaining non-air-conditioned housing units over three biennia—Fiscal year 2026–2027, 2028–29, and 30–31. Def. Ex. 20. The three-phase plan was based on lessons learned from the air conditioning projects TDCJ completed during the prior biennium. 3/31/26 Tr. at 198:16–25 (Collier).

506.    In this three-phase plan, TDCJ estimated the cost for each phase would be $118.2 million, $620.4 million, and $584.6 million, respectively, for a total cost of $1.3 billion and an estimated annual operating cost of $23.2 million. Def. Ex. 20. These cost estimates were based on the experience gained on air conditioning projects with funding appropriated in the prior session and what TDCJ believed it could accomplish in the following biennium. 3/31/26 Tr. at 199:4–25

(Collier). TDCJ estimated that $118 million would be enough funds to complete phase one of this plan. 3/31/26 Tr. at 199:4–25 (Collier).

507. The 89th Legislature appropriated $118 million to TDCJ specifically for new air conditioning. 3/31/26 Tr. at 196:20–23 (Collier), 3/31/26 Tr. at 318:5–10 (Lumpkin). In addition to the $118 million, TDCJ requested and ultimately received $350 million in additional funding to build air-conditioned expansion dorms that will add 5,600 additional cool beds and $110 million to purchase a 2,000 bed, air-conditioned facility in Post, Texas. 3/31/26 Tr. at 202:8–203:1 (Collier). These requests for expansion were made to provide additional cool beds for TDCJ's existing population and to provide additional capacity for expected inmate population increases. 3/31/26 Tr. at 203:2–23 (Collier). In total, the 89th Legislature appropriated more than $500 million impacting cool bed capacity. 4/6/26 Tr. at 143:1–144:10 (Nichols).

**D.    TDCJ funding requests for new air conditioning projects are measured by the number of projects that TDCJ can execute in the following biennium.**

508. In preparation for the upcoming legislative session in 2027, TDCJ prepared a two-phase road map of how it could complete the remaining air conditioning projects over the next two biennia—Fiscal Years 2028–29 and 2030–31. Def. Ex. 256. Thus, TDCJ is now projecting a two-phased approach to installing air conditioning in all its facilities, with a goal to operationalize funds for new air conditioning installation in all remaining prison units by 2031. 3/31/26 Tr. at 322:4–323:11 (Lumpkin).

509. As reflected in this plan, TDCJ anticipates that it could obligate $774 million in the first phase during Fiscal Years 2028–2029 and $730.7 million in second phase during Fiscal Years 2030–31 for air conditioning projects, for a total cost of $1.5 billion and $23.2 million estimated annual operating cost once fully implemented. Def.s' Ex. 256.

510. It is important that TDCJ only requests funding for projects that it reasonably believes can be executed in the following biennium because TDCJ must maintain credibility with Legislature. 3/31/26 Tr. at 214:24–215:20 (Collier). Such requests for air conditioning are guided by the cost estimates for air conditioning projects that TDCJ believes it can accomplish with such

funding in a single biennium because TDCJ must put funds to good use to build credibility for future appropriation requests. 3/31/26 Tr. at 162:10–163:8 (Collier). If TDCJ fails to properly deploy funds on the projects presented to the Legislature, it will severely hamper its ability to ask for additional funds in following legislative cycle. 3/31/26 Tr. at 214:24–215:20 (Collier).

511.    TDCJ has not requested the entire $1.3 billion or more it estimates that it will cost to install air conditioning systemwide because TDCJ does not have the capacity as an agency to obligate those funds in a single biennium. 3/31/26 Tr. at 165:21–166:15 (Collier). Furthermore, TDCJ cannot reasonably obligate more funds in a biennium than what is reflected in each phase of the two-phase plan because attempting more construction projects in a prison environment where the number one goal is safety would put a lot of people at risk. 4/9/26 Tr. at 265:14–266:5 (Hudson).

512.    TDCJ has never been given a green light to ask for the entire amount of funding necessary to air condition all housing areas. 3/31/26 Tr. at 172:4–5 (Collier). And contrary to Plaintiffs' expert witness testimony, there is no process pursuant to Texas Government Code Section 401.601 by which Bobby Lumpkin, as Executive Director of TDCJ, can request all the funding necessary for installing air conditioning, nor has Bobby Lumpkin ever heard of any other Executive Director of TDCJ requesting money like this. 3/31/26 Tr. at 324:7–325:16 (Lumpkin).

513.    While TDCJ does not control the legislature, it anticipates receiving additional funding appropriations for permanent cool beds with the ultimate goal of air conditioning every housing area in every TDCJ unit across the State. 4/6/26 Tr. at 232:2–233:6 (Nichols). In the meantime, TDCJ is installing air conditioning as fast as it can. 3/31/26 Tr. at 354:17–20 (Lumpkin).

### E.    Many obstacles and complexities arise when retrofitting operational Texas prisons.

514.    Designing air conditioning retrofits for prison systems comes with a unique set of challenges, the biggest issue being security and the duty to protect life. 4/8/26 Tr. at 169:15–171:1 (Cox).

515.    There are other factors to consider in detention environments, such as getting into the units to inspect the structures to evaluate designs. 4/8/26 Tr. at 169:15–171:1 (Cox).

516.    In design, construction sequencing is a big consideration as these are operating prisons and TDCJ does not have the luxury of vacating the population. 4/8/26 Tr. at 171:2–172:18 (Cox). Furthermore, designs must limit disruption to the interior of the building as much as possible. 4/8/26 Tr. at 171:2–172:18 (Cox).

517.    There are also additional code compliance and security compliance concerns that must be considered in the designs. 4/8/26 Tr. at 169:15–171:1 (Cox). Life safety codes must be considered in design, such as smoke purge. 4/8/26 Tr. at 172:19–174:9 (Cox). Such smoke purge systems need to be designed to evacuate smoke from fire and also manage situations when TDCJ needs to gain control of a population using tear gas or other gas agents. 4/8/26 Tr. at 172:19–174:9 (Cox). The design also needs to account for creating a system where enough air comes in during a smoke purge to not create a vacuum effect that could seal the doors shut, trapping everyone inside. 4/8/26 Tr. at 172:19–174:9 (Cox).

518.    Life cycle concerns are important in design because TDCJ needs to be a good steward of taxpayer dollars. 4/8/26 Tr. at 174:16–175:4 (Cox).

519.    Geography is an important complication in designing and installing air conditioning in Texas prisons, as they are spread all over the State. 4/8/26 Tr. at 175:5–22 (Cox). Some contractors have a preference to a certain geographic area. 4/8/26 Tr. at 175:5–22 (Cox). Traveling to and from work sites, some of which are in remote locations, takes time and increases the expense of these projects. 4/8/26 Tr. at 175:5–22 (Cox).

520.    The age of the prison units also affects the design, as older "system 1 units" like Coffield that were built before air conditioning was available will cause even greater design issues. 4/8/26 Tr. at 176:23–177:25 (Cox). Coffield has over one million windows and not all of them are intact all the time. 4/8/26 Tr. at 176:23–177:25 (Cox). It will be difficult to seal the exterior envelope of the system 1 units, a necessity when installing air conditioning, because they were built to

ventilate air with big thick concrete walls to draw cool air like a chimney so that cool air is coming in while exhausting hot air out. 4/8/26 Tr. at 176:23–177:25 (Cox.)

521.    In addition to challenges associated with design creation for air conditioning retrofits, there are also unique challenges with construction. 4/8/26 Tr. at 179:23–181:3 (Cox). The biggest consideration is the non-productive time added to get in and out of prisons, going through tool inventories, downtime waiting for an incident to be handled, and need for a dedicated correctional officer to accompany the construction crew as they go around the unit doing their work. 4/8/26 Tr. at 179:23–181:3 (Cox). Contraband searches are another big concern and cause for delays with respect to construction crews. 4/8/26 Tr. at 181:4–21 (Cox).

522.    A construction crew can expect to average about five hours of productive time a day on a unit—contrary to Plaintiffs' expert, Mr. Ramey's testimony that it takes five minutes to overcome the obstacles of getting in and out of prison leaving 7 hours and 55 minutes to do the work. 4/8/26 Tr. at 181:22–182:7 (Cox).

523.    TDCJ has also experienced significant issues with equipment availability due to increased demand for data centers being built all over Texas. 4/8/26 Tr. at 164:10–166:1 (Cox). To attempt to work around the data center demand, TDCJ is implementing a blend of different air conditioning solutions such as direct expansion air-conditioning and modular chilled water systems. 4/8/26 Tr. at 166:2–168:21 (Cox). Generators are also required for every air conditioning project as TDCJ's inmates are a captive population that cannot be moved if the power goes out, and TDCJ is experiencing long lead times on acquiring these units. 4/8/26 Tr. at 178:18–179:12 (Cox).

524.    In TDCJ's experience, there are also a limited number of contractors that are willing to bid on the air conditioning retrofits due to the challenges of working in the prison environment and because they can make more money working for the private sector. 4/8/26 Tr. at 182:21–183:12 (Cox). But TDCJ is attempting to expand the number of companies that bid on its air conditioning projects. 4/8/26 Tr. at 183:13–184:16 (Cox). TDCJ has made improvements on how it publicizes

the bids statewide and met with mechanical contractor associations at State and national levels. 4/8/26 Tr. at 183:13–184:16 (Cox).

525.    The biggest thing TDCJ has done to grow the vendor pool is its participation in trade organization shows for mechanical contractors to educate them on TDCJ's air conditioning projects. 4/8/26 Tr. at 183:13–184:16 (Cox). To be clear, TDCJ has no limitation that vendors must be from Texas and regularly works with design and construction firms located outside of Texas. 4/8/26 Tr. at 184:17–18 (Cox).

526.    TDCJ intends to start bundling some of the air conditioning projects as a strategy to get higher contract values of $100–$150 million to attract bigger and higher-level quality contractors that might not otherwise be interested  versus what TDCJ has been doing in the past in the $10–$20 million range. 4/8/26 Tr. at 176:1–10 (Cox). Now that TDCJ has gained designs and experience on these air condition projects, it is looking to bundle projects geographically into three of four sectors of the State. 4/8/26 Tr. at 176:11–22 (Cox).

### F.    TDCJ has made significant progress since receiving its first tranche of dedicated air conditioning funding.

527.    Installing air conditioning is both a future priority and one that is already underway. 4/6/26 Tr. at 165:15–166:4; 230:25–231:8, 231:19–232:1 (Nichols).

528.    Going into these larger new air-conditioning projects, TDCJ did not have any prior designs to work with. 4/8/26 Tr. at 153:24–154:1 (Cox). Thus, in the beginning, TDCJ implemented a strategy to get designs in place that have evolved over the years due to lessons learned over the last six or seven years doing these air conditioning projects. 4/8/26 Tr. at 154:2–21 (Cox).

529.    During these early stages, TDCJ had little funding. 4/8/26 Tr. at 154:2–21 (Cox). As more funding became available, TDCJ began grouping units in prototypical designs to get a concept design for each type of prototype that it could repeat. 4/8/26 Tr. at 154:2–21 (Cox). TDCJ grouped its 104 units together by what it calls prototypical designs as follows: 2250 Bed Max, 2144 Bed SJ, 2000 Bed XFR, 1000 Bed Medium, 1100 Bed State Jail, 1000 Bed SATF, 900 Bed SJ, 667

Bed SJ, 550 Bed Psychiatric, 500 Bed N-Group, 500 Bed SATF, Private Facilities, Fast Tracks, and Miscellaneous. 4/8/26 Tr. at 154:25–155:12 (Cox), Def. Ex. 223. So, when TDCJ receives a design for a unit from a certain group of prototypes and works that project through construction, TDCJ learns how to do similar prototypical units in the future. 4/8/26 Tr. at 154:25–155:12 (Cox), Def. Ex. 223.

530.    TDCJ developed a protype list to group like units and designing units to get concepts for each category. 4/9/26 Tr. at 245:3–21 (Hudson), Def. Ex. 223. Units highlighted in green identifies units that are fully air-conditioned. 4/9/26 Tr. at 245:3–21 (Hudson), Def. Ex. 223. Units identified in yellow are those either going to be in construction or are in procurement. 4/9/26 Tr. at 245:3–21 (Hudson), Def. Ex. 223. Units having a blue asterisk next to it signifies that these units are currently in the design phase with the plan to move to the construction phase when the TDCJ receives the next influx of funding for air conditioning projects. 4/9/26 Tr. at 245:3–21 (Hudson), Def. Ex. 223.

531.    While the categories of the prototype units are similar, they are variances as they were built by different contractors in different locations with varying soil and environmental conditions. 4/8/26 Tr. at 178:1–17 (Cox). As such, TDCJ still must obtain a final design for each unit. 4/8/26 Tr. at 178:1–17 (Cox).

532.    Currently, TDCJ has a concept design for every type of prototypical constructed project, especially those that were built in the '80s and '90s. 4/8/26 Tr. at 154:2–21 (Cox). All TDCJ needs is the funding and the ability to say go for the remaining prototypical units. 4/8/26 Tr. at 155:23–156:3 (Cox).

533.    TDCJ is prioritizing installation of air conditioning in its metal steel building prototype buildings as they tend to be hotter. 3/31/26 Tr. at 200:24–201:13 (Collier). The System 1 units, conversely, which are older red brick buildings and date back to the 1850's, do not typically reach the same temperature levels of TDCJ's newer-design facilities because they were built prior to air conditioning and therefore have much higher ceilings and allow for more air flow. 3/31/26 Tr. at 201:14–202:4 (Collier). These system 1 units are not prototypical and were built from the late

81

1800's through the 1960's, and TDCJ is currently working on fleshing out conceptual designs. 4/8/26 Tr. at 155:13–22 (Cox).

534.    When TDCJ first began the new air conditioning projects it started with what are called investigatory designs to help formulate the overall plan it has now. 4/8/26 Tr. at 158:15–159:4 (Cox). Now that TDCJ has investigatory designs in place it can now skip this step which speeds up the process. 4/8/26 Tr. at 159:5–15 (Cox).

535.    TDCJ's procurement processes for air conditioning projects have evolved to create efficiencies. 4/8/26 Tr. at 159:16–161:12 (Cox). In early stages, TDJC used what is called a lump sum, low bid process that, although alleviated some budget concerns due to the competitive nature, nevertheless resulted in a lower quality of contractors bidding on the projects. 4/8/26 Tr. at 159:16–161:12 (Cox). TDCJ transitioned to a design-bid-build request for proposal (RFP) where TDCJ evaluates both the qualifications and price so the lowest bid one does not always win, but rather the most qualified vendor based on past performance or similar experience on these types of projects will be awarded the contract. 4/8/26 Tr. at 159:16–161:12 (Cox).

536.    TDCJ continues to evolve and is now moving towards a construction manager at risk (CMAR) procurement method, where TDCJ hires the contractor before the project goes into design and the contractor and designer work together both reporting to TDCJ, thereby facilitating a more collaborative effort in the development of the final design. 4/8/26 Tr. at 159:16–161:12 (Cox).

537.    TDCJ envisions that moving from the design-bid-build to CMAR will provide the single biggest way to speed up the process of delivering the final product. 4/8/26 Tr. at 159:16–161:12 (Cox). Thus far, TDCJ has done two CMAR projects, and the quality of the contractor has improved. 4/8/26 Tr. at 159:16–161:12 (Cox).

538.    Moving to CMAR speeds things up and helps TDCJ contain costs. 4/8/26 Tr. at 162:6–24 (Cox). Cox believes that TDCJ completing installation of air conditioning projects in 36–51 months going forward is not unreasonable, assuming all the funding and necessary equipment are readily available using the CMAR procurement method. 4/8/26 Tr. at 162:25–163:22 (Cox).

539.    Currently, TDCJ has 104 units, 38 of which have fully air-conditioned inmate housing areas—up from 32 at the time of the preliminary injunction hearing. 4/9/26 Tr. at 242:18–243:2 (Hudson). Another 52 units are partially air-conditioned. 4/9/26 Tr. at 243:3–4 (Hudson).

540.    About 6,800 cool beds have been added since the preliminary injunction in this case. 4/9/26 Tr. at 243:20–24 (Hudson).

541.    Plaintiffs' allegations that TDCJ's efforts to build 3,857 air-conditioned beds per year are baseless ones, lacking any evidence that this is a constant rate of construction. 4/6/26 Tr. at 307:15–24 (Ishee). As TDCJ began receiving significant funding and entered the first phase of these air conditioning projects cool beds were added more slowly while TDCJ moved these projects through design. 4/9/26 Tr. at 243:25–244:19 (Hudson). There has, however, been a tremendous amount of progress made over the last couple of years as TDCJ began receiving significant funding and more experience. 4/9/26 Tr. at 244:20–24 (Hudson).

542.    At the end of 2017 when Collier made installation of air conditioning a priority, TDCJ had 36,777 cool beds out of the total capacity of 152,432 cool beds. 4/9/26 Tr. at 245:22–247:1 (Hudson), Def. Ex. 257. As of March 2026, TDJC has 52,438 cool beds. 4/9/26 Tr. at 246:6–247:1 (Hudson). TDCJ has another 12,584 currently in construction and another 18,922 beds in procurement, and additional beds in design. 4/9/26 Tr. at 246:6–247:1 (Hudson). When you add all this together, based on TDCJ's current capacity, TDCJ has about 38% of its capacity left in need of air conditioning. 4/9/26 Tr. at 246:6–247:1 (Hudson).

543.    While TDCJ has a current population of 141,000, it has a total capacity of 158,000 total beds and TDCJ's goal is to air condition all 158,000 beds. 4/9/26 Tr. at 247:2–10 (Hudson).

544.    TDCJ is also working on constructing air-conditioned expansion dorms which TDCJ received funding to construct from the last legislative session. 4/9/26 Tr. at 247:11–248:2 (Hudson). The contractor has signed the CMAR contract for four of those projects and for the other nine projects TDCJ is waiting on the award to the contractor to be finalized, which will bring another 5,600 cool beds online by first part of 2028. 4/9/26 Tr. at 247:11–248:2 (Hudson).

545.    TDCJ also acquired the Dalby Unit with approximately $100 million in funds it received in the last legislative session, which will add 1,906 cool beds once it is brought fully online. 4/9/26 Tr. at 248:3–17 (Hudson).

546.    By the end of 2026, TDCJ will have a little over 61,000 cool beds. 4/9/26 Tr. at 248:25–249:3 (Hudson). And TDCJ anticipates completing close to 91,000 total cool beds by the end of 2027 or early 2028. 4/9/26 Tr. at 253:11– 23 (Hudson).

**G.    TDCJ is in the midst of scaling up its air conditioning installation.**

547.    Recently, going into the 90th Legislative Session, TDJC prepared a two-phase plan setting forth how TDCJ could install air conditioning in all remaining units not currently in progress. 4/8/26 Tr. at 189:17–23 (Cox), Def. Ex. 25. This plan was created to give a basis of the cost for the remaining air conditioning projects if completed over the next two biennia. 4/8/26 Tr. at 190:7–23 (Cox).

548.    TDCJ is now able to move quickly because it has a lot of the initial details worked out. 4/8/26 Tr. at 190:7–23 (Cox). TDCJ is scaling up the speed at which it is installing air conditioning by continually improving and streamlining its processes based on the experience gained on these projects. 4/8/26 Tr. at 194:22–195:19 (Cox).

549.    There have been many changes in TDCJ's engineering department over the last three to four years to handle the increased work associated with the air conditioning projects. 4/8/26 Tr. at 152:6–153:1 (Cox). TDCJ recently made significant additions to the engineering group consisting of project managers and program managers to take the air conditioning projects from concept to completion. 4/8/26 Tr. at 152:6–153:1 (Cox). Having this new group in place will help TDCJ's ability to manage the large air conditioning projects and make sure they stay on track. 4/8/26 Tr. at 153:2–16 (Cox).

550.    In addition to the increased staffing in both the engineering and procurement departments, TDCJ has taken additional steps to speed up the process of installing air conditioning. 4/9/26 Tr. at 253:24–256:13 (Hudson). TDCJ looked at various procurement methods and

84

determined that CMAR is going to be the best solution for TDCJ and will speed things up in the future. 4/9/26 Tr. at 253:24–256:13 (Hudson). TDCJ's first projects using the CMAR method are the expansion dorms currently in progress. 4/9/26 Tr. at 253:24–256:13 (Hudson). TDCJ is taking its learnings from those projects to move forward with using CMAR on future air conditioning retrofits. 4/9/26 Tr. at 253:24–256:13 (Hudson).

551.    TDCJ is also exploring the bundling of projects to bring the total projects to a value of over a hundred-million dollars which it believes will attract more, larger vendors. 4/9/26 Tr. at 253:24–256:13 (Hudson). TDCJ intends to begin bundling projects with CMAR. 4/9/26 Tr. at 253:24–256:13 (Hudson).

552.    Moving forward with CMAR, additional staff on board, and work done advertising these projects to the vendor pool, TDCJ feels good about where it is heading in the future with these air conditioning projects. 4/9/26 Tr. at 253:24–256:13 (Hudson).

553.    TDCJ is doing everything it can to speed up installing air conditioning. 4/9/26 Tr. at 257:15–17 (Hudson). TDCJ is now seeing these air conditioning projects moving 14 months faster than in the beginning and believes with the implementation of CMAR and other things these projects will continue to move even faster. 4/9/26 Tr. at 256:17–257:14 (Hudson).

554.    On March 25, 2026, TDCJ updated its website to reflect the current status of air conditioning projects. Def. Ex. 254. Per this update, TDCJ has completed 15,661 cool beds since 2018 with an additional 12,584 beds under construction, 18,922 beds in procurement, and 9,206 beds in design across multiple units. 4/9/26 Tr. at 270:10–14 (Hudson).

555.    Estimated completion dates for the 12,584 cool beds currently under construction are as follows:

- Boyd Unit will be completed sometime before the summer of 2027, adding 1,365 cool beds. 4/9/26 Tr. at 270:18–271:4 (Hudson);
- Estelle Unit will be online by August 2026, adding 216 cool beds. 4/9/26 Tr. at 271:5–16 (Hudson);

- Gurney will be done by December 2026, adding 2,128 cool beds. 4/9/26 Tr. at 271:13–18 (Hudson);

- Hightower will be completed before the summer of 2027, adding 1,384 cool beds. 4/9/26 Tr. at 271:19–272:7 (Hudson);

- Jester III will be completely finished by December 2026; adding 914 cool beds. 4/9/26 Tr. at 272:8–12 (Hudson);

- Luther will be completed by December 2026, adding 1,304 cool beds. 4/9/26 Tr. at 272:13–18 (Hudson);

- Polunsky will be completed by the summer of 2027, adding 432 cool beds. 4/9/26 Tr. at 272:13–18 (Hudson);

- Powledge has some beds running online right now and will be completed before December 2026, adding 1,123 cool beds. 4/9/26 Tr. at 272:19–23 (Hudson);

- Stevenson will be completed by the summer of 2027 and probably sooner, adding 1,377 cool beds. 4/9/26 Tr. at 272:24–273:1 (Hudson);

- Stiles will come online by the summer of 2027, adding 432 cool beds. 4/9/26 Tr. at 273:2–4 (Hudson);

- Stringfellow will be completed by August 2026 and probably sooner, adding 319 cool beds. 4/9/26 Tr. at 273:2–10 (Hudson); and

- Terrell will be completed by the end of 2026 with a lot of beds coming online this summer, adding a total of 1,589 cool beds. 4/9/26 Tr. at 273:11–18 (Hudson).

556.    TDCJ does not wait until the whole unit gets completed to turn on the air conditioning, so as sections of housing areas are completed, they are brought online, meaning some cool beds will be online prior to the estimated completion date. 4/9/26 Tr. at 271:19–272:5 (Hudson).

557.    And TDCJ has another 9,206 cool beds in the design phase. Def. Ex. 254.

558.    TDCJ has gone from 35,000 air-conditioned beds in 2018 to 60,000 by the end of 2026. 4/6/26 Tr. at 165:15–166:4, 230:25–231:8, 231:19–232:1 (Nichols). By either the end of 2027

86

or early 2028, TDCJ will have 90,000 cool beds utilizing the funding it has already received from the Legislature. 4/6/26 Tr. at 165:15–166:4, 230:25–231:8, 231:19–232:1 (Nichols). And TDCJ is already designing additional units in anticipation of receiving additional funds from the Legislature. 4/9/26 Tr. at 245:3–21 (Hudson).

559.    TDCJ is trending in the right direction to complete its goal of air conditioning all inmate housing areas and is going to get there. 4/6/26 Tr. at 165:15–166:4, 230:25–231:8, 231:19–232:1 (Nichols).

**VII.    The design and construction project delivery methods TDCJ uses are reasonable.**

**A. The traditional design-bid-build method works for TDCJ.**

560.    TDCJ's procurement method has evolved over the last several years, going from low bid, lump sum to the design bid build RFP process and now to the CMAR process. 4/8/26 Tr. at 193:3–11 (Cox).

561.    TDCJ has not used the design build procurement process due to its negative past experiences using that procurement method. 4/8/26 Tr. at 193:12–194:6 (Cox). There are also too many unknowns to account for in design build and TDCJ would lose control over the design firm because the design firm works for the contractor. 4/8/26 Tr. at 193:12–194:6 (Cox). There can also be conflicts between contractors and designers to deal with. 4/8/26 Tr. at 193:12–194:6 (Cox).

562.    The examples of using design build on highway projects that Plaintiffs cite are not fair analogies to air conditioning retrofits as horizontal flat work is not as complicated as building construction work. 4/8/26 Tr. at 194:7–21 (Cox).

563.    Using the design build procurement method is a lot riskier cost-wise than design-bid-build or CMAR. 4/8/26 Tr. at 201:19–203:6 (Cox). In design build, the design firm learns things after construction has started making it necessary to increase the construction budget as things progress and there is no cap. 4/8/26 Tr. at 201:19–203:6 (Cox). And there is a risk-shifting mechanism whereby the owner is at risk for all increased costs. 4/8/26 Tr. at 201:19–203:6 (Cox).

**B.    TDCJ's expert, Chris Caddell, supports TDCJ's choice of the design-bid-build for the air conditioning retrofit projects.**

564.    Christopher Caddell has 38-plus years of experience in engineering practice. 4/9/26 Tr. at 55:11–12 (Caddell). Caddell is a registered professional engineer in the state of Texas and holds a Project Management Professional Certification from the Project Management Institute, a certification revolving around managing projects in both construction and other types of projects. 4/9/26 Tr. at 55:14–56:14 (Caddell). Caddell also holds a Certified Cost Professional Certification from Association for the Advancement of Cost Engineering that focuses on managing cost and schedule components of projects, both the development of costs and schedule and then, the execution of risk management. 4/9/26 Tr. at 55:14–56:14 (Caddell). Caddell also holds another specialized certification with the Decision and Risk Management Professional, also from AACE, that focuses on managing risk in projects, programs, and organizations. 4/9/26 Tr. at 55:14–56:14 (Caddell). The Court admitted Caddell as an expert in engineering design and construction project development and execution. 4/9/26 Tr. at 57:13–17 (Caddell).

565.    There are a number of unique situations involving designing air conditioning retrofits in a Texas prison. 4/9/26 Tr. at 58:21–59:17 (Caddell).

566.    One is geography, they are spread all over the state of Texas which is a large state. 4/9/26 Tr. at 58:21–59:17 (Caddell).

567.    The age of the facilities is another major component as they are a minimum of 25 years old and some date back to the 19th Century. 4/9/26 Tr. at 58:21–59:17 (Caddell). All these buildings were constructed without any consideration of a future retrofit for air conditioning, so it presents some unique challenges in how you then retrofit an old building. Security requirements and other restrictions also bring unique challenges. 4/9/26 Tr. at 58:21–59:17 (Caddell).

568.    Plaintiffs' experts, Carroll, Steigerwalt, Barry, and Ramey, did not address the unique requirements of working in TDCJ prisons while advocating that TDCJ use the design build project delivery method, and instead only focused on timesaving. 4/9/26 Tr. at 61:8–15 (Caddell). And such savings are not guaranteed—one cannot give absolute guarantees because you must look

at numerous factors to be able to understand what the appropriate method for each application is. 4/9/26 Tr. at 61:20–62:6 (Caddell).

569.    When doing these air conditioning retrofits, it is important to get the design right up front because there will be a lot of unknowns uncovered during the investigatory process of the design. 4/9/26 Tr. at 59:18–60:7 (Caddell). Part of the design process is to perform a lot of investigation into existing conditions to determine how to retrofit these facilities to accommodate the new air-conditioning facility or equipment. 4/9/26 Tr. at 59:18–60:7 (Caddell). TDCJ needs to maintain a high level of control over these projects. 4/9/26 Tr. at 60:8–16 (Caddell). It is not just the codes and regulations to consider, but it is also that these are operating facilities so it is crucial to understand how the ultimate design will be constructable in an operating facility while continuing to maintain all the security requirements and safety of everyone that is visiting the facility. 4/9/26 Tr. at 60:8–16 (Caddell).

570.    The design build project delivery method is not the proper choice for projects with these complex retrofits. 4/9/26 Tr. at 60:17–61:7 (Caddell). And the time savings in this method suggested by Plaintiffs' experts using a design build procurement method is overstated and flawed for various reasons. 4/9/26 Tr. at 60:17–61:7 (Caddell).

571.    The design-bid-build method used by TDCJ is superior to design build as it allows TDCJ to work out all the safety, security, and other issues through the design process in advance of starting construction, which makes construction more seamless and efficient. 4/9/26 Tr. at 60:17–61:7 (Caddell).

572.    Caddell explained that he disagrees with Carroll's contention that design-bid-build method is absolutely the slowest process and that Carroll is the only person he has ever heard express that opinion. 4/9/26 Tr. at 62:7–11 (Caddell). The time savings advocated by Carroll and Exponent is not as pronounced as it would be under normal circumstances with a new construction project. 4/9/26 Tr. at 65:4–66:23 (Caddell).

573.    An advantage of design-bid-build procurement method is that the designer serves as an advocate for the owner in providing checks and balances over the contractor, making sure that

89

the contractor's work complies with the design requirements which are in conformance with TDCJ's requirements. 4/9/26 Tr. at 62:12–22 (Caddell).

574.    The design-bid-build procurement also reduces the number of change orders necessary in a project because modifications to the design are handled in the design process prior to construction and therefore do not necessitate costly change orders. 4/9/26 Tr. at 62:23–63:23 (Caddell). Contrarily, in design build, because construction starts prior to completion of the design, changes to the design are not as easy to deal with. 4/9/26 Tr. at 62:23–63:23 (Caddell).

575.    Changes to the design after construction starts requires the contractor to re-procure materials to meet the design change which increases costs. 4/9/26 Tr. at 63:24–64:21 (Caddell). Construction may need to be stopped, which depending on the stage of construction can cause security issues in an occupied prison. 4/9/26 Tr. at 63:24–64:21 (Caddell). Utilizing the design-bid-build method, TDCJ has experienced very few changes once they start construction because TDCJ got complete designs prior to starting construction. 4/9/26 Tr. at 64:22–65:3 (Caddell).

576.    Caddell identifies a number of factors to consider when considering which procurement method to use as listed in published papers and guidelines by the American Institute of Architects and Construction Management Association of America. 4/9/26 Tr. at 66:24–67:10 (Caddell).

577.    American Institute of Architects (AIA) is a reliable authority on this topic as it is a worldwide organization with over 100,000 members. 4/9/26 Tr. at 67:15–24 (Caddell). The AIA is familiar with all types of project delivery methods and supports both design build and design-bid-build type projects. 4/9/26 Tr. at 67:15–24 (Caddell).

578.    Complexity of the project is a major factor in determining which approach is best. 4/9/26 Tr. at 68:3–10 (Caddell). Plaintiffs did not evaluate complexity when advocating the design build procurement method. 4/9/26 Tr. at 68:11–14 (Caddell).

579.    Budget and control are other key factors that must be evaluated on a project-by-project basis. 4/9/26 Tr. at 68:15–23 (Caddell).

90

580.    Risk allocation is another factor to consider, particularly for government agencies that try to allocate much, if not all, of the risk to the contractors on these projects. 4/9/26 Tr. at 68:24–69:13 (Caddell). Plaintiffs did not evaluate this factor. 4/9/26 Tr. at 68:24–69:13 (Caddell).

581.    Another important factor in choosing the procurement method is the relative need for the owner's involvement in the project. 4/9/26 Tr. at 69:14–20 (Caddell). In design-bid-build, the owner has more involvement in the design aspect because the designer works for the owner. 4/9/26 Tr. at 70:5–10 (Caddell). Owner involvement is absolutely important to TDCJ because the design needs to be something that can be constructed in a facility that is operating at the same time. 4/9/26 Tr. at 69:21–70:4 (Caddell).

582.    Another factor is the level of the owner's experience or expertise. 4/9/26 Tr. at 70:11–23 (Caddell). TDCJ and other Texas public entities do not have a tremendous amount of experience with design build beyond maybe transportation projects and few other limited instances. 4/9/26 Tr. at 70:11–23 (Caddell). So, TDCJ in particular has not used the design build method so that would present some challenges due to the learning curve. 4/9/26 Tr. at 70:11–23 (Caddell).

583.    Construction Management Association of America (CMAA) is an organization focused on construction management. 4/9/26 Tr. at 71:9–17 (Caddell). CMAA is a reliable authority for construction management. 4/9/26 Tr. at 71:18–22 (Caddell). In fact, Plaintiff's expert, Steigerwalt, is a member of CMAA. 4/9/26 Tr. at 71:1–16 (Caddell). CMAA publishes the considerations in selecting a delivery method that encapsulates the same attributes that were covered in the AIA list. 4/9/26 Tr. at 71:1–16 (Caddell).

584.    CMAA states that foremost importance to the owner is that the desired facility functions as envisioned while successfully fulfilling the needs of the owner and users, which is a particularly important factor both with the design and operation aspects. 4/9/26 Tr. at 72:17–24 (Caddell).

585.    One advantage of the design-bid-build method is that it is the most common approach for public owners, like TDCJ. 4/9/26 Tr. at 73:12–17 (Caddell). Another advantage of design-bid-build is that owner has significant amount of control over the end product, particularly

91

since the facility's features are fully determined and specified prior to the selection of the contract. 4/9/26 Tr. at 73:18–25 (Caddell). This ensures the owner has the ability to make sure the design is complete and in compliance with all its needs prior to selecting a contractor. 4/9/26 Tr. at 73:18–25 (Caddell).

586.    Disadvantages of the design build that the CMAA article highlights are the owner has less design control and involvement. 4/9/26 Tr. at 74:15–75:18 (Caddell). There are less checks and balances because the designer works for the contractor under design build, not for the owner, meaning the impetus for the design firm or if it is in-house with the contractor is to really optimize the profit for the contractor, not optimize the design and operation of the facility for the owner. 4/9/26 Tr. at 74:15–75:18 (Caddell).

587.    Plaintiffs' experts did not perform a full and complete analysis of all the factors that should be considered including advantages and disadvantages of the different procurement delivery methods when advocating that TDCJ should switch over to the design build delivery method. 4/9/26 Tr. at 75:19–25 (Caddell).

588.    Plaintiffs' experts offer no examples of the design build procurement method being used to retrofit prisons. 4/9/26 Tr. at 76:1–7. Instead, Plaintiffs' experts offer examples of highway projects and border walls which are completely different types of construction projects that are not suitable or applicable to TDCJ's air conditioning retrofits. 4/9/26 Tr. at 76:8–25 (Caddell).

589.    The Pankow study that Plaintiffs' experts rely upon to advocate time savings of the design build method involves only new construction of commercial buildings, not renovations, which are not the same type of project. 4/9/26 Tr. at 77:12–78:7 (Caddell). This study does not provide a reliable basis to conclude TDCJ's projects would have the same time savings. 4/9/26 Tr. at 78:8–19 (Caddell).

590.    Plaintiffs incorrectly allege that TDCJ is restricting the vendor pool that bids on its projects. 4/9/26 Tr. at 78:20–79:11 (Caddell). TDCJ advertises its projects on nationally available websites. 4/9/26 Tr. at 78:20–79:11 (Caddell).

591.    Design build is not necessarily going to achieve the time savings Plaintiffs claim. 4/9/26 Tr. at 99:19–100:9 (Caddell). Plaintiffs' experts are attributing general studies that are not applicable to this type of project and fail to show any examples of time savings happening in the type of project at issue. 4/9/26 Tr. at 99:19–100:9 (Caddell). And the time savings potentially gained by design build are often offset by a significant loss of control and involvement by the owner and other stakeholders. 4/9/26 Tr. at 101:12–19 (Caddell).

592.    Design build may be inappropriate if the owner is looking for an unusual or iconic design, which is definitely the situation with TDCJ's air conditioning projects. 4/9/26 Tr. at 101:25–102:7 (Caddell).

593.    Bottom line, there is not one delivery method that is right for every project as Plaintiffs suggest. 4/9/26 Tr. at 103:8–11 (Caddell). If there were, that delivery method would have replaced everything else by now. 4/9/26 Tr. at 103:8–11 (Caddell). No delivery method is right for every project. 4/9/26 Tr. at 72:25–73:6 (Caddell).

594.    TDCJ's decision to move to CMAR going forward is good development as having the input of a contractor during the design phase can be beneficial if that design contractor has experience with these types of correctional facilities. 4/9/26 Tr. at 80:23–81:5 (Caddell).

595.    The owner, in this case TDCJ, is in the best place to evaluate the factors that go into deciding which project delivery method should be used. 4/9/26 Tr. at 103:12–17 (Caddell). TDCJ's decision to use the design-bid-build method to this point was a reasonable choice. 4/9/26 Tr. at 80:12–22 (Caddell).

C.    **TDCJ's expert, Jared Higgins, also supports TDCJ's choice of the design-bid-build project delivery method for TDCJ's air conditioning retrofit projects.**

596.    Higgins is a registered mechanical engineer and a partner with the architectural engineering firm Parkhill. 4/8/26 Tr. at 249:14–22 (Higgins). He holds a Bachelor of Science in mechanical engineering from Texas Tech University, 4/8/26 Tr. at 249:23–250:4 (Higgins) and has roughly 20 years of experience in design engineering work. 4/8/26 Tr. at 250:8–14 (Higgins).

597.    Higgins's career as an engineer has included regular engagement with public procurement with Texas state and local government clients. 4/8/26 Tr. at 251:9–24 (Higgins).

598.    Higgins has handled design work for at least 15 TDCJ prison projects and other county jail projects, 4/8/26 Tr. at 252:8–10, 252:21–23 (Higgins), including as lead design engineer. 4/8/26 Tr. at 253:10–20 (Higgins). He also performed work as a construction administrator on TDCJ projects. 4/8/26 Tr. at 253:21–23, 254:17–22 (Higgins).

599.    Higgins has performed design work for both state and federal government clients. 4/8/26 Tr. at 254:23–255:2 (Higgins).

600.    Higgins testified that design engineering is the process of preparing and completing construction documents for a project while construction administration provides general oversight of a project as it progresses through construction. 4/8/26 Tr. at 253:24–254:13 (Higgins). Consequently, construction administrators work closely with the construction crew or contractor. 4/8/26 Tr. at 254:14–16 (Higgins).

601.    The Court admitted Higgins as an expert in engineering design and construction project delivery methods. 4/8/26 Tr. at 255:7–11 (Higgins).

602.    Higgins described the three main project delivery methods used in public procurement, the design-bid-build, design-build, and construction manager at risk. 4/8/26 Tr. at 255:17–256:1 (Higgins).

603.    Higgins has done design work on projects that use all three of the main procurement methods. 4/8/26 Tr. at 257:22–24 (Higgins).

604.    Design-bid-build is an "industry standard method," 4/8/26 Tr. at 257:25–258:2 (Higgins), and the majority of state agencies that utilize their own procurement services use design-bid-build as their predominant procurement method, including Texas Health and Human Services Commission, Texas General Land Office, Texas Juvenile Justice Department, Texas Department of Public Safety, and Texas Department of Parks and Wildlife. 4/8/26 Tr. at 258:3–16 (Higgins).

605.    Conversely, no state agency relies on design-build as its principal procurement method. 4/8/26 Tr. at 258:17–23 (Higgins).

606.    Higgins estimated that roughly 80 to 85% of state projects are delivered using design-bid-build. 4/8/26 Tr. at 259:11–15 (Higgins). And there is no trend of design build or another procurement method supplanting design-bid-build as the main method in state projects. 4/8/26 Tr. at 259:16–260:1 (Higgins).

607.    Likewise, design-bid-build is the principal project delivery method for federal procurement. 4/9/26 Tr. at 6:15–22 (Higgins). Higgins estimated that roughly 75% of federal projects are delivered using design-bid-build. 4/9/26 Tr. at 6:23–25 (Higgins).

608.    Higgins testified that TDCJ's design process does not take significantly longer than that of other government agencies and that the four-to-six-month timeline for design that Mr. Cox said was typical for TDCJ projects was also "typical of public projects from other state agencies," 4/9/26 Tr. at 7:13–8:1 (Higgins), as well as of federal procurement. 4/9/26 Tr. at 8:2–5 (Higgins).

609.    Higgins opined that the advantages of design-bid-build include the optionality to support a high degree of owner involvement in the design process. 4/8/26 Tr. at 260:2–18 (Higgins).

610.    Owner involvement in the design process is especially important in renovation projects because of the higher likelihood that the design team will encounter unforeseen circumstances that require changing the project. 4/8/26 Tr. at 262:3–15 (Higgins).

611.    Higgins testified that CMAR also allows a high degree of owner involvement, but design build does not because in a design build project the design engineer is employed by the contractor, not the owner. 4/8/26 Tr. at 262:19–263:10 (Higgins).

612.    Even when a design build contract facilitates owner input in design the design engineer will be the agent of the contractor and accountable to him, not the owner. 4/8/26 Tr. at 263:11–264:2 (Higgins).

613.    Another advantage of design-bid-build is that it allows owners to obtain complete designs before they engage a construction contractor. 4/8/26 Tr. at 264:3–8 (Higgins). This allows the owner to ensure that construction will deliver a project that meets his needs and increases the likelihood of delivery within budget. 4/8/26 Tr. at 264:9–19 (Higgins).

614.    Further, soliciting bids with complete design documents typically facilitates lower overall bids, which for a public entity is important to spend taxpayer money carefully and responsibly. 4/8/26 Tr. at 265:5–266:6 (Higgins).

615.    However, in design-build projects the owner enters a contract and pays for construction services without complete knowledge of what the construction process will deliver. 4/8/26 Tr. at 265:19–266:1 (Higgins).

616.    Higgins disagreed with Plaintiffs' expert that design-bid-build is the slowest procurement method. 4/8/26 Tr. at 266:7–16 (Higgins).

617.    Further, Higgins testified that claims that design build is faster do not count the pre-solicitation work that must be completed before bidding can commence on a design build project. 4/8/26 Tr. at 266:25–267:22 (Higgins). Before a design build contract can be awarded a scope of work package that comprises all the information that a contractor would need to provide pricing must be created. 4/8/26 Tr. at 267:23–268:12 (Higgins). A scope of work package includes significant preliminary design work. 4/8/26 Tr. at 268:13–15 (Higgins).

618.    One item that might be necessary to include in a scope of work package is a geo-technical report, which provides information on the soil relevant to the construction or improvement of a structure's foundation. 4/8/26 Tr. at 268:16–269:3 (Higgins). AC projects that involve erecting a chilled water plant—such as many of TDCJ's—will typically require a new structure and therefore a geo-technical report. 4/8/26 Tr. at 269:12–22 (Higgins).

619.    The front-end design work that goes into a scope of work package takes between 6 weeks and 6 months, 4/8/26 Tr. at 270:7–11 (Higgins), and may involve the owner hiring an outside design firm. 4/8/26 Tr. at 270:12–22 (Higgins). An owner may need to hire a design firm to create a scope of work package for a design-build project because the amount of preliminary design work may be significant and beyond the owner's capabilities. 4/8/26 Tr. at 270:23–271:5 (Higgins).

620.    Moreover, once the design build contract is awarded the design firm will still need to verify all the information contained within the scope of work package. 4/8/26 Tr. at 271:6–12 (Higgins).

96

621.    Conversely, design-bid-build provides a single seamless design process. 4/8/26 Tr. at 271:23–25 (Higgins).

622.    Higgins testified that when the time required for the scope of work package is accounted for a design build project on average takes the same overall length of time as a design-bid-build project. 4/8/26 Tr. at 272:1–11 (Higgins).

623.    Higgins also testified that design-build delivery carries a higher risk that change orders will need to be made during construction due to that method's relatively cursory initial design. 4/8/26 Tr. at 272:16–273:5, 273:13–20 (Higgins). For example, Higgins recounted a TDCJ, design-bid-build project he worked on where thorough design review of a mechanical system revealed that wastewater that system could not be discharged in the sewers. Had the project been delivered using design build method the infeasibility of discharge through the sewers would not likely have been caught by the scope of work package. 4/8/26 Tr. at 273:21–275:5 (Higgins).

624.    Numerous change orders can delay construction and increase costs. 4/8/26 Tr. at 275:13–16 (Higgins).

625.    Higgins testified that the security needs of prison facilities create challenges for design and construction teams to perform onsite work. 4/9/26 Tr. at 8:6–12:16. Design and construction crews need to observe TDCJ's security protocols when they conduct site work at operational prisons. 4/9/26 Tr. at 8:14–9:5, Def. 107 at 81 (Higgins).

626.    These security protocols require personnel to be checked for contraband and require a tool check at the beginning and end of each workday to ensure that construction tools have not been misplaced or kept by inmates. 4/9/26 Tr. at 8:14–23, 10:6–22 (Higgins).

627.    Compliance with TDCJ security protocols drastically shortens an average workday to four to six hours instead of the standard eight. 4/9/26 Tr. at 11:2–6 (Higgins). Compliance with security protocols lengthens the overall timeline necessary to complete a prison project. 4/9/26 Tr. at 11:14–17 (Higgins).

628.    While onsite work is ongoing, inmates need to be sequestered away from construction and design crews. 4/9/26 Tr. at 11:7–11 (Higgins). Inmate issues can necessitate

prison officials placing all or part of a unit on lockdown, and during lockdown, workers are not permitted access to the unit and cannot continue work. 4/9/26 Tr. at 11:21–12:2 (Higgins). Higgins testified that on several occasions he was unable to escorted offsite while conducting design investigations at a prison unit due to the prison being placed on lockdown. 4/9/26 Tr. at 12:3–8 (Higgins).

629.    In Higgins' experience, the need to comply with enhanced security measures and to endure the discomfort of a prison environment often leads design firms to decline prison work. 4/9/26 Tr. at 12:17–13:20 (Higgins).

630.    All prisons are designed to have a secure outer perimeter. 4/9/26 Tr. at 14:2–8 (Higgins). HVAC installation can compromise a prison's security by creating openings in its outer perimeter. 4/9/26 Tr. at 14:15–25 (Higgins). Openings for ducts and other HVAC components need to be secured by metal bars and other barriers. 4/9/26 Tr. at 14:15–25 (Higgins). Ensuring that this is done properly adds an additional layer of complexity to the design of prisons absent from other types of projects. 4/9/26 Tr. at 15:1–10 (Higgins).

631.    Higgins testified that because prison renovation involves a more complicated design process than highway construction Mr. Carroll's comparison of highway design to prison design was inapt. 4/9/26 Tr. at 15:11–16:9 (Higgins).

632.    Higgins testified that TDCJ's system I units come with several unique design challenges that will complicate air conditioning installation at these units. 4/9/26 Tr. at 16:10–21 (Higgins). The age and materials of system I units create a risk that water condensation from air conditioning will damage the structural integrity of walls and other building components. 4/9/26 Tr. at 16:22–18:14 (Higgins). Further, because system I units are so dated they may not have existing complete blueprints requiring design engineers to start composing design documents from scratch. 4/9/26 Tr. at 18:21–19:3 (Higgins). Due to these difficulties designing system I units will take longer than other units. 4/9/26 Tr. at 18:15–20 (Higgins).

633.    Installing HVAC in prisons must also take electricity needs and smoke exfiltration into account. 4/9/26 Tr. at 20:17–21:13 (Higgins).

634.    Design firms across Texas are currently experiencing very high levels of demand for their services. 4/9/26 Tr. at 23:14–24:13 (Higgins). A statewide construction "boom" means TDCJ must compete with private sector clients to hire design engineers. 4/9/26 Tr. at 24:17–25 (Higgins). Private sector work, in particular data center projects, is often more lucrative than prison construction and design. 4/9/26 Tr. At 25:4–10 (Higgins).

635.    Higgins testified that the abundance of private sector work increases both costs and the difficulty of soliciting contractors and design firms for TDCJ. 4/9/26 Tr. at 25:15–20 (Higgins).

636.    Higgins testified that even if TDCJ had the funding to initiate HVAC installation in all its unairconditioned units, it could not hire enough construction and design vendors to undertake work at every unit simultaneously. 4/9/26 Tr. at 26:10–19 (Higgins).

637.    Additionally, Higgins estimated that if TDCJ could somehow begin HVAC installation across its unairconditioned segment, the timeline needed to complete system-wide installation would be 48 to 72 months. 4/9/26 Tr. at 26:20–27:4 (Higgins).

638.    Higgins testified his estimate would not change if TDCJ adopted a primarily design build approach to procurement, 4/9/26 Tr. at 27:9–13 (Higgins), and that Plaintiffs' experts' 24-to 36-month timeline was not realistic even under perfect market conditions. 4/9/26 Tr. at 27:20–28:17 (Higgins).

639.    Higgins agreed that TDCJ is "doing everything that it can do to install air conditioning throughout its prison system" with its available resources and funding. 4/9/26 Tr. at 28:18–23 (Higgins).

**D.    Plaintiffs' experts advocate that TDCJ should use the design build method without any consideration of the multiple factors that need to be evaluated in selecting a project delivery method.**

**i.  Brian Carroll.**

640.    Carroll is not a professional engineer and does not hold project management professional, commission authority, or risk management certifications. 3/31/26 Tr. at 8:22–9:10 (Carroll).

99

641.    Carroll has never visited a Texas prison. 3/31/26 Tr. at 7:22–25 (Carroll).

642.    Complexity of HVAC design and construction is beyond the scope of Carroll's expertise and therefore he reviewed none of the designs for installation of HVAC systems in TDCJ's facilities that are either under construction or currently in design. 3/31/26 Tr. at 10:6–15 (Carroll).

643.    Carroll also did not review any requests for bids for HVAC renovation and installation projects at TDCJ. 3/31/26 Tr. at 10:16–19 (Carroll). Carroll is unaware what vendors have responded to any bids on TDCJ's HVAC projects or whether any out-of-state firms have submitted bids to the HVAC projects for TDCJ. 3/31/26 Tr. at 19:19–20:3, 21:12–15 (Carroll).

644.    Carroll agrees that installing HVAC across all TDCJ facilities is important for TDCJ to ensure these projects are well managed and that results in durable, functioning HVAC unites for TDCJ and the people in its care. 3/31/26 Tr. at 38:10–21 (Carroll). However, Carroll did not analyze the design complexity, construction complexity, maintenance, durability, safety, or TDCJ's experience on previous HVAC installation projects. 3/31/26 Tr. at 34:17–35:11 (Carroll).

645.    Carroll is not an expert on legislative appropriations. 3/31/26 Tr. at 11:7–9 (Carroll). Yet, Carroll claims TDCJ could simply return unobligated funds at the end of a biennium with no negative consequences while acknowledging credibility is important when seeking large appropriations. 3/31/26 Tr. at 12:10–19 (Carroll).

646.    Carroll was not part of the discussions between TDCJ and the legislature in previous legislative sessions about appropriations, did not review legislative transcripts, and is not aware of whether TDCJ has ever received full appropriations for their operating budget. 3/31/26 Tr. at 12:20–13:9 (Carroll). Nevertheless, Carroll opines that TDCJ has not identified any legitimate reason why it has not sought full HVAC installation in a single biennium. 3/31/26 Tr. at 13:19–24 (Carroll).

647.    Carroll is not familiar with TDCJ's budget and is unaware of its constituent parts for other items such as food, staff pay, fuel, and rehabilitation programs. 3/31/26 Tr. at 13:25–15:1 (Carroll).

648.    Carroll suggests that TDCJ unilaterally declare that it is going to spend 1.3 billion on an emergency basis and hope that when they go back to the Legislative Budget Board, the Governor's Office, or the Texas Legislature, that they get that money back, while agreeing that TDCJ does not control legislative appropriations and has an obligation to responsibly spend funds it has been appropriated. 3/31/26 Tr. at 27:12–28:2 (Carroll).

649.    Carroll acknowledges that design build is not always the most appropriate construction procurement method and even he sometimes recommends that his clients use the design-bid-build procurement method. 3/31/26 Tr. at 30:11–20, 31:9–18 (Carroll). Whether Carroll recommends design-bid-build, design build, CMAR or other procurement method will depend on the circumstances of the project, such as budget, design complexity, schedule, risk assessment, owner's level of experience, quality control, and legal and regulatory. 3/31/26 Tr. at 31:14–32:19 (Carroll).

650.    In all his 25 years of experience, Carroll could not provide the Court with any example of a prison system using design build for HVAC renovations. 3/31/26 Tr. at 37:1–5 (Carroll).

651.    Carroll acknowledges that he has seen design build projects go horribly wrong. 3/31/26 Tr. at 39:4–6. (Carroll).

### ii. Exponent.

652.    Plaintiffs retained the firm Exponent to serve as an expert witness on this case. 4/1/26 Tr. at 17:4–7 (Steigerwalt). Craig Steigerwalt primarily drafted Exponent's report with assistance from Michael Barry and Shannon Ramey. 4/1/26 Tr. at 17:8–22 (Steigerwalt).

653.    Steigerwalt agrees that as TDCJ gains experience in air conditioning design and implementation, this will allow it to scale up and move more quickly in the installation of air conditioning. 4/1/26 Tr. at 64:4–9, 69:25–70:2 (Steigerwalt).

654.    TDCJ's awarding of major work requests to larger, well-qualified firms in the design industry is a positive trend. 4/1/26 Tr. at 64:20–24 (Steigerwalt). Steigerwalt has no reason to

believe that TDCJ is restricting bids only to Texas firms and does not know whether TDCJ regularly works with nationwide or out-of-state design firms. 4/1/26 Tr. at 65:5–7, 11–15 (Steigerwalt). Steigerwalt is aware that TDCJ is publishing bids online to attract out-of-state contractors. 4/1/26 Tr. at 65:16–66:4 (Steigerwalt).

655.    When advising clients on choosing a procurement method, a variety of factors are considered. 4/1/26 Tr. at 73:15–17 (Steigerwalt). The right procurement method is a case-by-case determination. 4/1/26 Tr. at 73:25–74:2, 75:16–19 (Steigerwalt). Choosing the right procurement method really turns on what the owner's metric for success is because it is the owner's project. 4/1/26 Tr. at 74:3–8 (Steigerwalt). Ramey agrees that it is important to consider the owner's needs when selecting the procurement method. 4/1/26 Tr. at 137:7–15 (Ramey).

656.    Design-bid-build is known as the traditional delivery method. 4/1/26 Tr. at 71:18–21 (Steigerwalt). Over the last 10 years or so, there has been movement towards CMAR and design build, but it does not mean that everybody is, all of sudden, not using design-bid-build. 4/1/26 Tr. at 71:22–72:4 (Steigerwalt). Design-bid-build is still absolutely suitable today for projects. 4/1/26 Tr. at 72:5–8 (Steigerwalt).

657.    In order to utilize the design build procurement method, TDCJ needs to have preliminary designs called design concepts in place and Steigerwalt would expect that TDCJ would need to engage a design firm in order to put together these initial scoping documents. 4/1/26 Tr. at 68:6–23 (Steigerwalt).

658.    Steigerwalt believes that if TDCJ is moving towards CMAR as it scales up this would be a step in the right direction. 4/1/26 Tr. at 73:5–10 (Steigerwalt).

659.    Exponent used the 36- to 51-month timeline Cox testified about in his deposition as the keystone in the arch for the timeline it argued could be achieved using the design build method. 4/1/26 Tr. at 80:12–80:21 (Steigerwalt). Steigerwalt agrees that Cox's testimony about a 36- to 51-month timeline was about what might happen if TDCJ had all the resources needed, including all funding. 4/1/26 Tr. at 79:13–22 (Steigerwalt). And Steigerwalt agrees that, if realities are not in a

perfect world but rather in the real world, Exponent's purported 24- to 36-month timeline to install air conditioning systemwide would have to extend. 4/1/26 Tr. at 80:22–81:1 (Steigerwalt).

660. Steigerwalt understands that quality assurance and durability may be life-of-death matters for TDCJ to consider. 4/1/26 Tr. at 74:16–19 (Steigerwalt). However, Exponent did not analyze maintenance requirements on air conditioning systems to be installed as part of TDCJ projects. 4/1/26 Tr. at 82:5–7 (Steigerwalt). Exponent also did not analyze durability or safety concerns of air conditioning systems for TDCJ's air conditioning projects. 4/1/26 Tr. at 82:8–15 (Steigerwalt).

661. Barry has done no design work in Texas. 4/1/26 Tr. at 109:16–17 (Barry). He has never testified about what procurement method an owner should choose in a trial like this. 4/1/26 Tr. at 109:18–20 (Barry).

662. This is Barry's first experience dealing with TDCJ as an agency. 4/1/26 Tr. at 109:21–23 (Barry). Barry has not done any work design work in a prison setting. 4/1/26 Tr. at 110:2–4 (Barry). Barry has never visited a TDCJ facility. 4/1/26 Tr. at 110:5–6 (Barry).

663. Barry's only review of designs for air condition installation in TDCJ facilities was cursory. 4/1/26 Tr. at 110:7–10 (Barry).

664. Ramey is not licensed in Texas. 4/1/26 Tr. at 136:13–14 (Ramey). Ramey has not done any design work in Texas. 4/1/26 Tr. at 136:15–16 (Ramey). Ramey has never worked or performed any design work for a Texas prison. 4/1/26 Tr. at 136:20–137:1 (Ramey).

665. Ramey did not perform any analysis regarding the schedule and timelines of TDCJ's air conditioning projects. 4/1/26 Tr. at 138:3–6 (Ramey). Ramey did not perform any in-depth analysis of TDCJ's four-phase or three-phase plans. 4/1/26 Tr. at 139:7–9 (Ramey).

666. Ramey does not know the reasons why TDCJ has used the design-bid-build procurement method for its air conditioning renovations. 4/1/26 Tr. at 141:22–24 (Ramey).

667. Ramey has not reviewed the existing condition drawings for any of the previous TDCJ air conditioning projects. 4/1/26 Tr. at 142:7–10 (Ramey). Ramey has not spoken with any

design or construction professionals involved in TDCJ's air conditioning projects. 4/1/26 Tr. at 141:25–142:6 (Ramey).

668.     Ramey did not evaluate the maintenance issues that need to be considered for air conditioning systems that TDCJ is installing. 4/1/26 Tr. at 142:19–22 (Ramey). Ramey did not perform any analysis regarding the durability of the air conditioning systems that TDCJ is installing. 4/1/26 Tr. at 143:4–5 (Ramey).

669.     Exponent's report opines that TDCJ might improve efficiency by addressing the liquidated damages provision in its contracts. 4/1/26 Tr. at 75:20–76:2 (Steigerwalt). Steigerwalt's opinion was based solely on liquidated damages provisions common in the private sector, and he did not review liquidated damages provisions for other State agencies. 4/1/26 Tr. at 76:17–77:1 (Steigerwalt). Steigerwalt was not aware at the time this recommendation was made that Texas law forbids liquidated damages provisions in state agency contracts from being punitive. 4/1/26 Tr. at 77:2–7 (Steigerwalt).

## VIII.   Plaintiffs' members have not exhausted the administrative remedies available to them.

670.     ARRM also oversees the Grievance Office which tracks all heat related grievances. 4/2/26 Tri. at 82:18–22 (Echessa).

671.     The ARRM has a grievance department that uses the GR00 framework to track all grievances and code them by issue. 4/2/26 Tr. at 56:3–14 (Echessa). The Research and Development Department under ARRM queries the codes and creates and maintains reports specific to issues like heat-related illness. 4/2/26 Tr. at 56:3–14 (Echessa). ARRM also oversees the Grievance Office which tracks all heat related grievances. 4/2/26 Tri. at 82:18–22 (Echessa).

672.     Inmate grievances related to the heat, filed with TDCJ and as reported by TDCJ to the Texas Legislature, have consistently fallen with each passing year: 5,202 such grievances in 2023; 4,936 such grievances in 2024; and 4,319 such grievances in 2025. 3/31/26 Tr. at 328:4–329:11 (Lumpkin).

673.    TDCJ provides a two-step administrative remedy that allows inmates to file complaints concerning their treatment or conditions. 3/31/26 Tr. at 326:15–25 (Lumpkin). Inmates can grieve operational issues, services programs, or conduct of TDCJ's staff at all 104 facilities by filing an initial grievance (step one) and an appeal (step two) if TDCJ's response does not satisfy the aggrieved inmate. 3/31/26 Tr. at 326:15–25 (Lumpkin), 4/2/26 Tr. at 56:3–14 (Echessa). For each step, TDCJ has forty days to address an inmate's grievance. 3/31/26 Tr. at 326:15–25 (Lumpkin).

674.    TDCJ classifies grievances by subject matter and compiles the number of grievances related to heat. 3/31/26 Tr. at 327:1–7 (Lumpkin), 4/2/26 Tr. at 56:3–14 (Echessa). In addition to recording the number of heat-related grievances internally, TDCJ also gathers and annually reports heat-related grievances to the Legislature as part of its 'Rider 56' reporting. 3/31/26 Tr. at 325:17–326:3 (Lumpkin), Def. Exs. 136 (2022), 100 (2023), 72 (2024) and 214 (2025). Step one grievances are handled by prison officials at the complainant's unit while step two appeals are handled at the central office. 3/31/26 Tr. at 326:15–25, 328:9–113 (Lumpkin).

675.    According to the 2024 Rider 56 report, out of nearly 135,000 inmates, TDCJ received 829 step two grievances related to heat during 2024. 3/31/26 Tr. at 119:24–120:1 (Collier), Def. Ex. 72 at 1–2. According to the 2025 Rider report, TDCJ received 579 heat-related step two grievances during 2025. 3/31/26 Tr. at 120:22–23 (Collier), Def. Ex. 214 at 1–2.

676.    A grievance that TDCJ records being heat-related could cover a range of issues including lack of a working personal fan, access to heat mitigation, as well as high temperatures themselves, and does not necessarily convey a request for air-conditioned housing. 3/31/26 Tr. at 327:11–16 (Lumpkin).

677.    TDCJ collated the total heat-related step two grievances inmates filed between May 2022 and May 2024. Def. Ex. 53, 4/2/26 Tr. at 82:23–83:23 (Echessa).

678.    Defense counsel cross-referenced TDCJ's grievance record data between May 2022 and April 2024 with Lioness's membership list and found that only 11 inmates that Lioness claims as members had filed a step two grievance concerning heat—and only four of those inmates

105

were in unairconditioned housing. Def. Ex. 2 at 4. Each of the four inmates were housed at the Lane Murray Unit. Def. Ex. 2 at 4.

## IX. Plaintiffs do not represent the entire TDCJ inmate population.

### A. Lioness.

679. Lioness Justice Impacted Women's Alliance ("Lioness") was founded in 2022 by women who were formerly incarcerated in TDCJ facilities. 9/19/25 Toon Depo. at 11:2–19.

680. Jennifer Toon is the co-founder and executive director of Lioness and oversees the organization's operations. 4/1/26 Tr. at 147:19–148:15 (Toon).

681. Lioness restricts its membership to "individual[s] [who] have experienced…incarceration in the state of Texas" and "identify as a girl, woman, or gender expansive person." 9/19/25 Toon Depo. at 54:1–21.

682. Currently, and at the time of filing Lioness's incarcerated members are exclusively biological women. 4/1/26 Tr. at 188:5–7 (Toon), 9/19/25 Toon Depo. at 47:16–24, 48:5–15, 65:19–66:21.

683. Lioness members do not pay dues for membership, 4/1/26 Tr. at 189:19–21 (Toon), and Lioness does not ordinarily receive donations from inmates. 4/1/26 Tr. at 189:22–24 (Toon).

684. Lioness provided a list of its incarcerated members current at the time of filing. Def. 39, 4/1/26 Tr. at 188:17–189:6 (Toon).

685. Lioness identified 419 members who were incarcerated in a TDCJ unit at the time Lioness joined the litigation. 9/19/25 Toon Depo. at 63:19–25. According to Toon, of these, 261 had airconditioned housing assignments, leaving 158 members in unairconditioned housing who could claim to suffer from excessive heat. 9/19/25 Toon Depo. at 64:10–65:13. At trial, Toon testified the number of Lioness members with unairconditioned housing assignments was 118. 4/1/26 Tr. at 161:17–23 (Toon).

686. At the time of trial, the number of airconditioned beds at women's-only units exceeded 7,000. 4/1/26 Tr. at 193:23–194:15 (Toon), Def. 224. Toon testified that in her experience

inmates can be transferred from unairconditioned housing to airconditioned housing, 4/1/26 Tr. at 195:19–21 (Toon) and agreed that transferring inmates into airconditioned housing was likely easier and, from the standpoint of TDCJ's operations, less intrusive than building new air conditioning. 4/1/26 Tr. at 196:4–197:3 (Toon).

687.    Lioness members assigned to unairconditioned cells were incarcerated in the Lane Murray, Hobby, Carol Young, Crane, Hilltop, Mountain View, Woodman, and Plain units. 9/19/25 Toon Depo. at 68:12–69:11.

688.    Toon was formerly incarcerated in TDCJ but has not been housed in a TDCJ unit since December 2018. 4/1/26 Tr. at 179:20–180:5 (Toon).

689.    Since her release, Toon has entered only two TDCJ units on two separate occasions. 4/1/26 Tr. at 180:6–9 (Toon).

690.    During her incarceration Toon was housed at the O'Daniel, Lane Murray, Crain, Henley and Plane units. 4/1/26 Tr. at 180:10–19 (Toon). Most of these units were unairconditioned at the time of her incarceration. 4/1/26 Tr. at 149:12–17 (Toon). Toon acknowledged that since her release, TDCJ has made progress air conditioning its women's facilities so that, as of the day of her testimony, seven of twelve units were fully air conditioned and three were partially air-conditioned, leaving only the Hilltop and Hobby units without air conditioning. 4/1/26 Tr. at 187:10–188:4 (Toon).

691.    Toon testified she does not know what, if anything, is preventing air conditioning from being installed in TDCJ units. 4/1/26 Tr. at 175:11–16 (Toon).

692.    Toon testified that she has routine opportunities to meet with and address her concerns to high ranking TDCJ officials, including Defendant, about prison conditions. 4/1/26 Tr. at 190:20–193:22 (Toon). TDCJ regularly hosts open meetings that Toon frequently attends and has found beneficial. 4/1/26 Tr. at 191:16–192:5 (Toon). Toon is also a volunteer with TDCJ's reentry program, which oversees programs that aid in the reintegration of offenders into ordinary life. 4/1/26 Tr. at 192:18–193:8 (Toon). Toon has even been invited by TDCJ to tour its prison units. 4/1/26 Tr. at 192:14–17 (Toon).

107

693.    Toon testified that her engagement with TDCJ was "helpful" to Lioness's mission, 4/1/26 Tr. at 193:19–22 (Toon) and has allowed her to resolve issues faced by Lioness members. 4/1/26 Tr. at 191:7–15 (Toon).

**B.    Texas CURE.**

694.    Charles Malouff is the Vice President of Texas Citizens United for the Rehabilitation of Errants ("TX CURE" or "CURE") and conducts its day-to-day operations. 4/1/26 Tr. at 200:10–12. Mr. Malouff testified on behalf of TX CURE. 4/1/26 Tr. at 200:1–5 (Malouff).

695.    Malouff testified that at a given time between 50 and 100 inmates participate in CURE's myriad programs, 4/1/26 Tr. at 229:4–11 (Malouff), 9/3/25 Malouff Depo. Tr. at 36:2–10, and he estimated that CURE had helped 700 TDCJ inmates through its programming since CURE's inception. 9/3/25 Malouff Depo. Tr. at 37:20–38:7 (Malouff).

696.    TX CURE corresponds with TDCJ inmates, and Malouff testified that the number of inmates CURE corresponds with was 75 as of June 8, 2024, 4/1/26 Tr. at 228:9–12 (Malouff), and the number of inmates on its mailing list amounted to 222. Def. 243, 4/1/26 Tr. at 227:24–229:3 (Malouff), 9/3/25 Malouff Depo. Tr. at 73:16–74:3 (Malouff).

697.    CURE does not claim to have members and instead views the entire TDCJ prison population as its constituents. 4/1/26 Tr. at 202:24–203:7 (Malouff); 9/3/25 Malouf Depo Tr. at 67:3–5, 67:11–24 (Malouff).

698.    CURE does not have any inmates serving in leadership positions. 4/1/26 Tr. at 203:24–204:1 (Malouff), 9/3/25 Malouff Depo. Tr. at 75:16–20. Nor do inmates "ever vote to decide who will serve on CURE's leadership board." 9/3/25 Malouff Depo. Tr. at 75:10–15. CURE's leadership board approves high-level decisions, including new programs, while leaving the "day-to-day decision-making" to Malouff. 9/3/25 Malouff Depo. at 48:4–49:9 (Malouff).

699.    Malouff testified that inmates do not financially contribute to CURE. 9/3/25 Malouff Depo. Tr. at 51:17–52:6, 52:15–54:6; 4/1/26 Tr. at 202:9–11 (Malouff). Further,

108

Malouff testified that CURE did not seek approval from inmates before joining this lawsuit. 9/3/25 Malouff Depo. at 77:9–17, nor does the group consult with inmates before making litigation decisions. 9/3/25 Malouff Depo. at 78:12–16 (Malouff).

700.    Malouff was formerly incarcerated but has not been housed at TDCJ since his release in June 2018 and has not been inside the housing area of a TDCJ unit since his release. 4/1/26 Tr. at 216:18–217:14 (Malouff).

701.    Malouff was incarcerated in the Byrd, Hamilton, Torres, Pack, Michael, Dominguez, Memorial, Estelle and Diboll units, and during his time at TDCJ none of these units had permanent air conditioning. 4/1/26 Tr. at 217:15–218:8 (Malouff). At the time of trial, the Pack Unit was fully air conditioned, 4/1/26 Tr. at 218:9–11 (Malouff), and TDCJ had made progress adding air conditioning to seven of the nine units where Malouff had been housed. 4/1/26 Tr. at 220:3–10 (Malouff), Def. 224.

702.    Malouff has lobbied the Legislature to require and fund air conditioning in TDCJ prisons. 4/1/26 Tr. at 221:18–225:19 (Malouff).

703.    This advocacy includes support for HB 1708, HB 1355, and HB 2950 during the Texas Legislature's 88th regular session. 4/1/26 Tr. at 222:3–13 (Malouff). These bills would have mandated the relief that Plaintiffs are requesting, maintaining temperatures in TDCJ units between 65 and 85 degrees. 4/1/26 Tr. at 222:24–223:3 (Malouff), 13–16.

704.    The Texas House of Representatives created fiscal analyses for HB 1355 and HB 2950 estimating the cost to the State of fully air conditioning the TDCJ system was approximately $1.1 billion. 4/1/26 Tr. at 224:11–25 (Malouff).

705.    Aware of the cost, the Legislature did not enact HB 1355 or HB 2950. 4/1/26 Tr. at 225:13–19 (Malouff).

## C.    TPCA.

706.    Amite Dominick is the founder and president of Texas Prisons Community Advocates ("TPCA") and testified at trial on TPCA's behalf. 4/1/26 Tr. at 231:16–21 (Dominick).

707.    TPCA claims to represent the entire TDCJ prison population as "constituents." 9/10/25 Dominick Depo. at 100:14–16.

708.    However, inmates do not vote for TPCA's leadership, 9/10/25 Dominick Depo. at 54:1–17, nor have they ever served in leadership roles. 9/10/25 Dominick Depo.at 54:24–55:10. Inmates do not vote to decide TPCA business. 9/10/25 Dominick Depo. at 55:17–22. Inmates do not pay dues and only "very, very few" have made donations to TPCA. 9/10/25 Dominick Depo.at 106:24–107:9.

709.    TPCA also regards as members any inmate who "is interacting with," "writing [TPCA]," "part of our newsletter list" or "part of our email blast list" or who "volunteers" with TPCA. 4/1/26 Tr. at 247:11–17 (Dominick).

710.    TPCA keeps a list of inmates to whom it sends a periodic newsletter. Def. 250, 4/1/26 Tr. at 272:6–24 (Dominick), 9/10/25 Dominick Depo. at 56:12–14. Inmates are placed on the mailing list without being asked if they "want to be a member of TPCA." 9/10/25 Dominick Depo. at 57:1–3

711.    The number of inmates on TPCA's mailing list is 1568. Def. 250.

712.    TPCA also sends its newsletter to inmates who have never asked to receive the newsletter, 9/10/25 Dominick Depo. at 52:14–53:9, and sometimes TPCA sends out its newsletter cold. 9/10/25 Dominick Depo. at 57:4–13.

713.    Dr. Dominck testified that TPCA recruits incarcerated individuals to be "volunteers" 4/1/26 Tr. at 250:25–251:1 (Dominick). The number of TPCA volunteers is less than 12. 4/1/26 Tr. at 250:4–6, 271:2–7 (Dominick). Dr. Dominick testified that TPCA did not have inmate volunteers in every TDCJ unit and that TPCA's ability to solicit volunteers depends on TPCA's limited capacity. 4/1/26 Tr. at 271:24–272:5 (Dominick).

714.    TPCA does not have a membership policy. 4/1/26 Tr. at 274:3–5 (Dominick).

715.    TPCA's leadership board does not include inmates, 4/1/26 Tr. at 274:15–17 (Dominick), and does not collect dues or regularly receive donations from inmates. 4/1/26 Tr. at

274:18–275:6 (Dominick). In fact, Dr. Dominick agreed that "very little" of TPCA's funding comes from inmates. 4/1/26 Tr. at 275:7–9 (Dominick).

716.    Dr. Dominick has never been incarcerated in TDCJ nor been housed in a TDCJ unit. 4/1/26 Tr. at 266:23–267:2 (Dominick). She does not have personal experience of the conditions inside TDCJ housing units. 4/1/26 Tr. at 267:3–11 (Dominick).

717.    Dr. Dominick's ex-husband is currently incarcerated and has been held at the Gurney unit. 4/1/26 Tr. at 267:12–18 (Dominick). The Gurney unit is being outfitted with air conditioning and is scheduled to be fully air conditioned by October 2026. Def. 224; 4/1/26 Tr. at 268:13–269:16, 270:5–10 (Dominick).

<hr>

**PROPOSED CONCLUSIONS OF LAW**

<hr>

## I. Plaintiffs have not proven that extreme heat renders the conditions of confinement in TDCJ prisons cruel and unusual.

1.      Plaintiffs have not established the elements of a violation of the Eighth Amendment by Defendant nor proven a legally cognizable injury to any Plaintiff due to constitutionally violative conditions of confinement.

### A. Legal Standard

2.      The Eighth Amendment prohibits infliction of "cruel and unusual punishments." U.S. Const. amend. VIII.

3.      The Supreme Court has held the Eighth Amendment applies to "the treatment a prisoner receives in prison and the conditions under which he is confined." *Farmer v. Brennan*, 511 U.S. 825, 832 (1994) (citing *Helling v. McKinney*, 509 U.S. 25, 31 (1993)).

4.      However, "[i]t is well settled that 'the Constitution does not mandate comfortable prisons,' and that prison conditions may be 'restrictive and even harsh' without running afoul of the Eighth Amendment." *Hernandez v. Velasquez*, 522 F.3d 556, 560 (5th Cir. 2008) (quoting *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981)).

5.      "To be tantamount to the infliction of cruel and unusual punishment, prison conditions must pose an unreasonable risk of serious damage to a prisoner's health—an objective test—and prison officials must have acted with deliberate indifference to the risk posed—a subjective test." *Ball v. LeBlanc*, 792 F.3d 584, 592 (5th Cir. 2015) (quotation omitted); *see also Farmer*, 511 U.S. at 834.

6.      To meet the first, objective prong "prison conditions must pose an unreasonable risk of serious damage to a prisoner's health." *Ball*, 792 F.3d at 592; *see also Hudson v. McMillian*, 503 U.S. 1, 5 (1992). However, the Eighth Amendment does not protect against any and all risk of harm; rather it protects against "extreme" conditions that present an "unreasonable risk" of harm. *Hudson*, 503 U.S. at 9; *Helling*, 509 U.S. at 35; *Ball v. LeBlanc*, 881 F.3d 346, 356 (5th Cir. 2018) (Higginson, J., concurring in part and dissenting in part). "In Eighth Amendment cases, plaintiffs

112

can only obtain a remedy that reduces the risk of harm to a socially acceptable level. Some risk is permissible and perhaps unavoidable." *Ball*, 792 F.3d at 599.

7.      To establish an objectively unreasonable risk of harm, the district court must "assess whether society considers the risk that the prisoner complains of to be so grave that it violates contemporary standards of decency to expose anyone unwillingly to such a risk." *Helling*, 509 U.S. at 36; *Legate v. Livingston*, 822 F.3d 207, 210 (5th Cir. May 18, 2016).

8.      The second prong, deliberate indifference, requires "a prison official [to] have a sufficiently culpable state of mind," to inmate health and safety. *Farmer,* 511 U.S. at 834. "The second requirement follows from the principle that 'only unnecessary and wanton infliction of pain implicates the Eighth Amendment.'" *Id.* (quoting *Wilson v. Seiter*, 501 U.S. 294, 297 (1991)).

9.      To meet deliberate indifference "the plaintiff must show that the defendant: '(1) was 'aware of facts from which the inference could be drawn that a substantial risk of serious harm exists'; (2) subjectively 'dr[e]w the inference' that the risk existed; and (3) disregarded the risk.'" *Valentine*, 956 F.3d 797, 801 (5th Cir. 2020) (quoting *Cleveland v. Bell*, 938 F.3d 672, 676 (5th Cir. 2019)).

10.      "Deliberate indifference is an extremely high standard to meet." *Valentine v. Collier*, 956 F.3d at 801 (quoting *Cadena v. El Paso Cty.*, 946 F.3d 717, 728 (5th Cir. 2020)). Even inmate deaths do not by themselves prove deliberate indifference. *See Valentine v. Collier*, 978 F.3d 154, 163–64 (5th Cir. 2020) (noting that at least one inmate died despite TDCJ's COVID-19 mitigation efforts).

11.      Negligence is not enough. "Deliberate indifference is a mental state more blameworthy than negligence, equating to subjective recklessness under criminal law." *Cullum v. Tex. Dep't of Criminal Justice*, 375 F. App'x 417, 419 (5th Cir. 2010) (citing *Farmer*, 511 U.S. at 834–36)); *see also Valentine*, 956 F.3d at 802 (same).

12.      Thus, "a negligent or even a grossly negligent response to a substantial risk of serious harm" does not show deliberate indifference. *Dyer v. Houston*, 964 F.3d 374, 381 (5th Cir. 2020).

13.    "Deliberate indifference encompasses only unnecessary and wanton infliction of pain repugnant to the conscience of mankind." *McCormick v. Stalder*, 105 F.3d 1059, 1061 (5th Cir. 1999). "To satisfy the exacting deliberate indifference standard, a defendant's conduct must rise 'to the level of egregious intentional conduct.'" *Gobert v. Caldwell*, 463 F.3d 339, 351 (5th Cir. 2006).

14.    Under the deliberate indifference standard, prison officials are not liable if (1) "they were unaware even of an obvious risk to inmate health or safety," (2) "they did not know of the underlying facts indicating a sufficiently substantial danger," (3) "they knew the underlying facts but believed (albeit unsoundly) that the risk to which the facts gave rise was insubstantial or nonexistent," or (4) "they knew of a substantial risk to inmate health or safety . . . [and] responded reasonably to the danger, even if the harm ultimately was not averted." *Farmer*, 511 U.S. at 844–45.

15.    The reasonableness of a prison official's response is not evaluated based on its success or objective likelihood of success. *See Valentine*, 956 F.3d at 802-03 (correcting district court for analyzing reasonableness of TDCJ's response to COVID-19 on the basis of its results preventing infection). "The Eighth Amendment does not mandate perfect implementation." *Valentine*, 968 F.3d at 165. "[W]hen prison officials have attempted to care for a prisoner's [] needs, even if the care falls short, they have not exhibited subjective deliberate indifference." *Parker v. Hooper*, 171 F.4th 736, 756 (5th Cir. 2026).

16.    Even "inept or ineffective" mitigation strategies satisfy the Eighth Amendment, *Hardwick v. Bowman*, No. 6:21CV201, 2023 WL 4056050, at *10 (E.D. Tex. Apr. 26, 2023), *report and recommendation adopted*, 2023 WL 4054687 (E.D. Tex. June 16, 2023), provided prison officials undertake them with "concern and sincerity." *Parker*, 171 F.4th at 758. Officials are not indifferent if they take measures "they subjectively believe" are adequate. *Valentine*, 956 F.3d at 802.

17.    Plaintiffs have failed to meet either prong of the Eighth Amendment standard. The threat of injury from excessive heat, while certainly real, does not pose a grave risk to inmate health once TDCJ's heat mitigation measures are taken into account. Moreover, Director Lumpkin is not subjectively liable. Under his leadership, TDCJ takes the threat of heat seriously based on its

continued improvement of its heat response, including the unique heat score system and the installation of permanent air conditioning in inmate housing areas.

### B. TDCJ inmates generally do not face a substantial risk of serious harm from high heat.

18.    In the abstract, extreme heat can pose a risk of serious harm to human health. "The legal question is whether the Eighth Amendment requires TDCJ to do more to mitigate the risk of harm." *Valentine v. Collier*, 956 F.3d 797, 802 (5th Cir. 2020).

19.    Recognizing the potential dangers of high heat, TDCJ takes precautions. TDCJ's heat mitigation efforts are governed by Administrative Directive 10.64, a comprehensive policy first implemented in 1986 and frequently updated. 3/31/26 Tr. at 269:24–270:7, 272:1–5, 270:18–22 (Lumpkin). Each year from April 15 until October 31, Advance Directive 10.64 mandates a multifactorial set of measures in every unit, including chilled drinking water in housing, recreation, and dining areas; access to respite; additional cool showers; fans for every inmate regardless of custody level, with indigent fans provided free of charge; cool towels, shorts, and t-shirts; the rescheduling of work and recreation to cooler hours; and the substitution of sack meals for hot meals. 3/31/26 Tr. at 282:7–284:21 (Lumpkin), Def. Ex. 41.

20.    The uncontested evidence before the court shows the mitigation measures outlined in Advance Directive 10.64 are effective at reducing the risk of heat illness.

21.    First, the measures are grounded in mainstream thermoregulatory science and track the standards published by the National Institute for Occupational Safety and Health (NIOSH) and the United States Army, the same standards the Army Heat Center uses to prevent heat casualties among soldiers in training. 4/2/26 Tr. at 201:3–11 (DeGroot).

22.    Second, the measures are not merely written down but enforced and verified. TDCJ's heat strike team conducts unannounced audits requiring a perfect score on all thirteen checklist items mandated by Advance Directive 10.64, and in 2025 more than 90% of TDCJ's units passed on the first inspection, with only fourteen units failing initially and each required to submit and complete a corrective action plan. 3/31/26 Tr. at 294:6–12, 295:19–24, 309:3–9 (Lumpkin);

4/2/26 Tr. at 79:9–14, 85:3–18 (Echessa). TDCJ also measures, records, and reports daily indoor temperatures to the Legislature. 3/31/26 Tr. at 286:20–287:15 (Lumpkin); Def. Ex. 214.

23.    While TDCJ's heat mitigation efforts and heat score system is effective in reducing heat-related illness and deaths, it is not full proof. Despite TDCJ's earnest efforts, TDCJ's medical providers determined that heat contributed to the deaths of three TDCJ inmates in 2023.[1]

24.    Those inmates were John Castillo, Elizabeth Hagerty, and Patrick Womack, each of whose autopsy reports indicated heat as a contributing factor. Def. Ex. 100 at Tiede Def_0108152.

25.    To say that heat was a "contributing factor" is not to say that heat alone caused these deaths; rather, heat acted upon the decedents' existing health conditions, such as the obesity and diabetes that contributed to Hagerty's death, rather than independently causing heat stroke. 4/8/26 Tr. at 52:4–14 (Felicella), Pl. Ex. 169-D at Tiede Def_70850.

26.    Plaintiffs identified nine other inmate fatalities that they claim were caused by heat and presented evidence on their causes of death at trial.

27.    The earliest fatality that Plaintiffs present as a heat death was that of Jon Southards, who expired on June 28, 2023. Pl. Ex. 192–A at Tiede Def_32370. The latest was that of Wayne Straway on July 29, 2025. Pl. Ex. 403–A at Tiede Def_493160.

28.    Plaintiffs' allegations about system-wide conditions within TDCJ must be contextualized against the sheer scale of TDCJ, which has custody of approximately 141,000 inmates in 104 units scattered all over Texas. 3/31/26 Tr. at 263:18–264:4 (Lumpkin).

29.    TDCJ inmates face more serious health risks from substance abuse than heat. Nichols credibly testified that the influx of illicit drugs is a major issue across TDCJ and a far deadlier threat than extreme heat. 4/6/26 Tr. at 164:2–165:11, 173:14–174:3 (Nichols).

30.    Plaintiffs have not even shown that TDCJ inmates suffer heat injuries or fatalities at higher rates than the civilian population. The CDC reports approximately 700 heat-related deaths

---

[1] TDCJ has made significant improvements to its heat mitigation and heat score system since 2023. *See infra* ¶¶ 87-95.

per year across the entire United States. 4/7/26 Tr. at 206:2–23 (De La Cruz). During 2023, a year which saw especially high summer temperatures, the Texas Department of State Health Services found that 334 death certificates across the state recorded heat as the cause of death.[2]

31.     Thus, assuming arguendo that Plaintiffs are correct that heat caused every inmate death they identified at trial based on TDCJ/UTMB death records, they have not shown that the average inmate faces a substantial risk of serious harm from excessive heat. The Eight Amendment does not protect against all risk of harm, only extreme conditions that create an unreasonable risk. *See Hudson*, 503 U.S. at 9.

**C.     Inmate fatalities have been determined to have been caused by factors other than heat.**

32.     However, the death records Plaintiffs relied on do not show heat-related deaths.

33.     For a death to be attributed to environmental heat, the most reliable indicator is a core body temperature over 105°F measured at or near the time of death; ambient temperature where the individual was located is secondary, and an indoor reading not taken where the individual was located is less helpful still, and outdoor temperature is least helpful. 4/8/26 Tr. at 61:16–62:6, 67:15–68:3 (Felicella). There is no objective autopsy finding that is specifically diagnostic of hyperthermia, and without a core temperature one cannot say whether a person was experiencing heat-related stress. 3/30/26 Tr. at 243:23–244:1 (Uribe), 4/8/26 Tr. at 28:21–29:8 (Ravanelli). While TDCJ recommends that its medical providers take core body temperature when an inmate is in distress, TDCJ personnel are not qualified to make this decision and therefore defers to the judgement of its medical providers to make this determination. 3/31/26 Tr. at 285:20-286:15 (Lumpkin). Core body temperature should only be taken by a trained medical professional. 4/2/26 Tr. at 218:1-12, 219:25-220:1 (DeGroot); 4/6/26 Tr. at 64:11-16 (Everitt).

---

[2] *See* Erin Douglas & Alejandra Martinez, "I Don't Wish this on Anyone," Tex. Tribune (Jan. 12, 2024), https://www.texastribune.org/2024/01/12/texas-heat-deaths-2023-record-climate-change/ (reporting "data compiled by the Texas Department of State Health Services between Jan. 1 and Nov. 30 [2023]"). Government statistics are subject to judicial notice under F.R.E. 201(b)(2).

34.     Critically, elevated body temperature is not exclusive to environmental heat. Synthetic cannabinoids and methamphetamine can cause hyperthermia and death regardless of the ambient temperature, and patients on these substances can show signs of heat stroke even when the environmental temperature is below 80°F. 3/30/26 Tr. at 252:6–14, 263:16–264:1 (Uribe); 4/6/26 Tr. at 71:5–72:10, 79:12–24 (Everitt); 4/8/26 Tr. at 66:13–67:4 (Felicella). Serotonin syndrome, neuroleptic malignant syndrome, seizures, and infection or sepsis can each independently produce hyperthermia in a fully air-conditioned environment. 4/7/26 Tr. at 185:17–186:17 (De La Cruz).

35.     Jon Southards, whom Plaintiffs identify as the earliest case of heat death, likely died of a diphenhydramine overdose, not heat. His toxicology revealed a diphenhydramine concentration of 6,300 ng/ml, above the fatality threshold, and his cell also contained carbamazepine and sertraline metabolites that had not been prescribed to him. Pl. Ex. 192-A at Tiede Def_32457, 32456; 4/7/26 Tr. at 187:9–17 (De La Cruz). He had a history of severe depression and multiple suicide attempts, including a carbamazepine overdose roughly two weeks earlier, and was found in possession of ten 50-milligram diphenhydramine capsules consistent with hoarding. 4/7/26 Tr. at 186:23–187:7, 189:23–190:4 (De La Cruz). At lethal concentrations, diphenhydramine triggers serotonin syndrome, which produces hyperthermia and profuse sweating independent of the external environment. 4/7/26 Tr. at 191:14–192:22, 193:25–194:13 (De La Cruz). No core temperature was taken, and the indoor temperature was only 85.7°F, less than one degree over the temperature Plaintiffs claim is safe. Pl. Ex. 192-A at Tiede Def_32396; 3/30/26 Tr. at 209:8–13 (Vassallo).

36.     John Skinner's death cannot be attributed to heat because his cause and manner of death were undetermined even after careful review of his clinical history, the scene investigation, the autopsy findings, and toxicology results. Pl. Ex. 191 at Tiede Def_16883. No core temperature was taken to indicate hyperthermia, and the ambient temperature in his cell was 85.3°F—a mere three-tenths of a degree above the 85°F that Plaintiffs themselves contend is safe. Pl. Ex. 191 at Tiede Def_16883.

37.    Armando Gonzales's autopsy identified her cause of death as toxicity due to fentanyl, not heat. Pl. Ex. 168-A at Tiede Def_06106. Her roommate reported that Gonzales was crushing and snorting Effexor and Benadryl before becoming ill, a combination that at elevated doses can produce serotonin syndrome and dangerously high temperatures independent of the environment. Pl. Ex. 168-C at Tiede Def_70577; 3/30/26 Tr. at 261:14–262:8 (Uribe); 4/7/26 Tr. at 197:1–7, 198:23–199:3 (De La Cruz). Gonzales had a documented history of substance abuse, frequently used K2, appeared impaired earlier that day, and exhibited the orange fingertip discoloration that pathologists recognize as a marker of synthetic cannabinoid use. 4/7/26 Tr. at 197:1–2, 197:18–198:2, 198:14–18 (De La Cruz).

38.    Jason Wilson's toxicology was positive for both synthetic cannabinoids (K2) and fentanyl, each of which is independently lethal and capable of causing death regardless of temperature. 4/7/26 Tr. at 199:8–14 (De La Cruz). He had an extensive history of substance use disorder, a prior overdose attempt, and a documented history of hoarding medication, and he was housed in restrictive housing where he had in-cell water access and face-to-face delivery of ice water. 4/7/26 Tr. at 199:8–14 (De La Cruz); 3/31/26 Tr. at 133:14–18 (Collier).

39.    Ryan Fairchild's autopsy found his cause of death to be sudden cardiac death, with his heart enlarged to approximately 570 grams against a normal weight of around 300 grams, predisposing him to a fatal abnormal heartbeat. Pl. Ex. 358-A at Tiede Def_363306; 3/30/26 Tr. at 258:9–259:9 (Uribe); 4/6/26 Tr. at 80:17–81:10 (Everitt). His presentation was also consistent with sepsis rather than environmental heat: his temperature continued to rise while he was already under emergency medical care, his blood pressure was critically low, his white blood cell count was elevated, and he was started on the broad-spectrum antibiotics Vancomycin and Meropenem consistent with a sepsis protocol. 4/6/26 Tr. at 82:20–83:7, 84:16–24 (Everitt); 4/7/26 Tr. at 194:18–195:15 (De La Cruz). The term "hyperthermia" in his hospital chart means an elevated temperature and is not synonymous with heat stroke. 4/6/26 Tr. at 120:3–121:3 (Everitt).

40.    Robert Clincy's cause of death was hypertensive cardiovascular disease, with obesity as an important contributing factor; his autopsy revealed cardiomegaly with left ventricular

119

hypertrophy. Pl. Ex. 349 at Tiede Def_492694, 492693; 4/8/26 Tr. at 54:14–55:23 (Felicella). He died at 7:15 a.m., when temperatures tend to be lower, and the high indoor temperature that day was only 88.3°F. Pl. Ex. 349 at Tiede Def_492693. Dr. Felicella agreed with the autopsy and testified that she would not have ruled Clincy's death heat-related because there is no evidence indicating that it was. 4/8/26 Tr. at 57:9–23 (Felicella).

41.     Wayne Straway, Plaintiffs' latest claimed heat death, had three substances in his system at lethal levels: two distinct synthetic cannabinoids (5F-ADB and MDMB-4en-PINACA) and methamphetamine at approximately 6.3 milligrams per liter, more than twenty times the lethal threshold of 0.3 milligrams per liter. Pl. Ex. 403-A at Tiede Def_493160; 4/7/26 Tr. at 201:20–202:13 (De La Cruz). Each of these substances independently can cause hyperthermia, cardiac arrest, and sudden death, and together they constitute an independently life-threatening pharmacological picture. 4/7/26 Tr. at 202:18–203:1 (De La Cruz). Plaintiffs' experts assumed heat caused his death simply because he was housed without air conditioning and had a core temperature of 106°F, ignoring that a patient experiencing methamphetamine-induced hyperthermia exhibits the very same symptoms. 3/30/26 Tr. at 160:4–25, 238:18–24 (Vassallo).

42.     Plaintiffs' experts, Dr. Vassallo and Dr. Uribe, were forced to withdraw her opinion that "heat was surely a contributing factor" in the death of Samuel Rucker once she learned her assumption that he died in an un-air-conditioned cell was incorrect—Rucker in fact died during the summer while housed in air conditioning. 3/30/26 Tr. at 202:19–203:7 (Vassallo). Rucker had hypertension, heart failure, type II diabetes, sleep apnea, and clinical obesity, and he shared these same comorbidities with the very inmates Vassallo claimed would not have died had they been in air conditioning. 3/30/26 Tr. at 203:11–25, 213:22–214:3 (Vassallo).

43.     The pattern repeats with Bradley Sheets, who was 66 years old with high blood pressure, diabetes, and obesity—conditions that placed him at great risk of death from his underlying illnesses regardless of heat. 3/30/26 Tr. at 152:23–153:10 (Vassallo). Vassallo could say only that she "cannot rule out" heat in his death, and she did so without a core body temperature, without physical evidence of heat injury, and without having reviewed the indoor temperature log

120

showing 88°F. 3/30/26 Tr. at 153:11–12, 211:10–19 (Vassallo). Indeed, Vassallo conceded that air conditioning would not have eliminated the independent fatality risks posed by hypertension, heart failure, diabetes, sleep apnea, and obesity. 3/30/26 Tr. at 207:3–8 (Vassallo).

44.     Dr. Vassallo's about-face concerning the death of Mr. Rucker and guarded testimony concerning Mr. Sheets signals that her opinion that air conditioning is necessary for inmate safety colors her judgment concerning independent cause of death. Dr. Vassallo regards an unairconditioned housing assignment to indicate by itself that an inmate died due to heat, assuming the very conclusion Plaintiffs need to prove.

45.     Dr. Vassallo is not a medical examiner or pathologist, yet opined on ten to twenty causes of death from autopsies selected for her by counsel; she did not perform a full medical history evaluation of the decedents, did not review the 122 death records on Plaintiffs' exhibit list, incorrectly assumed all of the inmates were housed without air conditioning, and admitted she cannot actually rule out causes of death other than heat. 3/30/26 Tr. at 201:20–203:7, 207:9–16, 216:2–11 (Vassallo). Dr. De La Cruz, by contrast, testified that evaluating mortality in these cases requires accounting for all pharmacological factors, including lethal combinations of regulated and illicit drugs, and that the substances and conditions he identified are known to cause death in air-conditioned environments independent of external temperature. 4/7/26 Tr. at 211:7–10, 212:12–18, 263:10–24 (De La Cruz).

### D.     Plaintiffs' other evidence of severe heat risk fares no better.

46.     Plaintiffs' only attempt to present evidence that extreme heat affects every TDCJ unit was a study coauthored by Dr. Skarha and Dr. Zanobetti, titled "Provision of Air Conditioning and Heat-Related Mortality in Texas Prisons ("JAMA Study"), purporting to demonstrate an increased risk of mortality in Texas prisons without are conditioning during times of high heat.

47.     Plaintiffs relied extensively on the JAMA Study during the preliminary injunction hearing, as did this Court in its Preliminary Injunction Order. But at trial, after Defendant had an opportunity to depose both Dr. Skarha and Dr. Zanobetti during discovery, Plaintiffs virtually

abandoned the JAMA Study. Plaintiffs declined to call Dr. Skarha or Dr. Zanobetti and did not elicit any testimony concerning the JAMA Study.

48.    Consequently, Defendant presented the only testimony the Court heard at trial regarding the JAMA article, demonstrating grave flaws in its design process, and conclusions based on unknown data Plaintiffs either could not find or refused to disclose.

49.    Dr. Cunningham, the authority on causation analysis, credibly testified that Dr. Skarha's results cannot be recreated, even though replicability is a requirement of any reliable research. 4/7/26 Tr. at 87:12–101:21 (Cunningham). He could not recreate the article's air-conditioning file because Dr. Skarha did not provide either the underlying data or the instructions needed to do so, even after Defendant requested them by subpoena, and he testified that even with her files and the best available data set he still could not have reproduced her results. 4/7/26 Tr. at 98:6–24, 100:9–101:21 (Cunningham).

50.    The study also suffered from a fundamental mismatch between its design and its conclusions. Dr. Skarha employed a case-crossover design, which may be appropriate for studying the effects of heat but is not appropriate for studying the effects of air conditioning—the very thing her article purported to measure. 4/7/26 Tr. at 84:6–10, 86:10–13 (Cunningham). Her poor documentation of the "air-conditioning construction" process was a further reason the article departed from the accepted methods for the kind of study she attempted. 4/7/26 Tr. at 98:25–100:6 (Cunningham).

51.    Dr. Cunningham identified specific methodological errors. One of the biggest was that Dr. Skarha impermissibly combined treatment and control group units, and she also incorrectly interpreted what a p-value is when explaining it at her deposition. 4/7/26 Tr. at 114:5–23, 120:7–15 (Cunningham).

52.    Dr. Cunningham further demonstrated that the study was "underpowered" and produced a "fragile" result. To obtain the results she claimed, Dr. Skarha would have needed a much larger data set than she had, and by removing just three of the air-conditioned prisons—all of which were hospitals—the study's conditional logistic regression went "wild" and its

122

conclusions became unreliable and underpowered. 4/7/26 Tr. at 89:4–22, 92:8–93:8 (Cunningham). The decision to collapse different air-conditioning data sets led Dr. Cunningham to doubt both that the case-crossover method was appropriate and that one hundred researchers performing the same study would reach the same result. 4/7/26 Tr. at 105:24–107:3 (Cunningham).

53.    Dr. Cunningham concluded that the JAMA article is unconvincing and concluded that it does not establish that heat is killing TDCJ inmates. 4/7/26 Tr. at 123:3–124:10 (Cunningham).

54.    TDCJ's Director of Research, Andy Barbee, independently reviewed the same JAMA Network article and likewise found that its methods were not significant research and were not credible. 3/31/26 Tr. at 189:11–20 (Collier).

55.    Apart from the JAMA study, Plaintiffs' evidence of heat risk consisted only of the inmate death records, *see supra* ¶¶ 27-27, 32-46, the heat-related grievances inmates filed, and the heat-related illness statistics generated by TDCJ and its university medical partners.

56.    Plaintiffs offered no evidence of their own concerning the incidence of heat-related illness across the TDCJ system.

57.    The heat-related illness numbers as determined by TDCJ's by medical providers are not reflective of the risks Plaintiffs claim. TDCJ reported eleven heat-related illnesses among inmates in FY 2022, seventeen in FY 2023, twenty-nine in FY 2024, and six in FY 2025—an average of roughly sixteen inmate heat-related illnesses per year out of approximately 141,000 inmates. Def. Ex. 136 at 2; Def. Ex. 100 at 2–3; Def. Ex. 72 at 2; Def. Ex. 214 at 2; 3/31/26 Tr. at 263:18–264:4 (Lumpkin). Over the same period TDCJ reported three heat-related inmate deaths in FY 2022, FY 2023, and FY 2025, and a single death determined to be most likely heat-related in FY 2024. Def. Ex. 136 at 2; Def. Ex. 100 at 2; Def. Ex. 72 at 2; Def. Ex. 214 at 2.

58.    Plaintiffs showed that each year inmates file grievances related to heat. However, the inmate grievances that TDCJ receives about heat do not constitute evidence that TDCJ's heat mitigation is ineffective. "Because grievances are essentially pleadings, not evidence, they must have independent verification before they become probative." *Ball*, 792 F.3d at 595.

59.    Plaintiffs made no effort to ascertain the facts of any inmate grievances. Indeed, in a case about systemwide prison conditions, Plaintiffs presented zero testimony from any currently incarcerated inmates.

60.    Plaintiffs did not present any testimony by TDCJ inmates. As a result, in a case centered on the constitutionality of conditions in Texas prisons, the Court did not hear testimony from anyone that Plaintiffs purport to represent in this case having current, firsthand knowledge of current prison conditions. TDCJ, however, presented testimony to the Court from witnesses that regularly visit Texas prisons who believe TDCJ's heat mitigation practices are effective in combatting the risk of heat.

61.    The Eighth Amendment only requires that prison officials "reduce[] the risk of harm to a socially acceptable level. Some risk is permissible and perhaps unavoidable." *Ball*, 792 F.3d at 599; *see also Rhodes*, 452 U.S. at 347.

62.    The Fifth Circuit's Eighth Amendment precedent in the context of infectious disease is instructive. The "incidence of diseases or infections, standing alone," do not "imply unconstitutional confinement conditions, since any densely populated residence may be subject to outbreaks." *Shepherd v. Dallas Cty.*, 591 F.3d 445, 454 (5th Cir. 2009). Like disease, heat injury is a chronic risk. A low incidence of heat-related injuries—arising from a very large inmate population—does not create inhumane conditions of confinement.

63.    Because the Eighth Amendment does not mandate perfection, a low number of heat-related deaths with presenting contributory factors do not show that conditions in TDCJ prisons are objectively dangerous to a degree that violates the Constitution.

**E.    Director Lumpkin has not acted with deliberate indifference towards the risks that extreme heat poses to inmate health and safety.**

64.    Plaintiffs have not met the "extremely high standard" of deliberate indifference.

65.    Director Lumpkin's response to prison heat encompasses a plethora of heat mitigation measures that he reasonably believes address the risks to inmate health posed by high

124

heat. Additionally, relying on a heat score algorithm devised by UTMB and Texas Tech, TDCJ allocates air-conditioned housing to inmates that are especially heat sensitive.

66.    Plaintiffs contest the effectiveness of TDCJ's heat mitigation and argue that Director Lumpkin *should* recognize the inadequacy of these measures. However, a prison official is not indifferent for being "unaware even of an obvious risk to inmate health or safety." *Farmer*, 511 U.S. at 844. Rather, Eighth Amendment liability requires that the official was "both [] aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and [] also draw the inference." *Id*. at 837.

67.    Accordingly, even if Plaintiffs succeed in showing that Director Lumpkin's confidence in heat mitigation is unreasonable, that alone does not prove deliberate indifference. To establish deliberate indifference, Plaintiffs must show that Director Lumpkin believed that TDCJ's mitigation efforts were inadequate and stuck to them anyway. *Farmer*, 511 U.S. at 837; *Parker v. Hooper*, 171 F.4th 736, 758 (5th Cir. 2026)("The Defendants' remedial efforts may prove insufficient to cure all the identified institutional problems, but they indicate concern and sincerity on the part of prison officials that negate subjective indifference.").

68.    Plaintiffs' burden on deliberate indifference is harder still because TDCJ's efforts are not static. TDCJ continually improves its heat mitigation measures by making policy updates to Administrative Directive 10.64. 3/31/26 Tr. at 270:23-271:9 (Lumpkin). TDCJ has also expanded the heat score classification in conjunction with UTMB and Texas Tech. 4/2/26 Tr. at 274:9-275:8 (Fitzpatrick). And TDCJ is installing air conditioning across its prisons at an accelerating clip. 4/9/26 Tr. 244:20-24, 245:22-247:1 (Hudson); *see Parker v. Hooper*, 171 F.4th 736, 761 (5th Cir. 2026) ( evidence of "ongoing improvements and innovations gave rise to a strong legal likelihood that the Defendants were not guilty of continued deliberate indifference or disability discrimination.").

69.    To succeed on deliberate indifference, Plaintiffs need to show that all these efforts are insincere. To that end, Plaintiffs must persuade the Court that the testimony it heard from TDCJ's leadership—including Director Lumpkin, Director Collier, Chairman Nichols, and Chief

125

Operations Officer Hudson—describing TDCJ's heat mitigation efforts and its commitment to installing air conditioning, as well as the nearly $500 million TDCJ has already encumbered on air conditioning installation is mere bluff. 2/31/26 Tr. at 196:14–23 (Collier); 3/31/26 Tr. at 317:25–318:10 (Lumpkin); 4/6/26 Tr. at 143:1–144:10 (Nichols). *See Parker v. Hooper*, 171 F.4th 736, 758 (5th Cir. 2026) ("concern and sincerity on the part of prison officials . . . negate[d] subjective indifference.").

### i. TDCJ's heat mitigation measures are a reasonable remedial response.

#### a. Defendant is not indifferent because TDCJ's heat mitigation practices reflect standard approaches to managing heat risk.

70.     TDCJ's measures are comparable to those used by the United States Army to address the effects of high heat on recruits who must train outdoors or without access to air conditioning. 4/4/26 Tr. at 188:16–189:8 (Dr. DeGroot); Def. Ex. 160 at Tiede Def_517788, 517792.

71.     Likewise, national safety standards published by the National Institute for Occupational Safety and Health (NIOSH) recommend many of the same measures employed by TDCJ for workers who must spend the workday in hot weather without air conditioning. Def. Ex. 180. Specifically, NIOSH guidelines endorse respite as an effective means of relieving heat stress. Def. Ex. 180 at Tiede Def_517991. NIOSH also recommends access to cool drinking water and emphasizes the importance of training workers to proactively take heat mitigation. Def. Ex. 180 at Def_518060.

72.     In *Valentine*, the Fifth Circuit held TDCJ's response to COVID-19 did not exhibit deliberate indifference after finding that TDCJ officials had relied in part on guidance from the Center for Disease Control and Prevention (CDC). 956 F.3d at 802-03; *see also id.* at 802 (criticizing district court's injunction for exceeding CDC recommendations). Likewise, Defendant's adoption of similar heat mitigation strategies used by nationally respected organizations shows that he is not recklessly indifferent to the risks of high heat.

126

73.     While Plaintiffs criticize TDCJ's heat mitigation, other prison systems look up to TDCJ as the gold standard. Ishee testified that the North Carolina prison authority studied TDCJ's heat mitigation for use in its own prisons, 4/6/2026 Tr. at 246:20–249:1 (Ishee), and that TDCJ's approach to heat mitigation is considered within the prison corrections community to embody best practices. 4/6/2026 Tr. at 264:8–17 (Ishee).

74.     Many of TDCJ's mitigation measures have been endorsed by the Fifth Circuit as constitutionally acceptable responses to prison heat. *See Gates v. Cook*, 376 F.3d 323, 339 (5th Cir. 2004) (upholding injunction requiring prison to equip cells with fans, provide ice water, and allow daily showers); *Ball*, 792 F.3d 584, 600 ("The *Gates* court did not mandate a maximum heat index applicable in the Mississippi prison. It required particular measures, including fans, ice water, ice, and showers").

75.     TDCJ's approach to prison heat is even consistent with that ordered by Judge Ellison in *Cole v. Collier*, No. 4:14-CV-1698, 2017 WL 3049540 (S.D. Tex. July 19, 2017). There, the Court entered preliminary relief on behalf of a class of TDCJ inmates, mandating that TDCJ provide air-conditioned housing to "heat-sensitive" inmates, including inmates over the age of 65, but respite and showers to "young and healthy inmates." *Id.* at *45.

76.     Defendant acted reasonably by relying on methods trusted by the United States Army, NIOSH, and his colleagues in the corrections industry and approved by the Fifth Circuit.

### b. Defendant is not indifferent because TDCJ's heat mitigation measures are effective.

77.     Each of TDCJ's mitigation tools has a scientific basis for reducing the effects of heat on the human body. 4/2/26 Tr. at 191:11–12 194:5–195:12 (DeGroot); 4/6/26 Tr. at 66:20–67:10 (Everitt) (discussing the physiological reasons that hydration cools even when fluids are not cold); 4/2/26, 213:15–16 (DeGroot); 4/6/26 Tr. at 61:14–22, 67:15–23 (Dr. Everitt) (same for showers); 4/2/26 Tr. at 196:13–22 (DeGroot); 4/6/26 Tr. at 52:7–8 (Everitt) (fans).

78.     Even Plaintiffs' expert Dr. Vasallo has affirmed the adequacy of respite and heat mitigation measures other than air conditioning in the past, *see Ball*, 792 F.3d at 599 ("Dr. Vassallo,

explained that there are many acceptable remedies short of facility-wide air conditioning"), and at trial, relied on a New England Journal of Medicine study finding that those who spent some time in air conditioning respite faced a significantly lower risk of death. 3/30/26 Tr. at 193:13–22, 195:9–24 (Vassallo).

79.      Inmate behavior implies that inmates themselves find mitigation measures helpful. Inmates request respite and cool showers. 3/31/26 Tr. at 279:3–13 (Lumpkin); Def. Ex. 41 at Tiede Def_367753–4. Likewise, Director Lumpkin emphasized that he had never seen an inmate part with his personal fan during summertime. 3/31/2026 Tr. at 345:13–17 (Lumpkin).

80.      Heat injury statistics, as determined by TDCJ's medical providers, evince the effectiveness of TDCJ's heat mitigation. Across a population of approximately 141,000 inmates, TDCJ reported only eleven heat-related illnesses among inmates in FY 2022, seventeen in FY 2023, twenty-nine in FY 2024, and six in FY 2025—an average of roughly sixteen per year. Def. Exs. 136 (2022), 100 (2023), 72 (2024), and 214 (2025). In FY2023, TDCJ reported three deaths where elevated temperatures were cited as possible contributing factor. Def. Ex. 136 at 2. In FY2024, TDCJ reported a single instance where heat may have been a contributing factor regarding an inmate who collapsed while playing soccer in the recreation yard at the Gore Unit and subsequently deceased. Def. Ex. 100 at 2–3. TDCJ reported zero heat-related deaths in FY 2025. Def. Ex. 136 at 2; 3/31/26 Tr. at 263:18–264:4 (Lumpkin). These low numbers, in a system exposed to Texas summers, reflect mitigation that is working.

81.      TDCJ's heat injury statistics show improvement in 2025, the first year that TDCJ's heat strike audit and response program was fully implemented. Def. Ex. 136.

82.      Testimony by Plaintiffs expert Prof. Deitch that TDCJ's staffing shortages render its heat mitigation ineffective is not credible. Prof. Deitch admitted she had not been inside a TDCJ unit since 2019 and that her trial testimony was based on public sources rather than firsthand knowledge of prison conditions. 3/31/26 Tr. at 79:16–80:24 (Deitch). Further, Prof. Deitch did not opine that any particular staffing level is necessary to properly deliver heat mitigation.

128

83.    Although certain TDCJ units have staffing levels below 70%, Mr. Lumpkin credibly testified that TDCJ deploys a reserve of "mobile correctional officers" and transfers staff assignments from high-staffed units to raise headcount at understaffed units to operationally adequate levels. 3/31/26 Tr. at 350:6–351:1 (Lumpkin); *see also* 3/31/26 Tr. at 210:25–212:1 (Collier) (same).

84.    Plaintiffs did not present evidence that TDCJ's personnel reallocations are insufficient to resolve any operational impediments from staffing shortfalls. Moreover, the staffing statistics recorded in the Sunset Advisory Committee Report that Prof. Deitch relied on report ordinary headcount at particular TDCJ units and accordingly do not count the officers in TDCJ's mobile reserve. Plf. 282. The Report's staffing figures also do not take into account overtime hours or temporary personnel transfers from high-staffed to under-staffed units. Plf. 282; 3/31/26 Tr. at 57:22–58:9 (Deitch). Accordingly, while the Report shows that headcount at certain units is in the 30 to 40% range, those figures do not show the actual number of officers working onsite.

85.    Grievance numbers do not show that Defendant is indifferent. "A request for administrative relief is at best only circumstantial evidence that a prison official is aware of facts from which he can deduce a risk of harm; [but] it is not even particularly strong evidence of that." *Ball*, 792 F.3d at 595.

### c. Defendant is not indifferent because TDCJ continually upgrades its heat mitigation practices.

86.    TDCJ's leadership reviews Administrative Directive 10.64 every year. 3/31/26 Tr. at 270:18–22 (Lumpkin). First implemented in 1986, the directive has been updated every year in April since 2024, with updates drawn from nearly two dozen internal subject-matter experts, including executive staff, and refined through a process of continuous improvement that incorporates input from the Board, stakeholders, advocacy groups, and members of the Legislature. 3/31/26 Tr. at 270:18–272:5 (Lumpkin); 3/31/26 Tr. at 271:9–25 (Lumpkin); 4/6/26 Tr. at 147:23–148:12 (Nichols). Lumpkin himself has contributed several changes over the years, including

129

creating the reusable tumbler cup all inmates use for ice water and facilitating the movement of fans, ice, and water into the units. 3/31/26 Tr. at 272:9–25 (Lumpkin).

87.     Since the commencement of this litigation, TDCJ has made significant changes to its response to extreme heat.

88.     First, the heat score algorithm has been modified to give every inmate aged 65 or over a positive-value heat score. This ensures that all 65+ inmates are given the option to live in air-conditioned housing. 4/2/26 Tr. at 274:17–275:8 (Fitzpatrick); 4/7/26 Tr. at 25:20–22 (Leonardson). In February 2026, the algorithm was further updated to include highly active anticholinergic medications as a standalone condition. 4/2/26 Tr. at 274:17–275:8 (Fitzpatrick).

89.     Second, TDCJ has added new protocols for measuring and recording environmental temperatures. It measures, records, and reports indoor temperatures daily to the Legislature between April and September, and it is piloting the automated Room Alert system, which automatically monitors and records temperatures, uploads data that cannot be tampered with, and sends progressive alerts to more than 600 TDCJ personnel when a unit reaches a 91-, 103-, or 120-degree heat index. 3/31/26 Tr. at 276:23–277:4 (Lumpkin); 4/9/26 Tr. at 236:12–239:3 (Hudson); 3/31/26 Tr. at 278:12–279:2 (Lumpkin).

90.     Third, to ensure Administrative Directive 10.64 is faithfully carried out at the unit level, TDCJ has increased the frequency at which heat strike audits are conducted. These unannounced audits require a unit to score 100% on all thirteen checklist items mandated by Administrative Directive 10.64, and the team has grown rapidly—from roughly four members in 2023 to twenty-five in 2024, fifty-eight in 2025, and sixty-six in 2026—enabling it to audit every unit, some two or three times. 3/31/26 Tr. at 294:6–12, 295:19–24 (Lumpkin); 4/2/26 Tr. at 50:9–21, 53:15–18, 54:13–15, 60:5–11 (Echessa).

91.     These changes are already showing early signs of success. In 2025, more than 90% of TDCJ's units passed their heat strike inspection on the first visit, with only fourteen units failing initially—each of which was required to submit a corrective action plan. 3/31/26 Tr. at 309:3–9 (Lumpkin); 4/2/26 Tr. at 79:9–14, 85:3–18 (Echessa). Reported inmate heat-related illnesses fell to

just six in FY 2025, down from twenty-nine the prior year. Def. Ex. 214 at 2; Def. Ex. 72 at 2. And TDCJ's cool-bed capacity has expanded markedly, growing by roughly 6,800 beds since the preliminary injunction hearing in this case. 4/9/26 Tr. at 243:20–24 (Hudson).

92.    Each of these changes were designed to improve TDCJ's response to high heat and better protect inmates from the recurring health risks posed by seasonal heat.

93.    Courts must consider changes prison officials make to improve conditions during the pendency of litigation. *Valentine*, 993 F.3d at 282 (stating that "to establish eligibility for an injunction, the inmate must demonstrate the continuance of [deliberate] disregard during the remainder of the litigation and into the future."). Officials are not deliberately indifferent if they implement reforms after the commencement of suit that evince an intent to reset prison conditions to a constitutionally acceptable level. *Id.*; *see also Farmer*, 511 U.S. at 845-47.

94.    TDCJ's expanded heat score, enhanced temperature recording, and heat strike audits "indicate concern and sincerity on the part of prison officials that negate subjective indifference." *Parker*, 171 F.4th at 758. These reforms are not mere window dressing. Thousands of elderly inmates have given new housing assignments, every unit has been equipped with new temperature recording devices and staff trained in their use, and by inaugurating the heat strike team TDCJ has added an entirely new monitoring and reporting structure to its organization. Even if the Court finds these changes "less than transformative," the effort TDCJ has invested making them, nonetheless "dispel[s] the notion of deliberate indifference." *Id.* at 759.

### d.  TDCJ's practices recording body temperatures of distressed inmates is not negligent.

95.    Plaintiffs' experts contend that core body temperatures are essential to diagnosing hyperthermia and that the absence of a recorded core temperature for many decedents masks heat as a cause of death. 3/30/26 Tr. at 130:12–17 (Vassallo). Plaintiffs' correctional expert, Dean Williams, claimed he would require that body, skin, or core temperatures be taken as soon as possible 3/30/26 Tr. at 47:21–24, 87:1–21 (Williams).

96.     TDCJ's personnel are not medical professionals and are not equipped to take core body temperatures at the time of an emergency and do not make cause-of-death determinations; instead, TDCJ's university medical partners perform the autopsies, and TDCJ reports heat-related deaths to the Legislature based on the cause of death identified in those autopsies. 3/31/26 Tr. at 346:2–7 (Lumpkin), 4/6/26 Tr. at 177:22–178:19 (Nichols), 3/31/26 Tr. at 139:6–10 (Collier). TDCJ rightfully assumes the accuracy of the cause of death identified in the autopsy. 4/6/26 Tr. at 177:22–178:19 (Nichols).

97.     The death-investigation process is independent of TDCJ's Executive Director. The Office of the Inspector General, an independent entity that reports to the Texas Board of Criminal Justice rather than to TDCJ's Executive Director, investigates every death in the TDCJ system, and the results are reported through a process administered by the Texas Attorney General. 3/31/26 Tr. at 124:23–125:5, 137:5–11 (Collier); 4/6/26 Tr. at 137:12–19 (Nichols). The Executive Director has no power to shut down an OIG investigation or to dictate what it reports. 3/31/26 Tr. at 268:19–23, 269:21–23 (Lumpkin).

98.     Far from concealing heat, the autopsies affirmatively flag it when the evidence supports it. It is standard practice to indicate in an autopsy report if heat played a role in a death, and TDCJ's medical partners did exactly that—identifying heat as a contributing factor in the 2023 deaths of John Castillo, Elizabeth Hagerty, and Patrick Womack. 4/8/26 Tr. at 52:4–17 (Felicella), Def. Ex. 142, Def. Ex. 100 at 0108152, Pl. Ex. 161 at Tiede Def_14426; Pl. Ex. 169-D at Tiede Def_70850, Pl. Ex. 200 at Tiede Def_17452. Dr. Felicella even testified that she would have ruled the death of Armando Gonzales heat-related demonstrating that TDCJ's medical partner pathologists do not shy away from attributing deaths to heat. 4/8/26 Tr. at 62:7–64:4 (Felicella).

99.     The absence of recorded core body temperatures does not reflect deliberate undercounting on the part of TDCJ. There is no objective autopsy finding that is specifically diagnostic of hyperthermia, so a core temperature taken at the scene is the most reliable indicator—but obtaining one is a medical task. 3/30/26 Tr. at 243:23–244:1 (Uribe), 4/8/26 Tr. at 67:15–68:3 (Felicella). UTMB and Texas Tech are TDCJ's medical providers, and it is not Director Lumpkin's

role to dictate how medical professionals respond to and treat an inmate in distress 3/31/26 Tr. at 285:20-286:15 (Lumpkin). Every medical expert except Dr. Vassallo agreed that CPR takes priority over obtaining a core body temperature, so that life-saving efforts, not temperature-taking, are the proper first response to an inmate in distress. 3/30/26 Tr. at 244:23–245:13 (Uribe), 4/2/26 Tr. at 217:10–25, 219:1–5 (DeGroot), 4/6/26 Tr. at 61:1–10 (Everitt). And even Plaintiffs' own correctional expert, Williams, conceded that he would not ask TDCJ's non-medical officers to take temperatures if doing so was beyond their scope. 3/30/26 Tr. at 87:1–21, 88:8–11 (Williams).

100.    Nor is there any evidence of a hidden wave of heat deaths. Based on its autopsy and death investigations, TDCJ has no knowledge of any emergency or rapid situation in which numerous individuals are dying from exposure to indoor heat in its housing areas. 4/6/26 Tr. at 178:25–179:21 (Nichols). Even Dr. Vassallo testified that TDCJ should not overrule the independent pathologist when reporting cause of death to the Legislature. 3/30/26 Tr. at 214:4–8 (Vassallo). When TDCJ did discover a discrete problem—the falsified outdoor temperature logs at the Stiles Unit—it referred the matter to its independent auditor, took corrective action, and immediately began to identify a better way of tracking temperatures, reflecting transparency rather than concealment. 4/6/26 Tr. at 136:8–137:4, 190:15–191:16 (Nichols); 4/9/26 Tr. at 236:12–239:3 (Hudson).

101.    The Eighth Amendment merely requires prison officials to undertake a response to deficient prison conditions that they believe will ameliorate them. *Valentine*, 956 F.3d at 802–03. Corrective efforts need not be successful or optimal provided they are done with "concern and sincerity." *Parker*, 171 F.4th at 758.

102.    Defendant sincerely believes that TDCJ's Administrative Directive 10.64 policy setting out its heat mitigation practices paired with the heat score algorithm, heat strike audits, and diligent temperature monitoring reduces the risks of serious heat-related injury to levels where inmates are unlikely to suffer such an injury. Therefore, Defendant has not exhibited deliberate indifference to the dangers of excessive prison heat.

133

### ii. Heat-related injuries do not establish deliberate indifference.

103.    The deliberate indifference inquiry "concerns TDCJ's state of mind, not the scope of the injury." *Valentine*, 978 F.3d at 163; *see also Farmer*, 511 U.S. at 832 ("To violate the Cruel and Unusual Punishments Clause, a prison official must have a sufficiently culpable state of mind").

104.    However, Plaintiffs treat the deliberate indifference standard as if it looks to "whether the Defendant[] reasonably abated the risk of [heat]" and not on whether Defendant "subjectively believe[s] the measures [he is] taking are inadequate." *Valentine*, 956 F.3d at 802.

105.    As the Fifth Circuit observed, such an approach "collapse[s] the objective and subjective components of the Eighth Amendment inquiry . . . treating inadequate measures as dispositive of the Defendants' mental state." *Valentine*, 956 F.3d at 802.

106.    Accordingly, heat-related fatalities and illnesses cannot directly show that a prison official is indifferent. Any probative value they hold for the subjective standard is limited to circumstantial evidence that an official was "aware of facts from which the inference could be drawn that a substantial risk of serious harm exists" and "drew the inference." *Valentine*, 956 F.3d at 801 (quoting *Farmer*, 511 U.S. at 837). But because deliberate indifference does not turn on the success of officials' response, serious failures, let alone a low number of heat injuries, do not establish officials are indifferent. *Id*. at 802.

107.    Defendant believes that TDCJ's heat mitigation measures, as set out in the AD 10.64 policy, are working to effectively protect the well-being of inmates from heat-related risk. 3/31/26 Tr. at 270:4-17 (Lumpkin).

108.    There is no evidence before the Court that TDCJ's leadership believed the upgrades made to TDCJ's heat mitigation and the heat score would be anything but helpful.

109.     Plaintiffs also attempt to argue that 1) the incidence of heat injury during 2023 conveyed a failure of TDCJ's heat mitigation so "obvious" that Defendant "must have known about it," *Farmer*, 511 U.S. at 842, and 2) Defendant's decision to continue the same mitigation measures constitutes a deliberate "disregard" of that failure.

134

110.    Such a theory has several flaws. First, as shown above, the level of heat injuries during 2023 were not high enough to discredit the effectiveness of TDCJ's 2023 heat response. Second, the significant changes that TDCJ made to its heat response after Summer 2024 rebut any argument that Defendant passively accepted the level of heat casualties in 2023 or 2024. 3/31/26 Tr. at 273:11-274:19 (Lumpkin) Def. Ex. 41.

111.    Nor do the Court's preliminary findings that certain of TDCJ's heat mitigation measures were ineffective, see ECF No. 202 at 46–52, entail that Defendant is wantonly negligent for revising rather than replacing them. *First*, the Court found that TDCJ's measures were inadequate only after crediting evidence that the implementation and availability of these measures left inmates without reliable access to them, *id.*, leaving room to conclude that better implementation would make these measures effective. *Second*, the Court issued its findings in a preliminary posture, and Defendant reasonably believes that with a fuller picture the Court will reconsider the effectiveness of TDCJ's 2023 heat response. *Third*, "a layman may 'disagree' with any court's ruling yet not be deliberately indifferent," as prison officials must rely on their own judgment about prison administration even when the judiciary has spoken. *Parker*, 171 F.4th at 760.

112.    Accordingly, the incidence of heat fatality and illness do not show that Defendant was deliberately indifferent.

### iii. TDCJ's air conditioning installation efforts negate a finding of deliberate indifference.

113.    Under Defendant's leadership, TDCJ is implementing the exact relief that Plaintiffs assert will remedy excessive heat. "[P]rison officials who act reasonably [to cure unconstitutional conditions] cannot be found liable under the Cruel and Unusual Punishments Clause." *Farmer*, 511 U.S. at 844. Accordingly, even if every other measure TDCJ has taken to address prison heat is constitutionally inadequate, Defendant's plan to air-condition TDCJ's prisons shows that he is not deliberately indifferent.

### a. TDCJ's commitment to systemwide air conditioning is sincere.

114. Importantly, Plaintiffs did not introduce evidence questioning the sincerity of TDCJ's commitment to system-wide air conditioning. Nor could they. The Court heard nearly two days of testimony concerning the efforts TDCJ had undertaken and planned to initiate in furtherance of its goal to air-condition every unit. *See e.g.*, 3/31/26 Tr. at 204:24–207:3 (Collier); 4/6/26 Tr. at 165:12–166:4, 230:25–233:6 (Nichols); 4/8/26 Tr. at 152:6–195:19 (Cox); 4/9/26 Tr. at 234:16–257:17 (Hudson).

115. Both Director Lumpkin and his predecessor, Collier, testified that under their leadership installation of air conditioning has been a priority for TDCJ. 3/31/26 Tr. at 204:24–205:15 (Collier); 3/31/26 Tr. at 322:4–323:11, 354:17–20 (Lumpkin).

116. TDCJ has already encumbered more than $500 million in funding from the Texas Legislature to finance air condition installation. 4/6/26 Tr. at 143:1–144:10 (Nichols); *see also* 3/31/26 Tr. at 196:20–23, 202:8–203:1 (Collier).

117. During his tenure, Collier testified before the Legislature concerning the feasibility of systemwide air conditioning installation. 3/31/26 Tr. at 170:8–13, 198:2–6 (Collier). As part of this outreach, TDCJ developed and presented a series of phased plans that outlined TDCJ's best estimates of how quickly it could air condition its units and at what cost. 3/31/26 Tr. at 198:16–25 (Collier), Def. Ex. 20, Def. Ex. 23, Def. Ex. 25. This history of engagement with the Legislature shows that TDCJ is sincere in its commitment to full air conditioning.

118. The manner in which TDCJ seeks funding likewise reflects genuine commitment rather than posturing. TDCJ deliberately requests only the funding for projects it reasonably believes it can execute in the coming biennium, because it must put appropriated funds to good use and maintain credibility with the Legislature for future requests; requesting the entire estimated cost at once would exceed TDCJ's capacity to obligate the funds and would jeopardize its ability to secure later appropriations. 3/31/26 Tr. at 162:10–163:8, 165:21–166:15, 214:24–215:20 (Collier); 4/9/26 Tr. at 265:14–266:5 (Hudson).

**b.  TDCJ has made marked progress installing air conditioning.**

136

119.     At the start of trial TDCJ had 52,438 air-conditioned beds, 4/9/26 Tr. at 246:6–247:1 (Hudson), representing an increase of 6,800 'cool beds' since the 2024 preliminary injunction hearing. 4/9/26 Tr. at 243:20–24 (Hudson). TDCJ has 104 units, 38 of which have fully air-conditioned housing areas. 4/9/26 Tr. at 242:18–243:2 (Hudson). Another 52 units are partially air-conditioned. 4/9/26 Tr. at 243:3–4 (Hudson).

120.     TDCJ has another 12,584 cool beds currently in construction and another 18,922 cool beds in procurement, and additional cool beds in design. 4/9/26 Tr. at 246:6–247:1 (Hudson). When you add all this together, based on TDCJ's current capacity, TDCJ has about 38% of its capacity left in need of air conditioning. 4/9/26 Tr. at 246:6–247:1 (Hudson).

121.     By the end of 2026, TDCJ will have a little over 61,000 cool beds. 4/9/26 Tr. at 248:25–249:3 (Hudson). And TDCJ anticipates completing close to 91,000 total cool beds by the end of 2027 or early 2028. 4/9/26 Tr. at 253:11–23 (Hudson). Accordingly, approximately 65% of TDCJ total capacity will be air-conditioned by Summer 2028. 4/9/26 Tr. at 246:6–247:1 (Hudson).

122.     Separately, TDCJ has arranged for the construction of new housing areas, including expansion dorms and the newly acquired Dalby Unit, all of which will be built with original air conditioning. 4/9/26 Tr. at 247:11–248:17 (Hudson). These projects will further increase TDCJ's air-conditioned housing stock and accommodate the projected increase in the inmate population. 3/31/26 Tr. at 203:2–23 (Collier); 4/9/26 Tr. at 247:11–248:17 (Hudson); 4/2/26 Tr. at 303:19–304:2 (Fitzpatrick).

123.     TDCJ's progress is accelerating. TDCJ will add approximately 40,000 cool beds to the system between March 2026 and the end of 2027, close to six times the 6,800 added between July 2024 (PI hearing date) and March 2026 (Trial date). 4/9/26 Tr. at 243:25–244:24, 248:25–249:3, 253:11–23 (Hudson).

124.     Cox credibly testified that TDCJ has benefited from a learning curve, becoming more efficient at starting and delivering HVAC projects as TDCJ has gained experience. 4/8/26 Tr. at 194:22–195:19 (Cox). TDCJ has scaled up its air conditioning installation process, hiring more in-house engineers and making changes to its procurement and other aspects of its vendor process.

137

*See e.g.*, 4/9/26 Tr. at 253:24–256:13 (Hudson). Hudson testified that installation projects now proceed 14 months faster than when he began overseeing them. 4/9/26 Tr. at 256:17–257:14 (Hudson).

125.    Plaintiffs fudge this accelerating trend by fixating on the quantity of cool beds added between July 2024 and March 2026. Plaintiffs assume a linear rate for new installation but did not present any evidence showing that TDCJ's current and contemplated installation projects will deliver at a constant pace.

126.    TDCJ's progress was far from linear even at the time of trial. TDCJ increased its cool beds from 36,777 at the beginning of 2018 to 45,628 in July 2024—roughly 9,000 beds in six years—but added 6,800 beds between July 2024 and March 2026. 4/6/26 Tr. at 165:15–166:4 (Nichols); 4/9/26 Tr. at 243:20–24, 245:22–247:1 (Hudson).

127.    TDCJ's most recent projections are set out in the two-phase plan. 4/8/26 Tr. at 189:17–23 (Cox), Def. Ex. 25. Per those projections, TDCJ estimates that with adequate funding it will have operationalized air conditioning installation in all remaining prison units by the end of 2031. 3/31/2026 Tr. at 322:4–323:11 (Lumpkin). The projections in the two-phase plan accord with Higgins' testimony that systemwide installation would require between 48 and 72 months. 4/9/26 Tr. at 26:20–27:4 (Higgins).

128.    In addition to the increased staffing in both the engineering and procurement departments, TDCJ has taken additional steps to speed up the process of installing air conditioning. 4/9/26 Tr. at 253:24–256:13 (Hudson). TDCJ looked at various procurement methods and determined that CMAR is going to be the best solution for TDCJ and will speed things up in the future. 4/9/26 Tr. at 253:24–256:13 (Hudson). TDCJ's first projects using the CMAR method are the expansion dorms currently in progress. 4/9/26 Tr. at 253:24–256:13 (Hudson). TDCJ is taking its learnings from those projects to move forward with using CMAR on future air conditioning retrofits. 4/9/26 Tr. at 253:24–256:13 (Hudson).

129.    TDCJ is also exploring the bundling of projects to bring the total projects to a value of over a hundred-million dollars which it believes will attract more, larger vendors. 4/9/26 Tr. at

138

253:24–256:13 (Hudson). TDCJ intends to begin bundling projects in conjunction with CMAR. 4/9/26 Tr. at 253:24–256:13 (Hudson). Moving forward with CMAR, additional staff on board, and work done advertising these projects to the vendor pool, TDCJ feels good about where it is heading in the future with these air conditioning projects. 4/9/26 Tr. at 253:24–256:13 (Hudson).

130.    TDCJ's bounding progress towards systemwide air conditioning shows that Director Lumpkin is taking reasonable steps to implement the exact remedy Plaintiffs are requesting. *See Farmer*, 511 U.S. at 844.

### c.  Evidence that TDCJ's approach to HVAC installation is suboptimal does not show that Defendant is indifferent.

131.    Plaintiffs' Exponent experts criticize TDCJ for not doing everything it can and testified that TDCJ could make faster progress by changing procurement methods, bundling projects and streamlining other aspects of its project delivery.

132.    However, deliberate indifference cannot be established by showing TDCJ "did not choose the optimal approach to the problem." *United States v. Hinds Cnty. Bd. of Supervisors*, 128 F.4th 616, 630 (5th Cir. 2025). Testimony that TDCJ's approach is not the fastest, or even that it is the slowest, does not move the needle on deliberate indifference. *Parker,* 171 F.4th at 756, 758.

133.    Moreover, TDCJ has in fact adopted or is considering the same modifications that Plaintiffs' experts favor. For its new HVAC projects, TDCJ is switching to the construction manager at risk (CMAR) procurement method, 4/8/26 Tr. at 159:16–161:12 (Cox) and has already placed two projects under contract using CMAR. 4/8/26 Tr. at 159:16–161:12 (Cox).

134.    TDCJ's baseline procurement method, design-bid-build, is a standard approach to public procurement that Higgins testified is used for the majority of Texas state and federal projects. 4/8/26 Tr. at 257:25–258:2, 258:3–16 (Higgins); 4/9/26 Tr. at 6:15–25 (Higgins). Plaintiffs' experts' did not deny that design-bid-build is standard or the predominant method for public projects.

135.    Further, Defendant's experts testified that design-bid-build has advantages of its own and that on average design-bid-build does not deliver projects significantly slower than

139

alternative methods. 4/8/26 Tr. at 260:2–18, 264:3–19 (Higgins). Additionally, TDCJ's long institutional experience using design-bid-build renders it more adept at soliciting bids using this tried-and-true procurement method. 4/9/26 Tr. at 70:11–23 (Caddell). Accordingly, TDCJ's use of design-bid-build does not slow its air conditioning installation progress.

136.    TDCJ's ongoing mission to fully air-condition its prisons "demonstrate[s] a commitment to addressing the problem—the antithesis of the callous disregard required to make out an Eighth Amendment Claim," even if Plaintiffs' experts are correct that by revising its project delivery methods TDCJ "could have done more." *Parker*, 171 F.4th at 759 (quoting *Rasho v. Jeffreys*, 22 F.4th 703, 711 (7th Cir. 2022)).

137.    The deliberate indifference standard absolves prison officials of liability when they attempt solutions, even if they fall short. *Parker*, 171 F.4th at 756. By contrast, Plaintiffs agree that by installing air-conditioning TDCJ has chosen a response to prison heat that will fully resolve the problem it poses. Since Plaintiffs only criticisms of TDCJ's installation efforts revolve around timeline and delivery—details irrelevant to the Eighth Amendment—Plaintiffs have not offered any evidence even capable of showing these efforts constitute deliberate indifference. "Although [Plaintiffs] might do things differently, mere disagreement with TDCJ's [] decisions does not establish deliberate indifference." *Valentine*, 956 F.3d at 803 (quotation omitted).

138.    Accordingly, TDCJ's HVAC installation efforts prove that Defendant is not deliberately indifferent.

## II. Plaintiffs do not have standing.

### A. Legal Standard

139.    "[S]tanding is perhaps the most important of the jurisdictional doctrines." *FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 231 (1990) (internal quotation omitted).

*140.*    A plaintiff must demonstrate that it has standing to sue at the time the complaint is filed. *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 189 (2000) ("standing [assessed] at the time the action commences"); *Pluet v. Fraiser*, 355 F.3d 381, 385 (5th

Cir. 2004). As "an indispensable part of the plaintiff's case" standing "must be supported in the same way as any other matter on which the plaintiff bears the burden of proof." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992) (citations omitted). This means that Plaintiffs' burden needs to meet "the manner and degree of evidence required at the successive stages of the litigation," *id.*, and consequently "the proof required to establish standing increases as the suit proceeds." *Davis v. Fed. Election Comm'n*, 554 U.S. 724, 734 (2008).

141.     To establish standing, a plaintiff must show: (1) an actual or imminent, concrete and particularized "injury-in-fact"; (2) that is fairly traceable to the challenged action of the defendant (causation); and (3) that is likely to be redressed by a favorable decision (redressability). *Friends of the Earth*, 528 U.S. at 167, 180–81. Even as a case develops, a plaintiff must show he met these elements "at the outset of the litigation." *Id.* at 180.

142.     "An association or organization can establish an injury-in-fact through either of two theories, appropriately called 'associational standing' and 'organizational standing.'" *OCA-Greater Houston v. Texas*, 867 F.3d 604, 610 (5th Cir. 2017) (citation omitted). Either the association sues in its own name to assert "whatever rights and immunities the association itself [] enjoy[s]." *Warth v. Seldin*, 422 U.S. 490, 511 (1975), or, under a theory of associational standing, it "bring[s] suit on behalf of its members." *Tex. Bankers Assoc. v. Office of the Comptroller*, 728 F. Supp. 3d 412, 419 (N.D. Tex. 2024).

143.     Associational standing "is derivative of the standing of the association's members, requiring that they have standing" in order for an associational plaintiff to have standing. *OCA-Greater Houston*, 867 F.3d at 610. An association has standing to sue to vindicate its members' interests when "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Assoc. of Am. Physicians & Surgeons, Inc. v. Tex. Med. Bd.*, 627 F.3d 547, 550 (5th Cir. 2010) (citing the *Hunt* factors from *Hunt v. Wash. St. Apple Adver. Comm'n*, 432 U.S. 333, 343 (1977)). The first two prongs are Article III requirements whereas the last is prudential. *Id.*

144.    A "non-membership organization" usually "cannot contend that it has associational standing." *Vote.Org v. Callanen*, 39 F.4th 297, 303 n.2 (5th Cir. 2022). However, following *Hunt*, an organization that "is not a traditional voluntary membership organization"— even one that "has no members at all"—can establish associational standing by proving that it "represents" individuals it claims as constituents "and provides the means by which they express their collective views and protect their collective interests." *Hunt,* 432 U.S. at 342, 344–45 (ruling that state commission had standing to sue on behalf of in-state apple producers).

145.    The alignment between the organization and its claimed constituents must be so close as to effectively make the latter members in the traditional sense. *SFFA*, 600 U.S. at 200 (describing the holding of *Hunt* as "the Commission had standing because the apple growers and dealers it represented were *effectively* members of the Commission.") (emphasis in original); *see also Gettman v. Drug Enf't Admin.*, 290 F.3d 430, 435 (D.C. Cir. 2002) ("In determining whether an organization that has no members in the traditional sense may nonetheless assert associational standing, the question is whether the organization is the functional equivalent of a traditional membership organization.")

146.    To decide whether an organization without members nonetheless has associational standing, courts examine the claimed constituency for "indicia of membership." *Friends of the Earth, Inc. v. Chevron Chem. Co.*, 129 F.3d 826, 828 (5th Cir. 1997) (citing *Hunt*, 432 U.S. at 344–45). These include whether "members elect leadership, serve as the organization's leadership, and finance the organization's activities, including the case's litigation costs." *Funeral Consumers All., Inc. v. Serv. Corp. Intern.*, 695 F.3d 330, 344 n.9 (5th Cir. 2012) (quoting *Hunt,* 432 U.S. at 344–45). In particular, "[t]he Court in *Hunt* looked to who elected the governing body of the organization and who financed its activities." *Friends of the Earth,* 129 F.3d at 829.

147.    To demonstrate associational standing, it does not suffice to be dedicated to "a specialized segment" of the population. *See Ass'n for Retarded Citizens of Dallas v. Dallas Cnty. Mental Health & Mental Retardation Ctr. Bd. of Trustees (ARC)*, 19 F.3d 241, 244 (5th Cir. 1994)

(denying standing to "Advocacy, Inc." despite having a "statutory mandate [] to protect and advocate the rights of disabled individuals").

148. An advocacy organization lacks standing to represent persons it views as constituents when "most of its 'clients' . . . are unable to participate in and guide the organization's efforts." *Ass'n for Retarded Citizens of Dallas v. Dallas Cnty. Mental Health & Mental Retardation Ctr. Bd. of Trustees*, 19 F.3d 241, 244 (5th Cir. 1994); *see also Missouri Prot. & Advocacy Services, Inc. v. Carnahan*, 499 F.3d 803, 809–11 (8th Cir. 2007) (similar); *Disability Advocates, Inc. v. New York Coal. for Quality Assisted Living, Inc.*, 675 F.3d 149, 158–59 (2d Cir. 2012) (denying standing because "there is scant evidence in the record that the individuals with mental illness whom DAI purports to represent have the power to elect its directors, make budget decisions, or influence DAI's activities or litigation strategies.")

149. Each remaining Plaintiff is an association suing vicariously on behalf of members or 'constituents.' Lioness is a traditional membership association with incarcerated members while TPCA and TX CURE lack incarcerated members in the traditional sense.

150. No Plaintiff has standing to maintain this litigation.

## B. Lioness

151. Unique among Plaintiffs, Lioness has a formal membership policy and membership rolls that are not simply mailing lists. Pl. Ex. 536; Def. Ex. 39. Even before Lioness adopted its written membership policy, Lioness considered an individual to be a member only after an individual affirmatively stated her willingness to join Lioness. 4/1/26 Tr. at 157:17–23 (Toon).

152. Accordingly, Lioness is a traditional membership association because individuals voluntarily associate as Lioness members, i.e. Lioness members 'sign up' to join the organization.

153. Lioness restricts membership to women who are or have been incarcerated. 9/19/25 Toon Depo. Tr. at 52:4–20. While Lioness's definition of 'women' includes women-identifying men, at the time of filing and trial Lioness only had biological women members. 4/1/26 Tr. at 188:5–7 (Toon); 9/19/25 Toon Depo. Tr. at 47:16–24, 48:5–15, 65:19–66:21.

143

154.    Because Lioness is exclusively female, its incarcerated members are exclusively held at TDCJ's thirteen women-only units. 9/19/25 Toon Depo. Tr. at 69:12–18, 70:4–11. At the time of filing, Lioness had 419 incarcerated members, of whom 158 were housed in unairconditioned cells. 9/19/25 Toon Depo. Tr. at 63:19–25, 64:10–65:13; see also 4/1/26 Tr. at 161:17–23 (Toon) (testifying that as of the date of trial Lioness had 118 members incarcerated without airconditioned housing).

155.    Because Lioness inmates are only housed in thirteen women-only units, Lioness does not have standing to litigate conditions of confinement in every TDCJ unit. An associational plaintiffs' standing derives from its members standing. *OCA-Greater Houston*, 867 F.3d at 610. Accordingly, just as an individual inmate only has standing to challenge his own conditions of confinement, likewise an association of inmates only has standing to contest conditions faced by its members. Prison conditions in men's facilities do not injure Lioness members; consequently, Lioness lacks standing to bring an action that places conditions in every TDCJ unit at issue. *See Warth v. Seldin*, 422 U.S. 490, 499 (1975) ("this Court has held that the plaintiff generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties.").

156.    TDCJ does not have a systemwide policy of denying inmates air-conditioned housing. 3/31/26 Tr. at 270:18-22 (Lumpkin). TDCJ provides airconditioned housing where it can and shortage of air conditioning is not deliberate or coordinated. Thus, Lioness members in unairconditioned housing do not lack air conditioning due to TDCJ policy. Accordingly, Lioness cannot manufacture standing to bring a systemwide challenge by tracing the injuries of its members to a systemic policy.

157.    Lioness "must assert [its] own [members'] legal rights and interests, and cannot rest [its] claim to relief on the legal rights or interests of third parties." *Abdullah v. Paxton*, 65 F.4th 204 (5th Cir. 2023) (quoting *Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.*, 454 U.S. 464, 474 (1982)); *see also Vote.Org v. Callanen*, 39 F.4th at 303 (5th Cir. 2022) (holding

"part[ies] must ordinarily assert only [their] own legal rights and interests," not those of third-parties.).

## C. TPCA and TX C.U.R.E.

158.    TPCA ambiguously describes itself as a membership and non-membership organization. According to Amite Dominick, TPCA considers every TDCJ inmate to be their "constituents," but also claims to have incarcerated members. 4/1/26 Tr. at 247:11–17 (Dominick).

159.    TPCA does not have a membership policy or a process for interested persons to become members. 4/1/26 Tr. at 274:3–5 (Dominick). Rather, TPCA considers everyone on its mailing list and every inmate it "interact[s] with" to be a member of TPCA. 4/1/26 Tr. at 247:11–17 (Dominick).

160.    TPCA also has inmates who volunteer to serve as a point of contact to solicit other inmates' interest in TPCA activities. Dr. Dominick testified that TPCA had fewer than twelve inmate volunteers at the time of trial. 4/1/26 Tr. at 250:4–6 (Dominick).

161.    TPCA sends correspondence to inmates unsolicited, and Dr. Dominick testified that inmates are included on TPCA's mailing list without being asked if they "want to be a member of TPCA." 9/10/25 Dominick Depo. Tr. at 57:1–3. Accordingly, the inclusion of an inmate on one of TPCA's mailing lists does not indicate that inmate signed up to receive correspondence, and therefore, is not evidence that an inmate chose to associate with TPCA or would regard himself as a TPCA member.

162.    Further, to establish associational standing "it is not enough for putative members simply to read a group's publications, subscribe to its e-mail list, or follow its Facebook page." *Viasat, Inc. v. FCC*, 47 F.4th 769, 781 (D.C. Cir. 2022) (citing *Sorenson Communications, LLC v. FCC*, 897 F.3d 214, 225 (D.C. Cir. 2018)).

163.    Perhaps owing to these concerns, in their filings, Plaintiffs have argued that TPCA has standing based on *Hunt*'s functional equivalent standard rather than based on its membership. *See e.g.*, ECF No. 255-2 at 37–42. That makes sense, the Fifth Circuit has held that when an

organization lacks the formalities of membership the Hunt test determines whether it nonetheless can claim associational standing. *Friends of the Earth*, 129 F.3d at 828–29.

164.    TX CURE, per its own description, is not a membership organization. 4/1/26 Tr. at 202:24–203:7 (Malouff). In lieu of members, it considers every TDCJ inmate to be a "constituent." 4/1/26 Tr. at 202:24–203:7 (Malouff).

165.    Neither TPCA nor TX CURE have incarcerated members. Accordingly, to establish associational standing, they must show that they are the functional equivalent of a membership organization. *SFFA*, 600 U.S. at 200.

166.    The modest scale of both organizations makes such an ambition risible. Each Plaintiff has a presence in only a fraction of TDCJ's vast prison system. Mr. Malouff testified that at a given time between 50 and 100 inmates participate in TX CURE's myriad programs, 4/1/26 Tr. at 229:4–11 (Malouff), that cumulatively TX CURE had interacted with 700 inmates through its programming since its inception, 9/3/25 Malouff Depo. Tr. at 37:20–38:7, and that TX CURE corresponds with 75 inmates. 4/1/26 Tr. at 228:9–12 (Malouff).

167.    Similarly, TPCA corresponds with at most 1641 inmates, some or most of which is a one-way "email blast." 4/1/26 Tr. at 247:11–24 (Dominick), Def. Ex, 250 (recording 1641 unique names). Given that TDCJ's inmate population exceeds 135,000, these numbers imply that the average TDCJ inmate has never interacted with either TPCA or TX CURE.

168.    By contrast to *Hunt*, the Washington State Apple Advertising Commission included every producer and seller as a (compelled) member, guaranteeing that the Commission represented the stakeholders on whose behalf it litigated. *Hunt*, 432 U.S. at 345. As a result, the Court concluded that "it would exalt form over substance to differentiate between the Washington Commission and a traditional trade association." *Id.*

169.    Plaintiffs do not serve as "the means by which [constituents] express their collective views and protect their collective interests" just for having 1% of their target population on an email listserv. *Hunt*, 432 U.S. at 342, 344–45.

170.    *Hunt* and its progeny look for "indicia of membership" exhibited by a plaintiff's claimed constituents. 432 U.S. at 334; *Friends of the Earth,* 129 F.3d at 828. For Plaintiffs to meet the indicia of membership test they would need to show that inmates participate in their organizational decision making and leadership. *Id.*

171.    However, neither TPCA nor TX CURE have demonstrated indicia of membership. Inmates do not serve in the leadership of either organization, 4/1/26 Tr. at 274:15–17 (Dominick), 4/1/26 Tr. at 203:24–204:1 (Malouff), do not vote for leadership, 9/10/25 Dominick Depo. Tr. at 54:1–17, 9/3/25 Malouff Depo. Tr. at 75:10–15, do not make decisions on behalf of either organization, 9/10/25 Dominick Depo. Tr. at 55:17–22, 9/3/25 Malouff Depo. Tr. at 48:4–49:9, and are not responsible for funding either organization. 4/1/26 Tr. at 275:7–9 (Dominick), 4/1/26 Tr. at 202:9–11 (Malouff).

172.    Accordingly, neither TPCA nor TX CURE is the effective equivalent of a membership organization. Neither Plaintiff "represents" TDCJ inmates, and Plaintiffs do not provide the "the means by which [constituents] express their collective views and protect their collective interests." *Hunt*, 432 U.S. at 342, 344–45.

173.    Therefore, TPCA and TX CURE do not have standing to sue on behalf of inmates.

174.    Separately, all Plaintiffs lack standing due to the prudential requirement that "neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Tex. Med. Bd.*, 627 F.3d at 550. To prove that every inmate without air-conditioned housing endures inhumane conditions, Plaintiffs need to present inmate testimony concerning the conditions at each unit—a glaring omission from the trial record. That level of specificity requires the participation of individual inmates. *Id.* at 552.

175.    The PLRA creates another jurisdictional bar for Plaintiffs. The Act provides that "[p]rospective relief in any civil action with respect to prison conditions shall extend no further than necessary to correct the violation of the Federal right of a particular plaintiff or plaintiffs." 18 U.S.C. § 3626(a)(1)(A); *see also Ball*, 792 F.3d at 599 (stating that "[t]he PLRA limits relief to the particular plaintiffs before the court.") (citing 18 U.S.C. § 3626(a)(1)(A)). Since associations do not

147

have Eighth Amendment rights, when associational plaintiffs request prospective relief on behalf of their members "the Federal right of a particular plaintiff" is not at issue. Having no federal rights of their own, associational plaintiffs are precluded under § 3626 from obtaining relief in conditions of confinement cases. This statutory restraint on relief deprives associational plaintiffs of standing because it eliminates the availability of any judicial redress for their vicarious claims. *See United States v. Texas*, 599 U.S. 670, 704 (2023) (Gorsuch, J., concurring) (explaining that redressability is lacking where "federal courts do not have authority to redress [plaintiffs'] injuries.").

176.    Alternatively, by limiting relief to persons with "Federal rights" the PLRA deprives associational plaintiffs of the private right of action to litigate prison conditions they otherwise might have under § 1983.

177.    No Plaintiff developed an organizational theory of standing, and Plaintiffs did not present evidence showing they suffered organizational injuries.

178.    Accordingly, each Plaintiff lacks standing.

### III. Plaintiffs are barred from litigating by the PLRA's Exhaustion Requirement, 42 U.S.C. § 1997e.

#### A. Legal Standard

179.    The PLRA requires inmates to exhaust "such administrative remedies as are available" prior to filing suit in federal court to challenge prison conditions. 42 U.S.C. § 1997e(a). Section 1997e(a) provides that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until [] administrative remedies as are available are exhausted." *Id.*

180.    Compliance is mandatory, and "courts have zero discretion to hear unexhausted claims." *Valentine*, 978 F.3d at 160 (citing *Jones v. Bock*, 549 U.S. 199, 211 (2007)); *Porter v. Nussle*, 534 U.S. 516, 525 (2002) (calling § 1997e(a) a "mandatory" "prerequisite to suit."). The Supreme Court has "reject[ed] every attempt to deviate" from the PLRA's rigid exhaustion requirement by emphasizing that it has no "special circumstances" exception. *Ross v. Blake*, 578 U.S. 632, 635, 639–40 (2016); *see also Jones*, 549 U.S. at 211 (2007) (stating that "[t]here is no question that

148

exhaustion is mandatory under the PLRA and that unexhausted claims cannot be brought in court.").

181.    To satisfy the exhaustion requirement, inmates must properly exhaust their available remedies in conformance with the procedures adopted by the particular institution. *Woodford v. Ngo*, 548 U.S. 81, 93–95 (2006); *Bargher v. White*, 928 F.3d 439, 447 (5th Cir. 2019).

182.    An inmate's failure to exhaust gives rise to an affirmative defense. *Perttu v. Richards*, 605 U.S. 460, 469 (2025) (citing *Jones*, 549 U. S. a t 216). To succeed, a defendant must show (1) administrative remedies were available and (2) the inmate failed to exhaust the administrative remedies. *Cantwell v. Sterling*, 788 F.3d 507, 508–09 (5th Cir. 2015). Substantial compliance with this process is not enough to exhaust remedies under the PLRA. *See Dillon v. Rogers*, 596 F.3d 260, 268 (5th Cir. 2010) ("Under our strict approach, we have found that mere 'substantial compliance' with administrative remedy procedures does not satisfy exhaustion . . . .").

183.    The exhaustion requirement applies equally to associational plaintiffs. *See Green Haven Prison Preparative Meeting of Religious Soc'y of Friends v. N.Y. State Dep't of Corr. & Cmty. Supervision*, 16 F.4th 67, 82–83 (2d Cir. 2021) (dismissing associational plaintiff because its members failed to exhaust); *The Nat'l Fed'n v. Va. Dep't of Corr.*, No. 3:23-CV-127, 2024 WL 2059735, at *15 (E.D. Va. May 8, 2024) (adopting *Green Haven*'s approach and ruling exhaustion requirement barred suit by prisoner association).

184.    Interpreting § 1997e not to apply to associational plaintiffs would create a loophole to the mandatory bar to suit that Congress enacted. Such a construction will enable inmates to thwart the exhaustion requirement as long as they have the good sense to combine with at least one of their colleagues.

185.    "Congress presumably does not enact useless laws." *Garland v. Cargill*, 602 U.S. 406, 427 (2024) (quotation omitted). A construction that would nullify a statute's purpose is not viable when another reading is plausible. *See King v. Burwell*, 576 U.S. 473, 498 (2015); *see also* Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts 63 (2012)

149

(explaining the "presumption against ineffectiveness" holds that "[a] textually permissible interpretation that furthers rather than obstructs the document's purpose should be favored.").

186.    Accordingly, the Court should construe § 1997e to apply exclusively to suits brought personally by individual inmates only if that provides the only coherent reading.

187.    The operative language of § 1997e, "action . . . brought . . . by a prisoner," can be sensibly understood to include lawsuits where inmates are vicariously represented. An associational plaintiff's claims belong to its members and in litigating those claims the association represents its members. *Am. Legal Found. v. F.C.C.*, 808 F.2d 84, 90–91 (D.C. Cir. 1987) (stating that the associational standing involves a "theoretical identity between organizations and individuals"); *OCA-Greater Houston*, 867 F.3d at 610.

188.    That "theoretical identity" guided the Second Circuit's decision that an "action brought by [Associational Plaintiff] is brought to vindicate the rights of its members, and those members, as prisoners . . . may not avoid the exhaustion requirement simply by forming an organization and then suing in the name of that organization." *Green Haven,* 16 F.4th at 82–83.

189.    Even if the Court concludes that the plain meaning of "action . . . brought . . . by a prisoner" refers exclusively to suits filed by individual inmate plaintiffs, it should still decline that then § 1997e(a) is one of the "rare cases" where "the literal application of a statute will produce a result demonstrably at odds with the intentions of its drafters, and those intentions must be controlling." *Griffin v. Oceanic Contractors, Inc.*, 458 U.S. 564, 571 (1982).

190.    Construing § 1997e(a) to encompass actions filed by associational plaintiffs that rely on the complaints of incarcerated members is the only textually responsible reading that preserves the statute's purpose.

191.    Accordingly, the PLRA's exhaustion requirement applies to associational plaintiffs when they vicariously litigate inmates' claims. It therefore applies to Plaintiffs in this litigation.

192.    Separately, if the Court determines § 1997e(a) does not apply to associational plaintiffs, it must conclude that § 3626, limiting relief to "particular . . . plaintiffs" whose "Federal rights" are violated, bars associational plaintiffs from receiving relief. Section 3626 "limits relief to

150

the particular plaintiffs before the court." *Ball*, 792 F.3d at 599. If suits by inmate associations do not fit within an "action . . . brought . . . by a prisoner" because individual inmates do not appear before the court as plaintiffs in such cases, then they are not eligible for relief per § 3626.

**B.      Plaintiffs have failed to exhaust their remedies.**

193.    TDCJ provides an administrative remedy for inmate complaints using a two-step process that allows inmates to file an initial grievance (step one) within 15 days of the incident at issue and an appeal (step two) within 15 days if TDCJ's response does not satisfy the aggrieved inmate. 3/31/26 Tr. at 326:15–25 (Lumpkin), Def. Ex. 58. TDCJ makes grievance forms available throughout its prison system. 3/31/26 Tr. at 326:15–25 (Lumpkin), 4/2/26 Tr. at 56:3–14 (Echessa).

194.    TDCJ inmates must properly complete both the Step 1 complaint and Step 2 appeal to properly exhaust their administrative remedies. *See Wright v. Hollingsworth*, 260 F.3d 357, 358 (5th Cir. 2001).

195.    The Fifth Circuit has repeatedly affirmed the adequacy of TDCJ's two-step process. *See e.g.*, *Wright*, 260 F.3d at 358; *Johnson v. Johnson*, 385 F.3d 503, 515 (5th Cir. 2004).

196.    Only four Lioness members held in unairconditioned housing filed a step two grievance concerning heat during or prior to May 2024. Def. Ex. 2 at 4.

197.    Thus, of Lioness's incarcerated members, at most four exhausted their administrative remedies.

198.    If the Court finds that TPCA and TX CURE have standing as non-membership organizations, then these Plaintiffs must also comply with the PLRA.

199.    During 2024, out of nearly 135,000 inmates only 829 filed step two grievances related to heat. 3/31/26 Tr. at 119:24–120:1 (Collier), Pl. Ex. 279 at 6. TDCJ classifies grievances by general subject matter, so a heat-related grievance could complain about a range of issues, including problems that would not be resolved by moving the complainant into air conditioning. 3/31/26 Tr. at 327:11–16 (Lumpkin).

200.    Accordingly, all Plaintiffs are litigating on behalf of inmates who have not satisfied the PLRA's exhaustion requirement. Plaintiffs' Eighth Amendment claims arise from the purported injuries of thousands of inmates who have not exhausted.

201.    Because this Court has "zero discretion to hear unexhausted claims," *Valentine*, 978 F.3d at 160, it must dismiss Plaintiffs for failure to comply with the PLRA's exhaustion requirement.

## IV. Plaintiffs requested relief is overbroad under the PLRA and does not satisfy the balance of the equities.

### A.    Legal Standard

#### i.    The PLRA

202.    "Prospective relief in any civil action with respect to prison conditions shall extend no further than necessary to correct the violation of the Federal right of a particular plaintiff or plaintiffs. The court shall not grant or approve any prospective relief unless the court finds that such relief is narrowly drawn, extends no further than necessary to correct the violation of the Federal right, and is the least intrusive means necessary to correct the violation of the Federal right." 18 U.S.C. § 3626(a)(1)(A).

203.    "Under the PLRA, federal courts may neither grant nor approve prospective relief 'unless the court finds that such relief is narrowly drawn, extends no further than necessary to correct the violation of the Federal right, and is the least intrusive means necessary to correct the violation of the Federal right.'" *United States v. Hinds Cnty. Bd. of Supervisors*, 128 F.4th 616, 625 (5th Cir. 2025) (quoting 18 U.S.C. § 3626(a)(1)).

204.    "Under the PLRA, plaintiffs are not entitled to the most effective available remedy; they are entitled to a remedy that eliminates the constitutional injury." *Ball*, 792 F.3d at 599. Rather, "[i]n Eighth Amendment cases, plaintiffs can only obtain a remedy that reduces the risk of harm to a socially acceptable level." *Id.*

**B. Systemwide air-conditioning is not the least intrusive or minimum necessary means to mitigate the effects of extreme heat.**

205.    The Fifth Circuit has routinely expressed reluctance to affirm air conditioning as an acceptable form of relief in light of the PRLA's insistence on a minimal remedy. *See Ball*, 792 F.3d at 598–99 (reversing a lower court's order that required prison officials to air condition an entire unit both because "air conditioning [] is unnecessary to correct the Eighth Amendment violation" and because the district court "awarded relief facility-wide, instead of limiting such relief to" the individual plaintiffs); *Blackmon v. Garza*, 484 F. App'x 866, 872 (5th Cir. 2012) ("We also note that, like the *Gates* court, we do not suggest that air conditioning is mandatory to meet the requirements of the Eighth Amendment.").

206.    Even *Yates v. Collier* while commenting that "the PLRA [does not] categorically prohibit[] an injunction requiring that the [challenged] Unit be air-conditioned," cautioned that "air-conditioning [is] not appropriate" if "other acceptable and less-intrusive remedies ha[ve] yet to be tried." 868 F.3d 354, 370 (5th Cir. 2017).

207.    Plaintiffs presented no evidence that partial air conditioning would be an inadequate solution to the risks of high heat. TDCJ already has more than 52,000 cool beds (4/9/26 Tr. at 246:6–247:1 (Hudson)), including approximately 36,000 beds that are assigned to inmates without a heat score,[3] and TDCJ's total cool bed stock is set to grow to nearly 90,000 by Summer 2027. 4/6/26 Tr. at 165:15–166:4; 230:25–231:8, 231:19–232:1 (Nichols).

208.    TDCJ already has implemented sufficient means to address any risk and continues to improve. *Parker*, 171 F.4th at 756 (emphasizing *Famer's* "'restrained approach' to prevent federal courts from 'becoming enmeshed in the minutiae of prison operations." (some internal quotations omitted) (quoting *Farmer*, 511 U.S. at 847, 1984.).

209.    When analyzing the intrusiveness of a remedy courts factor in the costs. *See e.g.*, *Ball v. LeBlanc*, 881 F.3d 346, 353 n.11 (5th Cir. 2018) (holding that $500 cost of evaporative cooler

---

[3] There were 15,789 inmates with heat scores who chose to live in air-conditioned housing as of April 1, 2026. 4/2/26 Tr. at 291:5–8 (Fitzpatrick); Def. Ex. 204.

"is sufficiently inexpensive to satisfy our concerns relating to the PLRA" when compared "to the approximately $100,000 that would be required to air-condition Plaintiffs' portion of Tier C"). The approximately $1.5 billion cost of fully air conditioning TDCJ disqualifies Plaintiffs' requested relief under the PLRA.

210.    Because "acceptable remedies short of . . . air-conditioning . . . could possibly cure the Eighth Amendment violation," the Court may not award an order that requires Defendant to provide more air conditioning. *Yates*, 868 F.3d at 370.

211.    Moreover, the Court can provide complete relief to Lioness's incarcerated members simply by ordering TDCJ to move them into air-conditioned housing. The 7,000 air-conditioned beds at TDCJ's women's facilities is more than enough to house the 118 Lioness inmates who currently lack a cool bed assignment. 4/1/26 Tr. at 193:23–194:15 (Toon); Def. 224. *Cf. Trump v. CASA, Inc.*, 606 U.S. 831, 852 (2025) (holding a federal court's injunction may not provide more than "complete relief to the plaintiffs before the court.").

## C.  An order that requires TDCJ to expend funds that have not been allocated violates the PLRA and principles of federalism.

212.    TDCJ must allocate its funds for the purposes for which the Legislature appropriated them. Tex. Const. art. VIII, § 6 (requiring that "[n]o money shall be drawn from the Treasury but in pursuance of specific appropriations made by law; nor shall any appropriation of money be made for a longer term than two years."); *Hendee v. Dewhurst*, 228 S.W.3d 354, 359–60 (Tex. App. 2007) (declaring "[a]n 'appropriation' refers to a legislative enactment authorizing state funds to be expended for particular purposes.").

213.    TDCJ has no authority to borrow, tax, or otherwise raise new funds on its own. *See Henry v. Kaufman Cnty. Dev. Dist. No. 1*, 150 S.W.3d 498, 504 (Tex. App.—Austin 2004, pet. granted) (drawing on the well-established "legal principle that a political subdivision of a state has no inherent power to levy taxes and that such power must be expressly granted by law"); *Tri–City Fresh Water Supply Dist. No. 2 v. Mann*, 142 S.W.2d 945, 948 (1940) (same); Tex. Const. art. III,

154

§ 49(a) ("No debt shall be created by or on behalf of the State" without the Legislature's authorization).

214.    Courts cannot "dictate the state's authority over [prison facilities] by controlling the purse strings" of state correctional agencies. *Hinds Cnty. Bd. of Supervisors*, 128 F.4th at 638. The *Hinds* Court held that a district court order giving a receiver "power to set [the] budget" of a county correctional facility exceeded "the limitations imposed by the PLRA" and was therefore unlawful. *Id.* In the wake of Hinds, district courts may not impose structural injunctions against prison officials of the sort that commandeer control of a prison's budget. An order divesting prison officials of budget control "would [] assume a responsibility that should be left for the legislature." *Id.*

215.    Accordingly, any order this Court issues requiring TDCJ to install new air conditioning cannot command Defendant to reallocate funds appropriated by the Legislature for purposes other than air conditioning installation. Nor can a court order otherwise release TDCJ from its obligations to adhere to state fiscal law or impose new requirements that contradict budget restriction enacted by the Legislature. Thus, any injunction that binds Defendant to systemwide installation would impose an unfunded mandate.

216.    Defendant cannot comply with an order that commands TDCJ to initiate work that it cannot pay for. Systemwide air conditioning is an expensive undertaking that cannot be advanced without sufficient funding. TDCJ cannot spend money the Legislature declines to provide.

217.    Even if *Hinds* had not forbid courts from controlling prison budgets, an order that attempts to dictate TDCJ's budget priorities "raises sensitive federalism concerns," *Horne v. Flores*, 557 U.S. 433, 448 (2009). "States and local governments have limited funds. When a federal court orders that money be appropriated for one program, the effect is often to take funds away from other important programs." *Id.* A structural injunction necessarily reduces the discretionary authority of state officials.

218.    "[C]ourt rulings that seek to control prison management in violation of constitutional law and fundamental principles of federalism. Congress enacted the Prison

155

Litigation Reform Act ("PLRA") in 1996 to rein in such judicial adventurism." *Parker*, 171 F.4th at 741; *see also id*. at 750 ("Congress passed the PLRA in 1996 to limit the oversight of state prisons by federal courts."); *Gates*, 376 F.3d at 338 (stating federal courts "are not to micromanage state prisons.").

219.    "It is difficult to imagine an activity in which a State has a stronger interest, or one that is more intricately bound up with state laws, regulations, and procedures, than the administration of its prisons." *Preiser v. Rodriguez*, 411 U.S. 475, 491–92 (1973).

220.    Further, prison administration is best left to experienced state officials rather than judges. "Prison officials are experts in running prisons and evaluating the likely effects of altering prison rules, and courts should respect that expertise." *Holt v. Hobbs*, 574 U.S. 352, 364 (2015). Accordingly, courts "must accord substantial deference to the professional judgment of prison administrators, who bear a significant responsibility for defining the legitimate goals of a corrections system and for determining the most appropriate means to accomplish them." *Overton v. Bazzetta*, 539 U.S. 126, 132 (2003).

221.    In light of the PLRA and fundamental principles of federalism, an injunction ordering TDCJ to spend money on the installation of new air conditioning is improper. Imposing an unfunded obligation on TDCJ would be impracticable. *Cf. Hewlett-Packard Co. v. Quanta Storage, Inc.*, 961 F.3d 731, 744 n.8 (5th Cir. 2020) ("a district court must . . . ensure that it is possible to comply with its orders."). Accordingly, the Court should decline to enter an order that requires TDCJ to install air conditioning in its prisons.

Date: June 5, 2026.

KEN PAXTON
Attorney General

BRENT WEBSTER
First Assistant Attorney General

RALPH MOLINA
Deputy First Assistant Attorney General

ROB FARQUHARSON
Deputy Attorney General for Legal Strategy

RYAN G. KERCHER
Chief, Special Litigation Division
Texas Bar No. 24060998
ryan.kercher@oag.texas.gov

OFFICE OF THE ATTORNEY GENERAL
OF TEXAS
P.O. Box 12548, Capitol Station
Austin, Texas 78711-2548
Tel.: (512) 463-2100

Respectfully submitted,

*/s/ Wade A Johnson*
WADE A. JOHNSON
Deputy Chief, Special Litigation Division
Texas Bar No. 24062197
wade.johnson@oag.texas.gov

BRANDON J. MICKLE
Deputy Chief, Law Enforcement Defense Division
Texas Bar No. 24123140
brandon.mickle@oag.texas.gov

KYLE S. TEBO
LEGAL STRATEGY DIVISION
Special Counsel
Texas Bar No. 24137691
kyle.tebo@oag.texas.gov

LAUREN SAEGER
SPECIAL LITIGATION DIVISION
Assistant Attorney General
Texas Bar No. 24149365
lauren.seager@oag.texas.gov

ABIGAIL K. CARTER
LAW ENFORCEMENT DEFENSE DIVISION
Managing Attorney
Texas Bar No. 24126376
abigail.carter@oag.texas.gov

LAUREN E. MCGEE
CONSUMER PROTECTION DIVISION
Managing Attorney
Texas Bar No. 24128835
lauren.mcgee@oag.texas.gov

COUNSEL FOR DEFENDANT

## Certificate of Service

I certify that a true and accurate copy of the foregoing document was filed electronically (via CM/ECF) on June 5, 2026 and that all counsel of record were served by CM/ECF.

*/s/ Wade A. Jonson*
WADE A. JOHNSON